# EXHIBIT 5



DEEPAK GUPTA
dgupta@fbm.com
D 415.954.4419

May 31, 2017

*Via E-Mail to abajoria@linkedin.com*

Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation
1000 W. Maude Avenue
Sunnyvale, CA 94085

      Re:    <u>Cease and Desist Letter to hiQ Labs, Inc.</u>

Dear Abhishek:

      We are writing on behalf of hiQ Labs, Inc. in response to your letter dated May 23, 2017 and further to our teleconference of May 30, 2017.  As LinkedIn's cease and desist request poses an existential threat to hiQ in its current form, your letter combined with your uncompromising posture on our phone call puts the company in a very difficult position.  We reiterate our request, made on the May 30 call, that you immediately restore hiQ's access to public LinkedIn data and arrange a face-to-face meeting of business principals. This will allow hiQ to continue functioning as a business and give the parties the time they need to engage in discussions so that LinkedIn can better understand hiQ's business and hiQ can better understand LinkedIn's concerns.  Absent that, you leave hiQ with few options.

      Your letter mentions concerns about "data security" and "member trust."  We want to make sure there is no misunderstanding on LinkedIn's part as to what hiQ does.  hiQ collects public profile data from LinkedIn's users and analyzes these profiles to help employers understand (a) which of their employees are at the greatest risk of being recruited away ("Keeper"), and (b) the range of skills possessed by their workforce ("Skill Mapper").  These services are very much in line with the core focus of LinkedIn, which is to create economic opportunities for professionals in their careers.

      hiQ in no way accesses LinkedIn member private data or any area of LinkedIn's website requiring a password; it merely accesses data which LinkedIn's members have expressly made public.  LinkedIn publicly acknowledges that this data belongs to members, not to LinkedIn, and LinkedIn in fact promotes itself as a networking platform where this information will be publicly shared precisely to encourage members to join LinkedIn.  We are thus straining to understand how these activities in any way present a security or trust issue for LinkedIn.  Quite the opposite; the existence of hiQ enhances the value of having a LinkedIn public profile, which in the long run enriches LinkedIn.

Abhishek Bajoria
May 31, 2017
Page 2



As we discussed on our phone call, LinkedIn has for several years been aware of hiQ's synergistic activities and has participated in hiQ's Elevate conference on data analytics issues. LinkedIn has spoken at hiQ's events and employee Lorenzo Canlas even accepted hiQ's "Impact Award." hiQ has always operated in LinkedIn's plain view and with its support, so we are at a loss to understand the sudden (and potentially devastating) change of direction represented by your letter. hiQ is presently in the midst of a financing round, which is now endangered because of your letter.

When, on our phone call, we asked whether hiQ's activities caused any injury to LinkedIn, you stated you did not know. When asked whether hiQ's business was in fact synergistic to LinkedIn, you stated you did not know. Notably, your letter does not suggest that data collection by hiQ is impairing or interfering with LinkedIn servers, and in our phone call you were unable to identify any such impairment or interference.

The only reason that you stated lies behind LinkedIn's decision to revoke hiQ's access is an alleged violation of the User Agreement. But those terms are not enforceable against persons or entities that merely visit the website to view or use public information. Moreover, the User Agreement is so overbroad as to be, in our view, meaningless:

- The User Agreement states it is forbidden to "[s]crape or copy profiles" through "crawlers," "automated software," and "script robots." Yet Google and Bing access LinkedIn using scrapers and robots. And LinkedIn itself provides an automated feature to create a local PDF copy of profiles, which it then instructs that users may print (thereby creating a second "copy").
<<https://www.linkedin.com/help/linkedin/answer/4281/printing-a-profile?lang=en.>>
Thus, far from blocking the putatively prohibited actions, LinkedIn invites them.

- The User Agreement prohibits "copying profiles" through "manual work," yet every time people visit LinkedIn using a web browser they are engaging in "manual work" that creates a "copy" of a profile on their screen, a "copy" in their computer's memory and a "copy" on their hard drive. The ordinary operation of LinkedIn demands a breach of this provision.

- The User Agreement prohibits anyone from "us[ing], the content or data of others available on the Services (except as expressly authorized)." This means any time someone views a member profile and "uses" some information – e.g. sends an email to the address on their LinkedIn profile – he or she must first request "express permission" before sending the email. This, no one does.

- Similarly, the User Agreement forbids a member to "[s]hare or disclose information of others without their express consent." Yet LinkedIn itself provides a "Share Profile" feature. <<https://www.linkedin.com/help/linkedin/answer/1627.>> It also provides a convenient "share" button for users to share the posts of others. Unsurprisingly, these features do not first require "express permission" before sharing.

Abhishek Bajoria
May 31, 2017
Page 3



We understand LinkedIn's position to be that anytime someone engages in any of the above acts, he or she is in violation of the law.  Yet as shown above, these provisions are so self-contradictory that no LinkedIn user could reasonably be expected to comply with them.

Candidly, we have some concern that LinkedIn's sudden focus on hiQ may be for an anti-competitive purpose.  A page on the LinkedIn website states that it is investing now in its own internal data science projects.  *See* <<https://engineering.linkedin.com/data>>  Is it LinkedIn's position that it alone can perform data analysis on LinkedIn *public* profile pages?

The cases you cite arose under very different circumstances and did not involve potential anticompetitive motivations or conduct.

While we would like to reach an amicable resolution, we do not believe that hiQ has done anything unlawful.  To the contrary, we believe that LinkedIn's activity would be enjoined in a court of law and LinkedIn would face monetary exposure under, at minimum, the following list of theories:

- Common law promissory estoppel – LinkedIn is estopped from revoking hiQ's access to public profile pages because LinkedIn was aware that hiQ was relying on these expressly public pages for several years, and never threatened to revoke access; rather it participated and encouraged hiQ.  hiQ's reliance was justifiable and it is thus entitled to continue using LinkedIn's avowed public pages in its business.

- Common law intentional interference with contract and prospective advantage – LinkedIn induced members into joining by offering them the ability to create putatively "public profiles" and is now wrongfully making those profiles "non-public," at least as to hiQ. hiQ has millions of dollars' worth of business that now hangs in the balance because of LinkedIn's wrongful bait and switch.[1]

- California unfair competition and antitrust law – LinkedIn may not use its market power as the world's largest professional network to squelch competition in the neighboring field of data analytics.

- California Free Speech/First Amendment – Social networks are the new "town square." Much like the shopping mall in *Robins v. Pruneyard Shopping Center*, 592 P. 2d 341 (Cal. 1979) and *Fashion Valley Mall, LLC v. NLRB*, 172 P. 3d 742 (Cal. 2007), LinkedIn opened itself up to the "public," so it may not now selectively exclude those members of the public whom it dislikes.  Furthermore, it is apparent that LinkedIn is using the CFAA as an end run around the Copyright Act: you stated many times on our call that the alleged wrong by hiQ was "copying" webpages en masse.  However, "copyright law

---

[1] hiQ's current customers include eBay, Capital One, and GoDaddy.  Prospective customers include Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite.

Abhishek Bajoria
May 31, 2017
Page 4



contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186 (2003).  These include the requirement of ownership, the defense of license, the idea-expression dichotomy, and the fair use doctrine.  These limits on copyright law would immunize hiQ here, but by cloaking its allegations of improper "copying" in the garb of the CFAA, LinkedIn is attempting to circumvent the First Amendment protections of copyright law.

This is a non-exclusive listing of the protections to which hiQ is entitled.  We are prepared to protect hiQ's legal rights in court if necessary; LinkedIn's tactics pose a grave threat to hiQ's continued existence.  But we would prefer to amicably resolve this matter as you have proposed.  We ask that you promptly agree to stop denying hiQ access to LinkedIn's public pages, withdraw your cease and desist demand, and engage in meaningful discussions to try to resolve the matter.  In the meantime, we ask LinkedIn to preserve all records, data and documents, however stored, that mention, refer or relate to hiQ or to any desire, plan or effort to enter the data analytics business.

Very truly yours,

Deepak Gupta

DZG:ll
34556\5996250.1