C. Brandon Wisoff (State Bar No. 121930)
  bwisoff@fbm.com
Deepak Gupta (State Bar No. 226991)
  dgupta@fbm.com
Rebecca H. Stephens (State Bar No. 299234)
  rstephens@fbm.com
Jeffrey G. Lau (State Bar No. 281629)
  jlau@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Laurence H. Tribe* (State Bar No. 39441)
Carl M. Loeb University Professor and
Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-1767
*Pro hac vice* pending

Attorneys for Plaintiff hiQ Labs, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301 |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| vs. | |
| LinkedIn Corporation, | |
| Defendant. | Date: |
| | Time: |
| | Department: |

*Affiliation noted for identification purposes only.*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

34556\6000482.7

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

QUESTIONS PRESENTED ................................................................................................... 2

STATEMENT OF FACTS...................................................................................................... 4

I.     About hiQ Labs and its Services ................................................................................ 4

II.    The LinkedIn Professional Network and The Public Member Profile Portion of the Website. ...................................................................................................................... 5

III.   LinkedIn's Surprising Cease and Desist Letter To hiQ ........................................... 6

IV.   Recently Uncovered Evidence Suggests That LinkedIn Is Developing Its Own Offerings Based On Public Profile Data ................................................................... 7

ARGUMENT .......................................................................................................................... 8

I.     The Balance of Hardships Tips Strongly In Favor of hiQ ........................................ 8

II.    hiQ Has Raised Serious Questions on the Merits of its Claims ............................... 9

     A.    hiQ is Likely to Prevail on its Cause of Action for Intentional Interference with Contract and Prospective Economic Advantage. ........................................ 9

     B.    hiQ is Likely to Prevail on Its Claim Against LinkedIn for "Unlawful" and "Unfair" Competition. .......................................................................... 11

           1.    LinkedIn's disruption of hiQ's contractual and prospective business relationships is unlawful and  thus a violation of the UCL. ...................... 11

           2.    LinkedIn's unjustified and anticompetitive conduct in cutting off hiQ's access to public data is also an "unfair" practice under the UCL. ............. 12

     C.    hiQ is Likely to Prevail on its Cause of Action for Promissory Estoppel............... 15

     D.    California Free Speech Rights Protect HiQ's Right of Access. .............................. 16

     E.    hiQ is Likely Entitled To Declaratory Judgment that it Has Not Violated the DMCA, State Trespass Law, the CFAA, or California Penal Code § 502(c) ......... 20

           1.    An actual controversy exists between hiQ and LinkedIn........................... 20

           2.    LinkedIn's claims would be brought for an improper purpose and would have an impermissible effect........................................................................ 21

           3.    The technical blocks of member public profiles do not implicate the DMCA, because they are not implemented "with the authority of the copyright owner" ................................................................................... 22

           4.    California trespass law cannot apply in the absence of damage to LinkedIn's computer systems. ............................................................................... 23

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

i

34556\6000482.7

5.   hiQ cannot be liable for violating the CFAA or California Penal Code § 502(c). ...................................................... 23

III.   hiQ Will Suffer Immediate and Irreparable Harm Absent Injunctive Relief .................... 24

IV.   The Injunction is in the Public Interest ................................................................................ 25

V.   No Bond Should Be Required ............................................................................................... 25

CONCLUSION .......................................................................................................................... 25

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

ii

34556\6000482.7

# TABLE OF AUTHORITIES

**Page**

### Federal Court Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009)..................................................................................... 22

*Alaska v. Native Village of Venitie,*
   856 F.2d 1384 (9th Cir. 1988) ..................................................................................... 8

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011)...................................................................................... 8

*Authors Guild v. Google, Inc.,*
   804 F. 3d 202 (2d Cir. 2015) ...................................................................................... 21

*Cabell v. Zorro Prods., Inc.,*
   No. 5:15-CV-00771 (EJD), (2017 WL 2335597) (N.D. Cal. May 30, 2017) ........................... 21

*Craigslist Inc. v. 3Taps Inc.,*
   964 F. Supp. 2d 1178 (N.D. Cal. 2013) ................................................................. 23, 24

*CRST Van Expedited, Inc. v. Werner Enters., Inc.,*
   479 F.3d 1099 (9th Cir. 2007)................................................................................ 10, 11

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975) ................................................................................................... 24

*eBay, Inc. v. Bidder's Edge, Inc.,*
   100 F. Supp. 2d. 1058 (N.D. Cal. 2000) ..................................................................... 23

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003) ................................................................................................... 20

*Facebook, Inc. v. Power Ventures, Inc.,*
   844 F.3d 1058 (9th Cir. 2016).................................................................................23-24

*Facebook, Inc. v. Power Ventures, Inc.,*
   No. 13-17102, 2016 WL 3741956 (9th Cir. July 12, 2016) .......................................... 24

*Freedom Holdings, Inc. v. Spitzer,*
   408 F.3d 112 (2nd Cir. 2005)...................................................................................... 24

*Golan v. Holder,*
   565 U.S. 302 (2012) ................................................................................................... 20

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,*
   415 U.S. 423 (1974) ..................................................................................................... 8

*Harper & Row Publishers, Inc. v. Nation Enterprises,*
   471 U.S. 539 (1985) ................................................................................................... 20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

iii

34556\6000482.7

*In re iPhone Application Litigation,*
844 F. Supp. 2d. 1040, 1069 (N.D. Cal. 2012) ....................................................... 23

*Jorgenson v. Cassiday,*
320 F.3d 906 (9th Cir. 2003) .................................................................................. 25

*Kelly v. Arriba Soft Corp.,*
336 F.3d 811 (9th Cir. 2003) .................................................................................. 22

*Klein v. City of San Clemente,*
584 F.3d 1196 (9th Cir. 2009) ................................................................................ 25

*Lamont v. Postmaster General,*
381 U.S. 301 (1965) ................................................................................................ 17

*Max Factor & Co. v. Factor,*
226 F. Supp. 120 (S.D. Cal. 1963) ......................................................................... 25

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,*
708 F.2d 1081 (7th Cir. 1983) .......................................................................... 13, 14

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ........................................................................................... 20, 21

*Otter Tail Power Co. v. United States,*
410 U.S. 366 (1973) ........................................................................................... 13, 14

*Patino v. Franklin Credit Mgmt. Corp.,*
No. 16-cv-02695-LB, 2017 WL 1246853 at *1 (N.D. Cal. Apr. 5, 2017) .................. 8

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007) ................................................................................ 22

*Phillips v. Crown Central Petroleum Corp.,*
602 F.2d 616 (4th Cir. 1979) .................................................................................. 21

*PruneYard Shopping Center v. Robins,*
447 U.S. 74 (1980) ........................................................................................... 18, 19

*Shippers, Inc. v. Fontenot,*
No. 13CV1349 JLS(MDD), 2013 WL 12092056 at *6 (S.D. Cal. Sept. 23, 2013).................. 24

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) ................................................................................................ 17

*Stuhlbarg International Sales Co., Inc. v. John D. Brush & Co., Inc.,*
240 F.3d 832 (9th Cir. 2001) ............................................................................... 8, 24

*TransFresh Corp. v. Ganzerla & Assoc., Inc.,*
862 F. Supp. 2d 1009 (N.D. Cal. 2012) ............................................................. 20, 21

*Watt v. Alaska,*
451 U.S. 259 (1981) ................................................................................................ 22

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*Winter v. Nat. Res. Defense Council,*
  555 U.S. 7 (2008) ............................................................................................. 8

**State Court Cases**

*Ampex Corp. v. Cargle,*
  128 Cal. App. 4th 1569 (2005) ................................................................... 19-20

*Barquis v. Merchs. Collection Ass'n.,*
  7 Cal.3d 94 (1972) ........................................................................................ 12

*Barrett v. Rosenthal,*
  40 Cal.4th 33 (2006) ..................................................................................... 19

*Best Friends Animal Soc'y v. Macerich Westside Pavilion Property LLC,*
  193 Cal.App.4th 168 (2011) ........................................................................ 19

*Blank v. Kirwan,*
  39 Cal. 3d 311 (1985) ................................................................................... 13

*Bower v. AT&T Mobility, LLC,*
  196 Cal. App. 4th 1545 (2011) ..................................................................... 11

*Cal. Newspaper Ass'n v. Burbank,*
  51 Cal. App. 3d 50 (1975) ............................................................................ 17

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
  20 Cal. 4th 163 (1999) ........................................................................ 11, 12, 13

*Edmonds v. Los Angeles Cty.,*
  40 Cal.2d 642 (1953) .................................................................................... 16

*Fashion Valley Mall, LLC v. NLRB,*
  42 Cal. 4th 850 (2007) ............................................................................... 3, 18

*Garcia v. World Sav., FSB,*
  183 Cal. App. 4th 1031 (2010) ..................................... 15*H&M Associates v. City of El Centro,*
  109 Cal. App. 3d 399 (1980) ........................................................................ 10

*In re Tobacco II Cases,*
  46 Cal. 4th 298, 312 (2009) .......................................................................... 15

*Intel Corp. v. Hamidi,*
  30 Cal. 4th 1342 (2003) ................................................................................ 23

*Korea Supply Co. v. Lockheed Martin Corp.,*
  29 Cal. 4th 1134 (2003) ............................................................................. 9, 10

*Kwikset Corp. v. Super. Ct.,*
  51 Cal. 4th 310 (2011) .................................................................................. 11

*Metro-Goldwyn-Mayer, Inc. v. Lee,*
  212 Cal. App. 2d 23 (1963) .......................................................................... 25

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*Motors, Inc. v. Times Mirror Co.*,
   102 Cal. App. 3d 735 (1980) ............................................................ 12

*Nicol v. Nelson*,
   776 P.2d 1144 (Colo. App. 1989) .................................................... 16

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*,
   50 Cal.3d 1118 (1990) ........................................................................ 9

*People ex rel. Mosk v. Nat'l. Research Co. of Cal.*,
   201 Cal. App. 2d 765 (1962) ........................................................... 12

*Progressive W. Ins. Co. v. Yolo Cty. Sup. Ct.*,
   135 Cal. App. 4th 263 (2005) .......................................................... 12

*Reeves v. Hanlon*,
   33 Cal. 4th 1140, 1148 (2004) .................................................... 9, 10

*Robins v. Pruneyard Shopping Center*,
   23 Cal. 3d 899 (1979) ...................................................................... 17

*Robins v. Pruneyard Shopping Center*,
   592 P. 2d 341 (1979) .......................................................................... 3

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal. App. 4th 861 (1999) ............................................................ 12

*Snatchko v. Westfield LLC*,
   187 Cal.App.4th 469 (3d Dist. App. 2010) ..................................... 19

*Toscano v. Greene Music*,
   124 Cal. App. 4th 685 (2004) .......................................................... 15

*Trustees of Cal. State University & Colleges v. NCAA*,
   82 Cal. App. 3d 461 (1978) ............................................................. 15

*Wagner v. Glendale Adventist Medical Center*,
   216 Cal. App. 3d 1379 (1989) ......................................................... 15

*Wilson v. Bailey*,
   8 Cal. 2d 416 (1937) ......................................................................... 15

**Federal Statutory Authorities**

15 U.S.C. § 2 ...................................................................................... 13

17 U.S.C. § 1201(a) ........................................................................... 23

17 U.S.C. § 1201(a)(1)(A) ................................................................. 22

17 U.S.C. § 1201(a)(3) ....................................................................... 22

28 U.S.C. § 2201 ................................................................................ 20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

vi

34556\6000482.7

**State Statutory Authorities**

Cal. Bus. & Prof. Code § 17200 ............................................................................................ 11, 12

Cal. Bus. & Prof. Code § 17204 ................................................................................................. 11

Cal. Penal Code § 502 ............................................................................................................... 7

Cal. Penal Code § 502(c) ..................................................................................................... 20, 23

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

34556\6000482.7

**INTRODUCTION**

Defendant LinkedIn Corporation ("LinkedIn"), the world's largest professional network, with over 500 million members, has abruptly, unlawfully and without cause denied Plaintiff hiQ Labs, Inc. ("hiQ") access to the portion of the LinkedIn website containing wholly public member profiles.  hiQ relies on that public data, available nowhere but LinkedIn, for its data analytics business that serves clients including eBay, Capital One, and GoDaddy.  LinkedIn asserts as pretext a need to protect LinkedIn member data even though LinkedIn members have expressly made that information public and LinkedIn has identified no harm to itself or its members.

LinkedIn acknowledges on its website that public profile data belongs to LinkedIn members, not to LinkedIn, and that each member can choose the level of public disclosure allowed for his or her own information.  Members can choose to (1) keep their profile private; (2) share only with their direct connections; (3) share with connections within three degrees of separation; (4) allow access only to other signed-in members, or (5) allow access to everyone, even members of the public who may have no LinkedIn account and who can access the information without signing in or using any password.  It is only this fifth category of information – wholly public profiles – that is at issue here:  hiQ accesses only the profiles that LinkedIn members have made available to the public.  hiQ uses that information for data analytics that LinkedIn members' employers in turn use to retain and to create better career and internal mobility paths.  Thus, far from harming LinkedIn members, hiQ's access promotes precisely the type of professional and employment opportunities that lead LinkedIn members to make their profiles public in the first place.

The Court should by TRO and preliminary injunction enjoin LinkedIn from denying hiQ this access for a number reasons. Among them, LinkedIn's actions are anticompetitive: they are designed to prevent anyone but LinkedIn from being able to use public information for data analytics.  LinkedIn for years has known about hiQ and its business, has attended and presented at data analytics conferences hosted by hiQ and has even accepted awards from hiQ at these conferences.  But, having recently made several public statements about performing data analysis, LinkedIn  has abruptly decided to terminate hiQ's access.  LinkedIn's entire stated complaint is that hiQ "copies" the data its members have made public, but LinkedIn has asserted no copyright or

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

1

34556\6000482.7

other exclusive propriety interest in the data and it clearly has none.  Moreover, hiQ does not collect all (or even a substantial proportion) of the member profiles on LinkedIn, nor does it draw business away from LinkedIn by creating a substitute social network or job posting forum.  Rather, hiQ pulls data for a limited subset of users – usually its client's employees – and uses scientific methodology to analyze that data.  hiQ then provides its clients with this new data that it produced in a form that is by necessity very different from the public profile pages on LinkedIn.  Because LinkedIn has no legitimate copyright claim, it has instead threatened to sue hiQ under manifestly inapposite federal and state laws pertaining to hacking and unauthorized computer and network access in order to intimidate hiQ and force it to stop accessing these public profiles.  But LinkedIn cannot put those laws to an obviously improper purpose in order to obtain exclusive proprietary control over wholly public data in which it otherwise has no exclusive interest and which hiQ, and anyone else on earth, can freely access on the world wide web even with no log-in credentials or password.  Indeed, LinkedIn would not *have* that data on its website at all but for its promise to LinkedIn members that they can publicly disclose that information on LinkedIn for all the world to see and use.

hiQ has therefore filed the instant action to obtain a declaration of the parties' rights and liabilities under federal and state laws threatened by LinkedIn and for affirmative relief under state constitutional law, statutes and common law for LinkedIn's attempted destruction of hiQ's business. Immediate injunctive relief is needed and appropriate because hiQ will likely lose its contracts and employees (24 total full time employees, 21 based in San Francisco) and go out of business (rendering worthless the $14.5 million in venture capital invested since its start up in 2012) if it cannot access the public information on which its business completely depends.  By contrast, LinkedIn has not asserted and cannot assert any legitimate harm to itself or its members by allowing hiQ the continued access to wholly public profiles that it has enjoyed for years with LinkedIn's knowledge.

## QUESTIONS PRESENTED

**1.    Do LinkedIn's Actions Threaten Immediate, Irreparable Harm to hiQ?**  Yes, denying hiQ access to LinkedIn's public member profiles will effectively shut down hiQ's operations.  No more serious harm to a business is imaginable.

**2.    Does hiQ Present A Likelihood of Success on the Merits?**  Yes, applicable law clearly

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

2

34556\6000482.7

1   establishes that LinkedIn cannot selectively deny hiQ access for an improper anticompetitive

2   purpose in order to effectively give itself an exclusive right to data that its members, the world at

3   large, and settled rules of copyright law all deem to be public.  LinkedIn's reliance on laws to

4   prevent abusive computer and network invasion perverts the principles of those laws by using them

5   as a sword to prevent legitimate competition rather than as a shield against unlawfully invasive

6   harm.  LinkedIn's actions also violate independent law prohibiting tortious interference with hiQ's

7   contracts and prospective economic advantage and preventing unlawful and unfair business

8   practices.  LinkedIn is further estopped to deny access to data it obtained on its website specifically

9   by promising that the data would be public and after allowing hiQ access for years, only to do an

10  about-face and shutting down hiQ's access, effectively destroying hiQ, when LinkedIn apparently

11  decided to pursue data analytics of public profiles on its own.  Indeed, to interpret federal or state

12  law preventing computer abuse and hacking so as to *permit* LinkedIn to deny access to wholly

13  public profiles in these circumstances would violate California's constitutional free speech

14  provisions and principles as authoritatively interpreted in *Robins v. Pruneyard Shopping Center*,

15  592 P. 2d 341 (Cal. 1979) and *Fashion Valley Mall, LLC v. NLRB*, 172 P. 3d 742 (Cal. 2007).

16  Those decisions by California's highest court establish that, when a private property owner opens

17  its property to the public, constitutional principles of free and open speech and access to

18  information must be fully respected.  This means that, subject to reasonable and content-neutral

19  regulations of time, place, and manner ensuring continued public access, the owner of that property

20  cannot selectively silence or shut out particular speakers or listeners.  Even though such censorship

21  and information control by LinkedIn's servers resemble purely "private" suppression of free

22  expression on legally "private" property, LinkedIn created a public forum for professionals to meet

23  and exchange ideas, and "public profile pages" are a foundation stone of this expressive

24  community.  LinkedIn may not selectively exclude hiQ from this public forum, whether because

25  LinkedIn's managers resent hiQ's ability to profit from the information LinkedIn and its users

26  chose to make public, or for any other reason.  Deciding who can take advantage of public

27  information to earn a living is the essence of censorship, however apolitical it may appear to be.

28  **3.      <u>Does the Balance of Equities Tip Sharply in hiQ's Favor?</u>**  Yes, without an injunction

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

3

34556\6000482.7

1  hiQ will likely go out of business.  In contrast, LinkedIn can identify no legitimate harm in

2  permitting the status quo to continue while the merits are decided.  In the scales of justice

3  applicable to this case, there is much on one side and nothing at all on the other.

4  **4.**      **Would the Requested Injunction Serve the Public Interest?**  Yes, the public has both an

5  interest in seeing constitutional principles vindicated, the free flow of public information

6  preserved, and a valuable startup company like hiQ given a fair chance to thrive rather than being

7  forced to shut down its business, lay off its employees, and put to waste millions of dollars in

8  investor capital even before the merits can be decided.  The public also has an important interest in

9  ensuring proper enforcement of California's Unfair Competition Law and in enjoying the benefits,

10  both economic and moral, of preserving the fair playing field that the law is designed to ensure.

**STATEMENT OF FACTS**

12  **I.**      **ABOUT HIQ LABS AND ITS SERVICES**

13           hiQ has raised $14.5 million in two rounds of funding since its inception in 2012 as a

14  company applying predictive data science to issues related to a company's workforce.  hiQ was

15  then called OrgStars.  Declaration of Mark Weidick in Support of hiQ's Motion for TRO ("Weidick

16  Decl.") ¶ 3.  hiQ presently has 24 employees, the majority of whom are in its San Francisco office,

17  11 of whom have advanced degrees, including several PhDs.  *Id.*  hiQ sells Fortune 500 clients

18  "people analytics" – i.e. insights to their workforce – that it deduces by performing computerized

19  analyses of the public profile information available on LinkedIn.  *Id.* at ¶ 4.  hiQ provides its

20  customers two specific analytics services:  (a) "Keeper," which tells employers which of their

21  employees are at the greatest risk of being recruited away, and (b) "Skill Mapper," a summary of

22  the breadth and depth of aggregate or individual skills possessed.  *Id.* at ¶¶ 4-6.

23           hiQ uses the public profile section of the LinkedIn website as raw data for its analysis and

24  has historically used a variety of software and manual means to assimilate and organize this

25  information.  *Id.* at ¶ 8.  hiQ does not access the private sections of LinkedIn, such as profile

26  information that is visible only to those who have signed in as members, or member private data

27  that is visible only to those who are "connected" to a member.  *Id.*  Having accessed the information

28  it collects from LinkedIn, hiQ does not merely republish it but instead applies *analytics* to create

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION          4          34556\6000482.7

new business intelligence for its clients. *Id.* at ¶ 9.  In so doing, hiQ is engaged in the quintessential prerequisite of free expression: freedom of thought.  Nor do hiQ's services impair or impede the value of the LinkedIn social network.  On the contrary, they make it more valuable to have such a profile – an employer using the "Keeper" product might give an employee a "stay bonus" or a career development or internal mobility opportunity, or SkillMapper may demonstrate that its workforce lacks depth in a particular skill area, which could lead the employer to offer its employees free training to make up for that deficit.  *Id.* at ¶¶ 5-6.  Thus what hiQ does, and what LinkedIn is seeking to prevent hiQ from doing, enhances and in no respect diminishes, the value to everyone concerned of what LinkedIn provides.

## II.  THE LINKEDIN PROFESSIONAL NETWORK AND THE PUBLIC MEMBER PROFILE PORTION OF THE WEBSITE

The core of LinkedIn's business is a professional network that aggregates the profile information of about half a billion professionals, their interrelationships, their posts, and their cross-endorsements.  Ex. A at 2.  The purpose of the service is to "promote economic opportunity" and provide a place for professionals "to meet, exchange, ideas, learn and find opportunities…."  Ex. B at § 1.1.

LinkedIn member profiles contain resume information such as education, skills, publications, certifications, and employment history.  *See, e.g.*, Ex. C.  Members can connect their LinkedIn profiles to those of colleagues around the world.  *See, e.g.*, *id.*  LinkedIn's collection of public profiles is a one-of-a-kind resource.  It is the single largest, most up-to-date and authoritative repository of basic professional information about the world's professional community.  *See generally* Ex. A.

LinkedIn explains to members that "you own the content and information that you submit."  Ex. B at § 3.1.  LinkedIn is unequivocal that members control their profiles:  "You control the visibility and reach of your LinkedIn profile."  Ex. D. at 1.  LinkedIn gives members the ability and right to specify which portions of their profiles will be visible to their direct connections, their network (those within three degrees of separation), all LinkedIn members, and the "public."  Ex. C.  The "public" setting (which is at issue here) gives access to *"[a]ll LinkedIn members as well as*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

5

34556\6000482.7

*others who find you through search engines (e.g. Google, Bing) or other services."* Ex. E (pop-up box under "Customize Your Public Profile" (emphasis added)).  Public profiles may be reached via third-party services (e.g. Google and Bing) and directly via a web address (URL) that LinkedIn creates for its members.  *Id.*; *see also* Ex. F at 1.  The User Agreement explains that "Members and/or Visitors may access and share your content and information, consistent with your settings and degree of connection with them."  Ex. B at § 3.1.

Since its founding in 2002, LinkedIn has created numerous successful revenue streams, including selling services to corporations that help with their recruiting and sales processes.  As of hiQ's launch in 2012, LinkedIn's annual revenues were on the order of nearly $1 billion, a dollar figure that has nearly quadrupled by the end of 2016.  *Compare* Ex. G *with* Ex. H.  In late 2016, LinkedIn was purchased by Microsoft Corporation for $26 billion.  Ex. I.

## III.    LINKEDIN'S SURPRISING CEASE AND DESIST LETTER REVOKING ACCESS TO PUBLIC PROFILES

LinkedIn has known of hiQ since at least October 2015 when it started participating in hiQ's Elevate conference.  Weidick Decl. ¶ 11.  The hiQ Elevate conference was designed to build a community around the emerging field of people analytics and has provided a regular forum for participants to share insights and disseminate best practices.  *Id.* at ¶ 12.  Since October 2015, LinkedIn has sent at least ten different representatives to hiQ's Elevate conferences, including some that have attended multiple times.  *Id.* at ¶ 13.  hiQ has spoken freely about its data collection from LinkedIn at Elevate, so LinkedIn understood exactly what hiQ does.  *Id.* at ¶ 12.  Over the years, LinkedIn has spoken at Elevate, and in 2016 it applied for and won an Elevate "Impact Award."  *Id.* at ¶¶ 12-13.  hiQ's former CEO even held a series of in-person meetings with LinkedIn personnel discussing hiQ's business in late 2016 and early 2017.  *Id.* at ¶ 14.

Given LinkedIn's awareness of hiQ over the years and its seeming support of the business, hiQ management was surprised when on May 23, 2017, without any forewarning, LinkedIn's legal counsel emailed a letter to hiQ stating that hiQ was improperly "access[ing] and copy[ing]" LinkedIn public profile information.  *Id.* at ¶ 15; Ex. J.  The letter demanded that hiQ immediately "[c]ease and desist accessing or attempting to access or use LinkedIn's website, computers,

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION          6          34556\6000482.7

computer systems, computer network, computer programs, and data stored therein."  Ex. J at 2.

LinkedIn's letter stated that hiQ was in violation of the LinkedIn User Agreement, state trespass

law, the Computer Fraud and Abuse Act, California Penal Code 502, and the Digital Millennium

Copyright Act.  *Id*.  The letter also stated that any further access to the site would be "without

permission" and "without authorization."  Further, LinkedIn stated that it had implemented

"technical measures" to block hiQ from the site.  *Id*.

hiQ promptly retained counsel who contacted LinkedIn to explain hiQ's belief that it had a

right to access LinkedIn's public pages, that its business is synergistic to that of LinkedIn rather

than injurious, and that complying with LinkedIn's letter would devastate hiQ.  Counsel for hiQ

sought to understand whether LinkedIn believed it was being harmed in any way and, if so, how.

Declaration of Deepak Gupta in Support of hiQ's Motion for Temporary Restraining Order ("Gupta

Decl.") ¶ 4.  In response, LinkedIn's counsel was unable to point to any interference or impairment

with LinkedIn's servers from hiQ's accessing the site, and conceded that other commercial

enterprises, including Google and Yahoo!, are permitted to use automated software to access the

LinkedIn site.  *Id*. at ¶ 5.  When hiQ asked counsel for LinkedIn whether LinkedIn is building

services to compete with hiQ's Keeper and Skill Mapper services, counsel stated that he did not

know the answer to that question.  *Id*. at ¶ 6.  On May 31, 2017 counsel for hiQ sent a letter to

LinkedIn asking that hiQ be permitted to access the public profiles portion of the LinkedIn website,

at least in the interim while the parties discussed the possibility of a mutually amicable resolution.

*Id*. at ¶ 7; Ex. K.  As of this date, LinkedIn has not responded.  Gupta Decl. ¶ 8.

## IV.   RECENTLY UNCOVERED EVIDENCE SUGGESTS THAT LINKEDIN IS DEVELOPING ITS OWN OFFERINGS BASED ON PUBLIC PROFILE DATA

In hiQ's investigation in connection with these proceedings, it discovered that LinkedIn has

started building its own offerings based on public member profiles. Ex. L at 4, 13.  In a February

2015 earnings call, about three years after hiQ's launch, LinkedIn's CEO announced, "This year,

we plan to enter a new category with products allowing companies to utilize LinkedIn in the

enterprise by leveraging content and data that members are already sharing publicly."  *Id*. at 4.

When discussing this "new category," LinkedIn's CEO explained:

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

7

34556\6000482.7

> [T]here's an opportunity for LinkedIn to create value within an enterprise, within an organization *leveraging information that's already public.* So by way of example, *our public profile information*, which particularly at larger organizations, *you see some of those companies turning to LinkedIn to look up someone with their own company, because of how robust that public profile information can prove to be…..[W]e're trying to think about ways in which we can better leverage that to create value within an organization.*

*Id.* at 13 (emphasis added).  Furthermore, a page on the LinkedIn website states that it is also investing in its own data science projects.  *See*  Ex. M at 1-2.

## ARGUMENT

A temporary restraining order "preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary injunction application."  *Patino v. Franklin Credit Mgmt. Corp.*, No. 16-cv-02695-LB, 2017 WL 1246853, at *1 (N.D. Cal. Apr. 5, 2017), citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The standard for granting a temporary restraining order is "substantially identical" to the standard for granting a preliminary injunction.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co. Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The traditional test for issuing a temporary restraining order includes consideration of four factors: (1) the likelihood of the plaintiff's success on the merits; (2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; (3) the relative balance of harm to the plaintiff and the harm to the defendant if the injunction is not imposed; and (4) the public interest. *Alaska v. Native Village of Venitie*, 856 F.2d 1384, 1388 (9th Cir. 1988); *see also Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (articulating same four-factor test for preliminary injunctions).

California federal courts have adopted a version of this four-part test under which a temporary restraining order is appropriate if Plaintiff can show that serious questions going to the merits were raised and that the balance of hardships tips sharply in its favor, so long as both the threat of irreparable harm and public interest weigh in its favor.  *Patino*, 2017 WL 1246853 at *1, citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

## I.   THE BALANCE OF HARDSHIPS TIPS STRONGLY IN FAVOR OF HIQ

LinkedIn's revocation of hiQ's access to public profiles will devastate hiQ, while retaining

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION          8          34556\6000482.7

the status quo would have little, if any, negative effect on LinkedIn.  LinkedIn was a $26 billion corporation when it was purchased by Microsoft in 2016.  Whatever adverse economic effect hiQ's existence could conceivably have on LinkedIn could not possibly warrant the virtual certainty of driving hiQ into bankruptcy while the parties await a preliminary injunction hearing.

It bears emphasis that hiQ believes that its people analytics services add value to LinkedIn by giving employers and LinkedIn members useful analysis relating to their public profiles.  This, in the long run, enhances the importance to all professionals of having a LinkedIn public profile, which in turn helps LinkedIn maintain its position as the world's largest professional network.  If ever there was a situation, where an injunction helped both parties this would appear to be it.

## II.     HIQ HAS RAISED SERIOUS QUESTIONS ON THE MERITS OF ITS CLAIMS

### A.     hiQ is Likely to Prevail on its Cause of Action for Intentional Interference with Contract and Prospective Economic Advantage.

In California, "the law is settled that 'a stranger to a contract may be liable in tort for intentionally interfering with the performance of that contract.'"  *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004), citing *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).  The elements of intentional interference with contract are: (1) a valid contract; (2) the defendant's knowledge of that contract; (3) intentional disruption of the contractual relationship; (4) actual breach or disruption; and (5) damage.  *Id.*  To show interference with prospective economic advantage, a plaintiff must also plead and prove "that the defendant engaged in an independently wrongful act," which means an act that is "'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Id.* at 1152-53 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

First, hiQ has valid customer contracts with a number of clients, including eBay, Capital One, and GoDaddy.  Weidick Decl. ¶ 10.  Second, Linked has and had knowledge of hiQ's valid customer contracts.  hiQ has informed LinkedIn of its base of clients, ensuring such knowledge.  Weidick Decl. ¶ 14.  hiQ has also provided notice to LinkedIn of a pending financing, as well as prospective deals with Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite.  Ex. K at 2-3.  All of these deals are endangered by LinkedIn's conduct.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

9

34556\6000482.7

Third, in order to demonstrate intentional interference, hiQ can show that LinkedIn knew that disruption was certain or substantially certain to occur as a result of its actions. *Reeves,* 33 Cal. 4th at 1148. Here, LinkedIn was aware that hiQ's business relationships stood to be destroyed if its ability to access public profile pages was denied. Ex. K at 3.

Fourth, LinkedIn's conduct will disrupt or require breach of these contracts. hiQ's entire business is premised on performing data science on LinkedIn public profile pages. Terminating an essential service so that a company cannot perform under its contracts constitutes intentional interference. *H&M Assocs. v. City of El Centro*, 109 Cal. App. 3d 399, 405 (1980). Just as cutting off a water supply eliminated a key facility necessary for a landlord to keep his tenants, cutting off hiQ's access to public profile pages will require the breach of hiQ's contracts with existing customers, prevent it from consummating its pending deals with prospects, and disrupt the closing of its pending financing round. Ex. K at 2-3; Weidick Decl. ¶¶ 17-18. Fifth, the damage requirement is easily satisfied because, as detailed throughout the motion, hiQ will suffer lost business and possible bankruptcy if LinkedIn's disruptive activity is not restrained.

Further, for purposes of hiQ's claim for interference with prospective economic advantage, LinkedIn has committed an "independently wrongful act." *See Korea Supply Co*., 29 Cal. 4th at 1158. hiQ need only establish that LinkedIn's acts "were unlawful for a reason other than that they interfered with [plaintiff's] prospective economic advantage" in order to establish that the defendant committed an independently wrongful act. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007).

LinkedIn committed three independently wrongful acts when it revoked hiQ's access to public profiles: (1) it breached LinkedIn's express promises (including that the pages are "public," *members* control the visibility of these pages, and visitors may access and share these pages); (2) this constituted unfair competition, *infra*;[1] and (3) it violated California free speech protections,

_____

[1] A violation of California's Unfair Competition Law is sufficient to establish an "independently wrongful act" for purposes of a claim for interference with prospective economic advantage. *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1110-11 (9th Cir. 2007) ("We see nothing inconsistent with *Della Penna* in recognizing that the requirement of an independently wrongful act under the California law of intentional interference with prospective economic relations may be satisfied even by an alleged violation of a borrowing statute like the UCL.").

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

10

34556\6000482.7

*infra*.  LinkedIn should not be allowed to intentionally and wrongfully disrupt hiQ's contracts and prospective business dealings by revoking its access to admittedly public material.

### B.   hiQ is Likely to Prevail on Its Claim Against LinkedIn for "Unlawful" and "Unfair" Competition.

California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  LinkedIn's decision to deny hiQ access to admittedly "public" profile pages is both unlawful and unfair.

hiQ has standing under Business & Professions Code §17204 to seek injunctive relief. To establish standing under the UCL, a plaintiff must (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e.*, economic injury, and (2) show that the economic injury was the result of, *i.e.*, caused by, the unfair business practice.  *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1554 (2011) (internal citations omitted).  The injury in fact requirement is satisfied if the plaintiff can show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotations omitted).

hiQ's complained-of injuries – the loss of current and prospective revenues from its business relationships and the disruption of its current financing round – are all economic and are all being caused by LinkedIn's decision to revoke hiQ's access to public profile pages.  "Injunctions are 'the primary form of relief available under the UCL.'"  *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 337 (2011).

   1.   LinkedIn's disruption of hiQ's contractual and prospective business relationships is unlawful and  thus a violation of the UCL.

The UCL borrows "violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Thus, LinkedIn's tortious interference with hiQ's current and prospective contractual and business relationships gives rise to a claim under the "unlawful" business practices prong of the UCL.  *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099 (9th Cir. 2007).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

11

34556\6000482.7

2.    LinkedIn's unjustified and anticompetitive conduct in cutting off hiQ's access to public data is also an "unfair" practice under the UCL.

The concept of an "unfair" practice has a broad sweep: "'In permitting the restraining of all 'unfair' business practices, section [17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind.' . . . '(I)t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited (citations omitted), since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery.'" *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 739-40 (1980) (quoting *Barquis v. Merchs. Collection Ass'n.* 7 Cal. 3d 94 (1972) and *People ex rel. Mosk v. Nat'l Research Co. of Cal.*, 201 Cal. App. 2d 765 (1962)).

Courts have defined "unfair" differently in cases involving direct competitors and consumers. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 n.12 (1999). As between direct competitors, "unfair" includes conduct that "violates the policy or spirit of one of [the anti-trust] laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Id.* at 187. It is not necessary that the conduct actually violate the antitrust laws; to the contrary, any "practices that *have the effect* of harming competition may be unfair" under the UCL. *Id.* at 189 (emphasis added). In non-competitor commercial cases, some courts have applied this same definition while others have continued to apply the pre-*Cel-Tech* balancing test which "entails examination of the impact of the practice or act on its victim,'" "'balanced against the reasons, justifications and motives of the alleged wrongdoer.'" *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 n.24 (1999) (applying balancing test in commercial consumer context); *Progressive W. Ins. Co. v. Yolo Cty. Sup. Ct.*, 135 Cal. App. 4th 263, 285 (2005).

Here the parties are not strictly, or only, competitors. hiQ does not maintain any networking platform or simply republish the profiles or data as they appear on LinkedIn's website. Weidick Decl. ¶ 9. hiQ's data analytics services are synergistic to LinkedIn's stated purpose of assisting LinkedIn's members maximize their professional and business opportunities. *Id.* at ¶¶ 4-8. hiQ was itself a LinkedIn member with a business profile page on LinkedIn before LinkedIn took down

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

34556\6000482.7

hiQ's profile, terminated its membership and cut off its access, even as a non-member, to profile pages that LinkedIn members have explicitly made public for all to see. *Id.* at ¶ 16. To the extent that LinkedIn is now a competitor of hiQ, it is only because of LinkedIn's apparent recent decision to enter the data analytics business in which hiQ was already operating. But under any standard, LinkedIn's conduct is unfair.

First, LinkedIn's conduct is 'unfair' because LinkedIn is leveraging its power in the professional networking market to secure an anticompetitive advantage in another market – the data analytics market. Under the *Cel-Tech* competitor standard, LinkedIn's access denial "violates the policy or spirit of one of [the antitrust] laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. California courts look to federal antitrust law for guidance. *See Blank v. Kirwan*, 39 Cal. 3d 311, 320 (1985). And federal antitrust law makes it unlawful for a firm to use its monopolistic power in one market to exploit that power as a lever to secure a competitively unjustified advantage in a second ("leveraged") market, significantly and adversely affecting competition in that "leveraged" market. *See* 15 U.S.C. § 2; *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1106 (7th Cir. 1983); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) (use of monopoly power to destroy threatened competition violates Sherman Act). LinkedIn is using its dominant presence as the world's largest professional networking platform to assume exclusive proprietary control over data that is owned not by LinkedIn, but by its members, and which those members have explicitly designated as public. LinkedIn's actions suppress competition in the neighboring field of data analytics and violate the core principles and spirit of the antitrust laws.

Likewise, antitrust law has long recognized the "essential facilities" doctrine, which precludes a monopolist or attempted monopolist from denying access to a facility it controls that is essential to its competitors. Such anticompetitive conduct threatens the extension of the monopolist's control from one stage of production to another, or from one market to another. *MCI Commc'ns*, 708 F.2d at 1132-1133. The law thus imposes on firms controlling an "essential facility" "the obligation to make the facility available on non-discriminatory terms." *Id.* (evidence

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION                13

34556\6000482.7

1  supported jury verdict in favor of plaintiff long distance phone on "essential facility" claim where

2  "[n]o legitimate business or technical reason was shown for AT&T's denial of the requested

3  interconnections"; "MCI was not requesting preferential access to the facilities"; and "it was

4  technically and economically feasible for AT&T to have provided the requested interconnections");

5  *and see Otter Tail Power*, 410 U.S. at 377-78.

6         There is no viable alternative to LinkedIn's dominant member database to obtain data

7  relevant in the field of employee data analytics.  Weidick Decl. ¶ 17.  Even if it were theoretically

8  possible to create another competing networking platform and database, that is not a reality given

9  LinkedIn's undeniable dominance.  *See MCI*, 708 F.2d at 1132 (factors include practical ability to

10  duplicate essential facility).  LinkedIn has not identified any technical barrier or cost to LinkedIn

11  providing access.  Gupta Decl. ¶ 5.  Until recently, LinkedIn has been providing access to hiQ

12  without burden or complaint.  hiQ seeks nothing more than non-discriminatory access that others,

13  including Google, Bing, and Yahoo, already enjoy.

14         These same considerations show LinkedIn's conduct to be unfair business practices under

15  non-competitor standard applied in commercial cases.  The impact to hiQ is obvious and

16  devastating; its very business model and prospects, as well as its employee relationships, are

17  threatened beyond repair.  LinkedIn's purported justification – protection of member data – is by

18  contrast obviously pretextual inasmuch as hiQ accesses only data that LinkedIn members have

19  explicitly made public.  LinkedIn allows all major search engines to access, copy and display

20  portions of this member public data without complaint.  Ex C.  LinkedIn has never hinted at any

21  concrete harm that hiQ's access has caused to LinkedIn or its members.  Gupta Decl. ¶ 5; Weidick

22  Decl. ¶ 15.  LinkedIn has repeatedly complained about hiQ's "copying" of public data but does not

23  contend that it has any copyright or ownership interest in the data.  Ex. J at 1-2.  It simply wants to

24  lock down website access to public data in which it has no independent legal right in order to create

25  proprietary control where none could otherwise legally exist.  Under any standard, LinkedIn's

26  actions constitute violations of the UCL's "unfair" business practices prong.[2]

27  _____

28  [2] LinkedIn's conduct also violates the fraudulent prong of the UCL because LinkedIn's promises of access by everyone to public profile information are likely to deceive members and ecosystem

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION                    14                    34556\6000482.7

**C.      hiQ is Likely to Prevail on its Cause of Action for Promissory Estoppel.**

"The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.'" *See Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004) (identifying elements).  Each is satisfied here.

*LinkedIn's promise was and is clear.* "To be enforceable, a promise need only be 'definite enough that a court can determine the scope of the duty, and limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.'"  *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1045 (2010) (internal citation omitted).  LinkedIn guarantees members that *they* "control the visibility and reach of [their] LinkedIn profile[s]," and one of the settings offered is "public," a setting that gives access not just to LinkedIn members but to "everyone."  Ex. C.  This promise of the ability to publicly offer a "professional brand" by which a member can become known to customers, clients, recruiters and employers has been foundational to LinkedIn's success, and is built on public access.  Ex. N

LinkedIn contends in its cease and desist letter that its User Agreement limits the use of "automated software" to access these profiles.  This is spurious, because, *first*, visitors to the public profile pages of the LinkedIn site do not need to be members and thus never have to sign on to the User Agreement.  *Second*, as hiQ's counsel explained to LinkedIn, the User Agreement itself is so overbroad and riddled with contradiction as to be meaningless.  *See* Ex. K at 2-3.  *Third*, LinkedIn lets numerous companies access its public profiles using automated software, including hiQ – for *three years*.[3]

---

businesses alike.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("fraudulent" business practice under the UCL is one where members of the public are likely to be deceived).

[3]  *See Wagner v. Glendale Adventist Medical Center*, 216 Cal. App. 3d 1379, 1388 (1989) ("conduct or custom …[can create] modification of the written contract."); *Trustees of California State University & Colleges v. NCAA*, 82 Cal. App. 3d 461, 474 (1978) (conduct of NCAA implied that college was not in violation of by-laws); *Garcia*, 183 Cal. App. 4th at 1046 (silence could can establish promissory estoppel), citing *Wilson v. Bailey*, 8 Cal. 2d 416, 423 (1937) ("The person against whom the estoppel is asserted, must *by his silence* or his representations, have created a belief of the existence of a state of facts which it would be unconscionable to deny.") (emphasis added). This course of conduct led hiQ to believe that LinkedIn not only allowed hiQ's

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION      15      34556\6000482.7

*hiQ reasonably relied on LinkedIn's express and implied assurances that it could access public profiles.*  Weidick Decl. ¶ 4.  This business model was reasonable, because it has been commonplace since the advent of the Internet to build business by analyzing the content of publicly available webpages.  Starting with the Altavista and Excite search engines in the early 1990s through Lexis/Nexis, Intelius, and CoreLogic today, each of these businesses used automated software to index the content of publicly available webpages for keyword searching, precisely what LinkedIn now says hiQ cannot do.  LinkedIn has always allowed (and continues to allow) access from many "crawlers," including Google and Bing.  LinkedIn's conduct was particularly deceptive as to HiQ, because LinkedIn attended hiQ's conferences over a period of several years, where it learned of hiQ's business model, its growth, expansion, and continued use of data from its members' profiles.  LinkedIn never uttered an objection.

*hiQ's reliance on LinkedIn's promise was to its substantial detriment.*  Based on LinkedIn's actions, hiQ spent millions of dollars and thousands of hours investing in its business and developing its technology.  Weidick Decl. ¶ 4.

*hiQ will suffer damages and risks going out of business as a direct result of LinkedIn's conduct.*  An immediate injunction is necessary to prevent this damage.  "[I]njunctive relief is . . . a proper remedy for a claim based on promissory estoppel."  *Nicol v. Nelson*, 776 P.2d 1144, 1146 (Colo. App. 1989) (citing illustration from Restatement Section 90); *Edmonds v. Los Angeles Cty.*, 40 Cal. 2d 642, 653 (1953) (approving Restatement Section 90 and specifically enforcing property owner's promise to comply with grant of nonconforming use to ordinance).

### D.    California Free Speech Rights Protect HiQ's Right of Access.

Apart from and arguably even more fundamental than the above economic standards that LinkedIn's cease and desist demand violates, LinkedIn's selective blockage of hiQ's access to publicly available information on its website violates hiQ's constitutional free speech rights under Article I, Section 2 of the California Constitution, which provides that "*[e]very person may freely speak, write, and publish his or her sentiments on all subjects.* (emphasis added)."  In a perfect manifestation of the virtues of a federal system – and of the rights of individual states under the

access to its profiles, but that it encouraged them.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION          16          34556\6000482.7

1   Tenth Amendment to go further than the federal Bill of Rights requires each state to go in

2   protecting its citizens – this California guarantee goes materially beyond the Federal Constitution,

3   because it is not limited by its terms to restraining governmental action; rather, it is a positive grant

4   of freedom to all persons.  In this case, LinkedIn's actions violate hiQ's rights of access to

5   admittedly public profile information to carry out inquiry, information-gathering, and analysis in

6   the field of data science.  The fact that this in turn permits it to communicate with its clients and

7   enables them to communicate with LinkedIn Members, while not a necessary element of the free

8   speech claim, dramatically demonstrates the seamlessness of the system of free expression that

9   California's constitution wisely ensures.[4]

10      LinkedIn's actions demonstrably contravene the California Supreme Court's landmark

11   ruling in *Robins v. PruneYard Shopping Center*, 23 Cal. 3d 899, (1979), which held that

12   California's free speech guarantee protects expression even on privately owned property (there, a

13   privately owned shopping center).  The Court notably rejected the argument that private property

14   rights trump the interests of free expression, explaining that "the rights preserved to the individual

15   by these constitutional provisions are held in subordination to the rights of society.  Although one

16   owns property, he may not do with it as he pleases any more than he may act in accordance with his

17   personal desires."  23 Cal. 3d at 906 (internal quotation marks and citation omitted).  The Court

18   noted the "potential impact of the public forums sought here," citing the frequency of customer trips

19   to the shopping centers in the San Jose area and finding that "[t]he largest segment of the county's

20   population is likely to spend the most significant amount of its time in suburban areas where its

21   needs and wants are satisfied; and shopping centers provide the location, goods, and services to

22   satisfy those needs and wants."  *Id.* at 907.  In light of "the significance of the growing importance

---

23   [4]  The California Constitution (like the U.S. Constitution) protects the functioning of public fora as
24   places for speech to be uttered and *be heard* (not just the former).  *See Cal. Newspaper Ass'n v.
     Burbank*, 51 Cal. App. 3d 50, 53 (1975) (ban on "newsracks" was unconstitutional;  free speech is
25   not just an "in personam" right); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965).  These
     rights of access extend to the world of data analysis for commercial purposes.  In *Sorrell v. IMS
26   Health Inc.*, 564 U.S. 552 (2011) "data miners" brought a successful First Amendment challenge
     to a Vermont statute that restricted the sale, disclosure, and use of facts from pharmacy records
27   that revealed the prescribing practices of individual doctors in aid of pharmaceutical marketing.
     The Court found that it was constitutionally impermissible to discriminate against such marketing-
28   related data mining uses when "extensive" non-commercial uses were allowed.  *Id.* at 574.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION          17          34556\6000482.7

of the shopping center," the Court reasoned that "to prohibit expressive activity in the centers would impinge on constitutional rights." *Id.* The California Supreme Court concluded that "25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered" at the shopping center, and that the distribution of handbills, and soliciting signatures "would not markedly dilute defendant's property rights." *Id.* at 910-11. The U.S. Supreme Court, in reviewing the California Supreme Court's ruling, confirmed that free speech protections of a state constitution may exceed those provided by the Federal Constitution and held that California's right of access did not violate the shopping center's federal rights under the Takings Clause of the Fifth Amendment. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83-84 (1980) (opining that the "requirement that appellants permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Taking Clause").

PruneYard remains good law. In *Fashion Valley Mall, LLC v. NLRB*, 42 Cal. 4th 850 (2007), the California Supreme Court adhered to *PruneYard* and held that a private shopping mall owner was required to allow free speech related to a boycott of a retail establishment inside the mall: "a privately owned shopping center must permit peaceful picketing of businesses in shopping centers, even though such picketing may harm the shopping center's business interests." *Id.* at 864. "A shopping mall is a public forum in which persons may reasonably exercise their right to free speech guaranteed by article I, section 2 of the California Constitution." *Id.* at 869-70. The Court reiterated that the California free speech guarantee was even "broader" and "greater" than its federal counterpart. *Id.* at 863 (internal quotation marks and citation omitted). The Court explained that "the free speech clause in article I of the California Constitution differs from its counterpart in the federal Constitution both in its language and its scope," and "[o]ur decision that the California Constitution protects the right to free speech in a shopping mall, even though the federal Constitution does not, stems from the differences between the First Amendment to the federal Constitution and article I, section 2 of the California Constitution." *Id.* at 862 Further, the Court held that the anti-boycott rule was subject to "strict scrutiny," meaning that it was invalid unless proven to be "necessary to serve a compelling state interest, and ... narrowly drawn to achieve that

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

18

34556\6000482.7

end." *Id.* at 869 (internal quotation marks and citation omitted).  The Court concluded that the shopping center failed to meet its burden.  *See id.* ("The Mall's rule prohibiting speech that advocates a boycott cannot withstand strict scrutiny. The Mall's purpose to maximize the profits of its merchants is not compelling compared to the Union's right to free expression.").  LinkedIn cannot satisfy this high burden, either.  *See also Best Friends Animal Soc'y v. Macerich Westside Pavilion Prop. LLC*, 193 Cal. App. 4th 168, 181, (2d Dist. App. 2011) ("To sum up our survey of the law, it is a general proposition that a shopping mall must allow protests within aural and visual range of a targeted business whenever the mall is open to the public."); *Snatchko v. Westfield LLC*, 187 Cal. App. 4th 469 (2010) (invalidating private mall rule restricting speech under both strict scrutiny and intermediate scrutiny applicable to restrictions on speech).

The rule of *PruneYard* mandates that hiQ be granted a continued right of access to the public portions of LinkedIn.  Like the *PruneYard* shopping center, LinkedIn opens the public profile section of its website to the public.   LinkedIn promises its members that the public profiles on its site can be viewed by everyone.  Its promise is express and unqualified.  LinkedIn has a staggering 500 million members (anyone can join), far more than the shopping center in *PruneYard*.  Further, LinkedIn refers to itself as a "community" and expressly holds itself out as a place "to meet, exchange ideas, [and] learn," Ex. B § 1.1, making it a modern-day equivalent of the shopping mall or town square, a marketplace of ideas on a previously unimaginable scale.

The fact that LinkedIn is a privately owned website does not shield it from compliance with California free speech principles, because where private property is freely and openly accessible to the public, the California Constitution will treat it as a traditional public forum.  And, importantly, the principles embodied in California's Constitution are not confined to the kinds of forums familiar to those who lived in decades or centuries past.  This State's constitution, like that of the United States, was written to endure, not to be rendered obsolete by technological advance.  "The legal doctrines applicable to public forum law generally apply to virtual space as much as physical space."  Smolla & Nimmer on Freedom of Speech, Section 8.33.20.  *See, e.g., Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006) ("Web sites accessible to the public … are 'public forums' for purposes of the anti-SLAPP statute."); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

19

34556\6000482.7

(2005) (public forum is "traditionally defined as a place that is open to the public where information is freely exchanged… Websites that are accessible free of charge to any member of the public where members of the public may read the views and information posted, and post their own opinions, meet the definition of a public forum" for purposes of the anti-SLAPP statute).

Accordingly, and entirely apart from the violation of California's law regarding unfair competition and intentional interference, LinkedIn's selective exclusion egregiously violates hiQ's – and both its and LinkedIns' customers' and clients' – free speech rights under the California Constitution. LinkedIn has offered no compelling interest to warrant its suppression of free speech, much less any compelling interest to which its restriction is narrowly tailored, and its actions are thus invalid under the California Constitution.[5]

**E.   hiQ is Likely Entitled To Declaratory Judgment that it Has Not Violated the DMCA, State Trespass Law, the CFAA, or California Penal Code § 502(c).**

1.   An actual controversy exists between hiQ and LinkedIn.

Under the Declaratory Judgment Act, courts may "declare the rights and other legal relations" of parties "[i]n a case of actual controversy." 28 U.S.C. § 2201. "[T]he question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and citations omitted). In *TransFresh Corp. v. Ganzerla*

---

[5] While this motion does not argue that federal law directly curtails the private property rights of LinkedIn in its servers in this situation, a comparative look at the balance between private property rights and free speech interests that has emerged in the realm of U.S. copyright law provides guidance for the balancing this Court must perform under the *Pruneyard* line of cases. By avoiding calling its claim a "copyright claim," HiQ suspects that LinkedIn is trying to avoid the limits imposed by "copyright's built-in free speech safeguards." *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003) (limits on copyright are fundamentally constitutional). Those limits would almost certainly bar LinkedIn's claims, had they been framed as copyright infringement: LinkedIn *does not own* the copyrights at issue, hiQ is only taking *facts*, and hiQ's use would likely be viewed as a *transformative fair use*. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 556 (1985) ("idea/expression dichotomy 'strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression'" citation omitted); *Golan v. Holder*, 565 U.S. 302, 329 (2012) (*citing Harper & Row*, 471 U.S. at 560) (fair use defense embodies First Amendment safeguards that give "latitude for scholarship and comment"). If the litmus test that has emerged in copyright law is a guide, then the balancing of interests required by *Pruneyard* weighs in hiQ's favor.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION       20       34556\6000482.7

& *Assoc., Inc.*, the declaratory judgment defendant sent the plaintiff a cease-and-desist letter accusing the plaintiff of various illegalities.  862 F. Supp. 2d 1009, 1021 (N.D. Cal. 2012).  The letter "threatened to 'hold [plaintiff] responsible and liable for its unlawful and tortious conduct' if [plaintiff] did not comply with [defendant's] demands."  *Id.*  The court held that the declaratory relief claim was ripe for adjudication "[b]ased on the issues raised in the Cease-and-Desist Letter."  *Id.* at 1020-21.

An actual controversy exists between hiQ and LinkedIn based on the May 23 cease and desist letter.  Like the letter in *TransFresh*, LinkedIn's cease-and-desist letter details, with specificity, why hiQ's continued access of LinkedIn's website is allegedly illegal,  and threatens hiQ with litigation if it continues accessing LinkedIn's website.  Ex. J at 2-3.  hiQ and LinkedIn thus have adverse legal interests that are immediate and warrant the issuance of a declaratory judgment.  *MedImmune*, 549 U.S. at 127; *Transfresh*, 862 F. Supp. 2d at 1021; *see also Cabell v. Zorro Prods., Inc.*, No. 5:15-CV-00771 (EJD), (2017 WL 2335597), at *9 (N.D. Cal. May 30, 2017) (actual controversy existed between parties in part because declaratory judgment defendant's actions prevented plaintiff from licensing a musical to other production companies).

2.      LinkedIn's claims would be brought for an improper purpose and would have an impermissible effect.

As detailed in Sections II.A-D above, LinkedIn's revocation of hiQ's ability to access public member profiles on LinkedIn's website violates numerous common law, constitutional and unfair competition law principles.  Any claim LinkedIn could otherwise legally bring against hiQ is therefore void and without force, as it would be brought for an improper purpose and with an improper effect.  *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 629 (4th Cir. 1979) ("A refusal to deal [] right is limited to situations where the seller has not put together an arrangement in restraint of trade.").  LinkedIn's tactic of interpreting the DMCA and CFAA so broadly as to allow a *per se* prohibition of automated access to publicly available information on a website would do violence to the Copyright Act, by prohibiting (and even criminalizing) digital activity that copyright law holds to be privileged.[6]  There is a federal judicial duty to avoid gratuitous conflict between and

---

[6] *See e.g.*, *Authors Guild v. Google, Inc.*, 804 F. 3d 202, 217 (2d Cir. 2015) (automated scanning

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION          21          34556\6000482.7

among federal laws.  *See, e.g., Watt v. Alaska* 451 U.S. 259, 267 (1981) (two statutes in tension must be read "to give effect to each if we can do so while preserving their sense and purpose.") Thus, the CFAA and DMCA should be read narrowly so as not to proscribe forms of access which copyright law holds to be permissible.

3.   The technical blocks of member public profiles do not implicate the DMCA, because they are not implemented "with the authority of the copyright owner"

The Digital Millennium Copyright Act ("DMCA") prohibits "circumvent[ing] a technological measure that effectively controls access" to a "work protected under this title." 17 U.S.C. § 1201(a)(1)(A).  "[A] technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, *with the authority of the copyright owner*, to gain access to the work."  17 U.S.C. § 1201(a)(3) (emphasis added).

Any measures LinkedIn implements to block hiQ from accessing member public profile information on LinkedIn fall outside of the DMCA because such measures are – among other things – not implemented "with the authority of the copyright owner."  17 U.S.C. § 1201(a)(3).  LinkedIn's user agreement unambiguously states that LinkedIn's *users*, not LinkedIn itself, own "all of the content, feedback, and personal information [the user] provide[s] to [LinkedIn]."  User Agreement § 3; *see also* User Agreement § 3.1 ("As between you and LinkedIn, you own the content and information that you submit or post to the Services and you are only granting LinkedIn the following non-exclusive license.").  Thus, any copyrights to LinkedIn user profiles are owned by LinkedIn's users, not LinkedIn.  Any technological measure LinkedIn implements to control access to a user's public profile information—for example, by requiring a password to view public member profiles, or by using some other technological mechanism to block hiQ's access to LinkedIn—is implemented with only the authority of LinkedIn, not the member.  Thus, such measures are not protected by the

of books and indexing to create a "search function" -- despite lack of authorization -- is a "transformative" fair use.) *citing  A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639-40 (4th Cir. 2009), *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007), *and Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) ("examples of cases in which courts had similarly found the creation of complete digital copies of copyrighted works to be transformative fair uses….").

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION                    22                    34556\6000482.7

DMCA.  Declaratory judgment that hiQ will not violate section 1201(a) of the DMCA by accessing the public profiles available on LinkedIn is therefore appropriate.

>    4.    California trespass law cannot apply in the absence of damage to LinkedIn's computer systems.

"In order to prevail on a claim for trespass based on accessing a computer system, the plaintiff must establish: (1) defendant intentionally and without authorization interfered with plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately resulted in damage to plaintiff."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d. 1058, 1069-70 (N.D. Cal. 2000).  "[T]he tort does not encompass ... an electronic communication that neither damages the recipient computer system nor impairs its functioning" because such communications do "not interfere with the possessor's use or possession of, or any other legally protected interest in" the computer system.  *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1347 (Cal. 2003).  For example, in *Intel*, the defendant sent six mass emails to thousands of Intel email addresses over a 21-month period.  *Id.*  Because the record contained no evidence the emails "damaged Intel's computer system or slowed or impaired its functioning," the Court dismissed Intel's trespass claim.  *Id.* at 1349.  *See also in re iPhone Application Litigation*, 844 F. Supp. 2d. 1040, 1069 (N.D. Cal. 2012) (allegation of shortened battery life did "not plausibly establish a significant reduction in service constituting an interference with the intended functioning of the system, which is necessary to establish a cause of action for trespass.")  *Id.*  Like the defendants in *Intel* and *in re iPhone Application Litigation*, hiQ causes no damage and does not slow or impact LinkedIn's computer systems in any appreciable way. Indeed, LinkedIn made no such claim in its cease-and-desist letter and could not cite any impairment (let alone damage) in the parties' phone conference on May 30, 2017.  Any claim for trespass to chattels must therefore fail.

>    5.    hiQ cannot be liable for violating the CFAA or California Penal Code § 502(c).

Because LinkedIn's actions violate a number of common law, constitutional, and unfair competition laws, any claims LinkedIn might otherwise be permitted to bring are barred for their improper purpose and effect.  Moreover, both of the cases LinkedIn relies upon regarding the CFAA—*Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013) and *Facebook, Inc. v.*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION

23

34556\6000482.7

*Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016)—are readily distinguishable from the facts at issue here.[7]  3Taps and Power.com created substitute services that replaced the need for a user to ever have to visit Craigslist or Facebook.  *Craigslist*, 964 F. Supp. 2d at 1181; *Facebook*, 844 F.3d at 1063.  hiQ's services do not displace the need for, but are instead build on and are synergistic with, the services provided on LinkedIn.  And while the motives of 3Taps and Power.com were highly questionable, here it is LinkedIn's motives that are concerning.  It built a user base on the promise of "public pages," but now that it has critical mass, LinkedIn is selectively excluding companies like hiQ from those pages in order to stifle their ability to compete with LinkedIn in the field of data analytics.  The factual underpinnings of both *Craigslist* and *Facebook* are wholly distinct from, and should not be extended to apply to the facts at issue here.[8]

## III.   HIQ WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005). A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunction relief shows "irreparable injury."  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  In addition, the loss of current and prospective customers "is considered to be irreparable harm that justifies equitable relief."  *Shippers, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056 at *6 (S.D. Cal. Sept. 23, 2013), citing *Stuhlbarg Int'l Sales Co., Inc.*, 240 F.3d at 841.

For over three years, hiQ has invested in building its people analytics business based on the public profile pages available on LinkedIn.  Weidick Decl. ¶¶ 3-4.  If access to this vital resource is denied, then all of those efforts will have been for naught: hiQ will have to breach its agreements with its customers, stop discussions with its long list of prospective customers, lay off most if not all its employees, and shutter its operations.  *Id.* at ¶¶ 17-19.  hiQ has investigated whether any other public or non-public source of data would provide the information needed to sustain the

---

[7] LinkedIn's cease-and-desist letter cites *Facebook, Inc. v. Power Ventures, Inc.*, No. 13-17102, 2016 WL 3741956 (9th Cir. July 12, 2016).  This opinion was amended on December 6, 2016. This brief refers to the amended opinion, not the original.

[8] On March 9, 2017, Power Ventures filed a petition for a *writ of certiorari* with the Supreme Court, asking the Court to overturn the 9th Circuit's decision.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO   24
AND OSC RE PRELIMINARY INJUNCTION

34556\6000482.7

1    Keeper and Skill Mapper product for its Fortune 500 clientele.  The answer is negative.  *Id.* at ¶ 17.

2    **IV.      THE INJUNCTION IS IN THE PUBLIC INTEREST**

3            Finally, the public interest weighs strongly in favor of granting hiQ's motion.  Keeping hiQ's

4    employees employed and able to serve hiQ's business clients while the Court examines the legal

5    issues is good for the economy.  Further, the public interest will be served by enjoining LinkedIn

6    from committing acts of unfair and unlawful competition. *Max Factor & Co. v. Factor*, 226 F.

7    Supp. 120, 126 (S.D. Cal. 1963) ("courts have consistently recognized the need to protect the public

8    interest in suits for … unfair competition"); *Metro-Goldwyn-Mayer, Inc. v. Lee*, 212 Cal. App. 2d

9    23, 28 (1963) (statute permitting injunction against acts of unfair competition "recognizes … the

10   public interest in protection against unfair business practices."). Finally, the free speech principles

11   implicated here are of broad, public significance. *Klein v. City of San Clemente*, 584 F.3d 1196,

12   1208 (9th Cir. 2009) (recognizing "'significant public interest' in upholding free speech principles"

13   because of the potential impact to the free expression interests of third parties).

14   **V.      NO BOND SHOULD BE REQUIRED**

15           Where no damage will result from a temporary restraining order or preliminary injunction,

16   no bond is necessary.  *Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court

17   may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to

18   the defendant from enjoining his or her conduct.").  hiQ seeks to prevent Defendant from denying it

19   access to public pages on its website, access which it has had for three years.  LinkedIn has

20   identified no actual harm from hiQ's access.  Thus, no bond should be required.

21                              **<u>CONCLUSION</u>**

22           The Court should issue a temporary restraining order and an order to show cause why a

23   preliminary injunction should not be granted.

24   Dated:  June 7, 2017                      FARELLA BRAUN + MARTEL LLP

25

26                                       By:    /s/ Deepak Gupta

27                                            Deepak Gupta

28                                       Attorneys for Plaintiff hiQ Labs

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO APPLICATION FOR TRO
AND OSC RE PRELIMINARY INJUNCTION                    25                    34556\6000482.7