*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT A

# About us

## About LinkedIn

Want to know about our early days, members, metrics, and more?
Here's a quick view of who we are.

## Company Information

- LinkedIn's founders are **Reid Hoffman**, **Allen Blue**, **Konstantin Guericke**, **Eric Ly** and **Jean-Luc Vaillant**. LinkedIn started out in the living room of co-founder Reid Hoffman in 2002.
- The site officially launched on May 5, 2003. At the end of the first month in operation, LinkedIn had a total of 4,500 members in the network.
- The company has a diversified business model with revenues coming from talent solutions, marketing solutions and premium subscription products.
- LinkedIn's global headquarters are in Sunnyvale, California, with EMEA headquarters in Dublin and APAC headquarters in Singapore. LinkedIn U.S. offices are in Chicago, Los Angeles, New York, Omaha, San Francisco, Sunnyvale and Washington D.C. International LinkedIn offices are located in Amsterdam, Bangalore, Beijing, Dubai, Dublin, Graz, Hong Kong, London, Madrid, Melbourne, Milan, Mumbai, Munich, New Delhi, Paris, Perth, São Paulo, Shanghai, Singapore, Stockholm, Sydney, Tokyo and Toronto.
- LinkedIn is currently available in 24 languages: Arabic, English, Simplified Chinese, Traditional Chinese, Czech, Danish, Dutch, French, German, Indonesian, Italian, Japanese, Korean, Malay, Norwegian, Polish, Portuguese, Romanian, Russian, Spanish, Swedish, Tagalog, Thai and Turkish.
- LinkedIn has more than 10,000 full-time employees with offices in 30 cities around the world. LinkedIn started off 2012 with about 2,100 full-time employees worldwide, up from around 1,000 at the beginning of 2011 and about 500 at the beginning of 2010.

## Worldwide Membership

- LinkedIn operates the world's largest professional network on the Internet with more than 500 million members in over 200 countries and territories.
- Professionals are signing up to join LinkedIn at a rate of more than two new members per second.
- There are more than 40 million students and recent college graduates on LinkedIn. They are LinkedIn's fastest-growing demographic.



Regional membership

158+M EMEA
138+M USA
118+M Asia and the Pacific

70+M LATAM
22+M MENA
22+M Southeast Asia

For more information about our company, please visit our **Company Page** and check out our **LinkedIn Blog**.

For more information about our Products & Services, visit our **Products & Services** page.

For more information, please visit our **Press Center**. Members of the media may direct inquiries to **press@linkedin.com**

© LinkedIn Corporation 2017      About      Cookie Policy      Privacy Policy      User Agreement

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT B

Sign in     Join now

SlideShare, a content sharing platform, and LinkedIn Pulse, a news reading application, are part of the LinkedIn family.

# User Agreement

Welcome, and thanks for using LinkedIn.com, SlideShare.net, Pulse and/or other LinkedIn services and apps! When you use our products and services, you're agreeing to our terms, so please take a few minutes to read over the User Agreement below.

Note: You are entering into a legally binding agreement.

Who owns your content? You do.



## 1. Introduction

We will update our User Agreement soon. Please see the preview.

We are a social network and online platform for professionals.

### 1.1. Purpose
Our mission is to connect the world's professionals to allow them to be more productive and successful. ==Our services are designed to promote economic opportunity for our members by enabling you and millions of other professionals to meet, exchange ideas, learn, and find opportunities or employees, work, and make decisions in a network of trusted relationships.==

When you use our Services (including Slideshare and Pulse), you are entering into a legal agreement and you agree to all of these terms.

You also agree to our Privacy Policy, which covers how we collect, use, share, and store your personal information.

### 1.2. Agreement
You agree that by clicking "Join Now" "Join LinkedIn", "Sign Up" or similar, registering, accessing or using our services (including LinkedIn, SlideShare, Pulse, our related mobile apps, developer platforms, premium services, or any content or information provided as part of these services, collectively, "Services"), you are entering into a legally binding agreement (even if you are using our Services on behalf of a company). If you reside in the United States, your agreement is with LinkedIn Corporation and if you reside outside of the United States, your agreement is with LinkedIn Ireland Unlimited Company (each, "LinkedIn" or "we").

This "Agreement" includes this User Agreement and the Privacy Policy, and other terms that will be displayed to you at the time you first use certain features (such as starting a "Group," downloading one of our software applications or purchasing advertisements or InMails™), as may be amended by LinkedIn from time to time. If you do not agree to this Agreement, do NOT click "Join Now" (or similar) and do not access or otherwise use any of our Services.

Registered users of our Services are "Members" and unregistered users are "Visitors". This Agreement applies to both.

Back to Top ▲

## 2. Obligations

Here are some promises you make to us in this Agreement:

You're eligible to enter into this Agreement and you are at least our "Minimum Age."

### 2.1. Service Eligibility
To use the Services, you agree that: (1) you must be the "Minimum Age" (defined below) or older; (2) you will only have one LinkedIn account (and/or one SlideShare or Pulse account, if applicable), which must be in your real name; and (3) you are not already restricted by LinkedIn from using the Services.

"Minimum Age" means (a) 18 years old for the People's Republic of China, (b) 16 years old for the Netherlands, (c) 14 years old for the United States, Canada, Germany, Spain, Australia and South Korea, and (d) 13 years old for all other countries. However, if law requires that you must be older in order for LinkedIn to lawfully provide the Services to you (including the collection, storage and use of your information) then the Minimum Age is such older age. The Services are not for use by anyone under the age of 13.

You'll keep your password a secret.

You will not share an account with anyone else and will follow our rules and the law.

### 2.2. Your Membership
As between you and others, your account belongs to you. You agree to: (1) try to choose a strong and secure password; (2) keep your password secure and confidential; (3) not transfer any part of your account (e.g., connections, groups) and (4) follow the law and the Dos and Don'ts below. You are responsible for anything that happens through your account unless you close it or report misuse.

Note that for Premium Services purchased by another party for you to use (e.g. Recruiter seat bought by your employer), the party paying for the Premium Service controls such an account (which is different from your personal account) and may terminate your access to it.

Sign in    Join now

and you are okay with us storing your payment information. Also, there may be fees and taxes that are added to our prices.

We don't guarantee refunds.

applicable fees and taxes. Failure to pay these fees may result in the termination of your subscription. Also:

- Your purchase may be subject to foreign exchange fees or differences in prices based on location (e.g. exchange rates).

- You authorize us to store and continue billing your payment method (e.g. credit card) even after it has expired, to avoid interruptions in your service (e.g. subscriptions) and to facilitate easy payment for new services.

- You must pay us for applicable fees and taxes unless you cancel the Premium Service, in which case you agree to still pay these fees through the end of the applicable subscription period. Learn how to cancel or change your Premium Services and read about LinkedIn's refund policy.

- Taxes are calculated based on the billing information that you provide us at the time of purchase.

For LinkedIn, you can get a copy of your invoice through your account settings under "Purchase History" for SlideShare you can request your invoice through Customer Support.

---

You're okay with us using our websites, mobile apps, and email to provide you with important notices. This Agreement applies to mobile applications as well. Also, you agree certain additional information can be shared with us.

If the contact information you provide isn't up to date, you may miss out on these notices.

### 2.4. Notices and Service Messages

You agree that we may provide notices to you in the following ways: (1) a banner notice on the Service, or (2) an email sent to an address you provided, or (3) through other means including mobile number, telephone, or mail. You agree to keep your contact information up to date.

Please review your LinkedIn.com and Slideshare.net settings to control and limit what kind of messages you receive from us.

---

When you share information, others can see, copy and use that information.

### 2.5. Messages and Sharing

Our Services allow messaging and sharing of information in many ways, such as your profile, slide deck, links to news articles, job postings, InMails and blogs. Information and content that you share or post may be seen by other Members or, if public, by Visitors. Where we have made settings available, we will honor the choices you make about who can see content or information (e.g., sharing to a group instead of your network, changing the default setting for SlideShare content from public to a more restricted view, limiting your profile visibility, or not letting people know when you change your profile, make recommendations or follow companies). Note that other activities, such as applying for a job or sending an InMail, are by default private, only visible to the addressee(s).

We are not obligated to publish any information or content on our Service and can remove it in our sole discretion, with or without notice.

Back to Top ▲

---

## 3. Rights and Limits

You own all of the content, feedback, and personal information you provide to us, but you also grant us a non-exclusive license to it.

We'll honor the choices you make about who gets to see your information and content.

You promise to only provide information and content that you have the right to share, and that your LinkedIn profile will be truthful.

### 3.1. Your License to LinkedIn

As between you and LinkedIn, you own the content and information that you submit or post to the Services and you are only granting LinkedIn the following non-exclusive license: A worldwide, transferable and sublicensable right to use, copy, modify, distribute, publish, and process, information and content that you provide through our Services, without any further consent, notice and/or compensation to you or others. These rights are limited in the following ways:

a. You can end this license for specific content by deleting such content from the Services, or generally by closing your account, except (a) to the extent you shared it with others as part of the Service and they copied or stored it and (b) for the reasonable time it takes to remove from backup and other systems.

b. We will not include your content in advertisements for the products and services of others (including sponsored content) to others without your separate consent. However, we have the right, without compensation to you or others, to serve ads near your content and information, and your comments on sponsored content may be visible as noted in the Privacy Policy.

c. We will get your consent if we want to give others the right to publish your posts beyond the Service. However, other Members and/or Visitors may access and share your content and information, consistent with your settings and degree of connection with them.

d. While we may edit and make formatting changes to your content (such as translating it, modifying the size, layout or file type or removing metadata), we will not modify the meaning of your expression.

e. Because you own your content and information and we only have non-exclusive rights to it, you may choose to make it available to others, including under the terms of a Creative Commons license.

Sign in     Join now

By submitting suggestions or other feedback regarding our Services to LinkedIn, you agree that LinkedIn can use and share (but does not have to) such feedback for any purpose without compensation to you.

You agree to only provide content or information if that does not violate the law nor anyone's rights (e.g., without violating any intellectual property rights or breaching a contract). You also agree that your profile information will be truthful. LinkedIn may be required by law to remove certain information or content in certain countries.

| | |
|---|---|
| We may change or discontinue any of our Services. We can't promise to store or keep showing any information and content you've posted. | **3.2. Service Availability**<br>We may change, suspend or end any Service, or change and modify prices prospectively in our discretion. To the extent allowed under law, these changes may be effective upon notice provided to you.<br><br>LinkedIn is not a storage service. You agree that we have no obligation to store, maintain or provide you a copy of any content or information that you or others provide, except to the extent required by applicable law and as noted in Section 3.1 of our Privacy Policy |
| When you see or use others' content and information posted on our Services, it's at your own risk.<br><br>Third parties may offer their own products and services through LinkedIn, and we aren't responsible for those third-party activities. | **3.3. Other Content, Sites and apps**<br>By using the Services, you may encounter content or information that might be inaccurate, incomplete, delayed, misleading, illegal, offensive or otherwise harmful. LinkedIn generally does not review content provided by our Members. You agree that we are not responsible for third parties' (including other Members') content or information or for any damages as result of your use of or reliance on it.<br><br>You are responsible for deciding if you want to access or use third party apps or sites that link from our Services. If you allow a third party app or site to authenticate you or connect with your LinkedIn account, that app or site can access information on LinkedIn related to you and your connections. Third party apps and sites have their own legal terms and privacy policies, and you may be giving others permission to use your information in ways we would not. Except to the limited extent it may be required by applicable law, LinkedIn is not responsible for these other sites and apps – use these at your own risk. Please see Sections 2.6 and 2.7 of the Privacy Policy. |
| We have the right to limit how you connect and interact on our Services.<br><br>We're providing you notice about our intellectual property rights. | **3.4. Limits**<br>LinkedIn reserves the right to limit your use of the Services, including the number of your connections and your ability to contact other Members. LinkedIn reserves the right to restrict, suspend, or terminate your account if LinkedIn believes that you may be in breach of this Agreement or law or are misusing the Services (e.g. violating any Do and Don'ts).<br><br>LinkedIn reserves all of its intellectual property rights in the Services. For example, LinkedIn, SlideShare, LinkedIn (stylized), the SlideShare and "in" logos and other LinkedIn trademarks, service marks, graphics, and logos used in connection with LinkedIn are trademarks or registered trademarks of LinkedIn. Other trademarks and logos used in connection with the Services may be the trademarks of their respective owners. |

Back to Top ▲

# 4. Disclaimer and Limit of Liability

| | |
|---|---|
| This is our disclaimer of legal liability for the quality, safety, or reliability of our Services. | **4.1. No Warranty**<br>TO THE EXTENT ALLOWED UNDER LAW, LINKEDIN (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) (A) DISCLAIM ALL IMPLIED WARRANTIES AND REPRESENTATIONS (E.G. WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OF DATA, AND NONINFRINGEMENT); (B) DO NOT GUARANTEE THAT THE SERVICES WILL FUNCTION WITHOUT INTERRUPTION OR ERRORS, AND (C) PROVIDE THE SERVICE (INCLUDING CONTENT AND INFORMATION) ON AN "AS IS" AND "AS AVAILABLE" BASIS.<br><br>SOME LAWS DO NOT ALLOW CERTAIN DISCLAIMERS, SO SOME OR ALL OF THESE DISCLAIMERS MAY NOT APPLY TO YOU. |
| These are the limits of legal liability we may have to you. | **4.2. Exclusion of Liability**<br>TO THE EXTENT PERMITTED UNDER LAW (AND UNLESS LINKEDIN HAS ENTERED INTO A SEPARATE WRITTEN AGREEMENT THAT SUPERSEDES THIS AGREEMENT), LINKEDIN (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) SHALL NOT BE LIABLE TO YOU OR OTHERS FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF DATA, OPPORTUNITIES, REPUTATION, PROFITS OR REVENUES, RELATED TO THE SERVICES (E.G. OFFENSIVE OR DEFAMATORY STATEMENTS, DOWN TIME OR LOSS, USE OR CHANGES TO YOUR INFORMATION OR CONTENT).<br><br>IN NO EVENT SHALL THE LIABILITY OF LINKEDIN (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) EXCEED, IN THE AGGREGATE FOR ALL CLAIMS, AN AMOUNT THAT IS THE LESSER OF (A) FIVE TIMES THE MOST RECENT MONTHLY OR YEARLY FEE THAT YOU PAID FOR A PREMIUM SERVICE, IF ANY, OR (B) US $1000. |

User Agreement | LinkedIn

Sign in     Join now

POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF THESE REMEDIES FAIL THEIR ESSENTIAL PURPOSE.

SOME LAWS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY, SO THESE LIMITS MAY NOT APPLY TO YOU.

Back to Top ▲

## 5. Termination

We can each end this Agreement anytime we want.

LinkedIn or You may terminate this Agreement at any time with notice to the other. On termination, you lose the right to access or use the Services. The following shall survive termination:

- Our rights to use and disclose your feedback;
- Members' and/or Visitors' rights to further re-share content and information you shared through the Service to the extent copied or re-shared prior to termination;
- Sections 4, 6 and 7 of this Agreement;
- Any amounts owed by either party prior to termination remain owed after termination.

You can visit our Help Center to learn how to close your LinkedIn account, close your Pulse account, or close your Slideshare account.

Back to Top ▲

## 6. Dispute Resolution

In the unlikely event we end up in a legal dispute, it will take place in California courts, applying California law.

You agree that the laws of the State of California, U.S.A., excluding its conflict of laws rules, shall exclusively govern any dispute relating to this Agreement and/or the Services. We both agree that all of these claims can only be litigated in the federal or state courts of Santa Clara County, California, USA, and we each agree to personal jurisdiction in those courts.

Back to Top ▲

## 7. General Terms

Here are some important details about how to read the Agreement.

If a court with authority over this Agreement finds any part of it not enforceable, you and us agree that the court should modify the terms to make that part enforceable while still achieving its intent. If the court cannot do that, you and us agree to ask the court to remove that unenforceable part and still enforce the rest of this Agreement. To the extent allowed by law, the English version of this Agreement is binding and other translations are for convenience only. This Agreement (including additional terms that may be provided by us when you engage with a feature of the Services) is the only agreement between us regarding the Services and supersedes all prior agreements for the Services.

If we don't act to enforce a breach of this Agreement, that does not mean that LinkedIn has waived its right to enforce this Agreement. You may not assign or transfer this Agreement (or your membership or use of Services) to anyone without our consent. However, you agree that LinkedIn may assign this Agreement to its affiliates or a party that buys it without your consent. There are no third party beneficiaries to this Agreement.

We reserve the right to change the terms of this Agreement and will provide you notice if we do and we agree that changes cannot be retroactive. If you don't agree to these changes, you must stop using the Services.

You agree that the only way to provide us legal notice is at the addresses provided in Section 10.

Back to Top ▲

## 8. LinkedIn "DOs" and "DON'Ts."

**8.1. Dos.** You agree that you will:
- Comply with all applicable laws, including, without limitation, privacy laws, intellectual property laws, anti-spam laws, export control laws, tax laws, and regulatory requirements;
- Provide accurate information to us and keep it updated;
- Use your real name on your profile;
- Use the Services in a professional manner.

Sign in      Join now

- Add content that is not intended for, or inaccurate for, a designated field (e.g. submitting a telephone number in the "title" or any other field, or including telephone numbers, email addresses, street addresses or any personally identifiable information for which there is not a field provided by LinkedIn);
- Use an image that is not your likeness or a head-shot photo for your profile;
- Create a false identity on LinkedIn;
- Misrepresent your current or previous positions and qualifications;
- Misrepresent your affiliations with a person or entity, past or present;
- Misrepresent your identity, including but not limited to the use of a pseudonym;
- Create a Member profile for anyone other than yourself (a real person);
- Invite people you do not know to join your network;
- Use or attempt to use another's account;
- Harass, abuse or harm another person;
- Send spam or other unwelcomed communications to others;
- Scrape or copy profiles and information of others through any means (including crawlers, browser plugins and add-ons, and any other technology or manual work);
- Act in an unlawful, libelous, abusive, obscene, discriminatory or otherwise objectionable manner;
- Disclose information that you do not have the right to disclose (such as confidential information of others (including your employer));
- Violate intellectual property rights of others, including patents, trademarks, trade secrets, copyrights or other proprietary rights;
- Violate the intellectual property or other rights of LinkedIn, including, without limitation, using the word "LinkedIn" or our logos in any business name, email, or URL except as provided in the Brand Guidelines;
- Use LinkedIn invitations to send messages to people who don't know you or who are unlikely to recognize you as a known contact;
- Post any unsolicited or unauthorized advertising, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation unauthorized by LinkedIn;
- Send messages to distribution lists, newsgroup aliases, or group aliases;
- Post anything that contains software viruses, worms, or any other harmful code;
- Manipulate identifiers in order to disguise the origin of any message or post transmitted through the Services;
- Create profiles or provide content that promotes escort services or prostitution.
- Creating or operate a pyramid scheme, fraud or other similar practice;
- Copy or use the information, content or data of others available on the Services (except as expressly authorized);
- Copy or use the information, content or data on LinkedIn in connection with a competitive service (as determined by LinkedIn);
- Copy, modify or create derivative works of LinkedIn, the Services or any related technology (except as expressly authorized by LinkedIn);
- Reverse engineer, decompile, disassemble, decipher or otherwise attempt to derive the source code for the Services or any related technology, or any part thereof;
- Imply or state that you are affiliated with or endorsed by LinkedIn without our express consent (e.g., representing yourself as an accredited LinkedIn trainer);
- Rent, lease, loan, trade, sell/re-sell access to the Services or related any information or data;
- Sell, sponsor, or otherwise monetize a LinkedIn Group or any other feature of the Services, without LinkedIn's consent;
- Deep-link to our Services for any purpose other than to promote your profile or a Group on LinkedIn (as set forth in the Brand Guidelines), without LinkedIn's consent;
- Remove any copyright, trademark or other proprietary rights notices contained in or on our Service;
- Remove, cover or obscure any advertisement included on the Services;
- Collect, use, copy, or transfer any information obtained from LinkedIn without the consent of LinkedIn;
- Share or disclose information of others without their express consent;
- Use manual or automated software, devices, scripts robots, other means or processes to access, "scrape," "crawl" or "spider" the Services or any related data or information;
- Use bots or other automated methods to access the Services, add or download contacts, send or redirect messages;

- Engage in "framing," "mirroring," or otherwise simulating the appearance or function of the Services;
- Access the Services except through the interfaces expressly provided by LinkedIn, such as its mobile applications, linkedin.com and slideshare.net;
- Override any security feature of the Services;
- Interfere with the operation of, or place an unreasonable load on, the Services (e.g., spam, denial of service attack, viruses, gaming algorithms); and/or
- Violate SlideShare's Community Guidelines or, if you're a commercial user of SlideShare, the SlideShare Commercial Terms of Service.

Back to Top ▲

## 9. Complaints Regarding Content

We respect the intellectual property rights of others. We require that information posted by Members be accurate and not in violation of the intellectual property rights or other rights of third parties. We provide a policy and process for complaints concerning content posted by our Members.

Back to Top ▲

## 10. How To Contact Us

If you want to send us notices or service of process, please contact us:

ONLINE at:
https://linkedin.com/help/linkedin

OR BY MAIL at:

**For Members in the United States:**
LinkedIn Corporation
Attn: Agreement Matters (Legal)
1000 West Maude Avenue
SunnyvaleCA94085
USA

**For Members outside the United States:**
LinkedIn Ireland Unlimited Company
Attn: Agreement Matters (Legal)
Wilton Plaza,
Wilton Place,Dublin 2
Ireland

Back to Top ▲

LinkedIn Corporation, Sunnyvale, California, USA, and LinkedIn Ireland Unlimited Company, Dublin, Ireland, October 23, 2014

Sign up | Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | SlideShare | Online Learning
LinkedIn Influencers | Search Jobs | Directories | Members | Jobs | Pulse | Topics | Companies | Groups | Universities | Titles | ProFinder
© 2017 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Unsubscribe

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining
Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT C



*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT D

34468\6041969.1

    🔍 Search for help with...

**BROWSE HELP TOPICS**                                                    ⌄

# Public & Private Profiles

You control the visibility and reach of your LinkedIn profile. Learn more about your profile privacy settings, customizing your public profile URL, and more.

## Articles from LinkedIn

**LinkedIn Public Profile Visibility**

**Promoting Your Public Profile**

**Finding Your LinkedIn Public Profile URL**

**Customizing Your Public Profile URL**

**Machine Translated Public Profiles on LinkedIn**

**Sections Missing from Your Public Profile**

## Help Forum questions

### Cannot send recommendations
Asked by Martin Alley 1 month ago

▮ answers ▮ upvotes

### False information
Asked by Michael Roake 1 month ago

▮ answers ▮ upvotes

### Former Employee Still Showing They Are Working For Your Company
Asked by Susan Jones 2 days ago

▮ answers ▮ upvotes

in  LinkedIn Corp © 2017

About    Contact us    Privacy and terms

***hiQ Labs, Inc. v. LinkedIn Corp.***
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining
Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT E



*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining
Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT F

 ○ Search for help with...

**BROWSE HELP TOPICS**                                              ⌄

← Public & Private Profiles

# Finding Your LinkedIn Public Profile URL

If your profile is set to public, it will have a web address (URL) you can use to share with others. To find your profile's web address:

- ◼ Click the 🔘 **M**icon at the top of your LinkedIn homepage.
- ◼ Click **View profile**.
- ◼ On your profile page, click **Edit your public profile** in the right rail.
- ◼ Under the section **Edit public profile URL** in the right rail, locate the URL.
  - • It'll be an address that starts with **www.linkedin.com/in**.

- ◼ You can copy and paste this link to share it with others.

**Notes:**

- • This link won't appear if you don't have a public profile.
- • Members who live in certain countries have a public profile URL that begins with a 2-letter code based on the country listed on their profile. For example, if you live in Canada, your public profile URL could be h**ttp://ca.linkedin.com/in/linkedinyourname.**
- • If you change the country listed on your profile, your public profile URL automatically changes. The old URLs will still work.

You can learn about **editing your profile** or check out **more information specifically about your public profile**.

Last updated: 2 months ago

Was this answer helpful?

Yes        No

LinkedIn Corp © 2017

About    Contact us    Privacy and terms

Case 3:17-cv-03301-EMC   Document 23-1   Filed 06/22/17   Page 22 of 101

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT G

34468\6041969.1

NYSE:LNKD

**Finance**     **LinkedIn Corp**   (NYSE:LNKD)        [ Add to portfolio ]                    [ More results ]

Company
   Summary
   News
   Option chain
   Related companies
   Historical prices
   Financials
Markets
News
Portfolios
Stock screener
Google Domestic Trends

Recent Quotes (180 days)

| | | chg | % |
|---|---|---|---|
| LNKD | 195.96 | – | |
| NVDA | 148.95 | +1.61 | |
| IBM | 151.11 | -1.26 | |
| AAPL | 155.11 | +0.66 | |
| AKAM | 48.31 | -0.14 | |
| BFZ | 14.43 | -0.050 | |

Create portfolio from quotes

**Income Statement**   Balance Sheet   Cash Flow

View: Quarterly Data  **Annual Data**                    Hide charts



| In Millions of USD (except for per share items) | 12 months ending 2015-12-31 | 12 months ending 2014-12-31 | 12 months ending 2013-12-31 | 12 months ending 2012-12-31 |
|---|---|---|---|---|
| Revenue | 2,990.91 | 2,218.77 | 1,528.55 | 972.31 |
| Other Revenue, Total | - | - | - | - |
| Total Revenue | 2,990.91 | 2,218.77 | 1,528.55 | 972.31 |
| Cost of Revenue, Total | 418.86 | 293.80 | 202.91 | 125.52 |
| Gross Profit | 2,572.05 | 1,924.97 | 1,325.64 | 846.79 |
| Selling/General/Admin. Expenses, Total | 1,526.86 | 1,115.70 | 747.67 | 452.90 |
| Research & Development | 775.66 | 536.18 | 395.64 | 257.18 |
| Depreciation/Amortization | 420.47 | 236.95 | 134.52 | 79.85 |
| Interest Expense(Income) - Net Operating | - | - | - | - |
| Unusual Expense (Income) | - | - | - | - |
| Other Operating Expenses, Total | - | - | - | - |
| Total Operating Expense | 3,141.85 | 2,182.63 | 1,480.73 | 915.45 |
| Operating Income | -150.94 | 36.13 | 47.81 | 56.86 |
| Interest Income(Expense), Net Non-Operating | - | - | - | - |
| Gain (Loss) on Sale of Assets | - | - | - | - |
| Other, Net | -8.53 | 0.06 | 0.02 | -0.16 |
| Income Before Tax | -214.73 | 31.20 | 49.23 | 57.11 |
| Income After Tax | -164.76 | -15.32 | 26.77 | 21.61 |
| Minority Interest | -1.38 | -0.43 | - | - |
| Equity In Affiliates | - | - | - | - |
| Net Income Before Extra. Items | -166.14 | -15.75 | 26.77 | 21.61 |
| Accounting Change | - | - | - | - |
| Discontinued Operations | - | - | - | - |
| Extraordinary Item | - | - | - | - |
| Net Income | -166.14 | -15.75 | 26.77 | 21.61 |
| Preferred Dividends | - | - | - | - |
| Income Available to Common Excl. Extra Items | -166.14 | -15.75 | 26.77 | 21.61 |
| Income Available to Common Incl. Extra Items | -166.14 | -15.75 | 26.77 | 21.61 |
| Basic Weighted Average Shares | - | - | - | - |
| Basic EPS Excluding Extraordinary Items | - | - | - | - |
| Basic EPS Including Extraordinary Items | - | - | - | - |
| Dilution Adjustment | - | 0.00 | 5.04 | 7.78 |
| Diluted Weighted Average Shares | 129.02 | 122.80 | 141.33 | 153.45 |
| Diluted EPS Excluding Extraordinary Items | -1.29 | -0.13 | 0.23 | 0.19 |
| Diluted EPS Including Extraordinary Items | - | - | - | - |
| Dividends per Share - Common Stock Primary Issue | - | - | 0.00 | 0.00 |
| Gross Dividends - Common Stock | - | - | - | - |
| Net Income after Stock Based Comp. Expense | - | - | - | - |
| Basic EPS after Stock Based Comp. Expense | - | - | - | - |
| Diluted EPS after Stock Based Comp. Expense | - | - | - | - |
| Depreciation, Supplemental | - | - | - | - |

| | | | | |
|---|---|---|---|---|
| Total Special Items | - | - | - | - |
| Normalized Income Before Taxes | - | - | - | - |
| Effect of Special Items on Income Taxes | - | - | - | - |
| Income Taxes Ex. Impact of Special Items | - | - | - | - |
| Normalized Income After Taxes | - | - | - | - |
| Normalized Income Avail to Common | - | - | - | - |
| Basic Normalized EPS | - | - | - | - |
| Diluted Normalized EPS | -1.29 | -0.13 | 0.23 | 0.19 |

Google Finance Beta available in: Hong Kong - Canada - U.S. - China - U.K.

Information is provided "as is" and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2017 Google - Google Home - Blog - Help - Report a Problem - Privacy Policy - Terms of Service

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT H

NYSE:LNKD

**Finance**    **LinkedIn Corp**  (NYSE:LNKD)    Add to portfolio    More results

**Company**
  Summary
  News
  Option chain
  Related companies
  Historical prices
  Financials
Markets
News
Portfolios
Stock screener
Google Domestic Trends

Recent Quotes (180 days)

| | chg | % |
|---|---|---|
| LNKD | 195.96 | – |
| NVDA | 148.99 | +1.65 |
| IBM | 151.11 | -1.26 |
| AAPL | 155.12 | +0.67 |
| AKAM | 48.29 | -0.16 |
| BFZ | 14.43 | -0.050 |

Create portfolio from quotes

**Income Statement** | Balance Sheet | Cash Flow

View: **Quarterly Data** | Annual Data                                    Hide charts



| In Millions of USD (except for per share items) | 3 months ending 2016-09-30 | 3 months ending 2016-06-30 | 3 months ending 2016-03-31 | 3 months ending 2015-12-31 | 3 months ending 2015-09-30 |
|---|---|---|---|---|---|
| Revenue | 959.79 | 932.71 | 860.65 | 861.89 | 779.60 |
| Other Revenue, Total | - | - | - | - | - |
| Total Revenue | 959.79 | 932.71 | 860.65 | 861.89 | 779.60 |
| Cost of Revenue, Total | 119.77 | 120.53 | 117.53 | 119.00 | 111.37 |
| Gross Profit | 840.01 | 812.19 | 743.12 | 742.90 | 668.23 |
| Selling/General/Admin. Expenses, Total | 432.61 | 442.41 | 429.44 | 411.93 | 384.32 |
| Research & Development | 246.42 | 235.93 | 237.62 | 217.26 | 202.68 |
| Depreciation/Amortization | 137.93 | 139.40 | 142.28 | 129.59 | 117.90 |
| Interest Expense(Income) - Net Operating | - | - | - | - | - |
| Unusual Expense (Income) | - | - | - | - | - |
| Other Operating Expenses, Total | - | - | - | - | - |
| Total Operating Expense | 936.74 | 938.26 | 926.87 | 877.79 | 816.28 |
| Operating Income | 23.05 | -5.55 | -66.22 | -15.89 | -36.68 |
| Interest Income(Expense), Net Non-Operating | - | - | - | - | - |
| Gain (Loss) on Sale of Assets | - | - | - | - | - |
| Other, Net | -1.60 | -1.77 | -2.21 | -2.01 | -10.68 |
| Income Before Tax | 12.81 | -18.09 | -78.28 | -31.98 | -57.34 |
| Income After Tax | 9.11 | -118.74 | -45.32 | -7.91 | -46.91 |
| Minority Interest | -0.55 | -0.53 | -0.51 | -0.51 | -0.51 |
| Equity In Affiliates | - | - | - | - | - |
| Net Income Before Extra. Items | 8.56 | -119.27 | -45.83 | -8.43 | -47.42 |
| Accounting Change | - | - | - | - | - |
| Discontinued Operations | - | - | - | - | - |
| Extraordinary Item | - | - | - | - | - |
| Net Income | 8.56 | -119.27 | -45.83 | -8.43 | -47.42 |
| Preferred Dividends | - | - | - | - | - |
| Income Available to Common Excl. Extra Items | 8.56 | -119.27 | -45.83 | -8.43 | -47.42 |
| Income Available to Common Incl. Extra Items | 8.56 | -119.27 | -45.83 | -8.43 | -47.42 |
| Basic Weighted Average Shares | - | - | - | - | - |
| Basic EPS Excluding Extraordinary Items | - | - | - | - | - |
| Basic EPS Including Extraordinary Items | - | - | - | - | - |
| Dilution Adjustment | - | - | - | - | - |
| Diluted Weighted Average Shares | 135.14 | 134.13 | 132.78 | 131.58 | 130.72 |
| Diluted EPS Excluding Extraordinary Items | 0.06 | -0.89 | -0.35 | -0.06 | -0.36 |
| Diluted EPS Including Extraordinary Items | - | - | - | - | - |
| Dividends per Share - Common Stock Primary Issue | 0.00 | 0.00 | 0.00 | - | 0.00 |
| Gross Dividends - Common Stock | - | - | - | - | - |
| Net Income after Stock Based Comp. Expense | - | - | - | - | - |
| Basic EPS after Stock Based Comp. Expense | - | - | - | - | - |
| Diluted EPS after Stock Based Comp. Expense | - | - | - | - | - |
| Depreciation, Supplemental | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Depreciation, Supplemental | - | - | - | - | - |
| Total Special Items | - | - | - | - | - |
| Normalized Income Before Taxes | - | - | - | - | - |
| Effect of Special Items on Income Taxes | - | - | - | - | - |
| Income Taxes Ex. Impact of Special Items | - | - | - | - | - |
| Normalized Income After Taxes | - | - | - | - | - |
| Normalized Income Avail to Common | - | - | - | - | - |
| Basic Normalized EPS | - | - | - | - | - |
| Diluted Normalized EPS | 0.06 | -0.89 | -0.35 | -0.06 | -0.36 |

Google Finance Beta available in: Hong Kong - Canada - U.S. - China - U.K.

Information is provided "as is" and solely for informational purposes, not for trading purposes or advice, and may be delayed.
To see all exchange delays, please see disclaimer.

©2017 Google - Google Home - Blog - Help - Report a Problem - Privacy Policy - Terms of Service

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT I

# BUSINESS INSIDER

# MICROSOFT BUYS LINKEDIN FOR $26.2 BILLION



**STEVEN TWEEDIE**
JUN. 13, 2016, 8:31 AM

Microsoft is buying LinkedIn for $26.2 billion, the company announced on Monday.

Microsoft will pay $196 per share for the company.

LinkedIn CEO Jeff Weiner will remain CEO of the social network for professionals, reporting directly to Microsoft CEO Satya Nadella.

Under the terms of the acquisition, LinkedIn will maintain its "distinct brand, culture, and independence" — similar to how Facebook handled its acquisition of WhatsApp — and Microsoft says LinkedIn cofounder and chairman Reid Hoffman and Weiner "both fully support" the purchase, with both boards signing off.

The deal is expected to be completed this calendar year.

LinkedIn shares jumped more than 47% following the news when the markets opened. Microsoft shares, which were halted in pre-market trading pending the news, have since reopened and fallen about 4%.

Nadella announced the news to Microsoft employees in an email Monday morning, which you can read here. LinkedIn CEO Jeff Weiner also sent an email to staff, which you can read here.

Microsoft CEO Satya Nadella.

*Getty Images/Mat Hayward*



LinkedIn CEO Jeff Weiner.

*Chip Somodevilla/Getty*

## Integrating LinkedIn into existing Microsoft software

"This deal brings together the world's leading professional cloud with the world's leading professional network," Nadella wrote in the email. "I have been learning about LinkedIn for some time while also reflecting on how networks can truly differentiate cloud services. It's clear to me that the LinkedIn team has grown a fantastic business and an impressive network of more than 433 million professionals."

Nadella went on to mention how Microsoft's Office software suite could be combined with LinkedIn's network in the future, such as the ability for Microsoft to serve up suggestions for a specialized expert through LinkedIn when its software recognizes you're trying to complete a specific task.

LinkedIn will also be able to plug into Office to detect the kind of project you're working on, which the social network will then use to surface relevant articles to infuse into your LinkedIn news feed.

"We are in pursuit of a common mission centered on empowering people and organizations. Along with the new growth in our Office 365 commercial and Dynamics businesses this deal is key to our bold ambition to reinvent productivity and business processes," Nadella wrote.

"Think about it: How people find jobs, build skills, sell, market and get work done and ultimately find success requires a connected professional world. It requires a vibrant network that brings together a professional's information in LinkedIn's public network with the information in Office 365 and Dynamics. This combination will make it possible for new experiences such as a LinkedIn newsfeed that serves up articles based on the project you are working on and Office suggesting an expert to connect with via LinkedIn to help with a task you're trying to complete.

"As these experiences get more intelligent and delightful, the LinkedIn and Office 365 engagement will grow. And in turn, new opportunities will be created for monetization through individual and organization subscriptions and targeted advertising."

You can read Microsoft's full announcement here, or watch Nadella and Weiner discuss the purchase in the video below:

Satya Nadella and Jeff Weiner on Microsoft acquiring LinkedIn



Get the latest Microsoft stock price here.

Case 3:17-cv-03301-EMC    Document 23-1    Filed 06/22/17    Page 33 of 101

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining
Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT J



Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation
1000 W. Maude Avenue
Sunnyvale, CA 94085
abajoria@linkedin.com

May 23, 2017

*Via Email* to sales@hiqlabs.com

Mark Weidick
hiQ Labs, Inc.
575 Market Street, #850
San Francisco, CA 94105

**RE**:  **Demand to Immediately Cease and Desist Unauthorized Data Scraping and other Violations of LinkedIn's User Agreement**

Mr. Weidick:

I write on behalf of LinkedIn Corporation ("LinkedIn").  It has come to LinkedIn's attention that hiQ Labs, Inc. ("hiQ") has used and is using processes to improperly, and without authorization, access and copy data from LinkedIn's website, www.linkedin.com.  This is not acceptable.

hiQ's software offered at www.hiqlabs.com is impermissibly and illegally accessing and scraping data from LinkedIn.  Indeed, hiQ's website explains how its product improperly incorporates skills data from LinkedIn's website:

- Explore the skills that your employees are self-curating on the web and augment/update your company's database of employee competencies.
- Because Skill Mapper is based on publicly available data, you can explore the full scope of your workforce's skills, including skills from previous and current roles.

*See* https://www.hiqlabs.com/solutions.  Moreover, hiQ has stated during marketing presentations that its Skill Mapper product is built on profile data from LinkedIn, and that this data is "refreshed" every two weeks.  There can thus be no doubt that hiQ's product copies and scrapes data from LinkedIn, including "skills" information from the LinkedIn profiles of LinkedIn members.

LinkedIn has earned its members' trust by acting vigilantly to keep their data secure. hiQ's actions and products violate this trust, as well as several provisions of LinkedIn's User Agreement (found at https://www.linkedin.com/legal/user-agreement).  In particular, among other things, LinkedIn's User Agreement prohibits the following:

May 23, 2017
Page 2 of 3

- Scrape or copy profiles and information of others through any means (including crawlers, browser plugins and add-ons, and any other technology or manual work);
- Copy or use the information, content or data of others available on the Services (except as expressly authorized);
- Rent, lease, loan, trade, sell/re-sell access to the Services or any related information or data;
- Share or disclose information of others without their express consent; and
- Use manual or automated software, devices, scripts robots, other means or processes to access, "scrape," "crawl" or "spider" the Services or any related data or information.

As demonstrated above, hiQ is violating each of these provisions.

To be clear, hiQ's prior and present access of LinkedIn's website and/or servers violates LinkedIn's User Agreement and the law.  hiQ's company page on LinkedIn has been restricted. Any future access of any kind by hiQ is without permission and without authorization from LinkedIn.  Further, LinkedIn has implemented technical measures to prevent hiQ from accessing, and assisting others to access, LinkedIn's site, through systems that detect, monitor, and block scraping activity.  Circumventing these technical measures and accessing LinkedIn's website without LinkedIn's authorization constitute violations of multiple state and federal laws, including but not limited to:

- California Penal Code Section 502(c);
- Federal Computer Fraud and Abuse Act (18 U.S.C. §§1030);
- State common law of trespass; and
- the Digital Millennium Copyright Act (17 U.S.C. §§512, 1201).

*See, e.g., Craigslist Inc. v. 3Taps Inc. et al* (N.D. Cal., Aug. 16, 2013) (ignoring revocation of permissions to access, and circumventing IP blocking measures, constitutes a violation of the CFAA); *Facebook, Inc. v. Power Ventures, Inc.,* No. 13-17102, 2016 WL 3741956, at *8 (9th Cir. July 12, 2016) (defendant who "disregarded the cease and desist letter . . . accessed Facebook's computers 'without authorization' within the meaning of the CFAA and is liable under that statute").

Accordingly, LinkedIn demands that hiQ immediately:

1. Cease and desist accessing or attempting to access or use LinkedIn's website, computers, computer systems, computer network, computer programs, and data stored therein (whether directly or through third parties);

2. Destroy all data, documents, and other items, electronic or otherwise, in their possession, custody, or control, that were copied, extracted or otherwise derived from LinkedIn's website (whether directly, indirectly, via members, or from other third parties); and

May 23, 2017
Page 3 of 3

    3.   Cease and forever desist from any conduct inducing members to violating LinkedIn's User Agreement and Privacy Policy, including but not limited to offering software or services the use of which by members violates LinkedIn's User Agreement and Privacy Policy.

    LinkedIn would prefer to resolve this matter amicably, and I look forward to your response by May 31.  This letter is not a recitation of all of the facts pertaining to this matter or all of LinkedIn's possible claims.  Accordingly, LinkedIn is not waiving any of its rights and remedies, all of which LinkedIn expressly reserves.  If hiQ does not comply with the requests set forth in this letter, LinkedIn reserves all of its rights and remedies, including legal action.

Regards,

Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT K



**DEEPAK GUPTA**
dgupta@fbm.com
D 415.954.4419

May 31, 2017

*Via E-Mail to abajoria@linkedin.com*

Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation
1000 W. Maude Avenue
Sunnyvale, CA 94085

Re:     Cease and Desist Letter to hiQ Labs, Inc.

Dear Abhishek:

We are writing on behalf of hiQ Labs, Inc. in response to your letter dated May 23, 2017 and further to our teleconference of May 30, 2017.  As LinkedIn's cease and desist request poses an existential threat to hiQ in its current form, your letter combined with your uncompromising posture on our phone call puts the company in a very difficult position.  We reiterate our request, made on the May 30 call, that you immediately restore hiQ's access to public LinkedIn data and arrange a face-to-face meeting of business principals. This will allow hiQ to continue functioning as a business and give the parties the time they need to engage in discussions so that LinkedIn can better understand hiQ's business and hiQ can better understand LinkedIn's concerns.  Absent that, you leave hiQ with few options.

Your letter mentions concerns about "data security" and "member trust."  We want to make sure there is no misunderstanding on LinkedIn's part as to what hiQ does.  hiQ collects public profile data from LinkedIn's users and analyzes these profiles to help employers understand (a) which of their employees are at the greatest risk of being recruited away ("Keeper"), and (b) the range of skills possessed by their workforce ("Skill Mapper").  These services are very much in line with the core focus of LinkedIn, which is to create economic opportunities for professionals in their careers.

hiQ in no way accesses LinkedIn member private data or any area of LinkedIn's website requiring a password; it merely accesses data which LinkedIn's members have expressly made public.  LinkedIn publicly acknowledges that this data belongs to members, not to LinkedIn, and LinkedIn in fact promotes itself as a networking platform where this information will be publicly shared precisely to encourage members to join LinkedIn.  We are thus straining to understand how these activities in any way present a security or trust issue for LinkedIn.  Quite the opposite; the existence of hiQ enhances the value of having a LinkedIn public profile, which in the long run enriches LinkedIn.

Abhishek Bajoria
May 31, 2017
Page 2



As we discussed on our phone call, LinkedIn has for several years been aware of hiQ's synergistic activities and has participated in hiQ's Elevate conference on data analytics issues. LinkedIn has spoken at hiQ's events and employee Lorenzo Canlas even accepted hiQ's "Impact Award."  hiQ has always operated in LinkedIn's plain view and with its support, so we are at a loss to understand the sudden (and potentially devastating) change of direction represented by your letter.  hiQ is presently in the midst of a financing round, which is now endangered because of your letter.

When, on our phone call, we asked whether hiQ's activities caused any injury to LinkedIn, you stated you did not know.  When asked whether hiQ's business was in fact synergistic to LinkedIn, you stated you did not know.  Notably, your letter does not suggest that data collection by hiQ is impairing or interfering with LinkedIn servers, and in our phone call you were unable to identify any such impairment or interference.

The only reason that you stated lies behind LinkedIn's decision to revoke hiQ's access is an alleged violation of the User Agreement.  But those terms are not enforceable against persons or entities that merely visit the website to view or use public information.  Moreover, the User Agreement is so overbroad as to be, in our view, meaningless:

- The User Agreement states it is forbidden to "[s]crape or copy profiles" through "crawlers," "automated software," and "script robots."  Yet Google and Bing access LinkedIn using scrapers and robots.  And LinkedIn itself provides an automated feature to create a local PDF copy of profiles, which it then instructs that users may print (thereby creating a second "copy").
  <<https://www.linkedin.com/help/linkedin/answer/4281/printing-a-profile?lang=en.>> Thus, far from blocking the putatively prohibited actions, LinkedIn invites them.

- The User Agreement prohibits "copying profiles" through "manual work," yet every time people visit LinkedIn using a web browser they are engaging in "manual work" that creates a "copy" of a profile on their screen, a "copy" in their computer's memory and a "copy" on their hard drive.  The ordinary operation of LinkedIn demands a breach of this provision.

- The User Agreement prohibits anyone from "us[ing], the content or data of others available on the Services (except as expressly authorized)."  This means any time someone views a member profile and "uses" some information – e.g. sends an email to the address on their LinkedIn profile – he or she must first request "express permission" before sending the email.  This, no one does.

- Similarly, the User Agreement forbids a member to "[s]hare or disclose information of others without their express consent."  Yet LinkedIn itself provides a "Share Profile" feature.  <<https://www.linkedin.com/help/linkedin/answer/1627.>>  It also provides a convenient "share" button for users to share the posts of others.  Unsurprisingly, these features do not first require "express permission" before sharing.

Abhishek Bajoria
May 31, 2017
Page 3



We understand LinkedIn's position to be that anytime someone engages in any of the above acts, he or she is in violation of the law.  Yet as shown above, these provisions are so self-contradictory that no LinkedIn user could reasonably be expected to comply with them.

Candidly, we have some concern that LinkedIn's sudden focus on hiQ may be for an anti-competitive purpose.  A page on the LinkedIn website states that it is investing now in its own internal data science projects.  *See* <<https://engineering.linkedin.com/data>>  Is it LinkedIn's position that it alone can perform data analysis on LinkedIn *public* profile pages?

The cases you cite arose under very different circumstances and did not involve potential anticompetitive motivations or conduct.

While we would like to reach an amicable resolution, we do not believe that hiQ has done anything unlawful.  To the contrary, we believe that LinkedIn's activity would be enjoined in a court of law and LinkedIn would face monetary exposure under, at minimum, the following list of theories:

- Common law promissory estoppel – LinkedIn is estopped from revoking hiQ's access to public profile pages because LinkedIn was aware that hiQ was relying on these expressly public pages for several years, and never threatened to revoke access; rather it participated and encouraged hiQ.  hiQ's reliance was justifiable and it is thus entitled to continue using LinkedIn's avowed public pages in its business.

- Common law intentional interference with contract and prospective advantage – LinkedIn induced members into joining by offering them the ability to create putatively "public profiles" and is now wrongfully making those profiles "non-public," at least as to hiQ.  hiQ has millions of dollars' worth of business that now hangs in the balance because of LinkedIn's wrongful bait and switch.[1]

- California unfair competition and antitrust law – LinkedIn may not use its market power as the world's largest professional network to squelch competition in the neighboring field of data analytics.

- California Free Speech/First Amendment – Social networks are the new "town square."  Much like the shopping mall in *Robins v. Pruneyard Shopping Center*, 592 P. 2d 341 (Cal. 1979) and *Fashion Valley Mall, LLC v. NLRB*, 172 P. 3d 742 (Cal. 2007), LinkedIn opened itself up to the "public," so it may not now selectively exclude those members of the public whom it dislikes.  Furthermore, it is apparent that LinkedIn is using the CFAA as an end run around the Copyright Act: you stated many times on our call that the alleged wrong by hiQ was "copying" webpages en masse.  However, "copyright law

---

[1] hiQ's current customers include eBay, Capital One, and GoDaddy.  Prospective customers include Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite.

Abhishek Bajoria
May 31, 2017
Page 4



contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186 (2003). These include the requirement of ownership, the defense of license, the idea-expression dichotomy, and the fair use doctrine. These limits on copyright law would immunize hiQ here, but by cloaking its allegations of improper "copying" in the garb of the CFAA, LinkedIn is attempting to circumvent the First Amendment protections of copyright law.

This is a non-exclusive listing of the protections to which hiQ is entitled. We are prepared to protect hiQ's legal rights in court if necessary; LinkedIn's tactics pose a grave threat to hiQ's continued existence. But we would prefer to amicably resolve this matter as you have proposed. We ask that you promptly agree to stop denying hiQ access to LinkedIn's public pages, withdraw your cease and desist demand, and engage in meaningful discussions to try to resolve the matter. In the meantime, we ask LinkedIn to preserve all records, data and documents, however stored, that mention, refer or relate to hiQ or to any desire, plan or effort to enter the data analytics business.

Very truly yours,

Deepak Gupta

DZG:ll

34556\5996250.1

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT L



# LinkedIn Q4 2014 Quarterly Results Transcript

**LinkedIn Participants:**
Matt Sonefeldt – Head of Investor Education, LinkedIn
Jeff Weiner – Chief Executive Officer, LinkedIn
Steve Sordello – Chief Financial Officer, LinkedIn
Douglas Anmuth – JP Morgan
Gene Munster – Piper Jaffray
Stran Lee – CLSA
Peter Stabler – Wells Fargo
Dan Salmon – BMO Capital Markets
Brian Pitz – Jefferies
Stephen Ju – Credit Suisse
Justin Post – Bank of America Merrill Lynch
Kerry Rice – Needham
Mark Mahaney – RBC Capital Markets
John Blackledge – Cowen



# LinkedIn Q4 2014 Quarterly Results Transcript

**Mountain View, Calif. – February 5, 2015**

**[Matt Sonefeldt, Investor Education, LinkedIn]**

Good afternoon. Welcome to LinkedIn's fourth quarter of 2014 earnings call.  Joining me today to discuss our results are CEO Jeff Weiner, and CFO Steve Sordello.

Before we begin, I would like to remind you that during the course of this conference call, management will make forward-looking statements which are subject to various risks and uncertainties. These include statements relating to expected member growth and engagement, our product offerings including mobile and our product deployment process, the results of our R&D efforts, revenue including revenue growth rates of our 3 product lines talent solutions, marketing solutions, and premium subscriptions, adjusted EBITDA, depreciation and amortization, stock based compensation, share dilution, taxes, the product mix between online and field sales, churn rate and expenses. Actual results may differ materially from the results predicted and reported results should not be considered as an indication of future performance. A discussion of risks and uncertainties related to our business is contained in our filings with the Securities and Exchange Commission, in particular the section entitled "Risk Factors" in our quarterly and annual reports, and we refer you to these filings.

Also, I would like to remind you that during the course of this conference call, we may discuss some non-GAAP measures in talking about the company's performance.  Reconciliations to the most directly comparable GAAP financial measures are provided in the tables in our earnings release.

This conference call is also being broadcast on the Internet and is available through the investor relations section of the LinkedIn website.

With that, I will turn the call over to our CEO Jeff Weiner.

**[Jeff Weiner, CEO, LinkedIn]**

Thank you, Matt, and welcome to today's conference call.

I'll start by summarizing the operating results for the fourth quarter and full year of 2014, and I'll recap some of the key milestones that highlight the success of our strategy.

I'll then turn it over to Steve for a more detailed look at the numbers and outlook.

Q4 was a strong quarter, bringing to a close another successful year of growth and innovation. One year ago, we began a number of multi-year strategic investments in the platform. We continued our transition from desktop to mobile, and also focused on initiatives in jobs, content, and global expansion. While still early, we made significant progress on these priorities in 2014, and maintained solid growth across all member ecosystem metrics while delivering record financial results.

For Q4, overall revenues grew 44 percent to a record $643 million. We delivered adjusted EBITDA of $179 million, and non-GAAP EPS of $0.61 cents. For the full year 2014, revenue was $2.22 billion, up 45 percent, and we delivered adjusted EBITDA of $592 million, and a non-GAAP EPS of $2.02.

In Q4, our platform continued to show strong momentum, as measured by unique visiting



members and member pageviews. During Q4, cumulative members grew 25 percent to 347 million, unique visiting members grew 23 percent to an average of 93 million per month, and member pageviews grew 34 percent, well ahead of unique member growth. Again we saw a year over year increase in member pageviews per unique visiting member, demonstrating strengthening organic engagement. Our reach is much broader when including SlideShare, which approached nearly 70 million monthly unique visitors during Q4.

LinkedIn creates value for members by connecting them to the people, knowledge, and opportunities that matter most to them professionally. Today, we do this for nearly one-half of the world's professionals and students. Yet, our vision is to create economic opportunity for every member of the global workforce -- all 3 billion of them -- by building the world's first economic graph. In the last year, we've made meaningful strides against several of our multi-year initiatives that will help us achieve our vision.

Mobile was a top strategic priority for LinkedIn in 2014, and we focused our resources to ensure that our product and engineering organizations were fully mobilized. In 2014, we continued to execute against our multi-app strategy, which now includes our flagship LinkedIn app, Connected, Pulse, Jobs, and Slideshare. For our talent acquisition customers, we improved the Recruiter app, and we released a new Sales Navigator app for outbound sales customers. In the fourth quarter, mobile accounted for 49 percent of unique member visits to LinkedIn and is growing at double the rate of overall member activity.

Increasing the scale and relevance of jobs on LinkedIn was also a major investment in 2014, aligned with our core value proposition of helping connect members to the right opportunities. Early in the year we acquired Bright, and shortly afterwards we began adding open job listings to LinkedIn, targeted to active job seekers and making LinkedIn more attractive to hiring managers. There are now more than 3 million active job listings on LinkedIn, a greater-than 10x increase from a year ago. Our long-term goal is to have every available job in the world on LinkedIn. To achieve this, we are expanding on our ability to create better insights for our job-seeking members and ultimately put more relevant job opportunities in front of them. Our mobile Jobs app, which we launched last year, continues to show strong momentum, with more than a million downloads to date and a four star rating.

The growth of original content on our platform was another strategic priority in 2014, consistent with our goal of having all of the world's professionally relevant knowledge accessible through LinkedIn. In February, we introduced the ability to publish long-form content, allowing our members to augment their professional identities with their unique knowledge. Upon seeing rapid adoption and meaningful social engagement with these posts, we steadily accelerated the rollout of this functionality. By year's end, we made long-form posting available to all 230 million English-language members, on our way to eventually making this functionality available to LinkedIn members globally. We surpassed more than 1 million long-form posts on the platform, and we recently saw our first week with more than 50,000 new posts. Meanwhile, our roster of hundreds of professional Influencers continue to use LinkedIn to deliver compelling content to our members. A few weeks ago, Valerie Jarrett, senior advisor to President Obama, turned to LinkedIn to break news of the administration's new paid family leave initiatives. Her post has received nearly 400,000 views and thousands of likes, comments and shares.

Rich media also continues to grow on our platform. Slideshare now hosts more than 17 million presentations and videos, demonstrating strong progress toward our goal of making it the largest repository of professional knowledge on the Internet. Increasingly, we are seeing more well-known business influencers such as Eric Schmidt, Arianna Huffington and Suze Orman, use SlideShare to engage an active professional audience that is seeking out deep knowledge on specific subjects.

Expanding LinkedIn internationally has also been a major initiative. In Q4, more than 75 percent of new members came to LinkedIn from outside the US. China, with roughly one in five of the



world's professionals, emerged as a focus in 2014. In February, we launched our local Simplified Chinese version of the platform. Prior to this launch, there were 4 million English-language members in China. Currently, we have more than 8 million members in China. And earlier this quarter, our ICP license application for our local Chinese LinkedIn site was approved.

Creating value for our members enables us to deliver useful offerings to customers of our Talent Solutions, Marketing Solutions, and Premium Subscriptions products. These product lines transform the way our customers Hire, Market, and Sell on a global basis. In Q4, Talent Solutions grew 41 percent to $369 million; Marketing Solutions was up 56 percent to $153 million; and Premium Subscriptions increased 38 percent to $121 million.

For Talent Solutions, 2014 was a year of strategic investments in both our flagship Recruiter product and in our field sales team. At our annual Talent Connect conference, we introduced powerful new search capabilities to Recruiter that simplify the experience for hiring managers, as well as tools that help recruiters find the best fits for their particular companies. More broadly, our efforts to add millions of job listings to the platform should provide benefits to both recruiters and hiring managers who are looking to fill open positions with the best active job seekers.

For Marketing Solutions, in 2014 we made progress against two of our key initiatives -- the transition to a more scalable content marketing platform, and the creation of a full-funnel end-to-end product portfolio. Sponsored Updates continues to show strong momentum, now accounting for approximately one-third of total Marketing Solutions revenue. And with the acquisition and integration of Bizo, we are now ready to relaunch our Marketing Solutions product suite. We believe this will make LinkedIn the most effective integrated platform for marketers to reach, nurture, and acquire professional customers. We are currently in the process of transitioning our global marketing solutions sales force to deliver this new suite at scale.

Within Premium Subscriptions, 2014 saw the simplification of our various member-facing offerings, while investing heavily in our Sales Navigator flagship product. We are off to a strong start with Sales Navigator, which we believe will scale into our third, large vertically-focused product line following Talent Solutions and Marketing Solutions.

As we begin 2015, LinkedIn remains focused on our core strategic priorities. For our members, it's about connecting them to the people, knowledge and opportunities that matter most to them professionally. With regard to helping members build and nurture their professional relationships, we'll continue to invest in our profile and networking functionality on the platform, such as the flagship and Connected applications. Related to professional knowledge, we are committed to growing our publishing platform, making Slideshare the largest professional content repository on the Internet, and making Pulse the best application for relevant content based on who you are and who you know. And with regard to connecting our members to the right opportunities, we'll continue to make it easier to find the right jobs and get hired through our Jobs application by leveraging the scale and data of our platform.

On the customer side, we remain focused on helping companies Hire, Market, and Sell. In Talent Solutions, we are addressing key unmet needs in the marketplace for hiring managers by simplifying the search experience, streamlining the referral process, and making talent branding more powerful. In Marketing Solutions, we will integrate Bizo into a full-funnel solution that can be used both on and off the LinkedIn network. For Sales Solutions, we'll continue to educate the market around the power of social selling. And ==this year, we plan to enter a new category with products allowing companies to utilize LinkedIn in the enterprise by leveraging content and data that members are already sharing publicly.==

And now, I'll turn it over to Steve for a deeper dive into our operating metrics and financials.



**[Steve Sordello, CFO, LinkedIn]**

Thanks Jeff,

Today, I will discuss growth rates on a year-over-year basis unless indicated otherwise, and non-GAAP financial measures exclude items, such as stock-based compensation expenses, amortization of intangibles, and the tax impacts of these adjustments.

The fourth quarter underscored a strong 2014 for LinkedIn. We made progress on many of our long-term investments. We ended the year with positive momentum across the business portfolio, ranging from growing organic engagement in our member platform, to strong performance across all three product lines. As a result, we generated revenue growth consistent with prior quarters, and record levels of Non-GAAP Net Income and Adjusted EBITDA.

Specific to LinkedIn members, Jeff highlighted the trend of strengthening organic engagement, driven in particular by the shift to mobile and a richer content experience. We continue to invest in creating a platform that delivers value to members across specific professional use cases.

One example of a key 2014 investment was relevance, an area showing early positive results. The redesigned desktop homepage began gradually ramping in December. Members on the new experience have meaningfully increased engagement with news, publishing members, and social interactions - driving an approximate 90 percent increase in social activity. Wins like homepage relevance drive our investment into the member platform, where a stronger member experience expands our long-term monetization potential.

With regard to monetization, revenue totaled $643 million, an increase of 44 percent year-over-year.

Talent Solutions performed well during the year's seasonally strong quarter, growing 41 percent year-over-year to $369 million, and representing 57 percent of sales versus 58 percent last year.

Field sales comprised 77 percent of Talent Solutions revenue, and showed continued balance through our land and expand strategy. Pulling forward salesforce hiring was a key 2nd half investment, an initiative spanning reps for both customer acquisition and relationship management. Our conviction to accelerate investment stems from increased visibility into our long-term opportunity, which we outlined in our second quarter results. As a reminder, we see a pipeline for Talent Solutions in excess of $10 billion against the broader $27 billion full-time hiring market.

- New customer acquisition showed particular strength, even in well-established markets. For example, our large enterprise customers in North America drove more than expected new business, suggesting healthy headroom in more mature regions. Overall customer growth remained strong, increasing to over 33,000 customers.

- Business with existing customers was a particular point of strength, driven in our core markets in North America, EMEA, and with global strategic customers. The net ratio saw a strong seasonal uptick, helped in part by record low churn on a global basis. For the full year, the net ratio was essentially flat versus 2013 on a much larger book of business, strength we believe can continue into 2015.

In addition, the online channel generated solid performance. The job seeker subscription showed a meaningful increase in subscribers generated by the new self-serve purchasing experience. At the same time, self-serve jobs showed slower growth, a byproduct of pushing SMB accounts with larger upside into the field channel.

Marketing Solutions grew 56 percent to $153 million, representing 24 percent of total sales versus



22 percent last year. Powered by Sponsored Updates, our core business grew 40 percent year-over-year excluding Bizo, an improvement versus last quarter. This is a positive result given the comparison to Q4'13 when Sponsored Updates began fully ramping.

- The field sales channel generated strong performance on several dimensions, with greater than 20 percent growth in both spend per customer and total customers.

- Also, the number of field sales customers buying multiple products increased by nearly 50 percent. This dynamic has helped overall desktop display perform in excess of our expectations throughout the year, despite the challenge of slower desktop inventory growth.

- Sponsored Updates across both channels grew 50 percent quarter over quarter, and well over 3x vs last year. Effective pricing increased greater than 40 percent versus last year as we benefitted from strong click thru rates and growing demand in the auction.

As it relates to Bizo and our broader strategy:

- During the fourth quarter, Bizo contributed approximately $16 million to Marketing Solutions. The Bizo sales team closed a strong Q4, seeing a pull forward in demand ahead of the relaunch of our product suite. Included in the $16 million was approximately $4 million in data licensing revenue that will be discontinued going forward.

- More importantly, last year's Bizo acquisition represented a large step on the Marketing Solutions strategic roadmap, and we are pleased with the progress we've made against our integration plan.

- In Q4, we successfully joined our R&D teams to begin development on the re-envisioned product suite, which will launch in coming months. In Q1, we are unifying and training the LinkedIn and Bizo salesforce in preparation of introducing this integrated portfolio aimed at helping marketers reach, nurture, and ultimately acquire prospects.

Premium Subscriptions grew 38 percent to $121 million, contributing 19 percent of revenue, compared to 20 percent last year.

- As a reminder, we rolled out a simplified buying experience in Q4, reducing SKUs, better educating customers, de-emphasizing email marketing, and standardizing free trials. This drove a small downward revenue impact that we believe will be slightly larger in Q1 given the larger typical seasonal sign-up volume in the first quarter.

- More importantly, we believe the longer-term impact will increase the lifetime value per subscriber and lift overall revenue. To date, we have seen an increase in the number of new subscribers, and improvement in renewal rates.

Sales Solutions outpaced our expectations in the first full quarter post launch of the flagship Sales Navigator. While the majority of Sales Solutions remains online, field sales showed particularly strong performance as the primary driver behind growth.

- We have migrated virtually all enterprise customers to the new product, and encouragingly, churn has improved versus last year.

- We are seeing strong performance with larger customers on both new customer acquisition as well as renewals. The SAP deal is an example of larger enterprises finding value in social selling. And similar to Talent Solutions, we are seeing the land & expand model take root.



Our business continues to become more global. In Q4, international represented 40 percent of overall revenue versus 39 percent last year. By channel, field sales contributed 64 percent of revenue versus 61 percent last year.

Moving to the non-GAAP financials, revenue outperformance resulted in Adjusted EBITDA of $179 million, a 28 percent margin compared to $111 million and 25 percent margin last year.

Depreciation and amortization totaled $71 million while stock-based compensation was $94 million. On taxes, GAAP expense was $4 million with a positive impact from the R&D tax credit, creating a $16 million benefit. Non-GAAP tax expense was $42 million, reflecting the static 35 percent non-GAAP tax rate implemented in 2014.

GAAP net income was $3 million, resulting in earnings of two cents per share, compared to three cents last year. As a reminder, GAAP Net Income now includes a non-cash interest expense related to the convertible offering. The fourth quarter expense was $6 million, and will be approximately $11-12 million per quarter in 2015.

Non-GAAP net income was $77 million, resulting in earnings of 61 cents per share, compared with $48 million and 39 cents last year.

With respect to the balance sheet, the November convertible offering further strengthened our cash position with minimal dilution and interest, while providing flexibility to invest in our strategic roadmap. We ended the year with $3.4 billion of cash and marketable securities.

Free cash flow for the full year was $21 million; however, cash flow and capex were impacted by approximately $180 million in 2nd half property purchases in Dublin and Silicon Valley. We believe both geographies will help create centralized scale for our employees over the long-term. Without the property acquisitions, free cash flow would have been approximately $200 million in 2014, a positive result considering the level of investment in our self-managed datacenter project and global facilities expansion.

I will end the call with guidance for the first quarter and our initial outlook for 2015.

Revenue guidance for 2015 incorporates continued strength in our core business, a growing contribution throughout the year from key strategic initiatives, and the planned transitions in Marketing Solutions and Premium Subscriptions during Q1.

For revenue:
- We expect Q1 to range between $618 and $622 million, 31 percent growth at the midpoint.

- For the full year, we expect revenue to range between $2.93 and 2.95 billion, a 33 percent annual growth rate at the midpoint.

First quarter guidance includes the following impacts:
- Approximately $20 million related to Marketing Solutions, as the integration and training of our salesforce will push revenue to future quarters. $4 million of this impact also relates to shutting down the Bizo data product.

- Approximately $5 million related to changes in premium subscriptions, slightly more than Q4 given higher seasonality in signups.

- Approximately $10 million in impact related to the headwind from foreign exchange rate volatility.

As it relates to Adjusted EBITDA, we plan to maintain a consistent investment philosophy as in



past years where we balance creating scale and efficiency in our core operations with long-term investment towards our strategic roadmap.

For Adjusted EBITDA:
- We expect Q1 to range between $152 and $154 million, a 25 percent margin at the midpoint.

- For the full year, we expect approximately $785 million, a 27 percent margin, consistent with the level achieved in 2014.

Lastly:
- We expect non-GAAP EPS of approximately $0.53 cents for Q1 and approximately $2.95 for the full year.

Additional guidance inputs include:
- Depreciation of $61 million for Q1 and $270 million for the full year; and first quarter amortization of $12 million and $45 million for the full year.

- Stock based compensation of $103 million for Q1 and approximately $460 million for the full year.

- Related to the convertible offering, cash interest expense of $2 million per quarter. On a GAAP basis, there is an additional quarterly non-cash interest expense of $11-12 million.

- For GAAP taxes, our ability to forecast remains limited given the level of GAAP pre-tax income, but we anticipate greater than $80 million in tax expense for 2015 given the continued build of our global business.

- A Non-GAAP tax rate of 25 percent for Q1 and the full year 2015, the product of a growing international business. The change versus 2014 reflects a rolling long-term forecast that we expect to result in a stable long-term tax rate over the next several years.

- And finally, fully diluted weighted shares of approximately 128 million for Q1, and 130 million for the full year.

To conclude, 2014 represented a year of both new strategic investments and significant progress against LinkedIn's long-term roadmap. We improved our member experience by investing in mobile, content, and the successful launch in China. Within monetization, we increased investment to pursue the larger market opportunity in Talent Solutions, while laying the foundation for Marketing and Sales Solutions through the acquisition of Bizo and launch of the flagship Sales Navigator. We will continue to aggressively invest in our member and customer platforms to pursue the vision of building the world's first economic graph and realizing LinkedIn's full potential.

Thank you for your time, and we will now take questions.

**[Operator]**

Our first question comes from the line of Douglas Anmuth of JPMorgan.

**[Douglas Anmuth, JP Morgan]**

Hello, it's Diana Couter on for Doug.  Thanks for taking the questions.  Just wanted to ask on the level of investment for Sales Navigator this year:   your expectations relative to last year as the sales force was really ramping.



And then also, if you could provide any more color on how different this Marketing Solutions relaunch will be.  I know it's early, but anything you can provide would be great.  Thanks.

**[Steve Sordello, CFO, LinkedIn]**

On the Sales Solution side in terms of the investment, from a headcount perspective in terms of salespeople, we ended the year just north of 165 heads, between 165 and 170.  Today, we're at about 200.  We expect to grow that throughout next year by about 80 percent.  So we're still in investment mode in terms of rolling out the sales force, as well as continuing to transition the customer base.  We're virtually fully transitioned on the field side, but the online side is about 20 percent transitioned.

**[Jeff Weiner, CEO, LinkedIn]**

In terms of the Marketing Solutions roll-out and transition, it's really adding to our portfolio of Marketing Solutions products.  So on the heels of our success with native advertising and sponsored content, this reflects the integration of Bizo and multi-channel nurturing.

So that our Marketing Solutions partners are going to be able to nurture prospects on LinkedIn , off of LinkedIn , and that's both mobile and desktop.  So it's going to provide a much more robust set of solutions, and we're looking forward to bringing that to market.

**[Douglas Anmuth, JP Morgan]**

Thank you.

**[Operator]**

Our next question comes from the line of Gene Munster of Piper Jaffray.

**[Gene Munster, Piper Jaffray]**

Good afternoon.  If you could talk a little bit about the new seed growth of 36 percent year over year?  How sustainable is that?

I know that your sales force doesn't compound that growth.  So just some thoughts on how we should expect that to trend for the year?  And separately, as CapEx went up dramatically quarter on quarter, could you talk a little bit about some more about the investments that you're making?

**[Steve Sordello, CFO, LinkedIn]**

Sure.  I think you're referring to a page-view growth in terms of the traffic to the site.  And we have seen continued improvement in user engagement, both in terms of unique visitors and page-views.  Both of those accelerated in the quarter, page views from 28 percent to 34 percent, as you mentioned.

We're seeing I think good returns on some of the earlier investments in content.  We talked about the publishing platform and the home page growing at a material faster rate than the rest of the site, as well as mobile.  Mobile is now approaching 50 percent of unique visitors.  So investments in those two areas has been driving growth.

I think looking forward, I think we expect it to continue to grow in a healthy manner, not necessarily accelerate, as we continue into 2015 off of very healthy levels.  But we continue to be somewhat stable.



In terms of the CapEx, we're currently -- this last quarter we're influenced by a couple of large investments in purchases of land.  If you strip those out, we're running somewhere in the 17 percent of revenue level, in terms of CapEx.  And I would say for 2015, expect around that level, maybe slightly higher.

We're investing in a number of areas, self-managed data center is one that we have talked about previously.  We're planning on launching a third one this year on the international basis, and possibly a fourth, in addition to continuing with some pretty significant facility build-outs.  So, those two areas from a CapEx perspective are keeping it in that high teen range.

**[Gene Munster, Piper Jaffray]**

Excellent, thank you.

**[Operator]**

Our next question comes from the line of (Stran Lee) of CLSA.

**[Stran Lee, CLSA]**

Great, thanks for taking my questions.  Relating to China, now you're getting the ICP license.  Besides being able to put service on the ground, I was wondering, what does that allow you to do?

And also secondly, I think you recently appointed a new government relations officer.  I was just curious what his background was, and what you're hoping to achieve with this appointment.  Thank you so much.

**[Jeff Weiner, CEO, LinkedIn]**

So with regard to China license, it's business as usual.  That was always a part of our plan, and we continue to execute there.  Still a lot of work to be done.

But we have always talked about our focus on putting the right team in place, and we're very fortunate to have built a really talented group there in China.  Most recently, we added a Head of Engineering in China.  So we're looking forward to more localized development efforts there.

We had a good 12 months in terms of membership growth, doubling the number of members from 4 million to 8 million.  And we're going to continue to focus on the team and getting the product right and delivering the right member value.

In terms of government relations, I think you're referring to Pablo Chavez, who has been with us for roughly a year now.  And Pablo has been a wonderful addition to our team, and he's not focused specifically on China.  He works on government relations on a global basis, but we're very fortunate to have him here.

**[Operator]**

Our next question comes from the line of Peter Stabler of Wells Fargo.

**[Peter Stabler, Wells Fargo]**

Good afternoon.  Thanks for taking the questions, one for Jeff, and one for Steve.

Jeff, certified developer programs appear to have been really successful for some of your large social platform competitors.  Wondering if you could offer some thoughts on the importance there,



and maybe any plans to expand it.  It seems fairly limited at the current time.

And then, Steve, wondering if you could just give us a snapshot on currency, what the impact was in the quarter, and then what you're baking in, in terms of expectations for full-year 2015?  Thanks very much.

**[Jeff Weiner, CEO, LinkedIn]**

So with regard to our platform plan and certified developers, we're going to be getting increasingly focused on specific use cases for developers.  So for example, with regard to our Marketing Solutions efforts, APIs that facilitate third-party social media marketing agencies to create more value for their customers and our customers.  And we have a number of vertical areas where we think we have similar opportunities.

With regard to our general API program, we want to get as focused as possible on the things that make the most sense for multiple constituents within the ecosystem.  So a great example of that would be our in-share buttons and the ability to share content from third-party sites.  So I think going forward, the best way to characterize it would be greater clarity, and we'll be much more explicit about our objectives by vertical.

**[Steve Sordello, CFO, LinkedIn]**

And in terms of the currency, I think one of the factors in our Business is the consideration is 40 percent of our business is international, but over 70 percent of the total business is in USD.  So that somewhat mitigates it.  And we're also a ratable business, so the quarter-to-quarter volatility. It's more of a deferred volatility.

In the past, it's been nominal.  And in Q4, a less than 1 percent impact, on revenue in Q1 we're projecting less than 2 percent.  And for the year, somewhere between 1 percent and 2 percent impact.  There could be greater variability, but that's what we're projecting at this time.

**[Peter Stabler, Wells Fargo]**

Thank you.

**[Operator]**

Our next question comes from the line of Dan Salmon of BMO Capital Markets.

**[Dan Salmon, BMO Capital Markets]**

Good afternoon.  Jeff, I just wanted to ask a little bit about the LinkedIn  Corporate Solutions customer number for the quarter.  You saw nice acceleration again.

And I was just wondering if you could give us a little bit of color around that?  What maybe some of the drivers, if the international number is starting to pick up?

If Sales Navigator is opening some new doors, particularly against the context of a little bit more emphasis on expanding, rather than landing that seems like pretty positive figure.

**[Steve Sordello, CFO, LinkedIn]**

This is Steve.  So we did have a healthy quarter, both in terms of new business and existing business.  On the new side, nearly 3,000 customers.  A good number of those came from the more established companies in some of the larger markets, which is a good sign in terms of there continuing to be headroom.  So that was very positive.



We're also, obviously, continuing to expand more and more deeply into FNB in terms of the number of accounts.  One of the good phenomenons that's been happening over that prior quarters is, despite that longer tail being reached, our (technical difficulties) been able to been maintained at near record levels.

And that's due to the fact that we continue to also sell into our existing account base bigger deals.  So that's been a healthy rate.  Our net ratio has been strong in terms of add-ons, and renewals net of churn.

This last quarter, churn was a record low as we've focused.  And that really was mainly in North America and EMEA in the larger accounts.  So I think it's been pretty broad-based.

We also, in the Q3 time frame, started to accelerate a little more investment in terms of sales on the Hunter side as we did the work in terms of the visible pipeline and saw a larger opportunity.  So that had a moderate impact in the quarter.  But, good performance overall.

**[Dan Salmon, BMO Capital Markets]**

And then maybe just one quick follow-up.  You mentioned that Sales Navigator came in above expectations in the quarter.

Is there any color you could provide around maybe the level of promotional activity, whether that is free month to start, things like that?  And how the -- it sounds like a fairly positive demand environment may reflect that as 2015 goes on?

**[Steve Sordello, CFO, LinkedIn]**

Yes, what I would say is we've been continuing to focus on the migration, particularly in the field sales side.  Most of the growth has come on the field sales side.  I think we're making good progress in some of the larger accounts.

SAP was an example.  This is a little longer of sales cycle given it's a higher volume type of proposition than Talent Solutions.  But we felt good about the performance.

In terms of the business side, this is a ratable recognition.  So this is something that is going to build over time.  And today, we're very much still focused on continuing to improve the product, continuing to educate the customer on social selling and how to best utilize the product, in addition to the selling portion of going to market.

In terms of -- so yes, that's kind of a high-level takeaway.  Positive results so far, it's still in early stages of its life cycle.

**[Dan Salmon, BMO Capital Markets]**

Great.  Thank you, Steve.

**[Operator]**

Our next question comes from the line of Brian Pitz of Jefferies.

**[Brian Pitz, Jefferies]**

Thanks.  As you talk to clients about Sales Navigator, can you give us a sense for some of the feedback on how differentiated the product is versus competitors?  And what are the unique data assets that LinkedIn  actually has that can really further enhance Sales Navigator for clients?



Thanks.

**[Jeff Weiner, CEO, LinkedIn]**

So the primary point of differentiation is actually related to the second part of your question, and it is the data.  So by virtue of our membership representing their identity to the world, we understand who they are, their role, their experience.  Increasingly, those individuals are sharing their professionally relevant knowledge, which provides a really strong in for somebody looking to build a relationship with that prospect.

So I think the available data, I think beyond the data, is the insight that is generated from that data.  So understanding when someone switches jobs, when they're promoted into a new role so that they become decision maker within an organization that a salesperson needs to reach out to.

Sometimes it's the little things, like being notified when it's worth reaching out to someone to congratulate them on something in particular.  It helps to nurture that relationship.  So it really runs the spectrum, but I think the key point of differentiation is related to our data.

**[Operator]**

Our next question comes from the line of Stephen Ju of Credit Suisse.

**[Stephen Ju, Credit Suisse]**

Jeff, in your prepared remarks, I think you mentioned new product categories.  So I'm curious as to what this is.  And also, I think you mentioned good returns on content.  Presumably, you're talking about the publishing platform and the influencers.  Have you been able to see any traffic benefits from scaling the job listings to 3 million?  Thanks.

**[Jeff Weiner, CEO, LinkedIn]**

Yes, so with regard to the new product category, I think you're talking about some of our enterprise efforts.  And with regard to the enterprise, I would start by saying with regard to higher market itself, we already have enterprise products.  So Recruiter is really an enterprise product sales, Navigator is an enterprise product.  The way in which companies are interacting with their company profile on LinkedIn , and administrating those products and services, to some extent, that's an enterprise product.

What I was referring to in the prepared remarks is that we think increasingly there's an opportunity for LinkedIn  to create value within an enterprise, within an organization, leveraging information that's already public.  So by way of example, our public profile information, which particularly at larger organizations, you see some of those companies turning to LinkedIn  to look up someone within their own company, because of how robust that public profile information can prove to be.

So there's examples of content or information that's already publicly available, and we're trying to think about ways in which we can better leverage that to create value within an organization.  I think similarly, there's also opportunities to facilitate the way in which employees are sharing news and content.  Not only with one another, but externally in service of things like higher market end sell.

And we've got some interesting things that we've been working on that we're looking forward to continuing to test and experiment.  And hopefully, roll that out and create value in that regard.

With regard to the comments, you mentioned, part of your question on publishing platform's impact on traffic.  Yes, I do think our investment there, and the expansion of the publishing



platform at first 500 influencers to now north of 230 million members has certainly made a difference.  And we're hoping that similarly our investment in jobs liquidity will be making a difference as well, particularly in developing economies.

A market like India, for example, as we can create more job liquidity in a market like that.  We're hoping to generate more value for our membership, particularly the younger demographic.

**[Stephen Ju, Credit Suisse]**

Thank you.

**[Operator]**

Our next question comes from the line of Justin Post of Bank of America Merrill Lynch.

**[Justin Post, Bank of America Merrill Lynch]**

Hello.  Congratulations on a great quarter.  Can you hear me?

**[Steve Sordello, CFO, LinkedIn]**

Yes, thank you.

**[Jeff Weiner, CEO, LinkedIn]**

Thank you.

**[Justin Post, Bank of America Merrill Lynch]**

Actually, can you please update us with any large customer wins, such as SAP for the Sales Navigator category?  And also, I was wondering, what was the Sales Navigator revenue as a percent of Premium Subscription revenue?  I think was roughly 25 percent last quarter?

**[Steve Sordello, CFO, LinkedIn]**

Yes, so we did announce SAP in the quarter.  And as I mentioned, where we are seeing some success is in working with some of the larger accounts, both in terms of renewals, and add-ons.

And the goal is for SA to be an example of what can come on a greater scale.  So no immediate announcements on that side, but we feel good about the momentum that we are seeing.

In terms of the revenue, as a percentage of Premium Subscriptions, yes, last quarter it was roughly 25 percent.  This quarter it's approaching 30 percent.  Again, this is a business that will build gradually over time.

**[Justin Post, Bank of America Merrill Lynch]**

Great.  Thank you.

**[Operator]**

Our next question comes from the line of Kerry Rice of Needham.

**[Kerry Rice, Needham]**

Thanks a lot.  To go back to Marketing Solutions and maybe the expansion of the publishing



platform, can you talk a little bit about maybe the dynamics there as it relates to maybe providing additional inventory that you can advertise on, and if there's any impact to CPMs?  I know that a lot of times you sell out on the field sales side.

And so I was curious if you're even running advertising against maybe some of the long-form publishing?  And then the second question is, just beyond hiring additional sales people, and I know beyond China too, can you talk about other ways you think about monetizing the international markets?  Thanks.

**[Jeff Weiner, CEO, LinkedIn]**

So with regard to the relationship between the publishing platform and inventory, the vast majority of the inventory that's been sold for the purpose of sponsored content has been in our feed.  Both desktop and mobile/mobile actually comprises the majority of that.  So that's where that is focused.

In terms of the publishing platform and additional inventory, we're excited about the potential there, but it's still early.  And we want to make sure that we continue to invest in getting the platform right, those capabilities right.  One thing you didn't mention that I would certainly include in the mix with regard to future inventory creation through content would be SlideShare.

And SlideShare has roughly 70 million uniques.  And that, we feel, has very strong potential going forward.  Over 17 million presentations and videos have been created to date.  And thus far we haven't really been as focused there in terms of monetization and utilizing SlideShare as a source of potential Marketing Solutions inventory.

With regard to international and monetization opportunities, I think it's going to be very consistent across the business lines that we've been making progress on in the US.  So higher market and sell, and that's both through our field channel efforts and through self-service.

**[Kerry Rice, Needham]**

Great, thank you.

**[Operator]**

Our next question comes from the line of Mark Mahaney of RBC Capital Markets.

**[Mark Mahaney, RBC Capital Markets]**

Great, thank you.  It's Brian on for Mark.  Following up on the sponsored updates question.  Are you seeing any evidence that positive auction dynamics are starting to kick in or improve?  And then if you could, provide an update regarding the number of advertisers on the platform, and possibly highlight strengths you're seeing with any particular industry verticals?

**[Steve Sordello, CFO, LinkedIn]**

Yes, on the sponsored update side, we are continuing to see marketers adopt content marketing over the course of last year.  In terms of the auction, it is developing.  I think that's showing in terms of the improvement of the ECPMs, which were up about 40 percent year-on-year.  So it continues to build.

Our advertising, advertisers continue to grow.  I think the last number we had roughly 5,000 advertisers on the Marketing Solutions side.  It fluctuates here and there, in the fourth quarter it's seasonally strong on an active basis.



So that continues to build nicely.  And another I think healthy dynamic we saw in the last couple quarters is the spend per advertiser increasing nicely.

**[Mark Mahaney, RBC Capital Markets]**

OK.  Thank you very much.

**[Operator]**

Our next question comes from the line of John Blackledge of Cowen.

**[John Blackledge, Cowen]**

Great.  Thanks.  With the field sales ramping for Sales Navigator in 2015, can you just remind us how long it takes for them to get up and running from their start date?

And is Sales Navigator being sold to enterprises globally at this point?  And just any thoughts on the TAM for Sales Navigator in terms of total global salespeople, and/or a dollar amount for the opportunity?  Thanks.

**[Steve Sordello, CFO, LinkedIn]**

Yes, so in terms of the ramp time, it varies.  On average, I would say 6 to 9 months on average. In terms of the global opportunity, we haven't -- this is still a relatively nascent piece of our business, so we haven't really published a lot in terms of the TAM

What I would say is we've started to look at it from our internal dimensions of the visible pipeline that we see somewhere it would show Talent Solutions.  And it's roughly a similar number, which is around $10 billion opportunity based on our members and the network.

**[John Blackledge, Cowen]**

Thank you.

**[Jeff Weiner, CEO, LinkedIn]**

OK.  With that, that's going to conclude this quarter's call.  Thank you so much for your time, and we look forward to talking next quarter.  Take care.

**[Operator]**

Thank you.  This concludes today's call.

-- END --



**Investor contacts**

Matt Sonefeldt
msonefeldt@linkedin.com

Matthew Danziger
mdanziger@linkedin.com

Kristin Altorfer
kaltorfer@linkedin.com

**Press contact**

LinkedIn Corporate Communications Team
press@linkedin.com

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT M



## Looking for the Economic Graph Research program?

Call for Proposals Deadline: June 1

**Learn more**

Our data scientists and researchers work to unlock the potential in our data to change the world by empowering professionals to become more productive and successful.

LinkedIn operates the world's largest professional network on the Internet with more than 433 million members in over 200 countries and territories. This highly structured dataset gives our data scientists and researchers the ability to conduct applied research that fuel LinkedIn's data driven products including search, social graph, and machine learning systems. As a members first organization, LinkedIn keeps the privacy and security of our members at the forefront in all our research.

LinkedIn's team of data scientists and researchers work with huge amounts of data, solve real problems for our members around the world, and publish at major conferences. They work to improve the relevance in our products, contribute to the open source community, and are actively pursuing research in a number of areas, including:

- Computational advertising
- Data & graph mining
- Machine learning & infrastructure
- Recommender systems
- Online experimentation and A/B testing
- Text mining and sentiment analysis
- Machine translation, cross language text analysis
- Security & spam
- Information extraction
- Content understanding
- Scalable computing paradigms (MapReduce, Spark, etc.)
- Network visualization

Featured Projects

 LinkedIn.com

## Jobs

Many of our Talent Solutions products are built around mathematical models that try answer a simple question: is this opportunity of interest to this member at this time? Answering that question requires a multidisciplinary approach, drawing on tools from machine learning and data mining, often utilizing insights from psychological and sociological research.

View page

## Experimentation

We built our internal end-to-end A/B testing platform, called XLNT, to quickly quantify the impact of any A/B test in a scientific and controlled manner across our sites and mobile apps. XLNT allows for easy design and deployment of experiments, but it also provides automatic analysis that is crucial in popularizing A/B tests.

View page

## Feed

From catching up on trending news, getting updates from your network, or following a thought leader from our Influencer program – the professional information and insights in the LinkedIn Feed have become central to our member experience.

View page

## NLP

The NLP team provides natural language processing (NLP) tools, analyses and features for use throughout the entire company. Our mission is to take unstructured text, analyze it along with information from our structured and semi-structured sources, and produce useful structured representations for all of LinkedIn's current and future product areas.

View page

## Distributed Data Systems

The Distributed Data Systems (DDS) team builds horizontally scalable data storage and streaming systems used to serve LinkedIn applications. We have a diverse portfolio of technology solutions summarized below.

View page

## Data Network & Analytics (DNA)

Data processing is central to creating many of the data products on linkedin.com as well as understanding the performance of our products and businesses. Our analytics platforms, data pipelines, and data applications allow data consumers at LinkedIn to understand the data and create insights that power both internal and external user experiences.

View page

# Featured publications

## Ambry: LinkedIn's Scalable Geo-Distributed Object Store

**Authors**: Shadi Abdollahian Noghabi (University of Illinois), Sriram Subramanian (LinkedIn Corp), Priyesh Narayanan (LinkedIn Corp), Sivabalan Narayanan (LinkedIn Corp), Gopalakrishna Holla (LinkedIn Corp), Mammad Zadeh (LinkedIn Corp), Tianwei Li (LinkedIn Corp), Indranil Gupta (University of Illinois at Urbana-Champaign), Roy Campbell (University of Illinois at Urbana-Champaign)

**Published**: SIGMOD2016

**Abstract**: The infrastructure beneath a worldwide social network has to continually serve billions of variable-sized media objects such as photos, videos, and audio clips....

## Truss Decomposition of Probabilistic Graphs: Semantics and Algorithms

**Authors**: Xin Huang (UBC), Wei Lu (University of British Columbia, Linkedin Corp), Laks Lakshmanan (University of British Columbia)

**Published**: SIGMOD 2016

**Abstract**: A key operation in network analysis is the discovery of cohesive subgraphs. The notion of k-truss has gained considerable popularity in this regard, based on its rich structure and efficient computability. However, many complex networks such as social, biological and communication networks feature uncertainty, best modeled using probabilities....

**Full list**

Blog    Data    Open Source    Jobs    Women in Tech

LinkedIn Corporation © 2017    About    Cookie Policy    Privacy Policy    User Agreement

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT N



Newsroom

News    About us    Corporate    Media resources    Investors

# Manage Your Own Brand

LinkedIn Corporate Communications Team    February 6, 2013

Share    Tweet    Like 0    G+1 0

Own your professional brand and Google search results for your name by customizing your LinkedIn Public Profile URL. Edit the link so it's your firstnamelastname (or, if that's taken, lastnamefirstname). Now you control what people see when they do a search for your name on search engines. This means people will always get the most recent information about you as you change jobs, switch beats, and update LinkedIn accordingly.

## Topics

**LinkedIn For Journalists**

Related story                                   Related story
**Open the Door to Opportunities**              **Crowdsource Your Research**

LinkedIn.com

News    About us    Corporate    Media resources    Investors

LinkedIn Corporation © 2017

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining
Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT O

 Search for help with...

# Printing a Profile

If you're viewing a profile while signed in to LinkedIn, you have the option to export the profile to a PDF file and then print it; however, not all profile sections will appear in the PDF.

To export and print a profile:

- Click the 👤 M▥ icon at the top of your LinkedIn homepage and select **View profile**, or navigate to someone else's profile.
- Click the ••• **More** icon in the top section of the profile, to the right of the picture.
- Select ⬇ **Save to PDF** from the dropdown.
- The PDF file will be downloaded and saved to the default download location on your computer. Once you open the file, you can print it.

Learn how to **share a profile** with your connections.

**Note:** Only characters from the English alphabet will display properly in a PDF.

Last updated: 1 month ago

## Was this answer helpful?

Yes        No

**RELATED ARTICLES**

Printing A Table of Saved Profiles in Recruiter

Editing Your Profile

Forwarding Profiles in Recruiter

Finding Your LinkedIn Public Profile URL

Exporting Profile PDFs from the Clipboard in Recruiter

in LinkedIn Corp © 2017

Case 3:17-cv-03301-EMC   Document 23-1   Filed 06/22/17   Page 69 of 101

About     Contact us     Privacy and terms

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT P

 Search for help with...

# Introducing Two Connections by Sharing a Profile

If you want to introduce two connections who could benefit from knowing each other, you can use the **Share profile** option from one of their profiles to then send the message to both of them. Contact information will be included in the message so that both members can connect to each other. You can forward another member's profile to a connection using the share link:

- Search for one of the connection's profile using the 🔍 **Search** box at the top of your homepage.
- From the results page, click their name to view their profile.
- Click the **More** icon in the top section of their profile and select **Share profile.**
- Enter each recipient's name in the **Type a name** section of the **New message** page.
- Add a message to explaining how these two connections would benefit from knowing each other.
- Click **Send.**
  - Press the **Enter** key to send (if the **press enter to send** option is enabled), or click the **Send** button.

Learn more about the **different ways of getting introduced or sharing profiles**.

Last updated: 2 months ago

## Was this answer helpful?

Yes          No

RELATED ARTICLES

Different Ways of Getting Introduced on LinkedIn

Sending Messages to Connections

Introductions on the LinkedIn Mobile App

Finding a Connection's Profile

Searching Your Connection's Connections

Case 3:17-cv-03301-EMC   Document 23-1   Filed 06/22/17   Page 72 of 101

**RECENTLY VIEWED**

Printing a Profile

LinkedIn Corp © 2017

About     Contact us     Privacy and terms

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re: Preliminary Injunction**

# EXHIBIT Q

| | |
|---|---|
| **From:** | Abhishek Bajoria <abajoria@linkedin.com> |
| **Sent:** | Friday, May 26, 2017 11:48 AM |
| **To:** | Gupta, Deepak (22) x4419 |
| **Cc:** | Wisoff, Brandon (22) x4449 |
| **Subject:** | Re: HiQ Labs, Inc. |

Hi Deepak,

Thanks for confirming our call on Tuesday.  LinkedIn can commit to refraining from further legal escalation while we discuss.  We can also discuss removal of access restrictions as part of an overall resolution; however, LinkedIn cannot allow HiQ access to its platform during our discussions.

Thanks,
Abhishek


**Abhishek Bajoria**
Senior Litigation Counsel




On Fri, May 26, 2017 at 11:26 AM, Deepak Gupta <DGupta@fbm.com> wrote:

And, yes, to your question, we will make the 2 pm time work on Tuesday.

---

**From:** Gupta, Deepak (22) x4419
**Sent:** Friday, May 26, 2017 11:24 AM
**To:** 'Abhishek Bajoria'
**Cc:** Wisoff, Brandon (22) x4449
**Subject:** RE: HiQ Labs, Inc.


Hi Abhishek –


Thanks very much for your response back.  We are just getting our heads around the letter, but we did see that it purports to revoke authorization of hiQ's access to the LinkedIn website.  Can you confirm that LinkedIn will suspend any legal force or effect of that revocation pending our discussions?  I suspect it will take us more than an afternoon to come to a mutually acceptable resolution and we'd like to keep the business going uninterrupted while we are working things out.

How about we tentatively put in place a timeline of one month to talk?  We would maintain the business status quo in that time period (subject to further extensions if agreeable to you).  This seems to be in the spirit of "amicable resolution" which you mention in your letter.

Sincerely,

Deepak

**From:** Abhishek Bajoria [mailto:abajoria@linkedin.com]
**Sent:** Friday, May 26, 2017 10:20 AM
**To:** Gupta, Deepak (22) x4419
**Cc:** Wisoff, Brandon (22) x4449
**Subject:** Re: HiQ Labs, Inc.

Hi Deepak, sure, how about we discuss further on Tuesday afternoon, say 2 pm?  I'm flexible Tuesday afternoon if 2 pm doesn't work.  We can use the following dial-in: +1.408.740.7256; meeting ID: 4154048564

Thanks,

Abhishek

**Abhishek Bajoria**
Senior Litigation Counsel



On Thu, May 25, 2017 at 2:09 PM, Deepak Gupta <DGupta@fbm.com> wrote:

Dear Abhishek –

Our office was referred the cease and desist letter that you sent to HiQ Labs, Inc.  Please let us know a good time to talk (and a phone number where you can be reached).

Sincerely,


Deepak


**Deepak Gupta**

*Partner*

dgupta@fbm.com

415.954.4419

 FARELLA BRAUN + MARTEL LLP

Russ Building                          T 415.954.4400
235 Montgomery Street                  F 415.954.4480
San Francisco / CA 94104               www.fbm.com

---

This e-mail message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

Farella Braun + Martel LLP

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Renewed *Ex Parte* Motion for Temporary Restraining
Order and Order to Show Cause Re: Preliminary Injunction**


# EXHIBIT R

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PACKINGHAM *v.* NORTH CAROLINA

### CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

No. 15–1194.   Argued February 27, 2017—Decided June 19, 2017

North Carolina law makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14–202.5(a), (e). According to sources cited to the Court, the State has prosecuted over 1,000 people for violating this law, including petitioner, who was indicted after posting a statement on his personal Facebook profile about a positive experience in traffic court. The trial court denied petitioner's motion to dismiss the indictment on the ground that the law violated the First Amendment. He was convicted and given a suspended prison sentence. On appeal, the State Court of Appeals struck down §14–202.5 on First Amendment grounds, but the State Supreme Court reversed.

*Held*: The North Carolina statute impermissibly restricts lawful speech in violation of the First Amendment. Pp. 4–10.

(a) A fundamental First Amendment principle is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. Today, one of the most important places to exchange views is cyberspace, particularly social media, which offers "relatively unlimited, low-cost capacity for communication of all kinds," *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 870, to users engaged in a wide array of protected First Amendment activity on any number of diverse topics. The Internet's forces and directions are so new, so protean, and so far reaching that courts must be conscious that what they say today may be obsolete tomorrow. Here, in one of the first cases the Court has taken to address the relationship between the First Amendment and the modern Internet, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast

Syllabus

networks in that medium.  Pp. 4–6.

(b) This background informs the analysis of the statute at issue.
Even assuming that the statute is content neutral and thus subject to
intermediate scrutiny, the provision is not "'"'narrowly tailored to
serve a significant governmental interest."'" *McCullen* v. *Coakley*,
573 U. S. ___, ___.  Like other inventions heralded as advances in
human progress, the Internet and social media will be exploited by
the criminal mind.  It is also clear that "sexual abuse of a child is a
most serious crime and an act repugnant to the moral instincts of a
decent people," *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 244,
and that a legislature "may pass valid laws to protect children" and
other sexual assault victims, *id.,* at 245.  However, the assertion of a
valid governmental interest "cannot, in every context, be insulated
from all constitutional protections."    *Stanley* v. *Georgia*, 394 U. S.
557, 563.

Two assumptions are made in resolving this case.  First, while the
Court need not decide the statute's precise scope, it is enough to as-
sume that the law applies to commonplace social networking sites
like Facebook, LinkedIn, and Twitter.  Second, the Court assumes
that the First Amendment permits a State to enact specific, narrow-
ly-tailored laws that prohibit a sex offender from engaging in conduct
that often presages a sexual crime, like contacting a minor or using a
website to gather information about a minor.

Even with these assumptions, the statute here enacts a prohibition
unprecedented in the scope of First Amendment speech it burdens.
Social media allows users to gain access to information and com-
municate with one another on any subject that might come to mind.
With one broad stroke, North Carolina bars access to what for many
are the principal sources for knowing current events, checking ads for
employment, speaking and listening in the modern public square,
and otherwise exploring the vast realms of human thought and
knowledge.  Foreclosing access to social media altogether thus pre-
vents users from engaging in the legitimate exercise of First Amend-
ment rights.  Even convicted criminals—and in some instances espe-
cially convicted criminals—might receive legitimate benefits from
these means for access to the world of ideas, particularly if they seek
to reform and to pursue lawful and rewarding lives.  Pp. 6–8.

(c) The State has not met its burden to show that this sweeping law
is necessary or legitimate to serve its purpose of keeping convicted
sex offenders away from vulnerable victims.  No case or holding of
this Court has approved of a statute as broad in its reach.  The State
relies on *Burson* v. *Freeman*, 504 U. S. 191, but that case considered
a more limited restriction—prohibiting campaigning within 100 feet
of a polling place—in order to protect the fundamental right to vote.

Syllabus

The Court noted, moreover, that a larger buffer zone could "become an impermissible burden" under the First Amendment.  *Id.,* at 210. The better analogy is *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569.  If an ordinance prohibiting any "First Amendment activities" at a single Los Angeles airport could be struck down because it covered all manner of protected, nondisruptive behavior, including "talking and reading, or the wearing of campaign buttons or symbolic clothing," *id.,* at 571, 575, it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on websites integral to the fabric of modern society and culture.  Pp. 9–10.

368 N. C. 380, 777 S. E. 2d 738, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  ALITO, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., and THOMAS, J., joined.  GORSUCH, J., took no part in the consideration or decision of the case.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 15–1194

————

## LESTER GERARD PACKINGHAM, PETITIONER v. NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

[June 19, 2017]

JUSTICE KENNEDY delivered the opinion of the Court.

In 2008, North Carolina enacted a statute making it a felony for a registered sex offender to gain access to a number of websites, including commonplace social media websites like Facebook and Twitter. The question presented is whether that law is permissible under the First Amendment's Free Speech Clause, applicable to the States under the Due Process Clause of the Fourteenth Amendment.

## I

### A

North Carolina law makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14–202.5(a), (e) (2015). A "commercial social networking Web site" is defined as a website that meets four criteria. First, it "[i]s operated by a person who derives revenue from membership fees, advertising, or other sources related to the operation of the Web site." §14–202.5(b).

Opinion of the Court

Second, it "[f]acilitates the social introduction between two or more persons for the purposes of friendship, meeting other persons, or information exchanges." *Ibid.*  Third, it "[a]llows users to create Web pages or personal profiles that contain information such as the name or nickname of the user, photographs placed on the personal Web page by the user, other personal information about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site." *Ibid.*  And fourth, it "[p]rovides users or visitors . . . mechanisms to communicate with other users, such as a message board, chat room, electronic mail, or instant messenger." *Ibid.*

The statute includes two express exemptions.  The statutory bar does not extend to websites that "[p]rovid[e] only one of the following discrete services: photo-sharing, electronic mail, instant messenger, or chat room or message board platform."  §14–202.5(c)(1).  The law also does not encompass websites that have as their "primary purpose the facilitation of commercial transactions involving goods or services between [their] members or visitors." §14–202.5(c)(2).

According to sources cited to the Court, §14–202.5 applies to about 20,000 people in North Carolina and the State has prosecuted over 1,000 people for violating it.  Brief for Petitioner 6–8.

B

In 2002, petitioner Lester Gerard Packingham—then a 21-year-old college student—had sex with a 13-year-old girl.  He pleaded guilty to taking indecent liberties with a child.  Because this crime qualifies as "an offense against a minor," petitioner was required to register as a sex offender—a status that can endure for 30 years or more.  See §14–208.6A; see §14–208.7(a).  As a registered sex

Opinion of the Court

offender, petitioner was barred under §14–202.5 from gaining access to commercial social networking sites.

In 2010, a state court dismissed a traffic ticket against petitioner. In response, he logged on to Facebook.com and posted the following statement on his personal profile:

> "Man God is Good! How about I got so much favor they dismissed the ticket before court even started? No fine, no court cost, no nothing spent. . . . . .Praise be to GOD, WOW! Thanks JESUS!" App. 136.

At the time, a member of the Durham Police Department was investigating registered sex offenders who were thought to be violating §14–202.5. The officer noticed that a "'J. R. Gerrard'" had posted the statement quoted above. 368 N. C. 380, 381, 777 S. E. 2d 738, 742 (2015). By checking court records, the officer discovered that a traffic citation for petitioner had been dismissed around the time of the post. Evidence obtained by search warrant confirmed the officer's suspicions that petitioner was J. R. Gerrard.

Petitioner was indicted by a grand jury for violating §14–202.5. The trial court denied his motion to dismiss the indictment on the grounds that the charge against him violated the First Amendment. Petitioner was ultimately convicted and given a suspended prison sentence. At no point during trial or sentencing did the State allege that petitioner contacted a minor—or committed any other illicit act—on the Internet.

Petitioner appealed to the Court of Appeals of North Carolina. That court struck down §14–202.5 on First Amendment grounds, explaining that the law is not narrowly tailored to serve the State's legitimate interest in protecting minors from sexual abuse. 229 N. C. App. 293, 304, 748 S. E. 2d 146, 154 (2013). Rather, the law "arbitrarily burdens all registered sex offenders by preventing a wide range of communication and expressive activity

Opinion of the Court

unrelated to achieving its purported goal." *Ibid.* The North Carolina Supreme Court reversed, concluding that the law is "constitutional in all respects." 368 N. C., at 381, 777 S. E. 2d, at 741. Among other things, the court explained that the law is "carefully tailored . . . to prohibit registered sex offenders from accessing only those Web sites that allow them the opportunity to gather information about minors." *Id.*, at 389, 777 S. E. 2d, at 747. The court also held that the law leaves open adequate alternative means of communication because it permits petitioner to gain access to websites that the court believed perform the "same or similar" functions as social media, such as the Paula Deen Network and the website for the local NBC affiliate. *Id.*, at 390, 777 S. E. 2d, at 747. Two justices dissented. They stated that the law impermissibly "creates a criminal prohibition of alarming breadth and extends well beyond the evils the State seeks to combat." *Id.*, at 401, 777 S. E. 2d, at 754 (opinion of Hudson, J.) (alteration, citation, and internal quotation marks omitted).

The Court granted certiorari, 580 U. S. ___ (2016), and now reverses.

## II

A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 796 (1989). Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire.

While in the past there may have been difficulty in

Opinion of the Court

identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 868 (1997), and social media in particular. Seven in ten American adults use at least one Internet social networking service. Brief for Electronic Frontier Foundation et al. as *Amici Curiae* 5–6. One of the most popular of these sites is Facebook, the site used by petitioner leading to his conviction in this case. According to sources cited to the Court in this case, Facebook has 1.79 billion active users. *Id.,* at 6. This is about three times the population of North America.

Social media offers "relatively unlimited, low-cost capacity for communication of all kinds." *Reno, supra,* at 870. On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. See Brief for Electronic Frontier Foundation 15–16. In short, social media users employ these websites to engage in a wide array of protected First Amendment activity on topics "as diverse as human thought." *Reno, supra,* at 870 (internal quotation marks omitted).

The nature of a revolution in thought can be that, in its early stages, even its participants may be unaware of it. And when awareness comes, they still may be unable to know or foresee where its changes lead. Cf. D. Hawke, Benjamin Rush: Revolutionary Gadfly 341 (1971) (quoting Rush as observing: "'The American war is over; but this is far from being the case with the American revolution. On the contrary, nothing but the first act of the great drama

6                PACKINGHAM *v.* NORTH CAROLINA

Opinion of the Court

is closed'"). So too here. While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

This case is one of the first this Court has taken to address the relationship between the First Amendment and the modern Internet. As a result, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium.

### III

This background informs the analysis of the North Carolina statute at issue. Even making the assumption that the statute is content neutral and thus subject to intermediate scrutiny, the provision cannot stand. In order to survive intermediate scrutiny, a law must be "narrowly tailored to serve a significant governmental interest." *McCullen* v. *Coakley*, 573 U. S. ___, ___ (2014) (slip op., at 18) (internal quotation marks omitted). In other words, the law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.,* at ___ (slip op., at 19) (internal quotation marks omitted).

For centuries now, inventions heralded as advances in human progress have been exploited by the criminal mind. New technologies, all too soon, can become instruments used to commit serious crimes. The railroad is one example, see M. Crichton, The Great Train Robbery, p. xv (1975), and the telephone another, see 18 U. S. C. §1343. So it will be with the Internet and social media.

There is also no doubt that, as this Court has recog-

nized, "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 244 (2002). And it is clear that a legislature "may pass valid laws to protect children" and other victims of sexual assault "from abuse." See *id.,* at 245; accord, *New York* v. *Ferber*, 458 U. S. 747, 757 (1982). The government, of course, need not simply stand by and allow these evils to occur. But the assertion of a valid governmental interest "cannot, in every context, be insulated from all constitutional protections." *Stanley* v. *Georgia*, 394 U. S. 557, 563 (1969).

It is necessary to make two assumptions to resolve this case. First, given the broad wording of the North Carolina statute at issue, it might well bar access not only to commonplace social media websites but also to websites as varied as Amazon.com, Washingtonpost.com, and Webmd.com. See *post,* at 6–9; see also Brief for Electronic Frontier Foundation 24–27; Brief for Cato Institute et al. as *Amici Curiae* 10–12, and n. 6. The Court need not decide the precise scope of the statute. It is enough to assume that the law applies (as the State concedes it does) to social networking sites "as commonly understood"—that is, websites like Facebook, LinkedIn, and Twitter. See Brief for Respondent 54; Tr. of Oral Arg. 27.

Second, this opinion should not be interpreted as barring a State from enacting more specific laws than the one at issue. Specific criminal acts are not protected speech even if speech is the means for their commission. See *Brandenburg* v. *Ohio*, 395 U. S. 444, 447–449 (1969) (*per curiam*). Though the issue is not before the Court, it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor. Cf. Brief for Respond-

ent 42–43.  Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict.  (Of importance, the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is also not an issue before the Court.)

Even with these assumptions about the scope of the law and the State's interest, the statute here enacts a prohibition unprecedented in the scope of First Amendment speech it burdens.  Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind.  *Supra,* at 5.  By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.  These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard.  They allow a person with an Internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U. S., at 870.

In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights.  It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences.  Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives.

Opinion of the Court

## IV

The primary response from the State is that the law must be this broad to serve its preventative purpose of keeping convicted sex offenders away from vulnerable victims. The State has not, however, met its burden to show that this sweeping law is necessary or legitimate to serve that purpose. See *McCullen*, 573 U. S., at ___ (slip op., at 28).

It is instructive that no case or holding of this Court has approved of a statute as broad in its reach. The closest analogy that the State has cited is *Burson* v. *Freeman*, 504 U. S. 191 (1992). There, the Court upheld a prohibition on campaigning within 100 feet of a polling place. That case gives little or no support to the State. The law in *Burson* was a limited restriction that, in a context consistent with constitutional tradition, was enacted to protect another fundamental right—the right to vote. The restrictions there were far less onerous than those the State seeks to impose here. The law in *Burson* meant only that the last few seconds before voters entered a polling place were "their own, as free from interference as possible." *Id.*, at 210. And the Court noted that, were the buffer zone larger than 100 feet, it "could effectively become an impermissible burden" under the First Amendment. *Ibid.*

The better analogy to this case is *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569 (1987), where the Court struck down an ordinance prohibiting any "First Amendment activities" at Los Angeles International Airport because the ordinance covered all manner of protected, nondisruptive behavior including "talking and reading, or the wearing of campaign buttons or symbolic clothing," *id.*, at 571, 575. If a law prohibiting "all protected expression" at a single airport is not constitutional, *id.*, at 574 (emphasis deleted), it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on

10            PACKINGHAM *v.* NORTH CAROLINA

websites integral to the fabric of our modern society and culture.

\*      \*      \*

It is well established that, as a general rule, the Government "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft* v. *Free Speech Coalition*, 535 U. S., at 255.  That is what North Carolina has done here.  Its law must be held invalid.

The judgment of the North Carolina Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of this case.

Cite as:  582 U. S. ____ (2017)                    1

ALITO, J., concurring in judgment

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1194

_____

## LESTER GERARD PACKINGHAM, PETITIONER *v.* NORTH CAROLINA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
NORTH CAROLINA

[June 19, 2017]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, concurring in the judgment.

The North Carolina statute at issue in this case was enacted to serve an interest of "surpassing importance." *New York* v. *Ferber*, 458 U. S. 747, 757 (1982)—but it has a staggering reach.  It makes it a felony for a registered sex offender simply to visit a vast array of websites, including many that appear to provide no realistic opportunity for communications that could facilitate the abuse of children.  Because of the law's extraordinary breadth, I agree with the Court that it violates the Free Speech Clause of the First Amendment.

I cannot join the opinion of the Court, however, because of its undisciplined dicta.  The Court is unable to resist musings that seem to equate the entirety of the internet with public streets and parks.  *Ante*, at 4–5.  And this language is bound to be interpreted by some to mean that the States are largely powerless to restrict even the most dangerous sexual predators from visiting any internet sites, including, for example, teenage dating sites and sites designed to permit minors to discuss personal prob-

lems with their peers. I am troubled by the implications of the Court's unnecessary rhetoric.

## I

## A

The North Carolina law at issue makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14–202.5(a), (e) (2015). And as I will explain, the statutory definition of a "commercial social networking Web site" is very broad.

Packingham and the State debate the analytical framework that governs this case. The State argues that the law in question is content neutral and merely regulates a "place" (*i.e.*, the internet) where convicted sex offenders may wish to engage in speech. See Brief for Respondent 20–25. Therefore, according to the State, the standard applicable to "time, place, or manner" restrictions should apply. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989). Packingham responds that the challenged statute is "unlike any law this Court has considered as a time, place, or manner restriction," Brief for Petitioner 37, and he advocates a more demanding standard of review, *id.*, at 37–39.

Like the Court, I find it unnecessary to resolve this dispute because the law in question cannot satisfy the standard applicable to a content-neutral regulation of the place where speech may occur.

## B

A content-neutral "time, place, or manner" restriction must serve a "legitimate" government interest, *Ward*, *supra*, at 798, and the North Carolina law easily satisfies this requirement. As we have frequently noted, "[t]he

prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, *supra*, at 757. "Sex offenders are a serious threat," and "the victims of sexual assault are most often juveniles." *McKune* v. *Lile*, 536 U. S. 24, 32 (2002) (plurality opinion); see *Connecticut Dept. of Public Safety* v. *Doe*, 538 U. S. 1, 4 (2003). "[T]he . . . interest [of] safeguarding the physical and psychological well-being of a minor . . . is a compelling one," *Globe Newspaper Co.* v. *Superior Court, County of Norfolk*, 457 U. S. 596, 607 (1982), and "we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights," *Ferber*, *supra*, at 757.

Repeat sex offenders pose an especially grave risk to children. "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune*, *supra*, at 33 (plurality opinion); see *United States* v. *Kebodeaux*, 570 U. S. ___, ___–___ (2013) (slip op., at 8–9).

The State's interest in protecting children from recidivist sex offenders plainly applies to internet use. Several factors make the internet a powerful tool for the would-be child abuser. First, children often use the internet in a way that gives offenders easy access to their personal information—by, for example, communicating with strangers and allowing sites to disclose their location.[1] Second, the internet provides previously unavailable ways

—————

[1] See Pew Research Center, Teens, Social Media, and Privacy 5 (May 21, 2013), http://www.pewinternet.org/files/2013/05/PIP_TeensSocialMediaandPrivacy_PDF.pdf (all internet materials as last visited June 16, 2017); J. Wolak, K. Mitchell, & D. Finkelhor, National Center for Missing & Exploited Children, Online Victimization of Youth: Five Years Later 7 (2006) (prepared by Univ. of N. H., Crimes Against Children Research Center), http://www.unh.edu/ccrc/pdf/CV138.pdf.

of communicating with, stalking, and ultimately abusing children. An abuser can create a false profile that misrepresents the abuser's age and gender. The abuser can lure the minor into engaging in sexual conversations, sending explicit photos, or even meeting in person. And an abuser can use a child's location posts on the internet to determine the pattern of the child's day-to-day activities—and even the child's location at a given moment. Such uses of the internet are already well documented, both in research[2] and in reported decisions.[3]

Because protecting children from abuse is a compelling state interest and sex offenders can (and do) use the internet to engage in such abuse, it is legitimate and entirely

―――――――――

[2] See *id.*, at 2–3; Wolak, Finkhor, Mitchell, & Ybarra, Online "Predators" and Their Victims, 63 Am. Psychologist 111, 112 (Feb.–Mar. 2008).

[3] For example, in *State* v. *Gallo*, 275 Ore. App. 868, 869, 365 P. 3d 1154, 1154–1155 (2015), a 32-year-old defendant posing as a 15-year-old boy used a social networking site to contact and befriend a 16-year-old autistic girl. "He then arranged to meet the victim, took her to a park, and sexually abused her." *Ibid.*, 365 P. 3d, at 1155. In *United States* v. *Steele*, 664 Fed. Appx. 260, 261 (CA3 2016), the defendant "began interacting with a minor [victim] on the gay social networking cell phone application 'Jack'd.'" He eventually met the 14-year-old victim and sexually abused him. *Ibid.* Sadly, these cases are not unique. See, *e.g.*, *Himko* v. *English*, 2016 WL 7645584, *1 (ND Fla., Dec. 5, 2016) (a convicted rapist and registered sex offender "contacted a sixteen-year-old girl using . . . Facebook" and then exchanged explicit text messages and photographs with her), report and recommendation adopted, 2017 WL 54246 (Jan. 4, 2017); *Roberts* v. *United States*, 2015 WL 7424858, *2–*3 (SD Ohio, Nov. 23, 2015) (the defendant "met a then 14-year-old child online via a social networking website called vampirefreaks.com" and then enticed the child to his home and "coerced the child to perform oral sex on him"), report and recommendation adopted, 2016 WL 112647 (Jan. 8, 2016), certificate of appealability denied, No. 16–3050 (CA6 June 15, 2016); *State* v. *Murphy*, 2016–0901, p. 3 (La. App. 1 Cir. 10/28/16), 206 So. 3d 219, 224 (a defendant "initiated conversations" with his 12-year-old victim "on a social network chat site called 'Kik'" and later sent sexually graphic photographs of himself to the victim and received sexually graphic photos from her).

ALITO, J., concurring in judgment

reasonable for States to try to stop abuse from occurring
before it happens.

## C
### 1

It is not enough, however, that the law before us is
designed to serve a compelling state interest; it also must
not "burden substantially more speech than is necessary
to further the government's legitimate interests." *Ward*,
491 U. S., at 798–799; see also *McCullen* v. *Coakley*, 573
U. S. ___, ___–___ (2014) (slip op., at 18–19).  The North
Carolina law fails this requirement.

A straightforward reading of the text of N. C. Gen. Stat.
Ann. §14–202.5 compels the conclusion that it prohibits
sex offenders from accessing an enormous number of
websites.  The law defines a "commercial social network-
ing Web site" as one with four characteristics.  First, the
website must be "operated by a person who derives reve-
nue from membership fees, advertising, or other sources
related to the operation of the Web site."  §14–202.5(b)(1).
Due to the prevalence of advertising on websites of all
types, this requirement does little to limit the statute's
reach.

Second, the website must "[f]acilitat[e] the social intro-
duction between two or more persons for the purposes of
friendship, meeting other persons, or information ex-
changes."  §14–202.5(b)(2).  The term "social introduction"
easily encompasses any casual exchange, and the term
"information exchanges" seems to apply to any site that
provides an opportunity for a visitor to post a statement or
comment that may be read by other visitors.  Today, a
great many websites include this feature.

Third, a website must "[a]llo[w] users to create Web
pages or personal profiles that contain information *such as*
the name or nickname of the user, photographs placed on
the personal Web page by the user, other personal infor-

6                PACKINGHAM *v.* NORTH CAROLINA

mation about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site." §14–202.5(b)(3) (emphasis added). This definition covers websites that allow users to create anything that can be called a "personal profile," *i.e.*, a short description of the user.[4] Contrary to the argument of the State, Brief for Respondent 26–27, everything that follows the phrase "such as" is an illustration of features that a covered website or personal profile may (but need not) include.

Fourth, in order to fit within the statute, a website must "[p]rovid[e] users or visitors . . . mechanisms to communicate with other users, *such as* a message board, chat room, electronic mail, or instant messenger." §14–202.5(b)(4) (emphasis added). This requirement seems to demand no more than that a website allow back-and-forth comments between users. And since a comment function is undoubtedly a "mechanis[m] to communicate with other users," *ibid.*, it appears to follow that any website with such a function satisfies this requirement.

### 2

The fatal problem for §14–202.5 is that its wide sweep precludes access to a large number of websites that are most unlikely to facilitate the commission of a sex crime against a child. A handful of examples illustrates this point.

Take, for example, the popular retail website Amazon.com, which allows minors to use its services[5] and

––––––––––

[4] See New Oxford American Dictionary 1394 (3d ed. 2010); Webster's Third New International Dictionary 1811 (2002); 12 Oxford English Dictionary 576 (2d ed. 1989).

[5] See Amazon, Conditions of Use (June 21, 2016), https://www.amazon.com/gp/help/customer/display.html?ref=help_search_1-2?ie=UTF8& nodeId=201909000&qid=1490898710&sr=1-2.

meets all four requirements of §14–202.5's definition of a commercial social networking website. First, as a seller of products, Amazon unquestionably derives revenue from the operation of its website. Second, the Amazon site facilitates the social introduction of people for the purpose of information exchanges. When someone purchases a product on Amazon, the purchaser can review the product and upload photographs, and other buyers can then respond to the review.[6] This information exchange about products that Amazon sells undoubtedly fits within the definition in §14–202.5. It is the equivalent of passengers on a bus comparing notes about products they have purchased. Third, Amazon allows a user to create a personal profile, which is then associated with the product reviews that the user uploads. Such a profile can contain an assortment of information, including the user's name, e-mail address, and picture.[7] And fourth, given its back-and-forth comment function, Amazon satisfies the final statutory requirement.[8]

Many news websites are also covered by this definition. For example, the Washington Post's website gives minors access[9] and satisfies the four elements that define a com-

_____

[6]See Amazon, About Customer Reviews, https://www.amazon.com/gp/help/customer/display.html?ref=hp_left_v4_sib?ie=UTF8&nodeId=201967050; Amazon, About Public Activity, https://www.amazon.com/gp/help/customer/display.html?ref=hp_left_v4_sib?ie=UTF8&nodeId=202076150.

[7]See Amazon, About Your Profile, https://www.amazon.com/gp/help/customer/display.html?ref=hp_left_v4_sib?ie=UTF8&nodeId=202076210; Amazon, About Public Information, https://www.amazon.com/gp/help/customer/display.html?ref=help_search_1-2?ie=UTF8&nodeId=202076170&qid=1490835739&sr=1-2.

[8]Amazon does not appear to fall within the statute's exemption for websites that have as their "primary purpose the facilitation of commercial transactions involving goods or services between its members or visitors." §14–202.5(c)(2). Amazon's primary purpose seems to be the facilitation of commercial transactions between its users and *itself*.

[9]See Washington Post, Terms of Service (July 1, 2014), https://www.

ALITO, J., concurring in judgment

mercial social networking website. The website (1) derives revenue from ads and (2) facilitates social introductions for the purpose of information exchanges. Users of the site can comment on articles, reply to other users' comments, and recommend another user's comment.[10] Users can also (3) create personal profiles that include a name or nickname and a photograph. The photograph and name will then appear next to every comment the user leaves on an article. Finally (4), the back-and-forth comment section is a mechanism for users to communicate among themselves. The site thus falls within §14–202.5 and is accordingly off limits for registered sex offenders in North Carolina.

Or consider WebMD—a website that contains health-related resources, from tools that help users find a doctor to information on preventative care and the symptoms associated with particular medical problems. WebMD, too, allows children on the site.[11] And it exhibits the four hallmarks of a "commercial social networking" website. It obtains revenue from advertisements.[12] It facilitates information exchanges—via message boards that allow users to engage in public discussion of an assortment of health issues.[13] It allows users to create basic profile

---

washingtonpost.com/terms-of-service/2011/11/18/gIQAldiYiN_story.html?utm_term=.9be5851f95.

[10] See Washington Post, Ad choices (Nov. 21, 2011), https://www.washingtonpost.com/how-can-i-opt-out-of-online-advertising-cookies/2011/11/18/gIQABECbiN_story.html?utm_term=3da1f56d67e7; Washington Post, Privacy Policy (May 2, 2017), https://www.washingtonpost.com/privacy-policy / 2011 / 11 / 18 / gIQASIiaiN _ story.html ? utm _ term = .8252a76f8df2.

[11] See WebMD, Terms and Conditions of Use (Nov. 2, 2016), https://www.webmd.com/about-webmd-policies/about-terms-and-conditions-of-use.

[12] WebMD, Advertising Policy (June 9, 2016), http://www.webmd.com/about-webmd-policies/about-advertising-policy.

[13] WebMD, Message Board Overview (Sept. 22, 2016), http://www.webmd.com/about-webmd-policies/about-community-overview.

pages: Users can upload a picture and some basic information about themselves, and other users can see their aggregated comments and "likes."[14]  WebMD also provides message boards, which are specifically mentioned in the statute as a "mechanis[m] to communicate with other users." N. C. Gen. Stat. Ann. §14–202.5(b)(4).

As these examples illustrate, the North Carolina law has a very broad reach and covers websites that are ill suited for use in stalking or abusing children.  The focus of the discussion on these sites—shopping, news, health—does not provide a convenient jumping off point for conversations that may lead to abuse.  In addition, the social exchanges facilitated by these websites occur in the open, and this reduces the possibility of a child being secretly lured into an abusive situation.  These websites also give sex offenders little opportunity to gather personal details about a child; the information that can be listed in a profile is limited, and the profiles are brief.  What is more, none of these websites make it easy to determine a child's precise location at a given moment.  For example, they do not permit photo streams (at most, a child could upload a single profile photograph), and they do not include up-to-the minute location services.  Such websites would provide essentially no aid to a would-be child abuser.

Placing this set of websites categorically off limits from registered sex offenders prohibits them from receiving or engaging in speech that the First Amendment protects and does not appreciably advance the State's goal of protecting children from recidivist sex offenders.  I am therefore compelled to conclude that, while the law before us addresses a critical problem, it sweeps far too broadly to satisfy the demands of the Free Speech Clause.[15]

————————

[14]See WebMD, Change Your Profile Settings (Feb. 19, 2014), http://www.webmd.com/about-webmd-policies/profile.

[15]I express no view on whether a law that does not reach the sort of

ALITO, J., concurring in judgment

## II

While I thus agree with the Court that the particular law at issue in this case violates the First Amendment, I am troubled by the Court's loose rhetoric. After noting that "a street or a park is a quintessential forum for the exercise of First Amendment rights," the Court states that "cyberspace" and "social media in particular" are now "the most important places (in a spatial sense) for the exchange of views." *Ante*, at 4–5. The Court declines to explain what this means with respect to free speech law, and the Court holds no more than that the North Carolina law fails the test for content-neutral "time, place, and manner" restrictions. But if the entirety of the internet or even just "social media" sites[16] are the 21st century equivalent of public streets and parks, then States may have little ability to restrict the sites that may be visited by even the most dangerous sex offenders. May a State preclude an adult previously convicted of molesting children from visiting a dating site for teenagers? Or a site where minors communicate with each other about personal problems? The Court should be more attentive to the implications of its rhetoric for, contrary to the Court's suggestion, there are important differences between cyberspace and the physical world.

I will mention a few that are relevant to internet use by sex offenders. First, it is easier for parents to monitor the physical locations that their children visit and the individuals with whom they speak in person than it is to monitor their internet use. Second, if a sex offender is seen approaching children or loitering in a place fre-

---

sites discussed above would satisfy the First Amendment. Until such a law is before us, it is premature to address that question.

[16]As the law at issue here shows, it is not easy to provide a precise definition of a "social media" site, and the Court makes no effort to do so. Thus, the scope of its dicta is obscure.

Alito, J., concurring in judgment

quented by children, this conduct may be observed by parents, teachers, or others.  Third, the internet offers an unprecedented degree of anonymity and easily permits a would-be molester to assume a false identity.

The Court is correct that we should be cautious in applying our free speech precedents to the internet.  *Ante*, at 6. Cyberspace is different from the physical world, and if it is true, as the Court believes, that "we cannot appreciate yet" the "full dimensions and vast potential" of "the Cyber Age," *ibid.*, we should proceed circumspectly, taking one step at a time.  It is regrettable that the Court has not heeded its own admonition of caution.