C. Brandon Wisoff (State Bar No. 121930)
bwisoff@fbm.com
Deepak Gupta (State Bar No. 226991)
dgupta@fbm.com
Jeffrey G. Lau (State Bar No. 281629)
jlau@fbm.com
Rebecca H. Stephens (State Bar No. 299234)
rstephens@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Laurence H. Tribe* (State Bar No. 39441)
Carl M. Loeb University Professor and
Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-1767
*Admitted pro hac vice*

Attorneys for Plaintiff hiQ Labs, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301-EMC |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| vs. | |
| LinkedIn Corporation, | |
| Defendant. | |
| | The Hon. Edward M. Chen |
| | Date: June 29, 2017 |
| | Time: 1:30 P.M. |
| | Location: Courtroom 5, 17th Floor |
| | 450 Golden Gate Ave. |
| | San Francisco, CA 94102 |

* *Affiliation noted for identification purposes only.*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

34556\6071624.2

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

QUESTIONS PRESENTED ....................................................................................... 2

STATEMENT OF FACTS .......................................................................................... 4

I.     ABOUT HIQ LABS AND ITS SERVICES .................................................... 4

II.    THE LINKEDIN PROFESSIONAL NETWORK AND THE PUBLIC MEMBER
      PROFILE PORTION OF THE WEBSITE ...................................................... 5

III.   LINKEDIN'S SURPRISING CEASE AND DESIST LETTER REVOKING
      ACCESS TO PUBLIC PROFILES ................................................................. 6

IV.   RECENTLY UNCOVERED EVIDENCE SUGGESTS THAT LINKEDIN IS
      DEVELOPING ITS OWN OFFERINGS BASED ON PUBLIC PROFILE DATA ............... 7

ARGUMENT ............................................................................................................. 7

I.     THE BALANCE OF HARDSHIPS TIPS STRONGLY IN FAVOR OF HIQ ...................... 8

II.    HIQ HAS RAISED SERIOUS QUESTIONS ON THE MERITS OF ITS CLAIMS ............ 9

      A.    hiQ is Likely to Prevail on its Cause of Action for Intentional Interference with
           Contract and Prospective Economic Advantage. ................................................9

      B.    hiQ is Likely to Prevail on Its Claim Against LinkedIn for "Unlawful" and
           "Unfair" Competition. ......................................................................................10

           1.    LinkedIn's disruption of hiQ's contractual and prospective business
                 relationships is unlawful and thus a violation of the UCL. ...........................11

           2.    LinkedIn's unjustified and anticompetitive conduct in cutting off hiQ's
                 access to public data is also an "unfair" practice under the UCL....................11

      C.    hiQ is Likely to Prevail on its Cause of Action for Promissory Estoppel. ..................13

      D.    California Free Speech Rights Protect hiQ's Right of Access.....................................15

      E.    hiQ is Likely Entitled To Declaratory Judgment that it Has Not Violated the
           DMCA, State Trespass Law, the CFAA, or California Penal Code § 502(c)..............19

           1.    An actual controversy exists between hiQ and LinkedIn. ...............................19

           2.    LinkedIn's claims would be brought for an improper purpose and
                 would have an impermissible effect. ...............................................................19

           3.    The CFAA and DMCA must be read narrowly to preserve their validity
                under the U.S. Constitution and to avoid harm to the built-in safeguards
                of Copyright Law. ..........................................................................................20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

i

34556\6071624.2

4. The technical blocks of member public profiles do not implicate the DMCA, because they are not implemented "with the authority of the copyright owner" ...................................................................................22

5. California trespass law cannot apply in the absence of damage to LinkedIn's computer systems. ..........................................................23

III. HIQ WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ........................................................................... 24

IV. THE INJUNCTION IS IN THE PUBLIC INTEREST ....................................... 24

V. NO BOND SHOULD BE REQUIRED ........................................................... 25

CONCLUSION ............................................................................................................ 25

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

ii

34556\6071624.2

# **TABLE OF AUTHORITIES**

**Page**

## **FEDERAL CASES**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009)..............................................................................22

*Alaska v. Native Village of Venitie,*
   856 F.2d 1384 (9th Cir. 1988)..............................................................................8

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011)..............................................................................8

*American Tobacco Co. v. U.S.,*
   328 U.S. 781, 809 (1946)...................................................................................19

*Authors Guild v. Google, Inc.,*
   804 F. 3d 202 (2d Cir. 2015)..............................................................................22

*Cabell v. Zorro Prods., Inc.,*
   No. 5:15-CV-00771 (EJD), (2017 WL 2335597) (N.D. Cal. May 30, 2017)...........................19

*Craigslist Inc. v. 3Taps Inc.,*
   964 F. Supp. 2d 1178 (N.D. Cal. 2013) ..............................................................20

*CRST Van Expedited, Inc. v. Werner Enters., Inc.,*
   479 F.3d 1099 (9th Cir. 2007)......................................................................10, 11

*Doran v. Salem Inn, Inc.,*
   422 U.S. 922 (1975) .........................................................................................24

*eBay, Inc. v. Bidder's Edge, Inc.,*
   100 F. Supp. 2d. 1058 (N.D. Cal. 2000) ............................................................23

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003) .........................................................................................21

*Facebook, Inc. v. Power Ventures, Inc.,*
   844 F.3d 1058 (9th Cir. 2016)............................................................................20

*Facebook, Inc. v. Power Ventures, Inc.,*
   No. 13-17102, 2016 WL 3741956 (9th Cir. July 12, 2016) ................................24

*Freedom Holdings, Inc. v. Spitzer,*
   408 F.3d 112 (2nd Cir. 2005)............................................................................22

*Golan v. Holder,*
   565 U.S. 302 (2012) .........................................................................................20

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,*
   415 U.S. 423 (1974) ...........................................................................................8

*Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466 (7th Cir. 1982) ............................20

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*Gomez v. U.S.*,
490 U.S. 858, 864 (1989) ............................................................................................ 21

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985) .................................................................................................... 21

*In re iPhone Application Litigation*,
844 F. Supp. 2d. 1040, 1069 (N.D. Cal. 2012) .......................................................... 23

*Jorgenson v. Cassiday*,
320 F.3d 906 (9th Cir. 2003) ...................................................................................... 25

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ...................................................................................... 22

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) .............................................................................. 24, 25

*Lamont v. Postmaster General*,
381 U.S. 301 (1965) .................................................................................................... 15

*Max Factor & Co. v. Factor*,
226 F. Supp. 120 (S.D. Cal. 1963) ............................................................................. 24

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) .............................................................................. 12, 13

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .................................................................................................... 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519, 562 (2012) ............................................................................................ 21

*New York Times v. Sullivan*,
376 U.S. 254 (1964) .................................................................................................... 21

*Otter Tail Power Co. v. United States*,
410 U.S. 366 (1973) .............................................................................................. 12, 13

*Packingham v. North Carolina*,
No. 15-1194, 582 U.S. ___, slip op. at 6 (Jun. 19, 2017) .................................... 18, 20

*Patino v. Franklin Credit Mgmt. Corp.*,
No. 16-cv-02695-LB, 2017 WL 1246853 at *1 (N.D. Cal. Apr. 5, 2017) .................... 8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .................................................................................... 22

*Phillips v. Crown Central Petroleum Corp.*,
602 F.2d 616 (4th Cir. 1979) ...................................................................................... 19

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980) ................................................................................................ 16, 17

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

iv

34556\6071624.2

*Shelley v. Kraemer,*
   334 U.S. 1 (1948)..................................................................................................20

*Shippers, Inc. v. Fontenot,*
   No. 13CV1349 JLS(MDD), 2013 WL 12092056 at \*6 (S.D. Cal. Sept. 23, 2013)..................24

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ......................................................................................15, 21

*Stuhlbarg International Sales Co., Inc. v. John D. Brush & Co., Inc.,*
   240 F.3d 832 (9th Cir. 2001) ............................................................................8, 24

*TransFresh Corp. v. Ganzerla & Assoc., Inc.,*
   862 F. Supp. 2d 1009 (N.D. Cal. 2012) ....................................................................19

*Watt v. Alaska,*
   451 U.S. 259 (1981) ........................................................................................22

*Winter v. Nat. Res. Defense Council,*
   555 U.S. 7 (2008) ...........................................................................................8

## STATE CASES

*Ampex Corp. v. Cargle,*
   128 Cal. App. 4th 1569 (2005).............................................................................18

*Barrett v. Rosenthal,*
   40 Cal.4th 33 (2006).......................................................................................18

*Best Friends Animal Soc'y v. Macerich Westside Pavilion Property LLC,*
   193 Cal.App.4th 168 (2011) ...............................................................................17

*Blank v. Kirwan,*
   39 Cal. 3d 311 (1985)......................................................................................12

*Bower v. AT&T Mobility, LLC,*
   196 Cal. App. 4th 1545 (2011) ............................................................................11

*Cal. Newspaper Ass'n v. Burbank,*
   51 Cal. App. 3d 50 (1975) .................................................................................15

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
   20 Cal. 4th 163 (1999).................................................................................11, 12

*Edmonds v. Los Angeles Cty.,*
   40 Cal.2d 642 (1953) ......................................................................................15

*Fashion Valley Mall, LLC v. NLRB,*
   42 Cal. 4th 850 (2007).................................................................................3, 16

*Garcia v. World Sav., FSB,*
   183 Cal. App. 4th 1031 (2010) ............................................................................14

*H&M Associates v. City of El Centro,*
   109 Cal. App. 3d 399 (1980) ...............................................................................9

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

v

34556\6071624.2

*In re Tobacco II Cases,*
    46 Cal. 4th 298, 312 (2009).............................................................................................. 13

*Intel Corp. v. Hamidi,*
    30 Cal. 4th 1342 (2003)................................................................................................... 23

*Korea Supply Co. v. Lockheed Martin Corp.,*
    29 Cal. 4th 1134 (2003)............................................................................................... 9, 10

*Kwikset Corp. v. Super. Ct.,*
    51 Cal. 4th 310 (2011)..................................................................................................... 11

*Metro-Goldwyn-Mayer, Inc. v. Lee,*
    212 Cal. App. 2d 23 (1963)............................................................................................ 24

*Motors, Inc. v. Times Mirror Co.,*
    102 Cal. App. 3d 735 (1980).......................................................................................... 11

*Nicol v. Nelson,*
    776 P.2d 1144 (Colo. App. 1989) .................................................................................. 15

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
    50 Cal.3d 1118 (1990)...................................................................................................... 9

*Progressive W. Ins. Co. v. Yolo Cty. Sup. Ct.,*
    135 Cal. App. 4th 263 (2005).......................................................................................... 11

*Reeves v. Hanlon,*
    33 Cal. 4th 1140, 1148 (2004) ......................................................................................... 9

*Robins v. Pruneyard Shopping Center,*
    23 Cal. 3d 899 (1979)..................................................................................................... 17

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.,*
    72 Cal. App. 4th 861 (1999)............................................................................................ 11

*Snatchko v. Westfield LLC,*
    187 Cal.App.4th 469 (3d Dist. App. 2010) .................................................................... 17

*Toscano v. Greene Music,*
    124 Cal. App. 4th 685 (2004).......................................................................................... 14

*Trustees of Cal. State University & Colleges v. NCAA,*
    82 Cal. App. 3d 461 (1978)............................................................................................ 14

*Wagner v. Glendale Adventist Medical Center,*
    216 Cal. App. 3d 1379 (1989)........................................................................................ 14

*Wilson v. Bailey,*
    8 Cal. 2d 416 (1937)....................................................................................................... 14

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

vi

34556\6071624.2

# U.S. CONSTITUTION

U.S. Const. Art. I, § 9 ............................................................................................................ 21

# FEDERAL STATUTES

15 U.S.C. § 2 ............................................................................................................ 12

17 U.S.C. § 1201(a)(1)(A) ............................................................................................ 22

17 U.S.C. § 1201(a)(3) ................................................................................................ 22

28 U.S.C. § 2201 ........................................................................................................ 19

# STATE STATUTES

Cal. Bus. & Prof. Code § 17200............................................................................... 10, 11

Cal. Bus. & Prof. Code § 17204.................................................................................... 10

Cal. Penal Code § 502 ................................................................................................... 6

Cal. Penal Code § 502(c) ............................................................................................. 19

# OTHER AUTHORITY

Smolla & Nimmer on Freedom of Speech, Section 8.33.20....................................................18

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

34556\6071624.2

## INTRODUCTION

Defendant LinkedIn Corporation ("LinkedIn"), the world's largest professional network, with over 500 million members, has abruptly, unlawfully and without cause denied Plaintiff hiQ Labs, Inc. ("hiQ") access to the portion of the LinkedIn website containing wholly public member profiles.  hiQ relies on that public data, available nowhere but LinkedIn, for its data analytics business that serves clients including eBay, Capital One, and GoDaddy.  LinkedIn asserts as pretext a need to protect LinkedIn member data even though LinkedIn members have expressly made that information public and LinkedIn has identified no harm to itself or its members.

LinkedIn acknowledges on its website that public profile data belongs to LinkedIn members, not to LinkedIn, and that each member can choose the level of public disclosure allowed for his or her own information.  Members can choose to (1) keep their profile private; (2) share only with their direct connections; (3) share with connections within three degrees of separation; (4) allow access only to other signed-in members, or (5) allow access to everyone, even members of the public and third-party services who may have no LinkedIn account and who can access the information without signing in or using any password.  It is only this fifth category of information – wholly public profiles – that is at issue here:  hiQ accesses only the profiles that LinkedIn members have made available to the public.  hiQ uses that information for data analytics that LinkedIn members' employers in turn use to retain and to create better career and internal mobility paths.  Thus, far from harming LinkedIn members, hiQ's access promotes precisely the type of professional opportunities that lead LinkedIn members to make their profiles public in the first place.

The Court should by temporary restraining order ("TRO") and preliminary injunction enjoin LinkedIn from denying hiQ this access for a number reasons. Among them, LinkedIn's actions are anticompetitive: they are designed to prevent anyone but LinkedIn from being able to use public information for data analytics.  LinkedIn for years has known about hiQ and its business, has attended and presented at data analytics conferences hosted by hiQ and has even accepted awards from hiQ at these conferences.  But, having recently made several public statements about performing data analysis on public profiles, LinkedIn has abruptly decided to terminate hiQ's access.  LinkedIn's entire stated complaint is that hiQ "copies" the data its members have made public, but LinkedIn has asserted no

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

1

34556\6071624.2

copyright or other exclusive proprietary interest in the data and it clearly has none.  Moreover, hiQ does not collect all (or even a substantial proportion) of the member profiles on LinkedIn, nor does it draw business away from LinkedIn by creating a substitute social network or job posting forum.  Rather, hiQ pulls and analyzes data for a limited subset of users – usually its clients' employees.  The product that hiQ then provides its clients is by necessity very different from the public profile pages on LinkedIn. Because LinkedIn has no legitimate copyright claim, it has instead threatened to sue hiQ under inapposite federal and state laws pertaining to hacking and unauthorized computer and network access. But LinkedIn cannot put those laws to an obviously improper purpose in order to obtain exclusive proprietary control over wholly public data in which it otherwise has no exclusive interest and which hiQ, and anyone else on earth, can freely access on the world-wide web even with no log-in credentials or password.  Indeed, LinkedIn would not *have* that data on its website at all but for its promise to LinkedIn members that they can publicly disclose that information on LinkedIn for all the world to see and use.

hiQ has therefore filed the instant action to obtain a declaration of the parties' rights and liabilities under federal and state laws threatened by LinkedIn and for affirmative relief under state constitutional law, statutes and common law for LinkedIn's attempted destruction of hiQ's business.  Immediate injunctive relief is needed and appropriate because hiQ will likely lose its contracts and employees (23 total full time employees, 20 based in San Francisco) and go out of business (rendering worthless the $14.5 million in venture capital invested since its start up in 2012) if it cannot access the public information on which its business completely depends.  By contrast, LinkedIn has not asserted and cannot assert any legitimate harm to itself or its members by allowing hiQ the continued access to wholly public profiles that it has enjoyed for years with LinkedIn's knowledge.

## QUESTIONS PRESENTED

**1.     Do LinkedIn's Actions Threaten Immediate, Irreparable Harm to hiQ?**  Yes, denying hiQ access to LinkedIn's public member profiles will effectively shut down hiQ's operations.  No more serious harm to a business is imaginable.

**2.     Does hiQ Present A Likelihood of Success on the Merits?**  Yes, applicable law establishes that LinkedIn cannot selectively deny hiQ access for an improper anticompetitive purpose in order to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

2

34556\6071624.2

1   effectively give itself an exclusive right to data that its members, the world at large, and settled rules of

2   copyright law all deem to be public.  LinkedIn's reliance on laws to prevent abusive computer and

3   network invasion perverts the principles of those laws by using them as a sword to prevent legitimate

4   competition rather than as a shield against unlawfully invasive harm.  LinkedIn's actions also violate

5   independent law prohibiting tortious interference with hiQ's contracts and prospective economic

6   advantage and preventing unfair business practices.  LinkedIn is further estopped to deny access to data it

7   obtained on its website by promising that the data would be public and after allowing hiQ access for

8   years, only to do an about-face for anticompetitive purposes.  Indeed, to interpret federal or state law

9   preventing computer abuse and hacking so as to permit LinkedIn to deny access to wholly public profiles

10  in these circumstances would violate California's constitutional free speech provisions and principles as

11  authoritatively interpreted in *Robins v. Pruneyard Shopping Center*, 23 Cal. 3d 899 (Cal. 1979) and

12  *Fashion Valley Mall, LLC v. NLRB*, 42 Cal. 4th 850 (Cal. 2007).  Those decisions by California's highest

13  court establish that, when a private property owner opens its property to the public, constitutional

14  principles of free and open speech and access to information must be fully respected.  Subject to

15  reasonable and content-neutral regulations of time, place, and manner ensuring continued public access,

16  the owner of that property cannot selectively silence or shut out particular speakers or listeners.  Even

17  though such censorship and information control by LinkedIn's servers resemble purely "private"

18  suppression of free expression on legally "private" property, LinkedIn created a public forum for

19  professionals to meet and exchange ideas, and "public profile pages" are a foundation stone of this

20  expressive community.  LinkedIn may not selectively exclude hiQ from this public forum, whether

21  because LinkedIn's managers resent hiQ's ability to profit from the information that LinkedIn and its

22  users chose to make public, or for any other reason.  Deciding who can take advantage of public

23  information to earn a living is the essence of censorship, however apolitical it may appear to be.

24  **3.      Does the Balance of Equities Tip Sharply in hiQ's Favor?**  Yes, without an injunction hiQ

25  will likely go out of business, but LinkedIn will suffer no appreciable harm if the status quo continues

26  while the merits are decided.  In the scales of justice applicable to this case, there is much on one side

27  and nothing at all on the other.

28  **4.      Would the Requested Injunction Serve the Public Interest?**  Yes, the public has an interest

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

3

34556\6071624.2

1   in seeing constitutional principles vindicated, the free flow of public information preserved, and a

2   valuable startup company like hiQ given a fair chance to thrive rather than being forced out of business

3   before the merits can be decided.  The public also has an interest in ensuring proper enforcement of

4   California's competition laws and in enjoying the benefits, both economic and moral, of preserving the

5   fair playing field that the law is designed to ensure.

**STATEMENT OF FACTS**

6

7   **I.      ABOUT HIQ LABS AND ITS SERVICES**

8           hiQ has raised $14.5 million in two rounds of funding since its inception in 2012 as a company

9   applying predictive data science to issues related to a company's workforce.  hiQ was then called

10  OrgStars.  Declaration of Mark Weidick in Support of hiQ's Renewed Motion for TRO ("Weidick

11  Decl.") ¶ 3.  hiQ presently has 23 employees, the majority of whom are in its San Francisco office, 11 of

12  whom have advanced degrees, including several PhDs.[1]  *Id.*  hiQ sells Fortune 500 clients "people

13  analytics" – i.e. insights to their workforce – that it deduces by performing computerized analyses of the

14  public profile information available on LinkedIn.  *Id.* at ¶ 4.  hiQ provides its customers two specific

15  analytics services:  (a) "Keeper," which tells employers which of their employees are at the greatest risk

16  of being recruited away, and (b) "Skill Mapper," a summary of the breadth and depth of aggregate or

17  individual skills possessed.  *Id.* at ¶¶ 4-6.

18          hiQ uses the public profile section of the LinkedIn website as raw data for its analysis and has

19  historically used a variety of software and manual means to assimilate and organize this information.  *Id.*

20  at ¶ 8.  hiQ does not access the private sections of LinkedIn, such as profile information that is visible

21  only to those who have signed in as members, or member private data that is visible only to those who

22  are "connected" to a member.  *Id.*  Having accessed the information it collects from LinkedIn, hiQ does

23  not simply republish it, but rather transforms this information using *analytics*.  *Id.* at ¶ 9.  In so doing,

24  hiQ is engaged in the quintessential prerequisite of free expression: freedom of thought.  Nor do hiQ's

25  services impair or impede the value of the LinkedIn social network.  On the contrary, they make it more

26  valuable to have such a profile – an employer using the "Keeper" product might give an employee a

27

28

---

[1] Since the time of LinkedIn's cease and desist letter, hiQ has experienced retention issues and
recently lost an employee.  Weidick Decl., ¶ 19.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

4

34556\6071624.2

"stay bonus" or a career development or internal mobility opportunity, or SkillMapper may demonstrate that its workforce lacks depth in a particular skill area, which could lead the employer to offer its employees free training to make up for that deficit.  *Id.* at ¶¶ 5-6.  Thus what hiQ does, and what LinkedIn is seeking to prevent hiQ from doing, enhances and in no respect diminishes the value to everyone concerned of what LinkedIn provides.

## II.     THE LINKEDIN PROFESSIONAL NETWORK AND THE PUBLIC MEMBER PROFILE PORTION OF THE WEBSITE

The core of LinkedIn's business is a professional network that aggregates the profile information of about half a billion professionals.  Ex. A at 2.  The express purpose of the service is to provide a place for professionals "to meet, exchange, ideas, learn and find opportunities…."  Ex. B at § 1.1.

LinkedIn member profiles contain resume information such as education, skills, publications, certifications, and employment history.  *See, e.g.*, Ex. C.  LinkedIn's collection of public profiles is a one-of-a-kind resource.  It is the single largest, most up-to-date and authoritative repository of basic professional information about the world's professional community.  *See generally* Ex. A.

LinkedIn explains to members that "you own the content and information that you submit."  Ex. B at § 3.1.  LinkedIn is unequivocal :  "You [the Member] control the visibility and reach of your LinkedIn profile."  Ex. D. at 1.  LinkedIn gives members the ability and right to specify which portions of their profiles will be visible to their direct connections, their "network" (those within three degrees of separation), all LinkedIn members, and the "public."  Ex. C.  The "public" setting (which is at issue here) gives access to *"[a]ll LinkedIn members as well as others who find you through search engines (e.g. Google, Bing) or other services."*  Ex. E (pop-up box under "Customize Your Public Profile" (emphasis added)).  Public profiles may be reached via third-party services (e.g. Google and Bing) and directly via a web address (URL) that LinkedIn creates for its members.  *Id.*; *see also* Ex. F at 1.  The User Agreement explains that "Members and/or Visitors may access and share your content and information, consistent with your settings and degree of connection with them."  Ex. B at § 3.1.

Since its founding in 2002, LinkedIn has created numerous successful revenue streams.  As of hiQ's launch in 2012, LinkedIn's annual revenues were on the order of nearly $1 billion, a dollar figure that has nearly quadrupled by the end of 2016.  *Compare* Ex. G *with* Ex. H.  In late 2016, LinkedIn was

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

5

34556\6071624.2

purchased by Microsoft Corporation for $26 billion.  Ex. I.

## III.  LINKEDIN'S SURPRISING CEASE AND DESIST LETTER REVOKING ACCESS TO PUBLIC PROFILES

LinkedIn has known of hiQ since at least October 2015 when it started participating in hiQ's Elevate conference.  Weidick Decl. ¶ 11.  The hiQ Elevate conference was designed to build a community around the emerging field of people analytics and has provided a regular forum for participants to share insights and disseminate best practices.  *Id.* at ¶ 12.  Since October 2015, LinkedIn has sent at least ten different representatives to hiQ's Elevate conferences, including some that have attended multiple times.  *Id.* at ¶ 13.  hiQ has spoken freely about its data collection from LinkedIn at Elevate, so LinkedIn understood exactly what hiQ does.  *Id.* at ¶ 12.  LinkedIn has itself spoken at Elevate, and in 2016 it applied for and won an Elevate "Impact Award."  *Id.* at ¶¶ 12-13.  hiQ's former CEO held a series of in-person meetings with LinkedIn personnel discussing hiQ's business in late 2016 and early 2017.  *Id.* at ¶ 14.

Given LinkedIn's awareness of hiQ over the years, hiQ management was surprised when on May 23, 2017, without any forewarning, LinkedIn's legal counsel emailed a letter to hiQ stating that hiQ was improperly "access[ing] and copy[ing]" LinkedIn public profile information.  *Id.* at ¶ 15; Ex. J.  The letter demanded that hiQ immediately "[c]ease and desist accessing or attempting to access or use LinkedIn's website, computers, computer systems, computer network, computer programs, and data stored therein."  Ex. J at 2.  LinkedIn's letter stated that hiQ was in violation of the LinkedIn User Agreement, state trespass law, the Computer Fraud and Abuse Act, California Penal Code 502, and the Digital Millennium Copyright Act.  *Id.*  The letter also stated that any further access to the site would be "without permission" and "without authorization."  Further, LinkedIn stated that it had implemented "technical measures" to block hiQ from the site.  *Id.*

hiQ promptly retained counsel who contacted LinkedIn to explain hiQ's belief that it had a right to access LinkedIn's public pages, that its business is synergistic to that of LinkedIn rather than injurious, and that complying with LinkedIn's letter would devastate hiQ.  Counsel for hiQ asked if LinkedIn would allow hiQ to access the site while the parties figured out a mutually acceptable resolution, and LinkedIn's counsel said no.  hiQ's counsel further sought to understand whether LinkedIn believed it

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

6

34556\6071624.2

was being harmed in any way and, if so, how.  Declaration of Deepak Gupta in Support of hiQ's Renewed Motion for Temporary Restraining Order ("Gupta Decl.") ¶¶ 2-3.  LinkedIn's counsel was unable to point to any interference or impairment with LinkedIn's servers from hiQ's accessing the site, and conceded that other commercial enterprises, including Google and Yahoo!, are permitted to use automated software to programmatically access the LinkedIn site.  *Id.* at ¶ 4.  When asked whether LinkedIn is building services to compete with hiQ's Keeper and Skill Mapper services, LinkedIn's counsel responded that he did not know the answer.  *Id.* at ¶ 5.  On May 31, 2017 counsel for hiQ again sent a letter to LinkedIn asking that hiQ be permitted to access the public profiles portion of the LinkedIn website, at least in the interim while the parties discussed the possibility of a mutually amicable resolution.  *Id.* at ¶ 6; Ex. K.  LinkedIn did not respond, leading to hiQ's original TRO application (which was then withdrawn at LinkedIn's request to allow for settlement discussions which have now failed). Gupta Decl. ¶¶ 6-7.

## IV.    RECENTLY UNCOVERED EVIDENCE SUGGESTS THAT LINKEDIN IS DEVELOPING ITS OWN OFFERINGS BASED ON PUBLIC PROFILE DATA

In hiQ's investigation in connection with these proceedings, it discovered that LinkedIn has started building its own offerings based on public member profiles. Ex. L at 4, 13.  In a February 2015 earnings call, about three years after hiQ's launch, LinkedIn's CEO announced, "This year, we plan to enter a new category with products allowing companies to utilize LinkedIn in the enterprise by leveraging content and data that members are already sharing publicly."  *Id.* at 4.  When discussing this "new category," LinkedIn's CEO explained:

> [T]here's an opportunity for LinkedIn to create value within an enterprise, within an organization *leveraging information that's already public*.  So by way of example, *our public profile information*, which particularly at larger organizations, *you see some of those companies turning to LinkedIn to look up someone with their own company, because of how robust that public profile information can prove to be…..[W]e're trying to think about ways in which we can better leverage that to create value within an organization.*

*Id.* at 13 (emphasis added).  Furthermore, a page on the LinkedIn website states that it is investing in its own data science projects.  *See*  Ex. M at 1-2.

## ARGUMENT

A TRO "preserves the status quo and prevents irreparable harm until a hearing can be held on a

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

7

34556\6071624.2

preliminary injunction application." *Patino v. Franklin Credit Mgmt. Corp.*, No. 16-cv-02695-LB, 2017 WL 1246853, at *1 (N.D. Cal. Apr. 5, 2017), citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).  The standard for granting a TRO is "substantially identical" to the standard for granting a preliminary injunction.  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co. Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  The traditional test for issuing a TRO includes consideration of four factors: (1) the likelihood of the plaintiff's success on the merits; (2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; (3) the relative balance of harm to the plaintiff and the harm to the defendant if the injunction is not imposed; and (4) the public interest. *Alaska v. Native Village of Venitie*, 856 F.2d 1384, 1388 (9th Cir. 1988); *see also Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (articulating same four-factor test for preliminary injunctions).

California federal courts have adopted a version of this four-part test under which a TRO is appropriate if Plaintiff can show that serious questions going to the merits were raised and that the balance of hardships tips sharply in its favor, so long as both the threat of irreparable harm and public interest also weigh in its favor.  *Patino*, 2017 WL 1246853 at *1, citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

## I.      THE BALANCE OF HARDSHIPS TIPS STRONGLY IN FAVOR OF HIQ

LinkedIn's revocation of hiQ's access to public profiles will devastate hiQ, while retaining the status quo would have no appreciable effect on LinkedIn.  LinkedIn was a $26 billion corporation when it was purchased by Microsoft in 2016.  Whatever adverse economic effect hiQ's existence could conceivably have on LinkedIn does not warrant hiQ's destruction before the merits can be decided.

It bears emphasis that hiQ believes that its people analytics services add value to LinkedIn by giving employers and LinkedIn members useful analysis relating to their public profiles.  This, in the long run, enhances the importance to all professionals of having a LinkedIn public profile, which in turn helps LinkedIn maintain its position as the world's largest professional network.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

8

34556\6071624.2

## II.   HIQ HAS RAISED SERIOUS QUESTIONS ON THE MERITS OF ITS CLAIMS

### A.   hiQ is Likely to Prevail on its Cause of Action for Intentional Interference with Contract and Prospective Economic Advantage.

In California, "the law is settled that 'a stranger to a contract may be liable in tort for intentionally interfering with the performance of that contract.'" *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004), citing *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  The elements of intentional interference with contract are: (1) a valid contract; (2) the defendant's knowledge of that contract; (3) intentional disruption of the contractual relationship; (4) actual breach or disruption; and (5) damage.  *Id.*  To show interference with prospective economic advantage, a plaintiff must also plead and prove "that the defendant engaged in an independently wrongful act," which means an act that is "'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1152-53 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).

hiQ has raised substantial questions on each element.  hiQ has valid customer contracts with a number of clients, including eBay, Capital One, and GoDaddy.  Weidick Decl. ¶ 10.  Linked has and had knowledge of hiQ's valid customer contracts.  Weidick Decl. ¶¶ 14, 20.  hiQ has also provided notice to LinkedIn of a pending financing, as well as prospective deals with Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite.  Ex. K at 2-3.  LinkedIn's conduct endangers these relationships.  LinkedIn was aware that hiQ's business relationships stood to be destroyed if its ability to access public profile pages was denied.  Ex. K at 3.

LinkedIn's conduct will disrupt or require breach of these contracts.  hiQ's business is premised on performing data science on LinkedIn public profile pages.  Terminating an essential service so that a company cannot perform under its contracts constitutes intentional interference.  *H&M Assocs. v. City of El Centro*, 109 Cal. App. 3d 399, 405 (1980).  Just as cutting off a water supply eliminated a key facility necessary for a landlord to keep his tenants, cutting off hiQ's access to public profile pages will require the breach of hiQ's contracts with existing customers, prevent it from consummating its pending deals with prospects, and disrupt the closing of its pending financing round.  Ex. K at 2-3; Weidick Decl. ¶¶ 17-18.  The damage requirement is easily satisfied because, as detailed throughout the motion, hiQ

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

9

34556\6071624.2

1     will suffer lost business and possible bankruptcy if LinkedIn's disruptive activity is not restrained.

2          Further, for purposes of hiQ's claim for interference with prospective economic advantage,

3     LinkedIn has committed an "independently wrongful act." *See Korea Supply Co.*, 29 Cal. 4th at 1158.

4     hiQ need only establish that LinkedIn's acts "were unlawful for a reason other than that they interfered

5     with [plaintiff's] prospective economic advantage" in order to establish that the defendant committed an

6     independently wrongful act. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1110 (9th

7     Cir. 2007).

8          LinkedIn committed three independently wrongful acts when it revoked hiQ's access to public

9     profiles: (1) it breached LinkedIn's express promises (including that the pages are "public," *members*

10    *control* the visibility of these pages, and visitors may access and share these pages); (2) this constituted

11    unfair competition, *infra*;[2] and (3) it violated California free speech protections, *infra*.  LinkedIn should

12    not be allowed to intentionally and wrongfully disrupt hiQ's contracts and prospective business dealings

13    by revoking its access to admittedly public material.

14       **B.**    **hiQ is Likely to Prevail on Its Claim Against LinkedIn for "Unlawful" and "Unfair" Competition.**

15

16          California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or fraudulent

17    business act or practice."  Cal. Bus. & Prof. Code § 17200.  LinkedIn's decision to deny hiQ access to

18    admittedly "public" profile pages is both unlawful and unfair.

19          hiQ has standing under Business & Professions Code §17204 to seek injunctive relief. To

20    establish standing under the UCL, a plaintiff must (1) establish a loss or deprivation of money or

21    property sufficient to qualify as injury in fact, *i.e.*, economic injury, and (2) show that the economic

22    injury was the result of, *i.e.*, caused by, the unfair business practice.  *Bower v. AT&T Mobility, LLC*, 196

23    Cal. App. 4th 1545, 1554 (2011) (internal citations omitted).

24          hiQ's complained-of injuries – the loss of current and prospective revenues from its business

25    relationships and the disruption of its current financing round – are all economic and are all being caused

---

[2] A violation of California's Unfair Competition Law is sufficient to establish an "independently wrongful act" for purposes of a claim for interference with prospective economic advantage. *CRST*, 479 F.3d at 1110-11  ("We see nothing inconsistent with *Della Penna* in recognizing that the requirement of an independently wrongful act under the California law of intentional interference with prospective economic relations may be satisfied even by an alleged violation of a borrowing statute like the UCL.").

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

by LinkedIn's decision to revoke hiQ's access to public profile pages.  "Injunctions are 'the primary form of relief available under the UCL.'"  *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 337 (2011).

        1.     LinkedIn's disruption of hiQ's contractual and prospective business relationships is unlawful and  thus a violation of the UCL.

The UCL borrows "violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Thus, LinkedIn's tortious interference with hiQ's current and prospective contractual and business relationships gives rise to a claim under the "unlawful" business practices prong of the UCL.  *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099 (9th Cir. 2007).

        2.     LinkedIn's unjustified and anticompetitive conduct in cutting off hiQ's access to public data is also an "unfair" practice under the UCL.

The concept of an "unfair" practice has a broad sweep: "'. . . [17200] undeniably establishes only a wide standard to guide courts of equity; as noted above, given the creative nature of the scheming mind.' . . .  '(I)t would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited (citations omitted), since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery.'"  *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 739-40 (1980) (citations omitted).

Courts have defined "unfair" differently in cases involving direct competitors and consumers.  *See Cel-Tech*, 20 Cal. 4th at 187 n.12 .  As between direct competitors, "unfair" includes conduct that "violates the policy or spirit of one of [the anti-trust] laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Id.* at 187.  Any "practices that *have the effect* of harming competition may be unfair" under the UCL.  *Id*. at 189 (emphasis added).  In non-competitor commercial cases, some courts have applied this same definition while others have continued to apply the pre-*Cel-Tech* balancing test which "entails examination of the impact of the practice or act on its victim,'" "'balanced against the reasons, justifications and motives of the alleged wrongdoer.'"  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 n.24 (1999) (applying balancing test in commercial consumer context); *Progressive W. Ins. Co. v. Yolo Cty. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

11

34556\6071624.2

Here the parties are not strictly, or only, competitors. hiQ does not maintain any networking platform or republish the profiles or data as they appear on LinkedIn's website. Weidick Decl. ¶ 9. hiQ's analytics services are synergistic to LinkedIn's stated purpose of assisting LinkedIn's members maximize their professional opportunities. *Id.* at ¶¶ 4-8. hiQ was itself a LinkedIn member with a business profile page before LinkedIn took down hiQ's profile, terminated its membership and cut off its access, even as a non-member, to profile pages that LinkedIn members have explicitly made public for all to see. *Id.* at ¶ 16. If LinkedIn is now a competitor of hiQ, it is only because of LinkedIn's apparent recent decision to enter the data analytics business in which hiQ was already operating. But under any standard, LinkedIn's conduct is unfair.

First, LinkedIn is unfairly leveraging its power in the professional networking market to secure an anticompetitive advantage in another market – the data analytics market. Under the *Cel-Tech* competitor standard, LinkedIn's access denial "violates the policy or spirit of one of [the antitrust] laws . . . , or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. California courts look to federal antitrust law for guidance. *See Blank v. Kirwan*, 39 Cal. 3d 311, 320 (1985). And federal antitrust law prevents a firm from using its monopolistic power in one market to secure a competitively unjustified advantage in a second ("leveraged") market. *See* 15 U.S.C. § 2; *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1106 (7th Cir. 1983); *Otter Tail Power Co. v. U.Ss.*, 410 U.S. 366, 377 (1973) (use of monopoly power to destroy threatened competition violates Sherman Act). LinkedIn is using its dominant presence as the world's largest professional networking platform to assume exclusive proprietary control over data that is owned not by LinkedIn, but by its members, and which those members have explicitly designated as public. LinkedIn's actions suppress competition in the neighboring field of data analytics and violate the core principles and spirit of the antitrust laws.

Likewise, antitrust law has long recognized the "essential facilities" doctrine, which precludes a monopolist or attempted monopolist from denying access to a facility it controls that is essential to its competitors. Such anticompetitive conduct threatens the extension of the monopolist's control from one stage of production to another, or from one market to another. *MCI Commc'ns*, 708 F.2d at 1132-1133. The law thus imposes on firms controlling an "essential facility" "the obligation to make the facility

PLAINTIFF'S MPA ISO RENEWED MOTION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

12

34556\6071624.2

1    available on non-discriminatory terms." *Id.* (evidence supported jury verdict in favor of plaintiff long

2    distance phone on "essential facility" claim where "[n]o legitimate business or technical reason was

3    shown for AT&T's denial of the requested interconnections"; "MCI was not requesting preferential

4    access to the facilities"; and "it was technically and economically feasible for AT&T to have provided

5    the requested interconnections"); *and see Otter Tail Power*, 410 U.S. at 377-78.

6          There is no viable alternative to LinkedIn's dominant member database to obtain data relevant in

7    the field of employee data analytics.  Weidick Decl. ¶ 17.  Even if it were theoretically possible to create

8    another competing networking platform and database, that is not a reality given LinkedIn's undeniable

9    dominance.  *See MCI*, 708 F.2d at 1132 (factors include practical ability to duplicate essential facility).

10   LinkedIn has not identified any technical barrier or cost to LinkedIn providing access.  Gupta Decl. ¶ 4.

11   Until recently, LinkedIn has been providing access to hiQ without burden or complaint and it still

12   provides access to others, including Google, Bing, and Yahoo.

13         These same considerations show LinkedIn's conduct to be unfair business practices under non-

14   competitor standard applied in commercial cases.  The impact of LinkedIn's conduct on hiQ is obvious

15   and devastating.  LinkedIn's purported justification – protection of member data – is by contrast

16   obviously pretextual inasmuch as hiQ accesses only data that LinkedIn members have explicitly made

17   public.  LinkedIn allows all major search engines to access, copy and display portions of this member

18   public data without complaint.  Ex C.  LinkedIn has never hinted at any concrete harm that hiQ's access

19   has caused to LinkedIn or its members.  Gupta Decl. ¶ 4; Weidick Decl. ¶ 15.  LinkedIn has repeatedly

20   complained about hiQ's "copying" of public data but does not contend that it has any copyright or

21   ownership interest in the data.  Ex. J at 1-2.  It simply wants to lock down website access to public data in

22   which it has no independent legal right in order to create proprietary control where none could otherwise

23   legally exist.  Under any standard, LinkedIn's actions are "unfair."[3]

24   **C.    hiQ is Likely to Prevail on its Cause of Action for Promissory Estoppel.**

25         "The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial

26   _____

27   [3] LinkedIn's conduct also violates the fraudulent prong of the UCL because LinkedIn's promises of
     access by everyone to public profile information are likely to deceive members and ecosystem
     businesses alike.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("fraudulent" business
28   practice under the UCL is one where members of the public are likely to be deceived).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION          13
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

34556\6071624.2

detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.'" *See Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004) (identifying elements). Each is satisfied here.

*LinkedIn's promise was and is clear.* "To be enforceable, a promise need only be 'definite enough that a court can determine the scope of the duty, and limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.'" *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1045 (2010) (internal citation omitted). LinkedIn guarantees members that *you* "control the visibility and reach of your LinkedIn profile," (Ex. D), that "you own the content…that you submit" and that "you are only granting LinkedIn and our affiliates [a] non-exclusive license…" (Ex. B).

*hiQ relied on the above assurances that LinkedIn would not interfere with a Members' decision to make their profile public.* It was reasonable for hiQ to rely on the above assurances to infer that LinkedIn would not try to wall off content that it does not own. The public setting for profiles expressly assures access to "everyone" (member and non-members alike). Weidick Decl. ¶ 4. LinkedIn contends in its cease and desist letter that its User Agreement prohibits the use of "automated software" to access profiles. This is spurious, because, *first*, visitors to the public profile pages of the LinkedIn site do not need to be members and thus never have to sign on to the User Agreement. *Second*, as hiQ's counsel explained to LinkedIn, the User Agreement itself is so overbroad and riddled with contradiction as to be meaningless. *See* Ex. K at 2-3. *Third*, LinkedIn lets other companies access its public profiles using automated software (including hiQ – for *three years*) — and the member profile "public" setting expressly promises visibility to "other services."[4]  Ex. E.

*hiQ's reliance on LinkedIn's promise was to its substantial detriment.* Based on LinkedIn's actions, hiQ spent millions of dollars and thousands of hours investing in its business and developing its technology. Weidick Decl. ¶ 4.

---

[4] *See Wagner v. Glendale Adventist Medical Center*, 216 Cal. App. 3d 1379, 1388 (1989) ("conduct or custom …[can create] modification of the written contract."); *Trustees of California State University & Colleges v. NCAA*, 82 Cal. App. 3d 461, 474 (1978) (conduct of NCAA implied that college was not in violation of by-laws); *Garcia*, 183 Cal. App. 4th at 1046 (silence could can establish promissory estoppel), citing *Wilson v. Bailey*, 8 Cal. 2d 416, 423 (1937) ("The person against whom the estoppel is asserted, must *by his silence* or his representations, have created a belief of the existence of a state of facts which it would be unconscionable to deny.") (emphasis added).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

1    *hiQ will suffer damages and risks going out of business as a direct result of LinkedIn's conduct.*

2    "[I]njunctive relief is . . . a proper remedy for a claim based on promissory estoppel." *Nicol v. Nelson*,

3    776 P.2d 1144, 1146 (Colo. App. 1989) (citing illustration from Restatement Section 90); *Edmonds v.*

4    *Los Angeles Cty.*, 40 Cal. 2d 642, 653 (1953) (approving Restatement Section 90 and specifically

5    enforcing property owner's promise to comply with grant of nonconforming use to ordinance).

6    **D.       California Free Speech Rights Protect hiQ's Right of Access.**

7              LinkedIn's selective blockage of hiQ's access to publicly available information on its website

8    also violates hiQ's constitutional free speech rights under Article I, Section 2 of the California

9    Constitution, which provides that "*[e]very person may freely speak, write, and publish his or her*

10   *sentiments on all subjects.* (emphasis added)." In a perfect manifestation of the virtues of a federal

11   system – and of the rights of individual states under the Tenth Amendment to go further than the federal

12   Bill of Rights in protecting their citizens – this California guarantee goes materially beyond the Federal

13   Constitution, because it is not limited by its terms to restraining governmental action; rather, it is a

14   positive grant of freedom to all persons. In this case, LinkedIn's actions violate hiQ's rights of access to

15   admittedly public profile information to carry out inquiry, information-gathering, and analysis in the field

16   of data science, values that lie at the core of free speech.[5]

17             LinkedIn's actions demonstrably contravene the California Supreme Court's landmark ruling in

18   *Robins v. PruneYard Shopping Center*, 23 Cal. 3d 899 (1979), which held that California's free speech

19   guarantee protects expression even on privately owned property (there, a privately owned shopping

20   center). The Court notably rejected the argument that private property rights trump the interests of free

21   expression, explaining that "the rights preserved to the individual by these constitutional provisions are

22   held in subordination to the rights of society. Although one owns property, he may not do with it as he

---

[5]   The California Constitution (like the U.S. Constitution) protects the functioning of public fora as places for speech to be uttered and *be heard* (not just the former). *See Cal. Newspaper Ass'n v. Burbank*, 51 Cal. App. 3d 50, 53 (1975) (ban on "newsracks" was unconstitutional; free speech is not just an "in personam" right); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965). These rights of access extend to the world of data analysis for commercial purposes. In *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) "data miners" brought a successful First Amendment challenge to a Vermont statute that restricted the sale, disclosure, and use of facts from pharmacy records that revealed the prescribing practices of individual doctors in aid of pharmaceutical marketing. The Court found that it was constitutionally impermissible to discriminate against such marketing-related data mining uses when "extensive" non-commercial uses were allowed. *Id.* at 574.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

pleases any more than he may act in accordance with his personal desires." 23 Cal. 3d at 906 (internal quotation marks and citation omitted). The Court noted the "potential impact of the public forums sought here," citing the frequency of customer trips to the shopping centers in the San Jose area and finding that "[t]he largest segment of the county's population is likely to spend the most significant amount of its time in suburban areas where its needs and wants are satisfied; and shopping centers provide the location, goods, and services to satisfy those needs and wants." *Id.* at 907. In light of "the significance of the growing importance of the shopping center," the Court reasoned that "to prohibit expressive activity in the centers would impinge on constitutional rights." *Id.* The California Supreme Court concluded that "25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered" at the shopping center, and that the distribution of handbills, and soliciting signatures "would not markedly dilute defendant's property rights." *Id.* at 910-11. The U.S. Supreme Court, in reviewing the California Supreme Court's ruling, confirmed that free speech protections of a state constitution may exceed those provided by the Federal Constitution and held that California's right of access did not violate the shopping center's federal rights under the Takings Clause of the Fifth Amendment. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83-84 (1980) (opining that the "requirement that appellants permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Taking Clause").

  *PruneYard* remains good law. In *Fashion Valley Mall, LLC v. NLRB*, 42 Cal. 4th 850 (2007), the California Supreme Court adhered to *PruneYard* and held that a private shopping mall owner was required to allow free speech related to a boycott of a retail establishment inside the mall: "a privately owned shopping center must permit peaceful picketing of businesses in shopping centers, even though such picketing may harm the shopping center's business interests." *Id.* at 864. "A shopping mall is a public forum in which persons may reasonably exercise their right to free speech guaranteed by article I, section 2 of the California Constitution." *Id.* at 869-70. The Court reiterated that the California free speech guarantee was even "broader" and "greater" than its federal counterpart. *Id.* at 863 (internal quotation marks and citation omitted). The Court explained that "the free speech clause in article I of the California Constitution differs from its counterpart in the federal Constitution both in its language and its

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

16

34556\6071624.2

1  scope," and "[o]ur decision that the California Constitution protects the right to free speech in a shopping

2  mall, even though the federal Constitution does not, stems from the differences between the First

3  Amendment to the federal Constitution and article I, section 2 of the California Constitution." *Id.* at 862

4  Further, the Court held that the anti-boycott rule was subject to "strict scrutiny," meaning that it was

5  invalid unless proven to be "necessary to serve a compelling state interest, and ... narrowly drawn to

6  achieve that end." *Id.* at 869 (internal quotation marks and citation omitted). The Court concluded that

7  the shopping center failed to meet its burden. *See id.* ("The Mall's rule prohibiting speech that advocates

8  a boycott cannot withstand strict scrutiny. The Mall's purpose to maximize the profits of its merchants is

9  not compelling compared to the Union's right to free expression."). LinkedIn cannot satisfy this high

10  burden, either. *See also Best Friends Animal Soc'y v. Macerich Westside Pavilion Prop. LLC*, 193 Cal.

11  App. 4th 168, 181 (2d Dist. App. 2011) ("To sum up our survey of the law, it is a general proposition

12  that a shopping mall must allow protests within aural and visual range of a targeted business whenever

13  the mall is open to the public."); *Snatchko v. Westfield LLC*, 187 Cal. App. 4th 469 (2010) (invalidating

14  private mall rule restricting speech under both strict scrutiny and intermediate scrutiny applicable to

15  restrictions on speech).

16      The rule of *PruneYard* mandates that hiQ be granted a continued right of access to the public

17  portions of LinkedIn. Like the *PruneYard* shopping center, LinkedIn opens the public profile section of

18  its website to the public. LinkedIn promises its members that the public profiles on its site can be

19  viewed by everyone. Its promise is express and unqualified. LinkedIn has a staggering 500 million

20  members (anyone can join), far more than the shopping center in *PruneYard*. Further, LinkedIn refers to

21  itself as a "community" and expressly holds itself out as a place "to meet, exchange ideas, [and] learn,"

22  Ex. B § 1.1, making it a modern-day equivalent of the shopping mall or town square, a marketplace of

23  ideas on a previously unimaginable scale.

24      The fact that LinkedIn is a privately owned website does not shield it from compliance with

25  California free speech principles, because where private property is freely and openly accessible to the

26  public, the California Constitution will treat it as a traditional public forum. And, importantly, the

27  principles embodied in California's Constitution are not confined to the kinds of forums familiar to those

28  who lived in decades or centuries past. This State's constitution, like that of the United States, was

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

17

34556\6071624.2

written to endure, not to be rendered obsolete by technological advance.  "The legal doctrines applicable to public forum law generally apply to virtual space as much as physical space."  Smolla & Nimmer on Freedom of Speech, Section 8.33.20.  *See, e.g., Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006) ("Web sites accessible to the public … are 'public forums' for purposes of the anti-SLAPP statute."); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005) (public forum is "traditionally defined as a place that is open to the public where information is freely exchanged… Websites that are accessible free of charge to any member of the public where members of the public may read the views and information posted, and post their own opinions, meet the definition of a public forum" for purposes of the anti-SLAPP statute).

Just days ago, the U.S. Supreme Court noted the public free speech importance of social media sites like LinkedIn when striking down a North Carolina statute that categorically banned registered sex offenders from visiting social media.  The Court observed:

> While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace—the vast democratic forums of the Internet in general , and social media in particular.…[For example, o]n LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship…[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought….

Ex. R, *Packingham v. North Carolina*, No. 15-1194, 582 U.S. ___, slip op. at 6 (Jun. 19, 2017).  The Court, in striking down the North Carolina statute, found that it in

> one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard

*Id.* at 8.  These powerful observations of the U.S. Supreme Court reinforce and confirm the importance of protecting free speech rights in the new public fora of our digital age.

Accordingly, and entirely apart from the violation of California's business laws, LinkedIn's selective exclusion egregiously violates hiQ's – and both hiQ's and LinkedIn's customers' and clients' – free speech rights under the California Constitution.  LinkedIn has offered no compelling interest to warrant this suppression, much less any compelling interest to which its restriction is narrowly tailored.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

18

34556\6071624.2

**E.      hiQ is Likely Entitled To Declaratory Judgment that it Has Not Violated the DMCA, State Trespass Law, the CFAA, or California Penal Code § 502(c).**

1.      An actual controversy exists between hiQ and LinkedIn.

Under the Declaratory Judgment Act, courts may "declare the rights and other legal relations" of parties "[i]n a case of actual controversy."  28 U.S.C. § 2201.  In *TransFresh Corp. v. Ganzerla & Assoc., Inc.*, the declaratory judgment defendant sent the plaintiff a cease-and-desist letter accusing the plaintiff of various illegalities.  862 F. Supp. 2d 1009, 1021 (N.D. Cal. 2012).  The letter "threatened to 'hold [plaintiff] responsible and liable for its unlawful and tortious conduct' if [plaintiff] did not comply with [defendant's] demands."  *Id.*  The court held that the declaratory relief claim was ripe for adjudication "[b]ased on the issues raised in the Cease-and-Desist Letter."  *Id.* at 1020-21.

An actual controversy exists between hiQ and LinkedIn based on the May 23 cease and desist letter.  Like the letter in *TransFresh*, LinkedIn's cease-and-desist letter details, with specificity, why hiQ's continued access of LinkedIn's website is allegedly illegal, and threatens hiQ with litigation if it continues accessing LinkedIn's website.  Ex. J at 2-3.  hiQ and LinkedIn thus have adverse legal interests that are immediate and warrant the issuance of a declaratory judgment.  *MedImmune Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *TransFresh*, 862 F. Supp. 2d at 1021; *see also Cabell v. Zorro Prods., Inc.*, No. 5:15-CV-00771 (EJD), 2017 WL 2335597, at *9 (N.D. Cal. May 30, 2017) (actual controversy existed between parties in part because declaratory judgment defendant's actions prevented plaintiff from licensing a musical to other production companies).

2.      LinkedIn's claims would be brought for an improper purpose and would have an impermissible effect.

As detailed above, LinkedIn's revocation of hiQ's ability to access public member profiles on LinkedIn's website violates numerous common law, constitutional and unfair competition law principles.  Any claim LinkedIn could otherwise legally bring against hiQ is therefore void and without force, as it would be brought for an improper purpose and with an improper effect.  *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 629 (4th Cir. 1979) ("A refusal to deal [] right is limited to situations where the seller has not put together an arrangement in restraint of trade."); *American Tobacco Co. v. U.S.*, 328 U.S. 781, 809 (1946) (otherwise legal acts, when done for an improper purpose such as to illegally monopolize under the Sherman Act, are forbidden); *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*,

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

19

34556\6071624.2

694 F.2d 466 (7th Cir. 1982) (using otherwise lawful litigation to suppress competition may violate antitrust laws).

Both of the cases LinkedIn relies upon in its cease and desist letter regarding the CFAA—*Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013) and *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016)—are readily distinguishable from the facts at issue here.[6] 3Taps and Power.com created substitute services that replaced the need for a user to ever have to visit Craigslist or Facebook. *Craigslist*, 964 F. Supp. 2d at 1181; *Facebook*, 844 F.3d at 1063.  hiQ's services do not displace the need for, but instead build on and are synergistic with, the services provided on LinkedIn.  And while the motives of 3Taps and Power.com were highly questionable, here it is LinkedIn's motives that are concerning.  It built a user base on the promise of "public pages," but now that it has critical mass, LinkedIn is selectively excluding companies like hiQ from those pages in order to stifle their ability to compete with LinkedIn in the field of data analytics.[7]

        3.        The CFAA and DMCA must be read narrowly to preserve their validity under the U.S. Constitution and to avoid harm to the built-in safeguards of Copyright Law.

Allowing LinkedIn to use the CFAA and DMCA to proscribe access by a member of the public to public information would read this statutes with extreme breadth (well beyond their original intent), and in doing so, (1) raise serious constitutional questions, and (2) undermine important safeguards for digital innovators that exist within copyright law.

*First*, LinkedIn is interpreting the CFAA and DMCA as a means to block users from accessing their website at will.  But allowing such arbitrary use of these statutes by private parties would hew dangerously close to what the Supreme Court stated was unconstitutional in *Packingham v. North Carolina*.  If a state statute that categorically bans sex offenders from social media is unconstitutional, then there would be serious constitutional questions if these laws delegated to the corporate owners of these First Amendment fora the right to ban users *at will.  See, e.g., Shelley v. Kraemer*, 334 U.S. 1

---

[6] LinkedIn's cease-and-desist letter cites *Facebook, Inc. v. Power Ventures, Inc.*, No. 13-17102, 2016 WL 3741956 (9th Cir. July 12, 2016).  This opinion was amended on December 6, 2016.  This brief refers to the amended opinion, not the original.

[7] On March 9, 2017, Power Ventures filed a petition for a *writ of certiorari* with the Supreme Court, asking the Court to overturn the 9th Circuit's decision.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

20

34556\6071624.2

1   (1948) (judicial enforcement of racially restrictive covenant in private party property transaction

2   violated equal protection clause of 14th Amendment); and *New York Times v. Sullivan*, 376 U.S. 254

3   (1964) (private party may not achieve censorship through defamation law).  In *Sorrell v. IMS Health

4   Inc.*, the Supreme Court expressly upheld the First Amendment rights of data miners to access

5   information for inquiry and analysis, the same work that LinkedIn seeks to block hiQ from doing.  564

6   U.S. 552 (2011)  To avoid these constitutional issues, the Court should reject LinkedIn's overbroad

7   read of the CFAA and DMCA.  There are serious questions whether these statutes allow private parties

8   to block other private parties from accessing pages that are unprotected by passwords, that are not

9   owned by the entity instituting the block, and/or which the owner of those pages has expressly

10  designated public.  *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) ("[I]t is

11  well established that if a statute has two possible meanings, one of which violates the Constitution,

12  courts should adopt the meaning that does not do so."); *Gomez v. U.S.*, 490 U.S. 858, 864 (1989) ("It is

13  our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a

14  reasonable alternative interpretation poses no constitutional question.").[8]

15      *Second*, though LinkedIn has conspicuously avoided accusing hiQ of "copyright infringement,"

16  the thrust of its complaint clearly falls within copyright, because LinkedIn is claiming that hiQ

17  "access[ed] and *cop[ied]*" its public profile pages.  Ex. J (emphasis added).  By proceeding under the

18  labels of the CFAA and DMCA, LinkedIn is apparently trying to avoid "copyright's built-in free speech

19  safeguards," which the Supreme Court has explained are constitutional in import.  *Eldred v. Ashcroft*,

20  537 U.S. 186, 221 (2003).  Those limits would almost certainly bar LinkedIn's claims, had they been

21  labeled copyright infringement: LinkedIn <u>does not own</u> the copyrights at issue, hiQ is only taking

22  <u>facts</u>,[9] and hiQ's use would likely be viewed as a <u>transformative fair use</u>.[10]  LinkedIn should not by

---

[8] It would be false for LinkedIn to argue that the cease and desist letter prevents hiQ only from
using automated software from accessing the site.  The cease and desist letter state that any access
*at all* is banned.  LinkedIn even removed hiQ's corporate profile page from the LinkedIn site.  But
even a ban limited to automated access by hiQ would be unconstitutional, because such a ban
would not be narrowly tailored (and would be belied by the express allowance of numerous others
to use automated software to access the site).

[9] *See* U.S. Const. Art. I, § 9 (exclusive rights of intellectual property available to "authors"
(extended by Congress to transferees)); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S.
539, 556 (1985) ("idea/expression dichotomy strike[s] a definitional balance between the First
Amendment and the Copyright Act by permitting free communication of facts while still protecting

calling its claim something *other* than copyright infringement, vitiate the careful constitutional balance between the rights of digital innovators and copyright owners that courts have struck over the past several decades in copyright law.  *See* 17 U.S.C. § 1201(c)(1) ("Nothing in this section shall affect ….defenses to copyright infringement, including fair use…..");  *Watt v. Alaska.* 451 U.S. 259, 267 (1981) (statutes in tension must be read "to give effect to each if we can do so while preserving their sense and purpose.")  Thus, serious questions of constitutionality and the possibility of conflicts with copyright law counsel that the CFAA and DMCA should not be given the broad sweep that LinkedIn advocates.

> 4.  The technical blocks of member public profiles do not implicate the DMCA, because they are not implemented "with the authority of the copyright owner"

The Digital Millennium Copyright Act ("DMCA") prohibits "circumvent[ing] a technological measure that effectively controls access" to a "work protected under this title." 17 U.S.C. § 1201(a)(1)(A).  "[A] technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, *with the authority of the copyright owner*, to gain access to the work."  17 U.S.C. § 1201(a)(3) (emphasis added).

Any measures LinkedIn implements to block hiQ from accessing member public profile information on LinkedIn fall outside of the DMCA because such measures are – among other things – not implemented "with the authority of the copyright owner."  17 U.S.C. § 1201(a)(3).  LinkedIn's user

---

an author's expression);  *Golan v. Holder*, 565 U.S. 302, 329 (2012) (*citing Harper & Row*, 471 U.S. at 560) (fair use defense embodies First Amendment safeguards that give "latitude for scholarship and comment").

[10] Indeed, programmatic analysis of public webpages have been essential to and indeed generative of the Internet since the days of Alta Vista, and Excite, services from the mid-nineties, through Google, and the new breed of vertically-focused services, such as Intelius and DocketNavigator, today.  Without these automated software-based services, there would be no way to humanly harness the information contained in the Internet's billions of webpages.  Thus, what LinkedIn calls "scraping" is in actuality what makes the Internet tick.  Courts have accordingly repeatedly upheld the work of these services as fair use.  *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F. 3d 202 (2d Cir. 2015) (accessing and copying books to create a "search function" -- despite lack of authorization -- is a "transformative" fair use.") *citing  A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639-40 (4th Cir. 2009), *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007), *and Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) ("examples of cases in which courts had similarly found the creation of complete digital copies of copyrighted works to be transformative fair uses….").

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

22

34556\6071624.2

agreement unambiguously states that LinkedIn's *users*, not LinkedIn itself, own "all of the content, feedback, and personal information [the user] provide[s] to [LinkedIn]."  User Agreement § 3; *see also* User Agreement § 3.1 ("As between you and LinkedIn, you own the content and information that you submit or post to the Services and you are only granting LinkedIn the following non-exclusive license.").  Thus, any copyrights to LinkedIn user profiles are owned by LinkedIn's users, not LinkedIn.  Any technological measure LinkedIn implements to control access to a user's public profile information—for example, by requiring a password to view public member profiles, or by using some other technological mechanism to block hiQ's access to LinkedIn—is implemented with only the authority of LinkedIn, not the member.  Thus, such measures are not protected by the DMCA.

> **5.**    California trespass law cannot apply in the absence of damage to LinkedIn's computer systems.

"In order to prevail on a claim for trespass based on accessing a computer system, the plaintiff must establish: (1) defendant intentionally and without authorization interfered with plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately resulted in damage to plaintiff."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d. 1058, 1069-70 (N.D. Cal. 2000). "[T]he tort does not encompass ... an electronic communication that neither damages the recipient computer system nor impairs its functioning" because such communications do "not interfere with the possessor's use or possession of, or any other legally protected interest in" the computer system.  *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1347 (Cal. 2003).  For example, in *Intel*, the defendant sent six mass emails to thousands of Intel email addresses over a 21-month period.  *Id.*  Because the record contained no evidence the emails "damaged Intel's computer system or slowed or impaired its functioning," the Court dismissed Intel's trespass claim.  *Id.* at 1349.  *See also in re iPhone Application Litigation*, 844 F. Supp. 2d. 1040, 1069 (N.D. Cal. 2012) (allegation of shortened battery life did "not plausibly establish a significant reduction in service constituting an interference with the intended functioning of the system, which is necessary to establish a cause of action for trespass.")  *Id.*  LinkedIn has claimed no such damage in its cease-and-desist letter and could not cite any impairment (let alone damage) in the parties' phone conference on May 30, 2017.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

23

34556\6071624.2

### III.   HIQ WILL SUFFER IMMEDIATE AND IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005). A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunction relief shows "irreparable injury." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  In addition, the loss of current and prospective customers "is considered to be irreparable harm that justifies equitable relief." *Shippers, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056, at *6 (S.D. Cal. Sept. 23, 2013), citing *Stuhlbarg Int'l Sales Co., Inc.*, 240 F.3d at 841.

For over three years, hiQ has invested in building its people analytics business based on the public profile pages available on LinkedIn.  Weidick Decl. ¶¶ 3-4.  If access to this vital resource is denied, then all of those efforts will have been for naught: hiQ will have to breach its agreements with its customers, stop discussions with its long list of prospective customers, lay off most if not all its employees, and shutter its operations.  *Id.* at ¶¶ 17-19.  hiQ has been unable to identify any other public or non-public source of data would provide the information needed to sustain the Keeper and Skill Mapper product for its Fortune 500 clientele.  *Id.* at ¶ 17.

### IV.   THE INJUNCTION IS IN THE PUBLIC INTEREST

Finally, the public interest weighs strongly in favor of granting hiQ's motion.  Keeping hiQ's employees employed and able to serve hiQ's business clients while the Court examines the legal issues is good for the economy.  Further, the public interest will be served by enjoining LinkedIn from committing acts of unfair and unlawful competition. *Max Factor & Co. v. Factor*, 226 F. Supp. 120, 126 (S.D. Cal. 1963) ("courts have consistently recognized the need to protect the public interest in suits for … unfair competition"); *Metro-Goldwyn-Mayer, Inc. v. Lee*, 212 Cal. App. 2d 23, 28 (1963) (statute permitting injunction against acts of unfair competition "recognizes … the public interest in protection against unfair business practices."). Finally, the free speech principles implicated here are of broad, public significance. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (recognizing "'significant public interest' in upholding free speech principles" because of the potential impact to the free expression interests of third parties).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

24

34556\6071624.2

1

## V.    NO BOND SHOULD BE REQUIRED

2

Where no damage will result from a TRO or preliminary injunction, no bond is necessary.

3 *Jorgenson v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the

4 filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining

5 his or her conduct.").  hiQ seeks to prevent Defendant from denying it access to public pages on its

6 website, access which it has had for three years.  LinkedIn has identified no actual harm from hiQ's

7 access.  Thus, no bond should be required.

8

## CONCLUSION

9

The Court should issue a TRO and an order to show cause why a preliminary injunction should

10 not be granted.

11

12 Dated:  June 22, 2017                              FARELLA BRAUN + MARTEL LLP

13

14                                                   By:    /s/ Deepak Gupta
                                                           Deepak Gupta
15                                                   Attorneys for Plaintiff hiQ Labs

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S MPA ISO RENEWED MOTION
FOR TRO AND OSC RE PRELIMINARY
INJUNCTION

25

34556\6071624.2