1  JONATHAN H. BLAVIN (State Bar No. 230269)
   jonathan.blavin@mto.com
2  ROSEMARIE T. RING (State Bar No. 220769)
   rose.ring@mto.com
3  LAURA K. LIN (State Bar No. 281542)
   laura.lin@mto.com
4  NICHOLAS D. FRAM (State Bar No. 288293)
   nicholas.fram@mto.com
5  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
6  Twenty-Seventh Floor
   San Francisco, California 94105-2907
7  Telephone:    (415) 512-4000
   Facsimile:    (415) 512-4077
8
   Attorneys for LinkedIn Corporation
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13

14  hiQ Labs, Inc.,                    Case No. 17-CV-03301-EMC

15              Plaintiff,             **DECLARATION OF JONATHAN H.
                                       BLAVIN IN SUPPORT OF LINKEDIN'S**
16         vs.                         **OPPOSITION TO PLAINTIFF'S
                                       MOTION FOR A TEMPORARY**
17  LinkedIn Corporation,              **RESTRAINING ORDER**

18              Defendants.

19

20

21

22

23

24

25

26

27

28

I, Jonathan H. Blavin, declare as follows:

1.     I am an attorney with the law firm Munger, Tolles & Olson LLP, counsel for defendant LinkedIn Corporation in the above-captioned matter.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.  I submit this declaration in opposition to hiQ's motion for a temporary restraining order.

2.     Attached hereto as Exhibit A is a true and correct copy of the hiQ white paper, "hiQ Labs The Global Standard for People Analytics," posted to hiQ's website at https://static1.squarespace.com/static/5803b57737c581885cbd0667/t/5814ff6ae3df286e40896171/1477771114647/data+findings.pdf.  In this paper, hiQ states that it "scours the web for any publicly available information about a company's employees."  It also states that the hiQ platform contains "statistical patterns observed across hundreds of thousands of employees" and that its tools can "indicate [if] someone may be a flight risk."

3.     Attached hereto as Exhibit B is a true and correct copy of a screenshot from hiQ's homepage, https://www.hiqlabs.com/.  On this page, hiQ states that it "applies science to public data sources," without naming those sources.

4.     Attached hereto as Exhibit C is a true and correct copy of a screenshot from hiQ's solutions page, https://www.hiqlabs.com/solutions/.  It states that its products use "publicly available data."

5.     There are other white papers posted on the hiQ website, but they require registration to download.  *See* https://www.hiqlabs.com/white-papers/.

6.     Attached hereto as Exhibit D is a copy of the robots.txt file from hiQ's website, available at https://hiqlabs.com/robots.txt.

7.     Attached hereto as Exhibit E is a true and correct copy of a report from a 2017 conference of people analytics companies at the Wharton School of Business listing the following as competitors to hiQ: TrustSphere, CultureScope, Concentra Analytics, Humanyze, Twine, Peakon, Glint, and Textio.  The report is available at https://www.linkedin.com/pulse/key-takeaways-from-wharton-people-analytics-conference-david-green.

-1-

8.      Attached hereto as Exhibit F is a true and correct copy of an article from the website TechCrunch.com about the company Glint entitled "Glint raises $27 million to stop solid employees from bailing," explaining that Glint sends out short, anonymous surveys to specific groups of employees or companywide to gather feedback, and then uses machine learning, natural language, and predictive analytics to determine which teams are experiencing problems, why desirable employees may leave, and to identify areas for improvement.  It also explains that Glint recently raised $27 million.  The article is available at https://techcrunch.com/2016/08/31/glint-raises-27-million-to-stop-solid-employees-from-bailing/.

9.      Attached hereto as Exhibit G is a report entitled "State of Inbound" published by HubSpot at https://blog.hubspot.com/marketing/state-of-inbound-marketing-and-sales-research#sm.0001w45ympyazff8q3z21tmq5jvlf.  On page 69, it reports that in a recent survey, "74% of respondents use Facebook professionally, just shy of the 78% who use LinkedIn."

10.      Attached hereto as Exhibit H is a copy of an article entitled "6 Predictions For The $203 Billion Big Data Analytics Market" published by Forbes available at https://www.forbes.com/sites/gilpress/2017/01/20/6-predictions-for-the-203-billion-big-data-analytics-market/#715e9e6f2083.  It states that the market is a $130 billion market that is expected to grow to $203 billion by 2020.

11.      Attached hereto as Exhibit I is a true and correct copy of the consent judgment entered in *LinkedIn v. Robocog*, No. 14-cv-68-BLF (N.D. Cal. July 16, 2014).

12.      Attached as Exhibit J is a true and correct copy of the consent judgment entered in *LinkedIn v. Azot*, No. 16-cv-4463-LHK-NC (N.D. Cal. June 6, 2017).

13.      Attached hereto as Exhibit K is a copy of an order entered by Magistrate Judge Cousins on August 30, 2016 in *LinkedIn v. Azot*, No. 16-cv-4463-LHK-NC (N.D. Cal. Aug 30, 2017).

14.      Attached hereto as Exhibit L is a copy of a letter I sent to counsel for hiQ on June 24, 2017.

15.      On June 26, 2017, an associate at my law firm, under my instruction and supervision, created Table 1 below.  The numbers in Table 1 were collected using Facebook's Ads

-2-

Manager Tool and LinkedIn's Campaign Manager ads tool using filters provided by each platform that allow potential advertisers to target ads at users based on the employer the user lists in his or her profile.  The figures in Table 1 represent the estimated audience of six hypothetical ad campaigns targeted at users on Facebook and LinkedIn who listed these six employers (which include those on hiQ's current client list).  They are limited to people who claim to live in the United States.

Table 1

| Targeting Criteria Used | Facebook Ad Estimated Target Audience Size | LinkedIn Ad Estimated Target Audience Size |
|---|---|---|
| People in the United States who listed "Google" as their employer | 46,000 | 51,000+ |
| People in the United States who listed "Airbnb" as their employer | 2,000 | 3,000+ |
| People in the United States who listed "Uber" as their employer | 18,000 | 16,000+ |
| People in the United States who listed "Lyft" as their employer | 7,900 | 7,000+ |
| People in the United States who listed "eBay" as their employer | 8,600 | 11,000+ |
| People in the United States who listed "GoDaddy" as their employer | 2,800 | 4,000+ |

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 26, 2017 at San Francisco, California.

*/s/ Jonathan H. Blavin*
Jonathan H. Blavin

# EXHIBIT A



# hiQ LABS
# THE GLOBAL STANDARD FOR PEOPLE ANALYTICS

**hiQ Labs has built a scalable SaaS platform that helps HR teams make better, more reliable people decisions.**

### BACKGROUND

Over the past decade alone, technology has completely transformed the way that companies hire, develop, and retain their workforce. Social media has provided recruiters with unparalled access to top talent and the ability to reach out to them with just the touch of a button. Not only that but recruiters are often armed with more information about an employee than an employer has access to through their own HR systems.

Meanwhile, competition for talent has never been more fierce and the need for engagement more pressing. Large companies are diverting more and more resources to their recruiting efforts in order to counter-balance the hemorrhaging caused by employee departures. This is driven in part by the fact that employees in this day and age – especially millennials – tend to remain in their jobs for shorter periods of time and feel less loyalty to their employers. The outcome is an increasing outlay on recruiting and human resources in what has become an arm's race in the war for talent. Companies are searching for ways to stem this tide and seeking opportunities to retain their existing employees rather than just searching for new ones.

### hiQ LABS

hiQ Labs is the global standard for People Analytics. The company was founded with the vision of leveraging the power of predictive analytics and data science in order to elevate the HR function in the same way that they have transformed other functions like marketing and sales. By building a team of top data scientists and engineers, human resources experts, and people analytics leaders from the most respected technology and scientific firms, hiQ is uniquely positioned to help its customers develop their most valuable resource: their employees. The world's most forward thinking companies rely on hiQ Labs to help manage their workforce.

hiQ Labs has built a scalable SaaS platform that helps HR teams make better, more reliable people decisions by applying data science and machine learning to internal and external data,. Easy to deploy and fast to deliver predictive insights, hiQ Labs' cloud platform transforms how enterprises retain their best talent by allowing them unique insight into the factors that drive individuals out of the organization.

hiQ's retention platform scours the web for any publicly available information about a company's employees and then its data science engine extracts strong signals from that noise that indicate someone may be a flight risk. Based on the statistical patterns observed across hundreds of thousands of employees, powerful machine learning models then assign each of those employees a risk score: high (red), medium (yellow), or low (green). Companies are able to pinpoint with laser-like accuracy the employees that are highest risk, focus retention efforts on those employees, and keep them engaged and contributing happily to the organization.

**hiQ uses a sample of hundreds of thousands of employees across a variety of different industries in order to train its models to predict 3-month attrition.**

### THE SCIENCE

hiQ Labs' attrition predictions are incredibly accurate. hiQ uses a sample of hundreds of thousands of employees across a variety of different industries in order to train its models to predict 3-month attrition. It then applies these models to its clients' data to predict attrition across their workforces.



**Table one** Predicted risk

What happens when we compare these predictions to the employee attrition that is observed over a 3-month timeframe? The actual turnover numbers are represented by the color-coded dots displayed on the graph, bucketed by risk percentile (0-60% green, 60-90% yellow, 90-100% red). Each risk bucket contains thousands of employees with similar risk profiles.



**Table two** Observed risk

**CONTACT US**

hiQ Labs, Inc.
33 New Montgomery Street
San Francisco, CA 94105

866-765-5880
sales@hiqlabs.com

**hiQlabs.com**

The comparison reveals that the predictions are virtually identical to the observed turnover within each risk bucket. This means clients can spend less time wondering who is going to leave and more time deciding how to retain them. When clients intervene to retain their people, turnover can be very low, even in high-risk populations.



**Table three** After intervention

### ELEVATE

hiQ Labs organizes a regular conference series called Elevate in order to help build the people analytics community, share insights, and disseminate best practices.  Built by and for those leading the way in HR data science innovation, hiQ Elevate brings together Data Scientists, Workforce Scientists, Talent Analysts and Chief Human Resource Officers (CHROs) from Fortune 500 companies to discuss real-world case studies and best practices.  Keynote peakers at previous Elevate conferences have included such people analytics luminaries as Josh Bersin (Bersin by Deloitte), Amit Mohindra (Apple), Ian O'Keefe (Google), and other leaders across a variety of different industries and geographies.



# EXHIBIT B

HOME (/)      SOLUTIONS (/SOLUTIONS/)      ELEVATE (/ELEVATE/)

RESOURCES      ABOUT      CONTACT (/CONTACT/)

SIGN IN (HTTP://KEEPER.HIQLABS.COM/)



# Data-driven Talent Management

**UPCOMING EVENTS (/ELEVATE)**

hiQ Labs applies science to public data sources to help business leaders make better people decisions. The hiQ cloud platform is easy to implement and delivers new data, actionable insights, and impactful suggestions for engaging with employees.

The world's most forward-thinking brands rely on hiQ Labs to significantly reduce turnover, increase organizational agility, and answer questions about their workforce, such as:

How do we retain the best and brightest employees? Which employees are being heavily recruited? What are our organization's skills and capabilities gaps? What skills do we need to recruit or develop?

## hiQ Talent Management, Driven by Analytics

Change happens fast. Your workforce's online presence is bigger than ever, which means that recruiters and algorithms can easily find your employees. CHROs and business leaders have to be on top of their game to protect and grow talent. hiQ curates public data and fills crucial talent management gaps. Learn more about the impact we can have on your employee retention programs and skills-based workforce planning initiatives.

**ENTERPRISE SOLUTIONS (/SOLUTIONS)**

## Meet the Market Shapers

hiQ Labs released an innovative new analytics solution for retention, and have attracted the top data scientists in Silicon Valley.

— Josh Bersin, Bersin by Deloitte, published in Forbes



# What the Judges Said:





"hiQ is an ambitious undertaking. Not many organizations can or will do something similar on their own. It would take too much time, expertise, investment, etc., and the likelihood of being as successful would be very low.

The firm is thus taking a critical issue -- retention of key talent -- and providing an analytical-based leading indicator of voluntary turnover." - Human Resource Executive (http://www.hreonline.com/HRE/view/story.jhtml?id=534361124)

(http://www.hreonline.com/HRE
id=534361124)

© 2017 hiQ Labs

# EXHIBIT C

HOME (/)   SOLUTIONS (/SOLUTIONS/)

ELEVATE (/ELEVATE/)                    RESOURCES     ABOUT

CONTACT (/CONTACT/)     SIGN IN (HTTP://KEEPER.HIQLABS.COM/)

# Enterprise Solutions

Every day, thousands of hours and millions of dollars are spent on deciding who to hire, develop and retain. hiQ Labs helps CHROs and business leaders engage with the employees they have invested so much into attracting and developing.

We provide a crystal ball that helps you determine skills gaps or turnover risks months ahead of time, and a platform that shows you how and where to focus your efforts.


click photo to enlarge

## ✦ Manage attrition with Keeper

- Analyze attrition risk across your entire workforce, from business units, to specific employee segments, and even to individual employees.

- Stay ahead of costly, regrettable turnover by using a forward-looking, rather than backward-looking, indicator of attrition risk.

- Customize your employee retention plans by understanding what specific external factors are driving attrition risk.

- Use hiQ's actions library to create retention strategies tailored to help you keep specific top performing employees.

- Save time for your managers by focusing their attention the most at-risk employees and segments.

- Take an evidence-based approach to determining the most effective retention strategies for your company by tracking actions over time.

## ✦ Recruit vs. develop with Skill Mapper

- Discover your multitalented employees' hidden skills and skill sets.

- Explore the skills that your employees are self-curating on the web and augment/update your company's database of employee competencies.

- Identify your employees' hidden and adjacent skill sets, and leverage them as a tool for career development.

- Find the best-fit job matches for employees seeking new opportunities at your company following a business transformation or restructuring.

- Quickly identify which employees have similar skill sets to your top talent.

- Map out the talent and competencies of multiple legacy organizations after a business combination.

## Keeper

Keeper is the first HCM tool to offer predictive attrition insights about an organization's employees based on publicly available data.



The solution provides actionable insights into consumable, easy-to-deploy action plans so HR and business leaders can retain their key talent.

By identifying risk early, addressing potential issues proactively, and deploying remedial actions quickly, Keeper drives immediate business impact across organizations - and provides a built-in feedback loop so you can communicate your retention win to management



Click photo to enlarge

## Skill Mapper

Skill Mapper was built for Talent Acquisition and Management teams facing the challenge of building workforce and succession plans without sufficient data on their employees' skill sets in their current HCM systems.

Because Skill Mapper is based on publicly available data, you can explore the full scope of your workforce's skills, including skills from previous and current roles. Our customers use Skill Mapper for workforce and succession planning, driving employee engagement by promoting internal mobility, and reducing the costs associated with external talent acquisition.



Click photo to enlarge

SCHEDULE A DEMO
(HTTP://WWW2.HIQLABS.COM/L/148111/2016-
10-28/221MKM)

REQUEST RISK REPORT
(HTTP://WWW2.HIQLABS.COM/L/148111/2016-
10-28/221MKP)

    

SCHEDULE A DEMO (HTTP://WWW2.HIQLABS.COM/L/148111/2016-10-28/221MKM)

"

Thanks to hiQ Labs we have saved millions of dollars in employee churn and lost productivity

— Director of Workforce Planning - Fortune 500 Retail Company

© 2017 hiQ Labs

# EXHIBIT D

https://hiqlabs.com/robots.txt

```
# Squarespace Robots Txt

Sitemap: https://www.hiqlabs.com/sitemap.xml
User-agent: *
Disallow: /config
Disallow: /commerce/
Disallow: /checkout$
Disallow: /checkout/
Disallow: /cart$
Disallow: /cart/
Disallow: /account$
Disallow: /account/
Disallow: /api/
Disallow: /static/
Disallow:/*?author=*
Disallow:/*&author=*
Disallow:/*?tag=*
Disallow:/*&tag=*
Disallow:/*?category=*
Disallow:/*&category=*
Disallow:/*?month=*
Disallow:/*&month=*
Disallow:/*?view=*
Disallow:/*&view=*
Disallow:/*?format=json
Disallow:/*&format=json
Disallow:/*?format=page-context
Disallow:/*&format=page-context
Disallow:/*?format=main-content
Disallow:/*&format=main-content
Disallow:/*?format=json-pretty
Disallow:/*&format=json-pretty
Disallow:/*?format=ical
Disallow:/*&format=ical
Disallow:/*?reversePaginate=*
Disallow:/*&reversePaginate=*
```

# EXHIBIT E

6/26/2017
Case 3:17-cv-03301-EMC Document 26 Filed 06/26/17 Page 22 of 119
Key takeaways from Wharton People Analytics conference 2017 | David Green | Pulse | LinkedIn





Cade Massey opens the 2017 edition of the Wharton People Analytics Conference (Pic: Rufus Peabody @RufusPeabody)

# Key takeaways from Wharton People Analytics conference 2017

Published on April 5, 2017 | Featured in: **Company Culture**, **Human Resources**, **Leadership & Management**



**David Green** · **Follow**
People Analytics leader | Award Winning Writer | Speaker / …

👍 397    💬 32    ↗ 177

Last week I attended the fourth edition of the Wharton People Analytics Conference, hosted by Adam Grant and Cade Massey, in Philadelphia. Here are my key takeaways from a fabulous two days.

## #1 Does #WhartonPAC deserve the hype?

I was motivated to attend the conference because of the many superlatives I'd received from practitioners that I respect. #WhartonPAC 2017 didn't disappoint. The content at times was inspirational, the forum it provided for networking, sharing ideas and learning was superb and I met a number of practitioners who told me that this was the only conference they attend on people analytics. So, yes, the Wharton People Analytics conference is worthy of the hype and that has to be the first key takeaway.



*Wharton PAC hosts Adam Grant and Cade Massey discuss the surge of interest in people analytics*

## #2 Does people analytics help or hinder diversity?

Diversity was a central theme throughout the conference. Maxine Williams, Facebook's Global Head of Diversity, contested, in a powerful speech sans slides, that people analytics was failing to address the needs of underrepresented (in this case, black and Latino) groups in tech. The problem Williams documented concerned people analysts advising her that the $n$ sizes (number or sample size) are too small for the science to kick in or as Williams put it "*if there was more of you, we could tell you why there was so few of you*". The irony, of course, is that means practitioners like Williams have to rely solely on experience and instinct – the very skills that people analytics is supposed to augment and greatly enhance. Whilst qualitative data can help complement the quantitative data that is available, the impact of institutional marginalisation also needs to be weighted. Williams' call for a "*Moneyball for diversity*", at least when it applies to underrepresented groups certainly lay down the gauntlet to delegates, although many I spoke afterwards felt that Williams could have said more about the initiatives, experiments and to a degree successes that have been conducted in the field.

*Maxine Williams of Facebook delivers her conference keynote*

## #3 Inclusiveness, cognitive diversity, salience and a focus on teams

As Arun Sundar writes in this excellent article, which was inspired by the conference, diversity must not simply be regarded as a 'number'. Indeed as Adam Grant urged in his closing address, it's not enough to reduce bias. Instead, we need to create experiences that make people empathise. Refreshingly, the conference provided several examples of diversity, and more to the point inclusiveness, in the context of analytics in action:



inclusiveness were central to their strategy of hiring, training and supporting teachers for America's most challenging schools

- Kieran Snyder outlined how her company Textio is helping to change the way people write job descriptions and that if you write gender neutral job posts your time-to-fill drops by two weeks

- Joelle Emerson advocated the need to gather qualitative data when the 'n' is too small and how focus groups/interviews can help identify the underlying factors that can bring quantitative data to life, and as Derek Avery added give us a starting point for analytics projects.

- Linda van Leeuwen of Shell's people analytics team presented her winning entry in the Research Paper Competition on 'Capturing the salience of diversity attributes from a broader social context'. The failure of previous studies to capture salience, said van Leeuwen, is the reason why diversity research this far has been inconclusive. Certainly, the methodology presented on diversity mapping and fault lines was fascinating and I look forward to reading the final research paper when it is published. For more on the people analytics journey at Shell see here.

- Maxine Williams described how Facebook is working towards cognitive diversity – different ways of thinking based on people having different backgrounds, experiences and information – across all teams in the tech giant. For more on cognitive diversity in teams, see this HBR article.

- Finally, Anita Woolley described her research on team performance and how Collective Intelligence (CI, not to be confused with IQ) is a good predictor of success, with interestingly women tending to score higher on CI then men. Read more on Woolley's research on CI here.

## #4 Do managers matter?

This was the question posed for the project presented at the conference by Dawn Klinghoffer, who leads Microsoft's people analytics team and Ryan Fuller. For the managers out there – at least those at Microsoft, you can rest easy as the research demonstrated that managers do matter. The findings were fascinating in that it was factors such as managers with large networks, who provide consistent access and one-to-one time whilst promoting collaboration and work-life balance that fostered higher engagement, better performance and a stronger sense of belonging in their employees. Managers who work less hours and who send fewer emails out of work correlated with happier, more productive employees who are better able to manage their work-life balance. For more on Microsoft's people analytics journey please see my interview with Dawn.



*with top-left Dawn Klinghoffer and Ryan Fuller from Microsoft plus interviewer Martine Haas from Wharton Business School*

## #5 The importance of trust in people analytics

The majority of the data Microsoft used to investigate if managers matter came from email meta data. For some, this is regarded as 'creepy' and the subject of employee trust and privacy was a constant theme throughout the two days. Whenever I speak to practitioners about the challenges they face, trust and privacy is always in the top three. Kieran Snyder summarised it perfectly: "*the next decade will define the appetite for privacy versus benefit*" and certainly employee trust needs to be placed at the front and centre of any people analytics strategy. Dawn Klinghoffer explained how Microsoft communicated what they were doing and why, as well as laying out the benefits to employees (see this blog by Microsoft CHRO Kathleen Hogan for more on this).

> "The next decade will define the appetite for
> privacy versus benefit"
>
> Kieran Snyder

## #6 Outside in – people analytics has a lot to learn

Being the last function of the business to adopt a data-driven approach may be embarrassing but it does mean that providing HR is prepared to put its head above the parapet it can draw plenty of experience and learning from outside the function. Marketing for example, as remarked by Peter Fader, has been fighting the same battle for 30 years. The conference offered plenty of inspiration from elsewhere including from sport and medicine. In his entertaining interview with Dan Pink, Adam Silver (NBA Commissioner) conveyed how analytics has revolutionised basketball across a multitude of areas from the uptake in three-point shots to informing strategies around resting players. Silver revealed that NBA players are equipped with wearables and sleep monitors and that this is accepted as normal - a precursor to the future workplace? Perhaps even more powerfully, Rosalind Picard from MIT spoke to an enthralled audience on how analytics has helped autism and epilepsy patients live more fulfilling and safer lives. The Empatica device that predicts seizures was designed as a result of exploring unexpected data – a prompt as Picard said to dig a little deeper when the data is strange. In a similar vein, a session on applying gaming to people analytics led by Ethan Mollick, revealed how a paediatric oncology game had enabled patients to adopt a more positive mindset - resulting in huge shifts in white blood cell count and other positive immune response indicators (thanks Kieran Snyder for capturing this point).

> *"Dig a little deeper when the data is strange"*



## #7 People analytics is awash with exciting technology

Much of the innovation in the people analytics space is being provided through the vendor community, and many of these firms were present at the conference. The companies that caught my eye (in no particular order) were: TrustSphere, CultureScope, Concentra Analytics, Humanyze, hiQ Labs, Twine, Peakon, Glint and Textio.

## #8 Data alone is not enough

Malcolm Gladwell opened the conference with the cautionary tale of the 'neurotic tortoise' (see more in this excellent article by Tom Marsden) and the danger of assessment and selection methodology that doesn't correlate to performance. In his interview with Adam Grant afterwards, Gladwell adopted a pessimistic approach to analytics remarking he is "*more worried about becoming too dependent on analytics rather than not being dependent enough*" and adding chillingly that he was "*not optimistic about how analytics will go in the future*". 24 hours later, in closing the conference, Grant warned of the dangers of having "*too much of a good thing*" when it comes to analytics and urged the importance for people analytics to be focused on eradicating bias, increasing empathy and reducing defensiveness. As Grant commented, there is a danger that we like the data until it disagrees with what we believe. Instead, we need to get to the point where we express joy when the data shows we are wrong and couple it with judgement to make better decisions. Data alone is not enough. Data augmented with human judgement is the key to better decision-making for the benefit of the business – and for employees.

I'm more worried about becoming too
dependent on analytics rather than not being
dependent enough

Malcolm Gladwell

## #9 What is the future for People Analytics?

The conference confirmed my thinking beforehand that people analytics is moving towards a second phase of evolution – even if many organisations are yet to even embark on their analytics journey in HR. As well as the focus on teams (see #4) and productivity data (see #5), speakers talked about the use of physiological data to measure health and wellness (Anita Woolley), providing employees with the means to give and receive feedback (Steven Huang), using network analytics to measure employee interaction and collaboration (Kieran Snyder) and measuring the link between organisational loneliness and attrition (Keith McNulty). Several speakers described our



*now is as easy to run as regression"*. Finally, Adam Grant spoke of how analytics is being used to improve collaboration and culture from the bottom up. All in all, if people analytics can overcome some of the challenges it faces such as privacy concerns (see #5), HR capability and fear, and institutionalising the practice then the future looks rosy.

> "Text analysis now is as easy to run as regression"
>
> Cade Massey

*Adam Grant closes the Wharton People Analytics Conference 2017*

## #10 Congratulations

Finally, I'd like to highlight the competition winners and give thanks to the organisers. Eleven firms participated in the hotly contested **Start-up Competition**, with the People's Award going to CultureScope – congratulations to Tom Price-Daniel and Hani Nabeel - the recognition is well deserved. The judges also gave awards to Stellar Employ (two awards for Most Impactful and Best User Experience) and Fama (Most Innovative Use of Data). Congratulations also to Linda van Leeuwen of Shell's People Analytics team for taking away the spoils in the **Research Paper Competition**, as well as Andrew Ewbank, Ben Hodges and Justin Jones from Vanderbilt University for their triumph in the **Student Case Competition** (see more here). Last but not least, congratulations must go to the Wharton School for organising such a great conference – not just to Adam, Cade and Laura Zarrow from the Wharton People Analytics team, but also to the students who did much of the work. Adam highlighted Talia Stein, Gabrielle Levine and Jonathan Tugman. A bright future, hopefully in the people analytics space, awaits.

## For more on the Wharton People Analytics Conference:

The conference has already inspired a number of blogs and articles:

- Read Arun Sundar's blog: "Diversity isn't a number, it is a state of mind" - thoughts from Wharton People Analytics Conference 2017

- Tom Marsden was inspired by Malcolm Gladwell to write about neurotic tortoises: "Neurotic tortoises" and what they tell us about assessment

- Kieran Snyder provides an excellent overview of the conference and its implications for the future of people analytics: Measuring the immeasurable



Vanderbilt University: Vanderbilt MBA Team Wins Wharton PAC Case Competition

- Listen to Cade Massey's interviews, recorded on the conference floor, with Keith McNulty, Joelle Emerson, Trisha Williams, Matthew Salganik, Sean Waldheim and Kara Chambers & Lee Burbage – Live from the Wharton People Analytics Conference

- Keep an eye on the Wharton People Analytics Conference YouTube channel for videos of some of the speeches from the conference

Finally, the best conferences put networking at the front and centre of proceedings and this is something the Wharton People Analytics conference excelled at. I can't possibly remember all the people I enjoyed speaking to, but other than some of the names already mentioned I'd like to give a shout out to: Shekar Nalle Pilli Venkateswara, Keith McNulty, Arun Chidambaram, Geetanjali Gamel, Antony Ebelle, Davis Carlin, Bennet Voorhees, Manish Goel, Bharat Deore, Paul Edelman, Arun Sundar, Ramesh Karpagavinayagam, Ben Waber, Tom Marsden, Carla Arellano, Hani Nabeel, Russ Clarke, Linda van Leeuwen, Rupert Morrison, Dawn Klinghoffer, Tom Price-Daniel, Ben Teusch, Karyn Marciniak, Han Hu, Julian Holmes, Anu D'Souza, Nikhil Srivastava, Ryan Fuller, Jim Bell and Amelia Barker – you all helped make the conference an even more enriching experience for me. See you at #WhartonPAC 5!

*Want more #WhartonPAC? - Click on the image above to listen to Cade Massey's interviews from the conference floor*

---

## ABOUT THE AUTHOR

**David** *is a respected influencer, writer and speaker on people analytics, data-driven HR and the future of work. He was recognised as Best Writer at the 2015 HR Tech Writers' Awards, and was awarded one of ten LinkedIn Power Profiles for HR in 2016. David's role as Global Director, People Analytics Solutions at IBM enables him to help clients apply an analytical, insight led and business outcome focused approach to their talent strategies and people decisions.*

*David is chairing, speaking and/or attending the following conferences between now and June. If you are going to one of these conferences and would like to meet up with David, please feel free to contact him via LinkedIn:*


- *People Analytics World* (London, April 25-26 2017) - Co-Chair

- *HR Norge - HR Analytics 2017* (Oslo, May 31 2017) - Speaker

- *HR Tech World San Francisco* (San Francisco, June 14-15 2017)

*Connect with David on* Twitter *and* read his blogs here
*on LinkedIn and also on* HR Tech World *and* ERE.

**Keywords**: HR, Human Resources, HR Analytics, People Analytics, Talent, Recruiting, Hiring, Talent Acquisition, Talent Management, HR Metrics, Cost Per Hire, Workforce Analytics, Talent Analytics, Data Driven HR, Employee Engagement, Performance Management, Future of Work, Quality of Hire, Evidence based HR, HR Open Source, #HROS, Cognitive HR, Cognitive Computing, IBM, HR Technology, Flight Risk, Predictive Analytics,



Report this

**David Green**                                                    Follow
People Analytics leader | Award Winning Writer | Speaker / Chair | LinkedIn HR Power Pro…
64 articles

32 comments                                                    Newest ⌄

Leave your thoughts here…

**Terry Perez**                                                    … 2mo
Director, Global Workforce Planning at HP
Thanks for such a great and insightful summary, David! Hope to catch this conference in the future!
Like   Reply

**Gena Cox, Ph.D., PCC**                                          … 2mo
|| Talent Strategy | Talent Analytics | Employee Experience | Leader Effectiveness ||
Wow **David Green** This is a great summary … I get to learn without even leaving my desk! Thanks.
Like   Reply

There are 30 other comments. **Show more.**

Case 3:17-cv-03301-EMC   Document 26   Filed 06/26/17   Page 30 of 119



See more articles by David Green



### The 20 best HR Analytics articles: Mar & Apr 2017

David Green on LinkedIn



### Key takeaways from People Analytics World

David Green on LinkedIn



### The role of People Analytics, Employee Experience and AI in the Workplace

David Green on LinkedIn

## Looking for more of the latest headlines on LinkedIn?

Discover more stories

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2017  |  User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

# EXHIBIT F



News    Video    Events    Crunchbase

# Glint raises $27 million to stop solid employees from bailing

Posted Aug 31, 2016 by *Lora Kolodny* (*@lorakolodny*)

       



Redwood City-based Glint has raised $27 million in a Series C round of venture funding for software that helps companies figure out how their teams are experiencing problems, or why and when solid employees may leave, undesirably.

Glint replaces the traditional 360-review tools used by corporate HR teams and executives with short, anonymous surveys sent out once in a while to specific groups or company-wide to gather feedback.

Then, Glint's software-as-a-service uses machine learning, natural language processing and predictive analytics to identify key areas for improvement.

Understanding what employees want more or less of, and how employees are feeling about management, perks or benefits, their industry and more helps businesses avoid internal problems and attrition.

Meritech Capital Partners and Bessemer Venture Partners co-led the round joined by returning investors Norwest Venture Partners, and Shasta Ventures, and bringing Glint's total equity

Glint CEO and co-founder Jim Barnett explained that Glint protects confidentiality, in part, by only allowing employers to slice and dice data down to a group of 5 or more people, and only giving certain people permission to read employees' comments.

"Only the right people see the right survey data, and employees can choose to fill those out or not. We do get get average response rates of 85% though," he said.



Companies can customize surveys to be longer or shorter, more or less frequently issued.

Clients of Glint include Verizon-owned AOL (the parent company of TechCrunch), E-bay, Cognizant and Sky Broadcasting, among others.

*Glint CEO and cofounder Jim Barnett.*

Medium to large enterprises are drawn to Glint's software and analytics platform, the CEO said, because it helps them avoid attrition and performance issues, and allows them to take all employees' comments into consideration efficiently, unlike a traditional process that involved manual reviews and reading of suggestions or complaints.

The platform supports companies in 30 different languages, so far.

Glint also helps companies understand how employees' satisfaction with their work and their employers may be effecting their business. For example, a health care company may find that patient outcomes are highly correlated with happy employees, or employees who feel happy with the flexibility of their schedules, he said.

Bessemer Ventures' Kristina Shen said she believes Glint has the potential to get to an initial public offering, eventually. But the HR-tech market is one of many mergers and acquisitions, historically.

fact that losing good employees is very costly.

Shen said, "For every employee you lose, you spend a lot of money on recruiting, hiring and onboarding . It just feels better and costs you less to figure out what employees really want, then bring it to them, versus losing a good employee."

Glint intends to use its funding for hiring, product development and to move into new market segments, after early customer traction in Silicon Valley and with tech companies.

## From the Web

Sponsored Links by Taboola

**San Francisco, California: This Brilliant Company Is Disrupting a $200 Billion Industry**
EverQuote Insurance Quotes

**The Growing "On-Demand" Economy**
Intuit

**Hiring a Handyman: The Best Solution for Your Small Home Repairs**
HomeAdvisor

**Forget Your 401k If You Own A Home (Do This Instead)**
OneSmartPenny.com

## FEATURED STORIES



**Jeff Bezos says Amazon will 'keep investing' in India as rivals raise new war chests**
7 HOURS AGO | JON RUSSELL



**Recapping the first TechCrunch China event in Shenzhen**
9 HOURS AGO | JON RUSSELL



**SpaceX successfully launches and recovers second Falcon 9 in 48 hours**
20 HOURS AGO | DARRELL ETHERINGTON

## LATEST FROM STARTUPS



**Anki's Cozmo gets a free update aimed at helping kids learn to code**
1 HOUR AGO | BRIAN HEATER



**OMG Digital, the "BuzzFeed of Africa," raises a seed round of $1.1M**
4 HOURS AGO | CATHERINE SHU



**Tesco launches one-hour grocery deliveries in London, powered by Quiqup**
5 HOURS AGO | NATASHA LOMAS



**Company builder Entrepreneur First hires ex-Yahoo and Googler as new London head**
6 HOURS AGO | STEVE O'HEAR

News

Video

Events

Crunchbase

TechCrunch Store

## About

Staff

Contact Us

Advertise With Us

Event & Editorial Calendar

Send Us A Tip

Activations Blog

## International

China

Europe

Japan

# Follow TechCrunch





# TechCrunch Apps

# The Daily Crunch

Latest headlines delivered to you daily

| Enter Email Address | SUBSCRIBE |
|---|---|

© 2013-2017 Oath Inc. All rights reserved.

Privacy Policy    About Our Ads    Anti Harassment Policy    Terms of Service

Powered by WordPress.com VIP

Fonts by

Glint raises $27 million to stop solid employees from bailing | TechCrunch

# EXHIBIT G

# STATE *of* INBOUND
## *2017*

Welcome to the State of Inbound 2017.

We're pleased to bring you this year's report in your own words. Thanks to the thoughtful commentary of our respondents, we're revealing the top marketing and sales challenges and priorities businesses face today, while examining new trends and channels that will soon affect the way we all do business. Inbound continues to evolve, and this year we're seeing two major shifts take place: Marketers are making the leap into visual content creation while salespeople are slowly shifting from the hard-seller stereotype to a more trusted advisor.

Why the changes? Well, the way people do business has changed, and companies are rising to the challenge to meet consumers where they are—whether that's on Facebook, YouTube, in a messaging app, or on a mobile device.

This year's report will give you the data you need to benchmark your activities against our 6,000+ respondents while also giving you insight to plan your future marketing and sales strategies.

When we unpacked the data from the State of Inbound 2017, we found that the executives who set the vision for their companies have very different perspectives on the state of their business compared to individual contributors tasked with executing on that vision. Executives need a better understanding of the day-to-day challenges employees face, and employees need to communicate more clearly the roadblocks in the way of success. Without clear communication and alignment, a company will struggle to build strong and lasting relationships with its customers.

While we're more than a decade in, the inbound journey is just getting started. The move toward the future requires forward-thinking ideas to be embraced, experimentation to figure out which channels work best for your business, and an openness to try new technologies and tools to foster better relationships with your customers. All of these changes will create complexity and potential stress, but the way forward is not always easy or smooth. We here at HubSpot will be with you to tackle the challenges the future brings.

Thank you,

**Brian Halligan
CEO, HubSpot**

**STATE** *of*
**INBOUND**

# Table of Contents

*3.* Welcome

*6.* The State of Marketing and Sales

*8.* Top Marketing Priorities

*11.* Inbound Marketing Priorities

*14.* Sales Priorities

*16.* Marketing Challenges

*20.* Sales Challenges

*28.* The State of the Business

*30.* Is Marketing Effective?

*34.* Marketing and Sales Alignment

*37.* The Sales Business

*41.* The Marketing Business

*44.* Looking to the Future

*48.* Main Disrupter: Video

*50.* Potential Disrupter: AI and VR

*52.* Constant Disrupter: Social

*54.* Preparing For Disruptors

*56.* Sales Disruptor: Changing Preferences

*58.* Understanding the Modern Buyer

*62.* Trusted Sources of Information

*65.* How People Like to Communicate

*72.* Evolution of the State of Inbound: Trend Data

*76.* Sales is Evolving

*78.* Priorities Remain Consistent

*74.* Who We Surveyed





# THE STATE OF MARKETING AND SALES



# TOP MARKETING PRIORITIES

The majority of marketers today focus on converting leads into customers and growing traffic to their website. There's also strong focus on upselling existing customers. Historically considered a cost center for businesses, Marketing is now measured against its ability to contribute to the business's bottom line.

Over the years, proving marketing ROI has consistently been a challenge for marketers. A marketer surveyed wrote that planning campaigns holistically enabled them to measure ROI: *"Proactive strategic planning results in measurable activities for ROI"*.

*State of Inbound 2017*



## What are your company's top marketing priorities over the next 12 months?



| Priority | % |
|---|---|
| Don't know/not applicable | 2% |
| Reducing the cost of contacts/leads/customer acquisition | 24% |
| Sales enablement | 29% |
| Proving the ROI of our marketing activities | 39% |
| Increasing revenue derived from existing customers | 45% |
| Growing traffic to website | 55% |
| Converting contracts/leads to customers | 70% |

Across the globe, there are some minor differences in priorities. While all regions focus on converting leads into customers, marketers in Australia and New Zealand (ANZ) and Europe, the Middle East, and Africa (EMEA) are slightly more concerned with growing overall traffic compared to their peers. ROI is less of a sticking point for Latin American marketers, but they're more fixated on upselling their existing customer base. More Asian marketers cite sales enablement as a priority; given that relationship-building is a priority in Asia, it makes sense that marketers want to partner with their salespeople. Likewise, Asia-based marketers focus more on reducing the cost of customer acquisition, likely due to the extra facetime traditionally required to close deals in region.

### WHAT ARE YOUR COMPANY'S TOP MARKETING PRIORITIES OVER THE NEXT 12 MONTHS? (BY GEOGRAPHY)



# Inbound Marketing Priorities

With respect to inbound marketing projects, marketers are focused on improving their SEO presence, creating more blog content that can be found via search, and distributing and amplifying content.

A marketer highlighted their priorities as: *"focusing more on online presence such as industry directories, fixing and improving our own website, interacting with potential customers or people within the industry through online forums … rather than print mags which don't always reach our targets."*

With respect to SEO as the top overall priority, one respondent summed up their main challenge: *"Google makes a lot of changes to their search algorithms, and it impacts websites and SEO."* The changing technology landscape will continue to keep marketing teams on their toes.

*Thinking specifically about inbound marketing projects, what are your company's top priorities?*





*Size of Inbound 2017*

Across geographies, there is much more variance on inbound priorities. Uniformly, SEO and organic growth is at the top of the list in every region, but priorities then shift among content distribution and amplification, blog content creation, interactive content creation, and marketing automation. Latin American marketers focus more on interactive and visual content compared to others. North American marketers are tinkering with ways to distribute their content.

*Thinking specifically about inbound marketing projects, what are your company's top priorities? (by geography)*

| Rank | NAM | ANZ | ASIA | LATAM | EMEA |
|------|-----|-----|------|-------|------|
| 1 | Growing SEO/ organic presence 69% | Growing SEO/ organic presence 65% | Growing SEO/ organic presence 61% | Growing SEO/ organic presence 56% | Growing SEO/ organic presence 62% |
| 2 | Content distribution/ amplification 58% | Blog content creation 58% | Blog content creation 58% | Blog content creation 48% | Blog content creation 55% |
| 3 | Blog content creation 57% | Content distribution/ amplification 51% | Content distribution/ amplification 43% | Interactive content creation 45% | Content distribution/ amplification 50% |
| 4 | Interactive content creation 38% | Marketing automation 38% | Interactive content creation 42% | Visual content creation 42% | Marketing automation 41% |
| 5 | Marketing automation 37% | Long-form/visual content creation 30% | Marketing automation 40% | Marketing automation 40% | Interactive content creation 32% |
| 6 | Long-form/visual content creation 35% | Interactive content creation 29% | Visual content creation 39% | Content distribution/ amplification 38% | Long-form/visual content creation 30% |
| 7 | Visual content creation 22% | Visual content creation 29% | Online tools 28% | Online tools 37% | Online tools 25% |
| 8 | Webinars 21% | Product how-to videos 27% | Long-form/visual content creation 26% | Product how-to videos 27% | Product how-to videos 24% |
| 9 | Online tools 21% | Online tools 22% | Product how-to videos 26% | Long-form/ visual content creation 24% | Visual content creation 22% |
| 10 | Product how-to videos 16% | Webinars 13% | Webinars 22% | Webinars 16% | Webinars 21% |
| 11 | Freemium trials 3% | Freemium trials 4% | Freemium trials 11% | Freemium trials 7% | Freemium trials 7% |

Overall, we see strong adoption of inbound across the globe, with room to grow investments in the methodology in Australia, New Zealand, and Asia.

## WHAT IS YOUR ORGANIZATION'S PRIMARY APPROACH TO MARKETING?

*"We primarily conduct inbound marketing."*



| | |
|---|---|
| Global | 71% |
| NAM | 76% |
| LATAM | 72% |
| EMEA | 72% |
| ANZ | 68% |
| ASIA | 64% |

We also know what is not a priority for marketers today: traditional advertising. Once again, it's the top ranked "overrated marketing tactic".

## IN YOUR OPINION, WHAT IS THE MOST OVERRATED MARKETING TACTIC?



| | |
|---|---|
| Paid advertising (print, outdoor, broadcast) | 32% |
| Social media organic | 13% |
| Online paid advertising (social media ads, PPC) | 11% |
| Email Marketing | 10% |
| PR/analyst relations | 8% |
| SEO | 6% |
| Marketing automation | 3% |
| Blogging | 3% |
| Collateral development | 4% |
| Sales enablement | 3% |

In fact, one respondent wrote that they are completely abandoning broadcast to focus more on-demand content: *"We are abandoning the broadcast channels era to enter an individual on-demand environment, where places and things that surround users will create more useful, relevant, and customized experiences."*

# Sales Priorities

For sales professionals, closing more deals occupies the majority of their focus. This was followed by improving the efficiency of the sales funnel as a priority. Optimizing the sales process requires addressing organizational complexity and adapting to new buying habits, which require major shifts for any business. Social selling, another modern sales strategy, comes in as the third most important priority.

## WHAT ARE YOUR COMPANY'S TOP SALES PRIORITIES FOR THE NEXT YEAR?



| | |
|---|---|
| Closing more deals | 71% |
| Improving the efficiency of the sales funnel | 44% |
| Social selling | 29% |
| Training the sales team | 27% |
| Reducing the length of the sales cycle | 26% |
| Improving existing sales technologies | 23% |
| Investing in sales enablement | 16% |
| Investing in a CRM | 14% |
| Don't know/not applicable | 3% |

Some sales respondents also wrote in that they were focusing on "building stronger partnerships" and creating "thought leadership to start the conversation". Thought leadership is an effort that marketing teams should share with their sales counterparts. Forward-thinking content can elevate the profile of the company they serve as well as sales conversations.

Across regions, more sales respondents in ANZ indicate they are dealing with inefficiency in the sales funnel and that they need to improve their existing sales technologies. More respondents in Latin America and EMEA are looking into social selling. EMEA-based sales respondents are investing slightly more in sales enablement and CRM compared to their peers.

## What are your company's top sales priorities for the next year? (by geography)

| Rank | NAM | ANZ | ASIA | LATAM | EMEA |
|---|---|---|---|---|---|
| 1 | Closing more deals 72% | Closing more deals 65% | Closing more deals 65% | Closing more deals 76% | Closing more deals 68% |
| 2 | Improving the efficiency of the sales funnel 54% | Improving the efficiency of the sales funnel 58% | Improving the efficiency of the sales funnel 44% | Improving the efficiency of the sales funnel 36% | Improving the efficiency of the sales funnel 46% |
| 3 | Reducing the length of sales cycle 28% | Improving existing sales technologies 38% | Reducing the length of sales cycle 29% | Social selling 33% | Social selling 31% |
| 4 | Training the sales team 26% | Reducing the length of sales cycle 27% | Training the sales team 27% | Training the sales team 28% | Reducing the length of sales cycle 27% |
| 5 | Improving existing sales technologies 22% | Social selling 27% | Social selling 26% | Reducing the length of sales cycle 24% | Training the sales team 26% |
| 6 | Social selling 19% | Training the sales team 22% | Improving existing sales technologies 16% | Improving existing sales technologies 23% | Improving existing sales technologies 24% |
| 7 | Investing in sales enablement 15% | Investing in sales enablement 15% | Investing in sales enablement 15% | Investing in sales enablement 15% | Investing in sales enablement 19% |
| 8 | Investing in a CRM 11% | Investing in a CRM 9% | Investing in a CRM 10% | Investing in a CRM 15% | Investing in a CRM 17% |

# Marketing Challenges

Echoing their priorities, marketers today find generating traffic and leads to be their biggest challenge, followed by proving ROI and securing budget for marketing programs. The write-in responses show marketers are facing a very wide swath of issues, from figuring out strategy to social conversion to analytics to staffing.

*"Technology and analytics"*

"Developing Content"

"Moving into a modern marketing strategy—our industry is wicked old school"

*"Engaging the whole company to provide a disruptive marketing strategy; understanding our clients' profile, potential, and goals to develop each account in their own individual pace."*

"Social Conversion"

"We're overwhelmed by responsibilities expected per team member."

*"Having the time to do our own marketing"*

## WHAT ARE YOUR COMPANY'S TOP MARKETING CHALLENGES?



| | |
|---|---|
| Generating traffic and leads | 63% |
| Proving the ROI of our marketing activities | 40% |
| Securing enough budget | 28% |
| Identifying the right technologies for our | 26% |
| Managing our website | 26% |
| Targeting content for an international audience | 21% |
| Training our team | 19% |
| Hiring top talent | 16% |
| Finding an executive sponsor | 7% |

Globally, challenges are consistent, with Asian marketers citing targeted content for international audiences and hiring top talent as strong challenges. Latin American marketers are slightly more focused on finding the right technology solutions for their teams and training.

### *WHAT ARE YOUR COMPANY'S TOP MARKETING CHALLENGES? (BY GEOGRAPHY)*

| Rank | NAM | ANZ | ASIA | LATAM | EMEA |
|------|-----|-----|------|-------|------|
| 1 | Generating traffic and leads 61% | Generating traffic and leads 62% | Generating traffic and leads 59% | Generating traffic and leads 66% | Generating traffic and leads 62% |
| 2 | Proving the ROI of our marketing activities 45% | Proving the ROI of our marketing activities 44% | Proving the ROI of our marketing activities 39% | Proving the ROI of our marketing activities 37% | Proving the ROI of our marketing activities 40% |
| 3 | Securing enough budget 30% | Securing enough budget 26% | Targeting content for an international audience 37% | Identifying the right technologies for our needs 32% | Managing our website 27% |
| 4 | Identifying the right technologies for our needs 24% | Managing our website 24% | Securing enough budget 29% | Securing enough budget 29% | Securing enough budget 25% |
| 5 | Managing our website 20% | Identifying the right technologies for our needs 23% | Identifying the right technologies for our needs 26% | Managing our website 28% | Targeting content for an international audience 23% |
| 6 | Training our team 13% | Targeting content for an international audience 12% | Managing our website 26% | Training our team 26% | Identifying the right technologies for our needs 22% |
| 7 | Hiring top talent 13% | Training our team 11% | Training our team 20% | Targeting content for an international audience 19% | Training our team 18% |
| 8 | Targeting content for an international audience 11% | Hiring top talent 10% | Hiring top talent 20% | Hiring top talent 18% | Hiring top talent 14% |
| 9 | Finding an executive sponsor 5% | Finding an executive sponsor 2% | Finding an executive sponsor 11% | Finding an executive sponsor 10% | Finding an executive sponsor 5% |



**STATE** *of*
**INBOUND**

# Sales Challenges



On the sales side, respondents tell us it's getting harder to elicit a response from a prospect, close deals, and prospect for leads. 19% also say they're struggling to incorporate social media in their sales process, and 13% think using sales technologies is now harder than it used to be.

## What is more difficult to do in sales compared to 2 to 3 years ago?



| | |
|---|---|
| Getting a response from prospects | 38% |
| Closing deals | 35% |
| Identifying/prospecting good leads | 30% |
| Engaging multiple decision makers at a company | 27% |
| Avoiding discounting/negotiation | 25% |
| Connecting via phone | 20% |
| Incorporating social media into the sales process | 19% |
| Connecting via email | 17% |
| Using sales technologies | 13% |
| Sourcing referrals | 12% |
| Researching before initial call/email | 11% |
| Keeping someone on the phone | 11% |
| Delivering a presentation | 10% |
| Other | 2% |

Across regions, there is variance in the pressure points for salespeople. While in North America, salespeople have a tough time connecting on the phone, Australia and New Zealand-based salespeople have a hard time avoiding discounting, and Asian and Latin American salespeople struggle with closing deals.

## What is more difficult to do in sales compared to 2 to 3 years ago? (by geography)

| Rank | NAM | ANZ | ASIA | LATAM | EMEA |
|------|-----|-----|------|-------|------|
| **1** | Getting a response from prospects 49% | Getting a response from prospects 49% | Closing deals 37% | Closing deals 42% | Getting a response from prospects 34% |
| **2** | Connecting via phone 36% | Avoiding discounting/ negotiation | Getting a response from prospects 36% | Getting a response from prospects 35% | Identifying/ prospecting good leads |
| **3** | Engaging multiple decision makers at a company 36% | Identifying/ prospecting good leads 26% | Avoiding discounting/ negotiation 27% | Identifying/ prospecting good leads 33% | Closing deals 30% |
| **4** | Identifying/ prospecting good leads 30% | Engaging multiple decision makers at a company 23% | Engaging multiple decision makers at a company 26% | Engaging multiple decision makers at a company 28% | Avoiding discounting/ negotiation 30% |
| **5** | Closing deals 26% | Closing deals 19% | Identifying/ prospecting good leads 24% | Avoiding discounting/ negotiation 23% | Connecting via phone 25% |
| **6** | Connecting via email 20% | Connecting via phone 17% | Sourcing referrals 21% | Incorporating social media into the sales process 22% | Connecting via email 25% |
| **7** | Avoiding discounting/ negotiation 18% | Incorporating social media into the sales process 17% | Incorporating social media into the sales process 18% | Using sales technologies 19% | Engaging multiple decision makers at a company 23% |
| **8** | Keeping someone on the phone 12% | Sourcing referrals 17% | Connecting via email 14% | Delivering a presentation 17% | Incorporating social media into the sales process 18% |
| **9** | Incorporating social media into the sales process 12% | Connecting via email 15% | Connecting via phone 13% | Doing research before initial call/email 16% | Keeping someone on the phone 15% |
| **10** | Using sales technologies 11% | Keeping someone on the phone 8% | Keeping someone on the phone 12% | Connecting via phone 15% | Sourcing referrals 13% |
| **11** | Sourcing referrals 8% | Doing research before initial call/email 4% | Using sales technologies 10% | Connecting via email 14% | Using sales technologies 9% |
| **12** | Doing research before initial call/email 2% | Using sales technologies 2% | Doing research before initial call/email 10% | Keeping someone on the phone 9% | Delivering a presentation 6% |
| **13** | Delivering a presentation 2% | Delivering a presentation 2% | Delivering a presentation 5% | Sourcing referrals 8% | Doing research before initial call/email 5% |

*State of Inbound 2017*

STATE *of*
INBOUND

Most agree that prospecting is currently the toughest part of the sales process. Sales teams need help qualifying leads, whether it's with more robust lead scoring or for Marketing to use better lead-qualifying actions to ensure salespeople are given accounts that are most likely to convert into customers.

Regionally, only Asia-based salespeople opposed the trend by indicating that closing was the more difficult part of the process.

*In your opinion, what part of the sales process do reps struggle with most?*



*In your opinion, what part of the sales process do reps struggle with most? (by geography)*



And while most salespeople today use a CRM system to access and store customer records, data entry is the #1 challenge to using CRMs today, followed by a lack of integration. However, 18% of sales respondents didn't know how to answer our question on the biggest challenge in using a CRM—pointing to the fact that they might not be familiar enough with their CRM to confidently discuss what's working and what's not.

### *WHAT IS YOUR BIGGEST CHALLENGE IN USING YOUR EXISTING CRM?*



When we examined the amount of time salespeople are spending on data entry, we found that 57% of respondents are spending up to an hour per day on data entry. This time inputting information—time spent not engaging with prospecting—leads to frustration and a negative view of the tools meant to make salespeople more effective and efficient.

### *ON AVERAGE, HOW MUCH TIME PER DAY DOES YOUR SALES TEAM SPEND PERFORMING DATA ENTRY OR OTHER MANUAL TASKS?*



**STATE** *of*
**INBOUND**

An interesting theme develops when we slice the data by the respondent's title. On the whole, fewer C-level respondents think that data entry takes a significant amount of time to complete, with 21% indicating it takes an hour or more to complete each day. But in contrast, 45% of individual contributors, who are usually the ones actually doing data entry, say the same.

### *ON AVERAGE, HOW MUCH TIME PER DAY DOES YOUR SALES TEAM SPEND PERFORMING DATA ENTRY OR OTHER MANUAL TASKS? (BY SENIORITY)*



### WHAT HAS BEEN THE MOST SUCCESSFUL CHANNEL FOR YOUR SALES REPRESENTATIVES TO CONNECT WITH A PROSPECT?



The same disconnect reveals itself when we ask respondents what channel provides the best results when connecting with prospects. Overall, the most successful are telephone and email.

However, when responses are broken down by title, CEOs and VPs underplay the success of the phone channel and overestimate the impact of social media, such as Facebook and LinkedIn. Individual contributors (sales representatives) that actually prospect see the world differently. The question is: Why is there such a large gap between senior executives and individual contributors?

### *WHAT HAS BEEN THE MOST SUCCESSFUL CHANNEL FOR YOUR SALES REPRESENTATIVES TO CONNECT WITH A PROSPECT? (BY SENIORITY)*





# THE STATE OF THE BUSINESS



STATE of
INBOUND

# IS MARKETING EFFECTIVE?

We asked our marketing respondents to tell us what they really think: Is their organization's marketing strategy effective? Just 61% answered "yes" this year. One respondent wrote: *"The most disruptive force to affect my job in the next 3-5 years is the lack of research my company does when it comes to marketing strategies."*

Echoing the disconnect between sales leaders and staff, more senior respondents had a rosier picture of the marketing organization. 69% of C-level respondents said their marketing strategy was effective compared to 55% of individual contributors.

This begs the question: Are senior executives seeing benefits from marketing campaigns that are not being shared with individual teams and managers? It's possible that each individual team (consisting of a manager and any number of individual contributors) are not getting a holistic view of Marketing's performance. So, in the absence of clear results, teams are judging their organizations harshly. Or, even worse, performance is below established goals, and senior executives, for whatever reason, are blind to it. No matter the actual reason, at the end of the day there is a disconnect between leadership's view and employees' attitude. This will evolve into a larger business problem if it's not properly addressed. Clearer communication between leaders and staff is necessary in both scenarios.

*Do you feel that your organization's marketing strategy is effective?*



No 39%

Yes 61%

*DO YOU FEEL THAT YOUR ORGANIZATION'S MARKETING STRATEGY IS EFFECTIVE? (BY SENIORITY)*

*"YES, OUR MARKETING STRATEGY IS EFFECTIVE."*

| | |
|---|---|
| C-level executive (CEO, CMO) | 69% |
| VP/Director | 68% |
| Manager | 61% |
| Individual contributor | 55% |

Confidence in marketing strategy also wanes in Asia and Australia and New Zealand, areas with the lowest adoption of inbound marketing.

### *DO YOU FEEL THAT YOUR ORGANIZATION'S MARKETING STRATEGY IS EFFECTIVE? (BY GEOGRAPHY)*

**"YES, OUR MARKETING STRATEGY IS EFFECTIVE."**



| | |
|---|---|
| NAM | 67% |
| ANZ | 59% |
| ASIA | 56% |
| LATAM | 60% |
| EMEA | 63% |

*Based on your organization's approach to marketing, do you feel that your marketing strategy is effective?*



- 68%
- 48%
- 32%
- 52%

**"YES, OUR MARKETING STRATEGY IS EFFECTIVE."**    **"NO, OUR MARKETING STRATEGY IS NOT EFFECTIVE."**

● Inbound Marketing      ● Outbound Marketing

Organizations that are inbound are more likely to state that their marketing strategy is effective. Indeed, the majority of respondents who are part of outbound organizations do not think their marketing strategy is effective.



STATE *of*
INBOUND

# Marketing and Sales Alignment

Most respondents report a positive relationship between marketing and sales teams. 44% of respondents say Marketing and Sales are generally aligned, while 22% indicate there's a formal SLA in place between teams. A marketer gave a specific example of how both teams work together to achieve their goals: *"[We're] getting better aligned. [We] know that when someone fills out a 'request for quote' form, our Sales team is following up."*

*State of Inbound 2017*

*How would you characterize your company's Sales and Marketing relationship?*



| | |
|---|---|
| Tightly aligned (Sales and Marketing SLA) | 22% |
| Generally aligned | 44% |
| Rarely aligned | 14% |
| Misaligned | 11% |
| Don't know | 10% |

Once again, when we cut the responses by title, we see high confidence in Marketing and Sales alignment from senior executives, but not nearly as much of the same sentiment among individual contributors. 31% of C-level respondents say their organization has an SLA; just 17% of managers and individual contributors say the same.

*How would you characterize your company's Sales and Marketing relationship? (by seniority)*



The Sales and Marketing alignment concept (also known as smarketing) has the highest adoption in North America and is making its way around the globe. When it comes to aligning different parts of an organization, there's always room to improve collaboration, communication, and direction.

*How would you characterize your company's Sales and Marketing relationship? (by geography)*



STATE *of*
INBOUND

Why focus time on Sales and Marketing alignment? Over the years, we've consistently found that marketing and sales organizations with tight alignment perform better: Marketing respondents whose organizations have a service level agreement (SLA) in place are 3x more likely to say their strategy is effective compared to those in misaligned organizations.

### BASED ON HOW YOU CHARACTERIZED YOUR COMPANY'S MARKETING AND SALES RELATIONSHIP, DO YOU FEEL THAT YOUR MARKETING STRATEGY IS EFFECTIVE?



Likewise, sales teams benefit from SLAs with Marketing. Aligned sales organizations are more likely to grow headcount compared to misaligned organizations.

### BASED ON HOW YOU CHARACTERIZE YOUR COMPANY'S SALES AND MARKETING RELATIONSHIP, IS YOUR SALES TEAM INCREASING OR DECREASING IN SIZE?



# The Sales Business

Sales respondents have a very positive outlook for their teams in the next 12 months. 55% of respondents indicate their sales team will grow, with only 5% decreasing.

### IS YOUR COMPANY INCREASING OR DECREASING THE SIZE OF THE COMPANY OVER THE NEXT 12 MONTHS?



Most expect to spend $10,000 or less this year on sales technologies and training. It's also impressive that investment in training is nearly on par with spend on sales technologies. Aligning Sales and Marketing is not an easy process, especially if a company is new to inbound. Training is key in changing established behaviors and requires a great deal of effort. One marketer wrote: *"Retraining the sales team in the Sales and Marketing alignment and processes is a constant challenge that disrupts the inbound marketing strategies and procedures for three to six months."*

### *How much will your company spend on sales technologies and sales training for the next year?*



Salespeople find that the top sources of leads are those they source directly and referrals, not those sourced by Marketing.

### *Which is the top source of sales for your sales organization?*



However, sales respondents in organizations with an SLA between Marketing and Sales felt differently. Those respondents ranked marketing-sourced leads highest. Thanks to alignment, which sets clear expectations on the types of leads Marketing should provide and a feedback loop between departments, these sales respondents are finding much higher value in the leads Marketing generates for them.

### *Based on how you characterize your company's Sales and Marketing relationship, which is the top source of leads for your sales organization?*



When we examine responses by title, once again we find differences in perception between senior staff and individual contributors. C-level executives rate referrals as the top source of leads for their organizations, while individual contributors point to sales-sourced leads. Everyone is in agreement that marketing-sourced leads rank third.

### *Which is the top source of leads for your sales organization? (by seniority)*



When we asked respondents to rank the quality of referrals, sales leads, and marketing leads, referrals were rated as the highest quality lead. Perhaps C-level executives and VPs think highly of referrals because they are high-quality leads, which are more likely to convert. The big question for organizations is scaling referral systems so that more get fed into the sales funnel.

### *Rate the quality of your leads from the following sources:*



# The Marketing Business

Marketing respondents found that inbound campaigns yielded higher ROI compared to outbound campaigns, yet 41% of respondents either could not answer the question or could not calculate ROI. The inability to measure ROI will be a hindrance for marketing teams trying to prove their value or advocate for higher budgets.

### *WHICH MARKETING APPROACH HAS GIVEN YOUR ORGANIZATION HIGHER ROI: INBOUND OR OUTBOUND MARKETING?*



Most respondents will spend $25,000 or less on their marketing efforts in the next year. With limited budget, getting the highest ROI possible is crucial for marketing teams to deliver oversized impact.

## *HOW MUCH WILL YOUR COMPANY SPEND ON MARKETING OVER THE NEXT 12 MONTHS?*



## *How does your company's current budget for inbound marketing compare to last years?*



Budgets have either remained consistent or been increased, a good sign that businesses are growing and confident for the future.

Earlier we covered how sales teams rate leads from Marketing, with 30% rating marketing leads as poor quality. In contrast, 59% of marketers believe the leads they send to sales are very high quality.

## *WHICH SOURCE PROVIDES THE HIGHEST QUALITY LEADS FOR YOUR SALES TEAM?*



Splitting the data by alignment shows a similar pattern—marketers in tightly aligned organizations are more likely to feel confident about their inbound leads, while those with less alignment express more doubt and rank sales-sourced leads as of higher quality.

## *Based on how you characterize your company's Sales and Marketing relationship, which source provides the highest quality leads for your sales team?*



At the end of the day, there is still a disconnect between the leads Sales perceive as valuable and the leads Marketing generates. These two departments ultimately work together to achieve the same goal: create more customers. Working in tandem, or at least establishing better lines of communication, can only help both teams achieve their goals.



# LOOKING TO THE FUTURE

# LOOKING TO THE FUTURE

The times ... they are tumultuous. When we asked respondents about future disruptors to their business, people across the globe cited the current political landscape as a source of disruption in their jobs. For the first time, we received a multitude of references to current events: Brexit, the current U.S. administration, economic crises, world politics, and even a call-out on currency fluctuations in South Africa. For business leaders, uncertainty and fear in the political and economic climate are only complicated by the speed of change in the marketing and sales industry and the speed at which new digital challenges occur.

In the past few years, we've witnessed a shift from marketing where the primary channels -- email and website -- were owned and controlled by the brand. Now, marketing across a variety of social channels and content publishing platforms is challenging businesses to redefine how they communicate with their audience and track performance. Our respondents believe that having a website and blog is no longer enough to attract the attention of their buyers. Nor is a salesperson the go-to resource for when a business needs to make a purchase. These are significant changes for multiple parts of the business. So how are people planning to address these disruptions?

In marketing, forward-thinking respondents are prioritizing research and meeting their buyers where they "live." One respondent wrote, *"As the method to target and attract customers continues to evolve and becomes more precise, it will disrupt the way in which traditional marketing operates."*

*"Online is the new mainstream, so I think we will see less of 'digital' marketers and more just 'marketers.' Competition from peers will also increase as more people become trained in digital marketing."*

Because of the sheer number of channels businesses operate in today (web, mobile, social networks such as Twitter, Facebook, and LinkedIn, emerging networks such as Snapchat, WeChat, Messenger, and aggregation platforms such as Medium), marketers worry about resources and prioritization: *"Effectively managing the rapidly growing and changing social media landscape ... warrants a significant resource allocation."*

## *"IF A COMPANY IS SLOW TO CAPTURE A NEW MODE OF COMMUNICATION, IT MIGHT AS WELL STOP THE BUSINESS."*



# Main Disruptor: Video

Video is one of the top-cited disruptors in our survey. Many see video as a great channel to better connect with a prospect, while others fret that video will make their day jobs obsolete.

Here's some marketers who are betting on video:

**"We're moving towards more live videos and video content on social media and adapting our approach to be less 'in-your-face' and more subtle to acquire conversions."**

"We are looking more into video content and visuals. We are also want to get more into podcasting and creating relevant content that consumers enjoy looking at."

*"We're going to have a vast increase in video and reduction of outbound email. Video means we're taking even more time to foster lasting customer relationships in a way that's really difficult to scale (but super important)."*

*"We're responding to people's desire to learn online through video as opposed to face to face."*



On a more personal level, content marketers who specialize in writing and editing worry about the impact video will have on their careers: ***"I MOSTLY WRITE CONTENT RIGHT NOW, BUT I'M AFRAID IT MAY BEGIN TO DIMINISH MORE AND MORE WITH VIDEO."*** Others are choosing to get trained: "I'm learning new tactics (i.e., video)."

Others see video as the connecting force between a brand and their customers. One respondent argued that the move to video is a natural evolution, and the only those resistant to the change will see it as a disruption: *"Video is just going to get bigger and bigger. I think more people want raw, honest connection. They want to know you and the company in a way that feels personal. I don't see this as a disruption, but it might be for those who aren't willing to shift in this direction."*

For others, the struggle to adapt is caused by internal complexity: ***"WE ARE TRYING TO INTRODUCE NEW METHODS BUT FACING A LOT OF INTERNAL RESISTANCE. EVERYONE GETS A SAY ON EVERYTHING. IF SOMETHING WORKS FOR ONE THING, IT'S ROLLED OUT FOR EVERYTHING, EVEN WHEN IT'S NOT SUITABLE."***

A one-size-fits-all approach can be extremely difficult to pull off. Consider the channel, format, and the content topic.



# Potential Disruptor: AI and VR

Artificial intelligence, augmented reality, and virtual reality are all buzzwords in the technology and marketing community. Our respondents agree it is a disrupter, but since the technologies are not pervasively available and have so many potential use cases, there's not a lot of clarity around what impact AI will have in the near future and how marketers should prepare or adjust their approach.

In response to our open-ended question on what they see as disruptors to the marketing industry, many responded:

*"AI and automation will disrupt marketing."*

"AI and machine learning"

"I think virtual reality will further disrupt the digital marketing industry and represents huge opportunity for sales and marketing leaders."

"Artificial Intelligence and VR. Maybe even holograms!"

*"Artificial intelligence and the wider adoption of big data for hyper-personalization."*

Some saw an upside to the automation potential of AI and pointed to AI's ability to reduce the need for humans to do repetitive tasks:

*"INTEGRATION OF AI INTO DAILY ROUTINES AND MONOTONOUS/ REPETITIVE RESPONSIBILITIES."*

*"CHATBOTS, AI, BOTS, AND AUTOMATION OF REPEATABLE WORK AND PROCESSES."*

Others point to AI's natural language processing capabilities as a new way to generate content, though one respondent wasn't sure if it will happen.

*"AN AI SOFTWARE CREATING/ CURATING HIGH-QUALITY CONTENT. (DON'T REALLY THINK THAT'S GONNA HAPPEN THOUGH!)."*

*"AUTOMATION OF CONTENT PRODUC- TION WILL BE A DISRUPTION."*

In fact, these commentators have hit on a key trend happening in the marketing technology space: content written by AI software. We are already seeing AI-generated content today. Most of today's news articles outlining sports statistics and earning reports are written by AI programs.



# Constant Disruptor: Social

For some marketers, social is a necessary evil. Billions of people "live" on these networks, so businesses have to participate to expand their reach, but every year there's a new algorithm to deal with, a new type of content offering, or even a new social network to grow a presence on. On these platforms, marketers don't own the experience and have very little control, making it more and more challenging to prove ROI even while they know that a presence is necessary. So it's not surprising many respondents wrote that social is disrupting marketing.

One philosophical respondent summed up the environment: *"I think in this industry, you always have to be prepared to shift as your market shifts. As technology grows and evolves, so too will the best ways to interact with our ideal clients."*

Another honestly laid out the challenges of trying to keep up: *"We have a hard time sometimes because we work in the rapidly changing world of social media analytics. Social channels are constantly introducing and rolling out new features and metrics. We have to quickly wrap our minds around if it's important to our audience, how our audience can use it, and if we should integrate some kind of functionality into our product. It's very fast-paced and difficult to stay on top of."*

Our marketers are also keenly aware of the growth of messaging apps such as Whatsapp and the rise of Snapchat. We received many references to various apps:

## *"Snapchat"*

## "Messenger apps (WhatsApp, WeChat)."

**"Look at WeChat and how it manages to retain its users within the apps for multiple purposes throughout the day: messaging, newsfeed, information about companies and products (to a much more thorough degree than what Facebook provides), and payment."**

## "Whatsapp"

*"The increase in apps like messenger and WhatsApp and the move away from email will disrupt the way I do my job."*

Others grapple with tracking the impact of *"dark social media"* and coping with *"Facebook's constant changes to how ads work on their platform and how we reach clients."* Another bemoaned the fast-paced communication requirements that force their business to quickly adapt:

*"A disruptor is the influence of instant-communications … Speed, frequency, how to respond, what channels are all shifting."*

# Preparing for Disruptors

Consistent with the written feedback, marketing teams will maintain or increase their presence on YouTube and Facebook video and focus on figuring out how to market on messaging apps such as WhatsApp. Snapchat is still a mystery for many businesses, and we see a dip in focus as marketers opt to spend their time on larger emerging channels.

*WHAT CONTENT DISTRIBUTION CHANNELS DO YOU PLAN TO ADD TO YOUR MARKETING EFFORTS IN THE NEXT 12 MONTHS?*



True to their role as forward thinkers, C-level executives lead the charge, indicating a higher preference to try and expand across emerging distribution channels. Those who are on the ground, the individual contributors, are a bit more muted and pragmatic in their assessment. Facebook video is the top focus for individual contributors.

*WHAT CONTENT DISTRIBUTION CHANNELS DO YOU PLAN TO ADD TO YOUR MARKETING EFFORTS IN THE NEXT 12 MONTHS? (BY SENIORITY)*



State of Inbound 2017

STATE *of*
INBOUND

# Sales Disruptor: Changing Preferences

Many people consider sales to be a job function that will never change or evolve. Selling, as a process, has not undergone the same rapid change that marketing or IT departments have. But we are seeing inklings of change and concern from our sales respondents. Salespeople acknowledge that buyers nowadays are more independent and often bypass the salesperson completely. Some are looking to shift their sales role into that of an advisor or concierge to better service their prospects.

Here's what some salespeople wrote in when we asked what would impact how they do their jobs in the future:

*"Our industry is going through a seismic shift. Gone are the days of the salesperson being the gatekeeper for information. Our website has now become our primary mode of marketing where it used to be our brick-and-mortar locations. I think in the next three to five years we will see a shift to brand selling and concierge-like service."*

"Clients are more interested in doing digital purchases. They don't spend time meeting with a salesperson."

**"There's a generational change away from personal service and direct communication fed by a growing preference for technology—not people."**

*"Decentralization of decision-making units/more decision makers involved in buying decisions"*

"We see increasing smartness and competency levels in our B2B buyers."





# UNDERSTANDING THE MODERN BUYER



# UNDERSTANDING THE MODERN BUYER

We heard this theme loud and clear from our survey respondents when we asked how their marketing team is adapting to changing consumer behaviors. Trying to track and understand target customers across multiple channels is a complicated and challenging endeavor for many organizations.

"We're testing the field to observe the response and if it doesn't result effective in a determined period of time [we] find [an]other strategy."

"Now we're actively reaching customers where they want to be met."

"We need to get closer to our customers."

"We tap into the channels that customers mainly use to communicate."

"The amount of research and analysis that goes in before employing a particular strategy has increased manifold and constant checks on the trends of consumer behaviour are changing as well."

"The further diversification of media and how/where people spend their time consuming content. Being able to not only create content, but also target it for those various platforms is a constant evolution."

# Trusted Sources of Information

Referrals, customer references, media articles, and vendor-authored articles have consistently been the most reliable sources of information for our decision-makers. Word-of-mouth is a powerful influence in a purchase decision: A business's most important marketing asset is their customer base, who can advocate on their behalf. Word-of-mouth and customer case studies, the top two information sources, go a long way in impacting a decision-maker's purchase decision. Our data also shows that a business's content goes just as far as a media article or an analyst report. So lower profile organizations can still invest in content to influence their potential buyers. It's key to focus on middle and bottom of the funnel stories that will resonate with an organization's buyer personas.

Lastly, remember your salespeople are at the bottom of the ladder. Savvy businesses can make the best of lowered buyer expectations by outfitting their sales staff with helpful insights that buyers cannot unearth from media articles or case studies. Transform your salespeople into trusted advisors so that they make the best impression possible when they finally connect with a buyer.

*WHAT SOURCES OF INFORMATION DO YOU RELY ON WHEN MAKING A PURCHASE DECISION FOR BUSINESS SOFTWARE?*



When it comes to seniority, the same information sources rank high in the purchasing decision. C-level executives strongly rely on personal recommendations and tend to be more attuned to media coverage. The word-of-mouth factor is key because on the business side, more C-level respondents rate referrals as the highest quality leads for Sales. Their personal preferences influence their idea of what a top lead is. Both the individual contributor and the C-level executive rank salespeople lowest in terms of influence.

### *WHAT SOURCES OF INFORMATION DO YOU RELY ON WHEN MAKING PURCHASE DECISIONS FOR BUSINESS SOFTWARE? (BY SENIORITY)*



Regionally, Asian and Latin American respondants are less enthusiastic about referrals compared to their global peers. They rate formal customer references nearly as high as word-of-mouth in terms of importance and are less likely to use review sites as an information source. Compared to other regions, North American respondents depend more on salespeople, by five to seven percentage points.

### *WHAT SOURCES OF INFORMATION DO YOU RELY ON WHEN MAKING PURCHASE DECISIONS FOR BUSINESS SOFTWARE? (BY GEOGRAPHY)*



# How People Like to Communicate

When it comes to communication channels, email is the clear winner. Face-to-face and phone conversations still rank high for our respondents in comparison to relatively newer channels such as social media and video conferencing. However, adoption of new technologies can be swift. Chatting through messaging apps is now an ingrained part of business life for 31% of our respondents. We asked specifically about communicating for official business purposes to see if traditionally "personal" channels, such as social media and messaging apps, have crossed over into people's business life. For over a third of responses, social media and messaging apps are part of how they communicate professionally.

*How do you prefer to communicated for business purposes?*



STATE *of*
INBOUND

In a breakdown by title, it's noteworthy that C-level executives are social media and messaging power users, with 44% preferring to communicate via social media and 37% on messaging apps.

### *HOW DO YOU PREFER TO COMMUNICATE FOR BUSINESS PURPOSES? (BY SENIORITY)*



*How do you prefer to communicate for business purposes? (by seniority)*



For senior leaders who need to keep on top of the next big trend, it makes sense that they are more keen to try and test new technologies, especially those touted as the next big thing. Additionally, as executives tend to be on-the-go more often and in a position to dictate requests, these new channels allows them to communicate quickly and informally to members of their team.

Outside of North America, there's higher use of newer communication channels such as social media and messaging apps. While only 15% of North America respondents use messaging apps for business purposes, 45% of Latin American and 37% of Asian respondents do. Latin American-, Asian-, and EMEA-based respondents also more actively use social media for business communications compared to North America.

The adoption of social media has further blurred the line between personal and professional. Today, the majority of our respondents use what we think of as traditionally "personal" social networks such as Facebook and Twitter for professional purposes. 74% of respondents use Facebook professionally, just shy of the 78% who use LinkedIn, a network designed for professional use. Indeed, more people are using Twitter for professional purposes over personal purposes (59% versus 56%). In contrast, many use Instagram for personal reasons, but fewer leverage the network for professional purposes.

### *HOW DO YOU PREFER TO COMMUNICATE FOR BUSINESS PURPOSES? (BY GEOGRAPHY)*



### *WHICH SOCIAL MEDIA CHANNELS DO YOU USE FOR PROFESSIONAL AND/OR PERSONAL USE?*



When we look across regions at social networks used for professional purposes, we see Facebook outstripping LinkedIn in Latin America. The biggest users of Twitter live in North America and EMEA. Instagram is popular in Latin America and North America, while Quora surges comparatively in Asia. Asian respondents also are more active on WeChat, the dominate messaging social network hybrid in the region.

### *WHICH SOCIAL MEDIA CHANNELS DO YOU USE FOR PROFESSIONAL PURPOSES? (BY GEOGRAPHY)*



Consistent with the usage data above, C-level executives are the most active on various social networks for professional purposes. Senior leaders tend to have the widest professional networks, so it's not entirely surprising that they actively use these platforms to keep up with peers.

### *WHICH SOCIAL MEDIA CHANNELS DO YOU USE FOR PROFESSIONAL PURPOSES? (BY SENIORITY)*



# EVOLUTION OF THE STATE OF INBOUND: TREND DATA



*cv.2*

# EVOLUTION OF THE STATE OF INBOUND

We have been tracking the goals and priorities of inbound organizations for the past nine years and have assembled trending data from previous reports in this chapter. Our data has remained remarkably constant. This is to be expected, as the driving forces for marketing and sales activities -- generating more leads, converting more customers, etc., remain the same, but there have been a couple of interesting shifts over the years on the sales side.





# Sales Is Evolving

In 2015, salespeople indicated that referrals were their top source of leads. That has dropped 11% in the past two years. Today, leads directly sourced by Sales are ranked in the top position. Additionally, Sales' assessment of market-ing-sourced leads dropped 8%. This trend suggests sales thinks they can hunt much better leads than inbound mar-keting can bring in—this is a perception and trust issue for marketing leaders to address.

We've also seen some interesting shifts on the biggest challenges for using a CRM. In the past, up to 16% of sales teams didn't bother using their existing CRM. Now, adop-tion is much higher (only 6% reported that their team didn't use aCRM), but as a result, manual data entry is a headache. Incorrect data is another growing concern.

Many CRM software companies have made strides to solve the integration problems that first plagued the systems, causing a 5% drop in complaints around integrations. And, true to it's purpose, tracking the sales funnel is less of an issue for teams, dropping from 14% in 2015 to 9% today.

*State of Inbound 2017*

## Which is the top source of leads for your sales organizations?



## What is your biggest challenge using the CRM?



# Priorities Remain Consistent

Priorities and challenges have seen only small shifts over the years. Converting leads into customers is a continual focus for marketers.

*What are your company's top marketing priorities over the next 12 months?*



Converting contracts/leads to customers — 70% / 74% / 70%
Growing traffic to website — 55% / 57%
Increasing revenue derived from existing customers — 45% / 46% / 44%
Proving the ROI of our marketing activities — 39% / 42% / 41%
Sales enablement — 29% / 32%
Reducing the cost of contracts/leads/customer acquisition — 24% / 27% / 23%

2015   2016   2017

Likewise, salespeople continue to focus on closing more deals. Social selling has gained ground though; it's now the third highest priority in 2017 after ranking near the bottom of our list in 2015. Teams are less focused on improving sales technologies, which may indicate maturity of these tools in enabling sales teams. We came to this conclusion based on the fact that making the sales funnel more efficient and reducing the length of the sales cycle has gone down slightly in tandem.

### WHAT ARE YOUR COMPANY'S TOP SALES PRIORITIES OVER THE NEXT 12 MONTHS?



Closing more deals — 71% / 70% / 71%
Improving the efficiency of the sale funnel — 44% / 47% / 47%
Social selling — 29% / 28% / 27%
Training the sales team — 27% / 27% / 24%
Reducing the length of sales cycle — 26% / 31% / 29%
Improving existing sales technologies — 23% / 25% / 27%
Investing in sales enablement — 16% / 16% / 16%
Investing in a CRM — 14% / 13% / 14%

2015   2016   2017

Marketers still rate inbound marketing leads as the highest quality year over year. As we saw earlier, their contributions aren't valued by their counterparts in Sales as these respondents consistently rate marketing-sourced leads as the lowest quality compared to referrals and sales-sourced leads.

### WHICH SOURCE PROVIDES THE HIGHEST QUALITY LEADS FOR YOUR SALES TEAM?



Inbound practices — 52% / 59%
Self-sourced leads from sales teams — 31% / 26%
Outbound practices — 16% / 16%

2015   2016

Sales challenges remain consistent year over year. Salespeople continue to face problems getting a response, closing a deal, and prospecting.

### *WHAT IS MORE DIFFICULT TO DO IN SALES COMPARED TO 2 TO 3 YEARS AGO?*



For Sales, the early phases of the sales cycle prove to be the biggest challenge. Compared to 2015, closing is more manageable. Improvements in the qualification phases through better lead scoring software may be making salespeople more confident in the closing phase.

### *IN YOUR OPINION WHAT PART OF THE SALES PROCESS DO REPS STRUGGLE WITH MOST?*



Concerning is that fact that, salespeople are spending more of their valuable time on data entry compared to last year.

### *ON AVERAGE, HOW MUCH TIME PER DAY DOES YOUR SALES TEAM SPEND ON PERFORMING DATA ENTRY OR OTHER MANUAL TASKS?*



Phone is the best channel for sales to connect, but we see a slight dip in the success rate of email.

### *WHAT HAS BEEN THE MOST SUCCESSFUL CHANNEL FOR YOUR SALES REPRESENTATIVES TO CONNECT WITH A PROSPECT?*



Year over year, we see slight decreases in people's preference to communicate on nearly all channels. Phone stayed static and messenger apps were the only channel to grow, from 29% to 31% preferring it in 2017.



### *HOW DO YOU PREFER TO COMMUNICATE FOR BUSINESS PURPOSES?*

● 2016  ● 2017

Finally, our respondents across the globe consistently seek out opportunities for growth in a new job, followed by work-life balance, and compensation.



### *WHAT DO YOU CONSIDER WHEN LOOKING FOR A NEW JOB?*

● 2016  ● 2017



# WHO WE SURVEYED



# WHO WE SURVEYED

This year's State of Inbound survey had the largest number of global respondents: 6,399 professionals in 141 countries. Here's the breakdown of the respondents:

## WHERE ARE YOU BASED?



- 🔴 NAM
- 🟡 ANZ
- 🔵 ASIA
- 🟢 LATAM
- 🟠 EMEA



Not a HubSpot customer or partner 88%

HubSpot customer or partner agency 12%

## IS YOUR COMPANY ANY OF THE FOLLOWING?

## TO WHOM DOES YOUR COMPANY PRIMARILY SELL?



Don't know/not applicable 5%

Nonprofit/government 3%

Consumers 23%

Other businesses 23%



More than 1,000 — 10%
201 to 1,000 — 10%
26 to 200 — 23%
11 to 25 — 16%
Fewer than 10 — 42%

## HOW MANY FULL-TIME EMPLOYEES DOES YOUR COMPANY EMPLOY?

**STATE** of
**INBOUND**

## *WHAT BEST DESCRIBES YOUR COMPANY'S AVERAGE ANNUAL REVENUE?*



## *WHICH OF THE FOLLOWING BEST DESCRIBES THE PRINCIPAL INDUSTRY OF YOUR ORGANIZATION?*



## *WHAT BEST DESCRIBES YOUR LEVEL IN YOUR COMPANY?*



*Looking for more data?*
*Contact HubSpot Research*
*at research@hubspot.com*

# Bylines and Methodology

## *ABOUT THE TEAM:*

Author: Mimi An
Editor: Jami Oetting
Executive sponsor: Meghan Keaney Anderson
Survey creation, implementation, and analysis: Mimi An

## *METHODOLOGY:*

HubSpot fielded a global online survey from December 2016 through February 2017. The survey was available in English, French, German, Spanish, and Portuguese. The responses were sourced via email invitations, blog promotion, and social sharing. No personal information was collected and no paid incentives were offered for responses.

# EXHIBIT H

# Forbes



**Gil Press** Contributor

*I write about technology, entrepreneurs and innovation.*

Opinions expressed by Forbes Contributors are their own.

**TECH**   1/20/2017 @ 9:27AM | 35,285 views

# 6 Predictions For The $203 Billion Big Data Analytics Market



*Shutterstock*

The creation and consumption of data continues to grow by leaps and bounds and with it the investment in big data analytics hardware, software, and services and in data scientists and their continuing education. The availability of very large data sets is one of the reasons Deep Learning, a sub-set of artificial intelligence (AI), has recently emerged as the hottest tech trend, with Google, Facebook, Baidu, Amazon, IBM, Intel, and Microsoft, all with very deep pockets, investing in acquiring talent and releasing open AI hardware and software.

The increasing interest and investment in AI, in turn, will lead to the emergence of new tools for collecting and analyzing data and new enterprise roles and responsibilities. Here are a few predictions—based on analysis by the International Institute for Analytics (IIA), IDC, and NewVantage Partners—regarding the market for big data analytics.

*The big data analytics market will soon surpass $200 billion*

[IDC says that worldwide revenues for big data and business analytics](#) will grow from $130.1 billion in 2016 to more than $203 billion in 2020, at a compound annual growth rate (CAGR) of 11.7%. In addition to being the industry with the largest investment in big data and business analytics solutions (nearly $17 billion in 2016), banking will see the fastest spending growth.

*There's gold in them there mountains of data*

By the end of 2017, revenue growth from information-based products will double the rest of the product/service portfolio for one third of Fortune 500 companies, [says IDC](#). Raw data and various value-added content will be bought and sold either via marketplaces or in bilateral transactions and enterprises will begin to develop methods for valuing their data (see Chief Data Officer below). "Data monetization" will become a major source of revenues, as the world will create 180 zettabytes of data (or 180 trillion gigabytes) in 2025, up from less than 10 zettabytes in 2015, [according to IDC](#).

*Creating a data-driven culture will continue to be a challenge*

More than 85% of respondents report that their firms have started programs to create data-driven cultures, but only 37% report success thus far, according to [NewVantage Partners' 5th annual survey of senior corporate executives on the topic of Big Data](#). Technology is not the problem. The culprits include management understanding, organizational alignment, and general organizational resistance. "If only people were as malleable as data," say the authors of the NVP report.

*Cloud vendors will increasingly compete with traditional analytics providers*

With the rapid growth in analytics capabilities on cloud platforms, users will leverage large cloud vendors more prominently for analytical software in 2017, says the [International Institute for Analytics (IIA)](#). Similarly, [IDC predicts](#) that by 2018, new cloud pricing models for specific analytics workloads, will drive up to 5 times higher growth in spending on cloud versus on-premises analytics solutions.

*Chief Data Officers will lead their enterprises
data monetization initiatives*

Today, most executives see the role of the Chief
Data Officer as largely defensive, focused on
ensuring compliance with regulatory
requirements. But going forward, Chief data
Officers will drive innovation  and will build a
data culture for their organizations, say 48.3% of
respondents to the NewVantage Partners' survey.

*Data translators will proliferate*

In its much-quoted 2011 report on big data, the
McKinsey Global Institute (MGI) quantified the
 coming shortage of data scientists (140,000 to
190,000 people with "deep analytical skills" in
the U.S by 2018).  Now they forecast that
"millions of people" will be needed to serves as
translator of the results of the work of data
scientists to the rest of the organization.
Similarly, Chris Brady, Mike Forde, and Simon
Chadwick write in the *Sloan Management
Review* "...it may be easier for domain experts,
with deep knowledge of the business in which
they are engaged and the requisite interpersonal
skills, to obtain sufficient knowledge about data
analysis to act as the translator for data scientists
than for data scientists to gain enough knowledge
about the domain, especially the language of that
domain."

*Follow me on Twitter
@GilPress or Facebook or Google+ *

**RECOMMENDED BY FORBES**

2017 Predictions For AI, Big Data, IoT,
Cybersecurity, And Jobs From Senior...

A New AI-Driven Companion For Older Adults,
Improving Their Quality Of Life

A Very Short History Of Artificial Intelligence
(AI)

Artificial Intelligence Pioneers: Peter Norvig,
Google

The 10 Most Dangerous U.S. Cities

Apple Leak 'Confirms' iPhone 8 Shape Change

The Toughest Jobs To Fill In 2017

Check Your Social Security Benefits

This article is available online at:

2017 Forbes.com LLC™   All Rights Reserved

# EXHIBIT I

JEROME C. ROTH (State Bar No. 159483)
jerome.roth@mto.com
JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
LAURA K. LIN (State Bar No. 281542)
laura.lin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:      (415) 512-4000
Facsimile:      (415) 512-4077

Attorneys for Plaintiff LinkedIn Corporation

JAMES C. OTTESON, State Bar No. 157781
jim@agilityiplaw.com
BRANDON BAUM, State Bar No. 121318
brandon@agilityiplaw.com
DAVID L. LANSKY, State Bar No. 199952
dlansky@agilityiplaw.com
AGILITY IP LAW, LLP
149 Commonwealth Drive
Menlo Park, CA 94025
Telephone: (650) 227-4800
Facsimile: (650) 318-3483

Attorneys for Defendants
Robocog Inc. d/b/a HiringSolved,
and Shon Burton

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LINKEDIN CORPORATION,<br><br>              Plaintiff,<br><br>        vs.<br><br>ROBOCOG INC. D/B/A HIRINGSOLVED,<br>AND SHON BURTON,<br><br>              Defendants. | Case No. C14-00068 (BLF)<br><br>**[PROPOSED]** **FINAL JUDGMENT ON CONSENT**<br><br>Judge:    HON. BETH L. FREEMAN |

**FINAL JUDGMENT ON CONSENT**

WHEREAS, on January 6, 2014, Plaintiff LinkedIn Corporation ("LinkedIn") initiated the above-captioned lawsuit against unknown Doe defendants;

WHEREAS, on March 27, 2014, LinkedIn filed a First Amended Complaint against Defendants Robocog Inc. d/b/a HiringSolved and Shon Burton (collectively, "Defendants") alleging that Defendants had violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., California Penal Code § 502 et seq., and the Digital Millennium Copyright Act, 17 U.S.C. § 1201 et seq., and engaged in unlawful acts of breach of contract, trespass, and misappropriation;

WHEREAS, LinkedIn alleged that Defendants employed various automated software programs (often referred to as "bots") to register thousands of fake LinkedIn member accounts, circumvent various technical measures that control access to the LinkedIn site, and extract and copy data from many member profile pages using a process known as data "scraping";

WHEREAS, on May 16, 2014, Defendants filed an Answer admitting that Defendants used various automated software programs to register LinkedIn member accounts and copied data from many LinkedIn member profile pages without permission from either LinkedIn or its members;

WHEREAS, LinkedIn and Defendants (collectively, the "parties") have reached an agreement for resolution of the action, the full terms and conditions of which are set forth in the document entitled "Settlement Agreement," dated July 8, 2014 (the "Settlement Agreement"), and incorporated herein by reference in their entirety;

WHEREAS, all parties are represented by counsel who negotiated the Settlement Agreement and this Final Judgment on Consent; and

THEREFORE, Defendants consent and stipulate to judgment in favor of LinkedIn and authorize the Court to enter judgment granting relief in favor of LinkedIn as follows:

1.    Defendants consent to this Court's jurisdiction over them for the purposes of entry and enforcement of this Final Judgment on Consent and enforcement of the Settlement Agreement.

C14-00068 (BLF)
[PROPOSED] FINAL JUDGMENT ON CONSENT

2.      Defendants, and all of their officers, directors, agents, servants, and employees, and all persons in active concert or participation or in privity with any of them, ARE HEREBY PERMANENTLY RESTRAINED AND BARRED from:

a.      Circumventing technological measures that control access to the LinkedIn website or any portions thereof, including, but not limited to, measures that:  (i) impose a limit on the activity that an individual LinkedIn user may initiate on the LinkedIn website; (ii) monitor and/or block activity associated with particular Internet Protocol ("IP") addresses; (iii) require prospective members to re-type a word or text that appears in obscured, colored type (e.g., CAPTCHA technology); or (iv) provide a set of instructions to any automated technologies visiting the LinkedIn website that prohibit automated programs like those used by Defendants (e.g., a robots.txt file).

b.      Accessing or attempting to access or use LinkedIn's website, computers, computer systems, computer network, computer programs, and data stored therein, without authorization or in excess of authorization as conditioned by the LinkedIn User Agreement, including, but not limited to, the following provisions of the LinkedIn User Agreement:  (i) users may not "access the Services . . . through scraping, spidering, crawling or other technology or software used to access data without the express written consent of LinkedIn or its Members"; (ii) users may not "[u]se manual or automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' any web pages or other services contained in the site"; (iii) users may not "[d]uplicate, license, sublicense, publish, broadcast, transmit, distribute, perform, display, sell, rebrand, or otherwise transfer information found on LinkedIn (excluding content posted by you) except as permitted in this Agreement, LinkedIn's developer terms and policies, or as expressly authorized by LinkedIn"; (iv) users may not "[c]ollect, use, copy, or transfer any information, including, but not limited to, personally identifiable information obtained from LinkedIn except as expressly permitted in this Agreement or as the owner of such information may expressly permit"; (v) users "will only maintain one LinkedIn account at any given time"; and (vi) users "will use [their] real name[s] and only provide accurate information to LinkedIn."

c.      Accessing or using the LinkedIn website for any commercial purpose whatsoever, including but not limited to copying or extracting data from the LinkedIn website for use in a commercial service or offering.  This provision does not prohibit Defendant Shon Burton or employees of Defendants from maintaining their own LinkedIn member profile pages for personal and/or professional use, nor does it prohibit Defendant HiringSolved from maintaining a company profile page on LinkedIn.

d.      Marketing, advertising, or otherwise making any statements or representations to anyone regarding the inclusion or availability of LinkedIn member profile page data on Defendants' websites or through Defendants' services.

3.      Defendants shall destroy all LinkedIn member profile page data, whether stored in electronic form or otherwise, in their possession, custody, or control within 30 days of the date of the entry of the Final Judgment on Consent.

4.      Defendants shall pay an award of monetary relief in favor of LinkedIn in the total amount of $40,000.

5.      Violation of this Final Judgment on Consent shall expose Defendants and all other persons bound by this Final Judgment on Consent to all applicable penalties, including contempt of Court.

6.      All claims and defenses in this action are hereby resolved by this Final Judgment on Consent.  This Final Judgment on Consent is final and may not be appealed by any party.

7.      This Final Judgment on Consent does not alter or supersede the obligations of any parties pursuant to the Settlement Agreement.

8.      This Court shall retain continuing jurisdiction over the parties and the action for purposes of enforcing this Final Judgment on Consent and/or enforcing the Parties' Settlement Agreement.

*//*

C14-00068 (BLF)

1    **IT IS SO AGREED AND STIPULATED.**

2

3    DATED:  July 11, 2014              MUNGER, TOLLES & OLSON LLP
                                          JEROME C. ROTH
4                                         JONATHAN H. BLAVIN
                                          LAURA K. LIN
5

6

7                                   By:   */s/ Jonathan H. Blavin*
                                          JONATHAN H. BLAVIN
8                                         Attorneys for LinkedIn Corporation

9

10   DATED:  July 11, 2014              AGILITY IP LAW, LLP
                                          JAMES C. OTTESON
11                                        BRANDON BAUM
                                          DAVID L. LANSKY
12

13

14                                  By:   */s/ David L. Lansky*
                                          DAVID L. LANSKY
15                                        Attorneys for Robocog Inc. d/b/a HiringSolved,
                                          and Shon Burton
16

17

18

19

20

21

22

23

24

25

26

27

28

C14-00068 (BLF)
[PROPOSED] FINAL JUDGMENT ON CONSENT

**FINAL JUDGMENT**

**PURSUANT TO STIPULATION, IT IS SO ORDERED.**

DATED: July 16, 2014

_____

HONORABLE BETH L. FREEMAN

C14-00068 (BLF)

[PROPOSED] FINAL JUDGMENT ON CONSENT

**FILER'S ATTESTATION**

I, Jonathan H. Blavin, am the ECF user whose identification and password are being used to file the [PROPOSED] FINAL JUDGMENT ON CONSENT.  In compliance with General Order 45.X.B, I hereby attest that David L. Lansky concurs in this filing.


DATED:  July 11, 2014                    By:   */s/ Jonathan H. Blavin*
                                               JONATHAN H. BLAVIN

# EXHIBIT J

1  JONATHAN H. BLAVIN (State Bar No. 230269)
   jonathan.blavin@mto.com
2  NICHOLAS D. FRAM (State Bar No. 288293)
   nicholas.fram@mto.com
3  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
4  Twenty-Seventh Floor
   San Francisco, California 94105-2907
5  Telephone:    (415) 512-4000
   Facsimile:    (415) 512-4077
6
   Attorneys for Plaintiffs LinkedIn Corporation and
7  LinkedIn Ireland Unlimited Company

8

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12

13  LinkedIn Corporation and LinkedIn Ireland      Case No. 5:16-CV-04463-LHK-NC
    Unlimited Company,
14                                                 **[PROPOSED]** FINAL JUDGMENT ON
                Plaintiffs,                        CONSENT
15
            vs.                                    Judge:    HON. LUCY H. KOH
16
    Raphael Azot and Dataspectre,
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

# FINAL JUDGMENT ON CONSENT

WHEREAS, on August 8, 2016, Plaintiff LinkedIn Corporation (collectively with subsequently added Plaintiff LinkedIn Ireland Unlimited Company, "LinkedIn") initiated the above-captioned lawsuit against unknown Doe defendants;

WHEREAS, on March 9, 2017, LinkedIn filed a First Amended Complaint against Defendants Raphael Azot and Dataspectre (collectively, "Defendants") alleging that Defendants had violated the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et seq., California Penal Code § 502 et seq., and the Digital Millennium Copyright Act, 17 U.S.C. § 1201 et seq., and engaged in unlawful acts of breach of contract, trespass, and misappropriation;

WHEREAS, LinkedIn alleges that Defendants gained unauthorized access to the LinkedIn website and LinkedIn member profile data, acquired and stored LinkedIn member profile data without the authorization of LinkedIn or its members, and created and used fictitious member profiles on LinkedIn;

WHEREAS, Defendant Dataspectre is the alter ego of Defendant Azot;

WHEREAS, LinkedIn served Defendant Azot with certified translations of the Summons and First Amended Complaint on April 5, 2017;

WHEREAS, Defendant Azot has not filed an answer in this matter, but has contacted counsel for LinkedIn;

WHEREAS, LinkedIn and Defendants (collectively, the "parties") have reached an agreement for resolution of the action; and

THEREFORE, Defendants consent and stipulate to judgment in favor of LinkedIn and authorize the Court to enter judgment granting relief in favor of LinkedIn as follows:

1. Defendants consent to this Court's jurisdiction over them for the purposes of entry and enforcement of this Final Judgment on Consent.

2. Defendants, and all of their officers, directors, agents, servants, and employees, and all persons in active concert or participation or in privity with any of them, ARE HEREBY PERMANENTLY RESTRAINED AND BARRED from:

-1-

a.      Circumventing any technological measure that controls access to
LinkedIn's website, computers, computer systems, computer network, computer programs, or any
data stored therein (whether directly or through third parties);

b.      Accessing or attempting to access or use LinkedIn's website, computers,
computer systems, computer network, computer programs, and any data stored therein, without
authorization or in excess of authorization as conditioned by the LinkedIn User Agreement,
including, but not limited to, engaging in any of the following conduct prohibited by the LinkedIn
User Agreement:  (i) "Us[ing] manual or automated software, devices, scripts robots, other means
or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or
information"; (ii) "Scrap[ing] or copy[ing] profiles and information of others through any means
(including crawlers, browser plugins and add-ons, and any other technology or manual work)";
(iii) "Copy[ing] or us[ing] the information, content or data of others available on the Services
(except as expressly authorized); (iv) "Collect[ing], us[ing], copy[ing], or transfer[ing] any
information obtained from LinkedIn without the consent of LinkedIn"; and (v) "Creat[ing] a false
identity on LinkedIn."

c.      Accessing or using LinkedIn's website, computers, computer systems,
computer network, computer programs, or any data stored therein (whether directly or through
third parties), for any commercial purpose whatsoever, including but not limited to copying,
extracting, or using data from the LinkedIn website for use in a commercial service or offering.
This provision does not prohibit Defendant Azot from maintaining his own LinkedIn member
profile page for personal and/or professional use.

d.      Transferring, selling, or otherwise distributing to any party any LinkedIn
member profile data in Defendants' possession, custody, or control.

e.      Marketing, advertising, or otherwise making any statements or
representations to anyone regarding the inclusion or availability of LinkedIn member profile data
on Defendants' websites or through Defendants' services.

3.      Defendants shall provide LinkedIn with a full copy of all LinkedIn member profile
data, whether stored in electronic form or otherwise, in their possession, custody, or control, and

1  thereafter, shall destroy all such LinkedIn member profile data, within 15 days of the date of the
2  entry of the Final Judgment on Consent.

3      4.    Violation of this Final Judgment on Consent shall expose Defendants and all other
4  persons bound by this Final Judgment on Consent to all applicable penalties, including contempt
5  of Court.

6      5.    All claims and defenses in this action against Raphael Azot and Dataspectre are
7  hereby resolved by this Final Judgment on Consent. This Final Judgment on Consent is final and
8  may not be appealed by any party.

9      6.    This Court shall retain continuing jurisdiction over the parties and the action for
10 purposes of enforcing this Final Judgment on Consent.

11
12     **IT IS SO AGREED AND STIPULATED.**
13
14 DATED: May 3, 2017                MUNGER, TOLLES & OLSON LLP
15                                   JONATHAN H. BLAVIN
                                     NICHOLAS D. FRAM
16
17                     By: _____
18                         JONATHAN H. BLAVIN
19                         Attorneys for LinkedIn Corporation
20
21 DATED: May 30, 2017
22
23                     By: _____
24                         RAPHAEL AZOT
                           On his own behalf, and on behalf of Defendant
25                         Dataspectre
26
27
28

-3-

1 | **FINAL JUDGMENT: PURSUANT TO STIPULATION, IT IS SO ORDERED.**

2 | The Clerk shall enter judgment against Raphael Azot and Dataspectre.

3 |

4 | DATED:    June 7, 2017

HONORABLE LUCY H. KOH
U.S. DISTRICT JUDGE

**FILER'S ATTESTATION**

I, Jonathan H. Blavin, am the ECF user whose identification and password are being used to file this [PROPOSED] FINAL JUDGMENT ON CONSENT. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

DATED: May 31, 2017        By:   */s/ Jonathan H. Blavin*

                                    Attorneys for Plaintiffs LinkedIn Corporation and LinkedIn Ireland Unlimited Company

# EXHIBIT K

1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
8                  NORTHERN DISTRICT OF CALIFORNIA
9
10   LINKEDIN CORPORATION,                Case No.16-cv-04463 LHK   (NC)
11                 Plaintiff,
                                          **ORDER GRANTING IN PART**
12         v.                             **LINKEDIN CORPORATION'S  EX**
                                          **PARTE MOTION FOR EXPEDITED**
13   DOES 1 THROUGH 100, INCLUSIVE,       **DISCOVERY**
14                 Defendant.             Re: Dkt. No. 7
15

16         Plaintiff LinkedIn Corporation moves for expedited discovery to learn the identities

17   of unknown defendants.  Dkt. No. 7.  In this Computer Fraud and Abuse Act case,

18   LinkedIn seeks to subpoena specific internet service providers ("ISPs") and networks to

19   uncover the identities of doe defendants who allegedly scraped protected information from

20   its website.  Because LinkedIn shows good cause in its motion, the Court GRANTS in part

21   LinkedIn's motion, but limits discovery to the time period of December 2015 to the

22   present, and the subpoenaed entities to those specified in Exhibit B to Christopher

23   McLean's Declaration.  Dkt. No. 8.

24   **I.     BACKGROUND**

25       **A.   Facts**

26         LinkedIn Corporation, an online professional network, is headquartered in this

27   judicial district.  Dkt. No. 1 at 3.  LinkedIn uses a number of technological safeguards to

28   prevent the accessing and large-scale copying of member data.  *Id*. at 5.  Among these

Case No.16-cv-04463 LHK (NC)

safeguards are features that help uncover and prevent the creation of non-human profiles, limit usage, and scan and/or block suspicious activity associated with specific IP addresses. *Id*. at 5-6. LinkedIn alleges that starting in December 2015, unknown defendants extracted and copied data off of LinkedIn's website. Dkt. No. 7 at 6. In addition, LinkedIn argues, these defendants repeatedly violated its User Agreement, which prohibits creating fake accounts and data scraping. *Id*. at 6, 8. According to LinkedIn, defendants have used "large sets of distributed networks and IP addresses that change frequently" to circumvent its restrictions on the volume of activity members may initiate, as well as mask defendants' identities. Dkt. No. 1 at 9. Lastly, defendants allegedly manipulated a "whitelisted" cloud computing platform to circumvent LinkedIn technical safeguards. *Id*.

Since becoming aware of defendants' alleged misconduct, LinkedIn has conducted an "extensive" ongoing investigation. Dkt. No. 8 ("McLean Decl.") at 3. In the course of that investigation, LinkedIn has compiled spreadsheets and reports that track defendants' ISPs, networks, and IP addresses, the dates and times of activity on the website, and the number of LinkedIn pages accessed. Dkt. No. 1 at 10. Regarding the whitelisted entity, LinkedIn has information about those illicit usages. *Id*. LinkedIn argues it cannot learn defendants' identities without third-party discovery on the ISPs and networks, which will not disclose the identities of defendants unless served with a subpoena. Dkt. No. 7 at 12; McLean Decl. at 3. LinkedIn believes defendants are a small number of corporate entities that scraped data to use commercially. Dkt. No. 7 at 10; McLean Decl. at 4.

**B. Procedural History**

On August 8, 2016, LinkedIn filed a complaint alleging violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, California Penal Code § 502, the Digital Millennium Copyright Act, and various state law claims. Dkt. No. 1 at 11-17. On August 17, 2016, LinkedIn filed an ex parte motion seeking an order that would allow "it to conduct expedited third-party discovery for the limited purpose of obtaining the names, current and former addresses, telephone numbers, e-mail addresses, activity logs, and/or other information" to identify defendants. Dkt. No. 7 at 6. LinkedIn's purpose in seeking

1    this information is the identification of defendants so it can serve them. *Id.* at 10.

2    LinkedIn did not specify a date range for the information sought. *See* Dkt. No. 7.

3         In support of its motion, LinkedIn filed a declaration and exhibit identifying

4    "certain IP addresses and ISPs and networks" defendants allegedly used to scrape data.

5    Dkt. No. 7 at 10; Dkt. No. 8. According to LinkedIn, these ISPs and networks "span the

6    range of local, regional, and national providers in this country and abroad." Dkt. No. 7 at

7    9. Attached to the McLean Declaration is Exhibit B, which identifies fifteen different ISPs

8    and networks associated with the relevant IP addresses. McLean Decl. at 3-4, Exh. B.

9    These ISPs and networks are: Century Link, Charter Communications, Cogent

10   Communications, Comcast Business Communications, Comcast Cable, Cox

11   Communications, Google, Google Fiber, Level 3 Communications, Time Warner Cable,

12   Verizon Business, Verizon Fios, Verizon Internet Services, Verizon Wireless, and XO

13   Communications. LinkedIn identified no other ISPs or networks. *See* Dkt. No. 7.

## II.    Discussion

15        Ordinarily, a party may not seek discovery from any source before the initial Rule

16   26(f) planning conference. Fed. R. Civ. P. 26(d). But the court may authorize discovery

17   before the Rule 26(f) conference for good cause and in the interests of justice. Fed. R. Civ.

18   P. 26(d); *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal.

19   2002)). Good cause may exist where, in consideration of the administration of justice, the

20   need for expedited discovery outweighs the prejudice to a responding party. *OpenMind*

21   *Solutions, Inc. v. Does 1-39*, No. 11-cv-3311 MEJ, 2011 WL 4715200, at *2 (N.D. Cal.

22   Oct. 7, 2011).

23        A plaintiff who does not know the identities of defendants before filing a complaint

24   should be given the opportunity to identify the defendants through discovery unless it is

25   clear from the face of the complaint that it would be dismissed on other grounds, or that

26   discovery would not identify defendants. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir.

27   1980). In evaluating whether a plaintiff establishes good cause to identify defendants

28   through expedited discovery, courts consider whether: (1) the plaintiff can identify the

Case No.16-cv-04463 LHK (NC)          3

United States District Court
Northern District of California

1  missing party with sufficient specificity so the Court can determine the defendant is a real

2  person or entity who could be sued in federal court; (2) the plaintiff identified all previous

3  steps taken to locate the elusive defendant; (3) the plaintiff's suit could withstand a motion

4  to dismiss; and (4) the plaintiff demonstrated a reasonable likelihood of being able to

5  identify the defendant through discovery so service of process would be possible.

6  *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578-80 (N.D. Cal. 1999)).

7  **A.  LinkedIn Identified the Defendants with Sufficient Specificity.**

8  First, the Court examines if the plaintiff identified defendants with sufficient

9  specificity, so that each defendant is a real person or entity subject to the Court's

10  jurisdiction.  *Columbia Ins. Co*., 185 F.R.D. at 578.  Here, LinkedIn alleges defendants are

11  real persons or entities scraping and copying data from its website.  Dkt. No. 7 at 6.

12  LinkedIn "identified exact dates and times of the data scraping events as well as IP

13  addresses" defendants used.  *Id*. at 11.  LinkedIn believes defendants are corporate entities

14  engaging in data scraping for commercial use.  *Id*. at 10.  These alleged actions suggest a

15  coordinated scheme with real people or entities behind it.  Thus, the Court finds LinkedIn

16  provided sufficient specificity to demonstrate defendants are real people or entities.

17  **B.  LinkedIn Identified the Prior Steps Taken To Identify Defendants.**

18  Second, the plaintiff must identify the steps taken to identify the elusive defendant.

19  *Columbia Ins. Co*., 185 F.R.D. at 579.  A plaintiff can satisfy this element by attempting to

20  monitor and track defendants' online activities.  *OpenMind Solutions, Inc*., 2011 WL

21  4715200, at *3-4.  According to LinkedIn, it has conducted an "extensive investigation"

22  and identified the "exact dates and times of the data scraping events as well as IP

23  addresses" defendants used.  Dkt. No. 7 at 11; McLean Decl. at 3-4.  However, LinkedIn

24  cannot further identify defendants because ISPs and networks will not disclose such

25  information without a subpoena.  Dkt. No. 7 at 12. The Court finds LinkedIn investigated

26  and took steps to discover defendants' identities.

27  **C.  LinkedIn's Suit Would Withstand a Motion to Dismiss.**

28  Third, the Court considers whether LinkedIn's complaint would survive a motion to

Case No.16-cv-04463 LHK (NC)          4

dismiss. *Columbia Ins. Co.*, 185 F.R.D. at 579. To survive a motion to dismiss, a plaintiff must present "a short and plain statement of the claim" showing it is entitled to relief, and giving a defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Furthermore, to show good cause, a plaintiff need only allege facts to withstand a motion to dismiss on one of its claims. *New Sensations, Inc. v. Does 1-426*, No. 12-cv-3800 JSC, 2012 WL 4675281, at *6 (N.D. Cal. Oct. 1, 2012).

Here, LinkedIn brings a claim under the CFAA, 18 U.S.C. § 1030. Dkt. No. 1 at 11-12. The CFAA "creates criminal and civil liability for whoever 'intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer.'" *Facebook v. Power Ventures, Inc.*, No. 13-17102, 2016 WL 3741956, at *5 (9th Cir. July 12, 2016) (quoting § 1030(a)(2)(C)). The statute provides a private claim for losses caused by violation of that section, where losses are of at least $5,000 during a one-year period, and includes "the cost of responding to an offense, conducting a damage assessment … or other consequential damages incurred because of the interruption of service." § 1030(c)(4)(A)(i)(I), (e)(11), (g).

LinkedIn alleges defendants "knowingly, willfully, and with intent to defraud, accessed LinkedIn's computers and servers without authorization or in excess of authorization," and obtained "something of value." Dkt. No. 1 at 12. In addition, LinkedIn alleges damages exceeding $5,000 during the past year. Dkt. No. 1 at 12; § 1030(c)(4)(A)(i)(I). The Court finds that LinkedIn's complaint provides defendants with notice of this claim and the grounds for it. *See Bell Atl. Corp.*, 550 U.S. at 545. Thus, the Court concludes that LinkedIn's CFAA claim would survive a motion to dismiss.

LinkedIn also brings a claim under the Digital Millennium Copyright Act, 17 U.S.C. § 1201(a)(1). Dkt. No. 1 at 13-15. "To state a claim under § 1201(a), a plaintiff must allege: (1) ownership of a copyrighted work; (2) effectively controlled by a technological measure which has been circumvented." *Coupons, Inc. v. Stottlemire*, 588 F. Supp. 2d 1069, 1073 (N.D. Cal. 2008). LinkedIn alleges defendants circumvented its

United States District Court
Northern District of California

technological safeguards, gaining unauthorized access to copyrighted media on its website. The Court concludes LinkedIn's § 1201(a) claim would survive a motion to dismiss.

In addition, LinkedIn has shown the Court would have personal jurisdiction over its claims for purposes of this motion. For a Court to exercise specific personal jurisdiction over a defendant, it must determine that (1) the defendant purposefully directed its activities to the forum or purposefully availed itself of the privilege of conducting activities in the forum; (2) the claim arose out of or related to forum related activities; and (3) the exercise of jurisdiction is reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). Here, LinkedIn argues defendants are subject to this Court's personal jurisdiction because they "repeatedly, knowingly, and intentionally accessed and targeted LinkedIn's servers located in this judicial district." Dkt. No. 7 at 15. LinkedIn also asserts that defendants agreed to its User Agreement through registering as members of the website. *Id.* That agreement designates this judicial district as the forum where disputes must be resolved. *Id.* The Court finds that for purposes of this motion, defendants purposefully directed their activities towards California, subjecting themselves to the Court's jurisdiction.

**D.    LinkedIn Demonstrated a Reasonable Likelihood of Being Able to Identify the Defendants.**

Lastly, the Court examines whether a reasonable likelihood exists that the proposed discovery will lead to identifying information about the defendants making service of process possible. *Columbia Ins. Co.*, 185 F.R.D. at 580. LinkedIn argues that because it will provide the IP address information it compiled to the ISPs and networks, a "strong" likelihood exists that the subpoenas will lead to the identification of defendants. Dkt. No. 7 at 16. Based on LinkedIn's investigation, the Court agrees that the identifying information the ISPs and networks may provide will assist LinkedIn in identifying defendants and making service of process possible.

United States District Court
Northern District of California

### E. The ISPs and Networks Would Suffer Minimal Prejudice from the Proposed Discovery.

A court may find good cause where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party. *Semitool*, 208 F.R.D. at 276. Here, LinkedIn contends that once the ISPs and networks are subpoenaed, they "can quickly and readily identify the computers and particular accounts associated with [defendants'] IP addresses." Dkt. No. 7 at 9. According to LinkedIn, the administration of justice would be benefited by discovery, since LinkedIn would be able to identify defendants, and amend its complaint to include defendants before the discovery conference. *Id.* at 17.

The Court agrees that the ISPs and networks would suffer minimal burden from providing identifying data. The Proposed Order presented to the Court, however, provides no relevant time period for this request, which leads the Court to conclude that this request is overly broad as drafted. Dkt. No. 7-1 at 2. In addition, the Proposed Order does not identify the specific parties to be subpoenaed. *Id.* Accordingly, the Court will limit the time period of discovery to **December 2015 to the present**, and the entities to be subpoenaed to those specified in Exhibit B of the McLean Declaration. The Court chooses this date range based on LinkedIn's allegations that defendants' misconduct began in December 2015 and continues to the present. Dkt. No. 7 at 6. Accordingly, the Court finds early discovery furthers the interests of justice and poses minimal prejudice to defendants. Should later-identified defendants object to some portion of this discovery, they may seek a protective order from the Court.

## III. CONCLUSION

The Court concludes LinkedIn has shown good cause for expedited discovery as to the entities specified, and for the time period of December 2015 to the present. Therefore, the Court GRANTS in part the motion for expedited discovery. Any party may object to this order, but must do so within 14 days. Fed. R. Civ. P. 72(a).

1    **IT IS SO ORDERED.**

2

3    Dated:  August 30, 2016    _____
                                 NATHANAEL M. COUSINS
4                                United States Magistrate Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# EXHIBIT L

MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
STEPHEN M. KRISTOVICH
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR.*
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
KATHLEEN M. M°DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
SANDRA A. SEVILLE-JONES
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
JEROME C. ROTH
STEPHEN D. ROSE
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
DANIEL P. COLLINS
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
MARY ANN TODD
MICHAEL J. O'SULLIVAN
KELLY M. KLAUS
DAVID B. GOLDMAN
KEVIN S. MASUDA
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
GREGORY J. WEINGART
TAMERLIN J. GODLEY

JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
MICHAEL B. DESANCTIS*
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
FRED A. ROWLEY, JR.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
RANDALL G. SOMMER
ROSEMARIE T. RING
TODD J. ROSEN
MELINDA EADES LEMOINE
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
CHAD J. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
MATTHEW A. MACDONALD
BRYAN H. HECKENLIVELY
SAMUEL T. GREENBERG
KIMBERLY A. CHI
ADAM R. LAWTON
MARGARET G. MARASCHINO
JESLYN A. EVERITT
MARK R. SAYSON
JEREMY A. LAWRENCE
CHRISTOPHER M. LYNCH
ADAM I. KAPLAN
LAURA K. LIN
GREGORY M. SERGI
ACHYUT J. PHADKE
MART OVERBECK

JOHN M. GILDERSLEEVE
ERIC K. CHIU
SARAH L. GRAHAM
ZACHARY M. BRIERS
JENNIFER M. BRODER
EMILY B. VIGLIETTA
KEVIN L. BRADY
ELLEN MEDLIN RICHMOND
JORDAN D. SEGALL
WESLEY L. BURRELL
CHRISTA L. CULVER
KAREN A. LORANG
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
CRAIG A. LAVOIE
ELIA HERRERA
THOMAS P. CLANCY
JOSHUA PATASHNIK
JOSHUA S. MELTZER
ADAM B. WEISS
ROSE LEDA EHLER
AMY L. GREYWITT
CATHLEEN H. HARTGE
MARIA JHAI
ADAM P. BARRY
JENNIFER L. BRYANT
JUSTIN T. HELLMAN
ANDREW CATH RUBENSTEIN
JEFFREY A. PAYNE
HANNAH L. DUBINA
ADAM GOTTESFELD
NICHOLAS D. FRAM
JOHN F. MULLER
JOHN L. SCHWAB
SARA N. TAYLOR
ALEXANDER D. TEREPKA
MAXIMILLIAN L. FELDMAN
SAMUEL T. BOYD
PETER E. BOOS
SETH J. FORTIN
ANKUR MANDHANIA
J'ME K. FORREST
ASHLEY D. KAPLAN
JESSICA REICH BARIL
JEREMY K. BEECHER
MATTHEW K. DONOHUE
ALLYSON R. BENNETT

ELIZABETH A. LAUGHTON
EMILY CURRAN-HUBERTY
TIMOTHY J. MOON
JORDAN X. NAVARRETTE
JULIAN B. MAJOR
LAUREN C. BARNETT
NICHOLAS R. SIDNEY
C. HUNTER HAYES
KIMBERLY D. OMENS
AARON D. PENNEKAMP
TREVOR N. TEMPLETON
STEPHEN T. MAYER
SKYLAR D. BROOKS
ELIZABETH R. AYRAL
SARAH S. LEE
JULIAN BEACH
ELIZABETH A. KIM
SUSAN S. HAR
THOMAS RUBINSKY
NICHOLAS DUFAU
LAURA M. LOPEZ
MICHAEL C. BAKER
SARAH G. BOYCE.**
MOLLY K. PRIEDEMAN
BENJAMIN WOODSIDE SCHRIER
CELIA R. CHOY*
ADELE M. EL-KHOURI*

OF COUNSEL:
ROBERT K. JOHNSON
ALAN V. FRIEDMAN
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
MARK H. KIM
ALLISON B. STEIN
BRAD SCHNEIDER
ERIC P. TUTTLE
PETER E. GRATZINGER
MARK R. YOHALEM
CHAD GOLDER*
GINGER D. ANDERS*

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN DC AND NY ONLY
** ADMITTED IN DC AND MD ONLY

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

———

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

———

1155 F STREET N.W.
SEVENTH FLOOR
WASHINGTON, D.C. 20004-1361
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

June 24, 2017

Writer's Direct Contact
(415) 512-4011
(415) 644-6911 FAX
jonathan.blavin@mto.com

VIA ELECTRONIC MAIL ONLY

Deepak Gupta, Esq.
Farella, Braun + Martel, LLP
Russ Building
325 Montgomery Street
San Francisco, CA 94104
dgupta@fbm.com

Re:   Reinstatement of Demand to Immediately Cease and Desist hiQ's Unauthorized
      Data Scraping and Other Violations of the Law and LinkedIn's User Agreement

Dear Mr. Gupta:

I represent LinkedIn Corporation ("LinkedIn") in connection with the lawsuit that your client hiQ Labs, Inc. ("hiQ") has filed against it in the Northern District of California (No. 17 Civ. 3301) and am familiar with the correspondence history between you and LinkedIn.

LinkedIn hereby reinstates the demands in its letter dated May 23, 2017 to hiQ. hiQ's access and scraping of member profile data on the LinkedIn website through software and other automated processes, as outlined in greater detail in the May 23 letter, violate the LinkedIn User Agreement, to which hiQ was on notice of and is bound, as well as the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030 et seq.), California Penal Code § 502, and the Digital Millennium Copyright Act (17 U.S.C. §§ 1201 et seq.), and constitute unlawful acts of common law trespass and misappropriation. To be clear, any prior, present, or future access of LinkedIn's website and servers by hiQ is without authorization from LinkedIn. *See Facebook, Inc. v. Power Ventures,*

MUNGER, TOLLES & OLSON LLP

Deepak Gupta, Esq.
June 24, 2017
Page 2

*Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (a "defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly.").  LinkedIn has taken additional technical measures to prevent further access by hiQ to its website and servers, including blocking IP addresses known to be used in connection with hiQ's services.

Accordingly, LinkedIn reiterates its demand that hiQ immediately:

1.  Cease and desist accessing or attempting to access or use LinkedIn's website, computers, computer systems, computer network, computer programs, and data stored therein (whether directly or through third parties);

2.  Destroy all data, documents, and other items, electronic or otherwise, in their possession, custody, or control, that were copied, extracted or otherwise derived from LinkedIn's website (whether directly, indirectly, via members, or from other third parties); and

3.  Cease and forever desist from any conduct inducing members to violating LinkedIn's User Agreement and Privacy Policy, including but not limited to offering software or services the use of which by members violates LinkedIn's User Agreement and Privacy Policy.

This letter is not a recitation of all of the facts pertaining to this matter and LinkedIn expressly reserves all rights and remedies.

Regards,

*/s/ Jonathan H. Blavin*

Jonathan H. Blavin