1 JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
2 ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
3 LAURA K. LIN (State Bar No. 281542)
laura.lin@mto.com
4 NICHOLAS D. FRAM (State Bar No. 288293)
nicholas.fram@mto.com
5 MUNGER, TOLLES & OLSON LLP
560 Mission Street
6 Twenty-Seventh Floor
San Francisco, California 94105-2907
7 Telephone:   (415) 512-4000
Facsimile:    (415) 512-4077
8
Attorneys for LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| hiQ Labs, Inc., | Case No. 17-CV-03301-EMC |
|---|---|
| Plaintiff, | **DECLARATION OF ABHISHEK BAJORIA IN SUPPORT OF LINKEDIN'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| vs. | |
| LinkedIn Corporation, | |
| Defendants. | |

I, Abhishek Bajoria, declare as follows: .

1. I am Senior Litigation Counsel in the Legal Department at LinkedIn. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them. I submit this declaration in opposition to hiQ's motion for a temporary restraining order.

2. On May 23, 2017, LinkedIn sent a cease and desist letter to hiQ. A true and correct copy of that letter is attached hereto as Exhibit A.

3. On May 30, 2017, in reference to that letter, I had a conversation with counsel for hiQ, Deepak Gupta and Brandon Wisoff. On this call, hiQ's attorneys admitted that hiQ scraped LinkedIn, but stated that it only scrapes LinkedIn's data to obtain data concerning its customers' employees. hiQ's attorneys also asserted that hiQ has the legal right to scrape data from the LinkedIn website simply because it is available to the general public.

4. On this call, I explained that hiQ's conduct violates a variety of state and federal laws, and violates the LinkedIn User Agreement.

5. On the May 30, 2017 call, I also explained that hiQ's conduct harms LinkedIn in several ways. Most importantly, it undermines the trust that LinkedIn's members place in LinkedIn to safeguard their information.

6. On May 31, LinkedIn received a response to its May 23 letter. A true and correct copy of that response letter is attached hereto as Exhibit B.

7. On Tuesday, June 6, Mike Callahan, LinkedIn's General Counsel, received an email from Mr. Weidick. Mr. Weidick asked if Mr. Callahan was "willing to facilitate discussions with LinkedIn" regarding the May 23 cease and desist letter. He stated that he wanted Mr. Callahan "ideally to explore a commercial relationship but at the very least to help amicably resolve the legal matter." Perhaps acknowledging LinkedIn's consistent approach to those who scrape its website and violate the User Agreement, he stated that he "understand[s] that LinkedIn is actively seeking out TOS [terms of service] violators." A true and correct copy of Mr. Weidick's email is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 25, 2017 at Sunnyvale, California.

_____
Abhishek Bajoria

-2-
CASE NO. 17-CV-3301-EMC
BAJORIA DECL. ISO LINKEDIN'S OPP. TO TRO

# EXHIBIT A



Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation
1000 W. Maude Avenue
Sunnyvale, CA 94085
abajoria@linkedin.com

May 23, 2017

*Via Email* to sales@hiqlabs.com

Mark Weidick
hiQ Labs, Inc.
575 Market Street, #850
San Francisco, CA 94105

**RE**:  **Demand to Immediately Cease and Desist Unauthorized Data Scraping and other Violations of LinkedIn's User Agreement**

Mr. Weidick:

    I write on behalf of LinkedIn Corporation ("LinkedIn").  It has come to LinkedIn's attention that hiQ Labs, Inc. ("hiQ") has used and is using processes to improperly, and without authorization, access and copy data from LinkedIn's website, www.linkedin.com.  This is not acceptable.

    hiQ's software offered at www.hiqlabs.com is impermissibly and illegally accessing and scraping data from LinkedIn.  Indeed, hiQ's website explains how its product improperly incorporates skills data from LinkedIn's website:

- Explore the skills that your employees are self-curating on the web and augment/update your company's database of employee competencies.
- Because Skill Mapper is based on publicly available data, you can explore the full scope of your workforce's skills, including skills from previous and current roles.

*See* https://www.hiqlabs.com/solutions.  Moreover, hiQ has stated during marketing presentations that its Skill Mapper product is built on profile data from LinkedIn, and that this data is "refreshed" every two weeks.  There can thus be no doubt that hiQ's product copies and scrapes data from LinkedIn, including "skills" information from the LinkedIn profiles of LinkedIn members.

    LinkedIn has earned its members' trust by acting vigilantly to keep their data secure.  hiQ's actions and products violate this trust, as well as several provisions of LinkedIn's User Agreement (found at https://www.linkedin.com/legal/user-agreement).  In particular, among other things, LinkedIn's User Agreement prohibits the following:

May 23, 2017
Page 2 of 3

- Scrape or copy profiles and information of others through any means (including crawlers, browser plugins and add-ons, and any other technology or manual work);
- Copy or use the information, content or data of others available on the Services (except as expressly authorized);
- Rent, lease, loan, trade, sell/re-sell access to the Services or any related information or data;
- Share or disclose information of others without their express consent; and
- Use manual or automated software, devices, scripts robots, other means or processes to access, "scrape," "crawl" or "spider" the Services or any related data or information.

As demonstrated above, hiQ is violating each of these provisions.

To be clear, hiQ's prior and present access of LinkedIn's website and/or servers violates LinkedIn's User Agreement and the law. hiQ's company page on LinkedIn has been restricted. Any future access of any kind by hiQ is without permission and without authorization from LinkedIn. Further, LinkedIn has implemented technical measures to prevent hiQ from accessing, and assisting others to access, LinkedIn's site, through systems that detect, monitor, and block scraping activity. Circumventing these technical measures and accessing LinkedIn's website without LinkedIn's authorization constitute violations of multiple state and federal laws, including but not limited to:

- California Penal Code Section 502(c);
- Federal Computer Fraud and Abuse Act (18 U.S.C. §§1030);
- State common law of trespass; and
- the Digital Millennium Copyright Act (17 U.S.C. §§512, 1201).

*See, e.g., Craigslist Inc. v. 3Taps Inc. et al* (N.D. Cal., Aug. 16, 2013) (ignoring revocation of permissions to access, and circumventing IP blocking measures, constitutes a violation of the CFAA); *Facebook, Inc. v. Power Ventures, Inc.,* No. 13-17102, 2016 WL 3741956, at *8 (9th Cir. July 12, 2016) (defendant who "disregarded the cease and desist letter . . . accessed Facebook's computers 'without authorization' within the meaning of the CFAA and is liable under that statute").

Accordingly, LinkedIn demands that hiQ immediately:

1. Cease and desist accessing or attempting to access or use LinkedIn's website, computers, computer systems, computer network, computer programs, and data stored therein (whether directly or through third parties);

2. Destroy all data, documents, and other items, electronic or otherwise, in their possession, custody, or control, that were copied, extracted or otherwise derived from LinkedIn's website (whether directly, indirectly, via members, or from other third parties); and

May 23, 2017
Page 3 of 3

3. Cease and forever desist from any conduct inducing members to violating LinkedIn's User Agreement and Privacy Policy, including but not limited to offering software or services the use of which by members violates LinkedIn's User Agreement and Privacy Policy.

    LinkedIn would prefer to resolve this matter amicably, and I look forward to your response by May 31. This letter is not a recitation of all of the facts pertaining to this matter or all of LinkedIn's possible claims. Accordingly, LinkedIn is not waiving any of its rights and remedies, all of which LinkedIn expressly reserves. If hiQ does not comply with the requests set forth in this letter, LinkedIn reserves all of its rights and remedies, including legal action.

Regards,

*[signature]*

Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation

# EXHIBIT B



DEEPAK GUPTA
dgupta@fbm.com
D 415.954.4419

May 31, 2017

*Via E-Mail to abajoria@linkedin.com*

Abhishek Bajoria
Senior Litigation Counsel
LinkedIn Corporation
1000 W. Maude Avenue
Sunnyvale, CA 94085

      Re:    <u>Cease and Desist Letter to hiQ Labs, Inc.</u>

Dear Abhishek:

      We are writing on behalf of hiQ Labs, Inc. in response to your letter dated May 23, 2017 and further to our teleconference of May 30, 2017. As LinkedIn's cease and desist request poses an existential threat to hiQ in its current form, your letter combined with your uncompromising posture on our phone call puts the company in a very difficult position. We reiterate our request, made on the May 30 call, that you immediately restore hiQ's access to public LinkedIn data and arrange a face-to-face meeting of business principals. This will allow hiQ to continue functioning as a business and give the parties the time they need to engage in discussions so that LinkedIn can better understand hiQ's business and hiQ can better understand LinkedIn's concerns. Absent that, you leave hiQ with few options.

      Your letter mentions concerns about "data security" and "member trust." We want to make sure there is no misunderstanding on LinkedIn's part as to what hiQ does. hiQ collects public profile data from LinkedIn's users and analyzes these profiles to help employers understand (a) which of their employees are at the greatest risk of being recruited away ("Keeper"), and (b) the range of skills possessed by their workforce ("Skill Mapper"). These services are very much in line with the core focus of LinkedIn, which is to create economic opportunities for professionals in their careers.

      hiQ in no way accesses LinkedIn member private data or any area of LinkedIn's website requiring a password; it merely accesses data which LinkedIn's members have expressly made public. LinkedIn publicly acknowledges that this data belongs to members, not to LinkedIn, and LinkedIn in fact promotes itself as a networking platform where this information will be publicly shared precisely to encourage members to join LinkedIn. We are thus straining to understand how these activities in any way present a security or trust issue for LinkedIn. Quite the opposite; the existence of hiQ enhances the value of having a LinkedIn public profile, which in the long run enriches LinkedIn.

Abhishek Bajoria
May 31, 2017
Page 2



     As we discussed on our phone call, LinkedIn has for several years been aware of hiQ's synergistic activities and has participated in hiQ's Elevate conference on data analytics issues. LinkedIn has spoken at hiQ's events and employee Lorenzo Canlas even accepted hiQ's "Impact Award." hiQ has always operated in LinkedIn's plain view and with its support, so we are at a loss to understand the sudden (and potentially devastating) change of direction represented by your letter. hiQ is presently in the midst of a financing round, which is now endangered because of your letter.

     When, on our phone call, we asked whether hiQ's activities caused any injury to LinkedIn, you stated you did not know. When asked whether hiQ's business was in fact synergistic to LinkedIn, you stated you did not know. Notably, your letter does not suggest that data collection by hiQ is impairing or interfering with LinkedIn servers, and in our phone call you were unable to identify any such impairment or interference.

     The only reason that you stated lies behind LinkedIn's decision to revoke hiQ's access is an alleged violation of the User Agreement. But those terms are not enforceable against persons or entities that merely visit the website to view or use public information. Moreover, the User Agreement is so overbroad as to be, in our view, meaningless:

- The User Agreement states it is forbidden to "[s]crape or copy profiles" through "crawlers," "automated software," and "script robots." Yet Google and Bing access LinkedIn using scrapers and robots. And LinkedIn itself provides an automated feature to create a local PDF copy of profiles, which it then instructs that users may print (thereby creating a second "copy"). <<https://www.linkedin.com/help/linkedin/answer/4281/printing-a-profile?lang=en.>> Thus, far from blocking the putatively prohibited actions, LinkedIn invites them.

- The User Agreement prohibits "copying profiles" through "manual work," yet every time people visit LinkedIn using a web browser they are engaging in "manual work" that creates a "copy" of a profile on their screen, a "copy" in their computer's memory and a "copy" on their hard drive. The ordinary operation of LinkedIn demands a breach of this provision.

- The User Agreement prohibits anyone from "us[ing], the content or data of others available on the Services (except as expressly authorized)." This means any time someone views a member profile and "uses" some information – e.g. sends an email to the address on their LinkedIn profile – he or she must first request "express permission" before sending the email. This, no one does.

- Similarly, the User Agreement forbids a member to "[s]hare or disclose information of others without their express consent." Yet LinkedIn itself provides a "Share Profile" feature. <<https://www.linkedin.com/help/linkedin/answer/1627.>> It also provides a convenient "share" button for users to share the posts of others. Unsurprisingly, these features do not first require "express permission" before sharing.

Abhishek Bajoria
May 31, 2017
Page 3



We understand LinkedIn's position to be that anytime someone engages in any of the above acts, he or she is in violation of the law. Yet as shown above, these provisions are so self-contradictory that no LinkedIn user could reasonably be expected to comply with them.

Candidly, we have some concern that LinkedIn's sudden focus on hiQ may be for an anti-competitive purpose. A page on the LinkedIn website states that it is investing now in its own internal data science projects. *See* <<https://engineering.linkedin.com/data>>  Is it LinkedIn's position that it alone can perform data analysis on LinkedIn *public* profile pages?

The cases you cite arose under very different circumstances and did not involve potential anticompetitive motivations or conduct.

While we would like to reach an amicable resolution, we do not believe that hiQ has done anything unlawful. To the contrary, we believe that LinkedIn's activity would be enjoined in a court of law and LinkedIn would face monetary exposure under, at minimum, the following list of theories:

- Common law promissory estoppel – LinkedIn is estopped from revoking hiQ's access to public profile pages because LinkedIn was aware that hiQ was relying on these expressly public pages for several years, and never threatened to revoke access; rather it participated and encouraged hiQ.  hiQ's reliance was justifiable and it is thus entitled to continue using LinkedIn's avowed public pages in its business.

- Common law intentional interference with contract and prospective advantage – LinkedIn induced members into joining by offering them the ability to create putatively "public profiles" and is now wrongfully making those profiles "non-public," at least as to hiQ. hiQ has millions of dollars' worth of business that now hangs in the balance because of LinkedIn's wrongful bait and switch.[1]

- California unfair competition and antitrust law – LinkedIn may not use its market power as the world's largest professional network to squelch competition in the neighboring field of data analytics.

- California Free Speech/First Amendment – Social networks are the new "town square." Much like the shopping mall in *Robins v. Pruneyard Shopping Center*, 592 P. 2d 341 (Cal. 1979) and *Fashion Valley Mall, LLC v. NLRB*, 172 P. 3d 742 (Cal. 2007), LinkedIn opened itself up to the "public," so it may not now selectively exclude those members of the public whom it dislikes. Furthermore, it is apparent that LinkedIn is using the CFAA as an end run around the Copyright Act: you stated many times on our call that the alleged wrong by hiQ was "copying" webpages en masse. However, "copyright law

---

[1] hiQ's current customers include eBay, Capital One, and GoDaddy. Prospective customers include Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite.



contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186 (2003). These include the requirement of ownership, the defense of license, the idea-expression dichotomy, and the fair use doctrine. These limits on copyright law would immunize hiQ here, but by cloaking its allegations of improper "copying" in the garb of the CFAA, LinkedIn is attempting to circumvent the First Amendment protections of copyright law.

This is a non-exclusive listing of the protections to which hiQ is entitled. We are prepared to protect hiQ's legal rights in court if necessary; LinkedIn's tactics pose a grave threat to hiQ's continued existence. But we would prefer to amicably resolve this matter as you have proposed. We ask that you promptly agree to stop denying hiQ access to LinkedIn's public pages, withdraw your cease and desist demand, and engage in meaningful discussions to try to resolve the matter. In the meantime, we ask LinkedIn to preserve all records, data and documents, however stored, that mention, refer or relate to hiQ or to any desire, plan or effort to enter the data analytics business.

Very truly yours,

Deepak Gupta

DZG:ll

34556\5996250.1

# EXHIBIT C

From: **Mark Weidick** <mark.weidick@hiqlabs.com>
Date: Tue, Jun 6, 2017 at 3:47 PM
Subject: Confidential - Federal Rule of Evidence 408
To: mcallahan@linkedin.com

Hi Mike,
I'm following my voice mail from last Friday along with a thread below from our initial interaction from 2012.  As I said in my voicemail, we met a few years ago via a mutual contact and you graciously helped connect me to LinkedIn leadership via your friendship with Jeff Weiner to discuss a video conferencing company I was running then.

I'm reaching out to ask if you're once again willing to facilitate discussions with LinkedIn, this time under different circumstances given your role - and for me as I was recently named CEO of a big data for Human Resources company called hiQ Labs.

On May 23, 2017, I received a cease and desist letter from LinkedIn that surprised the company and our board because we thought we were operating well within LinkedIn's "member's first" approach, but also with LinkedIn's tacit approval because of its awareness of our business and support of hiQ at our industry event called Elevate.  To be clear, our business is vitally dependent upon PUBLIC LinkedIn data that we use to create value for LinkedIn members and their enterprise employers.

My call is to ask if you would facilitate dialogue with LinkedIn business leadership - ideally to explore a commercial relationship but at the very least to help amicably resolve the legal matter I suspect you're familiar with.

On May 31, 2017, we sent our timely written response to LI counsel Abishek Bajoria that restated our desire to find an amicable resolution.  We've started down several paths to network our way to LI leadership but we've had no success so far.

We understand that LinkedIn is actively seeking out TOS violators.  My expectation is that upon understanding hiQ's business, LI would recognize that we're more like a dolphin that got caught in the tuna net and that we deliver member benefits that complement all that LinkedIn offers as well as LinkedIn's "member's first" mission.

Are you able to raise our profile with a business counterpart to have this discussion?

Given our past interaction, I'd welcome a live discussion with you if that can help.  Thanks in advance for your consideration.

Regards,
Mark Weidick
CEO, hiQ Labs
415.215.6925

**From:** Mike Callahan <michael_j_callahan@yahoo.com>
**Reply-To:** Mike Callahan <michael_j_callahan@yahoo.com>
**Date:** Tue, 4 Dec 2012 20:49:35 -0800 (PST)
**To:** Mark Weidick <mark.weidick@tenhands.net>
**Subject:** Re: Mike Callahan intro to Fred Wang @ Trinity Ventures

thanks, yes i completely agree.  hopefully yahoo's new head of corp dev will see that too.  linked in is a perfect fit.  i am hoping to get a contact below jeff weiner shortly...

Mike Callahan
email:   michael_j_callahan@yahoo.com
mobile:   408.393.8509

**From:** Mark Weidick <mark.weidick@tenhands.net>
**To:** Mike Callahan <michael_j_callahan@yahoo.com>
**Sent:** Tuesday, December 4, 2012 4:13 PM
**Subject:** Re: Mike Callahan intro to Fred Wang @ Trinity Ventures

Good to see you're connecting with Fred.  Saw this today from Yahoo and thought about how they'd react to TenHands, which is truly a full answer to Hangouts:

http://techcrunch.com/2012/12/04/yahoo-acquires-video-chat-startup-ontheair-to-compete-with-google-hangouts/

I also saw that Spencer Stuart has moved all of their candidate data management to a Linkedin service e.g. Spencer Stuart no longer collects resumes directly.  Gotta believe a Linkedin voice/video service that allows for ad hoc communications would be a winner with the entire recruiting community.

Regards,
Mark

> **Mark Weidick**
> CEO & Founder, TenHands
> 1.415.215.6925
> mark.weidick@tenhands.net

**From:** Mike Callahan <michael_j_callahan@yahoo.com>
**Reply-To:** Mike Callahan <michael_j_callahan@yahoo.com>
**Date:** Mon, 3 Dec 2012 13:11:57 -0800 (PST)
**To:** Mark Weidick <mark.weidick@tenhands.net>
**Subject:** Re: Mike Callahan intro to Fred Wang @ Trinity Ventures

Mark,

Thanks!  we are talking on Friday.  I am going to see Morado/Jerry Yang tomorrow and will follow up on the fund raising efforts.  Hope you guys are great.

MJC

Mike Callahan
email:  michael_j_callahan@yahoo.com
mobile:  408.393.8509

---

**From:** Mark Weidick <mark.weidick@tenhands.net>
**To:** Mike Callahan <michael_j_callahan@yahoo.com>; Fred Wang <fred@trinityventures.com>
**Sent:** Friday, November 16, 2012 9:45 AM
**Subject:** Mike Callahan intro to Fred Wang @ Trinity Ventures

Mike,
As discussed, I wanted to connect you with Fred Wang from Trinity Ventures so that you're tapped into a bunch of good things Trinity is doing that I think are aligned with your post-Yahoo interests.

Fred,
In the course of briefing Mike about TenHands and subsequently understanding his career and personal interests, it struck me that he's a person Trinity should know.  I suspect he'd be a great resource in a few Trinity investment areas and encourage you to get together to explore that.

Regards,
Mark

> **Mark Weidick**
> CEO & Founder, TenHands
> 1.415.215.6925
> mark.weidick@tenhands.net