JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
LAURA K. LIN (State Bar No. 281542)
laura.lin@mto.com
NICHOLAS D. FRAM (State Bar No. 288293)
nicholas.fram@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:   (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>               Plaintiff,<br><br>     vs.<br><br>LinkedIn Corporation,<br><br>               Defendants. | Case No. 17-CV-03301<br><br>**DECLARATION OF LORENZO CANLAS IN SUPPORT OF LINKEDIN'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |

I, Lorenzo Canlas, declare as follows:

1. I am a Director of Business Operations and Analytics at LinkedIn. I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them. I submit this declaration in opposition to hiQ's motion for a temporary restraining order.

2. The Talent Analytics team at LinkedIn, which I manage, is an internal group focused on analyzing LinkedIn's own workforce. Its mission is to help LinkedIn make evidence-based decisions about its own employees. It is essentially a division supporting LinkedIn's Human Resources group. We are not directly involved in LinkedIn's website offerings or any of its external products. One of the ways our team adds value to LinkedIn is by more accurately predicting LinkedIn's hiring needs in the future (based on growth, attrition, and other factors), and adjusting the amount of recruiting that LinkedIn does in order to meet those anticipated needs.

3. My recent background is in management. Prior to joining LinkedIn, I spent eight years at McKinsey & Company and Accenture where I advised Fortune 500 companies on product strategy, operations, organization design, and large-scale transformation. I understand what data scraping is, but am not familiar with the technical details of how it is accomplished or the legal framework that governs it.

4. In October 2015, I attended a conference organized by hiQ called "Elevate." I believe I was invited to this conference because I specialize in people/talent analytics. Based on my observations at this conference and the few other Elevate conferences I attended over the ensuing year and a half, attendees at this conference are a mix of people analytics employees from various companies in a variety of industries (such as LinkedIn, Chevron, and Nestle) and representatives of vendors that specialize only in people analytics. I also recall luncheons for leaders in the people analytics space (from companies including Apple, Intel, JPMorgan, and AirBnB) that provide an opportunity for people in similar careers to network. I attended these conferences in my capacity as a people analytics professional at LinkedIn who focuses on the LinkedIn workforce.

5. At the October 2015 conference, I learned a bit about hiQ and the product it had at the time. I learned that hiQ's product used data from a variety of sources—internal and external—to predict employee attrition. I do not recall anyone at this conference saying how hiQ obtained the data it used for this product, or that hiQ was using LinkedIn data for this product.

6. I attended another Elevate conference in the fall of 2016 where awards were presented to people analytics teams at a number of different companies including Chevron, Nestle, Johnson Controls, Scottrade, Pepsico, and LinkedIn. I accepted an "Impact" award on behalf of LinkedIn. The award was given for my team's internal work regarding people analytics. The award's stated purpose was to recognize a team that had engaged in work with a strong impact and demonstrated return on investment in people analytics for their own company. It was not related to the LinkedIn website or LinkedIn member data, or to hiQ's product offerings.

7. I gave a presentation at that 2016 Elevate conference about how business leaders could use people analytics as a way to achieve business objectives. My presentation concerned work that I had done at LinkedIn. It was six slides long, including the cover slide. It had nothing to do with hiQ's products or services. The cover slide to the presentation contains the text "hiQ 2016 Elevate" because I was giving the presentation at the Elevate conference in 2016 organized by hiQ, not because I had collaborated with hiQ in any way on the presentation or in my work at LinkedIn more broadly. I gave the presentation because I was asked by hiQ to speak for five to ten minutes about the subject of the award that LinkedIn was given. There is no past or current cooperation or collaboration between the LinkedIn Talent Analytics group and hiQ on any LinkedIn or hiQ products or offerings.

8. I attended another Elevate conference in April 2017. There, hiQ formally launched a second product called "Skill Mapper." I recall someone from hiQ stating that they collected skills data from public professional profiles in order to provide hiQ's customers information about their employees' skill sets.

9. At no point did hiQ ever disclose to me any reliance on scraped LinkedIn data. At no point have I ever been asked by any representative from hiQ for LinkedIn's permission for hiQ to scrape data from LinkedIn's website, nor would I have had the authority to condone or permit

-2-

that. I generally am aware that LinkedIn prohibits certain types of automated access and scraping of data from LinkedIn's website, but I am not aware of the details because as previously mentioned, I work for an internal group and am not involved in data security or the management of LinkedIn's various websites and consumer-facing services.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on June 21, 2017 at Sunnyvale, California.

_____
Lorenzo Canlas