JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
LAURA K. LIN (State Bar No. 281542)
laura.lin@mto.com
NICHOLAS D. FRAM (State Bar No. 288293)
nicholas.fram@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:      (415) 512-4000
Facsimile:      (415) 512-4077

Attorneys for LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-CV-03301-EMC |
| Plaintiff, | **LINKEDIN CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| vs. | |
| LinkedIn Corporation, | |
| Defendant. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 2

    A.   The LinkedIn Platform ................................................................................. 2

    B.   hiQ Sells LinkedIn Members' Data to Employers Without Their Permission ........... 2

    C.   hiQ's Conduct Bypasses Multiple Measures that LinkedIn Takes to Protect Itself and Its Members' Personal Information from Data Scraping ........................... 3

        1.   hiQ Bypasses Technical Measures that Regulate Access to LinkedIn ............. 3

        2.   hiQ Ignores LinkedIn's Prohibitions on Automated Access and Scraping ................................................................................................ 5

        3.   hiQ Disregards Privacy Protections that LinkedIn Promises Its Members ................................................................................................ 5

    D.   Several Companies Offer Similar Products to hiQ Without Scraping LinkedIn ......... 6

    E.   LinkedIn Bars hiQ from Accessing LinkedIn's Website and Computers .................. 7

III.    LEGAL STANDARD ............................................................................................ 7

IV.     HIQ HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................................................................ 8

    A.   hiQ's Requested Relief—Continued Unauthorized Access to LinkedIn's Computers—Violates Federal and State Law and Is Improper ................................. 8

        1.   hiQ Seeks to Violate the CFAA ................................................................ 8

        2.   hiQ Seeks to Violate California Penal Code Section 502 ............................ 10

        3.   There Is No "Public" Data Exception to the CFAA or Section 502 .............. 11

    B.   hiQ's Affirmative Claims Are Not Likely to Succeed ........................................ 13

        1.   hiQ's Claims Are Impermissibly Premised On Its Ability to Engage in Illegal Conduct and Are Preempted by the Supremacy Clause .................... 14

        2.   The *Noerr-Pennington* Doctrine Bars All of hiQ's Claims ........................ 15

        3.   hiQ's Claims Fail on their Own Terms ...................................................... 16

            (a)   hiQ's Tortious Interference Claims Are Without Merit .................... 16

            (b)   hiQ's UCL Claim Is Without Merit .............................................. 18

            (c)   hiQ's Promissory Estoppel Claim Is Without Merit ........................ 20

            (d)   hiQ's Free Speech Claim Is Without Merit .................................... 22

V.      HIQ HAS NOT ESTABLISHED IRREPARABLE HARM ................................. 25

VI.     THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR LINKEDIN ........... 25

VII.    CONCLUSION .................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**FEDERAL CASES**

4

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
    836 F.3d 1171 (9th Cir. 2016).........................................................................19

5

6

*Aguilar v. Int'l Longshoremen's Union Local No. 10,*
    966 F.2d 443 (9th Cir. 1992)....................................................................20, 21

7

*Alaska Airlines, Inc. v. United Airlines, Inc.,*
    948 F.2d 536 (9th Cir. 1991)..................................................................18, 19

8

9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009)...........................................................................7

10

11

*Apple Inc. v. Psystar Corp.,*
    673 F. Supp. 2d 943 (N.D. Cal. 2009) ..........................................................25

12

*Barber ex rel. Barber v. Colo. Dep't of Revenue,*
    562 F.3d 1222 (10th Cir. 2009)......................................................................15

13

14

*Barnes v. Yahoo!, Inc.,*
    570 F.3d 1096 (9th Cir. 2009) .......................................................................20

15

16

*Blizzard Entertainment Inc. v. Ceiling Fan Software LLC,*
    941 F. Supp. 2d 1227 (C.D. Cal. 2013)....................................................19, 20

17

*Bolger v. Youngs Drugs Prods. Corp.,*
    463 U.S. 60 (1983) .........................................................................................25

18

19

*Buza v. Yahoo!, Inc.,*
    2011 WL 5041174 (N.D. Cal. Oct. 24, 2011) ...............................................22

20

21

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988)..........................................................................25

22

*Couponcabin LLC v. Savings.com, Inc.,*
    2016 WL 3181826 (N.D. Ind. June 8, 2016)............................................12, 13

23

24

*Craigslist Inc. v. 3Taps Inc.,*
    942 F. Supp. 2d 962 (N.D. Cal. 2013) ......................................10, 12, 13, 23

25

26

*Craigslist Inc. v. 3Taps Inc.,*
    964 F. Supp. 2d 1178 (N.D. Cal. 2013) ...................................................11, 23

27

*Craigslist, Inc. v. Kerbel,*
    No. C-11-3309 EMC, 2012 WL 3166798 (N.D. Cal. Aug. 2, 2012)..............9

28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Dollar Tree Stores Inc. v. Toyama Partners, LLC*,
    2010 WL 1688583 (N.D. Cal. Apr. 26, 2010) ............................................................17

*E & E Co., Ltd. v. Kam Hing Enters., Inc.*,
    2008 WL 3916256 (N.D. Cal. Aug. 25, 2008)...........................................................18

*eBay Inc. v. Digital Point Solutions, Inc.*,
    608 F. Supp. 2d 1156 (N.D. Cal. 2009) ...................................................................12

*ESS Tech., Inc. v. PC-Tel, Inc.*,
    1999 WL 33520483 (N.D. Cal. Nov. 4, 1999) .........................................................19

*Facebook, Inc. v. Power Ventures, Inc.*,
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ..........................................................19

*Facebook, Inc. v. Power Ventures, Inc.*,
    2017 WL 1650608 (N.D. Cal. May 2, 2017) .....................................................15, 25

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016)...................................................................... 1, passim

*Gen–Probe, Inc. v. Amoco Corp.*,
    926 F. Supp. 948 (S.D. Cal. 1996) .........................................................................15

*Guthy-Renker Corp. v. Evolution Skin Therapy, LLC*,
    2008 WL 5479112 (C.D. Cal. Dec. 16, 2008) ........................................................25

*Hartman v. Harris*,
    810 F. Supp. 82 (S.D.N.Y. 1992), aff'd, 996 F.2d 301 (2d Cir. 1993) ......................17

*Hathorn v. Lovorn*,
    457 U.S. 255 (1982) .................................................................................................8

*Hewlett v. U.S. Bankr. Court*,
    2007 WL 3232239 (N.D. Cal. Oct. 31, 2007)..........................................................15

*Horne v. Harley-Davidson, Inc.*,
    660 F. Supp. 2d 1152 (C.D. Cal. 2009).....................................................................20

*Hudgens v. NLRB*,
    424 U.S. 507 (1976) ...............................................................................................22

*Jenkins v. Greyhound Lines, Inc.*,
    1971 WL 529 (N.D. Cal. May 4, 1971) ...................................................................14

*Kinderstart.com LLC v. Google, Inc.*,
    2006 WL 3246596 (N.D. Cal. July 13, 2006) .........................................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*LinkedIn Corporation v. Does 1-100*,
   No.16-cv-04463 LHK (NC) (N.D. Cal.) ...................................................................12

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
   309 F. Supp. 2d 1156 (N.D. Cal. 2004) ..................................................................14

*Munaf v. Geren*,
   553 U.S. 674 (2008) .................................................................................................7

*Musacchio v. United States*,
   136 S.Ct. 709 (2016) ...............................................................................................8

*NCMIC Fin. Corp. v. Artino*,
   638 F. Supp. 2d 1042 (S.D. Iowa 2009)...................................................................13

*Noerr Theme Prom., Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008)...............................................................................15, 16

*Oracle Am., Inc. v. Serv. Key, LLC*,
   No. C 12-00790 SBA, 2012 WL 6019580 (N.D. Cal. Dec. 3, 2012)..........................13

*Packingham v. North Carolina*,
   No. 15-1194, 2017 WL 2621313 (U.S. June 19, 2017) .......................................24, 25

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) ..................................................................................................16

*QVC, Inc. v. Resultly, LLC*,
   159 F. Supp. 3d 576 (E.D. Pa. 2016) ...........................................................11, 13, 21

*R. N. Beach, Inc. v. Country Visions, Inc.*,
   2016 WL 1682046 (E.D. Cal. Apr. 27, 2016) ..........................................................21

*In re R2D2, LLC*,
   No. CV 13-3799 PSG, 2014 WL 12589668 (C.D. Cal. Jan. 9, 2014) ........................17

*RealNetworks, Inc. v. DVD Copy Control Ass'n*,
   2010 WL 145098 (N.D. Cal. Jan. 8, 2010) ...............................................................14

*Rock River Commc'ns, Inc. v. Universal Music Gp., Inc.*,
   745 F.3d 343 (9th Cir. 2014).....................................................................................17

*Sambreel Holdings LLC v. Facebook, Inc.*,
   906 F. Supp. 2d 1070 (S.D. Cal. 2012) .....................................................................20

*Satmodo, LLC v. Whenever Commc'ns, LLC*,
   2017 WL 1365839 (S.D. Cal. Apr. 14, 2017) ............................................................12

-iv-

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Snake River Valley Elec. Ass'n v. PacifiCorp*,
 357 F.3d 1042 (9th Cir. 2004) .......................................................................15

*Sorrell v. IMS Health Inc*,
 564 U.S. 552 (2011) ......................................................................................24

*Sosa v. DirecTV, Inc.*,
 437 F.3d 923 (9th Cir. 2006) ....................................................................15, 16

*Sw. Airlines Co. v. Farechase, Inc.*,
 318 F. Supp. 2d 435 (N.D. Tex. 2004) ............................................................12

*Tanaka v. Univ. of S. Cal.*,
 252 F.3d 1059 (9th Cir. 2001) .......................................................................18

*Triad Sys. Corp. v. Se. Express Co.*,
 64 F.3d 1330 (9th Cir. 1995) .........................................................................25

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,
 117 F. Supp. 3d 1092 (C.D. Cal. 2015) ...........................................................16

*United States v. Christensen*,
 828 F.3d 763 (9th Cir. 2015) .........................................................................10

*United States v. Nosal*,
 676 F.3d 854 (9th Cir. 2012) .......................................................................8, 11

*United States v. Nosal*,
 844 F.3d 1024 (9th Cir. 2016) .......................................................................10

*United States v. Shill*,
 740 F.3d 1347 (9th Cir. 2014) .......................................................................13

*United States v. Spencer*,
 160 F.3d 413 (7th Cir. 1998) .........................................................................22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) ......................................................................................18

*Virginia v. Hicks*,
 539 U.S. 113 (2003) .................................................................................22, 23

*W. Watersheds Project v. Michael*,
 196 F. Supp. 3d 1231 (D. Wyo. 2016) ............................................................24

*Weingand v. Harland Fin. Solutions., Inc.*,
 No. C-11-3109 EMC, 2012 WL 2327660 (N.D. Cal. June 19, 2012) .........................10

-v-

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................7

4

5

*Zemel v. Rusk,*
    381 U.S. 1 (1965) .....................................................................................23, 24

6

**STATE CASES**

7

*Landberg v. Landberg,*
    24 Cal. App. 3d 742 (1972) ...........................................................................20

8

9

*Lieberman v. KCOP Television, Inc.,*
    110 Cal. App. 4th 156 (2003) ........................................................................23

10

11

*Marathon Entm't, Inc. v. Blasi,*
    42 Cal. 4th 974 (2008) ...................................................................................17

12

*Robins v. Pruneyard Shopping Center,*
    23 Cal. 3d 899 (1979) ....................................................................................22

13

14

*Quelimane Co. v. Stewart Title Guar. Co.,*
    19 Cal. 4th 26 (1998) .....................................................................................17

15

16

*Renaissance Realty v. Soriano,*
    174 Cal. Rptr. 837 (1981) ..............................................................................17

17

*Richardson v. La Rancherita La Jolla, Inc.,*
    98 Cal. App.3d 73 (1979) ..............................................................................17

18

19

*Yoo v. Jho,*
    147 Cal. App. 4th 1249 (2007) ......................................................................17

20

**FEDERAL STATUTES**

21

18 U.S.C. § 1030. ..................................................................................... passim

22

**STATE STATUTES**

23

California Government Code § 56133 .............................................................14

24

California Penal Code § 502 ...................................................................... passim

25

California Penal Code § 632 ...........................................................................23

26

27

28

# I.  **INTRODUCTION**

Through a network of anonymous bots that circumvent LinkedIn's technical barriers, hiQ scrapes the personal information of hundreds of thousands of LinkedIn members without their consent.  hiQ then sells "intelligence" based on this surveillance to LinkedIn members' employers, who learn things that the members might not want their employers to know, including whether a member is a "flight risk" employee and his or her individual "risk score: high (red), medium (yellow), or low (green)."  Declaration of Jonathan H. Blavin ("Blavin Decl.") ¶ 4 & Ex. A at 2.

Of course, hiQ claims that only good things could come of this, but offers no evidence of those benefits, and ignores that an employer could use its products to fire, demote, or otherwise punish employees it suspects of being disloyal.  hiQ's conduct erodes the trust that LinkedIn has cultivated with its members, thereby damaging the platform in which LinkedIn has invested fifteen years and billions of dollars.  hiQ never asked LinkedIn for permission to do this, and for good reason: LinkedIn would have said no.

In fact, LinkedIn did say no.  In a cease-and-desist letter last month, LinkedIn made crystal clear to hiQ that its access to LinkedIn was unauthorized and in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, a number of other laws, and the express terms of the LinkedIn User Agreement, to which hiQ repeatedly agreed.  Under controlling Ninth Circuit law, any continued access by hiQ to LinkedIn's computers is "without authorization" and in violation of the CFAA.  *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016).

Remarkably, hiQ now asks this Court to bless its illegal behavior and adopt a truly breathtaking rule—hiQ claims that it is *unconstitutional* for LinkedIn to place reasonable limits on automated access to its servers.  Mot. 21 n.8.  LinkedIn's technical measures block 95 million automated calls to its servers every day.  But according to hiQ, LinkedIn—and presumably every other website—cannot use such measures to guard against data scrapers or other malicious actors who, lacking hiQ's "good" intentions, might sell troves of member data to spammers, fraudsters, or identity thieves.  The rule that hiQ advocates could cripple the ability of websites to protect themselves and their users.  Not surprisingly, hiQ does not cite a single case holding that a company cannot regulate access to its own computer systems—which is precisely the point of the CFAA.

Ignoring the overwhelming weight of authority against it, hiQ resorts to a hodgepodge of baseless theories that not only fail to satisfy the threshold legal elements of the claims asserted, but would violate a host of constitutional doctrines (including the Supremacy Clause and *Noerr-Pennington*).  hiQ's Motion turns the law, and the equities, on their head.  It should be denied.

## II.    BACKGROUND

### A.    The LinkedIn Platform

LinkedIn was started in 2002 in the living room of its co-founder, Reid Hoffman. Declaration of Robert Rosin ("Rosin Decl.") ¶ 3.  Since then, it has invested significant time, labor, skill, and resources (in the billions of dollars) into the development of its platform.  *Id*.  Through this investment, LinkedIn now has over 500 million members in over 200 countries worldwide.  *Id.* ¶ 4.

LinkedIn's mission is to connect the world's professionals to make them more productive and successful.  *Id.* ¶ 6.  Through its platform, LinkedIn allows its members to create, manage and share their professional histories and interests online.  *Id*.  At the heart of LinkedIn's platform are its members, whose LinkedIn profiles serve as their professional online identities.  *Id*.  LinkedIn's guiding philosophy is "Members First," which helps guide the decisions that LinkedIn makes, from which products to pursue to how to gather and respect personal information.  *Id*. ¶ 7.

LinkedIn offers its services to members for free.  *Id.* ¶ 12.  Anybody can become a member provided they comply with LinkedIn's User Agreement and Privacy Policy.  Declaration of Paul Rockwell ("Rockwell Decl.") ¶ 18.  Members have full control over their profiles and can change the amount and content of information they share at any time.  Rosin Decl. ¶ 12.  Members also can easily transport their data to other services whenever they want, or delete their profiles entirely.  *Id.*

### B.    hiQ Sells LinkedIn Members' Data to Employers Without Their Permission

According to hiQ, it provides two products that collect information about LinkedIn members, without their consent, that hiQ then packages into "intelligence" (Weidick Decl. ¶ 9) to sell to their employers: "(a) 'Keeper,' which tells employers which of their employees are at the greatest risk of being recruited away, and (b) 'Skill Mapper,' [which offers] a summary of the breadth and depth of aggregate or individual skills possessed."  Mot. 4.  hiQ states that it "uses a variety of software and manual means to gather the raw data it needs" from LinkedIn.  Weidick Decl. ¶ 8.  hiQ claims to

-2-

analyze data from "hundreds of thousands of employees" and "then assign[s] each of" them a "risk score," giving employers the ability to "pinpoint with laser-like accuracy" which employees are a "flight risk."  Blavin Decl., Ex. A at 2.  hiQ cites no evidence that any of these services actually benefit employees, and it is easy to see how they might not: if an employer thinks an employee is about to leave, the employer could deny that employee a bonus, terminate, or otherwise punish the employee, even if the employee actually has no intention of departing.

hiQ illicitly gathers LinkedIn's members' data without having any relationship with them or LinkedIn.  Unlike LinkedIn, hiQ makes no enforceable commitment in a privacy policy or otherwise to LinkedIn's members regarding what it will do with their data or to whom it may sell or transfer it, nor is there any way for LinkedIn members to "opt out" of hiQ's processing and selling of their data.  hiQ never asked LinkedIn if it could access its computers in order to scrape LinkedIn member data, and there is no "cooperation between [the] companies," as its CEO suggests.  Rockwell Decl. ¶ 33; Declaration of Lorenzo Canlas ("Canlas Decl.") ¶ 7.  hiQ does not identify a single statement by LinkedIn purporting to make such a promise because none exists.[1]  In fact, hiQ does not publicly reveal that it obtains data for its products by scraping LinkedIn, stating only on its website that it "applies science to public data sources," without naming those sources.  Blavin Decl. ¶ 3 & Ex. B.

### C.   hiQ's Conduct Bypasses Multiple Measures that LinkedIn Takes to Protect Itself and Its Members' Personal Information from Data Scraping

In accessing and scraping data from LinkedIn, hiQ circumvents LinkedIn's technical barriers, disregards express prohibitions on automated access and scraping in LinkedIn's User Agreement (to which it repeatedly agreed), and disrespects member privacy.

### 1.   hiQ Bypasses Technical Measures that Regulate Access to LinkedIn

In order to protect LinkedIn and the data that its members entrust to it, LinkedIn employs numerous technical measures designed to detect, limit, and block "scraping"—the accessing,

---

[1] Instead, hiQ relies on the attendance of LinkedIn employees, and specifically Lorenzo Canlas, at its "Elevate" conferences over the years.  Weidick Decl. ¶ 13.  Mr. Canlas is in charge of LinkedIn's Talent Analytics team, which focuses on analyzing information that LinkedIn has about its *own* workforce. Canlas Decl. ¶ 2.  At no time, at any conference, was Mr. Canlas ever asked by hiQ for LinkedIn's permission for hiQ to scrape data from LinkedIn, nor would he have granted such permission.  *Id.* ¶ 9.  In addition, Mr. Canlas has no recollection of hiQ ever stating that its products relied on LinkedIn data.  *Id.*  Finally, Mr. Canlas is not in a technical, engineering, or product role, and is not familiar with the technical details of how scraping works.  *Id.* ¶ 3.

extraction, and copying of data on a large scale. Rockwell Decl. ¶ 3. These measures include:

- The FUSE system, which scans and imposes a limit on the activity an individual may initiate in order to prevent would-be data scrapers utilizing automated technologies from quickly accessing and scraping (public or private) member profiles. *Id.* ¶ 6.

- The Quicksand system, which monitors patterns of webpage requests by members in order to identify non-human activity indicative of scraping and then quickly challenges or restricts an account to prevent scrapers from continuing to access the site. *Id.* ¶ 7.

- The Sentinel system, which scans, throttles, and at times blocks suspicious activity associated with particular accounts and Internet Protocol ("IP") addresses. *Id.* ¶ 8.

- LinkedIn's OrgBlock technology, which is implemented on a case-by-case basis to block known bad IP addresses and uses a machine-learned model that identifies groups of IP addresses serving large-scale scrapers. *Id.* ¶ 9.

- LinkedIn's Member and Guest Request Scoring systems, which also restrict automated, non-human forms of access that facilitate scraping. *Id.* ¶ 10.

These measures are designed to prevent accessing LinkedIn in automated ways and scraping LinkedIn member data, and are one way that LinkedIn clearly conveys that automated access and scraping are not authorized. *Id.* ¶ 11. To implement these measures, and to otherwise deter scraping activity and protect member data, LinkedIn devotes the equivalent of over 12 full-time employees and millions of dollars per year to these efforts. *Id.* ¶ 4.[2] On a daily basis, LinkedIn blocks an average of 95 million attempts by automated bots to scrape data from its servers. *Id.* ¶ 13.

hiQ's anonymous automated scraping bypasses these technical measures. hiQ states that it is scraping hundreds of thousands of member profiles (Blavin Decl., Ex. A at 2), which is consistent with LinkedIn's own investigation and indicates that hiQ is circumventing LinkedIn's technical barriers. Rockwell Decl. ¶ 32. Further, this volume of scraping is much higher than the volume of server requests that LinkedIn has identified as coming from hiQ's IP addresses, meaning that hiQ is disguising its calls to LinkedIn's computers and conducting its data gathering anonymously. *Id.* It is hard to fathom why hiQ would disguise its scraping if it thought LinkedIn approved of it, or had not purposefully designed its techniques to bypass LinkedIn's technical measures.

The order that hiQ seeks—and its claim that bans on automated access are per se unlawful—could require LinkedIn to disable some or all of these measures, exposing itself and its members not

---

[2] LinkedIn has spent well over 100 hours of employee time, and well over $5,000 investigating and responding to hiQ's conduct. Rockwell Decl. ¶ 30.

only to hiQ, but potentially to scores of other data scrapers and other malicious actors.

**2.    hiQ Ignores LinkedIn's Prohibitions on Automated Access and Scraping**

hiQ's conduct also is explicitly prohibited by LinkedIn's User Agreement, to which it repeatedly agreed.  LinkedIn's User Agreement informs its members that accessing its servers through automated means and scraping data is prohibited.  *Id.* ¶ 15 & Ex. A.  In particular, Section 8.2 of the October 23, 2014 User Agreement[3] prohibits the following:

- "Us[ing] … automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

- "Us[ing] bots or other automated methods to access the Services";

- "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology";

- "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services." *Id*.

hiQ has been on notice of and has agreed to the User Agreement on several different occasions.  hiQ explicitly acknowledges that "hiQ was itself a LinkedIn member with a business profile page" on LinkedIn.  Mot. 12.  hiQ's company page was created in June 2014 by hiQ's then-Chief Operating Officer, a LinkedIn member.  Rockwell Decl. ¶ 28.  hiQ also agreed to the User Agreement in January 2016 when it purchased ads on LinkedIn.  *Id.* ¶ 25.  In doing so, it had to click through and assent to the Ads Agreement, which incorporated the User Agreement.  *Id.* ¶¶ 26-27.[4]

**3.    hiQ Disregards Privacy Protections that LinkedIn Promises Its Members**

Just because LinkedIn members make certain data viewable to the public does not mean that that data can be scraped and used in any manner without limitation.  In its Privacy Policy, LinkedIn sets limits regarding what LinkedIn can and cannot do with member data.  *Id.* ¶ 21.  Foremost among them, LinkedIn informs its members that it will not rent or sell personal data that they post without their permission.  *Id*.  It also informs members that search engines may index and display their profiles, but permits them to "choose the parts of your profile that search engines index or

---

[3] This is the version of the User Agreement that hiQ agreed to and which was in effect during the period of unauthorized access by hiQ.  LinkedIn updated its User Agreement on June 7, 2017.  It contains substantially identical provisions to those set forth above.  *See* Rockwell Decl., Ex. B.

[4] Moreover, hiQ agreed to the User Agreement in December 2015 when it purchased a license for LinkedIn's Sales Navigator product.  Rockwell Decl. ¶ 29.  The LinkedIn Subscription Agreement hiQ agreed to in purchasing this product incorporates the LinkedIn User Agreement in full.  *Id*.

1  completely opt out of this feature." *Id.*, Ex. C at 6.[5]  Members also can limit the data that they share

2  with third parties with whom LinkedIn has negotiated agreements to use its platform.  *Id.* ¶ 21.

3       Although the Privacy Policy contains numerous other important safeguards, one is especially

4  important in the context of hiQ's claim that it should have unrestricted access to member data: if a

5  LinkedIn member decides to delete his or her account, LinkedIn pledges to permanently delete the

6  account and all of the member's information within 30 days.  *Id.* ¶ 22.  LinkedIn does not keep a

7  copy of that data.  *Id.*  The power to remove one's own information from LinkedIn helps ensure that

8  members have control of their own information.  hiQ does not claim that it makes any similar

9  pledge, nor could it, as it has no contractual relationship with LinkedIn's members.

10      LinkedIn also offers a number of privacy settings that let members control which information

11 is displayed and broadcast to others.  For example, LinkedIn permits members to choose whether

12 their connections are notified when they make changes to their profiles.  *Id.* ¶ 23 (setting screenshot).

13 Even if the data a member is editing is generally viewable by the public, the member might not want

14 to alert others that he or she is changing that data.  By contrast, hiQ's flight-risk analysis given to

15 employers appears to rely explicitly upon when LinkedIn members make changes to their profiles.[6]

16      **D.     <u>Several Companies Offer Similar Products to hiQ Without Scraping LinkedIn</u>**

17      Although hiQ claims that it cannot function without scraping LinkedIn data, that is a problem

18 of hiQ's own making.  hiQ has many legitimate competitors in the "people analytics" space who

19 exist without scraping LinkedIn, including Glint, TrustSphere, CultureScope, Concentra Analytics,

20 Humanyze, Twine, Peakon, and Textio.  Blavin Decl. ¶ 7 & Ex. E.  Glint, for example, provides

21 software that sends short, anonymous surveys periodically to specific groups or companywide to

22 gather feedback, and uses machine learning, natural language, and predictive analytics to determine

23 whether teams are experiencing problems, why desirable employees may leave, and to identify areas

24 _____

[5] LinkedIn's website contains a "robots.txt" file, which provides instructions to bots or crawlers that
25 attempt to scrape data from LinkedIn's servers.  While the robots.txt file does permit—consistent
with LinkedIn's Privacy Policy—certain identified crawlers (e.g., search engines such as Google or
26 Bing) to access the site, it expressly prohibits automated programs like those used by data scrapers.
Rockwell Decl. ¶ 12.  hiQ is not listed as an entity authorized by the file to access LinkedIn.  *Id.*

27 [6] LinkedIn also has brought legal actions against those who unlawfully access and scrape its
28 members' profile pages, and has obtained multiple consent judgments against scrapers in this
District, including one granted by Judge Koh earlier this month.  *See* Blavin Decl., Exs. I-J.

for improvement.  *Id.* ¶ 8 & Ex. F.  In other words, it provides very similar data analytics features as hiQ, but without scraping LinkedIn's site.  Glint also has recently raised tens of millions of dollars from venture capitalists; its non-scraping business model is certainly viewed as a viable one.  *Id.*

Moreover, LinkedIn is not the only website with professional data.  LinkedIn has many competitors with services that contain large quantities of user professional information, including sites with a similar focus, like Xing, GitHub, or Doximity, as well as ones with a broader focus, like Facebook.  Rosin Decl. ¶ 8.  For example, Facebook users can include in their profiles information including job, skills, education, and job descriptions.  *Id.* ¶ 10.  Based on potential ad audience sizes for Facebook and LinkedIn users, Facebook appears to have comparable amounts of professional data.  Blavin Decl. ¶ 15; Ex. G at 69 (74% of users use Facebook professionally vs. 78% LinkedIn).

### E.    LinkedIn Bars hiQ from Accessing LinkedIn's Website and Computers

LinkedIn sent a cease-and-desist letter to hiQ on May 23, 2017 requesting that hiQ stop scraping LinkedIn data and explicitly stating that any further access to LinkedIn's servers was unauthorized.  Declaration of Abhishek Bajoria ("Bajoria Decl.") ¶ 2, Ex. A at 1-2.  It demanded that hiQ, *inter alia*, cease accessing LinkedIn's servers, destroy all data it obtained, and cease violating the User Agreement.  *Id.* at 2-3.  Following hiQ's filing of its complaint and motion for a temporary restraining order ("TRO") on June 8, hiQ and LinkedIn agreed to a two-week standstill period to attempt to reach resolution.  The parties have been unable to do so.  At the conclusion of the standstill period, LinkedIn renewed its cease-and-desist request and instituted IP address blocks to prevent hiQ's continued unauthorized access to LinkedIn's servers.  Blavin Decl. ¶ 14 & Ex. L.

## III.    LEGAL STANDARD

In order to obtain a TRO, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A TRO "is an extraordinary and drastic remedy," *Munaf v. Geren,* 553 U.S. 674, 689 (2008), and a district court should enter a TRO only "upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).  hiQ has not met this high standard.

-7-

## IV.    HIQ HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    hiQ's Requested Relief—Continued Unauthorized Access to LinkedIn's Computers—Violates Federal and State Law and Is Improper

hiQ's Motion should be denied not only because it is unlikely to prevail on its affirmative claims, as explained below, but because the very relief it seeks—continued unauthorized access to LinkedIn's servers for the purpose of scraping member data—violates federal and state law, namely, the CFAA and California Penal Code Section 502.  This is wholly improper.  *Hathorn v. Lovorn*, 457 U.S. 255, 270 (1982) (courts must "refrain from ordering relief that would violate federal law").

#### 1.    hiQ Seeks to Violate the CFAA

The CFAA creates criminal and civil liability, *inter alia*, for whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer." 18 U.S.C. § 1030(a)(2)(C).  "The statute thus provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) obtaining access with authorization but then using that access improperly."  *Musacchio v. United States*, 136 S.Ct. 709, 713 (2016).

hiQ asks this Court to legitimize its unauthorized access to LinkedIn's servers.[7]  As hiQ's CEO states in his declaration, hiQ has used "a variety of software and manual means to gather the raw data it needs" from LinkedIn, which circumvented the technical access barriers of the LinkedIn website as discussed above.  Weidick Decl. ¶ 8; *see* Rockwell Decl. ¶ 32.  In addition, LinkedIn has expressly informed hiQ that access to its website in this manner is not authorized, and in fact, is expressly prohibited.  Under the User Agreement, which hiQ repeatedly agreed to and is bound by, *supra* at 5, parties are prohibited from using "automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information," and from "[s]crap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology."  Rockwell Decl. ¶ 15 & Ex. A.

If there was ever any doubt about the unauthorized nature of this access, LinkedIn expressly informed hiQ in its May 23 cease-and-desist letter, renewed on June 24, that "hiQ's prior and

---

[7] LinkedIn's computers are connected to the Internet and affect interstate commerce, making them "protected computers" under the CFAA.  *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012).

-8-

present access of LinkedIn's website and/or servers violates LinkedIn's User Agreement and the law," and that "[a]ny future access of any kind by hiQ is without permission and without authorization."  Bajoria Decl., Ex. A at 2; Blavin Decl., Ex. L at 1; Mot. 8.  The June letter also noted that LinkedIn has implemented technical measures to prevent hiQ from accessing LinkedIn's servers, including IP blocks.  Blavin Decl., Ex. L at 2.  As hiQ concedes, even under its flawed view, these letters "revoked" any purported access hiQ had.  Mot. 6, 10.

Under binding Ninth Circuit precedent, hiQ's efforts to continue to gain unauthorized access to LinkedIn to scrape member profile data violate the CFAA.  In *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), the defendant Power Ventures ("Power") operated a site that extracted and aggregated users' social networking information and contacts from Facebook and several other social networking sites onto a single webpage.  *Id*. at 1062.  No different than LinkedIn's cease-and-desist letter here, Facebook sent Power a letter "inform[ing] Power that it had violated Facebook's terms of use and demanded that Power stop soliciting Facebook users' information, using Facebook content, or otherwise interacting with Facebook through automated scripts."  *Id*. at 1067.  Facebook also "imposed IP blocks in an effort to prevent Power's continued access," which Power bypassed.  *Id*.  The Ninth Circuit held that a "defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission *has been revoked explicitly*."  *Id*. (emphasis added).  Thus, because Power "deliberately disregarded the cease and desist letter and accessed Facebook's computers without authorization to do so," it violated the CFAA.  *Id*. at 1068; *see also id.* ("after receiving written notification from Facebook . . . , Power accessed Facebook's computers 'without authorization' within the meaning of the CFAA")[8]; *Craigslist, Inc. v. Kerbel*, No. C-11-3309 EMC, 2012 WL 3166798, at *11 (N.D. Cal. Aug. 2, 2012) (entering default judgment on CFAA claim where Craigslist alleged that party "continued" unauthorized access to Craigslist "despite receiving cease and desist letters").

---

[8] For Power's access prior to receiving the cease-and-desist letter, the court held that "Power reasonably could have thought that consent from *Facebook users*" was "permission for Power to access *Facebook's* computers," and thus because "Power had at least arguable permission to access Facebook's computers, it did not initially access Facebook's computers 'without authorization' within the meaning of the CFAA."  844 F.3d at 1067.  Although LinkedIn's cease-and-desist letter here is dispositive for purposes of the prospective relief hiQ seeks in its TRO, prior to that letter LinkedIn's members did *not* provide hiQ with *any* consent to access and scrape their profiles.

1    Similarly, in *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016), the Ninth Circuit held

2    that an employee "whose computer access credentials were affirmatively revoked by [his employer]

3    acted 'without authorization' in violation of the CFAA when he or his former employee co-

4    conspirators used the login credentials of a current employee" to gain access to the employer's

5    computer systems. *Id*. at 1038. The court further held that there was no requirement in the CFAA

6    that "the party circumvents a technological access barrier," which is "missing from the statutory

7    language" and "would make little sense." *Id*. at 1038-39. *See also Weingand v. Harland Fin.*

8    *Solutions., Inc*., No. C-11-3109 EMC, 2012 WL 2327660, at *3 (N.D. Cal. June 19, 2012) (same).

9    Under this controlling law, hiQ's efforts to gain unauthorized access to LinkedIn to scrape

10   member profile data violates the CFAA. Not only was such access unauthorized prior to its cease-

11   and-desist letter,[9] but there can be no doubt that LinkedIn, upon sending the letter, unequivocally

12   revoked any purported authorization hiQ had to continue to access its computers under the CFAA.

### 2.    hiQ Seeks to Violate California Penal Code Section 502

14   hiQ's requested relief also plainly violates California Penal Code Section 502, which, *inter*

15   *alia*, imposes liability on a person who "[k]nowingly accesses and without permission takes, copies,

16   or makes use of any data from a computer, computer system, or computer network, or takes or

17   copies any supporting documentation, whether existing or residing internal or external to a computer,

18   computer system, or computer network." *Id*. § 502(c)(2). The Ninth Circuit has held that "[i]n

19   contrast to the CFAA," Section 502(c)(2) "does not require *unauthorized* access," and that a "plain

20   reading of the statute demonstrates that its focus is on unauthorized taking or use of information."

21   *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015). Thus, under Section 502(c)(2),

22   LinkedIn need only establish the unauthorized "taking or use" of data from the LinkedIn site, which

23   hiQ has admitted to in its papers. As *Power Ventures* held, "when Facebook sent the cease and

24   desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's

25   computers at all. Power, therefore, knowingly accessed and without permission took, copied, and

---

26   [9] hiQ's access to LinkedIn's servers prior to the cease-and-desist letter through automated means
     would have circumvented LinkedIn's technical barriers that block such access, and as such falls
27   within the heartland of conduct that the CFAA seeks to prevent. *See, e.g., Craigslist Inc. v. 3Taps*
     *Inc.*, 942 F. Supp. 2d 962, 970 (N.D. Cal. 2013) (Breyer, J.) (collecting authority for the proposition
28   that one way to violate the CFAA is by circumventing technical barriers).

1   made use of Facebook's data" in violation of the statute.  844 F.3d at 1069.  The same is true here.[10]

2   **3.   There Is No "Public" Data Exception to the CFAA or Section 502**

3          Ignoring this authority, hiQ argues that the CFAA cannot be construed to "proscribe access"

4   to "public" webpages, and that LinkedIn cannot "selectively exclud[e] companies like hiQ from

5   those pages."  Mot. 20.  hiQ fails to cite a single case supporting this proposition, which is

6   foreclosed by Ninth Circuit precedent.  As discussed, *Power Ventures* and *Nosal* squarely held that

7   once a party revokes access to its computers, any continued access is unauthorized.  *See supra* at 8-

8   10.  Thus, even if LinkedIn had generally authorized public access to its computers, LinkedIn could

9   revoke such authorization to hiQ.  *See Power Ventures*, 844 F.3d at 1067 n.2 (indicating that even

10  with respect to public or "open" websites, "permission" may be "revoked expressly").

11         In addition to the Ninth Circuit, numerous courts in this District and elsewhere have

12  repeatedly held that there is no exception to the CFAA for "public" websites.  In *Craigslist Inc. v.*

13  *3Taps Inc.*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013) (Breyer, J.), Craigslist alleged that the defendant

14  "3Taps copies (or 'scrapes') all content posted to Craigslist in real time, directly from the Craigslist

15  website," which it then allowed third parties to access in its competing products and websites.  *Id*. at

16  1180.  3Taps argued, like hiQ here, that "by making the classified ads on its website publicly

17  available, craigslist has 'authorized' the world, including 3Taps, to access craigslist.org."  *Id*. at

18  1182.  In a lengthy analysis, the court rejected this argument, holding that "Congress apparently

19  knew how to restrict the reach of the CFAA to only certain kinds of information, and it appreciated

20  the public vs. nonpublic distinction—but § 1030(a)(2)(C) contains no such restrictions or

21  modifiers."  *Id*. at 1182-83.  As the court concluded, the "statute protects all information on any

22  protected computer accessed 'without authorization,' and nothing in that language prohibits a

23  computer owner from selectively revoking authorization to access its website."  *Id*. at 1187.  The

24  court reached the same conclusion with respect to Section 502.  *Id.* at 1181 n.4.

25         Likewise, in *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576 (E.D. Pa. 2016), the court

26  considered whether the defendant acted without authorization under the CFAA when it crawled and

27

28  _____
[10] While LinkedIn also has strong claims under the Digital Millennium Copyright Act and under
trespass and misappropriation doctrines, it does not at this time set forth those claims in detail.

-11-

1    scraped the website QVC.com, even though it was "publicly accessible." *Id.* at 595.  The court held

2    that the "fact that QVC allowed certain entities, such as Google, to crawl its website does not

3    preclude and is not inconsistent with an argument that QVC specifically prohibited [others] from

4    crawling its webpage.  The relevant question is not whether [the defendant] was granted permission

5    to access the information on QVC.com, but whether that authorization was ever rescinded or limited

6    in a way that would put [the defendant] on notice that it was not authorized to access information it

7    was otherwise entitled to access." *Id.* at 596.  Because the defendant was on "notice" that QVC

8    "prohibited web-crawling," just "as a cease-and-desist letter would put a publisher on notice that its

9    actions were prohibited," the court held that QVC adequately pled a CFAA violation.  *Id.* at 597.

10        And in *Couponcabin LLC v. Savings.com, Inc.,* 2016 WL 3181826 (N.D. Ind. June 8, 2016),

11   the plaintiff filed suit against entities that "either manually scraped or employed scraping programs

12   'in order to download, copy and/or record, and/or enable the republishing of . . . data from'" the

13   plaintiff's publicly accessible website. *Id.* at *1.  The plaintiff sent letters "demand[ing] that they

14   cease and desist their data scraping, misappropriation" of "data from the [Plaintiff's] website." *Id.*

15   The court held that the plaintiff adequately pled a CFAA claim, and emphasized that "given the

16   'ordinary and plain meaning' of 'authorization,' coupled with the case law … CFAA liability may

17   exist in certain situations where a party's authorization to access electronic data—including

18   publicly accessible electronic data—has been affirmatively rescinded or revoked." *Id.* at *4.

19        And in a pending action in this District against anonymous scrapers of LinkedIn public

20   profiles, the court held on a motion for expedited discovery to identify the scrapers that "LinkedIn's

21   CFAA claim would survive a motion to dismiss."  *LinkedIn Corporation v. Does*, No.16-cv-04463

22   LHK (NC) (Blavin Decl., Ex. K at 5).  Numerous other courts have held the same.[11]

23        hiQ barely acknowledges this unbroken line of authority, other than to state that in *3Taps*

24   and *Power Ventures*, the defendants "created substitute services that replaced the need for a user to

---

25   [11] *See, e.g., Satmodo, LLC v. Whenever Commc'ns, LLC*, 2017 WL 1365839, at *3, *5 (S.D. Cal.

26   Apr. 14, 2017) (rejecting argument that "accessing Plaintiff's website through a publicly available third-party search engine" could not be a violation of the CFAA); *eBay Inc. v. Digital Point

27   Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (rejecting argument that access could not be "without authorization" under the CFAA because "eBay is a public website that may be

28   accessed by anyone and thus is not a 'protected computer' within the meaning of the CFAA"); *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439 (N.D. Tex. 2004) (same).

ever have to visit Craigslist or Facebook," whereas hiQ's services "instead build on and are synergistic with, the services provided on LinkedIn." Mot. 20.  While hiQ's services are not, in fact, "synergistic" with LinkedIn, this is wholly irrelevant.  In none of these cases cited above did the courts' analysis turn on *why* the defendants sought to obtain unauthorized access, or what *kind* of services (complimentary or not) they might have offered.  And in fact, in these cases, the CFAA's protections applied even where the defendant sought to use scraped data to create a complimentary service that actually directed traffic *to* the plaintiff's website.  *See QVC*, 159 F. Supp. 3d at 581, 598 (defendants "direct[ed] web-users to products they seek on QVC's website").

Equally meritless is hiQ's argument that to "avoid … constitutional issues" under the First Amendment, the "Court should reject LinkedIn's overbroad read of the CFAA."  Mot. 21.  Putting aside that hiQ's free speech arguments are meritless, as discussed below (*infra* at 22), where, as here, the "statutory language" is "not ambiguous, the doctrine of constitutional avoidance is inapplicable." *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014) (doctrine "only applicable where a statute is 'genuinely susceptible to two constructions'"); *3Taps*, 964 F. Supp. 2d at 1186–87 (same).  As courts consistently have held, under its plain, unambiguous language, the CFAA covers publicly accessible data.  *See id.* at 1182-83 ("under the plain language of the statute, 3Taps was 'without authorization' when it continued to pull data off of Craigslist's website"); *Couponcabin*, 2016 WL 3181826, at *4 (relying on the "'ordinary and plain meaning' of 'authorization'" under statute).

Finally, hiQ vaguely argues that construing the CFAA in this manner "conflicts" with the Copyright Act.  Mot. 21-22.  This contention makes no sense, as "claims under the Copyright Act involve rights that are qualitatively different from those protected under the CFAA."  *Oracle Am., Inc. v. Serv. Key, LLC*, No. C 12-00790 SBA, 2012 WL 6019580, at *10 (N.D. Cal. Dec. 3, 2012).[12]

## B.   hiQ's Affirmative Claims Are Not Likely to Succeed

hiQ has only sought injunctive relief with respect to its *affirmative* claims.  *See* ECF No. 1. Thus, to obtain an injunction, it must show a likelihood of success on such claims.  It cannot.

---

[12] In particular, the CFAA has no requirement that any data or information obtained through unauthorized access be copyrighted at all.  *See NCMIC Fin. Corp. v. Artino*, 638 F. Supp. 2d 1042, 1058-59 (S.D. Iowa 2009) (in addition to CFAA claim, "where the information stolen is *also copyrighted*, the theft may implicate certain rights under the copyright laws" (emphasis added)).

1

2

**1.    hiQ's Claims Are Impermissibly Premised On Its Ability to Engage in Illegal Conduct and Are Preempted by the Supremacy Clause**

hiQ's state law affirmative claims are wholly improper because they are premised on its

ability to engage in the illegal conduct set forth above, and separately violate the Supremacy Clause.

hiQ's chief argument as to why the Court should "enjoin LinkedIn from denying hiQ"

access to LinkedIn's servers is that "LinkedIn's actions are anticompetitive" as they "prevent" hiQ

from being able to scrape LinkedIn member profile data for its own "data analytics."  Mot. 1.

Although hiQ's various anti-competition and related claims suffer from a number of fatal defects on

their own terms, *see infra* at 16-25, a pervasive, fundamental flaw to each of them is that hiQ is

arguing that LinkedIn is impermissibly restraining hiQ's ability to engage *in illegal conduct*, i.e., to

gain unauthorized access to LinkedIn's computer systems and thereby violate the CFAA, Section

502, and other laws.  Courts, however, have "long recognized that 'an action under the antitrust

laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained

by the defendant, was itself unlawful.'"  *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.,* 309 F.

Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) (Patel, J.) (collecting cases).

In *Modesto Irrigation*, the plaintiff alleged that the defendant, a utility company, violated the

Sherman Act and related provisions of California state law by attempting to prevent the plaintiff

from offering competing electricity services in Pittsburg, California.  *Id.* at 1158, 1162, 1170 n.27.

The plaintiff's attempt to offer such services without the prior approval of a local agency, however,

violated California Government Code section 56133.  *Id*. at 1166-69.   The court held that the

plaintiff's claims were "untenable at their core" as it "possessed neither the legal right nor the

necessary [local agency] permission to expand its services into Pittsburg."  *Id*. at 1170.  "Because

[plaintiff's] conduct was unlawful by its own terms," the defendant's "response—however anti-

competitive or seemingly monopolistic"—could not form the basis of any liability.  *Id.* at 1170; *see*

*also, e.g., RealNetworks, Inc. v. DVD Copy Control Ass'n*, 2010 WL 145098, at *6 (N.D. Cal. Jan. 8,

2010) (dismissing anti-competition claims where "Real's purported injury stems from its own

decision to manufacture and traffic in a device that is almost certainly illegal under the DMCA").[13]

---

[13] *See also Jenkins v. Greyhound Lines, Inc*., 1971 WL 529, at *1 (N.D. Cal. May 4, 1971) (same);

-14-

1   Likewise here, hiQ possesses no authorization and thus "no legal right" to access and scrape

2   the LinkedIn site.  hiQ's claims that LinkedIn has impermissibly restrained its ability to engage in

3   such illegal conduct are equally "untenable at their core."  This is all the more true because "courts

4   have consistently held in CFAA cases" that the "public interest weighs in favor of an injunction"

5   enjoining a party *from violating the CFAA.  Facebook, Inc. v. Power Ventures, Inc.*, 2017 WL

6   1650608, at *16 (N.D. Cal. May 2, 2017).  "The public has an interest in ensuring that *computers*

7   *are not accessed without authorization*." *Id.*  (emphasis added).  hiQ remarkably seeks to flip, and

8   subvert, that public interest by forcing LinkedIn to grant access, without authorization, to its

9   computer systems.  The Court should reject this unprecedented request.

10   Further, hiQ's reliance on its affirmative state-law claims to excuse its non-compliance with

11   the CFAA violates the Supremacy Clause.  hiQ argues that because LinkedIn's "violates numerous

12   common law, constitutional, and unfair competition" laws under *state* law, "[a]ny claim LinkedIn

13   could otherwise legally bring," including under the CFAA, is "void."  Mot. 19.  But as courts have

14   held, "pursuant to the Supremacy Clause, federal law trumps state … laws" that 'interfere with, or

15   are contrary to' it," and the "notion" that a party would not be subject to federal law because it

16   "would conflict with" state law "is a non-starter."  *Hewlett v. U.S. Bankr. Court*, 2007 WL 3232239,

17   at *1 (N.D. Cal. Oct. 31, 2007) (citation omitted).  "Reliance on state statutes to excuse non-

18   compliance with federal laws is simply unacceptable under the Supremacy Clause."  *Barber ex rel.*

19   *Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1233 (10th Cir. 2009).

20   ## 2.   The *Noerr-Pennington* Doctrine Bars All of hiQ's Claims

21   hiQ's claims also are barred by the *Noerr-Pennington* doctrine, which protects "the right of

22   the people . . . to petition the Government for a redress of grievances" by providing immunity from

23   liability for petitioning conduct.  *Sosa v. DirecTV, Inc.,* 437 F.3d 923, 929 (9th Cir. 2006) (quotation

24   marks omitted).  While *Noerr* was developed in response to antitrust claims, courts have expanded it

25   to other contexts.  *Id.* at 930.  In short, "*Noerr* immunity bars any claim, federal or state, common

26   law or statutory, that has as its gravamen constitutionally-protected petitioning activity."  *Gen–*

27
28   *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1050 n.8 (9th Cir. 2004) ("[E]ven if
[defendant] acted anti-competitively . . . , there is no injury" because "it could not have taken any . . .
customers absent affirmative action by the PUC").

-15-

1   *Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 956 (S.D. Cal. 1996).  The Ninth Circuit has held that

2   "[c]onduct incidental to a lawsuit, including a pre-suit demand letter, falls within the protection" of

3   *Noerr.  Theme Prom., Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 1007 (9th Cir. 2008).  Thus,

4   "presuit letters threatening legal action and making legal representations" are protected, unless the

5   "threatened litigation" is "so baseless" as to be a "sham."  *Sosa,* 437 F.3d at 940.

6          Here, hiQ's affirmative claims are barred in their entirety by *Noerr-Pennington* because all

7   have as their gravamen protected petitioning activity— LinkedIn's threat in its letter to pursue its

8   valid claims against hiQ unless hiQ ceased its unauthorized access to LinkedIn's servers.  As the

9   TRO Motion states in its introduction, LinkedIn has "threatened to sue hiQ" under "federal and state

10  laws pertaining to hacking and unauthorized computer and network access," and goes on to attack

11  "LinkedIn's reliance on laws" as "a sword to prevent legitimate competition."  Mot. 2, 3.  Further,

12  the Motion squarely identifies the letter as the basis for LinkedIn's denial of authorization; it has a

13  section heading entitled LinkedIn's "CEASE AND DESIST LETTER REVOKING ACCESS TO

14  PUBLIC PROFILES."  Mot. 6.  Thus, hiQ is squarely complaining about LinkedIn's threats to

15  enforce its valid rights under the law.  This is core protected petitioning activity under *Noerr.*

16         Nor are LinkedIn's threatened claims an "objectively baseless" sham.  *Prof'l Real Estate*

17  *Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993).  Indeed, they are supported

18  by well-settled binding precedent, as discussed.  *Supra* at 8-13.  Accordingly, hiQ's claims are not

19  likely to succeed as they are bared by *Noerr-Pennington*.  *See, e.g., UMG Recordings, Inc. v. Glob.*

20  *Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1113–15 (C.D. Cal. 2015) ("any claim based on the cease-

21  and-desist letter lacks facial plausibility, and must be dismissed" under *Noerr*).

22              **3.        hiQ's Claims Fail on their Own Terms**

23         Even aside from these fundamental and insurmountable defects, hiQ's affirmative claims fail

24  on their own terms.  hiQ does not come close to satisfying the elements of such claims.

25              **(a)        hiQ's Tortious Interference Claims Are Without Merit**

26         hiQ cannot shield its own misconduct by accusing LinkedIn of tortious interference with

27  hiQ's contracts or prospective economic interests.  Such claims fail because LinkedIn's efforts to

28  enforce its own legitimate business interests do not give rise to liability under a tortious interference

theory.  The California Supreme Court expressly adopted this rule in *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 57 (1998), concluding that a tortious interference with contract claim must fail if a defendant acted with a "legitimate business purpose which justified its actions."  Thus, where a party has "a prior contract of his own . . . he is privileged to prevent performance of the contract of another which threatens it," and may "demand compliance with the essential terms" of his contract.  *Richardson v. La Rancherita La Jolla, Inc.*, 98 Cal. App.3d 73, 81 (1979); *see also Dollar Tree Stores Inc. v. Toyama Partners, LLC*, 2010 WL 1688583, at *3-4 (N.D. Cal. Apr. 26, 2010) (where claim alleged that defendant lender tortiously interfered with plaintiff's interest in leasing retail space from landlord when defendant cut off funding the landlord for construction of mall, holding that defendant had "a legitimate business purpose" in enforcing terms of its lending agreement and was "justified in discontinuing the loan," despite the effect on plaintiff).

Here, LinkedIn is "privileged to prevent" hiQ's misconduct by restricting data scraping from LinkedIn's site.  *Richardson*, 98 Cal. App. 3d at 81.  LinkedIn has a legitimate business interest in protecting its members' data and preventing scraping, and enforcing its valid rights under federal and state law and its User Agreement.  These interests foreclose hiQ's tortious interference claims.

Further, hiQ's illegal conduct precludes its tort claims because only *lawful* contracts are entitled to the protection of the courts when wrongfully disrupted.  *See Renaissance Realty v. Soriano*, 174 Cal. Rptr. 837, 839 (1981).  hiQ's scraping data from the LinkedIn site violates federal and state law, so any contracts hiQ may have to sell this illegally obtained data are "tainted with illegality."  *Marathon Entm't, Inc. v. Blasi*, 42 Cal. 4th 974, 996 (2008).  An illegal contract is "dead from the start" and thereby "nullifies [any] interference claim at the threshold."  *In re R2D2, LLC*, No. CV 13-3799 PSG, 2014 WL 12589668, at *8 (C.D. Cal. Jan. 9, 2014).  This includes contracts to sell illicitly-obtained property.  *See Hartman v. Harris*, 810 F. Supp. 82, 85 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993) (voiding sale contract under California law where "sculpture had been stolen"); *cf. Yoo v. Jho*, 147 Cal. App. 4th 1249, 1255 (2007) (where business "substantially involved in the sale of counterfeit goods," the "object of the business purchase agreement" was "illegal").  A prospective interest in future illegal contracts, too, is void.  *See Rock River Commc'ns, Inc. v. Universal Music Gp., Inc.*, 745 F.3d 343, 349 (9th Cir. 2014).

-17-

**(b)      hiQ's UCL Claim Is Without Merit**

hiQ's various antitrust theories under the UCL also fail.  hiQ's "unfairness" arguments are not only so ill-defined and speculative as to not even pass the most basic requirements of an antitrust claim, but courts consistently have rejected the very type of theories hiQ espouses.

hiQ argues that LinkedIn is "leveraging its power in the professional networking market to secure an anticompetitive advantage in another market—the data analytics market."  Mot. 12.  This claim fails right out the gate because the Ninth Circuit has expressly "reject[ed]" a "monopoly leveraging doctrine as an independent theory of liability."  *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir. 1991); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) ("disagree[ing]" that plaintiff "might state a claim under a 'monopoly leveraging' theory").  Moreover, hiQ has nowhere *even defined* either of these markets, much less established LinkedIn's "power" within either of them.  *See, e.g., Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1063-64 (9th Cir. 2001) (affirming dismissal where plaintiff failed to "appropriately define[]" markets and failed to allege defendant's conduct had "significant anticompetitive effects within a relevant market, however defined"); *E & E Co., Ltd. v. Kam Hing Enters., Inc.*, 2008 WL 3916256, at *3 (N.D. Cal. Aug. 25, 2008) (same).[14]

hiQ also argues that LinkedIn's "member database" is an "essential facility."  Mot. 13.  This is an extraordinary claim.  hiQ is arguing that if a company (unlawfully) designs a product to be built around a successful Internet platform like LinkedIn, the platform must allow access to the company because otherwise it is denying an essential facility.  Not surprisingly, this theory has no support in the law.  First, any such claim would fail at the outset because "[m]onopoly control of the upstream market is a necessary element of essential facility" claims, *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 545 n.12 (9th Cir. 1991), and as noted, hiQ fails to define the "professional networking market," much less establish LinkedIn's market power within it.

---

[14] At any rate, hiQ cannot establish LinkedIn's power in the "professional networking market." LinkedIn is hardly the only participant in the market for professional networking services, and competitors such as Facebook also have a wealth of similar professional data on their sites, including information about job title, skills, education, and job descriptions.  Rosin Decl ¶ 10.  Based on prospective ad audience sizes, Facebook appears to have comparable amounts of professional data. Blavin Decl. ¶ 15; *id.* ¶ 9.  Nor has hiQ come close to establishing that LinkedIn has a "'dangerous probability of success' in monopolizing" the "data analytics market."  *Trinko*, 540 U.S. at 415 n.4.

-18-

1    Further, hiQ ignores that the "threshold for finding a facility 'essential' in the Ninth Circuit

2    is high: 'A facility that is controlled by a single firm will be considered 'essential' only if control of

3    the facility carries with it the power to eliminate competition in the downstream market.'"

4    *Kinderstart.com LLC v. Google, Inc.,* 2006 WL 3246596, at *9 (N.D. Cal. July 13, 2006) (quoting

5    *Alaska Airlines,* 948 F.2d at 544).  While not providing any market definition, hiQ states that the

6    downstream market is the "data analytics market."  Mot. 12.  hiQ nowhere explains how any

7    control LinkedIn has over its servers can eliminate competition in the "data analytics market"—

8    which has been defined to be a $130 billion dollar market that is expected to grow to more than

9    $203 billion in 2020.  Blavin Decl., Ex. H at 3.  In fact, as the declaration of hiQ's CEO makes

10   clear, hiQ only claims that "*hiQ's entire business* depends on being able to access public LinkedIn

11   member profiles."  Weidick Decl. ¶ 17 (emphasis added).  That hiQ may have built a business

12   (again, illegally) entirely dependent on LinkedIn data is irrelevant—the question is whether there is

13   "actual harm to competition" in the downstream market, "not just injury to plaintiff."  *ESS Tech.,*

14   *Inc. v. PC-Tel, Inc.*, 1999 WL 33520483, at *3 (N.D. Cal. Nov. 4, 1999) (dismissing essential

15   facilities claim).  As set forth above, several people analytic firms (such as Glint) obtain alternative

16   data inputs, other than by scraping LinkedIn, and provide competitive offerings.  *Supra* at 6.  The

17   availability of substitutes "from other servicers" further shows hiQ cannot prove that LinkedIn is an

18   essential facility.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016).

19       At any rate, courts consistently have rejected the very types of antitrust theories hiQ now

20   advances.  In *Power Ventures*, the defendants asserted antitrust counterclaims similarly alleging that

21   Facebook has "'maintained its monopoly power by systematically threatening new entrants, such as

22   Power.com and others'" to "'discourage market entry and to stifle competition.'"  *Facebook, Inc. v.*

23   *Power Ventures, Inc.*, 2010 WL 3291750, at *13 (N.D. Cal. July 20, 2010) (citation omitted).  In

24   dismissing this claim, the court held that "Defendants cite no authority for the proposition that

25   Facebook is somehow obligated to allow third-party websites unfettered access to its own website,"

26   and that "[i]f Facebook has the right to manage access to and use of its website, then there can be

27   nothing anticompetitive about taking legal action to enforce that right," *id.* at *13-14.

28       Similarly, in *Blizzard Entertainment Inc. v. Ceiling Fan Software LLC*, 941 F. Supp. 2d 1227

-19-

1   (C.D. Cal. 2013), Blizzard, the developer of the online computer role-playing game World of

2   Warcraft ("WoW") brought suit against the defendants for their sale of unauthorized software bots

3   that accessed and simulated participation in the game.  The defendants counterclaimed, alleging,

4   *inter alia*, that requiring users to comply with Blizzard's terms of use, disabling the bots through

5   software updates, and threatening to sue and selectively suing entities that sold the bots, violated the

6   Sherman Act.  *Id*. at 1230.  The court dismissed the claims, holding that "Blizzard is entitled to

7   condition the use of WoW" on the "restrictions" set forth in its terms of use, and that its "authority"

8   to "use 'technological barriers' and software updates used to restrict or disable third-party software

9   is derived from its [terms], and amounts to no more than policing the restrictions."  *Id*. at 1236, 1237

10  n.8.; *see also Sambreel Holdings LLC v. Facebook, Inc.,* 906 F. Supp. 2d 1070, 1079 (S.D. Cal.

11  2012) (dismissing antitrust claims and holding that the "allegations here at most demonstrate that

12  Facebook has taken action to control the content of its own website").

13          As in these cases, LinkedIn's enforcement of its right to protect against unauthorized access

14  to and scraping of its servers is not subject to antitrust liability.

15                      **(c)     hiQ's Promissory Estoppel Claim Is Without Merit**

16          hiQ fails to present even a plausible—much less likely to succeed—theory of promissory

17  estoppel.  LinkedIn made no promises to hiQ and did not grant hiQ permission to violate the express

18  terms of LinkedIn's User Agreement barring scraping from LinkedIn's servers.

19          Promissory estoppel is a disfavored doctrine that demands a promise so clear and

20  unambiguous that it may be enforced despite no consideration.  *Landberg v. Landberg*, 24 Cal. App.

21  3d 742, 758-59 (1972) ("Estoppel is not favored").  "[T]he promise must 'be as clear and well

22  defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to

23  a traditional contract supported by consideration.'"  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108 (9th

24  Cir. 2009).  "[A] promise that is vague, general or of indeterminate application is not enforceable."

25  *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 446 (9th Cir. 1992).

26          As an initial matter, promissory estoppel is not a viable cause of action where there is an

27  explicit contract governing the same subject matter, unless the party asserting it is claiming the

28  promise concerns a modification to the contract.  *See Horne v. Harley-Davidson, Inc.*, 660 F. Supp.

-20-

2d 1152, 1163 (C.D. Cal. 2009) ("Plaintiffs cannot state a cause of action for promissory estoppel because a valid contract, supported by consideration, governs the same subject matter as the alleged promise."). Here, LinkedIn has a contract with hiQ: the User Agreement, which explicitly *prohibits* automated access and data scraping. hiQ would need to demonstrate that LinkedIn made a clear and definite promise to modify the agreement to the contrary, something it has not come close to doing.

LinkedIn made no promises to hiQ beyond the promises in its User Agreement, nor does hiQ identify any. Far from entering a clear promise allowing hiQ to scrape LinkedIn member data, LinkedIn repeatedly publicized that *no scraping* is permissible. *See supra* at 5. LinkedIn's public lawsuits against data scrapers further show that LinkedIn does not consent to data scraping of member profiles. *See* Blavin Decl. ¶¶ 11-13. hiQ's claim that the User Agreement somehow is not binding on it is entirely beside the point. Whether or not the User Agreement is binding on hiQ (which it is), its terms prove that LinkedIn did not, and would not, make the promise hiQ claims.

Unable to identify any promise by LinkedIn *to hiQ*, hiQ claims that LinkedIn's feature allowing members to set their profiles to "public" must be construed as somehow promising hiQ an unfettered right to scrape data from LinkedIn's site. Mot. 15. This is nonsense, and would impose the type of "vague, general or [] indeterminate application" forbidden by the Ninth Circuit. *See Aguilar*, 966 F.2d at 446 (internal quotation marks omitted). hiQ's additional evidence of a purported promise fares no better, including its arguments that (1) a handful of LinkedIn's thousands of employees attended a conference sponsored by hiQ and (2) LinkedIn allows certain search engines like Google and Bing to index its website.[15] These activities amount to standard business conduct and engagement with *others*, not evidence of a clear and unambiguous promise *to hiQ*. *See, e.g.*, *R. N. Beach, Inc. v. Country Visions, Inc.*, 2016 WL 1682046, at *6 (E.D. Cal. Apr. 27, 2016) (claim that "the Defendants 'represented' something to Plaintiff through their 'conduct' is

---

[15] As discussed, LinkedIn expressly permits certain search engines to crawl and index its website (and lets its members opt out of this feature, *see* Rockwell Decl. ¶ 21 & Ex. C at 6), but that is not inconsistent with its denial of access to hiQ. By indexing LinkedIn's site, search engines are providing a service to LinkedIn's members by making their professional identities more visible. Courts have held that permitting search engines to crawl and index a website is not inconsistent with prohibiting others from scraping the site. *See QVC*, 159 F. Supp. 3d at 596 ("The fact that QVC allowed certain entities, such as Google, to crawl its [site] does not preclude and is not inconsistent with an argument that QVC specifically prohibited [others] from crawling its webpage.").

1    insufficient to show an 'unequivocal promise.'").

2                    **(d)    hiQ's Free Speech Claim Is Without Merit**

3          hiQ argues that the LinkedIn website is a "public forum" like the shopping center at issue in

4    *Pruneyard*, and that prohibiting hiQ from accessing and scraping LinkedIn member data violates

5    Article One of the California Constitution and raises "constitutional questions" under the First

6    Amendment.  Mot. 15-16, 20.[16]  hiQ even goes on to claim that a "ban limited to automated access

7    by hiQ would be unconstitutional" (Mot. 21 n.8)—in other words, hiQ is asserting a constitutional

8    right to use automated technologies to scrape hundreds of thousands of user profiles, circumvent

9    technical measures put in place to protect LinkedIn member data, and upset established federal and

10   state law.  Not surprisingly, this breathtaking claim fails for multiple independent reasons.

11         *First*, hiQ is not challenging any restriction imposed *on speech* on LinkedIn (or elsewhere),

12   but is rather claiming a "right of access" to carry out "information-gathering," i.e., to scrape

13   LinkedIn's servers.  Mot. 15.  The ability to engage in speech was critical in *Pruneyard*, where the

14   plaintiff challenged a direct restriction on "public expressive activity" at a shopping mall.  23 Cal. 3d

15   899, 910 (1979).  *Pruneyard* and its progeny have nothing to say about any claimed "right" to access

16   privately held computers, without authorization, through automated scraping technologies.

17         In fact, the Supreme Court has directly rejected hiQ's theory, holding that a restriction to

18   prevent unlawful trespass—even one that prevents access to a public forum—does not implicate

19   free speech rights at all.  In *Virginia v. Hicks*, 539 U.S. 113 (2003), the Court held, unanimously,

20   that "[e]ven assuming the streets of [a property] are a public forum," a law that "subjects to arrest

21   those who reenter after trespassing and after being warned not to return—*regardless* of whether,

---

22   [16] While hiQ at times conflates the California Constitution and U.S. Constitution in its papers, it has
23   only asserted a claim under the former.  As explained, the Court need not reach the merits of this
     claim because it is preempted by the CFAA.  *See supra* at 15; *United States v. Spencer*, 160 F.3d
24   413, 414 (7th Cir. 1998) ("state constitutional provisions" cannot "override otherwise lawful federal
     statutes").  In addition, as hiQ knows, it *cannot* bring a claim under the U.S. Constitution, because
25   LinkedIn is not a state actor.  As courts have held in similar contexts, "Yahoo! correctly contends
     that because it is not a state actor, it cannot be held liable under the First Amendment for
26   suppressing speech.  [The] response that Yahoo!'s services should be seen as a 'public forum' in
     which the guarantees of the First Amendment apply is not tenable under federal law.  As a private
27   actor, Yahoo! has every right to control the content of material on its servers, and appearing on
     websites that it hosts."  *Buza v. Yahoo!, Inc.*, 2011 WL 5041174, at *1 (N.D. Cal. Oct. 24, 2011)
28   (citing *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976)).  The same is true for LinkedIn.

-22-

1  upon their return, they seek to engage in speech" does not have "anything to do with the First

2  Amendment." *Id.* at 122.  This "no more implicates the First Amendment than would the

3  punishment of a person who has (pursuant to lawful regulation) been banned from a public park

4  after vandalizing it, and who ignores the ban in order to take part in a political demonstration"—"as

5  there, it is [his] nonexpressive *conduct*—his entry in violation of the [rule]—not his speech, for

6  which he is punished as a trespasser." *Id.*  Similarly, the court in *3Taps* rejected the defendant's

7  argument that the CFAA's "application" to Craigslist's public pages "'raises serious First

8  Amendment'" issues, noting that the "enforcement of limits on the use of private property is

9  common."  964 F. Supp. 2d at 1186 n.8.

10        No different here, LinkedIn's efforts to prevent hiQ from circumventing its technical

11  barriers, disregarding its cease-and-letter, and accessing the LinkedIn website through automated

12  bots to scrape data from hundreds of thousands of member profiles, is not a ban on any protected

13  expressive acts; rather, it is an effort to stop hiQ's unauthorized and unlawful entry to LinkedIn—as

14  in *Hicks*, to prevent hiQ from trespassing.  *See Power Ventures*, 844 F.3d at 1065 ("CFAA prohibits

15  acts of computer trespass").  And unlike *Hicks*, hiQ does not seek to engage in expressive activity

16  on LinkedIn but to continue to access and scrape LinkedIn through automated bots, making its

17  theory even more baseless.

18        *Second*, hiQ's claim fails because private actors are "'not privileged to commit crimes and

19  independent torts in gathering'" data under the guise of freedom of speech.  *Lieberman v. KCOP*

20  *Television, Inc.*, 110 Cal. App. 4th 156, 166-67 (2003) (citation omitted).  In *Lieberman*, a television

21  station secretly recorded two conversations with Lieberman and then published the recordings.

22  Lieberman brought suit for violation of Penal Code Section 632, which prohibits recording

23  conversations without consent.  The court held that while the station's *publication* of the recordings

24  might be subject to constitutional protection, the data gathering operation that violated the law was

25  not: "'the First Amendment does not immunize the press from liability for torts or crimes committed

26  in an effort to gather news.'"  *Id.* at 169-70.  The court cited to and relied on *Zemel v. Rusk*, 381 U.S.

27  1 (1965), which cautioned that "[t]here are few restrictions on action which could not be clothed by

28  ingenious argument in the garb of decreased data flow," but that "[t]he right to speak and publish

-23-

does not carry with it the unrestrained right to gather information." *Id.* at 16-17.  Here, hiQ's plain

violation of law federal and state law cannot be sanctified under the guise of free speech.[17]

hiQ relies on the Supreme Court's recent decision in *Packingham v. North Carolina*, No. 15-1194, 2017 WL 2621313 (U.S. June 19, 2017), but that case has no relevance here.  There, the Court struck down a North Carolina law under the First Amendment that categorically banned *all* registered sex offenders from "access[ing] a commercial social networking Web site," which the Court held was a "complete bar to the exercise of First Amendment rights on websites" as to this group, as its "sweeping" nature was not "necessary or legitimate to serve" the purpose of "keeping convicted sex offenders away from vulnerable victims." *Id.* at *3, 7.

Putting aside the fact that unlike North Carolina, LinkedIn is not a state actor subject to the First Amendment, the restriction at issue in *Packingham* is far different than the action LinkedIn has taken here.  There, the state law imposed a preemptive ban on an entire category of users, regardless of their prior conduct at the forum.  By contrast, LinkedIn grants any party access to its site, so long as it respects the basic rules of access: abiding by its User Agreement and Privacy Policy, including its prohibitions on access via automated scraping technologies.[18]  After hiQ failed to abide by these basic rules, LinkedIn took action to enforce its rights as to this single entity.  Indeed, *Packingham* acknowledged that "[s]pecific criminal acts are not protected speech," and that "the First Amendment permits a State to enact specific, narrowly tailored laws," like prohibiting a sex offender from "using a website to gather information about a minor." *Id.* at *6.  No different here, hiQ is engaged in a specific unauthorized act—accessing LinkedIn's servers through automated scraping

---

[17] *Sorrell v. IMS Health Inc.* (Mot. 15 n.5) did not disturb—or even cite to—*Zemel* and does not help hiQ.  The statute at issue there was aimed at "the sale, disclosure, and use of pharmacy records," and thus "prohibiting a speaker from *conveying information that the speaker already possesses*" and seeks to distribute, not accessing a website or data in an illegal way.  564 U.S. 552, 567-68 (2011) (emphasis added).  As courts have held, "*Sorrell* … did not involve obtaining the information through illegal means," and there the "provider of information was aware, and willing" to distribute it.  *W. Watersheds Project v. Michael*, 196 F. Supp. 3d 1231, 1241 n.9 (D. Wyo. 2016).  Thus, *Sorrell* is inapplicable where, as is the case here, "until such permission or authorization is obtained, [the parties] are not a willing provider of the information Plaintiffs' seek." *Id.*

[18] Even *Pruneyard reaffirmed* that owners of private property may place "time, place, and manner rules" on speech on their property.  23 Cal. 3d at 910.  Although hiQ's conduct does not involve expressive activity, certainly if LinkedIn can place reasonable restrictions on speech, it can, consistent with the CFAA and state law, place reasonable restrictions on access.

-24-

1    bots—not engaging in protected speech, and LinkedIn took lawful measures to protect itself.[19]

2    **V.     HIQ HAS NOT ESTABLISHED IRREPARABLE HARM**

3           hiQ claims that it will need to "shutter its operations" if the TRO is not granted.  Mot. 24.

4    hiQ, however, cannot complain of any harm stemming from its inability to engage in an illegal

5    business.  *See, e.g., Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (parties

6    "cannot complain of the harm that will befall [them] when properly forced to desist from [their]

7    infringing activities"); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009)

8    (defendant "does not (and cannot) claim any *legitimate* hardships as a result of being enjoined from

9    committing unlawful activities").  Moreover, hiQ ignores the possibility of pivoting its business to

10   one that is legal and relies on data from other sources, like Glint (and which could attract additional

11   customers and/or funding), nor does it indicate that it would need to close its business *imminently*.

12   *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

13   **VI.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR LINKEDIN**

14          As noted, hiQ can claim no credible injury from being restricted from engaging in unlawful

15   conduct.  *See Power Ventures*, 2017 WL 1650608, at *15 ("restriction" that defendants cannot

16   "us[e] Facebook for commercial purposes" is "warranted to prevent future violations of the law").

17   By contrast, if hiQ is allowed to scrape LinkedIn's servers, LinkedIn and its members not only will

18   be harmed by hiQ, but by other malicious actors who view hiQ's challenge as invitation to do the

19   same.  *See id.* at *15 ("Facebook would suffer significant hardship" if "Defendants will engage in

20   similar conduct in the future"); *Guthy-Renker Corp. v. Evolution Skin Therapy, LLC*, 2008 WL

21   5479112, at *3 (C.D. Cal. Dec. 16, 2008) ("To impose on the infringer nothing more serious than an

22   injunction when he is caught is tacit invitation to other infringement.") (quotation marks omitted).

23   Finally, as noted above, the public interest favors LinkedIn as the "public has an interest in ensuring

24   that computers are not accessed without authorization." *Power Ventures*, 2017 WL 1650608, at *16.

25   **VII.   CONCLUSION**

26          For the foregoing reasons, the Court should deny hiQ's motion for a TRO.

27

28   [19] hiQ also ignores that unlike *Packingham*, it is engaged in purely commercial speech, which is
     afforded "less protection."  *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 64 (1983).

-25-

1   DATED:  June 26, 2017                    MUNGER, TOLLES & OLSON LLP

2

3

4                                    By:   */s/ Jonathan H. Blavin*
                                          JONATHAN H. BLAVIN
5
                                          Attorneys for Defendant Linkedin Corporation
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-26-