C. Brandon Wisoff (State Bar No. 121930)
bwisoff@fbm.com
Deepak Gupta (State Bar No. 226991)
dgupta@fbm.com
Jeffrey G. Lau (State Bar No. 281629)
jlau@fbm.com
Rebecca H. Stephens (State Bar No. 299234)
rstephens@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Laurence H. Tribe* (State Bar No. 39441)
Carl M. Loeb University Professor and
Professor of Constitutional Law
Harvard Law School
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-1767
*Admitted pro hac vice*

Attorneys for Plaintiff hiQ Labs, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.<br><br>       Plaintiff,<br><br>  vs.<br><br>LinkedIn, Corp.,<br><br>       Defendant. | Case No. 3:17-cv-03301-EMC<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>The Hon. Edward M. Chen<br><br>Hearing Date: June 29, 2017<br>Time: 1:30 P.M.<br>Location: Courtroom 5, 17th Floor<br>450 Golden Gate Ave.<br>San Francisco, CA 94102 |

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

34556\6079930.5

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY ..................................................................................1

II. HIQ HAS SATISFIED ITS BURDEN FOR OBTAINING TEMPORARY RELIEF ..............4

III. THE CFAA AND CALIFORNIA PENAL CODE DO NOT GIVE LINKEDIN THE PLENARY POWER TO REVOKE ACCESS TO PUBLIC PAGES AT WILL ......................7

    A. The CFAA does not give service providers plenary power to revoke access for an improper purpose in defiance of state law under the Supremacy Clause or otherwise. ........................................................................................................7

    B. None of the cases cited by LinkedIn raised the legal issues or supporting facts presented here. ..........................................................................................................8

IV. LINKEDIN FAILS TO MEANINGFULLY ADDRESS THE SERIOUS CONSTITUTIONAL CONCERNS WITH ITS OVERBROAD INTERPRETATION OF THE CFAA AND CALIFORNIA PENAL CODE .................................................................9

    A. hiQ's Challenge Under the U.S. Constitution is Likely to Succeed ............................9

    B. hiQ's California Free Speech Claim is Likely to Succeed. .......................................10

V. HIQ HAS ALSO SHOWN THAT IT IS LIKELY TO SUCCEED ON ITS AFFIRMATIVE CLAIMS ...........................................................................................................11

    A. hiQ's Tortious Interference Claim is Likely to Succeed. ..........................................11

    B. hiQ's Unfair Competition Claim is Likely to Succeed. ............................................12

    C. hiQ's Promissory Estoppel Claim is Likely to Succeed. ..........................................13

    D. The *Noerr-Pennington* Doctrine Does Not Shield The Private Acts Committed By LinkedIn Simply Because LinkedIn May Have Sought Legal Recourse If HiQ Had Not Complied. .....................................................................14

VI. LINKEDIN'S PURPORTED CONCERN ABOUT MEMBER PRIVACY IS FRIVOLOUS .................................................................................................................14

VII. CONCLUSION ..................................................................................................................15

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

i

34556\6079930.5

# TABLE OF AUTHORITIES

Page

**Federal Court Cases**

*Aliance for the Wild Rockies v. Cottrell*
  632 F.3d 1127 (9th Cir. 2011) .................................................................................... 4, 5

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
  486 U.S. 492 (1988) ....................................................................................................... 14

*American Passage Media Corp., v. Cass Communications, Inc.,*
  750 F.2d 1470 (9th Cir. 1985) ........................................................................................ 5

*Authors Guild v. Google, Inc.,*
  804 F. 3d 202 (2d Cir. 2015) .......................................................................................... 2

*Cobine v. City of Eureka,*
  No. C 16-02239 JSW, 2016 WL 1730084 (N.D. Cal. May 2, 2016) ............................. 5

*Couponcabin LLC v. Savings.com, Inc.,*
  2016 WL 3181826 (N.D. Ind. June 8, 2016) ................................................................. 8

*Craigslist Inc. v. 3Taps Inc.,*
  964 F. Supp. 2d 1178 (N.D. Cal. 2013) ..................................................................... 8, 9

*E&E Co., Ltd. v. Kam Hing Enterprises, Inc.,*
  No. C-08-0871 MMC, 2008 WL 3916256 (N.D. Cal. Aug. 25, 2008) ......................... 12

*eBay Inc. v. Digital Point Solutions, Inc.,*
  608 F. Supp. 2d 1156 (N.D. Cal. 2009) ......................................................................... 8

*Facebook, Inc. v. Power Ventures, Inc.,*
  844 F.3d 1058 (9th Cir. 2016) ........................................................................................ 8

*Florida Lime & Avocado Growers v. Paul,*
  373 U.S. 132 (1963) ................................................................................................. 8, 10

*Freedom Holdings v. Spitzer,*
  408 F.3d 112 (2d. Cir. 2005) .......................................................................................... 5

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,*
  415 U.S. 423 (1974) ....................................................................................................... 4

*Habeas Corpus Resource Center v. United States Department of Justice,*
  No. C-08-2649 CW, 2009 WL 185423 (N.D. Cal. 2009) .............................................. 5

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) .......................................................................................... 2

*Lewis v. U.S. Bank National Association,*
  No. 16-cv-05490-JSW, 2016 WL 5662030 (N.D. Cal. Sep. 28, 2016) ......................... 5

*LVRC Holdings LLC v. Brekka,*
  581 F.3d 1127 (9th Cir. 2009) ........................................................................................ 7

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

ii

34556\6079930.5

| | |
|---|---|
| *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081 (7th Cir. 1983) | 12 |
| *Pappas v. Naked Juice Co of Glendora, Inc.*, No. CV-11-8276-JAK (PLAx), 2012 WL 12885109, at *4 (C.D. Cal. Dec. 5, 2012) | 15 |
| *Patino v. Franklin Credit Management Corp.*, No. 16-cv-02695-LB, 2017 WL 1246853 (N.D. Cal. Apr. 5, 2017) | 4 |
| *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) | 2 |
| *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576 (E.D. Pa. 2016) | 8 |
| *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) | 7 |
| *Satmodo, LLC v. Whenever Commc'ns, LLC*, 2017 WL 1365839 (S.D. Cal. Apr. 14, 2017) | 8 |
| *Save Strawberry Canyon v. Department of Energy*, No. C 08-03494-WHA, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009) | 5 |
| *Sencion v. Saxon Mortg. Services, LLC*, No. 10-cv-3108 JF, 2011 WL 1364007 (N.D. Cal. Apr. 11, 2011) | 5 |
| *Shippers v. Fontenot*, No. 13CV1349 JLS(MDD), 2013 WL 12092056 (S.D. Cal. Sep. 23, 2013) | 5 |
| *Sorrell v. IMS Health*, 564 U.S. 552 (2011) | 11 |
| *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435 (N.D. Tex. 2004) | 8 |
| *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) | 8 |
| *Virginia v. Hicks*, 539 U.S. 113 (2003) | 10 |
| *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) | 4, 5 |

**State Court Cases**

| | |
|---|---|
| *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163 (1999) | 12 |
| *Moreno v. Hanford Sentinel, Inc.*, 172 Cal.App.4th 1125 (2009) | 15 |
| *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (1998) | 12 |

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

iii

34556\6079930.5

*Richardson v. La Rancherita,*
  98 Cal.App.3d 73 (1979) ............................................................................................... 12

**Federal Statutory Authorities**

17 U.S.C. § 106(a) ............................................................................................................. 10

**State Statutory Authorities**

Cal. Penal Code § 502 ................................................................................................... 9, 10

**Additional Authorities**

Tribe, Laurence, American Constitutional Law (3d ed. 2000),
  §§ 6-28 through 6-31, pp. 1172-1212 ............................................................................. 7

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

iv

34556\6079930.5

## I. INTRODUCTION AND SUMMARY

LinkedIn's Opposition rests on the faulty premise that hiQ's accessing and copying of admittedly public (and non-copyrightable) raw data is "a crime" because the CFAA and California Penal Code supposedly give LinkedIn an *unfettered* right to deny access to that data for any purpose, even a purpose that violates independent law. None of LinkedIn's cases even suggested, let alone held, that a website owner can use those anti-hacking statutes to restrict access to non-proprietary, public information for an otherwise unlawful purpose. Far from hiQ's request being "unprecedented," it is LinkedIn's position that exceeds all reasonable bounds: If LinkedIn were correct, it could with impunity use those criminal statutes to bar access to anyone based on race, religion, political views, or other discriminatory purpose. There is no "conflict" between the CFAA and California law that would cause the CFAA to trump hiQ's state law claims under the Supremacy Clause. To the contrary, LinkedIn simply invents a fiction – without support in the text of the CFAA – that the statute somehow gives LinkedIn an unlimited right to deny access to purely public data *even for an unlawful purpose*. Using that false fulcrum, LinkedIn then leverages its other overbroad arguments. Moreover, California's Penal Code could not – consistent with California's Constitution – criminalize activity that the California Supreme Court in *Pruneyard* declared as protected.

hiQ has presented evidence of LinkedIn's improper anticompetitive purpose; tellingly, LinkedIn is silent in the face of that direct accusation. LinkedIn submitted numerous declarations but not one of them denies that LinkedIn is now using the same public profile information to compete with hiQ's SkillMapper offering. LinkedIn does not even address its CEO's 2015 earnings call confirming that LinkedIn intends to sell to employers its analysis of employee public profile data. Indeed, the accompanying national television interview of LinkedIn's CEO confirms that LinkedIn is analyzing both individual and aggregate level data and selling the results to employers – the very "evil" of which it accuses hiQ. None of LinkedIn's declarants deny that the termination decision was motivated at least in part to deny hiQ competitive access to the public data that LinkedIn and others are still using.

To deflect attention from this improper motive, LinkedIn offers justifications for its actions that raise more questions than they answer. First, LinkedIn pejoratively labels hiQ a "scraper" and says that what hiQ is doing is a "crime." LinkedIn's brief uses the word "scraping" or its variants *84*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

1

34556\6079930.5

*times*. But copying data in the public sphere has never been a crime and indeed it is the foundation of progress in every human endeavor: taking what is known, analyzing it and using it to create new products, services and solutions. What LinkedIn calls "scraping" is the only way to make sense of the vast amount of information on the Internet. Webcrawlers starting with Alta Vista and Excite, to Google and Bing (owned by LinkedIn's own parent company Microsoft) have analyzed vast amounts of public information on virtually every website, making it meaningfully accessible at users' fingertips. Courts have accordingly held that "scraping" is fair use in numerous cases. *See*, *e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007), *and Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003). Transformative use of copyrighted works on a massive scale in the digital context was recently considered and found to be fair use in the "Google Books" case. *Authors Guild v. Google, Inc.*, 804 F. 3d 202 (2d Cir. 2015). LinkedIn tellingly makes no copyright claim, and does not even mention these cases, to avoid the elephant in the room of fair use. Instead LinkedIn makes the demonstrably false statement that "hiQ does not cite a single case holding that a company cannot regulate access to its own computer systems…." (Dkt. 31 at 1). hiQ's cases, however, stand for the proposition that even information on a copyright owner's servers must cede to the rights of the public to copy and use that information in a transformative way. Ironically, unlike in the above cases, LinkedIn does not, and cannot, even claim a copyright interest in the disputed data.[1]

LinkedIn seeks an end run around the limits of copyright and unfair competition law based solely on the fact that data in which it has no proprietary interest resides on its servers. But, of course, the data only resides there because of LinkedIn's promise that it would be public. And just as someone can photograph (copy) information or events that are displayed in open places and not subject to copyright, nothing should prevent one in the internet context from recording (copying) information that is not subject to copyright and is publicly displayed to anyone with an internet connection. In the former, the collector – while standing on his own or public property – uses photons of light to copy an image with no physical trespass onto private property. In the latter, the collector – standing on his own or public property – uses packets of electrons to digitally image information with

---

[1] Indeed, LinkedIn has tellingly abandoned any arguments about the Digital Millennium Copyright Act ("DMCA") violations asserted in its cease and desist letter.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

2

34556\6079930.5

no physical trespass onto private property. In both examples, the photons and electrons belong to no one and the information being copied is available for all the world to see.[2]

Unable to assert any of its *own* rights to the data, LinkedIn next claims that hiQ' use of the data – for a business that LinkedIn is now aggressively expanding into *itself* – constitutes a violation of its members' "privacy" rights. Of course the only data at issue is data that members *expressly opted* to make public to all persons, even those with no LinkedIn member account and who therefore never agreed to LinkedIn's terms of service. Moreover, LinkedIn welcomes Google and Bing to "scrape" this public information and then republish to a global audience of *2 billion web users*, for the express purpose of increasing profile visibility. Because there are no privacy rights in information so overtly and irretrievably public, LinkedIn invents another excuse. It reasons that members may later change their minds and make the information private or delete it altogether. But no legal principle supports the notion that anyone has a privacy interest in data already made public for all the world to see; while individuals can limit public display of information going forward they cannot complain that another has made fair use of information previously made public. LinkedIn then speculates – contrary to hiQ's evidence – that hiQ's "Keeper" offering allows employers to retaliate and fire member employees who hiQ determines are at risk of leaving their jobs. These kinds of invented pretexts tell all: employees at risk of leaving are at risk because they possess skills not being properly utilized or compensated. hiQ's offering is called "Keeper," not "Terminator," precisely because it allows employers to incent employees to stay, just as hiQ's Mark Weidick's declaration attests. (Weidick Decl., Dkt. 23-4 at ¶ 5).

LinkedIn's other purported justifications similarly fail; it complains about user agreement violations and automated bots. But it claims no server disruption or damage from hiQ's bots. And LinkedIn's terms of service purport also to prevent *manual* copying. So LinkedIn could, under its analysis, also deny access to anyone who with paper and pencil copies publicly displayed data. LinkedIn's focus on bots makes clear that its real motivation is not to protect data that members have made public. LinkedIn is instead seeking to prevent anyone *but LinkedIn* from accessing in an

---

[2] LinkedIn also has tellingly abandoned any arguments about "trespass to chattels" as threatened in its cease and desist letter, presumably because that claim requires demonstrated injury to servers which LinkedIn does not claim.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

3

34556\6079930.5

automated way public information – in which LinkedIn claims no legally recognized proprietary interest – so that it can feasibly be used for commercial purposes.

So the issue here – perhaps one of first impression in this website access context – is whether a website owner can use the CFAA or California Penal Code for an improper anticompetitive purpose as an end run around the limits in constitutional, copyright, and unfair competition law to prevent access and copying of admittedly public data in which the website owner has no legally protectable interest. Because (1) LinkedIn has not denied any anticompetitive motive, (2) the data resides on LinkedIn's site only because of its promises of public access, (3) LinkedIn has expressly given over the rights to control visibility to its members (as part of the bargain of gaining the ability to host the information), and (4) LinkedIn has identified no legally recognized harm to itself, the answer must be "no." Those laws were meant to be a shield against abusive access, not a sword to allow unlawful competition or speech suppression.

For TRO purposes, hiQ need not *prove* its claims. It has certainly raised *substantial and important* issues going to the merits; indeed, the ACLU is currently litigating a case in the U.S. District Court for the District of Columbia challenging the constitutionality of the CFAA to the extent it is interpreted to permit website owners from preventing access to public data. *See* Declaration of Deepak Gupta in Support of Plaintiff's Renewed Motion for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction ("Gupta Decl.") Ex. S (ACLU Complaint). hiQ has also overwhelmingly demonstrated irreparable harm, a balance of hardships tipping sharply in its favor, and a public interest in having the issues decided before hiQ goes out of business. The Court should thus grant a TRO and set a date for a preliminary injunction hearing.

## II. HIQ HAS SATISFIED ITS BURDEN FOR OBTAINING TEMPORARY RELIEF

As noted in hiQ's opening brief, a TRO "preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary injunction application." *Patino v. Franklin Credit Management Corp.*, No. 16-cv-02695-LB, 2017 WL 1246853, at *1 (N.D. Cal. Apr. 5, 2017), citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). In *Alliance for the Wild Rockies v. Cottrell*, the Ninth Circuit confirmed that the "serious questions" sliding scale approach survives the U.S. Supreme Court's decision in *Winter v. Natural*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

4

34556\6079930.5

*Resources Defense Council*, 555 U.S. 7 (2008). 632 F.3d 1127, 1134-35 (9th Cir. 2011). Thus, the Court may grant relief if the moving party demonstrates that there are serious questions going to the merits and a hardship balance that tips sharply toward the moving party, if the other two elements of the *Winter* test (likelihood of irreparable harm and the public interest in the party's favor) are also met. *Id.* at 1132. This allows the Court "to preserve the status quo where difficult legal questions require more deliberate investigation." *Lewis v. U.S. Bank National Association*, No. 16-cv-05490-JSW, 2016 WL 5662030, at *2 (N.D. Cal. Sep. 28, 2016), citing *Sencion v. Saxon Mortg. Services, LLC*, No. 10-cv-3108 JF, 2011 WL 1364007, at *2 (N.D. Cal. Apr. 11, 2011). hiQ has easily met this burden.[3]

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Shippers v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL 12092056, at *5 (S.D. Cal. Sep. 23, 2013), citing *Freedom Holdings v. Spitzer*, 408 F.3d 112, 114 (2d. Cir. 2005). hiQ is currently at risk of going out of business and has already lost one of its 24 employees due to uncertainty over the company's future. (Dkt. 24 at 4 n. 1, 24). Rather than addressing the harm hiQ will indisputably suffer absent relief, LinkedIn argues that hiQ should "pivot[] its business" and rely on other data sources to provide analytics to its customers. Notwithstanding that these other potential data sources do not have the volume of users or type of data that LinkedIn has and hiQ requires, LinkedIn's argument misses the point. The question before the Court is not whether hiQ could hypothetically, with enough time and money, function based on another model, but whether hiQ as it exists today will be irreparably harmed without a TRO. "The threat of being driven out of business is sufficient to establish irreparable harm." *American Passage Media Corp., v. Cass Communications,*

---

[3] *See also Cobine v. City of Eureka*, No. C 16-02239 JSW, 2016 WL 1730084, at *3 (N.D. Cal. May 2, 2016) (following *Winter,* courts in the Ninth Circuit have granted preliminary injunctive relief where there is a "lesser showing of likelihood of success that amounts to 'serious questions on the merits' and the balance of hardships tips strongly in plaintiff's favor."); *Save Strawberry Canyon v. Dept. of Energy*, No. C 08-03494-WHA, 2009 WL 1098888, at *2 (N.D. Cal. Apr. 22, 2009) (citing need for provisional relief in cases where "[i]rreparable injury is manifest and the balance of equities is manifest" but the plaintiff is not able to "demonstrate a probability of success on the merits without the benefit of discovery and some further investigation") (cited favorably by the Ninth Circuit in *Alliance for the Wild Rockies*, 632 F.3d at 1134); *Habeas Corpus Resource Center v. United States Department of Justice*, No. C-08-2649 CW, 2009 WL 185423, at *5 (N.D. Cal. Jan. 20, 2009) ("When the balance of harm tips decidedly toward the plaintiff, injunctive relief may be granted if the plaintiff raises questions serious enough to require litigation.") (internal citation omitted).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

5

34556\6079930.5

*Inc.*, 750 F.2d 1470, 1471 (9th Cir. 1985).

Further, hiQ has raised serious questions going to the merits of its claims. LinkedIn's opposition demonstrates an overtly arrogant view that it can use its own terms of service to terminate access to wholly public information in which it has no proprietary interest whether for no reason or even for an unlawful reason and without any demonstration of harm. Moreover, by relying on the CFAA to justify its actions, LinkedIn seeks not only to prevent, but to "criminalize," any access once revoked. The seriousness of these issues should be self-evident but they are highlighted by the recent actions of the ACLU, the nation's premier civil rights organization, in filing a constitutional challenge to the CFAA to the extent it is interpreted to allow such private delegation over defining "criminal" behavior. Thus, the ACLU alleged in its complaint:

> The Challenged Provision [] delegates power to companies that operate online to define the scope of criminal law through their own terms of service. As a result, individuals and organizations risk prosecution for conducting research into online discrimination where ToS prohibit their research techniques. They face prosecution even where, as in the case of Plaintiffs' activities, their research will not cause material harm to the target websites' operations and where they have no intent to commit fraud or to access any data or information that is not made available to the public.

Gupta Decl. Ex. S at ¶ 4. The ACLU complaint, filed by university researchers who audit and test for unlawful discrimination, noted that many websites (specifically mentioning LinkedIn) purport to prevent automated copying of public data thus denying meaningful discrimination research:

> In the offline world, audit testing has long been recognized as a crucial way to uncover racial discrimination in housing and employment, and to vindicate civil rights laws such as the Fair Housing Act and Title VII's prohibition on discrimination in employment. Courts and Congress have long encouraged such socially useful testing and investigations.
>
> In the online world, however, conducting the same kind of audit testing can subject individuals to prosecution under the CFAA. This inhibits the public's access to information about discrimination online, while also prohibiting a range of speech and expressive activity protected by the First Amendment.

*Id* at ¶ 3. Thus, hiQ is not alone and is not making some spurious claim. It has raised serious issues. Whatever the outcome in the ACLU case, it will likely be appealed where the limits of the CFAA, both statutory and constitutional, will be determined. This Court should lend its voice to that important debate and not allow LinkedIn to force hiQ out of business before a merits examination.

The balance of hardships clearly tips in hiQ's favor. (Dkt. 24 at 8). LinkedIn does not and cannot cite any injury to itself that would result from the Court issuing a TRO. Instead, LinkedIn

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

6

34556\6079930.5

advances vague, unsupported allegations of potential harm to its members. The harm that would result to hiQ absent relief significantly outweighs LinkedIn's weak, strained arguments. Finally, the public has an interest in the competition and free speech issues hiQ raises. (Dkt. 24 at 24).

## III. THE CFAA AND CALIFORNIA PENAL CODE DO NOT GIVE LINKEDIN THE PLENARY POWER TO REVOKE ACCESS TO PUBLIC PAGES AT WILL

LinkedIn incorrectly takes it as a given that the CFAA gives it plenary power to revoke access for any reason whatsoever to any user whatsoever:

### A. The CFAA does not give service providers plenary power to revoke access for an improper purpose in defiance of state law under the Supremacy Clause or otherwise.

The CFAA says that accessing a site "without authorization" to access information from a "protected computer" may be illegal. It does not say or imply that a service provider may revoke access for whatever it purpose it wishes, regardless of state law to the contrary: the statute is silent on the circumstances when revocation may allowed. Under LinkedIn's view, a contractually bound web hosting provider could under the CFAA revoke authorization for server access from its paying customers at will, thereby breaching its contract with impunity based on the Supremacy Clause and turning its customers into criminals to boot. Clearly, the CFAA does not supersede contract law, and for the same reason, it does not supersede state unfair competition law, the common law of torts, anti-discrimination law, etc.

LinkedIn's suggestion that the Supremacy Clause gives it plenary power to revoke access under the CFAA to whomever for whatever reason is spurious. Where there is no express or implied conflict between federal and state law, supremacy does not into come into play. *See, e.g.*, Laurence Tribe, American Constitutional Law (3d ed. 2000), §§ 6-28 through 6-31, pp. 1172-1212. "The CFAA was designed to target hackers who access computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possess the capacity to "access and control high technology processes vital to our everyday lives..." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130-31 (9th Cir. 2009) (quoting H.R. Rep. 98-894, 1984 U.S.C.C.A.N. 3689, 3694 (July 24, 1984)). This purpose does not conflict with unfair competition law or the alleged common law torts. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("the historic police powers of the States [are] not

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

7

34556\6079930.5

to be [ousted] by the Federal Act unless that was the clear and manifest purpose of Congress.").

Indeed, the CFAA's prohibition on accessing "without authorization" can readily co-exist with neutral state laws of general applicability. *See Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)("federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons – either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.").

### B. None of the cases cited by LinkedIn raised the legal issues or supporting facts presented here.

None of the cases cited by LinkedIn involved (1) public webpages where the website owner expressly abdicated its right to control access to these public webpages to its users; (2) allegations that the restriction on access violates free speech protections; and (3) unrebutted evidence of unfair competition and anticompetitive behavior. None of the cases LinkedIn cites controls here.

Neither *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) nor *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016), involved public webpages at all. In *Facebook*, the defendant, Power Ventures, gained access to private Facebook data by encouraging Power Ventures' users to give Power Ventures access to the Facebook webpage. *Facebook*, 844 F.3d at 1062-63. In *Nosal*, the defendant, whose access to the database at issue had been revoked, used someone else's credentials to access the same database. *Nosal*, 844 F.3d at 1031. In addition, free speech and unfair competition concerns were not raised in either case. *Facebook* and *Nosal* are thus inapplicable here.

LinkedIn's reliance on *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013) is similarly misplaced. Although *Craigslist* involved a public website, Craigslist had not told users that they, and not the website, control access to the website's content, and thus Craigslist had not expressly abdicated any right to revoke access to those pages. *Craigslist* also did not involve the free speech and unfair competition claims at issue here.[4]

---

[4] Similarly, in the other cases LinkedIn relies upon, the website owners did not give control of access to public information to its users, and no free speech or unfair competition issues were raised. *See Satmodo, LLC v. Whenever Commc'ns, LLC*, 2017 WL 1365839 (S.D. Cal. Apr. 14, 2017); *eBay Inc. v. Digital Point Solutions, Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009); *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439 (N.D. Tex. 2004); *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576 (E.D. Pa. 2016); *Couponcabin LLC v. Savings.com, Inc.*, 2016

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

8

34556\6079930.5

Even more fundamentally, in *Craigslist*, Judge Breyer used express words of caution that presaged the difficulty presented by the current situation: "To be sure, later cases may confront difficult questions concerning the precise contours of an effective 'revocation' of authorization to access a generally public website. This Court cannot and does not wade in to that thicket . . . ." *Craigslist*, 964 F. Supp. 2d at 1186. The instant case presents these exact difficult questions: the intersection of the CFAA with free speech and unfair competition law. hiQ submits that allowing the public pages of a social media website to be swept within the rubric of a "protected computer" would have a chilling effect on the flow of information that LinkedIn's users have made public. hiQ is entitled to its day in court for a conclusive determination of whether LinkedIn's interpretation of the CFAA would unlawfully abridge free speech and run afoul the Copyright Act's fair use doctrine.

## IV. LINKEDIN FAILS TO MEANINGFULLY ADDRESS THE SERIOUS CONSTITUTIONAL CONCERNS WITH ITS OVERBROAD INTERPRETATION OF THE CFAA AND CALIFORNIA PENAL CODE

### A. hiQ's Challenge Under the U.S. Constitution is Likely to Succeed.

*First*, in its opening papers, hiQ explained that allowing the CFAA or California Penal Code 502 to be read as an affirmative grant to a private party of the power to terminate user access to a social media website at will would encroach on free speech rights under cases like *Shelley v. Kraemer* and *New York Times v. Sullivan*, particularly after *Packingham v. North Carolina*. See Dkt, 24 at 20-21. LinkedIn ignored this argument. As the ACLU case cautions, the Court should be careful under any law, but especially under one making violations criminal, to delegate to LinkedIn unfettered control over who and under what circumstances any person or class or persons can access public portions of a website available to anyone with an Internet connection. This is a serious constitutional question. *See* Dkt. 24 at 21 (statutes must be read to preserve constitutionality).

*Second*, hiQ explained in its opening papers why avoiding the "copyright" label for its claims to do an end-run around the fair use doctrine would raise constitutional concerns under *Eldred v. Ashcroft* and *Golan v. Holder*. LinkedIn also ignored these cases. LinkedIn has now argued that "scraping" equates to "accessing, extracting and copying" data from a webpage. (Dkt. 31 at 3-4). This

---

WL 3181826 (N.D. Ind. June 8, 2016).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

9

34556\6079930.5

is precisely how digital information is "reproduced," and thus LinkedIn has now confirmed that it is impugning conduct that falls squarely within 17 U.S.C. § 106(a). The nexus to copyright is even more blatant with respect to California Penal Code section 502, which *expressly* refers to "copying." LinkedIn's attempt to attack activity that falls within the Copyright Act without facing fair use doctrine raises yet another serious constitutional question.

### B. hiQ's California Free Speech Claim is Likely to Succeed.

LinkedIn concedes as it must that the California Constitution protects free speech rights on private property and that it applies on Internet social media. LinkedIn's argument that the California Constitution is "pre-empted" by the CFAA is incorrect, because as explained above "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons – either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime*, 373 U.S. at 142. Here, California's state constitutional protections of free speech do not run afoul of the anti-hacking aims of the CFAA and, again, the CFAA does not by its terms purport to define the circumstances *when* access to a website may lawfully be revoked. Accordingly, there is no preemption problem in holding that the California Constitution proscribes revocation of access to the public pages of a privately-owned website, even if that forecloses a condition precedent for the website owner to bring a theoretical CFAA claim. It follows that LinkedIn's attempt to rely on cases like *Virginia v. Hicks*, 539 U.S. 113 (2003) and *3Taps* is misguided. While the U.S. Constitution may not guarantee free speech rights on private property opened to the public, the California Constitution clearly does. Notably, the recent *Packingham* decision marks an important shift even under federal law, by treating a privately-owned social media website as a public forum. No. 15-1194, 582 U.S. ____, slip op. (Jun. 19, 2017).

LinkedIn's attempt to distinguish between "rights of access," i.e. "information-gathering," and positive "public expressive activity" is equally artificial. Under the U.S. and California Constitutions, speakers and listeners are both protected. Thus, in *Packingham*, the Court held:

> "Social media allows users to *gain access to information and communicate with one another* on any subject that might come to mind. With one broad stroke, North Carolina bars access to what for many are the principal *sources* for knowing current events, *checking ads* for

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

10

34556\6079930.5

employment, speaking and *listening* in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. *Foreclosing access to social media altogether thus prevents users from engaging in the legitimate exercise of First Amendment rights.*" *Packingham,* slip op. at 2.

The attempted distinction is thus spurious. While LinkedIn seems to want to draw the line at "automated scraping technologies," there is no basis in any written authority for such a "time, place and manner" limitation. In this context such a regulation would be neither "narrowly tailored," "content-neutral" nor "viewpoint-neutral" because LinkedIn expressly permits access by such technologies already (e.g. Google, Bing, etc.) Such a restriction would also likely fail in light of cases like *Sorrell v. IMS Health*, 564 U.S. 552 (2011), where the Supreme Court struck down a statute that disallowed data mining for commercial uses, but allowed extensive non-commercial uses.[5]

## V. HIQ HAS ALSO SHOWN THAT IT IS LIKELY TO SUCCEED ON ITS AFFIRMATIVE CLAIMS

### A. hiQ's Tortious Interference Claim is Likely to Succeed.

LinkedIn does not dispute that it had knowledge of hiQ's business relationships which stood to be disrupted by LinkedIn's anticompetitive actions. Instead, LinkedIn argues that hiQ cannot prove tortious interference because LinkedIn's actions were justified by a "legitimate business purpose." That, however, is a disputed factual issue about which hiQ has raised serious questions. It is undisputed that in 2016 and early 2017, hiQ's CEO "held a series of in-person meetings with LinkedIn personnel" where he "advised LinkedIn of hiQ's active customer relationships." (Weidick Decl., Dkt. 23-4, ¶ 14). This was the timeframe directly leading up to LinkedIn's decision to revoke hiQ's access to LinkedIn's website. LinkedIn has equally and conspicuously failed to deny that it is trying to develop services which directly compete with those provided by hiQ. These facts taken together certainly support an inference of intent sufficient to freeze the status quo pending preliminary injunction proceedings.

---

[5] hiQ believes that LinkedIn is painting with too broad a brush by categorizing any and all automated access to web information as "scraping." hiQ believes that expert discovery will show that classic "scraping" involves the traversal of all links in a page in a recursive fashion to capture all the pages of a website (whether it be to build a legitimate search engine index, or to illicitly sell the information in an unchanged form to third parties). hiQ on the other hand captures *individual* pages for specific employees, that the employees have by definition designated public. This presents far less of a technical load on LinkedIn's servers (LinkedIn cites none), and no threat to LinkedIn's core business.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

11

34556\6079930.5

The cases cited by LinkedIn do not compel a different conclusion. Whether LinkedIn's conduct was justified is a fact-intensive inquiry not appropriate for adjudication without discovery. *See Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 57 (1998) (defendant's alleged legitimate business purpose was insufficient to grant a motion to dismiss, and the issue of defendant's true purpose was a matter for trial); *Richardson v. La Rancherita*, 98 Cal.App.3d 73 (1979) ("The test of whether there is justification for conduct which induces a breach of contract turns on a balancing of the social and private importance of the objective advanced by the interference against the importance of the interest interfered with, considering all of the circumstances including the nature of the actor's conduct and the relationship between the parties." (citation omitted)).

### B.   hiQ's Unfair Competition Claim is Likely to Succeed.

LinkedIn complains that hiQ has not adequately defined relevant markets and impact to support an antitrust claim, but hiQ has asserted an unfair competition claim, not an antitrust claim. As discussed in hiQ's moving papers, actions that violate the spirit of the antitrust laws can violate the UCL even if they do not constitute actual antitrust violations. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 187 (1999).[6] LinkedIn does not and cannot deny that it is the largest compilation of employment related profile data in the world. It also does not deny that it is now offering skills related data analysis similar to hiQ's SkillMapper offering.

LinkedIn similarly complains that hiQ cannot build its business around having access to LinkedIn and then claim that LinkedIn is an "essential facility." But that is exactly what MCI successfully did in the AT&T case where MCI launched a long-distance calling service that was reliant on AT&T's long distance phone lines. *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081 (7th Cir. 1983). In *MCI*, plaintiff MCI alleged that AT&T violated section 2 of the Sherman Act by denying MCI needed interconnections to AT&T's networks. *Id.* at 1096-97. The court upheld the jury's finding that AT&T's refusal to interconnect MCI with its facilities violated section 2 of the

---

[6] Notably, only one of the four cases LinkedIn cites in support of its UCL arguments actually arises under the UCL, whereas the other three arise under federal antitrust law. *See* Dkt. 31 at 18. The one UCL case LinkedIn cites is factually distinguishable as the UCL claim was dismissed because the plaintiff could not allege the existence of the agreement which formed the basis of its claims. *See E&E Co., Ltd. v. Kam Hing Enterprises, Inc.*, No. C-08-0871 MMC, 2008 WL 3916256, at *3 (N.D. Cal. Aug. 25, 2008).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

12

34556\6079930.5

Sherman Act. *Id.* at 1132-33. The Court found that "AT&T had complete control over the local distribution facilities that MCI required," that "[t]he interconnections were essential for MCI to offer FX and CCSA service," that the facilities were "essential" because it would "not be economically feasible for MCI to duplicate Bell's local distribution facilities," and that "[n]o legitimate business or technical reason was shown for AT&T's denial of the requested interconnections." *Id.* As explained in hiQ's TRO memorandum, the same is true of hiQ's business with respect to LinkedIn. (Dkt. 24 at 12-13). That hiQ operated for years in LinkedIn's plain view only to be shut down when LinkedIn announced an intent to explore a SkillMapper type offering says it all.

Further substantiating hiQ's claim of an anticompetitive motive, hiQ has uncovered additional evidence that LinkedIn is in the midst of an aggressive push into the analysis of skill information contained in profiles, i.e. specifically the business of hiQ. In a morning news segment that aired nationally on June 21, 2017, LinkedIn's CEO announced, "What LinkedIn would like to do is leverage all this extraordinary data we've been able to collect by virtue of having 500 million people join the site…to make sure that each individual member has information about where those jobs are" and that "[f]or employers, [the goal is to provide] an understanding of what skills they're gonna need to be able to continue to grow, and where that talent exists." Gupta Decl. Ex. T at 3:28-4:28, Ex. U at 2. These uses of member profile information are remarkably close to what hiQ is doing with Keeper and SkillMapper. LinkedIn's own use of member profile data also belies its purported justification that it is simply protecting member privacy.

### C. hiQ's Promissory Estoppel Claim is Likely to Succeed.

LinkedIn misses the key point of hiQ's promissory estoppel claim. LinkedIn *expressly* abdicated any control over profile visibility by stating to Members, "You control the visibility and reach of your LinkedIn profile." Thus, it is estoped from now taking control over those profiles.

Further, LinkedIn concedes that promissory estoppel can be a viable claim where a contract governs the same subject matter, if the party asserting estoppel is claiming the promise concerns a modification to the contract. (Dkt. 31 at 20). hiQ made precisely that argument. (Dkt. 24 at 14, n.4). Even assuming that LinkedIn's User Agreement created a binding contract on hiQ, LinkedIn's subsequent conduct led hiQ to believe that LinkedIn was aware of and approved hiQ's actions.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for
TRO and Order to Show Cause Re: Preliminary
Injunction - Case No. 3:17-cv-03301-EMC

13

34556\6079930.5

LinkedIn submitted a declaration from Lorenzo Canlas where he states he does not recall being *told* that hiQ was accessing LinkedIn data, but he conspicuously does not deny *knowing* that hiQ was using data from LinkedIn public profiles. (Canlas Decl., Dkt. 28 at ¶ 5). LinkedIn failed to submit declarations from the numerous other LinkedIn employees who also attended Elevate; so none of them has claimed ignorance of hiQ's activity. And most tellingly, Paul Rockwell, head of LinkedIn's Trust & Safety organization, does not state when he or his team first became aware that hiQ was accessing public data on the site. *See* Rockwell Decl., Dkt. 29 at ¶ 30. At this point the evidentiary record is too incomplete to draw any final conclusions. hiQ has for purposes of this emergency motion raised substantial questions on the promissory estoppel claim.[7]

### D. The *Noerr-Pennington* Doctrine Does Not Shield The Private Acts Committed By LinkedIn Simply Because LinkedIn May Have Sought Legal Recourse If HiQ Had Not Complied.

LinkedIn's *Noerr-Pennington* defense is baseless: hiQ's claims do not "have as their gravamen protected petitioning activity." It is axiomatic that "private action" does not enjoy *Noerr-Pennington* immunity. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988). Here, LinkedIn revoked hiQ's access to LinkedIn, terminated hiQ's LinkedIn account, removed its webpage from LinkedIn, and expressly erected technical obstacles to prevent hiQ from accessing the website. Such actions are not government petitioning activity; they are purely private actions. hiQ ceased accessing the site pending a TRO, so LinkedIn never had the need or opportunity to pursue legal claims. *See* Dkt. 23-1 at 36 ("Any *future* access of any kind by hiQ is without permission and *without authorization* from LinkedIn.") (emphasis added). LinkedIn's anti-competitive wrong of revoking access and erecting the blocking measures stated above stands separate and apart from any associated government petitioning activity.

## VI. LINKEDIN'S PURPORTED CONCERN ABOUT MEMBER PRIVACY IS FRIVOLOUS

Presumably because it cannot articulate any harm to itself that would result from hiQ's continued access to public profile data, LinkedIn puts forth vague arguments about the privacy

---

[7] Though LinkedIn now claims that it has "repeatedly publicized" through public lawsuits that it does not consent to third parties collecting data from public profiles, all three of the consent judgments LinkedIn submits as evidence arose out of cases involving the creation and use of fake, fictitious member profiles. *See* Blavin Decl., Dkt. 26 at ¶¶ 11-13, Exs. I, J, K.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

14

34556\6079930.5

interests of its members. LinkedIn's argument is an irrelevant distraction. As repeatedly articulated throughout Plaintiff's Motion and this Reply, hiQ only accesses information that members expressly make public. Thus, there are no privacy interests at stake. *See Pappas v. Naked Juice Co of Glendora, Inc.*, No. CV-11-8276-JAK (PLAx), 2012 WL 12885109, at *4 (C.D. Cal. Dec. 5, 2012) ("[T]he Court notes that under California law, online statements that are available to the public at large are not protected by the right to privacy."), citing *Moreno v. Hanford Sentinel, Inc.*, 172 Cal.App.4th 1125, 1130 (2009) (affirmative act of posting on a "hugely popular internet site" made information "available to any person with a computer and thus opened it to the public eye" … "no reasonable person would have had an expectation of privacy regarding the published material."). Unsurprisingly, LinkedIn recognizes the possibility that public profile information, after it is deleted by a Member, could persist elsewhere on the Internet, and that this is not an issue unique to hiQ: "[T]hird-party search engines may not automatically update their caches, *which may contain old public profile information.*" (Rockwell Decl., Ex. C, Dkt. 29 at 35, User Agreement ¶ 2.6).

Further, LinkedIn's supposed "privacy pledge" is anything but that, because LinkedIn's own privacy policy states: "We don't provide any of your *non*public information (like your email address) to third parties without your consent…" *Id*. (emphasis added); and "We do not rent or sell personal information that you have not posted on our Services, except as described in this Privacy Policy." *Id.* (emphasis added). The implication of all these double negatives is that your public information is public and anything you post may be sold by LinkedIn. This is consistent with most people's understanding of how LinkedIn makes money – by selling the personal information of its members to recruiters, and others.

## VII. CONCLUSION

For the foregoing reasons, hiQ respectfully requests that the Court grant its motion for a temporary restraining order.

Dated: June 27, 2017       FARELLA BRAUN + MARTEL LLP

By: /s/ Deepak Gupta
Deepak Gupta

Attorneys for Plaintiff hiQ Labs, Inc.

Plaintiff's Reply in Support of Renewed Motion for TRO and Order to Show Cause Re: Preliminary Injunction - Case No. 3:17-cv-03301-EMC

15

34556\6079930.5