Pages 1 - 66

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

hiQ Labs,                       )
                                )
            Plaintiff,          )
                                )
   VS.                          )        NO. C 17-03301 EMC
                                )
LinkedIn Corporation,           )
                                )
            Defendant.          )
_____)

                        San Francisco, California
                        Thursday, June 29, 2017

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                        FARELLA, BRAUN & MARTEL LLP
                        Russ Building
                        235 Montgomery Street, 18th Flr
                        San Francisco, California  94104
                   BY:  **BRANDON WISOFF**
                        **DEEPAK GUPTA**
                        **ATTORNEYS AT LAW**

For Defendant:
                        MUNGER, TOLLES & OLSON
                        560 Mission Street, 27th Floor
                        San Francisco, California  94105
                   BY:  **JONATHAN H. BLAVIN**
                        **ROSEMARIE RING**
                        **ATTORNEYS AT LAW**

Reported By:     Rhonda L. Aquilina, CSR #9956, RMR, CRR
                 Official Court Reporter

<u>**Thursday - June 29, 2017**</u>                    **3:21 p.m.**

**P R O C E E D I N G S**

---oOo---

**THE CLERK:**  Calling case C 17-3301, hiQ Labs versus LinkedIn.

Counsel, please come to the podium and state your name for the record.

**MR. WISOFF:**  Good afternoon, Your Honor.  Brandon Wisoff, Farella, Braun & Martel, on behalf of Plaintiff hiQ Labs.

**THE COURT:**  All right.  Good afternoon, Mr. Wisoff.

**MR. GUPTA:**  Your Honor, Deepak Gupta on behalf of hiQ Labs.

**THE COURT:**  All right, Mr. Gupta.

**MR. BLAVIN:**  Good afternoon, Your Honor.  Jonathan Blavin from Munger, Tolles & Olson on behalf of LinkedIn.

**THE COURT:**  Mr. Blavin.

**MS. RING:**  Good afternoon, Your Honor.  Rosemarie Ring, Munger, Tolles & Olson on behalf of LinkedIn.

**THE COURT:**  Good afternoon, Ms. Ring.

So let me ask a question first on the balance of hardships and irreparable injury, or not.

What is the harm to hiQ if a temporary restraining order is not issued, but I set a date for a full preliminary injunction within the next, you know, 28 days or something like

```
 1   that?
 2            MR. GUPTA:  Your Honor --
 3            THE COURT:  What's going to happen in the next month
 4   or two?
 5            MR. GUPTA:  It's going to be devastating.  The company
 6   already has lost one employee -- they're in the middle of a
 7   financing round -- and what is the life blood of their company
 8   has been cut off.
 9        As you know, the CFAA invoked criminal liability, and so
10   they cannot access the public data until there's a declaration
11   from you that it's safe for them to be doing that.  They --
12            THE COURT:  Well, safe, safe for a period of time.  I
13   mean, if you're in the middle of a funding round, even if you
14   were to obtain a temporary restraining order or even a
15   preliminary junction, that's no guarantee that you would
16   ultimately prevail.  I'm wondering whether your client is going
17   to have a funding problem absent resolution of the case.
18            MR. GUPTA:  Your Honor, if we could get a temporary
19   restraining order, the company will be able to continue to
20   access the data, service its existing clients.  It will be able
21   to get new clients.  And while there certainly will be this --
22   you're right on point, that there's going to be this cloud over
23   the company even during the pendency of preliminary injunction
24   proceedings, and even after that during the pendency of plenary
25   proceedings to a final judgment.  But it will certainly give
```

1    the company what it needs to keep going in the interim.

2         And, you know, the quicker we can get to preliminary

3    injunction, the quicker we can get to a final judgment.  That

4    all helps a lot.  But we have to take it one step at a time.

5    That's how the system is set up.

6         **THE COURT:**  Okay.  So when you say the company, still

7    within the next 30, 60 days, if you don't have a temporary

8    restraining order, are you saying that just even during that

9    short period of time the company is likely to go under, or what

10   are you --

11        **MR. GUPTA:**  I do think it's likely to go under,

12   because there's really -- people are coming to work --

13   employees are coming to work, and there's really nothing for

14   them to do.

15        The company has -- had 24 employees.  One left.  Now we're

16   down to 23.  And what this company does is data science.  Ten

17   or eleven of the employees have advanced degrees.  They've

18   built themselves around this data that when DMCA was public,

19   that users have designated public, and now they can't access

20   that data.  So they're coming home -- they're coming to work,

21   and they're sort of twiddling their thumbs, and nobody wants to

22   be in that position.

23        **THE COURT:**  So they would -- you could lose employees.

24        **MR. GUPTA:**  Absolutely, Your Honor.

25        **THE COURT:**  Because they have nothing to do.

 1          **MR. GUPTA:**  Right.

 2          **THE COURT:**  Conversely, what is the irreparable harm

 3     or the hardship to LinkedIn if a TRO is issued for the next --

 4     is in effect for the next 30, 40 days?

 5          **MR. BLAVIN:**  Yes, Your Honor.  Well, it's described in

 6     our papers.  Obviously, there's a loss of member trust and good

 7     will, given that LinkedIn considers these issues very seriously

 8     in terms of consumer privacy on the platform.  You know --

 9          **THE COURT:**  But explain that to me.  This has been

10     going on for some time.  It's not like admin or something just

11     happened or arisen.  This has been going on for some time.  So

12     the idea that within the next 30 days consumer good will and

13     perceptions are going to change dramatically --

14          **MR. BLAVIN:**  Well, this is the first time it's become

15     public that they've been taking the data from LinkedIn.  They

16     never disclosed that before; in fact, they affirmatively

17     concealed it.

18          **THE COURT:**  Do you have any evidence that in fact

19     there is active concern amongst users because of this hiQ's

20     analytics?

21          **MR. BLAVIN:**  Well, Your Honor, it's all very recent,

22     so, you know, there's just been some recent press about it.  I

23     don't know if we have anything specifically with respect to

24     members .

25        That all being said, Your Honor, we had previously

1    extended a standstill period for two weeks to allow them to

2    effectively access the site as they were prior to sending the

3    cease and desist letter, however they were doing that.

4    Although it seems undisputed at this point that they were

5    circumventing technical barriers to do that.

6        We would be prepared today to extend that agreement going

7    forward during the briefing and resolution of our preliminary

8    injunction motion.  And we don't think a TRO needs to be

9    granted.  We would extend that standstill period.

10            **THE COURT:**  So what about that?

11        **MR. GUPTA:**  Your Honor, this comes as a big surprise.

12   This has been and asked for -- the first day I talked to them,

13   I said, *would you guys do this?  Would you extend this to the*

14   *preliminary injunction period so that we could, you know,*

15   *continue to function and get a ruling from you*?  And now, you

16   know, this is a big surprise to us.  I have to say it's caused

17   us to go through all of this trouble of preparing these papers,

18   and showing up and taking your time.  And I'm astonished and

19   disappointed that this was not raised earlier.

20            **MR. BLAVIN:**  Your Honor, that is affirmatively untrue.

21   They asked us to stipulate to a temporary restraining order,

22   which we would not do.  I affirmatively offered to Mr. Gupta

23   the opportunity to extend the briefing on the temporary

24   restraining order to give them more time -- the Court more time

25   to consider the papers, and to extend the standstill period

1   well into July, and they rejected that offer.

2          **THE COURT:**  All right.  Well, that's -- rather than

3   arguing over what, let me ask you, given this offer now, what's

4   your reaction?

5          **MR. GUPTA:**  Your Honor, I do think we need to talk

6   with our client.  And it might make sense to speak with

7   opposing counsel to make sure we understand what they're

8   interested in.

9          **THE COURT:**  Okay.

10         **MR. WISOFF:**  There were a number of conditions imposed

11  on the discussions before that --

12         **THE COURT:**  All right.  Well --

13         **MR. WISOFF:**  -- that aren't being --

14         **THE COURT:**  Why don't you have that discussion and see

15  what we can do.

16         In the meanwhile, I would like to hear your comments on

17  this, because, if nothing else, it will prime us for the next

18  date, which is the preliminary injunction hearing.  But in case

19  you can't reach a resolution, then I will have to decide this

20  one way or the other.  So let me get to -- so the balance of

21  hardships, obviously, is one factor here.

22         The merits, of course, is a big deal in this case, and

23  this is all quite novel.  And I guess I'm trying to understand,

24  maybe you can help me understand, first of all, what the

25  technological restrictions that have been imposed, and how does

1    it work, I mean, just briefly.

2        **MR. BLAVIN:**  Yeah.  So, Your Honor, there's a number

3    of measures that LinkedIn takes to detect and block automated

4    access through bots, et cetera, to the LinkedIn web site.  As

5    we detailed in the papers, on a daily basis LinkedIn is

6    blocking 95 million requests through these automated bots.  So

7    it has measures in place that, for example, detect how many

8    times and how quickly something is trying to access the

9    LinkedIn site, and this includes both public and private

10   profile pages.  It also has measures in place to determine

11   whether or not requests are coming from what they believe to be

12   suspicious actors, and this is determined through, for example,

13   Internet protocol addresses that would identify the origin of

14   the requested access.  It also has measures in place to

15   determine if something is acting just simply too quickly on the

16   site; that's also indicative of whether or not something is

17   occurring through an automated process.

18       And in Mr. Rockwell's declaration, in addition to laying

19   out all of these measures that LinkedIn takes to protect the

20   site, he also notes that based upon the level of automated

21   access and scraping that's occurring here, which I don't think

22   hiQ disputes is hundreds of thousands of member profiles are

23   being scraped, that necessarily they would be circumventing

24   these technical measures.  And, in fact, in HiQ's Reply Brief,

25   they don't dispute this at all.  They say nothing about the

1   fact that there are these technical measures in place, and that

2   they would have to be getting around them somehow to scrape the

3   site.

4       In addition to that, it's worth emphasizing here that hiQ

5   does not dispute that it's accessing the site through anonymous

6   bots.  It's not identifying itself to LinkedIn when it's doing

7   this, which completely belies its theory that there was some

8   sort of cooperation or agreement between LinkedIn and hiQ,

9   which has absolutely no support in the record.

10      And to go a step further, Your Honor, it's important to

11  keep in mind what's actually occurring here.  HiQ is scraping

12  LinkedIn member profile pages to track any changes to member

13  pages.  It is then taking that surveillance, and it's selling

14  it to members' employers, and it's providing, to use hiQ's

15  words, laser-like accuracy whether a particular member is a

16  flight risk, and it's even giving that employee a

17  particularized risk score.

18      And this conduct of hiQ is directly contrary to the

19  privacy commitments that LinkedIn makes to its members,

20  including giving them the ability to control their data, and

21  specifically whether or not they want to broadcast to their

22  other connections whether or not they've made a change to their

23  profile.

24      And this is important, because as a professional network,

25  LinkedIn members are very likely connected to other people at

1    work, including their superiors, and they may not want to

2    broadcast to their superiors that they are making changes to

3    their profiles.  And hiQ's products specifically and directly

4    takes away that choice that LinkedIn members have.

5             THE COURT:  How does that actually work?  If a user

6    decides that it does not want to broadcast or allow any kind of

7    signaling of a changed profile, how is that accomplished?

8             MR. GUPTA:  Can I step in there for a second, Your

9    Honor?

10            THE COURT:  Well, let me ask this, and then you'll

11   have a chance to respond.

12        I mean, you say that there's a setting.

13            MR. BLAVIN:  Yes.

14            THE COURT:  So how does that work?

15            MR. WISOFF:  In the Rockwell declaration there's an

16   image of the setting, and you simply turn it off if you don't

17   want changes made to your profile broadcast to your other

18   connections.

19        Ordinarily, if you make a change like got a new job, or

20   you updated some of the narrative background about your skill

21   set, that would be broadcast to your connections.

22            THE COURT:  So it's a question of broadcasting to the

23   network that you've already --

24            MR. BLAVIN:  To your connections.

25            THE COURT:  To your connections.  You either -- it

1    either broadcasts it or it doesn't.

2            MR. BLAVIN:  Right.

3            THE COURT:  It doesn't hide it, obviously.  It changes

4    a change.

5            MR. BLAVIN:  A change is a change, but it's important

6    to remember what hiQ is doing.  When a LinkedIn member puts

7    their profile together, it's available publicly if they set it

8    to public visibility, but it's only for a particular snapshot

9    in time.

10       HiQ's products are essentially using a series of automated

11   bots analyzing every small change that is made over time, and

12   based upon that it's selling their intelligence, this

13   intelligence, to their employers; and that's something just

14   looking at someone's profile you can't determine how their

15   profile has changed historically.

16           THE COURT:  All right.  Let me back up, and let me ask

17   you another question.

18       The blocking of automated bots, 75 million a day, what's

19   the purpose of that?

20           MR. BLAVIN:  The purpose of that is to, in part, avoid

21   products like hiQ.

22           THE COURT:  What other purposes are there?

23           MR. BLAVIN:  Well, scraping an extraction of large

24   amounts of member data.  There could also be concerns about

25   hackers trying to infiltrate the site through automated

1  technologies, other wrongdoers, people who would be taking

2  member data and selling it to others for whatever purposes; it

3  could be identity theft; it could be for fraud.  There's a

4  number of reasons LinkedIn has these measures in place to

5  protect the integrity of its site.

6      And also, I mean, when you're dealing with that level of

7  automated access, that hitting the site -- I mean, there's a

8  technical concern, too, that if it didn't block it, whether or

9  not the site could actually be able to service all of its

10  existing legitimate members without going down.

11          **THE COURT:**  There's an overload.

12      **MR. BLAVIN:**  Yeah.  You could exactly have overload,

13  and that's a concern as well.

14      And it's important to recognize that when these bots are

15  requesting access to the site, I mean, particularly as hiQ is

16  doing through anonymous means, we have no idea who they are.

17  LinkedIn is not able to distinguish between, you know, someone

18  who, using hiQ's words, may have good intentions versus a party

19  that may have more malicious purposes.

20          **THE COURT:**  So does LinkedIn have the ability to

21  select whom it grants permission and therefore will be able to

22  get access to aggregate type information, notwithstanding these

23  filters?

24          **MR. BLAVIN:**  So LinkedIn does in certain instances

25  authorize certain parties to crawl the site, such as search

1    engines like Google or Bing.  It has what's called a robot.txt

2    file which lists the authorized entities and says how you may

3    access the site.

4         And with respect to these search engines, which we know

5    hiQ has made a lot of noise about in its papers, I mean,

6    LinkedIn obviously knows what Google or Bing is doing on the

7    site in terms of crawling it and making search engine results

8    with respect to member profiles.  But even in that respect,

9    Your Honor, in the privacy policy, in the user agreement, and

10   through the control settings LinkedIn allows members to opt out

11   of search engines indexing their public profiles.  That's

12   something that's impossible with respect to hiQ, because, of

13   course, hiQ has no relationship with LinkedIn, no relationship

14   with its members, and members cannot opt out of hiQ taking

15   their information in that respect.

16        **THE COURT:**  When a member decides to opt out of search

17   engine reach, what does LinkedIn do?  How do you accomplish

18   that?

19        **MR. BLAVIN:**  So the way that I understand that the

20   setting works is that essentially the member can choose which

21   information they want the search engine to index or cache.  So

22   they can go through their profile and figure out do you want

23   the search engine to take this information in your profile, or

24   they can just opt out all together from the search engine

25   crawling the site, with respect to that particular profile.  So

1   it wouldn't show up in the search engine results if you don't

2   want it to.

3        **THE COURT:**  So there is a way technologically,

4   obviously, that you can individualize what a search engine can

5   reach per member based on whatever their preferences are.

6        **MR. BLAVIN:**  Right.  With respect to a search engine.

7   And, again, that's a specific use case that LinkedIn has

8   authorized.  They know what Google or Bing are going to do, and

9   it's broadly consistent with their own policies, because some

10  members may want their profile page to show up in a search

11  engine result.  You know --

12       **THE COURT:**  Are there options with respect to

13  aggregate -- aggregative type entities, other than search

14  engines like Google and Bing, that they can sort of allow or

15  opt into that members can opt into?

16       **MR. BLAVIN:**  With respect to entities that are allowed

17  to crawl the site in this manner, only search engines, is my

18  understanding.

19       **THE COURT:**  I'm just curious now that you raise it, is

20  it possible, if one wanted to, to give users the option to say,

21  you know, *I like this hiQ kind of thing, that I might be able*

22  *to extract an extra bonus or something*, or *I'm seen as a*

23  *valuable* -- is there a way -- is there a technological way that

24  you could sort of allow an opt-in, for instance, to something

25  like hiQ?

1            **MR. BLAVIN:**  Listen, certainly if LinkedIn had some

2    actual arrangement with the entity, had authorized them to

3    engage in this conduct, certainly they could say to users if

4    you want to opt into this, you can.  But again, with respect to

5    hiQ, they not only don't have a choice about opting in, but

6    they can't opt out.  So it's dramatically different from the

7    circumstance that you would be talking about.  And, you know,

8    there could be partners.  But, again, LinkedIn would have to

9    view that relationship as beneficial to its members to agree to

10   do that.  And it does not view what hiQ is seeking to do here

11   as beneficial to its members.

12            **THE COURT:**  All right.  So you had a comment.

13            **MR. GUPTA:**  Your Honor, there was a whole lot said

14   there.  We covered bot walkers.  We covered what hiQ is.  It

15   was equated to a single product, and it was grossly

16   mischaracterized as to what it does.  We talked about how easy

17   it is for them to wipe this.  So I'm going to try to take all

18   that one by one to try to clean up the record as much as I can,

19   but I'm not confident I can do that, given all the information

20   you were just given.

21        So I'm going to start with, first of all, what is hiQ?

22   HiQ is a company that takes public data only.  I don't know

23   what Mr. Blavin is talking about when he's talking about these

24   settings that hiQ is reaching in and grabbing information that

25   search engines can't even get.  That's not true, as far as I

1    know.  And if -- and if we had an opportunity to take expert

2    discovery, I am quite confident that that would be conclusively

3    disproven, because I've asked my client numerous times that

4    exact question.

5         Now, we attached --

6              **THE COURT:**  What is the question?

7              **MR. GUPTA:**  The question is what information is hiQ

8    accessing?  LinkedIn --

9              **THE COURT:**  Okay.  So -- well, it is publicly

10   available, because that's what the user has set it.  So anybody

11   can go on there individually, manually, and go on and see it;

12   right?  That's undisputed, I assume.

13             **MR. GUPTA:**  Your Honor, so --

14             **THE COURT:**  So what I understand them to be doing is

15   disallowing or blocking more automated access.  So it is

16   publicly accessible, but it's not publicly aggregable.  Or, to

17   use their phrase, and I know you don't like, "scraping."  So it

18   is both.  It is public, but there's a -- appears to be a

19   technological restriction and a policy restriction of allowing

20   people to -- allowing machines to aggregate data at very high

21   speeds and doing things with it, which is saying it's public,

22   but you can't aggregate in a certain way and then apply

23   analytics to it.  That's what I understand the dispute to be.

24             **MR. GUPTA:**  So Your Honor, I think, for me, what

25   clarified this for me was I went on the LinkedIn site and

1    looked what are the settings available for me as a LinkedIn

2    member for my profile.  There are numerous settings available

3    for the user to specify what they want to do and who they want

4    to see their profile.

5        There's a setting called "public."  The public setting is

6    what this is about.  And if you look at the text around it,

7    we've attached it as an exhibit to my declaration; it's Exhibit

8    E.  Unfortunately, the reintroduction on paper doesn't look

9    that good.  I'm hoping if you can zoom in on your iPad, it will

10   be a little clearer.

11        **THE COURT:**  Well, unfortunately for some reason this

12   is -- you have two declarations.

13        **MR. GUPTA:**  Sorry.  My opening declaration.

14        **THE COURT:**  Unfortunately, the exhibits didn't -- I

15   don't know why -- didn't come through.  Do you happen to have a

16   hard copy of the exhibit?

17        **MR. GUPTA:**  I do.  I can hand it up.  Unfortunately,

18   it's not very clear.

19        **MR. WISOFF:**  It's Exhibit E to Mr. Gupta's opening

20   declaration.

21        **MR. GUPTA:**  So I think there was a glitch with the

22   printing.  But my point here is that there's a setting there at

23   the top.

24        **THE COURT:**  Nice photo, by the way.

25        **MR. GUPTA:**  I'm sorry?

1          **THE COURT:**  Nice photo.

2          **MR. GUPTA:**  Thank you.

3      There's a setting "make my profile visible to everyone."

4  And then you see a little further -- and that's what I've

5  selected.  And the reason I've selected that is because it's my

6  professional brand -- that's what LinkedIn tells me -- and I

7  want people to see that.  I want to be indexed on search

8  engines.  I might get new clients.  And then within that

9  there's -- you see there's a hover box, but below that there's

10 a setting that says "public."

11      Now, what it says in the hover box is:  "All LinkedIn

12 members, as well as others who find you through search engines

13 (e.g., Google, Bing) or other services."  So that's what they

14 are offering their clients.  That's what they're offering their

15 members, is the ability to have a public page.  And this is a

16 great thing for a professional to be able to have a public

17 professional identity.

18      The narrow question that is presented by this case,

19 certainly from a free speech point of view -- and I'll get to

20 the unfair competition in a second -- is whether, when a user

21 who has been expressly given the right to designate the

22 visibility of their profile as public, whether a data mining --

23 data science company like hiQ can access that public

24 information and extract information -- extract interesting

25 information from it that will help them in their careers in

different ways.  Or if, as Mr. Blavin says, some of the issues

he's uncomfortable with, and our view on that is, look, we've

got multiple products, we've got Skill Mapper, we've got

Keeper.  The question is not what's appealing, what's less

appealing.  This is public information.  That is, this

information has been designated public.

     **THE COURT:**  But if you look at it from the user's

privacy rights perspective -- and it's not clear to me exactly

what the connection is, because much of your argument, I'm

going to talk about later, is sort of derivative.  You're

saying you have certain rights, because these users have opted

for public view, and given that contractual theme, you're

almost like a third party beneficiary, though you've not

indicated that.  So it's not clear to me how derivative

rights --

    But if you looked at it, if you assumed there was some

relationship in a three-way triangle here, one could argue,

well, it just says, "other services."  If it knew that one of

the analytical services that's using it looks at, let's say,

among other things, changes and tracks changes and notifies --

allows employers to see those who are at risk or mobile, most

likely would be mobile, you may think it's a good thing, you

may think it's a bad thing.  I mean, it's not that clear.

    So the question is, just from a consumer rights point of

view, I don't know if there's enough disclosure here to say,

1    *well, everything is fair game, any kind of aggregative*

2    *analytics is okay with me*.

3        **MR. GUPTA:**  Your Honor, you know, I think that the

4    point you're making is an excellent one, that a user might, you

5    know, not know exactly how their stuff is being used, or there

6    might be different ways in which it's being used.  But there's

7    a really simple solution for that.

8        And, you know, particularly the generation that's growing

9    up now, that's growing up on the Internet, knows you have to be

10   careful what you put on the Internet.  If you're making the

11   document public, it's going to be used by a lot of different

12   people in a lot of different ways.  There's a trade-off there.

13   It's a decision that people are making when they say:  *I want*

14   *to make this public.  I want it to be viewable by everyone*.

15       Now, this -- let's talk for a minute about the bot

16   walkers.  What LinkedIn is doing here is painting an entire

17   field of inquiry that is -- that is an incredibly important

18   field in computer science labs at Stanford, MIT, everywhere,

19   which is -- what they characterize as scraping is the only way

20   to make sense of the massive amount of information that's out

21   there on the Internet.  So since the mid '90s, we've had Alta

22   Vista, we've had Excite, today we have Google.  These companies

23   are taking public web pages, analyzing them, and making them

24   meaningful and usable by people.

25       So to paint with this broad brush and try to characterize

 1   it as *oh, this is terrible stuff* is really doing it a

 2   disservice, and it's disingenuous.  I think what it leads to is

 3   another question, and that question is what's really going on

 4   here?  Why do they use the word "scraping" 84 times in their

 5   brief?  Because there's something going on.

 6       We've talked about the Keeper product.  The Skill Mapper

 7   product is our second product.  And the Skill Mapper product is

 8   what, one, Mr. Weiner was on TV last week saying they're doing

 9   something just like this.  And in the past 24 hours we've

10   received word from one of their very significant clients at

11   LinkedIn that LinkedIn is launching a product that is

12   essentially the same or very similar to Skill Mapper, and

13   trying to market it head-to-head against us inside of that

14   client.

15       So this raises -- one, I think it shows that what they're

16   talking about is being so horrible, and this really scary

17   information is really quite hypercritical, because they're

18   creating a product that's dead-on the same stuff as the Skill

19   Mapper product.

20           **THE COURT:**  Well, a lot of their concerns that they've

21   voiced is about the Keeper thing, the targeting of individual

22   employees and potentially identifying them as high risk, high

23   flight, or whatever you want to call it, or people you need to

24   keep and therefore you need to pay a bonus to, which is a

25   little bit different than your Skill Mapper product.

1      **MR. GUPTA:**  Right.  Your Honor, they're unhappy with

2  one product, they're happy with the other product, in fact,

3  they want to recreate it.  But the point is they can't police

4  what third parties are doing with information; right?

5      What we are doing with the Keeper product, whether or not

6  they like it, it's something that recruiters can do manually,

7  your HR department can do it manually.  It's public

8  information.  It's out there.  People can analyze it in this

9  way.  If people are truly scared of that, then they can

10  designate their profile at a lower level of public.  They can

11  give it a higher level of classification.

12      **THE COURT:**  Well, that's why I sort of asked.  It sort

13  of occurred to me, I asked a question of whether there's a way

14  of refining the options there.  You people might want to be

15  able to be found on Google and Bing, but not necessarily on --

16  subject to hiQ's, you know, analytics.

17      I mean, in a way, if the concern is maximizing the will of

18  the consumer, it seems to me that that's one approach to this.

19      **MR. GUPTA:**  Your Honor --

20      **THE COURT:**  And I don't know where that would leave

21  you, because then you might say, *well, now we're being blocked,*

22  *because given the option to consumers*, and they're saying *we*

23  *don't like -- we don't know what this thing is and therefore*,

24  *you know --*

25      **MR. GUPTA:**  Your Honor, actually, we would be

1    perfectly fine with that, because from what everything we hear,

2    consumers love our products, employers love our products.  The

3    company is doing well, that's why they're trying to move into

4    the same business.

5              **MR. BLAVIN:**  Your Honor, if I may chime in.

6              **THE COURT:**  Yeah.

7              **MR. BLAVIN:**  On that last point, LinkedIn knows that

8    members don't want this, that's why it specifically has this

9    setting discussed before not to broadcast changes to their

10   connections on LinkedIn, because of the very specific concern

11   that people at your work may see that you're making these

12   changes over time.  That's why LinkedIn gives members this

13   option.

14       With respect to the user agreement, you know, a couple

15   things on that.  First, it talks about making your profile

16   visible.  It doesn't talk about making your profile accessible

17   to any and all automated bots that are scraping the web site.

18       And, in fact, the user agreement, in section 8.2, states

19   repeatedly that you may not scrape the site through automated

20   technologies.  HiQ does not dispute it agreed to the user

21   agreement on multiple separate occasions.

22       User agreements set expectations about how your data is

23   going to be used in conjunction with the privacy policy.  If

24   you're a LinkedIn member and you sign up for the site, yes, you

25   understand that Google, Bing may crawl and index the site.  You

1  have the ability to turn off that setting as to you.  But you

2  also understand that LinkedIn is taking measures to protect the

3  site from these automated scraping technologies.

4          **THE COURT:**  How do you know that?

5          **MR. BLAVIN:**  It's in the user agreement.  It says you

6  may not do this.

7          **THE COURT:**  You may not do this.  That doesn't

8  necessarily mean that you're preventing non-members.

9          **MR. BLAVIN:**  Well, and LinkedIn also states in its

10  privacy policy that it takes measures to protect the site,

11  industry standard measures.  And of course LinkedIn has

12  actively --

13          **THE COURT:**  That could mean just from hacking any of

14  your personal information that you didn't want.  I don't know

15  what that means, "taking protective measures."

16          **MR. BLAVIN:**  Well, LinkedIn has also filed numerous

17  cases against automated scraping bots similar to this.  I mean,

18  it's been very public that it takes measures to protect the

19  site.  It's stated in the press it's taking measures to protect

20  the site.

21          But, again, Your Honor, I mean, thinking more broadly

22  about this, scraping is not the only way to do what hiQ wants

23  to do.  Numerous other competitors in this phase, in the people

24  analytics space, get data through other means without scraping

25  LinkedIn.

 1        Glint, an example that we highlight in our papers, $27

 2   million in funding creating a very similar product to what hiQ

 3   does.  It doesn't scrape LinkedIn to do that.  There's no need

 4   for them to do this.

 5        The harm that they're claiming was entirely foreseeable

 6   and preventable.  They could have gone through any number of

 7   means to do this.

 8        Moreover, this idea of a competitive product with

 9   LinkedIn, that's a total red herring.  As Your Honor has

10   recognized, LinkedIn does not want its member data to be sent

11   to two employers so they can analyze whether a member is a

12   particular flight risk.  That is a product that hiQ is touting

13   in its papers that its employers like.

14        In addition, just to go back to the likelihood of success

15   on the merits here, which is important.  The CFAA case law from

16   this circuit, *Power Ventures*, Judge Breyer in the *3Taps* case,

17   numerous other district court cases have repeatedly held that

18   the very conduct that hiQ is claiming that it wants to engage

19   in violates the CFAA.

20        LinkedIn has technical measures in place.  They're not

21   disputing that those circumvent -- that they circumvent those

22   technical measures.  That goes to the heartland of CFAA

23   liability, circumventing technical measures in place to block

24   unauthorized access to the site.  If that was not clear,

25   LinkedIn sent a cease and desist letter to hiQ making crystal

clear that any further access was unauthorized.  No different
than Facebook did in the *Power Ventures* case where the Ninth
Circuit held any further access after receiving that cease and
desist letter was a violation of the Computer Fraud and Abuse
Act.

HiQ has absolutely no response to these cases.  Does not
cite a single case that supports the proposition that it
somehow has some right based upon unfair competition laws that
it has loosely alleged or violated based upon some notion of
the First Amendment that it claims has been violated.  The CFAA
case law here is clear.

I'm happy to go through their other theories, which I
think have no basis in the law as well.  But, again, those
theories were actually considered in these other cases.

In *Power Ventures*, the defendant similarly asserted, oh,
Facebook is using its ability to block access to the site for
anti-competitive purposes, and that somehow violates the
antitrust laws.  There, the district court held if Facebook has
the right to manage access to and use of its web site, there
can be nothing anti-competitive about taking legal action to
enforce that right.

The *Blizzard Entertainment* case from the Central District
held the same thing with respect to automated software bots
that were trying to access the video game World Warcraft, which
was online.

1      But moreover, hiQ's antitrust theories that they espouse

2   simply have no support in the case law.  They put forth some

3   vague monopoly leveraging theory, which the Ninth Circuit has

4   rejected.  They don't even mention it in their Reply Brief.

5   Must have abandoned it.  They don't define market power.  They

6   don't define the markets at issue.  They put forth no evidence

7   to support them.

8      The Essential Facilities Doctrine that they claim --

9      **THE COURT:**  Let me -- you're getting far ahead of

10  where I'm at.

11     I want to ask you a question.  I want to explore and go

12  back to some practical questions.

13     Why can't -- I mean, they say consumers would really like

14  to be able to participate and be subject to hiQ.  You say no

15  way, because it risks their security, et cetera, et cetera.

16  Why not give consumers an option?

17     **MR. BLAVIN:**  Well, we would have -- that would have to

18  be a commercial arrangement that the parties make, and LinkedIn

19  would have to decide whether or not it wants to offer that

20  feature to its members.  And that's a commercial question for

21  the LinkedIn site to make in light of their concerns about

22  member privacy, in light about their own future commercial

23  objectives.

24     **MR. GUPTA:**  Your Honor, I'm not convinced that's

25  absolutely necessarily truly a commercial question.  I think

1   what the end question here, if we go down this road, is what

2   are the time, place, manner restrictions that are appropriate;

3   right?

4        And if hiQ -- and if there's a system where, you know,

5   these privacy concerns are built into some kind of solution

6   where employers or employees can opt in or opt out, that may

7   actually be a very viable approach.  But you need to start from

8   the premise that this is stuff that's public.  They can't

9   police the downstream uses.

10       And the key here is don't be misled by their tarnishing

11  and their harsh words about the Keeper product.  The really

12  interesting narrative from a business and commercial point of

13  view is Skill Mapper, because that's where they're going

14  themselves, that's when the cease and desist letter came out,

15  that's when they decided to revoke all access.

16       Today Mr. Blavin is talking about, well, scrapers, it's

17  all about scrapers.  If you look at their cease and desist

18  letter and their revocation of access, it is for all purposes.

19  It is for any purpose whatsoever, and that's because they're

20  using the blunt instrument of the CFAA.

21       We talked a lot about bot blockers.  Well, the law

22  actually has a provision within the Copyright Act that talks

23  about technical measures to protect access.  Their cease and

24  desist letter mentioned the DMCA 17 U.S.C. 1201.  But they have

25  not even made an argument, a single argument under the statute

1     that is supposed to be for this purpose.

2          The specific governs the general, Your Honor.  The CFAA is

3     a statute from 1986, from the time of mainframe computers, and

4     from the time of early PCs, before the Internet became a medium

5     for social interaction, before it became a communications

6     medium.  Two weeks ago -- it was two weeks ago that the Supreme

7     Court recognized in *Packingham* that, whoa, this is a game

8     changer -- right? -- this a forum for free speech.

9          So using the blunt instrument of the CFAA to revoke all

10    access, scrapers or not, is what they view as a shorthand,

11    because they think all this precedent supports them.  The

12    precedent does not support them, Your Honor.  If you look at

13    the cases from the Ninth Circuit, those were cases that

14    involved password sharing.  There was never a First Amendment

15    argument --

16              **THE COURT:**  What about *Power Ventures*?

17              **MR. GUPTA:**  *Power Ventures* involved password sharing,

18    Your Honor, where the users gave their passwords over to Power

19    Ventures.  So it's, you know, when you talk about access, a

20    password sort of pops in your mind as sort of a quintessential

21    access control measure.  I can see why the Ninth Circuit would

22    say, well, that's a clear case where there's authorization

23    issues or possibly, you know, the CFAA might kick in.

24          Back in the days of mainframe computers, they had

25    passwords, Your Honor.

1          **MR. BLAVIN:**  Your Honor --

2          **MR. GUPTA:**  If I could complete, Mr. Blavin.

3      **THE COURT:**  Yes.

4          **MR. BLAVIN:**  Go ahead.

5          **MR. GUPTA:**  So the point is, the rule of law that

6  they're proposing is breathtaking, Your Honor.  The rule of law

7  they're proposing is that the CFAA, the statute from 1986,

8  because it says when they revoke access, then you're a -- and

9  you come back, you're a criminal; that because the statute says

10  that, they can revoke access whenever they want for whatever

11  reason they want.  Complete disregard for all state law.  They

12  can do it for an improper purpose.  Why?  Because of the

13  supremacy clause.  They can disregard First Amendment rights.

14  They can disregard California free speech rights.  The CFAA to

15  them is this über law that trumps everything.  That's just --

16  that doesn't comply with supremacy principles at all.  If the

17  law is what they said, they could bar people based on their

18  race, because they felt like it that day; they could bar them

19  based on their religion; they could bar them based on their

20  political views.

21      What about the rest of the law, Your Honor?  The CFAA is

22  not the be-all, end-all.  It's not a weapon for commercial

23  entities to just exert their will over the public.

24          **MR. BLAVIN:**  Your Honor --

25          **THE COURT:**  I'll give you a chance to respond.

1          **MR. BLAVIN:**  Yes.  Thank you, Your Honor.

2       So first, with respect to the question of technical

3    measures, the Ninth Circuit made clear in *Nosal*, Your Honor has

4    made clear in prior decisions, including remand on *Nosal*, that

5    you don't even need to establish the circumvention of technical

6    measures to make out a CFAA case; right?  You just need to show

7    that access was unauthorized.  And the sending of the cease and

8    desist letter made clear that access was unauthorized.

9       But moreover --

10          **THE COURT:**  No, but it seems completely different.  I

11   mean, I tried the *Nosal* case.  That's getting into the interior

12   mainframe of a company to steal trade secrets, not collecting

13   data that is otherwise publicly available.

14          **MR. BLAVIN:**  Okay.  So --

15          **THE COURT:**  If you did it manually, if they went and

16   hired a billion people, they could do it; right?  If they

17   didn't use bots, they could do it.

18          **MR. BLAVIN:**  Well --

19          **THE COURT:**  And there's value to information that is

20   put out on the Internet.

21          **MR. BLAVIN:**  I do not --

22          **THE COURT:**  There's value to it, whether this picks

23   apart the First Amendment, I don't know.  But to say this a

24   *Nosal* kind of situation where somebody breaks into Korn Ferry

25   and takes customer lists, and this sort of thing, if you think

1    it's the same, you can think it's the same.  It's not the same

2    in my book.

3        So it does raise an important policy question.  Yes, you

4    have control over data access; obviously, you've assigned that

5    delegation, that control to your users.  They can select the

6    non-public.  But once something is public for all other

7    purposes, what kind -- to say that suddenly it becomes criminal

8    for somebody to aggregate that in a way that you could get that

9    information, you just can't get it this way.  You can get it

10   manually if you hired a hundred million people to do it, but if

11   you want to do it quickly and automatedly, you can't do it.

12   That is a crime?  That -- and a crime, not only is it a crime,

13   it's preemptive of all state law.  That's a pretty big pill to

14   swallow.  It's a nuclear option.

15        **MR. BLAVIN:**  And certainly, listen, we're talking

16   about the facts in this case.  What they are doing --

17        **THE COURT:**  Well, I've got to apply the law.  You want

18   CFAA to say, even without technological, you're right.  Let's

19   say *Nosal* says you don't need technological circumvention, just

20   a mere cease and desist letter, that's it.  *I don't want you*

21   *accessing my web site anymore.*  *You do, you go to jail.*  That's

22   pretty heavy stuff.

23        **MR. BLAVIN:**  In the *3Taps* decision from Judge Breyer,

24   which involved Craigslist, publicly accessible web page --

25   right? -- anyone can take it -- Judge Breyer made crystal clear

1   that under the CFAA, under its plain and unambiguous language

2   in the statute, with respect to "without authorization," that

3   Craigslist could selectively revoke access to particular

4   entities that it didn't want accessing the site.  Judge Breyer

5   engaged in a lengthy, extensive analysis of the statute, its

6   legislative history, other federal statutes, and reached that

7   conclusion.

8           **MR. GUPTA:**  Your Honor, may I respond to that?

9           **THE COURT:**  No.  Let him finish.

10          **MR. BLAVIN:**  In the *QVC.com versus Resultly* case,

11  another case dealing with publicly accessible web pages on the

12  QVC.com site, the Court made clear, looking at the statute,

13  looking at the authorities out there, that QVC could

14  selectively revoke access to particular crawlers, scrapers that

15  it didn't want accessing the site.  The Court specifically

16  noted that Google and Bing in that case may have accessed the

17  site, which is authorized, but that the web site under the

18  statute had the ability to withdraw access if it wanted to.

19      *Couponcabin* case, another recent decision, held the same

20  thing with respect to publicly accessible pages.

21      Now, with respect to the question of could there be

22  reasonable time, place, and manner restrictions --

23          **MR. GUPTA:**  Your Honor, could I just --

24          **THE COURT:**  I'm not there yet.  That's a different

25  issue.  I want to talk about the CFAA, so if you could confine

1  your comments to the CFAA, and especially Judge Breyer's

2  decision and Craigslist.

3      **MR. GUPTA:**  Yes, Your Honor.

4  So Judge Breyer in the *3Taps* decision -- I'm reading

5  straight from the opinion here -- he was extremely hesitant to

6  institute a broad regime that would ever impose the type of

7  restrictions that counsel is suggesting should apply here.

8  Here's what he said:

9      "To be sure, later cases may confront difficult

10     questions concerning the precise contours of an effective,

11     quote, revocation of authorization to access a generally

12     public web site.  This Court cannot and does not wade into

13     that thicket, except to say that under the facts here,

14     which include the use of a technological barrier to ban

15     all access, 3Taps' deliberate decision to bypass the

16     barrier and continue accessing the web site constituted

17     access without authorization under the CFAA."

18     **THE COURT:**  So why aren't those facts similar to this

19  case?

20     **MR. GUPTA:**  The facts are very different from this

21  case, Your Honor, because, first of all, the bot -- so we're

22  talking about bot blockers; right?  So what these things are is

23  basically speed bumps to limit the amount of access that people

24  are taking in the site.

25     We don't deny that there are bad scrapers out there, okay.

 1   There are scrapers probably sitting somewhere in another

 2   country who are trying to grab all the pages off of not just

 3   LinkedIn, but every major web site in the world, okay.  And who

 4   knows what they're going to do with it.  We don't dispute that

 5   they have a right to ratchet access in that way.  And that's

 6   exactly what, from my understanding, sitting here today, before

 7   we take any discovery, before the experts have had a chance to

 8   wade in, my understanding is that's what they're talking about.

 9        Well, guess what, there's some good news for hiQ, Your

10   Honor.  HiQ is missing a whole bunch of zeros in terms of its

11   access to the LinkedIn web site, okay.  We're not out there

12   scraping the whole site.

13        The way that hiQ works is let's say there's a client,

14   American Express.  American Express says *we've gotten thousand*

15   *employees, we want a skills map, okay.  We want to know where*

16   *are we strong, where are we weak, where can we improve our*

17   *skills*.  We just search for those individual users on Google

18   and literally grab their page.  It could be a manual process --

19   right? -- because if we're talking about 10,000 people,

20   literally you could just go to the site, you grab the profile.

21        **THE COURT:**  So you're saying it turns on how difficult

22   you say speed bumps -- you're saying it turns on the size of

23   the speed bump if the CFFA applies?

24        **MR. GUPTA:**  No.  What I'm saying, Your Honor, is

25   there's a difference between a lock on a door and a speed bump,

1   okay.  A password is akin to a lock on the door; right?

2           THE COURT:  Well, what did *Craigslist* involve?

3           MR. GUPTA:  *Craigslist* involved -- to be honest, it's

4   not entirely clear what the technological barriers were, but it

5   sounds like it was a complete IP block, which we're not even

6   sure if that even exists in this case with LinkedIn.

7       But the point is I think that the real -- the real

8   distinction you need to recognize with *3Taps* is that in the

9   *3Taps* case they were engaged in activity of taking the entire

10  web site.  They were taking the entire web site, turning it

11  into an API, and reselling it.

12      Here, hiQ is taking individual pages.  What hiQ is doing,

13  Your Honor, a key point here would be regarded as fair use

14  under the Copyright Act, because hiQ is taking individual

15  content and putting it to a transformative use without harming

16  the market for the person that's providing public information.

17          THE COURT:  Well, I feel like you're mixing, to a

18  certain extent, apples and oranges, because we're talking about

19  the ability of a web site, such as LinkedIn or Craigslist, to

20  define their own access level to impose their own speed bumps,

21  as you put it, or it's somewhere between a speed bump and a

22  locked door.  And you want to say, well, you got to look at the

23  purpose, and whether it's transformative, and whether it's a

24  noble purpose or bad purpose, and whether it's something -- I

25  don't know how that -- looking at the purpose is a different

 1   issue.

 2           **MR. GUPTA:**  Point taken.

 3           **THE COURT:**  So I'm -- so I'm troubled by, you know,

 4   this notion both ways, that, you know, you would think a web

 5   site would be able to control certain levels of access and

 6   access the bots, et cetera, et cetera.

 7       On the other hand, you know, the idea that suddenly, you

 8   know, things were criminalized, I find troubling.

 9           **MR. WISOFF:**  Your Honor, may I weigh in for just a

10   moment?

11           **THE COURT:**  Yes.

12           **MR. WISOFF:**  So Judge Breyer is next door, and one of

13   the most highly respected judges --

14           **THE COURT:**  I'll accept the first comment, not the

15   second one.

16                       (Laughter)

17       **MR. WISOFF:**  So I, you know, he decided what he

18   decided in a case that he decided.  There's certainly no Ninth

19   Circuit case that says that public -- completely public

20   information on a web site falls within the ability of a social

21   media site to revoke access to anyone at will for anyone

22   reason, regardless of whether it violates independent law.

23       Judge Breyer struggled with the decision that he had to

24   make.  He expressed reservations about it.  I'm not completely

25   familiar with the case.  My understanding is that they were

1  sort of reproducing the exact Craigslist stuff somewhere else

2  and providing an app that basically allowed people to

3  circumvent Craigslist entirely.

4      But also when Judge Breyer made his decision, he didn't

5  have the benefit of the United States Supreme Court *Packingham*

6  decision, which just came down and made very clear that social

7  media sites in particular are the public forums of the present

8  and future, and that --

9          THE COURT:  Well, I mean, I know you've raised that,

10 and there's obviously some distinctions, because that was a

11 complete ban of the person from social media.

12     But I will say that there's -- I sense a bit of irony that

13 we have to talk about, and that is to the extent that LinkedIn

14 can invoke the CFAA, and it becomes operative, that certainly

15 makes more of a state action element present in any

16 constitutional analysis.

17     Right now they've got a *PruneYard*, and they're trying to

18 extrapolate *PruneYard*, et cetera, et cetera, which I'm not so

19 sure about.  But once you say that the CFAA arms private

20 parties and sanctions private parties to block access to

21 information that otherwise is now public and available to the

22 public --

23          MR. WISOFF:  And that --

24          THE COURT:  -- at least it now raises the specter, a

25 higher specter of constitutional analysis than would be present

if it were purely private action.  Once you invoke the

imprimatur of the state, I think it changes the analysis.

     **MR. BLAVIN:**  Could I briefly respond?

     **MR. WISOFF:**  I just wanted to finish up.

     **THE COURT:**  Finish up.

     **MR. WISOFF:**  If the statute in -- if in North Carolina

in *Packingham*, instead of saying that any sex offender can't

access any social media site, it had said any social media site

can prevent a sex offender from accessing their site, would the

different -- would the Supreme Court have ruled differently

there?  I think not.

    So they want to interpret a federal statute, the CFAA, to

essentially delegate themselves to decide to exclude an entire

class of listeners in the Internet context, posters or

speakers, and visitors or copiers or listeners.  And at least

under Federal Constitutional law they're treated equally, and

they are given that both are necessary for the exchange of

ideas and for the advancement of human thought.

    And so they want to take the CFAA and say that -- and

basically accomplish indirectly what they couldn't accomplish

directly.  If the CFAA had said, you know, they can ban access

to a particular class of people or a particular class of

speakers or a particular class of listeners, I don't believe

that that would be upheld.  But they want to basically say that

behind the scenes, by sending out a cease and desist letter,

1   they can do just that.

2       Now, the California Penal Code, which they say is very

3   similar to the CFAA, would clearly be trumped by California

4   Constitutional principles.  And I don't think it's a far -- you

5   say you have to extrapolate the *PruneYard* case and the *Fashion*

6   *Valley Mall* case, but I don't think it's that big of an

7   extrapolation to say that an Internet site, social media site

8   of 500 million people should be able to exclude an entire class

9   of speakers or listeners based on what they think is

10  appropriate from what is clearly under California law a public

11  forum and now under Supreme Court law a public forum.  And --

12      **THE COURT:**  Well, I have to say, by the same token

13  that you say that the CFAA argument is so sweeping and

14  profound, your Constitutional argument has all sorts of

15  potential ramifications that we haven't even thought through.

16      I mean, if you say that suddenly, you know, access to the

17  Internet is like the town square and a public forum imbued with

18  sufficient, you know, protection under the -- with protection

19  under the California Constitutional right of free speech, does

20  that mean that web sites can do nothing to block -- any time

21  they try to block -- you know, there's this whole effort now to

22  ferret out fake news, or whatever it is, and somehow that's now

23  subject to Constitutional scrutiny every time they make some

24  kind of decision?

25      **MR. WISOFF:**  No, they can do -- they can have

1    reasonable time, place, and manner restrictions.  They can't --

2         **THE COURT:**  I'm not sure that's time, place, and

3    manner if you try to ferret out based on content, if you try to

4    ferret out terrorist messages.  That's just not time, place,

5    and manner.

6         **MR. WISOFF:**  Well, Your Honor, criminal activity is

7    not protected under the First Amendment or otherwise, and

8    California law recognizes that, as does federal law.

9         But what they're doing here -- and, you know, Mr. Blavin

10   said let's stick to the facts of the case, so let's stick to

11   the facts of the case.  Let's look at the reasons that they

12   have offered as justifications for their actions.

13        Member privacy.  Their own privacy policy says they will

14   not sell member non-public information.  It doesn't say they

15   won't sell member public information.  It says that they won't

16   post anything on -- they won't share anything that isn't posted

17   on the site.  Well, thank you very much.  Obviously, if

18   somebody doesn't post something on the site, they can't share

19   it.  So they are reserving for themselves the right to use the

20   information in the same ways that they are precluding other

21   people from using the information.

22        And California law is very clear -- you talked about sort

23   of wanting to conform things to consumer will.  I don't

24   necessarily agree that that's really the focus.  Because what

25   California law says is when you make something public, it is

```
 1  public.  You can't take it back.  And you have no expectation
 2  of privacy in it once you have made it public.  And so when
 3  people post something on the Internet, they no longer have an
 4  expectation of privacy, and it's only the public information
 5  that we are taking.
 6       THE COURT:  So if they want to post something, and
 7  they make changes, and they would like not to have it
 8  broadcast, which is one of the options --
 9       MR. WISOFF:  Right.
10       THE COURT:  -- which indicates their desire, you know,
11  yeah, it's public, but the fact of the change, although
12  publicly ascertainable, is something that I would rather not be
13  very discernible, you're saying, well, let's stop there, it's
14  whatever.
15       MR. WISOFF:  No.  They make that decision by delinking
16  it from being public.  The public setting allows web crawlers
17  and everybody to come in and see what they have posted.
18       THE COURT:  But it doesn't -- Google itself would not
19  broadcast or highlight a change made.
20       MR. WISOFF:  Right.  If they want to make a change,
21  they can dedesignate it as public and make the change and no
22  one will see the change.  But if you --
23       THE COURT:  How do you dedesignate just the change?
24       MR. WISOFF:  Because there's a setting --
25       THE COURT:  Just the change.
```

1          **MR. WISOFF:**  There's a setting where you can stop your

2     profile from being public.

3          **THE COURT:**  Oh, you dedesignate the entire profile?

4          **MR. WISOFF:**  Correct.

5          **THE COURT:**  But if you want the intermediate range of

6     keeping your profile out there and updating it, but you don't

7     want to broadcast that it's been changed, because it's going to

8     look like you're job hunting or doing something else, you know,

9     it's not clear to me that there shouldn't be that option, and,

10    you know, consumers shouldn't be able to have some control over

11    that.

12         **MR. GUPTA:**  Your Honor, so we're not broadcasting it

13    either; right?  We're not sure what the data exactly is that

14    they're talking about or what the process is.  Our

15    understanding is it's rather kosher what's going on, on the

16    Keeper product in particular, as well as Skill Mapper.

17         But the point is what the employers are using this

18    information for on the Keeper product is to say -- the general

19    theory is, look, I've got a hundred employees.  Let's see what

20    different people's skills are, whose got a hot skill set, whose

21    got a less hot skill set, who is more likely to be approached

22    by a recruiter, who is less likely to be approached by a

23    recruiter.  If I can't afford to lose somebody, I need to give

24    them a bonus.  So they use this as a mechanism --

25         **THE COURT:**  Well, it could work out that way.  It also

 1   could work out not so nicely.

 2        MR. GUPTA:  Your Honor, look, it's public information,

 3   and these are the engines of innovation.  These are these new

 4   ideas.

 5        THE COURT:  Everything is public information, but how

 6   you aggregate it, how you treat it, how you analyze it, and

 7   then you -- you know, you're putting kind of a label on it.

 8   There's a bit of an editorial comment here.  I mean, based on

 9   the analytics, you're saying based on this publicly available

10   information, here's a pattern IC, or I don't know exactly what

11   they do, but there's something to be discerned from that.  And

12   you know, what if I, as a user, am not comfortable with

13   somebody sort of making inferences from my data?

14        MR. GUPTA:  Your Honor, what if somebody was

15   performing searches on Google to determine who is a Trump

16   supporter, who is -- you know, you could figure that stuff out

17   from public information.  You could figure out who supported

18   Hillary Clinton.

19        I mean, there's so much information on the Internet,

20   there's probably lots and lots of applications that might make

21   someone feel a little queazy; right?  But the thing is we can't

22   sit here today and police every possible business model that

23   some entrepreneur in Silicon Valley might come up with.  It's

24   public information.  It's the marketplace of ideas.  It's the

25   engine of our country's growth.

1          **THE COURT:**  Well, I guess the question is can the web

2     site itself police and start restricting, and that what impact

3     does that have?

4          **MR. WISOFF:**  Well, the California Supreme Court at

5     least says a public forum cannot do that.  They cannot --

6          **THE COURT:**  If it's a public forum.

7          **MR. WISOFF:**  If it's a public forum.  And so the

8     question --

9          **THE COURT:**  Of course even that analysis is not so

10    clear, because you can -- there are times when the act of the

11    entity that has control can define whether it is a limited

12    public forum or full public forum or not public forum.  So it's

13    not like except for streets and certain things that are

14    dedicated to public forum until time immemorial, actually

15    owners have some discretion.

16         **MR. WISOFF:**  Well, the California Supreme Court said

17    that, in the shopping mall context, even if the activity was

18    damaging the business of businesses in the mall, you can't

19    restrict certain activity within the forum, so...

20         **MR. BLAVIN:**  Your Honor --

21         **THE COURT:**  I was making a simple point that even in

22    the traditional public forum analysis --

23         **MR. WISOFF:**  Correct.

24         **THE COURT:**  -- that the property owner, whatever the

25    entity is that has control often through its rules and

regulations, can actually kind of dictate whether it is

accorded full public forum analysis or limited public forum

analysis or not public forum analysis.

**MR. WISOFF:** I agree with that, Your Honor. And so

when you look at -- and the courts typically look at the

justifications for the action. They typically look at whether

or not there were less restrictive means to accomplish the same

result. They look at those kinds of factors.

But what hiQ is doing here is painting with this broad

brush of you can never come back to our web site again because

you're making money on data that our people put up there.

They're not going after people that are manually copying, even

though their terms of service prohibit manual copying. They're

going after people that are making money from information that

people post on their site so that they can prevent anyone else

from profiting off of information that appears on the LinkedIn

web site.

And that is discrimination against commercial users in the

same context that in the *Sorrell* case the United States Supreme

Court said that under state action under the First Amendment

you can't do; and that, in fact, it's not content neutral,

because you're discriminating against commercial uses when

you're allowing other uses. In *Sorrell*, they said that that

was subject to strict scrutiny and struck it down.

Now, here, we don't have, you know, the same kind of state

1    action, because we don't have a statute that is accomplishing

2    it.  We have a party that's trying to use the statute that

3    doesn't even define unauthorized access, and have you define it

4    in a way that allows them to do indirectly what a statute

5    cannot allow.

6              **MR. BLAVIN:**  Your Honor, may I chime in at this point?

7              **THE COURT:**  Yeah.

8              **MR. BLAVIN:**  So first, on this question of the

9    application of either the California Constitution or the First

10   Amendment with respect to free speech rights.

11         HiQ is seeking to access the site through anonymous

12   surveillance bots.  Bots do not speak.  What they're

13   complaining about is not a question of can I engage in

14   expressive conduct on the LinkedIn web site, as was at issue in

15   the *Packingham* case.  What they're talking about is can I use

16   these automated anonymous bots to access the site.

17         The Supreme Court in the *Virginia -v- Hicks* case, which

18   they barely respond to at all in their Reply, in a unanimous

19   decision drew a distinction between non-expressive conduct,

20   there, essentially someone who had been told do not access this

21   property.  The Supreme Court assumed that that property was a

22   public forum.  And the Supreme Court said when the property

23   owner says don't access the site, when you ignore that and you

24   trespass on the property, even if it is a public forum, that

25   the entry in violation of the restriction is not speech at all,

1    it's non-expressive conduct.

2        This is dramatically different from *PruneYard*.  In

3    *PruneYard*, the shopping mall had a policy that was to restrict,

4    quote, public expressive activity at the shopping mall.  That's

5    not what's occurring here.  These bots, surveillance bots, are

6    not speaking on LinkedIn's web site.  They're going onto the

7    site to access and extract all of this data.  And this isn't,

8    you know --

9        THE COURT:  Well, but that seems to me that's

10   ancillary to the right to receive information and the right to

11   listen.  I mean, that's pretty formalistic, to say the method

12   of using -- so if I use, you know, some kind of technological

13   assistance in reading something or hearing something, that's no

14   longer First Amendment activity?

15       MR. BLAVIN:  Well, the --

16       THE COURT:  I mean, you could say -- you could say

17   Google is not -- me going to Google is not First Amendment

18   activity.  Google is not speaking, it's just conveying

19   something, it's just picking up information so I can read it.

20   I mean, it's the right to receive information.  That's what's

21   critical.  That's just as important as the right to speak

22   information.

23       MR. BLAVIN:  Even --

24       THE COURT:  So I don't, frankly -- I'm not moved by

25   your argument that, well, you use a bot to receive information,

1    that's totally outside the ambit of any First Amendment,

2    assuming there's any First Amendment to apply here, which is

3    the bigger threshold question, it seems to me.

4            **MR. GUPTA:**  Your Honor, if I could respond.

5            **THE COURT:**  No, no.  Let him finish first.

6            **MR. BLAVIN:**  And further, Your Honor, they reference

7    the *Sorrell* case; right?  And they said, well, that case dealt

8    with the right of public access to data.  But in that case, the

9    party that possessed the data, they already possessed it, they

10   wanted to release that data, and the Court said, well, that

11   implicates First Amendment rights.  Courts have construed

12   *Sorrell* after that, such as the *Watersheds Project* cases.

13   *Sorrell* has no application when you're dealing with parties who

14   do not want to voluntarily provide the data to someone else.

15       And Your Honor, respectfully, I'd like to push back a

16   little bit with respect to your position that, well, we're

17   dealing with access to data versus data that, you know,

18   speaking in a public forum.  I mean, I think the Supreme Court

19   was pretty clear in *Hicks* that it's just not expressive

20   conduct, when you're dealing with trying to access property

21   when you don't have authorization to do so, that that's

22   trespassing.

23       The CFAA, by the *Power Ventures* decision, has been called

24   the computer trespass statute.  It's a different --

25           **THE COURT:**  Well, you know, let's not take it -- if

1  something is in a public forum and the City comes up with some

2  rules of access and say, oh, you can only access it from 1:00

3  to 2:00 in the morning on a Tuesday on every odd month, there

4  would be a problem with that.

5       **MR. BLAVIN:**  Well, in that case the Supreme Court

6  specifically noted a situation where you would have someone who

7  vandalized a public forum, engaged in conduct which was

8  prohibited in that public forum; and the Supreme Court said if

9  the party then decides you can't access this public forum

10  anymore, does not implicate free speech rights, the First

11  Amendment, at all.

12       **THE COURT:**  Right.  Well, that sort of begs the

13  question whether someone is engaged in conduct that warrants

14  sort of debarment from that which is probably what we're asking

15  here.

16       **MR. BLAVIN:**  To briefly respond to some of their other

17  points that they raised, if I may.

18       You know, with respect to this, it's public innovation, we

19  should be able to take it.  As Your Honor recognized, just

20  because something is publicly visible does not mean that users

21  don't have an expectation that that data won't be extracted,

22  aggregated, and used in a way that they do not approve.  So

23  user expectations are not aligned with, if I make it public, I

24  expect that my employers are going to get a detailed analysis

25  of every single minor change that I've made over time, and

1   assigned me a particularized flight risk.

2       On the question of, well, we are just looking at

3   particular employers' profiles; we're not scraping the site.

4   By their own admission, they're taking hundreds of thousands of

5   profiles now and, presumably, if their business is successful,

6   that will go easily into the millions.  This is not small

7   scale, you know, manual copying of data.  We're talking about

8   data which is currently in the hundreds of thousands of

9   profiles, easily could go into the millions.

10      And I think Your Honor recognized this.  I mean, we're

11  blocking already 95 million automated bots a day from accessing

12  the site.  Their suggestion that somehow we should let those

13  bot requests in that have a good intention as opposed to others

14  is totally unworkable.  We can't determine which requests are

15  good or bad, particularly when sites like hiQ are purposefully

16  anonymizing their bots, so we don't even know where they're

17  coming from.  That is why we may enter into certain

18  arrangements with some sites like Google and Bing we know that

19  are accessing the site, and we know what they're doing, versus

20  other sites that we can't detect.

21      And in the *3Taps* decision, Your Honor, Judge Breyer

22  specifically noted that the average person does not use

23  anonymous proxies like hiQ was doing to bypass an IP block set

24  set up to enforce a banning communication via personally

25  addressed cease and desist letter.

1          The facts here are almost identical to the *3Taps* case.

2    We've sent a cease and desist letter.  We have technical

3    measures in place to block them.  They are circumventing those

4    technical measures.  They want to disregard the cease and

5    desist letter, and they want to access the site.

6          **MR. GUPTA:**  Your Honor, can I respond to a few of

7    those points?

8          **THE COURT:**  Briefly.  And then I'm going to conclude.

9          **MR. GUPTA:**  Okay.  So Your Honor, just on this last

10   point, I want to make sure the record is clear.  Mr. Blavin has

11   said a few times they're accessing the site despite these

12   blocks.  We have not accessed the site since the end of the

13   standstill, okay.

14        They claim they put up a block on the 24th of June, that's

15   what it says in the declaration of Mr. Rockwell.  We have not

16   accessed the site since that date.

17        **THE COURT:**  I think the critical point that he's

18   making is that even before this cease and desist letter that

19   your client was using some means of circumventing the

20   anti-automated bots.

21        **MR. GUPTA:**  Okay.  But to compare it to *3Taps*, we

22   don't know the facts in our situation, the facts in that

23   situation, to me, seems quite a stretch.

24        On the listener/speaker thing, Your Honor, I mean, you hit

25   the nail on the head.  The First Amendment protects the flow of

1   information; it protects listeners, and it protects speakers,

2   and it protects everything in between; right?  And today in our

3   world where this marketplace of ideas includes these millions

4   and billions of web pages, any, any meaningful First Amendment

5   protection has to protect the process of making that stuff

6   humanly -- meaningful to humans.  And what that involves is

7   analysis of the information in those pages and condensing it in

8   a way that people can access and get valuable information they

9   need.  That's what hiQ does.  That's what Google does.  That's

10  what was going on in *IMS versus Sorrell*.  I think Mr. Blavin

11  has misread that case.

12      Quickly on *Virginia versus Hicks*, and I'll hand it over to

13  Mr. Wisoff.  *Virginia versus Hicks*, highly distinguishable.

14  There was a facial challenge to the over breadth.  There were a

15  lot of technical issues that Justice Scalia raised regarding

16  that.  Another key distinction there was that the gentleman who

17  had been criminally prosecuted was not -- there was no evidence

18  he was actually going to engage in protected speech.  So it's

19  apples and oranges; right?  I mean, in that sense it's apples

20  and oranges.

21      And finally, the Court even says:

22          "Rarely, if ever, will an over breadth challenge

23          succeed against a law of regulation that is not

24          specifically addressed to speech or to conduct necessarily

25          associated with speech."

1   So what we're saying here is, yes, we are definitely

2   engaged in speech conduct.   HiQ is -- there's really no dispute

3   about it.   Whether it turns out expert discovery shows the bots

4   were anonymous or not anonymous, it's all speech.   Anonymous

5   speech is speech.

6       And furthermore --

7       THE COURT:   But, I mean, you keep arguing the speech,

8   and the free speech argument, which I understand kind of the,

9   you know, the gist of that, but I'm still having trouble

10  outside the *PruneYard* analysis.   I don't know -- you're not

11  making any technical U.S. Constitution First Amendment

12  argument.

13      MR. GUPTA:   So, Your Honor, let me summarize that for

14  you.

15      U.S. Constitutional argument is very simple.   Yes, U.S.

16  Constitution requires state action.   However, when there is a

17  facially neutral statute that's being applied in a manner that

18  encroaches upon people's constitutional rights, the Supreme

19  Court has held that under some circumstances the judicial

20  enforcement of that law will be regarded as a violation of

21  their constitutional rights.

22      Two cases they didn't respond to:   *Shelley versus Kraemer*

23  and *New York City Times versus Sullivan*.   Both of those cases

24  involved private party civil statutes which were being sought

25  to be enforced in a manner that encroached on people's rights,

okay.  So the argument is simply that they're using the CFAA as

a statute that prevents access to information, literally that's

the provision that they're relying on, the one that prevents

access to information, and they're doing it in a way that's

stifling First Amended protected speech.  That's the first

prong, Your Honor.

There's a second prong to the argument, and I think it's

quite compelling, if you you'll bear with me.  It's under the

Copyright Act.  There is -- this area of human conduct is

governed by copyright law.  It's the access of information and

the use of information.  What they're saying is when a company

comes in with a computer and copies data, they have an at-will

right, or they can terminate that access for whatever improper

purpose they wish.  That's the position that LinkedIn is

taking.

However, under the Copyright Act, there are numerous cases

that have held precisely such conduct as protected as fair use.

So, for example, the *Perfect 10 versus Google* case, similarly

the *Ditto.com* case; these are cases where a search engine was

out there, it was quote-unquote scraping web sites around the

Internet.  The owners of the copyrights got upset and said,

*hey, you can't make thumbnails out of our images*, and they sued

for copyright infringement.  The Supreme -- well, various

courts --

            **THE COURT:**  I guess what I don't understand about your

1    copyright analysis, copyright analysis gives affirmative rights

2    to the copyright holder, and it creates some exceptions for

3    fair use, et cetera, et cetera.

4        Here, it seems like you're trying to use the copyright to

5    say, well, this is the limit of what someone can do.

6            **MR. GUPTA:**  That's where I was going.

7            **THE COURT:**  It defines not the floor, but the ceiling,

8    which is --

9            **MR. GUPTA:**  So Your Honor, there's two cases from the

10   Supreme Court, which they completely ignored in their papers,

11   which are *Eldred* and *Golan*, which held exactly what you just

12   said.  They held that there are these constitutional safeguards

13   that are hardwired into the Copyright Act, and one of them is

14   the Fair Use Doctrine.  The Fair Use Doctrine gives life to the

15   First Amendment.

16           **THE COURT:**  Right.  That insulates -- it limits what

17   somebody can do to enforce an affirmative right, a copyright, a

18   specific right conferred by statute.

19           **MR. GUPTA:**  Correct, Your Honor.  But if you look

20   at --

21           **THE COURT:**  It doesn't say that outside of the realm

22   of enforcement of that right, and whatever restrictions

23   including constitutional restrictions may lie, that somehow the

24   Copyright Act defines the outer limits of what one can do in an

25   otherwise, you know, free world.

1          **MR. GUPTA:**  I think what it is, Your Honor, is that

2     it's highly, highly instructive.  Because if you look at the

3     conduct that they're saying is violating their rights, it is

4     access and copying of information; right?  So in substance it

5     is exactly what is proscribed under 17 U.S.C. 106A.  It is

6     reproduction of information.  We are accessing --

7          In fact, if you look at the Northern District of

8     California jury instruction on copyright infringement and what

9     constitutes copying, it is access and substantial similarity.

10    So we have accessed and copied, that's the allegation.  So in

11    substance --

12         **THE COURT:**  Well, this suggests that they might not be

13    able to sue you for copyright.

14         **MR. BLAVIN:**  Your Honor, May I quickly --

15         **MR. GUPTA:**  But Your Honor, if I could just finish the

16    point.

17         **THE COURT:**  No.  Let him finish.

18         **MR. GUPTA:**  So the point I'm making, Your Honor, is

19    that so now that the Supreme Court has told us that there's

20    copyright, but you can't interfere with the flow of information

21    in certain ways, they're accusing what is precisely an act that

22    falls within the copyright realm under a different label.

23    They're labeling it something different, because they know that

24    there's all these laws out there.

25         **THE COURT:**  If they were to bring a copyright action,

1    you might have a fair use defense, period.  I don't know why

2    that's --

3         **MR. GUPTA:**  Your Honor, it's not a fair use defense,

4    it's a First Amendment defense.

5         **THE COURT:**  Well, but fair use defense is grounded in

6    the First Amendment.  But they're not seeking that.  And I

7    don't know why that would -- the fact that they could not bring

8    a copyright action does not mean they can't take other

9    self-help measures.

10        **MR. WISOFF:**  And, Your Honor, I don't think we're

11   saying that.  I think what we're saying is that they -- they

12   are -- what they're really complaining -- they've put up all

13   these justifications about member privacy, and the like, that

14   just don't hold water, because they can use the information for

15   the same reason, and because the information is public on a

16   public social media site and explicitly made so by the users.

17   So those justifications look like pretext.

18       What's really going on here is they don't want anyone to

19   be able to copy information in which they claim no proprietary

20   interest, because they have none.  And to -- and in order to do

21   an end-run around copyright law, because they don't have that

22   claim, they're trying to have you construe the CFAA in this

23   overbroad way to say that it overrides all independent --

24        **THE COURT:**  Or they're maybe just saying you have no

25   affirmative rights.

 1          **MR. WISOFF:**  They're saying --

 2          **THE COURT:**  I mean, apart from the sweeping defense of

 3     the CFAA they may be saying, okay, even if CFAA doesn't apply,

 4     what rights are you claiming here?

 5          **MR. WISOFF:**  Well, without the CFAA, they can't stop

 6     us from coming to the site and copying information, because the

 7     only other way they could stop us from doing it would be if

 8     they could show we were somehow damaging the site through

 9     trespass to chattels.  Or if they could show that we were

10     engaging in copyright violations, they could bring a copyright

11     claim.  But without the CFAA or the California Penal Code, they

12     have no way to prevent us from coming onto the site and

13     copying.  That's their vehicle to prevent us from coming on.

14          So the California Penal Code would clearly be preempted by

15     the California Constitution.  The CFAA, they're saying, hey,

16     even if what we're doing violates independent law, including

17     the California Constitution, Unfair Competition, whatever, the

18     supremacy clause of the Federal Constitution trumps it, because

19     the CFAA gives us this right.

20          **THE COURT:**  I understand that.

21          **MR. BLAVIN:**  Briefly on the Copyright Act.

22          I think, as Your Honor recognizes, these are statutes that

23     involve different qualitative rights and remedies, which the

24     Northern District decision in the *Oracle* case made clear.  I

25     mean, under the Copyright Act we could theoretically sue for

1  statutory damages.  You can't get that under the CFAA.

2  Accordingly, Congress made different policy determinations when

3  it enacted the Copyright Act and when it enacted the CFAA.  The

4  Copyright Act, in Section 107, they included a fair use

5  defense.  That's entirely absent from CFAA.  They're just

6  totally different statutes.

7          **THE COURT:**  Bottom line is you have not asserted a

8  copyright violation here.

9          **MR. BLAVIN:**  We have -- in the cease and desist

10 letter, we noted a potential violation of the Digital

11 Millennium Copyright Act.

12     In our papers, we're talking about the Computer Fraud

13 Abuse Act, and I think that's what's at issue, and Section 502

14 of the Penal Code.

15     And, again, just to be clear here, we're not talking about

16 restrictions on accessing the site.  They can access the site

17 like any other member can, as long as they abide by reasonable

18 limitations that LinkedIn has put in place.

19         **THE COURT:**  Could LinkedIn say:  *I don't want you to*

20 *even access the site manually*?

21         **MR. BLAVIN:**  Well, that's not what's at issue here.

22         **THE COURT:**  Let me ask you --

23         **MR. WISOFF:**  Actually, that's what their cease and

24 desist letter says.

25         **THE COURT:**  Can they?  Can your client do that?

1          **MR. BLAVIN:**  With respect to you can't manually copy

2    the site.  Well, one, that wouldn't circumvent technical

3    protection measures, so it would be a different case.

4          **THE COURT:**  But you say that's not necessary for the

5    CFAA, just the deauthorization is enough; and if somebody

6    violates the authorization rule, wouldn't that violate the CFAA

7    under your construction?

8          **MR. BLAVIN:**  Your Honor, it's not presented here, and

9    I would be hesitant to go that far right now.

10         I will say that in *Power Ventures*, though, the Ninth

11   Circuit did make clear that if you revoke authorization for

12   access -- in other words, access is not authorized.

13         If Your Honor would be more comfortable, we're happy --

14   and this is what we've tried to make crystal clear in our

15   papers.  We're talking about access through automated bots and

16   scraping technologies.  That's what this case is about.  It's

17   not about manual copying.  If they want to have their employees

18   go manually copy the site page by page, that's a different

19   issue.  That's not what we're talking about, and that's not

20   what the cease and desist letter was about, and it's not what

21   this case is about.

22         Now, with respect to the First Amendment, I just want to

23   quickly go back to this.  This is what the Supreme Court held

24   in *Virginia -v- Hicks*, and I'm quoting from the decision:

25              "Even assuming the streets of Whitcomb Court are a

1          public forum, the notice-barment rule," the statute at

2          issue there, "subjects to arrest those who reenter after

3          trespassing and after being warned not to return,

4          regardless of whether upon their return they seek to

5          engage in speech.

6     The Court went on at the end of that paragraph:

7          Here, as in this circumstance of someone vandalizing

8          the park, it is Hicks' non-expressive conduct, his entry

9          in violation of the notice-barment rule, not his speech,

10         for which is he is being punished as a trespasser.

11    The Court said the First Amendment free speech rights were

12    not implicated at all.

13         **THE COURT:**  Well, the distinction -- I know what

14    you're saying, and that is the distinction here is you're

15    trying to enter the park for information gathering purposes,

16    not to commit a wholly distinct nonspeech-related crime of

17    trespass.

18         **MR. WISOFF:**  Correct.

19         **THE COURT:**  And therefore it's different.

20    On the other hand, you know, we go back to the same

21    question earlier; isn't it a public square?

22         **MR. WISOFF:**  Your Honor, one other point on *Hicks* is

23    *Hicks* was a facial challenge.  They were trying to strike down

24    the entire statute as being unconstitutional.  What the Supreme

25    Court said is even if --

1          **THE COURT:**  Frankly, I don't find *Hicks* exactly very

2     helpful and informative to what we've got to deal with here.

3          **MR. WISOFF:**  Okay.  And I just point out that the

4     record representation there that they don't have a problem with

5     us coming onto the site manually --

6          **THE COURT:**  I understand.  I understand.  It's in the

7     cease and desist letter is written more broadly in terms --

8          **MR. WISOFF:**  Right.  But it makes our point that this

9     really isn't about privacy interests, it isn't about people

10    having the information or copying the information, it's about

11    people being able to collect it in a way that is commercially

12    feasible.  That is what they are trying to do, is to prevent

13    commercial use of the information.

14         **THE COURT:**  Well, and the question is whether there is

15    any restriction on that ability or not.

16         **MR. WISOFF:**  That's correct.

17         **MR. BLAVIN:**  Your Honor, just quickly to respond to

18    that.

19         I mean, obviously, if they're engaged in manual copying,

20    they're not going to be able to do it in the millions, which

21    implicates in the hundreds of thousands the privacy concerns

22    that our members have.  It's through the automated technologies

23    that they're able to --

24         **THE COURT:**  The counter consideration from a policy

25    viewpoint is, though, however, much of what is useful out there

 1  and has to be aggregated in a way that cannot be done manually.

 2  We know that.   I mean, that's what Google is about, that's what

 3  everything else is about.

 4      And so if restrictions on that process through some

 5  interpretation of a legal statute, or whatever, is deemed to

 6  obtain -- you know, that has some, you know, pretty serious

 7  implications, whether it's about future research, future

 8  access, future speech, the way that information is collected

 9  and exchanged in our society.  But yet a lot of this is -- you

10  know, I'm not sure necessarily informs the reading of the

11  statutes.  It may or may not.

12      MR. WISOFF:  Your Honor, obviously we're here for a

13  TRO, and I don't think we have to prove our case on a TRO.  We

14  have to prove that there's substantial questions going to the

15  merits that sharp -- decidedly tipping the balance of

16  hardships.

17      THE COURT:  It depends on the balance of hardships,

18  and the robustness -- which then informs the robustness of the

19  showing that you need to make.

20      MR. WISOFF:  Right.

21      THE COURT:  And I'm aware of that.  But what I'd like

22  you to do is to have that conversation about the standstill

23  agreement, see if you can come to an agreement, and allow us to

24  fully brief and set a schedule for a full preliminary

25  injunction hearing, which is going to be more consequential.

1  But I need to know when and what time frame you will let me

2  know whether you can reach an agreement, because, if not, then

3  I have to decide one way or another on this thing.  So in the

4  next couple of days --

5          **MR. BLAVIN:**  Yeah, that's fine.

6          **MR. GUPTA:**  Your Honor, I think we need -- we'll have

7  to get an answer sooner rather than later, so I think close of

8  business tomorrow.

9          **THE COURT:**  Okay.  Let me know by close of business

10  tomorrow whether you have an understanding, and, if you do,

11  what your preferred schedule for any further briefing might be.

12  Just with a caveat that I need, normally in a motion practice,

13  there's a two-week period between the last brief and the

14  hearing.  I can truncate that a bit since we are dealing with,

15  you know, a TRO Rule 65 type setting, but not by a lot.  And I

16  don't -- this two-day stuff is not very doable.

17          **MR. GUPTA:**  It's hard for everyone, Your Honor.

18          **THE COURT:**  So if you can agree on that, that would be

19  fine.  If not, I'll have to deal with this.

20          **MR. WISOFF:**  I'd just like to put one thing on the

21  record, Your Honor, because we noticed -- obviously, we had one

22  day to file the Reply Brief.  We noticed in the opposition they

23  did attach as an exhibit to the Declaration of Mr. Bajoria an

24  email from our client that was expressly marked as Evidence

25  Rule 408 protected.  We believe that that was an improper use

1    of the document.  And while we don't think it has any

2    consequence to the issues before Your Honor, we don't want to

3    be viewed as having waived any Rule 408 discussion, so we want

4    to make that clear on the record.

5              THE COURT:  All right.

6              MR. BLAVIN:  We would not argue that that's a waiver.

7              THE COURT:  All right.  Great.

8         All right.  Thank you, counsel.  Very helpful.

9                   (Proceedings adjourned at 4:45 p.m.)

10                        ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, July 6, 2017

8

9

10

11    _____

12           Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                         Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25