1  C. Brandon Wisoff (State Bar No. 121930)
   bwisoff@fbm.com
2  Deepak Gupta (State Bar No. 226991)
   dgupta@fbm.com
3  Jeffrey G. Lau (State Bar No. 281629)
   jlau@fbm.com
4  Rebecca H. Stephens (State Bar No. 299234)
   rstephens@fbm.com
5  Farella Braun + Martel LLP
   235 Montgomery Street, 17th Floor
6  San Francisco, California 94104
   Telephone: (415) 954-4400
7  Facsimile: (415) 954-4480

8  Laurence H. Tribe* (State Bar No. 39441)
   Carl M. Loeb University Professor and
9  Professor of Constitutional Law
   Harvard Law School
10 1575 Massachusetts Avenue
   Cambridge, Massachusetts 02138
11 Telephone: (617) 495-1767
   *Admitted pro hac vice*
12
   Attorneys for Plaintiff hiQ Labs, Inc.
13

14              UNITED STATES DISTRICT COURT

15             NORTHERN DISTRICT OF CALIFORNIA

16

17 hiQ Labs, Inc.                          Case No. 3:17-cv-03301-EMC

18            Plaintiff,                    **DECLARATION OF DEEPAK GUPTA IN
                                            SUPPORT OF PLAINTIFF'S MOTION
19       vs.                                FOR PRELIMINARY INJUNCTION**

20 LinkedIn, Corp.,                         The Hon. Edward M. Chen

21            Defendant.                    Date:      July 27, 2017
                                            Time:      1:30 P.M.
22                                          Location:  Courtroom 5, 17th Floor
                                                       450 Golden Gate Ave.
23                                                     San Francisco, CA 94102

24

25

26

27

28

GUPTA DECL. ISO PLAINTIFF'S MOTION FOR          *Affiliation noted for identification purposes only.*
PRELIMINARY INJUNCTION – Case No. 3:17-cv-                                          34556\6111148.1
03301-EMC

I, Deepak Gupta, declare as follows:

1.      I am a partner with the law firm of Farella Braun + Martel LLP, attorneys of record for Plaintiff hiQ Labs, Inc. ("hiQ").  I have personal knowledge of the facts set forth below and if called as a witness I could and would competently testify to those facts.  The materials listed below are publicly available and readily accessible on databases such as Lexis-Nexis.

2.      Attached as Exhibit V is a true and correct copy of LinkedIn's Notice of Motion and Motion to Dismiss First Amended Class Action Complaint and to Strike Class Allegations from *Perkins v. LinkedIn Corporation*, No. 5:13-cv-04303-LHK, Dkt. 17 (N.D. Cal. Dec. 6, 2013).

3.      Attached as Exhibit W is a true and correct copy of LinkedIn's Notice of Motion and Motion to Dismiss Second Amended Class Action Complaint and to Dismiss Request for Statutory Damages from *Perkins v. LinkedIn Corporation*, No. 5:13-cv-04303-LHK, Dkt. 60 (N.D. Cal. Sept. 18, 2014).

4.      Attached as Exhibit X is a true and correct copy of James Surowiecki, "Why Tesla is Worth More than GM," MIT Technology Review (Jun. 27, 2017).

5.      Attached as Exhibit Y is a true and correct copy of House of Representatives Report  No. 98-894, 1984 U.S.C.C.A.N. 3689 (1984).

6.      Attached as Exhibit Z is a true and correct copy of Senate Report No. 99-432, 1986 U.S.C.C.A.N.  2479 (1986).

7.      Attached as Exhibit AA is a true and correct copy of Legislative Counsel's Digest, 1987 Cal. Legis. Serv. 1499 (West).

8.      Attached as Exhibit BB is a true and correct copy of Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143 (2016).

9.      Attached as Exhibit CC is a true and correct copy of Judicial Council of California Civil Jury Instruction (CACI) 2210 ("Affirmative Defense – Privilege to Protect Own Financial Interest").

10.      Attached as Exhibit DD is a true and correct copy of Bala Iyer, et al., *The Next Battle in Antitrust Will be About Whether One Company Knows Everything About You*, Harvard

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

GUPTA DECL. ISO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – Case No. 3:17-cv-
03301-EMC

2

34556\6111148.1

Business Review (Jul. 6, 2017).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 20, 2017, at San Francisco, California.


_____*/s/ Deepak Gupta*_____
Deepak Gupta

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

GUPTA DECL. ISO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION – Case No. 3:17-cv-
03301-EMC

3

34556\6111148.1

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**

# EXHIBIT V

1  JEROME C. ROTH (State Bar No. 159483)
   ROSEMARIE T. RING (State Bar No. 220769)
2  JONATHAN H. BLAVIN (State Bar No. 230269)
   WILLIAM J. EDELMAN (State Bar No. 285177)
3  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, 27th Floor
4  San Francisco, California 94105
   Tel:   (415) 512-4000
5  Fax:  (415) 512-4077
   Email:  jerome.roth@mto.com
6
   *Attorneys for Defendant*
7  LINKEDIN CORPORATION

8                  **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN JOSE DIVISION**

11

12  PAUL PERKINS, PENNIE SEMPELL, ANN          CASE NO.  13-cv-04303-LHK
    BRANDWEIN, ERIN EGGERS, CLARE
13  CONNAUGHTON, JAKE KUSHNER,
    NATALIE RICHSTONE, NICOLE CROSBY,
14  and LESLIE WALL; individually and on        **DEFENDANT'S NOTICE OF MOTION
    behalf of all others similarly situated,    AND MOTION TO DISMISS FIRST
15                                               AMENDED CLASS ACTION
                    Plaintiffs,                  COMPLAINT AND TO STRIKE CLASS
16                                               ALLEGATIONS; MEMORANDUM OF
                                                 POINTS AND AUTHORITIES IN
17              v.                               SUPPORT THEREOF**

18
    LINKEDIN CORPORATION,
19                                               Judge:    Hon. Lucy H. Koh
                    Defendant.                   Date:     April 10, 2014
20                                               Time:     1:30 p.m.
                                                 Location: Courtroom 8 – 4th Floor
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND AND SUMMARY OF ALLEGATIONS ............................... 4

    A.    The Add Connections Networking Tool ............................................... 4

    B.    Accessing Email Contacts ..................................................................... 4

    C.    Sending Connection Invitations ............................................................ 6

    D.    Plaintiffs' Claims .................................................................................. 8

II.    LEGAL STANDARDS ........................................................................................ 9

III.    ARGUMENT ...................................................................................................... 10

    A.    All Of Plaintiffs' Claims Fail Because Members Consent To Allowing Access To Email Contacts and Sending Connection Invitations ........................... 10

    B.    Plaintiffs Lack Article III Standing To Bring Right Of Publicity, UCL, And Section 502 Claims ............................................................................. 15

    C.    Plaintiffs Fail To State A Claim For Violations Of California's Common Law Right Of Publicity .......................................................................... 21

    D.    Plaintiffs Fail To State A Claim For Violations Of California's Unfair Competition Law ................................................................................. 21

        1.    Plaintiffs Do Not Satisfy Rule 9(b) ......................................... 22

        2.    The Alleged Misrepresentations Are Not "Likely To Deceive" Reasonable Consumers As A Matter Of Law .......................... 23

        3.    Plaintiffs Do Not Allege Reliance ........................................... 24

        4.    Plaintiffs' Claims Under the Unlawful Prong Fail .................... 24

        5.    All Of Plaintiffs' UCL Claims Fail For Lack Of Standing ........ 25

    E.    Plaintiffs Fail To State A Claim Under The SCA ................................ 25

        1.    Plaintiffs Do Not Allege Access To "Electronic Communications" ........... 26

        2.    Plaintiffs Do Not Allege That Any "Electronic Communications" Were In "Electronic Storage" .................................................... 27

        3.    Plaintiffs' Allegations Establish That Google Authorized Access To Its Users' Accounts ............................................................. 27

    F.    Plaintiffs Fail To State A Claim Under The Wiretap Act ..................... 28

        1.    Plaintiffs Do Not Allege That The "Contents" Of Any "Electronic Communications" Were Intercepted .......................................... 29

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|

2. Plaintiffs Do Not Allege Any Interception ................................................. 29

G. Plaintiffs Fail To State A Claim Under California Penal Code Section 502 .......... 30

    1. Plaintiffs Do Not Allege Circumvention Of Any "Technical" Or "Code-Based" Barriers ............................................................... 30

    2. Plaintiffs Do Not Allege Any Cognizable Injury Under Section 502(c)(8) ............................................................................. 32

IV. IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS IN THE FAC .......................................................................... 33

A. If Held To Be An Issue of Fact, Consent Is Inherently Individualized ................... 33

B. Plaintiffs' Claims Based on Emotional Harm are Inherently Individualized ......... 35

V. CONCLUSION ....................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ................................................................................. 35

*Alvarado-Moralez v. Digital Equip. Corp.*,
    843 F.2d 613 (1st Cir. 1988) ................................................................................. 32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... 9, 26

*Be In, Inc. v. Google Inc.*,
    2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ................................................. 10, 11, 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................... 9

*Chamberlain v. Ford Motor Co.*,
    369 F. Supp. 2d 1138 (N.D. Cal. 2005) ............................................................... 13

*Chudner v. TransUnion Interactive, Inc.*,
    626 F. Supp. 2d 1084 (D. Or. 2009) .................................................................... 12

*Cohen v. Facebook, Inc.*,
    798 F. Supp. 2d 1090 (N.D. Cal. 2011),
    2011 WL 5117164 (N.D. Cal. Oct. 27, 2011) ................................................ passim

*Cornerstone Consultants, Inc. v. Prod. Input Solutions, L.L.C.*,
    789 F. Supp. 2d 1029 (N.D. Iowa 2011) ............................................................. 28

*Crowley v. CyberSource Corp.*,
    166 F. Supp. 2d 1263 (N.D. Cal. 2001) ............................................................... 29

*Cruz Lopez v. Pena*,
    2013 WL 819373 (N.D. Tex. Mar. 5, 2013) ......................................................... 27

*Daimlerchrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ............................................................................................... 9

*Facebook, Inc. v. Power Ventures, Inc.*,
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ...................................................... 31

*Fantasy, Inc. v. Fogerty*,
    984 F.2d 1524 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) ...... 32

*Faulkner v. ADT Sec. Servs., Inc.*,
    706 F.3d 1017 (9th Cir. 2013) ................................................................................. 9

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

**Page(s)**

*Feldman v. Google*,
    513 F. Supp. 2d 229 (E.D. Pa. 2007) ...................................................................................... 13

*Fields v. Mobile Messengers Am., Inc.*,
    2013 WL 6073426 (N.D. Cal. Nov. 18, 2013) ........................................................................ 34

*Fraley v. Facebook, Inc.*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) (Koh, J.) ............................................................ passim

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) .................................................................................................... 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ........................................................................................................ 15, 21

*Garback v. Lossing*,
    2010 WL 3733971 (E.D. Mich. Sept. 20, 2010) .................................................................... 30

*Garcia v. Haskett*,
    2006 WL 1821232 (N.D. Cal. June 30, 2006) ....................................................................... 28

*Gibson v. Chrysler Corp.*,
    261 F.3d 927 (9th Cir. 2001) .................................................................................................. 14

*Global Policy Partners, LLC v. Yessin*,
    686 F. Supp. 2d 631 (E.D. Va. 2009) .................................................................................... 30

*Hernandez v. Path, Inc.*,
    2012 WL 5194120 (N.D. Cal. Oct. 19, 2012) ................................................................. 26, 29

*Ibey v. Taco Bell Corp.*,
    2012 WL 2401972 (S.D. Cal. June 12, 2012) ....................................................................... 10

*In re Am. Airlines, Inc., Privacy Litig.*,
    370 F. Supp. 2d 552 (N.D. Tex. 2005) .................................................................................. 32

*In re Doubleclick Inc. Privacy Litig.*,
    154 F. Supp. 2d 497 (S.D.N.Y. 2001) .............................................................................. 16, 27

*In re Facebook Privacy Litig.*,
    2011 WL 6176208 (N.D. Cal. Nov. 22, 2011) ...................................................................... 32

*In re Google Android Consumer Privacy Litig.*,
    2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) ...................................................................... 30

*In re iPhone Application Litig.*,
    2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) (Koh, J.) ...................................... 15, 20, 30, 32

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

Page(s)

*In re JetBlue Airways Corp. Privacy Litig.*,
379 F. Supp. 2d 299 (E.D.N.Y. 2005) ..................................................................... 16

*In re LinkedIn User Privacy Litig.*,
932 F. Supp. 2d 1089 (N.D. Cal. 2013) ................................................................. 24

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ................................................................... 14, 22, 23

*Incorp Servs. Inc. v. Incsmart.Biz Inc.*,
2012 WL 3685994 (N.D. Cal. Aug. 24, 2012) ................................................. 31, 32

*Jones v. Corbis Corp.*,
815 F. Supp. 2d 1108 (C.D. Cal. 2011)
*aff'd*, 489 F. App'x 155, 156 (9th Cir. 2012) ........................................... 10, 12, 34

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ................................................................................. 29

*La Court v. Specific Media, Inc.*,
2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) ................................................ 15, 16

*Lapidus v. Hecht*,
232 F.3d 679 (9th Cir. 2000) ................................................................................... 9

*Legge v. Nextel Commc'ns, Inc.*,
2004 WL 5235587 (C.D. Cal. June 25, 2004) ....................................................... 35

*Low v. LinkedIn Corp.*,
2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) (Koh, J.) ........................................ 15

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................................. 9

*Lyons v. Bank of Am., NA*,
2011 WL 6303390 (N.D. Cal. Dec. 16, 2011) ................................................. 33, 35

*Mazur v. eBay Inc.*,
2008 WL 618988 (N.D. Cal. Mar. 4, 2008) ........................................................... 24

*Mazza v. Am. Honda Motor Co., Inc.*,
666 F.3d 581 (9th Cir. 2012) ................................................................................. 33

*Mintz v. Mark Bartelstein & Assocs. Inc.*,
906 F. Supp. 2d 1017 (C.D. Cal. 2012) ................................................................. 29

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

**TABLE OF AUTHORITIES**

Page(s)

*Moreno v. USG Corp.*,
   2007 WL 951301 (S.D. Cal. Mar. 19, 2007).......................................................................... 32

*Mortensen v. Bresnan Commc'ns, L.L.C.*,
   2010 WL 5140454 (D. Mont. Dec. 13, 2010) ...................................................................... 10

*Murray v. Fin. Visions, Inc.*,
   2008 WL 4850328 (D. Ariz. Nov. 7, 2008) ......................................................................... 34

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001).................................................................................................. 9

*Newcombe v. Adolf Coors Co.*,
   157 F.3d 686 (9th Cir. 1998)......................................................................................... 10, 21

*Nexsales Corp. v. Salebuild, Inc.*,
   2012 WL 216260 (N.D. Cal. Jan. 24, 2012) .................................................................. 26, 27

*O'Donovan v. Cashcall, Inc.*,
   278 F.R.D. 479 (N.D. Cal. 2011)......................................................................................... 34

*Sanders v. Apple, Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) .......................................................................... 33, 35

*Scherillo v. Dun & Bradstreet, Inc.*,
   684 F. Supp. 2d 313 (E.D.N.Y. 2010).................................................................................. 12

*Shefts v. Petrakis*,
   2011 WL 5930469 (C.D. Ill. Nov. 29, 2011) ...................................................................... 10

*Stearns v. Select Comfort Retail Corp.*,
   2009 WL 1635931 (N.D. Cal. June 5, 2009) ....................................................................... 33

*Talbot v. Robert Matthews Distrib. Co.*,
   961 F.2d 654 (7th Cir. 1992)................................................................................................ 32

*Theofel v. Farey–Jones*,
   359 F.3d 1066 (9th Cir. 2004).............................................................................................. 27

*Tietsworth v. Sears*,
   720 F. Supp. 2d 1123 (N.D. Cal. 2010) .............................................................................. 33

*Torres v. Nutrisystem, Inc.*,
   289 F.R.D. 587 (C.D. Cal. 2013) ........................................................................................ 34

*United States v. Forrester*,
   512 F.3d 500 (9th Cir. 2008)................................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012)...................................................................................... 31

*United States v. Reed*,
  575 F.3d 900 (9th Cir. 2009)...................................................................................... 29

*United States v. Weaver*,
  636 F. Supp. 2d 769 (C.D. Ill. 2009).......................................................................... 27

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003).............................................................................. 14, 22

*Yunker v. Pandora Media, Inc.*,
  2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) ............................................................ 26

**STATE CASES**

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999)................................................................................................ 25

*Chrisman v. City of Los Angeles*,
  155 Cal. App. 4th 29 (2007)....................................................................................... 30

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
  35 Cal. 3d 197 (1983)................................................................................................. 23

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009)................................................................................................ 24

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003).............................................................................................. 25

*Lugosi v. Universal Pictures*,
  25 Cal. 3d 813 (1979)................................................................................................. 20

*Miller v. Collectors Universe, Inc.*,
  159 Cal. App. 4th 988 (2008)..................................................................................... 20

*Slivinsky v. Watkins–Johnson Co.*,
  221 Cal. App. 3d 799 (1990)...................................................................................... 21

**FEDERAL STATUTES**

18 U.S.C. § 2510 .............................................................................................................. 9

18 U.S.C. § 2510(4) ........................................................................................................ 28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                    CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

**Page(s)**

18 U.S.C. § 2510(8) .................................................................................................................. 29

18 U.S.C. § 2510(17) ................................................................................................... 25, 26, 27

18 U.S.C. § 2511(1)(a) ............................................................................................................. 28

18 U.S.C. § 2511(2)(d) ............................................................................................................. 10

18 U.S.C. § 2701 ........................................................................................................................ 9

18 U.S.C. § 2701(a)(1) ....................................................................................................... 25, 26

18 U.S.C. § 2701(c)(1) ....................................................................................................... 27, 28

18 U.S.C. § 2701(c)(2) ............................................................................................................. 10

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200, *et seq.* ................................................................................ 21

Cal. Bus. & Prof. Code § 17204 .............................................................................................. 25

Cal. Civ. Code § 3344 ............................................................................................................... 17

Cal. Penal Code § 502 (Wiretap Act ) ............................................................................. passim

Cal. Penal Code § 502(b)(10) ............................................................................................ 10, 30

Cal. Penal Code § 502(c) .......................................................................................................... 30

Cal. Penal Code § 502(c)(1) .............................................................................................. 10, 30

Cal. Penal Code § 502(c)(6)-(8) ........................................................................................ 10, 30

Cal. Penal Code § 502(c)(7) ..................................................................................................... 30

Cal. Penal Code § 502(c)(8) ..................................................................................................... 32

Cal. Penal Code § 637 .............................................................................................................. 34

## FEDERAL RULES

Fed. R. Civ. P. 9(b) .......................................................................................................... passim

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 3, 9, 15

Fed. R. Civ. P. 12(b)(6) .................................................................................................... passim

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

**Page(s)**

Fed. R. Civ. P. 12(f) ........................................................................................................... 3, 32, 33

Fed. R. Civ. P. 23 .................................................................................................................... 33

Fed. R. Civ. P. 23(b)(3) ........................................................................................................... 33

Fed. R. Civ. P. 23(c)(1)(A) ................................................................................................... 4, 33

Fed. R. Civ. P. 23(d)(1)(D) ............................................................................................... 4, 5, 33

Fed. R. Civ. P. Rules 12(f) ......................................................................................................... 4

**CONSTITUTIONAL PROVISIONS**

U.S. Const., art. III ........................................................................................................... passim

**TREATISES**

Restatement (Second) of Torts § 892 ....................................................................................... 10

## NOTICE OF MOTION AND MOTION TO DISMISS AND TO STRIKE

PLEASE TAKE NOTICE that on April 10, 2014 at 1:30 p.m. before the Honorable Lucy H. Koh in Courtroom 8 on the Fourth Floor of the above-entitled Court located at 280 South 1st Street, San Jose, California, Defendant LinkedIn Corporation ("LinkedIn") will move to dismiss Plaintiffs' First Amended Class Action Complaint ("First Amended Complaint" or "FAC"), and in the alternative, to strike the class allegations therefrom. LinkedIn's motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 9(b), 12(f), 23(c)(1)(A), and 23(d)(1)(D), and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice filed herewith, the Declaration of William J. Edelman (and exhibits thereto) filed herewith, all pleadings and papers on file in this matter, and such other matters as may be presented to this Court at the hearing or otherwise.

## STATEMENT OF RELIEF SOUGHT

LinkedIn seeks an order, pursuant to Rules 12(b)(1), 12(b)(6), and 9(b), dismissing with prejudice the FAC and each of its causes of action for lack of standing and failure to state a claim upon which relief can be granted, or, in the alternative, an order pursuant to Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) striking the class allegations as immaterial and impertinent.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiffs have standing under Article III of the U.S. Constitution.

2. Whether the FAC states a claim upon which relief can be granted.

3. Whether the FAC's class allegations should be stricken.

## MEMORANDUM OF POINTS AND AUTHORITIES

LinkedIn is the world's largest professional network, with more than 259 million members. In contrast to social networks used to share personal information among friends and family, LinkedIn allows members to connect with, find, and be found by current and potential business contacts to create professional networks online. As with traditional business networking, the more connections a member has, the larger and more effective the member's professional network

becomes, and the more exposure and opportunities the member enjoys.  LinkedIn provides members with a variety of tools to expand their networks, including one called Add Connections, which allows members to import email addresses from their external email accounts and send emails inviting those contacts to join their networks.

In this putative class action, Plaintiffs bring a series of meritless claims based on their contention that Add Connections is a "deceptive advertising scheme" used by LinkedIn to expand its member base.  According to Plaintiffs, permission screens presented to members when they use Add Connections deceive them into allowing access to their email contacts and sending connection invitations to those contacts in violation of California's common law right to publicity, California's Unfair Competition Law ("UCL"), the Stored Communications Act ("SCA"), the Wiretap Act, and California Penal Code section 502.  As shown below, every one of these claims is groundless as a matter of law and should be dismissed.

*First*, all of Plaintiffs' claims fail because Plaintiffs' allegations establish, as a matter of law, that members consent to Add Connections accessing their email contacts and sending connection invitations.  Plaintiffs acknowledge that LinkedIn members must click through a series of permission screens when using Add Connections.  Any reasonably prudent Internet user who reviewed these screens would understand that, by clicking buttons labeled "Allow" and "Add Connections," they were consenting to the challenged actions.  At a minimum, Plaintiffs have not adequately pled their own lack of consent as required to state a claim under any of the asserted causes of action.  Because all of Plaintiffs' claims are based on their contention that Add Connections permission screens are deceptive, their claims are "grounded in fraud" and thus subject to the heightened pleading standard of Rule 9(b).  Plaintiffs do not come close to meeting this standard because they do not allege what screens *they* saw, how *they* were supposedly deceived by the screens, and what actions *they* took in reliance on them.  Without such allegations, Plaintiffs also fail to satisfy even the more lenient notice pleading standard of *Twombly/Iqbal*. There are no facts alleged from which a plausible inference may be drawn that, despite clicking though permission screens requiring members to consent *before* email contacts are accessed or connection invitations are sent, they did not consent to such actions.

-2-

*Second*, Plaintiffs' right of publicity, UCL, and California Penal Code Section 502 claims fail on the additional ground that Plaintiffs do not allege a cognizable injury sufficient to establish Article III standing or to state a claim.  Plaintiffs fail in their attempt to make this case "fit" this Court's opinion in *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 800 (N.D. Cal. 2011) (Koh, J.), because they do not allege facts showing that connection invitations have "concrete, measureable, and provable" economic value.  In *Fraley*, the plaintiffs challenged Facebook's "Sponsored Stories" program, by which paid advertisements were displayed stating that members "Like" the third-party advertiser.  The plaintiffs alleged that these "endorsements" were two to three times more valuable than regular advertisements, and that they were injured because Facebook should have compensated them for this increased value.  *Id.* at 797-99.  Here, by contrast, Add Connections allows members to expand their professional networks—the very reason they join LinkedIn—not to advertise on behalf of third parties.  Plaintiffs' contention that each connection invitation has economic value because, if accepted, it grows LinkedIn's member base is precisely the type of indirect and undefined economic value rejected as insufficient to show injury by this Court in *Fraley* and by *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090 (N.D. Cal. 2011), 2011 WL 5117164 (N.D. Cal. Oct. 27, 2011).  Nor do Plaintiffs allege that they suffered any emotional harm in support of their claims.

*Third*, Plaintiffs' claims under the SCA, the Wiretap Act, and Section 502 also fail because Plaintiffs do not allege facts showing that the importation of *email addresses*, or the manner in which they were imported, violates any of these statutes.  Instead, Plaintiffs falsely accuse LinkedIn of "hacking into" the contents of email communications.  These conclusory and baseless allegations are not only insufficient to state a claim, but are highly prejudicial to LinkedIn and should be stricken under Rule 12(f).

Plaintiffs' claims should be dismissed under Rule 12(b)(1), Rule 12(b)(6), and Rule 9(b).  To the extent any of Plaintiffs' claims survive dismissal because the Court concludes that consent is not established as a matter of law, or that injury in the form of emotional harm is sufficiently alleged, Plaintiffs' class allegations should be stricken.  Whether class members misunderstood Add Connections permission screens, or were embarrassed by a connection invitation, are

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1  individualized issues that preclude class treatment of Plaintiffs' claims.  Thus, the class allegations
2  should be stricken under Rules 12(f), 23(c)(1)(A), and 23(d)(1)(D) to avoid a waste of time and
3  resources by the Court and the parties on a futile class certification motion.

4  **I.      BACKGROUND AND SUMMARY OF ALLEGATIONS**

5  **A.     The Add Connections Networking Tool**

6  Add Connections allows LinkedIn members to expand their professional networks quickly
7  and efficiently by importing contacts from their external email accounts and sending emails
8  inviting their contacts to join the members' LinkedIn networks.  As Plaintiffs' allegations show,
9  members using Add Connections are guided through a multi-step process by a series of permission
10  screens that explain each step and require members to affirmatively consent *before* email contacts
11  are accessed and *before* connection invitations are sent. [1]  Because all of the permission screens
12  presented to members, and the order in which they are presented, are relevant to Plaintiffs'
13  contention that members are deceived into allowing Add Connections to access their email
14  contacts and send connection invitations, a screen omitted by Plaintiffs is properly subject to
15  judicial notice, *see* Request for Judicial Notice ("RJN") at 4-5, and set forth below as it was
16  presented to members.

17  **B.     Accessing Email Contacts**

18  Members must click through two permission screens affirmatively demonstrating consent
19  *before* email contacts are accessed.  The first screen is from LinkedIn and invites members to
20  "Grow your network on LinkedIn" and "Get started by adding your email address":

21
22
23
24
25

26  [1] Plaintiffs allege that Add Connections accesses email contacts from "Yahoo! Mail, Microsoft
27  Mail, Google Gmail, and any number of other email service providers," FAC ¶ 24, but only allege
   facts relating to Google Gmail.  Accordingly, Plaintiffs' claims are limited to accessing and
28  sending emails to contacts from Google Gmail.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                          CASE NO. 13-CV-04303-LHK



FAC ¶ 29 & Figure 3, at 15.  Members have the choice to "Continue" or "Skip this step."
Members who click "Continue" are connected to Google Gmail in one of two ways, depending on
whether they are logged into their Google accounts.  If they are not logged in, they have to enter
their passwords.  *Id*. ¶ 30.  Once they enter their passwords, or if they are logged into their Google
accounts, members are presented with a second permission screen from Google notifying them
that "LinkedIn is asking for some information from your Google Account," including "Google
Contacts," which Google describes elsewhere to Gmail users as follows: "[e]mail addresses are
automatically added to your Contacts list each time you use the Reply, Reply to all, or Forward
functions to send mail to addresses that don't already exist in your Contacts list."  Declaration of
William J. Edelman in Support of RJN ("Edelman Decl."), Ex. D.



FAC Figure 4.  Members have the choice to "Allow" access to their Google accounts, including
their Google Contacts, or to deny access by clicking "No thanks."

-5-

## C.    Sending Connection Invitations

For members who "Allow" access to their Google accounts and Google Contacts, email addresses are imported and presented to the members using two permission screens, one for contacts who are members of LinkedIn and one for contacts who are not.  Both screens require members to affirmatively demonstrate their consent *before* connection invitations are sent.  The first screen invites members to "Connect with people you know on LinkedIn":



Edelman Decl., Ex. F.  The LinkedIn profiles of these contacts are presented in a screen with a vertical scroll bar along the right side.  The screen invites members to select contacts they want to connect to ("Select the people you'd like to connect to"), and indicates that all contacts are currently selected by displaying a checked "Select All" checkbox and stating the total number selected ("218 Selected").  Members may consent or decline to send connection invitation emails by taking one of the following actions: (1) click "Add Connection(s)" to send connection invitation emails to all contacts; (2) uncheck the "Select All" box, select individual contacts, and click "Add Connection(s)" to send connection invitation emails to selected contacts; or (3) click "Skip this step" to decline to send connection invitations and proceed to the next screen.  If members choose (1) or (2), emails are sent to selected contacts.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

The second permission screen invites members to "Stay in touch with your contacts who aren't on LinkedIn yet" and "Invite them to connect with you":



FAC Figure 5.  The names and email addresses of these contacts are presented in a screen with a vertical scroll bar along the right side.  *Id.* ¶ 44.  The screen allows members to "[i]nvite them to connect with you," and indicates that all contacts are selected by displaying a checked "Select All" checkbox and stating the total number of contacts selected ("1132 Selected").  *Id.* Figure 5. Members may consent or decline to send connection invitations by taking one of the following actions: (1) click "Add to Network" to send connection invitation emails to all contacts; (2) uncheck the "Select All" box, select specific contacts, and click "Add to Network" to send connection invitation emails to selected contacts; or (3) click "Skip this step" to decline to send invitations.  For members who choose (1) or (2), emails are sent to selected contacts.  Because the vast majority of LinkedIn members have public profiles, including all of the Plaintiffs with current LinkedIn accounts, *see* Edelman Decl., Exs. B1-B9, these connection invitations convey no more information than what Plaintiffs made publicly available on LinkedIn.  As with all connection invitations, if there is no response, reminder emails are sent.  FAC ¶ 6.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                           CASE NO. 13-CV-04303-LHK

### D. Plaintiffs' Claims

Plaintiffs contend that Add Connections is a "deceptive advertising scheme to improperly use the names, photographs, likenesses, and identities of Plaintiffs for the purpose of generating substantial profits for LinkedIn." FAC ¶ 10. Plaintiffs do not challenge connection invitations sent to contacts who are LinkedIn members, presumably because it contradicts their theory that the purpose of Add Connections is to expand LinkedIn's member base. They also do not allege any facts about their own experiences with the Add Connections permission screens. They do not allege what screens they saw, what they understood them to mean, or whether they sent invitations to LinkedIn members or clicked "Skip this Step" to proceed directly to the screen used to send invitations to contacts who are not on LinkedIn. In short, Plaintiffs do not allege that they actually read or were deceived by any of the permission screens upon which their claims are based.

Plaintiffs also contend, without factual support, that connection invitations and "additional spam emails" containing their names were sent to their email contacts "endorsing and advertising" LinkedIn. *Id.* ¶¶ 13-21. Plaintiffs allege that they were "deprived [of the] monetary value" of these so-called "endorsements," *id.* ¶¶ 72-73, but they do not point to anything in the emails that endorses LinkedIn. They contend that invitations have "monetary value" because they increase the size of LinkedIn's member base. *See, e.g., id.* ¶¶ 52, 58. Plaintiffs misquote LinkedIn founder and Chairman Reid Hoffman as crediting Add Connections with LinkedIn's growth, *id.* ¶ 52 (quoting Mr. Hoffman as saying "it's that connection with the individual that I think leads to growth rate"), when in fact Mr. Hoffman was referring to *LinkedIn's* connection with its members. *See* Edelman Decl., Ex. A. Plaintiffs also selectively quote discussion board posts by anonymous LinkedIn members expressing frustration and embarrassment supposedly caused by invitations, *see, e.g.,* FAC ¶ 31, though they allege no such supposed injury as to themselves.

With respect to accessing email contacts, Plaintiffs falsely accuse LinkedIn of "guessing [email account] passwords" and of "hacking into," "breaking into," and "tunneling" into their email accounts and the "contents" of their emails, *id.* ¶¶ 2, 3, 32, 43, 114, 115, 119, all without any factual support whatsoever; they do not allege a single instance where a password was "guessed" or the contents of emails were accessed.

Plaintiffs' claims challenging Add Connections fall into three categories. *First*, Plaintiffs contend that Add Connections accessed their email contacts without consent in violation of the SCA, 18 U.S.C. § 2701 *et seq.*, the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, and California Penal Code Section 502. *See* FAC ¶¶ 110-138. *Second*, Plaintiffs contend that Add Connections, also without consent, sent emails inviting these contacts to join LinkedIn members' networks in violation of California's common law right of publicity. *Id.* ¶¶ 88-99. *Third*, Plaintiffs contend that Add Connections violates all three prongs of the UCL, California Business & Professions Code § 17200 *et seq.*, based on alleged violations of other state laws ("unlawful" prong) and alleged misrepresentations in permission screens and on LinkedIn's blog ("unfair" and "fraudulent" prongs). *Id.* ¶¶ 100-109. Plaintiffs seek to represent a class of "All natural persons in the United States who had an account registered on www.linkedin.com as of May 15, 2013, and had their names, photographs, likenesses, or identities associated with their accounts used in an endorsement email sent to third parties by LinkedIn." *Id.* ¶ 75.

## II.    LEGAL STANDARDS

Federal courts have subject matter jurisdiction only over "cases" or "controversies" under Article III of the U.S. Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). To invoke that jurisdiction, a plaintiff must allege "standing for each claim he seeks to press" or face dismissal under Rule 12(b)(1). *Daimlerchrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint "must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though the court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to the plaintiffs, *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013), it should not accept mere "labels and conclusions," nor a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). In addition to a plaintiff's allegations, the court may consider documents referenced in the complaint and relevant matters subject to judicial notice. *E.g.*, *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000).

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                              CASE NO. 13-CV-04303-LHK

## III.  ARGUMENT

### A.  All Of Plaintiffs' Claims Fail Because Members Consent To Allowing Access To Email Contacts and Sending Connection Invitations

Plaintiffs must show lack of consent to state a claim under each of the asserted causes of action.[2]  Because any reasonably prudent Internet user who reviewed the Add Connections permission screens would understand that they were consenting to Add Connections accessing their email contacts and sending connection invitations on their behalf, Plaintiffs' own allegations establish consent as a matter of law.  This is fatal to Plaintiffs' claims.  At a minimum, Plaintiffs do not adequately allege lack of consent under Rule 9(b) or even the more lenient notice pleading standard of *Twombly/Iqbal*.

Claims based on lack of consent can be dismissed on the pleadings where the allegations establish consent to the challenged conduct.  *See, e.g., Ibey v. Taco Bell Corp.*, 2012 WL 2401972, at *3 (S.D. Cal. June 12, 2012) (dismissing claim where "Plaintiff expressly consented to contact by Defendant"); *Mortensen v. Bresnan Commc'ns, L.L.C.*, 2010 WL 5140454, at *4-5 (D. Mont. Dec. 13, 2010) (finding consent for Wiretap Act claim where consent "evident" based on ISP privacy notice and user agreement).  "Consent is determined from the reasonable viewpoint of another person, not from Plaintiff's unexpressed subjective beliefs."  *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1112 n.2 (C.D. Cal. 2011) (*citing* Restatement (Second) of Torts § 892)), *aff'd*, 489 F. App'x 155, 156 (9th Cir. 2012); *see also Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *9 (N.D. Cal. Oct. 9, 2013) (Koh, J.) (applying "reasonably prudent internet user" standard to determine whether users had notice of website's terms of service so as to be bound by them).

---

[2] *See Cohen*, 798 F. Supp. 2d at 1093-94 (plaintiff must establish "lack of consent" under California common law right of publicity (citing *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998)); 18 U.S.C. § 2701(c)(2) (under SCA, person may "authorize[]" access to electronic communications if he or she is a "user" of the "service"); *Shefts v. Petrakis*, 2011 WL 5930469, at *7 n.10 (C.D. Ill. Nov. 29, 2011) ("under the SCA, it would be Plaintiff's burden to prove that the access was unauthorized"); 18 U.S.C. § 2511(2)(d) (under Wiretap Act, interception not unlawful where "one of the parties to the communication has given prior consent to such interception"); Cal. Penal Code §§ 502(c)(1) and (6)-(8), 502(b)(10) (requiring defendant to be acting "without permission").  Plaintiffs' UCL claim also relies upon the absence of consent because the alleged misrepresentations Plaintiffs contend negate consent (deceptive screens) are not "likely to deceive" a reasonable consumer, *see infra* Part III.D.2.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1    Plaintiffs' allegations establish that, as a matter of law, they consented to Add Connections

2    accessing their email contacts by clicking through two permission screens. In the first screen,

3    members are invited to "Grow your network on LinkedIn" and "Get started by adding your email

4    address," and are given the choice to "Continue" or "Skip this step." FAC Figure 3. Only

5    members who click "Continue" are taken to the second screen, which informs all first-time users

6    of the tool that "LinkedIn is asking for some information from your Google Account," including

7    "Google Contacts." *Id.* Figure 4. They are again given the choice to "Allow" access to their

8    Google accounts and Google Contacts or to deny access by clicking "No Thanks." *Id.* ¶ 32 &

9    Figure 4. Google Contacts are accessed *only* if members click "Allow." Members who read these

10   permission screens and clicked buttons labeled "Continue" and "Allow" would reasonably

11   understand that they were consenting to Add Connections accessing their Google Contacts.

12   Plaintiffs concede that members provide "authority and consent" to access "external email

13   accounts" and "contact lists" from those accounts. *Id.* ¶ 33. But they contend that the term

14   "Google Contacts" is deceptive because it does not mean email addresses "of every person

15   emailed by the users and every person who has received an email from LinkedIn's users." *Id.*

16   ¶ 33. Plaintiffs are wrong. As Plaintiffs acknowledge, "it is Google that provides this screen," *id.*

17   ¶ 32, not LinkedIn, and Google describes Google Contacts to Gmail users as follows: "Email

18   addresses are automatically added to your Contacts list each time you use the Reply, Reply to all,

19   or Forward functions to send mail to addresses that don't already exist in your Contacts list."

20   Edelman Decl., Ex. D (Google description of "Google Contacts"). Accordingly, by clicking

21   "Continue" and then "Allow," in response to screens stating that LinkedIn was requesting

22   information, including "Google Contacts," from their Google accounts, Plaintiffs consented to

23   Add Connections accessing all email addresses contained in their Google Contacts.

24   Plaintiffs' allegations also establish that, as a matter of law, they consented to Add

25   Connections sending connection invitations by clicking through a permission screen. A

26   reasonably prudent user who read the permission screen used by members to send invitations to

27   contacts who are not on LinkedIn would understand that clicking "Add to Network" on a screen

28   that asks them to "Stay in touch with your contacts who aren't on LinkedIn yet" and "Invite them

-11-    MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

to connect with you," and that provides a list of email addresses with a check-box indicating that all of them are selected along with the total number selected, will result in connection invitations being sent to the selected email addresses. *See* FAC Figure 5. In the context of a professional network, in which names are part of public profiles available for viewing by any Internet user, a reasonably prudent Internet user would understand that a connection invitation will include their names. Consent to sending reminder emails may also be determined as a matter of law because, under California's common law right of publicity, consent "may be implied from the consenting party's conduct and the circumstances of the case." *Jones*, 815 F. Supp. 2d at 1113. Reminder emails are no different than connection requests. They contain the same information and are sent to the same contacts. As LinkedIn explains to members, in a document the FAC cites to and relies upon, the "intention behind sending reminders is to jog the receiver's memory in case they overlooked the original message. No more than two reminders are ever sent," and the reminders stop once a member replies. Edelman Decl., Ex. E & FAC ¶ 8. In light of these circumstances, consent to reminder emails is implied from a member's consent to send the initial invitation.

Plaintiffs acknowledge that members are "provided a screen that allows [them] to scroll down and view the total list of email addresses downloaded," FAC ¶ 44, but contend that "the screen greys out this scroll bar," *id.* ¶ 34. However, the screen shot in the FAC shows the scroll bar and the total number of contacts available to be viewed. *Id.* Figure 5. Scroll bars are a common means to display a large amount of information on a website. Courts routinely hold, for example, that information is "'reasonably communicated' to a webpage user" where the user "simply has to scroll down a page to read the clause." *Scherillo v. Dun & Bradstreet, Inc.*, 684 F. Supp. 2d 313, 322 (E.D.N.Y. 2010) ("A person who checks the box agreeing to the terms and conditions of a purchase on an internet site without scrolling down to read all of the terms and conditions is in the same position as a person who turns to the last page of a paper contract and signs it without reading the terms.").[3]

---

[3] *See also, e.g.*, *Chudner v. TransUnion Interactive, Inc.*, 626 F. Supp. 2d 1084, 1090 (D. Or. 2009) ("[Plaintiff] argues that the TrueCredit forum selection clause was a surprise to consumers, because it was contained in a small text-box that required the consumer to scroll down repeatedly

-12-

Anecdotal allegations of complaints by a *de minimis* fraction of LinkedIn's more than 259 million members do nothing to change the conclusion that a reasonably prudent Internet user who viewed and clicked through the Add Connection permission screens consented as a matter of law. *See Chamberlain v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 (N.D. Cal. 2005) (where a "reasonable consumer" standard is used, "[a]necdotal evidence alone is insufficient" to show that a reasonable consumer is likely to be misled). While some members may conceivably have clicked on buttons labeled "Allow" and "Add Connections" without paying attention to the accompanying permission screens, that does not mean that they did not objectively consent, much like someone who inadvertently clicks on "Reply to All" in Outlook and sends an email to a broader audience than intended.

The Add Connections permission screens distinguish this case from this Court's decision in *Fraley* and from *Cohen*, 798 F. Supp. 2d 1090, which both held that consent could not be found as a matter of law where the defendant relied on provisions in a website's terms and conditions agreed to at registration. *See, e.g., Fraley*, 830 F. Supp. 2d at 805-06 (consent premised on Facebook's "Terms of Use" presented to users during initial account registration process prior to initiation of "Sponsored Stories" program); *Cohen*, 798 F. Supp. 2d at 1094-96 (consent argument premised on Facebook's "Statement of Rights and Responsibilities," "Principles," and "Privacy Policy"). The *Fraley* plaintiffs argued that they "were never asked to review or renew their Terms of Use subsequent to Facebook's introduction of the Sponsored Stories feature, which operates on an opt-out basis." *Fraley*, 830 F. Supp. 2d at 805. Here, in contrast, Plaintiffs acknowledge that members using Add Connections must click through the permission screens that establish consent, and thus cannot claim they did not have the opportunity to review them before consenting. The screen used to send connection invitations (FAC Figure 5) alone precludes Plaintiffs' right of

to read it in full.... Although [plaintiff] contends that this renders the forum selection clause hidden and, thus, unenforceable, that fact is simply insufficient to render the forum selection clause invalid due to surprise."); *Feldman v. Google*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) ("That the user would have to scroll through the text box of the Agreement to read it in its entirety does not defeat notice because there was sufficient notice of the Agreement itself and clicking 'Yes' constituted assent to all of the terms.").

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1   publicity and UCL claims since those claims relate solely to the supposed "endorsement" of

2   LinkedIn in those invitations.  The preceding two screens authorizing access to email contacts

3   (FAC Figures 3 & 4) dispose of Plaintiffs' remaining claims based on the SCA, the Wiretap Act,

4   and Section 502.

5          At a minimum, Plaintiffs do not adequately allege their own lack of consent to Add

6   Connections accessing email contacts and sending connection invitations.  Plaintiffs speculate

7   about what LinkedIn members might not understand about the Add Connections permission

8   screens, but a "class action, when filed, includes only the claims of the named plaintiff or

9   plaintiffs."  *Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001).  Plaintiffs allege nothing

10  about their *own* experiences with the Add Connections permission screens, aside from conclusory

11  statements that Add Connections accessed their email contacts "without [their] authorization,"

12  *e.g.*, FAC ¶ 13, and sent connection invitations "without prior consent," *e.g.*, *id.*  In addition,

13  because the alleged lack of consent is based entirely on the contention that LinkedIn intentionally

14  misled members into using Add Connections through deceptive permission screens — in other

15  words, obtained consent through fraud — all of Plaintiffs' claims are grounded in fraud and thus

16  subject to the particularity requirements of Rule 9(b).[4]  In "cases where fraud is not a necessary

17  element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant

18  has engaged in fraudulent conduct," and "allegations ('averments') of fraudulent conduct must

19  satisfy the heightened pleading requirements of Rule 9(b)."  *Vess v. Ciba-Geigy Corp. USA*, 317

20  F.3d 1097, 1103-05 (9th Cir. 2003).  Under Rule 9(b), Plaintiffs must plead with particularity

21  "'the who, what, when, where, and how' of the misconduct charged,"  *Vess*, 317 F.3d at 1106, and

22  "set forth an explanation as to why the statement or omission complained of was false or

23  misleading,"  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996).  Plaintiffs' failure to

24

25  ─────────────────────
    [4] *E.g.,* FAC ¶ 1 (LinkedIn engaged in "deceptive business practices")  ¶ 33 ("LinkedIn's
    disclosures on its website are designed to deceive"), ¶ 32 (screen "misleadingly states"
26  information), ¶ 34 ("design, layout, and format of the page is aimed to deceive"), ¶ 35 ("LinkedIn
    is deceiving its users"), ¶ 36 ("LinkedIn is aware that its web pages are deceptive"), ¶ 37 (screen
27  "misleads" users), ¶ 38 ("LinkedIn misleads its users with respect to the implications of
    [permission] screen"), ¶ 47 ("LinkedIn makes numerous deceptive and misleading statements").
28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                      CASE NO. 13-CV-04303-LHK

provide *any* facts about what permission screens *they* saw or how *they* were supposedly deceived falls far short of Rule 9(b)'s heightened pleading standard.

All of Plaintiffs' claims rise or fall on the contention that members do not consent to Add Connections accessing their email contacts and sending connection invitations.  Because any reasonably prudent Internet user who read the Add Connections permission screens would understand that by clicking through them they were agreeing to both, consent is established as a matter of law.  At a minimum, Plaintiffs do not adequately allege lack of consent as to themselves because they do not allege any facts showing that they were deceived by the permission screens and therefore did not consent to the challenged actions.

> **B.** **Plaintiffs Lack Article III Standing To Bring Right Of Publicity, UCL, And Section 502 Claims**

Plaintiffs fail to allege a cognizable injury to satisfy the standing requirements of Article III, and thus their right of publicity, UCL, and Section 502 claims should be dismissed under Rule 12(b)(1).

To establish Article III standing, a plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000).  For the injury-in-fact requirement, Plaintiffs must allege a "coherent and factually supported theory of what that injury might be," which means a "particularized example of economic injury or harm," not simply "abstract concepts" such as "value-for-value exchanges."  *In re iPhone Application Litig*., 2011 WL 4403963, at *5-6 (N.D. Cal.  Sept. 20, 2011) (Koh, J.) (internal citations and quotations omitted) (quoting *La Court v. Specific Media, Inc.*, 2011 WL 1661532, at *6 (C.D. Cal. Apr. 28, 2011); *see also Low v. LinkedIn Corp.*, 2011 WL 5509848, at *3-4 (N.D. Cal. Nov. 11, 2011) (Koh, J.) (plaintiff's allegation that "[p]ersonal information has an independent economic

1   value, and that he was not justly compensated for LinkedIn's transfer of his personal data" was

2   "too abstract and hypothetical to support Article III standing").[5]

3          Here, Plaintiffs do not allege any "coherent and factually supported" theory of economic or

4   non-economic harm to show injury in fact.  Two recent cases, *Cohen* (Seeborg, J.) and *Fraley*

5   (Koh, J.), addressed "what kind of facts must be alleged to show the existence of economic

6   damages" for right of publicity and UCL claims. *Cohen*, 2011 WL 5117164, at *2.  In *Cohen*, the

7   plaintiffs challenged Facebook's "Friend Finder" program, which allegedly was

8                  designed to encourage Facebook users to create larger networks of
                   'friends,' and, at least allegedly, to give Facebook access to email
9                  addresses for non-users who can then be solicited to join Facebook.
                   As such, the service facilitates Facebook's ability to increase both its
10                 user base and the amount of time individual users spend on the
                   site . . . . [I]t is beyond dispute that its ability to earn advertising
11                 revenues and its valuation as a company are dependent on the size
                   and involvement of its user base.

12  *Cohen*, 798 F. Supp. 2d at 1096.  The plaintiffs argued that their names and likenesses were used

13  by Facebook to promote the Friend Finder program, which "had an economic value to Facebook"

14  because their use "can be seen as serving a commercial purpose, undertaken with at least the intent

15  of achieving growth in Facebook's user base, thereby ultimately resulting in monetary gain for

16  Facebook." *Cohen*, 2011 WL 5117164, at *2.  The court held that such allegations, even if true,

17  did not identify a cognizable economic injury, and dismissed the claim in both the original and

18  amended complaints. *Id.* at *3; 798 F. Supp. 2d at 1097.

19         In contrast, this Court in *Fraley* held that the plaintiffs had "articulated a coherent theory of

20  how they were economically injured by the misappropriation of their names, photographs, and

21  likenesses." 830 F. Supp. 2d at 799.  In *Fraley*, the plaintiffs alleged that when they clicked the

22

23  _____

    [5] *See also, e.g., In re Doubleclick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001)
24  (unauthorized collection of personal information not "economic loss to the subject"); *LaCourt*,
    2011 WL 1661532, at *5 (plaintiffs failed to adequately allege injury in fact because they provided
25  no facts showing that they "ascribed an economic value" to their personal information, attempted a
    value-for-value exchange of information, or were deprived of its value); *In re JetBlue Airways*
26  *Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("there is [] no support for the
    proposition that an individual passenger's personal information has or had any compensable value
27  in the economy at large").

28

                                    -16-        MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                CASE NO. 13-CV-04303-LHK

"Like" button on Facebook pages of certain companies, they were subsequently featured in "Sponsored Stories" displayed to their Facebook Friends advertising that they "Like" the company's products, services, or brand. *Id.* at 797-99.

In holding that the *Fraley* plaintiffs adequately pled injury in fact under Article III, this Court emphasized that they "allege[d] that their individual, personalized endorsement of products, services, and brands to their friends and acquaintances has *concrete, provable value* in the economy at large, which can be measured by the additional profit Facebook earns from selling Sponsored Stories compared to its sale of regular advertisements." *Id.* at 799 (emphasis added). The Court noted that "Plaintiffs do not merely cite abstract economic concepts in support of their theory of economic injury, but rather point to specific examples of how their personal endorsement is valued by advertisers," *id.* at 799, including statements by Facebook executives that these endorsements were "worth two to three times more than traditional advertisements on Facebook," and that "Facebook presumably profits from exploitation of this *calculable commercial value*." *Id.* at 809 (emphasis added); *see also id.* at 799 (same). The *Fraley* plaintiffs thus "identified a direct, linear relationship between the value of their endorsement of third-party products, companies, and brands to their Facebook friends, and the alleged commercial profit gained by Facebook." *Id.* at 800.[6]

As this Court explained, *Cohen* was distinguishable from *Fraley* because the *Cohen* plaintiffs "were unable to show that their names and likenesses had any general commercial value" to Facebook. *Id.* at 800. In contrast to the *Cohen* plaintiffs who alleged that the Friend Finder service was used by Facebook "to attract a larger user base result[ing] in monetary gain for Facebook," *id.* at 809, the *Fraley* plaintiffs alleged that Sponsored Stories were "two to three times more valuable than generic advertisements sold to Facebook Advertisers, *id.* at 800. In addition, the *Fraley* plaintiffs "identified a direct, linear relationship between the value of their endorsement

---

[6] The Court in *Fraley* also noted that the plaintiffs there alleged "a violation of their individual statutory rights under California Civil Code § 3344, and therefore, an invasion of a legally protected interest for Article III purposes." F. Supp. 2d at 797. By contrast, Plaintiffs here only assert a common law misappropriation claim, and do not assert a claim under Civil Code Section 3344.

of third-party products, companies, and brands to their Facebook friends, and the alleged commercial profit gained by Facebook."  *Id.*  Thus, this Court concluded that, unlike the *Cohen* plaintiffs, the *Fraley* plaintiffs "alleged facts showing that their personal endorsement [had] concrete, measureable, and provable value in the economy at large."  *Id.*

Here, as in *Cohen*, Plaintiffs have not alleged facts showing that the alleged use of their names and likenesses in connection invitations have any general commercial value in the economy at large beyond allegedly growing LinkedIn's member base.  Plaintiffs do not allege that connection invitations contain "endorsements" of LinkedIn or any third party—a connection invitation is simply a request from a member to join his or her professional network.  Nor do Plaintiffs allege any basis for calculating a "concrete, measureable, and provable" value of connection invitations, in contrast to the facts alleged by the *Fraley* plaintiffs showing a "direct, linear" relationship between the alleged profits to Facebook and the value of their "endorsements" in Sponsored Stories.  Although Plaintiffs attempt to parrot this Court's ruling in *Fraley* by asserting the conclusory allegation that their "[i]ndividualized personalized endorsement of LinkedIn to Plaintiffs' friends and acquaintances has concrete provable value," FAC ¶ 53, the sole alleged basis for this claim is that connection invitations grow LinkedIn's member base, which leads to increased business for LinkedIn.  *See id.* ¶ 51 ("[h]aving a growing number of members is central to LinkedIn's business"; "[m]ember growth is directly correlated to the success of LinkedIn's business"); *id.* ¶ 58 ("LinkedIn is growing its network by having its members endorse LinkedIn multiple times without their consent"; "[t]his growth of LinkedIn's network is leading to increased direct revenue through sales of products directly to new members, and indirect revenue through sales to increasing numbers of recruiters and large corporations").  Not only do Plaintiffs misquote LinkedIn founder and Chairman Reid Hoffman in making this allegation, as discussed *supra* at 8, but even accepting this claim as true, any such indirect, undefined benefit is *precisely* what *Cohen* and this Court in *Fraley* found to be insufficient.

Because Plaintiffs allege no facts that could provide the necessary baseline for a "calculable commercial value," such as the value of generic advertisements in *Fraley*, they resort to alternative "calculations" based on other networking tools that have nothing to do with the

-18-

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

purported monetary value of connection invitations. For example, Plaintiffs suggest that because LinkedIn charges $10 to use its InMail networking tool, connection invitations must have the same value because InMail and connection invitations both involve sending emails and reminders. *See* FAC ¶ 55. That is specious, because the two services are completely different. InMail allows members to contact LinkedIn members with whom they have had no previous communication (and thus do not have their email addresses), and to customize the content of the message without space or other limitations applicable to connection invitations. In contrast, connection invitations sent through Add Connections use a standardized message and may be sent only to existing email contacts. *See* Edelman Decl., Ex. C. Indeed, if they were comparable services, no consumer would pay $10 for InMails when connection invitations are free of charge.

Plaintiffs also suggest that connection invitations may have the same value as the price of premium LinkedIn services that might be purchased by some recipients of those requests, FAC ¶ 56, a theory that, again, was soundly rejected by *Cohen* and *Fraley*—that "attract[ing] a larger user base resulted in monetary gain for [the defendant]." *Fraley*, 830 F. Supp. 2d at 809 (citing *Cohen*, 2011 WL 5117164, at *2). Moreover, the vast majority of connection invitations have no conceivable relationship to any premium account revenue for LinkedIn, as only a tiny percentage of LinkedIn members (less than 1%) have premium accounts. Plaintiffs' allegation that LinkedIn "would be forced to pay for email addresses to advertise and promote its services," FAC ¶ 57, is likewise off-base, because their right of publicity and UCL claims concern the alleged misappropriation of *their names or likenesses*, not of third-party email addresses.

Plaintiffs' failure to allege any injury in fact is not surprising because the Add Connections tool is designed to, and does, benefit members. Add Connections enables members to do just what they joined LinkedIn to do: expand their professional networks. While each Sponsored Story in *Fraley* provided a direct, calculable benefit to Facebook and its advertisers, with no such benefit to the plaintiffs, the situation here is reversed: Add Connections provides a direct benefit to members in the form of larger networks, no benefit to third parties, and, even as alleged, only an indirect, undefined benefit to LinkedIn.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

As for non-economic harm, Plaintiffs provide anecdotes from online discussion board users expressing frustration with the Add Connections tool.  *See, e.g.*, FAC ¶¶ 31, 33, 41, 49, 50, 58.  But *none* of those anecdotes are from Plaintiffs themselves.  Though Plaintiffs identify certain relationships they had with people they emailed through the Add Connections tool, *id.* ¶¶ 17, 18, 19, 21, no Plaintiff has alleged that they suffered *emotional* harm as a result.  *See id.* ¶¶ 72-73 (alleging that Plaintiffs were "deprived of *money*" and that "[e]ach plaintiff has been personally injured by this loss of *money*") (emphases added), ¶¶ 93-94 (alleging that "Plaintiffs were harmed by LinkedIn's actions" and that "Plaintiffs were deprived of the *earnings* they would otherwise be entitled to") (emphasis added).  Accordingly, Plaintiffs have not even attempted to state a right of publicity claim based on emotional injury.  *See, e.g.*, *In re iPhone*, 2011 WL 4403963, at *4 (dismissing claim where "Plaintiffs do not allege injury in fact to *themselves*").

In any event, the anecdotes do not identify any cognizable non-economic injury because the emotional harm they describe was not caused by LinkedIn allegedly misappropriating their name or likeness for commercial advantage; rather, it was caused by LinkedIn contacting people that the members did not intend to communicate with at all.  To state a right of publicity claim for emotional harm, a plaintiff must establish that the harm flows from a *commercial* misappropriation.  *See, e.g., Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988, 1006 (2008) ("mental anguish resulting from commercial misappropriation"); *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 835-36  & n.11 (1979) (noting that "[c]ommercial misappropriations may injure a person's feelings" such as the "person may find any commercial exploitation undesirable and offensive" or others "may disparage one who would sell their identity" for commercial purposes).  The mental harm described in the anecdotes, however, has nothing to do with any commercial exploitation of individuals' names or likenesses.  Rather, it flows entirely from Add Connections sending emails on behalf of members to people whom they would have preferred not to contact.  Thus, the alleged embarrassment would have been the same if the connection invitations did not mention LinkedIn at all.  And, as noted, all Plaintiffs with active LinkedIn accounts have created public LinkedIn profiles which can be viewed by all Internet users, precluding any claim that the association of their identities with LinkedIn was personally

-20-                          MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                         CASE NO. 13-CV-04303-LHK

1    offensive.  Accordingly, Plaintiffs have not alleged any cognizable emotional harm "fairly

2    traceable" to a violation of the right of publicity.  *Laidlaw*, 528 U.S. at 180-81.

3           **C.     Plaintiffs Fail To State A Claim For Violations Of California's Common Law
                     Right Of Publicity**
4
5           California's common law right of publicity has four elements: "(1) the defendant's use of

6    the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's

7    advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury."  *Cohen*, 798

8    F. Supp. 2d at 1093-94 (citing *Newcombe*, 157 F.3d at 692).  As demonstrated above, Plaintiffs

9    fail to adequately allege lack of consent or any resulting injury, which is "the *sine qua non* of a

10   cause of action for misappropriation of name."  *Id.* at 1097 (quoting *Slivinsky v. Watkins–Johnson

11   Co.,* 221 Cal. App. 3d 799, 807 (1990)).  Accordingly, Plaintiffs' right of publicity claim should

12   be dismissed under Rule 12(b)(6) for failure to state a claim.

13          **D.     Plaintiffs Fail To State A Claim For Violations Of California's Unfair
                     Competition Law**

14          California's Unfair Competition Law prohibits "any unlawful, unfair or fraudulent

15   business act or practice."  Cal. Bus. & Prof. Code § 17200, *et seq*.  Plaintiffs attempt to assert

16   claims under the "unfair" and "fraudulent" prongs based on alleged misrepresentations in Add

17   Connections permission screens and on LinkedIn's blog.  Claims asserted under the "unlawful"

18   prong are based on alleged violations of other state laws.  All of Plaintiffs' UCL claims fail.

19          Plaintiffs allege that LinkedIn misrepresented that members "have full control to prevent

20   their name and appearance in LinkedIn advertisements, including endorsement emails sent by

21   LinkedIn to third parties," and that "repeated emails would not be sent to third parties containing

22   their names and likenesses without their permission," but then "encourage[ed] [members] to

23   utilize LinkedIn in such a way that allowed LinkedIn to access [their] external email accounts and

24   send endorsement emails to email addresses contained therein."  FAC ¶¶ 103-04.  Plaintiffs do not

25   identify any statement by LinkedIn making any such representations.  Instead, they rely on words

26   and phrases plucked from Add Connections permission screens and LinkedIn's blog.  None of

27   these statements support a misrepresentation claim.

28

                                    -21-          MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                  CASE NO. 13-CV-04303-LHK

### 1.   Plaintiffs Do Not Satisfy Rule 9(b)

Plaintiffs' claims are subject to Federal Rule of Civil Procedure 9(b) but do not satisfy its heightened pleading standard.  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b) applies to state law claims "sound[ing] in fraud," regardless of whether they are labeled "fraud" claims.  *See Vess*, 317 F.3d at 1105.  Plaintiffs allege that LinkedIn "intentionally and knowingly" made misrepresentations regarding Add Connections, which members "justifiably relied upon …when deciding to join and utilize LinkedIn."  FAC ¶ 103.  Plainly, these claims "sound in fraud" and thus are subject to Rule 9(b)'s particularity requirement that Plaintiffs plead the "'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106.  Plaintiffs do not satisfy this standard because they do not allege *how* any of the selected words or phrases are false or misleading.

Plaintiffs allege that permission screens for accessing Google accounts use the terms "some information" and "Google Contacts" and therefore are "designed to deceive" members into believing that only their "contact lists" will be imported." *Id.* ¶ 32-33.  As explained above, members are invited to "Grow your network" by "adding your email address" and given the option to "Continue" or "Skip this step."  Members who choose to "Continue" are taken to a Google permission screen, stating that "LinkedIn is asking for some information from your Google Account," including "Google Contacts," which Google describes as including exactly the email addresses Plaintiffs contend are not included in "contact lists."  Plaintiffs do not explain *how* the challenged terms are false or misleading in light of these statements on the LinkedIn and Google permission screens.

With respect to the permission screen used to send connection invitations to contacts who are not LinkedIn members, Plaintiffs allege that the "Add to Network" button is deceptive because, "[a]lthough LinkedIn provides a list of the email addresses it has downloaded," it displays the emails in a scroll down format in which only the first ten are visible and it does not state that those email addresses will receive connection invitations or that reminder emails will be sent.  FAC ¶¶ 38-41.  Plaintiffs again ignore other statements on this screen.  As explained above, the screen offers members the opportunity to "Stay in touch with your contacts who aren't on

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

LinkedIn yet" and "Invite them to connect with you." Directly after these statements, the names and email addresses of all contacts not on LinkedIn are presented to members using a scroll-down list with checkboxes indicating that all of them have been selected ("Select All") as well as the total number selected ("1132 Selected"). Members have the option to "Add to Network" or "Skip this step." If Plaintiffs contend that, notwithstanding this context, they did not know that email addresses in addition to the ones visible were selected, and that by clicking on "Add to Network" the listed addresses would receive connection invitations, they must include those allegations to explain *how* the "Add to Network" button is false or misleading.

Finally, Plaintiffs allege that selected statements from LinkedIn's blog are misleading. *See Id.* ¶ 47. None of these alleged statements support any misrepresentation claim under the UCL because Plaintiffs do not allege *how* they are false or misleading in light of the Add Connections permission screens described above. Indeed, it is unclear whether and how they relate to Add Connections at all, *e.g.*, references to "spam" and "abusive behavior" by members spamming other members. *Id.* ("We take spam very seriously").

### 2. The Alleged Misrepresentations Are Not "Likely To Deceive" Reasonable Consumers As A Matter Of Law

Misrepresentation claims under the UCL require a showing that "members of the public are likely to be deceived." *See Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983) (same). Therefore, to state a claim, Plaintiffs must allege facts showing that the selected statements from Add Connections permission screens and LinkedIn's blog are "likely to deceive" reasonable consumers. As demonstrated above, the Add Connections permission screens are not "likely to deceive" a reasonable consumer who actually reads them. To the contrary, these screens not only explain each step in the process—from accessing and importing Google Contacts, to selecting and sending connection invitations to contacts on LinkedIn, to selecting and sending connection invitations to contacts not yet on LinkedIn—but require members to consent to each step by clicking buttons labeled "Continue," "Allow," "Add Connection(s)," and "Add to Network" *before* any action is taken. Any reasonably prudent Internet user clicking these buttons to move

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1   from one screen to the next would understand that they were consenting to allowing access to their

2   email contacts and to sending connection invitations. Indeed, Plaintiffs do not allege that they

3   read the permission screens, which, as set forth below, alone requires dismissal of their claims.

### 3.     Plaintiffs Do Not Allege Reliance

5          Plaintiffs do not allege that they actually and reasonably relied upon any of the alleged

6   misrepresentations. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (actual reliance

7   required for UCL claim). Rule 9(b) requires "the same level of specificity [] with respect to

8   [pleading] reliance' as with respect to misrepresentations." *Mazur v. eBay Inc.*, 2008 WL

9   618988, at *13 (N.D. Cal. Mar. 4, 2008)). This standard has not been met. Plaintiffs' allegations

10  of reliance are conclusory and do not allege facts specific to any named Plaintiff, such as what

11  screens they saw, what they understood them to mean, and whether they imported email contacts

12  and sent connection invitations to contacts who were LinkedIn members and those who were not,

13  or only to contacts who were not LinkedIn members by clicking "Skip this Step" in the permission

14  screen for contacts who were LinkedIn members. Plaintiffs simply allege that they "justifiably

15  relied upon" alleged misrepresentations. *See* FAC ¶ 103. Accordingly, Plaintiffs have not

16  adequately alleged actual and reasonable reliance on any misrepresentation. *Cf. In re LinkedIn*

17  *User Privacy Litig.*, 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013) (plaintiffs "[did] not even allege

18  that they actually read the alleged misrepresentation[] which would be necessary to support a

19  claim of misrepresentation").

### 4.     Plaintiffs' Claims Under The Unlawful Prong Fail

21         The "unlawful" prong of the UCL "embrac[es] 'anything that can properly be called a

22  business practice and that at the same time is forbidden by law.'" *Cel-Tech Commc'ns, Inc. v.*

23  *L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Plaintiffs' claims under the UCL's "unlawful"

24  prong are predicated on alleged violations of California's common law right of publicity, the

25  California Computer Fraud and Abuse Act, the California Comprehensive Data Access and Fraud

26  Act, the California Invasion of Privacy Act, and the California Consumer Remedies Act. FAC

27  ¶ 101. For the reasons stated above, Plaintiffs fail to state any claim for violations of California's

28  common law right of publicity or California's Comprehensive Data Access and Fraud Act. With

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

respect to California's Computer Fraud and Abuse Act (which is not actually a law), Invasion of Privacy Act, and Consumer Remedies Act, Plaintiffs do not even attempt to state claims under these laws.  Accordingly, Plaintiffs fail to state a claim under the "unlawful" prong of the UCL.

### 5. All Of Plaintiffs' UCL Claims Fail For Lack Of Standing

To have standing to sue under the UCL, Plaintiffs must show that they "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204.  As set forth above, Plaintiffs have not alleged sufficient facts to show injury in fact based on connection invitations sent using Add Connections.  Nor have they adequately alleged that connection invitations resulted in the loss of money or property recoverable as restitution under the UCL.  Indeed, Plaintiffs do not allege that they have ever paid any money to LinkedIn.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003) (Under the UCL, "prevailing plaintiffs are generally limited to injunctive relief and restitution.").

### E. Plaintiffs Fail To State A Claim Under The SCA

The SCA prohibits "(1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceed[ing] an authorization to access that facility ... *and thereby obtain[ing] ... access to a wire or electronic communication while it is in electronic storage in such system*." 18 U.S.C. § 2701(a)(1) (emphasis added).  "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication *incidental to the electronic transmission thereof*; and (B) any storage of such communication by an electronic communication service for purposes of *backup protection* of such communication." 18 U.S.C. § 2510(17) (emphases added).  In addition to failing to adequately allege that any access occurred without authorization, Plaintiffs' SCA claim should be dismissed under Rule 12(b)(6) for several additional reasons.

### 1. Plaintiffs Do Not Allege Access To "Electronic Communications"

There is no plausible allegation in the FAC that LinkedIn gained access to any "electronic communications."  As the FAC states, the "subject of this complaint" involves LinkedIn's alleged

practice of "downloading *email addresses*." FAC ¶ 2 (emphasis added). Indeed, the FAC alleges repeatedly that LinkedIn gained access only to email addresses.[7]

Email addresses are not "electronic communications" within the meaning of 18 U.S.C. § 2701(a)(1). In *Hernandez v. Path, Inc.*, 2012 WL 5194120 (N.D. Cal. Oct. 19, 2012), the plaintiffs similarly alleged that the defendant "accessed, uploaded and stored data from the users' Contact Address Books," which consisted of users' "contacts" including their "e-mail addresses." *Id.* at *1 & n.1. The court dismissed the SCA claim because "as defined by and used in the SCA, the term 'electronic storage' refers to the temporary, intermediate storage of the *electronic communication* that is incidental to the *electronic transmission of the communication*," and thus plaintiffs' "Contact Address Books are not a communication to which the SCA applies." *Id.* at *4 (quoting 18 U.S.C. § 2510(17)) (emphases added).

Plaintiffs allege that LinkedIn "accessed members' email communications," FAC ¶¶ 114-15, but those allegations are wholly conclusory, without any supporting factual detail, and are inconsistent with the other allegations in the FAC that allege only access to email *addresses*. These conclusory allegations fail as a matter of law. *See Iqbal*, 556 U.S. at 678; *Nexsales Corp. v. Salebuild, Inc.*, 2012 WL 216260, at *3 (N.D. Cal. Jan. 24, 2012) ("conclusory statements that repeat the statutory definitions of the terms" do "not support a claim under the [SCA]"); *Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *9 (N.D. Cal. Mar. 26, 2013) (dismissing "conclusory allegations that parrot the text of the [SCA]").

### 2. Plaintiffs Do Not Allege That Any "Electronic Communications" Were In "Electronic Storage"

Plaintiffs also have not alleged *any* facts showing that electronic communications were obtained while they were in "electronic storage." *See, e.g., Cruz Lopez v. Pena*, 2013 WL 819373, at *3 (N.D. Tex. Mar. 5, 2013) (complaint failed "to adequately allege facts showing that the emails were in 'electronic storage.'"). As noted, "electronic storage" is defined under the SCA as

---

[7] *See, e.g.*, FAC ¶ 3 ("extract email addresses"), ¶ 7 ("appropriation of email addresses"), ¶¶ 16-21, 24 ("harvesting email addresses"), ¶ 30 ("downloads the email addresses"), ¶ 33 ("accessing of email addresses"), ¶ 44 (same), ¶ 55 ("email addresses that LinkedIn takes"), ¶ 57 ("email addresses appropriated").

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

either (1) "temporary, intermediate storage" or (2) storage for purposes of "backup protection." 18 U.S.C. § 2510(17). Plaintiffs, however, "fail[] to provide specific facts demonstrating that [their] data was 'in electronic storage,' instead relying on conclusory statements that repeat the statutory definitions of the terms." *Nexsales*, 2012 WL 216260, at *4. Indeed, there is no allegation that LinkedIn accessed any communications that were in "temporary, intermediate storage," which courts have limited to "messages *not yet delivered* to their intended recipient." *Theofel v. Farey–Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004) (emphasis added); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) (dismissing SCA claim which failed to allege defendant obtained "communications temporarily stored . . . incident to their transmission-for example, when an email service stores a message until the addressee downloads it"). Moreover, the FAC does not allege that any communications were in storage for purposes of "backup protection," which courts have found inapplicable to web-based email services — such as the "Yahoo! Mail, Microsoft Mail," and "Google Gmail" services referenced in the FAC. FAC ¶ 24. As the Ninth Circuit has held, where the service "might be the only place a user stores his messages," as is the case with web-based email, the "messages are not stored for backup purposes." *Theofel*, 359 F.3d at 1070; *United States v. Weaver*, 636 F. Supp. 2d 769, 772 (C.D. Ill. 2009) (in "case of web-based email systems," service "is not storing that user's opened messages for backup purposes").

### 3. Plaintiffs' Allegations Establish That Google Authorized Access To Its Users' Accounts

Regardless of whether Plaintiffs consented to access, the SCA exempts from liability "conduct authorized ... by the person or entity providing a wire or electronic communications service." 18 U.S.C. § 2701(c)(1). Plaintiffs' allegations plainly establish that Google, the provider of the electronic communications services at issue, was authorized to access its users' accounts. Thus Plaintiffs' SCA claim falls squarely within this exemption and fails as a matter of law.

As Plaintiffs allege, *Google*, not LinkedIn, provides a permission screen in which Google states that "LinkedIn is asking for some information from your Google Account," including "Google Contacts." FAC ¶ 32 & Figure 4 ("it is Google that provides this screen"). "LinkedIn

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1   users provide" consent to such access, *id.* ¶ 33, by clicking "Allow" on the screen, *id.* Figure

2   4.  Plaintiffs' allegations thus clearly demonstrate that Google directly authorized access to its

3   users' accounts.  Moreover, Plaintiffs nowhere allege that Google did *not* provide such

4   authorization.  This pleading deficiency alone is fatal to Plaintiffs' SCA claim.  *See Cornerstone*

5   *Consultants, Inc. v. Prod. Input Solutions, L.L.C.*, 789 F. Supp. 2d 1029, 1051 (N.D. Iowa 2011)

6   ("[T]o allege the lack of authorization, *as required*, the plaintiffs would have to allege sufficient

7   facts to make it plausible that none of the entities identified in § 2701(c) authorized the access.

8   The plaintiffs have not done so, here.") (emphasis added); *Garcia v. Haskett*, 2006 WL 1821232,

9   at *5 (N.D. Cal. June 30, 2006) (although defendant may have accessed facility of third-party ISP

10   by accessing plaintiff's email account, plaintiff failed to state SCA claim because did not allege

11   that such access "was conduct unauthorized by" ISP).  "This glaring omission is not cured by the

12   plaintiffs' allegations that they 'did not authorize'" access to their accounts—which, as discussed

13   *supra* at Part III.A separately fails—"because a 'provider's' authorization would make a 'user's'

14   lack of authorization of no consequence" under the SCA.  *Cornerstone,* 789 F. Supp. 2d at 1051.

15   **F.      Plaintiffs Fail To State A Claim Under The Wiretap Act**

16          The Wiretap Act creates a right of action against anyone who "intentionally intercepts,

17   endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire,

18   oral, or electronic communication."  18 U.S.C. § 2511(1)(a).   The Act defines "intercept" as the

19   "acquisition of the contents of any wire, electronic, or oral communication through the use of any

20   electronic, mechanical, or other device." 18 U.S.C. § 2510(4).  In addition to failing to adequately

21   allege the absence of consent, Plaintiffs' Wiretap Act claim should be dismissed under Rule

22   12(b)(6) for several additional reasons.

23          **1.      Plaintiffs Do Not Allege That The "Contents" Of Any "Electronic**
                    **Communications" Were Intercepted**

24

25          Under the Wiretap Act, email addresses are not "contents" of "electronic

26   communications."  The Wiretap Act defines "contents" to mean "information concerning the

     substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

27   "Contents" thus includes the substantive text of an email or text message; it does not encompass

28

                                        -28-

address information.  *See, e.g., United States v. Reed*, 575 F.3d 900, 914-15 (9th Cir. 2009)

(identities of parties to a communication are not "contents"); *United States v. Forrester*, 512 F.3d

500, 509-10 (9th Cir. 2008) (address information, such as email addresses and IP addresses, are

not "contents" of communications).  As the *Hernandez* court held in also dismissing the plaintiff's

Wiretap Act claim, "[a]lthough [the defendant] allegedly transmitted the Class Members' Contact

Address Books from the Class Members' mobile devices to Path's servers," which included email

addresses, it "did not 'intercept' a 'communication' to do so."  *Hernandez,* 2012 WL 5194120, at

*3.  The same is true here.  And as noted, Plaintiffs' conclusory allegations that they accessed

"electronic communications" and the "contents" thereof, *see, e.g.*, FAC ¶¶ 119-20, simply parrot

the language of the statute, are unsupported by any factual allegations, and fail as a matter of law.

## 2.     Plaintiffs Do Not Allege Any Interception

Plaintiffs do not—and cannot—allege that electronic communications were acquired

"contemporaneous *with transmission*," a requirement of any "interception" under the statute.

*Konop v. Hawaiian Airlines, Inc*., 302 F.3d 868, 877-78 (9th Cir. 2002) (emphasis added).  At

best, Plaintiffs have alleged only access to data located in Google accounts, not communications

that were in transmission at the time of any alleged acquisition.  Thus, Plaintiffs fail to allege an

"interception" under the statute.  *See id.*; *Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp.

2d 1017, 1031 (C.D. Cal. 2012) (dismissing Wiretap Act claim where "Defendants did not access,

disclose, or use any emails that had been acquired during transmission.  Rather, the emails

Defendants viewed were stored on Gmail").  Finally, Plaintiffs' wholly conclusory assertions that

an "interception" occurred, FAC ¶¶ 119-20, simply repeat the language of the statute and are

legally insufficient.  *See Crowley v. CyberSource Corp*., 166 F. Supp. 2d 1263, 1268 (N.D. Cal.

2001) (courts should "not accept a conclusory allegation that conduct alleged in the complaint

constituted an interception under the Wiretap Act"); *Garback v. Lossing*, 2010 WL 3733971, at *4

(E.D. Mich. Sept. 20, 2010) ("no allegation that any emails were 'intercepted' contemporaneously

with transmission" and rejecting "conclusory allegation" of "intercept"); *Global Policy Partners,*

*LLC v. Yessin*, 686 F. Supp. 2d 631, 639 (E.D. Va. 2009) (same).

**G.    Plaintiffs Fail To State A Claim Under California Penal Code Section 502**

California Penal Code Section 502(c) prohibits, among other things, a person from "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network."  Cal. Penal Code § 502(c)(7).  Plaintiffs allege that Add Connections violates this and similar subsections of Section 502(c).  FAC ¶¶ 129-133 (alleging violations of Cal. Penal Code §§ 502(c)(1) and (6)-(8)).  In addition to failing to adequately allege injury in fact and lack of consent, *i.e.*, that LinkedIn acted "without permission," Plaintiffs' Section 502 claim should be dismissed under Rule 12(b)(6) on the additional grounds below.

**1.    Plaintiffs Do Not Allege Circumvention Of Any "Technical" Or "Code-Based" Barriers**

"Courts within this District have interpreted 'without permission'"— which is an element of each of the Section 502 subsections at issue (Cal. Penal Code §§ 502(c)(1) and (6)-(8), and 502(b)(10))—"to require that a defendant access a network 'in a manner that *circumvents technical or code based barriers* in place to restrict or bar a user's access.'"  *In re Google Android Consumer Privacy Litig.*, 2013 WL 1283236, at *11-12 (N.D. Cal. Mar. 26, 2013) (emphasis added); *In re iPhone Application Litig.*, 2011 WL 4403963, at *4 (citing authorities and stating that "individuals may only be subjected to liability for acting 'without permission' under Section 502 if they 'access[ ] or us[e] a computer, computer network, or website in a manner that overcomes technical or code-based barriers'") (alterations original).  "Section 502 defines 'access' in terms redolent of 'hacking' or breaking into a computer."  *Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29, 34 (2007).  Plaintiffs do not allege any circumvention of technical or code-based barriers; at best, they allege that Add Connections, *with permission*, accessed their email accounts, but then acted *in excess* of that authorization.  Plaintiffs allege that Add Connections communicates with external email accounts in one of two ways: first, for email accounts that are not already open, LinkedIn "requests the username and password of an external email account," and second, "[i]f a LinkedIn user leaves an external email account open," LinkedIn can directly communicate with that account. FAC ¶ 30.  Either way, members are notified that Add Connections is requesting access to their Google accounts and certain information, including

-30-

1  Google Contacts.  *Id.* ¶ 32 & Figure 4 ("Google screen pops up stating, 'LinkedIn is asking for

2  some information from your Google Account,'" specifically identifying "Google Contacts").  As

3  noted, Plaintiffs concede that members provide "authority and consent" to access their "external

4  email accounts," but assert that LinkedIn "exceeds" such authorization.  *Id*. ¶ 33.

5         Plaintiffs do not allege, however, that Add Connections circumvented any technical or

6  code-based barriers to exceed such authorization.  As the Ninth Circuit held in *United States v.*

7  *Nosal*, 676 F.3d 854 (9th Cir. 2012) with respect to the Computer Fraud and Abuse Act, the

8  federal corollary to Section 502,[8] a claim that a party "exceeds authorized access" would "apply to

9  *inside hackers*," *id*. at 858 (emphasis added), as opposed to those who exceed contractual use

10  restrictions, with "hacking" being defined as the "circumvention of technological access barriers,"

11  *id*. at 863.  Thus, as here, a party fails to state a claim that defendants "exceeded their authorized

12  access" where "there are no direct or clear allegations of 'hacking,'" being "broadly, the

13  'circumvention of technological access barriers.'"  *Incorp Servs. Inc. v. Incsmart.Biz Inc.*, 2012

14  WL 3685994, at *3 (N.D. Cal. Aug. 24, 2012) (quoting *Nosal*, 676 F.3d at 863).

15         Although the FAC is replete with conclusory allegations of "hacking" or "tunneling," *e.g.*,

16  FAC ¶¶ 3, 32, 43, 114, 119, there are no factual allegations detailing *how* technical or code-based

17  barriers are circumvented.  Indeed, as shown above, the FAC's allegations demonstrate the

18  opposite.  The FAC's threadbare assertions of "hacking" fail to establish a violation of Section

19  502.  *See Incorp*, 2012 WL 3685994, at *3 (dismissing complaint where "factual allegations fail to

20  'flesh out' what the Ninth Circuit has described as hacking"); *In re Am. Airlines, Inc., Privacy*

21  *Litig.*, 370 F. Supp. 2d 552, 559 n.14 (N.D. Tex. 2005) ("Although plaintiffs allege that AAI

22  'hacked' into American's electronic communication service or remote computing service . . . , this

23  is a conclusory assertion that the court need not accept" under "Rule 12(b)(6)").[9]

24  _____

25  [8] Courts routinely "consider[] cases interpreting the Computer Fraud and Abuse Act ('CFAA'),
   the federal corollary to Section 502, in evaluating how broad an application Section 502 should
26  properly be given."  *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *7 (N.D. Cal.
   July 20, 2010).

27  [9] Plaintiffs' "hacking" allegations should be stricken under Rule 12(f), which empowers district
28  courts to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                          CASE NO. 13-CV-04303-LHK

### 2. Plaintiffs Do Not Allege Any Cognizable Injury Under Section 502(c)(8)

With respect to Plaintiffs' claim under Section 502(c)(8), Plaintiffs nowhere allege that LinkedIn has "introduce[d] any computer contaminant into any computer, computer system, or computer network." Cal. Penal Code § 502(c)(8). As this Court has held, the phrase "computer contaminants" is "aimed at 'viruses or worms,' and other malware that usurps the normal operation of the computer or computer system." *In re iPhone App. Litig.*, 2011 WL 4403963, at *13. There is no allegation that LinkedIn has introduced any computer contaminants, like viruses or worms, that have usurped the normal operation of any computer system. Thus, Plaintiffs fail to state a claim under Section 502(c)(8). *See In re Facebook Privacy Litig.*, 2011 WL 6176208, at *4 (N.D. Cal. Nov. 22, 2011) (dismissing Section 502(c)(8) claim for failing to allege "'contaminant' introduced to 'usurp' the 'normal operations' of the subject computers").

## IV. IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THE CLASS ALLEGATIONS IN THE FAC

"Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained." *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1146 (N.D. Cal. 2010) (granting motion to strike). Accordingly, district courts regularly strike class allegations at the pleading stage "to avoid the expenditures of time and money that must arise from litigating

---

District courts enjoy considerable discretion in exercising that authority. *E.g.*, *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527-28 (9th Cir. 1993) (review for abuse of discretion), *rev'd on other grounds*, 510 U.S. 517 (1994). Scandalous allegations include allegations that "improperly cast[] a derogatory light on someone, most typically a party to the action," *Moreno v. USG Corp.*, 2007 WL 951301, at *1 (S.D. Cal. Mar. 19, 2007), or allegations that "are superfluous descriptions and not substantive elements of the cause of action," *Alvarado-Moralez v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988) (allegations that company conducted layoff in a cruel manner were properly stricken as scandalous). *See also Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir. 1992) (allegations that food distribution company intentionally caused salmonella outbreak were properly stricken as scandalous). Here, Plaintiffs' outrageous allegations that LinkedIn gained access to users' external email accounts by "hacking into," "breaking into," "tunneling" into, and "guessing [email account] passwords" for those accounts, FAC ¶¶ 2, 3, 32, 43, 114, 115, 119, should all be stricken. Plaintiffs allege no factual support for these "superfluous descriptions" that "improperly cast a derogatory light" on LinkedIn; nor could they, as Plaintiffs' own screen shots make plain that LinkedIn accesses external email accounts only after users consent to access by clicking "Allow" on a permission screen.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

spurious issues." *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 990–91 (N.D. Cal. 2009); *see also Lyons v. Bank of Am., NA*, 2011 WL 6303390, at *7 (N.D. Cal. Dec. 16, 2011); *Stearns v. Select Comfort Retail Corp.*, 2009 WL 1635931, at *19 (N.D. Cal. June 5, 2009).

Under Rule 23(b)(3), Plaintiffs must show that common factual issues "present a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). It is clear from the allegations of the FAC that Plaintiffs' claims are not suitable for class treatment. Allowing this case to proceed to the class certification stage would be a waste of both the Court's and the parties' time and resources through months of class certification discovery and briefing, while only postponing the inevitable conclusion that no class can be certified under Rule 23.

### A.  If Held To Be An Issue Of Fact, Consent Is Inherently Individualized

As demonstrated above, Plaintiffs' consent is established as a matter of law based upon the Add Connections permission screens requiring users to consent affirmatively to the challenged conduct. If, however, the Court were to conclude that consent is an issue of fact, allegations that consent may be determined on a classwide basis should be stricken. *See* FAC ¶ 78 ("Common questions of law and fact affecting the Class predominate over any individual issues," including "Whether Plaintiffs and the Class consented to the use of their names, photographs, likenesses, or identities in multiple endorsement emails sent to third parties by LinkedIn"); *id.* ¶ 61 (same). Whether class members misunderstood Add Connections permission screens is an individualized inquiry that predominates with respect to each of Plaintiffs' claims, precluding class certification.

Consent depends on numerous subjective factors concerning an individual's knowledge and state of mind, including whether he or she understands disclosures seeking consent, and is familiar with a company's practices based upon his or her experience or general awareness of industry practices. *See, e.g., Jones*, 815 F. Supp. 2d at 1114-17 (resolving consent issue based on evidence of the plaintiff's "past industry experience" and various "custom[s] and practice[s] in the entertainment industry"). Thus, it is not surprising that courts repeatedly have denied class certification in cases where consent is an element of the claims. *See, e.g., Murray v. Fin. Visions, Inc.*, 2008 WL 4850328, at *4-5 (D. Ariz. Nov. 7, 2008) (denying certification of Wiretap Act

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1    claim, noting that "question of consent, either express or implied," is a "fact intensive inquiry and

2    may vary with the circumstances of the parties" and "will require an individualized showing of

3    each class member's knowledge and consent with respect to each intercepted email"); *Torres v.*

4    *Nutrisystem, Inc*., 289 F.R.D. 587, 594 (C.D. Cal. 2013) (denying certification of California Penal

5    Code Section 637 claims, noting that "issue of whether class members consented to the recordings

6    would also require a detailed factual inquiry for each class member, likely resulting in varying

7    responses to the consent issue," including whether users "actually expected the calls to be

8    recorded"); *Fields v. Mobile Messengers Am., Inc*., 2013 WL 6073426, at *4 (N.D. Cal. Nov. 18,

9    2013) (holding that plaintiffs "failed to meet their burden to prove that the issue of consent can be

10   addressed with class-wide proof" and finding "individualized inquiries regarding consent");

11   *O'Donovan v. Cashcall, Inc*., 278 F.R.D. 479, 495 (N.D. Cal. 2011) (denying certification in

12   action alleging uniform wrongful conduct by initiating unauthorized electronic fund transfers

13   ("EFTs"), given need to assess whether "a specific borrower authorized or consented to [an]

14   EFT").

15          Here, if the Court here were to determine that consent is an issue of fact, the class

16   allegations should be stricken because determining whether class members consented will require

17   individualized inquiries that predominate over common issues and preclude class certification.

18   Consent will turn on each class member's subjective mental state, including, *e.g.,* whether, how,

19   and to what extent each class member read and understood Add Connections permission screens.

20   In addition, each class member's personal experiences, prior knowledge, and expectations about

21   how LinkedIn operates, including how connection invitations and reminders are used, will have to

22   be considered in determining whether there is consent.  As the court held in *Sanders*, 672 F. Supp.

23   2d 978, in striking class allegations where reliance was an element of the plaintiffs' claims, "if the

24   proposed class were to be certified, the Court would be forced to engage in individual inquiries of

25   each class member with respect to materiality of the statement, whether the member saw Apple's

26   advertisements or visited Apple's website, and what caused the member to make the purchase." *Id*.

27   at 991.  The same is true here with respect to consent, thus precluding class certification.

28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
                                                                    CASE NO. 13-CV-04303-LHK

### B.    Plaintiffs' Claims Based On Emotional Harm Are Inherently Individualized

Plaintiffs' claims based on emotional harm not only fail as a matter of law, but they are also individualized and preclude class certification.  As noted, Plaintiffs point to various highly personal statements of LinkedIn members describing embarrassment and other types of non-economic harm allegedly resulting from invitations being sent to individuals that they did not wish to contact.  *See, e.g.,* FAC ¶¶ 31, 41, 49-50.  These examples, which include contacting people who are mentally ill and acquaintances from the distant past whose spouses recently died, show the highly individualized and idiosyncratic nature of these harms.  *See, e.g., id.* ¶¶ 31, 41.

Determining whether and to what extent class members suffered such non-economic harm would be an inherently individualized inquiry for each class member that would revolve around highly unique and personal circumstances.  Courts repeatedly have held that class certification is improper for claims based on emotional harm.  *See, e.g., Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 417 (5th Cir. 1998) (the "very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy"); *Legge v. Nextel Commc'ns, Inc.*, 2004 WL 5235587, at *7 (C.D. Cal. June 25, 2004) ("mental distress, humiliation, embarrassment" damages always vary by consumer).  The Court should do the same here and strike all allegations of classwide injury based on non-economic harm.  *See, e.g., Lyons*, 2011 WL 6303390, at *8.

### V.    CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' FAC, or alternatively, strike Plaintiffs' class allegations.

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

DATED:  December 6, 2013

MUNGER, TOLLES & OLSON LLP
    JEROME C. ROTH
    ROSEMARIE T. RING
    JONATHAN H. BLAVIN
    WILLIAM J. EDELMAN


By:        */s/ Jerome C. Roth*
    JEROME C. ROTH
Attorneys for Defendant
LINKEDIN CORPORATION

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**


# EXHIBIT W

1  JEROME C. ROTH (State Bar No. 159483)
   ROSEMARIE T. RING (State Bar No. 220769)
2  JONATHAN H. BLAVIN (State Bar No. 230269)
   WILLIAM J. EDELMAN (State Bar No. 285177)
3  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, 27th Floor
4  San Francisco, California 94105
   Tel:   (415) 512-4000
5  Fax:  (415) 512-4077
   Email:  jerome.roth@mto.com
6
   *Attorneys for Defendant*
7  LINKEDIN CORPORATION

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10                   **SAN JOSE DIVISION**

11

12  PAUL PERKINS, PENNIE SEMPELL, ANN          CASE NO.  13-cv-04303-LHK
    BRANDWEIN, ERIN EGGERS, CLARE
13  CONNAUGHTON, JAKE KUSHNER,
    NATALIE RICHSTONE, NICOLE CROSBY,
14  and LESLIE WALL; individually and on       **DEFENDANT'S NOTICE OF MOTION**
    behalf of all others similarly situated,   **AND MOTION TO DISMISS SECOND**
15                                             **AMENDED CLASS ACTION**
                 Plaintiffs,                   **COMPLAINT AND TO DISMISS**
16                                             **REQUEST FOR STATUTORY**
                                               **DAMAGES; MEMORANDUM OF**
17           v.                                **POINTS AND AUTHORITIES IN**
                                               **SUPPORT THEREOF**
18
    LINKEDIN CORPORATION,
19
                 Defendant.                    Judge:    Hon. Lucy H. Koh
20                                             Date:     November 13, 2014
                                               Time:     1:30 p.m.
21                                             Location: Courtroom 8 – 4th Floor

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    PROCEDURAL BACKGROUND AND SUMMARY OF ALLEGATIONS................... 3

      A.    Add Connections ................................................................................. 3

      B.    Prior Proceedings ............................................................................... 4

      C.    Reminders.......................................................................................... 5

II.   LEGAL STANDARD .................................................................................. 6

III.  ARGUMENT ............................................................................................ 6

      A.    Plaintiffs' Request For Minimum Statutory Damages Under Section 3344
            Should Be Dismissed Because Plaintiffs Seek Damages For Only Economic
            Harm, Not Mental Harm ...................................................................... 6

      B.    Plaintiffs' Claims Are Barred By The Federal Communications Decency
            Act, 47 U.S.C. § 230 ......................................................................... 10

            1.    LinkedIn Is An "Interactive Computer Service" Provider ......................... 12

            2.    Plaintiffs' Claims Treat LinkedIn As A "Publisher Or Speaker" ............... 12

            3.    Plaintiffs Provided The Information, And LinkedIn Is Not An
                  "Information Content Provider".................................................... 14

      C.    Plaintiffs' Claims Are Barred By The First Amendment......................... 19

            1.    Reminder Emails Concern Matters of Public Interest................... 19

            2.    Reminder Emails Publicize Protected Speech ........................... 23

      D.    Plaintiffs' Claims Are Barred Because They Challenge An Incidental Use........... 24

IV.   CONCLUSION ....................................................................................... 25

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abdul–Jabbar v. Gen. Motors Corp.*,
    85 F.3d 407 (9th Cir. 1996) ................................................................. 22

*Almeida v. Amazon.com, Inc.*,
    456 F.3d 1316 (11th Cir. 2006) ........................................................... 25

*Alvarado-Moralez v. Digital Equip. Corp.*,
    843 F.2d 613 (1st Cir. 1988) ................................................................. 4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 6

*Asia Econ. Inst. v. Xcentric Ventures LLC*,
    2011 WL 2469822 (C.D. Cal. May 4, 2011) ............................... 15, 17

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ..................................................... 10, 13

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ..................................................... 17, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................. 6

*Black v. Google Inc.*,
    2010 WL 3222147 (N.D. Cal. Aug 13, 2010) ................................... 11

*Bolger v. Youngs Drug Products Corp.*,
    463 U.S. 60 (1983) ............................................................................. 20

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) .............................................. 10, 11, 15

*Cohen v. Facebook, Inc.*,
    798 F. Supp. 2d 1090 (N.D. Cal. 2011) .............................................. 8

*Daly v. United Healthcare Ins. Co.*,
    2010 WL 4510911 (N.D. Cal. Nov. 1, 2010) ...................................... 6

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001) .............................................. 19, 21, 22

*Evans v. Hewlett-Packard Co.*,
    2013 WL 5594717 (N.D. Cal. Oct. 10, 2013) ............................. 11, 14

# TABLE OF AUTHORITIES

**Page(s)**

*Fair Hous. Council of San Fernando Valley v. Roommates.com,*
  521 F.3d 1157 (9th Cir. 2008).............................................................................*passim*

*Fraley v. Facebook, Inc.,*
  830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................. 18, 19, 21, 22

*Gavra v. Google Inc.,*
  2013 WL 3788241 (N.D. Cal. July 17, 2013) .......................................... 14

*Global Royalties, Ltd. v. Xcentric Ventures, LLC,*
  544 F. Supp. 2d 929 (D. Ariz. 2008)........................................................ 18

*Goddard v. Google, Inc.,*
  640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................... 15

*Guillen v. Bank of Am. Corp.,*
  2011 WL 4071996 (N.D. Cal. Aug. 31, 2011) ......................................... 7

*Hoffman v. Capital Cities/ABC, Inc.,*
  255 F.3d 1180 (9th Cir. 2001)................................................................. 20

*In re Watts,*
  298 F.3d 1077 (9th Cir. 2002)................................................................... 7

*Joude v. WordPress Found.,*
  2014 WL 3107441 (N.D. Cal. July 3, 2014) ............................................ 11

*Jurin v. Google Inc.,*
  695 F. Supp. 2d 1117 (E.D. Cal. 2010) ................................................... 15

*Klayman v. Zuckerberg,*
  753 F.3d 1354 (D.C. Cir. 2014) ............................................................. 12

*Lapidus v. Hecht,*
  232 F.3d 679 (9th Cir. 2000)..................................................................... 6

*Levitt v. Yelp! Inc.,*
  2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ......................................... 14

*Midler v. Ford Motor Co.,*
  849 F.2d 460 (9th Cir. 1988)................................................................... 23

*Mitan v. A. Neumann & Assocs., LLC,*
  2010 WL 4782771 (D.N.J. Nov. 17, 2010)............................................. 14

*Moreno v. USG Corp.,*
  2007 WL 951301 (S.D. Cal. Mar. 19, 2007)............................................. 4

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

**Page(s)**

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ...................................................................... 6

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) .................................................................... 11

*Newcombe v. Adolf Coors Co.*,
    157 F.3d 686 (9th Cir. 1998) .................................................................... 22

*Novins v. Cannon*,
    2010 WL 1688695 (D.N.J. Apr. 27, 2010) ............................................... 16

*Optinrealbig.com, LLC v. Ironport Sys., Inc.*,
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) .................................................... 13

*Page v. Something Weird Video*,
    960 F. Supp. 1438 (C.D. Cal. 1996) .................................................... 23, 24

*Perfect 10, Inc. v. CCBill, LLC*,
    340 F. Supp. 2d 1077 (C.D. Cal. 2004) .................................................... 17

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) .................................................................. 11

*Perfect 10, Inc. v. Google, Inc.*,
    2008 WL 4217837 (C.D. Cal. July 16, 2008) ........................................... 14

*Prickett v. InfoUSA, Inc.*,
    561 F. Supp. 2d 646 (E.D. Tex. 2006) ...................................................... 15

*Ramey v. Darkside Prods., Inc.*,
    2004 WL 5550485 (D.D.C. May 17, 2004) ............................................... 14

*Shrader v. Biddinger*,
    2012 WL 976032 (D. Colo. Feb. 17, 2012) .............................................. 14

*Small Justice LLC v. Xcentric Ventures LLC*,
    2014 WL 1214828 (D. Mass. Mar. 24, 2014) ........................................... 17

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) .................................................................... 14

*Waits v. Frito–Lay, Inc.*,
    978 F.2d 1093 (9th Cir. 1992) .................................................................. 22

*White v. Samsung Elecs. Am., Inc.*,
    971 F.2d 1395 (9th Cir. 1992) .................................................................. 22

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

## TABLE OF AUTHORITIES

Page(s)

*Whittlestone, Inc. v. Handi-Craft Co.,*
  618 F.3d 970 (9th Cir. 2010) ................................................................................ 6

*Yeager v. Cingular Wireless LLC,*
  673 F. Supp. 2d 1089 (E.D. Cal. 2009) ................................................................ 24

*Young v. Facebook, Inc.,*
  2010 WL 4269304 (N.D. Cal. Oct. 25, 2010) ...................................................... 12

*Zeran v. Am. Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) ................................................................................ 14

STATE CASES

*Balmoral Hotel Tenants Ass'n v. Lee,*
  226 Cal. App. 3d 686 (1990) ................................................................................. 9

*Barrett v. Rosenthal,*
  40 Cal. 4th 33 (2006) ............................................................................... 10, 16, 17

*Comedy III Prods., Inc. v. Gary Saderup, Inc.,*
  25 Cal. 4th 387 (2001) .......................................................................................... 22

*Doe II v. MySpace Inc.,*
  175 Cal. App. 4th 561 (2009) ............................................................................... 16

*Donato v. Moldow,*
  374 N.J. Super. 475 (App. Div. 2005) .................................................................. 15

*Dora v. Frontline Video, Inc.,*
  15 Cal. App. 4th 536 (1993) ........................................................................... 21, 22

*Gionfriddo v. Major League Baseball,*
  94 Cal. App. 4th 400 (2001) ..................................................................... 19, 20, 22

*Guglielmi v. Spelling–Goldberg Prods.,*
  25 Cal. 3d 860 (1979) ........................................................................................... 23

*Hale v. Morgan,*
  22 Cal. 3d 388 (1978) ............................................................................................. 9

*Hung Tan Phan v. Lang Van Pham,*
  182 Cal. App. 4th 323 (2010) ............................................................................... 13

*Johnson v. Harcourt, Brace, Jovanovich, Inc.,*
  43 Cal. App. 3d 880 (1974) .................................................................................. 23

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                                CASE NO. 13-CV-04303-LHK

# TABLE OF AUTHORITIES

**Page(s)**

*Larson v. Casual Male Stores, LLC,*
   2009 WL 932648 (Cal. Ct. App. Apr. 8, 2009)...................................................................... 9

*Lugosi v. Universal Pictures,*
   25 Cal. 3d 813 (1979) ............................................................................................................ 7

*Miller v. Collectors Universe, Inc.,*
   159 Cal. App. 4th 988 (2008) ....................................................................................... *passim*

*Montana v. San Jose Mercury News, Inc.,*
   34 Cal. App. 4th 790 (1995)........................................................................................... 19, 22

*Rezec v. Sony Pictures Ent., Inc.,*
   116 Cal. App. 4th 135 (2004) ............................................................................................. 23

*Shulman v. Group W Prods., Inc.,*
   18 Cal. 4th 200 (1998) ......................................................................................................... 19

*Starbucks Corp. v. Superior Court,*
   168 Cal. App. 4th 1436 (2008) ......................................................................................... 8, 9

*State ex rel. Dockstader v. Hamby,*
   162 Cal. App. 4th 480 (2008) ............................................................................................... 9

*Stilson v. Reader's Digest Ass'n, Inc.,*
   28 Cal. App. 3d 270 (1972) .................................................................................................. 9

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ................................................................................................... *passim*

**FEDERAL STATUTES**

18 U.S.C. § 2510 *et seq.* ....................................................................................................... 4

18 U.S.C. § 2701 *et seq.* ....................................................................................................... 4

47 U.S.C. § 230 *et seq.* .............................................................................................. *passim*

**STATE STATUTES**

Cal. Civ. Code § 3344 ................................................................................................ *passim*

Cal. Lab. Code § 432.7 .......................................................................................................... 9

Cal. Lab. Code § 432.8 .......................................................................................................... 8

# TABLE OF AUTHORITIES

**Page(s)**

Cal. Penal Code § 502 ............................................................................................. 4

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 1, 6

Fed. R. Civ. P. 12(f) ............................................................................................... 4

**TREATISES**

McCarthy, *Rights of Publicity and Privacy* § 6:46 (2d ed.) ................................. 8

Restatement (Second) of Torts § 652C ............................................................... 24

Restatement (Second) of Torts § 652D ............................................................... 19

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                                CASE NO. 13-CV-04303-LHK

<u>**NOTICE OF MOTION AND MOTION TO DISMISS**</u>

PLEASE TAKE NOTICE that on November 13, 2014 at 1:30 p.m. before the Honorable Lucy H. Koh in Courtroom 8 on the Fourth Floor of the above-entitled Court located at 280 South 1st Street, San Jose, California, Defendant LinkedIn Corporation ("LinkedIn") will move to dismiss Plaintiffs' request for minimum statutory damages under California Civil Code Section 3344(a) and to dismiss the Second Amended Class Action Complaint ("SAC") in its entirety for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). LinkedIn's motion is based on this Notice of Motion and Motion and accompanying Memorandum of Points and Authorities, the Request for Judicial Notice and Declaration of Jonathan H. Blavin (and exhibits thereto) filed herewith, all pleadings and papers on file in this matter, and such other matters as may be presented to this Court at the hearing or otherwise.

<u>**STATEMENT OF RELIEF SOUGHT**</u>

LinkedIn seeks an order, pursuant to Rule 12(b)(6), dismissing the SAC with prejudice for failure to state a claim upon which relief can be granted, or in the alternative, dismissing the request for minimum statutory damages under California Civil Code Section 3344(a).

<u>**STATEMENT OF ISSUES TO BE DECIDED**</u>

1.     Whether the SAC's request for minimum statutory damages under California Civil Code Section 3344(a) should be dismissed.

2.     Whether the SAC states a claim upon which relief can be granted.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

In their Second Amended Class Action Complaint ("SAC"), Plaintiffs again assert claims based on LinkedIn's "Add Connections" feature, which allows LinkedIn members to build their online professional networks by importing contacts from external email accounts and sending connection invitation emails inviting some or all of those contacts to connect. If there is no response to the connection invitation, up to two "reminder" emails are sent reminding the recipient that the original invitation is pending.

The vast majority of the theories in Plaintiffs' first two complaints are now gone. In those complaints, Plaintiffs asserted that Add Connections violates various anti-hacking and computer

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1  crime laws by "hacking" into external email accounts and importing contacts, and that the

2  connection invitations and reminders sent to those contacts violate California's common law right

3  of publicity and California's Unfair Competition Law ("UCL").  By Order dated June 12, 2014,

4  this Court dismissed all of Plaintiffs' "hacking" claims and claims based on connection

5  invitations, holding that, as a matter of law, members consent to importing email contacts and

6  sending invitations to those contacts based on permission screens presented in real time when

7  using the Add Connections feature.

8      In the SAC, Plaintiffs abandon their baseless claims of "hacking" and all claims premised

9  on connection invitations, and now seek to represent a putative nationwide class based solely on

10 reminders.  Accordingly, all that remains in the case are claims based on the use of their names

11 and likenesses in reminder emails—the same use that Plaintiffs consented to in connection

12 invitations as a matter of law—under California's common law right of publicity, the UCL, and

13 now California's statutory right of publicity, Cal. Civ. Code § 3344, including minimum statutory

14 damages of $750.

15     As an initial matter, Plaintiffs' new claim for the minimum statutory damages under

16 Section 3344 should be dismissed because Plaintiffs' alleged injuries are based on economic harm,

17 not mental harm.  The California Court of Appeal has held that the statutory damages provision

18 applies only to claims based on mental harm.  *See Miller v. Collectors Universe, Inc.*, 159 Cal.

19 App. 4th 988, 1005 (2008).  Where, as here, a plaintiff claims injury for economic harm, his or her

20 sole recourse is to prove actual damages.

21     Plaintiffs also fail to state any claim upon which relief can be granted, requiring dismissal

22 of the SAC in its entirety for three reasons.  *First*, all of Plaintiffs' claims are preempted by the

23 Federal Communications Decency Act, 47 U.S.C. § 230 ("CDA"), which bars state law claims

24 attempting to impose liability on interactive computer services, like LinkedIn, for publication and

25 republication of content provided by users.  Connection invitations—and reminders that republish

26 them—are activities protected under the CDA because Plaintiffs consent to and create the content

27 of those communications.  The core policy behind the CDA of "promot[ing] the continued

28 development of the Internet and other interactive computer services," 47 U.S.C. §§ 230(b)(1)-(2),

-2-    MOTION TO DISMISS SECOND AMENDED COMPLAINT
        CASE NO. 13-CV-04303-LHK

1   would be advanced by finding that the state law claims asserted here are preempted, especially in

2   light of Plaintiffs' own claims that the reminders have been "critical" to the growth and

3   development of LinkedIn. *See, e.g.*, SAC ¶ 16.

4        *Second,* reminder emails are not actionable because they are protected activity under the

5   First Amendment. Reminders promote the First Amendment rights of free speech and association

6   and, therefore, concern matters of public interest. Even if Plaintiffs were to claim that reminders

7   are commercial speech, which they are not, the use of member names and likenesses in reminders,

8   which publicize connection invitations through which members exercise their rights of free speech

9   and association, are incidental uses also subject to protection under the First Amendment.

10       *Third*, reminder emails are not actionable because they fall within the incidental use

11  exception under the Restatement (Second) of Torts. The use of member names and likenesses in

12  reminders is necessary to identify the sender of a connection invitation so that the recipient knows

13  who is asking to connect. Accordingly, the challenged use is incidental to and customary for

14  online networking and, therefore, is not actionable as a right of publicity violation.

15  **I.    PROCEDURAL BACKGROUND AND SUMMARY OF ALLEGATIONS**

16      **A.    Add Connections**

17       LinkedIn is the world's largest professional network. It is a free service that members use

18  to build online professional networks through which they can connect with, find, and be found by

19  current and potential business contacts. LinkedIn provides a variety of tools for building online

20  professional networks, including a feature called Add Connections, which members use to import

21  email addresses from their external email accounts and send emails to some or all of those contacts

22  inviting them to join their LinkedIn networks. *See* SAC Figs. 3-10. Members can send

23  connection invitations to contacts who are already LinkedIn members and to those who are not.[1]

24  If there is no response to an invitation, up to two reminders are sent by email reminding the

25  recipient that the connection invitation is pending. SAC ¶ 11.

26

27  _____

[1] Plaintiffs challenge Add Connections only with respect to reminders sent to non-members. *See*

28  MTD Hr'g Tr. 18:1-12, Apr. 10, 2014; *see also, e.g.*, SAC ¶ 17.

-3-    MOTION TO DISMISS SECOND AMENDED COMPLAINT
         CASE NO. 13-CV-04303-LHK

**B.      Prior Proceedings**

Plaintiffs filed this case on September 17, 2013, and filed a First Amended Complaint ("FAC") on October 2, 2013, challenging the Add Connections feature.  Plaintiffs asserted, on behalf of a putative nationwide class, that Add Connections imported contacts from external email accounts, sent connection invitations, and sent up to two reminders of those connection invitations without member consent in violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, California Penal Code § 502, California's common law right of publicity, and the UCL.  *See* FAC, ECF No. 7 ¶¶ 110-138.  On December 6, 2013, LinkedIn moved to dismiss the FAC.  *See* ECF No. 17 ("MTD").  On June 12, 2014, this Court granted LinkedIn's MTD as to all but two claims, and limited those remaining claims to reminder emails.  Based on real-time permission screens presented to members using Add Connections, the Court held that, as a matter of law, Plaintiffs consented to importing email contacts and sending connection invitations.  *See* ECF No. 47 ("MTD Order") at 23-27.  On this and related grounds, the Court dismissed all of Plaintiffs' claims based on importing email contacts and sending connection invitations.  *Id.* at 28-30.  Because the Court found that consent to sending reminders could not be established as a matter of law, Plaintiffs' common law right of publicity claims and derivative UCL claims *based on reminders* survived.  *Id.* at 30-32.

On August 28, 2014, Plaintiffs filed the SAC.  Plaintiffs abandoned their baseless claims challenging their use of Add Connections to import email contacts and to send connection invitations.[2]  Instead, relying solely on reminders, they reassert the two claims that survived the

---

[2] LinkedIn renews its request that the Court strike under Rule 12(f) Plaintiffs' "hacking" allegations, which the Court denied in connection with the FAC, finding that these allegations were relevant to Plaintiffs' California Penal Code Section 502 claim.  MTD Order at 33 n.7.  Plaintiffs have dropped that claim in the SAC, but continue to assert, still without basis, allegations of "hacking," "break[ing] into" members' email accounts, and "tunneling."  *See* SAC ¶¶ 7, 50 51, 69.  The Court should strike these allegations as "immaterial, impertinent, [and] scandalous" under Rule 12(f).  *See* Fed. R. Civ. P. 12(f); *see also Moreno v. USG Corp.*, 2007 WL 951301, at *1 (S.D. Cal. Mar. 19, 2007) (scandalous allegations include allegations that "improperly cast[] a derogatory light on…a party to the action"); *Alvarado-Moralez v. Digital Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988).  Plaintiffs still do not allege any factual support for these allegations that "improperly cast a derogatory light" on LinkedIn; nor could they—as the

Court's MTD Order and add a new claim under California Civil Code Section 3344. Plaintiffs claim that, although they consented to importing email contacts and sending connection invitations as a matter of law, they did not consent to sending reminders. According to Plaintiffs, they suffered economic harm because they were "deprived" of the "monetary value" of the use of their names and likenesses in reminders. *See* SAC ¶¶ 104-05, 132-143.

### C. Reminders

Although Plaintiffs' entire case now hinges exclusively on reminders, the sixty-page SAC, which includes fifteen images of Add Connections permission screens and connection invitations, does not include a *single* image of a reminder. *See* SAC ¶¶ 9-11, 72. Below is an example from the putative class period of a reminder email sent to a non-member, which is properly subject to judicial notice, *see* Request for Judicial Notice ("RJN") at 2-3.



Declaration of Jonathan H. Blavin ("Blavin Decl."), Ex. A.

Court explained, Plaintiffs' own allegations make plain that LinkedIn accesses external email accounts only after users consent. *See* MTD Order at 23-27, 32-34.

-5-

A reminder is exactly what the name indicates—it reminds the recipient of a connection invitation that the invitation is pending. That is all.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court should not accept mere "labels and conclusions" in a complaint, nor a "formulaic recitation of the elements of a cause of action." *Id.* The court may consider documents referenced in the complaint and relevant matters subject to judicial notice. *E.g.*, *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000). Requests for damages that are precluded as a matter of law are subject to dismissal under Rule 12(b)(6). *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010); *Daly v. United Healthcare Ins. Co.*, 2010 WL 4510911, at *7 (N.D. Cal. Nov. 1, 2010) (Koh, J.) ("[A] Fed. R. Civ. P. 12(b)(6) motion is the proper method for dismissing a claim for damages . . . .").

## III. ARGUMENT

### A. Plaintiffs' Request For Minimum Statutory Damages Under Section 3344 Should Be Dismissed Because Plaintiffs Seek Damages For Only Economic Harm, Not Mental Harm

Under their new Section 3344 claim, Plaintiffs claim minimum statutory damages of $750. *See* SAC ¶ 143 (requesting "a remedy as provided for by the California Right of Publicity Statute in the amount of $750 per LinkedIn member"); *see also* Cal. Civ. Code § 3344(a).[3] Plaintiffs' claim for minimum statutory damages should be dismissed because Section 3344's statutory damages provision applies only to claims for mental harm, which Plaintiffs do not allege and, in

---

[3] California Civil Code Section 3344(a) provides that a defendant who violates the statute

shall be liable for any damages sustained by the person or persons injured as a result thereof. In addition, in any action brought under this section, the person who violated the section shall be liable to the injured party or parties in an amount equal to the greater of seven hundred fifty dollars ($750) or the actual damages suffered by him or her as a result of the unauthorized use, and any profits from the unauthorized use that are attributable to the use and are not taken into account in computing the actual damages.

1  fact, have expressly disclaimed.  In *Miller v. Collectors Universe, Inc.*, 159 Cal. App. 4th 988,

2  1005 (2008), the California Court of Appeal held that the statutory damages provision of Section

3  3344 is intended to protect plaintiffs seeking recovery for mental—not commercial—harm, and

4  thus only those plaintiffs may recover the $750 minimum statutory damages.  That ruling is

5  binding on this Court.[4]

6        In *Miller*, the plaintiff, an authenticator of memorabilia, sued his former employer

7  Collectors, alleging that following Miller's termination, Collectors had issued to customers 14,060

8  "certificates of authenticity" bearing Miller's name in violation of his statutory right of publicity

9  under Section 3344.  *See* 159 Cal. App. 4th at 991.  Miller sought $750 in statutory damages for

10  each of the 14,060 certificates.  *Id.*

11        The Court of Appeal reversed the judgment in plaintiff's favor after trial.  The court

12  explained that the right protected by Section 3344 "has two aspects: (1) the right of publicity

13  protecting the commercial value of celebrities' names and likenesses, and (2) the appropriation of

14  the name and likeness that brings injury to the feelings, that concerns one's own peace of mind,

15  and that is mental and subjective."  *Id.* at 1005.  Miller had contended that, apart from his claims

16  of mental harm, he was entitled to $750 in statutory damages for each of the certificates because

17  he had "suffered commercial loss from the dilution of the value of his future authentications."  *Id.*

18  at 1005-06.   After surveying the legislative history of Section 3344 in detail, the court rejected

19  Miller's argument, concluding that "the statutory minimum damages were meant to compensate

20  non-celebrity plaintiffs who suffer…mental anguish yet no discernible commercial loss."  *Id.* at

21  1006; *see also Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 842 n.23 (1979) (Bird, C.J.,

22  dissenting) (observing that "Legislature recently enacted Civil Code Section 3344 to provide a

23  minimum amount of damages" and that the "legislative history of Section 3344 strongly suggests

---

24
25  [4] This Court is "bound to follow" California appellate court interpretations "absent convincing
evidence that the California Supreme Court would reject the interpretation of" a statute by such
26  courts.  *In re Watts*, 298 F.3d 1077, 1082 (9th Cir. 2002); *see also Guillen v. Bank of Am. Corp.*,
2011 WL 4071996, at *4 (N.D. Cal. Aug. 31, 2011) ("This court must defer to the interpretation of
27  the California Court of Appeal absent convincing evidence the California Supreme Court would
decide the matter differently.").  There is no evidence, much less convincing evidence, that the
28  California Supreme Court would reject *Miller*.

-7-      

1    that the Legislature was concerned with an individual's right to privacy, not an individual's

2    proprietary interest in his or her name and likeness").

3          The *Miller* court concluded instead that the "primary right protected by section 3344(a)'s

4    provision for statutory minimum damages is the right to be free from . . . mental anguish resulting

5    from commercial misappropriation," and that Miller was therefore entitled only to a single award

6    of $750 for his claims of mental harm.  *Id.*  "To the extent Miller suffered commercial loss due to

7    his status as an authenticator well known in the 'close-knit collectibles and autograph industry,'"

8    the court held, "his recourse *was to prove actual damages* like any other plaintiff whose name has

9    commercial value."  159 Cal. App. 4th at 1006 (emphasis added).

10         Thus, under *Miller*, a plaintiff claiming damages based on economic harm allegedly

11   resulting from violation of the right to publicity, as Plaintiffs do here, is not entitled to Section

12   3344's minimum statutory damages but must "prove actual damages."  *Id.*; *see also Cohen v.

13   Facebook, Inc.*, 798 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011) (under *Miller*, plaintiffs are not

14   automatically entitled to statutory damages but "must, at a minimum, plead that they suffered

15   mental anguish as a result of the alleged misappropriation"); McCarthy, *Rights of Publicity and

16   Privacy* § 6:46 (2d ed.) (*Miller* held that "statutory minimum damages could not be recovered by a

17   person as a measure of damages for injury to the commercial value of his or her identity.  Rather,

18   the statutory minimum could be used only when a plaintiff seeks damages for injury to mental

19   feeling and peace of mind").

20         *Miller* is consistent with a long line of California cases holding that statutory damages may

21   be recovered only by those who "fall within the class of persons intended to be protected" by the

22   statutory damages provision.  *Starbucks Corp. v. Superior Court*, 168 Cal. App. 4th 1436, 1449

23   (2008).  In *Starbucks*, for example, the plaintiffs sued the coffee chain under a Labor Code

24   provision prohibiting employers from asking in a job application about marijuana convictions

25   more than two years old.  *Id.* at 1440 (citing Cal. Lab. Code § 432.8).  The plaintiffs, who did not

26   themselves have any marijuana convictions, sought to represent a class of 135,000 Starbucks

27   applicants, and requested statutory damages of $200 per applicant.  *Id.*  The Labor Code provision

28   at issue included a statutory damages component: "In any case where a person violates this section

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                                CASE NO. 13-CV-04303-LHK

1   . . . the applicant may bring an action to recover from that person actual damages or two hundred

2   dollars ($200)." Cal. Lab. Code § 432.7.

3       Notwithstanding that broad language, the California Court of Appeal "decline[d] to adopt

4   an interpretation that would turn the statute into a veritable financial bonanza for litigants like

5   plaintiffs." *Id.* at 1449. Instead, citing a long line of cases narrowly construing statutory damages

6   provisions to avoid disconnecting the award from the harm it was designed to address—including

7   the *Miller* decision—the court held that only applicants who themselves had marijuana

8   convictions could sue under that provision, because only those individuals were in the "class of

9   people the Legislature sought to protect." *Id.* at 1449-51 (citing *Hale v. Morgan*, 22 Cal. 3d 388,

10  402, 405 (1978) (narrowly interpreting a statutory damages provision)); *Balmoral Hotel Tenants*

11  *Ass'n v. Lee*, 226 Cal. App. 3d 686, 695, 697 (1990) (same)).[5]

12      *Miller* compels dismissal of Plaintiffs' statutory damages claims here. Recognizing the

13  impossibility of certifying a class based on claims of mental harm,[6] Plaintiffs abandoned any

14  theory of injury based on mental harm in opposition to LinkedIn's motion to strike the class

15  allegations in Plaintiffs' FAC, stating that the "harm giving rise to Plaintiffs' class actions *are the*

16  *economic harm* each Plaintiff has suffered as a result of LinkedIn," [sic] and that "it is Plaintiffs'

17  *economic injuries* giving rise to the class action claims at issue." ECF No. 24, at 33 n.20

18

19  [5] The "plain language" of Section 3344(a) does not counsel otherwise, because as the Court of
    Appeal in *Starbucks* explained in rejecting the lower court's conclusion that the "plain language"

20  of the statute required a contrary result, 168 Cal. App. 4th at 1443, to the extent the statutory
    damages provision can be read as providing damages for plaintiffs other than those the Legislature

21  intended to protect, it is ambiguous and must be "narrowly interpret[ed]" to avoid that "absurd
    result," 168 Cal. App. 4th at 1451. *See also State ex rel. Dockstader v. Hamby*, 162 Cal. App. 4th

22  480, 487-88 (2008) (although statute authorizing treble damages and civil penalties against "any
    natural person" was unambiguous on its face, it was ambiguous in context of purpose of statute

23  and prior judicial interpretation of law); *Larson v. Casual Male Stores, LLC*, 2009 WL 932648, at
    *4-6 (Cal. Ct. App. Apr. 8, 2009) (unpublished) ("The apparent purpose of a statute will not be

24  sacrificed to a literal construction. When aid to construction of the words, as used in the statute, is
    available, there certainly can be no rule of law which forbids its use, however clear the words may

25  appear on superficial examination." (internal citations and quotation marks omitted)).

26  [6] *See, e.g., Stilson v. Reader's Digest Ass'n, Inc.,* 28 Cal. App. 3d 270, 274 (1972) (in common
    law right of publicity case, denying class certification and noting that "to award even slightly more

27  than nominal damages, the court would be required to examine the mental and subjective state of

28  each of the millions of plaintiffs").

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                        CASE NO. 13-CV-04303-LHK

1    (emphases added).  Likewise, in the SAC, Plaintiffs limit allegations of injury solely to economic

2    harm.  *See* SAC ¶¶ 104-05 ("Each Plaintiff was deprived the [sic] *monetary value* of having his or

3    her endorsement appear in the endorsement emails" and "[e]ach Plaintiff has been personally

4    injured by this loss of money"), ¶¶ 132-143 (describing harm under 3344 claim as "receiv[ing] no

5    compensation" and being "deprived of earnings").  Just as in *Miller*, Plaintiffs cannot recover

6    statutory damages based on their claims of economic harm.  On the contrary, exactly as in *Miller*,

7    to the extent Plaintiffs claim that their status among their contacts gave rise to commercial losses,

8    they must prove their actual damages.

9         **B.       Plaintiffs' Claims Are Barred By The Federal Communications Decency Act,
                     47 U.S.C. § 230**

10        Under section 230 of the CDA, "[n]o provider or user of an interactive computer service

11   shall be treated as the publisher or speaker of any information provided by another information

12   content provider."  47 U.S.C. § 230(c)(1).  Section 230 expressly preempts any application of state

13   law that interferes with this rule, providing that "[n]o cause of action may be brought and no

14   liability may be imposed under any State or local law that is inconsistent with this section."  *Id*.

15   § 230(e)(3).  It "provides broad immunity [to websites that publish] content provided primarily by

16   third parties."  *Carafano v. Metrosplash.com, Inc*., 339 F.3d 1119, 1123 (9th Cir. 2003); *Barrett v.*

17   *Rosenthal*, 40 Cal. 4th 33, 57 (2006) (section 230 provides "blanket immunity from tort liability

18   for online republication of third party content").  Section 230 thus protects a "(1) a provider or

19   user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause

20   of action, as a publisher or speaker (3) of information provided by another information content

21   provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009).  As described further

22   below, all of Plaintiffs' claims are based on allegations that fall squarely within those three

23   elements of the protection afforded by the CDA and are therefore preempted.

24        Section 230 immunity for emails Plaintiffs send using Add Connections, including

25   reminders, is also consistent with and bolstered by the policies underlying the CDA.  Congress

26   enacted the immunity provisions of section 230 "to promote the continued development of the

27   Internet and other interactive computer services and other interactive media" and "to preserve the

28

                              -10-
                                       CASE NO. 13-CV-04303-LHK

1    vibrant and competitive free market that presently exists for the Internet and other interactive

2    computer services, unfettered by Federal or State regulation." 47 U.S.C. §§ 230(b)(1)-(2).

3    Without such immunity, websites "might not be able to offer" their "services and certainly not to

4    the same degree," thus undermining the "'continued development" of "interactive computer

5    services." *Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119 (9th Cir. 2003) (quoting 47 U.S.C.

6    § 230(b)(1)).  Here, Plaintiffs repeatedly allege that reminders have played a "critical" role in

7    LinkedIn's development as a professional online network.  *See, e.g.,* SAC ¶ 16 ("Sending a second

8    and third reminder email *was critical* to LinkedIn growing its user base." (emphasis added)).

9    Imposing liability on LinkedIn based on reminders because they allegedly allowed LinkedIn to

10   develop an online professional network would directly undermine the Congressional policies

11   underlying the CDA.

12          CDA immunity extends to all state statutory and common law claims, including claims for

13   violation of the right of publicity, *see Carafano*, 339 F.3d at 1125 (upholding section 230

14   immunity for misappropriation claim),[7] and is a proper ground upon which to grant a motion to

15   dismiss, *see Evans v. Hewlett-Packard Co.*, 2013 WL 5594717, at *3 (N.D. Cal. Oct. 10, 2013)

16   ("[E]valuating Section 230 immunity [is] proper at the dismissal stage").[8]  "[C]lose cases . . . must

17   be resolved in favor of immunity, lest we cut the heart out of Section 230 by forcing websites to

18   face death by ten thousand duck-bites . . . ." *Fair Hous. Council of San Fernando Valley v.

19   Roommates.com*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc).

20

21

22   _____

23   [7] *See also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) (affirming
     Section 230 immunity against right of publicity claims and for claims for unfair competition and

24   false advertising, noting "Congress's expressed goal of insulating the development of the Internet
     from various state-law regimes"); *Joude v. WordPress Found.*, 2014 WL 3107441, at *7 (N.D.

25   Cal. July 3, 2014) (under section 230, "computer service providers in this circuit are entitled to
     immunity from state intellectual property claims, including the right of publicity").

26   [8] *See also Black v. Google Inc.*, 2010 WL 3222147, at *3 (N.D. Cal. Aug 13, 2010) (granting

27   motion to dismiss under Section 230); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591
     F.3d 250, 255-58 (4th Cir. 2009) (courts should "resolve the question of § 230 immunity at the

28   earliest possible stage of the case" (citing *Roommates.com*, 521 F.3d at 1175)).

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                     CASE NO. 13-CV-04303-LHK

### 1.     LinkedIn Is An "Interactive Computer Service" Provider

An "interactive computer service" is "any information service system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).  Under Section 230(f)(4), an "access software provider" is "a provider of software (including client or server software), or enabling tools that do any one or more of the following: (A) filter, screen, or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, translate content."  LinkedIn is an "interactive computer service" provider within the meaning of the CDA, as courts have held in similar contexts for social networking websites.  *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access . . . to a computer server,' 47 U.S.C. § 230(f)(2), namely the servers that host its social networking website."); *Roommates.com*, 521 F.3d at 1162 n.6 ("[T]he most common interactive computer services are websites."); *Young v. Facebook, Inc.*, 2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010) (Facebook is an interactive computer service; granting motion to dismiss under Section 230). LinkedIn "provides information to 'multiple users' by giving them 'computer access . . . to a computer server,'" 47 U.S.C. § 230(f)(2)—the LinkedIn servers hosting its site—and in the specific context of connection invitations and reminders, "transmit[s]," "display[s]," and "organize[s]" content, among other functions, *id*. § 230(f)(4).

### 2.     Plaintiffs' Claims Treat LinkedIn As A "Publisher Or Speaker"

Plaintiffs' claims treat LinkedIn as the "publisher or speaker" of information because they challenge *LinkedIn's* alleged sending of reminder emails over the Internet.  *See, e.g.,* SAC ¶ 5 (claims arise from "practice of sending repeated endorsement emails"), ¶ 9 (same), ¶ 22 (Plaintiffs "filed this case to stop LinkedIn's practice of sending repeated endorsement emails").   All of Plaintiffs' causes of action arise from the sending of these reminder emails.  *See id.* ¶¶ 122, 134

(common law right of publicity and Section 3344 claims arising from use of Plaintiffs' names or likenesses in emails), ¶ 147 (UCL claim arising out of "send[ing] repeated reminder emails").

The Ninth Circuit has held, "what matters is not the name of the cause of action," but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another. In other words, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1100-01.

Courts consistently treat "distributors" of content as equivalent to "publishers" under the CDA, and repeatedly have held that claims challenging the sending of emails to third parties fall squarely within the scope of Section 230 immunity. In *Optinrealbig.com, LLC v. Ironport Systems, Inc.*, 323 F. Supp. 2d 1037 (N.D. Cal. 2004), for example, the plaintiff, a sender of "bulk commercial electronic mail (email)," brought suit against an Internet-based anti-SPAM service, claiming that the defendant overstated the complaints against the plaintiff to ISPs, causing the ISPs to curtail bandwidth for the plaintiff. The defendant's registered users would "forward what they believe to be spam" to the defendant, and the defendant would then email these reports to the originating ISP. *Id*. at 1040. The plaintiff filed various state law claims and sought a preliminary injunction enjoining defendant from "transmitting or sending reports it forwards to third parties." *Id*. at 1039, 1047.

The court denied the injunction and found that the defendant was immune from liability under the CDA. The plaintiff had argued that "deliberately sending the reports to non-subscribers, that is third parties who did not choose to receive the reports, removes SpamCop from immunity" under the CDA. *Id*. at 1046. Observing that courts "have consistently found that the CDA does not distinguish between publishers and distributors," the court held that section 230 immunity applied. *Id*. at 1045. Thus, while the defendants' "[d]istributing content to non-subscribers may be perceived as aggressive activity," it "does not destroy the distributor's immunity," as the "focus on distributor liability is and should be conterminous with the focus on publisher liability:

-13-

content." *Id.*  Numerous other courts have reached the same conclusion.[9]

Likewise, here, Plaintiffs' challenge to LinkedIn "distributing content" to third party non-subscribers treats LinkedIn as a "publisher or speaker" of information under the CDA.

### 3.  Plaintiffs Provided The Information, And LinkedIn Is Not An "Information Content Provider"

Plaintiffs provided the information in the challenged emails under the CDA—the request from each Plaintiff to a third party to join his or her professional network—and therefore LinkedIn cannot be considered an "information content provider."[10]

Under the CDA, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (cited with approval by *Roommates.com*, 521 F.3d at 1179–80); *Ramey v. Darkside Prods., Inc.*, 2004 WL 5550485, at *7 (D.D.C. May 17, 2004) (defendant was not an information content provider because it edited the ads posted on its website).  Accordingly, courts have held that where a defendant does not change the *substantive* nature of the content the user provides, it is not an

---

[9] *See, e.g., Hung Tan Phan v. Lang Van Pham,* 182 Cal. App. 4th 323, 325 (2010) (act of "forward[ing]" allegedly defamatory email to "to at least one" other individual with "introductory paragraph" immune from liability under CDA); *Mitan v. A. Neumann & Assocs., LLC*, 2010 WL 4782771, at *1, 5 (D.N.J. Nov. 17, 2010) (act of forwarding email immune under CDA, noting that "regardless of the original source of the [email], it is undisputed that [defendant] received the [email] via the Internet (email) and republished the same via the Internet (email)"); *Shrader v. Biddinger*, 2012 WL 976032, at *9 (D. Colo. Feb. 17, 2012) (holding that "directing" users to site through emailing "does not diminish the protections of the CDA's immunity"); *Gavra v. Google Inc.*, 2013 WL 3788241, at *3 (N.D. Cal. July 17, 2013) (rejecting plaintiff's attempt to "distinguish between publishers and distributors" under the CDA).

[10] Plaintiffs do not allege any facts to support their conclusory allegations that LinkedIn was the creator and developer of the content of "endorsement emails," *see, e.g.,* SAC ¶ 99 ("LinkedIn was solely responsible for the creation and development of each endorsement email, the content, and the advertisement scheme by which each endorsement email was created."), and actually demonstrate the opposite in the SAC.  Accordingly, the Court may ignore these allegations.  *See, e.g., Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418 (1st Cir. 2007) (plaintiff "has attempted to plead around" CDA immunity but the "facts pleaded simply do not fit those theories" and "[n]o amount of artful pleading can avoid that result"); *Evans v. Hewlett-Packard Company*, 2013 WL 5594717,at *4 (N.D. Cal. Oct. 10, 2013) ("Plaintiffs attempt to plead around Section 230, but these schemes fail."); *Perfect 10, Inc. v. Google, Inc.*, 2008 WL 4217837, at *8 (C.D. Cal. July 16, 2008) (where plaintiff "claims that it has pleaded around CDA preemption by alleging that Google is an 'information content provider'" rejecting these "conclusory allegations" as "at best, dubious"); *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *5 (N.D. Cal. Oct. 26, 2011) (same).

-14-

"information content provider."  *See Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *8 (C.D. Cal. May 4, 2011) ("Absent a changing of . . . substantive content that is visible to consumers, liability cannot be found."); *Roommates.com*, 521 F.3d at 1169 ("website operator who edits user-created content—such as by correcting spelling, removing obscenity or trimming for length—retains his immunity" whereas "a website operator" who "transform[s] an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune"); *Donato v. Moldow*, 374 N.J. Super. 475, 500 (App. Div. 2005) ("commenting favorably or unfavorably on some postings, without changing the substance of the message authored by another, does not constitute 'development'" under CDA).

Reminder emails fall squarely within the realm of "traditional editorial functions" that are immune from challenge under the CDA.  Traditional editorial functions immune from liability include using pre-written language in response to user conduct.  In *Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119 (9th Cir. 2003), for example, the Ninth Circuit held that a dating website that provided "a menu of 'pre-prepared responses'" for users was protected by the CDA because "no profile has any content until a user actively creates it" and  "[w]ithout standardized, easily encoded answers, [the site] might not be able to offer these services and certainly not to the same degree." *Id.* at 1125; *see also*, *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1997-99 (N.D. Cal. 2009) (CDA immunity applied even though Google allegedly "disproportionately suggests the term 'free ringtone' in response to an advertiser's entry of the term 'ringtone'"); *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (Google's practice of "suggesting keywords" to competing advertisers "merely helps third parties to refine their content" and was protected by the CDA); *Prickett v. InfoUSA, Inc.*, 561 F. Supp. 2d 646, 651-52 (E.D. Tex. 2006) (defendant not "information content provider" even though users "prompted to select subcategories through the Defendant's database gathering system" and the "Defendant directed the third party's selections").

The allegations of the SAC make clear that here Plaintiffs provided the substantive "content" to LinkedIn by providing their own names, likenesses, and contacts to LinkedIn, and by then clicking the "Add to Network" button on the LinkedIn permission screen; LinkedIn did not alter the substance of such content in connection invitations or reminders.  *See* SAC ¶¶ 64-65,

-15-                    MOTION TO DISMISS SECOND AMENDED COMPLAINT
                        CASE NO. 13-CV-04303-LHK

1  Figures 1-8. LinkedIn used the phrase "I'd like to add you to my professional network" in the

2  connection invitation in response to the user's action, SAC Figure 10, which is substantively

3  identical to the language Plaintiffs consented to by clicking the "Add to Network" button. As the

4  Court stated in its Order on LinkedIn's motion to dismiss, the

> actual email that is ultimately sent to the contacts states 'I'd like to add you to my
> professional network' with the name of the LinkedIn user below. *See* ECF No. 7,
> Fig. 7. The Court finds that a reasonable user who saw the disclosure "Invite
> [contacts] to connect with you' has consented to this language in the email. The
> email ***contains the message that LinkedIn discloses to users****:* an invitation from
> the user to the users' contacts to connect with the user on LinkedIn.

9  MTD Order at 29 (emphasis added). Indeed, as the Court emphasized, "Plaintiffs do not

10  challenge the specific format or content of the invitation email." *Id.* Moreover, Plaintiffs at all

11  times could have "skip[ped] this step" and declined to send any connection invitations or

12  reminders at all through Add Connections. *See id.* at 28-29 (noting ability to "'Skip this step'

13  altogether").[11] Accordingly, Plaintiffs are the source of the content of the communications at

14  issue.

15      LinkedIn's *republishing* of this user content—the request to join Plaintiff's professional

16  networks—through the sending of up to two reminder emails does not convert LinkedIn into an

17  information content provider. As the SAC makes clear, the challenged reminders contain nothing

18  more than the same substantive content as the initial connection invitations: "The reminder

19  endorsement emails requested that the recipients join LinkedIn." SAC ¶¶ 23, 25, 29, 31, 33, 35,

20  37, 39; *see also* Blavin Decl. Ex. A (showing text of reminder email). Courts repeatedly have held

21  that active and selective republication of user content is immune from liability, as "Congress has

22  comprehensively immunized republication" under the CDA. *Barrett*, 40 Cal. 4th at 62 (party that

23  "actively selected and republished information" on several different occasions on website remains

24  immune from liability as publisher); *see also Novins v. Cannon*, 2010 WL 1688695, at *2 (D.N.J.

---

[11] This is in contrast to sites where the user submitted certain information as a *required* condition
of using the site at all. *See, e.g., Doe II v. MySpace Inc.,* 175 Cal. App. 4th 561, 575 (2009) (that
users were "encouraged" to enter "personal information" and "information is organized by the
site" does not convert site into information content provider; emphasizing that user does not
"require[] its members to answer the profile questions as a condition of using the site").

    MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

1  Apr. 27, 2010) ("As multiple courts have accepted, there is no relevant distinction between a user

2  who knowingly allows content to be posted to a website he or she controls and a user who takes

3  affirmative steps to republish another person's content; CDA immunity applies to both").[12]

4  Indeed, courts have emphasized that under Ninth Circuit law, "[i]ncreasing the visibility

5  of a statement *is not tantamount* to altering its message," and that "[t]his holding is bolstered by

6  the Ninth Circuit's *en banc* opinion in *Roommates.com*," where the court "asserted that 'in cases

7  of enhancement by implication or development by inference ... section 230 *must be interpreted to*

8  *protect websites*.'" *Asia Econ. Inst.*, 2011 WL 2469822, at *8 (quoting *Roommates.com*, 521 F.3d

9  at 1174–75) (emphases added).  Thus, "[a]bsent a changing" of the "*substantive content* that is

10  visible to consumers," none of which is or can be alleged here with respect to connection

11  invitations or their reminders, "liability cannot be found."  *Id.* (emphasis added); *see also Small*

12  *Justice LLC v. Xcentric Ventures LLC*, 2014 WL 1214828, at *7 (D. Mass. Mar. 24, 2014) (where

13  defendant allegedly instructed search engines to make copies of user reports and to display copies

14  to "maximize the number of times each of the" reports were listed on search engines' index, court

15  held that "merely endeavoring to increase the prominence" of content "does not make [defendant]

16  an information content provider").

17  This is equally true where, as alleged here, the users who are the source of the content

18  claim that they did not explicitly authorize future republication, *i.e.*, reminder emails.  Courts may

19  withdraw "protection only for those internet service providers who would publish on the Internet

20  *private communications* the *provider* knew or had reason to know *were never intended to be*

21  *published at all*" online.  *Perfect 10, Inc. v. CCBill, LLC*, 340 F. Supp. 2d 1077, 1110-11 (C.D.

22  Cal. 2004), *aff'd in part, rev'd in part on other grounds and remanded*, 481 F.3d 751 (9th Cir.

23  2007) (emphasis added) (citing *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)).  Courts have

---

[12] As the California Supreme Court has held, "[a]t some point active involvement in the creation" of an "Internet posting would expose a defendant to liability as an original source," but where the defendant "made no changes" to the user consent, the court "need not consider when that line is crossed."  *Barrett*, 40 Cal. 4th at 60.  Here, LinkedIn made *no* substantive changes to the content at issue in the connection invitation, and only sent two reminders of those invitations to users. Thus, the Court need not consider precisely where such "active involvement" would cross the line.

-17-

therefore rejected arguments that CDA immunity turns on whether plaintiffs intended for work already published on the Internet to be published on the defendant's website in particular, holding that such a rule improperly would require the defendant "to determine whether the information content provider intended the content to be published in a particular forum." *Id.* Similarly, courts have held that a website is immune from liability even where the "author of the defamatory content himself requests that it be taken down," holding that "liability based on an author's notice, workable or not, is without statutory support and is contrary to well-settled precedent that the CDA is a complete bar to suit against a website operator for its 'exercise of a publisher's traditional editorial functions.'" *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 932 (D. Ariz. 2008).[13] The content at issue here was not "private" or "unpublished." As the Court held, Plaintiffs consented to LinkedIn distributing their connection invitations to third parties. LinkedIn's decision to republish those invitations through reminders—to the very same parties that *already* received the connection invitations—is immune from liability under the CDA.

This Court's decision in *Fraley* is not to the contrary. There, the Court held that although under Plaintiffs' allegations Facebook "members provide some of the information used in Sponsored Stories by taking an action such as clicking the 'Like' button on a third-party's website," Facebook so fundamentally transformed this information in its Sponsored Stories that Facebook itself became an "information content provider" under the CDA. *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801-02 (N.D. Cal. 2011). As the Court observed, Facebook created content by "*mistranslating* members' actions, such as clicking on a 'Like' button on a company's page, into the words 'Plaintiff likes [Brand],' and further combining that text with Plaintiff's photograph, the company's logo, and the label 'Sponsored Story.'" *Id.* at 802 (emphasis added). Facebook did not just "rearrang[e] text and images provided by members," but "by

---

[13] Even if Plaintiffs alleged that they had not intended for LinkedIn to distribute *any* connection invitations *at all*, which the Court rejected in its Order, the potential *absence* of consent or knowledge on Plaintiffs' end is irrelevant because under the CDA "the focus should be *not* on the information provider's intentions or knowledge when transmitting content but, instead, on the *service provider's or user's* reasonable perception of those intentions or knowledge." *Batzel*, 333 F.3d at 1034 (emphasis added). "Otherwise, posting of information on the Internet and other interactive computer services would be chilled, as the service provider or user could not tell whether posting was contemplated." *Id.*

-18-

grouping such content in a particular way with third-party logos, Facebook *transformed the character* of Plaintiffs' words, photographs, and actions into a *commercial endorsement*" and thus was not entitled to immunity under the CDA on the pleadings. *Id*. (emphases added).

Here, in contrast, Plaintiffs do not, and cannot, allege that LinkedIn "mistranslated" or "transformed the character" of any content provided by them. To the contrary, the connection invitation "*contains the message that LinkedIn discloses to users*" and to which they consented. MTD Order at 29 (emphasis added). The reminder emails merely refer back to and therefore contain exactly the same substantive content as the initial connection invitations, *e.g.,* SAC ¶ 23, and Plaintiffs "do not challenge the specific format or content" of the invitations or reminders, MTD Order at 29. Indeed, while the Court in *Fraley* held that the character of the content Facebook users created by pressing the "Like" button was "transformed" into a commercial endorsement, the Court here already has rejected the notion that there is a "distinction between invitations, which LinkedIn clearly discloses, and endorsements, which Plaintiffs contend are contained in the email," as "an invitation and endorsement are synonymous." *Id.* Thus, unlike in *Fraley*, Plaintiffs' allegations do not demonstrate that LinkedIn is an "information content provider" under the CDA.

## C. Plaintiffs' Claims Are Barred By The First Amendment

### 1. Reminder Emails Concern Matters of Public Interest

Under the First Amendment, publication of matters in the public interest is not actionable under California's common law or statutory rights of publicity. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994,1001 (9th Cir. 2001); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995). This defense "is not limited to 'news' in the narrow sense of reports of current events. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published." *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 225 (1998) (*citing* Restatement (Second) of Torts § 652D cmt. j). "The First Amendment requires that the right to be protected from unauthorized publicity be balanced against the public interest in the dissemination of news and information consistent with the democratic

1   processes under the constitutional guaranties of freedom of speech and of the press." *Gionfriddo*

2   *v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (2001) (internal citations and quotation

3   marks omitted).  "[T]his balancing process begins by identifying and weighing the factors

4   properly taken into account.  At a minimum, a court must first consider the *nature of the precise*

5   *information conveyed and the context of the communication* to determine the public interest in the

6   expression,…[which] must then be weighed against the plaintiffs' [asserted interests]."  *Id.* at 410

7   (emphasis added).  Here, the facts alleged in the SAC and subject to judicial notice establish, as a

8   matter of law, that reminder emails concern matters of public interest that outweigh Plaintiffs'

9   asserted economic interests, and therefore constitute activity protected by the First Amendment.

10          Reminders serve the function identified by their name and convey the information required

11   by that function—they remind the recipients of connection invitations sent by LinkedIn members

12   that those invitations are pending and identify the LinkedIn members who sent them so that the

13   recipients know who the pending invitations are from.  As a platform for creating professional

14   networks of people, LinkedIn promotes the rights of speech and association guaranteed by the

15   First Amendment.  Accordingly, reminder emails, which refer recipients to communications from

16   LinkedIn members expressing their desire to connect, and which, according to Plaintiffs, increase

17   the likelihood of creating such connections, facilitate associations among people and therefore

18   concern matters of public interest.

19          The challenged use of member names and likenesses in reminders conveys information

20   that directly relates to these matters of public interest and, therefore, constitutes noncommercial

21   speech subject to the full protection of the First Amendment.  "[T]he core notion of commercial

22   speech is that it does no more than propose a commercial transaction."  *Hoffman v. Capital*

23   *Cities/ABC, Inc.*, 255 F.3d 1180, 1184-85 (9th Cir. 2001) (quoting *Bolger v. Youngs Drug*

24   *Products Corp.*, 463 U.S. 60, 66 (1983)).   Here, even if the names and likenesses of LinkedIn

25   members used in reminders are found to endorse LinkedIn's services, they equally inform the

26   recipients of connection invitations sent by those same LinkedIn members that the invitations are

27   pending, as this Court has concluded.  *See* MTD Order at 29 ("an invitation and endorsement are

28

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                                                    CASE NO. 13-CV-04303-LHK

1    synonymous"). As such, the challenged use in this case is readily distinguishable from uses that

2    do "no more than propose a commercial transaction."

3         A comparison of *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993), and

4    *Downing,* 265 F.3d 994 (9th Cir. 2001), illustrates the difference between reminder emails and

5    uses that do no more than advertise a service or product. Both cases involved surfing and surf

6    culture, which were found to be matters of public interest, but only one conveyed information that

7    "contributed significantly" to that topic so as to be protected by the First Amendment. In *Dora*,

8    the plaintiff, surfing legend Mickey Dora, sued the producer of a surfing documentary for using

9    his name and likeness in the film without his consent, claiming common law and statutory

10   violations of his right of publicity. *See* 15 Cal. App. 4th at 540. The trial court and Court of

11   Appeal found that the challenged use was protected under the First Amendment because Dora's

12   contribution to the development of surf culture and his influence on the sport was "the point of the

13   program," and he was depicted in the documentary because his identity directly contributed to the

14   story about surfing. *Id.* at 543.

15        By contrast, in *Downing*, the Ninth Circuit held that the defendant retailer's use of the

16   plaintiff surfers' names and photographs in a product catalog were not protected by the First

17   Amendment. Although the catalog had a surfing theme, and therefore concerned a matter of

18   public interest, the court found that the challenged use was "essentially [] window-dressing to

19   advance the catalog's surf-theme." 265 F.3d at 1002. "The catalog did not explain that [plaintiffs]

20   were legends of the sport and did not in any way connect [plaintiffs] with the story preceding it."

21   *Id*. Accordingly, the court held that the First Amendment defense did not apply because the

22   challenged use did "not contribute significantly to a matter of the public interest." *Id.*

23        This Court's decision in *Fraley v. Facebook, Inc.*, further highlights the distinction. In

24   *Fraley*, the plaintiffs alleged that Facebook used member identities, without consent, in pure

25   advertisements for unrelated third-party products and services based on members clicking "Like"

26   buttons corresponding to the advertised products and services. 830 F. Supp. 2d at 791. The Court

27   held that it could not be determined as a matter of law that the plaintiffs' right of publicity claims

28   were barred by the First Amendment because the plaintiffs had sufficiently alleged that their

-21-    MOTION TO DISMISS SECOND AMENDED COMPLAINT
        CASE NO. 13-CV-04303-LHK

1    identities were used by Facebook in Sponsored Stories for "commercial advertising *purposes and*

2    *not part of 'any* news, public affairs, sports broadcast or account, or any political campaign.'" *Id.*

3    at 805 (emphasis added).

4            Here, as in *Dora*, the challenged use of member names and likenesses "directly contribute"

5    to the purpose of reminder emails because they identify the sender of connection invitations

6    referenced in reminder emails.  Indeed, they are "the point" of reminder emails because, without

7    such information, people receiving reminders would not know who sent the connection invitation

8    referenced in the reminder.  And, in contrast to *Downing* and *Fraley*, although Plaintiffs claim that

9    the challenged use is for commercial advertising purposes, they do not and cannot claim that it is

10   *solely* for advertising purposes.

11           In the SAC, Plaintiffs allege that LinkedIn sent reminders "endorsing its products, services,

12   and brand to potential new users," including premium memberships, for the purpose of "monetary

13   gain."  SAC ¶¶ 9, 14, 90.  Even taking this as true, a cursory review of an actual reminder shows

14   that member names are equally used in reminder emails *to convey factual information* concerning

15   a matter of public interest—that LinkedIn members have sent connection invitations.  According

16   to Plaintiffs, LinkedIn also sends reminders "to maximize membership growth and LinkedIn's

17   profits," which "increases its indirect revenue through sales to growing numbers of recruiters and

18   large corporations."  SAC ¶ 90.  But profits alone do not render expression purely commercial.

19   "The First Amendment is not limited to those who publish without charge.  [An expressive

20   activity] does not lose its constitutional protection because it is undertaken for profit." *Comedy III*

21   *Prods., Inc. v. Gary Saderup, Inc.,* 25 Cal. 4th 387, 396 (2001); *see also Montana*, 34 Cal. App.

22   4th at 797 n.2.

23           Finally, even commercial use is only actionable "when the plaintiff's identity is used,

24   without consent, to promote an *unrelated product*." *Gionfriddo*, 94 Cal. App. 4th at 413-14

25   (emphasis added); *see also, e.g.*, *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691–94 (9th Cir.

26   1998) (use of pitcher's image in beer advertisement); *Abdul–Jabbar* v. *Gen. Motors Corp.*, 85

27   F.3d 407, 416 (9th Cir. 1996) (use of basketball star's name in car commercial); *Waits v. Frito–*

28   *Lay, Inc.*, 978 F.2d 1093, 1097–98 (9th Cir. 1992) (use of imitation of singer's voice in snack food

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                                                                                                              CASE NO. 13-CV-04303-LHK

commercial); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1396  (9th Cir. 1992) (use of

game-show hostess's "identity" in ad for electronic products); *Midler v. Ford Motor Co.*, 849 F.2d

460, 461 (9th Cir. 1988) (use of imitation of singer's voice in car commercial).  In the context of

this case, challenging the means of creating an online professional network, the "product" is either

the sender of the connection invitation, the platform facilitating the connection, or both.

Accordingly, however the  "product" is defined, the challenged use is not only related to the

product, it is essential to its operation.

      Plaintiffs' right of publicity claims should be dismissed because the information conveyed

by reminder emails and the context in which it is conveyed establish, as a matter of law, that they

concern matters of public interest that outweigh Plaintiffs' claimed economic interest in being

compensated for the use of their names and likenesses in reminders.  Reminders *follow up on*

connection invitations sent by Plaintiffs themselves, are sent shortly after those connection

invitation to the *same people* for the *same purpose*, contain the *same information* which Plaintiffs

*chose to make public* by creating LinkedIn profiles and sending connection invitations, and which

are limited to *at most two emails*.  *See e.g., Johnson v. Harcourt, Brace, Jovanovich, Inc.*, 43 Cal.

App. 3d 880, 892 (1974) ("A person may, by his own activities or by the force of circumstances,

become a public personage and thereby relinquish a part of his right of privacy to the extent that

the public has a legitimate interest in his activities." (citation omitted)).

### 2.    Reminder Emails Publicize Protected Speech

      Even if reminders are commercial speech, they are protected by the First Amendment

because reminders merely refer to and publicize connection invitations which are themselves

protected activity under the First Amendment.  *See, e.g., Page v. Something Weird Video*, 960 F.

Supp. 1438, 1443–44 (C.D. Cal. 1996); *Guglielmi v. Spelling–Goldberg Prods.*, 25 Cal. 3d 860,

872–73 (1979) (Bird, C.J., concurring); *Rezec v. Sony Pictures Ent., Inc.*, 116 Cal. App. 4th 135,

140–44 (2004).  Under this line of cases, First Amendment protection is extended to the use of a

person's name and likeness in publicizing the underlying protected activities because it was

"adjunct" or "incidental" to those activities.  Here, because connection invitations promote the

rights of free speech and association protected by the First Amendment, to the extent reminders

-23-

1   are commercial speech, reminders are nevertheless protected by the First Amendment because

2   they refer to and publicize that protected activity.

3       In *Page v. Something Weird Video*, 960 F. Supp. 1438 (C.D. Cal. 1996), for example, a

4   manufacturer and distributor of videocassettes used drawings of the plaintiff, a former actress, to

5   advertise videos of films in which she starred.  The plaintiff claimed that the advertisements

6   misappropriated her identity by using newly-created drawings of her to publicize the release of the

7   videos.  *Id.* at 1444.  The court disagreed, holding that the "advertising is protected because the

8   videos themselves are protected by the First Amendment, and the advertising is incidental to the

9   protected publication of the videos."  *Id.*  Likewise, here, reminders publicize connection

10  invitations, which are themselves protected activity, by notifying the recipients of those invitations

11  that they are pending.  Accordingly, the First Amendment protections afforded to connection

12  invitations extends to the reminders that publicize them.

13      **D.    Plaintiffs' Claims Are Barred Because They Challenge An Incidental Use**

14      The alleged use of Plaintiffs' names and likenesses in reminder emails is an incidental use

15  under the Restatement (Second) of Torts ("Restatement"), and, therefore, is not actionable under

16  California's common law or statutory right of publicity.  The Restatement describes the incidental

17  use exception a follows:

18      *Incidental use of name or likeness*. The value of the plaintiff's name is not
        appropriated by mere mention of it, or by reference to it in connection with
19      legitimate mention of his public activities; nor is the value of his likeness
        appropriated when it is published for purposes other than taking advantage of his
20      reputation, prestige, or other value associated with him, for purposes of publicity.
        No one has the right to object merely because his name or his appearance is
21      brought before the public, since neither is in any way a private matter and both are
        open to public observation.  It is only when the publicity is given for the purpose
22      of appropriating to the defendant's benefit the commercial or other values
        associated with the name or the likeness that the right of privacy is invaded.
23

24  Restatement (Second) of Torts § 652C cmt. d.  Whether a challenged use falls within the

25  incidental use exception "is determined by the role that the use of the plaintiff's name or likeness

26  plays in the main purpose and subject of the work at issue."  *Yeager v. Cingular Wireless LLC*,

27  673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009).  Here, the "subject" of reminder emails is

28

MOTION TO DISMISS SECOND AMENDED COMPLAINT
                                            CASE NO. 13-CV-04303-LHK

connection invitations sent by LinkedIn members themselves, and their "purpose" is to "remind" recipients that those invitations that they are pending.

The "role" played by reminders further supports application of the incidental use exception because it represents a common industry practice. In *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1325–26 (11th Cir. 2006), the court held that use of the plaintiff's photo, which was displayed on Amazon.com's website to promote the sale of a book in which the photo appeared, did not constitute a violation of Florida's statutory right of publicity because "Amazon's use of book cover images is not an endorsement or promotion of any product or service, but is merely incidental to, and customary for, the business of Internet book sales." *Id.* The court held that it could "discern no set of facts by which an internet retailer such as Amazon, which functions as the Internet equivalent to a traditional bookseller, would be liable for displaying content that is incidental to book sales." *Id.*

Likewise, here, the use of member names and likenesses in reminders simulates "traditional" networking. People who want to connect in person share their names through business cards and other means. Accordingly, as an online network, LinkedIn's use of member names and likenesses in connection invitations and reminders is incidental to, and customary for, the practice of networking because it allows members to invite people to connect and for those they have invited to consider the invitation and decide whether to accept it. In light of these circumstances, it may be determined as a matter of law that, as in *Almeida*, the challenged use of member names and likenesses in reminder emails "is not an endorsement or promotion of any product or service," but is "incidental to, and customary for" the business of online networking, and therefore is not actionable as a violation of Plaintiffs' common law or statutory rights of publicity.

## IV. CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' request for statutory damages under California Civil Code Section 3344 and dismiss the SAC with prejudice.

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

DATED:  September 18, 2014

MUNGER, TOLLES & OLSON LLP
    JEROME C. ROTH
    ROSEMARIE T. RING
    JONATHAN H. BLAVIN
    WILLIAM J. EDELMAN


By:  */s/ Jerome C. Roth*
    JEROME C. ROTH
Attorneys for Defendant
LINKEDIN CORPORATION

MOTION TO DISMISS SECOND AMENDED COMPLAINT
CASE NO. 13-CV-04303-LHK

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**


# EXHIBIT X

Case 3:17-cv-03301-EMC　Document 48-1　Filed 07/20/17　Page 87 of 187



**Business Impact**

# Why Tesla Is Worth More Than GM

A few companies that master digital technologies are capturing huge chunks of the economy. Does this explain the persistence of slow growth?

by James Surowiecki　　June 27, 2017

T he digital economy has transformed the way we communicate with each other; the way we consume information, products, and services; the way we entertain ourselves. It's revolutionized seemingly non-digital industries—think of how different financial services, for instance, are today from what they were two decades ago—and investors expect it to soon transform others, which is why Tesla Motors is worth more than General Motors despite making a tiny fraction as many cars as GM makes and earning a tiny fraction of the revenue.

## 50 Smartest Companies, 2017

Browse the list

This phenomenon explains why the so-called Big Five of the digital economy—Apple, Alphabet, Microsoft, Amazon, and Facebook—have, at various points over the last year, been the five most valuable companies in the world.



**This story is part of our July/August 2017 Issue**

**See the rest of the issue**

**Subscribe**

So you might say that the digital economy has lived up to the expectations people had for it 20 years ago, in the early days of the Web. In other important ways, however, its consequences have been smaller than you might think. U.S. GDP growth has, by historical standards, been disappointingly slow since the arrival of the Internet. Productivity growth, which many assumed would be invigorated by the impact of digital technologies, has been dismal for much of this century. In the heyday of the Internet boom during the late 1990s, productivity growth accelerated for the first time since the 1970s, and it appeared for a short while as if technological innovation had solved a central problem with the U.S. economy. But the productivity boom ended in the early 2000s, and it never resumed. Some observers initially suspected mismeasurement, arguing that GDP was not capturing the true value of the many free goods the digital economy offers. But there's little doubt

that the productivity revolution we hoped digitization would usher in has yet to materialize.

The digital economy also has not transformed the job market as much as one might have expected. To be sure, we now have entirely new categories of workers: fleets of Uber drivers, and the TaskRabbiters who haunt Whole Foods stores in major cities. But Americans aren't job-hopping more than they used to—in fact, by some measures they're changing jobs less than at any point in the past two decades. And digitization has also eliminated swaths of workers—not just because of automation, but also because of things like online shopping, which has put hundreds of thousands of retail workers out of a job. More important, the digital economy has not been the source of a huge number of good, well-paying jobs. In fact, the rise and consolidation of the digital economy has coincided with an extraordinarily weak labor market. Wages for American workers have just recently started to grow at a clip faster than inflation, but for most of this century they've been close to stagnant. (The same is true in most developed countries.) That's not the fault of digitization. But digitization has not been the driver of job and economic growth that many hoped it would be. Information and communication technologies—which include software and IT companies and Internet firms, along with entertainment and publishing—have seen their share of GDP rise just 1 percent since 2000. And while that's almost certainly an understatement—and doesn't capture the impact of digitization on other industries—the number is striking. So, too, is the fact that only a small percentage of private-sector workers work in what you would think of as digital companies.

Still, the most surprising—and potentially troubling—thing about today's digital economy is how remarkably stable it has become. The buzzword that was always associated with digitization was "disruption." The Internet and other digital technologies, it was assumed, would accelerate competitive pressures and make it harder for incumbents to

hold onto power. If the old industrial order was characterized by companies that stayed at the top for decades, the digital economy, with its supposedly low barriers to entry and low switching costs, was going to be characterized by constant turnover at the top. Instead, the opposite is true. Today's digital economy, at least on the consumer side, is dominated by the same five giants that have dominated it for at least the past decade and that almost everyone seems to anticipate will dominate it for the foreseeable future (at least if you go by their market capitalizations, which anticipate many more years of enormous profits for all of them). The digital economy is an economy in which platforms are the biggest source of value, and the Big Five's platforms are the most lucrative ever invented. The result is that this economy is governed, in effect, by an oligopoly. The Big Five sometimes compete and sometimes coöperate, but ultimately each has solid control over its core markets.

"Oligopoly" sounds sinister, but this one was not primarily created by overtly anticompetitive or monopolistic behavior. Rather, digital markets are what economists call winner-take-all markets, in which success tends to breed nearly insuperable advantages. The rule that seems to govern today's digital economy, in fact, was well stated in Matthew 13:12: "For whoever has, to him more shall be given, and he will have an abundance." Which is great for those who have, and not so great for everyone trying to compete with them.

## POWER OF NUMBERS

How did we end up with a digital economy dominated by a few big players? The simplest explanation focuses on what are called network effects, whereby a product or service becomes more valuable the more people use it. In the classic example of a network effect, a telephone is worthless if only one person has one, since there's no one to call. If two people have telephones, they now have some value. And if a million

people have telephones, the phone network suddenly becomes
enormously valuable.

The implication is that the more users a network has, the easier it
becomes to add more users. And direct network effects in this sense are
important in understanding the success of a company like Facebook.
Facebook's single biggest advantage over any would-be competitors, at
this point, is simply that it's such an immense network that if you want
to connect with people, it's the logical place to start. The same is true of
services like Instagram and China's WeChat. For digital companies like
Snap and Twitter, which are struggling to become profitable, direct
network effects are just about the only value they have at all.

The Big Five also benefit from what are sometimes called indirect
network effects, including the fact that sellers want to be where buyers
are, and vice versa. Because Google has such an enormous user base,
companies want to advertise with it. And that makes Google a natural
place to go if you're looking to buy something. Similarly, because
Amazon has such a critical mass of customers, it's the natural place for
third-party sellers to gravitate. When Amazon made the decision to
allow third-party sellers on its site, competing with its own wares, the
decision seemed crazy to many at the time. But it positioned the
company to benefit from the network effect: having third-party sellers
made Amazon more appealing to customers, which in turn made it
more appealing to sellers, creating a virtuous cycle for the company.

Beyond the network effects is another, related way that the sheer scale of
the Big Five helps them stay on top: through the access they have to
enormous amounts of user data. That data, which is far more detailed
and granular than anything companies have been able to access in the
past, helps these companies improve their products and services, which
in turn helps them add more users, which gives them access to more
data, and so on. This data flywheel effect did not get as much attention

as network effects in the early days of the digital economy, but it's
become clear that user data is an enormous competitive advantage for
the powerhouses of the digital economy and a key reason why it's
difficult to imagine them being toppled anytime soon. By tracking
people's clicks, Google is continually improving its search results and ad
servicing. Amazon and Netflix and Apple mine their data to improve
their recommendation algorithms, making it more likely they'll offer you
things you want to buy or watch. This process isn't automatic—you need
to have lots of smart data scientists and be willing to invest the resources
to ceaselessly upgrade your product. But if you do that, and all of the Big
Five do, the rewards can be immense—far greater than what comes
merely from the traditional online business model of packaging data
and selling it to advertisers.

The ability to gather enormous amounts of data and analyze it efficiently
is also at least part of the reason investors think Tesla is more valuable
than General Motors. After a traditional car company sells a car to a
customer, its relationship with that customer typically is limited (except
for maintenance and servicing). Tesla, by contrast, collects terabytes of
driving data—including, in some cases, video data—from its customers.
That data is then put to use in improving the self-driving features of its
cars. According to Adam Jonas, an analyst at Morgan Stanley, Tesla cars
are now logging five million miles a day. Since making self-driving cars
work depends on machine learning, which in turn requires reams of the
data that AI learns from, Tesla's advantage in data is likely to translate
into a huge advantage in making safe and effective self-driving cars.
Indeed, Jonas has argued that Tesla's new mass-market Model 3 sedan
could be up to 10 times safer than the average car.

Finally, the Big Five have entrenched themselves in a more traditional
fashion, by using their highly valued stock and their enormous amounts
of cash to buy other companies, something they've done far more
aggressively in recent years. Together, Google, Apple, and Microsoft

have roughly a quarter of the cash reserves in the entire S&P 500. Google, the most active buyer, has averaged one acquisition a month. Acquisitions have become increasingly important as a way to gain new technology and new engineering talent, expand into new markets or new product areas, and in some cases squelch potential competition. And since no competitor has the resources to outbid the Big Five, it's another way in which simply being big makes it easier to keep getting bigger.

**DIGITAL MONOPOLIES**

So on the one hand, we have a digital economy that, for all the value it's created, has not dramatically improved economic growth or wage growth for ordinary workers; on the other, a big chunk of that economy is dominated by a very small group of players. And what's interesting is that there's some reason to think these two things are, in fact, connected to each other.

To begin with, the most important fact about platform companies is that they scale, meaning that they can create enormous amounts of value while employing a relatively small number of workers. This is a good thing from the perspective of efficiency. But it also helps explain why today's digital giants have a smaller impact on the economy than dominant companies had in the past. Together, the Big Five employ around 400,000 full-time workers in the United States. That might sound like a lot. But roughly half of those workers are Amazon employees, many in relatively low-skill, low-paying warehouse jobs. And it's actually fewer employees than General Motors alone had in 1979, when the U.S. workforce was a lot smaller. What's more, where GM's production led to eight jobs in its supply chain for every one person it employed directly, the ripple effects of the Big Five's businesses, with the exception of Apple, are much smaller. The result is that the rewards of

the digital economy are more concentrated among a small number of workers than the rewards of the industrial economy were.

This is aggravated by the fact that the Silicon Valley dream of starting a company in your garage and making it into a huge business has become less realistic than ever. Even though billions continue to be poured into venture funding (more than $200 billion between 2011 and 2016), and even though the number of so-called high-growth startups has not declined in recent years, work by the MIT economists Scott Stern and Jorge Guzman shows that fewer of those startups are succeeding than did in the past. Of course, we still have the Teslas and Ubers (or Lyfts) of the world. But they are rarer than they once were. And one plausible reason is the sheer scale and scope of the Big Five, which can meet competitive challenges either by copying the innovations of others (as Facebook arguably did with Snapchat), and thereby making them seem superfluous, or simply by buying potential competitors at an early stage. Regardless of why it's happening, though, the result is less dynamism in the economy, and less spreading of the wealth.

One obvious solution to the problems caused by the concentration of power in just a few companies is to break up the Big Five or regulate them as, in effect, public utilities. And of late, there have been more and more calls for dramatic action. But this is difficult for a variety of reasons. First, these companies don't, for the most part, fit the stereotype of the monopolist. They aren't "natural monopolies," like power companies, in markets where it would be practically impossible for a competitor to arise. Anyone who wants to build a new search engine, or a new online retailer, can do so. These companies also, with some exceptions, didn't achieve their dominance by engaging in conventionally anticompetitive behavior so much as they exploited the nature of the digital economy to build and maintain their empires.

Nor do you hear too many complaints from consumers, although issues of privacy obviously still matter. Indeed, relative to industries like cable television or airlines, digital companies tend to do well on customer satisfaction, and the digital economy as a whole has become a cornucopia of "free" stuff (paid for with consumers' attention but not their cash). And even though, in practice, consumers often get locked in to the technologies these companies offer (if only because once your data is in the cloud, it's so much easier to stay than leave), the businesses have no real leverage over consumers. Most also continue to pour billions of dollars into research and development, and they are constantly upgrading their products and services. So it's hard to argue that these giants have been anything but beneficial to consumer welfare, which since the 1970s has been the standard that antitrust regulators apply.

Indeed, when we look at what the digital economy has done over the past two decades, what becomes clear is that it has created an enormous amount of value for consumers and for a small group of big companies, even as it has diminished competition, centralized power, and made life much more difficult for businesses that produce content or try to compete with the economy's dominant players. (In one way or another, if you want to make money in the digital economy, you will almost certainly find yourself working with, rather than against, one of the Big Five.) In the industrial economy, the benefits were spread widely among companies, employees, and consumers. The digital economy is giving us a world in which the benefits are concentrated among consumers and the Big Five who serve them. Everyone else just lives in it.

*James Surowiecki is the author of* The Wisdom of Crowds *and a senior story producer at* Vice News Tonight.

# Hear more about Facebook at EmTech MIT 2017.
## Register now

# More from Business Impact

How technology advances are changing the economy and providing new opportunities in many industries.

---

01   **The Startup Behind NYC's Plan to Replace Phone Booths with 7,500 Connected Kiosks**

Intersection, which is funded by Alphabet, hopes they could someday guide autonomous vehicles, too.

by Elizabeth Woyke



---

02   **Customer Data Meets AI**

A new day is dawning for the customer experience, driven by the application of artificial intelligence, machine learning, and automated technologies to CRM data. The potential exists to transform the customer's experience by providing service in a more predictive and intuitive way than ever before.

by MIT Technology Review Custom

---

03   **The Best of the Physics arXiv (week ending July 15, 2017)**

This week's most thought-provoking papers from the Physics arXiv.

by Emerging Technology from the arXiv

**More from Business Impact**

---

Want more award-winning journalism? Subscribe to Insider Plus.

# Insider Plus $79.95/year*

Everything included in Insider Basic, plus ad-free web experience, select discounts to partner offerings and MIT Technology Review events

**Subscribe** ↗

**See details+**

*Prices are for U.S. residents only
<u>See international prices</u>

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**

# EXHIBIT Y

H.R. REP. 98-894, H.R. Rep. No. 894, 98TH Cong., 2ND Sess.

1984, 1984 U.S.C.C.A.N. 3689, 1984 WL 37453 (Leg.Hist.)

**3689 P.L. 98-473, CONTINUING APPROPRIATIONS,

1985-- COMPREHENSIVE CRIME CONTROL ACT OF 1984

SEE PAGE 98 STAT. 1837

HOUSE REPORT (APPROPRIATIONS COMMITTEE) NO. 98-1030,

SEPT. 17, 1984 (TO ACCOMPANY H.J.RES. 648)

SENATE REPORT (APPROPRIATIONS COMMITTEE) NO. 98-634,

SEPT. 25, 1984 (TO ACCOMPANY S.J.RES. 356)

HOUSE CONFERENCE REPORT NO. 98-1159, OCT. 10, 1984 (TO

ACCOMPANY H.J.RES. 648)

CONG. RECORD VOL. 130 (1984)

DATES OF CONSIDERATION AND PASSAGE

HOUSE SEPTEMBER 25, OCTOBER 10, 1984

SENATE OCTOBER 4, 11, 1984

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 98-894

JULY 24, 1984

MUCH OF TITLE II, CHAPTER XXI, WAS DERIVED FROM H.R. 5616, A PROPOSED COUNTERFEIT ACCESS DEVICE AND COMPUTER FRAUD AND ABUSE ACT OF 1984, AS PASSED BY THE HOUSE ON JULY 24, 1984. THE REPORT TO ACCOMPANY H.R. 5616 (HOUSE COMMITTEE ON THE JUDICIARY, H. REP. NO. 98-894, JULY 24, 1984) IS SET OUT:

*1 THE COMMITTEE ON THE JUDICIARY, TO WHOM WAS REFERRED THE BILL (H.R. 5616) TO AMEND CHAPTER 47 OF TITLE 18 OF THE U.S.C. TO PROVIDE PENALTIES FOR FRAUD AND RELATED ACTIVITIES IN CONNECTION WITH ACCESS DEVICES AND COMPUTERS, AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT FAVORABLY THEREON WITH AN AMENDMENT AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

* * * *

*4 PURPOSE OF THIS LEGISLATION

ON SEPTEMBER 29 AND NOVEMBER 10, 1983, AND MARCH 28, 1984, THE SUBCOMMITTEE ON CRIME HELD HEARINGS ON THE GENERAL ISSUES OF CREDIT CARD AND COMPUTER FRAUD AND ABUSE. GENERALLY, THESE HEARINGS DOCUMENTED THAT OUR SOCIETY IS INCREASINGLY BECOMING DEPENDENT ON NUMEROUS CREDIT CARDS AND OTHER PLASTIC DEVICES, ALL OF WHICH EVENTUALLY INVOLVE USE OF COMPUTERS AND OTHER ELECTRONIC DEVICES WHICH ALSO ARE SUBJECT TO CRIMINAL ATTACK. FOR EXAMPLE, THERE ARE INDICATIONS OF A GROWING PROBLEM IN COUNTERFEIT CREDIT CARDS AND UNAUTHORIZED USE OF ACCOUNT NUMBERS OR ACCESS CODES TO BANKING SYSTEM ACCOUNTS CALLED DEBIT INSTRUMENTS. FINANCIAL INSTITUTIONS **3690 CLAIM THAT THEY LOST $128 MILLION FROM BANK CARD FRAUD IN 1982-- AN INCREASE OF 35 PERCENT OVER 1981 LOSSES. THEY FURTHER ESTIMATE THAT $40 MILLION OF THIS FIGURE WAS JUST FROM COUNTERFEIT CREDIT CARDS WHICH WAS A 500-

PERCENT INCREASE SINCE 1980. THERE ARE ALSO INDICATIONS THAT THIEVES ARE BECOMING INCREASINGLY SOPHISTICATED AND IN FACT ARE STEALING ACCOUNT NUMBERS AND USING THEM WITHOUT EVEN GETTING PHYSICAL CONTROL OF THE CARDS THEMSELVES.

AS THE CREDIT INDUSTRY AND OTHER PARTS OF OUR SOCIETY ENLARGES ITS CAPACITY IN THE USE OF COMPUTER TECHNOLOGY, FOR EXAMPLE, IN THE USE OF 'SMART CARDS ' WHICH CONTAIN MICROCHIPS AND ARE THEMSELVES A FORM OF 'PASSIVE' COMPUTER, THERE IS EVERY INDICATION THAT THE CRIMINAL ELEMENT IS ENLARGING ITS CAPACITY IN THIS AREA. SINCE THE COMPUTER INDUSTRY IS ITSELF EXPANDING TO THE POINT WHERE IT IS PROJECTED THAT SOME 80 MILLION 'HOME COMPUTERS' WILL BE IN EXISTENCE BY 1990 (AS COMPARED WITH 5,000 IN 1978), IT SEEMS CLEAR THAT WE MUST NOT ONLY BRING OUR LAWS UP-TO-DATE IN THE CREDIT AREA, BUT ALSO GIVE SERIOUS CONSIDERATION TO DETERRING THE CRIMINAL ELEMENT FROM ABUSING COMPUTER TECHNOLOGY IN FUTURE FRAUDS. THE COMMITTEE BELIEVES THAT JUST REVIEWING PRESENT TRENDS MAY NOT BE ADEQUATE, FOR RAPIDLY CHANGING TECHNOLOGY WILL LEAVE THEM OBSOLETE IN ANOTHER 5 OR 10 YEARS AND POSSIBLY SOONER. EXPERTS TOLD THE COMMITTEE THAT WE NEED TO SHIFT ATTENTION IN OUR STATUTES FROM CONCEPTS SUCH AS 'TANGIBLE PROPERTY' AND CREDIT AND DEBIT INSTRUMENTS TO CONCEPTS OF 'INFORMATION' AND 'ACCESS TO INFORMATION.'

H.R. 5616, AS REPORTED BY THE COMMITTEE, IS AN ATTEMPT TO STEM THE TIDE OF CRIMINAL BEHAVIOR IN THESE DISTINCT BUT INTER-RELATED PROBLEMS.

BACKGROUND

H.R. 5616 IN GENERAL DEALS WITH CREDIT AND COMPUTER FRAUD WHICH CAN BE CHARACTERIZED AS 'WHITE COLLAR' CRIMES AND AS SUCH OFTEN ARE NEGLECTED BOTH AT THE FEDERAL AND STATE LEVELS. THE COMMITTEE BELIEVES THAT THIS NEGLECT IS A GREAT MISTAKE AND IN FACT AN ATTACK ON WHITE COLLAR CRIME CAN OFTEN BE MUCH MORE PRODUCTIVE, ECONOMICALLY, **\*5** TO THIS COUNTRY THAN THE MORE PUBLICIZED EMPHASIS ON VIOLENT CRIME.

FOR INSTANCE, THE WALL STREET JOURNAL EARLY IN THE SPRING OF 1983 NOTED THAT THE COST OF CONSTRUCTING HIGHWAYS IN THE NATION HAD FALLEN SIGNIFICANTLY, IN SOME CASES AS MUCH AS 25 TO 35 PERCENT BELOW ENGINEER ESTIMATES. THIS REMARKABLE DECLINE IN COSTS HAS BEEN DIRECTLY ATTRIBUTABLE BY MANY TO THE DEPARTMENT OF JUSTICE PROSECUTIONS IN DOZENS OF CASES OF BID-FIXING IN THE HIGHWAY CONSTRUCTION INDUSTRY. THESE PROSECUTIONS HAVE RESULTED IN OVER 90 PERCENT CONVICTIONS WITH NUMEROUS JAIL SENTENCES AND FINES TOTALLING $41 MILLION. THIS SITUATION IS EVIDENCE THAT THE DETERRENT POWER OF THE LAW WHEN ENFORCED CAN BE VERY STRONG, ESPECIALLY IN THE AREA OF WHITE COLLAR CRIME. THE PROSECUTION OF THIS TYPE OF CRIME, WHICH SILENTLY ROBS MILLIONS OF DOLLARS FROM ALL OF THE TAXPAYERS, A FEW DOLLARS AT A TIME, WE BELIEVE, MUST REMAIN A HIGH PRIORITY FOR FEDERAL LAW ENFORCEMENT. IT IS IN THIS PERSPECTIVE WE MUST DEAL WITH THE ANALOGOUS SITUATION PRESENTED IN CREDIT AND COMPUTER FRAUD AS WE MOVE CLOSER TO BECOMING A 'CASHLESS' SOCIETY, IN WHICH CURRENCY **\*\*3691** AND EVEN CHECKS ARE BECOMING A DIMINISHING PART OF OUR EVERYDAY LIFE.

CREDIT AND DEBIT CARDS-- PRESENT LAW

THERE ARE TWO MAJOR PIECES OF FEDERAL LEGISLATION IN THE CREDIT CARD AREA, BOTH IN TITLE 15 OF THE UNITED STATES CODE. THE FIRST IS 15 U.S.C. 1644, THE TRUTH IN LENDING ACT, WHICH DEALS WITH FRAUDULENT USE OF CREDIT CARDS AND PROHIBITS USE, TRANSPORTING, SELLING, RECEIPT OF TICKETS FOR INTERSTATE TRAVEL FROM SUCH CARDS ($500 THRESHOLD), AND FRAUDULENT FURNISHING OF MONEY TO PEOPLE WITH COUNTERFEIT, STOLEN OR LOST CREDIT CARDS. THIS LEGISLATION DOES NOT COVER THE ACTUAL COUNTERFEITING OR ALTERING OF THE CARDS AND THERE IS SOME QUESTION WHETHER IT COVERS THE STEALING AND USE OF THE ACCOUNT NUMBERS. ANOTHER LOOPHOLE IN THAT STATUTE IS THAT IT DOES NOT PUNISH POSSESSION OF FRAUDULENT CARDS OR OTHER SIMILAR PAYMENT DEVICES. FURTHERMORE, CASE LAW INTERPRETATION OF THE LANGUAGE OF THE STATUTE HAS LIMITED ITS PROHIBITIONS TO ACTS INVOLVING CREDIT CARDS THEMSELVES. U.S. V. CALLAHAN, 666 F.2D 422(1982). THE CURRENT LAW DOES NOT, FOR EXAMPLE, DEAL WITH THE USE OR SALE OF ANY DEVICE OR MECHANISM WHICH COULD BE USED IN THE PLACE OF A LEGITIMATE PAYMENT DEVICE (SUCH AS SALES SLIPS OR CREDIT SLIPS).

THE SECOND RELEVANT STATUTE IS A SECTION OF THE ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. 1693N, WHICH COVERS TRANSACTIONS INVOLVING DEBIT INSTRUMENTS IN A SIMILAR FASHION TO SECTION 1644. DEBIT INSTRUMENTS INCLUDE A CARD, CODE OR OTHER DEVICE OTHER THAN A CHECK, DRAFT OR OTHER PAPER INSTRUMENT WHICH MAY INITIATE AN ELECTRONIC FUNDS TRANSFER. THIS STATUTE DOES NOT COVER COUNTERFEITING OR FRAUDULENT POSSESSION OF DEBIT CARDS OR CODES.

BOTH OF THESE STATUTES USE A JURISDICTIONAL AMOUNT OF $1,000 OF ACTIVITY IN EACH INSTRUMENT WITHIN 1 YEAR; INDUSTRY REPRESENTATIVES STATE THAT THE ORGANIZED GROUPS GENERALLY STAY JUST UNDER THIS AMOUNT BUT USE MANY DIFFERENT COUNTERFEIT OR STOLEN CARDS OR DEBIT INSTRUMENTS.

*6 COMPUTER CRIME-- PRESENT LAW

THERE IS HO SPECIFIC FEDERAL LEGISLATION IN THE AREA OF COMPUTER CRIME. ANY ENFORCEMENT ACTION IN RESPONSE TO COMPUTER-RELATED CRIME MUST RELY ON STATUTORY RESTRICTIONS THAT WERE DESIGNED FOR OTHER OFFENSES, SUCH AS MAIL FRAUD (18 U.S.C . 1341) OR WIRE FRAUD (18 U.S.C. 1343) STATUTES. EVEN IF AN APPROACH IS DEVISED THAT APPARENTLY COVERS THE ALLEGED ACTS IN COMPUTER-RELATED CRIMES, IT STILL MUST BE TREATED AS AN UNTESTED BASIS FOR PROSECUTION IN THE FEDERAL TRIAL COURTS.

TWO CASES WERE CITED BY THE DEPARTMENT OF JUSTICE TO ILLUSTRATE THE PRESENT DILEMMA FACING FEDERAL PROSECUTORS. (STATEMENT BY JOHN C. KEENEY, DEPUTY ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION, U.S. DEPARTMENT OF JUSTICE, BEFORE THE SUBCOMMITTEE ON CIVIL AND CONSTITUTIONAL RIGHTS, HOUSE COMMITTEE ON THE JUDICIARY, NOVEMBER 18, 1983.) THE FIRST WAS PROSECUTED UNDER THE WIRE FRAUD STATUTE IN THE STATE OF MARYLAND (U.S. V. SEIDLITZ, 589 FE. REP.). THE FACTS OF THIS CASE WERE THAT THE OWNER OF A COMPUTER COMPANY STOLE CONFIDENTIAL SOFTWARE BY TAPPING INTO THE COMPUTER SYSTEM OF A PREVIOUS **3692 EMPLOYER FROM DEFENDANT'S REMOTE TERMINAL. HAD THE DEFENDANT NOT MADE TWO OF THE FIFTY ACCESS CALLS ACROSS STATE LINES, THE DEPARTMENT OF JUSTICE INDICATED THERE WOULD HAVE BEEN NO BASIS FOR FEDERAL

PROSECUTION. IN ANOTHER WIRE FRAUD CASE (UNREPORTED) THE DEFENDANT LANGEVIN, A FORMER EMPLOYEE OF THE FEDERAL RESERVE BOARD WHO WAS THEN EMPLOYED PRIVATELY AS A FINANCIAL ANALYST, WAS APPREHENDED AND CONVICTED AFTER HE ATTEMPTED TO CONTINUE TO ACCESS INFORMATION IN THE FEDERAL RESERVE BOARD'S MONEY SUPPLY (M-1) FILE WITHOUT AUTHORIZATION. ANY INFORMATION HE OBTAINED FROM THESE COMPUTER FILES WOULD HAVE BEEN EXTREMELY USEFUL IN ANALYZING HIS CLIENT'S HOLDINGS. AS IN SEIDLITZ, HAD THE ACCESS TELEPHONE CALLS NOT GONE ACROSS STATE LINES, THE U.S. PROSECUTOR WOULD NOT HAVE BEEN ABLE TO USE THE WIRE FRAUD STATUTE. UNDER H.R. 5616, THE PROSECUTOR WOULD BE ABLE TO PROSECUTE BOTH DEFENDANTS UNDER SEC. 1030(A)(1) (A FELONY) IF THEY COULD SHOW THAT THEIR CONDUCT AFFECTED INTERSTATE COMMERCE AND OBTAINED, ANYTHING OF VALUE AGGREGATING $5,000. IN THE LANGEVIN SITUATION, FEDERAL PROSECUTORS COULD HAVE PROVEN A MISDEMEANOR OFFENSE (SEC. 1030(A)(5)) BY JUST THE UNAUTHORIZED ACCESS.

THE COMMITTEE CONCLUDED THAT THE LAW ENFORCEMENT COMMUNITY, THOSE WHO OWN AND OPERATE COMPUTERS, AS WELL AS THOSE WHO MAY BE TEMPTED TO COMMIT CRIMES BY UNAUTHORIZED ACCESS TO THEM, REQUIRE A CLEARER STATEMENT OF PROSCRIBED ACTIVITY.

CREDIT AND DEBIT FRAUD-- NEED FOR LEGISLATION

THE INCREASE IN CREDIT AND DEBIT CARD FRAUD IN RECENT YEARS HAS BEEN DRAMATIC. STATISTICS PRESENTED BY WITNESSES TO THE SUBCOMMITTEE ON CRIME ILLUSTRATE THAT MANY OF THE CARD-RELATED ABUSES INVOLVE ACTIVITIES WHICH WERE UNIMAGINABLE WHEN EXISTING CREDIT CARD LAWS WERE ENACTED. SOPHISTICATED NATIONAL SCHEMES EXPLOITING STOLEN CARDS, COUNTERFEIT CARDS, ACCOUNT NUMBERS, AND CARD-MAKING EQUIPMENT HAVE BECOME WIDESPREAD. ACCORDING TO MASTERCARD INTERNATIONAL, THE TOTAL FRAUD LOSSES REPORTED BY INDIVIDUAL BANKS IN 1981 AND 1982 GREW 1,500 PERCENT OVER 1973 FIGURES. IN PARTICULAR, COUNTERFEIT LOSSES BY THESE BANKS IN THE SAME PERIOD INCREASED BY **7** AN ASTRONOMICAL 76,763 PERCENT. (STATEMENT OF THOMAS F. KELLEHER, SEPTEMBER 29, 1983, PAGE 3, BEFORE THE SUBCOMMITTEE ON CRIME OF THE HOUSE JUDICIARY COMMITTEE, 98 CONGRESS.) VISA HAS ESTIMATED THAT COUNTERFEITS COMPRISE 14 PERCENT AND ACCOUNT NUMBER ALTERATIONS MAKE UP 53 PERCENT OF ITS LOSSES, FAR OUTWEIGHING LOSSES FROM STOLEN OR LOST CARDS. (SEE, PAGE 3, FRAUDULENT USE OF PAYMENT DEVICES, A BOOKLET PUBLISHED BY VISA U.S.A. INC., JUNE 1983, CITED AS 'VISA BOOKLET ' SUBSEQUENTLY.)

THE ACTUAL SUMS LOST AS A RESULT OF CREDIT CARD COUNTERFEITING AND FRAUD ARE STAGGERING. VISA HAS ESTIMATED THAT WORLDWIDE CARD INDUSTRY LOSSES FROM COUNTERFEITING ALONE EXCEEDED $15 MILLION IN 1981. LOSSES INCREASED BY MORE THAN 300 PERCENT IN 1982 TO OVER $50 MILLION. APPROXIMATELY 94 PERCENT OF THOSE LOSSES OCCURRED IN THE UNITED STATES. (SEE, PAGE 3, VISA BOOKLET.) MASTERCARD MEMBERS REPORTED THAT ITS LOSSES FROM COUNTERFEITING INCREASED FROM $1,306,148 IN 1981 TO $9,337,354 IN 1982. THE INCREASE IN TOTAL FRAUD LOSSES DURING THAT PERIOD IS EVEN MORE ASTOUNDING. MASTERCARD MEMBERS REPORTED THAT BY 1982, DOLLAR LOSSES ESCALATED TO **3693** $45,613,550-- AN INCREASE OVER 1981 ALONE OF $19.8 MILLION. KELLEHER, SEPTEMBER 29, 1983, PAGE 4 AND APPENDIX A (SEE PREVIOUS CITE).

TESTIMONY SUBMITTED TO THE SUBCOMMITTEE ILLUSTRATES THAT RECENT FRAUDULENT CARD ACTIVITY IS OF A TYPE FAR DIFFERENT FROM THAT EXPERIENCED PRIOR TO 1980. IN THE

PAST, IMPROPER CARD USE TYPICALLY ORIGINATED FROM A LOST OR STOLEN CARD USED BY A THIEF FOR PERSONAL GAIN. MUCH OF THE RECENT FRAUDULENT ACTIVITY DOES NOT INVOLVE A LOST OR STOLEN CARD AT ALL, BUT RATHER THE IMPROPER USE OF ACCOUNT NUMBERS AND THE MANUFACTURE OF COUNTERFEIT CARDS. THE FRAUDULENT TECHNIQUES IN THIS AREA HAVE CLEARLY BECOME MORE SOPHISTICATED AND THE OFFENDERS ENGAGED IN SUCH ACTIVITIES MORE ORGANIZED.

VALID ACCOUNT NUMBERS CAN BE USED IMPROPERLY IN VARIOUS WAYS. DISHONEST MERCHANTS AND/OR THEIR EMPLOYEES CAN OBTAIN VALID NUMBERS TAKEN FROM AUTHORIZED SALES AT THE MERCHANT'S PLACE OF BUSINESS, TRANSCRIBE THOSE NUMBERS ONTO BLANK SALES SLIPS, AND EITHER SUBMIT THEM TO THEIR BANKS FOR PAYMENT OR SELL THEM TO OTHER COLLUDING MERCHANTS. PHONY SALES SLIPS CAN ALSO BE CREATED BY EMBOSSING VALID ACCOUNT NUMBERS ON 'WHITE PLASTIC CARDS' IN ORDER TO FAKE LEGITIMATE TRANSACTIONS.

IN ADDITION, IN RECENT YEARS LEGITIMATE TRANSACTIONS OVER THE TELEPHONE BY USE OF AN ACCOUNT NUMBER HAVE BECOME COMMONPLACE. THOSE TRANSACTIONS ARE POPULAR AND EXTREMELY CONVENIENT FOR THE AMERICAN CONSUMER. UNFORTUNATELY, HOWEVER, FRAUDULENT MISREPRESENTATION OVER THE TELEPHONE HAS ALSO BECOME A FREQUENT ACTIVITY. ANYONE WHO HAS ACCESS TO AN INDIVIDUAL'S ACCOUNT NUMBER AND EXPIRATION DATE CAN USE THAT INFORMATION TO ORDER GOODS AND SERVICES WHICH ARE SHIPPED TO AN ADDRESS GIVEN BY THE OFFENDER WHO THEN CHANGES LOCATIONS BEFORE THE CARDHOLDER CAN REPORT THE UNAUTHORIZED TRANSACTION FROM HIS BILLING STATEMENT.

MOST SIGNIFICANTLY, ACCOUNT NUMBERS CAN ALSO BE USED TO CREATE COUNTERFEIT CARDS. ONE COMMON TECHNIQUE UTILIZES 'SILKSCREENING' OR OFFSET PRINTING OF THE REGISTERED DESIGN OR SERVICE MARKS OF AN ORGANIZATION FOLLOWED BY EMBOSSING FRAUDULENTLY OBTAINED VALID ACCOUNT NUMBERS ON A CARD.

LOST AND STOLEN CARDS CAN ALSO BE USED IN A VARIATION OF THE OLD 'SHAVE AND PASTE' SCHEME, WHERE AN ACCOUNT NUMBER WAS RAZORED  **8**  OFF ONE CARD AND ATTACHED TO ANOTHER. A CRIMINAL CAN IRON OUT THE ORIGINAL IDENTIFYING INFORMATION LAND RE-EMBOSS THE CARD WITH A NEW VALID ACCOUNT NUMBER.

CRIMINALS HAVE ALSO DEVELOPED NUMEROUS METHODS FOR OBTAINING VALID ACCOUNT NUMBERS. ACCOUNT DATA CAN BE TAKEN FROM VALID CARBON SALES SLIPS DISCARDED BY MERCHANTS. IN OTHER INSTANCES, AN UNSUSPECTING CARDHOLDER MAY BE TRICKED INTO DIVULGING THE INFORMATION OVER THE TELEPHONE TO PURPORTED SURVEY TAKERS, PRODUCT SALESPEOPLE, OR 'BANK OFFICIALS' CALLING TO 'CONFIRM' THE ACCOUNT NUMBER.

ONE WITNESS APPEARING BEFORE THE SUBCOMMITTEE PRESENTED FINDINGS OF A COUNTERFEIT CREDIT CARD CONSPIRACY CASE IN WHICH MEMBERS OF SUCH A RING PRODUCED COUNTERFEIT VISA, MASTERCARD AND AMERICAN EXPRESS CARDS. AGENTS UNCOVERED SUFFICIENT MAGNETIC TAPE TO PRODUCE 100,000 CREDIT CARDS. WITNESSES IN THAT CASE TESTIFIED THAT THE LEADER OF THE RING DEALT EXCLUSIVELY WITH MEMBERS OF ORGANIZED CRIME. (KELLEHER, SEPTEMBER 29, 1983, PAGE 7 (SEE PREVIOUS CITE).)

**\*\*3694** DESPITE EFFORTS BY INDUSTRY TO COOPERATE WITH LAW OF ENFORCEMENT AGENCIES IN DEVELOPING PROCEDURES TO THWART THIS TYPE OF FRAUDULENT ACTIVITY, EVIDENCE IN THE HEARING RECORD DEMONSTRATES THAT FEDERAL LAW MUST BE IMPROVED TO DEAL EFFECTIVELY WITH THE GROWING PROBLEM OF FRAUDULENT ACTIVITY RELATING TO DEBIT AND CREDIT CARDS. TESTIMONY SUBMITTED TO THE SUBCOMMITTEE INDICATES THAT IN MANY CASES STATE STATUTES CANNOT DEAL EFFECTIVELY WITH THE GROWING PROBLEM IN LARGE PART BECAUSE THE MAJOR FRAUD CASES ARE GENERALLY INTERSTATE IN NATURE AND OFTEN EXTEND INTERNATIONALLY.

## COMPUTER FRAUD-- NEED FOR LEGISLATION

OVER THE PAST QUARTER OF A CENTURY OUR SOCIETY HAS WITNESSED AN AMAZING TECHNOLOGICAL TRANSFORMATION. THE COMPUTER HAS BECOME AN INTEGRAL PART OF OUR EVERYDAY LIVES, CRITICAL TO OUR NATIONAL DEFENSE, FINANCIAL TRANSACTIONS, AND INFORMATION TRANSMISSIONS. THE FEDERAL GOVERNMENT ALONE NOW HAS OVER 18,000 MEDIUM AND LARGE-SCALE COMPUTERS AT SOME 4,500 SITES. IN ADDITION, THE GENERAL SERVICES ADMINISTRATION ESTIMATES THAT THE FEDERAL GOVERNMENT COULD HAVE BETWEEN 250,000 AND 500,000 MICRO-COMPUTERS IN PLACE BY 1990.

DEVELOPMENTS IN PRIVATE INDUSTRY ARE EVEN MORE DRAMATIC. FOR INSTANCE, IN STATEMENTS BEFORE THE SUBCOMMITTEE ON CRIME (MARCH 28, 1984, PAGE 15), JAMES F. FALCO AN ASSISTANT STATE'S ATTORNEY IN MIAMI NOTED THAT IN 1976 SALES OF SOFTWARE FOR PERSONAL COMPUTERS WERE VIRTUALLY ZERO. BY 1981, SUCH SALES HAD ZOOMED TO $600 MILLION AND, THEN, AT YEAR-END 1982, TO $1 BILLION. SALES FOR 1983 ARE ESTIMATED AT $1.5 BILLION WITH SALES OF $12 BILLION PROJECTED BY 1990.

IN THE LAST FEW YEARS, THE SUBJECT OF COMPUTER-RELATED CRIMES HAS CAPTURED THE ATTENTION OF LAW ENFORCEMENT PERSONNEL, CRIMINOLOGISTS, THE MEDIA, AND THE GENERAL PUBLIC. RECENTLY, THIS HAS BEEN TRANSLATED INTO CONGRESSIONAL ATTENTION WHEN THE COMMITTEE ON SCIENCE AND TECHNOLOGY, U.S. HOUSE OF REPRESENTATIVES (SUBCOMMITTEE ON TRANSPORTATION, AVIATION AND MATERIALS) ISSUED A REPORT ON 'COMPUTER AND COMMUNICATIONS SECURITY AND PRIVACY' WHICH IN PART DEALT WITH COMPUTER CRIME (SERIAL AA, APRIL 1984). THIS REPORT AND TESTIMONY BEFORE THE SUBCOMMITTEE ON CRIME INDICATES **\*9** THAT WHILE OUR SOCIETY HAS BEEN READILY AFFORDED ACCESS TO COMPUTER TECHNOLOGY SO AS TO IMPROVE THE STANDARD OF LIVING OF LAW-ABIDING CITIZENS, SO TOO HAVE CRIMINAL ELEMENTS GAINED ACCESS TO COMPUTERS IN ORDER TO PERPETUATE CRIMES. IT HAS BEEN THE REALIZATION THAT CRIMINALS POSSESS THE CAPABILITY TO ACCESS AND CONTROL HIGH TECHNOLOGY PROCESSES VITAL TO OUR EVERYDAY LIVES WHICH HAS SPURRED THE RECENT ALARM OVER COMPUTER-RELATED CRIME.

DETERMINING THE EXACT NATURE AND EXTENT OF COMPUTER CRIME HAS BEEN THE MOST DIFFICULT ASPECT OF THIS PROBLEM. HOWEVER, THERE IS EVERY INDICATION THAT PRESENTLY IT IS A SUBSTANTIAL PROBLEM AND THE POTENTIAL IN THE FUTURE IS IMMENSE. FOR INSTANCE, IN A RECENT NATIONWIDE SURVEY OF PRIVATE ORGANIZATIONS AND PUBLIC AGENCIES, THE ABA STATED: [1099]

**\*\*3695** THE ANNUAL LOSSES INCURRED AS A RESULT OF COMPUTER CRIME APPEAR, BY ANY MEASURE, TO BE ENORMOUS. OVER 25% (72) OF THE SURVEY RESPONDENTS REPORTED 'KNOWN AND VERIFIABLE LOSSES DUE TO COMPUTER CRIME DURING THE LAST TWELVE MONTHS.' THE

TOTAL ANNUAL LOSSES REPORTED BY THESE RESPONDENTS FALL SOMEWHERE BETWEEN $145 MILLION AND $730 MILLION. THUS, THE ANNUAL LOSSES PER RESPONDENT REPORTING LOSSES COULD BE ANYWHERE FROM $2 MILLION TO AS HIGH AS $10 MILLION. APPROXIMATELY 28% OF THE SURVEY RESPONDENTS REPORTED NO AVAILABLE SYSTEM TO MONITOR OR ESTIMATE THE VALUE OF THEIR COMPUTER CRIME LOSSES.

AS THESE COMPUTER TECHNOLOGIES AND THE MEANS FOR ABUSING THEM HAVE RAPIDLY EMERGED, THEY HAVE BEEN CONFRONTED BY A CRIMINAL JUSTICE SYSTEM WHICH IS LARGELY UNINFORMED CONCERNING THE TECHNICAL ASPECTS OF COMPUTERIZATION, AND BOUND BY TRADITIONAL LEGAL MACHINERY WHICH IN MANY CASES MAY BE INEFFECTIVE AGAINST UNCONVENTIONAL CRIMINAL OPERATIONS. DIFFICULTIES IN COPING WITH COMPUTER ABUSE ARISE BECAUSE MUCH OF THE PROPERTY INVOLVED DOES NOT FIT WELL INTO CATEGORIES OF PROPERTY SUBJECT TO ABUSE OR THEFT; A PROGRAM, FOR EXAMPLE, MAY EXIST ONLY IN THE FORM OF MAGNETIC IMPULSES. ALSO, WHEN A PROGRAM OF SUBSTANTIAL COMMERCIAL VALUE IS MISAPPROPRIATED, THE PERSON FROM WHOM IT IS STOLEN ALMOST ALWAYS REMAINS IN POSSESSION OF THE ORIGINAL. INDEED, THE ORIGINAL PROGRAM MAY NOT HAVE BEEN MOVED SO MUCH AS A SINGLE INCH WHILE BEING ILLICITLY COPIED. IT IS OBVIOUS THAT TRADITIONAL THEFT/LARCENY STATUTES ARE NOT THE PROPER VEHICLE TO CONTROL THE SPATE OF COMPUTER ABUSE AND COMPUTER ASSISTED CRIMES. FOR EXAMPLE A RECENT LAW JOURNAL ARTICLE DESCRIBED AN ANALOGOUS PROBLEM IN THE FOLLOWING FASHION: [1100]

THE PROBLEM RAISED BY INTANGIBLE PROPERTY IS FURTHER ILLUSTRATED BY THE CASE OF COMMONWEALTH V. YOURAWSKI, 1981 MASS.ADV.SH. 1954, 425 N.E.2D 298. THERE THE DEFENDANT OWNED A CASSETTE TAPE CONTAINING A PIRATED COPY OF STAR WARS, RAISING THE QUESTION OF WHETHER IMAGES AND SOUNDS ON THE TAPE WERE PROPERTY SUBJECT TO LARCENY UNDER MASSACHUSETTS LAW. THE COURT DETERMINED THEY WERE NOT AND DISMISSED THE INDICTMENT. THE YOURAWSKI CASE WAS ONE OF THE **10** REASONS BEHIND THE MASSACHUSETTS LEGISLATURE'S AMENDMENT TO ITS LARCENY STATUTE DEFINING PROPERTY TO INCLUDE ELECTRONICALLY PROCESSED OR STORED DATA, EITHER TANGIBLE OR INTANGIBLE, DATA WHILE IN TRANSIT. ACT OF MAY 31, 1983, CH. 147, (1983) 3 MASS.ADV.LEGIS.SERV. 38 (LAW CO-OP.) (TO BE CODIFIED AT MASS. GEN. LAWS ANN. CH. 266, SEC. 30).

COMPOUNDING THIS IS THE ADVENT OF THE ACTIVITIES OF SO-CALLED 'HACKERS' WHO HAVE BEEN ABLE TO ACCESS (TRESPASS INTO) BOTH PRIVATE AND PUBLIC COMPUTER SYSTEMS, SOMETIMES WITH POTENTIALLY SERIOUS RESULTS. THE RELATIVE EASE OF ACCESS BY THE HACKER IS DUE TO A CORRESPONDING PROLIFERATION OF COMPUTER NETWORKING WHICH BEGAN DURING THE 1970'S. THIS PHENOMENON WHICH IS PREDOMINANTLY INTERSTATE IN NATURE WAS DESCRIBED BY A REPRESENTATIVE OF GTE TELENET IN THE **3696** SUBCOMMITTEE ON CRIME'S HEARING ON NOVEMBER 10, 1983, IN THE FOLLOWING FASHION:

THE COMPUTER NETWORKING ERA BROUGHT DRAMATIC NEW CAPABILITIES TO THE DATA COMMUNICATIONS MARKETPLACE. FOR EXAMPLE, NETWORKS ENABLE OTHERWISE INCOMPATIBLE COMPUTERS AND TERMINALS TO COMMUNICATE WITH ONE ANOTHER BY TRANSLATING CODES AND PROTOCOLS BETWEEN THESE DEVICES IN REAL TIME, VERY MUCH LIKE THE UNITED NATIONS PROVIDING SIMULTANEOUS TRANSLATIONS TO A MULTILINGUAL DIPLOMATIC CONSTITUENCY. ANOTHER EXAMPLE, IS THE ACCESSIBILITY OF COMPUTERS WHICH ARE CONNECTED TO NETWORKS FROM LOCAL TELEPHONE EXCHANGES VIA DIAL-IN FACILITIES. WITH THIS CAPABILITY, EVERY COMPUTER WHICH IS CONNECTED TO A MODERN

COMPUTER NETWORK CAN BE REACHED FROM ANY OF THE 100 MILLION TELEPHONES IN THE UNITED STATES BY MEANS OF A LOCAL TELEPHONE CALL TO THE NEAREST NETWORK ACCESS POINT. IT IS THIS VERY CAPABILITY WHICH HAS ALSO ENABLED THE RECENT FLURRY OF ELECTRONIC TRESPASSING INCIDENTS. BY COMBINING THE UBIQUITY OF THE TELEPHONE WITH THE CAPABILITY OF THE PERSONAL COMPUTER, A WHOLE NEW DIMENSION OF CRIMINAL ACTIVITY BECOMES POSSIBLE.

AS COMPUTER NETWORKING AND DISTRIBUTED DATA PROCESSING HAS GROWN SO HAS THE 'USER-FRIENDLINESS' OF ACCESSING COMPUTER RESOURCES THROUGH THE NETWORKS. THE REQUIREMENT OF 'USER-FRIENDLINESS' IS A NATURAL OUTGROWTH OF A DESIRE TO ALLOW LARGE NUMBERS OF AUTHORIZED USERS ACCESS TO COMPUTER RESOURCES. MOST SYSTEMS USE SOME SORT OF VARIANT OF AN IDENTIFICATION CODE/PASSWORD SYSTEM. THIS GENERALLY CONSISTS OF SIMPLE CODES WHICH ARE EASY FOR USERS TO REMEMBER AND SIMPLE TO TYPE. UNTIL RECENTLY, THIS FORM OF SECURITY WAS SUFFICIENT, SINCE MOST USERS ONLY HAD THE ABILITY TO USE 'DUMB' TERMINAL DEVICES FOR ACCESS. WITHIN THE LAST TWO YEARS THIS HAS CHANGED WITH THE ADVENT OF THE PERSONAL COMPUTER. THE PERSONAL COMPUTER ALLOWS ITS USER TO EMPLOY THE POWER OF THE COMPUTER TO BREAK INTO OTHER COMPUTER SYSTEMS BY SYSTEMATICALLY SPEEDING UP WHAT WOULD OTHERWISE BE A SLOW, HIT OR MISS PROCESS. FOR EXAMPLE, THE MOTION PICTURE 'WAR GAMES' SHOWED A REALISTIC REPRESENTATION OF THE AUTOMATIC DIALING AND ACCESS CAPABILITIES OF THE PERSONAL COMPUTER. ANOTHER WAY OF SAYING THIS IS THAT **11** PRIOR TO THE PERSONAL COMPUTER, PASSWORD CODES WERE GENERALLY SATISFACTORY DUE TO THE SECURITY INHERENT IN THE TEDIOUS TRIAL OF COMBINATIONS NECESSARY TO BREAK THE PASSWORDS MANUALLY. THIS ASPECT IS NOW GONE.

THE RESULTS OF THESE 'HACKER' INCIDENTS WERE POIGNANTLY ASSESSED BY DR. WILBUR MILLER, PRESIDENT OF DRAKE UNIVERSITY, AT OUR MOST RECENT HEARING ON MARCH 28, 1984. HE SAID:

TO DATE, THERE HAS BEEN A TENDENCY, ON THE PART OF THE PUBLIC, TO VIEW SUCH VIOLATIONS AS INTELLECTUAL PRANKSTERISM. THIS IS SIMPLY NOT THE CASE. THE UBIQUITY OF COMPUTERS IN VIRTUALLY EVERY DIMENSION OF OUR EVERYDAY LIVES UNDERLINES THIS POINT AND DICTATES OUR CONCERN. CONCERN, HOWEVER, **3697** IS NOT ENOUGH. UNIVERSITY LEADERS MUST CONTINUE TO ASSUME AND PURSUE THE RESPONSIBILITY OF PROVIDING SECURE COMPUTER ACCESS TO LEGITIMATE USERS. WE MUST BE PREPARED TO TAKE STRONG MEASURES IN RESPONSE TO INAPPROPRIATE BEHAVIOR BY THOSE WHO ARE MEMBERS OF OUR USER COMMUNITIES. THAT, HOWEVER, IS NOT ENOUGH. SOCIETAL DEFINITIONS, DETERRENTS, AND PUNISHMENTS ARE NEEDED TO CONTROL EXTERNAL VIOLATORS. MORE STATES MUST MOVE TO PROVIDE LAWS THAT DEFINE COMPUTER DAMAGE AND THEFT AS CRIMINAL ACTS AND APPROPRIATE SANCTIONS MUST BE PROVIDED. IN ADDITION, GIVEN THE INTERCONNECTEDNESS OF THE ENTERPRISE OF HIGHER EDUCATION, FEDERAL LEGISLATION TO THESE SAME ENDS IS ESSENTIAL. WE HAVE A PROBLEM. THE PROBLEM IS COMPUTER THEFT AND DAMAGE. WE FEEL THAT THE PROBLEM IS A SERIOUS ONE, ONE THAT WE CANNOT ADDRESS BY OURSELVES. WE NEED YOUR HELP. WE NEED LEGISLATION THAT WILL AID US IN OUR ATTEMPTS TO SECURE AND MAINTAIN A QUALITY EDUCATION FOR THIS GENERATION OF STUDENTS AND FOR GENERATIONS OF STUDENTS TO COME.

ANOTHER PERTINENT OBSERVATION BY DR. MILLER IN REGARD TO THE SCOPE OF JUST THE 'HACKER' ASPECT OF THIS PROBLEM WAS OUTLINED IN HIS ORAL TESTIMONY IN THE FOLLOWING FASHION:

BY THE WAY, A LOT MORE OF THIS HACKING HAS HAPPENED. I AM CONVINCED, THAN YOU READ ABOUT, EVEN THOUGH YOU READ A GREAT DEAL ABOUT IT. I WILL GIVE YOU AN EXAMPLE OF THE HACKERS AND DRAKE UNIVERSITY.

WE WERE ALMOST HOPING AT FIRST THAT THERE WOULD BE NO PUBLICITY ABOUT IT. NOW THAT SOUNDS WEIRD THAT I AM HERE, YOU KNOW, MAKING PUBLIC STATEMENTS, BUT MY OPINION HAS CHANGED GREATLY SINCE THAT INITIAL HAPPENING. I KNOW NOW THAT IT MUST BE PUBLIC AND WE MUST MAKE THESE THINGS KNOWN AND WE MUST EDUCATE THE PUBLIC AND FIND SOME AVENUES OF CORRECTION FOR IT.

BUT THE REASON WE WERE HOPING IT MIGHT NOT BE MADE PUBLIC IS BECAUSE IT GIVES EVERYONE ELSE IN TOWN THE SAME IDEA. THEY WANT TO TRY IT ALSO TO SEE IF THEY CAN DO THE SAME THING SOMEONE ELSE DID. MY HUNCH IS-- AND I KNOW A FEW FACTS WHERE IT HAS HAPPENED MORE AT SOME PLACES THAN YOU WOULD KNOW BECAUSE THEY DO NOT WANT IT MADE PUBLIC.

SO I THINK RIGHT NOW, IT IS A BIGGER PROBLEM THAN MOST OF US REALIZE.

**\*12** AS THIS STATEMENT ILLUSTRATES, THERE IS A TREMENDOUS ATTITUDINAL PROBLEM THAT GIVES THE COMMITTEE SOME CONCERN. PEOPLE CAN RELATE TO MUGGING A LITTLE OLD LADY AND TAKING HER POCKETBOOK, BUT THE PERCEPTION IS THAT PERHAPS THERE IS NOT SOMETHING SO WRONG ABOUT TAKING INFORMATION BY USE OF A DEVICE CALLED A COMPUTER EVEN IF IT COSTS THE ECONOMY MILLIONS NOW AND POTENTIALLY BILLIONS IN THE FUTURE.

WHAT H.R. 5616 DOES

IN THE CREDIT CARD AREA, H.R. 5616 PROHIBITS USE, PRODUCTION AND TRAFFICKING IN 'COUNTERFEIT' ACCESS DEVICES AND DEVICE-MAKING EQUIPMENT **\*\*3698** WITH A SUBSTANTIAL PUNISHMENT OF UP TO 15 YEARS IN PRISON AND FINES UP TO TWICE THE VALUE OBTAINED. IT ALSO PROHIBITS USE AND TRAFFICKING IN 'UNAUTHORIZED' ACCESS DEVICES WHICH ARE VALID CARDS THAT HAVE BEEN LOST, STOLEN, ETC., IF THE DEFENDANT OBTAINS $1,000 IN VALUE IN A YEAR OR POSSESSES 15 OR MORE 'UNAUTHORIZED' OR 'COUNTERFEIT' ACCESS DEVICES. THESE OFFENSES CAN BE PUNISHED WITH UP TO 10 YEARS IN PRISON AND FINES OF UP TO TWICE THE VALUE OBTAINED. REPEAT OFFENSES IN ANY OF THESE VIOLATIONS CALL FOR A SUBSTANTIAL INCREASE IN MAXIMUM PRISON SENTENCES (20 YEARS) AND SUBSTANTIAL FINES.

IN THE COMPUTER AREA THE BILL ESTABLISHES A SPECIFIC FEDERAL FELONY FOR UNAUTHORIZED ACCESS TO COMPUTERS IF THE DEFENDANT AGGREGATES $5,000 IN ILLEGAL GAINS IN 1 YEAR (OTHER THAN FROM JUST THE USE) OR THE DEFEN ANT ACCESSES CLASSIFIED INFORMATION REQUIRING PROTECTION AGAINST UNAUTHORIZED DISCLOSURE FOR REASONS FOR NATIONAL DEFENSE OR FOREIGN RELATIONS. THESE OFFENSES CAN BE PUNISHED WITH UP TO 10 YEARS IN PRISON AND FINES UP TO TWICE THE VALUE OBTAINED. REPEAT OFFENSES

OF EITHER OF THESE VIOLATIONS CALL FOR A SUBSTANTIAL INCREASE IN MAXIMUM PRISON SENTENCES (20 YEARS) AND SUBSTANTIAL FINES.

THE BILL ALSO CREATES THREE MISDEMEANOR CRIMES OF UNAUTHORIZED ACCESS OR COMPUTER ABUSE. THE FIRST INVOLVES ACCESS TO INFORMATION IN A COMPUTER PROTECTED BY THE RIGHT TO FINANCIAL PRIVACY ACT (12 U.S.C. 3401 ET SEQ.) OR THE FAIR CREDIT REPORTING ACT (15 U.S.C. 1681, ET SEQ.); THE SECOND INVOLVES ACCESS TO A COMPUTER IF THERE IS A GAIN TO THE DEFENDANT OR LOSS TO OTHERS THAT AGGREGATE $5,000 OR MORE IN VALUE DURING A 1-YEAR PERIOD AND SUCH ACTIVITY AFFECTS INTERSTATE OR FOREIGN COMMERCE; AND THIRD, IF THE DEFENDANT USES, MODIFIES, OR DISCLOSES INFORMATION IN OR PREVENTS AUTHORIZED USE OF A COMPUTER OWNED OR OPERATED FOR THE U.S. GOVERNMENT REGARDLESS OF LOSS OR GAIN. THESE MISDEMEANOR OFFENSES CAN BE PUNISHED WITH UP TO 1 YEAR IN PRISON AND FINES OF $5,000 OR UP TO TWICE THE VALUE OBTAINED OR LOSS CREATED BY THE OFFENSE. REPEAT OFFENSES OF ANY OF THESE VIOLATIONS CALL FOR A SUBSTANTIAL INCREASE IN MAXIMUM PRISON SENTENCES (10 YEARS) AND SUBSTANTIAL FINES.

## HISTORY OF THE ACT

ON SEPTEMBER 29 AND NOVEMBER 10, 1983, AND MARCH 28, 1984, THE SUBCOMMITTEE ON CRIME HELD HEARINGS ON THE ISSUES OF CREDIT CARD AND COMPUTER FRAUD AND ABUSE. THE BILLS BEFORE THE SUBCOMMITTEE WERE H.R. 3181 INTRODUCED BY MR. FISH ON JUNE 1, 1983 AND H.R. 3570 INTRODUCED BY MR. HUGHES ON JULY 14, 1983. ON THE LAST DAY OF HEARINGS ON MARCH 28, 1984, THE SUBCOMMITTEE ALSO CONSIDERED **\*13** H.R. 5112 INTRODUCED ON MARCH 13, 1984 BY MR. HUGHES FOR HIMSELF, MR. SAWYER AND MR. NELSON. THIS BILL HAD EVOLVED FROM THE EARLIER BILLS. DURING THIS THOROUGH PROCEDURE, THE SUBCOMMITTEE HEARD FROM 24 EXPERT WITNESSES FROM ALL WALKS OF LIFE INCLUDING MEMBERS OF CONGRESS, STATE AND LOCAL LAW ENFORCEMENT OFFICERS, NATIONAL DISTRICT ATTORNEYS ASSOCIATION, THE CREDIT AND BANKING INDUSTRY, DEPARTMENTS OF TREASURY AND JUSTICE, POST OFFICE DEPARTMENT, COMMUNICATIONS AND COMPUTER INDUSTRY, UNIVERSITY AND EDUCATION REPRESENTATIVES AND EVEN AN INCARCERATED CREDIT CARD VIOLATOR. ALL OF THE WITNESSES AGREED THAT THERE WERE PROBLEMS IN THE AREAS THEY **\*\*3699** DISCUSSED AND THE DIFFERENCES IN OPINION WERE ON EMPHASIS, REFINEMENTS AND THE TIMING OF SOLUTIONS TO THESE PROBLEMS.

## COMMITTEE ACTION

ON MAY 8, 1984 THE SUBCOMMITTEE ON CRIME MARKED UP H.R. 5112 AT WHICH TIME CHAIRMAN HUGHES OFFERED AN AMENDMENT IN THE NATURE OF A SUBSTITUTE TO H.R. 5112.

H.R. 5112, AS INTRODUCED, WOULD HAVE PROHIBITED TRANSACTIONS IN COUNTERFEITED 'FRAUDULENT ACCESS DEVICES' AND COUNTERFEIT DEVICE-MAKING EQUIPMENT FOR CREDIT AND DEBIT INSTRUMENTS IF THE ILLEGAL ACTS IN THE AGGREGATE OBTAINED ANYTHING OF VALUE WORTH $5,000 WITHIN 1 YEAR OR IF THE DEFENDANT WAS IN POSSESSION OF 10 OR MORE COUNTERFEIT INSTRUMENTS INDICATING THE DEFENDANT WAS MORE THAN A SMALL-TIME THIEF. IT WOULD ALSO HAVE PROHIBITED UNAUTHORIZED ACCESS OF A COMPUTER THAT AFFECTED INTERSTATE COMMERCE IF THE DEFENDANT THEREBY AGGREGATED $5,000 IN ILLEGAL GAINS IN ANY 1-YEAR PERIOD. THE BILL WOULD ALSO HAVE INCLUDED A

MISDEMEANOR CRIME OF COMPUTER ABUSE IF SUCH ABUSE AFFECTED INTERSTATE COMMERCE AND THE DEFENDANT USED, MODIFIED, OR DISCLOSED INFORMATION IN, OR PREVENTED AUTHORIZED USE OF A COMPUTER AND RESULTED IN LOSS TO OTHERS AGGREGATING $5,000 OR MORE IN VALUE DURING ANY 1-YEAR PERIOD.

THE AMENDMENT IN THE NATURE OF A SUBSTITUTE OFFERED AT THE SUBCOMMITTEE CONTAINED THE FOLLOWING NEW SUBSECTIONS:

SECTION 1029(A)(1) WHICH PROHIBITS PRODUCING OR TRAFFICKING IN 'COUNTERFEIT ACCESS DEVICES' AND 1029(A)(2) WHICH PROHIBITS TRAFFICKING IN 'UNAUTHORIZED ACCESS DEVICES' IF THE (A)(2) CONDUCT OBTAINS ANYTHING OF VALUE AGGREGATING $1,000 OR MORE DURING A 1-YEAR PERIOD.

THE ESSENTIAL DIFFERENCE BETWEEN THIS APPROACH AND H.R. 5112 IS THAT A DICHOTOMY IS MADE BETWEEN 'COUNTERFEIT' AND 'UNAUTHORIZED' ACCESS DEVICES (THERE IS NO THRESHOLD REQUIRED FOR PRODUCING AND TRAFFICKING IN COUNTERFEIT CARDS ON THE GROUNDS THAT DEALING WITH COUNTERFEITS, AS OPPOSED TO CARDS WHICH ARE GENUINE BUT BEING MISUSED, IS SUFFICIENTLY MORE SERIOUS TO WARRANT PROSECUTION WITHOUT ESTABLISHING A DOLLAR THRESHOLD). THE THRESHOLD FOR 'UNAUTHORIZED ACCESS DEVICES' IS ESTABLISHED AT $1,000. H.R. 5112 REQUIRED A THRESHOLD OF $5,000 VALUE OR INVOLVEMENT OF 10 OR MORE 'FRAUDULENT' ACCESS DEVICES.

SECTION 1029(A)(1) CREATES A COUNTERFEITING OFFENSE CONSISTENT WITH THE SENATE APPROACH IN S. 1870 (NO THRESHOLD) AND THE LOWERING OF THE DOLLAR VALUE TO $1,000 FOR 'UNAUTHORIZED' ACCESS DEVICES WHICH CONFORMS WITH THE THRESHOLD IN 'USE' OFFENSES IN THE TRUTH IN LENDING ACT (15 U.S.C. 1644) AND THE ELECTRONIC FUNDS TRANSFER **14 ACT (15 U.S.C. 1693N.) AS WELL AS THE CHANGES IN THESE LAWS ENVISIONED IN H.R. 3622 (BANKING COMMITTEE BILL) WHICH PASSED THE HOUSE ON NOVEMBER 16, 1983.

SECTION 1029(A)(3) ESTABLISHES A SEPARATE OFFENSE OF POSSESSION OF 15 OR MORE COUNTERFEIT OR UNAUTHORIZED ACCESS DEVICES. H.R. 5112 REQUIRED TRAFFICKING AND POSSESSION OF 10 CARDS OF OBTAINING $5,000 OF VALUE. THE SUBCOMMITTEE CONSIDERED THE POSSESSION OF 15 ACCESS DEVICES MORE THAN A MINOR VIOLATION AND BELIEVES THAT SUCH A FEDERAL OFFENSE WOULD CONCENTRATE FEDERAL RESOURCES ON MAJOR TRAFFICKERS AND COUNTERFEITERS.

**3700 SECTION 1029(A)(4) PROHIBITS PRODUCING, POSSESSION OF OR TRAFFICKING IN DEVICE-MAKING EQUIPMENT WITH THE INTENT TO DEFRAUD. THIS DIFFERED FROM H.R. 5112 IN THAT IT NO LONGER HAS THE THRESHOLD OF $5,000 OR 10 FRAUDULENT CARDS.

SECTION 1029(B) SETS UP BOTH AN ATTEMPT AND CONSPIRACY VIOLATION. H.R. 5112 HAD ONLY AN ATTEMPT VIOLATION. THE NEW CONSPIRACY OFFENSE IS CONSISTENT WITH THE APPROACH THE SUBCOMMITTEE TOOK IN THE PHARMACY ROBBERY BILL (CONTROLLED SUBSTANCES REGISTRANTS PROTECTION ACT OF 1984 (P.L. 98-305)-- PENALTY FOR CONSPIRACY SET AT ONE-HALF THAT FOR THE COMPLETED OFFENSE).

SECTION 1029(C)(1) SETS UP A MAXIMUM PENALTY OF 10 YEARS IMPRISONMENT, AND A FINE OF $10,000 OR ALTERNATE FINE FOR TRAFFICKING IN UNAUTHORIZED ACCESS DEVICES

OR POSSESSION OF 15 UNAUTHORIZED OR COUNTERFEIT ACCESS DEVICES. THIS ADDS THE ALTERNATIVE FINE TO THE H.R. 5112 SANCTIONS AND INCLUDES THE POSSESSION OFFENSE.

SECTION 1029(C)(2) PROVIDES A MAXIMUM PENALTY OF 15 YEARS, $50,000 OR ALTERNATE FINE FOR TRAFFICKING IN COUNTERFEIT ACCESS DEVICES OR POSSESSION, PRODUCING OR TRAFFICKING IN DEVICE-MAKING EQUIPMENT. THIS PROVISION ADDS TRAFFICKING IN COUNTERFEIT ACCESS DEVICES TO THE OFFENSES FOR WHICH THERE WERE MORE SEVERE SANCTIONS IN H.R. 5112.

SECTION 1029(C)(3) PROVIDES A MAXIMUM PENALTY OF A $100,000 FINE OR ALTERNATE FINE AND UP TO 20 YEARS FOR A SUBSEQUENT OFFENSE UNDER THIS SUBSECTION. THIS MERELY ADDS THE ALTERNATE FINE TO THE H.R. 5112 VERSION.

SECTION 1029(E)(1) CHANGED THE DEFINITION OF ACCESS DEVICE IN H.R. 5112 BY SUBSTITUTING 'THAT CAN BE USED' INSTEAD OF 'EXISTING FOR THE PURPOSE OF OBTAINING' AND 'THAT CAN BE USED TO INITIATE' FOR 'FOR THE PURPOSE OF INITIATING.'

SECTION 1029(E)(2) AND (E)(3) DEFINES 'COUNTERFEIT ACCESS DEVICE' AND 'UNAUTHORIZED ACCESS DEVICE.' THESE ARE NEW TERMS WHICH REPLACED THE 'FRAUDULENT ACCESS DEVICE' TERM USED IN H.R. 5112. THIS DICHOTOMY ESSENTIALLY IS TO DISTINGUISHED BETWEEN COUNTERFEIT ACCESS DEVICES AND GENUINE ACCESS DEVICES BEING USED WITHOUT AUTHORITY.

SECTION 1029(E)(5) DEFINES 'TRAFFIC' A NEW TERM IN THE BILL WHICH COMBINES THE COVERAGE OF 'BUY, SELL OR TRANSFER,' AS USED IN H.R. 5112, WITH COVERAGE OF ACTS OF 'RECEIVING.'

SECTION 1029(E)(6) DEFINES DEVICE-MAKING EQUIPMENT AND DELETES THE TERM 'SPECIALLY' USED IN H.R. 5112.

SECTION 1030(A)(1)(A) PROHIBITS (A FELONY) ACCESSING A COMPUTER WITHOUT AUTHORIZATION OR, IF AUTHORIZED, ABUSING THAT AUTHORIZATION WITH INTENT TO EXECUTE A FRAUD IF THAT FRAUD CULMINATES IN A $5,000 BENEFIT TO THE DEFENDANT OR LOSS TO THE VICTIM. THE COVERAGE OF 'ABUSE OF AUTHORIZATION' IS NEW. IN SEC. 1030(A)(1)(B) THE SUBCOMMITTEE **15** ADDED A FELONY COMPUTER OFFENSE FOR ACCESSING A COMPUTER AND OBTAINING CLASSIFIED INFORMATION WITHOUT A NEED TO SHOW ANY DOLLAR VALUE.

SECTION 1030(A)(2) PROHIBITS (A MISDEMEANOR) ACCESSING A COMPUTER WITHOUT AUTHORIZATION, OR IF AUTHORIZED, ABUSING THAT AUTHORIZATION, AND IN SO DOING THE DEFENDANT, USES, MODIFIES OR DISCLOSES INFORMATION IN, OR PREVENTS AUTHORIZED USE OF SUCH COMPUTER. THERE WOULD HAVE TO BE $5,000 WORTH OF BENEFIT TO THE DEFENDANT OR LOSS TO ANOTHER. IN SEC. 1030(A)(2)(B) THE SUBCOMMITTEE ADDED A MISDEMEANOR **3701** OFFENSE FOR ANY UNAUTHORIZED ACCESS, REGARDLESS OF ANY DOLLAR VALUE, OF A U.S. GOVERNMENT COMPUTER. (THE ADDITION OF AN ABUSE OF VALID AUTHORIZATION WAS ALSO ADDED TO BOTH OFFENSES.) THE JURISDICTIONAL BASE IS WHETHER THE CONDUCT AFFECTS INTERSTATE OR FOREIGN COMMERCE OR THE COMPUTER IS OPERATED FOR OR ON BEHALF OF THE U.S. GOVERNMENT, THE LATTER BEING AN ADDITION TO H.R. 5112.

SECTION 1030(B) PROHIBITS ATTEMPTS TO VIOLATE (A) AND CREATES A SEPARATE CONSPIRACY SECTION. THE CONSPIRACY SECTION WAS ADDED TO THE H.R. 5112 VERSION.

SECTION 1030(C)(1) SETS UP A FINE OF $10,000 OR ALTERNATE FINE AND A SENTENCE OF UP TO TEN YEARS FOR THE SUBSECTION (A)(1) COMPUTER FRAUD OFFENSE OR ATTEMPT, AND AN ESCALATION ($100,000 OR 20 YEARS) FOR A SUBSEQUENT OFFENSE. THE ALTERNATIVE FINE WAS ADDED TO THE H.R. 5112 VERSION.

SECTION 1030(C)(2) SETS UP A FINE OF $5,000 OR AN ALTERNATE FINE AND A SENTENCE OF 1 YEAR (MISDEMEANOR) FOR COMPUTER ABUSE, WITH AN ESCALATION OF $10,000 OR AN ALTERNATE FINE AND 20 YEARS FOR A SUBSEQUENT OFFENSE. THE MAXIMUM FIXED FINE FIGURES WERE ADDED TO THE H.R. 5112 VERSION, FROM WHICH THEY WERE UNINTENTIONALLY OMITTED.

SECTION 3 REQUIRES A SPECIAL REPORT ON PROSECUTIONS UNDER THIS ACT FROM THE ATTORNEY GENERAL FOR THE FIRST THREE YEARS AFTER THE BILL IS ENACTED. THIS IS AN ADDITION TO H.R. 5112.

THIS AMENDMENT IN THE NATURE OF A SUBSTITUTE WAS REPORTED UNANIMOUSLY AS A CLEAN BILL (H.R. 5616) TO THE FULL COMMITTEE AND CHAIRMAN HUGHES, THE RANKING MINORITY MEMBER MR. SAWYER, AND ALL THE MEMBERS OF THE SUBCOMMITTEE PLUS MR. NELSON ARE ORIGINAL CO-SPONSORS.

THE FULL COMMITTEE ON THE JUDICIARY MARKED UP H.R. 5616 ON JUNE 26, 1984 WITH THE FOLLOWING MAJOR SUBSTANTIVE AMENDMENTS:

(1) AN AMENDMENT TO SECTION 1030(A)(1) TO ALTER THE LANGUAGE OF THIS SECTION TO CONFORM WITH THAT OF THE MAIL AND WIRE FRAUD STATUTES (18 U.S.C. 1341 AND 1343). IT ALSO SPELLS OUT THE COVERAGE OF CLASSIFIED INFORMATION IN THE BILL AND INCLUDES 'INTENT' LANGUAGE CONSISTENT WITH THE EXISTING ESPIONAGE LAWS (18 U.S.C. 793). THE AMENDMENT ALSO SPLIT UP THE TWO MISDEMEANOR OFFENSES AND ADDS A CLAUSE EXCLUDING FROM THESE SECTIONS' COVERAGE OF A PERSON AUTHORIZED TO ACCESS A COMPUTER WHO MERELY EXCEEDS SUCH AUTHORIZATION BY THE INCIDENTAL USE OF THE COMPUTER (E.G., IF A GOVERNMENT EMPLOYEE DOES HOMEWORK OR PLAYS COMPUTER GAMES ON A GOVERNMENT COMPUTER.)

(2) A SECOND OFFENSE FOR A MISDEMEANOR IS REDUCED FROM A 20-YEAR FELONY TO A 10-YEAR FELONY.

(3) AN OFFENSE OF 'USING' A COUNTERFEIT ACCESS DEVICE OR UNAUTHORIZED ACCESS DEVICE IS ADDED TO SEC. 1029(A)(1) AND (A)(2).

(4) A DEFINITION OF THE WORD 'COMPUTER' IS ADDED TO SEC. 1030.

**\*16** (5) A CLARIFICATION IS MADE IN REGARD TO THE CONCURRENT AUTHORITY OF THE SECRET SERVICE TO INVESTIGATE UNDER THIS BILL. THIS AMENDMENT MANDATES COORDINATION BETWEEN THE DEPARTMENT OF JUSTICE AND THE DEPARTMENT OF THE TREASURY.

(6) A NEW MISDEMEANOR OFFENSE IS CREATED FOR UNAUTHORIZED ACCESS TO INFORMATION PROTECTED FROM DISCLOSURE BY THE RIGHT TO FINANCIAL PRIVACY ACT (12 U.S.C. 3401 ET SEQ.) AND THE FAIR CREDIT REPORTING ACT (15 U.S.C. 1681 ET SEQ.).

**\*\*3702**  THE BILL AS AMENDED WAS PASSED BY VOICE VOTE AS A COMMITTEE AMENDMENT IN THE NATURE OF A SUBSTITUTE TO H.R. 5616.

SECTION-BY-SECTION ANALYSIS

THE FOLLOWING IS A SECTION-BY-SECTION ANALYSIS OF H.R. 5616, AS REPORTED BY THE COMMITTEE ON THE JUDICIARY:

SECTION 1 OF THE BILL CONTAINS ITS SHORT TITLE: THE 'COUNTERFEIT ACCESS DEVICE AND COMPUTER FRAUD AND ABUSE ACT OF 1984.'

SECTION 2(A) OF THE BILL AMENDS CHAPTER 47 OF TITLE 18 OF THE U.S.C. (RELATING TO FRAUD AND FALSE STATEMENTS) TO ADD A NEW SECTION 1029, ENTITLED 'FRAUD AND RELATED ACTIVITY IN CONNECTION WITH ACCESS DEVICES.'

SECTION 1029 CONTAINS FIVE MAJOR PROVISIONS RELATING TO ACCESS DEVICE OFFENSES: (A) ELEMENTS OF THE OFFENSES AND THE BASIS FOR FEDERAL JURISDICTION; (B) PUNISHMENT FOR ATTEMPTING OR CONSPIRING TO COMMIT AN OFFENSE; (C) PUNISHMENT FOR COMMITTING AN OFFENSE; (D) AUTHORITY FOR INVESTIGATIVE JURISDICTION; AND (E) DEFINITIONS.

SECTION 1029(A) SETS OUT FOUR CATEGORIES OF OFFENSES WHICH, IF SUCH ACTIVITY 'AFFECTS INTERSTATE OR FOREIGN COMMERCE,' ARE SUBJECT TO THE PENALTY PROVISIONS OF SUBSECTION (C) OF THIS SECTION. IN USING THE PHRASE 'AFFECTS INTERSTATE AND FOREIGN COMMERCE' THE COMMITTEE INTENDS TO ESTABLISH A BROAD JURISDICTIONAL BASIS. THE PROVISION IS INTENDED TO PROVIDE FEDERAL PROSECUTORS WITH THE MEANS TO PROSECUTE EFFECTIVELY A BROAD VARIETY OF CREDIT CARD AND ACCOUNT-RELATED FRAUD SCHEMES. NEVERTHELESS, CERTAIN THRESHOLDS CONTAINED IN THE BILL, SUCH AS THE DOLLAR AMOUNT THRESHOLD ON TRAFFICKING IN OR USING UNAUTHORIZED DEVICES AND THE POSSESSION OF 15 OR MORE UNAUTHORIZED OR COUNTERFEIT DEVICES, WILL INSURE THAT FEDERAL INVOLVEMENT IS CONCENTRATED ON THOSE SITUATIONS WHERE THEY CAN BEST SUPPLEMENT THE EFFORTS OF STATE AND LOCAL GOVERNMENTS.

SECTION 1029(A)(1) WOULD MAKE IT A FEDERAL OFFENSE TO KNOWINGLY AND WITH INTENT TO DEFRAUD PRODUCE, USE OR TRAFFIC IN ONE OR MORE COUNTERFEIT ACCESS DEVICES, AS DEFINED IN PROPOSED SUBSECTION (E)(2).

A KNOWING STATE OF MIND WITH RESPECT TO AN ELEMENT OF THE OFFENSE IS (1) AN AWARENESS OF THE NATURE OF ONE'S CONDUCT, AND (2) AN AWARENESS OF OR A FIRM BELIEF IN THE EXISTENCE OF A RELEVANT CIRCUMSTANCE SUCH AS WHETHER AN ACCESS DEVICE WAS COUNTERFEIT BEFORE IT WAS USED OR TRAFFICKED IN. THE COMMITTEE INTENDS THAT THE KNOWING STATE OF MIND REQUIREMENT MAY BE SATISFIED BY PROOF THAT THE ACTOR WAS AWARE OF A HIGH PROBABILITY OF THE EXISTENCE OF THE CIRCUMSTANCE, ALTHOUGH A DEFENSE SHOULD SUCCEED IF IT IS PROVEN THAT THE ACTOR ACTUALLY BELIEVED THAT THE CIRCUMSTANCE DID NOT EXIST AFTER TAKING REASONABLE STEPS TO WARRANT SUCH BELIEF. THIS FOLLOWS THE PRACTICE OF THE PROPOSED MODEL PENAL CODE (SECTION 2.02(7)). THIS

APPROACH DEALS WITH THE SITUATION THAT HAS BEEN CALLED 'WILLFUL BLINDNESS,' **\*17** THE CASE OF THE ACTOR WHO IS AWARE OF THE PROBABLE EXISTENCE OF A MATERIAL FACT BUT DOES NOT SATISFY HIMSELF THAT IT DOES NOT IN FACT EXIST. WILLFUL BLINDNESS WOULD REQUIRE AN AWARENESS OF A HIGH PROBABILITY OF THE EXISTENCE OF THE CIRCUMSTANCE. UNITED STATES V. JEWELL, 532 F.2D 697, 700 N. 7(9TH CIR.) CERT. DENIED, 426 U.S. 951(1976).

THE COMMITTEE INTENDS THAT THE TERM 'WITH THE INTENT' HAVE THE SAME CULPABLE STATE OF MIND AS THE TERM 'PURPOSE' AS USED IN THE **\*\*3703** PROPOSED MODEL PENAL CODE (SEC. 2.02). THE DISTINCTION FROM A KNOWING STATE OF MIND WAS RECENTLY RESTATED BY JUSTICE REHNQUIST, 'AS WE POINTED OUT IN UNITED STATES V. UNITED STATES GYPSUM CO., 438 U.S. 422, 445(1978), A PERSON WHO CAUSES A PARTICULAR RESULT IS SAID TO ACT PURPOSEFULLY IF 'HE CONSCIOUSLY DESIRES THAT RESULT, WHATEVER THE LIKELIHOOD OF THAT RESULT HAPPENING FROM HIS CONDUCT,' WHILE HE IS SAID TO ACT KNOWINGLY IF HE IS AWARE 'THAT THAT RESULT IS PRACTICALLY CERTAIN TO FOLLOW FROM HIS CONDUCT, WHATEVER HIS DESIRE MAY BE AS TO THAT RESULT.'' UNITED STATES V. BAILEY, 444 U.S. 394, 404 [1101] (1980).

THERE IS NO REQUIREMENT THAT THE OFFENDER HAVE DIRECT CONTACT WITH THE PERSON WHO IS ULTIMATELY DEFRAUDED. FOR EXAMPLE, A COUNTERFEITER MAY DEAL WITH A DISTRIBUTOR WHO IS FULLY AWARE THAT COUNTERFEIT CARDS ARE INVOLVED, AND THEREFORE IS NOT A VICTIM OF FRAUD. HOWEVER, THE VALUE OF THE MANUFACTURER'S ILLEGALLY OBTAINED PRODUCT CLEARLY INDICATES AN INTENTION TO DEFRAUD ANY INNOCENT PARTY.

SECTION 1029(A)(2) WOULD MAKE IT A FEDERAL OFFENSE TO KNOWINGLY AND WITH INTENT TO DEFRAUD, TRAFFIC IN OR USE ONE OR MORE UNAUTHORIZED ACCESS DEVICES DURING ANY 12-MONTH PERIOD, IF THE CONDUCT RESULTS IN OBTAINING ANYTHING OF VALUE AGGREGATING $1,000 OR MORE DURING THAT PERIOD. THE BILL SETS A DOLLAR AMOUNT THRESHOLD ($1,000) FOR TRAFFICKING IN OR USING ONE OR MORE UNAUTHORIZED ACCESS DEVICES WHICH CONFORMS WITH THE THRESHOLD FOR CERTAIN OFFENSES UNDER THE TRUTH IN LENDING ACT (15 U.S.C. 1644) AND THE ELECTRONIC FUND TRANSFER ACT (15 U.S.C. 1693).

THE BILL SPECIFIES A THRESHOLD DOLLAR AMOUNT FOR 'UNAUTHORIZED' ACCESS DEVICES ONLY. NO THRESHOLD IS ESTABLISHED FOR PRODUCING, TRAFFICKING IN OR USING COUNTERFEIT DEVICES ON THE GROUNDS THAT DEALING WITH THEM, AS OPPOSED TO THOSE THAT ARE GENUINE BUT BEING MISUSED (UNAUTHORIZED), IS SERIOUS ENOUGH TO WARRANT PROSECUTION WITHOUT A DOLLAR THRESHOLD. COUNTERFEITING SUCH CARDS IS ANALOGOUS TO THE COUNTERFEITING OF U.S. CURRENCY.

SECTION 1029(A)(3) PROVIDES A SEPARATE OFFENSE FOR POSSESSION OF 15 OR MORE COUNTERFEIT OR UNAUTHORIZED ACCESS DEVICES WITH INTENT TO DEFRAUD. THE PURPOSE OF THE NUMERICAL LIMITATION IS TO CONCENTRATE FEDERAL GOVERNMENT INVOLVEMENT ON MAJOR TRAFFICKERS AND COUNTERFEITERS AND TO AUTHORIZE SUCH INVOLVEMENT EVEN IN CASES WHERE PRODUCING, TRAFFICKING IN OR USING SUCH ACCESS DEVICES CANNOT BE ESTABLISHED. ANY COMBINATION OF COUNTERFEIT OR UNAUTHORIZED ACCESS DEVICES WOULD BE SUFFICIENT TO MEET THE FIFTEEN-DEVICE REQUIREMENT.

SECTION 1029(A)(4) WOULD MAKE IT A FEDERAL OFFENSE TO KNOWINGLY, AND WITH INTENT TO DEFRAUD, PRODUCE, TRAFFIC IN, POSSESS, OR HAVE CUSTODY OR CONTROL OVER DEVICE-MAKING EQUIPMENT, WITH THE INTENT THAT SUCH EQUIPMENT BE USED IN THE PRODUCTION

OF A FRAUDULENT ACCESS DEVICE. THE CRIME IS SUFFICIENTLY SERIOUS TO WARRANT PROSECUTION WITHOUT A DOLLAR THRESHOLD. THE OFFENDER NEED NOT PERSONALLY HAVE PHYSICAL POSSESSION OF THE EQUIPMENT, AS LONG AS HE HAS CONTROL OVER **\*18** THE EQUIPMENT IN THE POSSESSION OF ANOTHER. THE CONDUCT INVOLVED MUST BE ACCOMPANIED BY AN INTENT TO DEFRAUD. HOWEVER, THE OFFENDER NEED NOT INTEND THAT HE HIMSELF WILL USE THE EQUIPMENT TO DEFRAUD. RATHER, HE NEED MERELY INTEND THAT THE EQUIPMENT WILL BE USE BY HIMSELF OR ANOTHER TO DEFRAUD.

**\*\*3704** SECTION 1029(B) ADDRESSES ATTEMPT OFFENSES AND CONSPIRACY TO COMMIT OFFENSES OUTLINED IN SUBSECTION (A). SUBSECTION 1029(B)(1) WOULD MAKE IT AN OFFENSE TO ATTEMPT TO COMMIT ANY OF THE OFFENSES OUTLINED IN PROPOSED SUBSECTIONS (A)(1), (2), (3), AND (4), AND SUCH ATTEMPT WOULD BE SUBJECT TO THE PENALTIES OUTLINED IN SUBSECTION (C) OF THIS SECTION.

SUBSECTION (B)(2) WOULD MAKE IT AN OFFENSE FOR TWO OR MORE PERSONS TO CONSPIRE TO COMMIT ANY OF THE OFFENSES DESCRIBED IN SUBSECTION (A), IF ANY OF THE PARTIES ENGAGES IN ANY CONDUCT IN FURTHERANCE OF SUCH OFFENSE. THE SUBSECTION PROVIDES THAT THE PUNISHMENT FOR SUCH A CONSPIRACY OFFENSE WOULD BE THE MAXIMUM FINE SET OUT IN SUBSECTION (C) OR IMPRISONMENT FOR NO LONGER THAN ONE-HALF THE MAXIMUM PERIOD PROVIDED FOR SUCH AN OFFENSE UNDER SUBSECTION (C).

SUBSECTION 1029(C) LISTS THE PENALTIES FOR COMMITTING, ATTEMPTING TO COMMIT OR CONSPIRING TO COMMIT OFFENSES DESCRIBED IN SUBSECTION (A). IN LINE WITH THE FALSE IDENTIFICATION CRIME CONTROL ACT OF 1982 (18 U.S.C. 1028), THE PENALTIES ARE GRADUATED BASED UPON THE SERIOUSNESS OF THE OFFENSE INVOLVED, THE DAMAGES RESULTING, AND THE OFFENDER'S PRIOR OFFENSES IN THE AREA. AS WAS EARLIER SPECIFIED IN SUBSECTION (B) (2), THE PUNISHMENT FOR CONSPIRACY OFFENSES WOULD BE THE MAXIMUM FINES SET OUT IN SUBSECTION (C) OR IMPRISONMENT FOR NO LONGER THAN ONE-HALF THE MAXIMUM TIME PROVIDED FOR SUCH AN OFFENSE.

SUBSECTION 1029(C)(1) WOULD AUTHORIZE A MAXIMUM FINE OF $10,000 OR TWICE THE VALUE OBTAINED BY THE OFFENSE AND/OR A MAXIMUM TERM OF IMPRISONMENT OF 10 YEARS FOR OFFENSES OR ATTEMPTED OFFENSES INVOLVING TRAFFICKING IN OR USE OF ONE OR MORE UNAUTHORIZED ACCESS DEVICES AND THEREBY OBTAINING $1,000 OR MORE IN VALUE DURING ANY 12-MONTH PERIOD OR POSSESSION OF FIFTEEN OR MORE COUNTERFEIT OR UNAUTHORIZED ACCESS DEVICES.

SUBSECTION 1029(C)(2) PROVIDES A MAXIMUM FINE OF $50,000 OR TWICE THE VALUE OBTAINED BY THE OFFENSES AND/OR A MAXIMUM TERM OF IMPRISONMENT OF 15 YEARS FOR OFFENSES RELATING TO PRODUCING, TRAFFICKING IN OR USING ONE OR MORE COUNTERFEIT ACCESS DEVICES OR PRODUCING, TRAFFICKING IN OR POSSESSING DEVICE-MAKING EQUIPMENT. THE COMMITTEE CONSIDERS THESE AS MORE SERIOUS OFFENSES THAN SEC. 1029(A)(2) OR (A)(3).

SUBSECTION 1029(C)(3) OUTLINES PENALTIES FOR REPEATED OFFENSES. A MAXIMUM FINE OF $100,000 OR TWICE THE VALUE OBTAINED AND/OR A MAXIMUM TERM OF IMPRISONMENT OF 20 YEARS IS PROVIDED FOR ANY OFFENSE UNDER A CONVICTION FOR ANY PRIOR OFFENSE UNDER SUBSECTION (A). A PRINCIPAL PURPOSE OF THIS SUBSECTION IS TO PROVIDE A DETERRENT AGAINST REPEATED OFFENSES BY DEFENDANTS WHO ARE ENGAGED IN THIS TYPE OF ILLEGAL ENTERPRISE.

SECTION 1029(D) GIVES AUTHORITY TO THE SECRET SERVICE, IN ADDITION TO ANY OTHER AGENCY HAVING JURISDICTION SUCH AS THE FEDERAL BUREAU OF INVESTIGATION (OR THE U.S. POSTAL SERVICE UNDER TITLE 15), TO INVESTIGATE OFFENSES UNDER THIS NEW SECTION. THE SECRET SERVICE CURRENTLY HAS JURISDICTION OVER COUNTERFEITING OFFENSES INVOLVING U.S. AND FOREIGN **\*19** CURRENCY, AND THE COMMITTEE HAS CONCLUDED THAT CONCURRENT JURISDICTION IS ALSO APPROPRIATE HERE. THE COMMITTEE HAS THAT THE DEPARTMENT OF THE TREASURY AND THE DEPARTMENT OF JUSTICE SPELL OUT THEIR VARIOUS RESPONSIBILITIES IN ORDER TO BETTER COORDINATE **\*\*3705** THEIR INVESTIGATIVE PROCEDURES AND BELIEVES THIS SHOULD BE ACCOMPLISHED PRIOR TO ANY ACTIVITY UNDER THIS SECTION.

SECTION 1029(E) CONTAINS DEFINITIONS. SUBSECTION (E)(1) DEFINES 'ACCESS DEVICE' TO INCLUDE ANY CARD, PLATE, CODE, ACCOUNT NUMBER OR OTHER MEANS OF ACCOUNT ACCESS THAT CAN BE USED, ALONE OR IN CONJUNCTION WITH ANOTHER ACCESS DEVICE, TO OBTAIN MONEY, GOODS SERVICES, OR ANY OTHER THING OF VALUE, OR THAT CAN BE USED TO INITIATE A TRANSFER OF FUNDS (OTHER THAN A TRANSFER ORIGINATED SOLELY BY PAPER INSTRUMENT). THIS WOULD COVER CREDIT CARDS, DEBIT CARDS, ACCOUNT NUMBERS AND COMBINATIONS OF THESE AND OTHER METHODS OF OBTAINING MONEY, GOODS AND SERVICES. THE DEFINITION OF THIS TERM IS BROAD ENOUGH TO ENCOMPASS FUTURE TECHNOLOGICAL CHANGES AND THE ONLY LIMITATION I.E., '(OTHER THAN A TRANSFER ORIGINATED SOLEY BY PAPER INSTRUMENT)' EXCLUDES ACTIVITIES SUCH AS PASSING FORGED CHECKS. THIS DEFINITION, HOWEVER, INCLUDES THE INVOICES, VOUCHERS, SALES DRAFTS AND OTHER MANIFESTATIONS OF ACCESS DEVICES USED BETWEEN MERCHANTS AND CREDIT CARD COMPANIES FOR PAYMENT FOR ACCESS DEVICE TRANSACTIONS. THUS, ANY SUCH PAPER MEDIUM WOULD ITSELF BE AN 'ACCESS DEVICE ' QUITE APART FROM ANY CARD, PLATE OR SIMILAR DEVICE THAT MAY HAVE BEEN USED IN CREATING SUCH A PAPER INSTRUMENT.

THE PHRASE USED 'ALONG OR IN CONJUNCTION WITH ANOTHER ACCESS DEVICE' IS INTENDED TO COVER ANY ACCOUNT ACCESS ELEMENTS OR MEANS OF IDENTIFICATION CURRENTLY AVAILABLE OR THAT MAY BECOME TECHNOLOGICALLY AVAILABLE, WHICH MAY BE USED IN CONNECTION WITH ACCOUNTS BUT WHICH THEMSELVES MAY NOT BE 'ACCESS DEVICES'. AN EXAMPLE OF THIS WOULD BE A PERSONAL IDENTIFICATION NUMBER (PIN) WHICH MAY BE USED IN CONNECTION WITH CARD ACCESS DEVICES.

SECTION 1029(E)(2) DEFINES 'COUNTERFEIT ACCESS DEVICE' AS ANY ACCESS DEVICE THAT IS COUNTERFEIT, FICTITIOUS, ALTERED, OR FORGED, OR AN 'IDENTIFIABLE COMPONENT OF AN ACCESS DEVICE OR A COUNTERFEIT ACCESS DEVICE'. THE TERM 'FICTITIOUS' IS INTENDED TO COVER A NUMBER OF DIFFERENT TYPES OF COUNTERFEIT DEVICES, INCLUDING REPRESENTATIONS, DEPICTIONS OR FACSIMILES OF AN ACCESS DEVICE.

THE DEFINITION IS INTENDED TO BE SUFFICIENTLY BROAD TO COVER COMPONENTS OF AN ACCESS DEVICE OR A COUNTERFEIT ACCESS DEVICE, BUT WOULD EXCLUDE INDISTINGUISHABLE RAW MATERIALS. THE COMPONENTS WOULD INCLUDE ELEMENTS OF DEVICES THAT ARE LEGITIMATE BUT OBTAINED OR USED WITH AN INTENT TO DEFRAUD. THUS, ANY IDENTIFIABLE COMPONENT, WHETHER IT IS IN FACT AN ACTUAL COMPONENT THAT HAS BEEN OBTAINED IN SOME FASHION BY A PERPETRATOR WITH AN INTENT TO DEFRAUD OR A FALSE OR COUNTERFEIT SUBSTITUTE FOR A LEGITIMATE COMPONENT, WOULD FALL WITHIN THE DEFINITION OF COUNTERFEIT ACCESS DEVICE. THE COMMITTEE INTENDS THE TERM 'COMPONENT' TO INCLUDE

INCOMPLETE ACCESS DEVICES OR COUNTERFEIT ACCESS DEVICES, SUCH AS ANY MAG STRIPS, HOLOGRAMS, SIGNATURE PANELS, MICROCHIPS, AND BLANK CARDS OF SO-CALLED 'WHITE PLASTIC.'

SUBSECTION (E)(3) DEFINES 'UNAUTHORIZED ACCESS DEVICE' AS AN ACCESS DEVICE THAT IS LOST, STOLEN, EXPIRED, REVOKED, CANCELLED OR OBTAINED WITH INTENT TO DEFRAUD. THE COMMITTEE WOULD DISTINGUISH BETWEEN ACTIVITY INVOLVING A CRIMINAL OR AN ORGANIZED CRIME RING THAT TRAFFICS IN THIS TYPE OF CARD, AND ACTIVITY WHICH WOULD INVOLVE A  *20  VALID CARD OWNER WHO KNOWINGLY USED AN EXPIRED OR REVOKED CARD. THE LATTER ACTIVITY IS MORE APPROPRIATELY HANDLED BY STATE AND LOCAL AUTHORITIES OR IN CIVIL ACTIONS BY CREDIT CARD COMPANIES.

 **3706  SUBSECTION (E)(4) DEFINES 'PRODUCE' AS INCLUDING DESIGN, ALTER, AUTHENTICATE, DUPLICATE, OR ASSEMBLE AND IS USED IN CONJUNCTION WITH COUNTERFEIT ACCESS DEVICES AND DEVICE-MAKING EQUIPMENT.

SUBSECTION (E)(5) DEFINES 'TRAFFIC' TO MEAN TRANSFER OR OTHERWISE DISPOSE OF, TO ANOTHER, OR OBTAIN CONTROL OF, WITH INTENT TO TRANSFER OR DISPOSE OF COUNTERFEIT OR UNAUTHORIZED ACCESS DEVICES OR DEVICE-MAKING EQUIPMENT. THE COMMITTEE INTENDS THAT THIS TERM INCLUDE THE CONCEPTS OF BUYING, SELLING, TRANSFERRING, RECEIVING, PLEDGING, DISTRIBUTING, LOANING OR GIVING PROPERTY.

SUBSECTION (E)(6) DEFINES 'DEVICE-MAKING EQUIPMENT' AS ANY EQUIPMENT, MECHANISM, OR IMPRESSION DESIGNED OR PRIMARILY USED FOR MAKING ACCESS DEVICES OR COUNTERFEIT ACCESS DEVICES. THE SUBCOMMITTEE ON CRIME DELETED THE WORD 'SPECIALLY' BEFORE THE WORD 'DESIGNED' IN ORDER TO AVOID AN UNDULY NARROW INTERPRETATION OF THIS PROVISION. THE COMMITTEE INTENDS COVERAGE OF, FOR EXAMPLE, EQUIPMENT DESIGNED FOR A BROAD RANGE OF ACTIVITIES, ONE OF WHICH IS A TYPE OF ACTIVITY INVOLVED IN THE ILLEGAL PRODUCTION OF ACCESS DEVICES. WE DO NOT INTEND COVERAGE UNDER THE 'DESIGNED' BRANCH OF THE OFFENSE TO BE LIMITED TO EQUIPMENT DESIGNED ONLY FOR DEVICE-MAKING.

COMPUTER CRIME

SUBSECTION 1030(A)(1) PROHIBITS (A FELONY) ACCESSING A COMPUTER WITHOUT AUTHORIZATION OR, IF AUTHORIZED, ABUSING THAT AUTHORIZATION WITH INTENT TO EXECUTE A FRAUD IF THAT FRAUD CULMINATES IN $5,000 OF VALUE TO THE DEFENDANT, OTHER THAN MERELY THE USE OF THE COMPUTER, IF SUCH CONDUCT AFFECTS INTERSTATE OR FOREIGN COMMERCE. THIS SUBSECTION INVOKES THE BROAD FEDERAL JURISDICTION OF 'AFFECTS INTERSTATE OR FOREIGN COMMERCE' AS DESCRIBED UNDER SUBSECTION 1029(A) BUT LIMITS IT TO CONDUCT THAT OBTAINS VALUE OF $5,000 OR MORE WITHIN A 1-YEAR PERIOD. THE PHRASE 'OTHER THAN THE USE OF THE COMPUTER' IS TO EXCLUDE 'TIME STEALING' FROM THE FELONY OFFENSE.

THE 'KNOWING' STATE OF MIND IN SEC. 1030(A) IS THE SAME AS DESCRIBED UNDER SEC. 1029(A) IN THIS SECTION-BY-SECTION ANALYSIS. THE LANGUAGE IN THIS SUBSECTION WAS CHANGED FROM H.R. 5616 AS INTRODUCED TO CONFORM TO LANGUAGE IN THE MAIL AND WIRE FRAUD STATUTES (18 U.S.C. 1341 AND 1343). IT IS NOTEWORTHY THAT SECTION 1030 DEALS WITH AN 'UNAUTHORIZED ACCESS' CONCEPT OF COMPUTER FRAUD RATHER THAN THE MERE USE OF

A COMPUTER. THUS, THE CONDUCT PROHIBITED IS ANALOGOUS TO THAT OF 'BREAKING AND ENTERING' RATHER THAN USING A COMPUTER (SIMILAR TO THE USE OF A GUN) IN COMMITTING THE OFFENSE.

SUBSECTION 1030(A)(2) PROHIBITS (A FELONY) ACCESSING A COMPUTER WITHOUT AUTHORIZATION, OR IT AUTHORIZED, ABUSING THAT AUTHORIZATION AND OBTAINING WHAT GENERICALLY IS CONSIDERED TO BE CLASSIFIED INFORMATION. THERE IS NO NEED TO PROVE A DOLLAR THRESHOLD UNDER THIS SUBSECTION. THE ABILITY TO SHOW A SPECIFIC DOLLAR VALUE OF GAIN OR LOSS IN THIS AREA WOULD BE DIFFICULT AND THE FEDERAL INTEREST IN PROHIBITING UNAUTHORIZED ACCESS ITSELF IS DEEMED SUFFICIENT TO WARRANT A FELONY CLASSIFICATION.

*21 THE CHANGE AT THE FULL COMMITTEE LEVEL FROM THE LANGUAGE IN H.R. 5616, AS INTRODUCED, WAS TO SPELL OUT THE DEFINITION OF CLASSIFIED INFORMATION IN THE CLASSIFIED INFORMATION PROCEDURES ACT (18 U.S.C. APPENDIX III) AND ALTER THE LANGUAGE TO CONFORM WITH EXISTING ESPIONAGE **3707 LAWS (18 U.S.C. 793). IN DOING SO WE HAVE INCLUDED THE LANGUAGE 'WITH INTENT OR REASON TO BELIEVE THAT THE INFORMATION TO BE OBTAINED IS TO BE USED TO THE INJURY OF THE UNITED STATES, OR TO THE ADVANTAGE OF ANY FOREIGN NATION.' AS THE SUPREME COURT STATED IN GORIN V. U.S., (312 U.S. 19, 28), 'THIS REQUIRES THOSE PROSECUTED TO HAVE ACTED IN BAD FAITH. THE SANCTIONS APPLY ONLY WHEN SCIENTER IS ESTABLISHED.'

SECTION 1030(A)(3) DESCRIBES AND PUNISHES TWO CATEGORIES OF MISDEMEANOR OFFENSES THAT MAY BE COMMITTED WITH RESPECT TO THE TYPE OF INFORMATION PROTECTED BY THE RIGHT TO FINANCIAL PRIVACY ACT (12 U.S.C. 3401 ET SEQ.) OR THE FAIR CREDIT REPORTING ACT (15 U.S.C. 1681 ET SEQ.). FIRST, IT WOULD BE A FEDERAL OFFENSE FOR ANYONE TO ACCESS A COMPUTER AND OBTAIN SUCH INFORMATION KNOWING THAT THE ACCESS IS UNAUTHORIZED. SECOND, THE PROVISION ALSO WOULD MAKE IT A CRIMINAL OFFENSE FOR ANYONE WHO HAS BEEN AUTHORIZED TO USE A COMPUTER TO ACCESS IT KNOWING THAT THE ACCESS IS FOR A PURPOSE NOT CONTEMPLATED BY THE AUTHORIZATION. AS A RESULT, IT PROHIBITS ACCESS TO A COMPUTER TO OBTAIN THE DESCRIBED DATA WHEN THE PERPETRATOR KNOWS THAT THE ACCESS IS NOT AUTHORIZED OR THAT IT IS NOT WITHIN THE SCOPE OF A PREVIOUS AUTHORIZATION. THE PROVISION DOES NOT ATTEMPT TO REACH THE SCOPE OF INFORMATION INCIDENTALLY OBTAINED OR THE USE OF INFORMATION THAT HAS BEEN OBTAINED LEGITIMATELY. THE PROVISION THEREFORE DOES NOT EXTEND TO ANY TYPE OR FORM OF COMPUTER ACCESS THAT IS FOR A LEGITIMATE BUSINESS PURPOSE. THUS, ANY ACCESS FOR A LEGITIMATE PURPOSE THAT IS PURSUANT TO AN EXPRESS OR IMPLIED AUTHORIZATION WOULD NOT BE AFFECTED. THE PROVISION DOES NOT EXTEND TO NORMAL AND CUSTOMARY BUSINESS PROCEDURES AND INFORMATION USAGE AND SO THESE LEGITIMATE PRACTICES WILL NOT BE INTERRUPTED OR OTHERWISE AFFECTED. IT IMPOSES CRIMINAL SANCTIONS UPON 'HACKERS' AND OTHER CRIMINALS WHO ACCESS COMPUTERS WITHOUT AUTHORIZATION.

THE SUBSTANTIVE INFORMATION THAT WOULD BE PROTECTED BY THIS PROVISION IS INFORMATION THAT IS WITHIN THE SCOPE OF THE RIGHT TO FINANCIAL PRIVACY ACT AND THE FAIR CREDIT REPORTING ACT. FOR EXAMPLE, THE RIGHT TO FINANCIAL PRIVACY ACT RESTRICTS THE DISCLOSURE BY FINANCIAL INSTITUTION TO A FEDERAL GOVERNMENTAL AGENCY OF RECORDS RELATING TO CUSTOMERS OF THE FINANCIAL INSTITUTION WHO ARE INDIVIDUALS OR PARTNERSHIPS CONSISTING OF FIVE OR FEWER PARTNERS. THEREFORE, THIS PROVISION IS INTENDED TO MAKE A FEDERAL OFFENSE TO ACCESS-- KNOWING THAT THE

ACCESS IS UNAUTHORIZED-- A COMPUTER MAINTAINED BY A 'FINANCIAL INSTITUTION ' AND THEREBY OBTAIN INFORMATION RELATING TO AN INDIVIDUAL OR A PARTNERSHIP OF FIVE OR FEWER INDIVIDUALS, IF SUCH INFORMATION IS IDENTIFIED WITH OR IDENTIFIABLE AS BEING DERIVED FROM THE FINANCIAL RECORDS OF A PARTICULAR CUSTOMER. THERE IS NO REQUIREMENT, HOWEVER, THAT THE OFFENDER BE AN EMPLOYEE OF, OR OTHERWISE BE ASSOCIATED WITH, A FEDERAL GOVERNMENTAL AGENCY.

SIMILARLY, THE FAIR CREDIT REPORTING ACT IS INTENDED TO RESTRICT THE DISSEMINATION OF INFORMATION IN A 'FILE' RELATING TO AN INDIVIDUAL'S CREDIT WORTHINESS, CREDIT STANDING, CREDIT CAPACITY, CHARACTER, GENERAL REPUTATION, PERSONAL CHARACTERISTICS, OR MODE OF LIVING MAINTAINED BY A 'CONSUMER REPORTING AGENCY,' SUCH AS A CREDIT **\*22** BUREAU. SECTION 1030(A)(3) IS INTENDED TO MAKE IT A 'FEDERAL OFFENSE TO ACCESS-- WITH KNOWLEDGE THAT THE ACCESS IS UNAUTHORIZED-- THIS INFORMATION.

**\*\*3708** SUBSECTION 1030(A)(4) PROHIBITS (A MISDEMEANOR) ACCESSING ANY COMPUTER WITHOUT AUTHORIZATION, OF IF AUTHORIZED, ABUSING THAT AUTHORIZATION IF IN SO DOING A DEFENDANT OBTAINS ANYTHING, OR CAUSES A LOSS, OF A VALUE TO ANOTHER. THE FEDERAL JURISDICTIONAL THRESHOLD IS THAT THERE MUST BE $5,000 WORTH OF BENEFIT TO THE DEFENDANT OR LOSS TO ANOTHER IN ORDER TO CONCENTRATE FEDERAL RESOURCES ON THE MORE SUBSTANTIAL COMPUTER OFFENSES THAT AFFECT INTERSTATE OR FOREIGN COMMERCE. THERE IS ALSO AN EXCLUSION IN THIS OFFENSE IF THE DEFENDANT HAS AUTHORIZATION TO USE THE COMPUTERS AND MERELY ABUSES THAT AUTHORIZATION BY MEANS OF USE OF 'TIME STEALING.' THIS LATTER OFFENSE SHOULD BE HANDLED PRIVATELY OR AT THE STATE OR LOCAL LEVEL.

SUBSECTION 1030(A)(5) PROHIBITS ACCESSING A COMPUTER WITHOUT AUTHORIZATION, OR IF AUTHORIZED, ABUSING THAT AUTHORIZATION, IF IN SO DOING A DEFENDANT USES, MODIFIES, DESTROYS OR DISCLOSES INFORMATION IN, OR PREVENTS AUTHORIZED USE OF SUCH COMPUTER AND IF THE COMPUTER IS OPERATED FOR OR ON BEHALF OF THE GOVERNMENT OF THE UNITED STATES REGARDLESS OF ANY DOLLAR 'THRESHOLD.'

THIS SUBSECTION REQUIRES THAT 'SUCH CONDUCT AFFECTS SUCH OPERATION'; THIS PHRASE IS TO COVER COMPUTERS WHICH ARE USED ONLY PART-TIME FOR THE U.S. GOVERNMENT. IF SUCH CONDUCT DOES NOT SUBSTANTIALLY AFFECT THE U.S. GOVERNMENT OPERATION, THE PROSECUTIONS, IF ANY, WOULD HAVE TO FALL WITHIN (A)(3) OR (A)(4). THERE IS ALSO AN EXCLUSION IN THIS SUBSECTION OF A PERSON AUTHORIZED TO ACCESS A GOVERNMENT COMPUTER WHO MERELY EXCEEDS SUCH AUTHORIZATION BY THE USE OF A COMPUTER IN, FOR EXAMPLE, DOING ONE'S HOMEWORK OR PLAYING COMPUTER GAMES. IT IS THE FELLING OF THE COMMITTEE THAT THIS TYPE OF CONDUCT SHOULD BE HANDLED ADMINISTRATIVELY.

SECTION 1030(B) PROHIBITS ATTEMPTS TO VIOLATE (A), WITH THE SAME SANCTIONS AS PROVIDED FOR THE COMPLETED OFFENSE, AND SETS UP A SEPARATE CONSPIRACY OFFENSE WITH THE PRISON PENALTY ONE-HALF THAT OF THE COMPLETED OFFENSE.

SECTION 1030(C)(1) AUTHORIZES A FINE OF $10,000 OR ALTERNATE FINE OF UP TO TWICE THE VALUE OF THE GAIN AND IMPRISONMENT OF UP TO 10 YEARS FOR A SUBSECTION (A)(1) OR (A)(2) COMPUTER FRAUD OFFENSE OR ATTEMPT, AND AN ESCALATION OF ($100,000 OR 20 YEARS) FOR A SUBSEQUENT OFFENSE.

SUBSECTION 1030(C)(2) AUTHORIZES A FINE OF $5,000 OR AN ALTERNATE FINE OF UP TO TWICE THE VALUE OBTAINED OR LOST AND IMPRISONMENT OF UP TO 1 YEAR (MISDEMEANOR) UNDER SUBSECTION (A)(3), (A)(4), OR (A)(5) AND AN ESCALATION TO $10,000 OR THE ALTERNATE FINE AND UP TO 10 YEARS FOR A SUBSEQUENT OFFENSE.

SUBSECTION 1030(D) WOULD GRANT TO THE SECRET SERVICE CONCURRENT JURISDICTION TO INVESTIGATE VIOLATIONS OF THIS SECTION. AS IN SUBSECTION 1029(D), HOWEVER, THIS AUTHORITY SHALL BE IN ACCORDANCE WITH AN AGREEMENT BETWEEN THE DEPARTMENT OF THE TREASURY AND THE DEPARTMENT OF JUSTICE TO INSURE COORDINATION AND THIS AGREEMENT SHOULD PRECEDE ACTIVITY UNDER THIS SECTION.

SUBSECTION 1030(E) DEFINES THE TERM 'COMPUTER' AS AN ELECTRONIC, MAGNETIC, OPTICAL, ELECTROCHEMICAL, OR OTHER HIGH SPEED DATA PROCESSING DEVICE PERFORMING LOGICAL, ARITHMETIC, OR STORAGE FUNCTIONS, AND INCLUDES ANY DATA STORAGE FACILITY OR COMMUNICATIONS FACILITY **23** DIRECTLY RELATED TO OR OPERATING IN CONJUNCTION WITH SUCH DEVICE, BUT SUCH TERM DOES NOT INCLUDE AN AUTOMATED TYPEWRITER OR TYPESETTER, A PORTABLE HAND-HELD CALCULATOR, OR OTHER SIMILAR DEVICE.

**3709** THE WHOLE ISSUE OF DEFINING THE WORD 'COMPUTER' HAS PLAGUED THE CONSIDERATION OF COMPUTER CRIME LEGISLATION SINCE ITS EARLY DAYS (SEE, COMPUTER SYSTEMS PROTECTION ACT OF 1979, S. 240: HEARING BEFORE THE SUBCOMMITTEE ON CRIMINAL JUSTICE OF THE SENATE COMMITTEE ON THE JUDICIARY, 96TH CONGRESS, 2ND SESSION 8(1980). INITIALLY, IT WAS THE SUBCOMMITTEE ON CRIME'S OPINION THAT THE DICTIONARY DEFINITION WAS AS GOOD AS ONE AVAILABLE CONSIDERING THE VOLATILE STATE OF TECHNOLOGY IN THIS AREA. THE COMMITTEE DECIDED, HOWEVER, THAT A SPECIFIC DEFINITION WAS DESIRABLE IN ORDER TO AVOID ATTACKS UPON THE STATUTE ON THE GROUNDS OF VAGUENESS. THE DEFINITION IN THE BILL IS A COMBINATION OF THAT SUGGESTED BY THE DEPARTMENT OF JUSTICE AND CONGRESSMAN NELSON'S BILL, THE FEDERAL COMPUTER SYSTEMS PROTECTION ACT OF 1983 (H.R. 1092).

SUBSECTIONS 1030(B) MERELY AMENDS THE TABLE OF SECTIONS OF CHAPTER 47.

SECTION 3 SETS UP A REPORTING REQUIREMENT IN REGARD TO PROSECUTIONS UNDER THIS BILL FOR THE NEXT 3 YEARS.

OVERSIGHT FINDINGS

THE COMMITTEE MAKES NO OVERSIGHT FINDINGS WITH RESPECT TO THIS LEGISLATION OTHER THAN THOSE INCLUDED IN THE TEXT OF THIS REPORT.

IN REGARD TO CLAUSE 2(L)(3)(D) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, NO OVERSIGHT FINDINGS HAVE BEEN SUBMITTED TO THE COMMITTEE BY THE COMMITTEE ON GOVERNMENT OPERATIONS.

NEW BUDGET AUTHORITY

IN REGARD TO CLAUSE 2(L)(3)(B) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, H.R. 3626 CREATES NO NEW BUDGET AUTHORITY OR INCREASED TAX EXPENDITURES FOR THE FEDERAL GOVERNMENT.

## INFLATIONARY IMPACT STATEMENT

PURSUANT TO CLAUSE 2(L)(4) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE FINDS THAT THE BILL WILL HAVE NO FORESEEABLE INFLATIONARY IMPACT ON PRICES OR COSTS IN THE OPERATION OF THE NATIONAL ECONOMY.

## FEDERAL ADVISORY COMMITTEE ACT OF 1972

THE COMMITTEE FINDS THAT THIS LEGISLATION DOES NOT CREATE ANY NEW ADVISORY COMMITTEES WITHIN THE MEANING OF THE FEDERAL ADVISORY COMMITTEE ACT OF 1972.

## COST ESTIMATE

IN REGARD TO CLAUSE 7 OF RULE XIII OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE AGREES WITH THE COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE.

## *24  STATEMENT OF THE CONGRESSIONAL BUDGET OFFICE

PURSUANT TO CLAUSE 2(L)(3)(C) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, AND SECTION 403 OF THE CONGRESSIONAL BUDGET **3710 ACT OF 1974, THE FOLLOWING IS THE COST ESTIMATE ON H.R. 5616 PREPARED BY THE CONGRESSIONAL BUDGET OFFICE.

U.S. CONGRESS,

CONGRESSIONAL BUDGET OFFICE,

WASHINGTON, D.C., JULY 20, 1984.

HON. PETER W. RODINO, JR.,

CHAIRMAN COMMITTEE ON THE JUDICIARY,

HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: THE CONGRESSIONAL BUDGET OFFICE HAS REVIEWED H.R. 5616, THE COUNTERFEIT ACCESS DEVICE AND COMPUTER FRAUD AND ABUSE ACT OF 1984, AS ORDERED REPORTED BY THE HOUSE COMMITTEE ON THE JUDICIARY, JUNE 26, 1984. WE ESTIMATE THAT NO SIGNIFICANT COST TO THE FEDERAL GOVERNMENT, OR TO STATE OR LOCAL GOVERNMENTS WOULD RESULT FROM ENACTMENT OF THIS BILL.

H.R. 5616 MAKES IT A FEDERAL CRIME TO USE, POSSESS, TRAFFIC IN, OR PRODUCE ANY COUNTERFEIT OR UNAUTHORIZED CARD, CODE, ACCOUNT NUMBER, OR OTHER MEANS OF

ACCOUNT ACCESS. DEPENDING UPON THE VIOLATION, A FIRST-TIME OFFENSE MAY RESULT IN A FINE OF THE GREATER OF $50,000 OR TWICE THE VALUE OBTAINED BY THE OFFENSE AND A PRISON TERM OF UP TO 15 YEARS. SUBSEQUENT OFFENSES WOULD RESULT IN MORE SEVERE PENALTIES. THE BILL ALSO PROVIDES PENALTIES FOR PERSONS WHO ACCESS A COMPUTER WITHOUT AUTHORIZATION, OR ABUSE THEIR AUTHORIZED USE OF A COMPUTER TO DEFRAUD, TO OBTAIN CLASSIFIED INFORMATION, TO PREVENT AUTHORIZED USE OF THE COMPUTER, OR TO DISCLOSE OR MODIFY INFORMATION. DURING THE FIRST THREE YEARS FOLLOWING ENACTMENT, THE ATTORNEY GENERAL SHALL SUBMIT ANNUAL REPORTS TO THE CONGRESS CONCERNING ANY PROSECUTIONS MADE UNDER THESE PROVISIONS.

BASED ON INFORMATION FROM THE DEPARTMENT OF JUSTICE, WE EXPECT THAT THE BILL WOULD PROVIDE A MORE SPECIFIC STATUTE ON WHICH TO BASE THE INVESTIGATION AND PROSECUTION OF SUCH ACTIVITIES, WHICH THE JUSTICE DEPARTMENT IS CURRENTLY UNDERTAKING UNDER OTHER AUTHORITY. ENACTMENT OF THE BILL IS NOT EXPECTED TO RESULT IN A SIGNIFICANT CHANGE IN THE GOVERNMENT'S LAW ENFORCEMENT PRACTICES, AND NO SIGNIFICANT COSTS ARE EXPECTED TO RESULT.

IF YOU WISH FURTHER DETAILS ON THIS ESTIMATE, WE WILL BE PLEASED TO PROVIDE THEM.

SINCERELY,

RUDOLPH G. PENNER, DIRECTOR.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 98-894, H.R. Rep. No. 894, 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 3689, 1984 WL 37453 (Leg.Hist.)

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**


# EXHIBIT Z

S. Rep. No. 432, 99TH Cong., 2ND Sess. 1986, 1986

U.S.C.C.A.N. 2479, 1986 WL 31918, S. REP. 99-432 (Leg.Hist.)

**2479 P.L. 99–474, COMPUTER FRAUD AND ABUSE ACT OF 1986

DATES OF CONSIDERATION AND PASSAGE

House June 3, October 6, 1986

Senate October 1, 3, 1986

House Report (Judiciary Committee) No. 99–612,

May 22, 1986 [To accompany H.R. 4718]

Senate Report (Judiciary Committee) No. 99–432,

Sept. 3, 1986 [To accompany S. 2281]

Cong. Record Vol. 132 (1986)

The House bill was passed in lieu of the Senate bill after amending its language
to contain much of the text of the Senate bill. The Senate Report is set out below.

SENATE REPORT NO. 99−432

September 3, 1986

*1  The Committee on the Judiciary, to which was referred the bill (S. 2281) to amend title 18, United States Code,
to provide additional penalties for fraud and related activities in connection with access devices and computers, and for
other purposes, having considered the same, reports favorably thereon with amendments and recommends that the bill,
as amended, do pass.

* * * * *

## I. GENERAL STATEMENT AND HISTORY OF THE LEGISLATION

During the past several years, the Congress has been investigating the problems of computer fraud and abuse to
determine whether  *2  Federal criminal laws should be revised to cope more effectively with such acts. The Judiciary
Committee's concern about these problems has become more pronounced as computers proliferate in businesses and
homes across the nation and as evidence mounts that existing criminal laws are insufficient to address the problem of
computer crime.

For some time, the United States has been in the midst of a technological explosion. The Federal Government alone
operates more than 18,000 medium-scale and large-scale computers at some 4,500 different sites, and the Office of
Technology Assessment estimates the Government's investment in computers over the past four years at roughly $60
billion. The General Services Administration estimates that there will be 250,000 to 500,000 computers in use by the
Federal Government by 1990.

Computer use has also become much more widespread among the nation's private sector. In 1978, there were an
estimated 5,000 desk-top computers in this country; today there are nearly 5 million. Financial institutions, in particular,
rely heavily on computer  **2480  communications; for instance, the Bureau of Justice Statistics reported that in 1983,
corporate transfers of funds via computer totaled more than $100 trillion. [1]  In addition, more than 100,000 personal
computers have been installed in the country's schools, and computers are found in millions of American homes.

This technological explosion has made the computer a mainstay of our communications system, and it has brought
a great many benefits to the government, to American businesses, and to all of our lives. But it has also created a new
type of criminal—one who uses computers to steal, to defraud, and to abuse the property of others. The proliferation
of computers and computer data has spread before the nation's criminals a vast array of property that, in many cases,
is wholly unprotected against crime.

In June 1984, the American Bar Association Task Force on Computer Crime, chaired by Joseph Tompkins, Jr., issued its Report on Computer Crime (hereinafter referred to as the 'ABA Report'), a study based upon a survey of approximately 1,000 private organizations and public agencies. [2] The ABA Report found that more than 50 percent of the 283 respondents had been victimized by some form of computer crime, [3] and that more than 25 percent of the respondents had sustained financial losses totaling between an estimated $145 million and $730 million during one twelve-month period. [4] The ABA Report also concluded that computer crime is among the worst white-collar offenses. [5] The Committee agrees but notes particularly that computer crimes pose a threat that is not solely financial in nature.

In 1983, for example, a group of adolescents known as the '414 Gang' broke into the computer system at Memorial Sloan-Kettering Cancer Center in New York. In so doing, they gained access to **\*3** the radiation treatment records of 6,000 past and present cancer patients and had at their fingertips the ability to alter the radiation treatment levels that each patient received. No financial losses were at stake in this case, but the potentially life-threatening nature of such mischief is a source of serious concern to the Committee.

Similarly, so-called 'pirate bulletin boards' have sprung up around the country for the sole purpose of exchanging passwords to other people's computer systems. The *Richmond (Va.) Times-Dispatch* recently reported that three such bulletin boards operating in Virginia carry information on how to break into the computers of the U.S. Defense Department and the Republican National Committee. While financial losses resulting from such pirate bulletin boards may not be imminent, the Committee believes that knowingly trafficking in other people's computer passwords should be proscribed.

It is clear that much computer crime can be prevented by those who are potential targets of such conduct. The ABA Report indicated that while the respondents to the survey overwhelmingly supported **\*\*2481** a Federal computer crime statute, [6] they also believed that the most effective means of preventing and deterring computer crime is 'more comprehensive and effective self-protection by private business' [7] and that the primary responsibility for controlling the incidence of computer crime falls upon private industry and individual users, rather than on the Federal, State, or local governments. [8] The Committee strongly agrees with these views.

The Committee also finds that education programs for both computer users and the general public should be undertaken to make young people and others aware of the ethical and legal questions at stake in the use of computers and to deflate the myth that computer crimes are glamorous, harmless pranks. The respondents to the ABA survey indicated strong support for such programs, [9] many of which are underway throughout the nation. The Committee commends those education and security improvement efforts and urges their continuation.

At the same time, the Committee finds that Federal criminal penalties for computer crime are an appropriate punishment for certain acts and can serve to deter would-be computer criminals and to reinforce education and security improvement programs.

To that end, both the Senate and House have devoted considerable attention to determining how the Federal Government can best approach computer-related crimes. The first Federal computer crime statute was enacted in 1984 as part of P.L. 98–473. This is the present 18 U.S.C. 1030, which makes it a felony to access classified information in a computer without authorization and makes it a misdemeanor to access financial records or credit histories in financial institutions or to trespass into a Government computer.

Legislation was introduced in both the Senate and House early in the 99th Congress to expand and to amend 18 U.S.C. 1030. On **\*4** May 23, 1985, the House Subcommittee on Crime held a hearing on H.R. 1001 (introduced

by Representative William J. Hughes (D-N.J.) and H.R. 930 (introduced by Representative Bill Nelson (D-Fla.). Representative Bill McCollum, R-Fla., subsequently introduced a computer crime bill, H.R. 3381, at the request of the Department of Justice. The Senate Subcommittee on Criminal Law held a hearing on October 30, 1985, on two computer crime bills: S. 440 (introduced by Senator Paul Trible (R-Va.) and S. 1678 (introduced by Senator Strom Thurmond, (R-S.C., at the request of the Department of Justice). S. 1678 is the Senate companion to H.R. 3381.

As a result of the testimony given at both the Senate and House hearings, Senator Trible and Representative Hughes introduced identical computer crime bills (S. 2281 and H.R. 4562) on April 10, 1986. The House Subcommittee on Crime considered H.R. 4562 on April 23, and on April 30 the subcommittee forwarded a clean bill, H.R. 4718, to the Committee on the Judiciary in lieu of H.R. 4562. The Committee on the Judiciary ordered H.R. 4718, as amended, reported on May 6 (see House Report 99–612), and on June 3 the House passed the bill by voice vote. In the Senate, the Committee on the Judiciary held a hearing on S. 2281 on April 16, 1986. The **2482 Committee ordered the bill, as amended, reported to the Senate on June 12, 1986.

Throughout its consideration of computer crime, the Committee has been especially concerned about the appropriate scope of Federal jurisdiction in this area. It has been suggested that, because some States lack comprehensive computer crime statutes of their own, the Congress should enact as sweeping a Federal statute as possible so that no computer crime is potentially uncovered. The Committee rejects this approach and prefers instead to limit Federal jurisdiction over computer crime to those cases in which there is a compelling Federal interest, i.e., where computers of the Federal Government or certain financial institutions are involved, or where the crime itself is interstate in nature. The Committee is convinced that this approach strikes the appropriate balance between the Federal Government's interest in computer crime and the interests and abilities of the States to proscribe and punish such offenses.

S. 2281, as reported by the Committee, is a consensus bill aimed at deterring and punishing certain 'high-tech' crimes in a manner consistent with the States' own criminal laws in this area.

## II. DISCUSSION OF COMMITTEE ACTION AND AMENDMENTS

On June 12, 1986, the Committee on the Judiciary met and unanimously ordered S. 2281 reported favorably to the full Senate. Several minor amendments were also approved unanimously by the Committee.

The first amendment was a technical change to page two, line eight of the bill, made necessary because of the second Committee amendment. That second amendment struck lines 9–24, relating to unauthorized access of Government computers, on page two, and inserted in their place the language that forms the new subsection 18 U.S.C. 1030(a)(3), as reported. That subsection is explained in detail in the section-by-section analysis of this Report.

**5 The third Committee amendment struck the new subsection (a)(5) from S. 2281 as introduced, and replaced it with amended language. In so doing the Committee added to (a)(5) the words 'damages, or destroys' to make explicit the subsection's application to acts—such as erasing data—that go beyond mere alteration of information. This amendment also changed 'that computer' (as written in the original S. 2281) to 'any such Federal interest computer'. The Committee wanted to prevent the possibility that a defense would be raised to the effect that the information that was altered, damaged, or destroyed, was not in the very same computer on to which the offender had signed. The use of 'any such Federal interest computer' makes clear that no such defense is possible. This amendment also deleted 'another' from the portion of S. 2281 relating to subsection (a)(5); the phrase 'one or more others' was inserted in its place. The Committee does not intend that every victim of acts proscribed under (a)(5) must individually suffer a loss of $1,000. Certain types of malicious mischief may cause smaller amounts of damages to numerous individuals, and thereby collectively create a loss of more than $1,000. By using 'one or more **2483 others', the Committee intends to make clear that losses caused by the same act may be aggregated for purposes of meeting the $1,000 threshold. Finally, this amendment added to the coverage of the new subsection (a)(5) acts that alter, damage, or destroy computerized medical records, and thereby

impair or threaten to impair an individual's medical care. The Committee's rationale for this addition is explained more fully in the section-by-section analysis pertaining to the new 18 U.S.C. 1030(a)(5).

The fourth Committee amendment changed 'such use' to 'the use of the financial institution's operation or the Government's operation of such computer'. This change simply makes clear that a computer that is not used exclusively by the United States Government or by a financial institution, as that term is defined by proposed 18 U.S.C. 1030(e)(4), is a Federal interest computer only to the extent that its use by the Government or the financial institution is affected. This clarification also appears in the Committee's amendment affecting proposed 18 U.S.C. 1030(a)(3).

The fifth Committee amendment was merely a technical change made necessary because the sixth Committee amendment added 'department of the United States' to the list of terms defined in the bill.

### III. SECTION-BY-SECTION ANALYSIS

The following is a section-by-section analysis of S. 2281, as reported by the Committee on the Judiciary.

Section 1 of the bill contains its short title, the 'Computer Fraud and Abuse Act of 1986'.

Section 2(a)(1) amends 18 U.S.C. 1030(a)(2) to change the scienter requirement from 'knowingly' to 'intentionally', for two reasons. First, intentional acts of unauthorized access—rather than mistaken, inadvertent, or careless ones—are precisely what the Committee intends to proscribe. Second, the Committee is concerned that the 'knowingly' standard in the existing statute might be inappropriate for cases involving computer technology. The Senate's **\*6** Report on the Criminal Code (Report No. 96–1396, pg. 33, citing *United States* v. *United States Gypsum Co.*, 438 U.S. 422, 425 [9a] (1978)), states that a person is 'said to act knowingly if he is aware 'that the result is practically certain to follow from his conduct, whatever his desire may be as to that result." (Footnote omitted.) While appropriate to many criminal statutes, this standard might not be sufficient to preclude liability on the part of those who inadvertently 'stumble into' someone else's computer file or computer data. This is particularly true in those cases where an individual is authorized to sign onto and use a particular computer, but subsequently exceeds his authorized access by mistakenly entering another computer file or data that happens to be accessible from the same terminal. Because the user had 'knowingly' signed onto that terminal in the first place, the danger exists that he might incur liability for his mistaken access to another file. This is so because, while he may not have desired that result, i.e., the access of another **\*\*2484** file, it is possible that a trier of fact will infer that the user was 'practically certain' such mistaken access could result from his initial decision to access the computer. The substitution of an 'intentional' standard is designed to focus Federal criminal prosecutions on those whose conduct evinces a clear intent to enter, without proper authorization, computer files or data belonging to another. Again, this will comport with the Senate Report on the Criminal Code, which states that "intentional' means more than that one voluntarily engaged in conduct or caused a result. Such conduct or the causing of the result must have been the person's conscious objective.' (Footnote omitted.)

Section 2(a)(2) deletes from the existing 18 U.S.C. 1030(a)(2) the phrase 'as such terms are defined in the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et seq.),'. The terms to which that phrase is applicable, 'financial institution' and 'financial record,' are defined in section (2)(g) of S. 2281.

The premise of 18 U.S.C. 1030(a)(2) will remain the protection, for privacy reasons, of computerized credit records and computerized information relating to customers' relationships with financial institutions. This protection is imperative in light of the sensitive and personal financial information contained in such computer files. However, by referring to the Right to Financial Privacy Act, the current statute limits its coverage to financial institution customers who are individuals, or are partnerships with five or fewer partners. The Committee intends S. 2281 to extend the same privacy protections to the financial records of all customers—individual, partnership, or corporate—of financial institutions.

The Department of Justice has expressed concerns that the term 'obtains information' in 18 U.S.C. 1030(a)(2) makes that subsection more than an unauthorized access offense, i.e., that it might require the prosecution to prove asportation of the data in question. [10] Because the premise of this subsection is privacy protection, the Committee wishes to make clear that 'obtaining information' in this context includes mere observation of the data. Actual asportation, in the sense of physically removing the data from its original  *7  location or transcribing the data, need not be proved in order to establish a violation of this subsection.

Section 2(b) of S. 2281 provides a substitute for the present 18 U.S.C. 1030(a)(3), and is designed to accomplish several goals.

First, it will change the scienter requirement from 'knowingly' to 'intentionally'. The same explanation offered for section 2(a)(1) is applicable here.

Second, section 2(b) will clarify the present 18 U.S.C. 1030(a)(3), making clear that it applies to acts of simple trespass against computers belonging to, or being used by or for, the Federal Government. The Department of Justice and others have expressed concerns about whether the present subsection covers acts of mere trespass, i.e., unauthorized access, or whether it requires a further showing that the information perused was 'used, modified, destroyed, or disclosed.' [11] To alleviate those concerns, the Committee  **2485  wants to make clear that the new subsection will be a simple trespass offense, applicable to persons without authorized access to Federal computers.

The Committee wishes to be very precise about who may be prosecuted under the new subsection (a)(3). The Committee was concerned that a Federal computer crime statute not be so broad as to create a risk that government employees and others who are authorized to use a Federal Government computer would face prosecution for acts of computer access and use that, while technically wrong, should not rise to the level of criminal conduct. At the same time, the Committee was required to balance its concern for Federal employees and other authorized users against the legitimate need to protect Government computers against abuse by 'outsiders.' The Committee struck that balance in the following manner.

In the first place, the Committee has declined to criminalize acts in which the offending employee merely 'exceeds authorized access' to computers in his own department ('department' is defined in section 2(g) of S. 2281). It is not difficult to envision an employee or other individual who, while authorized to use a particular computer in one department, briefly exceeds his authorized access and peruses data belonging to the department that he is not supposed to look at. This is especially true where the department in question lacks a clear method of delineating which individuals are authorized to access certain of its data. The Committee believes that administrative sanctions are more appropriate than criminal punishment in such a case. The Committee wishes to avoid the danger that every time an employee exceeds his authorized access to his department's computers—no matter how slightly—he could be prosecuted under this subsection. That danger will be prevented by not including 'exceeds authorized access' as part of this subsection's offense.

In the second place, the Committee has distinguished between acts of unauthorized access that occur within a department and those that involve trespasses into computers belonging to another department. The former are not covered by subsection (a)(3); the latter are. Again, it is not difficult to envision an individual who,  *8  while authorized to use certain computers in one department, is not authorized to use them all. The danger existed that S. 2281, as originally introduced, might cover every employee who happens to sit down, within his department, at a computer terminal which he is not officially authorized to use. These acts can also be best handled by administrative sanctions, rather than by criminal punishment. To that end, the Committee has constructed its amended version of (a)(3) to prevent prosecution of those who, while authorized to use some computers in their department, use others for which they lack the proper authorization. By precluding liability in purely 'insider' cases such as these, the Committee also seeks to alleviate concerns raised by Senators Mathias and Leahy that the existing statute casts a wide net over 'whistleblowers,' who disclose information they have gleaned from a government computer. Senators Mathias and Leahy first expressed their concerns in 1984  **2486  about the effect of the current statute on whistleblowers. Their concerns were embodied in S. 610, a

bill they introduced early in the 99th Congress. (See, Statements by Senator Mathias and Senator Leahy, Congressional Record of March 7, 1985; pp. S 2728–2730. See also their 'Additional Views' in this report.)

The Committee has thus limited 18 U.S.C. 1030(a)(3) to cases where the offender is completely outside the Government, and has no authority to access a computer of any agency or department of the United States, or where the offender's act of trespass is interdepartmental in nature. The Committee does not intend to preclude prosecution under this subsection if, for example, a Labor Department employee authorized to use Labor's computers accesses without authorization an FBI computer. An employee who uses his department's computer and, without authorization, forages into data belonging to another department, is engaged in conduct directly analagous to an 'outsider' tampering with Government computers. In both cases, the user is wholly lacking in authority to access or use that department's computer. The Committee believes criminal prosecution should be available in such cases.

The Committee acknowledges that in rare circumstances this may leave serious cases of intradepartmental trespass free from criminal prosecution under (a)(3). However, the Committee notes that such serious acts may be subject to other criminal penalties if, for example, they violate trade secrets laws or 18 U.S.C. 1030(a)(1), (a)(4), (a)(5), or (a)(6), as proposed in this legislation. The Committee believes this to be the best means of balancing the legitimate need to protect the Government's computers against the need to prevent unwarranted prosecutions of Federal employees and others authorized to use Federal computers.

The third goal of Section 2(b) is to clarify subsection (a)(3) to make clear that one trespassing in a computer used only part-time by the Federal Government need not be shown to have affected the operation of the government as a whole. The Department of Justice has expressed concerns that the present subsection's language could be construed to require a showing that the offender's conduct harmed the overall operation of the Government and that this would be an exceedingly difficult task for Federal prosecutors. [12]  **9**  Accordingly, Section 2(b) will make clear that the offender's conduct need only affect the use of the Government's operation of the computer in question.

Section 2(c) substitutes the phrase 'exceeds authorized access' for the more cumbersome phrase in present 18 U.S.C. 1030(a)(1) and (a)(2), 'or having accessed a computer with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend'. The Committee intends this change to simplify the language in 18 U.S.C. 1030(a)(1) and (2), and the phrase 'exceeds authorized access' is defined separately in Section (2)(g) of the bill.

Section (2)(d) adds three new offenses to 18 U.S.C. 1030. The new subsection 1030(a)(4) to be created by this bill is designed to penalize thefts of property via computer that occur as part of a scheme  **2487**  to defraud. It will require a showing that the use of the computer or computers in question was integral to the intended fraud and was not merely incidental. It has been suggested that the Committee approach all computer fraud in a manner that directly tracks the existing mail fraud and wire fraud statutes. However, the Committee was concerned that such an approach might permit prosecution under this subsection of acts that do not deserve classification as 'computer fraud.'

The Committee was concerned that computer usage that is wholly extraneous to an intended fraud might nevertheless be covered by this subsection if the subsection were patterned directly after the current mail fraud and wire fraud laws. If it were so paterned, the subsection might be construed as covering an individual who had devised a scheme or artifice to defraud solely because he used a computer to keep records or to add up his potential 'take' from the crime. The Committee does not believe that a scheme or artifice to defraud should fall under the ambit of subsection (a)(4) merely because the offender signed onto a computer at some point near to the commission or execution of the fraud. While such a tenuous link might be covered under current law where the instrumentality used is the mails or the wires, the Committee does not consider that link sufficient with respect to computers. To be prosecuted under this subsection, the use of the computer must be more directly linked to the intended fraud. That is, it must be used by an offender without authorization or in excess of his authorization to obtain property of another, which property furthers the intended fraud. Likewise, this subsection may be triggered by conduct that can be shown to constitute an attempted offense.

This approach is designed, in part, to help distinguish between acts of theft via computer and acts of computer trespass. In intentionally trespassing into someone else's computer files, the offender obtains at the very least information as to how to break into that computer system. If that is all he obtains, the offense should properly be treated as a simple trespass. But because the offender has obtained the small bit of information needed to get into the computer system, the danger exists that his and every other computer trespass could be treated as a theft, punishable as a felony under this subsection. A similar problem arises from recommendations made to the Committee that every act of unauthorized access to a 'Federal interest computer' be treated as theft of computer time, **\*10** punishable under this subsection as part of a scheme to defraud. The Committee agrees that the mere use of a computer or computer service has a value all its own. Mere trespasses onto someone else's computer system can cost the system provider a 'port' or access channel that he might otherwise be making available for a fee to an authorized user. At the same time, the Committee believes it is important to distinguish clearly between acts of fraud under (a)(4), punishable as felonies, and acts of simple trespass, punishable in the first instance as misdemeanors. That distinction would be wiped out were the Committee to treat every trespass as an attempt to defraud a service provider of computer time. One simply cannot trespass into another's computer without occupying a portion of the time that that computer service is available. Thus, **\*\*2488** that suggested approach would treat every act of unauthorized entry to a Federal interest computer—no matter how brief—as an act of fraud, punishable at the felony level. The Committee does not believe this is a proper approach to this problem. For that reason, the Committee has excluded from coverage under this subsection those instances where 'the object of the fraud and the thing obtained consists only of the use of the computer.'

However, the Committee agrees that lost computer time resulting from repeated or sustained trespasses can reach a level of seriousness sufficient to warrant Federal prosecution. The Committee believes such instances are more appropriately punished under the provision of the new subsection (a)(5) relating to preventing authorized use of a computer. A more detailed explanation of the Committee's intent respecting lost computer time is contained in the analysis for (a)(5).

The Committee remains convinced that there must be a clear distinction between computer theft, punishable as a felony, and computer trespass, punishable in the first instance as a misdemeanor. The element in the new paragraph (a)(4), requiring a showing of an intent to defraud, is meant to preserve that distinction, as is the requirement that the property wrongfully obtained via computer furthers the intended fraud. The new felony created by this subsection limits its jurisdiction to 'Federal interest computers.' These are defined in Section (2)(g) of the bill as computers used by the Federal Government or by financial institutions, or as computers located in different States.

The scienter requirement for this subsection, 'knowingly and with intent to defraud,' is the same as the standard used for 18 U.S.C. 1029 relating to credit card fraud.

The new subsection 1030(a)(5) to be created by the bill is designed to penalize those who intentionally alter, damage, or destroy certain computerized data belonging to another. The 'intentional' standard is the same as that employed in Section 2(a)(1) and 2(b)(1) of the bill. Like the new subsection 18 U.S.C. 1030(a)(3), this subsection will be aimed at 'outsiders,' i.e., those lacking authorization to access any Federal interest computer. It will penalize alteration, damage, or destruction in two circumstances. The first is those which cause a loss to the victim or victims totalling $1,000 or more in any single year period. The Committee believes this threshold is necessary to prevent the bringing of felony-level charges against every individual who modifies another's computer data. Some **\*11** modifications or alterations, while constituting 'damage' in a sense, do not warrant felony-level punishment, particularly when almost no effort or expense is required to restore the affected data to its original condition. The $1,000 valuation has been reasonably calculated by the Committee to preclude felony punishment in those cases, while preserving the option of felony punishment in cases involving more serious alteration, damage, or destruction. In many instances where the requisite dollar amount cannot be shown, misdemeanor-level penalties will remain available against the offender under subsections 1030(a)(2) or 1030(a)(3).

The Department of Justice has suggested that the concept of 'loss' embodied in this subsection not be limited to the costs of **2489 actual repairs. The Committee agrees and intends that other expenses accruing to the victim—such as lost computer time and the cost of reprogramming or restoring data to its original condition—be permitted to count toward the $1,000 valuation. The Committee wishes to leave no doubt that it intends lost computer time to be covered by this subsection. Once again, the Committee recognizes the inherent value of using computer time or of occupying a portion of the time that a computer service is made available. Many commercial services obtain revenue by charging authorized subscribers for the amount of time they are using the service. An unauthorized user can therefore impose substantial costs on the service provider by tying up one channel of access—a channel that the provider might otherwise be leasing at a profit to an authorized subscriber. The Committee recognizes this danger, and intends subsection (a)(5) to cover cases where an offender, having obtained unauthorized access to the computer, prevents authorized use of such a computer by occupying an access channel or 'port' that is in demand by authorized subscribers. In the preceding discussion of subsection (a)(4), the Committee made clear that acts of trespass causing a loss of computer time should not be treated as acts of fraud for purposes of that subsection. However, it is clear that lost computer time can impose significant costs on providers of computer services. Where those costs total more than $1,000 in any one-year period, the Committee believes prosecution should be available under this subsection.

Likewise, the Committee intends that certain network communications costs be permitted to count toward the $1,000 valuation; a summary of a recent incident best illustrates this area. Often, a telecommunications firm (called the host company) will allow users from all other the country to access its computers by dialing a phone number that is local to the user. A second company (called a network company) will provide the service that connects the user, via phone lines, to the host company's computer, thus acting as a bridge between the two. The fee for the network company's service is often paid by the host company itself. In the incident under discussion, an unauthorized user programmed his computer to make repeated, automatic calls to the host company's computers in an effort to break into these computers. The effort to break in failed, but the user's automatic dialing mechanism made repeated use of the network company's communications service. In turn, the network company billed the host company for the time during which the unauthorized user had accessed its communications line. This *12 is obviously unfair to the host company. Where billings to a host company for incidents such as this exceed $1,000 in a one-year period, the Committee believes they should be subject to prosecution under this subsection.

Similarly, the Committee is concerned that authorized users of computer services might incur substantial costs as a result of relying on information contained in a database that has been tampered with. For example, an individual who invests in a stock, after having read a computerized market analysis that had been altered to make it appear the stock's potential had improved, has clearly **2490 incurred a cost. The Committee intends that those costs also be permitted to count toward the $1,000 valuation.

The second circumstance in which this subsection will penalize alteration, damage, or destruction is in connection with data relating to medical care and treatment. The Sloan-Kettering case discussed earlier in this report is but one example of computer crimes directed at altering medical treatment records. Where such conduct impairs or potentially impairs an individual's medical care, the Committee does not believe a showing of $1,000 in financial losses is necessary. Tampering with computerized medical treatment records, especially given the potentially life-threatening nature of such conduct, is serious enough to warrant punishment without a showing of pecuniary loss to the victim or victims. The Committee also wishes to make clear that convictions are attainable under this subsection without a showing that the victim was actually given an incorrect or harmful treatment, or otherwise suffered as a result of the changed medical record. That his examination, diagnosis, treatment, or care was potentially changed or impaired is sufficient to warrant prosecution under this subsection.

Two other important concerns have also been expressed to the Committee regarding the reach of the new subsection (a)(5). The first is that it might cover authorized 'repairs' to a computer system because 'alteration' of the data is part of the

gravamen of the offense, and repairs presumably can involve altering data. It is not the Committee's intent to criminalize properly authorized repair activities. For example, this section does not prohibit employees of communications common carriers from engaging in activities that are necessary to the repair of the carrier's service. The Committee believes that the requirement in subsection (a)(5) that alterations occur after an unauthorized access is sufficient in itself to preclude its application to authorized repairs but wishes to leave no doubt that authorized repair activities are not covered by (a)(5).

The second concern is that (a)(5) might be construed as criminalizing the use in computer leasing services of automatic termination devices or so-called 'time bombs'. Frequently, a provider of computer services will build into his program a mechanism that automatically terminates the service if a user fails to pay his bill for the service on time. Concerns have been expressed that the provider might be considered liable under (a)(5) for having 'prevented authorized use' of the service. That is not the Committee's intent. Having failed to pay his bill for the Committee service, the delinquent user is no longer an 'authorized user' of the service, and termination of his access to the service is not an offense under this subsection.

   **13**  The new subsection 1030(a)(6) to be created by the bill is a misdemeanor offense aimed at penalizing conduct associated with 'pirate bulletin boards,' where passwords are displayed that permit unauthorized access to others' computers. It will authorize prosecution of those who, knowingly and with intent to defraud, traffic in such computer passwords. If those elements are present—and if the password in question would enable unauthorized access to a Federal Government computer, or if the trafficking affects interstate or foreign commerce—this subsection may be invoked. The concept of **2491** 'traffic' means to transfer, or otherwise dispose of, to another, or to obtain control of with intent to transfer or dispose of such passwords; the concept was borrowed from 18 U.S.C. 1029 relating to credit card offenses. The Committee also wishes to make clear that 'password', as used in this subsection, does not mean only a single word that enables one to access a computer. The Committee recognizes that a 'password' may actually be comprised of a set of instructions or directions for gaining access to a computer and intends that the word 'password' be construed broadly enough to encompass both single words and longer more detailed explanations on how to access others' computers.

Section 2(e) eliminates the specific conspiracy offense in the present law. The Committee intends that such conduct be governed by the general conspiracy offense in 18 U.S.C. 371.

Section 2(f) conforms the 'fine' provisions of 18 U.S.C. 1030 and this bill with the general fine provisions of the Criminal Fine Enforcement Act of 1984. It also contains the penalty provisions for the two new felony provisions (5 years first offense, 10 years second offense) and one new misdemeanor/felony provision (one year first offense, 10 years second offense).

Section (2)(g) establishes definitions for a 'Federal interest computer,' 'State', 'financial institution', 'financial record', the term 'exceeds authorized access,' and the term 'department of the United States', all of which are self-explanatory. The only committee note is that obtaining information as encompassed in the definition for 'exceeds authorized access' would include observing information as we discussed under Section 2(a)(2) supra.

Section 2(h) conforms the exception for proper law enforcement and intelligence activity in the computer crime bill with the credit card legislation in 18 U.S.C. 1029(f).

Finally, the Committee wishes to make two general observations that apply to each of the computer crime offenses amended or created by S. 2281.

First, the Committee recognizes the necessity that computerized information be considered 'property' for purposes of Federal criminal law. To date, computer users for providers of computer services have had to wrestle with a criminal justice system that in many respects is ill-equipped to handle their needs. Computer technology simply does not fit some of the older, more traditional legal approaches to theft or abuse of property. For example, computer data may be 'stolen'

in the sense that it is copied by an unauthorized user, even though the original data has not been removed or altered in any way. As long ago as 1983, the Department of Justice stated that:

> **\*14** Any enforcement action in response to criminal conduct indirectly or directly related to computers must rely upon a statutory restriction dealing with some other offense. This requires the law enforcement officer, initially the agent, and then the prosecutor, to attempt to create a 'theory of prosecution' that somehow fits what may be the square peg of computer fraud into the round hole of **\*\*2492** theft, embezzlement or even the illegal conversion of trade secrets. [13]

These enforcement problems can largely be overcome by recognizing computerized information as property. The Congress began that recognition by enacting the Computer Fraud and Abuse Act of 1984. The Committee intends S. 2281 to affirm the government's recognition of computerized information as property.

Secondly, the Committee wishes to make clear its intent to distinguish between conduct that is completely inadvertent and conduct that is initially inadvertent but later becomes an intentional crime. It has been suggested that this is a difficult line to draw in the area of computer technology because of the possibility of mistakenly accessing another's computer files. Nevertheless, the Committee would expect one whose access to another's computer files or data was truly mistaken to withdraw immediately from such access. If he does not and instead deliberately maintains unauthorized access after a non-intentional initial contact, then the Committee believes prosecution is warranted. The individual's intent may have been formed after his initial, inadvertent access. But his is an intentional crime nonetheless, and the Committee does not wish to preclude prosecution in such instances.

## IV. AGENCY VIEWS

In its testimony on April 16, 1986, the Department of Justice supported S. 2281, although it recommended several amendments to the bill. [14] The Committee adopted some of those recommendations, including an amendment clarifying the degree to which the offense in subsection 1030(a)(3) must affect the operation of the Government computer in question. Many of the Department's recommendations were incorporated into the Committee's report on S. 2281.

## V. CONGRESSIONAL BUDGET OFFICE STATEMENT

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, June 25, 1986.*

Hon. STROM THURMOND,
*Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed S. 2281, the Computer Fraud and Abuse Act of 1986, as ordered **\*15** reported by the Senate Committee on the Judiciary, June 12, 1986. We estimate that no significant cost to the Federal Government, and no cost to State or local governments would result from enactment of this bill.

S. 2281 makes a number of amendments to Section 1030 of Title 18 of the United States Code, dealing with computer fraud and related activity. These amendments include several changes in the standards determining violations of the law. The bill extends the **\*\*2493** existing Federal privacy protection of computerized financial information to cover all such records of financial institutions, as defined in the bill, and clarifies the prohibition against unauthorized access of computers used by the U.S. government. S. 2281 also creates three new offenses involving theft in the form of unauthorized computer access with the intent to defraud, malicious damage through unauthorized computer access,

and trafficking in computer passwords with the intent to defraud. The provisions governing fines for new and existing offenses would be made to conform with the Criminal Fine Enforcement Act of 1984.

Based on information from the Department of Justice, we expect that S. 2281 would provide a more specific statute on which to base the investigation and prosecution of these activities, which the Department is currently undertaking under other authority. Enactment of the bill is not expected to result in a significant change in the government's law enforcement practices or expenditures.

If you wish further details on this estimate, we will be pleased to provide them.

With best wishes,

Sincerely,

RUDOLPH G. PENNER.

VI. REGULATORY IMPACT STATEMENT

Pursuant to paragraph 11(b), rule XXVI, of the Standing Rules of the Senate, the Committee has concluded that the bill will have no direct regulatory impact. The bill encourages, but does not require, the agencies and departments of the Federal Government to develop clear rules and sanctions regulating the use of Government computers by employees and other authorized individuals. The bill also encourages other owners and users of Federal interest computers to establish clear statements of the scope of authority for those who use the Federal interest computers.

\* \* \* \* \*

**\*20**  VIII. ADDITIONAL VIEWS OF MESSRS. MATHIAS AND LEAHY

We are pleased to join with our colleagues on the Judiciary Committee in reporting S. 2281, the Computer Fraud and Abuse Act of 1986. The authors of the legislation have effectively carried out a delicate and complex task. The result is a bill that offers an appropriate Federal response to the real and growing problem of computer crime.

The committee's report on S. 2281 thoroughly describes the scope of that problem, and the details of that response. As the report notes, this bill builds upon the computer crime legislation enacted in the closing days of the 98th Congress. We wish to emphasize that S. 2281 not only refines and extends the computer crime provisions of Public Law 98–473, it also refocuses that legislation on its principal objectives, and minimizes the likelihood that it will be misused to cut back on the American public's right to know about the activities of its government.

**\*\*2494**  As enacted in 1984, the provision now codified as section 1030(a)(3) of title 18 makes it a crime to 'knowingly use . . . or disclose information in [any] computer . . . operated for or on behalf of the Government of the United States,' when the defendant gains access to the computer without authorization or his conduct exceeds the scope of his authorization. By its literal terms, this provision sweeps in all computerized government information, including documents that must, under the Freedom of Information Act, be disclosed to any member of the public upon proper request. Section 1030(a)(3) also glosses over the reality that the existence or exact scope of a government employee's authority to access a particular computerized data base is not always free from doubt. Under these circumstances, any employee asked to release data that must be disclosed under the FOIA would be understandably reluctant to do so unless assured of the precise contours of his authorization to access it. An incorrect assertion of authorization could expose the employee to prosecution and imprisonment. Any prudent employee would resolve doubts against disclosure, a conclusion directly contrary to the principles of open government underlying the FOIA.

Motivated by these concerns arising from provisions of the House-passed computer crime bill, the Senate, on the next-to-last day of the 98th Congress, unanimously approved our amendment to the bill which narrowed the sweeping provisions of the disclosure offense under section 1030(a)(3). Unfortunately, in the rush toward adjournment, the House never acted on the Senate amendment to this bill. Instead, the free-standing computer crime legislation was overtaken by a continuing appropriations resolution, to which had been appended hundreds of pages of crime legislation, including portions of the unamended House computer crime bill. Thus, in a particularly graphic lesson in the shortcomings of legislation by  *21  rider, section 1030(a)(3) was signed into law, despite the Senate's unanimous view that its scope was too broad.

The bill we now report, unlike its predecessor, has had the benefit of nearly 2 years of careful scrutiny and study by the Subcommittee on Criminal Law. Among the many improvements that it would make is a complete revision of section 1030(a)(3). The revised provision includes three salutary features that minimize the possibility that this computer crime legislation could be misused to weaken the Freedom of Information Act, or to impose unnecessary obstacles to the public's right to know about government activities.

First, the mental state required to establish a violation of revised section 1030(a)(3) is increased from 'knowingly' to 'intentionally.' As the committee report points out, the 'intentional' standard precludes criminal liability for inadvertent acts of unauthorized access. Instead, it is 'designed to focus Federal criminal prosecutions on those who evince a clear intent to enter, without proper authorization, computer files or data belonging to another.'

Second, S. 2281 would eliminate coverage for authorized access that aims at 'purposes to which such authorization does not extend.' This removes from the sweep of the statute one of the murkier grounds of liability, under which a Federal employee's access to computerized data might be legitimate in some circumstances, but criminal in other (not clearly distinguishable) circumstances  **2495  that might be held to exceed his authorization. As the committee report points out, administrative sanctions should ordinarily be adequate to deal with real abuses of authorized access to Federal computers (assuming, of course, that no other provision of section 1030 is violated). Like the heightened scienter requirement, this change serves to minimize the likelihood that a Federal employee, uncertain about the scope of his authority, would face a Hobson's choice between the disclosure mandates of FOIA and the criminal sanctions of title 18.

Finally, revised section 1030(a)(3) would not apply to access by a Federal employee of computers of that employee's own agency. This exclusion recognizes the reality that computer access rules for employees within a single agency are rarely as clear as rules governing access by outsiders to that agency's computers. Revised section 1030(a)(3) would provide prosecutors a clear, workable rule, regardless of the intricacies of a particular agency's computer access policies: absent a fraudulent motive, an employee could not be prosecuted for simple 'trespass' into one of his agency's own computers.

Like any bright-line rule, this one does not conform perfectly to the behavior it addresses. To treat employees of other agencies as 'outsiders' for the purposes of this statute may, in an exceptional instance, work some hardship. The committee report notes that the revised subsection may, on rare occasions, prove underinclusive; as well, it may be overinclusive in unusual cases. The fact is that many Federal agency data bases are separated from those of sister agencies not by well-defined walls, but by permeable membranes. Information sharing may become computer sharing without formal protocols of authorization. Access by one who appears to be an 'outsider' to the agency may be not only excusable, but helpful to the agency's mission.

 *22  But certainly this imprecision can be accommodated. Just as other criminal sanctions may well be at hand in cases that fall through the net of the revised subsection (a)(3), so administrative sanctions—and, of course, the discretion not to prosecute—will remain available for those cases of interdepartmental unauthorized access that do not justify prosecution.

S. 2281's revisions to section 1030(a)(3) do not track the approach adopted by the Senate in 1984, and embodied in our bill in this Congress, S. 610, for correcting the course set by the 1984 computer crime legislation. Both the 1984 Senate amendment, and S. 610, focused on the disclosure aspect of the offense created by section 1030(a)(3), and sought to exclude from the offense information whose disclosure ought not to be discouraged. Because the revised subsection is a simple trespass offense, rather than one requiring disclosure or some other act beyond access to the data, our earlier approach to the problem is now less apposite. We think the balance struck by S. 2281 on this issue is reasonable. It largely ameliorates our concern about the effect of section 1030(a)(3) on the free flow of government information to the American people. It goes far toward restoring the incentive for Federal employees to comply voluntarily with the Freedom of Information Act in their dealings with requests **2496 for computerized government information. At the same time, it gives the Government an adequate prosecutorial tool for deterring and punishing unauthorized access to sensitive Government information by those who have no colorable claim of a right to obtain it outside proper channels.

In this and other aspects, S. 2281 constitutes a real improvement on existing computer crime law. The Subcommittee on Criminal Law, under Senator Laxalt's leadership, and its House counterpart, the Subcommittee on Crime, have crafted well-considered and constructive legislation, and we are pleased to support it.

1 Bureau of Justice Statistics, *Report on Electronic Funds Transfer Fraud*, March 1985, NCJ–96666.

2 *Report on Computer Crime;* Task Force on Computer Crime, Section of Criminal Justice, American Bar Association; June 1984)

3 Ibid., pp. 16–18, Table 12.

4 Ibid., p. 38.

5 Ibid., pp. 36–40.

6 Ibid., p. 44.

7 Ibid., p. 23, Table 17.

8 Ibid., p. 11, Table 8.

9 Ibid., p. 23, Table 17.

9a. 98 S.Ct. 2864, 57 L.Ed.2d 854.

10 Statement of Victoria Toensing, Deputy Assistant Attorney General, Criminal Division; before the Senate Judiciary Committee, April 16, 1986.

11 Ibid.

12 Ibid.

13 Statement by John C. Keeney, Deputy Assistant Attorney General, Criminal Division; before the Senate Subcommittee on Oversight of Government Management, Committee on Governmental Affairs; October 26, 1983.

14 See, Statement of Victoria Toensing, Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, before the Senate Judiciary Committee; April 16, 1986.

S. Rep. No. 432, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 2479, 1986 WL 31918, S. REP. 99-432 (Leg.Hist.)

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**


# EXHIBIT AA

CRIMES AND OFFENSES—COMPUTERS—VIOLATIONS, 1987 Cal. Legis. Serv....

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 138 of 187

1987 Cal. Legis. Serv. 1499 (West)

CALIFORNIA LEGISLATIVE SERVICE 1987-88
REGULAR SESSION (1987 Laws)

Additions are indicated by <<+ UPPERCASE +>>
Deletions by <<- * * * ->>
Changes in tabular material are not indicated

CHAPTER 1499
Senate Bill No. 255
CRIMES AND OFFENSES—COMPUTERS—VIOLATIONS

An act to repeal and add Section 502 of the Penal Code, and to amend Section 653.5 of, and to add Section 653.1 to, the Welfare and Institutions Code, relating to crimes.

LEGISLATIVE COUNSEL'S DIGEST

SB 255, Davis. Crimes.

(1) Existing law provides that it is a public offense to engage in certain unlawful activities with regard to a computer system, computer network, computer program, and computer data. Existing law also allows the owner or lessee of computer systems, networks, programs, or data to maintain a civil action against any person convicted of violating the criminal provisions for compensatory damages.

This bill would substantially recast existing law. It would expand the scope of the prohibited activity, as specified, thereby imposing a state-mandated local program. It would also revise the definitions of that law. This bill would also include provisions exempting persons engaged in designated employee labor relations activities from criminal liability. This bill would also provide that the criminal penalties imposed by this bill do not apply to employees accessing an employer's computer when acting within the scope of his or her employment, or the use, knowingly and without permission, of an employer's computer outside an employee's scope of employment which does not result in an injury to an employer, as defined, so long as the value of that use does not exceed $100.

This bill would specify that for purposes of bringing a civil or a criminal action under this law, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

(2) Under existing law, if a probation officer determines that juvenile court proceedings to declare a person a ward of the juvenile court on the basis of criminal conduct should be commenced, the probation officer is required to cause an affidavit to be taken to the prosecuting attorney.

This bill provides that a probation officer shall cause an affidavit alleging that a minor is within the jurisdiction of the juvenile court on the basis of criminal conduct to be taken immediately or within 48 hours, depending upon the age of the minor and the nature of the offense, to the prosecuting attorney if he or she determines that proceedings to declare the minor a ward of the juvenile court should be commenced. To the extent that the bill would require a higher level of service upon probation officers, it would constitute a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement, including the creation of a State

CRIMES AND OFFENSES—COMPUTERS—VIOLATIONS, 1987 Cal. Legis. Serv....

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 139 of 187

Mandates Claims Fund to pay the costs of mandates which do not exceed $500,000 statewide and other procedures for claims whose statewide costs exceed $500,000.

This bill would provide that for certain costs no reimbursement is required by this act for a specified reason.

However, the bill would provide that, if the Commission on State Mandates determines that this bill contains other costs mandated by the state, reimbursement for those costs shall be made pursuant to those statutory procedures and, if the statewide cost does not exceed $500,000, shall be payable from the State Mandates Claims Fund.

The people of the State of California do enact as follows:

Section 1. This act shall be known and may be cited as the "Comprehensive Computer Data Access and Fraud Act."

CA PENAL § 502

SEC. 2. Section 502 of the Penal Code is repealed.

CA PENAL § 502

Sec. 3. Section 502 is added to the Penal Code, to read:

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means two or more computer systems connected by telecommunication facilities.

(3) "Computer program or software" means a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network.

(5) "Computer system" means a device or collection of devices, including support devices and excluding calculators which are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control.

(6) "Data" means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

(7) "Supporting documentation" includes, but is not limited to, all information, in any form, pertaining to the design, construction, classification, implementation, use, or modification of a computer, computer system, computer network, computer program, or computer software, which information is not generally available to the public and is necessary for the operation of a computer, computer system, computer network, computer program, or computer software.

(8) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access.

CRIMES AND OFFENSES—COMPUTERS—VIOLATIONS, 1987 Cal. Legis. Serv....

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 140 of 187

(9) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(c) Except as provided in subdivision (i), any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(d)(1) Any person who violates any of the provisions of paragraph (1), (2), (4), or (5) of subdivision (c) is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(2) Any person who violates paragraph (3) of subdivision (c) is punishable as follows:

(A) For the first violation which does not result in injury, and where the value of the computer services used does not exceed four hundred dollars ($400), by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation which results in a victim expenditure in an amount greater than five thousand dollars ($5,000) or in an injury, or if the value of the computer services used exceeds four hundred dollars ($400), or for any second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(3) Any person who violates paragraph (6) or (7) of subdivision (c) is punishable as follows:

(A) For a first violation which does not result in injury, an infraction punishable by a fine not exceeding two hundred fifty dollars ($250).

(B) For any violation which results in a victim expenditure in an amount not greater than five thousand dollars ($5,000), or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(C) For any violation which results in a victim expenditure in an amount greater than five thousand dollars ($5,000), by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in the county jail not exceeding one year, or by both that fine and imprisonment.

(e)(1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data may bring a civil action against any person convicted under this section for compensatory damages, including any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

Case 3:17-cv-03301-EMC Document 48-1 Filed 07/20/17 Page 141 of 187

CRIMES AND OFFENSES—COMPUTERS—VIOLATIONS, 1987 Cal. Legis. Serv....

(2) In any action brought pursuant to this subdivision the court may award reasonable attorney's fees to a prevailing party.

(f) This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any transaction, nor shall it make illegal any employee labor relations activities that are within the scope and protection of state or federal labor laws.

(g) This section applies only to public offenses committed on or after January 1, 1988. It is the intent of the Legislature that this section be given no retroactive effect and persons who commit a violation of the provisions of Section 502 in effect prior to January 1, 1988, shall be held responsible therefor.

(h) Any computer, computer system, computer program, instrument, apparatus, device, plans, instructions, or written publication used in the commission of any public offense described in subdivision (c) may be seized under warrant or incident to a lawful arrest. Any property seized under this subdivision is subject to forfeiture pursuant to Section 502.01.

(i)(1) Subdivision (c) does not apply to any person who accesses his or her employer's computer system, computer network, computer program, or data when acting within the scope of his or her lawful employment.

(2) Paragraph (3) of subdivision (c) does not apply to any employee who accesses or uses his or her employer's computer system, computer network, computer program, or data when acting outside the scope of his or her lawful employment, so long as the employee's activities do not cause an injury, as defined in paragraph (8) of subdivision (b), to the employer or another, or so long as the value of computer services, as defined in paragraph (4) of subdivision (b), which are used do not exceed one hundred dollars ($100).

(j) No activity exempted from prosecution under paragraph (2) of subdivision (i) which incidentally violates paragraph (2), (4), or (7) of subdivision (c) shall be prosecuted under those paragraphs.

(k) For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

## CA WEL & INST § 653.1

SEC. 4. Section 653.1 is added to the Welfare and Institutions Code, to read:

Notwithstanding Section 653, in the case of an affidavit alleging that the minor committed an offense described in Section 602, the probation officer shall cause the affidavit to be immediately taken to the prosecuting attorney if it appears to the probation officer that the minor has been referred to the probation officer for any violation of an offense listed in subdivision (b) of Section 707 and that offense was allegedly committed when the minor was 16 years of age or older. If the prosecuting attorney decides not to file a petition, he or she may return the affidavit to the probation officer for any other appropriate action.

## CA WEL & INST § 653.5

SEC. 5. Section 653.5 of the Welfare and Institutions Code is amended to read:

(a) Whenever any person applies to the probation officer to commence proceedings in the juvenile court, the application shall be in the form of an affidavit alleging that there was or is within the county, or residing therein, a minor within the provisions of Section 602, or that a minor committed an offense described in Section 602 within the county, and setting forth facts in support thereof. The probation officer shall immediately make any investigation he or she deems necessary to determine whether proceedings in the juvenile court shall be commenced.

(b) Except as provided in subdivision (c), if the probation officer determines that proceedings pursuant to Section 650 should be commenced to declare a person to be a ward of the juvenile court on the basis that he or she is a person described in Section 602, the probation officer shall cause the affidavit to be taken to the prosecuting attorney.

(c) Notwithstanding the provisions of subdivision (b), the probation officer shall cause the affidavit to be taken within 48 hours to the prosecuting attorney in all of the following cases:

(1) If it appears to the probation officer that the minor has been referred to the probation officer for any violation of an offense listed in subdivision (b) of Section 707.

Case 3:17-cv-03301-EMC Document 48-1 Filed 07/20/17 Page 142 of 187

CRIMES AND OFFENSES—COMPUTERS—VIOLATIONS, 1987 Cal. Legis. Serv....

(2) If it appears to the probation officer that the minor is under 16 years of age at the date of the offense and that the offense constitutes a second felony referral to the probation officer.

(3) If it appears to the probation officer that the minor was 16 years of age or older at the date of the offense and that the offense constitutes a felony referral to the probation officer.

The provisions of subdivision (c) shall not apply to a narcotics and drug offense set forth in Section 1000 of the Penal Code.

The prosecuting attorney shall within his or her discretionary power institute proceedings in accordance with his or her role as public prosecutor pursuant to subdivision (b) of Section 650 and Section 26500 of the Government Code. However, if it appears to the prosecuting attorney that the affidavit was not properly referred, that the offense for which the minor was referred should be charged as a misdemeanor, or that the minor may benefit from a program of informal supervision, he or she shall refer the matter to the probation officer for whatever action the probation officer may deem appropriate.

(d) In all matters where the minor is not in custody and is already a ward of the court or a probationer under Section 602, the prosecuting attorney, within five judicial days of receipt of the affidavit from the probation officer, shall institute proceedings in accordance with his or her role as public prosecutor pursuant to subdivision (b) of Section 650 of this code and Section 26500 of the Government Code, unless it appears to the prosecuting attorney that the affidavit was not properly referred or that the offense for which the minor was referred requires additional substantiating information, in which case he or she shall immediately notify the probation officer of what further action he or she is taking.

UNCODIFIED AND/OR SPECIAL MATERIAL IS NOT DISPLAYED.

Approved by Governor September 30, 1987.

Filed with Secretary of State September 30, 1987.

CA LEGIS (1987) 1499

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 5

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**


# EXHIBIT BB

NORMS OF COMPUTER TRESPASS, 116 Colum. L. Rev. 1143

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 144 of 187

**116 Colum. L. Rev. 1143**

Columbia Law Review

May, 2016

Essay

Orin S. Kerr[a1]

Copyright © 2016 by the Directors of The Columbia Law Review Association, Inc.; Orin S. Kerr

## NORMS OF COMPUTER TRESPASS

*This Essay develops an approach to interpreting computer trespass laws, such as the Computer Fraud and Abuse Act, that ban unauthorized access to a computer. In the last decade, courts have divided sharply on what makes access unauthorized. Some courts have interpreted computer trespass laws broadly to prohibit trivial wrongs such as violating terms of use to a website. Other courts have limited the laws to harmful examples of hacking into a computer. Courts have struggled to interpret authorization because they lack an underlying theory of how to distinguish authorized from unauthorized access.*

*This Essay argues that authorization to access a computer is contingent on trespass norms--shared understandings of what kind of access invades another person's private space. Judges are unsure of how to apply computer trespass laws because the Internet is young and its trespass norms are unsettled. In the interim period before norms emerge, courts should identify the best rules to apply as a matter of policy. Judicial decisions in the near term can help shape norms in the long term. The remainder of the Essay articulates an appropriate set of rules using the principle of authentication. Access is unauthorized when the computer owner requires authentication to access the computer and the access is not by the authenticated user or his agent. This principle can resolve the meaning of authorization before computer trespass norms settle and can influence the norms that eventually emerge.*

INTRODUCTION                                                                                          1144
I. TRESPASS IN PHYSICAL SPACE                                                         1148
A. Authorization and Social Norms                                                     1148
B. The Nature of the Space                                                                  1150
C. Means of Access                                                                              1152
D. Context of Access                                                                            1152
II. THE NORMS OF COMPUTER TRESPASS                                          1153
A. The Inevitability of Norms in Computer Trespass Law                    154
B. Because Computer Trespass Norms Are Unsettled, Courts Should Identify the Best Norms to Apply                                                                                                           1155
C. Trespass Law Provides the Appropriate Framework to Resolve Computer Misuse, and Courts Can Meet the Challenge                                                                                    1159
III. NORMS OF THE WORLD WIDE WEB                                              1161
A. The Inherent Openness of the Web                                                   1162
B. Authorized Access on the Web                                                         1163
C. Unauthorized Access on the Web and the Authentication Requirement          1171

IV. CANCELED, BLOCKED, AND SHARED ACCOUNTS      1174
A. Canceled Accounts      1175
B. New Accounts Following the Banning of an Old Account      1176
C. Password Sharing      1178
D. The Critical Role of Mens Rea      1180
CONCLUSION      1182

## *1144 INTRODUCTION

The federal government and all fifty states have enacted criminal laws that prohibit unauthorized access to a computer. [1] At first blush, the meaning of these statutes seems clear. [2] The laws prohibit trespass into a computer network just like traditional laws ban trespass in physical space. [3] Scratch below the surface, however, and the picture quickly turns cloudy. [4] Courts applying computer trespass laws have divided deeply over **\*1145** when access is authorized. [5] Circuit splits have emerged, with judges frequently expressing uncertainty and confusion over what computer trespass laws criminalize. [6]

Consider the facts of seven recent federal cases involving the federal unauthorized access law, the Computer Fraud and Abuse Act (CFAA). [7] In each case, the line between guilt and innocence hinged on a dispute over authorization:

1. An employee used his employer's computer at work for personal reasons in violation of a workplace rule that the computer could only be used for official business. [8]

2. An Internet activist logged on to a university's open network using a new guest account after his earlier guest account was blocked. [9]

3. Two men used an automated program to collect over 100,000 email addresses from a website that had posted the information at hard-to-guess addresses based on the assumption that outsiders would not find it. [10]

4. A man accessed a corporate account on a website using login credentials that he purchased from an employee in a secret side deal. [11]

5. A company collected information from Craigslist after Craigslist sent the company a cease-and-desist letter and blocked the company's IP address. [12]

 **\*1146** 6. A company used an automated program to purchase tickets in bulk from Ticketmaster's website despite the website's use of a barrier designed to block bulk purchases by automated programs. [13]

7. A former employee continued to access his former employer's computer network using a backdoor account that the former employer had failed to shut down. [14]

On the surface, there are plausible arguments on both sides of these cases. The prosecution can argue that access was unwanted, at least in some sense, and therefore was unauthorized. The defense can argue that access was allowed, at least in some sense, and therefore was authorized. [15] Liability hinges on what concept of authorization applies. However, courts have not yet identified a consistent approach to authorization. Authorization is not defined under most computer trespass statutes, and the statutory definitions that exist are generally circular. [16] Violating computer trespass laws can lead to severe punishment, often including several years in prison for each violation. [17] And yet several decades after the widespread enactment of computer trespass statutes, the meaning of authorization remains remarkably unclear.

This Essay offers a framework to distinguish between authorized and unauthorized access to a computer. It argues that concepts of authorization rest on trespass norms. As used here, trespass norms are broadly shared attitudes about what conduct amounts to an uninvited entry into another person's private space. [18] Relying on the example of physical-world trespass, this Essay contends that the scope of trespass crimes follows from identifying trespass norms in three ways: first, characterizing the nature of the space; second, identifying the means of permitted access; and third, **1147** identifying the context of permitted entry. These three steps can be used to identify the norms of computer trespass and to give meaning to criminal laws on unauthorized access.

Interpreting computer trespass laws raises an important new twist. Although trespass norms in physical space are relatively settled and intuitive, computer trespass norms online are often unsettled and contested. The Internet is new and rapidly changing. No wonder courts have struggled to apply these laws: Doing so requires choosing among unsettled norms in changing technologies that judges may not fully understand. In that context, courts cannot merely identify existing norms. Instead, they must identify the best rules to apply from a policy perspective, given the state of technology and its prevailing uses. Published court decisions can then help establish norms consistent with those rules.

After first identifying the conceptual challenges of applying computer trespass laws, this Essay argues that the principle of authentication provides the most desirable basis for computer trespass norms. Authentication requires verifying that the user is the person who has access rights to the information accessed. [19] Under this principle, the open norm of the World Wide Web should render access to websites authorized unless it bypasses an authentication gate. This approach leaves Internet users free to access websites even when their owners have put in place virtual speed bumps that can complicate access, such as hidden addresses, cookies-based limits, and IP address blocks. [20] Further, when access requires authentication, whether access is authorized should hinge on whether it falls within the scope of delegated authority the authentication implies. Access to canceled accounts should be unauthorized, and access using new accounts may or may not be authorized depending on the circumstances. [21] Finally, the lawfulness of access using a shared password should depend on whether the user intentionally acts outside the agency of the account holder.

The authentication principle advocated in this Essay best captures the competing policy goals of modern Internet use in light of the blunt and severe instrument of criminal law. Norms based on this principle give users wide berth to use the Internet as the technology allows, free from the risk of arrest and prosecution, as long as they do not contravene mechanisms of authentication. On the other hand, the norms give computer owners the ability to impose an authentication requirement and then control who accesses private information online. The result establishes both public and private virtual spaces online using a relatively clear and stable technological standard.

NORMS OF COMPUTER TRESPASS, 116 Colum. L. Rev. 1143

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 147 of 187

**\*1148**  This Essay contains four parts. Part I shows how trespass norms apply in physical space. Part II argues that courts should apply the same approach to computer networks but that they must identify the best trespass norms rather than simply identify existing norms. Part III considers the trespass norms that courts should identify in the many difficult cases involving the Web. Part IV explains how the norms of computer trespass should apply to the complex problems raised by canceled, blocked, and shared accounts.


## I. TRESPASS IN PHYSICAL SPACE

Imagine a suspicious person is lurking around someone's home or office. The police are called, and officers watch the suspect approach the building. Now consider: When has the suspect committed a criminal trespass that could lead to his arrest and prosecution? This section shows how the answer comes from trespass norms in physical space--shared understandings of obligations surrounding access to different physical spaces. The rules are not written down in trespass statutes. Instead, those called on to interpret physical trespass laws make intuitive conclusions based on the nature of that space and the understood purposes of different means of accessing it. From those intuitions, shared understandings emerge about whether and when access to a physical space is permitted. By unpacking our intuitions that govern physical trespass, we can then appreciate why courts have struggled to interpret computer trespass laws.


### A. *Authorization and Social Norms*

The concept of trespass implies signals sent by property owners about what uses of that property are permitted. In some cases, the signals are clear and direct. Recall the childhood game "red light, green light." [22] In the game, the game master barks out orders to the players. Green light, they can run. Red light, they must stop. The control is direct and in realtime, with the game master watching the players in person. In this environment, notions of authorization are obvious. The leader monitors and maintains complete control.

The more common and interesting problems arise when control of authorization is implicit. In most cases, permission is deduced from the circumstances based on signals that draw on shared understandings about the world. A Martian who landed on Earth for the first time would find the results deeply puzzling. Having never experienced human social interaction, it would miss the signals and see the human understandings as arbitrary. From our perspective, however, the signals are intuitive and usually seem obvious.

**\*1149**  Importantly, the text of criminal trespass statutes doesn't provide these answers. [23] Consider New York's trespass law, § 140.05. The language is brief: "A person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." [24] What does "unlawfully" mean? The statutory definition tries but fails to answer that question. "A person 'enters or remains unlawfully' in or upon premises," the definition says, "when he is not licensed or privileged to do so." [25] That's no help. When are you "licensed" to enter? What gives you a "privilege"? The text doesn't say.

Criminal trespass law can retain this textual ambiguity because the real meaning of trespass law comes from trespass norms that are relatively clear in physical space. [26] The written law calls on the norms, and the norms tell us, at an intuitive level, when entry to property is forbidden and when it is permitted. Although identifying social norms is often difficult generally, the specific nature of trespass norms allows greater clarity. Trespass norms are relatively specific: They are about shared intuitions about what is a trespass, not what is appropriate or inappropriate behavior generally. And those norms provide relative clarity about what is a physical trespass.

Relative clarity doesn't mean absolute clarity, of course. Criminal trespass law is rarely litigated. Physical trespass tends to be a low-level offense, [27] and it typically extends to those who unlawfully remain in place after being told by the homeowner to leave. [28] As a practical matter, the crime may be used primarily as a way to arrest and remove someone

who won't leave where he is not wanted rather than as a tool for criminal punishment **\*1150** on conviction.[29] As a result, some ambiguities may exist but remain latent in the statute.

But even if ambiguities remain, they are substantially narrowed by the three ways that trespass norms inform the meaning of criminal trespass laws. First, trespass norms provide a general set of rules that govern entrance based on the nature of the space. Second, they help resolve which means of access are permitted. And third, they explain the context in which the permitted means become authorized.

## B. *The Nature of the Space*

The first way that trespass norms guide notions of license and privilege is by providing informal rules based on the nature of each space. Different spaces trigger different obligations. Private homes trigger one set of rules. Commercial stores would trigger another. A public library might trigger a third. A public park a fourth. Life experience with common social practices creates shared understandings about what kinds of entry are permitted for different kinds of spaces.

Start with the home. The home triggers a robust set of assumptions about privacy and permission.[30] A person's home is his castle, the common law tells us.[31] And the principle of the common law remains deeply and widely held today. Everyone knows that you stay out of another's home unless there is an express invitation. If you break those norms, trouble will follow. You can expect a frightened homeowner to call the police, if not to emerge with a twelve gauge pointed in your direction. And trespass case law reflects the strong default presumption of the home: The slightest overstep or intrusion into the home, or even just entry based on false pretenses, has been held to be a trespass.[32]

But what is true for the home is not true for other physical spaces. Contrast the home with a commercial store. Imagine it's a weekday afternoon and you find a flower shop in a suburban strip mall. The norms governing access to the shop are very different from those governing access **\*1151** to a home. You can approach the store and peer through the window. If you see no one inside, you can try to enter through the front door. If the door is unlocked, you can enter the store and walk around. The shared understanding is that shop owners are normally open to potential customers. An unlocked door during work hours ordinarily signals an invitation. That openness is not unlimited, of course. You can't go into the back of the store, marked "Employees Only," without an invitation.[33] And if the store owner tells you to leave, you have to comply.[34] But in contrast to the closed default at a private home, the default at a commercial store is openness absent special circumstances indicating closure.

Even open spaces can have trespass norms, and those norms can differ from the norms governing entry into enclosed structures such as homes or stores. In a recent Fourth Amendment case, *Florida v. Jardines*,[35] the Supreme Court considered the trespass norms that apply to a front porch. Officers suspected that Jardines might be growing marijuana in his home, so they walked a drug-sniffing dog up to his front porch and had him give the front door a good, hard sniff.[36] The dog alerted to drugs, creating probable cause for a warrant and a search.[37]

The Justices ruled that walking up to the front door with the dog was a trespass that violated the Fourth Amendment because it exceeded the implied social license governing approach to the home.[38] According to Justice Scalia, some entry onto the front porch was permitted by social custom. Any visitor could "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."[39] On the other hand, bringing a drug-sniffing dog to the front door violated that customary understanding:

To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into  **1152**  the garden before saying hello and asking permission, would inspire most of us to--well, call the police. [40]

The lesson is that different spaces have different trespass norms. Some spaces are open, others are closed, and still others are open to some but closed to others. The text of trespass laws is often misleadingly simple--just the simple prohibition against unlicensed entry. Meanwhile, the real work of distinguishing culpable invasions from nonculpable explorations comes from space-specific norms.

## C. *Means of Access*

The second role of trespass norms is to identify means of permitted access. Permission to enter often is implicitly limited to specific methods of entrance. And we know which means of entry are permitted, and which are forbidden, by relying on widely understood social understandings.

Consider entrance to a commercial store. The trespass norm governing a commercial store might be that entrance is permitted when a ready means of access is available that can be read in context as an open invitation. That principle implies limits on which means of access are allowed. An open window isn't an invitation to jump through the window and go inside. If there's an open chimney or mail drop, that's not an invitation to try to enter the store. Barring explicit permission from the store owner, the only means of permitted access to a commercial store is the front door.

The source of these principles seems to be a socially shared understanding of the intended function of walls, windows, chimneys, and doors. Windows are there to let in light, not people. Chimneys exist to let out smoke, not admit guests (Santa excepted). We know from life experience that these ways in are not authorized. In contrast, entry through the unlocked front door is authorized. The front door is intended for customer entrance and exit. That's why it's there.

## D. *Context of Access*

Trespass norms play a third role by governing the context in which entrance can occur. Entry through the front door might be authorized, but the front door isn't for everyone. Doors usually come with locks, and locks are designed to let some people in and keep other people out. Locks are an example of access control by which we recognize a means of access but limit it to specific people with specific rights. [41]  To complete  **1153**  the picture of how norms govern authorization to enter a home, we need to consider how those norms apply to locks and keys.

The starting point is simple enough. The property owner owns the door, lock, and keys, so the owner presumptively is in charge. If the lock breaks, the owner has to buy another one. The owner has the power to decide who gets a key and who is permitted to use it. As a result, authorization of entrance by key depends on whether that entrance was within the zone of authority delegated by the owner.

Imagine you are walking down the street and you see and pick up a lost house key. Possession of the key doesn't entitle you to use the key and enter the house. You have the key, but you lack permission to use it. And you lack permission because there's no chain of authorization coming from the owner. Picking a lock is unauthorized for the same reasons, at least unless you're a locksmith who the owner hired to open the door after being locked out. [42]  If the owner grants you permission but later revokes it, your authorization expires with the revocation. If the homeowner gives someone else the key but places limits on access, those limits govern authorization. [43]

The lesson of these examples is that authorization rests on trespass norms. In a world of indirect communication, familiarity with the social signals of what entry is permitted or forbidden makes the law clear enough that most people don't fear arrest in their everyday activity. The nature of the space provides one set of messages, norms about the intended purpose of different means of access provide even more detailed guidance, and access controls within the zone of permission delegated by property owners provide an additional layer of rules.

## II. THE NORMS OF COMPUTER TRESPASS

The Internet has its own kind of trespass law that closely resembles its physical-world cousin. In cyberspace, the relevant law is found in computer misuse statutes such as the CFAA. [44] The CFAA and its state equivalents ban unauthorized access to a computer. [45] At a broad level, the purpose of those statutes is easy to describe: Unauthorized access statutes are computer trespass statutes. [46] Applying the new statutes requires translating **\*1154** concepts of trespass from physical space to the new environment of computers and networks. But as courts have found, understanding the concept of authorization to computers ends up being surprisingly hard. [47] The courts are divided, with many courts struggling to apply this simple-seeming concept. [48]

The norms-driven nature of physical trespass law explains why courts have struggled to interpret computer trespass laws. The trespass norms of physical space are relatively clear because they are based on shared experience over time. The Internet and its technologies are new, however, and the trespass norms surrounding its usage are contested and uncertain. When faced with an authorization question under a computer trespass law, today's judges bring to mind the Martian from outer space considering how traditional trespass laws might govern trespass into a home. Without established norms to rely on, the application of a seemingly simple concept like "authorization" becomes surprisingly hard.

This section develops three lessons for interpreting authorization in computer trespass statutes that follow from the norms-based nature of trespass law. First, the meaning of authorization will inevitably rest on the identification of trespass norms, which will in turn rest on models and analogies. Second, Internet technology is sufficiently new, and the norms of computer trespass sufficiently unsettled, that applying computer trespass law must not just identify existing trespass norms, but must identify as a policy matter the optimal rules that should govern the Internet. And third, despite these challenges, trespass provides a sensible framework for regulating computer misuse and courts have the ability to identify and apply the norms for computer trespass within the framework of existing laws.

### A. *The Inevitability of Norms in Computer Trespass Law*

The first lesson is that the meaning of authorization in computer trespass laws inevitably rests on the identification of proper trespass norms. Like their physical-world cousins, computer trespass laws feature unilluminating text. They prohibit unauthorized access to computers just like physical trespass laws prohibit unlicensed entry to physical spaces. In both contexts, the meaning of the law must draw from social understandings about access rights drawn from different signals within the relevant spaces. Courts must identify the rules of different spaces based on understandings of the relevant trespass norms.

It's no surprise that litigation over computer trespass laws often triggers a battle of physical-space analogies. The government, seeking a broad reading of the law, will push analogies to physical facts that trigger strict norms. The defense, seeking a narrow reading of the law, will push analogies **\*1155** to physical facts that implicate loose norms. The battle of analogies happens not because it is inevitable that we analogize cyberspace to physical space, [49] but rather because authorization inevitably rests on trespass norms. Litigants will use analogies from physical spaces with the trespass norms that best aid their side.

Consider the recent litigation in *United States v. Auernheimer*. [50] Auernheimer had been convicted of unauthorized access for using a software program that collected information from an AT&T website at hard-to-guess addresses intended to be kept private. [51] On appeal to the Third Circuit, the government's brief analogized the website to a home where trespass norms are at their zenith. Use of the program was a computer trespass, the government argued, because a physical trespass occurs "when an unauthorized person enters someone else's residence, even when the front door is left open or unlocked." [52] In contrast, the defense analogized the website to a public space where trespass norms are at their nadir. Use of the program was not a trespass, the defense argued, because putting information on a website "ma[d]e the information available to everyone and thereby authorized the general public to view the information." [53] Each analogy aimed to import a set of physical-world norms. [54]

## B. *Because Computer Trespass Norms Are Unsettled, Courts Should Identify the Best Norms to Apply*

The conflicting analogies found in computer trespass cases highlight the biggest difference between applying physical trespass and computer trespass laws: Computer trespass norms remain uncertain. Understandings of access rights surrounding the home are ancient, while understandings of access rights in computer networks are not. The statutes came first, and the statutory prohibition on unauthorized access has remained fixed while computer network technology has advanced at astonishing speed. In this environment, courts cannot merely identify existing norms. Instead, they should make a normative policy decision about what understandings should govern the Internet. Judicial decisions will then shape future computer trespass norms, allowing appropriate norms to emerge with the help of the courts.

**\*1156** To appreciate the problem, consider the rapid evolution of Internet technologies. The Internet itself is less than fifty years old. [55] The World Wide Web is only about twenty years old. [56] The experience of using the Internet morphs quickly. Fifteen years ago, connecting to the Internet meant logging in from a desktop computer at work or perhaps using a dial-up connection from home. Today, connecting to the Internet is very different. Wireless connections have become the norm, allowing anyone to access the Internet from almost anywhere. And in just the last five years, the rise of the "smart phone" has brought the Internet to a light hand-held device that most adults leave on 24/7 and carry with them in their pockets and purses. [57]

The programs we use to access the Internet also change rapidly. A majority of Americans now have a Facebook account, and about seventy percent of account holders visit Facebook every day. [58] But Facebook wasn't even invented until 2004, [59] and it already has become passé among teenagers who have moved on to Instagram (launched in 2010 [60] ) and Snapchat (launched in 2011 [61] ). [62] Or consider the popular Apple iPhone introduced in 2007. [63] The iPhone popularized the phrase "there's an app for that" [64] for the new applications, or "apps," that the phone can run. Apple's **\*1157** iTunes App Store has more than 1.5 million apps available already, [65] and about 1,000 new apps are submitted for approval every day. [66] Even the specific programs we use change over time. Regular updates and improvements are the norm, with new versions often adding features that can substantially change the user experience.

The problem is not just technological. The lawyers have stepped in, too. Companies often hire counsel to write detailed terms of use that purport to say when access is permitted. [67] These written contractual limitations can be extremely restrictive, [68] often creating a clash between what the technology allows a user to do and what the language of the terms says is allowed. In that case, what governs: the technology or the language? Amidst this rapid technological change, courts cannot merely invoke existing trespass norms to interpret authorization to access a computer. It's not clear any widely shared norms exist yet.

Deferring to jury verdicts is not workable, either. Trial courts have often used jury instructions that either leave authorization undefined or else tell the jury, unhelpfully, that access is unauthorized when it is without permission. [69] A study by Matthew Kugler suggests that this leads to verdicts far beyond whatever trespass norms may emerge. [70] Kugler surveyed 593 adult Americans by asking them to review short descriptions of the facts of several CFAA cases. [71] Respondents were asked to what extent the computer user had "authorization to use the computer" in the way **\*1158** he did, measured on a scale of one (not at all) to six (very much). [72] The study then asked respondents to assign the proper punishment for the act, with respondents choosing among four options: no punishment at all; punishment akin to a parking ticket, punishment for a minor crime such as petty theft, and punishment for a major crime such as burglary. [73]

Kugler's survey suggests that lay opinion about when use is "authorized" differs considerably from trespass norms. In most of the scenarios, respondents viewed the computer use as unauthorized. Mean values of authorization ranged from a low of 1.43 (for an employee who used his employer's computer to sell employer trade secrets) to a high of 2.32 (for an employee who used his employer's computer to check the weather report for personal reasons). [74] But these evaluations had little connection to the respondents' evaluations of what should be criminal. For example, although checking the weather report from work was generally considered unauthorized, sixty percent thought it should not be punishable at all and another thirty-two percent concluded that it should only be punished like a parking ticket. [75] Where clear trespass norms exist, we would expect most to say that violating them should subject the trespasser to at least some criminal punishment. Kugler's results suggest that lay judgments of authorization probably do not accurately measure trespass norms, at least to the extent such norms now exist.

Courts must instead decide between competing claims for what the trespass norms should be, imposing an answer as a matter of law now rather than allowing them to develop organically. One plausible response from courts could be to refuse to go along. If the law rests on unknown norms, perhaps courts should strike down unauthorized access statutes as unconstitutionally void for vagueness--or at least construe them narrowly in light of the vagueness concerns they present. [76] I have argued that position before, [77] and it retains significant force. However, the alternative path is for courts to draw lines based on the normatively desirable rules and standards that should govern Internet use. In the interim period before norms emerge, courts can identify the best rules to apply as a matter **\*1159** of policy. Judicial decisions in the near term can influence norms in the long term.

### C. *Trespass Law Provides the Appropriate Framework to Resolve Computer Misuse, and Courts Can Meet the Challenge*

It is worth asking whether trespass provides the right framework to apply and if judges are up to the task. I think the answer to both questions is yes. Trespass provides an appropriate framework because it implies an essential balance. On one hand, protecting online privacy requires recognizing some boundary that individuals cannot cross. On the other hand, preserving the public value of the Internet requires identifying uses that individuals can enjoy without fear of criminal prosecution. Some cases are easy. Everyone agrees that guessing another person's password to access his private email without his permission should be considered a criminal invasion of privacy. Similarly, everyone agrees that visiting a public website with no access controls or written restrictions should be legal. The trespass structure is sensible. The real challenge is applying it.

I am optimistic that courts can identify and apply computer trespass norms using existing statutes. The very first federal appellate case on the meaning of authorization in the CFAA, *United States v. Morris*, [78] shows why. *Morris* offers an early example of how courts can identify norms of computer trespass using the same three inquiries that govern trespass in the physical world: the nature of the space, the means of entry, and the context of entry.

In the fall of 1988, Robert Tappan Morris, a computer science graduate student, crafted and released a program often called "the Internet worm." [79] Morris designed the worm to reveal the weak computer security in place on the Internet. [80] First, the program exploited what the court called a "hole or bug (an error)" in three different software programs. [81] And second, the program guessed passwords, "whereby various combinations of letters are tried out in rapid sequence in the hope that one will be an authorized user's password." [82] Morris sent the worm from a computer at MIT, and it quickly spread around the world. [83] Morris was then charged with and convicted of "intentionally access[ing] a Federal interest computer without authorization." [84]

**\*1160**  On appeal, the Second Circuit affirmed the conviction. Writing for the court, Judge Jon Newman found three reasons why the access was without authorization. First, the evidence at trial demonstrated "that the worm was designed to spread to other computers at which he had no account and no authority, express or implied, to unleash the worm program." [85] Second, the worm exploited security flaws in software commands. "Morris did not use either of those features in any way related to their intended function." [86] Instead, Morris "found holes in both programs that permitted him a special and unauthorized access route into other computers." [87] Finally, the worm also guessed passwords, rendering access to those accounts unauthorized. [88]

Judge Newman's brief explanation of why the Internet worm had accessed computers without authorization contains all of the ingredients for the proper way to think about computer trespass. First, *Morris* addressed the nature of the virtual space. Although the computers were connected to each other, access was limited to (and based on) private accounts. A user needed an officially sanctioned account to access that particular machine. Much like houses on a row in a suburban street, the computers were linked to each other but required a key or special permission to jump from the inside of one to the inside of another.

Second, *Morris* focused on the means of entry. None of the programs, used as intended, were ways of gaining access to a private account. But the Internet worm exploited security flaws by using "holes" and "bugs" in the programs that permitted "special access" in a way that was contrary to the "intended function" of the commands. [89] Instead of gaining access through the virtual front door, the worm gained access by exploiting security flaws: It broke in through an open window instead. It gained entrance through a bug, not a feature.

Third, the *Morris* opinion focused on the context of entry. When the Internet worm accessed a private account with a password, it did so only by guessing that password. [90] Here the analogy to physical entry seems intuitive. Guessing a password is like picking a physical lock. A successful guess provides access, just like a successful lock pick does. But the access is not authorized because it does not come directly or indirectly from the property owner. The trespass norm governing locks is that access is permitted only to those who have been granted the key in a delegation of permission beginning with the owner. Password guessing is outside the norm and therefore unauthorized.

**\*1161**  *Morris* provides a helpful model for how courts can adopt sensible and clear computer trespass norms even when faced with new facts. A quarter century later, courts can follow the *Morris* example. The remaining Parts offer more specific guidance on how courts can do that for important cases that arise in the context of the Web, as well as blocked, canceled, and shared accounts.

## III. NORMS OF THE WORLD WIDE WEB

Many tricky questions interpreting computer trespass statutes involve use of the World Wide Web. The Web did not exist when Congress enacted the CFAA. [91] But it has quickly become an important--if not the *most* important-- way people use the Internet. Identifying the trespass norms of the Web is difficult because there are two competing narratives

in play. On one hand, the World Wide Web is open: By default, anyone can go to any website. On the other hand, website owners frequently put up speed bumps, barriers, and caveats to access that range from hidden website addresses and terms of use to limiting cookies and banning IP addresses. [92]  The hard question is this: When should use of the Web in the face of such efforts render the use unauthorized?

This Part argues that courts should adopt presumptively open norms for the Web. The nature of the space is inherently open. Courts should match the open technology of the Web by applying an open trespass norm. Limited efforts to regulate access such as terms of use, hidden addresses, cookies, and IP blocks should be construed as merely speed bumps rather than virtual barriers. None of these methods should overcome the basic open nature of the Web. Access that bypasses these regulations should still be authorized.

The authorization line should be deemed crossed only when access is gained by bypassing an authentication requirement. An authentication requirement, such as a password gate, is needed to create the necessary barrier that divides open spaces from closed spaces on the Web. This line achieves an appropriate balance for computer trespass law. It protects privacy when meaningful steps are taken to seal off access from the public while also creating public rights to use the Internet free from fear of prosecution. [93]

**\*1162  A. *The Inherent Openness of the Web***

The first step in applying computer trespass law to the Web is to identify the nature of the space that the Web creates. The Web is a publishing protocol for the Internet. It allows anyone in the world to publish information that can be accessed by anyone else without requiring authentication. When a computer owner decides to host a web server, making files available over the Web, the default is to enable the general public to access those files. A user who surfs the Web enters an address into the prompt at the top of the browser, directing the browser to send a request for data. [94]  If the address entered is correct, the web server will respond with data that the user's browser then reassembles into a webpage. [95]

This process is open to all. The computer doesn't care who drops by. By default, all visitors get service. In the language of the computer science literature, there is no authentication requirement. [96]  A visitor might be any one of the billion or so Internet users around the world. For that matter, the visitor doesn't need to be a person. It could be a "bot," a computer program running automatically. It could even be a dog, as the famous *New Yorker* cartoon reminds us. [97]  Because there is no authentication requirement, the web server welcomes all, and the norm is openness to the world. Access is inherently authorized.

The open nature of the Web is no accident; it is a fundamental part of the Web's technological design. From its inception in 1969, the creators of the Internet used "Requests for Comments" (RFCs) to describe the basic workings of different Internet protocols. [98]  The Internet Engineering  **\*1163**  Task Force later took over the task of crafting RFCs, and they stand as the definitive technical discussion of the intended function of different Internet applications. Think of them as computer-geek manuals for how the Internet works. The RFCs for the Web are RFC1945 and RFC2616. [99]  They teach how the Web works, or more specifically, they teach how "Hypertext Transfer Protocol" (HTTP) works; [100]  HTTP is one of the foundational protocols controlling data transfer between web servers and clients. And a quick review of the RFCs for the Web shows its inherently open nature.

RFC1945 and RFC2616 describe the protocol used for the Web as "a generic, stateless, object-oriented protocol" [101]  for "distributed, collaborative, hypermedia information systems." [102]  The means of operation are general and open. The Web works by allowing anyone to make a request for a webpage. As summarized in the RFCs, "[a] client establishes a connection with a server and sends a request to the server in the form of a request method, URI, and protocol version,

followed by a MIME-like message containing request modifiers." [103]  In English: Anyone can send a request without any authentication. And then, "the server responds with a status line, including the message's protocol version and a success or error code, followed by a MIME-like message containing server information, entity metainformation, and possible body content." [104]  Again, in English, the server responds to anyone who has made the request.

The protocols of the Web make websites akin to a public forum. To draw an analogy, websites are the cyber-equivalent of an open public square in the physical world. A person who connects a web server to the Internet agrees to let everyone access the computer much like one who sells his wares at a public fair agrees to let everyone see what is for sale. Sellers who want to keep people out, backed by the authority of criminal trespass law, shouldn't set up shop at a public fair. Similarly, companies that want to keep people from visiting their websites shouldn't connect a web server to the Internet and configure it so that it responds to every request. By choosing to participate in the open Web, the website owner must accept the open trespass norms of the Web.

## B. *Authorized Access on the Web*

Although the Web is open by default, website operators often place limits and restrictions on access to information. The challenge for courts  **\*1164**  is to distinguish provider-imposed restrictions and limits that are at most speed bumps (that cannot trigger trespass liability) from the real barriers to access (that can). In my view, an authentication requirement draws the proper line. When a limit or restriction does not require authentication, access is still open to all. The limit should be construed as insufficient to overcome the open nature of the Web. On the other hand, access that bypasses an authentication gate should, under proper circumstances, be deemed an unauthorized trespass. An authentication requirement provides a clear and easy-to-apply standard that both protects privacy and carves out public-access rights online.

A decade ago, I argued that unauthorized access should be limited to access that circumvents "code-based restrictions," which I defined as ways of tricking the computer into "giving the user greater privileges" when "computer code" has been used "to create a barrier designed to block the user from exceeding his privileges on the network." [105]  With the benefit of hindsight, that formulation was vague. Trying to figure out when access circumvented a code-based restriction proved harder than I predicted. I now see that the more precise way to formulate the standard is that unauthorized access requires bypassing authentication. The key point is not that some code was circumvented but rather that the computer owner conditioned access on authentication of the user and the access was outside the authentication. This section covers examples of limits and restrictions on access that do not require authentication and should not trigger trespass liability.

Begin with a relatively simple case. Access to a website should be authorized even if the webpage address is not published or is not intended to be widely known. This issue arose in *United States v. Auernheimer*, in which the federal government charged the defendant with violating the CFAA by using a webscraper that queried website addresses that the computer owner, AT&T, had not expected people to find. [106]  The website addresses queried were very difficult to guess because they ended in a long serial number. The defendant helped design a program to guess the numbers and collected information from over 100,000 website addresses. [107]

Had the Third Circuit reached the question, [108]  it should have held that these website visits were authorized because the website had imposed no authentication requirement. The open norm of the Web still governed. Content published on the Web is open to all. Because the Web allows anyone to visit, a website owner necessarily assumes the risk that information published on the Web will be found. A hard-to-guess URL is  **\*1165**  still a URL, and the information posted at that address is still posted and accessible to the world. Accessing the URL does not violate a trespass norm because all users are implicitly invited to access a publicly accessible address.

This conclusion is bolstered by the social value and ubiquitous nature of websurfing together with the severity and chilling effect of criminal punishment. We think, and therefore we Google. Courts should not lightly conclude that visiting an unwelcome URL should subject a person to arrest by federal agents and the potential for jail time. That is a particularly sensible approach because what looks like a hard-to-guess URL to a person may not seem hard to guess for a computer. To a computer, an address is an address. Even complicated addresses are easy for computers to find. Consequently, there is no workable line between an "easy" URL that can be accessed and one so hard to guess that access is implicitly forbidden.

The open understanding of the Web should also control access that violates terms of use. [109] Many websites come with terms of use that may on their face say when users are permitted to access the website. [110] The conditions can be arbitrary. One site might say that users must be eighteen years old to visit; another might say that users must agree to be polite. [111] Such terms should not be understood as controlling authorization. Access regulated only by written terms is not authenticated access. Everyone is let in, just subject to contractual restrictions. Such written terms should be understood as contractual waivers of liability rather than barriers to access.

This understanding is backed by the understandings of most website owners and users. Lawyers draft terms of use to minimize liability. [112] Broad terms allow computer owners to take action against abusive users and show good faith efforts to stop harmful practices occurring on the site. [113] True, terms of use may be drafted by lawyers to read like limitations on access. But companies do not actually expect the many visitors to otherwise-public websites to comply with the terms by keeping themselves **\*1166** out. [114] And because terms can be arbitrary, violating them implies no culpable conduct. [115] If a public website has terms prohibiting access by people who are left-handed and enjoy opera, a left-handed opera lover who visits the site anyway does not deserve arrest and jail time.

This understanding is also backed by the experience of most computer users. Studies suggest that very few Internet users read terms of use. [116] (For the record, I don't.) Few users could understand them if they tried. Terms of use are often lengthy and filled with legalese. [117] The terms can be hard to find and difficult to interpret. Such terms don't restrict access to a computer any more than a standard waiver of rights on the back of a baseball game ticket could control rights to enter the ballpark. Violating the terms on the ticket might change your legal rights to sue the ballpark if something goes wrong, but it doesn't make your entry to the ballpark a trespass. Similarly, violating terms of use while accessing a website should not render the access a computer trespass.

The same rule should apply to the use of cookies to record prior visits and prompt paywalls. Cookies are pieces of code that websites can place on a browser to customize the user's experience. [118] Websites can use cookies to prompt repeat visitors to subscribe rather than visit for **\*1167** free. Consider the popular *New York Times* website, nytimes.com. When you visit the *Times* website, it places a cookie on your browser that records the visit. [119] The cookie allows the *Times* to meter access: If a browser is used to visit more than ten stories on the site in a month, the website brings up a screen blocking the reading of additional articles. [120] The point of the block is to pressure frequent readers to buy a subscription. But what if a reader regularly clears out his browser, which erases the cookie and enables unlimited access? [121] Is accessing the site after clearing out the browser unauthorized?

The answer should be that access enabled by erasing cookies is still authorized. Browsers are designed to give users control over what cookies are stored on their browsers. [122] Such cookies do not authenticate users: They merely allow users to customize their browsing experience. Users can accept cookies, reject cookies, or clear out the cookies kept in their browsers as often as they like. [123] They can use different browsers or different computers. As a result, user control of cookies is an expected and common way to use the Internet. They do not really limit access to computers; they only

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   13

complicate access to the text of particular stories. Access limitations based on cookies are at most speed bumps rather than barriers. Instead of keeping people out, cookies-based barriers only impose enough of a hassle to encourage some users to buy a subscription. [124] Only the most unsophisticated users will see cookies as a barrier, and it will only be because they don't yet understand how cookies work. [125]

A more difficult case is raised by IP address blocking, which was the issue in *Craigslist v. 3Taps*. [126] Every device connected to the Internet has **\*1168** an IP address, which is a number that represents the Internet address of that device. [127] Web servers communicate with users on the Internet by receiving requests and sending data to them at their IP addresses. In *3Taps*, the defendant business scraped ads from Craigslist and republished them on its own website. [128] Craigslist responded by sending 3Taps a cease-and-desist letter and by blocking the IP addresses associated with 3Taps's computers. [129] 3Taps changed its IP addresses to circumvent the

> IP block. Judge Charles Breyer ruled that 3Taps's access was an unauthorized access under the CFAA because "[a] person of ordinary intelligence would understand Craigslist's actions to be a revocation of authorization to access the website." [130] Judge Breyer explained: IP blocking may be an imperfect barrier to screening out a human being who can change his IP address, but it is a real barrier, and a clear signal from the computer owner to the person using the IP address that he is no longer authorized to access the website. [131]

Judge Breyer is wrong. Understood in the context of the open Web, an IP block is not a real barrier. A user's IP address is not fixed. For many users, the IP addresses of their devices will change periodically during normal use. [132] Using multiple computers often means using multiple IP addresses. A person might surf the Web from his phone (using his cell phone's IP address), from his laptop at home (using his home connection's IP address), and from work (using the company's IP address). Users also can easily change their IP addresses if they wish. For some users, turning on and off their modems at home will lead their IP addresses to change. [133] For more sophisticated users, accessing the Web using Tor or a virtual private network allows them to change their IP addresses with the click of a button. [134] There is nothing untoward or blameworthy about using different IP addresses. It is a routine part of using the Internet.

Because of these technical realities, bypassing an IP block is no more culpable than bending your neck to see around someone who has temporarily blocked your view. To be sure, an IP block indicates that the computer **\*1169** owner does not want at least someone at that IP address to visit the website. But that subjective desire is not enough to establish a criminal trespass in light of the open nature of the Web. A computer owner cannot both publish data to the world and yet keep specific users out just by expressing that intent. It is something like publishing a newspaper but then forbidding someone to read it. Publishing on the Web means publishing to all, and IP blocking cannot keep anyone out. Merely circumventing an IP block does not violate trespass norms.

A particularly tricky case is access that circumvents a CAPTCHA, an issue that arose in *United States v. Lowson*. [135] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart." [136] You have probably seen CAPTCHAs when buying tickets online or posting online comments. The website presents you with an image like this requiring you to type in the words before you can proceed: [137]

**FIGURE 1: CAPTCHA EXAMPLE**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The purpose of the CAPTCHA, as the full name suggests, is to allow humans in but to block computer "bots" that can make thousands of automated requests at once. [138]

The interesting question is whether use of an automated program to bypass the CAPTCHA by guessing or reading the words is an unauthorized access. The question is difficult because the technology shares some characteristics of a traditional authentication gate but not others. Like a password gate, it requires a code to be entered; but unlike a password gate, it presents the code to the user. Although it's a close case, I think the better answer is that automated bypassing of a CAPTCHA is not itself an unauthorized access. Although the CAPTCHA *looks* like a password gate, it does not operate like one. The site tells everyone the password. It invites all to enter.

 **\*1170**  It is tempting to think that a CAPTCHA authenticates users as people instead of bots. But a "bot" request is still ultimately a request from a person. It is merely an automated request, with the person who used the software still responsible. That person could gain access and bypass the CAPTCHA manually by visiting the page and typing in the string of numbers that appear. As a result, a CAPTCHA is best understood as a way to slows a user's access rather than as a way to deny authorization to access. The CAPTCHA is a speed bump instead of a real barrier to access. Courts should hold that automated access is not a trespass merely because it bypasses a CAPTCHA.

Finally, it is worth considering the business implications of my proposed trespass rules. The examples in this section mostly involve businesses that might try to control customer use of their computers for business reasons. A ticket seller might use a CAPTCHA to limit scalpers, for example, just like the *New York Times* might use cookies to encourage readers to purchase subscriptions. That raises a fair question: If courts hold that these methods do not constitute a trespass, would that prevent businesses from using these methods--and if so, is that a policy reason to adopt different trespass norms?

The answer is that criminal trespass liability is unlikely to impact business strategies. Companies can already use civil contract law, based on terms of use, to set legal limits on how visitors use their websites. [139] Companies may not want to enforce those limits for a range of reasons. [140] But at least as a matter of law, often they can. [141] The scope of computer trespass laws implicates a different question: not just what user conduct is legal but what user acts are *criminal*. As a practical matter, it's hard to imagine a company using a business model that depends substantially on the prospect of the police arresting and prosecuting customers who circumvent speed bumps designed to regulate website use. Jailing customers for using a website isn't likely to be a good business strategy. It is telling that when the government has pursued aggressive criminal charges under the CFAA for use of websites, it has often been without the support of the companies claimed as victims. [142]

### *1171  C. *Unauthorized Access on the Web and the Authentication Requirement*

In contrast to the examples above, bypassing an authentication requirement should trigger liability for computer trespass. Even open spaces often have closed subspaces. Like a store open to the public in the front but for employees only in the back, the Web can have real barriers through which access violates trespass norms and is unauthorized. This moves the norms question from the first inquiry of the nature of the space to the second inquiry of the types of permitted entry. What counts as a real barrier on the Web, and what ways of overcoming those barriers are authorized? When a user bypasses an authentication requirement, either by using stolen credentials or bypassing security flaws to circumvent authentication, access should be considered an unauthorized trespass. This standard harnesses criminal law to protect privacy when network owners use technical means to enable access only to specific authenticated users.

The basic principle of authentication is probably intuitive to most Internet users. Every Internet user is familiar with the notion of an account that limits access. The requirement of credentials to identify the user is an authentication requirement. [143] When access to a computer requires an account, the user must register and obtain login credentials such

as a username and password. Before allowing the user to access specific information, the user must establish that he is someone with special rights to access the account. A user who cannot satisfy the authentication requirement is blocked from access. The account structure imposes an access control that separates the insiders with accounts from outsiders without them. Because only the account holder should be able to satisfy the authentication requirement, the world-- minus one user--is blocked. An authentication requirement creates a technical barrier to access by others. It carves out a virtual private space within the website or service that requires proper authentication to gain access.

Authentication requirements should be understood as the basic requirement of a trespass-triggering barrier on the Web. By limiting access to a specific person or group, the authentication requirement imposes a barrier that overrides the Web default of open access. The norm shifts from open to closed. At that stage, the emphasis shifts to means of access. **\*1172** Much like with a physical key to a door, access is authorized to the person who was given the password. On the other hand, as the *Morris* court noted, gaining access by guessing a password is just like picking a lock; both lack authorization. [144]

Exploits that circumvent authentication mechanisms or otherwise "break in" to systems are similarly unauthorized. *Morris* is again instructive. Access enabled by an exploit that uses a command in a way contrary to its intended function is unauthorized, much like entering through a window or a chimney in the physical world. For example, hacking techniques such as SQL injection attacks are unauthorized and illegal. [145] A Structural Query Language (SQL) injection attack is executed by attaching special extra language to the end of a web request. [146] Some web servers are misconfigured so that this extra language will execute a command on the web server rather than return a webpage. [147] The special command can provide access to the private database on the web server rather than just the pages to be published, providing the attacker with means to retrieve, alter, or delete the data. [148] Although a hacker using an SQL injection attack executes the injection by entering a command into a web browser--just like one would enter a username or password--the act exploits a security bug or hole just like the SENDMAIL flaw used in *Morris*. Access using an SQL injection is unauthorized for the same reason. An SQL injection attack is contrary to the intended function of the web browser: It violates the trespass norms surrounding the proper means of access to information on the server.

Importantly, the application of trespass norms can be technologically arbitrary even if they are socially meaningful. Consider the role of session cookies and persistent login cookies, which are browser cookies generated on a user's web browser during a typical login process to a website. [149] The website generates a long number associated with that login and passes the information back to the user's browser, with instructions for the browser to store it as a cookie. [150] When the user subsequently visits the website, the browser passes along the unique session-cookie value back to the website. Websites then use this information to automatically log in the user. You have likely benefited from these cookies when using web-based email, Amazon, or Facebook. After not visiting the page **\*1173** for a few minutes or even a few days, you can go back to the website and it will automatically log you in. The website does this by reading your stored login or session cookie and matching it to an ongoing known login session. [151]

Now consider how computer trespass principles might apply to access made by hijacking such information. Imagine a third party intercepts a login cookie sent over the Web, loads it into his own browser, and visits the website. Use of the cookie will automatically log the third party into the user's email or Facebook account without the user's permission or knowledge. Is the third-party access authorized because it was obtained merely by sending on a specific cookie value as part of the browser's web request? Or is it unauthorized because it does so in a way that bypasses an authentication gate?

Unauthorized use of a persistent login cookie should be considered a violation of trespass norms. The cookie acts as a temporary password, tied to the user's permanent password, that identifies the account and provides access to it. It circumvents the password gate in exactly the same way that entering the permanent username and password would. The fact that the cookie is sent by the browser, which is normally an environment controlled by the user for the user's benefit,

should not lead to a different result. This kind of cookie is an exception to the usual rule because it is a password; the embedding of the password in the browser does not change its function as a password.

The lines here are subtle, to be clear. Recall the *Auernheimer* case, where the information posted on a website was available only at a hard-toguess website address. [152] The difference between a hard-to-guess website address, which should not act as an authentication gate, and a hard-toguess session cookie, which should, is a matter of social understanding rather than technology. We can draw plausible lines about what acts as a password, but at some level the differences will boil down to shared understandings that some information is part of a public address while other information is a unique identifier. In close cases the technological arbitrariness is inevitable, as trespass norms are ultimately shared views about what invades another's private space and what doesn't. Technology alone cannot provide the answer. [153]

## *1174  IV. CANCELED, BLOCKED, AND SHARED ACCOUNTS

The next set of questions asks how computer trespass statutes should apply to canceled, blocked, and shared accounts. These questions implicate the third way that norms control trespass, the identification of norms governing the context of permitted access. At this stage, authentication clearly implicates trespass liability. If a stranger guesses a victim's username and password and enters those credentials to access her account without permission, that access is plainly unauthorized. [154] On the other hand, if the user enters her own credentials to access her own private account, that access is authorized. The hard cases lie between these two poles.

The gray area involves three basic problems. First, a computer owner might revoke the user's right to access an account but not close the account. If the credentials still work, and the user continues to access the account using them, is that access authorized or unauthorized? Second, a computer owner might cancel access to a user's account, and the user might then respond by creating a new account on the same system unbeknownst to the owner. Is use of the new account authorized or unauthorized? Third, an account holder might share her username and password with a third party who accesses the account. Is the third-party access authorized because it was by permission of the account holder, or is it unauthorized because it was not actually accessed by the account holder? In these cases, the law must grapple with how authorization norms apply when account rights are terminated, modified, or shared with others.

This Part attempts to answer all three questions using the principle of authentication. As explained in Part III, authentication of a user authorizes the user to access the account but makes access by others unauthorized. The trespass norm should aim to preserve that delegation of authority. Again, the goal is to achieve an optimal balance. Overly restricting delegations would prevent beneficial uses of networks by authenticated users. On the other hand, permitting authenticated users to further delegate authority, or to ignore withdrawals of delegation, would nullify the owner's power to designate who can access the network. Applying this approach suggests three rules. First, suspending an account withdraws authorization to access the account. Second, a suspension may or may not signal that access to additional accounts is prohibited. Finally, use of shared passwords should be permitted only when the third party access is within the scope of agency of the authenticated user.

This Part concludes by discussing the role of mental states, or mens rea, on computer trespass liability. When authorization hinges on the context of access, the user often will not know the facts that determine whether access was authorized. In that context, the statutory requirement **\*1175** that unauthorized access must be intentional or knowing plays an important role in narrowing criminal liability.

### A. *Canceled Accounts*

The first issue is how trespass laws should apply when the authority to use an account has been revoked but the user accesses the account anyway. The answer should come from an understanding of what authentication means. By

permitting an account that requires authentication, the computer owner should be understood to have delegated access rights to the authenticated user. The authenticated user has permission to access the account so long as the computer owner grants the account. The trespass norm should be to preserve that delegation. Preserving the delegation achieves the same dual goals as the authentication requirement provided in Part III. It enables use of computers (here, accounts held by authorized users) while affording them appropriate space to use their delegated accounts without fear of criminal prosecution for trespass.

Under this standard, the owner's revocation of the right to use an authenticated account revokes authorization. When the computer owner communicates the revocation to the user, the delegated authority ends. Subsequent account access violates trespass norms; it should be understood as entering a space where the user is no longer welcome. Because authority to use an authenticated account should exist only inside the zone of delegated power, ending the right to access the account should end the delegated right and end the authorization.

Courts have so far adopted this approach, as the Fourth Circuit's decision in *United States v. Steele* [155] demonstrates. Robert Steele worked as a backup system administrator at a business named SRA, and for work purposes he created a backdoor account that gave him access to SRA's network files. [156] After he resigned, Steele continued to use the account to access SRA's network. The Fourth Circuit ruled that "the fact that Steele no longer worked for SRA when he accessed its server logically suggests that the authorization he enjoyed during his employment no longer existed." [157] Having left the company, Steele's rights to access the account were revoked: "Just because SRA neglected to change a password on Steele's backdoor account does not mean SRA intended for Steele to have continued access to its information." [158]

**\*1176** This approach implies a distinction between the rules that should apply to a user who violates terms of use and a user whose account is suspended for violating terms of use. Recall that a user who violates terms of use is not committing an unauthorized access. [159] On the other hand, I argue here that a user whose account is revoked for violating terms of use but uses the banned account anyway is guilty of trespass. The distinction is justified because violating terms of use merely provides legal justification for revocation if the website owner chooses to do so. When a website owner authorizes an account for a user, the user has access rights unless the account is actually revoked. The authority is delegated by the issuing of the account and withdrawn by its revocation, so the act of revocation is needed to undo the act of granting the account.

## B. *New Accounts Following the Banning of an Old Account*

Next imagine that the computer owner cancels or blocks the account but the user can readily sign up for a new one. Imagine Gmail suspended your email account for violating Gmail's terms of use and you want to open another Gmail account the next day or the next year. Does the company's blocking the first account deny authorization to set up a second account? Or is the user free to start again after having been blocked once--or twice, or three times, or even hundreds of times?

This problem arose in the controversial case of *United States v. Swartz*. [160] The Internet activist Aaron Swartz created a guest account on MIT's network and used it to download a massive number of academic articles to his laptop. [161] Network administrators canceled the guest account in response; Swartz created a new guest account. [162] When system administrators blocked access through the new guest account, Swartz then figured out a way to circumvent guest-account registration: He found a closet in the basement of one of MIT's buildings that stored the server, entered it, and hard-wired his computer to the network. [163] He then assigned himself two new IP addresses from which he could continue **\*1177** his access. [164] The question was, did having been blocked with an account once mean that subsequent efforts to obtain access were unauthorized?

As before, the legal line should track the delegation of authority implied by authentication. The application of that principle is trickier, however, because the revocation of delegated authority is less obvious. When anyone can open an account, there is an implicit delegation to anyone who registers for a new account. In some contexts, a single act of blocking does not imply a total and permanent revocation. In other contexts, it does. For example, a user who has an account suspended for misconduct may be perfectly welcome to start again with a new account on the understanding that no further misconduct continues. On the other hand, users who are repeatedly banned eventually must get the message that they are not welcome.

The key question should be the objective signal sent by the banning or suspension, which will in some contexts allow the user to create a new account but in other contexts won't. When the ban would be reasonably interpreted as "don't do *that*," creating a new account and using it properly is authorized. When the ban would be reasonably interpreted as "go away and never come back," creating another account is unauthorized. In the *Swartz* case, for example, access would have been unauthorized by the time Swartz entered the closet to circumvent IP registration. Having had his accounts blocked multiple times by MIT's system administrators for violating the rules on MIT's network, Swartz had received clear signals that he was no longer welcome to create another account to continue the same conduct.

This approach once again ends up drawing a subtle distinction. Recall my earlier conclusion that an IP block is insufficient to trigger trespass liability. [165] Circumventing an IP address ban is permitted and authorized. At the same time, I am arguing here that if the computer owner requires an account to access a computer and then bans the account, circumventing that ban might not be authorized if the context can be interpreted as a complete ban. Is there really a difference? I think there is. Everyone can visit a public website, while not everyone can have the privilege of an account. By creating the access control of an account regime, the computer owner takes control of who can access it by making individualized decisions about specific accounts. A suspended account is not just a speed bump. It's a block to using that account and a potential signal about opening another one. The rules governing the two cases should be different.

### *1178 C. Password Sharing

The last and most difficult issue is identifying trespass norms that should govern shared passwords. Consider the facts of *United States v. Rich*. [166] A financial-services company, LendingTree, sold valuable access to financial information on its website to customers who paid a fee and received a username and password to access the site. [167] The defendant, Brian Rich, made a side deal with an employee at one of LendingTree's customers; he agreed to pay the employee to get the company username and password. [168] Rich then used the credentials to access the LendingTree website without paying LendingTree. [169] The question is: Does using a shared password constitute an unauthorized access in violation of trespass norms?

The starting point should again be that the computer owner's granting of an authenticated account delegated access rights to the account holder. The account holder is authorized but others are not. To preserve this principle, the trespass norm should be that access by the account holder or his agent is authorized while other access to the account is not. [170] When the account holder gives login credentials to a third party, access by the third party is authorized only when the third party acts as the agent of the account holder.

This approach mirrors the analogous rule in the physical world. When access is limited by a physical lock and key, whether entry is a physical trespass law depends on whether it falls within the zone of permission granted by the owner. [171] For example, in *Douglas v. Humble Oil & Refining Co.*, a business owner gave an employee the key to his home so the employee could feed his pets when he was away. [172] The employee later used the key to enter the home for a different reason. According to the court, this entry for reasons outside the scope of permission was a trespass. [173]

This approach allows computer account holders to share usernames and passwords with an agent. If the agent accesses the account on the account holder's behalf, the agent is acting in the place of the account holder and is authorized. The agent then has the same authorization **\*1179** rights as the account holder. For example, I recently set up a Gmail account for my students to email class assignments. I gave my assistant the account password and asked her go into the email inbox and collect them for me. When she did so, she was acting as my agent. Legally speaking, she was me.[174] She was fully authorized to access the account in her capacity as my agent. Her conduct was authorized and legal, much like employee access to an employer's account for work purposes.

On the other hand, a third party who uses a password in pursuit of her own ends stands in the same place as a third party who has guessed or stolen the password. Consider the facts of *Rich*.[175] When Rich accessed the LendingTree website using a password, he was not acting as an agent of a legitimate customer. Rich paid for access to the password, but he did not pay LendingTree. Instead, he paid an employee of a legitimate customer. Rich accessed the account to help himself get richer, not to help the employee. From the perspective of LendingTree, Rich's access was no different from access using a guessed or stolen password. Rich was not a legitimate customer or an agent of a legitimate customer. Whether he obtained the password by stealing it from the employee or by paying for it makes no difference to LendingTree. For that reason, Rich's access was unauthorized.

Two wrinkles need to be ironed out. First, what is the impact of terms of use to the delegated authority of the computer owner? Recall my use of a Gmail account for class. What if Gmail's Terms of Use forbid password sharing and my secretary's access violates those Terms?[176] In my view, terms of use barring shared access should be irrelevant for the same reason they are irrelevant to access more generally. As explained earlier, terms of use create rights for the computer owner rather than the account holder.[177] When terms are violated, the computer owner can suspend or restrict the account. But violating the terms does not render access an unauthorized trespass either in the context of public access websites or of specific accounts. By granting a user an account, the computer owner necessarily grants the user authorization to access the account for any reason.

Second, note that my treatment of the delegation from the computer owner to an account holder is different from my treatment of the delegation from the account holder to a third party. When authorized by the computer owner, the account holder has full access rights. When authorized **\*1180** by the account holder, on the other hand, the third party has narrower rights only to act as the account holder's agent. This distinction is justified by the underlying role of an authentication requirement. Setting up the authentication gate and granting a user account confers rights on the account holder and her agents. An account holder should have only a narrower power to confer access rights because otherwise that delegation would interfere with the original authentication. If computer owner A can confer access rights to account holder B, an unlimited power of B to confer access rights to C, D, and E would nullify A's judgment to confer access rights to only account holder B. The rule should be that third-party access outside the agency relationship is unauthorized access.

### D. *The Critical Role of Mens Rea*

The problem of canceled, blocked, and shared accounts is not complete without understanding the associated mental state, or mens rea, that accompanies computer trespass statutes.[178] The problem here is with the fact-sensitive context of permitted entry. The facts relevant to authorization may not be known to the user. In this context, the mental state of authorization plays a critical role. Computer trespass statutes generally require that the user commit an intentional or knowing unauthorized access.[179] The government's burden to prove that an unauthorized access was intentional or knowing plays a crucial role in establishing a limit on liability when authorization is lacking due to the context of entry.

Courts have not explored the role of mental state in establishing liability for computer trespass, so it is important to understand what a mental state or knowledge or intent might mean in this context. Consider the broadest section of the CFAA, which prohibits "intentionally access[ing] a computer without authorization" or intentionally "exceeding authorized access." [180]  The intent requirement plainly applies to the element that authorization is lacking. But does the requirement of intent with respect to lack of authorization require intent as to the legal conclusion that access is unauthorized, or does it merely mean intent as to the facts that make access legally unauthorized?

**\*1181**  Courts have not addressed the question, and it is surprisingly complex. [181]  The usual rule, however, is that a knowledge or intent requirement for a criminal element requires knowledge or intent about the facts that are legally relevant to the element rather than to a legal status the element implies. [182]  It is not entirely free from doubt that this rule applies to computer trespass statutes, [183]  although it is often enough the default rule in federal criminal law that it seems likely to apply at least to the CFAA. [184]  Applying the usual rule to computer trespass statutes, proving intentional unauthorized access likely requires the government to show that the defendant knew of or hoped for the facts legally relevant to authorization and intentionally accessed the computer anyway. The prosecution need not prove that the defendant knew or intended his conduct  **\*1182**  to be legally unauthorized. Instead, the key question is the defendant's state of mind about the facts that, once the law is understood, made the access unauthorized.

So construed, the mental state requirement of computer trespass has a significant narrowing effect on liability for using canceled, blocked, and shared accounts. The individual must not only take steps that are contrary to the delegated authority; he must know or hope that his steps are contrary to that delegated authority. Recall the *Steele* case, in which the ex-employee used the backdoor account after he had resigned. [185]  Steele obviously knew that the authority to access the account had been revoked: As the Fourth Circuit explained, the company had taken his work laptop, denied him physical access to the building, and made him sign a letter that he would not try to access the employer's network in the future. [186]  In other cases, however, the revocation might not be so clear. The ex-employee might not know that her access rights to the account had been revoked. In such a case, she would not be guilty of criminal computer trespass.

The mental state requirement is particularly important in cases that involve shared passwords. If B shares a password with C, C's access is without authorization when C is acting outside the agency of B. At the same time, C's access is intentionally without authorization only if C knows or hopes of facts that would bring C's access outside the agency of B. In many cases, C may not know how B uses the account, how often, or for what. C's state of mind about whether C is outside the agency relationship element may sharply limit C's liability.

For example, imagine Ann gives Bob her Netflix username and password and tells Bob to feel free to use her account. Bob then uses Ann's account as if it were his own. Whether Bob's use of Ann's account is outside the agency relationship is itself a murky question: General permission to use the account whenever Bob likes implies a broad or even perhaps limitless authorization. But that murkiness aside, Bob can't be criminally liable for accessing Ann's account unless he knows or hopes that his acts are outside Ann's authorization. In the usual case, Bob would lack intent to access the account without authorization. [187]

## CONCLUSION

Applying law to the Internet often rests on analogies. In litigation, each side will offer analogies that push the decisionmaker in a particular direction. Courts faced with competing analogies must know how to decide  **\*1183**  between them: How do you know whether Internet facts are more like one set of facts from the physical world or another?

This Essay can be understood as a conceptual guide to choosing analogies in the interpretation of computer trespass statutes. By appreciating the role of norms in the interpretation of physical trespass laws, courts can adopt sensible

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 165 of 187

rules based on technological realities and their social construction. Because computer-network norms remain largely unsettled, the task is normative rather than descriptive. Judicial identification of the best norms to apply can help bring public acceptance of those norms, or at least provide a temporary set of answers until real norms emerge.

This approach helps avoid analogies that mislead rather than inform by missing the underlying norms that make analogies fit. Applying physical-world trespass cases to the Internet without first considering the difference between the physical and network worlds risks applying precedents from an environment with one norm to an environment that merits a very different one.

## Footnotes

a1    Fred C. Stevenson Research Professor, George Washington University Law School. Thanks to Steve Bellovin, David Cruz, Tim Edgar, Hanni Fakhoury, David Fontana, Mary Anne Franks, Ahmed Ghappour, Robert Graham, James Grimmelmann, Stephen Henderson, Marcia Hofmann, Michael Madison, Jonathan Mayer, Janice Nadler, Paul Ohm, Michael Risch, Ken Simons, Daniel Solove, Ashkan Soltani, Peter Winn, and commenters at the Privacy Law Scholars Conference and faculty workshops at Northwestern University Law School and the University of Southern California Gould School of Law for extremely helpful comments on an earlier draft.

1    The federal law is the Computer Fraud and Abuse Act (CFAA), codified at 18 U.S.C. § 1030 (2012). For a summary of state laws, see generally A. Hugh Scott, Computer and Intellectual Property Crime: Federal and State Law 639-1300 (2001); Susan W. Brenner, State Cybercrime Legislation in the United States of America: A Survey, 7 Richmond J.L. & Tech. 28, para. 15 n.37 (2001), http://jolt.richmond.edu/v7i3/article2.html [http://perma.cc/4YFP-KH8S].

2    See United States v. Morris, 928 F.2d 504, 511 (2d Cir. 1991) (concluding lower court was not required to instruct jury on meaning of "authorization" because "the word is of common usage, without any technical or ambiguous meaning").

3    See S. Rep. No. 104-357, at 11 (1996) (noting CFAA "criminalizes all computer trespass").

4    See Orin S. Kerr, Vagueness Challenges to the Computer Fraud and Abuse Act, 94 Minn. L. Rev. 1561, 1572, 1574 (2010) [hereinafter Kerr, Vagueness Challenges] (discussing uncertain application of CFAA); Note, The Vagaries of Vagueness: Rethinking the CFAA as a Problem of Private Nondelegation, 127 Harv. L. Rev. 751, 751-52 (2013) (noting scope of CFAA-- chief federal computer crime law--"has been hotly litigated," and "the most substantial fight" is over meaning of authorization).

5    See, e.g., United States v. Nosal, 676 F.3d 854, 865 (9th Cir. 2012) (en banc) (Kozinski, C.J.) (noting circuit split between Ninth Circuit and Fifth and Eleventh Circuits over whether employee who violates written restriction on employer's computer use engages in criminal unauthorized access under CFAA); NetApp, Inc. v. Nimble Storage, Inc., No. 5:13-CV-05058-LHK (HRL), 2015 WL 400251, at *11 (N.D. Cal. Jan. 29, 2015) (noting deep division in district courts on whether copying constitutes damage under CFAA); Advanced Micro Devices, Inc. v. Feldstein, 951 F. Supp. 2d 212, 217 (D. Mass. 2013) (noting two distinct schools of thought in case law on what makes access authorized).

6    See, e.g., CollegeSource, Inc. v. AcademyOne, Inc., 597 F. App'x 116, 129 (3d Cir. 2015) (noting meaning of authorization "has been the subject of robust debate"); EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 582 n.10 (1st Cir. 2001) ("Congress did not define the phrase 'without authorization,' perhaps assuming that the words speak for themselves. The meaning, however, has proven to be elusive."); Feldstein, 951 F. Supp. 2d at 217 ("[T]he exact parameters of 'authorized access' remain elusive.").

7    18 U.S.C. § 1030 (2012).

8    See Nosal, 676 F.3d at 863-64 (holding such acts do not violate CFAA).

9    See Indictment at 4-7, United States v. Swartz, Cr. 11-ER-10260 (D. Mass. July 14, 2011) (charging criminal defendant for such conduct).

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 166 of 187

10    See United States v. Auernheimer, 748 F.3d 525, 534-35 (3d Cir. 2014) (reversing conviction on venue grounds but not reaching whether it violated CFAA).

11    See Brief of Appellant at 10-14, United States v. Rich (4th Cir. Mar. 2, 2015) (No. 14-4774), 2015 WL 860788 (arguing such conduct does not violate CFAA).

12    See Craigslist Inc. v. 3Taps Inc., 942 F. Supp. 2d 962, 968-70 (N.D. Cal. 2013) (concluding such conduct violates CFAA).

13    See United States v. Lowson, Crim. No. 10-114 (KSH), 2010 WL 9552416, at *6-7 (D.N.J. Oct. 12, 2010) (discussing but not resolving CFAA liability for such facts).

14    See United States v. Steele, 595 F. App'x 208, 210-11 (4th Cir. 2014) (holding this violates CFAA).

15    See James Grimmelmann, Computer Crime Law Goes to the Casino, Concurring Opinions (May 2, 2013), http://concurringopinions.com/archives/2013/05/computercrime-law-goes-to-the-casino.html [http://perma.cc/YYP8-A8A5] ("In any CFAA case, the defendant can argue, 'You say I shouldn't have done it, but the computer said I could!'").

16    For example, the CFAA does not define "without authorization," and the related term "exceeds authorized access" is defined circularly to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6) (2012).

17    See generally Orin S. Kerr, Computer Crime Law 328-75 (3d ed. 2013) (discussing sentencing under CFAA).

18    The word "norms" has been used to mean many different things, ranging from practices that are common and expected among members of a society to practices that are perceived as morally obligated within that group. See generally Richard H. McAdams & Eric B. Rasmusen, Norms and the Law, in 2 Handbook of Law and Economics 1575, 1576-78 (A. Mitchell Polinsky & Steven Shavell eds., 2007) (defining "norms"). In this Essay, I use the term "trespass norms" to focus specifically on norms that relate to perceptions of invasion of private space.

19    See infra section III.C (explaining authentication).

20    See infra Part III (discussing open nature of Web and mechanisms used by site owners to restrict access).

21    See infra Part IV (discussing distinction between canceled accounts, blocked accounts, and new accounts).

22    See Red Light/Green Light, Games Kids Play, http://www.gameskidsplay.net/games/sensing_games/rl_gl.htm [http://perma.cc/3JVF-NZWM] (last visited Jan. 26, 2016).

23    Trespass is an accordion-like concept that can mean different things in different contexts. See, e.g., 3 William Blackstone, Commentaries *208-09 (discussing variations of trespass at common law). Because computer trespass laws are primarily criminal statutes, the discussion focuses on liability under criminal trespass statutes. I am therefore excluding consideration of other kinds of trespass claims such as the scope of the common law tort of trespass to chattels. See generally eBay, Inc. v. Bidder's Edge, Inc., 100 F. Supp. 2d 1058, 1069-70 (N.D. Cal. 2000) (applying common law tort of trespass-to-chattels analysis in computer context).

24    N.Y. Penal Law § 140.05 (McKinney 2010).

25    Id. § 140.00(5).

26    See Richard H. McAdams, The Origin, Development, and Regulation of Norms, 96 Mich. L. Rev. 338, 340 (1997) ("Sometimes norms govern behavior irrespective of the legal rule, making the choice of a formal rule surprisingly unimportant."); see also Cass R. Sunstein, Social Norms and Social Roles, 96 Colum. L. Rev. 903, 914 (1996) (defining social norms as "social attitudes of approval and disapproval, specifying what ought to be done and what ought not to be done").

27    For example, under New York law, trespass only carries an offense level of a violation. N.Y. Penal Law § 140.05. A violation carries a maximum punishment of fifteen days. Id. § 10.00(3).

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 167 of 187

28    See, e.g., id. § 140.05 ("A person is guilty of trespass when he knowingly enters *or remains* unlawfully in or upon premises." (emphasis added)).

29    In general, probable cause to arrest a suspect for criminal trespassing can justify the suspect's arrest and removal so long as the offense--typically, the refusal to leave--is occurring in the officer's presence. See, e.g., N.Y. Crim. Proc. Law § 140.10 (McKinney 2004) (describing arrest powers).

30    See generally Stephanie M. Stern, The Inviolate Home: Housing Exceptionalism in the Fourth Amendment, 95 Cornell L. Rev. 905, 912 (2010) (discussing special status of home in Fourth Amendment law).

31    See Semayne's Case (1604) 77 Eng. Rep. 194, 198; 5 Co. Rep. 91 a, 93 a ("[T]he house of any one is not a castle or privilege but for himself.").

32    See, e.g., People v. Bush, 623 N.E.2d 1361, 1364 (Ill. 1993) ("If ... the defendant gains access to the victim's residence through trickery and deceit and with the intent to commit criminal acts, his entry is unauthorized and the consent given vitiated because the true purpose for the entry exceeded the limited authorization granted."); People v. Williams, 667 N.Y.S.2d 605, 607 (Sup. Ct. 1997) (concluding "person who gains admittance to premises through intimidation or by deception, trick or artifice, does not enter with license or privilege" for purposes of criminal trespass liability).

33    See, e.g., State v. Cooper, 860 N.E.2d 135, 138 (Ohio Ct. App. 2006) (entering portion of store marked "Employees Only" was trespass because sign "put the defendant on notice that by entering the room, he was in violation of restriction against access that applied to him").

34    See, e.g., Model Penal Code § 221.2(2)(a) (Am. Law Inst. 2015) (punishing as "defiant trespass" a person who stays in a place when notice of trespass has been provided by "actual communication to the actor").

35    133 S. Ct. 1409 (2013).

36    Id. at 1413.

37    Id.

38    See id. at 1417 ("[W]hether the officers had an implied license to enter the porch ... depends upon the purpose for which they entered. Here, their behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do.").

39    Id. at 1415.

40    Id. at 1416. According to Justice Scalia, the norms were readily grasped even though they were not written down: "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." Id. at 1415.

41    See Alfred J. Menezes, Paul C. van Oorschot & Scott A. Vanstone, Handbook of Applied Cryptography 3 (1996) (defining "access control" as means of "restricting access to resources to privileged entities").

42    Cf. Taha v. Thompson, 463 S.E.2d 553, 557 (N.C. Ct. App. 1995) (holding evidence that individual sent locksmith onto property to change locks without homeowner's permission establishes trespass).

43    See Douglas v. Humble Oil & Ref. Co., 445 P.2d 590, 591 (Or. 1968) (en banc) (holding employee who was given key to employer's home to feed employer's pets committed trespass when employee used key to enter home for different reason).

44    18 U.S.C. § 1030 (2012).

45    For an overview, see generally Scott, supra note 1, at 639-1300. In this Essay, I include both "access without authorization" and conduct that "exceeds authorized access" as within the general ban on unauthorized access. See infra section III.B (discussing unauthorized access).

46    See supra notes 2-5 (discussing court applications of computer trespass laws).

47     See supra notes 2-5.

48     See supra notes 4-5 (providing examples of disagreements among courts over concept of authorization in CFAA).

49     See Mark Lemley, Place and Cyberspace, 91 Calif. L. Rev. 521, 523-26 (2003) ("[E]ven a moment's reflection will reveal that the analogy between the Internet and a physical place is not particularly strong.").

50     748 F.3d 525 (3d Cir. 2014). Full disclosure: I represented Auernheimer.

51     Id. at 530-31.

52     Brief for Appellee at 34, Auernheimer, 748 F.3d 525 (No. 13-1816), 2013 WL 5427839.

53     Brief for Appellant at 15, Auernheimer, 748 F.3d 525 (No. 13-1816), 2013 WL 3488591.

54     The Third Circuit did not reach this issue, as it reversed on the ground that venue was lacking in the district where the prosecution was brought. Auernheimer, 738 F.3d at 541.

55     See Reno v. ACLU, 521 U.S. 844, 849-50 (1997) (tracing history of Internet from ARPANET in 1969).

56     See Tim Berners-Lee with Mark Fischetti, Weaving the Web: The Original Design and Ultimate Destiny of the World Wide Web by Its Inventor 69 (1999) (describing February 1993 release of first popular web browser).

57     See Riley v. California, 134 S. Ct. 2473, 2484 (2014) (recognizing "modern cell phones ... are now such a pervasive and insistent part of daily life" but were "unheard of ten years ago").

58     Elizabeth Weise, Your Mom and 58% of Americans Are on Facebook, USA Today (Jan. 9, 2015, 5:22 PM), http://www.usatoday.com/story/tech/2015/01/09/pew-surveysocial-media-facebook-linkedin-twitter-instagram-pinterest/21461381/ [http://perma.cc/QNK9-N5WZ].

59     Company Info: Our History, Facebook, http://newsroom.fb.com/timeline/company-info/ [http://perma.cc/9J9R-H2BT] (last visited Jan. 26, 2016).

60     MG Siegler, Instagram Launches with the Hope of Igniting Communication Through Images, TechCrunch (Oct. 6, 2010), http://techcrunch.com/2010/10/06/instagram-launch/ [http://perma.cc/T7E2-YNU3].

61     J.J. Colao, Snapchat: The Biggest No-Revenue Mobile App Since Instagram (Nov. 27, 2012, 1:36 PM), http://www.forbes.com/sites/jjcolao/2012/11/27/snapchat-the-biggestno-revenue-mobile-app-since-instagram/ [http://perma.cc/P6LY-7J73].

62     See Joanna Stern, Teens Are Leaving Facebook and This Is Where They Are Going, ABC News (Oct. 31, 2013), http://abcnews.go.com/Technology/teens-leaving-facebook/story?id=20739310 [http://perma.cc/4S6G-ZHYE] (noting migration of teen users from Facebook to Instagram and Snapchat).

63     See Press Release, Apple, Apple Reinvents the Phone with iPhone (Jan. 9, 2007), http://www.apple.com/pr/library/2007/01/09Apple-Reinvents-the-Phone-with-iPhone.html [http://perma.cc/L937-DHP4]; see also Steve Jobs, iPhone Introduction in 2007, YouTube (Jan. 10, 2014), http://www.youtube.com/watch?v=9hUIxyE2Ns8.

64     The phrase comes from a commercial for the iPhone 3G in 2009. Apple, There's an App for That, YouTube (Feb. 4, 2009), http://www.youtube.com/watch?v=szrsfeyLzyg.

65     Number of Available Apps in the Apple App Store from July 2008 to June 2015, Statista, http://www.statista.com/statistics/263795/number-of-available-apps-in-the-appleapp-store/ [http://perma.cc/CVH8-P4J5] (last visited Jan. 26, 2016).

66     Number of Newly Developed Applications/Games Submitted for Release to the iTunes App Store from 2012 to 2014 (Fee Based), Statista, http://www.statista.com/statistics/258160/number-of-new-apps-submitted-to-the-itunes-store-per-month/ [http://perma.cc/YN4W-7FM4] (last visited Jan. 26, 2016).

67    See Judith A. Powell & Lauren Sullins Ralls, Best Practices for Internet Marketing and Advertising, 29 Franchise L.J. 231, 235 (2010) (advising franchise operators to protect themselves by creating terms of use that allow franchisors to effectively control sites' content).

68    See United States v. Nosal, 676 F.3d 854, 860-63 (9th Cir. 2012) (providing examples of ways computer-use policies prohibit common activity).

69    See, e.g., United States v. Morris, 928 F.2d 504, 511 (2d Cir. 1991) (agreeing with lower court that "it was unnecessary to provide the jury with a definition of 'authorization' ... [s]ince the word is of common usage"); United States v. Drew, 259 F.R.D. 449, 461 (C.D. Cal. 2009) (noting no evidence Congress intended to give specialized meaning to "authorization" and "authorized" in CFAA and citing dictionary definition); Transcript for Trial at 26-27, United States v. Auernheimer, Crim. No. 11-cr-470 (SDW), 2012 WL 5389142 (D.N.J. Oct. 26, 2012), rev'd, 748 F.3d 525 (3d Cir. 2014) ("To access without authorization is to access a computer without approval or permission.").

70    See Matthew B. Kugler, Measuring Computer Use Norms (unpublished manuscript) (manuscript at 25) (Oct. 19, 2015), http://ssrn.com/abstract=2675895 (on file with the *Columbia Law Review*) [hereinafter Kugler, Measuring Norms] (noting participants' willingness to find common behavior blameworthy and, in some cases, criminal).

71    Id. (manuscript at 6).

72    Email from Matthew B. Kugler to Orin Kerr, Fred C. Stevenson Research Professor, George Washington Univ. Law Sch. (Nov. 13, 2015) (on file with the *Columbia Law Review*).

73    Kugler, Measuring Norms, supra note 70 (manuscript at 6).

74    Id. (manuscript at 14).

75    Id. Seventy-seven percent thought that selling trade secrets should be a serious crime like burglary, but of course, it already is: The crime is theft of trade secrets, a separate offense from computer trespass. See 18 U.S.C. § 1832 (2012).

76    See Kerr, Vagueness Challenges, supra note 5, at 1561 (arguing "CFAA requires courts to adopt narrow interpretations of the statute in light of the void-for-vagueness doctrine").

77    See id. at 1562 ("The CFAA has become so broad, and computers so common, that expansive or uncertain interpretations of unauthorized access will render it unconstitutional.").

78    928 F.2d 504 (2d Cir. 1991).

79    Id. at 505.

80    Id. ("The goal of this program was to demonstrate the inadequacies of current security measures on computer networks by exploiting the security defects that Morris had discovered.").

81    Id. at 506 (internal quotation marks omitted).

82    Id.

83    Id.

84    Id. (convicting defendant under 18 U.S.C. § 1030(a)(5)(A) (1986)).

85    Id. at 510.

86    Id.

87    Id.

88    Id.

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 170 of 187

NORMS OF COMPUTER TRESPASS, 116 Colum. L. Rev. 1143

89    Id.

90    Id.

91    Tim Berners-Lee invented the World Wide Web in 1990, and the first browser was introduced in 1993. See Berners-Lee & Fischetti, supra note 56, at 69 (recounting history of first web browsers).

92    See infra section III.B (discussing authorized web access).

93    The CFAA sometimes distinguishes between violations of the CFAA based on "access without authorization" and violations based on acts that "exceed[] authorized access." Compare 18 U.S.C. § 1030(a)(2) (2012) (prohibiting actors from both kinds of violations when actors obtain information), with id. § 1030(a)(5)(B) (prohibiting only access without authorization when it results in damage). I agree with the conclusion of the Second and Ninth Circuits that the two forms of liability cover the same acts. See United States v. Valle, 807 F.3d 508, 524-28 (2d Cir. 2015); United States v. Nosal, 676 F.3d 854, 858 (9th Cir. 2012) (en banc). That is, a person who violates a trespass norm to gain access to a computer commits an access without authorization if he has no authorization to access the computer, while he exceeds authorized access if he violates a trespass norm to gain a new level of access to a computer that he has some prior authorization to access. Both prohibitions implicate the trespass norms discussed in this Essay in the same way. The only difference is whether the defendant had some prior authorization to access the computer before violating the trespass norm. See Orin S. Kerr, Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes, 78 N.Y.U. L. Rev. 1596, 1662-63 & n.283 (2003) [hereinafter Kerr, Cybercrime's Scope] (advocating such interpretation). For these reasons, my proposed approach applies equally to acts that constitute access without authorization and acts that exceed authorized access.

94    Preston Gralla, How the Internet Works 21-23, 31 (1998).

95    Id.

96    See generally William E. Burr, Donna F. Dodson & W. Timothy Polk, Nat'l Inst. of Standards & Tech., NIST Special Pub. 800-63, Version 1.0.2, Electronic Authentication Guideline (2006) (providing technical guidance to federal agencies on electronic authentication of users over open networks). Authentication requirements can be added, which changes the analysis. See infra section III.C (discussing implications of authentication requirements).

97    See Peter Steiner, Cartoon, On the Internet, Nobody Knows You're a Dog, New Yorker, July 5, 1993, at 61.

98    See Stephen D. Crocker, Opinion, How the Internet Got Its Rules, N.Y. Times (Apr. 6, 2009), http://www.nytimes.com/2009/04/07/opinion/07crocker.html (on file with the Columbia Law Review) (explaining history, function, and significance of RFCs).

99    T. Berners-Lee et al., Network Working Grp., Request for Comments: 1945, Internet Engineering Task Force (2006), http://tools.ietf.org/html/rfc1945 [http://perma.cc/PS7 4-4C3A] [hereinafter RFC1945]; T. Berners-Lee et al., Network Working Grp., Request for Comments: 2616, Internet Engineering Task Force (1999), http://www.ietf.org/rfc/rfc2616.txt [http://perma.cc/7MJN-PWFK] [hereinafter RFC2616].

100    RFC1945, supra note 99, at 1; RFC2616, supra note 99, at 1.

101    RFC1945, supra note 99, at 1.

102    RFC2616, supra note 99, at 7.

103    RFC1945, supra note 99, at 6.

104    Id. at 6-7.

105    Kerr, Cybercrime's Scope, supra note 93, at 1644-46.

106    748 F.3d 525, 530-31 (3d Cir. 2014) (presenting facts of case and criminal charges).

107    Id. at 531.

108    The Third Circuit did not reach the authorization question, as the court reversed the conviction on venue grounds. See id. at 532.

109    This was the issue first raised in United States v. Drew, 259 F.R.D. 449, 451 (C.D. Cal. 2009) ("This case raises the issue of whether ... violations of an Internet website's terms of service constitute a crime under the [CFAA]." (footnote omitted)). Full disclosure: I represented Drew.

110    See United States v. Nosal, 676 F.3d 854, 861-62 (9th Cir. 2012) (providing examples).

111    See id. (listing specific details of various terms of use).

112    Consider this legal advice for franchisors who create websites:
       If a franchisor does decide to operate a site where it allows others to post content, it must address a number of issues. For example, it must take steps to avoid liability for copyright infringement, defamation, violation of privacy rights, and misappropriation of "hot news" and even criminal charges associated with such postings. It should, therefore, develop and publish comprehensive terms of use that prohibit inappropriate postings ....
       Powell & Ralls, supra note 67, at 235 (footnotes omitted).

113    Id.

114    In the Drew prosecution, for example, the government charged Drew with having participated in the creation of a MySpace profile that was not truthful in violation of MySpace's Terms of Use. See Drew, 259 F.R.D. at 452 (listing charges on indictment, including setting up profile of "16 year old male juvenile named 'Josh Evans'"). Although the government presented the use of MySpace in violation of the terms as a trespass, it turned out that the co-founder of MySpace, Tom Anderson, whose MySpace profile greeted every new user, lied about his age in his own profile in violation of MySpace's Terms of Use. See Jessica Bennett, MySpace: How Old Is Tom?, Newsweek (Oct. 27, 2007, 11:22 AM), http://www.newsweek.com/myspace-how-old-tom-103043 [http://perma.cc/8FZS-28ZD] (reporting on Anderson's false age on his profile).

115    See Kerr, Cybercrime's Scope, supra note 93, at 1657-58 ("[A] qualitative difference exists between the culpability and threat to privacy and security raised by breach of a computer use contract on one hand, and circumvention of a code-based restriction on the other.").

116    According to one study, only 1.4% of users fully read end user license agreements (EULAs) for software programs, even though they require explicit agreement and generally require the user to claim she read the agreement. See Jens Grosskhags & Nathan Good, Empirical Studies on Software Notices to Inform Policy Makers and Usability Designers, http://people.ischool.berkeley.edu/~jensg/research/paper/Grosskhags07-USEC.pdf [http://perma.cc/VP8S-RGVF] (last visited Jan. 26, 2016). The readership of terms of use on a website is likely much lower, as readers ordinarily are not prompted to do so and are less likely to see visiting a website as a significant occasion.

117    See Aleecia M. McDonald & Lorrie Faith Cranor, The Cost of Reading Privacy Policies, 4 I/S: J.L. & Pol'y for Info. Soc'y 543, 565 (2008) (concluding it would take hundreds of hours for typical consumer to actually read privacy policies encountered in one year of typical Internet use).

118    See In re Google Inc. Cookie Placement Consumer Privacy Litig., 988 F. Supp. 2d 434, 439-40 (D. Del. 2013) ("Cookies are used in internet advertising to store website preferences, retain the contents of shopping carts between visits, and keep browsers logged into social networking services and web mail as individuals surf the internet.").

119    Amit Agarwal, How to Bypass the New York Times Paywall (July 15, 2013), http://www.labnol.org/internet/nyt-paywall/18992 [http://perma.cc/R6XH-2GKD].

120    Id.

121    See id. (describing how to bypass New York Times paywall by deleting cookies).

122    This is the case with traditional browser cookies, at least. Different kinds of cookies may present different issues. See, e.g., Paul Lanois, Privacy in the Age of the Cloud, 15 J. Internet L. 3, 5 (2011) (discussing flash cookies).

NORMS OF COMPUTER TRESPASS, 116 Colum. L. Rev. 1143

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 172 of 187

123    For example, in the popular Chrome browser, users can go into "incognito" mode, which will not store cookies. Alternatively, they can delete all of the cookies stored on their browsers. See Laura, Google, Manage Your Cookies and Site Data, Chrome Help, http://support.google.com/chrome/answer/95647?hl=en [http://perma.cc/W262-45MU] (last visited Jan. 26, 2016) (describing how to delete cookies). Each step takes only seconds and is a common and expected part of surfing the Web.

124    See Danny Sullivan, The Leaky *New York Times* Paywall & How "Google Limits" Led to "Search Engine Limits," Search Engine Land (Mar. 22, 2011, 4:45 AM), http://searchengineland.com/leaky-new-york-times-paywall-google-limits-69302 [http://perma.cc/DW9Y-8KVZ] (describing shortcoming of *New York Times* paywall system).

125    The same principle also applies to browser restrictions based on "user agents," an issue that arose but was not resolved in the *Auernheimer* case. See Appellant's Amended Reply Brief at 13-14, United States v. Auernheimer, 748 F.3d 525 (3d Cir. 2014) (No. 13-1816), 2013 WL 6825411 ("Changing the user agent does not make a person guilty of trespass, whether that trespass is a physical trespass or the cyber trespass of the CFAA.").

126    964 F. Supp. 2d 1178 (N.D. Cal. 2013).

127    E.g., id. at 1181 n.2.

128    Id. at 1180.

129    Id. at 1180-81.

130    Id. at 1186.

131    Id. at 1186 n.7.

132    Why Does Your IP Address Change Now and Then?, What Is My IP Address, http://whatismyipaddress.com/keeps-changing [http://perma.cc/QE8N-KDLB] (last visited Jan. 26, 2016).

133    See How to Change Your IP Address, What Is My IP Address, http://whatismyipaddress.com/change-ip [http://perma.cc/9GLE-73RK] (last visited Jan. 26, 2016) (noting turning modem off and then back on will sometimes change IP address).

134    See Quentin Hardy, VPNs Dissolve National Boundaries Online, for Work and Movie-Watching, N.Y. Times: Bits Blog (Feb. 8, 2015, 5:30 AM), http://bits.blogs.nytimes.com/2015/02/08/in-ways-legal-and-illegal-vpn-technology-is-erasing-international-borders/ (on file with the *Columbia Law Review*) ("Millions of people around the world now pay for virtual private computer networks ... to hook into a server in the United States.").

135    No. 10-114 (KSH), 2010 WL 9552416 (D.N.J. Oct. 12, 2010).

136    E.g., Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1048 (N.D. Cal. 2010).

137    See CAPTCHA: Telling Humans and Computers Apart Automatically, CAPTCHA, http://www.captcha.net/ [http://perma.cc/9FHM-C62D] (last visited Jan. 26, 2016) (using this image as sample).

138    See id. (explaining usefulness of CAPTCHAs).

139    See, e.g., Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 162 (S.D.N.Y. 2014) (denying motion to dismiss in contract claim brought under website terms of use); Cvent, Inc. v. Eventbrite, Inc., 739 F. Supp. 2d 927, 937-38 (E.D. Va. 2010) (evaluating contract claim based on website terms of use).

140    Suing customers is costly and can trigger negative press attention, making such suits rare even if website misuse is common.

141    See, e.g., *Ward*, 3 F. Supp. 3d at 162 (denying motion to dismiss claim based on violation of website's terms of use).

142    For example, in the Lori Drew case, which involved a CFAA prosecution for violating MySpace's Terms of Use, MySpace remained curiously silent throughout the case. See, e.g., Scott Glover & P.J. Huffstutter, 'Cyber Bully' Fraud Charges Filed in L.A., L.A. Times (May 16, 2008), http://articles.latimes.com/2008/may/16/local/me-myspace16 [http://perma.cc/6QY3-

M9DX] (reporting on Drew's indictment and noting MySpace had not responded to request for comment). In the *Auernheimer* case, the victim, AT&T, was also quiet: At sentencing, when the probation office asked AT&T to detail its losses at sentencing, AT&T declined to respond. Brief of Defendant-Appellant at 52, United States v. Auernheimer, 748 F.3d 525 (3rd Cir. 2014) (No. 13-1816), 2013 WL 3488591. In the Aaron Swartz case, the victim, JSTOR, actively opposed the prosecution. See, e.g., Zach Carter et al., Aaron Swartz, Internet Pioneer, Found Dead Amid Prosecutor 'Bullying' in Unconventional Case, Huffington Post (Jan. 13, 2013), http://www.huffingtonpost.com/2013/01/12/aaron-swartz_n_2463726.html [http://perma.cc/ VXS8-W4LM] ("JSTOR opposed prosecuting Swartz ....").

143     See generally William E. Burr, Donna F. Dodson & W. Timothy Polk, Nat'l Inst. of Standards & Tech., Electronic Authentication Guideline 12-13 (2006), http://csrc.nist.gov/publications/nistpubs/800-63/SP800-63V1_0_2.pdf [http://perma.cc/VXS8-W4LM] (noting credentials are required part of e-authentication process).

144     United States v. Morris, 928 F.2d 504, 509 (2d Cir. 1991).

145     Claridge v. RockYou, Inc., 785 F. Supp. 2d 855, 858 (N.D. Cal. 2011).

146     E.g., Josh Shaul, Why Do SQL Injection Attacks Continue to Succeed?, SC Mag. (May 24, 2011), http:// www.scmagazine.com/why-do-sqlinjectionattacks-continue-to-succeed/article/203679/ [http://perma.cc/PM4C-TECV].

147     Id.

148     Id.

149     Michael R. Siebecker, Cookies and the Common Law: Are Internet Advertisers Trespassing on Our Computers?, 76 S. Cal. L. Rev. 893, 897 (2003).

150     See id. at 897-90 (outlining process by which cookies are placed on computers, how they work once deposited, and purposes they serve).

151     After a period of inactivity, the session may expire and the session cookie no longer works. At that point, the user must enter in the username and password to log in.

152     See supra notes 50-53 (discussing *Auernheimer* facts and issues).

153     Good security practices can help avoid the murkiest cases, however. For example, imagine a website required users to enter a secret password to enter the site but announced that the password was either "red" or "green." Such an example blurs the line between speed bump and authentication gate. But it is easy for website owners to avoid the blurry lines simply by having better authentication practices.

154     See United States v. Morris, 928 F.2d 504, 511 (2d Cir. 1991) (discussing "unauthorized access" requirement).

155     595 F. App'x 208 (4th Cir. 2014).

156     Id. at 209-10.

157     Id. at 211.

158     Id. For a similar case reaching the same result, see United States v. Shahulhameed, No. 14-5718, 2015 WL 6219237, at *2 (6th Cir. Oct. 22, 2015) (holding employee's authorization to access his work account ended when he was informed by telephone and email that he was fired). The point was assumed by the parties and apparently accepted by the court in LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1136 (9th Cir. 2009) (noting "[t]here is no dispute" that if employee accessed company computer after leaving company then employee "would have accessed a protected computer 'without authorization' for purposes of the CFAA").

159     See *Morris*, 928 F.2d at 511 (discussing meaning of "unauthorized access").

160     Indictment, United States v. Swartz, Cr. 11-ER-10260 (D. Mass. July 14, 2011). Swartz committed suicide before his case went to trial. John Schwartz, Internet Activist, a Creator of RSS, Is Dead at 26, Apparently a Suicide, N.Y. Times (Jan. 12, 2013),

NORMS OF COMPUTER TRESPASS, 116 Colum. L. Rev. 1143

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 174 of 187

http://www.nytimes.com/2013/01/13/technology/aaron-swartz-internet-activist-dies-at-26.html (on file with the *Columbia Law Review*). I will assume the facts in the indictment are true.

161  Indictment at 4-5, United States v. Swartz, Cr. 11-ER-10260 (D. Mass. July 14, 2011).

162  See id. at 4 (noting computer was registered under "fictitious guest name 'Gary Host'").

163  See id. at 8-9 (describing observation of Swartz "entering the restricted basement network wiring closet" and "attempt[ing] to evade identification").

164  Id. at 7-8.

165  See supra notes 126-134 and accompanying text (discussing trespass liability for circumventing IP blocks).

166  610 F. App'x 334 (4th Cir. 2015).

167  Brief of Appellant at 3, *Rich*, 610 F. App'x 334 (No. 14-4774), 2015 WL 860788, at *9.

168  Id. at 4.

169  Id.

170  See generally Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006) (defining agent).

171  See, e.g., Rich v. Tite-Knot Pine Mill, 421 P.2d 370, 374 (Or. 1966) (noting "one who originally enters the premises as a licensee may forfeit his license and become a trespasser if he exceeds its scope").

172  445 P.2d 590, 591 (Or. 1968) (en banc).

173  See id. ("The undisputed evidence was that the only purpose for which Douglas had authorized his employee to use the house key was to attend to the feeding of the Douglas's household pets.").

174  See State ex rel. Coffelt v. Hartford Accident & Indem. Co., 314 S.W.2d 161, 163 (Tenn. Ct. App. 1958) ("The basis for holding the principal for the acts of his agent is that the agent acts as the principal's *alter ego* or other self.").

175  United States v. Rich, 610 F. App'x 334, 335-36 (4th Cir. 2015).

176  They don't, at least right now. See Google Terms of Service, Google (Apr. 14, 2014), http://www.google.com/intl/en/policies/terms/ [http://perma.cc/7T2J-PEQL] (including warning to "keep your password confidential" but refraining from enacting formal requirement).

177  See supra section III.B (discussing legal implications of terms of use).

178  For an introduction to mens rea, see generally Joshua Dressler, Understanding Criminal Law 117-36 (6th ed. 2012).

179  See, e.g., 18 U.S.C. § 1030(a)(2) (2012) (prohibiting intentional access without authorization or exceeding authorized access); Cal. Penal Code § 502(c)(7) (West 2010) (prohibiting "access[]" to "any computer, computer system, or computer network" that is "[k]nowing[] and without permission"); Colo. Rev. Stat. Ann. § 18-5.5-102 (West 2013) (prohibiting knowing access without authorization or exceeding authorized access).

180  18 U.S.C. § 1030(a)(2).

181  See generally Kenneth W. Simons, Ignorance and Mistake of Criminal Law, Noncriminal Law, and Fact, 9 Ohio St. J. Crim. L. 487 (2012) (exploring difficulty raised by mental states with respect to criminal elements having aspects of both law and fact).

182  See, e.g., McFadden v. United States, 135 S. Ct. 2298, 2304 (2015) (holding, in prosecutions for knowingly distributing a controlled substance, government must prove either that defendant knew substance he distributed was on list of controlled substances or that defendant "knew the identity of the substance he possessed" and it was on the controlled-substances list); Elonis v. United States, 135 S. Ct. 2001, 2009 (2015) ("[A] defendant generally must know the facts that make his conduct fit the definition of the offense even if he does not know that those facts give rise to a crime." (citations omitted) (internal

quotation marks omitted) (quoting Staples v. United States, 511 U.S. 600, 607 n.3 (1994))); Morissette v. United States, 342 U.S. 246, 271 (1952) ("He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion."); United States v. Brown, 669 F.3d 10, 19-20 (1st Cir. 2012) (ruling, in prosecution for intentionally thwarting officers in course of their official duties, it was irrelevant that defendant believed officers were enforcing unconstitutional law and that therefore officers were not acting in course of their official duties).

183   For example, in *Liparota v. United States*, the Court construed a statute that punished knowingly using or possessing food stamps in a way unauthorized by law as requiring knowledge that the use or possession was legally unauthorized. 471 U.S. 419, 433 (1985). Applying *Liparota*, it could be argued that intentional unauthorized access also requires intent-- here, awareness or hope--about the act being legally unauthorized. This might be bolstered by the text of physical trespass statutes, which often plainly requires knowledge that presence is legally unauthorized. See, e.g., Model Penal Code § 221.2(2) (Am. Law Inst. 2015) ("A person commits an offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given ...."). *Liparota* is potentially distinguishable, however, because the lack of authorization in the computer trespass statute concerns lack of authorization with respect to the relevant norms, not the relevant law. Further, not all physical-trespass statutes have required knowledge as to the absence of legal privilege. See, e.g., N.J. Stat. Ann. § 2A:170-31 (repealed 1979).

184   See supra notes 160-164 (discussing defendant's knowledge of facts in *United States v. Swartz*). This is bolstered by the common use of "willfulness" in federal criminal statutes to indicate knowing violation of a legal duty, see, e.g., Cheek v. United States, 498 U.S. 192, 193 (1991) (applying willfulness standard to failure to file federal income tax return), a use that does not appear in the CFAA. A 1986 Senate report has a brief discussion of the purpose of changing the mental state for unauthorized access from knowing to intentional. S. Rep. No. 99-432, at 5-6 (1986), reprinted in 1986 U.S.C.C.A.N. 2479, 2483-84. The discussion is unclear and can be read as supporting either position.

185   United States v. Steele, 595 F. App'x 208 (4th Cir. 2014).

186   Id. at 211.

187   If courts construe the intent requirement as going to the legal conclusion that authorization is lacking, then the mental state requirement has an even more dramatic effect. It would prohibit liability unless the government can prove beyond a reasonable doubt that the defendant knew or hoped that his conduct was unlawful.

116 CLMLR 1143

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**

**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**

# EXHIBIT CC

Case 3:17-cv-03301-EMC   Document 48-1   Filed 07/20/17   Page 177 of 187

Judicial Council Of California Civil Jury Instruction 2210, Judicial Council Of California...

## Judicial Council Of California Civil Jury Instruction 2210

Judicial Council Of California Civil Jury Instructions  |  July 2017 Update
By the Judicial Council of California Advisory Committee on Civil Jury Instructions

Economic Interference


2210 Affirmative Defense—Privilege to Protect Own Financial Interest


[*Name of defendant*] claims that there was no intentional interference with contractual relations because [he/she/it] acted only to protect [his/her/its] legitimate financial interests. To succeed, [*name of defendant*] must prove all of the following:


1. That [*name of defendant*] had a [legitimate] financial interest in the contractual relations because [*specify financial interest*];

2. That [*name of defendant*] acted only to protect [his/her/its] own financial interest;

3. That [*name of defendant*] acted reasonably and in good faith to protect it; and

4. That [*name of defendant*] used appropriate means to protect it.

 *New June 2016*

**Directions for Use**

Give this instruction as an affirmative defense to a claim for intentional interference with contractual relations. (See CACI No. 2201.) The defense presents a justification based on the defendant's right to protect its own financial interest.

In element 1, the jury should be told the specific financial interest that the defendant was acting to protect. Include "legitimate" if the jury will be asked to determine whether that financial interest was legitimate, as opposed perhaps to pretextual or fraudulent.


**Sources and Authority**

- "In harmony with the general guidelines of the test for justification is the narrow protection afforded to a party where (1) he has a legally protected interest, (2) in good faith threatens to protect it, and (3) the threat is to protect it by appropriate means. Prosser adds: 'Where the defendant acts to further his own advantage, other distinctions have been made. If he has a present, existing economic interest to protect, such as the ownership or condition of property, or a prior contract of his own, or a financial interest in the affairs of the person persuaded, he is privileged to prevent performance of the contract of another which threatens it; and for obvious reasons of policy he is likewise privileged to assert an honest claim, or bring or threaten a suit in good faith.' " (Richardson v. La Rancherita (1979) 98 Cal.App.3d 73, 81 [159 Cal.Rptr. 285], internal citation omitted.)

- "Justification for the interference is an affirmative defense and not an element of plaintiff's cause of action." (*Richardson, supra,* 98 Cal.App.3d at p. 80.)

- "Something other than sincerity and an honest conviction by a party in his position is required before justification for his conduct on the grounds of 'good faith' can be established. There must be an objective basis for the belief which requires more than reliance on counsel." (*Richardson, supra,* 98 Cal.App.3d at pp. 82–83.)

Case 3:17-cv-03301-EMC  Document 48-1  Filed 07/20/17  Page 178 of 187

Judicial Council Of California Civil Jury Instruction 2210, Judicial Council Of California...

- "A thoroughly bad motive, that is, a *purpose solely to harm the plaintiff*, of course, is sufficient to exclude any apparent privilege which the interests of the parties might otherwise create, just as such a motive will defeat the immunity of any other conditional privilege. If the defendant does not act in a bona fide attempt to protect his own interest or the interest of others involved in the situation, he forfeits the immunity of the privilege. … *Conduct is actionable, when it is indulged solely to harm another, since the legitimate interest of the defendant is practically eliminated from consideration.* The defendant's interest, although of such a character as to justify an invasion of another's similar interest, is not to be taken into account when the defendant acts, not for the purpose of protecting that interest, but solely to damage the plaintiff." (Bridges v. Cal-Pacific Leasing Co. (1971) 16 Cal.App.3d 118, 132 [93 Cal.Rptr. 796], original italics.)

***Secondary Sources***

5 Witkin, Summary of California Law (10th ed. 2005) Torts, § 760

3 Levy et al., California Torts, Ch. 40, *Fraud and Deceit and Other Business Torts*, § 40.119 (Matthew Bender)

49 California Forms of Pleading and Practice, Ch. 565, *Unfair Competition*, § 565.137 (Matthew Bender)

12 California Points and Authorities, Ch. 122, *Interference*, § 122.42 et seq. (Matthew Bender)

© 2017 by the Judicial Council of California. All rights reserved. See front matter for a listing of Judicial Council Task Force and Advisory Committee members who have contributed to these jury instructions.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*hiQ Labs, Inc. v. LinkedIn Corp.*
**Case No. 3:17-cv-03301 EMC**


**Plaintiff's Supplemental Brief In Support Of
Motion for Preliminary Injunction**


# EXHIBIT DD

![Harvard Business Review]

**REGULATION**

# The Next Battle in Antitrust Will Be About Whether One Company Knows Everything About You

by Bala Iyer, Mohan Subramaniam, and U. Srinivasa Rangan

JULY 06, 2017



Vincent Tsui for HBR

Google's battle with the European Union has come to a head. On June 27 this year the EU fined Google $2.7 billion for alleged monopolistic or unfair trade practices. Google has appealed and is now preparing its defense. The EU's case asserts, among other things, that Google unfairly exploits its dominance in search engines and smartphone operating systems to restrict competition in

shopping services, ad placement services, and smartphone app store markets. In an earlier article, two of us (Bala and Srinivasa) provided a context to understand the respective argument of the EU and Google using the lens of digital-age markets. We highlighted how antitrust, the underpinnings of which are based on industrial-age economic theories, needs new thinking in the digital age to ensure that antitrust policies continue to remain effective guardians of consumer welfare without inadvertently impeding economic progress.

But as important as today's antitrust questions are, regulators shouldn't lose sight of the bigger picture. The coming battle in antitrust will not be about controlling markets in the traditional sense. It will be about the battle for control over consumers' information. The tech titans are currently in a race to see which of them can build a better digital replica of their consumers, which means finding a way to not just collect user data but also make it harder for competitors to do so. Tomorrow's monopolies won't be able to be measured just by how much they sell us. They'll be based on how much they know about us and how much better they can predict our behavior than competitors.

## How Monopoly Has Typically Worked

Monopolies were easier to define within well-circumscribed industries. Concentration ratios or assessments of dominance based on relative market shares were straightforward to measure. More important, the anticompetitive or anticonsumer welfare effects of any such monopolistic structures were easier to pin down. For example, Standard Oil's monopoly in the oil industry could be directly tied price gouging within that industry. However, digital markets do not follow the contours of conventional industry structures. They evolve more as interlocking ecosystems, and it's often difficult to determine how a monopoly position in one part of that ecosystem affects the rest of it. Based on observable market shares, the EU is correct in its claim that Google has a monopoly in search and smartphone OS. But evidence of its anticonsumer welfare effects is not clear-cut within those specific areas. In fact, Google gives those services away for free. Moreover, Google will most likely argue that its search engine has made e-commerce more efficient for consumers despite bundling it with AdSense and that its Android operating system has helped make smartphones and apps more ubiquitous and cheap despite bundling them with the Play Store. Essentially its case will rest on the tenuousness of the link between monopoly in one part of an interlocking ecosystem or technology stack and anticompetitive effects, if any, on another.

The tenuousness between monopolies and their anticonsumer welfare effects introduced by digital markets is only going to increase in the coming years. The next battle for monopoly may no longer be in observable markets or tangible parts of an interlocking ecosystem such as search or operating systems. And it may become even more difficult to tie any of the detrimental effects of these new monopolies to any specific company, market, or ecosystem. This new battle is for control of the *digital replica* of every individual. Google, Facebook, Amazon, and other such digital titans are already battling for dominance in this realm, fighting over who possesses a more complete digital replica of most individuals. As this battle intensifies, even the titans themselves may not have the necessary metrics to accurately gauge their relative dominance. And antitrust enforcers are a long way from being equipped to guard against its potential anticompetitive effects. Yet this is where the digital world is taking us.

## What Is a Digital Replica?

A *digital replica* is a digital representation of an individual, object, or asset. Such a representation is constructed based on an individual, object, or asset's interactions with its environment. In physical objects and assets, the concept has recently picked up steam with the easy availability of sensors and internet-of-things (IoT) connectivity. For instance, GE reportedly has 66,000 jet engine, locomotive, and turbine assets, each of which has a unique digital replica. The digital replica of its jet engine, for instance, relies on a variety of sensors that capture and transmit detailed information as the jet engine operates. This information is processed on a platform (Predix) using advanced modeling techniques. As a consequence, GE not only gets accurate predictions of how each component in the jet engine is faring but also is able to optimize the operation of the jet engine for maximum efficiency. The more elaborate and accurate the sensors, and the more the asset operates and interacts with its environment, the more precise its digital replica becomes. Using digital replicas, GE offers its customers new services such as predictive maintenance, which helps them plan for maintenance before a critical part of the engine breaks down. GE also offers outcome-based pricing, appropriating a part of the cost savings in fuel because of increased efficiency in the engine's performance.

Digital replicas are found in a growing number of physical assets, such as mattresses, toothbrushes, cars, excavators, CT scanners, dishwashers, and refrigerators. As most of such assets have a finite range of functions and interactions with their environments, it is understandable that the firms that own and operate them also have complete control over their digital replicas. Individuals,

however, are far more complex than physical assets; their digital replicas understandably are much harder to construct and control. Yet because of the ubiquity of e-commerce platforms, social media, IoT devices, smartphone apps, and the internet, most individuals leave substantial digital traces of their preferences, behaviors, and personas. They do so because the more intricate information they provide about themselves, the more customized services they get in return. This provides the digital titans with an unprecedented opportunity to collect all possible facets of this information and to construct as complete a digital replica as possible for every individual, one that most closely predicts peoples' behavior. The company that monopolizes this realm will wield far more power than what we have seen thus far.

## How Do the Digital Titans Create Individual Digital Replicas?

When Google developed its search engine, it probably never thought that it would start a journey toward building digital replicas for individuals. Every search we conduct offers select facets of our persona to Google. Similarly, every movie we watch through Netflix, every question we ask Alexa or Siri, and every interaction we have with our friends on Facebook imparts different slices of our persona, each contributing to a full digital replica of ourselves built by a digital titan. It is not surprising that these titans are trying everything they can think of to capture different facets of our personas. This in part explains many of their new forays outside of traditional tech services into domains such as automobiles and health care. A car can provide a treasure trove of information about our behavior. Most industrial-age firms, despite venturing into digital replicas, appear more interested in embellishing their traditional product sales and services. GE may make its dishwashers and refrigerators more attractive because of predictive maintenance features through its digital replicas. By contrast, a digital titan such as Amazon appears more interested in how we interact with a whole host of appliances and other objects in our homes through Alexa.

Historically, many firms have had deep knowledge about only specific facets of an individual's life. For example, financial institutions knew the financial lives of their customers; retailers accumulated knowledge about their customers' buying habits; and even libraries had information on users' reading habits. What they lacked, however, was a composite knowledge about individuals that came through the pooling of such information. Since competition was sector by sector, firms did not have the incentive to pool such information. Moreover, pooling disparate information was an onerous

task, and no firm had the desire to expend resources on such an effort. In other words, the analog versions of digital replicas were only partial pictures of individuals possessed by different market participants.

The arrival of the digital age has changed this picture completely. Digital titans like Google, Amazon, and Facebook now recognize that having a complete digital replica is not only desirable but also feasible. It is desirable because of enormous cross-selling and cross-advertising opportunities that would accrue for the firm that gets there ahead of others. It is becoming feasible because of how digitization has enveloped our lives, how we routinely leave digital traces as we interact in the digital world, and through technologies, such as APIs, that are making it easier for companies to share or access different slices of information that they possess.

## What Are the Implications?

If access to high-quality data on customer preferences is what companies are seeking, the ability to collect, connect, and integrate data from various sources will become the new competitive moat. This moat will restrict other competitors from gaining access to and control over individual digital replicas. Such new-age monopolies may not be visible through traditional industry concentration measures, but they will wield tremendous influence over consumers. Their allure will be their ability to provide unprecedented personalization based on the information they hold. Yet with such personalization customers may be restricted to see only what the provider wants them to see.

Monopolies in traditional markets are easy to detect. But a monopoly in who gets access to how individuals think, behave, and make day-to-day decisions is not. Individuals getting lured into providing monopoly access to their digital replicas because of the convenience of personalized services may never realize that their choices are being made not by them but by their providers.

## What Are Some Remedies?

Customers could try to control their identifying information and be careful about what access they provide to companies when they are in the market for a product or service. However, that's easier said than done. The more that personalization kicks in, the more we will expect sharing information to be the new norm.

Regulators will need to understand how to detect and prevent digital-age monopolies that enable control over individual digital replicas. While they should continue to watch out for mergers, acquisitions, and alliances that lead to market consolidation, regulators' attention should also be trained on efforts to consolidate access to information, enabling only a few firms to piece together full individual digital replicas. More important, they should also be watching out for how firms manage their APIs. These tactics may not be as visible as alliances or mergers, but they are potent tools for data integration and piecing together digital replicas.

Governments can control the infrastructure that provides identity services, with which they can prevent any one company from having a complete digital replica. The Indian government, with its Aadhaar card and UPI services, is one such example. With this control, the government can seek users' permission before allowing the search provider to integrate information.

Digital titans can create a protocol to share information and prevent anyone from getting an unfair advantage. This doesn't address privacy concerns, but it would go a long way toward assuaging our fears about this new form of information monopoly. When search results are provided, the titan should show the sources from which the information is gathered. This type of transparency will allow the customer to determine the sources of bias in the information provided.

In sum, data acquisition for digital replicas can manifest itself in many forms. These quests for data may pose major challenges for regulatory authorities keen on maintaining a well-functioning market system. As digital titans expand their reach and ownership of data across multiple domains, they may create a world where the atomistic competition so beloved by economists may become impossible.

---



**Bala Iyer** is a professor and chair of the Technology, Operations, and Information Management Division at Babson College in Wellesley, Massachusetts. Follow him on Twitter @BalaIyer.

---



Mohan Subramaniam is an associate professor of strategy at Boston College's Carroll School of Management. Follow him on Twitter @emsub57.



U. Srinivasa Rangan holds the Luksic Chair Professorship in Strategy and Global Studies at Babson College.

---

**This article is about REGULATION**

⊕ **FOLLOW** THIS TOPIC

Related Topics: TECHNOLOGY | INTERNET

---

## Comments

Leave a Comment

POST

---

**3** COMMENTS

---

### Gisela San Juan   9 days ago

I enjoyed read the article. I agree that is very important to have a perspective regulation about telcos.

**REPLY**                                                    0 👍 0 👎

---

∨ **JOIN THE CONVERSATION**

---

POSTING GUIDELINES

We hope the conversation that takes place in our community will be thoughtful, constructive, and respectful, providing all our readers must sign in or register. And to ensure the quality of the discussion, our moderating team will review all comments and may edit them for clarity, length, and relevance. Comments that are overly promotional, mean-spirited, or off-topic may be deleted per the moderators' judgment. All postings become the property of Harvard Business Publishing.