DONALD B. VERRILLI, JR. (*pro hac vice application pending*)
donald.verrilli@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
Washington, D.C.  20004
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
LAURA K. LIN (State Bar No. 281542)
laura.lin@mto.com
NICHOLAS D. FRAM (State Bar No. 288293)
nicholas.fram@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for LinkedIn Corporation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>             Plaintiff,<br><br>        vs.<br><br>LinkedIn Corporation,<br><br>             Defendant. | Case No. 17-CV-03301-EMC<br><br>**LINKEDIN CORPORATION'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     LINKEDIN'S ACTIONS ARE NOT SUBJECT TO CONSTITUTIONAL
        SCRUTINY .............................................................................................................. 3

        A.      LinkedIn's website is not a public forum ................................................... 3

        B.      A private party sending a letter is not state action ..................................... 5

III.    EVEN IF LINKEDIN'S CONDUCT WERE SUBJECT TO FIRST
        AMENDMENT SCRUNITY, HIQ CANNOT SHOW ANY CONSTITUTIONAL
        VIOLATIONS ........................................................................................................... 7

        A.      The CFAA is a law of general application and its enforcement therefore
                raises no First Amendment issue ............................................................... 7

        B.      hiQ lacks any basis for limiting the CFAA's application because the
                automated scraping activity of its bots is nonexpressive conduct that
                warrants no First Amendment protection .................................................. 9

        C.      hiQ cannot claim a "right to receive" member data via the scraping activity
                of its bots because it has not established the existence of a "willing speaker" ....... 11

        D.      Even if any right to access member data existed, hiQ has no right to access,
                extract, and aggregate LinkedIn member data through automated bots ................. 14

        E.      hiQ expressly agreed not to engage in the very conduct it now seeks an
                injunction to engage in, foreclosing any First Amendment claim ......................... 15

        F.      Even if LinkedIn's actions might be subject to First Amendment scrutiny
                and are considered a restraint on speech, they are lawful ...................................... 16

IV.     THE CALIFORNIA CONSTITUTION DOES NOT WARRANT ANY
        INJUNCTION ......................................................................................................... 16

V.      HIQ HAD FAIR NOTICE THAT ITS CONDUCT COULD LEAD TO
        PENALTIES ............................................................................................................ 18

VI.     HIQ'S ASSERTED POLICY CONCERNS ARE NOT IMPLICATED HERE ................ 20

VII.    CONCLUSION ....................................................................................................... 20

1

2

# TABLE OF AUTHORITIES

**Page**

3

**FEDERAL CASES**

4

*Alexis v. McDonald's Rests. of Mass., Inc.,*
    67 F.3d 341 (1st Cir. 1995) ........................................................................6, 7

5

6

*Angelico v. Lehigh Valley Hosp., Inc.,*
    184 F.3d 268 (3d Cir. 1999) .........................................................................6

7

8

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986) ...............................................................................7, 10

9

*Armes v. City of Philadelphia,*
    706 F. Supp. 1156 (E.D. Pa. 1989) ...............................................................8

10

11

*Barnard v. Young,*
    720 F.2d 1188 (10th Cir. 1983) ....................................................................6

12

13

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) .....................................................................................6

14

15

*Bolger v. Youngs Drugs Prods. Corp.,*
    463 U.S. 60 (1983) .....................................................................................16

16

*Bond v. Utreras,*
    585 F.3d 1061 (7th Cir. 2009) ....................................................................11

17

18

*Broad. Corp. v. Clark,*
    654 F.2d 423 (5th Cir. 1981) ......................................................................15

19

20

*Broadley v. Hardman,*
    301 F. App'x 4 (1st Cir. 2008) .....................................................................6

21

*Brooks v. Atwood,*
    2016 WL 226009 (C.D. Cal. Jan. 19, 2016)................................................6

22

23

*Brown v. Kerr-McGee Chem. Corp.,*
    767 F.2d 1234 (7th Cir. 1985) ....................................................................17

24

25

*Buza v. Yahoo!, Inc.,*
    2011 WL 5041174 (N.D. Cal. Oct. 24, 2011) ..............................................4

26

*Cape Cod Nursing Home Council v. Rambling Rose Rest Home,*
    667 F.2d 238 (1st Cir. 1981) ........................................................................7

27

28

*Carey v. Cont'l Airlines, Inc.,*
    823 F.2d 1402 (10th Cir. 1987)....................................................................7

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Cnty. of Orange*,
    245 B.R. 138 (C.D. Cal. 1997)...............................................................15

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991) ....................................................................8, 15

*Collins v. Womancare*,
    878 F.2d 1145 (9th Cir. 1989)...............................................................6

*CompuServe Inc. v. Cyber Promotions, Inc.*,
    962 F. Supp. 1015 (S.D. Ohio 1997)........................................................9

*Compuware Corp. v. Moody's Inv'rs Servs., Inc.*,
    499 F.3d 520 (6th Cir. 2007)...............................................................15

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ........................................................................16

*Couponcabin LLC v. Savings.com*,
    2016 WL 3181826 (N.D. Ind. June 8, 2016)................................................19

*Craigslist, Inc. v. 3Taps, Inc.*,
    964 F. Supp. 2d 1178 (N.D. Cal. 2013) ..........................................9, 19, 20

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ........................................................................17

*Cyber Promotions, Inc. v. Am. Online, Inc.*,
    948 F. Supp. 436 (E.D. Pa. 1996) ..........................................................4

*Dallas v. Stanglin*,
    490 U.S. 19 (1989) ........................................................................10

*Daniel v. City of Glendale*,
    2015 WL 5448803 (C.D. Cal. May 7, 2015)..................................................8

*Dennis v. Sparks*,
    449 U.S. 24 (1980) ..........................................................................6

*Denver Area Educ. Telecom's Consortium, Inc. v. F.C.C.*,
    518 U.S. 727 (1996) ........................................................................7

*Dietemann v. Time, Inc.*,
    449 F.2d 245 (9th Cir. 1971)............................................................1, 8

**TABLE OF AUTHORITIES**
(continued)

Page

*Drogin v. Yahoo*,
   2009 WL 1393248 (N.D. Cal. May 14, 2009) ...........................................................................4

*eBay, Inc. v. Bidder's Edge, Inc.*,
   100 F. Supp. 2d 1058 (N.D. Cal. 2000) ...............................................................................9

*Edmonson v. Leesville Concrete Co.*,
   500 U.S. 614 (1991) ...............................................................................6

*Everett v. Paul Davis Restoration, Inc.*,
   771 F.3d 380 (7th Cir. 2014) ...............................................................................7

*Facebook, Inc. v. Power Ventures, Inc.*,
   2013 WL 5372341 (N.D. Cal. Sept. 25, 2013) ...............................................................................20

*Facebook, Inc. v. Power Ventures, Inc.*,
   2017 WL 1650608 (N.D. Cal. May 2, 2017) ...............................................................................16

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ...............................................................................7, 8, 19

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
   194 F.3d 505 (4th Cir. 1999) ...............................................................................8

*Frankel v. Citicorp Ins. Servs., Inc.*,
   2014 WL 10518555 (E.D.N.Y. Aug. 12, 2014) ...............................................................................17

*Franklin v. Fox*,
   312 F.3d 423 (9th Cir. 2002) ...............................................................................6

*Gartner v. U.S. Info. Agency*,
   726 F. Supp. 1183 (S.D. Iowa 1989) ...............................................................................14

*Ginsberg v. Healey Car & Truck Leasing, Inc.*,
   189 F.3d 268 (2d Cir. 1999) ...............................................................................6

*Green v. Am. Online (AOL)*,
   318 F.3d 465 (3d Cir. 2003) ...............................................................................4

*Gregg v. Barrett*,
   771 F.2d 539 (D.C. Cir. 1985) ...............................................................................11, 12

*Grossman v. DTE Energy Co.*,
   2010 WL 5279836 (E.D. Mich. Dec. 17, 2010) ...............................................................................6

**TABLE OF AUTHORITIES**
(continued)

Page

*Hahn v. Star Bank*,
  190 F.3d 708 (6th Cir. 1999) ................................................................................6

*Hightower v. City & Cty. of San Francisco*,
  No. C-12-5841 EMC, 2013 WL 361115 (N.D. Cal. Jan. 29, 2013) ........................................10

*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015) .............................................................................10

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ................................................................................14, 15

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000) ................................................................................4

*Hudgens v. NLRB*,
  424 U.S. 507 (1976) ................................................................................3

*JA Apparel Corp. v. Abboud*,
  682 F. Supp. 2d 294 (S.D.N.Y. 2010) ................................................................15

*Jayne v. Google Internet Search Engine Founders*,
  263 F. App'x 268 (3d Cir. 2008) ................................................................................4

*Jefferson v. Save Mart Supermarket*,
  2011 WL 285040 (E.D. Cal. Jan. 26, 2011) ................................................................8

*Johnson v. Stuart*,
  702 F.2d 193 (9th Cir. 1983) ................................................................................2, 11

*Ketcham v. U.S. Nat'l Park Serv.*,
  2016 WL 4269037 (D. Wyo. Feb. 5, 2016) ................................................................12

*Kinderstart.com LLC v. Google, Inc.*,
  2006 WL 3246596 (N.D. Cal. July 13, 2006) ................................................................4

*Kirtley v. Rainey*,
  326 F.3d 1088 (9th Cir. 2003) ................................................................................6

*Klein v. San Diego Cnty.*,
  463 F.3d 1029 (9th Cir. 2006) ................................................................................17

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ................................................................................4

-v-

**TABLE OF AUTHORITIES**
(continued)

Page

*Lloyd Corp. v. Tanner*,
     407 U.S. 551 (1972) ................................................................................3, 8

*LRVC Holdings, Inc. v. Brekka*,
     581 F.3d 1127 (9th Cir. 2009) .................................................................18

*McKinney v. Herald News*,
     2008 WL 4601758 (D.N.J. Oct. 15, 2008) ...............................................4

*Murawski v. Pataki*,
     514 F. Supp. 2d 577 (S.D.N.Y. 2007) ......................................................4

*Nat'l Org. for Women v. Operation Rescue*,
     37 F.3d 646 (D.C. Cir. 1994) ...................................................................8

*Nixon v. Warner Commc'ns, Inc.*,
     435 U.S. 589 (1978) ................................................................................15

*Noah v. AOL Time Warner, Inc.*,
     261 F. Supp. 2d 532 (E.D. Va. 2003) .......................................................4

*Ohno v. Yasuma*,
     723 F.3d 984 (9th Cir. 2013) .............................................................5, 6, 7

*Packingham v. North Carolina*,
     137 S. Ct. 1730 (2017) ..........................................................................4, 5

*Paramount Contractors & Developers, Inc. v. City of Los Angeles*,
     805 F. Supp. 2d 977 (C.D. Cal. 2011) ....................................................18

*Penn. Family Inst., Inc. v. Black*,
     489 F.3d 156 (3d Cir. 2007) ...................................................................11

*Putnam Pit, Inc. v. City of Cookeville, Tenn.*,
     221 F.3d 834 (6th Cir. 2000) ..................................................................14

*Quigley v. Yelp*,
     2017 U.S. Dist. LEXIS 103771 (N.D. Cal. July 5, 2017) .........................4

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
     515 U.S. 819 (1995) ................................................................................16

*Sorrell v. IMS Health Inc.*,
     564 U.S. 552 (2011) ................................................................................12

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

4
*Spence v. State of Wash.*,
    418 U.S. 405 (1974) ...................................................................................................10

5

6
*Sutton v. Providence St. Joseph Med. Ctr.*,
    192 F.3d 826 (9th Cir. 1999)........................................................................................5

7
*Tompkins v. Cyr*,
    878 F. Supp. 911 (N.D. Tex. 1995).............................................................................7

8

9
*United States v. Grey Water*,
    395 F. Supp. 2d 850 (D.N.D. 2005) ...........................................................................17

10

11
*United States v. Jones*,
    565 U.S. 400 (2012) ...................................................................................................13

12
*United States v. Litchfield*,
    986 F. 2d 21 (2d Cir. 1993) .........................................................................................18

13

14
*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016)......................................................................................18

15

16
*United States v. Romm*,
    455 F.3d 990 (9th Cir. 2006)........................................................................................18

17
*United States v. Spencer*,
    160 F.3d 413 (7th Cir. 1998)........................................................................................17

18

19
*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ...................................................................................................11

20

21
*Virginia v. Hicks*,
    539 U.S. 113 (2003) ...............................................................................................2, 10

22
*W. Watersheds Project v. Michael*,
    196 F. Supp. 3d 1231, 1242 (D. Wyo. 2016) ..........................................................8, 12

23

24
*Wickersham v. City of Columbia*,
    481 F.3d 591 (8th Cir. 2007)........................................................................................6

25

26
*Wright v. City of St. Petersburg, Florida*,
    833 F.3d 1291 (11th Cir. 2016)....................................................................................10

27
*Wright v. Incline Vill. Gen. Improvement Dist.*,
    665 F.3d 1128 (9th Cir. 2011)......................................................................................3

28

# TABLE OF AUTHORITIES
## (continued)

Page

STATE CASES

*Beeman v. Anthem Prescription Mgmt., LLC*,
    58 Cal. 4th 329 (2013)....................................................................................................17

*City of Rancho Palos Verdes v. Abrams*,
    101 Cal. App. 4th 367 (2002).........................................................................................17

*Cychner v. Food 4 Less Holdings, Inc.*,
    2003 WL 22511527 (Cal. Ct. App. Nov. 6, 2003)..........................................................18

*Fashion Valley Mall, LLC v. NLRB*,
    42 Cal. 4th 850 (2007)......................................................................................................4

*Los Angeles Alliance for Survival v. City of Los Angeles*,
    22 Cal. 4th 352 (2000)....................................................................................................18

*People v. Navarro*,
    212 Cal. App. 4th 1336 (2013).......................................................................................18

FEDERAL STATUTES

18 U.S.C. § 1030 .............................................................................................. 1, *passim*

CONSTITUTIONAL PROVISIONS

U.S. Const., amend I .......................................................................................... 1, *passim*

## I.  **INTRODUCTION**

hiQ has identified no plausible legal justification for the unprecedented relief it seeks—a mandatory injunction granting hiQ access to LinkedIn's computers so that hiQ can deploy bots to scrape data and then use that data to threaten the privacy and job security of LinkedIn's members and the integrity of LinkedIn's relationship with those members.  LinkedIn's initial brief refuted the arguments that hiQ previously put forth to justify its remarkable demands.  This supplemental brief elaborates on why hiQ's "free speech" arguments are meritless.

LinkedIn has every right to stop hiQ from deploying bots to scrape data from LinkedIn's computers, and hiQ has no First Amendment right to countermand those efforts (indeed, it has not even asserted a direct First Amendment claim).  To state the obvious, LinkedIn is not the government.  It is a private entity with a right to control access to its private property and to decide how and to whom it will make information available from its servers as part of its business.  In particular, LinkedIn is not a public forum under the First Amendment; a *sine qua non* of a public forum is that it is owned and controlled *by the government*.  Nor is LinkedIn a state actor in any other sense that would justify imposing First Amendment constraints on its private choices.  Just as hiQ could not invoke the First Amendment to justify a physical trespass onto private property to obtain information for its business, it cannot invoke the First Amendment to justify a comparable digital trespass by its bots.  As the Ninth Circuit has made clear, "the First Amendment is not a license to trespass, to steal or to intrude by electronic means," and imposing liability for "wrongfully acquired data … chills intrusive acts.  It does not chill freedom of expression guaranteed by the First Amendment."  *Dietemann v. Time, Inc.*, 449 F.2d 245, 249-50 (9th Cir. 1971).

LinkedIn's decision to send hiQ a cease-and-desist letter invoking the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), as well as LinkedIn's other statutory, common law, and contract rights, does not convert LinkedIn into a government actor and magically grant hiQ a First Amendment access right that would not otherwise exist.  Even if the CFAA had never been enacted, LinkedIn would have every right to protect itself against hiQ's use of bots to scrape data from LinkedIn's computers, and hiQ, in turn, would have no First Amendment right to override those efforts.  The CFAA merely creates additional remedies to protect LinkedIn's private right to exclude

1  unwanted intrusions in the same way physical trespass law has provided remedies for owners of

2  private property for hundreds of years.  It is simply illogical to contend—as hiQ does—that

3  LinkedIn's invocation of the CFAA in a letter somehow gives hiQ an affirmative, judicially

4  enforceable First Amendment right to unleash its bots on LinkedIn's computers.  Yet that is

5  precisely what hiQ demands—not merely a declaration against LinkedIn's enforcement of the

6  CFAA but a mandatory injunction requiring LinkedIn to disable its technical measures and give hiQ

7  unfettered access to its servers.

8         In all events, any First Amendment challenge that hiQ might raise in response to LinkedIn's

9  efforts to protect its computers and assert its own rights under the CFAA would be spurious.  *First,*

10  LinkedIn's invocation of the CFAA raises no constitutional issue because the CFAA is a neutral law

11  of general application that prohibits unauthorized access to computers for any reason, whether

12  speech-related or not.  The intrusion, not the subsequent use of scraped data, violates the statute.

13         *Second*, hiQ's use of automated bots to scrape data from LinkedIn's computers is non-

14  expressive conduct, not speech entitled to First Amendment protection.  Enforcing the CFAA to stop

15  this conduct thus raises no First Amendment issue.  *See Virginia v. Hicks*, 539 U.S. 113, 123 (2003).

16         *Third*, hiQ has not asserted any other cognizable First Amendment interest that would excuse

17  its unauthorized access in violation of the CFAA.  It claims a "right to receive" information by using

18  bots to scrape data from LinkedIn's computers.  But what hiQ actually asserts is a right to *take* data

19  without LinkedIn's consent, not to receive it in the manner that LinkedIn makes it available to the

20  public.  Moreover, hiQ has failed to identify a "speaker who is willing to convey the information"

21  that hiQ seeks to take.  *Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983).  LinkedIn's members

22  may have elected to permit other people to view their profiles without logging in to LinkedIn, and to

23  permit certain search engines to index them.  But they did not agree to allow hiQ or any other third

24  party to extract, aggregate and analyze their information on a continuous basis and then sell the data-

25  mining results to their employers in ways that put their employment status and security at risk.  To

26  the contrary, hiQ's actions flagrantly violate LinkedIn's privacy commitments and member controls,

27  and subvert the expectations of LinkedIn members who opted to make their data visible.

28         *Fourth*, hiQ has not been denied the right to receive information in any relevant sense.

-2-

Anyone—including hiQ—who abides by LinkedIn's terms may view member public profile data. What hiQ demands, however, is the specific ability to use bots to take and manipulate data on LinkedIn's computers.  The First Amendment provides no such right.  And hiQ is particularly ill-placed to assert such a claim.  It repeatedly agreed to be bound by LinkedIn's User Agreement, including its express prohibitions on accessing the website through automated bots.  It cannot now claim a First Amendment right to violate its prior contractual commitments.

Acceptance of hiQ's arguments would threaten profound and harmful consequences. LinkedIn blocks approximately 95 million automated calls to its servers every day.  But as hiQ would have it, those efforts to prevent identity theft and other fraud, protect its users' privacy, and ward off denial of service attacks or other efforts to take down its system would all presumptively violate the newly-minted First Amendment right to receive information in the form and manner of the "recipient's" choosing.  It is untenable to suggest that the First Amendment would compel such a perverse result—a result inimical to both freedom of expression and to Internet innovation.  Yet that is precisely the path hiQ invites this Court to follow.  That invitation should be rejected.

## II.   LINKEDIN'S ACTIONS ARE NOT SUBJECT TO CONSTITUTIONAL SCRUTINY

LinkedIn is a private entity.  It has the right to decide what information it will make available to the public on its computers.  It also has the right to decide terms on which others may have access to its computers to obtain that information.  LinkedIn's exercise of those rights and its decision to send hiQ a cease-and-desist letter asserting those rights are private actions that are not subject to constitutional scrutiny.  No legal authority even remotely supports hiQ's remarkable assertion that the First Amendment limits LinkedIn's ability to protect itself and its members from hiQ's unwanted intrusions on the theory that LinkedIn is a public forum or that its letter is state action.

### A.   LinkedIn's website is not a public forum

The "general public does not generally have a First Amendment right to access private property for expression," much less for non-expressive data mining by anonymous automated bots. *See Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1137 (9th Cir. 2011); *see also Hudgens v. NLRB*, 424 U.S. 507, 519-21 (1976).  "Nor does property lose its private character merely because the public is generally invited to use it for designated purposes." *Lloyd Corp. v.*

-3-

*Tanner*, 407 U.S. 551, 569 (1972).  Indeed, hiQ itself acknowledges that the "'federal Constitution does not … protect[] the right to free speech'" on private property.  Mot. 16-17 (quoting *Fashion Valley Mall, LLC v. NLRB*, 42 Cal. 4th 850, 862 (2007)).

hiQ cannot evade these bedrock principles by mischaracterizing LinkedIn as a public forum. Courts uniformly have rejected the proposition that privately-owned Internet websites are public fora subject to constitutional limitations.  *See, e.g.*, *Quigley v. Yelp*, 2017 U.S. Dist. LEXIS 103771, at *5 (N.D. Cal. July 5, 2017) (denying request for TRO and rejecting argument that Yelp, Twitter and Facebook are subject to the First Amendment because they "perform a public function by disseminating news and fostering free and public political debate"); *Buza v. Yahoo!, Inc.*, 2011 WL 5041174, at *1 (N.D. Cal. Oct. 24, 2011) (rejecting claim "that Yahoo!'s services should be seen as a 'public forum' in which the guarantees of the First Amendment apply" as "not tenable under federal law.  As a private actor, Yahoo! has every right to control the content of material on its servers, and appearing on websites that it hosts."); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631–32 (D. Del. 2007) ("Plaintiff's analogy of [Google and other] Defendants' private networks to shopping centers and his position that since they are open to the public they become public forums is not supported by case law."); *Kinderstart.com LLC v. Google, Inc.*, 2006 WL 3246596, at *6 (N.D. Cal. July 13, 2006) (rejecting claim that Google is a state actor as the "Supreme Court has made clear that merely opening a space to the public does not dedicate the space to public use"); *Howard v. Am. Online Inc.*, 208 F.3d 741, 754 (9th Cir. 2000) (rejecting claim "AOL is a 'quasi-public utility' that 'involv[es] a public trust'" and "is an 'instrument or agent'" of state); *Green v. Am. Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) ("AOL is a private, for profit company and is not subject to constitutional free speech guarantees" because it "opens its network to the public").[1]

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), is fully consistent with this uniform body of law.  Contrary to hiQ's assertion (Reply 10), *Packingham* neither held nor implied that websites are public fora.  Rather, the Court struck down a state statute that "foreclos[ed] access to

---

[1] *See also, e.g.*, *Drogin v. Yahoo*, 2009 WL 1393248, at *1 (N.D. Cal. May 14, 2009); *Jayne v. Google Internet Search Engine Founders*, 263 F. App'x 268 (3d Cir. 2008); *Murawski v. Pataki*, 514 F. Supp. 2d 577, 588 (S.D.N.Y. 2007); *McKinney v. Herald News*, 2008 WL 4601758, at *3 (D.N.J. Oct. 15, 2008); *Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 546 (E.D. Va. 2003); *Cyber Promotions, Inc. v. Am. Online, Inc.*, 948 F. Supp. 436, 440-45 (E.D. Pa. 1996).

1   social media altogether" of an entire group of people.  *Id*. at 1737.  It said nothing about the rights of

2   a private entity to decide the terms of access to its own computers, nor did it bring about a seismic

3   shift in public forum law *sub silentio*.

4          Deeming private websites to be public fora would have drastic consequences.  First

5   Amendment scrutiny would potentially apply to every decision a website operator makes about

6   which automated bots to block—not to mention every decision an operator makes about what to say

7   and not say publicly.  Such a regime would be wholly inadministrable, both for website operators

8   (particularly given that entities like hiQ use anonymizing technologies to mask their identities) and

9   for the courts.  It would impose a perverse chill on both speech and Internet innovation.  As noted,

10   LinkedIn blocks approximately 95 million automated calls to its servers daily.  Rockwell Decl. ¶ 13.

11   LinkedIn has no idea whether a bot may have "good" intentions, or whether it is a malicious actor,

12   such as a hacker seeking to take down the LinkedIn site, a spammer, or an identity thief.  Yet hiQ

13   insists that every one of those 95 million daily decisions triggers First Amendment scrutiny because

14   it denies access to data that LinkedIn makes available to the public.  That cannot possibly be correct.

15          **B.      A private party sending a letter is not state action**

16          hiQ's alternative argument that LinkedIn's cease-and-desist letter triggers First Amendment

17   scrutiny is equally baseless.  LinkedIn is plainly not an arm of the government, and its letter—even

18   one that asserts its rights under a federal statute—is not state action.

19          There is a "presumption that private conduct does not constitute governmental action."

20   *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999).  To identify the rare

21   circumstances under which private conduct may become state action, courts employ a two-pronged

22   approach: "The first prong asks whether the claimed constitutional deprivation resulted from the

23   exercise of some right or privilege created by the State or by a rule of conduct imposed by the state

24   or by a person for whom the State is responsible.  The second prong determines whether the party

25   charged with the deprivation could be described in all fairness as a state actor."  *Ohno v. Yasuma*,

26   723 F.3d 984, 993-94 (9th Cir. 2013) (quotation marks and citation omitted).

27          To assess whether a private party can fairly be considered a state actor, courts employ a

28   variety of tests, *Ohno*, 723 F.3d at 995, only one of which is even arguably applicable here: the joint

-5-

action test.  Joint action exists where "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights."  *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (quotation marks omitted). [2]  The state must provide "'significant assistance' to the *underlying* acts" complained of.  *Ohno*, 723 F.3d at 996-97 (emphasis in original).  hiQ cannot possibly satisfy this test.  The government had nothing to do with LinkedIn's decision to revoke any purported access hiQ had through the cease-and-desist letter.

That the letter invoked LinkedIn's rights under federal and state law does not change the analysis.  A private party's assertion that another private party has violated the law is *not* state action.  For example, "merely complaining to the police does not convert a private party into a state actor."  *Collins v. Womancare*, 878 F.2d 1145, 1155 (9th Cir. 1989); *accord Wickersham v. City of Columbia*, 481 F.3d 591, 598 (8th Cir. 2007) ("mere invocation of state legal procedures, including police assistance, does not convert a private party into a state actor"); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) (same); *Alexis v. McDonald's Rests. of Mass., Inc.*, 67 F.3d 341, 351 (1st Cir. 1995) (calling police to remove trespasser was not state action).  Similarly, issuing a subpoena in litigation is not state action, even though, as with LinkedIn's cease-and-desist letter, "there are potential legal consequences attached to failure to obey a subpoena which might ultimately involve invoking the assistance of state officials."  *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 278 (3d Cir. 1999); *see also Hahn v. Star Bank*, 190 F.3d 708, 717 (6th Cir. 1999) (same); *Barnard v. Young*, 720 F.2d 1188, 1189 (10th Cir. 1983) (same); *Broadley v. Hardman*, 301 F. App'x 4, 6 (1st Cir. 2008).  Even filing a lawsuit is not state action. *See Dennis v. Sparks*, 449 U.S. 24, 28 (1980) ("merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge"); *Grossman v. DTE Energy Co.*, 2010 WL 5279836, at *2 (E.D. Mich. Dec. 17, 2010) (same);

---

[2] In other contexts, courts have found state action where (1) "the function at issue is both traditionally and exclusively governmental," *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (quotation marks omitted); (2) the state has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); or (3) where "state actors dominated decision making, . . . the private party's funds were supplied by state institutions, and . . . the private party is acting in lieu of a traditional state actor," *Brooks v. Atwood*, 2016 WL 226009, at *5 (C.D. Cal. Jan. 19, 2016); *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621-22 (1991).  Plainly, none of these standards is met here.

1  *Tompkins v. Cyr*, 878 F. Supp. 911, 915 (N.D. Tex. 1995) ("A litigant does not 'act under color of

2  state law' by merely filing a lawsuit and seeking a temporary injunction").

3          Respecting this public/private dichotomy is essential to protecting First Amendment values.

4  "[A] court's decision that a private party" is "a 'censor,' could itself interfere with that private

5  'censor's' freedom to speak." *Denver Area Educ. Telecom's Consortium, Inc. v. F.C.C.*, 518 U.S.

6  727, 737-38 (1996). This concern is directly implicated here, given that LinkedIn's cease-and-desist

7  letter *is itself protected speech and petitioning activity* under *Noerr-Pennington*. *See* Opp. 15-16.

8          In sending the cease-and-desist letter, all LinkedIn did was tell hiQ that it should cease

9  accessing LinkedIn's servers and that any further access would be unauthorized—or in other words,

10  would be a "computer trespass" under federal law. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d

11  1058, 1065 (9th Cir. 2016). Invoking one's rights under trespass law, and even calling the police to

12  enforce them, does not transform a private party into a state actor. *See Carey v. Cont'l Airlines, Inc.*,

13  823 F.2d 1402, 1404 (10th Cir. 1987); *Alexis*, 67 F.3d at 351. LinkedIn's actions thus fall into the

14  realm of private action that is not subject to constitutional scrutiny.[3]

15  **III.    EVEN IF LINKEDIN'S CONDUCT WERE SUBJECT TO FIRST AMENDMENT
         SCRUNITY, HIQ CANNOT SHOW ANY CONSTITUTIONAL VIOLATIONS**

16

17          Even if LinkedIn's cease-and-desist letter were erroneously considered state action sufficient

18  to implicate the Constitution, hiQ has utterly failed to identify any cognizable constitutional claim

19  that would justify the extraordinary relief it seeks.

20          **A.    The CFAA is a law of general application and its enforcement therefore raises
               no First Amendment issue**

21          Private parties may not "claim special protection from governmental regulations of general

22  applicability simply by virtue of their First Amendment protected activities." *Arcara v. Cloud*

---

23  [3] hiQ cited *Shelley v. Kramer* in its Motion. Aside from the fact that there the plaintiff obtained

24  affirmative judicial relief enforcing restrictive racial covenants, hiQ fails to mention that "*Shelley*'s
    attribution of state action to judicial enforcement has generally been confined to the context of

25  discrimination claims under the Equal Protection Clause." *Ohno*, 723 F.3d at 998; *accord Everett v.
    Paul Davis Restoration, Inc.*, 771 F.3d 380, 386 n.1 (7th Cir. 2014) (same). Of course, there are no

26  discrimination or Fourteenth Amendment claims at issue here. Moreover, courts have specifically

27  held that "[w]hatever the force [of *Shelley* and related discrimination cases] might have in the
    context of race discrimination and equal protection they do not serve to create a first amendment

28  right of access where none would otherwise exist." *Cape Cod Nursing Home Council v. Rambling
    Rose Rest Home*, 667 F.2d 238, 243 (1st Cir. 1981); *see infra* at 14.

1  *Books, Inc.*, 478 U.S. 697, 704-07 (1986).  Indeed, "generally applicable laws do not offend the First

2  Amendment simply because their enforcement . . . has incidental effects on [the] ability to gather"

3  information.  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).  Thus, laws protecting private

4  property owners against unauthorized intrusion may be enforced without raising any First

5  Amendment issue, even where an intruder claims that access is itself expressive activity or is

6  necessary to engage in speech.  As the Supreme Court held in *Tanner*, the "Court has never held that

7  a trespasser or an uninvited guest may exercise general rights of free speech on property privately

8  owned and used nondiscriminatorily for private purposes only."  *Tanner*, 407 U.S. at 568; *see also,*

9  *e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 521-22 (4th Cir. 1999) ("as

10  in *Cowles,* heightened scrutiny does not apply" to "trespass" claims).

11       Similarly, the Ninth Circuit has made clear that the "First Amendment is not a license to

12  trespass, to steal, or to intrude by electronic means," and that imposing liability for "wrongfully

13  acquired data" is what "chills intrusive acts.  It does not chill freedom of expression guaranteed by

14  the First Amendment."  *Dietemann*, 449 F.2d at 249-50.  And courts consistently have held that

15  parties "have no general First Amendment right to trespass on private property."  *Nat'l Org. for*

16  *Women v. Operation Rescue*, 37 F.3d 646, 655 (D.C. Cir. 1994); *see also Jefferson v. Save Mart*

17  *Supermarket*, 2011 WL 285040, at *4 (E.D. Cal. Jan. 26, 2011) ("Because there is no cognizable

18  federal First Amendment right to obtain signatures for initiatives or register citizens to vote at a

19  shopping mall, Officer Merchant's alleged arrest of plaintiff for trespass was lawful."); *Daniel v.*

20  *City of Glendale*, 2015 WL 5448803, at *3 (C.D. Cal. May 7, 2015) (rejecting claim that plaintiff

21  was "wrongly arrested" for "trespassing" as "plaintiff has no federal First Amendment right to free

22  speech on the property of a privately-owned shopping center"); *W. Watersheds Project v. Michael*,

23  196 F. Supp. 3d 1231, 1242 (D. Wyo. 2016) ("there is no First Amendment right to trespass upon

24  private property for the purpose of collecting resource data"); *Armes v. City of Philadelphia*, 706 F.

25  Supp. 1156, 1164 (E.D. Pa. 1989), *aff'd sub nom.*, 897 F.2d 520 (3d Cir. 1990) ("The right to

26  exclude others is a fundamental element of private property ownership, and the First Amendment

27  does not create an absolute right to trespass.").

28       The "CFAA prohibits acts of computer trespass."  *Power Ventures*, 844 F.3d at 1065.  Just

-8-

like state laws prohibiting trespass or other unwanted intrusions, it is a law of general application.  It does not target the act of speaking or the content of particular speakers or classes of speakers.  It prohibits unauthorized access to private and government computer systems, period, and without regard to speech.  Its enforcement to enjoin unauthorized intrusion by hiQ's automated bots would therefore raise no First Amendment issue—even if hiQ could manufacture an argument that its unauthorized scraping activities are expressive activities (and it cannot, *see infra* at 9-11).

The court in *3Taps* reached precisely this conclusion.  It rejected the defendant's argument that the CFAA's "plain language 'raises serious First Amendment implications,'" noting that the defendant "cites no authority even remotely on point, and does not respond" to the "observation that criminal enforcement of limits on the use of private property is common and not a presumptive violation of the First Amendment," citing *Tanner.* 964 F. Supp. 2d at 1186 n.8 (N.D. Cal. 2013); *see CompuServe Inc. v. Cyber Promotions, Inc*., 962 F. Supp. 1015, 1027 (S.D. Ohio 1997) ("Defendants' intentional use of plaintiff's proprietary computer equipment exceeds plaintiff's consent" and "continued after repeated demands that defendants cease"; the "First Amendment …provides no defense for such conduct").["4"]  hiQ likewise has made no such showing here.

**B.**   **hiQ lacks any basis for limiting the CFAA's application because the automated scraping activity of its bots is nonexpressive conduct that warrants no First Amendment protection**

Just as hiQ lacks any First Amendment argument for limiting enforcement of the CFAA's generally applicable prohibition of computer trespass, hiQ cannot identify any constraint on its *speech* or other *expressive* conduct that would warrant First Amendment protection.  LinkedIn seeks only to restrict hiQ's unauthorized access to and extraction of data from the LinkedIn website by hiQ's army of automated bots.  LinkedIn is not restricting anything hiQ says or sells to its clients, nor hiQ's speech on LinkedIn or any other website.

---

[4] In the trespass context, courts have long rejected the argument that a website being publicly accessible somehow authorizes access through any and all means.  As the court held in the seminal case *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000), which similarly involved a web scraper accessing eBay's website through automated technologies, the defendant "BE argues that it cannot trespass eBay's web site because the site is publicly accessible.  BE's argument is unconvincing.  eBay's servers are private property, conditional access to which eBay grants the public.  eBay does not generally permit the type of automated access made by BE.  In fact, eBay explicitly notifies automated visitors that their access is not permitted."  *Id.* at 1070.

The regulation of "*non*-expressive conduct … raise[s] no First Amendment concern in the first place." *Hodge v. Talkin*, 799 F.3d 1145, 1168 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2009 (2016); *see Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("[i]t is possible to find some kernel of expression in almost every activity a person undertakes … but such a kernel is not sufficient to bring the activity within the protection of the First Amendment"); *Hightower v. City & Cty. of San Francisco*, No. C-12-5841 EMC, 2013 WL 361115, at *7 (N.D. Cal. Jan. 29, 2013) (conduct must be "sufficiently expressive" to have "First Amendment protection"). The test for whether an activity is protected expressive conduct is (1) whether an "intent to convey a particularized message was present"; and (2) "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Wash.*, 418 U.S. 405, 410-11 (1974).

hiQ's automated bots merely scrape data. They do not speak at all, much less convey a particularized message. And it is well settled that an unauthorized attempt to gain access to private property is not itself "expressive" conduct warranting First Amendment protection—*even if* the party seeks to gain access to a public forum for the purpose of engaging in speech. *See, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) ("Even assuming the streets of [a property] are a public forum," a law that "subjects to arrest those who reenter after trespassing and after being warned not to return—*regardless* of whether, upon their return, they seek to engage in speech" does not have "anything to do with the First Amendment" (emphasis in original)); *Wright v. City of St. Petersburg, Florida*, 833 F.3d 1291, 1296-98 (11th Cir. 2016) ("Simply because the trespass warning incidentally burdened Wright's First Amendment activities does not mean that Ordinance § 20–30 is subject to First Amendment scrutiny. . . . First Amendment scrutiny 'has no relevance to [Ordinance § 20–30, which is] directed at imposing sanctions on nonexpressive activity'"); Opp. 22-23.

That such a restriction on non-expressive conduct might have an *incidental* effect on hiQ's ability to analyze LinkedIn member data and sell its current services is irrelevant, as the Supreme Court has made clear. Although "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities," a restriction is subject "to scrutiny *only where it was conduct with a significant expressive element that drew the legal remedy in the first place*." *Arcara*, 478 U.S. at 704-07 (emphasis added) (no First Amendment violation where illegal activity

-10-

prompting bookstore closure "manifest[ed] absolutely no element of protected expression").

Because LinkedIn's regulation of access to its website imposes no restriction on any *expressive conduct* by hiQ, hiQ can claim no conceivable violation of its First Amendment rights.

**C.      hiQ cannot claim a "right to receive" member data via the scraping activity of its bots because it has not established the existence of a "willing speaker"**

Because its automated bots are plainly not engaged in anything approaching expressive activity, hiQ must resort to arguing that enforcing the CFAA would infringe its "right to receive" LinkedIn member data.  That assertion is groundless.  No court has ever held that the First Amendment guarantees one private party a right to gain unauthorized access to data residing on the computers of another private party.  And at any rate, this theory fails because hiQ has not established, and cannot establish, that LinkedIn members are "willing speakers" of their profile data to hiQ's automated bots.

At the TRO hearing, the Court noted that "the right to receive information" is "just as important as the right to speak information."  Hr'g Tr. at 48:20-22 (June 29, 2017).  That is true. But for a constitutional violation to result "from a restriction of the right to receive information, there must be a speaker who is willing to convey the information."  *Johnson*, 702 F.2d at 195. Indeed, the "right to receive speech is 'entirely derivative' of the rights of the speaker," and thus "in order to maintain a 'right to listen' claim, a plaintiff must clearly establish the existence of a 'willing speaker.'"  *Penn. Family Inst., Inc. v. Black*, 489 F.3d 156, 165-66 (3d Cir. 2007); *see Bond v. Utreras*, 585 F.3d 1061, 1078 (7th Cir. 2009) ("Every circuit to have considered the question of standing in the context of a right-to-receive claim has reached the same conclusion: '[I]n order to maintain a 'right to listen' claim, a plaintiff must clearly establish the existence of a 'willing speaker.'"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) ("right to receive information" "presupposes a willing speaker").

Where parties do not wish for their speech to be accessed in a particular form or manner, they are not "willing speakers" of such information.  In *Gregg v. Barrett*, 771 F.2d 539 (D.C. Cir. 1985), the plaintiffs asserted a "right to receive a verbatim transcript of the proceedings of Congress," "undistorted" by subsequent additions or omissions made by members of Congress.  *Id.*

-11-

at 546.  The court held that a "member of Congress who makes a speech on the floor and later adds

or omits material for inclusion in the Congressional Record certainly cannot be considered a 'willing

speaker' for [plaintiffs'] purposes," as conveying the "undistorted" version of the transcript would

be "clearly contrary to the wishes of the individual speaker."  *Id.* at 547; *see also Ketcham v. U.S.*

*Nat'l Park Serv.*, 2016 WL 4269037, at *8 n.4 (D. Wyo. Feb. 5, 2016) (where National Park Service

imposed certain restrictions on ability of public to access and view bison culling activities, rejecting

plaintiff's "right to receive" unfettered access to bison culling and holding that "[t]here is no willing

speaker here, as the Defendants do not wish to allow Plaintiffs unrestricted access to bison culling.

Therefore, 'right to receive' information is not at issue in this case.").[5]

Likewise here, hiQ has not met, and cannot meet, its burden of "clearly establishing" that

LinkedIn's members are "willing speakers" in the sense that they wish to make their profile data

available for continuous, automated scraping by the surveillance bots of hiQ, which, among other

things, determines additions and omissions to profiles in order to sell its data-mining products to the

members' employers.  hiQ has not put forward a shred of evidence that *even a single* LinkedIn

member wants his or her data accessed, collected, and processed in this manner.  hiQ's entire

argument turns on the fact that LinkedIn members have selected the option that their profiles be

"visible" to the public (Mot. 17).  That argument is wrong and deeply threatening to the privacy

interests of LinkedIn's members and the integrity of LinkedIn's relationship with those members.

"Visible" simply means that users who are not logged into LinkedIn may *view* a member's

profile at a single snapshot in time, and that the profile may be indexed by certain search engines.

LinkedIn makes this clear to its members when they sign up for LinkedIn's services in its User

Agreement and Privacy Policy.  Rockwell Decl. ¶¶ 16, 21.  LinkedIn also offers settings that help

members control their data, including settings restricting the broadcasting of profile changes and

---

[5] *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) (Mot. 15 n.5) does not help hiQ.  First, that case concerned the constitutionality of a state statute, not private action.  Moreover, the law at issue there prohibited "the sale, disclosure, and use of pharmacy records," thus "prohibiting a speaker from conveying information that the speaker already possesses" and seeks to distribute, not accessing data in an unauthorized way against the speaker's wishes.  *Id.* at 567-68 (emphasis added).  As courts have held, "*Sorrell* … did not involve obtaining the information through illegal means," and there the "provider of information was aware, and willing" to distribute it.  *Michael*, 196 F. Supp. 3d at 1241 n.9.  Thus, *Sorrell* is inapplicable where, as here, "until such permission or authorization is obtained, [the parties] are not a willing provider of the information Plaintiffs' seek."  *Id.*

-12-

preventing search engines from indexing their profiles.  *Id.* ¶¶ 21-23.  LinkedIn's User Agreement also unambiguously prohibits automated scraping, and LinkedIn employs numerous technical measures and personnel to protect its site from automated bots.  *Id.* ¶¶ 5-16.  Contrary to hiQ's simplistic assertion, "visible" does not mean that members intend for their data to be received, aggregated, and analyzed by hiQ's bots on a continuous basis—and then conveyed to their employers, risking their job security.  *Cf. United States v. Jones*, 565 U.S. 400, 406 (2012) (even though vehicle was on "public roads" and "visible to all," party had reasonable expectation of privacy that vehicle would *not* be tracked by GPS device).  Indeed, if LinkedIn members knew that hiQ was accessing and collecting their data in this manner, many would not update their profiles— thus ultimately *chilling* speech on LinkedIn.  *See* Supp. Rockwell Decl. ¶ 4.

In fact, more than *50 million* LinkedIn members have used the feature restricting the broadcasting of profile changes, including over 15,000 members that work for hiQ's three identified customers (which is over 25% of these customers' employees with LinkedIn public profile pages). Supp. Rockwell Decl. ¶¶ 7, 10.  And in the last year, approximately 20% of LinkedIn members who made changes to their profiles have chosen not to broadcast those updates.  *Id.* ¶ 8.  By analyzing and transmitting every single change members make to their profiles, hiQ is directly undermining members' express choices *not* to broadcast their changes.  Further, LinkedIn has received numerous complaints from members who have discovered their scraped profile data on other sites, such as:

- "I will choose to keep what I want in my linkedin profile (either private or public) which is my choice and I will modify my profile when I want to. I could have even changed my profile details and modified my settings on linkedin. But it is not right for [a third party] to display the information I previously carried on my Linkedin profile. How does [a third party] get the permission to display my information to everyone without my authorization. I see this as a very serious privacy violation and what is Linkedin's stand"

- "I decided (for professional reasons) to hide part of my personal information so I changed my privacy setting and I deleted part of my working experience…. I found out that all the informations [sic] I tried to make not visible were still available on [another website]…. these kinds of things create a lack of confidence in using linkedin."

- "Why is [a third party] allowed to harvest and republish our data? . . . Are they selling it? Spamming us? What protection do you offer LinkedIn members?"

*Id.* ¶¶ 12-14, Exs. A-C.  Simply put, hiQ has not established and cannot clearly establish that either LinkedIn or its members were willing speakers to hiQ.  This is fatal to any "right to receive" claim.

**D.**      <u>**Even if any right to access member data existed, hiQ has no right to access, extract, and aggregate LinkedIn member data through automated bots**</u>

Even where a limited right to access certain information may exist (for example, from the government in limited situations), courts have held that there is no First Amendment right to access information in the specific form and manner the party demands.  Like any other user who abides by the terms of LinkedIn's User Agreement, hiQ could view LinkedIn public profile pages.  hiQ, however, argues that it has a constitutional right to access, extract, and aggregate LinkedIn member data through automated technologies that goes well beyond the access that LinkedIn affords to the public generally.  hiQ has pointed to no case establishing such a right.

To the contrary, the Supreme Court has expressly rejected this very theory.  In *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), the state allowed the press limited access to government information—reporters could tour a jail but could not bring in cameras or tape recorders, or interview inmates.  *Id*. at 5.  On the question of the type of access, the Court held that "[t]here is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information.  Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would, under the court of appeals approach [ordering state to allow the press to bring in cameras and tape recorders], be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems 'desirable' or 'expedient.'"  *Id*. at 14.  "We must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the first amendment.  To do so is to trivialize constitutional adjudication."  *Id*. at 13.

Other courts similarly have held that there is no right to access information in a specific form and manner, e.g., to obtain electronic copies of documents, to make verbatim copies of information, or to obtain recordings of public proceedings.  *See Putnam Pit, Inc. v. City of Cookeville, Tenn*., 221 F.3d 834, 840-41 (6th Cir. 2000) ("Davidian admits that he had access to the parking tickets in hard copy, although he complains of being denied the information in electronic form. . . . Davidian has no First Amendment right to government information in a particular form, as long as the information sought is made available"); *Gartner v. U.S. Info. Agency*, 726 F. Supp. 1183, 1189-90 (S.D. Iowa 1989) ("While reporters today may use lap-top computers and other technological advancements in

-14-

addition to tape recorders and cameras, the lesson of *Houchins* is that a court must respect the

statutory limitation of 'examination only' and not 'fashion ad hoc standards' of increased access

based on what may be 'expedient'"; plaintiffs "have no first amendment right to make verbatim

copies of USIA materials"); *Broad. Corp. v. Clark*, 654 F.2d 423, 426–27 (5th Cir. 1981) (no First

Amendment right to copy tapes where "[m]embers of the press were allowed to listen as the tapes

were played in court" and "transcripts" were available); *cf. Nixon v. Warner Commc'ns, Inc.*, 435

U.S. 589 (1978) (press had no First Amendment right to copies of White House tapes).

Thus, while it may be "'good,' 'desirable,' or 'expedient'" from hiQ's perspective for it to

access and scrape LinkedIn member data through automated bots, this is not "constitutionally

commanded." *Houchins*, 8 U.S. at 13.  All users who abide by LinkedIn's terms may view member

public profile data.  hiQ has no constitutional right, however, to access, extract and aggregate data

from those profiles through automated technologies in the precise form and manner it demands.

### E.   hiQ expressly agreed not to engage in the very conduct it now seeks an injunction to engage in, foreclosing any First Amendment claim

hiQ's First Amendment claim also fails because hiQ expressly agreed not to engage in this

very conduct through its acceptance of LinkedIn's User Agreement.

The Supreme Court has made clear that the "First Amendment does not confer" on a party "a

constitutional right to disregard promises that would otherwise be enforced under state law."

*Cowles*, 501 U.S. at 672.  In fact, a party may "contract away its First Amendment protection." *In

re Cnty. of Orange*, 245 B.R. 138, 147  (C.D. Cal. 1997); *see JA Apparel Corp. v. Abboud*, 682 F.

Supp. 2d 294, 317 (S.D.N.Y. 2010) (rejecting claim that "party cannot contract away his right to

engage in what otherwise might be considered protected commercial speech"); *Compuware Corp. v.

Moody's Inv'rs Servs., Inc.*, 499 F.3d 520, 535 (6th Cir. 2007) ("constitutional freedoms can be

contracted away in ways that the government cannot simply take them away").

hiQ does not dispute that it agreed to LinkedIn's User Agreement on several occasions,

Opp. 5, nor does it dispute the enforceability of its ban on automated scraping.  The agreement

contains multiple prohibitions on scraping the LinkedIn website through automated technologies,

including banning the use of "automated software, devices, scripts, robots, other means or processes

1   to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information," just as hiQ

2   does.  Rockwell Decl. ¶ 15.  hiQ's assumption of these contractual obligations—which plainly cover

3   the very conduct it seeks to engage in—independently forecloses any First Amendment claim.

**F.      Even if LinkedIn's actions might be subject to First Amendment scrutiny and are considered a restraint on speech, they are lawful**

6   Even if LinkedIn were a limited public forum and even if its conduct could be considered a

7   restraint on speech, "the State is not required to and does not allow persons to engage in every type

8   of speech.  The State may be justified 'in reserving [its forum] for certain groups or for the

9   discussion of certain topics.'"  *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819,

10  829 (1995).  The restriction must not discriminate against speech on the basis of viewpoint, *id.*, and

11  the restriction must be "reasonable in light of the purpose served by the forum," *Cornelius v.*

12  *NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).[6]

13  LinkedIn satisfies both elements.  First, there is no viewpoint discrimination.  As set forth

14  above, hiQ's bots are not expressing any views to begin with.  Further, like the CFAA itself,

15  LinkedIn's technical restrictions and contractual prohibitions on automated scraping technologies

16  are of general applicability.  In addition, the restrictions are reasonable.  As noted, LinkedIn does

17  not restrict users from viewing publicly visible information on its website or from engaging in

18  speech relating to such information.  LinkedIn restricts automated bots from making tens of millions

19  of calls to its servers to extract data.  This both protects members' privacy interests, and the

20  LinkedIn website itself from technical overload and other problems.  *See* Rockwell Decl. ¶ 14.

21  **IV.     THE CALIFORNIA CONSTITUTION DOES NOT WARRANT ANY INJUNCTION**

22  hiQ's "free speech" claim under the California Constitution likewise provides no

23  justification for the unprecedented injunction hiQ seeks.  First, its state constitutional claim directly

24  conflicts with and is therefore preempted by the CFAA.  Under the CFAA, LinkedIn would be

25  entitled to an injunction *preventing hiQ* from accessing its site without authorization.  The "public

26  interest weighs in favor of an injunction" in "CFAA cases" to "ensur[e] computers are not accessed

27  without authorization."  *Facebook, Inc. v. Power Ventures, Inc.*, 2017 WL 1650608, at *16 (N.D.

28  _____

[6] In addition, hiQ is engaging in commercial speech, which is afforded "less protection" under the First Amendment.  *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 64 (1983).

-16-

Cal. May 2, 2017).  hiQ seeks the opposite under the California Constitution—an injunction *forcing*

*LinkedIn* to grant hiQ unfettered access to its computers.  Where the "state law stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress," the state law

is preempted.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000).  This is equally

true for "state constitutional provisions," which cannot "override otherwise lawful federal statutes."

*United States v. Spencer*, 160 F.3d 413, 414 (7th Cir. 1998).[7]  Thus, hiQ's request for an injunction

"is preempted because, if granted, the injunction would stand 'as an obstacle to the accomplishment

of the full purposes and objectives' of federal" law—the CFAA.  *Brown v. Kerr-McGee Chem.*

*Corp.*, 767 F.2d 1234, 1242 (7th Cir. 1985); *see City of Rancho Palos Verdes v. Abrams*, 101 Cal.

App. 4th 367, 376 (2002) ("court's injunction is preempted because it conflicts with [federal law]").

    hiQ's request for an injunction under the California Constitution also fails on the merits.

Aside from whether a privately-owned website could be a public forum under the California

Constitution (and hiQ does not cite any case so holding), there is no reason to believe that California

courts would construe the scope of the California Constitution here differently than the above-

discussed authorities interpret the First Amendment.  As the California Supreme Court has held,

"case law interpreting California's free speech clause has given respectful consideration to First

Amendment case law for its persuasive value."  *Beeman v. Anthem Prescription Mgmt., LLC*, 58

Cal. 4th 329, 341 (2013).  And hiQ has identified no basis for the California Constitution to be

construed differently on the issues presented here.  *See Klein v. San Diego Cnty.*, 463 F.3d 1029,

1040 (9th Cir. 2006) (rejecting claim that California Constitution should be construed broader than

First Amendment where plaintiffs have not "pointed to any specific protection provided by the

California Constitution or the California courts that affects our analysis").

    To the contrary, in several relevant respects, courts have construed the California

Constitution's "free speech" clause to be coextensive with the First Amendment.  First, courts have

held that "general regulatory statutes, not intended to control the content of speech but incidentally

---

[7] *See also, e.g., United States v. Grey Water*, 395 F. Supp. 2d 850, 858 (D.N.D. 2005) (the "North Dakota Constitutional provision permitting individuals to keep and bear arms for hunting does not trump a federal law prohibiting certain individuals from lawfully possessing firearms"); *Frankel v. Citicorp Ins. Servs., Inc.*, 2014 WL 10518555, at *7 n.3 (E.D.N.Y. Aug. 12, 2014) ("the supremacy clause does not distinguish between state statutes and constitutional provisions").

-17-

limiting its unfettered exercise," do not violate free speech rights under the California Constitution. *People v. Navarro*, 212 Cal. App. 4th 1336, 1348 (2013); *see supra* at 8.  Second, with respect to non-expressive conduct, the "protection is the same" under the California Constitution as under the First Amendment; only "conduct that is 'sufficiently imbued with elements of communication'" will "justify constitutional protection." *Cychner v. Food 4 Less Holdings, Inc.*, 2003 WL 22511527, at *7-8 (Cal. Ct. App. Nov. 6, 2003); *see supra* at 10.  Third, the "California Constitution's protection of commercial speech is coextensive with the protection under the First Amendment." *Paramount Contractors & Developers, Inc. v. City of Los Angeles*, 805 F. Supp. 977, 1002 (C.D. Cal. 2011), *aff'd*, 516 F. App'x 614 (9th Cir. 2013).  Finally, California courts "employ[] time, place, and manner restrictions measured by federal constitutional standards." *Los Angeles Alliance for Survival v. City of Los Angeles*, 22 Cal. 4th 352, 364 n.7 (2000).  Thus, just as hiQ lacks any plausible First Amendment right to the relief it seeks, hiQ's desire to take data from LinkedIn's computers without authorization is entitled to no protection under the California Constitution.

## V.      HIQ HAD FAIR NOTICE THAT ITS CONDUCT COULD LEAD TO PENALTIES

At the TRO hearing, this Court expressed concern with the "idea that suddenly . . . things [are] criminalized" under the CFAA.  Tr. at 37:7-8.  hiQ, however, can claim no such concern.  It hid its bots from LinkedIn by using anonymous IP addresses, it circumvented LinkedIn's technical measures, and it received notice from LinkedIn making crystal clear that any future access to the website was unauthorized.  hiQ has received more than fair notice that its actions could subject it to civil, and to the extent the government exercises its prosecutorial discretion, criminal, penalties.

The rule of lenity, "which is rooted in considerations of notice, requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government." *United States v. Romm*, 455 F.3d 990, 1001 (9th Cir. 2006).  This rule prevents courts from "interpreting criminal statutes in surprising and novel ways that impose unexpected burdens on defendants." *LRVC Holdings, Inc. v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009).  The rule, however, is not applicable where, as here, a statute "unambiguously cover[s] the defendant's conduct." *United States v. Litchfield*, 986 F. 2d 21, 22 (2d Cir. 1993); *see also United States v. Nosal*, 844 F.3d 1024, 1035 n.6 (9th Cir. 2016) ("*Nosal II*") (declining to invoke the rule of lenity

-18-

after concluding that "without authorization" under the CFAA is not ambiguous and "the touchstone of the rule of lenity is statutory ambiguity").

The CFAA, as construed by the Ninth Circuit in *Power Ventures*—and the district courts in cases like *3Taps*—is not ambiguous. *See* Opp. 13. Under the plain meaning of "without authorization," LinkedIn can specifically revoke access to hiQ within the meaning of the CFAA, including to servers generally accessible to others. *See Power Ventures*, 844 F.3d at 1069 ("after receiving the cease and desist letter from Facebook, Power intentionally accessed Facebook's computers knowing that it was not authorized to do so, making Power liable under the CFAA"); *3Taps*, 964 F. Supp. 2d at 1182-83 ("under the plain language of the statute, 3Taps was 'without authorization' when it continued to pull data off of Craigslist's website"); *Couponcabin LLC v. Savings.com*, 2016 WL 3181826, *4 (N.D. Ind. June 8, 2016) (relying on "'ordinary and plain meaning' of 'authorization'" under statute). Thus, as *3Taps* held, the rule of lenity is inapplicable because "the plain meaning of the statute indicates that a penalty applies." 964 F. Supp. 2d at 1185.

And in fact, hiQ plainly has received fair notice. *3Taps* is again illustrative. There, the court noted that a "banned user has to follow only one, clear rule: do not access the website. The notice issue becomes limited to how clearly the website owner communicates the banning. Here, Craigslist affirmatively communicated its decision to revoke 3Taps' access through its cease-and-desist letter and IP blocking efforts." *Id.* at 1184. As the court noted, "prohibiting people from accessing websites they have been banned" from does not "threaten to criminalize large swaths of ordinary behavior," as "the average person does not use 'anonymous proxies' to bypass an IP block set up to enforce a banning communicated via [a] personally-addressed cease-and-desist letter." *Id.* The court concluded that "no serious constitutional doubts accompany [its] interpretation of the CFAA," as a "person of ordinary intelligence would understand Craigslist's actions to be a revocation of authorization to access the website, and thus have fair notice that further access was 'without authorization.'" *Id.* at 1185-86.

Here, too, LinkedIn sent hiQ a cease-and-desist letter explicitly telling hiQ that any further access to the LinkedIn site was without authorization. Bajoria Decl., ¶ 2 & Ex. A. Further, like Craigslist, LinkedIn instituted technological barriers (including IP blocks) to prevent hiQ's access to

1   its site.  Rockwell Decl. ¶¶ 5-14; Blavin Decl., ¶ 14 & Ex. L.  And hiQ filed this lawsuit *because* of

2   LinkedIn's notice to it.  964 F. Supp. 2d at 1184 ("3Taps had to circumvent Craigslist's IP blocking

3   measures to continue scraping, so it indisputably knew that Craigslist did not want it accessing the

4   website").  hiQ has had "fair notice that further access was 'without authorization.'"  *Id.* at 1186.

5        Similarly, hiQ's claim that it will suffer financial hardship if it cannot scrape LinkedIn going

6   forward is misplaced.  hiQ masked its identity by using surveillance bots with anonymous IP

7   addresses, circumvented LinkedIn's technical measures, and disregarded the express prohibitions on

8   automated scraping in the User Agreement.  hiQ could have prevented such harm by building its

9   business on data other than that scraped from LinkedIn, as its many competitors in this space have

10  done (like Glint, Opp. 6-7).  It chose not to do so.  As in *Power Ventures*, that LinkedIn's conduct

11  may "threaten[] [hiQ's] livelihood" is immaterial, as it "brought this risk upon [itself] by violating

12  the law."  2013 WL 5372341, at *16 (N.D. Cal. Sept. 25, 2013).

13  **VI.   HIQ'S ASSERTED POLICY CONCERNS ARE NOT IMPLICATED HERE**

14       In its papers, hiQ raises various policy concerns and slippery-slope hypotheticals in an

15  attempt to limit the reach of the CFAA.  For example, it posits that LinkedIn's ability to control

16  access to its servers will prevent the free flow of public information and criminalize research efforts

17  by academics.  Mot. 3-4; Reply 9.  hiQ's arguments are inappropriate and not implicated here.

18       As the court stated in *3Taps*, "[t]he current broad reach of the CFAA may well have impacts

19  on innovation, competition, and the general 'openness' of the internet, … but it is for Congress to

20  weigh the significance of those consequences and decide whether amendment would be prudent."

21  *3Taps*, 964 F. Supp. 2d at 1187.  And at any rate, hiQ's policy arguments are not implicated here

22  because hiQ is not an academic or a researcher; rather, it is scraping LinkedIn's servers to provide a

23  commercial offering.  Further, there is absolutely no evidence that LinkedIn has denied academics

24  or researchers access to its site, nor of anyone being denied access on a discriminatory basis.[8]

25  **VII.   CONCLUSION**

26       For the foregoing reasons, and those previously asserted by LinkedIn, the Court should deny

27  hiQ's motion for a preliminary injunction.

28  _____

[8] LinkedIn and other sites are of course subject to laws prohibiting discriminatory denials of access.

-20-

DATED:  July 20, 2017                    MUNGER, TOLLES & OLSON LLP


                                         By:   */s/ Donald B. Verrilli, Jr.*
                                               DONALD B. VERRILLI, JR.
                                               (*pro hac vice application pending*)


                                         By:   */s/ Jonathan H. Blavin*
                                               JONATHAN H. BLAVIN

                                         Attorneys for Defendant LinkedIn Corporation

-21-