1  C. Brandon Wisoff (State Bar No. 121930)
   bwisoff@fbm.com
2  Deepak Gupta (State Bar No. 226991)
   dgupta@fbm.com
3  Jeffrey G. Lau (State Bar No. 281629)
   jlau@fbm.com
4  Rebecca H. Stephens (State Bar No. 299234)
   rstephens@fbm.com
5  Farella Braun + Martel LLP
   235 Montgomery Street, 17th Floor
6  San Francisco, California 94104
   Telephone: (415) 954-4400
7  Facsimile: (415) 954-4480

8  Laurence H. Tribe* (State Bar No. 39441)
   Carl M. Loeb University Professor and
9  Professor of Constitutional Law
   Harvard Law School
10 1575 Massachusetts Avenue
   Cambridge, Massachusetts 02138
11 Telephone: (617) 495-1767
   *Admitted pro hac vice*
12
   Attorneys for Plaintiff hiQ Labs, Inc.
13

14                  UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16

17  hiQ Labs, Inc.                          Case No. 3:17-cv-03301-EMC

18             Plaintiff,                   **PLAINTIFF'S SUPPLEMENTAL BRIEF
                                            IN SUPPORT OF MOTION FOR
19       vs.                                PRELIMINARY INJUNCTION**

20  LinkedIn, Corp.,                        The Hon. Edward M. Chen

21             Defendant.                   Hearing Date:     July 27, 2017
                                            Time:             1:30 p.m.
22                                          Trial Date:       None Set

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

*Affiliation noted for identification purposes only.*
34556\6094735.4

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION...................................................................................................1

II. LEGAL STANDARD ..........................................................................................1

III. THE IRREPARABLE HARM, BALANCE OF HARDSHIPS, AND PUBLIC
INTEREST FACTORS WEIGH OVERWHELMINGLY IN FAVOR OF hiQ .................2

IV. hiQ HAS RAISED VERY "SERIOUS QUESTIONS GOING TO THE MERITS" ............5

    A. The Computer Fraud and Abuse Act And Penal Code § 502 Should Not Be
Extrapolated From Their Pre-Internet Anti-Hacking Origins To Criminalize
Automated Access To Public Information On Social Media .....................................5

    B. Construing The CFAA (and C.P.C. § 502) To Allow A Private Party to
Criminalize Access to Public Webpages Would Raise Serious First
Amendment Questions, and Such An Overbroad Interpretation Should Be
Avoided ....................................................................................................................11

    C. Absent an Overbroad Interpretation of the CFAA and Penal Code, LinkedIn
Would Need a Lawfully Recognized Reason to Deny hiQ Access to Public
Information. ...............................................................................................................15

    D. *Pruneyard* And Its Progeny Safeguard hiQ's State-Law Right Of Access To
Member Public Profiles On LinkedIn ......................................................................16

    E. hiQ's Common Law Claims Raise Serious Questions on the Merits ......................17

    F. hiQ Has Raised Serious Questions Going to the Merits of its UCL Claims. ...........18

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

**FEDERAL CASES**

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ............................................................................................ 13

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................ 19

*Ashwander v. TVA,*
   297 U.S. 288 (1936) ............................................................................................ 15

*Atherton v. FDIC,*
   519 U.S. 213 (1997) .............................................................................................. 9

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009) ........................................................................... 16

*BE & K Constr. Co. v. N.L.R.B.,*
   536 U.S. 516 (2002) ............................................................................................ 15

*Boos v. Barry,*
   485 U.S. 312 (1988) ..................................................................................... 14, 15

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
   531 U.S. 288 (2001) ............................................................................................ 13

*Carter v. Carter Coal Co.,*
   298 U.S. 238 (1936) ..................................................................................... 13, 14

*Chaney v. Fayette County Pub. Sch. District,*
   977 F. Supp. 2d 1308 (N.D. Ga. 2013) ............................................................... 3

*Craigslist Inc. v. 3Taps Inc.,*
   964 F. Supp. 2d 1178 (N.D. Cal. 2013) ........................................................ 9, 10

*Creative Mobile Techs., LLC v. Flywheel Software, Inc.,*
   No. 16-cv-02560-SI, 2016 WL 5815311 (N.D. Cal. Oct. 5, 2016) .................... 19

*Crowell v. Benson,*
   285 U.S. 22 (1932) ............................................................................................. 15

*D. Ginsberg & Sons v. Popkin,*
   285 U.S. 204 (1932) ........................................................................................... 10

*Davenport v. State Farm Mutual Auto Insurance Co.,*
   No. 3:11-cv-632-J-JBT, 2012 WL 555759 (M.D. Fla. Feb. 21, 2012) ................ 2

*Department of Transp. v. Assn. of Am. R.R.,*
   __ U.S. __, 135 S. Ct. 1225 (2015) .................................................................... 14

*eBay, Inc. v. Bidder's Edge, Inc.,*
   100 F. Supp. 2d 1058 (N.D. Cal. 2000) ............................................................... 4

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

ii

34556\6115363.1

*Edmonson v. Leesville Concrete Co.,*
    500 U.S. 614 (1991) ................................................................................................. 13

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988) ................................................................................................. 15

*Eubank v. Richmond,*
    226 U.S. 137 (1912) ................................................................................................. 14

*Facebook, Inc. v. Power Ventures, Inc.,*
    844 F.3d 1058 (9th Cir. 2016) ............................................................................. 8, 9

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) ............................................................................... 17

*Healthcare Advocates v. Harding,*
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ..................................................................... 10

*In re Perroton,*
    958 F.2d 889 (9th Cir. 1992) ................................................................................... 6

*Int'l Ass'n of Machinists v. Street,*
    367 U.S. 740 (1961) ................................................................................................. 15

*Larkin v. Grendel's Den, Inc.,*
    459 U.S. 116 (1982) ................................................................................................. 13

*Liparota v. United States,*
    471 U.S. 419 (1985) ................................................................................................... 7

*Lucas v. Alexander,*
    279 U.S. 573 (1929) ................................................................................................. 15

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922, 942 (1982) ........................................................................................ 13

*LVRC Holdings v. Brekka,*
    581 F.3d 1127 (9th Cir. 2009) ............................................................................. 7, 8

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
    486 U.S. 825 (1988) ................................................................................................. 11

*Marsh v. Alabama,*
    326 U.S. 501 (1946) ................................................................................................. 14

*Musacchio v. United States,*
    136 S. Ct. 709 (2016) ................................................................................................. 8

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    439 U.S. 96 (1978) ................................................................................................... 14

*Packingham v. North Carolina,*
    __ U.S. __, 137 S. Ct. 1730 (2017) ......................................................... 4, 5, 12, 16

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*Pappas v. Naked Juice Co. of Glendora, Inc.*,
   No. CV-11-8276-JAK (PLAx), 2012 WL 12885109 (C.D. Cal. Dec. 5, 2012) ........................ 2

*Perkins v. LinkedIn Corp.*,
   No. 13-cv-04303-LHK (N.D. Cal.) ................................................................................... 3

*Puente Ariz. v. Arpaio*,
   821 F.3d 1098 (9th Cir. 2016) ......................................................................................... 2

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ........................................................................................................ 9

*Rosario v. Clark Cty. Sch. Dist.*,
   No. 2:13-CV-362 JCM(PAL), 2013 WL 3679375 (D. Nev. Jul. 3, 2013) ........................ 3

*SEC v. Bivona*,
   No. 16-cv-01386-EMC, 2016 WL 2996903 (N.D. Cal. May 25, 2016) ............................ 2

*Smith v. Maryland*,
   442 U.S. 735 (1929) ........................................................................................................ 2

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*,
   531 U.S. 159 (2001) ...................................................................................................... 15

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ..................................................................................................... 2, 3

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ........................................................................................... 1

*Tompkins v. Detroit Metropolitan Airport*,
   278 F.R.D 387 (E.D. Mich. 2012) .................................................................................... 2

*United States v. Caira*,
   833 F.3d 803 (7th Cir. 2016) ........................................................................................... 2

*United States v. Meregildo*,
   883 F. Supp. 2d 523 (S.D. N.Y. 2012) ............................................................................ 3

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ........................................................................................ 7, 9

*United States v. Nosal*,
   844 F.3d 1024 (9th Cir. 2016) ......................................................................................... 8

*United States v. Wiltberger*,
   18 U.S. (5 Wheat.) 76 (1820) .......................................................................................... 7

*Washington ex rel. Seattle Title Trust Co. v. Roberge*,
   278 U.S. 116 (1928) ...................................................................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2009) ............................................................................................................ 1

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

iv

*Yates v. United States,*
  __ U.S. __, 135 S. Ct. 1074 (2015) .................................................................. 10

**STATE CASES**

*A.F. Arnold & Co. v. Pacific Prof. Ins., Inc.,*
  27 Cal. App. 3d 710 (1972) ........................................................................ 17

*Cel-Tech Communications v. Los Angeles Cellular Telephone Company,*
  20 Cal. 4th 163 (1999) ............................................................................... 18

*Chavez v. Whirlpool Corp.,*
  93 Cal. App. 4th 363 (2001) ...................................................................... 19

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
  11 Cal. 4th 376 (1995) ............................................................................... 18

*Heeron v. State Farm Mut. Ins. Co.,*
  56 Cal. 2d 202 (1961) ................................................................................ 17

*Korea Supply Co. v. Lockheed Martin Corp.,*
  29 Cal. 4th 1134 (2003) ............................................................................. 18

*Law Offices of Mathew Higbee v. Expungement Assistance Servs.,*
  214 Cal. App. 4th 544 (2013) .................................................................... 20

*Lushbaugh v. Home Depot U.S.A., Inc.,*
  93 Cal. App. 4th 1159 (2001) .................................................................... 16

*Moreno v. Hanford Sentinel, Inc.,*
  172 Cal. App. 4th 1125 (2009) .................................................................... 2

*Quelemaine Company, Inc. v. Stewart Title Guaranty Co.,*
  19 Cal. 4th 26 (1998) ................................................................................. 19

*Robins v. PruneYard Shopping Ctr.,*
  23 Cal. 3d 899 (1979) ................................................................................ 16

*Savage v. Trammell Crow Co.,*
  223 Cal. App. 3d 1562 (1990) .................................................................... 16

**FEDERAL STATUTES**

17 U.S.C. §512(c) ............................................................................................. 8

17 U.S.C. § 1201 ............................................................................................. 10

18 U.S.C. § 1030(a) ...................................................................................... 6, 8

47 U.S.C. §230 ............................................................................................... 16

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

## STATE STATUTES

Cal. Penal Code § 502 ............................................................................................... passim

Cal. Civ. Code § 1709 ..................................................................................................... 20

Cal. Civ. Code § 3336 ..................................................................................................... 20

## CONSTITUTIONAL PROVISION

U.S. Constitution, Article I, Section 2 ............................................................................ 16

## OTHER AUTHORITIES

1987 Cal. Legis. Serv. 1499 (West) .................................................................................. 6

Bala Iyer, et al., *The Next Battle in Antitrust Will be About Whether One Company Knows Everything About You*, Harvard Business Review (Jul. 6, 2017) ............................. 18, 19

Computer History Museum, Timeline of Computer History, http://www.computerhistory.org/timeline/computers/ (last visited July 17, 2017) ................. 5, 6

H.R. Rep. No. 98-894, 1984 U.S.C.C.A.N. 3689 (1984) ................................................. 6

http://www.robotstxt.org/orig.html ................................................................................. 10

https://www.copyright.gov/onlinesp/agents/l/linked-in.pdf ............................................. 9

James Surowiecki, *Why Tesla is Worth More than GM*, MIT Technology Review (Jun. 27, 2017) ................................................................................................................ 5

S. Rep. No. 99-432, 1986 U.S.C.C.A.N. 2479 (1986) ..................................................... 6

Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143 (2016) ............... 7, 8, 10, 12

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

34556\6115363.1

## I. **INTRODUCTION**

By pejoratively calling hiQ a "scraper," LinkedIn wrongly seeks to paint hiQ's actions as "criminal" to justify its sudden and obviously anticompetitive termination decision. But information gathering, "scraping" as it is called on the Internet, is the lifeblood of all speech and innovation and is perfectly lawful. It is LinkedIn's attempt to criminalize this activity – by converting (and perverting) the shield of the CFAA and Penal Code against invasive computer intrusions into a sword to cut down lawful competition for information and ideas – that is legally objectionable. The pretextual nature of LinkedIn's supposed justifications alone should give the Court pause; but LinkedIn's attempt to use anti-hacking statutes unilaterally to decide which members of the public can access and use purely public information, on pain of criminal liability, is breathtaking in scope and without limit. No Ninth Circuit case has ever applied these statutes to purely public information and the judicially-created "revocation" of authorization concept makes no sense when applied to public profile pages that require no authorization for access in the first place. Adoption of LinkedIn's overbroad interpretation would raise serious federal and state constitutional questions that should be avoided. Judicial application of these statutes to delegate to private web owners unfettered authority to define criminal activity relative to public information – by simply sending a cease and desist letter to any member of the general public for any reason, even an unlawfully motivated reason – would constitute state action triggering even federal constitutional problems. Because hiQ has raised serious questions going to the merits and all other factors weigh sharply in hiQ's favor, the Court should issue a preliminary injunction.

## II. **LEGAL STANDARD**

The standards for a temporary restraining order and preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). A preliminary injunction is appropriate where (1) the moving party is likely to succeed on the merits; (2) the moving party is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in the moving party's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2009). The Ninth Circuit has adopted a "sliding scale" analysis, where the moving party can obtain a preliminary injunction

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

1

34556\6115363.1

if it raises "serious questions as to the merits" and the "balance of hardships tips sharply" in its favor. *SEC v. Bivona*, No. 16-cv-01386-EMC, 2016 WL 2996903, at *2 (N.D. Cal. May 25, 2016), citing *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016).

### III. THE IRREPARABLE HARM, BALANCE OF HARDSHIPS, AND PUBLIC INTEREST FACTORS WEIGH OVERWHELMINGLY IN FAVOR OF hiQ

*Irreparable Harm.* If hiQ cannot access public profiles it will go bankrupt: hiQ's pending financing would be stopped in its tracks, hiQ's employees would become jobless, hiQ's contracts and customer relationships would be destroyed, and all of hiQ's progress in the field of data science would be lost. *See* Dkt. 23-4 (Weidick Decl.), ¶¶ 17-19. LinkedIn's argument that hiQ should get professional skill information from Facebook is rebutted by its self-described status as the "World's Largest Professional Network," and the reality that Facebook is a social, not a professional, network. LinkedIn public profiles are the only presently available source of the information that hiQ requires. Dkt. 23-4 (Weidick Decl.), ¶ 17.

*Balance of Hardships.* As the Court recognized at the hearing, LinkedIn has functioned for years with no difficulty despite hiQ's continuing use of public profile information. In fact, LinkedIn's revenues *quadrupled* during the time of hiQ's existence.

LinkedIn's purported member privacy concerns lack merit. There is no reasonable expectation of privacy in information that a user has publicly disclosed on the Internet.[1] In *Sorrell*

---

[1] *See Pappas v. Naked Juice Co. of Glendora, Inc.*, No. CV-11-8276-JAK (PLAx), 2012 WL 12885109, at *4 (C.D. Cal. Dec. 5, 2012) ("[T]he Court notes that under California law, online statements that are available to the public at large are not protected by the right to privacy."), citing *Moreno v. Hanford Sentinel, Inc.*, 172 Cal. App. 4th 1125, 1130 (2009) (affirmative act of posting on a "hugely popular internet site" made information "available to any person with a computer and thus opened it to the public eye … no reasonable person would have had an expectation of privacy regarding the published material."); *Davenport v. State Farm Mut. Auto Ins. Co.*, No. 3:11-cv-632-J-JBT, 2012 WL 555759, at *1 (M.D. Fla. Feb. 21, 2012) ("Generally, [social networking site] content is neither privileged nor protected by any right of privacy"); *United States v. Caira*, 833 F. 3d 803, 806 (7th Cir. 2016) (no expectation of privacy in IP address; "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties" quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1929)). Indeed, numerous courts have held that there is no privacy interest in information posted on social media *even where public access is restricted through privacy settings* (not at issue here). *See Tompkins v. Detroit Metro. Airport*, 278 F.R.D 387, 388 (E.D. Mich. 2012) ("[M]aterial posted on a 'private'

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

*v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011), the Supreme Court held that commercial data miners had a First Amendment right to analyze *confidential* prescription information, overruling a "medical privacy" objection because the information was in "extensive use" by others. *Id. A fortiori*, LinkedIn may not rightfully assert its members' "privacy" interests in information they have chosen to make publicly available. The real danger here is not the "privacy" of LinkedIn's members, but rather LinkedIn's assertion of the power selectively to block certain users from public profiles, a power that would allow LinkedIn to steer this information solely to its preferred recipients for its own anticompetitive reasons.[2]

LinkedIn's arguments regarding server impairment due to hiQ's automated access are

_____

Facebook page, that is accessible to a selected group of recipients but not available for viewing by the general public, is generally not privileged, nor is it protected by common law or civil law notions of privacy."); *United States v. Meregildo*, 883 F.Supp.2d 523, 525 (S.D. N.Y. 2012) (no expectation of privacy in Facebook posts even with "friends only" privacy setting; "legitimate expectation of privacy ended when he disseminated posts to his 'friends' because those 'friends' were free to use the information however they wanted"); *Chaney v. Fayette Cty. Pub. Sch. Dist.*, 977 F.Supp.2d 1308, 1315 (N.D. Ga. 2013) (no expectation of privacy in Facebook photo, even where plaintiff had invoked "semi-private" privacy setting); *Rosario v. Clark Cty. Sch. Dist.*, No. 2:13-CV-362 JCM (PAL), 2013 WL 3679375, at **5-6 (D. Nev. Jul. 3, 2013) (no expectation of privacy in tweets, even with private Twitter account setting).

[2] The pretextual nature of LinkedIn's privacy argument is confirmed by LinkedIn's own conduct and statements: (1) LinkedIn itself has argued in other litigation that its members have no privacy interest in information that they choose to make public. For example, in *Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK (N.D. Cal.), LinkedIn members brought a putative class action against LinkedIn alleging that it wrongfully harvested their contacts' email addresses and repeatedly sent emails soliciting them to join LinkedIn without the members' consent. LinkedIn (represented by the same attorneys as in this matter) contended that it should not be liable: "[b]ecause the vast majority of LinkedIn members have public profiles" and the "connection invitations convey no more information than what Plaintiffs made publicly available on LinkedIn" (Gupta Decl. Ex. V at 17); because the information in the solicitation emails was "part of public profiles available for viewing by any Internet user" (*id.* at 22); and because the connection invitations "contain[ed] the *same information* which Plaintiffs *chose to make public* by creating LinkedIn profiles and sending connection invitations." (Gupta Decl. Ex. W at 31 (emphasis in original)); (2) LinkedIn's pre-suit communications failed to mention "Keeper," which it now criticizes as raising privacy issues, then focusing solely on "SkillMapper," the product with which it is starting to compete (Dkt. 23-1 (Ex. J) at 35-37), and which it thus can no longer criticize as an "improper" use of the data; (3) LinkedIn conceded at the hearing that it would not object to manual copying of public profiles, an alternative way to gather data that in no way furthers member privacy, but would make hiQ's business prohibitively expensive (Hrg. Tr. at 60-61 (June 29, 2017)); and (4) LinkedIn's *privacy policy* expressly permits LinkedIn to sell to others the very member *public* data that LinkedIn seeks to deny to hiQ (Dkt. 33 at 20).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

1  similarly pretext: no such assertions were made in LinkedIn's cease and desist letter or the parties'

2  pre-suit communications.  The volume of hiQ's access to LinkedIn is exponentially smaller than a

3  search engine (or "crawler"), because hiQ performs directed searches for member profiles one at a

4  time by first entering these names on Google and then following the links to LinkedIn, so hiQ

5  never performs a recursive traversal of all LinkedIn links to index all the information on the site.

6  Even if hiQ grew to a point in the future where it accessed one million profiles per month – an

7  outside projection in the Rockwell Declaration submitted by LinkedIn– hiQ's activity would still

8  amount to only 0.035% of the access that LinkedIn blocks today, not to mention the amount of

9  access that LinkedIn does not block each day (no doubt orders of magnitude more).  In sum, even

10  if hiQ's business were to grow by one-hundred times, its access would remain a drop in the bucket

11  for LinkedIn.[3]  The balance of hardships prong tips sharply in favor of hiQ.[4]

12      *Public Interest.*  The free speech and competition issues raised by hiQ implicate the

13  public's interest in open and unfettered access to the Internet.  The data collection and analysis in

14  which hiQ is engaged are fully protected by the First Amendment.  *See Sorrell*, 564 U.S. at 570

15  (First Amendment protected data mining for commercial uses, because "the creation and

16  dissemination of information are speech within the meaning of the First Amendment … Facts,

17  after all, are the beginning point for much of the speech that is most essential to advance human

18  knowledge and to conduct human affairs.").  Moreover, the Supreme Court has described online

19  social media as "the modern public square." *Packingham v. North Carolina*, __ U.S. __, 137 S.

---

[3] Notably, LinkedIn has *not* invoked the law actually designed to address server impairment, the doctrine of trespass to chattels, and for good reason.  *See* Dkt. 24. at 31 (LinkedIn has no trespass to chattels claim because hiQ's data collection activities do not damage or impair the functioning of LinkedIn's servers). *Cf. eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) (action for trespass to chattels could lie where "recursive searching of the eBay system" caused "reduced system performance").

[4] As noted in hiQ's Reply (Dkt. 33 at 19), LinkedIn still has not disclosed *when* it first became aware of hiQ's activities.  Similarly, while LinkedIn's Lorenzo Canlas claims he does not remember being told at hiQ's Elevate conference that hiQ used LinkedIn public profiles, he nowhere denies having known that information and none of the other 9+ attendees at those conferences over the years submitted any declaration. Dkt. 28 (Canlas Decl.) at ¶ 5. These facts undermine any argument that hiQ's activities are somehow disruptive and raise questions concerning LinkedIn's sudden decision to terminate hiQ after knowing of them for years.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

4

34556\6115363.1

Ct. 1730, 1737 (2017); *see also id.* at 1735 ("cyberspace – the 'vast democratic forums of the Internet' in general, and social media in particular" – represents "the most important places" for communication today). The Court counseled "extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id.* at 1732.

The issues raised here also strike directly at the future of innovation: Data analytics on public information is a foundation stone of the modern internet starting with the Alta Vistas and Excites of the 90s to the Googles, Docket Navigators, hiQ and others of today. Without such technologies internet users would be unable to make sense of the billions of webpages that exist in this modern marketplace of ideas. To allow LinkedIn to impose debilitating financial and criminal liability on a startup for accessing public pages would have a widespread chilling effect on innovation across the country, and thereby thwart valuable commercial and academic research. Learned commentators in recent months have published widely about the dangers of anti-competitive conduct by leaders in the field of social media.[5] It is no understatement to say, then, that this case is in many ways a harbinger for innovation and entrepreneurship in America.

## IV.     hiQ HAS RAISED VERY "SERIOUS QUESTIONS GOING TO THE MERITS"

### A.     The Computer Fraud and Abuse Act And Penal Code § 502 Should Not Be Extrapolated From Their Pre-Internet Anti-Hacking Origins To Criminalize Automated Access To Public Information On Social Media

Legislators enacting the CFAA and Penal Code § 502 could not have envisioned use of those statutes to criminalize access to webpages that are public for the entire world to see, access to which requires *no authorization whatsoever*, whether via password or otherwise. These statutes date back to the 1980s, a time of mainframe computing and early PCs well before the existence of the public Web.[6] It was not until the launch of the Mosaic browser in 1993 by Marc Andreesen, a

---

[5] *See, e.g.,* Gupta Decl. Ex. X (James Surowiecki, *Why Tesla is Worth More than GM*, MIT Technology Review (Jun. 27, 2017)) at 4, 8 (the "Big Five" (which includes Microsoft), are an "oligopoly" that "can meet competitive challenges either by copying the innovations of others (as Facebook arguably did with Snapchat), and thereby making them seem superfluous, or simply by buying potential competitors at an early stage….[T]he result is less dynamism in the economy, and less spreading of the wealth.").

[6] *See, e.g.*, Computer History Museum, *Timeline of Computer History*,

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

graduate student at the University of Illinois, that the world saw the popular emergence of the Web, i.e. the hyperlinked collection of pages that we can browse today using software such as Chrome, Safari, Mozilla and Internet Explorer.  In only a quarter of a century the Internet has become the most inclusive and comprehensive medium of communication the world has ever known and the largest commercial marketplace in history.  A significant portion of this modern day aggregation of content consists of *public* pages.

In lockstep with this explosion of public content, the technology around automated analysis of this information has kept pace.  Today, computerized analysis of public webpages is an indispensable part of our everyday lives.  Search engines like Google and Bing are our primary portals to the Web, and a new generation of systems like DocketNavigator provide domain specific analysis of higher granularity.  Researchers in universities across the country are focused on introducing techniques like machine learning and predictive analytics to improve these systems.  Courts have recognized the tremendous value of these systems. *See, e.g.*, Dkt. 33 at 7 (sampling of cases regarding crawling and mass digitization).

Yet, Congress passed the CFAA in 1986, and California passed California Penal Code § 502 in 1987, at a time well before the advent of these technologies that constitute the modern Internet, to address "computer crime" which it understood as "hacking" or "trespass." Gupta Decl. Ex. Y (H.R. Rep. No. 98-894, 1984 U.S.C.C.A.N. 3689, 3691-92, 3695-97 (1984)) ("H. Rep"); Gupta Decl. Ex. Z (S. Rep. No. 99-432, 1986  U.S.C.C.A.N.  2479, 2480 (1986)) ("S. Rep"); Gupta Decl. Ex. AA (1987 Cal. Legis. Serv. 1499 (West)).  Proscribing access to "public" information, whether that access be manual or automated, was not Congress' focus or purpose. Rather, Congress understood "the premise" of 18 U.S.C. § 1030(a)(2) (the CFAA provision at issue here) at the time to be "privacy protection" and prohibiting unauthorized access to government-controlled "classified information."  Ex. Z (S. Rep) at 2484; Ex. Y (H. Rep.) at 3706-07; *see also In re Perroton*, 958 F.2d 889, 893-94 (9th Cir. 1992) ("Where statutory language is unclear, rules of statutory construction authorize use of extrinsic aids such as legislative history to

http://www.computerhistory.org/timeline/computers/ (last visited July 17, 2017) (highlighting types of computers available in the late 1980s and early 1990s.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - Case No. 3:17-cv-03301-EMC

6

34556\6115363.1

assist in construing legislative intent.").

LinkedIn's expansive interpretation – enabling it to impose potential civil and criminal liability for accessing public web pages for no reason or even otherwise unlawful reasons – flies in the face of the text and history of the statute and would raise serious constitutional issues as discussed more fully herein. The *en banc* Ninth Circuit has already rejected any interpretation that "would transform the CFAA from an anti-hacking statute into an expansive misappropriation statute." *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc) (*Nosal I*). LinkedIn's interpretation goes even further by transforming routine access to public websites into federal offenses. The Ninth Circuit warned that the CFAA should not be construed to "make criminals of large groups of people who would have little reason to suspect they are committing a federal crime," *id.* at 859, or to "allow[] private parties to manipulate" their website policies "so as to turn these relationships [with internet users] into ones policed by the criminal law." *Id.* at 860, 862 ("we shouldn't have to live at the mercy of our local prosecutor."). Instead, the Ninth Circuit applied the rule of lenity to the CFAA, opining that "'penal laws [must] be construed strictly.'" *Id.* at 863 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)); *see also*, *LVRC Holdings v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009) ("courts should interpret the statute consistently in both criminal and noncriminal contexts"). The Supreme Court has similarly construed criminal statutes narrowly when "to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Liparota v. United States*, 471 U.S. 419, 426 (1985).

The concepts of access "without authorization" and use "without permission," which are the threshold triggers of liability under these criminal statutes, cannot reasonably apply to public profile pages on a social media website, because "public" information is by definition authorized for the whole world and thus does not implicate concerns of trespass. *See* Gupta Decl. Ex. BB (Orin S. Kerr, *Norms of Computer Trespass*, 116 Colum. L. Rev. 1143 (2016)) at 1163 ("Sellers who want to keep people out, backed by the authority of criminal trespass law, shouldn't set up shop at a public fair. Similarly, companies that want to keep people from visiting their websites shouldn't connect a web server to the Internet and configure it so that it responds to every request."). Prof. Kerr argues that for cyberspace, the concept of authorization should be linked to

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

an authentication system, e.g. password protection.  *Id.* at 1147, 1161.  This interpretation is supported by the language of the CFAA itself, which provides "passwords" as the sole illustrative example of "information through which a computer may be accessed without authorization."  18 U.S.C. § 1030(a)(6).  None of the Ninth Circuit cases addressing these statutes – *Brekka*, 581 F.3d 1127; *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), or *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) (*Nosal III*) – hold  otherwise, as they all alleged improper use of a password to access an unauthorized account and obtain information that was *non*public – and thus correlated directly with the anti-hacking purposes of the statutes.[7]

While courts have judicially grafted the concept of "revocation of authorization" as a way for computer operators to create liability under these statutes, neither the CFAA nor Penal Code § 502 purports to address when authorization or permission may be "revoked."  Indeed, neither statute uses the word "revoke" at all, and neither provides that it may be done at any time, for any purpose.  Giving a private party the ability to arbitrarily "revoke" authorization to "public pages" absent any actual authentication system is incongruent with the "inherent openness" of the Web, and opens the door to mischief, because it would bestow upon private parties the  power to control and chill the acts of other private citizens with respect to public information.  Ex. BB (Kerr) at 1162.  Imposing "trespass" liability under such circumstances would be absurd because once a web server is connected to the Internet, it automatically responds to requests for public pages, so there is no initial "authorization" needed that can later be "revoked."[8]

---

[7] *See also*, *Musacchio v. United States*, 136 S.Ct. 709, 713 (2016) (defendant "using a password, continued to access" computer of former employer).  The criminalization of "password sharing" reflected in *Nosal* and *Power Ventures* is presently being challenged in the Supreme Court on the basis that the authorization that matters for the purpose of the CFAA, as extended to our modern world of Internet platforms and cloud computing, is the authorization of the user, not the computer owner.  Petitions for *certiorari* are pending in both cases.  If those cases succeed, that will provide an independent ground for hiQ to argue that the CFAA does not apply in this case: it is LinkedIn's members, and not LinkedIn, who have the power to control visibility of their profile information by determining what will and will not be posted publicly.

[8] A platform provider who offers the means for individuals to publish information on the Web does not own the content and thus lacks the power to revoke access.  *See, e.g.,* 17 U.S.C. § 512(c)("right and ability to control" content is a  DMCA safe harbor disqualifier); *see*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Nothing in the CFAA and Penal Code § 502 requires or suggests that they should be interpreted without reference to the existing corpus of California law, both to determine the meaning of "authorization" and "permission," and to define limitations on an owner's actions as required under constitutional, statutory and common law, including laws regulating unfair competition, tortious interference, and promissory estoppel. *See Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (holding that federal statute incorporated state-law standard for conduct of officers and directors of federally insured saving institutions and that Congress did not intend federal courts to create common-law rules, "for 'Congress acts … against the background of the total *corpus juris* of the states'") (citation omitted); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *Nosal I* at 857 (CFAA could not be "construe[d] as displacing a substantial portion of the common law," because Congress had not "clearly indicated its intent to do so."). *See* Dkt. 33 at 12 (hosting service may not revoke access under CFAA, and under Supremacy Clause breach client contract with impunity).

LinkedIn also cites several non-binding district court decisions adopting a broad construction of the CFAA as applied to public websites, but those cases did not involve extensive analysis of whether a website operator can use its authority to suppress speech or competition. *See* Dkt. 31 at 11-13. For example, Judge Breyer's decision in *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013), has rightly drawn criticism for its conclusion that a website owner can use a criminal statute selectively to "revoke" authorization to access public portions of its site. *See* Ex. BB (Kerr) at 1168 ("Judge Breyer is wrong."). Judge Breyer himself questioned the proper reach of his ruling as applied to public information. *Craigslist*, 964 F.Supp.2d at 1186. Moreover, the Ninth Circuit in *Power Ventures* refuted the finding in *Craigslist* that circumvention of self-help measures like IP Blocks could constitute a revocation of access. *See*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - Case No. 3:17-cv-03301-EMC

9

34556\6115363.1

1    844 F.3d at 1068 n.5 ("bypassing an IP address, without more, would not constitute unauthorized

2    use...."). [9]  In any event, *Craigslist* and the other cases LinkedIn relies upon did not involve the

3    detailed speech and competition-suppression claims being made here.

4         In fact, Penal Code § 502 was amended in 2014 to introduce for the first time the concept of

5    user "profiles," which it treats *differently* from "data," "computers" and "computer networks."  The

6    statute now defines "profiles" as including "[a]n Internet Web site user's personal page or section of

7    a page that is made up of data, in text of graphical form, that displays significant, unique, or

8    identifying information, including, but not limited to, listing acquaintances, interests, associations,

9    activities, or personal statements." *Id*. § 502(b)(15)(B).  The statute was simultaneously amended

10   to prohibit *only certain* use of such profile pages:  namely, the "knowingly and without permission"

11   use of someone else's profile in order to send "one or more electronic mail messages or posts and

12   thereby damage[] or causes damage to a computer, computer data, computer system, or computer

13   network. *Id*. § 502(c)(9).  The legislature's decision to *amend* the statute to cover particular activity

14   related to profile pages corroborates hiQ's argument that in its *original* form that statute did not

15   apply to such pages.  If it did, the amendment would have been redundant.  A reading of a statute

16   that renders portions of the statute superfluous should be disfavored; and the specific should govern

17   the general.  Given the similarity between the statutes, the same reasoning extends to the CFAA. [10]

18   _____

19   [9] *See also* Ex. BB (Kerr) at 1168 ("[u]nderstood in the context of the open Web, an IP block is not
     a real barrier.  There is nothing untoward or blameworthy about using different IP addresses.").
20   Notably, LinkedIn has *not* invoked the Digital Millennium Copyright Act Anti-Circumvention
     Provision (17 U.S.C. § 1201(a)(1)(A)), and for good reason.  *See* Dkt. 24 at 29-31 (LinkedIn has
21   no DMCA claim because any technological measure it implements to block hiQ from accessing
     public profiles was not authorized by the copyright owner—the member); *see also* 17 U.S.C. §
22   1201(c)(1) and (4) (fair use and free speech defenses).  Similarly, LinkedIn points to a "robots.txt"
     file.  This voluntary protocol has been considered in the context of the DMCA and it is "not
23   analogous to digital password protection or encryption."  *Healthcare Advocates v. Harding*, 497
     F.Supp.2d 627, 642 (E.D. Pa. 2007).  Moreover, the protocol defines robots as "programs that
24   traverse many pages in the World Wide Web *by recursively retrieving linked pages,*" which hiQ
     does not do. *See* http://www.robotstxt.org/orig.html  (emphasis added); p. 4 *supra*.  Also a robot
25   must access a site in order to retrieve and read robots.txt, so this protocol depends on access and
     thus cannot be said to "revoke access" under the CFAA.
26

27   [10] *See, e.g.*, *Yates. v. United States*, 135 S. Ct. 1074, 1077 (2015) (rejecting broad interpretation of
     the term "tangible object" in the Sarbanes-Oxley Act in part because broad interpretation would

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

Adopting LinkedIn's interpretation would thus stretch these statutes well beyond the bounds of the world in which they were enacted to cover a whole range of contemporary interactions with *public* Internet web pages. Computers are no longer used merely to store and process data; as portals to the Internet they have emerged as the primary means of global *communication*. No authorization is needed in the first instance to access public web pages and the judicially created notion of authorization revocation makes no sense in this context.

**B.** **Construing The CFAA (and C.P.C. § 502) To Allow A Private Party to Criminalize Access to Public Webpages Would Raise Serious First Amendment Questions, and Such An Overbroad Interpretation Should Be Avoided**

LinkedIn would interpret the CFAA (and Penal Code § 502) as delegating to private parties a sweeping power to deny access to public information on networked computers, on pains of criminal sanctions – an unnecessarily broad interpretation that raises grave First Amendment questions in a world where the Internet is a key place for public communication.

LinkedIn allows members to designate their profile information as "Public," meaning it will be accessible by anyone with an internet connection (Dkt. 23-1 (Ex. E) at 19). Hence, any claim of data "privacy" would be pretextual.[11]



Moreover, the LinkedIn "public profile" pages at issue in this case are no different (in

"render superfluous an entire provision passed in proximity as part of the same Act."); *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."); *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment … Specific terms prevail over the general in the same or another statute which otherwise might be controlling.") (internal citations omitted).

[11] A question came up at the hearing whether LinkedIn has "a way of refining the options" on its Member profile settings page to increase the granularity of privacy options available to Members. (Hrg. Tr. at 14, 22 (June 29, 2017)). Any such privacy system would have to be a valid "time, place, manner" restriction and comply with laws against unfair competition. (*Id.* at 28.) *However*, as hiQ explained above (*supra* at 2-3), in its Reply (Dkt. 33 at 19-20), and at the hearing many times, the Court does not need to go down this road, because the information at issue here is public and thus any purported privacy issue is a red herring.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION - Case No. 3:17-cv-03301-EMC

34556\6115363.1

principle) from public content on Twitter, Facebook, and many other forms of social media. A decision allowing LinkedIn to deny access to public information on its public profile pages will accord the same censorship power to other Internet platforms and will have grave implications for the electronic "public square" that the Supreme Court recognized in *Packingham*. Under LinkedIn's position, a website host, backed by governmental authority and possible criminal sanctions, could accomplish the same outcome as the North Carolina law invalidated in *Packingham* – banning specified persons from access to public websites, simply by notifying a potential user that a site is off-limits. Any host of a public website, without even citing a reason, could make it a federal crime for a specified person to view public portions of the site. Politicians could ban rivals from viewing their campaign website. Companies could ban their competitors from visiting their websites to learn about their products. Parties involved in litigation could prohibit their adversaries from gathering important information about them. Indeed, LinkedIn's own filings in this Court have cited materials drawn from hiQ's public website. Under LinkedIn's interpretation of the CFAA, hiQ could deny such access by sending LinkedIn an e-mail revoking authorization, thereby preventing LinkedIn's efforts to put this information before the Court. The possibilities are endless and the implications for speech alarming, as the ACLU complaint (Dkt. 34-1 (Gupta Decl. Ex. S)) demonstrates. Ex. BB (Kerr) at 1169 ("A computer owner cannot both publish data to the world and yet keep specific users out just by expressing that intent. It is something like publishing a newspaper and then forbidding someone to read it.").

    With the authority of government (and the threat of criminal sanctions) standing behind its suppression of protected speech, a website host's revocation of the right to view public content clearly satisfies the requirement of state action. As this Court recognized at the TRO hearing, "once you say that the CFAA arms private parties and sanctions private parties to block access to information that is now public and available to the public, … at least it now raises the specter, a higher specter of constitutional analysis than would be present if it were purely private action." Hrg. Tr. at 38-39 (June 29, 2017). "[T]o the extent that LinkedIn can invoke the CFAA, and it becomes operative, that certainly makes more of a state action element present in any constitutional analysis." *Id.* at 38.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

12

34556\6115363.1

This Court was right.  In *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), for example, the Supreme Court invalidated a governmental delegation of a veto power to a private body that used the veto to encroach on the First Amendment rights of another – there, a Massachusetts statute vesting in churches and schools the power to veto applications for liquor licenses within a 500-foot radius of the church or school.  The Court opined that the law "delegated" "governmental powers" to "religious institutions."  *Id.* at 127.  By the same token, LinkedIn's interpretation of the CFAA and Section 502 would delegate to website operators an effective "veto by revocation" enforced by the government – only their veto would deny access to public information, rather than liquor licenses.  Like the veto in *Grendel's Den*, LinkedIn's asserted veto is absolute, standardless, and carries the force of law.  If LinkedIn chooses to exercise its veto, then users face the quintessential state action – government-imposed sanctions, including the threat of criminal penalties – merely for typing in a publicly accessible web address.  A long pattern of cases in a wide variety of contexts shows that *Grendel's Den* is not limited to the Establishment Clause; the delegation of a traditional governmental power to private parties is state action – and often an impermissible abdication of governmental accountability.[12]

---

[12] *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (holding that interscholastic athletic association's regulatory enforcement action was "state action": "We have treated a nominally private entity as a state actor . . . when it has been delegated a public function by the State."); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624 (1991) (state rule delegating peremptory challenge power to private party in civil case constituted "state action" because "a private party could not exercise its peremptory challenges absent the overt, significant assistance of the court, "and "the government has 'create[d] the legal framework governing the [challenged] conduct'") (citations omitted and brackets in the original); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 933, 942 (1982) (prejudgment seizures of property by private parties pursuant to state-created garnishment and attachment schemes constitute state action: "private use of the challenged state procedures with the help of state officials constitutes state action for purposes of the Fourteenth Amendment," and state action test was met "when the State has created a system whereby state officials will attach property on the ex parte application of one party to a private dispute"); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (striking down statute granting coal producers and miners the power to issue rules setting maximum labor hours and minimum wages, explaining that delegation of authority to private party "is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business"); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) (striking down delegation of power to industry associations to draw up regulatory codes on

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

There is nothing exceptional about finding that private entities can violate the First Amendment when they use government-delegated authority to suppress speech. As long ago as *Marsh v. Alabama*, 326 U.S. 501, 508 (1946), the Supreme Court held that the private owner of a "company town" could not prohibit the distribution of religious literature in the town's "business block," which was "freely accessible and open to the people of the area and those passing through." The decision was not limited to religious pamphleteering but spoke in general terms in ruling that the private company's invocation of the state's prohibition against criminal trespass violated the First Amendment: "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.* at 506. Just as the leaflet distributor in *Marsh* sought to enter only the "business block" of the company town, hiQ seeks to access only the "public profile" pages on LinkedIn. hiQ does not seek to enter any protected portion of LinkedIn's website. This case therefore presents no issue of "trespass." This case involves the difference between (i) entering a home without authorization and (ii) unobtrusively reading lawn signs visible from a public street, merely to obtain information freely available to all other members of the public. The authority to regulate "public spaces" on the Internet is a quintessential exercise of governmental power.

The CFAA and Section 502 should not be interpreted as delegating to LinkedIn such broad authority to suppress speech. The Supreme Court has instructed that "the federal courts have the duty to avoid constitutional difficulties by [adopting a narrow construction] if such a construction

_____

the ground that "[s]uch a delegation of legislative power is unknown to our law and is utterly inconsistent with the constitutional prerogatives and duties of Congress."); *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928) (invalidating, as an unconstitutional delegation, a zoning ordinance giving landowners the authority to restrict a neighbor's lawful use of his property); *Eubank v. Richmond*, 226 U.S. 137 (1912) (invalidating city ordinance conferring the power to establish building setback lines on the owners of two-thirds of the property abutting the street); *see also Department of Transp. v. Assn. of Am. R.R.*, __ U.S. __, 135 S. Ct. 1225, 1231 (2015) (upholding certain rules promulgated by Amtrak over objection that "it was impermissible for Congress to 'delegate regulatory authority to a private entity'" only by concluding that Amtrak was governmental (rather than private) entity) (citation omitted); *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 125-26 (1978) (Stevens, J., dissenting) (discussing *Carter Coal* with approval and concluding that private delegation violates due process).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

is fairly possible." *Boos v. Barry*, 485 U.S. 312, 331 (1988); *see Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"). To trigger the canon of constitutional avoidance, a challenger need not show that its constitutional claim would succeed; a serious question, doubt, or possibility is enough.[13]

### C. Absent an Overbroad Interpretation of the CFAA and Penal Code, LinkedIn Would Need a Lawfully Recognized Reason to Deny hiQ Access to Public Information

The Court questioned at the TRO hearing whether even in the absence of these computer fraud statutes, LinkedIn has a right to prevent hiQ's access. Hrg. Tr. at 59 (June 29, 2017). As hiQ explained at the hearing, it is only those statutes, enforced by threat of criminal liability, that prevent hiQ from continuing to access public information on the site as it has been doing for years and as anyone else with an internet connection can still freely do. Though LinkedIn can prevent access via other legal vehicles if it can show that hiQ is copying proprietary material that LinkedIn owns (*e.g.*, copyright law, including the Digital Millennium Copyright Act), or causing harm to its servers (*e.g.*, trespass to chattels), this it has not done, and no principle of law affirmatively permits LinkedIn selectively to ban certain categories of persons from obtaining wholly public information. Thus, hiQ need not even demonstrate a likelihood of success on its own affirmative claims to obtain preliminary injunctive relief. But in fact, as demonstrated below, hiQ has certainly raised serious questions going to the merits of those claims as well.

---

[13] *E.g.*, *BE & K Consrt. Co. v. N.L.R.B.*, 536 U.S. 516, 535 (2002) ("difficult First Amendment issue" enough to trigger rule of constitutional avoidance); *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001) ("significant constitutional questions"); *DeBartolo*, 485 U.S. at 575 ("serious constitutional problems"); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749-50 (1961) ("if a serious doubt of constitutionality is raised") (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)); *Lucas v. Alexander*, 279 U.S. 573, 577 (1929) ("the answer must be construed with an eye to *possible constitutional limitations* so as to avoid doubts as to [a statute's] validity" (emphasis added)).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

15

34556\6115363.1

**D.** *Pruneyard* **And Its Progeny Safeguard hiQ's State-Law Right Of Access To Member Public Profiles On LinkedIn**

The California Constitution goes even further than the U.S. Constitution to protect the rights of free expression. Article I, Section 2 is not limited to restricting government action, but instead states that "[e]very person may freely speak, write, and publish his or her sentiments on all subjects." This provision protects expression even when it occurs on private property that the owners have opened to the public. *Robins v. PruneYard Shopping Ctr.*, 23 Cal. 3d 899, 910 (1979). Of course, the California Penal Code could not trump the California Constitution as construed in *PruneYard*, even if the Code were interpreted as LinkedIn seeks. Where a private website operator opens portions of its site to the public, it may not under *PruneYard* prohibit certain members of the public from visiting those public webpages.

At the TRO hearing, the Court asked whether applying *PruneYard* would prevent websites from addressing fake news and other issues. Hrg. Tr. at 40 (June 29, 2017). The answer is no. By analogy, *PruneYard* has not prevented private shopping centers from adopting rules to address disruptive or other forms of harmful speech. *See Lushbaugh v. Home Depot U.S.A., Inc.*, 93 Cal. App. 4th 1159, 1170 (2001) ("The company need not give activists free rein to directly accost every customer entering the store."); *Savage v. Trammell Crow Co.*, 223 Cal. App. 3d 1562, 1576 (1990) ("Trammell Crow's parking lot ban is a reasonable restriction on the time, place or manner of activities protected by the First Amendment and the liberty of speech clause."). *Packingham*, too, noted that the government could regulate online speech through narrowly targeted laws. *See* 137 S. Ct. at 1737.

Moreover, the federal Communications Decency Act ("CDA") protects a site like LinkedIn from liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, *whether or not such material is constitutionally protected*." 47 U.S.C. § 230 (emphasis added). So, as long as such self-regulation is carried out in "good faith," LinkedIn will not face additional exposure from being deemed a forum for free speech. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099-1100 (9th Cir. 2009) (CDA

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

16

34556\6115363.1

"encourage[s] voluntary monitoring for offensive or obscene material") (citation omitted); *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170 (9th Cir. 2008) (en banc) (explaining that "determin[ing] whether or not to prevent [the] posting" of third-party material online is "precisely the kind of activity" covered by the CDA. But the fact that the CDA expressly applies to "constitutionally protected" speech further demonstrates congressional recognition that public websites involve constitutionally protected speech.

With respect to "fake news" in particular, it is important to note that the *PruneYard* right of access applies only to the public portions of the sites – the public webpages that the website operator has chosen to make generally available to all comers. The "fake news" problem concerns a different issue – the ability of a user to log in to post content. Nothing in hiQ's theory requires this Court to decide how much authority a website operator may have to regulate postings by users subject to login requirements. hiQ is simply *collecting* information already publicly posted by others.

**E.      hiQ's Common Law Claims Raise Serious Questions on the Merits**

Plaintiff's Renewed Motion and Reply (Dkt. 24 at 17-23; Dkt. 33 at 16-19) detail the reasons Plaintiff is likely to succeed on its claims for promissory estoppel and intentional interference with contract and prospective economic advantage. LinkedIn does not dispute that hiQ has satisfied all of the elements for its claims of intentional interference with contract and prospective economic advantage, instead contending that its actions were justified by a "legitimate business purpose." (Dkt. 31 at 23-24). LinkedIn does not have a legitimate interest in exerting exclusive access rights to information owned by its members. Justification is an affirmative defense for which LinkedIn has the burden of proof. *See* Gupta Decl. Ex. CC (Judicial Council of California Civil Jury Instruction (CACI) 2210 ("Affirmative Defense – Privilege to Protect Own Financial Interest")). *A.F. Arnold & Co. v. Pacific Prof. Ins., Inc.*, 27 Cal.App.3d 710, 714 (1972) ("Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties." quoting *Heeron v. State Farm Mut. Ins. Co.*, 56 Cal.2d 202, 206-07 (1961)). Thus, whether LinkedIn's actions were justified or whether

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

PLAINTIFF'S SUPPLEMENTAL BRIEF IN
SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION - Case No. 3:17-cv-03301-EMC

34556\6115363.1

its stated justifications are mere pretext to harm hiQ and other competitors is a factual matter.  For purposes of this motion, all that is necessary is for hiQ to raise serious questions regarding the merits of its claims, which it has done.[14]

**F.      hiQ Has Raised Serious Questions Going to the Merits of its UCL Claims**

For the same reasons addressed above and in hiQ's prior briefing, LinkedIn's violation of California free speech rights, tortious interference with contractual relations and prospective economic advantage, and promissory estoppel constitute independent violations of the UCL's "unlawful" prong.  But even if that conduct were not unlawful (and it is), LinkedIn's actions still violate the "unfair" prong of the UCL.

LinkedIn wrongly argues that hiQ must state all of the elements of an antitrust claim in order to prove a UCL claim under the "unfair" prong.  *See* Dkt. 31 at 25-27 (citing to trial court motion to dismiss ruling in *Power Ventures*).  To the contrary, the California Supreme Court in *Cel-Tech Communications v. Los Angeles Cellular Telephone Company*, 20 Cal. 4th 163 (1999), held the opposite: even conduct that does not state an antitrust claim can nevertheless violate the UCL if it "violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, *or otherwise significantly threatens or harms competition*." *Cel-Tech*, 20 Cal. 4th at 187 (emphasis added).  UCL "unfair" claims need not be pled with specificity,

---

[14] At the TRO hearing the Court questioned whether hiQ was attempting to invoke third-party beneficiary doctrine by alleging how LinkedIn misleads members into believing that they own and control the reach of their public profiles.  Hrg. Tr. at 19 (June 29, 2017).  While not necessary to hiQ's claims, hiQ qualifies as an intended beneficiary, because LinkedIn's User Agreement states: "Members and/or Visitors may access and share your content and information, consistent with your settings and degree of connection with them."  Dkt. 23-1 at 8.  This gives force and effect to the user's choice to make the content "public." " In any event, for hiQ's interference claims it is of no import that these independently wrongful acts were targeted towards LinkedIn's members and not hiQ.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1163 (2003) ("[W]e find no sound reason for requiring that a defendant's wrongful actions must be directed towards the plaintiff seeking to recover for this tort.  The interfering party is liable to the interfered-with party 'when the independently tortious means the interfering party uses are independently tortious *only as to a third party*.  Even under these circumstances, the interfered-with party remains an intended (or at least known) victim of the interfering party – albeit one that is indirect rather than direct." (emphasis in original)), citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 409 (1995).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

see *Quelemaine Company, Inc. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 46-47 (1998) ("well-settled rule" is that fact-specific pleading is not required in UCL cases), and in federal court the allegations need only be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In fact, Judge Illston recently rejected the notion that *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001) (heavily relied upon by the trial court ruling in *Power Ventures* that LinkedIn cites) requires dismissal of a UCL claim where an antitrust claim raising the same or similar conduct was dismissed. *Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, No. 16-cv-02560-SI, 2016 WL 5815311, at *5 (N.D. Cal. Oct. 5, 2016). The court there distinguished *Chavez* as a consumer (not a competitor) case where the alleged conduct was expressly found to be lawful. *Id.*[15] Here, hiQ has not only sufficiently pled an unfair UCL violation, but has established at least substantial issues going to the merits.

First, hiQ has alleged well established antitrust concepts, including monopoly leveraging and the essential facilities doctrine, as supporting its UCL unfairness claim. With its acknowledged 500 million member base, LinkedIn is clearly the dominant, if not only viable, *professional* networking platform. LinkedIn *has admitted* that it is blocking anyone from copying public profile data (data in which it again, admittedly, has no proprietary interest) by automated means, presumably to prevent its collection for competitive commercial purposes. An article in the Harvard Business Review from early this month warns of these new information monopolies arising in the Cyber Age:

> The coming battle in antitrust will not be about controlling markets in the traditional sense. It will be about the battle for control over consumers' information. The tech titans are currently in a race to see which of them can build a better digital replica of their consumers, which means finding a way to not just collect user data but also make it harder for competitors to do so. Tomorrow's monopolies won't be able to be measured just by how much they sell us. They'll be based on how much they know about us and how much better they can predict our behavior than competitors.

---

[15] The allegedly unfair conduct in *Chavez* involved a manufacturer's well recognized right to terminate dealers who refused to follow pricing policies, conduct that was expressly permitted by the Supreme Court's *Colgate* doctrine. *Chavez v. Whirlpool Corp.*, 93 Cal. 4th 363 (2001). LinkedIn's conduct has not been expressly sanctioned "as lawful" under any authority and thus can constitute "unfair" conduct under the UCL even if not otherwise expressly "unlawful."

Gupta Decl. Ex. BB (Bala Iyer, et al., *The Next Battle in Antitrust Will be About Whether One Company Knows Everything About You*, Harvard Business Review (Jul. 6, 2017)) at 2. LinkedIn's conduct bears an eerie likeness to the conduct that these scholars flag as the future of antitrust enforcement. It is not only plausible, but probable, that LinkedIn can use its monopoly power in the professional networking space to prevent competitors from employing data analytics on the facts contained in professional profiles.

Second, LinkedIn's practices unlawfully threaten competition in other ways. As noted, LinkedIn misrepresents to the public that members own and control access to their profiles and that LinkedIn merely has a *non-exclusive* license to use the information. But in reality, LinkedIn uses control of its website to obtain *exclusive* use of the information it promised would be available to all. LinkedIn thus engages in wrongful conduct to obtain information that it then converts to its own exclusive use.[16] It is irrelevant if LinkedIn's misconduct was directed to members rather than to hiQ because hiQ suffered injury from LinkedIn's practices. Indeed, in *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544 (2013), the court held that a plaintiff law firm that had *no relationship whatsoever* with a competitor defendant law firm could maintain a UCL claim based on the defendant holding itself out to its clients as a law firm when in fact its members were not properly licensed. *Id*. at 563. Even though the plaintiff and defendant were strangers to each other, the plaintiff law firm lost market share to the defendant firm "as a result of" the defendant's conduct toward its clients and that was enough of a nexus to the plaintiff's injury to state a claim. Here, LinkedIn's unfair conduct has not only reduced hiQ's share of the professional profile data analytics market, but has imminently threatened hiQ's very existence.

Dated: July 20, 2017                    FARELLA BRAUN + MARTEL LLP

                                        By:  ___/s/ Deepak Gupta_____
                                             Deepak Gupta

                                        Attorneys for Plaintiff hiQ Labs, Inc.

---

[16] Both deceit and conversion are prohibited by legislatively expressed policies and are thus sufficient to support an unfair UCL claim under *Cel-Tech* and its progeny. See Cal Civ. Code §1709 (deceit); Cal. Civ. Code §3336 (presumed damages for conversion of personal property).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400