**Pages 1 - 110**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | |
|---|---|
| hiQ Labs, Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )   **NO. C 17-03301 EMC** |
| | ) |
| LinkedIn Corporation, | ) |
| | ) |
| Defendant. | ) |
| ———————————————————— | ) |

San Francisco, California
Thursday, July 27, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff hiQ Labs, Inc.:
                    Farella, Braun & Martel LLP
                    Russ Building
                    235 Montgomery Street, 18th Floor
                    San Francisco, California 94104
                    (415) 954-4400
                    (415) 954-4480 (fax)
          BY:   **DEEPAK GUPTA**
                **CARL BRANDON WISOFF**

                    Laurence H. Tribe
                    Carl M. Loeb University Professor and
                     Professor of Constitutional Law
                    Harvard Law School
                    1575 Massachusetts Avenue
                    Cambridge, MA  02138
                    (617) 495-1767
          BY:   **LAURENCE H. TRIBE**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1  <u>**APPEARANCES**</u>:

2  For Defendant LinkedIn Corporation:
                     Munger Tolles & Olson LLP
3                     1155 F Street NW, 7th Floor
                     Washington, DC  20004
4                     (202) 220-1101
                     (202) 220-2300 (fax)
5          **BY:  DONALD B. VERRILLI, JR.**

6                     Munger, Tolles & Olson, LLP
                     560 Mission Street, 27th Floor
7                     San Francisco, CA  94105-2907
                     (415) 512-4009
8                     (415) 644-6909 (fax)
          **BY:  JONATHAN HUGH BLAVIN**
9                     **ROSEMARIE T. RING**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Thursday - July 27, 2017**                              **1:57 p.m.**

2                         **P R O C E E D I N G S**

3                              **---000---**

4         **THE CLERK:**  Calling Case C. 17-3301, hiQ Labs versus

5    LinkedIn.  Counsel, please come to the podium and state your

6    name for the record.

7         **MR. WISOFF:**  Good afternoon, Your Honor.

8    Brandon Wisoff, Farella Braun & Martell, on behalf of

9    plaintiff, hiQ Labs.

10         **THE COURT:**  All right.  Thank you, Mr. Wisoff.

11         **MR. TRIBE:**  Good afternoon, Your Honor.  I'm

12    Laurence Tribe, here for hiQ.

13         **THE COURT:**  All right.  Thank you, Mr. Tribe.

14         **MR. GUPTA:**  Good afternoon, Your Honor.

15    Deepak Gupta, here for hiQ Labs.

16         **THE COURT:**  Thank you, Mr. Gupta.

17         **MR. VERRILLI:**  Good afternoon, Your Honor.  I'm

18    Don Verrilli, from Munger Tolles Olson, for LinkedIn.

19         **THE COURT:**  All right.  Thank you, Mr. Verrilli.

20         **MR. BLAVIN:**  Good afternoon, Your Honor.

21    Jonathan Blavin, for LinkedIn, from Munger Tolles, as well.

22         **THE COURT:**  All right.  Good morning.

23         **MS. RING:**  Good afternoon, Your Honor.

24    Rosemarie Ring, Munger Tolles & Olson, also on behalf of

25    LinkedIn.

```
 1            THE COURT:  All right.  Welcome, everyone.

 2       Okay.  We are on, obviously, for hiQ's motion for

 3   preliminary injunction.  This case, of course, raises a number

 4   of cutting-edge issues, but we are framed by a basic,

 5   well-known framework here with respect to the standard for

 6   preliminary injunction.  And one of the first questions that's

 7   going to guide the analysis on the merits is the balance of

 8   hardships.  And so I have to determine which way the balance of

 9   hardships tips; and if so, how sharply or not sharply they tip.

10       Now on the one hand, hiQ contends that it will be

11   subject to bankruptcy, essentially.  And maybe you can

12   elucidate if there's any more information in that regard if the

13   injunction does not issue here.

14            MR. GUPTA:  Your Honor, the injury would be

15   devastating.  The company's been already in a bit of a

16   tailspin.  Before the cease-and-desist letters were sent there

17   were 24 employees, and we're now down to 15.  There was a

18   resignation earlier this week.  The momentum of the company is

19   suffering over the uncertainty of this case hanging over its

20   head, and we're living day to day as to whether basic raw

21   materials of the business are going to be available to them.

22            THE COURT:  And all of the raw materials are taken

23   from LinkedIn?  There's no other --

24            MR. GUPTA:  Your Honor, the vast, vast preponderance

25   of the public material they're using is from LinkedIn, because
```

1   of LinkedIn's tremendous market power in this area as the host

2   of 500 million professional profiles for the world's

3   professionals.

4           THE COURT:  Well, there was reference to the fact

5   that other similar companies doing analytics are able to work

6   without using LinkedIn, but using other sources.  What's your

7   take on that?

8           MR. GUPTA:  Your Honor, we talked with the client

9   about that.  And these other companies are doing something

10  different.  They're not doing what hiQ does.  HiQ is in the

11  data-science business.  And all data-science companies dating

12  back to Alta Vista and Excite and Google require data; and

13  public data is what people use.  That's the business hiQ is

14  in.

15      These other companies do things like perform surveys on

16  employees about their employee satisfaction.  And that type of

17  data -- while some of these companies may choose to make a

18  business out of it, hiQ never opted to go in that direction.

19  And I think there are good business reasons why they didn't go

20  in that direction.

21          THE COURT:  But aren't there -- who would you say

22  would present databases about employees that, if one had to,

23  besides LinkedIn, what other sources are there of data?

24          MR. GUPTA:  Your Honor, our team has been looking

25  into that question for -- for months now.  And there are no

1  real alternatives to this data.

2      In LinkedIn's papers they suggested that Facebook might be

3  an alternative source, but that doesn't really pass the

4  red-face test, because everyone knows Facebook is a

5  social-networking platform where people connect with their

6  friends, post photographs, and that sort of thing.  It's not a

7  serious professional platform, where you can get skill

8  information and the other types of data that hiQ works on.

9          **THE COURT:**  You want to comment on that, Mr. Verilli;

10  just that point?

11          **MR. VERILLI:**  So, Your Honor, if you would like us to

12  address that specific point, I'm going to ask my colleague,

13  Mr. Blavin, to do so.

14          **THE COURT:**  Sure.

15          **MR. VERILLI:**  I do have some more general points I

16  think are of real significance on the balance of --

17          **THE COURT:**  Right.  I haven't gotten to your side of

18  the ledger yet.

19          **MR. VERILLI:**  But in terms of that, maybe we'll have

20  Mr. Blavin.  Thank you.

21          **THE COURT:**  All right.  Mr. Blavin.

22          **MR. BLAVIN:**  Thank you, Your Honor.

23      As Your Honor correctly identified, there are a number of

24  other competitors in what's called "the people analytics space"

25  that operate using alternative data inputs.  One of them is the

company, Glint, which we highlighted in our papers, which uses
internal surveys to collect data relating to employees.  It is
viewed as a direct competitor to the type of services that
hiQ is offering.

**THE COURT:**  But that's a very different process
than -- I mean, you just said it's internal surveys, which is
quite different than being able to sort of surf the World Wide
Web for posted information.

**MR. BLAVIN:**  It's different in the sense that it's
getting a different type of data input, but the actual service
it's offering within what's described as "the people analytics
space" is remarkably similar.  So if the question is, "Do other
companies exist in this space, and do they offer competitive
offerings, and succeed, without using scraped LinkedIn data,"
the answer to that question is "Yes."

Moreover, there are a number of other websites which do
have professional data on them, including skills data, job
descriptions, education, et cetera.  We highlight in our
declarations and in our brief a number of those, and one of
them is Facebook.

And notwithstanding that hiQ just generally takes the
position, *Well, that's not a professional network*, we've put
forward evidence in the Blavin Declaration and other supporting
declarations which show that Facebook has a substantial amount
of professional data on it.

1     For example, one of the things that we did in our

2  declaration is we looked at the advertising tools on Facebook

3  and on LinkedIn, searching for people who describe themselves

4  as working for a particular company.  You can target ads to

5  those people.

6     And the numbers of people as to various companies,

7  including hiQ's own clients, who describe themselves as

8  employees of those companies -- so they're obviously putting

9  down who their employer is -- the numbers are remarkably close,

10 between LinkedIn and Facebook.

11    And Facebook has the same fields that LinkedIn does that

12 they're describing:  Job titles, skills, education, job

13 descriptions, et cetera.

14    Moreover, survey evidence which we put in showed that on

15 Facebook, 74 percent of users put professional data on it, as

16 compared to 78 percent of LinkedIn users.  So notwithstanding

17 the conclusory allegation that only LinkedIn has professional

18 data, the actual evidence in the record demonstrates otherwise.

19         **THE COURT:**  Okay.  What's your response to that?

20      **MR. GUPTA:**  Your Honor, the company has invested

21 $14 million in a particular business.

22    What LinkedIn is suggesting -- and the hubris is

23 astounding -- is that we should take that $14 million

24 investment, write it off, and completely reinvent the business

25 to either do employee internal surveys, or somehow figure out a

1  way to use Facebook to make a viable product.

2      We have client contracts today that are based on the

3  product that we developed.  We won the HR Product of the Year

4  in 2016 for our Keeper product, because our product is

5  extremely compelling.

6      They're saying, *Well, forget about that product, guys.  Do

7  something completely different*.

8      We're saying, *No.  "Public" means "public."*  We built a

9  product on public information.

10          **THE COURT:**  Well, what Mr. Blavin is referring to is

11  not just the model of doing internal surveys -- I understand

12  it's a completely different process -- but doing the same

13  thing, running the same kind of analytics, but using a

14  different database, which they say or he says has the same kind

15  of information one would likely find in LinkedIn.

16          **MR. GUPTA:**  Your Honor, if there were a solution like

17  that, our client would have figured it out, because they have

18  no desire to be paying our law firm this kind of money to be

19  fighting against a powerhouse like Microsoft or LinkedIn.

20      The reality is Facebook may have a field in it where some

21  people choose to put down the name of the business they work

22  for.  That's utterly worthless for the hiQ product.  What

23  the hiQ products depends on is a robust, complete description

24  of a person's professional skills, previous employment,

25  interests, that kind of stuff, and update it on a regular

1   basis, so that it is a very rich resource that they can then

2   extract these analytics from.

3         Facebook is -- they've looked at it.  We've talked about

4   it.  Facebook cannot hold a candle to LinkedIn as a

5   professional networking site.

6         Your Honor, I think their own product marketing collateral

7   tells the whole story, which is, *We have 500 million-plus*

8   *members.  We are the world's largest professional networking*

9   *site.*  That's their own words.

10        **THE COURT:**  Is there anything in the record that

11  suggests or describes a difference in the quality and the depth

12  of the field of information, as a practical matter, that is

13  available from Facebook vis-à-vis LinkedIn?

14        The fields may be available, but maybe people don't use it

15  very often, because they maybe consider it more of a social as

16  opposed to a professional network.  The age, the demographics

17  may be different, such that utilization may be different.

18  Maybe the amount of attention in terms of updating is

19  different.  I don't know.  Is there any data that actually

20  compares these two, in terms of their richness of the data?

21        **MR. GUPTA:**  Your Honor --

22        **THE COURT:**  Professional data.

23        **MR. GUPTA:**  Your Honor, if we had to piece something

24  together from the Record, I think if you look at Exhibit E to

25  their TRO papers, that shows what LinkedIn has.  You know.  And

1  I don't think they've put in the comparable profile from

2  Facebook; but a Facebook profile does not have that kind of

3  information in it.

4      Furthermore, I think if you look at the Mark Weideck

5  Declaration, who's the CEO of our company, he states quite

6  clearly that there's no other source.  He had his CTO and his

7  team working around the clock when they got the

8  cease-and-desist letter, saying, *What do we do?  You know,*

9  *we're fighting for our lives here, guys.*

10     And these -- these engineers were working around the

11 clock, trying to figure out a way:  Well, can we somehow use a

12 different source of public information?  Is there anything out

13 there?  How do we keep this going?

14     It was only after they reached a conclusion that there is

15 no alternative that they said we need to take this measure.

16     And we did try to talk with them.  We did try to explain

17 this to LinkedIn before we pursued this route.  It was

18 unfruitful.  And that's why we ended up -- and that's why we're

19 here today, where we are.

20     **THE COURT:**  All right.  Let's focus on the other side

21 of the equation:  Hardship --

22     **MR. BLAVIN:**  Okay.

23     **THE COURT:**  -- to LinkedIn if the injunction were

24 granted.  And I know part of this that you made a big part of

25 your case has to do with the preferences in the more granular

1  settings -- display settings or privacy settings -- that have

2  been opted for by LinkedIn users; namely, for instance, not

3  broadcasting changes made to their profile, I guess, with the

4  risk that that might be interpreted by their employer as job

5  hunting, or something.  So why don't you elaborate on that?

6         **MR. VERILLI:**  Yes, exactly, Your Honor.  Of course,

7  we're focused on the balance of equities here, and I'm going to

8  address that directly.  To get to the balance of equities,

9  they've got to show likelihood of success on the cause of

10  action, or at least a serious question; but putting that to one

11  side, because we think they're nowhere near that here -- but

12  with respect to the balance of equities, what we would submit

13  is the most important equity before this Court now -- the

14  overriding equity -- are the privacy interest of LinkedIn's

15  members, and the integrity of LinkedIn's trust relationship

16  with its members, which is essential to its business.

17         Your Honor identified the Do Not Broadcast feature.  And I

18  think that's of critical importance.  The second Rockwell

19  Declaration, which is attached to our supplemental brief,

20  details the facts on that.  And our brief discussed it, too.

21  And it's critical.  Many millions of LinkedIn member, when they

22  change their profile settings, have opted not to chose the Do

23  Not Broadcast feature, which means that that information is

24  not sent out to their contacts, and not send out to their

25  employer.  And so they've made that decision, as paragraph 4 of

1    the Rockwell Decision [sic] -- the Rockwell Declaration

2    identifies, because we put that policy in place precisely

3    because LinkedIn members were worried that when they made a

4    change to their profile, that their employers might get notice,

5    and be -- and be suspicious that they were searching for a new

6    job.  And that was an invasion of their privacy.  And that's

7    why we have it.

8       And of those many millions of LinkedIn members --

9         **THE COURT:**  It was about 50 million, as I recall,

10    that have opted in?

11         **MR. VERILLI:**  That's correct, Your Honor.

12         **THE COURT:**  Is that about 10 percent of the user

13    base?

14         **MR. VERILLI:**  Right, but I think in addition, well

15    more than 10,000 of our members are employees of the companies

16    with which hiQ already has contracts, so they're already

17    under this surveillance, and they're already at risk of being

18    ratted out to their employers with this system.

19       And so -- and that's a -- that is a very serious intrusion

20    on their privacy.  Basically what's happening here is that they

21    have chosen -- our members have chosen Do Not Broadcast.

22    And hiQ is broadcasting the very information to the employer

23    that we have that our members have chosen not to broadcast.

24       Now even with respect to the other members who haven't

25    chosen that option, they have made their data visible -- their

1  information visible on LinkedIn, on the basis of an

2  understanding that we are going to respect the Terms and

3  Conditions that we have communicated to them.

4      One of the Terms and Conditions we have communicated to

5  them is that we don't allow scraping and data mining of this

6  kind, because it is an intrusion on their privacy.

7      And, as Your Honor will see from the second Rockwell

8  Declaration, we have also received numerous complaints from our

9  members that they believe that this kind of an intrusion --

10  this kind of scraping, and data mining, and ratting them out to

11  their employers, or disclosing this information in other

12  ways -- is an invasion of their privacy; is incompatible with

13  what they understood.

14          THE COURT:  Now let me ask you.  I'm trying to

15  recall.  When you say they've been informed that data, quote,

16  "scraping" -- I'll say quotes, because some people find it is a

17  loaded term, but I'm not sure what term to use for now.  I know

18  that's term that's used, because one of your arguments is that

19  hiQ signed on to that, and they're bound by that.

20      But how explicit is it that this is not allowed, not only

21  by users, but just generally; that LinkedIn takes affirmative

22  steps to block third-party, quote, "scraping," even if they

23  haven't signed this Agreement?

24          MR. VERILLI:  Of course, they have signed --

25          THE COURT:  Right, but --

1     **MR. VERILLI:**  -- but in addition --

2     **THE COURT:**  -- I'm talking about notice to the

3 average user.

4     **MR. VERILLI:**  Right.  It's in the Privacy Policy,

5 Your Honor.  It's in the Privacy Policy, which is

6 incorporated among the Terms of Use.  And the Privacy

7 Policy states more generally.  It doesn't just state that

8 if -- by agreeing to this User Agreement, you may not engage in

9 scraping.  The Privacy Policy more generally states that we

10 have measures in place to protect your privacy in this way.

11    And it's the complaints that we have identified from our

12 members in the Rockwell Declaration, some of which we've quoted

13 in our brief, show Your Honor the members take that seriously.

14 And they believe that their privacy is being violated by this.

15     **THE COURT:**  Can you identify --

16     **MR. VERILLI:**  And then --

17     **THE COURT:**  -- where that Privacy Policy --

18     **MR. VERRILLI:**  I don't have it at my fingertips,

19 Your Honor, but we will find it.

20    And then, of course, in addition to that, you know,

21 LinkedIn does maintain a vigorous set of technical measures,

22 which are outlined in the first Rockwell Declaration, which are

23 there to protect our members from -- and I'm going to use this

24 term, because it's the term -- "scraping" by automated bots,

25 which can be done for all kinds of purposes.  It can be done

for identity theft.  It can be done for other scams.  It can be done for spamming.

     And, as Your Honor is aware from the prior submissions in this case, those technical measures turn away 95 million incursions by automated bots every day.  We have no way of knowing in advance which of those automated anonymous bots is seeking information for one purpose or another.

     What we know is that all of them are acting in violation of our Terms of Service.  All are acting in violation of our policies.  And we need to protect our members' privacy interests against all of those kinds of intrusions, including hiQ's intrusion.

     Now, that's a very powerful equity here, that -- when you think about that, yes, they've got a certain number of employees.  Whether their business is at risk or not, I don't know; but if it's at risk, it's at risk because they have designed a system that -- and I realize we're moving a little bit to the merits here, but I will confine myself on that.  But they've designed a system that, in our view, is unlawful.

     And that -- in our view, they have not identified any legal basis that would require us to disable our technical measures so they can get access on the terms that they want access, which we don't give to the general public, and we don't give to others who want to scrape data for whatever purpose.

               **THE COURT:**  I think I asked this last time.  Is there

1   any kind of a setting that's available to LinkedIn users who

2   might want to be able to be out there for all purposes,

3   including being subject to collection by bots, because perhaps

4   there are some advantages to it?  Some might think that there

5   is.  Is there an option to allow that?

6           **MR. VERILLI:**  I'm not aware that there is.

7   Mr. Blavin can correct me if I don't have that fact right.  I'm

8   not aware that there is; but I also can't imagine that there

9   are very many members who are going to think something like

10  their Keeper product is something they'd want to have

11  themselves subjected to, which is -- it's essentially corporate

12  intel.  It's an anonymous surveillance of their behavior, to

13  rat them out to their employers.  And I can't imagine that any

14  member would think that that would be something of benefit to

15  them.

16          **THE COURT:**  Well, I mean, hypothetically that was

17  something posed initially by hiQ, is that people might be

18  seen as valuable, as "keepers."  They think they are going to

19  be seen as keepers.  And this is their subtle way of letting

20  their employers know that there's free agency out there, and

21  they might want to keep them.

22          **MR. VERILLI:**  I guess my point in response to that,

23  Your Honor, would be that that ought to be up to the autonomous

24  choice of the members.  It ought not to be up to hiQ, as a

25  matter of making a buck.

1    **THE COURT:**  Well, that's why I asked.  If you wanted,

2  really, a democratic process --

3    **MR. VERILLI:**  Right, right.

4    **THE COURT:**  -- one could envision that people could

5  have that option.

6    **MR. VERILLI:**  But I guess, Your Honor, what I would

7  say is if somebody wants their employer to know that they are

8  looking for a new job because they think it will give them

9  leverage, they don't need hiQ to tell them.  They have plenty

10  of ways that they can convey that information.

11    You know, I think this Keeper product is all down side.

12    And then there's another equity here even with respect to

13  the other product, which they try to portray as just something

14  that has no negative effects, as an equitable matter, at all --

15  and that's completely wrong -- their Mapper product.

16    Well, a lot of people make a decision to make their

17  profile visible, and then at some point in the future make a

18  decision that they no longer want it to be visible, so they

19  take it down; but at that point, hiQ's got it.  And so it's

20  not -- you know, so they have lost that control.  They've lost

21  that autonomy to decide what people know about them over time,

22  because hiQ's taking that information, in violation of these

23  norms on which we run our business, and they've got it

24  permanently.  And so there's -- that's another way in which

25  there's a real intrusion on the --

1          **THE COURT:**  Are there not other archival-type

2    websites out there that store this information?

3          **MR. VERILLI:**  I'm not aware that that would be

4    available, Your Honor; but what I do know is that they take

5    that -- that when members decide that they no longer want their

6    information visible, that's a choice that hiQ effectively has

7    overridden.  It's overridden their privacy.  It's overridden

8    their autonomy.  It's done it in numerous respects.  It does it

9    to hundreds of thousands of people, including tens of thousands

10   of people who are employed by hiQ's clients.

11         And I think that that is an extremely powerful set of

12   equities that far outweighs any equitable claim that hiQ has

13   to try to run this commercial enterprise -- we believe, in

14   violation of the law; certainly in violation of all of the

15   policies that we set up to protect our members.  And that

16   doesn't even get -- that's just about the members.

17         You also have to, I think, Your Honor, consider our

18   business model here.  Our business model depends on a trust

19   relationship between us and our members.  We need to have our

20   members put this information up and put it into the system and

21   make it available, in order for our business model to work.

22   And in order for that to happen, they have to trust that we're

23   going to be able to do what we say we're going to do, in terms

24   of protecting their privacy and protecting their autonomy.

25         And what hiQ comes in and says, essentially, is, *Doesn't*

*matter.  Does it matter what you tell your members about how*

*you're going to protect their privacy.  We get to take that*

*information, and use it for whatever purpose we want.*

And that is deeply damaging to our relationship -- the

fundamental relationship that makes our business work.

**THE COURT:**  Have there been any kind of surveys,

other than a collection of complaints, whether by your client

or anybody else, that look at what users' privacy expectations

are, whether it be Facebook, LinkedIn, or anything else, when

they choose a public setting?

Because one could make the argument that once somebody

goes public -- and they have a range of options, whether it's

Facebook or anything else -- they're taking a calculated risk.

And they do that at their own risk, and perhaps knowing that

there's a risk that -- who knows what kind of data?  I mean,

there are all sorts of people out there.  Could be creditors,

and all sorts of things.  But if you put it out there, that's

the risk, and that's what people expect.

**MR. VERILLI:**  So a couple of points about that,

Your Honor.

First, I think -- while I don't know the answer to the

question whether there have been any kind of surveys with

respect to that particular question, I think, based on this

Record, by far the fairest inference is that LinkedIn's members

put that information out there, when they make it visible, on

1  the understanding that the conditions that LinkedIn has imposed

2  are going to be respected, and that therefore their privacy and

3  their integrity is going to be respected.

4      And the second point I'd like to make -- I think this goes

5  a bit to the merits.  I think it's also highly relevant to the

6  balance-of-hardships analysis that we're talking about here --

7  is that what I would submit to Your Honor is that, with all due

8  respect, the dynamic is exactly the opposite.  If it were the

9  case that LinkedIn can't continue to use these technical

10  measures to block the kind of scraping, and data analytics, and

11  the ratting-out to the employer that their business model

12  relies on -- if we can't do that, that's not going to increase

13  the free flow information to the public.

14      It's going to decrease the free flow of information to the

15  public because what's going to happen is that many, many more

16  people are going to be unwilling to make their information

17  visible, precisely because they're not going to want to take

18  that risk.  For example, that number of people who choose

19  Do Not Broadcast, I'm sure, is going to go way, way up if

20  this is permissible activity.  And in addition, Your Honor, I'm

21  sure that many, many fewer people are going to make that

22  information visible, at all.  That just stands to reason.

23      So I think the fact, Your Honor, it's not the case that

24  people understand that they're taking a risk.  They think they

25  aren't taking this risk.  And once they learn that they're

1  taking this kind of risk of being exposed to their employer,

2  and having data that they no longer want public remain

3  public -- they're going to make the decision not to make that

4  data available in the first place.

5       And the only other option we have under their theory of

6  the way the law is supposed to work:  Either we've got to tell

7  our members this, which is going to lead to that reduction in

8  the free flow of information, or we have to put up a wall;

9  something like -- keep the information inside a wall with a

10  password, which, of course, is going to decrease the free flow

11  of information, because you won't be able to get it if you're

12  outside the wall.

13       So I think as an equitable matter as well as a legal

14  matter, that that runs exactly in the other direction.  What

15  they're asking for damages our members' privacy, damages our

16  business model, damages the free flow of information.  It

17  benefits them and their 20 employees, but it damages every

18  everything else I've just listed in a very serious way.

19       And, of course, the problem, Your Honor, is if they can do

20  it, so can everybody else.  This isn't a hiQ-only pass.  If

21  they can do it, everybody can do it.  And then I think you're

22  talking about a very, very serious denigration of important

23  interests.

24       My colleague, Mr. Blavin's, got the Privacy Policy site

25  here, Your Honor, for you.

1          **MR. BLAVIN:**  Yeah.  So two things, Your Honor.

2      First, with respect to the User Agreement, we know that

3  hiQ accepted and agreed to that.  They don't dispute it.  It's

4  important in terms of member expectations, though.

5      The User Agreement says, in Section 1.1, that it applies

6  to anyone who accesses or uses LinkedIn's services.  And, as

7  Your Honor is aware, in Section 8.2 it says if you're going to

8  access our site, you have to -- you know, we've quoted this

9  repeated times -- not use software, devices, scripts, robots,

10  or any other means or processes to scrape the services.

11      So a member, reading the User Agreement, itself, would

12  think that anyone who's accessing LinkedIn has to agree to its

13  terms, which included an explicit anti-automated-scraping

14  prohibition.

15          **THE COURT:**  Does that make it clear that it applies

16  to nonmembers?

17          **MR. BLAVIN:**  Well, it applies to anyone.  The

18  Agreement says, *You agree that by clicking Join Now to join*

19  *LinkedIn, to sign up, or similar, registering, accessing, or*

20  *using our services, you are agreeing to enter into a legally*

21  *binding contract with LinkedIn.*  So it applies to those who

22  simply access the site, as well.

23          **THE COURT:**  Is there any statement in that policy

24  that says, regardless of contract or membership, that we take

25  steps to preclude scrapers, et cetera?

1      **MR. BLAVIN:**  Well, as noted, it says that if you

2  access the site, you can't scrape.

3      **THE COURT:**  Yeah.  I understand that, but is there

4  something more affirmative that says, *We protect you, user,*

5  *against these third parties who might want to scrape your data*?

6      **MR. BLAVIN:**  Section 4.5 of the Privacy Policy,

7  which is attached as Exhibit C to the first Rockwell

8  Declaration, states that we have implemented security

9  safeguards designed to protect the personal information that

10  you provide, in accordance with industry standards.

11      It further goes on to note that to protect any data you

12  store on our servers, we also regularly monitor our system for

13  possible vulnerabilities and attacks.  And we use a tier-one

14  secured-access data center.

15      And the security measures are those that are outlined in

16  the Rockwell Declaration to prevent the estimated 95 million

17  automated attempts to access the site on a daily basis.

18      **THE COURT:**  This is C?

19      **MR. BLAVIN:**  Yeah.  Rockwell Declaration.

20      **THE COURT:**  Where would you say is the --

21      **MR. BLAVIN:**  It's in Section 4.5, which is at the end

22  of the Privacy Policy to the first Rockwell Declaration, not

23  the supplemental one.

24      **THE COURT:**  Well, this refers to information that is

25  secure.  It's stored.  It's stuff that you secure bypass word,

1  and everything.  We're taking measures to make sure that that's

2  not hacked.

3      It doesn't say -- it does not -- I don't see anything here

4  that suggests that things that you have set for public view is

5  not going to be subject to aggregation, or some kind of

6  analytic aggregation.

7          **MR. BLAVIN:**  Well, it does say that *to protect any*

8  *data you store on our servers.*

9      Data that is publicly visible on LinkedIn is data stored

10 on our servers.

11         **THE COURT:**  Yeah.  I'm sure you can read it like a

12 lawyer, but I don't think this says that.

13     And chances are 2 percent of the people reading this

14 thing -- the 2 percent who do -- I bet you if you took a survey

15 right now and asked, *Did you understand this to mean that you*

16 *would not be subject to any kind of aggregative collection,*

17 *with the exception of authorized search engines like Google,*

18 *that you --*

19     I don't see that here, frankly.

20         **MR. BLAVIN:**  You know, I respectfully push back, to

21 say that those security measures are the ones that are detailed

22 in the Rockwell Declaration.

23         **THE COURT:**  All right.

24         **MR. BLAVIN:**  Moreover, if there were a survey to say

25 how many people would opt into the type of service that hiQ

1  is offering, given everything that Mr. Verilli stated before

2  about the measures, the features, that LinkedIn has 50 million

3  people locked into them, I think it would be a very, very low

4  percentage that would actually opt into that type of service.

5      **THE COURT:**  All right.  Let me hear your response to

6  particularly the concerns that they've raised now repeatedly in

7  their papers about those who -- I guess something like

8  50 million, if I recall correctly; a large number of people --

9  who opt for the Do Not Broadcast.

10      **MR. GUPTA:**  Yes.  Thank you, Your Honor.

11      We're on the balance-of-hardships prong here.  Really

12  quick, big-picture point:  There is no hardship from the

13  existence of hiQ in real terms to LinkedIn or Microsoft.

14  Their valuation quadrupled during the lifespan of hiQ.

15  Microsoft today is trading at an all-time high.  Putting hiQ

16  out of business is not going to boost their market

17  capitalization over the next period of time before we take this

18  case to the next level.

19      Now, getting to the points that you asked about, the

20  premise of hiQ's business is very simple.  It's:  "Public"

21  means "public."  They built a business around analytics on

22  public information.

23      The most glaring silence in the papers of opposing counsel

24  is on the fact that we cited a tremendous number of cases that

25  say there is no expectation of privacy; that users

1   affirmatively publish on the Internet.  And that could be

2   published expressly with a public designation, which is what

3   we're talking about in the context of LinkedIn.

4       We've shown you that there's a button.  And I have a

5   better printout if you want one today, but I can tell you what

6   it says.  It's *Make my public profile visible to everyone*.

7   "Everyone" is a strong word, Your Honor.

8       And when you hover over the information box for that, what

9   it says is it will be visible to all LinkedIn members, as well

10  as others who find you through search engines; e.g., Google,

11  Bing, or other services.  So it's everyone:  The public,

12  members, nonmembers, humans, and, to use their term, "bots."

13  "Everyone" means everyone.

14          **THE COURT:**  What's the record cite?

15          **MR. GUPTA:**  That's Exhibit E to the TRO, Your Honor.

16  I'll hand up a cleaner copy for you.

17      There you go, Mr. Verilli (indicating).

18  (Whereupon a document was tendered to the Court.)

19          **MR. GUPTA:**  So, Your Honor, the case law that we

20  cited actually shows that even when it's not designated public,

21  and if it's just shared with a few people, you've lost your

22  expectation of privacy under the law; but that's not what we're

23  talking about here.  We're talking about stuff that people

24  affirmatively make public.  Mr. Verilli is --

25          **THE COURT:**  Well, what about those who also

1    affirmatively choose Do Not Broadcast?

2          **MR. GUPTA:**   Okay.   Let's talk about

3    Do Not Broadcast.   We were puzzling over what this is.   What

4    does it mean?   We're talking about public profiles.

5          So the first thing I did is I asked my client, *What are*

6    *they talking about?   What is this Do No Broadcast argument that*

7    *they're making?*

8          And my client's response was, *We don't do that.*

9          What they're accusing us of doing is something that Keeper

10   doesn't do.   Keeper doesn't provide this continuous feed of

11   updates in to users' employers' HR departments.

12         What they've accused us of doing is:   Every single change

13   members make to their profiles goes to the employer.

14         The way Keeper actually works is a bunch of different

15   factors are put into an algorithm, and out comes a composite

16   score.

17         So it could say, you know, John Doe.   He's at a -- he gets

18   a score of 75.   That's his score.   That could include any

19   number of factors.   It's not actually the content of the

20   changes.   That would might be one factor, is:   How frequently

21   is he updating?   But other things are huge contributors to that

22   composite score.

23         Point is:   What they're talking about is completely

24   irrelevant to what Keeper actually does.

25         So I'm going, *What are they talking about here?*   These are

some of the world's most accomplished lawyers.  What are they

talking about?

    And I'm Googling it.  And what I find is that there's

actually a product they have, called "Update Me," which is

something that's a part of their Recruiter product, which is a

huge cash generator for them.  And I'm handing up a true and

correct copy of what I've printed out just yesterday.

(Whereupon a document was tendered to the Court.)

            **MR. GUPTA:**  So Recruiter has this Update Me feature.

And the purpose of this feature is to know when to reach out to

prospects.

    I highlighted the first sentence here, because what they

say is, *Every enhancement we make to our flagship product,*

*LinkedIn Recruiter, is driven by our goal to make lives easier*

*for recruiters like you*.

    I thought that was sort of troubling, because we've heard

so much in this case already about members first, members

first, members first.  Apparently, every decision they're

making about this product has nothing do with members.  It has

to do with recruiters.

    I highlighted the second bullet point, where they say what

the product does.  It alerts you when prospects make changes to

their profiles, so that you can use those as signals to reach

out at just the right moment.  So they're providing this

continuous feed of updates to their recruiters, who are paying

1    for a license.

2         And when you go to the next page, Your Honor, it gives you

3    a little more detail on what this product does.  And I've

4    highlighted a sentence about three-quarters of the way down.

5    So after you activated this feature on a profile by pressing

6    the star button, what they tell you is from now on, when they

7    update their profile or celebrate a work anniversary, you'll

8    receive an update on your Home page.  So any time a recruiter

9    likes a candidate, they can turn on the Update Me feature.  And

10   then every time you visit your LinkedIn profile and make a

11   change, they're going to have a notification.  The recruiters

12   are watching everything.  When we talk about surveillance,

13   that's surveillance.

14        When we're talking about what we do, we're talking about

15   analytics on public information.  We're taking the soapbox that

16   the Supreme Court has talked about that the Internet provides,

17   that -- everyone gets their own soapbox.  They get to project

18   their message to the whole world.  We're taking that

19   information, and making more interesting information out of it.

20        What they're doing is creating a system that allows

21   them -- their recruiters -- to spy on people.

22        And the last sentence, Your Honor, is the real kicker.

23   *And don't worry.  They don't know you're following them*.

24             **THE COURT:**  How do names get to LinkedIn Recruiter?

25             **MR. GUPTA:**  Your Honor, the -- you mean how do they

1   find someone they want to --

2           **THE COURT:**  Yeah.  How does one even get on track?

3       **MR. GUPTA:**  So, Your Honor, we have actually looked

4   up the product collateral for Recruiter, because we've asked

5   ourselves the same question.  And it gets even more

6   interesting.

7       So the Privacy Policy that they were talking about -- we

8   quoted a few lines from the Privacy Policy in our reply brief

9   on the Temporary Restraining Order.  So here's a true and

10  correct copy of the product data sheet for the Recruiter

11  product.

12  (Whereupon a document was tendered to the Court.)

13          **MR. GUPTA:**  And what it says here is pretty

14  remarkable.  So this is the candidate-search tool to find the

15  perfect hire, even if they're not looking for a career move.

16  *Zero in on the right person with 20-plus premium search*

17  *filters*.

18      So they provide search filters.  If I want, you know, a

19  lawyer who knows copyright law, you know, I can -- I can find

20  them using the search filters.

21      And the second bullet point is, *View full profiles for the*

22  *entire LinkedIn network*.  All 500 million plus members.  Full

23  profiles, Your Honor.

24      So what people are checking here when they're saying, *Give*

25  *my profile only to my network*, or *Make it visible to no one --*

1   in this (indicating), that has absolutely no truth relative to

2   recruiters.  Recruiters have full access to the whole thing.

3       Now this gets better, because they've been talking about

4   Privacy Policy.  Right?  Well, in our reply brief he cited a

5   couple of lines from the Privacy Policy.  And I'm just going

6   to pull those up.  So page 15 of our TRO reply brief.  They've

7   got -- we quote their privacy pledge.  So the privacy pledge

8   says, *We don't provide any of your nonpublic information, like*

9   *your e-mail address, to third parties, without your consent.*

10      They're selling all -- they're selling all of your

11   information to recruiters.

12      And then they say, *We do not rent or sell personal*

13   *information that you have not posted on our services, except as*

14   *described in this Privacy Policy.*

15      Hm.  Really?

16      So, Your Honor, privacy here is a pretext, plain and

17   simple.  We're talking about public information.  Let's not mix

18   apples and oranges.  This isn't about surveillance.  We don't

19   engage in surveillance.  What we're talking about is allowing

20   people to achieve their potential in their careers.  LinkedIn

21   has created what is a fundamentally lopsided situation.  What

22   they're doing is giving recruiters this incredible arsenal to

23   look inside companies, and recruit them away.

24      All we're doing is saying, *Look*.  *There's a lot of public*

25   *information out there*.  *There are advantages to employee*

1   *retention.  There are going to be stars within your*

2   *organization you don't want to lose.  We've got algorithms that*

3   *will help you identify those stars, and give you a way to*

4   *counteract this incredibly destructive process of -- of*

5   *recruiting people out of companies.*

6      Companies today -- if you talk with them, they're going to

7   tell you that they have trouble keeping employees for more than

8   five years.  It's really, really hard to run a company.  Can

9   you imagine running a law firm or an organization, if it was

10   such a revolving door?

11      So, Your Honor, Do Not Broadcast carries really no

12   weight.  And what we found in our research of was extremely

13   disconcerting.

14         **MR. VERILLI:**  So, Your Honor, might I --

15         **THE COURT:**  It seems disconcerting to users all

16   around.  What you're saying is notwithstanding all of the

17   privacy concerns, you're saying that -- sort of unclean hands;

18   that LinkedIn has already doing all sorts of things that are at

19   least as problematic as yours, so what's the big deal?  Why not

20   add one more straw to that camel's back?

21         **MR. VERILLI:**  Your Honor, might I --

22         **MR. GUPTA:**  Yeah.  Your Honor, I do want to

23   address -- Mr. Verilli did say a lot of stuff.  So it's going

24   to just take me a couple minutes.

25      My point is really much simpler than that, Your Honor.

1   I'm not making an unclean-hands argument.

2       What I'm saying is that "public" means "public."  We're

3   working on public information.  We're doing stuff that has no

4   privacy concern associated with it.  And they haven't cited a

5   single case that states anything to the contrary.

6       In fact, you'll see in our supplemental briefing we found

7   that LinkedIn, itself, has made extensive argumentation of the

8   same form in their own cases, where they've been accused of

9   doing things like using people's contacts, and sending

10  unsolicited e-mails to those contacts, inviting them to

11  LinkedIn.  And their rationale in those cases was, *Well,*

12  *everyone knows your a member of LinkedIn, because you have a*

13  *public profile on LinkedIn, so there's no additional privacy*

14  *violation.  That was your own affirmative act of making it*

15  *public.*

16      So what I'm saying is this is really uncontrovertible

17  territory that we're talking about here.  We're talking about

18  stuff that actually both companies agree on.

19      I want to talk a bit about the User Agreement.  So the

20  User Agreement doesn't contain any -- any clear waiver.  The

21  User Agreement is a -- is a hornets' nest of contradictory

22  information.  It says -- if you walk through the Don'ts in this

23  Agreement --

24          **THE COURT:**  Which tab is this, again?

25          **MR. GUPTA:**  So this is Exhibit B to the

1  Rockwell Declaration.

2  **THE COURT:**  Yep.

3  **MR. GUPTA:**  Okay.  So if you go to the Don'ts, which

4  is a section near the end of the document --

5  **THE COURT:**  Section 8?

6  **MR. GUPTA:**  I'm sorry.  Did you find --

7  **THE COURT:**  Section 8?

8  **MR. GUPTA:**  Yes, it's in Section 8.

9  There's a whole series of don'ts here, and these

10  include -- when you go through them and read them carefully,

11  they include things like -- so, for example, the fourth from

12  the top.  It says, *You can't scrape or copy profiles and*

13  *information of others through any means, including crawlers,*

14  *browser plug-ins and add-ons, and any other technology or*

15  *manual work*.

16  So you can't copy a profile through manual work.  Yet, in

17  order to use the profiles, you have to access these things, and

18  you have to make a copy to -- at least to your computer.

19  Furthermore, there's actually a feature on the profile

20  that allows you to save a copy to your own computer, thereby

21  creating a manual copy.  And then you can print it.  There's --

22  it says you can't share information of others without their

23  express consent, yet their user interface actually has a Share

24  button on it.  It even says you can't manually access the site,

25  which is extremely ironic in this context.  Everybody's,

1  apparently, in violation of their terms of agreement -- of

2  their User Agreement, just by using the site.

3      **THE COURT:**  Which number are you looking at?

4      **MR. GUPTA:**  So that one is --

5      **THE COURT:**  Is it 8.2?  Don't?

6      **MR. GUPTA:**  It's -- it's in the Don'ts.  So if you go

7  to the fifth from the bottom, it says, *You can't use manual or*

8  *automated software -- manual or automated software, devices,*

9  *scripts, robots, other means or processes to access, scrape,*

10  *crawl, or spider the services or any related data or*

11  *information.*

12    So these are just extremely overbroad.  And there's no way

13  you could not allow your users to manually access the site.

14    But anyway, Your Honor, the point is this User Agreement,

15  if -- if --

16    First of all, those Don'ts don't even survive termination.

17  So they terminated hiQ from the Agreement.  And if you look

18  at what expressly survives termination, these Don'ts do not

19  survive termination.  So you're absolutely right.

20    The other thing to keep in mind is that this Agreement has

21  a dispute-resolution provision in it:  Section 6.  And

22  Section 6 says, *You agree that the laws of the State of*

23  *California, excluding its conflict-of-law rules, shall*

24  *exclusively govern any dispute relating to this Agreement*

25  *and/or the services.*

1        So if they're going to introduce the User Agreement into

2    this dispute, then this dispute relates to the User Agreement.

3        And they've got no CFAA claim anymore, because that's

4    federal law.

5        And all their preëmption arguments are out the door.

6        So this is just -- this is all theatrics.  It carries

7    absolutely no legitimate weight.

8        Your Honor, the *Don't scrape or don't automatically*

9    *collect information* statements that are in here -- all of these

10   self-contradictory statements in the User Agreement are clearly

11   contradicted by what the users actually read and actually click

12   on, which says, *Make it public to everyone:  Visitors, members,*

13   *humans, and bots*.  That's what people are asking for.  That's

14   what they're consenting to.

15           **MR. VERILLI:**  Your Honor, may I respond?

16           **THE COURT:**  Yes.

17           **MR. GUPTA:**  Your Honor, I did want to just --

18           **THE COURT:**  Well, I want to move on.

19       Go ahead briefly, please.

20           **MR. VERRILLI:**  Yes.  Several points.

21       Let me start where Mr. Gupta finished.  If Your Honor

22   looks at the document he handed up, the very top of it, what it

23   says is that by -- what you're agreeing to is making the

24   information visible.  Visible.  That's what you're agreeing to

25   here, and that's it.

1        Second, with respect to his points about

2   Do Not Broadcast, I think, with all due respect, Your Honor,

3   he did not answer Your Honor's question.  He says he points to

4   their algorithms.

5        Well, of course, their algorithms focus on whether

6   LinkedIn members change their profiles.  That's what drives up

7   their score.

8            **THE COURT:**  Well, when you say "focus on," how do I

9   know how big a factor it is?

10           **MR. VERILLI:**  Why -- well, why don't you ask

11  Mr. Gupta whether a change in the profile makes a difference,

12  and how big a factor it is.

13       But then in addition, Your Honor, with respect to this

14  Recruiter point, now, this wasn't made in the briefs.  And I

15  apologize to Your Honor that I'm not fully able to respond to

16  it, but with all due respect, it's a bit of an ambush here.

17  And we will find out.  We will find out what information is --

18  relevant information with respect to this Recruiter product;

19  but one thing is clear on the face of it is that that's not

20  information that goes to your employer.  So that's not

21  information that compromises your privacy and your employment

22  status in the way that their product does.

23       And if I could just ask Mr. Blavin to make a couple of

24  additional points.

25           **MR. BLAVIN:**  Thank you, Your Honor.

1      And our client is here, who just confirmed that LinkedIn's

2   understanding is that when the member selects

3   Do Not Broadcast, that the Recruiter product respects that,

4   and those changes are not notified to the recruiters.

5      Moreover, the Recruiter product is entirely different than

6   hiQ's product.  The Recruiter product is where the recruiters

7   are reaching out to people about job opportunities.  People

8   would welcome that.  There are new opportunities out there.

9      Their product is doing something entirely different.

10      **THE COURT:**  What information -- what warning's given?

11   Because you placed such a premium on protecting the privacy

12   rights of your users, where are users informed that no matter

13   what setting they pick, public or not, it appears that

14   recruiters will have access to that?

15      **MR. BLAVIN:**  Well, with respect to recruiters, if you

16   look on the Privacy Policy, Section 2.12, Talent Recruiting,

17   Marketing, and Sales Solutions -- I believe that's Exhibit C to

18   the Rockwell Declaration -- it explicitly states that user data

19   is made available to recruiters.

20      It goes on to say that you may limit --

21      **THE COURT:**  Where are you looking at?  What section?

22      **MR. BLAVIN:**  2.12.  I just want to make sure that's

23   the right exhibit.

24      **THE COURT:**  It says, *You may limit or prevent such*

25   *subscribers from exporting your profile information by*

1 *configuring your public profile visibility settings --*

2        **MR. BLAVIN:**  Correct.

3        **THE COURT:**  *-- restrict access.*

4        **MR. BLAVIN:**  And moreover, if you select

5 Do Not Broadcast, that means those changes -- those

6 notifications -- are not made to the recruiters on a continuous

7 basis.

8        **THE COURT:**  Well, how does that square, though, with

9 this alleged collateral here that says that you can view full

10 profiles of the entire LinkedIn network, not just those who

11 select public view?  Because all 500-plus million --

12        **MR. BLAVIN:**  Well, that's -- that's a collateral

13 material that's made to advertisers.

14     These are the privacy profile settings which are described

15 to the users.

16        **THE COURT:**  Well, when you "just" -- this is coming

17 from -- if this is an authentic LinkedIn.com website.  So

18 representation is made.  You're saying this is not a truthful

19 representation?

20        **MR. BLAVIN:**  No, no, no.  All I'm saying is that, as

21 a general matter, yes, all profile information for members is

22 visible --

23        **THE COURT:**  Well, then how can that be --

24        **MR. BLAVIN:**   -- subject to the privacy policies.

25        **THE COURT:**  How is that consistent with 2.12?

1  Because it just said you can configure your profile-visibility

2  settings to restrict those fields.

3       **MR. BLAVIN:**  I think it's a general collateral

4  material describing that member information is available,

5  obviously, subject to the privacy-policy protections which

6  LinkedIn is committed to its users to do, which is made

7  explicitly clear in 2.12.  And Your Honor, again, we've just

8  been thrown this --

9       **THE COURT:**  Well, at some point let's step back.

10     You are placing a lot of your arguments about business

11  model, protecting the privacy, maintaining the trust and

12  integrity of your user base, based on, frankly, fine print of

13  various policies which, assuredly, a very small percentage of

14  the people of your users would actually read and understand.

15  What they're likely to look at is when they actually make the

16  choice that's on the Web page.  That doesn't have all of these

17  qualifiers.

18     So, you know, we can sit here for nine hours, and you go

19  through every damn piece of paper.  And, frankly, I don't find

20  that convincing.

21       **MR. BLAVIN:**  Your Honor, if I could quickly respond

22  to that.

23       **THE COURT:**  You're the one talking about business

24  model, and putting the privacy rights of your users so high;

25  but frankly, you're doing that on a legal basis that I don't

```
 1  find, in the real, practical world, very persuasive --
 2          MR. BLAVIN:  Your Honor --
 3          THE COURT:  -- so let's move on to something else.
 4          MR. BLAVIN:  Just very quickly, to respond to:  Is it
 5  in real time?  When users make changes to their profile, this
 6  is in the supplemental Rockwell Declaration.  Right there, with
 7  respect to every change, they have the option of not
 8  broadcasting it.  That is not buried in a Privacy Policy.
 9  That is made clear to the user.
10          THE COURT:  That's your best case.
11      So what's your response to --
12          MR. GUPTA:  My response to that --
13          THE COURT:  -- how much effect --
14      I don't know what your algorithm is -- maybe you don't
15  know exactly -- but how do I know there's not a fairly close
16  one-to-one correlation between number of changes, and ranking?
17  That number of 57, or whatever it is.
18          MR. GUPTA:  Your Honor, what I'm told is that there
19  are a lot of factors.  I don't know how many factors.  I don't
20  know what the weighting is.
21      But I can tell you one thing about this Do Not Broadcast
22  argument, just to finish it off.  This idea that there's this
23  moment of consent when the user clicks the radio button that
24  says Do Not Broadcast -- the problem is the law recognizes
25  consent if it's informed consent.
```

1    And the document that we handed up to you explained that

2  the Recruiter product, when it's doing this Update Me

3  feature -- what we're calling, to use Mr. Verrilli's term,

4  "surveillance" -- that it says, *Don't worry*.  *They* -- the

5  user -- *don't know you're following them*.  The user doesn't

6  know that the recruiters are following them.

7        **THE COURT:**  We're not on the same -- yeah.  You

8  already said that; but what does that have to do with my point?

9    You're saying they violate expectations, so you can go

10  ahead and violate?

11        **MR. GUPTA:**  No, that's not what I'm saying, Your

12  Honor.

13        **THE COURT:**  It sounds like it.  I'm asking you a

14  question.

15        **MR. GUPTA:**  Right.

16        **THE COURT:**  And in most -- unbeknownst to most users,

17  this thing exists.  In fact, you apparently just found this

18  yesterday.  Otherwise, you would have included this, I hope, in

19  your supplemental --

20        **MR. GUPTA:**  Oh, absolutely, Your Honor.

21        **THE COURT:**  -- rather than springing it on counsel

22  and the Court the last minute.

23        **MR. GUPTA:**  Yeah.

24        **THE COURT:**  So the chances of an actual user knowing

25  of this now acting responsively and informing their decisions

1    are very, very small, when you, lead counsel, didn't even find

2    this when it's the center of your case.

3        So the question still -- and I guess you've told me now

4    you can't answer this.   To the extent people have opted for --

5    and I'm going to forget all of this collateral stuff; all of

6    these fine prints; Exhibit Triple E to some declaration.   The

7    thing that people see says, *Don't Broadcast*.

8        And if that, in fact, results in -- if changes do have a

9    large influence on whether they become ranked highly on Keeper,

10   that makes it more problematic.   I'm not saying that's

11   dispositive.   That creates a potential problem; but apparently

12   you can't tell me how much influence.   There's this black-box

13   algorithm, and so we don't know, as we sit here.

14        **MR. GUPTA:**   Your Honor, there's -- I don't know.   And

15   the employer doesn't know, either.   So it kind of -- it's not a

16   signal that someone is updating their profile in any meaningful

17   way, because no one actually knows the trade-secret algorithm.

18   That's the best I can tell you right now.   Your Honor, if you'd

19   like me to follow up, I'm happy to.

20        **THE COURT:**   Well --

21        **MR. WISOFF:**   I'd like to make one other point on

22   that --

23        **THE COURT:**   Make it short.   We've got to move on.

24        **MR. WISOFF:**   -- Your Honor, and that's that this

25   notion that the broadcast feature is a statement by the user

1  that they don't want anyone to know that they've made changes

2  to their profile is a pretty big leap of faith.

3      What it says is that every single time you make a change,

4  it's not --

5      All of your contacts -- the people that you are connected

6  with within LinkedIn; other LinkedIn members -- are not going

7  to get an e-mail telling them that you've made that change.

8          **THE COURT:**  So you're saying there are other reasons

9  why --

10         **MR. WISOFF:**  Well, certainly --

11         **THE COURT:**  -- one would not turn that setting off.

12         **MR. WISOFF:**  Absolutely.

13     From my perspective, I don't like it when I get bombarded

14  with e-mails from all of my contacts about every little thing

15  they've done.  In fact, on a Facebook account I sometimes get

16  an e-mail telling me when somebody's having dinner at a

17  particular restaurant in Philadelphia.  That's not really very

18  important to me.  And, in fact, it's somewhat annoying to me.

19     So to say that because people have checked this box, that

20  they somehow want to override the public-visibility setting

21  that they actually affirmatively agreed to, when all they're

22  saying is they don't want every change sent by e-mail to their

23  contacts, is a pretty big leap of faith.

24     The other point I would make is we keep talking about the

25  consumers' expectation of privacy.  And I would submit, Your

1 Honor, we're not writing on a clean slate here. There have

2 been vast numbers of legal decisions that say as a matter of

3 law there is no expectation of privacy in information posted on

4 a public website.

5 And, in fact, there are quite a few cases -- and these

6 were cited in our supplemental brief, and also in our original

7 papers -- that say that even where you have selected your

8 settings to be private, and not to share with the whole world,

9 you still don't have an expectation of privacy, because once

10 you've shared with some people, there's no expectation that

11 those people won't share it with someone else.

12 So I think when we are talking about an expectation of

13 privacy, we're in an area that's not just embodied in contract;

14 it's embodied in well-established doctrinal law that says when

15 you make your profile public, you have made a choice. There

16 are pros. There are cons.

17 And every time you go out on the World Wide Web, there are

18 all kinds of programs that are using your personal information

19 for all kinds of purposes that you don't know about. And maybe

20 at some point in time, Congress will pass a law that regulates

21 that and puts restrictions on that; but right now what LinkedIn

22 is trying to do is to restrict anyone that has any potentially

23 competitive business from using what has become the world's

24 largest database -- one of the most valuable databases in the

25 entire world that has 500 million people in it -- on a scale

1  that is unimaginable.

2      And to say that they can raise these privacy issues, when

3  they are reserved -- not only reserved to themselves, but are

4  actually going out and selling the same information to other

5  people for their own purposes, is the absolute hypocrisy.  It

6  is an absolute pretext.

7          THE COURT:  Let's get on to the merits.  Preview the

8  merits question.  And the front question is the CFAA, because

9  if the CFAA applies, number one, that preëmpts all your state

10 law causes of action.

11         MR. GUPTA:  We disagree with that, Your Honor.  And

12 we hope to have some time to talk with you about that.  We

13 completely disagree with that.

14     And the perhaps the most emblematic case that refutes that

15 point is *Nosal I*, where Judge Kozinski wrote very clearly that

16 the CFAA was enacted interstitially, and that it does not

17 displace common law, and that does not --

18         THE COURT:  It doesn't displace.  It's not field

19 preëmption; that is, if something that violates is found not to

20 violate the CFAA, does that mean that that doesn't violate some

21 state law.

22     But if something does violate, if conduct is deemed

23 illegal under federal law, a state law can't make it legal.

24 That's obstruction preëmption.

25         MR. GUPTA:  Your Honor, that's a direct-conflict

1  argument that they have made --

2          **THE COURT:**  Yes.

3          **MR. GUPTA:**  -- but we disagree with that, because

4  nothing in the CFAA talks about revoking authorization, and

5  nothing requires them to revoke authorization.

6          So it is often the case that people will make a choice to

7  exercise some statutory right; but the choice to exercise a

8  statutory right needs to be scrutinized under law that's

9  intrinsic to that statute, itself.  It happens all of the time,

10  Your Honor.

11          So, for example, take another federal property right,

12  patent law, governed in many cases by equitable estoppel

13  doctrine.  There are cases like *Qualcomm versus Broadcom*, which

14  have said that even though you own a validly issued federal

15  property right, you can't exercise it in a way that's

16  inequitable.

17          And that's exactly what we're saying here, Your Honor, is

18  that the statute doesn't talk about revocation.  It doesn't set

19  forth conditions for revocation.  It doesn't purport to require

20  revocation.  And it certainly doesn't talk about revocation of

21  access to public material.  That was never within the

22  contemplation of the statute; but the point is that there's

23  plenty of law that says you cannot exercise these rights as

24  weapons against other people to carry out unfair competitive

25  aims.

1        Another example of that is *U.S. versus Microsoft*, another

2   federal property right, which is the copyright right, where the

3   D.C. Circuit, when approving the consent judgment against

4   Microsoft, said that Microsoft made an argument that, *Well, we*

5   *owned duly issued copyrights on all of our Windows software*, *so*

6   *we can go out there and put all of these onerous restrictions*

7   *on our licensees*.

8        And the D.C. Circuit said that that borders on frivolous.

9   And it said that that's like saying, *Because I own a baseball*

10  *bat, I can do whatever I want with it*.

11          **THE COURT:**  Well, but has to be frivolous in order

12  for it to be unenforceable; doesn't it?

13          **MR. GUPTA:**  I don't think so, Your Honor.  I think

14  that -- I don't think that was a legal requirement.

15       I think the Judge was a little bit -- bristled at it.

16       The citation for that, Your Honor, is 253 F. 3d. 34 for

17  the *U.S. versus Microsoft* case.

18       And the *Qualcomm versus Broadcom* case is 548 F. 3d. 1004

19  Federal Circuit 2008, where equitable estoppel prohibited the

20  exercise of patent rights against a particular standard --

21  products that adhere to a particular standard, because Broadcom

22  had not disclosed its patents to the standards-setting

23  organization.

24          **THE COURT:**  Isn't that a matter ultimately of federal

25  law incorporating common-law principles?  You're saying that's

1    a stand-alone state law that --

2            **MR. GUPTA:**  Your Honor, the equitable estoppel

3    doctrine could be arguably a federal common law doctrine, so I

4    don't know if it would qualify as a state or federal common

5    law; but my point is simply that a federal property right, to

6    the extent it may exist, does not exist bereft of a matrix of

7    regulations on how you can use those property rights.

8            **THE COURT:**  Well, that still ultimately is a question

9    of federal law, and whether it recognizes a defense that

10   incorporates certain matters; but to say, for instance, that

11   the California constitutional right of free speech could

12   preëmpt -- reverse preëmpt, I guess -- a federal statutory --

13   or prevent somebody from exercising statutory rights -- that

14   seems odd to me.  I mean --

15           **MR. GUPTA:**  Your Honor, it --

16           **THE COURT:**  Assuming it's not a *Noerr-Pennington*

17   problem.

18           **MR. GUPTA:**  Yeah.  Your Honor, so on this point, to

19   me, it strikes me as a very straightforward point, because if

20   you think about -- they used a metaphor of trespass.

21   They're -- a lot of their argument is based on the CFAA as a

22   trespass statute.

23       Well, the case of *Marsh versus Alabama* and the case of

24   *PruneYard* -- these are all cases that talk about fundamentally

25   trespass.  And what they say is that the physical trespass law

1    needs to cede to free speech principles.

2        And so these property rights always exist within a matrix

3    of other rights.

4        **THE COURT:**  Well, that's a property right that

5    accedes to a federal constitutional right.  There's not a

6    Supremacy Clause problem there.  That's a question of whether

7    or not, you know, in the hierarchy of things, a constitutional

8    right prevails.  I'm talking about state and federal.  Let me

9    ask --

10       **MR. GUPTA:**  Your Honor, Your Honor, I just have one

11   example.  I want to just --

12       **THE COURT:**  One more example, and then I want to --

13       **MR. GUPTA:**  Let me give you an example, which is if

14   the CFAA had this sweeping, unbridled power of revoking

15   authorization to anyone, it would lead to incredibly absurd

16   results.

17       So let me give you an example.  Let's say that I'm a Web

18   hosting company.  And you're hosting your business' services on

19   my servers.  So we have a contract governed by California state

20   law.  In that situation, I owe it to you that I'm going to

21   continuously provide service to you for three years.

22       Under their interpretation of the CFAA, I could simply

23   revoke your access to the server.  You can never come onto the

24   server again, which you have a contract with me for.  But the

25   CFAA action that I took would preëmpt California law.  And, to

 1  boot, you know, there's all of these other consequences of the

 2  CFAA that are unspeakable.

 3       THE COURT:  So your argument is, for instance,

 4  whether or not there's a valid withdrawal of authorization

 5  which would be necessary in order to trigger CFAA protection

 6  might be governed by state law?  State contract law?

 7       MR. GUPTA:  Yeah.  The conditions and motivations and

 8  circumstances under which somebody might choose to revoke

 9  access under the CFAA would need to be governed by overarching

10  principles of equity, common law, unfair competition.  It's not

11  a weapon.

12       THE COURT:  All right.  What's your response on just

13  the preëmption question?

14       MR. VERILLI:  Yeah.  So Your Honor's quite right that

15  if the CFAA applies.  It preëmpts all of their causes of

16  action.

17    I would just note -- and I want to go into preëmption in

18  depth, but I would just note for Your Honor's focus here that

19  before you get to the question of preëmption, they have got to

20  have a likelihood of success on an affirmative cause of action

21  that justifies the injunction that they've claimed, preceded by

22  the intentional interference or unfair competition.

23       THE COURT:  Well, the preëmption would make that

24  difficult, because you don't even get to those if there's

25  preëmption.

1        **MR. VERILLI:**  Right, right.

2        **THE COURT:**  That's why I took that first.

3        **MR. VERILLI:**  Yes, yes.

4        **THE COURT:**  If there is no preëmption --

5        **MR. VERILLI:**  You're totally right about that, Your

6   Honor --

7        **THE COURT:**  -- then you have to get to their

8   merits --

9        (Reporter requests clarification.)

10        **MR. VERILLI:**  Forgive me.

11     You're totally right about that, Your Honor, but the

12   reverse is also true, in that if they don't have a viable cause

13   of action, you don't need to get to the preëmption.  And that's

14   what I'm saying.  You can resolve it either way.  Under either

15   one --

16        **THE COURT:**  I understand.

17        **MR. VERILLI:**  Now with respect to preëmption, I think

18   the right thing to do here is to focus on the relevant

19   statutory materials and the relevant precedent which address

20   the scope of the CFAA, and which indisputably lead to the

21   conclusion that their claims are preëmpted.

22     And I don't think there's any serious dispute here that

23   we're within the plain meaning of the terms of the CFAA.  This

24   is unauthorized access resulting in obtaining information that

25   inflicts more than $5,000 worth of damage, so we're within the

1  plain terms.  We have an express private right of action

2  entitling us to relief under those terms.  We're within the

3  plain terms.  And there's no doubt about that.

4      They're making an argument that the plain terms need to be

5  read more narrowly than they -- than they, on their face,

6  clearly state; but I would submit, Your Honor, that binding

7  Ninth Circuit precedent has already definitively rejected the

8  very argument they're making about the need to narrow the

9  scope.

10      **THE COURT:**  Well, I want to talk about the CFAA in a

11  moment, but before we get there I just want to hear the

12  predicate about what the consequences of finding a CFAA

13  application here.  And is there an exception to preëmption?

14      One of the arguments Mr. Gupta's making is that, yes, even

15  if the CFAA were generally applicable, if it is misused in a

16  way that violates certain state rights like breach of contract

17  or perhaps breach of the law of unfair competition to

18  monopolize -- the use of monopoly power -- that there is room

19  for state-law limits on the employment of that CFAA cause of

20  action.

21      **MR. VERILLI:**  Yes.  I don't think there's -- there's

22  absolutely no authority for that proposition.  Your Honor has

23  zeroed in on exactly the right points with respect to the

24  *Microsoft* case and the *Qualcomm* case.  In those cases, those

25  were both instances of reconciling two different strands of

1    federal authority, and making them work together.

2        They have not cited a single case -- and I'm not aware of

3    a single case -- suggesting that a federal statute's squarely

4    on point, and applies, and creates a particular right or

5    creates a particular prohibition that -- based on some kind of

6    equitable notion, that that would be unfair under state law;

7    that the federal statute doesn't apply.  There's no case for

8    that proposition.  It's a direct refutation of the Supremacy

9    Clause.

10       Now, the -- this is, as Your Honor correctly identified, a

11   question of conflict preëmption here, but in -- but I think

12   it's worth remembering that what my friends on the other side

13   are doing here is asserting an affirmative right to get

14   injunctive relief that would require us to disable our

15   technical measures so they can get on our website and get on

16   our servers, in contravention of our policies.

17       And so what we've asserted is our right under the CFAA to

18   block that unauthorized access.  And, having asserted that

19   right -- and we believe that we're clearly in the right here.

20   And I do want to talk about them finding Ninth Circuit

21   precedent on the question of the scope of the CFAA.

22       But having asserted that right, if we are correct that we

23   have a right --

24       And, as I think we've pointed out in our brief, *Power*

25   *Ventures* specifically describes the CFAA as a computer trespass

1  statute.   Its function is to provide remedies against

2  unauthorized access that are in the nature of a trespass.

3       And if that is what they are doing, they are violating

4  the -- they are violating the very thing that federal law

5  exists to protect.  And --

6            **THE COURT:**  Well, let me ask.  You place emphasis on

7  sort of the trespass notion.  The Ninth Circuit has referred to

8  the CFAA as kind of a digital trespass statute.  What's your

9  opinion of Professor Orin Kerr's analysis, if you read that?

10            **MR. VERILLI:**  Yes, I have.  I think --

11            **THE COURT:**  And, you know, looking at trespass now

12  through the lens of norms and silent expectations --

13       And the starting point, as he posits, is that the World

14  Wide Web is presumptively open.  And once you've placed

15  something on the Web, it's like putting it on the town square.

16  There are ways of taking it out of that arena, and thereby

17  invoking protection in the application of that CFAA.  That

18  de-emphasizes use of authentication techniques and what you

19  calls "bumps in the road," you know, like, you know, certain IP

20  disablers and other things that may make it difficult.

21       But his view is that there should be a presumption

22  under -- borrowing from the normal methodology of trespass

23  evolution law applied in the digital domain to start with a

24  very powerful premise that anything on the Web should be

25  presumptively open, and not subject to criminalization, even if

1   you get around these -- what he calls "speed bumps" on the

2   CFAA.

3        I take it you may not agree with his sense of it.

4        **MR. VERRILLI:**  Professor Kerr is a smart law

5   professor.  He's wrong about this.

6        Judge Breyer, in *3Taps*, is right.

7        But I think even more importantly, the Ninth Circuit has

8   already definitively rejected that very argument.  And you can

9   see it in two cases.  The first is in *Power Ventures*.

10       And if the Court looks at page 1067 of 844 F. 3d. in *Power

11  Ventures*, the Ninth Circuit sets out the standard for when the

12  CFAA applies.  And it says that -- acknowledges that a

13  violation of terms of use of a website, without more, can't

14  establish liability under the CFAA, but it does say -- and this

15  goes to a point Mr. Gupta was making earlier, and definitively

16  refutes that point.  It does say that, *and then you can run*

17  *afoul of the CFAA when a person has no permission to access a*

18  *computer, or when permission has been revoked explicitly*.  So

19  it's right there.  The Ninth Circuit definitively interpreted

20  the CFAA to cover revocation.  *Once permission has been*

21  *revoked, technological gamesmanship or the enlisting of a third*

22  *party in gaining access will not excuse liability*.

23           **THE COURT:**  But neither Facebook -- Facebook does not

24  address the situation.  There, I mean, arguably, the defendant

25  was able to kind of get into the website and obtain data on

usage and facilities in order to -- I forget whether it was

broadcast e-mails, or send out communications.  That was not

just using publicly available data.  I mean, so the Court

didn't have to address this question that Professor Kerr --

       **MR. VERILLI:**  So I want to get back --

       **THE COURT:**  It was more traditional trespass.  It was

getting into the system; deep into the system.

       **MR. VERILLI:**  I want to get back to *Power Ventures*,

but I do think *Nosal II* -- and that's, of course, a case Your

Honor's very familiar with.  But in *Nosal II* -- and I think

this is at pages, if I'm remembering correctly, 1037, 1038 of

*Nosal II*.  There was a question about whether the Jury

Instruction in that case was correct as a matter of law.  And

the argument was that you couldn't have, under the CFAA -- the

defendant's argument was, *You can't have a violation of the*

*CFAA unless, at a minimum, there is a technological barrier in*

*place that impedes access*.

And what the Ninth Circuit held in that case was that

there is no such requirement under the CFAA; that it's not

within -- the plain terms of the statute don't impose that

requirement, and it would make no sense to impose that

requirement.  That's what the Ninth Circuit held in the case.

And, of course, they're asking you to go a step beyond

*Nosal II*, because in *Nosal II* the argument was, *So you have to*

*show evasion or overcoming of technical barriers*.

1     Well, here we have the evasion or overcoming of technical

2 barriers.

3     What they want to do is go further and say, *You can only*

4 *violate the CFAA when you've got a wall up, with password*

5 *protection*.  I just think it's definitively refuted there.

6     And now if I might go back to *Power Ventures*, because I

7 want to direct Your Honor's attention, if I could, to the next

8 page after the one I was quoting, because I think this also,

9 even taking Your Honor's point, definitively refutes the

10 position of my friends on the other side.  So what the Court

11 said and held in *Power Ventures* was that for Power to continue

12 its campaign against -- campaign using Facebook's computers, it

13 needed authorization both from individual Facebook users who

14 control their data and personal pages, and from Facebook, which

15 stores the data on its physical servers.  Permission from the

16 users, alone, was not sufficient to constitute authorization

17 after Facebook issued the cease-and-desist letter.

18     Now, what the Court is saying there -- and I would submit

19 it's saying in very plain terms -- is that the argument that my

20 friend on the other side is making that once users make this

21 information of theirs public or available to be visible, at

22 least, on the Internet, that at that point, that the entity

23 that controls the computer or server on which that information

24 resides loses all authority -- loses all authority to control

25 the use of bots to scrape that data, or other unauthorized

1  incursions.

2      Well, *Power Ventures* expressly rejected that exact

3  argument, saying *It's not enough that it's okay*.  Because

4  remember in *Power Ventures* it was okay with the users.  They

5  had agreed to let Power have access to their data.  And the

6  Courts --

7      So that's a step beyond here, where, of course, because of

8  the issues we were talking about earlier this afternoon, they

9  don't have that kind of affirmative agreement.

10         **THE COURT:**  Well, but I think the focus that you're

11  focusing on, as well as *Nosal* -- the main focus on *Nosal*, as

12  evident by the dissent from Judge Reinhardt, was:  Who has the

13  power to grant that consent?

14      And the Ninth Circuit has come down squarely that it has

15  to be consent of the operator of the site.  If there is no --

16  if there is no authorization in that sense, there is no

17  authorization.

18      But the Professor Kerr point is a much broader -- it's a

19  different issue.  It's not a question of whom.  It's a question

20  of what.  Is there, quote, "unauthorized" access being obtained

21  to data that is otherwise open to the public in a way that's

22  different from breaking into Korn Ferry's database, or getting

23  into Facebook's?

24      And neither of those situations deal with this, I think,

25  emerging issue, where there hasn't been a lot.  And I think

1  Judge Breyer's decision is the one that comes closest to

2  otherwise publicly available data to which certain speed bumps

3  have been placed; technological speed bumps.

4     Is that the kind of thing that can be deemed subject to

5  criminalization, within the meaning of the CFAA?

6        **MR. VERILLI:**  I guess what I would say, Your Honor,

7  in response to that:  It's within the plain terms of the

8  statute.  There's simply nothing in the statute that supports

9  drawing that line.

10     The Ninth Circuit has not drawn that line, and could have.

11  It drew a line differently to try to deal with the problem that

12  I think professor Kerr is trying to deal with.  And that's why

13  the Ninth Circuit requires the cease-and-desist letter.  It

14  says that the terms of service, alone, aren't enough, because

15  it may not be clear enough that you're engaging in an

16  unauthorized intrusion; but once you get a cease-and-desist

17  letter -- and particularly when you get a cease-and-desist

18  letter, and that's in combination with the owner of the

19  computer or the owner of the server using technical measures to

20  try to block your access -- when those conditions are present,

21  then you're in a situation in which there is nothing unfair or

22  untoward or improper about enforcing the CFAA, and granting the

23  owner of the computer, the owner of the server, the right to

24  enforce the terms on which this information will be made

25  available.

1        **THE COURT:**  Well, that's certainly true from the

2   perspective of procedural due process and notice, because

3   there, there's no question you've got notice, and so any

4   deauthorization is well known.  It's not a question of, you

5   know, being surprised.

6        I don't know if it answers the larger question.

7        But I do want to ask you.  I mean, I think the most

8   powerful argument is that the plain language of the statute

9   talks about accessing a computer without authorization.

10       **MR. GUPTA:**  The simplest response to that, Your

11  Honor, is the plain language of the statute says nothing about

12  revoking authorization.  It does not mention the concept of

13  revoking authorization.  The predicate of not having

14  authorization under the CFAA is simply not having the rights,

15  as a matter of user name/password-type credentials, to get into

16  the system.  And so when an employer revokes your

17  authorization, your user name and password no longer work, and

18  so you are without authorization.

19       That is the situation that has come up for the

20  Ninth Circuit.  This is a --

21       The idea that they can drive this truck into words that

22  aren't in the statute -- that "revocation of authorization,"

23  because in these cases the Court focused and used those

24  words -- doesn't create enough capacity for the idea that all

25  public information could have been --

1      **THE COURT:**  I guess I don't understand your argument.

2  You're saying that because the CFAA doesn't contain the words

3  "revoke," that "without authorization" can only mean without

4  authorization from the get-go, and not change?

5      **MR. GUPTA:**  Your Honor, the point is that the entire

6  framework of the CFAA was not contemplating a situation where

7  people were plugging servers into an open Internet, and by

8  virtue of simply putting the server onto the Internet, people

9  could grab information from it.

10      That's the beauty of the internet.  It's a big, public,

11  open Internet.  There is no initial authorization.  It's just a

12  physical act.

13      And when the CFAA was being enacted, they were thinking of

14  authorization in the conventional, mainframe type of thing,

15  which is, *I have an employee*.  *I need to authorize the*

16  *employee*.

17      **THE COURT:**  No.  I understand that.  And, in fact,

18  the CFAA started off with, as I recall, criminalization of

19  hacking into government computers, and it was expanded two

20  years later to include private computers, all well before the

21  worldwide Internet became the World Wide Web.  And so, you

22  know, it's not hard to ascertain that Congress didn't have this

23  in mind at the time.  But what does one do?

24      I mean, I understand all of the policy concerns and the

25  implications.  And if suddenly you criminalize anybody who, you

 1    know, wants to have access to a business competitor, a

 2    political rival, or anything else, and wants to do research,

 3    and some government agency doesn't want them doing research,

 4    and all the implications, in terms of the marketplace of

 5    ideas -- but what do I do with this plain, seemingly simple

 6    language?

 7         "Accessing."  Is there something secret about, nuanced

 8    about the term "accessing a computer" -- we know what that

 9    is -- "without authorization"?

10         Well, if you say, *Well, "without authorization" only means*

11    *without initialing authorization, or you can't deauthorize when*

12    *it involves the World Wide Web* --

13              **MR. GUPTA:**  No, Your Honor.  I think that it's -- I

14    think -- you know.  Look.  Judge Kozinski already found once

15    that that phrase, including the "exceeds authorized access," is

16    ambiguous.  We're not asking you to go out on a limb here.

17         Authorization is ambiguous, because even -- even

18    Mr. Verrilli and I can disagree about whether these IP blocks

19    constitute a deauthorization.  Right?

20         I will point you to *Facebook versus Power Ventures*, where,

21    in Note 5 what they say is the opposite of what Mr. Verilli is

22    saying.  They say simply bypassing an IP address would not

23    constitute unauthorized use.

24         We're talking about speed bumps.  Right?  And

25    Professor Kerr talks about speed bumps.  Do speed bumps count

1    as authorization or deauthorization?

2         Our position is:  Absolutely not.

3         Their position is:  Absolutely yes.

4         So the language is undeniably ambiguous in the context of

5    the modern Internet.  And all we're saying is let's not fool

6    ourselves, and say that this language is unambiguous.  There is

7    no authorization that happens, beyond just plugging in that

8    computer, when somebody sets up public pages.

9         Your Honor, I did -- I actually want to cede the floor,

10   because obviously a huge part of this argument is the principle

11   of constitutional avoidance, but I just wanted to make two

12   quick points.  The first is that Mr. Verilli sort of presented

13   this sky-is-falling scenario of, you know, if the CFAA doesn't

14   allow them to kick us off, then they lose all authority to

15   control what's happening on their computers.  And obviously,

16   that's not true.  There are plenty of other bodies of law that

17   give them the ability to regulate malicious hacking and other

18   types of damaging activity.

19            THE COURT:  Well, what would you do if you're hit

20   with 95 million attempts a day, many of which may well be some

21   attempt at hacking?  You don't know for sure.  You have to

22   really just --

23            MR. GUPTA:  Your Honor, so I think that --

24            THE COURT:  What are you supposed to do in that

25   situation?

1          **MR. GUPTA:**  So this is a point that Mr. Verilli made

2     earlier, and I didn't have an opportunity to get to, which is

3     they get these 95 million attempts each day from people, and

4     they're trying to block these visits.  So these are people who

5     are trying to protect their user-privacy issues.  They

6     rationalized it in the Rockwell Declaration on three grounds as

7     to why they're blocking this information.

8          They said there's user-privacy issues.

9          And they said that it's to prevent identity theft and

10    other fraud.

11         And they said it's to ward off denial-of-services attacks.

12         So protecting user privacy and preventing identity theft

13    have absolutely no relevance to public pages.  Case after case

14    has held that public pages don't present a privacy concern.

15         The third is this warding off of denial-of-services

16    attacks.  We don't disagree that they have the right and they

17    have the necessity to fight off these malicious intruders.  And

18    there are entire companies, entire businesses, security

19    industries, built around that.

20         This is not what we are talking about here today.  What we

21    are talking about is they are trying to block a low-volume user

22    who is not engaged in a denial-of service attack from accessing

23    public --

24         **THE COURT:**  But your injunction would --

25         I mean, are you acceding or do you acknowledge that they

1    would generally have the right to use bot blockers?

2          MR. GUPTA:  Your Honor, they would have to use -- any

3    kind of blocking mechanism would have to be narrowly tailored,

4    and at a reasonable time, place, manner restriction from a

5    free-speech point of view, and it can't be anticompetitive.

6       What they're doing here is obviously competitive.

7          THE COURT:  So they would have to identify the source

8    of each bot attack to determine whether that's a legitimate --

9    whether that's a competitor, a potential competitor, versus a

10   hacker, versus a foreign agent attempt at surveillance, or

11   something else?  I mean --

12         MR. GUPTA:  Your Honor, my understanding is, if you

13   look at their papers, they've listed four or five different

14   types of protections that they use on their system.  Most of

15   them are designed to prevent large-scale intrusions that

16   would -- that would impair their servers.

17      All we're saying is they cannot block us.  They cannot

18   block hiQ, which is trying to access public pages.  They

19   can't block for motivations --

20         THE COURT:  So if they knew, for instance, that a

21   particular user --

22      Let's say if you accede that they could have a general

23   policy and have a general defense, a technical defense, I take

24   it your position is that once they are aware through exchange

25   that you are a user that doesn't fit into one of those threats,

1   that they would then have to "open the door," so to speak?

2        MR. WISOFF:  I don't even think you have to go that

3   far, Your Honor.  We're asking for preservation of the status

4   quo.  So to the extent they had general blocking mechanisms in

5   place, you know, we're not asking, as part of a preliminary

6   injunction, at least, for removal of that.

7        What we're saying is that they --

8        And you raised this issue.  Mr. Verilli raised this issue

9   that we have to win on our affirmative state claims, or show

10  that we have a likelihood of success on those in order to win

11  here.  I actually don't think that's entirely true.

12       And as we said in our supplemental brief, as a practical

13  matter, it is only the CFAA Penal Code threat that they have

14  made that -- and the criminal liability that attaches to that,

15  that, as a practical matter, keeps us from coming back to the

16  site, because --

17       THE COURT:  So would you be satisfied with an

18  injunction that's essentially a declaratory relief injunction?

19       MR. WISOFF:  An injunction that they can't give force

20  and effect to the CFAA Penal Code revocation, until the merits

21  of whether those statutes apply, and how they apply, have been

22  decided, because we've been able to gather data under the

23  status quo with these mechanisms in place.  Because these pages

24  are publicly accessible, we've been able to do that prior to

25  the lawsuit.

1        We just want to be able --

2        We don't want to be put out of business before the merits

3   can be determined.

4        And so we're not asking the Court to say they have to take

5   down all technical measures that generally block unidentified

6   automated bots coming onto their site; but to the extent that

7   they've specifically blocked our IP address, and have

8   specifically -- are trying to criminalize our access to the

9   website -- I mean, under the CFAA, even individuals can be

10  criminally liable if they cause their company to access the

11  site.  So --

12           **THE COURT:**  All right.  Let me go back to the first

13  question, then.  What is your argument in terms of -- in the

14  face of fairly -- what appears to be, at first glance, plain

15  language?

16       I guess you're arguing that "authorization" is not plain;

17  it's ambiguous.

18       Although if you read *Nosal II*, the Court goes to great

19  lengths to talk about how that's plain language.  It goes

20  through just about every Circuit in the nation to back them up

21  on that.  So I'm not sure.

22           **MR. WISOFF:**  Your Honor --

23           **THE COURT:**  Maybe your argument is that in this

24  context, in the context of the World Wide Web and the Internet,

25  that "authorization" or "without authorization" has a different

1  meaning, not addressed by the Ninth Circuit or any other

2  Circuit at this point.

3          **MR. WISOFF:**  Correct.

4          **MR. GUPTA:**  Right, Your Honor.

5          **MR. WISOFF:**  That's our argument, because these cases

6  that you're talking about --

7      You know, Mr. Verilli made a point that you don't have to,

8  you know, have -- to contradict Professor Kerr's opinion, he

9  talked about how it's not necessary to have a technical barrier

10  like a password.

11      So you know, obviously, I can't walk back into your

12  office, into your chambers, and look at your computer.  I don't

13  have authorization to do that.  That information was never

14  meant to be public.

15      So whether you have a password on your computer or not,

16  that still falls within the CFAA, because the purpose of this

17  statute was to protect information that's not generally

18  available to the public, that only certain people are

19  authorized to access.

20      But when you put up a website and you program a server to

21  respond to every request, by definition, there's been

22  authorization for the entire world.

23      And the idea that you could send a letter to one of

24  billions of people who visit that website every day and say, *If*

25  *you ever type our URL address into your computer while you're*

1 *sitting in the privacy of your home to view information that is*

2 *public for every other person in the world to see; that that's*

3 *a criminal -- a federal criminal violation*, I submit, Your

4 Honor, that you have to duty not to interpret a statute to lead

5 to such an absurd result.

6      **THE COURT:**  So you would say that once you place it

7 on a public setting for the World Wide Web, that is

8 authorization?  Even if you later attempt to delimit or revoke

9 that individually on a case-by-case basis for purposes of the

10 CFAA, that is not unauthorized?

11      **MR. WISOFF:**  I can't imagine that Congress intended

12 to criminalize that activity, or that any interpretation of the

13 statute that would lead to that result would be a sensible

14 interpretation, number one.

15     Number two, to the extent you are going to analogize to

16 trespass law, trespass law has always lived in conjunction with

17 other laws of general application.  And we're not talking about

18 a private home.  And we're not even talking about a mom-and-pop

19 business, but in the context of a mom-and-pop business, one of

20 the cases they cite, *Alexis versus McDonald's Restaurants of*

21 *Massachusetts* -- there is a Massachusetts trespass statute

22 where somebody came into a restaurant, and the question is;

23 whether they were properly thrown out or not.  And the Court

24 said that the statute on its face didn't admit of any

25 exceptions of an owner's ability to exclude, but that the

1  statute has to be read within the body of other laws.  And so

2  it said, absent some invidious, ulterior purpose, then once

3  proper notice has been given by the owner, the business

4  licensee remains.  He's subject to arrest.

5      So even in the real-property context -- you know, we're

6  not talking about homeowners, but a business property.  When

7  you open it up to the public, you don't have unfettered rights

8  to exclude people for any reason, whatsoever.

9      And in fact Judge Posner, in the *Desnick versus American*

10  *Broadcasting Companies* case -- and this case was not cited by

11  anybody.  I found it by Shepardizing one of their cases; the

12  *Dietemann versus Time* case.  It distinguished that.  It's at

13  44 F. 3d. 1345, Seventh Circuit, 1995.

14      There was a case where ABC News fraudulently gained

15  inducement into an eye clinic, in order to do an exposé, and

16  then broadcast information about it.

17      And Judge Posner, under Illinois law, said, you know, in

18  the context of business property that's been open to the

19  public, we have to be careful about other policy considerations

20  on trespass, and that the objectives of trespass law are to

21  protect breach of peace, invasion of privacy, damage to

22  property.  And none of these things exist, because -- he went

23  through each of the factors in the case, and said there was no

24  breach of the peace, no disruption of the business, no damage

25  to property, no invasion of privacy.  And therefore, why would

you apply trespass law to -- to access to a business property
that doesn't fulfill any of the purposes that trespass was
enacted to address?

So I think to interpret a 500 million-member website open
to billions of people on the World Wide Web -- to say that they
can single out somebody that they don't like, because they're
using information for a commercial purpose, ban them from the
site, from gaining public information that anyone else in the
world can get, and then say that's criminal -- and, by the way,
not just if you're doing it by automated bots, but under their
interpretation, if I got one of those letters, and I typed
their website address in again, I'm a criminal, even if I just
look at it, whether I manually copy it --

THE COURT:  You disagree with Judge Breyer, I take
it, in the *3Taps* case?

MR. WISOFF:  I do disagree with Judge Breyer,
although I do think that this case was different than this
case.

And I think that their own privacy policies don't support
their argument.  And I think when they choose California law as
the law to govern their dispute under their User Agreement,
that it's a little bit hypocritical to come to court and say
that California's law is preëmpted.

MR. VERILLI:  Your Honor, may I have a few words?

THE COURT:  Yes, you --

```
 1              MR. VERILLI:  Thank you, Your Honor.

 2              MR. WISOFF:  Your Honor --

 3              MR. VERILLI:  Thank you, Your Honor.

 4              THE COURT:  I've got to move on.

 5              MR. GUPTA:  Okay.  Thank you.  I just wanted to let

 6    you know that Professor Tribe would also like to speak.

 7              THE COURT:  All right.  So we're going to move on.

 8              MR. VERILLI:  A few points.

 9        Your Honor's identified Judge Breyer's opinion.  And, of

10    course, Judge Breyer noted the very statute at issue in the

11    very next subsection draws a distinction between public and

12    nonpublic computers.  It doesn't draw that distinction in the

13    preceding subsection, the one that's applicable to our case.

14    So Congress knew how to draw the line; didn't draw it.

15        Second, with respect to the consequences of adopting the

16    position my friend on the other side is urging, they kind of

17    spun up a lot of smoke about how there won't be a lot of

18    adverse consequences, but of course, there would, because their

19    argument is that unless we've got a wall, and this information

20    is password protected, that we can't assert a CFAA right

21    against anyone.  So it means not just that we can't assert it

22    against them.  We can't assert it against identity thieves,

23    scammers, spammers -- you name it -- because it's not behind a

24    wall.  That's their argument.

25        And I think the consequences of adopting a position like
```

```
1   that in the absence of any statutory authority -- a
2   Ninth Circuit authority, interpreting the statute pointing
3   exact opposite direction would be extraordinary.
4           THE COURT:  Well, what do you mean:  You can't
5   assert?  If a hacker gets in, and breaches, and goes beyond
6   just whatever the surface is that's visibly visible to the
7   public, obviously, you have to -- a hacker would have to get in
8   there and get information that is not public, but private --
9           MR. VIRELLI:  But Your Honor has made a point
10  already, though, that --
11          THE COURT:  -- the CFAA would --
12          MR. VIRELLI:  These bots are hitting us 95 million
13  times a day.  We don't know what they are in advance.  But
14  under their theory, we can't assert a CFAA against anybody.
15          THE COURT:  You could use bots.  You could employ
16  self-help measures.  That doesn't mean that then you can then
17  enjoin the force of criminal law for somebody who defeats that
18  bot, unless they get into the deeper layer.
19          MR. VERILLI:  But then people who scrape for these
20  other -- they say, *Well, we're scraping for this beneficial
21  purpose*.  Of course, we can test that.
22       But people who just scrape for nefarious purposes -- we
23  can't use -- we can't invoke the CFAA against them.  That's
24  their position.
25          THE COURT:  Well, if it's for nefarious purposes, you
```

1  may have a UCL claim.  You may have a tort claim.  You may have

2  other statutes.

3        **MR. VERILLI:**  Well, we may or we may not; but

4  congress gave us this.  And it does, by its plain terms, cover.

5  The Ninth Circuit covers it.

6        If I could, before we move on to the constitutional

7  issue -- and I know we're taxing Your Honor's patience --

8  there's one really important point.  My friends on the other

9  side have been saying this over and over and over again.  It

10  just isn't right.  They've premised their whole case on this

11  argument that once the information is visible, that it's

12  public, and that we have made it available to everyone, without

13  conditions.  And that just isn't right.

14        It's wrong in a number of ways that we've already

15  discussed.  There are multiple conditions that are imposed.

16  Do Not Broadcast is one condition.  The prohibition on

17  scraping is one condition.  The fact that we put these

18  technical measures in place to block is one condition.

19        And it gets to a point that I think is just of fundamental

20  importance here, and it's this.  Public/nonpublic is not an

21  on/off switch.  That isn't how it works.  Routinely information

22  is made public, but subject to conditions.  And I'll try to

23  give a couple of commonsense analogies that I hope will go

24  straight to the point.

25        Take a public library.  A public library makes the

1  information publicly available.  You go and get books and other

2  information and material from the public library, but the fact

3  that the information's available to the public in that sense

4  doesn't mean that you can break into the library with a crowbar

5  at 2:00 in the morning, because you're seized in with a desire

6  to read Moby Dick.  It doesn't mean that you can take a book

7  out, when you're supposed to return it in two weeks, and keep

8  it for a year, because you want that information.  It doesn't

9  mean if your library privileges have been revoked for abusing

10 the rules, that you can show a fake ID at the door, to get back

11 in.  The information's public, but it's subject to conditions.

12      Same thing with a museum.  Works of art are made available

13 to the public for viewing.  That doesn't mean that the museum

14 can't impose conditions.  You can't take flash photographs.

15 Maybe you can't take photographs, at all.  Maybe you've got to

16 pay for admission.  You've got, you know, a whole set of

17 conditions that are imposed on the public access.

18         **THE COURT:**  What if the museum had an outdoor display

19 in the public square?  Took it outside.  A sculpture, or

20 whatever it is.  And they said, *Well, you're in a public*

21 *square.  It's a public place.  You can see it's open to all*,

22 but then said, *No photographs*.

23      Now, would that be trespass, if someone came up -- it's on

24 public land -- and took a photo?

25         **MR. VERILLI:**  If there was a reasonable time.  It's

1  the government, of course.  The First Amendment applies to

2  them, which isn't us, because we're a private entity, and the

3  First Amendment doesn't apply to us; but with respect to the

4  government, the question there would be whether it's a

5  reasonable time, place, and manner restriction.  And it might

6  be.

7         **THE COURT:**  But I'm wondering about trespass law.  I

8  mean, governments can enforce trespass laws, as well.

9         **MR. VERILLI:**  Sure.

10        **THE COURT:**  Would that be trespass, to take a photo,

11 even though you're standing in a place that you're otherwise

12 able to do, but you're doing something --

13        **MR. VERILLI:**  Well, I don't know if that would be

14 trespass, but here's what would I think, Your Honor.  If

15 somebody were taking a photograph, and were told that they

16 weren't allowed to take a photograph, and they took another

17 photograph, and they were told that they have to leave the

18 premises because they're violating the rules, and then they

19 left the premises, and they came back on, in violation of the

20 order to leave the premises for violating rules, that would be

21 trespass.

22     And that would be a case very much like *Virginia against*

23 *Hicks*, which I know -- I assume we'll get to when we talk about

24 the First Amendment.  But that would be trespass here -- there.

25 And that is effectively what we have here, Your Honor.

1       We've -- you know, they talk about how we connect up our

2   servers to the Internet, and that means this information is

3   available to the public.  And that means, they say, that we

4   can't impose any conditions on the availability of that

5   information, because it's out there, and it's available to the

6   public.

7       Well, there's just --

8       **THE COURT:**  Well, it's not that you can't impose

9   conditions.  The question is whether you can back up those

10  conditions with the -- with the force of federal criminal law.

11      You may be able to back it up with state law, maybe some

12  state trespass law, maybe common law, or just self-help for no

13  legal remedy on the other side, which is one of the things

14  we're going to talk about.  But the question is whether you can

15  criminalize violation of those conditions.

16      **MR. VERILLI:**  So I'm going to repeat myself, and I

17  apologize for doing so, but Congress has made the judgment in

18  plain terms of Section 1030(a)(2), and it's made another

19  judgment in plain terms later in the statute, that we can get a

20  private right of action to enforce to enforce our ability to

21  impose conditions that can control access.  And it's just right

22  there on the plain -- on the face of the statute.  It's why

23  Judge Breyer reached the result he reached.

24      And I would submit to Your Honor that that is actually the

25  answer that is the speech-promoting answer in this case,

1  because the other options for us -- if my friends on the other

2  side are right about the CFAA, either we've got to put up a

3  wall and put everything behind a password, which means the

4  information is not going to be publicly available anymore,

5  which reduces the flow of the information to the public, or

6  we're going to tell our members that they're vulnerable to this

7  kind of surveillance and disclosure to their employers in a way

8  that's certainly going to deter people from making that

9  information available and visible to the public.

10      And so I really think, Your Honor, it's not just -- it's

11  clear that we do have a clear right under the law.  We do have

12  a clear right, as the Ninth Circuit has interpreted the law.

13  We are a private entity.  These are our computer servers.  The

14  information resides on our servers.  We have a right to control

15  who gets access to it and who doesn't, because we're a private

16  entity making private judgments.  And our view of the law is

17  the view of the law that is going to maximize the free flow of

18  information.

19          **THE COURT:**  All right.

20      **MR. GUPTA:**  Your Honor, I'd like to hand it off to

21  Professor Tribe, to talk about the constitutional avoidance

22  issue here.

23          **THE COURT:**  All right.

24      **MR. TRIBE:**  Thank you, Your Honor.

25          **THE COURT:**  Okay.

1      **MR. TRIBE:**  Maybe I could begin with that library

2  analogy before I try to put the case in its First Amendment

3  setting.  If it's a public library, you know, when I was a kid,

4  the books used to have a little tag inside that would tell you

5  how often the book was taken out, and when.

6      And I think when the public library lets people take those

7  books home, if they manually write down, *The most popular books*

8  *are the ones in the geography section* -- not likely, but

9  suppose it was -- and I want to make use of that information,

10 for the government to make it a crime for me to make use of

11 that information because they want to be the, perhaps,

12 exclusive distributors of information about what's popular to

13 read would, of course, be unconstitutional.

14     That's the setting in which I want to put this case.

15     Orin Kerr's article was very convincing to me, partly

16 because in 1991 I wrote pretty much the same thing in an

17 article called, "The Constitution in Cyberspace."  It is

18 ridiculous in today's world to use concepts like physical

19 trespass when you're talking about the public pages of a

20 website.

21     And it's not only ridiculous.  There is authority on the

22 point.  In *Packingham against North Carolina* on the 19th of

23 June this year the Supreme Court very clearly said that public

24 websites -- and they used LinkedIn as an example -- are public

25 fora.  They are the current equivalent of the town square, to

1   use Your Honor's analogy.

2       Now, that doesn't mean that for all purposes, social media

3   are to be treated as public utilities.  I mean, all of the

4   cases that they cited in their brief -- *Quigley*, *Buza*, *Langdon*,

5   *Kinderstart*, *Howard*, *Green*; cases about how Yahoo! and Google

6   and AOL are not simply public utilities; they have a right to

7   exercise editorial control.  Those have nothing do with this

8   case.  We are not arguing that we have some right to convert

9   LinkedIn's pages to our own purposes.  We're not trying to post

10  things on LinkedIn.

11      We're simply trying to do what the public, as a whole, has

12  been invited to do; and that is observe, collate the

13  information, use data science to process it and make it more

14  useful, both to employers who want to retain those of their

15  employees who are apparently most desirable to the outside

16  world, and outside employers who want to give employees greater

17  opportunity.

18      So *Packingham* holds that for that purpose, social media

19  are the modern equivalent of the town square.  And it also

20  holds -- and this is really important, I think -- that a

21  content-neutral restriction --

22      And in part three of the *Packingham* opinion, the Court

23  said that for purposes of this opinion, we will assume that

24  it's content neutral when you tell sex predators that they

25  cannot use any social media.

1    -- that a content-neutral restriction of First Amendment

2    activity is subject to intermediate scrutiny and a narrow

3    tailoring requirement.

4        And so, of course, if they do have interests, like not

5    being overwhelmed by an army of bots that lead them to go --

6    you know, their servers to crash.  If they can show when this

7    case gets beyond the preliminary stage, before they put us out

8    of business -- if they can show that they are using the

9    narrowest-possible alternative to serve that legitimate

10   interest, then we would have a different case.  Perhaps the

11   First Amendment standard could be met.

12       **THE COURT:**  But that would suggest that every

13   organization that puts themselves out on the Internet, to the

14   extent they want to limit bots or some other kind of -- you

15   know, put some technological "speed bumps," as Orin Kerr puts

16   it, that would be subject to constitutional scrutiny,

17   intermediate scrutiny, a narrowly tailored view.  And wouldn't

18   be that a pretty profound burden placed on even small websites

19   or small businesses, that don't have the ability to -- they

20   just buy off-the-shelf packages, that software anti-hacking

21   stuff, that may be overly broad in terms of who it filters out,

22   and the barriers that it imposes?  Would they have to go

23   through a narrowly tailored constitutional review every time

24   anybody --

25       **MR. TRIBE:**  Well, not strict scrutiny.  "Narrowly

1    tailored" simply means they have to show that it is not

2    gratuitously and substantially overbroad.  That's not a burden,

3    after *Ward v. Rock for Racism* [sic].  That's not a burden that

4    the Court has thought to be too extreme.

5        But look at how extreme their position is, when a website

6    that has tens of millions, hundreds of millions of people who

7    put their profiles out there to reach as much of the world as

8    they can is allowed to say, *You know, your business model is*

9    *pretty good.  We've been visiting your seminars.  Now we want*

10   *to adopt it, and kick you off*.

11       Well, that can't be done, unless you accept their position

12   that this case has nothing do with the First Amendment, because

13   we're not talking about protest or dissent.  We've got a

14   serious problem that follows from their position.

15       And in the *Sorrell* case the Court made very clear --

16   *Sorrell v. IMS Health* -- by a vote of six to three that data

17   mining of information whose owner has put it out to the world,

18   as the doctors in Vermont did when they said that *It's okay for*

19   *you to look at our prescription practices* -- that that kind of

20   data mining for purposes of marketing to those who could use

21   the analyzed information to make sounder economic decisions is

22   fully protected free speech.

23       Now, what make this case particularly dramatic, as Your

24   Honor noted, is that they're putting in the hands of a private

25   entity.  And they emphasize how private LinkedIn is.  It's not

1  the city.  It's not the town.  True enough.  But that just make

2  this a more extreme First Amendment violation, because they

3  want to delegate -- they want to read the CFAA as though

4  Congress, in its wisdom, decided to delegate to any website,

5  however huge, the unilateral, unrestrained discretion to decide

6  whom to lock out and deauthorize, for whatever reason, whether

7  2they don't want the competition, or whether they have

8  objections to the race, or the religion, or the sexual

9  orientation of the owner.

10       That violates a core principle that's been adopted by the

11  Supreme Court, even when the power is delegated to a

12  responsible governmental entity.  Think of a case like --

13            **THE COURT:**  But that's the question; is it?

14            **MR. TRIBE:**  Mm-hm.

15            **THE COURT:**  Where is the state action?

16       Because all of the other cases, whether it's *Sorrell*, or

17  *Packingham*, there are obvious state actions.  It's not a

18  problem.

19       Here are you relying on some delegation?

20            **MR. TRIBE:**  Yes.

21            **THE COURT:**  Because it's not -- you can't say this is

22  a case where they're -- like a railroad case, where there's

23  active encouragement.  By regulations, railroads were forced to

24  engage in your analysis.

25       You don't have -- the CFAA doesn't force them to do that.

1   It gives them --

2          MR. TRIBE:  No.  They're simply handing a blank

3   check.

4          THE COURT:  Okay.  And those cases where there's

5   delegation usually involve a delegation of inherently sovereign

6   power; something that's traditionally within the sovereignty,

7   within the power of the government.

8       Here, running a business -- I mean, I could understand why

9   it's like the town square in a functional way, but I don't

10  understand why it is state action.

11         MR. TRIBE:  Well, take a case like *Marsh against*

12  *Alabama*.  In *Marsh*, it was a privately owned company town in

13  Chickasaw.  And that company town was given the power under

14  Alabama law to call the police, and have anybody who comes into

15  the town to distribute literature that they don't want

16  distributed, or for any other purpose, to call the police,

17  arrest them for trespass, prosecute them, and convict them.

18      This is like *Marsh*.  Now, *Marsh* held that deciding who can

19  use the public parts of the town is an inherently governmental

20  function.  And it seems to me that after *Packingham* deciding

21  who can visit the public site of something like LinkedIn is

22  exactly like deciding who can use the public parks and streets

23  of a town.  That analogy is not --

24         THE COURT:  That was barring -- but there, that was

25  action barring offenders from the entire -- essentially, the

1  entire Internet; not from visiting a particular site.

2      **MR. TRIBE:**  Well, the Court did say in the Kennedy

3  opinion that if you exclude someone from websites like -- and

4  it used the examples of Twitter, LinkedIn, and Facebook -- that

5  you're excluding them from the equivalent of the modern town

6  square.

7      They didn't say you have to exclude from all media; that

8  is, if there had been a modification of the North Carolina law

9  in *Packingham*, saying that a certain group of people -- and

10 it's hard to think of a group less sympathetic and more

11 dangerous than registered sex offenders -- that they can't

12 visit a social platform that has on it the profiles and

13 professional aspirations of a substantial percentage of the

14 world, the case wouldn't have come out differently.  It was not

15 a quantitative case.  It was a case about principle.

16     And when the Court has said in cases like *Lakewood against*

17 *Plain Dealer*, in 1988, which involved a delegation by law to a

18 town of the power to decide which news boxes may or may not be

19 attached to public utility poles, the Court said that even if

20 the right to attach something to a public property is not

21 directly protected by the First Amendment, the danger of giving

22 even a town, let alone a private entity -- a huge, powerful

23 private entity -- discretion to decide who may and who may not

24 engage in activity that is related to freedom of speech and

25 information is constitutionally impermissible.

1          THE COURT:   That was speech on public property.

2          MR. TRIBE:   That's correct.  And this is --

3          THE COURT:   Well, you would say *Packingham* makes it

4    public property -- makes the Internet public property.

5       I'm not quite sure it goes that far.

6          MR. TRIBE:   Well, it does say it's the modern

7    equivalent of the town square.

8       The real reason that this is so crucial, Your Honor, is

9    that the First Amendment has really two branches.  There's a

10   branch that directly deals with government censorship.  It says

11   that if the government, itself, uses forbidden criteria, that's

12   no good, unless it's overwhelmingly justified.

13      Then there's another branch that says that there must be

14   enough breathing room for speech; that is, if you could divide

15   up the world -- either the cyberworld or the physical world --

16   into privately owned enclaves, where people who want to engage

17   in information processing or the dissemination of ideas need

18   the permission of the private owner, then there isn't enough

19   breathing room.  That's where the public forum doctrine was

20   born.

21      And what the Court said last month was that in today's

22   world, for there to be enough breathing room, you have to treat

23   privately owned social media platforms, at least in their

24   public face, as public forums.  And it seems to me that that

25   First Amendment principle is what's crucial here.

1     In our brief, I cited the *Grendel's Den* case, which

2  happens to be a favorite of mine because it arose in Cambridge,

3  and I was involved from the very beginning.  It was a case that

4  served for the same principle.  A body as private as a church

5  cannot be given governmental power over First Amendment

6  activity by state law.  It also can't be given that power by

7  federal law.

8     Now, Your Honor was certainly right that the federal

9  statute trumps contrary state law, although I agree with my

10  colleague that because the federal statute, the CFAA, doesn't

11  lay out detailed criteria for what constitutes authorization or

12  revocation, that there's room to absorb -- and there's a

13  presumption that one should absorb -- the backgrounds body of

14  state law in which the federal law is immersed; but surely the

15  federal statute trumps even a state constitutional provision,

16  which is one of the sources of our affirmative right here in

17  the *PruneYard* decision; but what trumps the federal statute is

18  surely the U.S. Constitution.

19     And I submit that even without deciding, especially at

20  this preliminary stage, that it would clearly violate the First

21  Amendment to read the CFAA the way my friend Verilli wants to

22  read it, it surely raises a grave constitutional question that

23  could be best avoided by deciding that this language about

24  authorization, which does not look to me unambiguous in today's

25  world, at least, as applied to the public pages of a website

1  like LinkedIn, reading that word "authorization" gratuitously

2  to completely wipe out the free-speech use that an organization

3  like hiQ wishes to make of that website seems to me to be

4  creating a constitutional problem that Your Honor would want to

5  avoid; that is, you want to construe the CFAA and the

6  California Penal Code not to clearly give this owner the

7  unilateral power, unbridled, to decide whom to admit and whom

8  not to admit; that is, they were fine with what we were doing,

9  until it looked like we could make money from it, and then they

10  thought, *Hey, there's an opportunity for us*, which is why we're

11  suing under the Unfair Competition Law.

12        **THE COURT:**  So is your First Amendment argument that

13  the First Amendment applies to anyone who participates now in

14  this newly declared public forum -- i.e., the Internet -- and

15  that would apply not just to LinkedIn, but any small website.

16  any business?  They would still be subject to scrutiny, in

17  terms of whether they could disable or disallow/deauthorize

18  people from accessing the website?

19      Or is it more the fact that the CFAA has delegated

20  essentially a sovereign power now, and that the deployment of

21  the CFAA would implicate the First Amendment?

22        **MR. TRIBE:**  It's principally the latter, but it's

23  also in part the former, in the sense that if you look back at

24  the series of decisions that ultimately led to *PruneYard*, the

25  Court seemed to draw a quantitative distinction.  A large

shopping center opened to the general public in California is
subject to the Free Speech Clause of the State Constitution.

It doesn't mean that a mom-and-pop grocery store has to
allow people who enter the store to circulate petitions; that
is, there may be a kind of de minimis exception before
something is classified as fitting the model of a social media
platform in the modern age.

But surely Your Honor needn't solve all of those problems
at this stage.  That is one of the, I think, sound pieces of
advice that Justice Kennedy gave in the *Packingham* case, was
that we should tread carefully before withdrawing First
Amendment protection from anything as important as a social
media platform of great magnitude.

Now, my friends turn that around, and say that being
cautious means we should put you out of business, because in
the long run if there are too many guys like you, we might get
overrun.

Well, in the long run we're all dead, but I think we can
cross that bridge we when come to it.  And I don't think that
they've made case of any kind for suffocating the First
Amendment in this sweeping way at this stage.

One thing I want to say that is not directly related to
the First Amendment.  I was interested in the argument that we
could always go elsewhere.  You know, if we're kicked off of
LinkedIn, we can go somewhere else.  And I was thinking of

Whac-A-Mole.  I mean, if LinkedIn has this power, so does

Facebook; and the entire universe of cyberspace can be gobbled

up by a small number of private owners.  That can't be what the

law of an open, democratic society with the First Amendment

means.  It can't possibly mean that.

　　　And what we suggest is that at least keeping us alive to

fight another day, when we face these difficult issues of *What*

*are the less-restrictive alternatives?  What are the more*

*narrowly tailored alternatives*, is the right way to solve the

problem.

　　　It's certainly not the case, as my friend Mr. Verilli

suggests, that the Ninth Circuit has already ended this inquiry

in *Nosal II*, and in a number of other --

　　　　　　　**THE COURT:**  *Power Ventures*.  Yeah.

　　　　　　　**MR. TRIBE:**  I mean, they -- it -- clearly, this

concern about free speech was not central in those cases.

Those cases involved using false pretenses or inducing people

to let you pass a password.

　　　This case is about the public space.  "Public" means

"public."

　　　And it seems to me that when Mr. Wisoff talked about the

Fourth Amendment law of justifiable expectations of privacy, he

brought the case home in an important way; that is, if you say

*I want my stuff to be public* --

　　　And I really liked your question whether they have an

1 option for saying, *I want it to be as public as possible*.  *I*
2 *want Broadcast*.

3     -- then it seems to me you're not respecting personal
4 autonomy by creating an automatic ability on the part of the
5 owner of the website, not the individual, to simply choose, for
6 whatever reason, however anticompetitive or otherwise
7 difficult, to knock someone off the website.

8     And I think that no matter how many times they use
9 adjectives like "scraping" and make it sound like we're
10 engaging in some kind of predatory behavior, they're really not
11 making what I would regard as a legal point that answers
12 *Packingham* and *Sorrell* and the cases about impermissible
13 delegation of power to criminalize, *Marsh*, *Grendel's Den*, which
14 involved de-licensing, and not even criminalization, and other
15 cases that stand for the broad proposition that giving any
16 powerful entity, public or private, the ability to choke off,
17 at its discretion, speech and the precursor of speech, the
18 analysis of information, and the gathering of facts in the
19 decision of how to make them most useful, is a dangerous path
20 down which we should not go.

21         **THE COURT:**  All right.  Thank you, Professor.

22         **MR. TRIBE:**  Thank you, Your Honor.

23         **THE COURT:**  Let me give Mr. Verilli a chance to
24 respond.

25         **MR. VERRILLI:**  Thank you, Your Honor.  I'd like to

1  first talk about the nature of the law being enforced here, and

2  the nature of the right that we're asserting, and why it

3  demonstrates there's no First Amendment issue.  Then I want to

4  address the delegation point that Professor Tribe has focused

5  most of his energies on.  And then I want to also talk about

6  the *Packingham* decision in particular, and this question about

7  whether constitutional avoidance is probative.

8       So let me start with the nature of the law.  As the

9  Ninth Circuit said in *Power Ventures*, the CFAA is a computer

10 trespass law.  It applies to prohibit or provide a private

11 cause of action against unauthorized access to private

12 computers, no matter why the entity wants to gain that

13 unauthorized access, whether they want to do it to harvest data

14 that they can subsequently use to support speech activity,

15 whether they want to do it in order to engage in identity

16 theft, or in order to do a denial-of service attack.  Doesn't

17 matter why.  The law does not turn on the motive of the person

18 seeking unauthorized access.  In that regard, it is a classic

19 law of general application that is not subject to any First

20 Amendment scrutiny when it is enforced.

21      That's what *Virginia against Hicks* says, by the Supreme

22 Court; *Cohen against Cowles Media*.  That's a fundamental

23 principle of Supreme Court First Amendment jurisprudence, that

24 when a law is a law of general application that applies

25 irrespective of any connection or lack of connection to speech

1    activity, there is no First Amendment argument to be made.

2       Secondly --

3          THE COURT:  Well, isn't there a converse implication

4    that's troubling?  Maybe it's not a First Amendment problem,

5    but what about hiQ's argument that if you arm LinkedIn and

6    other large websites with a power to deauthorize and debar or

7    demit large classes of people, even, let's say, on the basis of

8    race, gender, political beliefs, competition, it seems to me

9    that you're saying, *Well, the law is a law.  And it's like*

10   *trespass law:  You can bar anybody you want for any reason,*

11   *even if it's the kind of thing that would implicate traditional*

12   *First Amendment concerns, to exclude people from a particular*

13   *website, particularly if it's for information gathering.*

14      Isn't that troubling?

15         MR. VERILLI:  So a few points about that.  First, of

16   course, LinkedIn doesn't do that, and that's not what this case

17   is about.

18         THE COURT:  But I have to think about what your

19   proffered interpretation of the CFAA is.

20         MR. VERILLI:  Of course.

21         THE COURT:  Once you withdraw authorization, even

22   with a simple cease-and-desist letter, without any technology,

23   that's it.  You can't even look at the website -- whoever the

24   recipient is.

25         MR. VERILLI:  Yes.  There's another important

qualification to the applicability of the statute, which is
that the incursion has to inflict a minimum of $5,000 worth of
damage.  And that's going to take out of the equation the vast
majority of the circumstances that are in the parade of
horribles that my friends on the other side have identified.

With respect to a class of people defined by race or
religion, for example, there's no way that anybody's going to
be able to go through and say for each and every one of them
their use of the website is inflicting $5,000 worth of damages
on us.  So as a practical matter at a very minimum, those cases
are never going to come up.

And, of course, the CFAA has been around a long time.  And
those case versus never come up because they don't occur.
People don't do that.  And what my friends on the other side
are suggesting is that on the basis of this kind of far-fetched
hypothetical that never comes up in the real world, that the
statute contains a practical -- a practical mechanism to deal
with anyway, that you should interpret the statute so as not to
apply to this kind of situation that doesn't present any of
those concerns, and does present a kind of concern that the
statute exists to address.  And, you know --

But the second point with respect to going back to basic
First Amendment doctrine that I think is critical here is that
the incursion -- the unauthorized access here -- is not,
itself, speech.  It's gathering data to support speech in the

1  future; but it's not, itself, speech.

2      So the statute is not regulating expressive activity.  It

3  isn't doing that.  It's regulating nonexpressive conduct.  It's

4  not speech, itself.  And it's not conduct that has an inherent

5  expressive element, like burning a draft card or burning a

6  flag, in which case --

7          THE COURT:  Well, the gathering -- I understand your

8  argument about, *You have to have one of them speak here, or you*

9  *have the right to receive information*.  So I don't think you're

10  going to have to spend a lot of time on that.

11          MR. VERILLI:  Yeah.

12          THE COURT:  But I don't know if I buy the argument

13  that, well, just gathering information, harvesting information

14  has no protection under the First Amendment of the

15  Constitution.  Maybe it's not expressive conduct, but it is the

16  right to receive information, assuming other requisites are

17  made.

18          MR. VERILLI:  Right, but Your Honor, the other

19  requisites are what is critical here.  And there is no case

20  ever that we've found or that our friends on the other side

21  have cited that suggests that any right to receive information

22  authorizes trespass, or authorizes a violation of any other

23  legal norm that would otherwise prohibit the conduct.

24      And that gets back to this idea that it's a law of general

25  application that prohibits trespass.  And I don't know.

1          **THE COURT:**  That begs the question.  Trespass is

2     somebody who wants to go into do that marketplace and actually

3     get the books, or look at the art, or whatever it is.  And so,

4     I mean, it begs the question.  The trespass is getting access

5     to that information.  I wonder if there can be trespass if they

6     don't have a -- it's not trespass -- I mean, they're tied up.

7          **MR. VERILLI:**  The problem, Your Honor, is that

8     they're only tied up if you assume that we're the equivalent of

9     the government, but we're not.  We're a private company.  These

10    are private computers, private servers.

11         **THE COURT:**  No.  I understand that.  And that's why I

12    asked the questions of Professor Tribe.

13         **MR. VERILLI:**  That's why I think that it is trespass.

14    That's the classic definition of trespass, is unauthorized

15    invasion of property, of space.

16         And that is what the CFAA protects against, and provides a

17    remedy for.  And that's how the Ninth Circuit described it.

18    That's a law of general application.

19         So it's just like *Virginia against Hicks*.  And there, you

20    know, the person said -- the person was barred from being in a

21    public housing project.  And the person said, *Well, I need*

22    *to* -- and the person said, *I need to go on that public housing*

23    *project to engage in a speech*.  And that's the particular forum

24    which is very important:  Engaging in speech.

25         And what the Supreme Court held was, well, no.  That law

1    on trespass is a law of general application, and bars you,

2    irrespective of the reason you want to go on the property.

3        And there, unlike here, they wanted to go on the

4    property and actually engage in speech, which, of course, was

5    what *PruneYard* was.  *PruneYard* was not going into private

6    property to gather data to use at a subsequent time.  It was to

7    engage in speech, itself, in that forum.

8        And so I think those two points, and then, in addition,

9    the idea that even if you're going to take this gigantic leap,

10    and treat us as though we were the government, and subject to a

11    similar set of rules, this is clearly a reasonable time, place,

12    and manner restriction, for all of the reasons we identified

13    before.  We have to have the ability to keep these bots out,

14    and do our best to keep these bots out.  And it can't be that

15    first there's a First Amendment right to overcome that.

16        Now, if I might move on to the second point about the

17    delegation, there's a dispositive difference between the

18    situation here -- the sending the cease-and-desist letter --

19    and every single example that Professor Tribe has identified.

20    In every single example he's identified, the private actor is

21    exercising the government power, itself.

22        *Grendel's Den* is a good example.  The church got to decide

23    how the zoning laws were going to apply, and the church had the

24    last word.  There was no subsequent governmental body reviewing

25    it.  The government turned the decision over to the church, and

```
 1   the church made the final decision.

 2         Marsh against Alabama.  Marsh against Alabama, the

 3   government basically turned everything over to the private

 4   company, and they got to make the final decision about how

 5   government power's exercised.

 6         We sent a cease-and-desist letter.  We are asserting our

 7   rights under the law, but we are not making the final decision.

 8   The final decision is up to a Court.

 9         And so that's why there's state action in those cases, and

10   not in this case.

11         And what I think my friend Professor Tribe is trying to

12   address with his argument is that, well, yes, but you'll get to

13   the decide as a private actor against whom you are going to

14   assert your rights under the CFAA.  And that's true, but that

15   is a feature of trespass law generally.  It is always the case

16   that an entity that owns and controls property gets to decide

17   who it's going allow access to, and who it isn't.  And the

18   courts routinely enforce trespass claims at civil law and in

19   appropriate circumstances in criminal law, even though the root

20   of the judgment about whether the law will be enforced is a

21   decision of the property owner whether to allow access or

22   not.

23              THE COURT:  Well, that's where at least in California

24   law PruneYard comes in, because the trespass law has been

25   deemed at some point subject to some strictures of --
```

1          MR. VERRILLI:  Yes.  Certainly --

2          THE COURT:  -- the right of expression under

3    California.

4          MR. VERRILLI:  -- true, but no one's taken the leap

5    California case that we're aware of, Your Honor, to apply that

6    to websites.

7          THE COURT:  Well, the U.S. Supreme Court hasn't gone

8    much further beyond *Marsh*.

9          MR. VERILLI:  In fact, it's cut back on *Marsh*

10   repeatedly --

11         THE COURT:  I understand that.

12         MR. VERILLI:  -- since the 1940s, when *Marsh* was

13   enacted.

14      Now, if I might -- and that's why I think *Grendel's Den*

15   and *Marsh* -- every case my friends on the other side have

16   identified -- is a case in which the government has given the

17   final word to a private party.

18      That's not this case.  Right?

19      There's no case, I think, ever in history in which a

20   cease-and-desist letter has been found to be state action.  We

21   certainly couldn't find one.  Friends on the other side haven't

22   identified one.  And it would be an extraordinary thing to say

23   that it is.  It's a private assertion of rights.  That's what

24   it is.  It isn't a state action.  Can't be a state action.

25      Now with respect to the *Packingham* case and its

1  applicability or nonapplicability here, I want to make several

2  points, if I could.  First I direct Your Honor's attention to

3  page 8 of the slip opinion.  I apologize I don't have a more

4  updated cite than that, but page 8 of the slip opinion, in

5  which the case says exactly what Your Honor said it says.  And

6  in at least three places on page 8 what the Court said was that

7  the fault of this North Carolina law is it's weak in its scope.

8      Even with these assumptions about the scope of the law

9  that were set in the state's interest, the statute here enacts

10  a prohibition unprecedented in the scope of the First Amendment

11  speech it burdens.  It bars access to, for many, one of the

12  principal sources for knowing events, et cetera, et cetera.

13  And, in sum, to foreclose access to social media altogether is

14  to prevent the user to engage in a legitimate exercise of First

15  Amendment rights.

16      There's no doubt that the scope was critical.  And, in

17  fact, the whole point of the case was that the scope was

18  overbroad in relation to the state's interest in protecting

19  minors, because it swept in a whole host of websites that

20  didn't pose any risk of the sex offenders having contact with

21  minors.  So that's point one.

22      Point two.  And I think Your Honor's identified this point

23  exactly correctly, also.  This was a state statute that was

24  being enforced against an individual defendant.  Obviously,

25  there's state action there.  And in that situation, you have

1   the state intervening in between an individual who wanted

2   information, and the information that was out there to get.

3        That's nothing like this case.

4        In order to make *Packingham* like this case, what you'd

5   have to -- you'd have to changes the facts, so that the sex

6   offender would be making an argument.

7        So let's say you have a social media website that has --

8   that children use with great frequency, and that has a policy

9   that says, *We're not allowing registered sex offenders to have*

10  *access to this website*.

11       And the sex offender says, *Well, I have a First Amendment*

12  *right to access to this website despite your denial of*

13  *authorization, because that's information that is out there in*

14  *the world, and you don't require a password, and so I can go*

15  *on*.  That would be the parallel to this case.

16       And it's -- and nothing that the Supreme Court said in

17  *Packingham* comes anywhere near justifying that kind of a

18  result.  Nowhere near.  And so with respect to *Packingham*, I

19  think:  Just not applicable.

20       With respect to *Sorrell*, of course, the key difference

21  there was that the information at issue was already in the

22  possession of the people who wanted to use it for speech.

23  There was no trespass.  There was no unauthorized access.

24  There was no breaking of the law to get the information.  There

25  was no going around technological measures.  It was already in

1  their possession, A.

2       And, B, what the Court said in that circumstance was

3  because the information was already in the possession of the

4  people who want to use it for speech, and the law directly

5  targets the speech activity and says, *You may not use this law*

6  *for speech*, based on those two things, the First Amendment

7  applies.

8       In those two critical respects, this case is the polar

9  opposite.  This is information that's not in their possession.

10 And it's a law that prohibits unauthorized access, irrespective

11 of whether the entity seeking the access wants to use the

12 information for speech, or not.  So it really doesn't have

13 anything to do with the case.

14       **THE COURT:**  All right.  So we're going to have to

15 wrap this up.  And I'll let Professor Tribe rebut.

16       **MR. TRIBE:**  I'll try to be very brief.

17       In *Sorrell* the information is not in the possession of the

18 data miner, which was IMS; it was in the possession of somebody

19 else.  And the people who gave consent were the doctors who

20 prescribed.

21       And here, people who give consent are the people who put

22 their profiles on.  The case is on all fours with *Sorrell*,

23 because *Sorrell* holds that, just as Your Honor said, gathering

24 information and processing it is not just some ancillary

25 activity related to speech; it's at the heart of the First

Amendment.  The first Amendment is not applicable only to

handing out placards and petitions.  It's applicable to

processing and gathering information.

And as far as *Packingham* is concerned, it is true that the

breadth of the thing was important, but the Court did say --

and this is on page 1737 of 137 S. Court -- that this APPLIES

to social networking websites like Facebook, LinkedIn, and

Twitter.

Now, it can't be the law that if you exclude somebody from

one of those at a time, that's okay; and then you do it from

the second, that's fine; and the third, that's fine; but in the

end you've excluded from everyone.

And he hasn't really answered -- Mr. Verilli hasn't really

answered the Whac-A-Mole point.  If they can say "No" to us, so

can Facebook, so can every other website.

And as far as the answer to the delegation point, it

really does -- you know, maybe I can use the word *"chutzpah"* in

court.  To say that their cease-and-desist letter is reviewed

by a Court, and that's what makes it different -- that's

nonsense.  The cease-and-desist letter is weaponized.  In their

view, it is given the automatic effect of excluding anyone they

want to exclude, by virtue of the Computer Fraud and Abuse Act.

So that's not a distinction.  It's a distinction without a

difference.

And then the final point he makes is, *Let's not worry*

*about our ability to exclude people on invidious grounds like*
*race or belief.  It's never happened*; but that's because this
case hasn't come up yet.  People haven't yet had the effrontery
to say that something that they make open to the entire
world -- they have the power, by virtue of some federal law
designed to prevent trespass, which is not this -- by virtue of
that law, they have the power to send a kind of letter of
marque and reprisal, as the Constitution put it, to kind of
mark someone as ineligible to gather information.  That's a
breathtaking claim.  If that claim --

       **THE COURT:**  Probably in part because the response was
that the CFAA has a jurisdictional requirement of certain
amount of damages before it can be brought to bear; and
therefore, that screens out the vast majority of these parade
of horribles.

       **MR. TRIBE:**  If somebody said that no company that is
owned by -- that has a majority/minority ownership can access
this site, that would certainly exceed the $5,000.  We're not
talking about the use of the exclusionary cease-and-desist
power in a bill of tender way, simply to pick on particular
individuals.  Maybe that wouldn't meet the threshold.  We're
talking about uses that could be employing a forbidden
criterion causing lots of harm, with lots of money at stake.
Seems to me that if you were to allow this, then it would
multiply the number of such cases.  And I think that to do that

1   in a preliminary stage would be terrible.

2           **MR. WISOFF:**  Your Honor, if I can make --

3           **THE COURT:**  Last quick word.

4           **MR. WISOFF:**  -- quick comment.  So first of all,

5   Mr. Verilli said that the CFAA didn't turn on the motive of the

6   person seeking access to the computer.  I don't think that's

7   really what our argument has been.

8        Our argument -- what we've -- to the extent motive feeds

9   into this, I think what we've said is there's nothing in the

10  CFAA, just like any trespass law that's enacted at the state

11  level, to suggest that it was meant to not live in harmony with

12  other laws of general application.  And so maybe the motive of

13  the person seeking the information may not matter; but at the

14  end of the day there is room for you to interpret the CFAA in a

15  way where, even if under where they have a legitimate right to

16  refuse access, that if they're doing it for an improper

17  purpose -- a purpose that would violate other law -- that maybe

18  their right is limited, especially in the context of a public

19  website.  So I think that motive can play into it from that

20  end.

21       They've also said -- when you asked them, *Well, what if*

22  *you were trying to exclude people based on race or religion*,

23  one of their responses is, *Well, we don't do that*.  *We don't*

24  *discriminate*.  *You don't have to worry about that*.  Well, that

25  very argument was rejected in *Nosal I*, where the Ninth Circuit

1  said -- where the prosecutor said, *Well, we wouldn't bring*

2  *those kinds of cases.*  And the Court said, *No.  We have to*

3  *interpret the statute in a way that is reasonable, and that has*

4  *limits on it, and not rely on the good faith of prosecutors.*

5  And if the Ninth Circuit was saying, *You can't rely on the good*

6  *faith of prosecutors*, you certainly can't rely on the good

7  faith of a private web owner.

8      And then finally on the $5,000 damages -- that provision

9  has been interpreted to be satisfied, which they've done in

10  this case, to say, *Well, we spent more than $5,000*

11  *investigating just to figure out who you were.*  That criteria

12  could be satisfied in each and every case.  That is no

13  practical limit.

14      So if you were to interpret the statute the way they say,

15  they're sending of a letter, even if you're just manually

16  accessing, even if you've done nothing, for whatever reason,

17  even if it's based on race, religion, anticompetitive concerns,

18  anything, you commit a crime the second you type that website

19  address back into your browser.  That cannot be a reasonable

20  interpretation of the statute.

21          **MR. VERRILLI:**  Your Honor, I apologize.

22          **THE COURT:**  One extra minute.

23          **MR. VERILLI:**  I'm going to tax your patience here,

24  but let me be clear.  We're not saying that this statute can be

25  used to authorize these kinds of discrimination.  What we're

1   saying is that if it ever is, the Court can decide in that case

2   whether there's an interpretation of the statute that is

3   appropriately limited, such that it can't be enforced when its

4   enforcement would involve the enforcement of something that is

5   discriminatory on the basis of race or --

6        THE COURT:  How can you find that in the statute?  If

7   I find "authorization" means whatever --

8        MR. VERILLI:  Well, I don't think you can find it in

9   the statute.  I think you'd have to decide in that circumstance

10  whether there might be an as-applied limit under the

11  Constitution.

12       THE COURT:  Under the Constitution?

13       MR. VERILLI:  Yeah.  In a different case --

14       THE COURT:  What were the constitutional arguments?

15  If it's private, you've argued there's no state action.

16       MR. VERILLI:  Right.  Well, we think it is, but I

17  think if -- what I'm trying to stress here, Your Honor, is that

18  that's is a very different case than this one.  It doesn't pose

19  that issue.

20       THE COURT:  It's a different case, but one has to

21  look at the consequences of any interpretation; what the

22  implications are.

23       MR. VERILLI:  You're definitely correct, Your Honor.

24  But I guess what I would try to leave Your Honor with is this;

25  that in a situation in which the interests that the statute

1   exists to protect are directly implicated, and none of these

2   kinds of concerns are present, the Court can reserve for

3   another day the question of what to do in a case in which those

4   concerns are present.  And that does not and should not lead

5   the Court to the conclusion that the statute ought not to be

6   enforced in a situation in which its fundamental policies are

7   implicated.

8           **MR. WISOFF:**  Well, I think those concerns have been

9   raised, Your Honor.

10          **THE COURT:**  I'm going to take the matter under

11  submission.  My question is:  Right now, pending my decision on

12  this, did the parties have a stipulation to keep the -- I guess

13  there's kind of a stay in place.

14          **MR. VERILLI:**  Yes.  There's a standstill agreement in

15  place.

16      (Reporter requests clarification.)

17          **THE COURT:**  Standstill.

18      I appreciate the briefing and the argument.  Obviously,

19  it's been is superb.  And it's a very interesting issue.  I've

20  got a feeling it's not going to end here, so I will work on

21  this as quickly as I can, and get it out.

22          **MR. TRIBE:**  Thank you, Your Honor.

23          **MR. VERILLI:**  Thank you, Your Honor.

24      (At 4:28 p.m. the proceedings were adjourned.)

25

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4

5   _____   July 28, 2017

Signature of Court Reporter/Transcriber   Date

6   Lydia Zinn

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25