Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6600

Adam B. Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
865 Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone:    (213) 443-3000

Attorneys for Plaintiff hiQ Labs, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>             Plaintiff,<br><br>        vs.<br><br>LinkedIn Corp.,<br><br>             Defendant. | Case No. 3:17-cv-03301-EMC<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT (15 U.S.C. §§ 1 AND 2) AND THE CLAYTON ACT (15 U.S.C. §§ 15 AND 16)**<br><br>**DECLARATORY JUDGMENT UNDER 22 U.S.C. § 2201 THAT PLAINTIFF HAS NOT VIOLATED: (1) THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030); (2) THE DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. §1201);(3) COMMON LAW TRESPASS TO CHATTELS; OR (4) CAL. PENAL CODE § 502(c);**<br><br>**INJUNCTIVE RELIEF TO ENJOIN: (1) VIOLATIONS OF THE SHERMAN ACT (15 U.S.C. §§ 1 AND 2); (2) INTENTIONAL INTERFERENCE WITH CONTRACT AND PROSPECTIVE ECONOMIC ADVANTAGE; (3) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200); AND RELATED MONETARY RELIEF** |

Plaintiff hiQ Labs, Inc. ("hiQ"), by its undersigned counsel, hereby brings this action against Defendant LinkedIn Corporation ("Defendant" or "LinkedIn") and alleges as follows:

## INTRODUCTION

1.     hiQ brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  hiQ seeks to recover the damages it suffered as a result of LinkedIn's anticompetitive conduct, as well as obtain a declaration from the Court that hiQ has not violated and will not violate federal or state law by accessing and copying wholly public information from LinkedIn's website.  hiQ further seeks injunctive relief preventing LinkedIn from misusing the law to complete its attempted destruction of hiQ's business, and prevent LinkedIn from continuing to strangle competition by giving itself an unfair competitive advantage through unlawful and unfair business practices.

2.     LinkedIn is the world's largest professional social network, with over 660 million members.  Particularly relevant here is that LinkedIn rose to dominance in the professional social networking platform market because it created a social network platform in which users could publicly post all or portions of their resumes and work history, so that those users could connect with potential employers or other potential professional contacts.  The public portion of LinkedIn users' profiles has long been one of the network's primary selling points, and LinkedIn's website and user agreement have long stated that the information users chose to make public remained theirs to provide to whomever viewed it online.  These fundamental representations helped fuel LinkedIn's massive growth, which resulted in it obtaining undisputed monopoly power in the professional social networking platform market.

3.     hiQ, in contrast, is a tech startup nowhere near LinkedIn's size.  hiQ identified an opportunity for a new kind of "people analytics" service based on the massive trove of public information individuals chose to share in their professional social networking.  By collecting and analyzing public profile information on LinkedIn, hiQ provided its clients – mostly large companies – with insights and other data analytics about their employees, such as which

AMENDED COMPLAINT

Case No. 3:17-cv-03301-EMC

employees are most at risk to leave the company or which skills its employees have.  This service – the likes of which did not exist before hiQ and constitutes its own unique relevant market today – provides enormous value to both employers and employees, because it creates a way for employers to, *inter alia*, approach those employees that are at the highest risk of leaving the company in order to either renegotiate their pay and benefit packages (*i.e.*, provide better compensation to the employee), or otherwise address concerns those employees might have with their current employment situation, instead of incurring the significant cost and disruption of replacing a departed employee.  Similarly, people analytics help employers identify better positions and potential training for their employees within the company, so that their skillsets are further developed and put to their fullest and best use.  Enabling these types of proactive activities results in a win-win situation for all involved.  As reported by LinkedIn's 2020 Global Talent Trends report, "55% of talent professionals say they still need help putting basic people analytics into practice."  hiQ's services did just that.

4.      In order to provide people analytics services to its clients, hiQ does not analyze the private sections of LinkedIn, such as profile information that is only visible when you are signed-in as a member, or member private data that is visible only when you are "connected" to a member.  Rather, the information hiQ uses is wholly public information visible to anyone with an internet connection.  And, as noted, far from harming LinkedIn members, hiQ's access to this public information promotes precisely the type of professional and employment opportunities that lead LinkedIn members to make all or even just a portion of their profiles public in the first place.

5.      For years, LinkedIn knew about and sanctioned hiQ's services, because LinkedIn profited from doing so.  hiQ increased employer engagement on LinkedIn, because those employers paid more attention to their employees' LinkedIn public profiles to see when they might leave the company, and/or whether they might be better placed elsewhere within the organization.  It also incentivized employers to either directly or implicitly encourage their employees to use LinkedIn in the first place.  Employer participation in the LinkedIn network distinguishes that network from other social networks, and, indeed, it is one of the company's *raisons d'etre*.  As LinkedIn advertises on its website, it is a social network meant to help users

AMENDED COMPLAINT

Case No. 3:17-cv-03301-EMC

"[f]ind the right job or internship for you," "post your job for millions of people to see," and act as the social network for "[a]nyone looking to navigate their professional life."  Moreover, employers, employees, and recruiters often choose to pay LinkedIn subscription and other fees for a variety of reasons.  Increased employer and employee engagement through the "free advertising" LinkedIn received from hiQ's services directly led to higher revenues for LinkedIn.

6.     LinkedIn eventually realized that it might be able to profit by providing the same type of innovative and revolutionary analytics hiQ pioneered, and it developed its own competing version of that analytics service.  Then, in May 2017, LinkedIn abruptly, unlawfully and without cause denied hiQ access to the portion of the LinkedIn website containing wholly public member profiles.  hiQ relies on that public data, available nowhere but LinkedIn, for its data analytics business, which, prior to LinkedIn's conduct described herein, served well-known, innovative clients including eBay, Capital One, and GoDaddy.

7.     More specifically, on May 23, 2017, LinkedIn sent hiQ a cease-and-desist letter ordering hiQ to stop accessing LinkedIn and asserting that hiQ's continued access to the website violated the Computer Fraud and Abuse Act, Digital Millennium Copyright Act, and California Penal Code § 502(c) and constituted common law trespass to chattels.  This came as a surprise to hiQ, given that LinkedIn was aware of hiQ's activities for several years and never once objected to hiQ's use of this public information.

8.     In an attempt to justify this about-face, which followed years of profitable dealing with hiQ and other people analytics providers, LinkedIn asserted (pretextually) that it needs to protect LinkedIn member data even though LinkedIn members have expressly made that information public and LinkedIn has identified no harm to itself or its members.  LinkedIn publicly acknowledges on its own website that public profile data belongs to LinkedIn members, not to LinkedIn, and that each member is free to choose the level of public disclosure allowed for his or her own information.  LinkedIn members can choose to (1) keep their profile information private; (2) share only with their direct connections; (3) share with connections within three degrees of separation; (4) allow access only to other signed-in LinkedIn members, or (5) allow access to everyone, even members of the general public who may have no LinkedIn account and

1   who can access the information without signing in or using any password.  It is only this fifth

2   category of information – wholly public profiles – that is at issue here: hiQ only accesses the

3   profiles that LinkedIn members have made available to the general public.

4          9.      LinkedIn's entire stated complaint is that hiQ "copies" the data its members have

5   made public, but LinkedIn asserts no copyright or other exclusive propriety interest in the data and

6   it clearly has none.  Moreover, hiQ does not collect all (or even a substantial proportion) of the

7   member profiles on LinkedIn, nor does it compete with LinkedIn by creating a substitute social

8   network or job posting forum.  Rather, hiQ accesses public data for a limited subset of users –

9   usually its client's employees – and uses scientific methodologies to analyze the information.  hiQ

10  then provides its clients with this new, refined data that it produced in a form that is by necessity

11  very different from the public profile pages on LinkedIn.

12         10.     Because LinkedIn has no legitimate copyright claim, it has instead resorted to self-

13  help by actively preventing hiQ from obtaining the public data in LinkedIn users' profiles through

14  systematic means.  LinkedIn also threatened to sue hiQ under federal and state laws pertaining to

15  hacking and unauthorized computer and network access in order to intimidate hiQ and force it to

16  stop accessing these public profiles.  But LinkedIn cannot use those laws for an improper purpose

17  to obtain exclusive proprietary control over wholly public data in which it otherwise has no

18  exclusive interest and which hiQ, and anyone else, can freely access on the world wide web with

19  no log-in credentials or password.  Indeed, LinkedIn would not have that data on its website in the

20  first place but for its promise to LinkedIn members that they can publicly disclose that information

21  on LinkedIn for all the world to see and use.

22         11.     LinkedIn's about-face and active attempts to prevent hiQ (and, on information and

23  belief, all other people analytics providers) from obtaining employment data LinkedIn users make

24  public has had massive, immediate consequences for hiQ.  Suddenly, the public data source on

25  which all of its and its non-LinkedIn competitors' people analytics services rely was taken away.

26  This was long after LinkedIn told its members their profile information was their own and locked

27  them into its professional social networking platform based on that promise.  LinkedIn's about-

28  face, which followed years of profitable dealing with hiQ, prevented hiQ and other people

AMENDED COMPLAINT                                                          Case No. 3:17-cv-03301-EMC

analytics providers from providing the people analytics their clients needed, and those clients – including, particularly, hiQ's marquee Fortune 500 clients – quickly disappeared.  There is no point paying for a service one cannot receive, and there was nothing hiQ could do to prevent the attrition.  Unfortunately for competition, this has also meant that, today, LinkedIn has not only obtained monopoly power in that market through anticompetitive means, but has also crowded out hiQ, LinkedIn's best-in-class competitor – a competitor that *created* the market in the first place.

12.    As a consequence, hiQ lost the majority of its revenues almost overnight and today is unfortunately a shadow of what it once promised to be.  This has caused hiQ substantial monetary damages in the form of, *inter alia*, lost profits and diminution in business value.  hiQ intends to prove its damages at trial, but the Court should also enjoin LinkedIn from denying hiQ access to its public employment information database because LinkedIn's real motivation is obviously anticompetitive: to prevent anyone but LinkedIn from being able to use that public information for data analytics.

## THE PARTIES

13.    Plaintiff hiQ is a Delaware corporation with its principal place of business in San Francisco, California.

14.    On information and belief, Defendant LinkedIn is a Delaware corporation with its principal place of business in Sunnyvale, California.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 1337, because (a) Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and (b) Plaintiff's first and second claims for relief seek a declaratory judgment under 28 U.S.C. § 2201 and 2202 that Plaintiff has not violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Digital Millennium Copyright Act, 17 U.S.C § 1201.

16.    Under 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiff's third through tenth claims for relief because they arise out of the same common set of facts and conduct as Plaintiff's federal claims for relief.

17.     This Court has personal jurisdiction over Defendant LinkedIn in this action because, on information and belief, LinkedIn's corporate headquarters and principal place of business is within this judicial district, and LinkedIn has engaged in substantial business within this district.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant LinkedIn conducts substantial business within this District and a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this District.  Venue is further proper in this District pursuant to 28 U.S.C. § 1400(a) because this action relates to copyrights and Defendant LinkedIn resides in this District.

## INTRADISTRICT ASSIGNMENT

19.     Pursuant to N.D. Cal. Civil Local Rule 3-2(c), this case is, *inter alia*, an intellectual property action appropriate for assignment on a district-wide basis.

## FACTUAL ALLEGATIONS

**LinkedIn, the Professional Social Networking Platform Market, and the Public Member Profile Portion of LinkedIn's Professional Social Network Platform**

20.     The core of LinkedIn's business is a professional social network platform that aggregates the profile information of well over half a billion professionals, their interrelationships, their posts, and their cross-endorsements.  LinkedIn states that the purpose of the service is to "promote economic opportunity" and provide a place for professionals "to meet, exchange ideas, learn, and find opportunities...."   *See* Exhibit 1 (LinkedIn User Agreement).  For individuals, it is a place to network and seek out jobs; for companies and recruiters, it is an essential platform to post jobs and source talent.  For all, the focus is on business relationships.

21.     As opposed to other social networks, such as Facebook, Instagram, Twitter, etc., LinkedIn's focus on *professional* social networking puts it in a separate category.  Users participate in LinkedIn's network because its purpose is to connect professionals of all stripes, and to act as a constantly-updated repository of users' business information.  This is different than other social networks, which often focus on non-business-related aspects of their users' lives (*e.g.*, sharing family photos, posting thoughts or news stories, uploading videos).  Thus, the primary

service LinkedIn provides its users – the provision of a business-focused social network – is different in purpose and scope from other social networks, and satisfies a different need for its users.  In practice, LinkedIn users often have other social network accounts, but they do not typically use those other social networks for business purposes.  As a group, professional social networking platforms therefore constitute a separate relevant market, because consumers would reasonably switch to other professional social network platforms for business purposes (if they could), but would not similarly use more traditional social networks for the same purposes.

22.     LinkedIn was launched in May 2003 and, within one month, had over 4,500 users. This was approximately the same time period in which Facebook was founded (after MySpace, arguably the first major social networking platform, demonstrated the popularity of this new form of connecting online), but the two then-fledgling social networking platforms had very different purposes.  As the concept of social networking caught on in the broader populace, LinkedIn experienced meteoric growth because of the new professional social networking platform market it created.  Over the next 15 years, LinkedIn added hundreds of millions of users to its base, now with over 660 million members.  Today, LinkedIn is established in more than 200 countries, receives more than 100 million unique visitors a month, and reports that up to 60% of U.S. companies use it to hire staff.

23.     One of the main keys to LinkedIn's initial and then sustained growth was that it acted as a repository and platform for users to share their work history, also known as a curriculum vitae ("CV") or resume information.  LinkedIn member profiles contain resume information such as education, skills, publications, certifications, and employment history.  They also contain endorsements from colleagues and others within the member's professional social network. Members can connect their LinkedIn profiles to those of colleagues around the world.

24.     As particularly relevant to this lawsuit, users had – and, as of this filing, still have – the option to publicly share as much or as little of their CV as they want.  Most LinkedIn users choose to share at least a portion of their CV, because it allows other professionals to search them out for networking or recruiting purposes, and because it also helps elevate their professional profile in online searches.  This "public option" has long been one of LinkedIn's main value

drivers, because it facilitates the site's core professional social networking services and is one of the key reasons users first signed up for, and then maintained, their LinkedIn accounts.  Without the ability to publicly share CV information, LinkedIn would not be the dominant professional social network platform it is today.  Indeed, the entire purpose of a social network is to share information with those in your network, or who wish to join your network.  LinkedIn always promoted this core tenet of social networking (although, as discussed below, it has recently reneged on its promises that the information its members choose to share publicly shall remain freely accessible).

25.     As LinkedIn grew, so did its power in professional social networking platforms.  It was the first mover in the professional social networking platform market, and its explosive growth was self-reinforcing with respect to its market power.  A social network derives a major part of its value from the number and scope of users in the network; *i.e.*, the more users in the network and the broader the scope of those users, the more opportunities one has to be social and connect, and the more one is incentivized to be in that network rather than in smaller, less-populated networks.  LinkedIn was, for many years, the only real professional social networking platform and became the *de facto*, dominant standard for such networking.  Today, LinkedIn's collection of profiles is a one-of-a-kind resource.  It is the single largest, most up-to-date, and authoritative repository about the world's professional community.  There is no comparable data source anywhere else in the world, and no current likelihood that any other company can craft a similar database of information and users.  LinkedIn is the unquestioned, most dominant professional social networking platform in the world, counting, on information and belief, well over 75% of all professional social network users in the United States.[1]

26.     Put simply, LinkedIn has monopoly power in the professional social networking platform market, and it has erected substantial barriers to new entry by any professional social network platform that wishes to rival its power.  The first such barrier is simply the number of

---

[1]   To the extent professionals are members of other, smaller professional social networks, hiQ understands, on information and belief, that they typically *also* belong to LinkedIn.

LinkedIn users that currently exist.  As noted above, a social network derives its value (and power) from the number and scope of users in the network; a concept called "network effects."  A new entrant would need to sign up a substantial portion of LinkedIn users for its own platform in order to even begin to take share away from LinkedIn.  Second, the information LinkedIn currently houses on its servers is another barrier to entry, because a new rival would need to obtain similar amounts of information about its users in order to take share away from LinkedIn.  Third is the cost and logistical expense of creating a worldwide network with the same resources as LinkedIn. This includes not only the front-end website and/or application members use when accessing the social network, but also the massive back-end infrastructure needed to facilitate such large networking operations, and to generate members' ongoing trust in the network's reliability and security.

27.     LinkedIn grew to what it is today by telling its prospective members that their employment information would always remain their own, even if they include that information in their member profiles.  In its User Agreement, LinkedIn admits it does not own the data that its members decide to share publicly on LinkedIn's website.  LinkedIn explains to members that "you own the content and information that you submit."  *See* Exhibit 1 (LinkedIn User Agreement) at 3.1.  LinkedIn is unequivocal that members control their profiles: "You control the visibility and reach of your LinkedIn profile."  *See* Exhibit 2 (Public & Private Profiles | LinkedIn Help). LinkedIn gives members the ability and right to specify which portions of their profiles will be visible to their direct connections, their network (those within three degrees of separation), all LinkedIn members, and the "public."  The "public" setting (which is at issue here) allows *"[a]nyone [to] see [members'] public profile[s] in search engines, as well as in apps and other services."*  Exhibit 3 (showing public profile settings).  Public profiles may be reached via third-party services (e.g., Google and Bing) and directly via a web address (URL) that LinkedIn creates for its members.  Thus, LinkedIn acknowledges that a public setting will permit access for anyone in the world with an internet connection.  The Privacy Policy advises members: "Your profile is fully visible to all Members and customers of our Services.  Subject to your settings, it can also be visible to others on or off of our Services (e.g., Visitors to our Services or users of third-party

search engines."  Exhibit 6 (LinkedIn Privacy Policy) at 3.1.

28.     By encouraging the proliferation of public employment information in order to exponentially grow its professional social network (and therefore lock its users into that network), LinkedIn has effectively become a public forum where professionals can meet and exchange ideas, information, and news articles.  LinkedIn describes itself as a "community" and users are able to post publicly, share other members' posts, and comment on other members' posts.  LinkedIn cannot – consistent with the free speech clause of the California Constitution – selectively exclude hiQ from this "public" forum, even if LinkedIn's servers are considered "private" property.  The California Supreme Court has definitively interpreted these constitutionally guaranteed free speech rights as precluding an owner of private property from prohibiting such access when the property has been opened to the public and constitutes a public forum.  The United States Supreme Court has in turn upheld this California constitutional right as against a challenge that it amounts to a "taking" of private property under the United States Constitution.  LinkedIn cannot have it both ways even on its own web servers: promising a public forum and public access on the one hand, and then selectively excluding members of the public on the other.

29.     Since its launch in 2003, LinkedIn has created numerous successful revenue streams, including selling services to corporations that help with their recruiting and sales processes, memberships to corporate and individual users, targeted advertising based on members' usage of the site, and others.  All of this follows on LinkedIn's status as the world's largest and most recognizable professional social networking platform, and derives from its key decision early on to allow members to make any portion of the member profile public.  As of hiQ's launch in 2012, LinkedIn's annual revenues were on the order of nearly $1 billion, a number that had nearly quadrupled by the end of 2016.  In late 2016, LinkedIn was purchased by Microsoft Corporation for $26 billion.

**hiQ Labs Creates a New "People Analytics" Market Based on Professional Social Networkers' Publicly-Shared Information**

30.     hiQ was formed in July 2012 and has since raised $14.5 million in multiple rounds of funding.  It once had 24 employees, the majority of whom were in its San Francisco office, and

11 of whom had advanced degrees, including several PhDs.  Today, however, hiQ's workforce has been reduced to just one employee, because its business unfortunately cratered as a result of LinkedIn's anticompetitive acts described herein.

31.     When it was founded, hiQ identified a previously-unmet need among employers (particularly large employers, such as Fortune 500 companies) to identify those employees that were at the highest risk of leaving the company, as well as uncover the full scope of current and potential employees' skills.  Although one would expect this latter task to be the simpler of the two, it has proven an elusive goal over the years, because employees often do not know to share their full skillsets with their employer, or do not know that skills they possess might warrant a different or better job (*i.e.*, better "fit") within the company.

32.     hiQ's innovation was the realization that the facts employees choose to share about themselves publicly in a professional social network strongly predict their employment satisfaction and also demonstrate what skills they can bring to current and future jobs.  By utilizing modern technology to analyze this data, employers can eliminate inefficiencies in their organizations and also reduce transaction costs for themselves and their employees by highlighting which highly-valued employees are most at risk of leaving the company.  Employees seeking new jobs must spend time and effort to do so, and employers losing valued employees must spend time, money, and energy looking for new hires (or identifying those within the organization that can either be promoted to replace the lost employee, or have their jobs combined with some of the departing employee's responsibilities).  By predicting employee behavior and identifying hidden/adjacent skills based on the information those same employees or employee prospects share publicly, hiQ reduced these costs and helped their clients create a happier, better-compensated workforce that was simultaneously more suited for their jobs.

33.     In response to this realization, hiQ developed "people analytics," a new type of predictive data analytics aimed at providing employers in-depth, predictive insights into their workforce.  People analytics generally work by performing computerized analyses of employees' public professional information and history that then show which employees are at higher risk of looking for a new job, and which may have skills that are not being utilized in their current job.

hiQ created two specific analytics services: (a) "Keeper," which tells employers which of their employees are at the greatest risk of being recruited away, and (b) "Skill Mapper," a summary of the breadth and depth of aggregate or individual skills of current or prospective employees, which may not be obvious from internal company documents (such as internal performance reviews or the resume the employee supplied as part of the hiring process) or conversations with those employees.

34.    For these services, hiQ utilizes the public profile section of the LinkedIn website as raw data for its analysis and has historically used a variety of software and manual means to gather that information.[2]  hiQ does not analyze the private sections of LinkedIn, such as profile information that is only visible when you are "signed-in" as a member, or member private data that is visible only when you are "connected" to a member.  hiQ does not republish the information it collects from LinkedIn, but instead applies analytics to create new business intelligence for its clients.  hiQ's services thus do not impair or impede the value of the LinkedIn social network.  Rather, they make it more valuable to have such a profile – an employer using the "Keeper" product might give an employee a "stay bonus" or a career development or internal mobility opportunity, or SkillMapper may demonstrate that its workforce lacks depth in a particular skill area, which could lead the employer to offer its employees free training to improve their skillsets.

35.    Before hiQ, people analytics simply did not exist; at least, not in the form or at the level of predictive accuracy offered today.  Employers previously tried to make judgment calls regarding their workforce using limited, internal data only.  For example, before hiQ and the rise of the people analytics market, employers tried to manage attrition risk within their organizations through a variety of *ad hoc* internal methods, and they tried to identify employees' full skillsets through similarly *ad hoc* internal means.  Applying data analytics to those tasks based on

---

[2]  hiQ originally used other data sources for its analyses, but found over time that using only the LinkedIn public database provided better levels of predictive accuracy.  This further bolsters the fact that LinkedIn's public employment information database is a unique resource, and that there is no comparable data source available.

employees' own most recent self-curated public information created a new type of service employers were willing to purchase, because the service's value far outweighed its expense. hiQ's roster of clients, including several of the largest Fortune 500 companies, were able to reduce hard costs and transaction costs by better focusing on highly-valued current employees, and increase efficiencies within their organizations by identifying better jobs for their current and prospective employees' skillsets. On the employee front, hiQ (and the other people analytics companies that sprang up after it created the market) helped improve employment conditions by identifying situations in which employers needed to better compensate potentially dissatisfied employees, or where employees were better suited for other jobs within the organization. As noted previously, it was a win-win situation for all involved.

36. For those that consume people analytics services, there are no reasonable alternatives. The type of service itself did not exist until hiQ first came into being, and the only alternative to such services is the previous set of *ad hoc* measures that companies employed when trying to guess employee attrition risk and employees' full and current skillsets. As has been borne out since LinkedIn began committing its anticompetitive scheme (discussed further below), companies utilizing people analytics do not turn to other types of services or products when the price for people analytics services exceeds their value; the companies simply stop purchasing too-expensive people analytics services.[3]

**LinkedIn's Surprising Cease-and-desist Letter to hiQ and Its Broader About-Face With Respect to People Analytics Providers**

37. LinkedIn has known of hiQ since at least 2015, when it started participating in

---

[3] As described below, the quality of hiQ's people analytics necessarily dropped dramatically when LinkedIn cut off its access to the public employment information database. In economic terms, that meant the price at which hiQ sold its people analytics services far exceeded their value. On information and belief, the same phenomenon happened with the other people analytics companies LinkedIn cut off, which has led to significantly decreased demand for their services as well. The only remaining quality people analytics provider today is, as discussed below, LinkedIn itself, and it is to LinkedIn that consumers have turned for such services in the face of the decreased quality LinkedIn created in the rest of the market via its improper and anticompetitive conduct.

AMENDED COMPLAINT

Case No. 3:17-cv-03301-EMC

hiQ's annual "Elevate" conference.  The hiQ Elevate conference was designed to build a community around the emerging field of people analytics and has provided a regular forum for participants to share insights and disseminate best practices.  LinkedIn has sent representatives to each iteration of that conference since hiQ's founding.  hiQ has spoken freely about its public data collection from LinkedIn at Elevate; LinkedIn has thus always understood what hiQ does.  Over the years, LinkedIn has itself participated regularly in hiQ Elevate events.  At a 2016 Elevate conference, LinkedIn employee Lorenzo Canlas received special recognition and accepted the hiQ Elevate "Impact Award."

38.    All of this perhaps comes as little surprise, since hiQ (a) was open with LinkedIn regarding its people analytics services, and (b) LinkedIn profited from that new market's creation. As an initial matter, people analytics help prove LinkedIn's value proposition; specifically, they demonstrate why it is valuable for both employees and employers to belong to LinkedIn's professional social network, and why the public employment database benefits those who participate.  People analytics also help create a better workforce, in terms of happier employees with right-sized compensation packages and more efficient organizations that are better able to place their employees in the correct jobs.  Beyond proving the professional social network's value, people analytics also benefit LinkedIn in more direct ways, including through increased employer participation on the network platform, which leads to paid subscriptions and services.  Employers are also incentivized to either directly or indirectly encourage their employees to use LinkedIn, which further supports the network and often leads to additional, individual subscriptions from members and recruiters.

39.    Given LinkedIn's awareness of hiQ over the years, the profitable course of dealing it enjoyed from its relationship with hiQ and other people analytics providers, and its direct participation in hiQ events and seeming support of hiQ's business, hiQ was surprised when on May 23, 2017, without any forewarning, LinkedIn's legal counsel emailed a letter to hiQ, stating that hiQ was improperly "access[ing] and copy[ing]" LinkedIn public profile information.  The letter demanded that hiQ "[c]ease and desist accessing or attempting to access or use LinkedIn's website, computers, computer systems, computer network, computer programs, and data stored

therein." *See* Exhibit 4 (Cease-and-Desist Letter) at 2.  LinkedIn's letter stated that hiQ was in

violation of the LinkedIn User Agreement, state trespass law, the Computer Fraud and Abuse Act,

California Penal Code § 502, and the Digital Millennium Copyright Act.  *Id*.  The letter also stated

that any further access to the site would be "without permission" and "without authorization."

Further, LinkedIn stated it has implemented "technical measures" to block hiQ from the site.  *Id*.

40.     Importantly, the LinkedIn User Agreement does not apply to members of the

general public who access LinkedIn's website without an account or sign-in credentials.

Moreover, LinkedIn itself arbitrarily ignores many of its own user terms, selectively allowing

access and copying when it wants and purporting to enforce terms only when doing so is

advantageous to LinkedIn.  Here, for example, despite that LinkedIn user terms tell members that

they control who can see and use their public profiles, LinkedIn has unilaterally decided to

exclude hiQ from that otherwise public access.  In addition, while LinkedIn has targeted hiQ for

retribution, it appears to have no problem at all with other for-profit companies, including Google

and Bing, by necessity copying and indexing large swaths of the same public portions of

LinkedIn's website and displaying that information in their search engine results for all the world

to see.

41.     After receiving the cease-and-desist letter, hiQ promptly retained counsel who

contacted LinkedIn to explain hiQ's belief that it had a right to access public pages, that its

business is synergistic to LinkedIn, that the effect of LinkedIn's letter would devastate hiQ, and to

understand whether LinkedIn believed it was being harmed in any way.  LinkedIn's counsel was

unable to point to any interference or impairment with LinkedIn's servers from hiQ's accessing

the site, and conceded that various other commercial enterprises, including Google and Yahoo! are

permitted to use automated software to access the LinkedIn site.  When hiQ asked counsel for

LinkedIn whether LinkedIn is planning to offer services to compete with hiQ's Keeper and Skill

Mapper analytics, he stated that he did not know the answer to that question.  When asked what

copyright or propriety interest LinkedIn is claiming in the public data displayed by members, he

stated clearly that LinkedIn is asserting no copyright claim.

42.     LinkedIn is thus improperly using the Computer Fraud and Abuse Act, the Digital

Millennium Copyright Act and related state penal code and trespass law, not as a shield – as intended by those laws – to prevent harmful hacking and unauthorized computer access, but as a sword to stifle competition and assert propriety control over data in which it has conceded it has no exclusive interest.  In other words, LinkedIn recognizes it has no valid propriety or copyright interest, so it claims only that it has a propriety interest to control access to its website, treating that digital realm as though it were physical real property.  Not only is the analogy inapposite, but LinkedIn ignores that the public profile data of members would not reside on its website in the first place but for its express promise that this data would be public for all to see and use.  Thus, while LinkedIn can certainly prevent abusive access to its website, it should not be allowed to pervert the purpose of the laws at issue by using them as a pretext to destroy putative competitors and engage in unlawful and unfair business practices as alleged more fully herein.

43.     On May 31, 2017 counsel for hiQ sent a letter, attached as Exhibit 5, to LinkedIn asking that hiQ be permitted to access the public profiles portion of the LinkedIn website, at least in the interim while the parties discussed the possibility of a mutually amicable resolution.  On June 24, 2017, LinkedIn responded to hiQ's May 31 letter, reiterating its demand that that hiQ cease and desist.

44.     LinkedIn, however, did not stop its wrongful conduct.  Instead, LinkedIn engaged in self-help and effectively cut off hiQ's access to the public database.  Using technological means that could determine when hiQ accessed the public database, LinkedIn made it so hiQ's programs could not obtain any of the data LinkedIn's members made publicly available, as was their right.  This effectively cut off hiQ's raw data source and consequently prevented it from providing people analytics services, because it could no longer determine what its clients' employees were making public about their employment history, skills, etc.  LinkedIn thus completely cut off hiQ's critical data supply by effectively making it so that all LinkedIn members could not provide their public data to hiQ, regardless of whether they wanted to or not.  This, in turn, rendered hiQ's services virtually worthless.

45.     hiQ fought back and, on August 14, 2017, this Court granted hiQ's motion for a preliminary injunction, ordering LinkedIn to withdraw the two cease-and-desist letters and to

1  refrain from issuing any further letters.  The Court also enjoined LinkedIn from blocking or

2  preventing hiQ's access to its members' public profiles.  However, the damage was already done.

3  By sending the cease-and-desist letters and demonstrating it was willing at a moment's notice to

4  cut off hiQ's raw data supply for anticompetitive purposes, LinkedIn effectively eviscerated hiQ's

5  business.  It lost 75% of its employees, watched its business valuation plummet, was unable to

6  find any further investors, experienced an almost immediate (unwilling) cessation of conversations

7  with potential strategic partners, and lost several major clients, some of which specifically noted

8  that they could no longer do business with hiQ because of LinkedIn's conduct.

9        46.    On information and belief, LinkedIn did not only focus its efforts on hiQ.  Instead,

10  LinkedIn's letter to hiQ was simply one of many that it sent to people analytics providers

11  throughout the industry.  Although hiQ has not been able to obtain copies of these letters, it

12  understands that LinkedIn informed nearly every people analytics provider of note that they could

13  no longer access the public portion of LinkedIn's website and, similar to hiQ, cut off those

14  providers' access to the public database.

15        47.    As discussed above, other companies that do not provide people analytics services

16  (*e.g.*, Google and Bing) may (and do) still access LinkedIn's public database with ease, and

17  download raw data from that database without interference from LinkedIn.  It is only hiQ and

18  some of LinkedIn's other direct competitors that, on information and belief, have been effectively

19  banned from accessing and obtaining that data in a systematic, cost-effective way.  LinkedIn is

20  thus perfectly willing to provide its public database to other companies for the same price as it

21  always did (free), but is now unwilling to make that same database available to its people analytics

22  competitors.[4]

23  **LinkedIn Developed and Implemented Its Own People Analytics Services in the Lead Up to**
    **Cutting Off hiQ and Other Competitors, and Now Dominates That Market.**

24

25        48.    In hiQ's investigation in connection with these proceedings, it discovered that

26  _____

27     [4]  As discussed below, that is because LinkedIn apparently determined that people analytics
    providers are now its competitors and it wants to dominate that market, just as it dominates

28  professional social networking.

AMENDED COMPLAINT                                         Case No. 3:17-cv-03301-EMC

LinkedIn started building its own offerings based on public member profiles in at least early 2015. In a February 2015 earnings call, several years after hiQ's launch, LinkedIn's CEO announced: "This year, we plan to enter a new category with products allowing companies to utilize LinkedIn in the enterprise by leveraging content and data that members are already sharing publicly." When discussing this "new category" of products, LinkedIn's CEO explained:

> [T]here's an opportunity for LinkedIn to create value within an enterprise, within an organization *leveraging information that's already public*. So by way of example, *our public profile information*, which particularly at larger organizations, *you see some of those companies turning to LinkedIn to look up someone with their own company, because of how robust that public profile information can prove to be*.
>
> So there's examples of content or information that's already publicly available, and we're trying to think about ways in which we can better leverage that to create value within an organization.

A page on the LinkedIn website states that it is also investing in its own data science projects. *See* <<https://engineering.linkedin.com/data>> (accessed 2/6/20).

49.     On June 21, 2017, LinkedIn's CEO further announced the launch of a product that would analyze skills data from member profiles, just as hiQ's SkillMapper does:

> [W]hat LinkedIn would like to do is leverage all this extraordinary data we've been able to collect by virtue of having 500 million people join the site. We have over 10 million jobs that are now listed on the site. 50,000 standardized skills. *For employers, it's an understanding of what skills they're gonna need to be able to continue to grow, and where that talent exists.*

50.     A few days later, an IT buyer at a blue-chip Wall Street firm who had been evaluating hiQ's technology for purchase revealed that LinkedIn was marketing its SkillMapper-like product head-to-head against hiQ. The timing of this release – less than a month after LinkedIn's first cease-and-desist letter – was telling; LinkedIn cut off hiQ and other people analytics providers because it now viewed them as bona fide competitors.

51.     LinkedIn is aware that its denial of hiQ's access to the public portion of LinkedIn members' profiles jeopardized hiQ's existing contracts and prospective economic advantage and threatened hiQ's very survival. hiQ explicitly made LinkedIn aware of existing contracts with eBay, Capital One, and GoDaddy, and prospective relationships with Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier, and Jobvite. Exhibit 5 (Response to Cease-and-

AMENDED COMPLAINT                                                    Case No. 3:17-cv-03301-EMC

1    Desist Letter) at 3.  hiQ also informed LinkedIn of current financing negotiations that were

2    imperiled by its threats.  *Id.*  LinkedIn nevertheless refused to revoke its unlawful cease and desist

3    demands and never identified any actual harm to itself or anyone else from hiQ's continued access

4    to purely public profiles – access that is freely available to this day to anyone else in the world

5    with an internet connection.  And, just as hiQ predicted would come to pass, it did in fact lose its

6    major contracts and today is a shell of what it once promised to be (and which LinkedIn promoted

7    before it decided to enter the people analytics market itself).

8        52.    hiQ's investigation for this amended complaint further bolsters that no major

9    people analytics providers – besides LinkedIn – still exist.  Many startups that followed hiQ into

10   the people analytics market have either shuttered their operations or pivoted to different types of

11   services.  LinkedIn, however, has expanded its people analytics offerings since this lawsuit first

12   began and today is the only major provider of those services left standing.

13   **LinkedIn's Actions Had Immediate and Long-Lasting Anticompetitive Effects in the People**
14   **Analytics Market That Directly Harmed hiQ**

15       53.    The most immediate anticompetitive effect of LinkedIn's conduct described herein

16   was to eliminate – effectively overnight – nearly all of its people analytics competitors.  By cutting

17   off its competitors' supply of raw employment data, LinkedIn made it so those competitors could

18   not offer quality products in competition with LinkedIn.  This drastically reduced consumer choice

19   and product quality in the broader market, and also eliminated price competition in the market

20   because there were no viable people analytics providers left (besides LinkedIn).

21       54.    The remaining people analytics providers today either rely on much smaller data

22   sets – meaning their products cannot have anything close to the quality that LinkedIn provides – or

23   provide much narrower services.  In all instances, LinkedIn has either eliminated its rivals or

24   pushed up their costs dramatically, so much so that, on information and belief, they can only offer

25   people analytics services at prices higher than LinkedIn, or at the same price as LinkedIn for a

26   product of inferior quality.

27       55.    Due to its anticompetitive conduct, LinkedIn now completely dominates the market

28   for people analytics services, and has erected enormously high barriers to entry around that

AMENDED COMPLAINT                                                     Case No. 3:17-cv-03301-EMC

1   market.  A people analytics company seeking to provide top-quality services simply cannot

2   replicate the public employment information database, so must make do with inferior (or no) data

3   sets for their product.  People analytics providers similarly cannot compete too hard, or else risk

4   having LinkedIn shut them out of the market entirely, as it did with hiQ and the other people

5   analytics companies that were thriving until LinkedIn's about-face in 2017.

6   **Geographic Scope of the Relevant Markets**

7         56.     Both of the alleged relevant markets in this dispute are national in scope.

8   Consumers looking for options in the relevant market for professional social networking platforms

9   are not bound by their immediate locale and instead may choose between platforms (which are

10  available online) provided by companies spread throughout the nation.  Similarly, given people

11  analytics services' electronic nature, consumers of such services also are – or, before LinkedIn's

12  anticompetitive acts, were – able to choose from providers throughout the nation.

13        57.     In the alternative, the scope of each relevant market is worldwide, in that

14  international providers of such services may act as alternatives to U.S.-based providers in each

15  relevant market.

16  **LinkedIn's Conduct Has Negatively Affected Interstate Trade and Commerce**

17        58.     LinkedIn's conduct has taken place in, and affected the continuous flow of

18  interstate trade and commerce of the United States, in that, *inter alia*:

19           (a)     LinkedIn has provided professional social network platform and people

20  analytics services throughout the United States;

21           (b)     LinkedIn has used instrumentalities of interstate commerce to provide

22  professional social network platform and people analytics services throughout the United States;

23           (c)     In furtherance of the anticompetitive scheme alleged herein, LinkedIn has

24  traveled between states and exchanged communications through interstate wire communications

25  and via United States mail; and

26           (d)     The anticompetitive scheme alleged herein has affected millions of dollars

27  of commerce.  LinkedIn has inflicted antitrust injury by artificially reducing consumer choice and

28  price competition for people analytics services.

AMENDED COMPLAINT                        Case No. 3:17-cv-03301-EMC

# FIRST CLAIM FOR RELIEF

**Declaratory Judgment That hiQ Has Not Violated And Will Not Violate The Computer Fraud And Abuse Act 18 U.S.C. § 1030, By Accessing LinkedIn Public Profiles**

59.     hiQ hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

60.     Under the Declaratory Judgment Act, courts may "declare the rights and other legal relations" of parties "to a case of actual controversy."  28 U.S.C. § 2201.

61.     An actual controversy exists between hiQ and LinkedIn.  LinkedIn, through its cease-and-desist-letters and threats of litigation, is attempting to use the law for an improper, anticompetitive purpose and to give itself a competitive advantage.  LinkedIn's cease-and-desist letters allege that hiQ's continued access of LinkedIn's website would violate the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  LinkedIn has also threatened hiQ with litigation if it does not stop accessing LinkedIn's website, and complying with LinkedIn's demands would essentially destroy hiQ's business.  Indeed, LinkedIn has already threatened hiQ's business by implementing technical measures (which this Court has since temporarily enjoined) to prevent hiQ from accessing, and assisting others to access, LinkedIn's site.  hiQ thus has a real and reasonable apprehension that it will be subject to liability if it continues to access LinkedIn's website.  Moreover, this apprehension was caused by LinkedIn's actions – namely, LinkedIn's cease-and-desist letters and its implementation of technology to block hiQ from accessing its site.

62.     Plaintiff seeks a declaration that it has not and will not be in violation of the CFAA by continuing to access and use data from the public member profile sections of LinkedIn and that LinkedIn cannot use the provisions of the CFAA for an improper purpose in a way that leads to independent violations of California law and infringes on Plaintiff's rights.

63.     hiQ prays for relief as set forth below.

# SECOND CLAIM FOR RELIEF

**Declaratory Judgment That hiQ Has Not Violated And Will Not Violate The Digital Millennium Copyright Act, 17 U.S.C. § 1201, By Accessing LinkedIn Public Profiles**

64.     hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

1   though fully set forth herein.

2       65.   An actual controversy exists between hiQ and LinkedIn.  LinkedIn, through its

3   cease-and-desist-letters and threats of litigation, is attempting to use the law for an improper,

4   anticompetitive purpose and to give itself a competitive advantage.  LinkedIn's cease-and-desist

5   letters allege that hiQ's continued access of LinkedIn's website would violate the Digital

6   Millennium Copyright Act (17 U.S.C. §§ 512, 1201) ("DMCA").  LinkedIn has also threatened

7   hiQ with litigation if it does not stop accessing LinkedIn's website, and complying with

8   LinkedIn's demands would essentially destroy hiQ's business.  Indeed, LinkedIn has already

9   threatened hiQ's business by implementing technical measures (which this Court has since

10  temporarily enjoined) to prevent hiQ from accessing, and assisting others to access, LinkedIn's

11  site.  hiQ thus has a real and reasonable apprehension that it will be subject to liability if it

12  continues to access LinkedIn's website.  Moreover, this apprehension was caused by LinkedIn's

13  actions – namely, LinkedIn's cease-and-desist letters and its implementation of technology to

14  block hiQ from accessing its site.

15      66.   Plaintiff seeks a declaration that it has not and will not be in violation of the

16  DMCA by continuing to access and use data from the public member profile sections of LinkedIn

17  and that LinkedIn cannot use the provisions of the DMCA for an improper purpose in a way that

18  leads to independent violations of California law and infringes on Plaintiff's rights.

19      67.   hiQ prays for relief as set forth below.

20                          **THIRD CLAIM FOR RELIEF**

21  **Declaratory Judgment That hiQ Has Not Committed And Will Not Commit Common Law
    Trespass To Chattels By Accessing LinkedIn Public Profiles**

22

23      68.   hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

24  though fully set forth herein.

25      69.   An actual controversy exists between hiQ and LinkedIn.  LinkedIn, through its

26  cease-and desist-letters and threats of litigation, is attempting to use the law for an improper,

27  anticompetitive purpose and to give itself a competitive advantage.  LinkedIn's cease-and-desist

28  letters allege that hiQ's continued access of LinkedIn's website would constitute a trespass to

AMENDED COMPLAINT                                           Case No. 3:17-cv-03301-EMC

chattels under California common law.  LinkedIn has also threatened hiQ with litigation if it does not stop accessing LinkedIn's website, and complying with LinkedIn's demands would essentially destroy hiQ's business.  Indeed, LinkedIn has already threatened hiQ's business by implementing technical measures (which this Court has since temporarily enjoined) to prevent hiQ from accessing, and assisting others to access, LinkedIn's site.  hiQ thus has a real and reasonable apprehension that it will be subject to liability if it continues to access LinkedIn's website.  Moreover, this apprehension was caused by LinkedIn's actions – namely, LinkedIn's cease-and-desist letters and its implementation of technology to block hiQ from accessing its site.

70.     Plaintiff seeks a declaration that it has not committed and will not commit trespass to chattels by continuing to access and use data from the public member profile sections of LinkedIn and that LinkedIn cannot use common law protections against trespass to chattels for an improper purpose in a way that leads to independent violations of California law and infringes on Plaintiff's rights.

71.     hiQ prays for relief as set forth below.

### FOURTH CLAIM FOR RELIEF

**Declaratory Judgment That hiQ Has Not Violated And Will Not Violate California Penal Code § 502(c) By Accessing LinkedIn Public Profiles**

72.     hiQ hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

73.     An actual controversy exists between hiQ and LinkedIn.  LinkedIn, through its cease-and-desist-letters and threats of litigation, is attempting to use the law for an improper, anticompetitive purpose and to give itself a competitive advantage.  LinkedIn's cease-and-desist letters allege that hiQ's continued access of LinkedIn's website would constitute a violation of California Penal Code § 502(c).  LinkedIn has also threatened hiQ with litigation if it does not stop accessing LinkedIn's website, and complying with LinkedIn's demands would essentially destroy hiQ's business.  Indeed, LinkedIn has already threatened hiQ's business by implementing technical measures (which this Court has since temporarily enjoined) to prevent hiQ from accessing, and assisting others to access, LinkedIn's site.  hiQ thus has a real and reasonable

1  apprehension that it will be subject to liability if it continues to access LinkedIn's website.

2  Moreover, this apprehension was caused by LinkedIn's actions – namely, LinkedIn's cease-and-

3  desist letters and its implementation of technology to block hiQ from accessing its site.

4       74.    Plaintiff seeks a declaration that it has not and will not be in violation of California

5  Penal Code § 502(c) by continuing to access and use data from the public member profile sections

6  of LinkedIn and that LinkedIn cannot use the provisions of the California Penal Code for an

7  improper purpose in a way that leads to independent violations of California law and infringes on

8  Plaintiff's rights.

9       75.    hiQ prays for relief as set forth below.

10  ## FIFTH CLAIM FOR RELIEF

11  ### Intentional Interference With Contract

12       76.    hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

13  though fully set forth herein.

14       77.    hiQ had valid, current service contracts with each of its clients, including without

15  limitation eBay, Capital One, and GoDaddy.

16       78.    LinkedIn has and had knowledge of hiQ's valid customer contracts.  hiQ informed

17  LinkedIn of its base of clients such that it is aware of these contracts.  hiQ also provided notice to

18  LinkedIn of a pending financing, as well as potential deals with Bank of New York Mellon,

19  Chevron, Groupon, Honeywell, IBM, Visier and Jobvite.  LinkedIn's conduct interfered with all

20  of these contracts and prospective economic relationships.

21       79.    LinkedIn was aware of the harm to hiQ that would result from denying hiQ access

22  to its public member pages but chose to proceed anyway.  hiQ gave LinkedIn oral and written

23  notice that its customer relationships stood to be destroyed if its ability to access public profile

24  pages was denied.  In response to LinkedIn's May 23, 2017 cease-and-desist letter, hiQ wrote that

25  it has "millions of dollars' worth of business that now hangs in the balance because of LinkedIn's

26  wrongful bait and switch."  hiQ further wrote that it was "presently in the midst of a financing

27  round, which is now endangered because of your letter."

28       80.    LinkedIn's conduct disrupted and required breach or termination of these contracts.

1   hiQ's entire business was premised on applying data science to information gathered from

2   LinkedIn public profile pages.  Preventing hiQ from accessing this data necessarily meant that hiQ

3   could no longer perform under the contracts it had with its clients.

4        81.     As a direct and proximate result of LinkedIn's conduct, hiQ has suffered damages

5   including but not limited to lost business and potential bankruptcy.  Although LinkedIn was

6   restrained by a preliminary injunction, hiQ has suffered severe, irreparable harm in that it was

7   forced to terminate the contracts with its clients and has largely been forced out of business

8   entirely.

9        82.     hiQ has no adequate remedy at law because monetary damages will not afford

10  adequate relief for the loss of hiQ's business relationships, client goodwill, and ability to continue

11  operating.

12       83.     hiQ prays for relief as set forth below.

13                            **SIXTH CLAIM FOR RELIEF**

14            **Intentional Interference With Prospective Economic Advantage**

15       84.     hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

16  though fully set forth herein.

17       85.     As detailed in Plaintiff's fifth claim for relief above, LinkedIn intentionally

18  interfered with hiQ's contracts.

19       86.     LinkedIn committed an independently wrongful act when it revoked access to

20  public profiles for two reasons: (1) LinkedIn breached its express promises that members control

21  access to these pages, LinkedIn has only a non-exclusive license, and visitors may access and use

22  these pages; and (2) LinkedIn has violated California's Unfair Competition Law as detailed in

23  Plaintiff's seventh through ninth claims for relief.  LinkedIn should not be allowed to intentionally

24  and wrongfully disrupt hiQ's contracts and prospective business dealings by revoking its access to

25  avowedly public material.

26       87.     As a direct and proximate result of LinkedIn's conduct, hiQ has suffered and will

27  continue to suffer damages including but not limited to lost business and potential bankruptcy.

28  Although LinkedIn was restrained by a preliminary injunction, hiQ has suffered severe, irreparable

harm in that it was forced to terminate the contracts with its clients and has largely been forced out of business entirely.

88.    hiQ has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of hiQ's business relationships, client goodwill, and ability to continue operating.

89.    hiQ prays for relief as set forth below.

### SEVENTH CLAIM FOR RELIEF

**Unfair Competition In Violation Of Cal. Bus. Prof. Code § 17200, *et seq*.**

90.    hiQ hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

91.    Despite the injunctive relief this Court granted, hiQ suffered loss of money and property and an economic injury in fact, specifically being forced to terminate contracts with its customers and close its business and lay off the majority of its employees, and thus has standing to seek relief under section 17200.

92.    LinkedIn's access denial violates the policy and spirit of antitrust law, as discussed in detail herein and in the tenth through twelfth claims for relief below.  LinkedIn is using its dominant presence as the world's largest professional social networking platform to assume exclusive proprietary control over data that is owned not by LinkedIn, but by its members, and which those members have explicitly designated as public.  Indeed, LinkedIn promises members the ability to control public access to their profiles precisely to incent members to join LinkedIn.  LinkedIn's actions thus suppress competition and violate the core principles and spirit of the antitrust laws.

93.    The impact of LinkedIn's actions on hiQ is obvious and devastating; hiQ's very business model and prospects, as well as its employee relationships, were threatened and damaged beyond repair.  LinkedIn's purported justification – protection of member data – is by contrast obviously pretextual as hiQ accesses only data that LinkedIn members themselves have explicitly made public.  LinkedIn allows all major search engines to access, copy, use, and display portions of this member public data without complaint.  LinkedIn never substantiated any concrete harm

1  that hiQ's access caused to LinkedIn or its members.  LinkedIn nevertheless repeatedly

2  complained about hiQ's "copying" of public data but did not contend that it had any copyright or

3  ownership interest in the data.  It simply wanted to lock down website access to public data in

4  which it had no independent legal right in order to create propriety control where none could

5  otherwise legally exist.

6        94.    Thus, under any standard LinkedIn's actions constitute actionable violations of the

7  UCL's "unfair" business practices prong.

8        95.    As a direct and proximate result of LinkedIn's conduct, hiQ has suffered and will

9  continue to suffer loss of money and property including but not limited to lost business and

10  potential bankruptcy.  Although LinkedIn was restrained by a preliminary injunction, hiQ has

11  suffered severe, irreparable harm in that it was forced to terminate the contracts with its clients and

12  has largely been forced out of business entirely.

13        96.    hiQ has no adequate remedy at law because monetary damages will not afford

14  adequate relief for the loss of hiQ's business relationships, client goodwill, and ability to continue

15  operating.

16        97.    Plaintiff prays for relief as set forth below.

17                      **EIGHTH CLAIM FOR RELIEF**

18            **Unlawful Competition In Violation Of Cal. Bus. Prof. Code § 17200, _et seq._**

19        98.    Absent injunctive relief, hiQ will suffer loss of money or property and an economic

20  injury in fact, specifically being forced to terminate contracts with its customers and likely close

21  its business and lay off its employees, and thus has standing to seek relief under section 17200.

22        99.    LinkedIn's actions establish a claim of unlawful competition on multiple grounds.

23  LinkedIn's tortious interference with hiQ's current and prospective contractual and business

24  relationships give rise to a claim under the "unlawful" business practices prong of the UCL.

25        100.    As a direct and proximate result of LinkedIn's conduct, hiQ has suffered and will

26  continue to suffer damages including but not limited to lost business and potential bankruptcy.

27  Although LinkedIn was restrained by a preliminary injunction, hiQ has suffered severe, irreparable

28  harm in that it was forced to terminate the contracts with its clients and has largely been forced out

AMENDED COMPLAINT

Case No. 3:17-cv-03301-EMC

1    of business entirely.

2        101.    hiQ has no adequate remedy at law because monetary damages will not afford

3    adequate relief for the loss of hiQ's business relationships, client goodwill, and ability to continue

4    operating.

5        102.    hiQ prays for relief as set forth below.

6                              **NINTH CLAIM FOR RELIEF**

7        **Fraudulent Competition In Violation of Cal. Bus. Prof. Code § 17200, *et seq.***

8        103.    Absent injunctive relief, hiQ will suffer loss of money or property and an economic

9    injury in fact, specifically being forced to breach contracts with its customers and likely close its

10   business and lay off its employees, and thus has standing to seek relief under section 17200.

11       104.    LinkedIn's actions constitute fraudulent competition.  LinkedIn made a clear

12   promise that members' profile pages would be "public."  LinkedIn guarantees members that *the*

13   *members* "control the visibility and reach of [their] LinkedIn profile."  The User Agreement tells

14   each member that "*you* own the content and information that you submit," and "you are granting

15   LinkedIn [only a] non-exclusive license."  It further provides, "Members and/or Visitors *may*

16   *access and share your content and information, consistent with your settings and degree of*

17   *connection with them*."  These statements are likely to deceive the public, as LinkedIn is now

18   taking the position that it has the ability to control who can access member profiles and which

19   information will be public.

20       105.    hiQ reasonably relied to its detriment on LinkedIn's promises of public access and

21   LinkedIn's participation at hiQ conferences in building its business around those public profiles.

22       106.    As a direct and proximate result of LinkedIn's conduct, hiQ has suffered and will

23   continue to suffer economic injury including but not limited to lost business and potential

24   bankruptcy.  Although LinkedIn was restrained by a preliminary injunction, hiQ has suffered

25   severe, irreparable harm in that it was forced to terminate the contracts with its clients and has

26   largely been forced out of business entirely.

27       107.    hiQ has no adequate remedy at law because monetary damages will not afford

28   adequate relief for the loss of hiQ's business relationships, client goodwill, and ability to continue

1  operating.

2          108.    hiQ prays for relief as set forth below.

3                          **TENTH CLAIM FOR RELIEF**

4                  **Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2**

5          109.    hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

6  though fully set forth herein.

7          110.    LinkedIn has willfully acquired and maintained monopoly power in the relevant

8  markets for professional social networking platforms and people analytics.

9          111.    LinkedIn possesses monopoly power in the relevant markets for professional social

10  networking platforms and people analytics.  LinkedIn has the power to control prices or exclude

11  competition in the relevant markets.

12          112.    LinkedIn has willfully acquired and maintained monopoly power in the relevant

13  markets, by means of predatory, exclusionary, and anticompetitive conduct, including but not

14  limited to leveraging, lock-in, raising rivals' costs, tying, unilateral refusal to deal, denial of

15  essential facilities, and vertically-arranged boycotts, as alleged herein.

16          Leveraging

17          113.    LinkedIn has monopoly power in the relevant market for professional social

18  networking platforms.

19          114.    LinkedIn has used its monopoly power in that relevant market in a predatory,

20  exclusionary, and anticompetitive manner to monopolize the people analytics services market and

21  exclude competitors from that market, including but not limited to by means of lock-in, raising

22  rivals' costs, tying, unilateral refusal to deal, denial of essential facilities, and vertically-arranged

23  boycotts.

24          115.    LinkedIn has used its monopoly power to monopolize the relevant market for

25  people analytics services.

26          Lock-in

27          116.    LinkedIn lured users desiring professional social networking services into joining

28  LinkedIn with the promise that their employment information remained their own and could be

AMENDED COMPLAINT                                        Case No. 3:17-cv-03301-EMC

1  publicly shared and accessed.  Prospective LinkedIn users had no reason to doubt these promises

2  and, for years, LinkedIn kept to the promises as it grew its professional social network platform.

3  At a certain point, LinkedIn's growth and dominance became self-reinforcing, meaning that users

4  needed to stay a part of its professional social network platform, or else be excluded from the

5  largest and most useful professional social network in the world.

6        117.  Similarly, LinkedIn promised prospective employer members that they could

7  access users' public employment information without restriction.  This helped grow LinkedIn's

8  professional social network platform until, as described above, it became self-reinforcing and

9  employer members were locked into the network.

10        118.  Once users were locked into its professional social network platform, LinkedIn

11  utilized the power that lock-in conferred in order to advantage itself to the exclusion of its people

12  analytics competitors, as described herein.

13        119.  LinkedIn's actions, based on the lock-in it obtained via its promises regarding

14  users' ability to make and share their employment information publicly, have impeded its

15  competitors' ability to compete in the people analytics market.

16        <u>Raising rivals' costs</u>

17        120.  LinkedIn has monopoly power in the relevant market for professional social

18  networking platforms.  A major part of that monopoly power derives from LinkedIn's access to

19  and control over the employment information its members choose to post on LinkedIn's

20  professional social network platform.

21        121.  By foreclosing people analytics competitors' access to the public employment

22  information database on its site, LinkedIn raised those competitors' costs to do business.  It did so

23  by completely preventing them from obtaining the raw data they needed to provide people

24  analytics services, and/or, on information and belief, obtaining such raw data only through

25  prohibitively expensive means.

26        122.  LinkedIn's people analytics competitors had no choice in the face of their raised

27  costs (*i.e.*, the dramatic reduction in the quality of their services) but to either dramatically reduce

28  the price of their services, substantially reduce the scope or quality of those services, or cease

1    providing those services entirely.

2        123.    LinkedIn's conduct has affected a not insubstantial amount of interstate commerce
3    in the provision of people analytics services.

4        124.    LinkedIn's conduct has had an anticompetitive effect in the relevant market for
5    people analytics services.

6        Tying arrangements

7        125.    The provision of a professional social networking platform and people analytics
8    services are two separate services or products.

9        126.    LinkedIn has conditioned the provision of its dominant professional social
10   networking platform on the use of its people analytics services (or the non-use of its competitors'
11   people analytics services).

12       127.    LinkedIn has sufficient economic power in the relevant market for professional
13   social networking platforms to enable it to restrain trade in the relevant market for people analytics
14   services.

15       128.    LinkedIn's conduct has affected a not insubstantial amount of interstate commerce
16   in the provision of people analytics services.

17       129.    LinkedIn's conduct has had an anticompetitive effect in the relevant market for
18   people analytics services.

19       Unilateral refusal to deal

20       130.    LinkedIn has monopoly power in the relevant market for professional social
21   networking platforms.

22       131.    For years, LinkedIn engaged in a voluntary and profitable course of dealing with
23   hiQ and other people analytics providers that it then unilaterally terminated in 2017.

24       132.    Following its unilateral termination of the profitable course of dealing between it
25   and hiQ (and other people analytics providers), LinkedIn refused to provide hiQ or other people
26   analytics providers access to the public employment information database.

27       133.    Despite its refusal to permit hiQ or other people analytics competitors access to the
28   public employment information database, LinkedIn provides unfettered access to that same

AMENDED COMPLAINT                                                    Case No. 3:17-cv-03301-EMC

1   database to non-competitor companies, including but not limited to Google and Bing.

2   134.   LinkedIn had no other purpose to unilaterally cut off and refuse hiQ future access

3   to the public employment information database than to eliminate competition in the relevant

4   market for people analytics services.

5   135.   LinkedIn's conduct has had an anticompetitive effect in the relevant market for

6   people analytics services.

7   Denial of access to an essential facility

8   136.   LinkedIn has monopoly power in the relevant market for professional social

9   networking platforms.  A major part of that monopoly power derives from LinkedIn's access to

10  and control over the employment information its members choose to post on LinkedIn's

11  professional social network platform.

12  137.   The ability to share employment information publicly is a key reason LinkedIn's

13  professional social network platform exists in the form and scope it does today.  That public

14  employment information database has become an essential facility.

15  138.   Due to the self-reinforcing nature of LinkedIn's professional social network,

16  competitors have been, and remain, unable to replicate LinkedIn's essential public employment

17  information database facility.

18  139.   Absent a court-ordered injunction, LinkedIn refuses to permit hiQ or, on

19  information and belief, other people analytics competitors access to its essential facility.

20  140.   As the long, profitable course of dealing between LinkedIn and hiQ demonstrates,

21  providing access to the essential public employment information database facility is feasible.

22  141.   LinkedIn's conduct has had an anticompetitive effect in the relevant market for

23  people analytics services.

24  Vertically-arranged boycotts

25  142.   LinkedIn has induced, coerced, or otherwise forced LinkedIn members (including

26  without their knowledge) to boycott LinkedIn's competitors for the people analytics services.

27  143.   LinkedIn's conduct has foreclosed access to the public employment information

28  database under its control, which is necessary to enable LinkedIn's people analytics competitors to

AMENDED COMPLAINT                                          Case No. 3:17-cv-03301-EMC

1   compete.

2       144.    LinkedIn possesses a dominant position in the relevant market for professional

3   social networking platforms and, now, in the market for people analytics services.

4       145.    LinkedIn's conduct is not justified, because its conduct is not intended to enhance

5   overall efficiency and to make the relevant market more efficient.

6       146.    LinkedIn's conduct has had a substantial effect on interstate commerce.

7       147.    hiQ has been and will be in their property as a result of LinkedIn's conduct.

8       148.    hiQ has suffered and will suffer injury of the type that the antitrust laws were

9   intended to prevent.  hiQ has been and will be injured by the harm to competition as a result of

10  LinkedIn's conduct.

11                          **ELEVENTH CLAIM FOR RELIEF**

12          **Attempted Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2**

13      149.    hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

14  though fully set forth herein.

15      150.    With respect to the relevant market for people analytics services, LinkedIn has

16  engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to

17  leveraging, lock-in, raising rivals' costs, tying, unilateral refusal to deal, denial of essential

18  facilities, and vertically-arranged boycotts.

19      151.    LinkedIn's conduct has had an anticompetitive effect in the relevant market for

20  people analytics services.

21      152.    LinkedIn's conduct has no legitimate business purpose or procompetitive effect.

22      153.    LinkedIn has engaged in that conduct with the specific intent of monopolizing the

23  relevant market for people analytics services.

24      154.    LinkedIn has engaged in that conduct with a dangerous probability of

25  monopolizing the relevant market for people analytics services.

26      155.    LinkedIn's conduct has had a substantial effect on interstate commerce.

27      156.    hiQ has been and will be injured in its property as a result of LinkedIn's conduct.

28      157.    hiQ has suffered and will suffer injury of the type that the antitrust laws were

AMENDED COMPLAINT                                    Case No. 3:17-cv-03301-EMC

1    intended to prevent.  hiQ has been and will be injured by the harm to competition as a result of

2    LinkedIn's conduct.

3                 **TWELFTH CLAIM FOR RELIEF**

4               **Sherman Act, Section 1, 15 U.S.C. § 1**

5        158.    hiQ hereby incorporates by reference the allegations of the preceding paragraphs as

6    though fully set forth herein.

7        159.    As alleged above, LinkedIn and its members have entered into contracts or

8    combinations that have the effect of unreasonably restraining trade, controlling prices or excluding

9    competition, and willfully acquiring and maintaining LinkedIn's monopoly power in the relevant

10    markets for professional social networking platforms and people analytics services.

11        160.    As alleged above, LinkedIn has induced or coerced its members to enter into

12    contracts or combinations that have the effect of unreasonably restraining trade, controlling prices

13    or excluding competition, and willfully acquiring and maintaining LinkedIn's monopoly power in

14    the relevant markets for professional social networking platforms and people analytics services.

15        161.    As alleged above, LinkedIn has conditioned the provision of its professional social

16    networking platform on the boycotting of competing people analytics service providers and the

17    use of LinkedIn's people analytics services.

18        162.    These contracts, combinations, or conspiracies include but are not limited to tying

19    arrangements and vertically-arranged boycotts.

20        163.    LinkedIn's conduct has had an anticompetitive effect in the relevant market for

21    people analytics services.

22        164.    LinkedIn's conduct has no legitimate business purpose or procompetitive effect.

23        165.    There are less restrictive alternatives to the restraints LinkedIn imposed on the

24    relevant markets for professional social networking platforms and people analytics services.

25        166.    LinkedIn's conduct has had a substantial effect on interstate commerce.

26        167.    hiQ has been and will be injured in its property as a result of LinkedIn's conduct.

27        168.    hiQ has suffered and will suffer injury of the type that the antitrust laws were

28    intended to prevent.  hiQ has been and will be injured by the harm to competition as a result of

1 | LinkedIn's conduct.

2 | **PRAYER FOR RELIEF**

3 | WHEREFORE, Plaintiff hiQ prays for judgment against Defendant LinkedIn as follows:

4 | A. For preliminary injunctive relief, to prevent LinkedIn from curtailing hiQ's access to
5 | LinkedIn member public profiles;

6 | B. For a declaration that LinkedIn is now and shall remain obligated to continue to permit
7 | hiQ to access and use data from public LinkedIn member public profiles;

8 | C. For a declaratory judgment that hiQ has not violated the DMCA, CFAA, or California
9 | Penal Code § 502(c) or committed common law trespass;

10 | D. Any direct damages proximately caused by LinkedIn's conduct described herein;

11 | E. Any consequential damages proximately caused by LinkedIn's conduct described
12 | herein;

13 | F. Trebled damages proximately caused by LinkedIn's anticompetitive conduct pursuant
14 | to the above causes of action that permit trebled damages;

15 | G. Punitive damages;

16 | H. hiQ's attorneys fees and costs incurred in pursuing these claims as permitted by law;

17 | I. Pre-judgment and post-judgment interest; and

18 | J. For such other and further relief as the Court deems just and proper.

19 |

20 | Dated: February 14, 2020

QUINN EMANUEL URQUHART &
SULLIVAN LLP

22 | By: */s/ Corey Worcester*
Corey Worcester

Attorneys for Plaintiff hiQ Labs

AMENDED COMPLAINT

Case No. 3:17-cv-03301-EMC