DONALD B. VERRILLI, JR. (*pro hac vice*)
donald.verrilli@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
Washington, D.C. 20004
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

JONATHAN H. BLAVIN (SBN 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (SBN 220769)
rose.ring@mto.com
NICHOLAS D. FRAM (SBN 288293)
nicholas.fram@mto.com
MARIANNA MAO (SBN 318070)
marianna.mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendant LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-CV-03301-EMC |
| Plaintiff, | **LINKEDIN CORPORATION'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| vs. | |
| LinkedIn Corporation, | Judge: Hon. Edward M. Chen |
| Defendant. | Hearing Date: August 6, 2020 |
| | Hearing Time: 1:30 p.m. |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND AND PROCEDURAL HISTORY ......................................................2

    A.     LinkedIn Protects Member Privacy And Prohibits Scraping Of Member Data............2

    B.     hiQ Provides Employers With "Business Intelligence" About Their Employees ........................................................................................................3

    C.     LinkedIn Tells hiQ To Abide By The User Agreement And Stop Scraping ...............4

    D.     The Court Grants hiQ's Motion For A Preliminary Injunction And hiQ Amends Its Complaint Following An Appeal To The Ninth Circuit ........................5

III.    LEGAL STANDARD ..........................................................................................7

IV.     ALL OF HIQ'S CLAIMS FOR DAMAGES SHOULD BE DISMISSED ............................7

    A.     The *Noerr-Pennington* Doctrine Bars hiQ's Damages Claims .............................7

    B.     hiQ Does Not Plead And Cannot Avail Itself Of The Limited "Sham" Exception........................................................................................................9

    C.     The Litigation Privilege Bars hiQ's Damages Claims ......................................11

V.      HIQ FAILS TO STATE A SHERMAN ACT MONOPOLIZATION CLAIM.....................12

    A.     hiQ Does Not And Cannot Allege Antitrust Injury..........................................13

    B.     hiQ Fails To Define The Relevant Antitrust Product Market ..............................15

        1.     hiQ's Proposed "People Analytics" Market Is Facially Unsustainable ..........15

        2.     A Market Defined By The Quality Of A Product Is Improper .......................17

        3.     hiQ Cannot Allege That LinkedIn Has Monopoly Power............................19

    C.     hiQ Fails To Allege Anticompetitive Conduct Under Any Antitrust Theory............20

        1.     LinkedIn Has No Duty To Deal With hiQ ...................................................21

            (a)     Companies Generally Have No Duty To Deal ...................................21

            (b)     hiQ Cannot Avail Itself Of The Aspen Skiing Exception ..................22

        2.     LinkedIn's Website Is Not An Essential Facility.........................................26

        3.     hiQ's Remaining Monopolization Theories Are Nonsensical .......................27

VI.     HIQ'S ATTEMPTED MONOPOLIZATION CLAIM FAILS ........................................29

-i-

# TABLE OF CONTENTS
### (Continued)

Page

VII.  HIQ'S SHERMAN ACT SECTION ONE CLAIM FAILS...................................................30

VIII. CONCLUSION ...........................................................................................................30

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
    263 F.3d 239 (3d Cir. 2001) .................................................................................................9

*Aerotec International, Inc. v. Honeywell International, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ........................................................................12, 22, 23, 26

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ...........................................................................................26

*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...........................................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ...............................................................................22, 23, 24, 27

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) .........................................................................................................14

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................................7

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) .........................................................................................15

*Brooke Group Ltd. v. Brown & Williamson Corp.*,
    509 U.S. 209 (1993) .........................................................................................................12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) .........................................................................................................13

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
    208 F.3d 885 (10th Cir. 2000) ...........................................................................................8

*Cargill Inc. v. Budine*,
    2007 WL 2506451 (E.D. Cal. Aug. 30, 2007) ................................................................20

*Carr v. Beverly Health Care & Rehabilitation Servs., Inc.*,
    2013 WL 5946364 (N.D. Cal. Nov. 5, 2013) ..................................................................21

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) .....................................................................................13, 29

*ChriMar Systems, Inc v. Cisco Systems, Inc*,
    72 F. Supp. 3d 1012 (N.D. Cal. 2014) ......................................................................29, 30

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*City of Anaheim v. Southern California Edison Co.,*
    955 F.2d 1373 (9th Cir. 1992) ................................................................................27

*Colonial Medical Group, Inc. v. Catholic Healthcare West,*
    2010 WL 2108123 (N.D. Cal. May 25, 2010) ..........................................................15

*Couponcabin LLC v. Savings.com, Inc.,*
    2016 WL 3181826 (N.D. Ind. June 8, 2016) ............................................................11

*Craigslist Inc. v. 3Taps Inc.,*
    942 F. Supp. 2d 962 (N.D. Cal. 2013) .....................................................................10

*Craigslist Inc. v. 3Taps Inc.,*
    964 F. Supp. 2d 1178 (N.D. Cal. 2013) ...................................................................11

*Datel Holdings Ltd. v. Microsoft Corp.,*
    712 F. Supp. 2d 974 (N.D. Cal. 2010) .....................................................................18

*Doe v. Abbott Laboratories,*
    571 F.3d 930 (9th Cir. 2009) ....................................................................................29

*DriveCam, Inc. v. SmartDrive Systems, Inc.,*
    2012 WL 13175930 (S.D. Cal. Mar. 26, 2012) ........................................................10

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992) ..................................................................................................28

*Eastman v. Quest Diagnostics Inc.,*
    724 F. App'x 556 (9th Cir. 2018) .............................................................................28

*Facebook, Inc. v. Power Ventures, Inc.,*
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ..........................................................22

*Facebook, Inc. v. Power Ventures, Inc.,*
    844 F.3d 1058 (9th Cir. 2016) ..................................................................................10

*Fitbit, Inc. v. Laguna 2, LLC,*
    2018 WL 306724 (N.D. Cal. Jan. 5, 2018) ....................................................8, 11, 12

*In re Flonase Antitrust Litigation,*
    795 F. Supp. 2d 300 (E.D. Pa. 2011) .......................................................................10

*Freeman v. Lasky, Haas & Cohler,*
    410 F.3d 1180 (9th Cir. 2005) ....................................................................................7

-iv-

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Garon v. eBay, Inc.*,
    2011 WL 6329089 (N.D. Cal. Nov. 30, 2011) .................................................................19, 22

*General Signal Corp. v. MCI Telecommunications Corp.*,
    66 F.3d 1500 (9th Cir. 1995) ...............................................................................................21

*Genetic Systems Corp. v. Abbott Laboratories*,
    691 F. Supp. 407 (D.D.C. 1988) .........................................................................................28

*Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*,
    433 F. App'x 598 (9th Cir. 2011)........................................................................................15

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust System, Inc.*,
    723 F.3d 1019 (9th Cir. 2013) .............................................................................................13

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
    895 F.2d 1417 (9th Cir. 1990) .............................................................................................18

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018)........................................................................................16, 18

*Huawei Technologies, Co. v. Samsung Electronics Co.*,
    340 F. Supp. 3d 934 (N.D. Cal. 2018) ................................................................................13

*Hydranautics v. FilmTec Corp.*,
    204 F.3d 880 (9th Cir. 2000) ...............................................................................................12

*International Longshore & Warehouse Union v. ICTSI Oregon, Inc.*,
    863 F.3d 1178 (9th Cir. 2017) .............................................................................................10

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016)...............................................................................................18

*JamSports & Entertainment, LLC v. Paradama Productions, Inc.*,
    336 F. Supp. 2d 824 (N.D. Ill. 2004) ..................................................................................26

*Johnson v. United Airlines, Inc.*,
    2016 WL 3626707 (N.D. Cal. July 6, 2016) .........................................................................9

*Kerwin v. Parx Casino*,
    2019 WL 1098949 (E.D. Pa. Mar. 8, 2019) ........................................................................27

*Kottle v. Northwest Kidney Centers*,
    146 F.3d 1056 (9th Cir. 1998) ...........................................................................................8, 9

*LiveUniverse, Inc. v. MySpace, Inc,*
    2007 WL 6865852 (C.D. Cal. June 4, 2007)....................................................23, 24

*LiveUniverse, Inc. v. MySpace, Inc.,*
    304 F. App'x 554 (9th Cir. 2008)........................................................................24

*Med Vets Inc. v. VIP Petcare Holdings, Inc.,*
    2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) ...............................................15, 19

*Menzel v. Scholastic, Inc.,*
    2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ..................................................7, 14

*MetroNet Services Corp. v. Qwest Corp.,*
    383 F.3d 1124 (9th Cir. 2004).......................................................................24, 25, 26

*Midwest Gas Services, Inc. v. Indiana Gas Co.,*
    317 F.3d 703 (7th Cir. 2003)..............................................................................26

*Morales v. Cooperative of American Physicians, Inc., Mutual Protection Trust,*
    180 F.3d 1060 (9th Cir. 1999).............................................................................11

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
    924 F.2d 1484 (9th Cir. 1991).............................................................................16

*Newcal Industries, Inc. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008).............................................................................15

*Norcen Energy Resource Ltd. v. Pacific Gas & Elec. Co.,*
    1994 WL 519461 (N.D. Cal. Sept. 19, 1994).....................................................29

*NorthBay HealthCare Group, Inc. v. Kaiser Foundation Health Plan, Inc.,*
    305 F. Supp. 3d 1065 (N.D. Cal. 2018) .............................................................13

*Novell, Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013)..................................................................22, 23, 27

*NSS Labs, Inc. v. Symantec Corp.,*
    2019 WL 3804679 (N.D. Cal. Aug. 13, 2019)...................................................16

*Ohio v. American Express Co.,*
    138 S. Ct. 2274 (2018) ........................................................................................15

*Oregon Natural Resources Council v. Mohla,*
    944 F.2d 531 (9th Cir. 1991)................................................................................9

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.*,
    555 U.S. 438 (2009) ...........................................................................13, 21

*Paladin Associates, Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003)..............................................................29

*PNY Technologies, Inc. v. SanDisk Corp.*,
    2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ......................................20

*Power Analytics Corp. v. Operation Technology, Inc.*,
    2017 WL 11486807 (C.D. Cal. Dec. 7, 2017) .......................................14

*Prime Healthcare Services, Inc. v. Service Employees International Union*,
    2013 WL 3873074 (S.D. Cal. July 25, 2013)........................................20

*QVC, Inc. v. Resultly, LLC*,
    159 F. Supp. 3d 576 (E.D. Pa. 2016) ...................................................11

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995).............................................................19, 20

*Register.com, Inc. v. Verio, Inc.*,
    126 F. Supp. 2d 238 (S.D.N.Y. 2000) ..................................................11

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008)...........................................................19, 28

*Roberts v. Bartels*,
    2013 WL 6173142 (N.D. Cal. Feb. 19, 2013).......................................21

*Rock River Communications, Inc. v. Universal Music Group, Inc.*,
    745 F.3d 343 (9th Cir. 2014)..................................................................7

*Safeway Inc. v. Abbott Laboratories*,
    761 F. Supp. 2d 874 (N.D. Cal. 2011) .................................................29

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ................................................22

*Sheahan v. State Farm General Insurance Co.*,
    394 F. Supp. 3d 997 (N.D. Cal. 2019) .......................................12, 15, 30

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006).......................................................... *passim*

*Spanish Broad. System of Florida, Inc. v. Clear Channel Communications, Inc.*,
    376 F.3d 1065 (11th Cir. 2004)...................................................................................14

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ....................................................................................................29

*Stackla, Inc. v. Facebook Inc.*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019)...........................................................11

*Staley v. Gilead Sciences, Inc.*,
    2020 WL 1032320 (N.D. Cal. Mar. 3, 2020) ........................................................15, 16

*Stewart v. Gogo, Inc.*,
    2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) .............................................................19

*Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
    547 F. Supp. 2d 1086 (C.D. Cal. 2007).......................................................................19

*Sw. Airlines Co. v. Farechase, Inc.*,
    318 F. Supp. 2d 435 (N.D. Tex. 2004).........................................................................11

*Tanaka v. University of Southern California*,
    252 F.3d 1059 (9th Cir. 2001)......................................................................................18

*Tate v. Pacific Gas & Electric Co.*,
    230 F. Supp. 2d 1086 (N.D. Cal. 2002) .......................................................................24

*Theme Promotions, Inc. v. News American Marketing FSI*,
    546 F.3d 991 (9th Cir. 2008)..........................................................................................8

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989)......................................................................................15

*Ticketmaster L.L.C. v. RMG Technologies, Inc.*,
    507 F. Supp. 2d 1096 (C.D. Cal. 2007).......................................................................11

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .............................................................19

*UCP International Co. Ltd. v. Balsam Brands Inc.*,
    420 F. Supp. 3d 966 (N.D. Cal. 2019) .........................................................................10

*UMG Recordings, Inc. v. Glob. Eagle Entertainment, Inc.*,
    117 F. Supp. 3d 1092 (C.D. Cal. 2015)....................................................................9, 12

*Unigestion Holdings, S.A. v. UPM Technology, Inc.*,
    412 F. Supp. 3d 1273 (D. Or. 2019)....................................................17, 23, 25

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) ...........................................................................15, 18

*United States v. Lowson*,
    2010 WL 9552416 (D.N.J. Oct. 12, 2010) ...............................................11

*United Tactical Systems, LLC v. Real Action Paintball, Inc.*,
    2016 WL 524761 (N.D. Cal. Feb. 10, 2016).............................................9

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*,
    31 F.3d 800 (9th Cir. 1994)...................................................................10

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...................................................................... *passim*

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
    2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ........................................17, 18

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000)................................................................10

*William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009).................................................................30

*Woolen v. Surtran Taxicabs, Inc.*,
    801 F.2d 159 (5th Cir. 1986).................................................................14

**STATE CASES**

*Aronson v. Kinsella*,
    58 Cal. App. 4th 254 (1997)..................................................................11

*Blanchard v. DIRECTV, Inc.*,
    123 Cal. App. 4th 903 (2004)................................................................11

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993).........................................................................11

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990)...........................................................................11

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**CONSTITUTIONAL PROVISIONS**

First Amendment.....................................................................................................1, 7, 10

**FEDERAL STATUTES**

Sherman Act § 1, 15 U.S.C. § 1 ................................................................. *passim*

Sherman Act § 2, 15 U.S.C. § 2 ................................................................. *passim*

**STATE STATUTES**

California Business and Professions Code § 17200................................................5

California Civil Code § 47(b)...............................................................................11, 12

**FEDERAL RULES**

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1

**TREATISES**

3 Areeda & Hovenkamp.........................................................................................27

58 Corpus Juris Secundum Monopolies...............................................................26

# NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on August 6, 2020 at 1:30 p.m., or as soon thereafter as may be heard, in Courtroom 5 on the 17th Floor of the above-entitled Court, Defendant LinkedIn Corporation ("LinkedIn") will and hereby does move to dismiss Plaintiff's First Amended Complaint ("FAC"). LinkedIn seeks an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing all of hiQ's damages claims and dismissing hiQ's Sherman Act claims in their entirety.

## I.     INTRODUCTION

hiQ sued LinkedIn in 2017 after LinkedIn sent it a cease-and-desist letter demanding that it stop harvesting LinkedIn member data en masse without permission from LinkedIn or its members. hiQ now claims this letter somehow "effectively eviscerated" its business, even though hiQ has had unfettered access to the LinkedIn website since June 2017. With different counsel but the same old factual allegations, hiQ also now asserts newly-minted federal antitrust claims, seeking to transform this case from one about harm to a putative competitor to purported harm to competition in an elusive and ill-defined "people analytics" market. hiQ's First Amended Complaint consists of revisionist history, and its untenable legal claims should be dismissed.

At the outset, all of hiQ's claims for damages (including those it asserts under state tort law) should be dismissed because they are all predicated on LinkedIn's cease-and-desist letters. Under the Petitioning Clause to the First Amendment and the *Noerr-Pennington* doctrine, as well as the California litigation privilege, LinkedIn's letters are protected petitioning activity that cannot serve as the basis for any damages liability.

Moreover, all of hiQ's new federal antitrust claims should be dismissed as well. In the face of controlling precedent foreclosing an antitrust duty to deal claim, hiQ told the Ninth Circuit that "the basis for hiQ's claim is not a refusal to deal by LinkedIn." But now, hiQ asserts that LinkedIn has harmed competition under several novel (and unfounded) theories, all of which are predicated on LinkedIn's refusal to provide hiQ access to its servers. The antitrust laws, however, do not permit claims based on others' exercise of their legal rights or unwillingness to give away the fruits of their investments on terms that would harm their goodwill with their users. hiQ does not—and cannot—plead any of the elements of a federal antitrust claim.

*First*, hiQ's only allegations of harm to *competition*, as oppose to harm to itself, are that LinkedIn sent cease-and-desist letters to other unidentified "people analytics" companies. But even if the Court credits these conclusory allegations—which are repeatedly pled on information and belief, without factual support, and without naming a single recipient—such letters are likewise protected and not actionable under the *Noerr-Pennington* doctrine.

*Second*, hiQ utterly fails to define the "people analytics" market. It does not name a *single other company or product* in that market; does not identify any product *LinkedIn* has in that market; and does not allege that LinkedIn has any market power (the ability to raise prices or restrict output).

*Third*, hiQ has not alleged that LinkedIn engaged in any anticompetitive conduct. Although hiQ attempts to cast LinkedIn's conduct as anticompetitive under *seven* different monopolization theories, they are all a variant of the duty to deal theory that hiQ abandoned at the Ninth Circuit. Even if hiQ were allowed to assert a duty to deal claim, LinkedIn has no duty to deal with hiQ under the Sherman Act, and hiQ cannot avail itself of any of the narrow exceptions to this settled rule.

At bottom, hiQ claims that LinkedIn crushed an entire market by sending two cease-and-desist letters to hiQ. But hiQ lacks the factual allegations to support this sweeping and nonsensical assertion, and with good reason: LinkedIn did not damage competition in a "people analytics" market, a "market" that hiQ invented and gerrymandered for litigation, or any other market. This is a classic case of overreach. For the reasons that follow, the Court should dismiss all of hiQ's claims for damages (under both the Sherman Act and state tort law), and all of hiQ's Sherman Act claims.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    LinkedIn Protects Member Privacy And Prohibits Scraping Of Member Data

LinkedIn is a social networking service that allows its members to create, manage, and share their professional identities and interests online. (FAC ¶ 2.) Members post information such as skills, education, and employment history to their profiles, which LinkedIn stores on its servers. (*Id.* ¶¶ 23, 28.) Through LinkedIn's hard work and significant investment in its platform, it has grown from having zero members at its founding in 2003 to over 660 million members today. (*Id.* ¶ 22.)

Earning members' trust has been critical to LinkedIn's growth. (*Id.* ¶ 26.) The LinkedIn User Agreement and Privacy Policy—both attached to the complaint (*id.* Exs. 1 & 6)—set the basic

terms for using LinkedIn.  The User Agreement, which applies to anybody who accesses LinkedIn's website—whether or not they are a member (*id.* Ex. 1 at 2)—sets limits on access to and use of LinkedIn's site in order to keep the platform professional and free from abuse.  As is relevant here, LinkedIn prohibits "scrap[ing] the Services," "circumvent[ing] any access controls or use limits," or "[u]s[ing] bots or other automated methods to access the Services."  (*Id.* at 19-20.)  hiQ has never disputed that it consented to the User Agreement and was aware of LinkedIn's anti-scraping terms.  And, regardless, LinkedIn's May 23, 2017 cease-and-desist letter to hiQ gave hiQ further, actual notice that access to LinkedIn's website is predicated on adhering to these terms.  (*Id.* Ex. 4 at 2.)  The Privacy Policy makes a number of commitments to members about what LinkedIn can and cannot do with the data they post to the website, including promising that LinkedIn will delete their information if they wish to close their accounts.  (*Id.* Ex. 6 at 26.)

## B.    hiQ Provides Employers With "Business Intelligence" About Their Employees

hiQ alleges that it "developed 'people analytics'" services to provide employers with "in-depth, predictive insights into their work force."  (FAC ¶ 33.)  hiQ offers two distinct products, "Keeper" and "Skill Mapper."  "Keeper" "tells employers which of their employees are at the greatest risk of being recruited away," by considering factors such as how frequently an employee updates her LinkedIn profile.  (*Id.*)  "Skill Mapper" summarizes "the breadth and depth of aggregate or individual skills of current or prospective employees."  (*Id.*)  hiQ, thus, has "two specific analytic services" with two different purposes and applications.  (*Id.*)

hiQ "originally used other [non-LinkedIn] data sources for its analyses, but found over time that using only the LinkedIn public database provided better levels of predictive accuracy."  (FAC at 13 n.2.)  hiQ contends that LinkedIn "knew" of hiQ and "understood what hiQ [did]" solely because a handful of LinkedIn's thousands of employees attended one or more conferences sponsored by hiQ.  (*Id.* ¶¶ 5, 37.)  hiQ does not allege, however, that it ever sought to negotiate any affirmative agreement with LinkedIn to access member data, or directly told LinkedIn it was scraping its site to extract such data.  (Nor has hiQ ever disputed that it was using anonymous IP addresses to cloak its identity to LinkedIn (ECF No. 29 ¶ 32).)  hiQ also does not allege that it ever obtained consent from or notified the LinkedIn members whose data hiQ routinely mined from LinkedIn's servers.

## C. **LinkedIn Tells hiQ To Abide By The User Agreement And Stop Scraping**

Despite a lack of consent from LinkedIn or its members, hiQ made the conscious choice to build its company around scraped LinkedIn member data. This was a business model fraught with the obvious and inherent risk that LinkedIn could enforce its terms of use against hiQ. That is exactly what happened on May 23, 2017, when LinkedIn sent hiQ a cease-and-desist letter demanding that hiQ stop scraping members' personal data from LinkedIn's website, and asserting that such activity violated the User Agreement as well as various federal and state laws. (FAC Ex. 4.) LinkedIn warned hiQ that, because of its breach of the User Agreement and data harvesting, future access to the site would be "without authorization," and that LinkedIn had technical measures in place that detect and block automated access. (*Id.* at 2.)

hiQ filed its original complaint and a concurrent application for a temporary restraining order on June 7, 2017, two weeks after receiving LinkedIn's letter. (ECF Nos. 1, 3.) The original complaint, drafted by hiQ's former counsel, alleged that hiQ voluntarily stopped accessing LinkedIn after receiving the cease-and-desist because it did not wish to incur liability under the Computer Fraud and Abuse Act ("CFAA"). (ECF No. 1 ¶ 34 ("hiQ thus has a real . . . apprehension that it will be subject to liability" if it continues to access the website on account of LinkedIn's cease-and-desist letter; *see also* FAC ¶ 61 (same).)[1] Not once did hiQ allege that it was ever blocked by LinkedIn's technical measures, nor could it, as hiQ's data harvesting required successfully evading them.

What happened next is curiously absent from hiQ's amended complaint, but appears on the face of records in this case of which the Court can take judicial notice. On June 9, the parties reached a temporary standstill agreement whereby "LinkedIn agreed to allow hiQ to continue to function . . . as it had been doing before the cease and desist letter was sent by LinkedIn." (ECF No. 23-3, Gupta Decl. ¶ 8.) This first standstill agreement expired on June 23, 2017, after the parties were unable to resolve the case amicably. (*Id.* ¶ 10.) On June 24, 2017 LinkedIn sent a second cease-and-desist letter, again revoking hiQ's access to LinkedIn's website. (FAC ¶ 43.)

---

[1] *See also* ECF No. 46, at 3:9-11 (hiQ counsel stating that "the CFAA invoked criminal liability, and so [hiQ] cannot access the public data until there's a declaration from [the Court] that it's safe for them to be doing that"); ECF No. 48, at 15 (hiQ brief: "[it] is only those statutes, enforced by threat of criminal liability, that prevent hiQ from continuing to access public information on the site").

The FAC alleges that LinkedIn implemented "technological means that could determine when hiQ accessed the public database" (i.e., IP address blocks), thereby preventing hiQ from obtaining "data LinkedIn's members made publicly available." (FAC ¶ 44.) LinkedIn implemented IP address blocks on June 24, the same day it sent the second letter. (ECF No. 29 ¶ 31.) But the FAC completely ignores that LinkedIn lifted those blocks *on June 30*—a mere *six days* later. LinkedIn agreed to restore hiQ's access pending the resolution of hiQ's preliminary injunction motion in Court, on the record, on June 29 (ECF No. 46 at 6:6-9), and then memorialized this in a stipulation filed with the Court the very next day. (ECF No. 44 ¶ 1 ("During the standstill period, hiQ will be able to access the LinkedIn site … and LinkedIn will withdraw its current IP address blocks.").) The FAC, however, misleadingly implies that access was not restored to hiQ until August 14, 2017, when the Court granted hiQ's motion for a preliminary injunction (FAC ¶ 45).

In sum, hiQ voluntarily refrained from accessing LinkedIn's website from May 23 to June 9, 2017 following the receipt of LinkedIn's first letter, and, at most, LinkedIn's hiQ-targeted technical measures (IP address blocks) prevented hiQ from accessing LinkedIn's site from June 24 to June 30, 2017—a mere six days.[2] There is no allegation in the complaint that hiQ required access to LinkedIn's site during this six-day period, or that hiQ lost any customers because it could not access the site then. hiQ has had access to LinkedIn's website since June 30, 2017.

**D.** **The Court Grants hiQ's Motion For A Preliminary Injunction And hiQ Amends Its Complaint Following An Appeal To The Ninth Circuit**

hiQ's theory for relief was, and remains that LinkedIn caused it harm by threatening it with liability if it continued to scrape data from LinkedIn's website. (FAC ¶¶ 11-12.) To remedy this supposed wrong, hiQ's original complaint alleged several causes of action under California tort and constitutional law, including intentional interference with contract and prospective business relations, unfair competition under California Business and Professions Code § 17200 ("UCL"), promissory estoppel, and a violation of the free speech clause of the California Constitution. (ECF

---

[2] hiQ's suggestion that these IP address blocks in fact prevented hiQ's access is highly dubious, and, at a minimum, is in tension with statements made by hiQ's prior counsel in Court indicating that hiQ had not *attempted* to access the site at all after June 24 (not that it was blocked from doing so). (*See* ECF No. 46, at 52:14-16 (hiQ's counsel stating that "They *claim* they put up a block on the 24th of June . . . . We *have not accessed the site since that date*." (emphases added)).)

No. 1 ¶¶ 49-101.)  hiQ also asserted four declaratory relief claims, seeking rulings that its conduct did not violate the CFAA or the Digital Millennium Copyright Act, and did not constitute a breach of its contract with LinkedIn or state law trespass.  (*Id.* ¶¶ 32-48.)

On August 14, 2017, the Court granted hiQ's motion for a preliminary injunction.  (ECF No. 63.)  The Court rejected hiQ's free speech and promissory estoppel claims (which hiQ has dropped from its FAC), but concluded that hiQ had demonstrated "serious questions" as to its UCL claim. The Court held there was "some evidence" that "LinkedIn's decision to revoke hiQ's access to its data was made for the purpose of eliminating hiQ as a competitor in the data analytics field, and thus potentially 'violates the policy or spirit' of the Sherman Act."  (*Id.* at 23.)  The Court did not hold that hiQ had stated a claim under the Sherman Act itself.  The Court also held that LinkedIn could not invoke the CFAA to prevent hiQ from coming onto its servers.

The Ninth Circuit affirmed this Court's grant of a preliminary injunction, but on different grounds.  It explicitly did "not reach hiQ's [UCL] claim," and did not address the Sherman Act, but held that hiQ had demonstrated "at least serious questions going to the merits of its tortious interference with contract claim."  (ECF No. 114 at 24.)

On remand, hiQ filed its FAC on February 14, 2020.  The factual allegations in the FAC are almost identical to those in the original complaint, but the FAC adds causes of action for monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and horizontal restraint of trade in violation of Section 1, 15 U.S.C. § 1.  hiQ's basic Sherman Act theory is that LinkedIn has market power in a "professional social networking platform" market,[3] and is using that power to obtain a competitive advantage in a "people analytics" market.  (FAC ¶¶ 6-11.)  hiQ does not explain what LinkedIn's market share is in such a "people analytics" market, what product LinkedIn offers, or what LinkedIn's pricing practices have been. Instead, it offers labels and conclusions that LinkedIn "wants to dominate" or "completely dominates" this "people analytics" market.  (*Id.* at 18 n.4; *id.* ¶ 55.)  Moreover, the only allegations about conduct that led to market-wide harm are that LinkedIn sent cease-and-desist letters to

---

[3] Though not squarely relevant to the arguments raised in this Motion, LinkedIn strongly disputes hiQ's allegations regarding a purported "professional social networking platform" market.  LinkedIn

"people analytics providers throughout the industry." (*Id.* ¶ 46.) hiQ makes these allegations on "information and belief" and concedes that it has not seen a single one of these supposed letters. (*Id.*) It also does not identify a single company that competes in the "people analytics" market or that was driven from the market because of LinkedIn's supposed anticompetitive behavior.

## III.   LEGAL STANDARD

To survive a motion to dismiss, a plaintiff has an "obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory allegation[s] based on information and belief remain[] insufficient under *Iqbal/Twombly*." *Menzel v. Scholastic, Inc.*, 2018 WL 1400386, at *2 (N.D. Cal. Mar. 19, 2018) (Chen, J.).

## IV.   ALL OF HIQ'S CLAIMS FOR DAMAGES SHOULD BE DISMISSED

The *Noerr-Pennington* doctrine and the California litigation privilege are well-established protections for freedom of access to the courts. Under *Noerr-Pennington*, the Petitioning Clause of the First Amendment precludes liability predicated on filing a lawsuit or conduct incidental to such a filing, including pre-litigation cease-and-desist letters. Similarly, the litigation privilege protects pre-litigation cease-and-desist letters that assert claims in contemplation of litigation. hiQ's damages claims under the Sherman Act and state tort law should be dismissed because they are predicated on LinkedIn's cease-and-desist letters, which are protected petitioning conduct.

### A.    The *Noerr-Pennington* Doctrine Bars hiQ's Damages Claims

"The *Noerr–Pennington* doctrine derives from the First Amendment's guarantee of 'the right of the people ... to petition the Government for a redress of grievances.'" *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). "[T]hose who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Id. Noerr-Pennington* protects not only the act of "bringing a lawsuit—that is, petitioning a court," but also "'conduct incidental to' a petition." *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1183–84 (9th Cir. 2005). Thus, "cease-and-desist letters and threats of litigation," are "immune from suit unless the threatened lawsuit was a 'sham.'" *Rock River Commc'ns, Inc. v. Universal Music Grp.,*

disputes that any such market exists or that if it did, LinkedIn has market power in it.

*Inc.*, 745 F.3d 343, 351 (9th Cir. 2014); *Sosa*, 437 F.3d at 937; *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 897–99 (10th Cir. 2000) ("[N]umerous courts have applied *Noerr-Pennington* immunity to claims arising from cease-and-desist letters").

hiQ's claims for damages under its intentional interference theories (counts 5-6) and for violation of the Sherman Act (counts 10-12) derive from the cease-and-desist letters LinkedIn sent that ostensibly "cut off" hiQ's access to LinkedIn's website. (*E.g.*, FAC ¶ 45 ("By sending the cease-and-desist letters and demonstrating it was willing at a moment's notice to cut off hiQ's raw data supply for anticompetitive purposes, LinkedIn effectively eviscerated hiQ's business.").) hiQ alleges that it stopped accessing LinkedIn's website after LinkedIn's May 23, 2017 letter threatened hiQ with liability if it continued to scrape the LinkedIn website. (*Id.* ¶¶ 7, 39; *see also id.* Ex. 5 (hiQ response stating that "LinkedIn's cease and desist request poses an existential threat to hiQ").) hiQ alleges that in its June 24, 2017 letter LinkedIn "reiterate[ed] its demand that hiQ cease and desist" and once again threatened hiQ with liability if it continued to scrape the website. (*Id.* ¶ 43.)

Clearly-established law "do[es] not permit the maintenance of a lawsuit for the sending of a prelitigation demand to settle legal claims that do not amount to a sham." *Sosa*, 437 F.3d at 942. That rule forecloses hiQ's damages claims. *See Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1063 (9th Cir. 1998) (*Noerr* applies to claims "seek[ing] damages ... for conduct'" that is "protected by the First Amendment'"). LinkedIn's letters informed hiQ that scraping its website was not authorized and violated federal and state law and LinkedIn's terms, and sought to resolve the impending dispute before it proceeded to litigation. (FAC Ex. 4.) LinkedIn's letters, thus, were protected activity under *Noerr-Pennington*, and all of hiQ's claims for damages should be dismissed. *See, e.g.*, *Sosa*, 437 F.3d at 937 (collecting cases "that have extended immunity to presuit settlement demands . . . in the context of antitrust suits"); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007–08 (9th Cir. 2008) ("*Noerr–Pennington* bars Theme's intentional interference claims" based on "[p]re-suit letters threatening legal action"); *Fitbit, Inc. v. Laguna 2, LLC*, 2018 WL 306724, at *1 (N.D. Cal. Jan. 5, 2018) (Chen, J.) (dismissing UCL and tortious interference claims predicated on pre-suit demand letter).

hiQ may argue that its damages claims are based not only on LinkedIn's letters but also on

-8-

the targeted technical measures LinkedIn implemented. (FAC ¶ 44.) At the outset, that allegation is in tension with, if not contradicted by, hiQ's statements that "[b]y sending the cease-and-desist letters," "LinkedIn effectively eviscerated hiQ's business," that the "cease and desist request" was what "pose[d] an existential threat to hiQ," and that hiQ stopped accessing the site after receiving the letter. (FAC ¶¶ 45, 7, 39 & Ex. 5.) Indeed, hiQ has long claimed in this case that the *reason* it ceased accessing the site is fear of incurring liability under the CFAA and other laws. (ECF No. 1 ¶ 34; FAC ¶ 61; *supra* at 4 n.1.)[4] It is thus clear that hiQ's alleged "injuries are caused by the act of petitioning." *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir. 2001).

But even if LinkedIn's hiQ-targeted technical measures in fact caused hiQ any harm, they would have stopped hiQ's access for only a six-day period in June 2017. *Supra* at 5. Thus, any claim for damages for lack of access *for any other period* is necessarily based on LinkedIn's letters and should be dismissed. Where a complaint alleges claims for damages based on both protected and non-protected conduct, courts dismiss the claims to the extent that they are premised on activity protected by *Noerr*. *See, e.g.*, *Johnson v. United Airlines, Inc.*, 2016 WL 3626707, at *3–4 (N.D. Cal. July 6, 2016) (assessing allegations paragraph by paragraph in complaint and holding that claims "*to the extent* they are based on the August 2015 letter, are therefore dismissed with prejudice" under *Noerr* (emphasis added)); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2016 WL 524761, at *5–6 (N.D. Cal. Feb. 10, 2016) (same); *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1114–15 (C.D. Cal. 2015) ("interference claims, to the extent premised on the cease-and-desist letter" are barred). The Court should do the same here.

### B. hiQ Does Not Plead And Cannot Avail Itself Of The Limited "Sham" Exception

The only exception to *Noerr-Pennington* immunity arises where a plaintiff alleges with specificity that the defendant's protected activity was a "sham." *Kottle*, 146 F.3d at 1063; *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991). To avail itself of the sham exception, hiQ must plead that LinkedIn's demand lacked objective merit *and* that LinkedIn acted with an illegal motive. *Sosa*, 437 F.3d at 938. "If the suit turns out to have objective merit, the

---

[4] Indeed, as this Court previously noted, hiQ had been successfully "circumvent[ing] … LinkedIn's measures to prevent use of bots and implementation of IP address blocks." (ECF No. 63 at 16.)

plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham." *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994). A threatened lawsuit has objective merit so long as the lawsuit was "arguably warranted by existing law or at the very least [is] based on an objectively good faith argument for the extension, modification, or reversal of existing law." *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1188–89 (9th Cir. 2017) (affirming *Noerr* dismissal, though suit was pursued "even after success became very unlikely").

The Ninth Circuit does "not lightly conclude in any *Noerr-Pennington* case that the litigation in question is objectively baseless, as doing so would leave that action without the ordinary protections afforded by the First Amendment, a result we would reach only with great reluctance." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000). Thus, "the plaintiff must plead the sham litigation exception with specificity" and "[c]ourts can assess the sham litigation exception at the motion to dismiss stage where past proceedings or judicially noticeable facts make it clear that the sham litigation exception does not apply." *UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 981 (N.D. Cal. 2019). Threatened "litigation is not considered a sham so long as at least one claim in the lawsuit has objective merit." *DriveCam, Inc. v. SmartDrive Sys., Inc.*, 2012 WL 13175930, at *3 (S.D. Cal. Mar. 26, 2012); *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 311–12 (E.D. Pa. 2011) (same). Accordingly, hiQ must plead with specificity that *all* of the claims that LinkedIn threatened in its letters were a sham.

hiQ does not and cannot do so. As this Court already acknowledged, the CFAA claim that LinkedIn asserted in its original cease-and-desist letter (FAC Ex. 4 at 2) was "not without basis," and "whether 'access' to a publicly viewable site may be deemed 'without authorization' under the CFAA where the website host purports to revoke permission is not free from ambiguity." (ECF No. 63 at 10 (citing *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962 (N.D. Cal. 2013).)[5] After all, at the time that LinkedIn sent its initial letter, courts throughout the country had permitted website-

---

[5] LinkedIn's cease-and-desist also expressly relied on *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016), which held that Power accessed Facebook's computers "without authorization" once Facebook "issued its written cease-and-desist letter to Power . . . [and] then imposed IP blocks in an effort to prevent Power's continued access." (*Id.* at 1067; FAC Ex. 4 at 2.)

owners to invoke the CFAA to stop third-parties from accessing portions of website that were accessible without a password.[6]  Nor was it objectively baseless for LinkedIn to assert a breach of its User Agreement.  hiQ agreed to the User Agreement's terms, and it is well-established that websites have a strong interest in "decisively polic[ing] the integrity of [their] platforms" by enforcing their terms.  *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at \*6 (N.D. Cal. Sept. 27, 2019).

In sum, hiQ's damages claims should be dismissed because they are based on LinkedIn's pre-litigation demand letters which are protected petitioning conduct under *Noerr-Pennington*.

## C.  The Litigation Privilege Bars hiQ's Damages Claims

California's litigation privilege, Cal. Civ. Code § 47(b), provides an additional and independent ground to dismiss hiQ's state law damages claims.  *See Fitbit*, 2018 WL 306724, at \*9 ("The scope of the *Noerr-Pennington* doctrine is similar to the California litigation privilege.").  Section 47(b) creates an absolute privilege extending to "any communication . . . required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved."  *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990).  Covered communications are protected from liability for "all torts except malicious prosecution," regardless of alleged "motives, morals, ethics or intent."  *Id.* at 212, 220.  "Numerous decisions have applied the privilege to prelitigation communications," *Rubin v. Green*, 4 Cal. 4th 1187, 1194–95 (1993), including to pre-litigation demand letters.  *See, e.g.*, *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 270 (1997).  "[A]ny doubt as to whether the privilege applies is resolved in favor of applying it."  *Morales v. Coop. of Am. Physicians, Inc., Mut. Prot. Tr.*, 180 F.3d 1060, 1062 (9th Cir. 1999).

LinkedIn's cease-and-desist letters are protected because its litigation threats were "made with a good faith belief in a legally viable claim and in serious contemplation of litigation."  *Blanchard v. DIRECTV, Inc.*, 123 Cal. App. 4th 903, 919 (2004).  As explained, LinkedIn's claims

---

[6] *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013); *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 595–97 (E.D. Pa. 2016); *Couponcabin LLC v. Savings.com, Inc.*, 2016 WL 3181826, at \*3–4 (N.D. Ind. June 8, 2016); *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 437 (N.D. Tex. 2004); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 244, 251 (S.D.N.Y. 2000); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1102–03, 1113 (C.D. Cal. 2007); *United States v. Lowson*, 2010 WL 9552416, at \*5–7 (D.N.J. Oct. 12, 2010).

were "legally viable" based on existing case law. *See Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 887 (9th Cir. 2000) (litigation privilege "essentially the same" as standard for objective baselessness required to invoke sham exception to *Noerr-Pennington*). And, clearly, hiQ contends that LinkedIn was serious about its threatened litigation—after all, hiQ alleges that the letter precipitated its own need to file suit against LinkedIn. (FAC ¶¶ 61, 65, 69, 73.) Thus, Section 47(b) provides a separate, independent ground for dismissing hiQ's state law damages claims. *See Fitbit*, 2018 WL 306724, at *9 (dismissing claims based on § 47(b)); *UMG Recordings*, 117 F. Supp. 3d at 1115 (same).

## V. HIQ FAILS TO STATE A SHERMAN ACT MONOPOLIZATION CLAIM

Not only are hiQ's federal antitrust claims premised on protected activity, but hiQ also fails to allege critical elements of such claims. To plead a claim for unlawful monopolization under Section 2, hiQ must allege that LinkedIn (1) possesses monopoly power in the relevant market, (2) acquired or maintained monopoly power through exclusionary conduct, and (3) has caused antitrust injury. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Critically, this is a higher standard than pleading a UCL claim, and hiQ must plead far more than that LinkedIn acted unfairly or with anticompetitive intent: "§ 2 of the Sherman Act regulates anti-competitive conduct, not merely anticompetitive aspirations." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016); *see also Brooke Grp. Ltd. v. Brown & Williamson Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition."). hiQ itself has contrasted a federal antitrust claim with its UCL claim. *See* ECF No. 36 at 40, No. 17-16783 (9th Cir.) ("Br.") ("hiQ's claim is under the UCL – not the Sherman Act – and no formal market definition or market power allegations are required.").

hiQ's effort now to transform its UCL allegations into a federal antitrust claim under Section 2 fails for multiple independent reasons. *First*, hiQ fails to allege that it suffered any antitrust injury, or "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the [antitrust] defendants' acts unlawful." *Sheahan v. State Farm Gen. Ins. Co.*, 394 F. Supp. 3d 997, 1011 (N.D. Cal. 2019) (Chen, J.) (quotation marks omitted, alteration in original). In order to plead antitrust injury, a plaintiff must "demonstrate injury to competition in the market as

-12-

a whole, not merely injury to itself as a competitor.'" *Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 955–56 (N.D. Cal. 2018). But hiQ's complaint focuses entirely on harm to itself. hiQ's allegations regarding harm to overall competition merely consist of conclusory statements that LinkedIn supposedly sent cease-and-desist letters to an unidentified group of companies, which is, in any event, protected activity under *Noerr-Pennington*.

*Second*, hiQ fails to define the relevant market, an indispensable element of its claim. hiQ's proffered "people analytics" market is gerrymandered for litigation and hopelessly unclear. hiQ fails to identify *a single competitor* (other than LinkedIn) or *single competing product* offered by LinkedIn or others. Further, hiQ's allegations about its own products show that the market is improperly defined and cannot support any inference that LinkedIn has monopoly power.

*Third*, hiQ has failed to allege that LinkedIn engaged in anticompetitive conduct. hiQ's smorgasbord of antitrust theories boil down to the allegation that LinkedIn had a duty to deal with hiQ on terms that permitted hiQ to scrape LinkedIn's website—a theory hiQ expressly disclaimed before the Ninth Circuit. But the Supreme Court has long instructed courts not to impose an antitrust duty to deal with a putative rival in all but the narrowest of circumstances, none of which apply here. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).

## A. hiQ Does Not And Cannot Allege Antitrust Injury

"The antitrust laws ... were enacted for 'the protection of competition not competitors[.]'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Thus, a federal "antitrust claimant 'must demonstrate injury to competition in the market as a whole, not merely injury to itself as a competitor.'" *Huawei Techs.*, 340 F. Supp. 3d at 955–56 (quoting *Gorlick Distrib. Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013)). The Supreme Court "has often reinforced the principle that the antitrust laws' prohibitions focus on protecting the competitive process and not on the success or failure of individual competitors." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008); *see also NorthBay HealthCare Grp., Inc. v. Kaiser Found. Health Plan, Inc*., 305 F. Supp. 3d 1065, 1073 (N.D. Cal. 2018) (dismissing complaint where plaintiff did "not allege any antitrust injury or harm to competition generally. It alleges injury only to itself.").

-13-

hiQ's *only* allegation of market harm, as opposed to harm to hiQ, is that LinkedIn allegedly sent cease-and-desist "letters" to other unidentified "people analytics" companies. (FAC ¶ 46.) This allegation fails to plead antitrust injury for two reasons. *First*, hiQ makes this allegation solely "on information and belief" (*id.* ¶¶ 11, 46, 47, 54, 139) with no factual support, conceding that it has neither obtained nor even viewed a single such letter. (*Id.* ¶ 46.) hiQ does not say which companies received such letters, what the letters said, what products those companies offered, whether their products used LinkedIn data, or what effect any such letters had on their ability to compete in "people analytics." Nor does hiQ allege *a single product or company* that exited the "people analytics" market because of LinkedIn's alleged letters. Such "conclusory allegation[s] based on information and belief remain[] insufficient under *Iqbal/Twombly*." *Menzel*, 2018 WL 1400386, at *2 (Chen, J.). hiQ thus fails to plead specific facts demonstrating antitrust injury to the market as a whole. *See Power Analytics Corp. v. Operation Tech., Inc.*, 2017 WL 11486807, at *20 (C.D. Cal. Dec. 7, 2017) (dismissing complaint where "allegations in the SAC regarding harm to competition are conclusory"); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072–73 (11th Cir. 2004) ("no 'actual damage to competition' has been sufficiently alleged in the plaintiff's amended complaint").

*Second*, even if hiQ's conclusory allegations of market harm satisfied the *Iqbal/Twombly* standard (which they do not), they allege conduct protected under *Noerr-Pennington*. As noted, the Sherman Act does not impose liability for "litigation-related activities preliminary to the formal filing of the litigation," including cease-and-desist letters. *See Sosa*, 437 F.3d at 937 (approving and listing cases "that have extended immunity to presuit settlement demands . . . in the context of antitrust suits"); *supra* at 7-8. "The *Noerr-Pennington* doctrine provides an exception to antitrust liability," even where the protected petitioning activity "will harm or eliminate competition." *Woolen v. Surtran Taxicabs, Inc.*, 801 F.2d 159, 168 (5th Cir. 1986). Thus, because hiQ's theory of harm to competition is predicated *entirely* on LinkedIn's alleged sending of cease-and-desist letters—protected petitioning activity—hiQ has failed to allege any actionable "injury of the type the antitrust laws were intended to prevent," and its Sherman Act claims should be dismissed. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quotation marks omitted).

-14-

**B.** **hiQ Fails To Define The Relevant Antitrust Product Market**

Not only has hiQ failed to allege harm to competition in the relevant market, but it also has failed to allege the contours of the market in the first place. That is fatal because "[d]etermination of the relevant market is a necessary predicate" to hiQ's monopolization claim. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *accord Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989) ("defining the relevant market is indispensable to a monopolization claim"). hiQ must plead a plausible relevant market because "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018). Courts routinely dismiss antitrust claims at the pleading stage where the plaintiff's market definition is "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *see also Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) ("The failure to allege a product market consisting of reasonably interchangeable goods renders [a complaint] 'facially unsustainable' and appropriate for dismissal").[7] As explained below, this case is a paradigmatic example. Not only has hiQ failed to allege basic facts needed to define the market, but *its own allegations* show that its purported market makes no sense.

### 1. hiQ's Proposed "People Analytics" Market Is Facially Unsustainable

All that hiQ alleges about the shape of the supposed "people analytics" market is that it is national or global in scope (FAC ¶¶ 56-57), and that it encompasses services that use "public information" to provide "insights and other data analytics about" current or prospective employees (*id.* ¶¶ 3, 33.) These allegations are insufficient to define a relevant market for Sherman Act claims.

---

[7] *See also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (dismissing complaint that did not allege "that there are no other goods or services that are reasonably interchangeable with lodging accommodations or ski packages" in proposed market); *Sheahan*, 394 F. Supp. 3d at 1010 (Chen, J.) (same where "Plaintiffs have not clearly alleged what the relevant market is," whether "insurance, data analytics, some combination of both?"); *Staley v. Gilead Sciences, Inc.*, 2020 WL 1032320, at *29 (N.D. Cal. Mar. 3, 2020) (Chen, J.) (same where "it is not clear from the CAC what exactly the cART product market is" and "Plaintiffs have not explained, *e.g.*, how there is reasonable interchangeability of use with respect to different cART drugs."); *Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *4 (N.D. Cal. Apr. 22, 2019) (dismissing antitrust complaint where "one cannot determine what types of products are encompassed by" proposed market); *Colonial Med. Grp., Inc. v. Catholic Healthcare W.*, 2010 WL 2108123, at *3–5 (N.D. Cal. May 25, 2010), *aff'd* 444 F. App'x 937 (9th Cir. 2011) (same).

*First*, hiQ fails to allege what companies compete in the "people analytics" market or what product substitutes exist. "For antitrust purposes, defining the product market involves identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991) (quotation marks omitted). A properly defined market "must encompass the product at issue as well as all economic substitutes for the product," which "have a 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant product." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–23 (9th Cir. 2018) (affirming dismissal of monopolization claim where alleged market was facially implausible).

The FAC, however, does not once use the terms "substitute" or "cross-elasticity of demand." hiQ states the conclusion that there are other "people analytics" providers but does not name a single current or past competitor or identify any product (offered by LinkedIn or anyone else) that is or was a reasonable substitute. (FAC ¶ 54 (referring to "remaining people analytics providers" that rely on "smaller data sets" or "provide much narrower services," without naming a single company or describing a single service).) Dismissal is warranted where, like here, a complaint "fails to identify the economic substitutes for the product markets" and does not "plead any facts regarding the cross-elasticity of demand between the Relevant Product Markets and their substitutes." *NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019); *see also Gilead Sciences*, 2020 WL 1032320, at *29 (dismissing claim where "Plaintiffs have not explained, *e.g.*, how there is reasonable interchangeability of use"). hiQ's failure to properly allege a relevant market makes it impossible for this Court to assess whether hiQ has adequately alleged that LinkedIn possesses monopoly power in such market—a prerequisite of a monopolization claim.

*Second*, hiQ fails to allege what product *LinkedIn* offers in its purported "people analytics" market, and how that product competes with hiQ's. All hiQ alleges are two announcements by LinkedIn's CEO that generally describe the company's product development plans—(1) one in 2015 regarding LinkedIn's plans "to enter a new category with products allowing companies to utilize LinkedIn in the enterprise [sic] by leveraging content and data that members are already sharing publicly" (FAC ¶ 48); and (2) another in 2017—after hiQ brought suit—where hiQ alleges

-16-

"LinkedIn's CEO further announced the launch of a product that would analyze skills data from member profiles." (*Id.* ¶ 49.)  Nowhere does hiQ allege whether LinkedIn *actually* launched any relevant product in 2015 or 2017, what that product does, or whether or how that product competes with hiQ's products.  After five years since the initial CEO announcement, the most that hiQ can allege is that LinkedIn has some unnamed "SkillMapper-like product." (*Id.* ¶ 50.)  hiQ does not allege what market share LinkedIn's putative product has.  hiQ's failure to plead such basic information about LinkedIn's products makes it impossible for this Court to infer that the plaintiff's and defendant's products are reasonable substitutes constituting the same product market—a fundamental requirement for Sherman Act claims.  *See Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 412 F. Supp. 3d 1273, 1283 (D. Or. 2019) (dismissing § 2 claims after analyzing whether plaintiff offered a service that was an "interchangeable alternative" with defendants' services).

*Third*, a close look at how hiQ describes its *own* two products shows that its purported "people analytics" market is facially unsustainable.  hiQ alleges that it provides "two specific analytic services" with different applications and purposes: (1) "Keeper" helps employers "identify those employees that were at the highest risk of leaving the company," whereas (2) "Skill Mapper" offers a snapshot of "aggregate or individual skills of current or prospective employees" to "uncover the full scope of current and potential employees' skills." (FAC ¶¶ 31, 33.)  In short, "Keeper" analyzes employees at the *individual* level, providing guesses about an employee's propensity to leave the company, while Skill Mapper analyzes a company's workforce in the *aggregate*.  hiQ fails to allege how these two separate products with entirely different use cases are reasonable substitutes that compete in the same market, which underscores that its purported "people analytics" market is ill-defined.  *See Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015) (dismissing complaint where "market definitions by their terms include products that cannot plausibly be considered substitutes for the products offered or sold by Plaintiffs").

### 2.     A Market Defined By The Quality Of A Product Is Improper

Instead of defining the market in terms of what "people analytics" products are and who provides them, hiQ improperly alleges a market of products whose only common feature is that they use higher "quality" LinkedIn data.  (*See* FAC at 14 n.3 (alleging that LinkedIn is the only "quality

people analytics provider"); *see also id.* at 13 n.2 & ¶ 53 (alleging that hiQ relied on LinkedIn data because it "provided better levels of predictive accuracy," and that "[b]y cutting off its competitors' supply of raw employment data, LinkedIn made it so those competitors could not offer quality products in competition with LinkedIn."). Thus, in reality, the defining characteristic of the "people analytics" market as formulated by hiQ is hiQ's (and purportedly other companies') use of LinkedIn data as an input to all products in the alleged market. (*Id.* ¶¶ 3; 34-36 & nn.2-3 (hiQ "only [uses] the LinkedIn public database"); *id.* ¶¶ 53-54.)

It is improper as a matter of law to frame a market in terms of one competitor's advantage over others, such as control of an input that it has allegedly declined to share. In defining a market, "it is the *use or uses to which the commodity is put* that control." *E.I. du Pont*, 351 U.S. at 395–96 (emphasis added). A market ultimately based on products that use LinkedIn data because of its perceived superiority is deficient because it is "'not natural,' 'artificial,' and [is] 'contorted to meet [hiQ's] litigation needs.'" *Hicks*, 897 F.3d at 1121; *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("No party can expect to gerrymander its way to an antitrust victory without due regard for market realities.").

For this reason, courts consistently reject efforts to define markets in terms of what makes one product more attractive to some customers because "[r]easonable interchangeability means all products which could be used for the same general purpose, despite functional or price differences among them." *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996 (N.D. Cal. 2010). "Courts have repeatedly rejected efforts to define markets by … product quality variances." *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, at *3 (9th Cir. 1990) (citing cases); *E.I. du Pont*, 351 U.S. at 399 (cellophane in same market as other flexible wrapping because "despite cellophane's advantages it has to meet competition from other materials in every one of its uses"); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (claim that "UCLA women's soccer program" was "unique" and "not interchangeable" was "insufficient" where desire to play at UCLA was based on plaintiff's personal preferences). Further, courts have specifically held that a market cannot be defined by a single platform or website notwithstanding its perceived quality. *See Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190,

-18-

1199–1200 (N.D. Cal. 2008) (rejecting "circular" market based on "Mac OS market" though Apple was "known for its 'market performance and brand leadership'"); *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) (dismissing claim based on single-brand market though defendant's technology was "unique" and "more attractive"); *cf. Garon v. eBay, Inc.*, 2011 WL 6329089, at *4 (N.D. Cal. Nov. 30, 2011) (rejecting claim plaintiffs excluded from "relevant antitrust market" as they were allegedly "excluded from Defendant's own website").

hiQ's allegations that customers prefer products that use LinkedIn data do not define a "people analytics" market any more than allegations that consumers prefer the Coca-Cola formula define the soft drink market. Though hiQ acknowledges that other data sources exist and that hiQ itself "used other data sources for its analyses," (FAC ¶¶ 3; 34-36 & nn.2-3, 54-55), its allegations regarding the nature of the market at issue are predicated almost entirely on the quality of data from LinkedIn. hiQ's market allegations fail for this separate reason as well.

### 3. hiQ Cannot Allege That LinkedIn Has Monopoly Power

Because hiQ does not allege any plausible relevant market, it also fails to allege that LinkedIn has market power in any such market. "A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008). To allege monopoly power, hiQ must allege that LinkedIn has the ability to restrict output or impose supra-competitive prices. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). But hiQ's complaint is completely silent about these issues. Not only does the FAC fail to identify a single LinkedIn product, it contains *no* allegations as to what price LinkedIn charges for any of its supposedly competitive products, or that LinkedIn has the power to increase price to monopolistic levels. Courts routinely dismiss monopolization complaints lacking such allegations. *See, e.g. Med Vets*, 2019 WL 1767335, at *6; *Stewart v. Gogo, Inc.*, 2013 WL 1501484, at *4 n.3 (N.D. Cal. Apr. 10, 2013) (Chen, J.) (dismissing federal antitrust claim where complaint "does not contain accompanying allegations of restricted output"); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015) (same, where plaintiff "fails to allege any evidentiary facts plausibly suggesting restricted output or supracompetitive prices").

Nor does hiQ allege monopoly power through circumstantial evidence. "To demonstrate

market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at 1434. In addition to failing to define the relevant market, hiQ has not alleged any of these other elements. hiQ admits that other "people analytics" providers exist that use other data sets or provide other services. (FAC ¶ 54.) But hiQ does not allege who those companies are, what services they provide, or what share of the "market" they have. The most that hiQ has alleged is that LinkedIn "dominates" the "people analytics" market (*id.* ¶ 55), which is a conclusory allegation that is insufficient to state a claim. *See Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 2013 WL 3873074, at *15 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016) (dismissing complaint where allegations that defendants were the "dominant force" with "substantial market share and power" were conclusory); *Cargill Inc. v. Budine*, 2007 WL 2506451, at *8 (E.D. Cal. Aug. 30, 2007) (dismissing complaint because allegations that defendant purchased "all," "essentially all," or "much if not all" of a product market were "labels and conclusions").

hiQ also fails to plead that any purported barriers to entry in the "people analytics" market are significant enough to stifle competition. The only barrier to entry that hiQ identifies is access to LinkedIn member data. (FAC ¶ 55.) But hiQ itself alleges that other sources of data exist—it admits that it "originally used *other data* sources for its analyses." (*Id.* at 13 n.2 (emphasis added); *see also id.* ¶ 55.) hiQ also alleges that a company's "internal data" about its own employees can be a source of data for analytics. (*Id.* ¶ 35.) Indeed, such data contains information that *cannot* be found on LinkedIn, such as employee compensation, organizational charts and who employees' supervisors are, badge in/badge out times, use of benefits, email patterns, and internal connectivity. These allegations further establish that hiQ has failed to allege monopoly power. *See PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *10 (N.D. Cal. Apr. 25, 2014) (dismissing § 2 claim where plaintiff "acknowledge[d] alternative and more profitable channels of distribution").

## C. hiQ Fails To Allege Anticompetitive Conduct Under Any Antitrust Theory

With respect to anticompetitive conduct, another required element of a monopolization claim, hiQ throws seven theories at the wall to see if one will stick. None does. The Court should

-20-

also dismiss hiQ's monopolization claim because hiQ has not alleged any anticompetitive conduct.

### 1. LinkedIn Has No Duty To Deal With hiQ

#### (a) Companies Generally Have No Duty To Deal

hiQ's core theory, which it labels as a "refusal to deal," is that LinkedIn allegedly harmed it by refusing to allow it to access (i.e. scrape) LinkedIn's site (in violation of the terms of the User Agreement hiQ agreed to). (FAC ¶¶ 38-45, 112, 114, 130-135.) In other words, hiQ alleges that LinkedIn had a duty to deal with hiQ on terms that permitted hiQ to scrape the LinkedIn website, and LinkedIn monopolized the entire "people analytics" market by refusing to deal on those terms. As the Supreme Court and Ninth Circuit have made clear, businesses are generally free to choose the parties with whom they will deal, and well-settled law forecloses hiQ's duty to deal theory.

Indeed, hiQ itself recognized as much in the Ninth Circuit. In the face of such authority, hiQ repeatedly and emphatically asserted to the Ninth Circuit that "the basis for hiQ's claim *is not a refusal to deal by LinkedIn*." (Br. at 49 (emphasis added); *id.* at 3 ("hiQ's claim does not conflict with the antitrust principle that a monopolist generally has no duty to deal with a would-be rival."); *id.* at 40 ("hiQ seeks to impose no affirmative duty to deal").) Having discouraged the Ninth Circuit from considering its case under a duty-to-deal framework, hiQ cannot now revive this theory under the exact same facts. *See Carr v. Beverly Health Care & Rehab. Servs., Inc.*, 2013 WL 5946364, at *2 (N.D. Cal. Nov. 5, 2013) (Chen, J.) (party may not "'assert[] one position, and then later seek[] an advantage by taking a clearly inconsistent position'"). Indeed, under the judicial estoppel doctrine, "a party can be estopped even if the previous tribunal did not rely upon the first position, if the party is now playing 'fast and loose' with the court," which hiQ is plainly doing here. *Roberts v. Bartels*, 2013 WL 6173142, at *5 (N.D. Cal. Feb. 19, 2013) (quoting *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995)).

Even if hiQ could resurrect a duty to deal theory now, it has failed to allege that this is one of the rare exceptions where antitrust law would impose such a duty. "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Linkline*, 555 U.S. at 448. Courts have thus uniformly rejected efforts to impose antitrust liability for barring access to a website, recognizing that the company that controls a

-21-

website "has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product." *Sambreel Holdings LLC v. Facebook, Inc*., 906 F. Supp. 2d 1070, 1075 (S.D. Cal. 2012) (dismissing antitrust claims for denial of website access to alleged competitor that violated terms of service); *see Garon*, 2011 WL 6329089, at *4 (dismissing antitrust claim premised on allegations "that [plaintiffs] have been excluded from Defendant's own website" as "[t]he decision of a single company not to do business with a given client generally does not give rise to an antitrust claim"); *cf. Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750, at *14 (N.D. Cal. July 20, 2010) (dismissing antitrust counterclaims because "[i]f Facebook has the right to manage access to and use of its website, then there can be nothing anticompetitive about taking legal action to enforce that right").

The Supreme Court has "been very cautious in recognizing [] exceptions" to firms' general freedom to choose the parties with whom they will do business "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Trinko*, 540 U.S. at 408. Were it otherwise, courts would become Internet regulators that "would have to pick and choose the applicable terms and conditions" that websites could offer. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013). This would require "antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S. at 408. hiQ's refusal to deal theory, at base, is that LinkedIn has a duty to make an exception to its general policy prohibiting scraping because hiQ built its business on violating that policy. But the antitrust laws do not require firms to give putative competitors special treatment. They do not impose on LinkedIn a relationship with hiQ on terms to which LinkedIn never agreed and, indeed, expressly prohibited.

**(b)    hiQ Cannot Avail Itself Of The *Aspen Skiing* Exception**

Based on its decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), the Supreme Court has recognized only a "narrow exception" to the general rule that the antitrust laws do not require a firm to deal with its rivals. *Aerotec*, 836 F.3d at 1184; *see Trinko*, 540 U.S. at 409. In order to fall within this exception, the plaintiff must plead the "unilateral termination of a voluntary … and … profitable course of dealing" in which "the *only conceivable*

-22-

*rationale or purpose*" of the defendant's termination is "to obtain higher profits in the long run from the exclusion of competition." *Aerotec*, 836 F.3d at 1184 (emphasis added); *Novell*, 731 F.3d at 1075 (refusal "must be irrational but for its anticompetitive effect").

hiQ has not met, and cannot meet, that standard here. At the outset, as this Court has acknowledged, there were other *conceivable* rationales for LinkedIn barring hiQ that had nothing to do with excluding competition. Indeed, LinkedIn's May 23, 2017 letter made clear that LinkedIn was excluding hiQ to protect "its members' trust" and "keep their data secure." (FAC Ex. 4 at 1.) The Court has acknowledged that this privacy rationale was "not without merit." (ECF No. 63 at 6.)[8] Because there were clearly other plausible rationales for LinkedIn's conduct, that alone is sufficient to doom the applicability of the *Aspen Skiing* exception here. *See Unigestion*, 412 F. Supp. 3d at 1289–90 (dismissing claim and rejecting *Aspen Skiing* exception on pleadings where defendant's alleged conduct "would be a rational attempt to protect itself from lost profits and not anticompetitive"). Indeed, perhaps acknowledging as much, hiQ told the Ninth Circuit that the "basis" for its claim is "unlike *Aspen Skiing*." (Br. at 49.)[9]

Apart from this, hiQ has failed to allege the other necessary prerequisites for a duty to deal claim to proceed under *Aspen Skiing*: (1) that LinkedIn was engaged in a *voluntary* course of dealing with hiQ, i.e., that it made an affirmative agreement to permit scraping by hiQ; (2) that LinkedIn terminated a *profitable* course of dealing with hiQ; or (3) that LinkedIn generally made its website available to the public for scraping on the identical terms hiQ now demands.

***Not Voluntary.*** The Supreme Court has held that a refusal to deal claim does not lie unless the defendant "voluntarily engaged in a course of dealing with its rivals." *Trinko*, 540 U.S. at 409. Absent this, a defendant's "prior conduct sheds no light upon the motivation of its refusal to deal." *Id.* Applying this rule, the court in *LiveUniverse, Inc. v. MySpace, Inc*, 2007 WL 6865852 (C.D. Cal. June 4, 2007), *aff'd* 304 F. App'x 554 (2008), dismissed LiveUniverse's monopolization claim alleging that the website MySpace had a duty to deal under *Aspen Skiing* because LiveUniverse had

---

[8] Indeed, particularly in the wake of the data harvesting scandals involving companies such as Cambridge Analytica and Clearview AI, social media platforms are often criticized for not doing *more* to protect their user data and the integrity of their platforms.

[9] Nonetheless, the amended complaint is replete with conclusory references to a purported

not identified any access arrangement to which "the parties formally agreed." *Id.* at \*13. MySpace's alleged "previous practice" of allowing certain access and activity on its website was not sufficient to bring the case "within Aspen Skiing." *Id.* As the Ninth Circuit held in affirming dismissal, "LiveUniverse contends a refusal-to-deal claim does not require 'an affirmative decision or agreement to cooperate' between competitors. LiveUniverse is mistaken." *LiveUniverse, Inc. v. MySpace, Inc.,* 304 F. App'x 554, 556 (9th Cir. 2008); *see also Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1086, 1090 (N.D. Cal. 2002), *aff'd*, 94 F. App'x 529 (9th Cir. 2004) (no refusal to deal where there was no letter or "written application for supply").

The same is true here. hiQ does not point to any affirmative arrangement or agreement that LinkedIn terminated, because there is none. After all, hiQ told the Ninth Circuit it "asked nothing of LinkedIn." (Br. at 49.) As hiQ acknowledges, LinkedIn's User Agreement expressly *prohibits* scraping by entities like hiQ. (*Supra* at 3; FAC Ex. 1.) At most, hiQ alleges that LinkedIn "has known" about hiQ and hiQ was "open with LinkedIn regarding its people analytics services" simply because a handful of LinkedIn's thousands of employees attended hiQ-sponsored conferences. (FAC ¶¶ 37-38.) This falls far short of an "affirmative decision or arrangement" to supply data to hiQ that is required to defeat the well-settled rule that a firm has no duty to deal. *LiveUniverse*, 304 F. App'x at 556; *Trinko*, 540 U.S. at 409. Indeed, if the attendance of a handful of employees at a competitor's conference were enough to satisfy the *Aspen Skiing* exception, such exception would effectively swallow the established no-duty-to-deal rule.

**Not Profitable.** Courts also have rejected applying the *Aspen Skiing* exception unless the plaintiff alleges the termination of a "*profitable* course of dealing," such that the termination would be economically irrational but for the exclusion of competition. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) (emphasis added); *see also Trinko*, 540 U.S. at 409 (rejecting duty to deal claim based on refusal to deal at cost). hiQ does not allege that it ever paid LinkedIn to scrape—nor could it, for hiQ contends it should be able to scrape for free. Instead, hiQ vaguely alleges that its services purportedly "increased employer engagement on LinkedIn, because those employers paid more attention to their employees' LinkedIn public profiles" while customers

---

"voluntary" and "profitable" course of dealing with LinkedIn. (FAC ¶¶ 8, 11, 39, 131-132, 140.)

of hiQ. (FAC ¶ 5.) This highly attenuated allegation fails to plausibly allege that the purported course of dealing that LinkedIn terminated (voluntary or not) was *profitable* to LinkedIn. *See, e.g.*, *Unigestion*, 412 F. Supp. 3d at 1289–90 (dismissing claim and holding that the alleged course of dealing on the pleadings "is not presumably profitable").

hiQ's own numbers do not add up. LinkedIn has over 660 million members. (FAC ¶ 2.) hiQ identifies three customers. (*Id*. ¶ 6.) hiQ does not allege what level of engagement these three customers or their employees had on LinkedIn while using hiQ's products, what level they had after hiQ stopped serving them, whether their usage of LinkedIn declined at all, how much money this reduced engagement cost LinkedIn, or even how LinkedIn made money off of such incremental engagement. Nor does hiQ allege that LinkedIn knew the scope of any engagement it was potentially sacrificing by telling hiQ to stop scraping its site. If LinkedIn did not know the magnitude of what it was allegedly sacrificing, then it is inconceivable that LinkedIn's actions were so economically irrational such that LinkedIn's only reason for telling hiQ to stop scraping was to exclude competition.

Even assuming for the moment that these three customers actually interacted with LinkedIn less, sacrificing such an infinitesimally small amount of "engagement" cannot render LinkedIn's decision so economically irrational as to suggest a "willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409.

**Scraping Not Generally Available.** In addition, a court cannot impose an antitrust duty to deal on terms that "are not otherwise marketed or available to the public." *Trinko*, 540 U.S. at 410; *MetroNet*, 383 F.3d at 1133 (rejecting duty to deal where defendant "refused to provide to [its] competitor[] products that were already sold in a retail market to other customers"). hiQ cannot satisfy this requirement because the User Agreement on which LinkedIn makes its service generally available to the public *explicitly prohibits scraping*. (FAC Ex. 1, at 19-21.) The Agreement applies to anybody who uses LinkedIn's website, and those who sign up for a LinkedIn account expressly agree to its terms. (*Id.* at 2-4.) hiQ alleges that LinkedIn allows search engines like Google and Bing to access the website for *search indexing* purposes (e.g., *id.* ¶¶ 40-41, 47), but hiQ does not and cannot allege that LinkedIn generally allows the public to scrape its site for any and all purposes

-25-

(much less to allow employers to surveil their employees)—which is what hiQ seeks to do. What hiQ really alleges is that the antitrust laws require LinkedIn to deal with it on *unique* terms because it is a putative competitor that built its business on scraping. Binding precedent squarely forecloses that theory. *MetroNet*, 383 F.3d at 1133 (defendant had no duty to offer the plaintiff special terms different from those generally available to the public). Even if antitrust law did recognize a rare duty not to deny competitors terms made available to the general public, it does not require a firm to make available unique terms to a claimed competitor that it presently offers to *no* party.

## 2.    LinkedIn's Website Is Not An Essential Facility

hiQ also has failed to plead that LinkedIn has denied an essential facility. (FAC ¶¶ 136-141.) An essential facilities theory "is a variation on a refusal to deal claim" that "imposes liability where competitors are denied access to an input that is deemed essential, or critical, to competition." *Aerotec*, 836 F.3d at 1184. To establish an essential facilities claim, hiQ must plead, at a minimum, "that [LinkedIn] is a monopolist in control of an essential facility," *id*. at 1185, and that "control of the facility carries with it the power to *eliminate* competition in the downstream market" (which, as noted, hiQ has failed to even properly allege). *Alaska Airlines, Inc. v. United Airlines, Inc*, 948 F.2d 536, 544 (9th Cir. 1991) (emphasis added). Even "the most economical route is not an essential facility when other routes are available." *Midwest Gas Servs., Inc. v. Indiana Gas Co*., 317 F.3d 703, 714 (7th Cir. 2003).

hiQ's own allegations doom this theory. hiQ admits that there are *other* sources of data for "people analytics." In fact, hiQ alleges that it "originally used other data sources for its analyses," and only started using LinkedIn data because it "provided *better levels* of predictive accuracy." (FAC at 13 n.2 (emphasis added); *id.* ¶ 55.) hiQ further alleges that companies themselves have "internal data" that could be analyzed. (*Id.* ¶ 35.) hiQ's allegations that these data sources are "inferior" (*id.* ¶ 55) does not suffice to allege that LinkedIn's website is an essential facility. "Essential means essential; it does not mean 'the most economical.' Nor does it mean 'best' or 'preferable.'" *JamSports & Entm't, LLC v. Paradama Prods., Inc*., 336 F. Supp. 2d 824, 839 (N.D. Ill. 2004). *See also* 58 Corpus Juris Secundum Monopolies § 91 (under "essential facilities doctrine, 'essential' means essential, not 'best,' 'most profitable,' 'preferable,' or 'most economical'; a

-26-

facility is not essential even if it is widely preferred by consumers and producers in the market, as long as there is an alternative, albeit inferior, venue."); *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1381 (9th Cir. 1992) ("that the Cities could achieve savings at the expense of Edison and its other customers is not enough to turn the Pacific Intertie into an essential facility"); *Kerwin v. Parx Casino*, 2019 WL 1098949, at *8 (E.D. Pa. Mar. 8, 2019), aff'd, 2020 WL 1313345 (3d Cir. Mar. 18, 2020) ("Plaintiff's own allegations … undermine any claim that the event centers of the Defendant Casinos are essential facilities" where plaintiff "admits" that "other venues exist" he has used; "essential does not mean the most economical or the most preferable").  And LinkedIn is aware of no case where a court held that a privately-owned *website* was an essential facility.

### 3.     hiQ's Remaining Monopolization Theories Are Nonsensical

hiQ's remaining monopolization theories are variations on the duty to deal claim it has failed to plead or are nonsensical on their face.  None saves hiQ's Section 2 claim.

***Raising Rivals' Costs.***  hiQ contends that by cutting off access to its data, LinkedIn forced hiQ to get data from sources that were, apparently, more expensive.  (FAC ¶¶ 120-124.)  But the "refusal to deal doctrine is not so easily evaded" by recasting it as a theory of raising rivals' costs. *Novell*, 731 F.3d at 1078–79.  The fact that a refusal to deal can raise the rival's costs "by forcing it to forgo reliance on the monopolist's facilities" and "compete on its own" simply describes why the rival seeks to impose a duty to deal.  *Id.* at 1079.  It does not "displace *Aspen* and *Trinko*'s profit sacrifice test in the narrow world of refusal to deal cases."  *Id.*; *cf.* 3 Areeda & Hovenkamp, ¶ 651, at 102, 109 (raising rivals' costs theory "can never operate as a complete test for exclusionary conduct").  This theory thus fails for the same reason hiQ's refusal to deal theory fails.

***Lock-In.***  hiQ alleges that LinkedIn "lured users" to become members, and then enticed "employer members" to join, promising "that they could access users' public employment information without restriction," thereby locking employer members into becoming members of LinkedIn.  (FAC ¶¶ 116-119.)  This appears to be a variant on hiQ's now-discarded promissory estoppel claim, which the Court held "appear[ed] meritless" as hiQ did not identify any promises made *to hiQ*.  (ECF No. 63 at 23.)  Indeed, hiQ does not contend that it was locked in and forced to buy any product from LinkedIn.  Nor does hiQ contend that any of LinkedIn's members are forced

to purchase any product from LinkedIn. The User Agreement explicitly informs all of its members that there are restrictions on how they can access data on LinkedIn's website, including prohibitions on scraping, and that they are free to delete their profiles and quit LinkedIn at any time. (FAC Ex. 1 at 19-21.) As the Court has noted, "there is no indication that LinkedIn has made any promises to users that their data may be used in" the way hiQ seeks to use it. (ECF No. 63 at 23.)

hiQ also misapprehends an antitrust lock-in theory. The classic lock-in claim arises where a consumer buys one product from a company, and then, without warning, is forced to buy aftermarket products or services from that same company at monopolistic prices in order to use the product. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 476 (1992). hiQ does not allege this, nor could it: while other LinkedIn products enhance the value of the network for members, a LinkedIn member does not have to buy any additional product to use the network.

**Tying.** "[T]ies are prohibited where a seller 'exploits,' 'controls,' 'forces,' or 'coerces' a buyer of a tying product into purchasing a tied product." *Rick-Mik*, 532 F.3d at 971. hiQ conclusorily alleges that "LinkedIn has conditioned the provision of its dominant professional social networking platform on the use of its people analytics services." (FAC ¶ 126.) This makes no sense. Millions of members use LinkedIn's website every day without paying for "people analytics" services. hiQ does not and cannot allege that LinkedIn threatened to deny access to its service to even one member on the ground that the member refused to use LinkedIn's purported "people analytics" service. *See Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 560 (9th Cir. 2018) (affirming dismissal of tying claim where "plaintiffs failed to adequately plead coercion").

**Vertically-Arranged Boycotts.** hiQ alleges that LinkedIn is forcing LinkedIn members to boycott other "people analytics" providers. (FAC ¶ 142.) But there is not a single factual allegation that LinkedIn ever asked (much less forced) a single member not to do business with or share data with hiQ or any other "people analytics" company, or that LinkedIn has ever prevented hiQ from doing business with any other site. This is facially insufficient. *E.g., Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 417 (D.D.C. 1988) ("merely alleging a 'vertical' group boycott does not relieve plaintiff of its obligation to show a combination or conspiracy by more than one entity" and "plaintiff can only survive the motion to dismiss by alleging that such an agreement was reached").

**Monopoly Leveraging.** hiQ's "monopoly leveraging" theory is just a repackaged version of its other theories. (FAC ¶ 114 (explaining that its leveraging claim is based on "lock-in, raising rivals' costs, tying, unilateral refusal to deal, denial of essential facilities, and vertically-arranged boycotts").) As the Ninth Circuit has explained, "allegations of monopoly leveraging" do not "state a claim under § 2 of the Sherman Act absent an antitrust refusal to deal (or some other exclusionary practice) in the monopoly market or below-cost pricing in the second market." *Doe v. Abbott Labs.*, 571 F.3d 930, 931 (9th Cir. 2009). Thus, "monopoly leveraging, on its own, is not proscribed under Section 2." *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 895–96 (N.D. Cal. 2011); *see also Norcen Energy Res. Ltd. v. Pac. Gas & Elec. Co.*, 1994 WL 519461, at *15 (N.D. Cal. Sept. 19, 1994) ("Ninth Circuit has specifically rejected monopoly leveraging as a basis for liability under § 2"). As hiQ has not otherwise pled a Section 2 claim, there can be no monopoly leveraging claim.

## VI. HIQ'S ATTEMPTED MONOPOLIZATION CLAIM FAILS

hiQ's attempted monopolization claim fails for all the reasons that it fails to allege a monopolization claim—and then some. "To demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health*, 515 F.3d at 893. As explained above, hiQ does not allege any "anticompetitive" conduct that harmed competition in the market, other than demand letters that hiQ alleges on "information and belief" LinkedIn supposedly sent to other "people analytics" companies. But, again, even if such unfounded assertions could be credited for purposes of this motion, the conduct is completely protected under *Noerr-Pennington*. *Sosa*, 437 F.3d at 937.

In addition, as hiQ has not defined the "people analytics" market, it could not possibly plead that LinkedIn is on the verge of achieving monopoly power. A "dangerous probability" likewise requires "inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *see Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1163 n.22 (9th Cir. 2003); *ChriMar Sys., Inc v. Cisco Sys., Inc*, 72 F. Supp. 3d 1012, 1019 (N.D. Cal. 2014) (dismissing attempted monopolization claim for failure to adequately define relevant market).

-29-

Even if hiQ had defined a relevant market, hiQ's allegation that LinkedIn is the only "major" provider left is insufficient. hiQ alleges that other people analytics providers and other data sources exist, and does not allege what LinkedIn's market share is in the "people analytics" market. Where a product market has multiple suppliers, alleging that the defendant is the "major" provider does not support an inference of a dangerous probability of achieving monopoly power. *E.g., Sheahan*, 394 F. Supp. 3d at 1014 (Chen, J.) (dismissing for failure to adequately allege dangerous probability, where complaint asserted State Farm had 10% market share); *ChriMar Sys.*, 72 F. Supp. 3d at 1019–20 ("[A]lthough a lower percentage is required for an attempted monopoly claim," party "must still allege sufficient market power"). And as noted, hiQ does not allege that LinkedIn had the ability to raise prices or control output and thus has not alleged that it was dangerously close to a monopoly.

## VII. HIQ'S SHERMAN ACT SECTION ONE CLAIM FAILS

hiQ alleges that "LinkedIn and its members have entered into contracts or combinations" that violate Section 1 of the Sherman Act. (FAC ¶ 159.) The FAC does not identify which "contracts or combinations" hiQ contends are anticompetitive, how they restrain trade, or even who the parties to them are. A Section 1 complaint must be dismissed where it does "not clearly assert which individual agreement or agreements constitute in themselves a 'contract ... by which the persons or entities intended to harm or restrain trade,'" which is precisely the case here. *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 669 (9th Cir. 2009).

Without identifying any actual agreements, hiQ hints that they are "tying arrangements or vertically arranged boycotts." (FAC ¶ 162.) As noted, to the extent hiQ challenges the User Agreement between LinkedIn and its members, this fails as the agreement does not tie or coerce members into purchasing any "people analytics" product from LinkedIn, nor does it prohibit them from buying any product from, or providing their data to, *any* other company. To the extent hiQ contends that the User Agreement it agreed to with LinkedIn is anticompetitive, hiQ fails to specify which part of the agreement hindered its ability to compete in the "people analytics" market or how.

## VIII. CONCLUSION

For the foregoing reasons, the Court should dismiss hiQ's Sherman Act claims in their entirety, and dismiss all of hiQ's damages claims (under the Sherman Act and under state tort law).

DATED: April 14, 2020                    MUNGER, TOLLES & OLSON LLP


                                         By:    _/s/ Jonathan H. Blavin_
                                                Jonathan H. Blavin

                                         Attorneys for Defendant LinkedIn Corporation

-31-