QUINN EMANUEL URQUHART AND SULLIVAN, LLP
Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6600

Adam B. Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
865 Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone:     (213) 443-3000

Attorneys for Plaintiff hiQ Labs, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301-EMC |
| Plaintiff, | **PLAINTIFF HIQ LABS, INC.'S OPPOSITION TO LINKEDIN CORPORATION'S MOTION TO DISMISS AMENDED COMPLAINT** |
| vs. | |
| LinkedIn Corp., | |
| Defendant. | Judge:              Hon. Edward M. Chen |
| | Hearing Date:    August 6, 2020 |
| | Hearing Time:    1:30 p.m. |

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...................................................................................1

II.  RELEVANT ALLEGATIONS AND BACKGROUND ........................................3

    A.  LinkedIn Possesses Monopoly Power in Professional Social Networking ...............3

    B.  hiQ Creates a New Type of Predictive Employment Analytic Based on Employees' Public, Self-Curated Information .............................................................4

    C.  After Encouraging People Analytics Competition For Years, LinkedIn Made an About Face and Now has Market and Monopoly Power in That Market ..............................................................................................................5

III.  ARGUMENT .........................................................................................................5

    A.  LinkedIn Does Not Challenge the Majority of hiQ's Non-Antitrust Claims ...........6

    B.  In Arguing Against the "People Analytics" Market Definition, LinkedIn Ignores Both Well-Pled Allegations and Reality ......................................................6

        1.  Consumers use people analytics services for a particular purpose, based on the *type* of analysis, not quality ......................................................7

        2.  hiQ is not required to use magic words nor identify every single competitor to plausibly allege a relevant market ...........................................10

    C.  Given High Market Share, High Barriers to Entry, and Proven Ability to Exclude Competitors, LinkedIn Clearly Has Market/Monopoly Power ..................11

    D.  Under the *Hynix* and *USS-POSCO* Doctrines, LinkedIn's Cease-and-Desist Letter Campaign is Actionable as Part of its Broader Anticompetitive Scheme ..............................................................................................................13

        1.  The *Hynix* doctrine renders LinkedIn's cease-and-desist letters actionable as part of its broader anticompetitive scheme ...........................13

        2.  The *USS-POSCO* doctrine renders LinkedIn's pattern of baseless cease-and-desist letters actionable as a standalone anticompetitive act .......................................................................................................15

    E.  hiQ Alleges Anticompetitive Conduct Under Multiple, Well-Accepted, Overlapping Doctrines ...........................................................................................16

        1.  The unilateral refusal to deal standard does not apply to conduct that, as hiQ alleges, forced third parties to bend to LinkedIn's power .........18

        2.  LinkedIn's conduct is similarly anticompetitive under multiple other unilateral action doctrines .................................................................21

        3.  hiQ plausibly alleges an anticompetitive unilateral refusal to deal .............24

(a)     hiQ never disclaimed a refusal to deal theory at the Ninth Circuit; it noted that it wanted to be left to compete on the merits ................................................................................24

(b)     hiQ alleges all the "hallmarks" of an illegal refusal to deal............25

(c)     There is no "website exception" to the law against anticompetitive refusals to deal.......................................27

(d)     The User Agreement does not immunize LinkedIn's refusal to deal ............................................................28

F.     hiQ Alleges Personal Harm Flowing From Harm to Competition; *i.e.*, Antitrust Injury.................................................................28

G.     hiQ Plausibly States an Attempted Monopolization Claim ....................................30

IV.     CONCLUSION ......................................................................................30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016)...................................................................................... 21, 25, 27

*AFMS, LLC v. United Parcel Serv. Co.*,
    2011 WL 13135632 (C.D. Cal. May 27, 2011).................................................................. 23, 24

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991)..................................................................................................... 23

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*,
    190 F.3d 1051 (9th Cir. 1999)................................................................................................... 28

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010) .................................................................................................................. 16

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996)................................................................................................... 16

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
    No. 16-cv-00923-BLF, Dkt. 281 (N.D. Cal. May 21, 2018)............................................... 14, 22

*In re ATM Fee Antitrust Litig.*,
    2010 WL 2557519 (N.D. Cal. June 21, 2010) ....................................................................... 9, 10

*Avaya Inc., RP v. Telecom Labs, Inc.*,
    838 F.3d 354 (3d Cir. 2016)...................................................................................................... 21

*B.R. v. Beacon Health Options*,
    2017 WL 5665667 (N.D. Cal. Nov. 27, 2017)........................................................................... 29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 6, 29

*Boucher v. Shaw*,
    572 F.3d 1087 (9th Cir. 2009)..................................................................................................... 6

*Cal. ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011)............................................................................................. 16, 17

*Cal. Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ............................................................................................................ 15, 16

*Calculators Haw., Inc. v. Brandt, Inc.*,
    724 F.2d 1332 (9th Cir. 1983)................................................................................................... 18

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,
    148 F.3d 1080 (D.C. Cir. 1998)................................................................................................ 17

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)............................................................................................... 17, 20

*Catch Curve, Inc. v. Venali, Inc.*,
    519 F. Supp. 2d 1028 (C.D. Cal. 2007)..................................................................................... 17

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
    2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ..................................................................... 2, 6, 23

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
    868 F. Supp. 2d 876 (N.D. Cal. 2012)"), *vacated in part on other*
    *grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012) ............................................. 2, 8, 11, 20

*City of Anaheim v. S. Cal. Edison Co.*,
    955 F.2d 1373 (9th Cir. 1992)..................................................................................... 13, 18, 23

*CollegeNET, Inc. v. Common Application, Inc.*,
    711 F. App'x 405 (9th Cir. 2017).......................................................................................... 17, 29

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
    710 F.2d 752 (11th Cir. 1983) ............................................................................................. 18, 19

*Cousins v. Lockyer*,
    568 F.3d 1063 (9th Cir. 2009).................................................................................................. 6

*Datel Holdings Ltd. v. Microsoft Corp.*,
    712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................................ 7, 10, 12

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005)...................................................................................................... 20

*United States v. E.I. du Pont Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................................................................ 7, 9

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ................................................................................. 2, 13, 14, 15, 16, 29

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .................................................................................... 11, 18, 20, 21, 22

*Facebook, Inc. v. Power Ventures, Inc.*,
    2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................................................. 27, 28

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008).................................................................................................. 23

*Funai Elec. Co. v. LSI Corp.*,
    No. 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ............................................................. 14

*Garon v. eBay, Inc.*,
    2011 WL 6329089 (N.D. Cal. Nov. 30, 2011)....................................................................... 27

*Genetic Sys. Corp. v. Abbott Labs.*,
    691 F. Supp. 407 (D.D.C. 1988) ............................................................................................. 19

*In re German Automotive Mfrs. Antitrust Litig.*,
    --- F. Supp. 3d ---, 2020 WL 1542373 (N.D. Cal. Mar. 31, 2020)........................................ 8

*Haagen-Daaz Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
    895 F.2d 1417 (9th Cir. 1990).................................................................................................... 9

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001)..................................................................................................... 25

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015).............................................................................................. 15, 16

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018)..................................................................................................... 7

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019)...................................................................................................... 25

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017) ....................................................................... 6, 24, 25

*Hurst Int'l, LLC v. Sinclair Sys. Int'l, LLC*,
  2018 WL 4961908 (C.D. Cal. May 18, 2018)..................................................................... 29

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
  527 F. Supp. 2d 1084 (N.D. Cal. 2007) ................................................... 2, 13, 14, 15

*Image Tech. Servs. v. Eastman Kodak*,
  125 F.3d 1195 (9th Cir. 1997) ........................................... 3, 7, 17, 18, 29, 30

*InfoStream Grp., Inc. v. PayPal, Inc.*,
  2012 WL 3731517 (N.D. Cal. Aug. 28, 2012) ............................................ 24

*JTC Petrol. Co. v. Piasa Motor Fuels, Inc.*,
  190 F.3d 775 (7th Cir. 1999)............................................................................ 20

*Kaiser Foundation Health Plan, Inc. v. Abbott Labs., Inc.*,
  552 F.3d 1033 (9th Cir. 2009)...................................................................... 15, 16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ........................................................................... 25

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) ...................................................................... 17, 21

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008)............................................................... 25, 26

*Los Angeles Cty. v. Davis*,
  440 U.S. 625 (1979) ....................................................................................... 27

*Menzel v. Scholastic, Inc.*,
  2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) ............................................... 29

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004)....................................................................... 23, 25

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ......................................................................... 19

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
  2016 WL 1464545 (D. Del. Apr. 13, 2016) .................................................... 14

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015)........................................................................ 19

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020)................................................................... 16, 17

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ....................................................................................... 24

*Newcal Indus., Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008).......................................................................... 10

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ............................................................................... 17, 29

*Pac. Mailing Equip. Corp. v. Pitney Bowes, Inc.*,
  499 F. Supp. 108 (N.D. Cal. 1980) ..................................................................... 7

*Page v. Stanley*,
  2012 WL 5471107 (C.D. Cal. Oct. 19, 2012), *report and
  recommendation adopted*, 2012 WL 5464629 (C.D. Cal. Nov. 9, 2012) ..................... 5

*Paladin Assocs., Inc. v. Mont. Power Co.*,
  328 F.3d 1145 (9th Cir. 2003)........................................................................ 20

*Premier Elec. Constr. Co. v. National Elec. Contractors Ass'n, Inc.*,
  814 F.2d 358 (7th Cir. 1987) ................................................................................. 20

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
  219 F.3d 92 (2d Cir. 2000) .............................................................................. 15, 16

*Primo v. Pac. Biosciences of Cal., Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) ................................................................. 6

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .......................................................................... 11, 12

*Relevant Grp., LLC v. Nourmand*,
  2020 WL 2523115 (C.D. Cal. May 18, 2020) ...................................................... 16

*Safeway Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................................. 25

*Sambreel Holdings LLC v. Facebook, Inc.*,
  906 F. Supp. 2d 1070 (S.D. Cal. 2012) ............................................................... 27

*Sheahan v. State Farm Gen. Ins. Co.*,
  394 F. Supp. 3d 997 (N.D. Cal. 2019) ................................................................... 8

*Staley v. Gilead Sciences, Inc.*,
  --- F. Supp. 3d ---, 2020 WL 1032320 (N.D. Cal. Mar. 3, 2020) ........................... 8

*United States v. Syufy Enterp.*,
  903 F.2d 659 (9th Cir. 1990) ............................................................................... 12

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) ............................................................................. 10

*Tate v. Pac. Gas & Elec. Co.*,
  230 F. Supp. 2d 1086 (N.D. Cal. 2002) ............................................................... 26

*Twin City Sportservice v. Charles O'Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ............................................................................... 7

*United Mine Workers of Am. v. Pennington*,
  381 U.S. 657 (1965) ................................................................. 2, 13, 14, 15, 16, 29

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades
  Council, AFL-CIO*,
  31 F.3d 800 (9th Cir. 1994) ..................................................................... 2, 13, 15, 16

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ....................................................................................... 2, 18

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ............................................................................... 28

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*,
  728 F.3d 354 (4th Cir. 2013) ............................................................................... 15

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
  588 F.3d 659 (9th Cir. 2009) ................................................................................. 6

*In re Yahoo Mail Litig.*,
  7 F. Supp. 3d 1016 (N.D. Cal. 2014) ..................................................................... 6

*Zenith Elecs., LLC v. Sceptre, Inc.*,
  2015 WL 12765633 (C.D. Cal. Feb. 5, 2015) ...................................................... 14

**Rules / Statutes**

Rule 8(a) ................................................................................................................. 29

Rule 12(b)(6) ............................................................................................................. 5

## Other Authorities

*https://business.linkedin.com/talent-solutions/recruiting-tips/global-talent-trends-2020.* ............. 11

*https://business.linkedin.com/talent-solutions/talent-insights.* ......................................... 11

Philip E. Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶, 651 (4th ed., 2020 Cum. Supp. 2013-2019) ....................................... 20

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1901d (3rd & 4th Eds., 2018 Cum. Supp. 2010-2017) ............................... 13

Plaintiff hiQ Labs, Inc. ("hiQ") respectfully submits this opposition to Defendant LinkedIn Corporation's ("Defendant" or "LinkedIn") motion to dismiss (Dkt. 137) ("Motion").

## I.    PRELIMINARY STATEMENT

LinkedIn's Motion notably ignores that both this Court and the Ninth Circuit observed that the facts of this case exhibit strong indications of anticompetitive intent. Prior to LinkedIn's anticompetitive attack, hiQ innovated and created a new type of workforce-focused data analytics that greatly benefited employers, employees, and LinkedIn. LinkedIn was not only aware of that development, but actively worked with and encouraged hiQ by participating in its conferences, discussing the fledgling market, and even receiving an award from hiQ. However, at some point, LinkedIn decided it wanted to provide its own people analytics services, and wanted no competition. It therefore began a multi-faceted campaign aimed at seizing that market completely, including by cutting off competitors' access to the public employment information on LinkedIn's platform—on the pretense they were "scraping," even though LinkedIn permits and promotes scraping by non-competing companies every day. LinkedIn supplemented its scheme by spreading "FUD" in the market (fear, uncertainty and doubt), and by issuing a wide swath of baseless cease-and-desist letters threatening legal action if people analytics providers did not stop accessing public information that LinkedIn allowed everyone else to access. This campaign was remarkably effective: today, LinkedIn is the only real people analytics provider left.

These facts clearly support antitrust claims under Sections 1 and 2 of the Sherman Act. In response, LinkedIn ignores relevant allegations entirely, raises factual disputes inappropriate for a motion to dismiss, or misinterprets what the law requires regarding plausible allegations at this early stage of the case. Its Motion should therefore be rejected.

*First*, LinkedIn argues that hiQ does not plausibly allege a relevant product market, nor LinkedIn's power in such a market. These arguments fail mainly because they ignore hiQ's actual allegations, and secondarily because they try to contort those allegations into something they are not. As alleged, "people analytics" are a recognized category of data analytic, the demand for which is based on their core functionality. The market is not, as LinkedIn tries to argue, defined by the "quality" of the services (even though hiQ's services are best-in-class). Rather, the market is

defined by the *types* of insights people analytics provide—ones that were previously unattainable, even with companies' internal data. Furthermore, contrary to LinkedIn's arguments, the law does not require hiQ to use magic words, such as "reasonable interchangeability" and "cross-elasticity of demand," in order to adequately allege that such concepts apply to people analytics. LinkedIn similarly errs by ignoring that hiQ has not only circumstantially alleged LinkedIn possesses market and monopoly power due to high market share and high barriers to entry, but also that—under the "functional approach" to direct evidence of such power (as this Court previously noted in its *Church & Dwight* decisions)—LinkedIn plainly possesses such power due to its ability to exclude competitors from the market with impunity.

*Second*, LinkedIn's argument that its cease-and-desist letter campaign is immunized from antitrust liability by *Noerr-Pennington* is incorrect under both the *Hynix* and *USS-POSCO* doctrines. *Hynix* attaches antitrust liability to otherwise-protected petitioning conduct when it is part of a broader scheme that includes other acts with independent anticompetitive effect; *e.g.*, wrongfully cutting off competitors' access to a key resource and spreading FUD about them. Similarly, *USS-POSCO* attaches antitrust liability to a pattern of petitioning conduct that was initiated in order to harm competition; *e.g.*, the many cease-and-desist letters LinkedIn sent to competitors in order to remove them from the market. Both doctrines negate *Noerr-Pennington*'s application to this case, yet LinkedIn does not even address them in its Motion.

*Third*, LinkedIn tries to argue that this case is solely about a unilateral refusal to deal and that hiQ cannot allege such a claim. As an initial matter, the second premise is simply wrong. As alleged in the Amended Complaint ("FAC"), LinkedIn reversed a prior voluntary course of profitable dealing, sacrificed short term profits in order to eliminate competition, and clearly could have continued in a competitive manner without excluding hiQ. LinkedIn is free to dispute these facts later, but it cannot ignore such well-pled allegations at this stage.

But, even if that were not the case, the first premise in LinkedIn's argument is also incorrect. The *unilateral* refusal to deal standard, by law, does not apply to "concerted action," as the Supreme Court's *Trinko* opinion recognized. hiQ plausibly alleges such conduct under Sections 1 and 2, including because LinkedIn forced third parties—*i.e.*, employees *and*

employers—to not deal with hiQ (a vertically-arranged boycott); raised its rivals' costs; and tied. LinkedIn gives short shrift to these theories, and raises incorrect straw-man arguments to each. As for hiQ's unilateral conduct theories, those are considered distinct from refusal to deal, even when the facts might support liability under each. hiQ alleges LinkedIn abused its power over locked-in members (a "*Kodak* lock-in claim"); denied its competitors access to an essential facility; and leveraged its monopoly power in professional social networking to also monopolize people analytics. Each of LinkedIn's arguments against these theories either relies on a misstatement of the law or tries to ignore the FAC's broader allegations. All such arguments fail.

*Finally*, LinkedIn argues hiQ cannot establish antitrust injury; *i.e.*, personal injury flowing from a broader harm to competition. But, as an excluded competitor, hiQ is the quintessential example of a party with antitrust injury. LinkedIn thus instead posits that hiQ does not plausibly establish harm to competition because it does not name every competitor that Linked excluded. That argument, however, fails on the law. hiQ has a good faith basis to allege that such exclusion occurred, and did so in the FAC. In all events, LinkedIn does not—because it cannot—deny that it sought to prevent all such competitors from accessing critical public employment information. Harm to competition is therefore not only plausible, but more likely than not.

LinkedIn's Motion is scattershot, hyper-technical, and wrong. Furthermore, LinkedIn fails to meaningfully address hiQ's non-Sherman Act claims, so this case will proceed no matter what. Respectfully, the Motion should be denied and the action should proceed to the next phase.

## II.     RELEVANT ALLEGATIONS AND BACKGROUND

### A.     LinkedIn Possesses Monopoly Power in Professional Social Networking

LinkedIn's core business and source of power is its professional social network platform, which today includes well over half a billion members and is a "must have" membership for any person wishing to engage in professional social networking. (FAC ¶¶ 20-21.) Today, LinkedIn members are "locked-in" to its professional social network. (*Id.* ¶¶ 116-17.) In its Motion, LinkedIn does not attempt to challenge that it has market and monopoly power in professional social networking or that its members are locked-in to its professional social network platform.

One of the ways LinkedIn grew its power in professional social networking was by

(a) telling members their information would remain their own (even if stored on LinkedIn's platform), and (b) allowing members to publicly share whatever employment information they wished. (*Id.* ¶ 27.) Most members chose to share at least a portion of their employment information publicly, so that they could be searchable online (via sites, like Google or Yahoo!, that scrape LinkedIn's website for web searches). (*Id.* ¶¶ 24, 40-41.) This public option was and remains one of the primary reasons members were attracted to LinkedIn's platform. (*Id.* ¶ 24.)

### B.   hiQ Creates a New Type of Predictive Employment Analytic Based on Employees' Public, Self-Curated Information

Founded in 2012, hiQ figured out that employers, particularly large ones, had a real need for data-driven analytics about their workforces. It therefore created an entirely new type of such analytics—people analytics—that quickly developed into its own category. (*Id.* ¶¶ 31-33.)

Demand for people analytics stems from their particular purpose; *i.e.*, they provide in-depth, data-driven insights into a workforce that the employer is unable to replicate on its own using purely internal data. (*See*, *e.g.*, FAC ¶¶ 32-33.) The key to these unique insights is that they rely on information that employees—both at the individual and aggregate level—self-curate and choose to share publicly, away from their employer. (*Id.*) Companies recognize that people analytics are a unique form of product and are willing to pay for such services, regardless of any *ad hoc* analytics such companies currently or historically used internally, because they offer unique value those customers are unable to provide themselves. (*Id.* ¶¶ 35-36.)

As a product category, people analytics did not exist before hiQ; however, several competitors (including LinkedIn) sprung up after hiQ created the market. (*Id.* ¶ 36.) Customers are willing to pay for such services in lieu of internal, *ad hoc* processes, and they will not switch to other types of services in the face of a price increase for all such services. (*Id.*) hiQ offers different types of people analytics, including its "Keeper" and "Skill Mapper" services, which respectively help HR functions by assessing employees' flight risk and untapped (or unknown) skills. (*Id.* ¶¶ 31, 33.) LinkedIn similarly offers different types of people analytics, as did other competitors until LinkedIn succeeded in either driving them out of the market or reducing their product quality such that they were unable to meaningfully compete anymore. (*Id.* ¶¶ 48-49, 52-54.)

Currently, the only viable data source for people analytics is the public employment information available on LinkedIn's platform. (*Id.* ¶¶ 25, 55.) Although hiQ originally tried to use other sources for its people analytics, it was unable to provide useful analytics based on those sources. (*Id.* ¶ 34, n.2.) When it was cut off from the public employment information LinkedIn hosts, hiQ was unable to provide any sort of quality analytics, and all other people analytics providers that LinkedIn cut off were similarly hobbled. (*Id.* ¶¶ 44, 53-54.)

**C.      After Encouraging People Analytics Competition For Years, LinkedIn Made an About Face and Now has Market and Monopoly Power in That Market**

Beginning in at least 2015, LinkedIn not only knew about hiQ and its people analytics, but also encouraged those services. LinkedIn participated each year in hiQ's annual "Elevate" conference, and even accepted an award from hiQ. (*Id.* ¶ 37.) hiQ, in turn, was open with LinkedIn about its practices, the data source for its analytics, and the benefits it brought to LinkedIn, including by, *inter alia*, incentivizing greater employer engagement (*e.g.*, paid subscriptions and advertisements) on LinkedIn. (*Id.* ¶ 38.)

Then, LinkedIn changed course with respect to all people analytics providers, because it was developing its own people analytics services. (*Id.* ¶¶ 39, 48-49.) LinkedIn technologically cut off its competitors' access to the public employment information on its platform, with the intent and effect of rendering their people analytics useless. (*Id.* ¶ 53.) Although LinkedIn claims it later reversed that self-help ban, by then the damage was done to hiQ and the broader market. (*Id.* ¶¶ 11-12, 51-53.) LinkedIn sealed that fate by sending a broad series of cease-and-desist letters to hiQ and all other people analytics providers, claiming that they could not access information that LinkedIn members marked public and made available for public review on the LinkedIn platform. (*Id.* ¶ 50.) Today, LinkedIn is the only major people analytics supplier left. (*Id.* ¶ 55.)

**III.      ARGUMENT**

On a Rule 12(b)(6) motion, the defendant bears the "burden of showing that no set of facts consistent with Plaintiff's allegations would entitle Plaintiff to relief." *Page v. Stanley*, 2012 WL 5471107, at *7 (C.D. Cal. Oct. 19, 2012), *report and recommendation adopted*, 2012 WL 5464629 (C.D. Cal. Nov. 9, 2012). Factual disputes are "not properly resolved" at the motion to dismiss stage,

*Boucher v. Shaw*, 572 F.3d 1087, 1092 (9th Cir. 2009), and "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009).

A complaint need include only "enough facts to state a claim to relief that is plausible on its face," *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and need only "give the defendant fair notice of a legally cognizable claim and the grounds on which it rests." *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1110 (N.D. Cal. 2013) (citing *Twombly*, 550 U.S. at 555). Put simply, "if the facts alleged raise a reasonable inference of liability—stronger than a mere possibility—the claim survives; if they do not, the claim should be dismissed." *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 2011 WL 1225912, at *5 (N.D. Cal. Apr. 1, 2011) (Chen, J.) ("*Church & Dwight I*").

### A.   LinkedIn Does Not Challenge the Majority of hiQ's Non-Antitrust Claims

In its Motion, LinkedIn provides no argument regarding the majority of hiQ's claims. Accordingly, the Motion fails as to those claims and they must proceed to discovery, because LinkedIn cannot raise arguments regarding them for the first time in reply. *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1035 (N.D. Cal. 2014). The only state law claim LinkedIn attacks is hiQ's tortious interference claim. *See* Mot. at 8. Its truncated argument against that claim, however, is premised on the same faulty analysis it offers as to the antitrust claims, *see infra at* 13-16, and fails for the same reasons. Moreover, this Court already ruled that the tortious interference claim tracks hiQ's UCL claim, which LinkedIn does not contest on this Motion. *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1118 n.14 (N.D. Cal. 2017) ("*hiQ I*"). Thus, the tortious interference claim should proceed on that basis alone.

### B.   In Arguing Against the "People Analytics" Market Definition, LinkedIn Ignores Both Well-Pled Allegations and Reality

LinkedIn is correct that hiQ's Section 1 and 2 antitrust claims each require it to plausibly allege a relevant product market. LinkedIn is also correct that the proper way to analyze the outer bounds of such a market is "reasonable interchangeability of use" between products. But that is where LinkedIn's market definition arguments run astray.

LinkedIn tries to reframe hiQ's allegations as though alleging a product market based on quality rather than the purposes for which consumers use people analytics. LinkedIn also argues that hiQ needs to use magic words and list every competitor and competitive product in order to plausibly allege a relevant market. Neither tack addresses hiQ's well-pled, non-conclusory fact allegations, and the latter clearly misstates the law. Both therefore fail.

### 1.   Consumers use people analytics services for a particular purpose, based on the *type* of analysis, not quality

"Reasonable interchangeability means all products which could be used for the same general purpose, despite functional or price differences among them." *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 996 (N.D. Cal. 2010) (citing *United States v. E.I. du Pont Nemours & Co.*, 351 U.S. 377, 396 (1956)). The purpose of this analysis is to identify "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). Although an alleged market cannot be obviously "not natural," "artificial," or "contorted to meet [plaintiff's] litigation needs," *id.* at 1121, "[u]ltimately what constitutes a relevant market is a factual determination for the jury." *Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1203 (9th Cir. 1997); *see also Twin City Sportservice v. Charles O'Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved . . . .").

As noted above, *see supra* at 4-5, hiQ alleges that demand for people analytics stems from the unique, data-driven insights they provide an employer, which the employer is unable to replicate using internal data. *Id.* The only source for such insights is people analytics providers, and employer customers would not switch to other types of services in the face of a people analytics-wide price increase. *Id.* These allegations focus on the purposes for which customers seek out the product in question, as well as the nature of other competitive products within the market; *i.e.*, define the market based on reasonable interchangeability of use. *See*, *e.g.*, *Pac. Mailing Equip. Corp. v. Pitney Bowes, Inc.*, 499 F. Supp. 108, 111 (N.D. Cal. 1980) (the relevant market "consists of those products or services which are reasonably interchangeable by consumers

for the same purpose."); *see also Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 892 (N.D. Cal. 2012) (Chen, J.) ("*Church & Dwight II*") (noting "is it [consumers for a product's] views as to the substitutability and interchangeability of products that matter"), *vacated in part on other grounds*, 2012 WL 1745592 (N.D. Cal. May 16, 2012).

Oddly, LinkedIn seems to argue that the alleged market definition is too *broad*, because it encompasses all types of people analytics rather than trying to compartmentalize them into relevant submarkets. *See* Mot. at 17 (arguing that, because hiQ's Keeper and Skill Mapper services have "different use cases," the market is "ill-defined"). Relevant market analysis, however, is typically concerned with overly *narrow* market definitions, because plaintiffs often try to gerrymander market definitions into smaller shapes, so they can more easily allege a defendant has market power. *See*, *e.g.*, *In re German Automotive Mfrs. Antitrust Litig.*, --- F. Supp. 3d ---, 2020 WL 1542373, at *6-7 (N.D. Cal. Mar. 31, 2020) (plaintiffs tried to allege "German only" automobile markets, which ignored that German automobile manufacturers compete with manufacturers from other regions). If LinkedIn wishes to argue later that the people analytics market should be subdivided into narrower categories, it can, but such an inherently factual contention now improperly ignores that hiQ alleges that multiple types of such services are reasonably interchangeable with each other. (FAC ¶¶ 33-34.)[1] Moreover, LinkedIn's argument is, at best, one against market power or monopoly power, not market definition, and hiQ explains below, *see infra* at 11-13, why it has plausibly alleged such power.

To the extent LinkedIn argues (at 17-19) that hiQ defines the market in terms of product

---

[1] LinkedIn's citations (at 15 n.7) to this Court's previous rulings in *Sheahan v. State Farm Gen. Ins. Co.*, 394 F. Supp. 3d 997 (N.D. Cal. 2019), and *Staley v. Gilead Sciences, Inc.*, --- F. Supp. 3d ---, 2020 WL 1032320 (N.D. Cal. Mar. 3, 2020), actually help establish this point. In contrast to here, where the product market is defined as workforce-oriented data analytics of all types (with the name "people analytics"), the plaintiff in *Sheahan* vaguely lumped clearly different categories of products into one relevant market, 394 F. Supp. 3d at 1010 ("insurance, data analytics, some combination of both?"), and the plaintiff in *Gilead Sciences* failed to explain whether a broad cART drug product market included "all" cART drugs, or just Gilead cART drugs. 2020 WL 1032320, at *29 n.31. Notably, the plaintiff in *Gilead Sciences* did articulate narrower markets based on allegations, such as those hiQ makes (FAC ¶¶ 33-36). Consumers would not switch to other products in the face of a price hike. 2020 WL 1032320, at *29. The remainder of the citations in LinkedIn's note 7 speak only in generalities inapplicable here.

1   quality rather than reasonable interchangeability, that argument misleadingly attempts to confuse

2   allegations regarding harm to competition with those about market definition. As discussed in

3   further detail below, *see infra* at 11-13, artificially reducing competitors' product quality in order

4   to maintain or obtain market/monopoly power is illegal under both Sections 1 and 2. The FAC

5   alleges that LinkedIn's scheme accomplished exactly that goal, leaving LinkedIn as the only high-

6   quality people analytics provider left. That establishes *anticompetitive effects*, and handily so.

7   LinkedIn's effort to equate such allegations with market definition is an attempt at misdirection.

8   *Cf. In re ATM Fee Antitrust Litig.*, 2010 WL 2557519, at *4 (N.D. Cal. June 21, 2010) (denying

9   motion to dismiss based on relevant market definition and noting "a court must construe the

10  pleadings in the light most favorable to the plaintiff, and must accept as true all material

11  allegations in the complaint, as well as any reasonable inferences to be drawn from them").

12      LinkedIn similarly tries to obscure the issues when it argues (at 17-18) that hiQ defines the

13  market based solely on the use of LinkedIn's data, and that this supposedly means hiQ alleges a

14  "single-brand" market. But that is not what hiQ alleges at all. People analytics rely on employees'

15  self-curated public employment information. *See supra* at 4. Such insights do not depend on the

16  specific source of the data, but rather its self-curated and public nature. *Id.* To be sure, the market

17  reality is that LinkedIn currently controls the essential input for such analytics (*see* FAC ¶¶ 25-

18  26), but it is immaterial whether that input is maintained by one or multiple companies. Were that

19  data maintained collectively by several companies, LinkedIn would not have the monopoly and

20  market power it is now abusing. *See infra* at 22-23.

21      At bottom, LinkedIn confuses the novel type of *insights* people analytics provide—which

22  create unique customer demand for such services, *see supra* at 4-5—with the idea that markets

23  often include products of varying quality.[2] LinkedIn's misdirection, however, does not change the

24  ───────────────────

25      [2] LinkedIn's citations on this point (at 18) add nothing to the discussion, because, like the
    alleged people analytics market here, all observed that a product's *purpose* is the key to reasonable
26  interchangeability, even if there are higher- and lower-quality variants of the same type of product.
    *See Haagen-Daaz Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417, at *3 (9th
27  Cir. 1990) (different ice cream brands, while unique, "do[] not constitute a separate product
    market"); *U.S. v. E. I. du Pont*, 351 U.S. at 399 (cellophane was within the same market as other
28

1   plausibility of hiQ's factual allegations, nor the reasonable inferences to draw therefrom.

2   **2.    hiQ is not required to use magic words nor identify every single competitor to plausibly allege a relevant market**

3   The remainder of LinkedIn's arguments against relevant market definition (at 16-17) are

4   hyper-technical and seek to impose a burden on hiQ that the law does not require.

5   *First*, although it is true hiQ did not use the words "substitute" or "cross-elasticity of

6   demand" in the FAC (*see* Mot. at 16), that is irrelevant. hiQ alleged, in non-conclusory fashion,

7   people analytics' defining features; the purposes to which customers put such services; the nature

8   of demand for them; and that hiQ, LinkedIn and multiple other companies provided—or attempted

9   to provide—those services. *See supra* at 6-11. This is more than sufficient under applicable law.

10  *See ATM Fee*, 2010 WL 2557519, at *5 (plaintiffs need only plead facts showing that their

11  product market "bear[s] a rational relation to the methodology courts prescribe to define a market

12  for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand,

13  and it must be plausible."); *Datel*, 712 F. Supp. 2d at 997 (plausible market where plaintiff alleged

14  that the Xbox 360 and Playstation 3 consoles were differentiated from other types of gaming

15  systems due to, *inter alia*, distinct functionality, consumer perception, and customer targeting).

16  *Second*, LinkedIn is simply incorrect in suggesting (at 16-17) that hiQ needs to identify, by

17  name, all competitors and product names. That is not the law. *See Newcal Indus., Inc. v. Ikon

18  Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("There is no requirement that [the market

19  definition] elements of the antitrust claim be pled with specificity."). But, even if it were, hiQ

20  explicitly alleges that LinkedIn itself now sells people analytics services, and that other companies

21  (listed below) did so as well, until they fell victim to LinkedIn's scheme. *See supra* at 5.

22  To the extent LinkedIn suggests (at 17) that hiQ could not provide such additional

23  allegations, that simply ignores reality. As an initial matter, LinkedIn very clearly offers people

24  

25  

26  _____

27  types of flexible wrapping, even if some consumers preferred cellophane); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("UCLA women's soccer program," although higher

28  quality, is interchangeable with other intercollegiate athletic programs offering similar teams).

analytics via, *inter alia*, its "Talent Insights"[3]; indeed, it literally touts the services it provides, which are the same or similar to those hiQ innovated, as "people analytics."[4] As for other people analytics providers that have suffered from LinkedIn's scheme, examples include TalentBin, Refresh, Connectifier, Bright.com, Jobr, Hiring Solved, Gild, Glint, Seekout, and ZapInfo. Some have been relegated to obscurity; LinkedIn acquired others following a cease-and-desist letter; and still others succumbed to LinkedIn's scheme in other ways.

### C.   Given High Market Share, High Barriers to Entry, and Proven Ability to Exclude Competitors, LinkedIn Clearly Has Market/Monopoly Power

As this Court previously recognized, a plaintiff alleging a Section 1 claim under the rule of reason (as hiQ does here) must plausibly establish the defendant's "market power," which is "the power to force a purchaser to do something that he would not do in a competitive market." *Church & Dwight II*, 868 F. Supp. 2d at 896 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992)). Similarly, under Section 2, a plaintiff must plausibly allege "monopoly power," which is "narrower than market power." *Id.* at 900 n.10. Monopoly power is the "power to control prices or exclude competition." *Id.* at 916 (quoting *Kodak*, 504 U.S. at 481).

For both, a plaintiff may establish such power through direct or circumstantial evidence. Direct evidence includes evidence of "restricted output and supracompetitive prices." *Id.* at 896 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)). Circumstantial evidence includes allegations of dominant market share in a market with significant barriers to entry, and in which existing competitors are unable to increase their output in the short run. *Id.* at 898. This Court has also previously observed there is a "functional approach" to direct evidence, which looks at "the ability to exclude some competitors from the market, even in the absence of market-wide restricted output or supracompetitive prices . . . especially given [a defendant's] undisputed dominant market share." *Id.* at 900.

LinkedIn argues (at 19-20) that hiQ does not plausibly allege LinkedIn's market and monopoly power, but, as with much of the Motion, does so only by misconstruing the FAC's fact

---

[3]   *See* https://business.linkedin.com/talent-solutions/talent-insights.

[4]   *See* https://business.linkedin.com/talent-solutions/recruiting-tips/global-talent-trends-2020.

allegations and by ignoring the reasonable inferences that flow therefrom.

As an initial matter, hiQ unquestionably alleges direct evidence of market and monopoly power under the "functional approach." LinkedIn excluded hiQ and other competitors from the market (and claims the power to do so at will), and it has an extremely high, dominant market share. *See supra* at 11-12. LinkedIn quibbles (at 20) that hiQ does not allege a specific market share percentage, but the clear allegation and inference is that LinkedIn's share now encompasses nearly the *entire* market (*i.e.*, far above 50%) and that LinkedIn is able to maintain that market share regardless of competitors' efforts. *See, e.g.*, *Datel*, 712 F. Supp. 2d at 998 (market power based on allegations that, *inter alia*, defendant "controls over 50% of both markets"); *see also United States v. Syufy Enterp.*, 903 F.2d 659, 665-66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to maintain market share."). But, even if this were not the case, it is a simple amendment; hiQ can allege that LinkedIn now dominates well over 90% of the market.

As for circumstantial evidence, besides LinkedIn's high market share, hiQ alleges high barriers to new entry and competitors' inability to increase output in the short term to compete against LinkedIn. The only current, viable input for people analytics services is the public employment information LinkedIn maintains. *See supra* at 4-5. New entrants would need to outlay incredible amounts to even attempt to recreate such a data source, which is essentially impossible at this point. (FAC ¶ 26.) LinkedIn has effectively foreclosed all people analytics competitors from accessing that data source, thereby preventing any from selling services that can actually compete with LinkedIn's own. *Id*. These are quintessential high barriers to entry.[5]

In terms of competitors' inability to increase output in the short term, they simply cannot do so without access to the key data source. (*See* FAC ¶¶ 11, 25-26, 44.) Moreover, increasing

---

[5]   *See, e.g.*, *Rebel Oil*, 51 F.3d at 1439 (entry barriers are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns," including, *inter alia*, "control of an essential or superior resource" [*i.e.*, the public employment information], "entrenched buyer preferences for established brands" [*i.e.*, locked-in LinkedIn users], "capital market evaluations imposing higher capital costs on new entrants" [*i.e.*, the cost to create or obtain a data source comparable to the LinkedIn user public employment information database], and "economies of scale [*i.e.*, the ability to pool data from a social network hundreds of millions strong]).

product quality in the market, although not a way to define the market itself, *is* a way to increase market output. *Cf.* Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1901d (3rd & 4th Eds., 2018 Cum. Supp. 2010-2017) (an agreement "to make a product of inferior quality ... count[s] as [an] output reduction"). As hiQ alleges, LinkedIn prevents competitors from doing so, thereby hobbling their ability to increase market output in the short- *and* long-term. *See supra* at 5. For these reasons, hiQ plausibly alleges circumstantial evidence of LinkedIn's power along with direct evidence of its power.

### D.   Under the *Hynix* and *USS-POSCO* Doctrines, LinkedIn's Cease-and-Desist Letter Campaign is Actionable as Part of its Broader Anticompetitive Scheme

Understanding that hiQ plausibly alleges a relevant market in which LinkedIn possesses power, the next question is whether LinkedIn acted anticompetitively in that market. LinkedIn's centerpiece defense in this regard (at 7-12) is that the *Noerr-Pennington* doctrine supposedly immunizes it from antitrust liability for its cease-and-desist letter campaign. This argument errs, however, by ignoring the *Hynix* and *USS-POSCO* doctrines, which respectively render LinkedIn's campaign actionable either as part of a larger anticompetitive scheme, or as an independently anticompetitive pattern of baseless legal threats. LinkedIn's primary dismissal argument thus fails.

### 1.   The *Hynix* doctrine renders LinkedIn's cease-and-desist letters actionable as part of its broader anticompetitive scheme

In *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007), another court in this District conducted a survey of relevant authority regarding when, if, and how petitioning activity may be actionable if it is part of a broader anticompetitive scheme. Based on that survey, the *Hynix* court concluded that "scheme" antitrust allegations may include otherwise-protected petitioning activity "within the 'overall course of conduct,'"[6] but only if "other aspects of the scheme independently produce anticompetitive harms" and the petitioning activity "was causally connected to these anticompetitive harms." *Id.* at 1096-97. Multiple courts since have

---

[6]   Anticompetitive schemes and the alleged harm they cause must be viewed in their entirety rather than broken into their constituent parts. *See, e.g.*, *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (it is improper "to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect").

applied the *Hynix* doctrine to scheme allegations,[7] and, although *Hynix* addressed an alleged scheme involving anticompetitive patent litigation, the doctrine applies to all petitioning activity.[8]

A particularly relevant example of a case applying the *Hynix* doctrine from this District is *Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-cv-00923-BLF, Dkt. 281 (N.D. Cal. May 21, 2018) ("*Arista* MSJ Order").[9] In *Arista*, the plaintiff alleged that the defendant engaged in an "open early, closed late" scheme, whereby it allegedly encouraged its customers to adopt its products with the understanding they could openly use its interface on multiple manufacturers' devices (the "open early" step), and then, once it had a dominant market position, began excluding competition through a variety of different mechanisms (the "closed late" step), including actual litigation, threats of litigation, and a FUD campaign. *Id.* at 4-5, 16. The defendant moved for summary judgment based on *Noerr-Pennington*, arguing that its copyright and patent infringement lawsuit, as well as its public statements about that lawsuit, were immunized. *Id.* at 15. Relying on *Hynix*, the Court denied the defendant's motion, because it found the public FUD campaign was not protected petitioning activity and caused independent anticompetitive harms. *Id.* at 17-22.

This is a much simpler case than *Arista*. LinkedIn encouraged users, by word and conduct, to join its professional social network with the understanding that their public employment information remained their own and would, in fact, be publicly accessible. (FAC ¶ 27.) LinkedIn similarly encouraged employers to join the network (and have their employees join the network). (*Id.* ¶¶ 29, 117.) LinkedIn not only permitted people analytics competitors to access public employment information, but also encouraged them in various ways. (*Id.* ¶ 37.) During this period,

---

[7]  *See, e.g.*, *Funai Elec. Co. v. LSI Corp.*, No. 2017 WL 1133513, at *5-6 (N.D. Cal. Mar. 27, 2017); *Microsoft Mobile Inc. v. Interdigital, Inc.*, 2016 WL 1464545, at *3-4 (D. Del. Apr. 13, 2016); *Zenith Elecs., LLC v. Sceptre, Inc.*, 2015 WL 12765633, at *6 n.2 (C.D. Cal. Feb. 5, 2015).

[8]  Indeed, neither *Noerr* nor *Pennington* involved any sort of patent litigation. *See E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129 (1961) (petitioning included trying convince government to take adverse action toward trucking companies); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965) (petitioning included efforts to influence public officials). LinkedIn would therefore have no basis on reply to argue that the *Hynix* doctrine, which circumscribes the *Noerr-Pennington* doctrine based on broader concepts of antitrust law, is limited only to patent litigation.

[9]  The *Arista* MSJ Order is attached as Exhibit A to the Declaration of Corey Worcester.

LinkedIn amassed tremendous power in professional social networking (the "open early" step) and, after amassing that unquestioned power, cut off competitors' access to the public employment information on its platform, as well as began issuing cease-and-desist letters (the "closed late" step). The steps LinkedIn took to cut off competitors' access were themselves anticompetitive under multiple different doctrines. *See* Section III.E, *infra*. Its cease-and-desist letter campaign is therefore an additional anticompetitive act under the *Hynix* doctrine, because it is "causally connected" to the efforts to cut off competitors' access to the public employment information.

### 2. The *USS-POSCO* doctrine renders LinkedIn's pattern of baseless cease-and-desist letters actionable as a standalone anticompetitive act

Even if the *Hynix* doctrine alone were not enough to negate *Noerr-Pennington* here, the Ninth Circuit's *USS-POSCO* doctrine provides an alternative basis to do so. In that case, the Ninth Circuit observed that the Supreme Court, in *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), made clear that initiating "a whole series" of legal proceedings "without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade." *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994).[10] "The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id.* This includes both multiple proceedings asserted against one competitor, as well as proceedings asserted against multiple competitors. *See, e.g.*, *Kaiser Foundation Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (series of individual lawsuits against different competitors could qualify as a sham pattern). Multiple Circuit Courts of Appeal have since adopted the same reasoning for "series" claims. *See Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 178–81 (3d Cir. 2015); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363–64 (4th Cir. 2013); *Primetime 24*

---

[10] It is for this reason that LinkedIn's extensive discussion of the sham litigation standard (at 10-11) is almost entirely irrelevant to this dispute. That standard applies only to a single sham petition, not a series of them. *Id.*

1    *Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000).

2           hiQ alleges exactly the sort of sham campaign that *Cal. Motor Transport* and *USS-POSCO*

3    prohibit. LinkedIn sent numerous cease-and-desist letters to its people analytics competitors, all of

4    which were baseless. (FAC ¶ 46.) This negates *Noerr-Pennington*'s application to hiQ's claims.

5    *See*, *e.g.*, *Relevant Grp., LLC v. Nourmand*, 2020 WL 2523115, at *5 (C.D. Cal. May 18, 2020)

6    (finding that *Noerr-Pennington* did not apply to RICO claim under *USS-POSCO* where plaintiff

7    alleged sham pattern of environmental lawsuits and threats of such lawsuits).

8           Indeed, underscoring why the *USS-POSCO* doctrine applies is that none of the bases on

9    which courts have previously dismissed such claims are present in this case. hiQ alleges that *all* of

10   LinkedIn's litigation threats were baseless (FAC ¶¶ 39-42), which is in contrast to other instances

11   where success on 50% or more of the legal proceedings indicated the overall series was not a

12   sham. *See*, *e.g.*, *USS-POSCO*, 31 F.3d at 811-12; *Kaiser*, 552 F.3d at 1047. Similarly, hiQ alleges

13   that LinkedIn made threats to every major people analytics competitor, and engaged in self-help

14   with respect to all. (FAC ¶ 46.) This is in marked contrast to cases dismissing sham series claims

15   because there were too few threats or lawsuits to constitute a "series" or "pattern,"[11] although even

16   four such proceedings can constitute a sham pattern. *Hanover 3201 Realty*, 806 F.3d at 181.

### E.    hiQ Alleges Anticompetitive Conduct Under Multiple, Well-Accepted, Overlapping Doctrines

17
18          hiQ alleges claims under both Sections 1 and 2 of the Sherman Act. Section 1 prohibits any

19   "contract, combination, … or conspiracy" that unreasonably restrains competition. *Cal. ex rel.*

20   *Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011). The touchstone is "concerted action"

21   between two or more entities. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190

22   (2010). Section 2, in contrast, "covers both concerted and independent action." *Id.*

23          Under Section 1, conduct of the type hiQ alleges is analyzed under the "rule of reason,"

24   which weighs the conduct's anticompetitive effects against its non-pretextual procompetitive

25   benefits. *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d

26

---

27          [11]  *See*, *e.g.*, *Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996), *as amended* (Jan. 15, 1997) (two lawsuits and essentially identical counterclaim in a third not "a whole series").

28

1239, 1256(9th Cir. 2020).[12] If the anticompetitive effects outweigh the procompetitive benefits, then the competitive restraint is illegal. *Id.*; *see also Safeway*, 651 F.3d at 1133 n.10 (same).

Under Section 2, actionable anticompetitive conduct "is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). Thus, "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory . . . . [The word] 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1036 (C.D. Cal. 2007).

Evidence of an act's anticompetitive nature includes, *inter alia*, excluding all (or nearly all) competitors; artificially depressing competitors' product quality; and reducing consumer choice. *See*, *e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284(2018) (direct evidence of anticompetitive effects includes, *inter alia*, "reduced output…or decreased quality in the relevant market"); *CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) (evidence of anticompetitive effects included limited consumer choice, decreased scope of services and price competition in the market, and foreclosure of rivals from entry to the market); *Image Tech.*, 125 F.3d at 1209 (noting a monopolist cannot engage in conduct "that unnecessarily excludes or handicaps competitors in order to maintain a monopoly").

These standards overlap in many ways, and are subject to similar analysis under multiple different doctrines. But the key to each is *flexibility*, because "[a]nticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) (*en banc*) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). Furthermore, it is improper "to focus on specific individual acts of an accused

---

[12] Section 1 also addresses *per se* illegal conspiracies, such as price fixing, bid rigging, and market allocation conspiracies. hiQ does not allege that LinkedIn engaged in such conduct here.

monopolist while refusing to consider their overall combined effect." *City of Anaheim*, 955 F.2d at 1376. Likewise, "[b]ehavior that might otherwise not be of concern to the antitrust laws . . .  can take on exclusionary connotations when practiced by a monopolist." *Image Tech.*, 125 F.3d at 1217 (quoting *Kodak*, 504 U.S. at 488).

### 1. The unilateral refusal to deal standard does not apply to conduct that, as hiQ alleges, forced third parties to bend to LinkedIn's power

As noted above, Sections 1 and 2 of the Sherman Act each cover concerted action that harms competition. The refusal to deal standard upon which LinkedIn so heavily relies, however, applies only to *unilateral* conduct. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004). hiQ alleges, *inter alia*, concerted action between LinkedIn and third parties—albeit forced concerted action, which is still an abuse of LinkedIn's market and monopoly power (discussed below). LinkedIn ignores these allegations and its failure to meaningfully engage with the concerted action theories dooms its Motion.

***Vertically-arranged boycotts.*** A vertically-arranged boycott is one in which a defendant with market or monopoly power harms competition by restraining a third party at a different level of the supply chain from dealing with the defendant's competitors. For example, in *Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752 (11th Cir. 1983) ("*CAT*"), a dominant sand, gravel, and other rock material ("aggregate") producer forced a key hauler to not transport its competitor's aggregate; *i.e.*, to boycott providing services to that competitor. This caused the competitor substantial harm and the restraint, although involuntary on the hauler's part, was assessed under the rule of reason. *Id.* at 777-79; *see also Calculators Haw., Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1337 n.2 (9th Cir. 1983) (*concerted* refusal to deal with company between participants at different levels of the supply chain subject to the rule of reason).

hiQ alleges that LinkedIn always represented that users' public employment information is their own, to share however they want. (FAC ¶ 27.) Yet, now that LinkedIn possesses power in professional social networking and has locked in those same users, LinkedIn prohibits them from actually sharing their employment information in the manner they choose, in order to harm competition for people analytics. (*Id.* ¶¶ 44, 46-47.) LinkedIn does so via a bad faith reading of its

1    User Agreement, as well as via its control over its users' public employment information. (*Id.*

2    ¶¶ 39-40.) This, in turn, destroys people analytics competitors' ability to compete (*id.* ¶ 53), and

3    therefore is a vertically-arranged boycott subject to the rule of reason. *CAT*, 710 F.2d at 777-79.

4            LinkedIn's sole citation regarding this theory of liability, *Genetic Sys. Corp. v. Abbott*

5    *Labs.*, 691 F. Supp. 407 (D.D.C. 1988), is inapposite. As that decision makes clear in language

6    LinkedIn omits from its selective quotations, a "group boycott" in antitrust parlance is a

7    "conspiracy by more than one entity *at the same level of competition*." *Id.* at 417 (emphasis

8    added). The plaintiff in *Genetic Sys.* failed to allege a vertically-arranged conspiracy *between*

9    *horizontal competitors* (also known as a hub-and-spoke conspiracy[13]), and could not allege any

10   actionable vertical combinations, because it alleged a conspiracy between a corporation and its

11   own incorporated business units, which is not an actionable combination under the Supreme

12   Court's *Copperweld* doctrine. *Id.* at 418. In contrast, hiQ does *not* allege a horizontal conspiracy

13   between LinkedIn and other competitors; it alleges that LinkedIn forced its users to not allow

14   LinkedIn's people analytics competitors to access their public employment information. Such an

15   arrangement, even if forced upon LinkedIn's users, is an actionable vertical competitive restraint

16   subject to both Sections 1 and 2. *See CAT*, 710 F.2d at 777-79.

17           ***Raising rivals' costs.*** Another concerted action-based competitive restraint is LinkedIn's

18   use of the LinkedIn User Agreement to prevent people analytic providers from accessing users'

19   otherwise public employment data. Invoking the User Agreement (*i.e.*, contract with LinkedIn

20   users) in this manner, LinkedIn artificially raised its people analytics competitors' costs and

21   pushed them out of the market. (FAC ¶¶ 120-24.) Concerted action having this effect has long

22   been considered anticompetitive under both Sections 1 and 2, and is clearly not subject to the

23   unilateral refusal to deal standard.[14] LinkedIn's Motion provides no argument to the contrary.

24   _____

25       [13]  *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir.
     2015) (a "traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant
26   purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical
     agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements
27   among the spokes.").

28       [14]  *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (defendant's

To the extent LinkedIn's unilateral actions raised its rivals' costs, Section E.2 below discusses in further detail the multiple, well-accepted unilateral action doctrines under which such behavior violates Section 2 irrespective of the unilateral refusal to deal standard.

**Tying.** A tying arrangement violates the Sherman Act if the plaintiff proves that the defendant (1) tied together the sale of two distinct products or services; (2) possesses enough economic power in the tying product market to coerce its customers into the tying arrangement; and (3) affected a not insubstantial volume of commerce in the tied product market. *Cascade Health*, 515 F.3d at 913 (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)). Contrary to LinkedIn's argument (at 28), the actual "tie" need not occur at the time of the original purchase of the tying product (here, joining LinkedIn's professional social network). *See*, *e.g.*, *Kodak*, 504 U.S. at 463 (tying occurred when copying machine consumers needed to purchase repair parts and/or services). Furthermore, tying violations occur where the defendant coerces a counterparty into agreeing they "will not purchase the tied product from any other supplier." *Paladin*, 328 F.3d at 1159; *see also Kodak*, 504 U.S. at 461 (tie occurs where purchaser "at least agrees that he will not purchase that [tied] product from any other supplier").

For hiQ's tying claim, the relevant consumers are *employers* that purchase people analytics; not, as LinkedIn argues (at 28), the LinkedIn members who post their employment information publicly. *See Church & Dwight II*, 868 F. Supp. 2d at 892 (the proper focus for an antitrust claim is "the relevant 'consumers'" allegedly targeted by the claim). LinkedIn used its

---

exclusionary contracts relegated rival Netscape to higher-cost distribution channels); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (similar); *JTC Petrol. Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778-79 (7th Cir. 1999) (members of cartel may have paid off suppliers to charge cartel rivals significantly higher prices); *Premier Elec. Constr. Co. v. National Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 370-31 (7th Cir. 1987) (alleged agreement between union and contractors' association probably intended to raise the costs of nonmember contractors).

Furthermore, to the extent LinkedIn selectively quotes the Areeda & Hovenkamp treatise to imply that a raising rivals' costs theory of liability is not actionable on its own, that is a clear misstatement. The full quote states that *unreasonably* raising rivals' costs is illegal. *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶651 (4th ed., 2020 Cum. Supp. 2013-2019) ("As a result, raising rivals' costs can never operate as a *complete* test for exclusionary conduct. One must always add 'unreasonably,' but that invariably requires some kind of balancing or trade-off.") (emphasis in original).

undisputed power in professional social networking to coerce employers into *not* purchasing hiQ's (or any other people analytics provider's) service. (FAC ¶ 126.) This coercion, in turn, foreclosed nearly all commerce in the tied people analytics market. (*Id.* ¶¶ 125-29.) Thus, hiQ plausibly alleges illegal tying, which is not analyzed under the unilateral refusal to deal standard.

### 2.   LinkedIn's conduct is similarly anticompetitive under multiple other unilateral action doctrines

Even if hiQ had not alleged concerted action subject to multiple different antitrust standards, LinkedIn cannot wish away the multiple unilateral conduct doctrines under which its conduct is actionable. Courts routinely recognize this principle and analyze the same anticompetitive conduct under multiple different theories, even if one of those theories is the unilateral refusal to deal standard.[15]

*Abuse of power derived from locked-in consumers.* Yet another well-accepted theory under which LinkedIn's conduct is anticompetitive is the *Kodak* "lock-in" doctrine. If a defendant lures in consumers such that they become "locked-in" to the defendant's products or services, and then abuses the power they have over such consumers in order to harm competition, that is anticompetitive. *See*, *e.g.*, *Kodak*, 504 U.S. at 478-79. Contrary to LinkedIn's arguments (at 28), *Kodak* is not limited to abuse of aftermarkets; it applies to any harm to competition based on exploiting power derived from locked-in consumers. *See, e.g.*, *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 399 (3d Cir. 2016) ("[W]e interpret *Kodak* as standing for two propositions: (1) that firms operating in a competitive primary market are not thereby categorically insulated from antitrust liability for their conduct in related aftermarkets; and (2) that exploitation of locked-in customers is one theory that courts will recognize to justify such liability."); *cf. Kodak,* 504 U.S. at 466-67 ("Legal presumptions that rest on formalistic distinctions rather than actual market

---

15   *See*, *e.g.*, *Kodak*, 504 U.S. at 463 n.8 (noting that, despite defendant's argument the case was just about a refusal to deal, the conduct at issue was properly analyzed under the tying doctrine as well); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) (analyzing the same core set of facts under theories of exclusive dealing, bundled discounts, price discrimination, and unilateral refusal to deal); *see also LePage's*, 324 F.3d at 152 ("Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.") (internal quotations omitted).

1   realities are generally disfavored. This Court has preferred to resolve antitrust claims on a case-by-

2   case basis, focusing on the 'particular facts disclosed by the record.'") (citations omitted).

3          hiQ alleges that LinkedIn engaged in exactly such behavior. The FAC details how

4   LinkedIn drew in individual members and employer users to its professional social network

5   through a variety of means that locked-in all such users. (FAC ¶¶ 116-17.) Today, the users *must*

6   have a LinkedIn account for professional social networking, even if they use other social networks

7   as well. (*Id.* ¶ 116.) Contrary to LinkedIn's improper factual (and fantastical) argument (at 28), the

8   FAC alleges in non-conclusory fashion that LinkedIn users *cannot* simply delete their account if

9   they wish to engage in professional social networking today. (*Id.*)

10         This lock-in gives LinkedIn unquestioned power over its users and their public

11  employment information, (*id.* ¶¶ 116-19), power it has exploited to harm competition in the people

12  analytics market (*id.* ¶ 118). These allegations lead to the inevitable conclusion that, by reversing

13  course with the "public" nature of now-locked-in users' employment information in order to harm

14  competition, LinkedIn is acting anticompetitively. *See, e.g.*, *Arista* MSJ Order, at 27-28 (finding

15  that *Kodak* applied to defendant's alleged "open early, closed late" scheme).

16         LinkedIn has no real response to the *Kodak* doctrine's applicability. *First*, it dissembles (at

17  27-28) by arguing this is just a species of hiQ's previous promissory estoppel claim. It is not.

18  LinkedIn does not—cannot—argue that it lacks power over locked-in users. Nor can it dispute the

19  FAC alleges it exploited that power to harm competition. *See id.* Thus, the question on this Motion

20  is whether that exploitation is anticompetitive; it is *not* whether there were actionable promises at

21  the user level. LinkedIn's main argument against *Kodak* lock-in liability is thus a red herring.

22         *Second*, LinkedIn argues that the *Kodak* doctrine only applies to aftermarket sales. As

23  discussed above, that is entirely incorrect.

24         ***Denial of access to an essential facility.*** LinkedIn's sole argument against hiQ's essential

25  facilities theory of liability (at 26-27) is that access to the public employment information stored

26  on LinkedIn's platform supposedly is not "essential" for people analytics providers because

27  (a) hiQ alleged that it originally tried to use other, much more limited data sources for its people

28  analytics—and failed, because they were too limited, even in the aggregate, (FAC ¶ 34 n.2); and

(b) employers have internal data on their employees that they have tried—and failed—to use in the past to perform *ad hoc* predictive analyses of their employees, (*id.* ¶ 35). Neither of these, however, negates the essential nature of LinkedIn users' public employment information.[16]

In this regard, LinkedIn once again errs by zeroing in on a single allegation (*id.* ¶ 34 n.2) without considering the whole. *Church & Dwight I*, 2011 WL 1225912 at *16. A facility is "essential" if access to it is necessary to compete and is "otherwise unavailable [to a competitor] and cannot be reasonably or practically replicated." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1129-30 (9th Cir. 2004) (quoting *City of Anaheim*, 955 F.2d at 1380). As LinkedIn concedes, such a facility is not the "best" available, but rather one where "control of the facility carries with it the power to eliminate competition in the downstream market." *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991). Importantly, this illustrates that a market may have multiple available facilities, but still include an *essential* facility.

hiQ alleges that it tried to use other data sources for its people analytics, but that they were insufficient for the task and did not permit the sort of insights that define people analytics. (FAC ¶ 34 n.2.) In contrast, the public employment information LinkedIn maintains is the *only* data source available—whether in isolation or in combination—that allows for people analytics. (*Id.* ¶ 25.) To this point, not only hiQ, but also every *other* people analytics provider was unable to provide people analytics following LinkedIn's efforts to cut them off. (*Id.* ¶ 11.) This demonstrates the essential nature of the public employment information on LinkedIn's platform in the people analytics market, and why LinkedIn's dismissal arguments on this theory of liability fail.[17]

***Monopoly leveraging.*** The initial problem with LinkedIn's argument on monopoly leveraging (at 29) is that the Ninth Circuit does recognize such a claim. *See AFMS, LLC v. United Parcel Serv. Co.*, 2011 WL 13135632, at *15 (C.D. Cal. May 27, 2011). The key in the Ninth Circuit is that the defendant must use its monopoly power in one market to gain or attempt to gain

---

[16] LinkedIn does not challenge any of the other essential facility elements, and thus has waived such arguments. *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

[17] Furthermore, to the extent the Court finds that the current allegations do not adequately flesh out this essential nature, remedying any such deficiencies is a straightforward amendment.

monopoly power in another market, while other Circuits hold that it is enough to just obtain a

"competitive advantage" in the second market. *Id.*; *InfoStream Grp., Inc. v. PayPal, Inc.*, 2012

WL 3731517, at *4-5 (N.D. Cal. Aug. 28, 2012).

Nevertheless, implicit in LinkedIn's argument is that, if hiQ plausibly alleged other

anticompetitive conduct, then it has also plausibly alleged leveraging accompanying that conduct.

*See* Mot. at 29. For the reasons discussed at length above, hiQ has done exactly that.

### 3. hiQ plausibly alleges an anticompetitive unilateral refusal to deal

LinkedIn offers two arguments against hiQ's unilateral refusal to deal allegations: (1) that

hiQ is judicially estopped from making such an argument, and (2) in any event, hiQ does not

allege the necessary elements. Both arguments fail.

#### (a) hiQ never disclaimed a refusal to deal theory at the Ninth Circuit; it noted that it wanted to be left alone to compete on the merits

The irony of LinkedIn's judicial estoppel argument is it demonstrates that LinkedIn's

attempt to cast this entire dispute as one about unilateral refusal to deal is disingenuous. hiQ

previously argued there is no need to resort to the unilateral refusal to deal standard because this

dispute provides strong evidence of anticompetitive intent under multiple other liability theories.

In the Ninth Circuit brief LinkedIn cites (at 21), hiQ was clear that it believed (and believes)

LinkedIn's acts are anticompetitive because it has no right to cut hiQ off from public data, and that

LinkedIn's only reason to do so is in order to harm competition.[18] As discussed above, these

statements are fully consistent with hiQ's allegations that LinkedIn's conduct is anticompetitive

under multiple theories of liability. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (a party's

new assertion must be "clearly inconsistent" with its earlier position, in order to judicial estoppel

to potentially apply). Moreover, hiQ was clear in moving for a TRO that it believes LinkedIn's

conduct is an anticompetitive denial of access to an essential facility, which LinkedIn admits is a

"variation on a refusal to deal claim." *Compare* Mot. at 26; *with hiQ I*, 273 F. Supp. 3d at 1117-18

---

[18] Dkt. 138, at 49 ("hiQ asked nothing of LinkedIn," and "the information for which LinkedIn has blocked hiQ's access is not only publicly accessible, but does not belong to LinkedIn in the first place"), 3 ("hiQ's business requires no affirmative assistance from LinkedIn because hiQ uses only data belonging to LinkedIn's members who expressly made their profiles public").

1   (hiQ presented evidence that LinkedIn's conduct violates the spirit of the antitrust laws, including

2   by denying access to an essential facility).

3          Nevertheless, just because hiQ does not *need* to rely on the unilateral refusal to deal

4   standard to state a claim does not mean that such a claim does not exist. Furthermore, neither this

5   Court's nor the Ninth Circuit's findings hinged on whether hiQ asserted (or not) a unilateral

6   refusal to deal theory at that time; therefore, even if there were an inconsistency now (which there

7   is not),[19] judicial estoppel does not apply. *See Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d

8   778, 783 (9th Cir. 2001) (judicial estoppel only applies "to cases where the court relied on, or

9   'accepted,' the party's previous inconsistent position").

10                 (b)      hiQ alleges all the "hallmarks" of an illegal refusal to deal

11         No one disputes that the unilateral refusal to deal standard is an exception to a company's

12  default right to choose with whom one wants to do business. The Supreme Court and Ninth

13  Circuit, however, have repeatedly recognized there are several hallmarks establishing when "the

14  only conceivable rationale or purpose" for refusing to deal with a competitor is anticompetitive in

15  nature. *See* Mot. at 22-23 (quoting *Aerotec*, 836 F.3d at 1184). These include when a defendant

16  monopolist (1) terminates a "voluntary and profitable course of dealing;" (2) refuses to deal or

17  offers to deal only on unreasonable terms and conditions that "amount to a practical refusal to

18  deal"; and (3) refuses to provide competitors with products that the defendant is willing to provide

19  other customers. *MetroNet Servs.*, 383 F.3d at 1132-33. A plaintiff alleging such facts plausibly

20  establishes a refusal to deal claim. *See*, *e.g.*, *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874,

21  894 (N.D. Cal. 2011). hiQ does so here.

22         ***Prior voluntary course of dealing.*** LinkedIn's first argument (at 23-24) is that a plaintiff

23  cannot establish a voluntary course of dealing unless it cites some sort of formal agreement. That

24  is not the law, as LinkedIn's own citation shows. In *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F.

25  App'x 554 (9th Cir. 2008), the Ninth Circuit noted that knowing acceptance of a practice can be

27         [19]  *See generally hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019); *hiQ I*, 273 F.

28  Supp. 3d 1099.

evidence of a voluntary course of dealing, as can evidence of an "implicit understanding." *Id.* at 557. The key is that the understanding be between the parties; in *LiveUniverse*, there was no such evidence because the plaintiff only alleged that the social network defendant knew its users were able to link to outside websites, rather than that they were linking to the plaintiff. *Id.* This was evidence of a course of dealing with the social network users, but not the plaintiff competitor.[20]

In contrast, hiQ alleges that LinkedIn not only knew hiQ was using the public employment information on its platform for its people analytics, but *also* that LinkedIn encouraged hiQ in those efforts. (FAC ¶ 37.) These allegations offer clear inferences that LinkedIn either explicitly agreed to deal with hiQ, or, at bare minimum, implicitly did so.

**Profitable course of dealing.** hiQ alleges in detail the ways it profited LinkedIn, including increased employer engagement with and payments to LinkedIn, and increased member sign ups. (*Id.* ¶ 38.) hiQ also notes that the customers it identified in its FAC are representative—not exhaustive—examples. (*Id.* ¶ 51.) In response, LinkedIn factually contends (at 24-25) that hiQ needs to identify more of its customers and that the profits hiQ generated for LinkedIn are not *large enough* to qualify for this hallmark of a unilateral refusal to deal. hiQ is unaware of any authority requiring it to identify at the pleading stage every single customer and source of incremental profit LinkedIn gave up by refusing to deal with hiQ. Nor is hiQ aware of any case stating that profits generated from dealing with a competitor must be of a certain size to establish this hallmark of an anticompetitive refusal to deal. Notably, LinkedIn does not cite any.

LinkedIn fundamentally ignores that the FAC alleges it shut down a profitable course of dealing and sacrificed short-term profits in doing so (*e.g.*, because LinkedIn had not yet launched the competing services it now touts in company publications). (*Id.* ¶¶ 38-39, 48-50.) This strongly supports a refusal to deal claim.

**LinkedIn cut off its competitors and continues to threaten to do so.** At various points in its brief (*e.g.*, at 5), LinkedIn argues that it only cut off hiQ for a short period, the implication

---

[20]  LinkedIn's other cite, *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1086, 1090 (N.D. Cal. 2002), is inapposite because the issue there was the plaintiff did not show the defendant actually refused to deal with them. LinkedIn's cease-and-desist letter is a stark contrast to that situation.

being there is no longer any harm and, thus, no foul. That is not a valid dismissal argument. LinkedIn unquestionably cut off hiQ, and it cannot deny that, as hiQ alleges, it similarly cut off other people analytics competitors. (FAC ¶¶ 36 n.3, 46.) Those actions destroyed hiQ's business and harmed broader competition. (*Id.* ¶¶ 45, 51-54.) A defendant that engages in such anticompetitive self-help establishes a case or controversy, and the sword of Damocles it hangs over competitors' heads provides the basis for an ongoing lawsuit for damages and injunctive relief. *See*, *e.g.*, *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) ("voluntary cessation of allegedly illegal conduct . . . does not make the case moot"). LinkedIn refused to deal with hiQ and must face the consequences of that decision, regardless of whether (or not) it scaled back those efforts in the face of this lawsuit.

**The refusal only applied to people analytics competitors.** LinkedIn notably does not dispute that it still allows non-competitors unfettered access to the public employment information on its platform. (*Id.* ¶ 47.) Google and Yahoo!, for example, are free to scrape the public data. (*Id.*) This fact further bolsters the clear inference that LinkedIn's "only conceivable rationale or purpose" for refusing to allow such access is anticompetitive. *Aerotec*, 836 F.3d at 1184.

    (c)  <u>There is no "website exception" to the law against anticompetitive refusals to deal</u>

   LinkedIn argues (at 21-22) that courts "uniformly" reject refusal to deal arguments against website operators who bar competitors from their website, but LinkedIn's citations say no such thing. Each dismissal in those cases hinged on *other* pleading failures, and *none* concluded the plaintiff was categorically unable to articulate the hallmarks of a refusal to deal claim.[21] There is

---

[21] In *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070 (S.D. Cal. 2012), the court found that the plaintiff, an online advertiser, failed to allege a relevant market Facebook was capable of monopolizing; did not allege a group boycott, negative tying, or any other exclusionary conduct with the relevant market; and did not allege causal injury. *Id.* at 1079-82. The plaintiff did not allege unilateral refusal to deal. *Id.* In *Garon v. eBay, Inc.*, 2011 WL 6329089 (N.D. Cal. Nov. 30, 2011), the court found only that the plaintiff could not state antitrust injury, because they did not allege they had been excluded from any other auction website, and did not allege they paid any supracompetitive fees. *Id.* at *4-*5. Finally, in *Facebook, Inc. v. Power Ventures, Inc.*, 2010 WL 3291750 (N.D. Cal. July 20, 2010), the counterclaim plaintiff alleged only that Facebook should allow it the same access as the plaintiff granted Facebook to its own website. The court found

---

1    no "website exception" to the law on unilateral refusals to deal.

2                    (d)    The User Agreement does not immunize LinkedIn's refusal to deal

3              LinkedIn's final gambit on unilateral refusal to deal is to argue (at 25) that its User

4    Agreement ostensibly prohibits scraping, somehow erasing the parties' prior course of dealing and

5    requiring the Court to ignore that LinkedIn has shown that it has no problem with "the general

6    public" scraping, if the scraper is not a people analytics competitor. (FAC ¶ 40.) Besides ignoring

7    hiQ's well-pled factual allegations, this argument also errs by ignoring the reasonable inferences

8    from those facts. hiQ alleges the public is in fact free to scrape public information from LinkedIn's

9    platform, and that non-people analytics providers remain free to do so today. (*Id.* ¶¶ 27, 40.)

10   Moreover, the question is not whether every member of "the public" can access and scrape public

11   information, but whether "potential buyers" of that information—*i.e.*, companies that use it for

12   business purposes—are able to do so. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th

13   Cir. 2020) (noting the third hallmark of a unilateral refusal to deal is a "refusal to sell to rivals on

14   the same terms as other potential buyers"). LinkedIn ignores these allegations without explanation,

15   and ignores the proper way to analyze allegations of this type at the pleading stage. This portion of

16   LinkedIn's refusal to deal argument therefore fails just as the others do.

17        **F.    hiQ Alleges Personal Harm Flowing From Harm to Competition;** *i.e.*,
            **Antitrust Injury**

18

19             LinkedIn's next argument (at 13-14) is that hiQ has not plausibly alleged antitrust injury—

20   *i.e.*, personal harm flowing from the harm to competition that LinkedIn caused or attempted to

21   cause[22]—because hiQ does not possess copies of the communications and threats LinkedIn sent to

22   other people analytics providers, and thus had to allege the full scope of the anticompetitive

23   scheme on information and belief. To be clear, LinkedIn does not contest that it in fact conducted

24   such a campaign (including by cutting off competitors' access), nor that hiQ was (or is) without

25   _____

26   there was no body of law that required such reciprocity. *Id.* at *14. Notably, the plaintiff did *not*
     allege any voluntary prior course of dealing between it and Facebook. *See generally id.*

27   [22] *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1057 (9th Cir. 1999)
     ("Antitrust injury requires the plaintiff to have suffered its injury in the market where competition
28   is being restrained . . . [C]onsumers and competitors are most likely to suffer antitrust injury[.]").

basis to make such allegations on information and belief. This situation is thus a far cry from this Court's decision in *Menzel v. Scholastic, Inc.*, 2018 WL 1400386, at *2-3 (N.D. Cal. Mar. 19, 2018), where the plaintiff pled no accompanying facts to suggest that allegations made on information and belief were true.

Antitrust claims are governed by Rule 8(a) and thus "do not require heightened fact pleading of specifics," only enough to state a plausible claim. *Twombly*, 550 U.S. at 570. Rule 8(a) does not disallow allegations "'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *B.R. v. Beacon Health Options*, 2017 WL 5665667, at *5-6 (N.D. Cal. Nov. 27, 2017) (collecting cases); *see also Hurst Int'l, LLC v. Sinclair Sys. Int'l, LLC*, 2018 WL 4961908, at *4 (C.D. Cal. May 18, 2018) (finding plausible predatory pricing scheme premised in part "on information and belief").

As noted above, harm to competition includes, *inter alia*, excluding competitors, artificially depressing their product quality, and reducing consumer choice. *Am. Express*, 138 S. Ct. at 2284; *CollegeNET*, 711 F. App'x at 407; *Image Tech.*, 125 F.3d at 1209. hiQ alleges LinkedIn did all of this and more—specifically, by threatening and excluding *all* people analytics providers (*id.* ¶ 46-47); cutting off such competitors' access to the public employment information on its platform (*id.*); and reducing consumer choice by forcing competitors to drastically reduce the quality of their people analytics products and services, and/or leave the market entirely (*id.* ¶ 54). Given that hiQ has a good faith basis for these allegations that LinkedIn does not (and cannot) deny, and because they hinge on information currently within LinkedIn's sole control, they plausibly allege harm to competition, even if made on information and belief.

Finally, to the extent LinkedIn once again invokes *Noerr-Pennington* in relation to antitrust injury (at 14), that argument fails for the same reasons discussed above. hiQ alleges LinkedIn not only harmed competition by threatening competitors, but *also* by cutting off their access to the public employment information its users posted; *i.e.*, non-petitioning conduct not covered by *Noerr-Pennington*. (FAC ¶ 46-47.)

**G.     hiQ Plausibly States an Attempted Monopolization Claim**

LinkedIn's arguments against hiQ's attempted monopolization claim (at 29-30) are largely derivative of the other arguments discussed above; hiQ therefore respectfully refers the Court to its previous discussion for why they all fail. LinkedIn also suggests, however, that the claim fails because hiQ does not plausibly allege a "dangerous probability" that LinkedIn will obtain monopoly power in the people analytics market, because hiQ alleges that, as a result of its scheme, LinkedIn is the only "major" people analytics provider left. Such a hyper-technical parsing of the word "major" ignores the FAC's broader allegations and inferences and, in any event, is easily remedied.

hiQ alleges that LinkedIn decided it wanted to dominate the people analytics market and therefore excluded the only other major people analytics provider (hiQ) and either forced out other, smaller competitors, or made it so they could not offer competitive products. (FAC ¶¶ 36 n.3, 48-54.) The clear inference of these allegations is that LinkedIn was dangerously likely to obtain—and did obtain—monopoly power. In any event, the "issue" is one that can be remedied with a minor amendment, if necessary. hiQ can allege that LinkedIn today controls well over 90% of the people analytics market. That is clearly sufficient to state a dangerous probability. *See, e.g., Image Tech.*, 125 F.3d at 1206 (noting that a 65% share is *prima facie* evidence of market power).

**IV.     CONCLUSION**

For the foregoing reasons, hiQ respectfully submits that the Court should deny LinkedIn's motion to dismiss in full.

Dated: June 12, 2020                            QUINN EMANUEL URQUHART &
                                                SULLIVAN LLP


                                                By: *Corey Worcester*
                                                     Corey Worcester
                                                     Terry Wit
                                                     Adam Wolfson
                                                     Renita Sharma

                                                Attorneys for Plaintiff hiQ Labs