# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ARISTA NETWORKS, INC.,

                Plaintiff,

    v.

CISCO SYSTEMS INC.,

                Defendant.

Case No.  16-cv-00923-BLF

**ORDER (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Re: ECF 213, 221]

Plaintiff Arista Networks, Inc. ("Arista") brings this action against Defendant Cisco Systems, Inc. ("Cisco") alleging violations of antitrust and unfair competition laws.  First Am. Compl. ("FAC"), ECF 161.  Before the Court are Arista's motion for partial summary judgment and Cisco's motion for summary judgment.  Arista's Mot., ECF 213; Cisco's Mot., ECF 221.  The Court heard oral argument on the motions on April 19, 2018.  For the reasons discussed below, Arista's motion is DENIED and Cisco's motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

### A.  The Parties and Events Preceding this Action

Founded in 1984, Cisco is a technology company that offers networking, security, and cloud products and services.  Ex. A to Seddon Decl. in Opp'n to Arista's Mot., ECF 236-2.  Cisco's operating system software allows engineers to configure and manage Cisco routers and switches through the use of a command-line interface ("CLI").  Cisco's Mot. 2.  By typing text commands into the CLI, engineers can instruct the Ethernet switches to perform specific functions.  FAC ¶ 23.

During the 2000s, some providers of Ethernet switches began to use "Cisco-like" CLI.[1] Some documents show that Cisco recognized the popularity of its CLI. For example, in 2003, Cisco made a presentation to AT&T stating that "Cisco IOS CLI [is the] current de-facto standard." Ex. 6 to Nelson Decl. in Supp. of Arista's Mot., ECF 210-13. A 2008 Cisco email states that "[t]he popularity of IOS has spawned many, many IOS-like CLIs on Cisco (and other vendors) product lines)." Ex. 5 to Nelson Decl. in Supp. of Arista's Mot., ECF 210-12.

In 2002, ███████████████████████████████████████
████████████████████████████████████████████████
███████████████████  Ex. 4 to Nelson Decl. in Supp. of Arista's Mot., ECF 210-11. A few months later, in 2003, Cisco sued Huawei, a competitor, alleging that Huawei infringed Cisco's intellectual property rights. *See* Ex. A3 to Seddon Decl. in Supp. of Cisco's Mot., ECF 218-9. Cisco and Huawei settled their dispute in July 2004. Ex. A5 to Seddon Decl. in Supp. of Cisco's Mot., ECF 218-11. According to the settlement, Huawei agreed to make changes to its CLI. *See id.*

Arista was founded in 2004 and began selling its own Ethernet switches in 2008. FAC ¶ 18. Apparently, Cisco recognized Arista as a serious competitor and engaged in numerous efforts to compete. For example, Cisco lowered prices and acquired a networking startup named Insieme to build "Arista killer" products. *See* Ex. 14 to Nelson Decl. in Supp. of Arista's Mot. ¶¶ 60–61 ("Scott Morton Report"), ECF 210-21; Ex. 7 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 243-8.

In July 2014, ███████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████  Ex. 33 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 239-30. On October 1, 2014, ████████████████████████
███████████████████████████████  Exs. 11, 12 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 239-15, -16. A few months later, Cisco initiated litigation against

---

[1] The parties dispute how the industry used and perceived Cisco's CLI or Cisco-like CLI.

United States District Court
Northern District of California

Arista.

### B. Litigation between Arista and Cisco

#### i. District Court Litigation

On December 5, 2014, Cisco filed two actions against Arista in this District. One action was a copyright and patent case ("the CLI case"), where Cisco alleged that Arista infringes Cisco's patents and copyrights in its CLI. *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 14-cv-05344-BLF. In that case, a jury found that Arista infringed Cisco's copyright but that the infringement was excused by the scènes à faire affirmative defense.[2] The jury did not find patent infringement. Case No. 14-cv-05344-BLF, Dkt. 749. The other action is a patent case, where Cisco alleges that Arista infringes several patents owned by Cisco. *Cisco Systems, Inc. v. Arista Networks, Inc.*, Case No. 14-cv-05343-JSW. Judge Jeffrey S. White stayed that action until two cases pending before the U.S. International Trade Commission ("ITC") are resolved.

#### ii. ITC Litigation

On December 19, 2014, Cisco filed two cases at the ITC: *In the Matter of Certain Network Devices, Related Software and Components Thereof (I)*, ITC Inv. No. 337-TA-944 ("the '944 Investigation") and *In the Matter of Certain Network Devices, Related Software and Components Thereof (II)*, ITC Inv. No. 337-TA-945 ("the '945 Investigation"). In both investigations, the ITC found that Arista's Ethernet switches infringed certain patents owned by Cisco. As a result, the ITC issued limited exclusion orders and cease and desist orders that limited Arista's ability to sell certain products that the ITC found to infringe in the '944 and '945 Investigations. Cisco's Mot. 4. Exs. 7, 8 to Leary Decl., ECF 110-10, -11; Exs. 16, 17 to Leary Decl., ECF 130-4, -5.

#### iii. Cisco's Conduct after Litigation Commenced

While litigating the above cases against Arista, Cisco made public statements regarding the parties' dispute on Cisco's blog. The same day Cisco filed the two district court actions on December 5, 2014, Mr. Chandler uploaded a blog post stating that Arista promotes the "theft" of Cisco's intellectual property. Ex. 15 to Nelson Decl. in Opp'n to Cisco's Mot. 5, ECF 243-10.

---

[2] The CLI case is on appeal before the U.S. Court of Appeals for the Federal Circuit.

United States District Court
Northern District of California

Specifically, the December 5, 2014 blog post states that "Arista has copied more than 500 Cisco multi-word command expressions, while networking products from HP, Brocade, Alcatel-Lucent, Juniper Networks and Extreme each have only a small fraction of overlapping CLI commands" and that "the patented and copyrighted Cisco features and implementations being used by Arista are not industry standards." *Id.* Thereafter, Mr. Chandler uploaded numerous blog posts that discussed the parties' CLI case and patent disputes in the district court and the ITC. *See* Ex. 17 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 243-12; Exs. A29–A49 to Seddon Decl. in Supp. of Cisco's Mot., ECF 219-19 to -30, 220-1 to -9.[3]

Cisco also contemplated directly communicating with potential customers about the parties' litigation. For example, a ████████████████████████████████████ ████████████████████████████████████████████████ ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 18 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 239-20. However, ████████████████████ ███████████████████████████████████████ A76 to Leary Decl. in Reply, ECF 257-1. In any case, Cisco sent direct emails about the parties' CLI and patent litigation to customers. *See, e.g.*, Exs. 19–22 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 239-21 to -24.

### iv. This Action

While the CLI and patent disputes were ongoing, Arista filed this action against Cisco on February 24, 2016. Arista's first amended complaint alleges that Cisco engages in unlawful maintenance of monopoly power and unlawfully attempts to monopolize certain markets in violation of § 2 of the Sherman Act, 15 U.S.C § 2 and California's Unfair Competition Law ("UCL"). FAC ¶¶ 1, 112–33. Arista alleges that Cisco carried out a long-time policy that encouraged customers and competitors to use Cisco's CLI but reversed its policy and engaged in

---

[3] Many of Cisco's blog posts discuss only the ITC cases but not the CLI case.
[4] FUD is an acronym for "fear, uncertainty and doubt."

United States District Court
Northern District of California

tactics to hinder competition to monopolize the Ethernet switches market (the "open early, closed late" scheme). *See, e.g., id.* ¶¶ 114–18.

Arista alleges that Cisco engaged in anticompetitive behavior in four relevant markets: (1) all Ethernet switches market in the United States; (2) all Ethernet switches market worldwide; (3) high-speed Ethernet switches market in the United States; and (4) high-speed Ethernet switches market worldwide. FAC ¶ 50. High-speed Ethernet switches are defined as switches of 10Gb speed and higher. Scott Morton Report ¶ 86. According to Arista, the time between December 5, 2014 and December 14, 2016 (when the CLI case was ongoing) is the main period affected by Cisco's purported anticompetitive conduct.[5] Scott Morton Report ¶¶ 208–10. During this period, Cisco had at least 50% market share in terms of revenue between 2014 and 2016 for all four relevant markets: (1) all Ethernet switches market in the United States (73%~69%); (2) all Ethernet switches market worldwide (60%~57%); (3) high-speed Ethernet switches market in the United States (66%~56%); and (4) high-speed Ethernet switches market worldwide (60%~52%). Figs. 4 and 5 to Scott Morton Report; Ex. 27 to Nelson Decl. in Supp. of Arista's Mot., ECF 254-11; *see also* Figs. 16–19 to Scott Morton Report.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary,* 699 F. Supp. 756, 759 (N.D. Cal. 1987).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue

---

[5] Cisco filed the CLI case on December 5, 2014 and the jury reached a jury verdict on December 14, 2016.

United States District Court
Northern District of California

of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell,* 547 U.S. 518, 559-60 (2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 250 (internal quotation marks omitted). If the nonmoving party's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted). Mere conclusory, speculative testimony in affidavits and moving papers is also insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).

## III.  DISCUSSION

### A.  Arista's Motion for Partial Summary Judgment

Arista moves for partial summary judgment that: (1) Arista has established the four alleged relevant markets and (2) Cisco has monopoly power in each of the four relevant markets. For the reasons stated below, the Court DENIES Arista's motion.

#### i.  The Relevant Markets

As a threshold issue in an antitrust case, a plaintiff must first define the relevant market. "A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical

United States District Court
Northern District of California

cartel, would have market power in dealing with any group of buyers." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citation omitted). "Without a definition of the relevant market, it is impossible to determine market share." *Id.*

Here, Arista contends that there is no genuine issue of material fact that it has established four relevant markets: (1) all Ethernet switches market in the United States; (2) all Ethernet switches market worldwide; (3) high-speed Ethernet switches market in the United States; and (4) high-speed Ethernet switches market worldwide. Arista' Mot. 6–8. Arista argues that its expert, Dr. Scott Morton, applied a Hypothetical Monopolist Test ("HMT") based on a "small but significant and non-transitory increase in the price" ("SSNIP") analysis to conclude that the above four markets are relevant markets in this case. *Id.* A SSNIP analysis determines a relevant market by considering whether a hypothetical monopolist could profitably impose a "small but significant and non-transitory increase in the price." *See* U.S. Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines, issued August 19, 2010 (the "Horizontal Merger Guidelines"). According to Arista, Dr. Scott Morton determined that a "hypothetical monopolist could impose at least a SSNIP on at least one product" in each relevant market. Arista's Mot. 7 (citing Scott Morton Report ¶¶ 82–94). On the other hand, Arista argues, Dr. Carlton (who is Cisco's expert) does not provide any analysis disputing the definitions offered by Dr. Scott Morton or establish any alternative definition of the relevant markets. *Id.* at 8.

### a.  Whether Arista has Satisfied Its Moving Burden

Arista must first affirmatively demonstrate that no reasonable trier of fact could find other than for Arista. *Celotex*, 477 U.S. at 325. Cisco argues that Dr. Scott Morton's Report cannot carry Arista's burden of proof to establish a relevant market on the grounds that her analysis is based on a results-oriented approach that is neither reliable nor admissible. Cisco's Opp'n to Arista's Mot. 9–10, ECF 235-4.

First, Cisco asserts that Dr. Scott Morton's report provides no economic analysis showing that (1) low-speed and high-speed switches are interchangeable in the all Ethernet switches market or that (2) all high-speed Ethernet switches of 10Gb speed and higher are reasonably interchangeable within that narrower market. *Id.* at 10, 12–13. Arista responds that it is not

1    required to show such interchangeability because the SSNIP analysis evaluates cross-elasticity of

2    demand. Arista's Reply 5–6, ECF 252-6. The Court agrees with Arista that an explicit discussion

3    of interchangeability is not required in every case. The HMT inherently takes into account

4    whether certain products are substitutes for one another. *See* Horizontal Merger Guidelines 8–9.

5    Moreover, Dr. Scott Morton did consider evidence regarding the interchangeability of high-speed

6    and low-speed Ethernet switches. Scott Morton Report ¶¶ 87, 87 n.152 (citing the testimony of a

7    Cisco engineer).

8         Second, Cisco asserts that Dr. Scott Morton failed to calculate an increased price or

9    conduct an analysis of any effect that increased price would have on the hypothetical monopolist's

10   profits. Cisco's Opp'n to Arista's Mot. 11. Cisco further contends that Dr. Scott Morton provides

11   no economic analysis and explanation on how she reached her conclusion. *Id.* However, Dr. Scott

12   Morton states that she considered the interchangeability (or lack thereof) between Ethernet

13   switches and their closest functional substitute, Ethernet hubs. Scott Morton Report ¶ 83. She

14   then explains that a significant number of Ethernet switch buyers would not forego switches after

15   a SSNIP and that the declining switch prices show that a hypothetical monopolist could profitably

16   raise prices if there were no competition. *Id.* ¶ 84. Dr. Scott Morton does a similar analysis for

17   the high-speed Ethernet switches market. After considering the interchangeability between high-

18   speed and low-speed Ethernet switches, Dr. Scott Morton concluded that a hypothetical

19   monopolist could profit from a SSNIP as evidenced by the declining prices due to competitive

20   pressure in the market. *Id.* ¶¶ 87–88.

21        To be sure, Dr. Scott Morton did not explicitly calculate a price increase and the

22   accompanying effects. But unlike Cisco's contention, her analysis does not lack any "econometric

23   evidence." As discussed above, Dr. Scott Morton bases her opinion on evidence of declining

24   prices in the relevant markets. Insofar as Dr. Scott Morton's analysis departed from a traditional

25   SSNIP analysis, Cisco may cross examine her regarding the soundness of her approach during

26   trial. *See, e.g., Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.2002) ("In most cases,

27   objections to the inadequacies of a study are more appropriately considered an objection going to

28   the weight of the evidence rather than its admissibility. Vigorous cross-examination of a study's

United States District Court
Northern District of California

1 inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility

2 of prejudice.") (internal citation omitted).

3        Third, Cisco argues that Dr. Scott Morton failed to identify the narrowest possible market

4 and then iteratively add the next best substitutes in accordance with the SSNIP test. Cisco's

5 Opp'n to Arista's Mot. 11–12. In particular, Cisco relies on *In re Live Concert* where the court

6 rejected the report of defendant's expert who "both started and ended" with the purported market

7 and "did not employ the iterative approach called for under the SSNIP methodology." *In re Live*

8 *Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987 (C.D. Cal. 2012). Arista responds that the

9 Ninth Circuit in *Olin* and the Supreme Court in *Brown Shoe* recognized that a plaintiff need not

10 define the smallest possible market. Arista's Reply 9 (citing *Olin Corp. v. FTC*, 986, F.2d 1295,

11 1298 (9th Cir. 1993); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

12       As a general matter, the Court agrees with Arista that a relevant market definition may

13 include submarkets. *Brown Shoe* makes this clear. 370 U.S. at 325 ("[W]ithin this broad market,

14 well-defined submarkets may exist which, in themselves, constitute product markets for antitrust

15 purposes." (citation omitted)). Thus, to the extent that Cisco argues that the SSNIP analysis must

16 always begin with the narrowest market possible, the Court does not find that such a rule must

17 apply in all cases. The SSNIP analysis is an economic tool, and an expert should be able to

18 flexibly apply the test as appropriate under the circumstances.[6] Moreover, as Arista argues, the

19 2010 version of the Horizontal Merger Guidelines does not include any language that the market

20 should be defined by first identifying the "narrowest" market and then broadening it by an

21 iterative process. *See* Horizontal Merger Guidelines.

22       *In re Live Concert* is also distinguishable from this case. In *In re Live Concert*, the expert's

23 own report described that his SSNIP methodology required an "iterative approach" but he failed to

24 carry out his methodology. 863 F. Supp. 2d at 987. Moreover, the expert did not consider any

25 narrower definition of the market at all. *See id.* at 987–88. In contrast, here, Dr. Scott Morton did

26

27                  
[6] Any flaws in the expert's analysis can be cross examined during trial. *See, e.g., Hemmings*, 285

28 F.3d at 1188. The jury will be instructed that it is free to reject Arista's analysis if it finds the
expert opinions unpersuasive.

United States District Court
Northern District of California

consider the interchangeability between high-speed and low-speed Ethernet switch markets.  Scott Morton Report ¶ 87.

Fourth, according to Cisco, Dr. Scott Morton failed to conduct any analysis on the elasticity of supply in the alleged markets.  Cisco's Opp'n to Arista's Mot. 14.  Arista counters that Dr. Scott Morton analyzed a host of evidence regarding the supply side of relevant markets.  Arista's Reply 10–11 (citing Scott Morton Report ¶¶ 39–56, 95–107).  Indeed, to some extent, Dr. Scott Morton considered the elasticity of the supply side by assessing the barriers to entry and expansion in the all Ethernet switches market and the high-speed Ethernet switches market.  *See* Scott Morton Report ¶¶ 101–06.  Dr. Scott Morton concluded that Cisco's large installed base of Ethernet switches and customer's preference for CLI, costs of changing switch venders, and high capital requirements to enter the market were barriers to entry and expansion.  *See id.*

Accordingly, the Court rejects Cisco's arguments that Dr. Scott Morton's analysis is inadmissible and that Arista failed to satisfy its moving burden.  Where Cisco contends that Dr. Scott Morton's analysis contains flaws, those issues generally go to the weight, rather than the admissibility, of the expert's testimony.  *See, e.g., Hemmings*, 285 F.3d at 1188.  While an expert's analysis may be inadmissible if it is so incomplete to render the analysis irrelevant, *id.*, as discussed above, the Court does not find that to be the case here.  The conclusion that Dr. Scott Morton's opinions are based on sparse evidence or just plain wrong is a jury question.  But the report crosses the threshold to admissibility.  Concluding that Arista has met its initial burden, the Court turns to whether Cisco has provided "specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 250.

### b.  Whether Cisco has Shown a Genuine Dispute of Material Facts

Pointing to numerous exhibits, Cisco argues that Arista's alleged markets are contradicted by the evidence.  Cisco's Opp'n to Arista's Mot. 6–8.  Specifically, Cisco contends that the evidence shows that Ethernet switches of different speeds are not interchangeable.  *Id.*  For example, Cisco points out that Arista's Chief Customer Officer, Anshul Sadana, stated that some customers will not find low-speed and high-speed Ethernet switches to be interchangeable.  Ex. K to Seddon Decl. in Opp'n to Arista's Mot. 116:11–14, ECF 235-11.  In Cisco's view, Dr. Scott

Morton agrees on this issue.  Cisco's Opp'n to Arista's Mot. 6 (citing Scott Morton Report ¶¶ 86–89).  Dr. Scott Morton's Report also identifies witness testimony that "distinguish[es] . . . campus (or enterprise) switches where the switches connect to end user devices (e.g. personal computers, phones, etc.) [from] data center switches where the switches provide connectivity between servers."  Scott Morton Report ¶ 87 n.153.  As another example, Cisco points to the price differential between switches of different speeds.  Cisco's Opp'n to Arista's Mot. 6–7.  Indeed, in 2017, the average U.S. per port price for 1Gb switches was about $40, for 10Gb switches about $100, and for 40Gb switches around $400.  *See* Figs. 12–14 to Scott Morton Report.  Cisco argues that the price differential shows a low cross-price elasticity and thus contradicts Arista's claim that switches of different speeds are interchangeable.  Cisco's Opp'n to Arista's Mot. 7.

When drawing reasonable inferences in favor of Cisco, the Court concludes that there is a genuine issue of material fact on whether Dr. Scott Morton properly considered the interchangeability of products within the all Ethernet switches market and high-speed Ethernet switches market.  As discussed above, Arista's own executive testified that low-speed and high-speed Ethernet switches are not interchangeable for some consumers.  Ex. K to Seddon Decl. in Opp'n to Arista's Mot. 116:11–14, ECF 235-11.  The evidence also shows that there is a price differential between switches within the high-speed Ethernet switches, which is an indication of low cross-elasticity of demand.  *See* Figs. 12–14 to Scott Morton Report.  Thus, a reasonable jury may conclude that Dr. Scott Morton's opinions on the market definition are inconsistent with the realities of the market.  But, again, this is a decision best left to the jury.  Therefore, the Court DENIES Arista's motion for summary judgment that Arista has established the four alleged relevant markets.

### ii.  Monopoly Power

The first amended complaint alleges that Cisco engaged in unlawful conduct to maintain its monopoly power in the four alleged markets and thus violated § 2 of the Sherman Act.  FAC ¶¶ 1, 112–33.  To state a claim for monopolization, a plaintiff must allege: "(1) the defendant possesses monopoly power in the *relevant market*; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury."  *Cost Mgmt.*

11

Case 5:16-cv-00023-BLF Document 281-2 Filed 09/21/18 Page 13 of 38

*Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (emphasis added).

In bringing its motion, Arista argues that there is no genuine issue of material fact that Cisco has monopoly power in each of the four alleged markets. Arista's Mot. 8. As discussed above, the Court is not able to determine as a matter of law the definition of the relevant markets, finding that the dispute over the definition of a relevant market is a "factual inquiry for the jury." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). Thus, Arista's argument that it is entitled to summary judgment that Cisco has monopoly power in the alleged four relevant markets necessarily fails because the relevant market definitions cannot yet be determined. Even if the Court were to determine the boundaries of Arista's relevant markets, Arista's request for summary judgment that Cisco has monopoly power would be denied as discussed below. The Court turns to the arguments raised by Arista in support of its motion.

As Arista points out, monopoly power may be proven by either direct or circumstantial evidence. *Rebel Oil*, 51 F.3d at 1434. "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* In its motion, Arista argues that it has established the three factors required to establish monopoly power based on circumstantial evidence. *See* Arista' Mot. 9–15.

First, Arista avers that Dr. Scott Morton has defined the relevant markets. *Id.* at 9.

Second, Arista contends that Cisco has a dominant market share in each of the relevant markets and points to Dr. Scott Morton's Report analyzing Cisco's share in each relevant market. *Id.* at 9–11. According to the Scott Morton Report, Cisco's share in the (1) U.S. Ethernet switch market exceeded 65% from 2008 to 2016, (2) worldwide Ethernet switch market exceeded 50% from 2008 to 2017, (3) U.S. high-speed Ethernet switch market remained above 70% in the U.S and 65% in the worldwide market from 2008 to 2013. *Id.* at 10 (citing Scott Morton Report ¶¶ 42, 98–99). Arista further asserts that Cisco's expert Dr. Carlton offers no opinion that Cisco does not own a dominant share of the relevant markets. *Id.* at 11. Based on Dr. Scott Morton's analysis, Arista argues that Cisco wields substantial market power. *Id.* at 10.

Third, Arista avers that it is undisputed that entry barriers exist in the four relevant markets.  Arista's Mot. 12–15.  According to Arista, the existing installed base of Cisco switches is approximately 80% of the entire installations and customers have an "entrenched" preference for compatible products.  *Id.* at 12.  Arista also argues that a new entrant would need hundreds of millions of dollars in capital investments to enter the relevant markets.  *Id.* at 13.  As a final point, Arista contends that vendor reputation is another barrier for a new company to enter the relevant markets.  *Id.* at 15.

Upon reviewing the evidence, the Court does not find that the evidence is undisputed.  As Cisco points out, Arista's CEO, Jayshree Ullal, described the pricing environment as "dynamic and highly competitive and highly pressured on the price."  Ex. X to Seddon Decl. in Opp'n to Arista's Mot. 21, ECF 236-25.  Indeed, Dr. Carlton shows that prices in the four relevant markets have been declining.  Ex. B to Seddon Decl. in Opp'n to Arista's Mot. ¶¶ 94–95 ("Carlton Report."), ECF 235-6.  Except in the U.S. all Ethernet switches market, Cisco had less than 65% market share during the relevant time period between 2014 and 2016.  Figs. 4 and 5 to Scott Morton Report; Ex. 27 to Nelson Decl. in Reply in Supp. of Arista's Mot.  This falls short of the 65% market share which courts typically required to "establish a prima facie case of market power."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).  In addition, Dr. Carlton reports that Cisco does not have the highest prices when compared to other competitors.[7]  Carlton Report ¶ 45.  Hence, there is sufficient evidence to undercut Arista's argument that Cisco's relatively high market share amounts to market power.  *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 367 (9th Cir. 1988) (holding that a high market share may not support monopoly power if other factors show constraints on the defendants' power over the market place).

Cisco also disputes Arista's characterization of the evidence.  For example, Cisco argues that Arista's "claim that Cisco holds 80% of the installed base of Ethernet switches" is

---

[7] Dr. Carlton states that Cisco's price per port 10Gb Ethernet switches was above Dell's and below Huawei's in 2014.  Carlton Report ¶ 45; *see also* Ex. J to Seddon Decl. in Opp'n to Arista's Mot., ECF 235-10.

unsupported.  Cisco's Opp'n to Arista's Mot. 21.  The reference to "80%" comes from Dr. Scott Morton's Report which states that "Cisco estimated that its products made up 80% of the 'network installed base.'"  Scott Morton Report ¶ 101.  For support, Dr. Scott Morton cites a blog post on Cisco's website.  *Id.* ¶ 101 n.163.  That blog post, however, does not mention whether "network installed base" constitutes only Ethernet switches.  Ex. I to Seddon Decl. in Supp. of Cisco's Opp'n, ECF 236-10.  In addition, Cisco disagrees with Arista's arguments that Dr. Carlton "offers no opinion . . . that Cisco lacks market power."  Cisco's Opp'n to Arista's Mot. 21.  For support, Cisco points out that Dr. Carlton opined that Cisco faces "increasing competition from expanding incumbents and new entrants."  Carlton Report ¶ 26.  As for capital requirements for entry, Cisco argues that entrants have been able to raise the requisite startup capital: Arista raised at least $60 million dollars and two other companies raised $19.1 million and $119.5 million, respectively.  Ex. K to Seddon Decl. in Opp'n to Arista's Mot. 90:25–91:14, ECF 235-11; Carlton Decl. ¶ 38 n.67.

As discussed above, there is an abundance of evidence that is disputed or that weighs against Arista's contention that Cisco has monopoly power in the relevant markets.  Hence, when drawing all reasonable inferences in favor of Cisco, the Court finds that there is a material factual dispute on whether Cisco has monopoly power.  The Court therefore DENIES Arista's motion for summary judgment that Cisco has monopoly power in the four relevant markets.

### iii.    Arista's Request for an Order that Certain Facts are Not Disputed

In the event that some portion of its request is not granted, Arista asks that the Court issue an order stating that certain facts are not disputed pursuant to Federal Rule of Civil Procedure 56(g).  Arista's Mot. 4.  Arista provided a list of 26 "undisputed facts."  *Id.* at 4–5.  Cisco counters that Arista must prove those 26 assertions and that the assertions are not material facts subject to Rule 56(g).  Cisco's Opp'n to Arista's Mot. 4–5.  Rule 56(g) provides that:

> **(g) Failing to Grant All the Requested Relief.**  If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case.

Fed. R. Civ. P. 56(g).  The Court has discretion to enter an order under Rule 56(g).  *See* Advisory

Case 5:16-cv-00923-BLF   Document 281-2   Filed 09/21/18   Page 15 of 38

Committee Notes: 2010 Amendment. The Court finds that the issues listed by Arista are "better illuminated by the trial of related facts that must be tried in any event." *Id.* As such, the Court DECLINES to issue an order under Rule 56(g) regarding Arista's 26 issues that are listed in its motion.

### B.   Cisco's Motion for Summary Judgment

Cisco moves for summary judgment on the following grounds: (1) Cisco's CLI litigation and communications concerning that litigation are protected under the *Noerr-Pennington* doctrine and are not exclusionary conduct; (2) Arista cannot show that Cisco has monopoly power or a dangerous probability of obtaining monopoly power; (3) Arista cannot establish injury-in-fact or damages caused by CLI-related conduct; (4) Arista cannot show harm to competition; and (5) Arista's UCL claim fails because the antitrust claim is deficient. The Court finds that Cisco's motion should be denied except for Cisco's request for summary judgment that Cisco's CLI lawsuit was objectively reasonable.

### i.   The *Noerr-Pennington* Doctrine and Exclusionary Conduct

Cisco argues that its participation in the CLI case and communications about that litigation is protected by the *Noerr-Pennington* doctrine as government petitioning activity. Cisco's Mot. 8–10. Cisco further avers that its CLI-related communications are not anticompetitive as a matter of law because at best they are presumed to have a *de minimis* effect on competition. *Id.* at 10–13. The Court first turns to Cisco's reliance on the *Noerr-Pennington* doctrine.

### a.   *Noerr-Pennington* Doctrine

"The *Noerr-Pennington* doctrine allows private citizens to exercise their First Amendment rights to petition the government without fear of antitrust liability." *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1044 (9th Cir. 2009). "Those who petition government for redress are generally immune from antitrust liability." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 56 (1993). The Supreme Court has recognized two exceptions to *Noerr-Pennington:* the "sham" exception and the *"Walker-Process"* exception. "A sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all." *City of Columbia v. Omni Outdoor*

United States District Court
Northern District of California

*Advert., Inc.*, 499 U.S. 365, 380 (1991) (internal quotation marks and citation omitted). The *Walker-Process* exception applies when an entity obtains a patent fraudulently and then uses that patent to exclude a competitor from the market through infringement litigation. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965).

Neither exception is applicable here. The *Walker-Process* exception does not apply because there are no allegations that a patent was fraudulently obtained. As for the "sham" exception, the parties agree that the CLI case was not a sham litigation. Cisco's Mot. 6; Hearing Tr. 31:11–14, ECF 264 (Arista representing that its theory never has been that the CLI litigation was a sham). In fact, in the CLI case, the jury found that Arista infringed Cisco's copyright but that the infringement was excused by the scènes à faire affirmative defense. Case No. 14-cv-05344-BLF, Dkt. 749. It is undisputed that the CLI case was not a sham. The Court therefore GRANTS Cisco's request for summary judgment that the CLI lawsuit was objectively reasonable.[8]

Here, Arista's theory of antitrust liability does not rely on the "sham" or "*Walker-Process*" exceptions but rather that Cisco's CLI lawsuit was the "enforcement mechanism" of the purported "open early, closed late" anticompetitive scheme. Hearing Tr. 33:1–5; Arista's Opp'n to Cisco's Mot. 10, ECF 239-4. In essence, Arista argues that the CLI litigation and conduct incidental to that litigation are not protected by the *Noerr-Pennington* doctrine because Cisco used such conduct as tools to further the "closing" step of the "open early, closed late" scheme. Arista's Opp'n to Cisco's Mot. 11–12. Arista further asserts that application of the *Hynix* test shows that the CLI litigation and "Cisco's purported ['fear, uncertainty, and doubt (FUD)'] campaign (including Mr. Chandler's blog)" was anticompetitive. *Id.* at 12–13 (citing *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007)). While disputing Arista's conclusion, Cisco agrees that the *Hynix* test is applicable. Cisco's Reply 8–9, ECF 256-4; Hearing Tr. 24:1–7.

Neither the Supreme Court nor the Ninth Circuit has spoken on the precise issue of how to

---

[8] Cisco requests that, at minimum, the Court should grant summary judgment that Cisco's CLI lawsuit was objectively reasonable. Cisco's Mot. 8.

evaluate a constitutionally protected lawsuit as part of a larger anticompetitive scheme. *Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210, 2017 WL 1133513, at *5–6 (N.D. Cal. Mar. 27, 2017); *Hynix*, 527 F. Supp. 2d at 1095–96 (analyzing Ninth Circuit cases). Upon conducting an extensive discussion of relevant authority, Judge Whyte in *Hynix* concluded that the Supreme Court would recognize some "scheme" antitrust allegations that include constitutionally protected litigation within the "overall course of conduct" but only those in which the litigation is "causally connected" to anticompetitive harms. *Hynix*, 527 F. Supp. 2d at 1096–97. *Hynix* further provided a two-step test:

> The court concludes that before otherwise protected litigation can be a part of an "anticompetitive scheme" claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms. Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.

*Id.* at 1097.

*Hynix* has been followed by some courts and disavowed by others. *See, e.g., Funai*, 2017 WL 1133513, at *6 (following *Hynix*); *Microsoft Mobile Inc. v. Interdigital, Inc*., No. CV 15-723, 2016 WL 1464545, at *3 (D. Del. Apr. 13, 2016) (following *Hynix*); *Zenith Elecs., LLC v. Sceptre, Inc.*, No. LA CV14-05150, 2015 WL 12765633, at *6 n.2 (C.D. Cal. Feb. 5, 2015) (following *Hynix*); *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, No. 5:03-00887, 2009 WL 8727693, at *8 n.7 (C.D. Cal. Feb. 17, 2009) (disapproving *Hynix*). This Court is persuaded by the reasoning of *Hynix* and will join those courts which have followed it. As discussed above, the parties agree that *Hynix*'s two-step test should be applied.

### Hynix: Step One

At the first step of the *Hynix* inquiry, the Court sets aside the fact that Cisco filed its CLI suit against Arista and reviews the other proffered evidence to determine whether that other evidence shows that Cisco has engaged in conduct that produced anticompetitive harms. It is Cisco's contention that there is no evidence outside of *Noerr-Pennington* protection. Cisco claims

17

Case 5:16-cv-00023-BLF Document 281-2 Filed 09/21/18 Page 18 of 38

that Arista's evidence supporting "closed late" is limited to the CLI lawsuit and communications related to the lawsuit for which Cisco has immunity from antitrust liability. Cisco's Mot. 8–9. Cisco further submits that its CLI-related communications are not anticompetitive. *Id.* at 10. The Court summarizes below Arista's proffered evidence showing that Cisco's conduct relates to the purported "closed late" portion of the alleged scheme that is unrelated to the CLI lawsuit:

Conduct Prior to Filing the CLI Lawsuit

1. Cisco lowered prices (Scott Morton Report ¶¶ 60–61) and acquired a networking startup named Insieme to build "Arista killer" products (Ex. 7 to Nelson Decl. in Opp'n to Cisco's Mot.).

2. ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████ Ex. 33 to Nelson Decl. in Opp'n to Cisco's Mot.

3. ████████████████████████████████████ ██████████████████████ Exs. 11, 12 to Nelson Decl. in Opp'n to Cisco's Mot. ██████████████████████████████████ ██████████████ Ex. 13 to Nelson Decl. in Opp'n to Cisco's Mot.

4. ██████████████████████████████████ ██████ Ex 14 to Nelson Decl. in Opp'n to Cisco's Mot.

Cisco's Public Communications about the Litigation Between the Parties

5. On December 5, 2014, Mr. Chandler uploaded a blog post about the district court actions. Ex. 15 to Nelson Decl. in Opp'n to Cisco's Mot.

6. Mr. Chandler subsequently uploaded a series of blog posts about the parties' dispute. *See* Ex. 17 to Nelson Decl. in Opp'n to Cisco's Mot.; Exs. A29–A49 to Seddon Decl. in Supp. of Cisco's Mot.

Cisco's Direct Communication with Customers

7. Cisco's account manager sent an email containing a link to Mr. Chandler's blogs and an online article about the parties' disputes to a potential customer. A few days after sending the email, the account manager secured a sale with the customer. Scott Morton Report ¶ 148.

8. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Ex. 19 to Nelson Decl. in Opp'n to Cisco's Mot. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 21 to Nelson

Decl. in Opp'n to Cisco's Mot. He also had similar email correspondence with other companies. *See* Exs. 20, 22 to Nelson Decl. in Opp'n to Cisco's Mot. In those emails, Mr. Chandler indicated that Arista copied Cisco's CLI.

9. Arista's Chief Customer Officer, Anshul Sadana, testified that Arista believes it lost sales due to the "litigation or fear of the litigation" between the parties. Ex. 28 to Nelson Decl. in Opp'n to Cisco's Mot. 29:4–11, ECF 239-27. Mr. Sadana referred to the parties' CLI and patent disputes as the "litigation." *Id.* at 27:3–15.

10. 

Ex. 18 to Nelson Decl. in Opp'n to Cisco's Mot. ▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. A76 to

1      Leary Decl. in Supp. of Cisco's Mot.

2

3      The Court first turns to the evidence pertaining to Cisco's conduct prior to filing the CLI

4 lawsuit in 2014.  As to the first item, Cisco's efforts to lower prices and its acquisition of a startup

5 company Insieme to build "Arista killer" products can only be seen as normal business practices

6 and not anticompetitive.  Arista does not argue otherwise.

7      As to the second and third items, Arista contends that Cisco made "a decision to close" the

8 use of CLI during the October 2014 Board of Directors meeting where Ms. Jiandani and Mr.

9 Chandler presented their "Arista strategy."  Hearing Tr. 50:1–2.  However, even drawing all

10 reasonable inferences in favor of Arista, ██████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ██████████████████ (*see* Exs. 11–13 to Nelson Decl. in Opp'n to Cisco's

14 Mot.), ████████████████████████████ (Ex. 14 to Nelson Decl. in Opp'n to Cisco's

15 Mot.).  So, ████████████████████████████████████

16 ████████████████████████████████████

17 ██████████████████████████████ The decision to

18 file the CLI lawsuit is "'conduct incidental to the prosecution of the suit' and protected by the

19 *Noerr–Pennington* doctrine."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006) (citation

20 omitted).  The Court concludes that the evidence regarding the October 2014 Board of Directors

21 meeting does not support Arista's theory that Cisco decided to engage in other anticompetitive

22 conduct to "close" the purported "open early, closed late" scheme.

23      The Court next jointly addresses Cisco's blog posts and direct correspondence with

24 customers regarding the litigation between the parties because they are commonly based on

25 Cisco's communication about the CLI litigation.  Cisco argues that those communications are

26 protected by the *Noerr-Pennington* doctrine because they were "conduct incidental" to the CLI

27 litigation.  Cisco's Mot. 9 (citing *Sosa*, 437 F.3d at 935).  For further support, Cisco cites several

28 out-of-circuit cases finding that public statements discussing litigation are protected by the *Noerr–*

Case 5:16-cv-00923-BLF Document 281-2 Filed 09/21/18 Page 22 of 38

*Pennington* doctrine. *Id.* at 9–10. For example, Cisco contends that *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 384 F. Supp. 2d 1334, 1349, 1353 (S.D. Iowa 2005) held that "press releases regarding competitor's alleged patent infringement protected under *Noerr*" and *Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*, 634 F. Supp. 316, 326 (D. Kan. 1986) held that "public statements in newspapers discussing litigation and intimating that competitors' customers" are "protected under *Noerr*." *Id.* Arista counters that the "mere filing of a lawsuit does not immunize the defendant's anticompetitive behavior outside of and beyond the lawsuit itself." Arista's Opp'n to Cisco's Mot. 11.

Cisco's arguments are unpersuasive because its reading of the Ninth Circuit's decision in *Sosa* is overly broad. In that case, the Ninth Circuit held that communication on settlement demands prior to initiating any actual litigation enjoyed *Noerr-Pennington* immunity. *Sosa*, 437 F.3d at 935. The underlying reasoning was that although the demand "letters were not themselves petitions, the Petition Clause may nevertheless preclude burdening them so as to preserve the breathing space required for the effective exercise of the rights it protects." *Id.* at 933. The Ninth Circuit recognized that "not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the *prosecution* of the suit' is protected activity. *Id.* at 934 (citation omitted) (emphasis added). As such, "communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr–Pennington* doctrine, so long as they are sufficiently related to *petitioning* activity." *Id.* at 935 (emphasis added).

Here, Cisco's CLI-related communications are in one sense related to the CLI litigation because they discuss the parties' copyright dispute. However, those communications have no relation to the *prosecution* of the CLI lawsuit as they are merely statements about the status of the parties' litigation and Cisco's intellectual property rights. *Riverbed Tech., Inc. v. Silver Peak Sys.*, No. C 13-02980 JSW, 2015 U.S. Dist. LEXIS 188737, at *7-8 (N.D. Cal. Apr. 7, 2015) (holding that a commercial "competitive brief" that contained statements about pending litigation was not entitled to protection because the "speech" merely described the litigation and was not in "furtherance or incidental to it"). In fact, the First Amendment concerns in *Sosa* are absent here. In *Sosa*, the Ninth Circuit was concerned that the lack of protection for pre-suit demand letters

would restrict the right of access to the courts which is protected by the First Amendment. *Sosa*, 437 F.3d at 936. The court concluded that demand letters are sufficiently close to prosecuting the lawsuit. *See id.* In contrast, Cisco's communications at issue in this case had little relevance to Cisco's ability to pursue its CLI lawsuit. In other words, those communications were not in "furtherance or incidental" to the CLI litigation. *Riverbed Tech.*, 2015 U.S. Dist. LEXIS 188737, at *7-8. In fact, a reasonable jury could find that Cisco raised the specter of the CLI lawsuit to persuade customers to abandon Cisco's competitors.

Moreover, some of the out-of-circuit cases cited by Cisco are factually distinguishable because they involved more than mere descriptions of the litigation. *See, e.g.*, *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (letters sent to the defendants to settle the litigation and letters sent to companies to determine whether they should be joined as defendants were protected); *Nineteen Eighty-Nine, LLC v. Icahn Enterprises L.P.*, 99 A.D.3d 546, 547 (N.Y. App. Div. 2012) (the amended Schedule 13D was filed due to the commencement of the litigation and as part of the regulatory scheme required by the SEC, and thus was protected). To the extent that some cases, including *Kemin Foods* and *Aircapital*, contradict *Riverbed*, the Court decides to follow *Riverbed* as being more consistent with the Ninth Circuit's reasoning in *Sosa*.

The Court's above conclusion does not end the inquiry in *Hynix*'s first step. Even if Cisco's blog posts and communications with customers are not protected by the *Noerr-Pennington* doctrine, Arista must show that such communications constitute exclusionary conduct. *Hynix*, 527 F. Supp. 2d at 1097 ("[O]ther aspects of the scheme [must] independently produce anticompetitive harm."); *see also Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61 (1993) ("[E]ven a plaintiff who defeats the defendant's claim to Noerr immunity . . . by demonstrating . . . a sham must still prove a substantive antitrust violation."). Thus, the Court next addresses whether evidence other than Cisco's filing of the CLI lawsuit shows exclusionary conduct.

Cisco contends that its CLI-related communications are not anticompetitive under *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'n Pub'ns, Inc.*, 108 F.3d

Case 5:16-cv-00923-BLF Document 281-2 Filed 09/21/18 Page 24 of 38

1147 (9th Cir. 1997). Cisco's Mot. 10–13. In *Harcourt Brace*, the Ninth Circuit considered whether the "disparagement of a rival" would lead to harmful effects on competitors "significant enough to warrant recognition under § 2 of the Sherman Act." 108 F.3d at 1151. The Ninth Circuit opined that while false statements about rivals can obstruct competition, courts should be cautious on attaching much weight to disparaging statements because many consumers recognize "disparagement as non-objective and highly biased." *Id.* at 1152. The Ninth Circuit further concluded that the "disparagement must overcome a presumption that the effect on competition . . . was de minimis" to prove that the "false and misleading" statements constituted exclusionary conduct. *Id.* As a de minimis test, the Ninth Circuit articulated that a plaintiff may overcome the de minimis presumption by satisfying all six factors of a "serious de minimis test."[9] *Id.* Cisco argues that Arista cannot satisfy any of the six factors in *Harcourt Brace*. Cisco Mot. 11–12.

Arista counters that *Harcourt Brace* is inapplicable because it is not arguing that Cisco made disparaging statements. Hearing Tr. 37:24–39:5. Rather, according to Arista, Cisco's communications were statements to the industry that use of Cisco's CLI is now "closed" as part of the purported "open early, closed late" scheme. *Id.* In fact, Arista argues that Cisco's communications were in part true, and thus Arista does not rely on the "falsity" of Cisco's statements. *Id.* at 38:13–16.

The Court has reviewed the evidence and is persuaded that *Harcourt Brace* is inapplicable. While Cisco's blog posts contain some disparaging statements against Arista, the posts also suggest that Cisco's CLI is not an "industry standard." For example, Mr. Chandler's December 5, 2014 blog post states that:

> Arista incorporates features knowing that Cisco holds intellectual property rights related to those features, all of which are Cisco proprietary and **none of which are industry standards**.
>
> Arista's copying was a strategy, not an accident, and this is

---

[9] "[A] plaintiff may overcome de minimis presumption 'by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals.'" *Harcourt Brace*, 108 F.3d at 1152 (citation omitted).

United States District Court
Northern District of California

illustrated by the action we brought today regarding copyrighted materials. Entire sections of our copyrighted user manuals, complete with grammatical errors, are included in Arista's documentation. In addition, Arista lifted over 500 of our multiword command line expressions identically and directly from our "IOS" into Arista's "EOS", comprising almost half of their entire command line interface. While simple, single-word commands ("Copy", "Paste", "Delete", for example) may not be protectable under copyright, unique multi-word commands like "aaa group server radius", "dot1x max-reauth-req" and "clear ip igmp group" are not self-evident.

**For those who might think a CLI reflects some kind of standard that simply must be used by every industry participant for products to work together, let me offer a direct point of contrast:**
**Arista has copied more than 500 Cisco multi-word command** expressions, while networking products from HP, Brocade, Alcatel-Lucent, Juniper Networks and Extreme each have only a small fraction of overlapping CLI commands. In the case of Juniper Junos, the overlap is less than 30 multi-word commands. These formidable competitors have innovated on their own, rather than copy, to create value and interoperability for their customers.

Importantly, however, **the patented and copyrighted Cisco features and implementations being used by Arista are not industry standards.** In some cases, the engineers who were the named inventors on the patents now work at Arista….

Ex. 15 to Nelson Decl. in Opp'n to Cisco's Mot. (emphasis added). As quoted above, Cisco made statements that Cisco's copyrighted features that were used by Arista "are not industry standards." *Id.* When drawing reasonable inferences in favor of Arista, the Court concludes that there is a genuine issue of material fact on whether Cisco's statements constituted a reversal of the purported open-CLI policy and amounted to exclusionary conduct. As the anticompetitive harm stemming from Cisco's purported "open early, closed late" scheme does not rely on whether Cisco disparaged Arista, *Harcourt Brace*'s concern about assigning much weight to "false or misleading" statements does not exist here. Thus, *Harcourt Brace*'s six factor de minimis test is inapplicable.

In addition, when drawing all reasonable inferences in favor of Arista, there is a material dispute of fact whether Cisco engaged in sales tactics that amounted to exclusionary conduct. For example, ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████     Ex. 18 to Nelson Decl. in Opp'n to Cisco's Mot. 2.    ████████████████

United States District Court
Northern District of California

24

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ *Id.* at 22.

Cisco argues that there is no evidence that the above draft was distributed to its salesforce and that

another draft of the playbook omits the above quoted portions. Cisco's Reply 3. However, as

even Cisco recognizes in its reply brief (*id.*), there are instances where Cisco's sales personnel

discussed the parties' litigation (*see, e.g.*, Scott Morton Report ¶¶ 148, 148 n.266).[10] While there

is a dispute over whether Cisco's sales personnel discussed the CLI litigation or the ITC actions,

when viewing the evidence as a whole and drawing inferences favorable to Arista, the Court finds

that there is a material factual dispute over whether Cisco used its CLI litigation to create FUD in

an anticompetitive manner.

 For the above reasons, there is sufficient evidence (excluding Cisco's filing of the CLI

litigation) which a reasonable jury could credit to conclude that Cisco engaged in anticompetitive

behavior separate from the CLI litigation. On this basis, the Court is satisfied that the first step in

*Hynix* is met and turns to the second step.


### **Hynix: Step Two**

 At step two, the Court inquires whether Cisco's CLI lawsuit was "causally connected" to

the disputed anticompetitive conduct discussed in step one. *Hynix*, 527 F. Supp. 2d at 1096–97. If

the answer is yes, then an antitrust plaintiff may include good faith litigation as part of the

anticompetitive scheme. *Id.*

 Cisco argues that its "*Noerr* protected litigation" cannot be considered part of any

anticompetitive scheme because Arista has not identified any conduct "outside the scope of

*Noerr*" that independently produced anticompetitive harm. Cisco's Reply 8–9. In Cisco's view

---

[10] In presenting "injury-in-fact" arguments, Cisco contends that Arista's evidence comes
secondhand from conversations Arista's sales personnel purportedly had with customers and thus
depends on inadmissible hearsay. Cisco's Reply 12 (citing Scott Morton Report ¶¶ 148, 190–91).
However, paragraph 148 of the Scott Morton Report describes statements of Cisco's *own* account
manager as well as representations of Arista's sales representative.

United States District Court
Northern District of California

this action is different from *Funai* and *Hynix* which involved independent misconduct by the defendant who refused to honor FRAND commitments. *Id.* To be sure, this case does not involve any misconduct before a standard setting organization as in *Funai* and *Hynix*. *Funai*, 2017 WL 1133513, at *1; *Hynix*, 527 F. Supp. 2d at 1098. However, as discussed above in step one, the Court finds that there is a material dispute of fact whether Cisco engaged in exclusionary conduct by "closing" the purported "open early, closed late" scheme through Cisco's the blog posts and client communications. Thus, Cisco's premise that Arista failed to identify any independent anticompetitive conduct other than the CLI litigation is wrong.

The Court concludes that the CLI lawsuit was arguably causally connected to the harms produced by Cisco's blog posts and communications with customers as that lawsuit can reasonably be portrayed as the mechanism to carry out the purported "open early, closed late" scheme. As discussed later in this order, those communications raise a reasonable inference that competition was harmed. As such, Cisco's request to exclude the CLI lawsuit as part of the alleged anticompetitive scheme is DENIED.

### b. Whether Arista's "Open Early, Closed Late" Theory Has No Legal Basis

Cisco argues that the purported "open early, closed late" scheme based on its CLI litigation has no legal basis. Cisco's Mot 13–18. In particular, Cisco contends that courts have recognized intellectual property "hold-up" when standards developed in multiparticipant, rules-based standard-setting organizations ("SSOs") are involved. *Id.* at 13–14 (citing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007); *Hynix*, 527 F. Supp. 2d 1084. Because Arista does not dispute that "no SSO has ever created a standard for Ethernet switching CLI," Cisco asserts that Arista's antitrust theory has no legal basis. *Id.* at 14.

However, Cisco does not point to any authority that concluded that an anticompetitive "open early, closed late" scheme necessarily requires intellectual property "hold-up" or "lock-in" of standards set by an SSO. The Court therefore is unpersuaded by Cisco's argument. Here, Cisco is essentially disputing the "open" portion of the alleged "open early, closed late" scheme. But the evidence shows that Cisco has previously represented that "Cisco IOS CLI [is the] current de-facto standard." *See, e.g.*, Ex. 6 to Nelson Decl. in Supp. of Arista's Mot. Thus, when drawing

reasonable inferences in favor of Arista, there is a genuine issue of material fact whether Cisco's CLI was marketed as an industry standard.

Cisco further contends that Arista's reliance on *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) in support of the "open early, closed late" scheme is incorrect. Cisco's Mot. 15. In *Kodak*, several independent service organizations ("ISOs") brought an antitrust action against Eastman Kodak Company ("Kodak"). Kodak manufactured photocopiers and also sold service and replacement parts for its equipment. *Kodak*, 504 U.S. at 455. In the early 1980s, the ISOs began purchasing replacement parts and servicing Kodak copying machines. *Id.* However, in the mid-1980s, Kodak implemented a policy of selling replacement parts only to buyers who used Kodak's services. *Id.* Kodak also took additional steps to restrict the ISOs' ability to compete. For example, Kodak and the original equipment manufacturers ("OEMs") agreed that the OEMs would not sell parts to anyone other than Kodak. *Id.* at 458. This put the ISOs out of business.

In Cisco's view, *Kodak* is inapplicable because Cisco had no enforceable prior course of dealing regarding its CLI with its competitors. Cisco's Mot. 15–16. Insofar as Cisco is arguing that it would be liable only if there was a formal contractual relationship with its competitors, the Court disagrees. *Kodak* does not indicate that a contractual relationship between Kodak and the ISOs was a prerequisite to Kodak's liability. In fact, some ISOs purchased replacement parts from OEMs and thus would not have had a formal relationship with Kodak. *See Kodak*, 504 U.S. at 458.

According to Cisco, the purported policy reversal was foreseeable because Arista knew that Cisco had sued "Huawei for infringing Cisco's CLI" in 2003. Cisco's Mot. 16. In response, Arista asserts that the Cisco executive who initiated the Huawei litigation testified under oath that "the litigation was perceived even by Cisco itself as being about Huawei's wholesale copying of Cisco's source code, not CLI or copyright." Arista's Opp'n to Cisco's Mot. 10 (citing Ex. 4 to Nelson Decl. in Supp. of Arista's Opp'n 994:3-9 ("Giancarlo CLI Trial Testimony"), ECF 243-5). In light of the dispute over the true nature of the Huawei lawsuit, the Court finds that the foreseeability issue raises a genuine dispute of fact which cannot be resolved at summary

27

judgment.

As a final point, Cisco argues that *Kodak* is distinguishable because Arista and other competitors continue to compete without altering their CLI, whereas Kodak had actually eliminated the ISOs' access to replacement parts. Cisco's Mot. 16. The Court does not find that this distinction bars Arista's antitrust liability theory. The fact that competitors have not altered their CLI does not tell the whole story. As discussed below, when drawing all reasonable inferences in favor of Arista, there is evidence that raises a material dispute of fact on whether competition was harmed due to the purported "open early, closed late" scheme regardless of the continued use of CLI by competitors.

### c. Conclusion

For the above reasons, the Court DENIES Cisco's motion for summary judgment that Cisco's CLI litigation and communications concerning that litigation are protected under the *Noerr-Pennington* Doctrine and are not exclusionary conduct.

### ii. Monopoly Power or a Dangerous Probability of Obtaining Monopoly Power

Cisco argues that Arista cannot show that Cisco possessed or had a dangerous probability of achieving monopoly power. Cisco's Mot. 18. Section 2 of the Sherman Act prohibits monopolization and attempts to monopolize. 15 U.S.C. § 2. To state a claim for monopolization, a plaintiff must allege: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs.*, 99 F.3d at 949; *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir.2010). A claim for attempted monopolization, requires allegations of the defendant's "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." *Cost Mgmt. Servs.*, 99 F.3d at 949.

In its motion, Cisco asserts that Arista has failed to show monopoly power through either direct or circumstantial evidence. Cisco's Mot. 19–20. A plaintiff may prove monopoly power directly by showing supracompetitive pricing and restricted output. *Rebel Oil*, 51 F.3d at 1434.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    As an alternative, the plaintiff may establish market power based on circumstantial evidence.  *Id.*

2    "To demonstrate market power circumstantially, [the] plaintiff must: (1) define the relevant

3    market, (2) show that the defendant owns a dominant share of that market, and (3) show that there

4    are significant barriers to entry and show that existing competitors lack the capacity to increase

5    their output in the short run."  *Id.*  "The more common type of proof [of market power] is

6    circumstantial evidence pertaining to the structure of the market."  *Id.*

7          As for direct evidence, Cisco contends that Arista cannot show supracompetitive pricing

8    because "the market is highly competitive" and prices have declined in the relevant markets.

9    Cisco's Mot. 19 (citing Ex. A65 to Seddon Decl. in Supp. of Cisco's Mot. 21, ECF 220-26; Figs.

10   12–15 to Scott Morton Report).  For support, Cisco contends that its "products are less expensive

11   on average than the products of many of its competitors."  *Id.* (citing Ex. A10 to Seddon Decl. in

12   Supp. of Cisco's Mot. ¶ 45, ECF 218-16).  Also, Cisco argues that Arista cannot show restricted

13   output because output has increased in recent years.  *Id.* at 19–20.  In support of its position, Cisco

14   points to evidence that shows Arista has increased its market share and manufacturing output over

15   the past six years.  *Id.* at 19 (citing Ex. A10 to Seddon Decl. in Supp. of Cisco's Mot. ¶¶ 43, 97–

16   98; Ex. A69 to Seddon Decl. in Supp. of Cisco's Mot. 239:16–21, ECF 220-30).  Other

17   competitors, including Huawei and Juniper, have also increased their share in the worldwide high-

18   speed Ethernet switches market.  Ex. A10 to Seddon Decl. in Supp. of Cisco's Mot. ¶ 43.  As for

19   circumstantial evidence, Cisco claims that Arista cannot show monopoly power circumstantially

20   because Cisco's market share has declined in recent years and new entrants (Arista and white box

21   switches deployed by other companies) and existing competitors (such as Huawei and Juniper)

22   have expanded output and gained market share.  Cisco's Mot. 20.

23         Arista counters that its expert, Dr. Scott Morton, conducted a detailed analysis of the

24   market data and other facts of this case and concluded that Cisco's "long-standing dominant

25   market share" and other circumstantial evidence establish that Cisco has monopoly power in each

26   alleged market.  Arista's Opp'n to Cisco's Mot. 14.  Arista further argues that Cisco did not rebut

27   Dr. Scott Morton's findings and that Cisco's arguments based on its declining market share and

28   competitors' expanded output and market share fail.  *Id.*

United States District Court
Northern District of California

1  Here, Arista does not explicitly address Cisco's arguments on direct evidence regarding

2  supracompetitive pricing and restricted output instead relying on Dr. Scott Morton's analysis of

3  Cisco's "dominant market share" and "other circumstantial evidence." *Id.*; *see also* Arista's Mot.

4  9 (arguing the three factors required to demonstrate market power circumstantially). The Court

5  notes that Dr. Scott Morton reports that Cisco has charged premiums for its products compared to

6  competitors in terms of per port price. Scott Morton Report ¶ 107; Figs. 23 and 24 to Scott

7  Morton Report. To the extent that Dr. Scott Morton's report is inconsistent with Dr. Carlton's

8  statement that Cisco does not have the highest prices when compared to other competitors

9  (Carlton Report ¶ 45), there is a material dispute of fact on whether Cisco has charged premiums

10 for its switches. In any case, because Arista may establish market power by circumstantial

11 evidence, it is not required to provide direct evidence on supracompetitive pricing and restricted

12 output. *See Rebel Oil*, 51 F.3d at 1434. As such, the Court turns to Cisco's argument that Arista

13 cannot show monopoly power circumstantially due to Cisco's decline in market share and

14 competitors' gain in market share.

15  The Court disagrees with Cisco that Arista cannot establish monopoly power because

16 Cisco's market share has declined in recent years. While a "declining market share may reflect an

17 absence of market power, . . . it does not foreclose a finding of such power." *Oahu Gas Serv., Inc.*

18 *v. Pac. Res., Inc.*, 838 F.2d 360, 366–67 (9th Cir. 1988). Indeed, courts have found monopoly

19 power despite the fact that the defendant's market share declined. *See, e.g.*, *id.* at 367 (holding

20 that a decline in market share does not preclude a finding of monopoly power where there is a

21 showing of high market share and significant entry barriers). Here, as discussed below, Arista has

22 shown that there is a material dispute over whether Cisco has a dominant share of the alleged

23 relevant markets and whether there are significant barriers to entry or expansion.

24  The Court is also unpersuaded by Cisco's argument that its competitors' increase in output

25 and market share precludes a finding of monopoly power. On this issue, Cisco asserts that there

26 are no meaningful barriers to entry and expansion because its competitors' market shares have

27 increased. Cisco's Reply 11 (citing *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th

28 Cir. 1997)). However, *Omega* is distinguishable from this case. In *Omega*, the court concluded

United States District Court
Northern District of California

that the defendant's exclusive dealing policy was not an entry barrier given that one competitor entered the market and increased its market share. *Omega*, 127 F.3d at 1164. In that case, there were no other factors that served as barriers to the market. In contrast, as discussed below, this case involves other evidence pertaining to unique factors—such as costs associated with replacing Ethernet switch vendors and the status of CLI within the industry—that support a showing of barriers which did not exist in *Omega*. Indeed, entry barriers may exist even if competitors enter the market and increase their market share. *See Rebel Oil*, 51 F.3d at 1441. The Court therefore is unpersuaded that the fact that an accused monopolist's rivals have increased their market share, alone, necessarily means that there are no significant barriers to the market.

In fact, Arista points to evidence in support of its position that there are significant barriers to entry or expansion and that competitors lack the capacity to increase the output in the short run. Arista's Opp'n to Cisco's Mot. 15. For example, Arista contends that no competitor has achieved more than 10% market share in revenue during the relevant time period. *Id.*; *see also* Figs. 4 and 5 to Scott Morton Report; Ex. 27 to Nelson Decl. in Reply in Supp. of Arista's Mot. Arista also argues that Cisco's dominant share of the existing Ethernet switch installed base and customers' preference for Cisco-like CLI "creates 'foundational' switching costs" that serves as a barrier to entry or expansion. Arista's Opp'n to Cisco's Mot. 15; Arista's Mot. 12. Arista's assertion is not without support. The evidence shows that Cisco estimates that its products constitute 80% of the "network installed base." Scott Morton Report ¶ 101. While Cisco responds that the "network installed base" includes products other than Ethernet switches, the evidence suggests that Cisco has a dominant share of the installed Ethernet switches given that it historically had the highest market share. Also, Cisco's Rule 30(b)(6) witness testified that Cisco' CLI is "foundational" to customers who could avoid retraining their team when purchasing new switches. *See* Ex. 17 to Nelson Decl. in Supp. of Arista's Mot. 21:21–22:23 ("Palumbo Dep."), ECF 210-22. Thus, when viewing the evidence as a whole, a reasonable inference can be drawn that a significant number of customers would continue purchasing Cisco's products due to the costs associated with switching to other products that do not use Cisco's CLI. Such a factor may constitute a barrier to entry and expansion and prevent an increase in output in the short run.

Other factors also support Arista's position. Evidence suggests that a high capital outlay is required to enter the market. Insieme, the company acquired by Cisco to compete with Arista, started with an initial investment of $135 million. Carlton Report ¶ 38. Moreover, Dr. Carlton agreed with Cisco's Rule 30(b)(6) witness and stated that "the reputation of a new vendor matters a tremendous amount and that it's risky to bring in a new vendor." Ex. B to Nelson Decl. in Supp. of Arista's Mot. 133:8–134:22, ECF 210-10. To be sure, the mere existence of either high capital requirements or vendor reputation does not support a finding of an entry barrier. *See W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 975 (9th Cir. 1999); *Harcourt Brace*, 108 F.3d at 1154. But, when drawing all reasonable inferences in favor of Arista, the combination of evidence—the high capital outlay, "tremendous" importance of vendor reputation, and other costs discussed above—raises a material dispute over the existence of significant barriers to the market.

Cisco also argues that Arista cannot show that Cisco has a "dominant market share" because Cisco's market shares are lower than 65% in the alleged markets except for the "implausible" all Ethernet switches market. Cisco's Reply 10–11. The Court disagrees. While "[c]ourts generally require a 65% market share to establish a *prima facie* case of market power," *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (emphasis added), there is no categorical rule that the defendant must have market share of more than 65% to possess monopoly power. Although the Ninth Circuit recognized that some "courts have considered a 50% share of the market as inadequate to establish a proscribed monopoly," it did not preclude such a finding. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975). Here, Arista's evidence shows that Cisco had at least 50% market share between 2014 and 2016 for all four relevant markets: (1) all Ethernet switches market in the United States (73%~69%); (2) all Ethernet switches market worldwide (60%~57%); (3) high-speed Ethernet switches market in the United States (66%~56%); and (4) high-speed Ethernet switches market worldwide (60%~52%). Figs. 4 and 5 to Scott Morton Report; Ex. 27 to Nelson Decl. in Reply in Supp. of Arista's Mot.; *see also* Figs 16–19 to Scott Morton Report. Considering Arista's evidence on barrier to entry or expansion, the Court concludes that the fact that Cisco had less than 65% share in some of the alleged market does not warrant summary

judgment in favor of Cisco as to the monopoly power issue.  Moreover, the Court has not determined the composition of the relevant markets, thus these percentages cannot now be applied.

Cisco further avers that Arista's circumstantial evidence cannot show monopoly power because Arista admits that the market is "highly competitive and highly pressured on . . . price" and cannot overcome "unrebutted direct evidence" that shows "lack of monopoly power."  *See* Cisco's Reply 10 (citing Ex. A65 Seddon Decl. in Supp. of Cisco's Mot. 21, ECF 220-26).  For support, Cisco cites *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366–67 (9th Cir. 1988) ("A high market share, though it may ordinarily raise an inference of monopoly power, *will not do so in a market with* low entry barriers or *other evidence of a defendant's inability to control prices or exclude competitors*." (internal citation omitted) (emphasis added)).  Cisco appears to read *Oahu* as holding that Arista must show direct evidence that Cisco lacks the ability "to control prices or exclude competition" in order to show monopoly power.  *See* Cisco's Reply 10. However, *Oahu* recognizes that while "[i]nquiries into the existence of monopoly power focus generally on a firm's ability to "control prices or exclude competition . . . . no single factor has been held determinative as to the existence of such power, [and] inquiries in this area often depend heavily upon *market share and barriers to entry*."  *Oahu*, 838 F.2d at 366 (internal citation omitted) (emphasis added).  Hence, the Court finds Cisco's arguments unpersuasive.  As discussed above, Arista has provided sufficient evidence that raises a material dispute of fact regarding the barriers to entry to support a finding of monopoly power.

Accordingly, the Court DENIES Cisco's motion for summary judgment that Arista cannot show that Cisco has monopoly power or a dangerous probability of obtaining monopoly power.

### iii.    Injury-in-Fact Caused by CLI-related conduct

As its third ground for summary judgment, Cisco argues that Arista cannot show that Cisco's CLI-related conduct caused an injury to Arista.  Cisco's Mot. 20.  "In order to find that an antitrust injury exists, [a court] must examine both the nature of the injury and whether the injury is causally related to the antitrust violation."  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1003 (9th Cir. 2008) (citation omitted).

Cisco asserts that Arista has no direct evidence of lost sales due to Cisco's CLI-related

conduct. Cisco's Mot. 20. According to Cisco, Arista's Rule 30(b)(6) witness, Anshul Sadana, "did not distinguish" between the CLI litigation and the ITC actions when investigating "opportunities that Arista lost to Cisco during the litigation." *Id.* On the grounds that Arista cannot show it suffered damages due to Cisco's CLI-specific conduct as opposed to other factors such as the ITC litigation, Cisco requests that the Court grant summary judgment in its favor on the injury-in-fact issue. *Id.* at 20–23.

Upon reviewing the evidence, the Court is unpersuaded by Cisco's arguments. Mr. Sadana testified that Arista has identified a list of about ▮ customers who decided not to purchase Arista's products due to "the litigation or fear of litigation." [11] Exs. 27, 28 to Nelson Decl. in Opp'n to Cisco's Mot., ECF 239-26, -27. While Mr. Sadana did not distinguish the CLI litigation and the ITC actions during his discussions about the litigation, he stated that "there's some color the customer gives on . . . the importance of . . . CLI." Ex. 28 to Nelson Decl. in Opp'n to Cisco's Mot. at 27:3–23. Moreover, the list of customers includes several companies that Cisco had previously identified to have purchased Arista's switches only because of the CLI. *Compare* Ex. 27 to Nelson Decl. in Opp'n to Cisco's Mot. *with* Ex. 24 to Nelson Decl. in Supp. of Arista's Reply ("Cisco's Responses to Arista's Interrogatory No. 15 in the CLI case"), ECF 252-10. Based on the foregoing evidence, a reasonable inference can be drawn that, due to the CLI litigation, Arista lost sales at least for those companies that place a high value on CLI. The Court therefore DENIES Cisco's motion for summary judgment that Arista cannot show injury-in-fact caused by Cisco's CLI-related conduct.

The parties also dispute whether the econometric model in Dr. Scott Morton's Report is sufficient to establish injury-in-fact. The Court need not reach that issue because as discussed above there is direct evidence that raises a material issue of fact on whether Arista suffered damages due to Cisco's CLI-related conduct.

---

[11] Cisco argues that Arista's evidence comes from "secondhand conversations its sales personnel . . . had with customers and, thus, depends on inadmissible hearsay." Cisco's Reply 12. However, Mr. Sadana testified that he has personal knowledge on some of the customer accounts. Ex. 28 to Nelson Decl. in Opp'n to Cisco's Mot. 38:2–41:13. The parties will have the opportunity to raise objections during trial.

United States District Court
Northern District of California

### iv.    Harm to competition

Cisco next argues that Arista cannot show antitrust injury because it provides no more than speculation that Cisco's conduct harmed competition in the alleged market.  Cisco's Mot. 23. "Antitrust injury is defined . . . as injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Theme Promotions*, 546 F.3d at 1003 (citation omitted).  Hence, "[w]here the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) (citation omitted).

Courts have recognizes a variety of anticompetitive effects including: (1) restrictions that prevent consumers from making free choices between market alternatives, *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003); (2) stymied innovation, *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, No. 5:11-CV-03613-EJD, 2015 WL 365491, at *9 (N.D. Cal. Jan. 27, 2015); (3) decreased product quality, *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012); and (4) supracompetitive prices, *id.*

Arista argues that Cisco's "open early, closed late" scheme harmed Arista and the competition by slowing down Arista's acquisition of new switch customers and the spread of innovative products.  Arista's Opp'n to Cisco's Mot. 22–23.  Cisco responds that injury to Arista—standing alone—cannot establish harm to competition.  Cisco's Reply 15.  However, "injury to competitors may be probative of harm to competition."  *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990).

Upon reviewing the evidence, the Court finds that there is a material dispute of fact on whether Cisco's purported exclusionary conduct caused harm to the competition.  As discussed earlier, drawing all reasonable inferences in favor of Arista, the evidence shows that Arista has lost sales due to customers' concern on using CLI.  *See* Ex. 27 to Nelson Decl. in Opp'n to Cisco's Mot. (testimony regarding clients that Arista believes to have lost due to the parties' litigation); Cisco's Responses to Arista's Interrogatory No. 15 in the CLI case (Cisco's list of companies that purchased Arista's products because the switches had CLI capabilities ).  Hence, it can be inferred that Cisco's CLI-related conduct restricted the customers from making free choices between

35

different products.  Such a restriction results in antitrust injury.  *Glen Holly*, 352 F.3d at 374 ("One form of antitrust injury is "[c]oercive activity that prevents its victims from making free choices between market alternatives." (alteration in original) (citation omitted)).

In addition, there is a material dispute of fact on whether Cisco's CLI-related conduct stymied innovation in the alleged markets.  The Scott Morton Report states that Arista's research and development ("R&D") have been impacted by the parties' litigation.  In particular, Arista had to cancel an "ultra-low latency switch . . .  after delays caused by the litigation."  Scott Morton Report ¶ 348.  Cisco contends that Arista diverted R&D resources to address "patent workarounds," which would not have been caused by CLI-related conduct.  Cisco's Reply 15 (citing Scott Morton Report ¶ 247).  However, the Scott Morton Report also states that the drop in Arista's sales can impact the amount spent in R&D.  Scott Morton Report ¶¶ 247, 247 n.351.  Because a reasonable inference can be drawn that Arista suffered CLI-related lost sales and thus reduced its R&D resources, the Court finds that there is a material factual dispute on whether Cisco's CLI-related conduct interfered with Arista's ability to innovate and denied customers the benefits of innovation in the market.  *Free FreeHand*, 852 F. Supp. 2d at 1185 (recognizing decreasing innovation in the market as a type of antitrust injury).

Accordingly, when drawing all reasonable inferences in favor of Arista, there is a material factual dispute on whether Cisco's conduct resulted in harm to the market.  The Court therefore DENIES Cisco's motion for summary judgment that Arista cannot show harm to competition.

### v.   UCL Claim

Cisco argues that Arista's UCL claim fails for the same reasons the antitrust claim fails.  Cisco's Mot. 25.  For the same reasons discussed above, the Court DENIES Cisco's motion for summary judgment that Arista's UCL claim fails.

Cisco has raised strong arguments and produced sound evidence in support of its motion.  Only by the application of the demanding criterion for summary judgment and drawing all reasonable inferences in Arista's favor does Cisco's motion fail.

### IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1    (1) Arista's motion for partial summary judgment is DENIED.

2    (2) Cisco's motion for summary judgment is DENIED except for its request for summary

3 judgment that the CLI lawsuit was objectively reasonable.

4    (3) Cisco's request for summary judgment that the CLI lawsuit was objectively reasonable

5 is GRANTED.

6    **IT IS SO ORDERED.**

7 Dated: May 9, 2018

8

9                  BETH LABSON FREEMAN
                   United States District Judge