DONALD B. VERRILLI, JR. (*pro hac vice*)
donald.verrilli@mto.com
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
Washington, D.C.  20004
Telephone:    (202) 220-1100
Facsimile:    (202) 220-2300

JONATHAN H. BLAVIN (SBN 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (SBN 220769)
rose.ring@mto.com
NICHOLAS D. FRAM (SBN 288293)
nicholas.fram@mto.com
MARIANNA MAO (SBN 318070)
marianna.mao@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for Defendant LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-CV-03301-EMC |
| Plaintiff, | **LINKEDIN CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| vs. | |
| LinkedIn Corporation, | Judge:          Hon. Edward M. Chen |
| Defendant. | Hearing Date**:**   August 6, 2020 |
| | Hearing Time:   1:30 p.m. |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    HIQ'S DAMAGES CLAIMS BASED ON LINKEDIN'S LETTERS ARE
       BARRED BY *NOERR-PENNINGTON* AND CALIFORNIA'S LITIGATION
       PRIVILEGE ........................................................................................................ 2

       A.    hiQ Does Not Address LinkedIn's Showing That Its Claims Had Merit .................. 2

       B.    The *USS-POSCO* Exception Does Not Apply ........................................... 3

       C.    The *Hynix* "Exception" Does Not Apply ..................................................... 4

             1.    The alleged facts do not fit within the *Hynix* "exception" ........................... 4

             2.    hiQ fails to allege anticompetitive harm caused by non-petitioning
                   acts .......................................................................................................... 5

             3.    The alleged technical blocks were not "ineffective" without the
                   letters ...................................................................................................... 6

       D.    California's Litigation Privilege Also Bars hiQ's State Law Claims ...................... 7

III.   HIQ DOES NOT ALLEGE INJURY FROM HARM TO COMPETITION ......................... 7

IV.    HIQ FAILS TO PROPERLY DEFINE A RELEVANT ANTITRUST MARKET ............... 8

       A.    hiQ's Market Improperly Excludes Substitutes Based On Quality And
             Features ..................................................................................................... 9

       B.    hiQ's Relevant Market Improperly Includes Products That Are Not
             Substitutes ................................................................................................. 11

V.     HIQ FAILS TO ALLEGE LINKEDIN'S POWER IN THE RELEVANT MARKET ......... 12

VI.    HIQ FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT ......................................... 14

VII.   CONCLUSION ................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016)................................................................ 14, 15

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1996) ........................................................................ 3

*Apple, Inc. v. Motorola Mobility, Inc.*,
   886 F. Supp. 2d 1061 (W.D. Wis. 2012).......................................................... 5

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
   No. 16-cv-00923-BLF (N.D. Cal. May 21, 2018), ECF No. 281 .......................4-5

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016) .......................................................................... 16

*Aventis Pharma S.A. v. Amphastar Pharm., Inc.*,
   2009 WL 8727693 (C.D. Cal. Feb. 17, 2009) ................................................... 4

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 8

*Broam v. Bogan*,
   320 F.3d 1023 (9th Cir. 2003) ........................................................................ 1

*Cargill Inc. v. Budine*,
   2007 WL 2506451 (E.D. Cal. Aug. 30, 2007) ................................................. 13

*Church & Dwight Co. v. Mayer Labs., Inc.*,
   868 F. Supp. 2d 876 (N.D. Cal. 2012) ...................................................... 12, 13

*City of Anaheim v. Southern Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992)......................................................................... 2

*Datel Holdings Ltd. v. Microsoft Corp.*,
   712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................... 10

*Drake v. Cox Enterprises, Inc.*,
   2013 WL 557024 (D. Kan. Feb. 13, 2013) ..................................................... 12

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
   504 U.S. 451 (1992)...................................................................................... 16

*Evans Hotels, LLC v. Unite Here Local 30*,
   433 F. Supp. 3d 1130 (S.D. Cal. 2020) ........................................................... 3

Case No. 17-CV-03301-EMC

Reply ISO MTD FAC

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Funai Electric Co. v. LSI Corp.*,
2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) ........................................................ 5, 7

*Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*,
895 F.2d 1417 (9th Cir. 1990) ........................................................................... 10

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) .............................................................................. 9

*Huawei Technologies, Co. v. Samsung Electronics Co.*,
340 F. Supp. 3d 934 (N.D. Cal. 2018) .................................................................. 7

*Hurst Int'l, LLC v. Sinclair Sys. Int'l*,
2018 WL 4961908 (C.D. Cal. May 18, 2018) ........................................................ 8

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
527 F. Supp. 2d 1084 (N.D. Cal. 2007) ....................................................... *passim*

*Int'l Television Productions Ltd. v. Twentieth Century Fox*,
622 F. Supp. 1532 (S.D.N.Y. 1985) ................................................................. 11-12

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ................................................................................ 9

*Kaiser Foundation Health Plan, Inc. v. Abbott Labs., Inc.*,
552 F.3d 1033 (9th Cir. 2009) .............................................................................. 4

*Kaplan v. Burroughs Corp.*,
611 F.2d 286 (9th Cir. 1979) .............................................................................. 11

*Kerwin v. Parx Casino*,
2019 WL 1098949 (E.D. Pa. Mar. 8, 2019) ........................................................ 16

*LiveUniverse, Inc. v. MySpace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) ...................................................................... 14

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) .................................................... 12

*Menzel v. Scholastic, Inc.*,
2018 WL 1400386 (N.D. Cal. Mar. 19, 2018) .................................................. 7, 8

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ............................................................................ 15

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
2016 WL 1464545 (D. Del. Apr. 13, 2016) .......................................................... 5

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Newcal Industries, Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ................................................................. 16

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .............................................................. 17

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) ...................................................................... 9, 11

*Oregon Natural Resources Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991) ............................................................ 2, 3, 6

*PNY Technologies, Inc. v. SanDisk Corp.*,
    2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ........................................ 14

*Prime Healthcare Services, Inc. v. Service Employees Int'l Union*,
    2013 WL 3873074 (S.D. Cal. July 25, 2013) ......................................... 13

*PSKS, Inc. v. Leegin Creative Leather Products, Inc.*,
    615 F.3d 412 (5th Cir. 2010) ................................................................ 12

*Rebel Oil Co. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................ 13

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) ................................................................ 17

*Roberts v. Bartels*,
    2013 WL 6173142 (N.D. Cal. Feb. 19, 2013) ....................................... 14

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
    745 F.3d 343 (9th Cir. 2014) .................................................................. 2

*Rosenfeld v. U.S. Dep't of Justice*,
    903 F. Supp. 2d 859 (N.D. Cal. 2012) ..................................................... 7

*Stewart v. Gogo, Inc.*,
    2013 WL 1501484 (N.D. Cal. Apr. 10, 2013) ....................................... 12

*Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
    547 F. Supp. 2d 1086 (C.D. Cal. 2007) ................................................. 10

*Tanaka v. University of Southern California*,
    252 F.3d 1059 (9th Cir. 2001) .............................................................. 10

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ........................................ 12

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Unigestion Holdings, S.A. v. UPM Technology, Inc.*,
   412 F. Supp. 3d 1273 (D. Or. 2019)...................................................................... 12

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) .............................................................................................. 10

*United Tactical Systems v. Real Action Paintball, Inc.*,
   2016 WL 524761 (N.D. Cal. Feb. 10, 2016)............................................................ 2

*USS-POSCO Industries v. Contra Costa County Bldg.*,
   31 F.3d 800 (9th Cir. 1994)................................................................................. 3, 4

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) .............................................................................................. 15

*Vinci v. Waste Management, Inc.*,
   80 F.3d 1372 (9th Cir. 1996).................................................................................. 12

*Westlake Services, LLC v. Credit Acceptance Corp.*,
   2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ......................................................... 11

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000).................................................................................. 3

*Wonderful Real Estate Dev. LLC v. Laborers Int'l Union of N. Am. Local 220*,
   2020 WL 91998 (E.D. Cal. Jan. 8, 2020)................................................................. 3

*Zenith Elecs., LLC v. Sceptre, Inc.*,
   2015 WL 12765633 (C.D. Cal. Feb. 5, 2015) .......................................................... 5

**STATE CASES**

*Aronson v. Kinsella*,
   58 Cal. App. 4th 254 (1997)..................................................................................... 7

**TREATISES**

58 Corpus Juris Secundum Monopolies § 91 ................................................................ 15

I.     **INTRODUCTION**

    Unable to dispute that its complaint is devoid of essential allegations supporting its damages and Sherman Act claims, hiQ's opposition repeatedly conjures up "facts" *nowhere* to be found in its complaint.  Of course, "a court *may not* look beyond the complaint" to asserted facts in an "opposition to a motion to dismiss," *Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003), and hiQ's attempt to go beyond the pleadings merely underscores that its pleading is deficient.

    *First*, hiQ's damages claims—and sole theory of antitrust injury—are barred in their entirety by *Noerr-Pennington* and California's litigation privilege because they allege harm from protected cease-and-desist letters.  Circuit precedent requires hiQ to plead an exception to *Noerr-Pennington* with heightened specificity.  But faced with LinkedIn's showing that the claims in its letters had merit, hiQ does not, and cannot, point to any allegations that the letters were a sham, much less part of a broader pattern of sham litigation.  Nor can hiQ rely on the purported *Hynix* "exception" to *Noerr-Pennington*, which is limited to bait-and-switch schemes involving false invitations to use a party's technology as an industry standard, and at any rate, hiQ fails to satisfy both steps of *Hynix*.

    *Second*, all of hiQ's antitrust claims should also be dismissed because hiQ has not properly defined the relevant market.  hiQ failed to allege a single LinkedIn product or competitor other than the parties in its complaint.  To make its individual dispute about scraping LinkedIn look like an antitrust claim about the "market," hiQ has gerrymandered its proposed market to products that, conveniently like hiQ's, use LinkedIn data.  hiQ's attempt to limit the market to products that rely on LinkedIn data because of its supposedly "better quality" ignores commercial realities and is contrary to settled law rejecting markets defined by quality variances, including at the pleadings stage.

    *Third*, even if hiQ had alleged a proper market, hiQ has failed to allege LinkedIn engaged in actionable anticompetitive conduct.  hiQ adopts a kitchen-sink approach, throwing out seven different theories in the hope that one will stick.  But none do.  The antitrust laws do not force a duty on LinkedIn to allow scraping when it has always banned scraping.  Nor can LinkedIn be an essential facility where hiQ itself alleges that other services and employers provide people analytic services without LinkedIn data.  And hiQ's theories of boycotts, lock-in and tying fail because hiQ does not allege any agreement in which LinkedIn prevented anyone from buying from competitors.

## II.   HIQ'S DAMAGES CLAIMS BASED ON LINKEDIN'S LETTERS ARE BARRED BY *NOERR-PENNINGTON* AND CALIFORNIA'S LITIGATION PRIVILEGE

Since the beginning of this lawsuit, hiQ's damages theory has focused on hiQ's "apprehension that it will be subject to liability if it continues to access LinkedIn's website." FAC ¶ 61, ECF No. 131; ECF No. 1 ¶ 34.  hiQ alleges LinkedIn's "cease and desist request" "pose[d] an existential threat to hiQ," and that hiQ stopped accessing the site after receiving the letter.  FAC ¶¶ 45, 7, 39 & Ex. 5.  hiQ does not dispute that demand letters are petitioning activity protected by the First Amendment and, thus, generally immune from liability under the *Noerr-Pennington* doctrine.  Thus, there can be no dispute that all of hiQ's damages claims based on such letters must be dismissed unless hiQ has pled an exception to the *Noerr-Pennington* doctrine.

To sustain that burden, hiQ's complaint must "satisfy more than the usual 12(b)(6) standard." *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991).  hiQ's "complaint must include allegations of the specific activities which bring the defendant's conduct into one of the exceptions to *Noerr–Pennington* protection." *Id.* (quotations omitted).  hiQ comes nowhere close to satisfying this heightened standard.  Accordingly, the Court must carefully review hiQ's allegations and dismiss its damages claims to the extent that they are based on LinkedIn's demand letters.  Mot. 9 (citing, *e.g.*, *United Tactical Sys. v. Real Action Paintball, Inc.*, 2016 WL 524761, at *6 (N.D. Cal. Feb. 10, 2016) (dismissing "Sherman Act claims to the extent they are based on" petitioning).[1]

### A.   hiQ Does Not Address LinkedIn's Showing That Its Claims Had Merit

hiQ does not dispute that *Noerr-Pennington* protects cease-and-desist letters "unless the threatened lawsuit was a 'sham.'" *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 351 (9th Cir. 2014).  In its motion, LinkedIn showed that its CFAA and contract claims were supported by Ninth Circuit and Northern District case law.  Mot. 10-11.  Indeed, this Court already noted that LinkedIn's CFAA claim was "not without basis," ECF No. 63 at 10, as have other courts in this District considering similar claims.  Supp. Request for Judicial Notice ("Supp. RJN"), Ex. B at 5 (*Does* discovery order) ("LinkedIn's CFAA claim would survive a motion to dismiss.");

---

[1] hiQ misstates the law when it urges the Court to view its allegations "in their entirety rather than broken into their constituent parts."  Opp. 13 n.6.  *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992), which hiQ cites, does not involve petitioning conduct at all.

*see also White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000) (courts do "not lightly conclude in any *Noerr-Pennington* case that the litigation in question is objectively baseless").  Rather than address this Court's conclusion or LinkedIn's authorities, hiQ simply asserts without support that "*all* of LinkedIn's litigation threats were baseless."  Opp. 16 (citing FAC ¶¶ 39-42), ECF No. 142.  But the cited portions of the FAC hiQ relies upon establish only that hiQ has a different view of the merits.  hiQ does not, and cannot, allege that LinkedIn's threatened claims were all objectively baseless.

## B.   The *USS-POSCO* Exception Does Not Apply

hiQ relies on *USS-POSCO Indus. v. Contra Costa Cty. Bldg*., 31 F.3d 800 (9th Cir. 1994), which recognizes liability for "a pattern of baseless, repetitive claims."  *Amarel v. Connell,* 102 F.3d 1494, 1519 (9th Cir. 1996).  hiQ, however, cannot rely on *USS-POSCO* because it "fails to allege with specificity" that LinkedIn has engaged in any "pattern of baseless" petitioning activity, let alone how LinkedIn's cease-and-desist letter to hiQ "fits into that pattern."  *Mohla*, 944 F.2d at 535.

The FAC does not identify any other people analytics competitors who allegedly received cease-and-desist letters, much less the content of those letters, why any legal assertions in such letters lacked merit, or how those letters may have impacted competition.[2]  Such conclusory invocations of the *USS-POSCO* sham exception are consistently dismissed on the pleadings.  *E.g., Wonderful Real Estate Dev. LLC v. Laborers Int'l Union of N. Am. Local 220*, 2020 WL 91998, at *9–11 (E.D. Cal. Jan. 8, 2020) (dismissing complaint under *Noerr* and rejecting *USS-POSCO* exception; "Without any information regarding the merits of the lawsuits, this Court cannot determine whether the legal filings were made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment.") (listing cases); *Evans Hotels, LLC v. Unite Here Local 30*, 433 F. Supp. 3d 1130, 1148–49 (S.D. Cal. 2020) (same; citing *Mohla* and holding that "Plaintiffs fail to allege facts from

---

[2] For the first time in its opposition, hiQ belatedly identifies other companies that purportedly "suffered from LinkedIn's scheme."  Opp. 11.  As noted, the Court cannot consider such statements outside the pleadings.  *Supra* at 1.  At any rate, hiQ lacks any reasonable basis for making such claims.  As just one example, hiQ suggests HiringSolved was a competitor targeted by this "scheme."  Opp. 11.  But LinkedIn discovered HiringSolved's identity only after filing a *Doe* lawsuit in 2014 to stop harmful site behavior—including the creation of thousands of fake accounts and scraping member data from LinkedIn's password-protected site—by an *unknown* actor (and HiringSolved ultimately agreed to a consent judgment).  Supp. RJN, Exs. C-D.

which the Court can infer that Defendants' past filings … were improperly motivated in filing any lawsuit against Plaintiffs" and thus the "serial petition sham exception does not apply").

In any event, hiQ cannot allege that LinkedIn lacked a "plausible" claim in its letters to hiQ or any other scraper. In *Kaiser Foundation Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009)—which hiQ relies upon—the court held that *USS-POSCO* did not apply where Abbott brought 17 lawsuits and lost 10 because "in each of" those cases "it had a plausible argument on which it could have prevailed." *USS-POSCO* does not apply here, either, because LinkedIn plainly had and has a plausible argument on which it could prevail on its claims.

## C.   The *Hynix* "Exception" Does Not Apply

### 1.   The alleged facts do not fit within the *Hynix* "exception"

hiQ also invokes a narrow "exception" recognized in *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007), for a rare case in which the plaintiff alleges both that the defendant's *non-petitioning* activity *independently caused* anticompetitive harm, and that the defendant's petitioning activity was "causally connected" to that harm because the scheme would have been "ineffective without the threat of litigation." *Id.* at 1097–98. *Hynix*, however, has been held to be "incompatible" with the Ninth Circuit's decision in *Kaiser*, 552 F.3d at 1044, because it "conflates *Noerr–Pennington* immunity with the substantive § 2 element of antitrust injury." *Aventis Pharma S.A. v. Amphastar Pharm., Inc.*, 2009 WL 8727693, at *8 n.7 (C.D. Cal. Feb. 17, 2009).

Regardless, hiQ's attempt to rely on *Hynix* is a square peg in a round hole. *Hynix* and the related cases cited by hiQ all involve a similar pattern: (1) the defendant affirmatively promised and misrepresented to competitors they could use its technology and intellectual property as an industry standard; and (2) in doing so, competitors across the industry became vulnerable if and when the defendant asserted the legal right to control the technology as a weapon to block competition. In *Hynix*, Rambus "participated in a standards-setting organization" but fraudulently "withheld information about its patent applications" on technologies competitors were considering for the standard, leaving them exposed to infringement suits after the "industry was irreversibly 'locked in' to the standard." 527 F. Supp. 2d at 1098. Similarly, in *Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-cv-00923-BLF (N.D. Cal. May 21, 2018), ECF No. 281, Cisco "encouraged customers and

competitors to use Cisco's CLI [command-line interface]" as an "industry standard" ("open early"),
but "reversed its policy" and began informing its competitors' customers that CLI was not a standard
and the competitors were using it illegally ("closed late").  *Id.* at 4-5; 26-27.[3]

In short, these cases all involved a bait-and-switch, where a defendant affirmatively misled
competitors into using its technology and intellectual property on the understanding that no legal
action would result from doing so.  hiQ's allegations do not remotely fit this template.  hiQ alleges
only that LinkedIn enforced legal rights it has *always claimed*.[4]  Far from affirmatively telling
competitors that data from its site was available for scraping and that it would not take legal action
against scrapers but then changing course, LinkedIn always has expressly prohibited scraping data
from its site.  FAC, Ex. 1 § 8.2.  hiQ does not dispute this.  Citing Paragraph 37 of the FAC, hiQ
*argues* LinkedIn "encouraged [competitors] in various ways" to "access" LinkedIn data.  Opp. 14.
But Paragraph 37 at most alleges that LinkedIn was *aware* of hiQ's activities because some
LinkedIn employees attended a handful of hiQ's conferences.  Even if that were true, nothing in the
FAC alleges LinkedIn *encouraged* hiQ, much less any other analytics providers, to scrape LinkedIn
contrary to its clear terms prohibiting scraping.  On its face, *Hynix* does not extend to these facts.

### 2.    hiQ fails to allege anticompetitive harm caused by <u>non-petitioning</u> acts

Even if *Hynix* had any possible application to this context (which it does not), hiQ has not
satisfied its first requirement:  hiQ has not alleged that LinkedIn harmed *competition*—or even just
hiQ—through *non-petitioning* activity.  *See Hynix*, 527 F. Supp. 2d at 1097 (non-petitioning
"aspects of the scheme" must "independently produce anticompetitive harms"); *Apple, Inc. v.
Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1075–77 (W.D. Wis. 2012) (*Hynix* inapplicable
where Apple failed to show that it "suffered any antitrust injury as a result of Motorola's" alleged
non-petitioning acts and "only injury" shown was from patent litigation).

hiQ's opposition states that LinkedIn "cut off competitors' access" to LinkedIn data "*as*

---

[3] The other cases hiQ cites—*Funai Elec. Co. v. LSI Corp.*, 2017 WL 1133513, at *5–6 (N.D. Cal. Mar. 27, 2017); *Microsoft Mobile Inc. v. Interdigital, Inc.*, 2016 WL 1464545, at *3–4 (D. Del. Apr. 13, 2016); and *Zenith Elecs., LLC v. Sceptre, Inc.*, 2015 WL 12765633, at *6 n.2 (C.D. Cal. Feb. 5, 2015)—involved similar schemes with respect to standard essential patents.

[4] hiQ also argues that LinkedIn encouraged *users and employers* to join its network, Opp. 14, but that conduct does not involve competitors and there is nothing anticompetitive about it.

*well as* began issuing cease-and-desist letters," as if there were some conduct other than the letters. Opp. 15 (emphasis added).  But the FAC alleges only that LinkedIn sent *letters* to other unnamed purported people analytics providers.  FAC ¶ 46 ("LinkedIn's *letter* to hiQ was simply one of many that it sent" (emphasis added)).  hiQ's opposition argues in passing about a nebulous "scheme" of LinkedIn "spreading 'FUD' in the market (fear, uncertainty and doubt)."  Opp. 1.  But this is totally outside the pleadings.  hiQ's complaint does not allege anything even remotely related to a "FUD" campaign, let alone with the specificity the Ninth Circuit's decision in *Mohla* requires.

The FAC does accuse LinkedIn of implementing targeted "technical measures … to prevent *hiQ* from accessing … LinkedIn's site."  FAC ¶ 61 (emphasis added).  But activity directed at a single competitor cannot cause the independent harm to *competition in general* that *Hynix*'s first step requires.  Regardless, hiQ has consistently alleged that LinkedIn's *letters* were the actual source of its injuries.  hiQ alleges that (a) "[b]y sending the cease-and-desist letters," "LinkedIn effectively eviscerated hiQ's business," (b) the "cease and desist request" was what "pose[d] an existential threat to hiQ," and (c) hiQ stopped accessing LinkedIn after receiving the letters given its "apprehension that it will be subject to liability if it continues to access" it.  FAC ¶¶ 45, 7, 39, 61 & Ex. 5.  Moreover, hiQ does not dispute that LinkedIn's hiQ-specific IP address blocks could have prevented hiQ's access for at most *six* days (Mot. 5), and hiQ has never alleged or argued harm from any purported loss of technical access during this six-day period.  It would make little sense for hiQ to claim that these targeted technical blocks caused it to exit the market when hiQ had previously ceased accessing LinkedIn after receiving a cease-and-desist letter without any such barriers.  hiQ's claim of harm arises wholly from the letters, not any non-petitioning conduct.

### 3.      The alleged technical blocks were not "ineffective" without the letters

Even if hiQ could satisfy step one of *Hynix*, hiQ would still have to satisfy *Hynix*'s second required element:  the non-petitioning anti-competitive scheme must be "ineffective without the threat of litigation."  *Hynix*, 527 F. Supp. 2d at 1098.  hiQ *argues* in conclusory fashion that the letters are "'causally connected' to the efforts to cut off competitors' access," Opp. 15, but the FAC does not allege a single fact to support this.  Nor would such a theory make sense.  First, technical blocks do not require litigation to be effective.  The blocks either work or they don't.  Second, here,

the undisputed timing of events definitively establishes that LinkedIn's cease-and-desist letter could not have been a "mechanism[] to maintain [a] monopol[y] obtained by" any technical blocks. *Funai*, 2017 WL 1133513, at *6. The letter *preceded* any technical cut-off by a full month (Mot. 4-5). By contrast, in *Hynix* and all the cases hiQ cites applying *Hynix*, the petitioning conduct was used to *enforce* a prior anticompetitive scheme achieved through non-petitioning conduct.

**D.      California's Litigation Privilege Also Bars hiQ's State Law Claims**

The Court should also dismiss hiQ's state law damages claims because hiQ failed to respond to LinkedIn's separate California litigation privilege arguments. *See Rosenfeld v. U.S. Dep't of Justice*, 903 F. Supp. 2d 859, 869 (N.D. Cal. 2012) (Chen, J.) ("In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment"). In passing, hiQ states that LinkedIn only made a "truncated argument" (Opp. 6), attacking its state law claims. Not so. LinkedIn squarely argued that all damages flowing from state law claims should be dismissed under *both Noerr* and the litigation privilege. Mot. 8-12. That argument is correct. Section 47(b) grants absolute protection against damages liability for claims premised on pre-litigation demands. *Aronson v. Kinsella*, 58 Cal. App. 4th 254, 270 (1997).

**III.      HIQ DOES NOT ALLEGE INJURY FROM HARM TO COMPETITION**

hiQ's federal antitrust claims separately fail because hiQ has not pled that it suffered antitrust injury. hiQ does not dispute that it "must demonstrate injury to competition in the market as a whole, not merely injury to itself as a competitor." *Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 955–56 (N.D. Cal. 2018). hiQ's allegations about LinkedIn's conduct toward competitors consist solely of a single conclusory sentence on "information and belief" that LinkedIn sent cease-and-desist letters to other unknown people analytics providers. FAC ¶ 46. At the outset, hiQ does not dispute that if LinkedIn's letters are protected petitioning conduct (which they are), then hiQ has not pled any antitrust injury. This alone dooms hiQ's antitrust claims.

Regardless, hiQ has not plausibly alleged anticompetitive harm even from such protected activity. hiQ argues that it is enough to allege a letter-writing campaign based on "information and belief" and nothing else. Opp. 29. But "conclusory allegation[s] based on information and belief remain[] insufficient under *Iqbal/Twombly*." *Menzel v. Scholastic, Inc.*, 2018 WL 1400386, at *2

(N.D. Cal. Mar. 19, 2018) (Chen, J.). hiQ argues that the plaintiff in *Menzel* "pled no accompanying facts that allegations made on information and belief were true." Opp. 29. But hiQ hasn't done so, either. hiQ does not point to *any facts* that support the basis for its belief that LinkedIn sent "many" letters to "people analytics providers throughout the industry." FAC ¶ 46.[5] Nor does hiQ's complaint identify a single other company that competed in or has allegedly been driven from the "people analytics" market. hiQ thus tries to reverse the burden, arguing that LinkedIn "does not contest" that it "conducted … a campaign" of cease-and-desist letters. Opp. 28. But that is not how a motion to dismiss works. Under *Twombly*, hiQ's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV.    HIQ FAILS TO PROPERLY DEFINE A RELEVANT ANTITRUST MARKET.

hiQ's antitrust claims also fail in their entirety because hiQ has not properly alleged a relevant antirust market. hiQ agrees that all of its "antitrust claims each require it to plausibly allege a relevant product market." Opp. 6. hiQ also agrees that "the proper way to analyze the outer bounds of such a market is 'reasonable interchangeability of use' between products," which "means *all products* which could be used for the same general purpose, despite functional or price differences between them." Opp. 6-7 (emphases added).

The problem for hiQ is that its complaint does not practice what its opposition preaches. Rather than include all products that can be used for the same purpose, hiQ has gerrymandered its alleged market to correspond to its business model of scraping LinkedIn data. hiQ is trying to transform its individual assertion of a right to scrape data from LinkedIn's website into a Sherman Act claim about broader "competition." So in order to frame LinkedIn's long-standing policy prohibiting scraping member data as affecting the market as a whole, hiQ has rigged the market to include only companies that use LinkedIn data. Indeed, that is why hiQ's complaint does not name any other people analytics providers or products in the alleged market—a defect that hiQ confirms when it tries to assert facts outside the pleadings. Opp. 11 & nn.3-4.

---

[5] hiQ relies on *Hurst Int'l, LLC v. Sinclair Sys. Int'l*, 2018 WL 4961908, at *4–5 (C.D. Cal. May 18, 2018). But the plaintiff there alleged anticompetitive conduct in far more detail, including: (1) alleging that defendant offered "a 50% discount when the cost of the goods is above the discounted price," (2) "describ[ing] how these pricing strategies … lock[ed] customers into long-term contracts"; and (3) "provid[ing] two specific examples of Defendant's supracompetitive pricing."

A market defined in terms of hiQ's business model "meet[s] [hiQ's] litigation needs,'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018), but ignores "commercial realities" as shown by hiQ's *own* allegations.  *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2285 (2018).  Nobody "can expect to gerrymander its way to an antitrust victory without due regard for market realities."  *It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676, 683 (4th Cir. 2016).  Failure to define the market in terms of the competitive reality of the marketplace requires dismissal of hiQ's antitrust claims.

### A.    hiQ's Market Improperly Excludes Substitutes Based On Quality And Features

hiQ agrees that the relevant market must include "all products which could be used for the same general purpose, despite functional or price differences among them."  Opp. 7.  hiQ alleges that the purpose of "people analytics" is "providing employers in-depth, predictive insights into their workforce."  FAC ¶ 33.  hiQ's complaint in fact alleges that there are multiple ways that people analytics products can serve that purpose.  *One* way is to use data from LinkedIn's website.  But hiQ alleges that it "originally used other data sources for its analyses," *id*. ¶ 34 n.2, and other existing "people analytics providers today" rely on other "data sets," *id.* ¶¶ 54-55.  hiQ further acknowledges that some employers can provide their own workforce insights using their own internal data to assess "employee attrition risk and employees' full and current skillsets."  *Id*. ¶¶ 35-36.  As hiQ alleges, such unique data—including, e.g., internal survey results and performance reviews— allow companies to determine if they need "to better compensate potentially dissatisfied employees" or if "employees were better suited for other jobs."  *Id*. ¶ 35.

Taking as true hiQ's allegations that the purpose of people analytics products is to provide workforce insights, all products that provide workforce insights should be part of the market— regardless of what data or analytical methods the products use to provide insights.  hiQ appears to embrace this implication of its complaint, stating at one point that "the product market is defined as workforce-oriented data analytics *of all types."*  Opp. 8 n.1 (emphasis added).

hiQ nevertheless seeks to limit the relevant market only to products that provide employers with workforce insights using the LinkedIn data that hiQ *chose* to use.  hiQ limits the "people analytics" market to products that provide workforce insights in one particular way:  "performing computerized analyses of employees' public professional information and history."  FAC ¶ 33.  hiQ

1    claims that this means only those products that use LinkedIn data, arguing that "LinkedIn currently

2    controls" individuals' "self-curated public employment information."  Opp. 9.

3            However, the only difference hiQ claims between products using LinkedIn data—which are

4    in the alleged market—and products that use other data or methods for the same purpose—which

5    are outside of the alleged market—is that products using LinkedIn data allegedly perform better.

6    hiQ alleges that "using only the LinkedIn public database provided *better levels of predictive*

7    *accuracy*" than the other data sources hiQ relied upon, rendering it "unique."  FAC ¶ 34 & n.2

8    (emphasis added).  And hiQ alleges that the other "people analytics providers today" (excluded

9    from the proposed market) "rely on much smaller data sets" that lack the "*quality* that LinkedIn

10   provides," *id.* ¶¶ 53-54 (emphasis added).  Thus, hiQ argues that it was unable to provide the

11   "*quality* analytics" it wanted to provide without access to LinkedIn data.  Opp. 5 (emphasis added).

12           However, as LinkedIn explained in its motion, defining the market by the quality of a

13   product is improper.  "Courts have repeatedly rejected efforts to define markets by … product

14   quality variances."  *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417,

15   at *3 (9th Cir. 1990) (citing cases) (quotation marks omitted); *see United States v. E. I. du Pont de*

16   *Nemours & Co.*, 351 U.S. 377, 398–99 (1956) (rejecting market defined by "cellophane's

17   advantages").  And contrary to hiQ's suggestion (Opp. 10),[6] courts consistently dismiss antitrust

18   claims on the pleadings where the market definition is based on quality variances.  In *Tanaka v.*

19   *University of Southern California*, 252 F.3d 1059, 1063 (9th Cir. 2001), the Ninth Circuit affirmed

20   dismissal of antitrust claims on the ground that the allegation that "UCLA women's soccer program"

21   was "unique" was "insufficient" to define a market.  Likewise, in *Streamcast Networks, Inc. v. Skype*

22   *Technologies, S.A.,* 547 F. Supp. 2d 1086 (C.D. Cal. 2007), the court dismissed antitrust claims that

23   defined a market in terms of "different quality features."  *Id.* at 1094–96.  Plaintiff's "numerous

24   allegations concerning the purported 'uniqueness'" of the defendant's FastTrack technology "f[e]ll

25   short of establishing that FastTrack and other P2P technologies are not sufficiently reciprocal to

26

27   ───────────────────
     [6] hiQ relies on *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 974, 997 (N.D. Cal. 2010),
28   but the court there held that "some of [the plaintiff's] allegations *do not* relate to price and quality,
     and therefore, *are appropriate* differentiations at the pleading stage."  *Id.* (emphases added).

1    constitute the same product market." *Id.*

2          Just so here, hiQ's alleged market is predicated entirely on the purported "quality"

3    differences of LinkedIn data that render it "unique."  FAC ¶ 34 & n.2; ¶¶ 53-54.  In an effort to

4    distinguish this binding precedent, hiQ now claims that its allegations about quality relate to "harm

5    to competition" as opposed to "market definition," but that gets hiQ nowhere.  Opp. 9.  It makes no

6    sense to wall off competitive harm from market definition.  Indeed, "[i]t is the impact upon

7    competitive conditions *in a definable product market* which distinguishes the antitrust violation

8    from the ordinary business tort."  *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291 (9th Cir. 1979)

9    (emphasis added).  hiQ's effort to compartmentalize its allegations underscores that its market

10   definition is a strategic gambit designed for litigation rather than an attempt to capture the reality of

11   the marketplace.  *Am. Express Co.*, 138 S. Ct. at 2285 (definition of relevant market should not be

12   based "on formalistic distinctions rather than actual market realities").

13          **B.      hiQ's Relevant Market Improperly Includes Products That Are Not Substitutes**

14          The deficiency of hiQ's market definition is further revealed by the fact that its own products

15   are not reasonable substitutes for one another, much less for any product offered by LinkedIn.

16          hiQ agrees that "the market is defined by the types of insights people analytics provide."

17   Opp. 1-2.  But hiQ's complaint alleges, and its opposition concedes, that it "offers different types"

18   of products.  Opp. 4; *see* FAC ¶¶ 31, 33.  hiQ's "Keeper" product "assess[es] employees' flight

19   risk."  Opp. 4.  By contrast, its "Skill Mapper" product assesses "untapped (or unknown) skills."

20   *Id.*  These products are not even reasonable substitutes for one another.  In *Westlake Servs., LLC v.*

21   *Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015), which hiQ ignores,

22   the court rejected a market on the pleadings that similarly included software products that provided

23   different services related to auto loans.  The court held that the proposed market failed because it

24   included the plaintiff's software for acquiring and servicing auto loans as well as "software used to

25   compare auto finance packages or direct users to sources of automobile financing"—which "cannot

26   plausibly be considered substitutes for" one another.  *Id.*  The same is true here.  hiQ's only

27   response is that defendants more often object to "overly narrow market definitions."  Opp. 8.  But

28

1    courts frequently dismiss antitrust claims premised on markets defined in overly broad terms.[7]

2         Further, hiQ fails to identify in its complaint *any* LinkedIn products, much less allege how

3    any particular LinkedIn product is interchangeable with hiQ's.  If the plaintiff and the defendant do

4    not actually compete in the same market, then the plaintiff's claim cannot be an *antitrust* claim for

5    harm to competition, and should be dismissed.  *Vinci v. Waste Mgmt., Inc.,* 80 F.3d 1372, 1376 (9th

6    Cir. 1996); *see also Unigestion Holdings, S.A. v. UPM Tech., Inc.*, 412 F. Supp. 3d 1273, 1283 (D.

7    Or. 2019) (dismissing antitrust claim where complaint indicated the defendant "provides no service

8    that is an interchangeable alternative to what is provided by Plaintiff").

9    **V.    HIQ FAILS TO ALLEGE LINKEDIN'S POWER IN THE RELEVANT MARKET**

10        As hiQ agrees, power to restrict output or impose supra-competitive prices market-wide is

11   another required element of hiQ's antitrust claims.  Opp. 11.  hiQ's opposition confirms that it has

12   failed to allege this required element through either direct or circumstantial evidence.

13        ***Direct Evidence.***  LinkedIn demonstrated in its motion that hiQ failed to allege direct proof

14   that LinkedIn had market power because it failed to allege what price LinkedIn charges for any of its

15   supposedly competitive products, or that LinkedIn has the power to increase price to monopolistic

16   levels.  hiQ does not even address any of the cases dismissing antitrust claims where plaintiffs failed

17   to allege these direct indicia of market power, including this Court's decision in *Stewart v. Gogo,*

18   *Inc.*, 2013 WL 1501484, at *4 n.3 (N.D. Cal. Apr. 10, 2013) (Chen, J.).  *See also Med Vets Inc. v.*

19   *VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *6 (N.D. Cal. Apr. 22, 2019); *Top Rank, Inc. v.*

20   *Haymon*, 2015 WL 9948936, at *8 (C.D. Cal. Oct. 16, 2015).

21        hiQ argues that it has pled LinkedIn's power under a "functional approach" to direct

22   evidence.  But hiQ has misconstrued and misapplied this Court's decision in *Church & Dwight Co.*

23   *v. Mayer Labs., Inc.*, 868 F. Supp. 2d 876, 892 (N.D. Cal. 2012).  In that case, this Court

24   "assume[d] *arguendo*" that Mayer had raised a triable issue on market power in light of Church &

25   Dwight's "undisputed dominant market share," *id.* at 900–01, which Mayer had shown to be

26

27   [7] *See, e.g.*, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010)
     ("'women's accessories' too broad and vague to constitute a market"); *Drake v. Cox Enters., Inc.*,

28   2013 WL 557024, at *3 (D. Kan. Feb. 13, 2013) (alleged market for "religion based television
     shows and religion based consumer products" was "legally insufficient as it is overly broad"); *Int'l*

approximately 75%, *id.* at 898.  Even if that dicta were a holding, hiQ has not alleged any facts

showing LinkedIn's market share.  Nor has hiQ alleged any facts supporting the inference that

LinkedIn has the "ability to exclude competition" under a functional approach.  *Id.* at 900.  hiQ

casts LinkedIn's ability to exclude companies from scraping data on its platform as the power to

exclude competition, but most if not all websites have the ability to prohibit scraping in their terms

and send C&D letters telling scrapers to stop scraping their sites.  hiQ's reliance on LinkedIn's

control of its own website simply reprises hiQ's flawed market definition:  Because the market

cannot be limited to companies that scrape LinkedIn data, LinkedIn's ability to prohibit scraping

data on the LinkedIn website cannot establish the power to exclude competition market-wide.

     ***Circumstantial Evidence.***  hiQ does not dispute that a plaintiff alleging market power

circumstantially must "show that the defendant owns a dominant share of that market" *and* "that

there are significant barriers to entry."  *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1434 (9th

Cir. 1995) (emphasis added).  hiQ argues that LinkedIn has "an extremely high, dominant market

share" in the "people analytics market" (Opp. 12), but it admits that it "does not allege a specific

market share percentage," *id*.  hiQ does not try to distinguish LinkedIn's cases dismissing similar

conclusory characterizations of "dominance" as insufficient.  *E.g., Prime Healthcare Servs., Inc. v.

Serv. Emps. Int'l Union*, 2013 WL 3873074, at *15 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x

665 (9th Cir. 2016); *Cargill Inc. v. Budine*, 2007 WL 2506451, at *8 (E.D. Cal. Aug. 30, 2007).

And hiQ's promises about what it "can allege" (Opp. 12) merely confirm that it has not *actually

alleged* facts supporting a circumstantial inference of dominant market share.

     Because hiQ's failure to allege facts showing LinkedIn has a dominant share of the market

alone requires dismissal, hiQ cannot state a claim merely by showing that there are high barriers to

entry.  *Rebel Oil Co.*, 51 F.3d at 1434.  At any rate, hiQ's opposition does not identify cognizable

barriers to entry, either.  The sole supposed barrier hiQ identifies is that "the public employment

information LinkedIn maintains" allegedly is "[t]he only current, viable input for people analytics

services."  Opp. 12.  But, as noted, this ignores hiQ's own allegations that other data sources exist

and are used.  FAC at 13 n.2; *id.* ¶ 55.  And hiQ does not address LinkedIn's cited authority

---

*Television Prods. Ltd. v. Twentieth Cent. Fox*, 622 F. Supp. 1532, 1539 (S.D.N.Y. 1985) (similar).

1    holding that control over an input cannot be a barrier to entry where other inputs can be used. *See*

2    *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *10 (N.D. Cal. Apr. 25, 2014).

3    **VI.**    <u>**HIQ FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT**</u>

4       In addition to rigging its antitrust market, hiQ casts about for a theory of why LinkedIn's

5    refusal to permit scraping of its website was anticompetitive; it asserts seven antitrust theories. The

6    court does not have to address any of them because hiQ's failure to allege that LinkedIn had power

7    in a properly defined market disposes of every theory. Regardless, none of hiQ's theories pleads

8    actionable "concerted" conduct under Section One or "unilateral" conduct under Section Two.

9       ***Duty to Deal***. As set forth in LinkedIn's motion, all of hiQ's antitrust claims essentially

10   boil down to a duty to deal—that LinkedIn has an obligation to permit hiQ to scrape data from its

11   site. Given that such a theory has no plausible legal basis, hiQ rightly abandoned it before the

12   Ninth Circuit, stating that "the basis for hiQ's claim is not a refusal to deal." RJN, Ex. A at 49,

13   ECF No. 138. The Court should not accept hiQ's efforts to resurrect this theory now. Even if the

14   Ninth Circuit "did not rely upon the first position," hiQ, armed with no new facts, clearly "is now

15   playing 'fast and loose' with the court." *Roberts v. Bartels*, 2013 WL 6173142, at *5 (N.D. Cal.

16   Feb. 19, 2013).

17       At any rate, hiQ agrees that LinkedIn has a "default right" to choose the parties with whom it

18   deals and that the "narrow exception recognized in *Aspen Skiing*" applies only where "the *only*

19   conceivable rationale or purpose" for refusing to deal is to exclude competition. Opp. 25; *Aerotec*

20   *Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (emphasis added). hiQ

21   comes nowhere close to pleading that LinkedIn's only conceivable motivation was anticompetitive.

22   As this Court stated, LinkedIn's claim that it acted to protect member privacy was "not without

23   merit." ECF No. 63 at 6. Recent events involving Clearview and Cambridge Analytica put to rest

24   any doubt that LinkedIn had good reason to act to protect its members' data and privacy. hiQ cannot

25   plead that LinkedIn's *only* conceivable purpose in curbing hiQ's data scraping was anticompetitive.

26       hiQ also cannot satisfy the elements of the *Aspen Skiing* exception. hiQ never alleges any

27   "affirmative decision or agreement to cooperate," as it must, *LiveUniverse, Inc. v. MySpace, Inc.*,

28   304 F. App'x 554, 556 (9th Cir. 2008). hiQ argues, Opp. 26, that LinkedIn "has known of" hiQ

because several employees attended a few hiQ-sponsored conferences where hiQ allegedly "spoke[] freely about its public data collection from LinkedIn."  Even if those allegations could support the inference that LinkedIn had "always understood what hiQ does," FAC ¶ 37, they do not allege the required "affirmative" agreement between hiQ and LinkedIn permitting scraping.  No such agreement is alleged, nor can it be as LinkedIn's User Agreement prohibits scraping.  (hiQ knew this, which is why it surreptitiously scraped LinkedIn using anonymous bots to begin with.)

Likewise fatal to hiQ's *Aspen Skiing* claim is that it does not allege that being scraped was a profitable course of dealing for LinkedIn.  hiQ implausibly claims that LinkedIn profited because hiQ's scraping supposedly led to "increased employer engagement with and payments to LinkedIn, and increased member sign ups."  Opp. 26.  But hiQ fails to allege that LinkedIn *sacrificed* this, or any other profit, by refusing to deal with hiQ.  *Aerotec*, 836 F.3d at 1184.  hiQ does not allege that LinkedIn's letters caused LinkedIn to lose a single employer's engagement or a single user signup.

Finally, it is dispositive that hiQ does not deny that LinkedIn's terms explicitly *prohibit* scraping because a court cannot impose a duty to deal on terms that "are not otherwise marketed or available to the public."  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004).  hiQ alleges that LinkedIn permits Google and Yahoo! to access LinkedIn for search indexing purposes, not "people analytics" purposes.  But hiQ cites no case holding that a defendant providing access to a few companies on certain terms has a duty to provide access to any competitor on *any* terms of its choosing.  To the contrary, binding precedent holds that a competitor is not entitled to special terms.  *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133-34 (9th Cir. 2004) (only duty to offer "same terms" and not unique or special terms).

***Essential Facilities***.  hiQ argues that it needs LinkedIn data to provide the highest "quality analytics."  Opp. 5.  But hiQ itself agrees that an input used to make a product is not "essential" just because it is the "best."  Opp. 23.  Rather, a facility is only "essential" if it is *necessary* to provide any competing offering.  *Aerotec*, 836 F.3d at 1184; 58 Corpus Juris Secundum Monopolies § 91 ("'essential' means essential, not 'best'").  Therefore, the only way that LinkedIn's website could be essential is if "people analytics" could not be performed at all using any other data.  But as hiQ repeatedly concedes in its complaint, other data is available, and other existing "people analytics"

1    providers and employers use that data, including hiQ in the past.  FAC at 13 n.2, ¶¶ 34, 54-55.  This

2    dooms hiQ's essential facilities theory.  *E.g., Kerwin v. Parx Casino*, 2019 WL 1098949, at *8

3    (E.D. Pa. Mar. 8, 2019), *aff'd*, 802 F. App'x 723 (3d Cir. 2020) (defendant's "event centers" not

4    essential facilities where plaintiff "admits" that "other venues exist" that he had used).

5         **Lock-In**.  hiQ invokes the "'lock-in' doctrine" recognized in *Eastman Kodak Co. v. Image*

6    *Tech. Services, Inc.*, 504 U.S. 451 (1992).  In that case, the "theory was that Kodak was engaging in

7    illegal practices to prevent independent service companies from competing with Kodak in the

8    aftermarket for service of Kodak-brand equipment" because "[o]wners of Kodak-brand equipment ...

9    were forced to purchase replacement parts and services only from" Kodak.  *Newcal Indus., Inc. v.*

10   *Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008).  As hiQ's own cases explain, a *Kodak* lock-in

11   claim is a "specialized theory of *tying*":  a defendant requires customers who bought a product in the

12   primary market to buy parts or services in an aftermarket to keep using the original product.  *Avaya*

13   *Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016) (emphasis added).

14        hiQ has not pled any facts supporting such a theory.  hiQ argues that users are locked-in to

15   LinkedIn's networking because they supposedly "*must* have a LinkedIn account for professional

16   social networking."  Opp. 22.  But whereas Kodak required copier customers to use Kodak parts

17   and services in the aftermarket to keep their copiers running, hiQ does not and cannot allege that

18   LinkedIn requires users to buy people analytics from LinkedIn in order for their individual accounts

19   to retain value, which would be a facially ridiculous assertion.  hiQ's theory that LinkedIn made a

20   "false promise" to users about their data is also demonstrably false because hiQ does not dispute

21   that the User Agreement has always informed users that LinkedIn prohibits scraping.[8]  Under hiQ's

22   own authority, "no antitrust liability for a *Kodak*-style attempted monopolization claim could lie . . .

23   when customers were put on clear notice" of LinkedIn's policies.  *Avaya*, 838 F.3d at 399.

24        **Tying**.  hiQ agrees that a plaintiff asserting a tying claim must allege that the defendant

25   coerced consumers by conditioning the sale of one product on the purchase of another.  Opp. 20;

26

27   _____
     [8] hiQ says that "*Kodak* is not limited to abuse of aftermarkets."  Opp. 21.  But both cases hiQ cites
     for that proposition—*Kodak* and *Avaya*—involved aftermarkets, and *Avaya* describes *Kodak* as

28   standing for the proposition that "*tying* liability may exist in an aftermarket where the seller can
     exploit customers who have already purchased the equipment."  838 F.3d at 399 (emphasis added).

*see also Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008).  hiQ argues that LinkedIn "coerce[d] employers into *not* purchasing hiQ's" products.  Opp. 21.  But, again, hiQ does not and cannot allege *any facts* supporting the claim that LinkedIn conditioned employers' access to its professional network on their agreement to purchase people analytics from LinkedIn or not to purchase people analytics from hiQ.  hiQ therefore has failed to allege tying.

     ***Vertically-Arranged Boycotts***.  According to hiQ, a defendant engages in a vertical boycott "by restraining a third party at a different level of the supply chain from dealing with the defendant's competitors."  Opp. 18.  Again, hiQ has not alleged a vertical boycott because it has not alleged that LinkedIn restrained *anyone* from dealing with hiQ or any other competitor.  hiQ argues that "LinkedIn forced its users to not allow LinkedIn's people analytics competitors to access their public employment information."  Opp. 19.  But hiQ does not allege that LinkedIn forced its members or anyone who wanted to provide employment information *to hiQ* not to do so, and hiQ remains free to ask anyone for such information.  LinkedIn has not arranged any *boycott* of hiQ merely because it told hiQ to stop secretly scraping personal information from its website.

     ***Raising Rivals' Costs***.  hiQ does not dispute that the mere allegation that a defendant's conduct raised its rivals' costs cannot state an antitrust claim, as it fails to "displace *Aspen* and *Trinko's* profit sacrifice test in the narrow world of refusal to deal cases."  *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1079 (10th Cir. 2013).  hiQ asserts that "[c]oncerted action having this effect" and conduct deemed anticompetitive under "well-accepted unilateral doctrines" can be actionable.  Opp. 19-20.  But hiQ does not allege any such conduct.  hiQ thus has no independent antitrust claim premised on the mere allegation that refusing to let hiQ scrape made business harder for hiQ.

     ***Monopoly Leveraging***.  hiQ agrees that its "leveraging" theory is not itself a basis for antitrust liability, and rises and falls with its other theories:  "if hiQ plausibly alleged other anticompetitive conduct, then it has also plausibly alleged leveraging accompanying that conduct."  Opp. 24; *see* Mot. 29.  Since hiQ has not alleged that LinkedIn engaged in any anticompetitive conduct, it has not alleged that LinkedIn unlawfully engaged in monopoly leveraging.

## VII.  <u>CONCLUSION</u>

     The Court should dismiss hiQ's damages claims and its federal antitrust claims.

1    DATED:  July 14, 2020                    MUNGER, TOLLES & OLSON LLP

2

3

4                                        By:    /s/ Jonathan H. Blavin
                                                Jonathan H. Blavin
5

6                                               Attorneys for Defendant LinkedIn Corporation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28