Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

HIQ LABS, INC.,                )
                               )
            Plaintiff,         )
                               )
  VS.                          )   **No. C 17-03301 EMC**
                               )
LINKEDIN CORP.,                )
                               )
            Defendant.         )
_____)   San Francisco, California
                                    Thursday, August 20, 2020


**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via Zoom Video Conferencing)

For Plaintiff:          QUINN EMANUEL URQUHART AND SULLIVAN
                        51 Madison Avenue, 22nd Floor
                        New York, New York 10010
                   BY:  **COREY WORCESTER, ESQ.**
                        **RENITA SHARMA, ESQ.**

                        QUINN EMANUEL URQUHART AND SULLIVAN
                        865 Figueroa St., 10th Floor
                        Los Angeles, California 90017
                   BY:  **ADAM B. WOLFSON, ESQ.**

For Defendant:          MUNGER, TOLLES & OLSON
                        560 Mission Street, 27th Floor
                        San Francisco, California  94105-2907
                   BY:  **JONATHAN H. BLAVIN, ESQ.**


Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

| | |
|---|---|
| 1 | **Thursday - August 20, 2020**                                    **1:34 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  This court is now in session.  The |
| 5 | Honorable Edward M. Chen presiding. |
| 6 | Calling civil action 17-3301, hiQ Labs, Inc., versus |
| 7 | LinkedIn Corporation. |
| 8 | Counsel, please state your appearances for the record |
| 9 | beginning with plaintiff's counsel. |
| 10 | **MR. WORCESTER:**  Good morning, Your Honor.  This is |
| 11 | Corey Worcester from Quinn Emanuel Urquhart & Sullivan.  With |
| 12 | me, off camera, is my colleague Renita Sharma, and on camera is |
| 13 | my colleague Adam Wolfson. |
| 14 | **THE COURT:**  All right.  Good afternoon.  Thank you, |
| 15 | Mr. Worcester. |
| 16 | **MR. BLAVIN:**  Good afternoon, Your Honor.  Jonathan |
| 17 | Blavin, from Munger Tolles, on behalf of LinkedIn. |
| 18 | **THE COURT:**  All right.  Thank you, Mr. Blavin. |
| 19 | Okay.  Let's talk about the motion to dismiss.  There are |
| 20 | lots of issues.  We're not going to cover everything today.  I |
| 21 | want to kind of zoom in on the issues that I think we -- that |
| 22 | will benefit the Court in terms of some discussion. |
| 23 | I'm aware of the Noerr-Pennington issue.  I will just note |
| 24 | that I subscribe to the so-called middle option, the *Hynix* kind |
| 25 | of line, and there we would look to the underlying conduct. |

1          And even though litigation or protected activity might be

2     used to implement or enforce the underlying conduct plan, that

3     does not place the entirety of the conduct under the umbrella

4     or penumbra of Noerr-Pennington.

5          And so here my view is that the underlying conduct is the

6     exclusion or attempt to exclude hiQ from having access to the

7     data, to LinkedIn's data.  And the fact that that has resulted

8     in cease and desist letters and other First Amendment activity

9     does not implicate Noerr-Pennington.

10         I understand there are contrary arguments, but I'd like to

11    spend more time, actually, on the antitrust questions.  Those

12    are the ones that I think that I could use some help on, and

13    that's what I want to talk about.

14         So the first question is the product market, the

15    definition of a product market.  And maybe hiQ can explain,

16    what are the parameters of this market?  What is it other than

17    saying it is people analytics?

18         **MR. WORCESTER:**  Sure.  Your Honor, would you like me

19    to address that first?

20         **THE COURT:**  Yeah.  Yeah.

21         **MR. WORCESTER:**  Great.  Okay.

22         So, obviously, we've alleged two markets.  The first

23    market I don't think is really in dispute, which is the social

24    networking platform market.  The second one, which is the one

25    that you asked about, and the question is:  What is it?

1          And I would encourage Your Honor to take a look at

2     paragraphs 30 to 36 of the complaint.  But, in essence, what

3     the market is, is that prior to hiQ companies didn't really

4     have a way to look at data regarding employees, potential

5     hires, people that they would want to promote from within to an

6     empty spot in the company, other than really going through

7     resumes or -- or, you know, a long manual process.

8          The innovation that hiQ came up with was that in the

9     modern digital age, particularly post LinkedIn, people are

10    putting a lot of data about themselves out into the public.

11    And it's being updated constantly.

12         And those constant updates enable analysis and insights

13    which help companies; right.  A review of the publicly

14    available data and what it says, what it used to say, what it

15    says tomorrow can inform a company about what's going on.

16         Now, LinkedIn, itself, has noted in its annual talent

17    report -- and we cite this in the complaint -- that 55 percent

18    of companies feel they need help with people analytics.  That

19    was their 2020 report.

20         So the market knows what the product is.  And what the

21    product is, is the analysis of information that people put out

22    publicly about themselves in the professional context, that can

23    then be analyzed and insight taken from that analysis and then

24    given to companies who want such.

25         And the first --

1      **THE COURT:**  So let me ask you, that's how -- you've

2   now been much more specific.  It's not just people analytics,

3   it is the process or the business of analyzing public

4   information that can be analyzed and then provided -- from

5   which analysis can be provided to employers.

6      Is that -- is that the market?  It's publicly available --

7   is it limited to publicly available data, or does it encompass

8   data that is obtained, let's say, from the company, like in the

9   good old days, or data that is obtained -- are you limiting

10   that definition to publicly available data?

11      And is it publicly available data that is put out by

12   social networking companies or publicly available data one can

13   just get off of Google, off of -- what is it?

14      **MR. WORCESTER:**  Right.  It's a good question, Your

15   Honor.  And so to answer -- and let me break it down into a

16   couple of parts because I think you had a couple of questions

17   in there.

18      The first one is, does it include the good old days like

19   the companies used to do it?  And the answer to that, as

20   alleged in the complaint, is no.  This is like the horse and

21   buggy moving to the automobile.  The old way simply isn't a

22   substitute for the new way, and nobody would pay for the old

23   way.

24      And, in fact, we allege in the complaint that when you add

25   outside data to the publicly available data, which at the

1    moment is just LinkedIn, basically, when you add in the other

2    data it actually makes the results worse.

3        So the other data isn't really a market substitute,

4    probably never was.  But since LinkedIn was created, it is.

5    And what we allege in the complaint is nobody is going back to

6    the old way.  If you lose the access to the LinkedIn data, you

7    simply don't have a product anymore.

8        And then to your second question, the second question, as

9    I took it, was what about Google, what about Facebook, what

10   about other forms of publicly available data?

11       The short answer is, the market is depending on the

12   insights drawn from the data, but at the moment the only place

13   to get those insights is LinkedIn.

14       So if there was another company, let's call them "Not

15   LinkedIn" and Not LinkedIn had data similar to LinkedIn, then

16   LinkedIn's data wouldn't be the only source out there in the

17   market.  It wouldn't be an essential facility as we allege it.

18       But in the current state of the world and for the

19   foreseeable future, given the barriers to entry, the only place

20   you can get the data for the market is from LinkedIn's data.

21           **THE COURT:**  So you're saying -- you're defining the

22   market to exclude any company that does analysis of publicly

23   available data that is available, let's say, on Facebook and

24   Google, but if that's all they're using, that's not in the same

25   market?

1          **MR. WORCESTER:**  Yeah, I guess what I'm saying, Your

2     Honor -- and, again, it's a good question.  I guess what I'm

3     saying is I don't think there are any companies doing that,

4     because it doesn't work.

5          (Unreportable simultaneous colloquy.)

6          **THE COURT:**  Well, maybe not.  But we need to know what

7     the definition is.

8          **MR. WORCESTER:**  Yeah.

9          **THE COURT:**  If they rely on something other than -- is

10    it exclusively nonLinkedIn reliance?  Or what if the company

11    uses the aggregation of data from Facebook, from Google, from

12    LinkedIn, from other networks?  What -- are they in the market

13    or not?

14         **MR. WORCESTER:**  I think, Your Honor, we would say if

15    it was possible to do that, it would be within the market.

16    It's simply not possible to do that.

17         **THE COURT:**  All right.

18         **MR. WORCESTER:**  We're not relying on the LinkedIn data

19    as something that the market can only be LinkedIn data.  If you

20    could draw the insights from elsewhere, the market could be

21    broader than that.  But at the moment there is no other place

22    to get the information from.

23         **THE COURT:**  So it's everyone who relies on LinkedIn

24    data with or without supplementation.  Is that -- is that how

25    you define it?

1          **MR. WORCESTER:**  Again, I don't mean to limit it just

2     to LinkedIn data.  It's anybody who could get public insight --

3     anyone who could sell and market people analytics insights from

4     publicly available data.

5          But at the moment those only come from LinkedIn.  I don't

6     mean to limit it to LinkedIn in that regard, but in response to

7     the question, at the moment that's where it comes from.

8          And I don't think we're drawing a line between people who

9     use LinkedIn data with other things or not.  We're simply

10    saying if you don't use the LinkedIn data, you don't have a

11    product you can market right now.

12         So the market could include people who have other data,

13    but, in fact, unless you have the LinkedIn data, you're not in

14    the market.

15         **THE COURT:**  Well, all right.  That's kind of getting

16    ahead of ourselves.  I'm trying to figure out what the

17    predicate definition is.

18         So, as I now understand it is, anybody who uses publicly

19    available data, whether or not it's possible, but whether or

20    not it's from Facebook, Google, LinkedIn, nonLinkedIn,

21    they're -- they're part of the relevant market.

22         But those who rely on the old way, the old-school way, the

23    internal data gotten from the company, as, you know, McKenzie

24    or somebody else would look at, that does not -- that's not in

25    the market.  Do I have it right?

1        **MR. WORCESTER:**  I think that's right, Your Honor.   The

2   old way is simply a different market.   It's too hours

3   intensive, too extensive.   It simply can't compete.

4        As you define the new way, with the caveat that there is

5   no other data besides LinkedIn, but it would be theoretically

6   possible in a world without barriers to entry that there could

7   be.

8        **THE COURT:**  All right.   So let me ask LinkedIn.

9        If that's the definition, analysis of -- and I assume it's

10   employee-related analysis?   I mean, that's the whole point of

11   this.   HR-type analysis.   That kind of analysis that is

12   performed on publicly available data to do predictive data

13   analytics in the HR-type field, is that an -- is that an

14   adequate relevant market definition?

15        **MR. BLAVIN:**  That market definition isn't adequate.

16   We think it's facially unsustainable.   And there's multiple

17   reasons for that, Your Honor.

18        At the outset, this elusive definition that took Your

19   Honor multiple minutes from plaintiff's counsel even to

20   understand what the market is, but what it basically comes down

21   to is the market is people analytics services who use data from

22   LinkedIn.   And that market is conveniently gerrymandered to

23   match hiQ's business model of scraping data from LinkedIn.

24        **THE COURT:**  That's why I ask.   And I think counsel

25   replied that it's not -- the definition would not be so

gerrymandered that it would include all sources of publicly

available data if some firm were somehow able to use Facebook

and Google and other nonLinkedIn or additionally sourced -- you

know, other sources.  They would be included in that.  So it's

not -- that's why I ask the question.

     **MR. BLAVIN:**  Well, I think you heard counsel say that

there is no other data, in their opinion, which is available,

so it is purely LinkedIn data.  But I take your question.

    But even assuming that it could, in theory, encompass

other sources of publicly available data, none of which hiQ's

counsel has identified, it's that type of market that the

courts have repeatedly rejected.

    The only reason why plaintiff's counsel has defined the

market in that way is because it believes that these publicly

accessible sources of data -- and, again, their claim is it

only comes from LinkedIn -- is superior to other forms of data

and that this renders, you know, that data source somehow

unique.

    But courts have consistently rejected market definitions

on the pleadings, which can include similar types of

allegations.

    And as the Ninth Circuit held in the *Häagen-Dazs* case, for

example, courts have repeatedly directed efforts to define

markets by product quality variance.  That's exactly what

they're doing.

1          The complaint itself acknowledges there are other data

2     sources.   There are data sources which employers use.

3     Employers use those data sources, internal data sources, for

4     the exact same purposes that hiQ defines people analytics.

5          It says in its opposition, for example, that people

6     analytics services provide in-depth data-driven insights into a

7     workforce.   Employers have all sorts of information and data,

8     which are internal, which they use to get those data insights.

9          Those are excluded from the market definition.   And that's

10    data that you can't even get on LinkedIn.   That data, for

11    example, internal surveys that they could do,

12    check-in/check-out times, when people log into their computers

13    or not, all of that provides workforce insights that an

14    employer could use, which hiQ is excluding from the market.

15         In that sense, this is like the *Hicks versus PGA Golf

16    Course* case from the Ninth Circuit.   There the market had been

17    narrowly defined as in-play golf advertising excluding other

18    forms of advertising.   So if there's an advertisement during a

19    golf game on a bridge at the golf course.

20         And they said, well, this is the best type of -- this is

21    the best type of advertising.   It's unique, it captures

22    people's interest while they're watching the game.

23         The Ninth Circuit said no, you can't define the market

24    narrowly that way to exclude other forms of advertising.   It's

25    insufficient on its face.

1      **THE COURT:**  All right.  So if the market were not --

2   you're essentially saying that what Mr. Worcester called the

3   old way should be included because that's still the -- a

4   viable -- and perhaps not perfect, but a substitute.  There's

5   enough cross-elasticity of demand that that should be included.

6      So a more proper definition would be HR analysis -- you

7   know, HR analytics, whether the source is internal, external,

8   Google, Facebook, whatever, as long as you're providing

9   analytics to get at, you know, utilization, et cetera, et

10  cetera.

11     **MR. BLAVIN:**  Exactly, Your Honor.  If you're using

12  data that allows you to get workforce insights.  You look for

13  the purpose of the data.

14     And they acknowledge that there's other data sources that

15  are out there, internally and externally, that companies can

16  use.  They acknowledge that they, themselves, used other data

17  sources before using LinkedIn data.

18     They decided to move to LinkedIn data because they thought

19  it provided better levels of predictive accuracy.  They allege

20  that in the complaint in Footnote 2.

21     That's the exact kind of quality variance which courts

22  consistently have rejected in the sense that you can't define a

23  market based on the spectrum of quality.  You look at the

24  purpose of the product and whether or not -- if products have

25  similar purposes, they all have to be within the market.

1     The market they have defined in this respect is way too

2 narrow and excludes many different types of data sources,

3 internal data sources, other data sources which may be

4 external, which could be used for that very same purpose.

5     They acknowledge today that other companies are using

6 other data sources that are out there.  They claim that those

7 are narrower data sources, they're not as good, but they

8 acknowledge other companies are using them, and that those

9 companies currently compete in the marketplace, too, and

10 provide this type of people analytics service.

11     **THE COURT:**  All right.  Is this an issue that can be

12 decided as a matter of law at a 12(b)(6) stage, or does it

13 require some factual determination such as looking at whether

14 there is some cross-elasticity of demand or substitutability

15 with respect to traditional old-school method versus, you know,

16 a high -- the new method?

17     **MR. BLAVIN:**  I think this issue can and should be

18 resolved on the 12(b)(6).  The *Hicks versus PGA Golf Course*

19 case from the Ninth Circuit was resolved on the 12(b)(6).  And

20 the Court said, based on the allegations alone, it's clear that

21 the product market is unsustainable.

22     I think, based upon their allegations in the complaint

23 relating to employers -- and this is, again, paragraph 35 of

24 their complaint, they say employers are using internal data to

25 analyze attrition risk within the organization and the

employees' full skill sets.  Those are the exact same purposes

that LinkedIn's -- that hiQ's products purportedly provide

services; Skill Mapper and Keeper.

Moreover, many other courts have resolved market

definition issues on the pleadings.  The *NuCal* case from the

Ninth Circuit, the *Golden Gate* case from the Ninth Circuit; all

of these cases resolve that question on the pleadings based

upon their own allegations in the complaint.

It's evidently clear that the allegations are too narrow

in terms of how the market is defined.  And they're excluding

products based upon quality and functionality, and that's

exactly what the Ninth Circuit consistently has said you

shouldn't do.

**THE COURT:**  All right.  Let me -- I've got several

other things I want to get to.  Appreciate both of your

arguments there.

Let's get to the anticompetitive conduct question.

Unilateral refusal to deal now after *Qualcomm*.

It seems to me, Mr. Worcester, that *Qualcomm* makes pretty

clear that the Ninth Circuit takes the fairly narrow

interpretation of *Aspen Skiing*.  And there are elements,

several elements that must be made, must be satisfied in order

to fit within the *Aspen Skiing* kind of acceptance with a normal

presumption that one can deal with whoever they want to deal

with, or not deal with whomever they don't want to deal with.

1        So, you know, I saw your comment after the submission of

2   the notice of a new case, but it seems to me it doesn't really

3   address the fact that there really was a holding here and there

4   was an interpretation, and the elements do seem to be pretty

5   clear.

6        You know, there has to be a termination of a voluntary and

7   profitable course of dealing.  There's got to be a sacrifice of

8   short-term benefits, i.e., some profit to obtain higher profits

9   in the long run, and refusal to deal once-involved products

10   that the defendant already sells in the existing market to

11   similarly situated customers.

12        So how -- how do you contend with all those?

13        **MR. WORCESTER:**  Sure, Your Honor.  And if I could,

14   when I'm done answering the question, I'd like to just hit,

15   briefly, the question Your Honor submitted a minute ago about

16   whether or not the market definition can be resolved at

17   12(b)(6).

18        But in response to your question about *Qualcomm*, taking

19   the elements as laid out, first, terminating a voluntary and

20   profitable course of dealing, the complaint alleges that hiQ

21   and the other people analytics providers actually made LinkedIn

22   money.

23        They not only benefited employers, not only benefited

24   employees, it actually benefited LinkedIn itself because by

25   engaging with employers who then needed LinkedIn's data, they

```
 1  would encourage employees to have subscriptions.  They would
 2  get subscriptions themselves.
 3      And the data that we generated through the process would
 4  allow LinkedIn to target advertising data.  And this is alleged
 5  in the complaint that this actually was a profitable course of
 6  dealing --
 7          THE COURT:  What paragraph would that --
 8          MR. WORCESTER:  Sure.  Take a look, Your Honor, at
 9  paragraph 5.  And I suspect there's others.
10      And while I answer the rest of the question, I'm going to
11  ask my colleague, Ms. Sharma, to take a look for them.  And
12  then I'll read them off to you when I'm done answering the rest
13  of the questions.
14      So we allege in the complaint that there was a voluntary
15  and profitable course of dealing, primarily through the
16  engagement with employers, who would then encourage
17  subscriptions to LinkedIn, putting money in LinkedIn's pocket.
18      We also allege that we are a direct competitor of
19  LinkedIn.  So that's the second element of not providing access
20  to a competitor.  We allege we're a direct competitor to
21  LinkedIn and that access was cut off.
22      And we also allege that LinkedIn provides the service to
23  others.  We mentioned specifically Bing.  We mentioned
24  specifically Yahoo!  We mentioned specifically Google.
25      But the truth is the material is publicly available.
```

1    LinkedIn, in essence, provides access to everyone in the world

2    who isn't a competitor.  And what they're denying their

3    competitors the right to do, after having allowed it for years,

4    they're doing themselves.

5        In order to sell their competing product, they then go

6    scrape all the date just like they accuse everyone else of

7    having done.  But for years it wasn't a problem until there

8    were competitors in the market.

9        That termination of a previously profitable and voluntary

10   course of dealing, when they're providing the access to

11   everyone else in the world except their competitors, meets the

12   Ninth Circuit standard as articulated in *Qualcomm* and as

13   articulated in *Metrex* and other cases.

14       **THE COURT:**  What about the requirement that the

15   only -- this quote:  The only conceivable rationale or purpose

16   is to sacrifice short-term benefits in order to obtain higher

17   profits in the long run?

18       It's almost, you know, counterintuitive conduct to

19   basically hurt yourself in order to gain a long-term benefit.

20       What is the short-term sacrifice made by cutting off hiQ?

21       **MR. WORCESTER:**  It's the loss of the engagement from

22   the hiQ customers, which included several Fortune 500

23   companies, large major accounts.  And --

24       **THE COURT:**  You would lose -- they would lose --

25   LinkedIn would lose accounts from these companies because of

1    what it did to hiQ?

2         MR. WORCESTER:  If you think about the way LinkedIn

3    developed itself from, you know, 2009 onward, the way it's

4    built its platform was by being open to the world and telling

5    everyone it was going to be open to the world.  It encouraged

6    that.

7         And what it wanted, prior to achieving the monopoly

8    status, was more engagement.  It wanted more companies to

9    interact with it, more companies to become engaged in it, more

10   companies to become dependent on it.

11        THE COURT:  Well, let me ask right there.  How do

12   companies engage other than encouraging their employees?  Isn't

13   it --

14        MR. WORCESTER:  They also --

15        THE COURT:  It's individuals who subscribe and who

16   communicate, right, through this network?

17        MR. WORCESTER:  Companies also do, Your Honor.

18        THE COURT:  Well --

19        MR. WORCESTER:  Companies also subscribe.  And, in

20   addition to that, they pay for individual accounts.  And

21   there's also -- within LinkedIn, there's various other features

22   that you can pay to have access to.

23        So you and I probably only have the single LinkedIn

24   account, but companies often do more than that.

25        THE COURT:  All right.  So what -- what is the -- are

1  you saying that once they run on a campaign -- they allowed it

2  before and they stopped.  They stopped the -- whether you call

3  it scraping, which kind of sounds pejorative, but whatever you

4  want to call it, the gathering of data off of LinkedIn, the

5  database, what was the sacrifice?

6       Are you saying then companies stopped subscribing because

7  of what the new policy was vis-a-vis bots in hiQ-type

8  companies?

9            **MR. WORCESTER:**  They would lose the business that

10 LinkedIn was driving to the extent that LinkedIn -- several

11 Fortune 500 companies, which are all large, were out there

12 pushing people and encouraging extra subscriptions.  Losing hiQ

13 and losing that type of engagement from the HR department at

14 hiQ's customers would push down subscription rates and would

15 push down -- I can't tell you the exact percentage, obviously,

16 but economically losing that engagement from the HR department

17 and from the major Fortune 500 companies would, short-term,

18 cost LinkedIn subscribers money.

19           **THE COURT:**  I guess my question is whether that is a

20 plausible sustainable claim under *Twombly* and *Iqbal*.

21      You know, in the *Aspen Skiing* case, it's pretty obvious;

22 right?  This one's not so obvious.  This is almost an indirect

23 effect.  Essentially, by cutting hiQ off at the knees, you

24 create a disincentive for companies to subscribe or

25 encouraging -- discouraging them to -- or no longer encouraging

1  their employees to subscribe; and, therefore, that is costing

2  subscription money to LinkedIn.

3      Is that the chain of causation here?

4          **MR. WORCESTER:**  That is the chain of causation, Your

5  Honor.  And I would point out that I don't think the cases say

6  that it can't be an indirect effect.

7      And the cases certainly don't focus on the amount of the

8  damages or the amount of the loss.  The point is there is a

9  short-term loss.  And a short-term loss is taken for a -- an

10  anticompetitive gain.

11      The other thing I would point out, Your Honor, is we have

12  seven theories of -- of anticompetitive harm.  The refusal to

13  deal was not the only one.  And several of the theories are

14  conservative action theories which go outside of the case law

15  relied upon by LinkedIn in its briefing.

16          **THE COURT:**  All right.  Before we go to the next one,

17  let me ask you --

18          **MR. WORCESTER:**  Sure.

19          **THE COURT:**  -- I know there's some controversy in the

20  law about this, but *Aerotec* came up with this language of "the

21  only conceivable rationale or purpose," which is different from

22  "the rationale or purpose."  And we don't know whether that was

23  intended or not.

24      It's like the difference between traditional equal

25  protection clause where any conceivable, you know, rationale

will do versus modern-day heightened scrutiny equal protection
where you actually have to look at the rationale.

Aerotec seems to use very loose language.  And I don't
know whether that's gaining ground in other circuits, but it's
now being picked up and repeated in Qualcomm.  So if the issue
of whether there's only a -- all you need is a conceivable
rationale, the only conceivable rationale is all the ones they
talked about.

You know, we want to respect the privacy of employees.
That, you know, they didn't agree.  They want it public but not
necessarily harvested.  Et cetera, et cetera, et cetera.
What's your take?

Is that quotation still, again, just a mechanical and not
really meant to be a holding?  What do we do with that?

MR. WORCESTER:  Your Honor, I think the response to
that is that it's a fact issue.  We allege that LinkedIn,
itself, is scraping.  We allege that LinkedIn is allowing
numerous other people -- in essence, everyone who's not a
competitor -- to scrape.

So the conceivable rationale that it wants to prevent
scraping is, on its face, farcible, because they're scraping
themselves and allowing everyone else in the world to scrape.
The only people they don't want to scrape, it appears, are
their competitors.  And so that's what I would say to the other
conceivable rationale.

1          The other point I would make on that, in terms of

2     protecting privacy and et cetera, is LinkedIn's entire business

3     model is taking the information you need, its other 660 million

4     subscribers give it, and selling that information.  It sells it

5     to advertisers.  It sells it themselves through some people

6     analytics product.

7          If you read the LinkedIn -- if you read the LinkedIn Terms

8     of Service, they say you shouldn't include anything you don't

9     want to be made public because they acknowledge anyone in the

10    world can get it.

11         And that includes the cookies that they're browsing, the

12    advertising materials they sell, the data they give to

13    companies in their own people analytics.

14         It's not a privacy concern.  It's not an antiscraping

15    concern.  It's a competitive concern.  And that's what we

16    allege in the complaint.

17         **THE COURT:**  Well, and so my question is -- you're

18    saying it's a fact question, which certainly would be true if

19    we had to, perhaps, inquire into the actual rationale or

20    purpose, which is part of what you're saying.

21         But when they use -- when *Aerotec* used the word

22    "conceivable rationale," it almost suggests, if you take that

23    literally, that all you've got to do is articulate some

24    conceivable rationale, even if it's not the real rationale,

25    which has always been, you know, the way we learn in law school

 1   about rational basis test.  Doesn't have to be the real thing.

 2        So if that's the case, then it looks more like a question

 3   of law than a question of fact.  And I guess my question is:

 4   Do you think that that is -- that articulates the actual test

 5   in the Ninth Circuit?

 6        **MR. WORCESTER:**  I don't think -- look, Your Honor, the

 7   word "conceivable" is obviously in both opinions, but I don't

 8   think I would articulate it the same way that you just did.

 9        I don't think that the Ninth Circuit intended to say that

10   if you can come up with any rationale, no matter how far

11   afield, if it isn't anticompetitive, as a defendant you are

12   finished.  Right?  That is not a viable test.  That cannot be

13   what the Ninth Circuit intended.

14        What I assume the Ninth Circuit was saying was the

15   conceivable basis test was:  Would an ordinary juror, looking

16   at all of the relevant facts, conceive that this is what was

17   really going on?

18        Is there any sort of conceivable rational "passes the

19   smell test" set of facts here that an ordinary juror would be

20   able to accept without the plaintiff moving for JLB?

21        And what we're suggesting here is, given the privacy

22   actions that LinkedIn takes itself and the scraping that it

23   allows, it isn't really conceivable that the actions they took

24   were to protect or to stop scraping or to protect privacy.  It

25   was clearly a competitive act given that they allow everyone

1    else in the world to continue scraping.

2         THE COURT:  Well, but what if their rationale was see

3    if we can make more money?  If they're outright blatant about

4    it and said, you know, we want to do this thing, why should we

5    share our data, give it to somebody else, we want to use the

6    data.  That's not -- that's not sacrificing short-term benefits

7    for obtaining.  That's -- similar to Qualcomm, that's obtaining

8    both short-term and long-term benefit.

9         MR. WORCESTER:  Respectfully, Your Honor, if that's

10   what the Ninth Circuit meant, that would eliminate refusal to

11   deal law because a defendant always wants to make more money.

12   Right?

13        THE COURT:  Well, the short-term with the long-term.

14   That's right.  I mean, what made *Aspen* so unique there their

15   giving up profits in the short-term sounds like predatory

16   pricing.

17        I mean, you're giving up in the short-term in order to get

18   long-term benefits.  And, you know, antitrust law doesn't like

19   that.  Just like predatory pricing, you don't like that.

20        But if you're doing it for both short-term and long-term,

21   then it seems to me that the argument is, given antitrust law,

22   it's not so bad.

23        MR. WORCESTER:  And here, Your Honor, again, I think

24   that even in *Aspen Skiing* the argument would be once we drove

25   the competitor out of business or significantly reduced their

1  market share, we would have long-term -- we would have

2  long-term profits.

3      I think it's always the case that you're looking for both

4  the short-term and the long-term when you're trying to drive up

5  profits.

6      The allegations of the complaint, at least with respect to

7  the refusal to deal claim, are that LinkedIn benefited -- and

8  I've got the list of -- I've got the list of other paragraphs

9  to point you to, Your Honor.

10      That's okay.  I want to make it easier for the court

11  reporter if I can.

12      But -- and so the allegations of the complaint, Your

13  Honor, are that LinkedIn was benefiting short-term.  So to

14  drive hiQ and everyone else out of the market drove out all --

15  reduced the engagement of all of their customers causing

16  LinkedIn, at least in the short-term, before they got their own

17  product up and running, short-term profit loss.

18      Maybe they recoup it back on the back end.  They obviously

19  thought they would.  But it was a short-term reduction in

20  profits for an anticompetitive purpose.

21          **THE COURT:**  All right.  Let me ask, Mr. Blavin, you

22  want to respond briefly?

23      Then I want to go to the essential facilities.

24          **MR. WORCESTER:**  Before we do that, Your Honor, can I

25  give you the other paragraphs?

```
 1              THE COURT:  Yes, yes.
 2              MR. WORCESTER:  Paragraph 38.  And then referenced,
 3     also, in 39, 141, and 140.
 4              THE COURT:  Great.  Thank you.
 5              MR. WORCESTER:  Thank you.
 6              THE COURT:  All right.  Mr. Blavin.
 7              MR. BLAVIN:  Yes, Your Honor.  At the outset, I think
 8     Qualcomm recognized that when you have a case that sounds in
 9     duty to deal, you analyze it through the duty-to-deal
10     framework.
11         Your Honor will remember that the court there specifically
12     rejected any sort of additional exception beyond Aspen Skiing
13     to a duty-to-deal claim and rejected the FTC's arguments in
14     that respect.
15         So we would submit that, notwithstanding that they
16     effectively asserted seven various antitrust theories, none of
17     which we think have merit, that the Court should primarily
18     analyze this through the framework of a duty to deal.
19         And under the duty-to-deal framework and the very narrow
20     Aspen Skiing exception, they don't come close to alleging that
21     the exception would apply in this case.
22         And I'll go quickly through the various elements that the
23     Ninth Circuit has recognized in the Aerotec case and now the
24     Qualcomm case.
25         But starting with what Your Honor correctly noted, that
```

1    the language's only conceivable rationale or purpose, it's

2    clear on its face that this is an objective test that can be

3    decided as a matter of law in the *Novell* case from the Tenth

4    Circuit.  Justice Gorsuch, when he was on that court, similarly

5    noted that the conduct must be irrational but for its

6    anticompetitive test.  This is clearly an objective test.

7         And under that, their allegations plainly fail.

8    Obviously, LinkedIn, even from an objective perspective, had

9    other rationales or motives that were conceivable.

10        As the Court recognized in its preliminary injunction

11   order, LinkedIn's concerns about member privacy were, quote,

12   not without merit.  That is plainly one of the rationales or

13   purposes, which is conceivable in light of the *Cambridge*

14   *Analytica*, in light of the *Clearview* scandals.  Those concerns

15   have become even more important and obvious to all.

16        So there's no way that they can plead that LinkedIn's only

17   conceivable purpose was curbing data scraping for an

18   anticompetitive purpose.  But even aside from that, even if

19   they could satisfy that, they have to show that there was a

20   voluntary and profitable course of dealing.

21        He spoke a lot about whether or not it was profitable, but

22   just focusing on the voluntary language, what the Ninth Circuit

23   has made clear, and this is in the *LiveUniverse versus MySpace*

24   case, is that there must be an affirmative decision or

25   agreement to cooperate between the parties, some kind of

1    agreement, contract, et cetera.

2         Nothing like that is remotely alleged.  All they allege is

3    that LinkedIn has understood that hiQ was engaged in scraping,

4    notwithstanding the fact that LinkedIn's user agreement

5    expressly prohibits this very activity.

6         And in *LiveUniverse*, there the allegations were that,

7    well, MySpace knew that its users were posting LiveUniverse

8    videos and links on the web page of MySpace, and the Court said

9    but that doesn't establish any sort of affirmative agreement or

10   decision to cooperate with LiveUniverse.

11        So they haven't established --

12        **THE COURT:**  What case says that the termination of a,

13   quote, voluntary and profitable, quote, course of dealing has

14   to be an affirmative contract as opposed to, you know, consent

15   to course of conduct, dealing?  I mean...

16        **MR. BLAVIN:**  So the --

17        **THE COURT:**  Why does it have to be a formal agreement?

18    Why does it have to be a contract per se?

19        **MR. BLAVIN:**  Well, it has to be an affirmative

20   decision or agreement to cooperate.  That's what the Ninth

21   Circuit said in the *LiveUniverse versus MySpace* case.

22        I don't see how acquiescence into activity arises to the

23   level to actually agree to cooperate with hiQ.  So it doesn't

24   satisfy that.

25        But even if -- even if you could view this as a voluntary

course of dealing, such as was an actual affirmative decision
or agreement to cooperate, the allegations that LinkedIn is
sacrificing short-term profits, I think, as Your Honor
recognized, are just frankly implausible.

I mean, hiQ does not identify in its complaint, nor
frankly could it, that LinkedIn's letters to hiQ and decision
to cut off access to hiQ, it all resulted in a single
employer's engagement or a single user's sign-up decreasing
such that LinkedIn was irrationally sacrificing short-term
profits.

It's not alleged in the complaint.  And even if it were,
it's implausible.  All they say is, conclusorily, this was a
voluntary prior course of dealing in which LinkedIn sacrificed
short-term profits.

Just saying that doesn't actually make it true.  They
actually have to allege facts under *Iqbal* and *Twombly* which
render it plausible, and they haven't done that.

But, finally, fourth, apart from all of that, they need to
show that LinkedIn is depriving hiQ of the same general terms
that it's offering to the public.  And they can't do that.

What they've alleged is LinkedIn has allowed search
engines -- Google, Yahoo!, et cetera -- to collect data from
the site for search index purposes.  But they don't allege that
LinkedIn is letting any party scrape the site for any and all
purposes.

1          Under the Ninth Circuit's decision in *MetroNet*, where the

2     Ninth Circuit was clear, you have to be depriving the

3     competitor of the same terms, not unique or special terms that

4     they want, but the same terms that you're giving other -- the

5     general public.

6          And they haven't alleged that, and they can't allege that.

7     LinkedIn doesn't permit the world at large to scrape its site.

8     It's clear in the User Agreement attached to their complaint,

9     in which LinkedIn prohibits this activity.  All they've alleged

10    is that search engines are allowed to do it for a very limited

11    purpose.

12         If hiQ wants to become a search engine and compete with

13    Google and Yahoo!, et cetera, and LinkedIn were depriving it of

14    the ability to index the site, that would be a different case.

15    But they want to use it for different unique terms that

16    LinkedIn doesn't allow anyone.

17         **THE COURT:**  All right.  Let me -- I've got to move on.

18    Thank you for, again, both of your arguments.

19         And I know there are other claims.  I know they're tying

20    to other claims.  But I mentioned in the denial of essential

21    facilities assertion here -- and I guess I have kind of a basic

22    question.  And that is:  How essential must the facility be in

23    order to be an essential facility within the meaning of

24    *Aerotec*, *Alaska Airlines*, et cetera, et cetera?

25         You know, it's all degrees; right?  One could argue that.

1    And I think hiQ is arguing that, you know, there's nothing like

2    LinkedIn data.  You can try other stuff.  You can -- you know,

3    you can use other sources, but none of it is nearly as

4    effective and good, and that's what makes its product

5    particularly valuable.

6        But the fact that there are other, arguably, substitutes

7    out there, maybe inferior, at what point does somebody become

8    essential?

9        I guess that's my question.  Where do I find the best case

10   law that defines essential?

11             **MR. BLAVIN:**  I'm happy to address that, Your Honor.

12       If you look it the *Aerotec* case from the Ninth Circuit,

13   which also addressed an essential facilities claim, the Ninth

14   Circuit first noted at the outset that you have to construe the

15   essential facilities doctrine very narrowly because it, quote,

16   shares the same concerns as mandating dealing with a

17   competitor.

18       So the Ninth Circuit said you have to construe it

19   narrowly, otherwise you're going to effectively overrule our

20   entire body of case law.

21       And what the Ninth Circuit said is that for a facility to

22   be essential, it must be, quote, necessary, to offer any

23   competing offering in the marketplace.  And their own

24   allegations demonstrate that that's not the case.

25       A number of other cases we've cited have said essential

means essential.  It doesn't mean better.  It doesn't even mean

best.  It means truly essential to offering any sort of

offering in the market.

They, themselves, allege in their complaints -- and,

again, this is paragraphs 54 to 55 -- that other people

analytics services are offering products in the market today.

Now, hiQ says those products are inferior, that they're

only analyzing a narrower set of data, and they're not as great

as LinkedIn's data, they're not as, you know, purportedly

unique as LinkedIn's data.  But clearly the fact that other

offerings are in the marketplace demonstrates that it's not

essential.

And, likewise, the fact that employers are using data from

their own workforce, internal data, to provide these same types

of services demonstrates that this data is not essential.

hiQ itself says that it used other data but switched to

LinkedIn because LinkedIn's data provided, quote, better levels

of predictive accuracy.

Under *Aerotec* and all the cases we cite in our motion

papers, this demonstrates they're not essential, they're simply

better or unique, and that doesn't suffice.

Indeed, in the *Kerwin* case from the Eastern District of

Pennsylvania, recently affirmed by the Third Circuit this year,

the plaintiff alleged in the complaint that they had used other

venues.  But those venues weren't as good, and they wanted to

1    use the venue that the defendant had, and the defendant cut off

2    access.   The Court said the fact that you pled that you used

3    other venues demonstrates that this venue is not an essential

4    facility for that same reason.

5        The fact that hiQ has alleged it used other data sources,

6    that other companies are using other data sources, and that

7    employers can use their own data source demonstrates this is

8    not an essential facility.   And, frankly, it's the same reason

9    why the market definition fails.

10       **THE COURT:**   I was going to ask you that very question;

11   and that is, does -- in order to evaluate the essential

12   facilities doctrine and determine whether, for instance, there

13   was power to eliminate competition in the downstream market,

14   does that require some definition of a relevant market in order

15   to make that -- that last determination?

16       **MR. BLAVIN:**   Definitely.   The essential facility

17   doctrine requires you first to have a facially sustainable

18   product market.   That's a threshold requirement.

19       And the arguments dovetail with one another because their

20   market definition is so narrowly defined to basically only

21   include data from LinkedIn, that, yes, under their facially

22   unsustainable market definition, if you're going to define the

23   market that way, then *ipso facto* LinkedIn data would be what

24   you need to compete in that market.

25       But what we're saying is that's not how courts examine

essential facilities doctrine.  They look at the broad range of

purposes for the data and whether or not you can offer

competing offering.

We think their own allegations demonstrate that other

parties are offering competing offers, that employers are using

this data.  It's not an essential facility.  And their market

definition fails for very similar reasons.

THE COURT:  Are there any cases you can cite to that

expressly hook in the relevant market analysis or definition

into or incorporate it into the essential facilities analysis?

Can you think of any case that does that?

MR. BLAVIN:  I haven't seen any cases specifically

drawing the connection, in part because there may not have been

such a similar failure, both with respect to market definition

and essential facilities.

I will say, though, that the courts clearly say you have

to define your relevant product market to have any sort of

antitrust claim.  And that would be equally true for the

essential facilities doctrine.

I would also note, though, that the Ninth Circuit, in

*Aerotec*, is very clear that the data has to be necessary to

offer any sort of competing offering.  So that would

necessarily suggest, well, what are the competing offerings in

the relevant market?

It's our position, and we think this is absolutely clear

1  based on their allegations, that they've pled themselves out of

2  an essential facility claim because they acknowledge that other

3  people analytic services -- again, paragraphs 54 to 55 of the

4  complaint -- are offering services right now not using LinkedIn

5  data.

6      They just claim they're inferior or they're offering

7  narrower services, but they're clearly competing offerings.

8  And given the Ninth Circuit concern in *Aerotec* that you define

9  the essential facility doctrine narrowly, because it's dealing

10  with the same issue of mandating dealing with a competitor, we

11  think that their essential facility doctrine claim necessarily

12  fails based upon their own allegations.

13      **THE COURT:**  All right.  Response, Mr. Worcester?

14      **MR. WORCESTER:**  Before I get to it, could I respond by

15  reading one paragraph from the Livewire case which goes to the

16  refusal to deal voluntary standard we were talking about a

17  second ago?

18      **THE COURT:**  Oh.

19      **MR. BLAVIN:**  It's Livewire at 3557 -- *LiveUniverse*,

20  I'm sorry.  And it says:

21      "*LiveUniverse*'s only allegation is that before MySpace

22      redesigned its platform individual users were able to link

23      to content on Videolife.com.  Though this may indicate a

24      prior course of dealing between MySpace and its users,

25      nothing in the complaint suggests an agreement or even an

1          implicit understanding between MySpace and LiveUniverse

2          regarding the functionality of embedded links."

3      And the point of that paragraph, Your Honor, is, as your

4   question suggested, the case law allows for implicit

5   understandings or course of dealings.  Even the *LiveUniverse*

6   case, which was LinkedIn's principal case.

7          **THE COURT:**  All right.

8          **MR. WORCESTER:**  With that, I'll go to essential

9   facilities.

10         **THE COURT:**  Great.  Thanks.

11         **MR. WORCESTER:**  And the questions Your Honor asked

12  were, I think, two.  One is how essential, and is the market

13  tied in.  And I think both of these questions are answered by

14  *Aerotec*.

15     And Mr. Blavin focused on the same quote that we would

16  focus on.  And it may be one of the few times today Mr. Blavin

17  and I will be in agreement.  But he focused on the quote that

18  said:  "A facility is only essential if it is necessary to

19  provide any competing offering."

20     And the word "competing" in there, I think, answers your

21  question about market definition, because if the product isn't

22  competing, it's, by definition, not in the same market.

23     So I think that the point is the Court has to solve the

24  market definition question before it can rule on the essential

25  facilities question.

1          And as you asked earlier, is the market definition

2     question something that can be decided on a Rule 12(b)(6)?   I

3     think the answer to that is, it's not that it's never happened,

4     but it doesn't happen very often.   It's an inherently factual

5     question, market definition.

6          And if you look at the things that LinkedIn is

7     challenging, they use the word "gerrymandering" over and over,

8     throughout both their opening brief and their reply brief.

9          And the question about quality, the question about should

10    there be sub markets, the question about what products are in

11    versus out, these are all factual questions that will be

12    decided by expert testimony, witness testimony.

13         And as the *NuCal* court said when the Ninth Circuit ruled

14    in *NuCal*, oftentimes, market definitions survive 12(b)(6)

15    because the Court knows we're going to challenge them at

16    summary judgment and later at trial.   That's typically what

17    happens.

18         As long as, on its face, it's a plausible "could hold

19    together through reasonable inferences" market, it gets to

20    survive, and gets challenged later.

21         And I'm sure Your Honor, who has done more antitrust cases

22    than I have, and you know that very often market definitions

23    get narrowed or changed as the case goes on.

24         So that's what I see, both the question I didn't answer

25    earlier about 12(b)(6) on market definition and the essential

```
 1    facilities.

 2          THE COURT:   What about Mr. Blavin's citation to the

 3    complaint which acknowledges that there are other players in

 4    the market; maybe not as effective, but there are players

 5    offering a competing product?

 6          MR. WORCESTER:   Yeah.   I think, Your Honor, the

 7    complaint taken as a whole, if you don't cherrypick out

 8    allegations, alleges that LinkedIn destroyed the market and

 9    that if you don't have access to LinkedIn's data, you don't

10    have access to a competing product at this point in time.

11          The LinkedIn data -- what we allege in the complaint is

12    that if you don't have the LinkedIn data, you don't have

13    something that people want.   You don't have something that's

14    comparable to LinkedIn.   You may have some kind of a product

15    that is doing something totally different and is in a different

16    market, but you don't have something that can compete and sell.

17    It's not substitutable.

18          And the table wine analogy that the Court used in -- I'm

19    blanking on the case, but there was a case from years ago

20    involving Coca-Cola, where the FTC took the position table wine

21    and sweet wine are not in the same market.

22          And the point here is, the question is both, as Mr. Blavin

23    said, purpose, but it's also substitutability of purpose.

24    Right?   The fact that a horse and a buggy and an automobile

25    both get you from A to B means they have the same purpose, but
```

 1   they don't have any substitutability of purpose.

 2          **THE COURT:**  Well, that's why I asked -- in some ways,

 3   it's a question of degree, which would sort of underscore your

 4   point about that, well, that's something for the Court or jury

 5   or finder of fact to determine.

 6          But at some point, you know, it may not have to be as

 7   extreme as table wine and sweet wine, but there's a difference

 8   between, you know, French wine and Two Buck Chuck.  You know,

 9   they're not in the same market.

10          On the other hand, you know, you get a $30 bottle of wine

11   and a $12 bottle of wine, you know, at some point they do --

12   there is some -- you know, so I guess that's the question.

13          At what point does it become so clear that it's not a

14   question of fact anymore?  And -- you know.

15          **MR. BLAVIN:**  Your Honor, I don't -- I'm sorry.  Go

16   ahead.

17          **MR. WORCESTER:**  Your Honor --

18          **THE COURT:**  Let's let Mr. Worcester finish, and then

19   I'll come back to you.

20          **MR. WORCESTER:**  Your Honor, I don't want to be Potter

21   Stewart here, but I think to some extent the answer is:  You

22   know it when you see it.

23          There have been cases where -- and I think Your Honor

24   handled one of them -- where somebody tried to include both a

25   data analytics piece and some thoroughly unrelated things.

1    If you owned a hotel and casino in Las Vegas and you tried

2    to allege a market that was only hotels and casinos but neither

3    hotels nor casinos, I could imagine a set of facts where that

4    would be okay.  But I think the Court would look at it and

5    really think about it.

6    I could imagine somebody making an argument that SUVs and

7    cars are not always in the same market, but that would be a

8    very fact-specific thing.

9    So I think it's one of those things where, generally, it's

10   going to be a question of fact when it gets to the jury.  But

11   there may be instances where, a particular set of facts, the

12   Court feels comfortable saying this isn't even a close call,

13   clearly those are two are in the same market.

14            THE COURT:  All right.  Mr. Blavin.

15        MR. BLAVIN:  So, just briefly on that, Your Honor.

16   First, as the Ninth Circuit made clear in the *Häagen-Dazs*

17   case, and a number of other cases have made clear that courts

18   consistently reject markets as a matter of law based on whether

19   or not the markets are defined in terms of quality variances.

20            THE COURT:  Defined as what?  I didn't hear you.

21        MR. BLAVIN:  In terms of quality variances.

22            THE COURT:  Oh.

23        MR. BLAVIN:  And their own allegations demonstrate --

24   again, their allegation that they decided to use LinkedIn

25   because it was better, that their attempt to define the market

1    is purely based on the fact that they think that LinkedIn's --

2    the data from LinkedIn offers a better input.

3         But that, as a matter of law, Your Honor, fits.  And the

4    courts that have looked at similar allegations have resolved

5    this question on the pleadings.

6         In the *Tanaka* case, the Ninth Circuit said, yes, you

7    define UCLA's soccer program as somehow uniquely better than

8    other programs, but that's based upon the purported uniqueness

9    of the soccer program.

10        In the *Hicks* case, *versus PGA*, the Ninth Circuit

11   considered a similar allegation that in golf advertising was

12   somehow unique or better, more effective than other forms of

13   advertisements.  And the Court said, no, you're trying to

14   define the market in terms of its alleged uniqueness or some

15   sort of better quality relating to it.  And as a matter of law,

16   that fails.

17        But, moreover, if you look at their allegations -- and,

18   again, paragraph 54 of the complaint, 55 -- they're

19   acknowledging other competitors are out there using other

20   datasets to provide people analytic services.

21        They say they're inferior, but they don't allege that

22   they're absolutely necessary to provide a competing offering.

23   They just say they're not as good and LinkedIn's data is

24   better.

25        And that, I think, as a matter of law, the Court can

 1   resolve that issue now, and it should.  Their market definition

 2   is based upon impermissible distinction, based on quality and

 3   uniqueness, and that's what the courts consistently have

 4   rejected as a matter of law.

 5        And that's why the same reason their essential facilities

 6   doctrine argument fails, too, because it's based upon a

 7   spectrum of quality, you know, whether it's superior or

 8   inferior, and that is a matter of law.  You can't define the

 9   market that way.

10        Even the *Datel* case that they rely upon, *Datel versus*

11   *Microsoft*, from the Northern District, where the court said,

12   no, you've sufficiently pled a market, the court was absolutely

13   clear that the reason why the market was sufficiently pled is

14   because it did not hinge on questions of quality variance, of

15   whether or not one use of the data or one use of the product

16   there was better than another.

17        So under their own cases, if you're going to define the

18   market in terms of is it better, is it more -- you know, does

19   it offer more insights than employers' data or other data,

20   that's improper.

21        Moreover, even if you look at employers' data, there's

22   insights you can get from that data that LinkedIn can't even

23   get.  So even their own theory is implausible.

24        Employer data allows people to look at, you know, internal

25   surveys, how people feel about the company, when people are

1   logging in and logging out of email, when they're leaving the

2   office, when they're coming into the office.  That reveals a

3   lot more about workforce insights, frankly, than the data

4   that's available on LinkedIn.

5        So even under their own allegations, the idea that

6   LinkedIn's data is somehow unique or better is implausible.

7        I mean, they acknowledge that that workforce data allows

8   employers to get insights into questions of workforce attrition

9   and special kills.  LinkedIn doesn't have access to that data.

10  It, in itself, in many ways is superior to LinkedIn's data.

11       So we just think that the market as defined is

12  implausible, and they can't satisfy the essential facility

13  doctrine, which, again, the Ninth Circuit in *Aerotec* made clear

14  you have to construe narrowly.

15       **THE COURT:**  All right.  I'll give you the last word,

16  Mr. Worcester.

17       **MR. WORCESTER:**  Thank you, Your Honor.  And I will

18  say, in response to that, that I think Mr. Blavin has outlined

19  for me what his expert report is going to say.

20       And I appreciate that, but everything he just said is

21  raising factual issues.  And we should have a chance to develop

22  those facts.

23       And if you take a look at *Häagen-Dazs* itself, which I

24  think is LinkedIn's leading case on this topic, I note it's a

25  summary judgment case.  Right?  In that case testimony had

 1   already occurred, documents had already been produced, experts

 2   had written reports, and the court had the chance to consider

 3   all of that.

 4        The court did not decide at the motion to dismiss stage

 5   that the ice cream market wasn't divided into premium quality

 6   ice cream and nonpremium quality ice cream.  It could only

 7   reach that conclusion after everyone had weighed in and we

 8   could determine the substitutability.

 9        Because you could imagine a priori that, in fact, they

10   weren't substitutable.  Maybe people who want high quality ice

11   cream don't want low quality ice cream.  It turned out that

12   wasn't the case after all the evidence had been developed, but

13   the chance to develop that evidence was critical.

14        Here we clearly allege that people who want the kind of

15   products, at the prices that you can do if you have access to

16   the LinkedIn data, don't want to go the old manual route.  They

17   don't want to use limited data, and they won't pay for that.

18   The products aren't substitutable.  That's clearly what the

19   complaint alleges.

20        **THE COURT:**  All right.  I will take the matter under

21   submission.  I appreciate the arguments have been very helpful.

22   And I will try to get out a ruling as quickly as possible.

23        Let me ask, in terms of case management, we do have a case

24   management here.  I guess the proposal is to set a further case

25   management in November to see what the Supreme Court does on

1  the cert petition?  There appears to be an agreement about

2  that.

3          **MR. WORCESTER:**  That's correct, Your Honor.

4      I don't think the -- the parties have been actually

5  getting along extremely well, and I don't think we had any

6  disagreements in the case management statement.

7          **THE COURT:**  All right.  And you did have a -- I know

8  you had a session with Judge Ryu more than two years ago.  A

9  lot of water under the bridge and a lot of things have

10 happened.

11     Have you talked at all about mapping out any further ADR?

12         **MR. WORCESTER:**  We have not, Your Honor.

13         **MR. BLAVIN:**  We have not, no.

14         **THE COURT:**  Well, let's do this.  Let's schedule

15 something for November.

16     Why don't we get a date now, Angie.

17     And I'd like you to meet and confer and think about and

18 talk about ADR, given how much has transpired since your last

19 meeting, because, obviously, that's always at the top of my

20 mind.  Hopefully, at the top of yours as well.

21     Angie.

22         **THE CLERK:**  November 12th, Your Honor, 10:30.

23         **THE COURT:**  All right.  November 12th, at 10:30.  And

24 we'll include ADR on that topics list.

25     Meanwhile, I will make every effort to get out a ruling as

1  quickly as possible on this, on this motion, so we can sort of

2  move forward.

3      Appreciate your contributions to my understanding.

4      Thank you.

5          **MR. WORCESTER:**  Thank you, Your Honor.

6          **MR. BLAVIN:**  Thank you, Your Honor.

7      (At 2:35 p.m. the proceedings were adjourned.)

8                          - - - - -

9

10                  **CERTIFICATE OF REPORTER**

11      I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13  DATE: Tuesday, September 1, 2020

14

15

16                _Katherine Sullivan_

17  _____

18      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

19

20

21

22

23

24

25