1

2

3

4             UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7   HIQ LABS, INC.,                           Case No.  17-cv-03301-EMC

8                      Plaintiff,

9           v.                                 **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S
10  LINKEDIN CORPORATION,                      MOTION TO DISMISS**

11                     Defendant.              Docket No. 137

12

13        Plaintiff hiQ Labs, Inc. has filed suit against LinkedIn Corp. seeking declaratory relief as

14  well as injunctive relief and damages.  According to hiQ, it has not violated any laws by

15  "scraping" public information about LinkedIn users from LinkedIn's website.  Furthermore, hiQ

16  asserts, LinkedIn has violated various antitrust and fair practices laws by trying to prevent hiQ

17  from accessing the public information on the website.  Currently pending before the Court is

18  LinkedIn's motion to dismiss the first amended complaint ("FAC").  The motion primarily

19  challenges the antitrust claims asserted for the first time in the FAC.

20        Having considered the parties' briefs as well as the oral argument of counsel, the Court

21  hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.

22           I.        **FACTUAL & PROCEDURAL BACKGROUND**

23        The main allegations in the FAC which are related to the antitrust claims are as follows.

24        "LinkedIn is the world's largest professional social network, with over 660 million

25  members."  FAC ¶ 2.  Individuals who use the LinkedIn network can make certain information

26  about themselves – *e.g.*, resumes and work history – publicly available on the LinkedIn website.

27  *See* FAC ¶ 2.

28        "hiQ identified an opportunity for a new kind of 'people analytics' services" based on the

United States District Court
Northern District of California

1   information publicly available on LinkedIn.  FAC ¶ 3.  "People analytics" is

2           a new type of predictive data analysis aimed at providing employers
3           in-depth, predictive insights into their workforce.  People analytics
            generally work by performing computerized analyses of employees'
            public professional information and history that then show which
4           employees are at higher risk of looking for a new job, and which
            may have skills that are not being utilized in their current job.  hiQ
5           created two specific analytics services: (a) "Keeper," which tells
            employers which of their employees are at the greatest risk of being
6           recruited away, and (b) "Skill Mapper," a summary of the breadth
            and depth of aggregate or individual skills of current or prospective
7           employees, which may not be obvious from internal company
            documents (such as internal performance reviews or the resume the
8           employee supplied as part of the hiring process) or conversations
            with those employees.

9

10  FAC ¶ 33.  Before hiQ, people analytics either did not exist or was not very accurate – *e.g.*,

11  employers relied on internal data only and took an ad hoc approach; hiQ, with its people analytics

12  services, was "able to reduce hard costs and transaction costs" for employers.  FAC ¶ 35.

13          LinkedIn eventually realized that it might be able to profit by
            providing the same type of innovative and revolutionary analytics
14          hiQ pioneered, and it developed its own competing version of that
            analytics service.  Then, in May 2017, LinkedIn abruptly,
15          unlawfully and without cause denied hiQ access to the portion of the
            LinkedIn website containing wholly public member profiles.
16

17  FAC ¶ 6.

18          hiQ is not alone in being denied access to the public portion of LinkedIn's website;

19  LinkedIn has denied access to other people analytics providers as well.  *See* FAC ¶ 46.  However,

20  LinkedIn has not denied access to companies that do not provide people analytics services (*e.g.*,

21  Google and Bing).  *See* FAC ¶ 47.

22          "The most immediate anticompetitive effect of LinkedIn's conduct . . . was to eliminate –

23  effectively overnight – nearly all of its people analytics competitors."  FAC ¶ 53.  People analytics

24  providers who remain either offer their services at much higher prices than LinkedIn does, or at

25  the same price but with inferior quality.  *See* FAC ¶ 54.  Through its actions, LinkedIn has thus

26  reduced consumer choice and price competition.  *See* FAC ¶ 58(d).

27          LinkedIn's conduct implicates two product markets.  First, there is the market for

28  professional social networking platforms.  Professional social networking platforms must be

*United States District Court*
*Northern District of California*

2

differentiated from traditional social networking platforms because the former, unlike the latter, focus only on business relationships. *See* FAC ¶¶ 20-21 (alleging, *inter alia*, that "consumers would reasonably switch to other professional social network platforms for business purposes (if they could), but would not similarly use more traditional social networks for the same purposes"). "LinkedIn was, for many years, the only real professional social networking platform . . . ." FAC ¶ 25. Today, LinkedIn has "well over 75% of all professional social network users in the United States." FAC ¶ 25.

Second, there is the market for people analytics services. This "type of service . . . did not exist until hiQ first came into being, and the only alternative to such services is the previous set of *ad hoc* measures that companies employed when trying to guess employee attrition risk and employees' full and current skillsets." FAC ¶ 36.

Based on, *inter alia*, the above allegations, hiQ has asserted three antitrust claims.

- Monopolization, in violation of § 2 of the Sherman Act. According to hiQ, LinkedIn has acquired and maintained monopoly power in the markets for professional social networking platforms and people analytics services through unlawful means, including "leveraging, lock-in, raising rivals' costs, tying, unilateral refusal to deal, denial of essential facilities, and vertically-arranged boycotts." FAC ¶ 12.

- Attempted monopolization, also in violation of § 2 of the Sherman Act. According to hiQ, there is a dangerous probability that LinkedIn will monopolize the market for people analytics services because it has engaged in anticompetitive conduct such as "leveraging, lock-in, raising rivals' costs, tying, unilateral refusal to deal, denial of essential facilities, and vertically-arranged boycotts." FAC 150.

- Unreasonable restraint of trade, in violation of § 1 of the Sherman Act. According to hiQ, LinkedIn and its members have entered into contracts or combinations that have the effect of unreasonably restraining trade. *See* FAC ¶ 159. The contracts or combinations include "tying arrangements and vertically-arranged boycotts." FAC ¶ 162.

United States District Court
Northern District of California

1        In addition to the antitrust claims, hiQ has asserted claims for, *inter alia*, declaratory relief, intentional interference with contract and prospective economic advantage, and violation of California Business & Professions Code § 17200.

        LinkedIn moves to dismiss certain claims asserted in hiQ's FAC.  In particular, LinkedIn argues that all claims for damages (*i.e.*, the antitrust and intentional interference claims) should be dismissed based on the *Noerr-Pennington* doctrine and the California litigation privilege. LinkedIn further argues that the antitrust claims should be dismissed on various merits grounds (*e.g.*, failure to allege antitrust injury, a product market, and anticompetitive conduct).

## II.   **DISCUSSION**

A.   Legal Standard

        Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted).

United States District Court
Northern District of California

4

B.      Claims for Damages

In the FAC, hiQ seeks declaratory relief, injunctive relief, and damages.  The request for damages is based on the following causes of action: (1) the antitrust claims and (2) the intentional interference claims.  LinkedIn moves to dismiss both damages claims based on the *Noerr-Pennington* doctrine.  LinkedIn also moves to dismiss the intentional interference claims based on the California litigation privilege.

1.      *Noerr-Pennington* Doctrine

> The essence of the *Noerr-Pennington* doctrine is that those who petition any department of the government for redress are immune from statutory liability for their petitioning conduct.  The doctrine derives from two Supreme Court cases holding that the First Amendment Petition Clause immunizes acts of petitioning the legislature from antitrust liability.  The doctrine has since been applied to actions petitioning each of the three branches of government, and has been expanded beyond its original antitrust context.

*Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006-07 (9th Cir. 2008).  For example, the doctrine can apply to a state claim for tortious interference with prospective economic advantage.  *See id.* at 1007; *see also Hi-Top Steel Corp. v. Lehrer*, 24 Cal. App. 4th 570, 577-78 (1994) (noting that, "[w]hile the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, it has been applied or discussed in cases involving other types of civil liability, including liability for interference with contractual relations or prospective economic advantage or unfair competition").

LinkedIn concedes that it has not directly petitioned the government for any relief.  However, it points out that "[c]onduct incidental to a lawsuit, *including a pre-suit demand letter*, falls within the protection of the *Noerr-Pennington* doctrine."  *Id.* (emphasis added).  LinkedIn maintains that hiQ's antitrust and intentional interference claims "derive from the cease-and-desist letters LinkedIn sent that ostensibly 'cut off' hiQ's access to LinkedIn's website."  Mot. at 8.  *See, e.g.*, FAC ¶¶ 7, 39 (referring to a cease-and-desist letter sent on May 23, 2017); FAC ¶ 43 (referring to letter sent on June 24, 2017, reiterating demand to cease and desist).

In response, hiQ argues that "petitioning activity may be actionable if it is part of a broader anticompetitive scheme."  Opp'n at 13.  The broader anticompetitive scheme includes the actual

cutting off of competitors' access to the public information on LinkedIn's website – which is not petitioning activity.  *See* Opp'n at 15.

hiQ's argument relies in large part on *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007) (Whyte, J.).  In *Hynix*, Rambus was a member of a SSO (standard-setting organization) and allegedly used its membership in the SSO to discover how a particular standard was developing and then drafted patent claims to cover the standard.  "Once the industry became 'locked in' to the DRAM standard, Rambus sprang the 'patent trap' and demanded royalties," and further "backed up its royalty demands with infringement litigation."  *Id.* at 1089.  Hynix subsequently brought an antitrust claim based on Rambus's "'overall course of conduct' – including [its] patent litigation."  *Id.*

Before Judge Whyte, Rambus argued that, "because its use of the courts to enforce its patents is protected petitioning activity pursuant to the *Noerr-Pennington* doctrine . . . , Hynix could not claim its litigation expenses as damages."  *Id.* at 1086.  Judge Whyte ultimately disagreed.

Judge Whyte noted that there were "three possible approaches to whether patent litigation can be an anticompetitive act in violation of the antitrust laws."  *Id.* at 1091.

- Under the first approach (the Second Circuit's "absolute bar"), "only frivolous patents can be anticompetitive and part of an unlawful scheme."  *Id.* at 1091-92.

- Under the second approach (labeled the "*Kobe* claim") – and at "the opposite end of the spectrum" – even nonfrivolous patent litigation can be anticompetitive if part of a broader anticompetitive scheme (*i.e.*, "brought in conjunction with other antitrust misconduct").  *Id.* at 1092-94.

- The third approach was a middle ground between the first two approaches.  *See id.* at 1094.  Under the third approach, "good faith litigation" could be "unlawful if done as part of an anticompetitive scheme" but, in order to get litigation costs as part of the damages for the antitrust violation, there must be "an explicit linkage between [the] antitrust violation and the litigation" – *i.e.*, a causal connection.  *Id.* at 1095.

6

Judge Whyte endorsed the third approach.

> [T]he court believes that the Federal Circuit and the Supreme Court would recognize some "scheme" antitrust allegations that include constitutionally protected litigation within the "overall course of conduct," but only those in which the patent litigation is "causally connected" to anticompetitive harms. . . . The court concludes that before otherwise protected litigation can be a part of an "anticompetitive scheme" claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms.  Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms.  If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.

*Id.* at 1096-97.[1]  He added: "[W]here the patent litigation is used to *further* the harm caused under a 'more traditional antitrust theory,' a plaintiff should be allowed a full recovery."  *Id.* at 1097 (emphasis added); *see also Arista Networks, Inc. v. Cisco Sys. Inc.*, No. C-16-0923 BLF (N.D. Cal.) (Docket No. 281) (Order at 16) (taking note of plaintiff's argument that defendant's intellectual property "lawsuit was the 'enforcement mechanism' of the purported 'open early, closed late' anticompetitive scheme" – *i.e.*, defendant used the litigation and conduct incidental to that litigation "*as tools to further* the 'closing' step of the 'open early, closed late' scheme") (emphasis added).

According to LinkedIn, the Court should reject the application of *Hynix* to the instant case because the facts in *Hynix* and the facts in the instant case are not sufficiently similar.  LinkedIn maintains that *Hynix*-type cases all involve "a bait-and-switch, where a defendant affirmatively

---

[1] In its papers, LinkedIn argues that the anticompetitive nonpetitioning activity must be "ineffective" without the petitioning activity in order to avoid the *Noerr-Pennington* doctrine.  *See* Reply at 6-7.  LinkedIn comes up with this requirement because Judge Whyte stated in *Hynix* as follows:

> Because Rambus' alleged conduct at JEDEC can independently qualify as an anticompetitive harm under section 2, the court finds that Rambus' current patent litigation is "causally connected" to that behavior and therefore properly included in an "anticompetitive scheme" allegation.  To be clear, the causal connection is that a patent "ambush" or "hold-up" is ineffective without the threat of litigation.

*Hynix*, 527 F. Supp. 2d at 1098.  But as should be clear from the above, although Judge Whyte did use the term "ineffective," he was not imposing some kind of ineffectiveness requirement.  Rather, he simply imposed a requirement of causal connection.

United States District Court
Northern District of California

United States District Court
Northern District of California

misled competitors into using its technology and intellectual property on the understanding that no legal action would result from doing so." Reply at 5. LinkedIn's argument is not persuasive. It provides no rationale as to why *Hynix* should be narrowly construed to these facts. *Hynix* clearly made a broader point: it asks whether the petitioning activity furthered an anticompetitive scheme involving nonpetitioning activity; if the gravamen of the action centers on nonpetitioning activity, the fact that petitioning activity is employed to further that conduct is not sufficient to implicate the *Noerr-Pennington* doctrine.

LinkedIn argues that even if *Hynix* has broader application, its cease-and-desist letters (petitioning activity) did not *further* the anticompetitive scheme that involved the blocking of access to its website (nonpetitioning activity). LinkedIn points out that its first cease-and-desist letter was issued *before* it blocked hiQ's access to the website. *See* Reply at 7 ("The [first] letter *preceded* any technical cut-off by a full month."). But LinkedIn's position is problematic for two reasons.

- First, LinkedIn's second cease-and-desist letter was issued *on the same day* that LinkedIn blocked access. *See* Mot. at 5 ("LinkedIn implemented IP address blocks on June 24, the same day it sent the second letter."). Therefore, arguably, the second letter was used to further the anticompetitive scheme involving the blocking.

- Second, it is not clear that the causal connection requirement always demands that the anticompetitive petitioning activity come after the anticompetitive nonpetitioning activity; a cease-and-desist letter that comes before the actual blocking still reinforces the overall anticompetitive scheme.

At bottom, LinkedIn's argument defies the fundamental logic of *Hynix*.

Finally, LinkedIn contends that, should the Court favor hiQ on the above arguments, then the Court should – at the very least – restrict hiQ's damages claims. More specifically, LinkedIn maintains that, if the anticompetitive nonpetitioning activity is the blocking of hiQ's access, then damages should be limited to the timeframe when hiQ was actually blocked – a "six-day period in June 2017." Mot. at 9 (arguing that "any claim for damages for lack of access *for any other*

United States District Court
Northern District of California

1    *period* is necessarily based on LinkedIn's letters and should be dismissed") (emphasis in original);

2    *see also* Reply at 6.  But LinkedIn's position is not persuasive because, even if petitioning activity

3    arguably cannot be a basis for *liability* under the *Noerr-Pennington* doctrine, that does not mean

4    that a plaintiff cannot get *damages* based on the petitioning activity,[2] and the petitioning activity

5    can take place at a different time than the nonpetitioning activity.  Furthermore, LinkedIn takes too

6    narrow a view of the *impact* that the nonpetitioning activity (blocking of access) could have – that

7    impact could extend beyond the time of the actual blocking.  For example, even if the actual

8    blocking lasted for only six days, it seems plausible that this conduct might dissuade hiQ

9    customers from subsequently signing up for hiQ's people analytics services.  *Cf. Arista* (Docket

10   No. 281) (Order at 21-22) (noting that "a reasonable jury could find that [the defendant] raised the

11   specter of the . . . lawsuit to persuade customers to abandon [the defendant's] competitors").

12          Accordingly, the *Noerr-Pennington* doctrine does not bar hiQ's antitrust and interference

13   claims.

14          2.      California Litigation Privilege

15          As noted above, LinkedIn argues that the state claims for intentional interference are also

16   protected by the California litigation privilege.  The parties' briefs indicate that the above analysis

17   for *Noerr-Pennington* applies here as well.  For the reasons stated above, the California litigation

18   privilege is not a bar to hiQ's interference claims.

19   C.     Antitrust Claims: Product Market

20          LinkedIn contends the antitrust claims are still deficient for independent reasons, including

21   a failure on the part of hiQ to adequately allege a product market – *i.e.*, a people analytics market.[3]

22   _____

23   [2] *See* Hovenkamp, *et al.*, IP & Antitrust § 11.04[F] (suggesting that liability should not be based

24   on protected petitioning but damages are a different matter: "'a plaintiff that can prove an antitrust
     violation without the use of protected petitioning can recover damages caused by that petitioning
     as well as damages by the conduct that proved the violation'").

25   [3] Technically, hiQ makes reference to two different product markets in the FAC – (1) the market

26   for people analytics services and (2) the market for professional social networking platforms.  *See,*
     *e.g.*, FAC ¶ 110 (alleging that "LinkedIn has willfully acquired and maintained monopoly power

27   in the relevant markets for professional social networking platforms and people analytics"); FAC ¶
     159 (alleging that "LinkedIn and its members have entered into contracts or combinations that

28   have the effect of unreasonably restraining trade . . . in the relevant markets for professional social
     networking platforms and people analytics services").  But LinkedIn challenges only hiQ's

United States District Court
Northern District of California

1    A product market "encompass[es] the product at issue as well as all economic substitutes

2   for the product."  *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  "'The

3   outer boundaries of a product market are determined by the reasonable interchangeability of use or

4   the cross-elasticity of demand between the product itself and substitutes for it.'"[4]  *Id.*  "[W]hat

5   constitutes a relevant market is a factual determination for the jury," *Image Tech. Servs. v.

6   Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997); *see also Todd v. Exxon Corp.*, 275 F.3d

7   191, 199-200 (2d Cir. 2001) (stating that, "[b]ecause market definition is a deeply fact-intensive

8   inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market");

9   however, the relevant market must still be plausibly alleged to make it past a 12(b)(6) challenge.

10    In the instant case, the FAC indicates that people analytics is "a new type of predictive data

11   analytics aimed at providing employers in-depth predictive insights into their workforce."  FAC ¶

12   33.  The FAC also alleges that "[p]eople analytics generally work by performing computerized

13   analyses of employees' public professional information and history."  FAC ¶ 33.  Nevertheless,

14   the parameters of the people analytics market – as pled – are vague.  Most notably, as the Court

15   discussed with the parties at the hearing, it is not clear what substitutes there are for people

16   analytics products such as those offered by hiQ.  Should a product be considered a substitute if the

17   people analytics are based on an employer's internally maintained data?  Should a product be

18   considered a substitute if the people analytics are based on publicly available information other

19   than that available on LinkedIn's website?  Even if more established analytic techniques have

20   become dated, that does not mean there is no substitutability or cross-elasticity of demand between

21   different modes of people analytics.

22    At the hearing, hiQ asserted that a product that uses an employer's internally maintained

23   data should not be deemed a substitute but the FAC fails to explain why.  For example, the FAC

24

25   attempt to define the people analytics market.

26   [4] "Elasticity of demand is a concept used to signify the relationship between changes in price and
     responsive changes in demand."  *United States v. LSL Biotechnologies*, 379 F.3d 672, 697 (9th
27   Cir. 2004); *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992)
     (indicating that cross-elasticity of demand refers to "the extent to which consumers will change
28   their consumption of one product in response to a price change in another").

does not explain why internal data such as performance reviews and resumes should be considered "limited" in nature. FAC ¶ 35. The FAC also fails to explain why, even if an employer was not able to use internal data successfully itself, *see* FAC ¶ 35 (alleging that "employers tried to manage attrition risk within their organizations through a variety of *ad hoc* internal methods, and they tried to identify employees' full skillsets through similarly *ad hoc* internal means"), the employer could not hire a company to put that data to good use. Indeed, hiQ suggests that that was the conventional approach before hiQ came on the scene with its analytics. It is not plausible to suggest without specific facts that the entire field of analytics using internal data is now obsolete. In fact, it would appear that internal data which might include direct polling could yield information not otherwise accessible via LinkedIn.

As for a product that bases its people analytics on publicly available information other than LinkedIn, hiQ made a different argument at the hearing. According to hiQ, *in theory*, such a product would be a substitute (and thus in the same market as hiQ's products) but, hiQ maintained, *as a practical matter*, the only place to get publicly available data is LinkedIn. But similar to above, the FAC contains no specific allegations establishing such. The Court does not doubt that LinkedIn is a useful source for publicly available data given its focus on professional social networking and its prominence in the professional social networking space; however, that does not mean that useful publicly available information cannot be gleaned from other sources such as Google and Facebook or other industry directories and sources. Indeed, in this day and age, it would not be surprising if a person's digital footprint – even apart from LinkedIn – were enlightening to the analytics task.

The Court acknowledges hiQ's suggestion that products using employer internal data or publicly available data other than LinkedIn's are different in quality from hiQ's products – and thus it is at least a question of fact whether there is some elasticity of demand between them and whether those products are in the same market as hiQ's products. *See generally Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S. Ct. 1502, 1524-25 (1962) ("agree[ing] with the District Court that in this case a further division of product lines based on 'price/quality' differences [medium-priced shoes and low-priced shoes] would be 'unrealistic'"); *see also In re Live Concert*

United States District Court
Northern District of California

1  *Antitrust Litig.*, 247 F.R.D. 98, 129 (C.D. Cal. 2007) (indicating that consumers may differentiate

2  or distinguish among products based on performance, price, and so forth but that does not

3  necessarily mean that the products are in separate markets).  The problem for hiQ is that it has not

4  yet shown that it is *plausible* that the relevant market should be defined as that which uses only

5  LinkedIn data.

6        Accordingly, the Court finds all of hiQ's antitrust claims deficient for failure to adequately

7  allege a product market.[5]  The Court, however, shall give hiQ an opportunity to amend to correct

8  this deficiency.

9  D.    <u>Antitrust Claims: Anticompetitive Conduct</u>

10        There are additional reasons why the antitrust claims are not viable as currently pled.  In

11  particular, LinkedIn persuasively argues that hiQ has failed to adequately allege anticompetitive

12  conduct.

13        For its first antitrust claim – monopolization in violation of § 2 of the Sherman Act – hiQ

14  alleges as follows:

> LinkedIn has willfully acquired and maintained monopoly power in
> the relevant markets [*i.e.*, the market for professional social
> networking platforms and the market for people analytics services],
> by means of predatory, exclusionary, and anticompetitive conduct,
> including but not limited to by means of lock-in, raising rivals'
> costs, tying, unilateral refusal to deal, denial of essential facilities,
> and vertically-arranged boycotts . . . .

19  FAC ¶ 112.  hiQ repeats these theories for its second antitrust claim, *i.e.*, attempted

20  monopolization).  *See* FAC ¶ 150.  For the final antitrust claim – concerted action that

21  unreasonably restrains trade – hiQ asserts the tying and vertical boycott theories only.  *See* FAC ¶

22  162.  Each of the above theories, as addressed below, is deficient.

23      1.    <u>Unilateral Refusal to Deal</u>

24        As an initial matter, the Court rejects LinkedIn's contention that hiQ cannot raise a theory

25  of unilateral refusal to deal because, during the Ninth Circuit proceedings, hiQ stated that it was

---

[5] Because the Court finds a deficiency in the allegation of a product market, it does not address
LinkedIn's argument that hiQ has failed to adequately allege monopoly or market power in the
relevant market.

not asserting such a theory. *See* Mot. at 21 (asserting that, "[h]aving discouraged the Ninth Circuit from considering its case under a duty-to-deal framework, hiQ cannot now revive this theory under the exact same facts"). Although LinkedIn makes an analogy to the doctrine of judicial estoppel, that doctrine requires that a court rely on a representation being made by the party against whom estoppel is asserted. *See Casa Del. Caffe Vergnano S.P.A. v. Italflavors San Diego, Ltd. Liab. Co.*, 816 F.3d 1208, 1213 (9th Cir. 2016) (noting that judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase'"). LinkedIn has made no showing that the Ninth Circuit relied on hiQ's representation above in making its decision on hiQ's motion for a preliminary injunction.

As for the merits of the unilateral refusal-to-deal theory, the Court begins with the predicate that, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 448 (2009). This includes dealing or not dealing with a rival. *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (stating that "there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals'"). However, there are "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability," as indicated in the Supreme Court's seminal case *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985). *See Aerotec*, 836 F.3d at 1184. That being said, the *Aspen Skiing* exception is very narrow, as both the Supreme Court and Ninth Circuit have made clear. *See Verizon Communs., Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 409 (2004) (characterizing *Aspen Skiing* as "at or near the boundary of § 2 liability"); *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020), *available at* No. 19-16122, 2020 U.S. App. LEXIS 25347, at \*30 (9th Cir. Aug. 11, 2020) (stating that *Aspen Skiing* represents a "limited exception to [the] general rule that there is no antitrust duty to deal"); *Aerotec*, 836 F.3d at 1184 (stating that *Aspen Skiing* is a "narrow exception").

In *Aspen Skiing*, the defendant owned three of four mountain areas for skiing, and the plaintiff owned the fourth. The two parties

had cooperated for years in the issuance of a joint, multiple-day, all-area ski ticket.  After repeatedly demanding an increased share of the proceeds, the defendant canceled the joint ticket.  The plaintiff, concerned that skiers would bypass its mountain without some joint offering, tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price.  The defendant refused even that.  [The Supreme Court] upheld a jury verdict for the plaintiff, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor."

*Trinko*, 540 U.S. at 408-09 (2004).

The Ninth Circuit has explained that, under *Aspen Skiing*,

a company engages in prohibited, anticompetitive conduct when (1) it "unilateral[ly] terminat[es] . . . a voluntary and profitable course of dealing"; (2) "the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition'"; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers.

*Qualcomm*, 2020 U.S. App. LEXIS 25347, at *30-31.

In the instant case, hiQ has failed to adequately allege at least the first two *Aspen Skiing* factors.  For example, hiQ has failed to make a plausible case that it and LinkedIn had engaged in a voluntary course of dealing.  In ¶ 37, hiQ alleges as follows:

LinkedIn has known of hiQ since at least 2015, when it started participating in hiQ's annual "Elevate" conference.  The hiQ Elevate conference was designed to build a community around the emerging field of people analytics and has provided a regular forum for participants to share insights and disseminate best practices.  LinkedIn has sent representatives to each iteration of that conference since hiQ's founding.  hiQ has spoken freely about its public data collection from LinkedIn at Elevate; LinkedIn has thus always understood what hiQ does.  Over the years, LinkedIn has itself participated regularly in hiQ Elevate events.  At a 2016 Elevate conference, LinkedIn employee Lorenzo Canlas received special recognition and accepted the hiQ Elevate "Impact Award."

FAC ¶ 37.  But that certain LinkedIn employees knew about hiQ and its practices does not mean that the two companies were thereby dealing with one another.  It is not even clear whether these LinkedIn employees were high-level employees who could act on behalf of the company.  And even if they were, LinkedIn's tolerance of hiQ's data gathering did not give rise to an agreement

14

1    or an "implicit understanding" between the companies.  *LiveUniverse v. MySpace, Inc.*, 304 Fed.

2    Appx. 554, 557 (9th Cir. 2008) (noting "nothing in the complaint suggests an agreement, or even

3    an implicit understanding, between MySpace and LiveUniverse") (emphasis omitted).  Unlike

4    *Aspen Skiing*, there was no mutual commerce or course of dealing between LinkedIn and hiQ.

5            Moreover, even if there were a voluntary course of dealing between LinkedIn and hiQ, hiQ

6    still must show that LinkedIn sacrificed a profitable course of dealing in the short term in order to

7    benefit long term from the exclusion of competition.  Absent what would otherwise be irrational

8    short-term behavior (like the defendant's conduct in *Aspen Skiing*), there is no antitrust claim for

9    refusal to deal.  To establish this element, hiQ maintains that "people analytics help prove

10   LinkedIn's value proposition; specifically, they demonstrate why it is valuable for both employees

11   and employers to belong to LinkedIn's professional social network, and why the public

12   employment database benefits those who participate."  FAC ¶ 38.  Thus, hiQ implies that

13   LinkedIn lost business as a result of hiQ's being excluded from access to information publicly

14   available on LinkedIn's website.  But hiQ has not specifically alleged that, *e.g.*, employers stopped

15   using LinkedIn's services (or discouraged employees from using LinkedIn's services) after

16   LinkedIn blocked hiQ from accessing its website.  Its theory of short-term sacrifice is far from

17   obvious or even intuitive.  Absent specific factual allegations, it is speculative to assume that

18   LinkedIn gave up *any* short-term benefit by refusing to deal with hiQ.

19           Accordingly, to the extent hiQ's antitrust claims are predicated on a unilateral refusal to

20   deal, the Court finds such a theory, as pled, implausible.

21           2.    Denial of Essential Facilities

22           LinkedIn also asserts the essential facilities doctrine as another theory of anticompetitive

23   conduct.

24                    [An essential facilities] theory is a variation on a [unilateral] refusal
                      to deal claim.  It imposes liability where competitors are denied
25                    access to an input that is deemed essential, or critical, to
                      competition.  Although the Supreme Court has never recognized the
26                    doctrine, [the Ninth Circuit has] continued to treat it as having a
                      basis in § 2 of the Sherman Act.
27
                      To establish a violation of the essential facilities doctrine, [a
28                    plaintiff] must show (1) that [the defendant] is a monopolist in

United States District Court
Northern District of California

15

1
2
3
4
5

> control of an essential facility, (2) that [the plaintiff], as [the defendant's] competitor, is unable reasonably or practically to duplicate the facility, (3) that [the defendant] has refused to provide [the plaintiff] access to the facility, and (4) that it is feasible for [the defendant] to provide such access.  Because mandating access, as the essential facilities doctrine implies, shares the same concerns as mandating dealing with a competitor, a facility is essential "only if control of the facility carries with it the power to eliminate competition in the downstream market."

6    *Aerotec*, 836 F.3d at 1184-85; *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536,

7    544 (9th Cir. 1991) (stating that "[a] facility that is controlled by a single firm will be considered

8    'essential' only if control of the facility carries with it the power to eliminate competition in the

9    downstream market").

10        In the instant case, hiQ asserts that LinkedIn's social networking platform amounts to an

11   essential facility.  However, the Court cannot assess the viability of hiQ's essential facilities

12   argument without there first being a properly defined downstream market (*i.e.*, the people

13   analytics market).  The Court therefore dismisses the essential facilities theory based on a failure

14   to adequately allege a people analytics market.

15        3.    <u>Lock-In</u>

16        In the FAC, hiQ further alleges anticompetitive conduct on the basis that

17
18
19
20
21

> LinkedIn lured users desiring professional social networking services into joining LinkedIn with the promise that their employment information would be their own and could be publicly shared and accessed. . . . At a certain point, LinkedIn's growth and dominance became self-reinforcing, meaning that users needed to stay a part of its professional social network platform, or else be excluded from the largest and most useful professional social network in the world.

22   FAC ¶ 116.  Allegedly, a similar lure and lock into the network took place with respect to

23   employers: "LinkedIn promised prospective employer members that they could access users'

24   public employment information without restriction."  FAC ¶ 117.  According to hiQ, "[o]nce users

25   were locked into its professional social network platform, LinkedIn utilized the power that lock-in

26   conferred in order to advantage itself to the exclusion of its people analytics competitors . . . ."

27   FAC ¶ 118.

28        In its motion to dismiss, LinkedIn argues that hiQ's lock-in theory should be rejected as it

1    fails to map onto the "classic" lock-in situation "where a consumer buys one product from a

2    company, and then, without warning, is forced to buy aftermarket products or services from that

3    same company at monopolistic prices in order to use the product."  Mot. at 28 (citing *Eastman*

4    *Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 476 (1992)).  In response, hiQ contends that

5    there must be a flexible approach in evaluating whether conduct is anticompetitive.  *See Avaya*

6    *Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 404 (3d Cir. 2016) (noting that the court had

7    previously "declined to read *Kodak* as applying narrowly to only cases involving '[a]n aftermarket

8    policy change'").

9         While hiQ makes a fair point regarding flexibility, it is still invoking the concept of a lock-

10   in as a basis for the antitrust violation – and a lock-in typically means that a locked-in *consumer* is

11   exploited, as even the Third Circuit case cited by hiQ indicates.  *See id.* (stating that, under *Kodak*,

12   "exploitation of locked-in *customers* is one theory that courts will recognize to justify [antitrust]

13   liability" for conduct in an aftermarket related to a primary market) (emphasis added); *see also*

14   *Mich. Div. – Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir.

15   2008) (noting that "[m]arket power may exist in a lock-in case where once a customer buys one

16   product, he or she is locked in to buying another product because of the seller's rules"); *Xerox*

17   *Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 546-47 (S.D.N.Y. 2009) (noting that post-*Kodak*

18   decisions "establish that for a nonmonopolist producer of a durable good to be held to have

19   monopoly power in the aftermarket for parts, service, or supplies, a plaintiff generally must show

20   that (i) customers who own the good are 'locked in' by the prohibitive costs of switching to an

21   alternate product, and (ii) the lock-in permitted those customers to be exploited").  In the instant

22   case, hiQ has not explained how LinkedIn has exploited its locked-in *customers* (*i.e.*, users).

23   Indeed, hiQ does not appear to claim any exploitation of locked-in *customers*; instead, it suggests

24   that LinkedIn has used the lock-in to harm *people analytics providers*.  *See* Opp'n at 22.  Similar

25   to the problem with hiQ's tying argument, *see infra*, this is not a case whether the *same party*

26   lured to do business with the defendant is then evoked in to purchase additional products and

27   serving from that defendant.

28         The Court therefore finds the lock-in theory implausible and without precedent and

1    dismisses it.

2         4.    <u>Tying</u>

3         "A tying arrangement is 'an agreement by a party to sell one product but only on the

4    condition that the buyer also purchases a different (or tied) product, or at least agrees that he will

5    not purchase that product from any other supplier.'"[6]  *Eastman Kodak*, 504 U.S. at 461-62.  "[I]f

6    the seller has 'appreciable economic power' in the tying product market and if the arrangement

7    affects a substantial volume of commerce in the tied market," there is an antitrust violation.  *Id.* at

8    462.

9              "The essential characteristic of an invalid tying arrangement lies in
              the seller's exploitation of its control over the tying product to force
10             the buyer into the purchase of a tied product that the buyer either did
              not want at all, or might have preferred to purchase elsewhere on
11             different terms. When such 'forcing' is present, competition on the
              merits in the market for the tied item is restrained and the Sherman
12             Act is violated."

13   *Id.* at 464 n.9.

14        In the FAC, hiQ alleges that the tying product is LinkedIn's "professional social

15   networking platform" and the tied product is people analytics services.  FAC ¶ 125.  hiQ further

16   alleges that there is illegal tying because "LinkedIn has conditioned the provision of its dominant

17   professional social networking platform on the use of its people analytics services (or the non-use

18   of its competitors' people analytics services)."  FAC ¶ 126.

19        The tying claim, however, makes no sense.  hiQ has not explained how LinkedIn has

20   essentially forced employers to purchase LinkedIn's people analytics product (or forced employers

21   not to purchase other companies' comparable products) in order for the employers to use

22   LinkedIn's professional social networking platform.  Again, there are two different consumer

23   groups:  (1) those individuals who use LinkedIn's professional social network, and (2) employers

24

25   ───────────────
     [6] A tying theory is usually brought under § 1 of the Sherman Act instead of § 2.  *See, e.g.*,
26   *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1142-43 (10th Cir. 1997) ("hold[ing] that a
     contract between a buyer and seller satisfies the concerted action element of section 1 of the
27   Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement imposed by
     the seller[;] [t]he essence of section 1's contract, combination, or conspiracy requirement in the
28   tying context is the agreement, however reluctant, of a buyer to purchase from a seller a tied
     product or service along with a tying product or service").

United States District Court
Northern District of California

1    want to purchase people analytics products.  As noted above, there is no tying of products directed

2    at the same consumer group.

3         5.        Vertically-Arranged Boycotts

4         hiQ's theory of a vertical boycott suffers from a similar flaw as does its tying theory.

5    According to hiQ, "LinkedIn has induced, coerced, or otherwise forced LinkedIn members

6    (including without their knowledge) to boycott LinkedIn's competitors for the people analytics

7    service."  FAC ¶ 142.  But hiQ has failed to explain *how* LinkedIn was able to coerce its members;

8    there is no allegation that, *e.g.*, LinkedIn does not allow anyone to use its professional social

9    networking platform if he/she/it purchases people analytics services from hiQ or any other

10   provider.  In its opposition, hiQ argues that LinkedIn improperly prohibits its members from

11   sharing their information as they choose (contrary to what it represented to members to lure them

12   in).  But even if LinkedIn engaged in some kind of misconduct there, that does not explain how

13   any members were thereby forced to boycott hiQ's or other companies' people analytics services.

14        6.        Raising Rivals' Costs

15        In the FAC, hiQ alleges that, "[b]y foreclosing people analytics competitors' access to the

16   public employment information database on its site, LinkedIn raised those competitors' costs to do

17   business."  FAC ¶ 121.  As LinkedIn points out in its papers, this theory seems to be nothing more

18   than a unilateral refusal to deal, and this theory is problematic for the reasons discussed above.

19        In its opposition brief, hiQ tries to get around this problem by claiming that this theory is

20   based on both unilateral action by LinkedIn (a § 2 violation) *and* concerted action between

21   LinkedIn and its members (a § 1 violation).  *See* Opp'n at 18 (arguing that the refusal-to-deal

22   standard discussed above "applies only to *unilateral* conduct" and not to concerted conduct).

23   According to hiQ, this theory involves concerted action because LinkedIn's User Agreement

24   "prevent[s] people analytic providers [as users] from accessing [other] users' otherwise public

25   employment" and, by relying on the User Agreement, "LinkedIn artificially raised its people

26   analytics' competitors' costs and pushed them out of the market."  Opp'n at 19.  But the § 1 claim,

27   as pled in the FAC, is based only on tying and vertical boycotts.  *See* FAC ¶ 162 ("These

28   contracts, combinations, or conspiracies include but are not limited to tying arrangements and

19

1   vertically-arranged boycotts."). No viable Section 1 claim is stated. Even if that were not the

2   case, § 1 claims typically involve concerted action between multiple defendants or between a

3   defendant and a third party that harms the plaintiff – not concerted action between the defendant

4   and the plaintiff. hiQ cites no precedent for this novel theory.

5           7.    Leveraging

6           Finally, LinkedIn attacks the leveraging theory tendered by hiQ. With respect to

7   leveraging, hiQ alleges as follows in the FAC:

8               LinkedIn has used its monopoly power in [the market for
                professional social networking platforms] in a predatory,
9               exclusionary, and anticompetitive manner to monopolize the people
                analytics services market and exclude competitors from that market,
10              including but not limited to by means of lock-in, raising rivals'
                costs, tying, unilateral refusal to deal, denial of essential facilities,
11              and vertically-arranged boycotts.

12  FAC ¶ 114. LinkedIn argues that, based on the above allegation, the leveraging theory is simply a

13  derivative theory. LinkedIn emphasizes that the fact of leveraging, in and of itself, does not give

14  rise to a viable claim; rather, there must also be some anticompetitive conduct. *See Doe v. Abbott*

15  *Labs.*, 571 F.3d 930, 931 (9th Cir. 2009) (holding that "allegations of monopoly leveraging

16  through pricing conduct in two markets [does not] state a claim under § 2 of the Sherman Act,

17  absent an antitrust refusal to deal (or some other exclusionary practice) in the monopoly market or

18  below-cost pricing in the second market"). hiQ does not disagree that there be anticompetitive

19  conduct in order for there to be a viable leveraging theory. This makes sense because an antitrust

20  violation requires that there be anticompetitive conduct and leveraging by itself is not inherently

21  anticompetitive in nature.

22          Accordingly, as LinkedIn argues, the leveraging theory rises or falls with the other theories

23  identified above.

24          8.    Summary

25          For the foregoing reasons, the Court finds each theory of anticompetitive conduct

26  implausible. The Court further finds the majority of these theories futile. The only theories where

27  hiQ may be able to allege a plausible claim for relief are (1) the unilateral refusal to deal and (2)

28  the essential facilities doctrine. The Court shall allow amendment on these two theories, although

United States District Court
Northern District of California

20

1    it notes it is skeptical of the refusal-to-deal theory in light of the narrowness of the *Aspen Skiing*

2    exception.[7]

3                            III.        **CONCLUSION**

4          LinkedIn's motion to dismiss is granted in part and denied in part.

5          The motion to dismiss the interference claims is denied as they are not barred by the

6    *Noerr-Pennington* doctrine or the California litigation privilege.

7          The motion to dismiss the antitrust claims is granted.  hiQ has failed to adequately allege a

8    product market (*i.e.*, the people analytics market).  In addition, hiQ has failed to adequately allege

9    anticompetitive conduct.  The Court shall give hiQ leave to amend its antitrust claims, but only to

10   the extent they are based on the theories of unilateral refusal to deal and the essential facilities

11   doctrine.  The other theories are futile.

12         hiQ shall have four weeks to file an amended complaint.  LinkedIn shall have four weeks

13   thereafter to respond to the amended complaint.

14         This order disposes of Docket No. 137.

15

16         **IT IS SO ORDERED**.

17

18   Dated: September 9, 2020

19

20                                                          _____
21                                                          EDWARD M. CHEN
                                                            United States District Judge
22

23

24

25

26

27

---

28   [7] Because hiQ has not pled plausible anticompetitive conduct in the first place, the Court does not address LinkedIn's additional contention that hiQ has failed to adequately allege antitrust injury.