COREY WORCESTER (*pro hac vice*)
coreyworcester@quinnemanuel.com
RENITA SHARMA (*pro hac vice*)
renitasharma@quinnemanuel.com
QUINN EMANUEL URQUHART AND
SULLIVAN LLP
51 Madison Avenue, 22nd Floor New
York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

TERRY L. WIT (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND
SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for Plaintiff hiQ Labs, Inc.

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
ROBERT L. URIARTE (SBN 258274)
ruriarte@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
MARIA N. SOKOVA (SBN 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE
LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Defendant and Counterclaimant
LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301-EMC |
| Plaintiff, | **JOINT CASE MANAGEMENT STATEMENT** |
| vs. | The Hon. Edward M. Chen |
| LinkedIn Corp., | Hearing Date:    February 25, 2021 |
| Defendant. | Time:             10:30 a.m. |
| | Trial Date:        None Set |
| LinkedIn Corporation | |
| Counterclaimant, | |
| vs. | |
| hiQ Labs, Inc. | |
| Counterdefendant | |

Plaintiff hiQ Labs, Inc. ("hiQ") and Defendant/Counterclaimant LinkedIn Corporation ("LinkedIn") jointly submit this Joint Case Management Statement pursuant to the Standing Order for All Judges of the Northern District of California dated November 1, 2018, Civil Local Rule 16-9, and the Court's December 5, 2020 Order (ECF 173).

**1.      Jurisdiction and Service**

The parties agree that the Court has federal question jurisdiction over LinkedIn's affirmative claim and hiQ's declaratory judgment claim of no liability under the Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), and hiQ's declaratory judgment claim under the Digital Millennium Copyright Act (17 U.S.C. § 1201), because both are federal statutes.   LinkedIn notes that it has not pled a counterclaim under the DMCA and thus doubts whether there is subject matter jurisdiction in the form of an actual controversy over hiQ's declaratory relief claim under that statute.   hiQ believes there is subject matter jurisdiction over its declaratory judgment claim under the DMCA because there remains an actual controversy as LinkedIn stated in its May 23, 2017 demand letter that it believes hiQ's activities are a violation of the DMCA (ECF 131-4).   hiQ notes that LinkedIn failed to raise an issue regarding subject matter jurisdiction in its motion to dismiss (ECF 137).

The Court has supplemental jurisdiction over hiQ's state law claims and LinkedIn's state law counterclaims, as all of the state law claims arise out of the same common nucleus of operative facts as the federal claims.

The parties agree that personal jurisdiction and venue are proper in the Northern District of California.

No parties remain to be served.

**2.      Facts**

*(a)       hiQ's Statement*

The gravamen of this dispute is whether LinkedIn, the world's largest and most recognizable social networking platform, may lawfully prohibit hiQ, a tech startup that develops "people analytics" products that compete with LinkedIn's products, from accessing LinkedIn

1

members' publicly available profile data—data to which LinkedIn permits its *non-competitors* unfettered access.

These questions first arose on May 23, 2017, when LinkedIn sent hiQ the first in a series of cease-and-desist letters, ordering hiQ to stop accessing LinkedIn members' public profiles and asserting that hiQ's continued access to LinkedIn's website violated a litany of laws, including the Computer Fraud and Abuse Act ("CFAA"), the Digital Millennium Copyright Act, and California Penal Code § 502(c), and constituted common law trespass to chattels. LinkedIn's letter further indicated that it was protecting its members from hiQ's "copying" of their information. LinkedIn then altered its website to block hiQ's access to users' public profiles.

In its cease and desist letters, and also in this litigation, LinkedIn attempts to frame this dispute as one regarding internet privacy. But LinkedIn members *chose* to post this information publicly. Indeed, the public portion of LinkedIn users' profiles has long been one of the network's primary selling points, and LinkedIn's website and user agreement have long stated that the information users chose to make public remained theirs to provide to whomever viewed it online.

LinkedIn's conduct makes clear that LinkedIn is not attempting to protect its users' privacy, but its own market power. LinkedIn's cease-and-desist campaign, and its shutdown of hiQ's access to its website, began only when LinkedIn developed people analytics products that were a direct competitor of hiQ's products. And LinkedIn has not attempted to block third-party *non-competitors* (such as Google or Bing) from accessing its members' public data. LinkedIn's appeals to privacy concerns appear to be a convenient smokescreen to shield its anticompetitive conduct. LinkedIn's cease-and-desist letters, and its willingness to cut off hiQ's raw data supply for anticompetitive purposes, effectively eviscerated hiQ's business. hiQ lost 75% of its employees, watched its business valuation plummet, and lost investors and business opportunities, including major clients who specifically noted that they could no longer do business with hiQ because of LinkedIn's conduct.

hiQ seeks to recover the damages it suffered as a result of LinkedIn's unlawful conduct, as well as to obtain a declaration from the Court that hiQ has not violated and will not violate federal or state law by accessing and copying wholly public information from LinkedIn's website. hiQ

2

further seeks injunctive relief preventing LinkedIn from misusing the law to complete its attempted destruction of hiQ's business, and preventing LinkedIn from continuing to strangle competition by giving itself an unfair competitive advantage through unlawful and unfair business practices.

### b.   LinkedIn's Statement

LinkedIn's mission is to connect the world's professionals to make them more productive and successful.  Through its platform, LinkedIn allows its members to create, manage and post their professional histories and interests online.  At the heart of LinkedIn's platform are its members, whose LinkedIn profiles serve as their professional online identities.  Since its founding in 2002, LinkedIn has invested significant time, labor, skill, and resources (in the billions of dollars) developing its platform, which is available for free and provides value to hundreds of millions of users around the world.  LinkedIn's investment in the technical aspects of its platform includes not only computer hardware, software, and internet bandwidth, but an array of technological safeguards designed to protect platform integrity—both the technical infrastructure of the platform and the information residing on it.  Access to LinkedIn's platform requires authorization.  Every time a user attempts to open a member profile on the LinkedIn website, the user's computer sends a request to LinkedIn's data servers seeking access to the information on those servers.  Upon LinkedIn's grant of such access permissions, the webpage displays that member profile.  On the other hand, if LinkedIn's system determines that the request is improper or from a blocked IP address, LinkedIn's system denies access permission and the member profile will not be displayed.  LinkedIn's technical defenses currently block hundreds of millions of requests per day to access guest profiles.  Such access control is the only way that LinkedIn can do its part to ensure the information security and privacy of its members.   Protecting member privacy, including by honoring the limitations they place on distribution of their data, is one of LinkedIn's core value propositions and helps to maintain and grow its member base.

hiQ's automated software—known as "bots"—access LinkedIn's computers to scrape information from them, and then sell that data to hiQ's corporate clients who wish to monitor their employees.  According to hiQ's complaint, it originally used other data for its analytics

1   (something its competitors still do), but over time decided that it was easier to take data from

2   LinkedIn.  hiQ does not notify users when it takes their data, and unlike LinkedIn, makes no

3   enforceable commitment in a privacy policy or otherwise to LinkedIn's members regarding what it

4   will or will not do with their data once it is scraped or to whom it may sell or transfer it.  Nor is

5   there any way for LinkedIn members to "opt out" of hiQ's processing and selling of their data.

6   Prior to the Court's preliminary injunction order (which required LinkedIn to whitelist hiQ's

7   access to its servers), hiQ did not identify itself when it deployed bots to scrape LinkedIn's

8   computers and circumvented technical barriers that LinkedIn erected to prevent such scraping and

9   automated access.

10          Since hiQ filed its suit, information security online has taken on even clearer importance.

11   Information security scandals have included Clearview AI, a company that scraped billions of

12   pictures from social media and other websites without permission to fuel a facial recognition tool

13   sold to law enforcement and others, and Cambridge Analytica, a company that harvested and

14   misused user data from Facebook.  AI analysts worry that purloined datasets could be used to

15   create personalized phishing weapons.  Each day LinkedIn is faced with millions of requests and

16   must use every tool in its arsenal to allow legitimate uses while maintaining its capability to stop

17   the next AI trying to crack people's passwords.

18          hiQ's scraping of member data and product offerings interfere with and undermine the

19   consent provided by LinkedIn members.  Every social media user in this day and age must make

20   informed choices about what to share, how to share it, whom to share it with, and for what

21   purpose.  LinkedIn is responsible for explaining to its members how their data will be used and it

22   would be held accountable to them for any misuse.  hiQ is not.  Members make their profiles

23   *visible* to the public *on LinkedIn*, where they can alter or remove them—but that does not mean

24   they consent to any and all companies harvesting their data, storing it permanently in databases,

25   tracking their disclosures across time on one or many sites, and using the data for any purpose.

26          In short, as a scraper, hiQ is a data collector who has undertaken none of the obligations of

27   information governance.  Accordingly, on May 23, 2017, LinkedIn asked hiQ to stop scraping

28   member data from its servers without permission, and explicitly prohibited hiQ's access to

LinkedIn's servers under the CFAA.  hiQ responded by suing LinkedIn, claiming that it has an unfettered right to access LinkedIn's computers and gather data without member consent.  hiQ previously alleged that this cases is not just a suit about the letter that LinkedIn sent in 2017, but also about some nebulous plan to monopolize an entire ill-defined market, but the Court has since dismissed such claims  hiQ's unauthorized access to LinkedIn's computers is not supported or privileged under any source of law.  LinkedIn is the true plaintiff in this action, and it plans to vigorously protect the security of its members' information through its counterclaims and its defense of hiQ's anticipatory claims.

***Principal Factual Issues In Dispute.***

**hiQ believes the following are the principal factual issues in dispute:**

- LinkedIn's knowledge of hiQ's scraping activities prior to its decision to send hiQ the May 23, 2017 cease and desist letter;
- LinkedIn's motivations for sending hiQ the May 23, 2017 cease and desist letter;
- The timeline relating to LinkedIn's decision to create its own people analytics products that would compete with hiQ's products;
- The impact that LinkedIn's cease and desist letter had on hiQ's business development (including its impact on investor interest and commitments);
- The identities of other competitors in the people analytics space who received cease and desist letters similar to LinkedIn's May 23, 2017 letter to hiQ;
- Whether LinkedIn's stated reasons for attempting to preclude hiQ from accessing its members' public profile data are pre-textual;
- Whether LinkedIn's members with public profiles in fact believe that their publicly-available information is protected from access and use by third-parties;

**LinkedIn believes the following are the principal factual issues in dispute:**

- The methods that hiQ used to gain access to LinkedIn's computers and scrape data of LinkedIn's members, including the use of automated software or "bots," and whether hiQ was aware of or knowingly bypassed LinkedIn's technical measures;

- Whether the LinkedIn members whose data hiQ scrapes are aware that their data are being obtained by hiQ, repackaged, and sold to their employers;

- The extent to which hiQ informed LinkedIn that it was obtaining data from LinkedIn's computers, regarding the methods it used to obtain data from LinkedIn's computers, and regarding its existing and prospective contractual and business relationships;

- Whether LinkedIn entered into any agreements or made any affirmative statements to hiQ authorizing its scraping practices prior to sending its cease-and-desist letter;

- The risks of startups in general, hiQ's risky business model in particular, the risks of that business model independent of LinkedIn's May 23, 2017 cease and desist letter or any other actions taken by LinkedIn, the reasons some of its former employees may have departed, and the reasons that hiQ had difficulty signing customers or raising money and investments (including all of the reasons why hiQ's business has failed if indeed it has);

- The harm, if any, hiQ has suffered based on hiQ's decision to stop scraping LinkedIn data for a period of two weeks after hiQ received a cease-and-desist letter from LinkedIn;

- The risks created by hiQ and other data harvesters who avoid responsibility to social media users for misuse of their data;

- The harm to LinkedIn and its members from unauthorized access by hiQ and other data harvesters seeking to circumvent LinkedIn's information security controls.

**3.      Legal Issues**

The parties dispute a number of legal issues, including:

- Whether hiQ's continued access to LinkedIn's website violates either the "unauthorized access" and/or the "exceeds authorized access" provisions of the CFAA;

- Whether there is presently an actual controversy regarding the DMCA, and if so, whether hiQ's continued access to LinkedIn's website violates the DMCA;

- Whether hiQ is obliged to either cease using the LinkedIn website or be bound by the terms of the User Agreement in doing so;

6

- Whether hiQ's continued access to LinkedIn's website constitutes trespass to chattels;
- Whether hiQ's collection of member data from LinkedIn's website constitutes common law misappropriation and violates California Penal Code §502;
- Whether any of LinkedIn's claims are preempted by the California Uniform Trade Secrets Act;
- Whether the California Penal Code § 502 is simply coextensive with the CFAA or has a broader scope, whether it applies to public profile pages on the LinkedIn website and, if it does apply, whether hiQ's access to such profiles violates the statute;
- Whether hiQ has stated a claim for unfair competition in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;
- Whether hiQ has stated a claim for fraudulent competition in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;
- Whether hiQ has stated a claim for intentional interference with contract;
- Whether hiQ has stated a claim for intentional interference with prospective economic advantage;
- Whether any of hiQ's claims are preempted by the CFAA or California Penal Code § 502; and
- Whether hiQ breached the LinkedIn User Agreement, which specifically prohibits automated access and scraping.

### 4. Motions

hiQ filed a complaint and motion for a temporary restraining order on June 7, 2017 (ECF Nos. 1, 3). On June 9, 2017, hiQ withdrew its motion for a temporary restraining order without prejudice to allow discussion among the parties (ECF No. 15); however, those discussions did not prove fruitful, and hiQ renewed its motion on June 22, 2017. (ECF No. 23). On June 26, 2017, LinkedIn opposed hiQ's motion (ECF No. 31), and hiQ replied to that opposition on June 27, 2017 (ECF No. 33). The Court held a hearing on July 27, 2017, and on August 14, 2017, the Court granted hiQ's motion for a preliminary injunction. (ECF No. 63). The Ninth Circuit affirmed the Court's order granting hiQ a preliminary injunction. (ECF No. 114). LinkedIn's petition for a

writ of certiorari with the Supreme Court of the United States regarding the Ninth Circuit's holding in its opinion regarding the applicability of the CFAA to the scraping of public (i.e., non-password protected) websites has been held over repeatedly since it was first distributed for conference in October.  It remains pending.  LinkedIn believes at this point that it has been held pending the outcome of *Van Buren v. United States*, 140 S.Ct. 2667 (April 20, 2020), argued on November 30, 2020, which concerns interpretation of certain provisions of the CFAA.

Pursuant to the current Court-ordered scheduling order (ECF No. 129), hiQ filed an amended complaint on February 14, 2020 (ECF No. 131), and LinkedIn moved to dismiss hiQ's new Sherman Act claims and its damages claims (ECF No. 137).  The Court held a hearing on August 20, 2020 and, on September 9, 2020, granted in part and denied in part LinkedIn's motion to dismiss (ECF No. 158).

On November 20, 2020, LinkedIn filed an answer to hiQ's First Amended Complaint, asserting counterclaims for (1) violation of the CFAA, (2) violation of California Penal Code § 502(c), (3) breach of contract, (4) misappropriation,  and (5) trespass to chattels (ECF 170).  On January 18, 2021, hiQ moved to dismiss LinkedIn's counterclaims (ECF 182).   Pursuant to a stipulation between the parties, LinkedIn has until March 4, 2021 to oppose hiQ's motion (ECF 181).

The parties anticipate there may be future discovery and dispositive motions, but do not have any additional motions to report.

5.   **Amendment of Pleadings**

hiQ filed an Amended Complaint on February 14, 2020.  Pursuant to paragraph 1 of the current Court-ordered scheduling order (ECF No. 129), hiQ no longer can amend its complaint as of right.  hiQ reserves the right to seek to amend the pleadings based on additional information that may be obtained through discovery.  LinkedIn does not presently intend to amend its Answer and Counterclaims unless such a request becomes relevant in the context of the briefing and argument of the motion to dismiss counterclaims.

8

1    **6.     Evidence Preservation**

2    Both hiQ and LinkedIn have reviewed the Guidelines Relating to the Discovery of

3  Electronically Stored Information ("ESI Guidelines"), and met and conferred in September 2017

4  pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve

5  evidence relevant to the issues reasonably evident in this action.

6    **7.     Disclosures**

7    Pursuant to paragraph 5 of the current Court-ordered scheduling order (ECF No. 129),

8  initial disclosures are set to be exchanged either (i) 10 days after the date the Supreme Court issues

9  an order denying LinkedIn's certiorari petition, or (ii) if the Supreme Court grants LinkedIn's

10  certiorari petition, 10 days after the Supreme Court issues an opinion on the merits in the case or

11  otherwise disposes of the petition.

12    **8.     Discovery**

13    Pursuant to paragraph 3 of the current Court-ordered scheduling order (ECF No. 129),

14  discovery is currently stayed until either (i) 10 days after the date the Supreme Court issues an

15  order denying LinkedIn's certiorari petition, or (ii) if the Supreme Court grants LinkedIn's

16  certiorari petition, 10 days after the Supreme Court issues an opinion on the merits in the case or

17  otherwise disposes of the petition.

18    The parties agree that the Court should defer entering a scheduling order until after the

19  expiration of the current discovery stay.  The parties propose that they submit a proposed

20  scheduling order upon the expiration of the discovery stay.

21    **9.     Class Actions**

22    This case is not a class action.

23    **10.    Related Cases**

24    On February 22, 2018, this Court entered an order to the effect that *3taps, Inc. v. LinkedIn*

25  *Corp.*, No. 4:18-cv-00855-NC, filed on February 8, 2018, is ordered related to this matter under

26  Civil Local Rule 3-12. (ECF No. 102).  The *3taps* case, like this case, raises the question of

27  whether LinkedIn can invoke the CFAA to prevent scraping of its website.  The parties are not

28  aware of any other related cases.

11.    **Relief**

hiQ's Amended Complaint (ECF No. 131) seeks the following relief:

- A declaration that LinkedIn is now and shall remain obligated to continue to permit hiQ to access and use data from public LinkedIn member public profiles;

- A declaratory judgment that hiQ has not violated the DMCA, CFAA, or California Penal Code § 502(c) or committed common law trespass;

- Any direct damages proximately caused by LinkedIn's conduct described therein;

- Any consequential damages proximately caused by LinkedIn's conduct described therein;

- Punitive damages;

- hiQ's attorneys' fees and costs incurred in pursuing its claims, as permitted by law;

- Pre-judgment and post-judgment interest; and

- Any such other and further relief as the Court deems just and proper.

LinkedIn denies that hiQ is entitled to any relief, and for its Counterclaim (ECF No. 170) seeks the following relief:

- A permanent injunction prohibiting hiQ from accessing, using, or copying data from LinkedIn's servers;

- A declaration requiring hiQ to abide by LinkedIn's User Agreement and finding that any future effort by hiQ to scrape member data without authorization would violate the relevant federal and state laws specified herein;

- An order for destruction of all data wrongfully obtained by hiQ from LinkedIn's website, along with any derivatives thereof including any derivative data or any models created using the data;

- An award to LinkedIn of damages and disgorgement of hiQ's profits, if any, from its unlawful activity;

- Punitive damages;

- Costs of suit, including reasonable attorneys' fees as permitted by law;

- Any such other and further relief as the Court deems just and proper.

**12.** **Settlement and ADR**

The parties conducted a settlement conference before a Magistrate Judge Ryu in February 2018.  The case did not settle.  The parties have had conversations regarding settlement since the last CMC and are contemplating next steps but have not yet come to any agreement.

**13.** **Consent to Magistrate Judge for All Purposes**

The parties did not consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment.  Currently, there is not a magistrate judge assigned to the matter.

**14.** **Other References**

The parties agree that this case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**15.** **Narrowing of Issues**

In hiQ's view, its motion to dismiss is the only mechanism through which issues can be narrowed at this time, but reserves the right to suggest additional ways to narrow issues depending on how the case progresses.

In LinkedIn's view, hiQ should dismiss its claim for declaratory relief under the DMCA since there is no present controversy regarding that issue.

The parties will work together in good faith to develop suggestions to expedite the presentation of evidence at trial.

**16.** **Expedited Trial Procedure**

The parties agree that this case is not amenable to expedited trial.

**17.** **Scheduling**

As explained in Section 8 (Discovery) above, the parties agree that they should defer submitting a proposed scheduling order until the expiration of the current stipulated discovery stay.

**18.** **Trial**

Both parties have requested a jury trial for the issues so triable.  Depending on which claims and defenses proceed to trial, LinkedIn estimates that trial could last between seven (7) and

twenty days (20), whereas hiQ estimates that trial could last between seven (7) and ten (10) days. LinkedIn asserts that hiQ is not entitled to a jury trial on its equitable claims.

**19.     Disclosure of Non-Party Interested Entities or Persons**

The parties have filed their certifications of interested entities or persons.  LinkedIn refers the Court to its certificate of interested entities which it filed on June 28, 2017 (ECF No. 36).  hiQ refers the Court to its amended certificate of interested entities, which it filed under seal on August 12, 2020 (ECF 148).

**20.     Professional Conduct**

The parties certify that all attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

**21.     Other**

None.

Dated:  February 18, 2021

QUINN EMANUEL URQUHART AND SULLIVAN LLP

By:     */s/ Corey Worcester*

Corey Worcester (*pro hac vice*)

*Attorneys for Plaintiff hiQ Labs, Inc.*

Dated:  February 18, 2021

ORRICK HERRINGTON & SUTCLIFFE

By:     */s/ Annette Hurst*

Annette Hurst

*Attorneys for LinkedIn Corp.*

**N.D. Cal. Civil Local Rule 5-1 Attestation**

I,  Terry Wit, am the ECF user whose credentials were utilized in the electronic filing of this document.  In accordance with N.D. Cal. Civil Local Rule 5-1, I hereby attest that Annette Hurst concurred in the filing of this document.

*/s/ Terry Wit*

Terry Wit