ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
ROBERT L. URIARTE (SBN 258274)
ruriarte@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
MARIA N. SOKOVA (SBN 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for LinkedIn Corporation*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>              Plaintiff,<br><br>      vs.<br><br>LinkedIn Corporation,<br><br>              Defendant. | Case No. 17-cv-03301-EMC<br><br>**LINKEDIN'S OPPOSITION TO HIQ'S MOTIONS TO DISMISS AND STRIKE COUNTERCLAIMS**<br><br>Judge:          Hon. Edward M. Chen<br>Hearing date:  April 8, 2021<br>Hearing time:  1:30 p.m. |
| LinkedIn Corporation<br><br>              Counterclaimant,<br>      vs.<br><br>hiQ Labs, Inc.<br><br>              Counterdefendant, | |

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION AND SUMMARY OF ARGUMENT** ..................................................- 1 -

**FACTUAL ALLEGATIONS** ............................................................................................. 3

    A.    LinkedIn Has A Network Of Users Who Count On LinkedIn To Protect Their Data. . 3

    B.    hiQ Disregards and Circumvents LinkedIn's Restrictions ........................................... 4

    C.    hiQ's Contractual Obligations ..................................................................................... 5

    D.    Scraping On LinkedIn's Website Causes LinkedIn Significant Harm. ........................ 6

**ARGUMENT** .................................................................................................................... 6

**I.**    **HIQ'S MOTION TO STRIKE IS MERITLESS.** .................................................... 7

**II.**    **LINKEDIN'S COUNTERCLAIMS ARE SUFFICIENTLY PLED.** ........................... 9

    A.    LinkedIn Properly Pleads A Section 502 Claim. ....................................................... 9

    B.    LinkedIn's CFAA Claims Should Not Be Dismissed. ............................................... 12

        1.    LinkedIn States A "Without Authorization" CFAA Claim. .................................. 12

        2.    LinkedIn Pleads an "Exceeds Authorized Access" Claim. ..................................... 18

    C.    LinkedIn Sufficiently Pleads Common Law Misappropriation. .................................. 19

        1.    hiQ Misappropriated LinkedIn's Proprietary Interest. ............................................. 19

        2.    CUTSA Supersession Does not Apply. .................................................................. 22

    D.    LinkedIn Sufficiently Alleges Trespass to Chattels. .................................................. 24

**CONCLUSION** ................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AccuImage Diagnostics Corp v. Terarecon, Inc.*,
   260 F. Supp. 2d 941 (N.D. Cal. 2003) ................................................................. 23

*Am. Civil Liberties Union v. U. S. Dept. of Justice*,
   750 F.3d 927 (D.C. Cir. 2014) ........................................................................... 17

*Am. Econ. Ins. Co. v. Reboans, Inc.*,
   852 F. Supp. 875 (N.D. Cal.), *on reconsideration,* 900 F. Supp. 1246 (N.D.
   Cal. 1994) ...................................................................................................... 20

*Arc of California v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) ............................................................................. 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 9

*Brodsky v. Apple Inc*,
   445 F. Supp. 3d 110 (N.D. Cal. 2020) ........................................................... 11, 14

*Builders Corp. of Am. v. United States*,
   259 F.2d 766 (9th Cir. 1958) ........................................................................... 12

*Compulife Software, Inc. v. Newman*,
   959 F.3d 1288 (11th Cir. 2020) ....................................................................... 17

*Couponcabin LLC v. Sav..com, Inc.*,
   2016 U.S. Dist. LEXIS 74369 (N.D. Ind. 2016) ................................................. 14

*Craigslist Inc. v. 3Taps Inc. et al*,
   964 F. Supp. 2d 1178 (N.D. Cal. 2013) ................................................. 14, 15, 16, 17

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) ........................................................................... 8

*Doe v. Shurtleff*,
   628 F.3d 1217 (10th Cir. 2010) ....................................................................... 16

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
   449 F. Supp. 3d 1024 (W.D. Wash. 2020) ....................................................... 15

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
   781 F. App'x 604 (9th Cir. 2019) (unpublished) .............................................. 7, 18

*eBay, Inc. v. Bidder's Edge, Inc.*,
   100 F. Supp. 2d 1058 (N.D. Cal. 2000) ........................................................... 25

*EF Cultural Travel BV v. Zefer Corp.*,
318 F.3d 58 (1st Cir. 2003) ............................................................................ 14

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020).................................................................... 16, 17

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016).......................................................... 12, 14, 15

*hiQ Labs, Inc. v. LinkedIn Corp.*,
273 F. Supp. 3d 1099,1109 (N.D. Cal. 2017), *aff'd and remanded,* 938 F.3d
985 (9th Cir. 2019) ........................................................................................ 12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985 (9th Cir. 2019).................................................................*passim*

*Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*,
151 Cal.App.4th 631 (2007).......................................................................... 21

*Int'l News Serv. v. Associated Press*,
248 U.S. 215 (1918) ...................................................................................... 20

*Integral Dev. Corp. v. Tolat*,
675 F. App'x 700 (9th Cir. 2017) (unpublished) ......................................... 22

*Intel Corp. v. Hamidi*,
30 Cal.4th 1342,1355–57 (2003) ................................................................. 25

*K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*,
171 Cal.App.4th 939 (2009)..................................................................... 22, 23

*Levy v. Only Cremations for Pets, Inc.*,
57 Cal.App.5th 203 (2020)............................................................................ 24

*Lifeline Food Co. v. Gilman Cheese Corp.*,
2015 WL 2357246 (N.D. Cal. May 15, 2015) ............................................. 23

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009)...................................................................... 15

*Miller v. 4Internet*,
LLC, 471 F. Supp. 3d 1085 (D. Nevada 2020) ........................................... 14

*Multiven, Inc. v. Cisco Sys., Inc.*,
725 F. Supp. 2d 887 (N.D.Cal. 2010) .......................................................... 11

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F. Supp. 3d 816 (N.D. Cal. 2014) ........................................................... 23

*Nexsales Corp. v. Salebuild, Inc.*,
    2012 WL 216260 (N.D. Cal. Jan. 24, 2012) ........................................................ 11

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014)................................................................................ 7

*NovelPoster v. Javitch Canfield Grp.*,
    140 F. Supp. 3d 954 (N.D. Cal. 2014) .................................................................. 12

*Oracle USA, Inc. v. Rimini St., Inc.*,
    879 F.3d 948 (9th Cir. 2018), *rev'd in part,* 139 S. Ct. 873 (2019)................................ 11, 12

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019), *cert. denied,* 140 S. Ct. 937 (2020) ...................... 17

*People v. Camacho*,
    23 Cal. 4th 824 (2000) ........................................................................................ 16

*People v. Childs*,
    220 Cal. App. 4th 1079 (2013)........................................................................ 10, 11

*People v. Lawton*,
    48 Cal. App. 4th Supp. 11 (1996) ....................................................................... 11

*People v. Tillotson*,
    157 Cal. App. 4th 517 (2007)................................................................................. 9

*Pollstar v. Gigmania, Ltd.*,
    170 F. Supp. 2d 974 (E.D. Cal. 2000).................................................................. 21

*QVC, Inc. v. Resultly, LLC*,
    159 F. Supp. 3d 576 (E.D. Pa. 2016) ................................................................... 14

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't
    of Agr.*,
    499 F.3d 1108 (9th Cir. 2007)................................................................................ 8

*Register.com, Inc. v. Verio, Inc.*,
    126 F. Supp. 2d 238 (S.D.N.Y. 2000), *aff'd as modified,* 356 F.3d 393 (2d Cir.
    2004) .................................................................................................................... 14

*Rodriguez v. SGLC Inc.*,
    2013 U.S. Dist. LEXIS 180409 (E.D. Cal. Dec. 23, 2013).................................... 8

*Royal Truck & Trailer Sales & Serv. v. Kraft*,
    974 F.3d 756 (6th Cir. 2020)................................................................................ 10

*Sandvig v. Barr*,
    451 F. Supp. 3d 73 (D.D.C. 2020) ....................................................................... 14

iii

1
2
*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010) ........................................................................................... 22
3
*SunPower Corp. v. SolarCity Corp.*,
   2012 WL 6160472 (N.D. Cal. Dec. 11, 2012) ................................................................. 21
4
5
*Sw. Airlines Co. v. Farechase, Inc.*,
   318 F. Supp. 2d 435 (N.D. Tex. 2004) ............................................................................. 14
6
*Thrifty-Tel, Inc. v. Bezenek*,
7
   46 Cal. App. 4th 1559 (1996) ........................................................................................... 24
8
*Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*,
   315 F. Supp. 3d 1147 (C.D. Cal. 2018) ............................................................................ 11
9
*Ticketmaster LLC v. RMG Techs., Inc.*,
10
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) ............................................................................ 14
11
*United States Golf Ass'n v. Arroyo Software Corp.*,
   69 Cal.App.4th 607 (Cal. Ct. App. 1999) ........................................................... 20, 21, 22, 24
12
13
*United States v. Alexander*,
   106 F.3d 874 (9th Cir. 1997) ............................................................................................. 8
14
*United States v. Chen*,
15
   2020 U.S. Dist. LEXIS 210476 (N.D. Cal. Nov. 10, 2020) ........................................ 18, 19
16
*United States v. Christensen*,
   828 F.3d 763 (9th Cir. 2016) ............................................................................ 2, 9, 11, 14
17
18
*United States v. Jones*,
   565 U.S. 400 (Sotomayor, J., concurring) ........................................................................ 17
19
20
*United States v. Lowson*,
   2010 U.S. Dist. LEXIS 145647 (D.N.J. Oct. 12, 2010) .................................................. 14
21
*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ................................................................................ 10, 18, 19
22
*United States v. Nosal (Nosal II)*,
23
   844 F.3d 1024 (9th Cir. 2016) ..................................................................................... 14, 15
24
*Van Buren v. United States*
   No. 19-783 (filed Dec. 18, 2019). .................................................................................... 18
25
26
*WhatsApp Inc. v. NSO Grp. Techs., Ltd.*,
   2020 U.S. Dist. LEXIS 125628 (N.D. Cal. July 16, 2020) .............................................. 19
27
*Wood v. Snider*,
28
   187 N.Y. 28 (1907) ........................................................................................................... 16

*X17, Inc. v. Lavandeira*,
  563 F. Supp. 2d 1102 (C.D. Cal. 2007)...................................................................... 21

**Statutes**

Cal. Civil Code § 3426.......................................................................................... *passim*

Cal. Penal Code § 502............................................................................................ *passim*

Federal Rule of Civil Procedure, Rule 12 ........................................................ 2, 7, 9, 17

U.S. Code, Title 18
  § 1030............................................................................................................ *passim*
  § 2511(2)(g) .......................................................................................................... 17
  § 2701 ................................................................................................................... 17

U.S. Code, Title 5
  § 552 ..................................................................................................................... 16

**Other Authorities**

75 Am. Jur. 2d Trespass § 40 ............................................................................... 16

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

2      Much has changed since the Court's preliminary injunction ruling in this case.  The risks

3  of potential data misuse have become a daily drumbeat in headlines such as "The Secretive

4  Company that Might End Privacy as We Know It," *New York Times*, January 18, 2020,

5  "Facebook data misuse and voter manipulation back in the frame with latest Cambridge Analytica

6  leaks," *TechCrunch*, January 6, 2020, "This is how we lost control of our faces," *MIT Technology*

7  *Review*, February 5, 2021, or "New AI deepfake app creates nude images of women in seconds,"

8  *The Verge*, June 27, 2019, and "The rising trend of personalized phishing attacks," *T_HQ*,

9  February 13, 2019.  LinkedIn's efforts to combat misuse of its member data to fuel rogue

10  machine learning tools have become ever more demanding.  When all of this started, the volume

11  of scraping attempts on LinkedIn's website reached 95 million requests per day.  That number has

12  grown dramatically, and today LinkedIn blocks hundreds of millions of requests.  LinkedIn's

13  systems and dedicated security personnel turn back more unauthorized guest profile requests than

14  they permit authorized guest profile requests every day.  LinkedIn's Counterclaims in this action

15  are nothing less than an effort to vindicate its right to protect its technical infrastructure and the

16  right of its members to give limited consent to the use of their data.

17      Meanwhile, the scope of hiQ's concerns has been revealed as exceedingly narrow.  hiQ

18  was unable to plead any antitrust theory, let alone a plausible market for so-called "people

19  analytics."  hiQ seeks only to vindicate its parochial interest in its ability to scrape data off of the

20  LinkedIn platform, and leverage the harvested data for its own business interests, even where it

21  violates individuals' rights to control their personal data and harms LinkedIn's infrastructure.

22  Thus, hiQ would leave everyone exposed to an ever-increasing set of risks of data manipulation,

23  as its Motions to Dismiss and Strike lay bare its view that civil law has no role in regulating

24  information governance and consent.  In hiQ's view, once LinkedIn's members have decided,

25  subject to a User Agreement, to engage in selective publication of their data for limited purposes,

26  they and LinkedIn have no right to any further control of that information.  Under hiQ's

27  approach, LinkedIn would have no right to police the boundaries of its own infrastructure, nor the

28  information residing on it; in other words, there would be no claim by which LinkedIn can stop

OPP. TO MTD AND MTS COUNTERCLAIMS
17-cv-03301-EMC

the unauthorized collection and misuse of its member data.  The Court should reject hiQ's dystopian view that eschews any role for private actors in supporting information governance—hiQ's position that LinkedIn has no remedy in contract, tort, or statute is not only incorrect, it has sweeping implications that would leave vast swaths of the internet unprotected.

In all events, LinkedIn should be permitted to develop a full factual record so that the Court can make an *informed* judgment about how best to balance these competing risks.  After all, this case is still in its infancy as a procedural matter: LinkedIn has taken no discovery, and there are open factual questions about, for example, whether hiQ ever engaged in "logged-in" scraping, how many IP addresses hiQ used, the scope of hiQ's scraping, and how hiQ used the data.  LinkedIn's claims cannot properly be resolved on a Rule 12 motion.

*First*, hiQ's motion to strike is meritless.  hiQ continues to access LinkedIn with knowledge of LinkedIn's User Agreement, and is therefore liable for ongoing breach of contract. Part I, *infra*.

*Second*, LinkedIn's Section 502 claims are sufficiently pled.  hiQ's cursory argument ignores the language of the statute, California case law, and the Ninth Circuit's acknowledgement in *United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016) that a 502 claim "does not require unauthorized access."  Part II(A), *infra.*

*Third*, LinkedIn's CFAA claims are sufficiently pled.  Unresolved questions pending in the Supreme Court render a Rule 12 dismissal inappropriate.  Setting those aside, LinkedIn alleges that hiQ scraped servers that are not "open to all comers," and that hiQ circumvented technical barriers to do so.  These allegations are sufficient under existing law.  Part II(B), *infra*.

*Fourth*, LinkedIn has pled a cognizable misappropriation claim.  California recognizes the misappropriation tort in contexts where other intellectual property law does not apply, as confirmed by cases that postdate its Uniform Trade Secrets Act.  Part II(C), *infra*.

*Fifth,* LinkedIn has pled the harm element required to state a claim for trespass to chattels.  A computer owner need not wait until its systems are overrun to have a claim.  Part II(D), *infra*.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FACTUAL ALLEGATIONS

**A.      LinkedIn Has A Network Of Users Who Count On LinkedIn To Protect Their Data.**

LinkedIn is a social network with over 700 million members around the globe. Counterclaims ("CC") ¶ 1.  LinkedIn's mission is to create economic opportunity for every member of the global workforce and, by connecting them, to make professionals more productive and successful.  *Id.*  LinkedIn's platform is made up of its members, who provide profile information to build their professional online identifies.  *Id.* ¶ 2.  LinkedIn members have control over the information they choose to publish about themselves.  When members delete information from their profiles, LinkedIn deletes that information, too.  *Id.* ¶ 3.  In order to communicate clearly and on binding terms how member data is treated—as well as how the public may use LinkedIn's website and the information viewable therein—LinkedIn publishes a User Agreement, Privacy Policy, and Cookie Policy.  *Id.* ¶ 21.

The LinkedIn User Agreement by its terms applies not only to its members, but also anyone else who accesses LinkedIn's website.  *Id.* ¶ 51.  The User Agreement expressly prohibits—and has prohibited since long before this dispute—scraping LinkedIn's website. Prohibited scraping includes "automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider'" LinkedIn's website.  *Id.* ¶¶ 48–49.  The User Agreement likewise prohibits using automated methods to access the website, copying information of others through automated means, and trading on access to LinkedIn's website or the data contained therein.  *Id.* ¶ 49.  That continues to include hiQ, since only a few weeks ago it served a letter on LinkedIn demanding that it be granted ongoing access through a new set of IP addresses.  Uriarte Decl. Ex. 1.

Although the terms of the User Agreement are clear and binding on all who access LinkedIn's website, many parties, like hiQ, disregard those limitations and attempt to use LinkedIn's website in prohibited ways and by prohibited means.  In order to enforce its User Agreement and meet expectations of its members, LinkedIn "employs an array of technological safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from

accessing and copying its members' data on a large scale", employing a "dedicated team of engineers whose full-time job is to detect and prevent scraping, and maintain LinkedIn's technical defenses."  CC ¶ 24.  In other words, "LinkedIn's website and servers are not unconditionally open to the general public.  Rather, each call to LinkedIn's servers requires LinkedIn to authorize or permit the party seeking access to LinkedIn's servers," which are "protected by sophisticated defenses designed to prevent unauthorized access and abuse that evaluate whether to grant each request made to LinkedIn's servers."  These defensive barriers to access "*reject[] more requests* to access guest profiles (i.e. denies authorization or permission to obtain information from LinkedIn's servers*) than they authorize*." *Id.* ¶ 25 (emphasis added).  "LinkedIn has restricted over 100 million IP addresses that have attempted to access LinkedIn's servers in ways that challenge or circumvent LinkedIn's technical defenses." *Id.* ¶ 27.

These measures are essential to meeting the expectations of LinkedIn's members that they have a right to control their personal data.  *See, e.g.*, *id*. ¶ 7.  These measures are also essential to ensuring that LinkedIn's infrastructure is available for serving legitimate needs of members.  *Id.* ¶¶ 53, 83.  The User Agreement is at the heart of LinkedIn's ability to provide security, stability, and governance of member information.

### B.    hiQ Disregards and Circumvents LinkedIn's Restrictions

hiQ is exactly the kind of data scraper that undermines the trust that LinkedIn members place in LinkedIn to safeguard their personal data.  CC ¶ 8.  Although the full extent of hiQ's scraping conduct remains unknown because discovery has not started in this case, *id*. ¶ 64, it is known that sometime before 2017, hiQ deployed automated "bots" secretly to "extract and copy data from hundreds of thousands of LinkedIn pages at a rate far faster than any human could," and that hiQ had to "circumvent LinkedIn's technical barriers" in order to do so. *id.* ¶¶ 6, 68 ("hiQ's bots are sophisticated and programmed in ways to evade LinkedIn's technical defenses" and have "made millions of calls to LinkedIn's servers.").

LinkedIn uses numerous safeguards to protect its website.  At the most basic level, much of LinkedIn's information is behind a password wall.  *Id.* ¶ 34.  Even for data viewable without a password, LinkedIn has implemented over 200 custom rules to detect and prevent scraping, and

has blocked over 100 million IP addresses that it suspects were being used by data scrapers. LinkedIn protects its website using the FUSE system.  CC ¶ 6.  LinkedIn also controls access via its FUSE system, which scans and imposes a limit on the activity that an individual LinkedIn member may initiate on the site; this limit is intended to prevent would-be data scrapers utilizing automated technologies from quickly accessing a substantial volume of member profiles."  CC ¶ 26.  Similarly, the Member Request Scoring System monitors page requests made by LinkedIn members while logged into their accounts.  If high levels of activity are detected for certain types of accounts, the member is logged out and may either be warned, restricted, or challenged with a CAPTCHA in order to log back into LinkedIn."  CC ¶ 31. "Another protection measure is LinkedIn's Sentinel system, through which LinkedIn's defenses scan, throttle, and block suspicious activity associated with particular accounts and IP addresses."  *Id.* ¶ 27.   hiQ circumvented these technological barriers.  *Id.* ¶ 90.

In some instances, hiQ's collection and dissemination of data from LinkedIn's website directly undermines the privacy expectations of LinkedIn's members.  One privacy control that LinkedIn offers is the "Do Not Broadcast" setting.  *Id.* ¶ 57.  When a user enables this setting, the member's updates to their profile will not be broadcast to the LinkedIn network or anywhere else. *Id.*  The feature was implemented to protect member privacy when members were updating their profiles in the course of looking for a new job and to avoid tipping off their current co-workers and employers.  *Id.*  Over 88 million members have availed themselves of this protection.  *Id.* ¶ 61.  hiQ expressly aims to make this very information public.  It offers a product called Keeper, which surreptitiously surveils and reports every change that members make to their LinkedIn profiles.  *Id.* ¶ 9.  Not only is this type of surveillance impossible without scraping and circumventing LinkedIn's technological protection measures, it specifically flags LinkedIn members that might be a "flight risk" to their current employers, defeating the protection of the "Do Not Broadcast" setting.  *Id.* ¶ 9.[1]

---

[1] Unlike hiQ's "Keeper" product, "[w]hen members select 'Do Not Broadcast,' LinkedIn respects this choice in its other products, such as Recruiter."  CC ¶ 61.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1

## C.     hiQ's Contractual Obligations

2        At all relevant times, hiQ has been subject to the LinkedIn User Agreement.  hiQ agreed

3   to abide by the terms of the User Agreement when it expressly agreed to those terms on multiple

4   occasions.  CC ¶¶ 37–48 (detailing notice of and consent to the User Agreement).

5        In May and June of 2017, LinkedIn sent hiQ a cease-and-desist letter demanding that hiQ

6   stop scraping LinkedIn, explaining that hiQ's conduct violated its agreement with LinkedIn and a

7   host of state and federal laws; LinkedIn also implemented targeted IP address blocks against hiQ.

8   CC ¶ 11.  Despite receiving additional direct notice of the User Agreement, hiQ continued to

9   insist that it could lawfully access LinkedIn's website and scrape data in violation of its terms.

10  As recently as January 2021, hiQ asked LinkedIn to "whitelist" (i.e., authorize access to)

11  additional IP addresses that it uses to scrape data from LinkedIn's website.  Uriarte Decl. Ex. 1.

12  Since the terms of the User Agreement apply to anyone who uses LinkedIn's website, hiQ

13  remains subject to the User Agreement terms and is continuing to knowingly violate those terms.

14  *See* CC ¶ 51.

15

## D.     Scraping On LinkedIn's Website Causes LinkedIn Significant Harm.

16        Although scraping has always been a problem for LinkedIn, the volume of attempted

17  scraping has grown substantially in recent years, including since this lawsuit was filed.  CC ¶ 82.

18  Around the time LinkedIn's dispute with hiQ began, outside actors attempted to scrape

19  LinkedIn's website approximately 95 million times per day.  That figure now has reached

20  hundreds of millions of blocked requests per day.  CC ¶¶ 82, 84.  Although any particular scraper

21  might start small, if it is successful it will invariably expand its operations and increase the

22  demand on LinkedIn's servers as it mines valuable data for free.  In the aggregate, automated

23  scrapers place a substantial burden on LinkedIn's infrastructure and place a commensurate

24  financial burden on LinkedIn.  CC ¶ 83.  If hiQ is allowed to continue scraping LinkedIn's

25  website with impunity, other scrapers will follow as they seek to acquire LinkedIn's valuable

26  member data at little or no cost.  CC ¶ 83.  Absent legal means to limit scraping and protect

27  LinkedIn's servers, LinkedIn's cost of attempting to prevent unauthorized scraping will exceed

28  LinkedIn's cost of providing services to its users.  *Id.* ¶¶ 84–85.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1

## **ARGUMENT**

2       Although this case has been pending for some time, procedurally it is in its infancy.  There

3   has been no discovery: no disclosures, no document production, no deposition testimony.  hiQ's

4   assertions during the preliminary injunction process have not been tested through the adversary

5   process.  Whether hiQ ever engaged in "logged-in" scraping is an open question.  Moreover, we

6   do not yet know the IP addresses used by hiQ, the scope of its scraping activity, or every way in

7   which it has used the data.  LinkedIn's claims cannot properly be resolved on a Rule 12 motion.

8       **I.      HIQ'S MOTION TO STRIKE IS MERITLESS.**

9       hiQ's motion to strike portions of LinkedIn's breach of contract claim is based on hiQ's

10  factual contention—outside of the record—that it no longer uses LinkedIn.  This speaking motion

11  is contrary to the allegations of the Counterclaims and thus is an improper motion for summary

12  judgment that should be summarily rejected.  hiQ's outside-of-the record contention also appears

13  to be untrue, since hiQ just asked LinkedIn to update its IP whitelist *on January 22, 2021*.  Uriarte

14  Decl. Ex. 1.  It is certainly plausible that the reason for such a request is hiQ's continuing use of

15  LinkedIn, subjecting it to LinkedIn's User Agreement, which "[b]y its terms, … applies not only

16  to LinkedIn members … but to anybody who uses LinkedIn's website."  CC ¶ 51.

17      Under blackletter law, a user who accesses a website with knowledge of the terms of

18  service creates a binding contract with the website operator.  *E.g.*, *Nguyen v. Barnes & Noble*

19  *Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014) ("courts have consistently enforced [terms of

20  service agreements that are binding upon use of a website] where the user had actual notice of the

21  agreement."); *Domain Name Comm'n Ltd. v. DomainTools, LLC,* 781 F. App'x 604, 607 (9th

22  Cir. 2019) (unpublished) (access of website by automated bots sufficed to create binding contract

23  where party controlling bots had actual knowledge of website terms of service).  hiQ has actual

24  knowledge of LinkedIn's User Agreement because it agreed to it on multiple occasions.  *E.g.*, CC

25  ¶ 41–47.  LinkedIn restricted hiQ's company page in 2017 and made clear to hiQ that any further

26  access was unauthorized; nonetheless, hiQ continued to access LinkedIn's website knowing that

27  by doing so it was subject to the User Agreement.  CC ¶¶ 63–64, 73.  hiQ's ongoing access to and

28  use of LinkedIn's website is sufficient to establish assent to the terms of the User Agreement.

*Barnes & Noble*, 763 F.3d at 1175–76.  LinkedIn alleges hiQ's assent to the User Agreement and breach of its terms; that is all that is required to plead its claim.

Nothing in this Court's or the Ninth Circuit's holdings in the preliminary injunction context supports the Motion to Strike.  hiQ seems to take the view that LinkedIn's User Agreement cannot apply to hiQ because of the law of the case doctrine.  Not so.  Preliminary injunction proceedings are just that—preliminary.  "[T]he general rule" is that "decisions at the preliminary injunction phase do not constitute the law of the case."  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007).  Decisions on preliminary injunctions must often be made on less than a full record.  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013).  While there is a narrow exception that "conclusions on pure issues of law…are binding," that exception has no bearing on the *factual* question of whether hiQ continues to access LinkedIn's website with knowledge of the terms of the User Agreement.  *Ranchers*, 499 F.3d at 1114.

The Ninth Circuit's comments on hiQ's user status are squarely within the normal rule that factual findings made on appeal from a preliminary injunction do not become "law of the case."  The Ninth Circuit assumed without analysis, for instance, that termination of hiQ's user account terminated the User Agreement.  *hiQ Labs, Inc. v. LinkedIn Corp.,* 938 F.3d 985, 998 (9th Cir. 2019).   LinkedIn never terminated hiQ's user account; and, even if it had, the User Agreement "applies not only to LinkedIn members, which hiQ was, but to anybody who uses LinkedIn's website."  CC ¶ 51.  The same is true with this Court's preliminary injunction order—this Court found that a question remained as to whether "hiQ's aggregation of data from LinkedIn's public profiles is dependent on its status as a LinkedIn user," but made no findings about whether access to LinkedIn's website is sufficient to bind hiQ to the User Agreement.  *See* ECF No. 63 at 7, n.4.  Only after discovery will the extent of hiQ's access to LinkedIn be known.  *See* CC ¶ 64.

In any event, hiQ's admission that it continues to access LinkedIn's website with ample notice of the terms of the User Agreement constitutes "changed circumstances" which would "demand departure from the law of the case doctrine" were it applicable.  *E.g., Rodriguez v.*

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

*SGLC Inc.*, 2013 U.S. Dist. LEXIS 180409, at *9 (E.D. Cal. Dec. 23, 2013) (citing *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997)).  hiQ continues to access LinkedIn's website, thus subjecting itself to the User Agreement terms.  *See* Uriarte Decl. Ex. 1.

## II.   LINKEDIN'S COUNTERCLAIMS ARE SUFFICIENTLY PLED.

LinkedIn's counterclaims are supported by detailed factual allegations establishing that (i) hiQ has a contractual duty to LinkedIn not to violate the User Agreement, (ii) hiQ circumvented technical barriers to LinkedIn's system to make millions of requests to LinkedIn's servers, (iii) hiQ took data from LinkedIn's computers in a manner that is harmful to LinkedIn and its members, and (iv) hiQ's conduct will be expanded and copied by others, impairing and destroying LinkedIn's private property interests in its business infrastructure.  The Rule 12(b)(6) standard is plausibility.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  hiQ erroneously conflates the preliminary injunction proceedings with the 12(b)(6) standard.  *E.g., Arc of California v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014) (injunction and Rule 12 standards "are not conterminous").  Under the proper standard, these allegations are sufficient to state every claim for relief asserted in LinkedIn's Counterclaims.

### A.   LinkedIn Properly Pleads A Section 502 Claim.

LinkedIn's Section 502 claim is sufficiently pled.  hiQ's only argument is to treat Section 502 like a mere tag-along claim that is coextensive with the CFAA, but that is legally incorrect: "The statutes are different."  *Christensen*, 828 F.3d at 789.  So even if hiQ were correct about the CFAA, *but see* Section II(B), *infra*, there is no basis to dismiss LinkedIn's Section 502 claim.

"In contrast to the CFAA, the California statute *does not require unauthorized access*.  It merely requires knowing access." *Id.* (emphasis added).  This is clear from the plain text of Section 502(c), which provides in pertinent part that a person who commits the following acts is guilty of a public offense:

> (1) *Knowingly accesses* and *without permission*…uses any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property, or data.

> (2) *Knowingly accesses* and *without permission takes, copies, or makes use of any data* from a computer, computer system, or computer network….

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1   (emphasis added).  This text plainly does not specify an unauthorized access element.  *See People*

2   *v. Tillotson*, 157 Cal. App. 4th 517, 538 (2007) (discussing the three elements of Section

3   502(c)(1) claim).  By contrast, other provisions of Section 502 *do* include an access-permission

4   requirement.  *See* Cal. Penal Code. § 502(c)(7) ("Knowingly and *without permission accesses* or

5   causes to be accessed any computer") (emphasis added).  "The Legislature's requirement of

6   unpermitted access in some Section 502 offenses and its failure to require that element in other

7   parts of the same statute" shows that "the subdivisions that do not require unpermitted access

8   were intended to apply to persons who gain lawful access to a computer but then abuse that

9   access."  *People v. Childs*, 220 Cal. App. 4th 1079, 1102 (2013).  California's construction of

10  Section 502(c)(1) and (c)(2) stands in stark contrast to the narrow construction of the CFAA

11  adopted by the Ninth Circuit and several of its sister courts, which "emphasiz[e] that the CFAA's

12  authorization requirements focus narrowly on whether one's threshold access was authorized."

13  *Royal Truck & Trailer Sales & Serv. v. Kraft*, 974 F.3d 756, 761 (6th Cir. 2020).

14          hiQ argues that LinkedIn's claim fails because the "publicly-accessible data accessed by

15  hiQ does not require *'authorization' under the CFAA*."  Mot. at 11 (emphasis added).  But

16  "authorization under the CFAA" is irrelevant for the reasons just set forth.  The legislative history

17  of Section 502 buttresses this conclusion.  Whereas, according to the Ninth Circuit, Congress did

18  not intend for the CFAA to "allow criminal liability to turn on the vagaries of private polices

19  [sic]" such as "the typical corporate policy that computers can be used only for business

20  purposes," *United States v. Nosal ("Nosal I) "*, 676 F.3d 854, 860 (9th Cir. 2012), California's

21  legislature expressly contemplated criminalizing such conduct when it enacted Section 502.  *See*

22  Request for Judicial Notice Ex. B at 5 (Senate Committee on Judiciary, SB255 Final History, LIS

23  – 3) ("Under this bill, an employee who used a computer…for such personal projects as preparing

24  a personal letter…could be guilty of a felony…"); *id.* Ex. B at 3 (Assembly Committee on Public

25  Safety Analysis, June 1, 1987, LIS-9a) ("This bill would make it a crime to knowingly and

26  without permission use a computer including, for example, an employee who uses his or her

27  computer…to write a term paper."); *see also* Cal. Penal Code § 502(h) (establishing a defense for

28  actions within reasonable scope of employment).

To the extent hiQ's position is that "publicly available" data requires no "permission" to take or use, that argument, too, is foreclosed by the text. Section 502(b)(8) defines "data" broadly to include "a representation of information, knowledge, facts, concepts" in "any form," and the statute does not exempt so-called "publicly available" data from protection. Section 502(a) establishes that the statute protects "*all types* and forms of lawfully created…computer data." *People v. Lawton*, 48 Cal. App. 4th Supp. 11, 14-15 (1996) (emphasis added). *Lawton*, for example, affirmed a conviction arising from defendant's access to the UNIX operating system running on a public library terminal. *Id.*, *see also Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147, 1176 (C.D. Cal. 2018) (Section 502(c)(2) claim based on use of bots to access public website). Importantly, the Legislature knew how to carve out publicly available data when it wished to do so. Section 502(b)(9) defines "supporting documentation" as information "not generally available to the public." The fact that this qualifying language appears nowhere else in the statute shows that "generally available" public data is entitled to Section 502's protections. *See, e.g., Childs*, 220 Cal. App. 4th at 1102 ("When different words are used in adjoining subdivisions of a statute that were enacted at the same time, that fact raises a compelling inference that a different meaning was intended"). Section 502 reflects a broad policy in favor of information governance.

hiQ disregards both text and policy in making no separate argument about Section 502; its entire argument is predicated upon the incorrect assumption that Section 502 and the CFAA are the same. *See* Mot. at 11 (discussing only "'authorization' under the CFAA"). The cases it cites contain the same error. *Nexsales Corp. v. Salebuild, Inc*., 2012 WL 216260, at *3 (N.D. Cal. Jan. 24, 2012) and *Multiven, Inc. v. Cisco Sys., Inc.,* 725 F. Supp. 2d 887, 895 (N.D.Cal. 2010) predate *Christensen* and contain no reasoned analysis of the textual differences between the CFAA and Section 502. *Brodsky* fails to acknowledge *Christensen*, and its holding was based primarily on pleading deficiencies that are not at issue here. *Brodsky v. Apple Inc,* 445 F. Supp. 3d 110, 131 (N.D. Cal. 2020) (dismissal because complaint failed to allege "accessing Plaintiffs' login activities without authorization").

Nor does *Oracle USA, Inc. v. Rimini St., Inc*., 879 F.3d 948, 962 (9th Cir. 2018), *rev'd in*

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

*part,* 139 S. Ct. 873 (2019), support hiQ.  In *Rimini St.*, the Ninth Circuit held that "taking data using a method prohibited by the applicable terms of use, *when the taking itself generally is permitted*, does not violate [section 502]."  *Id.*  Here, hiQ continued scraping even after LinkedIn specifically asked it to stop doing so in accord with the User Agreement.  *Contra id.* ("at least at the time it took the data *in the first instance*, Rimini did not violate the state statutes) (emphasis added, citing *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016)).  And, unlike *Rimini St.*, hiQ did not have contractual authorization to take the data in the first instance. 879 F.3d at 955-56.  Even if hiQ "did not, at first, violate the statute," when "[LinkedIn] sent the cease and desist letter…[hiQ] knew that it no longer had permission," but continued to "knowingly access[] and without permission [take], cop[y], and ma[ke] use of [LinkedIn's] data." *Power*, 844 F.3d at 1069 (affirming judgment on section 502 claim).  Finally, hiQ's conduct involved technical circumvention, which is antithetical to "permission" to scrape.  Numerous cases hold that a defendant can be liable under Section 502 where, as here, "they access or use a computer . . . in a manner that overcomes technical or code-based barriers." *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 966 (N.D. Cal. 2014) (collecting cases).

**B.      LinkedIn's CFAA Claims Should Not Be Dismissed.**

A ruling at this time that LinkedIn can prove no set of facts to give rise to a CFAA claim would be a mistake.  The Court has acknowledged that LinkedIn's position "is not without basis" in existing precedent, *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099,1109 (N.D. Cal. 2017), *aff'd and remanded,* 938 F.3d 985 (9th Cir. 2019).  The Supreme Court continues to hold LinkedIn's certiorari petition pending resolution of *van Buren*.  Particularly because the Supreme Court's decision in *van Buren* is likely to influence the CFAA counterclaims, it is a bad time to reach definitive rulings.  *E.g., Builders Corp. of Am. v. United States*, 259 F.2d 766, 771 n.12. (9th Cir. 1958) ("In the present fluid and relatively uncertain state of the law, this is certainly not a case to dispose of on a motion to dismiss the complaint.").  Given some uncertainty regarding the proper interpretation of the CFAA, rather than trying to assess *right now* whether LinkedIn's claims are valid, the better course is to develop a record for the case and address these matters on summary judgment.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1

**1.      LinkedIn States A "Without Authorization" CFAA Claim.**

2

Even if the CFAA reaches only password-protected websites as this Court previously

3

suggested, LinkedIn sufficiently pleads a Section 1030(a)(2) "without authorization" claim.  That

4

is because LinkedIn's allegations about security measures it uses to block access to its servers give

5

rise to a plausible inference that information at issue in this case is "information for which

6

authorization or access permission, such as password authentication, is generally required."  *hiQ*,

7

938 F.3d at 1001.

8

Specifically, LinkedIn alleges that "[m]uch of the information on LinkedIn's website is

9

behind a password barrier," and that "[p]eriodically, LinkedIn will prevent 'logged-out' users

10

from viewing more than a certain number of pages before being asked to enter a user name and

11

password to see more."  CC ¶ 34.  LinkedIn further alleges that when "high levels of activity are

12

detected for certain types of accounts, the member is logged out and may either be warned,

13

restricted, or challenged with a CAPTCHA in order to log back into LinkedIn."  CC ¶ 31.  hiQ

14

circumvented these "systems and password wall to scrape data from LinkedIn's protected

15

servers."  CC ¶ 90.[2]  In addition, "in June 2017, LinkedIn implemented targeted blocks as to

16

hiQ's known IP addresses."  CC ¶ 28.  "LinkedIn's servers will not return information in response

17

to any calls received from blocked IP addresses, but will return an error message."  *Id.*  "In order

18

for a business entity to access LinkedIn's computers after confronting an IP block, that business

19

entity must circumvent the IP block."  *Id.*  These allegations give rise to a plausible inference that,

20

far from being "open to all comers," *hiQ*, 938 F.3d at 1002, the massive volume of data scraped

21

by hiQ could only be obtained by circumventing access barriers like passwords, forced log-outs,

22

warning messages, account restrictions, and CAPTCHAs.[3]

23

24

[2] Because LinkedIn has taken no discovery, the precise nature and scope of hiQ's scraping is unknown.  But given the types of access that LinkedIn's systems prevent (e.g., CC ¶ 34) and the

25

allegation that "hiQ's bots made millions of calls to LinkedIn's servers," CC ¶ 68, it is more than plausible that hiQ took steps to circumvent password and other barriers to access.

26

[3] LinkedIn disputes the characterization of CAPTCHAs as a mere "'way to slow[] a user's access,'

27

rather than as a way to deny authorization to access."  *hiQ*, 273 F. Supp. 3d at 1113 (citation omitted).  A CAPTCHA is a means for telling computers and humans apart, CC ¶ 31, for the express

28

purpose of excluding bots from accessing a website.  That some scofflaws view CAPTCHAs as something merely to be avoided does not change this fact.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

LinkedIn's allegations that hiQ continued access to LinkedIn's systems notwithstanding technical barriers and a cease and desist notice bring this case squarely within the holding of *Power Ventures*: hiQ "disregarded the cease and desist letter and accessed [LinkedIn's] computers without authorization to do so.  It circumvented IP barriers that further demonstrated that [LinkedIn] had rescinded permission for [hiQ] to access [LinkedIn's] computers."  844 F.3d at 1068.  hiQ thus gained "unauthorized access—getting into the computer after categorically being barred from entry."  *United States v. Nosal (Nosal II)*, 844 F.3d 1024, 1034 (9th Cir. 2016).

hiQ's cited cases do not suggest otherwise.  *Brodsky* is inapposite: it concerned a claim that Apple accessed iPhones without authorization by pushing an iOS update.  445 F. Supp. at 129.  hiQ miscites *Brodsky* as "relying" on the Ninth Circuit's *hiQ* decision, but the case did not concern publicly accessible data, and the plaintiffs "abandoned their CFAA claims."  *Id.*  And *Brodsky* recognized that, in cases such as this one, "where a plaintiff clearly revokes access to a party and not simply the means, manner, or method for such access, that party may be liable under the CFAA."  Likewise, in *Miller v. 4Internet*, LLC, 471 F. Supp. 3d 1085, 1090 (D. Nevada 2020), the court noted that, unlike this case, the plaintiff did not allege that the computer owner "plainly revoke[d] [the defendant's] authorization to access the website or notify them that they violated some law."

Moreover, the CFAA is not limited to protecting only those computers hosting websites that are password-protected.  *See, e.g*., *Craigslist Inc. v. 3Taps Inc. et al*, 964 F. Supp. 2d 1178 (N.D. Cal. 2013).[4]  The CFAA's focus is on unauthorized access *to computers*, *see* 18 U.S.C. § 1030(a)(2), not "on unauthorized taking or use of information," *Christensen*, 828 F.3d at 789.  Thus, the question is whether hiQ "intentionally accessed [LinkedIn's] computers knowing that it was not authorized to do so," *Power Ventures*, 844 F.3d at 1069, *not* whether hiQ obtained "private information," *hiQ*, 938 F.3d at 1001.  And here, "[t]he record shows unequivocally that

---

[4] *Accord Ticketmaster LLC v. RMG Techs., Inc*., 507 F. Supp. 2d 1096, 1102-03, 1113 (C.D. Cal. 2007);  *Couponcabin LLC v. Sav..com, Inc*., 2016 U.S. Dist. LEXIS 74369, at *11 (N.D. Ind. 2016); *Register.com, Inc. v. Verio, Inc*., 126 F. Supp. 2d 238, 244, 251 (S.D.N.Y. 2000), *aff'd as modified*, 356 F.3d 393 (2d Cir. 2004); *Sw. Airlines Co. v. Farechase, Inc*., 318 F. Supp. 2d 435, 439 (N.D. Tex. 2004); *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 596 (E.D. Pa. 2016)); *EF Cultural Travel BV v. Zefer Corp*., 318 F.3d 58, 62-63 (1st Cir. 2003); *see also United States v. Lowson*, 2010 U.S. Dist. LEXIS 145647, at *18 (D.N.J. Oct. 12, 2010).

1   [hiQ] knew that it no longer had authorization to access [LinkedIn's] computers, but continued to

2   do so anyway." *Power*, 844 F.3d at 1067.  "It is the [computer owner's] decision to allow or to

3   terminate [a user's] *authorization to access a computer* that determines whether the [user] is with

4   or 'without authorization.'"  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009)

5   (emphasis added); *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024,

6   1028, 1032 n.4 (W.D. Wash. 2020) (distinguishing *hiQ*, approving of CFAA claim regarding

7   scraping of information "available to the public through plaintiff's website").

8          The text of the CFAA does not support a distinction between computers hosting

9   password-protected websites and computers hosting public websites; rather, it broadly defines a

10  "protected computer" as any computer "used in or affecting interstate or foreign commerce or

11  communication." 18 U.S.C. § 1030(e)(2)(B).  Nor does the text of the CFAA support an

12  exception for publicly visible data.  Section 1030(a)(2) prohibits obtaining "information" from

13  any protected computer, an unambiguous term with a decidedly broad scope that inherently

14  covers non-confidential information.[5]  Nor does the phrase "without authorization" support a

15  distinction between computers that are protected by passwords and those that are not  "'[W]ithout

16  authorization' is an unambiguous, non-technical term that, given its plain and ordinary meaning,

17  means accessing a protected computer without permission." *Nosal II*, 844 F.3d at 1028.  The

18  "ordinary meaning" of the terms "authorization" and "permission" do not so much as hint at a

19  password requirement.  "As the 'ordinary, contemporary, common meaning' of the word

20  indicates…'authorization' turns on the decision of the 'authority' that grants—or prohibits—

21  access." *3Taps*, 964 F. Supp. 2d at 1183-84.  Issuing a set of login credentials is not the only way

22  for a website owner to grant permission, nor is locking a website behind a password the only

23  means of revoking such permission.  *See, e.g., Power*, 844 F.3d at 1069 (letter revoking access

24  sufficed to terminate permission); *hiQ*, 938 F.3d at 1003 (discussing "access permissions, *such as*

25  username and password requirements") (emphasis added).    The legislative history of the CFAA

26  confirms that it does not exclude non-password protected websites from protection.  The 1996

27

28  _____

   [5] *See, e.g.,* https://www.merriam-webster.com/dictionary/information ("1a (1) knowledge
   obtained from investigation, study, or instruction (2): intelligence, news; (3):facts, data.").

amendment that added Section1030(a)(2) to the CFAA shows Congress understood that "accessing" a "publicly available" computer "via an agency's World Wide Web site" without authorization could trigger liability.  *See* S. Rep. No. 104-357, at 8-9 (1996).  That is why, in enacting Section 1030(a)(3) alongside Section 1030(a)(2), Congress expressly limited § 1030(a)(3) to accessing a "*nonpublic* [government] computer." 18 U.S.C. § 1030(a)(3) (emphasis added).  Section 1030(a)(3) shows that Congress "appreciated the public vs. nonpublic distinction—but § 1030(a)(2)(C) contains no such restrictions or modifiers." *3Taps*, 964 F. Supp. 2d 1182–83.  The 1996 legislative history is inconsistent with the conclusion that "the prohibition on unauthorized access is properly understood to apply only to private information."  *hiQ*, 938 F.3d at 85.[6]  The CFAA expressly protects "information from any department or agency of the United States," much of which is inherently *not* "private information" by operation of statute.  *See* The Freedom of Information Act, 5 U.S.C. § 552.  And, of course, the fact that data is hosted on a password-protected site does not mean that the data is "private information."

Privacy in the digital age is not a binary concept, which is why courts are moving away from rigid rules that treat online privacy like an on/off switch.  *Compare Doe v. Shurtleff*, 628 F.3d 1217, 1226 (10th Cir. 2010) (there is "no reasonable expectation of privacy in 'information…voluntarily transmitted to the third-party internet providers") *with In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605-06 (9th Cir. 2020) (rejecting *Shurtleff* and relying on the "sensitivity" of the users' data to conclude that "whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved

---

[6] In holding otherwise, the Ninth Circuit looked to legislative history from the 1980s discussing traditional trespass doctrines.  *hiQ*, 938 F.3d at 1000.  But those doctrines also do not support the idea that only websites behind password walls are protected by the CFAA.  "By the common law it was as unlawful for the beasts of a neighbor to cross the invisible boundary line as it would be to overleap or throw down the most substantial wall."  *Wood v. Snider*, 187 N.Y. 28, 35 (1907) (collecting cases); *see also People v. Camacho*, 23 Cal. 4th 824, 835 (2000) (rejecting "the proposition that defendant forfeited the expectation his property would remain private simply because he did not erect an impregnable barrier to access").  Traditional trespass law also establishes that while "[o]pening an establishment to transact business with the public is permission to enter," that permission "may be revoked"; "[o]nce the proprietor requests that a person leave, that individual has no legal right to remain."  75 Am. Jur. 2d Trespass § 40.

at the pleading stage.");[7] *see also Am. Civil Liberties Union v. U. S. Dept. of Justice*, 750 F.3d 927, 933 (D.C. Cir. 2014) ("we reject the dissent's surrender of any reasonable expectation of privacy to the Internet—a surrender that would appear to result from a failure to distinguish between the mere ability to access information and the likelihood of actual public focus on that information."). A black-and-white rule that no information hosted on a public website is entitled to privacy protection is "ill-suited to the digital age." *United States v. Jones*, 565 U.S. 400, 415(2012) (Sotomayor, J., concurring). Treating privacy as a binary concept ignores "[t]echnological advances" that "provide access to a category of information otherwise unknowable and implicate privacy concerns in a manner different from traditional intrusions…" *Davis*, 956 F.3d at 603 (citing *Patel v. Facebook, Inc*., 932 F.3d 1264, 1273 (9th Cir. 2019), *cert. denied,* 140 S. Ct. 937 (2020)). Here, LinkedIn's allegations provide facts and context establishing that its members retain privacy interest in their LinkedIn data, CC ¶¶ 54-61, and those allegations must be accepted as true on a Rule 12 motion.

Technology like hiQ's scraping system "can obtain information that is 'detailed, encyclopedic, and effortlessly compiled'" in a way that is "impossible without such technology," *Patel*, 932 F.3d at 1273, and in a way that is impossible without circumventing LinkedIn's technical access barriers, *see Compulife Software, Inc. v. Newman*, 959 F.3d 1288, 1314 (11th Cir. 2020) ("Nor does the fact that the defendants took the quotes from a publicly accessible site automatically mean that the taking was authorized…Although Compulife has plainly given the world implicit permission to access as many quotes as is humanly possible, a robot can collect more quotes than any human practicably could."). Legislative history suggesting that Section 1030(a)(2) was intended "to increase protection for the privacy and confidentiality of computer information" thus supports LinkedIn's view of the CFAA, which allows website owners (and users) to control the scope of authorized access to their websites and data. S. Rep. No. 104-357, at 7. On the other hand, hiQ's view that the CFAA only applies to password-protected websites

---

[7] *Davis* involved claims under *inter alia* the Stored Communications Act, which unlike the CFAA, contains an express carve out for communications "readily accessible to the general public." 18 U.S.C. § 2511(2)(g). The CFAA contains no analogous language, which is telling. *See 3Taps*, 964 F. Supp. 2d at 1183.

1    undercuts one of the statute's objectives by forever eliminating all privacy protection for internet

2    users who post information on non-password protected websites.  *Contra Domain Name Comm'n*

3    *Ltd.* 781 F. App'x at 607 (affirming anti-scraping injunction based on "evidence that DNCL's

4    customers care deeply about the privacy of information about themselves," notwithstanding that

5    those customers had already posted the subject information on publicly accessible website).

6                    **2.      LinkedIn Pleads an "Exceeds Authorized Access" Claim.**

7            The question whether a person who has been authorized to access a computer for certain

8    purposes but then uses that access for other, improper, purposes violates Section 1030(a)(2) is

9    currently pending before the Supreme Court.  *See Van Buren v. United States*, petition for cert.

10   pending, No. 19-783 (filed Dec. 18, 2019).  The outcome of *Van Buren* may be dispositive of

11   hiQ's arguments, which is reason enough to deny hiQ's motion.  But regardless, LinkedIn's claim

12   that hiQ exceeded authorized access is sufficiently pled under existing precedent.

13           The CFAA defines "exceeds authorized access" as "to access a computer with

14   authorization and to use such access to obtain or alter information in the computer that the

15   accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).  The Ninth Circuit construes

16   this phrase narrowly, such that "'exceeds authorized access' in the CFAA is limited to violations

17   of restrictions on access to information"; i.e., "the circumvention of technological access

18   barriers."  *Nosal I*, 676 F.3d at 864.  Even under the narrowest possible construction suggested in

19   *Nosal*—the defendant's suggestion that the phrase only applies to "someone who's authorized to

20   access only certain data or files but accesses unauthorized data or files," *id.* at 856-57—LinkedIn

21   states a claim.  *See also United States v. Chen*, 2020 U.S. Dist. LEXIS 210476, at *9 (N.D. Cal.

22   Nov. 10, 2020) (employee who was authorized to *access* data may have violated the CFAA by

23   *copying* that data to a flash drive, despite employer's technical barriers to copying).  The

24   Complaint alleges that LinkedIn's systems "prevent 'logged-out' users from viewing more than a

25   certain number of pages before being asked to enter a user name and password to see more," CC

26   ¶ 34, and that hiQ circumvented these technical barriers to scrape voluminous records beyond

27   anything LinkedIn ever authorized.  CC ¶ 90. "Avoiding technical restrictions goes beyond any

28   contractual limits imposed by the terms of service."  *WhatsApp Inc. v. NSO Grp. Techs., Ltd.*,

1    2020 U.S. Dist. LEXIS 125628, at *61 (N.D. Cal. July 16, 2020).

2        In short, even if hiQ had *some* authorization to access LinkedIn's computers, hiQ was akin

3    to an "inside hacker[]…whose initial access to a computer [was] authorized but who access[ed]

4    unauthorized information or files."  676 F.3d at 858.  For example, LinkedIn's counterclaims

5    allege that, after "viewing more than a certain number of pages" hosted on LinkedIn's servers,

6    LinkedIn's system would have prevented hiQ from viewing further pages without entering a

7    username and password to see more.  CC ¶ 34.  It is plausible to infer that hiQ circumvented this

8    access control either by masking its IP address, using a different IP address, or logging in to a

9    LinkedIn account to continue viewing pages that it would otherwise not have been able to view.

10   *Id*.  In the latter scenario, hiQ would have eventually been forcibly logged out and confronted

11   with warnings, restrictions, and CAPTCHA challenges, only to circumvent these barriers, too, in

12   order to continue accessing portions of LinkedIn's website that LinkedIn attempted to restrict hiQ

13   from.  CC ¶ 31.  hiQ's alleged conduct is thus analogous to inside-employee cases involving

14   intentional circumvention of technical limits placed on the employee's internal permissions.  *See*

15   *Chen*, 2020 U.S. Dist. LEXIS 210476, at *9.

16       **C.    LinkedIn Sufficiently Pleads Common Law Misappropriation.**

17       hiQ moves to dismiss LinkedIn's common law misappropriation claim based on two

18   incorrect premises.  First, hiQ argues that LinkedIn does not "own" the data at issue.  But there is

19   no such requirement for common-law misappropriation—on the contrary, the claim developed at

20   common law specifically to address situations where a free rider took information that was

21   collected at significant expense, even though the information was not subject to "ownership" by

22   the claimant.  Second, hiQ argues that trade secret law supersedes the common law

23   misappropriation tort.  On the contrary, California courts recognize this tort where, as here, the

24   misappropriated information is not a failed trade secret.

25       **1.    hiQ Misappropriated LinkedIn's Proprietary Interest.**

26       Although common law misappropriation has four elements, hiQ challenges only the

27   first—that LinkedIn "invested substantial time, skill or money in developing its property."  *See*

28   Mot. at 13–14 (citing *United States Golf Ass'n v. Arroyo Software Corp.*, 69 Cal.App.4th 607,

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

618 (Cal. Ct. App. 1999)).  hiQ's argument misunderstands the nature of the common law misappropriation tort and the types of "property" to which it applies.

"Common law misappropriation … is normally invoked in an effort to protect something of value ***not*** otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or some other form of unfair competition." *U.S. Golf Ass'n*, 69 Cal.App.4th at 618 (emphasis added).  Rather than applying independently to "property," the "purpose" of the tort "is to ***create*** quasi-property rights." *Am. Econ. Ins. Co. v. Reboans, Inc.*, 852 F. Supp. 875, 879–880 (N.D. Cal. 1994), *on reconsideration,* 900 F. Supp. 1246 (N.D. Cal. 1994) (emphasis added).

That LinkedIn is not required to claim exclusive "ownership" over the specific misappropriated information is clear from the lengthy history of the tort, which recognizes a proprietary interest in facts that are available to the public. Most famously, the tort was used to establish the "hot news" application of the tort in *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 238–39 (1918), where the Supreme Court recognized that, although the facts underlying the news reports were not the plaintiff's "property," the competitor's tactic of "copying news from bulletin boards and from early editions of complainant's newspapers and selling this, either bodily or after rewriting it, to defendant's customers" nonetheless constituted misappropriation. *Id.* at 231, 239–40 (finding that such conduct is actionable under unfair competition law).

Under California's version of the misappropriation tort, the tort is not limited to "hot news"; it applies more broadly to anything the "plaintiff invested substantial time, skill or money in developing." *U.S. Golf Ass'n*, 69 Cal. App. 4th at 618.  In *U.S. Golf Association*, the "property" was a published system and formulas for determining golf handicaps—which was not subject to patent, copyright, trademark, or trade secret protection. *See id.* at 618–19.  The formulas were freely available to "any entity …, free of charge, for the purpose of providing handicap computation services or software to any authorized public or private golf club or association utilizing the USGA Handicap System," subject to conditions such as publicly posting scores and peer review of the results. *Id.* at 613.  When the defendant took the formulas and built software to provide computational golf handicap services *without* meeting the conditions, the Court of Appeal found actionable misappropriation. *Id.* at 614–15.  The tort has been applied in

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1    other contexts as well.  In *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 979–80 (E.D. Cal.

2    2000), the plaintiff alleged a sufficient interest in concert listing information it collected from

3    public sources and posted online—allowing a misappropriation claim to proceed to discovery on

4    allegations that the defendant copied the data and reposted it.  *See also X17, Inc. v. Lavandeira*,

5    563 F. Supp. 2d 1102, 1103 (C.D. Cal. 2007) (finding a property interest in being the first to

6    publish a photo).  In none of these cases was the plaintiff required to show "ownership" beyond

7    the substantial investment of time, skill, or money.

8        LinkedIn has alleged a classic misappropriation under California law.  It has invested

9    millions of dollars in developing its social network, including building out its physical

10   infrastructure and attracting the participation of hundreds of millions of members.  *E.g.*, CC ¶¶

11   20–23, 129.  By making this investment, and subject to its members' privacy settings, LinkedIn is

12   able to observe, access, use, and understand member data, much of which is time sensitive.  The

13   data hiQ focused on was certainly time sensitive, as its whole value proposition lie in the recency

14   of member changes as a proxy for job hunting.  LinkedIn only uses that data to increase the value

15   of its platform and improve member experience in a manner consistent with, and as disclosed

16   under, its User Agreement and other applicable policies.  CC ¶¶ 60–61, 130.  hiQ acted contrary

17   to that Agreement and those policies.  hiQ is free-riding on LinkedIn's investments in the exact

18   manner proscribed by the common law.  *See U.S. Golf Ass'n*, 69 Cal. App. 4th at 618.

19       The two cases hiQ relies on are inapposite.  *Hollywood Screentest of Am., Inc. v. NBC

20   Universal, Inc.*, 151 Cal.App.4th 631, 650 (2007), did not address the element of a quasi-property

21   interest.  There, the plaintiffs claimed that a studio stole their idea for a television show.  The

22   studio rebutted that showing with evidence of independent invention.  *Id.*  It was on the *second*

23   element, taking from the plaintiff, that the court dismissed the claim.  *Id.*  Likewise, *SunPower

24   Corp. v. SolarCity Corp.*, 2012 WL 6160472 (N.D. Cal. Dec. 11, 2012), does not address the

25   question of sufficiency of the quasi-property interest outside of the supersession context

26   (addressed below).  Nor should *SunPower* be read to require an extra element of "positive law"

27   creating a property interest; such a rule would be inconsistent with *U.S. Golf Association*, which

28   required no such showing for the Association's golf formulas.  69 Cal.App.4th at 618 (listing

1    elements of claim).  Finally, even were such an extra element of positive law required,

2    California's broad assertion of the right to control electronic data in Section 502 surely suffices.

3                        **2.        CUTSA Supersession Does not Apply.**

4          hiQ also argues that the common law misappropriation claim is superseded by the

5    California Uniform Trade Secrets Act ("CUTSA").  That is likewise incorrect.

6          CUTSA "*does not* affect … civil remedies that are not based upon misappropriation of a

7    trade secret."  Cal. Civil Code § 3426.7(b).  In order to determine if a claim is superseded, it is

8    necessary to conduct a "a factual inquiry … that examines the conduct alleged in the [purportedly

9    superseded] claim" to determine if it is "based on the same nucleus of facts as the

10   misappropriation of trade secrets claim for relief."  *K.C. Multimedia, Inc. v. Bank of Am. Tech. &*

11   *Operations, Inc.*, 171 Cal.App.4th 939, 958 (2009).  Once the case-specific factual inquiry is

12   made, only claims that are based on the same facts as a trade secret claim are superseded.  *Id.* at

13   958–59 ("Depending on the particular facts pleaded, the statute can operate to preempt [] specific

14   common claims.").  Thus, if the claim does not depend on trying to establish that the information

15   at issue is a trade secret, it is not superseded.   For example, a breach of fiduciary duty claim

16   brought for the wrongful disclosure of confidential information is not superseded because the

17   claim "does not require that the confidential information 'qualify as a trade secret.'"  *Integral*

18   *Dev. Corp. v. Tolat*, 675 F. App'x 700, 704 (9th Cir. 2017) (citing *Silvaco Data Sys. v. Intel*

19   *Corp.*, 184 Cal. App. 4th 210, 231 (2010)).  Properly understood, supersession is a limited form

20   of preemption designed only to prevent failed trade secret claims from coming back to life in the

21   guise of other indistinguishable torts.

22         LinkedIn has not alleged that the information at issue here is confidential in the sense

23   implicated by CUTSA.  Member resume information is plainly known to people in addition to the

24   members themselves and could not therefore be the subject of efforts by LinkedIn to maintain its

25   secrecy.  hiQ identifies no allegation in LinkedIn's Counterclaims that suggests secret or

26   confidential information is at issue such that CUTSA supersession can apply, and there is no such

27   allegation.  Indeed, hiQ itself is quick to argue that the information is not confidential in seeking

28   dismissal of the CFAA claims, and hiQ cannot have it both ways.

LinkedIn has presented a theory whereby the timing of member change data and the aggregate of member change data implicate member privacy interests and their right to information governance, but it has not alleged or argued that such data is a trade secret or even "confidential" in the sense of trying to meet the elements of CUTSA.[8]  In all events, LinkedIn is entitled to plead multiple claims, including claims in the alternative, based on the facts it has set forth in its Counterclaim.  The claims are plausible depending upon how the facts shake out in discovery, and the legal standards are different under the different bodies of law.  CUTSA supersession does not apply at the pleading stage on the facts alleged by LinkedIn because there is no allegation that the data misappropriated by hiQ was akin to a trade secret.

None of the cases relied on by hiQ lead to a different result.  The cases in hiQ's motion involve classic CUTSA supersession where the lead claim is brought under CUTSA, but the plaintiff brings common law claims as backup in case the CUTSA claim fails.  In other words, CUTSA superseded common law claims in those cases because the core factual basis for *all* of the claims was the same theft of secret information.  In *K.C. Multimedia, Inc*, for example, the plaintiff lost on its trade secrets claim and sought to revive its backup common law claims for a second bite at the apple.  171 Cal. App. 4th at 944–45; *see also AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 954 (N.D. Cal. 2003) (finding common law misappropriation *of trade secrets* to be superseded by CUTSA).  As these and the other cases cited by hiQ demonstrate, CUTSA supersession applies only where "secret" information is at issue—but that is not the case with LinkedIn's claim.  *See NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 839–40 (N.D. Cal. 2014) (finding CUTSA supersession where plaintiff "has not alleged any misconduct … other than theft of *secret* information" (emphasis added)); *Lifeline Food Co. v. Gilman Cheese Corp.*, 2015 WL 2357246, at *1 (N.D. Cal. May 15, 2015) (similar).

Nor does hiQ address the cases holding that common-law misappropriation covers situations where the misappropriated material was never intended to be a trade secret.  *U.S. Golf Ass'n*, 69 Cal. App. 4th at 618 ("Common law misappropriation is … normally invoked … to

---

[8] Nothing in this brief should be construed as an admission that *no* parts of LinkedIn's platform are confidential or restricted from the public.  But some member profile information scraped by hiQ is viewable to the public in a manner comparable to *International News*.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1   protect something of value not otherwise covered by … trade secret law.").  LinkedIn alleges that

2   hiQ accessed LinkedIn's website infrastructure in violation of the User Agreement to scrape

3   members' profiles, including time-sensitive profile updates.  CC ¶ 130.  The claim does not

4   depend on the information being confidential or secret—individual publicly viewable profiles are

5   *not* confidential—and applying CUTSA preemption on these facts would effectively overrule

6   authority like *U.S. Golf Ass'n*, which held nearly 15 years after CUTSA was codified that

7   common law misappropriation is a valid claim under California law.

8              **D.      LinkedIn Sufficiently Alleges Trespass to Chattels.**

9              hiQ contends that LinkedIn has not established the quantum of harm necessary to sustain a

10   trespass to chattels claim.  The argument fails for at least two reasons.  First, LinkedIn has alleged

11   facts that plausibly suggest both existing harm and threatened future harm from hiQ's activity,

12   and there has not yet been discovery into the extent of hiQ's scraping.  Second, threatened harm

13   from the impact of follow-on scrapers is sufficient to state a claim for trespass to chattels.

14              First, the quantum of harm necessary to sustain trespass to chattels involving electronic

15   resources is minimal.  The claim in *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1564

16   (1996), was upheld as valid on evidence that "approximately 90" manual telephone calls

17   "consuming roughly 24 minutes of telephone time during the first two days" and 72 calls on a

18   third day "over an almost 16-minute period" was sufficient harm to state a claim.[9]  Indeed, the

19   California Court of Appeal has approved nominal damages for such a claim.  *Levy v. Only*

20   *Cremations for Pets, Inc.*, 57 Cal.App.5th 203, 262 (2020).

21              LinkedIn alleges two kinds of cognizable harm arising from hiQ's scraping.  *First*,

22   LinkedIn alleges that hiQ made millions of requests to LinkedIn servers, CC ¶ 68, and that

23   LinkedIn devotes substantial resources to abating the harm caused by such scraping activity. CC

24   ¶¶82-86.  LinkedIn also alleges that "the full extent of hiQ's illicit scraping is not currently

25   known," as "hiQ has gone to substantial lengths to hide its methods."  *Id.* ¶ 64.  Accepting

26   _____

27   [9] This case is often misread as an automated software bot case.  But the automated calls were not
     actionable due to the plaintiff's failure to mitigate, and the remand was limited to damages for a
28   relatively small number of manual telephone calls that consumed approximately 40 minutes of
     telephone system time.  *Thrifty-Tel*, 46 Cal. App. 4th at 1564, 1572.

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC

1    LinkedIn's allegations as true, the question is not *whether* LinkedIn suffered harm from hiQ's

2    scraping, but how much—an issue that can only be resolved once there is an opportunity for

3    discovery.  Some quantum of the activity attributable to scrapers is attributable to hiQ.  With its

4    recent request for new IP whitelisting, hiQ also continues to threaten such future harm.

5         *Second*, LinkedIn alleges that hiQ's conduct has been replicated by others since this

6    litigation began, and that LinkedIn is currently inundated with hundreds of millions of website

7    requests from unauthorized bots every day and is incurring substantial costs as a result.  CC ¶ 82–

8    84.  The California Supreme Court in *Hamidi* recognized that the mere *threat* of such follow-on

9    harm is sufficient to state a trespass to chattels claim.  *Intel Corp. v. Hamidi,* 30 Cal.4th

10   1342,1355–57 (2003) (holding that "conduct, if widely replicated, would likely impair the

11   functioning of the plaintiff's system" states a trespass to chattels claim).  Here, LinkedIn alleges

12   not only the threat but that it has become reality.  Thus, while it suffices that LinkedIn alleges a

13   substantial threat that hiQ's conduct will be replicated by others and that the aggregate conduct

14   will harm LinkedIn, LinkedIn has gone even further.  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.

15   Supp. 2d 1058, 1066 (N.D. Cal. 2000) (finding harm from scraping that, if "allowed to continue

16   unchecked," "would encourage other [scrapers] to engage in similar" conduct and cause

17   substantial harm in the aggregate).

18        *Hamidi* expressly considered the theory in *Bidder's Edge* and found that it was an

19   accurate statement of California law.  30 Cal.4th at 1355–57.  Here, LinkedIn alleges that

20   scraping of the type engaged in by hiQ "will continue to escalate," along with related costs to

21   maintain necessary infrastructure.  CC ¶ 85; *see also* CC ¶ 86 ("hiQ's conduct, if expanded and/or

22   replicated unchecked by others, will cause harm to LinkedIn in the form of impaired condition,

23   quality and value of its servers, infrastructure and services.").  hiQ-style scraping, if allowed to

24   proliferate unchecked, threatens to overwhelm LinkedIn's ability to maintain a public website,

25   essentially destroying a key component of LinkedIn's business model.  CC ¶ 85.

26                                    **CONCLUSION**

27        For the foregoing reasons, hiQ's Motions to Dismiss and Strike should be denied.

28

1

Dated: March 4, 2021

Orrick, Herrington & Sutcliffe LLP

2

3

By:           */s/ Annette L. Hurst*

4

ANNETTE L. HURST
Attorneys for Defendant
LinkedIn Corporation

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP. TO MTD AND MTS COUNTERCLAIMS
18-cv-00855-EMC