Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6331


Attorneys for Plaintiff hiQ Labs, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301-EMC |
| Plaintiff, | |
| vs. | **PLAINTIFF HIQ LABS, INC.'S ANSWER TO DEFENDANT LINKEDIN CORP.'S COUNTERCLAIMS** |
| LinkedIn Corp., | |
| Defendant. | |

# ANSWER[1]

Plaintiff and Counter-Defendant hiQ Labs, Inc. ("hiQ") hereby answers the allegations of Defendant and Counterclaimant LinkedIn Corporation ("LinkedIn") as follows:

## INTRODUCTION[2]

1.     LinkedIn is a social network, with over 700 million members around the globe. LinkedIn's vision is to create economic opportunity for every member of the global workforce. Its mission is to connect the world's professionals to make them more productive and successful. Through its proprietary platform, LinkedIn allows its members to create and manage their professional histories and interests online.

**ANSWER:** hiQ admits the allegations in the first sentence of Paragraph 1. hiQ lacks knowledge sufficient to admit or deny the remaining allegations in this Paragraph.

2.     At the heart of LinkedIn's platform are its members, whose LinkedIn profiles serve as their professional online identities. LinkedIn members post information to LinkedIn in order to network with, and be found by, other professionals on LinkedIn. When a member posts an educational experience, crafts a narrative description of her skills, or makes a new connection, the member does so for these particular purposes.

**ANSWER:** hiQ admits the allegations in the first sentence of Paragraph 2. hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 2, which relate to LinkedIn's members' states of mind.

3.     It is important that LinkedIn members have control over the information that they choose to publish about themselves. People evolve and careers evolve, and the information and

---

[1]  In this Court's April 19, 2021 Order granting in part and denying in part hiQ's Motion to Dismiss LinkedIn's counterclaims, the Court noted that it was "defer[ring] ruling on the motion to dismiss the counterclaims for violation of the CFAA and California Penal Code § 502." The Court then held that it was terminating the motion to dismiss "for administrative purposes only … even though the CFAA and § 502 counterclaims have not yet been addressed." The Court further stated that hiQ may "renew[] its motion to dismiss the CFAA and § 502 counterclaims once the Supreme Court issues its decision in *Van Buren* and/or this case." Dkt. 199 at 17. hiQ intends to move to dismiss these claims again once the parties have received a ruling from the Ninth Circuit on LinkedIn's pending appeal, and answers LinkedIn's CFAA and § 502 counterclaims solely to preserve its rights.
[2]  The headings in this Answer are LinkedIn's. hiQ repeats LinkedIn's headings for reference only.

vocabulary that people use to describe themselves and their experiences evolve as well.  It is thus critical that members be able to control their information and how they describe themselves. That's why when members delete information from LinkedIn, LinkedIn deletes it too.  And LinkedIn promises members that it will do so.

**ANSWER:**  hiQ admits the allegations in the first and third sentences of Paragraph 3 that "[i]t is important that LinkedIn members have control over the information that they choose to publish about themselves" and that "[i]t is … critical that members be able to control their information" to the extent this means that it is important that LinkedIn members have control over determining what information they choose to publish on LinkedIn's website in the first instance; however, hiQ denies these allegations to the extent they are intended to mean that LinkedIn members have control over information they choose to publish about themselves after they have published such information in the public domain.  hiQ admits the allegations in the second sentence of Paragraph 3.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 3.

4.      Data scrapers—companies that systematically access, extract, and copy data from LinkedIn's servers through bots or other automated means on a massive scale—make no such promises.  They have no relationship with LinkedIn's members. They do not ask permission of LinkedIn or its members to take member data, and they typically take member data without the knowledge of LinkedIn or its members. They do not explain to members how they will use member data and they do not promise to delete member data if a member removes that data from LinkedIn. Thus, once a scraper has scraped a member's data, the members have no recourse to stop the scraper from copying, archiving, and forever keeping any information that the member ever published on LinkedIn. The member cannot stop the scraper from, among other things, using that data to target spam, selling or inadvertently exposing that data to scammers, or combining that

data with other data to create psychological profiles of users.[3] In short, once data has been scraped, member data can end up in any number of databases controlled and used for any purpose.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 4 as these allegations relate to the conduct and behavior of "companies [generally] that systematically access, extract, and copy data from LinkedIn's servers."

5. Data scraping therefore poses a significant threat to LinkedIn's business because it undermines the trust that LinkedIn has built with its members. LinkedIn takes this trust very seriously, and its commitment to member trust is widely recognized: LinkedIn was recently named the most trusted social network in the country according to the annual U.S. Digital Trust Survey by Insider Intelligence.[4] According to the survey, which gathered views on nine different social networks, 73% of respondents agreed that LinkedIn protected their privacy and data, the highest marks in the survey. Consumers have a wide range of social networks to choose from, and LinkedIn's business model, focused on trust, helps distinguish it from the field and plays a key role in LinkedIn's efforts to maintain and grow its user base.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 5. As to the allegations relating to the results of a third-party survey, that survey speaks for itself and hiQ lacks knowledge sufficient to verify the reliability or methodology of that survey.

6. The loss of that trust has serious consequences for LinkedIn's members and for LinkedIn's business. In order to protect the data that LinkedIn's members entrust to LinkedIn and maintain their trust, LinkedIn has invested significant technical and human resources to detect, limit, and block data scraping. LinkedIn has a dedicated team of engineers whose full time job is to track and prevent scraping attempts. On the technical side, LinkedIn has implemented over 200 custom rules to detect and prevent scraping, and has blocked over 100 million IP addresses that it suspects were being used by data scrapers. Historically, LinkedIn's technical measures block over half of all requests for guest profiles on its servers because they are coming from non-human

---

[3] 2 https://www.zdnet.com/article/data-firm-leaks-48-million-user-profiles-it-scraped-fromfacebook-linkedin-others/.

[4] https://www.adweek.com/programmatic/americans-trust-linkedin-with-their-data-but-they-are-wary-of-facebook/.

sources. LinkedIn's measures are designed to ensure that LinkedIn's website is used for its intended purpose of humans making connections with other humans and to protect members' expectations that their data will be used for that purpose.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 6.

7.       LinkedIn's User Agreement also plays an important role in setting member expectations and building trust by prohibiting "[s]crap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology" used to access the LinkedIn website. Because LinkedIn cannot always stop scraping through its technical defenses, it must be able to resort to legal means to prevent scraping when necessary.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 7, which relate to LinkedIn members' states of mind and contain LinkedIn's statements about itself and its technical capabilities.  As to the allegations relating to the contents of LinkedIn's User Agreement and the undated quotations purporting to be therefrom, that document speaks for itself.

8.       hiQ is exactly the kind of data scraper that undermines the trust that LinkedIn members place in LinkedIn to safeguard their data. hiQ's automated "bots" secretly extract and copy data from hundreds of thousands of LinkedIn pages at a rate far faster than any human could. They circumvent LinkedIn's technical barriers, and operate in blatant violation of LinkedIn's User Agreement. hiQ never obtains consent from LinkedIn or its members to scrape member data. Indeed, it never even asks members, even though there is nothing stopping hiQ from doing so. Once hiQ has scraped LinkedIn member data, there is no telling what hiQ might do with it. hiQ has no enforceable contract with the members whose data it scrapes without their knowledge. Nor does hiQ have any obligation to delete member data that it has scraped if members delete that data from LinkedIn.

**ANSWER:** hiQ denies the allegations in the first sentence of Paragraph 8.  hiQ denies the allegation in the second sentence of Paragraph 8 that hiQ "secretly" extracts and copies data and admits the remaining allegations in the second sentence of Paragraph 8.  hiQ lacks sufficient

information to admit or deny that it "circumvent[ed] LinkedIn's technical barriers," and the statement that hiQ "operate[s] in blatant violation of LinkedIn's User Agreement" is a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies that it "operate[s] in blatant violation of LinkedIn's User Agreement."  hiQ denies that it did not have consent from LinkedIn to scrape member data and admits the remaining allegations in the fourth sentence of this Paragraph.  hiQ denies the allegations in the fifth sentence of this Paragraph.  hiQ admits the allegations in the sixth and seventh sentence of this Paragraph.  hiQ denies the remaining allegations in Paragraph 8.

9.      One known use that hiQ makes of the member data that it has furtively scraped is to fuel its "Keeper" product. "Keeper" surreptitiously surveils every change that members make to their LinkedIn profiles in order to provide their employers with an analysis of whether the members may be looking for new jobs and are a "flight risk." Members may not want such information provided to their employers. Employees often do not disclose to their employers that they are considering leaving their jobs, and could risk adverse career consequences if their employers learn that they are thinking about leaving. Indeed, to avoid this exact type of situation, many members choose the "Do Not Broadcast" option in their settings on LinkedIn to mute their profile changes.

**ANSWER:**  hiQ denies the characterization in the first sentence of Paragraph 9 of hiQ's actions as "furtive[]" and admits the remaining allegations in that sentence.  hiQ denies the allegations in the second sentence of Paragraph 9.  hiQ lacks sufficient information to admit or deny the remaining allegations in Paragraph 9.

10.      hiQ has long known that LinkedIn prohibits scraping. In a 2017 article, hiQ's Chief Technology Officer Dan Miller admitted that hiQ knew that "LinkedIn had been aggressively complaining about what they considered unfair scraping practices for some time," and that LinkedIn "went through a lot of trouble technically to make it difficult to collect that data."[5] Yet knowing that LinkedIn did not want hiQ scraping its data did not stop hiQ from intentionally

---

[5]  https://www.bloomberg.com/news/features/2017-11-15/the-brutal-fight-to-mine-your-data-and-sell-it-to-your-boss.

1    building its business around that premise. Rather, hiQ went through substantial lengths to build

2    scraping software that could avoid LinkedIn's background technical measures that seek to detect

3    and block scraping.

4         **ANSWER:**  As to the allegations relating to the contents of a 2017 article, that document

5    speaks for itself.  hiQ denies the remaining allegations in Paragraph 10.

6         11.    This was a risky business model that suffered from the obvious and inherent danger

7    that LinkedIn would discover hiQ's furtive scraping, implement additional technical measures to

8    attempt to block hiQ, and assert its legal rights against hiQ and ask hiQ to stop. This risk came to

9    pass in May and June of 2017, when LinkedIn sent hiQ a cease-and-desist letter demanding that

10    hiQ stop scraping LinkedIn, explaining that hiQ's conduct violated its agreement with LinkedIn

11    and a host of state and federal laws, and implemented targeted IP address blocks against hiQ.

12         **ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 11.  hiQ denies

13    the allegation in the second sentence of Paragraph 11 that "[t]his risk came to pass" and admits the

14    allegation in the second sentence of Paragraph 11 that LinkedIn sent hiQ cease and desist letters in

15    May and June 2017—the contents of which speak for themselves.

16         12.    LinkedIn sent that letter, and asserts these counterclaims, to stop hiQ's illicit

17    scraping.  LinkedIn is committed to protecting its users' privacy and safeguarding their trust, and

18    the need to do so has become even more pronounced in the last several years, as scandals

19    involving Cambridge Analytica,[6] Hyp3r,[7] Clearview AI,[8] and others have come to light. For

20    example, Clearview deployed bots to systematically scrape social media and other websites to

21    amass a database of more than three billion personal photos, without the consent of those websites

22    or their users. It then exploited this scraped data to support a powerful facial recognition tool that

23    it licensed to over 600 law enforcement agencies as well as select foreign governments and private

24

---

25       [6]  https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html

26       [7]  https://www.zdnet.com/article/instagram-boots-ad-partner-hyp3r-for-mass-collection-of-user-data/; https://www.businessinsider.nl/startup-hyp3r-saving-instagram-users-stories-tracking-

27    locations-2019-8/.

   [8]  https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-

28    recognition.html.

companies. When social media websites asked Clearview to stop, Clearview responded by saying that all it was doing was scraping "public photos."[9] There is mounting evidence that technology like Clearview's can be used in ways that pose fundamental threats to our society.

**ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 12.  The remaining allegations in Paragraph 12 do not require a response from hiQ, as those statements are not relevant to any claims or defenses in this case.  Further, hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 12.  To the extent the allegations in Paragraph 12 are grounded in or reference articles prepared by third parties, those documents speak for themselves.

13.     LinkedIn's members display information on their publicly viewable LinkedIn profiles for a particular purpose—to be found by and network with other professionals and advance their careers—and expect to retain control over the information they post consistent with LinkedIn's User Agreement and Privacy Policy. They do not expect that companies like hiQ, with whom they have no relationship and have provided no consent, will harvest and exploit their personal information en masse, and use it in ways that are inconsistent with their own expressed intention and against their interests. LinkedIn brings these counterclaims to stop this dangerous behavior that harms LinkedIn's members and harms LinkedIn, by eroding the trust that lies at the core of LinkedIn's relationship with its members.

**ANSWER:**  hiQ denies the allegation that it uses LinkedIn members' publicly available profile information "against their interests."  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 13 because these allegations relate to LinkedIn members' states of mind and "expect[ations]" and LinkedIn's statements about itself.

### **JURISDICTION AND VENUE**

14.     This Court has federal question jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this action alleges violations of the federal Computer Fraud and Abuse

---

[9]   https://www.cnet.com/news/clearview-ai-hit-with-cease-and-desist-from-google-over-facial-recognition-collection/.

Act, 18 U.S.C. § 1030. The Court has supplemental jurisdiction over the state law causes of action pleaded herein pursuant to 28 U.S.C. § 1367.

**ANSWER:** hiQ admits the allegations in Paragraph 14.

15. This Court has personal jurisdiction over hiQ because, as hiQ alleges, it has its principal place of business in San Francisco, California. Moreover, hiQ brought the instant action in this judicial district, thereby submitting itself to the Court's jurisdiction.

**ANSWER:** hiQ admits the allegations in Paragraph 15.

16. Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. During all relevant times, hiQ repeatedly, knowingly, and intentionally targeted its wrongful acts at LinkedIn, which is headquartered in this judicial district.

**ANSWER:** hiQ admits that venue is proper in this district and denies the remaining allegations in Paragraph 16.

## INTRADISTRICT ASSIGNMENT

17. This case has been assigned to the Honorable Edward M. Chen.

**ANSWER:** hiQ admits the allegation in Paragraph 17.

## THE PARTIES

18. LinkedIn is a Delaware corporation with its principal place of business in Sunnyvale, California.

**ANSWER:** hiQ admits the allegations in Paragraph 18.

19. hiQ alleges that it is a Delaware corporation with its principal place of business in San Francisco, California.

**ANSWER:** hiQ admits the allegations in Paragraph 19.

## FACTS

### The LinkedIn Social Network

20. LinkedIn's mission is to connect the world's professionals to make them more productive and successful. Through its proprietary platform, LinkedIn members are able to create and manage their professional identities online, build and engage with their network, access shared

knowledge and insights, and find business opportunities, enabling them to be more productive and successful. LinkedIn's broader vision is to create economic opportunity for every member of the global workforce.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 20 relating to LinkedIn's "mission" and its "broader vision."  hiQ admits the remaining allegations in Paragraph 20.

21.     At the heart of LinkedIn's platform are its members, who create individual profiles that serve as their professional profiles online. LinkedIn is available at no cost to anyone who wants to join and who agrees to the terms of LinkedIn's User Agreement, Privacy Policy, and Cookie Policy. Today, LinkedIn has over 700 million members around the globe.

**ANSWER:**  hiQ admits the allegations in the first and last sentence of Paragraph 21, and lacks knowledge sufficient to admit or deny the remaining allegations in this Paragraph.

22.     LinkedIn members populate their profiles with a wide range of personal information concerning their professional lives, including summaries (narratives about themselves), job histories, skills, interests, educational background, professional awards, photographs, and other information.

**ANSWER:**  hiQ admits the allegations in Paragraph 22.

23.     LinkedIn has invested and plans to continue to invest substantial time, labor, skill, and financial resources into the development and maintenance of the LinkedIn site.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 23, which speak to LinkedIn's past investments and future business plans.

**LinkedIn's Technical Safeguards and Security Measures Protect LinkedIn Against Unauthorized Access**

24.     LinkedIn works hard to protect the integrity and security of its network and systems. Among other things, it employs an array of technological safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from accessing and copying its members' data on a large scale. It has a dedicated team of engineers whose full-time job is to detect and prevent scraping, and maintain LinkedIn's technical defenses.

1   **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

2   24 and the unnumbered heading that precedes it.

3   25.   LinkedIn's website and servers are not unconditionally open to the general public.

4   Rather, each call to LinkedIn's servers requires LinkedIn to authorize or permit the party seeking

5   access to LinkedIn's servers to view information on LinkedIn's website. This is because

6   LinkedIn's servers are protected by sophisticated defenses designed to prevent unauthorized

7   access and abuse that evaluate whether to grant each request made to LinkedIn's servers.

8   LinkedIn's technical defenses currently block hundreds of millions of requests to access guest

9   profiles per day from bots and scrapers, which constitute the majority of the requests made to

10   LinkedIn's servers for guest profiles. That is, LinkedIn rejects more requests to access guest

11   profiles (i.e. denies authorization or permission to obtain information from LinkedIn's servers)

12   than it authorizes.

13   **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

14   25.

15   26.   LinkedIn has many different technical systems that detect and block both logged-in

16   and logged-out scraping. One such safeguard is LinkedIn's FUSE system. FUSE scans and

17   imposes a limit on the activity that an individual LinkedIn member may initiate on the site. This

18   limit is intended to prevent would-be data scrapers utilizing automated technologies from quickly

19   accessing a substantial volume of member profiles.

20   **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

21   26.

22   27.   Another protection measure is LinkedIn's Sentinel system, through which

23   LinkedIn's defenses scan, throttle, and block suspicious activity associated with particular

24   accounts and IP addresses. Through Sentinel, LinkedIn maintains a list of IP addresses that are not

25   permitted to make calls on LinkedIn's servers because they either have in the past or are engaged

26   in abuse. An IP address is a unique sequence of integers or letters that identifies a computer when

27   that computer is communicating over the Internet (or some other network of computers). Any

28   computer connected to the Internet must have an IP address while it is connected to the Internet.

1   LinkedIn has restricted over 100 million IP addresses that have attempted to access LinkedIn's

2   servers in ways that challenge or circumvent LinkedIn's technical defenses. LinkedIn adds IP

3   addresses to this list daily, either automatically as its machine learning model detects scraping

4   attempts, or manually as needed by LinkedIn's dedicated team.

5           **ANSWER:**  hiQ admits the allegations in the third and fourth sentences of Paragraph 27

6   relating to what IP addresses are and how they function.  hiQ lacks knowledge sufficient to admit

7   or deny the remaining allegations in Paragraph 27.

8           28.     Business entities generally have IP addresses that remain static. This means that

9   computers connected to the Internet from a given business generally will keep the same IP address

10  each time those computers access the Internet. Because LinkedIn's servers receive the IP

11  addresses of computers sending calls to LinkedIn's servers, LinkedIn can program its servers to

12  block calls originating from specific IP addresses. When LinkedIn does this, LinkedIn's servers

13  will not return information in response to any calls received from blocked IP addresses, but will

14  return an error message. In June 2017, LinkedIn implemented targeted blocks as to hiQ's known

15  IP addresses.

16          **ANSWER:**  hiQ admits the allegations in Paragraph 28.

17          29.     In order for a business entity to access LinkedIn's computers after confronting an

18  IP block, that business entity must circumvent the IP block. In other words, it must use a computer

19  with an IP address that is different from those that the business normally uses, or must otherwise

20  make its requests to LinkedIn's servers look like they are coming from other computers by using

21  proxy servers or other masking techniques.

22          **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

23  29.

24          30.     LinkedIn also employs over 200 custom rules that it applies to requests made to its

25  servers to determine whether the requests is from a human or a bot. These rules include artificial

26  intelligence-based models and proprietary algorithms. LinkedIn's dedicated team is constantly

27  monitoring the effectiveness of its rules, adding to them and editing them in an effort to keep up

28  with scrapers.

PLAINTIFF AND COUNTER-DEFENDANT HIQ LABS, INC.'S ANSWER TO COUNTERCLAIMS

1    **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

2    30.

3    31.    Some of these rules fall under the Member and Guest Request Scoring systems,

4    which also restrict automated, non-human forms of access that facilitate scraping. The Member

5    Request Scoring System monitors page requests made by LinkedIn members while logged into

6    their accounts. If high levels of activity are detected for certain types of accounts, the member is

7    logged out and may either be warned, restricted, or challenged with a CAPTCHA[10] in order to log

8    back into LinkedIn.

9    **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

10   31.

11   32.    Similarly, the LinkedIn Guest Request Scoring system monitors and limits page

12   requests made by users who are not logged into LinkedIn. If unusual patterns or high levels of

13   activity are detected, the user is redirected to LinkedIn's log-in page and is prevented from

14   viewing additional LinkedIn pages while not logged in.

15   **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

16   32.

17   33.    LinkedIn also employs a "robots.txt" file, which is a technical protocol that is

18   designed to prevent unauthorized access by bots. This file, available at

19   https://www.linkedin.com/robots.txt, provides a set of instructions to any automated technologies

20   visiting the LinkedIn site, as well as an explicit warning in plain-to-read prose that the use of bots

21   to access LinkedIn without express permission is strictly prohibited. While LinkedIn's robots.txt

22   file does permit some webcrawlers (e.g., search engines such as Google or Bing) to crawl and

23   index the site, it prohibits and is intended to prevent automated bots like those used by hiQ.

24   **ANSWER:** hiQ admits that LinkedIn uses a "robots.txt" file, the content of which speaks

25   for itself.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in this

26

27   _____

     [10]  CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers
     and Humans Apart."

28   **ANSWER:** hiQ admits this allegation.

1    Paragraph, except that hiQ admits that LinkedIn permits certain third-parties automated access to

2    its site.

3         34.     Much of the information on LinkedIn's website is behind a password barrier as

4    well. Periodically, LinkedIn will prevent "logged-out" users from viewing more than a certain

5    number of pages before being asked to enter a user name and password to see more.

6         **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

7    34.

8         35.     LinkedIn's technical measures are vitally important to ensuring that the website is

9    available to legitimate human users. This, in turn, helps build and protect member trust.

10        **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

11   35, which are LinkedIn's statements about itself and its members' purported states of mind.

12        36.     LinkedIn's User Agreement[11] also prohibits accessing and scraping LinkedIn's

13   website through automated software and other technologies.

14        **ANSWER:**  The allegations in Paragraph 36 state legal conclusions to which no response

15   is required.  Further, LinkedIn's User Agreement is a document that speaks for itself.

16        37.     LinkedIn's User Agreement explains that members, users, and visitors to the

17   LinkedIn website must abide by certain restrictions in accessing and using the LinkedIn website.

18   The relevant version of the User Agreement, effective October 23, 2014, states that "You agree

19   that by clicking 'Join Now' 'Join LinkedIn', 'Sign Up' or similar, registering, accessing or using

20   our services ..., you are entering into a legally binding agreement (even if you are using our

21   Services on behalf of a company)." The current version contains similar language.

22        **ANSWER:**  The allegations in Paragraph 37 state legal conclusions to which no response

23   is required.  Further, LinkedIn's User Agreements are documents that speak for themselves.

24        38.     hiQ agreed to the User Agreement on several different occasions.

25        **ANSWER:**  The allegation in Paragraph 38 states a legal conclusion to which no response

26   is required.  To the extent a response is required, hiQ denies the allegation in Paragraph 38.

27

28       [11]  See https://www.linkedin.com/legal/user-agreement (last visited November 19, 2020).

PLAINTIFF AND COUNTER-DEFENDANT HIQ LABS, INC.'S ANSWER TO COUNTERCLAIMS

39.     hiQ has admitted in this litigation that "hiQ was itself a LinkedIn member with a business profile page on LinkedIn."[12]

**ANSWER:** hiQ admits the allegations in Paragraph 39.

40.     hiQ has maintained a Company Page on LinkedIn.

**ANSWER:** hiQ admits the allegation in Paragraph 40.

41.     In order for a user to create a Company Page on LinkedIn, that user must have signed up as a member, and therefore have already consented to the User Agreement. LinkedIn's records indicate that hiQ's Company Page was set up by hiQ's then-Chief Operating Officer Xander Oltmann on June 23, 2014. Mr. Oltmann is also a LinkedIn member who agreed to the User Agreement.

**ANSWER:** The allegations in Paragraph 41 state legal conclusions to which no response is required.  hiQ lacks knowledge sufficient to admit or deny the allegations in the first sentence of Paragraph 41.  hiQ lacks knowledge sufficient to admit or deny the contents of LinkedIn's records. The allegations relating to whether Mr. Oltmann holds an individual LinkedIn account and/or agreed on an individual basis to the User Agreement do not require a response from hiQ, as those allegations are not relevant to any claims or defenses in this case.

42.     hiQ also affirmatively agreed and assented to the LinkedIn Subscription Agreement ("LSA")[13] when it purchased a company license for LinkedIn's Sales Navigator product. On December 23, 2015, Darin Medeiros, hiQ's Vice President of Sales, Marketing and Operations signed a contract for hiQ to purchase Sales Navigator. The LSA is incorporated by reference into that contract. The Sales Navigator company license that hiQ purchased cost thousands of dollars.

**ANSWER:** The allegations in Paragraph 42 state legal conclusions to which no response is required.  hiQ admits that hiQ's then-Vice President of Sales, Marking and Operations signed a contract for hiQ to purchase a company license for the Sales Navigator product on December 23,

---

[12]   hiQ's Memorandum of Points and Authorities in Support of Renewed Ex Parte Motion for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, Dkt. 24 at 12.
[13]   The version that hiQ agreed to is dated November 15, 2015.

2015 and that the license cost hiQ thousands of dollars.  As to the contents of the contract, that document speaks for itself.

43.     The LSA incorporates the LinkedIn User Agreement, stating in Section 2.1 that the "terms of the User Agreement are incorporated into this LSA. Customer will ensure that Customer Users comply with the User Agreement." Hence, by affirmatively agreeing and assenting to the LSA, hiQ also agreed to and assented to the User Agreement.

**ANSWER:**  The allegations in Paragraph 43 state legal conclusions to which no response is required.  Further, the LSA and LinkedIn User Agreement are documents that speak for themselves.

44.     Beginning on January 25, 2016 and throughout 2016, hiQ also purchased advertising on LinkedIn.

**ANSWER:**    hiQ admits the allegation in Paragraph 44 that hiQ purchased advertising on LinkedIn, but lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 44.

45.     In doing so, it agreed to LinkedIn's Ads Agreement, which in turn incorporates the User Agreement. To agree to the Ads Agreement, one has to click through a screen where the Ads Agreement is hyperlinked above the button on which one needs to click to assent, as demonstrated by the below screenshot:



By clicking Launch campaign, you agree to the Linkedin Ads Agreement and Advertising Guidelines.

**Launch campaign**

**ANSWER:**  The allegations in Paragraph 45 state legal conclusions to which no response is required.  Further, LinkedIn's Ads Agreement is a document which speaks for itself.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 45.

46.     The LinkedIn Ads Agreement provided that "in addition" to "this Agreement, the standard LinkedIn User Agreement ... applies to your use of the LinkedIn Ads service," and that

"[a]s a consequence of your violation of any of the aforementioned agreements, LinkedIn may, at its sole discretion, prohibit you from any further participation in the LinkedIn Ads service and any other service or program offered by LinkedIn, or suspend or remove your LinkedIn account. LinkedIn may undertake technical measures in furtherance of such prohibition."

**ANSWER:** The LinkedIn Ads Agreement is a document that speaks for itself.

47.     There are also dozens of current and former employees of hiQ who maintain individual member profiles on LinkedIn and who have agreed to the LinkedIn User Agreement.

**ANSWER:** The allegations in Paragraph 47 state legal conclusions to which no response is required.  Further, the allegations in Paragraph 47 are not relevant to any claims or defenses in this case and therefore no response is required.  To the extent a response is required, hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 47.

48.     The User Agreement expressly prohibits scraping LinkedIn's website.

**ANSWER:** The allegation in Paragraph 48 states a legal conclusion to which no response is required.  Further, the User Agreement is a document which speaks for itself.

49.     Section 8.2 of the User Agreement prohibits those who are bound to the agreement from engaging in any of the following activities:

- "Us[ing] ... automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

- "Us[ing] bots or other automated methods to access the Services";

- "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology"; and

- "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or related any information or data."

**ANSWER:** The allegations in Paragraph 48 state legal conclusions to which no response is required.  Further, the User Agreement is a document which speaks for itself.

50.     As explained above, hiQ was aware and on actual notice of LinkedIn's User Agreement and LinkedIn's prohibitions against scraping for years. Moreover, hiQ agreed to abide

1  by LinkedIn's User Agreement, including its prohibitions against scraping and related conduct, on
2  multiple occasions.

3      **ANSWER:**  The allegations in Paragraph 50 state legal conclusions to which no response
4  is required.  To the extent a response is required, hiQ denies these allegations.

5      51.      In addition to agreeing to the User Agreement, as explained above, LinkedIn also
6  provided hiQ actual notice of the content of Section 8.2 of the User Agreement when it sent hiQ
7  its initial cease and desist letter on May 23, 2017. Since at least May 23, 2017, hiQ has therefore
8  known that any future use of LinkedIn's website is conditioned on abiding by LinkedIn's User
9  Agreement. By its terms, the User Agreement applies not only to LinkedIn members, which hiQ
10  was, but to anybody who uses LinkedIn's website.

11      **ANSWER:**  The May 23, 2017 cease and desist letter and the User Agreement are
12  documents which speak for themselves.  As to the allegations that use of LinkedIn's website is
13  conditioned on the User Agreement and that the User Agreement may legally "appl[y] … to
14  anybody who uses LinkedIn's website," those are legal conclusions to which no response is
15  required.  To the extent a response is required, hiQ denies these allegations.

16      52.      Section 3.4 of the User Agreement specifically provides that LinkedIn "reserves the
17  right to restrict, suspend, or terminate" a person or entity's access to LinkedIn. This provision is
18  necessary to allow LinkedIn to police its own website and violations of the User Agreement.

19      **ANSWER:**  The User Agreement is a document which speaks for itself.  hiQ lacks
20  knowledge sufficient to admit or deny the second sentence of Paragraph 52.

21      53.      LinkedIn takes violations of its User Agreement by any user of its website
22  seriously, and routinely takes action against such violations. LinkedIn has restricted over 27
23  million accounts for engaging in behavior violating the User Agreement including scraping, fraud,
24  and spamming.  While LinkedIn is often able to get bad actors to agree to cease their bad behavior
25  short of filing a lawsuit, LinkedIn has also enforced its rights in court on several occasions. *See*
26  *LinkedIn Corporation v. Robocog Inc*., No. 14 Civ. 0068 (N.D. Cal.); *LinkedIn Corporation v.*
27  *Scraping Hub Limited*, No. 16 Civ. 4463 (N.D. Cal.); *LinkedIn Corporation v. Raphael Azot and*
28  *Dataspectre*. No. 16 Civ. 4463 (N.D. Cal.).

1      **ANSWER:**  hiQ admits that LinkedIn has filed several lawsuits, including the ones listed

2 in Paragraph 53; however, the allegation that these lawsuits were filed against "bad actors" is a

3 legal conclusion to which no response is required.  To the extent a response is required, hiQ lacks

4 sufficient knowledge to admit or deny LinkedIn's characterization of the defendants to those

5 lawsuits as "bad actors."  hiQ lacks knowledge sufficient to admit or deny the remaining

6 allegations in Paragraph 53.

7                          **LinkedIn Member Privacy Choices**

8      54.      The privacy choices that LinkedIn offers its members are fundamentally important

9 to their decisions to entrust information to LinkedIn and to LinkedIn's platform. hiQ's illicit

10 scraping implicates several of them.

11      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in the first

12 sentence of Paragraph 54, which go to LinkedIn members' states of mind.  hiQ denies the

13 allegation in the second sentence of Paragraph 54.

14      55.      In its Privacy Policy, LinkedIn sets limits regarding what LinkedIn can and cannot

15 do with member data. The Privacy Policy expressly informs members that search engines may

16 index and display information in their profiles. LinkedIn limits such indexing to well-known

17 search engines, such as Google, Bing and Duck Duck Go. LinkedIn permits members to choose

18 the parts of their profiles that search engines index, or to opt out of this feature entirely. Members

19 thus have choice about whether they want search engines to index their profiles and display them

20 in relevant search results. LinkedIn offers members this choice because it allows members to be

21 found via search engines, which link to their LinkedIn profiles, where the member has stored and

22 controls his or her profile information. In other words, this is a policy that benefits LinkedIn's

23 members and is consistent with their expectations about how their data will be used.

24      **ANSWER:**  As to the allegations relating to the content of LinkedIn's Privacy Policy, the

25 Privacy Policy is a document that speaks for itself.  hiQ lacks knowledge sufficient to admit or

26 deny the remaining allegations in Paragraph 55.

27      56.      The Privacy Policy also promises that if a member decides that he or she wants to

28 delete his or her profile, LinkedIn will permanently delete the account and all of the data that the

1  member posted to LinkedIn within 30 days. Members' ability to remove their own information

2  helps ensure that members are the ones who have ultimate control over it.

3      **ANSWER:**  LinkedIn's Privacy Policy is a document which speaks for itself.  hiQ denies

4  the allegations in the second sentence of Paragraph 56.

5      57.      Another privacy control that LinkedIn offers is the "Do Not Broadcast" setting.

6  LinkedIn's platform allows members to update their profiles at any time with, for example, a new

7  employer, position, or skill. When a member updates the information in his or her profile,

8  LinkedIn lets that member choose whether to broadcast that change on LinkedIn. If a member

9  decides that he or she does not want to broadcast changes to his or her profile, that member can

10  click on a radio button and make that choice. If a member elects to employ this "Do Not

11  Broadcast" setting, then any changes that the member makes to his or her profile will be visible,

12  but the fact that the member made a change will not be broadcast to his or her LinkedIn

13  connections or to anyone else.

14      **ANSWER:**  hiQ denies that the "Do Not Broadcast" setting is a "privacy control."  hiQ

15  otherwise admits the allegations in Paragraph 57, except for the allegation that "the fact that the

16  member made a change will not be broadcast to … anyone else," because hiQ lacks knowledge

17  sufficient to admit or deny this allegation.

18      58.      LinkedIn implemented the "Do Not Broadcast" feature in the 2009-2010 timeframe

19  in response to feedback from LinkedIn members who were hesitant to update their profiles for fear

20  that their co-workers or employers would suspect they were searching for a new job or otherwise

21  thinking of leaving their current jobs.

22      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

23  58.

24      59.      LinkedIn offers members the ability to elect this "Do Not Broadcast" setting in

25  numerous places. First, LinkedIn members can go into their privacy settings and select this feature

26  at any time, as demonstrated by the following screenshot:

27

28

Sharing profile edits                                            Close
Choose whether your network is notified about profile changes      No

Do you want to share your profile changes with your network?
Your network may see when you change your profile, make
recommendations, or follow companies.

No

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 59. As to the content of the screenshot in Paragraph 59, that screenshot speaks for itself and hiQ lacks knowledge sufficient to verify the accuracy or original location of the screenshot.

60.     Second, LinkedIn provides members the option of electing the "Do Not Broadcast" feature in real-time anytime the member goes to make a change to his or her profile, by surfacing the feature directly in the dialog box in which the member makes profile changes.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 60.

61.     Many LinkedIn members have taken advantage of this privacy feature. Over 88 million LinkedIn members have elected to employ the "Do Not Broadcast" feature in the last three years. Of the 136 million members who updated their profiles in the last year, 36 million employed the "Do Not Broadcast" privacy setting—which is approximately 26% of those members. When members select "Do Not Broadcast," LinkedIn respects this choice in its other products, such as Recruiter.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 61.

62.     hiQ claims that it has three customers (eBay, Capital One, and GoDaddy) and several "potential" customers (including Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier, and Jobvite). As of 2017, over 100,000 LinkedIn members that work for these companies have taken advantage of the "Do Not Broadcast" privacy setting.

**ANSWER:** hiQ admits that the entities listed were, *prior to LinkedIn's conduct*, some of hiQ's customers or potential customers but hiQ denies that these were hiQ's *only* customers or

potential customers.  The allegation in the last sentence of Paragraph 62 does not require a response from hiQ, as that allegation is not relevant to any claims or defenses in this case.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 62.

<b>hiQ's Unlawful Data Scraping Activities</b>

63.    hiQ has engaged in widespread scraping of LinkedIn's website, circumventing LinkedIn's technical measures and violating the User Agreement. hiQ does not deny this. Although it formerly obscured the sources from which it harvested data to put into its products, stating only that it applied its algorithms to "public data sources,"[14] its filings in this very case concede that it scrapes significant amounts of data from LinkedIn. Since its original complaint, hiQ has alleged that it uses LinkedIn member data "as raw data for its analysis and has historically used a variety of software and manual means to gather this information" from LinkedIn's website.[15]

**ANSWER:**  As to the unnumbered heading that proceeds Paragraph 63 ("hiQ's Unlawful Data Scraping Activities"), that heading infers a legal conclusion to which no response is required. To the extent that heading requires a response, hiQ denies that its conduct was in any way unlawful.  As to the allegations in Paragraph 63, hiQ denies the characterizations of its scraping activity as "widespread" as well as the allegation that it scrapes "significant amounts of data," as those terms are relative with respect to the entirety of data on LinkedIn's website.  The statement in Paragraph 63 that hiQ violated the User Agreement is a legal conclusion to which no response is required; however, to the extent a response is required, hiQ denies that it violated the User Agreement.  hiQ denies that it ever "obscured the sources" of the data hiQ uses for its products. As to LinkedIn's quotations of hiQ's original complaint and amended complaint, those documents speak for themselves; however, hiQ denies the accuracy of those quotations, as LinkedIn's selective quotation to these documents omits the first portion of the quotes, which make clear that "hiQ uses the *public profile section* of the LinkedIn website as raw data for its analysis ...."  (Dkt. Nos. 1 ¶ 18, 131 ¶ 34) (emphasis added).

---

[14]   Dkt. 26 at 10.
[15]   Dkt. 1, ¶ 18; *see also* Dkt. 131 (First Amended Complaint) ¶ 34.

64.     The full extent of hiQ's illicit scraping is not currently known to LinkedIn, as hiQ has gone to substantial lengths to hide its methods from public view. It has not disclosed how it evaded LinkedIn's technical barriers.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny what is "currently known to LinkedIn" and otherwise denies the allegations in Paragraph 64.

65.     hiQ has never asked LinkedIn for permission to scrape LinkedIn's servers.

**ANSWER:**  hiQ admits the allegation in Paragraph 65.

66.     LinkedIn has never granted hiQ permission to scrape its servers.

**ANSWER:**  hiQ denies the allegation in Paragraph 66.

67.     From what LinkedIn understands, hiQ uses bots to scrape data from hundreds of thousands of profiles of LinkedIn members from LinkedIn's website. hiQ does not obtain permission from LinkedIn's members before scraping their LinkedIn data, nor do LinkedIn members have any enforceable way to limit what hiQ does with their data after it has been scraped.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny LinkedIn's understanding of hiQ's processes.  hiQ admits that it does not actively seek permission from LinkedIn's members before scraping their public profile data, but denies that any such efforts are necessary where members have opted to make their data publicly available.  As to the allegation that "LinkedIn members [do not] have any enforceable way to limit what hiQ does with their data," that is a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies this allegation.

68.     hiQ's bots are sophisticated and programmed in ways to evade LinkedIn's technical defenses.  hiQ's bots also use anonymous IP addresses, meaning they do not identify themselves to LinkedIn's computers as having been tasked by hiQ to scrape data (and thus would evade targeted IP address blocks). On information and belief, hiQ's bots made millions of calls to LinkedIn's servers prior to May 23, 2017.

**ANSWER:**  hiQ lacks sufficient knowledge to admit or deny these allegations as it is unclear what "hiQ's bots" refers to.

69.     After scraping data from LinkedIn's servers, hiQ uses the data for at least two products that it sells to its customers: (1) "Keeper," which hiQ claims tells employers which of their employees are flight risks, and (2) "Skill Mapper," which hiQ claims offers a summary of the breadth and depth of aggregate or individual skills possessed. hiQ claims to have sold these products to companies who want to keep better tabs on their employees.

**ANSWER:** hiQ admits that, *prior to LinkedIn's conduct*, it used public profile data from LinkedIn's website for the Keeper and Skill Mapper products.  hiQ admits to the high-level description of the Keeper and Skill Mapper products, but notes that these descriptions are not fulsome or complete descriptions of the products.  hiQ denies the characterization of these products as serving the purpose of "keep[ing] better tabs on [hiQ's clients'] employees."

70.     hiQ does not sell its products to employees. In fact, hiQ's "Keeper" product would lose its functionality if employees knew that their employers were using it. Many employees who want to find new jobs do not want their employers to know that they are looking for other jobs.

**ANSWER:** hiQ admits that it does not sell its products to employees.  hiQ denies that its "'Keeper' product would lose its functionality if employees knew that their employers were using it."  hiQ lacks knowledge sufficient to admit or deny the allegation as to the states of mind of "[m]any employees" who "are looking for other jobs."

71.     hiQ has no contractual relationship with LinkedIn's members and does not obtain permission from LinkedIn or its members to scrape their data from LinkedIn's website. Once hiQ has a member's data, no enforceable privacy policy or terms of service between hiQ and the people whose data it has scraped limit what hiQ could do with that data.

**ANSWER:** hiQ admits that it has no contractual relationship with LinkedIn's members, except to the extent any of LinkedIn's members are clients of hiQ with whom hiQ had a contractual relationship.  hiQ admits that it does not seek permission from LinkedIn's members to scrape their publicly available profile information; however, hiQ denies that any such permission is necessary where members have opted to make their data publicly available.  hiQ admits the remaining allegations in Paragraph 71.

72.     hiQ's scraping does not respect the privacy choices that LinkedIn's members have made, including the Do Not Broadcast feature, or subsequently make after the data has been scraped. Rather, hiQ's products defeat the privacy protection LinkedIn offers. Indeed, a goal of hiQ's "Keeper" product is to tell employers when LinkedIn members change their profiles, even if members have chosen not to broadcast such changes to their connections (including their employers).

**ANSWER:**  hiQ denies the allegations in Paragraph 72.

73.     After LinkedIn discovered hiQ's illicit scraping, it sent a cease-and-desist letter to hiQ on May 23, 2017 requesting that hiQ stop scraping LinkedIn data and explicitly stating that any further access to LinkedIn's servers was unauthorized. LinkedIn demanded that hiQ, inter alia, cease accessing LinkedIn's servers, destroy all data it obtained, and cease violating the User Agreement.

**ANSWER:**  hiQ denies the allegation in the first sentence of Paragraph 73 that its scraping was "illicit" and also denies the implication that LinkedIn was not aware, long before it sent its May 23, 2017 cease and desist letter, that hiQ was scraping LinkedIn members' publicly available data.  As to the contents of the cease and desist letter, that document speaks for itself.

74.     Thereafter, hiQ sued LinkedIn and obtained a preliminary injunction.

**ANSWER:**  hiQ admits the allegation in Paragraph 74.

**hiQ Has Caused and Threatens Ongoing and Irreparable Injury to LinkedIn**

75.     By engaging in the activities described above, hiQ has caused, and if not halted will continue to cause, ongoing and irreparable harm to LinkedIn, in a variety of ways, including ongoing and irreparable harm to its consumer goodwill. hiQ admits that it has scraped data from hundreds of thousands of LinkedIn users without their consent. hiQ's conduct should be permanently enjoined.

**ANSWER:**  hiQ denies the allegation in the unnumbered heading preceding Paragraph 75. The allegations in Paragraph 75 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

76.     LinkedIn's members entrust to LinkedIn their professional histories and interests on LinkedIn's site. LinkedIn will suffer ongoing and irreparable harm to its consumer goodwill and trust, which LinkedIn has worked hard for years to earn and maintain, if hiQ's conduct continues. LinkedIn has received numerous complaints from members when they suspect third parties of scraping their data.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in the first and third sentences of Paragraph 76.  The allegations in the second sentence of Paragraph 76 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.  hiQ denies the remaining allegations in this Paragraph.

77.     The below complaint, from June 2017, shortly after hiQ sued LinkedIn, is representative of the complaints that LinkedIn receives. In it, the member asked why a third party was "allowed to harvest and republish" his LinkedIn data and asked LinkedIn "[w]hat protection do you offer LinkedIn members?" This demonstrates that members expect that LinkedIn will take action to preserve their privacy and protect data that members post to LinkedIn's website. LinkedIn has received myriad complaints like this.

> Your Question : Why is holaconnect.com allowed to harvest and republish our data? Because they have a LinkedIn profile, they can harvest easily. Are they selling it? Spamming us? What protection do you offer Linkedin members? Or do you encourage their use of our data? Thanks

**ANSWER:**  The allegations in this Paragraph are not relevant to the claims or defenses in this action because they do not purport to relate to hiQ.  However, to the extent a response is required, to the extent these allegations quote from or make inferences based on a complaint, that document speaks for itself.  Moreover, hiQ lacks knowledge sufficient to admit or deny the authenticity of the complaint referenced in Paragraph 77, whether this complaint is "representative of the complaints that LinkedIn receives," whether LinkedIn in fact receives "myriad" complaints, or what the state of mind or expectations are of members who submit complaints.

78.     The below complaint is another example of the types of complaints that LinkedIn gets when members find information that they entrusted to LinkedIn posted on third party websites. In the below complaint, the member laments that once the member's information has

been taken by a third party, the member no longer controls it and can no longer delete it or make it
private, as would be the case with information that hiQ takes:



**Member** (02/13/2017 22:41 CST)

Email: : ██████@gmail.com

ta_group :

Your Question : Hi, I recently was let know by a friend that Rocketreach site carried information that I had on my linked in profile previously and displayed it unprotected. https://rocketreach.co ██████ I will choose to keep what I want in my linkedin profile (either private or public) which is my choice and I will modify my profile when I want to. I could have even changed my profile details and modified my settings on linkedin. But it is not right for Rocketreach to display the information I previously carried on my Linkedin profile. How does Rocketreach get the permission to display my information to everyone without my authorization. I see this as a very serious privacy violation and what is Linkedin's stand on Other providers using APIs to gather information from Linkedin Profile and displaying outdated information without the consent of the users. It defeats the purpose of updating my linkedin profile and making details private. Thanks, ██████.

**ANSWER:**  The allegations in this Paragraph are not relevant to the claims or defenses in
this action because they do not purport to relate to hiQ.  However, to the extent a response is
required, to the extent these allegations quote from or make inferences based on a complaint, that
document speaks for itself.  Moreover, hiQ lacks knowledge sufficient to admit or deny the
authenticity of the complaint referenced in Paragraph 78, whether this complaint "is an example of
the type of complaints that LinkedIn gets," or whether LinkedIn in fact receives such complaints.

79.      LinkedIn members have also complained about hiQ's scraping. For example, one
member complained: "How the hell does hiQ Labs, Inc. get the right to scrape data we placed on
LinkedIn? Is it just me or have things gotten way off the rails."

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph
79.

80.      LinkedIn has expended hundreds if not thousands of hours of employee time in
maintaining its technical defenses and investigating and responding to hiQ's unlawful activities, at
a cost to LinkedIn well in excess of $5,000.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph
80.

81.      Scraping also threatens the trust that LinkedIn has built with its members, which
could decrease member engagement. hiQ's actions – which are focused only on its narrow interest

1    to exploit LinkedIn data for its own benefit – detracts from the significant investments and efforts

2    undertaken by LinkedIn to ensure the LinkedIn platform is valuable to all members.

3        **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the implication that LinkedIn

4    "has built [trust] with its members."  hiQ denies the remaining allegations in Paragraph 81.

5        82.    Although LinkedIn has been plagued by unauthorized scraping traffic since the

6    early days of the platform, scraping traffic has grown substantially over the past few years.

7    Despite clear instructions to robots and clear policies prohibiting bots and scraping, LinkedIn

8    nonetheless receives many millions of unauthorized requests of its servers from bots every day.

9    The volume of such unauthorized traffic was meaningful by the time hiQ began its operations,

10   reached 95 million requests per day by the outset of the parties' dispute, and has further increased

11   dramatically during this litigation.

12       **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

13   82.

14       83.    Unauthorized scrapers like hiQ present multiple problems for LinkedIn. First, while

15   any particular scraper may start small, if it is successful it will seek to expand its automated data

16   collection, increasing the number of calls to LinkedIn's servers. Second, taken in the aggregate,

17   automated scrapers place a substantial burden on LinkedIn's infrastructure—reaching at present

18   into hundreds of millions of blocked access requests per day. While of course LinkedIn configures

19   its platform infrastructure to be resilient and scalable, the significant volume of automated

20   scraping activity forces LinkedIn to invest more in capital and operational resources than it

21   otherwise would if it were able to prevent these access requests from ever happening. Scraping

22   operations force LinkedIn to alter its priorities for use of its computing resources and impair the

23   efficiency of such resources. The current volume of bot requests could easily impair the ability of

24   many websites that do not invest as much in their infrastructure as LinkedIn does.

25       **ANSWER:**  hiQ denies the characterization of hiQ as an "[u]nauthorized" scraper and

26   lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 83.

27       84.    If hiQ were allowed to scrape unlimited numbers of pages, others would surely

28   follow. It is only because of LinkedIn's ongoing protection efforts as well as its willingness to

1  spend increasing amounts to maintain a high service level that it has been able to prevent a

2  degradation in the quality of its services. Attempts to scrape LinkedIn's website are now so

3  rampant that LinkedIn currently blocks the majority of daily requests to access guest LinkedIn

4  profiles—in the hundreds of millions of requests. In other words, but for LinkedIn's blocking

5  efforts and its investment in first-in-class back-end infrastructure, LinkedIn's servers would spend

6  more time and resources responding to unauthorized requests for guest profile information from

7  scrapers like hiQ than they would responding to people requesting such information in good faith

8  and in compliance with the scope of permission afforded by LinkedIn.

9      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

10  84.

11      85.      If LinkedIn has no legal means to prevent the ongoing escalation of these

12  automated scraping efforts, then its cost structure for infrastructure will also continue to escalate—

13  even assuming that its self-help efforts continue to be successful. LinkedIn will be forced into

14  making the choice of investing more in its infrastructure to ensure the availability of its website, or

15  succumbing to the burden of bot-based scraping. This is not much of a choice, as surely LinkedIn,

16  like any business, would prefer to have its website remain available. But this outcome means that

17  LinkedIn must plan its infrastructure around the whims of others, which means that its property is

18  no longer its own.

19      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

20  85.

21      86.      Left unchecked, scraping activity like hiQ's is both likely to be expanded and

22  replicated by others, causing LinkedIn harm in the form of impaired condition, quality and value

23  of both its infrastructure and services.

24      **ANSWER:**  hiQ denies the allegations in Paragraph 86.

25                      **FIRST CLAIM FOR RELIEF**

26          **Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA")**

27      87.      LinkedIn restates and incorporates by reference all of the preceding paragraphs.

28      **ANSWER:**  hiQ incorporates by reference all of its answers to the preceding paragraphs.

88.     LinkedIn's computers and servers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. §1030(e)(2).

**ANSWER:**  The allegations in Paragraph 88 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 88.

89.     hiQ knowingly and intentionally accessed LinkedIn's computers and servers without authorization or in excess of authorization.

**ANSWER:**   The allegations in Paragraph 89 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 89.

90.     LinkedIn's website and servers are not unconditionally open to the general public. Rather, they require authorization or permission from LinkedIn to access. LinkedIn uses various technological barriers to protect its computers, servers, and member data against unauthorized access including FUSE, Sentinel, the Member and Guest Request Scoring systems, its password wall, and related measures. hiQ circumvented these technical barriers and violated express access restrictions of LinkedIn's User Agreement. At no point did hiQ have authorization to access LinkedIn's servers by circumventing LinkedIn's technical barriers. hiQ appears to have gone to great lengths to mask its illicit scraping so that it was undetectable by LinkedIn and evade LinkedIn's technical barriers.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in the first three sentences of Paragraph 90.  hiQ denies the allegation in the fourth sentence of Paragraph 90 that it circumvented technical barriers, and the statement that hiQ "violated express access restrictions of LinkedIn's User Agreement" is a legal conclusion to which no response is required. To the extent a response is required, hiQ denies the allegation that it violated LinkedIn's User Agreement.  The allegation in the fifth sentence of Paragraph 90 states a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies this allegation.  hiQ denies the remaining allegations in Paragraph 90.

91.     LinkedIn also expressly revoked any authorization for hiQ to access its website when it sent the May 23, 2017 cease-and-desist letter.

1    **ANSWER:**  The allegation in Paragraph 91 states a legal conclusion to which no response

2    is required.  To the extent a response is required, hiQ denies the allegation in Paragraph 91.

3    92.    After accessing LinkedIn's computers and servers without authorization or in

4    excess of authorization, hiQ accessed, obtained and used valuable information from LinkedIn's

5    computers and servers in transactions involving interstate or foreign communications in violation

6    of 18 U.S.C. § 1030(a)(2). This information includes, among other things, the contents of many

7    LinkedIn profiles, and this use includes, among other things, analyzing and distributing that

8    content to others. This data was otherwise protected by LinkedIn's technical measures.

9    **ANSWER:**  hiQ admits that it accessed the publicly available data of specific LinkedIn

10   members' profiles and that it analyzed that data and distributed its analysis to others. hiQ denies

11   that it "distribut[ed] [the] content[s]" of LinkedIn profiles, or provided specific public profile

12   information to anyone who would not have otherwise been able to access it.  hiQ denies that

13   LinkedIn's members' publicly available profile data was "protected by LinkedIn's technical

14   measures."  The remaining allegations in Paragraph 92 state legal conclusions to which no

15   response is required.  To the extent a response is required, hiQ denies these allegations.

16   93.    LinkedIn has put hiQ on notice that its access to LinkedIn's servers is not

17   authorized by LinkedIn. Subject to LinkedIn's compliance with the Court's preliminary injunction

18   order, any further scraping by hiQ would be without authorization by LinkedIn.

19   **ANSWER:**  The allegations in Paragraph 93 state legal conclusions to which no response

20   is required.  To the extent a response is required, hiQ denies these allegations.

21   94.    LinkedIn has suffered damage and loss by reason of these violations, including,

22   without limitation, harm to LinkedIn's computer systems, expenses associated with being forced

23   to investigate and respond to the unauthorized access and abuse of its computers and servers, and

24   other losses and damage in an amount to be proven at trial, in excess of $5,000 aggregated over a

25   one-year period.

26   **ANSWER:**  The allegations in Paragraph 94 state legal conclusions to which no response

27   to required.  To the extent a response is required, hiQ denies these allegations.

28

95.     In addition, LinkedIn has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate it for injuries inflicted by hiQ. Accordingly, LinkedIn is entitled to injunctive relief.

**ANSWER:**  The allegations in Paragraph 95 state legal conclusions to which no response to required.  To the extent a response is required, hiQ denies these allegations.

## SECOND CLAIM FOR RELIEF

**California Comprehensive Computer Access and Fraud Act, Cal. Penal Code §§ 502 et seq.**

96.     LinkedIn restates and incorporates by reference all of the preceding paragraphs.

**ANSWER:**  hiQ restates and incorporates by reference its answers to all of the preceding paragraphs.

97.     LinkedIn's computers and servers are computers, computer systems, and/or computer networks within the meaning of Cal. Penal Code § 502(b).

**ANSWER:**  The allegations in Paragraph 97 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 97.

98.     hiQ circumvented various technological barriers LinkedIn has employed to protect its computers, servers, and member data against unauthorized access—including FUSE, Sentinel, the Member and Guest Request Scoring systems, its password barrier, and related measures—and has violated express access and use restrictions in LinkedIn's User Agreement.

**ANSWER:**  The allegations in Paragraph 98 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

99.     hiQ wrongfully obtained and used valuable information from LinkedIn's website.

**ANSWER:**  The allegations in Paragraph 99 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

100.    hiQ knowingly accessed LinkedIn's website and servers, and, without permission took, copied and made use of data and files from LinkedIn's computers, computer systems, and/or computer networks, including to wrongfully control and/or obtain such data, in violation of Cal. Penal Code §§ 502(c)(1) & (2).

1   **ANSWER:**  The allegations in Paragraph 100 state legal conclusions to which no response

2   is required.  To the extent a response is required, hiQ denies these allegations.

3   101.   hiQ knowingly and without permission accessed or caused to be accessed

4   LinkedIn's computers, computer systems, and/or computer networks in violation of Cal. Penal

5   Code § 502(c)(7).

6   **ANSWER:**  The allegations in Paragraph 101 state legal conclusions to which no response

7   is required.  To the extent a response is required, hiQ denies these allegations.

8   102.   LinkedIn has put hiQ on notice that its access to LinkedIn's servers is not

9   authorized by LinkedIn. Subject to LinkedIn's compliance with the Court's preliminary injunction

10  order, any further scraping by hiQ would be without permission by LinkedIn.

11  **ANSWER:**  The allegations in Paragraph 102 state legal conclusions to which no response

12  is required.  To the extent a response is required, hiQ denies these allegations.

13  103.   As a direct and proximate result of hiQ's unlawful conduct, hiQ has caused damage

14  to LinkedIn in an amount to be proven at trial. LinkedIn is also entitled to recover its reasonable

15  attorney's fees pursuant to Cal. Penal Code § 502(e).

16  **ANSWER:**  The allegations in Paragraph 103 state legal conclusions to which no response

17  is required.  To the extent a response is required, hiQ denies these allegations.

18  104.   LinkedIn believes that hiQ's acts were willful and malicious, including that hiQ's

19  acts described above were done with the deliberate intent to harm LinkedIn. LinkedIn is therefore

20  entitled to punitive damages.

21  **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny LinkedIn's "belie[fs]."  The

22  remaining allegations in Paragraph 104 state legal conclusions to which no response is required.

23  To the extent a response is required, hiQ denies these allegations.

24  105.   In addition, LinkedIn has suffered and will continue to suffer irreparable harm, and

25  its remedy at law is not itself adequate to compensate it for injuries inflicted by hiQ. Accordingly,

26  LinkedIn is entitled to injunctive relief.

27  **ANSWER:**  The allegations in Paragraph 105 state legal conclusions to which no response

28  is required.  To the extent a response is required, hiQ denies these allegations.

### THIRD CLAIM FOR RELIEF

**Breach of Contract**

106. LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

**ANSWER:** hiQ restates and incorporates by reference its answers to all of the preceding paragraphs.

107. Use of the LinkedIn website and use of LinkedIn services are governed by and subject to the User Agreement.

**ANSWER:** The allegations in Paragraph 107 state legal conclusions to which no response is required. To the extent a response is required, hiQ denies these allegations.

108. LinkedIn members are presented with the User Agreement and must affirmatively accept and agree to the User Agreement to register for a LinkedIn account.

**ANSWER:** The allegations in Paragraph 108 state legal conclusions to which no response is required. To the extent a response is required, hiQ denies these allegations.

109. At all relevant times, LinkedIn also prominently displayed a link to the User Agreement on LinkedIn's homepage. Those who use LinkedIn's website with actual knowledge of the terms of the User Agreement are required to abide by those terms if they choose to access LinkedIn's website.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the first sentence of Paragraph 109. The remaining allegations in Paragraph 109 state a legal conclusion to which no response is required. To the extent a response is required, hiQ denies the remaining allegations in Paragraph 109.

110. All LinkedIn members are required to agree to the User Agreement.

**ANSWER:** The allegation in Paragraph 110 states a legal conclusion to which no response is required. To the extent a response is required, hiQ lacks knowledge sufficient to admit or deny the allegation in Paragraph 110.

111. hiQ has admitted that it was a LinkedIn member.

**ANSWER:** hiQ admits the allegation in Paragraph 111.

112.    hiQ was on notice of and agreed to the User Agreement in several ways, including when it agreed to the LinkedIn Ads Agreement, when it agreed to the LSA, and when it created its Company Page.

**ANSWER:**  The allegations in Paragraph 112 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 112.

113.    In addition, LinkedIn put hiQ on actual notice of the anti-scraping terms of its User Agreement on May 23, 2017, in its cease-and-desist letter.

**ANSWER:**  The May 23, 2017 cease-and-desist letter is a document that speaks for itself.

114.    The User Agreement is enforceable and binding on hiQ.

**ANSWER:**  The allegations in Paragraph 114 state a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies these allegations to the extent they suggest that hiQ was bound by any agreement when it was not logged in to its Company Page.

115.    The User Agreement prohibits accessing LinkedIn's website through automated means.

**ANSWER:**  The allegation in Paragraph 115 states a legal conclusion to which no response is required.  Further, the User Agreement is a document that speaks for itself.

116.    The User Agreement prohibits scraping data from LinkedIn's website using automated means.

**ANSWER:**  The allegation in Paragraph 116 states a legal conclusion to which no response is required.  Further, the User Agreement is a document that speaks for itself.

117.    After being bound by the terms of the User Agreement, hiQ repeatedly accessed the LinkedIn website and scraped data in ways that violate the terms of the User Agreement.

**ANSWER:**  The allegations in Paragraph 117 state a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 117.

118.    hiQ willfully and repeatedly breached the User Agreement.

1    **ANSWER:**  The allegations in Paragraph 118 state a legal conclusion to which no

2    response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph

3    118.

4        119.    LinkedIn has performed all conditions, covenants, and promises required of it in

5    accordance with the User Agreement.

6    **ANSWER:**  The allegations in Paragraph 119 state legal conclusions to which no response

7    is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 119.

8        120.    In addition, hiQ agreed to the LSA.

9    **ANSWER:**  hiQ admits the allegation in Paragraph 120.

10       121.    The LSA was, therefore, binding on hiQ.

11   **ANSWER:**  The allegation in Paragraph 121 states a legal conclusion to which no

12   response is required.  To the extent a response is required, hiQ denies the allegation to the extent it

13   suggests that hiQ was bound by the LSA when it was scraping publicly available data from

14   LinkedIn's website.

15       122.    The LSA incorporates the terms of the User Agreement by reference.

16   **ANSWER:**  The allegation in Paragraph 122 states a legal conclusion to which no

17   response is required.  Further, the LSA is a document that speaks for itself.

18       123.    hiQ willfully and repeatedly breached the LSA.

19   **ANSWER:**  The allegations in Paragraph 123 state legal conclusions to which no response

20   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 123.

21       124.    LinkedIn has performed all conditions, covenants, and promises required of it in

22   accordance with the LSA.

23   **ANSWER:**  The allegations in Paragraph 124 state legal conclusions to which no response

24   is required.  To the extent a response is required, hiQ lacks knowledge sufficient to admit or deny

25   the allegations in Paragraph 124.

26       125.    hiQ's conduct has damaged LinkedIn, and caused and continues to cause

27   irreparable harm and injury to LinkedIn.

28

1    **ANSWER:** The allegations in Paragraph 125 state legal conclusions to which no response

2    is required. To the extent a response is required, hiQ denies the allegations in Paragraph 125.

3    126.    Any future use of LinkedIn's website by hiQ is subject to the terms of the User

4    Agreement.

5    **ANSWER:** The allegations in Paragraph 126 state a legal conclusion to which no

6    response is required. To the extent a response is required, hiQ denies the allegations in Paragraph

7    126.

8    127.    LinkedIn is entitled to injunctive relief, declaratory relief, compensatory damages,

9    and/or other equitable relief.

10    **ANSWER:** The allegations in Paragraph 127 state legal conclusions to which no response

11    is required. To the extent a response is required, hiQ denies the allegations in Paragraph 127.

12    <u>**FOURTH CLAIM FOR RELIEF**</u>

13    **Misappropriation**

14    128.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

15    **ANSWER:** hiQ restates and incorporates by reference its answers to all of the preceding

16    paragraphs.

17    129.    LinkedIn has invested substantial time, labor, skill, and financial resources into the

18    creation and maintenance of LinkedIn, its computer systems and servers, including system and

19    server capacity, as well as the content on the LinkedIn website, which is time-sensitive. hiQ has

20    invested none of its own time and resources into developing and building the LinkedIn website

21    and platform.

22    **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in the first

23    sentence of Paragraph 129. hiQ admits the allegation in the second sentence of Paragraph 129.

24    130.    Disregarding the prohibitions set forth in LinkedIn's User Agreement to which hiQ

25    was on notice of and expressly consented to, and in circumvention of various technical barriers,

26    hiQ, without authorization, wrongfully accessed LinkedIn's website, computer systems and

27    servers, and obtained data from the LinkedIn site. The data that hiQ took included time-sensitive

28    updates to member profiles.

1   **ANSWER:**  The allegations in Paragraph 130 state legal conclusions to which no response

2   is required.  Further, hiQ denies the allegations in the first sentence of Paragraph 130.  hiQ lacks

3   knowledge sufficient to admit or deny the allegation in the second sentence of this Paragraph that

4   hiQ took "time-sensitive updates to member profiles" as hiQ does not understand what a "time-

5   sensitive update" is.  To the extent a response is required, hiQ denies these allegations.

6   131.    hiQ's appropriation and use of this data was at little or no cost to hiQ, without hiQ

7   having to make the substantial investment in time, labor, skill, and financial resources made by

8   LinkedIn in developing the LinkedIn website and platform. In other words, hiQ reaped what it did

9   not sow. hiQ's use of LinkedIn's computer systems and servers, including member data from the

10   LinkedIn site and system and server capacity, constitutes free-riding on LinkedIn's substantial

11   investment of time, effort, and expense.

12   **ANSWER:**  The allegations in Paragraph 131 state legal conclusions to which no response

13   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 131.

14   132.    As a result of this misappropriation, LinkedIn has been forced to expend additional

15   time and resources, including but not limited to, investigating and responding to hiQ's activities,

16   and hiQ has been able to exploit and benefit from LinkedIn's substantial investment of time,

17   effort, and expense.

18   **ANSWER:** The allegations in Paragraph 132 state legal conclusions to which no response

19   is required.  Further, hiQ denies that it misappropriated anything from LinkedIn.  hiQ lacks

20   knowledge sufficient to confirm or deny the remaining allegations in paragraph 132 except that

21   hiQ denies "exploit[ing]" LinkedIn's investment of time, effort, and expense.

22   133.    LinkedIn has been and will continue to be damaged as the result of hiQ's acts of

23   misappropriation.

24   **ANSWER:**  The allegations in Paragraph 133 state legal conclusions to which no response

25   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 133.

26   134.    LinkedIn has suffered and will continue to suffer irreparable injury, and its remedy

27   at law is not itself adequate to compensate it for injuries inflicted by hiQ.

28

1    **ANSWER:**  The allegations in Paragraph 134 state legal conclusions to which no response

2    is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 134.

3                                            **FIFTH CLAIM FOR RELIEF**

4                                              **Trespass to Chattels**

5    135.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

6    **ANSWER:**  hiQ restates and incorporates by reference its answers to all of the preceding

7    paragraphs.

8    136.    LinkedIn owns, possesses, and/or has the right to possess the servers and

9    infrastructure used to run its business.

10   **ANSWER:**  The allegations in Paragraph 136 state legal conclusions to which no response

11   is required.  Further, hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

12   136.

13   137.    hiQ intentionally interfered with LinkedIn's use and possession of LinkedIn's

14   servers and infrastructure.

15   **ANSWER:**  The allegations in Paragraph 137 state a legal conclusion to which no

16   response is required.  To the extent a response is required, hiQ denies the allegation in Paragraph

17   137.

18   138.    LinkedIn has never consented to hiQ's conduct.

19   **ANSWER:**  hiQ denies the allegation in Paragraph 138.

20   139.    hiQ's conduct, if expanded and/or replicated unchecked by others, will cause harm

21   to LinkedIn in the form of impaired condition, quality and value of its servers, infrastructure and

22   services.

23   **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

24   139.  hiQ denies that its conduct has caused harm to LinkedIn.

25                                            **PRAYER FOR RELIEF**

26   WHEREFORE, LinkedIn prays that judgment be entered in its favor and against hiQ, as

27   follows:

28

1       1.      A permanent injunction enjoining and restraining hiQ, its employees,

2 representatives, agents, and all persons or entities acting in concert with it prior to, during, and

3 after the pendency of this action perpetually from: (a) accessing or using LinkedIn's website,

4 servers, systems, and any data displayed or stored therein, including through scraping and

5 crawling technologies, for any commercial purpose whatsoever; and (b) extracting and copying

6 data appearing on LinkedIn's website to their own servers or systems or those controlled by them;

7       **ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

8       2.      A declaration stating (a) that hiQ must abide by the terms of LinkedIn's User

9 Agreement should it choose to access LinkedIn's website in the future; (b) that any future data

10 scraping would be without authorization under the CFAA; (c) and that any future taking and use

11 of LinkedIn's data would be without permission and would violate California Penal Code § 502;

12       **ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

13       3.      An order requiring hiQ to destroy all documents, data, and other items, electronic

14 or otherwise, in its possession, custody, or control, that were wrongfully extracted and copied

15 from LinkedIn's website, along with any data that hiQ has inferred as a result of data wrongfully

16 extracted and copied from LinkedIn's website;

17       **ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

18       4.      An award to LinkedIn of damages, including, but not limited to, compensatory

19 damages, statutory damages, profits of hiQ, and/or punitive damages, as permitted by law, in an

20 amount to be proved at trial;

21       **ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

22       5.      An award to LinkedIn of its costs of suit, including, but not limited to, reasonable

23 attorney's fees, as permitted by law; and

24       **ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

25       6.      Such other relief as the Court deems just and proper.

26       **ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

27       LinkedIn demands a trial by jury on all issues so triable.

28       **ANSWER:** hiQ consents to a trial by jury on all issues so triable.

**AFFIRMATIVE DEFENSES**

In addition to the above, hiQ sets forth the below defenses to LinkedIn's counterclaims. Each defense is asserted as to all claims for relief against hiQ, except where otherwise noted.  By asserting the matters set forth below, hiQ does not allege or admit or deny that it has the burden of proof and/or the burden of persuasion with respect to any of these matters.  hiQ asserts as follows:

**FIRST DEFENSE**

**(Failure to State a Claim)**

LinkedIn has failed to state any claim against hiQ upon which relief may be granted.

**SECOND DEFENSE**

**(Statute of Limitations)**

LinkedIn's claims are barred, in whole or in part, by any and all applicable statutes of limitations.

**THIRD DEFENSE**

**(Estoppel)**

LinkedIn's claims are barred, in whole or in part, by the equitable doctrine of estoppel. LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains.  Nevertheless, LinkedIn unreasonably delayed in bringing any claims against hiQ relating to this matter and such unreasonable delay resulted in prejudice to hiQ.

**FOURTH DEFENSE**

**(Adequate Remedy at Law)**

LinkedIn's claims for equitable relief are barred, in whole or in part, because LinkedIn has not suffered any harm, any alleged injury to LinkedIn is not immediate or irreparable, and LinkedIn has an adequate remedy at law.

## FIFTH DEFENSE

### (Waiver)

LinkedIn's claims are barred, in whole or in part, under the doctrine of waiver.  LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains, and LinkedIn has therefore waived any right to complain about such conduct now.

## SIXTH DEFENSE

### (Ratification)

LinkedIn's claims are barred, in whole or in part, under the doctrine of ratification. LinkedIn knew for years prior to sending its cease-and-desist letters to hiQ that hiQ was engaging in the conduct of which LinkedIn now complains.  Thus, by its inaction, LinkedIn ratified hiQ's conduct as valid and binding.

## SEVENTH DEFENSE

### (No Injury)

LinkedIn's claims are barred, in whole or in part, because LinkedIn has suffered no actual injury in fact and therefore has suffered no damages for which hiQ can be liable.

## EIGHTH DEFENSE

### (*In Pari Delicto*)

LinkedIn's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## NINTH DEFENSE

### (Consent)

LinkedIn's claims are barred, in whole or in part, by the doctrine of consent.  LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains and LinkedIn consented to that conduct.

### TENTH DEFENSE

### (Good Faith)

LinkedIn's claims are barred, in whole or in part, because hiQ acted at all times in good faith.

### ELEVENTH DEFENSE

### (Unclean Hands)

LinkedIn's claims are barred, in whole or in part, based on the unclean hands of LinkedIn, its agents, or affiliates.

### TWELFTH DEFENSE

### (Intervening/Superseding Causes)

LinkedIn's claims are barred, in whole or in part, because LinkedIn did not suffer damages attributable to any action by hiQ and/or because any damages or harms allegedly suffered by LinkedIn, which hiQ denies, are attributable solely to causes other than acts or omissions by hiQ.

### THIRTEENTH DEFENSE

### (Failure to Mitigate Damages)

LinkedIn's claims are barred, in whole or in part, because to the extent LinkedIn sustained any damages at all due to hiQ's acts or omissions, which hiQ denies, LinkedIn failed to mitigate their damages.

### FOURTEENTH DEFENSE

### (Speculative Damages)

LinkedIn's claims are barred, in whole or in part, because LinkedIn's alleged damages are speculative, uncertain, or contingent, and are not recovered at law or equity.

### FIFTEENTH DEFENSE

### (No Basis for Punitive Damages)

LinkedIn's claims for punitive damages are barred, in whole or in part, because LinkedIn fails to state any facts or legally cognizable basis upon which an award of punitive damages may be granted against hiQ.

## SIXTEENTH DEFENSE

### (No Basis for Attorneys' Fees)

LinkedIn's claims for attorneys' fees are barred, in whole or in part, because LinkedIn fails to state any facts or legally cognizable basis upon which an award of attorneys' fees may be granted against hiQ.

## SEVENTEENTH DEFENSE

### (Laches)

LinkedIn's claims are barred, in whole or in part, by the equitable doctrine of laches. LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains.  Nevertheless, LinkedIn unreasonably delayed in bringing any claims against hiQ relating to this matter and such unreasonable delay resulted in prejudice to hiQ.

## EIGHTEENTH DEFENSE

### (Reservation of Rights for Additional Affirmative Defenses)

hiQ reserves the right to assert additional defenses upon discovery of further information concerning LinkedIn's claims.

## PRAYER FOR RELIEF

WHEREFORE, hiQ respectfully requests the following:

a.      That LinkedIn take nothing by way of its claims;

b.      That LinkedIn be denied each and every demand and prayer for relief contained in its Counterclaims;

c.      That LinkedIn's claims be dismissed with prejudice and that judgment be entered against LinkedIn and in favor of hiQ;

d.      For attorney's fees and the costs of suit to the extent permitted under applicable law and contracts; and

e.      For such other and further relief as the Court may deem to be just and proper.

Dated: September 3, 2021

QUINN EMANUEL URQUHART & SULLIVAN LLP

By:    */s/ Corey Worcester*
         Corey Worcester

Attorneys for Plaintiff/Counter-Defendant hiQ Labs, Inc.