ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
SARAH K. MULLINS (SBN 324558)
sarahmullins@orrick.com
MARIA N. SOKOVA (SBN 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

*Attorneys for LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., <br><br> Plaintiff, <br><br> vs. <br><br> LinkedIn Corporation, <br><br> Defendant. | Case No. 17-cv-03301-EMC <br><br> **DECLARATION OF ANNETTE HURST IN SUPPORT OF LINKEDIN'S MOTION TO DISSOLVE PRELIMINARY INJUNCTION AND REQUEST FOR INDICATIVE RULING PURSUANT TO FED. R. CIV. P. 62.1** |
| LinkedIn Corporation <br><br> Counterclaimant, <br> vs. <br><br> hiQ Labs, Inc. <br><br> Counterdefendants, | Date:    Oct. 14, 2021 <br> Time:    1:30 p.m. <br> Courtroom: 5 – 17th Floor <br> Judge:   Hon. Edward M. Chen <br><br> Complaint Filed: June 7, 2017 <br> Trial Date:    Feb. 27, 2023 <br><br> **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.** |

I, Annette L. Hurst, hereby declare as follows:

1. I am an attorney at the law firm of Orrick, Herrington & Sutcliffe LLP, counsel of record for LinkedIn Corporation in this action. I am a member of the California State Bar and am admitted to practice before this Court. I have personal knowledge of the facts stated in this declaration.

2. Discovery in this case commenced only after the expiration of the stay pending until the Supreme Court's June 14, 2021 order granting certiorari, vacating the Ninth Circuit's judgment, and remanding the case for further consideration.

3. In the weeks since the stay expired, the parties have exchanged initial disclosures, served initial written discovery requests and responses thereto, agreed upon a stipulated protective order that was entered by the Court, and conducted several meetings to negotiate an ESI Protocol applicable to the discovery of electronic source information in this action as required by the Local Rules and the Court's standing orders. The parties conducted a settlement conference on August 2. I participated in meetings on August 6th, August 20th, September 3d and September 7th with counsel for hiQ where we discussed, among other topics, the protocols for preservation, collection, and production of ESI.

4. In every substantive meeting with counsel for hiQ since the expiration of the stay, counsel for hiQ have implied or stated that its business is no longer in operation. In the first ESI Protocol meeting on August 6th, Ms. Sharma and Ms. Skibitsky explained that they were gathering information about the nature of hiQ's ESI by conducting multiple conversations with former employees. They also explained that they were still in the process of data transfer and learning about what still exists. They stated that hiQ had archived certain of its data in August or September of 2018. In particular, they stated that hiQ had archived its "G Suite" of communication and collaboration tools, its Box and Dropbox information, its source code on GitHub, and its Slack data. There were open questions regarding certain other accounts and data, including a question regarding the status of the accounts, database and data used to collect and store data scraped from LinkedIn.

5. During this conversation, we scheduled a follow-up meeting for two weeks later on August 20th. My colleague Robert Uriarte sent an email to Ms. Sharma and Ms. Skibitsky explaining what information LinkedIn sought in connection with our second planned ESI meeting. A true and correct copy of that email dated August 11, 2021 is attached hereto as Exhibit 1.

6. Meanwhile, I sought to understand more about how long it had been since hiQ had been operating its business by reviewing hiQ's discovery responses. All of its disclosures were stated in the past tense. For example, attached hereto as Exhibit 2 is a true and correct copy of Plaintiff hiQ's June 24, 2021 Rule 26(a)(1) Disclosures. All hiQ employees likely to have discoverable information are identified therein as "former" employees. I then asked colleagues at Orrick to check the LinkedIn profiles of every hiQ employee to see whether the profiles show those individuals as still employed at hiQ or working elsewhere. For those persons who had profiles on LinkedIn, every single one showed that the individual was employed elsewhere. Attached hereto as Exhibit 3 is a true and correct copy of LinkedIn pages of former hiQ employees identified in hiQ's Initial Disclosures.

7. hiQ served its initial Interrogatory Responses on July 29, 2021. The Interrogatory Responses further described hiQ's business in the past tense, referring to entities that "were hiQ's customers," stating that it had no competitors "when it was a going concern," and acknowledging that "because hiQ is no longer operational, it cannot be said to have any competitors." A true and correct copy of relevant excerpts from the partially redacted version of Plaintiff hiQ's July 29, 2021 Responses to LinkedIn's First Set of Interrogatories, served on August 30, 2021, is attached hereto as Exhibit 4. (hiQ has not yet served a fully unredacted version as it has stated it cannot do so without first making disclosures to a variety of third parties.)

8. In our second ESI Protocol meeting on August 20th, Ms. Sharma and Ms. Skibitsky were largely prepared to answer the questions of Mr. Uriarte's August 11th email. I also asked a series of questions designed to confirm how long hiQ had been out of business and the status of its electronic information in light of the fact that it was out of business. During the

course of the discussions, hiQ's counsel clearly stated that hiQ had ceased its operations sometime in the August or September 2018 timeframe. hiQ's counsel also said that hiQ's full-time employees had all departed. hiQ's counsel further stated that, since that time, hiQ has shut down all of the key systems and databases it used to conduct its business.

9. One of the things that we learned during the August 20th meeting was that hiQ had not maintained its collection of scraped LinkedIn data in the fashion that it was stored during the ordinary course of business. Ms. Sharma and Ms. Skibitsky described two sources of LinkedIn data: (1) an AWS (Amazon Web Services) account where the "native" and "flat files" of LinkedIn scraped data were stored in their original form; (2) a MongoDB database where the "parsed" or processed LinkedIn data was stored. The AWS account and the MongoDB database no longer existed after being shut down in 2018. Counsel represented that the data that had previously been stored there was archived on hard drives and is not currently accessible.

10. In addition, Ms. Sharma and Ms. Skibitsky had reported during the first meeting on August 6th that hiQ used Salesforce to manage all of its customer relationships. Salesforce is a cloud-based customer relationship management ("CRM") system. On August 6th, they explained that hiQ no longer had access to its Salesforce account but that they were still investigating the status of that data. In the second meeting on August 20th, they confirmed that hiQ had allowed its Salesforce account to expire without exporting all of the data from the account. They also reported that hiQ no longer had access to the Quickbooks account previously used to manage the company's general ledger and finances.

11. I explained during the August 20th meeting the seriousness with which LinkedIn viewed hiQ's apparent destruction of its CRM system long after litigation was commenced. I explained that LinkedIn viewed customer and sales information as among the most relevant source of data in an action brought by hiQ alleging unfair competition and interference with economic relations. I stated that my general understanding of Salesforce is that it is a multi-channel database tool used to collect in one place all information and interactions regarding each customer and prospective customer, and likely the best single source of data to understand the

reasons why hiQ's customers and potential customers had chosen or declined to do business with it. Ms. Sharma and Ms. Skibitsky confirmed that hiQ used its Salesforce system in the ordinary fashion to collect information regarding its customer relationships, and they agreed that they would conduct further follow-up investigation on the topic of whether that data could be restored. We scheduled a third meeting for September 3d.

12. On August 25th, I wrote a letter to hiQ's counsel confirming the representations made about hiQ's business and the status of hiQ's various data sources. A true and correct copy of that letter is attached as Exhibit 5. In the letter I confirmed, among other facts, that hiQ had been out of business since August or September of 2018. I also asked counsel to correct any inaccuracies described therein. I did not receive any response to that letter. On September 3d we met again to discuss ESI and discovery responses. During the meeting, counsel explained that hiQ's Salesforce account had lapsed when its prepaid subscription lapsed, in January of 2020. They stated that it was Salesforce's policy to delete all data within 90 days after an account has lapsed. Based on their investigation, it was not possible to resuscitate the data even by re-activating the account. This means that hiQ destroyed its sales database *after* it filed this lawsuit.

13. To further document that hiQ has been out of business for at least three years, I asked my colleagues at Orrick to assess whether hiQ's website showed signs of ongoing marketing and business activity. The website shows that hiQ's last podcast was on February 28, 2017, its last blog post was on June 2, 2017, and last news article was posted February 21, 2018. Attached hereto as Exhibit 6 are true and correct copies of relevant excerpts from hiQ's website.

14. I also asked my colleagues to assess the activity from hiQ's Twitter account. hiQ's last tweet related to the conduct of its business was on January 8, 2018; all recent Twitter activity has been related solely to the litigation. Attached hereto as Exhibit 7 are true and correct copies of relevant excerpts from hiQ's Twitter feed.

15. HiQ's business address listed on its website is 575 Market Street, Suite 850, in San Francisco. I asked my colleagues to see whether they could determine if hiQ still occupied that location. We learned that the landlord is currently listing the location for rent. Attached hereto as

Exhibit 8 is a true and correct copy of CBRE's listing of the space at 575 Market St., Ste 850, San Francisco, CA 94105.

16. All of the information that we at Orrick have been able to uncover confirms that hiQ is out of business and has been out of business for years. I was very surprised by this because one of the very first things that happened after Orrick became counsel of record was that hiQ's counsel sent us a letter asking that LinkedIn *add* two new IP addresses to the "whitelist" (or in LinkedIn's parlance, "allowlist") of IP addresses that have guaranteed access to the LinkedIn website as a result of the Court's preliminary injunction. A true and correct copy of Ms. Sharma's letter dated January 22, 2021 making this request is attached hereto as Exhibit 9. The letter from Ms. Sharma said that the two new requested IP addresses "will be used by hiQ to access public LinkedIn profiles."

17. That letter created the obvious impression that hiQ was conducting ongoing business operations, and that impression was furthered by additional correspondence. My colleague Rob Uriarte responded to the letter asking who and how hiQ intended to use these IP addresses and any information collected from them. A true and correct copy of that response letter dated February 2, 2021 is attached hereto as Exhibit 10. Mr. Uriarte expressed a particular concern about *hiQ continuing to use the website* in light of its stated position in its Motion to Dismiss LinkedIn's Counterclaims that hiQ was not bound by LinkedIn's User Agreement. Counsel for hiQ responded on February 8th, 2021. A true and correct copy of that letter is attached hereto as Exhibit 11. The response insisted that the new IP addresses be allowed, refused to make representations about how they would be used, but reasserted that "the IP addresses identified in our January 22, 2021 letter are used only by hiQ, and in accordance with hiQ's rights under the PI Order, as affirmed." The overall impression we drew from this correspondence is that hiQ was making ongoing use of the IP addresses in its business operations.

18. During the Settlement Conference conducted on August 2d, the discussions were such that I suspected hiQ may no longer be engaged in business operations. I was sensitive, however, to the fact that any discussions and data shared in that context could not be used for

purposes other than settlement. Accordingly, it was not until we spoke on August 6th in the context of the ESI Protocol that I felt we had usable information about hiQ's status. After that we sought further information from counsel and to confirm in other ways. It took several weeks to conduct all of the analysis, including LinkedIn's analysis of the IP addresses. We brought this motion as soon as practicable after obtaining the necessary information supporting it.

19. I understand from LinkedIn's analysis of the IP addresses listed in Ms. Sharma's January 22d letter that they show a substantial drop-off in activity after the late 2018 time period, consistent with the fact that hiQ went out of business at that time. This analysis is explained in the declaration of Yukai Zhong filed with the Motion. That analysis also shows that the new IP addresses provided by Ms. Sharma in January, that she represented were being used only by hiQ, were never used. Mr. Zhong's analysis further shows, however, that some of the other IP addresses identified in the letter as having been previously used by hiQ *continued to be used to scrape LinkedIn in 2019 and 2020, even after hiQ was out of business*.

20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bright Data publicizes this Court's ruling on the preliminary injunction on its website as a justification for its scraping activity. A true and correct copy of the relevant portion of the Bright Data website is attached hereto as Exhibit 12. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 10, 2021, at San Francisco, California.

                                                           */s/ Annette L. Hurst*
                                                             Annette L. Hurst