# EXHIBIT 4
**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.**

1  Corey Worcester (*pro hac vice*)
   coreyworcester@quinnemanuel.com
2  Renita Sharma (*pro hac vice*)
   renitasharma@quinnemanuel.com
3  Hope Skibitsky (*pro hac vice*)
   hopeskibitsky@quinnemanuel.com
4  QUINN EMANUEL URQUHART AND SULLIVAN LLP
   51 Madison Avenue, 22nd Floor
5  New York, NY 10010
   Telephone:  (212) 849-7000
6
   Terry L. Wit (SBN 233473)
7  terrywit@quinnemanuel.com
   QUINN EMANUEL URQUHART AND SULLIVAN LLP
8  50 California Street, 22nd Floor
   San Francisco, CA 94111
9  Telephone:  (415) 875-6331

10
   Attorneys for Plaintiff hiQ Labs, Inc.
11

12 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
13

14 | hiQ LABS, INC., | Case No.: 17-CV-03301-EMC |
   |---|---|
15 |              Plaintiff, | **PLAINTIFF HIQ LABS, INC.'S RESPONSES TO LINKEDIN** |
   |     vs. | **CORPORATION'S FIRST SET OF** |
16 | LINKEDIN CORPORATION, | **INTERROGATORIES** |
17 |              Defendant. | Judge:  Hon. Edward M. Chen |

18
19
20
21
22
23
24
25
26
27
28

1  Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and this Court's Local
2  Civil Rules, Plaintiff hiQ Labs, Inc. ("hiQ"), by and through its undersigned counsel, hereby
3  provides the following objections and responses to Defendant LinkedIn Corporation's
4  ("LinkedIn's) First Set of Interrogatories dated June 29, 2021.

5  hiQ makes the responses herein solely for the purposes of this Action.  By responding to
6  each Interrogatory, hiQ does not waive objections to the admission of these responses into
7  evidence on the grounds of relevance, materiality, or any other proper grounds for objection.  hiQ
8  reserves all objections to the use of these responses to Interrogatories.  hiQ may impose all such
9  objections at the time of trial or as otherwise required by the applicable rules or order of the Court.
10 hiQ objects to the Interrogatories to the extent they seek information protected by the attorney-
11 client privilege, the attorney work product doctrine, and/or any other applicable privileges.

12 hiQ is willing to meet and confer with LinkedIn in relation to all Interrogatories, and hiQ's
13 responses and objections set forth herein are based upon information presently known to hiQ, at a
14 time when discovery is in the very early stages.  hiQ reserves the right to amend, supplement, or
15 withdraw its responses and objections to each Interrogatory, including to take into account
16 additional information that comes to light during the discovery process.

17 **OBJECTIONS AND RESPONSES TO INTERROGATORIES**
18 **INTERROGATORY NO. 1:**
19 Separately, identify all persons to whom you have provided or intend to provide in the
20 future data from LinkedIn's website, computers, servers, or services, including, without limitation,
21 analyses, compilations, summaries, and reports that use, are derived from, rely upon, refer to, or
22 incorporate such data.

23 **RESPONSE TO INTERROGATORY NO. 1:**
24 hiQ has never provided and does not intend to provide in the future any data from
25 LinkedIn members' public profiles to any third-party.  hiQ has provided analyses and reports that
26 are prepared using data from LinkedIn members' public profiles (accessed through LinkedIn's
27 website) to the below entities, which were hiQ's customers.
28

1 (abajoria@linkedin.com) responding to LinkedIn's May 23, 2017 cease-and-desist letter. In that
2 May 31, 2017 correspondence, hiQ advised LinkedIn: "hiQ's current customers include eBay,
3 Capital One, and GoDaddy. Prospective customers include Bank of New York Mellon, Chevron,
4 Groupon, Honeywell, IBM, Visier and Jobvite." (May 31, 2017 Ltr. at 4 n.1).

**INTERROGATORY NO. 3:**

Describe in detail your means of access to LinkedIn's website by listing all IP addresses and user agents that you have used—currently or have reason to believe you will use in the future—to access LinkedIn's website, computers, or servers, whether directly or indirectly, and for each such IP address and user agent stating how hiQ gained access to the IP address or user agent, the time period for which the IP address or user agent was in use, the number of calls or requests you made to LinkedIn's website, servers, or computers from each IP address or user agent, the specific LinkedIn webpages accessed through each IP address or user agent, and the organization or provider formally associated with each IP address or user agent at the time of your use.

**RESPONSE TO INTERROGATORY NO. 3:**

hiQ accessed public LinkedIn pages either directly (through its own IP addresses and those of hiQ's employees working remotely) or indirectly (via arrangement with a third-party vendor).

**hiQ's Direct Access.** hiQ accessed the publicly-available LinkedIn members' profile pages directly: hiQ employees—either from hiQ's offices or while working remotely—would access such public profile pages from, respectively, the IP address associated with hiQ or their own personal IP addresses. hiQ sometimes also used dynamically-assigned IP addresses. While hiQ accessed public data directly throughout the period that it was a going concern, this direct access was more common during earlier stages of hiQ's product development, including for testing code. Generally, these IP addresses would have been traceable back to hiQ and/or hiQ's employees. hiQ used Python-based user agents to access LinkedIn's website.

As disclosed in a January 22, 2021 letter from Renita Sharma to Robert Uriarte, hiQ used the following IP addresses until in or about January 2021:

- 34.211.215.114
- 34.211.30.33
- 34.206.56.174

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 34.234.103.91
- 34.213.99.139
- 52.8.230.165
- 54.153.107.141

In the January 22 letter referenced above, hiQ requested the following IP addresses be added to LinkedIn's "whitelist," which IP addresses are currently active, but not actively being used by hiQ:

- ███████████
- ███████████

Each of the above-listed IP addresses were held on Amazon Web Services.

**hiQ's Indirect Access.**  hiQ began using third-party vendors to scrape public data at a larger scale.  While hiQ experimented with a few third-party vendors for scraping data, hiQ ultimately used third-party providers ███████████████████  ██████████ (effective May 2017).  hiQ does not have a list of the IP addresses or specific user agents used by these providers to access LinkedIn members' public profile data, but believes that these providers distributed their access requests among a broad network of requesters using randomized user agents to access the site.  Given that the majority of data scraping was performed by third parties, hiQ lacks information regarding "the time period for which the IP address or user agent was in use, the number of calls or requests [hiQ] made to LinkedIn's website, servers, or computers from each IP address or user agent, the specific LinkedIn webpages accessed through each IP address or user agent, and the organization or provider formally associated with each IP address or user agent at the time of use."

Notwithstanding the above, hiQ estimates that over any given month, hiQ (via its third-party vendors) scraped data from between several hundred thousand to one million public profile URLs.  hiQ would only scrape data from those URLs once or twice a month at most.

**INTERROGATORY NO. 4:**

Describe every way you have accessed and extracted or have reason to believe you will access and extract data from LinkedIn's website, computers, or servers, including for each way the applicable time frame of use and every step used to access and extract data.

**RESPONSE TO INTERROGATORY NO. 4:**

Generally, hiQ compiled or was provided with lists of employees whom its clients wished to analyze and identified the URL for each employee's public LinkedIn profile page. From the sources described in its Response to Interrogatory No. 3, hiQ sent HTTP requests to LinkedIn's servers, which returned the requested HTML documents from these URL addresses. hiQ stored these responses and used proprietary software to internally process the collected HTML documents, pulling out information about employees' skills and experience that those users had publicly posted. hiQ employed contractors to manually verify some of that information by accessing public LinkedIn profiles using traditional web browsers and visually confirming the accuracy of the automated data gathering. Additionally, from early to mid-2017, hiQ purchased public profile data from third-party data gatherers.

**INTERROGATORY NO. 5:**

Identify and describe each and every source of information that hiQ has ever used or considered for its products, including the timeframe that each source was accessed, the IP addresses or user agents hiQ used to access each source, the fields of data retrieved from each source, and the products into which the source of information (or analyses derived from the source of information) was incorporated.

**RESPONSE TO INTERROGATORY NO. 5:**

hiQ objects to this request as unduly burdensome in that it seeks IP addresses or user agents used with respect to each source of data and that information is not reasonably available at this stage of discovery.

Subject to the foregoing objection, hiQ states as follows. On occasion, hiQ's customers would provide hiQ with a list of employee names or other information (i.e., job title or geographic location) to assist hiQ in identifying the correct employee. More often than not, however, hiQ was not given any information from its customers about their employees. hiQ has never used or considered using personal social media data (such as that on Facebook, Twitter, Instagram, or Pinterest) for any of its products.

The public data sources hiQ has used are as follows:

1  Interrogatory to the extent that LinkedIn may be better positioned to identify all the ways its
2  products competed with hiQ's products and/or would have competed with hiQ's products if hiQ
3  had not been wrongfully forced out of business by LinkedIn.
4      Subject to the foregoing objection, hiQ states that, when the predecessor of what became
5  "hiQ Labs, Inc." was founded in 2012 as "OrgStars," no person or business was attempting to
6  solve the problems hiQ was and would be solving—which were running data analytics on external
7  professional employee data (that is, information not held by an employer) to determine employees'
8  risk of leaving their employer (the "Keeper" product) and to analyze the skill set of employers (the
9  "Skill Mapper" product). The work hiQ was doing in the space was novel. In fact, hiQ won the
10 "Human Resources Executive's Top Product of 2016" for its innovative business solution that
11 predicts employee attrition. As such, initially, LinkedIn was *not* a competitor of hiQ.
12     However, in an earnings call three years after hiQ's launch, LinkedIn's then-CEO
13 announced a plan to "enter a new category" by creating products for other companies which
14 "leverag[e] content and data that members are already sharing publicly." He explained:

15  > So by way of example, our public profile information, which particularly at larger organizations, you see some of those companies turning to LinkedIn *to look
16  > up someone within their own company,* because of how robust that public profile
17  > information can prove to be . . . . *[W]e're trying to think about ways in which we
   > can better leverage that to create value within an organization.*
18
19     On June 21, 2017, LinkedIn's then-CEO announced the launch of a product that would
20 analyze skills data from member profiles, just as hiQ's SkillMapper did:

21  > [W]hat LinkedIn would like to do is leverage all this extraordinary data
   > we've been able to collect by virtue of having 500 million people join the site. We
22  > have over 10 million jobs that are now listed on the site. 50,000 standardized skills.
   > *For employers, it's an understanding of what skills they're gonna need to be able
23  > to continue to grow, and where that talent exists.*

24     A few days later, an IT buyer at a blue-chip Wall Street firm who had been evaluating
25 hiQ's technology for purchase revealed that LinkedIn was marketing its SkillMapper-like product
26 head-to-head against hiQ.
27     Now, LinkedIn offers employers a range of products through its Talent Solutions business,
28 many of which replicate hiQ's previous offerings. For example, LinkedIn's Talent Insights

product uses "real time data" comprising "over 12 billion data points… from the world's largest professional network" to help businesses "[f]ind or deploy talent effectively using workforce snapshots," "[a]ddress current and future skill gaps," and "[i]nform retention and headcount planning…."[3]  LinkedIn's Recruiter tool lets employers "search current employees to see who's a good fit and ready for a new role" and "share candidate profiles with hiring managers (with our without Recruiter access)…."[4]  Some of LinkedIn's current "happy customers" of these offerings are hiQ's former clients.[5]

**INTERROGATORY NO. 13:**

Identify each product or service offered by a third party that competes with, competed with, or provides similar functionality to hiQ's Keeper product.

**RESPONSE TO INTERROGATORY NO. 13:**

hiQ objects to this Interrogatory as vague and ambiguous as to the terms "competes with, competed with, or provides similar functionality to," none of which are defined.

Subject to the foregoing objection, hiQ states that, with the exception of LinkedIn's products discussed above, at the time hiQ was a going concern, no other person or business was running data analytics on external professional employee data (that is, information not held by an employer) to determine employees' risk of leaving their employer (the "Keeper" product).  Thus, hiQ had no direct competitors when it was a going concern.  Moreover, because hiQ is no longer operational, it cannot be said to have any competitors.

**INTERROGATORY NO. 14:**

Identify each product or service offered by a third party that competes with, competed with, or provides similar functionality to hiQ's Skill Mapper product.

**RESPONSE TO INTERROGATORY NO. 14:**

hiQ objects to this Interrogatory as vague and ambiguous as to the terms "competes with, competed with, or provides similar functionality to," none of which are defined.

---

[3] https://business.linkedin.com/talent-solutions/talent-insights
[4] https://business.linkedin.com/talent-solutions/recruiter
[5] https://business.linkedin.com/talent-solutions

1    Subject to the foregoing objection, hiQ states that, with the exception of LinkedIn's
2 products discussed above, at the time hiQ was a going concern, no other person or business was
3 running data analytics on external professional employee data (that is, information not held by an
4 employer) to analyze the skill set of employers (the "Skill Mapper" product). Moreover, because
5 hiQ is no longer operational, it cannot be said to have any competitors.

**INTERROGATORY NO. 15:**

State all facts concerning the circumstances of any customer who canceled or reduced their contracted services with hiQ from May 23, 2017, to August 14, 2017, including identification of each such customer and the dates on which each customer canceled or reduced contracted services.

**RESPONSE TO INTERROGATORY NO. 15:**

hiQ states that no customer cancelled or reduced their contracted services with hiQ from May 23, 2017 to August 14, 2017.

Dated: July 29, 2021

QUINN EMANUEL URQUHART & SULLIVAN LLP

By: */s/ Corey Worcester*
Corey Worcester
coreyworcester@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Plaintiffs hiQ Labs Inc.*

## VERIFICATION OF HIQ LABS, INC.'S RESPONSES AND OBJECTIONS TO LINKEDIN CORPORATION'S FIRST SET OF INTERROGATORIES

I, Mark Weidick, hereby verify that the information provided in hiQ Labs, Inc.'s Responses and Objections to LinkedIn Corporation's First Set of Interrogatories is true and correct to the best of my knowledge, information, and belief.

Date: 7/29/21

Mark Weidick