1  ANNETTE L. HURST (SBN 148738)
   ahurst@orrick.com
2  RUSSELL P. COHEN (SBN 213105)
   rcohen@orrick.com
3  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
4  DANIEL JUSTICE (SBN 291907)
   djustice@orrick.com
5  SARAH K. MULLINS (SBN 324558)
   sarahmullins@orrick.com
6  MARIA N. SOKOVA (SBN 323627)
   msokova@orrick.com
7  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
8  405 Howard Street
   San Francisco, CA  94105-2669
9  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
10
   Attorneys for Defendant
11 LinkedIn Corporation

12

13                 UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                    SAN FRANCISCO DIVISION

16

| | |
|---|---|
| 17  hiQ Labs, Inc., | Case No. 17-CV-03301-EMC |
| 18          Plaintiff, | **DECLARATION OF PAUL ROCKWELL IN SUPPORT OF LINKEDIN'S MOTION TO DISSOLVE PRELIMINARY INJUNCTION AND REQUEST FOR INDICATIVE RULING PURSUANT TO FED R. CIV. P. 62.1** |
| 19      v. | |
| 20  LinkedIn Corporation, | |
| 21          Defendants. | |
| 22 | Date:          Oct. 14, 2021<br>Time:          1:30 p.m.<br>Courtroom:    5 – 17th Floor |
| 23  LinkedIn Corporation | Judge:         Hon. Edward M. Chen |
| 24          Counterclaimant, | Complaint Filed:   June 7, 2017<br>Trial Date:         February 27, 2023 |
| 25      v. | |
| 26  hiQ Labs, Inc. | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.** |
| 27          Counterdefendant, | |

28

1      I, Paul Rockwell, hereby declare as follows:

2      1.      I have worked at LinkedIn for nine years and am currently head of the Trust &

3  Safety organization.  I have personal knowledge of the facts stated in this declaration unless

4  otherwise indicated, and if called upon as a witness, could competently testify to them.  I submit

5  this declaration in support of LinkedIn's motion to dissolve the August 14, 2017 preliminary

6  injunction, request for indicative ruling, and related motion to seal.

7      2.      The Trust & Safety organization sits within Trust Engineering and is charged with

8  addressing operational, product, and security risks.  Trust Engineering, along with partner teams,

9  is responsible for developing mechanisms for detection and mitigation of scraping and for

10  investigating significant and high-scale abuse incidents.  A primary goal of our teams is to ensure

11  that the data LinkedIn's members entrust to LinkedIn remains secure, and to prevent unauthorized

12  access to the platform—including automated access by bots, crawlers, or scrapers that attempt to

13  scrape data from LinkedIn servers.

14      3.      LinkedIn is a professional network with over 750 million members around the

15  world.  LinkedIn's platform is made up of its members, who provide profile information to build

16  their professional online identities.  LinkedIn offers members a number of privacy settings that

17  permit them to control what information is displayed and published to others.

18      4.      Among the many challenges that LinkedIn faces, various individuals and business

19  entities periodically attempt to misappropriate data from the LinkedIn website—data that

20  LinkedIn's members have entrusted to it—by using automated means or "scraping," meaning the

21  accessing, extraction, and copying of data on a large scale.

22      5.      In order to communicate clear, binding terms for treatment of member data—as

23  well as how the public may use LinkedIn's website and the information viewable therein—

24  LinkedIn publishes its User Agreement, Privacy Policy, and Cookie Policy.  The LinkedIn User

25  Agreement applies not only to its members, but to anyone else who accesses LinkedIn's website.

26  The User Agreement expressly prohibits scraping LinkedIn's website.  In particular, Section 8.2

27  of the August 11, 2020 User Agreement, which is the most current version of the User

28

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

Agreement, prohibits:

    a.  "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots or any other means or processes (including crawlers, browser plugins and add-ons or any other technology) to scrape the Services or otherwise copy profiles and other data from the Services";

    b.  "Overrid[ing] any security feature or bypass[ing] or circumvent[ing] any access controls or use limits of the Service (such as caps on keyword searches or profile views)";

    c.  "Copy[ing], us[ing], disclos[ing] or distribut[ing] any information obtained from the Services, whether directly or through third parties (such as search engines), without the consent of LinkedIn";

    d.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] or otherwise monetiz[ing] the Services or related data or access to the same, without LinkedIn's consent."

6.      Attached hereto as Exhibit 1 is a true and correct copy of LinkedIn's August 11, 2020 User Agreement.

7.      Analogous prohibitions have been present in prior versions of the User Agreement applicable during the period of hiQ's scraping LinkedIn data.

8.      Section 8.2 of the October 23, 2014 User Agreement prohibited those bound by it from engaging in any of the following activities:

a. "Us[ing] … automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

b. "Us[ing] bots or other automated methods to access the Services";

c. "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology";

d. "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or related any information or data."

9.      Attached hereto as Exhibit 2 is a true and correct copy of LinkedIn's October 23,

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1 | 2014 User Agreement.[1]

2 | 10.    Section 8.2 of the June 7, 2017 User Agreement similarly prohibited:

3 | a.  "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots, or any other

4 | means or processes (including crawlers, browser plugins and add-ons, or any other

5 | technology or manual work) to scrape the Services or otherwise copy profiles and other

6 | data from the Services";

7 | b. "Bypass[ing] or circumvent[ing] any access controls or Service use limits (such as caps

8 | on keyword searches)";

9 | c. "Copy[ing], us[ing], disclos[ing] or distribut[ing] any information obtained from the

10 | Services, whether directly or through third parties (such as search engines), without the

11 | consent of LinkedIn";

12 | d. "Us[ing], disclos[ing] or distribut[ing] any data obtained in violation of this policy";

13 | e. "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or

14 | related data";

15 | f. "Us[ing] bots or other automated methods to access the Services, add or download

16 | contacts, send or redirect messages."

17 | 11.    Attached hereto as Exhibit 3 is a true and correct copy of LinkedIn's June 7, 2017

18 | User Agreement.

19 | 12.    LinkedIn takes its obligations to protect members' data and its platform seriously,

20 | and devotes resources accordingly.  LinkedIn dedicates over fifteen people across various teams,

21 | including trust engineering, analytics, machine learning, product, and legal, who work to prevent

22 | scraping on LinkedIn's platform.  LinkedIn spends millions of dollars per year in compensation

23 | and other resources, including large-scale computing resources, on this protection effort.

24 | 13.    In addition to dedicated personnel, LinkedIn employs an array of technological

25 | safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from

26 |

27 | [1] This is the version of the User Agreement that hiQ agreed initially agreed to.  By continuing to access LinkedIn's website and data, hiQ agreed to subsequent versions of the User Agreement as well.

28 |

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1  accessing and copying its members' data on a large scale.  Unauthorized data scraping forces

2  LinkedIn to expend resources in responding to scraping events and in deploying technical

3  measures to prevent such scraping.  On average, on a daily basis, LinkedIn blocks hundreds of

4  millions of unauthorized requests to access LinkedIn's servers.  LinkedIn's systems and dedicated

5  security personnel turn back more unauthorized guest profile requests than they permit authorized

6  guest profile requests every day.  Over the past four years, the cost and manpower LinkedIn has

7  devoted to combating scraping has only increased.

8        14.  At all relevant times, LinkedIn's Privacy Policy has limited what LinkedIn can and

9  cannot do with member data.  Section 3.1 of LinkedIn's current Privacy Policy, adopted August

10  11, 2020, allows members to adjust their settings to determine what portions of their profile, if

11  any, search engines can index and search.  Further, Section 4.2 of the Privacy Policy gives

12  members "many choices about how [their] data is collected, used and shared," including the

13  ability to delete data, restrict the use of data, or control the visibility of information members

14  placed on LinkedIn.  A true and correct copy of the August 11, 2020 Privacy Policy is attached

15  hereto as Exhibit 4.

16        15.  Among other protections LinkedIn offers, LinkedIn's members can delete

17  information from their profiles, or their profiles entirely, at any time.  If a member deletes his or

18  her profile, LinkedIn will delete that information from its servers, generally within 30 days,

19  subject to limited exceptions.  LinkedIn will not keep a copy of that data.  Members' ability to

20  remove their information helps ensure members retain ultimate control over it.

21        16.  Prior versions of the Privacy Policy, published on June 7, 2017 and October 23,

22  2014,[2] include similar statements permitting members to delete profile data, control who can see

23  their profile and activity, and limit how LinkedIn uses their data.  True and correct copies of the

24  June 7, 2017 and October 23, 2014 versions of the Privacy Policy are attached as Exhibits 5 and

25  6, respectively.

26

27  [2] This is the version of the Privacy Policy that hiQ initially agreed to.

28                                    - 4 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-CV-03301-EMC

17.     In addition to the Privacy Policy, LinkedIn offers members a number of other privacy settings that permit them to control what information is displayed and broadcast to others. For example, LinkedIn's "Do Not Broadcast" setting also promotes member control over their information by allowing members to update their profiles at any time without broadcasting the changes.  hiQ's scraping necessarily disregarded member privacy settings—which were invisible to hiQ and its scraping vendors—including members' selection of LinkedIn's Do Not Broadcast feature.

18.     LinkedIn has received numerous complaints from members when they suspect scraping activity.  One example is a complaint from June 2017, where the member asked why a third party was "allowed to harvest and republish" his LinkedIn data and asked LinkedIn "[w]hat protection do you offer LinkedIn members?"  LinkedIn members have complained about hiQ's scraping specifically.  For example, one member complained: "How the hell does hiQ Labs, Inc. get the right to scrape data we placed on LinkedIn?  Is it just me or have things gotten way off the rails."  Attached hereto as Exhibit 7 is a true and correct copy of examples of redacted customer complaints to LinkedIn.

19.     hiQ and the third-party scrapers it retained bound themselves to the User Agreement, among other ways, each time they accessed LinkedIn's website, as the User Agreement provides: "You agree that by [. . .] accessing or using our services (including LinkedIn, [. . .] or any content or information provided as part of these services, collectively, 'Services'), you are entering into a legally binding agreement."  *See* Exhibit 2, § 1.2.  The June 7, 2017 version of the User Agreement similarly provided: "You agree that by [. . .] accessing or using our services (described below), **you are agreeing to enter into a legally binding contract** with LinkedIn [. . .].  If you do not agree to this contract[, . . .] do not access or otherwise use any of our Services."  *See* Exhibit 3, § 1.1 (emphasis in original).  The August 20, 2020 version includes identical language to the June 7, 2017 agreement.  *See* Exhibit 1, § 1.1.

20.     Pursuant to the preliminary injunction entered in this case on August 14, 2017, LinkedIn allowed hiQ unrestricted access to publicly viewable profile data on LinkedIn's servers.

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1    LinkedIn confirmed via a letter to hiQ on November 28, 2017 that LinkedIn was "committed to

2    complying with the terms of the preliminary injunction order" and had "therefore taken steps to

3    ensure that hiQ is not prevented from accessing 'public profiles' on LinkedIn's website" by

4    ensuring that the IP address identified by hiQ was not blocked.[3]  A true and correct copy of

5    LinkedIn's November 28, 2017 letter is attached hereto as Exhibit 8.  As set forth in the letter,

6    LinkedIn personnel implemented affirmative measures to ensure hiQ's IP address had

7    unrestricted access to LinkedIn publicly viewable profile data.  LinkedIn accomplished this

8    through "allowlisting" (also referred to as "whitelisting") the IP address, which allows the device

9    connected to that address to access certain portions of LinkedIn's site without blocking access

10   through the anti-scraping measures described above.  hiQ requested the addition of new IP

11   addressed on April 8, 2018.  A true and correct copy of hiQ's April 8, 2018 email is attached

12   hereto as Exhibit 9.

13          21.     Even prior to the injunction, hiQ enjoyed largely unfettered access to LinkedIn.

14   LinkedIn had implemented IP blocks on certain IP addresses it thought were associated with hiQ

15   prior to the injunction.  In my prior declaration, I stated that LinkedIn blocked traffic from those

16   IP addresses on June 24, 2017.  I later learned that although LinkedIn started the process to block

17   traffic from those IP addresses on June 24, the block did not go into place until June 29, 2017.

18   LinkedIn then removed the block on June 30, 2017, after the hearing on hiQ's motion for a

19   temporary restraining order.

20          22.     LinkedIn continues to take affirmative steps to ensure that hiQ has access to

21   LinkedIn's servers.  As recently as January 2021, hiQ's counsel sent LinkedIn another letter

22   requesting that LinkedIn allowlist additional IP addresses, and LinkedIn took affirmative steps to

23   guarantee those IP addresses' access.  *See* Declaration of Annette Hurst, Exhibit 9.  LinkedIn has

24   no knowledge of who ultimately controls the IP addresses hiQ designates and no visibility into

25   what hiQ does with the information it accesses.

26

27   [3] An IP address (or Internet Protocol address) is an identifying number for a device (e.g., a
     computer or smart phone) connected to a network.

28
                                                        DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                                     - 6 -                MOT. TO DISSOLVE PRELIM. INJ. AND
                                                          REQUEST FOR INDICATIVE RULING
                                                                17-cv-03301-EMC

23.     It is important that the IP addresses identified by hiQ remain confidential.  After consultation with LinkedIn's Chief Information Security Officer, I am concerned that if the IP addresses that LinkedIn has allowlisted for hiQ were publicly disclosed, third parties could use this knowledge to infer sensitive information about the sources and methods used in the defense of our computer systems and protection of our members' data, and disclosure could enable such third parties to devise novel methods, or attempt to use or "spoof" the IP addresses, to circumvent technical barriers that would otherwise prevent them from, among other things, scraping LinkedIn and thereby gaining access to scrape LinkedIn members' publicly viewable profile data, in violation of the member protections set forth in LinkedIn's User Agreement and Privacy Policy and described herein.  For that reason, LinkedIn does not publicly disclose the IP addresses it allowlists.

24.     The pendency of the injunction has created an ongoing perception that scrapers have an open door to LinkedIn profile data, which erodes the member trust LinkedIn has made the cornerstone of its business.  At least one scraper, ██████████████████ ██████████████████████, tells the public and its customers that this Court's injunction makes it "irrefutably legal" for anyone to scrape LinkedIn, even though LinkedIn's terms of use provide otherwise.  *Bright Data* website, https://brightdata.com/legality-of-web-data-collection.  And the sister company of OxyLabs, ████████████████████████, conducted "an almost complete scrape of LinkedIn data" in 2019.  "Personal and Social Information of 1.2 Billion People Discovered in Massive Data Leak," *Night Lion Security Blog*, Nov. 22, 2019, a true and correct copy of which is attached as Exhibit 10.

25.     Data misuse has been the subject of extensive news coverage in recent years.  This coverage often describes scraping as a "fiasco" or (incorrectly) as "breaches" of member data. Many articles explicitly refer to data scraped from LinkedIn, with headlines like: "LinkedIn's 1.2B Data-Scrape Victims Already Being Targeted by Attackers," *threatpost*, July 1, 2021; "Why Facebook and LinkedIn's data scraping fiascos are a huge security problem for their users," *Fortune*, April 17, 2021; "Data scraped from 500 million LinkedIn users found for sale online,"

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1   *TechRepublic*, April 6, 2021; "LinkedIn data breach grows to include over a billion hacked files:

2   The security of the social networking platform is very concerning, one expert says,"

3   *ConsumerAffairs*, July 1, 2021; "Massive data leak exposes 700 million LinkedIn users'

4   information," *Fortune*, June 30, 2021; "From Facebook to LinkedIn, data-scraping leaks

5   proliferate: The incentives and opportunities for harvesting valuable personal information have

6   multiplied," *Financial Times*, April 15, 2021.  Other coverage focuses on the proliferation of

7   companies—like Cambridge Analytica, Clearview AI, and others—using personal information on

8   social media profiles in ways users did not expect or intend.  Examples of this coverage include:

9   "Leaked: List of police, govt, uni orgs in Clearview AI's facial-recognition trials," *The Register*,

10  August 29, 2021; "Facebook data misuse and voter manipulation back in the frame with latest

11  Cambridge Analytica leaks," *TechCrunch*, Jan. 6, 2020.  These press cycles lead to member

12  complaints and confusion, and further erode members' trust by creating the impression that the

13  security of their personal information has been breached.  Press of this nature also has led to

14  regulatory inquiries that cost LinkedIn time and money as well as reputational harm.  Attached

15  hereto as Exhibit 11 are true and correct copies of the articles referenced in this paragraph.

16          26.     A court order compelling LinkedIn to provide privileged access to an admitted

17  scraper creates the impression among both scrapers and members that LinkedIn cannot legally

18  protect member data, harming LinkedIn's reputation.  This is especially true where a company,

19  like hiQ, has no apparent business purpose for accessing the data.

20          I declare under penalty of perjury under the laws of the United State that the foregoing is

21  true and correct.  Executed on September 10, 2021, at Los Gatos, California.

22

23                                          DocuSigned by:

24                                          ───────────────────
                                            BDF7F452989E4D5...   Paul Rockwell

25

26

27

28