ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
SARAH K. MULLINS (SBN 324558)
sarahmullins@orrick.com
MARIA N. SOKOVA (SBN 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>LinkedIn Corporation,<br><br>                    Defendant. | Case No. 17-cv-03301-EMC<br><br>**LINKEDIN'S MOTION TO DISSOLVE PRELIMINARY INJUNCTION AND REQUEST FOR INDICATIVE RULING PURSUANT TO FED. R. CIV. P. 62.1**<br><br>Date:           Oct. 14, 2021<br>Time:           1:30 p.m.<br>Courtroom:   5 – 17th Floor<br>Judge:          Hon. Edward M. Chen |
| LinkedIn Corporation<br><br>                    Counterclaimant,<br>        vs.<br><br>hiQ Labs, Inc.<br><br>                    Counterdefendant, | Complaint Filed:  June 7, 2017<br>Trial Date:         February 27, 2023<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.** |

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ................................................................. ii

**NOTICE OF MOTION AND MOTION** ..........................................................1

**MEMORANDUM OF POINTS AND AUTHORITIES** ...............................................3

**INTRODUCTION** .........................................................................3

**STATEMENT OF FACTS** ..................................................................5

    A.    LinkedIn's Business Provides A Network To Members Who Count On LinkedIn To Protect Their Data. ..............................................5

    B.    hiQ Developed A Business Dependent On Violating LinkedIn's User Agreement And Member Expectations. ..........................................6

    C.    hiQ Claimed It Needed A Preliminary Injunction To Continue To Operate Its Business. ........................................................7

    D.    LinkedIn's Appeal Of The Injunction Is Pending Before The Ninth Circuit After Supreme Court Remand. ......................................9

    E.    Recent Events Reveal hiQ No Longer Operates Its Business And Thus No Longer Faces A Risk Of Likely Irreparable Harm. ...........................9

**ARGUMENT** ...........................................................................12

**I.**    **THE INJUNCTION SHOULD BE DISSOLVED BECAUSE HIQ'S BUSINESS IS NO LONGER OPERATIONAL.** ..................................................12

    A.    hiQ's Business Shutdown Is A Significant Change In Facts Demonstrating It Cannot Suffer The Requisite Irreparable Harm. ..........................13

    B.    The Balance Of Hardships And Public Interest Also Favor Dissolving The Injunction. ....................................................17

**II.**    **THIS COURT SHOULD ISSUE AN INDICATIVE RULING TO FACILITATE PROMPT DISSOLUTION OF THE INJUNCTION.** ..........................19

**CONCLUSION** .........................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

**Cases**

3

4

*A&M Records, Inc. v. Napster, Inc.*,
   284 F.3d 1091 (9th Cir. 2002)................................................................................................ 12

5

*All. for the Wild Rockies v. Bradford*,
   864 F. Supp. 2d 1011 (D. Montana. 2012) ........................................................................... 12

6

7

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)............................................................................................... 13

8

9

*Apple Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846-LHK, 2012 WL 4097751 (N.D. Cal. Sept. 17, 2012)............................. 20

10

*Apple Inc. v. Samsung Elecs. Co.*,
   No. 11-CV-01846-LHK, 2012 WL 4490558 (N.D. Cal. Oct. 1, 2012) ........................... 20, 21

11

12

*Bank Julius Baer & Co. Ltd v. Wikileaks*,
   535 F.Supp.2d 980 (N.D. Cal. 2008) .................................................................................... 15

13

14

*BoomerangIt, Inc. v. ID Armor, Inc.*,
   No. 5:12-CV-0920 EJD, 2012 WL 2368466 (N.D. Cal. June 21, 2012) ......................... 16, 17

15

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
   No. C 10-3428 PSG, 2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ........................................ 16

16

17

*Communities for a Better Env't v. Pac. Steel Casting Co.*,
   No. C06-4184 BZ, 2006 WL 4491437 (N.D. Cal. Sept. 21, 2006) ....................................... 16

18

19

*First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*,
   155 F. Supp. 2d 194 (M.D. Pa. 2001) .................................................................................. 16

20

*Great Am. Ins. Co. v. Chang*,
   No. 12-CV-00833-SC, 2014 WL 2967469 (N.D. Cal. July 1, 2014)................................ 19, 21

21

22

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   938 F.3d 985 (9th Cir. 2019), *vacated by LinkedIn Corp. v. hiQ Labs, Inc.*, No.
   19-1116, 2021 WL 2405144 (S. Ct. June 14, 2021) ............................................................ 19

23

*Idaho v. Coeur D'Alene Tribe*,
   794 F.3d 1039 (9th Cir. 2015)............................................................................................... 13

24

25

*Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*,
   No. 2:09-cv-00023-MCE-GGH, 2009 WL 805813 (E.D. Cal. Mar. 26, 2009)..................... 13

26

27

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019)............................................................................................... 12

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

*Kauai Kunana Dairy Inc. v. United States*,
   No. 09–00473 DAE–LEK, 2009 WL 4668744 (D. Haw. Dec. 8, 2009) ............................... 15

*Overstreet v. Apex Linen Serv., Inc.*,
   No. 217CV02923APGCWH, 2018 WL 2245145 (D. Nev. Apr. 19, 2018) .......................... 20

*Russell Rd. Food and Beverage, LLC v. Galam*,
   No. 2:13–CV–776 JCM (NJK), 2013 WL 2949615 (D. Nev. June 13, 2013)....................... 20

*Salazar v. Buono*,
   559 U.S. 700 (2010) ......................................................................................................... 12

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir.1984)........................................................................................... 16

*Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc.*,
   No. 1:20-cv-00005-RGE-CFB, 2021 WL 2627454 (S.D. Iowa Apr. 23, 2021).................... 15

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) ...................................................................................................... 9

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................................... 13, 16

*Zhenhua Logistics (Hong Kong) Co. v. Metamining, Inc.*,
   No. C-13-2658 EMC, 2013 WL 3360670 (N.D. Cal. July 3, 2013)..................................... 17

**Other Authorities**

*Bright Data* website, https://brightdata.com/legality-of-web-data-collection ............................. 18

Fed. R. App. P. 12.1 ..................................................................................................... 4, 21

Fed. R. Civ. P. 62.1 ................................................................................................... *passim*

https://oxylabs.io/blog/is-web-scraping-legal ................................................................... 18

"LinkedIn data breach grows to include over a billion hacked files: The security of
   the social networking platform is very concerning, one expert says,"
   *ConsumerAffairs*, July 1, 2021.............................................................................................. 18

"LinkedIn's 1.2B Data-Scrape Victims Already Being Targeted by Attackers,"
   *threatpost*, July 1, 2021 ...................................................................................................... 18

"Personal and Social Information of 1.2 Billion People Discovered in Massive
   Data Leak," *Night Lion Security Blog*, Nov. 22, 2019......................................................... 18

"Why Facebook and LinkedIn's data scraping fiascos are a huge security problem
   for their users," *Fortune*, April 17, 2021 ........................................................................... 18

iii

## NOTICE OF MOTION AND MOTION

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE** that on October 14, 2021 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 on the 17th Floor of the above-entitled Court (or by Zoom or other videoconference if the Court so designates), LinkedIn Corporation ("LinkedIn") will, and hereby does, move based on the Court's inherent authority to dissolve its August 14, 2017 preliminary injunction ordered in this action.  As the preliminary injunction is pending on appeal to the Ninth Circuit, LinkedIn further requests an indicative ruling pursuant to Federal Rule of Civil Procedure Rule 62.1 that the Court would grant LinkedIn's motion to dissolve the preliminary injunction if it had jurisdiction to do so, or at the very least that LinkedIn's motion raises a substantial question as to whether the injunction should be dissolved that should be promptly addressed by this Court.

The grounds for the Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to Fed. R. Civ. P. 62.1 ("Motion") are as follows:  There are changed circumstances because, as LinkedIn learned in the past few weeks, hiQ Labs, Inc. ("hiQ") is no longer operating its business, and despite LinkedIn's compliance with the injunction, hiQ will not have been operating its business *for three years* by the time this Motion is heard.  Accordingly, hiQ is incapable of suffering the irreparable harm required to sustain injunctive relief, and the Court should dissolve the preliminary injunction pursuant to the Court's inherent authority.  Because the Court does not presently have jurisdiction to dissolve the injunction in light of the pending appeal to the Ninth Circuit, LinkedIn also seeks indicative relief under Rule 62.1.  In all events, LinkedIn has undoubtedly raised a substantial issue as to whether the injunction should be dissolved in light of the changed circumstances, and pursuant to Rule 62.1 this Court should advise the Ninth Circuit that the matter should be remanded for its consideration of the dissolution motion.

The Motion is based on the following materials:  the Memorandum of Points and

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1  Authorities following herein; the Declarations of Paul Rockwell, Yukai Zhong, and Annette

2  Hurst, and exhibits thereto, filed herewith; the papers and pleadings on file in this action as cited

3  herein; and such other and further papers and arguments as may be presented to the Court prior to

4  or at the hearing of this Motion.

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **INTRODUCTION**

This Court previously granted a preliminary injunction because it found hiQ had raised a substantial question as to whether LinkedIn's effort to prevent hiQ from scraping LinkedIn's website was the product of unfair competition, and that hiQ had demonstrated a strong case for likely irreparable harm by claiming it would go out of business absent an injunction.  *See* ECF No. 63 (Prelim. Inj. Ord.).  In the more than four years since, LinkedIn complied with the preliminary injunction ensuring that IP addresses provided by hiQ had access to LinkedIn's website.  Even with the benefit of an injunction, hiQ went out of business as most early-stage startups like hiQ do.  Indeed, LinkedIn learned in the past few weeks that hiQ went out of business *three years ago*.

hiQ's lack of an ongoing business is a material change in the circumstances underlying a preliminary injunction predicated on an unfair competition claim.  Despite LinkedIn's compliance, hiQ's employees have left, it has no customers, and it shut down all the systems it used to conduct its business.  hiQ thus no longer faces a threat of likely irreparable harm because it has no business to be harmed.  It is black letter law that a preliminary injunction may not be maintained when the threat of likely irreparable harm no longer exists.  That is true even when such a threat was found to exist when the injunction first issued, so long as changed circumstances eliminate the likelihood of irreparable harm.  hiQ shuttering its operations is precisely the kind of changed circumstance that eliminates the risk of likely irreparable harm and compels dissolution of the injunction.

hiQ may seek to avoid dissolution of the injunction by blaming LinkedIn for driving it out of business.  Any such assertion would be baseless.  hiQ admits no customer terminated its contract between LinkedIn's initial cease-and-desist letter and the Court's Preliminary Injunction Order, and hiQ had full access to LinkedIn publicly viewable profiles—the data hiQ claimed was the lifeblood of its business—throughout the relevant period.  hiQ simply experienced a fate common to startups:  Its business failed.  In all events, the cause of hiQ's shutdown is irrelevant

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

to whether the injunction should be dissolved.  The relevant question is whether hiQ still faces a threat of likely irreparable harm now that it is no longer a going concern.  The answer is self-evident—there is no risk of likely irreparable harm to a business that has already shut down.

There is no basis for an injunction absent irreparable harm and the injunction should be dissolved based on that factor alone.  Yet the changed circumstances also shift the balance of hardships associated with the injunction and make continued maintenance of the injunction contrary to the public interest.  With no ongoing business, hiQ no longer has any interest in scraping LinkedIn user data.  Yet hiQ's IP addresses remain allowlisted (also known as "whitelisted") at LinkedIn, allowing hiQ to have privileged access to LinkedIn's website.  hiQ's ongoing ability to compel LinkedIn to provide hiQ access to its member data—allowing scraping activity that violates LinkedIn's User Agreement—threatens broad use of members' LinkedIn profile data in ways they did not intend and did not consent to.  The dangers associated with potential misuse of personal data scraped from the web have only grown in the past four years.  Recent news coverage has focused on threats resulting from personal information scraped from LinkedIn, in particular, characterizing scrapes as "fiascos" and describing scrapers as "attackers" who "target[]," or attempt to profit from, users whose data was scraped.  Each new public scraping story leads to member complaints and confusion, and further erodes members' trust by creating the impression that the security of their personal information has been breached.  The continued existence of this injunction risks exacerbating the harms associated with scraping and emboldening data scrapers.

Given these changed circumstances, the only appropriate remedy is to dissolve the injunction.  While this Court at present lacks jurisdiction to enter an order dissolving the injunction because of the ongoing appeal, it has the authority to render an indicative ruling that it would grant the requested relief or that it finds a substantial issue warranting this Court's prompt consideration of the motion to dissolve.  Fed. R. Civ. P. 62.1; *see* Fed. R. App. P. 12.1.  Several courts in this circuit have found it appropriate to issue an indicative ruling under Rule 62.1 when changed circumstances call into question the continued propriety of a preliminary injunction

1  pending on appeal.  An indicative ruling that this Court would dissolve the injunction—or, at the

2  very least, that LinkedIn has raised a substantial issue as to whether the injunction should be

3  dissolved—would be especially appropriate here where the Ninth Circuit is about to embark on

4  another round of oral argument and will otherwise be called upon to render a new opinion on

5  remand from the Supreme Court with respect to an injunction that no longer serves any purpose.

6  **STATEMENT OF FACTS**

7  The circumstances that changed from the time the Court entered the injunction are as

8  simple as they are consequential.  The injunction four years ago was premised on preventing

9  harm to hiQ's ongoing business; today, hiQ no longer has any such business.  LinkedIn discusses

10  the following facts related to its platform, hiQ's prior alleged use of that platform, and the

11  procedural history of this case to place hiQ's cessation of business in context, and to show why

12  the fact that hiQ is no longer a going concern destroys the foundation on which the prior

13  injunction was built.

14  **A.**      **LinkedIn's Business Provides A Network To Members Who Count On LinkedIn To Protect Their Data.**

15

16  LinkedIn is a professional network with over 750 million members around the globe.

17  Declaration of Paul Rockwell in Support of LinkedIn's Mot. to Dissolve Prelim. Inj. and Request

18  for Indicative Ruling ("New Rockwell Decl.") ¶ 3.  LinkedIn members have control over the

19  information they choose to publish about themselves.  *Id.*  In order to communicate clear, binding

20  terms for treatment of member data—as well as how the public may use LinkedIn's website and

21  the information viewable therein—LinkedIn publishes a User Agreement, Privacy Policy, and

22  Cookie Policy. *Id.* ¶ 5.  The LinkedIn User Agreement applies not only to LinkedIn members,

23  but to anyone who accesses LinkedIn's website.  *Id.* ¶ 5 & Exs. 1-3.  The User Agreement

24  expressly prohibits scraping (that is, using automated methods to access and copy information)

25  LinkedIn's website.  *Id.*

26  Despite the clear, binding terms of the User Agreement, there are parties, like hiQ, that

27  disregard those limitations and attempt to use LinkedIn's website in prohibited ways.  *See* ECF

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1    No. 29 (Rockwell Decl.) ¶ 30.  Accordingly, to enforce its User Agreement and meet its

2    members' expectations, LinkedIn devotes enormous time and money to technological safeguards

3    and barriers that are designed to prevent data scrapers, bots, and other automated systems from

4    accessing and copying its members' data.  New Rockwell Decl. ¶¶ 12-13.  Indeed, in the past four

5    years, the cost and manpower LinkedIn has devoted to combating scraping has only increased.

6    *Id.* ¶ 13.

7         LinkedIn has received numerous complaints from members when they suspect scraping

8    activity.  *Id.* ¶ 18.  In one representative complaint from June 2017, the member asked why a third

9    party was "allowed to harvest and republish" his LinkedIn data and asked, "What protection do

10   you offer LinkedIn members?"  *Id.* ¶ 18 & Ex. 7.  LinkedIn members have complained about

11   hiQ's scraping specifically:  "How the hell does hiQ Labs, Inc. get the right to scrape data we

12   placed on LinkedIn? Is it just me or have things gotten way off the rails."  *Id.*

13   **B.    hiQ Developed A Business Dependent On Violating LinkedIn's User**
14   **Agreement And Member Expectations.**

15        Before it ceased operations, hiQ had developed a business model that depended on

16   scraping personal data from LinkedIn member profiles without authorization from LinkedIn or its

17   members.  *See* ECF No. 24 (hiQ's Renewed TRO/PI Mot.) at 1-2.  In addition to its own direct

18   automated access, hiQ also contracted with recently disclosed "third-party vendors to scrape

19   public [LinkedIn] data at a larger scale."  Declaration of Annette Hurst in Support of LinkedIn's

20   Mot. to Dissolve Prelim. Inj. and Request for Indicative Ruling ("Hurst Decl.") Ex. 4 at 11-12.

21   Through these third parties—███████████████—hiQ "scraped data from between *several*

22   *hundred thousand to one million* public profile URLs" a month.  *Id.* at 12 (emphasis added).  hiQ

23   did not contact members whose profiles were scraped to obtain consent; instead, hiQ "was

24   provided with lists of employees whom its clients wished to analyze" and proceeded to scrape

25   profile data from there.  *Id.* at 13.  hiQ stored all the information it gathered (*id.*), meaning that

26   information a LinkedIn member deleted from his profile lived on in perpetuity at hiQ and could

27   be disclosed to the member's employer through hiQ's services.

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

hiQ used this scraped data for at least two products: (1) "Keeper," which hiQ claims told employers which of their employees were flight risks, and (2) "Skill Mapper," which hiQ claims offered a summary of the breadth and depth of aggregate or individual skills its customers' employees possessed. ECF No. 24 (hiQ's Renewed TRO/PI Mot.) at 4. hiQ's scraping necessarily disregarded member privacy settings—which were invisible to hiQ and its scraping vendors—including members' selection of LinkedIn's Do Not Broadcast feature. New Rockwell Decl. ¶ 17.

At all relevant times, hiQ has been subject to the LinkedIn User Agreement. ECF No. 29 (Rockwell Decl.) ¶¶ 24-29. hiQ expressly agreed to abide by the terms of the User Agreement on multiple occasions: when it established a company profile, when it purchased a company license for LinkedIn's Sales Navigator product, and when it purchased advertising on LinkedIn. *Id.* hiQ and the third-party scrapers it retained also bound themselves to the User Agreement each time they accessed LinkedIn's website, as the User Agreement provides: "You agree that by [. . .] *accessing* or using our services (including LinkedIn, [. . .] or any content or information provided as part of these services, collectively, 'Services'), you are entering into a legally binding agreement." New Rockwell Decl. ¶ 19 & Exs. 1-3. In May 2017, LinkedIn sent hiQ a cease-and-desist letter demanding that hiQ stop scraping LinkedIn, explaining that hiQ's conduct violated its User Agreement with LinkedIn and a number of state and federal laws. ECF No. 131 (First Am. Compl.) ¶ 7. hiQ refused to stop scraping and brought this lawsuit instead.

**C.**   **hiQ Claimed It Needed A Preliminary Injunction To Continue To Operate Its Business.**

After hiQ initiated these legal proceedings, it pursued immediate injunctive relief. The thrust of hiQ's motion was that hiQ could not operate its business without access to LinkedIn data and that it needed an injunction to allow its business to continue to operate. hiQ repeatedly asserted that access to LinkedIn data was necessary to the ongoing operation of its business. It argued that "immediate injunctive relief" was necessary because "denying hiQ access to LinkedIn's public member profiles will effectively shut down hiQ's operations." ECF No. 24

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

(hiQ's Renewed TRO/PI Mot.) at 2.  hiQ said it needed the preliminary injunction "because hiQ will likely lose its contracts and employees (23 total full time employees, 20 based in San Francisco) and go out of business (rendering worthless the $14.5 million in venture capital invested since its start up in 2012) if it cannot access the public information on which its business completely depends."  *Id.*  hiQ further maintained its people analytics business was "based on the public profile pages available on LinkedIn" and that access to LinkedIn data was necessary to prevent hiQ from "breach[ing] its agreements with its customers, stop[ping] discussions with its long list of prospective customers, lay[ing] off most if not all its employees, and shutter[ing] its operations."  *Id.* at 24.  In supplemental briefing, hiQ again grounded its request for relief in its asserted need to use LinkedIn data for its ongoing business, saying "[i]f hiQ cannot access public profiles it will go bankrupt:  hiQ's pending financing would be stopped in its tracks, hiQ's employees would become jobless, hiQ's contracts and customer relationships would be destroyed, and all of hiQ's progress in the field of data science would be lost."  ECF No. 48 (hiQ's Supp. Brief) at 2.

The Court relied on hiQ's assertions of likely irreparable harm in granting the preliminary injunction, finding it "credible" that without the injunction, "hiQ will simply go out of business; it will have to breach its agreements with its customers, stop discussions with its long list of prospective customers, lay off most if not all its employees, and shutter its operations."  ECF No. 63 (Prelim. Inj. Ord.) at 4.  The Court further found "hiQ unquestionably faces irreparable harm in the absence of an injunction, as it will likely be driven out of business."  *Id.* at 7.

Pursuant to the Court's Preliminary Injunction Order, LinkedIn has continued to allow hiQ unrestricted access to publicly viewable profile data on LinkedIn's servers.  New Rockwell Decl. ¶¶ 20-22.  In fact, at virtually all times relevant to this case, hiQ enjoyed access to publicly viewable profile data.[1]  Even now, LinkedIn continues to take affirmative steps to ensure that hiQ has access to LinkedIn's servers—as recently as January 2021, hiQ (through its counsel) sent

---

[1] Prior to the injunction, LinkedIn implemented IP blocks on certain IP addresses it thought were associated with hiQ for at most two days.  New Rockwell Decl. ¶ 21.

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1   LinkedIn a letter requesting that LinkedIn allow access for additional IP addresses, which "will be

2   used by hiQ to access public LinkedIn profiles," and LinkedIn took affirmative steps to guarantee

3   access to those IP addresses.  *Id.* ¶ 22; Hurst Decl. Ex. 9.  hiQ did not inform LinkedIn in its

4   January 2021 letter that it had shut down its business, to the contrary it specifically stated that the

5   IP addresses would be "used by hiQ to access public LinkedIn profiles."  Hurst Decl. ¶ 16 & Ex.

6   9.  Nor did hiQ explain what it intended to do with any LinkedIn data it accessed.  In response to

7   a request that it do so (*id.* Ex. 10), hiQ expressly refused to provide information about how the IP

8   addresses would be used.  *Id.* Ex. 11.  Instead, hiQ said the IP addresses would be "used by hiQ in

9   accordance with [its] rights under the PI Order, as affirmed," creating the impression that hiQ was

10  making ongoing use of the IP addresses in its business operations.  *Id.* Ex. ¶ 17 & Ex. 11.

11          **D.      LinkedIn's Appeal Of The Injunction Is Pending Before The Ninth Circuit**
            **After Supreme Court Remand.**
12

13          LinkedIn appealed the Preliminary Injunction Order to the Ninth Circuit.  *See* ECF No. 72

14  (LinkedIn Notice of Appeal).  In October 2017, this Court stayed the proceedings pending the

15  issuance of the mandate in LinkedIn's appeal.  ECF No. 80 (Stip. & Order).  After the Ninth

16  Circuit affirmed, LinkedIn filed a petition for writ of certiorari to the United States Supreme

17  Court.  *See* ECF No. 129 (Stip. & Sched. Order).  Certain pleading-stage activity took place

18  before this Court while the certiorari petition was pending, but the Court extended the stay of

19  discovery through resolution of that petition.  *See id.*  On June 14, 2021, the Supreme Court

20  granted certiorari, vacated the Ninth Circuit's judgment, and remanded the case for further

21  consideration in light of *Van Buren v. United States*, 141 S. Ct. 1648 (2021).  *See* ECF No. 202

22  (Order).  As a result of the remand, the Ninth Circuit currently has jurisdiction over the

23  preliminary injunction.  The parties filed supplemental briefs at the court's request and oral

24  argument is scheduled for October 18, 2021.

25          **E.      Recent Events Reveal hiQ No Longer Operates Its Business And Thus No**
            **Longer Faces A Risk Of Likely Irreparable Harm.**
26

27          In August 2021, LinkedIn learned that hiQ had ceased operations sometime in the August

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

or September 2018 timeframe.  Hurst Decl. ¶¶ 4, 8, 16-18.  hiQ further revealed during meet and confer discussions that, around the same time, hiQ shut down all the key systems and databases it used to conduct its business.  *Id.* ¶¶ 9-10 & Ex. 5.  hiQ had used Amazon Web Services (AWS) to store native versions of LinkedIn profile pages scraped from LinkedIn and a database instance on MongoDB to store a processed form of that data.  *Id.* ¶ 9.  hiQ represented that it imaged the AWS account and shut it down in 2018 such that it is no longer accessible.  *Id.*  hiQ used Salesforce to manage all its customer relationships, but its account expired, is no longer accessible, and has not been replaced with another system.  *Id.* ¶¶ 10-12.  And hiQ used Quickbooks to manage the company's finances, but that account, too, is no longer active.  *Id.* ¶ 10.  Thus, all systems hiQ used to analyze LinkedIn data, manage customer relationships, and prepare the company's finances are no longer in use and, in some cases, no longer even reasonably accessible.

hiQ's representations in meet and confer discussions are supported by statements in its initial disclosures and in other recent written discovery responses.  For example, hiQ's initial disclosures identified all hiQ witnesses as "former" employees of the company.  *Id.* Ex. 2 at 2-6.  LinkedIn's further investigation confirmed each of these individuals purport to have moved on from hiQ to new opportunities.  *Id.* ¶ 6 & Ex. 3.  Similarly, in its interrogatory responses, hiQ described its business exclusively in the past tense.  It referred to entities that "*were* hiQ's customers," stated that it had no competitors "when it *was* a going concern," and acknowledged that "because hiQ is *no longer operational*, it cannot be said to have any competitors."  *Id.* Ex. 4 at 1, 26, 27 (emphases added).

hiQ's lack of ongoing public presence further confirms it ceased doing business.  hiQ's website has not been updated in years, with its last posted podcast dated February 28, 2017, last blog post dated June 2, 2017, and last posted news article dated February 21, 2018.  *Id.* ¶ 13 & Ex. 6.  Similarly, hiQ's last tweet related to its business was on January 8, 2018; all further Twitter activity is related solely to this litigation.  *Id.* ¶ 14 & Ex. 7.  Finally, hiQ's listed business address at 575 Market Street, Suite 850, in San Francisco is currently available for rent.  *Id.* ¶ 15

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

& Ex. 8.

hiQ's scraping activity through the IP addresses it disclosed to LinkedIn also shows a significant change to its business around late 2018.  From the date of the injunction through September 2018, hiQ scraped LinkedIn almost daily, making more than 75 million requests to view (and, presumably, copy) LinkedIn profile pages.  Declaration of Yukai Zhong in Support of LinkedIn's Mot. to Dissolve Prelim. Inj. and Request for Indicative Ruling ("Zhong Decl.") ¶ 7.  After that time, hiQ's access fell off.  *Id.* ¶ 8.  The IP addresses made almost no requests to LinkedIn's website after May 2019 until a brief flurry of activity in April 2020, and then have made no requests at all in the last 17 months.  *Id.* ¶ 9.  Even so, in the three years since hiQ ceased doing business and thus no longer had any business use for LinkedIn data, hiQ's IP addresses accessed more than 18 million LinkedIn profiles.  *Id.* ¶ 8.  The following chart demonstrates the analysis of this activity:



LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1    Despite having shuttered its operations in the late summer and early fall of 2018, hiQ

2    continued and continues to have unfettered access to publicly viewable profiles all the way until

3    the present.  New Rockwell Decl. ¶ 22.  hiQ—or someone else acting with its IP addresses—

4    appears to have made use of that access *even after hiQ shuttered its operations*.  Zhong Decl. ¶¶

5    8-10 & Exs. 1-2; Hurst Decl. ¶¶ 19-20.  LinkedIn has no knowledge of who ultimately controls

6    the IP addresses hiQ designates, and no visibility into what any third parties may do with

7    information acquired using those addresses.  New Rockwell Decl. ¶ 22.

8                                  **ARGUMENT**

9    **I.     THE INJUNCTION SHOULD BE DISSOLVED BECAUSE HIQ'S BUSINESS IS
            NO LONGER OPERATIONAL.**

10

11    "A district court has inherent authority to modify a preliminary injunction in consideration

12    of new facts."  *See A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002).  "A

13    party seeking modification or dissolution of an injunction bears the burden of establishing that a

14    significant change in facts or law warrants revision or dissolution of the injunction."  *Karnoski v.*

15    *Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019).  "It is an abuse of discretion if, after the moving

16    party carries this burden, a court refuses to modify an injunction in light of such changes."  *All.*

17    *for the Wild Rockies v. Bradford*, 864 F.Supp.2d 1011, 1017 (D. Mont. 2012) (quotation marks

18    omitted).  Put another way, "[b]ecause injunctive relief is drafted in light of what the court

19    believes will be the future course of events ... a court must never ignore significant changes in the

20    ... circumstances underlying an injunction lest the decree be turned into an instrument of wrong."

21    *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (quotation marks omitted).

22    The inquiry on a motion to dissolve a preliminary injunction is twofold.  The first question

23    is "whether the party seeking dissolution of the injunction has established a significant change in

24    facts or law."  *Karnoski*, 926 F.3d at 1198 (quotation marks omitted).  If the first step is satisfied,

25    the "court must then address whether this change warrants dissolution of the injunction."  *Id.*

26    (quotation marks and alterations omitted).  "This latter inquiry should be guided by the same

27    criteria that govern the issuance of a preliminary injunction."  *Id.*

28

A preliminary injunction is never appropriate in the absence of likely irreparable harm. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21-22 (2008); *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). A plaintiff seeking a preliminary injunction "'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.'" *Coeur D'Alene Tribe*, 794 F.3d at 1046. While the Ninth Circuit applies a "sliding scale" that weighs the likelihood of success on the merits relative to the balance of hardships if an injunction issues, the plaintiff must always "show[] that there is a likelihood of irreparable injury" to obtain, or maintain, an injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (test for obtaining injunction); *see also Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*, No. 2:09-cv-00023-MCE-GGH, 2009 WL 805813, at *3 (E.D. Cal. Mar. 26, 2009) ("Under either formulation of the test for granting injunctive relief, however, Plaintiffs must demonstrate a significant threat of irreparable injury.").

As set forth herein, there is a material change in circumstances that compels a finding that hiQ is incapable of suffering any irreparable harm, and that the injunction must therefore be dissolved. Part A, *infra*. Additionally, even assuming hiQ raises a serious question regarding unfair competition after its antitrust claims were dismissed and it declined to amend, the balance of hardships and public interest factors now clearly favor dissolution of the injunction. Part B, *infra*.

**A.** **hiQ's Business Shutdown Is A Significant Change In Facts Demonstrating It Cannot Suffer The Requisite Irreparable Harm.**

hiQ no longer operates the business that allegedly faced a threat of likely irreparable harm when the injunction issued in August of 2017. hiQ's preliminary injunction motion was all about preserving its ability to do business—no other basis for irreparable harm was identified. hiQ represented it had 23 employees whose jobs it wanted to preserve, at least three customers whose contracts it needed to honor, and investors from which hiQ was actively soliciting financing. *See* ECF No. 24 (hiQ's Renewed TRO/PI Mot.) at 2, 9. hiQ further represented that access to

1   LinkedIn data was essential to its ongoing business.  *Id*. at 24 (describing an ongoing people

2   analytics business "based on" LinkedIn pages); ECF No. 48 (hiQ's Supp. Brief) at 2 (alleging

3   harm to ongoing business).  And the Court grounded its injunction in findings that hiQ's inability

4   to access LinkedIn data would be likely to cause irreparable harm by ending hiQ's ability to

5   continue its business:  "If LinkedIn prevails, hiQ will simply go out of business; it will have to

6   breach its agreements with its customers, stop discussions with its long list of prospective

7   customers, lay off most if not all its employees, and shutter its operations."  ECF No. 63 (Prelim.

8   Inj. Ord.) at 4 (quotation marks omitted).

9          A year after the Court issued its order, and notwithstanding hiQ's full, unfettered access to

10  LinkedIn data, hiQ's business no longer existed.  Three years after that, LinkedIn has discovered

11  that hiQ's business evaporated despite the injunction put in place to preserve it.  hiQ does not

12  have active customers or contracts, the employees who focused on its commercial business have

13  taken positions elsewhere, it has shut down (and in some instances lost) the systems and

14  databases it had used to conduct its business, stopped having any meaningful web presence, and

15  appears to no longer occupy its physical headquarters.  Indeed, hiQ's counsel in discovery

16  responses now describes its business exclusively in the past tense, saying it "*was* a going

17  concern" but is "no longer operational."  Hurst Decl. Ex. 4 at 1, 26, 27.  This is a fundamental

18  change in the circumstances upon which the injunction was based.  hiQ wanted access to

19  LinkedIn data so it could continue to conduct business, but it is no longer conducting that

20  business at all.  Nor is there any indication this change is merely temporary—although LinkedIn

21  only recently learned of these developments, hiQ has not had employees, customers, customer

22  data, or business systems for years.  As a result, hiQ has no business need for ongoing access to

23  LinkedIn data.

24         This material change in circumstances means there is no longer any threat of likely

25  irreparable harm that could justify maintaining the preliminary injunction.  hiQ based its request

26  for injunctive relief on the threat that its people analytics business would end without injunctive

27  relief.  hiQ obtained the injunction but its business shut down anyway; therefore, the preliminary

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

injunction no longer serves any purpose.  *See Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc.*, No. 1:20-cv-00005-RGE-CFB, 2021 WL 2627454, at *2 (S.D. Iowa Apr. 23, 2021) ("A preliminary injunction is not appropriate when injunctive relief will not prevent additional harm to the plaintiff.").  *Smithfield* is particularly instructive.  In that case, an injunction was originally entered against a former Smithfield employee (who had become a Dietz employee) to prevent Smithfield from losing customers to Dietz & Watson during the pendency of the litigation due to the former employee's misappropriation of Smithfield's trade secrets.  During the pendency of the case, two Smithfield customers stopped doing business with Smithfield and began doing business with Dietz & Watson.  The Court then dissolved the preliminary injunction as to those two customers because "[t]he preliminary injunction no longer prevents Smithfield from losing either Coborn's or Homeland as customers"; in other words, Smithfield was no longer likely to suffer the irreparable harm on which the injunction was based.  *Id*. at *3.  The court further held that Smithfield's attempt to blame the defendants for improperly taking the customers was irrelevant to whether the injunction should be maintained.  "To the extent Smithfield alleges it suffered harm because [defendant employee] has wrongfully misappropriated its customers, a remedy at law exists—damages."  *Id.  See also Kauai Kunana Dairy Inc. v. United States*, No. 09–00473 DAE–LEK, 2009 WL 4668744, at *4 (D. Haw. Dec. 8, 2009) (declining to grant injunction where alleged high prices and restrictions on commerce "would have no effect [on the businesses before the court] because those companies are already out of business"); *Bank Julius Baer & Co. Ltd v. Wikileaks*, 535 F.Supp.2d 980, 985 (N.D. Cal. 2008) (declining to grant injunction where there was "evidence in the record that 'the cat is out of the bag' and the issuance of an injunction would therefore be ineffective").

The changed circumstances here are directly analogous to those in *Smithfield*—the preliminary injunction no longer prevents hiQ from losing its customers, contracts, or employees, because hiQ has already lost them.  To be clear, LinkedIn disputes any attempt hiQ might make to suggest LinkedIn is responsible for hiQ's business shutting down.  But who bears responsibility for hiQ's business ending is irrelevant to the legal inquiry at issue here—all that matters is that

1    hiQ is not operating its business and thus has no ongoing business left to protect.

2          That is the relevant inquiry because a preliminary injunction is an extraordinary remedy

3    only warranted where there is a likelihood of irreparable harm.  The Supreme Court's decision in

4    *Winter* rejected the Ninth Circuit standard that preliminary injunctive relief could be "based only

5    on a 'possibility' of irreparable harm," and reiterated that injunctive relief is "an extraordinary

6    remedy" requiring a plaintiff to "demonstrate that irreparable injury is *likely*."  555 U.S. at 22.

7    Following this guidance, courts "have consistently identified a showing of likely irreparable harm

8    as the single most important prerequisite for the issuance of a preliminary injunction; Plaintiff

9    must make that showing before the other requirements for the issuance of a preliminary

10   injunction need even be considered."  *BoomerangIt, Inc. v. ID Armor, Inc.*, No. 5:12-CV-0920

11   EJD, 2012 WL 2368466, at *3 (N.D. Cal. June 21, 2012).

12         Moreover, such likely irreparable harm "*must be prospective*"; a "preliminary injunction

13   is not a vehicle through which a plaintiff can seek correction of past wrongs."  *See First Health

14   Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235-236 (M.D. Pa. 2001)

15   (emphasis added).  Indeed, a preliminary injunction is "'a device for preserving the status quo'";

16   when that status quo changes even though the defendant complied with the injunction, ongoing

17   maintenance of the injunction no longer performs that function.  *Communities for a Better Env't

18   v. Pac. Steel Casting Co.*, No. C06-4184 BZ, 2006 WL 4491437, at *1 (N.D. Cal. Sept. 21, 2006)

19   (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir.1984)).

20   Given that the injunction no longer serves its intended purpose of preserving the status quo by

21   preventing hiQ from going out of business during the pendency of the litigation, the sole

22   remaining purpose of the injunction would be to punish LinkedIn, which is not a permissible use

23   of injunctive relief.  *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. C 10-3428 PSG,

24   2013 WL 890126, at *11 (N.D. Cal. Jan. 23, 2013) ("Injunctions, however, are not meant to be

25   punitive in nature."); *First Health*, 155 F. Supp. 2d at 235 ("[T]he purpose of a preliminary

26   injunction is to deter, not to punish").  Past wrongs (if any) are addressed through damages, not

27   equitable relief—indeed, hiQ is pursuing tort claims that would entitle it to damages if it carries

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

16

1    its burden to prove it was wronged (which it will not be able to do, but that is not the subject of

2    this Motion).

3         hiQ cannot show a continued risk of likely irreparable harm here.  Having admitted it is no

4    longer a going concern and not operational, any continuing threat of harm hiQ might attempt to

5    articulate would be speculative or hypothetical at best.  *See BoomerangIt,* 2012 WL 2368466, at

6    *3 ("An injunction will not issue if the moving party merely shows a possibility of some remote

7    future injury or a conjectural or hypothetical injury.").  And the absence of likely irreparable harm

8    is enough, on its own, to compel dissolution of the injunction without consideration of the

9    additional injunctive relief factors.  Because hiQ no longer conducts business using LinkedIn

10   data, the injunction mandating LinkedIn to provide hiQ access to its data should be dissolved.

11        **B.      The Balance Of Hardships And Public Interest Also Favor Dissolving The
           Injunction.**

12

13        The absence of likely irreparable harm to hiQ tips the balance of the hardships heavily in

14   LinkedIn's favor and makes maintaining the injunction contrary to the public interest.[2]  *See*

15   *Zhenhua Logistics (Hong Kong) Co. v. Metamining, Inc.*, No. C-13-2658 EMC, 2013 WL

16   3360670, at *3 (N.D. Cal. July 3, 2013) (finding that plaintiff was unable to show that the

17   hardship balance tips sharply in its favor "in light of its inability to establish a likelihood of

18   irreparable harm").  Whatever the legitimacy of hiQ's prior access to scrape LinkedIn data for

19   business purposes—and LinkedIn maintains there was no legitimate prior access—any pretense

20   of legitimacy has fallen away since hiQ is no longer conducting that business.  There is no longer

21   any conceivable need for hiQ to have privileged access that would allow it to scrape millions of

22   LinkedIn member profiles a month for the duration of this lawsuit.  Yet the injunction requires

23   LinkedIn to maintain a hole in its defenses through which hiQ is free to conduct uncontrolled

24   _____

25   [2] This Court need not reopen the record to reconsider the merits of hiQ's unfair competition claim
     in light of hiQ's subsequent failure to plead a viable antitrust claim and LinkedIn's subsequent
     filing of its counterclaims.  Instead, solely for purposes of this motion, LinkedIn is willing to

26   accept the Court's previous finding that hiQ "raised serious questions going to the merits" of its
     claims.  ECF No. 63 (Prelim. Inj. Ord.) at 25.  No matter hiQ's likelihood of success on the

27   merits, the changed circumstances of its business shutdown make it apparent under *Winter* that
     the preliminary injunction must be dissolved.

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

scraping of members' personal information, despite no longer operating its business.

The harms LinkedIn articulated in its opposition to hiQ's original request for injunctive relief—erosion of the privacy interests of LinkedIn users and the trust relationship between LinkedIn and its members—have only been exacerbated by hiQ now having access to LinkedIn member data divorced from any conceivably legitimate business purpose.  *See* ECF No. 31 (LinkedIn Opp.) at 1, 3, 5-6; New Rockwell Decl. ¶¶ 4, 24-26.  hiQ's injunction emboldens other scrapers ███████████████████████████████.  Bright Data has distorted the injunction in marketing to the public and its customers as making it "irrefutably legal" for anyone to scrape LinkedIn.  *Bright Data* website, https://brightdata.com/legality-of-web-data-collection.  And OxyData, sister company of OxyLabs—which also discusses this Court's injunction in supporting the legality of scraping (https://oxylabs.io/blog/is-web-scraping-legal)—conducted "an almost complete scrape of LinkedIn data" in 2019.  New Rockwell Decl. ¶ 24 & Ex. 10 ("Personal and Social Information of 1.2 Billion People Discovered in Massive Data Leak," *Night Lion Security Blog*, Nov. 22, 2019).  Moreover, LinkedIn frequently deals with negative press cycles around scraped data sets that are spun to the public as "breaches" of member data that threaten to cause members harm.  *See id.* ¶ 25 & Ex. 11 ("LinkedIn data breach grows to include over a billion hacked files:  The security of the social networking platform is very concerning, one expert says," *ConsumerAffairs*, July 1, 2021; "LinkedIn's 1.2B Data-Scrape Victims Already Being Targeted by Attackers," *threatpost*, July 1, 2021; "Why Facebook and LinkedIn's data scraping fiascos are a huge security problem for their users," *Fortune*, April 17, 2021).[3]

A court order compelling LinkedIn to provide privileged access to an admitted scraper—particularly one that no longer needs access for business purposes—creates the impression among both scrapers and members that LinkedIn cannot legally protect member data.  Moreover,

---

[3] Other examples include: "From Facebook to LinkedIn, data-scraping leaks proliferate: The incentives and opportunities for harvesting valuable personal information have multiplied," *Financial Times*, April 15, 2021; "Massive data leak exposes 700 million LinkedIn users' information," *Fortune*, June 30, 2021; "Data scraped from 500 million LinkedIn users found for sale online," *TechRepublic*, April 6, 2021.  *See* New Rockwell Decl. Ex. 11

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1 LinkedIn remains subject to the inherent harms any injunction poses.  It must conduct its business

2 in the manner this Court's injunction directs, at the risk of being held in contempt or facing other

3 sanctions if for whatever reason it fails to comply.  hiQ, on the other hand, no longer has any

4 threat of likely irreparable harm to balance against the harms LinkedIn faces.  Indeed, hiQ was

5 not ordered to post a bond securing the injunction (*see* ECF No. 63 at 25), so LinkedIn has no

6 recourse for any ongoing harm that it suffers as a result of the preliminary injunction.  The

7 balance of hardships now tips sharply in LinkedIn's favor.

8       As to the impact of the injunction on the public interest, the Ninth Circuit in this case

9 recognized a "significant public interest" in ensuring that public websites are not "forced to

10 choose between leaving their servers open to … attacks or protecting their websites with

11 passwords, thereby cutting them off from public view."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938

12 F.3d 985, 1005 (9th Cir. 2019), *vacated by LinkedIn Corp. v. hiQ Labs, Inc.*, No. 19-1116, 2021

13 WL 2405144 (S. Ct. June 14, 2021).  The court further recognized "a substantial interest in

14 thwarting denial-of-service attacks and blocking abusive users, identity thieves, and other ill-

15 intentioned actors."  *Id.*  Now that it is beyond dispute that hiQ lacks any legitimate business

16 interest in accessing LinkedIn's servers, there is no longer even an arguable distinction between

17 hiQ and those illicit actors.  This Court and the Ninth Circuit previously recognized that LinkedIn

18 is entitled to use general measures to repel unauthorized access requests to its platform.  *See* ECF

19 No. 63 (Prelim. Inj. Ord.) at 16; *hiQ Labs*, 938 F.3d at 1005.  The public interest does not support

20 broad scraping of personal information, in violation of the terms of use applicable to the websites

21 on which individuals post information about themselves, by actors who have no legitimate need

22 for that information.  There is no public interest served by maintaining the preliminary injunction.

## II.    THIS COURT SHOULD ISSUE AN INDICATIVE RULING TO FACILITATE PROMPT DISSOLUTION OF THE INJUNCTION.

25       Federal Rule of Civil Procedure 62.1 allows a court to make an indicative ruling "when

26 a timely motion for relief is made but the court lacks authority to grant it because an appeal is

27 pending."  *Great Am. Ins. Co. v. Chang*, No. 12-CV-00833-SC, 2014 WL 2967469, at *2 (N.D.

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1    Cal. July 1, 2014).  Under Rule 62.1, a Court may "state either that it would grant the motion if

2    the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed.

3    R. Civ. P. 62.1(a)(3).  A motion raises a substantial issue when "the movant has raised an issue

4    that merits reconsideration of the order."  *Russell Rd. Food and Beverage, LLC v. Galam*, No.

5    2:13–CV–776 JCM (NJK), 2013 WL 2949615, at *2 (D. Nev. June 13, 2013).  "A statement that

6    the motion raises substantial issues does not tie the district court to a particular ruling on the

7    motion after remand."  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL

8    4097751, at *3 (N.D. Cal. Sept. 17, 2012).  Courts in this circuit commonly issue indicative

9    rulings in the preliminary injunction context where the "basis for the [] Preliminary Injunction no

10   longer exists."  *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 4490558, at

11   *2 (N.D. Cal. Oct. 1, 2012).

12       This is precisely the kind of scenario Rule 62.1 was designed to address.  Changed

13   circumstances have mooted the need for the preliminary injunction and the injunction no longer

14   serves its intended purpose.  LinkedIn brought these circumstances to the Court's attention within

15   weeks and as soon as practicable after it learned of them.  But the court currently exercising

16   jurisdiction over the injunction—the Ninth Circuit—cannot dissolve the injunction based on those

17   changed circumstances because those facts are beyond the appellate record.  And while under

18   ordinary circumstances this Court unquestionably would have the power to dissolve an injunction

19   it issued, pendency of the appeal currently deprives this Court of jurisdiction to do so.  Several

20   district courts in this circuit have found it appropriate to issue indicative rulings where new

21   evidence raised substantial issues related to the continued propriety of a preliminary injunction

22   pending on appeal.  *See Overstreet v. Apex Linen Serv., Inc.*, No. 217CV02923APGCWH, 2018

23   WL 2245145, at *2 (D. Nev. Apr. 19, 2018) (issuing indicative ruling where preliminary

24   injunction was pending on appeal because defendant offered new evidence that raised substantial

25   issues that might alter the evaluation of plaintiff's likelihood of success on the merits and the

26   balance of factors in awarding injunctive relief); *Russell Rd. Food & Beverage, LLC*, 2013 WL

27   2949615, at *3 (issuing an indicative statement that "defendants' motion to vacate or modify the

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

20

preliminary injunction raises a substantial issue" where defendant presented new evidence "that may warrant reconsideration of the preliminary injunction"); *see also Apple Inc.*, 2012 WL 4490558, at *2 (dissolving preliminary injunction following remand after indicative ruling where "the sole basis for the [] Preliminary Injunction no longer exists").

Issuing an indicative ruling "may help the Ninth Circuit to streamline, or perhaps dismiss entirely" the appeal of an injunction that was based on findings of likely irreparable harm that have been rendered moot by changed circumstances. *See Great Am. Ins. Co.*, 2014 WL 2967469, at *3 (granting plaintiff's motion for an indicative ruling where "indicating its willingness to enforce the settlement may help the Ninth Circuit to streamline, or perhaps dismiss entirely, the [defendants'] appeal"). It would be a waste of judicial resources and may result in prolonged delay in final resolution of the merits if the Ninth Circuit is required to re-consider the merits of the original injunction, when the fundamental premise supporting that injunction no longer exists.

Instead, the better course would be for the matter to be remanded to this Court to consider the dissolution motion in the first instance. Even if the Court is not prepared to indicate it would dissolve the injunction based on the current motion—although LinkedIn respectfully submits the record clearly compels that outcome—at the very least the change in hiQ's circumstances raises a substantial issue as to the continued justification for the preliminary injunction that warrants this Court's consideration of the continued propriety of the injunction in the first instance, before the Ninth Circuit renders a decision about the merits of an out-of-date and moot prior injunction. Accordingly, LinkedIn requests the Court issue an indicative ruling under Rule 62.1 that the Court would issue an order dissolving the Preliminary Injunction if it had jurisdiction to do so or, in the alternative, that LinkedIn's motion to dissolve the Preliminary Injunction presents a substantial issue. If this Court issues the requested indicative ruling, LinkedIn will file a motion under Federal Rule of Appellate Procedure Rule 12.1 asking the Ninth Circuit to remand to enable this Court to hear the motion to dissolve.[4]

---

[4] LinkedIn will also shortly advise the Ninth Circuit Clerk of the Court by letter that LinkedIn has filed this Motion.

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC

1

## **CONCLUSION**

2    Based on the foregoing, LinkedIn respectfully requests that the Court grant LinkedIn's

3  Motion for an Indicative Ruling that the Court would dissolve the Preliminary Injunction or that

4  LinkedIn's motion presents a substantial issue as to whether the Preliminary Injunction should be

5  dissolved.

6  Dated: September 10, 2021                     Orrick, Herrington & Sutcliffe LLP

7

8                                   By: _____
                                              */s/ Annette L. Hurst*
9                                            ANNETTE L. HURST
                                            Attorneys for Defendant
10                                          LinkedIn Corporation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LINKEDIN'S MOT. TO DISSOLVE
PRELIM. INJ. AND REQUEST FOR
INDICATIVE RULING
17-cv-03301-EMC