Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6331

*Attorneys for Plaintiff and*
*Counterclaim Defendant*
*hiQ Labs, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301-EMC |
| *Plaintiff and Counterclaim Defendant*, | **PLAINTIFF HIQ LABS, INC.'S OPPOSITION TO DEFENDANT AND LINKEDIN CORP.'S MOTION TO DISSOLVE PRELIMINARY INJUNCTION AND REQUEST FOR INDICATIVE RULING PURSUANT TO FED. R. CIV. P. 62.1** |
| vs. | |
| LinkedIn Corp., | |
| *Defendant and Counterclaim Plaintiff.* | Judge:        Hon. Edward M. Chen<br>Hearing Date:  October 21, 2021<br>Hearing Time:  1:30 p.m. |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

I.       LINKEDIN ATTEMPTS TO AVOID YET ANOTHER UNFAVORABLE RULING
         ON ITS CFAA DEFENSE .......................................................................................... 2

II.      LINKEDIN LONG AGO PUSHED HIQ INTO DORMANCY ................................. 5

LEGAL ARGUMENT ............................................................................................................ 6

I.       THE COURT SHOULD DENY LINKEDIN'S MOTION FOR AN INDICATIVE
         RULING PURSUANT TO RULE 62.1 ...................................................................... 6

         A.       LinkedIn's Strategic Delay In Bringing This Motion Is A Deliberate Effort To
                  Impede Resolution And Waste Judicial Resources ....................................... 6

         B.       An Indicative Ruling Would Not Be Useful to The Court Of Appeals, Which Is
                  Well-Positioned To Provide Clarity On The CFAA ....................................... 8

         C.       LinkedIn Does Not Need An Indicative Ruling From This Court To Raise Its
                  Mootness Argument With the Ninth Circuit ................................................. 12

II.      LINKEDIN'S UNDERLYING MOTION TO DISSOLVE THE PRELIMINARY
         INJUNCTION IS WITHOUT MERIT ...................................................................... 12

         A.       HiQ Will Be Irreparably Harmed If The Preliminary Injunction Is Dissolved ........ 13

         B.       The Balance of Hardships Continues To Tip Strongly In hiQ's Favor ................... 15

         C.       The Public Interest Continues To Favor hiQ ................................................. 17

CONCLUSION ...................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page**

## Cases

*3Taps, Inc. v. LinkedIn Corp.,*
    3:18-cv-00855-EMC (ECF No. 9) ................................................................... 11

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) ...................................................................................... 12

*Bank Julius Baer & Co. Ltd. V. Wikileaks,*
    535 F. Supp. 2d 980 (N.D. Cal. 2008) ........................................................ 15

*Facebook, Inc. v. Power Ventures, Inc.,*
    252 F. Supp. 3d 765 (N.D. Cal. 2017) ........................................................ 14

*Feldenkrais Guild of N. Am. v. Wildman,*
    2018 WL 2331905 (N.D. Cal. May 23, 2018) .............................................. 14

*Han Tak Lee v. Cameron,*
    No. 4:08-CV-1972, 2015 WL 1000231 (M.D. Pa. Mar. 5, 2015)............................ 12

*Heckler v. Lopez,*
    463 U.S. 1328 (1983) .................................................................................. 16

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    938 F.3d 985, 989 (9th Cir. 2019), *cert. granted, judgment vacated,*
    No. 19-1116, 2021 WL 2405144 (U.S. June 14, 2021) ...................... 2, 3, 9, 10, 17, 18

*International Snowmobile Manufacturers Association v. Norton,*
    304 F. Supp. 2d 1278 (D. Wyo. 2004) ........................................................ 13

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019)..................................................................... 13

*Kauai Kunana Dairy Inc. v. United States,*
    No. 09-00473 DAE-LEK, 2009 WL 4668744 (D. Haw. Dec. 8, 2009)..................... 14

*Lopez-Cacerez v. Mayorkas,*
    No. 20-55613, 2021 WL 2454436 (9th Cir. May 25, 2021) .................................. 12

*Lowry v. Barnhart,*
    329 F.3d 1019 (9th Cir. 2003)..................................................................... 12

*Maryln Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009)...................................................................... 16

*Muskrat v. United States,*
    219 U.S. 346 (1911) ...................................................................................... 6

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.,*
    242 F.3d 1163 (9th Cir. 2001)...................................................................... 6

*North Carolina v. Rice,*
   404 U.S. 244 (1971) ................................................................................................ 6

*Planned Parenthood v. U.S. Dep't of Health & Human Servs.,*
   946 F.3d 1100 (9th Cir. 2020) .............................................................................. 10

*Planned Parenthood of Greater Washington & N. Idaho v.*
   *U.S. Dep't of Health & Hum. Servs.,*
   946 F.3d 1100 (9th Cir. 2020) ................................................................................ 9

*Prosterman v. Am. Airlines, Inc.,*
   747 F. App'x 458 (9th Cir. 2018) .......................................................................... 7

*Quinn v. Robinson,*
   783 F.2d 776 (9th Cir. 1986) .................................................................................. 9

*Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of New York Mellon,*
   297 F.R.D. 218 (S.D.N.Y. 2013) ..................................................................... 8, 11

*Sharp v. Weston,*
   233 F.3d 1166 (9th Cir. 2000) .............................................................................. 13

*Sharp Healthcare v. Leavitt,*
   2009 WL 790113 (S.D. Cal. Mar. 25, 2009) ................................................... 9, 15

*Singleton v. Wulff,*
   428 U.S. 106 (1976) ................................................................................................ 9

*Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc.,*
   No. 1:20-cv-00005-RGE-CFB, 2021 WL 2627454 (S.D. Iowa Apr. 23, 2021) ....... 14

*Tribe v. Nat'l Marine Fisheries Serv.,*
   2018 WL 2010980 (N.D. Cal. Apr. 30, 2018) ...................................................... 6

*United States v. All Assets Held in Acct. No. 80020796, in the Name of Doraville*
   *Properties Corp.,*
   No. CV 13-1832 (JDB), 2017 WL 6886092 (D.D.C. Nov. 15, 2017) .................. 10

*United States v. Patrin,*
   575 F.2d 708 (9th Cir. 1978) .................................................................................. 9

*Van Buren v. United States,*
   593 U.S. ---, 141 S. Ct. 1648 (June 3, 2021) ........................................................ 4

*Matter of Verity Health Sys. of California, Inc.,*
   814 F. App'x 275 (9th Cir. 2020) ........................................................................ 12

*Wallace v. Christensen,*
   802 F.2d 1539 (9th Cir. 1986) .............................................................................. 11

*Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) .............................................................................. 13

*Winter v. Nat. Rs. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................................. 12

**<u>Rules / Statutes</u>**

Fed. R. App. P. 12.1 ................................................................................................. 11

Fed. R. Civ. P. 62.1 ................................................................................. 1, 4, 6, 11, 12

Fed. R. Civ. P. 62.1(a) ................................................................................................ 6

Local Civil Rule 3-12 ............................................................................................... 11

Rule 60(b)(2) ............................................................................................................. 7

Section 1030(a)(2)…………..……………………………………………………….10, 11

**<u>Other Authorities</u>**

Jesse Snyder, Does Federal Rule of Civil Procedure
    62.1 Entice District Courts to Render Unconstitutional Advisory Opinions?,
    42 U. Dayton L. Rev. 1, 1-10 (2017) .............................................................. 6

## MEMORANDUM OF POINTS AND AUTHORITIES

hiQ Labs, Inc. ("hiQ") respectfully submits this opposition to LinkedIn Corporation's ("LinkedIn's") Motion to Dissolve the Preliminary Injunction and for an Indicative Ruling Under Federal Rule of Civil Procedure 62.1 (the "Motion").  hiQ's opposition is supported by its prior submissions in this action, the September 24, 2021 Declaration of Mark Weidick (the "New Weidick Decl.") submitted herewith, and the exhibits attached thereto.

## INTRODUCTION

More than eighteen months after hiQ filed an Amended Complaint stating that LinkedIn's conduct had "effectively eviscerated hiQ's business" and that hiQ had "largely been forced out of business," LinkedIn filed a motion for indicative relief on the basis that it "learned in the past few weeks that hiQ went out of business *three years ago*" (Mot. at 1 (emphasis in original)).  In support of that motion, LinkedIn cites its own data, which shows that hiQ's "IP addresses made almost no requests to LinkedIn's website after May 2019 until a brief flurry of activity in April 2020, and then have made no requests at all in the last 17 months."  The record before this Court, and LinkedIn's own alleged evidence, belie LinkedIn's claim of urgency.  LinkedIn's motion is not timely, and should be denied on that basis under Federal Rule of Civil Procedure 62.1.

Even if the motion were timely, however, it should be denied because an indicative ruling would waste judicial resources and further delay the ultimate resolution of this case.  In the eighteen months since hiQ informed this Court that had largely gone out of business, LinkedIn has filed a petition for a writ of certiorari with the Supreme Court and filed a brief on remand before the Ninth Circuit Court of Appeals, in both cases seeking those Courts' review on the scope of the Computer Fraud and Abuse Act.  In none of those briefs did LinkedIn raise the issue of seeking relief from the preliminary injunction on the basis of mootness.  The Ninth Circuit has scheduled oral argument on the applicability of the CFAA in this case for October 18, 2021, after which it will issue a ruling backed by the benefit of multiple rounds of briefing and oral argument, as well as guidance from the Supreme Court directed to this very question.  An indicative ruling by this Court would therefore neither conserve judicial resources nor aid the Court of Appeals before argument.

Finally, LinkedIn's Motion should also be denied because LinkedIn has simply not met its burden of showing that the injunction should be dissolved.  LinkedIn is likely to inflict further irreparable harm on hiQ if LinkedIn gets its way, and LinkedIn cannot show that the balance of hardships tips in its favor where—as here—LinkedIn acknowledges that it has been at least seventeen

months since hiQ has accessed its website.  Finally, the public interest continues to favor hiQ.  As such, on that independent basis as well, LinkedIn's motion should be denied.

## BACKGROUND

### I.   LINKEDIN ATTEMPTS TO AVOID YET ANOTHER UNFAVORABLE RULING ON ITS CFAA DEFENSE

Over four years ago, this Court granted hiQ's motion for injunctive relief, enjoining LinkedIn from "preventing hiQ's access, copying, or use of public profiles on LinkedIn's website" (the "Injunction").  Order Granting hiQ's Mot. for Prelim. Inj., ECF No. 63 ("Order").  The Court concluded:

> In sum, hiQ unquestionably faces irreparable harm in the absence of an injunction, as it will likely be driven out of business.  The asserted harm LinkedIn faces, by contrast, is tied to its users' expectations of privacy and any impact on user trust in LinkedIn.  However, those expectations are uncertain at best, and in any case, LinkedIn's own actions do not appear to have zealously safeguarded those privacy interests.
>
> Furthermore, despite the fact that hiQ has been aggregating LinkedIn's public data for five years with LinkedIn's knowledge, LinkedIn has presented no evidence of harm, financial or otherwise resulting from hiQ's activities.  Indeed, LinkedIn has not explained why suddenly it has now chosen to revoke its consent (or at least tolerance) of hiQ's use of that data.

*Id.* at 7-8.

In evaluating hiQ's likelihood of success on the merits of its claims, the Court expressed its "doubt[] that the Computer Fraud and Abuse Act may be invoked by LinkedIn to punish hiQ for accessing publicly available data" and concluded that "the broad interpretation of the CFAA advocated by LinkedIn, if adopted, could profoundly impact open access to the Internet, a result that Congress could not have intended when it enacted the CFAA over three decades ago." *Id.* at 2.  The Court therefore ordered LinkedIn to immediately unblock certain IP addresses used by hiQ, *id.* at 25, and LinkedIn "whitelisted" hiQ's IP addresses such that those IP addresses would be permitted to access LinkedIn's website.

On September 5, 2017, LinkedIn appealed this Court's Order granting the Injunction to the Court of Appeals for the Ninth Circuit.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019), *cert. granted, judgment vacated*, No. 19-1116, 2021 WL 2405144 (U.S. June 14, 2021) ("*hiQ*

*I*").  LinkedIn secured an expedited briefing schedule pursuant to Ninth Circuit Local Rule 3-3, and the parties stipulated to stay all interim deadlines "in the interests of judicial efficiency and conserving the resources of this Court and the parties" and given that "resolution of the Appeal will provide significant guidance regarding the critical issues in this case…"  Stipulation and Order Staying Further Proceedings and Deadlines at 2, ECF No. 80.  On appeal, "LinkedIn's counsel suggested that [the court] should address the CFAA question in this appeal for 'pragmatic reason[s]' because it 'is going to be a significant issue on remand no matter what happens to this injunction.'"  *hiQ I*, 938 F.3d at 989 at 1005 (Wallace, J., concurring).  The Ninth Circuit did so, affirming the Injunction upon a finding that "[p]ublic LinkedIn profiles, available to anyone with an Internet connection" are classified as "information for which access is open to the general public and permission is not required" under the CFAA and that "[t]he data hiQ seeks to access is not owned by LinkedIn and has not been demarcated by LinkedIn as private using… an authorization system."  *Id.* at 1001-5.

On February 14, 2020, three months after the issuance of *hiQ I*, hiQ filed its Amended Complaint.  ECF No. 131.  Therein, hiQ alleged, *inter alia*, that despite the Court's issuance of a preliminary injunction, "LinkedIn effectively eviscerated hiQ's business.  It lost 75% of its employees, watched its business valuation plummet, was unable to find any further investors, experienced an almost immediate (unwilling) cessation of conversations with potential strategic partners, and lost several major clients, some of which specifically noted that they could no longer do business with hiQ because of LinkedIn's conduct."  *Id.* at ¶ 45.  hiQ acknowledged that "[a]s a consequence, hiQ lost the majority of its revenues almost overnight and today is unfortunately a shadow of what it once promised to be."  *Id.* at ¶ 12.  hiQ further alleged that "[a]s a direct and proximate result of LinkedIn's conduct, hiQ has suffered damages including but not limited to lost business and potential bankruptcy. Although LinkedIn was restrained by a preliminary injunction, hiQ has suffered severe, irreparable harm in that it was forced to terminate the contracts with its clients *and has largely been forced out of business entirely*."  *Id.* at ¶ 81 (emphasis added); *see also id.* ¶¶ 87, 95, & 106.

On March 9, 2020, weeks after hiQ had made these allegations regarding the effect on its business, LinkedIn appealed the Ninth Circuit's decision to the Supreme Court.  LinkedIn's appeal purported to present the question of "[w]hether a company that deploys anonymous computer 'bots' to

1    circumvent technical barriers and harvest millions of individuals' personal data from computer servers

2    that host public-facing websites—even after the computer servers' owner has expressly denied

3    permission to access the data—'intentionally accesses a computer without authorization' in violation

4    of the Computer Fraud and Abuse Act."  LinkedIn's Pet. for Writ of Cert. at i.  LinkedIn argued that

5    its petition "raise[d] issues of exceptional importance that warrant immediate review" and professed

6    that "this case is a good vehicle for this Court's review" because the CFAA question is a "threshold

7    issue."  Pet. Cert. Reply at 8, 10.

8         On April 14, 2021, LinkedIn moved to dismiss certain of the claims hiQ asserted in its

9    Amended Complaint.  In its introduction to its motion, LinkedIn quoted hiQ's assertion that

10   LinkedIn's issuance of a cease-and-desist "letter somehow 'effectively eviscerated' its business."

11   ECF No. 137 at 1; *see also id.* at 8-9.  LinkedIn's motion was granted, in part.  ECF No. 158.

12        On June 14, 20221, the Supreme Court granted certiorari, vacated the judgment of the Court of

13   Appeals and remanded "for further consideration in light of *Van Buren v. United States*," a recent case

14   considering the CFAA.  *Linkedin Corp. v. hiQ Labs, Inc.*, No. 19-1116, 2021 WL 2405144, at *1

15   (U.S. June 14, 2021).  In *Van Buren*, the Supreme Court issued a definitive ruling on the CFAA's

16   "exceeds authorized access" prong, but did not address the interpretation of the "without

17   authorization" prong of that provision.  LinkedIn's Supp. Br. at 1.  That question is now before the

18   Court of Appeals for the Ninth Circuit.

19        On July 9, 2021, LinkedIn and hiQ submitted supplemental briefs to the Court of Appeals

20   addressing the effect of the Supreme Court's ruling in *Van Buren* on the Ninth Circuit's previous

21   interpretation of the CFAA.  9th Cir. Dkt. No. 97.  Oral argument is scheduled for October 18, 2021.

22        On September 10, 2021, LinkedIn filed this Motion seeking an indicative ruling pursuant to

23   Fed. R. Civ. P. 62.1, claiming that it learned only "[i]n August 2021… that hiQ had ceased

24   operations…"  LinkedIn did not address hiQ's statements in its Amended Complaint to that effect, nor

25   did it acknowledge its own motion to dismiss quoting those statements.  Instead, LinkedIn argued that

26   its pending Ninth Circuit appeal is therefore moot.  LinkedIn's Mot. at 9, 20, ECF No. 217.  That same

27   day, LinkedIn filed a letter to the Ninth Circuit notifying that court of its Motion and attaching its brief

28   as an "exhibit."  9th Cir. Dkt. No. 118.  Oral Argument on LinkedIn's Motion is scheduled for

1    October 21, 2021, three days after the Ninth Circuit will hear argument on the CFAA question

2    pending before it.

3    **II.    LINKEDIN LONG AGO PUSHED HIQ INTO DORMANCY**

4           Despite the Injunction, LinkedIn's conduct has had its desired effect of pushing hiQ out of the

5    market.  The cloud of uncertainty caused by LinkedIn's conduct lingered over hiQ's enterprise as hiQ

6    attempted to conduct business as usual after the Injunction.  *See* September 24, 2021 Declaration of

7    Mark Weidick ("New Weidick Decl.") at ¶ 4.  As a result, hiQ lost funding and its employees, and it

8    could no longer solicit new clients or renew client contracts.  *Id.*

9           The wind-down of hiQ's business operations can be tracked against the extent of its requests to

10   LinkedIn's servers from hiQ's whitelisted IP addresses, which LinkedIn monitors.  *See generally*

11   Declaration of Yukai Zhong, ECF No. 217-5; LinkedIn's Mot. at 11.  According to LinkedIn's

12   tracking, "hiQ's scraping activity through the IP addresses it disclosed to LinkedIn also shows a

13   significant change to its business around late 2018…. The IP addresses made almost no requests to

14   LinkedIn's website after May 2019, until a brief flurry of activity in April 2020, and then have made

15   no requests at all in the last 17 months."  LinkedIn's Mot. at 11.

16          As hiQ's business was winding down, hiQ wanted to ensure that, if the opportunity presented

17   itself, it could still capitalize on the years' worth of efforts that had made hiQ the outstanding success

18   it had come to be, and that it could get its services running as seamlessly as possible.  Accordingly,

19   hiQ's employees archived its intellectual property, including its source code and algorithms.  New

20   Weidick Decl. at ¶ 5.

21          Since hiQ was forced into dormancy, it has received several inquiries from prospective

22   commercial partners seeking to leverage hiQ's technology.  *Id.*  at ¶ 9.  Without the Injunction, hiQ

23   would not have been able to—and cannot continue to— entertain these inquiries and consider whether

24   it could salvage what remains of its business to try to mitigate the harm that LinkedIn has caused.  *Id.*

25   at ¶¶ 9-15.

26

27

28

# **LEGAL ARGUMENT**

## I.   THE COURT SHOULD DENY LINKEDIN'S MOTION FOR AN INDICATIVE RULING PURSUANT TO RULE 62.1

The filing of a notice of appeal divests the district court "of jurisdiction over the matters being appealed." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001). The purpose of this divestiture "is to promote judicial economy and avoid the confusion that would ensue from having the same issues before two courts simultaneously." *Id.* Federal Rule of Civil Procedure 62.1, adopted in 2009, codified a previously informal practice by which a district court may offer guidance as to how it would rule over an issue over which it otherwise lacks jurisdiction.[1] A District Court has discretion to (1) defer, (2) deny or (3) entertain the motion based on its assessment of whether it is "wise… to determine whether it in fact would grant the motion if the court of appeals remands for that purpose." Fed. R. Civ. P. 62.1 advisory committee's note to 2009 amendment. In deciding whether to entertain a motion under Rule 62.1, courts "consider the merits" of the underlying motion. *Tribe v. Nat'l Marine Fisheries Serv.*, 2018 WL 2010980, at *1 (N.D. Cal. Apr. 30, 2018).

Because the CFAA question before the Court of Appeals is fully briefed and ripe for decision, an indicative ruling would waste judicial resources and further delay the ultimate resolution of this case. Further, LinkedIn's motion to dissolve the Injunction is not properly before this Court, and fails to justify dissolution in any event.

### A.   LinkedIn's Strategic Delay In Bringing This Motion Is A Deliberate Effort To Impede Resolution And Waste Judicial Resources

Rule 62.1 requires a motion seeking an indicative ruling to be "timely" filed. Fed. R. Civ. P. 62.1(a). LinkedIn claims that it "brought th[e] [changed] circumstances to the Court's attention within weeks and as soon as practicable after it learned of them." LinkedIn's Mot. at 20. That claim is irreconcilable with the record and makes a mockery of LinkedIn's own counterclaims.

---

[1]   The Supreme Court has never issued an opinion considering Rule 62.1, and some observers have argued that indicative rulings violate the Constitutional prohibition on advisory opinions. *See generally Muskrat v. United States*, 219 U.S. 346, 351-53 (1911); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971); *see also* Jesse Snyder, *Does Federal Rule of Civil Procedure 62.1 Entice District Courts to Render Unconstitutional Advisory Opinions?*, 42 U. Dayton L. Rev. 1, 1-10 (2017).

LinkedIn did not "learn[] in the past few weeks that hiQ went out of business *three years ago*" (LinkedIn's Mot. at 3 (emphasis in original)), because *hiQ told LinkedIn and the Court* the facts within weeks of the Ninth Circuit's ruling, over *eighteen months* before LinkedIn's motion was filed. hiQ's First Amended Complaint, filed on February 14, 2020, stated that "just as hiQ predicted would come to pass, it did in fact lose its major contracts and today is a shell of what it once promised to be," and that "hiQ has suffered severe, irreparable harm in that it was forced to terminate the contracts with its clients and has largely been forced out of business." ECF No. 131 at ¶¶ 51, 81.  hiQ further alleged "[b]y sending the cease-and-desist letters and demonstrating it was willing at a moment's notice to cut off hiQ's raw data supply for anticompetitive purposes, LinkedIn effectively eviscerated hiQ's business." *Id.* at ¶ 45.  hiQ also stated that its "investigation for this amended complaint further bolsters that no major people analytics providers—besides LinkedIn—still exist," noting that "[m]any startups that followed hiQ into the people analytics market have either shuttered their operations or pivoted to different types of services." *Id.* at ¶ 52.  Similarly, hiQ's June 12, 2020 opposition to LinkedIn's motion to dismiss stated that "[LinkedIn's] actions destroyed hiQ's business[.]" ECF No. 142 at 27.  Indeed, LinkedIn's own motion quoted hiQ's assertions *on its first page*.  ECF No. 137 at 1.

To the extent these statements left any room for interpretation—which they did not— LinkedIn's current motion demonstrates that LinkedIn could have discovered that hiQ was non-operational through "reasonable diligence."  *Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462-63 (9th Cir. 2018) (finding a Rule 60(b)(2) motion untimely where it was "doubtful" that plaintiffs could "establish that evidence of this online meeting could not have been discovered earlier with 'reasonable diligence'… given that [p]laintiffs admit they found this evidence [online]").

LinkedIn "tracks and logs requests to access LinkedIn's website, including the IP address associated with each request."  Zhong Decl. at ¶ 2.  By simply "creat[ing] and r[unning] queries against the databases where the IP address information regarding LinkedIn site access requests is stored," LinkedIn easily identified the number of times hiQ's whitelisted IP addresses accessed LinkedIn's site.  *Id.* at ¶ 4.  Based on this information, LinkedIn states that "hiQ's scraping activity through the IP addresses it disclosed to LinkedIn [] shows a significant change to its business around

late 2018." LinkedIn's Mot. at 11. LinkedIn further states that the activity of hiQ's whitelisted IP addresses on LinkedIn's website substantially decreased in 2019, such that "[t]he IP addresses *made almost no requests to LinkedIn's website after May 2019* until a brief flurry of activity in April 2020, and then have made no requests at all in the last 17 months." *Id.* (emphasis added). Moreover, as LinkedIn also mentions, a simple check of hiQ's social media presence demonstrates that it has not been posting actively since 2018. LinkedIn's Mot. at 10.

LinkedIn has portrayed itself as a vigilant defender of user privacy and belabored the intolerable costs that hiQ's scraping has purportedly imposed on it. *See, e.g.*, LinkedIn's Mot. at 6; LinkedIn's Answer and Counterclaims at 32-35, ECF No. 170 (detailing LinkedIn's anti-scraping countermeasures); *id.* at 41-44 (claiming to have spent "thousands of hours of employee time in maintaining its technical defenses and investigating and responding to hiQ's unlawful activities…"). In its Motion, LinkedIn further complains that even the "continued existence of this injunction risks exacerbating the harms associated with scraping and emboldening data scrapers," such that the balance of hardships now favors LinkedIn. LinkedIn's Mot. at 4. Nevertheless, despite having the ready access to data regarding hiQ's access under the injunction, LinkedIn now professes to be *shocked* to learn that hiQ stopped accessing LinkedIn's site nearly a year and a half ago. Crediting that assertion would require this Court to assume that that the balance of hardships should favor a company that failed to notice, *for nearly seventeen months*, that it was suffering no hardship at all.

LinkedIn's Motion should be denied on the basis of LinkedIn's gamesmanship and delay.

## B. An Indicative Ruling Would Not Be Useful to The Court Of Appeals, Which Is Well-Positioned To Provide Clarity On The CFAA

Even if LinkedIn's Motion were timely, which it is not, an indicative ruling would waste judicial resources because it would "slow resolution of this action and impede the appeal." *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of New York Mellon*, 297 F.R.D. 218, 222 (S.D.N.Y. 2013).

The "threshold question in this case" (LinkedIn's Cert. Pet. at 49a) is the question of the CFAA's application to data in the public sphere. As put succinctly by the Ninth Circuit, "[m]ay LinkedIn, the professional networking website, prevent a competitor, hiQ, from collecting and using

information that LinkedIn users have shared on their public profiles, available for viewing by anyone with a web browser?" *hiQ I*, 938 F.3d at 989 (henceforth the "CFAA Question"). In considering the CFAA Question currently before it, the Ninth Circuit will have had the benefit of two rounds of briefing, two rounds of oral argument, and guidance from the Supreme Court directed to this very question. LinkedIn's belated attempt to dissolve the Injunction and render *its own appeal* moot is plainly a last-ditch effort to avoid yet a third (and more definitive) adverse decision on whether it may continue to use the CFAA as a sword to cut down competitors.

As a threshold matter, any partial mootness of an underlying dispute does not warrant dissolution of a preliminary injunction where "a single issue remains 'very much in dispute between the parties.'" *Sharp Healthcare v. Leavitt*, 2009 WL 790113, at *3 (S.D. Cal. Mar. 25, 2009) (*see also* Section II, *infra*.). But LinkedIn's mootness argument is a red herring even on its own terms, because the Court of Appeals "may exercise [its] equitable discretion to reach the merits of a case when the court below did not." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020); *see Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978). That is, *regardless* of whether the preliminary injunction is moot, the Court of Appeals may nonetheless issue a ruling on whether the CFAA prohibits hiQ's conduct because "the question is a purely legal one and the record has been fully developed prior to appeal." *Quinn v. Robinson*, 783 F.2d 776, 814 (9th Cir. 1986). Until a few weeks ago, LinkedIn had consistently and stridently advocated for precisely this outcome. *See* LinkedIn's App. Br. at 32, 9th Cir. Dkt. No. 6 (arguing that "The District Court Erred *as a Matter of Law* in Holding That hiQ Would Not Violate The CFAA by Re-Accessing LinkedIn's Servers") (emphasis added); Pet. Cert. Reply at 10 ("this case is a good vehicle for this Court's review [of the CFAA question]…"). There is no dispute between the parties as to what hiQ did—only whether it violated the CFAA. *See* hiQ's Answer to LinkedIn's Countercls. at 4, ECF No. 214 (hiQ "admits" that its "automated 'bots'… extract and copy data from hundreds of thousands of LinkedIn pages…"); Sharma Decl. at Ex. A (LinkedIn's Responses to hiQ's First Set of Requests for Production at 11) ("[M]alicious hacking [and] other similar activities have no relevance to the claims and defenses in this litigation.").

An appellate court has "flexib[ility]" to invoke its equitable discretion when, *inter alia*, "injustice might otherwise result… [or] significant questions of general impact are raised." *Planned Parenthood v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1110-11 (9th Cir. 2020) (reversing district court's dismissal of complaint for lack of standing and reaching two issues in the first instance) (internal citations omitted).  Both elements are present here.

*First*, LinkedIn essentially concedes that, to the extent hiQ has been driven out of business, hiQ's case alleges that the fault lies with LinkedIn's conduct.  *See* LinkedIn's Mot. at 3 ("hiQ may… blam[e] LinkedIn for driving it out of business.")[2]  To permit LinkedIn to escape the effect of an injunction against inflicting competitive harm *by succeeding in inflicting the harm that was enjoined* would be manifestly perverse and encourage precisely the conduct that this Court and the Court of Appeals found was likely to constitute competitive injury, a manifestly unjust result.

LinkedIn's reversal on the desirability of a clear ruling is jarring.  LinkedIn's Mot. at 19 (*quoting hiQ I*, 938 F.3d at 1005); *hiQ I*, 938 F.3d at 1005 (Wallace, J., concurring) (noting that LinkedIn urged the Court of Appeals to pass on the CFAA Question for "pragmatic reason[s]"); LinkedIn's Supp. Pet. at 1 ("[P]roper application [of Section 1030(a)(2) of the CFAA] is an issue of manifest and increasing importance."); *id.* at 3 ("There is a pressing need for an answer to that [CFAA] question.").  After LinkedIn advocated that position before this Court, the Ninth Circuit, and the Supreme Court, to permit LinkedIn to disclaim it now—in a transparent effort to avoid potentially losing once and for all on the very issue it has been pressing all along—would be unfair.

*Second*, the parties agree that there is a "significant public interest" in the Ninth Circuit's providing clarity on the CFAA Question, both for efficiency in this dispute and to guide parties in the future.  Since its May 23, 2017 cease-and-desist letter, LinkedIn has put the CFAA's applicability front and center of this dispute.  Finality from the Ninth Circuit is necessary for the parties and this Court to resolve the case.  *See, e.g.*, *United States v. All Assets Held in Acct. No. 80020796, in the Name of Doraville Props. Corp.*, No. CV 13-1832 (JDB), 2017 WL 6886092, at *2 (D.D.C. Nov. 15,

---

[2]  hiQ is not, as LinkedIn asserts, "out of business," and the continuing injunction is crucial to hiQ's prospects of resuming operations.  *See* Section II.A, *infra*.  That hiQ has already suffered some irreparable harm does not mean it cannot suffer more.  *See id.*

Case No. 3:17-cv-03301-EMC
HIQ'S OPPOSITION TO LINKEDIN'S MOT. TO DISSOLVE PRELIM. INJ.
AND REQUEST FOR INDICATIVE RULING

2017) (deferring ruling on a motion to vacate "[b]ecause a decision by the D.C. Circuit will 'more finally resolve [this] issue as opposed to proceeding with a district court decision subject to appeal.'").

Moreover, as LinkedIn has insisted, the Ninth Circuit's ruling on the CFAA Question in this case will provide much-needed clarity for current and future litigants who are not parties here. *See* LinkedIn's Pet. for Writ of Cert. at 14 ("The issue whether public-facing websites can invoke Section 1030(a)(2) is a recurring one that is likely to arise with increasing frequency because of the critical importance of protecting the privacy of user data to citizens and website operators alike."); LinkedIn's Supp. Pet. at 3 (identifying four cases decided between March 2020 and June 2021 issuing divergent interpretations of Section 1030(a)(2).).  For example, in the related case of *3Taps, Inc. v. LinkedIn Corp.* pending before this Court,[3] LinkedIn agreed with 3Taps to stay that action pending resolution of the Ninth Circuit's decision on the hiQ appeal, noting that doing so "is in the interests of judicial efficiency and conserving the resources of this Court and the parties." *3Taps, Inc. v. LinkedIn Corp.*, 3:18-cv-00855-EMC (ECF No. 9).  Like hiQ, plaintiff 3Taps "seeks a declaration that it will not violate the [CFAA] if it uses automated means to access and use publicly-available data from LinkedIn's website." 3taps Mot. at 1, ECF No. 97.  Should uncertainty in the interpretation of Section 1030(a)(2) persist, more such cases are sure to follow.  *Wallace v. Christensen*, 802 F.2d 1539, 1562 (9th Cir. 1986) ("As always, uncertainty will spawn litigation which will necessitate further guidance from this court.") (Kozinski, J., concurring).

LinkedIn's argument willfully ignores the probable consequences of its adoption.  Should the Ninth Circuit dissolve the injunction, hiQ's Declaratory Judgment claim will remain before this Court. Absent a clear pronouncement from the Court of Appeals on the CFAA Question, any decision here is virtually certain to be appealed by the losing party.  Thus, LinkedIn's Motion—far from streamlining this litigation—would only "spawn[] future appeals." *Ret. Bd. of the Policemen's Annuity & Benefit Fund*, 297 F.R.D. at 223.  Rule 62.1 was not "intended… to be used… to ask a district court to issue an indicative ruling reconsidering the same question being reviewed by the court of appeals." *Id.* at 221.  The only "waste" is of this Court's time in considering dissolution before any remand.  *See* Fed.

---

[3]    This Court has directed that *3Taps, Inc. v. LinkedIn Corp.* be deemed related to this matter under Local Civil Rule 3-12.  *See* ECF No. 102.

R. App. P. 12.1; *see also Han Tak Lee v. Cameron*, No. 4:08-CV-1972, 2015 WL 1000231, at *1, *6 (M.D. Pa. Mar. 5, 2015) (denying Rule 62.1 motion and noting "we are confident that, if the court of appeals deemed an indicative ruling to be of aid to it, the court would direct a remand to us for that purpose.").

### C.     LinkedIn Does Not Need An Indicative Ruling From This Court To Raise Its Mootness Argument With the Ninth Circuit

LinkedIn urges this Court to grant its motion, stating that "the court currently exercising jurisdiction over the injunction—the Ninth Circuit—cannot dissolve the injunction" based on the status of hiQ's business "because those facts are beyond the appellate record." LinkedIn's Mot. at 20. This is simply wrong.

To the extent LinkedIn truly believed that changed circumstances render its appeal moot, it had the opportunity—and the obligation—to bring those circumstances to the Ninth Circuit's attention. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 23 (1997) ("It is the duty of counsel to bring to the federal [appellate] tribunal's attention, '*without delay*,' facts that may raise a question of mootness."). LinkedIn failed to do so. And while LinkedIn is correct that the Ninth Circuit will generally "consider only the district court record on appeal," it is well within the Ninth Circuit's power to supplement the record. *Lowry v. Barnhart*, 329 F.3d 1019, 1024-25 (9th Cir. 2003). More pertinently, supplementing the record may be appropriate, and even necessary, when "engaging in a mootness analysis." *Matter of Verity Health Sys. of California, Inc.*, 814 F. App'x 275, 278 n.3 (9th Cir. 2020); *see also Lopez-Cacerez v. Mayorkas*, No. 20-55613, 2021 WL 2454436, at *1 (9th Cir. May 25, 2021) (granting motion to supplement the record because "the panel must consider facts that bear on the question of mootness").

## II.     LINKEDIN'S UNDERLYING MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION IS WITHOUT MERIT

The Supreme Court articulated a four-part preliminary injunction test in *Winter v. Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (likelihood of success on the merits; irreparable harm absent relief; balance of equities tips in movant's favor; injunction is in the public interest). This Court applies a sliding-scale approach allowing for a preliminary injunction where "serious questions going

to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).   A party seeking modification or dissolution of an injunction "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000); *see also Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (same).   LinkedIn has not carried its burden to show why the injunction should not remain in place.

### A.   HiQ Will Be Irreparably Harmed If The Preliminary Injunction Is Dissolved

The gist of LinkedIn's argument is that, because LinkedIn eviscerated hiQ's business, hiQ has been harmed to the fullest extent possible and thus cannot be harmed *further* by the dissolution of the Injunction.   *See* LinkedIn's Mot. at 3, 13-17.   This argument is built upon the false premise that irreparable harm cannot be made worse; that hiQ cannot be kicked while it is down.   That is not the case.   *See Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1287 (D. Wyo. 2004) ("While these businesses may have already suffered irreparable injury, an injunction seems to be the only way to salvage even a part of the season for many of these businesses.").

There is no dispute that hiQ is no longer fully operational.   Although LinkedIn was restrained by the Injunction, the uncertainty of this litigation left hiQ with no funds, employees, or customers. New Weidick Decl. at ¶ 4.   Without funds, hiQ could not afford to keep the lights on, and was forced to shut down the majority of its systems and archive its core IP.   *Id.* at ¶ 5.   However, although hiQ has largely been forced to close its proverbial doors, it is likely to suffer even further irreparable harm and be unable to mitigate any harm caused by LinkedIn's conduct if it cannot entertain future discussions with potential business partners.

The Injunction has permitted hiQ to entertain several commercial inquiries even after hiQ went dormant.   *Id.* at ¶ 9.   Generally, when hiQ receives a commercial inquiry, hiQ's Chief Executive Officer, with the assistance of one or two of hiQ's former software engineers (who were not paid for their efforts), would attempt to automatically access LinkedIn's servers with whitelisted IP addresses to ensure that hiQ could deliver on its contractual obligation if any prospective deals were to close. *Id.* at ¶ 11.   It is hiQ's post-wind-down periodic access of LinkedIn through the whitelisted IP addresses for commercial purposes that account for the activity from hiQ's whitelisted IP addresses on

LinkedIn's servers.  *See id.* at ¶¶ 7-14.  In other words, hiQ was doing precisely what this Court provided it was entitled to do pending a determination on the merits of this case.

LinkedIn speculates that "[t]he continued scraping after hiQ ceased operations coupled with the use by hiQ of scraping vendors raises the specter that third parties may have been using hiQ's IP addresses to scrape LinkedIn's website."  Hurst Decl. at ¶ 20, ECF No. 217-3.  Of course, LinkedIn has absolutely zero evidence to support the suggestion that hiQ has been allowing third parties to access its white-listed IP addresses.  To be clear, hiQ has never permitted third parties access to the whitelisted IP addresses.  New Weidick Decl. at ¶ 7.  LinkedIn likely knows this to be the case, which is why LinkedIn never bothered to ask hiQ whether it was allowing third parties to scrape LinkedIn's website using the whitelisted IP addresses before irresponsibly and baselessly accusing hiQ of doing so in its Motion.

Were the Court to dissolve the preliminary injunction, hiQ would suffer further harm in that it would lose out on future commercial relationships that could leverage its expertise, experience, and access to LinkedIn's servers—the exact relief this Court granted in July 2017.  *See Feldenkrais Guild of N. Am. v. Wildman*, 2018 WL 2331905 at *9 (N.D. Cal. May 23, 2018) ("Evidence of lost business or business opportunities, as well as damage to goodwill, will satisfy the requirement to show irreparable harm.")

Because hiQ will continue to suffer further irreparable harm if the Injunction is lifted, the cases LinkedIn relies upon for its "can't kick them while they're down" theory are distinguishable.  In each of those cases, unlike here, the party for whom injunctive relief was sought was not capable of suffering further harm.  *See Smithfield Packaged Meats Sales Corp. v. Dietz & Watson, Inc.*, No. 1:20-cv-00005-RGE-CFB, 2021 WL 2627454, at *3 (S.D. Iowa Apr. 23, 2021) ("Smithfield does not allege continuing the injunction will lessen possible ongoing damages.…  Nor does Smithfield argue the preliminary injunction is necessary to prevent any irreparable harm other than [the harm that had already occurred].");  *see also Kauai Kunana Dairy Inc. v. United States*, No. 09-00473 DAE-LEK, 2009 WL 4668744, at *4 (D. Haw. Dec. 8, 2009) (declining to grant injunction where "the evidence does not demonstrate that Plaintiffs have or will suffer a cognizable injury.").  That hiQ has already suffered much irreparable harm does not mean that it cannot suffer more.  *See, e.g., Facebook, Inc. v.*

HIQ'S OPPOSITION TO LINKEDIN'S MOT. TO DISSOLVE PRELIM. INJ.
AND REQUEST FOR INDICATIVE RULING

1    *Power Ventures, Inc.*, 252 F. Supp. 3d 765, 783 (N.D. Cal. 2017) ("Thus, not only has Facebook

2    suffered irreparable harm, it is very likely that in the absence of a permanent injunction, Facebook will

3    suffer irreparable harm again in the future."); *Sharp Healthcare v. Leavitt*, 2009 WL 790113, at *5

4    (S.D. Cal. Mar. 25, 2009) (denying motion for dissolution of injunction, which would give defendants

5    "discretion" to inflict same injury previously enjoined.); *Bank Julius Baer & Co. Ltd. V. Wikileaks*,

6    535 F. Supp. 2d 980, 985 (N.D. Cal. 2008) (finding an injunction would not be effective where the

7    information sought to be kept private had already been made public).

8

9          **B.        The Balance of Hardships Continues To Tip Strongly In hiQ's Favor**

10          In light of the further harm hiQ will face if the Injunction is lifted, the balance of hardships

11    continues to tip strongly towards hiQ.  LinkedIn claims that "[t]he harms LinkedIn articulated in its

12    opposition to hiQ's original request for injunctive relief—erosion of the privacy interests of LinkedIn

13    users and the trust relationship between LinkedIn and its members—have only been exacerbated"

14    since hiQ became non-operational.  LinkedIn's Mot. at 18.  This Court was unmoved by these

15    arguments the first time around, *see* Order at 4-9, and LinkedIn has not presented any further evidence

16    to substantiate these claims now.

17          LinkedIn attempts to augment its twice-rejected (first by this Court then by the Ninth Circuit)

18    member privacy and erosion of trust theories of harm by now claiming that third parties have used the

19    Injunction to justify their scraping of LinkedIn's data, and that "LinkedIn frequently deals with

20    negative press cycles around scraped data sets that are spun to the public as 'breaches' of member data

21    that threaten to cause members harm."  LinkedIn's Mot. at 18.  According to LinkedIn, "[e]ach new

22    public scraping story leads to member complaints and confusion, and further erodes members' trust by

23    creating the impression that the security of their personal information has been breached."  *Id.* at 4.

24    As an initial matter, hiQ is not responsible for the activities of third parties, nor for LinkedIn's PR

25    troubles or the media's coverage related thereto.  But in any event LinkedIn has not cited to even a

26    single complaint that post-dates any of the news coverage it points to as eroding member trust.[4]  New

27

28          [4]   Despite the increase in over 250 million members from 2017 to present (*compare* Order
     Granting hiQ's Mot. for Prelim. Inj. 2 *with* New Rockwell Decl. ¶ 3), coupled with its purported

Rockwell Decl. at ¶¶ 18, 25, Ex. 7, ECF No. 217-4.  LinkedIn cites only to one purported complaint referencing hiQ from 2019, and retreads the same June 2017 complaint making no reference to hiQ.  LinkedIn's Mot. at 6; Order at 6 ("LinkedIn has presented little evidence of users' actual privacy expectation; out of its hundreds of millions of users, including 50 million using Do Not Broadcast, LinkedIn has only identified *three* individual complaints specifically raising concerns about data privacy related to third-party data collection.…  None actually discuss hiQ or the 'Do Not Broadcast' setting.").

In the absence of supporting evidence, LinkedIn effectively asks this Court to take it at its word that LinkedIn's motivation for seeking to dissolve the Injunction is its concern for its members' privacy and a purported erosion of its members' trust.  But LinkedIn still "allows other third-parties to access user data without its members' knowledge or consent" and "trumpets its own product in a way that seems to afford little deference to the very privacy concerns it professes to be protecting in this case."  Order at 6-7.

Finally, LinkedIn summarily argues that it "remains subject to the inherent harms any injunction poses" in that it must comply with the injunction or be found in contempt.  LinkedIn's Motion 19.  Notably, the preliminary injunction is prohibitory in nature, not mandatory.  The order "prohibits [LinkedIn] from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.'"  *Maryln Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (citations omitted); *see Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits").  Given that LinkedIn states that hiQ has not scraped data in seventeen months, and that LinkedIn apparently did not bother to actively monitor visits from hiQ's whitelisted IP addresses to LinkedIn's website (or did bother but took no action) until it decided to file this Motion (Zhong Decl. at ¶ 4), LinkedIn cannot credibly be heard to argue now that it faces difficulty in complying with the Injunction.

concerns over its members' privacy interests, LinkedIn only dedicates "over fifteen people … to prevent scraping on LinkedIn's platform," which is appears to be only approximately three more people than it dedicated to this "cause" over four years ago (*compare* New Rockwell Decl. ¶ 12 *with* Rockwell Declaration ¶ 4, ECF No. 29).

Case No. 3:17-cv-03301-EMC

HIQ'S OPPOSITION TO LINKEDIN'S MOT. TO DISSOLVE PRELIM. INJ.
AND REQUEST FOR INDICATIVE RULING

C.      **The Public Interest Continues To Favor hiQ**

In its 2017 Opinion, this Court noted that while LinkedIn's privacy arguments were "at best uncertain," adopting LinkedIn's position could pose an "ominous threat to public discourse and the free flow of information." Order at 23-24.  This Court explained:

> It is likely that those who opt for the public view setting expect their public profile will be subject to searches, data mining, aggregation, and analysis.  On the other hand, conferring on private entities such as LinkedIn, the blanket authority to block viewers from accessing information publicly available on its website for any reason, backed by sanctions of the CFAA, could pose an ominous threat to public discourse and the free flow of information promised by the Internet.

*Id.* at 24.  This Court noted that the public interest leans even further in hiQ's favor in light of "the Court's holding that hiQ has raised serious questions that LinkedIn's behavior may be anticompetitive conduct in violation of California's Unfair Competition Law." *Id.* at 24.  The Ninth Circuit agreed with this analysis, noting that allowing companies like LinkedIn to decide who may collect and use public data "that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest." *hiQ I*, 938 F.3d at 1005.

Dissolving the Injunction now solely because hiQ is no longer fully operational only exacerbates the harm to the free flow of information that this Court and the Ninth Circuit recognized as significant.  That is, lifting the Injunction will send the message to LinkedIn that it may continue to engage in unfair business practices in its quest for an information monopoly without any meaningful repercussions, so long as LinkedIn succeeds in putting its competitors out of business.

LinkedIn has not presented any changed circumstances that warrant a different finding on the public interest prong.  Instead, LinkedIn references the Ninth Circuit's recognition of "a substantial interest in thwarting denial-of-service attacks and blocking abusive users, identity thieves, and other ill-intentioned actors." LinkedIn's Mot. at 19.  LinkedIn claims that "[because] it is beyond dispute that hiQ lacks any legitimate business interest in accessing LinkedIn's servers, there is no longer even an arguable distinction between hiQ and those illicit actors." *Id.*  First, as discussed *supra*, hiQ continues to have a legitimate public interest in accessing LinkedIn's servers.  Second, LinkedIn offers no support for its spurious claim that hiQ is a bad actor, and disregards the Ninth Circuit's

statement that "we do not view the district court's injunction as opening the door to such malicious activity." *hiQ I*, 938 F.3d at 1005.  Indeed, as recently as its July 26, 2021 written responses to hiQ's Requests for Production, LinkedIn stated "malicious hacking [and] other similar activities have no relevance to the claims and defenses in this litigation."   Declaration of Renita Sharma, Ex. A (LinkedIn's Responses to hiQ's First Set of Requests for Production at 11).  Finally, the Ninth Circuit also noted "that the injunction does not preclude LinkedIn from continuing to engage in 'technological self-help' against bad actors." *hiQ I*, 938 F.3d at 1005.  The fact that LinkedIn has apparently been unable to successfully protect its servers is a "LinkedIn issue."  LinkedIn cannot be heard to blame hiQ or the Injunction for its own shortcomings.

## **CONCLUSION**

For the foregoing reasons, hiQ respectfully requests that this Court deny LinkedIn's motion for an indicative ruling.

Dated: September 24, 2021

QUINN EMANUEL URQUHART &
SULLIVAN LLP

By:     */s/ Corey Worcester*
Corey Worcester

*Attorneys for Plaintiff hiQ Labs, Inc.*