Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6331

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>　　*Plaintiff and Counterclaim Defendant,*<br><br>　　vs.<br><br>LinkedIn Corp.,<br><br>　　*Defendant and Counterclaim Plaintiff.* | Case No. 3:17-cv-03301-EMC<br><br>**DECLARATION OF MARK WEIDICK IN OPPOSITION TO LINKEDIN'S MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION AND FOR AN INDICATIVE RULING** |

I, Mark Weidick, declare as follows:

1. I am the Chief Executive Officer of hiQ Labs, Inc. ("hiQ"). The facts stated in this declaration are based on my personal knowledge, discussions with former company personnel, and my review of records kept in the ordinary course of business. I could and would testify truthfully to these facts, under oath, if required.

2. I joined hiQ as its Chief Executive Officer on February 14, 2017. Only a few months later, on May 23, 2017, hiQ received the first cease-and-desist letter from LinkedIn accusing hiQ of violating various state and federal laws through its automated access of public profiles on LinkedIn's website. A true and correct copy of that letter is attached to hiQ's Amended Complaint and is located on the public docket. ECF No. 131-4.

3. On June 22, 2017, I executed a declaration in support of hiQ's motion for a temporary restraining order against LinkedIn. ECF No. 23-4. Therein, I stated as follows:

> hiQ's entire business depends on being able to access public LinkedIn member profiles. hiQ has investigated and concluded that there is no current viable alternative to LinkedIn's member database to obtain data from hiQ's Keeper and Skill Mapper services. Without access to these profiles, hiQ cannot deliver its services; its contracts with existing customers will be in jeopardy and hiQ will be prevented from consummating its pending deals with prospective clients.
>
> hiQ is also in the middle of a pending financing round, which has been disrupted due to LinkedIn's actions.
>
> If LinkedIn continues to deny hiQ access to the public profiles on LinkedIn's website, hiQ will be forced to close its business and lay off most, if not all, of its employees. In fact, hiQ has already started to lose employees as a result of LinkedIn's cease-and-desist letter. One of our employees recently resigned due to hiQ's currently precarious position and uncertainty over whether we will be able to continue operations.

*Id.* ¶¶ 17-19.

4. On August 14, 2017, this Court granted hiQ's motion for a preliminary injunction ("Injunction"). ECF No. 63. I was hopeful that the Injunction would allow hiQ to continue to grow and expand as a company as it had been doing over the years leading up to the May 23, 2017 cease-and-desist letter. Unfortunately, despite the Injunction, the cloud of uncertainty caused by LinkedIn's conduct lingered over the business. As a result, hiQ lost out on funding from investors, its employees

(needing stability) sought employment elsewhere, and hiQ could no longer solicit new clients or renew current client contracts. Without funding or employees, hiQ was forced into dormancy.

5. The wind-down of hiQ's business happened over the course of many months. I asked hiQ's employees to archive hiQ's data and systems in 2018. I requested this for two principal reasons. First, I wanted to ensure that hiQ's data was preserved for the purposes of litigation. Second, I wanted to ensure that hiQ's years' worth of efforts and intellectual property was archived in the event that hiQ sought to resume operations again. In and around August-September 2018, hiQ's former employee, Daniel Miller, backed up a number of files and data onto a hard drive. I received a copy of that hard drive.

6. While hiQ wound down its operations in the latter half of 2018, hiQ's servers continued running into 2019 to deliver on client contracts. During this time, a few former hiQ employees were lightly involved in continuing to service existing client accounts.

7. I have reviewed LinkedIn's Rule 62.1 Motion and the accompanying materials. I understand that LinkedIn suggests in their Motion that hiQ may have given third-parties permission to scrape LinkedIn data using hiQ's whitelisted IP addresses. This is simply not true. hiQ has never given any third-party access to the whitelisted IP addresses.

8. I understand that LinkedIn expresses concerns in its Motion over the fact that there has been intermittent activity on LinkedIn's servers from hiQ's whitelisted IP addresses after hiQ's wind-down of operations. This intermittent activity is easily explained.

9. Since hiQ has been made dormant, I have been approached several times by prospective business partners interested in a commercial relationship with hiQ. Generally, these prospective business partners are interested in a business relationship that would require hiQ to leverage its technology that allows for automated access of public profiles on LinkedIn's website.

10. When I am approached about a potential commercial relationship that I believe could help mitigate some of the losses hiQ has suffered on account of LinkedIn's conduct, I generally engage in discussions to see whether an engagement might be possible.

11. Typically in response to outreaches from potential commercial partners, I ask one of hiQ's former software engineers—either Andrew Kim or Boris Dev—to test hiQ's code to ensure that

hiQ could deliver on commercial opportunities if such opportunities were to close. When Messrs. Kim and Dev test hiQ's code, they do so through the IP addresses that LinkedIn has added to its whitelist in accordance with the Injunction. These test-runs would account for the activity of hiQ's whitelisted IP addresses on LinkedIn's systems after hiQ stopped fulfilling its clients' contracts.

12. For example, in or around April 2020, I received an inquiry regarding a potential commercial relationship. Upon receiving that inquiry, I asked Mr. Kim to attempt to access LinkedIn public profiles using three IP addresses that hiQ had previously requested that LinkedIn whitelist. Mr. Kim advised that he was "unable to access LinkedIn public profiles" using any of those three IP addresses. A true and correct copy of the email from Mr. Kim is attached hereto as **Exhibit A**. Thereafter, hiQ's counsel notified LinkedIn's counsel of the issue with access and the issue was resolved.

13. In or around January 2021, I was contacted by an individual interested in a potential commercial relationship with hiQ. In anticipation of a possible deal, I again wanted to confirm that hiQ was able to access LinkedIn's servers. However, by that time, hiQ's Amazon Web Services account on which its previously-whitelisted IP addresses had been running had been shut down because hiQ could not afford to renew its subscription. Accordingly, hiQ needed new IP addresses to be whitelisted in order to access LinkedIn's public profile pages through its automated technology. I therefore requested that hiQ's counsel ask LinkedIn to whitelist two new IP addresses in accordance with the Injunction. hiQ's counsel made that request in a January 22, 2021 letter, a true and correct redacted version of which is available on the docket at ECF No. 216-9. In that letter, hiQ's counsel also advised LinkedIn's counsel of the IP addresses that hiQ had ceased using, noting that those IP addresses could therefore be released from LinkedIn's whitelist. hiQ did not ultimately end up testing its access to LinkedIn with the two new IP addresses listed in the January 22 letter, and the January 2021 prospective relationship did not close.

14. While hiQ is now dormant, it is only one commercial inquiry away from a paid engagement. If hiQ loses its Injunction, it will lose the ability to engage in any discussions surrounding commercial relationships.

15. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed September 24, 2021, at San Francisco, California.

By: *[signature]*

Mark Weidick

# EXHIBIT A

**From:** Andrew Kim <andrew.kim@hiqlabs.com>
**Date:** April 1, 2020 at 1:09:09 PM PDT
**To:** Mark Weidick <Mark.Weidick@hiqlabs.com>
**Subject: Fwd: Request for additional whitelisted IPs**

Hi Mark,

I've tested the three IPs in the email below and have confirmed that I am unable to access LinkedIn public profiles.

Thanks,
Andrew

---------- Forwarded message ---------
From: **Andrew Kim** <andrew.kim@hiqlabs.com>
Date: Fri, Apr 6, 2018 at 12:06 PM
Subject: Request for additional whitelisted IPs
To: Mark Weidick <mark.weidick@hiqlabs.com>

Hi Mark,

If we can kindly ask LinkedIn to whitelist three IPs in place of the current single office IP it would greatly help development and stability. The purpose of this request is primarily for stability and not increasing throughput.

There are three reasons behind this request:

- <u>Dependence on a physical location</u> - The office IP is tied to the space we currently lease. If we ever decide to change locations (or even change Internet providers) we would lose access, causing a disruption in business.

- <u>Resiliency</u> - The office IP is a single point of failure. We have experienced intermittent downtime due to a variety of factors that could/have impacted connectivity. Power outages, hardware failures, or service outages are just a few factors that could disrupt the pipeline.

- <u>Hardware maintainability</u> - In order for our services to run through the single office IP we must set up hardware to allow our servers to access the network. This additional piece of hardware is another single point of failure and is a piece of hardware that the team must maintain. The latter being an issue as the team runs extremely lean now.

The three IPs we wish to be whitelisted are:

- 34.211.30.33

- 54.153.107.141

- 34.206.56.174

Each IP is in a separate AWS region to ensure availability.

Thanks,
Andrew