ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

MARIA N. SOKOVA (SBN 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

*Attorneys for LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-cv-03301-EMC |
| Plaintiff, | **LINKEDIN'S OPPOSITION TO HIQ'S RENEWED MOTION TO DISMISS FIRST AND SECOND COUNTERCLAIMS** |
| vs. | |
| LinkedIn Corporation, | Judge:              Hon. Edward M. Chen |
| Defendant. | Hearing date:   July 14, 2022 |
| | Hearing time:   1:30 p.m. |
| LinkedIn Corporation | |
| Counterclaimant, | |
| vs. | |
| hiQ Labs, Inc. | |
| Counterdefendant, | |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ................................................................................................ 1

3   FACTUAL ALLEGATIONS ................................................................................. 3

4       A.   LinkedIn Restricts Scrapers And Bots From Accessing Its Servers In Order To
             Protect User Data And Privacy Expectations And Safeguard The Functioning Of
5            Its Platform. ........................................................................................................ 3

6       B.   hiQ Disregards And Circumvents LinkedIn's Restrictions. ........................... 5

7       C.   hiQ Obtains A Preliminary Injunction And The Ninth Circuit Affirms. ........ 7

8       D.   Scraping On LinkedIn's Website Causes LinkedIn Significant Harm. .......... 8

9   ARGUMENT ....................................................................................................... 9

10  I.   LINKEDIN PROPERLY PLEADS CLAIMS UNDER THE CFAA .................. 9

11      A.   LinkedIn States A "Without Authorization" CFAA Claim. ......................... 9

12      B.   LinkedIn Pleads An "Exceeds Authorized Access" Claim. ........................ 17

13  II.  LINKEDIN PROPERLY PLEADS CLAIMS UNDER § 502. .......................... 18

14  III. GRANTING A MOTION TO DISMISS AT THIS STAGE OF THE CASE IS UNWISE
         IN LIGHT OF THE IMPORTANCE OF THE ISSUES AND THE IMPENDING
15       SUMMARY JUDGMENT MOTIONS. .............................................................. 21

16  CONCLUSION ................................................................................................... 24

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. U. S. Dep't of Just.*,
750 F.3d 927 (D.C. Cir. 2014) ................................................................................................ 23

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) .................................................................................................... 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................... 9

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ...................................................................... 16, 17, 21

*Couponcabin LLC v. Sav..com, Inc.*,
No. 14-CV-39, 2016 U.S. Dist. LEXIS 74369 (N.D. Ind. June 8, 2016) ............................. 15

*Craigslist Inc. v. 3Taps Inc.*,
964 F. Supp. 2d 1178 (N.D. Cal. 2013) ........................................................................... 15, 23

*Doe v. Shurtleff*,
628 F.3d 1217 (10th Cir. 2010)............................................................................................... 23

*Domain Name Comm'n Ltd. v. DomainTools, LLC*,
449 F. Supp. 3d 1024 (W.D. Wash. 2020) .............................................................................. 15

*EF Cultural Travel BV v. Zefer Corp.*,
318 F.3d 58 (1st Cir. 2003) ..................................................................................................... 15

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020)................................................................................................... 23

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ........................................................................................ *passim*

*Genentech Inc. v. JHL Biotech, Inc.*,
No. C 18-06582, 2019 WL 2476617 (N.D. Cal. June 13, 2019) ............................................ 12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ........................................................................................ *passim*

*hiQ Labs, Inc. v. LinkedIn Corp.*,
938 F.3d 985 (9th Cir. 2019).................................................................................................... 8

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009)................................................................................................. 15

*Miller v. 4Internet, LLC,*
    471 F. Supp. 3d 1085 (D. Nev. 2020) ................................................................... 17

*Multiven, Inc. v. Cisco Sys., Inc.,*
    725 F. Supp. 2d 887 (N.D. Cal. 2010) ................................................................... 21

*Nexsales Corp. v. Salebuild, Inc.,*
    No. C-11-3915, 2012 WL 216260 (N.D. Cal. Jan. 24, 2012) ................................ 21

*NovelPoster v. Javitch Canfield Grp.,*
    140 F. Supp. 3d 954 (N.D. Cal. 2014) ................................................................... 21

*Oracle USA, Inc. v. Rimini St., Inc.,*
    879 F.3d 948 (9th Cir. 2018), *rev'd in part*, 139 S. Ct. 873 (2019) ...................... 21

*People v. Childs,*
    220 Cal. App. 4th 1079 (2013) ........................................................................ 19, 20

*People v. Lawton,*
    48 Cal. App. 4th Supp. 11 (1996) .......................................................................... 20

*People v. Tillotson,*
    157 Cal. App. 4th 517 (2007) ................................................................................ 19

*QVC, Inc. v. Resultly, LLC,*
    159 F. Supp. 3d 576 (E.D. Pa. 2016) ..................................................................... 15

*Register.com, Inc. v. Verio, Inc.,*
    126 F. Supp. 2d 238 (S.D.N.Y. 2000), *aff'd as modified*, 356 F.3d 393 (2d Cir.
    2004) ...................................................................................................................... 15

*Royal Truck & Trailer Sales & Serv. v. Kraft,*
    974 F.3d 756 (6th Cir. 2020) ................................................................................. 19

*Sw. Airlines Co. v. Farechase, Inc.,*
    318 F. Supp. 2d 435 (N.D. Tex. 2004) ................................................................... 15

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.,*
    315 F. Supp. 3d 1147 (C.D. Cal. 2018) ................................................................. 20

*Ticketmaster LLC v. RMG Techs., Inc.,*
    507 F. Supp. 2d 1096 (C.D. Cal. 2007) ................................................................. 15

*United States v. Chen,*
    No. 17-cr-00603-BLF-1, 2020 WL 6585803 (N.D. Cal. Nov. 10, 2020) .............. 18

*United States v. Christensen,*
    828 F.3d 763 (9th Cir. 2016) .............................................................. 2, 15, 18, 21

*United States v. Jones*,
    565 U.S. 400 (2012) .................................................................................................. 23

*United States v. Lowson*,
    No. 10-114, 2010 U.S. Dist. LEXIS 145647 (D.N.J. Oct. 12, 2010) ...................................... 15

*United States v. Nosal (Nosal I)*,
    676 F.3d 854 (9th Cir. 2012) .................................................................................. 17, 18, 20

*United States v. Nosal (Nosal II)*,
    844 F.3d 1024 (9th Cir. 2016) ...................................................................................... 8, 11

*United States v. Thompson*,
    No. CR19-159RSL, 2022 WL 834026 (W.D. Wash. Mar. 21, 2022) ................................... 11

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ..................................................................................... 8, 11, 14, 17

*WhatsApp Inc. v. NSO Grp. Techs., Ltd.*,
    472 F. Supp. 3d 649 (N.D. Cal. 2020) ............................................................................. 17

**Statutes**

18 U.S.C. § 1030(a)(1) ............................................................................................................ 10

18 U.S.C. § 1030(a)(2) ...................................................................................................... 15, 17

18 U.S.C. § 1030(e)(6) ............................................................................................................ 17

18 U.S.C. § 2511(2)(g) ............................................................................................................ 23

Cal. Penal Code § 502 ....................................................................................................... *passim*

Cal. Penal Code § 502(a) ......................................................................................................... 20

Cal. Penal Code § 502(b)(8) .................................................................................................... 20

Cal. Penal Code § 502(b)(9) .................................................................................................... 20

Cal. Penal Code § 502(c) ......................................................................................................... 18

Cal. Penal Code § 502(c)(1) .................................................................................................... 19

Cal. Penal Code § 502(c)(2) ............................................................................................... 19, 20

Cal. Penal Code § 502(c)(7) .................................................................................................... 19

Cal. Penal Code § 502(h) ........................................................................................................ 20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

When hiQ persuaded this Court and the Ninth Circuit of "serious questions" concerning the CFAA's preemption of its claims, the story it told went like this:  LinkedIn's servers contain publicly available profile information placed there by LinkedIn members.  LinkedIn imposes no generally applicable barriers and no authentication requirements when it comes to accessing the servers holding this publicly available information.  And hiQ said its regular scraping operations depended only on accessing public portions of LinkedIn that anyone with a web browser could access—hiQ just used its automated bots instead.  Accepting these representations at the preliminary injunction stage, this Court found that "because hiQ accessed only publicly viewable data not protected by an authentication gateway," ECF No. 63 at 16, there were serious questions concerning the CFAA's applicability.  The Ninth Circuit relied on the same story in affirming that conclusion.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1197 (9th Cir. 2022).

But hiQ's story was fiction.  Discovery has revealed that the findings underpinning these preliminary rulings are simply untrue.[1]  It turns out that one of hiQ's two main products, Keeper, depended on a scraping system that required hiQ to obtain information accessible only to *logged-in* members—that is, nonpublic information stored on computers behind LinkedIn's "authentication gateway."  But when LinkedIn's general self-help technical defenses restricted account credentials as a result of suspected violations of LinkedIn's User Agreement, hiQ had no valid way through LinkedIn's password wall.  So it created fraudulent login credentials.  hiQ specifically instructed a team of hired contractors called "mechanical turkers" to create fraudulent LinkedIn accounts, and then directed the turkers to use these digital disguises to gain access to servers and information that was otherwise unavailable.  Using hiQ's data collection system, the turkers fed the information gained using fake accounts into hiQ's overall scraping technology operation used to support its broader scraping enterprise.  ACC ¶¶ 66-68.  At a minimum, then, hiQ's most longstanding product, Keeper, depends on "circumvent[ing] a computer's generally

---

[1] Concurrent with this opposition, LinkedIn has sought leave to amend its counterclaims. LinkedIn cites its Amended Counterclaims "ACC."

OPP. TO RENEWED MTD
17-cv-03301-EMC

1   applicable rules regarding access permissions, such as username and password requirements, to

2   gain access to a computer"—the core conduct to which the CFAA applies.  *hiQ*, 31 F.4th at 1201.

3     LinkedIn's proposed amended counterclaims also now plead salient technical details of

4   LinkedIn's technological architecture and defenses that make clear that, contrary to the factual

5   rulings on a preliminary record, LinkedIn's servers are *not* merely a "public website" that can be

6   reached without "authorization or access permission," *id.* at 1197.  They are "protected

7   computers," in the CFAA's words, that a member of the public may access only subject to

8   conditions.  Those conditions are enforced by various code-based defenses that deny access to

9   certain actors, including scrapers.  When triggered, these defenses lower a code-based

10  authentication gate—for example, an IP block or a requirement of login credentials (i.e., a

11  password wall).  These technical details matter.  They are material to consideration of the CFAA,

12  a statute calibrated for the protection of *computers*, not "websites."  And they establish that

13  LinkedIn *did* ultimately require authorization to reach those computers, which hiQ lacked.

14  Indeed, although LinkedIn did not know hiQ's identity at the time, by May 2017 its technical

15  defenses had lowered the gates on hiQ completely, and hiQ knew it.  But hiQ nevertheless kept

16  trying to circumvent these gates through sophisticated ruses like the purchase of proxy IP

17  addresses or the use of fake accounts, accessing LinkedIn's computers without authorization or

18  exceeding their authorized access under the CFAA.  LinkedIn's CFAA claims are therefore

19  sufficiently pled and the motion to dismiss them should be denied.  Part I, *infra*.

20    LinkedIn's § 502 claims are also sufficiently pled.  This flows *a fortiori* from the CFAA

21  analysis.  But even if hiQ were right about the CFAA, it would be wrong about § 502.  hiQ's

22  cursory argument for dismissal is based on the false premise that the CFAA and § 502 are

23  coterminous.  That ignores the language of the statute, California case law, and the Ninth

24  Circuit's acknowledgement that a § 502 claim "does not require unauthorized access."  *United*

25  *States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016).  Rather, the relevant subsections of

26  § 502 require only *knowing* access followed by a broad range of actions undertaken "without

27  *permission*"—that is, affirmative consent.  hiQ has violated these provisions in a host of ways,

28  with respect to both public and restricted areas of LinkedIn.  Part II, *infra*.

1    Beyond the above, hiQ's ill-timed dismissal motion should be rejected because summary

2  judgment is on the immediate horizon.  Fact discovery has closed and summary judgment

3  motions are due just weeks after the hearing on this motion.  Now that the facts have come to

4  light, the important issues presented in this case should be revisited on a full record.  What that

5  full record shows is that LinkedIn did everything it could to make clear to hiQ that hiQ was not

6  authorized on LinkedIn's premises, and hiQ deployed a series of ruses, disguises, and outright

7  frauds to sneak in anyway.  To hold that the CFAA and § 502 have no applicability to such

8  schemes without considering them on a full record would threaten to render those statutes dead

9  letter, while undermining the important interests they seek to advance.  The motion should be

10 denied.  Part III, *infra*.

## FACTUAL ALLEGATIONS

### A.  LINKEDIN RESTRICTS SCRAPERS AND BOTS FROM ACCESSING ITS SERVERS IN ORDER TO PROTECT USER DATA AND PRIVACY EXPECTATIONS AND SAFEGUARD THE FUNCTIONING OF ITS PLATFORM.

15    LinkedIn is a social network with over 700 million members around the globe.

16 Declaration of Annette L. Hurst in Support of Motion for Leave to Amend Exhibit A (LinkedIn

17 Corporations Answer and [Proposed] Amended Counterclaims) ("ACC") ¶ 1.  LinkedIn's mission

18 is to create economic opportunity for every member of the global workforce and, by connecting

19 them, make professionals more productive and successful.  *Id.*  LinkedIn's platform is made up of

20 its members, who provide profile information to build their professional online identities.  *Id.* ¶ 2.

21 LinkedIn members have control over the information they choose to publish about themselves.

22 When members delete information from their profiles, LinkedIn deletes that information, too.  *Id.*

23 ¶ 3.

24    Not all information on LinkedIn's platform is generally accessible to the public.  Much of

25 it is behind a password wall.  *Id.* ¶ 34.  And even for information that can be accessed without

26 entering a password, LinkedIn conditions access on compliance with binding terms of LinkedIn's

27 User Agreement, Privacy Policy, and Cookie Policy.  *Id.* ¶ 21.  The LinkedIn User Agreement

28 applies not only to its members, but also to anyone else who accesses LinkedIn's website.

1   *Id.* ¶ 51.  The User Agreement expressly prohibits—and has prohibited since long before this

2   dispute—scraping LinkedIn's website.  Prohibited scraping includes "automated software,

3   devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider'"

4   LinkedIn's website.  *Id.* ¶¶ 48-49.  The User Agreement likewise prohibits using automated

5   methods to access the website, copying information of others through automated means, and

6   trading on access to LinkedIn's website or the data contained therein.  *Id.* ¶ 49.

7   So, much as a movie theater may decline to admit patrons who arrive with video recording

8   devices, LinkedIn has chosen to create and enforce restrictions against scrapers.  In this way,

9   "LinkedIn's website and servers are not unconditionally open to the general public.  Rather, each

10  call to LinkedIn's servers requires LinkedIn to authorize or permit the party seeking access to

11  LinkedIn's servers."  *Id.* ¶ 25.  These access and authorization restrictions are imposed "by

12  sophisticated defenses designed to prevent unauthorized access and abuse" and they "evaluate

13  whether to grant each request made to LinkedIn's servers."  *Id.*

14  LinkedIn's technological system for authorizing (or not authorizing) access to its servers

15  "employs an array of technological safeguards and barriers designed to prevent data scrapers,

16  bots, and other automated systems from accessing and copying its members' data on a large

17  scale."  *Id.* ¶ 24.  At a high level, these technological safeguards are designed to detect scrapers—

18  typically based on the high volume of activity—and refuse them access to LinkedIn's servers

19  absent advance permission.  For example, the FUSE system scans and imposes a limit on the

20  activity that an individual LinkedIn member may initiate on the site.  *Id.* ¶ 26.  Similarly, the

21  Guest Request Scoring System monitors for "unusual patterns or high levels of activity," and, if

22  detected, "redirect[s] to LinkedIn's log-in page," effectively placing the requested information

23  behind a password wall.  *Id.* ¶ 32.  And "[t]he Member Request Scoring System monitors page

24  requests made by LinkedIn members while logged into their accounts.  If high levels of activity

25  are detected for certain types of accounts, the member is logged out and may either be warned,

26  restricted, or challenged with a CAPTCHA in order to log back into LinkedIn."  *Id.* ¶ 31.

27  "Another protection measure is LinkedIn's Sentinel system, through which LinkedIn's defenses

28  scan, throttle, and block suspicious activity associated with particular accounts and IP addresses."

1   *Id.* ¶ 27.

2          All told, LinkedIn has implemented over 200 custom rules to detect and prevent scraping,

3   and has blocked over 100 million IP addresses that it suspects were being used by data scrapers.

4   *Id.* ¶ 6.  LinkedIn also, of course, restricts access to information on certain servers through

5   password protection, requiring only those with valid login credentials to access those servers.

6   *Id.* ¶ 34.  And LinkedIn may restrict accounts where users violate the User Agreements to which

7   they expressly agreed when they signed up.  *Id.* ¶ 31.

8          These measures are essential to meeting the expectations of LinkedIn's members that they

9   maintain their right to control their personal data.  *See, e.g.*, *id*. ¶ 7.  They are also essential to

10   ensuring that LinkedIn's infrastructure is available for serving legitimate needs of members.

11   *Id.* ¶¶ 53, 83.

12          **B.  HIQ DISREGARDS AND CIRCUMVENTS LINKEDIN'S RESTRICTIONS.**

13          hiQ is the kind of data scraper that undermines the trust that LinkedIn members place in

14   LinkedIn.  *Id.* ¶ 8.  Before discovery in this case, all LinkedIn knew was that beginning sometime

15   before 2017, hiQ deployed automated "bots" secretly to "extract and copy data from hundreds of

16   thousands of LinkedIn pages at a rate far faster than any human could."  *Id.*  It did so in defiance

17   of the User Agreement it had agreed to several times over.  *Id.* ¶¶ 37-48 (detailing notice of and

18   consent to the User Agreement).  And it did so by "circumvent[ing] LinkedIn's technical

19   barriers," *Id.* ¶ 8.  Rather more has now come to light.

20          Well before 2017, and unbeknownst to LinkedIn, hiQ was accessing password-protected

21   areas of LinkedIn using fraudulent login credentials, then obtaining information that it needed to

22   support its scraping.  One of hiQ's products, Keeper, was designed to tell employers which of

23   their employees were flight risks.  *Id.* ¶ 66.  Keeper was reliant on a scraping technique called

24   "core scraping," *id.* ¶ 67, which in turn depended on access to information behind LinkedIn's

25   password wall.  *Id.* ¶ 68.  But hiQ's logged-in conduct resulted in "their legitimate accounts

26   [being] restricted for unauthorized use."  *Id.* ¶ 68.  hiQ's authorization to access certain

27   information on LinkedIn's servers had thus been revoked.  So hiQ developed a scheme to allow it

28   to continue to get behind LinkedIn's password wall to obtain information that was not available to

1    the general public.  *Id.* ¶ 68.  hiQ instructed a phalanx of "mechanical turkers" to create

2    fraudulent LinkedIn accounts, then instructed them to log in to access password-protected servers

3    and data.  *Id.* ¶ 68.  hiQ thus itself and through its agents knowingly accessed password-protected

4    areas of LinkedIn without valid password-based authorization.

5          hiQ's scraping also evaded LinkedIn's technical IP blocking and authentication system.

6    Although "hiQ's bots are sophisticated and programmed in ways to evade LinkedIn's technical

7    defenses," *id.* ¶ 70, LinkedIn's "general technical anti-scraping defenses … blocked scraping

8    from IP addresses that LinkedIn only later discovered (in this lawsuit) were used by hiQ at its

9    office and by its employees while they were testing hiQ's scraping system."  *Id.* ¶ 71.  Although

10   LinkedIn did not know hiQ's identity, "hiQ understood well that its profile access requests were

11   not authorized by LinkedIn."  *Id.* ¶ 72.  hiQ surreptitiously asked for permission to obtain the data

12   using authorized means, and was refused.  hiQ thus knew it did not have permission to access

13   LinkedIn.  *Id.* ¶¶ 64-65, 72.  Instead, hiQ "purchase[d] proxy IP addresses" from third parties in

14   an attempt to get around LinkedIn's permission requirements.  *Id.* ¶ 73.  LinkedIn's defenses

15   detected and blocked those, too, effectively restricting hiQ's access.  *Id.* ¶ 73.

16         If any more were needed to communicate to hiQ that it was categorically barred from

17   accessing LinkedIn's servers, it came in the form of the cease-and-desist letter LinkedIn sent on

18   May 23, 2017.  *Id.* ¶ 77.  That letter clearly stated that hiQ's access to LinkedIn was categorically

19   revoked and that any further action by hiQ accessing LinkedIn's servers was unauthorized.  *Id.*

20   And the following month, LinkedIn imposed targeted IP blocks on known hiQ corporate IP

21   addresses.  *Id.* ¶ 28.  So by the end of June 2017, hiQ had repeatedly run into (and circumvented)

22   a password wall; run into, circumvented, and run into IP blocks; been told explicitly that it was

23   categorically prohibited from accessing LinkedIn in any way; and had its known IP addresses

24   barred.

25         LinkedIn had good reason for withdrawing access authorization from hiQ.  hiQ was

26   flagrantly breaching the User Agreement and hiQ's collection and dissemination of data from

27   LinkedIn's website directly undermined the privacy expectations of LinkedIn's members.  For

28   example, one privacy control that LinkedIn offers is the "Do Not Broadcast" setting.  *Id.* ¶ 57.

When a user enables this setting, the member's updates to their profile will not be broadcast to the LinkedIn network or anywhere else.  *Id.*  The feature was implemented to protect member privacy when members were updating their profiles in the course of looking for a new job and to avoid tipping off their current co-workers and employers.  *Id.*  Over 88 million members have availed themselves of this protection.  *Id.* ¶ 61.  hiQ expressly aims to make this very information public.  Its Keeper product surreptitiously surveils and reports every change that members make to their LinkedIn profiles.  *Id.* ¶ 9.  Not only is this type of surveillance impossible without scraping and circumventing LinkedIn's technological protection measures, it specifically flags LinkedIn members that might be a "flight risk" to their current employers, defeating the protection of the "Do Not Broadcast" setting.  *Id.* ¶ 9.[2]

## C.  HIQ OBTAINS A PRELIMINARY INJUNCTION AND THE NINTH CIRCUIT AFFIRMS.

Upon receiving LinkedIn's cease-and-desist letter, hiQ brought this lawsuit and sought a preliminary injunction.  As noted, LinkedIn did not know the full scope of hiQ's scraping activities at the time.  So the story of hiQ's conduct came from hiQ.  Two factual claims were highly salient.  hiQ stated unequivocally that "hiQ *does not access the private sections of LinkedIn*, such as profile information that is visible only to those who have signed in as members, or member private data that is visible only to those who are 'connected' to a member."  ECF No. 24 at 4 (emphasis added); *see also* Motion for Leave to Amend Counterclaims at 1 (collecting additional representations).  Its other assertion was that LinkedIn's cease-and-desist letter threatened it with harm because it would force hiQ to stop scraping.  ECF No. 4 at 6-7, 9 (motion for temporary restraining order); ECF No. 5 at 2 (Gupta Decl. in support of temporary restraining order); ECF No. 51 at 1 (hiQ's supplemental brief in support of preliminary injunction).

hiQ's claim that it accessed only "public" data became the core premise undergirding this Court's finding that hiQ had raised "serious questions going to the merits" of LinkedIn's argument that the CFAA preempted hiQ's affirmative claims.  This Court specifically adopted the

---

[2] Unlike hiQ's "Keeper" product, "[w]hen members select 'Do Not Broadcast,' LinkedIn respects this choice in its other products, such as Recruiter."  ACC ¶ 61.

assertion that "hiQ accessed only publicly viewable data."  ECF No. 63 at 16.  And it relied on

this factor as the sole distinction between this case, as it was presented at the preliminary

injunction stage, and the otherwise controlling decisions in *Facebook, Inc. v. Power Ventures,*

*Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) and *United States v. Nosal* (*Nosal II*), 844 F.3d 1024

(9th Cir. 2016).  In affirming this Court's decision, the Ninth Circuit too relied heavily on hiQ's

claim.  It found that "[t]he data hiQ seeks to access … has not been demarcated by LinkedIn as

private."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1003 (9th Cir. 2019).  And it adopted,

for preliminary purposes, this Court's "distinction between 'private' computer networks and

websites protected by a password authentication system and 'not visible to the public,' and

websites that are accessible to the general public." *Id.*  The Ninth Circuit reaffirmed its own

decision, on much the same grounds, following the Supreme Court's decision in *Van Buren v.*

*United States*, 141 S. Ct. 1648 (2021).  This Court and the Ninth Circuit also accepted hiQ's story

that it would be irreparably harmed when LinkedIn's cease-and-desist letter forced it to stop

scraping.

But as these layers of appellate review were proceeding, the parties were conducting

discovery.  And that discovery demonstrated that hiQ's claim concerning access only to publicly

accessible LinkedIn servers was simply untrue.  It also revealed that, unbeknownst to LinkedIn

and the Court, hiQ's scraping had been shut down by LinkedIn's general anti-abuse defenses

before the letter was ever sent.  The preliminary injunction in this case was therefore based on

blatantly false premises.  LinkedIn now has a clearer sense of hiQ's activities, detailed above and

in its Amended Counterclaims.  It is these allegations—informed by actual facts, considered

outside of the context of preliminary review and the relaxed "serious questions" framework—to

which the CFAA must now be applied.

### D.  SCRAPING ON LINKEDIN'S WEBSITE CAUSES LINKEDIN SIGNIFICANT HARM.

Meanwhile, scraping activities like hiQ's continue to harm LinkedIn.  Although scraping

has always been a problem, the volume of attempted scraping has grown substantially in recent

years, including since this lawsuit was filed.  ACC ¶ 86.  Around the time LinkedIn's dispute with

hiQ began, outside actors attempted to scrape LinkedIn's website approximately 95 million times per day.  That figure now has reached hundreds of millions of blocked requests per day.  *Id.* ¶¶ 86, 88.  LinkedIn has expended hundreds if not thousands of hours of employee time in maintaining its technical defenses and investigating and responding to hiQ's unlawful activities.  *Id.* ¶ 84.  In the aggregate, automated scrapers place a substantial burden on LinkedIn's infrastructure and place a commensurate financial burden on LinkedIn.  *Id.* ¶¶ 87-89.  If hiQ is allowed to continue scraping LinkedIn's website with impunity, other scrapers will follow as they seek to acquire LinkedIn's valuable member data at little or no cost.  *Id.* ¶ 88.

## ARGUMENT

The preliminary injunction inquiry and the Rule 12(b)(6) analysis "are not conterminous."  *Arc of Cal. v. Douglas*, 757 F.3d 975, 993 (9th Cir. 2014).  The only CFAA question at issue at the preliminary injunction stage was whether, on the undeveloped factual record that existed at the time, "hiQ ha[d] raised serious questions about whether LinkedIn may invoke the [CFAA] to preempt hiQ's possibly meritorious tortious interference claim."  *hiQ*, 31 F.4th at 1185.

The Rule 12(b)(6) standard, by contrast, requires only that LinkedIn plausibly allege an affirmative CFAA claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To withstand a motion to dismiss, LinkedIn need not show that its CFAA claim preempts any claim made by hiQ, nor is LinkedIn confined to the stylized factual context of the early stages of the case.  The analysis now proceeds not on hiQ's preferred narrative, but on the allegations in LinkedIn's counterclaims, with all inferences drawn in LinkedIn's favor.  LinkedIn's CFAA and § 502 counterclaims easily satisfy these standards.

## I.      LINKEDIN PROPERLY PLEADS CLAIMS UNDER THE CFAA.

### A.  LINKEDIN STATES A "WITHOUT AUTHORIZATION" CFAA CLAIM.

When LinkedIn opposed hiQ's initial motion to dismiss, it explained that a ruling that hiQ did not plausibly violate the CFAA "would be a mistake."  ECF No. 189 at 12.  At the time, "the precise nature and scope of hiQ's scraping [was] unknown."  *Id.* at 12 n.2.  But it was "more than plausible," in light of LinkedIn's defenses and what was known about hiQ's conduct, that "hiQ took steps to circumvent password and other barriers to access."  *Id.*  It is no longer just plausible

OPP. TO RENEWED MTD
18-cv-00855-EMC

that hiQ circumvented password barriers—it is now certain that hiQ's course of conduct with respect to the scraping system used to support its core product, Keeper, *depended* on hiQ's circumvention of LinkedIn's password wall.  And LinkedIn has also adequately pled that hiQ bypassed still more "access permissions" to obtain information on LinkedIn servers.

LinkedIn's initial counterclaims plausibly pled liability based on hiQ "knowingly access[sing]" LinkedIn's servers "without authorization," 18 U.S.C. § 1030(a)(1), and its Amended Counterclaims only do so more forcefully.

### 1.  hiQ's scraping operations depended on circumventing password requirements.

hiQ's entire renewed motion to dismiss is based on the argument that "LinkedIn has failed to state a claim against hiQ for violations of the CFAA because—as LinkedIn does not contest—the data that hiQ scraped was accessible to the general public."  ECF No. 274 ("Mot.") at 7.  But hiQ knows full well what LinkedIn uncovered in discovery.  hiQ itself, and its hired contractors acting at hiQ's direction, created fraudulent accounts to access *password-protected* information that hiQ knew it was not authorized to access.  *Supra* 5-6.  They used these false credentials to access, without permission, LinkedIn's servers, and "obtain" information that hiQ then used for its scraping operations.  ACC ¶ 68.  These allegations are not just plausible on their face—as explained in LinkedIn's accompanying Motion for Leave to Amend, they have been confirmed by hiQ's witnesses and documents.  And they establish that hiQ "circumvent[ed] [LinkedIn's] generally applicable rules regarding access permissions, such as username and password requirements, to gain access to [LinkedIn's servers]."  *hiQ*, 31 F.4th at 1201.

This prohibited conduct was essential to hiQ's scraping operation.  ACC ¶ 68.  And that reality, in turn, undermines completely hiQ's previous basis for arguing that its scraping was authorized.  hiQ's argument to this point—and the positions this Court and the Ninth Circuit adopted previously—has been fundamentally based on the notion that *all* of hiQ's access involved solely public areas of LinkedIn's website.  That is what made hiQ akin to "anyone with a web browser," ostensibly distinguishing from "a baseline in which access is not generally available and so permission is ordinarily required."  31 F.4th at 1195.  And that is what, in the Ninth Circuit's view, distinguished *Nosal* and *Power Ventures*, which the Court read as requiring

1    the revocation of access through login credentials.

2          But new revelations show that hiQ was not at all seeking access on par with "anyone with

3    a web browser."  On the contrary, its attempts to access LinkedIn's servers unquestionably ran

4    into lowered gates, including authentication barriers, and the means it used to circumvent them

5    were hardly what one would expect from a member of the general public.  Permission *was* the

6    baseline.  hiQ needed to get permission to conduct its activities, but permission was denied, so

7    hiQ employed sophisticated means to get around this.  And this unauthorized access was itself

8    essential to hiQ's broader course of conduct, including its logged out scraping.  Simply put, a

9    necessary component of hiQ's access was behind a gate that this Court, the Ninth Circuit, and

10   *Van Buren* all acknowledge as both effective and legally sufficient under the CFAA.  And hiQ

11   knew full well that its activities were not akin to any member of the public, and indeed were

12   wholly unauthorized.  ACC ¶ 72.

13         hiQ's deliberate circumvention of username and password requirements for access to

14   LinkedIn's servers is indistinguishable from the conduct at issue in *Nosal II*, 844 F.3d 1024.  That

15   case involved a "former employee[] whose computer access was categorically revoked and who

16   surreptitiously accessed data owned by their former employer."  *Id.* at 1038.  Like the defendant

17   in *Nosal II*, hiQ was authorized to access the LinkedIn servers it targeted only through password

18   authentication.  ACC ¶¶ 66-67.  Like the defendant in *Nosal II*, hiQ had that authorization

19   revoked when its accounts were restricted.  *Id.* ¶¶ 66-71, 75.  And like the defendant in *Nosal II*,

20   hiQ devised a scheme to access password-protected information through bogus credentials.  In

21   fact, hiQ's conduct is more troubling than the defendant's in *Nosal II*, which involved the use of a

22   co-conspirator's legitimate credentials.  844 F.3d at 1038.  hiQ directed others to create *entirely*

23   *fake* accounts, ACC ¶ 68, hiring agents to don digital disguises in order to enter premises from

24   which hiQ had been categorically barred.  But no matter the "process defendant used to obtain the

25   security credentials," the result is the same—if the defendant is "not an authorized user," it

26   violates the CFAA when it accesses a protected computer anyway.  *United States v. Thompson*,

27   No. CR19-159RSL, 2022 WL 834026, at *4 (W.D. Wash. Mar. 21, 2022).  hiQ's unauthorized

28   access, including access through its agent turkers, alone warrants denial of hiQ's motion.  *See*

*Genentech Inc. v. JHL Biotech, Inc.*, No. C 18-06582, 2019 WL 2476617, at *2-3 (N.D. Cal. June 13, 2019) (applying agency analysis to CFAA claim).

        ***2. hiQ's scraping operations circumvented additional access barriers.*** In accessing LinkedIn's servers, hiQ also circumvented still more gates, in the form of general technological defenses that applied to any member of the public and acted to categorically block scrapers, including hiQ. As detailed above, LinkedIn alleges that its technological defenses monitor guest (i.e., logged-out) scraping on an IP address basis, detecting certain conduct and either blocking access to that IP address entirely, ACC ¶ 27, or lowering a password gate, *id.* ¶ 32. Logged-in access to LinkedIn is also subject to technological defenses that, when triggered, withdraw authorization to access information behind the password wall by restricting login credentials. *Id.* ¶ 31. hiQ ran directly into these gates, knew full well that they were rejections of authorization for hiQ to access LinkedIn (even if LinkedIn did not know hiQ's identity), and circumvented them. *Id.* ¶¶ 66-73. When hiQ found that it could no longer circumvent them, hiQ surreptitiously applied for (and was refused) permission to get the data by other means, reinforcing the fact that it understood full well it was not authorized. ACC ¶ 64. And although hiQ told the Court that it was LinkedIn's cease-and-desist letter that threatened to put an end to its scraping (and its business), in fact hiQ's scraping system had already failed before that letter was sent. ACC ¶ 71.

        The defenses LinkedIn alleges in its complaint plausibly establish that LinkedIn's servers *cannot* be generalized into a "publicly available website."[3] These defenses block far more requests for access to the computers housing the member profile data than are served. *Id.* ¶ 25. And as we now know, these defenses were entirely effective against then-anonymous scraper hiQ, whose scraping operations had been shut down by LinkedIn's self-help defenses. ACC ¶ 71. To be sure, the *reason* for blocking IP addresses may be scraping activity, and LinkedIn usually does

---

[3] The full factual record developed during discovery contains even greater detail concerning LinkedIn's network architecture. LinkedIn's witnesses and documents explained that LinkedIn's member profile servers are surrounded by multiple sophisticated layers of defense that generally operate to exclude certain entities. There are multiple computer networks between any access request for a member profile and a LinkedIn profile server. While the outer layer of LinkedIn traffic servers are computers that may be open to all comers as an initial matter, that is *not true* of its profile servers. Requests for access have to make it through the traffic servers and multiple layers of defense implemented in LinkedIn's networks, including a sophisticated machine-learning "bot model," before they can ever be served member profile data.

not know the identity of the user of the IP address in question.  But as plausibly pled, the block itself applies to IP addresses, which are typically static markers of the *identity* of the party on the other end.  *Id.* ¶ 28.  In simple terms, if a computer owner blocks your IP address, you can rest assured they are blocking *you* from accessing their servers, not merely some form of access.  hiQ hit but circumvented these systems and password wall to scrape data from LinkedIn's protected servers, *Id.* ¶ 94, without necessary permissions.

In addition, "in June 2017, LinkedIn implemented targeted blocks as to hiQ's known IP addresses."  *Id.* ¶ 28.  "LinkedIn's servers will not return information in response to any calls received from blocked IP addresses, but will return an error message."  *Id.*  Again, "[i]n order for a business entity to access LinkedIn's computers after confronting an IP block, that business entity must circumvent the IP block," *id.* ¶ 29, or obtain permission.  These allegations give rise to a plausible inference that, far from being "open to all comers," *hiQ*, 31 F.4th at 1199, the massive volume of data scraped by hiQ could only be obtained by circumventing access barriers like passwords, forced log-outs, warning messages, account restrictions, and CAPTCHAs.[4]

At this point, what *more* could LinkedIn have done to communicate that hiQ was not authorized to access LinkedIn's servers?  And even after that, hiQ *still* continued to access both private and public areas of LinkedIn's servers alike, with the former essential to the latter.

This case is therefore also controlled by *Power Ventures*.  Like *Power Ventures*, hiQ's scraping activities depended on access to information behind lowered gates, which access was revoked in several ways.  Once that authorization was revoked via account restrictions and technological blocks, hiQ was "on notice that it was no longer authorized to access" LinkedIn's computers.  844 F.3d at 1067 n.3.  And critically, the holding in *Power Ventures* recognizes that once an actor loses authorization based on a permission baseline, it violates the CFAA by circumventing *any* defense—the defendant in that case continued to gain access through users' valid credentials in that case, but it violated the CFAA by evading "IP barriers."  *Id.* at 1068.  So,

---

[4] LinkedIn disputes the characterization of CAPTCHAs as a mere "'way to slow[] a user's access, rather than as a way to deny authorization to access."  ECF No. 63 at 15 (citation omitted).  A CAPTCHA is a means for telling computers and humans apart, ACC ¶ 31, for the express purpose of excluding bots from accessing a website.

regardless of whether circumvention of those barriers in the first instance would constitute a CFAA violation, *id.* at 1068 n.5, it certainly does if undertaken following express withdrawal of access permissions.  That is just what happened here.  hiQ ran into gate after gate—authentication gates and technological gates, "code-based" gates and gates in "contracts and policies," *Van Buren*, 141 S. Ct. at 1659 n.9.  Its access to LinkedIn's servers was unauthorized in every conceivable respect, and yet it accessed LinkedIn's servers anyway.  That gives rise to CFAA liability.

   **3. hiQ's arguments for dismissal are meritless.**  hiQ's arguments for dismissal all rest on a stylized preliminary record in which its access to LinkedIn's servers did not entail and require access behind LinkedIn's password wall.  That was not true, and hiQ's arguments are unavailing for that reason alone.  But even leaving aside hiQ's logged-in conduct, LinkedIn has plausibly alleged generally applicable security measures that effectively required permission to *all* areas of LinkedIn that hiQ sought to access.  hiQ's access thus always involved servers containing "information for which authorization or access permission, such as password authentication, is generally required."  *hiQ*, 31 F.4th at 1199-1200.

   At the preliminary stages of this case, this Court appeared to view LinkedIn's measures as falling short of some unstated definition of the term "authentication gateway."  ECF No. 63 at 16.  But ultimately making that determination requires consideration of technical details—that is, it turns on technological facts, not abstract legal conclusions.  And as alleged in LinkedIn's counterclaims, LinkedIn's measures—like IP blocks—*are* authentication-based gates that absolutely *do* lower to unauthorized *entities*, not merely unauthorized *conduct*.  To be sure, a defendant does not violate CFAA unless it *knowingly* circumvents those barriers, as *Power Ventures* explains.  844 F.3d at 1067 n.3.  But if an entity like hiQ runs into an authentication-based IP block, knows that this gate has restricted its authorization, knows that it must obtain permission to access servers in light of the block, and circumvents it anyway, then it has accessed a computer without authorization under the CFAA.  It does not matter if *LinkedIn* knew the actual identity of the scraper on the other side of its IP blocks any more than a bouncer must know the name of a bar patron before ejecting him.

OPP. TO RENEWED MTD
18-cv-00855-EMC

1   hiQ nevertheless asserts that the only relevant question is whether it seeks access to public

2   "information" (which we now know is false anyway).  Mot. 7-8.  But the CFAA is not limited to

3   password-protected information.  *See, e.g.*, *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178

4   (N.D. Cal. 2013).[5]  It is not focused on "information" at all.  The CFAA's focus is on

5   unauthorized access *to computers*, *see* 18 U.S.C. § 1030(a)(2), *not* "on unauthorized taking or use

6   of information," *Christensen*, 828 F.3d at 789.  Thus, as explained above, the question is whether

7   hiQ "intentionally accessed [LinkedIn's] computers knowing that it was not authorized to do so,"

8   *Power Ventures*, 844 F.3d at 1069, *not* whether hiQ obtained "private information," *hiQ*, 31 F.4th

9   at 1197.  And here, "[t]he record shows unequivocally that [hiQ] knew that it no longer had

10   authorization to access [LinkedIn's] computers, but continued to do so anyway."  *Power*

11   *Ventures*, 844 F.3d at 1067.  "It is the [computer owner's] decision to allow or to terminate [a

12   user's] *authorization to access a computer* that determines whether the [user] is with or 'without

13   authorization.'"  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009) (emphasis

14   added); *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1028, 1032 n.4

15   (W.D. Wash. 2020) (distinguishing *hiQ*, approving of CFAA claim regarding scraping of

16   information "available to the public through plaintiff's website").

17       Also unavailing is hiQ's reliance on this Court's observation that "'authorization … is

18   most naturally read in reference to the *identity* of the person accessing the computer or website,

19   not *how* access occurs.'"  Mot. 9 (quoting ECF No. 63 at 15).  It follows, hiQ argues, that "'[a]

20   user does not "access" a computer "without authorization" by using bots.'"  *Id.* (quoting ECF No.

21   63 at 15).  Respectfully, this is a false distinction—conduct and identity are related concepts when

22   it comes to LinkedIn's defenses, not distinct ones.  At most, this Court's reasoning would apply

23   only to defenses that narrowly block "automated scraping of user data," ECF No. 63 at 15, which

---

[5] *Accord Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1102-03, 1113 (C.D. Cal. 2007); *Couponcabin LLC v. Sav..com, Inc.*, No. 14-CV-39, 2016 U.S. Dist. LEXIS 74369, at *11 (N.D. Ind. June 8, 2016); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 244, 251 (S.D.N.Y. 2000), *aff'd as modified*, 356 F.3d 393 (2d Cir. 2004); *Sw. Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 439 (N.D. Tex. 2004); *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 596 (E.D. Pa. 2016)); *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62-63 (1st Cir. 2003); *see also United States v. Lowson*, No. 10-114, 2010 U.S. Dist. LEXIS 145647, at *18 (D.N.J. Oct. 12, 2010).

1    stop particular activities, rather than particular actors.  Surely this Court was not adopting a

2    blanket ruling, based on preliminary facts, that LinkedIn could never plead as a factual matter that

3    its technological defenses, while triggered by conduct, in fact deny authorization to the *actor*

4    engaged in that conduct, and not merely the conduct alone.  And that is precisely what LinkedIn

5    has done by plausibly alleging that it applies generally applicable conditions to members of the

6    public that then trigger identity-based authentication requirements—in the form of password

7    walls and IP blocks—for further use.  ACC ¶¶ 71-73.

8         This is entirely ordinary conduct for any business, and it is perfectly natural to understand

9    it as a form of authorization.  Virtually every business that opens itself up to the "public" imposes

10   conditions on entry.  As noted above, a movie theater may deny entry to a business that wants to

11   videorecord movies.  A restaurant may refuse a patron who has been rude to its servers one too

12   many times.  Your local coffee shop can exclude someone who shows up daily to run a crypto

13   mining business on coffee shop wifi.  A golf course can refuse access to football teams wishing to

14   use the course as a gridiron.  And so forth.  Virtually any business, upon identifying a member of

15   the public or another business that routinely flouts its conditions on access, would refuse to

16   permit that person or business continued access going forward.

17        LinkedIn imposes precisely such restrictions.  Its User Agreement conditions access on

18   compliance with generally applicable rules.  ACC ¶¶ 48-49.  The first time someone circumvents

19   that agreement, it is circumventing a restriction on particular conduct.  But then LinkedIn and its

20   generally applicable technological systems enforce those conditions by barring *further* access to

21   those people or entities that flout generally applicable conditions—whether LinkedIn knows their

22   particular identity or not.  As pled by LinkedIn, those systems, most notably IP blocks, bar not

23   just "how access occurs," but *who* can gain access at all.  Indeed, in June 2017, LinkedIn erected

24   targeted, identity-based IP blocks against hiQ in this case and spelled out hiQ's categorical

25   exclusion in a cease-and-desist letter, making abundantly clear that hiQ itself was unauthorized to

26   access LinkedIn's servers.  ACC ¶ 28.  hiQ's circumvention of effective technical barriers to

27   entry, designed specifically to deny it access, constitutes access without authorization.

28        Lastly, hiQ's cited cases do not support dismissal at this stage.  *Brodsky v. Apple Inc.* is

OPP. TO RENEWED MTD
18-cv-00855-EMC

1    inapposite:  It concerned a claim that Apple accessed iPhones without authorization by pushing

2    an iOS update.  445 F. Supp. 3d 110, 129 (N.D. Cal. 2020).  hiQ miscites *Brodsky* as "relying" on

3    the Ninth Circuit's *hiQ* decision, but the case did not concern publicly accessible data, and the

4    plaintiffs "abandoned their CFAA claims."  *Id.*  And *Brodsky* recognized that, in cases such as

5    this one, "where a plaintiff clearly revokes access to a party and not simply the means, manner, or

6    method for such access, that party may be liable under the CFAA."  *Id.* (citing *Power Ventures*,

7    844 F.3d at 1068-69).  Likewise, in *Miller v. 4Internet, LLC*, the court noted that, unlike this case,

8    the plaintiff did not allege that the computer owner "plainly revoke[d] [the defendant's]

9    authorization to access the website or notify them that they violated some law."  471 F. Supp. 3d

10   1085, 1090 (D. Nev. 2020).  LinkedIn states a "without authorization claim."

11          **B.  LINKEDIN PLEADS AN "EXCEEDS AUTHORIZED ACCESS" CLAIM.**

12          LinkedIn has also plausibly pled a claim that hiQ exceeded authorized access under

13   § 1030(a)(2).

14          The CFAA defines "exceeds authorized access" as "to access a computer with

15   authorization and to use such access to obtain or alter information in the computer that the

16   accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  The Ninth Circuit has

17   construed this phrase to embrace "violations of restrictions on access to information"; that is, "the

18   circumvention of technological access barriers."  *United States v. Nosal (Nosal I)*, 676 F.3d 854,

19   863-64 (9th Cir. 2012); *accord Van Buren*, 141 S. Ct. at 1652 (rejecting liability based on

20   "improper motives").

21          LinkedIn pleads a claim on this basis.  Its counterclaim alleges that LinkedIn's systems

22   "prevent 'logged-out' users from viewing more than a certain number of pages before being

23   asked to enter a user name and password to see more," ACC ¶ 34, and that hiQ circumvented

24   these technical barriers to scrape voluminous records beyond anything LinkedIn ever authorized.

25   *Id.* ¶¶ 96-97.  "Avoiding technical restrictions goes beyond any contractual limits imposed by the

26   terms of service."  *WhatsApp Inc. v. NSO Grp. Techs., Ltd.*, 472 F. Supp. 3d 649, 682 (N.D. Cal.

27   2020).

28          In short, even if hiQ had *some* authorization to access LinkedIn's computers, hiQ was akin

OPP. TO RENEWED MTD
18-cv-00855-EMC

1   to an "inside hacker[] … whose initial access to a computer [was] authorized but who access[ed]

2   unauthorized information or files." *Nosal I*, 676 F.3d at 858.  Again, LinkedIn's counterclaims

3   allege that, after "viewing more than a certain number of pages" hosted on LinkedIn's servers,

4   LinkedIn's system would have prevented hiQ from viewing further pages without entering a

5   username and password to see more.  ACC ¶ 34.  It is plausible to infer that hiQ circumvented

6   this access control either by masking its IP address, using a different IP address, or logging in to a

7   LinkedIn account to continue viewing pages that it would otherwise not have been able to view.

8   *Id.*  In the latter scenario, hiQ would have eventually been forcibly logged out and confronted

9   with warnings, restrictions, and CAPTCHA challenges, only to circumvent these barriers, too, in

10  order to continue accessing portions of LinkedIn's website that LinkedIn attempted to restrict hiQ

11  from.  ACC ¶ 31.  hiQ's alleged conduct is thus analogous to inside-employee cases involving

12  intentional circumvention of technical limits placed on the employee's internal permissions.  *See*

13  *United States v. Chen*, No. 17-cr-00603-BLF-1, 2020 WL 6585803 (N.D. Cal. Nov. 10, 2020).

14          hiQ offers no contrary argument.  Instead, it argues only that "hiQ did not exceed any

15  authorization simply because it accessed public information after receiving LinkedIn's May 23,

16  2017 cease-and-desist letter."  Mot. 11.  But that is not the basis for LinkedIn's claim.  And hiQ

17  fails to advance any argument that the claim LinkedIn has actually pled is implausible or

18  otherwise invalid.

19  **II.     LINKEDIN PROPERLY PLEADS CLAIMS UNDER § 502.**

20          In all events, LinkedIn's § 502 claim is sufficiently pled.  hiQ's only argument is to treat

21  § 502 like a mere tag-along claim that is coextensive with the CFAA.  Mot. 12.  For the same

22  reasons hiQ's motion fails as to LinkedIn's CFAA claims, it thus fails with respect to LinkedIn's

23  § 502 claims.  But even if hiQ were right about the CFAA, it is simply incorrect to suggest that all

24  these claims rise and fall together, because it is well settled that "[t]he statutes are different."

25  *Christensen*, 828 F.3d at 789.

26          "In contrast to the CFAA, the California statute *does not require unauthorized access*.  It

27  merely requires knowing access."  *Id.* (emphasis added).  This is clear from the plain text of

28  § 502(c), which provides in pertinent part that a person who commits the following acts is guilty

OPP. TO RENEWED MTD
18-cv-00855-EMC

of a public offense:

> (1) *Knowingly accesses* and *without permission*…uses any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property, or data.
>
> (2) *Knowingly accesses* and *without permission takes, copies, or makes use of any data* from a computer, computer system, or computer network….

Cal. Penal Code § 502(c)(1) & (2) (emphasis added).  This text of subparagraphs (1) and (2) plainly does not specify an unauthorized access element.  *See People v. Tillotson*, 157 Cal. App. 4th 517, 538 (2007) (discussing the three elements of § 502(c)(1) claim).  By contrast, other provisions of § 502 *do* include an access-permission requirement.  *See* § 502(c)(7) ("Knowingly and *without permission accesses* or causes to be accessed any computer") (emphasis added).[6] "The Legislature's requirement of unpermitted access in some § 502 offenses and its failure to require that element in other parts of the same statute" shows that "the subdivisions that do not require unpermitted access were intended to apply to persons who gain lawful access to a computer but then abuse that access."  *People v. Childs*, 220 Cal. App. 4th 1079, 1102 (2013). California's construction of § 502(c)(1) and (c)(2) stands in stark contrast to the narrow construction of the CFAA adopted by the Ninth Circuit and several of its sister courts, which "emphasiz[e] that the CFAA's authorization requirements focus narrowly on whether one's threshold access was authorized."  *Royal Truck & Trailer Sales & Serv. v. Kraft*, 974 F.3d 756, 761 (6th Cir. 2020).

hiQ argues that LinkedIn's claim fails because the "publicly-accessible data accessed by hiQ does not require *'authorization' under the CFAA*."  Mot. at 12 (emphasis added).  Of course, LinkedIn has now pled that hiQ seeks more than just publicly accessible data.  *Supra* 5-6, 9-11. But in any event, "authorization under the CFAA" is irrelevant for the reasons just set forth.  The legislative history of § 502 buttresses this conclusion.  Whereas, according to the Ninth Circuit, Congress did not intend for the CFAA to "allow criminal liability to turn on the vagaries of private polices [sic]" such as "the typical corporate policy that computers can be used only for

---

[6] Unlike the § 502(c)(1) and (2) claims, the § 502(c)(7) does track the CFAA in material respects. hiQ's bid to dismiss that claim fails for the same reasons its bid to dismiss the CFAA claims fails.

OPP. TO RENEWED MTD
18-cv-00855-EMC

1    business purposes," *Nosal I*, 676 F.3d at 860, California's legislature expressly contemplated

2    criminalizing such conduct when it enacted § 502.  *See* Request for Judicial Notice Ex. B at 5

3    (Senate Committee on Judiciary, SB255 Final History, LIS – 3) ("Under this bill, an employee

4    who used a computer … for such personal projects as preparing a personal letter … could be

5    guilty of a felony…"); *id.* Ex. B at 3 (Assembly Committee on Public Safety Analysis, June 1,

6    1987, LIS-9a) ("This bill would make it a crime to knowingly and without permission use a

7    computer including, for example, an employee who uses his or her computer … to write a term

8    paper."); *see also* Cal. Penal Code § 502(h) (establishing a defense for actions within reasonable

9    scope of employment).

10           To the extent hiQ's position is that "publicly available" data requires no "permission" to

11   take or use, Mot. 13-14, that argument, too, is foreclosed by the text.  Section 502(b)(8) defines

12   "data" broadly to include "a representation of information, knowledge, facts, concepts" in "any

13   form," and the statute does not exempt so-called "publicly available" data from protection.

14   Section 502(a) establishes that the statute protects "*all types* and forms of lawfully

15   created … computer data."  *People v. Lawton*, 48 Cal. App. 4th Supp. 11, 14-15 (1996) (emphasis

16   added).  *Lawton*, for example, affirmed a conviction arising from the defendant's access to the

17   UNIX operating system running on a public library terminal.  *Id.*; *see also Ticketmaster L.L.C. v.*

18   *Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1176 (C.D. Cal. 2018) (§ 502(c)(2) claim based on

19   use of bots to access public website).  Importantly, the Legislature knew how to carve out

20   publicly available data when it wished to do so.  Section 502(b)(9) defines "supporting

21   documentation" as information "not generally available to the public."  The fact that this

22   qualifying language appears nowhere else in the statute shows that "generally available" public

23   data is entitled to § 502's protections.  *See, e.g.*, *Childs*, 220 Cal. App. 4th at 1102 ("When

24   different words are used in adjoining subdivisions of a statute that were enacted at the same time,

25   that fact raises a compelling inference that a different meaning was intended.").  Section 502

26   reflects a broad policy in favor of information governance.

27           hiQ disregards both text and policy in making no separate argument about § 502.  Its

28   argument is predicated upon the incorrect assumption that § 502 and the CFAA are the same.  *See*

1   Mot. at 12 (discussing only "'authorization' under the CFAA").  The cases it cites contain the

2   same error.  *Nexsales Corp. v. Salebuild, Inc.*, No. C-11-3915, 2012 WL 216260, at *3 (N.D. Cal.

3   Jan. 24, 2012) and *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010)

4   predate *Christensen* and contain no reasoned analysis of the textual differences between the

5   CFAA and § 502.  *Brodsky* fails to acknowledge *Christensen*, and its holding was based primarily

6   on pleading deficiencies that are not at issue here.  445 F. Supp. 3d at 131-32 (dismissal because

7   complaint failed to allege "accessing Plaintiffs' login activities without authorization").

8        Nor does *Oracle USA, Inc. v. Rimini St., Inc.* support hiQ.  879 F.3d 948, 962 (9th Cir.

9   2018), *rev'd in part*, 139 S. Ct. 873 (2019).  In *Rimini St.*, the Ninth Circuit held that "taking data

10  using a method prohibited by the applicable terms of use, *when the taking itself generally is*

11  *permitted*, does not violate [section 502]."  *Id.*  Here, hiQ continued scraping even after LinkedIn

12  specifically directed it to stop doing so in accord with the User Agreement.  *Contra id.* ("at least

13  at the time it took the data *in the first instance*, Rimini did not violate the state statutes")

14  (emphasis added) (citing *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058).  And, unlike

15  *Rimini St.*, hiQ did not have contractual authorization to take the data in the first instance.  879

16  F.3d at 955-56.  Even if hiQ "did not, at first, violate the statute," when "[LinkedIn] sent the cease

17  and desist letter … [hiQ] knew that it no longer had permission," but continued to "knowingly

18  access[] and without permission [take], cop[y], and ma[ke] use of [LinkedIn's] data."  *Power*

19  *Ventures*, 844 F.3d at 1069 (affirming judgment on § 502 claim).  Finally, hiQ's conduct involved

20  technical circumvention, which is antithetical to "permission" to scrape.  Numerous cases hold

21  that a defendant can be liable under § 502 where, as here, "they access or use a computer … in a

22  manner that overcomes technical or code-based barriers." *NovelPoster v. Javitch Canfield Grp.*,

23  140 F. Supp. 3d 954, 966 (N.D. Cal. 2014) (collecting cases).

### III.   GRANTING A MOTION TO DISMISS AT THIS STAGE OF THE CASE IS UNWISE IN LIGHT OF THE IMPORTANCE OF THE ISSUES AND THE IMPENDING SUMMARY JUDGMENT MOTIONS.

26       Finally, prudence counsels against granting a motion to dismiss at this stage.  hiQ's

27  motion is based entirely on stale findings made on a preliminary record which we now know

28  contained at least two material false premises, that hiQ exclusively accessed "public" information

OPP. TO RENEWED MTD
18-cv-00855-EMC

1   and that LinkedIn's cease-and-desist letter (as opposed to LinkedIn's general anti-abuse technical

2   self-help defenses) stopped its scraping.  Much has changed since, and it would be unwise to

3   finally resolve the important issues in this case in a factual vacuum, without all relevant

4   considerations before the Court.

5       We have already detailed at length the new factual revelations that have come to light, all

6   of which are worthy of consideration on the basis of the full record, which this Court will have

7   before it later this summer.  And the passage of time has also thrown the underlying interests of

8   all stakeholders into sharp relief.  The risks of potential data misuse have become a daily

9   drumbeat in headlines such as "The Secretive Company that Might End Privacy as We Know It,"

10  *The New York Times* (Jan. 18, 2020), "Facebook data misuse and voter manipulation back in the

11  frame with latest Cambridge Analytica leaks," *TechCrunch* (Jan. 6, 2020), "This is how we lost

12  control of our faces," *MIT Technology Review* (Feb. 5, 2021), or "New AI deepfake app creates

13  nude images of women in seconds," *The Verge* (June 27, 2019), and "The rising trend of

14  personalized phishing attacks," *T_HQ* (Feb. 13, 2019).  Moreover, LinkedIn's efforts to combat

15  misuse of its member data to fuel rogue machine learning tools have become ever more

16  demanding.  The full factual record and expert testimony on these topics bears on the legal issues

17  in this case, including the nature of LinkedIn's defenses and data, hiQ's knowledge and conduct

18  in accessing LinkedIn's servers, and the relative interests underlying both.

19      Meanwhile, the scope of hiQ's concerns has been revealed as exceedingly narrow.  hiQ

20  was unable to plead any antitrust theory, let alone a plausible market for so-called "people

21  analytics."  hiQ seeks only to vindicate its parochial interest in its ability to scrape data off of the

22  LinkedIn platform, and leverage the harvested data for its own business interests, even where it

23  violates individuals' rights to control their personal data and harms LinkedIn's infrastructure.

24  Thus, hiQ would leave everyone exposed to an ever-increasing set of risks of data manipulation,

25  as its Motions to Dismiss and Strike lay bare its view that civil law has no role in regulating

26  information governance and consent.  In hiQ's view, once LinkedIn's members have decided,

27  subject to a User Agreement, to engage in selective publication of their data on LinkedIn's site for

28  limited purposes, they and LinkedIn have no right to any further control of that information.

1  Under hiQ's approach, LinkedIn would have no right to police the boundaries of its own

2  infrastructure, nor the information residing on it; in other words, there would be no claim by

3  which LinkedIn can stop the unauthorized collection and misuse of its member data.  The Court

4  should reject hiQ's dystopian view that eschews any role for private actors in supporting

5  information governance—hiQ's position that LinkedIn has no remedy in contract, tort, or statute

6  is not only incorrect, it has sweeping implications that would leave vast swaths of the internet

7  unprotected.

8        Privacy in the digital age is not a binary concept, which is why courts are moving away

9  from rigid rules that treat online privacy like an on/off switch.  *Compare Doe v. Shurtleff*, 628

10  F.3d 1217, 1226 (10th Cir. 2010) (there is "no reasonable expectation of privacy in

11  'information…voluntarily transmitted to the third-party internet providers'") *with In re Facebook,*

12  *Inc. Internet Tracking Litig.*, 956 F.3d 589, 605-06 (9th Cir. 2020) (rejecting *Shurtleff* and relying

13  on the "sensitivity" of the users' data to conclude that "whether Facebook's tracking and

14  collection practices could highly offend a reasonable individual is an issue that cannot be resolved

15  at the pleading stage.");[7] *see also ACLU v. U. S. Dep't of Just.*, 750 F.3d 927, 933 (D.C. Cir.

16  2014) ("we reject the dissent's surrender of any reasonable expectation of privacy to the

17  Internet—a surrender that would appear to result from a failure to distinguish between the mere

18  ability to access information and the likelihood of actual public focus on that information.").  The

19  black-and-white rules hiQ advances in its motion are "ill-suited to the digital age." *United States*

20  *v. Jones*, 565 U.S. 400, 415-17 (2012) (Sotomayor, J., concurring).  And they are no basis for

21  granting a motion to dismiss.

22

23

24

25

26

---

27  [7] *Davis* involved claims under *inter alia* the Stored Communications Act, which unlike the CFAA, contains an express carveout for communications "readily accessible to the general

28  public."  18 U.S.C. § 2511(2)(g).  The CFAA contains no analogous language, which is telling. *See 3Taps*, 964 F. Supp. 2d at 1183.

OPP. TO RENEWED MTD
18-cv-00855-EMC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, hiQ's Renewed Motion to Dismiss should be denied.

Dated: June 9, 2022

Orrick, Herrington & Sutcliffe LLP


By: _____/s/ Annette L. Hurst_____
            ANNETTE L. HURST
        Attorneys for Defendant
          LinkedIn Corporation