Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
Elisabeth Miller (*pro hac vice*)
elisabethmiller@quinnemanuel.com
Zane Muller (*pro hac vice*)
zanemuller@quinnemanuel.com
Daily Guerrero (*pro hac vice*)
dailyguerrero@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6331

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>    *Plaintiff and Counterclaim Defendant*,<br><br>vs.<br><br>LinkedIn Corp.,<br><br>    *Defendant and Counterclaim Plaintiff.* | Case No. 3:17-cv-03301-EMC<br><br>**PLAINTIFF HIQ LABS, INC.'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT LINKEDIN CORP.'S MOTION TO DISSOLVE PRELIMINARY INJUNCTION**<br><br>Judge:        Hon. Edward M. Chen<br>Hearing Date:  July 14, 2022<br>Hearing Time:  1:30 p.m. |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................................II

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................1

INTRODUCTION................................................................................................................................1

ARGUMENT .......................................................................................................................................2

I.   LINKEDIN HAS NOT ESTABLISHED A SIGNIFICANT CHANGE THAT WARRANTS DISSOLUTION OF THE INJUNCTION .......................................................2

II.  HIQ'S BUSINESS REMAINS IN THE SAME HOLDING PATTERN AS WHEN THE AMENDED COMPLAINT WAS FILED..................................................................3

III. THE BALANCE OF HARDSHIPS CONTINUES TO FAVOR HIQ .................................7

IV.  THE PUBLIC INTEREST FAVORS MAINTAINING THE INJUNCTION .....................9

CONCLUSION ....................................................................................................................................9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Exp. Co. v. Italian Colors Restaurant*,
 133 S. Ct. 2304 (2013) .................................................................................................................. 9

*hiQ Labs, Inc. v. LinkedIn Corp.*,
 31 F.4th 1180 (9th Cir. 2022) ............................................................................................... 1, 7, 9

*Jackson Women's Health Org. v. Currier*,
 878 F. Supp. 2d 714 (S.D. Miss. 2012) ......................................................................................... 2

*Karnoski v. Trump*,
 926 F.3d 1180 (9th Cir. 2019) ....................................................................................................... 2

*Maxim Integrated Products, Inc. v. Quintana*,
 654 F. Supp. 2d 1024 (N.D. Cal. 2009) ........................................................................................ 2

*Naretto v. City of Petaluma*,
 No. 21-CV-10027-EMC, 2022 WL 1539780 (N.D. Cal. May 16, 2022) ..................................... 2

*Santos v. Reverse Mortg. Sols., Inc.*,
 No. 12-3296-SC, 2012 WL 4891597 (N.D. Cal. Oct. 12, 2012) .................................................. 2

*Sharp v. Weston*,
 233 F.3d 1166 (9th Cir. 2000) ....................................................................................................... 2

*Stuhlbarg Int'l Sales Co. v. John D. Brush Co.*,
 240 F.3d 832 (9th Cir. 2001) ......................................................................................................... 3

**Other Authorities**

*https://docs.microsoft.com/en-us/linkedin/shared/integrations/people/profile-api?view=li-lms-2022-06* ..................................................................................................................................... 8

*https://www.linkedin.com/robots.txt* ................................................................................................ 8

SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF THE HOUSE COMMITTEE ON THE JUDICIARY, 116TH CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS (2020) https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519 ...................................................................... 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

hiQ Labs, Inc. ("hiQ") respectfully submits this opposition to LinkedIn Corporation's ("LinkedIn's") Supplemental Brief ("Supp. Br.") in Support of its Motion to Dissolve the Preliminary Injunction (the "Motion"). ECF No. 294.

**INTRODUCTION**

LinkedIn asks this Court to overturn the August 14, 2017 preliminary injunction (the "PI") that permits hiQ's scraping of LinkedIn's public member data, which the Court issued because "(1) the balance of hardships tips sharply in hiQ's favor; (2) hiQ has raised serious questions going to the merits of its UCL claim and the applicability of the CFAA; and (3) the public interest favors a preliminary injunction." ECF No. 63 ("Order") at 24–5. These conclusions remain true, and subsequent developments only bolster hiQ's need for the PI. *First*, the Ninth Circuit, with guidance from the Supreme Court, reaffirmed its finding that scraping public data is not a CFAA violation. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201(9th Cir. 2022) ("*hiQ Labs II*"). *Second*, discovery has confirmed that "LinkedIn terminated hiQ's access to its public member data in large part because it wanted exclusive control over that data for its own business purposes" – *i.e.*, "developing a product that competes directly with hiQ's Skill Mapper product" – and that it did so deliberately for the purpose of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Order at 22; *See also* Declaration of Zane Muller in Support of hiQ's Supplemental Opposition to LinkedIn's Motion to Dissolve the Preliminary Injunction ("Muller Dec.") Ex. 1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Third*, hiQ remains in the same holding pattern as when it filed its Amended Complaint, where it explained that "LinkedIn effectively eviscerated hiQ's business." ECF No. 131 at 18. *Fourth*, LinkedIn has shown no harm resulting to its business from the PI. To the contrary, LinkedIn's competing Talent Insights product generates tens of millions of dollars of revenue per year as part of its multi-billion dollar Talent Solutions business. *Finally*, given LinkedIn's consolidation of its position as the dominant professional social network, the public interest tips even more strongly against letting LinkedIn off the hook for its anticompetitive practices.

Accordingly, LinkedIn cannot meet its burden to establish that the PI should be dissolved, and hiQ respectfully requests that the Court deny LinkedIn's motion.

# ARGUMENT

## I. LINKEDIN HAS NOT ESTABLISHED A SIGNIFICANT CHANGE THAT WARRANTS DISSOLUTION OF THE INJUNCTION

A party seeking modification or dissolution of an injunction "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000); *see also Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (same). "The inquiry under *Sharp* has two parts. The court must first address whether the party seeking dissolution of the injunction has established a significant change in facts or law. If this showing has been made, the court must then address whether this change warrants dissolution of the injunction." *Naretto v. City of Petaluma*, No. 21-CV-10027-EMC, 2022 WL 1539780, at *1 (N.D. Cal. May 16, 2022) (Chen, J.) (internal quotations and citations omitted). LinkedIn has not carried its burden.

LinkedIn "fail[s] to identify any relevant change in law or circumstance" to justify dissolution of the injunction. *Santos v. Reverse Mortg. Sols., Inc.*, No. 12-3296-SC, 2012 WL 4891597, at *7 (N.D. Cal. Oct. 12, 2012). That hiQ's business has been significantly diminished since the PI – *i.e.*, that the *threatened irreparable harm to hiQ has largely come to pass* – if anything more strongly warrants denial of LinkedIn's Motion, as it merely confirms a factor militating for the injunction that was previously only likely. *See Maxim Integrated Products, Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1035 (N.D. Cal. 2009) (granting injunction where "irreparable harm has already occurred, and . . . further irreparable harm is imminent absent an injunction."); *Jackson Women's Health Org. v. Currier*, 878 F. Supp. 2d 714, 719 (S.D. Miss. 2012) (granting preliminary injunction in part where "irreparable injury currently exists."). Evidence that LinkedIn has produced in discovery has likewise confirmed hiQ's allegations that LinkedIn's ████████████████████████████████████████████████████████████████████ *See, e.g.*, Muller Dec. Ex. 2 ████████

1  ████████████████████████████████████████████████████████████
2  ████████████████████████████████████████████████████████████ ; Ex. 3
3  ████████████████████████████████████████████████████████████
4  ████████████████████████████████████████████████████████████ ;
5  Ex. 1 ██████████████████████████████████████████████████████
6  ████████████████████████████████████████████████████████████
7  ████████████████████████████████████████████████████████████
8  ██████████████████████████████████. The allegations made by hiQ that this Court found justified an injunction in the first place have been substantiated through discovery. To the extent that the law and facts have changed since the injunction was granted, they have changed because of actions by LinkedIn, and thus hiQ is *more* deserving of the Court's continued intervention, not less.

## II. HIQ'S BUSINESS REMAINS IN THE SAME HOLDING PATTERN AS WHEN THE AMENDED COMPLAINT WAS FILED

hiQ was and remains "one opportunity away" from being able to reactivate its business. *See* ECF No. 219 ("Opp.") at 5; ECF No. 219-2 ("Weidick Aff.") at 2–3. While it is true that LinkedIn's conduct has forced hiQ to strip down its operations and has left it unable to sustain its previously-existing business, the "threatened loss of prospective customers" also constitutes irreparable harm. *Stuhlbarg Int'l Sales Co. v. John D. Brush Co.*, 240 F.3d 832, 841 (9th Cir. 2001). But, since the PI was entered, hiQ's prospects of customer relationships remain, and, indeed, hiQ continues to receive commercial inquiries and negotiate with prospective customers and partners through the present. *See* Supp. Weidick Aff., Ex. A (July 12, 2019 Citadel Email noting that "hiQ's collection is done under a Northern California District Court directive that mandates LinkedIn remove any technical or legal impediments to hiQ's access to member public profiles."); Ex. B (September 10, 2019 email exchange with Nathan Barnes of PricewaterhouseCoopers LLP discussing potential engagement); Ex. C (December 2019 discussion with start-up founder Jonah Hanig to discuss prospective partnership); Ex. D (January 10, 2020 email to hiQ CEO Mark Weidick from Co-founding Partner of Kauffman Fellows Fund "looking for a data provider to collaborate with that offers the historical

work histories of a list of startup people"); Ex. E (August 18, 2021 inquiry on behalf of Italian energy infrastructure company Snam S.p.A. to discuss possible purchase of hiQ's services); Ex. F (Neudata Email of 5/17/2022 wherein a Business Development Executive from Neudata writes to hiQ CEO Mark Weidick: "It would be great to hop on a call this week to discuss the best way for us to work together, and strike while the iron is hot."); Ex. G (June 10, 2022 message to hiQ CEO Mark Weidick from a physician working on a research project requesting "access to the data [hiQ has] extracted from LinkedIn").

These commercial opportunities were and remain contingent on hiQ's access to LinkedIn data, as buttressed by the Court's Order. *See* Supp. Weidick Aff. Ex. A–G. LinkedIn's claim that hiQ has "misused" this Court's PI is simply another misguided attempt to vilify hiQ and reflects, at best, a misunderstanding of the PI that LinkedIn has been bound by since 2017. LinkedIn argues—with no citations to the PI or accompanying Order of this Court—that hiQ may *only* capitalize on the PI in connection with its Keeper and Skill Mapper products. *See* Supp. Br. at 1 (describing business activities "divorced from either of hiQ's Keeper or Skill Mapper products"); *id.* at 4 ███████████████████████████████████████████████████████████████████████████. But the PI was not so limited: it enjoined LinkedIn from "(1) preventing hiQ's ***access, copying, or use of public profiles*** on LinkedIn's website . . . [or] (2) blocking or putting in place any mechanism (whether legal or technical) with the effect of blocking hiQ's ***access*** to such member public profiles." Order at 25 (emphasis added). Nowhere in the PI is there a requirement that LinkedIn can dictate how hiQ runs its business, *e.g.*, by mandating that hiQ *only* use public profile data in its then-existing products as of a frozen moment in time, nor any prohibition on exploring other commercial uses of its scraping technology. Wish as it may, LinkedIn cannot rewrite the PI to make itself the arbiter of what business opportunities hiQ should or should not pursue, on pain of hiQ losing the protections of the PI this Court granted.

LinkedIn's argument that this Court should not take seriously hiQ's ability to pursue further business opportunities because it no longer maintains accounts with various vendors is likewise unavailing. LinkedIn cites to deposition excerpts and documents relating to hiQ's inability to access

some previously-existing technical systems due to cost issues (Supp. Br. 3–5), but in doing so merely illustrates what hiQ has long since made clear: that as a result of LinkedIn's conduct, "hiQ has suffered severe, irreparable harm . . . and has largely been forced out of business[.]" ECF No. 131 at 26; Opp. at 7. For all of LinkedIn's hand-waving about "destroyed" computers and servers (Supp. Br. at 3–5)—the characterization of which hiQ strongly disputes—the administrative particulars of how hiQ put its operations on ice do not change the fundamental state of play. Crucially, hiQ preserved its key technology assets, including source code that it used to scrape and analyze data, as well as much of the raw, scraped data that it had previously collected (*See* Muller Dec. Ex. 4 ("Weidick Dep.") at 14:5–17:25). That certain vendors discontinued hiQ's accounts when hiQ could no longer afford to pay its bills is perfectly consistent with hiQ's positions throughout this litigation. *Id.* at 23:11–20; 62:13–18; 102:1–21. And LinkedIn's suggestion that hiQ cannot possibly "qualify prospective customers for its products" (Supp. Br. at 7) because it no longer has a Salesforce account is almost comical. After all, many companies manage to do business without using Salesforce.

Likewise, LinkedIn's efforts to relitigate the issuance of the PI in the first place by attempting to show that hiQ had already "failed" prior to its receipt of the cease-and-desist letter and subsequent PI (Supp. Br. at 8–10) are misplaced and misleading, relying on cherry-picked examples and out-of-context quotations purporting to show that hiQ's scraping efforts were doomed and that hiQ's finances were unsustainable. In fact, hiQ's technical efforts to scrape public profile data were the subject of constant experimentation and adjustment, and hiQ had regularly encountered and overcome LinkedIn's technical blocks to its public scraping. *See, e.g.*, Muller Dec. Ex. 5 ("Kim Dep.") at 189:20–190:7 ("We're at a start-up, okay. We're -- battling one fire at a time. . . . Q. And all of those fires were threats to the existence of your company at any given time, weren't they? A. No. . . . Q. Well, this one [scraping difficulties in April 2017] was, wasn't it? . . . A. I – I don't think so. I didn't see it that way."); Ex. 6 (hiQ_00602534) (CTO Dan Miller noting "efforts that appear to be getting scraping back on its feet"); Ex. 7 (hiQ_00641039) (April 26, 2017 email from hiQ's CEO to the Board, stating: "To be clear, I'm amped every[]day by the magnitude

1  of our opportunity.  All of our investors should feel the same optimism even with the challenges we
2  face. . . . We've been able to satisfy customer requirements[.]").
3         hiQ's value, like most startups, was premised on its ability to innovate, not on its ability to
4  immediately generate profit.  And while LinkedIn makes much of hiQ's customer churn (Supp. Br.
5  at 10), LinkedIn ███████████████████████████████████████████████████
6  ███.  See Muller Dec. Ex. 9 (████████████████████████████████████████
7  ███████████████████████████████████████████████████).  Yet
8  LinkedIn's ██████████████████████████████████████████████████████
9  ████████████.  See Muller Dec. Ex. 10 ███████████████████████████
10 ████████████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████████████
13 ██████████████████████████████████████; Ex. 11 █████████████████
14 ████████████████████████████████████████████████████████████
15 ████████████████████████).  While it is true that hiQ was operating with a
16 six-month cash reserve when LinkedIn sent its cease-and-desist letter, hiQ was also preparing for
17 its Series C funding round, which was derailed by LinkedIn's threats of legal action.  In short, hiQ
18 was in a stable financial condition until LinkedIn torpedoed investor and customer confidence,
19 thereby cutting off critical sources of expected funding.
20         Finally, LinkedIn's argument that because hiQ has rejected certain business opportunities
21 since the PI was issued somehow suggests that hiQ has no *intention* of pursuing opportunities is
22 nonsense.  See Suppl. Br. at 7–8.  While LinkedIn ████████████████████████
23 ████████████████████████████████████████████████████████████
24 ███████████████████████████, see Muller Dec. Ex. 1 ████████████████
25 ████████████████████████████████████████████████████████████
26 ██████████████████████████████████████████████████████ it is hiQ
27 and its CEO—not LinkedIn—who get to decide which business opportunities are worth exploring,
28

1  and LinkedIn's implied assertion that hiQ should either accept any and every business opportunity
2  that comes its way or forfeit the PI is nonsense.
3        Thus, while it is true that, with respect to hiQ's business, "[c]ircumstances have changed
4  significantly since the Court entered its preliminary injunction", Supp. Br. at 2, LinkedIn's argument
5  for dissolution remains the same: that because LinkedIn has been largely successful in its efforts to
6  shut hiQ down, it should be rewarded with permission to deny hiQ its last lifeline to reactivation.
7  *See* Opp. at 13–15. The Court should reject that argument and preserve the PI.

## III.  THE BALANCE OF HARDSHIPS CONTINUES TO FAVOR HIQ

9        In arguing that the balance of hardships has tilted in its favor, LinkedIn points to the
10 supposed "significant harm" stemming from hiQ's access to public profile data under the PI. Supp.
11 Br. at 11. Yet in granting the PI, this Court previously considered LinkedIn's argument that "if hiQ
12 is able to continue its data collection unabated, LinkedIn members' privacy may be compromised,
13 and the company will suffer a corresponding loss of consumer trust and confidence[,]" but
14 concluded that "it is not obvious that LinkedIn members who decide to set their profiles to be
15 publicly viewable expect much privacy at all in the profiles they post." Order at 6–7. Changes in
16 circumstances demonstrate, if anything, that any privacy interest in public profile data which may
17 have existed in 2017 is effectively non-existent at present, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
19 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Muller Dec. Ex. 12 ▇▇▇▇▇▇▇▇▇▇▇▇.
20       The commercial realities of operating a professional social network that relies on public
21 profiles, as well as LinkedIn's own specific commercial practices, "afford little deference to the
22 very privacy concerns it professes to be protecting in this case." Order at 7. LinkedIn's hypocrisy
23 is baffling: LinkedIn not only uses member profile data as the raw material for the suite of people
24 analytics products it offers through its Talent Solutions business—it also grants direct access to

member profile data to a host of third parties through its own Profile Application Programming Interface[1] and grants explicit permission to a number of third parties to scrape the same.[2]

And even LinkedIn must concede the fact that public profile scraping is a fact of life on the internet: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *see* Ex. 12 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ; *cf.* ECF No. 217-5 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. While LinkedIn ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ LinkedIn member profiles "are scraped very frequently" by various third parties ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Yet, LinkedIn is unable to identify any specific harm caused by hiQ—because there is none. In fact, as LinkedIn's own data shows, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The notion that "LinkedIn members' privacy may be compromised, and the company will suffer a corresponding loss of consumer trust and confidence" as a result of the PI remaining in force is simply not plausible.[5]

---

[1] See https://docs.microsoft.com/en-us/linkedin/shared/integrations/people/profile-api?view=li-lms-2022-06 (describing LinkedIn's Profile API).

[2] See https://www.linkedin.com/robots.txt (identifying various third parties with permission for automated access to LinkedIn for inclusion in publicly-available search engines).

[3] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[4] Ex. 12, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[5] Ex. 12, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

## IV. THE PUBLIC INTEREST FAVORS MAINTAINING THE INJUNCTION

LinkedIn has presented no new evidence or arguments to disturb this Court's finding that "the public interest favors hiQ's position" in light of the likelihood that "those who opt for the public view setting expect that their public profile will be subject to searches, dat[a] mining [*sic*], aggregation, and analysis" as well as the "public interest in vigilant enforcement of the antitrust laws[.]" Order at 24 (citing *American Exp. Co. v. Italian Colors Restaurant,* 133 S. Ct. 2304, 2313 (2013)). As the Ninth Circuit noted, a ruling in favor of LinkedIn "risks the possible creation of information monopolies that would disserve the public interest[,]" *hiQ Labs II* at 1202, a risk which has only grown since the PI was issued.[6] And, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[7]

## CONCLUSION

For the foregoing reasons, hiQ respectfully requests that this Court deny LinkedIn's motion to dissolve the preliminary injunction.

Dated: June 22, 2022

                                                QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                                By: */s/ Corey Worcester*
                                                           Corey Worcester

                                                *Attorneys for Plaintiff hiQ Labs, Inc.*

---

[6] *See generally* SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF THE HOUSE COMMITTEE ON THE JUDICIARY, 116TH CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS (2020) (finding widespread evidence of business practices by incumbent tech platforms tending to harm competition and violate various policies and principles underpinning antitrust law), https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf?utm_campaign=4493-519.

[7] *See* Muller Dec. Ex. 13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮