# Exhibit 4

### Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION
 3
 4   hiQ Labs, Inc.,            )
             Plaintiff,         )
 5                              )
          vs.                   ) Case No.
 6                              ) 17-cv-03301-EMC
     LinkedIn Corporation,      )
 7           Defendant.         )
     _____)
 8                              )
     LinkedIn Corporation,      )
 9           Counterclaimant,   )
                                )
10        vs.                   )
                                )
11   hiQ Labs, Inc.,            )
             Counter-defendant.)
12                              )
     _____)
13
14        REMOTE VIDEO-RECORDED 30(b)(6)
15           DEPOSITION OF MARK WEIDICK
16              Los Gatos, California
17                March 18, 2022
18                   Volume I
19   REPORTED BY:
20   JOHNNA PIPER
21   CSR 11268
22   Job No. 10097379
23
24   Pages 1 through 122
25
```

### Page 2

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION
 3
 4   hiQ Labs, Inc.,            )
             Plaintiff,         )
 5                              )
          vs.                   ) Case No.
 6                              ) 17-cv-03301-EMC
     LinkedIn Corporation,      )
 7           Defendant.         )
     _____)
 8                              )
     LinkedIn Corporation,      )
 9           Counterclaimant,   )
                                )
10        vs.                   )
                                )
11   hiQ Labs, Inc.,            )
             Counter-defendant.)
12                              )
     _____)
13
14
15        Remote video-recorded 30(b)(6) deposition
16   of MARK WEIDICK, Volume I, taken on behalf of
17   Defendant, Los Gatos, California, beginning at 10:04
18   a.m. and ending at 2:13 p.m. on Friday, March 18,
19   2022, before JOHNNA PIPER, Certified Shorthand
20   Reporter No. 11268.
21
22
23
24
25
```

### Page 3

```
 1   APPEARANCES:
 2
 3   For the Plaintiff and Counter-defendant:
 4        Quinn Emanuel Urquhart & Sullivan LLP
 5        51 Madison Avenue, 22nd Floor
 6        New York, New York 10010
 7        (212) 849-7000
 8        hopeskibitsky@quinnemanuel.com
 9        renitasharma@quinnemanuel.com
10        By:  Hope Skibitsky, Esq.
11             Renita Sharma, Esq.
12
13
14   For the Defendant and Counterclaimant:
15        Orrick, Herrington & Sutcliffe LLP
16        405 Howard Street
17        San Francisco, California 94105-2669
18        (415) 773-5700
19        clui@orrick.com
20        By:  Catherine Y. Lui, Esq.
21             Isaac Behnawa, Esq.
22
23
24   Also Present:  Erin James, LinkedIn; Marisa Ramos,
25   video technician
```

### Page 4

```
 1                    I N D E X
 2   WITNESS                              EXAMINATION
 3   Mark Weidick
          By Ms. Lui                          7
 4
          By Ms. Skibitsky                  117
 5
 6
 7              EXHIBITS
 8   DEFENDANT'S                              PAGE
 9   Exhibit 1   LinkedIn's Amended Rule 30(b)(6)   8
                 Notice of Data Preservation
10               Deposition to hiQ
11   Exhibit 2   Declaration of Mark Weidick in   107
                 Opposition to Linkedin's Motion
12               to Dissolve the Preliminary
                 Injunction and for an Indicative
13               Ruling
14
15         ATTORNEY'S EYES ONLY
16
17         Starts                              111
18         Ends                                113
19
20              ***
21
22
23
24
25
```

Page 13

1  Q. That's correct.
2  A. Again including, but not limited to,
3  Genevieve Graves, Dan Miller, Andrew Kim, Darren
4  Kaplan, Darin Medeiros, Boris Dev, those were the
5  former employees that I spoke with.
6  Q. Did you take notes for any of the
7  conversations that you had with any of these
8  individuals?
9  A. No.
10  Q. Do you know if they took notes --
11  A. I don't.
12  Q. -- of any of your conversations?
13  A. I don't.
14  Q. Okay. Let's start with Ms. Graves. When
15  did you speak with her?
16  A. Again, I'll give you an approximate time
17  frame. It would have been last summer. I could
18  check my calendar for exact dates.
19  Q. You said "last summer"?
20  A. Yes.
21  Q. Okay. And what -- what did you speak with
22  Ms. Graves about?
23       MS. SKIBITSKY: Mark, hold on for one
24  second. I'm just going to caution the witness not
25  to reveal any privileged communication where counsel

Page 14

1  may have been on the call.
2       THE WITNESS: That's my hesitation, that
3  one of the conversations was with counsel.
4  BY MS. LUI:
5  Q. Did you have -- did you speak with
6  Ms. Graves in preparation for today's deposition?
7  A. Yes.
8  Q. Okay. And what did you discuss with
9  Ms. Graves?
10  A. The condition and availability of datasets
11  that are largely housed in a lot of the applications
12  listed in the 30(b)(6) document in front of me.
13  Q. What datasets are those?
14  A. It would be things like the -- the source
15  code for our product, the documentation in and
16  around operating the business with Genevieve
17  specifically, the methodologies or the condition of
18  the information we collected that we scraped.
19  Q. Did you speak with Ms. Graves as to
20  whether -- whether those items that you just
21  described were preserved for this litigation?
22  A. I did.
23  Q. Okay. And tell me about the nature of that
24  conversation.
25       MS. SKIBITSKY: Objection. Form.

Page 15

1       THE WITNESS: What do I do?
2       MS. SKIBITSKY: You can answer, Mark.
3       THE WITNESS: Okay. Repeat the question,
4  Counsel, please.
5  BY MS. LUI:
6  Q. Okay. Tell me about the nature of the
7  conversation -- or actually, let me -- let me
8  reframe.
9       Describe what you and Ms. Graves discussed
10  related to the preservation of the items that you
11  previously testified about.
12  A. Largely to confirm my understanding of
13  the -- the location, the whereabouts, the condition,
14  the availability, the degree to which had already
15  been -- some of which had already been archived off
16  to ensure availability. Largely refreshed my
17  understanding because this has been going on for
18  five years now.
19  Q. Did you discuss anything that was not
20  available?
21  A. We did not.
22  Q. So all the items that you discussed with
23  Ms. Graves are preserved and archived for this
24  litigation?
25       MS. SKIBITSKY: Objection. Form.

Page 16

1       THE WITNESS: I talked to Ms. Graves about
2  the availability of the -- the datasets. I mean in
3  some cases, the applications that we subscribed to
4  to preserve those datasets that were largely guided
5  by my legal counsel at the time, way, way back in
6  the day when the legal hold was issued; again to
7  refresh my memory because at that point it was over
8  five years old.
9  BY MS. LUI:
10  Q. Now, you also mentioned having a
11  conversation with Mr. Miller. When did you have a
12  conversation with Mr. Miller to prepare for your
13  deposition today?
14       MS. SKIBITSKY: Objection. Misstates
15  testimony.
16       THE WITNESS: Yeah. Dan Miller was in the
17  same conversation as that with Genevieve Graves.
18  BY MS. LUI:
19  Q. Was there anything else discussed with
20  Mr. Miller that you have not already testified to
21  when you were describing your conversations with
22  Ms. Graves?
23  A. At a granular level, yes, because Dan had
24  more direct responsibility for, say, archiving off
25  datasets to preserve to a -- a specific hard drive

Page 17

1  for example, so yes.
2      Q.  And what did Mr. Miller tell you about
3  archiving datasets to a specific hard drive?
4      A.  That he had done it and it was the hard
5  drive that I still had in my possession.
6      Q.  What's on that hard drive?
7      A.  That hard drive includes, but is not
8  limited to, a lot of the operational data we -- we
9  had at the time.  So the -- the -- the training data
10  that we used for our machine learning modeling, so
11  there's -- the training data is the scraped LinkedIn
12  profiles -- routines for different software
13  applications that would allow us to run the
14  software, although in an unconnected way.  Those
15  files would have been preserved on that hard drive,
16  and I know this from conversations with Dan.  I
17  actually have not on my own opened the hard drive to
18  take a look.
19      Q.  Does this hard drive contain specific
20  databases that LinkedIn was -- or that hiQ was
21  using?
22      A.  Yes.
23      Q.  Okay.  What are those databases?
24      A.  The things I just described, so one --
25      Q.  What are -- sorry.  Go ahead.

Page 18

1      A.  I'm getting feedback now.  Is my audio
2  clear for you, Counsel?
3      Q.  It is.
4      A.  It's not only databases.  So the database
5  of the LinkedIn -- scraped LinkedIn profiles in
6  their raw condition I understand to be about a
7  terabyte of data.
8      Q.  Okay.  And for that specific terabyte of
9  data, before it was preserved onto this hard drive,
10  where would it have been stored at hiQ?
11      MS. SKIBITSKY:  Objection.  Assumes facts.
12      So, Mark, you can -- you can answer as long
13  as I say [sic], "Don't answer."
14      THE WITNESS:  I understand.
15      Repeat the question, Counsel.  Where?
16  BY MS. LUI:
17      Q.  For that specific terabyte of data, before
18  it was preserved onto this hard drive, where would
19  that data have been stored at hiQ?
20      A.  Depending on time of the -- the time and
21  the lifecycle of the business, either on a not
22  cloud-based MongoDB database or then in the Amazon
23  cloud, AW -- so-called AWS under Amazon Web Services
24  in a MongoDB version that Amazon allowed us to host
25  there.

Page 19

1      Short answer:  In a cloud.
2      Q.  And you said it depends on "the time and
3  the lifecycle of the business" --
4      A.  Yes.
5      Q.  -- what do you mean by that?
6      A.  Early on the data, before I arrived there,
7  my understanding was that it had not been moved to
8  the cloud, so it was an architectural decision.
9      Q.  When it was not in the cloud, where would
10  that data of scraped LinkedIn profiles reside?
11      MS. SKIBITSKY:  Objection.  Form.
12      THE WITNESS:  On a -- on a hosted version
13  of MongoDB.
14  BY MS. LUI:
15      Q.  And what do you mean by a -- oh, you said
16  "Hosted" -- "hosted version"?
17      A.  Yes, hosted, H-O-S-T-E-D, yes.
18      Q.  Okay.  Thank you.  I thought -- I thought
19  you said "posted."  This makes more sense.  Thank
20  you.
21      So tell me what is MongoDB.
22      A.  To the best of my knowledge, MongoDB is a
23  relational database.
24      Q.  And is the MongoDB database hosted in the
25  cloud?

Page 20

1      A.  It can be.
2      Q.  For hiQ was hosted in the cloud?
3      A.  It was.
4      Q.  So as I understand it, the scraped LinkedIn
5  data profiles would exist either on a MongoDB
6  cloud-based platform or on a cloud-based AWS
7  platform.  Is that correct?
8      A.  Not exactly.
9      MS. SKIBITSKY:  Objection to form.
10  BY MS. LUI:
11      Q.  Okay.  Please explain.
12      A.  AWS allowed for a hosted -- a version of
13  Mongo in their cloud.
14      Q.  So was it that anything that was scraped
15  from LinkedIn would be both available in Mongo or
16  AWS?
17      A.  It's not an "or."  AWS hosted Mongo; we
18  used it, Mongo, in AWS.
19      Q.  So the scraped LinkedIn profiles data would
20  be stored in Mongo, and Mongo was hosted on AWS.  Is
21  that correct?
22      A.  It is.
23      Q.  And why is it that hiQ had Mongo hosted on
24  AWS versus just using Mongo as a cloud-based
25  platform?

Page 21

1    A.  So it's an information technology decision.
2  For us it was more efficient, more accessible, more
3  reliable, and my understanding was it cost less, but
4  that cost determination wasn't made -- wasn't made
5  while I was the CEO.
6    Q.  Now, from the beginning of the time of hiQ
7  existence, was hiQ always using MongoDB?
8    MS. SKIBITSKY:  Objection.  Form.
9    THE WITNESS:  Well, the answer would be no,
10  we didn't need Mongo on day one.
11    Q.  When was Mongo used -- first used at hiQ?
12    A.  I don't know.
13    Q.  And am I correct there was a time when
14  MongoDB was not hosted onto AWS?
15    A.  Yes, you're correct.
16    Q.  And what would that time frame be?
17    A.  I don't know.
18    Q.  Who would know that information?
19    A.  Dan Miller.
20    Q.  And before Mongo was hosted onto AWS, was
21  it hosted on any other platform?
22    A.  I'm not sure.  Mongo may have had their own
23  hosted instance to run.
24    Q.  So on that hard drive that Mr. Miller
25  preserved and gave to you, is MongoDB on that hard

Page 22

1  drive?
2    A.  I -- I would expect not.  The dataset is.
3    Q.  Why would you expect that MongoDB would not
4  be on that hard drive?
5    A.  Because it's an applica -- a software
6  application.
7    Q.  How did Mr. Miller extract the data from
8  MongoDB to preserve onto that hard drive?
9    A.  An export function similar to what you
10  would run to export any information from one place
11  to another.
12    Q.  Do you know if he exported everything from
13  the MongoDB onto that hard drive?
14    A.  Everything?
15    Q.  Yes.
16    A.  Everything?
17    Q.  Yes.
18    A.  Well, he didn't -- he didn't -- our email
19  wasn't in MongoDB, so he wouldn't have exported
20  email from MongoDB, so, no, not everything.
21    Q.  So my question was specific to MongoDB.  Do
22  you know if Mr. Miller extracted everything
23  available that was in MongoDB and exported it onto
24  that hard drive?
25    A.  Yes.

Page 23

1    Q.  And my question was "do you know," so you
2  said "yes."  So did Mr. Miller extract everything
3  available that was on MongoDB and exported it onto
4  that hard drive?
5    A.  Yes.
6    Q.  How do you know that?
7    A.  Verbal confirmation, discussion with Dan.
8    Q.  Do you know when that export from MongoDB
9  to the hard drive occurred?
10    A.  Not precisely.  Years ago, though.
11    Q.  What else did you discuss with Mr. Miller
12  to prepare for your deposition today?
13    A.  Some of the billing logistics associated
14  with the applications that had a subscription fee
15  associated with them and the assorted credit cards
16  that were expiring; in that case, you know, that we
17  would potentially put our own credit cards to pay
18  for it.  So largely to find a way to pay when we're
19  out of money for applications that counsel advised
20  the data was critical and needed to be preserved.
21    Q.  Okay.  And which applications did you
22  discuss?
23    A.  Our email system -- well, our -- our Google
24  suite of applications including email, documents,
25  slides, Google Sheets, et cetera -- "G Suite" I

Page 24

1  think is what they call it -- Slack, our Slack
2  service for internal communications; AWS where we
3  were in arrears more than six months for several
4  years; GitHub, similar situation, not in a position
5  to pay them because we didn't have any money because
6  we were nonoperational.
7    Q.  Any other applications discussed with
8  Mr. Miller?
9    A.  Probably all of them at some point.  I mean
10  even casually, "Dan, are we" -- you know, they're
11  listed here, Box -- all of them that are listed
12  there.
13    Q.  Did you discuss with Mr. Miller Salesforce?
14    A.  At the time, we -- probably not.  My
15  recollection is that at that point, Salesforce had
16  shut us off.  They had unilaterally shut us off for
17  nonpayment.
18    Q.  Okay.  We'll get back to that.  I just want
19  to keep focusing on your conversation with
20  Mr. Miller as to your preparation for the deposition
21  today.  Anything else that we haven't covered?
22    A.  Not to my recollection.
23    Q.  Okay.  You also said you had a conversation
24  with Mr. Kim in preparation for your deposition
25  today.  When did that occur?

Volume I  Case 3:17-cv-03301-EMC   Document 308-4   Filed 06/22/22   Page 6 of 7
Mark Weidick                                                                        hiQ Labs, Inc. vs.
                                                                                    LinkedIn Corp.

Page 61

1  slideware, across the organization.  We used
2  G Sheets for spreadsheet calculations.  We use
3  Google Docs for written documents along the lines of
4  we used to do with Microsoft Word.
5      Q.  Did hiQ also use Google Drive to store and
6  share documents --
7      A.  Yes.
8      Q.  -- and other items?
9      A.  Yes.  I think a suite is the set of
10 applications we used, but we continue to pay $400 a
11 month to preserve data for more than 68 different
12 individuals who have worked for us from each of
13 those applications.
14     Q.  Since the inception of hiQ, has it always
15 used the G Suite of products?
16         MS. SKIBITSKY:  Objection to form.
17         THE WITNESS:  I think so.  hiQ, I think we
18 started in 2013.  I don't remember datewise that --
19 there may have been a period of time we're not --
20 where G Suite didn't exist while OrgStars at the
21 time prior to hiQ did.
22 BY MS. LUI:
23     Q.  And do you know what type of a platform
24 that OrgStars or hiQ in its early formation was
25 using if not G Suite?

Page 62

1      A.  I do not.
2      Q.  You testified that hiQ is currently paying
3  $400 a month to preserve data.  Tell me more about
4  the nature of that contractual obligation.
5          MS. SKIBITSKY:  Objection.  Calls for a
6  legal conclusion.
7          THE WITNESS:  We subscribed to G Suite,
8  G Drive, everything else I just described.  The
9  moment we stop paying, at some point they're going
10 to eliminate all the data, so we continue to pay.
11 On occasion --
12         (Indiscernible crosstalk.)
13         THE WITNESS:  On occasion as bills lapse
14 and come due, that may be one of the applications
15 that someone put a personal credit card down from
16 time to time to preserve that subscription to
17 main -- to maintain continuity for that
18 subscription, and that is, I think, $408 a month.
19 BY MS. LUI:
20     Q.  Has there ever been an interruption of
21 service for G Suite?
22     A.  No, though we've been fished and led to
23 believe that our credit cards have expired on
24 multiple occasions, and as far as we can tell, we
25 have never been turned off.

Page 63

1      Q.  So to this day right now, G Suite would be
2  accessible and available to hiQ employees?
3          MS. SKIBITSKY:  Objection to form.
4          THE WITNESS:  To hiQ employees?  There are
5  no hiQ employees other than me.
6  BY MS. LUI:
7      Q.  Okay.  So is G Suite accessible and
8  operational to you at this point?
9      A.  Yes.
10     Q.  At any point was there an export of the
11 data that resides in G Suite into a local copy form
12 such as on a hard drive?
13     A.  I don't think so.
14     Q.  So the hard drive that Mr. Miller had
15 created for you, does not include any G Suite
16 information or data?
17     A.  All that's in the cloud.  I don't recall if
18 we archived that part.
19     Q.  So as long as hiQ continues to pay the
20 monthly bill to Google, all the data in G Suite will
21 be available in the cloud.
22     A.  Yes.
23     Q.  And do you know if any settings have been
24 shut off on the back end to assure that there would
25 be no destruction of any data in G Suite?

Page 64

1          MS. SKIBITSKY:  Objection.  Assumes facts
2  not in evidence.
3          THE WITNESS:  Again, the policy is not to
4  delete.  That anybody has proactively gone in to
5  confirm not delete, I don't know.
6  BY MS. LUI:
7      Q.  And, again, when you're saying "the
8  policy," are you referring to the litigation hold or
9  some other corporate policy?
10     A.  Specifically in that case, I was pointing
11 to the way we operated the business.
12     Q.  So it's your understanding there was a
13 corporate policy not to delete data outside of --
14         (Indiscernible crosstalk.)
15 BY MS. LUI:
16     Q.  Let me repeat it, and just give me a little
17 bit of time.
18         So it's -- is it your understanding there
19 was a corporate policy at hiQ not to delete data,
20 and this is a policy outside of the litigation hold?
21         MS. SKIBITSKY:  Objection.  Vague.
22         THE WITNESS:  The word "policy" implies to
23 me a certain behavior.  We had a behavior that was
24 not memorialized in a written document.  It wasn't
25 part of the employee handbook.  Didn't delete data.

Page 101

1  accounting at hiQ.
2      Q.  Do you know if Salesforce provided several
3  warnings that it was going to turn off the account
4  due to nonpayment?
5      A.  I do not.
6      Q.  Prior to September 2018, had there been any
7  discussion of archiving or preserving the data in
8  Salesforce?
9      A.  We had talked multiple times over under
10 legal hold and thereafter about a general policy of
11 no data deletion.
12     Q.  Was there ever any specific discussion
13 about archiving or preserving the data in Salesforce
14 prior to September 2018?
15     A.  No, because it was expected that it was
16 available to us.
17     Q.  Prior to September 2018, was there ever any
18 discussion that the data in Salesforce should be
19 exported to a local copy?
20     A.  The reporting we took from it was the
21 main -- the main result of that, and it was
22 sufficient for so many things, informing investors,
23 et cetera, so no.  At that point, customers were
24 largely expired out of the business.  There was no
25 tracking being done in Salesforce specifically so --

Page 102

1      Q.  Prior to September 2018, was there ever any
2  discussion at hiQ to figure out ways to pay the bill
3  to Sales Force?
4      A.  I have several hundred thousand dollars'
5  worth of creditors at this point in the story end to
6  this day.  There was a regular discussion with my
7  board at who I could pay and who I can't pay.  So
8  that's an emphatic yes.
9      Q.  Well, prior to September of 2018, was there
10 ever any discussion that Salesforce should be paid
11 in lieu of another creditor?
12     A.  I can't prioritize one creditor over
13 another.  I sought out creditors to negotiate
14 standstills based on the volume of money owed to
15 them -- based on the amount of money owed to them.
16 So Salesforce was never carved out specifically.
17     Q.  Prior to September 2018, did you or anybody
18 else at hiQ ever reach out to Salesforce to discuss
19 a potential billing plan or standstill agreement?
20     A.  You put two things in there.
21     Q.  You can answer either or both.
22     A.  You're asking the questions.
23     Q.  Prior to September 2018, did you or anybody
24 else at hiQ ever reach out to Salesforce to discuss
25 a potential billing plan?

Page 103

1      A.  We changed our billing plan with Salesforce
2  to reduce the number of subscribers to take it down
3  to what we thought was the bare minimum, which
4  yielded a $3600-a-year bill for two subscribers
5  prior to September 2018.
6      Q.  Beyond reducing the number of subscribers,
7  any other discussions with Salesforce about a
8  billing plan?
9      A.  No.
10     Q.  Prior to September 2018, did you or anybody
11 else at hiQ ever reach out to Salesforce to discuss
12 a potential standstill agreement?
13     A.  The way you asked the question, no.  No.
14     Q.  When hiQ learned that Salesforce had ended
15 access to its server due to nonpayment, what steps
16 did hiQ take to try to obtain that data back?
17     A.  Escalation into Salesforce through our
18 customer support, customer service, and multiple
19 organizations at Salesforce to try to reconstitute
20 the data, including, if I remember right, getting
21 the -- getting some assistance from Quinn Emanuel.
22     Q.  And what were the results of those efforts?
23     A.  Data was no longer available -- outside of
24 the reports that I've pointed to several times over
25 that were created from the raw data which are in our

Page 104

1  possession.
2      Q.  What was Salesforce's -- there's a lot of
3  feedback there.  Let me start over.
4          To your knowledge, was the raw data
5  available at the moment that Salesforce cut off
6  hiQ's access?
7      A.  I expect it would be -- would have been.  I
8  did not specifically ask, "At what point in time,
9  Salesforce, did you hit the button to delete forever
10 and ever."
11     Q.  To your knowledge, do you know how long
12 Salesforce will keep such raw data?
13     A.  I don't know --
14         MS. SKIBITSKY:  Objection -- objection.
15 Outside of the scope.
16         THE WITNESS:  I don't know.
17 BY MS. LUI:
18     Q.  What was the time period between when
19 Salesforce cut off hiQ's access to the account and
20 when hiQ escalated queries to Salesforce about
21 trying to obtain the data?
22     A.  Oh, many months.
23     Q.  Why did it take so long to then try to
24 escalate to Salesforce to try to get the data back?
25     A.  We didn't know what had happened.