# Exhibit 5

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
    hiQ Labs, Inc.,
 5
             Plaintiff,
 6                                 Case No.:
         vs.                       17-cv-03301-EMC
 7
    LinkedIn Corporation,
 8
             Defendant.
 9  _____
10  LinkedIn Corporation,
11          Counterclaimant,
12       vs.
13  hiQ Labs, Inc.,
14          Counter-defendant.
    _____
15
16            VIDEO-RECORDED DEPOSITION
17       REMOTELY TAKEN VIA ZOOM CONFERENCE OF
18                   ANDREW KIM
19               MONDAY, MAY 9, 2022
20
21
22
23  Stenographically Reported by:
    Linda E. Marquette
24  RPR, CLR, CSR No. 11874
25  Job No. 10100480
```

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
    hiQ Labs, Inc.,
 5
             Plaintiff,
 6                                 Case No.:
         vs.                       17-cv-03301-EMC
 7
    LinkedIn Corporation,
 8
             Defendant.
 9  _____
10  LinkedIn Corporation,
11          Counterclaimant,
12       vs.
13  hiQ Labs, Inc.,
14          Counter-defendant.
    _____
15
16
17
18       VIDEO-RECORDED DEPOSITION REMOTELY TAKEN VIA ZOOM
19  CONFERENCE of ANDREW KIM, taken on behalf of LinkedIn
20  Corporation, with everyone appearing at their remote
21  address, and the witness appearing at Tiburon,
22  California, commencing at 9:02 a.m., and concluding at
23  5:53 p.m., on Monday, May 9, 2022, before Linda E.
24  Marquette, RPR, CLR, Certified Shorthand Reporter No.
25  11874.
```

## Page 3

```
 1  APPEARANCES:
 2       (All parties appearing remotely)
 3    For Plaintiff/Counter-defendant hiQ Labs, Inc.:
 4       BY:  ZANE MULLER, ESQ.
            BY:  RENITA SHARMA, ESQ.
 5       BY:  HOPE SKIBITSKY, ESQ.
            QUINN EMANUEL URQUHART & SULLIVAN LLP
 6       51 Madison Avenue
            22nd Floor
 7       New York, NY  10010
            212.849.7000
 8       zanemuller@quinnemanuel.com
            renitasharma@quinnemanuel.com
 9       hopeskibitsky@quinnemanuel.com
10
11    For Defendant/Counterclaimant LinkedIn Corporation:
12       BY:  ANNETTE L. HURST, ESQ.
            BY:  ISAAC BEHNAWA, ESQ.
13       ORRICK, HERRINGTON & SUTCLIFFE LLP
            405 Howard Street
14       San Francisco, California  94105-2669
            415.773.5700
15       415.773.5759 fax
            ahurst@orrick.com
16       ibehnawa@orrick.com
17
18
19       ALSO PRESENT:
20           Aaron Isaacs, Videographer/Zoom host
21           Devon Hanley Cook, LinkedIn
22
23
24
25
```

## Page 4

```
 1                    I N D E X
 2  WITNESS:                                        PAGE
 3      ANDREW KIM
 4  EXAMINATION BY MS. HURST                         13
    EXAMINATION BY MR. MULLER                       284
 5  FURTHER EXAMINATION BY MS. HURST                289
 6
 7
 8              EXHIBITS
 9  NO.    DESCRIPTION                              PAGE
10  Exhibit 242                                      39
        E-mail dated 5/14/2018 at 7:49 p.m. from
11      Andrew Kim to Mark Weidick; Bates
        hiQ_00043116 and CV of Andrew A. Kim;
12      Bates hiQ_00043117
13  Exhibit 243                                      41
        E-mail dated 1/09/2015 at 3:04 p.m. from
14      Andrew A. Kim to Ryan Hammond; Subject:
        Editable version of Product Deck; Bates
15      hiQ_00047346 with attachment of hiQ
        Product Overview & Roadmap January 9th,
16      2015 PowerPoint (24 pages)
17  Exhibit 244                                      53
        E-mail dated 2/15/2018 at 4:03 p.m. from
18      Andrew Kim to Mark Scott; Subject:  Re:
        PPT version of I-O Pharma Report; Bates
19      hiQ_00643168 with attachment of Pharma
        Talent Report Focus on Immuno-Oncology
20      Professionals PowerPoint (14 pages)
21  Exhibit 245                                      54
        E-mail dated 1/19/2016 at 2:38 p.m. from
22      Manisha Gupta to Ryan Hammond; Andrew
        Kim; Dan Miller; Chris LeBailly;
23      Subject: Positioning and Roadmap slides;
        Bates hiQ_00603900 and attachment
24      Positioning, Strategy and Product
        Roadmap for discussion at hiQ Off-site -
25      Jan 2016 PowerPoint (9 pages)
```

Page 185

1  name wrong, Linda.  I'm sorry.
2  A.   Sorry.  Can you repeat that?
3  BY MS. HURST:
4  Q.   Yeah.  Earlier you referred to someone who
5  succeeded Ms. Gupta as the product manager or VP of
6  product, right?
7  A.   Yeah.  And then I -- I -- I -- I think I
8  misremembered his last name.  This is probably his last
9  name.
10 Q.   Okay.  And you're looking now at Exhibit 267
11 and that's refreshing your recollection that Prakash
12 Aditham was the product -- had a product after
13 Ms. Gupta?
14 A.   Yeah, I -- yeah.  That's correct.
15 Q.   So now back to the contents of the e-mail,
16 Exhibit 267.  Mr. Weidick to you, among others,
17 regarding the "data scraping-centric portion of my board
18 update."  I'd like you to go ahead and read the entirety
19 of this e-mail and let me know when you're finished.
20 A.   Okay.  Okay.  I've read it.
21 Q.   Okay.  Do you recall this e-mail from
22 Mr. Weidick?
23 A.   I -- I do not.
24 Q.   Okay.  So your new CEO wrote:
25     "I thought it may be useful to

Page 186

1     read some of the summary I provided
2     to the board last week, in
3     particular, the commentary on our
4     data-scraping situation, which is
5     clearly an area of intense focus and
6     concern in the company."
7     Do you see that?
8  A.   Yes.
9  Q.   And do you recall that data scraping was an
10 area of intense focus and concern in the company in
11 April of 2017?
12 A.   Yes.  I remember at some point in time it
13 was -- there was a lot of focus on it.
14 Q.   Do you have any reason to doubt that that was
15 the case in April of 2017?
16 A.   No.
17 Q.   And, I mean, you would certainly take very
18 seriously an e-mail from your CEO explaining to you what
19 he had recently reported to the board of directors of
20 the company, wouldn't you?
21     MR. MULLER:  Objection, form.
22 A.   It depends on the substance of the e-mail.
23 BY MS. HURST:
24 Q.   Well, the activity under consideration here,
25 scraping, was an activity that you were ultimately

Page 187

1  responsible for at this point in time, correct?
2     MR. MULLER:  Objection, misstates testimony.
3  A.   I believe this -- I believe this was part --
4  someone on my team was working on this, yes.
5  BY MS. HURST:
6  Q.   Right.  The people who were working on this
7  reported to you, Mr. Kim, correct?
8  A.   Yes.
9  Q.   All right.  And -- and I just want to be
10 clear.  The people who were working on the thing that
11 the CEO was writing to the board about as a area of
12 intense focus and concern in the company, you wouldn't
13 have paid close attention to that?
14     MR. MULLER:  Objection.  Counsel, witness has
15 already shared his recollection of what he knows on this
16 e-mail.  The fact that you're dissatisfied with it
17 doesn't change his answer.
18 BY MS. HURST:
19 Q.   Do you understand the question, Mr. Kim?
20 A.   I -- I do understand the question but I feel
21 as though you're oversimplifying something here, is
22 that -- this is not providing new information to me at
23 this point in time.  So I don't understand why I would
24 remember this particular e-mail.
25 Q.   All right.  So it was of no moment to you, it

Page 188

1  was unremarkable, unmemorable that your CEO was telling
2  the board that an area of the company's activity for
3  which you were responsible was of intense focus and
4  concern in the company; is that right?
5     MR. MULLER:  Objection to form.  Asked and
6  answered.
7  A.   I -- I'm not sure what you're -- what you're
8  trying to get at.  There's a lot of assumptions baked
9  into here, right.  I -- yeah, he -- he's not -- he's not
10 providing me with new information, so no, I don't find
11 this particularly memorable.
12     The fact that the board simply knows about it
13 is not going to change our circumstances in that matter.
14 It wouldn't affect me.  I'm more concerned probably at
15 this point in time, I can only assume, the execution of
16 a solution or finding a path out.  Just because somebody
17 else knows doesn't make it all of a sudden memorable to
18 me.
19 BY MS. HURST:
20 Q.   So you were already aware as of April 11,
21 2017, that the problems with scraping were of intense
22 focus and concern in the company?
23     MR. MULLER:  Objection, misstates testimony.
24 A.   I would assume that this -- that this isn't
25 telling me new information.

**Page 189**

1  BY MS. HURST:
2  Q.  Are you assuming that or are you saying it?
3  A.  I -- I'm going to say it, that I -- this
4  isn't -- wasn't new information to me.  I wouldn't find
5  out through the board that my team was having -- was
6  focusing on something.
7  Q.  Right.  Because you remember, this was a
8  problem, right?
9      MR. MULLER:  Objection.  Misstates testimony.
10  A.  I do recall that there was a point in time
11  where it was -- that there were -- there were -- we had
12  some challenges, yes.
13  BY MS. HURST:
14  Q.  The challenges were sufficiently serious that
15  the CEO was reporting to the board on them and you were
16  convening and all-hands meeting called a Data Scraping
17  Summit, right?
18      MR. MULLER:  Objection.  Asked and answered
19  and the document speaks for itself.
20  A.  Yes.  We're at a start-up, okay.  We're --
21  we're -- we're battling one fire at a time.  So yes.
22  BY MS. HURST:
23  Q.  And all of those fires were threats to the
24  existence of your company at any given time, weren't
25  they?

**Page 190**

1  A.  No.
2      MR. MULLER:  Object to form.
3  BY MS. HURST:
4  Q.  Well, this one was, wasn't it?
5      MR. MULLER:  Object to form.
6  A.  I -- I don't think so.  I didn't see it that
7  way.
8  BY MS. HURST:
9  Q.  Well, did it cause you to risk missing
10  customer deliverables?
11  A.  I don't recall.
12  Q.  Did it cause you to consider whether you
13  should stop selling the product because you couldn't
14  deliver it?
15      MR. MULLER:  Object to form.
16  A.  I don't believe so.
17  BY MS. HURST:
18  Q.  You'll see at the bottom of this e-mail from
19  Mr. Weidick there's a section called "Legal Notes."  Do
20  you see that?
21  A.  Yes.
22  Q.  And there's a reference to a LinkedIn lawsuit
23  there.  Do you see that?
24  A.  Is that the first bullet point?
25  Q.  Yep.

**Page 191**

1  A.  Okay.
2  Q.  And it refers -- and Mr. Weidick wrote that
3  the complaint points to public scraping.  Do you see
4  that?
5  A.  Mm-hmm.  I see it.
6  Q.  When you received this did you do anything to
7  investigate whether there were legal concerns regarding
8  public scraping of LinkedIn?
9      MR. MULLER:  Objection.  Calls for a legal
10  conclusion.
11  A.  I don't -- I don't remember this e-mail so ...
12  BY MS. HURST:
13  Q.  So did you ever do anything to investigate at
14  hiQ Labs whether there were such concerns prior to the
15  time that you received a cease and desist letter from
16  LinkedIn?
17      MR. MULLER:  Object to form.  Vague.  And
18  calls for a legal conclusion.
19  A.  I don't recall doing that, no.
20      MS. HURST:  Exhibit 268 is tab -- it's tab 261
21  and 261.1, Aaron, hiQ_00602534 and 535.
22      (Exhibit 268 marked for
23      identification by the Certified
24      Shorthand Reporter.)
25  ///

**Page 192**

1  BY MS. HURST:
2  Q.  All right.  Do you see here's an e-mail from
3  Mr. Miller to you, Ms. Graves and Mr. Weidick attaching
4  a production scraper dashboard?
5      Do you see that?
6  A.  Yes, I see this.
7  Q.  And Mr. Miller wrote:
8      "... FYI, these guys are pulling
9      rabbits out of a hat here.  Yeoman
10      efforts that appear to be getting
11      scraping back on its feet.  Note how
12      the trend lines in the top graphic
13      go from 1.0 (all banned) to .85, 100
14      percent due to smarter scrape logic
15      realized through hours of browsing
16      by hand and methodically noting the
17      results."
18      See that?
19  A.  Yes.
20  Q.  Yeah.  Does this refresh your recollection
21  that there were points in time when all of your scraping
22  requests were being banned?
23      MR. MULLER:  Objection.  Misstates testimony.
24  A.  Oh, gosh.  I don't really remember this.  I
25  remember there was a point in time where it was