Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
Elisabeth Miller (*pro hac vice*)
elisabethmiller@quinnemanuel.com
Zane Muller (*pro hac vice*)
zanemuller@quinnemanuel.com
Daily Guerrero (*pro hac vice*)
dailyguerrero@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6331

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>*Plaintiff and Counterclaim Defendant*,<br><br>vs.<br><br>LinkedIn Corp.,<br><br>*Defendant and Counterclaim Plaintiff.* | Case No. 3:17-cv-03301-EMC<br><br>**SUPPLEMENTAL DECLARATION OF MARK WEIDICK IN OPPOSITION TO LINKEDIN'S MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION** |

I, Mark Weidick, declare as follows:

1. I am the Chief Executive Officer of hiQ Labs, Inc. ("hiQ"). The facts stated in this declaration are based on my personal knowledge, discussions with former company personnel, and my review of records kept in the ordinary course of business. I could and would testify truthfully to these facts, under oath, if required.

2. On September 24, 2021, I executed a Declaration in support of hiQ's opposition to LinkedIn's motion to dissolve the preliminary injunction against LinkedIn. ECF No. 219-2. Therein, I stated as follows:

> Since hiQ has been made dormant, I have been approached several times by prospective business partners interested in a commercial relationship with hiQ. Generally, these prospective business partners are interested in a business relationship that would require hiQ to leverage its technology that allows for automated access of public profiles on LinkedIn's website.
>
> When I am approached about a potential commercial relationship that I believe could help mitigate some of the losses hiQ has suffered on account of LinkedIn's conduct, I generally engage in discussions to see whether an engagement might be possible.

*Id.* ¶¶ 8-9.

3. At that time, hiQ had been approached by various prospective business partners interested in a commercial relationship with hiQ. Generally, these partners sought arrangements that would leverage hiQ's technology that allows for automated access of public profiles on LinkedIn's website, and hiQ's continued access to LinkedIn data, as buttressed by the preliminary injunction, was essential to hiQ's ability to pursue and negotiate these opportunities.

4. For example, in July and August of 2019, I engaged in a discussion with Eric Nollette of Citadel LLC, a hedge fund and financial services company, about a potential commercial engagement. On Friday, July 12, I sent Mr. Nollette an email containing a summary of our discussion outlining that potential commercial engagement. A true and correct copy of that email is attached as **Exhibit A** (hiQ_00422730). As I noted in that email, a key element of our prospective engagement was that "hiQ's [data] collection is done under a Northern California District Court directive that mandates LinkedIn remove any technical or legal impediments to hiQ's access to

1  member public profiles." On August 8, 2019 Mr. Nollette informed me that Citadel was putting the
2  project on hold.

3      5.    In another case, in September of 2019, Darren Kaplan and I spoke with Nathan
4  Barnes of PricewaterhouseCoopers LLP, to discuss hiQ's services and provide a demonstration of
5  a use case applying hiQ's technology to the evaluation of mergers and acquisitions. On September
6  10, 2019, Mr. Kaplan and I spoke with Mr. Barnes and his colleagues via conference call. A true
7  and correct copy of the email exchange laying out the agenda for that call is attached as **Exhibit B**
8  (hiQ_00587339)**.** Following extensive back-and-forth, Mr. Barnes ultimately decided not to pursue
9  an engagement.

10      6.    In another case, in December of 2019, I received an inquiry from Jonah Hanig of
11  Kaz, a start-up backed by Y Combinator LLC, to discuss a prospective partnership opportunity. A
12  true and correct copy of that email is attached as **Exhibit C** (hiQ_00423588)**.** After speaking with
13  Mr. Hanig, he informed me that he decided not to pursue a partnership further in light of the legal
14  risk faced by hiQ.

15      7.    In another case, on January 10, 2020 I received an inquiry from Collin West of the
16  Kaufman Partners Fund to discuss the possibility of using hiQ's technology to gather data on
17  historical work histories for startup employees. A true and correct copy of that email is attached as
18  **Exhibit D** (hiQ_00423821)**.** After a month of discussion, Mr. West paused our conversations in
19  light of budget constraints but expressed interest in renewing discussions the following year.

20      8.    In another case, on August 18, 2020, I received an email from Nicholas Sartor on
21  behalf of Snam S.p.A., an Italian energy infrastructure company, to discuss the possibility of using
22  hiQ's proprietary offerings to allow Snam to gather and map its employees' skills and improve
23  internal training and mobility. A true and correct copy of that email is attached as **Exhibit E**
24  (hiQ_00424323). I ultimately decided not to pursue that opportunity due to additional barriers posed
25  by European regulations on data collection.

26      9.    In the time since I made the September 24, 2021 Declaration, hiQ has been
27  approached by additional prospective parties interested in a commercial relationship with hiQ.
28

Generally, these partners have sought arrangements that leverage hiQ's technology that allows for automated access of public profiles on LinkedIn's website.

10. In or around May 2017, I registered for and tuned in to a webinar hosted by Neudata Technology Services, LLC, a data intelligence firm, outlining the implications of the Ninth Circuit opinion in this matter. Shortly after listening to that webinar, I reached out to Donald D'Amico, Neudata's General Counsel, to discuss a potential business relationship. On May 17, 2022, Mark Hulbert of Neudata contacted me to discuss a potential partnership between Neudata and hiQ. A true and correct copy of that email is attached as **Exhibit F.** My conversations with Mr. Hulbert about a prospective partnership remain ongoing as of the date of this filing and Neudata has already sent hiQ a prospective customer.

11. On June 10, 2022, I was contacted by Dr. Pia Alfonso, a physician conducting academic research in collaboration with Dr. Leo Celi of Harvard University, to inquire about the possibility of using hiQ's data for her research. Dr. Alfonso specifically cited the recent Ninth Circuit decision affirming the preliminary injunction. A true and correct copy of that email is attached as **Exhibit G**. My conversations with Dr. Alfonso are ongoing as of the date of this filing.

12. As these examples illustrate, and as I stated in my September 24, 2021 Declaration, hiQ continues to receive and explore commercial opportunities, and remains one commercial inquiry away from a paid engagement so long as it is protected by the preliminary injunction.

13. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed June 22, 2022, at Chicago, Illinois.

By: _____

Mark Weidick