ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for Defendant and Counterclaimant
LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>            Plaintiff<br><br>    v.<br><br>LinkedIn Corporation,<br><br>            Defendant.<br><br>───────────────<br>LinkedIn Corporation,<br><br>            Counterclaimant,<br><br>    v.<br><br>hiQ Labs, Inc.,<br><br>            Counter-Defendant. | Case No. 17-cv-03301-EMC<br><br>**DEFENDANT AND COUNTERCLAIMANT LINKEDIN CORPORATION'S ANSWER AND AMENDED COUNTERCLAIMS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge:  Hon. Edward M. Chen<br><br><br>Complaint Filed:    June 7, 2017<br>Trial Date:            February 27, 2023 |

# ANSWER

Defendant and Counterclaimant LinkedIn Corporation ("LinkedIn") hereby answers the allegations of Plaintiff and Counter-Defendant hiQ Labs, Inc. ("hiQ"), contained in hiQ's First Amended Complaint, as follows:

## INTRODUCTION[1]

1.      LinkedIn denies the allegations in Paragraph 1.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's former claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

2.      LinkedIn denies the allegations in Paragraph 2, except states that LinkedIn admits that it operates a social networking platform, and that it has over 660 million members.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's former claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

3.      As to Paragraph 3, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies the remaining allegations in Paragraph 3, except states that the quoted passage reproduced in this paragraph speaks for itself.

4.      As to Paragraph 4, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies the remaining allegations in Paragraph 4.

5.      As to Paragraph 5, the quoted passage reproduced in this paragraph speaks for itself; LinkedIn denies any implications that flow from the quotation.  LinkedIn denies all remaining allegations in this paragraph.

6.      As to Paragraph 6, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn admits that it sent hiQ a cease-and- desist letter on May 23, 2017, but denies the characterization of this letter as "unlawful."

---

[1] The headings in this Answer are hiQ's. LinkedIn repeats hiQ's heading for convenience only. References in this Answer to "Paragraphs" are to paragraphs in hiQ's First Amended Complaint.

That letter speaks for itself.  LinkedIn denies all remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

7.      As to Paragraph 7, LinkedIn admits that it sent hiQ a cease-and-desist letter on May 23, 2017.  That letter speaks for itself.  LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph.

8.      Except as specifically admitted herein, LinkedIn denies the allegations in Paragraph 8.  LinkedIn admits that it sent hiQ a cease-and-desist letter on May 23, 2017.  That letter speaks for itself.  LinkedIn denies that any of the letter's rationale was pretext.  LinkedIn admits that it has certain policies that govern the relationship between it and its members, including its User Agreement and Privacy Policy, documents which speak for themselves, but denies hiQ's paraphrasing of the text of these documents or any implications that hiQ is attempting to make from any text in any such documents.  The statement that "only this fifth category of information . . . is at issue here" is a legal conclusion to which no response is required.  To the extent a response is required, LinkedIn denies this allegation.

9.      Except as specifically admitted herein, LinkedIn denies the allegations in Paragraph 9.   LinkedIn admits that LinkedIn has demanded that hiQ cease-and-desist its automated access and copying of member information from LinkedIn's website without LinkedIn's authorization.  The statement that LinkedIn has no protectable interest in access to data on its website is a legal conclusion to which no response is required; to the extent a response is required, LinkedIn denies this allegation.  LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.

10.      Except as specifically admitted herein, LinkedIn denies the allegations in Paragraph 10.  The statements that LinkedIn has "no legitimate copyright claim" and that LinkedIn "cannot use those laws for an improper purpose" are legal conclusions to which no response is required; to the extent a response is required, LinkedIn denies them.  LinkedIn admits

1    that it sent hiQ a cease- and-desist letter on May 23, 2017.  That letter speaks for itself.

2         11.    Except as specifically admitted herein, LinkedIn denies the allegations in

3    Paragraph 11.  LinkedIn admits that it sent hiQ a cease-and-desist letter on May 23, 2017.  That

4    letter speaks for itself.  LinkedIn admits that it has certain policies that govern the relationship

5    between it and its members, including its User Agreement and Privacy Policy, documents which

6    speak for themselves, but denies hiQ's paraphrasing of the text of these documents or any

7    implications that hiQ is attempting to make from any text in any such document.  LinkedIn lacks

8    knowledge on which to confirm or deny hiQ's statements about itself or its customers, and on that

9    basis denies them.  The allegations in this paragraph are irrelevant to the extent they relate to

10   hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158)

11   and hiQ declined to amend (Dkt. 163).

12        12.    As to Paragraph 12, LinkedIn lacks knowledge on which to confirm or deny hiQ's

13   statements about itself or its customers, and on that basis denies them.  The statements about

14   remedies and hiQ's intended course of conduct in this litigation are legal conclusions to which no

15   response is required; to the extent any response is required, LinkedIn denies them.  LinkedIn

16   denies any other allegation in this paragraph to which any response is required.  The allegations in

17   this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act,

18   which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend

19   (Dkt. 163).

20                                    **THE PARTIES**

21        13.    LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about

22   itself, and on that basis denies the allegations of Paragraph 13.

23        14.    LinkedIn admits that it is a Delaware corporation with its principal place of

24   business in Sunnyvale, California, as alleged in Paragraph 14.

25                              **JURISDICTION AND VENUE**

26        15.    As to Paragraph 15, LinkedIn admits that hiQ has brought claims for relief

27   pursuant to several federal and state laws, and LinkedIn further alleges that it has brought

28   counterclaims under federal and state law as follows herein.  The remaining statements in this

paragraph are legal conclusions to which no response is required; to the extent any response is required, LinkedIn denies them, and any implication that it has violated any of the laws recited in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

16.     As to Paragraph 16, LinkedIn admits that hiQ has brought several claims for relief based in state law.  The remaining statements in this paragraph are legal conclusions to which no response is required; to the extent any response is required, LinkedIn denies them, and any implication that it has breached any of the laws recited in this paragraph.

17.     As to Paragraph 17, LinkedIn admits that its principal place of business is within this judicial district and that it conducts business within this judicial district.  The remaining statements in this paragraph are legal conclusions to which no response is required.

18.     As to Paragraph 18, LinkedIn admits that it conducts business within this judicial district.  The remaining statements in this paragraph are legal conclusions to which no response is required.

**INTRADISTRICT ASSIGNMENT**

19.     The statements in Paragraph 19 are legal conclusions to which no response is required.

**FACTUAL ALLEGATIONS**

20.     Except as specifically admitted herein, LinkedIn denies the allegations in Paragraph 20 and the unnumbered heading that precedes it.  LinkedIn admits that part of its business is operation of a social networking platform.  LinkedIn admits that over 500 million people have signed up for LinkedIn's website.  The statements quoted from LinkedIn's User Agreement speak for themselves.

21.     LinkedIn denies the allegations in Paragraph 21.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

22.     Except as specifically admitted here, LinkedIn denies the allegations in

Case No. 17-cv-03301-EMC
LINKEDIN'S ANSWER AND
AMENDED COUNTERCLAIMS

Paragraph 22.  LinkedIn admits that its website launched in May 2003; that it added hundreds of millions of members over the subsequent years; that over 660 million people in over 200 countries have signed up as members; that it receives more than 100 million unique visitors a month to its website; and that it has reported that up to 60% of U.S. companies have used it to hire employees at one point.

23.     Except as specifically admitted here, LinkedIn denies the allegations in Paragraph 23.  LinkedIn admits that it offers a platform for members to post information about their careers; that members can endorse other members for certain reasons; and that members can connect with other members through LinkedIn's platform.  LinkedIn denies any implications, stated or unstated, that flow from hiQ's characterization of LinkedIn's platform.

24.     LinkedIn denies the allegations in Paragraph 24.

25.     LinkedIn denies the allegations in Paragraph 25 and footnote 1.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

26.     As to Paragraph 26, most of the allegations in this paragraph, including the allegations that LinkedIn has "monopoly power" and there are barriers to entry, are legal conclusions to which no response is required; to the extent a response is required, LinkedIn denies the allegations.  LinkedIn denies the remaining allegations in this paragraph except that LinkedIn admits that it has invested significant resources in its business, but denies any inferences that hiQ seeks from this admission.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

27.     As to Paragraph 27, LinkedIn admits that it has certain policies that govern the relationship between it and its members, including its User Agreement and Privacy Policy, documents which speak for themselves, but denies hiQ's paraphrasing of the text of these documents or any implications that hiQ is attempting to make from any text in any such document.  LinkedIn denies the remaining allegations in this paragraph.

28.     Paragraph 28 consists predominantly of legal conclusions to which no response is required; to the extent that a response is required, LinkedIn denies them.  LinkedIn denies the remaining allegations in this paragraph.

29.     As to Paragraph 29, LinkedIn admits that it has several revenue streams, that it has many members, that it was acquired by Microsoft Corporation, and that its brand is widely recognized.  LinkedIn denies the remaining allegations in this paragraph.

30.     As to Paragraph 30 and the unnumbered heading that precedes it, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

31.     As to Paragraph 31, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.

32.     As to Paragraph 32, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.

33.     As to Paragraph 33, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.

34.     As to Paragraph 34 and footnote 2, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.

35.     As to Paragraph 35, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

36.     As to Paragraph 36 and footnote 3, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

37.     As to Paragraph 37 and the unnumbered heading that precedes it, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself or what happened at its conferences, and on that basis denies them.  LinkedIn admits that certain LinkedIn employees may have attended one or more Elevate conferences (and hiQ may have bestowed an award on one of them), but LinkedIn denies that it ever "sent" any employees to hiQ's conferences or that they ever had the actual or apparent authority to receive notice or otherwise act on behalf of or bind LinkedIn with respect to any matter of legal significance.  LinkedIn denies all remaining allegations in this paragraph as well.

38.     As to Paragraph 38, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies all remaining allegations in this paragraph as well.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

39.     As to Paragraph 39, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn admits that it sent a cease-and-desist letter to hiQ on May 23, 2017; that letter speaks for itself.  LinkedIn denies all remaining allegations in this paragraph for which any response is required.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

40.     As to Paragraph 40, the statements about the scope of LinkedIn's User Agreement are legal conclusions to which no response is required; to the extent a response is required, LinkedIn denies them.  The User Agreement speaks for itself.  LinkedIn denies all remaining allegations in this paragraph as well.  The allegations in this paragraph are irrelevant to the extent

they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

41.     As to Paragraph 41, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn admits that its in-house counsel and counsel for hiQ had a conversation on or around May 31, 2017, but denies that hiQ's description of the conversation is accurate or complete.  LinkedIn denies all remaining allegations in this paragraph.

42.     As to Paragraph 42, most of the statements in this paragraph are legal conclusions to which no response is required; to the extent that any response is required, LinkedIn denies them.  LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn admits that it has a right to control access to its private servers and website, and that it has a right to prevent abusive access to its website, but denies any implication that such rights do not encompass the right to exclude hiQ.  LinkedIn denies all remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

43.     As to Paragraph 43, LinkedIn admits that counsel for hiQ sent a letter to LinkedIn on May 31, 2017 but denies that the letter is complete or accurate and denies any implications, stated or unstated, that flow from the letter.  That letter speaks for itself.  LinkedIn denies that hiQ's allegations in this paragraph contain a complete or accurate recitation of the parties' interactions between May 31, 2017 and June 24, 2017.  LinkedIn admits that it sent hiQ a letter on June 24, 2017; that letter speaks for itself.  LinkedIn denies all remaining allegations in this paragraph as well.

44.     As to Paragraph 44, LinkedIn admits that it implemented an IP Address block for certain hiQ corporate IP Addresses for a short period of time in June 2017, but denies that this IP Address block in fact prevented hiQ's software from accessing LinkedIn's computers or website.  LinkedIn denies the remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court

dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

45.     As to Paragraph 45, LinkedIn admits that this Court issued an order granting hiQ's motion for a preliminary injunction on August 14, 2017.  That order speaks for itself.  LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  LinkedIn denies the remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

46.     LinkedIn denies the allegations in Paragraph 46.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

47.     As to Paragraph 47 and footnote 4, LinkedIn admits that certain reputable public search engines are granted express, limited, revocable permission to index certain portions of LinkedIn's website for search engine purposes, but denies any implication, stated or unstated, that flows from this admission.  LinkedIn denies the remaining allegations of this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

48.     As to Paragraph 48 and the unnumbered heading that precedes it, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself, and on that basis denies them.  The quoted statements in this paragraph speak for themselves but LinkedIn denies that hiQ has quoted them completely, accurately, or in the proper context.  LinkedIn denies the remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

49.     As to Paragraph 49, the quoted statement speaks for itself but LinkedIn denies that hiQ has quoted it completely, accurately, or in the proper context.  LinkedIn denies the remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they

relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

50.     As to Paragraph 50, LinkedIn lacks knowledge on which to confirm or deny hiQ's statements about itself and its interactions with others, and on that basis denies them.  LinkedIn denies the remaining allegations in this paragraph as well.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

51.     As to Paragraph 51, LinkedIn admits that hiQ sent it a letter on May 31, 2017, a letter which speaks for itself, but denies that the letter had any legal implications.  LinkedIn denies all remaining allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

52.     LinkedIn denies the allegations in Paragraph 52.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

53.     Most of the statements in Paragraph 53 and the unnumbered heading that precede it are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them.  LinkedIn denies the factual allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

54.     Most of the statements in Paragraph 54 are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them except that LinkedIn admits that there are many other companies providing people analytic services.  LinkedIn denies the factual allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

55.     Most of the statements in Paragraph 55 are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them except that LinkedIn

admits that there are many other companies providing people analytic services.  LinkedIn denies the factual allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

56.     The allegations in Paragraph 56 and the unnumbered heading that precedes it are legal conclusions to which no response is required; to the extent any response is required, LinkedIn denies them.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

57.     The allegations in Paragraph 57 are legal conclusions to which no response is required; to the extent any response is required, LinkedIn denies them.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

58.     Most of the statements in Paragraph 58 and the unnumbered heading that precedes it are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them, except to the extent that LinkedIn admits that its business uses the Internet.  LinkedIn denies the remaining factual allegations in this paragraph.  The allegations in this paragraph are irrelevant to the extent they relate to hiQ's claims under the Sherman Act, which the Court dismissed on September 9, 2020 (Dkt. 158) and hiQ declined to amend (Dkt. 163).

## FIRST CLAIM FOR RELIEF

59.     In response to Paragraph 59, LinkedIn repeats and incorporates its responses contained in the prior paragraphs as though fully set forth herein.

60.     The statement in Paragraph 60 is a legal conclusion to which no response is required.

61.     Most of the statements in Paragraph 61 are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them.  LinkedIn's prior statements to hiQ regarding its legal position speak for themselves.  LinkedIn denies the remaining allegations of this paragraph.

LINKEDIN'S ANSWER AND
AMENDED COUNTERCLAIMS

62.     The statement in Paragraph 62 is a legal conclusion to which no response is required.  LinkedIn denies that it has harmed hiQ in any way.

63.     The statement in Paragraph 63 is a legal conclusion to which no response is required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

**SECOND CLAIM FOR RELIEF**

64.     In response to Paragraph 64, LinkedIn repeats and incorporates its responses contained in the prior paragraphs as though fully set forth herein.

65.     Most of the statements in Paragraph 65 are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them.  LinkedIn's prior statements to hiQ regarding its legal position speak for themselves.  LinkedIn denies the remaining allegations of this paragraph.

66.     The statement in Paragraph 66 is a legal conclusion to which no response is required.  LinkedIn denies that it has harmed hiQ in any way.

67.     The statement in Paragraph 67 is a legal conclusion to which no response is required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

**THIRD CLAIM FOR RELIEF**

68.     In response to Paragraph 68, LinkedIn repeats and incorporates its responses contained in the prior paragraphs as though fully set forth herein.

69.     Most of the statements in Paragraph 69 are legal conclusions that require no response; to the extent they require any response, LinkedIn denies them.  LinkedIn's prior statements to hiQ regarding its legal position speak for themselves.  LinkedIn denies the remaining allegations of this paragraph.

70.     The statement in Paragraph 70 is a legal conclusion to which no response is required.  LinkedIn denies that it has harmed hiQ in any way.

71.     The statement in Paragraph 71 is a legal conclusion to which no response is required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

**FOURTH CLAIM FOR RELIEF**

72.     In response to Paragraph 72, LinkedIn repeats and incorporates its responses

1    contained in the prior paragraphs as though fully set forth herein.

2         73.    Most of the statements in Paragraph 73 are legal conclusions that require no

3    response; to the extent they require any response, LinkedIn denies them.  LinkedIn's prior

4    statements to hiQ regarding its legal position speak for themselves.  LinkedIn denies the

5    remaining allegations of this paragraph.

6         74.    The statement in Paragraph 74 is a legal conclusion to which no response is

7    required.  LinkedIn denies that it has harmed hiQ in any way.

8         75.    The statement in Paragraph 75 is a legal conclusion to which no response is

9    required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

10                           **FIFTH CLAIM FOR RELIEF**

11        76.    In response to Paragraph 76, LinkedIn repeats and incorporates its responses

12   contained in the prior paragraphs as though fully set forth herein.

13        77.    LinkedIn denies the allegations of Paragraph 77.  LinkedIn lacks knowledge

14   regarding hiQ's contracts.  To the extent the allegations in this paragraph consist of legal

15   conclusions, no response is required.

16        78.    LinkedIn denies the allegations of Paragraph 78.

17        79.    LinkedIn denies the allegations of Paragraph 79.

18        80.    LinkedIn denies the allegations of Paragraph 80.

19        81.    LinkedIn denies the allegations of Paragraph 81.

20        82.    The statements in Paragraph 82 are legal conclusions to which no response is

21   required.  To the extent any response is required, LinkedIn denies the allegations in this

22   paragraph.

23        83.    The statement in Paragraph 83 is a legal conclusion to which no response is

24   required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

25                           **SIXTH CLAIM FOR RELIEF**

26        84.    In response to Paragraph 84, LinkedIn repeats and incorporates its responses

27   contained in the prior paragraphs as though fully set forth herein.

28        85.    LinkedIn denies the allegations of Paragraph 85.

1   86.   The statements in Paragraph 86 are legal conclusions to which no response is

2   required.  To the extent any response is required, LinkedIn denies the allegations in this

3   paragraph.

4   87.   LinkedIn denies the allegations of Paragraph 87.

5   88.   The statements in Paragraph 88 are legal conclusions to which no response is

6   required.  To the extent any response is required, LinkedIn denies the allegations in this

7   paragraph.

8   89.   The statement in Paragraph 89 is a legal conclusion to which no response is

9   required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

10   **SEVENTH CLAIM FOR RELIEF**

11   90.   In response to Paragraph 90, LinkedIn repeats and incorporates its responses

12   contained in the prior paragraphs as though fully set forth herein.

13   91.   LinkedIn denies the allegations in Paragraph 91.

14   92.   The statements in Paragraph 92 are legal conclusions to which no response is

15   required.  To the extent any response is required, LinkedIn denies the allegations in this

16   paragraph.

17   93.   As to Paragraph 93, LinkedIn admits that it sent hiQ a cease-and-desist letter on

18   May 23, 2017.  That letter speaks for itself.  LinkedIn denies the remaining allegations in this

19   paragraph as well as hiQ's characterization of that letter.

20   94.   The statement in Paragraph 94 is a legal conclusion to which no response is

21   required.  To the extent any response is required, LinkedIn denies the allegation in this paragraph.

22   95.   LinkedIn denies the allegations in Paragraph 95.

23   96.   The statements in Paragraph 96 are legal conclusions to which no response is

24   required.  To the extent any response is required, LinkedIn denies the allegations in this

25   paragraph.

26   97.   The statement in Paragraph 97 is a legal conclusion to which no response is

27   required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

28   //

**EIGHTH CLAIM FOR RELIEF**

98.     In response to Paragraph 98, LinkedIn repeats and incorporates its responses contained in the prior paragraphs as though fully set forth herein.

99.     The statements in Paragraph 99 are legal conclusions to which no response is required.  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

100.    LinkedIn denies the allegations in Paragraph 100.

101.    The statements in Paragraph 101 are legal conclusions to which no response is required.  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

102.    The statement in Paragraph 102 is a legal conclusion to which no response is required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

**NINTH CLAIM FOR RELIEF**

103.    In response to Paragraph 103, LinkedIn repeats and incorporates its responses
        contained in the prior paragraphs as though fully set forth herein.

104.    As to Paragraph 104, the User Agreement speaks for itself.  LinkedIn denies that hiQ's quotations from the User Agreement are complete or in the proper context, and denies any implications, stated or unstated, that hiQ attempts to import from its quotations from the User Agreement.  LinkedIn denies the remaining allegations of this paragraph.

105.    LinkedIn denies the allegations of Paragraph 105.

106.    LinkedIn denies the allegations of Paragraph 106.

107.    The statements in Paragraph 107 are legal conclusions to which no response is required.  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

108.    The statement in Paragraph 108 is a legal conclusion to which no response is required.  LinkedIn denies that hiQ is entitled to any relief whatsoever.

**TENTH CLAIM FOR RELIEF**

109.    In response to Paragraph 109, LinkedIn repeats and incorporates its responses

Case No. 17-cv-03301-EMC
LINKEDIN'S ANSWER AND
AMENDED COUNTERCLAIMS

contained in the prior paragraphs as though fully set forth herein.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

110.    The statements in Paragraph 110 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

111.    The statements in Paragraph 111 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

112.    The statements in Paragraph 112 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

113.    The statements in Paragraph 113 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

114.    The statements in Paragraph 114 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

115.    The statements in Paragraph 115 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

116.    LinkedIn denies the allegations in Paragraph 116.  The Court dismissed the claim

1   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

2   complaint (Dkt. 163).

3          117.    LinkedIn denies the allegations in Paragraph 117.  The Court dismissed the claim

4   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

5   complaint (Dkt. 163).

6          118.    LinkedIn denies the allegations in Paragraph 118.  The Court dismissed the claim

7   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

8   complaint (Dkt. 163).

9          119.    LinkedIn denies the allegations in Paragraph 119.  The Court dismissed the claim

10  to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

11  complaint (Dkt. 163).

12         120.    The statements in Paragraph 120 are legal conclusions to which no response is

13  required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

14  (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

15  required, LinkedIn denies the allegations in this paragraph.

16         121.    LinkedIn denies the allegations in Paragraph 121.  The Court dismissed the claim

17  to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

18  complaint (Dkt. 163).

19         122.    LinkedIn denies the allegations in Paragraph 122.  The Court dismissed the claim

20  to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

21  complaint (Dkt. 163).

22         123.    The statements in Paragraph 123 are legal conclusions to which no response is

23  required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

24  (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

25  required, LinkedIn denies the allegations in this paragraph.

26         124.    The statements in Paragraph 124 are legal conclusions to which no response is

27  required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

28  (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

required, LinkedIn denies the allegations in this paragraph.

125.    LinkedIn denies the allegations in Paragraph 125.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

126.    LinkedIn denies the allegations in Paragraph 126.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

127.    The statements in Paragraph 127 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

128.    The statements in Paragraph 128 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

129.    The statements in Paragraph 129 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

130.    The statements in Paragraph 130 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

131.    LinkedIn denies the allegations in Paragraph 131.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

132.    LinkedIn denies the allegations in Paragraph 132.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

1   complaint (Dkt. 163).

2       133.    LinkedIn denies the allegations in Paragraph 133.  The Court dismissed the claim

3   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

4   complaint (Dkt. 163).

5       134.    LinkedIn denies the allegations in Paragraph 134.  The Court dismissed the claim

6   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

7   complaint (Dkt. 163).

8       135.    The statements in Paragraph 135 are legal conclusions to which no response is

9   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

10   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

11   required, LinkedIn denies the allegations in this paragraph.

12       136.    The statements in Paragraph 136 are legal conclusions to which no response is

13   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

14   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

15   required, LinkedIn denies the allegations in this paragraph.

16       137.    LinkedIn denies the allegations in Paragraph 137.  The Court dismissed the claim

17   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend

18   complaint (Dkt. 163).

19       138.    LinkedIn denies the allegations in Paragraph 138.  The Court dismissed the claim

20   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

21   complaint (Dkt. 163).

22       139.    LinkedIn denies the allegations in Paragraph 139.  The Court dismissed the claim

23   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

24   complaint (Dkt. 163).

25       140.    LinkedIn denies the allegations in Paragraph 140.  The Court dismissed the claim

26   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

27   complaint (Dkt. 163).

28       141.    The statements in Paragraph 141 are legal conclusions to which no response is

required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

142.    LinkedIn denies the allegations in Paragraph 142.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

143.    LinkedIn denies the allegations in Paragraph 143.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

144.    The statements in Paragraph 144 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

145.    LinkedIn denies the allegations in Paragraph 145.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

146.    The statements in Paragraph 146 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

147.    The allegations in Paragraph 147 are unintelligible.  LinkedIn denies them.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

148.    The statement in Paragraph 148 is a legal conclusion to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  LinkedIn denies that hiQ is entitled to any relief whatsoever.

//

1

**ELEVENTH CLAIM FOR RELIEF**

2      149.    In response to Paragraph 149, LinkedIn repeats and incorporates its responses

3   contained in the prior paragraphs as though fully set forth herein.  The Court dismissed the claim

4   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

5   complaint (Dkt. 163).

6      150.    The statements in Paragraph 150 are legal conclusions to which no response is

7   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

8   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

9   required, LinkedIn denies the allegations in this paragraph.

10      151.    The statements in Paragraph 151 are legal conclusions to which no response is

11   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

12   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

13   required, LinkedIn denies the allegations in this paragraph.

14      152.    LinkedIn denies the allegations in Paragraph 152.  The Court dismissed the claim

15   to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

16   complaint (Dkt. 163).

17      153.    The statements in Paragraph 153 are legal conclusions to which no response is

18   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

19   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

20   required, LinkedIn denies the allegations in this paragraph.

21      154.    The statements in Paragraph 154 are legal conclusions to which no response is

22   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

23   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

24   required, LinkedIn denies the allegations in this paragraph.

25      155.    The statements in Paragraph 155 are legal conclusions to which no response is

26   required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

27   (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

28   required, LinkedIn denies the allegations in this paragraph.

156.    LinkedIn denies the allegations in Paragraph 156.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

157.    The statement in Paragraph 157 is a legal conclusion to which no response is required; to the extent a response is required, LinkedIn denies it.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  LinkedIn denies that hiQ is entitled to any relief whatsoever.

## TWELFTH CLAIM FOR RELIEF

158.    In response to Paragraph 158, LinkedIn repeats and incorporates its responses contained in the prior paragraphs as though fully set forth herein.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

159.    The statements in Paragraph 159 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

160.    The statements in Paragraph 160 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

161.    LinkedIn denies the allegations in Paragraph 161.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

162.    The statements in Paragraph 162 are legal conclusions to which no response is required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is required, LinkedIn denies the allegations in this paragraph.

163.    The statements in Paragraph 163 are legal conclusions to which no response is

1  required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

2  (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

3  required, LinkedIn denies the allegations in this paragraph.

4          164.    LinkedIn denies the allegations in Paragraph 164.  The Court dismissed the claim

5  to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

6  complaint (Dkt. 163).

7          165.    The statements in Paragraph 165 are legal conclusions to which no response is

8  required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

9  (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

10  required, LinkedIn denies the allegations in this paragraph.

11          166.    The statements in Paragraph 166 are legal conclusions to which no response is

12  required.  The Court dismissed the claim to which this paragraph pertains on September 9, 2020

13  (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).  To the extent any response is

14  required, LinkedIn denies the allegations in this paragraph.

15          167.    LinkedIn denies the allegations in Paragraph 167.  The Court dismissed the claim

16  to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

17  complaint (Dkt. 163).

18          168.    The statement in Paragraph 168 is a legal conclusion to which no response is

19  required; to the extent a response is required, LinkedIn denies it.  The Court dismissed the claim

20  to which this paragraph pertains on September 9, 2020 (Dkt. 158) and hiQ declined to amend its

21  complaint (Dkt. 163).  LinkedIn denies that hiQ is entitled to any relief whatsoever.

22                                  **PRAYER FOR RELIEF**

23          169.    LinkedIn denies that hiQ is entitled to any relief whatsoever.  To the extent hiQ

24  prays for relief that is available to it under the Sherman Act but not under any of its other claims

25  for relief, such demand is ineffective because the Court dismissed hiQ's Sherman Act claims on

26  September 9, 2020 (Dkt. 158) and hiQ declined to amend its complaint (Dkt. 163).

27                                       **DEFENSES**

28          In addition to the above, LinkedIn sets forth below its defenses.  Each defense is asserted

as to all claims for relief against LinkedIn, except where otherwise noted.  By setting forth these defenses, LinkedIn does not concede that these are affirmative defenses and does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to hiQ.  Moreover, nothing stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter necessarily is relevant to hiQ's allegations.

<strong><u>FIRST DEFENSE</u></strong>

<strong>(Failure to State a Claim)</strong>

hiQ's Complaint fails to state a claim upon which relief can be granted or state facts sufficient to constitute a cause of action against LinkedIn.

<strong><u>SECOND DEFENSE</u></strong>

<strong>(No Actual Injury)</strong>

hiQ's claims are barred, in whole or in part, because it has suffered no injury in fact and therefore has suffered no damages for which LinkedIn is liable.

<strong><u>THIRD DEFENSE</u></strong>

<strong>(<em>Noerr-Pennington</em>)</strong>

hiQ's claims are barred, in whole or in part, insofar as they challenge the exercise of rights protected by the First Amendment of the Constitution of the United States and/or by the *Noerr-Pennington* doctrine.

<strong><u>FOURTH DEFENSE</u></strong>

<strong>(California Litigation Privilege)</strong>

hiQ's state-law claims are barred, in whole or in part, by the California Litigation Privilege, California Civil Code § 47.

<strong><u>FIFTH DEFENSE</u></strong>

<strong>(Unclean Hands)</strong>

hiQ's claims are barred, in whole or in part, by the doctrine of unclean hands.

//

//

## SIXTH DEFENSE

### (*In Pari Delicto*)

hiQ's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## SEVENTH DEFENSE

### (Statute of Limitations)

hiQ's claims are barred, in whole or in part, by the applicable statutes of limitations.

## EIGHTH DEFENSE

### (Laches)

hiQ's claims are barred, in whole or in part, by the doctrine of laches.

## NINTH DEFENSE

### (Consent)

hiQ's claims are barred, in whole or in part, by the doctrine of consent.

## TENTH DEFENSE

### (Failure to Mitigate)

hiQ's claims are barred, in whole or in part, by hiQ's failure to mitigate its damages, if any.

## ELEVENTH DEFENSE

### (Speculative or No Damages)

hiQ's claims are barred, in whole or in part, because LinkedIn did not cause, directly or indirectly, the alleged damages complained of, and the alleged damages, if any, are speculative and impossible to ascertain.

## TWELFTH DEFENSE

### (Intervening or Superseding Cause)

hiQ's claims are barred, in whole or in part, because the alleged damages, if any, were the result of one or more intervening or superseding causes or caused by the acts and/or omissions of persons other than LinkedIn.

//

//

Case No. 17-cv-03301-EMC
LINKEDIN'S ANSWER AND
AMENDED COUNTERCLAIMS

1

## THIRTEENTH DEFENSE

2

### (Unjust Enrichment)

3    hiQ's claims against LinkedIn are barred, in whole or in part, because it seeks a windfall

4    that it is not otherwise entitled to recover.

5

## FOURTEENTH DEFENSE

6

### (Adequate Remedy at Law)

7    The equitable relief that hiQ seeks is barred, in whole or in part, because hiQ has an

8    adequate remedy at law.

9

## FIFTEENTH DEFENSE

10

### (Legitimate Business Justification)

11    hiQ's claims against LinkedIn are barred, in whole or in part, because LinkedIn had

12    legitimate business and/or economic justifications for the conduct at issue.

13

## SIXTEENTH DEFENSE

14

### (Conduct Permitted by Law or Contract)

15    hiQ's claims against LinkedIn are barred, in whole or in part, to the extent that LinkedIn's

16    conduct was permitted by law or its contract with hiQ.

17

## SEVENTEENTH DEFENSE

18

### (Preemption)

19    hiQ's state law claims against LinkedIn are barred, in whole or in part, to the extent they

20    are preempted by federal law or the Constitution of the United States.

21

## EIGHTEENTH DEFENSE

22

### (Additional Defenses)

23    Because hiQ's Amended Complaint is often phrased in conclusory terms, LinkedIn cannot

24    fully anticipate all affirmative defenses that may be applicable to this action.  Accordingly,

25    LinkedIn has done its best to anticipate the possible affirmative defenses consistent with the

26    requirements of Federal Rule of Civil Procedure 8(c).  LinkedIn reserves the right to assert

27    additional defenses to the extent such defenses are or become applicable.

28    //

-26-                               Case No. 17-cv-03301-EMC

LINKEDIN'S ANSWER AND
AMENDED COUNTERCLAIMS

**COUNTERCLAIMS**

Counterclaimant LinkedIn Corporation ("LinkedIn"), by and through its attorneys, brings these counterclaims against counter-defendant hiQ Labs, Inc. ("hiQ").  At issue in this lawsuit is the ability of LinkedIn to enforce its own terms of service against a company that has brazenly violated them; to determine who can access the servers that LinkedIn owns and controls; and to safeguard the personal data that members entrust with LinkedIn.  LinkedIn alleges as follows:

**INTRODUCTION**

1.      LinkedIn is a social network, with over 700 million members around the globe.  LinkedIn's vision is to create economic opportunity for every member of the global workforce.  Its mission is to connect the world's professionals to make them more productive and successful.  Through its proprietary platform, LinkedIn allows its members to create and manage their professional histories and interests online.

2.      At the heart of LinkedIn's platform are its members, whose LinkedIn profiles serve as their professional online identities.  LinkedIn members post information to LinkedIn in order to network with, and be found by, other professionals on LinkedIn.  When a member posts an educational experience, crafts a narrative description of her skills, or makes a new connection, the member does so for these particular purposes.

3.      It is important that LinkedIn members have control over the information that they choose to publish about themselves.  People evolve and careers evolve, and the information and vocabulary that people use to describe themselves and their experiences evolve as well.  It is thus critical that members be able to control their information and how they describe themselves.  That's why when members delete information from LinkedIn, LinkedIn deletes it too.  And LinkedIn promises members that it will do so.

4.      Data scrapers—companies that systematically access, extract, and copy data from LinkedIn's servers through bots or other automated means on a massive scale—make no such promises.  They have no relationship with LinkedIn's members.  They do not ask permission of LinkedIn or its members to take member data, and they typically take member data without the knowledge of LinkedIn or its members.  They do not explain to members how they will use

member data and they do not promise to delete member data if a member removes that data from LinkedIn.  Thus, once a scraper has scraped a member's data, the members have no recourse to stop the scraper from copying, archiving, and forever keeping any information that the member ever published on LinkedIn.  The member cannot stop the scraper from, among other things, using that data to target spam, selling or inadvertently exposing that data to scammers, or combining that data with other data to create psychological profiles of users.[2]  In short, once data has been scraped, member data can end up in any number of databases controlled and used for any purpose.

5.       Data scraping therefore poses a significant threat to LinkedIn's business because it undermines the trust that LinkedIn has built with its members.  LinkedIn takes this trust very seriously, and its commitment to member trust is widely recognized:  LinkedIn was recently named the most trusted social network in the country according to the annual U.S. Digital Trust Survey by Insider Intelligence.[3]  According to the survey, which gathered views on nine different social networks, 73% of respondents agreed that LinkedIn protected their privacy and data, the highest marks in the survey.  Consumers have a wide range of social networks to choose from, and LinkedIn's business model, focused on trust, helps distinguish it from the field and plays a key role in LinkedIn's efforts to maintain and grow its user base.

6.       The loss of that trust has serious consequences for LinkedIn's members and for LinkedIn's business.  In order to protect the data that LinkedIn's members entrust to LinkedIn and maintain their trust, LinkedIn has invested significant technical and human resources to detect, limit, and block data scraping.  LinkedIn has a dedicated team of engineers whose full time job is to track and prevent scraping attempts.  On the technical side, LinkedIn has implemented over 200 custom rules to detect and prevent scraping, and has blocked over 100 million IP addresses that it suspects were being used by data scrapers.  Historically, LinkedIn's technical measures block over half of all requests for guest profiles on its servers

---

[2]    https://www.zdnet.com/article/data-firm-leaks-48-million-user-profiles-it-scraped-from-facebook-linkedin-others/.

[3]    https://www.adweek.com/programmatic/americans-trust-linkedin-with-their-data-but-they-are-wary-of-facebook/.

because they are coming from non-human sources.  LinkedIn's measures are designed to ensure that LinkedIn's website is used for its intended purpose of humans making connections with other humans and to protect members' expectations that their data will be used for that purpose.

7.     LinkedIn's User Agreement also plays an important role in setting member expectations and building trust by prohibiting "[s]crap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology" used to access the LinkedIn website.  Because LinkedIn cannot always stop scraping through its technical defenses, it must be able to resort to legal means to prevent scraping when necessary.

8.     hiQ is exactly the kind of data scraper that undermines the trust that LinkedIn members place in LinkedIn to safeguard their data.  hiQ's automated "bots" secretly extract and copy data from hundreds of thousands of LinkedIn pages at a rate far faster than any human could.  They circumvent LinkedIn's technical barriers, and operate in blatant violation of LinkedIn's User Agreement.  hiQ never obtains consent from LinkedIn or its members to scrape member data.  Indeed, it never even asks members, even though there is nothing stopping hiQ from doing so.  Once hiQ has scraped LinkedIn member data, there is no telling what hiQ might do with it.  hiQ has no enforceable contract with the members whose data it scrapes without their knowledge.  Nor does hiQ have any obligation to delete member data that it has scraped if members delete that data from LinkedIn.

9.     One known use that hiQ makes of the member data that it has furtively scraped is to fuel its "Keeper" product.  "Keeper" surreptitiously surveils every change that members make to their LinkedIn profiles in order to provide their employers with an analysis of whether the members may be looking for new jobs and are a "flight risk."  Members may not want such information provided to their employers.  Employees often do not disclose to their employers that they are considering leaving their jobs, and could risk adverse career consequences if their employers learn that they are thinking about leaving.  Indeed, to avoid this exact type of situation, many members choose the "Do Not Broadcast" option in their settings on LinkedIn to mute their profile changes.

10.    hiQ has long known that LinkedIn prohibits scraping.  In a 2017 article, hiQ's

Chief Technology Officer Dan Miller admitted that hiQ knew that "LinkedIn had been aggressively complaining about what they considered unfair scraping practices for some time," and that LinkedIn "went through a lot of trouble technically to make it difficult to collect that data."[4]  Yet knowing that LinkedIn did not want hiQ scraping its data did not stop hiQ from intentionally building its business around that premise.  Rather, hiQ went through substantial lengths to build scraping software that could avoid LinkedIn's background technical measures that seek to detect and block scraping.

11.     This was a risky business model that suffered from the obvious and inherent danger that LinkedIn would discover hiQ's furtive scraping, implement additional technical measures to attempt to block hiQ, and assert its legal rights against hiQ and ask hiQ to stop.  This risk came to pass in May and June of 2017, when LinkedIn sent hiQ a cease-and-desist letter demanding that hiQ stop scraping LinkedIn, explaining that hiQ's conduct violated its agreement with LinkedIn and a host of state and federal laws, and implemented targeted IP address blocks against hiQ.

12.     LinkedIn sent that letter, and asserts these counterclaims, to stop hiQ's illicit scraping.  LinkedIn is committed to protecting its users' privacy and safeguarding their trust, and the need to do so has become even more pronounced in the last several years, as scandals involving Cambridge Analytica,[5] Hyp3r,[6] Clearview AI,[7] and others have come to light.  For example, Clearview deployed bots to systematically scrape social media and other websites to amass a database of more than three billion personal photos, without the consent of those websites or their users.  It then exploited this scraped data to support a powerful facial recognition tool that it licensed to over 600 law enforcement agencies as well as select foreign governments and private companies.  When social media websites asked Clearview to stop, Clearview

---

[4]  https://www.bloomberg.com/news/features/2017-11-15/the-brutal-fight-to-mine-your-data-and- sell-it-to-your-boss.

[5]  https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html

[6]  https://www.zdnet.com/article/instagram-boots-ad-partner-hyp3r-for-mass-collection-of-user-data/;        https://www.businessinsider.nl/startup-hyp3r-saving-instagram-users-stories-tracking-locations-2019-8/.

[7]  https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

responded by saying that all it was doing was scraping "public photos."[8]  There is mounting

evidence that technology like Clearview's can be used in ways that pose fundamental threats to

our society.

13.     LinkedIn's members display information on their publicly viewable LinkedIn

profiles for a particular purpose—to be found by and network with other professionals and

advance their careers—and expect to retain control over the information they post consistent with

LinkedIn's User Agreement and Privacy Policy.  They do not expect that companies like hiQ,

with whom they have no relationship and have provided no consent, will harvest and exploit their

personal information en masse, and use it in ways that are inconsistent with their own expressed

intention and against their interests.  LinkedIn brings these counterclaims to stop this dangerous

behavior that harms LinkedIn's members and harms LinkedIn, by eroding the trust that lies at the

core of LinkedIn's relationship with its members.

## JURISDICTION AND VENUE

14.     This Court has federal question jurisdiction over this action under 28 U.S.C.

§§ 1331 and 1338 because this action alleges violations of the federal Computer Fraud and Abuse

Act, 18 U.S.C. § 1030.  The Court has supplemental jurisdiction over the state law causes of

action pleaded herein pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over hiQ because, as hiQ alleges, it has its

principal place of business in San Francisco, California.  Moreover, hiQ brought the instant action

in this judicial district, thereby submitting itself to the Court's jurisdiction.

16.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part

of the events or omissions giving rise to the claims occurred in this judicial district.  During all

relevant times, hiQ repeatedly, knowingly, and intentionally targeted its wrongful acts at

LinkedIn, which is headquartered in this judicial district.

## INTRADISTRICT ASSIGNMENT

17.     This case has been assigned to the Honorable Edward M. Chen.

---

[8]   https://www.cnet.com/news/clearview-ai-hit-with-cease-and-desist-from-google-over-facial-recognition-collection/.

1

**THE PARTIES**

2        18.      LinkedIn is a Delaware corporation with its principal place of business in

3    Sunnyvale, California.

4        19.      hiQ alleges that it is a Delaware corporation with its principal place of business in

5    San Francisco, California.

6

**FACTS**

7

**The LinkedIn Social Network**

8        20.      LinkedIn's mission is to connect the world's professionals to make them more

9    productive and successful.  Through its proprietary platform, LinkedIn members are able to create

10   and manage their professional identities online, build and engage with their network, access

11   shared knowledge and insights, and find business opportunities, enabling them to be more

12   productive and successful.  LinkedIn's broader vision is to create economic opportunity for every

13   member of the global workforce.

14       21.      At the heart of LinkedIn's platform are its members, who create individual profiles

15   that serve as their professional profiles online.  LinkedIn is available at no cost to anyone who

16   wants to join and who agrees to the terms of LinkedIn's User Agreement, Privacy Policy, and

17   Cookie Policy.  Today, LinkedIn has over 700 million members around the globe.

18       22.      LinkedIn members populate their profiles with a wide range of personal

19   information concerning their professional lives, including summaries (narratives about

20   themselves), job histories, skills, interests, educational background, professional awards,

21   photographs, and other information.

22       23.      LinkedIn has invested and plans to continue to invest substantial time, labor, skill,

23   and financial resources into the development and maintenance of the LinkedIn site.

24

**LinkedIn's Technical Safeguards and Security Measures Protect LinkedIn Against
Unauthorized Access**

25

26       24.      LinkedIn works hard to protect the integrity and security of its network and

27   systems.  Among other things, it employs an array of technological safeguards and barriers

28   designed to prevent data scrapers, bots, and other automated systems from accessing and copying

its members' data on a large scale.  It has a dedicated team of engineers whose full-time job is to detect and prevent scraping, and maintain LinkedIn's technical defenses.

25.     LinkedIn's website and servers are not unconditionally open to the general public. Rather, each call to LinkedIn's servers requires LinkedIn to authorize or permit the party seeking access to LinkedIn's servers to view information on LinkedIn's website.  This is because LinkedIn's servers are protected by sophisticated defenses designed to prevent unauthorized access and abuse that evaluate whether to grant each request made to LinkedIn's servers. LinkedIn's technical defenses currently block hundreds of millions of requests to access guest profiles per day from bots and scrapers, which constitute the majority of the requests made to LinkedIn's servers for guest profiles.  That is, LinkedIn rejects more requests to access guest profiles (i.e. denies authorization or permission to obtain information from LinkedIn's servers) than it authorizes.

26.     LinkedIn has many different technical systems that detect and block both logged-in and logged-out scraping.  One such safeguard is LinkedIn's FUSE system.  FUSE scans and imposes a limit on the activity that an individual LinkedIn member may initiate on the site.  This limit is intended to prevent would-be data scrapers utilizing automated technologies from quickly accessing a substantial volume of member profiles.

27.     Another protection measure is LinkedIn's Sentinel system, through which LinkedIn's defenses scan, throttle, and block suspicious activity associated with particular accounts and IP addresses.  Through Sentinel, LinkedIn maintains a list of IP addresses that are not permitted to make calls on LinkedIn's servers because they either have in the past or are engaged in abuse.  An IP address is a unique sequence of integers or letters that identifies a computer when that computer is communicating over the Internet (or some other network of computers).  Any computer connected to the Internet must have an IP address while it is connected to the Internet.  LinkedIn has restricted over 100 million IP addresses that have attempted to access LinkedIn's servers in ways that challenge or circumvent LinkedIn's technical defenses.  LinkedIn adds IP addresses to this list daily, either automatically as its machine learning model detects scraping attempts, or manually as needed by LinkedIn's dedicated team.

28.     Business entities generally have IP addresses that remain static.  This means that computers connected to the Internet from a given business generally will keep the same IP address each time those computers access the Internet.  Because LinkedIn's servers receive the IP addresses of computers sending calls to LinkedIn's servers, LinkedIn can program its servers to block calls originating from specific IP addresses.  When LinkedIn does this, LinkedIn's servers will not return information in response to any calls received from blocked IP addresses, but will return an error message.  In June 2017, LinkedIn implemented targeted blocks as to hiQ's known IP addresses.

29.     In order for a business entity to access LinkedIn's computers after confronting an IP block, that business entity must circumvent the IP block.  In other words, it must use a computer with an IP address that is different from those that the business normally uses, or must otherwise make its requests to LinkedIn's servers look like they are coming from other computers by using proxy servers or other masking techniques.

30.     LinkedIn also employs over 200 custom rules that it applies to requests made to its servers to determine whether the requests is from a human or a bot.  These rules include artificial intelligence-based models and proprietary algorithms.  LinkedIn's dedicated team is constantly monitoring the effectiveness of its rules, adding to them and editing them in an effort to keep up with scrapers.

31.     Some of these rules fall under the Member and Guest Request Scoring systems, which also restrict automated, non-human forms of access that facilitate scraping.  The Member Request Scoring System monitors page requests made by LinkedIn members while logged into their accounts.  If high levels of activity are detected for certain types of accounts, the member is logged out and may either be warned, restricted, or challenged with a CAPTCHA[9] in order to log back into LinkedIn.

32.     Similarly, the LinkedIn Guest Request Scoring system monitors and limits page requests made by users who are not logged into LinkedIn.  If unusual patterns or high levels of

---

[9]     CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart."

Case No. 17-cv-03301-EMC

LINKEDIN'S ANSWER AND
AMENDED COUNTERCLAIMS

activity are detected, the user is redirected to LinkedIn's log-in page and is prevented from viewing additional LinkedIn pages while not logged in.

33.     LinkedIn also employs a "robots.txt" file, which is a technical protocol that is designed to prevent unauthorized access by bots.  This file, available at https://www.linkedin.com/robots.txt, provides a set of instructions to any automated technologies visiting the LinkedIn site, as well as an explicit warning in plain-to-read prose that the use of bots to access LinkedIn without express permission is strictly prohibited.  While LinkedIn's robots.txt file does permit some webcrawlers (e.g., search engines such as Google or Bing) to crawl and index the site, it prohibits and is intended to prevent automated bots like those used by hiQ.

34.     Much of the information on LinkedIn's website is behind a password barrier as well.  Periodically, LinkedIn will prevent "logged-out" users from viewing more than a certain number of pages before being asked to enter a user name and password to see more.

35.     LinkedIn's technical measures are vitally important to ensuring that the website is available to legitimate human users.  This, in turn, helps build and protect member trust.

**LinkedIn's Legal Prohibitions on Data Scraping and Other Unauthorized Conduct and hiQ's Assent to LinkedIn's User Agreement**

36.     LinkedIn's User Agreement[10] also prohibits accessing and scraping LinkedIn's website through automated software and other technologies.

37.     LinkedIn's User Agreement explains that members, users, and visitors to the LinkedIn website must abide by certain restrictions in accessing and using the LinkedIn website. The relevant version of the User Agreement, effective October 23, 2014, states that "You agree that by clicking 'Join Now' 'Join LinkedIn', 'Sign Up' or similar, registering, accessing or using our services …, you are entering into a legally binding agreement (even if you are using our Services on behalf of a company)." The current version contains similar language.

38.     hiQ agreed to the User Agreement on several different occasions.

39.     hiQ has admitted in this litigation that "hiQ was itself a LinkedIn member with a

---

[10]     *See* https://www.linkedin.com/legal/user-agreement (last visited November 19, 2020).

1   business profile page on LinkedIn."[11]

2        40.    hiQ has maintained a Company Page on LinkedIn.

3        41.    In order for a user to create a Company Page on LinkedIn, that user must have

4   signed up as a member, and therefore have already consented to the User Agreement.  LinkedIn's

5   records indicate that hiQ's Company Page was set up by hiQ's then-Chief Operating Officer

6   Xander Oltmann on June 23, 2014.  Mr. Oltmann is also a LinkedIn member who agreed to the

7   User Agreement.

8        42.    hiQ also affirmatively agreed and assented to the LinkedIn Subscription

9   Agreement ("LSA")[12] when it purchased a company license for LinkedIn's Sales Navigator

10   product.  On December 23, 2015, Darin Medeiros, hiQ's Vice President of Sales, Marketing and

11   Operations signed a contract for hiQ to purchase Sales Navigator.  The LSA is incorporated by

12   reference into that contract.  The Sales Navigator company license that hiQ purchased cost

13   thousands of dollars.

14        43.    The LSA incorporates the LinkedIn User Agreement, stating in Section 2.1 that the

15   "terms of the User Agreement are incorporated into this LSA.  Customer will ensure that

16   Customer Users comply with the User Agreement." Hence, by affirmatively agreeing and

17   assenting to the LSA, hiQ also agreed to and assented to the User Agreement.

18        44.    Beginning on January 25, 2016 and throughout 2016, hiQ also purchased

19   advertising on LinkedIn.

20        45.    In doing so, it agreed to LinkedIn's Ads Agreement, which in turn incorporates the

21   User Agreement.  To agree to the Ads Agreement, one has to click through a screen where the

22   Ads Agreement is hyperlinked above the button on which one needs to click to assent, as

23   demonstrated by the below screenshot:

24

25

26   _____

27   [11]   hiQ's Memorandum of Points and Authorities in Support of Renewed Ex Parte Motion for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, Dkt. 24 at 12.

28   [12]   The version that hiQ agreed to is dated November 15, 2015.

46.     The LinkedIn Ads Agreement provided that "in addition" to "this Agreement, the standard LinkedIn User Agreement … applies to your use of the LinkedIn Ads service," and that "[a]s a consequence of your violation of any of the aforementioned agreements, LinkedIn may, at its sole discretion, prohibit you from any further participation in the LinkedIn Ads service and any other service or program offered by LinkedIn, or suspend or remove your LinkedIn account. LinkedIn may undertake technical measures in furtherance of such prohibition."

47.     There are also dozens of current and former employees of hiQ who maintain individual member profiles on LinkedIn and who have agreed to the LinkedIn User Agreement.

48.     The User Agreement expressly prohibits scraping LinkedIn's website.

49.     Section 8.2 of the User Agreement prohibits those who are bound to the agreement from engaging in any of the following activities:

- "Us[ing] … automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";
- "Us[ing] bots or other automated methods to access the Services";
- "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology"; and
- "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or related any information or data."

50.     As explained above, hiQ was aware and on actual notice of LinkedIn's User Agreement and LinkedIn's prohibitions against scraping for *years*.  Moreover, hiQ agreed to abide by LinkedIn's User Agreement, including its prohibitions against scraping and related conduct, on multiple occasions.

51.     In addition to agreeing to the User Agreement, as explained above, LinkedIn also

provided hiQ actual notice of the content of Section 8.2 of the User Agreement when it sent hiQ its initial cease and desist letter on May 23, 2017.  Since at least May 23, 2017, hiQ has therefore known that any future use of LinkedIn's website is conditioned on abiding by LinkedIn's User Agreement.  By its terms, the User Agreement applies not only to LinkedIn members, which hiQ was, but to anybody who uses LinkedIn's website.

52.     Section 3.4 of the User Agreement specifically provides that LinkedIn "reserves the right to restrict, suspend, or terminate" a person or entity's access to LinkedIn.  This provision is necessary to allow LinkedIn to police its own website and violations of the User Agreement.

53.     LinkedIn takes violations of its User Agreement by any user of its website seriously, and routinely takes action against such violations.  LinkedIn has restricted over 27 million accounts for engaging in behavior violating the User Agreement including scraping, fraud, and spamming.

While LinkedIn is often able to get bad actors to agree to cease their bad behavior short of filing a lawsuit, LinkedIn has also enforced its rights in court on several occasions.  *See LinkedIn Corporation v. Robocog Inc.*, No. 14 Civ. 0068 (N.D. Cal.); *LinkedIn Corporation v. Scraping Hub Limited*, No. 16 Civ. 4463 (N.D. Cal.); *LinkedIn Corporation v. Raphael Azot and Dataspectre*. No. 16 Civ. 4463 (N.D. Cal.).

**LinkedIn Member Privacy Choices**

54.     The privacy choices that LinkedIn offers its members are fundamentally important to their decisions to entrust information to LinkedIn and to LinkedIn's platform.  hiQ's illicit scraping implicates several of them.

55.     In its Privacy Policy, LinkedIn sets limits regarding what LinkedIn can and cannot do with member data.  The Privacy Policy expressly informs members that search engines may index and display information in their profiles.  LinkedIn limits such indexing to well-known search engines, such as Google, Bing and Duck Duck Go.  LinkedIn permits members to choose the parts of their profiles that search engines index, or to opt out of this feature entirely.  Members thus have choice about whether they want search engines to index their profiles and display them in relevant search results.  LinkedIn offers members this choice because it allows members to be

found via search engines, which link to their LinkedIn profiles, where the member has stored and controls his or her profile information.  In other words, this is a policy that benefits LinkedIn's members and is consistent with their expectations about how their data will be used.

56.     The Privacy Policy also promises that if a member decides that he or she wants to delete his or her profile, LinkedIn will permanently delete the account and all of the data that the member posted to LinkedIn within 30 days.  Members' ability to remove their own information helps ensure that members are the ones who have ultimate control over it.

57.     Another privacy control that LinkedIn offers is the "Do Not Broadcast" setting. LinkedIn's platform allows members to update their profiles at any time with, for example, a new employer, position, or skill.  When a member updates the information in his or her profile, LinkedIn lets that member choose whether to broadcast that change on LinkedIn.  If a member decides that he or she does not want to broadcast changes to his or her profile, that member can click on a radio button and make that choice.  If a member elects to employ this "Do Not Broadcast" setting, then any changes that the member makes to his or her profile will be visible, but the fact that the member made a change will not be broadcast to his or her LinkedIn connections or to anyone else.

58.     LinkedIn implemented the "Do Not Broadcast" feature in the 2009-2010 timeframe in response to feedback from LinkedIn members who were hesitant to update their profiles for fear that their co-workers or employers would suspect they were searching for a new job or otherwise thinking of leaving their current jobs.

59.     LinkedIn offers members the ability to elect this "Do Not Broadcast" setting in numerous places.  First, LinkedIn members can go into their privacy settings and select this feature at any time, as demonstrated by the following screenshot:

60.     Second, LinkedIn provides members the option of electing the "Do Not Broadcast" feature in real-time anytime the member goes to make a change to his or her profile, by surfacing the feature directly in the dialog box in which the member makes profile changes.

61.     Many LinkedIn members have taken advantage of this privacy feature.  Over 88 million LinkedIn members have elected to employ the "Do Not Broadcast" feature in the last three years.  Of the 136 million members who updated their profiles in the last year, 36 million employed the "Do Not Broadcast" privacy setting—which is approximately 26% of those members.  When members select "Do Not Broadcast," LinkedIn respects this choice in its other products, such as Recruiter.

62.     hiQ claims that it has three customers (eBay, Capital One, and GoDaddy) and several "potential" customers (including Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier, and Jobvite).  As of 2017, over 100,000 LinkedIn members that work for these companies have taken advantage of the "Do Not Broadcast" privacy setting.

### hiQ's Unlawful Data Scraping Activities

63.     hiQ has engaged in widespread scraping of LinkedIn's website, circumventing LinkedIn's technical measures and violating the User Agreement.  hiQ does not deny this. Although it formerly obscured the sources from which it harvested data to put into its products, stating only that it applied its algorithms to "public data sources,"[13] its filings in this very case concede that it scrapes significant amounts of data from LinkedIn.  Since its original complaint, hiQ has alleged that it uses LinkedIn member data "as raw data for its analysis and has historically used a variety of software and manual means to gather this information" from LinkedIn's website.[14]

64.     hiQ has never asked LinkedIn for permission to scrape LinkedIn's servers.  hiQ did surreptitiously apply to LinkedIn for other means of obtaining the data, and was denied.

65.     LinkedIn has never granted hiQ permission to scrape its servers.

66.     After scraping data from LinkedIn's servers, hiQ used the data for at least two

---

[13]  Dkt. 26 at 10.

[14]  Dkt. 1, ¶ 18; *see also* Dkt. 131 (First Amended Complaint) ¶ 34.

products that it sold to customers: (1) "Keeper," which hiQ claims tells employers which of their employees are flight risks, and (2) "Skill Mapper," which hiQ claims offers a summary of the breadth and depth of aggregate or individual skills possessed.  hiQ claims to have sold these products to companies who want to keep better tabs on their employees.  hiQ does not obtain permission from LinkedIn's members before scraping their LinkedIn data, nor do LinkedIn members have any enforceable way to limit what hiQ does with their data after it has been scraped.

67.     hiQ's system used different terminology for its scraping methods, including "blind scraping," which targeted categories or groups of profiles such as by employer, industry, or position, and "core scraping," which targeted specific employees of its customers by name.  In order for the Keeper product to be commercially successful, hiQ needed to obtain "coverage" of the employees of its customers—in other words, it needed to be able to find a high percentage of their profiles on LinkedIn and follow those profiles over time.  Changes to LinkedIn profiles of hiQ's customer employees were the strongest signal that it used in its data modelling for the Keeper product.

68.     In order to conduct its core scraping operations to support its Keeper product, hiQ needed to find a way to validate URLs in order to identify a sufficient number of employees for scraping.  hiQ built a system for use by hired contractors referred to as "mechanical turkers."  At first, these turkers used their existing individual LinkedIn accounts to conduct their hiQ operations.  After their legitimate accounts were restricted for unauthorized use, however, hiQ's turkers had to circumvent LinkedIn's password wall by creating fake accounts in further violation of LinkedIn's User Agreement.  hiQ instructed the turkers to create fake LinkedIn accounts and to use those fake accounts to log in to LinkedIn in order to search for and copy the employee URLs into hiQ's system.  hiQ's core scraping system utilized the data obtained by turkers while logged in using fake accounts and its Keeper product depended on hiQ's logged-in turkers to obtain a sufficient number of employee profiles.  Numerous hiQ employees also utilized fake LinkedIn accounts to test scraping, to analyze profiles, and to support other aspects of hiQ's system.  hiQ used fake accounts to obtain unauthorized access to LinkedIn's servers.  All of these activities

violated LinkedIn's User Agreement.  While hiQ touted to this Court that it only engaged in "logged-out" scraping, in fact hiQ depended upon a range of logged-in conduct to develop and support its business, including its scraping activity.

69.    With respect to that scraping activity, hiQ used bots to make many unauthorized access requests on LinkedIn's servers in order to scrape data from millions of profiles of LinkedIn members.  LinkedIn's best estimate of the number of such unauthorized access requests is that it ranged into the billions, but the true number is unknown because hiQ destroyed the server logs that would have provided that information.

70.    hiQ's bots are sophisticated and programmed in ways to evade LinkedIn's technical defenses.  hiQ used a variety of methods with its bots in order to simulate human conduct in an effort to evade LinkedIn's defenses, including cookies, user-agents, timing and throttling restrictions, and other methods.  hiQ's bots also used residential IP addresses purchased from third parties in order to conceal hiQ's activity.

71.    Nonetheless, LinkedIn's general technical anti-scraping defenses were effective against hiQ even prior to May 23, 2017.  These defenses, applicable to all guest requests, blocked scraping from IP addresses that LinkedIn only later discovered (in this lawsuit) were used by hiQ at its office and by its employees while they were testing hiQ's scraping system.  LinkedIn's guest-request defenses blocked requests from IP addresses associated with certain cloud providers known to be used by scrapers and used by hiQ.  LinkedIn implemented its "bot-model," a machine-learning based defense, in the Spring of 2017.  LinkedIn was then able to identify scrapers based on additional indicators, and trigger IP blocks.  As LinkedIn has learned through discovery in this lawsuit but did not know at the time it sent its cease and desist letter, its general anti-abuse systems were of such increasing effectiveness against hiQ over time that hiQ's scraping of LinkedIn had been shut down completely by the Spring of 2017.

72.    hiQ responded to these defenses using a variety of techniques.  hiQ understood well that its profile access requests were not authorized by LinkedIn.  In the words of its software engineer responsible for scraping at the time, "LinkedIn does NOT want us in the party."  Both its CTO and its new CEO knew about other lawsuits that LinkedIn had filed against scrapers.  hiQ

expressly agreed repeatedly to LinkedIn's User Agreement in a variety of commercial contexts where it purchased services from LinkedIn, and multiple officers of the Company received notice of updates to its terms.  Its CTO reviewed the terms of the User Agreement and quoted the scraping prohibition to multiple officers of the company.  hiQ applied to LinkedIn for API access as a means of obtaining authorization to obtain member profile data, and was rejected.  hiQ knew that its conduct was inconsistent with LinkedIn's User Agreement and therefore not authorized, it simply took the view that it was not bound by that Agreement so long as it conducted its scraping on a "logged out basis"—which was a fiction in any event because hiQ's scraping system was not sufficient to deliver its product without its logged-in turking.

73.     Despite its knowledge that its requests for LinkedIn profiles were not authorized, hiQ engaged in a variety of efforts over time to get around LinkedIn's anti-abuse technical defenses.  It purchased proxy IP addresses to evade the blocks on those addresses LinkedIn had identified as belonging to a scraper, in order to conceal its identity as a scraper from LinkedIn's anti-abuse systems.  hiQ engaged in a program to "reverse engineer" LinkedIn's defenses in order to defeat them.  A hiQ engineer monitored information about LinkedIn's bot detection program and then conducted numerous experiments designed to simulate ordinary human browsing (instead of scraper) conduct.  Despite these efforts by hiQ, LinkedIn's guest-request defenses successfully identified and blocked hiQ as one of many anonymous scrapers.  Indeed, hiQ's new CEO reported to the Board within weeks of taking his position that scraping was a serious problem faced by the company.  hiQ held an internal "Data Scraping Summit" on May 2, 2017.  Less than two weeks later on May 15, hiQ's inability to obtain profile data was a significant subject at a meeting of its Board of Directors.  Although LinkedIn did not know it at the time due to hiQ's efforts to conceal its identity, when it sent its cease and desist letter to hiQ on May 23, 2017, LinkedIn had already effectively blocked hiQ as a scraper.

74.     hiQ does not sell its products to employees.  In fact, hiQ's "Keeper" product would lose its functionality if employees knew that their employers were using it.  Many employees who want to find new jobs do not want their employers to know that they are looking for other jobs.

1    75.    hiQ has no contractual relationship with LinkedIn's members and does not obtain

2    permission from LinkedIn or its members to scrape their data from LinkedIn's website.  Once hiQ

3    has a member's data, no enforceable privacy policy or terms of service between hiQ and the

4    people whose data it has scraped limit what hiQ could do with that data.

5    76.    hiQ's scraping does not respect the privacy choices that LinkedIn's members have

6    made, including the Do Not Broadcast feature, or subsequently make after the data has been

7    scraped.  Rather, hiQ's products defeat the privacy protection LinkedIn offers.  Indeed, a goal of

8    hiQ's "Keeper" product is to tell employers when LinkedIn members change their profiles, even

9    if members have chosen not to broadcast such changes to their connections (including their

10   employers).

11   77.    After LinkedIn discovered hiQ's illicit scraping, it sent a cease-and-desist letter to

12   hiQ on May 23, 2017 requesting that hiQ stop scraping LinkedIn data and explicitly stating that

13   any further access to LinkedIn's servers was unauthorized.  LinkedIn demanded that hiQ, *inter*

14   *alia*, cease accessing LinkedIn's servers, destroy all data it obtained, and cease violating the User

15   Agreement.

16   78.    Thereafter, hiQ sued LinkedIn and obtained a preliminary injunction.

17            **hiQ Has Caused and Threatens Ongoing and Irreparable Injury to LinkedIn**

18   79.    By engaging in the activities described above, hiQ has caused, and if not halted

19   will continue to cause, ongoing and irreparable harm to LinkedIn, in a variety of ways, including

20   ongoing and irreparable harm to its consumer goodwill.  hiQ admits that it has scraped data from

21   hundreds of thousands of LinkedIn users without their consent.  hiQ's conduct should be

22   permanently enjoined.

23   80.    LinkedIn's members entrust to LinkedIn their professional histories and interests

24   on LinkedIn's site.  LinkedIn will suffer ongoing and irreparable harm to its consumer goodwill

25   and trust, which LinkedIn has worked hard for years to earn and maintain, if hiQ's conduct

26   continues.  LinkedIn has received numerous complaints from members when they suspect third

27   parties of scraping their data.

28   81.    The below complaint, from June 2017, shortly after hiQ sued LinkedIn, is

representative of the complaints that LinkedIn receives.  In it, the member asked why a third party was "allowed to harvest and republish" his LinkedIn data and asked LinkedIn "[w]hat protection do you offer LinkedIn members?"  This demonstrates that members expect that LinkedIn will take action to preserve their privacy and protect data that members post to LinkedIn's website. LinkedIn has received myriad complaints like this.

> Your Question : Why is holaconnect.com allowed to harvest and republish our data? Because they have a LinkedIn profile, they can harvest easily. Are they selling it? Spamming us? What protection do you offer LinkedIn members? Or do you encourage their use of our data? Thanks

82.     The below complaint is another example of the types of complaints that LinkedIn gets when members find information that they entrusted to LinkedIn posted on third party websites.  In the below complaint, the member laments that once the member's information has been taken by a third party, the member no longer controls it and can no longer delete it or make it private, as would be the case with information that hiQ takes:

> **Member** (02/13/2017 22:41 CST)
>
> Email: : ███████@gmail.com
>
> ta_group :
>
> Your Question : Hi, I recently was let know by a friend that Rocketreach site carried information that I had on my linked in profile previously and displayed it unprotected. https://rocketreach.c███████████████████ I will choose to keep what I want in my linkedin profile (either private or public) which is my choice and I will modify my profile when I want to. I could have even changed my profile details and modified my settings on linkedin. But it is not right for Rocketreach to display the information I previously carried on my Linkedin profile. How does Rocketreach get the permission to display my information to everyone without my authorization. I see this as a very serious privacy violation and what is Linkedin's stand on Other providers using APIs to gather information from Linkedin Profile and displaying outdated information without the consent of the users. It defeats the purpose of updating my linkedin profile and making details private. Thanks, ███.

83.     LinkedIn members have also complained about hiQ's scraping.  For example, one member complained:  "How the hell does hiQ Labs, Inc. get the right to scrape data we placed on LinkedIn? Is it just me or have things gotten way off the rails."

84.     LinkedIn has expended hundreds if not thousands of hours of employee time in maintaining its technical defenses and investigating and responding to hiQ's unlawful activities, at a cost to LinkedIn well in excess of $5,000.

85.     Scraping also threatens the trust that LinkedIn has built with its members, which could decrease member engagement.  hiQ's actions – which are focused only on its narrow interest to exploit LinkedIn data for its own benefit – detracts from the significant investments

and efforts undertaken by LinkedIn to ensure the LinkedIn platform is valuable to all members.

86.     Although LinkedIn has been plagued by unauthorized scraping traffic since the early days of the platform, scraping traffic has grown substantially over the past few years. Despite clear instructions to robots and clear policies prohibiting bots and scraping, LinkedIn nonetheless receives many millions of unauthorized requests of its servers from bots every day. The volume of such unauthorized traffic was meaningful by the time hiQ began its operations, reached 95 million requests per day by the outset of the parties' dispute, and has further increased dramatically during this litigation.

87.     Unauthorized scrapers like hiQ present multiple problems for LinkedIn.  First, while any particular scraper may start small, if it is successful it will seek to expand its automated data collection, increasing the number of calls to LinkedIn's servers.  Second, taken in the aggregate, automated scrapers place a substantial burden on LinkedIn's infrastructure—reaching at present into hundreds of millions of blocked access requests per day.  While of course LinkedIn configures its platform infrastructure to be resilient and scalable, the significant volume of automated scraping activity forces LinkedIn to invest more in capital and operational resources than it otherwise would if it were able to prevent these access requests from ever happening. Scraping operations force LinkedIn to alter its priorities for use of its computing resources and impair the efficiency of such resources.  The current volume of bot requests could easily impair the ability of many websites that do not invest as much in their infrastructure as LinkedIn does.

88.     If hiQ were allowed to scrape unlimited numbers of pages, others would surely follow.  It is only because of LinkedIn's ongoing protection efforts as well as its willingness to spend increasing amounts to maintain a high service level that it has been able to prevent a degradation in the quality of its services.  Attempts to scrape LinkedIn's website are now so rampant that LinkedIn currently blocks the majority of daily requests to access guest LinkedIn profiles—in the hundreds of millions of requests.  In other words, but for LinkedIn's blocking efforts and its investment in first-in-class back-end infrastructure, LinkedIn's servers would spend more time and resources responding to unauthorized requests for guest profile information from scrapers like hiQ than they would responding to people requesting such information in good faith

1    and in compliance with the scope of permission afforded by LinkedIn.

2         89.    If LinkedIn has no legal means to prevent the ongoing escalation of these

3    automated scraping efforts, then its cost structure for infrastructure will also continue to

4    escalate—even assuming that its self-help efforts continue to be successful.  LinkedIn will be

5    forced into making the choice of investing more in its infrastructure to ensure the availability of

6    its website, or succumbing to the burden of bot-based scraping.  This is not much of a choice, as

7    surely LinkedIn, like any business, would prefer to have its website remain available.  But this

8    outcome means that LinkedIn must plan its infrastructure around the whims of others, which

9    means that its property is no longer its own.

10        90.    Left unchecked, scraping activity like hiQ's is both likely to be expanded and

11   replicated by others, causing LinkedIn harm in the form of impaired condition, quality and value

12   of both its infrastructure and services.

13                           **FIRST CLAIM FOR RELIEF**

14          **Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA")[15]**

15        91.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

16        92.    LinkedIn's computers and servers are involved in interstate and foreign commerce

17   and communication, and are protected computers under 18 U.S.C. §1030(e)(2).

18        93.    hiQ knowingly and intentionally accessed LinkedIn's computers and servers

19   without authorization or in excess of authorization.

20        94.    LinkedIn's website and servers are not unconditionally open to the general public.

21   Rather, they require authorization or permission from LinkedIn to access.  LinkedIn uses various

22   technological barriers to protect its computers, servers, and member data against unauthorized

23   access including FUSE, Sentinel, the Member and Guest Request Scoring systems, its password

24   wall, and related measures.  hiQ knowingly circumvented these technical barriers and violated

25   express access restrictions of LinkedIn's User Agreement.  hiQ also used fake accounts to log in

26

---

27   [15]   The question of whether the CFAA applies to unauthorized access to webpages that are not
     behind a password wall is raised in the petition for a writ of certiorari that LinkedIn filed with the
     Supreme Court of the United States. That petition remains pending. LinkedIn pleads this cause of
28   action to preserve it.

                                   LINKEDIN'S ANSWER AND
                                   AMENDED COUNTERCLAIMS

1    and obtain URL data for its scraping operations in knowing violation of LinkedIn's User

2    Agreement, thereby knowingly exceeding authorized access to data protected by a password login

3    requirement.  At no point did hiQ have authorization to access LinkedIn's servers by

4    circumventing LinkedIn's technical barriers or by using fake accounts.  hiQ understood that

5    LinkedIn objected to its scraping activity and went to great lengths to mask its illicit scraping so

6    that it was undetectable by LinkedIn.  hiQ used multiple proxy services to conceal its IP

7    addresses, and spent a great deal of time and effort trying to reverse engineer LinkedIn's defenses

8    in order to defeat them.  Over time, hiQ adopted not only proxy services to conceal its IP

9    addresses, but also other technical measures designed to conceal scraping such as request timing

10   protocols, user-agents, cookies, and other methods designed to simulate human use of a web

11   browser.  hiQ adopted all of these methods knowingly in order to evade LinkedIn's technical

12   barriers and knowing that it was accessing LinkedIn's profile servers without authorization.

13           95.     LinkedIn also expressly revoked any authorization for hiQ to access its website

14   when it sent the May 23, 2017 cease-and-desist letter.  After LinkedIn sent the cease and desist

15   letter, hiQ continued to make access requests to LinkedIn's profile servers using its various

16   methods of concealment and circumvention of LinkedIn's technical defenses.  After LinkedIn

17   sent the cease and desist letter, hiQ also continued to direct its "turkers" to log in to LinkedIn's

18   servers using their fake accounts in order to obtain URL data for its scraping operations.

19           96.     After accessing LinkedIn's computers and servers without authorization or in

20   excess of authorization, hiQ accessed, obtained and used valuable information from LinkedIn's

21   computers and servers in transactions involving interstate or foreign communications in violation

22   of 18 U.S.C. § 1030(a)(2).  This information includes, among other things, the URLs for and

23   contents of many LinkedIn profiles, and this use includes, among other things, analyzing and

24   distributing that content to others.  This data was otherwise protected by LinkedIn's technical

25   measures.

26           97.     LinkedIn has put hiQ on notice that its access to LinkedIn's servers is not

27   authorized by LinkedIn.  Subject to LinkedIn's compliance with the Court's preliminary

28   injunction order, any further scraping by hiQ would be without authorization by LinkedIn.

98.     LinkedIn has suffered damage and loss by reason of these violations, including, without limitation, harm to LinkedIn's computer systems, expenses associated with being forced to investigate and respond to the unauthorized access and abuse of its computers and servers, and other losses and damage in an amount to be proven at trial, in excess of $5,000 aggregated over a one-year period.

99.     In addition, LinkedIn has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate it for injuries inflicted by hiQ. Accordingly, LinkedIn is entitled to injunctive relief.

## SECOND CLAIM FOR RELIEF

**California Comprehensive Computer Access and Fraud Act, Cal. Penal Code §§ 502 et seq.**

100.     LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

101.     LinkedIn's computers and servers are computers, computer systems, and/or computer networks within the meaning of Cal. Penal Code § 502(b).

102.     hiQ circumvented various technological barriers LinkedIn has employed to protect its computers, servers, and member data against unauthorized access—including FUSE, Sentinel, the Member and Guest Request Scoring systems, its password barrier, and related measures—and has violated express access and use restrictions in LinkedIn's User Agreement.

103.     hiQ wrongfully obtained and used valuable information from LinkedIn's website.

104.     hiQ knowingly accessed LinkedIn's website and servers, and, without permission took, copied and made use of data and files from LinkedIn's computers, computer systems, and/or computer networks, including to wrongfully control and/or obtain such data, in violation of Cal. Penal Code §§ 502(c)(1) & (2).

105.     hiQ knowingly and without permission accessed or caused to be accessed LinkedIn's computers, computer systems, and/or computer networks in violation of Cal. Penal Code § 502(c)(7).

106.     LinkedIn has put hiQ on notice that its access to LinkedIn's servers is not authorized by LinkedIn.  Subject to LinkedIn's compliance with the Court's preliminary injunction order, any further scraping by hiQ would be without permission by LinkedIn.

107.     As a direct and proximate result of hiQ's unlawful conduct, hiQ has caused damage to LinkedIn in an amount to be proven at trial.  LinkedIn is also entitled to recover its reasonable attorney's fees pursuant to Cal. Penal Code § 502(e).

108.     LinkedIn believes that hiQ's acts were willful and malicious, including that hiQ's acts described above were done with the deliberate intent to harm LinkedIn.  LinkedIn is therefore entitled to punitive damages.

109.     In addition, LinkedIn has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate it for injuries inflicted by hiQ. Accordingly, LinkedIn is entitled to injunctive relief.

## THIRD CLAIM FOR RELIEF

### Breach of Contract

110.     LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

111.     Use of the LinkedIn website and use of LinkedIn services are governed by and subject to the User Agreement.

112.     LinkedIn members are presented with the User Agreement and must affirmatively accept and agree to the User Agreement to register for a LinkedIn account.

113.     At all relevant times, LinkedIn also prominently displayed a link to the User Agreement on LinkedIn's homepage.  Those who use LinkedIn's website with actual knowledge of the terms of the User Agreement are required to abide by those terms if they choose to access LinkedIn's website.

114.     All LinkedIn members are required to agree to the User Agreement.

115.     hiQ has admitted that it was a LinkedIn member.

116.     hiQ was on notice of and agreed to the User Agreement in several ways, including when it agreed to the LinkedIn Ads Agreement, when it agreed to the LSA, and when it created its Company Page.

117.     In addition, LinkedIn put hiQ on actual notice of the anti-scraping terms of its User Agreement on May 23, 2017, in its cease-and-desist letter.

118.     The User Agreement is enforceable and binding on hiQ.

119.    The User Agreement prohibits accessing LinkedIn's website through automated means.

120.    The User Agreement prohibits scraping data from LinkedIn's website using automated means.

121.    After being bound by the terms of the User Agreement, hiQ repeatedly accessed the LinkedIn website and scraped data in ways that violate the terms of the User Agreement.

122.    hiQ willfully and repeatedly breached the User Agreement.

123.    LinkedIn has performed all conditions, covenants, and promises required of it in accordance with the User Agreement.

124.    In addition, hiQ agreed to the LSA.

125.    The LSA was, therefore, binding on hiQ.

126.    The LSA incorporates the terms of the User Agreement by reference.

127.    hiQ willfully and repeatedly breached the LSA.

128.    LinkedIn has performed all conditions, covenants, and promises required of it in accordance with the LSA.

129.    hiQ's conduct has damaged LinkedIn, and caused and continues to cause irreparable harm and injury to LinkedIn.

130.    Any future use of LinkedIn's website by hiQ is subject to the terms of the User Agreement.

131.    LinkedIn is entitled to injunctive relief, declaratory relief, compensatory damages, and/or other equitable relief.

## FOURTH CLAIM FOR RELIEF

### Misappropriation

132.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

133.    LinkedIn has invested substantial time, labor, skill, and financial resources into the creation and maintenance of LinkedIn, its computer systems and servers, including system and server capacity, as well as the content on the LinkedIn website, which is time-sensitive.  hiQ has invested none of its own time and resources into developing and building the LinkedIn website

1    and platform.

2         134.    Disregarding the prohibitions set forth in LinkedIn's User Agreement to which hiQ

3    was on notice of and expressly consented to, and in circumvention of various technical barriers,

4    hiQ, without authorization, wrongfully accessed LinkedIn's website, computer systems and

5    servers, and obtained data from the LinkedIn site.  The data that hiQ took included time-sensitive

6    updates to member profiles.

7         135.    hiQ's appropriation and use of this data was at little or no cost to hiQ, without hiQ

8    having to make the substantial investment in time, labor, skill, and financial resources made by

9    LinkedIn in developing the LinkedIn website and platform.  In other words, hiQ reaped what it

10   did not sow.  hiQ's use of LinkedIn's computer systems and servers, including member data from

11   the LinkedIn site and system and server capacity, constitutes free-riding on LinkedIn's substantial

12   investment of time, effort, and expense.

13        136.    As a result of this misappropriation, LinkedIn has been forced to expend additional

14   time and resources, including but not limited to, investigating and responding to hiQ's activities,

15   and hiQ has been able to exploit and benefit from LinkedIn's substantial investment of time,

16   effort, and expense.

17        137.    LinkedIn has been and will continue to be damaged as the result of hiQ's acts of

18   misappropriation.

19        138.    LinkedIn has suffered and will continue to suffer irreparable injury, and its remedy

20   at law is not itself adequate to compensate it for injuries inflicted by hiQ.

21                              **FIFTH CLAIM FOR RELIEF**

22                                  **Trespass to Chattels**

23        139.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

24        140.    LinkedIn owns, possesses, and/or has the right to possess the servers and

25   infrastructure used to run its business.

26        141.    hiQ intentionally interfered with LinkedIn's use and possession of LinkedIn's

27   servers and infrastructure.

28        142.    LinkedIn has never consented to hiQ's conduct.

Case No. 17-cv-03301-EMC

                                        LINKEDIN'S ANSWER AND
                                        AMENDED COUNTERCLAIMS

143.    hiQ's conduct, if expanded and/or replicated unchecked by others, will cause harm to LinkedIn in the form of impaired condition, quality and value of its servers, infrastructure and services.

### **PRAYER FOR RELIEF**

WHEREFORE, LinkedIn prays that judgment be entered in its favor and against hiQ, as follows:

1.    A permanent injunction enjoining and restraining hiQ, its employees, representatives, agents, and all persons or entities acting in concert with it prior to, during, and after the pendency of this action perpetually from:  (a) accessing or using LinkedIn's website, servers, systems, and any data displayed or stored therein, including through scraping and crawling technologies, for any commercial purpose whatsoever; and (b) extracting and copying data appearing on LinkedIn's website to their own servers or systems or those controlled by them;

2.    A declaration stating (a) that hiQ must abide by the terms of LinkedIn's User Agreement should it choose to access LinkedIn's website in the future; (b) that any future data scraping would be without authorization under the CFAA; (c) and that any future taking and use of LinkedIn's data would be without permission and would violate California Penal Code § 502;

3.    An order requiring hiQ to destroy all documents, data, and other items, electronic or otherwise, in its possession, custody, or control, that were wrongfully extracted and copied from LinkedIn's website, along with any data that hiQ has inferred as a result of data wrongfully extracted and copied from LinkedIn's website;

4.    An award to LinkedIn of damages, including, but not limited to, compensatory damages, statutory damages, profits of hiQ, and/or punitive damages, as permitted by law, in an amount to be proved at trial;

5.    An award to LinkedIn of its costs of suit, including, but not limited to, reasonable attorney's fees, as permitted by law; and

//

//

//

6.      Such other relief as the Court deems just and proper.

LinkedIn demands a trial by jury on all issues so triable.


Dated: June 29, 2022                    Orrick, Herrington & Sutcliffe LLP


                                        By:    /s/ Annette L. Hurst
                                              ANNETTE L. HURST
                                     Attorneys for Defendant/Counterclaimant
                                              LinkedIn Corporation