```
                                          Pages 1 - 17

             UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF CALIFORNIA

       BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

HIQ LABS, INC.,                    )
                                   )
           Plaintiff,              )
                                   )
  VS.                              ) NO. 17-cv-03301-EMC
                                   )
LINKEDIN CORPORATION,              )
                                   ) San Francisco, California
           Defendant.              )
                                   )
_____)

                                   Friday, July 15, 2022
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:   (By Zoom webinar)

For Plaintiff:
          QUINN EMANUEL URQUHART & SULLIVAN, LLP
          51 Madison Avenue
          New York, New York  10010
          **BY: COREY WORCESTER, ESQ.**
          **HOPE SKIBITSKY, ESQ.**

For Defendant:
          ORRICK HERRINGTON & SUTCLIFFE, LLP
          405 Howard Street
          San Francisco, California  94105
          **BY: ANNETTE L. HURST, ESQ.**
          **RUSSELL P. COHEN, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
          Official Reporter, U.S. District Court

```
 1   Friday - July 15, 2022                               9:01 a.m.
 2                        P R O C E E D I N G S
 3           THE COURTROOM DEPUTY:  Court is calling the case hiQ
 4   Labs Inc. versus LinkedIn Corporation, Case No. 17-3301.
 5   Counsel, please state your appearances for the record,
 6   beginning with the plaintiff.
 7           MR. WORCESTER:  (Inaudible)
 8           THE COURT:  We can't hear you, Mr. Worcester.  Maybe
 9   your microphone's not working?
10       Can't hear you.  You might to have to select your
11   microphone with that caret by the microphone icon, and it gives
12   you a chance to go in and select your speakers and your
13   microphone.
14           THE COURTROOM DEPUTY:  It was working a little while
15   ago, because he spoke to me.
16           THE COURT:  Oh.
17           MR. WORCESTER:  Can you hear me now?
18           THE COURT:  Now, yes.
19           MR. WORCESTER:  Okay.  Sorry about that.  I'm not sure
20   what happened.
21           THE COURT:  Okay.
22           MR. WORCESTER:  In any event, it's good to see you
23   again.  Corey Worcester from Quinn Emanuel Burkhart and
24   Sullivan, on behalf of hiQ.  And in the room with me but
25   off-camera is my colleague, Hope Skibitsky.
```

|    |                                                                                        |
|----|----------------------------------------------------------------------------------------|
| 1  | **THE COURT:** Thank you.  Welcome.                                                    |
| 2  | **MS. HURST:** Good morning, Your Honor.  Annette Hurst                                |
| 3  | from Orrick Herrington & Sutcliffe on behalf of LinkedIn                               |
| 4  | Corporation.                                                                           |
| 5  | **THE COURT:** Good morning, Ms. Hurst.                                                |
| 6  | **MR. COHEN:** Good morning, Your Honor.  Russell Cohen                                |
| 7  | from Orrick Herrington & Sutcliffe, also on behalf of LinkedIn. |
| 8  | **THE COURT:** Thank you, Mr. Cohen.                                                   |
| 9  | All right, so this is a motion to dissolve the preliminary                             |
| 10 | injunction in this case.  What is the current status?  Remind                          |
| 11 | me what the current status is with respect to appellate                                |
| 12 | proceedings.                                                                           |
| 13 | **MS. HURST:** All pending appellate proceedings have                                  |
| 14 | concluded, Your Honor.                                                                 |
| 15 | **THE COURT:** All right.  So there is no question about                               |
| 16 | the jurisdiction of this Court over this matter at this point. |
| 17 | **MS. HURST:** That's correct.                                                         |
| 18 | **THE COURT:** All right, so we go straight to the merits |
| 19 | of whether or not there's been a sufficient change in facts to |
| 20 | warrant the either modification or dissolution of the                                  |
| 21 | preliminary injunction in this case.                                                   |
| 22 | The obvious fact here is that it appears, for all intents                              |
| 23 | and purposes, hiQ is no longer operational in business.  And so |
| 24 | it does seem quite material because the irreparable harm when  |
| 25 | we first addressed these issues several years ago was that     |

1   there was a threat to hiQ and its continued operations.  And
2   this was an existential threat. And I think that was part of
3   the analysis in finding both irreparable injury and the balance
4   of hardships.  For various reasons, we are in a different
5   situation now.  I think what was feared in some ways in some
6   sense has sort of come to pass.
7       And so I'm having a hard time seeing what the likelihood
8   -- and you have to -- under *Winters*, you have to find that
9   irreparable injury is likely, not possible.  Given the
10  circumstances that -- the shutdown of the operations, I know
11  there's been some activity, an attempt to generate some future,
12  you know, relationships.  But none of those have come to
13  fruition.  And the active discussions consist of two things.
14  But those seem, at this juncture, not of a concreteness to
15  constitute the more-likely-than-not standard under *Winters* for
16  irreparable injury.
17      So I'm going to put the burden on hiQ to tell me why the
18  injunction's still necessary.
19          **MR. WORCESTER:**  (Inaudible)
20          **THE COURT:**  Oh, we lost you again.
21          **MR. WORCESTER:**  Can you hear me now, Your Honor?
22          **THE COURT:**  No.
23       Now we can.
24          **MR. WORCESTER:**  Sorry.  Thank you, Your Honor.  And I
25  do think it's true that hiQ has been driven into dormancy.  We

1  don't dispute that.  But I think the important point that got
2  elided a little bit in LinkedIn's briefing is that the
3  fundamental algorithm and things like that can be turned back
4  on if a business opportunity presents itself.
5        And in that regard, the injunction -- you know, it wasn't
6  as successful as perhaps we all hoped in 2017 in preserving
7  hiQ's business, but it has helped.  I don't think hiQ would
8  still be in business now if not for the injunction.
9        And there has been -- as LinkedIn's own papers note, for
10 nine months after the injunction, it was able to continue doing
11 work.  There were two business opportunities that came in that
12 hiQ was, in fact, able to work on.
13       It continues to get on, you know, a monthly or bimonthly
14 basis, inquiries, some of which are serious and looked at
15 seriously, that would help alleviate, you know, the ongoing
16 cash issues of the company.  And those wouldn't be possible
17 without the injunction.  Right?
18       So there are still, you know, certain --
19            **THE COURT:**  Can you elaborate, Mr. Worcester?  Like,
20 the New Data and the research project.  What -- how are those
21 implicated by the injunction?
22            **MR. WORCESTER:**  So what would be done -- let's say,
23 for example, with New Data would be a gathering of materials
24 from LinkedIn, which would then be provided to New Data for
25 them to use in their own data analysis.  And it would be done

1  by hiQ using hiQ's algorithms.  And New Data would pay for it.
2  And the money would go to hiQ and help alleviate some of the
3  financial burdens.
4       **THE COURT:**  What is New Data's project?  What is their
5  project?  What do they do?
6       **MR. WORCESTER:**  I believe they're an investment
7  adviser, Your Honor.  And they do -- and this may be getting
8  beyond my specific knowledge, but they do what's called a
9  crystal ball analysis for retention risk or employee movement
10 with respect to their employees.  So in essence they'd be doing
11 the kind of work that hiQ did before, for an investment
12 analyst.
13      **THE COURT:**  But then, they must use their own
14 algorithms to do that.  I mean, if they're doing analytics and
15 employee movement.  It sounds like what they want is the
16 database, and not the algorithm.
17      **MR. WORCESTER:**  I'm not sure that's right, Your Honor.
18 I think that what they want is for hiQ to gather up the
19 materials and sort of make high-level recommendations to them
20 in the way that hiQ used to do for customers.
21      I think Ms. Hurst is right in her briefing that it's not
22 exactly the same product anymore, but I think it's similar to
23 what hiQ had been doing, as the type of work they'd be looking
24 to do going forward.
25      And the point is I don't think these are purely

speculative, under the *Winter* analysis. This is not saying a customer -- a potential customer might walk in the door tomorrow. Mr. Weidick, in his affidavit, pointed to more than a dozen customers that have walked in the door, that we've analyzed the opportunities that we've looked at. And we know that there are more customers coming in all the time, asking, any one of which would be really meaningful for hiQ. But I don't think that leaving the white list that the IP address is on is that burdensome on LinkedIn.

So in a balancing test, it's -- hiQ is dormant, and the heartbeat is getting fainter. But turning off the injunction would in essence end hiQ. Right? If not today, then in the future, not very far away. Whereas with the ability to keep looking for potential customers, there's the chance that they'll -- you know, these business opportunities are real; they do exist. A couple of them have panned out over the past couple of years. And if a couple more pan out in the same way, that's really helpful to hiQ.

**THE COURT:** Let me ask. The hiQ algorithms, is that an algorithm that would work if you had database, whether it's from LinkedIn or any other similar source? Is it an algorithm that has value on its own?

**MR. WORCESTER:** I believe the algorithm works with LinkedIn. I think that's what it's designed for. But if you're asking could the algorithm be sold to someone else, I

1  suppose the answer to that is probably yes.
2  **THE COURT:** So someone else could get -- scrape the
3  data and do the thing that is at issue here, but doesn't have
4  the analytics to deal with that --
5  **MR. WORCESTER:** Right.
6  **THE COURT:** That there could be value there. And
7  just -- just the IP in the algorithm, sounds like.
8  **MR. WORCESTER:** Yeah, I do think you're right that
9  there's probably a -- you know, if you think about it, they
10 breaking up the pieces the way the 80's private equities guys
11 used to do, there probably is break-up-the-pieces value in hiQ.
12 But that's not the same as an ongoing business, obviously.
13 **THE COURT:** Right. But the piece that you say is
14 valuable is having access to that data -- well, kind of works
15 the other way. If someone else has their own -- that's why I
16 was suggesting -- asked about New Data. If someone else has an
17 algorithm or an analytics program, getting that database via
18 hiQ, you're asserting has some value.
19 **MR. WORCESTER:** I suppose if somebody else had their
20 own database, then that would be valuable. I don't think
21 that's what's going on here.
22 **THE COURT:** And what about this -- the physician in
23 the Philippines? What is that project, research project?
24 **MR. WORCESTER:** So I believe -- I don't know the
25 details of what Dr. Alonzo (Phonetic) is looking to do. My

understanding is that he's associated with Harvard.  He's looking for a large collection of information, including public LinkedIn data.  Not private data, but public LinkedIn data.  I have to admit, Your Honor, I don't know exactly what he plans to do with the data.

**THE COURT:**  So he's looking for the data, not necessarily the algorithms.

**MR. WORCESTER:**  Yes.  That's right.

**THE COURT:**  Let me hear, Ms. Hurst, what about this argument that their ability to sort of continue to search out partnerships and other -- even if they are not producing in the original product, that they have something that is valuable under the injunction that they bring to the table, and without that, they're not able to continue their -- I don't know if you call it a partnership, joint venture, sale, some kind of collaborative agreement.

**MS. HURST:**  Your Honor, I think two things.  First of all, it's clear from the record even as offered by hiQ that it's really speculative that any of these possibilities might come to fruition.  There have been, by hiQ's own account, Mr. Weidick's own account, more than a dozen of them over the past several years, none of which have come to fruition.

And that's not surprising, Your Honor, because hiQ doesn't have any employees, and it doesn't have operational systems. It decided in early 2020, when it thought it had one of these

1  opportunities, not to reactivate and pursue it.
2      Your Honor, Mr. Weidick's own words, when they shut down
3  their servers -- allowed their servers to be shut down by
4  Amazon and all of their infrastructure to be destroyed because
5  they chose not to pay their AWS bill, they were -- their
6  services were, quote, "Decisively no longer available."  End
7  quote.
8      And, Your Honor, there's no showing whatsoever in hiQ's
9  papers that they have the capital to restore their operations
10 to even pursue these opportunities, even were they anything
11 more than speculation or a mere possibility, which is clearly
12 inadequate under *Winter*, Your Honor.  It's a likely threat of
13 ongoing irreparable harm under *Winter*.  It's not a speculative
14 or remote possibility.
15     And that's what all of these business opportunities are at
16 this point, to the extent they are real opportunities at all,
17 Your Honor.  Which, you know, frankly, if you read this, it's a
18 series of emails that -- they're basic inquiries:  Hey, what
19 are you doing; what's available?
20     And part of that, Your Honor, is just because hiQ has not
21 been forthcoming.  It has not announced to the world that it is
22 out of business, when it is clearly out of business.  It is a
23 defunct entity.  It has no employees; it has no operations.  It
24 is not capable, even, of pursuing these opportunities, as
25 reflected by its own course of conduct since the spring of

1    2020.
2         Your Honor, the other thing that I would say is that it's
3    not proper for hiQ to use the extraordinary power of this
4    Court, which has compelled LinkedIn to provide it with
5    something that it never had -- that we now know as a result of
6    discovery, it never had, at the time that the injunction was
7    first granted.  It's not proper for them to seek to compel
8    LinkedIn, using this Court's offices, to provide that
9    privileged access to data, for purposes that go far beyond what
10   the Court ever contemplated at the time that the preliminary
11   injunction was granted.
12        You know, certainly hiQ is correct, Your Honor, that
13   there's no explicit restriction in the preliminary injunction
14   about how the data would be used.  But the entire underpinning
15   for any grant of preliminary injunction was that hiQ had legal
16   claims -- legal or equitable claims of some sort that were
17   bounded by elements that it was required to make some showing
18   of.
19        And in this case, the Court lessened that showing on the
20   unfair competition claim, did not even require them to
21   demonstrate likely success on the merits.  But, ultimately, it
22   was the unfair competition claim with respect to the Keeper and
23   the Skill Mapper products that provided the court with some
24   basis, it felt, for granting an injunction.
25        And now they're talking about taking what was compelled --

1  is compelled access by LinkedIn, and using that for different
2  purposes, altogether.  It's a bait-and-switch, Your Honor.  And
3  it's not a proper use of the Court's power.  And it's
4  especially not proper, Your Honor, when not only is the
5  threshold showing not met under *Winter* for ongoing likely
6  irreparable harm, but there is also harm to LinkedIn and its
7  members.
8       And I'll stop there.  I'm sure I'll have an opportunity to
9  elaborate on that point when the Court --
10           **THE COURT:**  Well, no, I understand that point.  Let me
11 ask Mr. Worcester to respond.
12      This Court did find, as a basis for the preliminary
13 injunction, did rely in part upon a substantive claim of unfair
14 competition because I found that, you know, there was evidence
15 that I think you had presented or your party presented showing
16 that, you know, this was being done to advance -- in an unfair
17 way, arguably -- LinkedIn's own competing, you know, program.
18      And so that was what was, you know -- other than a
19 declaratory relief that this doesn't violate the CFAA and that
20 sort of stuff, the affirmative injunction was designed in part
21 to address that kind of unfair competition.  Because -- and
22 that was for a specific product, your client's product, and
23 their product.
24      And the idea that this was all done contrary to the
25 earlier collaborative efforts and the conferences and all that

1  sort of stuff, suddenly once they came up with their own
2  product: Hey, we're going to squeeze you out. And that was
3  the narrative. And now this narrative is different.
4  I mean, so, again, doesn't that remove the underpinnings
5  of the preliminary injunction?
6  **MR. WORCESTER:** Thank you for the question,
7  Your Honor.
8  I don't think so. I think what discovery has shown is
9  that the narrative hiQ put forth turned out to be exactly
10 right. We know now that LinkedIn was aware of hiQ as early as
11 2014, but took no steps to send a cease-and-desist or stop hiQ
12 at that point.
13 We know that, in 2016, LinkedIn sent numerous employees --
14 **THE COURT:** No, I understand it's played out. I
15 understand you feel there was merit to that, and it was
16 warranted. The problem is now that you're no longer in
17 competition -- maybe it's because they've already succeeded, in
18 your view, in doing what they wanted to do.
19 **MR. WORCESTER:** Well --
20 **THE COURT:** You know, the equities thing, I have to
21 figure out what's the claim for injunction left. Maybe you
22 have a damages theory or something, but I don't know what the
23 injunction theory is, if there's not a continued unfair
24 competition of the type that I found earlier.
25 **MR. WORCESTER:** As hiQ's own data shows, the

1   injunction did allow hiQ to keep operating as it was for months
2   afterwards.  It did allow two different paying clients to come
3   in the door.  It has allowed continued discussions with other
4   potential paying clients to do, if not the exact Skill Keeper
5   product, then similar work to that.  Nobody's product stayed
6   the same over a five-year stretch in the technology space.
7        And I don't think it is fair for LinkedIn to say:  The
8   injunction enables us to manage the business of our
9   competitors.  The principal question presented in the case that
10  you addressed at the injunctive stage, that the Ninth Circuit
11  and Supreme Court have both weighed in on, is:  Is it okay to
12  take publicly-scraped data and do things with it?
13       And all -- you, the Ninth Circuit and the Supreme Court
14  have now all in essence answered yes to that question.  That's
15  what hiQ is continuing to do.  And it should be allowed to
16  continue to do that.  Because if the injunction's taken away
17  and it can't do that anymore, then it has no hope, really, of
18  staying in business.  And that obviously is a permanent loss of
19  good will.
20       **THE COURT:**  Well, you have -- you have rulings.  As
21  you just said, the Ninth Circuit has ruled that scraping under
22  these circumstances, at least -- at least preliminarily
23  indicating that that's not a violation of the CFAA.  Right?  I
24  mean, so -- and ultimately I assume what you would be seeking
25  is some kind of ultimate final judgment of declaratory relief,

or something of that nature.

But the question here is not that. The question is injunctive relief, which is generally, you know, fairly extraordinary. And that's why *Winters* sets this test. When you compel some party to do something that they otherwise wouldn't do, you've got to show -- in *Winters*, a likelihood of irreparable injury is certainly one indispensable element. And likely, not just possible. And that's -- that's the problem I'm seeing here.

**MR. WORCESTER:** Yeah. I understand that, Your Honor. And as I said, this is not a situation where we are coming in, having had no discussions with anyone over the last 12 months where we're saying look, Your Honor, it's possible someone could walk in the door tomorrow. We're looking at particular people who have come in and asked about our products. We have been in discussions with them, been in negotiations.

Ms. Hurst points to one that hiQ, itself, turned down. The reason it was turned down was not because we couldn't turn the machines back on, but because they were in Europe, and there's extra data privacy obligations in Europe. And, you know, maybe we would have been in a suit with LinkedIn in Europe if we'd gone and done that. So there are reasons for each of these.

But the point is, these are real opportunities. This is not speculation. We're not trying to say oh, it might happen.

1   We're saying it is happening, day to day.

2   **THE COURT:** All right.  Well, I understand your point.
3   But I think the standard as been set by the Supreme Court is a
4   fairly high standard, and that is a threshold showing of
5   likelihood of irreparable injury, not just the possibility.  As
6   distinguished from when you get to the balance of hardship, you
7   know, you know, the merits, you know, the sliding scale test is
8   kind of a different matter.

9   But the requirement of irreparable injury I think has been
10  repeated and reaffirmed by the Ninth Circuit.  And a likelihood
11  is something more than speculation and more than even just the
12  possibility.  I think it has to be more concrete.  And given
13  what's happened to hiQ, I don't see that here.

14  And so I'm going to grant the motion to dissolve the
15  injunction.  However, that's without prejudice.  So if there is
16  some concrete situation that can be demonstrated where there is
17  a likelihood of irreparable injury, you know, that's without
18  prejudice to hiQ coming back and seeking either a TRO or
19  preliminary injunction.  But you've got to meet the *Winter*
20  standards.

21  And at that point, I'm sure Ms. Hurst will have her brief
22  ready with the balance of hardships and why this is harmful,
23  and why the balance actually tips in the other way because of
24  the, you know, problems.  But I don't need to hear that now,
25  because I'm basing this on the threshold question of a showing

of irreparable injury.

So, I mean, there's a little bit of an irony in that thing that the injunction was in part designed to prevent.  And I'm not saying there's a causal relationship, but I'm just saying, you know, we are now in a situation in which the thing that was feared in a way has happened.  At least, the dormant state of the operations.

And, you know, whether -- what the remedies are, I guess we'll address in the next stage of this case.  Declaratory relief, or if there's a damages claim, I don't know; there may be some interesting legal questions there.  But we'll address that as that comes up.

So I'll get out a minute order or a brief order summarizing this.  But, that's the ruling of the Court.

    **MR. WORCESTER:**  Okay.  Thank you, Your Honor.

    **MS. HURST:**  Thank Your Honor.

    **THE COURT:**  All right.  Thank you, counsel.

    **MR. COHEN:**  Thank you, Your Honor.

    **THE COURT:**  Thank you.

(Proceedings concluded)

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Saturday, July 16, 2022