1   Corey Worcester (*pro hac vice*)
    coreyworcester@quinnemanuel.com
2   Renita Sharma (*pro hac vice*)
    renitasharma@quinnemanuel.com
3   Hope Skibitsky (*pro hac vice*)
    hopeskibitsky@quinnemanuel.com
4   QUINN EMANUEL URQUHART AND SULLIVAN LLP
    51 Madison Avenue, 22nd Floor
5   New York, NY 10010
    Telephone:    (212) 849-7000
6
    Terry L. Wit (SBN 233473)
7   terrywit@quinnemanuel.com
    QUINN EMANUEL URQUHART AND SULLIVAN LLP
8   50 California Street, 22nd Floor
    San Francisco, CA 94111
9   Telephone:    (415) 875-6331

10

    Attorneys for Plaintiff hiQ Labs, Inc.
11

12                    **UNITED STATES DISTRICT COURT**
13                 **NORTHERN DISTRICT OF CALIFORNIA**

14   hiQ Labs, Inc.,                      Case No. 3:17-cv-03301-EMC

15                  Plaintiff,
                                          **PLAINTIFF HIQ LABS, INC.'S ANSWER**
16        vs.                             **TO DEFENDANT LINKEDIN CORP.'S**
                                          **AMENDED COUNTERCLAIMS**
17   LinkedIn Corp.,

18                  Defendant.

19

20

21

22

23

24

25

26

27

28

# ANSWER[1]

Plaintiff and Counter-Defendant hiQ Labs, Inc. ("hiQ") hereby answers the allegations of Defendant and Counterclaimant LinkedIn Corporation ("LinkedIn") as follows:

# INTRODUCTION[2]

1.      LinkedIn is a social network, with over 700 million members around the globe. LinkedIn's vision is to create economic opportunity for every member of the global workforce.  Its mission is to connect the world's professionals to make them more productive and successful. Through its proprietary platform, LinkedIn allows its members to create and manage their professional histories and interests online.

**ANSWER:**  hiQ admits the allegations in the first sentence of Paragraph 1.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in this Paragraph.

2.      At the heart of LinkedIn's platform are its members, whose LinkedIn profiles serve as their professional online identities.  LinkedIn members post information to LinkedIn in order to network with, and be found by, other professionals on LinkedIn.  When a member posts an educational experience, crafts a narrative description of her skills, or makes a new connection, the member does so for these particular purposes.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations of Paragraph 2, which relate to the "heart of LinkedIn's platform" and LinkedIn's members' states of mind.

3.      It is important that LinkedIn members have control over the information that they choose to publish about themselves.  People evolve and careers evolve, and the information and vocabulary that people use to describe themselves and their experiences evolve as well.  It is thus

---

[1]   In this Court's April 19, 2021 Order granting in part and denying in part hiQ's Motion to Dismiss LinkedIn's counterclaims, the Court noted that it was "defer[ring] ruling on the motion to dismiss the counterclaims for violation of the CFAA and California Penal Code § 502."  The Court then held that it was terminating the motion to dismiss "for administrative purposes only . . . even though the CFAA and § 502 counterclaims have not yet been addressed."  The Court further stated that hiQ may "renew[] its motion to dismiss the CFAA and § 502 counterclaims once the Supreme Court issues its decision in *Van Buren* and/or this case."  Dkt. No. 199 at 17.  hiQ intends to move to dismiss these claims again once the parties have received a ruling from the Ninth Circuit on LinkedIn's pending appeal, and answers LinkedIn's CFAA and § 502 counterclaims solely to preserve its rights.
[2]   The headings in this Answer are LinkedIn's.  hiQ repeats LinkedIn's headings for reference only.

critical that members be able to control their information and how they describe themselves. That's why when members delete information from LinkedIn, LinkedIn deletes it too.  And LinkedIn promises members that it will do so.

**ANSWER:**  hiQ admits the allegations in the first and third sentences of Paragraph 3 that "[i]t is important that LinkedIn members have control over the information that they choose to publish about themselves" and that "[i]t is … critical that members be able to control their information" to the extent this means that it is important that LinkedIn members have control over determining what information they choose to publish on LinkedIn's website in the first instance; however, hiQ denies these allegations to the extent they are intended to mean that LinkedIn members have control over information they choose to publish about themselves after they have published such information in the public domain.  hiQ admits the allegations in the second sentence of Paragraph 3.  hiQ denies that as a categorical rule "when members delete information from LinkedIn, LinkedIn deletes it too," and hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 3.

4.     Data scrapers—companies that systematically access, extract, and copy data from LinkedIn's servers through bots or other automated means on a massive scale—make no such promises.  They have no relationship with LinkedIn's members.  They do not ask permission of LinkedIn or its members to take member data, and they typically take member data without the knowledge of LinkedIn or its members.  They do not explain to members how they will use member data and they do not promise to delete member data if a member removes that data from LinkedIn.  Thus, once a scraper has scraped a member's data, the members have no recourse to stop the scraper from copying, archiving, and forever keeping any information that the member ever published on LinkedIn.  The member cannot stop the scraper from, among other things, using that data to target spam, selling or inadvertently exposing that data to scammers, or combining that data with other data to create psychological profiles of users.[3]  In short, once data has been scraped, member data can end up in any number of databases controlled and used for any purpose.

---

[3]  https://www.zdnet.com/article/data-firm-leaks-48-million-user-profiles-it-scraped-fromfacebook-linkedin-others/.

1      **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 4

2  as these allegations relate to the conduct and behavior of "companies [generally] that systematically

3  access, extract, and copy data from LinkedIn's servers."

4      5.      Data scraping therefore poses a significant threat to LinkedIn's business because it

5  undermines the trust that LinkedIn has built with its members.  LinkedIn takes this trust very

6  seriously, and its commitment to member trust is widely recognized:  LinkedIn was recently named

7  the most trusted social network in the country according to the annual U.S. Digital Trust Survey by

8  Insider Intelligence.[4]  According to the survey, which gathered views on nine different social

9  networks, 73% of respondents agreed that LinkedIn protected their privacy and data, the highest

10 marks in the survey.  Consumers have a wide range of social networks to choose from, and

11 LinkedIn's business model, focused on trust, helps distinguish it from the field and plays a key role

12 in LinkedIn's efforts to maintain and grow its user base.

13     **ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 5.

14 As to the allegations relating to the results of a third-party survey, that survey speaks for itself and

15 hiQ lacks knowledge sufficient to verify the reliability or methodology of that survey.

16     6.      The loss of that trust has serious consequences for LinkedIn's members and for

17 LinkedIn's business.  In order to protect the data that LinkedIn's members entrust to LinkedIn and

18 maintain their trust, LinkedIn has invested significant technical and human resources to detect, limit,

19 and block data scraping. LinkedIn has a dedicated team of engineers whose full time job is to track

20 and prevent scraping attempts.  On the technical side, LinkedIn has implemented over 200 custom

21 rules to detect and prevent scraping, and has blocked over 100 million IP addresses that it suspects

22 were being used by data scrapers.  Historically, LinkedIn's technical measures block over half of all

23 requests for guest profiles on its servers because they are coming from non-human sources.

24 LinkedIn's measures are designed to ensure that LinkedIn's website is used for its intended purpose

25 of humans making connections with other humans and to protect members' expectations that their

26 data will be used for that purpose.

27

28

---

[4]  https://www.adweek.com/programmatic/americans-trust-linkedin-with-their-data-but-they-are-wary-of-facebook/.

1    **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 6.

2    7.    LinkedIn's User Agreement also plays an important role in setting member

3    expectations and building trust by prohibiting "[s]crap[ing] or copy[ing] profiles and information of

4    others" through "crawlers, browser plugins and add-ons, and any other technology" used to access

5    the LinkedIn website.  Because LinkedIn cannot always stop scraping through its technical defenses,

6    it must be able to resort to legal means to prevent scraping when necessary.

7    **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 7,

8    which relate to LinkedIn members' states of mind and contain LinkedIn's statements about itself

9    and its technical capabilities.  As to the allegations relating to the contents of LinkedIn's User

10   Agreement and the undated quotations purporting to be therefrom, that document speaks for itself.

11   8.    hiQ is exactly the kind of data scraper that undermines the trust that LinkedIn

12   members place in LinkedIn to safeguard their data. hiQ's automated "bots" secretly extract and copy

13   data from hundreds of thousands of LinkedIn pages at a rate far faster than any human could.  They

14   circumvent LinkedIn's technical barriers, and operate in blatant violation of LinkedIn's User

15   Agreement.  hiQ never obtains consent from LinkedIn or its members to scrape member data.

16   Indeed, it never even asks members, even though there is nothing stopping hiQ from doing so. Once

17   hiQ has scraped LinkedIn member data, there is no telling what hiQ might do with it.  hiQ has no

18   enforceable contract with the members whose data it scrapes without their knowledge.  Nor does

19   hiQ have any obligation to delete member data that it has scraped if members delete that data from

20   LinkedIn.

21   **ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 8.  hiQ denies the

22   allegation in the second sentence of Paragraph 8 that hiQ "secretly" extracts and copies data and

23   admits the remaining allegations in the second sentence of Paragraph 8.  hiQ lacks sufficient

24   information to admit or deny that it "circumvent[ed] LinkedIn's technical barriers," and denies that

25   allegation to the extent it implies any wrongful conduct by hiQ.  The statement that hiQ "operate[s]

26   in blatant violation of LinkedIn's User Agreement" is a legal conclusion to which no response is

27   required.  To the extent a response is required, hiQ denies that it "operate[s] in blatant violation of

28   LinkedIn's User Agreement."  hiQ denies that it did not have consent from LinkedIn to scrape

member data and admits the remaining allegations in the fourth sentence of this Paragraph.  hiQ denies the allegations in the fifth sentence of this Paragraph.  hiQ denies the allegations in the sixth sentence of this paragraph to the extent that they suggest that LinkedIn members who make information publicly available do not have knowledge that third-parties may access that data.  hiQ lacks information sufficient to admit or deny the allegations in the seventh sentence of this Paragraph as it is unclear what LinkedIn means by the term "obligations" and, to the extent this sentence contains a legal conclusion, no response is required.  hiQ denies the remaining allegations in Paragraph 8.

9.     One known use that hiQ makes of the member data that it has furtively scraped is to fuel its "Keeper" product. "Keeper" surreptitiously surveils every change that members make to their LinkedIn profiles in order to provide their employers with an analysis of whether the members may be looking for new jobs and are a "flight risk." Members may not want such information provided to their employers.  Employees often do not disclose to their employers that they are considering leaving their jobs, and could risk adverse career consequences if their employers learn that they are thinking about leaving.  Indeed, to avoid this exact type of situation, many members choose the "Do Not Broadcast" option in their settings on LinkedIn to mute their profile changes.

**ANSWER:**  hiQ denies the characterization in the first sentence of Paragraph 9 of hiQ's actions as "furtive[]" and admits the remaining allegations in that sentence.  hiQ denies the allegations in the second sentence of Paragraph 9.  hiQ lacks sufficient information to admit or deny the remaining allegations in Paragraph 9.

10.     hiQ has long known that LinkedIn prohibits scraping. In a 2017 article, hiQ's Chief Technology Officer Dan Miller admitted that hiQ knew that "LinkedIn had been aggressively complaining about what they considered unfair scraping practices for some time," and that LinkedIn "went through a lot of trouble technically to make it difficult to collect that data."[5]  Yet knowing that LinkedIn did not want hiQ scraping its data did not stop hiQ from intentionally building its business around that premise.  Rather, hiQ went through substantial lengths to build scraping

---

[5]  https://www.bloomberg.com/news/features/2017-11-15/the-brutal-fight-to-mine-your-data-and-sell-it-to-your-boss.

software that could avoid LinkedIn's background technical measures that seek to detect and block scraping.

**ANSWER:**  As to the allegations relating to the contents of a 2017 article, that document speaks for itself.  hiQ denies the remaining allegations in Paragraph 10.

11.    This was a risky business model that suffered from the obvious and inherent danger that LinkedIn would discover hiQ's furtive scraping, implement additional technical measures to attempt to block hiQ, and assert its legal rights against hiQ and ask hiQ to stop.  This risk came to pass in May and June of 2017, when LinkedIn sent hiQ a cease-and-desist letter demanding that hiQ stop scraping LinkedIn, explaining that hiQ's conduct violated its agreement with LinkedIn and a host of state and federal laws, and implemented targeted IP address blocks against hiQ.

**ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 11.  hiQ denies the allegation in the second sentence of Paragraph 11 that "[t]his risk came to pass" and admits the allegation in the second sentence of Paragraph 11 that LinkedIn sent hiQ cease and desist letters in May and June 2017—the contents of which speak for themselves.

12.    LinkedIn sent that letter, and asserts these counterclaims, to stop hiQ's illicit scraping.  LinkedIn is committed to protecting its users' privacy and safeguarding their trust, and the need to do so has become even more pronounced in the last several years, as scandals involving Cambridge Analytica,[6] Hyp3r,[7] Clearview AI,[8] and others have come to light. For example, Clearview deployed bots to systematically scrape social media and other websites to amass a database of more than three billion personal photos, without the consent of those websites or their users.  It then exploited this scraped data to support a powerful facial recognition tool that it licensed to over 600 law enforcement agencies as well as select foreign governments and private companies. When social media websites asked Clearview to stop, Clearview responded by saying that all it was

---

[6]   https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.
[7]   https://www.zdnet.com/article/instagram-boots-ad-partner-hyp3r-for-mass-collection-of-user-data/; https://www.businessinsider.nl/startup-hyp3r-saving-instagram-users-stories-tracking-locations-2019-8/.
[8]   https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

doing was scraping "public photos."[9]  There is mounting evidence that technology like Clearview's can be used in ways that pose fundamental threats to our society.

**ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 12.  The remaining allegations in Paragraph 12 do not require a response from hiQ, as those statements are not relevant to any claims or defenses in this case.  Further, hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 12.  To the extent the allegations in Paragraph 12 are grounded in or reference articles prepared by third parties, those documents speak for themselves.

13.  LinkedIn's members display information on their publicly viewable LinkedIn profiles for a particular purpose—to be found by and network with other professionals and advance their careers—and expect to retain control over the information they post consistent with LinkedIn's User Agreement and Privacy Policy.  They do not expect that companies like hiQ, with whom they have no relationship and have provided no consent, will harvest and exploit their personal information en masse, and use it in ways that are inconsistent with their own expressed intention and against their interests.  LinkedIn brings these counterclaims to stop this dangerous behavior that harms LinkedIn's members and harms LinkedIn, by eroding the trust that lies at the core of LinkedIn's relationship with its members.

**ANSWER:**  hiQ denies the allegation that it uses LinkedIn members' publicly available profile information "against their interests."  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 13 because these allegations relate to LinkedIn members' states of mind and "expect[ations]" and LinkedIn's statements about itself.  To the extent any allegations in this paragraph are intended to suggest that LinkedIn has any valid business reasons for bringing these counterclaims, hiQ denies those allegations.

## JURISDICTION AND VENUE

14.  This Court has federal question jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 because this action alleges violations of the federal Computer Fraud and Abuse Act, 18

---

[9]  https://www.cnet.com/news/clearview-ai-hit-with-cease-and-desist-from-google-over-facial-recognition-collection/.

U.S.C. § 1030.  The Court has supplemental jurisdiction over the state law causes of action pleaded herein pursuant to 28 U.S.C. § 1367.

**ANSWER:**  hiQ admits the allegations in Paragraph 14.

15.     This Court has personal jurisdiction over hiQ because, as hiQ alleges, it has its principal place of business in San Francisco, California.  Moreover, hiQ brought the instant action in this judicial district, thereby submitting itself to the Court's jurisdiction.

**ANSWER:**  hiQ admits the allegations in Paragraph 15.

16.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  During all relevant times, hiQ repeatedly, knowingly, and intentionally targeted its wrongful acts at LinkedIn, which is headquartered in this judicial district.

**ANSWER:**  hiQ admits that venue is proper in this district and denies the remaining allegations in Paragraph 16.

## INTRADISTRICT ASSIGNMENT

17.     This case has been assigned to the Honorable Edward M. Chen.

**ANSWER:**  hiQ admits the allegation in Paragraph 17.

## THE PARTIES

18.     LinkedIn is a Delaware corporation with its principal place of business in Sunnyvale, California.

**ANSWER:**  hiQ admits the allegations in Paragraph 18.

19.     hiQ alleges that it is a Delaware corporation with its principal place of business in San Francisco, California.

**ANSWER:**  hiQ admits the allegations in Paragraph 19.

## FACTS

**The LinkedIn Social Network**

20.     LinkedIn's mission is to connect the world's professionals to make them more productive and successful.  Through its proprietary platform, LinkedIn members are able to create and manage their professional identities online, build and engage with their network, access shared

1  knowledge and insights, and find business opportunities, enabling them to be more productive and

2  successful.  LinkedIn's broader vision is to create economic opportunity for every member of the

3  global workforce.

4      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

5  20 relating to LinkedIn's "mission" and its "broader vision."  hiQ admits the remaining allegations

6  in Paragraph 20 to the extent those allegations discuss some functionalities of the LinkedIn platform.

7      21.    At the heart of LinkedIn's platform are its members, who create individual profiles

8  that serve as their professional profiles online.  LinkedIn is available at no cost to anyone who wants

9  to join and who agrees to the terms of LinkedIn's User Agreement, Privacy Policy, and Cookie

10  Policy.  Today, LinkedIn has over 700 million members around the globe.

11      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny what the "heart of LinkedIn's

12  platform" is and admits the remaining allegations in the first sentence of Paragraph 21.  To the extent

13  the second sentence in this Paragraph calls for a legal conclusion regarding the enforceability of any

14  purported agreements, no response is required.  hiQ admits the allegations in the last sentence of

15  this Paragraph.

16      22.    LinkedIn members populate their profiles with a wide range of personal information

17  concerning their professional lives, including summaries (narratives about themselves), job

18  histories, skills, interests, educational background, professional awards, photographs, and other

19  information.

20      **ANSWER:**  hiQ admits the allegations in Paragraph 22.

21      23.    LinkedIn has invested and plans to continue to invest substantial time, labor, skill,

22  and financial resources into the development and maintenance of the LinkedIn site.

23      **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

24  23, which speak to LinkedIn's past investments and future business plans.

25  **LinkedIn's Technical Safeguards and Security Measures Protect LinkedIn Against
   Unauthorized Access**

26

27      24.    LinkedIn works hard to protect the integrity and security of its network and systems.

28  Among other things, it employs an array of technological safeguards and barriers designed to

prevent data scrapers, bots, and other automated systems from accessing and copying its members' data on a large scale.  It has a dedicated team of engineers whose full-time job is to detect and prevent scraping, and maintain LinkedIn's technical defenses.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 24 and the unnumbered heading that precedes it.

25.    LinkedIn's website and servers are not unconditionally open to the general public. Rather, each call to LinkedIn's servers requires LinkedIn to authorize or permit the party seeking access to LinkedIn's servers to view information on LinkedIn's website.  This is because LinkedIn's servers are protected by sophisticated defenses designed to prevent unauthorized access and abuse that evaluate whether to grant each request made to LinkedIn's servers.  LinkedIn's technical defenses currently block hundreds of millions of requests to access guest profiles per day from bots and scrapers, which constitute the majority of the requests made to LinkedIn's servers for guest profiles.  That is, LinkedIn rejects more requests to access guest profiles (i.e., denies authorization or permission to obtain information from LinkedIn's servers) than it authorizes.

**ANSWER:**  hiQ denies the allegation in the first sentence of Paragraph 25.  hiQ lacks knowledge sufficient to admit or deny the allegations in the second and third sentences of Paragraph 25.  hiQ admits the allegations in the last two sentences of this Paragraph.

26.    LinkedIn has many different technical systems that detect and block both logged-in and logged-out scraping. One such safeguard is LinkedIn's FUSE system.  FUSE scans and imposes a limit on the activity that an individual LinkedIn member may initiate on the site.  This limit is intended to prevent would-be data scrapers utilizing automated technologies from quickly accessing a substantial volume of member profiles.

**ANSWER:**  hiQ admits that LinkedIn uses a system called FUSE and lacks knowledge sufficient to admit or deny the allegations in Paragraph 26.

27.    Another protection measure is LinkedIn's Sentinel system, through which LinkedIn's defenses scan, throttle, and block suspicious activity associated with particular accounts and IP addresses.  Through Sentinel, LinkedIn maintains a list of IP addresses that are not permitted to make calls on LinkedIn's servers because they either have in the past or are engaged in abuse.

An IP address is a unique sequence of integers or letters that identifies a computer when that computer is communicating over the Internet (or some other network of computers).  Any computer connected to the Internet must have an IP address while it is connected to the Internet. LinkedIn has restricted over 100 million IP addresses that have attempted to access LinkedIn's servers in ways that challenge or circumvent LinkedIn's technical defenses. LinkedIn adds IP addresses to this list daily, either automatically as its machine learning model detects scraping attempts, or manually as needed by LinkedIn's dedicated team.

**ANSWER:**  hiQ admits that LinkedIn uses a Sentinel system and admits the allegations in the third and fourth sentences of Paragraph 27 relating to what IP addresses are and how they function.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 27.

28.    Business entities generally have IP addresses that remain static.  This means that computers connected to the Internet from a given business generally will keep the same IP address each time those computers access the Internet.  Because LinkedIn's servers receive the IP addresses of computers sending calls to LinkedIn's servers, LinkedIn can program its servers to block calls originating from specific IP addresses.  When LinkedIn does this, LinkedIn's servers will not return information in response to any calls received from blocked IP addresses, but will return an error message.  In June 2017, LinkedIn implemented targeted blocks as to hiQ's known IP addresses.

**ANSWER:**  hiQ admits the allegations in Paragraph 28.

29.    In order for a business entity to access LinkedIn's computers after confronting an IP block, that business entity must circumvent the IP block.  In other words, it must use a computer with an IP address that is different from those that the business normally uses, or must otherwise make its requests to LinkedIn's servers look like they are coming from other computers by using proxy servers or other masking techniques.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 29.

30.    LinkedIn also employs over 200 custom rules that it applies to requests made to its servers to determine whether the requests is from a human or a bot.  These rules include artificial

intelligence-based models and proprietary algorithms.  LinkedIn's dedicated team is constantly monitoring the effectiveness of its rules, adding to them and editing them in an effort to keep up with scrapers.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in the first and third sentences of Paragraph 30.  hiQ admits the allegation in the second sentence of Paragraph 30.

31.     Some of these rules fall under the Member and Guest Request Scoring systems, which also restrict automated, non-human forms of access that facilitate scraping.  The Member Request Scoring System monitors page requests made by LinkedIn members while logged into their accounts.  If high levels of activity are detected for certain types of accounts, the member is logged out and may either be warned, restricted, or challenged with a CAPTCHA[10] in order to log back into LinkedIn.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 31.

32.     Similarly, the LinkedIn Guest Request Scoring system monitors and limits page requests made by users who are not logged into LinkedIn.  If unusual patterns or high levels of activity are detected, the user is redirected to LinkedIn's log-in page and is prevented from viewing additional LinkedIn pages while not logged in.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 32.

33.     LinkedIn also employs a "robots.txt" file, which is a technical protocol that is designed to prevent unauthorized access by bots.  This file, available at https://www.linkedin.com/robots.txt, provides a set of instructions to any automated technologies visiting the LinkedIn site, as well as an explicit warning in plain-to-read prose that the use of bots to access LinkedIn without express permission is strictly prohibited.  While LinkedIn's robots.txt

---

[10]   CAPTCHA is an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart."

file does permit some webcrawlers (e.g., search engines such as Google or Bing) to crawl and index the site, it prohibits and is intended to prevent automated bots like those used by hiQ.

**ANSWER:** hiQ admits that LinkedIn uses a "robots.txt" file, the content of which speaks for itself.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in this Paragraph, except that hiQ admits that LinkedIn permits certain third-parties (e.g., Google and Bing) automated access to its site.

34.     Much of the information on LinkedIn's website is behind a password barrier as well. Periodically, LinkedIn will prevent "logged-out" users from viewing more than a certain number of pages before being asked to enter a user name and password to see more.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 34.

35.     LinkedIn's technical measures are vitally important to ensuring that the website is available to legitimate human users.  This, in turn, helps build and protect member trust.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 35, which are LinkedIn's statements about itself and its members' purported states of mind.

36.     LinkedIn's User Agreement[11] also prohibits accessing and scraping LinkedIn's website through automated software and other technologies.

**ANSWER:** The allegations in Paragraph 36 state legal conclusions to which no response is required.  Further, LinkedIn's User Agreement is a document that speaks for itself.

37.     LinkedIn's User Agreement explains that members, users, and visitors to the LinkedIn website must abide by certain restrictions in accessing and using the LinkedIn website. The relevant version of the User Agreement, effective October 23, 2014, states that "You agree that by clicking 'Join Now' 'Join LinkedIn', 'Sign Up' or similar, registering, accessing or using our services . . . , you are entering into a legally binding agreement (even if you are using our Services on behalf of a company)."  The current version contains similar language.

---

[11]   See https://www.linkedin.com/legal/user-agreement (last visited November 19, 2020).

**ANSWER:**  The allegations in Paragraph 37 state legal conclusions to which no response is required.  Further, LinkedIn's User Agreements are documents that speak for themselves.

38.     hiQ agreed to the User Agreement on several different occasions.

**ANSWER:**  The allegation in Paragraph 38 states a legal conclusion to which no response is required.

39.     hiQ has admitted in this litigation that "hiQ was itself a LinkedIn member with a business profile page on LinkedIn."[12]

**ANSWER:**  hiQ admits the allegations in Paragraph 39.

40.     hiQ has maintained a Company Page on LinkedIn.

**ANSWER:**  hiQ admits the allegation in Paragraph 40.

41.     In order for a user to create a Company Page on LinkedIn, that user must have signed up as a member, and therefore have already consented to the User Agreement.  LinkedIn's records indicate that hiQ's Company Page was set up by hiQ's then-Chief Operating Officer Xander Oltmann on June 23, 2014. Mr. Oltmann is also a LinkedIn member who agreed to the User Agreement.

**ANSWER:**  The allegations in the first and third sentences of Paragraph 41 state legal conclusions to which no response is required (e.g., whether any agreement was consented to and/or enforceable).  To the extent LinkedIn is referring to a specific document in its "records" in the remaining allegations in this paragraph, that document speaks for itself.  The allegations relating to whether Mr. Oltmann holds an individual LinkedIn account do not require a response from hiQ, as those allegations are not relevant to any claims or defenses in this case.

42.     hiQ also affirmatively agreed and assented to the LinkedIn Subscription Agreement ("LSA")[13] when it purchased a company license for LinkedIn's Sales Navigator product.   On December 23, 2015, Darin Medeiros, hiQ's Vice President of Sales, Marketing and Operations

---

[12]   hiQ's Memorandum of Points and Authorities in Support of Renewed Ex Parte Motion for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, Dkt. No. 24 at 12.

[13]   The version that hiQ agreed to is dated November 15, 2015.

signed a contract for hiQ to purchase Sales Navigator.  The LSA is incorporated by reference into that contract.  The Sales Navigator company license that hiQ purchased cost thousands of dollars.

**ANSWER:**  The allegations in Paragraph 42 state legal conclusions to which no response is required.  hiQ admits that hiQ's then-Vice President of Sales, Marking and Operations signed a contract for hiQ to purchase a company license for the Sales Navigator product on December 23, 2015 and that the license cost hiQ thousands of dollars.  As to the contents of the contract, that document speaks for itself.

43.     The LSA incorporates the LinkedIn User Agreement, stating in Section 2.1 that the "terms of the User Agreement are incorporated into this LSA. Customer will ensure that Customer Users comply with the User Agreement."  Hence, by affirmatively agreeing and assenting to the LSA, hiQ also agreed to and assented to the User Agreement.

**ANSWER:**  The allegations in Paragraph 43 state legal conclusions to which no response is required.  Further, the LSA and LinkedIn User Agreement are documents that speak for themselves.

44.     Beginning on January 25, 2016 and throughout 2016, hiQ also purchased advertising on LinkedIn.

**ANSWER:**   hiQ admits the allegation in Paragraph 44 that hiQ purchased advertising on LinkedIn, but lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 44.

45.     In doing so, it agreed to LinkedIn's Ads Agreement, which in turn incorporates the User Agreement.  To agree to the Ads Agreement, one has to click through a screen where the Ads Agreement is hyperlinked above the button on which one needs to click to assent, as demonstrated by the below screenshot:

1  **ANSWER:**  The allegations in Paragraph 45 state legal conclusions to which no response is

2  required.  Further, LinkedIn's Ads Agreement is a document which speaks for itself.  hiQ lacks

3  knowledge sufficient to admit or deny the remaining allegations in Paragraph 45.

4  46.  The LinkedIn Ads Agreement provided that "in addition" to "this Agreement, the

5  standard LinkedIn User Agreement . . . applies to your use of the LinkedIn Ads service," and that

6  "[a]s a consequence of your violation of any of the aforementioned agreements, LinkedIn may, at

7  its sole discretion, prohibit you from any further participation in the LinkedIn Ads service and any

8  other service or program offered by LinkedIn, or suspend or remove your LinkedIn account.

9  LinkedIn may undertake technical measures in furtherance of such prohibition."

10  **ANSWER:**  The LinkedIn Ads Agreement is a document that speaks for itself.

11  47.  There are also dozens of current and former employees of hiQ who maintain

12  individual member profiles on LinkedIn and who have agreed to the LinkedIn User Agreement.

13  **ANSWER:**  The allegations in Paragraph 47 state legal conclusions to which no response is

14  required.  Further, the allegations in Paragraph 47 are not relevant to any claims or defenses in this

15  case and therefore no response is required.  To the extent a response is required, hiQ lacks

16  knowledge sufficient to admit or deny the allegations in Paragraph 47 relating to how many hiQ

17  employees had individual profiles on LinkedIn.

18  48.  The User Agreement expressly prohibits scraping LinkedIn's website.

19  **ANSWER:**  The allegation in Paragraph 48 states a legal conclusion to which no response

20  is required.  Further, the User Agreement is a document which speaks for itself.

21  49.  Section 8.2 of the User Agreement prohibits those who are bound to the agreement

22  from engaging in any of the following activities:

23  • "Us[ing] ... automated software, devices, scripts robots, other means or processes to

24  access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

25  • "Us[ing] bots or other automated methods to access the Services";

26  • "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers,

27  browser plugins and add-ons, and any other technology"; and

28

- "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or related any information or data."

**ANSWER:**  The allegations in Paragraph 49 state legal conclusions to which no response is required.  Further, the User Agreement is a document which speaks for itself.

50.     As explained above, hiQ was aware and on actual notice of LinkedIn's User Agreement and LinkedIn's prohibitions against scraping for years.  Moreover, hiQ agreed to abide by LinkedIn's User Agreement, including its prohibitions against scraping and related conduct, on multiple occasions.

**ANSWER:**  The allegations in Paragraph 50 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

51.     In addition to agreeing to the User Agreement, as explained above, LinkedIn also provided hiQ actual notice of the content of Section 8.2 of the User Agreement when it sent hiQ its initial cease and desist letter on May 23, 2017.  Since at least May 23, 2017, hiQ has therefore known that any future use of LinkedIn's website is conditioned on abiding by LinkedIn's User Agreement.  By its terms, the User Agreement applies not only to LinkedIn members, which hiQ was, but to anybody who uses LinkedIn's website.

**ANSWER:**  The May 23, 2017 cease and desist letter and the User Agreement are documents which speak for themselves.  As to the allegations that use of LinkedIn's website is conditioned on the User Agreement and that the User Agreement may legally "appl[y] . . . to anybody who uses LinkedIn's website," those are legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

52.     Section 3.4 of the User Agreement specifically provides that LinkedIn "reserves the right to restrict, suspend, or terminate" a person or entity's access to LinkedIn.  This provision is necessary to allow LinkedIn to police its own website and violations of the User Agreement.

**ANSWER:**  The User Agreement is a document which speaks for itself.  hiQ lacks knowledge sufficient to admit or deny the second sentence of Paragraph 52.

53.     LinkedIn takes violations of its User Agreement by any user of its website seriously, and routinely takes action against such violations.  LinkedIn has restricted over 27 million accounts

1  for engaging in behavior violating the User Agreement including scraping, fraud, and spamming.

2  While LinkedIn is often able to get bad actors to agree to cease their bad behavior short of filing a

3  lawsuit, LinkedIn has also enforced its rights in court on several occasions.   *See LinkedIn*

4  *Corporation v. Robocog Inc.*, No. 14 Civ. 0068 (N.D. Cal.); *LinkedIn Corporation v. Scraping Hub*

5  *Limited*, No. 16 Civ. 4463 (N.D. Cal.); *LinkedIn Corporation v. Raphael Azot and Dataspectre*. No.

6  16 Civ. 4463 (N.D. Cal.).

7       **ANSWER:**  hiQ admits that LinkedIn has filed several lawsuits, including the ones listed in

8  Paragraph 53; however, the allegation that these lawsuits were filed against "bad actors" is a legal

9  conclusion to which no response is required.   To the extent a response is required, hiQ lacks

10  sufficient knowledge to admit or deny LinkedIn's characterization of the defendants to those

11  lawsuits as "bad actors."  hiQ lacks knowledge sufficient to admit or deny the remaining allegations

12  in Paragraph 53.

13  **LinkedIn Member Privacy Choices**

14       54.     The privacy choices that LinkedIn offers its members are fundamentally important

15  to their decisions to entrust information to LinkedIn and to LinkedIn's platform.   hiQ's illicit

16  scraping implicates several of them.

17       **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in the first

18  sentence of Paragraph 54, which go to LinkedIn members' states of mind.  hiQ denies the allegation

19  in the second sentence of Paragraph 54.

20       55.     In its Privacy Policy, LinkedIn sets limits regarding what LinkedIn can and cannot

21  do with member data.   The Privacy Policy expressly informs members that search engines may

22  index and display information in their profiles. LinkedIn limits such indexing to well-known search

23  engines, such as Google, Bing and Duck Duck Go.   LinkedIn permits members to choose the parts

24  of their profiles that search engines index, or to opt out of this feature entirely.   Members thus have

25  choice about whether they want search engines to index their profiles and display them in relevant

26  search results.   LinkedIn offers members this choice because it allows members to be found via

27  search engines, which link to their LinkedIn profiles, where the member has stored and controls his

28

or her profile information.  In other words, this is a policy that benefits LinkedIn's members and is consistent with their expectations about how their data will be used.

**ANSWER:**  As to the allegations relating to the content of LinkedIn's Privacy Policy, the Privacy Policy is a document that speaks for itself.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 55.

56.     The Privacy Policy also promises that if a member decides that he or she wants to delete his or her profile, LinkedIn will permanently delete the account and all of the data that the member posted to LinkedIn within 30 days.  Members' ability to remove their own information helps ensure that members are the ones who have ultimate control over it.

**ANSWER:**  LinkedIn's Privacy Policy is a document which speaks for itself.  hiQ denies the allegations in the second sentence of Paragraph 56.

57.     Another privacy control that LinkedIn offers is the "Do Not Broadcast" setting. LinkedIn's platform allows members to update their profiles at any time with, for example, a new employer, position, or skill.  When a member updates the information in his or her profile, LinkedIn lets that member choose whether to broadcast that change on LinkedIn.  If a member decides that he or she does not want to broadcast changes to his or her profile, that member can click on a radio button and make that choice.  If a member elects to employ this "Do Not Broadcast" setting, then any changes that the member makes to his or her profile will be visible, but the fact that the member made a change will not be broadcast to his or her LinkedIn connections or to anyone else.

**ANSWER:**  hiQ denies that the "Do Not Broadcast" setting is a "privacy control."  hiQ otherwise admits the allegations in Paragraph 57, except for the allegation that "the fact that the member made a change will not be broadcast to . . . anyone else," because hiQ lacks knowledge sufficient to admit or deny this allegation.

58.     LinkedIn implemented the "Do Not Broadcast" feature in the 2009-2010 timeframe in response to feedback from LinkedIn members who were hesitant to update their profiles for fear that their co-workers or employers would suspect they were searching for a new job or otherwise thinking of leaving their current jobs.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 58.

59.     LinkedIn offers members the ability to elect this "Do Not Broadcast" setting in numerous places.  First, LinkedIn members can go into their privacy settings and select this feature at any time, as demonstrated by the following screenshot:



**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 59.  As to the content of the screenshot in Paragraph 59, that screenshot speaks for itself and hiQ lacks knowledge sufficient to verify the accuracy or original location of the screenshot.

60.     Second, LinkedIn provides members the option of electing the "Do Not Broadcast" feature in real-time anytime the member goes to make a change to his or her profile, by surfacing the feature directly in the dialog box in which the member makes profile changes.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 60.

61.     Many LinkedIn members have taken advantage of this privacy feature.  Over 88 million LinkedIn members have elected to employ the "Do Not Broadcast" feature in the last three years.  Of the 136 million members who updated their profiles in the last year, 36 million employed the "Do Not Broadcast" privacy setting—which is approximately 26% of those members.  When members select "Do Not Broadcast," LinkedIn respects this choice in its other products, such as Recruiter.

**ANSWER:** hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 61.

62.     hiQ claims that it has three customers (eBay, Capital One, and GoDaddy) and several "potential" customers (including Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier, and Jobvite).   As of 2017, over 100,000 LinkedIn members that work for these companies have taken advantage of the "Do Not Broadcast" privacy setting.

**ANSWER:**  hiQ admits that the entities listed were some of hiQ's customers or potential customers but hiQ denies that these were hiQ's *only* customers or potential customers.   The allegation in the last sentence of Paragraph 62 does not require a response from hiQ, as that allegation is not relevant to any claims or defenses in this case.  hiQ lacks knowledge sufficient to admit or deny the remaining allegations in Paragraph 62.

**hiQ's Unlawful Data Scraping Activities**

63.     hiQ has engaged in widespread scraping of LinkedIn's website, circumventing LinkedIn's technical measures and violating the User Agreement. hiQ does not deny this.  Although it formerly obscured the sources from which it harvested data to put into its products, stating only that it applied its algorithms to "public data sources,"[14] its filings in this very case concede that it scrapes significant amounts of data from LinkedIn. Since its original complaint, hiQ has alleged that it uses LinkedIn member data "as raw data for its analysis and has historically used a variety of software and manual means to gather this information" from LinkedIn's website.[15]

**ANSWER:**  As to the unnumbered heading that proceeds Paragraph 63 ("hiQ's Unlawful Data Scraping Activities"), that heading infers a legal conclusion to which no response is required. To the extent that heading requires a response, hiQ denies that its conduct was in any way unlawful. hiQ denies the characterizations of its scraping activity as "circumventing LinkedIn's technical measures."  hiQ also denies the characterization of its scraping activity as "widespread" as well as the allegation that it scrapes "significant amounts of data," as that phrasing is relative with respect to the entirety of data on LinkedIn's website.  The statement in Paragraph 63 that hiQ violated the User Agreement is a legal conclusion to which no response is required; however, to the extent a response is required, hiQ denies that it violated the User Agreement.  hiQ denies that it "obscured

---

[14]   Dkt. No. 26 at 10.
[15]   Dkt. No. 1 ¶ 18; *see also* Dkt. No. 131 (First Amended Complaint) ¶ 34.

the sources" of the data hiQ uses for its products.  As to LinkedIn's quotations of hiQ's original complaint and amended complaint, those documents speak for themselves; however, hiQ denies the accuracy of those quotations, as LinkedIn's selective quotation to these documents omits the first portion of the quotes, which make clear that "hiQ uses the *public profile section* of the LinkedIn website as raw data for its analysis . . . ." (Dkt. Nos. 1 ¶ 18, 131 ¶ 34) (emphasis added).

64.     hiQ has never asked LinkedIn for permission to scrape LinkedIn's servers.  hiQ did surreptiously apply to LinkedIn for other means of obtaining the data, and was denied.

**ANSWER:**  hiQ denies the allegations in this paragraph to the extent they are to suggest that hiQ required permission from LinkedIn to access publicly-available data and denies the characterization of hiQ's conduct as "surreptious[]."   hiQ admits the remaining allegation in Paragraph 64.

65.     LinkedIn has never granted hiQ permission to scrape its servers.

**ANSWER:**  hiQ denies the allegation in Paragraph 65.

66.     After scraping data from LinkedIn's servers, hiQ uses the data for at least two products that it sells to its customers:  (1) "Keeper," which hiQ claims tells employers which of their employees are flight risks, and (2) "Skill Mapper," which hiQ claims offers a summary of the breadth and depth of aggregate or individual skills possessed. hiQ claims to have sold these products to companies who want to keep better tabs on their employees.  hiQ does not obtain permission from LinkedIn's members before scraping their LinkedIn data, nor do LinkedIn members have any enforceable way to limit what hiQ does with their data after it has been scraped.

**ANSWER:**  hiQ admits that it used public profile data from LinkedIn's website for the Keeper and Skill Mapper products.  hiQ admits to the high-level description of the Keeper and Skill Mapper products, but notes that these descriptions are not fulsome or complete descriptions of the products.  hiQ denies the characterization of these products as serving the purpose of "keep[ing] better tabs on [hiQ's clients'] employees."  hiQ denies the allegations in the last sentence of this Paragraph insofar as they suggest that hiQ required permission from LinkedIn members to scrape publicly-available data and lacks knowledge sufficient to admit or deny whether LinkedIn members "have any enforceable way to limit what hiQ does with their data after it has been scraped."

67.     hiQ's system used different terminology for its scraping methods, including "blind scraping," which targeted categories or groups of profiles such as by employer, industry, or position, and "core scraping," which targeted specific employees of its customers by name.  In order for the Keeper product to be commercially successful, hiQ needed to obtain "coverage" of the employees of its customers—in other words, it needed to be able to find a high percentage of their profiles on LinkedIn and follow these profiles over time.  Changes to LinkedIn profiles of hiQ's customer employees were the strongest signal that it used in its data modelling for the Keeper product.

**ANSWER:**  hiQ admits that it used different terminology for its scraping methods including the phrases "blind scraping" and "core scraping," but hiQ lacks knowledge sufficient to admit or deny the allegations in this Paragraph insofar as the paragraph includes undefined ambiguous terms like "targeted," "commercially successful," and "coverage."  Similarly, hiQ does not know what "[c]hanges to LinkedIn profiles of hiQ's customer employees" means.  To the extent a response is required, hiQ denies these allegations.

68.     In order to conduct its core scraping operations to support its Keeper product, hiQ needed to find a way to validate URLs in order to identify a sufficient number of employees for scraping.  hiQ built a system for use by hired contractors referred to as "mechanical turkers."  At first, these turkers used their existing individual LinkedIn accounts to conduct their hiQ operations. After their legitimate accounts were restricted for unathorized use, however, hiQ's turkers had to circumvent LinkedIn's password wall by creating fake accounts in further violation of LinkedIn's User Agreement.  hiQ instructed the turkers to create fake LinkedIn accounts and to use those fake accounts to log in to LinkedIn in order to search for and copy the employee URLs into hiQ's system. hiQ's core scraping system utilized the data obtained by turkers while logged in using fake accounts and its Keeper product depended on hiQ's logged-in turkers to obtain a sufficient number of employee profiles.  Numerous hiQ employees also utilized fake LinkedIn accounts to test scraping, to analyze profiles, and to support other aspects of hiQ's system.  hiQ used fake accounts to obtain unauthorized access to LinkedIn's servers.   All of these activities violated LinkedIn's User Agreement.  While hiQ touted to this Court that it only engaged in "logged-out" scraping, in fact

hiQ depended upon a range of logged-in conduct to develop and support its business, including its scraping acitvity.

**ANSWER:**  hiQ admits that it hired contractors known as "turkers."  hiQ lacks sufficient information to admit or deny the allegations regarding "fake accounts", as that term is ambiguous and undefined.  hiQ denies the remaining allegations in Paragraph 68.

69.     With respect to that scraping activity, hiQ used bots to make many unauthorized access requests on LinkedIn's servers in order to scrape data from millions of profiles of LinkedIn members.  LinkedIn's best estimate of the number of such unauthorized access requests is that it ranged into the billions, but the true number is unknown because hiQ destroyed the server logs that would have provided that information.

**ANSWER:**  The allegations in Paragraph 69 state legal conclusions concerning whether hiQ's access to LinkedIn was "authorized" to which no response is required.  hiQ lacks information sufficient to admit or deny what LinkedIn's best estimate of the number of hiQ's access requests are and denies the remaining allegations in this paragraph.

70.     hiQ's bots are sophisticated and programmed in ways to evade LinkedIn's technical defenses.  hiQ used a variety of methods with its bots in order to simulate human conduct in an effort to evade LinkedIn's defenses, including cookies, user-agents, timing and throttling restrictions, and other methods.  hiQ's bots also used residential IP addresses purchased from third parties in order to conceal hiQ's activity.

**ANSWER:**  hiQ lacks sufficient knowledge to admit or deny the allegations in Paragraph 70 as it is unclear what "hiQ's bots" refers to.  To the extent the allegations in this paragraph call for a legal conclusion, no response is required.  hiQ denies the characterization of its conduct in this paragraph as being "eva[sive]" and "conceal[ing]."

71.     Nonetheless, LinkedIn's general technical anti-scraping defenses were effective against hiQ even prior to May 23, 2017.  These defenses, applicable to all guest requests, blocked scraping from IP addresses that LinkedIn only later discovered (in this lawsuit) were used by hiQ at its office and by its employees while they were testing hiQ's scraping system.  LinkedIn's guest-request defenses blocked requests from IP addresses associated with certain cloud providers known

1    to be used by scrapers and used by hiQ.  LinkedIn implemented its "bot-model," a machine-learning

2    based defense, in the Spring of 2017.  LinkedIn was then able to identify scrapers based on additional

3    indicators, and trigger IP blocks.  As LinkedIn has learned through discovery in this lawsuit but did

4    not know at the time it sent its cease and desist letter, its general anti-abuse systems were of such

5    increasing effectiveness against hiQ over time that hiQ's scraping of LinkedIn had been shut down

6    completely by the Spring of 2017.

7        **ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 71 to the extent

8    that sentence suggests that LinkedIn's general technical anti-scraping defenses were 100% effective

9    against hiQ prior to May 23, 2017.  hiQ denies the allegation in the last sentence that "hiQ's scraping

10   of LinkedIn had been shut down completely by the Spring of 2017" to the extent that suggests that

11   LinkedIn's anti-scraping defenses were 100% effective against hiQ.  hiQ lacks information

12   sufficient to admit or deny the remaining allegations in Paragraph 71 which relate to LinkedIn's

13   knowledge and conduct and the precise capabilities of LinkedIn's "defenses".

14       72.    hiQ responded to these defenses using a variety of techniques.  hiQ understood well

15   that its profile access requests were not authorized by LinkedIn.  In the words of its software

16   engineer responsible for scraping at the time, "LinkedIn does NOT want us in the party."  Both its

17   CTO and its new CEO knew about other lawsuits that LinkedIn had filed against scrapers.  hiQ

18   expressly agreed repeatedly to LinkedIn's User Agreement in a variety of commercial contexts

19   where it purchased services from LinkedIn, and multiple officers of the Company received notice

20   of updates to its terms.  Its CTO reviewed the terms of the User Agreement and quoted the scraping

21   prohibition to multiple officers of the company.  hiQ applied to LinkedIn for API access as a means

22   of obtaining authorization to obtain member profile data, and was rejected.  hiQ knew that its

23   conduct was inconsistent with LinkedIn's User Agreement and therefore not authorized, it simply

24   took the view that it was not bound by that Agreement so long as it conducted its scraping on a

25   "logged out basis"—which was a fiction in any event because hiQ's scraping system was not

26   sufficient to deliver its product without its logged-in turking.

27       **ANSWER:**  hiQ lacks sufficient knowledge to admit or deny the allegations in the first

28   sentence of Paragraph 72 as it is unclear what "defenses" and what "a variety of techniques" refer

to.  hiQ denies the allegations in the second sentence of Paragraph 72.  The third sentence quotes from a document, the contents of which speaks for itself.  hiQ lacks knowledge sufficient to admit or deny the allegations in the fourth sentence of Paragraph 72 as those alleations do not specify a time period of any purported knowledge and do not identify which of hiQ's two CEOs is referred to.  The allegation in the fifth sentence of Paragraph 72 – that hiQ "expressly agreed repeatedly to LinkedIn's User Agreement" – consists of a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies that allegation.  The allegations in the sixth sentence of Paragraph 72 purport to summarize a document, the contents of which speaks for itself.  hiQ admits the allegation in the eighth sentence that it applied for API access but denies the remaining allegations in that sentence.   The remaining allegations in Paragraph 72, which purport to characterize hiQ's position on a legal issue and also purport to offer legal conclusions, do not require a response.  To the extent a response is required, hiQ denies those allegations.  hiQ denies the allegation in the last sentence that "hiQ's scraping system was not sufficient to deliver its product without its logged-in turking."

73.      Despite its knowledge that its requests for LinkedIn profiles were not authorized, hiQ engaged in a variety of efforts over time to get around LinkedIn's anti-abuse technical defenses.  It purchased proxy IP addresses to evade the blocks on those addresses LinkedIn had identified as belonging to a scraper, in order to conceal its identity as a scraper from LinkedIn's anti-abuse systems.  hiQ engaged in a program to "reverse engineer" LinkedIn's defenses in order to defeat them.  A hiQ engineer monitored information about LinkedIn's bot detection program and then conducted numerous experiments designed to simulate ordinary human browsing (instead of scraper) conduct.  Despite these efforts by hiQ, LinkedIn's guest-request defenses successfully identified and blocked hiQ as one of many anonymous scrapers.  Indeed, hiQ's new CEO reported to the Board within weeks of taking his position that scraping was a serious problem faced by the company. hiQ held an internal "Data Scraping Summit" on May 2, 2017.  Less than two weeks later on May 15, hiQ's inability to obtain profile data was a significant subject at a meeting of its Board of Directors.  Although LinkedIn did not know it at the time due to hiQ's efforts to conceal its

1 identity, when it sent its cease and desist letter to hiQ on May 23, 2017, LinkedIn had already
2 effectively blocked hiQ as a scraper.

3     **ANSWER:**  hiQ admits the allegations in the seventh sentence of Paragraph 73.  hiQ lacks
4 information sufficient to admit or deny the allegations in the fifth sentence of Paragraph 73.  hiQ
5 denies the remaining allegations in Paragraph 73.

6     74.    hiQ does not sell its products to employees. In fact, hiQ's "Keeper" product would
7 lose its functionality if employees knew that their employers were using it.  Many employees who
8 want to find new jobs do not want their employers to know that they are looking for other jobs.

9     **ANSWER:**  hiQ admits that it does not sell its products to employees.  hiQ denies that its
10 "'Keeper' product would lose its functionality if employees knew that their employers were using
11 it."  hiQ lacks knowledge sufficient to admit or deny the allegation as to the states of mind of
12 "[m]any employees" who "are looking for other jobs."

13     75.    hiQ has no contractual relationship with LinkedIn's members and does not obtain
14 permission from LinkedIn or its members to scrape their data from LinkedIn's website.  Once hiQ
15 has a member's data, no enforceable privacy policy or terms of service between hiQ and the people
16 whose data it has scraped limit what hiQ could do with that data.

17     **ANSWER:**  hiQ admits that it has no contractual relationship with LinkedIn's members,
18 except to the extent any of LinkedIn's members are clients of hiQ with whom hiQ had a contractual
19 relationship.  hiQ admits that it does not seek permission from LinkedIn's members to scrape their
20 publicly available profile information; however, hiQ denies that any such permission is necessary
21 where members have opted to make their data publicly available.  hiQ admits the remaining
22 allegations in Paragraph 75.

23     76.    hiQ's scraping does not respect the privacy choices that LinkedIn's members have
24 made, including the Do Not Broadcast feature, or subsequently make after the data has been scraped.
25 Rather, hiQ's products defeat the privacy protection LinkedIn offers.  Indeed, a goal of hiQ's
26 "Keeper" product is to tell employers when LinkedIn members change their profiles, even if
27 members have chosen not to broadcast such changes to their connections (including their
28 employers).

1    **ANSWER:**  hiQ denies the allegations in Paragraph 76.

2    77.    After LinkedIn discovered hiQ's illicit scraping, it sent a cease-and-desist letter to

3    hiQ on May 23, 2017 requesting that hiQ stop scraping LinkedIn data and explicitly stating that any

4    further access to LinkedIn's servers was unauthorized.  LinkedIn demanded that hiQ, inter alia,

5    cease accessing LinkedIn's servers, destroy all data it obtained, and cease violating the User

6    Agreement.

7    **ANSWER:**  hiQ denies the allegation in the first sentence of Paragraph 77 that its scraping

8    was "illicit" and also denies the implication that LinkedIn was not aware, long before it sent its May

9    23, 2017 cease and desist letter, that hiQ was scraping LinkedIn members' publicly available data.

10   As to the contents of the cease and desist letter, that document speaks for itself.

11   78.    Thereafter, hiQ sued LinkedIn and obtained a preliminary injunction.

12   **ANSWER:**  hiQ admits the allegation in Paragraph 78.

13   **hiQ Has Caused and Threatens Ongoing and Irreparable Injury to LinkedIn**

14   79.    By engaging in the activities described above, hiQ has caused, and if not halted will

15   continue to cause, ongoing and irreparable harm to LinkedIn, in a variety of ways, including ongoing

16   and irreparable harm to its consumer goodwill.  hiQ admits that it has scraped data from hundreds

17   of thousands of LinkedIn users without their consent.  hiQ's conduct should be permanently

18   enjoined.

19   **ANSWER:**  hiQ denies the allegation in the unnumbered heading preceding Paragraph 79.

20   The allegations in Paragraph 79 state legal conclusions to which no response is required.  To the

21   extent a response is required, hiQ denies these allegations.

22   80.    LinkedIn's members entrust to LinkedIn their professional histories and interests on

23   LinkedIn's site.  LinkedIn will suffer ongoing and irreparable harm to its consumer goodwill and

24   trust, which LinkedIn has worked hard for years to earn and maintain, if hiQ's conduct continues.

25   LinkedIn has received numerous complaints from members when they suspect third parties of

26   scraping their data.

27   **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in the first and

28   third sentences of Paragraph 80.  The allegations in the second sentence of Paragraph 80 state legal

1  conclusions to which no response is required.  To the extent a response is required, hiQ denies these

2  allegations.  hiQ denies the remaining allegations in this Paragraph.

3      81.    The below complaint, from June 2017, shortly after hiQ sued LinkedIn, is

4  representative of the complaints that LinkedIn receives.  In it, the member asked why a third party

5  was "allowed to harvest and republish" his LinkedIn data and asked LinkedIn "[w]hat protection do

6  you offer LinkedIn members?"  This demonstrates that members expect that LinkedIn will take

7  action to preserve their privacy and protect data that members post to LinkedIn's website.  LinkedIn

8  has received myriad complaints like this.

9  > Your Question : Why is holaconnect.com allowed to harvest and republish our data? Because they have a LinkedIn profile, they can harvest easily. Are they selling it? Spamming us? What protection do you offer LinkedIn members? Or do you encourage their use of our data? Thanks

10     **ANSWER:**  The allegations in this Paragraph are not relevant to the claims or defenses in

11  this action because they do not purport to relate to hiQ.  However, to the extent a response is

12  required, to the extent these allegations quote from or make inferences based on a complaint, that

13  document speaks for itself.  Moreover, hiQ lacks knowledge sufficient to admit or deny the

14  authenticity of the complaint referenced in Paragraph 81, whether this complaint is "representative

15  of the complaints that LinkedIn receives," whether LinkedIn in fact receives "myriad" complaints,

16  or what the state of mind or expectations are of members who submit complaints.

17     82.    The below complaint is another example of the types of complaints that LinkedIn

18  gets when members find information that they entrusted to LinkedIn posted on third party websites.

19  In the below complaint, the member laments that once the member's information has been taken by

20  a third party, the member no longer controls it and can no longer delete it or make it private, as

21  would be the case with information that hiQ takes:

22

23  **Member** (02/13/2017 22:41 CST)

24  Email: : ███████@gmail.com

  ta_group :

25  Your Question : Hi, I recently was let know by a friend that Rocketreach site carried information that I had on my linked in profile previously and

26  displayed it unprotected. https://rocketreach.cc████████ I will choose to keep what I want in my linkedin profile
  (either private or public) which is my choice and I will modify my profile when I want to. I could have even changed my profile details and
  modified my settings on linkedin. But it is not right for Rocketreach to display the information I previously carried on my Linkedin profile. How

27  does Rocketreach get the permission to display my information to everyone without my authorization. I see this as a very serious privacy violation
  and what is Linkedin's stand on Other providers using APIs to gather information from Linkedin Profile and displaying outdated information

28  without the consent of the users. It defeats the purpose of updating my linkedin profile and making details private. Thanks, ████ .

**ANSWER:**  The allegations in this Paragraph are not relevant to the claims or defenses in this action because they do not purport to relate to hiQ.  However, to the extent a response is required, to the extent these allegations quote from or make inferences based on a complaint, that document speaks for itself.  Moreover, hiQ lacks knowledge sufficient to admit or deny the authenticity of the complaint referenced in Paragraph 82 and whether this complaint "is an example of the 'type' of complaints that LinkedIn gets."

83.    LinkedIn members have also complained about hiQ's scraping.  For example, one member complained:  "How the hell does hiQ Labs, Inc. get the right to scrape data we placed on LinkedIn?  Is it just me or have things gotten way off the rails."

**ANSWER:**  This allegation purports to quote from a document, the contents of which speak for itself.

84.    LinkedIn has expended hundreds if not thousands of hours of employee time in maintaining its technical defenses and investigating and responding to hiQ's unlawful activities, at a cost to LinkedIn well in excess of $5,000.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 84.

85.    Scraping also threatens the trust that LinkedIn has built with its members, which could decrease member engagement. hiQ's actions – which are focused only on its narrow interest to exploit LinkedIn data for its own benefit – detracts from the significant investments and efforts undertaken by LinkedIn to ensure the LinkedIn platform is valuable to all members.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegation that LinkedIn "has built [trust] with its members" and whether scraping has any impact on that purported trust. hiQ denies the remaining allegations in Paragraph 85.

86.    Although LinkedIn has been plagued by unauthorized scraping traffic since the early days of the platform, scraping traffic has grown substantially over the past few years.  Despite clear instructions to robots and clear policies prohibiting bots and scraping, LinkedIn nonetheless receives many millions of unauthorized requests of its servers from bots every day.  The volume of such unauthorized traffic was meaningful by the time hiQ began its operations, reached 95 million

1  requests per day by the outset of the parties' dispute, and has further increased dramatically during

2  this litigation.

3     **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

4  86.

5     87.     Unauthorized scrapers like hiQ present multiple problems for LinkedIn.  First, while

6  any particular scraper may start small, if it is successful it will seek to expand its automated data

7  collection, increasing the number of calls to LinkedIn's servers.  Second, taken in the aggregate,

8  automated scrapers place a substantial burden on LinkedIn's infrastructure—reaching at present into

9  hundreds of millions of blocked access requests per day.  While of course LinkedIn configures its

10  platform infrastructure to be resilient and scalable, the significant volume of automated scraping

11  activity forces LinkedIn to invest more in capital and operational resources than it otherwise would

12  if it were able to prevent these access requests from ever happening.  Scraping operations force

13  LinkedIn to alter its priorities for use of its computing resources and impair the efficiency of such

14  resources.  The current volume of bot requests could easily impair the ability of many websites that

15  do not invest as much in their infrastructure as LinkedIn does.

16     **ANSWER:**  hiQ denies the characterization of hiQ as an "[u]nauthorized" scraper and lacks

17  knowledge sufficient to admit or deny the remaining allegations in Paragraph 87.

18     88.     If hiQ were allowed to scrape unlimited numbers of pages, others would surely

19  follow.  It is only because of LinkedIn's ongoing protection efforts as well as its willingness to spend

20  increasing amounts to maintain a high service level that it has been able to prevent a degradation in

21  the quality of its services.  Attempts to scrape LinkedIn's website are now so rampant that LinkedIn

22  currently blocks the majority of daily requests to access guest LinkedIn profiles—in the hundreds

23  of millions of requests.  In other words, but for LinkedIn's blocking efforts and its investment in

24  first-in-class back-end infrastructure, LinkedIn's servers would spend more time and resources

25  responding to unauthorized requests for guest profile information from scrapers like hiQ than they

26  would responding to people requesting such information in good faith and in compliance with the

27  scope of permission afforded by LinkedIn.

28

1    **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

2    88.

3        89.    If LinkedIn has no legal means to prevent the ongoing escalation of these automated

4    scraping efforts, then its cost structure for infrastructure will also continue to escalate—even

5    assuming that its self-help efforts continue to be successful.  LinkedIn will be forced into making

6    the choice of investing more in its infrastructure to ensure the availability of its website, or

7    succumbing to the burden of bot-based scraping.  This is not much of a choice, as surely LinkedIn,

8    like any business, would prefer to have its website remain available.  But this outcome means that

9    LinkedIn must plan its infrastructure around the whims of others, which means that its property is

10   no longer its own.

11       **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

12   89.

13       90.    Left unchecked, scraping activity like hiQ's is both likely to be expanded and

14   replicated by others, causing LinkedIn harm in the form of impaired condition, quality and value of

15   both its infrastructure and services.

16       **ANSWER:**  hiQ denies the allegations in Paragraph 90.

17                          **FIRST CLAIM FOR RELIEF**

18          **Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA")**

19       91.    LinkedIn restates and incorporates by reference all of the preceding paragraphs.

20       **ANSWER:**  hiQ incorporates by reference all of its answers to the preceding paragraphs.

21       92.    LinkedIn's computers and servers are involved in interstate and foreign commerce

22   and communication, and are protected computers under 18 U.S.C. §1030(e)(2).

23       **ANSWER:**  The allegations in Paragraph 92 state legal conclusions to which no response is

24   required.  To the extent a response is required, hiQ denies the allegations in Paragraph 92.

25       93.    hiQ knowingly and intentionally accessed LinkedIn's computers and servers without

26   authorization or in excess of authorization.

27       **ANSWER:**  The allegations in Paragraph 93 state legal conclusions to which no response is

28   required.  To the extent a response is required, hiQ denies the allegations in Paragraph 93.

94.     LinkedIn's website and servers are not unconditionally open to the general public. Rather, they require authorization or permission from LinkedIn to access.  LinkedIn uses various technological barriers to protect its computers, servers, and member data against unauthorized access including FUSE, Sentinel, the Member and Guest Request Scoring systems, its password wall, and related measures.  hiQ knowingly circumvented these technical barriers and violated express access restrictions of LinkedIn's User Agreement.  hiQ also used fake accounts to log in and obtain URL data for its scraping operations in knowing violation of LinkedIn's User Agreement, thereby knowingly exceeding authorized access to data protected by a password login requirement. At no point did hiQ have authorization to access LinkedIn's servers by circumventing LinkedIn's technical barriers or by using fake accounts.  hiQ understood that LinkedIn objected to its scraping activity and went to great lengths to mask its illicit scraping so that it was undetectable by LinkedIn. hiQ used multiple proxy services to conceal its IP addresses, and spent a great deal of time and effort trying to reverse engineer LinkedIn's defenses in order to defeat them.  Over time, hiQ adopted not only proxy services to conceal its IP addresses, but also other technical measures designed to conceal scraping such as request timing protocols, user-agents, cookies, and other methods designed to simulate human use of a web browser.  hiQ adopted all of these methods knowingly in order to evade LinkedIn's technical barriers and knowing that it was accessing LinkedIn's profile servers without authorization.

**ANSWER:**  hiQ denies the allegations in the first sentence of Paragraph 94.  hiQ lacks knowledge sufficient to admit or deny the allegations in the second and third sentences of Paragraph 94. hiQ denies the allegation in the fourth sentence of Paragraph 94 that it "knowingly circumvented these technical barriers," and the statement that hiQ "violated express access restrictions of LinkedIn's User Agreement" is a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies the allegation that it violated LinkedIn's User Agreement.  The allegation in the fifth sentence of Paragraph 94 states a legal conclusion to which no response is required.  hiQ admits the allegation in the eighth sentence of Paragraph 94 that it used proxy services to scrape LinkedIn, but denies the remaining allegations in that sentence.  hiQ denies the remaining allegations in Paragraph 94.

95.     LinkedIn also expressly revoked any authorization for hiQ to access its website when it sent the May 23, 2017 cease-and-desist letter.  After LinkedIn sent the cease and desist letter, hiQ continued to make access requests to LinkedIn's profile servers using its various methods of concealment and circumvention of LinkedIn's technical defenses.  After LinkedIn sent the cease and desist letter, hiQ also continued to direct its "turkers" to log in to LinkedIn's servers using their fake accounts in order to obtain URL data for its scraping operations.

**ANSWER:**  The allegation in the first sentence of Paragraph 95 states a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies the allegation in the first sentence of Paragraph 95.  hiQ denies the allegations in the second sentence of Paragraph 95. hiQ admits that it continued to employ "turkers" after the cease-and-desist letter but denies the remaining allegations in the third sentence of Paragraph 95.

96.     After accessing LinkedIn's computers and servers without authorization or in excess of authorization, hiQ accessed, obtained and used valuable information from LinkedIn's computers and servers in transactions involving interstate or foreign communications in violation of 18 U.S.C. § 1030(a)(2).  This information includes, among other things, the contents of many LinkedIn profiles, and this use includes, among other things, analyzing and distributing that content to others. This data was otherwise protected by LinkedIn's technical measures.

**ANSWER:**  hiQ admits that it accessed the publicly available data of specific LinkedIn members' profiles and that it analyzed that data and distributed its analysis to others.  hiQ denies that it "distribut[ed] [the] content[s]" of LinkedIn profiles, or provided specific public profile information to anyone who would not have otherwise been able to access it.  hiQ denies that LinkedIn's members' publicly available profile data was "protected by LinkedIn's technical measures."  The remaining allegations in Paragraph 96 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

97.     LinkedIn has put hiQ on notice that its access to LinkedIn's servers is not authorized by LinkedIn.  Subject to LinkedIn's compliance with the Court's preliminary injunction order, any further scraping by hiQ would be without authorization by LinkedIn.

1   **ANSWER:**  The allegations in Paragraph 97 state legal conclusions to which no response is

2   required.  To the extent a response is required, hiQ denies these allegations.

3   98.   LinkedIn has suffered damage and loss by reason of these violations, including,

4   without limitation, harm to LinkedIn's computer systems, expenses associated with being forced to

5   investigate and respond to the unauthorized access and abuse of its computers and servers, and other

6   losses and damage in an amount to be proven at trial, in excess of $5,000 aggregated over a one-

7   year period.

8   **ANSWER:**  The allegations in Paragraph 98 state legal conclusions to which no response is

9   required.  To the extent a response is required, hiQ denies these allegations.

10   99.   In addition, LinkedIn has suffered and will continue to suffer irreparable harm, and

11   its remedy at law is not itself adequate to compensate it for injuries inflicted by hiQ.  Accordingly,

12   LinkedIn is entitled to injunctive relief.

13   **ANSWER:**  The allegations in Paragraph 99 state legal conclusions to which no response to

14   required.  To the extent a response is required, hiQ denies these allegations.

15   <u>**SECOND CLAIM FOR RELIEF**</u>

16   **California Comprehensive Computer Access and Fraud Act, Cal. Penal Code §§ 502 _et seq._**

17   100.   LinkedIn restates and incorporates by reference all of the preceding paragraphs.

18   **ANSWER:**  hiQ restates and incorporates by reference its answers to all of the preceding

19   paragraphs.

20   101.   LinkedIn's computers and servers are computers, computer systems, and/or

21   computer networks within the meaning of Cal. Penal Code § 502(b).

22   **ANSWER:**  The allegations in Paragraph 101 state legal conclusions to which no response

23   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 101.

24   102.   hiQ circumvented various technological barriers LinkedIn has employed to protect

25   its computers, servers, and member data against unauthorized access—including FUSE, Sentinel,

26   the Member and Guest Request Scoring systems, its password barrier, and related measures—and

27   has violated express access and use restrictions in LinkedIn's User Agreement.

28

1    **ANSWER:**  The allegations in Paragraph 102 state legal conclusions to which no response

2    is required.  To the extent a response is required, hiQ denies these allegations.

3        103.    hiQ wrongfully obtained and used valuable information from LinkedIn's website.

4    **ANSWER:**  The allegations in Paragraph 103 state legal conclusions to which no response

5    is required.  To the extent a response is required, hiQ denies these allegations.

6        104.    hiQ knowingly accessed LinkedIn's website and servers, and, without permission

7    took, copied and made use of data and files from LinkedIn's computers, computer systems, and/or

8    computer networks, including to wrongfully control and/or obtain such data, in violation of Cal.

9    Penal Code §§ 502(c)(1) & (2).

10    **ANSWER:**  The allegations in Paragraph 104 state legal conclusions to which no response

11    is required.  To the extent a response is required, hiQ denies these allegations.

12        105.    hiQ knowingly and without permission accessed or caused to be accessed LinkedIn's

13    computers, computer systems, and/or computer networks in violation of Cal. Penal Code §

14    502(c)(7).

15    **ANSWER:**  The allegations in Paragraph 105 state legal conclusions to which no response

16    is required.  To the extent a response is required, hiQ denies these allegations.

17        106.    LinkedIn has put hiQ on notice that its access to LinkedIn's servers is not authorized

18    by LinkedIn.  Subject to LinkedIn's compliance with the Court's preliminary injunction order, any

19    further scraping by hiQ would be without permission by LinkedIn.

20    **ANSWER:**  The allegations in Paragraph 106 state legal conclusions to which no response

21    is required.  To the extent a response is required, hiQ denies these allegations.

22        107.    As a direct and proximate result of hiQ's unlawful conduct, hiQ has caused damage

23    to LinkedIn in an amount to be proven at trial.  LinkedIn is also entitled to recover its reasonable

24    attorney's fees pursuant to Cal. Penal Code § 502(e).

25    **ANSWER:**  The allegations in Paragraph 107 state legal conclusions to which no response

26    is required.  To the extent a response is required, hiQ denies these allegations.

27

28

108.    LinkedIn believes that hiQ's acts were willful and malicious, including that hiQ's acts described above were done with the deliberate intent to harm LinkedIn.  LinkedIn is therefore entitled to punitive damages.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny LinkedIn's "belie[fs]."  The remaining allegations in Paragraph 108 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

109.    In addition, LinkedIn has suffered and will continue to suffer irreparable harm, and its remedy at law is not itself adequate to compensate it for injuries inflicted by hiQ.  Accordingly, LinkedIn is entitled to injunctive relief.

**ANSWER:**  The allegations in Paragraph 109 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

### THIRD CLAIM FOR RELIEF

#### Breach of Contract

110.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

**ANSWER:**  hiQ restates and incorporates by reference its answers to all of the preceding paragraphs.

111.    Use of the LinkedIn website and use of LinkedIn services are governed by and subject to the User Agreement.

**ANSWER:**  The allegations in Paragraph 111 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

112.    LinkedIn members are presented with the User Agreement and must affirmatively accept and agree to the User Agreement to register for a LinkedIn account.

**ANSWER:**  The allegations in Paragraph 112 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies these allegations.

113.    At all relevant times, LinkedIn also prominently displayed a link to the User Agreement on LinkedIn's homepage.  Those who use LinkedIn's website with actual knowledge of the terms of the User Agreement are required to abide by those terms if they choose to access LinkedIn's website.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the first sentence of Paragraph 113.  The remaining allegations in Paragraph 113 state a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies the remaining allegations in Paragraph 113.

114.    All LinkedIn members are required to agree to the User Agreement.

**ANSWER:**  The allegation in Paragraph 114 states a legal conclusion to which no response is required.  To the extent a response is required, hiQ lacks knowledge sufficient to admit or deny the allegation in Paragraph 114.

115.    hiQ has admitted that it was a LinkedIn member.

**ANSWER:**  hiQ admits the allegation in Paragraph 115.

116.    hiQ was on notice of and agreed to the User Agreement in several ways, including when it agreed to the LinkedIn Ads Agreement, when it agreed to the LSA, and when it created its Company Page.

**ANSWER:**  The allegations in Paragraph 116 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 116.

117.    In addition, LinkedIn put hiQ on actual notice of the anti-scraping terms of its User Agreement on May 23, 2017, in its cease-and-desist letter.

**ANSWER:**  The May 23, 2017 cease-and-desist letter is a document that speaks for itself.

118.    The User Agreement is enforceable and binding on hiQ.

**ANSWER:**  The allegations in Paragraph 118 state a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies these allegations to the extent they suggest that hiQ was bound by any agreement when it was not logged in to its Company Page.

119.    The User Agreement prohibits accessing LinkedIn's website through automated means.

**ANSWER:**  The allegation in Paragraph 119 states a legal conclusion to which no response is required.  Further, the User Agreement is a document that speaks for itself.

120.    The User Agreement prohibits scraping data from LinkedIn's website using automated means.

1   **ANSWER:**  The allegation in Paragraph 120 states a legal conclusion to which no response

2   is required.  Further, the User Agreement is a document that speaks for itself.

3   121.   After being bound by the terms of the User Agreement, hiQ repeatedly accessed the

4   LinkedIn website and scraped data in ways that violate the terms of the User Agreement.

5   **ANSWER:**  The allegations in Paragraph 121 state a legal conclusion to which no response

6   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 121.

7   122.   hiQ willfully and repeatedly breached the User Agreement.

8   **ANSWER:**  The allegations in Paragraph 122 state a legal conclusion to which no response

9   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 122.

10   123.   LinkedIn has performed all conditions, covenants, and promises required of it in

11   accordance with the User Agreement.

12   **ANSWER:**  The allegations in Paragraph 123 state legal conclusions to which no response

13   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 123.

14   124.   In addition, hiQ agreed to the LSA.

15   **ANSWER:**  hiQ admits the allegation in Paragraph 124.

16   125.   The LSA was, therefore, binding on hiQ.

17   **ANSWER:**  The allegation in Paragraph 125 states a legal conclusion to which no response

18   is required.  To the extent a response is required, hiQ denies the allegation to the extent it suggests

19   that hiQ was bound by the LSA when it was scraping publicly available data from LinkedIn's

20   website.

21   126.   The LSA incorporates the terms of the User Agreement by reference.

22   **ANSWER:**  The allegation in Paragraph 126 states a legal conclusion to which no response

23   is required.  Further, the LSA is a document that speaks for itself.

24   127.   hiQ willfully and repeatedly breached the LSA.

25   **ANSWER:**  The allegations in Paragraph 127 state legal conclusions to which no response

26   is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 127.

27   128.   LinkedIn has performed all conditions, covenants, and promises required of it in

28   accordance with the LSA.

**ANSWER:**  The allegations in Paragraph 128 state legal conclusions to which no response is required.  To the extent a response is required, hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph 128.

129.    hiQ's conduct has damaged LinkedIn, and caused and continues to cause irreparable harm and injury to LinkedIn.

**ANSWER:**  The allegations in Paragraph 129 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 129.

130.    Any future use of LinkedIn's website by hiQ is subject to the terms of the User Agreement.

**ANSWER:**  The allegations in Paragraph 130 state a legal conclusion to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 130.

131.    LinkedIn is entitled to injunctive relief, declaratory relief, compensatory damages, and/or other equitable relief.

**ANSWER:**  The allegations in Paragraph 131 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 131.

### FOURTH CLAIM FOR RELIEF

#### Misappropriation

132.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

**ANSWER:**  hiQ restates and incorporates by reference its answers to all of the preceding paragraphs.

133.    LinkedIn has invested substantial time, labor, skill, and financial resources into the creation and maintenance of LinkedIn, its computer systems and servers, including system and server capacity, as well as the content on the LinkedIn website, which is time-sensitive.  hiQ has invested none of its own time and resources into developing and building the LinkedIn website and platform.

**ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in the first sentence of Paragraph 133.  hiQ admits the allegation in the second sentence of Paragraph 133.

134.     Disregarding the prohibitions set forth in LinkedIn's User Agreement to which hiQ was on notice of and expressly consented to, and in circumvention of various technical barriers, hiQ, without authorization, wrongfully accessed LinkedIn's website, computer systems and servers, and obtained data from the LinkedIn site.   The data that hiQ took included time-sensitive updates to member profiles.

**ANSWER:**  The allegations in Paragraph 134 state legal conclusions to which no response is required.  Further, hiQ denies the allegations in the first sentence of Paragraph 134.  hiQ lacks knowledge sufficient to admit or deny the allegation in the second sentence of this Paragraph that hiQ took "time-sensitive updates to member profiles" as hiQ does not understand what a "time-sensitive update" is.  To the extent a response is required, hiQ denies these allegations.

135.     hiQ's appropriation and use of this data was at little or no cost to hiQ, without hiQ having to make the substantial investment in time, labor, skill, and financial resources made by LinkedIn in developing the LinkedIn website and platform.  In other words, hiQ reaped what it did not sow.  hiQ's use of LinkedIn's computer systems and servers, including member data from the LinkedIn site and system and server capacity, constitutes free-riding on LinkedIn's substantial investment of time, effort, and expense.

**ANSWER:**  The allegations in Paragraph 135 state legal conclusions to which no response is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 135.

136.     As a result of this misappropriation, LinkedIn has been forced to expend additional time and resources, including but not limited to, investigating and responding to hiQ's activities, and hiQ has been able to exploit and benefit from LinkedIn's substantial investment of time, effort, and expense.

**ANSWER:** The allegations in Paragraph 136 state legal conclusions to which no response is required.  Further, hiQ denies that it misappropriated anything from LinkedIn.  hiQ lacks knowledge sufficient to confirm or deny the remaining allegations in Paragraph 136 except that hiQ denies "exploit[ing]" LinkedIn's investment of time, effort, and expense.

137.     LinkedIn has been and will continue to be damaged as the result of hiQ's acts of misappropriation.

1    **ANSWER:**  The allegations in Paragraph 137 state legal conclusions to which no response

2  is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 137.

3    138.    LinkedIn has suffered and will continue to suffer irreparable injury, and its remedy

4  at law is not itself adequate to compensate it for injuries inflicted by hiQ.

5    **ANSWER:**  The allegations in Paragraph 138 state legal conclusions to which no response

6  is required.  To the extent a response is required, hiQ denies the allegations in Paragraph 138.

7  

**FIFTH CLAIM FOR RELIEF**

8  

**Trespass to Chattels**

9    139.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

10    **ANSWER:**  hiQ restates and incorporates by reference its answers to all of the preceding

11  paragraphs.

12    140.    LinkedIn owns, possesses, and/or has the right to possess the servers and

13  infrastructure used to run its business.

14    **ANSWER:**  The allegations in Paragraph 140 state legal conclusions to which no response

15  is required.  Further, hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

16  140.

17    141.    hiQ intentionally interfered with LinkedIn's use and possession of LinkedIn's servers

18  and infrastructure.

19    **ANSWER:**  The allegations in Paragraph 141 state a legal conclusion to which no response

20  is required.  To the extent a response is required, hiQ denies the allegation in Paragraph 141.

21    142.    LinkedIn has never consented to hiQ's conduct.

22    **ANSWER:**  hiQ denies the allegation in Paragraph 142.

23    143.    hiQ's conduct, if expanded and/or replicated unchecked by others, will cause harm

24  to LinkedIn in the form of impaired condition, quality and value of its servers, infrastructure and

25  services.

26    **ANSWER:**  hiQ lacks knowledge sufficient to admit or deny the allegations in Paragraph

27  143.  hiQ denies that its conduct has caused harm to LinkedIn.

28

## PRAYER FOR RELIEF

WHEREFORE, LinkedIn prays that judgment be entered in its favor and against hiQ, as follows:

1.      A permanent injunction enjoining and restraining hiQ, its employees, representatives, agents, and all persons or entities acting in concert with it prior to, during, and after the pendency of this action perpetually from: (a) accessing or using LinkedIn's website, servers, systems, and any data displayed or stored therein, including through scraping and crawling technologies, for any commercial purpose whatsoever; and (b) extracting and copying data appearing on LinkedIn's website to their own servers or systems or those controlled by them;

**ANSWER:**  hiQ denies that LinkedIn is entitled to any relief whatsoever.

2.      A declaration stating (a) that hiQ must abide by the terms of LinkedIn's User Agreement should it choose to access LinkedIn's website in the future; (b) that any future data scraping would be without authorization under the CFAA; (c) and that any future taking and use of LinkedIn's data would be without permission and would violate California Penal Code § 502;

**ANSWER:**  hiQ denies that LinkedIn is entitled to any relief whatsoever.

3.      An order requiring hiQ to destroy all documents, data, and other items, electronic or otherwise, in its possession, custody, or control, that were wrongfully extracted and copied from LinkedIn's website, along with any data that hiQ has inferred as a result of data wrongfully extracted and copied from LinkedIn's website;

**ANSWER:**  hiQ denies that LinkedIn is entitled to any relief whatsoever.

4.      An award to LinkedIn of damages, including, but not limited to, compensatory damages, statutory damages, profits of hiQ, and/or punitive damages, as permitted by law, in an amount to be proved at trial;

**ANSWER:**  hiQ denies that LinkedIn is entitled to any relief whatsoever.

5.      An award to LinkedIn of its costs of suit, including, but not limited to, reasonable attorney's fees, as permitted by law; and

**ANSWER:**  hiQ denies that LinkedIn is entitled to any relief whatsoever.

6.      Such other relief as the Court deems just and proper.

**ANSWER:** hiQ denies that LinkedIn is entitled to any relief whatsoever.

LinkedIn demands a trial by jury on all issues so triable.

**ANSWER:** hiQ consents to a trial by jury on all issues so triable.

## AFFIRMATIVE DEFENSES

In addition to the above, hiQ sets forth the below defenses to LinkedIn's counterclaims. Each defense is asserted as to all claims for relief against hiQ, except where otherwise noted. By asserting the matters set forth below, hiQ does not allege or admit or deny that it has the burden of proof and/or the burden of persuasion with respect to any of these matters. hiQ asserts as follows:

## FIRST DEFENSE

## (Failure to State a Claim)

LinkedIn has failed to state any claim against hiQ upon which relief may be granted.

## SECOND DEFENSE

## (Statute of Limitations)

LinkedIn's claims are barred, in whole or in part, by any and all applicable statutes of limitations.

## THIRD DEFENSE

## (Estoppel)

LinkedIn's claims are barred, in whole or in part, by the equitable doctrine of estoppel. LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains. Nevertheless, LinkedIn unreasonably delayed in bringing any claims against hiQ relating to this matter and such unreasonable delay resulted in prejudice to hiQ.

## FOURTH DEFENSE

## (Adequate Remedy at Law)

LinkedIn's claims for equitable relief are barred, in whole or in part, because LinkedIn has not suffered any harm, any alleged injury to LinkedIn is not immediate or irreparable, and LinkedIn has an adequate remedy at law.

## FIFTH DEFENSE

### (Waiver)

LinkedIn's claims are barred, in whole or in part, under the doctrine of waiver.  LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains, and LinkedIn has therefore waived any right to complain about such conduct now.

## SIXTH DEFENSE

### (Ratification)

LinkedIn's claims are barred, in whole or in part, under the doctrine of ratification.  LinkedIn knew for years prior to sending its cease-and-desist letters to hiQ that hiQ was engaging in the conduct of which LinkedIn now complains.  Thus, by its inaction, LinkedIn ratified hiQ's conduct as valid and binding.

## SEVENTH DEFENSE

### (No Injury)

LinkedIn's claims are barred, in whole or in part, because LinkedIn has suffered no actual injury in fact and therefore has suffered no damages for which hiQ can be liable.

## EIGHTH DEFENSE

### (*In Pari Delicto*)

LinkedIn's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## NINTH DEFENSE

### (Consent)

LinkedIn's claims are barred, in whole or in part, by the doctrine of consent.  LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that hiQ was engaging in the conduct of which LinkedIn now complains and LinkedIn consented to that conduct.

**TENTH DEFENSE**

**(Good Faith)**

LinkedIn's claims are barred, in whole or in part, because hiQ acted at all times in good faith.

**ELEVENTH DEFENSE**

**(Unclean Hands)**

LinkedIn's claims are barred, in whole or in part, based on the unclean hands of LinkedIn, its agents, or affiliates.

**TWELFTH DEFENSE**

**(Intervening/Superseding Causes)**

LinkedIn's claims are barred, in whole or in part, because LinkedIn did not suffer damages attributable to any action by hiQ and/or because any damages or harms allegedly suffered by LinkedIn, which hiQ denies, are attributable solely to causes other than acts or omissions by hiQ.

**THIRTEENTH DEFENSE**

**(Failure to Mitigate Damages)**

LinkedIn's claims are barred, in whole or in part, because to the extent LinkedIn sustained any damages at all due to hiQ's acts or omissions, which hiQ denies, LinkedIn failed to mitigate their damages.

**FOURTEENTH DEFENSE**

**(Speculative Damages)**

LinkedIn's claims are barred, in whole or in part, because LinkedIn's alleged damages are speculative, uncertain, or contingent, and are not recovered at law or equity.

**FIFTEENTH DEFENSE**

**(No Basis for Punitive Damages)**

LinkedIn's claims for punitive damages are barred, in whole or in part, because LinkedIn fails to state any facts or legally cognizable basis upon which an award of punitive damages may be granted against hiQ.

1

## **SIXTEENTH DEFENSE**

2

### **(No Basis for Attorneys' Fees)**

3        LinkedIn's claims for attorneys' fees are barred, in whole or in part, because LinkedIn fails

4   to state any facts or legally cognizable basis upon which an award of attorneys' fees may be granted

5   against hiQ.

6

## **SEVENTEENTH DEFENSE**

7

### **(Laches)**

8        LinkedIn's claims are barred, in whole or in part, by the equitable doctrine of laches.

9   LinkedIn has known for years (and years prior to sending its cease-and-desist letters to hiQ) that

10  hiQ was engaging in the conduct of which LinkedIn now complains.  Nevertheless, LinkedIn

11  unreasonably delayed in bringing any claims against hiQ relating to this matter and such

12  unreasonable delay resulted in prejudice to hiQ.

13

## **EIGHTEENTH DEFENSE**

14

### **(Reservation of Rights for Additional Affirmative Defenses)**

15       hiQ reserves the right to assert additional defenses upon discovery of further information

16  concerning LinkedIn's claims.

17

## **PRAYER FOR RELIEF**

18       WHEREFORE, hiQ respectfully requests the following:

19      a.    That LinkedIn take nothing by way of its claims;

20      b.    That LinkedIn be denied each and every demand and prayer for relief contained in

21          its Counterclaims;

22      c.    That LinkedIn's claims be dismissed with prejudice and that judgment be entered

23          against LinkedIn and in favor of hiQ;

24      d.    For attorney's fees and the costs of suit to the extent permitted under applicable law

25          and contracts; and

26      e.    For such other and further relief as the Court may deem to be just and proper.

27

28

Dated: July 20, 2022

QUINN EMANUEL URQUHART & SULLIVAN LLP

By: */s/ Corey Worcester*
    Corey Worcester

*Attorneys for Plaintiff/Counter-Defendant hiQ Labs, Inc.*