# Exhibit N

Videotaped Deposition of

# Darren Kaplan

May 04, 2022

hiQ Labs, Inc.

vs.

LinkedIn Corp.

**Confidential**



```
                                                        Page 1                                                          Page 3
 1            UNITED STATES DISTRICT COURT               1                 INDEX OF EXAMINATION
 2           NORTHERN DISTRICT OF CALIFORNIA             2    WITNESS:  DARREN KAPLAN
 3                SAN FRANCISCO DIVISION                 3
 4    HIQ LABS, INC.,                                         EXAMINATION                                      PAGE
 5              Plaintiff,                               4
 6    vs.                   Case No. 17-cv-03301-EMC             BY MR. RUGANI                                    7
 7    LINKEDIN CORPORATION,                              5
 8              Defendant.                               6
 9    _____                            7
10    AND RELATED CROSS-ACTION.                          8
11    _____                            9
12                                                      10        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
13                                                      11              PAGE       LINE
14                    CONFIDENTIAL                      12               82         24
15         VIDEOTAPED DEPOSITION OF DARREN KAPLAN       13
16                    May 4, 2022                       14
17                     9:10 a.m.                        15                    * * *
18                                                      16
19         2601 South Bayshore Drive, Suite 1550        17
20                   Miami, Florida                     18
21                                                      19
22    KATHIA CAMACHO, Court Reporter                    20
23    Transcribed by TERRI NESTORE                      21
      CSR No. 5614, RPR, CRR                            22
24                                                      23
25    Job No. 10103963                                  24
                                                        25

                                                        Page 2                                                          Page 4
 1   APPEARANCES                                         1           DEFENDANT'S INDEX OF EXHIBITS
 2   Counsel for Plaintiff:                              2   MARKED      DESCRIPTION                           PAGE
 3       QUINN EMANUEL URQUHART & SULLIVAN, LLP          3   EXHIBIT 1   4-page Notice of Deposition of           9
         HOPE SKIBITSKY, ESQ.                                            Darren Kaplan
 4       RENITA N. SHARMA, ESQ.                          4
         ZANE MULLER, ESQ. (Appearing remotely)              EXHIBIT 2   30-page Plaintiff hiQ Lab's,            28
 5       51 Madison Avenue, 22nd floor                   5               Inc.'s Responses to LinkedIn
         New York, New York 10010                                        Corporation's First Set of
 6       212.849.7100                                    6               Interrogatories
         hopeskibitsky@quinnemanuel.com                  7   EXHIBIT 3   2-page email string; top one from       111
 7       renitasharma@quinnemanuel.com                                   Darren Kaplan to George Seiters,
         zanemuller@quinnemanuel.com                     8               8/21/14; Bates Nos.
 8                                                                       HiQ_00104671-2
     Counsel for Defendant:                              9
 9                                                           EXHIBIT 4   email string; top one from Xander      116
         ORRICK, HERRINGTON & SUTCLIFFE LLP             10               Oltmann to Darren Kaplan, 3/9/15;
10       PAUL F. RUGANI, ESQ.                                            Bates No. HiQ_00250311
         777 South Figueroa Street, Suite 3200         11
11       Los Angeles California 90017-5855                   EXHIBIT 5   2-page email string; top one from      128
         213.612.2456                                   12               Darren Kaplan to Davis Carlin,
12       prugani@orrick.com                                              9/23/15; Bates Nos.
13       ORRICK, HERRINGTON & SUTCLIFFE LLP             13               HiQ_00473646-7
         MARIA N. SOKOVA, ESQ. (Appearing remotely)     14   EXHIBIT 6   2-page email string; top one from      132
14       1000 Marsh Road                                                 Darren Kaplan to Davis Carlin,
         Menlo Park, California 94025                   15               2/3/16; Bates Nos. HiQ_00473074-5
15       650.614.7400                                   16   EXHIBIT 7   1-page email string; top one from      135
         msokova@orrick.com                                              Genevieve Graves to Cameron Cole,
16                                                      17               8/25/16; Bates No. HiQ_00117432
17   Also Present:                                      18   EXHIBIT 8   2-page email from Mark Weidick to      136
18       AARON JAMES, LinkedIn (Appearing remotely)                      Dan Miller, et al., 4/11/17;
19                                                      19               Bates Nos. hiQ_00504080-1
20   JAVIER F. ORDOÑEZ, Videographer                    20   EXHIBIT 9   4-page Keeper debriefing; Bates        143
21                                                                       Nos. HiQ_00019673-6
22                                                      21
23                                                           EXHIBIT 10  1-page email from Jackson McNutt      146
24                                                      22               to Cameron Cole, 5/5/16; Bates
25                                                                       No. HiQ_00189601
                                                        23
                                                        24
                                                        25
```

Page 57

1  check. We would have definitely started hiring once we --
2  in that frame 2012 - '13. The employees that were with us
3  were still with us, so most of 'em. They didn't pass
4  away. But I'm saying employees that were early stayed
5  with us until we had the cease and desist.
6       Q. Do you remember, roughly speaking, around the
7  time that Mr. DeSantis decided to get involved as a
8  co-founder, how many employees OrgStars had at that point
9  in time?
10         MS. SKIBITSKY: Objection. Form, foundation.
11         THE WITNESS: Just one more time ask that
12  question.
13  BY MR. RUGANI:
14      Q. Sure. Do you recall, at the time that
15  Mr. DeSantis joined as a co-founder, how many employees
16  OrgStars had at that time?
17         MS. SKIBITSKY: Objection. Form, foundation.
18         THE WITNESS: I'd have to go back, but yes.
19  BY MR. RUGANI:
20      Q. How many?
21      A. Employees? It's an approximate.
22         Three, four, five.
23      Q. So when you decided that the culture fit product
24  was not where you wanted to focus your attention, what was
25  the next product or service that you conceived of OrgStars

Page 58

1  offering?
2      A. So the next product is our retention product,
3  which ultimately became Keeper. So the company changed
4  its name from OrgStars to hiQ and then the retention
5  product we started at OrgStars became the foundational
6  product at hiQ, Keeper.
7      Q. Whose idea was it to start a -- to have a --
8  excuse me, I'll rephrase.
9         Whose idea was it for OrgStars to offer a
10  retention product?
11      A. When you're working at a startup, it's not a
12  person's idea, it's sometimes it's just everyone was part
13  of the concept, so I can't point to a person.
14         It's the magic that happened in a startup.
15      Q. And who was involved with the company either as
16  an employee or an advisor, when the company decided to
17  develop a retention product?
18      A. Do you want me to give you the names?
19         Is that the names?
20      Q. Please.
21      A. Steve Pecko, P-E-C-K-O; Sherman Hu, Sunil Saha.
22         THE REPORTER: I'm sorry?
23         THE WITNESS: Sunil Saha, Scott Nicholson. And
24  it was -- did I say Sherman, right? You did, yeah. And
25  there was another person who I forget his name. There

Page 59

1  might be a couple few but I think that's who I remember.
2         There might be one or two others.
3  BY MR. RUGANI:
4      Q. Any of those individuals that you just named or
5  that you recall but couldn't name, employees of OrgStars
6  at the time?
7         MS. SKIBITSKY: Objection. Vague as to time.
8         THE WITNESS: Yeah, if you can carve out what you
9  mean by time, that would be helpful.
10  BY MR. RUGANI:
11      Q. At the time that OrgStars decided it wanted to
12  start developing a retention product.
13      A. At that time it was the only loosely defined term
14  of employee not getting paid, but employee was Sherman and
15  myself. Or no, I think it might have just been myself at
16  that point and depending on how you define employee.
17         So then I would call everybody else advisors.
18      Q. When OrgStars first conceived of a retention
19  product, how did you conceive of it working?
20         MS. SKIBITSKY: Objection to form, vague.
21         THE WITNESS: When you're at a startup, you try
22  and you think about so many ways it could work, and you
23  conceive it over drinks, during walks, and the internet
24  keeps changing while you're trying to build.
25         So the how did we conceive it is just... I think

Page 60

1  just being out in the valley and I think -- was that your
2  question, the how? Or did I miss your question?
3  BY MR. RUGANI:
4      Q. I'm happy to have your answer. I think my
5  question was how did you -- what did you understand the
6  product was going to do?
7      A. Right. So what we -- I -- believed was that in
8  that time period 2012 -- so you have to not think about
9  today, think about then -- there was two worlds.
10         There is a... let me rephrase that.
11         In human resources, I believed that there's two
12  worlds. You're either an applicant or an employee.
13         That's the world human resources live in. And if
14  you are an applicant and you want to now disrupt that
15  sector, it's really crowded. You have known winners, and
16  a big winner at that time, and still is, is LinkedIn.
17         You also had a site named monster.com, I think
18  CareerBuilder, Indeed. So in thinking about building a
19  company and going into recruiting, it's pretty mature,
20  that sector.
21         When we started thinking about it as let's look
22  at the employee, we started really spending time thinking
23  about the employee experience. We always wanted to be an
24  organizational star, and what we then started thinking
25  about is companies spend all this time recruiting and

Page 61

1  building up the skill set, and then the companies' most
2  valuable asset are their people, and their people are now
3  open and their resumes are open for anybody to see.
4       So as much as you can staff up your team,
5  LinkedIn I think had still several hundred million
6  profiles, and LinkedIn has a product that enables
7  companies to, you know, buy a recruiter license and
8  recruit.
9       So if you want to find an engineer that has cell
10 phone experience, well, you can just type in "Engineer
11 Apple" or you can type in "Engineer android" and your
12 entire organization for knowledge workers is online.
13      So your whole employee directory is online and
14 you can be poached, and LinkedIn is very good at surfacing
15 those profiles.  They make a lot of money surfacing those
16 profiles.
17      And then we said, well, maybe we can build
18 something that everybody wins, where we can help a company
19 retain their employee and get them the career path they
20 want so the employee can stay and get clear direction and
21 the company also can retain that company (sic), and that
22 started us down that path of let's look at retention.
23 Retention is positive, attrition is a negative word,
24 right?  You know people leave, so retention is just the
25 positive part of it.

Page 62

1       So as we then started looking at retention, we
2  started to look at how companies are doing retention and
3  then we just looked at what's going on in the world and we
4  started to really think about, you know, how we can
5  rethink how people are retained, and the people that I
6  surrounded myself with were all ex-LinkedIn employees.
7       And we always wanted to build something that
8  complemented LinkedIn and the things that LinkedIn did and
9  we said, you know, retention is something that's really
10 good, and we just started thinking about profiles and then
11 we started really thinking about there are these two
12 dimensions of LinkedIn.  There is an online logged in and
13 a logged out, and we were able to build things that really
14 made a difference.
15      Q.  As you were thinking about retention, what's the
16 first time that you recall addressing retention by
17 predicting whether individual employees were at higher or
18 lower risk of leaving to different employment?
19          MS. SKIBITSKY:  Objection, form.
20          THE WITNESS:  Yeah, I was thinking about
21 something else just now.  Can you re-ask that question?
22 BY MR. RUGANI:
23      Q.  Sure.  As you were thinking about building a
24 product to address employee retention issues, when is the
25 first time that you recall thinking about doing so by

Page 63

1  addressing whether employees would be at higher or lower
2  risk of leaving their current employment?
3       A.  I'm not sure.  I mean retention or attrition,
4  it's -- I can't tell you the exact time we thought about
5  it.  I couldn't tell you that.
6       Q.  As you were thinking about building a retention
7  product, you described you wanted to build something that
8  would complement LinkedIn.
9           From the outset of your thinking about a
10 retention product, were you thinking about using
11 information on LinkedIn profiles in connection with that
12 product?
13          MS. SKIBITSKY:  Objection, form.
14          Misstates testimony.
15          THE WITNESS:  We had a belief that at that time
16 that LinkedIn just was maybe the beginning of how far we
17 can push data for human resources.  We had a belief that
18 LinkedIn for recruiting would not go away.
19          So for us, we were thinking about how to
20 complement it beyond recruiting.
21          THE REPORTER:  How to complement it?
22          THE WITNESS:  Beyond recruiting because
23 LinkedIn's offering for human resources was recruiting and
24 if you're in human resources, that budget is not going to
25 go away.  But that was focused on an applicant and we

Page 64

1  really wanted to focus on the employee.
2       I think that's how everybody wins.
3  BY MR. RUGANI:
4       Q.  And as you were thinking about developing a
5  product to focus on employee retention, when did it first
6  occur to you to use information on LinkedIn profile pages
7  to develop such a product?
8           MS. SKIBITSKY:  Objection, form, asked and
9  answered.
10          THE WITNESS:  The when, I can't give you a date
11 on the when.  I can't tell you specifically.
12          I don't know a date.
13 BY MR. RUGANI:
14      Q.  As you recall the development of a product, do
15 you think it was from very early on in thinking about, "We
16 should develop a product for employee retention and we
17 should use information on LinkedIn profiles to do so," or
18 was it later in the development process that it occurred
19 to you to use information on LinkedIn profiles as part of
20 a retention product?
21          MS. SKIBITSKY:  Objection, form.
22          THE WITNESS:  I would...  when we were thinking
23 about retention, we were not focused on LinkedIn, we were
24 focused on how people publicly portray themselves.
25          So LinkedIn was a place, it wasn't the only, but

Page 65

1  we were thoughtful on, in those early years -- I won't say
2  years -- but you're at an early stage company and you're
3  concepting and you're thinking, and our bigger thought
4  was, you know, let's look at -- we really started to hone
5  in on public information and what public information can
6  tell us about something.
7         So that is our focus, was public information and
8  they said, can it be a predictor?
9  BY MR. RUGANI:
10     Q.  Okay.  So talk to me a little bit about how you
11  developed a retention product from concept stage into
12  product stage.
13         MS. SKIBITSKY:  Objection to form, vague.
14         THE WITNESS:  For some reason I have to go to the
15  bathroom after this question.  I don't know why but after
16  this question, is it okay if I just run to the bathroom?
17  BY MR. RUGANI:
18     Q.  It is.
19     A.  I don't know why.  Okay, sorry about that.
20         Can you re-ask that question?
21         MR. RUGANI:  Sure.  Tell you what; why don't I
22  let you go to the bathroom.
23         THE WITNESS:  Real quick.
24         MR. RUGANI:  I would just ask you, because there
25  is a question pending, if you not speak to your attorney

Page 66

1  until you get back on the record.
2         THE WITNESS:  I understand.  Thank you.
3         Give me two seconds.
4         THE VIDEOGRAPHER:  The time is 11:14 a.m. and we
5  are going off the record.
6         (Recess taken 11:14 a.m. - 11:22 a.m.)
7         THE VIDEOGRAPHER:  The time is 11:22 a.m., and we
8  are back on the record.
9  BY MR. RUGANI:
10     Q.  Mr. Kaplan, during the break did you have any
11  conversations with your attorneys, other than that brief
12  exchange that I just witnessed?
13     A.  No.
14     Q.  So I think the question that was pending before
15  we took the break was to ask you to describe for me the
16  process of taking a retention product from concept stage
17  to having a product.
18     A.  So the process, right.  So the process... it's
19  something called rapid prototyping, which is -- it could
20  also be called a sprint, where you build something with
21  code that's meant just to show conceptually it can do it,
22  and that code or that concept is not built to be a general
23  release.  It is a prototype.  There is nothing behind it.
24  It's just if I showed you a screen, which button would you
25  click on.  And you want to build out a prototype, that's

Page 67

1  one side, and then you want to show it to people, that's
2  the other side.
3         And then through that journey you'll know if
4  people take your next call, if people invite you to their
5  office, if people get excited about it, if people want to
6  buy it.
7         So the prototyping part is...  it's also called
8  discovery, where you're going through this place of you
9  have an idea and you're building and showing; building,
10  showing; building, showing; building, showing, and through
11  showing you get feedback.
12        So then it's building, showing, fixing; building,
13  showing, changing; building, showing until you get to a
14  place where someone's like, "I want to give you money for
15  it."  I don't think a company's ever done with product,
16  but that is the place.
17        And then as a startup in 2012, you're doing
18  building, showing, everything on your personal credit
19  card, so it's -- when we talked earlier about employees,
20  it's how would you define an employee when there's no
21  money, it's on credit cards, right?
22        And that's... that's how you kind of get to it.
23     Q.  And the process that you just described is the
24  process that OrgStars followed for the development of its
25  retention product?

Page 68

1     A.  OrgStars, yes, not hiQ.  Because when Rob came in
2  we understood how to do it at scale but at that moment of
3  just proving like there is a need, there is an absolute
4  need, there is a hunger for this, and it was during that
5  time that we understood that the need was for data science
6  for human resources.  There was a need to understand what
7  are the external factors that are impacting organizations.
8         So what came out of it were the insights of HR
9  has woken up to the fact that their entire -- most of
10  their employee database is on LinkedIn and although it was
11  great for recruiting when you want to recruit, it's not
12  great when they want to recruit from you.
13        So that was what came out of that prototyping
14  exercise was the need and want to understand external
15  forces, impacts on the workforce, and then a roadmap that
16  followed.
17        THE REPORTER:  And then?
18        THE WITNESS:  A roadmap followed.
19  BY MR. RUGANI:
20     Q.  And at the prototype stage was there a specific
21  method that the retention product was following to help
22  give information about those external forces to human
23  resources departments?
24     A.  Yes.
25     Q.  And what was that method?