ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*pro hac vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>LinkedIn Corporation,<br><br>　　　　　Defendant. | Case No. 17-cv-03301-EMC<br><br>**LINKEDIN'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　　　　　September 29, 2022<br>Time:　　　　　1:30 p.m.<br>Courtroom:　　5 – 17th Floor (Zoom)<br>Judge:　　　　Hon. Edward M. Chen<br><br>Complaint Filed:　June 7, 2017<br>Trial Date:　　　February 27, 2023 |
| LinkedIn Corporation<br><br>　　　　　Counterclaimant,<br>　　vs.<br><br>hiQ Labs, Inc.<br><br>　　　　　Counterdefendant. | |

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES .................................................................................. iii

3   NOTICE OF MOTION AND MOTION ............................................................... vii

4   MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

5   INTRODUCTION AND STATEMENT OF ISSUES ............................................ 1

6   STATEMENT OF FACTS .................................................................................... 3

7          A.   LinkedIn Bars Scrapers To Protect Its Platform And Honor Member Expectations
                And Interests. ......................................................................................... 3
8
           B.   hiQ Builds A Business On Prohibited Scraping. ................................... 5
9
           C.   hiQ's Business Fails Before May 23, 2017 ............................................ 7
10
           D.   LinkedIn Asserts Its Rights In A Cease-And-Desist Letter. ................ .8
11
           E.   hiQ Obtains Preliminary Relief On A Lowered Merits Standard, Then Cannot
12              Plead Any Theory Of Anticompetitive Conduct Or Maintain Its Business Despite
                Unfettered Access to LinkedIn Data. .................................................... 10
13
     ARGUMENT .................................................................................................... 11
14
     I.    HIQ BREACHED LINKEDIN'S USER AGREEMENT AS A MATTER OF LAW ......... 11
15
           A.   Undisputed Facts Establish That hiQ Breached The User Agreement. ...................... 11
16
           B.   hiQ's Affirmative Defenses Are Baseless. .................................................. 13
17
     II.   HIQ'S TORT AND UCL CLAIMS ARE BARRED BY CAL. CIV. CODE § 47. ............ 15
18
     III.  HIQ'S INTERFERENCE TORT CLAIMS FAIL FOR OTHER REASONS ..................... 17
19
           A.   hiQ Cannot Satisfy Essential Elements Of Its Tort Claims. .......................... 17
20
                1. hiQ identifies no live contract with which LinkedIn interfered. ............................ 17
21
                2. hiQ's interference with prospective economic advantage claims fail on numerous
22                 grounds. ................................................................................. 18

23              3. LinkedIn's conduct caused neither breach nor any resulting harm ........................ 20

24         B.   LinkedIn's Conduct Was Justified Because It Was Undertaken In Good Faith To
                Enforce LinkedIn's Legal Rights. ................................................................... 21
25
           C.   Summary Judgment Is Appropriate On hiQ's Unrecognized "Lost Business
26              Value" Damages Theory. .................................................................................. 22

27         D.   hiQ Has No Evidence To Support Its Request For Punitive Damages. ..................... 22

28   IV.   HIQ'S UCL CLAIMS ALSO MUST BE DISMISSED. ............................................ 23

A.  hiQ's "Unfair," "Unlawful," And "Fraudulent" UCL Claims Must All Be Dismissed Because It Has No Cognizable Remedy...................................................... 23

B.  hiQ's "Unfair" Prong UCL Claim Must Be Dismissed As A Matter Of Law............. 24

    1. hiQ's failure to amend its antitrust claims requires dismissal of its Seventh Claim for Relief..................................................................................................... 24

    2. Any "unfair" UCL claim based on monopolization fails as a matter of law. .......... 26

C.  hiQ's "Fraudulent" Prong UCL Claim Fails As A Matter Of Law Because hiQ Can Show Neither A Fraudulent Statement Nor Reliance........................................... 29

D.  hiQ's "Unlawful" Prong UCL Claim Fails As A Matter Of Law................................ 30

CONCLUSION .......................................................................................................................... 30

1

## TABLE OF AUTHORITIES

Page(s)

2      **Federal Cases**

3      *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
          836 F.3d 1171 (9th Cir. 2016)...................................................................... 27, 28

4

5      *American-Arab Anti-Discrimination Comm. v. Reno,*
          70 F.3d 1045 (9th Cir. 1995).............................................................................. 23

6      *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
          472 U.S. 585 (1985)............................................................................................. 27

7

8      *City of San Jose v. Office of the Comm'r of Baseball,*
          776 F.3d 686 (9th Cir. 2015)............................................................................... 25

9      *Clements v. Screen Gems, Inc.,*
          No. CV10-220-R, 2010 WL 5174376 (C.D. Cal. Dec. 13, 2010) ......................... 11

10

11     *Craigslist, Inc. v. Naturemarket, Inc.,*
          694 F. Supp. 2d 1039 (N.D. Cal. 2010) .............................................................. 11

12     *Diva Limousine, Ltd. v. Uber Techs., Inc.,*
          392 F. Supp. 3d 1074 (N.D. Cal. 2019) .............................................................. 25

13

14     *Doe v. Abbott Lab'ys,*
          571 F.3d 930 (9th Cir. 2009).............................................................................. 26

15     *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek,*
          No. 117CV00808DADEPG,

16        2018 WL 2463869 (E.D. Cal. June 1, 2018)....................................................... 13

17     *Facebook, Inc. v. Power Ventures, Inc.,*
          844 F.3d 1058 (9th Cir. 2016)....................................................................... 16, 21

18

19     *In re Google Assistant Priv. Litig.,*
          546 F. Supp. 3d 945 (N.D. Cal. 2021) ................................................................ 13

20     *Hill v. Walmart Inc.,*
          32 F.4th 811 (9th Cir. 2022) .............................................................................. 11

21

22     *hiQ Labs, Inc. v. LinkedIn Corp.,*
          31 F.4th 1180 (9th Cir. 2022) ...................................................................... 10, 17

23     *In re Holl,*
          925 F.3d 1076 (9th Cir. 2019).............................................................................. 11

24

25     *Huynh v. Quora, Inc.,*
          508 F. Supp. 3d 633 (N.D. Cal. 2020) ................................................................ 23

26     *Jam Sports & Ent., LLC v. Paradama Prods., Inc.,*
          336 F. Supp. 2d 824 (N.D. Ill. 2004) .................................................................. 28

27

28

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
No. 20-CV-07182-JCS,
2022 WL 1990225 (N.D. Cal. June 6, 2022) ....................................................... 11, 13, 21

*Metronet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ............................................................................... 27, 28

*MH Pillars Ltd. v. Realini*,
No. 15-cv-13830-PJH,
2018 WL 1184847 (N.D. Cal. Mar. 7, 2018) ................................................................ 13

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
317 F.3d 703 (7th Cir. 2003) ....................................................................................... 28

*Niantic, Inc. v. Global++*,
No. 19-cv-03425-JST, 2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ............................ 11

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ..................................................................................................... 27

*Pac. Rollforming, LLC v. Trakloc N. Am., LLC*,
No. 07-cv-1897-IEG (MDD), 2011 WL 13176817 (S.D. Cal. Dec. 1, 2011) ...................... 22

*SIC Metals, Inc. v. Hyundai Steel Co.*,
442 F. Supp. 3d 1251 (C.D. Cal. 2020) ......................................................................... 21

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........................................................................................ 23

*Sybersound Recs., Inc. v. UAV Corp.*,
517 F.3d 1137 (9th Cir. 2008) ...................................................................................... 30

*Tanvilai v. Am. Economy Ins. Co.*,
No. SACV 07-1339-CJC(MLG),
2008 WL 11342952 (C.D. Cal. July 15, 2008) ............................................................... 23

*Vinson v. Cal. Dep't of Corr. & Rehab.*,
No. 13-CV-00699-JST,
2014 WL 4594208 (N.D. Cal. Sept. 15, 2014) ............................................................... 17

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
382 U.S. 172 (1965) ..................................................................................................... 26

*Williams v. Apple, Inc.*,
338 F.R.D. 629 (N.D. Cal. 2021) .................................................................................. 14

**California Cases**

*Abbott v. City of L.A.*,
50 Cal. 2d 438 (1958) .................................................................................................. 14

*Aguilar v. Atlantic Richfield Co.*,
25 Cal. 4th 826 (2001) ................................................................................................. 25

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
204 Cal. App. 4th 1 (2012) .......................................................................................... 25

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*,
    52 Cal. App. 4th 867 (1997) ............................................................... 18

*Brant v. Cal. Dairies*,
    4 Cal. 2d 128 (1935) ............................................................................ 13

*Brown v. Grimes*,
    192 Cal. App. 4th 265 (2011) ............................................................. 15

*Casey v. U.S. Bank Nat'l Ass'n*,
    127 Cal. App. 4th 1138 (2005) ........................................................... 15

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ............................................. 23, 24, 25, 26, 29

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) ............................................................... 25

*City of Ukiah v. Fones*,
    64 Cal. 2d 104 (1966) ......................................................................... 14

*Edwards v. Centex Real Est. Corp.*,
    53 Cal. App. 4th 15 (1997) ................................................................. 15

*Elation Sys., Inc. v. Fenn Bridge LLC*,
    71 Cal. App. 5th 958 (2021) ............................................................... 13

*Electronic Funds Solutions, LLC v. Murphy*,
    134 Cal. App. 4th 1161 (2005) ........................................................... 22

*Gregory v. Albertson's, Inc.*,
    104 Cal. App. 4th 845 (2002) ............................................................. 25

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (2020) ......................................................... 17, 18, 19

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ...................................................................... 20

*Kwikset Corp. v. Super. Ct.*,
    51 Cal. 4th 310 (2011) ........................................................................ 29

*Lentz v. McMahon*,
    49 Cal. 3d 393 (1989) ......................................................................... 14

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
    200 Cal. App. 4th 480 (2011) ....................................................... 25, 26

*Mireskandari v. Gallagher*,
    59 Cal. App. 5th 346 (2020) ............................................................... 17

*Oasis W. Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ........................................................................ 11

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998), *as modified* (Sept. 23, 1998) ............................................... 21

*Richardson v. La Rancherita*,
  98 Cal. App. 3d 73 (1979) ............................................................................ 21, 22

*Rubin v. Green*,
  4 Cal. 4th 1187 (1993) ........................................................................ 15, 16, 17

*Silberg v. Anderson*,
  50 Cal. 3d 205 (1990) ................................................................................ 15, 16

*Transport Clearings-Bay Area v. Simmonds*,
  226 Cal. App. 2d 405 (1964) .................................................................................. 14

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
  42 Cal. App. 4th 507 (1996) ................................................................................... 19

**Federal Statutes and Rules**

Fed. R. Civ. P. 56(a) .............................................................................................. 11

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ............................................. 10, 17

Sherman Act, 15 U.S.C. § 1 ................................................................................ 10, 26

**California Statutes**

California Unfair Competition Law, California Business & Professions Code
  § 17200 ................................................................................................. *passim*
  § 17203 ........................................................................................................ 23

California Civil Code
  § 47 (Privileged Communications) ............................................... 2, 15, 16, 17
  § 337(a) (Statute of Limitations) ................................................................. 13
  § 1798.100 (California Consumer Privacy Act) ......................................... 25
  § 3294 (Punitive Damages) ......................................................................... 23

California Comprehensive Computer Data Access and Fraud Act,
  California Penal Code § 502 ......................................................................... 10

Cartwright Act, California Business & Professions Code § 16600 ................... 25, 26

1

## NOTICE OF MOTION AND MOTION

2    TO PLAINTIFF/COUNTER-DEFENDANT AND ITS ATTORNEYS OF RECORD:

3    PLEASE TAKE NOTICE THAT pursuant to Rule 56 of the Federal Rules of Civil Procedure, on

4    September 29, 2022 at 1:30 p.m. by remote Zoom teleconference at the address published by the

5    Court, or as soon thereafter as the matter may be heard, Defendant/Counterclaimant LinkedIn

6    Corporation will, and hereby does, move for summary judgment.

7    LinkedIn seeks partial summary judgment finding hiQ Labs, Inc. liable for breach of

8    contract on the Third Claim for Relief of the Amended Counterclaim, because the undisputed

9    facts establish as a matter of law that hiQ assented to and breached multiple provisions of the

10   LinkedIn User Agreement thereby harming LinkedIn, and none of hiQ's excuses can be credited.

11   LinkedIn also seeks summary judgment dismissing with prejudice the Fifth through Ninth

12   Claims for Relief of the Amended Complaint filed by hiQ.  All of hiQ's affirmative claims are

13   barred by California's absolute privilege for litigation communications, Civil Code § 47.

14   Moreover, hiQ cannot establish (or LinkedIn has disproven) required elements of its Fifth and

15   Sixth Claims for tortious interference with economic relations, and the undisputed material facts

16   show that LinkedIn was justified in asserting its legal rights.  Finally, hiQ's Seventh through

17   Ninth Claims for Relief for violation of Business and Professions Code § 17200 must also be

18   dismissed, because hiQ is not entitled to the limited remedies available under that statute.

19   Additionally, each of its "unfair," "fraudulent," and "unlawful" claims are legally defective

20   and/or lack required evidence.

21   Accordingly, LinkedIn seeks an order finding that hiQ is liable to LinkedIn on the Third

22   Claim for Relief of the Amended Counterclaim in an amount of damages to be proven at trial, and

23   dismissing fully and finally each of the Fifth through Ninth Claims for Relief of the Amended

24   Complaint.

25

26

27

28

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

## <u>INTRODUCTION AND STATEMENT OF ISSUES</u>

3    For all its seeming complexity, this case ultimately turns on the straightforward question

4 of whether the law gives LinkedIn the right to set for itself, and enforce, the conditions under

5 which it offers services.  Virtually every business imposes such conditions, from "no shirt, no

6 shoes, no service" to "turn off your cell phones during the performance."  For its part, LinkedIn

7 has chosen to bar scrapers from use of its services in order to honor its members' expectations

8 concerning use of their data, safeguard its servers from disruption, and protect its ability to

9 monetize its own platform.  No law bars LinkedIn from making that choice in the first place,

10 implementing it through general technical defenses against scraping, or—most relevant here—

11 asserting its rights against violators.  Just the opposite, the law affirmatively protects LinkedIn's

12 freedom to do those very things.

13    As discovery has unfolded in this case, hiQ's attempt to turn LinkedIn into a public utility

14 has utterly collapsed.  When it first sought preliminary relief, hiQ pledged to prove that all it ever

15 did was seek access to so-called "public data" on equal footing with any member of the public.

16 But discovery revealed that hiQ's product was not commercially viable without use of an

17 elaborate scheme of fake member accounts designed to circumvent LinkedIn's password barriers.

18 After obtaining a preliminary injunction on less than a likely merits showing, hiQ could not even

19 *plead*, let alone prove, the existence of a product market or any anticompetitive behavior by

20 LinkedIn in that market.  And the assertion that LinkedIn's cease-and-desist letter (C&D letter)

21 interfered with its contracts proved empty, too—it turns out hiQ was already a failed business on

22 borrowed time when LinkedIn sent its letter.

23    Summary judgment is appropriate for the following reasons.

24    *First*, partial summary judgment establishing liability is appropriate on LinkedIn's Third

25 Claim for Relief for breach of contract because undisputed facts show that hiQ assented to and

26 repeatedly violated unambiguously applicable provisions of LinkedIn's User Agreement

27 prohibiting scraping and unauthorized commercial activity.  None of hiQ's affirmative defenses

28 excuse its breaches.  The Court should grant summary judgment of liability on that claim,

1   confirming LinkedIn's legal interest in setting the terms of use on its own platform.  Part I, *infra*.

2       *Second*, summary judgment dismissing with prejudice each of hiQ's remaining affirmative

3   claims (its Fifth through Ninth Claims for relief) should be granted under California's absolute

4   privilege protecting litigation communications, Cal. Civ. Code § 47.  hiQ has now conceded that

5   *all* of its alleged harm flows from LinkedIn sending a C&D letter, which hiQ further confirmed

6   was not published by LinkedIn to anyone other than hiQ.  That prelitigation communication is

7   quintessentially privileged.  Just as it had with many scrapers before, LinkedIn correctly believed

8   hiQ was engaging in conduct that violated its User Agreement and the law, and LinkedIn

9   demanded that hiQ stop doing so as a precursor to potential litigation.  hiQ has every ability to

10  challenge the rights LinkedIn asserted by defending against them, and even, as here, seeking

11  preemptive declaratory relief; but § 47 protects absolutely LinkedIn's right to communicate to

12  hiQ its potential claims in advance of filing suit.  Part II, *infra*.

13      *Third*, hiQ's claims for tortious interference with economic relations (Claims Five and

14  Six) fail for multiple additional and independent reasons.  hiQ has no intentional interference with

15  contract claim because it concedes it performed under all contracts existing at the time it received

16  the C&D letter.  hiQ also cannot establish a claim for interference with prospective economic

17  advantage, both because it cannot show an independent wrongful act under its UCL claims and

18  because it cannot establish that LinkedIn sent its C&D letter with any knowledge of a specific

19  economic relationship likely to result in benefit to hiQ.  Beyond that, hiQ has no evidence that

20  LinkedIn's letter *caused* a single lost business opportunity—unsurprising since even the

21  privileged access to LinkedIn data mandated by the Court's preliminary injunction could not

22  resuscitate hiQ's business.  And hiQ's economic tort claims also fail for the independent reasons

23  that LinkedIn's C&D letter is a privileged assertion of its legal rights and members' interests.

24  Finally, hiQ's "lost business valuation" and punitive damages requests fail for independent

25  reasons as well, the former because it is not a valid damages theory under California law as

26  explained in LinkedIn's accompanying *Daubert* Motion to Exclude Opinions of Benjamin Sacks,

27  the latter because hiQ could never show by clear and convincing evidence the requisite malice,

28  oppression, or fraud where LinkedIn acted to protect established rights.  Part III, *infra*.

*Fourth*, summary judgment is appropriate against hiQ's three UCL claims (Claims Seven through Nine).  All fail because hiQ cannot establish entitlement to restitution or an injunction, the sole remedies available under that statute.  Each fails for other, independent reasons as well.  As for "unfair" competition, all of hiQ's theories of anticompetitive conduct were previously dismissed.  In any event, as a matter of law, LinkedIn has no duty to deal with hiQ and is not an essential facility, even assuming California law recognized such theories under the UCL.  As this Court previously held in dismissing hiQ's promissory estoppel claim, hiQ's notion of "fraudulent" competition makes no sense—hiQ identifies no misleading statement about scraping, and certainly none it relied upon.  And hiQ has no claim for "unlawful" competition because that claim is entirely derivative of its tort claims, which also fail.  Part IV, *infra*.

From start to finish, hiQ has failed to find a viable legal theory supported by evidence.  Along the way, it misled LinkedIn and the Court with its false narrative that it accessed only "public" member profile data.  Indeed, as explained in LinkedIn's contemporaneously filed motion for spoliation sanctions, hiQ has compromised the very integrity of this proceeding by spoliating highly salient evidence that would prove the depth of its prohibited conduct.  In short, this case is not what hiQ said it was.  It is about LinkedIn's basic and fundamental right to enforce the promises undertaken by users of its platform, which foreclose hiQ's baseless claims of improper conduct.  This Court should grant LinkedIn's motion.

## STATEMENT OF FACTS

**A.    LinkedIn Bars Scrapers To Protect Its Platform And Honor Member Expectations And Interests.**

LinkedIn is a social network whose "vision is to create economic opportunity for every member of the global workforce."[1]  Rockwell Decl. ¶ 1.  That opportunity comes from connections among LinkedIn's 850 million (and counting) members.  *Id.*  LinkedIn's highest priority is and always has been those members.  In short, "Members First."  CE 939 (Reid Dep.).

Like most platforms, LinkedIn imposes restrictions on who uses its services and how they do so.  Among these conditions is that LinkedIn restricts unauthorized bots from making high-

---

[1] LinkedIn cites the Compendium of Evidence in Support of LinkedIn's August 5 Motions "CE."

1    volume requests to LinkedIn's servers, i.e., scraping.  Scraping is bad for members and LinkedIn.

2    It burdens LinkedIn's servers, inhibiting the site's performance.  CE 8-9 (Bray Dep.); CE 461-65

3    (Malackowski Rpt.).  Mass collection and use of member information also interferes with

4    fundamental member interests in control over their information.  CE 6-7 (Bray Dep.); CE 1381-

5    82 (Rockwell Decl.); CE 828-29 (Murphy Rpt.).  For example, when members delete information

6    from their profiles, they justifiably expect that LinkedIn will delete it, too.  Lawit Decl. Ex. C

7    (User Agreement ¶ 3.1(a)).  But scrapers may retain and sell that information, interfering with

8    members' control over or expectations with respect to their information.  CE 947-50 (Rockwell

9    Dep.).  Barring scraping thus serves important business interests for LinkedIn.  As economics

10   expert, Kevin Murphy, explained, anti-scraping policies "increase members' trust" and "enhance

11   the performance of the platform," making it more valuable.  CE 805-06, 825 (Murphy Rpt.).

12        LinkedIn prohibits unauthorized scraping through its User Agreement and enforces that

13   prohibition with general technical defenses that operate to bar access requests by scrapers.

14   LinkedIn's terms provide that "by … accessing or using our services … you are entering into a

15   legally binding agreement."  *E.g.*, Lawit Decl. Ex. C § 1.2.  The User Agreement thus governs not

16   only members who register for an account, but also expressly applies to "Visitors" who access the

17   site's services without having done so.  *Id.*  When a user assents to the Agreement, it "agree[s]

18   that [it] will not" do various things, including: "Scrape or copy profiles and information of others

19   through any means"; "Use manual or automated software, devices, scripts robots, other means or

20   processes to access, 'scrape,' 'crawl,' or 'spider' the Services or any related data or information";

21   or "Use bots or other automated methods to access the services."  *Id.* § 8.2

22        LinkedIn maintains robust technical defenses as one means of self-help to broadly enforce

23   its terms of use.  CE10-12 (Bray Dep.).  Like stadium security, LinkedIn's defenses are general

24   and anonymous in the sense that they screen all requests to access LinkedIn's servers without

25   regard to or knowledge of the identity of the requester.  *Id.*; CE 1298-1302 (Wu Dep.).  When a

26   request comes in for access to profile data stored on one of LinkedIn's servers, that request must

27   run a gauntlet designed to detect whether or not that request is consistent with LinkedIn's terms.

28   That gauntlet, LinkedIn's "Anti-Abuse Infrastructure" and its "Anti-Scraping Technical

Strategy," is highly effective at blocking scrapers.  CE 1313-15 (Rockwell Decl.); CE 10-12 (Bray Dep.); CE 810-11 (Murphy Rpt.).  All told, LinkedIn's defenses block hundreds of millions of scraping requests every day.  CE 13-14 (Bray Dep.); CE 810-11 (Murphy Rpt.).

### B.      hiQ Builds A Business On Prohibited Scraping.

Before hiQ failed, its business was built on scraping LinkedIn member profile data.  Its first product was "Keeper" (originally named "Control Center"), which it completed in the first half of 2014.  CE 1477.  Keeper scraped LinkedIn member profiles for a company's employees in order to look for changes that would suggest which employees were "flight risks."  CE 626-27 (Medeiros Dep.); CE 397-424 (hiQ product overview); *see* CE 392-95 (Kim Dep.) (hiQ knew LinkedIn members could choose not to share changes to their profiles but collected and sold that information anyway).  Skill Mapper, which hiQ sought to launch in the Spring of 2017, was designed to scrape profiles to identify the skills possessed by a company's current employees.  CE 130-39 (hiQ product overview); CE 101-02 (Graves Dep.).  To be cost-effective and accurate, both products depended on bots that extracted information from LinkedIn's profile data servers at a rate far beyond human capability.  Schmidt Decl. Ex. A at 107-10, Table 3.

hiQ has long known that LinkedIn prohibits scraping.  CE 927 (March 9, 2015 email showing CEO Kaplan excerpt from User Agreement that prohibits scraping, stating "don't want to freak anyone out"); CE 106-08 (Graves Dep.).  Its personnel knew about, reviewed, and repeatedly accepted the User Agreement by accessing and using LinkedIn's services.[2]  It accepted the agreement in running advertising and signing up for LinkedIn subscriptions also subject to the User Agreement.[3]  And hiQ admits that it was a LinkedIn Member with a Company Page.  ECF No. 24 at 12; ECF No. 327 at 14; Lawit Decl. ¶ 5, Ex. I (record of hiQ company page).

hiQ also knew that to effectively perform the scraping on which its business depended, it would need to illicitly circumvent LinkedIn's general technical defenses.  The source code of

---

[2] CE 370-71 (Kaplan Dep.); CE 87 (Graves Dep.); CE 1148-49 (Weidick Dep.); CE 919 (Oltmann Dep.); CE 705, 707 (Miller Dep.); CE 30-31 (Dev Dep.); CE 393 (Kim Dep.).

[3] Lawit Decl. ¶¶ 7-8, Exh. J-M; CE 118-19 (Graves Dep.); CE 615 (Medeiros Dep.); ECF No. 327 at 15 (hiQ purchased advertising on LinkedIn); ECF No. 327 at 39 (hiQ agreed to the LSA); CE 637-39 (hiQ Sales Navigator order form incorporating LSA); CE 64-61 (hiQ Sales Navigator invoices).

1   hiQ's first scraper from May 2014 reveals "several intentional techniques to evade

2   detection … by LinkedIn, ████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████." Schmidt Decl. Ex. A at 42. As hiQ continually ran into

5   more and more sophisticated iterations of LinkedIn's defenses, hiQ worked to develop more

6   advanced circumvention methods. *Id.* at 42-46; *see* CE 729 (████████████████████); CE

7   703-04 (hiQ CTO Miller: ████████████████████████████████████████████████

8   ████████████████████████████████████). hiQ ran numerous experiments and

9   implemented its findings in an admitted effort to reverse engineer LinkedIn's systems and avoid

10  detection by simulating human site-access behaviors. CE 706, 714-16 (Miller Dep.); CE 1601-03

11  (notes on reverse engineering LinkedIn's systems); CE 731-33 (same); CE 730 ████████████

12  ████████████████████████████████); CE 737-48 (Scraper Wars Presentation).

13       In fact, contrary to repeated representations hiQ made at the outset of this case, hiQ even

14  circumvented LinkedIn's *password* barriers. For its Keeper product, it was critical that hiQ

15  obtain information about as many of a customer's employees as possible. CE 104-05 (Graves

16  Dep.). When this "coverage" was lacking, customers stopped buying Keeper. CE 682 (eBay

17  non-renewal); CE 673-76 (Apax coverage issue). So, to get enough "coverage" of a customer

18  company's employees, hiQ had to log into a LinkedIn member account to collect profile URLs.[4]

19  The process was essential. CE 1514-17 (report of hiQ data coverage with and without turking);

20  CE 144-46 (████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████); CE 97-98 (Graves Dep.).

22  hiQ thus hired a phalanx of third-party "turkers" to perform the process. CE 1573-85 (record of

23  payments to all turkers from Sep. 2015 to Sep. 2016); CE 1538-49 (turking instructions).

24       Because LinkedIn's general technical defenses would pick up on the unusual high-volume

25  patterns of turking and restrict the turkers' real accounts, CE 148-49 (internal email), hiQ

26  ───────────────────────

[4]   CE 104-05 (Graves noting the importance of data coverage); CE 151-54 (describing the

27  turking process); CE 148-49 (Graves discussing circumvention of LinkedIn "usage" restrictions);
    CE 773 (turking "logged out" is not "going to work at all"); CE 2067 (same); CE 1462 (logged

28  out turking is an "exercise in frustration"); CE 1460 ("There are two new search links that will
    perform a search within linkedin, which will only work if you are logged into linkedin.").

instructed that it was a "good idea to make a fake account."  CE 151 (turking instructions); *see* CE 118-19, 123-25 (Graves Dep.).  This ran afoul of the User Agreement's prohibition on "[c]reat[ing] a false identity on LinkedIn," Lawit Decl. Ex. C ¶ 8.2; CE 927 (March 9, 2015 email).  hiQ, including its head of data science, Genevieve Graves, knew that both turking itself and the fake accounts violated the User Agreement.  CE 106-08, 112-14 (Graves Dep.); *see* CE 328 (hiQ violated "the requirement that users of LinkedIn don't create false identities"); CE 167 ("I feel as though creating a training set of fake profiles to standardize turking will be an arduous process, one that requires more cunning and deceptive tactics to perform, and will end up breaking more terms of use than turking.")

But hiQ was never deterred.  Although hiQ spoliated the data that would confirm the precise scope of its activities, LinkedIn estimates hiQ sent approximately 50 billion scraping requests from Fall 2016 through the Spring of 2018.  CE 1303-05 (Wu Dep.).

### C.    hiQ's Business Fails Before May 23, 2017.

Although hiQ had no compunctions about violating LinkedIn's User Agreement or circumventing LinkedIn's general technical defenses, the latter was easier said than done.  By the end of March 2017, hiQ CEO Mark Weidick "shut[] down scraping" because hiQ was "only getting a trickle of data" from LinkedIn.  CE 1173; *see* CE 1174 (Weidick reporting technical and legal issues with scraping).  Two weeks later, things had not improved, and Weidick noted that the "first order of business is to get scraping up and running to some viable place."  CE 1258 (Weidick email).  But two weeks after that, a hiQ data scientist described hiQ's scraping operation as "back to square one," CE 1259 (LeBailly email), and its CTO acknowledged the scraping situation had "come to a head." *Id*. (Miller email).  hiQ tried still more tricks with ████ ████, but those did not work either, and hiQ was seeing ban rates of ██% or more.[5]

During this time, the state of hiQ's scraping operation was so dire that, apparently on Weidick's instruction, a hiQ data scientist, Boris Dev, anonymously requested access to

---

[5] CE 51 (ban rates between ████████); CE 1626-27 (hiQ dependent on ████████████████); CE 1616 (████████████████ unavailable for two weeks on May 3, 2017); CE 1624 (████ still down as of May 26, 2017); CE 1622 (testing alternative ████ service); CE 770 (reporting ban rate greater than ██%).

1   LinkedIn's APIs.  CE 1608 (Weidick email).  Weidick worried that the request had "go[ne] in as

2   hiQ," and that he "probably encouraged [Dev] to go a few steps to[o] far on this given our

3   dependency on LinkedIn." *Id.*  Dev assured Weidick that he "did not mention our company

4   name" or "use my real LinkedIn profile," instead "anonymously testing the water," CE 49-50.

5   *See* CE 39-44 (Dev Dep.); CE 1165-66 (Weidick Dep.)  LinkedIn rejected the request.  CE 49-50.

6          Meanwhile, hiQ's business was collapsing.  It had only ▮▮▮▮▮▮ of cash remaining and

7   no ability to seek more outside investment.  CE 1150-51, 1161 (Weidick Dep.); CE 1220-53

8   (May 15, 2017 presentation to hiQ Board).  Its "exceptionally poor renewal rate," CE 1228 (May

9   15, 2017 presentation to hiQ Board), and customer "churn" meant it was "not a sustainable

10  business."  CE 170 (internal email).  By mid-May 2017, hiQ's business had failed and its Board

11  was conducting a complete reexamination of the company's business model.  CE 1220-53 (May

12  15, 2017 presentation to hiQ Board).  As LinkedIn's business strategy expert, Yael Hochberg,

13  opined, hiQ was headed out of business because of its "poor financing position, risky business

14  model, lack of sustainable competitive advantage, as well as hiQ's apparent struggles with

15  product-market fit, execution, and customer acquisition and retention."  CE 212 (Hochberg Rpt.)

16         **D.     LinkedIn Asserts Its Rights In A Cease-And-Desist Letter.**

17         As Spring 2017 approached, LinkedIn did not know that hiQ's business was failing.  Nor

18  did it know that its general technical defenses had effectively blocked hiQ's scraping operation.

19         Scraping had been an issue for LinkedIn for a long time.  Since 2010, LinkedIn had sent

20  scores of notices to scrapers, most of which were resolved by agreement, but some of which

21  resulted in litigation.  Lawit Decl. ¶¶ 12, 17.  Its general technical defenses had been in place

22  since at least 2012 and were continually evolving to thwart ever-more creative attempts to

23  circumvent them.  CE 11-12 (Bray Dep.); CE 1298-1302 (Wu Dep.); CE 955 (Rockwell Dep.);

24  CE 810-11 (Murphy Rpt.); CE 1274-75 (Womer Dep.).  LinkedIn also, in Fall 2013, had created a

25  group called "Scraper Council," made up of LinkedIn employees from its Legal, Product Trust,

26  Trust Engineering, Trust and Safety, Data Science, and Business Development Groups, and

27  tasked with collaborating to prevent scraping abuse.  Lawit Decl. ¶ 13.  In April 2015 there was

28  an executive meeting bringing renewed emphasis to the issue of scraping abuse on the platform.

1  The presentation noted "that scraping is on the rise," identified it as a "a Members First issue,"

2  and listed several prominent scrapers (hiQ not among them).  CE 960, 966.

3         In October of 2015, Lorenzo Canlas, an employee who worked on LinkedIn's internal

4  analytics as part of its human resources function, noted hiQ to some colleagues, one of whom

5  brought hiQ to the attention of Scraper Council.  CE 1279 (Canlas email).  But Scraper Council

6  lacked the resources to respond to every report of possible scraping it received, and did not

7  investigate hiQ at that time.  Lawit Decl. ¶ 15.

8         In April of 2017, a few LinkedIn employees were invited by hiQ to attend its "Elevate"

9  conference where it announced the launch of its Skill Mapper product.  CE 62-63 (employee

10  notes from conference).  hiQ's description of Skill Mapper suggested to the attendees that hiQ

11  was obtaining LinkedIn data by scraping.  CE 63 (notes indicating hiQ "[r]efresh (scrape) profile

12  data every few weeks").  So they reported this to a department called Trust Engineering, *id.*,

13  which in turn referred the matter to LinkedIn's Legal team, the department ultimately responsible

14  for determining whether a user has violated LinkedIn's rights, and for deciding whether to initiate

15  some form of legal enforcement against it.  Bajoria Decl. ¶¶ 3-5; Lawit Decl. ¶ 10.

16         By then, LinkedIn's Scraper Council was receiving over 100 reports of scraping per year.

17  Lawit Decl. ¶ 14.  When the report came in on hiQ, the Legal department did what it typically

18  does: investigate, evaluate whether the scraper's conduct is unlawful, then exercise legal

19  judgment in deciding whether to send a C&D letter.  Bajoria Decl. ¶¶ 3-4.  Ultimately, LinkedIn's

20  Legal department decided, just as it had dozens of times before, to send a C&D letter.  Bajoria

21  Decl. ¶ 5; Lawit Decl. ¶ 12.  Its May 23, 2017 letter explained that hiQ's scraping "violates

22  LinkedIn's User Agreement and the law."  Bajoria Decl. Ex. A at 2.  It invoked the User

23  Agreement's prohibitions on scraping, as well as hiQ's promises not to "[c]opy or use the

24  information, content or data of others … (except as expressly authorized); "[r]ent, lease, loan,

25  trade, sell/resell access to the Services or any related information or data; or "[s]hare or disclose

26  information of others without their express consent."  *Id.*  The letter further asserted that

27  "[c]ircumventing these technical measures … without authorization" would violate California

28  Penal Code § 502, the CFAA, the state common law of trespass, and the anti-circumvention

1   provisions of the Digital Millennium Copyright Act.  *Id.*  And it reserved "all … rights and

2   remedies, including legal action."  *Id.*

3   **E.**     **hiQ Obtains Preliminary Relief On A Lowered Merits Standard, Then Cannot Plead Any Theory Of Anticompetitive Conduct Or Maintain Its Business Despite Unfettered Access to LinkedIn Data.**

4

5         In response, hiQ sued, claiming that LinkedIn's C&D letter constituted tortious

6   interference with contract and violated California's Unfair Competition Law, Cal. Bus. & Prof.

7   Code § 17200 (UCL).  It also sought a preliminary injunction.  Its showing was based on two key

8   premises.  First, hiQ claimed repeatedly that its conduct involved only areas of LinkedIn's

9   website that did not require "logging in."  *E.g.*, ECF No. 24 at 4.  And second, hiQ claimed that

10  LinkedIn's letter would drive it out of business.  ECF No. 4 at 6-7, 9; ECF No. 5 at 2; ECF No.

11  51 at 1.  On the basis of these representations, this Court granted a preliminary injunction, finding

12  a likelihood of irreparable harm and "serious questions going to the merits" of hiQ's claims.  ECF

13  No. 63 at 16.  The Ninth Circuit affirmed.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1197

14  (9th Cir. 2022).

15        Meanwhile, hiQ failed to plead actionable anticompetitive conduct.  It attempted to allege

16  three separate claims under the Sherman Act, with seven different theories.  ECF No. 131 at 30-

17  34.  But this Court found "each theory … implausible."  ECF No. 158.  hiQ did not try to

18  resuscitate those claims.  Then, discovery revealed that hiQ's Keeper product in fact *depended* on

19  access to password-protected areas of LinkedIn's website, belying hiQ's claims of purely

20  "public" access.  Discovery also revealed hiQ's inability to scrape and business troubles before

21  LinkedIn sent its C&D letter.  *Supra* 7-8.

22        In addition, it became apparent during discovery that hiQ had gone out of business,

23  necessitating dissolution of the preliminary injunction because there was no longer any threat of

24  irreparable harm.  ECF No. 329.  Discovery also revealed that hiQ spoliated evidence of both its

25  scraping activity and its customer relationship management databases.  *See* LinkedIn's Motion for

26  Spoliation Sanctions, filed herewith.  LinkedIn now moves for summary judgment to enforce its

27  contract, and to dismiss hiQ's remaining affirmative claims in its Amended Complaint.

28

1

## ARGUMENT

2          Summary judgment is appropriate if "the movant shows that there is no genuine dispute as

3   to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

4   56(a).  "A genuine issue of material fact will be absent if, upon viewing the evidence and

5   inferences which may be drawn therefrom in the light most favorable to the adverse party, the

6   movant is clearly entitled to prevail as a matter of law." *Hill v. Walmart Inc.*, 32 F.4th 811, 815-

7   16 (9th Cir. 2022) (quotation marks omitted).  Alternatively, "[w]here plaintiff has the burden of

8   proof, defendant need only point out the relevant issue for which plaintiff has no substantive

9   evidence and the burden shifts to the plaintiff to furnish substantive evidence sufficient to raise a

10  triable issue of fact." *Clements v. Screen Gems, Inc.*, No. CV10-220-R, 2010 WL 5174376, at *2

11  (C.D. Cal. Dec. 13, 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

12  **I.      HIQ BREACHED LINKEDIN'S USER AGREEMENT AS A MATTER OF LAW.**

13          **A.      Undisputed Facts Establish That hiQ Breached The User Agreement.**

14          The elements of a breach of contract claim are "(1) the existence of the contract, (2)

15  plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the

16  resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821

17  (2011).  Those elements are met here as to hiQ's breach of the User Agreement's scraping, fake

18  account, and commercial use prohibitions.  Courts have enforced such provisions in

19  indistinguishable circumstances, and the result should be the same here.  *See Meta Platforms, Inc.*

20  *v. BrandTotal Ltd.*, No. 20-CV-07182-JCS, 2022 WL 1990225, at *23 (N.D. Cal. June 6, 2022);

21  *Niantic, Inc. v. Global++*, No. 19-cv-03425-JST,  2019 WL 8333451, at *7 (N.D. Cal. Sept. 26,

22  2019); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1059 (N.D. Cal. 2010).

23          ***hiQ assented to the User Agreement.***  "Courts have consistently enforced terms of use

24  agreements where the user had actual notice of the agreement," "or where the user is required to

25  affirmatively acknowledge the agreement before proceeding with use of the service." *In re Holl*,

26  925 F.3d 1076, 1084-85 (9th Cir. 2019) (brackets and quotation marks omitted) (quoting *Nguyen*

27  *v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)).  Assent is established here many

28  times over, both by express agreement and by constructive acceptance of the terms with

knowledge.  *Supra* 5-6.  hiQ's witnesses have confirmed repeatedly that hiQ reviewed the terms of LinkedIn's User Agreement.  CE 370-71 (Kaplan Dep.); CE 707 (Miller Dep.); CE 106-08 (Graves Dep.).  LinkedIn undisputedly put hiQ on further notice of the terms with its C&D letters. Bajoria Decl. Ex. A; Lawit Decl. Ex. O (June 24, 2017 C&D letter).  hiQ continued to seek access to the site throughout the entire period with knowledge of the terms.

   ***LinkedIn Performed.***  hiQ has not identified any basis to dispute that LinkedIn performed its material obligations under the User Agreement.

   ***hiQ undisputedly breached the unambiguous terms.***  hiQ breached the provisions of the User Agreement identified in the C&D letter.  Lawit Decl. Ex. C (User Agreement § 8.2).  The User Agreement is unambiguous in barring "[s]crap[ing] [of] profiles and information of others through any means"; "[u]s[ing] manual or automated software … , devices, scripts, robots, other means or processes to access, 'scrape,' 'crawl,' or 'spider' the Services"; and or any related data or information"; or "[u]s[ing] bots or other automated methods to access the services." *Id.*  hiQ has never denied that this is precisely what it did.

   hiQ also breached the User Agreement's prohibition on "creat[ing] a false identity on LinkedIn." *Id.*  It directed agents to make fake accounts and then copy url data for its scraping operations while acting in the course of hiQ's business.  CE 151-54 (describing the turking process); CE 2058-59 (exemplar consulting agreement); CE 2063; *see supra* 7.  hiQ's use of the data it collected to sell its Keeper and Skill Mapper products also violated promises that it would not "use, disclose, or distribute any information …without the consent of LinkedIn"; "sell/re-sell access to the Services or related data"; or "[s]hare or disclose information of others without their express consent."  Lawit Decl. Ex. C (User Agreement § 8.2).

   hiQ argues that the User Agreement does not apply to it when it is "not logged in to its Company Page."  ECF No. 327 at 38 (Answer).  Nothing in the User Agreement suggests such an interpretation.  By its terms, the User Agreement applies to all access or use of services, whether that is done by a registered Member (which hiQ acknowledges it was) or by a Visitor (even assuming hiQ was only "visiting" when it was logged out).  Lawit Decl. Ex. C (User Agreement § 1.2).  hiQ's corporate representative testified that hiQ nevertheless "believed the public

1    information was publicly available and okay to index." CE 374 (Kaplan Dep.). Whatever hiQ

2    "personally believed the agreement of the parties to be" is "immaterial" in the face of objectively

3    unambiguous contract language. *Brant v. Cal. Dairies*, 4 Cal. 2d 128, 133 (1935). Nor would

4    that belief in any way excuse hiQ's undisputed breach of provisions prohibiting sharing member

5    data without consent, use of data for commercial purposes, or creation of fake accounts.

6    ***LinkedIn suffered damage as a result of hiQ's actions.*** There is no material factual

7    dispute that LinkedIn was harmed by hiQ's breaches, in an amount to be proven at trial. LinkedIn

8    expended resources investigating and remediating hiQ's breaches. CE 1320 (ECF No. 29); CE

9    459-60 (Malackowski Rpt.); Bajoria Decl. ¶ 4. *See E. & J. Gallo Winery v. Instituut Voor*

10   *Landbouw-En Visserijonderzoek*, No. 117CV00808DADEPG, 2018 WL 2463869, at *9 (E.D.

11   Cal. June 1, 2018) ("security and investigation costs" support contract damages). hiQ's high-

12   volume scraping imposed a substantial burden on LinkedIn's servers, increasing LinkedIn's costs

13   of providing service. CE 1304-05 (Wu Dep.); CE 461-65 (Malackowski Rpt.). hiQ was unjustly

14   enriched by its unauthorized commercial use of valuable data about LinkedIn members. *In re*

15   *Google Assistant Priv. Litig.*, 546 F. Supp. 3d 945, 967 (N.D. Cal. 2021) ("[U]nder California

16   law, a defendant's unjust enrichment can satisfy the 'damages' element of a breach of contract

17   claim.") (citation omitted). In any event, nominal damages are sufficient to sustain liability for a

18   breach of contract claims. *Elation Sys., Inc. v. Fenn Bridge LLC*, 71 Cal. App. 5th 958, 965-66

19   (2021); *see Meta*, 2022 WL 1990225, at *22-23.

20         **B.    hiQ's Affirmative Defenses Are Baseless.**

21   hiQ's Answer pleads a series of baseless affirmative defenses all fundamentally premised

22   on the notion that LinkedIn waived enforcement of its rights. ECF No. 327 at 44.

23         ***Statute of Limitations (Second Defense) and Laches (Seventeenth Defense).*** LinkedIn's

24   contract claim is well within the four-year statute of limitations. *See* Cal. Civ. Code § 337(a).

25   hiQ breached the contract repeatedly in multiple ways beginning in 2014—less than four years

26   before hiQ filed this lawsuit on June 7, 2017, ECF No. 1—and continuously through the filing of

27   suit. *See MH Pillars Ltd. v. Realini*, No. 15-cv-13830-PJH, 2018 WL 1184847, at *3 (N.D. Cal.

28   Mar. 7, 2018) (collecting "weight of authority" establishing the compulsory counterclaims relate

back to filing of plaintiff's complaint).  This also dooms invocation of laches, which is not a valid

defense to a breach-of-contract action brought within the limitations period.  *Abbott v. City of*

*L.A.*, 50 Cal. 2d 438, 461-62 (1958).

**Waiver (Fifth Defense).**  hiQ's waiver defense requires "clear and convincing evidence"

of an "intentional relinquishment of a known right."  *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107

(1966); *see Williams v. Apple, Inc.*, 338 F.R.D. 629, 646 (N.D. Cal. 2021).  Both hiQ's CEOs

Kaplan and Weidick conceded that LinkedIn never provided express consent to hiQ's conduct.

CE 368-69 (Kaplan Dep.); CE 1160 (Weidick Dep.).  In fact, hiQ knew it did not have

permission.  It was well aware that LinkedIn's general technical defenses blocked scraping.

*Supra* 5-6.  And when it could no longer circumvent them, it requested—anonymously, to avoid

revealing itself to LinkedIn—access to LinkedIn's APIs, which LinkedIn denied.  *Supra* 8.  hiQ

can point to no act by LinkedIn which constitutes a waiver of its contractual rights.

**Estoppel (Third Defense).**  Estoppel similarly demands a showing that the plaintiff

"intend[ed] that [its] conduct shall be acted upon, or … so act[ed] that the party asserting the

estoppel had a right to believe it was so intended."  *Lentz v. McMahon*, 49 Cal. 3d 393, 399

(1989).  hiQ admits that it never asked permission to scrape.  ECF No. 327 at 22.  LinkedIn

undisputedly deployed its general defenses without exception for hiQ—which hiQ knew given its

repeated, ultimately unsuccessful attempts at circumvention.  It also undisputedly never gave hiQ

permission to scrape, and (anonymously) refused hiQ access to its APIs.  Against this backdrop, a

LinkedIn HR employee's (Canlas) attendance at hiQ's promotional conferences could not have

induced a reasonable belief by hiQ that it was entitled to operate a mass-scale scraping enterprise.

There is no evidence that hiQ asked Canlas for permission to scrape, nor that anyone could have

thought Canlas was authorized to grant such permission anyway.  CE 325-26.  At most hiQ can

point to "mere silence," which "will not create an estoppel" absent "some obligation to speak."

*Transport Clearings-Bay Area v. Simmonds*, 226 Cal. App. 2d 405, 427 (1964).

**Unclean hands (Eleventh Defense), In Pari Delicto *(Eighth Defense), Ratification**

**(Sixth Defense), and Consent (Ninth Defense).**  hiQ's remaining defenses warrant only brief

mention.  Unclean hands requires LinkedIn to have committed some "improper conduct" that

"directly affect[s]" hiQ's obligations under the User Agreement and that "prejudicially affect[ed]" hiQ. *Brown v. Grimes*, 192 Cal. App. 4th 265, 282-84 (2011). As already explained, LinkedIn did *nothing* towards hiQ, other than ultimately enforce its bargained-for rights under the User Agreement. *In pari delicto* requires that both parties be "participant[s]" in the same "illegal, fraudulent, or inequitable conduct," *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1143 n.1 (2005)—this makes no sense because the parties were not joint participants in hiQ's conduct. And to the extent hiQ is claiming "ratification" or "consent" as defenses to a breach of contract claim, they likewise fail because LinkedIn did nothing that would ever approach a knowing, intentional grant of permission to hiQ.

## II.     HIQ'S TORT AND UCL CLAIMS ARE BARRED BY CAL. CIV. CODE § 47.

Turning to hiQ's affirmative claims, each fails for the threshold reason that it is barred by California's litigation privilege, Cal. Civ. Code § 47(b). Recognized for "well over a century," § 47 renders litigation communications "absolutely immune from tort liability." *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993); *see Silberg v. Anderson*, 50 Cal. 3d 205, 215-16 (1990). The only exception is a claim for malicious prosecution, which first requires that the action have been terminated favorably to the complainant. *Rubin*, 4 Cal. 4th at 1194. The privilege extends not only to communications made in the course of litigation, but also to communications made in anticipation of potential litigation: "The classic example of an instance in which the privilege would attach to prelitigation communications is the attorney demand letter threatening to file a lawsuit if a claim is not settled." *Edwards v. Centex Real Est. Corp.*, 53 Cal. App. 4th 15, 35 n.10 (1997); *see Rubin*, 4 Cal. 4th at 1194 ("[N]umerous decisions have applied the privilege to prelitigation communications.").

hiQ attributes as the sole cause of its harm in this action the C&D letter sent by LinkedIn. CEO Weidick, testifying as hiQ's 30(b)(6) witness on alleged harm and damages, testified as such during his deposition. CE 1207-09 (Weidick Dep.). hiQ's damages expert also identifies the C&D letter as the sole LinkedIn act causing hiQ damages. CE 998-1004 (Sacks Dep.). Nor did LinkedIn even arguably go beyond the confines of sending a prelitigation communication, as Weidick also conceded that LinkedIn did not publicize the letter to anyone other than hiQ (such

as hiQ customers), and that in fact it was hiQ *who hired a publicist and publicized the letter itself*. CE 1162-64 (Weidick Dep.).

That letter confirms that it is precisely the type of prelitigation communication that *Rubin*'s "numerous decisions" have held protected.  *See* Bajoria Decl. Ex. A at 2.  On its face, the letter is an assertion of legal rights.  *Id.*  It was sent by a lawyer.  *Id.*  While preferring an amicable resolution, it expressly contemplates the potential of legal action.  *Id.*  And it followed a format for express revocation of authorization to access a protected computer that was industry-standard in the wake of *Facebook, Inc. v. Power Ventures*, *Inc.*, 844 F.3d 1058 (9th Cir. 2016). Bajoria Decl. ¶ 5; Lawit Decl. ¶ 18.  The letter plainly has "some relation" to a lawsuit—this lawsuit, in which LinkedIn has asserted Counterclaims that largely track the letter.  *Rubin*, 4 Cal. 4th at 1194.  There is no authority for the proposition that hiQ's filing of a preemptive lawsuit deprived LinkedIn of the protection of § 47 for its prelitigation demand letter.

Nor do a few emails between non-lawyer LinkedIn employees expressing a desire to get rid of hiQ as a competitor create an exception to the privilege.  Even if those personnel had authority to conduct legal enforcement—and they plainly did not—the "privilege is absolute in nature," and "appl[ies] to *all* publications, irrespective of their maliciousness."  *Silberg*, 50 Cal. 3d at 215-16.  Indeed, *Rubin* expressly rejected an unfair competition claim where the gravamen of the claimed harm was a privileged prelitigation communication.  4 Cal. 4th at 1200-03.  Those emails are irrelevant.

Even if non-Legal LinkedIn emails had some relevance, that still would not matter, because the choice to send the letter was undisputedly a legal judgment made by lawyers. LinkedIn was seeing more than 100 reports a year of potential abuse.  Lawit Decl. ¶ 14.  It did not have the resources to investigate and pursue all of those potential claims.  *Id.*  LinkedIn candidly acknowledges that it takes into account a desire to protect its business investments when prioritizing its limited resources for enforcement actions.  Lawit Decl. ¶ 10.  But the lawyers and only the lawyers—subject to all pertinent legal and ethical obligations—make a decision about whether LinkedIn will assert its legal rights, as happened here.  Bajoria Decl. ¶ 5; Lawit Decl. ¶ 10.  As LinkedIn firmly believed at the time, and as we now know, the allegations of the letter

1   were well-founded.  hiQ was in fact a scraper violating unambiguous promises in a binding

2   contract with LinkedIn.  And LinkedIn's assertions of rights under the CFAA and state law were

3   and remain based on a reasonable—and LinkedIn believes *correct*—interpretation of precedent.

4       At the motion to dismiss stage, this Court rejected LinkedIn's affirmative defense under

5   the *Noerr-Pennington* doctrine by differentiating between LinkedIn's "cease-and-desist letters

6   (petitioning activity)" and "the blocking of access to its website (nonpetitioning activity)."  ECF

7   No. 158 at 8.  While LinkedIn continues to disagree with that ruling, it has no bearing here.

8   Although "similar," the California litigation privilege is "broader."  *Vinson v. Cal. Dep't of Corrs.*

9   *& Rehab.*, No. 13-CV-00699-JST, 2014 WL 4594208, at *6 (N.D. Cal. Sept. 15, 2014).  The

10  California Supreme Court has never adopted for § 47 the approach this Court used in evaluating

11  *Noerr-Pennington*, and indeed refused in *Rubin* to apply special rules for competition claims.  *See*

12  4 Cal. 4th at 1193. Thus, while § 47 may not privilege wholly independent *conduct* (as opposed to

13  communications, or conduct related to a prelitigation assertion), that is no longer a relevant

14  consideration here because hiQ pegs the entirety of its harm to the C&D letter itself.  There is no

15  evidence of "an independent, noncommunicative, wrongful act" causing hiQ any harm that would

16  bring its claims outside the ambit of § 47.  *Mireskandari v. Gallagher*, 59 Cal. App. 5th 346, 369

17  (2020).  Section 47 forecloses hiQ's Fifth through Ninth Claims for Relief as a matter of law.

18  **III.   HIQ'S INTERFERENCE TORT CLAIMS FAIL FOR OTHER REASONS.**

19      Even if they were not barred by § 47, hiQ's claims for tortious interference with economic

20  relations fail as a matter of law for several additional and independent reasons.

21      **A.   hiQ Cannot Satisfy Essential Elements Of Its Tort Claims.**

22          **1.   hiQ identifies no live contract with which LinkedIn interfered.**

23      When the Ninth Circuit found serious questions going to the merits of hiQ's intentional

24  interference with contract claims, it had in mind the sorts of "ripened," live agreements entitled to

25  "solicitude" under the law.  *hiQ*, 31 F.4th at 1191-92.  To make out a claim for tortious

26  interference with contract, hiQ would have to show that LinkedIn's conduct resulted in "actual

27  breach or disruption" of a "concrete[]" contract.  *Ixchel Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th

28  1130, 1141, 1147-48 (2020).  The allegedly interfered-with contract must "cement … bargained-

1   for intentions … into the future," and it cannot be "terminable at will." *Id.* at 1146.  In short, hiQ

2   needs to point to an "existing enforceable contract" at the time of LinkedIn's C&D letter that

3   LinkedIn knew about and intentionally interfered with.  *Bed, Bath & Beyond of La Jolla, Inc. v.*

4   *La Jolla Vill. Square Venture Partners*, 52 Cal. App. 4th 867, 878 (1997).

5          Discovery has revealed that hiQ has no contracts on which it can base such a claim.  That

6   is because every contract that was active at the time LinkedIn sent its C&D letter was fully paid

7   and performed.  hiQ's CEO specifically confirmed this, and hiQ does not claim that it did not

8   receive payment on any contract.  CE 1197-98 (Weidick Dep.) (confirming hiQ continued to

9   deliver against its contracts post-C&D and could not "recall a single [customer]" that terminated

10  its contract with hiQ).  It therefore cannot satisfy the essential element of proving any existing

11  contract with which LinkedIn allegedly interfered by sending the C&D letter.  Summary

12  judgment is therefore appropriate on any intentional interference with contract claim.

### 2.     hiQ's interference with prospective economic advantage claims fail on numerous grounds.

15         Because hiQ can point to no live contract with which LinkedIn could have interfered, it is

16  left only with the theory that LinkedIn interfered with its ability to secure *renewal* of those

17  contracts that existed at the time LinkedIn sent its C&D letter—that is, it is left with an

18  interference with prospective economic advantage claim.  All of hiQ's agreements were entirely

19  at-will or renewable at-will, such that any customer could terminate the relationship at any time.[6]

20  hiQ thus had no concrete contractual right, as *Ixchel* defines it, to expect that customers whose

21  contracts had been paid and performed would renew.  And it is undisputed that many customers

22  *did not* do so before LinkedIn ever sent its C&D letter—its "customer churn" and "exceptionally

23  low renewal rate" were major pre-existing problems for its business.  CE 169-70 (internal hiQ

24  email); CE 1228 (May 15, 2017 presentation to hiQ Board).

25         At most, then, hiQ can claim only an "expectation"—not an "assurance"—of "future

---

[6] *See* CE 1867-1902 (            ); CE 1706-15 (                ); CE1496 (       ); CE 1733-88
(            ); CE 1835-65 (         ); CE 1794-1816 (            ); CE 1655-62 (            ); CE 1664-
82 (       ); CE 1684-1704 (            ); CE 1965-2009 (         ); CE 1587-92 (            ); CE
1522 (         ); CE 1420-22 (         ); CE 1937-56 (       ); CE 2011-28 (            ); CE
1829-33 (       ); CE 1789-92 (         ); CE 2030-56 (         ); CE 1818-28 (       ).

contractual relations.'"  *Ixchel*, 9 Cal. 5th at 1147 (citing *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1053 (2012)).  It therefore may not rely on the rule that interference is "a wrong in and of itself."  *Id.*  hiQ must instead establish that LinkedIn committed an independently wrongful act, and that it did so with knowledge of particular, existing hiQ relationships with a reasonable probability of resulting in future business.  It cannot.

**LinkedIn committed no wrongful act.**  The requirement of an independently wrongful act is a stringent one.  "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Ixchel*, 9 Cal. 5th at 1143.  hiQ's only conceivable basis for demonstrating an independently wrongful act is its UCL claims.  But as discussed below (at 23-30), those claims fall flat.  hiQ gave up on any attempt to even *plead* a theory of anticompetitive conduct to make out a claim for unfair competition under the UCL.  *Infra* 24-29.  Its claim for fraudulent competition fails because LinkedIn made no false statement at all about scraping, let alone one hiQ relied upon, since hiQ always knew its scraping was prohibited.  *Infra* 29.  And its claim for wrongful competition cannot save it, because it too requires some independent legal wrong—an element hiQ intended to borrow from the intentional interference claims we are discussing here.  *Infra* 30.  And so not only do those claims fail in their own right, they also fail because *they* depend on hiQ's *tort* claims, too.  hiQ is playing a shell game.  To prove tortious conduct, it invokes the UCL; to show unfair, fraudulent, or unlawful conduct under the UCL, it invokes alleged tortious conduct.  What it never does is establish that LinkedIn committed any actionable wrong.

**No specific beneficial relationship of which LinkedIn had knowledge.**  hiQ also can provide no evidence of any *specific* relationship, with a "reasonably probable" chance of yielding "the expected benefit," of which LinkedIn had knowledge at the time it sent its C&D letter.  It is well-settled that a plaintiff cannot base an intentional interference with prospective business advantage claim on abstract interference with opportunity in "the market" generally.  *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996).  hiQ must come forward with specific customers, establish each element for each customer, and show LinkedIn "knew of the *existence* of the relationship."  *Id.* at 526.  There is no evidence that LinkedIn knew

about any specific relationship at the time it sent the letter.  At most, hiQ has only ever pointed to the generalized existence of customers, without specific evidence establishing the elements of an interference tort as to any one of them.

hiQ cannot manufacture a claim by pointing to its notification in a May 31, 2017 letter of certain customers.  CE 2078-81.  The only conduct hiQ complains of took place when LinkedIn made the decision to send its C&D letter on May 23, 2017, prior to having knowledge of any of hiQ's economic relationships.  Bajoria Decl. Ex. A at 2.  LinkedIn engaged in no new conduct after hiQ's May 31 letter that could possibly constitute knowing interference with any relationship.  The only thing LinkedIn did was send an additional C&D letter to hiQ, from LinkedIn's outside counsel and approved by LinkedIn's General Counsel, reasserting rights with the same effect as LinkedIn's prior letter.  Lawit Decl. ¶ 19, Ex. O.  hiQ needs to make out the elements of its tort claim with respect to customers at the time of the May 23, 2017 C&D letter, and hiQ lacks the evidence to do so.

### 3.   LinkedIn's conduct caused neither breach nor any resulting harm.

Even if hiQ could point to specific relationships and establish knowing, wrongful conduct with respect to them—it cannot—its tort claims still fail because hiQ cannot show that LinkedIn's C&D letter "proximately caused" it to breach any agreement or lose any business opportunity. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).  The undisputed facts establish that by the time hiQ received LinkedIn's May 23, 2017 C&D letter, LinkedIn's general technical defenses had already thwarted hiQ's scraping so dramatically that hiQ could not offer its products anyway.  *Supra* 7-9.  Any lost opportunities hiQ suffered were proximately caused by the factors that were driving it out of business.  CE 212 (Hochberg Rpt.).

As LinkedIn's spoliation motion explains, moreover, hiQ spoliated evidence of its scraping logs and customer database information, which would have established that hiQ was unable to circumvent LinkedIn's general technical defenses *before* LinkedIn sent the C&D letter, and that it lost customer relationships for reasons having nothing to do with the C&D letter. Because hiQ spoliated evidence that would have confirmed these truths, it cannot now claim a disputed issue of fact on this point.  Summary judgment is therefore appropriate on the ground of

1  proximate causation as well.

2  **B.  LinkedIn's Conduct Was Justified Because It Was Undertaken In Good Faith
3  To Enforce LinkedIn's Legal Rights.**

4  Independently, LinkedIn is entitled to summary judgment on any intentional interference

5  claims because LinkedIn's enforcement of its contractual rights was legally justified and therefore

6  not tortious.  "Justification" is an affirmative defense to a claim of intentional interference with

7  contractual relations.  *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D.

8  Cal. 2020), *aff'd*, 838 F. App'x 315 (9th Cir. 2021).  That means, generally, "[i]f the [defendant]

9  is not acting criminally nor with fraud or violence or other means wrongful in themselves but

10  [instead] is endeavoring to advance some interest of his own, the fact that he is aware that he will

11  cause interference with the plaintiff's contract … [is] not improper."  *Quelimane Co. v. Stewart*

12  *Title Guar. Co.*, 19 Cal. 4th 26, 56 (1998), *as modified* (Sept. 23, 1998) (quoting Restatement 2d

13  of Torts § 766)); *see Meta*, 2022 WL 1990225, at *36 (granting summary judgment for defendant

14  based on legitimate purpose justification).

15  LinkedIn's conduct was justified as a matter of law because it sought to protect "a prior

16  contract of [its] own"—the User Agreement—by "demand[ing] compliance with the essential

17  terms."  *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 81 (1979).  LinkedIn's entitlement to

18  summary judgment on its breach of contract claim *alone* establishes its justification defense.

19  Simply put, LinkedIn asserted rights that have now been vindicated, foreclosing liability based on

20  that assertion of rights.

21  A party is justified in alleged interference with contractual relations "where (1) he has a

22  legally protected interest, (2) in good faith threatens to protect it, and (3) the threat is to protect it

23  by appropriate means."  *Id.*  LinkedIn had a "legally protected interest" in enforcing its own User

24  Agreement.  *Supra* 11-13.  Add to that its legally protected rights in law, most notably the legal

25  framework in *Facebook*, 844 F.3d 1058.  *See* Bajoria Decl. ¶ 5; Lawit Decl. ¶ 18.  In asserting its

26  rights under that case, LinkedIn was following the Ninth Circuit's prescribed guidance on the use

27  of a C&D letter to further revoke authorization to access its website.  That conduct establishes

28  "good faith" in this context, which requires only that LinkedIn had "any reasonable basis, either

1    factually or legally … to believe" that its assertion of rights was justified.  *Richardson*, 98 Cal.

2    App. 3d at 81.  LinkedIn's belief in its assertion of its rights was not just reasonable, but correct.

3    And LinkedIn's C&D letter, a standard manner of asserting legal rights, constitutes an

4    "appropriate means" of protecting its legal interests.

5            These grounds alone are sufficient to establish a justification, but if more were needed,

6    LinkedIn's assertion of its rights was also justified as a business matter.  As LinkedIn's economic

7    expert, Dr. Murphy, explained, LinkedIn's anti-scraping policies based on its legal interests are

8    also eminently justified as a business matter, because they "increase members' trust" and

9    "enhance the performance of the platform."  CE 825-37, 839-40 (Murphy Rpt.).  hiQ's own

10   expert, Minjae Song, agreed that "member trust is a business justification" for LinkedIn's

11   policies.  CE 1133 (Song Dep.).  And Dr. Murphy further explained how hiQ's scraping would

12   interfere with the interest underlying LinkedIn's anti-scraping policies; LinkedIn's assertion of

13   rights against hiQ was justified by a business rationale.  CE 825-37 (Murphy Rpt.).  hiQ's

14   interference claim therefore fails as a matter of law.

15           **C.     Summary Judgment Is Appropriate On hiQ's Unrecognized "Lost Business
16                    Value" Damages Theory.**

17           Summary judgment should be granted on hiQ's "lost business value" theory of damages

18   for reasons explained in LinkedIn's Motion to Exclude Opinions of Benjamin Sacks, filed

19   herewith.  As explained in that motion, "California [federal and state] courts have rejected the

20   proposition that a plaintiff may recover the value of the lost business."  *E.g.*, *Pac. Rollforming,*

21   *LLC v. Trakloc N. Am., LLC*, No. 07-cv-1897-IEG (MDD), 2011 WL 13176817, at *3 (S.D. Cal.

22   Dec. 1, 2011) (footnote omitted); *Electronic Funds Solutions LLC v. Murphy*, 134 Cal. App. 4th

23   1161, 1180 (2005).

24           **D.     hiQ Has No Evidence To Support Its Request For Punitive Damages.**

25           Under California law, a plaintiff may obtain punitive damages only by proving "by clear

26   and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal.

27   Civ. Code § 3294; *see Tanvilai v. Am. Economy Ins. Co.*, No. SACV 07-1339-CJC(MLG), 2008

28   WL 11342952, at *4 (C.D. Cal. July 15, 2008).  hiQ cannot establish anything like the

1    "aggravating circumstances," *id.*, or "despicable conduct" required to show oppression or malice,

2    Cal. Civ. Code § 3294, and its attempt to plead fraud in the context of its UCL claim is wholly

3    meritless, *infra* 29.  Punitive damages are therefore unavailable in all events.

4    **IV.     HIQ'S UCL CLAIMS ALSO MUST BE DISMISSED.**

5             California Business & Professions Code § 17200, the UCL, defines unfair competition to

6    include any "unlawful, unfair or fraudulent business act or practice."  *Cel-Tech Commc'ns, Inc. v.*

7    *L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  hiQ purported to plead claims under all three

8    prongs:  the Seventh asserts the "unfair" prong, the Eighth asserts the "unlawful" prong, and the

9    Ninth asserts the "fraudulent" prong.  All of these claims fail because hiQ cannot establish

10   entitlement to any available equitable remedy, and for additional independent reasons as well.

11
12             **A.     hiQ's "Unfair," "Unlawful," And "Fraudulent" UCL Claims Must All Be**
                 **Dismissed Because It Has No Cognizable Remedy.**

13            Summary judgment is appropriate against all of hiQ's UCL claims because hiQ cannot

14   show entitlement to a remedy.  The UCL affords only the equitable remedies of restitution or

15   injunctive relief.  *See* Cal. Bus. & Prof. Code § 17203.  hiQ did not plead for restitution (ECF No.

16   131 at 36), and hiQ's damages expert concedes that the monetary remedies he calculated are not

17   restitutionary in nature.  CE 1012-13 (Sacks Dep.).  Thus, hiQ is limited to at most injunctive

18   relief.  On the current record, injunctive relief is unavailable as a matter of law, foreclosing any

19   UCL claim.  *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 662-63 (N.D. Cal. 2020) (granting

20   summary judgment where plaintiff could not establish remedy and collecting cases).

21            In federal court, a permanent injunction can issue only if there is a "likelihood of

22   substantial and immediate irreparable injury."  *American-Arab Anti-Discrimination Comm. v.*

23   *Reno*, 70 F.3d 1045, 1066-67 (9th Cir. 1995); *see Sonner v. Premier Nutrition Corp.*, 971 F.3d

24   834, 844 (9th Cir. 2020) (federal law controls availability of injunction under UCL).  As this

25   Court found, however, "hiQ no longer offers the competing products that underpinned its UCL

26   claim; it does not have agreements with customers to breach; its employees are gone; its

27   operations are dormant for the indefinite future."  ECF No. 329 at 6.  Any "harm" it claims "has

28   already occurred."  *Id.*  Because it cannot create a fact issue on the existence of legally relevant

1  future harm, hiQ has no UCL remedy; because it has no UCL remedy, it has no UCL claim.

2  **B.  hiQ's "Unfair" Prong UCL Claim Must Be Dismissed As A Matter Of Law.**

3  **1.  hiQ's failure to amend its antitrust claims requires dismissal of its Seventh Claim for Relief.**

4

5  Conduct is unfair under the UCL only if it "threatens an incipient violation of an antitrust

6  law, or violates the policy or spirit of one of those laws because its effects are comparable to or

7  the same as a violation of the law, or otherwise significantly threatens or harms competition."

8  *Cel-Tech*, 20 Cal. 4th at 187.  hiQ pled a "policy and spirit" unfairness claim incorporating its

9  antitrust claims by reference.  ECF No. 131 at 27-28.  In seeking a preliminary injunction, hiQ

10  posited theories of "unfair leveraging" and denial of "essential facilities."  ECF No. 24 at 12.  hiQ

11  subsequently filed an Amended Complaint, ECF No. 131, incorporating those and five other

12  antitrust theories by reference into its UCL claim.  All told, it tried to plead monopolization and

13  attempted monopolization by conduct "including, but not limited to, leveraging, lock-in, raising

14  rivals' costs, tying, unilateral refusal to deal, denial of essential facilities, and vertically-arranged

15  boycott."  ECF No. 131 ¶¶ 112, 150.

16  The Court dismissed every one of these claims on grounds of legal insufficiency and

17  implausibility.  hiQ could not plausibly allege the existence of a "people analytics market," which

18  also made it impossible to allege that LinkedIn has monopoly power or the power to harm

19  competition in any such market.  ECF No. 158 at 9-12.  The Court then systematically rejected

20  every theory of anticompetitive conduct, too, finding each "not viable as currently pled."  *Id.* at

21  13-20.  The majority of these theories the Court found irredeemable; it gave hiQ the chance to

22  plead a plausible claim based only on "unilateral refusal to deal … and the essential facilities

23  doctrine."  *Id.* at 20.  hiQ declined the opportunity, thereby doing nothing to support its derivative

24  unfairness claim based upon those theories and leaving no notion of a market or theory of

25  anticompetitive conduct in the case.

26  For two independent reasons, this Court's dismissal of each of hiQ's theories of

27  anticompetitive conduct requires summary judgment on hiQ's unfair competition claim.  First,

28  "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or

1    practice for the same reason—because it unreasonably restrains competition and harms

2    consumers—the determination that the conduct is not an unreasonable restraint of trade

3    necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool*

4    *Corp.*, 93 Cal. App. 4th 363, 375 (2001).  An "independent claim under California's UCL

5    is … barred" because LinkedIn's "activities are lawful under the antitrust laws." *City of San Jose*

6    *v. Office of the Comm'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015).

7        Second, even if it were possible to build a UCL "policy or spirit" claim on conduct that

8    does not violate federal antitrust laws, hiQ has not pled any such theory—as a "matter of fact" its

9    unfair competition claims are entirely derivative of failed antitrust theories.  *Aguilar v. Atlantic*

10   *Richfield Co.*, 25 Cal. 4th 826, 866-67 (2001) (dismissing UCL claim on this ground).  hiQ has

11   not pled, for example, that LinkedIn has engaged in unfairness "tethered to some legislatively

12   declared policy" other than the antitrust laws.  *Cel-Tech*, 20 Cal. 4th at 186-87; *cf. Diva*

13   *Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1090-91 (N.D. Cal. 2019).  If

14   anything, California state policy weighs in favor of protecting individuals' information online.

15   *See* Cal. Consumer Privacy Act, Cal. Civ. Code § 1798.100.  Nor has or could hiQ plead some

16   "adverse effect on competition," *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 856 (2002),

17   since this Court has already found that hiQ failed to plead a plausible market in which some

18   adverse effect could be discerned.  *See Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App.

19   4th 480, 496 (2011) (explaining that without a market definition there are no "objective

20   benchmarks" for evaluating a claim of anticompetitive conduct).  Moreover, hiQ has no claim

21   sounding in California's Cartwright Act, under which "single firm monopolization is not

22   cognizable."  *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 626 (2012).

23       As for the additional "detail[] herein" hiQ referenced in its Seventh Cause of Action, it is

24   hard even to parse, let alone to make out a full and coherent theory of unfair competition.  Squint

25   and perhaps one might discern the outlines of hiQ's original "leveraging" claim in the allegation

26   that "LinkedIn is using its dominant presence as the world's largest professional social

27   networking platform to assume proprietary control over data that is owned not by LinkedIn, but

28   by its members," thus harming "hiQ's business model and prospects."  ECF No. 131 at 27-28.

But this Court has since recognized that "leveraging by itself is not inherently anticompetitive in nature," dismissing hiQ's leveraging theory as implausible.  ECF No. 158 at 20; *see Doe v. Abbott Lab'ys*, 571 F.3d 930, 931 (9th Cir. 2009).  So the few additional allegations under hiQ's unfair competition claim that were not formally dismissed with hiQ's Sherman Act claims have nevertheless been rejected as a basis for alleging anticompetitive conduct.

In short, hiQ built its UCL unfair competition claim on theories of anticompetitive conduct that have collapsed.  The Seventh Claim for Relief should be dismissed.

> **2.      Any "unfair" UCL claim based on monopolization fails as a matter of law.**

Even assuming the Seventh Claim for Relief could be considered beyond the defective pleading, it fails as a matter of law on the record made during discovery.

***No market definition.***  Every theory of anticompetitive harm hiQ has ever posited in this case is based on monopolization or attempted monopolization.  Again, all of its claims under the Sherman Act were dismissed and California's Cartwright Act does not even bar single firm monopolization.  But even if hiQ had tried to plead a "policy and spirit" monopolization theory, it ultimately would have to demonstrate that LinkedIn's conduct had "effects [that] are comparable to or the same as a violation of the law."  *Cel-Tech*, 20 Cal. 4th at 187.  That is a problem for hiQ because showing the existence and effects of monopoly power in a market requires *defining that market* and demonstrating harms in it—something hiQ has never attempted to do.  "Without a definition of [a] market there is no way to measure [a defendant's] ability to lessen or destroy competition."  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).  Otherwise there are no "objective benchmarks for separating reasonable and unreasonable restraints."  *Marsh*, 200 Cal. App. 4th at 496.

When LinkedIn posed an interrogatory concerning these requirements, hiQ deflected by saying the topic was "more appropriate[]" for "expert discovery."  CE 2105-06 (Interrogatory Response 25).  But then its experts did not even try to define any market for a monopolization theory or show harms in that market in any form.  CE 1132 (Song Dep.) (conceding that he conducted no market analysis and offered no opinion on whether Linkedin harmed any market);

CE 887-88 (Murphy Rebuttal Rpt.) (hiQ's expert McElfresh "has not conducted an analysis of the relevant market, and he has not evaluated the competitive constraints on companies in the relevant market").  Having failed to allege a plausible market, hiQ did not even retain an expert economist who could posit one.  Nor has it ever attempted to explain how LinkedIn could be found a monopolist in an undefined people analytics market, or to posit some objective measure of LinkedIn's market power or its effect on competition.

   ***Duty to Deal.***  This Court was right to be "skeptical of the refusal-to-deal theory."  ECF No. 158 at 21.  It is a non-starter.  Even assuming hiQ was LinkedIn's competitor, "there is no duty to aid competitors."  *Metronet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004).  "[B]usinesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  The only "narrow exception" to that rule is from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and it requires a plaintiff to show a "unilateral termination of a voluntary and profitable course of dealing," *MetroNet*, 383 F.3d at 1132, where "the only conceivable rationale or purpose" of termination is "to obtain higher profits in the long run from the exclusion of competition."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016).  No facts support any of these elements.

   hiQ and LinkedIn had no "voluntary" course of dealing whereby LinkedIn assented to hiQ's conduct.  As both of hiQ's CEOs conceded, there was never any such permission.  CE 367-68 (Kaplan Dep.) (hiQ's former CEO conceding that hiQ did not tell LinkedIn or members that it was scraping LinkedIn with third-party scrapers); CE 1160 (hiQ's CEO conceding that he had no communications with anyone at LinkedIn before the C&D letter).  hiQ's course of conduct was unambiguously prohibited by LinkedIn's User Agreement.  Based on the limited information hiQ provided in its anonymous request to access profile data under LinkedIn's API program, LinkedIn declined.  Nor is there evidence that the parties' "course of dealing"—if one could even label hiQ's ongoing breaches of the User Agreement with LinkedIn as such—was "profitable" to LinkedIn such that foregoing it could only be chalked up to an anticompetitive purpose, *Aerotec*, 836 F.3d at 1184.  *See also supra* 21-22 (detailing LinkedIn's legitimate purposes).

***Essential Facilities.***  An "essential facilities" theory is similarly doomed.  The "'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors."  *Metronet*, 383 F.3d at 1128.  The plaintiff must show that the defendant is "a monopolist in control of an essential facility."  *Id.*  And "[b]ecause mandating access, as the essential facilities doctrine implies, shares the same concerns as mandating dealing with a competitor, a facility is essential 'only if control of the facility carries with it the power to *eliminate* competition in the downstream market."  *Aerotec*, 836 F.3d at 1185 (citing *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir. 1991)).

As this Court noted in dismissing this theory, ECF No. 158 at 16, it is impossible to establish because hiQ has made no effort to define a market in which LinkedIn could ostensibly possess the power to eliminate competition.  Nor can hiQ establish that LinkedIn has the power to "eliminate competition" in people analytics, *Aerotec*, 836 F.3d at 1185, however one defines that market.  Again, its experts did not even try to do so.  *Supra* 26-27.

In any event, the record is clear that LinkedIn is not an essential facility.  The standard for establishing that status is exceedingly high.  "Essential means essential; it does not mean 'the most economical.'"  *Jam Sports & Ent., LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 839 (N.D. Ill. 2004).  Even "the most economical route is not an essential facility when other routes are available."  *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 714 (7th Cir. 2003).  Undisputed evidence establishes that there are many competitors who provide people analytics products.  CE 1911-17 (2017 internal market trend report); CE 268-69 (Hochberg Rpt.).  And these products do not depend on scraped data from LinkedIn as an essential input.  CE 243 (Hochberg Rpt.) ("In reality, hiQ's competitors relied on different avenues to collect the data needed for their products to work, which possibly suggests that other startups did not perceive hiQ's business model of entirely relying on LinkedIn data as sustainable.").  It may be that for a company like hiQ, scraping data from LinkedIn free of charge is the most economically advantageous way of operating.  But that is not enough.

***"Monopoly Broth."***  Finally, hiQ has occasionally made the sweeping argument that

LinkedIn has leveraged an "effective monopoly" on "real-time resumé data," combined with a cumulation of actions—like "acquisitions" or decisions on API access—to "stifle competition." CE 2101-02 (Interrogatory Response 22).  This appears to be an attempt at a so-called "monopoly broth" theory, ECF No. 262 at 3, or perhaps hiQ's leveraging theory all over again.  To be clear, hiQ never even *attempted* to plead a "monopoly broth" theory in its complaint, and it certainly did not plead a theory of anticompetitive conduct based on conduct having nothing to do with hiQ at all.  Having failed to point to any coherent theory of anticompetitive conduct, hiQ is hoping a word cloud will save its case.  But the problem with this theory is the problem with all the rest:  It defines no people analytics market, which means it cannot establish that LinkedIn is a monopolist exercising monopoly power to unlawfully harm competition.  At most it claims "injury to a competitor," which is not enough.  *Cel-Tech*, 20 Cal. 4th at 186.

### C.   hiQ's "Fraudulent" Prong UCL Claim Fails As A Matter Of Law Because hiQ Can Show Neither A Fraudulent Statement Nor Reliance.

hiQ's fraudulent competition claim under the UCL also fails.  hiQ bases this claim on LinkedIn's alleged fraudulent statements to members that, for example, members "control the visibility and reach of [their] LinkedIn profile" or that "Members and/or Visitors may access and share your content and information, consistent with your settings and degree of connection with them." ECF No. 131 at 29.  This claim is nothing but a repackaged version of the promissory estoppel claim this Court recognized as "meritless" at the preliminary injunction stage.  ECF No. 63 at 23.  Nothing about LinkedIn's prohibitions on scraping is inconsistent with the statements upon which hiQ purports to base its claim.  *Id.*  And hiQ can offer no proof that it or anyone else relied on these statements to deem scraping permissible.  *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326 (2011) (requiring reliance).  Just the opposite: Undisputed evidence shows hiQ was aware that scraping was prohibited by LinkedIn's User Agreement, *supra* 5, aware that LinkedIn's general technical defenses were designed to thwart scraping, *supra* 5-6, and aware that LinkedIn had rejected its anonymous request for permission to scrape, *supra* 8.  So it could never have thought the statements it now claims are fraudulent represented some blanket authorization to scrape.

1

**D.      hiQ's "Unlawful" Prong UCL Claim Fails As A Matter Of Law.**

2

"Unlawful acts are anything that can properly be called a business practice and that at the

3

same time is forbidden by law."  *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th

4

Cir. 2008).  hiQ's claims for unlawful competition are entirely derivative of its claims for

5

"tortious interference with hiQ's current and prospective contractual and business relationships."

6

ECF No. 131 at 28-29.  Because those claims fail, so too does hiQ's unlawful competition claim.

7

**CONCLUSION**

8

For the foregoing reasons, the Court should grant the motion for summary judgment.

9

10

Dated: August 5, 2022                              Orrick, Herrington & Sutcliffe LLP

11

12

                                                        By:  _____ */s/ Annette L. Hurst*_____

13

                                                               ANNETTE L. HURST
                                                               Attorneys for Defendant

14

                                                               LinkedIn Corporation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30