ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*Pro Hac Vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

*Attorneys for Defendant/Counterclaimant*
*LinkedIn Corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>LinkedIn Corporation,<br><br>                    Defendant. | Case No. 17-cv-03301-EMC<br><br>**LINKEDIN CORPORATION'S MOTION FOR SPOLIATION SANCTIONS**<br><br>Hearing Date:       September 29, 2022<br>Hearing Time:       1:30 p.m.<br>Courtroom:           5 – 17th Floor (Zoom) |
| LinkedIn Corporation<br><br>                    Counterclaimant,<br>        vs.<br><br>hiQ Labs, Inc.<br><br>                    Counterdefendant. | Complaint Filed:   June 7, 2017<br>Trial Date:            February 27, 2023 |

1

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ............................................................................... V

2

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

3

INTRODUCTION AND STATEMENT OF ISSUES.......................................................... 1

4

STATEMENT OF FACTS ................................................................................................... 3

5       A.   HIQ INITIATES SUIT AND ISSUES A LITIGATION
             PRESERVATION NOTICE ......................................................... 3

6       B.   HIQ DESTROYS ITS SCRAPING ACTIVITY RECORDS.................... 3

7            1.   HIQ STANDS BY WHILE AWS DELETES SCRAPING
                  AND TURKING DATA .......................................................... 4

8
             2.   HIQ'S SCRAPING ACTIVITY RECORDS ARE
9                 DELETED FROM SPLUNK ................................................... 7

10      C.   HIQ ALSO DESTROYED ITS SALESFORCE CRM DATABASE
             THROUGH DELIBERATE NONPAYMENT.......................................... 9

11

ARGUMENT ....................................................................................................................... 10

12   I.  THE THREE THRESHOLD ELEMENTS OF RULE 37(E) SPOLIATION
         ARE PRESENT HERE .......................................................................................... 11
13
         A.   HIQ HAD A DUTY TO PRESERVE SCRAPING ACTIVITY
14            RECORDS AND SALESFORCE CRM DATABASE ............................ 12

15       B.   HIQ FAILED TO TAKE REASONABLE STEPS TO PRESERVE
             THE EVIDENCE .................................................................................... 13
16
         C.   THE EVIDENCE IS IRREPLACEABLE ............................................... 14

17   II. HIQ ACTED WITH THE REQUISITE INTENT TO JUSTIFY
         APPLICATION OF SANCTIONS UNDER RULE 37(E)(2)............................. 15
18
     III. HIQ'S SPOLIATION PREJUDICED LINKEDIN ............................................. 18
19
         A.   THE SCRAPING ACTIVITY RECORDS WOULD HAVE
20            PROVEN THE FULL SCOPE OF HARM FROM HIQ'S
             SCRAPING AND ESTABLISHED HARM TO LINKEDIN ................. 19
21
             1.   HARMFUL VOLUME OF SERVER REQUESTS .................... 19
22
             2.   BAN RATE EVIDENCE TO REBUT CAUSATION ................ 21

23       B.   THE SALESFORCE CRM DATABASE WOULD HAVE
             SHOWN THE TRUE REASONS FOR HIQ'S CUSTOMER LOSS....... 22
24
     IV. IN LIGHT OF HIQ'S INTENT AND THE PREJUDICE TO LINKEDIN,
25       RULE 37(E)(2) SANCTIONS ARE WARRANTED ......................................... 24

26   CONCLUSION ................................................................................................................... 25

27

28

1

2

## TABLE OF AUTHORITIES

3

**Page(s)**

4

**Federal Cases**

5

*Alden v. Mid-Mesabi Assoc. Ltd. P'ship*,
   No. 06-954, 2008 WL 11463477 (D. Minn. Feb. 25, 2008) ................................................. 17

6

7

*Aramark Mgmt., LLC v. Borquist*,
   No., No. 8:18-cv-01888-JLS-KESx, 2021 WL 864067 (C.D. Cal. Jan. 27,
   2021) ............................................................................................................................. 11

8

9

*Blazer v. Gall*,
   No. 1:16-CV-01046-KES, 2019 WL 3494785 (D.S.D. Aug. 1, 2019) ................................... 15

10

11

*Capricorn Mgmt. Sys., Inc., v. Gov't Empl. Ins. Co.*,
   15-cv-2926 (DRH)(SIL), 2019 WL 5694256 (E.D.N.Y. July 22, 2019) .............................. 17

12

13

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) ............................................................................................. 12

14

*Columbia Pictures Indus. v. Bunnell*,
   No. CV 06-1093FMCJCX, 2007 WL 2080419 (C.D. Cal. May 29, 2007) .......................... 12

15

16

*Compass Bank v. Morris Cerullo World Evangelism*,
   104 F. Supp. 3d 1040 (S.D. Cal. 2015) ................................................................................ 11

17

18

*Dong Ah Tire & Rubber Co. v. Glasforms, Inc.*,
   2009 WL 10692632 (N.D. Cal. July 30, 2009) ..................................................................... 14

19

*Fortinet, Inc. v. Forescout Techs., Inc.*,
   No. 20-cv-03343-EMC, 2021 WL 5565836 (N.D. Cal. Nov. 29, 2021) ............................... 23

20

21

*Fourth Dimension Software v. DER Touristik Deutschland GmbH*,
   No. 19-cv-05561-CRB, 2021 WL 5919821 (N.D. Cal. Dec. 15, 2021) ........................ 16, 18

22

*Goodman v. Praxair Servs., Inc.*,
   632 F. Supp. 2d 494 (D. Md. 2009) ..................................................................................... 12

23

24

*Greyhound Lines, Inc. v. Wade*,
   485 F.3d 1032 (8th Cir. 2007) ............................................................................................. 15

25

26

*Hice v. Lemon*,
   No. 19-cv-4666 (JMA)(SIL), 2021 WL 6053812 (E.D.N.Y. Nov. 17, 2021) ....................... 17

27

*Johns v. Gwinn*,
   503 F. Supp. 3d 452 (W.D. Va. 2020) .................................................................................. 14

28

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006) ................................................................................. 16

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    --- F. Supp. 3d. ---, No. 20-cv-07182-JCS, 2022 WL 1990225 (N.D. Cal. May
    27, 2022) ........................................................................................................... 11, 12

*Moody v. CSX Transp., Inc.*,
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) ................................................................. 16

*Morris v. Union Pac. R.R.*,
    373 F.3d 896 (8th Cir. 2004) ................................................................................. 15

*O'Berry v. Turne*r,
    No. 7:15-CV-00064-HL, 2016 WL 1700403 (M.D. Ga. Apr. 27, 2016) ............... 17

*Ottoson v. SMZBC Leasing and Fin., Inc.*,
    268 F. Supp. 3d 570 (S.D.N..Y. 2017) ................................................................. 16

*Paisley Park Enters., Inc. v. Boxill*,
    No. 17-cv-1212, 2019 WL 1036058 (D. Minn. Mar. 5, 2019) .............................. 25

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) ................................................................................... 11

*Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*,
    906 F.3d 253 (2d Cir. 2018) ................................................................................. 17

*Ronnie Van Zant, Inc. v. Pyle*,
    270 F. Supp. 3d 656, 670-71 (S.D.N.Y. 2017) ..................................................... 17

*Security Alarm Fin. Enters. L.P. v. Alarm Prot. Tech, LLC*,
    No. 3:13-cv-00102-SLG, 2016 WL 7115911 (D. Alaska Dec. 6, 2016) ............... 11

*Silvestri v. Gen. Motors Corp.*,
    271 F.3d 583 (4th Cir. 2001) ................................................................................. 14

*Sines v. Kessler*,
    No. 3:17-cv-00072, 2021 WL 4943742 (W.D. Va. Oct. 22, 2021) ....................... 16

*Spencer v. Lunada Bay Boys*,
    No. CV 16–02129–SJO, 2018 WL 839862 (C.D. Cal. Feb. 12, 2018) .................. 25

*WeRide Corp. v. Kun Huang*,
    No. 5:18-cv-07233-EJD, 2020 WL 1967209 (N.D. Cal. April 24, 2020) ............. 25

**State Cases**

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ......................................................................................... 23

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ................................................................................ 23

**State Statutes**

California Unfair Competition Law ("UCL") ....................................................... 3, 24

**Rules**

Fed. R. Civ. P.  37(e) ...................................................................................... *passim*

Fed. R. Civ. P. 37(e)(1) .............................................................................. 10, 18, 25

Fed. R. Civ. P. 37(e)(2) ................................................................................... *passim*

Fed. R. Civ. P. 702 ...................................................................................... 20, 24, 25

**Other Authorities**

Restatement (2d) Torts § 768 ............................................................................. 23

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 29, 2022, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 on the 17th Floor of the above-entitled Court (or by remote Zoom teleconference as the Court directs), Defendant/Counterclaimant LinkedIn Corporation ("LinkedIn") will, and hereby does, move pursuant to Rule 37(e), and as applicable the inherent authority of the Court, to sanction Plaintiff/Counterdefendant hiQ Labs, Inc. ("hiQ") for intentionally spoliating evidence it had a duty to preserve.

The grounds for the motion are that hiQ intentionally permitted the destruction of two categories of electronically stored information that were significant for this lawsuit knowing it had a duty to preserve this evidence: (1) records of various types stored in multiple locations showing the activity of hiQ's scraping software, particularly requests by hiQ's software bots to LinkedIn's servers and the outcome thereof, reflecting the volume of hiQ's requests for access on LinkedIn's servers and the efficacy of LinkedIn's general technical defenses; and (2) hiQ's entire Salesforce.com customer relationship management database. Further, LinkedIn has been prejudiced both in defending against hiQ's claims and in prosecuting its own claims against hiQ as a result of this spoliation. Accordingly, pursuant to Rule 37(e) and the inherent authority of the Court, LinkedIn is entitled to the full range of available sanctions.

LinkedIn seeks the following sanctions: (1) with respect to the destruction of the scraping activity records, an evidentiary presumption that expert analysis submitted by LinkedIn quantifying hiQ's access requests is correct, a jury instruction to that effect, and an order precluding hiQ from offering any evidence or argument to the contrary; (2) with respect to the destruction of the scraping activity records, an evidentiary presumption that LinkedIn's general technical defenses had already prevented hiQ from collecting data to such a degree that hiQ could no longer effectively scrape LinkedIn profiles prior to LinkedIn sending a cease-and-desist letter to hiQ on May 23, 2017, a jury instruction to that effect, and an order precluding hiQ from offering any evidence or argument to the contrary; and (3) with respect to the destruction of the Salesforce.com customer relationship management database, terminating sanctions in the form of dismissal of all of hiQ's claims that involve its relationships with its customers and prospective

customers, including the Fifth through Ninth Claims for Relief of the Amended Complaint (ECF No. 131), or in the alternative, an order precluding hiQ from offering any evidence or argument attributing its loss of customers or potential customers to any action by LinkedIn, including preclusion of its expert report calculating "business value" based on implied customer relationships.  LinkedIn requests that these evidentiary sanctions be applied coincident with its pending summary judgment and Rule 702 motions, and to the extent necessary thereafter, as jury instructions.  LinkedIn also seeks monetary sanctions in an amount subject to proof in connection with LinkedIn's expert analysis quantifying hiQ's requests for access to LinkedIn's servers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION AND STATEMENT OF ISSUES**

In the years since filing its first Complaint in this action, hiQ has overseen the permanent destruction of two highly relevant categories of evidence: (1) data that was automatically created by hiQ's scraper software reflecting the requests hiQ made to LinkedIn's servers for access to data and the rate at which LinkedIn's general technical defenses were successful in blocking those requests (the "scraping activity records"); and (2) hiQ's entire customer relationship management database, which included detailed customer information organized by customer, such as internal strategy notes and logs of customer communications and outreach (hiQ's "Customer Relationship Management Database" or "CRM Database").

hiQ stored the evidence with three different cloud service providers: Salesforce, Splunk, and Amazon Web Services ("AWS").  As hiQ's business collapsed, it stopped paying its bills. The cloud companies gave hiQ numerous warnings that its payments were past due and that hiQ's accounts were in danger of being suspended and ultimately deleted.  Employees at hiQ discussed the need to save the evidence.  hiQ's litigation hold clearly encompassed these categories of evidence.  The hiQ software engineer who was in charge of logging scraping operations even wrote to company employees, including hiQ's CTO, that the evidence could "███████████████ ██████████"  CE[1] 786 (6/12/18 hiQ Chat Tr.).  ████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████.  CE 1259 (3/2/20 Weidick email).  Out of all of this data hiQ should have preserved, it mysteriously kept only a small ██████ excerpt of its scraping activity records.

There can be no real dispute that hiQ had a duty to preserve this evidence and knew it: hiQ had been litigating this case for years when it purposely let the evidence be destroyed, hiQ's officers and employees wrote emails and chat messages showing they knew prior to destruction that the evidence was relevant to the case and should be preserved, and hiQ's attorneys instructed hiQ to preserve the evidence.  hiQ violated that duty when it allowed the evidence to be

---

[1] LinkedIn cites the Compendium of Evidence in Support of LinkedIn's August 5 Motions "CE."

destroyed.  And destroyed it is; neither hiQ nor LinkedIn has been able to recover it from any other source.

The prejudice to LinkedIn is apparent.  hiQ's scraping activity records were a detailed record of hiQ's total load on LinkedIn's computers, including both the volume of access requests and the efficacy of LinkedIn's general technical defenses.  Without hiQ's records, LinkedIn was forced to estimate hiQ's activity through an expert data analysis that required significant machine and employee time and expense, as well as the work of outside experts.  hiQ's deleted CRM Database was important to show what, precisely, caused hiQ's customers to stop buying its products (or its prospective customers to decline to purchase them in the first place) and the root cause of hiQ's business collapse.  It was crucial evidence for cross-examining hiQ's assertions that it lost actual and prospective customers because of LinkedIn's May 23, 2017, cease-and-desist letter ("C&D letter").  Without it, LinkedIn is limited to fragments in emails and hiQ's say-so about why customers left the fold.

This was no ordinary oversight.  As described in the accompanying Schmidt Declaration, hiQ failed to preserve multiple types of scraping activity records from different types of storage at two separate cloud providers (AWS and Splunk).  Worse, hiQ was perfectly able to create an archive of its AWS data, and selectively retained only data reflecting raw scraped LinkedIn profiles (i.e., the raw profile data hiQ scraped, stored, and used to power its products).  Presumably, hiQ preserved the raw scraped profiles in the belief that it would need that data either to resume its business or to support its argument that it copied only so-called "public" profiles.  But it did *not* retain the records showing its volume of access requests and the astronomically large number of scraping attempts blocked by LinkedIn's general technical defenses.  Moreover, AWS data showing logged-in (i.e., non-"public") "Turker" access to the LinkedIn website was also deleted.  As for the Splunk logs, hiQ began using Splunk specifically to store and analyze hiQ's access requests and report on them so that hiQ could monitor the failure of its scraping activity to try to adjust its strategy.  Even though the Splunk logs contained a comprehensive report of all hiQ activity on LinkedIn's site, hiQ preserved only a small snapshot of the Splunk logs from 2020, years after the injunction was entered.  The rest were deleted.

Mot. for Spoliation Sanctions
No. 17-cv-03301-EMC

Rule 37(e) and inherent authority allow this Court to sanction a party for the spoliation of electronically stored information.  Severe sanctions are warranted where a party intentionally allows evidence to be destroyed, knowing its relevance to the litigation.  That is what hiQ did here.  LinkedIn therefore seeks terminating, evidentiary, and monetary sanctions.

## STATEMENT OF FACTS

### A.    hiQ Initiates Suit and Issues a Litigation Preservation Notice.

LinkedIn put hiQ on notice of LinkedIn's potential claims against it on May 23, 2017, when it sent its C&D letter to hiQ detailing LinkedIn's objections to hiQ's scraping activity.  ECF No. 27, Ex. A (5/23/17 C&D Letter).  hiQ responded by filing the instant action on June 7, 2017, alleging, *inter alia*, claims for declaratory relief anticipating LinkedIn's claims, as well as affirmative claims of its own in the form of economic torts and alleged violations of California's Unfair Competition Law (the "UCL").  ECF No. 1.  Nearly two weeks later, on June 20, 2017, hiQ's counsel issued ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ *Id.*

Soon after filing, hiQ obtained a preliminary injunction mandating that LinkedIn provide hiQ access to LinkedIn member profiles while the case was pending.  ECF No. 63.  hiQ argued in obtaining the injunction that it needed access to LinkedIn data to continue its business.  ECF No. 4 at 24.  While discovery was stayed pending appeal (ECF No. 195 ¶ 8), however, hiQ shuttered its operations, ECF No. 219 at 5; *see* ECF No. 329, at 3, 5.

### B.    hiQ Destroys Its Scraping Activity Records.

LinkedIn's expert analysis of hiQ's source code and other hiQ documents produced in discovery revealed that, in the ordinary course of its business, hiQ maintained various types of data relating to its scraping activity.  There were at least three collections of data stored in a

MongoDB database housed at AWS.  Declaration of Douglas C. Schmidt ISO Motion for Spoliation Sanctions ("Schmidt Decl.") ¶¶ 7-8.  There were also logs generated and stored in Splunk, which were then archived in AWS storage at various points.  *Id.* ¶ 12.  Together, these records (collectively, the "scraping activity records") included different types of information about the number of access requests made by hiQ's scrapers to LinkedIn profile servers during different periods of time,[2] the failure rate of those requests as a result of LinkedIn's general technical defenses,[3] and records of hiQ's use of proxy servers to mask its scraping.  Schmidt Decl. ¶¶ 7, 8, 12.  Almost all of this data has been destroyed.

**1.     hiQ Stands by While AWS Deletes Scraping and Turking Data**.

MongoDB is a computer database program that allows a user to store data.  Schmidt Decl. ¶ 5.  hiQ used MongoDB to store and organize scraping data in MongoDB groupings called "collections."  *Id.*  hiQ's MongoDB data was housed on AWS servers.  CE 387-388 (Kim Dep.).  One collection housed hiQ's "raw scrape" data—the actual information scraped from LinkedIn member profile web pages.  *Id.* ¶ 6.  hiQ also used MongoDB to store records of scraping activity, ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████—information that was not available to LinkedIn.  *Id.* ¶ 7.  Several MongoDB collections contained these types of records.  First, there were the "████████" and "████████" collections (collectively the "████████████████████"), which contained scraping information for ██████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████  *Id.* ¶ 7.  Second, a "████████████████" organized data around ████████████████

<hr>

[2] Every time a computer (either a person using a web browser or an automated web scraping bot) accesses a website, it does so via a "request" to the website's servers.  Schmidt Decl. ¶ 3.

[3] All of the methods that LinkedIn used to prevent scraping bots from accessing its servers are referred to as LinkedIn's "general technical defenses."  As discussed further in LinkedIn's Motion for Summary Judgment, LinkedIn's defenses are both general and anonymous in the sense that they screen all requests to access LinkedIn's servers without regard to or knowledge of the identity of the requester.  CE 10 (Bray Dep.).

MOT. FOR SPOLIATION SANCTIONS
No. 17-cv-03301-EMC

1    ████████████████████████████████████████████████.  *Id.* ¶ 8.[4]  The

2    source code hiQ produced, however, does not show specifically how these collections were stored

3    and backed up, and since almost all of hiQ's AWS data was later deleted, it is impossible to say

4    how much of it there was at any given time and what exactly it would have shown.  *Id.* ¶ 9.

5          Also included in MongoDB was data related to a process hiQ dubbed "Mechanical

6    Turking" or "Turking," which was used to collect LinkedIn data that was "critical" to hiQ's

7    products.  CE 95 (Graves Dep.); CE 150 (Turking Instructions).  Turking was performed by hiQ

8    contractors that were instructed to log into LinkedIn's platform in order to collect LinkedIn

9    profile data that was not "publicly available."  CE 150 (Turking Instructions).  Turkers logged

10   into LinkedIn, often using fake accounts to avoid having their real accounts restricted by

11   LinkedIn's automated website defenses, and used LinkedIn's search capabilities to find individual

12   profiles and record the URL addresses for those profiles once located.  *Id.* ("██████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████.[5]  Schmidt Decl. ¶ 11.  This data is central to disproving

17   hiQ's contention—the centerpiece of its case for a preliminary injunction—that all data it

18   obtained from LinkedIn was so-called "public" data.[6]

19   ██████████████████████████████████████████████████████████████

20   ██████  *See* CE 1556 (5/23/18 Board Meeting PPT).  ██████████████████████████

21   ████████████████████████████████████████.  CE 2061 (5/24/18 Weidick

22   _____

     [4] ██████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████

25   [5] ██████████████████████████████████████████████████████████████████

26   ████████████████

27   [6] LinkedIn learned of hiQ's Turking late in the fact discovery period and is still evaluating the
     importance of hiQ's destruction of evidence regarding Turking.  It is offered here as further
28   evidence of hiQ's intentional spoliation, and LinkedIn may return to the Court for further
     remedies if its further and continuing investigation regarding Turking warrants doing so.

email) (updating investors regarding hiQ's "████████████"); CE 1169-1171 (Weidick Dep.).

At that point, hiQ decided to only "archive[] the raw data scraped from LinkedIn as it was sitting

in the MongoDB as of April 25, 2018," meaning it kept the actual LinkedIn member profile

information that it had scraped thus far (referred to as the "raw scrape" data) but no records of its

broader activity such as the volume of scrape attempts, the results of its scrape attempts, or the

amount of logged-in Turking activity on the LinkedIn website.  CE 1391 (hiQ Second Supp.

Resp. to LinkedIn's Interrogatory No. 16).  hiQ neglected to archive any other data in AWS,

including the scraping activity records and Turking data in Mongo.  *Id.*

Around this time, hiQ chats and emails began referencing a strategy to "████████████

████████████████████████████████████████████.  CE 1618 (5/16/18

Chat Tr.); CE 775 (12/7/17 Miller email); CE 1440 (1/15/18 Barta email); CE 1637 (9/6/18 Chat

Tr.); CE 1618 (5/16/18 Chat Tr.).  ████████████████████████████████████

████████████████████████████████████████████

████████████████████.  CE 1613 (7/6/18 Chat Tr.).  hiQ chat transcripts and emails from

around this time discuss employees' plans to ████████████████████████████

████████████████████████████.  Schmidt Decl. ¶ 10; CE 1614

(7/6/18 Chat Tr.) (discussing ████████████████████); CE 1618 (5/16/18 Chat Tr.)

("████████████████████████"); CE 1634 (8/22/17 Chat Tr.) (discussing deleting

"████████████"); CE 1535 (2/02/18 email setting up "████████████████████

████████████████████████").  ████████████████████████████████████

████████████████████████████████████████████████

████████.

In May 2018, hiQ "████████████████████████████████████████

████████████████████████" CE 782 (5/16/18 Chat Tr.); *see also* CE 1599 (5/7/18 Weidick email);

CE 1640 (5/7/18 Chat Tr.) (████████████████████████████████████).

These notices continued and escalated until in early 2020 it was apparent that all ████████████

████████████████████████████████████████████████

████████████████████████████████.

█████████. CE 1255 (3/2/20 Weidick email).  Weidick explained that AWS accounted for

only ████████████ and recognized that there were multiple options to preserve AWS.  *Id.*

First, hiQ could preserve the AWS data by simply paying AWS to keep the account active—

████████████ until the litigation ended; or second, hiQ could avoid the ongoing AWS cost and

move the AWS data to "██████████."  *Id.*  CEO Weidick also acknowledged that if no action

were taken and AWS was not paid, the account would "██████████████████████."  *Id.*

With a full understanding of the consequences and multiple options available, hiQ made no effort

to preserve the additional data that remained in AWS and the account indeed "██████████" and

was "██████████████," just as Mr. Weidick predicted.  *See id.*; CE 1597 (4/20/20 AWS

Suspension email); CE 1391 (hiQ's Second Supp. Resp. to LinkedIn's Second Set of

Interrogatories, No. 16).  At no time between May 2018 and September 2020 did hiQ inform

LinkedIn or the Court that any data were on the verge of being destroyed or that simple

interventions could have preserved the data.

hiQ turned over the April 25, 2018, "raw scrape" archive in discovery.  It did not produce

anything else from AWS.  CE 1391 (hiQ Second Supp. Resp. to LinkedIn's Interrogatory No.

16).

## 2.   hiQ's Scraping Activity Records Are Deleted from Splunk.

In August 2016, hiQ began using specialized software provided by a company called

Splunk to log its scraping activity.  Schmidt Decl. ¶ 12; CE 23-29, 32-36 (Dev Dep.).  Splunk

logged and kept for analysis the data about █████████████████████████████████████

█████████.  Schmidt Decl. ¶ 12.

On July 12, 2018, Boris Dev, a hiQ software developer responsible for its scraping

software development, discussed in an online chat with various other employees the winding

down of storage management services and what data to keep for litigation.  CE 786 (6/12/18 Chat

Tr.).  Dev was asked about ███████████████████████████████████████████████████

█████████████████████████████████████████."  *Id.*  When asked for more detail

about what it contained, he responded "████████████"  *Id.*  hiQ did not heed Dev's instruction

and did *not* retain the Splunk data.

hiQ's statements to LinkedIn regarding Splunk and how the Splunk data was destroyed have been contradictory.  At first, hiQ failed to disclose the existence of Splunk at all—omitting it from the parties' detailed discussions regarding ESI that occurred from August to November 2021.  CE 1396 (4/28/22 LinkedIn Ltr.).  After LinkedIn discovered the existence of Splunk from references in produced documents, hiQ admitted Splunk's existence and in response to an interrogatory claimed "███████████████████████████."  CE 2086 (hiQ Resp. to LinkedIn's Interrogatory No. 16).  Then, when asked for an update several weeks later, hiQ, through counsel, explained,

> hiQ received notification that it had successfully renewed its Splunk account on May 17. However, since then, while we have been able to log in to the general Splunk account, we have not been able to access the "instance" where we understand the data would be stored. Accordingly, we have not been able to verify that the data has been restored to that instance. We have a support ticket out to Splunk and are awaiting further assistance. We will revert with an update on Tuesday.

CE 1399 (6/3/22 email).  Ten days later, hiQ finally admitted that nearly all of its Splunk data had been lost.  CE 1418 (6/13/22 email).  The lost data was completely accessible to hiQ until the point at which Splunk discontinued its services to hiQ.  CE 37-38 (Dev Dep.).[7]

The small amount of Splunk data that hiQ *did* retrieve and produce was from a short period of time years after the preliminary injunction went into effect.  The produced data contains logs corresponding to a time period of ██████████████████████████████████████ ██. Schmidt Decl.¶ 12.  The produced Splunk data shows the richness of the scraping logs that were stored in Splunk prior to deletion.  The log that was produced ███████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████. Schmidt Decl. ¶ 12.  In other words, the Splunk logs, had they been preserved, ████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. *Id.*; CE

---

[7] There is no way for LinkedIn to know how a small amount of Splunk data managed to survive, as hiQ produced it after the close of discovery.

1611 (4/18/17 Chat Tr.) (showing a chat message from Boris Dev stating, ██████████████

████████████████████████████████████████████████████████████ ").

### C.   hiQ Also Destroyed Its Salesforce CRM Database Through Deliberate Nonpayment.

The scraping activity records were not the only evidence that hiQ destroyed after this litigation began.  hiQ sales staff used a cloud-based Salesforce.com CRM Database to monitor and track its customer and potential customer outreach and activity.  CE 666 (Salesforce "Best Practices"); CE 1141-1143 (Weidick Dep.) (describing how Salesforce was hiQ's central repository about customers that contained customer feedback, estimate that potential customers would close, and dollar amounts).  It also used an accompanying Salesforce-based solution called Pardot to manage its marketing communications.  CE 1143 (Weidick Dep.) (describing hiQ's use of Pardot to manage outbound marketing campaigns and events registration invites).

According to hiQ's own "best practices" guide, its sales staff was supposed to keep detailed information about every customer in Salesforce.  hiQ's Salesforce CRM database thus recorded not just basic contact information and the general status of the relationship, but also a log of every communication with the customer, as well as notes regarding customer strategy.  CE 666 (Salesforce "Best Practices").  The richness of this customer-specific data is shown in recorded meetings where hiQ's Head of Sales Darin Medeiros gave updates to senior leadership about customer retention and acquisition based on Salesforce screenshots.  CE 2070 (presentation screenshot).  In one example, the value of each customer is listed in some of the screenshots, as are notes for "next step," and a "probability" assessment for each customer.  *Id.*

In May 2018, hiQ's Vice-President of Sales, Darin Medeiros, had an email exchange with its Chief Technology Officer, Daniel Miller, about the looming expiration of hiQ's Salesforce account and "███████████████████████████████████████████."  CE 780 (5/9/18 email); *see also* CE 1177 (4/8/19 email) (email from Salesforce to hiQ warning of an impending account suspension).  Miller instructed Medeiros, "████████████████████████ ████████████████"  CE 780 (5/9/18 email).  Medeiros reassured Miller that Salesforce would not expire for nine months, and that it "████████████████████" to export the Salesforce data.  *Id.*

Miller responded, ████████████████████████████████████." *Id.*  That export was never made.  According to hiQ, "████████████████████████████████████████" *more than a year later* "████████████████████████████████████ ████" CE 1391 (hiQ Second Supp. Resp. to LinkedIn's Interrogatory No. 16).  hiQ never informed LinkedIn or the Court about the possibility that its CRM Database would be destroyed.

In its response to LinkedIn's interrogatory about the spoliated evidence, hiQ claimed that certain "information stored in that Salesforce instance is otherwise available and has been produced."  CE 1390 (hiQ's Second Supp. Resp. to LinkedIn's Interrogatory No. 16).  This information is in the form of "reports," which are one-to-two-page summaries of sales data from Salesforce that hiQ executives would receive via email to see general trends.  CE 620-621 (Medeiros Dep.); CE 669 (Salesforce Report).  None of those reports contain the logs of customer interactions and summaries of their prospects that were the heart of the CRM database.

Late in the day on August 3, 2022, hiQ disclosed in a supplement to its interrogatory responses that hiQ "████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████"  CE 1392 (hiQ's Second Supp. Resp. to LinkedIn's Interrogatory No. 16).  hiQ's extremely late disclosure of this fact has prevented LinkedIn from learning more about what might have been in this account, or the circumstances of its deletion, and it is unknown how many sales calls were destroyed.[8]

## **ARGUMENT**

Rule 37(e) authorizes this Court to sanction a party for spoliation of electronically stored information ("ESI") upon a showing that a party had a duty to preserve evidence but failed to do so, and the evidence cannot be restored.  Fed. R. Civ. P. 37(e).  Once a party makes that showing, the question turns to what sanction is appropriate.  *Compare* Fed. R. Civ. P. 37(e)(1) *with* Fed. R. Civ. P. 37(e)(2).  Rule 37(e)(1) provides a baseline upon a showing of prejudice by

---

[8] hiQ's second supplementary interrogatory response did not explain what "█████" is, other than that it contained recordings of sales calls.

1   the moving party that sanctions to the spoliating party shall be "no greater than necessary to cure

2   the prejudice."  Rule 37(e)(2) permits more severe sanctions—including dismissal or the entry of

3   a default judgment—if a court finds that the spoliating party "acted with the intent to deprive

4   another party of the information's use in the litigation."  When making factual findings incident

5   to a claim of spoliation, courts in the Ninth Circuit apply a preponderance of the evidence

6   standard.  *Aramark Mgmt., LLC v. Borquist*, No., No. 8:18-cv-01888-JLS-KESx, 2021 WL

7   864067, at *6 (C.D. Cal. Jan. 27, 2021) (citing *Compass Bank v. Morris Cerullo World*

8   *Evangelism*, 104 F. Supp. 3d 1040, 1052-53 (S.D. Cal. 2015)). [9]

9        Here, there is little question that hiQ destroyed evidence it had a duty to preserve, and that

10  LinkedIn's litigation position is prejudiced by that destruction.  hiQ also acted intentionally such

11  that the stronger sanctions under Rule 37(e)(2) are appropriate: with notice that critical relevant

12  data was going to be destroyed—months or even years ahead of time—hiQ knowingly and

13  purposefully failed to take any action to save this evidence.

14  **I.    THE THREE THRESHOLD ELEMENTS OF RULE 37(E) SPOLIATION ARE**
15  **PRESENT HERE**.

16       To trigger Rule 37(e), "[f]irst, the ESI must be information that party had a duty to

17  preserve; second, there must have been a loss of that ESI because a party failed to take reasonable

18  steps to preserve it; and third, the lost ESI must be irreplaceable."  *Security Alarm Fin. Enters.*

19  *L.P. v. Alarm Prot. Tech, LLC*, No. 3:13-cv-00102-SLG, 2016 WL 7115911, at *3 (D. Alaska

20  Dec. 6, 2016). All three conditions are satisfied here.

21

22  [9] The standard for imposition of sanctions under the Court's inherent authority allows harsher
    sanctions than Rule 37(e) in cases of negligent or grossly negligent spoliation.  *See id.* at *6
23  (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002)).  The
    committee note for Rule 37(e) states that that rule was adopted to "foreclose[] reliance on
24  inherent authority or state law to determine when certain measures should be used," but given the
    separation of powers issues, there is authority for the proposition that this Court retains its
25  inherent authority to sanction parties for spoliation outside of Rule 37(e).  *See Meta Platforms,*
    *Inc. v. BrandTotal Ltd.*, --- F. Supp. 3d. ---, No. 20-cv-07182-JCS, 2022 WL 1990225, at *5
26  (N.D. Cal. May 27, 2022) (collecting authority relying on both Rule 37(e) and the Court's
    inherent authority to sanction for spoliation of electronically stored information).  In the unlikely
27  event that the Court finds hiQ's spoliation was not intentional, then LinkedIn also relies upon
    inherent authority for its request for the full panoply of sanctions.
28

11

**A.**     **hiQ Had a Duty to Preserve Scraping Activity Records and Salesforce CRM Database**.

There is no question that hiQ had a duty to preserve relevant evidence once it filed this action, at the very latest. *See Meta Platforms, Inc. v. BrandTotal Ltd.*, --- F. Supp. 3d. ---, No. 20-cv-07182-JCS, 2022 WL 1990225, at *6 (N.D. Cal. May 27, 2022) (holding that the duty to preserve evidence arises "no later than when [a party] filed its first complaint"). The missing evidence is clearly relevant, as even hiQ employees were aware at the time. CE 786 (6/12/18 Chat Tr.) ("██████████████████████████████████████" (emphasis added)); CE 780 (5/9/18 email) ("███████████████████████████████████████████ ████████████"); CE 782 (5/16/18 Chat Tr.) ████████████████████████ ██████████████████████████████). In fact, during a deposition, hiQ's Chief Technology Officer Daniel Miller admitted that hiQ ████████████████ AWS data. *See* CE 752A (Miller Dep.). And hiQ's own ██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ *Id.*

The fact that the data was stored by hiQ with third-party service providers does not relieve it of its preservation obligation. The duty to preserve extends to all evidence in a party's "possession, custody, or control." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 515 (D. Md. 2009) (citations omitted). In the Ninth Circuit, "[c]ontrol is defined as the legal right to obtain documents upon demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999); *see also Columbia Pictures Indus. v. Bunnell*, No. CV 06-1093FMCJCX, 2007 WL 2080419, at *5 (C.D. Cal. May 29, 2007) (holding that a party had a duty to preserve data on a third party's server). At the time that hiQ maintained an account with AWS, Splunk, and Salesforce, it clearly had a right to access the data that hiQ was storing on those companies' servers. *See* AWS Customer Agreement ¶ 8.1, *available at* https://aws.amazon.com/agreement/ ("Except as

1  provided in this Section 8, we obtain no rights under this Agreement from you (or your licensors)

2  to Your Content."); Splunk General Terms of Service ¶ 4.E., *available at*

3  http://splunk.com/en_us/legal/splunk-general-terms.html ("Customer Content may be retrieved

4  by you and removed from the Hosted Services in accordance with the applicable

5  Documentation."); Salesforce Master Services Agreement, ¶ 2.2, *available at*

6  http://salesforce.com/content/dam/web/en_us/www/documents/legal/Salesforce_MSA.pdf

7  (discussing "protection of customer data").  After all, the entire point of cloud service providers

8  is that the customer can store data with a third party and access it at any time.  This is why hiQ

9  was able to save *some* of the data—e.g., the raw scrapes of member profiles before April 25,

10  2018, and ▉▉▉▉ of Splunk logs.  It simply chose not to save the rest.

11      **B.      hiQ Failed to Take Reasonable Steps to Preserve the Evidence**.

12          hiQ created an archive of raw scraped LinkedIn member profile data in its MongoDB

13  database on April 25, 2018.  CE 1391 (hiQ Second Supp. Resp. to LinkedIn's Interrogatory No.

14  16).  It never archived any of the collections that housed the scraping activity records.  And hiQ

15  never updated the archive of raw scrape data to capture any LinkedIn member profile data that

16  was added after ▉▉▉▉▉▉▉▉▉▉▉▉▉▉, when AWS permanently deleted all of

17  hiQ's data. *Id.* ("▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

18  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.").  There is even

19  evidence that hiQ employees affirmatively deleted MongoDB collections containing scraping

20  activity records.  CE 1614 (7/6/2018 Chat Tr.) (▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉");

21  CE 1618 (5/16/2018 Chat Tr.) ("▉▉▉▉▉▉▉▉▉▉▉▉▉.");  Schmidt Decl. ¶ 10.

22  The subsequent complete deletion by AWS prevents anyone from knowing exactly what hiQ

23  deleted affirmatively, and what was lost when hiQ stopped paying AWS.  Confusingly, hiQ's

24  response to LinkedIn's interrogatory about spoliation did not mention any of those affirmative

25  deletions—just the deletion following the AWS account suspension.  CE 1391 (hiQ's Second

26  Supp. Resp. to LinkedIn's Interrogatory No. 16).  Either way, hiQ did nothing to preserve the

27  AWS scraping activity records, even though the CEO of the company knew they should be

28  preserved for litigation.  CE 1259 (3/2/20 Weidick email).

13

1    There is similar uncertainty surrounding exactly what happened to the Splunk Logs.  hiQ

2    cannot explain why there is only ███████████████████.  CE 1418 (6/13/22 email).  But in

3    any event, there is no evidence that hiQ took any step to preserve the data for litigation, even

4    after one of its engineers wrote in a chat in 2018 including hiQ's management that it was

5    "██████████████████."  CE 786 (6/12/2018 Chat Tr.).

6          As for hiQ's Salesforce data, hiQ did not make a full archive before Salesforce

7    deactivated its account, despite both its head of sales and its chief technology officer knowing

8    that such an archive was required.  CE 780 (5/9/18 email).

9          hiQ cannot rely on the fact of its insolvency to excuse its spoliation.  First, hiQ preserved

10   information that hiQ wanted for its business or this lawsuit (i.e., the raw scraped member profile

11   data), showing that where it had the will to preserve, it had the means.  In any event, hiQ

12   received █████████████████████████████████████, yet

13   apparently did not spend any of it to keep its accounts active or make archives to retain the data

14   necessary for the litigation.  CE 1182-1183 (6/1/22 Weidick Dep.).  Finally, regardless of the

15   likely minimal cost to add additional data to hiQ's preservation archives, hiQ was under an

16   obligation to, at the very least, notify either LinkedIn or the Court that the evidence was about to

17   be permanently destroyed.  *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591-92 (4th Cir.

18   2001) ("If a party cannot fulfill this duty to preserve because he does not own or control the

19   evidence, he still has an obligation to give the opposing party notice of access to the evidence or

20   of the possible destruction of the evidence if the party anticipates litigation involving that

21   evidence."); *accord Dong Ah Tire & Rubber Co. v. Glasforms*, *Inc.*, No. C 06-3359 JF (RS),

22   2009 WL 10692632, at *10 (N.D. Cal. July 30, 2009) (following *Silvestri*); *see also Johns v.*

23   *Gwinn*, 503 F. Supp. 3d 452, 460-74 (W.D. Va. 2020) (applying *Silvestri* under Rule 37(e)).

24          **C.**   **The Evidence Is Irreplaceable**.

25          hiQ has offered no way to replace the data it lost from Salesforce, Splunk, and AWS.

26   Regarding Salesforce, it claims that the data is replicated in various "reports" that management

27   gave to the board of directors regarding hiQ's customers.  CE 1390 (hiQ Second Supp. Resp. to

28   LinkedIn's Interrogatory No. 16); CE 1140 (3/18/22 Weidick Dep.).  But these short "Sales

14

Performance Dashboards" are simple overviews of the customer relationship derivatively created from the full (now lost) Salesforce data.  CE 669 (Salesforce Report); CE 620-621 (Medeiros Dep.).  While recordings of sales calls might have duplicated some of the information that was in Salesforce, hiQ allowed ███████████████████████████████████████████ ████.  CE 1392 (hiQ Second Supp. Resp. to LinkedIn's Interrogatory No. 16).

And hiQ may point to some high-level summary data that Splunk automatically circulated via email.  CE 1644 (Splunk report).  But there is simply no reasonable replacement for the data lost from Splunk and AWS.  The scraping activity records covered years of activity in great detail, including the critical period leading up to the C&D letter when it seems that (unbeknownst to LinkedIn at the time) LinkedIn's general technical defenses had already effectively blocked hiQ's scraping activity.  Having knowingly destroyed data showing that hiQ's technology had failed, hiQ now wants to blame LinkedIn's C&D letter for the loss of its business.  hiQ also refuses to acknowledge the burden that its unauthorized activity placed on LinkedIn's servers.  Summaries or snapshot summaries of the logs that may be reflected in chats or emails are inherently incomplete because they do not contain the actual number of requests, IPs used, nor the actual failure rate for all of hiQ's scraping activity.  There was one source of truth for hiQ's scraping activity, and it was the detailed scraping activity records.  Those records have been permanently destroyed.

## II.    HIQ ACTED WITH THE REQUISITE INTENT TO JUSTIFY APPLICATION OF SANCTIONS UNDER RULE 37(e)(2).

A Court may issue severe sanctions, including case-terminating sanctions, if it finds that a party destroyed evidence "with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).  "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors."  *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (quoting *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004)).  "No showing of prejudice is required under Rule 37(e)(2), because prejudice is inferred through the court's finding of intent."  *Blazer v. Gall*, No. 1:16-CV-

1  01046-KES, 2019 WL 3494785, at *4 (D.S.D. Aug. 1, 2019).  The circumstances in this case

2  show that hiQ acted (or knowingly failed to act) with the intent to prevent LinkedIn from seeing

3  and using the spoliated evidence.

4       hiQ knew that it had to save the evidence contained in its various third-party databases,

5  and simply declined to do so.  Engineer Boris Dev wrote in a chat to various employees,

6  including Chief Technology Officer Daniel Miller, that Splunk was "█████████████████████

7  ██████████████"  CE 786 (6/12/18 Chat Tr.).  Yet almost all of the Splunk data was deleted.

8  CTO Miller also was aware in May 2018 that AWS was going to suspend hiQ's account and

9  delete its data, as was the CEO at the time, Mark Weidick.  CE 782 (5/16/18 Chat Tr.).  While

10  some of the raw scraped member profile data was archived, the scraping activity records were not

11  saved.  And despite having ████████████████████, hiQ never archived its Salesforce

12  CRM Database at all.  CE 780 (5/9/18 email).  A knowing failure to save evidence relevant to a

13  litigation—such as the scraping activity records and Salesforce CRM Database here—satisfies the

14  intent requirement of Rule 37(e)(2).  *See Fourth Dimension Software v. DER Touristik*

15  *Deutschland GmbH*, No. 19-cv-05561-CRB, 2021 WL 5919821, at *10 (N.D. Cal. Dec. 15, 2021)

16  ("A party's deletion of information qualifies as intentional 'if the party has some notice that the

17  documents were *potentially* relevant to the litigation before they were destroyed.'" (quoting *Leon*

18  *v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)).

19       Courts around the country agree that this type of obvious failure to preserve evidence is

20  "so stunningly derelict as to evince intentionality."  *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d

21  410, 432 (W.D.N.Y. 2017).  *Moody* concerned the loss of data from a train data recorder after an

22  accident.  *Id.* at 422.  The train company's foreman downloaded the data to a computer and was

23  supposed to then transmit the data to a centralized server.  *Id.*  Although it was unclear precisely

24  what happened, there is indication that the foreman inadvertently transmitted the wrong file.  *Id.*

25  His computer then crashed and the company lost the computer without ever trying to retrieve the

26  data.  *Id.* at 423.  The Court held that the company's "failure to make any effort over the course of

27  four years to confirm that the data was properly preserved" proved that it "acted with the intent to

28  deprive Moody of the use of the event recorder data."  *Id.* at 431.  *Moody* is not an outlier.  *See*

*Ottoson v. SMZBC Leasing and Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (finding intent where a party "failed to take any reasonable steps to preserve" evidence and collecting similar cases); *Sines v. Kessler*, No. 3:17-cv-00072, 2021 WL 4943742, at *10 (W.D. Va. Oct. 22, 2021) ("[A] party's 'conscious dereliction of a known duty to preserve electronic data—whether passive or active—is both necessary and sufficient to find that the party acted with the intent to deprive another party of the information's use under Rule 37(e)(2).'" (quoting *Capricorn Mgmt. Sys., Inc., v. Gov't Empl. Ins. Co.*, 15-cv-2926 (DRH)(SIL), 2019 WL 5694256, at *11 (E.D.N.Y. July 22, 2019)); *O'Berry v. Turner*, No. 7:15-CV-00064-HL, 2016 WL 1700403, at *3-4 (M.D. Ga. Apr. 27, 2016) (imposing sanctions under Rule 37(e)(2) based on a party's failure to take reasonable steps to preserve evidence, calling it "irresponsible and shiftless behavior").

Moreover, the circumstances surrounding the loss of the scraping activity records are highly suggestive of intent.  hiQ retained *some* material, but only the material that it thought it needed or might be helpful to it in litigation.  hiQ managed to lose scraping activity records *from two separate storage locations*: AWS and Splunk.  Schmidt Decl. ¶¶ 9 & 12.  Yet hiQ was able to archive some "raw scrape" data from AWS, thus specifically saving the scraped member profile data, and discarding the scraping activity records showing how many requests had to be made, including blocked requests, to get the member profile data.  In other words, it kept the evidence that supported its story that it was only scraping publicly available data, but deleted evidence of how effective (or ineffective) hiQ's scrapers were at skirting LinkedIn's general technical defenses and obtaining member profiles, and how much of a burden this placed on LinkedIn.

Courts consistently recognize that such targeted destruction of evidence is strongly suggestive of an intent to deprive the opposing party of the use of that evidence.  *See Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670-71 (S.D.N.Y. 2017) (finding that a party that got a new phone and "manag[ed] to back-up pictures but, somehow, not text messages . . . evince[s] the kind of deliberate behavior that sanctions are intended to prevent and weigh in favor of an adverse inference") *rev'd in part on other grounds by Ronnie Van Zant, Inc. v. Cleopatra Records, Inc.*, 906 F.3d 253 (2d Cir. 2018); *Hice v. Lemon*, No. 19-cv-4666 (JMA)(SIL), 2021 WL 6053812, at *6 (E.D.N.Y. Nov. 17, 2021) (finding that a party's production of certain helpful

text messages but deletion of unhelpful ones evinced an intent to hide the unhelpful ones from the opposing party in litigation); *cf. Alden v. Mid-Mesabi Assoc. Ltd. P'ship*, No. 06-954 (JRT/RLE), 2008 WL 11463477, at *7 (D. Minn. Feb. 25, 2008) ("Although we do not, now, recommend a spoliation sanction, we do not rule out the propriety of such a punishment if, after appropriate discovery, it is demonstrated, as now may be suggested, that the Plaintiff has been destroying documents on a selective basis, so as to advance her claims, while impairing adverse claims.").

That hiQ also deleted Turking data is also strong evidence that it intended to prevent LinkedIn from using the deleted AWS data in litigation.  When this case was filed, hiQ filed signed pleadings, submitted sworn declarations, and made arguments to the Court claiming that *all* of its access to LinkedIn was to so-called "public" areas of LinkedIn's website—i.e., areas that did *not* require a login.  *E.g.*, ECF 6 ¶ 8 (hiQ's CEO, Mark Weidick, declaring, "[a]ll of these means access only the public profiles section of LinkedIn's website.  None of these means access any private sections of LinkedIn."); ECF 59 at 9:8-9 (hiQ "built a product on public information"); *id.* at 26:20-21 ("Public means public" was hiQ's mantra).  Of course, none of this was true because hiQ's products have always required logged-in access to LinkedIn to collect data through Mechanical Turking.  In his deposition, Mr. Weidick admitted that the statements about public-only access applied to Turking, but the *logged-in* access was never disclosed to the Court.  CE 1212-1218 (6/1/22 Weidick Dep.).  Again, the Turking data hiQ deleted would have been *inconsistent with* its position in this case because it would have shown the full scope of hiQ's logged-in access to LinkedIn's website and fact account activity.  And again, evidence that contradicts hiQ's positions was deleted while other evidence hiQ viewed as favorable was preserved.  *See Ronnie Van Zant, Inc.*, 270 F. Supp. 3d at 670-71 (noting that selective preservation indicates intent).

## III.    HIQ'S SPOLIATION PREJUDICED LINKEDIN.

Sanctions under Rule 37(e)(1) are warranted even without a showing of intent if the spoliation prejudiced the other party.  *See Fourth Dimension*, 2021 WL 5919821, at *8, 10 (describing Rule 37(e)).  The destroyed evidence goes to issues at the very heart of this case— hiQ's scraping activity and its relationships with customers.  The bits and pieces of related

1    evidence that actually were preserved and produced paint a partial picture of how probative the

2    missing evidence would have been.  There is no doubt that LinkedIn is in a worse litigation

3    position due to the loss of hiQ's spoliated data.

A.    **The Scraping Activity Records Would Have Proven the Full Scope of Harm
From hiQ's Scraping and Established Harm to LinkedIn**.

1.    **Harmful Volume of Server Requests**

7        One of the principal factual disputes in this case involves "[t]he methods that hiQ used to

8    gain access to LinkedIn's computers and scrape data…," and "the harm to LinkedIn and its

9    members from unauthorized access by hiQ."  ECF No. 95 at 5-6.  Part of this harm comes from

10   the considerable load that hiQ's scraping placed on LinkedIn's servers, and the resources that

11   LinkedIn expended to block the scraping.  As LinkedIn's computer science expert, Douglas

12   Schmidt, puts it: "web scraping can cause significant problems for websites. For example, web

13   scraping can overload servers, slow the website's performance for human users."  Schmidt Decl.

14   ¶ 3.  More requests from hiQ's scraping bots on LinkedIn's servers caused more problems for

15   LinkedIn's technical infrastructure and LinkedIn incurred more costs to carry the scraping traffic.

16   This factual question—how many requests hiQ's scraping bots made to LinkedIn's servers—goes

17   directly to hiQ's argument that LinkedIn cannot show the requisite harm to its system.

18       The scraping activity records would have shown very clearly the number of requests to

19   LinkedIn's servers that hiQ's scraping bots made over the years.  During the time that hiQ was

20   using Splunk, the deleted data showed the full scope of hiQ's scraping activity.  Schmidt Decl.

21   ¶ 13 ("Assuming the Splunk Scraping Logs from August 2016 to March 2020 were similar to

22   what was provided to me, which is a reasonable assumption given what the source code reflects

23   about data capture, I would have easily been able to calculate the total number of requests that

24   hiQ's scraping software made to LinkedIn's servers during the period hiQ used Splunk.  I would

25   have been able to see each and every scrape job that hiQ's scrapers made, how many of its scrape

26   attempts were successful, and how many were blocked by LinkedIn's defenses.").  While it is

27   unclear how rich the AWS scraping activity records (including the ██████████████████

28   ████████████████) would have been when they were deleted, it is very likely based on hiQ's

code that it would have provided enough information to make a much more precise estimate of all the scraping requests from the period before hiQ started using Splunk.[10]  Schmidt Decl. ¶ 9.

Without the scraping activity records, LinkedIn was forced to run a complex analysis of information culled from the raw scrape data produced by hiQ.  CE 1307 (Wu Disclosure).  hiQ produced two large files containing raw scraped LinkedIn profiles that hiQ scraped between March 6, 2014, through April 25, 2018.  Schmidt Decl. ¶ 6.  These files did *not* include the IP addresses used to send scraping requests to LinkedIn's servers.  LinkedIn's expert extracted into a table the timestamp, URL, and scrape ID from the raw scrape data produced by hiQ.  *Id.*  The extracted table was provided to LinkedIn.  LinkedIn Director of Software Engineering, Xiaofeng Wu, directed an analysis of that data with the assistance of LinkedIn's Data Science team.  The analysis consisted of two steps.  First, LinkedIn's team constructed custom data queries that compared the URL and timestamp from hiQ's raw scrape data to existing activity logs that LinkedIn maintains, in order to identify the IP addresses that made the requests reflected in hiQ's raw scrape data.  Once those IP addresses were identified, in the second step LinkedIn used another custom data query to locate requests in LinkedIn's server logs associated with the IP addresses.  The results showed that *activity associated with the hiQ IP addresses totaled over **50 billion requests** in an 18-month period*.  CE 1309 (Wu Disclosure).

While this analysis is certainly reliable and sufficient for Rule 702 purposes, it is only a substitute estimate for the actual data.  We know that this analysis undercounts the requests because there were profiles that hiQ scraped after April 2018 that it did not archive, and LinkedIn was unable to perform the same analysis after that period.  It also does not include any data for the access requests that were made by hiQ's Turkers.  Nonetheless, hiQ will undoubtedly seek to attack this analysis and claim it overcounts the number of hiQ's scraping requests.

The lack of hiQ data also prejudiced LinkedIn financially.  LinkedIn paid its outside

---

[10] For instance, even if every request was not kept in the AWS scraping data, each of the static proxy IP addresses that hiQ was using to scrape was logged in AWS at various times.  Schmidt Decl. ¶ 9.  With that information, it would have been possible for LinkedIn to find all the requests from those IP addresses in its own server logs.  *Id.*; *see also* ECF 217-5 (Zhong Decl.) (describing such an analysis on hiQ's allow listed IP addresses used to provide hiQ the special access mandated in the Preliminary Injunction).

experts and consultants to analyze and organize the raw scrape data provided by hiQ to support the analysis.  Mr. Wu, a LinkedIn data scientist, and other LinkedIn team members collectively spent dozens of hours setting up the computational infrastructure, planning the necessary queries and verifying the soundness of their methodology.  The queries were resource intensive and required dedicated machine time that could have been used for LinkedIn's other operations.  And it required additional work from Dr. Schmidt and his supporting team.  Had hiQ simply preserved and produced its scraping activity records, this time and expense would have been avoided and the full scope of hiQ's scraping would be known with certainty.  *See* CE 1307 (Wu Disclosure).

### 2. Ban Rate Evidence to Rebut Causation

In addition to showing the burden of the total number of requests that hiQ's scrapers placed on LinkedIn's servers, the scraping activity records also would have shown the failure rate (or as hiQ's engineers referred to it, the "ban rate," CE 1611 (4/18/17 Chat Tr.), for those requests.  Ban rates in spring 2017 are needed to show, among other things, whether hiQ's business downfall was caused by LinkedIn's C&D letter, or instead resulted from hiQ's inability to circumvent LinkedIn's general technical defenses at a rate sufficient to support the data demands of hiQ's products.  There is strong evidence that by early 2017, before the C&D letter and unknown to LinkedIn, hiQ's scraping was essentially blocked by LinkedIn's general technical defenses (i.e., the ban rate was so high that hiQ could no longer scrape profiles sufficient to meet customer demand).  *E.g.*, *id.* (indicating the ban rate at times was ▮▮▮); CE 755 (Miller May 26 Dep.); CE 719 (Miller May 13 Dep.) (noting that scraping "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮" prior to and after the C&D letter); CE 1154-1155 (Weidick May 23 Dep.) (hiQ's CEO recalling shutting down scraping at the end of March 2017); CE 1174 (Weidick Board Report) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); CE 1258 (4/11/17 email) ("▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); CE 1259 (4/24/17 email) (hiQ data scientists stating hiQ was "▮▮▮▮▮▮▮▮▮▮▮▮▮"); CE 1259 (4/24/17 email) (hiQ's CTO stating, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ …."); *see generally* LinkedIn's Supp. Br. In Supp. of Mot. to Dissolve Prelim. Inj., ECF No. 294,

at 9 (collecting additional evidence).  Knowing the ban rate in the scraping logs would confirm

that hiQ's business already failed at the time of the C&D letter, showing its demise was not

*because of* the letter.

### B.    The Salesforce CRM Database Would Have Shown the True Reasons for hiQ's Customer Loss.

According to hiQ itself, one of the "principal factual issues in dispute" in this case is

"[t]he impact that LinkedIn's cease and desist letter had on hiQ's business development…."  ECF

No. 195 at 5.  While the Salesforce data would have gone a long way to showing this impact, or

lack of it, there is strong evidence showing that LinkedIn's C&D letter had no effect whatsoever

on hiQ's business development as it was failing well beforehand.  CE 169 (███████████████

███████████████); CE 1220 (5/15/17 Board Presentation) (███████████████

███████████████).  Quite the opposite; Head of Sales Darin Medeiros bragged in an

email, ███████████████████████████████████████████████

███████████████████████████████  CE 1594 (9/27/17 Medeiros email).  ████

███████████████████████████████████████████

Nonetheless, for purposes of litigation, hiQ is claiming the C&D letter was the cause of its

business downturn with self-serving hearsay testimony from its CEO and expert testimony being

used to backdoor the hearsay into trial.  CE 1063-1065 (Sacks Dep.) (discussing how hiQ's expert

relied on Mr. Weidick's hearsay reports of customer statements to support the claim that the C&D

letter disrupted hiQ's business relationships).

There is reason to believe that the Salesforce data would be able to specifically contradict

hiQ's claims.  hiQ produced videotaped presentations that contain screenshots of hiQ's Salesforce

dashboards.  CE 2070 (presentation screenshots).  While just a small slice of the Salesforce

universe, they show columns for the value of the customer, some sort of ██████████

███████████████████████.  *Id.*  And that is just from a summary list of some customers,

not the granular customer-specific data at the heart of Salesforce.  Moreover, there is evidence

that hiQ's sales team was operating under a "███████████████████████████████

███████████████████████" CE 667 (Salesforce Best Practices).  That guide

also listed fields to be completed for customers in the Salesforce interface, such as the " █████

██████████████████████████████████████████████████████████████

██████████ "  *Id.*  And while hiQ's late disclosure of the deletion of the sales calls in " █████

██████████████████████████████ , the additional loss of evidence of what customers

actually said to hiQ during the crucial months in 2017 leading up to and after the C&D letter

prejudices LinkedIn just like the loss of the Salesforce CRM Database.

The loss of the Salesforce CRM Database is pernicious because it was solely in hiQ's

possession (e.g., there is no way LinkedIn's records could partially reconstruct the data as with

scraping activity), and it supports hiQ's affirmative claims against LinkedIn.  Tortious

interference claims such as hiQ's require a detailed showing on a customer-by-customer basis of

harm to an existing business relationship.  For a prospective interference claim, hiQ must show an

existing relationship with the expectation of gain.  *Westside Ctr. Assocs. v. Safeway Stores 23,*

*Inc.*, 42 Cal. App. 4th 507, 527 (1996) (requiring identification of an existing economic

relationship to support a prospective interference claim); *Fortinet, Inc. v. Forescout Techs.*, *Inc.*,

No. 20-cv-03343-EMC, 2021 WL 5565836, at *25 (N.D. Cal. Nov. 29, 2021) (dismissing

prospective interference claim where the relationship was with an "as yet unidentified" customer).

For interference with contract, hiQ must identify specific contracts with which LinkedIn

interfered. [11]  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

The full CRM Database is the only contemporaneous evidence of what relationships hiQ

had, what existing customer contracts LinkedIn supposedly interfered with, and whether hiQ's

customers opted not to renew their contracts because they were dissatisfied with hiQ's products

or some other reason unrelated to LinkedIn.  Given the general lack of contemporaneous direct

evidence (including any writing at all) that *any* customer stopped doing business with hiQ

*because* of the C&D letter, it is likely that Salesforce's detailed records would have conclusively

shown that hiQ failed for reasons unrelated to the C&D letter.  hiQ brought claims arguing that

LinkedIn's actions harmed its existing and prospective customer relationships, and then hiQ

---

[11] Existing contracts that fail to renew based on alleged tortious conduct fall under prospective
interference.  *See* Restatement (2d) Torts § 768 ("Even an option to renew or extend a contract is
prospective while not exercised.").

1  destroyed the best evidence of the nature of those relationships.  To not sanction hiQ for this loss

2  would be to let hiQ benefit from its own bad act.

3  **IV.    IN LIGHT OF HIQ'S INTENT AND THE PREJUDICE TO LINKEDIN, RULE**
   **37(e)(2) SANCTIONS ARE WARRANTED**.

4

5      When a party destroys evidence with the intent to deprive the opposing party of its use in

6  litigation, Rule 37(e)(2) allows a court to "(A) presume that the lost information was unfavorable

7  to the party; (B) instruct the jury that it may or must presume the information was unfavorable to

8  the party; or (C) dismiss the action or enter a default judgment." Here, all three sanctions are

9  appropriate both to "address" and to "deter failures to preserve electronically stored information."

10  Rule 37(e), comm. note.  LinkedIn requests that the Court order evidentiary sanctions up to and

11  including dismissal of hiQ's claims, and also award monetary sanctions.

12      ***Destruction of the Scraping activity records.***  To remedy hiQ's intentional spoliation of

13  its scraping activity records, LinkedIn respectfully requests the Court do the following.  First, the

14  Court should presume that LinkedIn's expert Xiaofeng Wu's analysis is correct and that hiQ's

15  scrapers made at least fifty billion requests on LinkedIn's servers.  At trial, the Court should

16  instruct the jury that hiQ had a duty to preserve the scraping activity records, that hiQ failed to

17  preserve them, and that because of that, the jury must presume that the data would have shown

18  that hiQ's scrapers made at least fifty billion requests on LinkedIn's web servers in the analyzed

19  period.  The Court should also preclude hiQ from offering any evidence to the contrary or

20  otherwise disputing that analysis in connection with summary judgment, Rule 702 motions, and

21  trial.

22      Second, the Court should presume that, prior to hiQ's receipt of the C&D letter,

23  LinkedIn's general technical defenses had blocked hiQ's anonymous scraping from collecting

24  data to such a degree that hiQ could no longer effectively scrape LinkedIn profiles.  At trial, the

25  Court should instruct the jury to that effect.  The Court should also preclude hiQ from offering

26  any contrary evidence or otherwise disputing that fact at summary judgment, Rule 702 motions,

27  and trial.

28      ***Destruction of the Salesforce CRM Database.***  As for the Salesforce CRM Database

24

evidence, the Court should employ terminating sanctions to dismiss all customer and prospective-customer related claims, including hiQ's Intentional Interference with Contract, Intentional Interference with Prospective Economic Advantage, and California Unfair Competition Law claims.  The status of hiQ's customers and prospects goes straight to the heart of hiQ's affirmative claims, and no lesser sanction could remedy the prejudice that LinkedIn has suffered.  *See WeRide Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 WL 1967209, at *13 (N.D. Cal. April 24, 2020) (looking to prejudice to determine the appropriate sanction under Rule 37(e)(2)).  In the event the Court is unwilling to exercise its discretion to dismiss those claims, then in the alternative it should preclude hiQ from offering any evidence or argument regarding the reasons for its loss of customers and prospects, and should also preclude hiQ from offering its "enterprise value" damages calculation discussed at length in LinkedIn's accompanying Rule 702 Motion relating to Mr. Sacks.  That calculation depends on implied current and future customer relationships that LinkedIn cannot cross-examine without the Salesforce CRM Database.

**Monetary Sanctions.**  The Court should also award LinkedIn's attorneys' fees and costs for this motion, as well as the costs associated with analysis directed by Mr. Wu, which would have been unnecessary had hiQ retained its scraping activity records and produced them.  Courts routinely award fees and costs in similar circumstances.  *E.g.*, *Paisley Park Enters., Inc. v. Boxill*, No. 17-cv-1212 (WMW/TNL), 2019 WL 1036058, *8 (D. Minn. Mar. 5, 2019) ("Many courts have imposed monetary sanctions under Rule 37(e)(1)."); *Spencer v. Lunada Bay Boys*, No. CV 16–02129–SJO (RAOx), 2018 WL 839862, at *1 (C.D. Cal. Feb. 12, 2018) (collecting cases).  Once sanctions are awarded, LinkedIn will meet and confer with hiQ regarding the amount, and if necessary will supply a declaration to the Court documenting its relevant fees and expenses.

## CONCLUSION

LinkedIn respectfully requests that the Court sanction hiQ for its intentional spoliation of evidence in the manner requested herein and as set forth in the accompanying proposed order.

1    Dated: August 5, 2022                    Orrick, Herrington & Sutcliffe LLP

2

3                                             By:    _/s/ Annette L. Hurst_____

4                                                   ANNETTE L. HURST
                                                   Attorneys for Defendant
5                                                  LinkedIn Corporation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28