1  ANNETTE L. HURST (SBN 148738)
   ahurst@orrick.com
2  RUSSELL P. COHEN (SBN 213105)
   rcohen@orrick.com
3  PAUL F. RUGANI (SBN 342647)
   prugani@orrick.com
4  CATHERINE Y. LUI (SBN 239648)
   clui@orrick.com
5  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
6  DANIEL JUSTICE (SBN 291907)
   djustice@orrick.com
7  EMILY RENZELLI (*Pro Hac Vice*)
   erenzelli@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
9  San Francisco, CA  94105-2669
   Telephone:    +1 415 773 5700
10 Facsimile:    +1 415 773 5759

11 *Attorneys for Defendant/Counterclaimant*
12 *LinkedIn Corporation*

13            UNITED STATES DISTRICT COURT

14           NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16 hiQ Labs, Inc.,                          | Case No. 17-cv-03301-EMC

17            Plaintiff,                     | **LINKEDIN CORPORATION'S NOTICE
                                             | OF MOTION AND *DAUBERT* MOTION
18     vs.                                   | PURSUANT TO FRE 403, 702 TO
                                             | EXCLUDE EXPERT TESTIMONY OF
19 LinkedIn Corporation,                     | STEPHEN MCELFRESH**

20            Defendant.                     | Date:         September 29, 2022
                                             | Time:         1:30 p.m.
21 ─────────────────────────────            | Courtroom:    5 – 17th Floor (Zoom)
                                             | Judge:        Hon. Edward M. Chen
22 LinkedIn Corporation
                                             | Complaint Filed:   June 7, 2017
23            Counterclaimant,               | Trial Date:        February 27, 2023

24     vs.

25 hiQ Labs, Inc.

26            Counterdefendant.

27

28

1

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 2

INTRODUCTION AND STATEMENT OF ISSUES............................................................. 2

STATEMENT OF FACTS ...................................................................................................... 4

      A.     McElfresh's Unsupported Opinions About the Product Market and
             hiQ's Position in It ..................................................................................... 4

      B.     McElfresh's Opinions About hiQ's Products ............................................ 6

      C.     McElfresh's Opinions About LinkedIn...................................................... 8

      D.     Accepted Methods of Market Analysis and Customer Behavior................ 8

LEGAL STANDARD............................................................................................................... 9

ARGUMENT ......................................................................................................................... 10

I.     MCELFRESH'S OPINIONS ABOUT HIQ'S PRODUCT MARKET AND
       HIQ'S POSITION IN IT ARE UNSUPPORTED AND UNRELIABLE. ........... 10

      A.     McElfresh Has Done No Economic Analysis to Support His
             Opinions ................................................................................................. 10

      B.     McElfresh Has No Specialized Economic Knowledge............................. 14

II.    MCELFRESH'S OPINIONS ABOUT HIQ'S PRODUCTS ARE
       UNSUPPORTED AND UNRELIABLE ........................................................... 16

      A.     McElfresh's Opinions About hiQ's Products Are Not Based on
             Specialized Knowledge or Reliable Methods ........................................... 16

      B.     McElfresh Should Be Prohibited From Giving a Lay Opinion
             About hiQ's Products or About LinkedIn Under Rule 403 ...................... 19

CONCLUSION ...................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AFMS LLC v. United Parcel Serv. Co.*,
  No. CV 10-5830 JGB, 2014 WL 12515335 (C.D. Cal. Feb. 5, 2014)............................. 15, 18

*Apple, Inc. v. Samsung Electronics Co., Ltd.*,
  2014 WL 6687122 ............................................................................................................... 9

*Boyd v. City & Cnty. of San Francisco*,
  576 F.3d 938 (9th Cir. 2009)............................................................................................. 10

*Cole v. JPMorgan Chase Bank, N.A.*,
  No. C13-959RSL, 2014 WL 1320140 (W.D. Wash. Mar. 31, 2014) .................................. 12

*Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*,
  43 F.3d 1311 (9th Cir. 1995).............................................................................................. 10

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993).................................................................................................... 10, 13

*Epic Games, Inc. v. Apple, Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ................................................................................. 8

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  No. 17-CV-00220-LHK, 2018 WL 6460573 (N.D. Cal. Dec. 10, 2018) ............................. 12

*Fed/ Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)................................................................................................ 8

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)........................................................................................................... 10

*Gomez v. Fachko*,
  No. 19-CV-05266-LHK, 2021 WL 5630623 (N.D. Cal. Dec. 1, 2021) .......................... 18, 19

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018)......................................................................................... 8, 11

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  491 F.Supp.2d 20 (D. Mass. 2007) ....................................................................................... 9

*In re Viagra and Cialis Prods. Liab. Litig.*,
  424 F. Supp. 3d 781 (N.D. Cal. 2020) ................................................................................ 10

*Lam v. City of San Jose*,
  No. 14-cv-00877-PSG, 2015 WL 6954967 (N.D. Cal. Nov. 10, 2015)................................ 18

*Lucido v. Nestle Purina Petcare Co.*,
    217 F. Supp. 3d 1098 (N.D. Cal. 2016) ................................................................. 15, 17

*Lust v. Merrell Dow Pharms., Inc.*,
    89 F.3d 594 (9th Cir. 1996).................................................................................... 9, 13

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008)....................................................................................... 8

*Ohio v. Am. Express Co. ("Amex")*,
    138 S. Ct. 2274 (2018) .................................................................................... 8, 11, 13

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)........................................................................................ 2, 8, 11

*United States v. Gadson*,
    763 F.3d 1189 (9th Cir. 2014)..................................................................................... 19

*United States v. Grant*,
    No. 18-CR-00391-EMC-1, 2020 WL 870948 (N.D. Cal. Feb. 21, 2020) ............................ 15

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000)..................................................................................... 14

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002)..................................................................................... 13

*United States v. Williams*,
    2016 WL 899145 (N.D. Cal. Mar. 9, 2016)................................................................... 15

*W. Sugar Coop. v. Archer-Daniels-Midland Co.*,
    No. 2:11-cv-3473-CBM-(PJWx), 2015 WL 13759740 (C.D. Cal. Oct. 26,
    2015) .................................................................................................................... 17

*Waymo LLC v. Uber Techs., Inc.*,
    No. C 17-00939 WHA, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ....................... 3, 15, 20

*Zeiger v. WellPet LLC*,
    526 F. Supp. 3d 652 (N.D. Cal. 2021) ........................................................................ 15

**Other Authorities**

Fed. R. Evid. 403 ................................................................................ 3, 10, 15, 16, 19, 20

Fed. R. Evid. 701 ..................................................................................................... 17

Fed. R. Evid. 702 ............................................................................ 3, 9, 10, 11, 13, 15, 16, 17, 19

Fed. R. Evid. 702(a) ................................................................................................. 13

Fed. R. Evid. 702(c) .......................................................................................................... 13, 18

Hal R. Varian, Intermediate Microeconomics: A Modern Approach, Eighth
    Edition, New York, NY, W.W. Norton & Company, 2010 ....................................................... 9

MOT. TO EXCLUDE EXPERT TESTIMONY
18-cv-00855-EMC

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 29, 2022, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 on the 17th Floor of the above-entitled Court (or by remote Zoom teleconference as the Court directs), Defendant/Counterclaimant LinkedIn Corporation ("LinkedIn") will, and hereby does, move for an order excluding certain opinions set forth in the June 7, 2022 Report of Plaintiff/Counterdefendant hiQ Labs, Inc.'s ("hiQ") expert Dr. Stephen McElfresh and testimony related to those opinions.

LinkedIn respectfully requests that the Court exclude the opinions of Dr. McElfresh related to hiQ's products, the market for those products, and that LinkedIn is a "unique" source for publicly available professional data contained in paragraphs 11, 12, 13, 23, 25, 31-33, 36, 38-41, 46, 51-53, and 57-58 of his report under Federal Rules of Evidence 702 and 403.  The referenced opinions are not based on specialized knowledge or sufficient facts or data, are not the product of reliable methods and principles, and, if admitted, present a danger of misleading the jury and confusing the issues in this case.

The Motion is based on the following materials: this Notice of Motion, the Memorandum of Points and Authorities following herein; the Declaration of Daniel Justice and exhibits thereto, filed herewith as the Compendium of Evidence Filed In Support of LinkedIn Corporation's August 5, 2022, Motions; the papers and pleadings on file in this action as cited herein; and such other and further papers and arguments as may be presented to the Court prior to or at the hearing of this Motion.

1
2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**INTRODUCTION AND STATEMENT OF ISSUES**</u>

3
4
5
6
7
8

hiQ's customers weren't buying what it was selling.  By mid-May 2017—before ever receiving a cease-and-desist ("C&D") letter from LinkedIn—hiQ's business was suffering.  It had flat customer counts and high customer "churn" (poor renewal rates).  It did not have product market fit, meaning it was not meeting the needs of the market.  It replaced its CEO and had other executive departures.  It also faced technical challenges that had brought its scraping business to a halt.

9
10
11
12
13
14
15
16
17
18
19
20

To counter its contemporaneous admissions and the well-established market facts about its failing performance and lack of business prospects, hiQ puts forward unsupported and speculative expert testimony from Stephen McElfresh, a long-time human resources ("HR") executive with a Ph.D. in social psychology but no background in economics or antitrust principles.  McElfresh offers several opinions purportedly based on specialized knowledge, including that hiQ created a "new market" with its "valuable" Keeper and Skill Mapper products, had the opportunity to obtain a "dominant market position" for the foreseeable future, and that its absence from the market is detrimental to employees and employers.  McElfresh's opinions are based solely on: (1) his attendance at hiQ's Elevate Conferences, (2) his unsuccessful attempt to convince his employer to purchase one of hiQ's products in 2015, and (3) review of case documents and Google searches he conducted to try to identify hiQ's competitors in the course of writing his report.  That's it.

21
22
23
24
25
26
27

Markets have a specialized meaning in antitrust economics, and McElfresh has performed none of the hallmarks of a product market analysis.  He has not defined a product market, established whether there are economic substitutes for hiQ products, or examined pricing or market data to determine whether customers view other products to be substitutable with hiQ based on "price, use[,] qualit[y, and]" "characteristics."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380-381, 404 (1956).  He has done nothing to assess whether hiQ's exit has in fact had any effect on anyone.

28

Because McElfresh is offering lay opinions masquerading as expert opinions, they must

Mot. to Exclude Expert Testimony
18-cv-00855-EMC

be excluded under Federal Rules of Evidence 403 and 702.  McElfresh's HR experience has not provided him with any specialized knowledge that qualifies him to define a product market or find harm to competition in that market, he has not based his opinions on sufficient (or any) data, and he has not applied anything resembling a reliable principle or method to arrive at his opinions.  Indeed, beyond reviewing documents provided by counsel, the only original work done by McElfresh to support his opinions were some simple Google searches apparently aimed at identifying any other companies using public data for retention prediction.  Given that McElfresh has offered no basis to conclude that he is qualified to perform a proper and reliable product market analysis, allowing him to opine on such issues would offer little help to the jury while running substantial risks of confusing the issues and misleading the jury.  Nor would it be an answer for plaintiff to assert that McElfresh is simply offering opinions based on his HR experience, not based on antitrust expertise.  Cloaking his lay opinions in faux expertise risks giving him far more influence than he is entitled to under the law.  *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) (where an expert's "only contribution would be to pile on a misleading facade of expertise…. [h]is opinion should … be excluded under both [Fed. R. Evid.] 702 and [Fed. R. Evid.] 403.").  McElfresh's opinions on market position expressed in paragraphs 11, 13, 23, 25, 31-32, 36, 40-41, 51-52, and 57-58 of his Report should be excluded on this basis.  Part I, *infra*.

McElfresh has also offered several unsupported and unreliable opinions about the "value" of hiQ's products and their features and functionality.  The fundamental problem with each of these opinions is that McElfresh has *never* used hiQ's product.  Nor did he review any data about the actual use of hiQ's products, such as qualitative feedback from hiQ's customers, hiQ's financial information, or hiQ's customer retention and acquisition numbers.  His opinions are seemingly based only on hiQ's well-crafted marketing of its products.  In contrast with McElfresh's subjective observations, economics provides an accepted way to assess how customers value hiQ's products: revealed preferences.  In other words, a customer's actions speak louder than McElfresh's words.

The jury can draw its own conclusions about hiQ's products from marketing and other

materials, and McElfresh has no specialized knowledge or other background that would help the jury better understand them.  Allowing him to testify on these issues under the veneer of an expert witness will only mislead and confuse the jury.  McElfresh's opinions on product value expressed in paragraphs 11, 13, 23, 25, 31-33, 36, 38-41, 51, 53, and 57 of his Report should be excluded on this basis.  Part II, *infra*.

## STATEMENT OF FACTS

hiQ retained Dr. Stephen McElfresh, a former HR executive and now consultant, to "discuss the history and development of the field of people analytics and … what [he] perceived and understood to be the market position and opportunity of hiQ."  CE[1] 551 (McElfresh Dep. at 17:5-9).  McElfresh offers five main opinions in his expert report: (1) that voluntary employee turnover is costly for organizations, CE 586 (McElfresh Rpt. ¶ 9); (2) that tools that help reduce turnover are valuable, CE 586 (*id*. ¶ 10); (3) that hiQ created a new product category in the HR marketplace with its "valuable" Keeper and Skills Mapper products, CE 586-587 (McElfresh Rpt. ¶ 11), CE 587 (*id*. ¶ 13), CE 589 (*id*. ¶ 23);  (4) that it is "detrimental both to employers and employees" that hiQ is no longer able to offer its products, CE 586-587 (*id*. ¶ 11); and (5) LinkedIn is "unique as a source for publicly available professional data" and that there is no "comparable resource that comes anywhere close to LinkedIn", CE 595 (*id*. ¶ 46).[2]  LinkedIn describes McElfresh's hiQ-specific opinions and their bases (or lack thereof) in more detail below.

### A.      McElfresh's Unsupported Opinions About the Product Market and hiQ's Position in It.

McElfresh, a Ph.D. in social psychology, CE 586 (McElfresh Rpt. ¶ 5), is not an economist and admits that he has no expertise in economics, in analyzing the impact of competition on markets, or in defining a relevant product market.  CE 555-556 (McElfresh Dep. at 26:11-27:5).  He also has no experience providing recommendations regarding people analytics products or providing analyses of the products or services available in the people analytics

[1] LinkedIn cites the Compendium of Evidence in Support of LinkedIn's August 5 Motions "CE."

[2] LinkedIn only seeks to exclude the third through fifth categories of opinions.

1   market.  CE 560 (McElfresh Dep. at 37:9-38:12).  Nonetheless, McElfresh offers several opinions

2   about hiQ's market position, potential market opportunity, and harm to the market due to hiQ's

3   exit that could readily be misunderstood as competition and market-related opinions.[3]

4       First, McElfresh opines that hiQ "was well ahead of the market in applying predictive

5   analytics to public data and offering a solution for organizations trying to retain talent and combat

6   the costs associated with turnover."  CE 586-587 (McElfresh Rpt ¶ 11).  McElfresh believes that

7   hiQ's Keeper product was "disruptive technology" and "may have been the first-ever product that

8   analyzed data from public sources to provide HR functions with valuable insights for managing

9   employees."  CE 589 (McElfresh Rpt. ¶ 23)  McElfresh clarified at his deposition that he has no

10   knowledge of hiQ's technology per se, but he thought the *idea* of using public data to predict

11   employee turnover was disruptive.  CE 568 (McElfresh Dep. at 78:2-16).  He further clarified

12   during his deposition that he does not know whether hiQ was, in fact, first to provide such a

13   product, as he also uncovered a company named Joberate that seems to have provided a similar

14   product at the time hiQ was in operation.  CE 569-570 (*id.* at 79:17-80:20).  McElfresh came to

15   the conclusion that Joberate was hiQ's only competitor by reviewing materials provided by

16   counsel and conducting Google searches for "[a]ny firm that was using publicly sourced data for

17   turnover prediction."  CE 552 (*id.* at 18:12-19), CE 553-554 (*id.* at  23:19-24:6).  McElfresh

18   stated he was not aware of Joberate when he was still a "buyer of voluntary termination

19   prevention tools" and hiQ was still in business.  CE 569-570 (*id.* at 79:16-80:20).  McElfresh also

20   admitted at his deposition that he "ha[s] no idea about … Joberate's actual operations and

21   capabilities."  CE 557 (*id.* at 29:8-19).

22       Second, McElfresh claims that "because Keeper had 'first-mover advantage,' Keeper had

23   an opportunity to be the dominant player in the people analytics space for the foreseeable future."

24   CE 592-593 (McElfresh Rpt. ¶ 36).  In fact, Keeper may not have been the "first mover," as he

25   acknowledged, and at his deposition, he amended that statement, limiting it to a much more

26   specific market—the market for individualized turnover prediction based on publicly sourced

27

28   [3] McElfresh expressed uncertainty at his deposition about whether hiQ had, in fact, left the market and whether hiQ's products were still available.  CE 558 (McElfresh Dep. at 30:5-8).

MOT. TO EXCLUDE EXPERT TESTIMONY
18-cv-00855-EMC

data.  CE 572-573 (McElfresh Dep. at 95:21-96:1).  McElfresh admitted he "did nothing to try to estimate" the likelihood that hiQ actually would be the "dominant player" in any market, did not conduct any analysis to determine whether hiQ had a sustainable competitive advantage, and did not review hiQ's financial information in making his assessment about hiQ's potential dominance.  CE 573-574 (*id*. at 96:2-97:11) CE 558-559 (*id*. at 30:9-31:16).  He further admitted that it would be appropriate to consider "every company that attempts to reduce turnover or help companies address turnover" to be hiQ's competitors and to take them into account in assessing hiQ's market opportunity.  CE 575 (*id*. at 100:8-19).  McElfresh did not, however, conduct any analysis to forecast the effect of those company's on hiQ's market position.  CE 573-574 (*id*. at 96:2-97:11).

Finally, McElfresh asserts that the fact that hiQ "is no longer able to offer its products is detrimental both to employers and employees … who may have benefited therefrom."  CE 586-587 (McElfresh Rpt. ¶ 11).  McElfresh stated that this opinion is based merely on the fact hiQ is not in the market and its absence "has removed from my toolset a perspective and lever I could otherwise provide."  CE 567 (McElfresh Dep. at 76:12-21).  He admitted that he does not know "[i]f in fact [hiQ's products] w[ere] useful."  *Id.*

### B.   McElfresh's Opinions About hiQ's Products.

McElfresh's opinions regarding hiQ's products are based only on his perceptions as an HR executive from when hiQ was in the market.  CE 568 (McElfresh Dep. at 78:11-16); CE 576-577 (*id*. at 110:21-111:8).  But McElfresh never used hiQ's products at that time.  CE 576-577 (*id*. at 110:21-111).  McElfresh sought to purchase hiQ's products in 2015 when he was the Vice President of People at New Relic, but New Relic's Chief Financial Officer refused to approve the purchase.  CE 576-577 (*id*. at 110:21-111:8) CE 578 (*id*. at 113:8-20).  McElfresh also did not review feedback from any actual hiQ customers in the course of preparing his report.  CE 558 (*id*. at 30:18-22).  His analysis is derived entirely from (1) attending hiQ's Elevate conference, a marketing event put on by hiQ, in 2015, 2016, and 2017, (2) recalling years-old conversations he had in the past with people analytics colleagues, and (3) reviewing materials provided by counsel in this case, which were unrelated to actual customer feedback.  CE 565 (*id*. at 71:5-13).

Despite having no experience using hiQ's products himself and no information from hiQ's actual customers to draw from, McElfresh has expressed opinions regarding the benefits and value of hiQ's products to customers and potential customers.[4]  McElfresh opines that Keeper "gave companies valuable insight into which employees were at risk of attrition" by "apply[ing] predictive algorithms to what hiQ coined 'pull factors,' such as whether the employee is likely to be heavily recruited, has a high-demand skill, is in a growing sector, and/or is a high visibility performer."  CE 591 (McElfresh Rpt. ¶¶ 31-32).  At his deposition, McElfresh admitted that he made no attempt to address the "empirical question" of whether any particular customer got value from Keeper.  CE 563-564 (McElfresh Dep. at 58:13-59:4).  Nor did he analyze or offer an opinion regarding whether Keeper was, in fact, predictive of employee turnover, CE 564-565 (McElfresh Dep. at 59:9-60:9), or whether public data is a better predictor of turnover risk than a company's internal data, CE 579-580 (McElfresh Dep. at 136:25-137:18).  Instead, his opinion about Keeper's value was based solely on Keeper's *novelty*—he believes (without conducting any market analysis and doing no research besides Google searches) that individualized assessment of turnover risk based on public data was not available to companies before hiQ launched Keeper and that having that data was potentially valuable.  CE 562-564 (McElfresh Dep. at 57:16-58:5; 58:13-59:4).

McElfresh also opines that hiQ's Skill Mapper product "offered a more accurate, complete, and up-to-date assessment of an organization's workforce than the understanding a company is likely to have obtained based solely on internal data."  CE 593-594 (McElfresh Rpt. ¶ 40).  Despite never having used the product, McElfresh characterized Skill Mapper as providing "thoughtful, easy compilation[s] of skills and abilities throughout an organization."  CE 589 (McElfresh Rpt. ¶ 25).  He believes that "Skill Mapper's offerings would have provided unique and important value to the people analytics market and to individual organizations' assessments of their workforce."  CE 587 (McElfresh Rpt. ¶ 13).  Like his assessment of Keeper, McElfresh's assessment of Skill Mapper is not based on actual use of the product or information from actual

---

[4] In contrast with McElfresh's unsubstantiated opinions about its products, hiQ is of course free to present trial testimony from its actual customers.

Skill Mapper customers.  CE 568 (McElfresh Dep. at 78:11-16).  There is, in fact, very little

actual customer feedback to consider—Skill Mapper was never a fully functional product and

only ever had three customers in 2017.  CE 818 (Murphy Rpt. ¶ 35, Ex. 3).  hiQ's CEO Mark

Weidick testified that, as of May 2017, Skill Mapper was a "paid proof of concept in beta."  CE

1195-1196 (6.1.2022 Weidick Dep. at 361:25-362:9).

### C.      McElfresh's Opinions About LinkedIn.

McElfresh also opines—without any methodology—that LinkedIn is "unique as a source

of publicly available professional data."  CE 595 (McElfresh Rpt. ¶ 46), *see also* CE 587 (*id*. ¶

12).  McElfresh relies only on his "experience very broadly in the HR industry" for this opinion.

CE 581-582 (McElfresh Dep. at 158:13-159:8) ("if you're in this business, you  -- you know,

there's just simply no question there's no resource that comes close to the breadth and depth of

LinkedIn").

### D.      Accepted Methods of Market Analysis and Customer Behavior.

In contrast with McElfresh's unsupported observations on the market and the value of

hiQ's product, there are accepted methods for defining relevant markets, assessing harm to

competition and determining consumer behavior.  A relevant market refers to "the area of

effective competition."  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)

(quoting *Ohio v. Am. Express Co.* ("*Amex*"), 138 S. Ct. 2274, 2285 (2018)).  It is comprised of

both a product and geographic market, which hiQ, as plaintiff, bears the burden to establish.  *Epic

Games, Inc. v. Apple, Inc.*, 559 F. Supp. 3d 898, 1015 (N.D. Cal. 2021).  To define a market, a

plaintiff must identify "all economic substitutes for the product."  *Newcal Indus., Inc. v. Ikon

Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Economic substitutes are shown through

"'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand' with the relevant

product."  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (citation omitted).  This

is a fact-intensive inquiry that looks to whether consumers find these products can be easily

substituted for one another based on "price, use[,] qualit[y, and]" "characteristics."  *E. I. du Pont*,

351 U.S. at 404.  In sum, a relevant market is defined with regard to demand substitution, which

focuses on consumers' views of which products are acceptable substitutes and alternatives.

1    Without defining a market, there is "no way to measure [the defendant's] ability to lessen

2    or destroy competition." *Amex*, 138 S. Ct. at 2285 (citation omitted).  As LinkedIn's expert, Dr.

3    Kevin Murphy, a Professor of Economics at the University of Chicago explained, "McElfresh has

4    not conducted an analysis of the relevant market, and he has not evaluated the competitive

5    constraints on companies in that relevant market after hiQ's exit.  This means that he has

6    provided no economic basis for offering any opinion on the impact of hiQ's exit on competition

7    or consumers."[5]  CE 887-888 (Murphy Rebuttal Rpt. ¶ 4).

8    There are also accepted methodologies for assessing a product's value in the marketplace,

9    known as revealed preferences, which are the actions actually taken by a consumer.[6]  LinkedIn's

10   expert, Professor Yael Hochberg, a Professor of Entrepreneurship at Rice University, has

11   analyzed hiQ's customers, customer churn, and contract value to form opinions on the market's

12   actual response to hiQ's products.  CE 304 (Hochberg Rebuttal Rpt. ¶ 34); CE 306-307 (*id*. ¶ 37).

13   These revealed preferences tell a very different story than the one McElfresh is advancing.  *See*

14   *id.*  Critical for these purposes, however, they reveal what an expert analysis of the market's

15   reception of hiQ's products must entail.

16   **LEGAL STANDARD**

17   Under Fed. R. Evid. 702, expert testimony is permitted at trial only if: (1) it is based on

18   "scientific, technical, or other specialized knowledge"; (2) the expert's specialized knowledge

19   "will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) it is

20   "based on sufficient facts or data";  (4) it "is the product of reliable principles and methods"; and

21

22   [5] Dr. Murphy did not define a relevant market because it was not required for any of LinkedIn's
23   claims.  Had hiQ properly defined a relevant market, he would have addressed it in his rebuttal
     report.

24   [6] The "revealed preferences method [is] predicated on the theory economic agents reveal their
25   preferences, and implicitly the information they relied on, by their actual market decisions and
     behavior." *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F.Supp.2d 20, 88 (D. Mass.
26   2007); *see also Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2014 WL  6687122, at *16
     (accepting plaintiff's expert's revealed preferences theory for showing customer value); (Hal R.
27   Varian, Intermediate Microeconomics: A Modern Approach, Eighth Edition, New York, NY,
     W.W. Norton & Company, 2010 ("Varian (2010)")), pp. 118-135 (detailing background and
28   application of revealed preference methodology).

(5) "the expert has reliably applied the principles and methods to the facts of the case."  The

proponent of expert testimony "has the burden of proving admissibility."  *Lust v. Merrell Dow*

*Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  In evaluating whether an expert's options are

based on sufficient facts or data, courts consider whether, for a given conclusion, "there is simply

too great an analytical gap between the data and the opinion proffered."  *In re Viagra and Cialis*

*Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) (quoting *Gen. Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997)).  In evaluating whether an expert's opinion is based on reliable

principles and methods, courts consider factors such as: (1) whether the expert's theory or method

is generally accepted in the scientific community; (2) whether the expert's methodology can be or

has been tested; (3) the error rate of the technique; and (4) whether the method has been subjected

to peer review and publication.  *Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*, 43 F.3d 1311,

1316 (9th Cir. 1995) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94

(1993)).

> In addition to Rule 702, Rule 403 provides that expert opinions may be excluded "if

[their] probative value is substantially outweighed by a danger of one or more of the following:

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or

needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The trial court has discretion

over whether to admit potentially prejudicial testimony under Rule 403.  *Boyd v. City & Cnty. of*

*San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).

## **ARGUMENT**

## I.   **MCELFRESH'S OPINIONS ABOUT hiQ'S PRODUCT MARKET AND hiQ'S POSITION IN IT ARE UNSUPPORTED AND UNRELIABLE.**

### A.   **McElfresh Has Done No Economic Analysis to Support His Opinions**.

> McElfresh's opinions regarding the market for hiQ's products—namely that hiQ created a

new market, that it had the opportunity to be the dominant player in that market, and that hiQ's

exit from the market was detrimental to employees and employers—all suffer from the same fatal

flaw: they fail to adequately define a relevant market.  *See* CE 586-587 (McElfresh Rpt. ¶¶ 11,

13), CE 589 (*id* ¶¶ 23, 25), CE 591-597 (*id.* ¶¶ 31-32, 36, 40-41, 51-52, 57- 58).  McElfresh

oscillates between grouping hiQ into a people analytics market—a relevant market this court has already rejected (ECF No. 158)—and hiQ establishing an undefined new market for which it had the opportunity to be a dominant player. *See* CE 587 (McElfresh Rpt. ¶ 13); CE 572-573 (McElfresh Dep. at 95:21-96:1). But he does so without any analysis whatsoever. And this renders meaningless his observation that hiQ's absence from the market is detrimental to employers and employees. CE 586-587 (McElfresh Rpt. ¶ 11). None of this is surprising. McElfresh has no training or expertise in economics and has no basis to opine about economic concepts unique to antitrust law. CE 555-556 (McElfresh Dep. at 26:11-27:5), CE 560-561 (*id*. at 37:9-38:12).

McElfresh did not investigate whether there were economic substitutes for hiQ's products, *see, e.g., Hicks*, 897 F.3d at 1120, and whether consumers find these products can be easily substituted for one another based on "price, use[,] qualit[y, and]" "characteristics." *E. I. du Pont*, 351 U.S. at 404. The extent of his work in this regard was to locate using Google a company named "Joberate" that was "doing a similar thing to hiQ," (CE 555 (McElfresh Dep. at 27:6-11)) and a conclusory statement that LinkedIn Talent Insights "would have competed with hiQ," (CE 597 (McElfresh Rpt. ¶ 57). Without having done any of the necessary work to identify actual substitutes, McElfresh has no basis to make any assessment of harm to market participants. *Amex*, 138 S. Ct. at 2285 (no way to measure whether market was lessened or destroyed by defendant without defining a market). Nor would it matter whether McElfresh intended to undertake such an analysis or reach such opinions, because there is a significant risk the opinions he does reach could confuse a jury. For these reasons alone, all of McElfresh's market-specific opinions must be excluded under Rule 702. *See* CE 586-587 (McElfresh Rpt. ¶¶ 11, 13), CE 589 (*id* ¶¶ 23, 25), CE 591-597 (*id.* ¶¶ 31-32, 36, 40-41, 51-52, 57- 58).

Even if defining a relevant product market were not required to opine on the state of that market (it is), McElfresh's market-specific opinions are still unreliable for several other independent reasons. *First*, McElfresh claims that hiQ created a new market category with its "disruptive technology," and that Keeper "may have been" the first product in this category are unreliable and unhelpful. CE 586-587 (McElfresh Rpt. ¶ 11), n. 15, CE 589 (*id*. ¶ 23). This

1    evidence is based only on McElfresh's memory regarding hiQ's 2015-2017 Elevate conferences,

2    materials provided by counsel in this case, and present-day Google searches, CE 565 (McElfresh

3    Dep. at 71:5-13).  Experience-based expert testimony, like the kind McElfresh is offering, is

4    reliable if the expert "explain[s] how that experience leads to the conclusion reached, why that

5    experience is a sufficient basis for the opinion, and how that experience is reliably applied to the

6    facts." *Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 WL 6460573, at *4

7    (N.D. Cal. Dec. 10, 2018) (citations omitted).  McElfresh has failed to provide that necessary

8    foundation here.

9         That is for good reason.  As highlighted, McElfresh's conclusion that hiQ's products *may*

10   *have been* new and disruptive are based solely on attending a handful of hiQ's marketing

11   conferences (where he was apparently exposed to hiQ's "skillfully subtle" promotion of its

12   products) and keyword Google Searches.  *See* CE 596 (McElfresh Rpt. ¶ 53).  These "principles

13   and methods" are not a reliable way to assess the state of the relevant market.  For one, hiQ has

14   no incentive to fairly represent offerings of competitors at an event designed to promote its own

15   products.  Nor is searching on Google an accurate way to determine the state of the relevant

16   market eight years prior.  *See, e.g.*, *Cole v. JPMorgan Chase Bank, N.A.*, No. C13-959RSL, 2014

17   WL 1320140, at *4 (W.D. Wash. Mar. 31, 2014) (concluding that expert opinion "based on

18   speculation and internet searches" was unreliable).  Indeed, McElfresh actually encountered—and

19   ignored—evidence in his Google searches that undermined his opinions that hiQ's services were

20   unique or that hiQ was a "first-mover" in this category.  *See* CE 570-571 (McElfresh Dep. at

21   80:21-81:12) (acknowledging he does not know "whether Joberate or hiQ was technically the first

22   to offer its respective product,").  McElfresh also has never used hiQ's technology and thus has

23   no basis to say whether or not it was "disruptive."  *See* CE 568 (McElfresh Dep. at 78:11-16); CE

24   576-577 (*id.* at 110:21-111:8).

25        *Second*, McElfresh's opinion that hiQ had the opportunity to be "the dominant player" in

26   its market for the "foreseeable future," CE 592-593 (McElfresh Rpt. ¶ 36), rests on similarly

27   shaky ground.  McElfresh "did nothing to try to estimate" the likelihood that hiQ actually would

28   be the "dominant player" in any market, CE 573 (McElfresh Dep. at 96:3-10), did not conduct

Mᴏᴛ. ᴛᴏ Exᴄʟᴜᴅᴇ Exᴘᴇʀᴛ Tᴇsᴛɪᴍᴏɴʏ
18-cv-00855-EMC

1   any analysis to determine whether hiQ had a sustainable competitive advantage, CE 573-574 (*id*.

2   at 96:19-97:11), and did not review hiQ's financial information in making his assessment about

3   hiQ's potential dominance, CE 559 (*id*. at 31:8-16).  He admitted that assessing "the viability of

4   [a] business is not [his] expertise."  *Id.*  McElfresh made clear that his analysis was not a

5   "project[ion]" but a purely hypothetical possibility based on the fact that hiQ was the "first-

6   mover" in the market.  CE 573 (McElfresh Dep. at 96:3-10).  McElfresh also did nothing to

7   account for hiQ's many competitors, which would include "every company that attempts to

8   reduce turnover or help companies address turnover."  *See* CE 573 (McElfresh Dep. at 96:3-

9   97:11), CE 575 (*id*. at 100:8-19).  His opinion about hiQ's potential market dominance is based

10   on "subjective belief or unsupported speculation" and must be excluded under Rule 702(c).  *See*

11   *Daubert*, 509 U.S. at 590.

12       *Finally*, McElfresh's opinion about harm to the market resulting from hiQ's absence is the

13   product of circular reasoning.  McElfresh testified that he based this opinion on the fact that hiQ's

14   absence from the market "has removed from my toolset a perspective and lever I could otherwise

15   provide."  CE 567 (McElfresh Dep. at 76:12-21).  In other words, hiQ's absence from the market

16   is bad for employers and employees because hiQ is no longer in the market.  This opinion,

17   assumes, without analysis, that hiQ's products were valuable.  This type of "circular, subjective

18   reasoning does not satisfy the Rule 702 reliability requirement."  *See United States v. Hermanek*,

19   289 F.3d 1076, 1096 (9th Cir. 2002).  It is also simply wrong.  *Amex*, 138 S. Ct. at 2285 (without

20   a market defined, there is no way to "measure the defendant's ability to lessen or destroy

21   competition").  As LinkedIn's expert Dr. Murphy opines, "[a]s a matter of economics, the

22   presence of one fewer competitor in a market does not, in and of itself, establish harm to

23   competition or consumers."[7]  CE 887-888 (Murphy Rebuttal) at ¶ 4.

24       McElfresh's opinions concerning the market for hiQ's products and the impact of its exit

25

26   [7] McElfresh's opinions about the market for hiQ's products, and the harm to competition arising
    from hiQ's absence in the market, are also simply irrelevant to any issue remaining in the case.

27   *See* LinkedIn's Mot. for Summary Judgment at 24-29.  Courts exclude, under Rule 702(a)
    "[e]xpert testimony which does not relate to any issue in the case" because it is "not relevant and,

28   ergo, non-helpful."  *Daubert*, 509 U.S. at 591 (citation omitted).

Mot. to Exclude Expert Testimony
18-cv-00855-EMC

from the market, *see* CE 586-587 (McElfresh Rpt. ¶¶ 11, 13), CE 589 (*id.* ¶¶ 23, 25), CE 591-597 (*id.* ¶¶ 31-32, 36, 40-41, 51-52, 57- 58), must be excluded because they are not "based on sufficient facts or data"; they are not "the product of reliable principles and methods"; and he has done nothing to "reliably appl[y] the principles and methods to the facts of the case." *Lust,* 89 F.3d at 598.  There is also a significant risk that his opinions—regardless of whether he intended to offer economic opinions—could mislead or confuse the jury, *see* I.B., *supra.*

### B.   McElfresh Has No Specialized Economic Knowledge.

McElfresh's market-related opinions must also be excluded because McElfresh is not qualified to offer any opinions about hiQ's market position and any harm to consumers attributable to hiQ ceasing to carry on business.[8]  McElfresh admits that he has no expertise in, or specialized knowledge about, economics, analyzing the impact of competition on markets, or defining a relevant product market.  CE 555-556 (McElfresh Dep. at 26:11-27:5).  McElfresh's two-year stint from 1998 to 2000 as the CEO of the Saratoga Institute, an organization that at the time provided "benchmarking and analytic services to help … companies to improve productivity, retention, and motivation," similarly does not qualify him to opine about the state of the people analytics tools marketplace *more than a decade later*.  CE 600.  And while McElfresh has many years of experience as a HR executive and consultant, the only purported basis for his "specialized knowledge" regarding hiQ's market position is his attendance at hiQ's Elevate conferences from 2015-2017, his unsuccessful attempt to purchase hiQ's Keeper product for his company in 2015, and Google searches he conducted in the course of preparing his report.[9]  CE 565 (McElfresh Dep. at 71:5-13).

That type of limited experiential knowledge is not sufficient to provide an opinion regarding the relevant product market or harm to competition.  Expert testimony is inadmissible if the expert lacks "appropriate qualifications—i.e., some special knowledge, skill, experience,

---

[8] McElfresh explicitly stated that he is not offering an opinion regarding causation, i.e., the reasons why hiQ is no longer in business.  CE 566 (McElfresh Dep. at 73:12-15).

[9] McElfresh also acknowledged he has no experience providing recommendations to his clients regarding people analytics products or providing analyses of the products or services available in the people analytics market.  CE 560-561 (McElfresh Dep. at 37:13-38:12).

Mot. to Exclude Expert Testimony
18-cv-00855-EMC

training or education on [the relevant] subject matter." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). McElfresh is admittedly unqualified to perform such an analysis, nor does he appear even to have attempted to do so. CE 555-556 (McElfresh Dep. at 26:7-16). Because economic expertise is required to answer questions about competitive harms and the composition of a particular market, *AFMS LLC v. United Parcel Serv. Co.*, No. CV 10-5830 JGB (AJWx), 2014 WL 12515335, at *7 (C.D. Cal. Feb. 5, 2014), allowing McElfresh to opine on those topics risks "misleading the jury" and "confusing the issues." Fed. R. Evid. 403. Where an expert's "only contribution would be to pile on a misleading facade of expertise…. [h]is opinion should … be excluded under both [Fed. R. Evid.] 702 and [Fed. R. Evid.] 403." *Waymo LLC*, 2017 WL 5148390, at *5 (excluding expert testimony where expert "br[ought] no specialized knowledge to the table" in his future profits analysis and merely "performed grade-school arithmetic"); *see also United States v. Williams*, 2016 WL 899145, at *4 (N.D. Cal. Mar. 9, 2016) ("expert testimony will assist the trier of fact" only if the "'untrained layman' would be unable intelligently to determine 'the particular issue' in the absence of guidance from an expert.") (quoting Fed. R. Evid. 702 advisory committee notes).

Opining on the state of the market is also outside the scope of any HR-related expertise McElfresh may possess. Courts routinely refuse to permit expert witnesses to testify about matters outside the scope of their expertise. *See Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1103 (N.D. Cal. 2016) (refusing to allow a veterinarian to testify about what a reasonable consumer would consider material when deciding to purchase dog food); *United States v. Grant*, No. 18-CR-00391-EMC-1, 2020 WL 870948, at *2 (N.D. Cal. Feb. 21, 2020) (refusing to allow a doctor to testify about the VA's policies or practices). Similar to the veterinarian in *Lucido* and the doctor in *Grant*, McElfresh purports to opine on hiQ's market position and future market potential based merely on information he gained "by virtue of [his] position" as a potential consumer of hiQ's services. *See Lucido*, 217 F. Supp. 3d at 1103. McElfresh's awareness of hiQ and its competitors is no different than the awareness that any other potential consumer of specialized business-to-business software would have of that software and product market. That is insufficient to qualify him to testify as an expert. S*ee*

*Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 678 (N.D. Cal. 2021) (excluding testimony based on "knowledge … acquired on the job" where the topic of the testimony was "plainly specialized knowledge that require[d] expertise" that the witness lacked).  Rather than relying on such unsubstantiated opinions,  hiQ is of course free to present trial testimony from ***actual*** customers who purchased hiQ's products and used them.

This Court should exclude McElfresh's market-based opinions (CE 586-587 (McElfresh Rpt. ¶¶ 11, 13), CE 589 (*id* ¶¶ 23, 25), CE 591-597 (*id.* ¶¶ 31-32, 36, 40-41, 51-52, 57- 58)) under Rule 403 and Rule 702 because he lacks relevant expertise.

## II.    MCELFRESH'S OPINIONS ABOUT hiQ'S PRODUCTS ARE UNSUPPORTED AND UNRELIABLE.

McElfresh's opinions about the value and performance of hiQ's products are similarly not based on specialized knowledge or the product of reliable principles or methods.  *See* CE 586-587 (McElfresh Rpt. ¶¶ 11, 13) CE 589-597 (*id.* ¶¶ 23, 25, 31-33, 36, 38-41, 51-53, 57).

### A.    <u>McElfresh's Opinions About hiQ's Products Are Not Based on Specialized Knowledge or Reliable Methods</u>.

McElfresh has two categories of opinions about hiQ's products themselves (as opposed to the market for those products).  First, he claims that hiQ's products were "valuable" because they provided companies with previously unavailable data with which to assess turnover risk and employee skills.  CE 587 (McElfresh Rpt. ¶ 13), CE 589 (*id*. ¶ 23), CE 591-595 (*id*. ¶¶ 31-33, 36. 51), CE 562-563 (McElfresh Dep. at 57:11-58:5).  Second, he has made a variety of assertions about the functionality and operation of the products (e.g., that Skill Mapper provided more "accurate," "up-to-date," and "complete" information than other skills inventories).  CE 589-591 (McElfresh Rpt. ¶¶ 25, 31-32), CE 593-594 (*id*. ¶¶ 38-41), CE 597 (*id*. ¶ 57).  Neither of those categories of opinions are based on "specialized knowledge" or reliable principles or methods.

***Opinions on Value of hiQ's Products***.  Although McElfresh may have experience as an HR executive and consultant, that is not specialized knowledge he has relied upon in reaching his opinions about the value of hiQ's products.  Courts consistently distinguish between lay opinions which "result[] from a process of reasoning familiar in everyday life" and expert opinions which

1    "result[] from a process of reasoning which can be mastered only by specialists in the field." *See*

2    *Lucido*, 217 F. Supp. 3d at 1103; Fed. R. Evid. 702 Advisory Committee Notes ("There is no

3    more certain test for determining when experts may be used than the common sense inquiry

4    whether the untrained layman would be qualified to determine intelligently and to the best

5    possible degree the particular issue without enlightenment from those having a specialized

6    understanding of the subject involved in the dispute."). McElfresh's reasoning regarding the

7    value of hiQ's products is a classic example of reasoning that would be familiar to any lay juror.

8    Essentially, McElfresh has determined that having more options—in this case, having a product

9    based on public data to evaluate turnover risk and employee skills—is valuable. CE 591

10   (McElfresh Rpt. ¶ 32), CE 562-564 (McElfresh Dep. at 57:16-58:5; 58:13-59:4).

11        But McElfresh has not applied specialized knowledge to evaluate whether the options

12   provided by hiQ were *good* or *useful*—he has not evaluated whether Keeper or Skills Mapper

13   fulfilled their intended purposes, whether hiQ's customers found Keeper's insights to be valuable,

14   whether hiQ was able to retain existing customers and attract new customers, or whether public

15   data is a better turnover predictor than internal data as a general manner. *See supra* § B

16   (Statement of Facts). McElfresh even admitted that he does not know "[i]f in fact [hiQ's

17   products] w[ere] useful." CE 567 (McElfresh Dep. at 76:12-21). Given the superficiality of

18   McElfresh's analysis, any lay juror could reach the same conclusion based on facts about hiQ's

19   products and existing offerings in the market. *See W. Sugar Coop. v. Archer-Daniels-Midland

20   Co.*, No. 2:11-cv-3473-CBM-(PJWx), 2015 WL 13759740, at *1 (C.D. Cal. Oct. 26, 2015)

21   ("Expert testimony may be excluded under Rule 702 where the jury can understand the concepts

22   at issue without the assistance of expert opinion.").

23        McElfresh's simplistic analysis is also not the product of a reliable principle or method.

24   McElfresh freely admits that his opinions are not based on any empirical analysis—or any

25   analysis at all. *See* CE 558-559 (McElfresh Dep. at 30:9-31:16), CE 563-564 (*id.* at 58:13-59:4),

26   CE 579-580 (*id.* at 136:25-137:18). His opinion about Keeper's value was based solely on the

27   fact that he believes that Keeper may have been new and offered a service that was previously

28   unavailable, or so he believes based on his Google searching. CE 562 (McElfresh Dep. at 57:16-

58:5).  Under McElfresh's reasoning, *any* product is "valuable" if it is new and different from other products that came before it.  Common sense dictates that such an approach does not produce a reliable indicator of a new product's value.  History is littered with examples of new products that failed because people did not find them to be valuable (*see, e.g.*, "new" Coke, Google Plus).  McElfresh has not explained why having an additional option is valuable on its own.  His "method"—to the extent it can be characterized as such—is not reliable under Rule 702(c).  *See AFMS LLC*, 2014 WL 12515335, at *7–8 (finding expert did not apply a reliable methodology where he "offer[ed] no explanation for how he arrived at his conclusions, nor [did] he define or explain the methodology he used").

In contrast, LinkedIn's expert, Professor Hochberg, has reached opinions regarding hiQ's products based on revealed preferences, an accepted economic measure for drawing inferences from the actions of market participants.  CE 304 (Hochberg Rebuttal Rpt. ¶ 34); CE 306-307 (*id.* ¶ 37).  Unlike McElfresh's subjective and unsubstantiated observations about hiQ's products, evidence from hiQ's customers' actions reveal that they did not see significant value in hiQ's products.  In the period leading up to the May 23, 2017 C&D letter, customer counts were flat or declining, customer churn was high and contract values were stagnant.  *Id.*  Professor Hochberg's analysis provides an example of the kind of reliable methods that McElfresh could have employed, but did not, to reach an opinion about the value of hiQ's products.

***Opinions on the functionality of hiQ's products***.  Similarly, McElfresh's opinions regarding the functionality and operation of hiQ's products are based on little more than his review of hiQ's marketing materials (i.e., his attendance at hiQ's conferences and review of materials provided by counsel in this case).  CE  552  (McElfresh Dep. at 18:12-19).  Courts routinely refuse to permit expert testimony on matters that merely involve an alleged expert interpreting source materials that require no "specialized knowledge" to evaluate.  For example, courts have refused to permit experts to testify on what a video depicts, *see Gomez v. Fachko*, No. 19-CV-05266-LHK, 2021 WL 5630623, at *1-*2 (N.D. Cal. Dec. 1, 2021), what a person said on a recording, *Lam v. City of San Jose*, No. 14-cv-00877-PSG, 2015 WL 6954967, at *2 (N.D. Cal. Nov. 10, 2015), or what a witness meant in deposition testimony, *Gomez*, 2021 WL 5630623, at

*1.  McElfresh has not used hiQ's products or attempted to evaluate their effectiveness.  *See* CE 568 (McElfresh Dep. at 78:11-16); CE 576-577 (*id*. at 110:21-111:8).  Jurors are perfectly capable of making an assessment regarding how hiQ's products worked based on their own independent review of hiQ's marketing materials.

For the same reasons, McElfresh's opinions regarding the operation and functionality of hiQ's products are unreliable.  Based solely on hiQ's marketing materials and presentations, and never having used the product himself, there is no "reliable" way to determine whether Skill Mapper provides "accurate, complete, and up-to-date assessment of an organization's workforce," CE 593-594 (McElfresh Rpt. ¶ 40) or whether its compilations of skills and abilities are "thoughtful" or "easy." CE 589 (*id*. ¶ 25).  And McElfresh agrees, conceding that it is impossible to evaluate a company's product based purely on marketing materials when he testified about Joberate.  CE 557 (McElfresh Dep. at 29:8-19) ("I have no idea about … Joberate's actual operations and capabilities and the like.  It may have been just PR.  I don't know.").

Because McElfresh's product-related opinions (*See* CE 586-587 (McElfresh Rpt. ¶¶ 11, 13) CE 589-597 (*id.* ¶¶ 23, 25, 31-33, 36, 38-41, 51-53, 57)) are not based on specialized knowledge and are not the product of reliable principles or methods, they do not qualify as permissible expert opinion testimony under Rule 702.

**B.    McElfresh Should Be Prohibited From Giving a Lay Opinion About hiQ's Products or About LinkedIn Under Rule 403**.

Assuming McElfresh offers expert testimony on other topics at trial, this Court should prohibit him from providing lay opinion testimony about hiQ's products under Rule 403.  "[W]itnesses who testify as an expert may receive 'unmerited credibility' for their lay testimony, because expert testimony is 'likely to carry special weight with the jury'...."  *United States v. Gadson*, 763 F.3d 1189, 1212 (9th Cir. 2014) (citations omitted).  As discussed in the Statement of Facts §§ (A) & (B), *infra*, the evidence that McElfresh has relied on in forming his opinions about hiQ's products "speak[s] for itself, and his only contribution would be to pile on a misleading facade of expertise."  *Waymo LLC*, 2017 WL 5148390, at *5 (excluding expert

1   opinion under Rules 702 and 403 where expert had no specialized knowledge and his analysis

2   was "well within the ken of the average juror").  Because allowing McElfresh to offer a lay

3   opinion on hiQ's products would risk "misleading the jury" and result in "unfair prejudice" to

4   LinkedIn, this Court should prohibit him from offering *any* opinion on that topic under Rule 403.

5       McElfresh should similarly be barred from testifying that LinkedIn is a "unique" source

6   for publicly available professional data.  CE 587 (McElfresh Rpt. ¶ 12), CE 595 (*id*. ¶ 46).  The

7   only basis for his opinion is that by "being in the business", he just knows that LinkedIn is a

8   unique resource.  There is no other methodology, specialized knowledge, or other analysis

9   supporting this opinion, and in the absence of such, there is the strong risk that McElfresh's

10  opinion would mislead the jury to LinkedIn's prejudice.  This risk is underscored when such

11  testimony is not even relevant to hiQ's claims.  hiQ cannot allege any valid unfair competition or

12  antitrust claim; in particular, this opinion risks misleading the jury to conclude that LinkedIn is

13  somehow an "essential facility" for hiQ—which hiQ cannot sustain.  *See* LinkedIn's Mot. for

14  Summary Judgment at 28.  The prejudice to LinkedIn and the risk the jury believes that hiQ has

15  a viable antitrust claim (which it does not) far outweighs any minimal probative value to hiQ.

16  McElfresh's lay opinions about hiQ's products and LinkedIn should be excluded under Rule 403.

17                                  **CONCLUSION**

18      For the foregoing reasons, LinkedIn respectfully requests that the Court strike

19  McElfresh's opinions regarding hiQ's products, the market for those products, and that LinkedIn

20  is a unique source,  and exclude his testimony regarding the same.

21

22  Dated: August 5, 2022                    Orrick, Herrington & Sutcliffe LLP

23

24                                           By: _____*/s/ Annette L. Hurst*_____
                                                    ANNETTE L. HURST
25                                                  Attorneys for Defendant
                                                    LinkedIn Corporation
26

27

28