1    ANNETTE L. HURST (SBN 148738)
     ahurst@orrick.com
2    RUSSELL P. COHEN (SBN 213105)
     rcohen@orrick.com
3    PAUL F. RUGANI (SBN 342647)
     prugani@orrick.com
4    CATHERINE Y. LUI (SBN 239648)
     clui@orrick.com
5    NATHAN SHAFFER (SBN 282015)
     nshaffer@orrick.com
6    DANIEL JUSTICE (SBN 291907)
     djustice@orrick.com
7    EMILY RENZELLI (*Pro Hac Vice*)
     erenzelli@orrick.com
8    ORRICK, HERRINGTON & SUTCLIFFE LLP
     405 Howard Street
9    San Francisco, CA  94105-2669
     Telephone:    +1 415 773 5700
10   Facsimile:    +1 415 773 5759

11   *Attorneys for Defendant/Counterclaimant*
12   *LinkedIn Corporation*

13                  UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15                   SAN FRANCISCO DIVISION

16   hiQ Labs, Inc.,                          Case No. 17-cv-03301-EMC

17              Plaintiff,                     **LINKEDIN'S *DAUBERT* MOTION TO
                                              EXCLUDE DAMAGES OPINIONS OF**
18        vs.                                  **BENJAMIN SACKS**

19   LinkedIn Corporation,                     Date:          September 29, 2022
                                              Time:          1:30 p.m.
20              Defendant.                      Courtroom:     5 – 17th Floor (Zoom)
                                              Judge:         Hon. Edward M. Chen
21
                                              Complaint Filed:   June 7, 2017
22                                             Trial Date:        February 27, 2023

23   ─────────────────────────────
     LinkedIn Corporation
24
                Counterclaimant,
25        vs.

26   hiQ Labs, Inc.

27              Counterdefendant.

28

                                              Mot. To Exclude Sacks
                                              No. 17-cv-03301-EMC

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ............................................................................ IV

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

     A.    hiQ's Financial and Operational Roadblocks at the Time of the C&D Letter ........ 3

     B.    Sacks's "Full Damages" (Lost Business Value) Opinion ..................................... 4

          1.    The Overly Broad Regression Dataset ........................................................ 5

          2.    The Unreliable Regression Results ............................................................. 6

          3.    Sacks's Failure To Test The Reliability Of The Regression ...................... 7

     C.    Sacks's "Subset Damages" (Lost Profits) Opinion ................................................. 9

ARGUMENT ................................................................................................................... 10

I.     THE FULL DAMAGES OPINION IS INADMISSIBLE BECAUSE IT IS
       CONTRARY TO LAW AND UNRELIABLE .................................................. 11

     A.    The Full Damages Opinion is Inadmissible Because Lost Business Value Is
          Not Recoverable As A Matter of Law ....................................................... 11

     B.    Sacks's Full Damages Opinion is Based on a Fundamentally Unreliable
          Regression Technique ................................................................................. 14

          1.    Sacks's Regression Technique is Both Unreliable as a Valuation
              Method and Unreliably Applied to This Record. .................................... 15

          2.    The Predicted Value of hiQ is Statistically Meaningless. ........................ 17

II.    THIS COURT SHOULD EXCLUDE SACKS'S SUBSET DAMAGES OPINION ....... 20

     A.    Sacks's Subset Damages Opinion is Not Based on the Required Loss of
          Net Profits Methodology ............................................................................ 20

     B.    The Lost Profits Analysis Double Counts as Lost Profits Revenues hiQ
          Actually Received ...................................................................................... 22

CONCLUSION ................................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012) ........................ 12, 15

*ATA Airlines, Inc. v. Fed. Express Corp.*,
665 F.3d 882 (7th Cir. 2011)............................................................................... 15, 19, 21

*Boyd v. City & Cnty. of San Francisco*,
576 F.3d 938 (9th Cir. 2009)............................................................................................. 11

*Butler v. Home Depot, Inc.*,
984 F. Supp. 1257 (N.D. Cal. 1997) ................................................................................. 11

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................................ 11, 12, 16, 18

*Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*),
43 F.3d 1311 (9th Cir. 1995) ............................................................................................ 11

*Elec. Funds Sols., LLC v. Murphy*,
134 Cal. App. 4th 1161 (2005)......................................................................................... 12

*Elsbach v. Mulligan*,
58 Cal. App. 2d 354 (1943)............................................................................................... 13

*Faulkner v. Arista Recs. LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014) ................................................................................ 23

*Feduniak v. Old Republic Nat'l Title Co.*,
No. 13-cv-02060, 2015 WL 1969369 (N.D. Cal. May 1, 2015)........................................... 11

*Griffin v. Bd. of Regents of Regency Univs.*,
795 F.2d 1281 (7th Cir. 1986)........................................................................................... 15

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*,
87 F. Supp. 3d 928 (N.D. Cal. 2015) ......................................................................... 19, 20

*Intel Corp. v. Tela Innovations, Inc.*,
No. 3:18-cv-02848-WHO, 2021 WL 1222622 (N.D. Cal. Feb. 11, 2021) ............................ 12

*Kids' Universe v. In2Labs*,
95 Cal. App. 4th 870 (2002).............................................................................................. 14, 15

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ......................................................................................................... 11

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012).......................................................................... 16, 17

*Pac. Rollforming, LLC v. Trakloc N. Am., LLC*,
    No. 07cv1897 IEG (MDD), 2011 WL 13176817 (S.D. Cal. Dec. 1, 2011) ......................... 12

*Parlour Enters., Inc. v. Kirin Grp., Inc.*,
    152 Cal. App. 4th 281 (2007)....................................................................... 13, 21, 22

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
    360 F. Supp. 3d 994 (N.D. Cal. 2018), *aff'd*, 815 F. App'x 117 (9th Cir. 2020) .................. 13

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................................. 15, 16, 17, 18

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
    55 Cal. 4th 747 (2012) ......................................................................... 21, 22, 23

*Snyder v. Bank of Am., N.A.*,
    No. 15-CV-04228-KAW, 2020 WL 6462400, at *5 (N.D. Cal. Nov. 3, 2020)..................... 23

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare
    Fund v. Teikoku Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ................................................................. 12

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996)............................................................................ 13

**Statutes**

California Business and Professions Code § 17200 ....................................................... 3

**Other Authorities**

Fed. R. Evid. 403 ................................................................................. iv, 11, 12

Fed. R. Evid. 702 ................................................................. iv, 1, 11, 12, 15, 16

Ref. Manual on Scientific Evidence (3d), *available at*
    https://nap.nationalacademies.org/read/13163/.......................................................... 8, 18, 20

iii

## NOTICE OF MOTION AND MOTION

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE** that on September 29, 2022 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 5 on the 17th Floor of the above-entitled Court (or by Zoom or other videoconference if the Court so designates), LinkedIn Corporation ("LinkedIn") will, and hereby does, move to exclude opinions set forth in the June 22, 2022 Amended Expert Report of Benjamin Sacks (the "Sacks Report") and to exclude related exhibits and testimony.

Pursuant to Federal Rules of Evidence 702 and 403, LinkedIn moves this Court for an order excluding certain opinions and testimony of Defendant hiQ Labs, Inc.'s ("hiQ") retained-expert Benjamin Sacks.  LinkedIn respectfully requests the Court exclude the opinions of Sacks contained in Sections IV ("The Value of hiQ on the Valuation Date") and VI ("Subset Damages") of the Sacks Report (and related portions of Section II ("Assignment and Summary of Opinions") and V ("Other Valuation Methods are Less Reliable in this Matter")), and to exclude related exhibits and testimony, as such opinions are legally unsound, lack sufficient reliability, and are unduly prejudicial.  If admitted, these opinions would mislead the jury and confuse important issues in this case.  Once the improper portions of Sacks's opinions are excluded, any remaining opinion fails to meet Fed. R. 702's standard of relevance, and his testimony should be thus excluded entirely.

The Motion is based on the following materials: this Notice of Motion, the Memorandum of Points and Authorities following herein; the Declaration of Daniel Justice and exhibits thereto, filed herewith as the Compendium of Evidence Filed In Support of LinkedIn Corporation's August 5, 2022 (hereinafter cited as "CE"), Motions; the papers and pleadings on file in this action as cited herein; and such other and further papers and arguments as may be presented to the Court prior to or at the hearing of this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION AND SUMMARY OF ARGUMENT

At the time hiQ initiated this lawsuit, it was a failing startup.  Its Series B investment round was ███████ ██████████████████████████████████ and it had virtually no ability to scrape LinkedIn—and therefore no ability to sell products—as a result of LinkedIn's general technical website defenses.  Yet hiQ now seeks through this lawsuit to recover what its proffered damages expert Benjamin Sacks calls "full damages"—████████ that hiQ claims is the full value of hiQ's business at the time LinkedIn sent a cease-and-desist letter (the "C&D letter"), a legally unrecoverable enterprise value measure.  Alternately, Sacks opines that hiQ should be entitled to recover as "subset damages" ████████ in damages based on what he says are lost profits from a set of existing customers and a speculative partnership with ██, but he double counts as "lost profits" revenues hiQ actually received and admittedly fails to deduct the full panoply of required expenses.  Both of Sacks's opinions are fundamentally irrelevant to this case and unreliable, and his opinions should be excluded.  Once excluded, any remaining opinion fails to meet Fed. R. 702's standard of relevance, and, thus, his testimony should be excluded entirely.

To support his "full" damages opinion, hiQ directed Sacks to perform a business valuation.  But this entire exercise is inappropriate and legally barred.  Sacks attributes the entire loss of hiQ's business to LinkedIn's C&D letter, and then attempts to value hiQ's entire business at that moment in time as damages.  But lost business value cannot be recovered as damages under California law, and the reasons for this rule are apparent when considered in light of the nature of hiQ's economic interference torts and the fact hiQ was ████████████████.  Business interference torts remediate only interference with specific, established relationships, not every speculative potentiality a business may hope comes to pass.  This case illustrates the

---

[1]  "Series B" and "Series C" as used in Sacks's report and throughout this brief refer to standard investment events in the lifecycle of a startup company where investment funds are raised to fund the company in exchange for selling ownership interest (equity) to investors.  *See* CE 1084–85 (Sacks Rpt. ¶ 24).  An implied valuation can be calculated at each investment event by essentially multiplying the price-paid-per-share by the total number of outstanding shares.  *See id.*

1  wisdom of that rule: hiQ's lost business value claim is riddled with uncertainty because it seeks to

2  recover the purported value of a business with an unbroken record of ███████ and dubious

3  prospects of ███████ Part I(A), *infra*.

4        Even if Sacks's full damages opinion was not legally barred, it would still need to be

5  excluded because it is inherently unreliable and will be grossly misleading to the jury.  Sacks

6  attempts to value hiQ's business as of May 2017 *not* by evaluating its financial condition and

7  expected financial performance.  Instead, he created a regression model that identifies the average

8  difference in valuation between the Series B and Series C funding rounds of 250 venture-backed

9  companies—a sample that excluded *any* companies that failed to reach Series C.  Then Sacks

10  *assumes* that hiQ's change in valuation would have been precisely in line with the average.  Sacks

11  knows of no similar analysis performed in business or academia.  He invented the average-

12  change-in-valuation approach just for this case, and it shows.  His model does not control for

13  obvious factors that would drive a business's change in valuation after a Series B funding round.

14  Indeed, Sacks made no effort to determine whether the firms in his dataset were comparable to

15  hiQ in key metrics such as revenues, profitability, Series B valuations, or business model.  And,

16  ultimately, Sacks's model produces a meaningless range of results—known technically as a wide

17  prediction interval—indicating a high error, and consequently, a model that could never yield a

18  reliable result.  Part I(B), *infra*.

19        Sacks's second opinion, the "subset damages" opinion, is similarly deficient.  In it, Sacks

20  calculates ███████ in damages that he calls lost profits from a set of existing customers and a

21  speculative partnership with ███.  Critically, nowhere in that opinion does Sacks establish, or

22  take the necessary steps to establish, that hiQ—████████████████████████

23  ██████████ as is required under a proper lost profits analysis.  The only reason that

24  Sacks's lost profits amount is ████████████ fails to deduct necessary

25  expenses in his calculation.  Part II, *infra*.

26        The Court should exclude Sacks's testimony from the case.

27

28

Mᴏᴛ. Tᴏ Exᴄʟᴜᴅᴇ Sᴀᴄᴋs
Nᴏ. 17-cv-03301-EMC

1

**STATEMENT OF FACTS**

2     hiQ has five remaining affirmative causes of action against LinkedIn that it claims arise

3 from LinkedIn sending hiQ a C&D letter on May 23, 2017, to stop scraping LinkedIn's platform:

4 (1) interference with contract; (2) interference with prospective economic relations; and (3) three

5 causes of action for unfair competition under California Business and Professions Code § 17200,

6 et seq.  ECF 131 (Amended Complaint) ¶¶75-108.  hiQ is seeking damages for the alleged

7 economic interference torts only.  UCL remedies are limited to restitution or injunctive relief, and

8 hiQ does not seek restitution from LinkedIn.  *See* Compendium of Evidence ("CE") 1012-13

9 (Sacks Dep.).

10     In support of the claimed damages for the economic interference claims, Sacks provides

11 two alternative damages opinions: (1) a "full damages" opinion—seeking ▮▮▮▮▮▮ premised

12 on a business value methodology purporting to calculate hiQ's full business value on the date it

13 received the C&D letter; and (2) a "subset damages" opinion that calculates ▮▮▮▮▮ in lost

14 profits from a handful of hiQ's customers as of the date of the C&D letter and one potential

15 partner.

16     **A.     hiQ's Financial and Operational Roadblocks at the Time of the C&D Letter**

17     hiQ was a startup that faced significant financial and operational hurdles from its

18 inception up until the time of the C&D.  There was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮"  CE 1057 (Sacks Dep.).  Precipitating hiQ's financial condition was ▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Indeed,

21 although hiQ's board authorized sale of up to ▮▮▮▮▮ shares of stock in its 2016 Series B

22 financing round, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮.  CE 1068-1070 (Sacks Dep.).  At the same time, hiQ was burning through

24 cash—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ CE 351 (2/8/17 hiQ

25 Board Deck).  As a result, hiQ was on its last leg financially with less than six months of cash left

26 by the time it received the C&D.  CE 1150, 1151 (Weidick 30(b)(6) Dep.); CE 1224 (5/15/2017

27 hiQ Board Deck) (reflecting hiQ will run out of cash by October 2017).

28     On the operational front, hiQ's business model was falling apart.  LinkedIn's general anti-

1  scraping defenses had all but thwarted hiQ's scraping entirely, effectively halting hiQ's

2  operations.  *See, e.g.*, CE 1627 (6/1/2016 hiQ Slack Tr.); CE 1174-75 (4/5/2017 Weidick report to

3  hiQ board that hiQ is unable to scrape); CE 1258 (4/11/2017 Weidick Email) ("███████████

4  ██████████████████████████████████████).  By April 2017, the month

5  before LinkedIn sent the C&D letter, the "ban rate" for hiQ's scraping requests was ███.  CE

6  1051 (4/26/17 hiQ Slack Tr.).  In the words of hiQ's CTO, scraping LinkedIn "████████████

7  ████████████" both before and after the C&D.  CE 719 (██████ Dep.).  hiQ's best hope as of May

8  2017 was an experimental and unproven solution using MiFi devices to circumvent LinkedIn's

9  general defenses, which would have given hiQ "████████████████" of scraping at best. CE 727

10  (Miller Dep.).  As a direct result of these operational issues, hiQ experienced low employee

11  confidence and high executive turnover leading up to May 2017, with CEO Darren Kaplan being

12  replaced, CE 1559 (Weidick Offer Letter), and co-founder and Chief Science Officer Genevieve

13  Graves announcing her resignation, CE 77-78 (2/4/17 hiQ Email), in February 2017.

14  **B.    Sacks's "Full Damages" (Lost Business Value) Opinion**

15  Sacks's full damages opinion is premised on the assumption, made at the instruction of

16  counsel, that LinkedIn's May 23, 2017, "C&D interfered with hiQ's existing and prospective

17  contracts and business relationships, effectively destroying hiQ's business, and that LinkedIn is

18  liable to hiQ for the damage that caused."  CE 1076–78 (Sacks. Rpt. § II.A).  Because Sacks

19  presumes that a private letter from LinkedIn to hiQ destroyed hiQ's entire business, the full

20  damages opinion seeks to establish as damages "the value of hiQ's business as of the date of the

21  C&D" with no deductions and to assign LinkedIn liability for the full amount.  CE 67 (Sacks

22  Dep.).

23  The full damages analysis is not based on hiQ's revenues, actual business performance, or

24  any financial projections because hiQ was unprofitable.  *See* CE 1057 (Sacks Dep.).  Rather,

25  Sacks attempted to use hiQ's implied value at the time of its actual Series B valuation to "predict"

26  hiQ's theoretical implied value at the time of a hypothetical Series C funding round that he

27  assumed would have happened at some time after the C&D letter, then somehow further convert

28  *that* prediction back to a valuation at the time of the letter.  *See* CE 1109 (Sacks Rpt. ¶ 91)

("[T]he Regression Approach predicts a round C pre-money value for hiQ of ▮▮▮▮▮▮▮▮").  To perform the first step, Sacks used a regression analysis to determine the average performance of an index of over 250 venture-backed startup companies that successfully proceeded from Series B to Series C investment events.  *See* CE 1108-09 (Sacks Rpt. ¶ 89).  And because no one had ever used this method to value a business before, Sacks had to develop novel methodologies for creating a dataset and evaluating the regression results.

### 1.    The Overly Broad Regression Dataset

In order to build a dataset on which to base his regression, Sacks used data from Pitchbook, an industry reporting firm that reported Series B valuations and Series C valuations for a large number of venture-backed firms.  Sacks settled on an index of 257 companies by applying several criteria.  The firms in Sacks's dataset first had to have announced or completed a Series C financing round from 1/1/2010 to 5/17/2022 and have a dollar amount listed for its Series C implied value—that is, he excluded any company that failed before reaching a Series C round, a not uncommon outcome for startups.  CE 1105 (Sacks Rpt. ¶ 83.a–b).

Once the firms met these basic criteria, they were further selected from a set of "broad industr[ies]."  CE 1108 (Sacks Rpt. Fig. 5) (indicating source for dataset is "Pitchbook, (Broad Industry Filter, 257 complete data points)".  Sacks included a company in the dataset if it met at least one of the following broadly-defined criteria: (1) the company description included the phrase "predictive analytics," (2) the listed industry was "Human Capital Services," **or** (3) the company was in the business of "Big Data," "HR Tech," or "software as a service."  CE 1105-06 (Sacks Rpt. ¶ 83).

Sacks applied "no additional criteria" in order "to investigate the actual nature of the businesses that were included in this Pitchbook data[set] to compare [them] to hiQ beyond these broad categories."  CE 1019 (Sacks Dep.).  Sacks did not consider whether the dataset firms were comparable to hiQ in other financial metrics, including (1) the amount of trailing 12-month revenue reported, CE 1018 (Sacks Dep.); (2) their profitability (or unprofitability), CE 1018 (Sacks Dep.); (3) whether the dataset firms were comparably valued to hiQ at their Series B valuation (aside from removing a few outlier firms that were orders of magnitude more valuable

1 than other firms in the dataset), CE 1019A (Sacks Dep.); and (4) whether those firms had similar

2 investor profiles to hiQ, which had "effectively one Series B investor," CE 1020 (Sacks Dep.),

3 Sacks also did not consider whether the other firms "were facing a pretty substantial barrier with

4 respect to producing their products" similar to hiQ's technological barrier to scraping LinkedIn

5 data. CE 1021 (Sacks Dep.). Sacks further paid no consideration to whether the dataset

6 companies were comparable to hiQ in any specific metric such as actual valuation amount, type

7 of business, type of products, or reported revenues or profitability. *See* CE 1105-06 (Sacks Rpt. ¶

8 83).

9         **2.**        **The Unreliable Regression Results**

10      In order to find the average performance of companies in the index of 257 U.S. venture-

11 backed firms in the dataset, Sacks first plotted each company in the index by its Series B implied

12 valuation on the horizontal X-axis by its Series C implied valuation on the Y-axis. CE 1108

13 (Sacks Rpt.), 1022 (Sacks Dep.). Sacks then calculated a standard "least squares" regression line

14 that shows the line that "best fit" the plotted company data. *Id.*; CE 1015 (Sacks Dep.).



FIGURE 5. ROUND C PRE-MONEY VALUATIONS VS ROUND B POST-MONEY VALUATIONS IN A UNIVERSE OF COMPARABLE [PEOPLE ANALYTICS] COMPANIES FROM PITCHBOOK EXCLUDING ROUND B VALUATIONS GREATER THAN $200 MILLION[157]

$$y = 9.2 + 2.5\,x \quad R^2_{adj} = 0.37$$

Company's Series C Pre-Money Pitchbook Valuation ($M)

Company's Series B Post-Money Pitchbook Valuation ($M)

Source: Pitchbook (Broad Industry Filter, 257 complete data points)

From this line of best fit, Sacks derived an equation that describes the "average" relationship" between Series B and Series C valuations for companies in the dataset: $y$ = \$9.2 million + 2.5$x$, where $x$ is the actual Series B valuation and $y$ is the predicted Series C valuation. CE 1108 (Sacks Rpt.); CE 1010 (Sacks Dep.).  Then he applied that equation to hiQ—in essence, finding the point directly on the blue regression line above corresponding with hiQ's Series B valuation to give the predicted Series C value.  Sacks estimated hiQ's Series B value at ██████, and put hiQ's implied Series B valuation into the equation and got the result of ██████████████████████ for hiQ's (hypothetical) Series C valuation.  Because hiQ "had not yet raised nor priced" a Series C round, Sacks arbitrarily discounted the valuation by 20%, resulting in \$72.9 million. CE 1109-10 (Sacks Rpt. ¶ 92).  (As he acknowledged in his deposition, Sacks made an error in his Series B valuation estimate, which required him to reduce his lost-business value-damages from ████████████████████ but a report detailing the corrected calculation was never produced.  *See* CE 992 (Sacks Dep.).

### 3.    Sacks's Failure To Test The Reliability Of The Regression

Sacks did little to test his approach.  Sacks reported an $R^2$ value of .37 for his regression line.  Because the regression seeks to measure the "average" relationship, the $R^2$ value measures "variation" of the dataset firms from the average.  CE 1023-24 (Sacks Dep.).  An $R^2$ of .37% means 37% of the variation in value from Series B to Series C correlates with the Series B valuation, and conversely 63% correlates with factors not in Sacks's model.  CE 1109 (Sacks Rpt. ¶ 90); CE 1024 (Sacks Dep.).  But Sacks did not explore what the factors driving 63% of the variance could be or otherwise seek to identify or quantify them.  CE 1024 (Sacks Dep).

Sacks also did not do any calculations to illustrate the "confidence" of the prediction derived from his model, and thus made no calculation as to the statistical significance of hiQ's predicted value (the ██████ number, pre-20% discount).  *See* CE 1109 (Sacks Rpt. ¶ 90). A prediction made through a regression equation can be tested for statistical significance—*i.e.*, the statistical confidence that the "true" value is within a certain range.  The "confidence interval of a prediction," also known as a "prediction interval" or "Standard Error of the Forecast" ("SEF"), is "used to determine how accurate a given forecast is."  Reference Manual on Scientific

Evidence at 348–49 (3d ed. 2011);[2] CE 1036-37 (Sacks Dep.) (agreeing that SEF and prediction interval are the same thing).  For example, if the interval at a 95% confidence level is 10 to 100, there is 95% confidence that the true value is within that range.  *See* Ref. Manual on Sci. Evid. at 244.  Sacks conceded that he has no "model" on "the relative uncertainty of the prediction" of hiQ's hypothetical Series C value.  CE 1045 (Sacks Dep.).

As shown in the calculations for Sacks's prediction of ███████ below performed by LinkedIn's expert Dr. Hochberg,[3] the prediction interval ranges for his model are hundreds of millions of dollars.  At 95% confidence, the interval ranges from ██████████ ████.  That means, knowing only hiQ's Series B valuation and applying Sacks's approach, the best you can say with 95% confidence is that hiQ's Series C valuation would come in at $0, $376.8 million, or any number in between—i.e., no number in the range can be rejected since they all have the same 95% confidence.

At his deposition, Sacks reviewed and agreed that intervals calculated at various confidence levels for his prediction of hiQ's value were mathematically correct.  CE 1038-42 (Sacks Dep.) (agreeing the prediction interval calculations are mathematically correct); CE 1124-25 (Sacks Dep. Exs. 608–609).[4]

---

[2] *Available at* https://nap.nationalacademies.org/read/13163/.

[3] Because Sacks disclosed an error in his calculation for first time at his deposition, the calculation is based on the ██████████ figure in his report.  The mathematics do not meaningfully change with the adjustment.

[4] Sacks Dep. Ex. 609 is identical to Ex. 608, except the numbers are scaled by the 20% discount Sacks applied to his ██████████ prediction for hiQ.

1

### C.        Sacks's "Subset Damages" (Lost Profits) Opinion

Sacks's alternative calculation, the "subset damages" opinion, estimates loss of expected revenues from a set of 21 existing hiQ customers (with contracts in effect as of May 2017) and a hypothetical partnership with IBM based on preliminary discussions and the possibility of entering into an exploratory memorandum of understanding ("MOU").

██████ As of May 23, 2017, hiQ and ██ did not have a contract; the parties had only talked about (but never signed) a non-binding MOU.  CE 1060-61 (Sacks Dep.).  Therefore, "any profits associated with an ██ relationship would be based on some prospective new relationship."  CE 1048 (Sacks Dep.).  Sacks assigned a 75% probability that hiQ and ██ would enter into some sort of agreement, and simply assumed that it would net hiQ ██████ per year (discounted to ██████ based on the 75% probability of occurrence).  CE 1117-18 (Sacks Rpt. ¶¶ 123–124).

***Existing hiQ Customers***.  For the remainder of his lost profits damages calculation, Sacks assumes that each current hiQ customer as of May 2017 is part of hiQ's lost profits analysis.  CE 1060-61 (Sacks Dep.).  Like ██, each current customer was assigned a risk that the customer would not renew based on historical performance, with ██ of hiQ's first-time customers renewing and ██ of customers who previously renewed opting to renew again.  CE 1116 (Sacks Rpt. ¶¶ 117–18).  Because hiQ's customers generally paid up front, Sacks assumes that any contract that existed in May 2017 was paid in full for the year, and starts calculating lost profits as of January 1, 2018.  CE 1118 (Sacks Rpt. ¶ 125).

***Deductions***.  Because the subset damages opinion is a lost profits (not lost revenue) calculation, Sacks deducts (1) the cost to scrape based on a hypothetical scraping operation that hiQ never implemented in reality, CE 1117 (Sacks Rpt. ¶ 120), and (2) the COGS (Cost of Goods Sold) line on hiQ's income sheet, *id.* (Sacks Rpt. ¶ 121).  Both deductions were prorated to decrease commensurately as the probability of customers not renewing reduced revenues over time.  No other deductions for costs (i.e., for overhead, rents, marketing, customer support, or software development, etc.) were made.  CE 1049-50 (Sacks Dep.).

After counting revenue from the hypothetical contracts, Sacks predicts that hiQ would

have received ██████ in profits from 2018 to 2027 but-for the C&D letter.  CE 118 (Sacks Rpt. ¶ 125, Fig. 10).  Because Sacks was instructed to assume that hiQ's business ceased as of May 23, 2017, he does not consider any actual revenues received by hiQ from the customers in his lost-profits calculation or any other source.  *See* CE 1067 (Sacks Dep.).  At his deposition, Sacks testified that this figure, too, was incorrect because it included the same contract twice.  As with the full damages opinion, no corrected calculation has been provided.  CE 992 (Sacks Dep.).

## ARGUMENT

In determining whether expert opinion evidence is admissible, the court acts as a "gatekeeper" to ensure that any scientific testimony or evidence admitted "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999); *Feduniak v. Old Republic Nat'l Title Co.*, No. 13-cv-02060, 2015 WL 1969369, at *1 (N.D. Cal. May 1, 2015). To be sufficiently relevant, the expert testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (quoting Fed. R. Evid. 702).  To be reliable, the opinion offered must have adequate support.  *Id.* at 588-90.  Reliability is shown through factors such as:  (1) whether the expert's theory or method is generally accepted in the scientific community; (2) whether the expert's methodology can be or has been tested; (3) the error rate of the technique; and (4) whether the method has been subjected to peer review and publication.  *Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1316 (9th Cir. 1995) (citing *Daubert*, 509 U.S. at 593-94).  The proponent of the expert testimony bears the burden of establishing the testimony's admissibility by a preponderance of the evidence.  *Butler v. Home Depot, Inc*., 984 F. Supp. 1257, 1260 (N.D. Cal. 1997).

In addition to Rule 702, Rule 403 provides that expert opinions may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  The trial court has discretion over whether to admit potentially prejudicial testimony under Rule 403.  *Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).

Fundamentally, an expert's opinion must not be contrary to law.  *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017).  If the opinion is contrary to law, it is "unreliable under FRE 702 and unduly prejudicial under FRE 403" and must be excluded.  *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *7 (N.D. Cal. June 30, 2012).

## I.     THE FULL DAMAGES OPINION IS INADMISSIBLE BECAUSE IT IS CONTRARY TO LAW AND UNRELIABLE.

Sacks's "full damages" opinion should be excluded because it is legally improper, not based on an accepted methodology, and fundamentally unsound.  It is a transparent attempt to put a large number before the jury with a claim of expert imprimatur—just the sort of opinion Rule 702 exists to prohibit.

### A.     The Full Damages Opinion is Inadmissible Because Lost Business Value Is Not Recoverable As A Matter of Law.

Sacks's lost business valuation measure of damages is inherently unhelpful because it cannot be used by the jury to determine a fact in issue.  As a matter of blackletter California law, a plaintiff cannot recover lost business value—in whole or in part—as damages for economic tort claims.  *Elec. Funds Sols., LLC v. Murphy*, 134 Cal. App. 4th 1161, 1180 (2005) (a plaintiff under California law "may recover only the profits lost, *not* the value of the lost business" (emphasis added)).  Sacks's full damages opinion and analysis is, therefore, completely irrelevant because it contravenes binding state law on damages recovery.  *Apple*, 2012 WL 2571332, at *7; *see also Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2021 WL 1222622, at *27 (N.D. Cal. Feb. 11, 2021) (holding that "opinions … contrary to law" are "inadmissible under *Daubert* and FRE 403 as it would confuse the issues and mislead the trier of fact").

A plaintiff under California law is limited to recovery of lost net profits.  *Elec. Funds Sols.*, 134 Cal. App. 4th at 1180.  Accordingly, California state and federal courts applying California law "have rejected the proposition that a plaintiff may recover the value of the lost business" as damages for economic interference torts (and other claims).  *See, e.g., Pac. Rollforming, LLC v. Trakloc N. Am., LLC*, No. 07cv1897 IEG (MDD), 2011 WL 13176817, at *3

(S.D. Cal. Dec. 1, 2011) (rejecting lost business value method for calculating damages for claims including, *inter alia*, "interference with contract/prospective business advantage").  Indeed, courts consistently hold that the proper approach for measuring damages for harm-to-business claims is lost *net profits*, which are calculated by the "gains made from sales after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed." *Parlour Enters., Inc. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281, 287 (2007) (quotation marks omitted); *see also Elsbach v. Mulligan*, 58 Cal. App. 2d 354, 366–67 (1943) ("The measure of damages for the diminution of the value of business due to a wrongful act *is reflected by loss of profits, expenses incurred or similar concrete evidences of injury*." (quotation marks omitted) (emphasis added)).  Sacks's full damages analysis is categorically barred by California law because it seeks recovery of hiQ's lost business value not the lost net profits permitted under California law.

The rationale behind the categorical bar on recovery of lost business value makes sense in the context of hiQ's specific claims for two reasons.  ***First***, recovery of the full value of a business is barred by the elements of hiQ's tort claims—intentional interference with contract and prospective economic advantage.  Economic interference torts make actionable only interference with specific, established relationships, not abstract opportunities in "the market" generally. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521 (1996).  They are thus limited to fact patterns involving either (1) frustration of an *existing* contractual relationship, or (2) the disruption of an *existing* relationship that has an expectancy of future economic benefit. *Id.* at 518, 521–22 (affirming grant of summary judgment because plaintiff failed to establish "an existing relationship with a particular third party as opposed to a prospective relationship with an unknown class of potential buyers or investors"); *see also Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1017 (N.D. Cal. 2018) (granting summary judgment because "there is insufficient evidence to allow a reasonable fact finder to conclude that Prostar had existing economic relationships with [potential customers]"), *aff'd*, 815 F. App'x 117 (9th Cir. 2020).

Per Sacks, hiQ's full business value as of the date of the C&D letter *does not* "start[] with

existing profits related to existing customers and clients," and is instead a calculation of "all-expected profits from … the distant future."  CE 997 (Sacks Dep.).  Sacks **claimed** at his deposition that the full damages opinion is "the same thing" as a "full lost profits analysis" because the value of hiQ as a business is not "the present value of future lost profits and losses but the net present value of all future cash flows."  CE 996 (Sacks Dep.).  It isn't.  But even if it were the same thing, it wouldn't save his model.  A calculation of hiQ's business value based on the "net present value of all future cash flows" using a method like discounted cash flow analysis—which is not what Sacks did—would still be flawed as necessarily extending far beyond the existing customers hiQ alleges LinkedIn's conduct interfered with to consider "distant" "expected profits" from unknown future economic relationships.  Indeed, when Sacks did look at *existing* economic relationships for his subset damages opinion,[5] he came up with ███ ███—less than 5% of the full damages amount of ████████████.

     **Second,** hiQ was a startup ████████████.  "[W]here the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative."  *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002).  That is, under California law, startups (i.e., unestablished businesses) face particularly stringent requirements when seeking *any* recovery.  hiQ cannot overcome that hurdle because ████████ ██████████████████████████.  Because "████████████████████████ ████████████████" the unestablished business rule applies.  *See* CE 1057 (Sacks Dep.); *Kids' Universe*, 95 Cal. App. 4th at 888 (requiring "evidence … it was reasonably probable the venture would have been profitable, i.e., gains from … sales would have exceeded the costs of operating").  In *Kids' Universe*, the court rejected damages evidence based on an expert's business value calculation pegging the "capital value" of a previously unprofitable business at $50 million.  *Id.* at 877.  The business value amount supposedly reflected a "present value of lost profits" based on hypothetical future success in a new market.  *Id.*; *compare with* CE 996 (Sacks

---

[5] The subset damages opinion is also flawed for the reasons discussed in Section II, *infra*.

Dep 17:2-8) (explaining business value calculation is "net present value of all future cash flows"). The damages theory rejected in *Kids' Universe* is indistinguishable from Sacks's full damages opinion.  As with *Kids'*, ███████████████████████████████████ ████████████████████ in a new market.  Per *Kids Universe*, such an analysis cannot support a damages award as a matter of law.

The sole remedy for hiQ on its tortious interference with contract and prospective economic advantage claims is recovery of lost net profits, if any, that hiQ can prove it would have received from existing economic relationships at the time of the alleged wrongful conduct (i.e., the C&D letter).  Because Sacks's full damages opinion seeks recovery based on hiQ's lost business value and is based on profits from unidentified relationships in the "distant future," the full damages opinion is contrary to law and thus irrelevant and inadmissible under Rule 702. *Apple*, 2012 WL 2571332, at *7.

**B.**  **Sacks's Full Damages Opinion is Based on a Fundamentally Unreliable Regression Technique.**

Sacks's novel regression-based method for calculating hiQ's value is also both unprecedented and unreliable.  Courts have exercised their "responsibility to screen expert testimony" to exclude bogus regression analyses.  *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 896 (7th Cir. 2011) (finding that flawed regression analysis should have been excluded); *Griffin v. Bd. of Regents of Regency Univs.*, 795 F.2d 1281, 1289 n.15 (7th Cir. 1986) ("[R]egression analysis is subject to misuse and thus must be employed with great care ....") (internal quotation marks omitted)); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010) (excluding regression analysis that "has very little explanatory power" because it failed to account for "major factors").  This Court should do the same here because Sacks's technique and his application of that technique to this case are so fundamentally unreliable that his testimony carries "very little explanatory power," and risks misleading the jury into awarding significant damages for a failing company.

1.   **Sacks's Regression Technique is Both Unreliable as a Valuation Method and Unreliably Applied to This Record.**

Sacks's method of calculating hiQ's valuation at the time of a hypothetical Series C round is not just unusual—Sacks conceded that it is unprecedented and has never been used in *either* a real-world business *or* in the academic literature.  CE 1005-06, 1008-09 (Sacks Dep.).  That is damning under Rule 702, because one of the key considerations for the reliability of a methodology under that rule is whether the technique has "general acceptance."  *Daubert*, 509 U.S. at 593.

To ponder Sacks's approach is to appreciate how extraordinary it is.  Imagine an investor considering an investment in a company.  "We are a valuable business," the company says—"a previous investor once thought we were worth ▮▮▮▮▮."  "We would be happy to consider the investment," the investor replies.  "Just give us the opportunity to evaluate your particular business model, assess the details of your assets and liabilities, consider your growth since your last valuation, and review your projections for your future financial performance."  "Oh, none of that information will be necessary," the company assures.  "The only thing you need is our prior valuation.  You can simply assume from there that our valuation has changed in a way that is precisely equal to the average change in valuation for 250 other companies in a range of businesses that have at least some apparent connection to what we do.  Here's a handy equation."  No investor would accept this analysis.  Sacks identified no investor, no economist, no academic, no court, and no one else who has ever relied on anything like his technique.  CE 1005-06, 1008-09 (Sacks Dep.).  And no jury should be asked to award damages on the basis of something so spurious.

Sacks's invented regression technique suffers from a host of problems that explain why no one would ever use it to value a company.  In building any regression model, it is required for admissibility under Rule 702 that the analysis consider "major factors" that account for "other possible causes" of correlation that appear in the regression results.  *In re REMEC*, 702 F. Supp. 2d at 1273.  An appropriate model should therefore explore, test for, and rule out alternative causes of correlation by identifying alternate reasons for correlation and eliminating them.  *See In*

15

*re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 981 (C.D. Cal. 2012) ("The law is clear that [an expert] must account for major factors" and "cannot simply ignore them and perform the analysis as if they did not exist.").

Yet with respect to Sacks's regression, the only inputs are a single independent variable— a company's value at Series B—and a single dependent variable—the company's value at Series C.  CE 1109 (Sacks Rpt. ¶ 90) ("I rely on a regression approach to estimate how C round pre-money valuations related to B round post-money valuations…").  Sacks does not consider *any other variable* that could explain performance from one investment round to the other.  The regression ignores whether the dataset firms compared with hiQ in any major factor, including (1) whether the dataset firms had similar "trailing 12-month revenue," CE 1018 (Sacks Dep.); (2) "were similarly profitable" or unprofitable, *id.* ("I don't even know if they report profitability."); (3) had similar "investor profile[s]" (i.e., the number of investors and investment amounts), CE 1020 (Sacks Dep.); or (4) whether any of the dataset companies faced challenges similar to those faced by hiQ such as hiQ's inability to collect a key raw material for its products (LinkedIn Data), *id.* at 1020A-1021.  Sacks's omission "significant variables that are quantifiable from" from his analysis renders his "study … so incomplete that it is inadmissible as irrelevant and unreliable." *In re REMEC*, 702 F. Supp. 2d at 1273.

Sacks also made no attempt to control for major causal factors by excluding non-comparable firms from his dataset.  *See In re Live Concert*, 863 F. Supp. 2d at 982–83 (excluding expert regression analysis where it "fails to account for any 'major factors' … [and] simply did not test them").  He simply did not consider whether the companies swept in by his broad definitional criteria had any features that would suggest they carry predictive value for hiQ.  And just as problematic as the companies Sacks included in his dataset are those his technique *excludes*: every company that failed entirely *before* reaching Series C funding and would have a Series C value of $0.  That makes no sense on this record, which shows that hiQ ███████ ██████████████████████████████████████████████, and hiQ's condition as of May 2017 was dire.  *Supra*, Stmt. of Facts § A.

The resulting dataset is essentially an index of all venture-funded companies in industries

16

so broad that they are effectively meaningless (e.g., "Predictive Analytics," "Big Data," and "Software as a Service"). Sacks suggests, without explaining exactly why, that hiQ should be valued based on the average performance of the overall index of 257 companies. Intuitively, building such a broad index of companies to predict the performance of a single company makes little sense. The S&P 500,[6] for example, is an index that tracks the market performance of around 500 publicly traded companies. The index goes up and down, reflecting the average performance of the index, but no one would use it to assess the value of a single company in the index. That is not what it is for—just the opposite, the point of the index is to wash out company-specific details. There may be some correlation in the performance of the index because the companies may face some of the same factors (e.g., prevailing economic environment), but the performance of the index as a whole has little causal connection to the performance of any particular company in the index. And consistent with common sense, courts exclude under *Daubert* regression analyses that attempt to peg one company's fiscal performance to an industry index without controlling for other causal variables. *In re REMEC*, 702 F. Supp. 2d at 1272–73 (excluding expert opinion that bases damages on "industry index" that does not "account for other possible causes" of value change); *see also* Ref. Manual on Sci. Evid. at 309 ("A correlation between two variables does not imply that one event causes the second."). This Court should similarly exclude Sacks's technique here.

### 2. The Predicted Value of hiQ is Statistically Meaningless.

Unsurprisingly in light of the above defects, testing Sacks's regression model with standard statistical analysis reveals that his attempt to predict Series C valuation based on Series B valuation gives worthless results. His regression carries a massive variance from the average amongst companies in the dataset, leaving it with no statistically significant predictive power as to hiQ's hypothetical value and rendering the analysis useless to the jury.

To assess this sort of variance, courts consider statistical measures of "confidence" and related intervals. "Confidence intervals (familiar as the 'margins of error' reported in predictions

---

[6]    S&P Dow Jones Indices, *S&P 500 Overview*, https://www.spglobal.com/spdji/en/indices/equity/sp-500/#overview.

of election outcomes) are statistical estimates of the range within which there can be reasonable

confidence that a … prediction is not the result of chance variability in the sample on which the

correlation or prediction was based; 95 percent confidence is the standard criterion of reasonable

confidence used by statisticians." *ATA*, 665 F.3d at 895.[7]  As discussed *supra*, Stmt. of Facts § B,

measuring confidence of a predicted value yields a "prediction interval" or "standard error of the

forecast" ("SEF")).  In simple terms, if a model, based on variable *x*, can predict variable *y* within

a narrow interval at the standard 95% confidence level, the model has significant explanatory

power—the tight correlation suggests that *x* carries great statistical significance.  If, by contrast,

the interval is very wide, *x* does not effectively explain *y*.

The prediction interval for Sacks's model shows staggering variance and "is so wide that

there can be no reasonable confidence in [it]," *ATA*, 665 F.3d at 896.  Although Sacks did not

himself calculate a prediction interval, CE 1043-44 (Sacks Dep.) ("I don't have a model that I

would use to talk about the uncertainty about what we are calling the prediction interval."),

LinkedIn's expert, Professor Hochberg, did, and Sacks agreed that the calculations are correct.

CE 1038-42 (Sacks Dep.).

At the generally accepted 95% confidence standard, the prediction interval for hiQ's

Series C valuation covers *hundreds of millions of dollars* from █ ███████████.  That

is, there is no statistically significant difference between Sacks's predicted value for hiQ of ██

█████, a valuation of $0, and a valuation of █████████.  The massive prediction interval in

Sacks's model is several times the size of the $90 million interval the Seventh Circuit rejected in

*ATA* as too large to have any explanatory power.  *ATA*, 665 F.3d at 896.  Because it gives no

statistically significant valuation number upon which it is reasonable to rely, Sacks's regression

will *not* "assist the trier of fact to understand or determine a fact in issue."  *Icon-IP Pty Ltd. v.*

*Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 939 (N.D. Cal. 2015).

---

[7] Confidence intervals generally measure standard error around population average, Ref. Manual on Sci. Evid. 244; prediction intervals measure the same thing, standard error, around a predicted value, *id.* 348–49.

[8] As a practical matter, a company's valuation does not drop below zero.

MOT. TO EXCLUDE SACKS
NO. 17-cv-03301-EMC

1    There are other significant problems with Sacks's regression exposed by the prediction

2 interval calculation.  Any "confidence interval that contains zero is not statistically significant."

3 CE 1035 (Sacks Dep.).  That is of course because zero has no discernable statistical difference

4 from any other value in the interval at the given confidence level and "the expert cannot reject the

5 hypothesis" that the true result is zero.  Ref. Manual on Sci. Evid. at 343.  In this case, each

6 interval from 80% confidence to 99% spans zero by tens of millions of dollars, meaning that

7 Sacks's regression cannot "reject the hypothesis" that hiQ's actual value at Series C would have

8 been zero.  CE 1017 (Sacks Dep.) ("[I]t is possible that if a company fails to hit Series C that the

9 value could go to zero[.]").

10    The mathematical calculation of the prediction interval itself shows that Sacks's

11 regression is inherently unreliable; considering real companies in the dataset shows why that is.

12 One example, Tapjoy, had an initial Series B valuation of $107.55 million and a Series C

13 valuation of $41 million—a decrease of about $60 million.  CE 1025-26 (Sacks Dep.).  But

14 plugging Tapjoy's Series B value into the regression equation yields a predicted value of *$278.08*

15 *million*, deviating from actual by *nearly a quarter billion dollars* ($278.08 million – $41 million).

16 CE 1027-28 (Sacks Dep.).  Another example, Bounty Jobs, has an actual Series B value of $84

17 million, and an actual Series C value of $11 million.  CE 1029 (Sacks Dep.).  But plugging

18 Bounty Jobs' actual Series B value into the regression equation yields a predicted value of $219.2

19 million—again, over $200 million different from the actual.  CE 1030-31 (Sacks Dep.).

20

21

| Company | Actual Series B Valuation | Actual Series C Valuation | Predicted Series C Valuation | Difference Between Actual/Predicted |
|---------|---------------------------|---------------------------|------------------------------|-------------------------------------|
| BountyJobs | $84 million | $11 million | $219.2 million | $208.2 million |
| Tapjoy | $107.55 million | $41.06 million | $278.075 million | $237 million |

22

23

24 Other examples are hundreds of millions of dollars off the regression line used to value hiQ as well.

25 CE 1030-31 (Sacks Dep.).

26    Sacks's failure to model the uncertainty of his prediction and evaluate reliability is itself

27 sufficient to exclude his regression analysis, as "the proponent of the expert bears the burden of

28 proving admissibility," i.e., that the evidence is "both reliable and relevant."  *Icon-IP*, 87 F. Supp.

1   3d at 938–39.  Sacks had no good excuse for his failure to model uncertainty, guessing without

2   analysis that his model's uncertainty is "smaller than the uncertainty associated with any other

3   method."  CE 1045 (Sacks Dep.).  But an unreliable method is *not* admissible because it is less

4   unreliable than alternatives.  And once modeled and the actual data considered, the uncertainty of

5   his prediction is shown to be so wide that it provides no reasonable or reliable information to the

6   jury to assist in its evaluation of hiQ's claimed value.  Thus, the opinion should be excluded.

7   *ATA*, 665 F.3d at 896.

8   **II.     THIS COURT SHOULD EXCLUDE SACKS'S SUBSET DAMAGES OPINION**

9        Sacks's subset damages opinion must also be excluded because he did not perform the

10  appropriate net profits analysis and his methodology "double counts" as he does not remove from

11  his revenues what hiQ actually earned from customers.

12      **A.     Sacks's Subset Damages Opinion is Not Based on the Required Loss of Net**
            **Profits Methodology.**
13

14       As explained above, where a defendant's wrongful actions result in interference with an

15  economic relationship, the proper measure of damages is based on loss of net profits.  *Parlour*

16  *Enters.*, 152 Cal. App. 4th at 287 ("Damage awards in injury to business cases are based on net

17  profits.").  "Net profits are the gains made from sales after deducting the value of the labor,

18  materials, rents, and *all expenses*, together with the interest of the capital employed [i.e.,

19  opportunity cost]."  *Id.* (emphasis added) (quotation marks omitted).  To establish loss of net

20  profits "[a] plaintiff must show loss of net pecuniary gain, not just loss of gross revenue."  *Id.*

21  Sacks's subset damages opinion fails to do so in any reliable way.

22       *First*, the lost profits calculation is facially wrong because it projects *profits* from █

23  ██████████████ . CE 1057 (Sacks Dep.) ("█████████████████████████

24  ███████████████████████████")  Under California law, however,

25  a consistently ███████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ██████" *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 778 (2012) ("An *established*

28  *company* may base its claim to future profits on evidence of its *past profits*." (emphasis added)).

Here, even if hiQ's contracts in existence during May 2017 were to continue into the future, the evidence ███████████████████████████████████████████████████████ ███████████████████████ CE 1425-28 (████████████████████████████████████ ████████████).

 *Second*, the lost profits calculation is incorrect as a matter of law because even if hiQ could show future lost profits based on its track record (it cannot), Sacks failed to deduct *all expenses* as required.  *Parlour Enters.*, 152 Cal. App. 4th at 287.  For each contract Sacks projects into the future, Sacks calculates expected revenues and from that figure deducts only costs of goods sold ("COGS") and a projected cost to pay workers to scrape data from LinkedIn.  CE 1116-17 (Sacks Rpt. ¶¶ 119-20); CE 1050 (Sacks Dep.).  Sacks did not deduct anything else, including marketing costs, rents, product development, costs to obtain data necessary to scrape ("Turking"), or overhead.  CE 1051-55 (Sacks Dep.).  Of course, hiQ's existing income statements included all those costs, which is why, █████████████████████████████ ████████████████████████. CE 1425-28 (████████████████████████████████████ █████).  Had Sacks deducted *all expenses* as required, even on a pro-rata basis, the outcome of his subset damages analysis would have been ████████████.  *Parlour Enters.*, 152 Cal. App. 4th at 287 (To establish loss of net profits "a plaintiff must show loss of net pecuniary gain, not just loss of gross revenue." (quotation marks omitted)).

 *Third*, because hiQ has ████████████████████, any lost profits claim must be based on evidence ████████████████████.  "While lost profits can be established with the aid of expert testimony, economic and financial data, market surveys and analysis, business records of similar enterprises and the like, the underlying requirement for each is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed."  *Sargon Enters., Inc.*, 55 Cal. 4th at 776 (quotation marks omitted).  Sacks, however, conducted no analysis to determine if hiQ was ████████████ ████████████████████.  He did not "██████████████████████████████████████ ██████████████," nor did he "███████████████████████████████████" to assess a ██████████████████.  CE 1058-59 (Sacks Dep.).  Simply put, Sacks is "████████████

1  ████████████████████████████████████████████████████ and thus has no

2  opinion to offer to support hiQ's ███████████████████. CE 1059 (Sacks Dep.);

3  *Sargon Enters.*, 55 Cal. 4th at 776 (affirming exclusion of expert who did not provide the proper

4  net profits analysis).

5      ## B.   The Lost Profits Analysis Double Counts as Lost Profits Revenues hiQ

6      **Actually Received.**

7      Both of Sacks's opinions (full damages and subset damages) rest on an instructed

8  assumption that the C&D letter destroyed hiQ's business as of May 23, 2017.  CE 1046-47 (Sacks

9  Dep.).  Accordingly, he "stopped [his] analysis on the date of the [C&D]" and did not consider

10  any actual revenues received by hiQ.  Because several customers renewed in 2018, Sacks

11  impermissibly double-counts as damages revenues received from those customers.  CE 1066

12  (Sacks Dep.) ("Well, the – money that they paid after 2018 should be subtracted from damages");

13  CE 994 (Sacks Dep.) ("[A]ny double counting in the subset damages should be netted out and

14  you believe you've done that?  A. Yes."); *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 383

15  (S.D.N.Y. 2014) (noting that an expert opinion is "not reliable" where it "contained material

16  errors such as double-counting" (quotation marks omitted)); *see Snyder v. Bank of Am., N.A.*, No.

17  15-CV-04228-KAW, 2020 WL 6462400, at *5 (N.D. Cal. Nov. 3, 2020) (excluding an opinion

18  "double-counting the need for a foundation replacement" as damages as "unreliable"), *appeal*

19  *filed*, No. 21-15350 (9th Cir. Mar. 1, 2021).

20      Sacks includes in his subset damages calculation several customers that renewed their

21  contracts with hiQ and continued paying hiQ's fees into 2018.  *Compare* CE 1125B (Sacks Work

22  Paper E) *with* CE 2072 (hiQ ledger showing 2018 payments).  As reflected in hiQ's general

23  ledger, hiQ customers including ███████████████████████████████████

24  ████████████████████████ all renewed and paid revenue to hiQ in 2018, and should have

25  been netted out of Sacks's subset damages calculation.  The calculation thus double-counts and it

26  is unreliable as a matter of economics and the law.

27      ## CONCLUSION

28      For the foregoing reasons, LinkedIn respectfully requests that the Court exclude the

testimony of hiQ's proffered expert Benjamin A. Sacks because both his full damages and subset damages opinions are (1) contrary to law and (2) inherently unreliable, and once excluded, any remaining opinion becomes irrelevant.

Dated: August 5, 2022                                    Orrick, Herrington & Sutcliffe LLP


By: _____ */s/ Annette L. Hurst*_____
                                                                ANNETTE L. HURST
                                                                Attorney for Defendant
                                                                LinkedIn Corporation

23