1  ANNETTE L. HURST (SBN 148738)
   ahurst@orrick.com
2  RUSSELL P. COHEN (SBN 213105)
   rcohen@orrick.com
3  PAUL F. RUGANI (SBN 342647)
   prugani@orrick.com
4  CATHERINE Y. LUI (SBN 239648)
   clui@orrick.com
5  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
6  DANIEL JUSTICE (SBN 291907)
   djustice@orrick.com
7  EMILY RENZELLI (*Pro Hac Vice*)
   erenzelli@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
9  San Francisco, CA  94105-2669
   Telephone:   +1 415 773 5700
10 Facsimile:   +1 415 773 5759

11 *Attorneys for Defendant/Counterclaimant*
12 *LinkedIn Corporation*

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16 | hiQ Labs, Inc., | Case No. 17-cv-03301-EMC |

17 | Plaintiff, | **COMPENDIUM OF EVIDENCE FILED IN SUPPORT OF LINKEDIN CORPORATION'S AUGUST 5, 2022 MOTIONS (1 OF 6)** |

18 | vs. | |

19 | LinkedIn Corporation, | Date:        September 29, 2022 |

20 | Defendant. | Time:        1:30 p.m. |
                  Courtroom:   5 – 17th Floor (Zoom)
21                Judge:        Hon. Edward M. Chen

22

23 | LinkedIn Corporation, | Complaint Filed:   June 7, 2017 |
                             Trial Date:        February 27, 2023
24 | Counterclaimant, | |
   | vs. | |
25 | hiQ Labs, Inc. | |
26 | Counterdefendant. | |

27

28

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 1 | Deposition Transcript of Jenelle Bray (Excerpts) | 05/18/2022 | | 1 |
| 2 | Deposition Transcript of Boris Dev and exhibits (Excerpts) | 05/04/2022 | | 16 |
| | **Dep. Ex. 231 –** Email string between Dev and Weidick re: Your application for private LinkedIn API access (3/23/17) (hiQ_00200007-08) | 03/27/2017 | | 49 |
| | **Dep. Ex. 237 –** Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 51 |
| 3 | Deposition Transcript of Daniel Francis and exhibits (Excerpts) | 05/25/2022 | | 53 |
| | **Dep. Ex. 1335 –** hiQ Elevate Conference Notes (LINK_HIQ_000184276-77) | 04/20/2017 | | 62 |
| 4 | Deposition Transcript of McKinsey & Co. by and through 30(b)(6) designee Christopher Gagnon | 06/27/2022 | | 64 |
| | **Dep. Ex. 591 –** Email string between Gagnon, Veynerchuk, et al. re: departure announcement (hiQ_00580838-40) | 02/04/2017 | | 77 |
| 5 | Deposition Transcript of Genevieve Graves and exhibits (Excerpts) | 05/25/2022 | | 80 |
| | **Dep. Ex. 498 –** hiQ Tech Stack: Product Suite PPT (hiQ_00545758) | Undated | | 129 |
| | **Dep. Ex. 503 –** Email from Graves to Hammond, et al. re: Insufficient Data Coverage (hiQ_00023356-59) | 07/13/2016 | | 144 |
| | **Dep. Ex. 510 –** Email string between Miller, Graves, et al. re: Banned from LinkedIn (hiQ_00143432-33) | 07/14/2015 | | 148 |
| | **Dep. Ex. 512 –** Email from Cole to Marshall re: NDA, Training, and VPN access (hiQ_00191862-78) | 01/29/2016 | | 150 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 514 –** Email string between Cole, Graves, et al. re: feedback: list of frustrations (hiQ_00174514-15) | 05/22/2016 | | 167 |
| | **Dep. Ex. 525 –** Email string between Graves and Medeiros re: 2016 Customer Churn (hiQ_000855562-64) | 11/15/2016 | | 169 |
| 6 | Deposition Transcript of Yael Hochberg, Ph.D. and exhibits (Excerpts) | 07/29/2022 | | 172 |
| | **Dep. Ex. 1385 –** Expert Report of Yael Hochberg, Ph.D. (Appendix C Materials Considered removed) | 06/07/2022 | | 180 |
| | **Dep. Ex. 1386 –** Expert Rebuttal Report of Yael Hochberg, Ph.D. | 06/30/2022 | | 283 |
| 7 | Deposition Transcript of Darren Kaplan and exhibits (Excerpts) | 05/04/2022 | | 313 |
| | **Dep. Ex. 10 –** Email from McNutt to Cole re: Question [LinkedIn User Agreement and turking] (hiQ_00189601) | 05/05/2016 | | 328 |
| | **Dep. Ex. 17 -** hiQ Confidential Board Deck PPT (discussing state of the business, engineering and product update, financials, and administrative) (hiQ_003177150 | 02/08/2017 | | 329 |
| 8 | Deposition Transcript of Darren Kaplan (Excerpts) | 05/05/2022 | | 361 |
| 9 | Deposition Transcript of Andrew Kim (Excerpts) | 05/09/2022 | | 376 |
| | **Dep. Ex. 246 -** hiQ Product Strategy PPT (discussing current and new hiQ products) (hiQ_00304309) | Undated | | 397 |
| 10 | Deposition Transcript of James Malackowsi and exhibits (Excerpts) | 07/28/2022 | | 425 |
| | **Dep. Ex. 1379 –** Expert Report of James E. Malackowski (Appendices 2-6 removed) | 06/07/2022 | | 437 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 11 | Deposition Transcript of Stephen B. McElfresh and exhibits (Excerpts) | 07/20/2022 | | 543 |
| | **Dep. Ex. 650 –** Expert Report of Stephen B. McElfresh | 06/07/2022 | | 584 |
| 12 | Deposition Transcript of Darin Medeiros and exhibits (Excerpts) | 05/20/2022 | | 606 |
| | **Dep. Ex. 436 –** Email from Berman to Medeiros re: Completed: Order form for hiQ Labs, Inc.-LSS (hiQ_00352028-30) | 12/23/2015 | | 637 |
| | **Dep. Ex. 437 –** Email from Sennert to Medeiros re: hiQ Labs Account #: 120941 with attached invoices (hiQ_00008090-91; 8509-11; 7822-24; 7273-75; 6812-14; 6668-70; 5955-60) | 06/10/2016 | | 640 |
| | **Dep. Ex. 438 –** Email string between Medeiros, Dick, et al. re: SFDC guide with hiQ's CRM Best Practices (hiQ_00123595-601) | 07/25/2017 | | 662 |
| | **Dep. Ex. 439 –** Email from Medeiros to DeSantis, et al. re: Weekly Update with hiQ Sales Dashboard (hiQ_00175647-50) | 11/28/2016 | | 669 |
| | **Dep. Ex. 443 –** Email from Medeiros to Weidick, et al. re: Customer asking why hiQ didn't scrape through a paid LinkedIn account (hiQ_00619694-97) | 05/16/2017 | | 673 |
| | **Dep. Ex. 447 –** Chat transcript between Medeiros and Barker re: Customer Feedback (hiQ_00443465-75) | 10/11/2017 | | 677 |
| | **Dep. Ex. 455 –** Email from Medeiros to Weidick, et al. re: State of Renewals 2017 (hiQ_00180173) | 10/16/2017 | | 688 |
| 13 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/13/2022 | | 694 |
| | **Dep. Ex. 322A –** Email from Miller to Dev re: scraping tips (hiQ_00084314) | 08/11/2016 | | 729 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 322B** – Tips for [scraping] LinkedIn (hiQ_00084315) | 08/11/2016 | | 730 |
| | **Dep. Ex. 331** – Notes on reverse engineering LinkedIn's defenses (hiQ_00354518-20) | Undated | | 731 |
| | **Dep. Ex. 344** – Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 734 |
| | **Dep. Ex. 350A & 350B** – Email from Cole to Dev with attached file named "The Scraper Wars PPT" (hiQ_00189161-63) | Undated | | 736 |
| 14 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/26/2022 | | 749 |
| | **Dep. Ex. 535** – Email string between Miller and Sharon re: Purchase monthly services (hiQ_00141957-59) | 07/17/2017 | | 770 |
| | **Dep. Ex. 539** – Email string between Cole, Miller, et al. re: turking (hiQ_00359637-38) | 09/27/2017 | | 773 |
| | **Dep. Ex. 540** – Email string between Brokken and Miller re: culling the database nightmare (hiQ_00060671-75) | 12/07/2017 | | 775 |
| | **Dep. Ex. 543** – Email string between Miller, Medeiros, et al. re: Cancelling hiQ services (hiQ_00329112-13) | 05/09/2018 | | 780 |
| | **Dep. Ex. 545** – Chat transcript between Miller, Kim, et al. re: suspension notice from AWS (hiQ_00451932-33) | 05/16/2018 | | 782 |
| | **Dep. Ex. 546** – Chat transcript between Kim, Barta, et al. re: scraping (hiQ_00436300-07) | 06/12/2018 | | 784 |
| 15 | Deposition Transcript of Kevin Murphy and exhibits (Excerpts) | 07/19/2022 | | 792 |
| | **Dep. Ex. 603** – Expert Report of Kevin M. Murphy (Appendix B removed) | 06/07/2022 | | 800 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 16 | Declaration of Kevin Murphy ISO LinkedIn's Motion for Summary Judgment and *Daubert* Motion to Exclude Expert Testimony of Stephen McElfresh and exhibit, No. 17-cv-03301 | 08/04/2022 | | 883 |
| | **Ex. A –** Rebuttal Expert Report of Kevin M. Murphy | 06/30/2022 | | 886 |
| 17 | Deposition Transcript of Alexander Oltmann and exhibits (Excerpts) | 05/13/2022 | | 914 |
| | **Dep. Ex. 4 –** Email string between Oltmann, Kaplan, et al. re: FLAGGING you DEEP Nishar (hiQ_00250311-13) | 03/09/2015 | | 927 |
| 18 | Deposition Transcript of Dan Reid (Excerpts) | 05/19/2022 | | 930 |
| 19 | Deposition Transcript of Paul Rockwell and exhibits (Excerpts) | 05/19/2022 | | 941 |
| | **Dep. Ex. 1233-A –** LinkedIn 3rd Party Scraping PPT (LINK_HIQ_000169080-110) | 04/02/2015 | | 957 |
| 20 | Deposition Transcript of Benjamin Sacks and exhibits (Excerpts) | 07/08/2022 | | 988 |
| | **Dep. Ex. 599 –** Amended Expert Report of Benjamin A. Sacks (Appendices A-B removed) | 06/22/2022 | | 1072 |
| | **Dep. Ex. 608 -** Chart – Calculation 1: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, Before Application of 20% Discount | Undated | | 1124 |
| | **Dep. Ex. 609 –** Chart – Calculation 2: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, After Application of 20% Discount | Undated | | 1125 |
| | **Dep. Ex. 610 –** Sacks Work Paper E Showing Customers Included In Lost Profits (Excerpt of Native Excel file converted to PDF) | Undated | | 1125A |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 21 | Deposition Transcript of Minjae Song (Excerpts) | 07/27/2022 | | 1126 |
| 22 | Deposition Transcript of Mark Weidick (Excerpts) | 03/18/2022 | | 1135 |
| 23 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 05/23/2022 | | 1145 |
| | **Dep. Ex. 475** – Chat transcript between Miller and Weidick re: shutting down scraping (biQ_00442222) | 03/31/2017 | | 1173 |
| | **Dep. Ex. 480** – Email from Weidick to Lustig, et al. re: Reading time 4 mins 39 sec (hiQ_00641062-64) | 04/05/2017 | | 1174 |
| | **Dep. Ex. 486** – Email from Jeremias to Weidick, et al. re: Urgent: Suspension Warning (hiQ_00319806-07) | 04/08/2019 | | 1177 |
| 24 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 06/01/2022 | | 1179 |
| | **Dep. Ex. 489** – hiQ Board Deck PPT (hiQ_00221829) | 05/15/2017 | | 1220 |
| | **Dep. Ex. 556** – Email string between Sharma, Weidick, et al. re: hiQ budget information (hiQ_00705751-54) | 07/13/2020 | | 1254 |
| | **Dep. Ex. 564** – Email string between Weidick and Dev re: Scraping (hiQ_00183419) | 04/11/2017 | | 1258 |
| | **Dep. Ex. 566** – Email string between Miller, Weidick, et al. re: Scraping Update (hiQ_00576322-23) | 04/24/2017 | | 1259 |
| 25 | Deposition Transcript of Lee Womer and exhibits (Excerpts) | 05/11/2022 | | 1261 |
| | **Dep. Ex. 294** – Email string between Womer, Canlas, et al. re: Anti-scraping (LINK_HIQ_000205777-78) | 10/07/2015 | | 1279 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 26 | Deposition Transcript of Xiaofeng Wu and exhibits (Excerpts) | 07/25/2022 | | 1281 |
| | **Dep. Ex. 1361** – LinkedIn's Rule 26 Disclosure of Xiaofeng Wu | 06/07/2022 | | 1307 |
| 27 | Declaration of Paul Rockwell ISO LinkedIn's Opposition to Plaintiff's Motion for Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 26, 2017) (ECF No. 29) | 06/26/2017 | | 1311 |
| 28 | Declaration of Paul Rockwell ISO LinkedIn's Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to FRCP 62.1, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. Sept. 10, 2021) (ECF No. 216.13) | 09/10/2021 | | 1377 |
| 29 | hiQ's Second Supplemental Responses to LinkedIn's Second Set of Interrogatories (No. 16) | 08/03/2022 | | 1387 |
| 30 | Letter from Shaffer to Worcester, et al. re: ESI sources | 04/28/2022 | | 1394 |
| 31 | Email string between counsel for the parties re: hiQ ESI Sources [Splunk] | 06/03/2022 | | 1398 |
| 32 | Email from Skibitsky to Shaffer, et al. re: lost Splunk data | 06/13/2022 | | 1417 |
| 33 | hiQ Sales Order for Pfizer (hiQ_00003890-92) | 11/03/2016 | | 1419 |
| 34 | hiQ Labs Inc. Income Statement (hiQ_00004324) (Native Excel file converted to PDF) | 06/2017 | | 1423 |
| 35 | Email string between Barta, Kim, et al. re: culling the database nightmare (hiQ_00028241-53) | 01/15/2018 | | 1439 |
| 36 | Email string between Williams and Cole re: borrow your SDR team for a few days (hiQ_00080487-91) | 03/15/2016 | | 1453 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 37 | Email from Klevecz to Mechanical Turkers and Cole re: Turking Interface Changes (hiQ_00080559) | 12/03/2015 | | 1459 |
| 38 | Email string between Cherry and Graves re: Another LinkedIn account shutdown (hiQ_00087989-91) | 07/14/2015 | | 1461 |
| 39 | Email from Kaplan to dk.nk41@hiqlabs with hiQ pitch deck showing release timing of Keeper (Control Center) (hiQ_00103925-40) | 09/20/2014 | | 1465 |
| 40 | Master SAAS Agreement between hiQ and BMC Software Inc. (hiQ_00149369-98) | 06/22/2016 | | 1482 |
| 41 | Email string between Cole, "science," et al. re: Weekly Turking Report (hiQ_00174125-28) | 03/10/2017 | | 1513 |
| 42 | Amended and Restated Collaboration Agreement between McKinsey & Co. and hiQ (hiQ_00179991-180005) | 06/30/2016 | | 1518 |
| 43 | Email from Miller to Weidick, et al. re: All-hands AWS cleanup (hiQ_00193748) | 02/02/2018 | | 1534 |
| 44 | Email from Schwade to Graves re: Turking Work Instruction and attachment (hiQ_00211880 & hiQ_00211881) | 06/24/2015 | | 1536 |
| 45 | Board Meeting – Plan Forward (Agenda: Litigation, Hibernation, Assorted Details) PPT (hiQ_00225254) (Native PPT file converted to PDF) | 05/23/2018 | | 1550 |
| 46 | hiQ letter to Weidick re: offer of employment (hiQ_00251922-33) | 02/09/2017 | | 1558 |
| 47 | Record of payments to turkers from Sep. 2015 to Sep. 2016 (hiQ_00316522) (Native Excel file converted to PDF) | Undated | | 1571 |
| 48 | Purchase Order for Honeywell Int'l (hiQ_00318142-47) | 12/07/2017 | | 1586 |
| 49 | Email string between Medeiros, Pauletich, et al. re: Next steps (hiQ_00332055-56) | 09/28/2017 | | 1593 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 50 | Email from Amazon Web Services to ops@hiqlabs.com and Miller re: Your AWS Account has been suspended for non-payment (hiQ_00355253) | 04/20/2020 | | 1596 |
| 51 | Email string between Weidick and Miller re: Belt & suspenders (hiQ_00358094) | 05/07/2018 | | 1598 |
| 52 | Note re: Experiments that Genevieve is running (hiQ_00369157-59) | Undated | | 1600 |
| 53 | Email string between Patch, Kaplan, et al. re: Board Deck (hiQ_00390283-84) | 02/05/2017 | | 1604 |
| 54 | Email string between Weidick, Dev, et al. re: Your application for private LinkedIn API access (hiQ_00429401-02) | 03/23/2017 | | 1607 |
| 55 | Chat transcript between Dev and Miller re: scraping (hiQ_00436623) | 04/18/2017 | | 1610 |
| 56 | Chat transcript between Kim, Miller, et al. (hiQ_00437584-85) | 07/06/2018 | | 1612 |
| 57 | Chat transcript between Miller and Dev re: Luminati (hiQ_00437609) | 05/03/2017 | | 1615 |
| 58 | Chat transcript between Barta, Cole, et al. (hiQ_00438613-15) | 05/16/2018 | | 1617 |
| 59 | Chat transcript between Dev and Miller (hiQ_00439403) | 05/25/2017 | | 1621 |
| 60 | Chat transcript between Dev and Miller re: Luminati (hiQ_00439495) | 05/26/2017 | | 1623 |
| 61 | Chat transcript between Miller and Dev (hiQ_00442040-41) | 06/01/2016 | | 1625 |
| 62 | Chat transcript between Miller, Dev, et al. re: state of scrape (hiQ_00447111-13) | 03/30/2017 | | 1628 |
| 63 | Chat transcript between Miller and Wegener (hiQ_00447584-86) | 08/22/2017 | | 1632 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 64 | Chat transcript between Miller, Dev, et al. (hiQ_00449462-63) | 09/06/2018 | | 1636 |
| 65 | Chat transcript between Wegener and Miller (hiQ_00451103-05) | 05/07/2018 | | 1639 |
| 66 | Splunk Production Scraper Dashboard (hiQ_00457966-67) | 11/08/2016 | | 1643 |
| 67 | Email string between Patch, Graves, et al. re: People not getting paid (hiQ_00463750-54) | 11/05/2015 | | 1646 |
| 68 | Email from Dev to Miller re: [JIRA] (DENG-2) Find alternative sources of proxies (hiQ_00466086) | 01/19/2017 | | 1652 |
| 69 | Purchase Order for Facebook (hiQ_00466148-55) | 06/15/2017 | | 1654 |
| 70 | Software Services Agreement between The Gap and hiQ (hiQ_00466407-25) | 04/15/2015 | | 1663 |
| 71 | Master SAAS Services Agreement between Hartford Fire Ins. Co. and hiQ, and Sales Order (hiQ_00467036-56) | 12/12/2016 | | 1683 |
| 72 | Mutual Non-Disclosure Agreement between American Express Travel Related Services Co. and hiQ, and Sales Order (hiQ_00469682-91) | 11/10/2016 | | 1705 |
| 73 | hiQ Labs Retention Module, Statement of Work between hiQ and Pfizer Inc. (hiQ_00473572-86) | 10/30/2015 | | 1716 |
| 74 | Master Application Service Provider Agreement between Capital One Services LLC and hiQ (hiQ_00521357-412) | 08/15/2016 | | 1732 |
| 75 | hiQ Sales Order for Celgene (hiQ_00521671) | 09/27/2016 | | 1789 |
| 76 | Services Agreement between eBay Inc. and hiQ (hiQ_00521783-805) | 07/29/2015 | | 1793 |
| 77 | Master SAAS Services Agreement between hiQ and UTC Aerospace Systems (hiQ_00536554-64) | 01/15/2016 | | 1817 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 78 | hiQ Sales Order for Box Inc. (hiQ_00542110-13) | 03/31/2016 | | 1829 |
| 79 | License and Services Agreement between hiQ and Comcast Cable Communications Management LLC and Order #1(hiQ_00542226-56) | 09/25/2015 | | 1834 |
| 80 | Master "Software as a Service" (SAAS) Subscription Agreement between Allstate Ins. Co. and hiQ (hiQ_00555778-813) | 10/25/2016 | | 1866 |
| 81 | PA Trend Report 2017 PPT (hiQ_00568929-60) | Undated | | 1903 |
| 82 | Master SAAS Services Agreement between hiQ and Apax Partners LP and Sales Order for Apax (hiQ_00580069-88) | 01/13/2017 | | 1936 |
| 83 | hiQ Revenue spreadsheet (hiQ_00621582) (Excerpt of Native Excel file converted to PDF) | Undated | | 1957 |
| 84 | The Hershey Company SAAS Agreement between Hershey and hiQ (hiQ_00642063-107) | 03/31/2016 | | 1964 |
| 85 | Master SAAS Services Agreement between hiQ and BNY Mellon and Sales Order for BNY (hiQ_00642108-25) | 03/01/2016 | | 2010 |
| 86 | Master SAAS Services Agreement between hiQ and PayPal, Inc. (hiQ_00656809-35) | 01/26/2016 | | 2029 |
| 87 | Consulting Agreement between hiQ and Allan Schwade (hiQ_00679076-77) | 05/24/2016 | | 2057 |
| 88 | Email string between Werlin, Weidick, et al. re: hiQ Investor update (hiQ_00683817-18) | 05/24/2018 | | 2060 |
| 89 | hiQ Company Pages Confluence Wiki (hiQ_00723764) (Excerpt of Native PDF file) | Undated | | 2063 |
| 90 | Email string between Weidick, Gupta, et al. re: turking while logged out (hiQ_00727057) | 09/20/2017 | | 2066 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 91 | Screenshot at 14:31 (hiQ_00727061) (Screenshot of Native Video file converted to PDF) | Undated | | 2068 |
| 92 | hiQ Labs Inc. General Ledger from 8/10/2012 to 9/1/2019 (hiQ_00734930) (Excerpt of Native Excel file converted to PDF) | Undated | | 2071 |
| 93 | Memorandum from Gupta to Distribution List re: Notice of Legal Hold (hiQ_00734977-78) | 06/20/2017 | | 2073 |
| 94 | hiQ Labs, Inc. Response to LinkedIn Cease and Desist Letter, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 7, 2017) (ECF No. 4-11) | 05/31/2017 | | 2076 |
| 95 | Plaintiff hiQ Labs, Inc.'s First Supplemental Responses to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/11/2022 | | 2082 |
| 96 | Plaintiff hiQ Labs, Inc.'s Supplemental Responses and Objections to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/13/2022 | | 2088 |

# Compendium Exhibit 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    ----------------------------------------------x

5    hiQ LABS, INC.,

6              Plaintiff,

7    vs.                              Case No.
                                      17-cv-03301-EMC

8    LINKEDIN CORPORATION,

9              Defendant.

10   ----------------------------------------------x

     AND RELATED CROSS-ACTION.

11   ----------------------------------------------x

12

13      *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

14

15    REMOTE 30(b)(6) VIDEOTAPED DEPOSITION BY ZOOM OF

16              LINKEDIN CORPORATION

17        CORPORATE DESIGNEE: JENELLE BRAY

18           Wednesday, May 18, 2022

19

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

```
 1                    Wednesday, May 18, 2022
 2                         9:05 a.m.
 3   -----------------------------------------------------
 4            THE VIDEOGRAPHER:  Good morning.  We're
 5   going on the record at 9:05 a.m. Pacific Daylight
 6   time on May 18th, 2022.
 7            Please note the microphones are very, very
 8   sensitive and may pick up whispering; however,
 9   please speak slowly with your voices up at all
10   times.
11            Please silence all cell phones and place
12   them away from the microphones as they can interfere
13   with deposition audio.
14            Audio and video recording will continue to
15   take place unless all parties agree to go off the
16   record.
17            This is Media Number 1 of the
18   video-recorded deposition of Jenelle Bray taken by
19   counsel for plaintiff in the matter of hiQ Labs Inc.
20   versus LinkedIn Corporation filed in the United
21   States District Court, Northern District of
22   California.  Case number 17-cv-03301-EMC.
23            This deposition is taking place via
24   Veritext Virtual.  All participants are attending
25   remotely.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 9

1              My name is Brandon Miller from the firm

2      Veritext Legal Solutions; I'm the videographer.  The

3      court reporter is Lynne Ledanois from the firm

4      Veritext Legal Solutions.

5              I'm not related to any party in this

6      action, nor am I financially interested in the

7      outcome.

8              Counsel and all present in the room and

9      everyone attending remotely besides the witness will

10     now state their appearances and affiliations for the

11     record beginning with the noticing attorney and the

12     witness will be sworn in.  Thank you.

13             MR. MULLER:  This is Zane Muller with

14     Quinn Emanuel Urquhart & Sullivan.  Also with me is

15     my colleague Renita Sharma with hiQ Labs.

16             MR. SHAFFER:  This is Nathan Shaffer from

17     Orrick, Herrington & Sutcliffe on behalf of LinkedIn

18     Corporation.  I'm joined by Devon Hanley Cook, also

19     from LinkedIn Corporation, and the witness, Jenelle

20     Bray.

21                     JENELLE BRAY,

22        having been duly sworn, testified as follows:

23                      EXAMINATION

24     BY MR. MULLER:

25         Q    Ms. Bray, could you please state your name

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1   for the record?

2       A    Jenelle Bray.

3       Q    And what is your position at LinkedIn?

4       A    I am a director of engineering of the

5   anti-abuse AI team.

6       Q    And you understand that you're here to

7   testify as a corporate representative on behalf of

8   LinkedIn; correct?

9       A    Yes.

10      Q    Where are you currently located for this

11  deposition?

12      A    I'm in Menlo Park at the Orrick offices.

13      Q    Is anyone in the room with you?

14      A    Yes.

15      Q    Who's in the room with you?

16      A    Nathan Shaffer and Devon Hanley Cook.

17      Q    And you understand that you're testifying

18  under oath?

19      A    Yes, I do.

20      Q    Okay.  Is there any reason why you're

21  unable to answer truthfully today?

22      A    No.

23      Q    Are you ill or under the influence of any

24  psychoactive substance?

25      A    No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36

1          THE WITNESS:  So prior to a few weeks ago,

2    because I work in anti-scraping, my understanding of

3    the cost and damage of scraping had been and is

4    still the same.  I mean, in that it -- I mean, it

5    costs a lot of money and resources to build these

6    defenses.

7          It costs a lot of money to LinkedIn to

8    serve all these profiles to scrapers.  It also

9    causes a lot of damage for like interrupting service

10   for members, for profiles and other parts of

11   LinkedIn.

12         It also costs a lot to like the

13   LinkedIn -- trust in LinkedIn because members find

14   their data in other places.  They didn't have

15   control of where that data went because they down

16   linked and they have control of where their data is

17   used.

18         And also, cost to members because that

19   data is often combined with other third parties'

20   data and used for things like phishing and scams and

21   actually that can cause members like identity theft

22   or -- and money.

23         Then also costs to LinkedIn in terms of

24   like reputation.  Often scraping shows up as things

25   like -- people think accounts were hacked and so

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 37

1   LinkedIn was hacked and there's tens of millions of

2   profiles around.

3          So I think all of that was my

4   understanding before and it is still my

5   understanding.

6   BY MR. MULLER:

7      Q   So your understanding is the same as

8   what's reflected in this list where it says,

9   "Personnel, Physical Plant/Real Estate, Cost for

10  Defenses, cost to serve traffic," that's the same as

11  your understanding of what these scraping

12  interference costs are?

13         MR. SHAFFER:  Objection, vague and

14  mischaracterizes testimony.

15         THE WITNESS:  So my understanding is that

16  there are a lot of costs including the ones that I

17  said before and, yes, including personnel, real

18  estate, to have those personnel and to have the

19  computer systems and -- but also they said like the

20  damage to members, damage to LinkedIn, the damage to

21  like the infrastructure, et cetera.

22  BY MR. MULLER:

23     Q   Are there any understanding of damage that

24  you can identify that's not listed on this document?

25     A   I think this document is fairly complete.  I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 83

1    users.

2              It could be for various reasons, but

3    essentially that service was not working for users.

4         Q    Has a scraping attack ever brought down a

5    service on LinkedIn?

6              MR. SHAFFER:  Objection, vague.

7              THE WITNESS:  Yes, a scraping attack has

8    brought down a service on LinkedIn.

9    BY MR. MULLER:

10        Q    Can you describe the circumstances that

11   you're familiar with of any scraping attacks that

12   have brought down services at LinkedIn?

13        A    There actually have been several times.  I

14   can't speak to all of them.

15             We have had scraping attacks -- we've

16   definitely had several times scraping attacks bring

17   down our defense services so then it would allow

18   like all scraping to happen with no defenses.

19             We have had attacks that I believe have

20   brought -- like I'm not sure for how long, but I've

21   made like the profile service, so when you want to

22   look at a member's profile, I think unavailable.

23   But I'm not sure how long it was unavailable.

24             And we've also had scraping attacks that

25   can at least -- I think I described this before,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 84

1   there's like shared systems, maybe shared data that

2   the scraping defenses use and then other parts of

3   LinkedIn use.

4           So we've had scraping attacks that have

5   made those databases go down.  And then that can

6   degrade services in other parts of LinkedIn.

7           But generally, it's a very high-volume

8   scraping attack for guest profiles that causes this.

9      Q    When you say "high volume," can you give

10  me an idea of the scale that you're talking about?

11     A    Yes.  So I mean, even now -- when we say

12  attacks, there are constant attacks on -- like

13  constant scraping attacks on guest profiles.

14          So currently, we have almost 90 --

15  definitely more than 95 percent of our requests are

16  scraping.  So I think we have something like on a

17  normal week, like 5 billion requests to --

18  5 billion, something like 5 billion scraping

19  requests to LinkedIn.

20          So sometimes we'll see that like all at

21  once and we'll have -- I mean, I don't think I can

22  quote numbers, but I mean, just billions of

23  requests.  We see billions of requests in a day.

24     Q    In a typical day you see billions of

25  requests?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 87

1    defenses to try to get around our defenses.

2            So you can't just put in a defense and

3    then, you know, we're done with it.  You can't do

4    that.  You have to always be investing more time and

5    resources to like improving defenses because the

6    adversaries will also be improving their defenses.

7        Q    And so can you describe -- you said that

8    you have to be constantly improving defenses.

9            Can you give me a sense of the investments

10   that LinkedIn has made in the last year to improve

11   its defenses against these attacks?

12       A    So, I mean, there is a whole team, there's

13   like part of my team that works -- you know, several

14   AI engineers, several infrastructure engineers, data

15   scientists, product manager, investigators, they are

16   always working on -- that's their job is to work on

17   anti-scraping.

18           And so the different -- there's like

19   improvement in the infrastructure, so when there are

20   big attacks, like nothing -- like things don't go

21   down as often.

22           There is improvement in the models.  I

23   mean, my team has built models that -- this is

24   actually quite unusual, but because the attacks

25   change so quickly, these models have to take in new

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

1   data and retrain, so like -- and deploy

2   automatically like every three hours to respond to

3   changing attack patterns, so all the infrastructure

4   to deploy that.

5             There's also like scaling the actual

6   infrastructure, like if there's going to be more

7   requests, we might need more servers to handle those

8   requests.

9             So basically we're always working on

10  anti-scraping.  And then there's also the incident

11  management team, the -- when there are attacks that

12  are not well defended by our current defenses, they

13  will put in new rules and then we work with them to

14  add the signals that they found in the rules, like

15  put those into our models and then like improve our

16  models.

17       Q    When did LinkedIn start implementing the

18  anti-scraping defenses that you're describing?

19             MR. SHAFFER:  Objection, compound and

20  vague.

21             THE WITNESS:  So the defenses that I am

22  describing now are -- you know, are the state of the

23  art right now.  But we have always -- I started

24  eight and a half years ago.

25             The first project I worked on was building

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

1    a model for the scraping.  There already existed

2    scraping -- some scraping defenses then.

3              The volume of scraping was -- like has

4    increased and the sophistication of the scrapers

5    have increased, so I'd say we definitely have more

6    and more investment in it, but we've had

7    anti-scraping defenses for like longer than --

8    defenses and people working on it for definitely

9    longer than I've been there.

10   BY MR. MULLER:

11        Q    Do you know how much longer?

12        A    I don't know.  I mean, I think -- no, I

13   mean, I can't say specifically.

14        Q    Do you think there was ever a time when

15   LinkedIn had a website that did not have

16   anti-scraping defenses?

17        A    I don't know for sure.  I mean, given how

18   much we care about member data not being found other

19   places, I would assume that there have always been.

20   But I don't know what the defenses were like right

21   when LinkedIn was formed, for example.  I don't know.

22             But I know we have had an investment in

23   scraping for like -- I mean, LinkedIn is 15, 18 -- I

24   mean for a very long time.

25             MR. MULLER:  Tevin, would you please put

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 115

1   logged in.

2          And logged-in profiles -- not for

3   scraping -- sorry, that's not what I meant.

4          They specify like what can be seen for

5   logged-out profiles versus logged-in profiles.

6          Then also for logged-in profiles, there is

7   just more information available on logged-in

8   profiles.

9   BY MR. MULLER:

10      Q     So where it says "Profiles Scraped

11  (Guests)" prevented as 179 million, can you just

12  explain to me what that figure represents?

13      A     So before I described how for guest

14  scraping, there is like a series of defenses and a

15  series of like checkpoints and then for one request,

16  you have to get through like all of these different --

17  get through all of these gates essentially.

18          And the prevented is the number of

19  profiles we stop at all these different checkpoints,

20  at all these different gates that we determined were

21  scraping.

22          So the scrapers were not able to view the

23  profile and we successfully blocked those requests

24  from viewing the profile.

25      Q     Where it says prevented 97.8 percent for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 116

1    "Profiles Scraped (Guest)", what does that mean?

2          A    So that is the -- it should be the

3    prevalence should be the number -- sorry.  So it would

4    basically be what percentage did we prevent.

5               So you see there is 179 million prevented

6    and 4 million scraped.  So that would be -- so it

7    would be 179 over 179 plus 4.  So it would

8    essentially be the number of requests -- scraping

9    requests that we successfully blocked that did not

10   serve the profile.

11         Q    This is from 2019; correct?

12         A    Yes.

13         Q    And earlier you testified that at present,

14   the number of attempted scrapes per week is in the

15   billions; is that correct?

16         A    Yes.  I said on like a kind of normal week,

17   often we have -- yes, we have billions left in like a

18   round.  But it changes a lot because there's so many

19   different attacks.  But maybe about 5 billion that we

20   prevent a week.

21         Q    Do you know if the percentage is

22   comparable currently to the percentage that is

23   represented in this document?

24         A    So, I mean, one thing is this is just one

25   week.  So this varies a fair amount.  And it varies

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 176

1              I, LYNNE M. LEDANOIS, a Certified

2    Shorthand Reporter of the State of California, do

3    hereby certify:

4              That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that a record of the proceedings was made by me

7    using machine shorthand which was thereafter

8    transcribed under my direction; that the foregoing

9    transcript is a true record of the testimony given.

10             Further, that if the foregoing pertains to

11   the original transcript of a deposition in a Federal

12   Case, before completion of the proceedings, review

13   of the transcript [ ] was [ ] wasn't requested.

14             I further certify I am neither financially

15   interested in the action nor a relative or employee

16   of any attorney or party to this action.

17             IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: May 19, 2022.

21

22

23

24   _____

     LYNNE MARIE LEDANOIS

25   CSR No. 6811

# Compendium Exhibit 2

# (CE0049-0052 of Exhibit Filed

# Under Seal)

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4   hiQ Labs, Inc.,

5          Plaintiff,

6      vs.                        No. 17-cv-03301-EMC

7   LinkedIn Corporation,

8          Defendant.
   _____/

9

10  LinkedIn Corporation,

11          Counterclaimant

12  vs.

13  hiQ Labs, Inc.

14          Counterdefendants.
   _____/

15

16              CONFIDENTIAL

17          VIDEOTAPED DEPOSITION OF

18                BORIS DEV

19          Wednesday, May 4, 2022

20

21

22  Stenographically Reported by:

23  GINA V. CARBONE, CSR, RPR, RMR, CRR, CCRR

24  California State Lic. No. 8249

25  Job No. 10100029

**Confidential**

```
 1   reporter today is Gina Carbone and she will now

 2   swear in the witness.

 3          MR. WIT:  Is there anyone on Zoom who needs

 4   to appear?

 5          MS. HURST:  We do have someone watching

 6   remotely.

 7          MR. WIT:  Okay.  Can we get the name of

 8   whoever it is?

 9          MS. HURST:  Yeah.  Our source code

10   reviewer, Junsu Choi, is logged in remote.

11          MR. WIT:  Thanks.

12

13                   BORIS DEV,

14              having been sworn, was

15          examined and testified as follows:

16

17              EXAMINATION BY MS. HURST

18   BY MS. HURST:

19       Q.  Good morning, Mr. Dev.

20       A.  Good morning.

21       Q.  My name is Annette Hurst and I represent

22   LinkedIn.  As you heard before we started, we've all

23   agreed to wear masks, you know, for everyone's

24   safety today.  But if you can't understand me, let

25   me know and I'll take mine off.  All right?
```

Confidential

```
 1              Have you ever had a deposition taken

 2    before?

 3         A.   No.

 4         Q.   All right.  I'm sure that Mr. Wit has had a

 5    chance to meet with you and explain the process but

 6    I'll just go over a couple of the rules.  All right?

 7         A.   Yes.

 8         Q.   Okay.  I'm going to ask you a series of

 9    questions, and if you could wait until my question

10    is finished before you answer that will make the

11    record clear for the court reporter who is taking

12    down everything that we both say.  All right?

13         A.   Okay.

14         Q.   And I will also refrain from interrupting

15    your answers for the same reason.

16              You're under oath today.  It's the same

17    oath that you would take if we were in court and you

18    were testifying in front of a jury.  You should

19    treat it with the same level of seriousness.

20              Do you understand that?

21         A.   Yeah.

22         Q.   If there's anything you don't understand

23    about my question, please ask for clarification.  If

24    you answer the question, then I will assume that you

25    understood it; is that clear?
```

CE 0019

```
1        A.   Yeah.
2        Q.   All right.  And after the deposition you'll
3   have an opportunity to review the transcript of your
4   questions and answers and make corrections to them;
5   however, you should give your best testimony here
6   today and not expect to be able to change your
7   answers afterwards.
8             Do you understand that?
9        A.   Yeah.
10       Q.   Are you under the influence of any
11  medication or is there any other reason why you
12  can't give your best testimony today?
13       A.   No.
14       Q.   By whom are you currently employed?
15       A.   Simple Legal is the name.  The parent
16  company is called Onit, and the product that I work
17  on is Simple Legal.  And that's that.
18       Q.   All right.  And for how long have you been
19  working for Onit?
20       A.   March 1st, give or take a few days.
21       Q.   March 1st of this year, 2022?
22       A.   Yes.
23       Q.   Okay.  And prior to that, by whom were you
24  employed?
25       A.   Sight Machine.
```

CE 0020

1      Q.  Okay.  And what did you work on at Sight

2   Machine?

3      A.  Are you asking what my job title was?

4      Q.  Sure.

5      A.  Software -- back end software engineer.

6      Q.  All right.  And how long were you with

7   Sight Machine?

8      A.  Three years, about.

9      Q.  So 2019 to 2022?

10      A.  No.  I think -- I think it was like

11   September 2018.  So I guess it was a little more

12   than -- did I get three and a half years there?

13      Q.  Sure.

14      A.  Yeah.

15      Q.  September '18.  All right.  And --

16      A.  So --

17      Q.  Sorry.

18      A.  No, I'm sorry.  You know what I mean, just

19   thinking about it.

20      Q.  Sure.  So you started with Sight Machine

21   around September 2018?

22      A.  I think so.  Yeah.

23      Q.  All right.  And you were there until March

24   1st -- or sometime before March 1st of this year?

25      A.  Yeah.

CE 0021

**Confidential**

1     Q.  Okay.  And prior to that, were you employed

2  by hiQ?

3     A.  Yes.

4     Q.  Are you still employed by hiQ?

5     MR. WIT:  Objection to form.

6     You can answer.

7     THE WITNESS:  From what I know, it's a

8  comp- -- it's a complex topic, but from what I know,

9  yes.

10  BY MS. HURST:

11     Q.  Okay.

12     A.  Mark was trying to explain it to us that

13  you guys -- you're not going to get a paycheck, but

14  you're employed.

15     Q.  Okay.  Tell me everything you understand

16  about the nature of your current relationship with

17  hiQ.

18     MR. WIT:  Objection to form.  Vague and

19  ambiguous.

20     Also caution the witness not to reveal

21  anything that was the subject of attorney-client

22  communications.  Other than that, you can answer.

23     THE WITNESS:  Repeat the question.

24  BY MS. HURST:

25     Q.  Sure.  Tell me everything that you can that

1   we're going to do better data analysis to query the

2   data and do analytics and make cool charts and

3   plots, then we would do it in Postgres.  So he took

4   some of our data and put it in Postgres.

5          And actually now it's triggering a memory.

6   I had to write a Post- -- once -- I think once out

7   of all the times I wrote a Postgres query to see

8   that the flow -- for the pharmaceutical industry, I

9   made a data visualization to see the flow of, you

10  know, there's Merck.  What colleges sent what people

11  to Merck, and what -- and after Merck, where did

12  they go, to what other companies.

13  BY MS. HURST:

14      Q.  Okay.  Did you use Splunk in connection

15  with your work at hiQ?

16          MR. WIT:  Objection to form.  Vague.

17          THE WITNESS:  Yes.

18  BY MS. HURST:

19      Q.  And how did you use Splunk in connection

20  with your work at hiQ?

21          MR. WIT:  Objection to form.  Vague.

22          THE WITNESS:  Splunk was my -- I would -- I

23  set up a dashboard, like you have a dashboard in

24  your car, speedometer, how many miles you got left

25  before you run out of gas, all that stuff.  I set

**Confidential**

1   up -- I set that up with Splunk.  That was a tool to

2   set up a dashboard.  And then I told Splunk, every

3   morning send me a PDF of my dashboard to an email.

4   BY MS. HURST:



Confidential

**Boris Dev**

hiQ Labs, Inc. vs.
LinkedIn Corp.



www.aptusCR.com
CE 0025

**Boris Dev**



**Boris Dev**



**Boris Dev**



Confidential

**Boris Dev**

hiQ Labs, Inc. vs.
LinkedIn Corp.



Page 39

**Boris Dev**                    Confidential                    hiQ Labs, Inc. vs.
                                                                  LinkedIn Corp.

1    Exhibit 200 a LinkedIn page for Boris Dev.

2              Here you go, Mr. Dev.  Take a look at that.

3              MR. WIT:  Thank you.

4    BY MS. HURST:

5         Q.  Mr. Dev, do you recognize Exhibit 200?

6         A.  Yes.

7         Q.  And what is it?

8         A.  Looks like my page.  My LinkedIn page.

9         Q.  All right.  Are you a LinkedIn member?

10             MR. WIT:  Objection to form.

11             THE WITNESS:  What's a LinkedIn member

12   mean?

13   BY MS. HURST:

14        Q.  Do you have an account with LinkedIn where

15   you can log in and...?

16        A.  Yes.

17        Q.  And did you post a page on LinkedIn?

18             MR. WIT:  Objection to form.  Vague.

19             THE WITNESS:  You mean this?

20   BY MS. HURST:

21        Q.  Well, I'm just asking in general, first of

22   all.  You made an account with LinkedIn, correct?

23        A.  Yes.

24        Q.  And you posted a page on LinkedIn?

25             MR. WIT:  Objection to form.  Vague.

**Page 52**

1    THE WITNESS:  Yeah.  I made -- I made this.

2  BY MS. HURST:

3    Q.  Okay.  And so Exhibit 200 is your personal

4  page that you created on LinkedIn?

5    MR. WIT:  Objection to form.

6    THE WITNESS:  Yes.

7  BY MS. HURST:

8    Q.  All right.  You have a Ph.D. in geography?

9    A.  (Nonverbal response.)  Yes.

10    Q.  Any particular subjects that you studied in

11  connection with your Ph.D. work?

12    A.  Dissertation was called -- any particular

13  subject?

14    Q.  Yeah.  Well, oftentimes people with Ph.D.s

15  get very narrow.  I don't know if that was the case

16  for you or not.

17    MR. WIT:  Objection to form.

18    THE WITNESS:  Believe it or -- just give me

19  a second, because --

20  BY MS. HURST:

21    Q.  It's been a while.

22    A.  And also, like, how do I explain my -- what

23  the hell I was doing back then.

24    The subject would be -- I think my

25  dissertation was called geographic income

**Boris Dev**



**Boris Dev**



**www.aptusCR.com**
CE 0033

**Boris Dev**



**Boris Dev**



24      A.   I don't know where else it would go.   So I
25   think --

**Boris Dev**                   Confidential                   hiQ Labs, Inc. vs.
                                                                 LinkedIn Corp.

1       Q.  Once your --

2       A.   I can't remember anywhere else it would be.

3       Q.  I'm sorry, I didn't mean to interrupt.  My

4   apologies.

5            Once your scraping system was up and

6   running in production --

7       A.   Yeah.

8       Q.  -- it always went directly into Splunk?  I

9   want to just make sure I understand.  It was never

10  stored anywhere else?

11           MR. WIT:  Objection to form.

12  BY MS. HURST:

13      Q.  Is that right?

14           MR. WIT:  Objection to form.  Vague and

15  ambiguous.  Misstates.

16           THE WITNESS:  From the best that I can

17  recall.

18  BY MS. HURST:

19      Q.  Was there anyone else who requested to you

20  to receive copies of reports from Splunk?

21           MR. WIT:  Objection to form.

22           THE WITNESS:  I can't remember who asked me

23  for a report.

24  BY MS. HURST:

25      Q.  Do you recall whether Mr. Miller was also

**Page 123**

```
 1   witness not to answer on the grounds of privilege,
 2   any communications, if they came from a lawyer.
 3            Otherwise you can answer the question.
 4            THE WITNESS:  I remember Mark having a
 5   meeting saying there's going to be discovery,
 6   save -- like save things so we're good.
 7   BY MS. HURST:
 8        Q.  Okay.  And what steps did you take to
 9   comply with that instruction?
10            MR. WIT:  Again, caution the witness not to
11   reveal attorney-client communications.
12            Otherwise you can answer.
13            THE WITNESS:  I can't remember.  That
14   wasn't my -- that wasn't my role.  That was for a
15   little bit higher up.
16   BY MS. HURST:
17        Q.  Did you ever discontinue the Splunk account
18   of hiQ?
19            MR. WIT:  Objection to form.  Vague and
20   ambiguous.
21            THE WITNESS:  No.
22   BY MS. HURST:
23        Q.  Did you have credentials to that account?
24            MR. WIT:  Objection to form.  Vague and
25   ambiguous.
```

1          THE WITNESS:   Yes.

2    BY MS. HURST:

3          Q.  **What were the circumstances under which you**

4    **can recall last using any Splunk dashboards in**

5    **connection with scraping and hiQ?**

6               MR. WIT:   Objection to form.   Instruct the

7    witness not to answer to the extent it reveals

8    attorney-client communications or work done at the

9    direction of counsel in connection with the

10   litigation.

11              Otherwise you can answer.

12              THE WITNESS:   So I'm going into my memory

13   banks.   The last time I saw something on Splunk

14   would have been the last day we were allowed to

15   scrape.

16   BY MS. HURST:

17         Q.  **And what do you mean by "the last day we**

18   **were allowed to scrape"?**

19         A.  There was a day that they -- they -- they

20   shut down the pipeline repo.

21         Q.  **Who is "they"?**

22         A.  Andrew and Mark sent -- there was a day

23   that Andrew and Mark said stop.

24         Q.  **Stop scraping?**

25         A.  Stop scraping.

1        A.   No.

2    BY MS. HURST:

3        **Q.   Did you actually apply on behalf of hiQ to**

4    **be an API partner of LinkedIn?**

5             MR. WIT:   Objection to form.

6             THE WITNESS:   I don't -- I don't have -- I

7    was a -- I don't have the authority to apply to any

8    type of program.

9    BY MS. HURST:

10       **Q.   Did you submit anything to LinkedIn in**

11   **connection with this API partner program?**

12            MR. WIT:   Objection to form.

13            THE WITNESS:   What we're both reading here,

14   that's -- like we're both -- that's the information

15   that I have right now.   And it says I asked for

16   someone to contact me about the partner program.

17   That's what I....

18            MS. HURST:   Exhibit 231 is hiQ_00200007 and

19   8.

20            (Whereupon, Exhibit 231 was marked for

21            identification.)

22   BY MS. HURST:

23       **Q.   Okay.   Mr. Dev, do you see in Exhibit 231**

24   **that you received an email from LinkedIn Developer**

25   **Access on March 23rd, 2017, "Subject:   Your**

```
 1    application for private LinkedIn API access."
 2              You received that on or about that date;
 3    correct?
 4         A.  I'm reading that with you right now.  Yeah.
 5    "Your application for private LinkedIn API access."
 6         Q.  Right.  And you, in fact, received this
 7    email from LinkedIn on or about that date, correct?
 8              MR. WIT:  Objection to form.  Foundation.
 9              THE WITNESS:  It's impossible for me to
10    remember, but we're looking at the same data printed
11    out there.
12    BY MS. HURST:
13         Q.  All right.  Do you have any reason to doubt
14    that you received this email from LinkedIn on or
15    about March 23rd, 2017?
16         A.  No.
17         Q.  And you forwarded it to Mr. Weidick,
18    correct?
19         A.  That's what it says at the top of the piece
20    of paper you gave me.  "To Mark Weidick."  But I
21    can't remember the details at the time.
22         Q.  But you wrote, "Hi Mark.  FYI.  Below is
23    the negative response we just got from the LinkedIn
24    partner program due to our use case."
25              Right?
```

**Confidential**

hiQ Labs, Inc. vs.
LinkedIn Corp.

```
 1          A.   Sorry, just spaced out.   "Hi Mark.   FYI."

 2     Okay, there's three.   There's three emails here.

 3          Q.   Yeah.

 4          A.   "Hi Mark."   We're both reading the same

 5     thing.

 6          Q.   Okay.   So you got this negative response

 7     and you forwarded it to Mr. Weidick, correct?

 8          A.   That's what it looks like on this paper.

 9     Yes.

10          Q.   Do you recall doing that?

11          A.   No.

12          Q.   Then Mr. Weidick responded to you, "Thx.

13     What was the process?   Did you need to submit a use

14     case (If so, what did you send)?   Did the request go

15     in as hiQ?"

16               Right?

17          A.   Yeah.

18          Q.   And then you responded to Mr. Weidick, "I

19     did not mention our company name.   And I did not use

20     my real LinkedIn profile.   I was very short on

21     explaining the use case -- forecast employee

22     leaving.   Basically I was anonymously testing the

23     water."

24          A.   Yeah.

25          Q.   And is all of that true?
```

**Confidential**

1            MR. WIT:  Objection to form.  Foundation.

2               THE WITNESS:  It's exactly -- you're just

3    reading what I wrote in the paper -- in this email.

4    BY MS. HURST:

5        Q.  Yeah, but was it true at the time when you

6    wrote the email?

7            MR. WIT:  Objection to form.  Foundation.

8               THE WITNESS:  I don't remember writing the

9    email, but what you're saying is what we're reading,

10   so yeah.

11   BY MS. HURST:

12       Q.  Okay.  Well, let me put it to you a

13   different way.

14           Did you have a habit of lying to your CEO?

15       A.  Oh, no.

16           MR. WIT:  Objection.

17   BY MS. HURST:

18       Q.  Best as you understand, as you sit here

19   today, when you described to Mr. Weidick what you

20   did in applying for the LinkedIn API program, that

21   was truthful?

22           MR. WIT:  Objection to form.

23   BY MS. HURST:

24       Q.  Correct?

25       A.  Based on what I know.

CE 0042

**Boris Dev**                    Confidential                hiQ Labs, Inc. vs.
                                                                  LinkedIn Corp.

1         Q.   So without identifying yourself as

2    affiliated with hiQ, when you applied to be -- to

3    use LinkedIn's API and gave the use case forecast

4    employee leaving --

5         A.   Yeah.

6         Q.   -- that application got denied, correct?

7              MR. WIT:   Objection to form.

8              THE WITNESS:   That's what we're both

9    reading.   Yes.   That's what we're both reading.

10   BY MS. HURST:

11        Q.   And LinkedIn said to you, your use case

12   does not qualify for enhanced API access, right?

13             MR. WIT:   Objection to form.   Foundation.

14             THE WITNESS:   Okay.

15             (Reporter clarification.)

16             THE WITNESS:   Oh, yeah.   Sorry.

17             I'm reading it.   "Thanks for submitting

18   your request for enhanced API access through

19   LinkedIn developer site.   We reviewed information

20   provided in your application and determined that

21   your use case does not qualify for enhanced API

22   access."

23   BY MS. HURST:

24        Q.   So that's what -- that's what LinkedIn

25   communicated to you, correct?

Page 262

CE 0043

**Boris Dev**                                    **Confidential**                    hiQ Labs, Inc. vs.
                                                                                    LinkedIn Corp.

1        A.  Yeah.  That's what we're both reading.

2        Q.  Did you ever have any follow-up

3    communications with anyone at LinkedIn about API

4    access?

5            MR. WIT:  Objection to form.

6            THE WITNESS:  Not that I remember.

7    BY MS. HURST:

8        Q.  Did you ever form any understanding as to

9    why this use case was problematic?

10       A.  No.

11       Q.  Did Mr. Weidick ask you to investigate the

12   API?

13           MR. WIT:  Objection to form.

14           THE WITNESS:  I think it was my idea.  I

15   think it was my idea.  I think it was my idea.  It

16   was a long time ago.  I think I said that a couple

17   answers ago.

18           MS. HURST:  Exhibit 232 is hiQ_00439693 and

19   694.

20           (Whereupon, Exhibit 232 was marked for

21           identification.)

22   BY MS. HURST:

23       Q.  And this is a Slack transcript from March

24   29, 2017.  And Mr. Dev, you wrote, "Is there a way

25   for you to see if LinkedIn profiles have changed" --

**Confidential** hiQ Labs, Inc. vs.
LinkedIn Corp.

1            THE WITNESS:  I can't remember.

2   BY MS. HURST:

3       Q.  Can you remember anything at all about

4   learning or studying or reviewing anything related

5   to a LinkedIn lawsuit filed against anonymous

6   scrapers in or about April 2017?

7       A.  Zero.

8            MR. WIT:  Objection to form.

9            MS. HURST:  Exhibit 237 is hiQ_00437027 --

10  pardon me -- 26 and 27.

11           (Whereupon, Exhibit 237 was marked for

12           identification.)

13  BY MS. HURST:

14      Q.  In Exhibit 237, Mr. Dev, we have a Slack

15  chat transcript among you, Mr. Miller, Chris, and

16  Cameron Cole.

17           Do you see that?

18           MR. WIT:  I'm sorry, you said 237?

19           MS. HURST:  Oh, is this not 237?

20           MR. WIT:  I think it's 242, unless you

21  wanted us to go back to -- I'm sorry.  I just -- did

22  I read the wrong -- I apologize.  I wrote the wrong

23  number.

24           MS. HURST:  It's you this time.

25           MR. WIT:  I made a mistake.  You got me.

**Confidential**



1   It's almost 6:00 o'clock.  You got me.  I apologize.

2          MS. HURST:  No worries.

3   BY MS. HURST:

4      Q.  April 26th, 2017.  Do you see that,

5   Mr. Dev?

6      A.  Bang.  Got it.

Confidential                                        hiQ Labs, Inc. vs.
LinkedIn Corp.



17          MS. HURST:   What's our time?

18          THE VIDEOGRAPHER:   Right now it's 6:12.

19          MS. HURST:   After -- I'm going to switch

20  topics completely now.

21          MR. WIT:   Can we take a quick bathroom

22  break?

23          MS. HURST:   Absolutely.   Sure.

24          MR. WIT:   Thank you very much.

25          THE VIDEOGRAPHER:   The time is 5:48 p.m.

**Boris Dev**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1        I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2    CCRR, certify: that the foregoing proceedings were taken

3    before me at the time and place herein set forth; at

4    which time the witness was duly sworn; and that the

5    transcript is a true record of the testimony given.

6

7        Witness review, correction and signature

8    was

9    ( ) by code.                    (X) requested.

10   ( ) waived.                     ( ) not requested.

11   ( ) not handled by the deposition officer due to

12   party stipulation.

13

14       The dismantling or unbinding of the original

15   transcript will render the reporter's certificate null

16   and void.

17       I further certify that I am not financially

18   interested in the action, and I am not a relative or

19   employee of any attorney of the parties, nor of any of

20   the parties.

21       Dated this 6th day of May, 2022.

22

23   _____

     GINA V. CARBONE
24   CSR #8249, STATE OF CALIFORNIA

25

**Page 312**

Compendium Exhibit 3

(CE0062-0063 of Exhibit
Filed Under Seal)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5   hiQ LABS, INC.                 )
                                    )
 6         Plaintiff,               )
                                    )
 7     vs.                          )Case No.
                                    )17-CV-03301-EMC
 8   LINKEDIN CORPORATION,          )
                                    )
 9         Defendant.               )
                                    )
10
11
12
13
14
15     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
16
17
18              REMOTE VIDEO DEPOSITION OF
19                   DANIEL FRANCIS
20
21
22
23   DATE TAKEN:  May 25, 2022
24
25   REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                                    Page 8
 1        APPEARING VIRTUALLY FROM MENLO PARK, CALIFORNIA;
 2              WEDNESDAY, MAY 25, 2022, 9:01 A.M.
 3
 4                        DANIEL FRANCIS,
 5     called as a witness and having been first duly
 6     sworn by the Certified Shorthand Reporter, was
 7     examined and testified as follows:
 8
 9                         EXAMINATION
10      BY MR. MULLER:
11          Q.   Mr. Francis, would you please state your
12     name for the record.
13          A.   Sure.  It's Daniel Francis.
14          Q.   And what is your current job?
15          A.   I'm currently a co-founder and head of
16     product at a company called Drive Technologies.
17          Q.   What's your current place of residence?
18          A.   Current place of residence is Belmont,
19     California.
20          Q.   Have you previously worked at LinkedIn?
21          A.   Yes.
22          Q.   When did you start working at LinkedIn?
23          A.   Started working at LinkedIn in May 2022.
24          Q.   When did you leave LinkedIn?
25          A.   I left LinkedIn in February 2021 -- or
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                        Page 9
 1    sorry, 2022.
 2         Q.  Do you own any equity in LinkedIn?
 3         A.  I own -- no.  I don't own equity in
 4    LinkedIn, but I do have equity in Microsoft.
 5         Q.  What's the form of that equity in
 6    Microsoft?
 7         A.  Public shares.
 8         Q.  Where are you currently located?
 9         A.  Currently located in Belmont, California.
10         Q.  I mean, today in this deposition, your
11    present location.
12         A.  Oh, sorry, this deposition.  Menlo Park,
13    California.
14         Q.  And who is in the room with you?
15         A.  Paul, counsel.  And Maria, counsel, as
16    well.
17         Q.  And you understand that you are
18    testifying under oath?
19         A.  I do.
20         Q.  Is there any reason why you would be
21    unable to give truthful testimony today?
22         A.  No.
23         Q.  Have you testified under oath before
24    today?
25         A.  No.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 11

```
 1          MR. RUGANI:  I'd just caution you in

 2      answering that question, not to disclose the

 3      substance of any communications that you may

 4      have had with any attorneys.

 5          But otherwise I think it's fine for you

 6      to answer the question.

 7          THE WITNESS:  Sorry, Zane.  Could you

 8      please repeat -- repeat the question?

 9   BY MR. MULLER:

10      Q.  Sure.

11          When did you first become aware of the

12   hiQ v. LinkedIn litigation?

13      A.  I think it was at some point last year.

14      Q.  And how did you learn about the

15   litigation?

16      A.  Through communication with our attorneys,

17   in-house attorney.

18      Q.  And when you say "our in-house attorney,"

19   do you mean LinkedIn's in-house attorney?

20      A.  That's correct.  LinkedIn's in-house

21   attorney.

22      Q.  Okay.  Were you still working at LinkedIn

23   when you learned about the litigation?

24      A.  Yes.

25      Q.  When did you start preparing for this
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 162

1    conference notes.  So yes, I believe so.

2            MR. MULLER:  Tevin, would you pull up

3       Tab 11, please.

4            THE TECHNICIAN:  Okay.  Tab 11 has been

5       introduced as Exhibit 1335.

6            (Exhibit 1335 was received and marked

7            for identification on this date and is

8            attached hereto.)

9            THE WITNESS:  Okay.  I can see the

10      document, but please give me a moment to look

11      through it briefly.

12    BY MR. MULLER:

13       Q.  Sure.

14       A.  All right.  I've had a chance to review.

15       Q.  Are these the HiQ Elevate Conference

16    notes that you contributed to that we were

17    discussing previously?

18       A.  These are a set of HIQ Conference notes

19    that I contributed to.

20       Q.  Do you recall what were your

21    contributions to this note?

22       A.  I do not recall exactly.  I did

23    contribute to this document.

24       Q.  Okay.  Do you remember changing any

25    information because it was inaccurate when you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 163

1   made contributions to the note?

2        A.   I don't remember exactly how I

3   contributed to the document.   I suspect I had gone

4   through, and, you know, based on what I

5   remembered, had, you know, initial commentary or

6   notes.

7        Q.   Do you have any reason to think that the

8   notes that are contained in this document are

9   inaccurate about what you and Mr. Jennings would

10  have seen at the conference?

11       A.   Well, I don't know if it's a hundred

12  percent accurate.   We were just attendees at the

13  conference.   But I think it reflects, you know,

14  what we thought we heard.

15       Q.   Do you see at the top where it says,

16  "Attendees:   Dan Francis, Mike Jennings, Lorenzo

17  Canlas"?

18       A.   Yes, I do.

19       Q.   Does that refresh your recollection at

20  all as to whether Mr. Canlas attended the Elevate

21  Conference with you and Mr. Jennings?

22       A.   I don't remember -- I don't remember him

23  exactly attending the conference, so -- and I

24  don't remember having a conversation with him at

25  the conference.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 164

1         But this would suggest to me that he

2    probably was in attendance.

3         Q.  So at the top, where it says, "New

4    product announced:  hiQ Skill Mapper."

5             Do you see that?

6         A.  Yes, I do.

7         Q.  And underneath that, it says, "Data

8    Sources:  Publicly available data (mostly LinkedIn

9    public profile data plus GitHub public profiles.)"

10            Do you see that?

11        A.  Yes.

12        Q.  Do you recall hiQ being open about using

13   LinkedIn public profile data at the conference?

14        A.  I do.  I believe that they mentioned it

15   at this event.

16        Q.  Do you see the second sort of indented

17   bullet point where it says, "Team lead with 'Show

18   of hands'"?

19        A.  Yes, I do.

20        Q.  "How many people have gone into Workday

21   or HRIS and updated their skills, no one raised

22   their hand.  'How many people update their

23   LinkedIn profile,' everyone raised their hands."

24            Do you recall why that was included as a

25   note in this document?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 274**

```
 1   STATE OF CALIFORNIA        )

 2                              )      ss.

 3   COUNTY OF LOS ANGELES      )

 4

 5          I, RENEE HARRIS, do hereby certify that I

 6   am a licensed Certified Shorthand Reporter, duly

 7   qualified and certified as such by the State of

 8   California;

 9      That prior to being examined, the witness named

10   in the foregoing deposition was by me duly sworn

11   to testify to tell the truth, the whole truth, and

12   nothing but the truth;

13      That the said deposition was by me recorded

14   stenographically;

15      And the foregoing pages constitute a full,

16   true, complete and correct record of the testimony

17   given by the said witness;

18          That I am a disinterested person, not

19   being in any way interested in the outcome of said

20   action, or connected with, nor related to any of

21   the parties in said action, or to their respective

22   counsel, in any manner whatsoever.

23   DATED: May 26, 2022

24
                       _____

25                       Renee Harris, CSR 14168, RPR
```

Compendium Exhibit 4


(CE0077-70 of
Exhibit Filed Under Seal)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3   hiQ LABS, INC.,              )
                                  )
 4       Plaintiff and Counter- )
         Claim Defendant,        )
 5                                )
         vs.                      )  Case No.
 6                                )  3:17-cv-03301-EMC
     LINKEDIN CORPORATION,        )
 7                                )
         Defendant and Counter- )
 8       Claim Plaintiff.         )
 9
10
11
12
13   ************************************************
14        REMOTE VIDEOTAPED ORAL DEPOSITION OF
15                MCKINSEY & COMPANY
16     BY AND THROUGH ITS RULE 30(B)(6) DESIGNEE
17              CHRISTOPHER EDWARD GAGNON
18                  JUNE 27, 2022
19                (Reported Remotely)
20      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
21   ************************************************
22
23
24
25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1    Skibitsky from Quinn Emanuel Urquhart & Sullivan on

2    behalf of plaintiff, hiQ Labs, Inc.

3                    MR. SHAFFER:  And good morning, Nathan

4    Shaffer and Isaac Behnawa on behalf of LinkedIn

5    Corporation, and we're from Orrick Herrington &

6    Sutcliffe.

7                    THE REPORTER:  Mr. Joseph?

8                    MR. JOSEPH:  Andrew Joseph from Faegre

9    Drinker Biddle & Reath on behalf of McKinsey and the

10   witness, Mr. Gagnon.

11                   CHRISTOPHER EDWARD GAGNON,

12   having been first duly sworn, testified as follows:

13                        EXAMINATION

14   BY MS. SKIBITSKY:

15       Q.   Good morning, Mr. Gagnon.

16       A.   Good morning.

17       Q.   I introduced myself off the record, but my

18   name is Hope Skibitsky.  I represent hiQ in this

19   matter and I'll be taking your deposition.

20            Can you please state your full name for

21   the record?

22       A.   Christopher Edward Gagnon.

23       Q.   Mr. Gagnon, are you currently employed?

24       A.   I am.

25       Q.   By who are you employed?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 9

```
 1        A.    McKinsey & Company.

 2        Q.    Have you ever been deposed before today?

 3        A.    Yes.

 4        Q.    How many times?

 5        A.    Once.

 6        Q.    And when was that?

 7        A.    Roughly 1994.

 8        Q.    Fair to say it wasn't a Zoom deposition?

 9        A.    It was not.

10        Q.    So I would like to go over some quick

11   instructions just to help the process run smoothly.

12              First, you are under oath, so even though

13   this is a Zoom deposition, your testimony has the

14   same effect as it would as if given in a court with

15   a judge present.

16              Do you understand that, Mr. Gagnon?

17        A.    I do.

18        Q.    And I will ask you questions and I ask

19   that you answer my questions with a verbal answer so

20   that the court reporter is able to take down your

21   responses.

22              I would ask for you to please wait for me

23   to finish a question before responding so that the

24   court reporter can capture a nice clean record, and

25   I will try to do the same.  Sometimes that's a
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1    little bit difficult to do over Zoom because there

2    might be a delay.  So I will try my best to do that,

3    and I apologize in advance if I jump on you before

4    you finish an answer.

5              If Mr. Joseph asks -- objects to a

6    question, he may state that objection for the

7    record.  You are permitted to answer the question,

8    and, in fact, you should answer the question unless

9    Mr. Joseph instructs you otherwise and you decide to

10   comply with that instruction.

11             If you need to take a break at any time,

12   please let me know, and we will, of course,

13   accommodate you.  I would just ask that you request

14   a break after you have answered the last question.

15             Do you have any issues following these

16   instructions, Mr. Gagnon?

17        A.   No.

18        Q.   And is there any reason that you can't

19   testify truthfully today?

20        A.   No.

21        Q.   Do you understand that you have been

22   designated to testify about certain topics on behalf

23   of McKinsey today?

24        A.   I do.

25                  MS. SKIBITSKY:  Can we please pull up

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 11

1    tab A and mark that as Exhibit 570.

2                    (Exhibit 570 marked.)

3                    VERITEXT CONCIERGE:  It has been

4    introduced.

5                    MS. SKIBITSKY:  Thank you.

6        Q.   Mr. Gagnon, do you see an Exhibit 0570 in

7    that marked exhibits folder?

8        A.   I do.

9        Q.   Have you seen this document before?  It's

10   titled Plaintiff hiQ Labs, Inc., Notice of Service

11   of Subpoena to McKinsey & Co.?

12       A.   I don't believe so.

13       Q.   If you scroll down to the second page --

14   it's the third page of the PDF but the second page

15   of the page numbering, and it's Exhibit A, Topics

16   for Examination.

17            Do you see that?

18       A.   Yes.

19       Q.   Do you see that the first topic states:

20   McKinsey's decision to invest in hiQ in

21   February 2016 (through AFOS, LLC) or at any other

22   time, including the reasons why McKinsey decided not

23   to invest in hiQ?

24            Do you see that topic?

25       A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 12

```
 1        Q.   Are you prepared today to testify on
 2   behalf of McKinsey with respect to that topic?
 3        A.   Yes.
 4        Q.   And the second topic is:  McKinsey's
 5   decision not to reinvest in hiQ in any subsequent
 6   financing rounds, including the reasons why McKinsey
 7   decided not to continue with its investment in hiQ.
 8             Do you see that topic?
 9        A.   I do.
10        Q.   And are you prepared today to testify as
11   to that topic?
12        A.   Yes, but I don't understand the factual
13   question.  We did invest in a subsequent financing
14   round.
15        Q.   Okay.  That's fair.  We can -- and we can
16   get into the substantive question throughout the
17   deposition.
18             And -- and please -- I don't think I said
19   this, but to the extent you don't understand any
20   question that I ask, please do let me know because I
21   want to make sure that we're on the same page.
22             Did you do anything to prepare for today's
23   deposition?
24        A.   Yes.
25        Q.   What did you do to prepare for today's
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1      A.    No.

2      Q.    Mr. Gagnon, how long have you been with

3   McKinsey?

4      A.    I have had two careers at McKinsey.  The

5   first ran from 1987 to 1997, and then the second ran

6   from 2011 to the present.

7      Q.    What is your current title at McKinsey?

8      A.    Senior partner.

9      Q.    Have you held that title since 2011?

10     A.    No.

11     Q.    What was your title when you came into

12  McKinsey in 2011?

13     A.    In 2011, I believe my title was head of

14  organization solutions.  That's not correct.  It was

15  head of the Organizational Health Index.  We later

16  renamed the group organization solutions.

17     Q.    Are you still in that role as head of

18  organizational solutions at McKinsey?

19     A.    No.

20     Q.    How long were you in that role as head of

21  organizational solutions or the predecessor, head of

22  the Organizational Health Index?

23     A.    Ten years.

24     Q.    Okay.  So approximately when did you leave

25  that specific role as head of organizational

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

1    solutions?

2         A.    Oh, six or eight months ago.

3         Q.    So from 2011 to approximately -- through

4    2021, you had the title of head of organizational

5    solutions at McKinsey or the predecessor term?

6         A.    Yes.  There were other titles that I had.

7    At some point, I was elected a partner and then a

8    senior solution partner and a senior partner.  Those

9    are sort of parallel definitions of my role.

10        Q.    Did your role as head of organizational

11   solutions at McKinsey change from 2011 to 2021,

12   let's say, as your title changed in the -- in the

13   manner you just described?

14        A.    I don't understand the question.

15        Q.    That's fair.

16              In 2011 as head of organizational

17   solutions at McKinsey, what -- what was your

18   specific role in that position?

19        A.    My role was to lead the development and

20   operations of a group that was called The McKinsey

21   Solution.  That solution was the Organizational

22   Health Index.

23        Q.    What is the Organizational Health Index?

24        A.    It is a suite of tools McKinsey uses to

25   help clients measure and manage the -- their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

1    organizational health or culture.

2        Q.    And in the 2015 time period, were you

3    still leading the development and operations of

4    McKinsey Solution?

5        A.    Yes.  By that time, the portfolio

6    solutions I was leading had expanded to include some

7    other things, and I was the head of what was

8    referred to as OrgSolutions.

9        Q.    And what is OrgSolutions?

10       A.    OrgSolutions was the structural name of

11   the group that provided solutions-based services on

12   organization issues to our clients.  So that

13   included not only the Organizational Health Index

14   but a tool called OrgLab, which was used to help

15   clients manage their organization structures, and

16   our People Analytics unit, which brought big data to

17   bear on talent and people issues within -- within

18   our clients.  There were some other smaller things

19   but probably not relevant for our discussion.

20       Q.    Were you head of OrgSolutions from 2015

21   through the beginning of 2019?

22       A.    Yes.

23              MS. SKIBITSKY:  Can we mark into

24   evidence tab C as Exhibit 571, please.

25              (Exhibit 571 marked.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 138**

1      Q.    Okay.  And you held that role as board

2    observer, correct?

3      A.    I did.

4      Q.    And your role as board observer began in

5    2015 and continued through at least fall of 2017; is

6    that correct?

7      A.    I believe so.

8      Q.    And as board observer, you had access to

9    information about hiQ's business and finances,

10   correct?

11     A.    I did.

12     Q.    In your role at McKinsey, you would have

13   been involved in discussions about whether to make

14   further investments in hiQ, correct?

15     A.    Yes.

16     Q.    And you would have considered information

17   that you had as a board observer in deciding whether

18   to make an investment in hiQ, correct?

19     A.    Correct.

20               MR. SHAFFER:  I would like to mark tab

21   18 as Exhibit 591.

22               (Exhibit 591 marked.)

23               VERITEXT CONCIERGE:  591 has been

24   introduced.

25     Q.    Let me know when you have it open,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 139

1    Mr. Gagnon.

2         A.    Open.

3         Q.    Okay.   So we're looking at an email from

4    you to a number of different people, including

5    Darren Kaplan and Rob DeSantis, dated February 4,

6    2017, correct?

7         A.    Correct.

8         Q.    Do you remember this email?

9         A.    Yes.

10        Q.    Is this a true and accurate copy of the

11   email you sent?

12        A.    I believe so.

13        Q.    And if you go to the first email in the

14   chain, so, you know, at the bottom of the document,

15   do you see an email there from Genevieve Graves?

16        A.    Uh-huh.

17        Q.    Who is Genevieve Graves?

18        A.    She was the chief data scientist of hiQ

19   Labs.

20        Q.    And you testified earlier that meeting

21   with her before McKinsey's initial investment was

22   part of the reason that McKinsey invested in hiQ --

23   strike that question.

24             You testified earlier that you met with

25   Ms. Graves or Dr. Graves prior to making McKinsey's

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 178

1    STATE OF TEXAS    )
2    COUNTY OF DALLAS )
3         I, Michelle L. Munroe, Certified Shorthand
4    Reporter in and for the State of Texas, certify that
5    the foregoing deposition of CHRISTOPHER EDWARD GAGNON
6    was reported stenographically by me at the time and
7    place indicated, said witness having been placed
8    under oath by me, and that the deposition is a true
9    record of the testimony given by the witness;
10        That the amount of time used by each party at
11   the deposition is as follows:
         Ms. Skibitsky     -    1 hour, 54 minutes
12       Mr. Shaffer       -    2 hours, 1 minute
         I further certify that I am neither counsel for
13   nor related to any party in this cause and am not
     financially interested in its outcome.
14        Given under my hand on this the 28th day
     of June, 2022.
15
16
17
         Michelle L. Munroe, CSR No. 6011
18       Commission expires 1-31-24
         Firm Registration #571
19
20
21
22
23
24
25

# Compendium Exhibit 5

# (CE0167-171 of Exhibit Filed Under Seal)

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4
  hiQ Labs, Inc.,
5
              Plaintiff,
6                                    Case No.:
              vs.                    17-cv-03301-EMC
7
  LinkedIn Corporation,
8
              Defendant.
9  _____

10 LinkedIn Corporation,

11            Counterclaimant,

12            vs.

13 hiQ Labs, Inc.,

14            Counter-defendant.
   _____
15

16        VIDEO-RECORDED DEPOSITION

17    REMOTELY TAKEN VIA ZOOM CONFERENCE OF

18            GENEVIEVE GRAVES

19       Individually and as 30(b)(6)

20        WEDNESDAY, MAY 25, 2022

21

22

23 Stenographically Reported by:
   Linda E. Marquette
24 RPR, CLR, CSR No. 11874

25 Job No. 10101217

CE 0081

**Genevieve Graves**

```
1    LinkedIn Corporation.
2              And I'll be joined today by Isaac Behnawa,
3    also from my law firm, Orrick Herrington & Sutcliffe.
4              MR. WORCESTER:  And Corey Worcester from Quinn
5    Emanuel Urquhart & Sullivan on behalf of hiQ and the
6    witness.
7              Thank you.
8              Our court reporter for today, Linda Marquette,
9    will now administer the oath.
10                       GENEVIEVE GRAVES,
11    having been first duly administered an oath remotely,
12             was examined and testified as follows:
13
14                       EXAMINATION
15   BY MR. SHAFFER:
16     Q.     Good morning, Dr. Graves.  Could you please
17   state your full name for the record.
18     A.     My name is Genevieve Graves.
```

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

```
22     Q.     Have you been deposed before?
23     A.     Never.
24     Q.     Okay.  So it will be a new and interesting
25   experience.
```

1   attendance in a personal capacity today.

2         MR. SHAFFER:  So just mark that as

3   Exhibit 490.

4         And could we drop tab 2 in as 491, please.

5         (Exhibit 491 marked for

6         identification by the Certified

7         Shorthand Reporter.)

8   BY MR. SHAFFER:

9   Q.    Let me know when you have that available.

10  A.    I have it.

11  Q.    Have you seen this document before?

12  A.    I'm not sure.

13  Q.    If you go ahead and scroll down there's a

14  section starting on page 5 that's titled "Topics for

15  Examination."

16  A.    Yes.

17  Q.    So starting with topic 1:

18        "hiQ's products and services

19        including the development, design,

20        functionality, architecture,

21        structure, features, capabilities,

22        and programming of those products

23        and services."

24        Do you see that topic?

25  A.    I do.

1     Q.    And are you prepared to testify on that topic

2   on behalf of hiQ, the entity, today?

3     A.    Yes, I am.

4     Q.    And how about topic No. 4 which is:

5              "hiQ's use of data obtained by it

6              or others from LinkedIn's website,

7              servers or computers to develop,

8              market, sell, offer to sell or

9              deliver products or services to any

10             third party, including any analyses

11             hiQ presented to its customers and

12             the inputs for those analyses."

13             Do you see topic 4?

14     A.    Yes, I do.

15     Q.    And are you prepared to testify on behalf of

16   hiQ, the entity, as to topic 4 today?

17     A.    Yes.

18     Q.    Okay.  Then topic 8:

19             "Sources of information that hiQ

20             has ever used or considered for use

21             in connection with its products and

22             services, including the time frame

23             that each source was accessed, the

24             means and methods by which hiQ

25             assessed or attempted to access each

**Genevieve Graves**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1             source, the fields of data retrieved

2             from each source and the products or

3             services offered by hiQ which were

4             derived either directly or

5             indirectly using information from

6             that source."

7         You see topic 8?

8    A.    I do.

9    Q.    And are you prepared to testify on topic 8 on

10   behalf of hiQ as -- as an entity today?

11   A.    Yes.

12   Q.    Okay.  And how about topic 9:

13            "hiQ's assessment of and decision

14            to use LinkedIn as a source of data

15            for its products and services."

16        Are you prepared to testify on topic 9 on

17   behalf of hiQ as the entity today?

18   A.    Yes.

19   Q.    Okay.  And then the next two topics:  Persons

20   knowledgeable about the subject matter of the topics and

21   the documents and communications and things and data

22   that you prepared -- that you reviewed in preparing for

23   the deposition.

24        Those may come up as we go forward but as to

25   topic 42, do you see that one?

www.aptusCR.com
CE 0085

1      A.    I do.

2      Q.    Are you prepared to testify on that one within

3  the scope of your -- the other four topics today, topics

4  1, 4 -- 1 through -- 1, 4, 8 and 9?

5      A.    I don't understand how 42 is different from

6  those.

7      Q.    Fair enough.  So you're -- you're saying

8  you're prepared on the other four topics and it would be

9  subsumed?

10     A.    That's -- that's my understanding.

11     Q.    Okay.  Good enough.  And what did you do to

12  prepare for your deposition today?

13     A.    I had a meeting with my counsel yesterday for

14  some number of hours.

15     Q.    How long was the meeting?

16     A.    We went from 9:00 to 2:00, so five hours.

17     Q.    Who was there?

18     A.    Myself, and then two -- for most of the

19  meeting it was one representative from Quinn Emanuel,

20  that was Elisabeth, and Corey joined us for maybe half

21  an hour to an hour of that.

22     Q.    Okay.  Other than the meeting yesterday with

23  counsel, did you do anything else to prepare for your

24  deposition today?

25     A.    No.

Genevieve Graves

1   BY MR. SHAFFER:

2       Q.    You can close them.  If you need to reference

3   them, they should remain in the chat.  But if you can't

4   find them, Mr. -- Mr. Isaacs will be available to

5   provide them again.

6            Let me know when you have that document open.

7       A.    Yeah, I have it open.

8       Q.    Have you had a chance to look at it?

9       A.    I'm glancing through it now but it is familiar

10  to me.

11      Q.    And what is Exhibit 492?

12      A.    It is my -- it looks like a dump of my

13  LinkedIn profile.

14      Q.    Okay.  And -- and by "dump" you mean a -- a

15  image of the information that --

16      A.    Yeah.  I mean a --

17            (Simultaneous cross-talk.)

18  BY MR. SHAFFER:

19      Q.    -- appears -- let me finish.

20      A.    Yeah.

21      Q.    So -- so you're looking at a -- at a PDF that

22  reflects your current LinkedIn profile; is that correct?

23      A.    That's correct.

24      Q.    Okay.  And --

25            MR. WORCESTER:  If I can jump in for a second.

1   trajectory of companies, their perception as a workplace

2   and their sort of location.  And we were also using job

3   market data about what kinds of jobs were highly in

4   demand in which sorts of locations.

5       Q.   Okay.  And when you joined hiQ, what was your

6   position?

7       A.   I think I joined as chief science officer or

8   chief data scientist.

9       Q.   Who else worked at hiQ when you joined?

10      A.   I was the first employee so the only -- the

11  person who was at hiQ was Darren Kaplan, who was the

12  founder of hiQ.  There were a -- a number of advisers in

13  different topics and across different functionality.

14  But I was the first employee and then we, within a

15  matter of weeks or months, hired several more people.

16      Q.   Okay.  So -- so employee No. 1, would you say

17  that?

18      A.   Employee No. 1.

19      Q.   Okay.  And you said Mr. Kaplan was involved?

20      A.   That's correct.  Darren Kaplan was the founder

21  of hiQ and he is the person who hired me.

22      Q.   And --

23           MR. WORCESTER:  Genevieve, can I -- can I

24  interrupt for a second.  I think you've got someone in

25  your house who -- how do I say this delicately -- may

 1   BY MR. SHAFFER:

 2       Q.    Okay.  So what -- you said you joined --

 3   remind me, what was the position when you joined hiQ?

 4       A.    Chief data scientist.

 5       Q.    And -- and what were your responsibilities

 6   there?

 7             MR. WORCESTER:  Beyond the scope.

 8   BY MR. SHAFFER:

 9       Q.    You can answer.

10             MR. WORCESTER:  Yeah.  So, Genevieve, the way

11   objections work is the only objection that will stop you

12   from answering is a privileged objection.  Then I'll

13   specifically say "Don't answer the question."  So you

14   won't have to guess.  So unless I tell you not to

15   answer, you can go ahead and answer.  The objections are

16   kind of -- "game" is the wrong word, but they're things

17   lawyers do so the judge can sort it out later.

18             THE WITNESS:  Understood.

19       A.    My role as chief scientist was to help assess

20   what data we were going to collect, how we were going to

21   use it, how to build predictive models and how that --

22   how data and the models we're building were going to

23   feed into the product that we offered customers.

24   BY MR. SHAFFER:

25       Q.    Okay.  So how did that role involve product

1   development?

2      A.    Are you asking initially when I first joined

3   the company or overtime?

4      **Q.    I want to start when you first joined.  What**

5   **was your involvement with product development when you**

6   **first joined?**

7      A.    When I first joined the company, my main role

8   with product development was to develop the models and

9   predictions that would feed into the product.

10     **Q.    Okay.  Did you work on product conception at**

11  **that time?**

12     A.    Product conception was something that happened

13  somewhat in a group setting, so there were a lot of

14  brainstorming meetings that involved many people, and I

15  was one of those people, but I did not have the

16  fundamental responsibility for driving that forward or

17  making decisions about the product.

18     **Q.    Okay.  And what -- what product were you**

19  **working on when you first joined in 2014?**

20     A.    I believe by the time I had joined or very

21  shortly thereafter, the company had decided to focus on

22  a first product that predicted the risk of turnover of

23  employees.

24     **Q.    And what -- what platform was that product**

25  **designed for?  Was it web-based, software as a service?**

1    A.    I don't.  But again, you know, I -- I
2  apologize.  By the time that this documentation was
3  being put together, I usually was not involved in the
4  sort of details of -- of documentation and recording.
5  But I probably -- I -- I can speak to a lot of things
6  that are in this document even though I'm not familiar
7  with the document itself.
8    **Q.    Okay.**
9    A.    Because I was -- I was involved at the
10  conversational level and this planning level with
11  probably most of the projects that are in here.  I just
12  wasn't involved in the documentation.  And I didn't
13  reference the documentation because I wasn't trying to
14  do these technical things myself.
15    **Q.    Okay.  I understand.**
16         MR. WORCESTER:  Let's go ahead and mark tab 11
17  as 498.
18         (Exhibit 498 marked for
19         identification by the Certified
20         Shorthand Reporter.)
21  BY MR. SHAFFER:
22    Q.    And, Dr. Graves, this one was produced as a
23  native PowerPoint presentation so hopefully you can open
24  it on your computer but, if not, let me know.
25    A.    I opened it.  It -- it looks like it opened in

**Genevieve Graves**

1    a browser as a PDF just fine so ...

2        Q.    Oh, perfect.

3        A.    Yeah.  I'm -- so I'm looking at it in the same

4    web -- in the same box web browser as everything else.

5        Q.    Okay.  Could you please take a look at the

6    presentation and let me know if you recognize this?

7        A.    Yes, I believe I -- I made this presentation.

8        Q.    Okay.  Did you make it for Mr. Weidick when he

9    joined as CEO?

10       A.    Let me take a look.  Quite possibly.  I'm sure

11   that some of these slides already existed from other

12   presentations that we had given to the board or

13   internally or as customers but I -- this -- this does

14   look like -- what's the date on it?

15       Q.    It's --

16       A.    Go ahead.

17       Q.    February 2017.

18       A.    Yeah.  So that -- this -- this very -- this

19   does look -- this looks like kind of like an overview of

20   what's going on in the team.  So it's very -- it's

21   very -- it sounds consistent to me that I would have

22   made this for Mark to give him kind of a data dump of

23   everything that was going on.  And some of these slides

24   were actually made by other people.  And, in fact, you

25   can even see that in there.  It says, you know, from Dan

**Genevieve Graves**

<br/>

**hiQ Labs, Inc. vs.**
**LinkedIn Corp.**

1   Miller or from Lou Wegener and Conner Swann.  So some of

2   these slides must have been things that I asked people

3   on the team to make to summarize what their piece of it

4   was doing because -- basically because those were parts

5   of the tech process that I was, you know, less involved

6   in the day to day.  So I asked whoever was the person

7   who was -- who was sort of leading that effort to -- to

8   produce a slide.

9       Q.    Okay.  And then was this -- was this document

10  -- was this document created in the ordinary course of

11  hiQ's business?

12      A.    Well, this document was created to help

13  onboard a new CEO.

14      Q.    Okay.  So that was part of the business?

15      A.    Yes.

16      Q.    And then you said --

17      A.    I don't -- I don't know that I would consider

18  onboarding a new CEO ordinary -- you know, like, yes.

19  It was something we only did once so it was not a repeat

20  activity, but yes.

21      Q.    Okay.  And you said that some other people

22  contributed to this.  Would they have been people with

23  personal knowledge of the information that they were

24  putting into the document?

25      A.    Yes.

<br/>

**Page 79**

CE 0093

Genevieve Graves

1      Q.    And it would have been personal knowledge of

2   their -- their jobs or roles in the company as it

3   existed at that time; is that right?

4      A.    Yes.

5      Q.    Okay.  And then going up to the second page of

6   the presentation?

7      A.    Mm-hmm.

8            MR. WORCESTER:  You mean the page of the

9   actual presentation or the second slide?  So can you

10  read the --

11           MR. SHAFFER:  The second page of the document,

12  Corey.

13  BY MR. SHAFFER:

14     Q.    So you see here there's like a list of -- of

15  products and future products, two lists; is that right?

16     A.    Yeah.

17     Q.    Okay.  So we talked a little bit about the

18  Keeper product.  That was a hiQ product as of

19  February 2017, right?

20     A.    Mm-hmm.

21     Q.    And then Skill Mapper is another hiQ product

22  as of February 2017; is that correct?

23     A.    As of February 2017 Skill Mapper was in the, I

24  would say, late stage of develop.  It -- in that the

25  product -- at least a, you know, sort of MVP, minimum

1    Q.    -- remind you to do a yes --

2    A.    I'm sorry.

3    Q.    -- or correct.  It will -- it will be helpful.

4          Okay.  And then Cameron Cole, not an engineer,

5    he's -- he's blue, so he's a data scientist?

6    A.    Mm-hmm.

7    Q.    What was his role in the data collection team?

8          Sorry, you -- you did the "mm-hmm" again.

9    A.    Yes.

10   Q.    So Cameron Cole, he's -- he's an engineer and

11   he's a data scientist?

12   A.    Cameron -- yeah.  Cameron was -- I mean,

13   whether he was a data science or a data engineer person

14   is -- is somewhat amorphous.  There's overlap between

15   these titles and roles.  So is your question, what was

16   Cameron responsible for on the data --

17   Q.    That's correct.

18   A.    -- collection team?

19   Q.    That's right.

20   A.    Cameron's primary responsibility on the data

21   collection team was managing the turking process.

22   Q.    Okay.  What is -- what is turking?

23   A.    Ah, turking.  So we were collecting LinkedIn

24   profile information on individuals from their public

25   pages.  It was critical to make sure that the

**Genevieve Graves**

1    information we were collecting was for the right person,

2    right, because what you don't want to do is serve data

3    and it's somebody else's data because there's two

4    different John Smiths or something like that.  So the --

5    I think -- I would assume we're going to get into this

6    in detail somewhere else in the deposition about the

7    whole turking process.  But in summary, it was the -- it

8    was a human vetting method that we used to have a human

9    verify yes or no.  Like is this the correct LinkedIn

10   profile to go with this person, yes or no.  That's --

11       Q.    Okay.

12       A.    So that was done by a set of people.  That was

13   a process that we outsourced.  Cameron managed the

14   process of finding and hiring those people.  And managed

15   the process -- and also built the sort of form in which

16   they put -- you know, recorded what their -- their

17   work -- and recorded their yes-or-no answers about is

18   this the right profile and which -- you know, which ones

19   they had done versus which ones had not been done yet.

20       Q.    Okay.  And, if I understand correctly, the

21   people that were engaged in turking were hiQ employees;

22   is that right?

23       A.    No.  They were outside contractors.  So they

24   worked -- they worked from home at what -- with flexible

25   hours part time.  Many of them were stay-at-home moms,

1    Q.    So he -- he was the data scientist overseeing

2    the data collection operation, right?

3    A.    The science part of it, yes.

4    Q.    Okay.  So with these summaries there's a

5    public data collection, there's a reference to customer

6    data coming in from HRIS.  What's HRIS?

7    A.    Stands for Human Resource -- actually, that's

8    a good question -- Information System, I think.

9    Usually -- it -- it's the -- an HRIS is like the

10   internal software system that companies use to manage

11   their HR data.

12   Q.    Okay.  And then list collection --

13   A.    I think it stands for Human Resource

14   Information System.

15   Q.    Okay.  And then list collection, what's that

16   referring to?  Oh, that's the turking process; is that

17   right?

18   A.    No.  This is -- yes.  The turking process is

19   part of list collection.  So like we've talked about

20   earlier with Crystal Ball, sometimes -- we had the

21   ability to just go with zero information from a

22   customer, go and use Google and Bing query -- searches

23   to find LinkedIn profiles of employees who worked at a

24   specific company.  So we didn't need any information

25   from the company to do that -- from a customer company

1    to do that.  That was called blind collection.  So we

2    were going in blind because we didn't know who we were

3    looking for.  We were just trying to find as many people

4    as we could find who worked at that company.

5              That was blind collection.  And, of course,

6    that doesn't require turking because there's no --

7    you're not trying to match a person to a specific -- the

8    person you found with some specific person, right.  So

9    blind collection was just a thing that we did with the

10   search engines.

11             List collection meant a company had given --

12   maybe they had said we only want to do this for our

13   technical people in San Francisco.  And then they

14   would -- they would give us a list of the names and

15   sometimes the job titles of their employees for whom

16   they wanted to do data collection.  So that's list

17   collection.  That's -- we used that nomenclature, list

18   collection for that, as opposed to blind collection.

19   And that is the place where turking was part of the

20   process because it was critical to make sure that the

21   data that we were serving and the predictions we were

22   serving were -- were -- were for that actual specific

23   person we'd been asked for.

24       Q.    Got it.  And then the descriptions here, so

25   they're from Chris LeBailly and his role in the data

1    time baseline.

2        Q.    Okay.  So let's talk about the time-variant

3    variables?

4        A.    Uh-huh.

5        Q.    What are some examples of time-variant

6    variables that hiQ considered for its Keeper model?

7        A.    Yeah, I think -- to be honest with you, I

8    think there was one of those which was, has this profile

9    changed.

10       Q.    Okay.  So to measure that you would look at

11   the current profile and some past profile?

12       A.    The current profile and whatever was the

13   previous one.  So has the -- has the profile changed

14   within that -- between the last thing.

15       Q.    Okay.  So --

16       A.    It may have been more granular than that.

17   Again, I -- I don't -- I don't remember.  There may have

18   been a few -- we may have specifically said, did this

19   person change their title?  Did this person change

20   their -- I mean, obviously they changed companies,

21   right, that was the outcome variable.  Right.  So did

22   they change the company?  Did they change their title?

23   Did, you know -- I don't know why we would have tracked

24   more than just like company, title or, you know, any

25   other -- basically any other change.  So there may have

**Genevieve Graves**

1    been -- there was not a lot of granularity in there, but

2    there may have been some.

3        Q.    Okay.  And then for the time-variant variables

4    it necessarily requires comparing one version of a -- of

5    a profile against a prior version and measuring whether

6    or not information has changed; is that right?

7        A.    That is correct.

8        Q.    Okay.  So when -- when this page says that

9    there's continuous updating of the underlying data and

10   models, including rescraped and refresh external data on

11   a biweekly basis, was it important for hiQ to maintain

12   the Keeper product to have fresh data?

13       A.    It was important -- it was -- it was important

14   to have relatively fresh data.  It was not essential to

15   have, you know, up to the minute, you know, what

16   happened today data.  It was -- it was possible to

17   function with data even for some number of months of --

18   without having data refresh.  But the whole point was to

19   give predictions that were based on roughly now, you

20   know, roughly an employee's current, you know, skill

21   set, job market now because that from two years ago

22   would not be useful.

23       Q.    Okay.  So -- so fair to say that Keeper's

24   predictions depended on relatively frequent access to

25   LinkedIn data?

1        Q.    So in terms of imputed data, imputed data is

2     inherently less accurate than actual data, correct?

3        A.    That is correct.

4        Q.    And then we increase uncertainty and hiQ's

5     predictions?

6        A.    That is correct.

7        Q.    And then I want to go back to your prior

8     answer.  I asked you what would happen if hiQ lost

9     access to continuously refreshed LinkedIn data.  And I

10    think and I want to understand, your answer was that

11    it -- it would have been something to design around,

12    not -- not a company killer but something you could have

13    designed around; is that right?

14       A.    We would have been able to design around it to

15    some extent.  Without having done that experiment it's

16    hard for me to know how successful that would have been.

17    And if it had been reasonably successful, which I think

18    is plausible but not certain because we didn't do it,

19    then that would have been -- we would have just moved

20    forward with that.  If it had been unsuccessful or

21    inadequately successful, then Keeper would have been

22    dead as a product and we would have been sort of whole

23    hog focused on Skill Mapper and the other products that

24    we had in our roadmap that were not critically dependent

25    on LinkedIn data.

**Genevieve Graves**

1    Q.    Got it.  So either you would have been able to

2   design around and continue producing Keeper with

3   valuable predictions for your customers, or you would

4   have just focused on other products without that

5   technical limitation, correct?

6    A.    Correct.

7    Q.    And I -- I also want to clarify.  So Skill

8   Mapper I think you said was initially built with

9   LinkedIn data because that's what you had; is that

10  right?

11    A.    That's correct.

12    Q.    But there was nothing about LinkedIn data that

13  was required for Skill Mapper; you could have found

14  alternate sources, correct?

15    A.    That's correct.

16    Q.    There's another type of variable that I think

17  we reported out separately from the risk score --

18    A.    Mm-hmm.

19    Q.    -- called composite variables?  Do you --

20    A.    Yeah.

21    Q.    Are you familiar with composite variables?

22    A.    Yes, I am.

23    Q.    Okay.  And what are they?

24    A.    So I'm going to give several answers to this

25  question.  The technical answer is that they are linear

CE 0102

1              (Exhibit 503 marked for

2              identification by the Certified

3              Shorthand Reporter.)

4    BY MR. SHAFFER:

8        Q.    Okay.  So if you go down to the very first

9    e-mail in the chain.

10       A.    Yeah.

11       Q.    It's -- it's an e-mail from you saying "Hi

12   George" and that's to George Lan, correct?

13       A.    Yes.

14       Q.    And he was in the sales -- George Lan was in

15   the sales organization under Darin Medeiros, right?

16       A.    He was a customer success person under Ryan

17   Hammond who reported into Darin Medeiros --

18       Q.    Okay.

19       A.    -- I believe.

20       Q.    Fair enough.  So he's -- he's customer facing?

21       A.    Correct.

1   don't remember -- I don't remember this specific use

2   case in detail.  Clearly we did it.  Clearly I -- you

3   know, here I am communicating about it.  But I don't

4   remember -- I hadn't actually remembered that we did

5   that and I don't remember exactly what the process was

6   by which that happened.  It is -- if it's a mechanical

7   turking process, it's definitely going to be true that

8   it was a human doing it.  But what exactly their process

9   was, I just don't remember.

10       Q.    Okay.

11       A.    I'm looking at this e-mail to see if there's

12   sort of additional --

13       Q.    Let -- let me ask a -- a different question.

14   When you were seeking to increase coverage --

15       A.    Mm-hmm.

16       Q.    -- that's because customers wanted to cover as

17   many people on -- either on their employment roster or

18   on the list that they gave you as possible?

19       A.    That's right.

20       Q.    Okay.  So from that perspective, whether the

21   data collection or the sort of identification of people

22   was automated or through turking, the goal was to get as

23   many people as you possibly could included in the

24   customers' analysis; is that right?

25       A.    Correct.  As many of the people as the

**Genevieve Graves**

1   customer wanted included in that analysis, right.   In

2   some cases they were only focused on specific parts of

3   the team.   But yes, deliver to them as much as -- of

4   what they had asked for as we could find in the public

5   data.

6        Q.     While you were at hiQ did you or anybody else

7   working on behalf of the company create LinkedIn

8   profiles for -- for use by the company, by hiQ?

9        A.     There was a hiQ company page I'm sure that was

10   probably created by the sales team.   And there may have

11   been -- I think there were a couple of profiles that

12   were created that were used for testing purposes because

13   that's a profile where you, you know, you can go in, you

14   can make changes to the profile and then you can -- you

15   could scrape the -- the public profile -- you can sort

16   of make things public or private and see, you know,

17   what -- what disappears when and you can make changes to

18   it and see like, you know, our -- is our -- is our

19   scraping and HTML parsing working correctly.

20             MR. SHAFFER:   Okay.   Let's -- let's mark

21   tab 27 as Exhibit 505.

22             (Exhibit 505 marked for

23             identification by the Certified

24             Shorthand Reporter.)

25   ///

CE 0105

**Genevieve Graves**

```
1   the document from my binder.  So Isaac is going to pull

2   it for us and we'll come back to it.

3               MR. WORCESTER:  You guys have been super fast

4   on the documents today.  Can't complain about one missed

5   one.

6   BY MR. SHAFFER:

7       Q.    Okay.  So --

8               MR. WORCESTER:  And, Genevieve, my -- my

9   comment is just normally at depositions, there's a lot

10  of looking around for documents.  It does not normally

11  go as fast as Nathan has seems to have done it today.

12  So if that's Isaac, he deserves some credit.

13              MR. SHAFFER:  Thanks, Corey.

14              Okay.  Let's jump up to tab 35 and mark that

15  as Exhibit 508.

16              (Exhibit 508 marked for

17              identification by the Certified

18              Shorthand Reporter.)

19  BY MR. SHAFFER:

20      Q.    Let me know when you have that open.

21      A.    I have it open.

22      Q.    Okay.  Do you know who Anthony Kosinski is?

23      A.    I don't recognize the name from this -- from

24  this e-mail.  I would infer that he was one of the

25  turkers.
```

CE 0106

**Genevieve Graves**

1     Q.    Okay.  And he's reporting to you in the first

2  sentence:

3            "I think I was banned from

4            LinkedIn today.  For some reason

5            they are not telling me."

6            Do you see that?

7     A.    Uh-huh, yes.

8     Q.    And then below that he pastes a quote that he

9  says -- is originally from LinkedIn that says it's a

10  violation of LinkedIn's user agreement to use -- use:

11            "Automated or manual means to

12            view an excessively high number of

13            profiles or mini-profiles."

14            Do you see that?

15     A.    Uh-huh.

16     Q.    And in the last paragraph he says:

17            "This is hugely surprising ...!"

18            And I think reflects he's joking there, right?

19     A.    I interpret it that way as well.

20     Q.    Okay.  So my understanding of what the

21  turkers -- as you see he calls himself a turker there in

22  the -- in the next-to-the-last sentence.  So that refers

23  to people that mechanical turk for hiQ; is that right?

24     A.    That's correct.

25     Q.    So my understanding is that the turkers would

**Page 221**

1    log into LinkedIn's website and they would view a large

2    number of profiles, right?

3        A.    That's correct.

4        Q.    And at -- at one point here Anthony Kosinski

5    says he got banned from LinkedIn; is that right?

6        A.    That -- that's -- that is what this e-mail

7    says.

8        Q.    Okay.  And he's reporting it to you.  Why?  Do

9    you -- do you know why he's coming to you?

10       A.    Yeah.  I mean, so this is July 2015, so at

11   some point Cameron took over the turking management

12   process, but probably this was before that had happened,

13   so I was probably the direct point of contact for the

14   early external turkers that we used.

15       Q.    Okay.  And what did you do to investigate the

16   report that Anthony is giving you that turking violates

17   the LinkedIn user agreement?

18       A.    I don't think we did anything.  I think we

19   just told him to not -- not turk for a while.

20       Q.    Okay.  At this point did you understand that

21   turking -- that it was LinkedIn's position that turking

22   to view a large number of profiles was a violation of

23   the LinkedIn user agreement?

24       A.    Well, it says it right here so by -- you know,

25   I assume I read this e-mail so, yes.

1    out what -- you know, what was and wasn't possible.  So

2    I, you know, was involved in the early processes of,

3    like, how do we, you know, how do we vet -- how do we --

4    how do we vet profiles to make sure that we're finding

5    the right people, what is a process that works.

6            I believe by the time this e-mail was sent I

7    was mostly out of the loop on that.  And probably the

8    reason I didn't respond to this e-mail was because I did

9    not have any additional ideas or thoughts to offer.

10   Because it had been some time since I had been actively

11   involved in that process and Chris had been doing more

12   of it than me.

13        Q.    Okay.

14              MR. SHAFFER:  Let's mark 37 as 510.

15              (Exhibit 510 marked for

16              identification by the Certified

17              Shorthand Reporter.)

18   BY MR. SHAFFER:

19        Q.    Do you have this e-mail open?

20        A.    Yes.

25        Q.    Okay.  So here you're saying:

**Genevieve Graves**

1             "It's clear that LinkedIn has

2             cracked down on usage in a way that

3             is making problems for turking."

4        Do you see that?

5    A.    Uh-huh.

6    Q.    And you say "Dan" -- that's Dan Miller, right?

7    A.    Uh-huh.

8    Q.        "Can you check and see if you

9             are having issues with scraping?"

10            Correct?

11   A.    Yes.   That's what it says.

12   Q.    Okay.   And then in the next paragraph you

13   reference logged-in accounts doing the searching?

14   A.    Mm-hmm.

15   Q.    And then below that you say:

16            "... for now, can you instruct

17            turkers on how to proceed without

18            logging in?"

19            In all caps.

20            Do you see that?

21   A.    Yes.

22   Q.    So at this point were you instructing the

23   turkers to no longer login to LinkedIn's website?

24   A.    That's -- yes, looks like it.

25   Q.    Okay.   And then you say:

CE 0110

**Genevieve Graves**

| | | |
|---|---|---|
| 1 | | [As read.] |
| 2 | | "I recognize this will impair the |
| 3 | | ability to find people, but it will |
| 4 | | not completely destroy it." |
| 5 | | Do you see that? |
| 6 | A. | Mm-hmm. |
| 7 | Q. | So was your plan at this point to just -- to |
| 8 | continue turking but from logged-out access? | |
| 9 | A. | That's what it looks like in this e-mail. |
| 10 | I -- I don't remember, you know, 2015.  So this is seven | |
| 11 | years ago.  I don't remember what I was thinking seven | |
| 12 | years ago.  But yes, this e-mail looks like it was now | |
| 13 | sort of moving forward into a new process that involved | |
| 14 | not logging in for the turking. | |
| 15 | MR. SHAFFER:  Okay.  Let's mark 38 as | |
| 16 | Exhibit 511. | |
| 17 | (Exhibit 511 marked for | |
| 18 | identification by the Certified | |
| 19 | Shorthand Reporter.) | |
| 20 | BY MR. SHAFFER: | |
| 21 | Q. | So I apologize about the quality of this one. |
| 22 | This is -- I think because there's images in it, this is | |
| 23 | how it was produced to us.  Let me know when you have it | |
| 24 | open and you've had a chance to look at it. | |
| 25 | A. | This is July of 2015. |

**Genevieve Graves**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1           Shayla this afternoon?  We need to

2           resolve this without getting

3           LinkedIn involved."

4           Do you see that?

5      A.    Mm-hmm.

6      Q.    Why didn't you want to get LinkedIn involved?

7      A.    So we knew that we were doing things that were

8    kind of a cat and mouse game, right.  We had things that

9    we wanted to do using public LinkedIn data and there was

10   a little bit of this, you know, what -- what is -- like

11   what is actually possible and what is not going to be

12   possible.  So I -- you know, I -- I think that it was

13   clear that we wanted to figure out what was going to be

14   technically doable without having direct conversations

15   with LinkedIn.

16     Q.    So you didn't want LinkedIn to know what you

17   were doing on the site, right?

18     A.    Correct.

19     Q.    And I -- I just want to be clear about

20   something.  You said that you wanted to do things using

21   public LinkedIn data, right?

22     A.    Uh-huh.

23     Q.    But earlier in your testimony you made a

24   pretty clear distinction between public LinkedIn data

25   and private LinkedIn data and you said the private data

**Genevieve Graves**

**hiQ Labs, Inc. vs.**
**LinkedIn Corp.**

1  is what's available when you log in; is that right?

2      A.    That's correct.

3      Q.    And turkers were logging in, correct?

4      A.    That's correct.

5      Q.    All right.  So that implicated the private

6  portions of LinkedIn's website behind the password wall,

7  correct?

8      A.    That's correct.

9      Q.    Okay.  And they were turkers as we saw in

10  earlier exhibits.  They were logging into LinkedIn's

11  website and they were recording URLs from -- from the

12  website that they obtained while logged in; is that

13  right?

14      A.    They were logging in and they were recording,

15  yes or no, is this the person that we thought we were

16  looking for.

www.aptusCR.com
CE 0113

Genevieve Graves

1    Q.    Got it.  And that's from a logged in --

2    logged-in access?

3    A.    That is correct.

4    Q.    Okay.  So then you've got this e-mail here,

5    July 20 -- July 14th, 2015.  You tell Ari to try to

6    resolve it without getting LinkedIn involved?

7    A.    Mm-hmm.

8    Q.    Did hiQ continue to turk after July 14th,

9    2015?

10   A.    Yes, we did.

11   Q.    Okay.  Who is Cameron Cole?  We talked about

12   him earlier.  Can you remind me what role he played?

13   A.    Cameron Cole joined the company as an intern

14   and then was in a -- I think his title was data

15   engineer.  But he was in a sort of -- he did some data

16   science and some engineering work.  And he's the person

17   who took over management of the turking process at some

18   point.

19            MR. SHAFFER:  Okay.  And let's mark tab 39.

20   So this is a document with a number of exhibits.  Can

21   you -- is it possible to mark them with sub numbers,

22   like the main e-mail will be Exhibit 512 and then the

23   attachments will be 512.1 and so on?

24            MR. WORCESTER:  That's fine by me.

25   ///

1              (Exhibit 512 marked for

2              identification by the Certified

3              Shorthand Reporter.)

4    BY MR. SHAFFER:

5        Q.    So while he's marking those, let's just take a

6    look the first cover e-mail, which is tab -- sorry,

7    Exhibit 512, with no decimal.

8        A.    Uh-huh.

9        Q.    So this is an e-mail from Cameron Cole to

10   Logan Marshall?

11       A.    That's what the e-mail says, yes.

12       Q.    Do you know who Logan Marshall was?

13       A.    I do not.

14       Q.    Okay.  So -- so based on the attachments here,

15   we have turk instructions redux.docx; a mutual NDA and

16   some VPN information.

17            Do you see -- do you see those attachments

18   referenced in this e-mail?

19       A.    Yes.

20       Q.    Does that suggest to you that this is a -- a

21   person who's being retained to turk for hiQ?

22       A.    Yes.  I -- that is the assumption I would make

23   based on this e-mail and these documents.

24       Q.    Okay.  And he's asking the -- the recipient to

25   sign the NDA for me.  Do you see that?

1        A.      Yes.

2        Q.      Was it a common practice for hiQ to require

3    the turkers to sign NDAs?

4        A.      I don't know.  My -- my interpretation of this

5    e-mail would be that -- that, yes, that this was part of

6    the process that Cameron put in place.

7        Q.      Okay.  Do you know why they were signing NDAs?

8        A.      We had most people that we interacted with

9    sign NDAs.  It's pretty standard practice in Silicon

10   Valley if you're going to talk to somebody in any level

11   of detail about what your company does.  So it does not

12   surprise me that we had the turkers sign NDAs.

13       Q.      Okay.  Let's go to the first attachment 39 --

14   sorry, 512.1.

15               (Exhibit 512.1 marked for

16               identification by the Certified

17               Shorthand Reporter.)

18       A.      Uh-huh.

19   BY MR. SHAFFER:

20       Q.      So this is the turk instructions redux

21   document?

22       A.      Uh-huh.

23       Q.      Have you seen this before?

24       A.      Yes.

25       Q.      Okay.  So first I want to look at the graphic

Genevieve Graves

hiQ Labs, Inc. vs.
LinkedIn Corp.

1   that's under paragraph No. 2.

2        A.     Mm-hmm.

3        Q.     Is this the interface that turkers use to

4   record the information that they needed for turking?

5        A.     Yes, that's my understanding.

6        Q.     Okay.  And then it -- it looks like they have

7   two options with the URL.  So they have a proposed URL

8   and that would come from the automated process to find

9   people; is that right?

10        A.     Correct.

11        Q.     And then they had a option to either use the

12   proposed URL or replace that URL with something else,

13   right?

14        A.     Correct.

15        Q.     So if the proposed URL was -- was incorrect,

16   it was with the wrong person, they would actually record

17   the correct URL from LinkedIn and place it into that

18   replace box; is that right?

19        A.     They could type a different URL in there and

20   use replace to say use this one instead.

21        Q.     Okay.  And that was the point of turking,

22   right, is to take incorrect URLs and replace them with

23   the correct one; is that right?

24        A.     The primary purpose of turking was to identify

25   incorrect URLs so we didn't use them.  And in some cases

**Page 235**

1   there -- it was possible to then identify a correct URL

2   and use that instead.  But the primary purpose of

3   turking was to not use incorrect URLs.

4        Q.    Okay.  And going back to the cover e-mail, so

5   the -- the main Exhibit 512, that one's dated

6   January 29th, 2016, right?

7        A.    Yes.

8        Q.    So that's about six months after the e-mails

9   we just looked at referring to bans from turking,

10  correct?

11       A.    Yes.

12       Q.    Paragraph -- going back to 512.1, the first

13  attachment, the -- the turking instructions.

14       A.    Mm-hmm.

15       Q.    Do you see paragraph 3, which is on the first

16  and second page of the document?

17       A.    Mm-hmm.

18       Q.    The instruction there is:

19            "Log into a LinkedIn.com account.

20            It is a good idea to make a fake

21            account with a fake e-mail to deal

22            with the possibility of being banned

23            on LinkedIn."

24            Do you see that?

25       A.    Mm-hmm, yes.

CE 0118

**Genevieve Graves**

1    Q.    So these instructions to turkers recommended

2    that fake accounts be made to avoid banning on LinkedIn,

3    correct?

4    A.    Correct.

5    Q.    And you understand -- you understood that

6    logging in to -- or strike that.

7          You understood that registering for an account

8    on LinkedIn required agreeing to the user agreement,

9    correct?

10   A.    Yes, that makes sense.

11          MR. SHAFFER:  And okay.  Let's bring up tab 40

12   as Exhibit 513.

13          (Exhibit 513 marked for

14          identification by the Certified

15          Shorthand Reporter.)

16   BY MR. SHAFFER:

17   Q.    And we've got an e-mail from Sarah G. to

18   Cameron Cole here.  Do you see that?

19   A.    I see that.

20   Q.    And the attachment is mechanical turking

21   statement of work.  Do you see that?

22          MR. WORCESTER:  That's not what I'm looking

23   at.  Hold on.

24   A.    I see that name for the attachment.  I do not

25   actually see the attachment.

Genevieve Graves

hiQ Labs, Inc. vs.
LinkedIn Corp.

1   BY MR. SHAFFER:

2       Q.    I think the attachment is in the chat as the

3   second file.

4       A.    Ah.  Okay.  Yes, there.  Yeah.

5       Q.    Okay.  So this is dated --

6             MR. WORCESTER:  Do you want the attachment or

7   the e-mail, Nathan?

8             MR. SHAFFER:  The e-mail.

9   BY MR. SHAFFER:

10      Q.    So you've got an e-mail here dated

11  6/12/2018 from a turker to Cameron Cole, correct?

12      A.    That's what I see.

13      Q.    Okay.  So hiQ continued to turk through at

14  least June of 2018; is that right?

15      A.    That's what it looks like.

16            MR. SHAFFER:  Okay.  Let's mark 41 as

17  Exhibit 514.

18            (Exhibit 514 marked for

19            identification by the Certified

20            Shorthand Reporter.)

21  BY MR. SHAFFER:

22      Q.    Let me know when you have that.

23      A.    I have it open.

24      Q.    And this is an e-mail from Cameron Cole to

25  you?

**Page 238**

1       A.      Yes.   This is an e-mail to me.

2       Q.      Okay.  And if you go down to the -- the bottom

3   e-mail, looks like you invited the team to send the top

4   five frustrations that they have with the company,

5   right?

6       A.      Yes.

7       Q.      And then Cameron responds with only three.  So

8   I take that he's a pretty satisfied employee because he

9   wasn't able to get up to five.  But let's focus on the

10  third one.

11      A.      Uh-huh.

12      Q.      He's talking about some issues with turking.

13  And just to ground us in a date, this is 5/22/2016, so

14  about a year after those banned e-mails we looked at

15  earlier?

16      A.      Sorry.  Say that again.

17      Q.      I'm just trying to -- to orient you in the

18  timeline.

19      A.      Yeah.

20      Q.      So --

21      A.      This is early -- this is sort of late spring

22  2016.

23      Q.      Okay.  And he's referencing -- it says:

24              "However, I think what happened

25              with Jackson and Crystal is a weird,

1               one-off situation that was easily

2               diffused."

3               Do you know what he's talking about there?

4     A.    I don't know.  I don't remember.  I -- I don't

5   know who Jackson and Crystal are.  I assume that they

6   were turkers.  What happened with Jackson and Crystal?

7   So I don't remember this incident that he's referring to

8   here.  I infer from this e-mail that Jackson and Crystal

9   were turkers and what he's talking about here is

10  background checks.  So maybe some kind of formalized

11  process about onloading -- about onboarding people.

12     Q.    Do you have any recollection as to why

13  background checks may have been under consideration for

14  turkers?

15     A.    I don't.  We may have started requiring them

16  for internal employees around this time and it may have

17  been decided we wanted to extend that to turkers.  But I

18  don't -- I don't remember.

19     Q.    Okay.  And then about halfway through the

20  paragraph --

21     A.    Mm-hmm.

22     Q.    -- he says:

23               "I feel as though creating a

24               training set of fake profiles to

25               standardize turking would be an

**Genevieve Graves**

1              arduous process, one that requires

2              more cunning and deceptive tactics

3              to perform and will end up breaking

4              more terms of use than turking."

5              Do you see that?

6        A.    Uh-huh, I do.

7        Q.    So at this time hiQ understood that turking

8   violated LinkedIn's terms of use, correct?

9              MR. WORCESTER:  Object to the form.

10       A.    We definitely knew that we were on thin ice

11   with turking because people were logging in and then

12   looking at a large number of profiles.  And it was clear

13   from the fact that people were then getting banned or

14   shut down that this was not activity that LinkedIn

15   wanted.  I don't think we had a clear sense of exactly,

16   you know, where that line was and what it meant to be,

17   you know, on which side of it.  But we were aware that

18   we were, like, you know, on the edge.

19   BY MR. SHAFFER:

20       Q.    Okay.  So we looked at an e-mail earlier that

21   said -- you know, from LinkedIn that Anthony Kosinski

22   sent to you that said that it did violate the terms of

23   use, right?

24       A.    Mm-hmm.

25       Q.    And here you have Cameron Cole saying it

CE 0123

**Genevieve Graves**

1   violates the terms of use, right?

2        A.   So I believe -- we can go back to the e-mail

3   from Anthony, but I believe what it said was that

4   look -- looking at a large number of profiles manually

5   violates the terms of use or was it saying that pulling

6   data out of those profiles violates the terms of use?

7        Q.   It said viewing them.  You can look at it if

8   you want.

9        A.   Yeah.  So if viewing profiles manually above

10  some number -- some, you know, some -- some number that

11  you don't know until you walk across that trip line

12  violates the terms of use, our turkers were doing that

13  because they were walking across that trip wire and

14  then, therefore, violating the terms of use.

15       Q.   And your turkers were also creating fake

16  accounts regularly, correct?

17       A.   I don't think that was happening regularly.  I

18  think --

19       Q.   It was in the instruction sheet, wasn't it?

20       A.   Oh, sorry.  Was -- they were -- they -- they

21  were setting up an account for themselves that they were

22  then using to turk.  Yes, they -- they were doing that.

23       Q.   Correct.  And that was something hiQ

24  suggested, that they create fake accounts, correct?

25       A.   That's what's in this document, yes.

1       Q.     Okay.  And did you look at LinkedIn's terms of

2    use to see if creating fakes -- fake accounts was

3    prohibited?

4       A.     We did not.

5       Q.     And did you follow up on Cameron Cole's

6    statement that turking violates terms of use here?

7       A.     Follow up in, um ...

8       Q.     Did you read LinkedIn's terms of use to see --

9    to see what the issues might be?

10      A.     No.

11      Q.     So you elected not to read LinkedIn's terms of

12   use to see if you were in compliance?

13      A.     Correct.

14              MR. SHAFFER:  Let's go back to the Liz Brokken

15   e-mail because we -- we got it again.  It should be in

16   the -- Aaron, it should be in your file as tab 57.

17   Okay.  So Exhibit 515.

18              (Exhibit 515 marked for

19              identification by the Certified

20              Shorthand Reporter.)

21   BY MR. SHAFFER:

22      Q.     Do you have it?

23      A.     Uh-huh.

24      Q.     Okay.  So this is related to the Joe Shmoe

25   profile that we looked at earlier, the -- the rocks and

1          MR. SHAFFER:  Okay.  Let's mark Exhibit 51 --

2    I'm sorry, tab 51 as Exhibit 524.

3          VIDEOGRAPHER:  We're on 525.

4          MR. SHAFFER:  525.

5          (Exhibit 525 marked for

6          identification by the Certified

7          Shorthand Reporter.)

8          THE WITNESS:  Wait.  I'm sorry, I just opened

9    the same thing again.

10          MR. SHAFFER:  Sorry, my mistake.

11          THE WITNESS:  No, not a problem.

12    BY MR. SHAFFER:

13      Q.    Okay.  So this e-mail is November 15th, 2016,

14    so about two weeks later from you to Darin Medeiros,

15    right?

16      A.    Mm-hmm.

17      Q.    And then you say, in the middle paragraph,

18    this one sentence:

19          "If this business is not viable,

20          then we should be looking for an

21          exit."

22          Do you see that?

23      A.    Mm-hmm.

24      Q.    And you're specifically talking about hiQ as a

25    business; is that right?

Genevieve Graves

1      A.    That's correct.

2      Q.    So at this point you had concerns about

3   whether or not the business was viable?

4      A.    Sure.  I -- there was -- there were few times

5   within the existence of, you know, the company where you

6   don't think that -- the start-up, that you're always

7   worried about that.

8      Q.    Okay.

9      A.    This was a difficult time.

10          MR. SHAFFER:  And then let's mark tab 52 as

11   Exhibit 526.

12          (Exhibit 526 marked for

13          identification by the Certified

14          Shorthand Reporter.)

15   BY MR. SHAFFER:

16      Q.    About four days later you have an e-mail from

17   Rob DeSantis and you respond:

18          [As read.]

19             "Thank you for your advice.  I

20          know you would [sic] like to help

21          and it is always interesting to hear

22          your input.  Unfortunately, in this

23          case, it's off the mark."

24          Do you remember this interaction?

25      A.    No.  But let me -- let me take a look at

1   State of California      )
                             )SS:
2   County of San Diego      )

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken

6   ( X ) remotely (  ) live before me at the time and place

7   herein set forth; that any witnesses in the foregoing

8   proceedings, prior to testifying, were placed under

9   oath; that a verbatim record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; further, that the

12  foregoing is an accurate transcription thereof.

13       Further, that if the case is pending in the

14  Federal Court, before the proceedings were transcribed

15  by me, review [  ] was [ X ] was not requested.

16       I further testify that I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney of any of the parties.

19       IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21  DATED  May 27, 2022.

22

23  _____

24  LINDA E. MARQUETTE, CSR

25  Certificate No. 11874

CE 0128

# Compendium Exhibit 6


# (CE0180-0312 of Exhibit
Filed Under Seal)

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
    hiQ LABS, Inc.,                      )
 5                                       )
               Plaintiff,               )
 6         vs.                          )   Case No.
                                        )   17-cv-03301-EMC
 7  LINKEDIN CORPORATION,               )
                                        )
 8             Defendant.               )
    --------------------------------X
 9  LINKEDIN CORPORATION               )
                                        )
10             Counterclaimant,        )
           vs.                          )
11                                      )
    hiQ LABS, INC.                      )
12                                      )
               Counter-Defendant.      )
13  --------------------------------X
14
15           VIDEOTAPED ORAL DEPOSITION OF
16               YAEL HOCHBERG, Ph.D.
17              Friday, July 29, 2022
18                10:09 a.m. (CT)
19
20              (Conducted Remotely)
21
22
23
    Stenographically remotely reported by:
24  Mayleen Ahmed, RMR, CRR, CRC, CRR/CSR
25
```

```
                                                  Page 8
1                    ----------------
2                    YAEL HOCHBERG, Ph.D.
3          having been duly sworn, testified as follows:
4                    ----------------
5                        EXAMINATION
6    BY MS. MILLER:
7         Q.    Good morning, Dr. Hochberg.  This is
8    Elisabeth Miller from Quinn Emanuel.  As you just
9    heard, I will be asking you questions today.
10              Just some ground rules before we get
11   started, please.  If you have any questions about my
12   questioning, if you need me to clarify, please ask,
13   and I will do my best to do so.  If you need a
14   break, please ask for one, but I just ask that you
15   answer any pending questions before we go on a
16   break.
17              I think you stated already that you do
18   not have anything in front of you open besides clean
19   copies of your reports, Mr. Sacks' reports, and
20   Dr. McElfresh's reports; is that correct?
21        A.    That is correct.
22        Q.    And you don't have anything open on your
23   screen; is that correct?
24        A.    I do not.  And I have also endeavored
25   to -- actually, hold on one second.  There is an
```

Page 11

```
1    reports.  Obviously, both of Mr. Sacks' reports,

2    Dr. McElfresh's reports, various of the source

3    documents underlying all of these reports.

4              I think that's pretty much it.

5         Q.   How many hours total do -- do you

6    estimate that you spent preparing for this

7    deposition?

8         A.   Oh, a few hours a day for the last five

9    or six days.

10             MS. MILLER:  Chad, can we, please, pull

11   up the opening report, tab A?

12             You see that there are three folders,

13   Chad?  And I'm talking about the opening folder.

14             THE CONCIERGE:  Correct.

15             MS. MILLER:  Just confirming, Chad,

16   that's been pulled up.

17             THE CONCIERGE:  Yes.  Exhibit 1385 is

18   ready.

19             MS. MILLER:  Okay.  Thank you.

20             (Exhibit 1385 marked for identification.)

21             MS. MILLER:  Thank you.

22   BY MS. MILLER:

23        Q.   Dr. Hochberg, if you can please open up

24   Exhibit 1385.

25        A.   Yep.
```

Page 12

1        Q.      And do you recognize this as the opening
2    report you submitted in this matter on June 7, 2022?
3        A.      Obviously, without reading the entirety
4    of the document, I can say that this does look like
5    it is the report.  I take your representation that,
6    it is, in fact, a soft copy of it.
7        Q.      And did you prepare this report?
8        A.      Yes, I did.
9        Q.      Did you draft the report yourself?
10        A.      Yes, I did.  There's -- people from
11    Analysis Group helped me with formatting and making
12    sure I had all of the documents I relied on
13    correctly, and the appendix, and making my figures
14    look prettier than I am capable of making them.
15    But, ultimately, this is a hundred percent my work
16    product and my drafting, yes.
17        Q.      And the documents that you relied upon
18    to draft this opinion, the ones produced by parties
19    in this action, whether hiQ or LinkedIn, those were
20    provided by your counsel; is that right?
21        A.      Yes, those were provided by counsel.
22        Q.      And at any point, did you ask your
23    counsel for additional documents that were produced
24    in this action?
25                MR. COHEN:  I'm going to object.  We

1                    (Exhibit 1386 marked for identification.)

2    BY MS. MILLER:

3          Q.    Okay.  Dr. Hochberg, please let me know

4    when you have 1386 open.

5          A.    Okay.  There we go.

6                Okay.  Hold on one second.  I'm opening

7    it.

8                Okay.

9                MS. MILLER:  And just for the record,

10   can we, please, mark rebuttal tab 32, and also

11   rebuttal tab 33.  And I'll introduce each of those.

12               THE REPORTER:  Did you say tab 3 or 33,

13   Counsel?

14               MS. MILLER:  32 and 33, please.

15   BY MS. MILLER:

16         Q.    So 1386, will you please open that?

17         A.    Uh-hmm.

18         Q.    Do you recognize that as the rebuttal

19   report that you filed in this case?

20         A.    Again, subject to the caveat that I

21   won't waste your time reading through every page of

22   it, it does appear to be my rebuttal report in this

23   matter, yes.

24         Q.    Okay.

25                    (Exhibit 1387 marked for identification.)

```
                                              Page 230
 1   off the record.

 2                  (Recess taken.)

 3                  THE VIDEOGRAPHER:  We're back on the

 4   record.  The time is 4:21 p.m.

 5                  MS. MILLER:  Thank you, Dr. Hochberg,

 6   for your time today.  I have no further questions.

 7                  THE WITNESS:  Thank you.

 8                      ---o0o---

 9                     EXAMINATION

10   BY MR. COHEN:

11        Q.    Professor Hochberg, I have just a couple

12   of questions.

13               The opinions that are contained in your

14   opening report and your rebuttal report, do those

15   accurately reflect the opinions that you intend to

16   provide in connection with this matter?

17        A.    Yes, they do.  I would just add that I

18   also have some opinions that I am developing

19   regarding Mr. Sacks' rebuttal to my report that I

20   may wish to also opine on at a later date.

21                  MR. COHEN:  Thank you.  I have no

22   further questions.

23                  THE VIDEOGRAPHER:  The time is 4:22 p.m.

24   We're off the record.

25                  (Deposition concluded at 4:22 p.m.)
```

Page 233

1                    REPORTER'S CERTIFICATE
2
3              I, MAYLEEN AHMED, the undersigned, a
       Registered Merit Reporter, Certified Realtime
4      Reporter, and Certified Shorthand Reporter holding a
       valid license in the State of California, do hereby
5      certify:
6              That the witness, YAEL HOCHBERG, Ph.D.,
       before examination was remotely duly sworn.
7
               That the foregoing deposition was taken
8      remotely stenographically by me on July 29, 2022,
       and thereafter was transcribed by me, and that the
9      deposition is a full, true, and complete transcript
       of the testimony, including questions and answers,
10     and objections, motions and exceptions made by
       counsel.
11
               That, in accordance with FRCP 30(e),
12     before completion of the proceedings, review of the
       transcript was not requested and signature was not
13     reserved by the witness.
14             I further certify that I am not a
       relative or employee of any attorney or counsel or
15     any party to this action, and that I am not
       financially interested in the said action or the
16     outcome thereof.
17             In WITNESS WHEREOF, I have hereunto set
       my hand this 30th of July 2022.
18
19             _Mayleen Ahmed_
20     _____
       /s/   MAYLEEN AHMED, RMR, CRR, CRC
21     Washington CCR No. 3402 - Exp 12/29/22
       Oregon CSR No: 17-0447 - Exp 12/31/23
22     Texas CSR No:  9428 - Exp 7/31/23
       California CSR No: 14380 - Exp 12/31/22
23     New York Notary Public
24
25

# Compendium Exhibit 7

# (CE0328-0360 of Exhibit Filed Under Seal)

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4    HIQ LABS, INC.,

5              Plaintiff,

6    vs.                        Case No. 17-cv-03301-EMC

7    LINKEDIN CORPORATION,

8              Defendant.

9    _____

10   AND RELATED CROSS-ACTION.

11   _____

12

13

14                   CONFIDENTIAL

15        VIDEOTAPED DEPOSITION OF DARREN KAPLAN

16                   May 4, 2022

17                    9:10 a.m.

18

19        2601 South Bayshore Drive, Suite 1550

20                  Miami, Florida

21

22   KATHIA CAMACHO, Court Reporter

23   Transcribed by TERRI NESTORE
     CSR No. 5614, RPR, CRR

24

25   Job No. 10103963

CE 0314

1        THE VIDEOGRAPHER:   Good morning.

2        We are now on the record.   Today's date is

3  May 4th, 2022, and the time is 9:10 a.m.   This is the

4  videotaped deposition of Darren Kaplan taken in the matter

5  of hiQ Labs, Inc. vs. LinkedIn Corporation.

6        We are located at 2601 South Bayshore Drive,

7  Miami, Florida.   The court reporter is Kathia Camacho and

8  the videographer is Javier Ordoñez.

9        Would counsel please introduce themselves for the

10  record, after which the court reporter will swear in the

11  witness.

12        MS. SKIBITSKY:   Good morning.   Hope Skibitsky

13  from Quinn Emanuel Urquhart & Sullivan, here on behalf of

14  plaintiff hiQ Labs, Inc. and the witness Darren Kaplan,

15  and with me is my colleague Renita Sharma.

16        MR. RUGANI:   And good morning, Paul Rugani from

17  Orrick, Herrington & Sutcliffe for LinkedIn.

18        Also joining via Zoom are my colleague Maria

19  Sokova and Aaron James of LinkedIn.

20        THE REPORTER:   Good morning, sir.   I'm going to

21  ask you to raise your right hand, please.

22

23                    DARREN KAPLAN,

24          having been first duly sworn,

25        was examined and testified as follows:

CE 0315

```
 1              THE REPORTER:  The witness has been sworn.
 2              We are officially on the record.
 3
 4                           EXAMINATION
 5   BY MR. RUGANI:
 6        Q.  Great.  Good morning, Mr. Kaplan.
 7        A.  Good morning.
 8        Q.  Could you please state your full name for the
 9   record.
10        A.  Darren Kaplan.
11        Q.  And your current address?
12        A.  Um, 4250 Galt Ocean Drive, Fort Lauderdale,
13   Florida.  I think it's apartment 6M.
14        Q.  Thank you.
15            Mr. Kaplan, have you ever been deposed before?
16        A.  No.
17        Q.  Have you ever offered sworn testimony in any
18   form?
19        A.  No.
20        Q.  So just to give you a little bit of orientation
21   for the process for what's going to happen today.
22            So you were just sworn in by the court reporter
23   and you understand that the testimony that you're giving
24   today is under oath, as if you were sitting in a
25   courtroom?
```

**Confidential**

**Darren Kaplan**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1   for the record, I don't know that that's something that

2   Mr. Kaplan would necessarily know, which documents he was

3   reviewing in the course of his personal preparation versus

4   his 30(b)(6).

5              MR. RUGANI:  Understood.

6      **Q.   There are documents that you reviewed in**

7   **preparation for your deposition, generally speaking?**

8      A.   Generally speaking.

9      **Q.   That's fine.**

10             **So I understand that you founded the company that**

11  **became hiQ in 2012; is that correct?**

12     A.   Yes.  Co-founded.

13     **Q.   That was my next question.**

14             **Who did you found the company with?**

15     A.   Um, the...  there was a few co-founders.  They

16  came in at different times.  So Sherman Hu, H-U.

17     **Q.   H-U.**

18     A.   Then Rob DeSantis, then Genevieve Graves.

19     **Q.   Any other co-founders?**

20     A.   No.

21     **Q.   You said they came in at different times.  Are**

22  **any of the three people that you mentioned, co-founders**

23  **from the very start of the company?**

24             MS. SKIBITSKY:  Objection, vague.

25             THE WITNESS:  When it was founded, Sherman Hu and

CE 0317

1   I were the first two.

2   BY MR. RUGANI:

**3**      Q.  And I understand that at the time the company was

4   founded it was called OrgStars; is that correct?

5      A.  Yes.

**6**      Q.  How did you know Sherman Hu?

7      A.  Sherman worked at LinkedIn, I worked at a

8   different company and Sherman was my sales rep so when I

9   needed to buy LinkedIn job postings and profiles, I would

10  call Sherman and that's how we met.

**11**     Q.  What company were you working at at that time?

12     A.  A company named eQuest.

**13**     Q.  What did eQuest do?

14     A.  They were a job posting aggregator.

15         We worked with big companies and we helped them

16  post jobs on the internet?

17         So LinkedIn was a destination of job postings.

**18**     Q.  What was your job at eQuest?

19     A.  Sales.  Sales rep.

**20**     Q.  At the time that you and Mr. Hu decided to start

21  OrgStars, was he a current LinkedIn employee?

22     A.  Um, when we started -- he left.

23         He was not there at that time.

**24**     Q.  When you and Mr. Hu started OrgStars, what was

25  the business plan for the company?

1          MS. SKIBITSKY:  Objection, vague.

2          THE WITNESS:  I would say there's probably -- can

3   you ask that in a different way?

4   BY MR. RUGANI:

5     **Q.  What was the purpose of OrgStars when you started**

6   **the company with Mr. Hu?**

7     A.  OrgStars was short for Organizational Stars and

8   we were focused on employees and setting employees up for

9   success and trying to find if we can understand culture

10  fit for an employee inside an organization.

11    **Q.  Prior to starting OrgStars, had you been a CEO**

12  **anywhere before?**

13    A.  No.

14    **Q.  What was Mr. Hu's role at the start of OrgStars?**

15    A.  Co-founder.

16    **Q.  Aside from being co-founder, did he have any**

17  **other title at the company?**

18    A.  No.

19    **Q.  Did you have a title of CEO at OrgStars?**

20    A.  Yes.

21    **Q.  How would you describe the...  the duties that**

22  **Mr. Hu had as a co-founder of OrgStars?**

23    A.  Market research and...  I would say market

24  research and um...  um...  I'm not sure I have the right

25  phrasing here, but like sounding board, like...

Darren Kaplan

Confidential

hiQ Labs, Inc. vs.
LinkedIn Corp.

1   any concern?

2       A.   I don't -- I do not know what they were doing.

3             MR. RUGANI:   The next one is 10.  It's an email.

4             The Bates number is hiQ_00189601.

5             It's a May 5th, 2016, email.

6             (Exhibit 10 marked.)

7   BY MR. RUGANI:

8       Q.   And Mr. Kaplan, you are not on the email.

9             Go ahead and read it, if you would like.

10            MR. MULLER:   What tab will this be?

11            MR. RUGANI:   So sorry.  It was Tab 29.

12            MR. MULLER:   Will Tab 152 be available digitally

13  as well?

14            MR. RUGANI:   Yeah, we'll make sure we do so.

15      Q.   All right, have you had a chance to read that?

16      A.   Yes.

17      Q.   Did anybody at any time, while you were CEO of

18  hiQ, raise a concern that by turking, hiQ might be in

19  violation of LinkedIn's user agreement?

20            MS. SKIBITSKY:   Objection, form.

21            THE WITNESS:   I'm sorry, can you ask that one

22  more time?

23  BY MR. RUGANI:

24      Q.   Sure.  At any time while you were CEO of hiQ, did

25  anyone raise any concerns to you that turking might be in

1          MR. RUGANI:  Does that work for you?  Okay.

2          THE WITNESS:  Can you do me a favor?  Can you

3  shut off maybe this main light?  Maybe that will help her.

4          Maybe it's just a lighting issue.

5          THE VIDEOGRAPHER:  That's going to affect my...

6          THE WITNESS:  Okay, sorry.  Bad suggestion.

7          Okay.  All right, Paul, I'm still ready.

8          MR. RUGANI:  All right, Exhibit 17 is our

9  Tab 110, which is Bates No. HiQ_00317715, a Board Deck

10 from a February 8, 2017, board meeting.

11         (Exhibit 17 marked.)

12 BY MR. RUGANI:

13     Q.  Mr. Kaplan, did you participate in this meeting?

14     A.  Paul, give me one second.  I just want to give a

15 quick glance.  Okay, Paul, what was your question?

16     Q.  Did you participate in this board meeting?

17     A.  February.  I think this was -- the answer is yes.

18     Q.  I want to look to -- unfortunately these slides

19 are not numbered.  Go to the ninth page of the document,

20 it should have the 2016 FY waterfall heading on it.

21     A.  This?

22     Q.  No.  A little further.  That should be it.

23     A.  Oh, thank you.

24     Q.  There's a note down at the bottom of this

25 waterfall that says "377K churn is 49 percent churn;

**Confidential**

1    Excluding BMS 100K churn is 36 percent."

2          Do you know what this note is describing?

3      A.  A churn would be a customer that did not renew.

4      Q.  So 49 percent churn, what is that 49 measured

5    against?

6      A.  I do not...  I do not recall.

7      Q.  Is this saying that roughly half of the existing

8    customer value is not renewing its agreements?

9      A.  I think there was -- I'm not -- 36.  I think the

10   number should be 36.  I'm not sure if it's half, but the

11   36 percent would mean that 36 percent did not renew.

12     Q.  And do you know what the reference to "Excluding

13   BMS" is?

14     A.  I don't remember.  It might have been how that

15   contract was set up.

16     Q.  Is "BMS" a reference to Bristol-Myers Squibb?

17     A.  Yes.

18     Q.  If you go forward a few pages to Positive/Risk of

19   Sales Team.

20     A.  Can I see what it looks like?

21          Is it this one, Paul?

22     Q.  Yes, that's right.

23     A.  All right, go for it.

24     Q.  So under Risks, the second full bullet there

25   says, "Demand generation zero inbound lead activity."

CE 0322

1       Do you know what "zero inbound lead activity" is

2  referring to?

3       A.  I believe so.

4       Q.  What do you understand it to be referring to?

5       A.  That means the work that our sales team is doing

6  is they are doing everything, calling out everything

7  versus some -- someone filling out a form on our website

8  requesting information.

9            THE REPORTER:  Requesting?

10           THE WITNESS:  Information.

11  BY MR. RUGANI:

12       Q.  What actions were hiQ taking to try to increase

13  the amount of inbound activity that it got for demand of

14  its products?

15       A.  I'm sorry, can you repeat that question?

16       Q.  Sure.  What actions were hiQ taking around this

17  time period to increase the amount of inbound activity for

18  demand in its products?

19       A.  So...  you know, at this moment, which is

20  February 2017, so much of our...  our demand gen was built

21  around us building a community and us putting together

22  Elevate conferences, build out our product roadmap, our

23  brands.  So, so much of our efforts, in a great way, was

24  done around the community.

25           Now at this date, February 8th, I think there's

1  probably my final board meeting as CEO and what's -- what

2  was a good moment was Mark was coming in, and Mark had his

3  own kind of vision on how we should approach messaging and

4  marketing.

5          So I don't think this is a negative, but it was

6  just how we were kind of thinking about our traction

7  channels, and so much of our traction channels was about

8  building out events.  So I don't think this was -- I don't

9  think Mark was at this meeting, but I think it was just --

10 this might have been the last meeting before Mark became

11 CEO.  Or maybe Mark was at this meeting.  I'm not sure.

12      Q.  Okay.  If you'll flip forward a few slides to one

13 that has the fiscal year 2016 cash flow statement.

14      A.  Got it.

15      Q.  And there's a bullet on the right that notes

16 "Cash-Out date September."

17      A.  Mm-hmm.

18      Q.  Do you understand what that's referring to?

19      A.  Let me just get a quick read of this.  Yeah.

20      Q.  What is that referring to?

21      A.  It's if...  that's a term that says based on this

22 page, nothing changes.  No money coming in, no investors

23 coming in.  There will be no cash in the bank.  That's if

24 nothing changes.  That's if no new clients come in, that's

25 if no new investment comes in.

Confidential

1      A.   Just how I was introduced to Scott Roberts as the

2   startup killer, and then another person I met who was told

3   he was there to shut down companies that Reid Hoffman did

4   not invest in.

5      Q.   **And any other independent basis, aside from that?**

6      A.   I have to keep thinking about it but...

7      **Q.   In any of the conversations that you had with**

8   **Lorenzo Canlas, did you affirmatively ask him, is LinkedIn**

9   **okay with hiQ collecting data from LinkedIn profiles?**

10          MS. SKIBITSKY:   Objection, form.

11          THE WITNESS:   I wouldn't use those -- I did not

12   use those exact words.

13   BY MR. RUGANI:

14      **Q.   Did you ever ask him if LinkedIn consented to**

15   **what hiQ was doing?**

16          MS. SKIBITSKY:   Objection, form.

17          THE WITNESS:   I don't think I would ask him -- I

18   wouldn't ask him that.

19   BY MR. RUGANI:

20      **Q.   Why not?**

21      A.   We would spend our time talking about our product

22   and talking about the LinkedIn data that we're using and

23   how we're thinking about public information and we would

24   have just like really good conversations about the power

25   of data and the power of public data, types of data we're

**Confidential**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1   getting from LinkedIn.

2          At no point did he say, "Stop.  Don't come to our

3   office.  I'm going to call security.  I can't have this

4   conversation with you.  Don't tell me what you're doing."

5          It was just an exciting time of, you know,

6   building a company and just lucky to have access to people

7   at LinkedIn to talk about product roadmap, to talk about

8   how we see this being built and the impact it could have.

9       Q.  In any of the conversations that you had with

10   Mr. Canlas did you describe how hiQ collected data from

11   LinkedIn?

12       A.  I would say not at a technical level of a "how."

13       Q.  Did you ever tell Mr. Canlas, "hiQ is scraping

14   LinkedIn profile data from LinkedIn"?

15          MS. SKIBITSKY:  Objection.

16          Form, asked and answered.

17          THE WITNESS:  I don't know if I used the word

18   "scraping" or "indexing."

19   BY MR. RUGANI:

20       Q.  Do you --

21       A.  But Can was aware, yes.

22       Q.  Do you have a recollection of specifically

23   telling Mr. Canlas that hiQ was indexing information from

24   LinkedIn profiles?

25       A.  Yes.

**Confidential**

```
 1                    C E R T I F I C A T E

 2

 3         I, TERRI NESTORE, Certified Shorthand Reporter/

 4    Transcriptionist, do hereby certify that I was authorized

 5    to transcribe the foregoing recorded proceeding, and that

 6    the transcript is a true and accurate transcription of my

 7    shorthand notes, to the best of my ability, taken while

 8    listening to the provided recording.

 9

10         I further certify that I am not of counsel or

11    attorney for either or any of the parties to said

12    proceedings, nor in any way interested in the events of

13    this cause, and that I am not related to any of the

14    parties thereto.

15

16

17    Dated this 22nd day of July, 2022.

18

19

20    _____

21    TERRI NESTORE, CSR 5614, RPR, CRR

22

23

24

25
```

CE 0327

# Compendium Exhibit 8

```
 1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2                SAN FRANCISCO DIVISION

 3  HIQ LABS, INC.,

 4              Plaintiff,

 5  vs.                        Case No. 17-cv-03301-EMC

 6  LINKEDIN CORPORATION,

 7              Defendant.
    _____
 8
    AND RELATED CROSS-ACTION.
 9  _____

10

11

12                   CONFIDENTIAL

13        VIDEOTAPED DEPOSITION OF DARREN KAPLAN

14    AS HIQ LABS, INC.'S FEDERAL RULES OF CIVIL PROCEDURE

15   30(b)(6) DESIGNEE FOR TOPIC NOS. 5-7, 10, 13-16, and 18

16                   May 5, 2022

17                    9:03 a.m.

18

19        2601 South Bayshore Drive, Suite 1550

20                  Miami, Florida

21

22  KATHIA CAMACHO, Court Reporter

23  Transcribed by TERRI NESTORE
    CSR No. 5614, RPR, CRR
24

25  Job No. 10103965
```

1          THE VIDEOGRAPHER:  Good morning.

2          We are now on the record.  Today's date is May

3    5th, 2022, and the time is 9:03 a.m.  This is the

4    videotaped deposition of Darren Kaplan, taken in the

5    matter of hiQ Labs, Incorporated vs. LinkedIn Corporation.

6          We are located at 2601 South Bayshore Drive,

7    Miami, Florida.  The court reporter is Kathia Camacho.

8          The videographer is Javier Ordoñez.

9          Would counsel please introduce themselves, after

10   which the court reporter will swear in the witness.

11         MS. SKIBITSKY:  Good morning.  Hope Skibitsky

12   from Quinn Emanuel Urquhart & Sullivan, here on behalf of

13   plaintiff hiQ Labs, Inc. and the witness, Mr. Kaplan.

14         MR. RUGANI:  And Paul Rugani of Orrick for

15   LinkedIn, and joining remotely is my colleague, Maria

16   Sokova.

17         THE REPORTER:  Counsel, was the witness sworn

18   yesterday or would you like --

19         MR. RUGANI:  Re-swear the witness.

20         THE REPORTER:  Good morning again, Mr. Kaplan.

21         THE WITNESS:  Good morning.

22         THE REPORTER:  Can I ask you to raise your right

23   hand.

24   //

25   //

CE 0363

```
 1                        DARREN KAPLAN,

 2                having been first duly sworn,

 3             was examined and testified as follows:

 4

 5          THE REPORTER:  The witness has been sworn and we

 6  are officially on the record.

 7          MR. RUGANI:  And we're starting at 21 today for

 8  exhibits; is that correct?

 9          THE REPORTER:  Yes, the last one was 20.

10          (Exhibit 21 marked.)

11

12                          EXAMINATION

13  BY MR. RUGANI:

14      Q.  All right.  So Mr. Kaplan, I've handed you

15  Exhibit 21, which is Tab 2 in our set, which is not

16  consistent with Tab 2 in my binder.

17          Mr. Kaplan, have you seen this before?

18      A.  I don't think so.

19      Q.  So I'll represent to you this is an amended

20  Notice of Deposition of you as hiQ Labs Rule 30(b)(6)

21  designee for certain deposition topics, LinkedIn's

22  Rule 30(b)(6) notice, and the specific individual topics

23  are listed, starting at page 5.  And if you could just

24  take a look through those topics and let me know when

25  you're done reading them.
```

CE 0364

Confidential

1    A.  Just on page 5, I assume?

2    Q.  Yes.

3    A.  I am finished.

4    Q.  Do you understand that you have been designated

5  by hiQ to provide testimony on hiQ's behalf as to the

6  topics that were listed on page 5?

7    A.  Yes.

8    Q.  Are there any of those topics that you read where

9  you are not prepared to provide testimony today on behalf

10  of hiQ as to the topic?

11    A.  No.

12    Q.  As you read through those topics, are there any

13  limitations that you understand, in terms of the scope of

14  your testimony that you're providing on behalf of any of

15  those topics?

16        MS. SKIBITSKY:  Objection to form.

17        THE WITNESS:  I don't think I understand the

18  question.

19  BY MR. RUGANI:

20    Q.  Sure.  So let's just take, for example, topic 5,

21  if you would look at it so that we're on the same page.

22    A.  Okay.

23    Q.  Topic 5 references --

24    A.  Okay.

25    Q.  -- companies offering products and/or services

Confidential

1  that delivered the same or similar functionality as hiQ's

2  products and services.

3          Do you understand that you're providing testimony

4  here in response to topic 5 as it's written, or do you

5  intend to limit the scope of your testimony on topic 5 in

6  any way?

7          MS. SKIBITSKY:  Objection, form.

8          THE WITNESS:  I was going to talk about that.

9          I was going to answer -- I'm prepared to answer

10 that question.

11 BY MR. RUGANI:

12     Q.  And is that true for the rest of the topics as

13 well?

14     A.  Yes.

15     Q.  We talked a little bit yesterday about what you

16 did in preparation for your deposition, and I want to

17 focus now specifically on your preparation to testify as

18 hiQ's corporate designee on these topics.

19          Is there anything that you did to prepare to

20 offer testimony as hiQ's corporate designee, that you did

21 not describe yesterday?

22     A.  No.

23     Q.  So as I understood it, the only other individuals

24 that you spoke with, aside from your attorneys, were

25 Mr. Weidick and Ms. Kaplan; is that correct?

Confidential

Darren Kaplan

hiQ Labs, Inc. vs.
LinkedIn Corp.

1        Is it hiQ's position that LinkedIn members

2   consented to hiQ using the information available on the

3   members' non-logged in profile in the way that hiQ used

4   that information in its products?

5        MS. SKIBITSKY:  Objection to form, vague and

6   ambiguous, calls for speculation, outside the scope.

7        THE WITNESS:  I can't speak on behalf of the 500

8   million members.  I don't know what they know.

9   BY MR. RUGANI:

10       Q.  HiQ at some point retained the services of third

11  parties to scrape LinkedIn's website; is that correct?

12       A.  Yes.  Are we still on the same question?

13       Q.  Same topic, yes.

14       A.  Okay, good.

15       Q.  And are you aware that Oxylabs is one of those

16  entities?

17       A.  Yes.

18       Q.  And a company known at various points of time as

19  BrightData or Luminati is also one of those entities?

20       A.  Yes.

21       Q.  Was it hiQ's...  rephrase.

22            Is it hiQ's position that the scraping activity

23  that those entities engaged in on LinkedIn's website on

24  hiQ's behalf was authorized by LinkedIn?

25            MS. SKIBITSKY:  Objection to form, vague and

www.aptusCR.com

CE 0367

**Confidential**                    hiQ Labs, Inc. vs.
                                                                    LinkedIn Corp.

1  ambiguous, calls for a legal conclusion.

2          THE WITNESS:  Paul, can you re-ask that question,

3  please?

4  BY MR. RUGANI:

5      Q.  Sure.  Is it hiQ's position that the scraping

6  activity that those entities engaged in on LinkedIn's

7  website on hiQ's behalf was authorized by LinkedIn?

8      A.  Our belief was this information was publicly

9  available as an -- and indexed on Google and others.

10         By making that public, that was our belief, that

11  it can be accessed.

12     Q.  Prior to May 23rd of 2017, did hiQ disclose to

13  LinkedIn that it was using third party vendors to scrape

14  information from LinkedIn's website?

15         MS. SKIBITSKY:  Objection to form.

16         THE WITNESS:  I don't recall.

17  BY MR. RUGANI:

18     Q.  Did you ever say that to anybody at LinkedIn?

19         MS. SKIBITSKY:  Objection to form.

20         THE WITNESS:  Is the "that," third party scraper?

21  BY MR. RUGANI:

22     Q.  I'll just re-ask the full question.

23     A.  Great.

24     Q.  Did you ever disclose to anybody who worked at

25  LinkedIn, prior to May 23rd of 2017, that hiQ was using

**Confidential**

1   **third party vendors to scrape information from LinkedIn's**

2   **website?**

3         A.  We did not tell LinkedIn or people how it was

4   scraped, so...

5         MR. RUGANI:  We'll do Exhibit 22, which is our

6   Tab 20.  And so this document has a Bates number of

7   LINK_HIQ_000095502, and it is a LinkedIn user agreement

8   effective as of October 23rd, 2014.

9         (Exhibit 22 marked.)

10        MS. SKIBITSKY:  Objection to form.

11        MR. RUGANI:  What's the objection on the exhibit?

12        MS. SKIBITSKY:  My objection is that the

13   representation of its effective date.  I don't see on here

14   any indication of its effective date.

15        MR. RUGANI:  I'm representing it's effective as

16   of October 23rd, 2014.  You can add your objection to

17   that.

18        **Q.  Mr. Kaplan, have you ever seen this before?**

19        A.  Not that I recall.

20        **Q.  Have you ever seen any version of a LinkedIn user**

21   **agreement before?**

22        A.  Yes.

23        **Q.  When was the first time that you saw a version of**

24   **a LinkedIn user agreement?**

25        A.  I...  I do not recall.

**Darren Kaplan**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1       Q.   Did hiQ consult the LinkedIn user agreement at

2   any time prior to May 23rd, 2017, to attempt to understand

3   if its activities were consistent with the LinkedIn user

4   agreement?

5       A.   Paul, can you ask that question again?

6       Q.   Did hiQ consult the LinkedIn user agreement at

7   any time prior to May 23rd of 2017 to attempt to

8   understand whether its activities were consistent with the

9   LinkedIn user agreement?

10      A.   Someone -- let me rephrase that.   Consult?

11           I don't know if I'd use the word "consult" but I

12   know that Xander looked at the agreement, and Xander's not

13   a lawyer, I'm not a lawyer, but Xander did review the

14   agreement.

15      Q.   What was Mr. Oltmann's -- you're referring to

16   Xander Oltmann, when you say "Xander"?

17      A.   Sorry, Xander Oltmann, yes.

18      Q.   What was Mr. Oltmann's role at hiQ?

19      A.   Operations.

20      Q.   And did Mr. Oltmann, was he responsible for any

21   other contract review at hiQ, aside from reviewing

22   LinkedIn's user agreement?

23           MS. SKIBITSKY:   Objection to form, misstates

24   testimony, foundation.

25           THE WITNESS:   Can you re-ask that question?

Darren Kaplan                      **Confidential**                      hiQ Labs, Inc. vs.
                                                                          LinkedIn Corp.

1   BY MR. RUGANI:

2       Q.   Sure.   Did Mr. Oltmann's job responsibilities at

3   hiQ include responsibilities for reviewing the terms of

4   contracts and agreements that hiQ entered into?

5       A.   No.

6       Q.   When did the review that Mr. Oltmann performed of

7   the LinkedIn user agreement take place?

8           MS. SKIBITSKY:   Objection to form.

9           THE WITNESS:   I don't know but there was an email

10  that we saw yesterday with Deep Nishar, so I don't know

11  what exhibit it was but we can probably pull out that

12  email.

13  BY MR. RUGANI:

14      Q.   Yeah, so that was an email that he sent to you in

15  March of 2015 --

16      A.   Okay.

17      Q.   -- noting a provision of the LinkedIn user

18  agreement.   Is that the review that you were referring to?

19      A.   Yes.

20      Q.   And if you look to Section 8 of the agreement in

21  front of you.

22      A.   This is just like these numbers 2, 3, like that?

23      Q.   There's a sort of bold heading.

24      A.   Okay, got it.   Dos and Don'ts.

25      Q.   Right.   So LinkedIn Dos and Don'ts and

```
 1  for a legal conclusion, misstates testimony.
 2          THE WITNESS:  What I believe I said was that when
 3  you click the "Join Now" "Join LinkedIn" or "Sign Up," you
 4  are now in a LinkedIn gated section and in order to access
 5  services, you need to have -- you need to be logged in.
 6          When you're logged out, it's just a name.  It's a
 7  name, maybe a job title.  But the services happen when
 8  you're logged in.  That's what I thought I said.
 9  BY MR. RUGANI:
10      Q.  That's not an answer to my question.
11          My question -- and I'll break it down.
12          Does hiQ agree that hiQ assented to the terms of
13  the user agreement, subscription agreement and ads
14  agreement when it was logged into LinkedIn?
15          MS. SKIBITSKY:  Objection.  Form, vague and
16  ambiguous, calls for a legal conclusion.
17          THE WITNESS:  I'm not an attorney but there is --
18  when you're logged in, you are agreeing to this when
19  you're logged in.
20  BY MR. RUGANI:
21      Q.  So yes, hiQ agrees that it was assented to, the
22  user agreement, subscription agreement and ads agreements,
23  when it was logged in?
24          MS. SKIBITSKY:  Objection to form, vague as to
25  time, calls for a legal conclusion.
```

www.aptusCR.com

CE 0372

1        THE WITNESS:  There's no way to get in unless you

2   agree to this, so when you click "Join as a member," you

3   are agreeing to this.

4   BY MR. RUGANI:

5        Q.  And it's hiQ's position that at the same time

6   whenever it engaged with LinkedIn's website while it was

7   not logged in, that its activities were not subject to the

8   user agreement, subscription agreement or ads agreement;

9   is that correct?

10        MS. SKIBITSKY:  Objection to form, calls for a

11   legal conclusion.

12        THE WITNESS:  I'm not a lawyer, but you're not --

13   you're not logged in.

14   BY MR. RUGANI:

15        Q.  And as you sit here today speaking on hiQ's

16   behalf in response to this topic, that means that hiQ's

17   position is that it was not bound by the terms of these

18   agreements when it was not logged in; am I understanding

19   that correctly?

20        MS. SKIBITSKY:  Objection to form, vague and

21   ambiguous, calls for a legal conclusion.

22        THE WITNESS:  Can you clarify that, please?

23   BY MR. RUGANI:

24        Q.  What do you need me to clarify about that?

25        A.  Can you just repeat the question, please?

**Confidential**

1      Q.   Sure.   It is hiQ's position, is it not, that when

2    it interacted with LinkedIn's website when it was not

3    logged in, that its activities were not subject to the

4    user agreement, subscription agreement or ads agreement?

5             MS. SKIBITSKY:   Objection to form, vague and

6    ambiguous, calls for a legal conclusion.

7             THE WITNESS:   We believed the public information

8    was publicly available and okay to index.

9    BY MR. RUGANI:

10      Q.   That's not an answer to the question.   So the

11   question is really about did you believe that the terms of

12   the agreements -- did hiQ believe, excuse me -- that the

13   terms of the user agreement, subscription agreement or ads

14   agreement applied to hiQ when hiQ accessed LinkedIn's

15   website, not logged in?

16             MS. SKIBITSKY:   Objection.   Form, vague and

17   ambiguous, calls for a legal conclusion.

18             THE REPORTER:   I'm sorry, could you repeat it?

19             MS. SKIBITSKY:   Vague and ambiguous, calls for a

20   legal conclusion.

21             THE WITNESS:   I'm not a lawyer but I believe that

22   when you're not logged in and you're not using the

23   services, this didn't apply.

24             MS. SKIBITSKY:   Do you think we could take a

25   short break?

1                    C E R T I F I C A T E

2

3          I, TERRI NESTORE, Certified Shorthand Reporter/

4    Transcriptionist, do hereby certify that I was authorized

5    to transcribe the foregoing recorded proceeding, and that

6    the transcript is a true and accurate transcription of my

7    shorthand notes, to the best of my ability, taken while

8    listening to the provided recording.

9

10         I further certify that I am not of counsel or

11   attorney for either or any of the parties to said

12   proceedings, nor in any way interested in the events of

13   this cause, and that I am not related to any of the

14   parties thereto.

15

16

17   Dated this 22nd day of July, 2022.

18

19

20   _____

     TERRI NESTORE, CSR 5614, RPR, CRR

21

22

23

24

25

CE 0375