1   ANNETTE L. HURST (SBN 148738)
    ahurst@orrick.com
2   RUSSELL P. COHEN (SBN 213105)
    rcohen@orrick.com
3   PAUL F. RUGANI (SBN 342647)
    prugani@orrick.com
4   CATHERINE Y. LUI (SBN 239648)
    clui@orrick.com
5   NATHAN SHAFFER (SBN 282015)
    nshaffer@orrick.com
6   DANIEL JUSTICE (SBN 291907)
    djustice@orrick.com
7   EMILY RENZELLI (*Pro Hac Vice*)
    erenzelli@orrick.com
8   ORRICK, HERRINGTON & SUTCLIFFE LLP
    405 Howard Street
9   San Francisco, CA  94105-2669
    Telephone:   +1 415 773 5700
10  Facsimile:   +1 415 773 5759

11  *Attorneys for Defendant/Counterclaimant*
12  *LinkedIn Corporation*

13                UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16  hiQ Labs, Inc.,                          | Case No. 17-cv-03301-EMC

17          Plaintiff,                       | **COMPENDIUM OF EVIDENCE FILED IN
                                             | SUPPORT OF LINKEDIN
18      vs.                                  | CORPORATION'S AUGUST 5, 2022
                                             | MOTIONS (2 OF 6)**
19  LinkedIn Corporation,
                                             | Date:         September 29, 2022
20          Defendant.                       | Time:         1:30 p.m.
                                             | Courtroom:    5 – 17th Floor (Zoom)
21                                           | Judge:        Hon. Edward M. Chen

22  ─────────────────────────

23  LinkedIn Corporation
                                             | Complaint Filed:   June 7, 2017
24          Counterclaimant,                 | Trial Date:        February 27, 2023
        vs.
25  hiQ Labs, Inc.

26          Counterdefendant.

27

28

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 1 | Deposition Transcript of Jenelle Bray (Excerpts) | 05/18/2022 | | 1 |
| 2 | Deposition Transcript of Boris Dev and exhibits (Excerpts) | 05/04/2022 | | 16 |
| | **Dep. Ex. 231** – Email string between Dev and Weidick re: Your application for private LinkedIn API access (3/23/17) (hiQ_00200007-08) | 03/27/2017 | | 49 |
| | **Dep. Ex. 237** – Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 51 |
| 3 | Deposition Transcript of Daniel Francis and exhibits (Excerpts) | 05/25/2022 | | 53 |
| | **Dep. Ex. 1335** – hiQ Elevate Conference Notes (LINK_HIQ_000184276-77) | 04/20/2017 | | 62 |
| 4 | Deposition Transcript of McKinsey & Co. by and through 30(b)(6) designee Christopher Gagnon | 06/27/2022 | | 64 |
| | **Dep. Ex. 591** – Email string between Gagnon, Veynerchuk, et al. re: departure announcement (hiQ_00580838-40) | 02/04/2017 | | 77 |
| 5 | Deposition Transcript of Genevieve Graves and exhibits (Excerpts) | 05/25/2022 | | 80 |
| | **Dep. Ex. 498** – hiQ Tech Stack: Product Suite PPT (hiQ_00545758) | Undated | | 129 |
| | **Dep. Ex. 503** – Email from Graves to Hammond, et al. re: Insufficient Data Coverage (hiQ_00023356-59) | 07/13/2016 | | 144 |
| | **Dep. Ex. 510** – Email string between Miller, Graves, et al. re: Banned from LinkedIn (hiQ_00143432-33) | 07/14/2015 | | 148 |
| | **Dep. Ex. 512** – Email from Cole to Marshall re: NDA, Training, and VPN access (hiQ_00191862-78) | 01/29/2016 | | 150 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 514 –** Email string between Cole, Graves, et al. re: feedback: list of frustrations (hiQ_00174514-15) | 05/22/2016 | | 167 |
| | **Dep. Ex. 525 –** Email string between Graves and Medeiros re: 2016 Customer Churn (hiQ_000855562-64) | 11/15/2016 | | 169 |
| 6 | Deposition Transcript of Yael Hochberg, Ph.D. and exhibits (Excerpts) | 07/29/2022 | | 172 |
| | **Dep. Ex. 1385 –** Expert Report of Yael Hochberg, Ph.D. (Appendix C Materials Considered removed) | 06/07/2022 | | 180 |
| | **Dep. Ex. 1386 –** Expert Rebuttal Report of Yael Hochberg, Ph.D. | 06/30/2022 | | 283 |
| 7 | Deposition Transcript of Darren Kaplan and exhibits (Excerpts) | 05/04/2022 | | 313 |
| | **Dep. Ex. 10 –** Email from McNutt to Cole re: Question [LinkedIn User Agreement and turking] (hiQ_00189601) | 05/05/2016 | | 328 |
| | **Dep. Ex. 17 -** hiQ Confidential Board Deck PPT (discussing state of the business, engineering and product update, financials, and administrative) (hiQ_003177150 | 02/08/2017 | | 329 |
| 8 | Deposition Transcript of Darren Kaplan (Excerpts) | 05/05/2022 | | 361 |
| 9 | Deposition Transcript of Andrew Kim (Excerpts) | 05/09/2022 | | 376 |
| | **Dep. Ex. 246 -** hiQ Product Strategy PPT (discussing current and new hiQ products) (hiQ_00304309) | Undated | | 397 |
| 10 | Deposition Transcript of James Malackowsi and exhibits (Excerpts) | 07/28/2022 | | 425 |
| | **Dep. Ex. 1379 –** Expert Report of James E. Malackowski (Appendices 2-6 removed) | 06/07/2022 | | 437 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 11 | Deposition Transcript of Stephen B. McElfresh and exhibits (Excerpts) | 07/20/2022 | | 543 |
| | **Dep. Ex. 650 –** Expert Report of Stephen B. McElfresh | 06/07/2022 | | 584 |
| 12 | Deposition Transcript of Darin Medeiros and exhibits (Excerpts) | 05/20/2022 | | 606 |
| | **Dep. Ex. 436 –** Email from Berman to Medeiros re: Completed: Order form for hiQ Labs, Inc.-LSS (hiQ_00352028-30) | 12/23/2015 | | 637 |
| | **Dep. Ex. 437 –** Email from Sennert to Medeiros re: hiQ Labs Account #: 120941 with attached invoices (hiQ_00008090-91; 8509-11; 7822-24; 7273-75; 6812-14; 6668-70; 5955-60) | 06/10/2016 | | 640 |
| | **Dep. Ex. 438 –** Email string between Medeiros, Dick, et al. re: SFDC guide with hiQ's CRM Best Practices (hiQ_00123595-601) | 07/25/2017 | | 662 |
| | **Dep. Ex. 439 –** Email from Medeiros to DeSantis, et al. re: Weekly Update with hiQ Sales Dashboard (hiQ_00175647-50) | 11/28/2016 | | 669 |
| | **Dep. Ex. 443 –** Email from Medeiros to Weidick, et al. re: Customer asking why hiQ didn't scrape through a paid LinkedIn account (hiQ_00619694-97) | 05/16/2017 | | 673 |
| | **Dep. Ex. 447 –** Chat transcript between Medeiros and Barker re: Customer Feedback (hiQ_00443465-75) | 10/11/2017 | | 677 |
| | **Dep. Ex. 455 –** Email from Medeiros to Weidick, et al. re: State of Renewals 2017 (hiQ_00180173) | 10/16/2017 | | 688 |
| 13 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/13/2022 | | 694 |
| | **Dep. Ex. 322A –** Email from Miller to Dev re: scraping tips (hiQ_00084314) | 08/11/2016 | | 729 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 322B** – Tips for [scraping] LinkedIn (hiQ_00084315) | 08/11/2016 | | 730 |
| | **Dep. Ex. 331** – Notes on reverse engineering LinkedIn's defenses (hiQ_00354518-20) | Undated | | 731 |
| | **Dep. Ex. 344** – Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 734 |
| | **Dep. Ex. 350A & 350B** – Email from Cole to Dev with attached file named "The Scraper Wars PPT" (hiQ_00189161-63) | Undated | | 736 |
| 14 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/26/2022 | | 749 |
| | **Dep. Ex. 535** – Email string between Miller and Sharon re: Purchase monthly services (hiQ_00141957-59) | 07/17/2017 | | 770 |
| | **Dep. Ex. 539** – Email string between Cole, Miller, et al. re: turking (hiQ_00359637-38) | 09/27/2017 | | 773 |
| | **Dep. Ex. 540** – Email string between Brokken and Miller re: culling the database nightmare (hiQ_00060671-75) | 12/07/2017 | | 775 |
| | **Dep. Ex. 543** – Email string between Miller, Medeiros, et al. re: Cancelling hiQ services (hiQ_00329112-13) | 05/09/2018 | | 780 |
| | **Dep. Ex. 545** – Chat transcript between Miller, Kim, et al. re: suspension notice from AWS (hiQ_00451932-33) | 05/16/2018 | | 782 |
| | **Dep. Ex. 546** – Chat transcript between Kim, Barta, et al. re: scraping (hiQ_00436300-07) | 06/12/2018 | | 784 |
| 15 | Deposition Transcript of Kevin Murphy and exhibits (Excerpts) | 07/19/2022 | | 792 |
| | **Dep. Ex. 603** – Expert Report of Kevin M. Murphy (Appendix B removed) | 06/07/2022 | | 800 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 16 | Declaration of Kevin Murphy ISO LinkedIn's Motion for Summary Judgment and *Daubert* Motion to Exclude Expert Testimony of Stephen McElfresh and exhibit, No. 17-cv-03301 | 08/04/2022 | | 883 |
| | **Ex. A –** Rebuttal Expert Report of Kevin M. Murphy | 06/30/2022 | | 886 |
| 17 | Deposition Transcript of Alexander Oltmann and exhibits (Excerpts) | 05/13/2022 | | 914 |
| | **Dep. Ex. 4 –** Email string between Oltmann, Kaplan, et al. re: FLAGGING you DEEP Nishar (hiQ_00250311-13) | 03/09/2015 | | 927 |
| 18 | Deposition Transcript of Dan Reid (Excerpts) | 05/19/2022 | | 930 |
| 19 | Deposition Transcript of Paul Rockwell and exhibits (Excerpts) | 05/19/2022 | | 941 |
| | **Dep. Ex. 1233-A –** LinkedIn 3rd Party Scraping PPT (LINK_HIQ_000169080-110) | 04/02/2015 | | 957 |
| 20 | Deposition Transcript of Benjamin Sacks and exhibits (Excerpts) | 07/08/2022 | | 988 |
| | **Dep. Ex. 599 –** Amended Expert Report of Benjamin A. Sacks (Appendices A-B removed) | 06/22/2022 | | 1072 |
| | **Dep. Ex. 608 -** Chart – Calculation 1: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, Before Application of 20% Discount | Undated | | 1124 |
| | **Dep. Ex. 609 –** Chart – Calculation 2: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, After Application of 20% Discount | Undated | | 1125 |
| | **Dep. Ex. 610 –** Sacks Work Paper E Showing Customers Included In Lost Profits (Excerpt of Native Excel file converted to PDF) | Undated | | 1125A |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 21 | Deposition Transcript of Minjae Song (Excerpts) | 07/27/2022 | | 1126 |
| 22 | Deposition Transcript of Mark Weidick (Excerpts) | 03/18/2022 | | 1135 |
| 23 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 05/23/2022 | | 1145 |
| | **Dep. Ex. 475** – Chat transcript between Miller and Weidick re: shutting down scraping (biQ_00442222) | 03/31/2017 | | 1173 |
| | **Dep. Ex. 480** – Email from Weidick to Lustig, et al. re: Reading time 4 mins 39 sec (hiQ_00641062-64) | 04/05/2017 | | 1174 |
| | **Dep. Ex. 486** – Email from Jeremias to Weidick, et al. re: Urgent: Suspension Warning (hiQ_00319806-07) | 04/08/2019 | | 1177 |
| 24 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 06/01/2022 | | 1179 |
| | **Dep. Ex. 489** – hiQ Board Deck PPT (hiQ_00221829) | 05/15/2017 | | 1220 |
| | **Dep. Ex. 556** – Email string between Sharma, Weidick, et al. re: hiQ budget information (hiQ_00705751-54) | 07/13/2020 | | 1254 |
| | **Dep. Ex. 564** – Email string between Weidick and Dev re: Scraping (hiQ_00183419) | 04/11/2017 | | 1258 |
| | **Dep. Ex. 566** – Email string between Miller, Weidick, et al. re: Scraping Update (hiQ_00576322-23) | 04/24/2017 | | 1259 |
| 25 | Deposition Transcript of Lee Womer and exhibits (Excerpts) | 05/11/2022 | | 1261 |
| | **Dep. Ex. 294** – Email string between Womer, Canlas, et al. re: Anti-scraping (LINK_HIQ_000205777-78) | 10/07/2015 | | 1279 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 26 | Deposition Transcript of Xiaofeng Wu and exhibits (Excerpts) | 07/25/2022 | | 1281 |
| | **Dep. Ex. 1361 –** LinkedIn's Rule 26 Disclosure of Xiaofeng Wu | 06/07/2022 | | 1307 |
| 27 | Declaration of Paul Rockwell ISO LinkedIn's Opposition to Plaintiff's Motion for Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 26, 2017) (ECF No. 29) | 06/26/2017 | | 1311 |
| 28 | Declaration of Paul Rockwell ISO LinkedIn's Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to FRCP 62.1, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. Sept. 10, 2021) (ECF No. 216.13) | 09/10/2021 | | 1377 |
| 29 | hiQ's Second Supplemental Responses to LinkedIn's Second Set of Interrogatories (No. 16) | 08/03/2022 | | 1387 |
| 30 | Letter from Shaffer to Worcester, et al. re: ESI sources | 04/28/2022 | | 1394 |
| 31 | Email string between counsel for the parties re: hiQ ESI Sources [Splunk] | 06/03/2022 | | 1398 |
| 32 | Email from Skibitsky to Shaffer, et al. re: lost Splunk data | 06/13/2022 | | 1417 |
| 33 | hiQ Sales Order for Pfizer (hiQ_00003890-92) | 11/03/2016 | | 1419 |
| 34 | hiQ Labs Inc. Income Statement (hiQ_00004324) (Native Excel file converted to PDF) | 06/2017 | | 1423 |
| 35 | Email string between Barta, Kim, et al. re: culling the database nightmare (hiQ_00028241-53) | 01/15/2018 | | 1439 |
| 36 | Email string between Williams and Cole re: borrow your SDR team for a few days (hiQ_00080487-91) | 03/15/2016 | | 1453 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 37 | Email from Klevecz to Mechanical Turkers and Cole re: Turking Interface Changes (hiQ_00080559) | 12/03/2015 | | 1459 |
| 38 | Email string between Cherry and Graves re: Another LinkedIn account shutdown (hiQ_00087989-91) | 07/14/2015 | | 1461 |
| 39 | Email from Kaplan to dk.nk41@hiqlabs with hiQ pitch deck showing release timing of Keeper (Control Center) (hiQ_00103925-40) | 09/20/2014 | | 1465 |
| 40 | Master SAAS Agreement between hiQ and BMC Software Inc. (hiQ_00149369-98) | 06/22/2016 | | 1482 |
| 41 | Email string between Cole, "science," et al. re: Weekly Turking Report (hiQ_00174125-28) | 03/10/2017 | | 1513 |
| 42 | Amended and Restated Collaboration Agreement between McKinsey & Co. and hiQ (hiQ_00179991-180005) | 06/30/2016 | | 1518 |
| 43 | Email from Miller to Weidick, et al. re: All-hands AWS cleanup (hiQ_00193748) | 02/02/2018 | | 1534 |
| 44 | Email from Schwade to Graves re: Turking Work Instruction and attachment (hiQ_00211880 & hiQ_00211881) | 06/24/2015 | | 1536 |
| 45 | Board Meeting – Plan Forward (Agenda: Litigation, Hibernation, Assorted Details) PPT (hiQ_00225254) (Native PPT file converted to PDF) | 05/23/2018 | | 1550 |
| 46 | hiQ letter to Weidick re: offer of employment (hiQ_00251922-33) | 02/09/2017 | | 1558 |
| 47 | Record of payments to turkers from Sep. 2015 to Sep. 2016 (hiQ_00316522) (Native Excel file converted to PDF) | Undated | | 1571 |
| 48 | Purchase Order for Honeywell Int'l (hiQ_00318142-47) | 12/07/2017 | | 1586 |
| 49 | Email string between Medeiros, Pauletich, et al. re: Next steps (hiQ_00332055-56) | 09/28/2017 | | 1593 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 50 | Email from Amazon Web Services to ops@hiqlabs.com and Miller re: Your AWS Account has been suspended for non-payment (hiQ_00355253) | 04/20/2020 | | 1596 |
| 51 | Email string between Weidick and Miller re: Belt & suspenders (hiQ_00358094) | 05/07/2018 | | 1598 |
| 52 | Note re: Experiments that Genevieve is running (hiQ_00369157-59) | Undated | | 1600 |
| 53 | Email string between Patch, Kaplan, et al. re: Board Deck (hiQ_00390283-84) | 02/05/2017 | | 1604 |
| 54 | Email string between Weidick, Dev, et al. re: Your application for private LinkedIn API access (hiQ_00429401-02) | 03/23/2017 | | 1607 |
| 55 | Chat transcript between Dev and Miller re: scraping (hiQ_00436623) | 04/18/2017 | | 1610 |
| 56 | Chat transcript between Kim, Miller, et al. (hiQ_00437584-85) | 07/06/2018 | | 1612 |
| 57 | Chat transcript between Miller and Dev re: Luminati (hiQ_00437609) | 05/03/2017 | | 1615 |
| 58 | Chat transcript between Barta, Cole, et al. (hiQ_00438613-15) | 05/16/2018 | | 1617 |
| 59 | Chat transcript between Dev and Miller (hiQ_00439403) | 05/25/2017 | | 1621 |
| 60 | Chat transcript between Dev and Miller re: Luminati (hiQ_00439495) | 05/26/2017 | | 1623 |
| 61 | Chat transcript between Miller and Dev (hiQ_00442040-41) | 06/01/2016 | | 1625 |
| 62 | Chat transcript between Miller, Dev, et al. re: state of scrape (hiQ_00447111-13) | 03/30/2017 | | 1628 |
| 63 | Chat transcript between Miller and Wegener (hiQ_00447584-86) | 08/22/2017 | | 1632 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 64 | Chat transcript between Miller, Dev, et al. (hiQ_00449462-63) | 09/06/2018 | | 1636 |
| 65 | Chat transcript between Wegener and Miller (hiQ_00451103-05) | 05/07/2018 | | 1639 |
| 66 | Splunk Production Scraper Dashboard (hiQ_00457966-67) | 11/08/2016 | | 1643 |
| 67 | Email string between Patch, Graves, et al. re: People not getting paid (hiQ_00463750-54) | 11/05/2015 | | 1646 |
| 68 | Email from Dev to Miller re: [JIRA] (DENG-2) Find alternative sources of proxies (hiQ_00466086) | 01/19/2017 | | 1652 |
| 69 | Purchase Order for Facebook (hiQ_00466148-55) | 06/15/2017 | | 1654 |
| 70 | Software Services Agreement between The Gap and hiQ (hiQ_00466407-25) | 04/15/2015 | | 1663 |
| 71 | Master SAAS Services Agreement between Hartford Fire Ins. Co. and hiQ, and Sales Order (hiQ_00467036-56) | 12/12/2016 | | 1683 |
| 72 | Mutual Non-Disclosure Agreement between American Express Travel Related Services Co. and hiQ, and Sales Order (hiQ_00469682-91) | 11/10/2016 | | 1705 |
| 73 | hiQ Labs Retention Module, Statement of Work between hiQ and Pfizer Inc. (hiQ_00473572-86) | 10/30/2015 | | 1716 |
| 74 | Master Application Service Provider Agreement between Capital One Services LLC and hiQ (hiQ_00521357-412) | 08/15/2016 | | 1732 |
| 75 | hiQ Sales Order for Celgene (hiQ_00521671) | 09/27/2016 | | 1789 |
| 76 | Services Agreement between eBay Inc. and hiQ (hiQ_00521783-805) | 07/29/2015 | | 1793 |
| 77 | Master SAAS Services Agreement between hiQ and UTC Aerospace Systems (hiQ_00536554-64) | 01/15/2016 | | 1817 |

COMPENDIUM OF EVIDENCE FILED ISO
LINKEDIN'S AUG. 5, 2022 MOTIONS
No. 17-cv-03301-EMC

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 78 | hiQ Sales Order for Box Inc. (hiQ_00542110-13) | 03/31/2016 | | 1829 |
| 79 | License and Services Agreement between hiQ and Comcast Cable Communications Management LLC and Order #1(hiQ_00542226-56) | 09/25/2015 | | 1834 |
| 80 | Master "Software as a Service" (SAAS) Subscription Agreement between Allstate Ins. Co. and hiQ (hiQ_00555778-813) | 10/25/2016 | | 1866 |
| 81 | PA Trend Report 2017 PPT (hiQ_00568929-60) | Undated | | 1903 |
| 82 | Master SAAS Services Agreement between hiQ and Apax Partners LP and Sales Order for Apax (hiQ_00580069-88) | 01/13/2017 | | 1936 |
| 83 | hiQ Revenue spreadsheet (hiQ_00621582) (Excerpt of Native Excel file converted to PDF) | Undated | | 1957 |
| 84 | The Hershey Company SAAS Agreement between Hershey and hiQ (hiQ_00642063-107) | 03/31/2016 | | 1964 |
| 85 | Master SAAS Services Agreement between hiQ and BNY Mellon and Sales Order for BNY (hiQ_00642108-25) | 03/01/2016 | | 2010 |
| 86 | Master SAAS Services Agreement between hiQ and PayPal, Inc. (hiQ_00656809-35) | 01/26/2016 | | 2029 |
| 87 | Consulting Agreement between hiQ and Allan Schwade (hiQ_00679076-77) | 05/24/2016 | | 2057 |
| 88 | Email string between Werlin, Weidick, et al. re: hiQ Investor update (hiQ_00683817-18) | 05/24/2018 | | 2060 |
| 89 | hiQ Company Pages Confluence Wiki (hiQ_00723764) (Excerpt of Native PDF file) | Undated | | 2063 |
| 90 | Email string between Weidick, Gupta, et al. re: turking while logged out (hiQ_00727057) | 09/20/2017 | | 2066 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 91 | Screenshot at 14:31 (hiQ_00727061) (Screenshot of Native Video file converted to PDF) | Undated | | 2068 |
| 92 | hiQ Labs Inc. General Ledger from 8/10/2012 to 9/1/2019 (hiQ_00734930) (Excerpt of Native Excel file converted to PDF) | Undated | | 2071 |
| 93 | Memorandum from Gupta to Distribution List re: Notice of Legal Hold (hiQ_00734977-78) | 06/20/2017 | | 2073 |
| 94 | hiQ Labs, Inc. Response to LinkedIn Cease and Desist Letter, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 7, 2017) (ECF No. 4-11) | 05/31/2017 | | 2076 |
| 95 | Plaintiff hiQ Labs, Inc.'s First Supplemental Responses to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/11/2022 | | 2082 |
| 96 | Plaintiff hiQ Labs, Inc.'s Supplemental Responses and Objections to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/13/2022 | | 2088 |

Compendium Exhibit 9

(CE0397-0494 of
Exhibit Filed Under Seal)

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4
   hiQ Labs, Inc.,
5
                Plaintiff,
6                                    Case No.:
                vs.                  17-cv-03301-EMC
7
   LinkedIn Corporation,
8
                Defendant.
9  _____

10 LinkedIn Corporation,

11              Counterclaimant,

12              vs.

13 hiQ Labs, Inc.,

14              Counter-defendant.
   _____
15

16            VIDEO-RECORDED DEPOSITION

17      REMOTELY TAKEN VIA ZOOM CONFERENCE OF

18                 ANDREW KIM

19              MONDAY, MAY 9, 2022

20

21

22

23 Stenographically Reported by:
   Linda E. Marquette
24 RPR, CLR, CSR No. 11874

25 Job No. 10100480

CE 0377

**Andrew Kim**

```
 1              VIDEO-RECORDED DEPOSITION

 2          REMOTELY TAKEN VIA ZOOM CONFERENCE

 3               MONDAY, MAY 9, 2022

 4               9:02 A.M. to 5:53 P.M.

 5

 6          VIDEOGRAPHER:  Good morning.  We are now on

 7  the record.  Today's date is May 9th, 2022.  The time is

 8  9:02 a.m.

 9          This is the remote videotaped deposition of

10  Andrew Kim being taken via Zoom videoconference.  This

11  matter is entitled hiQ Labs, Inc. versus LinkedIn Corp.

12          The deponent is appearing remotely from

13  Tiburon, California.

14          My name is Aaron Isaacs appearing for Aptus

15  Court Reporting, located at 600 West Broadway, Suite

16  300, San Diego, California 92101.  I'm the official

17  videographer and this recording is the only authorized

18  video recording of this deposition.

19          The audio and video recording will take place

20  at all times unless all counsel agree to go off the

21  record.

22          Will counsel please identify yourselves and

23  anyone with you and state the parties that you

24  represent.

25          MR. MULLER:  This is Zane Muller on behalf of
```

CE 0378

**Andrew Kim**

1   Quinn Emanuel Urquhart & Sullivan on behalf of hiQ Labs

2   and the witness.  With me is my colleague Renita Sharma

3   and also Hope Skibitsky.

4            MS. HURST:  Annette Hurst from Orrick on

5   behalf of LinkedIn.  And with me is my colleague Isaac

6   Behnawa.

7            VIDEOGRAPHER:  Thank you, Counselors.

8            Our court reporter for today, Linda Marquette,

9   will now administer the oath.

10                      ANDREW KIM,

11    having been first duly administered an oath remotely,

12          was examined and testified as follows:

13

14                     EXAMINATION

15   BY MS. HURST:

16       **Q.   Would you please state your full name for the**

17   **record.**

18       A.   That's Andrew Kim.

19       **Q.   And where do you currently reside?**

20       A.   Tiburon, California.

21       **Q.   What is your residence address?**

22       A.   5 Janet Way in Tiburon, California 94920.

23       **Q.   By whom are you currently employed?**

24       A.   GitHub.

25       **Q.   Have you ever had a deposition taken before?**

CE 0379

Andrew Kim

```
1        A.    No.

2        Q.    So the oath that you've taken is the same one

3   that you would take if you were testifying in court in

4   front of a judge or a jury and we ask that you treat it

5   with the same degree of seriousness.

6              Do you understand that?

7        A.    I understand.

8        Q.    Is there anyone present with you in the room

9   today?

10       A.    No.

11       Q.    Okay.  So the rules around consulting with

12  your lawyer in a deposition allow you to consult with

13  your lawyer if you have a question about attorney-client

14  privilege only.  Otherwise, you're not permitted to

15  consult with your lawyer or communicate with your lawyer

16  while there is a question pending.

17             Do you understand that?

18       A.    I understand.

19       Q.    All right.  And that includes the use of

20  electronic means, such as texting, chat or other kinds

21  of electronic communications.

22             Do you understand?

23       A.    Yes.

24       Q.    All right.  If there is any reason why you

25  don't understand one of my questions today, please feel
```

CE 0380

1    free to ask me for -- for clarification.

2            And, I'm sorry, you heard me say my name

3    earlier, but my name is Annette Hurst.  We've never met

4    before.  I'm representing LinkedIn in this matter.

5    Don't -- don't mean to be rude.

6        A.    Oh.  Thank you.

7        Q.    All right.  And generally the court reporter

8    will be taking down our questions and answers into a

9    transcript that you'll get an opportunity to review

10   afterwards in order to make any corrections.  Although

11   you have that opportunity to make corrections, you

12   should still try to give your best testimony today.

13           Do you understand that?

14       A.    Yes.

15           MR. MULLER:  Also, sorry, note for the record

16   that substantial portions of this deposition may be

17   confidential and hiQ reserves the right to designate

18   specific portions as such in accordance with the

19   protective order.

20   BY MS. HURST:

21       Q.    Is there any reason, such as the illness or

22   the influence of medication, why you can't give your

23   best testimony today?

24       A.    No.

25       Q.    All right.  When did you first learn about any

CE 0381

1    opportunity to perform services for hiQ Labs?

2        A.    Are -- are you speaking about the -- the --

3    the date --

4        Q.    Yes.

5        A.    -- around the time?

6        Q.    Yes.

7        A.    November.  Early November 2014.

8        Q.    And how did that -- how did hiQ Labs come to

9    your attention at that time?

10              MR. MULLER:  Object to form.  Vague.

11       A.    Yeah.  Can -- can you be more specific about

12   what you mean came to my attention?

13   BY MS. HURST:

14       Q.    Well, what happened in November of 2014 to

15   bring hiQ Labs to your attention?

16       A.    I -- somebody had mentioned -- I was -- I was

17   meeting with somebody and they had mentioned that they'd

18   like to introduce me to some -- Darren.  But they didn't

19   say him by name.

20       Q.    All right.  And by Darren you meaning Darren

21   Kaplan?

22       A.    Yes.

23       Q.    And were you -- were you employed at the time

24   of this conversation?

25       A.    No.

Andrew Kim

1      Q.    All right.  Were you in school?

2      A.    No.

3      Q.    Were you looking for a job?

4      A.    Casually, yes.

5      Q.    All right.  What was the next thing that

6   happened after this conversation that -- on the path of

7   you meeting people at hiQ and becoming affiliated with

8   that company?

9            MR. MULLER:  Object to form.

10     A.    Do you mean what happened after I met with

11  Darren or after I met with the individual that was going

12  to introduce me -- introduce me to Darren?

13  BY MS. HURST:

14     Q.    Yeah.  The conversation that you just

15  described.  What was the --

16     A.    Oh.

17     Q.    -- next thing that happened after that

18  conversation?

19     A.    Oh, boy.  An introduction happened.  I -- I --

20  I can't remember the means.  But Darren reached out to

21  me.  I can't -- I think he gave me a phone call and

22  asked me to meet for drinks which -- and then -- which

23  we did.

24     Q.    All right.  And did he explain to you what

25  role might be available for you at hiQ?

CE 0383

1     A.    I think so.  You know, I -- I'm not -- I'm

2   not -- at early stage start-up it's -- it -- you know,

3   there's not -- never a specific role that you define.

4   It's more like, you know, are you just a good fit.  But

5   I -- I think so, generally.  He -- he talked about

6   needs, I guess.

7     **Q.    All right.  And what were the needs he**

8   **discussed with you?**

9     A.    I can't recall specifics but it was mostly

10  around somebody taking ownership of how the -- just to

11  make sure that the product is incorporating the voice of

12  the customer.  Yeah.

13    **Q.    All right.  And did you go forward from the**

14  **initial drinks with Mr. Kaplan to ultimately become**

15  **employed by hiQ Labs?**

16    A.    Yes.

17    **Q.    And when did you become employed by hiQ Labs?**

18    A.    Early January.  Yeah, that's when I first --

19  or I started working with hiQ Labs.

20    **Q.    And that was January 2015?**

21    A.    Yes.

22    **Q.    Was there any product in existence that was**

23  **being sold to customers at the time you joined the**

24  **company?**

25              MR. MULLER:  Object to form.

CE 0384

Andrew Kim

```
 1        A.    You're asking if there's -- if hiQ was --
 2   was -- had a product that it was selling to customers?
 3   BY MS. HURST:
 4        Q.    Correct.
 5        A.    Yes.
 6        Q.    And what was that product?
 7        A.    We called it Keeper.
 8        Q.    And what was the functionality of the Keeper
 9   product when you joined hiQ Labs in January of 2015?
10        A.    I'm sorry?
11        Q.    What was the functionality of the Keeper
12   product at the time you joined hiQ Labs in 2015?
13              MR. MULLER:  Object to form.
14        A.    When we talk about functionality I -- I can --
15   I can go pretty deep into all the aspects of the
16   product.  Is there something specific about the
17   functionality that -- that you're interested in?
18   BY MS. HURST:
19        Q.    Why don't you start with a general overview of
20   the value proposition to customers.
21              (Simultaneous cross-talk.)
22        A.    Well, I think the -- the value proposition at
23   that point -- vaguely, I -- I -- it -- it's so
24   challenging to remember exactly what it was.  Let me
25   think if I can actually remember.  I don't think it's
```

1   really changed but the basic premise was that we -- hiQ

2   Labs is designed for people analytics teams so they

3   could better understand -- they could better understand

4   the -- their workforce and retain talent so that they

5   stay longer, I believe is something of that sort.

6   BY MS. HURST:

7       **Q.    How long were you with hiQ Labs?**

8           MR. MULLER:  Object to form.

9       A.    I assume you mean the -- my tenure.   About

10  three years, maybe a little over three years.

11  BY MS. HURST:

12      **Q.    Okay.   Through 2018?**

13      A.    Some point in time in 2018 I was no longer

14  getting a paycheck and so I assume that meant ending my

15  employment.

16      **Q.    All right.   Are you still employed by hiQ**

17  **Labs?**

18      A.    No.

19      **Q.    After hiQ Labs what, if anything, was your**

20  **next place of employment?**

21      A.    After hiQ Labs my next place of employment was

22  a company I founded called Datamode.

23      **Q.    And how long were you with Datamode?**

24      A.    Year and a half.

25      **Q.    And what was your next place of employment?**

1    place?

2              MR. MULLER:   Object to form.

3        A.    Yes.

4    BY MS. HURST:

5        Q.    And when that data was scraped and stored in

6    MongoDB, was it -- was it stored there directly?

7              MR. MULLER:   Object to form.

8        A.    Yes.

9    BY MS. HURST:

10       Q.    Was it also then backed up anywhere?

11       A.    Yes.

12       Q.    And where was it backed up to?

13       A.    Where Dan backed it up.

14       Q.    Oh.   I don't mean -- I don't mean by

15   Mr. Miller specifically in archiving, you know, for

16   litigation.   I mean, just generally in the ordinary

17   operation of business.

18       A.    Oh.

19       Q.    When you were scraping data in the ordinary

20   operation of business and the raw data was going into

21   the MongoDB, was it -- was -- was that MongoDB data

22   collection then being backed up anywhere?

23       A.    Partly, yes.   I -- I -- I mean, that's what

24   we -- we use for S3 kind of.

25       Q.    What was the relationship between the

Andrew Kim

1    scraping, you know, the -- the raw scraped storage as

2    between MongoDB and AWS S3, like what -- what was the

3    relationship there?

4              MR. MULLER:  Object to form.

5         A.    They were the same data just dumped into two

6    different places.

7    BY MS. HURST:

8         Q.    And what was the -- the reason for that

9    structure?

10        A.    Geez.  Mongo has been our -- our central

11   database for -- for as long as I can remember at hiQ.

12   S3 was used -- I -- I can't remember as to why we

13   initially began using S3.  But one -- one possibility

14   that -- that made it easier was that it -- it enables

15   connections to -- to big data technologies a little bit

16   easier, instead of having it all on one Mongo instance.

17        Q.    Where was the Mongo instance hosted?

18        A.    AWS.

19        Q.    Was that -- was that true throughout your

20   tenure?

21        A.    Yes.

22        Q.    And was there a particular AWS location that

23   the Mongo instance was hosted?

24        A.    What do you mean by specific AWS location?

25        Q.    Well, I'll represent to you that we've seen in

CE 0388

1   That's my understanding of it.

2   BY MS. HURST:

3       Q.    And who was in -- who was in charge of that

4   program?

5       A.    Depends on what point in time.

6       Q.    Who were the people over time who were in

7   charge of that program?

8       A.    I -- the -- the only people that I remember

9   are Dan Miller at some point in time and -- and Cameron

10  Cole.

11          MS. HURST:  Okay.  Exhibit 246 is going to be

12  tabs 134 and 134.1, cover and attachment.

13          (Exhibit 246 marked for

14          identification by the Certified

15          Shorthand Reporter.)

16      A.    Okay.

17  BY MS. HURST:

18      Q.    All right.  Mr. Kim, do you have Exhibit 246

19  open?

20      A.    Yes, I believe so.

21      Q.    All right.  And you see there an e-mail from

22  you to Xander Oltmann dated January 18, 2015?

23      A.    Yes.

24      Q.    Okay.  And who was Xander Oltmann at hiQ Labs?

25      A.    I don't really -- I -- I don't really know

1    what he did but he was more on the -- on the business

2    side, I suppose.

3        Q.    Okay.  Did he overlap with your tenure at hiQ

4    Labs?

5        A.    Yes.

6        Q.    How long was he there while you were there?

7        A.    When did Xander leave?  For two years

8    probably.

9        Q.    And what, if anything, do you know about the

10   circumstances of his departure?

11       A.    I don't recall.  I think -- I think Xander

12   went to do his own start-up, right.

13       Q.    Okay.  If you would look at your e-mail and

14   the attachment.  Your e-mail; "Subject:  Re: Slide deck

15   from Friday."  And there's an attachment called "hiQ

16   Product Overview and Strategy January 16, 2015."

17           Do you see that?

18       A.    Yes.

19       Q.    All right.  And in Exhibit 246 is this an

20   e-mail and attachment that you sent to Mr. Oltmann in or

21   about January 18, 2015?

22       A.    I don't remember it, but, yeah, I don't see

23   why not.

24       Q.    Do you recognize this slide deck as one you're

25   familiar with in Exhibit 246?

Andrew Kim

```
1      A.    Yes.  Isn't that the same deck I -- we saw
2   earlier?
3      Q.    You're -- you're going to be welcome to make a
4   comparison later if you want but -- but for now if you
5   could just answer my question whether you recognize it,
6   I would appreciate it.
7      A.    Oh, I -- yes.
8      Q.    Okay.  Thank you.
9            Okay.  Turning to slide five of the attachment
10  in Exhibit 246.
11     A.    Okay.
12     Q.    You have there a slide entitled:
13            "Using these verticals as a
14            starting point we can see how the
15            market is shaping up based on these
16            logos."
17            Do you see that?
18     A.    Yes.
19     Q.    And was this a market analysis that you
20  performed in or about January 2015 at the time you
21  joined hiQ Labs?
22            MR. MULLER:  Object to form.
23     A.    I don't remember but, yeah, given the -- the
24  content on the slide.
25  ///
```

CE 0391

1   using their profile data to predict that they were

2   considering a new job?

3           MR. MULLER:  Objection.  It's vague.

4       A.   Yeah, can you be more specific about that?

5   BY MS. HURST:

6       Q.   Yeah.

7           In connection with your Keeper product, you

8   were -- you were using LinkedIn profile data in part to

9   predict whether somebody was at a risk of leaving their

10  job, right?

11      A.   Yes, that's what --

12      Q.   And, in particular, the signal that you were

13  looking at in the data that was so valuable was whether

14  they had made a change to their LinkedIn profile within

15  a recent period of time, correct?

16          MR. MULLER:  Objection, foundation.

17      A.   Yeah, we -- we -- yeah.

18  BY MS. HURST:

19      Q.   Okay.  And were you aware that LinkedIn

20  actually had a setting on its platform that allow people

21  to choose not to share the fact that they had made

22  changes to their profile?

23          MR. MULLER:  Objection.  It's vague.

24      A.   I was aware personally, yes.

25  ///

1   BY MS. HURST:

2       Q.      Yeah, because you were also a LinkedIn user,

3   right?

4       A.      Yes.

5       Q.      And did you ever consider, as someone who was

6   a LinkedIn user and aware that you were given the choice

7   not to share information -- that you had made a change

8   to your profile, that you were actually violating the

9   expectations of other LinkedIn users by keeping their

10  profiles and analyzing over time whether they had

11  changed them?

12              MR. MULLER:  Objection, form.  And

13  speculation.

14      A.      No, because Google, Bing, they all did the

15  same thing.

16  BY MS. HURST:

17      Q.      Sorry, what did you say?

18      A.      All the search engines do the same thing, so

19  no.

20      Q.      If the search engines do the same thing, then

21  why didn't you just get the data from them, Mr. Kim?

22      A.      Because they actually -- (audio interruption.)

23              MR. MULLER:  Objection, form.

24      A.      I don't -- I don't know why, but I don't think

25  that they were -- search engines don't typically share

1    that data, do they?

2    BY MS. HURST:

3        Q.    Search engines publish their data, Mr. Kim,

4    don't they?

5        A.    They -- right.  But they also index it and

6    part of that, the value of the search engine is that

7    they can -- they index it and rank it in a certain way

8    so it's not easily accessible if you want to collect

9    specific types of data, but yeah.

10       Q.    All right.  So it's your testimony, Mr. Kim,

11   that because search engines could do it you thought it

12   was okay for you to violate people's privacy

13   expectations; is that --

14             (Simultaneous cross-talk.)

15       A.    No.

16             MR. MULLER:  Objection, misstates --

17   BY MS. HURST:

18       Q.    I want to make sure I understand your

19   testimony here.

20             MR. MULLER:  Objection.  That misstates

21   testimony.

22       A.    No, absolutely not.  That is not what I said.

23   BY MS. HURST:

24       Q.    All right.  So as a user you knew that people

25   could choose not to share the fact that they had changed

Andrew Kim

1  your profile -- their profiles, but you continued to

2  collect and sell that information anyway, correct?

3            MR. MULLER:  Objection to form.

4       A.    I believe that's what the company did, yes.

5            MS. HURST:  All right.  No further questions.

6            MR. MULLER:  So I just want to ask Mr. Kim a

7  few questions on redirect [sic] and I promise I won't

8  take up too much more of your time today.

9            THE WITNESS:  Okay.

10                      EXAMINATION

11  BY MR. MULLER:

12      Q.    But I'd like for us to turn back to

13  Exhibit 273 which you might see as tab 161.

14      A.    Okay.  I see it in front of me.

15      Q.    Okay.

16            MS. HURST:  I'm sorry, which exhibit was it?

17            MR. MULLER:  It's Exhibit 273.

18            MS. HURST:  Sorry, my cat -- my coworker in

19  the form of a feline just massively interrupted me

20  there.  My apologies for the distraction.

21            MR. MULLER:  That's a generous -- generous

22  amount of forbearance for how long we've been on the

23  record today.

24  BY MR. MULLER:

25      Q.    So, Mr. Kim, do you have Exhibit 273 in front

```
 1   State of California      )
                              )SS:
 2   County of San Diego      )

 3        I, the undersigned, a Certified Shorthand

 4   Reporter of the State of California, do hereby certify:

 5        That the foregoing proceedings were taken

 6   (X) remotely ( )live before me at the time and place

 7   herein set forth; that any witnesses in the foregoing

 8   proceedings, prior to testifying, were placed under

 9   oath; that a verbatim record of the proceedings was made

10   by me using machine shorthand which was thereafter

11   transcribed under my direction; further, that the

12   foregoing is an accurate transcription thereof.

13        Further, that if the case is pending in the

14   Federal Court, before the proceedings were transcribed

15   by me, review [X] was [ ] was not requested.

16        I further testify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19        IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21   DATED  May 10, 2022.

22

23                              _____

24                              LINDA E. MARQUETTE, CSR

25                              Certificate No. 11874
```

Page 291

CE 0396

# Compendium Exhibit 10

# (Filed Under Seal)

Page 1

1

             IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
3

4    HIQ LABS, INC.,                  )
                  Plaintiff;         )
5                                     )
         -v-                          )
6                                     )
     LINKEDIN CORPORATION,            )
7             Defendant.             )
     _____)No. 17-cv-03301-EMC
8    LINKEDIN CORPORATION,            )
           Counter-Claimant;        )
9                                     )
         -v-                          )
10                                    )
     HIQ LABS, INC.,                  )
11         Counter-Defendant.         )
12

13

14    The Video-Recorded Deposition of JAMES MALACKOWSKI
15   having been called by the Plaintiff for examination,
16   taken pursuant to all applicable Federal Rules of
17   Civil Procedure, conducted via Zoom videoconference,
18   and commencing at the hour of 9:01 a.m. on the 28th
19   day of July, 2022.
20

21   Reported By Beth Radtke, RPR, CRR
22   License No. 084-004561
23   Legal Videographer:  Peter Hudson
24   Concierge Technician:  Duane Milner

**Page 2**

1                    APPEARANCES

2

3   QUINN EMANUEL URQUHART & SULLIVAN, LLP

    By Mr. Zane Muller

4        51 Madison Avenue

         22nd Floor,

5        New York, New York 10010

         (212)849-7000

6        zanemuller@quinnemanuel.com

         Appeared on behalf of the HiQ Labs;

7

8   ORRICK, HERRINGTON & SUTCLIFFE, LLP

    By Ms. Catherine Lui

9        The Orrick Building

         405 Howard Street

10       San Francisco, California 94105-2669

         clui@orrick.com

11       Appeared on behalf of the LinkedIn Corporation.

12                       *****

13

14

15

16

17

18

19

20

21

22

23

24

**Page 3**

1                         INDEX

2

3  WITNESS                                    PAGE

4    JAMES MALACKOWSKI
     Examination By Mr. Muller              5

5

6  EXHIBITS

7    Exhibit 1379    Malackowski report      21
     Exhibit 1380    Malackowski rebuttal    21

8                    report
     Exhibit 1381    Imperva web scraping     40

9                    document
     Exhibit 1382    LINK_HIQ_000192449      65

10   Exhibit 1383    Excel spreadsheet       109
                     LINK_HIQ_000206261

11   Exhibit 1384    Excel spreadsheet       114
                     LINK_HIQ_000206256

12

   PREVIOUSLY MARKED EXHIBITS

13

     Exhibit 1371    Excel spreadsheet       86

14                   LINK_HIQ_000206264
     Exhibit 1363    Cost estimate           94

15                   LINK_HIQ_000206259
     Exhibit 1365    Cost per query          112

16                   LINK_HIQ_000206257

17
                         * * * * *

18

19

20

21

22

23

24

                                                         Page 4

1              THE VIDEOGRAPHER:  We are on the record at

2     10:04 a.m., eastern Daylight Time, on July 28, 2022,

3     beginning the remote video-recorded deposition of

4     James Malackowski, taken in the matter of hiQ Labs,

5     Inc., versus LinkedIn Corporation in the United

6     States District Court for the Northern District of

7     California, Case Number 17-CV-03301.

8              My name is Peter Hudson, the videographer;

9     the court reporter is Beth Radtke; and our concierge

10    is Duane Milner.

11             Counsel, will you please state your

12    appearances.

13             MR. MULLER:  This is Zane Muller with Quinn,

14    Emanuel, Urquhart & Sullivan on behalf of plaintiff,

15    hiQ Labs.

16             MS. LUI:  Catherine Lui, Orrick Herrington &

17    Sutcliffe, on behalf of defendant/counter-claimant

18    LinkedIn Corporation and the witness, James

19    Malackowski.

20             THE VIDEOGRAPHER:  Thank you.

21             The court reporter will swear the witness,

22    and you may then proceed.

23             (Witness sworn.)

24

Page 20

1  should move on.

2  BY MR. MULLER:

3      Q.   And so it's true that you are being

4  compensated at $975 per hour, is that accurate?

5      A.   No.   More accurately is my firm would be

6  compensated at that rate.  My compensation is not

7  dependent upon how much time I spend on any given

8  matter.

9      Q.   Understood.

10          Is that a straight hourly rate, or are there

11  other provisions such as a retainer in the agreement?

12      A.   I believe there are no other provisions, but

13  again, I am not the billing partner, so I can't say

14  for certain.

15          MR. MULLER:  So, Duane, if we could enter

16  Tab 01 as the first exhibit.

17  BY MR. MULLER:

18      Q.   And, Mr. Malackowski, this is your opening

19  report.  So you can refer to it either on the screen

20  or on the clean paper copy that you have.

21          MR. MILNER:  Exhibit 1379 has been marked.

22  BY MR. MULLER:

23      Q.   And just for the sake of good order,

24  Mr. Malackowski, would you take a look at the

Page 21

1   document that's been entered as an exhibit and

2   confirm that it is the same as your opening report?

3       A.   I will.   I have refreshed twice and I don't

4   see it on Exhibit Share yet.

5           MR. MILNER:   There are two folders in

6   Exhibit Share.   One was from the deposition from two

7   weeks ago that was scheduled.

8           THE WITNESS:   Oh.

9           MR. MILNER:   So I would just make sure --

10          THE WITNESS:   Yes, I believe in the wrong

11  one.

12          Correct, now I am in the LinkedIn Exhibit

13  Share with today's date, and I see the first exhibit.

14  I'll open it.

15          Yes, this is a copy of my original report

16  dated June 7th of this year, along with the various

17  appendices.

18          MR. MULLER:   And then, Duane, would you

19  please enter Tab 2, which is the rebuttal report?

20          MR. MILNER:   Exhibit 1380 has been marked.

21  BY MR. MULLER:

22      Q.   Mr. Malackowski, when you have a chance, if

23  you could just review that exhibit and confirm that

24  it is your rebuttal report?

Page 22

1      A.   Yes, it is in fact my rebuttal report dated

2   June 30th of this year.

3      Q.   Okay.  So we'll refer to these repeatedly

4   throughout today's deposition, so if you prefer to

5   refer on the screen or in the paper copy that you've

6   printed out, either way is fine.

7           So I'd like to start with your resume, which

8   is Exhibit A to the original report, the opening

9   report.

10      A.   And as I said, that is the one thing I do

11   not have printed, so I will rely upon the virtual

12   copy, and I have it in front of me.

13      Q.   And can you describe your educational

14   background and any degrees or certifications that you

15   possess?

16      A.   Yes.  I would certainly defer to the

17   description in my CV, but in summary, I have an

18   undergraduate degree from the University of Notre

19   Dame in accounting and philosophy.  I do not have a

20   postgraduate degree.  I have taught at a number of

21   undergraduate, graduate, and law classes, which is,

22   to some extent, part of my educational background,

23   and I have a history of continuing professional

24   education, both in the accounting area and various

Page 23

1    subparts of accounting, as well as in the area of

2    licensing or technology transfer.

3         Q.   Do you have a juris doctor degree?

4         A.   I do not.

5         Q.   Do you have a master of law degree?

6         A.   I do not.

7         Q.   Do you have any legal training or

8    experience?

9         A.   Well, that's a broad question.  So as I

10   indicated, I have taught at law schools, I have

11   participated in numerous continuing legal educational

12   programs related to my field, but I have not enrolled

13   as a law student in a university program.

14        Q.   Are you qualified to offer legal opinions,

15   in your own view?

16        A.   I don't seek to offer legal opinions, so

17   frankly, it's not an issue I have considered.

18        Q.   If someone asked you to express a legal

19   opinion, would you say you are qualified to do it?

20        A.   Well, I would certainly want to understand

21   the scope of the opinion and whether or not it is

22   truly legal and only legal and not also a business

23   contract or business licensing opinion.  So it would

24   be context dependent, but I have not, and as I sit

1   to the processes for a large company like IBM, but

2   more importantly, because of the condition of hiQ for

3   all the reasons we've been talking about.

4        Q.   So sitting here today, having gone through

5   several hours of questioning about your opening

6   report and your rebuttal report, is there any part of

7   either report that you would now like to change or

8   modify in any way?

9        A.   No.   I would say, if anything, I feel

10  stronger about my conclusions having gone through

11  this exercise.

12       Q.   Is it the case that you continue to stand by

13  each of the opinions in your reports?

14       A.   Yes, sir.

15       Q.   And you intend to offer each of the opinions

16  in your reports at later stages in this case,

17  including at trial?

18       A.   I don't know.   As I discussed earlier in the

19  day, I have not discussed with counsel the scope of

20  my opinions at trial, though I do believe they would

21  be limited to what's within my report, what's related

22  to my report, what was produced later, or what's

23  related to my opinions and presented at trial.

24       Q.   At this time, are there any additional

Page 203

1    opinions that you intend to offer later on in this

2    case?

3         A.    No, sir.

4               MR. MULLER:   I have no further questions.

5               THE WITNESS:   Thank you.   Very professional.

6               MR. MULLER:   Thanks for your time,

7    Mr. Malackowski.

8               THE WITNESS:   Catherine, this is when you

9    say you have no questions.

10              MS. LUI:   I have no questions, yes.

11              THE VIDEOGRAPHER:   I'm sorry, Catherine, I

12   didn't understand.   Do you have questions?

13              MS. LUI:   I have no questions, no.

14              THE VIDEOGRAPHER:   All right.   Then this

15   concludes the deposition of James Malackowski on

16   July 28, 2022.   The time is 4:13 p.m. Eastern

17   Daylight Time, and we are now off the record.

18              (Deposition concluded at 4:13 Eastern Time.)

19

20

21

22

23

24

Page 204

1                    CERTIFICATE OF

2             CERTIFIED SHORTHAND REPORTER

3       I, Beth Radtke, a Certified Shorthand

4   Reporter of the State of Illinois, CSR License No.

5   084-004561, do hereby certify:

6       That previous to the commencement of the

7   examination of the aforesaid witness, the witness

8   was duly sworn by me to testify the whole truth

9   concerning the matters herein;

10      That the foregoing deposition transcript was

11  stenographically reported by me and was thereafter

12  reduced to typewriting under my personal direction

13  and constitutes a true and accurate record of the

14  testimony given and the proceedings had at the

15  aforesaid deposition;

16      That I am not a relative or employee or attorney

17  or counsel for any of the parties herein, nor am I

18  interested directly or indirectly in the outcome of

19  this action.

20      IN WITNESS WHEREOF, I do hereunto set my hand at

21  Chicago, Illinois, this 29th day of July, 2022.

22

23  _____

            Beth Radtke, RPR, CRR

24          License No. 084-004561

**Exhibit 1379**



# HIQ LABS, INC.

# V.

# LINKEDIN CORPORATION

Civil Action No. 3:17-cv-03301

United States District Court for the Northern District of California

---

# EXPERT REPORT OF JAMES E. MALACKOWSKI

**June 7, 2022**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 INTELLECTUAL CAPITAL EQUITY

1    FIRM BACKGROUND AND QUALIFICATIONS ................................................................. 1

2    SUMMARY OF ASSIGNMENT ................................................................................................. 2

3    SUMMARY OF OPINIONS ....................................................................................................... 5

4    RELEVANT ENTITIES ............................................................................................................. 6
       4.1    LINKEDIN .................................................................................................................. 6
       4.2    HIQ ............................................................................................................................. 9

5    SUMMARY OF THE DISPUTE ............................................................................................. 14

6    HIQ'S ALLEGEDLY UNLAWFUL CONDUCT .................................................................. 15

7    BACKGROUND REGARDING DATA SCRAPING ............................................................ 15

8    TIMELINE OF EVENTS ......................................................................................................... 17

9    LINKEDIN'S SUBSTANTIAL INVESTMENT IN ITS PLATFORM ................................ 18

10    LOSS THRESHOLD UNDER THE COMPUTER FRAUD AND ABUSE ACT .................... 21

11    QUANTIFICATION OF DAMAGES ..................................................................................... 22
       11.1    COSTS ASSOCIATED WITH DROPPING, CHECKING, AND SERVING HIQ'S GUEST PROFILE REQUESTS ......... 23
       11.2    VALUE OF LINKEDIN PROFILES MISAPPROPRIATED BY HIQ ....................... 27

12    IRREPARABLE HARM TO LINKEDIN ............................................................................. 31
       12.1    HARM TO REPUTATION AND GOODWILL ..................................................... 31
       12.2    COSTS ASSOCIATED WITH PERSONNEL TO CREATE AND USE DEFENSES ......... 41
       12.3    CONCLUSION ........................................................................................................ 44

13    SIGNATURE .............................................................................................................................. 45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0438

 **INTELLECTUAL CAPITAL EQUITY**

## 1    FIRM BACKGROUND AND QUALIFICATIONS

My name is James E. Malackowski, and I am a Co-founder and Senior Managing Director of Ocean Tomo, LLC, a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, and Advisory services related to intellectual property (IP) and other intangible assets; corporate accounting investigations; regulatory and reporting obligations; solvency and restructuring; and contractual or competition disputes. Practice offerings address economic damage calculations and testimony; accounting investigations and financial forensics; technology and intangible asset valuation; strategy and risk management consulting; mergers and acquisitions; debt and equity private placement; and IP brokerage.  Subsidiaries of Ocean Tomo include Ocean Tomo Investments Group, LLC, a registered broker dealer.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

Along with Supreme Court Justice Stephen Breyer, I was inducted into the IP Hall of Fame in 2022, chosen by the IP Hall of Fame Academy from a long list of nominees put forward by the global IP community.  I was recognized by the Academy in 2022 with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset.  My inclusion into the IP Hall of Fame follows annual recognition since 2007 by leading industry publications as one of the "World's Leading IP Strategists."  Significantly, I have been listed among "50 Under 45" by IP Law & Business™; included in the National Law Journal's inaugural list of 50 Intellectual Property Trailblazers & Pioneers; and named as one of "The Most Influential People in IP" by Managing Intellectual Property™.  I was named as 1 of 50 individuals, companies and institutions that framed the first 50 issues of IAM Magazine as well as 1 of 60 leading global Economics Expert Witnesses by the same publication in 2014.  In 2011 I was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013, I was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.  In 2018, I joined the Standards Development Organization Board of the Licensing Executives Society (USA & Canada), Inc. governing voluntary consensus-based professional practices that are guided in their development by the American National Standards Institute's (ANSI's) Essential Requirements. LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management.

On more than one hundred occasions, I have served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to intellectual property economics, including the subject of valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch-Waxman Act market exclusivity, business significance of licensing terms including RAND obligations, venture financing including expected risk / return, and equities of a potential injunction.  My experience extends to matters of general business valuation and commercial disputes, both domestic and foreign.  I have publicly addressed policy issues affecting international trade and have provided expert opinions concerning antidumping and countervailing duties imposed by the U.S. Department of Commerce as well as testimony on domestic industry, bond, and remedies before the International Trade Commission.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0439

 **INTELLECTUAL CAPITAL EQUITY**

I have substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues. I am Past President of The Licensing Executives Society International, Inc., with oversight for more than ten thousand members in thirty-two countries. I focus my non-for-profit efforts with organizations leveraging science and innovation for the benefit of children and students, including those located in lesser developed countries. I have served since 2002 as a Trustee or Director of the National Inventors Hall of Fame, Inc., an organization providing summer enrichment programs for more than 100,000 students annually. For more than ten years I served as a Director of Chicago's Stanley Manne Children's Research Institute, advancing the organization's agenda to measure and report the impact of its pediatric research. I most recently served on the Pritzker School of Molecular Engineering Council at the University of Chicago.

I am a frequent speaker on emerging technology markets and related financial measures. I have addressed mass media audiences including Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CNBC World Wide Exchange, CBS News Radio, and Fox Business National Television as well as other recognized news-based internet video channels. I am a current or past judge for the Illinois Technology Association's CityLIGHTS™ Innovation Awards program, the University of Notre Dame McCloskey Venture Competition, 1st Source Faculty Commercialization Awards, and PBS's Everyday Edisons.

As an inventor, I have more than twenty issued U.S. patents. I am a frequent instructor for graduate studies on IP management and markets and a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy. I am Certified/Accredited in Financial Forensics, Business Valuation, and Blockchain Fundamentals. I am a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois. I have been certified to receive United States Sensitive Security Information (SSI) as governed by Title 49 Code of Federal Regulations.

A detailed version of my *curriculum vitae* is attached as Appendix 1.

Ocean Tomo is presently being compensated for my work in this matter at a billing rate of $975/hr. Other Ocean Tomo consultants are assisting me in this engagement and are being compensated at rates less than $975/hr.[1] No part of my compensation depends on the outcome of this dispute or the substance of my testimony.

2    **SUMMARY OF ASSIGNMENT**

Ocean Tomo was retained by LinkedIn Corporation ("LinkedIn") in connection with this matter. Ocean Tomo was asked to analyze certain accounting, financial, marketing, and other business data in order to assess

---

[1] Other Ocean Tomo consultants that assisted me in this engagement include Alexander Clemons, Sergio Alviso, Sonja Popovich, and Liam Howe.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

the various harms to LinkedIn and benefits to hiQ Labs, Inc. ("hiQ") resulting from hiQ's allegedly unlawful conduct.

In order to appropriately assess damages that may be recoverable if liability is found, I have relied upon:

- Legal filings and proceedings;

- Documents produced by LinkedIn in connection with this matter;

- Documents produced by hiQ in connection with this matter;

- Deposition testimony of the following LinkedIn personnel:

    - Jenelle Bray, Director of Engineering of the Anti-Abuse AI Team at LinkedIn, May 18, 2022;[2]

    - Blake Lawit, Senior Vice President and General Counsel at LinkedIn, May 20, 2022;[3]

    - Eric Owski, Former Senior Director, Global Product Management at LinkedIn Talent Solutions, May 23, 2022;[4]

    - Dan Reid, Senior Director of Product Management at LinkedIn, May 19, 2022;[5]

    - Scott Roberts, Vice President of Business Development and Head of the Global Business Development Team at LinkedIn, May 5, 2022;[6]

    - Paul Rockwell, Vice President of Trust and Safety at LinkedIn, May 19, 2022;[7]

    - Lee Wormer, Vice President of Business Development at LinkedIn, May 11, 2022;[8]

- Deposition testimony of the following hiQ personnel:

    - Robert DeSantis, Investor, Co-Founder and Strategic Advisor at hiQ, May 17, 2022;[9]

    - Boris Dev, Back End Software Engineer at hiQ, May 4, 2022;[10]

    - Darren Kaplan, Co-Founder and Former CEO of hiQ, May 4 and 5, 2022;[11]

---

[2] Deposition of Jenelle Bray, May 18, 2022, pp. 1, 10.

[3] Deposition of Blake Lawit, May 20, 2022, pp. 1, 8.

[4] Deposition of Eric Owski, May 23, 2022, pp. 1, 6, 29.

[5] Deposition of Dan Reid, May 19, 2022, pp. 1, 26.

[6] Deposition of Scott Roberts, May 5, 2022, pp. 1, 23.

[7] Deposition of Paul Rockwell, May 19, 2022, pp. 1, 12.

[8] Deposition of Lee Wormer, May 11, 2022, pp. 1, 20.

[9] Deposition of Robert DeSantis, May 17, 2022, pp. 1, 11.

[10] Deposition of Boris Dev, May 4, 2022, pp. 1, 23.

[11] Deposition of Darren Kaplan, May 4, 2022, pp. 1, 39-41, 115; Deposition of Darren Kaplan, May 5, 2022, p. 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

- Andrew Kim, Former VP of Technology at hiQ, May 9, 2022;[12]
- Darin Medeiros, Former VP of Sales at hiQ, May 20, 2022;[13]
- Daniel Miller, CTO of hiQ, May 13, 2022;[14]
- Alexander Oltmann, Former COO of hiQ, May 13, 2022;[15]
- Mark Weidick, CEO of hiQ, March 18 and May 23, 2022;[16]

- Deposition testimony of the following third-parties:
  - Chris Lamb, Products Manager at IBM Research, May 18, 2022;[17]
  - Robert Rosin, Partner at Defy Partners, May 23, 2022;[18]
  - Oxydata, Inc., March 9, 2022;[19]

- The following declarations and expert reports:
  - Expert Report of Yael Hochberg, Ph.D., June 7, 2022;
  - Expert Report of Kevin M. Murphy, June 7, 2022;

- Discussions with the following individuals:
  - Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn;
  - Chase Baldwin, Vice President of Central Finance at LinkedIn;
  - Xiaofeng Wu, Director of Software Engineering at LinkedIn;
  - Abhishek Bajoria, Director, Cybersecurity Policy, at LinkedIn;
  - Erin James, Senior Litigation Counsel at LinkedIn;

- Publicly available information.

A detailed listing of documents reviewed by Ocean Tomo in connection with this litigation to date is attached as Appendix 2. References to documents and testimony herein are meant to provide examples of supporting information but are not intended to be a comprehensive or exhaustive list of all known support.

---

[12] Deposition of Andrew Kim, May 9, 2022, pp. 1, 20, 87.

[13] Deposition of Darin Medeiros, May 20, 2022, pp. 1, 13.

[14] Deposition of Daniel Miller, May 13, 2022, pp. 1, 15.

[15] Deposition of Alexander Oltmann, May 13, 2022, pp. 1, 17, 27.

[16] Deposition of Mark Weidick, March 18, 2022, pp. 1, 8; Deposition of Mark Weidick, May 23, 2022, p. 1.

[17] Deposition of Chris Lamb, May 18, 2022, pp. 1, 7.

[18] Deposition of Robert Rosin, May 23, 2022, pp. 1, 13.

[19] Deposition of Oxydata, Inc., March 9, 2022, pp. 1, 3. I understand the Oxydata, Inc., 30(b)(6) witness did not appear for the scheduled deposition.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

The following report and accompanying analyses summarize my current opinions regarding the various harms to LinkedIn resulting from the allegedly unlawful conduct of hiQ. The opinions discussed throughout this report are based on my current understanding of the facts and circumstances surrounding this matter, my review of the produced documentation, testimony, third party information available to date, and any underlying assumptions upon which I have relied. The information in this report is based on discovery to date and information that is currently available. Accordingly, my opinions described herein should be considered preliminary and subject to change based on future discovery, the testimony of other experts, and other case developments. I reserve the right to submit a supplemental report if both necessary and allowed by the Court. In addition to this report, I may rely on excerpts taken from videotaped depositions and/or demonstrative exhibits that illustrate the concepts and conclusions contained in this report.

**3      SUMMARY OF OPINIONS**

Based on the totality of the circumstances in this case and the information available to me at this time, I have quantified certain harms to LinkedIn and benefits to hiQ that have resulted from the allegedly unlawful conduct of hiQ, as described more fully in Section 11 below and shown in the following figures.



However, these quantifiable damages do not represent the totality of the harms that have or will be suffered by LinkedIn as a result of hiQ's allegedly unlawful conduct. As described more fully in Section 11, certain data recorded by hiQ was not produced in this litigation that would likely have substantiated and provided the basis for further harm suffered by LinkedIn as a result of hiQ. As described more fully in Section 12, LinkedIn has suffered additional harms and will continue to suffer additional harms in the future, if hiQ is allowed to continue its allegedly unlawful conduct. Based on the totality of the circumstances in this case and the information available to date, it is my opinion that scraping of LinkedIn profile data, including the

---

[20] Appendix 3.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

allegedly unlawful conduct of hiQ aggregated with other unauthorized scrapers, may result in significant harm to LinkedIn's reputation, goodwill, and monetary costs that are difficult or impossible to quantify and thus not compensable with monetary damages, if such data scraping is allowed to continue.

## 4    RELEVANT ENTITIES

### 4.1    LinkedIn



LinkedIn, headquartered in Mountain View, California, was founded in 2002, launched in 2003, and acquired by Microsoft Corporation in 2016.[21]  With over 830 million members in more than 200 countries and territories worldwide, LinkedIn operates the world's largest social network with a professional focus.[22]  The network features a platform through which members "create, manage, and share their professional identity online; build and engage with their professional networks; access shared knowledge and insights; and find business opportunities."[23]  LinkedIn's mission is to "connect the world's professions to make them more productive and successful."[24]

---

[21] "About LinkedIn," *LinkedIn*, https://about.linkedin.com/; "LinkedIn Corporation – Private Company Profile," *S&P Capital IQ*, https://www.capitaliq.com/CIQDotNet/company.aspx?companyId=7704259.

[22] "About LinkedIn," *LinkedIn*, https://about.linkedin.com/.

[23] "LinkedIn Corporation – Private Company Profile," *S&P Capital IQ*, https://www.capitaliq.com/CIQDotNet/company.aspx?companyId=7704259.

[24] "About LinkedIn," *LinkedIn*, https://about.linkedin.com/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

**Figure 2: LinkedIn's Members[25]**



LinkedIn's network is available through its website and through its mobile applications across a range of platforms and languages such as iOS, Android, Blackberry, Nokia Asha, and Windows Mobile.[26]

LinkedIn has been recognized as the most trusted social network for the past five years, above other social platforms, including Pinterest, Instagram, Twitter, and Facebook.[27]   According to eMarketer and Insider Intelligence's 2021 Digital Trust Benchmark Report, LinkedIn ranked above all other social media platforms in four out of five "pillar of trust" categories:  security, legitimacy, community, and ad experience.[28]

---

[25] Geyser, Werner, "54 of the Most Important LinkedIn Stats for 2022," *Influencer Marketing Hub*, December 29, 2021, https://influencermarketinghub.com/linkedin-stats/.

[26] "LinkedIn Corporation – Private Company Profile," *S&P Capital IQ*, https://www.capitaliq.com/CIQDotNet/company.aspx?companyId=7704259.

[27] Deneva, Dilyana, "LinkedIn Is the Most Trusted Social Media Network for 2021," *The LinkedIn Blog*, October 26, 2021, https://thelinkedblog.com/2021/linkedin-is-the-most-trusted-social-media-network-for-2021-979/; LINK_HIQ_000148931-965.

[28] Deneva, Dilyana, "LinkedIn Is the Most Trusted Social Media Network for 2021," *The LinkedIn Blog*, October 26, 2021, https://thelinkedblog.com/2021/linkedin-is-the-most-trusted-social-media-network-for-2021-979/; LINK_HIQ_000148931-965.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

Figure 3:  2021 Digital Trust Rankings[29]



In response, Daniel Roth, Editor in Chief and VP at LinkedIn, highlighted LinkedIn's dedication to upholding trust among its users:[30]

> *Fostering meaningful connections among users and making them feel safe engaging with an online community is the third most significant factor affecting user trust.  A positive sense of community can encourage social sharing and engagement and spark conversation between users and brands.*

---

[29] Deneva, Dilyana, "LinkedIn Is the Most Trusted Social Media Network for 2021," *The LinkedIn Blog*, October 26, 2021, https://thelinkedblog.com/2021/linkedin-is-the-most-trusted-social-media-network-for-2021-979/; LINK_HIQ_000148931-965.

[30] Deneva, Dilyana, "LinkedIn Is the Most Trusted Social Media Network for 2021," *The LinkedIn Blog*, October 26, 2021, https://thelinkedblog.com/2021/linkedin-is-the-most-trusted-social-media-network-for-2021-979/; LINK_HIQ_000148931-965.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

LinkedIn diversifies its business with revenues from membership subscriptions, advertising sales, and recruitment, sales, and learning solutions.[31]  For example, LinkedIn provides talent solutions, including hiring solutions that enable enterprises and professional organizations to find, contact, and hire qualified candidates; learning and development solutions including professional development education courses; marketing solutions products that enable both enterprises and individuals to advertise to its member base and potential customers based on specific attributes such as industry, function, seniority, and company size; premium subscription services that are designed for general professionals to manage their professional identity, grow their networks, and connect with talent; and social selling solutions like LinkedIn Sales navigator.[32]

**Figure 4:  LinkedIn's Business Solutions[33]**

| Hire | Market | Sell | Learn |
|---|---|---|---|
| Attract talent and recruit candidates from the world's largest talent pool. | Market to the world's largest professional audience. | Power your social selling efforts with real-time sales intelligence. | Develop talent and keep skills current with online learning. |

I have also reviewed, relied upon, and incorporated by reference the expert report of Kevin M. Murphy, Ph.D., which provides additional discussion and analysis of LinkedIn; its revenue and costs; its privacy policies; its anti-abuse efforts; its authorized use of members' information; and other relevant topics.[34]

## 4.2    hiQ

hiQ, headquartered in San Francisco, California, was incorporated in 2012.[35]  The company described itself as "a data science company, informed by public data sources, applied to human capital."[36]  Specifically, the company developed a cloud-based platform for employee selection, development, and retention.[37]  According to hiQ, "[t]here is more information about your employees outside the walls of your organizations than inside it."[38]  hiQ claimed that it curated and leveraged this data—through the power of predictive analytics, data science, and its scalable, machine-learning-based SaaS platform—to drive employee-positive actions and better and more reliable people

---

[31] "About LinkedIn," *LinkedIn*, https://about.linkedin.com/; "Business Solutions," *LinkedIn*, https://business.linkedin.com/.

[32] "LinkedIn Corporation – Private Company Profile," *S&P Capital IQ*, https://www.capitaliq.com/CIQDotNet/company.aspx?companyId=7704259.

[33] "Business Solutions," *LinkedIn*, https://business.linkedin.com/.

[34] Expert Report of Kevin M. Murphy, June 7, 2022.

[35] "hiQ Labs, Inc. – Private Company Profile," *S&P Capital IQ*, https://www.capitaliq.com/CIQDotNet/company.aspx?companyId=267199401.

[36] "hiQ," *hiQ Labs*, https://www.hiqlabs.com/.

[37] "hiQ Labs, Inc. – Private Company Profile," *S&P Capital IQ*, https://www.capitaliq.com/CIQDotNet/company.aspx?companyId=267199401.

[38] "hiQ," *hiQ Labs*, https://www.hiqlabs.com/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

   INTELLECTUAL CAPITAL EQUITY

decisions.[39]  The company described its enterprise solutions, Keeper and Skill Mapper, as "a crystal ball that helps [organizations] determine skills gaps or turnover risks months ahead of time, and a platform that shows [them] how and where to focus [their] efforts."[40]

hiQ described its Keeper solution as follows:[41]

> *Keeper is the first HCM [human capital management] tool to offer predictive attrition insights about an organization's employees based on publicly available data.  The solution turns those attrition insights into consumable, easy-to-deploy action plans so HR and business leaders can retain their key talent.*
>
> *By identifying risk early, addressing potential issues proactively, and deploying remedial actions quickly, Keeper drives immediate business impact across organizations - and provides a built-in feedback loop so you can communicate your retention win to management.*

By analyzing information about an organization's employees, the platform's "data science engine extract[ed] strong signals from that noise that indicate someone may be a flight risk."[42]  Keeper then used "statistical patterns observed across hundreds of thousands of employees" and its machine-learning models to assign the organization's employees a risk score:  high (red), medium (yellow), or low (green).[43]  The solution translated these attrition insights into action plans for so-called high-risk employees, enabling HR and businesses to focus efforts on those employees and better retain their key talent.[44]

---

[39] "hiQ," *hiQ Labs*, https://www.hiqlabs.com/; "hiQ LABS – The Global Standard for People Analytics," *hiQ Labs*, p. 1, https://static1.squarespace.com/static/5803b57737c581885cbd0667/t/59c44d5ee5dd5bcfde0dc232/1506037087308/predictive_accuracy.pdf.

[40] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

[41] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

[42] "hiQ LABS – The Global Standard for People Analytics," *hiQ Labs*, p. 2, https://static1.squarespace.com/static/5803b57737c581885cbd0667/t/59c44d5ee5dd5bcfde0dc232/1506037087308/predictive_accuracy.pdf.

[43] "hiQ LABS – The Global Standard for People Analytics," *hiQ Labs*, p. 2, https://static1.squarespace.com/static/5803b57737c581885cbd0667/t/59c44d5ee5dd5bcfde0dc232/1506037087308/predictive_accuracy.pdf.

[44] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index; "hiQ LABS – The Global Standard for People Analytics," *hiQ Labs*, p. 2, https://static1.squarespace.com/static/5803b57737c581885cbd0667/t/59c44d5ee5dd5bcfde0dc232/1506037087308/predictive_accuracy.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

**Figure 5:  Managing Attrition with hiQ's Keeper Solution**[45]

+ Manage attrition with Keeper

- Analyze attrition risk across your entire workforce, from business units, to specific employee segments, and even to individual employees.
- Stay ahead of costly, regrettable turnover by using a forward-looking, rather than backward-looking, indicator of attrition risk.
- Customize your employee retention plans by understanding what specific external factors are driving attrition risk.
- Use hiQ's actions library to create retention strategies tailored to help you keep specific top performing employees.
- Save time for your managers by focusing their attention on the most at-risk employees and segments.
- Take an evidence-based approach to determining the most effective retention strategies for your company by tracking actions over time.

**Figure 6:  hiQ's Keeper Solution Interface**[46]



_____

[45] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

[46] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

hiQ descried its Skill Mapper solution as follows:[47]

*Skill Mapper was built for Talent Acquisition and Management teams facing the challenge of building workforce and succession plans without sufficient data on their employees' skill sets in their current HCM [human capital management] systems.*

*Because Skill Mapper is based on publicly available data, you can explore the full scope of your workforce's skills, including skills from previous and current roles. Our customers use Skill Mapper for workforce and succession planning, driving employee engagement by promoting internal mobility, and reducing the costs associated with external talent acquisition.*

**Figure 7: Recruit vs. Develop with hiQ's Skill Mapper[48]**

+ Recruit vs. develop with Skill Mapper

- Discover your multitalented employees' hidden skills and skill sets.
- Explore the skills that your employees are self-curating on the web and augment/update your company's database of employee competencies.
- Identify your employees' hidden and adjacent skill sets, and leverage them as a tool for career development.
- Find the best-fit job matches for employees seeking new opportunities at your company following a business transformation or restructuring.
- Quickly identify which employees have similar skill sets to your top talent.
- Map out the talent and competencies of multiple legacy organizations after a business combination.

---

[47] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

[48] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0450

INTELLECTUAL CAPITAL EQUITY

**Figure 8:  hiQ's Skill Mapper Solution Interface[49]**



I understand that "[w]hile hiQ wound down its operations in the latter half of 2018, hiQ's servers continued running into 2019 to deliver on client contracts.  During this time, a few former hiQ employees were lightly involved in continuing to service existing client accounts."[50]

I note that the section above draws from hiQ's characterizations, and I reserve the right to assess and consider the strength of hiQ's characterizations, as necessary, including in any rebuttal report.

I have also reviewed, relied upon, and incorporate by reference the expert report of Yael Hochberg, Ph.D., which provides additional discussion and analysis regarding hiQ; hiQ's business model, which was entirely reliant on member profile data scraped from LinkedIn as its single data source for individual information; hiQ's poor positioning for potential success and lack of a sustainable competitive advantage; hiQ's significant cash needs and issues attracting financing; hiQ's operating losses, difficulty attracting customers, and executive turnover; hiQ's cash conservation plan; hiQ's general downward trajectory; and other relevant topics.[51]  Additionally, I have reviewed, relied upon, and incorporated by reference the expert report of Kevin

---

[49] "Enterprise Solutions," *hiQ Labs*, https://www.hiqlabs.com/new-index.

[50] Declaration of Mark Weidick in Opposition to LinkedIn's Motion to Dissolve the Preliminary Injunction and for an Indicative Ruling, September 24, 2021, p. 2.

[51] Expert Report of Yael Hochberg, Ph.D., June 7, 2022.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0451



INTELLECTUAL CAPITAL EQUITY

M. Murphy, Ph.D., which provides additional discussion and analysis regarding hiQ; hiQ's allegedly unlawful conduct; and other relevant topics.[52]

**5      SUMMARY OF THE DISPUTE**

In its amended complaint, filed February 14, 2020, hiQ asserted the following claims:[53]

1.  Declaratory judgment that hiQ has not violated and will not violate the Computer Fraud and Abuse Act, 18 U.S.C § 1030, by accessing LinkedIn public profiles;

2.  Declaratory judgment that hiQ has not violated and will not violate the Digital Millennium Copyright Act, 17 U.S.C § 1201, by accessing LinkedIn public profiles;

3.  Declaratory judgment that hiQ has not committed and will not commit common law trespass to chattels by accessing LinkedIn public profiles;

4.  Declaratory judgment that hiQ has not violated and will not violate California Penal Code § 502(c) by accessing LinkedIn public profiles;

5.  Intentional interference with contract;

6.  Intentional interference with prospective economic advantage;

7.  Unfair competition in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;

8.  Unlawful competition in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;

9.  Fraudulent competition in violation of Cal. Bus. Prof. Code § 17200, *et seq.*;

10. Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2;

11. Attempted monopolization, Sherman Act, Section 2, 15 U.S.C. § 2; and

12. Sherman Act, Section 1, 15 U.S.C. § 1.

I understand that the Court granted LinkedIn's motion to dismiss hiQ's Sherman Act antitrust claims, stating:[54]

---

[52] Expert Report of Kevin M. Murphy, June 7, 2022.

[53] Amended Complaint, February 14, 2020, pp. 22-36.

[54] Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, September 9, 2020, p. 21.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*hiQ has failed to adequately allege a product market (i.e., the people analytics market). In addition, hiQ has failed to adequately allege anticompetitive conduct.*

In its counterclaims, filed November 20, 2020, LinkedIn asserted the following claims:[55]

1.  Computer Fraud and Abuse Act, 18 U.S.C § 1030;

2.  California Comprehensive Computer Access and Fraud Act, Cal. Penal Code §§ 502, *et seq.*;

3.  Breach of contract;

4.  Misappropriation; and

5.  Trespass to chattels.

## 6   HIQ'S ALLEGEDLY UNLAWFUL CONDUCT

I understand that LinkedIn has alleged that hiQ knowingly and intentionally accessed LinkedIn's computers and servers without authorization, in excess of authorization, without permission, tortiously, and/or in breach of contract, in order to scrape member profile data from LinkedIn's computers and servers.[56]

## 7   BACKGROUND REGARDING DATA SCRAPING

Web scraping is the process of using bots (i.e., "a software program that runs automated tasks over the internet, typically performing simple, repetitive tasks at great speeds unattainable, or undesirable by humans") to automatically collect information and extract content and data from a website.[57] Web scraping, including I understand that engaged in by hiQ, extracts the underlying HTML code along with the data stored in a database, allowing a scraper to replicate an entire website's content.[58]

According to Edward Roberts, the Director of Strategy for Application Security at Imperva, automated scraping "must be a top concern for businesses and security practitioners … [o]rganizations must take proactive action to secure their websites, applications and APIs from these threats as bots are increasingly

---

[55] Defendant and Counterclaimant LinkedIn Corporation's Answer and Counterclaims, November 20, 2020, pp. 44-49.

[56] Defendant and Counterclaimant LinkedIn Corporation's Answer and Counterclaims, November 20, 2020, pp. 44-49.

[57] "Web scraping," *Imperva*, https://www.imperva.com/learn/application-security/web-scraping-attack/; Hasan, Nabeel, "Good or Evil? What Web Scraping Bots Mean for Your Site," *Imperva*, April 18, 2016, https://www.imperva.com/blog/web-scraping-bots/.

[58] "Web scraping," *Imperva*, https://www.imperva.com/learn/application-security/web-scraping-attack/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 INTELLECTUAL CAPITAL EQUITY

involved in fraudulent activity that can be a source of reputational and financial damage."[59]  For example, malicious web scraping can result in the theft of copyrighted content, price lists, customer lists, datasets, and other intellectual property.[60]  Furthermore, malicious bot traffic presents a "challenge to organizations that want to mitigate downtime, reduce bandwidth consumption and improve experiences for legitimate human customers … [and] creates havoc for organizations through price scraping, content scraping, account creation, account takeover, fraud, denial of service and denial of inventory."[61]

I understand that "[s]ince all scraping bots have the same purpose—to access site data—it can be difficult to distinguish between legitimate and malicious bots."[62]  Although certain security measures can mitigate malicious bot traffic, "[t]he increased sophistication in malicious scraper bots has rendered some common security measures ineffective."[63]  "When a site is polluted with any kind of bot traffic, it slows web performance and makes it harder for legitimate users to access the information or services they need."[64]

Regardless of its intent, web scraping generally results in higher costs and lower revenue for the targeted company.[65]  According to Imperva, "[a]n online entity targeted by a scraper can suffer severe financial losses."[66]  As of 2018, Imperva estimated that, on average, 2% of online revenue was lost as a result of web scraping.[67]  According to a May 2020 analysis, Aberdeen estimates that within the media sector "the annual business impact of website scraping is between 3.0% and 14.8% (median: 7.9%) of annual website revenue."[68]

---

[59] "The Pandemic of the Internet: Imperva® Research Labs Reveals Bot Traffic Climbs to Record High in 2020," *Imperva*, April 13, 2021, https://www.imperva.com/company/press_releases/the-pandemic-of-the-internet-imperva-research-labs-reveals-bot-traffic-climbs-to-record-high-in-2020/.

[60] "Web scraping," *Imperva*, https://www.imperva.com/learn/application-security/web-scraping-attack/; Hasan, Nabeel, "Good or Evil? What Web Scraping Bots Mean for Your Site," *Imperva*, April 18, 2016, https://www.imperva.com/blog/web-scraping-bots/.

[61] "The Pandemic of the Internet: Imperva® Research Labs Reveals Bot Traffic Climbs to Record High in 2020," *Imperva*, April 13, 2021, https://www.imperva.com/company/press_releases/the-pandemic-of-the-internet-imperva-research-labs-reveals-bot-traffic-climbs-to-record-high-in-2020/.

[62] "Web scraping," *Imperva*, https://www.imperva.com/learn/application-security/web-scraping-attack/.

[63] "Web scraping," *Imperva*, https://www.imperva.com/learn/application-security/web-scraping-attack/.

[64] "The Pandemic of the Internet: Imperva® Research Labs Reveals Bot Traffic Climbs to Record High in 2020," *Imperva*, April 13, 2021, https://www.imperva.com/company/press_releases/the-pandemic-of-the-internet-imperva-research-labs-reveals-bot-traffic-climbs-to-record-high-in-2020/.

[65] Brink, CISSP, Derek E., "The Business Impact of Website Scraping: It's Probably Bigger than You Think – Here's Why," *Aberdeen*, May 2020, p. 2, https://www.perimeterx.com/resources/reports/aberdeen-research-report-web-scraping/.

[66] "Web scraping," *Imperva*, https://www.imperva.com/learn/application-security/web-scraping-attack/.

[67] Ajala, Eleanor, "The Economics Of Web Scraping Report" *Imperva*, August 21, 2018, https://www.imperva.com/blog/the-economics-of-web-scraping-report/.

[68] Brink, CISSP, Derek E., "The Business Impact of Website Scraping: It's Probably Bigger than You Think – Here's Why," *Aberdeen*, May 2020, p. 7, https://www.perimeterx.com/resources/reports/aberdeen-research-report-web-scraping/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

Additionally, according to Aberdeen, "[t]he median annual business impact of website scraping is as much as 27% of overall website profitability."[69]  According to another source, automated bots operated by malicious actors are costing businesses an average of 3.6% of their annual revenue.[70]

In addition to the brief background information provided above, my opinions have also been informed by my review of the various documents and testimony that have been provided for my review in this matter.  I have also reviewed, relied upon, and incorporate by reference the expert report of Yael Hochberg, Ph.D., which provides additional discussion and analysis regarding technology startups, including their inherent risks, common reasons for failure, indicators of potential success, and reliance on outside financing; HR analytics, including human capital management software vendors, HR analytics startups, and internal analytics departments; and other relevant topics.[71]  Additionally, I have reviewed, relied upon, and incorporated by reference the expert report of Kevin M. Murphy, Ph.D., which provides additional discussion and analysis regarding the economics of social networking platforms; the business reasons for adopting anti-scraping practices, including increasing the value of the platform, increasing members' trust and incentives to share information, reducing the effects of free riding, and enhancing the functionality of the platform; and other relevant topics.[72]

I understand that Professor Doug Schmidt will be providing a report that describes the technical aspects of scraping in some detail on June 17, 2022, and I expressly reserve the right to supplement and/or amend my report to incorporate information from his report regarding scraping.

## 8    TIMELINE OF EVENTS

Several events related to this matter are listed below:

- ▪    2003                              LinkedIn is launched.[73]

- ▪    July 2012                       hiQ is formed.[74]

---

[69] Brink, CISSP, Derek E., "The Business Impact of Website Scraping: It's Probably Bigger than You Think – Here's Why," *Aberdeen*, May 2020, p. 7, https://www.perimeterx.com/resources/reports/aberdeen-research-report-web-scraping/.

[70] Germain, Jack, "Malicious Bot Attacks Continue To Cost Retailers Big Bucks," *LinuxInsider*, September 1, 2021, https://www.linuxinsider.com/story/malicious-bot-attacks-continue-to-cost-retailers-big-bucks-87257.html.

[71] Expert Report of Yael Hochberg, Ph.D., June 7, 2022.

[72] Expert Report of Kevin M. Murphy, June 7, 2022.

[73] "About LinkedIn," *LinkedIn*, https://about.linkedin.com/.

[74] Amended Complaint, February 14, 2020, p. 11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

   INTELLECTUAL CAPITAL EQUITY

- April/May 2017      "LinkedIn, as an entity with people specifically responsible for anti-scraping enforcement, first [has] 'suspicion' that hiQ [is] scraping member profiles," following hiQ's April 19, 2017, Elevate Conference.[75]

- May 23, 2017      LinkedIn sends hiQ a cease and desist letter, requesting that hiQ stop scraping LinkedIn data and explicitly stating that any further access to LinkedIn's servers was unauthorized.[76]

- 2nd Half of 2018      hiQ winds down its operations, but its servers continue running into 2019 to deliver on client contracts.[77]

## 9   LINKEDIN'S SUBSTANTIAL INVESTMENT IN ITS PLATFORM

I have been asked to consider whether the investments that LinkedIn has made in its platform, including the member profile information that makes up a large portion of the platform, have been substantial.  As discussed below, it is my opinion that LinkedIn has made substantial investments in its platform over the years.

According to LinkedIn, it has developed its platform, website, and related infrastructure "with the goal of maximizing the availability of [its] platform to [its] members, enterprises and professional organizations."[78] LinkedIn has explained that its "platform capabilities support [its key] value propositions by enabling a member to:  establish and manage their reputation through their LinkedIn profile, build their professional network, and research and contact any professional on LinkedIn."[79]

LinkedIn has made substantial investments in its technology platform.  For example, according to LinkedIn's 2015 annual report:[80]

> *Our technology platform is designed to create an engaging professional networking experience for our members and is built to enable future growth at scale.  We employ technological innovations to increase efficiency and scale our business.*

---

[75] Defendant LinkedIn Corporation's Response to Second Set of Interrogatories, April 7, 2022, pp. 7-8.

[76] Defendant and Counterclaimant LinkedIn Corporation's Answer and Counterclaims, November 20, 2020, p. 41.

[77] Declaration of Mark Weidick in Opposition to LinkedIn's Motion to Dissolve the Preliminary Injunction and for an Indicative Ruling, September 24, 2021, p. 2.

[78] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 12, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

[79] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," pp. 4-5, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

[80] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 11, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



*Our products rely upon and leverage the massive amounts of data in our network. This rich dataset has grown exponentially, requiring scalable computing resources. We will continue to invest in building proprietary technologies and using open sourced technologies for our data, search and solutions. Our product development expense was $775.7 million, $536.2 million and $395.6 million in 2015, 2014 and 2013, respectively.*

LinkedIn further explained that its "philosophy has been to invest for future growth."[81]  Specifically, in its 2015 Annual Report, LinkedIn's "technology infrastructure, including architecture, development tools scalability, availability, performance and security, as well as disaster recovery measures," and its "product development, including investments in [its] product development team and the development of new features for both members and customers," were listed first and second among areas on which LinkedIn "expect[ed] to continue to expend substantial financial and other resources."[82]

"As a result of [its] investment philosophy, [LinkedIn] expect[ed] to be in an operating loss" in the near-term as it continued to focus on "sustainable, long-term growth" and making investments in its core business.[83] For example, LinkedIn provided the following details regarding its investment plans:[84]

*We plan to continue to invest in our global member experience focusing on our value propositions:  helping members stay connected and informed, advance their careers, and work smarter.  …  We plan to invest in our core product development efforts to transform the way customers hire, market, sell, and learn.*

*…*

*We expect to continue to make significant capital expenditures to upgrade our technology and network infrastructure to improve the ability of our website to handle expected increases in usage, to enable the release of new features and solutions, and to scale for future growth.  These investments are particularly focused on expanding our footprint of data centers.*

Regarding product development expenses, specifically, LinkedIn stated:[85]

*Our product development expenses primarily consist of salaries, benefits and stock-based compensation for our engineers, product managers and developers.  In addition, product development expenses include outside services and consulting, as well as allocated facilities, and other supporting overhead costs.  We believe that continued investment in features,*

---

[81] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 24, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

[82] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 24, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

[83] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 44, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

[84] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 44, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

[85] "LinkedIn Corporation Form 10-K for the fiscal year ended December 31, 2015," p. 53, https://www.capitaliq.com/CIQDotNet/Filings/DocumentRedirector.axd?documentId=1540987941.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0457

 INTELLECTUAL CAPITAL EQUITY

*software development tools, and code modification is important to achieving our strategic objectives. Consistent with our investment philosophy for 2016, we expect to continue to invest heavily in product development. Accordingly, we expect product development expense to increase on an absolute basis and remain flat as a percentage of revenue.*



Based on the above, it is my opinion that LinkedIn has made substantial investments in its platform.[92]

---

[86] LINK_HIQ_000206139, tab "LI P&L".

[87] LINK_HIQ_000206139, tab "LI P&L".

[88] LINK_HIQ_000206139, tab "LI P&L".

[89] LINK_HIQ_000206253, tab "Expenses"; LINK_HIQ_000206255; LINK_HIQ_000206254.

[90] LINK_HIQ_000206139, tab "LI P&L".

[91] LINK_HIQ_000206139, tab "LI P&L".

[92] I understand that "[t]he elements of a claim for misappropriation under California law consist of the following: (a) the plaintiff invested substantial time, skill or money in developing its property; (b) the defendant appropriated and used the plaintiff's property at little or no cost to the defendant; (c) the defendant's appropriation and use of the plaintiff's property was without the authorization or consent of the plaintiff; and (d) the plaintiff can establish that it has been injured by the defendant's conduct." *United States Golf Assn. v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 618, 81 Cal. Rptr. 2d 708 (1999). I further understand that the following evidence has been found sufficient to establish "substantial" investment: "The evidence in the record fully supports the trial court's conclusion that as a result of 'addressing and updating the basic approach to handicapping' through 'the efforts of many people laboring for thousands of hours over more than two decades,' and the expenditure of 'millions of dollars in promoting the integrity of that system,' USGA developed a 'unique' Handicap System, such that the Formulas it employs 'today are a far cry from the rudimentary form of score equalization used even 20 years ago....'" *United States Golf Assn. v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 617, 81 Cal. Rptr. 2d 708 (1999). In my opinion, LinkedIn's investment in its platform has been even more substantial, as discussed above.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

I have discussed the internal LinkedIn financial documents described above with Chase Baldwin, Vice President of Central Finance at LinkedIn.[93]  I understand that the P&L is a fully allocated income statement for LinkedIn, which ties into the audited financials for its parent company.[94]  I understand that the other financial documents are derived from LinkedIn's "Essbase," which is the tool LinkedIn uses for management reporting of their actual financial results and is the "source of truth" for LinkedIn's forecasts for all business activity.[95]  Based on these discussions it is my opinion that these financial documents are the product of reasonable and reliable methods and sources and are the types of data that are routinely relied upon by experts such as myself in both litigation and non-litigation contexts.

**10      LOSS THRESHOLD UNDER THE COMPUTER FRAUD AND ABUSE ACT**

I have been asked to consider whether, under the Computer Fraud and Abuse Act ("CFAA"), LinkedIn has suffered losses aggregating at least $5,000 during any 1-year period as a result of hiQ's allegedly unlawful conduct.[96]  I understand that costs incurred while investigating allegedly unlawful conduct under the CFAA count towards this $5,000 threshold.  As discussed below, it is my opinion that LinkedIn has met this loss threshold.

In a declaration dated June 26, 2017, Mr. Rockwell stated:[97]

> *The Trust & Safety organization was made aware that hiQ may be circumventing LinkedIn's technical barriers, accessing LinkedIn's website through automated means, and scraping data from LinkedIn's computer servers.  Our organization, along with others at LinkedIn, have investigated hiQ's activities.  As of the date of this declaration, I estimate that LinkedIn employees have spent over 100 hours responding to hiQ's activities.  This represents over $5,000 in employee time.  This does not include the large-scale computing, overhead, and external vendor costs associated with LinkedIn's response.*



---

[93] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn; LINK_HIQ_000206139; LINK_HIQ_000206253; LINK_HIQ_000206255; LINK_HIQ_000206254.

[94] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn.

[95] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn.

[96] 18 U.S.C. § 1030.

[97] Declaration of Paul Rockwell in Support of LinkedIn Corporation's Opposition to Plaintiff's Motion for a Temporary Restraining Order, June 26, 2017, p. 8.

[98] Email from Adam Botzenhart, Senior Managing Counsel at LinkedIn, June 6, 2022; LINK_HIQ_000192449-450 at 449; LINK_HIQ_000206265; LINK_HIQ_000206266.

[99] LINK_HIQ_000192449-450 at 449.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**INTELLECTUAL CAPITAL EQUITY**



## 11    QUANTIFICATION OF DAMAGES

In the sections below, I have quantified certain harms to LinkedIn and benefits to hiQ that have resulted from the allegedly unlawful conduct of hiQ.  I note that this quantification of damages does not represent the totality of the harms that have or will be suffered by LinkedIn.  As described more fully in Section 12, LinkedIn has suffered additional harms and will continue to suffer additional harms in the future, if hiQ is allowed to continue its allegedly unlawful conduct.  These additional harms are extremely difficult to calculate and not likely to be quantifiable with certainty or readily compensated with monetary payments in the form of damages.  In the sections below, I have quantified those harms to LinkedIn and benefits to hiQ that are quantifiable, based on the information currently available to me.

---

[100] Appendix 5.1.  I understand that typically LinkedIn anti-scraping employees are expected to work 40 hours per week.  I understand that 2 weeks per year LinkedIn is shut down and employees take an average of 15 days off per year for vacation.  (52*40) - (2*40) - (15*8) = 1,880.  Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.  This calculation is conservative to the extent that an employee takes off additional vacation time or holidays.

[101] Appendix 5.1; LINK_HIQ_000206265; LINK_HIQ_000206266.

[102] Appendix 5.1.

[103] Email from Adam Botzenhart, Senior Managing Counsel at LinkedIn, June 6, 2022.

[104] Email from Adam Botzenhart, Senior Managing Counsel at LinkedIn, June 6, 2022; Declaration of Yukai Zhong in Support of LinkedIn's Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to Fed. R. Civ. P. 62.1, September 10, 2021 (Deposition of Paul Rockwell, May 19, 2022, Exhibit 1242).

[105] Discussions with Abhishek Bajoria, Director, Cybersecurity Policy, at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

**11.1   Costs Associated with Dropping, Checking, and Serving hiQ's Guest Profile Requests**



---

[106] Deposition of Jenelle Bray, May 18, 2022, p. 10.

[107] Deposition of Jenelle Bray, May 18, 2022, pp. 78-79.

[108] Deposition of Jenelle Bray, May 18, 2022, pp. 68-70, 113-114.

[109] Deposition of Jenelle Bray, May 18, 2022, pp. 113-114.

[110] Deposition of Jenelle Bray, May 18, 2022, p. 79.

[111] Plaintiff hiQ Labs, Inc.'s Supplemental Responses and Objections to LinkedIn Corporation's Second Set of Interrogatories, May 13, 2022, p. 2.

[112] Deposition of Jenelle Bray, May 18, 2022, pp. 115-116.

[113] Deposition of Jenelle Bray, May 18, 2022, p. 36.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0461

INTELLECTUAL CAPITAL EQUITY

Based on discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn, I understand that hiQ's guest profile requests place a burden on LinkedIn's infrastructure and that there are certain costs associated with dropping, checking, and serving these requests.[114]

In order to quantify these costs, I understand that LinkedIn performed an internal analysis to identify the volume of guest profile requests associated with hiQ IP addresses.[115]  LinkedIn first analyzed data regarding profile requests provided by hiQ produced in the litigation.[116]  LinkedIn then matched hiQ's data regarding profile requests to its internal data regarding these requests, in order to identify the IP addresses that sent the hiQ profile requests.[117]  LinkedIn then analyzed its internal data to catalogue all guest profile requests sent from these identified IP addresses.[118]  Based on this analysis, LinkedIn was able to identify guest profile requests from October 21, 2016, through May 1, 2018, sent from these identified IP addresses.[119]  LinkedIn catalogued the total profile requests associated with hiQ IP addresses, as shown in the following figure.[120]

**Figure 9:  Total Guest Profile Requests Associated with hiQ[121]**



| | Total |
|---|---|
| Total Guest Profile Requests Associated with hiQ | 53,258,458,645 |

LinkedIn also performed analyses to quantify the costs associated with dropping, checking, and serving these requests.[122]

---

114 Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

115 Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

116 Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

117 Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

118 Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

119 Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn; LINK_HIQ_000206264, tab "point 2 hiQ IP Lookup filtered".

120 Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn; LINK_HIQ_000206264, tab "point 2 hiQ IP Lookup filtered".  I understand that LinkedIn's analysis of guest profile requests associated with hiQ may be overinclusive, to the extent the identified IP addresses sent profile requests on behalf of any other entities.  However, in the absence of accurate and reliable records from hiQ regarding all profile requests made on their behalf to further their scraping efforts, the above-described analysis by LinkedIn is the best available evidence of the volume of guest profile requests associated with hiQ.  Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.  *See also,* Deposition of Paul Rockwell, May 19, 2022, p. 265 ("As mentioned earlier, it is incredibly hard to identify scrapers and just because the scrapers had given us, in this case hiQ, had given us a range of IPs, it does not mean those were the only IPs that they were using or the only services that they had contracted to scrape LinkedIn.").

121 Appendix 3.6.

122 Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY


**INTELLECTUAL CAPITAL EQUITY**

I understand that LinkedIn performed an internal analysis to identify the "per-request cost to detect and drop Guest Scraping requests."[123]  LinkedIn collected data regarding the total cost to drop profile requests and the total cost to check profile requests before dropping them or serving them, during a representative sample period from February 1 through February 28, 2022.[124]  These total costs were then divided by the total profile requests dropped and the total profile requests checked before dropping them or serving them, during this representative sample period, in order to calculate representative per-request costs to drop profile requests and to check profile requests before dropping them or serving them.[125]

I understand that LinkedIn also performed an internal analysis to identify the cost per query to serve profile requests.[126]  LinkedIn considered the various services that are triggered when searching and loading a profile, the number of requests made to each service, and the cost per request for each service, in order to calculate the total cost to serve each profile request.[127]

The above-described costs are shown in the following figure.

**Figure 10:  LinkedIn's Costs Per Guest Profile Request[128]**

Based on discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn, who coordinated LinkedIn's quantification of these costs per request, I understand that all profile requests incur the cost to check a profile request.[129]  If a request is checked and dropped, then the

---

[123] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn; LINK_HIQ_000206259-260; LINK_HIQ_000206261.

[124] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn; LINK_HIQ_000206259-260; LINK_HIQ_000206261.

[125] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn; LINK_HIQ_000206259-260; LINK_HIQ_000206261.

[126] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn; LINK_HIQ_000206257-258; LINK_HIQ_000206256.

[127] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn; LINK_HIQ_000206257-258; LINK_HIQ_000206256.

[128] Appendix 3.5.

[129] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**INTELLECTUAL CAPITAL EQUITY**

request also incurs the cost to drop, in addition to the cost to check.[130]  If a request is checked and served, then the request also incurs the cost to serve, in addition to the cost to check.[131]

Based on this understanding, I have applied the above calculated cost to check a profile request to the above calculated volume of guest profile requests associated with hiQ, as shown in the following figure.

**Figure 11:  LinkedIn's Cost to Check Guest Profile Requests Associated with hiQ[132]**



I understand that but-for hiQ's scraping efforts, LinkedIn would not have needed to incur the above calculated costs to check guest profile requests associated with hiQ.[133]  Based on the analysis described above, these costs represent a quantifiable form of harm to LinkedIn associated with the allegedly unlawful conduct of hiQ.  I note that this calculation is conservative, as it has calculated only the cost to check profile requests associated with hiQ, without accounting for the additional costs to block or serve such profile requests.  If each of these profile requests were also served, for example, the additional cost would amount to $13,645,[134] but I understand that some portion of these requests may be blocked by LinkedIn's filters, without being served.[135]

I have discussed the internal LinkedIn analyses described above with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn, who coordinated LinkedIn's quantification of LinkedIn's costs per guest profile request and Xiaofeng Wu, Director of Software Engineering at LinkedIn, who catalogued the total profile requests associated with hiQ IP addresses.[136]  I understand that the underlying data used to calculate LinkedIn's costs per guest profile request are collected and stored for normal course business use.[137]  LinkedIn frequently analyzes its total costs associated with checking, blocking, and serving guest profile requests and makes business decisions based on those analyses.[138]  Given the

---

[130] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

[131] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

[132] Appendix 3.4.

[133] Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

[134] Appendix 3.4.

[135] Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

[136] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn; Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

[137] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

[138] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

amount of infrastructure involved, LinkedIn tracks this data to ensure it is being efficient and cost effective with its anti-scraping efforts.[139]  Regarding the analysis of profile requests associated with hiQ IP addresses, I understand that this was an accurate and reliable method for cataloging guest profile requests associated with hiQ from LinkedIn's data.[140]  Based on these discussions it is my opinion that these analyses are the product of reasonable and reliable methods and sources and are the types of data and analyses that are routinely relied upon by experts such as myself in both litigation and non-litigation contexts.

## 11.2   Value of LinkedIn Profiles Misappropriated by hiQ

I understand that hiQ's primary or exclusive data source is data scraped from LinkedIn.  For example, according to chat transcripts from May 2017, Andrew Kim of hiQ stated that hiQ does "scrape other data but LinkedIn is the core data," to which Darin Medeiros of hiQ responded "what other data?"[141]  Mark Weidick, CEO of hiQ, further described the importance of LinkedIn's member profile data to hiQ, stating:[142]

> *hiQ's entire business depends on being able to access public LinkedIn member profiles.  hiQ has investigated and concluded that there is no current viable alternative to LinkedIn's member database to obtain data from hiQ's Keeper and Skill Mapper services.  Without access to these profiles, hiQ cannot deliver its services; its contracts with existing customers will be in jeopardy and hiQ will be prevented from consummating its pending deals with prospective clients.*

As further discussed in the expert report of Yael Hochberg, Ph.D., hiQ's core business model relied on scraping a single data source for individual information, LinkedIn, without permission.[143]

Accordingly, the benefit hiQ realized from misappropriated LinkedIn data is difficult to overstate.



---

[139] Discussions with Scott McDaniel, Senior Engineering Manager, Trust Senior Engineering Manager, at LinkedIn.

[140] Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

[141] Deposition of Andrew Kim, May 9, 2022, p. 216, Exhibit 273 (hiQ_00443337-343 at 338).

[142] Declaration of Mark Weidick in Opposition to LinkedIn's Motion to Dissolve the Preliminary Injunction and for an Indicative Ruling, September 24, 2021, p. 1.

[143] Expert Report of Yael Hochberg, Ph.D., June 7, 2022, Section VII.A.

[144] Plaintiff hiQ Labs, Inc.'s Responses to LinkedIn Corporation's First Set of Interrogatories, July 29, 2021, p. 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY



---

[145] hiQ_00425435-453 at 435, 448-450.  *See also*, hiQ_00394941-943; hiQ_00300885-891; hiQ_00442618; hiQ_00589246-247; hiQ_00707952-953; hiQ_00554759-762; hiQ_00706807-813; hiQ_00426195-199; hiQ_00425410-415; hiQ_00425500-505; hiQ_00425533-538.

[146] Deposition of Boris Dev, May 4, 2022, p. 299.

[147] hiQ_00115323-325 at 323 ("Then for each candidate … they want to be able to pull the education and job experience data from the public profile and then they [Klarna] want to be able to mine it themselves for insights."); hiQ_00602861-862 at 861.

[148] hiQ_00425435-453 at 435, 448-450.

[149] hiQ_00734931, rows 36911 and 37430; hiQ_00734930, rows 3873 and 3874.

[150] Email from Professor Doug Schmidt, June 2, 2022.

[151] Appendix 3.2.  I understand that the hiQ produced data covers the period from March 6, 2014, through April 25, 2018; whereas, the Klarna agreement was not entered into until May 2018.  Email from Professor Doug Schmidt, June 2, 2022; hiQ_00425435-453 at 435, 443, 448, 453.

[152] hiQ_00425435-453 at 448.

[153] hiQ_00197574-575 at 574; hiQ_00478006-007 at 006; hiQ_00197561-573; hiQ_00477993-005; hiQ_00197560; hiQ_00477991-992.  I note that there is no record of a payment from Switch in the financial records produced by hiQ. hiQ_00734931; hiQ_00734930.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Page 28 of 45

CE 0466



INTELLECTUAL CAPITAL EQUITY



---

[154] Declaration of Mark Weidick in Opposition to LinkedIn's Motion to Dissolve the Preliminary Injunction and for an Indicative Ruling, September 24, 2021, p. 2 (Claiming that hiQ wound down operations in the latter half of 2018.).

[155] Appendix 3.2.

[156] hiQ_00425435-453 at 448.  4,284,965 × $1.50 = 6,427,447.50.

[157] hiQ_00439030-031 at 030.

[158] Plaintiff hiQ Labs, Inc.'s First Supplemental Responses to LinkedIn Corporation's Second Set of Interrogatories, May 11, 2022, p. 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY



Moreover, as discussed above, I understand that hiQ's primary or exclusive data source is data scraped from LinkedIn. Additionally, I understand that hiQ produced records reflecting millions of distinct profiles scraped from LinkedIn, meaning that one of hiQ's core, and potentially most substantial, company assets was obtained by misappropriating from and/or freeriding on LinkedIn's platform. As a result, due to hiQ's dependance on LinkedIn's data, it follows that substantially all value in hiQ was primarily derived from LinkedIn data and hiQ's allegedly unlawful scraping of this data. As a result, to the extent hiQ has or has had

---

[159] *See, e.g.,* hiQ_00558664; hiQ_00558850; hiQ_00558856; hiQ_00558861; hiQ_00559017; hiQ_00559021; hiQ_00559024; hiQ_00559028; hiQ_00642537; hiQ_00642552; hiQ_00642568; hiQ_00642580; hiQ_00642587; hiQ_00393466; hiQ_00558848; hiQ_00558854; hiQ_00558859; hiQ_00559015; hiQ_00559019; hiQ_00559023; hiQ_00559026; hiQ_00559027; hiQ_00558849; hiQ_00558855; hiQ_00558860; hiQ_00559016; hiQ_00559020; hiQ_00184529.

[160] hiQ_00439030-031 at 030; hiQ_00734931, rows 36960, 37414, 37709, 37842, 37859. 37885, 38018, 38118, 38122, 38127, 38131, 38136, and 38141.

[161] Appendix 3.3.

[162] Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

any value as a company, this value depends on value realized by hiQ from the misappropriation of scraped LinkedIn profiles.

## 12    IRREPARABLE HARM TO LINKEDIN

In addition to the quantifiable harms discussed above, LinkedIn has suffered additional harms and will continue to suffer additional harms in the future if hiQ is allowed to continue its allegedly unlawful conduct, as discussed below.

### 12.1    Harm to Reputation and Goodwill

According to Chad Lake and Changbai Xiao, former managers of the LinkedIn scraping engineering team, "LinkedIn, as a business, is built on its economic graph - the data concerning people, companies, relationships, jobs and skills are central to its mission of making the world's professionals more productive and successful."[163]  I understand that the economic graph is a term LinkedIn uses to describe "the data on LinkedIn about … companies, jobs, members, skills and how they are all connected."[164]  LinkedIn's "services safeguard the value of LinkedIn by identifying and blocking the efforts of those that seek to abuse [its] services by circumvent[ing] LinkedIn's business model."[165]

According to Jenelle Bray, director of engineering of the anti-abuse AI team at LinkedIn,[166] the primary purpose of LinkedIn's anti-scraping efforts is to protect members and their data, which in turn helps to protect LinkedIn's business:[167]

> *I think the biggest purpose [behind the anti-abuse and anti-scraping investments that LinkedIn makes] is to protect members and their data.  But I think because LinkedIn is a professional network and it's so -- like builds upon trust that that is like -- having trust in LinkedIn is extremely important to the LinkedIn business.*
>
> *So I think that by protecting member data and protecting members, it will definitely help protect the LinkedIn business.*

Although I understand that "scraping isn't always bad" (i.e., "web scraping by search engines" that "are expressly authorized to scrape in order to collect and index information … benefits both the websites and the users of search services"), "automated collection of data against the terms of service … of the website in a

---

[163] Deposition of Jenelle Bray, May 18, 2022, pp. 159-161, Exhibit 1060 (LINK_HIQ_000192648).

[164] Deposition of Jenelle Bray, May 18, 2022, p. 161; Exhibit 1060 (LINK_HIQ_000192648).

[165] Deposition of Jenelle Bray, May 18, 2022, pp. 161-162, Exhibit 1060 (LINK_HIQ_000192648).

[166] Deposition of Jenelle Bray, May 18, 2022, p. 10.

[167] Deposition of Jenelle Bray, May 18, 2022, p. 162.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 INTELLECTUAL CAPITAL EQUITY

large scale is harmful."[168]   According to a blog post written by Paul Rockwell, Vice President of the trust and safety team at LinkedIn:[169]

> *What makes [scraping] nefarious is when it's done without permission.  When this happens, you have no ability to track where your data has gone and how it is being used.  …  On LinkedIn, our members trust us with their information, which is why we prohibit unauthorized scraping on our platform.*

As explained by Mr. Rockwell:[170]

> *Scraping is stealing our members' data and a violation of our terms, so our members have trusted us with that data to be used on LinkedIn and the negative impact is that data being taken from LinkedIn and used for purposes that our members did not consent to and cannot control.*

According to Dr. Bray, when data has been successfully scraped, "LinkedIn has lost control of that data for those members or members have lost control of that data.  …  LinkedIn does not have control over scrapers. [S]crapers have no agreement with LinkedIn, so that control has been lost for that member."[171]  While scraping on LinkedIn may only capture certain profile data, Dr. Bray explained that member "data is often combined with other third parties' data and used for things like phishing and scams and actually that can cause members like identity theft or -- and money."[172]  According to Dr. Bray, "I've seen data that's scraped and that is combined with other data and then it is used to try to hack people's accounts.  …  And hacking people's accounts often leads to identity thefts, not always but often."[173]  As explained by one commentator:[174]

> *Data scraping can open the door to spear phishing attacks; hackers can learn the names of superiors, ongoing projects, trusted companies or organizations, etc.  Essentially, everything a hacker could need to craft their message to make it plausible and provoke the correct response in their victims.*

---

[168] Deposition of Jenelle Bray, May 18, 2022, pp. 129-130, Exhibit 1055; Rockwell, Paul, "LinkedIn Safety Series: What is scraping?" *LinkedIn*, July 15, 2021, https://blog.linkedin.com/2021/july/15/linkedin-safety-series-what-is-scraping.

[169] Deposition of Paul Rockwell, May 19, 2022, p. 12; Deposition of Jenelle Bray, May 18, 2022, p. 133, Exhibit 1055; Rockwell, Paul, "LinkedIn Safety Series: What is scraping?" *LinkedIn*, July 15, 2021, https://blog.linkedin.com/2021/july/15/linkedin-safety-series-what-is-scraping.

[170] Deposition of Paul Rockwell, May 19, 2022, p. 197.

[171] Deposition of Jenelle Bray, May 18, 2022, pp. 158-159.

[172] Deposition of Jenelle Bray, May 18, 2022, p. 36.

[173] Deposition of Jenelle Bray, May 18, 2022, p. 39.

[174] Willems, Eddy, "Scraping: Is it good, bad or something in between?" *G DATA*, June 14, 2021, https://www.gdatasoftware.com/blog/data-scraping.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



Both Facebook and LinkedIn have been the victims of "abusive data scraping."[175]  For example, "[i]n April 2021, researchers discovered a database containing the personal details of more than 500 million Facebook users, which was circulating on hacker forums."[176]  I understand that the "database did contain personal data such as phone numbers and email addresses" and that most of this data was not acquired through "typical data breach methods" but was instead scraped from Facebook.[177]

As another example, also in April 2021, the Italian data protection authority opened an investigation after reports that a dataset compiled from 500 million LinkedIn profiles, representing more than two-thirds of LinkedIn's 740 million users at the time, was available for sale on a hacker forum.[178]  The data scraped from LinkedIn was aggregated with data from a number of different websites and companies.[179]  The information in the dataset included names, emails, phone numbers, and links to other social media profiles.[180]  With this information, a bad actor could "stage much more convincing phishing and social engineering attacks or even commit identity theft against the people whose information has been exposed on the hacker forum."[181]  Two million records were made publicly visible as evidence, while the remainder were offered for sale for an

[175] Willems, Eddy, "Scraping: Is it good, bad or something in between?" *G DATA*, June 14, 2021, https://www.gdatasoftware.com/blog/data-scraping.

[176] Willems, Eddy, "Scraping: Is it good, bad or something in between?" *G DATA*, June 14, 2021, https://www.gdatasoftware.com/blog/data-scraping; Kelly, M. J., "You've been scraped, the Facebook data leak explained," *Mozilla*, April 7, 2021, https://blog.mozilla.org/en/privacy-security/facebook-data-leak-explained/.

[177] Willems, Eddy, "Scraping: Is it good, bad or something in between?" *G DATA*, June 14, 2021, https://www.gdatasoftware.com/blog/data-scraping; Kelly, M. J., "You've been scraped, the Facebook data leak explained," *Mozilla*, April 7, 2021, https://blog.mozilla.org/en/privacy-security/facebook-data-leak-explained/.

[178] Neuburger, Jeffrey, "Trove of Online LinkedIn User Data Fuels LinkedIn's Anti-Scraping Position," *New Media and Technology Law Blog*, April 13, 2021, https://newmedialaw.proskauer.com/2021/04/13/trove-of-online-linkedin-user-data-fuels-linkedins-anti-scraping-position/.

[179] Neuburger, Jeffrey, "Trove of Online LinkedIn User Data Fuels LinkedIn's Anti-Scraping Position," *New Media and Technology Law Blog*, April 13, 2021, https://newmedialaw.proskauer.com/2021/04/13/trove-of-online-linkedin-user-data-fuels-linkedins-anti-scraping-position/.

[180] "Scraped data of 500 million LinkedIn users being sold online, 2 million records leaked as proof," *CyberNews*, April 6, 2021, https://cybernews.com/news/stolen-data-of-500-million-linkedin-users-being-sold-online-2-million-leaked-as-proof-2/.

[181] "Scraped data of 500 million LinkedIn users being sold online, 2 million records leaked as proof," *CyberNews*, April 6, 2021, https://cybernews.com/news/stolen-data-of-500-million-linkedin-users-being-sold-online-2-million-leaked-as-proof-2/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 INTELLECTUAL CAPITAL EQUITY

undisclosed bitcoin payment.[182]  In response, LinkedIn reiterated its dedication to upholding its members' trust:[183]

> *Members trust LinkedIn with their data, and any misuse of our members' data, such as scraping, violates LinkedIn terms of service.  When anyone tries to take member data and use it for purposes LinkedIn and our members haven't agreed to, we work to stop them and hold them accountable.*

The scraping attacks described above showcase how scraping can result in the loss of control of user information and can be harmful to LinkedIn's reputation.  As explained by Dr. Bray:[184]

> *Then also costs to LinkedIn in terms of like reputation.  Often scraping shows up as things like -- people think accounts were hacked and so LinkedIn was hacked and there's tens of millions of profiles around.*

To a typical user, scraping is often perceived to be synonymous with hacking.[185]  Dr. Bray explained that because these terms are often conflated by the public, any unauthorized scraping can cause additional reputational harm to LinkedIn, in addition to the harm already caused by unauthorized scraping:[186]

> *In the anti-abuse world, yes, scraping is different from hacking.  But I think there are a few issues here.*
>
> *One is that most people outside of like who aren't experts in this area think that hacking – don't understand what the difference is.*
>
> *So they see an article or something that says, you know, 50 million profiles have been -- are on sale in the dark web or have been found from LinkedIn.*
>
> *And they think that LinkedIn accounts were hacked or passwords were hacked.*
>
> *So that's one thing.  They are different, but the public does not realize they are different.  So it causes a lot of damage to LinkedIn when the scraping happens and the public thinks it's hacking.*
>
> *Then the other thing is you can use data like email addresses or other parts of profile data from scraping to combine with other data that may have been scraped from other places or hacked from other places and then you can combine that to hack.*

---

[182] Neuburger, Jeffrey, "Trove of Online LinkedIn User Data Fuels LinkedIn's Anti-Scraping Position," *New Media and Technology Law Blog*, April 13, 2021, https://newmedialaw.proskauer.com/2021/04/13/trove-of-online-linkedin-user-data-fuels-linkedins-anti-scraping-position/.

[183] "An update on report of scraped data," *LinkedIn*, June 29, 2021, https://news.linkedin.com/2021/june/an-update-from-linkedin.

[184] Deposition of Jenelle Bray, May 18, 2022, pp. 36-37.

[185] Deposition of Jenelle Bray, May 18, 2022, pp. 36-37, 39-40.

[186] Deposition of Jenelle Bray, May 18, 2022, pp. 39-40.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0472

 INTELLECTUAL CAPITAL EQUITY

*But scraping and hacking are different but related.*

Dr. Bray explained that scraping can result in a loss of "trust in LinkedIn because members find their data in other places.  They don't have control of where that data went … [or] where their data is used."[187]  Dr. Bray further stated that scraping can cause "[m]embers [to] lose trust in LinkedIn and stop using LinkedIn as much, which makes the LinkedIn product less valuable for everybody."[188]  According to the 2021 Digital Trust Benchmark Report, 77% of U.S. social media users indicated that whether a platform protected their privacy and data was extremely or moderately impactful to their trust in a given social media platform.[189]  This report further explained that, "[b]uilding trust is critical for social platforms and their advertisers; it affects how users feel when they use social media and may also impact whether users want to engage with ads on social media platforms."[190]

**Figure 14:  What Most Affects US Social Media Users' Decision to Engage[191]**



---

[187] Deposition of Jenelle Bray, May 18, 2022, p. 36.

[188] Deposition of Jenelle Bray, May 18, 2022, p. 147.

[189] LINK_HIQ_000148931-965 at 933.

[190] LINK_HIQ_000148931-965 at 933.

[191] "Digital Trust Benchmark Report 2021," *eMarketer*, October 25, 2021, https://www.emarketer.com/content/digital-trust-benchmark-report-2021; LINK_HIQ_000148931-965 at 932.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

Trust is particularly important to LinkedIn, as the social media network ranked first in trust for the past five years.[192]  Another market research analysis on "Building Trust and Safety," similarly confirmed that "LinkedIn is the Most Trusted Digital Platform," stating:[193]

> *Based on Business Intelligence survey, LinkedIn won by a huge margin on most attributes and is the most-trusted digital platform.  Content on the platform is more likely to be viewed as forthright and honest, which increases the persuasiveness of ads and marketing messages that appear alongside it.*

LinkedIn understands that its "[m]embers have very strong opinions and understanding of their data and privacy as it pertains to their overall online presence and experiences."[194]  As stated in a 2015 LinkedIn presentation, titled "3rd Party Scraping," "LinkedIn has a responsibility to protect members' data and failure to do so could undermine its trust with members."[195]  The presentation further stated, "[o]ur business model is built on our member data, and if we're unable to protect this data it could have a major impact on our business."[196]  As explained by Paul Rockwell, "[t]he risk to the business is if members don't believe they can trust that their data is safe on LinkedIn, they will not come to LinkedIn."[197]

When asked if LinkedIn has any data to suggest that members whose profiles are scraped are less likely to engage on the platform, Dr. Bray explained that it "would be very hard to actually do that calculation or that analysis."[198]  For example, while I understand that the expert report of Kevin M. Murphy, Ph.D., investigated whether publicity regarding scraping events led to an increase in LinkedIn account closings,[199] such account closings are only one, particularly extreme, measurement of decreased engagement.  As explained by Dr. Bray:[200]

> *Members can lose trust in LinkedIn and stop using LinkedIn as much, which makes the LinkedIn product less valuable for everybody.  It doesn't necessarily mean they're going to close their account or something.*

Additionally, the increased bot traffic associated with scraping presents a "challenge for organizations that want to mitigate downtime, reduce bandwidth consumption and improve experiences for legitimate human

---

[192] Deneva, Dilyana, "LinkedIn Is the Most Trusted Social Media Network for 2021," *The LinkedIn Blog,* October 26, 2021, https://thelinkedblog.com/2021/linkedin-is-the-most-trusted-social-media-network-for-2021-979/.

[193] LINK_HIQ_000149655-668 at 655.

[194] LINK_HIQ_000149718-740 at 719.

[195] Deposition of Paul Rockwell, May 19, 2022, p. 178, Exhibit 1233-A (LINK_HIQ_000169080-110 at 082).

[196] Deposition of Paul Rockwell, May 19, 2022, p. 179, Exhibit 1233-A (LINK_HIQ_000169080-110 at 082).

[197] Deposition of Paul Rockwell, May 19, 2022, p. 179.

[198] Deposition of Jenelle Bray, May 18, 2022, p. 146.

[199] Expert Report of Kevin M. Murphy, June 7, 2022.

[200] Deposition of Jenelle Bray, May 18, 2022, p. 147.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0474



INTELLECTUAL CAPITAL EQUITY

customers."[201]  According to Imperva Research Labs, "[w]hen a site is polluted with any kind of bot traffic, it slows web performance and makes it harder for legitimate users to access the information or services they need."[202]  As described by Dr. Bray, at scale, scraping can negatively impact the experience of users:[203]

> *[Scraping] may interfere if the -- if overall there was a large scraping attack and it was causing disruption to LinkedIn services.  But it wouldn't -- just your individual profile being scraped, it wouldn't interfere but like -- like the entire aggregate of scraping could affect your experience on LinkedIn.*
>
> *…*
>
> *So it's possible that like if there was a large attack and preventing that like could cause some issues in, like, profile -- like it could take much longer to view the profile.*

When asked how LinkedIn typically measures the damage resulting from a single profile being scraped, Dr. Bray explained that aggregate scraping at scale can cause damage to LinkedIn's infrastructure that is difficult to gauge with any single measurement:[204]

> *So I think we -- generally we would -- so there's quantifying damage and so we measure damage by the number of profiles scraped that can help us understand the, like, quantity of the damage.*
>
> *In terms -- so there's also damage that is done to, like, the infrastructure if it causes degradation in performance, if it causes false positive rates, so real members can't access the profile.  So there's all those parts.  There is no like one easy measurement[] that combines all of those.*
>
> *It's hard to split it into one profile because all this damage is compounded.  So all the different scrapers combined essentially can cause a lot of damage to the infrastructure and also cause you to spend a lot of money working on scraping, a lot of resources.*

According to the declaration of Paul Rockwell:[205]

> *LinkedIn has suffered and will continue to suffer harm to its consumer goodwill and trust, which LinkedIn has worked hard for years to earn and maintain, if hiQ's unauthorized access to LinkedIn computers continues.  I understand and*

---

[201] "The Pandemic of the Internet: Imperva® Research Labs Reveals Bot Traffic Climbs to Record High in 2020," *Imperva*, April 13, 2021, https://www.imperva.com/company/press_releases/the-pandemic-of-the-internet-imperva-research-labs-reveals-bot-traffic-climbs-to-record-high-in-2020/.

[202] "The Pandemic of the Internet: Imperva® Research Labs Reveals Bot Traffic Climbs to Record High in 2020," *Imperva*, April 13, 2021, https://www.imperva.com/company/press_releases/the-pandemic-of-the-internet-imperva-research-labs-reveals-bot-traffic-climbs-to-record-high-in-2020/.

[203] Deposition of Jenelle Bray, May 18, 2022, pp. 126-127.

[204] Deposition of Jenelle Bray, May 18, 2022, pp. 151-152.

[205] Declaration of Paul Rockwell in Support of LinkedIn Corporation's Opposition to Plaintiff's Motion for a Temporary Restraining Order, June 26, 2017, p. 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 INTELLECTUAL CAPITAL EQUITY

*believe that hiQ provides two products that collect information about LinkedIn members, without their consent, that hiQ then sells to the members' employers. This is unlike LinkedIn, where, as discussed above, members have full control over their information and can change the amount and content of information they share at any time. Thus, hiQ's unauthorized access to and scraping of LinkedIn's servers undermines the consumer trust and goodwill LinkedIn has earned from its members.*

I have also reviewed, relied upon, and incorporated by reference the expert report of Kevin M. Murphy, Ph.D., which further discusses how the value of LinkedIn's platform depends on members' willingness to share information, which further depends on members' trust that LinkedIn will protect their information; that scraping reduces members' trust in the platform, reduces members' incentives to share information, and reduces the value of the platform; that participation in the LinkedIn platform has fallen and account closings have increased after publicized scraping events; that scrapers free ride on LinkedIn's investment in the platform, which reduces LinkedIn's profits, incentives to invest in the platform, and the value of the platform, as well as harming consumers; that LinkedIn believes that scraping reduces the performance of the platform, due to vastly increased numbers of profile requests, which reduces the value of the platform by reducing performance; that hiQ's services, specifically, reduced members' trust in LinkedIn, reduced their willingness to share information, and reduced the value of the platform; and other relevant topics.[206]

As illustrated above, scraping of LinkedIn profile data, including the allegedly unlawful conduct of hiQ, can result in significant injury to LinkedIn's reputation and goodwill. Such injuries to reputation and goodwill are classic examples of irreparable harms, because they are difficult to quantify and assign monetary damages.[207] As explained by J. Thomas McCarthy in his treatise on trademarks and unfair competition:[208]

> *In the author's view, a likelihood of damage to reputation is by its nature "irreparable" in the legal sense. Like trying to un-ring a bell, trying to "compensate" after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.*

While this statement was directed towards trademark cases, the principles and rationale apply equally here. Courts have also stated that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury" and that "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."[209] As explained by one Court:[210]

> *Harm to business goodwill and reputation is unquantifiable and considered irreparable. See Rent–A–Center, Inc. v. Canyon Tele. & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) ("Intangible injuries, such as damage*

---

[206] Expert Report of Kevin M. Murphy, June 7, 2022.

[207] "Irreparable harm," *Cornell Law School*, https://www.law.cornell.edu/wex/irreparable_harm.

[208] § 30:46. Irreparable injury—Nature of irreparable injury, 5 McCarthy on Trademarks and Unfair Competition § 30:46 (5th ed.).

[209] *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).

[210] *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

*to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); Optinrealbig.com, LLC v. Ironport Sys., Inc., 323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004) ("Damage to a business's goodwill is typically irreparable injury because it is difficult to calculate.").*

Additionally, in this case, such harms are not merely theoretical or speculative.[211]  Emails from LinkedIn members indicate that they are concerned about their data being scraped, including by hiQ specifically,[212] with one member stating, for example:[213]

> *I see you are being forced to allow scraping of our data.  That's a hard no for me.  I will be deleting my profile tomorrow.  I hope you can fight this—it will kill your platform.  Good luck.*

While it is clear that the loss of trust that results from data scraping can cause significant harm to LinkedIn, it is not possible to fully and accurately quantify this harm.  As discussed above, the injuries to LinkedIn's reputation and goodwill could result in reduced member engagement, both with LinkedIn itself and with revenue generating advertisements on LinkedIn.  Not only is it impossible to fully and accurately predict and measure this decrease in engagement, but it is also impossible to fully and accurately predict and measure the impact to LinkedIn that will be caused by this decrease in engagement.

LinkedIn will be further harmed if hiQ is permitted to continue scraping because its scraping activity has and will continue to encourage other entities to scrape LinkedIn's site without permission.  One prominent scraper, Bright Data,[214] posted on its website that a preliminary ruling in favor of hiQ meant that "collecting publicly available information from LinkedIn, is in fact, irrefutably legal."[215]  National news outlets have similarly reported that hiQ's scraping means that scraping from LinkedIn is legal and permissible.[216]  Indeed, LinkedIn's records show sharp increases in total guest profile requests and in blocked guest profile requests in recent years, illustrating that scraping activity has drastically increased, as shown in the figure below.[217]  Additionally, as shown in the figure below, corresponding with the August 14, 2017, order granting preliminary injunction in favor of hiQ in this case, I note that LinkedIn's records show a significant spike in

---

[211] *See e.g.*, Deposition of Scott Roberts, May 5, 2022, pp. 108-109 ("And we get countless situations and have countless situations where members will reach out to us and ask us why their information shows up in places around the web or in certain applications that they did not authorize and give access to.  And when that happens via scraping -- we in some cases will hear from members and their frustration -- we don't have the ability to remedy that because the data has been taken by scrapers."); Deposition of Paul Rockwell, May 19, 2022, pp. 238-246 (Discussing complaints from members regarding scraping behavior and hiQ.).

[212] LINK_HIQ_000091445-446; LINK_HIQ_000090379; LINK_HIQ_000090050; LINK_HIQ_000202363-369; LINK_HIQ_000203213-216; LINK_HIQ_000203403.

[213] LINK_HIQ_000091445-446 at 445.

[214] Bright Data was contracted by hiQ to support hiQ's scraping efforts.  Plaintiff hiQ Labs, Inc.'s Responses to LinkedIn Corporation's First Set of Interrogatories, July 29, 2021, p. 12.

[215] "Legality of web data collection - some useful links," *bright data*, September 9, 2019, https://brightdata.com/legality-of-web-data-collection/hiq-labs-inc-v-linkedin-corp.

[216] Whittaker, Zach, "Web scraping is legal, US appeals court reaffirms," *TechCrunch*, April 18, 2022, https://techcrunch.com/2022/04/18/web-scraping-legal-court/.

[217] LINK_HIQ_000206264, tab "point 1 guest scraping request."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

scraping activity, represented by blocked requests.[218]  Scraping activity also spiked in September 2019, the
month the Ninth Circuit affirmed the preliminary injunction in this case,[219] and has increased significantly
since September 2020.

**Figure 15:  Chart of LinkedIn Daily Guest Profile Requests[220]**



According to Dr. Bray, scraping is an aggregate problem and increased scraping requests in the aggregate
harm LinkedIn by increasing its costs and degrading website performance.[221]  Due to the aggregate nature of
the harms, it would be difficult to quantify and for LinkedIn to recover from hiQ or any individual scraper
the full scope of its monetary damages associated with scraping.  Additionally, I understand that scraping, in
the aggregate, is such a high level of traffic that, if it were not blocked, it would overwhelm and shut down
the entire website.[222]

---

[218] LINK_HIQ_000206264, tab "point 1 guest scraping request"; Order Granting Plaintiff's Motion for Preliminary
Injunction, August 14, 2017.

[219] Opinion, September 9, 2019, No. 17-16783 (9th Circuit).

[220] LINK_HIQ_000206264, tab "point 1 guest scraping request".

[221] Deposition of Jenelle Bray, May 18, 2022, pp. 35-37, 126-127, 152.

[222] Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

 **INTELLECTUAL CAPITAL EQUITY**

## 12.2    Costs Associated with Personnel to Create and Use Defenses

According to Jenelle Bray, director of engineering of the anti-abuse AI team at LinkedIn,[223] LinkedIn has implemented anti-scraping defenses for "a very long time," and "definitely longer than [she has] been there."[224]  Given how much LinkedIn cares about member data not being found other places, Dr. Bray assumes "that there have always been" anti-scraping defenses at LinkedIn.[225]  According to Dr. Bray, LinkedIn incurs "a lot of costs" related to its defenses, including its personnel costs.[226]  Dr. Bray testified that "it costs a lot of money and resources to build [anti-scraping] defenses"[227] and to address the significant damage that results from scraping.[228]

As explained by Dr. Bray, within LinkedIn's trust group, "there are several different groups that work on anti-abuse."[229]  Dr. Bray's team, the anti-abuse AI team, builds and manages several machine learning models used to detect and mitigate abuse, i.e., remove the abuse or send the abuse for review.[230]  The trust engineering team "builds the infrastructure to deploy the models that [the anti-abuse AI team] makes," as well as "take[s] action against members or actions like … scraping requests."[231]  Data scientists "measure abuse to understand how … [LinkedIn's] defenses are doing."[232]  The incident response team implements "rules for any attacks that bypass [LinkedIn's] defenses."[233]  Furthermore, Dr. Bray explained that anti-abuse activities span beyond the trust group and may involve personnel from product management teams, for example.[234]

According to Dr. Bray, detecting abuse within the machine learning models "is not an easy task.  It takes a lot of people and a lot of expertise to do it."[235]  For example, LinkedIn's anti-abuse team alone consists of about 45 people and "it's growing."[236]

---

[223] Deposition of Jenelle Bray, May 18, 2022, p. 10.

[224] Deposition of Jenelle Bray, May 18, 2022, pp. 88-89.  *See also*, Deposition of Blake Lawit, May 20, 2022, p. 56.

[225] Deposition of Jenelle Bray, May 18, 2022, pp. 88-89.

[226] Deposition of Jenelle Bray, May 18, 2022, p. 37.

[227] Deposition of Jenelle Bray, May 18, 2022, pp. 35-36.

[228] Deposition of Jenelle Bray, May 18, 2022, p. 152.

[229] Deposition of Jenelle Bray, May 18, 2022, pp. 58-59.

[230] Deposition of Jenelle Bray, May 18, 2022, pp. 57, 61.

[231] Deposition of Jenelle Bray, May 18, 2022, p. 59.

[232] Deposition of Jenelle Bray, May 18, 2022, p. 59.

[233] Deposition of Jenelle Bray, May 18, 2022, pp. 59, 88.

[234] Deposition of Jenelle Bray, May 18, 2022, pp. 60-61.

[235] Deposition of Jenelle Bray, May 18, 2022, p. 64.

[236] Deposition of Jenelle Bray, May 18, 2022, p. 57.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

When asked about the investments LinkedIn has made in the last year to improve its defenses against scraping attacks, Dr. Bray gave the following response about the personnel and work required to defend against scraping:[237]

> So, I mean, there is a whole team, there's like part of my team that works -- you know, several AI engineers, several infrastructure engineers, data scientists, product manager, investigators, they are always working on – that's their job is to work on anti-scraping.

> And so the different – there's like improvement in the infrastructure, so when there are big attacks, like nothing -- like things don't go down as often.

> There is improvement in the models.  I mean, my team has built models that -- this is actually quite unusual, but because the attacks change so quickly, these models have to take in new data and retrain, so like -- and deploy automatically like every three hours to respond to changing attack patterns, so all the infrastructure to deploy that.

> There's also like scaling the actual infrastructure, like if there's going to be more requests, we might need more servers to handle those requests.

> So basically we're always working on anti-scraping.

According to a LinkedIn blog post:[238]

> We have a dedicated team of data scientists, software engineers, machine learning engineers, and investigators who are constantly analyzing abusive behavior on the platform and improving the technology we use to combat it.  Our team develops automated defenses that analyze risk signals and patterns of abuse and take automated action, and constantly improve them to adapt to new threat patterns.

Based on Dr. Bray's testimony, I understand that the immense volume of profile scraping from hiQ and other entities has required LinkedIn employees to engage in significant anti-scraping efforts and that LinkedIn has incurred substantial costs associated with the time its employees have spent engaging in these anti-scraping efforts.



---

[237] Deposition of Jenelle Bray, May 18, 2022, pp. 87-88.

[238] Rockwell, Paul, "An update on how we keep members safe on LinkedIn," *LinkedIn*, March 18, 2022, https://blog.linkedin.com/2022/march/18/an-update-on-how-we-keep-members-safe-on-linkedin.

[239] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn; LINK_HIQ_000206255.  *See also*, LINK_HIQ_000206253; LINK_HIQ_000206254.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY



In order to further quantify these costs specifically to anti-scraping efforts, I requested data and analysis from LinkedIn regarding the time spent by LinkedIn personnel on anti-scraping efforts.  I was provided with internal data and analysis, gathered and performed by various individuals at LinkedIn, that I understand identifies employees that have spent time engaged in anti-scraping efforts, the time periods during which these employees were engaged in anti-scraping efforts, the percentage of their total time during these time periods that was devoted to anti-scraping efforts, and the total wages paid to these employees, during the period from 2015 through 2021.[243]

Based on this analysis, I considered the time periods during which these employees were engaged in anti-scraping efforts and the percentage of their total time during these time periods that was devoted to anti-scraping efforts.[244]  I used this information to calculate a time allocation factor to account for the portion of each employee's time that was spent in each year from 2015 through 2021 engaging in anti-scraping efforts.[245]  I then applied this time allocation factor for each employee and each year to the wages paid by LinkedIn to each employee in each year.[246]  The result of this calculation is shown in the following figure.

---

[240] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn; LINK_HIQ_000206255.  *See also*, LINK_HIQ_000206253; LINK_HIQ_000206254.

[241] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn; LINK_HIQ_000206255.  *See also*, LINK_HIQ_000206253; LINK_HIQ_000206254.

[242] Discussions with Chase Baldwin, Vice President of Central Finance at LinkedIn.

[243] Discussions with Erin James, Senior Litigation Counsel at LinkedIn; LINK_HIQ_000206263; LINK_HIQ_000206262.

[244] Discussions with Erin James, Senior Litigation Counsel at LinkedIn; LINK_HIQ_000206263; LINK_HIQ_000206262.

[245] Appendix 4.3; Appendix 4.2.

[246] Appendix 4.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

I have discussed the internal LinkedIn analyses described above with Erin James, Senior Litigation Counsel at LinkedIn.[248]  I understand that the data was gathered through a process of identifying relevant individuals who engaged in anti-scraping efforts and then gathering additional information from those individuals or their supervisors, while the wage information was gathered from payroll.[249]  I understand that LinkedIn has performed similar analyses to estimate employees' time percentages in the course of resource allocation and planning exercises in the past, such as identifying existing headcount dedicated to various priorities and the additional headcount that will be needed to meet various objectives.[250]  Based on those discussions it is my opinion that these analyses are the product of reasonable and reliable methods and sources and are the types of data and analyses that are routinely relied upon by experts such as myself in both litigation and non-litigation contexts.

But-for the immense volume of profile scraping from hiQ and other entities, LinkedIn would not have needed to incur the above calculated costs associated with the time its employees have spent engaging in these anti-scraping efforts, as the majority of LinkedIn's anti-scraping defenses would no longer be needed.[251]  At least some not insignificant portion of these costs represents a monetary harm to LinkedIn associated with the allegedly unlawful conduct of hiQ.  However, assigning a specific dollar amount of harm attributable to hiQ is difficult for a number of reasons.  For example, unauthorized scrapers other than hiQ made requests to LinkedIn's computers during the relevant time period, meaning that although some costs of LinkedIn's overall anti-abuse efforts are attributable to hiQ it is difficult to determine a specific amount that LinkedIn spent that is directly attributable to hiQ's scraping.

## 12.3   Conclusion

Based on the totality of the circumstances in this case and the information available to date, it is my opinion that scraping of LinkedIn profile data, including the allegedly unlawful conduct of hiQ aggregated with other unauthorized scrapers, may result in significant harm to LinkedIn's reputation, goodwill, and monetary costs

---

[247] Appendix 4.1.  I have conservatively only included U.S.-based employees in the above calculation, although LinkedIn data indicates that at least two non-U.S. employees also engaged in anti-scraping efforts.

[248] Discussions with Erin James, Senior Litigation Counsel at LinkedIn.

[249] Discussions with Erin James, Senior Litigation Counsel at LinkedIn.

[250] Discussions with Erin James, Senior Litigation Counsel at LinkedIn.

[251] Discussions with Xiaofeng Wu, Director of Software Engineering at LinkedIn.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

that are difficult or impossible to quantify and thus not compensable with monetary damages, if such data scraping is allowed to continue.

**13    SIGNATURE**

Respectfully submitted,

_____          ____June 7, 2022_____

James E. Malackowski                                  Date

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CE 0483

# Appendix 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



June 7, 2022

# JAMES E. MALACKOWSKI
## CURRICULUM VITAE

**James E. Malackowski** is a Co-founder and Senior Managing Director of Ocean Tomo, LLC, a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, and Advisory services related to intellectual property (IP) and other intangible assets; corporate accounting investigations; regulatory and reporting obligations; solvency and restructuring; and contractual or competition disputes. Practice offerings address economic damage calculations and testimony; accounting investigations and financial forensics; technology and intangible asset valuation; strategy and risk management consulting; mergers and acquisitions; debt and equity private placement; and IP brokerage.  Subsidiaries of Ocean Tomo include Ocean Tomo Investments Group, LLC, a registered broker dealer.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

Along with Supreme Court Justice Stephen Breyer, Mr. Malackowski was inducted into the IP Hall of Fame in 2022, chosen by the IP Hall of Fame Academy from a longlist of nominees put forward by the global IP community. Mr. Malackowski was recognized by the Academy in 2022 with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset. Mr. Malackowski's inclusion into the IP Hall of Fame follows annual recognition since 2007 by leading industry publications as one of the 'World's Leading IP Strategists'.   Significantly, Mr. Malackowski is listed among "50 Under 45" by *IP Law & Business*™; included in the *National Law Journal's* inaugural list of 50 Intellectual Property Trailblazers & Pioneers; and, named as one of "The Most Influential People in IP" by *Managing Intellectual Property*™.  Mr. Malackowski was named as1 of 50 individuals, companies and institutions that framed the first 50 issues of *IAM Magazine* as well as 1 of 60 leading global Economics Expert Witnesses by the same publication in 2014.  In 2011 Mr. Malackowski was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013 he was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.  In 2018, Mr. Malackowski joined the Standards Development Organization Board of the Licensing Executives Society (USA & Canada), Inc. governing voluntary consensus-based professional practices that are guided in their development by the American National Standards Institute's (ANSI's) Essential Requirements.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management.

On more than one hundred occasions, Mr. Malackowski has served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to intellectual property economics including the subject of valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch Waxman Act market exclusivity, business significance of licensing terms including RAND obligations, venture financing including expected risk / return, and equities of a potential injunction.  Mr. Malackowski's experience extends to matters of general business valuation and commercial disputes, both domestic and foreign.  Mr. Malackowski has publicly addressed policy issues affecting international trade and has provided expert opinions concerning antidumping and countervailing duties imposed by the U.S. Department of Commerce as well as testimony on domestic industry, bond, and remedies before the International Trade Commission.

CE 0485



Mr. Malackowski has substantial experience as a Board Director for leading technology corporations and research organizations as well as companies with critical brand management issues.  He is Past President of The Licensing Executives Society International, Inc., with oversight for more than ten thousand members in thirty-two countries.  Mr. Malackowski focuses his non-for-profit efforts with organizations leveraging science and innovation for the benefit of children and students, including those located in lesser developed countries.  He has served since 2002 as a Trustee or Director of the National Inventors Hall of Fame, Inc., an organization providing summer enrichment programs for more than 100,000 students annually.  For more than ten years Mr. Malackowski served as a Director of Chicago's Stanley Manne Children's Research Institute, advancing the organization's agenda to measure and report the impact of its pediatric research.  He most recently served on the Pritzker School of Molecular Engineering Council at the University of Chicago.

Mr. Malackowski is a frequent speaker on emerging technology markets and related financial measures.  He has addressed mass media audiences including Bloomberg Morning Call, Bloomberg Evening Market Pulse, Bloomberg Final Word, CNBC Closing Bell, CNBC On the Money, CNBC Street Signs, CNBC World Wide Exchange, CBS News Radio and Fox Business National Television as well as other recognized news-based internet video channels.  Mr. Malackowski is a current or past judge for the Illinois Technology Association's CityLIGHTS™ Innovation Awards program, the University of Notre Dame McCloskey Venture Competition, 1st Source Faculty Commercialization Awards, and PBS's *Everyday Edisons*.

As an inventor, Mr. Malackowski has more than twenty issued U.S. patents.  He is a frequent instructor for graduate studies on IP management and markets and a Summa Cum Laude graduate of the University of Notre Dame majoring in accountancy and philosophy.  Mr. Malackowski is Certified/Accredited in Financial Forensics, Business Valuation and Blockchain Fundamentals.  He is a Certified Licensing Professional and a Registered Certified Public Accountant in the State of Illinois.  Mr. Malackowski has been certified to receive United States Sensitive Security Information (SSI) as governed by Title 49 Code of Federal Regulations.

| | |
|---|---|
| **EMPLOYMENT** | Co-Founder and Senior Managing Director, *Ocean Tomo, LLC, a part of J.S. Held.,* July 1, 2003 to present.  Mr. Malackowski is responsible for all aspects of the firm's merchant banking practice.  Mr. Malackowski served as Chairman from the firm's founding in 2003 until 2020.  He served as Chief Executive Officer of Ocean Tomo, LLC from formation until its sale to J.H. Held in 2022. |
| | President and Chief Executive Officer, *IP Equity Management, LLC,* doing business as Duff & Phelps Capital Partners, March 1, 2002 to June 30, 2003.  The firm's intellectual property structured finance efforts were consolidated with Ocean Tomo on July 1, 2003. |
| | Principal and Founder, *VIGIC Services, LLC*, July 1, 2000 to February 28, 2002.  Mr. Malackowski identified and evaluated intellectual capital based private equity investment opportunities and served as an advisor to four completed transactions. |
| | Principal and co-Founder, *IPC Group LLC*, August 1, 1988 – June 30, 2000.  Mr. Malackowski also held the offices of President and CEO and was a Board member / chairman of the firm.  Along with four co-founders, Mr. Malackowski grew IPC Group to become the largest professional services firm specializing in |

2



intellectual property valuation and strategy consulting.  IPC Group was sold in 1999 later changing its name to InteCap.

Executive Consultant, *Peterson & Co. Consulting*, Chicago, June 3, 1985 – July 30, 1988.  Mr. Malackowski began with Peterson as a Staff Consultant and was the firm's quickest promotion to both Senior Consultant and Executive Consultant.  Mr. Malackowski helped to establish the firm's intellectual property litigation and valuation practice.  Peterson & Co. was sold to Saatchi & Saatchi PLC in 1988.

**NON-PROFIT AND ASSOCIATION EXPERIENCE**

Mr. Malackowski has been active in The Licensing Executives Society (LES) locally, nationally and internationally.  LES is the premiere global professional association of technology transfer and intellectual asset management professionals with more than 9,000 members in more than 32 countries.

Mr. Malackowski is Past President of the Licensing Executives Society International, LLC, where his experience included the following positions:

- Director, LES Standards Development Organization (2018 – present)
- Chair, Past President's Council (2012 – 2013)
- President and Member of the Board (2011 - 2012)
- President Elect and Member of the Board (2010 - 2011)
- Secretary and Member of the Board (2007 - 2010)
- Member and Permanent Alternate, Board of Delegates (1992 - 2005)
- Past Chair, Membership, Investment, Education, Long-range Planning and Global Technology Impact Forum Committees.

Mr. Malackowski's term as President of LESI has been recognized for creation of the LESI Global Technology Impact Forum and concurrent Invent For Humanity™ Technology Transfer Exchange Fair; formalizing the National Presidents' Council; establishing the position of a permanent Executive Director; and, restructuring the leadership of LESI committees utilizing a Chair, Past Chair, Chair Elect ladder combined with functional responsibilities for committee Vice Chairs.  This later organizational stamp is based largely on Mr. Malackowski's experience as President of LES USA & Canada described below where he led a restructuring of the Board from a regional to a functional focus for each officer and Trustee.   As with his tenure at his national Society discussed below, Mr. Malackowski led a financial turn-around returning LESI to positive cash flow following its' only two years of loss.

Mr. Malackowski is also Past President of The Licensing Executives Society (USA and Canada), Inc. where he held numerous offices in the organization including:

- President and Member of the Board (2001 – 2002)
- International Vice President and Member of the Board (2000)
- Treasurer and Member of the Board (1996 -- 1999)
- Trustee and Member of the Board (1992 – 1996)

CE 0487



- Chair, Annual Meeting in Miami Beach (1998) and the Summer Meeting in Chicago (1997)

Mr. Malackowski presided over a restructuring of the LES USA & Canada Board and a financial turn-around returning the organization to positive cash flow following its only two years of loss to such date.  Mr. Malackowski is the youngest President to hold office at LES USA & Canada as well as at LES International.

In 2007, Mr. Malackowski was the Founding Chair of the Board of Governors for what is now Certified Licensing Professionals, Inc., administrator of the Certified Licensing Professional (CLP) program for professionals in the fields of licensing, business development and commercialization of intellectual property.  More than 1,000 individuals involved in patenting, marketing, valuation, IP law, negotiation, and intellectual asset management have earned the CLP certification.  CLP, Inc. is a 501(c)(6) organization whose mission is to elevate the licensing profession through knowledge and standards.

In 2018 Mr. Malackowski joined the Standards Development Organization Board of LES USA & Canada.  LES standards are voluntary consensus-based professional practices that are guided in their development by the "American National Standards Institute's (ANSI's) Essential Requirements."  ANSI is the unique accrediting agency in the United States for voluntary consensus standards development organizations.  LES is an accredited ANSI Standards Developer and as such guarantees its constituents that its standards will be developed in a fair, balanced, consensus-based, due process driven way.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management and, where appropriate, offer enterprises the opportunity to differentiate themselves based on their use of these consensus professional practices, through certification of conformance to those standards.

Mr. Malackowski extends significant time to non-profit activities directed towards a further understanding of the economic importance of innovation and intellectual property, in both the United States and developing economies.  These efforts include:

- Founding Board Member and member of the Executive Committee, United Stages Intellectual Property Alliance (USIPA), (2020 -)
- Judge, University of Notre Dame McCloskey Venture Competition (2019 -)
- Advisory Council, University of Chicago, Pritzker School of Molecular Engineering (2018 - 2022)
- Judge, Illinois Technology Association, CityLIGHTS™ Innovation Awards (2013 - 2020)
- Member, World Economic Forum Network of Global Agenda Councils (2011 - 2012)
- Director, International Intellectual Property Institute, Washington D.C., (2002 - 2007)
- Resident Advisor, U.S. Information Agency, (1999)
- Resident Advisor, U.S. Department of Commerce Commercial Law and Development Program (1997)
- Founder and Chairman, The Center for Applied Innovation, Inc. (2004 -)

4



In addition to his University instruction described herein, Mr. Malackowski focuses his non-for-profit efforts with those organizations leveraging science and innovation for the benefit of children.

- Director, Children's Research Fund (2013); Co-Chair Annual Fund Campaign (2013)
- Director, National Inventors Hall of Fame, Inc. (NIHF) including service as a Member, Trustee or Director of related subsidiaries and Board Committees (2001 - 2019).   The NIHF provides summer enrichment programs for more than 160,000 students annually including Camp Invention™ for kids in grades 1-6 (and their parents and teachers); Collegiate Inventors Competition™ for college students (and their mentors); and, Club Invention™ for kids in grades 1-6 (and their parents and teachers).  NIHF provides more than 20,000 camp scholarships annually for children in financial need.
- President's Council, Chicago Museum of Science and Industry (2005 - 2011) including participation on the Education Advisory Committee (2007 - 2009) and the Alternative Revenue Committee (2008 - 2011)
- Director, Stanley Manne Children's Research Institute (2009 - 2020) including Chair of the Board's Technology Transfer Committee (2014 - 2020) and the Strategic Planning Resources Committee (2011 - 2012).  Mr. Malackowski is recognized for initiating the development of a program to measure and track innovation metrics relevant to the Institute.

Mr. Malackowski was the Founder of the Center for Applied Innovation, a Chicago based non-for-profit with both local and international programs.  CAI was created to manage education, public policy outreach and related economic activity around applied technology and intellectual property (IP) rights in the State of Illinois and around the world.

- CAI created and patented the first commoditized contract for technology licensing, the Unit License Right™.  This innovation has been licensed to the Chicago-based Intellectual Property Exchange International.
- Under Mr. Malackowski's continued leadership as Chairman, CAI organizes the Invent for Humanity™ Technology Transfer Exchange Fair (InventforHumanity.org) launched in January, 2012, in Geneva, Switzerland. Invent for Humanity showcases field-ready, sustainable innovations, known as "appropriate technologies", leveraging the experience of licensing professionals to match and structure the actual transfer of such technology to meet recognized needs of emerging market economies.

Mr. Malackowski's association and non-profit activities are informed in part by his participation in the Harvard Business School Executive Education Program on Governing for Nonprofit Excellence, November 2000.  Mr. Malackowski's Board service is informed by his participation at the Rock Center Corporate Governance Directors College for Venture-Backed Company Directors, Stanford University, March 2016.

CE 0489



---

**RELATED OFFICES**

*Berg, LLC*, Member, Council of Advisors, Senior Advisor, Intellectual Property Licensing & Innovation (2012 - 2015)

*The Copyright Hub, LLC d/b/a 3Discovered*, Founder.  The company was formed as a collaborative venture between Ocean Tomo, LLC and Liberty Advisor Group in 2013.  3Discovered is a current portfolio company of US-based venture capital firm AITV.  Mr. Malackowski served as Chairman of the company through September 2016.  (2103 – 2106)

*Career Capture, LLC*, Secretary (2022 - ).  Career Capture is a video based recruiting platform focused on engineering and technical school graduates entering the labor market.  The company is a University of Southern California Iovine & Young Academy project led by Chase J. Malackowski (son).

*Curious Networks, Inc.*, Director, (1999 - 2000), Co-Chair of the Board's Strategic Partnership Committee.  Mr. Malackowski led the company's first and second round of venture funding.

*ewireless, Inc.* (f/k/a JEMAN Holdings, Inc. d/b/a Cellular Linking), Director, (1995-1999, 2000-2002)

*Ford Global Technologies, Inc.*, Ford Motor Company, Director (1997 - 2001).  Mr. Malackowski advised Ford Motor Company on the original business strategy which led to the formation of FGTI.  FGTI was the largest known technology management company in the United States during Mr. Malackowski's term.

*Infocast, Corporation* (OTC BB: IFCC.OB), Director (2001-2002).  Member of the Audit and Compensation Committees.  Mr. Malackowski led the transition of the company's senior management team and continued U.S. based funding efforts.

*Insignis, Inc.*, Director (2000 - 2002)  Mr. Malackowski led the company's first round of venture funding.  Insignis is a Chicago based provider of institutional financial data services.

*The Intellectual Property Coin Group, Inc.*, Chairman and Co-Founder (2018 - 2021).  The company is a planned Ethereum based blockchain platform and related cryptocurrency designed to facilitate IP based transactions.

*The Intellectual Property Exchange International, Inc*.  Mr. Malackowski was the founder of the company guiding initial product development of IPXI and recruitment of executive management.  In 2011, IPXI was funded by an industry consortium including the Chicago Board Options Exchange.  Mr. Malackowski was the Chair or Co-Chair of the Exchange from inception to February 26, 2015.

*JEMAN Technologies, Inc*., Founder. (1995 – 1999).  Mr. Malackowski led the company's efforts to develop new technologies related to wireless direct response services.  JEMAN was sold to ewireless, Inc. in 1999 as part of a venture transaction funded by Bedrock Capital Partners and Tredegar Investments.

6



*Positive Growth Ventures, LLC*, Chairman. (2021 - ).  Mr. Malackowski organized the formation of an industry collective to facilitate direct-to-consumer cooperative advertising for health supplements and related medical products.

*Silent-Yachts, GmbH*,  Member, Advisory Board (2021 - ).  Mr. Malackowski provides general business advice to both the company's chief executive as well as its U.S. distributor of solar-electric catamarans.  Silent-Yachts is located in Magdalensberg, Kärnten, Austria.

*Solutionary, Inc.*, Director (2000 - 2013).  Arranged and advised on Solutionary's asset acquisition of S3Networks effective August 31, 2001 and sale to strategic buyer in 2013.  Member of the Board's Compensation Committee.

*Sendle, Pty*, Advisor (2012 - 2015).  See www.Sendle.com.

---

**EDUCATION AND CERTIFICATION**

University of Notre Dame, B.B.A., Bachelor of Business Administration with majors in Accountancy and Philosophy.  Graduated Summa Cum Laude, 1985.

Registered Certified Public Accountant, State of Illinois Certificate Number 41,187 issued January 16, 1986; License No. 239.007831; Expires September 24, 2022.

Certified Licensing Professional, Certificate Number 1606 issued July 1, 2008; Recertification through November 29, 2022.

Certified in Financial Forensics, CFF™, American Institute of Certified Public Accountants, Certificate Number 391 issued July 31, 2008; Expires July 31, 2022.

Accredited in Business Valuation, ABV™, American Institute of Certified Public Accountants, Certificate Number 4278 issued May 31, 2014; Expires July 31, 2022.

Accredited in Blockchain Fundamentals for Accounting and Finance Professionals, American Institute of Certified Public Accountants, Certificate Number 15860970, 2018 - 2020.

---

**UNIVERSITY INSTRUCTION**

John Marshall Law School, Intellectual Property Damages (1992 - 1994)

DePaul University, Intellectual Property Entrepreneurial Finance (2003)

The George Washington University Law School, Intellectual Property Management (2004)

The University of Chicago Graduate School of Business:

7



- Intellectual Property Investment (2004 - 2006)
- Entrepreneurial Discovery, MBA Course 34705, Adjunct Professors Mark Tebbe and Brian Coe (Fall 2014 - 2015)

Indiana University Kelly School of Business, Intellectual Property Finance (2005)

University of Notre Dame, Mendoza College of Business, Adjunct Instructor:

- MBA Interterm Intensives, Intellectual Property Based Market Transactions, Valuation and Trading (Fall 2006, Fall 2008)
- MBA Executive Program, Course MBAE 70639, Intellectual Property, (Spring Semester 2008)
- MBA Program, Litigation Support and Valuation (Spring 2009)
- Notre Dame Law School, Advanced Trial Advocacy, LAW 75713-10 (Spring 2017)
- Member, Venture Builder Community Advisory Board (2019 - )

University of California at Berkeley Haas School of Business, Innovation Markets (2008)

Chicago-Kent College of Law, Adjunct Professor of Law, IP Financial Markets and Legal Principles (Fall 2008)

Rutgers Professional Science Master's Program, Fundamentals of Intellectual Property (Summer 2011)

Northwestern University Kellogg School of Management, Adjunct Instructor:

- MGMT 441, Intellectual Property Management, Clinical Professor James G. Conley (Fall 2012, Spring 2013 - 2017)
- DSGN 460, Innovation in Context, McCormick Engineering School (Spring 2017)

University of Texas McCombs School of Business, MBA Course:  Open Innovation, Professor Sirkka Jarvenpaa (Spring 2013)

University of Arizona, James E. Rogers College of Law, Advisor, Intellectual Property & Entrepreneurship Clinic (2017 - )

- IP Valuation (Spring 2017)
- IP Valuation for Commercial Transactions (Spring 2019)

University of Southern California, Lloyd Greif Center for Entrepreneurial Studies at the Marshall School of Business, Entrepreneurs Guide to Intellectual Property, Professor Luke L. Dauchot, JFF 322 (Fall 2017)

---

**MEMBERSHIPS**     American Institute of Certified Public Accountants, Member 01182237 (1985 -)



The Economic Club of Chicago (1990 - 2019)
The Licensing Executives Society (1988 - )
Young Presidents' Organization ("YPO" / "YPO Gold" Chicago Chapter, 2006 – 2017) (Mid-America U.S. At Large Chapter, 2019 - 2021)

**RECOGNITION AND AWARDS**

Individually, Mr. Malackowski has been recognized for his expertise as well as his work in developing markets for intellectual property transfer including:

- Inductee, IP Hall of Fame Academy (2022)
- Received Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset (2022)
- *EY Entrepreneur Of The Year®*, Regional Semifinalist (2019 and 2020)
- "IAM Global Leaders", *IAM Magazine* (2020)
- "IAM Patent 1000: The World's Leading Patent Professionals", *IAM Magazine* (2015-2021)
- Named to the *National Law Journal's* inaugural list of 50 Intellectual Property Trailblazers & Pioneers.  (August 2014)
- Named as 1 of 60 leading global Economics Expert Witnesses in the *IAM Patent 1000, IAM Magazine.* Selection based on interviews by IAM researchers with more than 100 patent litigators.  (May 2014)
- Inductee, Chicago Area Entrepreneurship Hall of Fame as selected by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration, (2013; 28th Year of Program)
- Named as 1 of 50 Individuals, Companies and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011.
- "IP Personalities of 2008", *IAM blog* by Joff Wild, Editor
- "IAM Strategy 300:  The World's Leading IP Strategists", *IAM Magazine* (2012-2021); formally presented and included as "World's 250 Leading IP Strategists", *IAM Magazine* (2009-2011)
- "50 Under 45", *IP Law & Business™* (2008)
- "The Most Influential People in IP", *Managing Intellectual Property™* (2007)
- Member, IP Hall of Fame Academy (2007- )

Ocean Tomo as a firm has been likewise recognized for its accomplishments including:

- Ocean Tomo was chosen as the exclusive U.S. representative for the 2016 Healthcare & Pharma Leading Expert Awards by *Global Health & Pharma Magazine*.
- Ocean Tomo was recognized as a member of the *2015 Inc.5000®* list of fastest-growing private companies in America.
- Ocean Tomo was honored in 2011 with the "Best of Chicago Award in Investment Advisory Services" by the U.S. Commerce Association (USCA).
- In addition to Mr. Malackowski, Ocean Tomo as a firm was named as 1 of 50 Individuals, Companies and Institutions that Framed the First 50 Issues of *IAM Magazine*, November / December 2011 and the only firm other than Microsoft (2 of 50 mentions) to be recognized multiple times (5 of 50 mentions).



- The firm's Chicago office was presented the *2011 Alfred P. Sloan Awards for Business Excellence in Workplace Flexibility* after having been finalist for scoring in the top 20% of all firm's measured nationally.
- Ocean Tomo was recognized in 2010 by Corporate Voices for Working Families for its work-life balance as part of the National Workplace Flexibility Campaign published by *USA Today*.
- Ocean Tomo was recognized as a juried Finalist for the Illinois Technology Association 2010 CityLIGHTS Award for raising the stature of the Illinois technology industry.
- Selected as case study organization for Haas School of Business, University of California, Berkeley (2009)
- Selected as case study organization for Harvard Business School MBA Program (2008)
- Ocean Tomo was named one of 20 small and mid-sized firms recognized as the "Best Places to Work in Illinois" by Best Companies Group in a competition sponsored by the Illinois Chamber of Commerce and the Illinois State Council Society for Human Resource (2007)
- Ocean Tomo Auctions received the 2006 Chicago Innovation Award for most innovative new product or service introduced between January 1, 2005, and July 31, 2006, that uniquely satisfied unmet needs in the marketplace. The award was presented by Kuczmarski & Associates and the *Chicago Sun-Times*.
- Ocean Tomo Auctions was awarded the Department of Commerce Technology Administration & National Knowledge & Intellectual Property Management 2006 Innovator of the Year Award.
- Ocean Tomo was recognized as a "Top Ten IP Newsmakers of 2006" by *IP Law & Business*, Almanac 2006.

Numerous authors and graduate business programs have written case studies about Ocean Tomo and its affiliates including:

- Piscione, Deborah Perry, <u>The Risk Factor</u>, Copyright 2014.
- Houle, David, <u>Entering the Shift Age</u>, Copyright 2013.
- Kuczmarski, Thomas D., Dan Miller and Luke Tanen, <u>Innovating Chicago-Style:  How Local Innovators Are Building The National Economy</u>, Copyright 2012.
- Houle, David, <u>The Shift Age</u>, Copyright 2007.
- Chesbrough, Henry, <u>Open Business Models: How to Thrive in the New Innovation Landscape</u>, Copyright 2006.
- Harvard Business School Case Study
- University of California Business School Case Study

---

**RELATED U.S. SPEECHES AND PUBLICATIONS**

"The Determination of a Reasonable Royalty: Hypothetical Negotiation v. A General License Agreement", The Licensing Executives Society, Chicago Chapter, December 8, 1987.

"The Business Economics of Technology Development", The Licensing Executives Society, New England Chapter, February 9, 1988.

10



"The Importance of Protecting Intellectual Property Through Corporate Transition", Licensing Executives Society, National Meeting, October 18, 1989, Moderator.

"Valuation of Intellectual Property Rights", The Chicago Bar Association, March 6, 1990.

"Dispute Resolution -- There Are Alternatives!", Licensing Executives Society, National Meeting, October 22, 1990.

"How to Value a License", Adding to the Bottomline Through Licensing, LES / John Marshall Law School, November 1, 1990.

"An Advanced Discussion on Licensing and Patent Damages", Licensing Executives Society, National Meeting, October 28, 1992.

"An Advanced Discussion on Patent Damages", Licensing Executives Society, National Meeting, October 18, 1993.

Royalty Provisions in Technology License Agreements, Technology Transfers, American Conference Institute, November 15 & 16, 1993.

"Commercializing Technology and the Intellectual Property Quality Management Imperative", Technology Transfer, American Conference Institute, June 20 & 21, 1994.

"How to Accurately Value Software", The Software Protection and Litigation Institute, July 28 & 29, 1994.

"IP Damages Advanced Case Studies", Licensing Executives Society, National Meeting, October 19, 1994.

"Preparation and Presentation of Damages by Outside Consultants", AIPLA Mid-Winter Meeting, February 1, 1995

"Damages Discovery - An Expert's Perspective", Intellectual Property Law Association, New York, December 15, 1995.

"Pre-Litigation Damages Techniques: Patents and More", The Intellectual Property Strategist, March, 1996.

"Corporate Exposures to Copyright, Patent, Trademark, and Trade Secret Claims", Digital Bullets - Digital Shields: A Financial Perspective, American Conference Institute, New York, March 5, 1996.

"IP Management and Taxation - How companies are proactively managing IP assets to maximize shareholder value, including measuring contribution of IP protection to corporate value", American Bar Association, Virginia, April 11, 1996.

11



"Effectively Select & Use Experts in Trademark & Copyright Cases", AIPLA Spring Meeting, Boston, May 1, 1996.

"The Industry-University Interface: Mechanisms For Technology Transfer", 1996 AUTM Central Region / Licensing Executives Society Chicago Chapter, Chicago, July 21, 1996.

"Valuing Health Care Technologies", Licensing Executives Society Winter Meeting, South Carolina, March 13, 1997.

"Creative Marketing & Packaging - How to Differentiate Yourself in a Competitive Market", CTIA Annual Meeting, Atlanta, February 23, 1998.

"Intellectual Property Valuation: The Latest Techniques from Boardroom and Courtroom", Patent Law Association of South Florida Annual Meeting, Fort Lauderdale, October 22, 1998.

"The Aftermath of *Rite-Hite v. Kelly*", 16th Judicial Conference of the U.S. Court of Appeals for the Federal Circuit, Washington D.C., April 6, 1999.

"Expert Admissibility After Daubert", Wisconsin Academy of Trial Lawyers, Milwaukee, December 3, 1999.

"Intellectual Property Strategic Planning: a Corporate Perspective", Research Directors Association of Chicago, Winter Meeting, January 10, 2000.

"Intellectual Property Asset Management: Linking IP and Corporate Strategy", 44th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School, Chicago, February 25, 2000.

"Boost Your Client's Intellectual Capital IQ: Get Top Management Involved", Corporate Legal Times, October 2000, p. 104.

"Strategic and Financial Opportunities for Privately Held and Public Middle Market Companies:  Building Shareholder Value", The Standard Club, Chicago, October 5, 2000.

"Commercializing Intellectual Capital Through Venture Funding", LESI Expanded Board of Directors Meeting and Seminar, Delray Beach, Florida, January 26, 2001; LES Chicago Meeting, May 10, 2001.

"New Paths to Growth:  Joint Ventures and Accessing Equity Capital", Panel Presentation and Discussion, LaSalle Street Project Economic Summit, Chicago, May 10, 2001.

*ViewPoints*, The Newsletter of the Licensing Executives Society (U.S.A. and Canada), Inc., President's Column: Vol. VIII No. 5, Nov. / Dec. 2001, "President Changes the Way LES Does Business";  Vol. VIV No. 1, Jan. / Feb. 2002, "It's Time To Count Our Intellectual Assets"; Vol. VIV No. 2; Vol. VIV No. 3, May / June 2002, "Mid-Year Review"; Vol. VIV No. 4, July / August 2002, "Ethical Issues Related To Intellectual Property".

CE 0496



"Venture Investment Grounded In Intellectual Capital", <u>From Ideas To Assets: Investing Wisely in Intellectual Property</u>, Edited by Bruce Berman, John Wiley & Sons, Inc., 2002.

"Current Issues in Accounting for Intangibles", Congressional Economic Leadership Institute, Panel Presentation and Discussion with Steven H. Wallman, Former Commissioner, United States Securities and Exchange Commission, Washington, DC, May 1, 2002.

"Intellectual Capital Based Corporate Carve-outs: Strategy, Structure and Funding", James E. Malackowski and Suzanne Harrison, <u>The LESI Guide to Licensing Best Practices</u>, Edited by Robert Goldscheider, John Wiley & Sons, Inc., 2002.

"Intellectual Property Finance: Securitization to Venture Capital", American Bar Association Intellectual Property Law Conference, Philadelphia, June 28, 2002.

"The IIPI Roundtable:  The New Emphasis on Patent Value – Opportunities and Challenges", Washington DC, July 22, 2002.

"Moving Technology from University to Marketplace:  Business Creation and the Venture Capital Community, Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Presidents' Forum on Intellectual Property:  A Leadership Discussion with The Licensing Executives Society, the American Intellectual Property Law Association, the Association of University Technology Managers, the Intellectual Property Owners Association, The National Inventors Hall of Fame, and BIO", Licensing Executives Society Annual Conference, Chicago, September 24, 2002.

"Extracting Value From Your Intellectual Asset Portfolio: Ensuring ROI from IP and Technology Assets", World Research Group, November 22, 2002, Chicago, Illinois.

"Licensing", American Intellectual Property Law Association 2003 Mid-Winter Institute, Marco Island, Florida, January 22 – 25, 2003.

"Cashing in on Chicago: A Closer Look at Liquidity in the Heartland", The Executives' Club of Chicago, Panel Discussion, February 11, 2003.

Conference Chair and Speaker, "Optimizing Valuation & Value Realization of your IP/Intellectual Assets", World Research Group, Las Vegas, February 27-28, 2003.

Live Webcast, "Turning Your Intellectual Property into Cash", Ernst & Young Business Insights, April 28, 2003.

Intermediate PDS Workshop:  Application of Private Equity and Leveraged Finance Investing to Intellectual Property, LES / AUTM Summer Meeting, Philadelphia, May 8, 2003.

13



World Research Group, Advanced Intellectual Property Structured Finance, Conference Co-Chair Person, New York City, June 29-30, 2003.

The Conference Board, The 2003 Conference on Intellectual Asset Management & Value Reporting, "Application of Private Equity and Leveraged Finance Investing to Intellectual Property", Chicago, June 4, 2003.

Intellectual Property and Information Technology for Investment Funds, "Intellectual Capital Equity Management", Panel Discussion Sponsored by Schulte Roth & Zabel, New York City, June 18, 2003.

Chicago Capital Access Forum III, "Private Investors: The Case for Domestic Emerging Market Investments", Panel Discussion, Chicago, June 26, 2003.

Pension Consultants' Forum, "Extracting Value from Private Equity Investing", World Research Group, Chicago, July 22, 2003.

Midwest Intellectual Property Institute, "Intellectual Capital Equity Management", Minneapolis, September 19, 2003.

"Intellectual Asset Strategies", Add-On Seminar at the 2003 Licensing Executives Society Annual Meeting, San Diego, September 25, 2003.

"Leveraging Intellectual Property", Keynote Speaker, Thomson Financial Thought Leadership Forum, New York, October 8, 2003.

"Beyond Licensing: Innovative Techniques for Extracting Value", Advanced Forum on Licensing Intellectual Property, San Francisco, December 9, 2003.

<u>Intellectual Asset Management</u>, *Column:  IP Merchant Banker*, Douglas R. Elliott & James E. Malackowski, Issue 01, "Challenges of the Fifth Epoch", July / August 2003; Issue 02, "What the Market Fortells", September / October 2003; Issue 03, "Economics, Ethos and Intellectual Ethics", December / January 2004; Issue 04, "Patent Predictions – facts or fictions?", February / March 2004; "Wealth management in the age of patents", June / July 2004; "Patent pools – the 80% solution", August / September 2004.

"Intellectual Capital Equity Management:  IP as an Asset Class", Minnesota State Bar Association Continuing Legal Education, Minneapolis, January 15-16, 2004.

"Understanding the Motivations Behind an IP Structured Finance Transaction", "Analyzing the Anatomy of A Patent-Based Structured Finance Transaction", World Research Group, New York, January 21-22, 2004.

"Managing Your Intellectual Property", Investment Banking for Women / Minority Owned Business Enterprises, Annual Forum, Conference Co-Chairperson, Chicago, March 3-5, 2004.

"Private Equity: Investor Capital for Mature Businesses", Dream*Makers* Forum 2004, Santa Barbara, California, March 7 – 10, 2004.

14



"IP Finance:  Convergence of IP Valuation and Value Creation", World Research Group 2nd Annual Strategies and Solutions for Optimizing IP Valuation & Value Creation, Chicago, March 23 – 24, 2004.

"Leveraging the Value of Intellectual Property", Creating, Managing & Valuing an Intellectual Property Portfolio, Vedder Price Conference Series, Chicago, April 28, 2004.

"Federal Circuit Damages Decision Emphasizes the Importance of Sound Economic Models", IP Review, McDermott Will & Emery, with Robert M. Hess, Spring 2004.

"Intellectual Property Merchant Banking:  Leveraging Corporate Intangible Assets", The Licensing Executives Society (U.S.A. & Canada), Inc., Fairfield-Westchester Counties Chapter, June 23, 2004.

"Intellectual Property Financing and Securitization:  Conclusions and Future Implications for Financing the IP Market", New York, New York, July 21, 2004.

"Emerging Financial Concepts in IP Asset Management", Mining Patent Portfolios, Seattle, Washington, September 13, 2004.

"Intellectual Property Investment", National Institutes of Health, Commercialization Assistance Program, Larta Institute, Chicago, November 12, 2004.

"Using Intellectual Property to Grow", The Beacon, Chicagoland Entrepreneurial Center, Volume 3, Issue 4, December 10, 2004.

"Techniques for Assessing the Value of Your IP Portfolio", The Wall Street Transcript Intellectual Property Conference, New York, January 27, 2005.

"The Tipping Point:  Assessing Major Challenges and Growth Opportunities in IP Finance", Moderator, The 3rd Annual Advancing IP Structured Finance World Research Group Conference", New York, February 3, 2005.

"Commerce One IP Auction", Optimizing IP Valuation and Value Creation, World Research Group Conference, Miami, March 30-31, 2005.

"Intellectual Capital Equity Management: IP As An Asset Class", Minnesota Continuing Legal Education Conference, Minneapolis, May 12, 2005.

"Techniques for Evaluating IP Potential", Life for After Rembrandts, Law Seminars International, Chicago, Illinois, August 4, 2005.

Keynote Address, 2nd Annual Intellectual Property Financing and Securitization Summit, New York, September 26, 2005.

"The Power of Intellectual Property in Private Equity Deals", Association for Corporate Growth and The Licensing Executives Society Connecticut Chapters, Greenwich, Connecticut, October 6, 2005.

15



"Maximizing the Value of Distressed Debt Backed by Intellectual Property", Financial Research Associates Distressed Debt Summit 2005, New York, October 7, 2005.

"To Sell or Not to Sell", Licensing in the Boardroom 2005, a supplement to *Intellectual Asset Management* magazine, 2005.

Patent Auctions & Marketplaces: Leveraging Value from Under-employed Technologies, IP Master Class Presentation, Washington DC, January 10, 2006.

"Risky Business: Overlooking Patents as Financial Assets", Making Innovation Pay, Edited by Bruce Berman, Published by John Wiley & Sons, Inc., 2006.

"The State of Development & Current Trends in IP Structured Finance" and "The Tipping Point: Assessing Major Challenges, Growth Opportunities and Future Trends in IP Finance", Moderator, The 4th Annual Summit on IP Structured Finance, New York, March 22-23, 2006.

"Generating Revenue From Your Inventions", IIR 2nd Annual Summit on IP Rights for Financial Services, New York, April 25-26, 2006.

"A Behind the Scenes Look at the Patent Bazaar: How Companies and Industry Are Buying and Selling Patents", Innovators in IP Litigation, IP Law & Business, San Jose, California, May 17, 2006.

"Patent Markets and Their Impact to R&D Strategy", Industrial Research Institute Annual Meeting, May 21-24, 2006, Colorado.

USC Gould School of Law 2006 Intellectual Property Institute; Featured Speaker, "A Final Word"; Panelist, "Patent Trolls: The Good, the Bad and the Ugly"; May 23, 2006, Los Angeles.

"Patent Auctions: Past, Present & Future", The 50th Annual Conference on Developments in Intellectual Property Law, John Marshall Law School Center for Intellectual Property Law, May 25-26, 2006, Chicago.   Speech published as "The Intellectual Property Marketplace: Past, Present and Future", 5 J. Marshall Rev. of Intell. Prop. L. 605, (2006)

"Patent Auctions: Risky Endeavor or Legitimate Market Opportunity?", Strafford Legal Teleconference Presentations, June 8, 2006.

The Intellectual Property Investment Summit:  Connecting Investors with Strategic Intellectual Property Opportunities, Presented by the Center for Applied Innovation, Summit Co-Chairperson, June 15, 2006, Chicago.

Innovative Structures for Acquiring Intellectual Property:  The Benefits, Challenges and Process, LSI Law Seminars International, Program Co-Chair, July 17, 2006, Chicago.

"Licensing and Intellectual Property", Chicago Regional Independent Inventor's Conference, Presented by the United States Patent and Trademark Office,

16



Northwestern University School of Law, and the National Inventors Hall of Fame Foundation, July 28-29, 2006, Chicago.

"Reinventing the IP Marketplace – The Exclusive Ocean Tomo Patent Auction Case Study", IP Licensing Summit: Practical Strategies to Maximize Revenue in Today's Challenging Intellectual Property Marketplace, August 21-23, 2006, New York.

"Unlocking the Value of Intellectual Property Rights", Conference of the International Bar Association, September 20, 2006, Chicago.

"This Too Shall Pass", <u>Americas IP Focus 2006, Managing Intellectual Property Rights</u>, Copyright, Euromoney Institutional Investor, PLC, 2006.

"Developing Markets for Intellectual Assets and Technology", 21st Annual Intellectual Assets and Technology Law Institute, October 5 & 6, 2006, Irving, Texas.

"Patent Damages" and "Patent Reform Efforts: An Update and Review", The Sedona Conference Patent Litigation VII, October 12-13, 2006, Sedona, Arizona.

"Patent Auctions", 44th Annual Intellectual Property Law Conference, The Center for American and International Law, November 9-10, 2006, Plano, Texas.

"The Future of Developing IP Markets", 3rd Annual Monetization of Intellectual Property & Intangible Assets, Strategic Research Institute, November 16-17, 2006, Boston.

"The IP Transactional Landscape", Economics of IP Based Transactions, National Knowledge & Intellectual Property Management Taskforce Series Program, November 29-30, 2006, Washington, D.C.

Keynote Presentation, The Business of Intellectual Property Conference, Tech Council of Maryland, Rockville, Maryland, January 10, 2007.

Luncheon Speaker, Corporate Intellectual Property Roundtable, Georgia State University College of Law, Atlanta, January 24, 2007.

"Patent Markets", American Intellectual Property Law Association, 2007 Mid-Winter Institute, New Orleans, January 24-27, 2007.

"Assessing the Real Value of Your IP Portfolio" and "Growing IP Impact on Public and Semi-Public Markets", The 5th Annual Summit on Monetizing, Financing & Securitizing IP, New York, January 30-31, 2007.

"Ocean's 300", Moderator, <u>World Intellectual Property Review 2007</u>, pp. 16-20.

"The Intellectual Property Marketplace: Emerging Transaction and Investment Vehicles", Co-author with Cardoza, Gray and Conroy, *The Licensing Journal*, Aspen Publishers, Vol. 27, No. 2, pages 1 - 11, February 2007.

CE 0501



"The Importance of Emerging Intellectual Property Market Opportunities to the City of Chicago", Keynote Speaker, Notre Dame Club of Chicago Meeting, Chicago, March 8, 2007.

"The Intellectual Property Marketplace", Harvard Business School Club of New York, New York, April 12, 2007.

Keynote Address, BRICs & Mortar: Technological Drivers in Booming Economies of Brazil, Russia, India and China, Northwestern University Journal of Technology & Intellectual Property Second Annual Symposium, Chicago, April 13, 2007.

"Innovation Measurement:  The Economic Impact of Patent Value", Co-author with Barney, Cardoza, Walker and Gray, Submission to United States Department of Commerce Economics and Statistics Administration, Pursuant to Notice in the Federal Register, Vol. 72, No. 71, 18627, May 11, 2007.

"Objective Patent Valuation", Business Meeting, Association of Corporate Patent Counsel, Newport, Rhode Island, June 27, 2007.

"Intellectual Property Exchange Chicago", a two day symposium presented by The National Knowledge & Intellectual Property Management Taskforce and The Center for Applied Innovation, Moderator and Speaker, July 17 – 18, 2007, Chicago.

"Start-up Stories: Tales from the Front Line", TiE Midwest, August 1, 2007, Chicago.

Keynote Address, Notre Dame Financial Executives Alumni Conference, September 21, 2007, South Bend, Indiana.

"The Birth of an IP Marketplace", Missouri Bar Association Seminar, November 2, 2007, St. Louis, Missouri.

"Market Forces and IP", The Giles S. Rich American Inn of Court, Howard University, January 17, 2008.

"Market for Technology:  Challenges and Opportunities", Panel Discussion on Impediments to Technology Markets, Duke University's Fuqua School of Business, February 20, 2008.

"IP Markets – An Intangible Walk Down Wall Street", Keynote Address, Securities Industry and Financial Markets Association, March 11, 2008, New York.

"Patent Valuation, Is there One or Many?", Mini-Plenary Session of the High Tech Sector, The Licensing Executives Society International Annual Meeting, May 7, 2008, Chicago.

"What is Patent Quality – A Merchant Banc's Perspective", with Jonathan A. Barney, *les Nouvelles*, June 2008, p. 123 – 134.

CE 0502



"Intangibles in the Firm and Financial Markets", *Intangible Assets: Measuring and Enhancing Their Contribution to Corporate Value and Economic Growth*, The National Academies, Washington DC, June 23, 2008.

"Developing IP Markets:  Opportunity for the Financial Services Industry", Keynote Address, The 5th Annual Patents & The Financial Services Industry Symposium, New York, July 29, 2008.

"New Trends in Monetizing IP Rights:  Trolls, Licensing and Securitization", *Managing Intellectual Property* Webinar, September 3, 2008.

"Magnificent Mile – Shopping for the Ideal IP Expert", DRI Intellectual Property Litigation Seminar, September 4-5, 2008, Chicago.

From Assets to Profits: Competing for IP Value and Return, Contributing Author, Edited by Bruce Berman, John Wiley & Sons, November 2008.

Ocean Tomo:  The New Kid on the (Auction) Block is All Grown Up, Institute for Law and Technology, 46th Annual Conference on Intellectual Property Law, November 10 – 11, 2008, Plano, Texas.

Federal Trade Commission:  The Evolving Intellectual Property Marketplace, Keynote Address, Public Hearings, April 17, 2009, Washington, DC.

"Protecting and Commercializing New Ideas", CoreNet Global Chicago Chapter Meeting, Chicago, May 13, 2009.

"The Future of the IP Marketplace", Moderator and Plenary Speaker, IP Markets 2009, Chicago, July 23, 2009.

"Staying Ahead of the Curve – Strategic Intelligence, Value Assessments and Monetization in a Highly Competitive Economy", The 6th Annual Patents & The Financial Services Industry Conference, New York City, July 28-29, 2009.

"Helping Companies in a Down Economy: Strategic Planning for Identifying and Valuing Your IP", American Bar Association Annual Meeting, Chicago, July 31, 2009.

"Managing IP During Uncertain Times", NanoBusiness Alliance Conference, Chicago, September 8, 2010.

National Economic Framework for Intellectual Property Based Commerce, A Research Report by the National Knowledge & Intellectual Property Management Taskforce, Net Worth Press, 2009.

"The Role of IP in Tough Economic Times and How to Use it to Your Advantage:  Corporate Recovery and Restructuring", Licensing Executives Society Annual Meeting, San Francisco, October 19, 2009.

"Global IP Market Development", 11th Annual Utah IP Summit, Salt Lake City, February 13, 2010.

19



"Law, Economics, Business and Policy Implications for Innovation and Competition of Diverse Business Models for Using Patents", Stanford University Hoover Institution Annual Conference, Stanford, California, June 25, 2010.

"Establishing an Objective Value of IP", IPO Annual Meeting, Atlanta, September 14, 2010.

"Intellectual Property and the Marketplace:  Hot Topics Impacting the Role of Patents, Trademarks and Copyrights in Today's Business World", Vedder Price Illinois Continuing Legal Education Forum, Chicago, October 6, 2010.

"IP Essentials for the Chief Executive Officer", Illinois Technology Association, Chairman's Dinner Keynote Speaker, Chicago, October 20, 2010.

"Valuation of IP in Emerging Market Platforms", 2010 IP Damages Institute, CalCPA Education Foundation, Los Angeles, November 8, 2010.

"Shifting Sands:  What is Discoverable and Admissible for Damages, Willfulness and Other Purposes", Intellectual Property Owners Association CLE Roundtable, Washington, DC, March 21, 2011.

"Intellectual Property: From Asset to Asset Class", Intellectual Property Strategies for the 21st Century Corporation, Bryer, Lebson & Asbell Editors, John Wiley & Sons, Inc., 2011.

"The Next Big Think in Monetizing IP: A Natural Progression to Exchange-Traded Units", Ian D. McClure co-author, *LANDSLIDE*, A Publication of the ABA Section of Intellectual Property Law, Volume 3, Number 5, May/June 2011, pp. 32-37.

"Risk Management Strategies to Defend Against Patent Trolls and the New Trend in Patent Royalty Trusts", 2011 Congress on Patent Strategies for the Financial Services Industry, New York, September 19-20, 2011.

"Patent Quality and its Impact on Valuation", Licensing Executives Society United States and Canada, Inc., Annual Meeting, San Diego, October 17, 2011.

Introduction, "LESI Global Technology Impact Forum (GTIF) Creates Tech Transfer Platform", *les Nouvelles*, Journal of the Licensing Executives Society International, Volume XLVII No. 2, June 2012.

Panelist, "IP Monetization", McDermott Will & Emery 2012 Intellectual Property Symposium, Chicago, June 14, 2012.

Keynote Address, Northwestern Law Fifth Annual Conference on Entrepreneurship and Innovation, Chicago, June 14, 2012.

"IP Market Development", 38th Annual Intellectual Property Law Summer Institute, Sponsored by the Intellectual Property Law Section of the State Bar of Michigan, Traverse City, Michigan, July 21, 2012.

20



"An Investors' Perspective on IP", CenterForce IP Strategy Summit, New York City, New York, November 13, 2012.

"Investing in IP", DealFlow Media Webinar, January 10, 2013.

"Evolving IP Marketplace", American Intellectual Property Law Association, Mid-Winter Meeting, Tampa, Florida, February 1, 2013.  Includes paper: *New Emphasis on the Analytical Approach of Apportionment In Determination of a Reasonable Royalty* by James E. Malackowski, Justin Lewis and Robert Mazur.

"An Inventor's Walk Down Wall Street", PatCon 3 at Illinois Institute of Technology Chicago-Kent School of Law, Chicago, April 12, 2013.

*Report on Judge Rader Comments at the 2013 LESI Annual Conference*, LES Global News, Vol. XLVIII No. 2, June 2013.

"Strategic Insights", Plenary Panel Discussion, IPBC 2013, IP Business Congress, Boston, June 9, 2013.

"IP and Antitrust", Panel Discussion, McDermott 2013 IP Symposium, June 13, 2013, Chicago.

*IP Investments and Markets* Presented by the Center for Applied Innovation, Panelist on IP Marketplace, Chicago, June 25-26, 2013.

*Capturing Innovation*, Irish Entrepreneurs:  An Affiliate Group of the Notre Dame Club of Chicago, Chicago, September 5, 2013.

*Preventing the Napsterization of 3D Printing:  Areas for Industry Collaboration and Transparency*, Inside 3D Printing Conference and Expo, San Jose, California, September 18, 2013.

*The Latest Thinking about Non-Practicing Entities*, 2013 AIPLA Annual Meeting, Washington, DC, October 25, 2013.

*Challenges and Opportunities in Asia*, Think Asia, Think Hong Kong: IP, Technology & China/U.S. Opportunities, The Hong Kong Business Association of the Midwest, Chicago, November 19, 2013.

*Rationalizing Remedies,* The 2013 Patent Institute presented by Cravath Swain & Moore, New York, December 5, 2013.

*Special Address:  Looking to the Future of the Intellectual Property Marketplace – Where Will We Be in 2020?,* Best Practices in Patent Monetization, Law Seminars International, San Francisco, March 6-7, 2014.

*Reinventing Finance:  Funding Innovation Beyond Silicon Valley*, Forbes Reinventing America Summit, Chicago, March 27-28, 2014.

21



*IP Pricing – Current Issues for Markets and Courts*, Georgia State University / Licensing Executives Society Joint Meeting, Atlanta, May 28, 2014.

*The Growing Global 3DP IP Market & How Much Is At Stake*, 3D Printing Politics, Washington D.C., September 17, 2014.

*The Changing Role of the Expert*, 2014 IP Institute presented by the Engleberg Center on Innovation Law & Policy at New York University and Cravath, Swaine & Moore, LLP, New York, December 4, 2104.

"Intellectual Property Exchange", Dallas Chapter Meeting of the Licensing Executives Society (USA & Canada), Inc., Dallas, January 22, 2015.

"Actavis, Valuation, and Fairness Opinions", 2015 Generic Pharmaceutical Association Annual Meeting, Miami, February 9-11, 2015.

Patent Damages Roundtable, USC Gould School of Law 2015 Intellectual Property Institute, Los Angeles, March 23, 2015.

"Intellectual Property Impact on M&A", Transaction Advisors Midwest Symposium, Chicago, September 17, 2015

"The Changing Landscape of Patent Value and Patent Risks", 2016 Berkeley Law / Cleary Gottlieb M&A-IP-Antitrust Conference, Berkeley Center for Law, Business and the Economy, San Francisco, January 29, 2016.

"Damages Experts on Evidence and Gatekeeping", The University of Texas School of Law Conference on Patent Damages, Austin, Texas, June 9-10, 2016.

"Investing In Innovation: Global Trends In Innovation and Sustainability", CFA Society of Chicago, Chicago, September 28, 2016.

IP Remedies Roundtable and Workshop, USC Gould School of Law 2017 Intellectual Property Institute, Los Angeles, March 20, 2017.

"Economic Tools Used for Damages Estimation", Panel Discussion, Intellectual Property Owners Association, Chicago, June 7, 2017.

"Quantitative Approaches to Determining FRAND Royalties", Intellectual Property Owners Association Annual Meeting, San Francisco, September 18, 2017.

"The Intersection of Intellectual Property, Blockchain and Cryptocurrency", Licensing Executives Society International Annual Conference, San Diego, April 30, 2018 – May 1, 2018.

"Best Practices and Useful Tools for Assessing the Value of Your Company's IP", American Intellectual Property Law Association 2018 Spring Meeting, May 15 - 17, 2018.

"Practical Blockchain", IDEA Week Innovation Festival, South Bend, Indiana, April 8, 2019.

22



"Blockchain Primer," Introductory Remarks by Hon. Kara F. Stoll, The Giles S. Rich American Inn of Court, Washington D.C., February 11, 2020.

*Managing Your Intellectual Property*, LESI Business Briefings, Series Co-author, May 2020.

"IP Transaction Ecosystem: An Update on Market Activity", LES USA & Canada, Inc., Greater Washington D.C. Chapter, September 9, 2021.

"Judicial Perspectives on Using Damages Specialty Experts", Intellectual Property Law Association of Chicago, Litigation Committee, September 15, 2021

"Global Patent Issues", Plenary Panel, University of Illinois Chicago 65th Annual IP Law Conference, UIC School of Law, Chicago, November 4, 2021.

---

**INTERNATIONAL SPEECHES AND PUBLICATIONS**

"Taxation Issues when Licensing with the U.S.", Licensing Executives Society International, South Africa Conference, January 28, 1996.

"Intellectual Property Damages: Advanced Case Studies", Licensing Executives Society Annual Meeting, Puerto Rico, September 30, 1996.

"License Agreement Royalty Audits: Untapped Riches Or Fool's Gold?", Licensing Executives Society Annual Meeting, Puerto Rico, October 1, 1996

"Valuation of IPR", Conference on Appeals Related to Intellectual Property, Bucharest, Romania, November 20, 1997.

"Avaliacao e Contabilizacao de Propriedade Intellectual – Metodologia e Aspectos Fiscais", XIX Seminario Nacional de Propriedade Intellectual, Rio de Janeiro, Brazil, August 16, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Sao Paolo, Brazil, August 18, 1999.

"Avaliacao e Contabilizacao de Propriedade Intelectual", Conferencia pela Consulate General of the United States of America, Curitiba, Brazil, August 20, 1999.

"IP Valuation Trends", Licensing Add-on Seminar, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 21, 2000.

"Intellectual Property from a Board Room Window", Plenary Session II LESI Strategies, LESI Annual Conference, Krasnapolsky, Amsterdam, Netherlands, May 23, 2000.

23



"Due Diligence in an Intellectual Capital Focused Investment", LES Annual Conference Add-on Session, Toronto, September 14, 2000.

"What's New in Intellectual Property Asset Management", Panel Discussion, 8th Annual Intellectual Property Law Institute, State Bar of Georgia,  Puerto Vallarta Mexico,  November 15, 2002.

"Les brevets en tant qu'actifs economiques: comment les exploiter au mieux" and "Brevets et financement: couvrir les couts, trouver des investisseurs", Un System Du Brevet Competitif Pour L'Europe,  sponsored by the European Patent Office, Brussels, May 3-4, 2006.

"What is Patent Quality?", Co-author with Jonathan A. Barney, Paper Presented to the Colloquium on a Comprehensive Approach to Patent Quality, Federation Internationale Des Conseils En propriete Industrielle, Amsterdam, June 8-9, 2007.

"Fostering Innovation with Seed Money and Venture Capital", Licensing Executives Society International Annual Conference, Zurich, June 19, 2007.

"Legal Problems Arising from Auctioning of IPR", Bi-Annual International Forum, Association Internationale Pour La Protection De La Propriete Intellectuelle, October 6, 2007.

"IP Auctions", Plenary Address, The Licensing Executives Society Annual Meeting, October 16, 2007, Vancouver, Canada.

"IP Valuation for IPO's", Warsaw Stock Exchange Executive Conference, June 27, 2008, Warsaw, Poland.

"IP As A Business Tool", Licensing Executives Society International Conference, January 29-30, 2009, New Delhi, India.

"Global IP Market Development", Keynote Address, The Licensing Executives Society Australia and New Zealand, April 2-4, 2009, Camberra, Australia.

"Global IP Market Development", The Licensing Executives Society Philippines, June 8, 2009, Manila, Philippines.
Entwicklung einer Infrastruktur im Blickpunkt, Der Intellectual Property Exchange, *IP Manager:  Journal for the Knowledge Economy*, 01/2009.

"Global IP Market View", Division des Analyses Economiques et des Statistiques, Organization de Cooperation et de Developpement Economiques, January 8, 2010, Paris, France.

"Global IP Market View", BusinessEurope Patents Working Group Meeting, The Confederation of European Business a.l.a.b.l., January 28, 2010, Brussels, Belgium.

"Global IP Market View", Inaugural Annual Conference, LES Turkey, January 29, 2010, Istanbul, Turkey.

24



"Commercialization Strategies for Industrial Property Assets", LES Brazil Annual Congress, January 28, 2011, Rio de Janeiro, Brazil.

"Developing Commercial IP Markets", LES Arab Countries and Abu Dhabi Higher Colleges of Technology Seminar, October 12, 2011, Abu Dhabi, UAE.

"Asian IP Market Development", LES Asia Pacific Meeting, LES Singapore, November 9-10, 2011, Singapore.

"Patent Auctions & Technology in an Emerging Global Economy", LES Philippines, November 16, 2011, Manila.

"Tech Transfer for Humanitarian Purpose", LESI Annual Conference, April 2, 2012, Auckland.

Moderator, "New Challenges in ICT:  How to Compete Using IP Assets", LES Pan European Meeting, Rome, June 12, 2012.

Workshop Panelist, "Accelerate Licensing & Avoid Litigation: Effective Use of Transparency, Investors & Risk Management Tools", LES Pan European Meeting, Rome, June 12, 2012.

Keynote Speech, "Research Trends Around the Globe on Licensing", LES Asia Pacific Regional Conference, Tokyo, Japan, September 3, 2012.

"Investing in IP and Developing IP Monetization and Risk Markets: U.S. Perspective", LES Scandinavia Annual Meeting, Helsinki, Finland, September 12, 2012.

"El Mercado Global De Tecnologia", LESI Innovation Tour, LES Mexico and Asociacion Mexicana de Directivos de la Investigation Aplicada y el Desarrollo Tecnologico, A.C., Mexico City, Mexico, September 21, 2012.

Research Handbook on Intellectual Property Licensing, Forward, Jacques de Werra, University of Geneva, Editor, Edward Elgar Publishing, 2012.

"Markets for Humanitarian Technology Transfer" and "Adoption by Resolution of LESI IP Business Principles", LESI Global Technology Impact Forum, Geneva, Switzerland, January 22, 2013.

Forward, Research Handbook on Intellectual Property Licensing, Edited by Jacques de Werra, Edward Elgar Publishing Limited, 2013.

"IP Market Development" / "Simplicity in Global IP Valuation", LESI Annual Conference, Rio de Janeiro, Brazil, April 10, 2013.

"Collaboration for IP Based Accounting and Reporting", LESI Global Technology Impact Forum, Geneva, Switzerland, January 20-21, 2014.

"IP Licensing and Intermediaries", LES Asia-Pacific Regional Conference, Seoul, Korea, November 4-6, 2014.

25



"Building IP Transaction Platforms", Keynote Presentation, 14th Annual Shanghai International Intellectual Property Forum, Hosted by the World Intellectual Property Organization, (Shenzhen, China, December 7, 2017 as an advance local presentation) Shanghai, China, December 13, 2017.

"Building and Enforcing a Global Portfolio for Protection and Monetization", Moderator, 2018 LES IP100 Executive Forum, Phoenix, Arizona, February 15-16, 2018.

"Valuation of IP In the Eye of the Beholder" and "IP Monetization Lifecycle", Moderator, Inaugural IP Conference on Issues that Make a Difference, University of Arizona Law, Tucson, Arizona, March 5-6, 2018.

<u>Best Practices and Useful Tools For Assessing the Value of IP</u>, Co-authored with Mick Baciu and Drew Sills, American Intellectual Property Law Association 2018 Spring Meeting, Seattle, Washington, May 15-17, 2018.

"Toward Early Dispute Resolution of Standard Essential Patents in the 5G Era", International Arbitration Center Tokyo, Mock Arbitration, Tokyo, Japan, June 29, 2018.

"Practical Blockchain", LESI Annual Conference, Yokohama, Japan, May 28, 2019.

"Managing Your Intellectual Property", LESI Business Briefing Report, published by the Licensing Executives Society International, Inc., Copyright 2020.

"Managing Your Intellectual Property", Rigorous Empirical Research on Intellectual Property, virtual presentation by 4iP Council and the Licensing Executives Society International, September 29, 2020.

"A Global Economic Framework for Intellectual Based Commerce", World IP Forum, India, April 30, 2021.

"Growth Financing", European Patent Office High-Tech Business Forum, European Patent Academy, October 28, 2021.

---

**TELEVISION, RADIO AND EDITORIAL**

Bloomberg Morning Call with Brian Sullivan, "Patent Auctions", March 3, 2006.

CNBC Closing Bell, "Patents for Purchase", Interview with Maria Bartilomo, April 4, 2006.

CNBC On the Money, "Patents for Sale", Interview and Report by Scott Wapner, April 7, 2006.

Bloomberg Morning Call with Brian Sullivan, "Ocean Tomo 300 Index" and "Fall Intellectual Property Auction", September 13, 2006.

CE 0510



CBS WBBM-AM News Radio with Andy Giersher, Noon Business Hour, "New Stock Market Index", December 2, 2006 plus repeats.

Bloomberg Evening *Market Pulse* with Pimm Fox, "Stock Selections with Strong Patents", January 9, 2007.

Judge, *Everyday Edisons: Ordinary People, Extraordinary Ideas*, a Public Broadcasting System documentary series, 2nd Season, to be aired 2008.

Bloomberg Final Word with Brian Sullivan, "Changes in IP Laws Affect Stock Price", March 10, 2008.

FOX Business National, "Investing in Patents", June 5, 2008.

"It's the auto technology, Congress", *The Detroit News*, detnews.com, December 2, 2008.

FOX Business National, "Capturing Value from IP During a Recession", January 12, 2009.

FOX Business National, "The Value of Technology and Patents in a Chrysler Bankruptcy", May 1, 2009.

FOX Business National, "Exchange Looks to Value Patents", October 5, 2009.

TV Tokyo, "IP Markets, October 4, 2010.

FOX Business National, "Patent Litigation Trends", October 4, 2010.

CNBC Street Signs, "Patent-Palooza", July 26, 2011.

CNBC Street Signs, "Patent Battleground", August 15, 2011.

CNBC Street Signs, "IPXI: Trading Patents in 2012", December 14, 2011.

CEO IntroNet, May 16, 2012.

CNBC Street Signs, "Research In Motion's Patent Portfolio, May 30, 2012.

Crain's Chicago Business, Chicago Business Video, "Preview of the Eureka Index", April 25, 2013.

CNBC Street Signs, "Valuing Intangible Assets", August 5, 2013.

Chicago Tribune Blue Sky Innovation, "Why Robots Roam the Halls…", July 16, 2014.

CNBC Worldwide Exchange, "The Big Battle Over Intellectual Property:  U.S. – China Trade Tariffs and IP", March 26, 2018.

CE 0511



**EXPERT TESTIMONY**

01 Communique Laboratory, Inc. v. Citrix Systems, Inc. & Citrix Online, LLC
Civil Action 1:06-CV-0253 (N.D. Ohio)
United States District Court for the Northern District of Ohio
Deposition Testimony

Abiomed Inc. v. Maquet Cardiovascular LLC
No. 1:16-cv-10914-FDS
United States District Court for the District of Massachusetts
Deposition Testimony

ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v. Genus, PLC
Civil Action: 14-cv503-wmc
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Acadia Research Group, LLC and Lifeport Sciences, LLC v. Boston Scientific Corporation
AAA File No. 02-15-0004-9460
American Arbitration Association
Hearing and Deposition Testimony

Acantha LLC v. DePuy Synthese Sales, Inc., DePuy Synthes Products, Inc., DePuy Synthes, Inc., Johnson & Johnson, Inc. Synthes, Inc. Synthes USA, LLC, DePuy Orthopaedics, Inc. and DePuy Spine, LLC
Case No. 1:15-cv-01257-WCG
United States District Court for the Eastern District of Wisconsin Green Bay Division
Trial and Deposition Testimony

Acorda Therapeutics, Inc. v. Alkermes PLC
Case No. 01-20-0010-8421
American Arbitration Association
Deposition Testimony

Advanced Aerospace Technologies, Inc. v. The United States of America and The Boeing Company and Institu, Inc.
Case No. 12-85C
United States Court of Federal Claims
Deposition Testimony

Advanced Micro Devices, Inc. and ATI Technologies, ULC v. Samsung Electronics Co. Ltd. et al.
No. CV-08-0986-SI
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

Advanced Technology Materials, Inc. v. Praxair, Inc.,
Civil Action No.03 CV 5161 (RO)
United States District Court for the Southern District of New York
Deposition Testimony

28



A.I.T. Industries, Inc., f/k/a Photocentron, Inc. v. Yordan Vurich and Opti-Vue, Inc.
Civil Action No.94-C-5196
Deposition Testimony

Allan Stimmel v. Eugene Weiner, Kurt Gutfreund and M & L International, Inc.
Civil Action No. 89 C 6510 (ACW)
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Allscripts Healthcare, LLC v. DR / Decision Resources, LLC
Case No. 1:19-cv-11038
United States District Court for the District of Massachusetts
Trial and Deposition Testimony

Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva
Pharmaceuticals Industries Ltd., et. al.
Civil Action No. 04-2355
United States District Court for the District of New Jersey
Deposition Testimony

Analog Devices, Inc. v. Christopher Michalski, Kiran Karnik and Maxim
Integrated Products, Inc.
Case 01 CVS 10614
State of North Carolina Superior Court Division, County of Guilford
Deposition Testimony

Andrx Pharmaceuticals, LLC v. GlaxoSmithKline, PLC and SmithKline
Beecham Corporation
Case No. 05-23264-CIV-Graham/O'Sullivan
United States District Court for the Southern District of Florida
Deposition Testimony

Appian Corporation v. Pegasystems Inc. and Youyong Zou
Case No 2020 07216
Virginia: In the Circuit Court of the Fairfax County
Trial and Deposition Testimony

Appliance Computing III, Inc. Redfin Corporation
Case No. 6:20-cv-00376-ADA
United States District Court for the Western District of Texas
Trial and Deposition Testimony

Applied Medical Resources Corporation v. Gaya Limited
AAA Case No. 50 133T00316 06
Arbitration Testimony

Arendi S.A.R.L. v. Apple Inc.
Case No. 1:12-cv-01596
United States District Court for the District of Delaware
Deposition Testimony

29



Arthur Takeall v. PepsiCo, Inc.
Civil Action S92-766
United States District Court for the District of Maryland
Deposition Testimony

Ashley Furniture Industries v. Laura Ashley Holdings Plc and Laura Ashley, Inc.
AAA File No. 51 133 Y 01056 08
American Arbitration Association
Arbitration and Deposition Testimony

Atlantic Richfield Company, Chevron U.S.A., Inc., Exxon Corporation, Mobil
Oil Corporation, Shell Oil Products Company and Texaco Refining &
Marketing, Inc. v. Unocal Corporation and Union Oil Company of California
and  Union Oil Company of California v. Atlantic Richfield Company, Chevron
U.S.A., Inc., Exxon Corporation, Mobil Oil Corporation, Shell Oil Products
Company and Texaco Refining & Marketing, Inc.
Civil Action No. CV-95-2379 KMW(JRx)
Trial and Deposition Testimony

Avery Dennison Corp. et al v. FLEXcon Company, Inc.
Civil Action No. 96-C 4820
United States District Court for the Northern District of Illinois, Eastern
Division
Deposition Testimony

Aylus Networks, Inc. vs. Apple, Inc.
Case No. 3:13-cv-4700
United States District Court for the Northern District of California
Deposition Testimony

Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC
Case No. 11 Civ 1594 (GBD)
United States District Court for the Southern District of New York
Deposition Testimony

Baxalta Inc. and Baxalta, GMbH v. Genentech, Inc.
C.A. No. 17-cv-00509-TBD
United States District Court for the District of Delaware
Deposition Testimony

Baxter International Inc. and Baxter Healthcare Corp. v. CyDex
Pharmaceuticals, Inc.
AAA Case No. 01-21-0002-6106
American Arbitration Association
Deposition Testimony

Bayer Pharma AG, Bayer Intellectual Property GMBH and Bayer Healthcare
Pharmaceuticals, Inc. v. Watson Laboratories, Inc.
Civil Action No 12-517-GMS
United States District Court for the District of Delaware
Trial and Deposition Testimony

CE 0514



Beloit Corp v. Voith, Inc. & J.M. Voith GmbH
Civil Action No. 92 C 0168 C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Bio-Rad Laboratories, Inc. and the President and Fellows of Harvard College v.
10x Genomics, Inc.
Case No. 1:19-cv-12533
United States District Court for the District of Massachusetts
Deposition Testimony

Bio-Rad Laboratories, Inc., the University of Chicago, Lawrence Livermore
National Security, LLC and Fellows of Harvard College v. Stilla Technologies,
Inc and Stilla Technologies
Case No. 1:19-cv-11587
United States District Court for the District of Massachusetts
Deposition Testimony

Bio-Rad Laboratories, Inc. and the University of Chicago v. 10x Genomics, Inc.
Case No. 15-152-RGA
United States District Court for the District of Delaware
Trial and Deposition Testimony

Board of Trustees of the Leland Stanford Junior University and Litton Systems,
Inc. v. Tyco International LTD., Tyco International, Inc., Tyco
Telecommunications, Inc, Tyco Networks, Inc., Lucent Technologies, Inc.,
Agere Systems, Inc., JDS Uniphase Corporation, Ciena Corporation, Pirelli
S.p.A., Ericsson, Inc., Telefonaktiebolaget Lm Ericsson and Ericsson
Microelectronics Ab, Optoelectronic Products.
Case No. Cv-00-10584-TJH (RCx)
United States District Court for the Central District of California – Western
California
Deposition Testimony

Bracco Diagnostics, Inc. v. Amersham Health Inc., Amersham Health AS,
Amersham plc and Amersham Health Inc. v. Bracco Diagnostics, Inc.
Civil Action No. 03-6025
United States District Court for the District of New Jersey
Trial and Deposition Testimony

Brian D. Zdeb, et al v. Baxter International, Inc.
Civil Action No. 91-L-8726
Appellate Court of Illinois, First District, Sixth Division
Trial and Deposition Testimony

Briggs & Stratton Corporation v. Kohler Company
Case No. 05-C-0025-C
United States District Court for the Western District of Wisconsin
Deposition Testimony

Bristol-Myers Squibb Company v. Apotex Inc. and Apotex Corp.

31



Civil Action No. 3:10-cv-05810 (MLC)
United States District Court for District of New Jersey
Deposition Testimony

Brocade Communications Systems, Inc. and Foundry Networks, LLC v. A10
Networks, Inc. et al.
Case No. 10-cv-03428 LHK
United States District Court for the Northern District of California San Jose
Division
Trial and Deposition Testimony

Callpod, Inc. v. GN Netcom, Inc. et al.
Case No. 06-CV-4961
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

CareDx, Inc. v. Natera, Inc.
Case No. 1:19-cv-00662-CFC-CJB
United States District Court for the District of Delaware
Trial and Deposition Testimony

CareFusion 303 v. Sigma International
Case No 10cv0442 DMS (WMC)
United States District Court for the Northern District of California
Trial and Deposition Testimony

Carter Bryant v. Mattel, Inc. and Consolidated Actions
United States District Court for the Central District of California Southern
Division
Case No. CV 04-9049-DOC (RNBx)
Consolidated with Nos. CV 04-9059 and CV 05-2727
Trial and Deposition Testimony

Catalina Marketing Corp. v. Advanced Promotion Technologies, Inc.
Civil Action No. CV 93-4741 WJR (Sx)
Deposition Testimony

Caterpillar Inc. v. International Truck & Engine Corp., Siemens Diesel Systems
Technology, LLC, Sturman Industries, Inc., Sturman Engine Systems, LLC,
Oded E. Sturman and Carol K. Sturman
United States District Court for the District of South Carolina, Columbia
Division
Case No. 3:03-1739-17
Deposition Testimony

CEATS, Inc. v. Continental Airlines, Inc., AeroSvit Airlines, CJSC, Air China,
Ltd., Air Europa Lineas Aereas, SAU, AirTran Airways, Inc., Alaska Airlines,
Inc., Horizon Air Industries, Inc., All Nippon Airways Co., Ltd., Aerovias Del
Contenente Americano SA, Brendan Airways, LLC, Caribbean Airlines, Ltd.,
Delta Air Lines, Inc., EgyptAir Airlines, Co., Frontier Airlines, Inc., JetBlue
Airways Corporation, Malaysia Airline System Berhad, Qatar Airways
Company QCSC, Alia Royal Jordanian, PLC, TAM, SA, Thai Airways

32



International Public Co., Ltd., United Air Lines, Inc., US Airways, Inc., Virgin America, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

CEATS, Inc. v. Granada Theater, Live Nation Worldwide, Inc., Ticketmaster, LLC, Tickets.com, Inc., Ticket Software, LLC, Ticket Network, Inc., TicketsNow.com, Inc., TNow Entertainment Group, Inc., Concur Technologies, Inc.
Case No. 6:10-cv-120 LED
United States District Court for the Eastern District of Texas Tyler Division
Trial and Deposition Testimony

Centripetal Networks, Inc. v. Cisco Systems, Inc.
Case No. 2:18-CV-00094-HCM-LRL
United States District Court for the Eastern District of Virginia Norfolk Division
Trial and Deposition Testimony

Cheetah Omni, LLC v. Alcatel-Lucent USA Inc., et al. (on behalf of Tellabs North America, Inc.)
Case No.  6:11CV390
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Ciba Specialty Chemicals Corporation v. Hercules Inc. and Cytec Industries, Inc.
Civil Action No. 04-293
United States District Court for the District of Delaware
Deposition Testimony

Cisco Systems, Inc. and Cisco Technology, Inc. v. Jedd Williams
In Arbitration before JAMS
Reference No. 1310025030
Deposition Testimony

Comair Rotron, Inc. v. Matsushita Electric Corporation of America, et al. - New Jersey Action
Civil Action No. 85-4308 (HLS)
Trial and Deposition Testimony

Comet Technologies USA Inc. v. XP Power LLC
Case No. 5:20-CV-06408-NC
United States District Court for the Northern District of California
Trial and Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Lenovo (United States) et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:09-cv-00399-LED
Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. Cisco Systems, Inc.

33

CE 0517



United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:11-cv-00343-LED
Trial and Deposition Testimony

Commonwealth Scientific and Industrial Research Organization v. MediaTek
Inc., et al.
United States District Court for the Eastern District of Texas Tyler Division
Case No. 6:12-cv-578-LED
Deposition Testimony

Computer Generated Solutions, Inc. v. Peter Loral, Loral Incorporated, PJK, Inc.
and Belle Loral, LLC
Civil Action No. 97 Civ. 6298 (MBM)
Deposition Testimony

Construction Technology, Inc. v. Cybermation, Inc. et al.
Civil Action No. 91 Civ. 7474 (JSM)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Cordis Corporation v. SciMed Life Systems, Inc.
Case No. CV 4-96-261
United States Court for the District of Minnesota
Deposition Testimony

CoStar Realty Information, Inc. v. Civix-DDI, LLC and Civix-DDI, LLC v.
LoopNet, Inc.
Case No. 1:12-cv-04968 (consolidated with 07091 and 08632)
United States District Court for the Northeastern District of Illinois Eastern
Division
Deposition Testimony

C.R. Bard v. M3 Systems
Civil Action No. 93 C-4788
Trial Testimony

Crocs, Inc. v. Effervescent, Inc. et al.
Civil Action No. 06-cv-00605-PAB-KMT
United States District Court for the District of Colorado
Deposition Testimony

Cuker Interactive, LLC v. Pillsbury Winthrop Shaw Pittman LLP
AAA Case No. 01-18-0001-5005
American Arbitration Association
Arbitration Testimony

Curtis Amplatz and Carina Royalty, LLC v. AGA Medical Corporation
Court File No. 27-CV-10-27664
State of Minnesota District Court, County of Hennepin, Fourth Judicial District
Trial Testimony

DaiNippon Screen Mfg., Co. Ltd. *et al.* v. Scitex Corp. Ltd. *et al.*

34



Case No. C 96-3296 FMS
United States District Court for the Northern District of California
Arbitration and Deposition Testimony

Dalmatia Import Group, Inc. and Maia MaGee v. Foodmatch, Inc., Lancaster
Fine Foods, Inc. et al.
Case No. 2:16-cv-02767-EGS
United States District Court for the Eastern District of Pennsylvania
Trial and Deposition Testimony

Digital-Vending Services International, Inc. v. The University of Phoenix, Inc.
Civil Action No. 2:09-cv-00555
United States District Court for the Eastern District of Virginia
Deposition Testimony

Design Solange, Ltd., Inc. v. Lane Bryant, Inc.
Civil Action No. 94 CIV 1299 (JFK)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Donald R. Cameron, et al. v. Apple Inc.
Civil Action No. 4:19-cv-03074-YGR
United States District Court for the Northern District of California
Deposition Testimony

DTS, Inc. and DTS Licensing Ltd. v. Nero AG and Nero Inc.
Case No. 2:14-cv-09791-RGK-PJW
United States District Court for the Central District of California
Deposition Testimony

Durel Corporation v. Osram Sylvania, Inc.
Civil Action No. 95-1750 PHx (EHC)
United States District Court for the District of Arizona
Trial and Deposition Testimony

Dynetix Design Solutions, Inc. v. Synopsys, Inc. and Does 1-50
Case No. 5:11-cv-05973-PSG
United States District Court for the Northern District of California
Deposition Testimony

Dyson, Inc. v. Bissell Homecare, Inc.
Case No. 10-cv-08126
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Edward K. Isbey, Jr. v. Cooper Companies, Inc.
Civil Action No. 89-CVS-3776
Supreme Court of North Carolina
Deposition Testimony

Ellison v. The Chicago Heart Association
Civil Action No. 92-K-706

35



Deposition Testimony

Emblaze Ltd. v. Apple Inc.
Civil Action No. 45:11-cv-01079-SBA (PSG)
United States District Court for the Northern District of California San Jose
Division
Trial and Deposition Testimony

Enterasys Networks, Inc. v. Extreme Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Epic Games, Inc. v. Apple Inc.
Civil Action No. 4:20-cv-05640-YGR
United States District Court for the Northern District of California Oakland
Division
Trial and Deposition Testimony

Errant Gene Therapeutics, LLC v. Sloan Kettering Institute for Cancer Research
and Bluebird Bio Inc.
Index No. 150586/2017
Supreme Court of the State of New York
Trial and Deposition Testimony

Escada Beaute, et al. v. The Limited Inc. et al.
Civil Action No. 92-CIV-7530 (LLS)
United States District Court for the Southern District of New York
Trial and Deposition Testimony

Esquel Enterprises, Ltd., v. TAL Apparel Limited and TALTECH Limited
Civil Action No. C04-974Z
United States District Court for the Western District of Washington at Seattle
Deposition Testimony

EVEMeta, LLC v. Siemens Convergence Creators Corporation, Synacore, Inc.
Case No. 23139/MK
Supreme Court of New York for the County of New York
Deposition Testimony

Express, LLC v. Fetish Group, Inc.
Civil Action No. CV05-2931 SWV (JTLx)
United States District Court for the Central District of California Western
Division
Deposition Testimony

Extreme Networks, Inc. v. Enterasys Networks, Inc.
Civil Action No. 07-C-0229-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Facebook, Inc. & Subsidiaries v. Commission of Internal Revenue

CE 0520



Docket No. 21959-16
U.S. Tax Court
Trial Testimony

Fairchild Semiconductor Corporation and System General Corporation v. Power
Integrations, Inc.
Civil Action No. 12-00540
United States District Court for the District of Delaware
Trial and Deposition Testimony

Faye Fish Estate et al. v. Beech Aircraft et al.
Civil Action No. 631333
Deposition Testimony

FidoPharm, Inc. & Omnipharm, Ltd. v. Cheminova, Inc. A/S
AAA Case No. 50 503 T 00266 12
American Arbitration Association
Hearing Testimony

First Quality Tissue, LLC v. Irving Consumer Products Limited and Irving
Consumer Products, Inc.
Case No. 1:19-cv-00428
United States District Court for the District of Delaware
Deposition Testimony

Footstar, Inc. et al v. Kmart Corporation
Chapter 11 Case No. 04-22350 (ASH)
United States Bankruptcy Court for the Southern District of New York
Deposition Testimony

Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.
Case No.: CV07-02-962
United States District Court for the Central District for the State of California
Deposition Testimony

Fractus, S.A. v. Samsung Electronics Co. Ltd.; et al (including LG Electronics,
Inc. and related parties)
Civil Action No. 6:09cv203
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

Fujitsu Ltd. v. Tellabs, Inc. et al.
Case No. 1:09-cv-04530
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

FXOne, LLC & Rosario Ingargiola v. Seabury Financial Solutions, et. al
JAMS New York, New York
Arbitration Hearing Testimony

General Mills, Inc. and General Mills IP Holdings II, LLC v. Fage Dairy
Industry, S.A., Fage USA Dairy Industry, Inc. and Fage USA Holdings, Inc.

37



United States District Court for the Northern District of New York
Deposition Testimony

Georgia-Pacific Corp. v. United States Gypsum Co. and L&W Supply Co.
Civil Action No. 94-989-RRM
United States District Court for the District of Delaware
Trial Testimony

Gibson Guitar Corp. v. Heritage Guitar, Inc. and Lasar Music Corp.
Civil Action No. 3-90-0009
Deposition Testimony

Gilberto Arvelo v. American International Insurance
Civil Action No. 93-1287
United States District Court for the District of Puerto Rico
Deposition Testimony

The Gillette Company LLC v. Dollar Shave Club, Inc., Dorco Company Ltd.,
and Pace Shave, Inc.
Case No. 1:15-CV-01158 (LPS)
United States District Court for the District of Delaware
Deposition Testimony

Google LLC v. Anthony Levandowski and Lior Ron
JAMS Ref No. 1100086069
Hearing and Deposition Testimony

Government Employees Insurance Company v. Google, Inc. and Overture
Services, Inc.
United States District Court, Eastern District of Virginia, Alexandria Division
Civil Action No: 1:04cv507
Deposition Testimony

Group One v. Hallmark
Civil Action No. 97-1224-CV-W-1
United States District Court for the Western District of Missouri, Western
Division
Deposition Testimony

GSI Technology, Inc. v. United Memories, Inc., Integrated Silicon Solution, Inc.
Case No. 13-CV-1081-PSG
United States District Court for the Northern District of California, San Jose
Division
Trial and Deposition Testimony

Hitachi, Ltd. v. Samsung Display Devices Co., Ltd. and Samsung Display
Devices Co., Inc. and Samsung Electronics Co., Ltd. and Samsung Electronics
America Inc. and Office Depot
Civil Action No. 97-1988-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

CE 0522



Hoechst Celanese Corporation v. Chase Plastic Services and Kevin P. Chase
Civil Action No. 94-75361
United States District Court
Trial and Deposition Testimony

Hoechst Celanese Corporation v. Nylon Engineering Resins, Inc.
Civil Action No. 94-346-CIV-FTM-24D
United States District Court for the Middle District of Florida
Trial Testimony

Huawei Technologies Co. Ltd. v. Verizon Communications, Inc. et al.
Civil Action No. 2:20-cv-00030
United States District Court for the Eastern District of Texas Marshall Division
Trial and Deposition Testimony

ICON Health & Fitness, Inc. v. Peloton Interactive, Inc.
Case No. 1:20-cv-01386-RGA
United States District Court for the District of Delaware
Deposition Testimony

iHance, Inc. v. Eloqua Limited and Eloqua Corporation
Case No. 2;11-CV-257-MSD-TEM
United States District Court for the Eastern District of Virginia Norfolk Division
Deposition Testimony

Illumina, Inc. et. al v. Ariosa Diagnostics, Inc.
Case No 3:14-cv-01921-SI
United States District Court for the Northern District of California
Trial and Deposition Testimony

Immunocept, LLC, Patrice Anne Lee, and James Reese Matson v. Fullbright & Jaworski, LLP
Cause No. A 05 CA 334 SS
United States District Court of Texas, Austin Division
Deposition Testimony

Impact Engine, Inc. v. Google LLC
Case No. 3:19-cv-01301-CAB-DEB
United States District Court for the Southern District of California
Deposition Testimony

In Re Apple iPhone Antitrust Litigation
Civil Action No. 4:11-cv-06714-YGR
United States District Court for the Northern District of California
Deposition Testimony

In Re Gabapentin Patent Litigation
MDL Docket No. 1384 (FSH)
Master Civil Action No. 00-2931 (FSH)
On behalf of Defendants Teva Pharmaceutical Industries Ltd. and IVAX Corporation and related parties
United States District Court for the District of New Jersey

39



Deposition Testimony

In Re Nortel Networks Inc. et al. and
In the Matter of the Companies' Creditors Arrangement Act
Case No. 09-10138 (KG) and R.S.C. 1985, c. C-36
United States Bankruptcy Court for the District of Delaware and the Ontario
Superior Court of Justice
Trial and Deposition Testimony

In the Matter of Arbitration Between Open Text, Inc., Claimant, and State
Employee's Credit Union, Respondent
JAMS Arbitration No. 1400015026
Arbitration Testimony

In the Matter of Certain Botulinum Toxin Products, Processes for
Manufacturing or Relating to Same and Certain Products Containing Same
Investigation No. 337-TA-1145
On behalf of Allergan plc, Allergan, Inc. and Medytox Inc.
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Electronic Devices with Graphics Data Processing
Systems, Components Thereof, and Associated Software
Investigation No. 337-TA-813
On behalf of Respondent Apple Inc.
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Pre-Filled Syringes for Intravitreal Injection and
Components Thereof
Investigation No. 337-TA-1207
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Robotic Floor Cleaning Devices and Components
Thereof
Investigation No. 337-TA-1252
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Semiconductor Chips with Minimized Chip Package
Size and Products Containing Same (III)
Investigation No. 337-TA-630
On behalf of Respondents Acer, Nanya and Powerchip
United States International Trade Commission
Hearing and Deposition Testimony

In the Matter of Certain Short-Wavelength Light Emitting Diodes, Laser Diodes,
and Products Containing Same
Investigation No. 337-TA-640
On behalf of Respondent Panasonic
United States International Trade Commission

CE 0524



Deposition Testimony

In the Matter of Certain Wearable Activity Tracking Devices, Systems and
Components Thereof
Investigation No. 337-TA-973
On Behalf of Complainant Fitbit, Inc.
United States International Trade Commission
Deposition Testimony

In the Matter of Certain Wiper Blades
Investigation No. 337-TA-816
On behalf of Respondents
United States International Trade Commission
Hearing (written) and Deposition Testimony

Industrial Print Technologies, LLC v. O'Neil Data Systems, Inc. and Hewlett-
Packard Company et. al
Case No. 3:15-cv-01100-M, 01101-M, 01103-M, 01104-M and 01106-M
United States District Court for the Northern District of Texas Dallas Division
Deposition Testimony

InLine Connection, Corp v. AOL Time Warner, Inc. and American Online, Inc
Civil Action 02-272
United States District Court for the District of Delaware
Deposition Testimony

InLine Connection, Corp v. Earthlink, Inc.
Civil Action 02-477
United States District Court for the District of Delaware
Deposition Testimony

Innovention Toys, LLC v. MGA Entertainment, Inc., Wal-Mart Stores, Inc. and
Toys 'R Us, Inc.
Civil Action No. 07-6510
United States District Court for the Eastern District of Louisiana
Trial and Deposition Testimony

Intel Corporation v. Future Link Systems, LLC
Civil Action No. 14-377(LPS)
United States District Court for the District of Delaware
Deposition Testimony

InterDigital Technology Corporation v. Motorola, Inc.
Civil Action No. 94-73
United States District Court for the District of Delaware
Trial and Deposition Testimony

International Business Machines Corporation v. Groupon, Inc.
C.A. No. 16-122-LPS-CJB
United States District Court for the District of Delaware
Trial and Deposition Testimony

CE 0525



Invensas Corporation v. Renesas Electronics Corporation and Renesas
Electronics America, Inc.
Case No. 11-cv-00448-GMS
United States District Court for the District of Delaware
Deposition Testimony

Invention Capital Partners v. Phoenix Technologies Ltd., Marlin Equity
Partners, et. al
Case No: 113CV242491
Superior Court of the State of California County of Santa Clara
Deposition Testimony

Isogon Corporation v. Amdahl Corporation
Civil Action No. 97 CIV 6219 (SAS)
United States District Court for the Southern District of New York
Deposition Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0902C
United States District Court for the Western District of Wisconsin
Trial Testimony

J.M. Voith GmbH v. Beloit Corp.
Civil Action No. 93C-0905C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Jaguar Land Rover Limited v. Bentley Motors Limited and Bentley Motors, Inc.
Case No. 2:18-cv-320-MSD-LRL
United States District Court for the Eastern District of Virginia, Norfolk
Division
Deposition Testimony

Jamdat Mobile, Inc. v. JAMSTER International Sarl, Ltd; JAMBA! GMBH; and
Verisign, Inc.
Civil Action No. CV05-3945 PA (FMOx)
Deposition Testimony

James Hayden v. 2K Games, Inc. and Take-Two Interactive Software, Inc.
Civil Action No. 1:17-cv-02636-CAB
United States District Court for the Northern District of Ohio Eastern Division
Deposition Testimony

Jenner & Block LLP v. Parallel Networks, LLC and EpicRealm Licensing LP
JAMS Arbitration No. 1310019934
Arbitration and Deposition Testimony

John W. Evans, et al. v. General Motors Corporation
Docket # X06-CV-94-0156090S
Superior Court of Connecticut Judicial District of Waterbury
Deposition Testimony

42



Joy Recovery Technology Corp. v. The Penn Central Corp. and Carol Cable
Company, Inc., aka General Cable Industries, Inc.
Civil Action No. 93 C 0992
Deposition Testimony

K-Tube Corp. v. Sterling Stainless Tube Corp. et al.
Case No. CV 90 1653 JLQ (M)
Trial and Deposition Testimony

Kay-Cee Enterprises, Inc. v. Amoco Oil Company
Civil Action No. 97-2406 (JWL)
United States District Court for the District of Kansas
Trial and Deposition Testimony

Kennecott Corporation v. Kyocera International
Civil Action No. 80-0516 R (M)
United States District Court for the Southern District of California
Deposition Testimony

Keurig, Inc. v. Kraft Foods Global, Inc., Tassimo Corp., and Kraft Foods Inc.
C.A. No. 07-17 (GMS)
United States District Court for the District of Delaware
Deposition Testimony

Kimberly-Clark Corporation v. Cardinal Health 200, LLC
Civil Action No. 1:10 CV-0034-CAP
United States District Court Northern District of Georgia, Atlanta Division
Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest
University Health Services v. Bluesky Medical Group, Inc., Richard Weston,
Medela AG, Medela, Inc., and Patient Care Systems, Inc.
Civil Action SA-03-CA-0832-RG
United States District Court Western District of Texas San Antonio Division
Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc. and Wake Forest
University Health Services v. Bluesky Medical Group, Inc. and Smith &
Nephew, Inc.
Case No. SA:08-CV-00102-WRF
United States District Court Western District of Texas San Antonio Division
Preliminary Injunction Hearing, Trial and Deposition Testimony

Kinetic Concepts, Inc., KCI Licensing, Inc., KCI USA, Inc., KCI Medical
Resources, Medical Holdings Limited, KCI Manufacturing and Wake Forest
University Health Sciences v. Convatec, Inc., Boehringer Wound Systems, LLC
and Boehringer Technologies, LP
Civil Action No. 1:08-CV-00918-WO-LPA
United States District Court for the Middle District of North Carolina
Deposition Testimony

Kruse Technology Partnership v. Caterpillar, Inc.

43

CE 0527



Case No. CV 04-10435
United States District Court for the Central District of California
Deposition Testimony

Kuryakan Holdings LLC v. Ciro, LLC et al
Civ. No. 3:15-CV-00703
United States District Court for the Western District of Wisconsin
Deposition Testimony

Leo Pharma A/S v. Tolmar, Inc. et al.
United States District Court for District of Delaware
C.A. No. 10-269 (SLR)
Deposition Testimony

Lincoln Electric Company, et al. v. National Standard, LLC
No. 1:09-cv-01886-DCN
United States District Court of Ohio Eastern Division
Deposition Testimony

LNP Engineering Plastics, Inc. and Kawasaki Chemical Holding Co., Inc. v.
Miller Waste Mills, Inc. trading as RTP Company
Civil Action No. 96-462 (RRM)
United States District Court for the District of Delaware
Trial Testimony

Lotes Co. Ltd. v. Hon Hai Precision Industry Co. Ltd and Foxconn Electronics, Inc.
Civil Action No. 3:11-cv-01036-WHA
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Lucent Technologies Inc. v. Extreme Networks, Inc.
Civil Action No. 03-508 (JJF)
United States District Court for the District of Delaware
Trial and Deposition Testimony

Lunar Corp. & The UAB Research Foundation v. EG&G Astrophysics Research Corp.
Civil Action No. 96-C-199-S
Trial Testimony

Match Group, LLC v. Bumble Trading Inc. et al.
Civil Action 6:18-cv-00080
United States District Court for the Western District of Texas Waco Division
Deposition Testimony

Matsushita Electric Industrial Co., Ltd. v. MediaTek, Inc., Oppo Digital., and
Micro-Star International Computer Corp.
Case No. C05-03148 MMC
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

44

CE 0528



McKinley v. Zdeb
Civil Action No. 99-S-1178
United States District Court for the District of Colorado
Fact Deposition Testimony

Medgraph, Inc. v. Medtronic, Inc.
Case No. 6:09-cv-06610-DGL-MWP
United States District Court for the Western District of New York
Rochester Division
Deposition Testimony

MedImpact Healthcare Systems, Inc. et al v. IQVIA, Inc. et al.
Case No. 3:19-cv-1865-GPC-DEB
United States District Court for the Southern District of California
Deposition Testimony

Medtronic Xomed, Inc. v. Gryus ENT LLC
Case No.: 3:04CV400-J-32 MCR
United States District Court for the Middle District of Florida
Jacksonville Division
Deposition Testimony

MEI, Inc. v. JCM American Corp & Japan Cash Machine Co. Ltd.
Civil Action No. 09-00351
United States District Court for the District of New Jersey
Deposition Testimony

Meribear Productions, Inc. v. Showroom Interiors, Inc. et. al.
Case No. VC065653
Superior Court of the State of California, County of Los Angeles
Deposition Testimony

Message Phone, Inc. v. SVI Systems, Inc. and Tharaldson Properties
Civil Action No. 379CV-1813H
Trial Testimony

MGA Entertainment, Inc. and Isaac Larian v. Hartford Insurance Company of
the Midwest, Harford Fire Insurance Company, The Hartford Financial Services
Group and Does 1 through 10.
Case No. CV 08-0457 DOC (RNBx)
United States District Court for the Central District of California Southern
Division
Deposition Testimony

Military Professional Services, Inc. v. BancOhio National Bank
Civil Action No. 91-5032
Deposition Testimony

Milwaukee Electric Tool Corporation, Metco Battery Technologies, LLC AC
(Macao Commercial Offshore) Limited and Techtronic Industries Co. Ltd. v.
Snap-On Incorporated
Case No. 2:14-cv-01296

45



United States District Court for the Eastern District of Wisconsin
Trial and Deposition Testimony

Minebea Co., Ltd., Precision Motors Deutsche Minebea GmbH, and Nippon
Miniature Bearing Corp. v. George Papst, Papst Licensing GmbH, and Papst
Licensing Verwaltungsgesellschaft MIT Beschrankter Haftung
Civil Action No. 97-CV-590 (PLF)
Trial and Deposition Testimony

Mitek Surgical Products, Inc. v. Arthrex, Inc.
Case No. 1:96CV 0087S
United States District Court for the District of Utah, Central Division
Deposition Testimony

Mitsubishi Electric Corp., Koninklijke Philips N.V., Thomson Licensing, GE
Technology Development, Inc. Panasonic Corporation and Sony Corporation v.
Sceptre, Inc.
Case No. 2:14-cv-04994-ODW-AJW
United States District Court for the Central District of California
Deposition Testimony

Money Suite Company v. Insurance Answer Center, LLC; Answer Financial,
Inc.; AllState Insurance Company; Esurance Insurance Services, Inc.
United States District Court Central District of California Southern Division
Deposition Testimony

Motorola, Inc. v. InterDigital Technology Corporation
Civil Action No. 93-488
United States District Court for the District of Delaware
Trial and Deposition Testimony

Motorola Solutions, Inc. and Motorola Solutions Malaysia SDN, BHD v. Hytera
Communications Corporation Ltd., Hytera America, Inc. and Hytera
Communications America (West), Inc.
Civil Action No. 1:17-cv-1973
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

Motorsport Aftermarket Group, Inc. v. Thomas Ellsworth
AAA Case No. 01-15-0006-1319
American Arbitration Association
Hearing Testimony

Natera, Inc. v. ArcherDx, Inc., ArcherDx, LLC and Invitae Corp.
Civil Action No. 20-125-LPS
United States District Court for the District of Delaware
Deposition Testimony

Nellcor Puritan Bennett, LLC v. CAS Medical Systems, Inc.
Case No. 2:11-CV-15697
United States District Court for the Eastern District of Michigan Southern
Division

46



Deposition Testimony

Netlist, Inc. v. Diablo Technologies, Inc.
Civil Action No. 4:13-CV-05962-YGR
United States District Court for the Central District of California Oakland Division
Trial Testimony

Nomadix, Inc. v. Hewlett-Packard Company, et al.
Civil Action No. CV09-08441 DDP(VBKx)
United States District Court for the Central District of California Western Division
Deposition Testimony

Nomix Corporation v. Quikrete Companies, Inc.
Civil Action No. H88-463-AHN
Trial and Deposition Testimony

Optical Air Data Systems, LLC v. L-3 Communications Corporation et al.
Civil Action No. N17C-05-619
Superior Court of the State of Delware
Trial and Deposition Testimony

Oracle America, Inc. v. Google, Inc.
Case No. 3:10-CV-03561-WHA
United States District Court for the Northern District of California San Francisco Division
Deposition Testimony

Orthofix, Inc., et al v. EBI Medical Systems, Inc., et al.
Civil Action No. 95-6035 (SMO)
United States District Court for the District of New Jersey
Trial and Deposition Testimony

Pharmacia & Upjohn Company, LLC v. Sicor Inc. and Sicor Pharmaceuticals, Inc.
Civil Action No. 04-833 (KAJ)
United States District Court for the District of Delaware
Deposition Testimony

Picker International, Inc. v. Mayo Foundation, et al.
Case No. 95-CV-2028
United States District Court for the Northern District of Ohio, Eastern Division
Trial and Deposition Testimony

Penda Corporation v. United States of America and Cadillac Products, Inc.
Case No. 473-89-C
United States Court of Federal Claims
Trial and Deposition Testimony

Peter Daou and James Boyce v. Arianna Huffington, Kenneth Lerer and TheHuffingtonPost.com, Inc.
Index No. 651997/2010



Supreme Court of the State of New York, County of New York
Deposition Testimony

PlastiPak Packaging, Inc. v. Premium Waters Inc.
Case No. 3:20-cv-00098
United States District Court for the Western District of Wisconsin
Deposition Testimony

Plexxikon Inc. v. Novartis Pharmaceuticals Corporation
Case No. 4:17-cv-04405-HSG
United States District Court for the Northern District of California Oakland
Division
Trial Deposition Testimony

Power Integrations, Inc. v. Fairchild Semiconductor International, Inc., Fairchild
Semiconductor Corporation and System General Corporation
Case No. 3:09-cv-05235-MMC
United States District Court for the Northern District of California
Trial and Deposition Testimony

Powertech Technology, Inc. v. Tessera, Inc.
Case No. CV10-00945EMC
United States District Court for the Northern District of California
Deposition Testimony

Praxair, Inc. and Praxair Technology, Inc. v. ATMI, Inc. and Advanced
Technology Materials, Inc.
Civil Action No. 03-1158-SLR
United States District Court District of Delaware
Deposition Testimony

Prism Technologies, LLC v. AT&T Mobility, LLC
Civil Action No. 8:12-cv-122-LES-TDT
United States District Court of Nebraska
Deposition Testimony

Prism Technologies, LLC v. T-Mobile USA, Inc.
Civil Action No. 8:12-cv-00124
United States District Court of Nebraska
Trial and Deposition Testimony

Prism Technologies, LLC v. Sprint Spectrum L.P. d/b/a/ Sprint PCS
Civil Action No. 8:12-cv-123-LES-TDT
United States District Court of Nebraska
Trial and Deposition Testimony

The Procter & Gamble Company v. Paragon Trade Brands, Inc.
Civil Action No. 94-16-LON
United States District Court for the District of Delaware
Trial and Deposition Testimony

CE 0532



Purecircle USA Inc. and Purecircle SDN BHD v. Sweegen, Inc. and Phyto Tech Corp.
Case No. 8:18-CV-1679 JVS (JDE)
United States District Court for Central District of California Southern Division
Deposition Testimony

QR Spex, Inc. and Thomas G. Swab v. Motorola, Inc. and Frog Design, Inc.
Civil Action No 03-6284 JFW (FMOx)
United States District Court for the Central District of California
Deposition Testimony

Qualcomm, Inc. v. InterDigital Communications Corporation
Case No. 93-1091G (LSP)
Deposition Testimony

Quickie, LLC v. Medtronic, Inc.
Civil Action No. 02 CV 1157 (GEL)
United States District Court for the Southern District of New York
Deposition Testimony

Radware, LTD, and Radware, Inc. v. F5 Networks, Inc.
Civil Action No. 5:13-cv-02024 RMW
United States District Court for the Southern District of California San Jose Division
Trial and Deposition Testimony

Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG et. Al
Case IPR2021-00816
United States Patent and Trademark Office Before the Patent Trial and Appeal Board
Deposition Testimony and Written Declaration

Remcor v. Scotsman/Booth
Civil Action No. 93 C 1822
United States District Court for the Northern District of Illinois, Eastern Division
Deposition Testimony

Remcor v. Servend
Civil Action No. 93 C 1823
United States District Court for the Northern District of Illinois, Eastern Division
Deposition Testimony

Rensselaer Polytechnic Institute and Dynamic Advances, LLC v. Apple Inc.
Case No 1:13-cv-00633 (DNH/DEP)
United States District Court for the Northern District of New York
Deposition Testimony

Research Corporation Technologies, Inc. v. Hewlett-Packard Company
Civil Action No. CIV 95-490-TUC-JMR
United States District Court for the District of Arizona

49



Deposition Testimony

Robert E. Morley, Jr. and REM Holdings 3, LLC v. Square, Inc., Jack Dorsey
and James McKelvey, Jr.
No. 4:14-cv-00172-CDP
United States District Court for the Eastern District of Missouri
Deposition Testimony

Roche Diabetes Care, Inc. v. Insulet Corporation
Case No. 1:20-cv-00825
United States District Court for the District of Delaware
Deposition Testimony

Rommy Hunt Revson v. The Limited, Inc. et al.
Civil Action No. 90-3840 (MGC)
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Ameren Corporation; Union
Electric Company; Central Illinois Public Service Company; Cilcorp, Inc.;
Central Illinois Light Company
Case No. 07-4955 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. AOL, LLC, CompuServe
Interactive Services and Netscape Communications Corporation
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Cablevision Systems Corporation
et. al.
Case No. 2:07-ML-01816 / 02314 RGK-FFM
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Charter Communications, Inc.;
Charter Communications Holding Company, LLC; Charter Communications
Operating, LLC; and Charter Communications Entertainment I, LLC
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. CIGNA Corporation, CIGNA
Health Corporation, CIGNA HealthCare of Delaware, Inc., Tel-Drug of
Pennsylvania, LLC and Tel-Drug, Inc.
CV 07-2192 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Comcast Corporation, Sirius-XM
Radio, Inc., et al.



NO. 2:07-ML-01816-C RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. DHL Holdings (USA) Inc., DHL
Express (USA), Inc., and Sky Courier, Inc.
Case No. 07-ml-01816-B RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Fifth Third Bankcorp, Fifth Third
Bank, Fifth Third Bank (Central Ohio)
Case No. 07-4960 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. Time Warner Cable Inc., Time
Warner NY Cable LLC and Time Warner Entertainment Company, L.P.
CV 07-2134 RGK (FFMx)
United States District Court for the Central District of California
Deposition Testimony

Ronald A. Katz Technology Licensing, LP v. United States Cellular
Corporation, TDS Telecommunications Corporation and TDS Metrocom, LLC
Case No.07-ML-01816-B-RGK (FFMX)
United States District Court for the Central District of California
Deposition Testimony

Rosetta Stone Ltd. v. Google Inc.
Civil Action No. 1:09 CV 736 GBL / JFA
United States District Court for the Eastern District of Virginia
Deposition Testimony

RWM Kinetic Enterprises, Inc. and Thomas J. Ring v. Kinetic Concepts, Inc.
and KCI Therapeutic Services, Inc.
Case No. SA-96-CA-603-OG
United States District Court for the Western District of Texas San Antonio
Division
Trial Testimony

Sanofi-Aventis U.S. LLC and Regeneron Pharmaceuticals, Inc. v. Genentech,
Inc. and City of Hope
Case No. 2:15-CV-05685
United States District Court for the Central District of California Western
Division
Deposition Testimony

Sanyo Electric Co., Ltd. v. Intel Corporation
Civil Action No. 2018-0723-MTZ
Court of Chancery of the State of Delaware
Deposition Testimony

CE 0535



Saxon Innovations, LLC v. Nokia Corp, et al. (including Samsung Electronics, Co. and related parties)
Civil Action No. 6:07-cv-490-LED-JDL
United States District Court for the Eastern District of Texas Tyler Division
Deposition Testimony

SecurityPoint Holdings, Inc. v. The United States
Case No. 1:11-cv-00268-EGB
In the United States Federal Court of Claims
Deposition and Trial Testimony

Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd., S-LCD Corporation, Samsung Electronics America, Inc. Samsung Telecommunications America, LLC
Civil Action No. 3:09-cv-00001
United States District Court for the Western District of Wisconsin
Deposition Testimony

Selex Galileo, Inc. v. Nomir Medical Technologies, Inc.
Case No. 01-17-0003-0930
American Arbitration Association
Hearing Testimony

Seven Networks, LLC v. Apple Inc.
Civil Action No. 2:19-cv-115-JRG
United States District Court for the Western District of Texas Marshall Division
Deposition Testimony

Shuffle Tech International, LLC and Aces Up Gaming, Inc. and Poydras-Talrick Holdings, LLC v. Scientific Games Corporation and Bally Technologies, Inc. (d/b/a SHFL Entertainment or Shuffle Master) and Bally Gaming, Inc.
Civil Action No. 1:15-cv-3702
United States District Court for the Northern District of Illinois Eastern Division
Trial and Deposition Testimony

Silicon Image, Inc. v. Analogix Semiconductor, Inc.
Case No. C 07-00635 JCS
United States District Court for the Northern District of California, San Francisco Division
Deposition Testimony

Site Microsurgical Systems v. The Cooper Companies
Civil Action S92-766
Deposition Testimony

Slot Speaker Technologies, Inc. v. Apple Inc.
Case No. 4:13-cv-01161-HSG
United States District Court Northern District of California Oakland Division
Deposition Testimony

SmartPhone Technologies, LLC v. Research In Motion Corp. et. al (on behalf LG Electronics, Inc. and LG Electronics USA, Inc.)

52



Civil Action No. 6:10cv74-LED
United States District Court Eastern District of Texas Tyler Division
Deposition Testimony

St. Clair Intellectual Property Consultants v. Fuji Photo Film Co., Ltd., Fuji
Photo Film U.S.A., Inc., Fujifilm America, Inc., et al.
Civil Action No. 03-241 JJF
United States District Court for the District of Delaware
Trial and Deposition Testimony

Steven E. Berkheimer v. Hewlett-Packard Company
Case No. 1:12-cv-09023
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV44
United States District Court of Texas Sherman Division
Deposition Testimony

STMicroelectronics, Inc. v. SanDisk Corp.
C.A. No. 4:05CV45
United States District Court of Texas Sherman Division
Deposition Testimony

Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil,
and Technics, Inc.
Civil Action No. 4:19-cv-01145
United States District Court for the Southern District of Texas Houston Division
Trial and Deposition Testimony

Sunoco Partners Marketing & Terminals L.P. v. U.S. Venture, Inc., U.S. Oil,
and Technics, Inc.
Civil Action No. 1:15-CV-8178
United States District Court for the Northern District of Illinois Eastern Division
Deposition Testimony

Synopsys, Inc. v. Ubiquiti Networks, Inc. et al.
Civil Action No. 3:17-cv-00561-WHO
United States District Court for the Northern District of California
Deposition Testimony

Takata Corp. v. Allied Signal, Inc. and Breed Technologies, Inc.
Civil Action CV-95-1750
Deposition Testimony

Technol Medical Products, Inc., et al v. Robert Busse & Co., Inc.
Civil Action No. 3:94-CV-2284-X
Deposition Testimony

Tekmira Pharmaceuticals Corporation and Protiva Pharmaceuticals, Inc. v.
Alnylam Pharmaceuticals, Inc. and AlCana Technologies, Inc.

CE 0537



Civil Action No. 11-1010-BLS2
Massachusetts Superior Court for Suffolk County
Deposition Testimony

Tessera, Inc. v. Advanced Micro Devices, Inc. et al.
Case No. 4:05-cv-04063-CW
United States District Court for Northern District of California Oakland Division
Deposition Testimony

Tessera, Inc. v. UTAC (Taiwan) Corporation
Case No.: 5:10-cv-04435-EJD
United States District Court for Northern District of California San Jose
Division
Deposition Testimony

Therma-Tru Corporation v. Caradon Peachtree, Inc.
Civil Action No. 95-CV-75534-DT
Deposition Testimony

Toro Company v. MTD Products Inc., MTD Consumer Group Inc., and Cub
Cadet LLC
Civil Action No 10-cv-007-JNE-TNL
United States District Court for the District of Minnesota
Deposition Testimony

Ultratec, Inc. and CapTel, Inc. v. Sorenson Communications, Inc. and
CaptionCall, LLC
Case No.: 3:14-cv-66-BBC
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Unwired Planet, LLC v. Apple, Inc.
Case No. 3:13-cv-4134-VC
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

U.S.A. Dawgs, Inc. et al. v. Ronald Synder, et al.
Civil Action No. 16-cv-02004-PAB-KMT
United States District Court for the District of Colorado
Deposition Testimony

Valmet Paper Machinery, Inc. and Valmet-Charlotte, Inc. v. Beloit Corporation
Civil Action No. 93-C-587-C
United States District Court for the Western District of Wisconsin
Trial and Deposition Testimony

Verinata Health, Inc. and the Board of Trustees of the Leland Stanford Junior
University v. Sequenom, Inc. and Sequenom Center for Molecular Medicine, LLC.
Case No. 3:12-cv-00865-SI
Deposition Testimony

CE 0538



Verinata Health, Inc. v. Ariosa Diagnostics, Inc.
Case No. 3:12-cv-055501-SI
United States District Court for the Northern District of California
Trial and Deposition Testimony

Viacom International Inc. v. MGA Entertainment, Inc.
Case No.: 2:15-cv-09621-R (Ex)
United States District Court for the Central District of California
Deposition Testimony

VimpelCom Ltd. v. Orascom TMT Investments S.a.r.l.
London Court of International Arbitration
Arbitration No: 153077
Hearing Testimony

Volterra Semiconductor Corporation v. Primarion, Inc., Infineon Technologies
AG and Infineon Technologies North America Corporation
Case No. C 08-05129 CRB
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Wang Laboratories, Inc. v. America Online, Inc. and Netscape Communications
Corporation
Civil Action No. 97-1628-A
United States District Court for the Eastern District of Virginia
Deposition Testimony

Wang Laboratories, Inc. v. FileNet Corporation
Civil Action No. 94-12141-RCL
Deposition Testimony

Waukesha Cherry-Burrell v. Wrightech Corporation
Civil Action No. 96-CV-00384
Deposition Testimony

Waymo LLC v. Uber Technologies, Inc., Ottomotto LLC and Otto Trucking LLC
Case No. 3:17-cv-00939-WHA
United States District Court for the Northern District of California San
Francisco Division
Deposition Testimony

Whirlpool Corporation v. Drinker Biddle & Reath LLP et. al.
Case No. 2015-L-007631
Circuit Court of Cook County, Illinois
Trial and Deposition Testimony

Zenith Electronics LLC, Panasonic Corporation, U.S., Philips Corporation, and
the Trustees of Columbia University in the City of New York v. Sceptre, Inc.
Case No. 9:13-CV-80567
United States District Court for the Central District of California
Deposition Testimony

CE 0539



Zenith Electronics LLC v. Vizio, Inc.; Westinghouse Digital Electronics LLC, et al.
No. 5:06CV246-DF
United States District Court for the Eastern District of Texas
Texarkana Division
Deposition Testimony

ZiiLabs Inc., Ltd. v. Samsung Electronics Co. Ltd (and related Samsung parties) and Apple Inc.
Case No. 2:14-cv-00203
United States District Court for the Eastern District of Texas Marshall Division
Deposition Testimony

In the Matter of Certain Robotic Floor Cleaning Devices and Components Thereof
Case No. 337-TA-1252
On behalf of the Respondents SharkNinja Operating LLC, SharkNinja Management LLC, SharkNinja Management Company, SharkNinja Sales Company, SharkNinja Hong Kong Co. Ltd., and EP Midco LLC
United States International Trade Commission
Deposition Testimony

---

**PATENTS**

Inventor, United States Patent No. 5,752,186, Access Free Wireless Telephony Fulfillment Service System, May 12, 1998.

Inventor, United States Patent No. 5,867,780, Access Free Wireless Telephony Fulfillment Service System, February 2, 1999.

Inventor, United States Patent No. 6.397,057, System and Method of Providing Advertising Information to a Subscriber Through a Wireless Device, May 28, 2002.

Inventor, United States Patent No. 6,411,803, System and Method of Providing Service Information to a Subscriber Through a Wireless Device, June 25, 2002.

Inventor, United States Patent No. 6,769,767, Eyewear with Exchangeable Temples Housing a Transceiver Forming Ad Hoc Networks with Other Devices, August 3, 2004.

Inventor, United States Patent No. 6,839,556, System and Method of Providing Information to a Subscriber through a Wireless Device, January 4, 2005.

Inventor, United States Patent No. 6,911,172, Method of Manufacturing Eyewear, June 28, 2005.

Inventor, United States Patent No. 6,929,365, Eyewear with Exchangeable Temples Housing Bluetooth Enable Apparatus, August 16, 2005.

Inventor, United States Patent No. 7,181,200, Method of Providing Information to a Telephony Subscriber, February 20, 2007.

56



Inventor, United States Patent No. 7,353,202, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 1, 2008.

Inventor, United States Patent No. 7,769,685, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, August 3, 2010.

Inventor, United States Patent No. 7,813,716, Method of Providing Information to a Telephony Subscriber, October 12, 2010.

Inventor, United States Patent No. 7,885,897, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, February 8, 2011.

Inventor, United States Patent No. 7,930,231, System and Method of Risk Minimization and Enhanced Returns In An Intellectual Capital Based Venture Investment, April 19, 2011.

Inventor, United States Patent No. 7,987,142, Intellectual Property Trading Exchange, July 26, 2011.

Inventor, United States Patent No. 8,041,341, System of Providing Information to a Telephony Subscriber, October 18, 2011.

Inventor, United States Patent No. 8,180,711, Intellectual Property Trading Exchange, May 15, 2012.

Inventor, United States Patent No. 8,255,932, System and Method for Managing Intellectual Property-Based Risks, January 15, 2013.

Inventor, United States Patent No. 8,515,851, Method and System for Generating an Index of Securities, August 20, 2013.

Inventor, United States Patent No. 8,554,687, Intellectual Property Trading Exchange and a Method for Trading Intellectual Property Rights, October 8, 2013.

Inventor, United States Patent No. 8,694,419, Methods and Systems for Utilizing Intellectual Property Assets and Rights, April 8, 2014.

Inventor, United States Patent No. 8,787,878, System of Providing Information to a Telephony Subscriber, July 22, 2014.

Inventor, United States Patent No. 8,831,985, Financial Instrument Based on Content and Methods for Valuation, September 9, 2014.

Inventor, United States Patent No. 8,880,031, System of Providing Information to a Telephony Subscriber, November 4, 2014.

CE 0541



Inventor, United States Patent No. 9,058,628, Marketplace for Trading Intangible Asset Derivatives and a Method for Trading Intangible Asset Derivatives, June 16, 2015.

Inventor, United States Patent No. 9,244,292, Eyewear with Exchangeable Temples Housing A Radio Frequency, January 26, 2016.

---

**CONTACT**  James E. Malackowski
Co-founder and Senior Managing Director
Ocean Tomo, LLC, a part of J.S. Held
Miami, Florida

312-327-4410 Direct
jmalackowski@oceantomo.com

58

CE 0542