ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*Pro Hac Vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for Defendant/Counterclaimant*
*LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-cv-03301-EMC |
| Plaintiff, | **COMPENDIUM OF EVIDENCE FILED IN SUPPORT OF LINKEDIN CORPORATION'S AUGUST 5, 2022 MOTIONS (3 of 6)** |
| vs. | |
| LinkedIn Corporation, | Date:          September 29, 2022 |
| Defendant. | Time:          1:30 p.m. |
| | Courtroom:   5 – 17th Floor (Zoom) |
| | Judge:         Hon. Edward M. Chen |
| LinkedIn Corporation | |
| Counterclaimant, | Complaint Filed:   June 7, 2017 |
| vs. | Trial Date:          February 27, 2023 |
| hiQ Labs, Inc. | |
| Counterdefendant. | |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 1 | Deposition Transcript of Jenelle Bray (Excerpts) | 05/18/2022 | 1 | 1 |
| 2 | Deposition Transcript of Boris Dev and exhibits (Excerpts) | 05/04/2022 | 1 | 16 |
| | **Dep. Ex. 231 –** Email string between Dev and Weidick re: Your application for private LinkedIn API access (3/23/17) (hiQ_00200007-08) | 03/27/2017 | | 49 |
| | **Dep. Ex. 237 –** Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 51 |
| 3 | Deposition Transcript of Daniel Francis and exhibits (Excerpts) | 05/25/2022 | 1 | 53 |
| | **Dep. Ex. 1335 –** hiQ Elevate Conference Notes (LINK_HIQ_000184276-77) | 04/20/2017 | | 62 |
| 4 | Deposition Transcript of McKinsey & Co. by and through 30(b)(6) designee Christopher Gagnon | 06/27/2022 | 1 | 64 |
| | **Dep. Ex. 591 –** Email string between Gagnon, Veynerchuk, et al. re: departure announcement (hiQ_00580838-40) | 02/04/2017 | | 77 |
| 5 | Deposition Transcript of Genevieve Graves and exhibits (Excerpts) | 05/25/2022 | 1 | 80 |
| | **Dep. Ex. 498 –** hiQ Tech Stack: Product Suite PPT (hiQ_00545758) | Undated | | 129 |
| | **Dep. Ex. 503 –** Email from Graves to Hammond, et al. re: Insufficient Data Coverage (hiQ_00023356-59) | 07/13/2016 | | 144 |
| | **Dep. Ex. 510 –** Email string between Miller, Graves, et al. re: Banned from LinkedIn (hiQ_00143432-33) | 07/14/2015 | | 148 |
| | **Dep. Ex. 512 –** Email from Cole to Marshall re: NDA, Training, and VPN access (hiQ_00191862-78) | 01/29/2016 | | 150 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 514 –** Email string between Cole, Graves, et al. re: feedback: list of frustrations (hiQ_00174514-15) | 05/22/2016 | | 167 |
| | **Dep. Ex. 525 –** Email string between Graves and Medeiros re: 2016 Customer Churn (hiQ_000855562-64) | 11/15/2016 | | 169 |
| 6 | Deposition Transcript of Yael Hochberg, Ph.D. and exhibits (Excerpts) | 07/29/2022 | 1 | 172 |
| | **Dep. Ex. 1385 –** Expert Report of Yael Hochberg, Ph.D. (Appendix C Materials Considered removed) | 06/07/2022 | | 180 |
| | **Dep. Ex. 1386 –** Expert Rebuttal Report of Yael Hochberg, Ph.D. | 06/30/2022 | | 283 |
| 7 | Deposition Transcript of Darren Kaplan and exhibits (Excerpts) | 05/04/2022 | 1 | 313 |
| | **Dep. Ex. 10 –** Email from McNutt to Cole re: Question [LinkedIn User Agreement and turking] (hiQ_00189601) | 05/05/2016 | | 328 |
| | **Dep. Ex. 17 -** hiQ Confidential Board Deck PPT (discussing state of the business, engineering and product update, financials, and administrative) (hiQ_003177150 | 02/08/2017 | | 329 |
| 8 | Deposition Transcript of Darren Kaplan (Excerpts) | 05/05/2022 | 1 | 361 |
| 9 | Deposition Transcript of Andrew Kim (Excerpts) | 05/09/2022 | 2 | 376 |
| | **Dep. Ex. 246 -** hiQ Product Strategy PPT (discussing current and new hiQ products) (hiQ_00304309) | Undated | | 397 |
| 10 | Deposition Transcript of James Malackowsi and exhibits (Excerpts) | 07/28/2022 | 2 | 425 |
| | **Dep. Ex. 1379 –** Expert Report of James E. Malackowsi (Appendices 2-6 removed) | 06/07/2022 | | 437 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 11 | Deposition Transcript of Stephen B. McElfresh and exhibits (Excerpts) | 07/20/2022 | 3 | 543 |
| | **Dep. Ex. 650** – Expert Report of Stephen B. McElfresh | 06/07/2022 | | 584 |
| 12 | Deposition Transcript of Darin Medeiros and exhibits (Excerpts) | 05/20/2022 | 3 | 606 |
| | **Dep. Ex. 436** – Email from Berman to Medeiros re: Completed: Order form for hiQ Labs, Inc.-LSS (hiQ_00352028-30) | 12/23/2015 | | 637 |
| | **Dep. Ex. 437** – Email from Sennert to Medeiros re: hiQ Labs Account #: 120941 with attached invoices (hiQ_00008090-91; 8509-11; 7822-24; 7273-75; 6812-14; 6668-70; 5955-60) | 06/10/2016 | | 640 |
| | **Dep. Ex. 438** – Email string between Medeiros, Dick, et al. re: SFDC guide with hiQ's CRM Best Practices (hiQ_00123595-601) | 07/25/2017 | | 662 |
| | **Dep. Ex. 439** – Email from Medeiros to DeSantis, et al. re: Weekly Update with hiQ Sales Dashboard (hiQ_00175647-50) | 11/28/2016 | | 669 |
| | **Dep. Ex. 443** – Email from Medeiros to Weidick, et al. re: Customer asking why hiQ didn't scrape through a paid LinkedIn account (hiQ_00619694-97) | 05/16/2017 | | 673 |
| | **Dep. Ex. 447** – Chat transcript between Medeiros and Barker re: Customer Feedback (hiQ_00443465-75) | 10/11/2017 | | 677 |
| | **Dep. Ex. 455** – Email from Medeiros to Weidick, et al. re: State of Renewals 2017 (hiQ_00180173) | 10/16/2017 | | 688 |
| 13 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/13/2022 | 3 | 694 |
| | **Dep. Ex. 322A** – Email from Miller to Dev re: scraping tips (hiQ_00084314) | 08/11/2016 | | 729 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 322B** – Tips for [scraping] LinkedIn (hiQ_00084315) | 08/11/2016 | | 730 |
| | **Dep. Ex. 331** – Notes on reverse engineering LinkedIn's defenses (hiQ_00354518-20) | Undated | | 731 |
| | **Dep. Ex. 344** – Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 734 |
| | **Dep. Ex. 350A & 350B** – Email from Cole to Dev with attached file named "The Scraper Wars PPT" (hiQ_00189161-63) | Undated | | 736 |
| 14 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/26/2022 | 3 | 749 |
| | **Dep. Ex. 535** – Email string between Miller and Sharon re: Purchase monthly services (hiQ_00141957-59) | 07/17/2017 | | 770 |
| | **Dep. Ex. 539** – Email string between Cole, Miller, et al. re: turking (hiQ_00359637-38) | 09/27/2017 | | 773 |
| | **Dep. Ex. 540** – Email string between Brokken and Miller re: culling the database nightmare (hiQ_00060671-75) | 12/07/2017 | | 775 |
| | **Dep. Ex. 543** – Email string between Miller, Medeiros, et al. re: Cancelling hiQ services (hiQ_00329112-13) | 05/09/2018 | | 780 |
| | **Dep. Ex. 545** – Chat transcript between Miller, Kim, et al. re: suspension notice from AWS (hiQ_00451932-33) | 05/16/2018 | | 782 |
| | **Dep. Ex. 546** – Chat transcript between Kim, Barta, et al. re: scraping (hiQ_00436300-07) | 06/12/2018 | | 784 |
| 15 | Deposition Transcript of Kevin Murphy and exhibits (Excerpts) | 07/19/2022 | 3 | 792 |
| | **Dep. Ex. 603** – Expert Report of Kevin M. Murphy (Appendix B removed) | 06/07/2022 | | 800 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 16 | Declaration of Kevin Murphy ISO LinkedIn's Motion for Summary Judgment and *Daubert* Motion to Exclude Expert Testimony of Stephen McElfresh and exhibit, No. 17-cv-03301 | 08/04/2022 | 3 | 883 |
| | **Ex. A –** Rebuttal Expert Report of Kevin M. Murphy | 06/30/2022 | | 886 |
| 17 | Deposition Transcript of Alexander Oltmann and exhibits (Excerpts) | 05/13/2022 | 3 | 914 |
| | **Dep. Ex. 4 –** Email string between Oltmann, Kaplan, et al. re: FLAGGING you DEEP Nishar (hiQ_00250311-13) | 03/09/2015 | | 927 |
| 18 | Deposition Transcript of Dan Reid (Excerpts) | 05/19/2022 | 3 | 930 |
| 19 | Deposition Transcript of Paul Rockwell and exhibits (Excerpts) | 05/19/2022 | 3 | 941 |
| | **Dep. Ex. 1233-A –** LinkedIn 3rd Party Scraping PPT (LINK_HIQ_000169080-110) | 04/02/2015 | | 957 |
| 20 | Deposition Transcript of Benjamin Sacks and exhibits (Excerpts) | 07/08/2022 | 4 | 988 |
| | **Dep. Ex. 599 –** Amended Expert Report of Benjamin A. Sacks (Appendices A-B removed) | 06/22/2022 | | 1072 |
| | **Dep. Ex. 608 -** Chart – Calculation 1: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, Before Application of 20% Discount | Undated | | 1124 |
| | **Dep. Ex. 609 –** Chart – Calculation 2: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, After Application of 20% Discount | Undated | | 1125 |
| | **Dep. Ex. 610 –** Sacks Work Paper E Showing Customers Included In Lost Profits (Excerpt of Native Excel file converted to PDF) | Undated | | 1125A |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 21 | Deposition Transcript of Minjae Song (Excerpts) | 07/27/2022 | 4 | 1126 |
| 22 | Deposition Transcript of Mark Weidick (Excerpts) | 03/18/2022 | 4 | 1135 |
| 23 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 05/23/2022 | 4 | 1145 |
| | **Dep. Ex. 475** – Chat transcript between Miller and Weidick re: shutting down scraping (biQ_00442222) | 03/31/2017 | | 1173 |
| | **Dep. Ex. 480** – Email from Weidick to Lustig, et al. re: Reading time 4 mins 39 sec (hiQ_00641062-64) | 04/05/2017 | | 1174 |
| | **Dep. Ex. 486** – Email from Jeremias to Weidick, et al. re: Urgent: Suspension Warning (hiQ_00319806-07) | 04/08/2019 | | 1177 |
| 24 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 06/01/2022 | 4 | 1179 |
| | **Dep. Ex. 489** – hiQ Board Deck PPT (hiQ_00221829) | 05/15/2017 | | 1220 |
| | **Dep. Ex. 556** – Email string between Sharma, Weidick, et al. re: hiQ budget information (hiQ_00705751-54) | 07/13/2020 | | 1254 |
| | **Dep. Ex. 564** – Email string between Weidick and Dev re: Scraping (hiQ_00183419) | 04/11/2017 | | 1258 |
| | **Dep. Ex. 566** – Email string between Miller, Weidick, et al. re: Scraping Update (hiQ_00576322-23) | 04/24/2017 | | 1259 |
| 25 | Deposition Transcript of Lee Womer and exhibits (Excerpts) | 05/11/2022 | 4 | 1261 |
| | **Dep. Ex. 294** – Email string between Womer, Canlas, et al. re: Anti-scraping (LINK_HIQ_000205777-78) | 10/07/2015 | | 1279 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 26 | Deposition Transcript of Xiaofeng Wu and exhibits (Excerpts) | 07/25/2022 | 4 | 1281 |
|  | **Dep. Ex. 1361 –** LinkedIn's Rule 26 Disclosure of Xiaofeng Wu | 06/07/2022 |  | 1307 |
| 27 | Declaration of Paul Rockwell ISO LinkedIn's Opposition to Plaintiff's Motion for Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 26, 2017) (ECF No. 29) | 06/26/2017 | 4 | 1311 |
| 28 | Declaration of Paul Rockwell ISO LinkedIn's Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to FRCP 62.1, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. Sept. 10, 2021) (ECF No. 216.13) | 09/10/2021 | 4 | 1377 |
| 29 | hiQ's Second Supplemental Responses to LinkedIn's Second Set of Interrogatories (No. 16) | 08/03/2022 | 4 | 1387 |
| 30 | Letter from Shaffer to Worcester, et al. re: ESI sources | 04/28/2022 | 4 | 1394 |
| 31 | Email string between counsel for the parties re: hiQ ESI Sources [Splunk] | 06/03/2022 | 4 | 1398 |
| 32 | Email from Skibitsky to Shaffer, et al. re: lost Splunk data | 06/13/2022 | 4 | 1417 |
| 33 | hiQ Sales Order for Pfizer (hiQ_00003890-92) | 11/03/2016 | 4 | 1419 |
| 34 | hiQ Labs Inc. Income Statement (hiQ_00004324) (Native Excel file converted to PDF) | 06/2017 | 4 | 1423 |
| 35 | Email string between Barta, Kim, et al. re: culling the database nightmare (hiQ_00028241-53) | 01/15/2018 | 4 | 1439 |
| 36 | Email string between Williams and Cole re: borrow your SDR team for a few days (hiQ_00080487-91) | 03/15/2016 | 4 | 1453 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 37 | Email from Klevecz to Mechanical Turkers and Cole re: Turking Interface Changes (hiQ_00080559) | 12/03/2015 | 4 | 1459 |
| 38 | Email string between Cherry and Graves re: Another LinkedIn account shutdown (hiQ_00087989-91) | 07/14/2015 | 4 | 1461 |
| 39 | Email from Kaplan to dk.nk41@hiqlabs with hiQ pitch deck showing release timing of Keeper (Control Center) (hiQ_00103925-40) | 09/20/2014 | 4 | 1465 |
| 40 | Master SAAS Agreement between hiQ and BMC Software Inc. (hiQ_00149369-98) | 06/22/2016 | 4 | 1482 |
| 41 | Email string between Cole, "science," et al. re: Weekly Turking Report (hiQ_00174125-28) | 03/10/2017 | 4 | 1513 |
| 42 | Amended and Restated Collaboration Agreement between McKinsey & Co. and hiQ (hiQ_00179991-180005) | 06/30/2016 | 4 | 1518 |
| 43 | Email from Miller to Weidick, et al. re: All-hands AWS cleanup (hiQ_00193748) | 02/02/2018 | 4 | 1534 |
| 44 | Email from Schwade to Graves re: Turking Work Instruction and attachment (hiQ_00211880 & hiQ_00211881) | 06/24/2015 | 4 | 1536 |
| 45 | Board Meeting – Plan Forward (Agenda: Litigation, Hibernation, Assorted Details) PPT (hiQ_00225254) (Native PPT file converted to PDF) | 05/23/2018 | 5 | 1550 |
| 46 | hiQ letter to Weidick re: offer of employment (hiQ_00251922-33) | 02/09/2017 | 5 | 1558 |
| 47 | Record of payments to turkers from Sep. 2015 to Sep. 2016 (hiQ_00316522) (Native Excel file converted to PDF) | Undated | 5 | 1571 |
| 48 | Purchase Order for Honeywell Int'l (hiQ_00318142-47) | 12/07/2017 | 5 | 1586 |
| 49 | Email string between Medeiros, Pauletich, et al. re: Next steps (hiQ_00332055-56) | 09/28/2017 | 5 | 1593 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 50 | Email from Amazon Web Services to ops@hiqlabs.com and Miller re: Your AWS Account has been suspended for non-payment (hiQ_00355253) | 04/20/2020 | 5 | 1596 |
| 51 | Email string between Weidick and Miller re: Belt & suspenders (hiQ_00358094) | 05/07/2018 | 5 | 1598 |
| 52 | Note re: Experiments that Genevieve is running (hiQ_00369157-59) | Undated | 5 | 1600 |
| 53 | Email string between Patch, Kaplan, et al. re: Board Deck (hiQ_00390283-84) | 02/05/2017 | 5 | 1604 |
| 54 | Email string between Weidick, Dev, et al. re: Your application for private LinkedIn API access (hiQ_00429401-02) | 03/23/2017 | 5 | 1607 |
| 55 | Chat transcript between Dev and Miller re: scraping (hiQ_00436623) | 04/18/2017 | 5 | 1610 |
| 56 | Chat transcript between Kim, Miller, et al. (hiQ_00437584-85) | 07/06/2018 | 5 | 1612 |
| 57 | Chat transcript between Miller and Dev re: Luminati (hiQ_00437609) | 05/03/2017 | 5 | 1615 |
| 58 | Chat transcript between Barta, Cole, et al. (hiQ_00438613-15) | 05/16/2018 | 5 | 1617 |
| 59 | Chat transcript between Dev and Miller (hiQ_00439403) | 05/25/2017 | 5 | 1621 |
| 60 | Chat transcript between Dev and Miller re: Luminati (hiQ_00439495) | 05/26/2017 | 5 | 1623 |
| 61 | Chat transcript between Miller and Dev (hiQ_00442040-41) | 06/01/2016 | 5 | 1625 |
| 62 | Chat transcript between Miller, Dev, et al. re: state of scrape (hiQ_00447111-13) | 03/30/2017 | 5 | 1628 |
| 63 | Chat transcript between Miller and Wegener (hiQ_00447584-86) | 08/22/2017 | 5 | 1632 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 64 | Chat transcript between Miller, Dev, et al. (hiQ_00449462-63) | 09/06/2018 | 5 | 1636 |
| 65 | Chat transcript between Wegener and Miller (hiQ_00451103-05) | 05/07/2018 | 5 | 1639 |
| 66 | Splunk Production Scraper Dashboard (hiQ_00457966-67) | 11/08/2016 | 5 | 1643 |
| 67 | Email string between Patch, Graves, et al. re: People not getting paid (hiQ_00463750-54) | 11/05/2015 | 5 | 1646 |
| 68 | Email from Dev to Miller re: [JIRA] (DENG-2) Find alternative sources of proxies (hiQ_00466086) | 01/19/2017 | 5 | 1652 |
| 69 | Purchase Order for Facebook (hiQ_00466148-55) | 06/15/2017 | 5 | 1654 |
| 70 | Software Services Agreement between The Gap and hiQ (hiQ_00466407-25) | 04/15/2015 | 5 | 1663 |
| 71 | Master SAAS Services Agreement between Hartford Fire Ins. Co. and hiQ, and Sales Order (hiQ_00467036-56) | 12/12/2016 | 5 | 1683 |
| 72 | Mutual Non-Disclosure Agreement between American Express Travel Related Services Co. and hiQ, and Sales Order (hiQ_00469682-91) | 11/10/2016 | 5 | 1705 |
| 73 | hiQ Labs Retention Module, Statement of Work between hiQ and Pfizer Inc. (hiQ_00473572-86) | 10/30/2015 | 5 | 1716 |
| 74 | Master Application Service Provider Agreement between Capital One Services LLC and hiQ (hiQ_00521357-412) | 08/15/2016 | 5 | 1732 |
| 75 | hiQ Sales Order for Celgene (hiQ_00521671) | 09/27/2016 | 5 | 1789 |
| 76 | Services Agreement between eBay Inc. and hiQ (hiQ_00521783-805) | 07/29/2015 | 5 | 1793 |
| 77 | Master SAAS Services Agreement between hiQ and UTC Aerospace Systems (hiQ_00536554-64) | 01/15/2016 | 5 | 1817 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 78 | hiQ Sales Order for Box Inc. (hiQ_00542110-13) | 03/31/2016 | 5 | 1829 |
| 79 | License and Services Agreement between hiQ and Comcast Cable Communications Management LLC and Order #1(hiQ_00542226-56) | 09/25/2015 | 5 | 1834 |
| 80 | Master "Software as a Service" (SAAS) Subscription Agreement between Allstate Ins. Co. and hiQ (hiQ_00555778-813) | 10/25/2016 | 6 | 1866 |
| 81 | PA Trend Report 2017 PPT (hiQ_00568929-60) | Undated | 6 | 1903 |
| 82 | Master SAAS Services Agreement between hiQ and Apax Partners LP and Sales Order for Apax (hiQ_00580069-88) | 01/13/2017 | 6 | 1936 |
| 83 | hiQ Revenue spreadsheet (hiQ_00621582) (Excerpt of Native Excel file converted to PDF) | Undated | 6 | 1957 |
| 84 | The Hershey Company SAAS Agreement between Hershey and hiQ (hiQ_00642063-107) | 03/31/2016 | 6 | 1964 |
| 85 | Master SAAS Services Agreement between hiQ and BNY Mellon and Sales Order for BNY (hiQ_00642108-25) | 03/01/2016 | 6 | 2010 |
| 86 | Master SAAS Services Agreement between hiQ and PayPal, Inc. (hiQ_00656809-35) | 01/26/2016 | 6 | 2029 |
| 87 | Consulting Agreement between hiQ and Allan Schwade (hiQ_00679076-77) | 05/24/2016 | 6 | 2057 |
| 88 | Email string between Werlin, Weidick, et al. re: hiQ Investor update (hiQ_00683817-18) | 05/24/2018 | 6 | 2060 |
| 89 | hiQ Company Pages Confluence Wiki (hiQ_00723764) (Excerpt of Native PDF file) | Undated | 6 | 2063 |
| 90 | Email string between Weidick, Gupta, et al. re: turking while logged out (hiQ_00727057) | 09/20/2017 | 6 | 2066 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 91 | Screenshot at 14:31 (hiQ_00727061) (Screenshot of Native Video file converted to PDF) | Undated | 6 | 2068 |
| 92 | hiQ Labs Inc. General Ledger from 8/10/2012 to 9/1/2019 (hiQ_00734930) (Excerpt of Native Excel file converted to PDF) | Undated | 6 | 2071 |
| 93 | Memorandum from Gupta to Distribution List re: Notice of Legal Hold (hiQ_00734977-78) | 06/20/2017 | 6 | 2073 |
| 94 | hiQ Labs, Inc. Response to LinkedIn Cease and Desist Letter, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 7, 2017) (ECF No. 4-11) | 05/31/2017 | 6 | 2076 |
| 95 | Plaintiff hiQ Labs, Inc.'s First Supplemental Responses to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/11/2022 | 6 | 2082 |
| 96 | Plaintiff hiQ Labs, Inc.'s Supplemental Responses and Objections to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/13/2022 | 6 | 2088 |

# Compendium Exhibit 11

# (Filed Under Seal)

# Compendium Exhibit 12

## (CE0637-639,
## CE0662-70
## Filed Under Seal)

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION
 3

 4  hiQ Labs, Inc.,            )
              Plaintiff,       )
 5                             )
              vs.              )   Case No.
 6                             )   17-cv-03301-EMC
    LinkedIn Corporation,      )
 7            Defendant.       )
    _____)
 8                             )
    LinkedIn Corporation,      )
 9            Counterclaimant, )
                               )
10            vs.              )
                               )
11  hiQ Labs, Inc.,            )
              Counter-defendant.)
12                             )
    _____)
13


14


15       HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

16    REMOTE VIDEO-RECORDED DEPOSITION OF DARIN MEDEIROS

17               Los Angeles, California

18                   May 20, 2022

19

20  REPORTED BY:

21  JOHNNA PIPER

22  CSR 11268

23  Job No. 10100978

24

25  Pages 1 through 209
```

CE 0607

Darin Medeiros

```
 1   Los Angeles, California; Friday, May 20, 2022;
 2   9:02 a.m.
 3                     PROCEEDINGS
 4
 5         VIDEO TECHNICIAN:  Good morning.  We are
 6   now on the record.  Today's date is May 20th, 2022.
 7   The time is 9:02 a.m.
 8         This is the remote videotaped deposition of
 9   Darin Medeiros being taken via Zoom video
10   conference.  This matter is entitled hiQ Labs, Inc.,
11   versus LinkedIn Corp.  The deponent is appearing
12   remotely from Los Angeles, California.
13         My name is Aaron Isaacs, appearing for
14   Aptus Court Reporting, located at 600 West Broadway,
15   Suite 300, San Diego, California 92101.  I'm the
16   official videographer, and this recording is the
17   only authorized video recording of this deposition.
18   The audio and video recording will take place at all
19   times unless all counsel agree to go off the record.
20         Will counsel please identify yourselves and
21   anyone with you and state the parties that you
22   represent.
23         MS. SHARMA:  Renita Sharma from --
24         MR. COHEN:  Good morning.
25         MS. SHARMA:  Sorry, Russ.
```

CE 0608

```
 1            MR. COHEN:  Go ahead, Renita.

 2            MS. SHARMA:  Thank you.

 3            Renita Sharma for Plaintiff hiQ Labs and

 4    for the witness, from Quinn Emanuel.

 5            MR. COHEN:  Good morning.  Russ Cohen from

 6    Orrick, Harrington & Sutcliffe on behalf of

 7    LinkedIn.

 8

 9                    DARIN MEDEIROS,

10    having been first duly sworn, testifies as follows:

11

12                     EXAMINATION

13    BY MR. COHEN:

14        Q.  Good morning, Mr. Medeiros.

15        A.  Good morning.

16        Q.  You heard me introduce myself.  My name is

17    Russell Cohen.  I'm with the Orrick law firm.  I

18    represent LinkedIn, and I'm going to be taking your

19    deposition today.

20            Have you ever had your deposition taken

21    before?

22        A.  No.

23        Q.  All right.  Well, why don't we go over some

24    ground rules, but before we do that, can you just

25    say your name for the record and then spell it,
```

CE 0609

1    that?

2       A.   Yes.

3       Q.   And if you don't ask me for clarification,

4    I will assume you've understood my question.  Fair?

5       A.   Yes.

6       Q.   Okay.  We're not going to go without a

7    break.  If you need a break at some point, you just

8    let me know, and I'll be happy to go off the record

9    and we'll take a break.  The only thing I would ask

10   of you is if we're going to take a break, that we

11   not do it while a question is pending.  So I -- I

12   would like for you to answer the question first, and

13   then we can take a break.  Do you understand?

14      A.   Yes.

15      Q.   All right.  And, Mr. Medeiros, is there any

16   reason why you can't provide truthful and accurate

17   testimony today?

18      A.   No.

19      Q.   Okay.  Let -- let -- let me start by asking

20   about your time at hiQ.  I'm going to get to some of

21   your other positions, but let's start there.  When

22   did you join hiQ?

23      A.   2015.  I -- I believe it was in the March

24   or April time frame.

25      Q.   And what was the position at which you

CE 0610

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**                                                  hiQ Labs, Inc. vs.
                                                                    LinkedIn Corp.

```
 1   joined?
 2        A.   VP of sales.
 3        Q.   And when did you leave hiQ -- leave your
 4   employment there?
 5        A.   I think formally in December, but then I --
 6   December of 2017, and then I continued to consult
 7   for them for about four or five months.
 8        Q.   Taking you into early 2018?
 9        A.   Like April.  April 2018.
10        Q.   Got it.  Got it.  And when you left hiQ in
11   December of 2017, formally left before you switched
12   over to a consultant, what was your position at that
13   time?
14             (Reporter requests clarification.)
15             THE WITNESS:  I ran sales and marketing.
16             COURT REPORTER:  Thank you.
17   BY MR. COHEN:
18        Q.   Did you have the same title, VP sales?
19        A.   Yes.
20        Q.   Let's go to the responsibilities that you
21   had as VP sales when you joined hiQ in April of
22   2015.  How would you describe your role?
23        A.   I essentially built -- hired the sales team
24   and taught them how to sell our product to our
25   prospects and customers.
```

CE 0611

**Highly Confidential - Attorneys' Eyes Only**

Darin Medeiros

hiQ Labs, Inc. vs.
LinkedIn Corp.

1    Q.   And how big a team did you build?

2    A.   I think at its peak there were 14 of us.

3    Q.   And that's 14 sales reps or 14 positions

4    including sales reps and others?

5    A.   There was sales staff.  There was account

6    executives.  There was a CS, customer success

7    person.  And then we had people analytic experts

8    that would, you know, help in the sales process.

9    Q.   And when you joined hiQ, did you also have

10   responsibility for marketing?

11   A.   I took that over after the first year.

12   Q.   Okay.  And how many people did you have

13   responsibility for in marketing?

14   A.   We used an outside agency, so there was

15   maybe one person internally and then the outside

16   agency.

17   Q.   And then you said you had 14 employees at

18   its peak.  At the time that you left your formal

19   employment at hiQ in December of 2017, what was the

20   size of that sales organization?

21   A.   I -- maybe three or four.  I can't quite

22   remember.

23   Q.   And you mentioned at -- at least at some

24   point while you were there when you were responsible

25   for marketing you had one person who was an employee

CE 0612

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**

hiQ Labs, Inc. vs.
LinkedIn Corp.

```
 1    of hiQ; is that right?
 2              MS. SHARMA:  Objection.
 3              THE WITNESS:  Yes.
 4              MR. COHEN:  Can we put up Tab 94, please?
 5         (Exhibit 436 was marked for identification.)
 6    BY MR. COHEN:
 7         Q.  Mr. Medeiros, do you have what has been
 8    marked as Exhibit 436 in front of you?
 9         A.  Yes.
10         Q.  And it is a -- a three-page document with a
11    cover email from somebody named Nicholas Berman to
12    you dated December 23rd, 2015, with a subject line
13    "Completed order form for hiQ Labs LSS."  Do you see
14    that?
15         A.  Yes.
16         Q.  And in this Exhibit 436 is the order --
17    completed order for Sales Navigator that you made on
18    behalf of hiQ in December of 2015?
19         A.  Yes.
20         Q.  And if we look at page 2 of the PDF,
21    Exhibit 436, it is not a very good quality scan, but
22    you can see that you are listed as the contact at
23    hiQ.  Do you see that?
24         A.  Yes.
25         Q.  And it has a purchase of a product and a
```

**www.aptusCR.com**

CE 0613

**Highly Confidential - Attorneys' Eyes Only**

hiQ Labs, Inc. vs.
**Darin Medeiros**                                        LinkedIn Corp.

1    quantity number of seats and an order total of about

2    $21,660.  Do you see that?

3        A.  Yes.

4        Q.  And if we turn to the third page of

5    Exhibit 436, again, not a very clear scan of the

6    document, but you see that your signature is on the

7    bottom of the page on behalf of hiQ?

8        A.  Yes.

9        Q.  And if we look above your signature block,

10   there is a section in the document that appears to

11   say "terms."  Do you see that?

12       A.  Yes.

13       Q.  And I don't know if it helps you to zoom

14   in, Mr. Medeiros, but if we read the bullet point

15   which is the third from the bottom, it appears to

16   say, "Services provided under this order form are

17   provided pursuant to LinkedIn's terms conditions" --

18   "terms and conditions set forth at," and then it has

19   a URL, "some of the terms of which are incorporated

20   into this order form."  Do you see that?

21       A.  Yes.

22       Q.  And -- and, Mr. Medeiros, you were the hiQ

23   company contact for its hiQ Sales Navigator

24   subscription, right?

25       A.  Yes.

www.aptusCR.com

CE 0614

```
 1          MR. COHEN:  And if we could call up as the
 2   next exhibit Tab 96.
 3       (Exhibit 437 was marked for identification.)
 4   BY MR. COHEN:
 5          Q.  Mr. Medeiros, if you open Exhibit 437,
 6   which is in front of you, you will see that it is a
 7   compilation of cover notes and invoices for the
 8   Sales Navigator service that you ordered on behalf
 9   of hiQ pursuant to Exhibit 436.  Do you see that?
10          A.  Yes.
11          Q.  And these are invoices that you would have
12   received from LinkedIn in your role at hiQ for the
13   Sales Navigator services; is that correct?
14          A.  Yes.
15          Q.  Great.  We can -- we can close that
16   document.
17          Mr. Medeiros, after the cease and desist
18   letter, which I'll represent was dated May 23rd,
19   2017, did -- did you ever try to acquire any
20   LinkedIn services on behalf of hiQ?
21          A.  I don't believe so.  I don't remember.
22          Q.  You don't know whether hiQ could have
23   acquired any LinkedIn services after that date?
24          A.  What services would we have wanted to
25   acquire outside of Sales Navigator?
```

**www.aptusCR.com**

CE 0615

**Darin Medeiros**                    **Highly Confidential - Attorneys' Eyes Only**        **hiQ Labs, Inc. vs.**
                                                                                           **LinkedIn Corp.**

1   BY MR. COHEN:

2        Q.   With the expectation that they would follow

3   those best practices, correct?

4             MS. SHARMA:   Objection.

5             THE WITNESS:   Yes, but they never do.   Like

6   you never get 100 percent participation, no matter

7   what you do, in any company.

8                  (Indiscernible crosstalk.)

9             MR. COHEN:   Sorry.   Didn't mean to speak

10  over you.

11            Can we go to Tab 39, please?

12       (Exhibit 438 was marked for identification.)

13  BY MR. COHEN:

14       Q.   Mr. Medeiros, if you could turn -- what has

15  been marked as Exhibit 438, do you see that?

16       A.   Yeah.

17       Q.   And this is -- this is an email string.

18  The first email in the string appears to be from

19  Mateo Epshteyn -- Epshteyn.   And -- and I think you

20  mentioned earlier that Mateo was one of the sales

21  reps at hiQ; is that right?

22       A.   Yes.

23       Q.   And Mateo is forwarding to you on

24  March 30th, 2017, the -- excuse me, the SFDC guide.

25  Do you see that?

**www.aptusCR.com**

CE 0616

Highly Confidential - Attorneys' Eyes Only

**Darin Medeiros**

hiQ Labs, Inc. vs.
LinkedIn Corp.

1     A.  Yes.

2        Q.  And -- and this appears to be a response to

3    something that you had asked Mateo earlier; is that

4    correct?

5           MS. SHARMA:  Objection.

6           THE WITNESS:  I -- I don't know why he sent

7    this.  I -- yeah, I -- I don't -- I don't know why

8    he sent this -- I don't -- yeah.  I probably asked

9    him if he had something existing.

10   BY MR. COHEN:

11       Q.  Got it.  You -- you don't know why he sent

12   this to you in the first email, but you received

13   that email and then you respond to Mateo asking him

14   to add certain additional things to the SFDC guide;

15   is that right?

16       A.  Yes.  It says it right here.

17       Q.  When you say right here, you are referring

18   to the email that you, Mr. Medeiros, sent to Mateo

19   on March 30th, 2017, at 8:38 a.m.?

20       A.  Yes.

21       Q.  And then Mateo sent it back to you.  It

22   says, "Updated.  Take a look," correct?

23       A.  What page is that on?

24       Q.  It is on the first page of Exhibit 438.  If

25   you look at Mateo's email from 10:45 a.m. -- you see

CE 0617

**Darin Medeiros**

 1   that?

 2        A.   Yes.

 3        Q.   You -- you forward this to somebody named

 4   Mark Dick at healthengine.com.au.   Who is that?

 5        A.   He is a friend of mine.

 6        Q.   Got it.   And -- and so you were just

 7   sharing with him hiQ's theory on best practices?

 8        A.   Yeah.   He also is a -- I worked with him at

 9   LinkedIn, and it is very common for heads of sales

10   to share best practices on Salesforce and -- so he

11   would just -- I think he just started building up

12   the sales team at Healthengine in Australia and

13   wanted to know how we were tracking deals in

14   Australia -- or tracking deals at hiQ.

15        Q.   Got it.   And if we scroll to the attachment

16   to these cover emails, which begins on page 3 of the

17   PDF of Exhibit 438, do you see there's a document

18   entitled, "hiQ Labs best practices for

19   salesforce.com"?   Do you see that?

20        A.   Yes.

21        Q.   And it contains information under Heading 1

22   for basic data entry.   See that?

23        A.   Yes.

24        Q.   And this was best practices for what your

25   team should be entering into salesforce.com,

Highly Confidential - Attorneys' Eyes Only

Darin Medeiros

hiQ Labs, Inc. vs.
LinkedIn Corp.

```
 1   correct?

 2        A.   Yes.

 3        Q.   And if we go to page 6 of the PDF, it's got

 4   that Bates number at the bottom, hiQ 00123600.   Do

 5   you see that?   There's a heading at the top of the

 6   page that says, "Logging calls, meetings."   Do you

 7   see that?

 8        A.   Yes.

 9        Q.   And underneath that heading, it says,

10   "Given the complexity and length of the hiQ sales

11   cycle, it is critical to log all sales calls and

12   meetings."   You see that?

13        A.   Yes.

14        Q.   All right.   We can put that document away.

15             I -- I think you mentioned something called

16   -- I don't -- I don't recall the exact words you

17   used, but a report from Salesforce that you would

18   use at your weekly meetings.   Do you recall

19   testifying to that?

20        A.   Yes.

21             MS. SHARMA:   Objection.

22             THE WITNESS:   Yeah, we had a forecast

23   report.

24   BY MR. COHEN:

25        Q.   All right.   Was that the name?   Like is
```

CE 0619

1  that the formal name, the forecast report, or did it

2  have some, I don't know, special name that you guys

3  gave it?

4       A.  It is the -- it is a sales term, like -- if

5  you want to say what your pipeline is, you call it a

6  forecast report.  I don't -- I don't know if we had

7  a custom name for it at hiQ, but it was the forecast

8  report.

9            MR. COHEN:  Got it.  If we could go to

10 Tab 45.

11      (Exhibit 439 was marked for identification.)

12 BY MR. COHEN:

13      Q.  Mr. Medeiros, I've just put in front of you

14 Exhibit 439.  It is an email from you to Rob

15 DeSantis, Rob Theis, Darren Kaplan, Cindy McNutt,

16 Genevieve Graves, John Magner, with a subject line

17 "Weekly updates."  Do you see that?

18      A.  Yes.

19      Q.  And it says, "Hey, folks.  Happy Monday.

20 Here is the weekly updates in the dashboard."  You

21 see that?

22      A.  Yes.

23      Q.  And if you go to the -- the next page of

24 Exhibit 439, there's a three-page document that has

25 as its heading "Sales performance dashboard."

**Darin Medeiros**



1        A.   Yes.

2        Q.   Is -- is that the report that you just

3    referenced in your testimony that would be generated

4    from Salesforce?

5             MS. SHARMA:   Objection.

6             THE WITNESS:   Yes.

7    BY MR. COHEN:

8        Q.   Now, it looks like in this Exhibit 439 you

9    are sending it to Mr. DeSantis and Theis and

10   Mr. Kaplan and others.   Was this the same document

11   that you used with your sales team for these weekly

12   meetings that you testified about earlier?

13       A.   Yes.   We would work on the dashboard.

14       Q.   And I'm not a Salesforce user, so can you

15   explain to me what you would use this dashboard for

16   in your meetings with your team?

25       Q.   Does -- does Salesforce track who the sales

**Page 72**

CE 0621

**Darin Medeiros**

```
 1   rep or account executive is for each of these
 2   account names?
 3           MS. SHARMA:  Objection.
 4           THE WITNESS:  Yes.
 5   BY MR. COHEN:
 6       Q.  Were emails relating to the accounts that
 7   are here from your sales team or account executives
 8   logged in Salesforce?
 9       A.  In the ideal world, yes, but I can -- I can
10   tell you based on -- my experience is they probably
11   weren't, because it is a super manual process and
12   sales reps are lazy.
13       Q.  The -- the practice -- the -- strike that.
14           The best practice document that we just
15   looked at at hiQ called for sales reps to log
16   emails.  We can agree on that?
17       A.  Yes.
18       Q.  And the best practices document at hiQ that
19   we just looked at called for sales reps to also log
20   telephone conferences or calls with accounts,
21   correct?
22       A.  Yes.
23       Q.  Mr. Medeiros, how -- strike that.
24           You've -- you've testified about how you
25   used these dashboards at your weekly meetings.  Did
```

CE 0622

Highly Confidential - Attorneys' Eyes Only

Darin Medeiros

hiQ Labs, Inc. vs.
LinkedIn Corp.

```
 1   you use Salesforce in other ways in connection with

 2   your responsibilities as the vice president of sales

 3   at hiQ?

 4       A.   Like what other -- what other ways would we

 5   use Salesforce?

 6       Q.   Fair enough.  It wasn't a very clear

 7   question.  Let me try it this way:  If you had a

 8   question about a particular account, could you have

 9   logged into Salesforce to look at the status of that

10   account in Salesforce?

11       A.   Yes.

12       Q.   And that would give you information, for

13   example, about, you know, when -- when the contract

14   ran until, right?

15       A.   Yes.

16           MS. SHARMA:  Objection.

17   BY MR. COHEN:

18       Q.   And who at hiQ was responsible for that

19   relationship, right?

20           MS. SHARMA:  Objection.

21           THE WITNESS:  Yes.

22   BY MR. COHEN:

23       Q.   And who at the customer was the primary

24   point of contact for hiQ, right?

25           MS. SHARMA:  Objection.
```

Page 74

CE 0623

1          THE WITNESS:  Yeah.  Mostly yes, but

2   sometimes the -- the contact information wasn't

3   always accurate.  So -- again, they -- it just -- it

4   is a -- it is a rep behavior issue whether they --

5   they keep Salesforce up to date or not.

6   BY MR. COHEN:

7       Q.  Got it.  And -- and was that a use of

8   Salesforce that -- strike that.

9          Did you use Salesforce in that way; in

10  other words, to find out, you know, the status of

11  particular accounts, while you were at hiQ?

12         MS. SHARMA:  Objection.

13         THE WITNESS:  No, I would really just reach

14  out to the reps.  The -- the thing that we did do is

15  we could run a renewal report so we could see what

16  accounts were renewing and when, and -- but when it

17  came to close date and amount and stuff like that,

18  that is really something we would do kind of on a

19  one-on-one on a weekly basis.  So as much as I would

20  love to say Salesforce is a source of truth, the --

21  the challenge is making it the source of truth and

22  getting everybody to comply.

23  BY MR. COHEN:

24      Q.  You communicated with your sales team at

25  these weekly meetings to get information about the

Highly Confidential - Attorneys' Eyes Only

**Darin Medeiros**                                                                    hiQ Labs, Inc. vs.
                                                                                      LinkedIn Corp.

 1  status of their accounts, correct?

 2          MS. SHARMA:  Objection.

 3          THE WITNESS:  Yes.

 4  BY MR. COHEN:

 5      **Q.  And you used the Salesforce reports at**

 6  **these weekly meetings in the way that you just**

 7  **described to us, correct?**

 8          MS. SHARMA:  Objection.

 9          THE WITNESS:  Yes, but they were never

10  right.  But -- and -- and running a sales team --

11  like once you've run a sales team multiple times,

12  you'll always have like a surprise experience when

13  you go through these reports.  So would I live and

14  die based on these dashboards?  No, because it is --

15  there's always a ton of corrections as you go

16  through the weekly sales meetings.

17  BY MR. COHEN:

18      **Q.  That -- that wasn't my question, but -- my**

19  **question to you was:  Did you use these Salesforce**

20  **reports at your weekly meetings?**

21          MS. SHARMA:  Objection.

22          THE WITNESS:  Yes, we would start here.

23  BY MR. COHEN:

24      **Q.  Did you communicate directly with your**

25  **sales team in between these weekly meetings as well?**

www.aptusCR.com

CE 0625

**Highly Confidential - Attorneys' Eyes Only**    hiQ Labs, Inc. vs.
LinkedIn Corp.

**Darin Medeiros**

1      A.  Yes.

2      Q.  And what were the modes of communication?

3 In person, email, Slack, what -- what -- how did you

4 communicate with them?  All of the above?

5      A.  Yes, all of the above.

6      Q.  Slack was one of the means you used to

7 communicate with your team in order to get updates,

8 for example, on the status of certain accounts or

9 prospects?

10     A.  Yeah.

11     Q.  Common to use Slack in that way with your

12 team?

13     A.  Yeah.

14     Q.  All right.  I want to ask about hiQ's

15 products.  How would you explain to me the way in

16 which Keeper was used by hiQ customers?

17     A.  Typically, the -- the typical customer

18 using Keeper had some retention -- like regrettable

19 retention issue where they didn't know why people

20 were leaving and they wanted to start to identify

21 those individuals ahead of time and maybe, you know,

22 start some sort of retainment type programs for

23 those individuals.  And so there's -- there's been

24 some companies, they had very valuable assets that

25 were a flight risk and they wanted to mitigate that

1   problem.

2       Q.  Did any of hiQ's customers or prospects

3   want to use Keeper in order to assist them with

4   layoffs or reductions in force?

5       A.  I -- I don't -- I don't see how they could

6   use Keeper to do that.  That is not what Keeper was

7   built for.

8       Q.  Did any of hiQ's customers or prospects

9   wish to use hiQ's Keeper product for that purpose?

10          MS. SHARMA:  Objection.

11          THE WITNESS:  Not that I recall.

12  BY MR. COHEN:

13      Q.  Did any of hiQ's customers or prospects

14  communicate to you or to your team that they had a

15  use case in which they were seeking to lay off or

16  riff employees and they wanted to understand whether

17  they could use Keeper in that connection?

18      A.  I wasn't part of those conversations, so --

19  and I don't recall any of my direct reports telling

20  me that that was a use case for Keeper.

21      Q.  Do you recall anybody, whether they were

22  your direct reports or otherwise, communicating that

23  that could be a use case for Keeper, using it in

24  connection with layoffs or riffs?

25      A.  No, I don't -- I -- I -- I can't remember

**Darin Medeiros**



```
 1            MR. COHEN:  All right.  Let's go to Tab 112
 2   as the next exhibit, please.
 3         (Exhibit 443 was marked for identification.)
 4   BY MR. COHEN:
 5         Q.  Mr. Medeiros, Exhibit 443 has just been
 6   dropped into the chat.  Do you have that in front of
 7   you?
 8         A.  Yeah, give me a second.  Yes.
 9         Q.  And this is an email string -- at least the
10   top email in the string is between you,
11   Ms. McFadden, and Mr. Weidick from May of 2017, so
12   following the email that we just looked at.  Do you
13   see that?
14         A.  Yes.
```

Page 115

CE 0628

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**

**hiQ Labs, Inc. vs.
LinkedIn Corp.**



Page 116

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**

**hiQ Labs, Inc. vs.
LinkedIn Corp.**



Page 133

CE 0630

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**

hiQ Labs, Inc. vs.
LinkedIn Corp.



**www.aptusCR.com**

CE 0631

Darin Medeiros



15        Q.  And do you know whether there is any

16   additional information on why McKinsey stopped

17   working with hiQ in Salesforce?

18             MS. SHARMA:  Objection.

19             THE WITNESS:  No, I have no idea.

20             MR. COHEN:  Let's go to Tab 82, please.

21        (Exhibit 455 was marked for identification.)

22             VIDEO TECHNICIAN:  Counsel, for Tab 82, do

23   you mean 82 and 82.1, or just 82?

24             MR. COHEN:  Yeah, if we can do that.  82.1

25   is a spreadsheet, so if you could bring up the cover

1   email and spreadsheet and we can mark it all as 455.

2            VIDEO TECHNICIAN:   Sure.   One moment.

3   BY MR. COHEN:

4       Q.   Mr. Medeiros, we've dropped into the chat

5   the next exhibit, Exhibit 455, which is a covering

6   email and then a Excel spreadsheet.   Do you have

7   that in front of you?

8       A.   Yes.

9       Q.   Great.   The covering email is an email from

10  you to Mr. Weidick, Mark Scott, Amelia Barker, and

11  Andrew Kim dated October 16, 2017.   Do you see that?

12      A.   Yes.

13      Q.   And you say, "Hey guys, Here is our renewal

14  experience for 2017 based on our plan," and then you

15  indicate further down in your email, "Column M is

16  any comment associated with the account."   Do you

17  see that?

18      A.   Yes.

19      Q.   And if we go to the spreadsheet -- do you

20  have that in front of you?

21      A.   Yes.

22      Q.   And this is a spreadsheet called, "hiQ Labs

23  Sales Forecast, Fiscal Year 2017," correct?

24      A.   Yes.

25      Q.   But based on the cover note we just looked

CE 0633

1    at, it contains comments that were, at least as of

2    October 16, 2017, the information that you had at

3    hand, correct?

4            MS. SHARMA:  Objection.

5            THE WITNESS:  Yes.

6    BY MR. COHEN:

7        Q.  And if we look at this spreadsheet, we see

8    the opportunity name in the A column, right?

9        A.  Yes.

10       Q.  And we see the comments in the M column,

11   correct?

12       A.  Yes.

13       Q.  And what was the source, if you recall, for

14   the comments that you included in Column M?

15           MS. SHARMA:  Objection.

16           THE WITNESS:  Amelia would -- Amelia would

17   have had to have been the one to populate Column M.

18   BY MR. COHEN:

19       Q.  All right.  And do you believe that that

20   was the best information that Amelia would have had

21   as of the date of the document?

22           MS. SHARMA:  Objection.  Calls for

23   speculation.

24           THE WITNESS:  Do I still answer?

25           MS. SHARMA:  You can answer, Darin.

CE 0634



1        THE WITNESS:  Okay.  She would have been

2   the best source of truth for the accounts.

3   BY MR. COHEN:

4        Q.  And you would have expected that she would

5   have provided you with the best information she had

6   knowing that you were pulling this state of renewal

7   spreadsheet together for Mr. Weidick and others,

8   correct?

9        MS. SHARMA:  Objection.

10       THE WITNESS:  Yeah.  Yeah, she -- she would

11  have -- yeah, she would have -- she would have

12  answered -- she would have put what she knows by

13  account.

14  BY MR. COHEN:

CE 0635

```
 1              CERTIFICATE OF REPORTER

 2         I, JOHNNA PIPER, a Certified Shorthand

 3  Reporter, hereby certify that the witness in the

 4  foregoing deposition was by me duly sworn to tell

 5  the truth, the whole truth, and nothing but the

 6  truth in the within-entitled cause;

 7         That said deposition was taken in shorthand

 8  by me, a disinterested person, at the time and place

 9  therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12         That before completion of the deposition,

13  review of the transcript [ X ] was [   ] was not

14  requested.  If requested, any changes made by the

15  deponent (and provided to the reporter) during the

16  period allowed are appended hereto.

17         I further certify that I am not of counsel

18  or attorney for either or any of the parties to the

19  said deposition, nor in any way interested in the

20  event of this cause, and that I am not related to

21  any of the parties thereto.

22  DATED: 05/24/2022.

23

24

25              JOHNNA PIPER, CSR NO. 11268
```

CE 0636



From:       Stephen Sennert
Sent:       Fri 6/10/2016 11:03 AM (GMT-07:00)
To:         darin.medeiros@hiqlabs.com
Cc:
Bcc:
Subject:    HIQ LABS Account #: 120941
Attachments: 6527343.pdf


Dear Darin,


This is a follow up to our email previously sent.


Our records indicate that a payment has not been received for the invoices attached.  It is critical
that payment is received based on the contracted terms.


We would appreciate it if you could please provide a payment date for the past due invoices within
the next 3 days.


Please let me know if you have any questions or require additional details.


--
Happy to Help,

Stephen Sennert
Client Service Representative
ssennert@linkedin.com
866-208-0701
877-684-8938 (fax)

Supervisor - Renee Fields - rfields@linkedin.com
*Need Help NOW? : https://help.linkedin.com/app/home*

hiQ_00008090



**LinkedIn Corporation**
FEIN: 47-0912023
2029 Stierlin Ct
Mountain View 94043
United States
Fax No: 650-687-0505

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

## Invoice

**REMIT TO:**
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

| PAGE: | 1 of 1 |
| --- | --- |
| INVOICE NUMBER: | 6527343 |
| INVOICE DATE: | 25-JAN-16 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | CS2003870-15 |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | 24-FEB-16 |

| LINE | DESCRIPTION | UOM | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407 : 1 of 8  Billing Period From 01/25/2016 To 04/24/2016 | Each | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | TOTAL | 2,707.50 |
| --- | --- | --- |
| | SALES TAX | .00 |
| | CURRENCY | BALANCE DUE |
| | USD | 2,707.50 |
| SPECIAL INSTRUCTIONS: | | |
| | Please contact us at http://lnkd.in/billinghelp with any questions. | |



**Please reference our invoice #(s) with your payment.**

| CUSTOMER NAME | | Wire Information: |
| --- | --- | --- |
| HIQ LABS | | Bank of America, NA |
| **CUSTOMER #** | **INVOICE #** | 315 Montgomery St, 13th Fl |
| 120941 | 6527343 | San Francisco, CA 94104 |
| **CONTRACT #** | **INVOICE DATE** | |
| LSS6012243 | 25-JAN-16 | ABA/ROUTING: 026009593 |
| | | ACH Routing: 121000358 |
| **CURRENCY** | **AMOUNT PAID** | Final Credit A/C #: 1499813713 |
| USD | 0.00 | SWIFT CODE: BOFAUS3N |
| | | Account Name: LinkedIn Corporation |
| | **NET AMOUNT DUE** | Reference Invoice Number on Wire |
| | **2,707.50** | |

## CE 0641

From:       Accounts Receivable
Sent:       Mon 4/25/2016 10:27 AM (GMT-07:00)
To:         darin.medeiros@hiqlabs.com
Cc:
Bcc:
Subject:    LinkedIn Invoice(s): HIQ LABS
Attachments: 6532370.pdf

Dear Customer:
This email contains the most recent invoice(s) posted to your account as follows:

6532370 (2 of 8)

Our payment instructions such as Lockbox location, electronic fund & wire transfer instructions
are located on the attached invoice(s).

Please contact us at http://lnkd.in/billinghelp with any questions.

Best regards & thank you for your partnership.

Linkedin Accounts Receivable



hiQ_00008509



## Invoice

**LinkedIn Corporation**
FEIN: 47-0912023
2029 Stierlin Ct
Mountain View 94043
United States
Fax No: 650-687-0505

**REMIT TO:**
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

| | |
|---|---|
| PAGE: | 1 of 2 |
| INVOICE NUMBER: | 6532370 |
| INVOICE DATE: | 25-APR-16 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | CS2003870-15 |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | Medeiros, Darin |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | 25-MAY-16 |

| LINE | DESCRIPTION | UOM | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
|---|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407 : 2 of 8 Billing Period From 04/25/2016 To 07/24/2016 | Each | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | | | |
|---|---|---|---|
| | TOTAL | | 2,707.50 |
| | SALES TAX | | .00 |
| | CURRENCY | | BALANCE DUE |
| | USD | | 2,707.50 |
| SPECIAL INSTRUCTIONS: | | | |
| | Please contact us at http://lnkd.in/billinghelp with any questions. | | |



**Please reference our invoice #(s) with your payment.**

| CUSTOMER NAME | | Wire Information: |
|---|---|---|
| HIQ LABS | | Bank of America, NA |
| CUSTOMER # 120941 | INVOICE # 6532370 | 315 Montgomery St, 13th Fl San Francisco, CA 94104 |
| CONTRACT # LSS6012243 | INVOICE DATE 25-APR-16 | ABA/ROUTING: 026009593 ACH Routing: 121000358 |
| CURRENCY USD | AMOUNT PAID 0.00 | Final Credit A/C #: 1499813713 SWIFT CODE: BOFAUS3N Account Name: LinkedIn Corporation |
| | NET AMOUNT DUE 2,707.50 | Reference Invoice Number on Wire |

hiQ_00008510

CE 0643



| **Remittance Detail** |
|---|

All payments **must** include the **LinkedIn invoice number detail** to ensure your account is credited.  Invoice numbers can be found on the top right-hand corner of your invoice

§   **Electronic Payments (Wires/ACH Transfers)**
   o   Via the ACH Payment Network (CTX, CCD+, PPD+ payments)
      All invoice numbers in full must be entered in *the correct required format*, within the RMR segment, including the invoice number qualifier "IV", and repeating for multiple invoices against one payment where relevant.
      Example:
      RMR*IV*3761234**25000.00*
      RMR*IV*3761235**12500.50*
      If paying via CCD or PPD formats, ACH network will not have an RMR segment available to you. In such cases please send your remittance advice directly to **ar-receipts@linkedin.com**
   o   Via Wire Transfer
      Include *all* invoice numbers *in full* in *correct format* in the remittance field provided by your bank with your payment – including the reference tag "INV?"
      Example
      INV?3761234
§   **For Check payments**
   Include *all* invoice numbers in remittance advice accompanied by check

| **Financial Detail** |
|---|

*Available methods of payment: Wire/ACH Transfer, Checks*

**United States Dollar (USD) only**

*For Electronic Transfers*
Bank name: Bank of America, N.A.
Bank address: 315 Montgomery St, 13th Fl, San Francisco, CA 94104

ABA/**Wire** Routing: 026009593 – **or** – ACH Routing: 121000358
Final Credit A/C #: 1499813713
SWIFT CODE: BOFAUS3N
Account Name: LinkedIn Corporation

*Check Payments*
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

**Contacts**
Remittance Email Address: ar-receipts@linkedin.com
Billing Inquiries: Please contact us via our webform http://lnkd.in/billinghelp

hiQ_00008511

CE 0644

From:     Accounts Receivable
Sent:     Mon 7/25/2016 9:59 AM (GMT-07:00)
To:     darin.medeiros@hiqlabs.com
Cc:
Bcc:
Subject:     LinkedIn Invoice(s): HIQ LABS
Attachments: 6537758.pdf

Dear Customer:
This email contains the most recent invoice(s) posted to your account as follows:

6537758 (3 of 8)

Our payment instructions such as Lockbox location, electronic fund & wire transfer instructions are located on the attached invoice(s).

Please contact us at http://lnkd.in/billinghelp with any questions.

Best regards & thank you for your partnership.

Linkedin Accounts Receivable



hiQ_00007822



## Invoice

**LinkedIn Corporation**
FEIN: 47-0912023
2029 Stierlin Ct
Mountain View 94043
United States
Fax No: 650-687-0505

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

| | |
|---|---|
| PAGE: | 1 of 2 |
| INVOICE NUMBER: | 6537758 |
| INVOICE DATE: | 25-JUL-16 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | CS2003870-15 |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | Medeiros, Darin |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | 24-AUG-16 |

| LINE | DESCRIPTION | UOM | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
|---|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407 : 3 of 8 Billing Period From 07/25/2016 To 10/24/2016 | Each | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | | |
|---|---|---|
| **TOTAL** | | 2,707.50 |
| **SALES TAX** | | .00 |
| **CURRENCY** | | **BALANCE DUE** |
| USD | | 2,707.50 |
| **SPECIAL INSTRUCTIONS:** | | |
| | **Please contact us at http://lnkd.in/billinghelp with any questions.** | |



**Please reference our invoice #(s) with your payment.**

| | | |
|---|---|---|
| **CUSTOMER NAME** HIQ LABS | | **Wire Information:** Bank of America, NA 315 Montgomery St, 13th Fl San Francisco, CA 94104 |
| **CUSTOMER #** 120941 | **INVOICE #** 6537758 | |
| **CONTRACT #** LSS6012243 | **INVOICE DATE** 25-JUL-16 | ABA/ROUTING: 026009593 ACH Routing: 121000358 Final Credit A/C #: 1499813713 SWIFT CODE: BOFAUS3N Account Name: LinkedIn Corporation Reference Invoice Number on Wire |
| **CURRENCY** USD | **AMOUNT PAID** 0.00 | |
| | **NET AMOUNT DUE** **2,707.50** | |

**REMIT TO:**
**LinkedIn Corporation**
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

hiQ_00007823

CE 0646



| **Remittance Detail** |
| --- |

All payments **must** include the **LinkedIn invoice number detail** to ensure your account is credited.  Invoice numbers can be found on the top right-hand corner of your invoice

- § **Electronic Payments (Wires/ACH Transfers)**
  - o Via the ACH Payment Network (CTX, CCD+, PPD+ payments)
    All invoice numbers in full must be entered in *the correct required format*, within the RMR segment, including the invoice number qualifier "IV", and repeating for multiple invoices against one payment where relevant.
    Example:
    RMR*IV*3761234**25000.00*
    RMR*IV*3761235**12500.50*
    If paying via CCD or PPD formats, ACH network will not have an RMR segment available to you. In such cases please send your remittance advice directly to **ar-receipts@linkedin.com**
  - o Via Wire Transfer
    Include *all* invoice numbers *in full* in *correct format* in the remittance field provided by your bank with your payment – including the reference tag "INV?"
    Example
    INV?3761234
- § **For Check payments**
    Include *all* invoice numbers in remittance advice accompanied by check

| **Financial Detail** |
| --- |

*Available methods of payment: Wire/ACH Transfer, Checks*

**United States Dollar (USD) only**

*For Electronic Transfers*
Bank name: Bank of America, N.A.
Bank address: 315 Montgomery St, 13th Fl, San Francisco, CA 94104

ABA/**Wire** Routing: 026009593 – **or** – ACH Routing: 121000358
Final Credit A/C #: 1499813713
SWIFT CODE: BOFAUS3N
Account Name: LinkedIn Corporation

*Check Payments*
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

**Contacts**
Remittance Email Address: ar-receipts@linkedin.com
Billing Inquiries: Please contact us via our webform http://lnkd.in/billinghelp

hiQ_00007824

CE 0647

From:        Accounts Receivable
Sent:        Tue 10/25/2016 5:08 PM (GMT-07:00)
To:          darin.medeiros@hiqlabs.com
Cc:          ar@linkedin.com
Bcc:
Subject:     LinkedIn Invoice(s): HIQ LABS
Attachments: 10110014579.pdf


Dear Customer:
This email contains the most recent invoice(s) posted to your account as follows:

10110014579 (4 of 8)

Our payment instructions such as Lockbox location, electronic fund & wire transfer instructions
are located on the attached invoice(s).

Please contact us at http:/lnkdin/billing with any questions.

Best regards & thank you for your partnership.

LinkedIn Accounts Receivable



hiQ_00007273



**LinkedIn Corporation**
FEIN: 47-0912023
2029 Stierlin Ct
Mountain View 94043
United States
Fax No: 650-687-0505

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

## Invoice

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

| | |
|---|---|
| PAGE: | 1 of 2 |
| INVOICE NUMBER: | 10110014579 |
| INVOICE DATE: | 25-OCT-16 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | CS2003870-15 |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | 24-NOV-16 |

| LINE | DESCRIPTION | UOM | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
|---|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407 : 4 of 8 Billing Period From 10/25/2016 To 01/24/2017 | Each | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | | |
|---|---|---|
| TOTAL | | 2,707.50 |
| SALES TAX | | .00 |
| CURRENCY | | BALANCE DUE |
| USD | | 2,707.50 |

**SPECIAL INSTRUCTIONS:**

**Please contact us at http://lnkd.in/billinghelp with any questions.**



**Please reference our invoice #(s) with your payment.**

| CUSTOMER NAME | | Wire Information: |
|---|---|---|
| HIQ LABS | | Bank of America, NA |
| CUSTOMER # | INVOICE # | 315 Montgomery St, 13th Fl |
| 120941 | 10110014579 | San Francisco, CA 94104 |
| CONTRACT # | INVOICE DATE | ABA/ROUTING: 026009593 |
| LSS6012243 | 25-OCT-16 | ACH Routing: 121000358 |
| CURRENCY | | Final Credit A/C #: 1499813713 |
| USD | AMOUNT PAID | SWIFT CODE: BOFAUS3N |
| | 0.00 | Account Name: LinkedIn Corporation |
| | NET AMOUNT DUE | Reference Invoice Number on Wire |
| | 2,707.50 | |

**REMIT TO:**
**LinkedIn Corporation**
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

CE 0649



| **Remittance Detail** |
|---|

All payments **must** include the **LinkedIn invoice number detail** to ensure your account is credited.  Invoice numbers can be found on the top right-hand corner of your invoice

§ **Electronic Payments (Wires/ACH Transfers)**
  ○ Via the ACH Payment Network (CTX, CCD+, PPD+ payments)
    All invoice numbers in full must be entered in *the correct required format*, within the RMR segment, including the invoice number qualifier "IV", and repeating for multiple invoices against one payment where relevant.
    Example:
    RMR*IV*3761234**25000.00*
    RMR*IV*3761235**12500.50*
    If paying via CCD or PPD formats, ACH network will not have an RMR segment available to you. In such cases please send your remittance advice directly to **ar-receipts@linkedin.com**
  ○ Via Wire Transfer
    Include *all* invoice numbers *in full* in *correct format* in the remittance field provided by your bank with your payment – including the reference tag "INV?"
    Example
    INV?3761234
§ **For Check payments**
    Include *all* invoice numbers in remittance advice accompanied by check

| **Financial Detail** |
|---|

*Available methods of payment: Wire/ACH Transfer, Checks*

**United States Dollar (USD) only**

*For Electronic Transfers*
Bank name: Bank of America, N.A.
Bank address: 315 Montgomery St, 13th Fl, San Francisco, CA 94104

ABA/**Wire** Routing: 026009593 – **or** – ACH Routing: 121000358
Final Credit A/C #: 1499813713
SWIFT CODE: BOFAUS3N
Account Name: LinkedIn Corporation

*Check Payments*
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

**Contacts**
Remittance Email Address: ar-receipts@linkedin.com
Billing Inquiries: Please contact us via our webform http://lnkd.in/billinghelp

hiQ_00007275

CE 0650

From:        Accounts Receivable
Sent:        Wed 1/25/2017 9:32 AM (GMT-08:00)
To:          darin.medeiros@hiqlabs.com
Cc:
Bcc:
Subject:     Reference Number(s):CS2003870-15 LinkedIn Invoice(s): HIQ LABS
Attachments: 10110080613.pdf


Dear Customer:
This email contains the most recent invoice(s) posted to your account as follows:

10110080613 (5 of 8)

Our payment instructions such as Lockbox location, electronic fund & wire transfer instructions
are located on the attached invoice(s).

Please contact us at http://lnkd.in/billinghelp with any questions.

Best regards & thank you for your partnership.

LinkedIn Accounts Receivable



hiQ_00006812



**Invoice**

**LinkedIn Corporation**
FEIN: 47-0912023
1000 West Maude Ave
Sunnyvale, CA 94085
United States
Fax No: 650-687-0505

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

| PAGE: | 1 of 2 |
|---|---|
| INVOICE NUMBER: | **10110080613** |
| INVOICE DATE: | 25-JAN-17 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | **CS2003870-15** |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | Medeiros, Darin |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | **24-FEB-17** |

| LINE | DESCRIPTION | UOM | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
|---|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407 : 5 of 8<br>Billing Period From 01/25/2017 To 04/24/2017 | Each | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | | |
|---|---|---|
| **TOTAL** | | 2,707.50 |
| **SALES TAX** | | .00 |
| **CURRENCY** | | **BALANCE DUE** |
| USD | | 2,707.50 |

**SPECIAL INSTRUCTIONS:**

**Please contact us at http://lnkd.in/billinghelp with any questions.**



**Please reference our invoice #(s) with your payment.**

| CUSTOMER NAME | | Wire Information: |
|---|---|---|
| HIQ LABS | | Bank of America, NA |
| CUSTOMER # | INVOICE # | 315 Montgomery St, 13th Fl |
| 120941 | 10110080613 | San Francisco, CA 94104 |
| CONTRACT # | INVOICE DATE | ABA/ROUTING: 026009593 |
| LSS6012243 | 25-JAN-17 | ACH Routing: 121000358 |
| CURRENCY | | Final Credit A/C #: 1499813713 |
| USD | AMOUNT PAID | SWIFT CODE: BOFAUS3N |
| | 0.00 | Account Name: LinkedIn Corporation |
| | NET AMOUNT DUE | Reference Invoice Number on Wire |
| | 2,707.50 | |

**REMIT TO:**
**LinkedIn Corporation**
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

hiQ_00006813

CE 0652



| Remittance Detail |
|---|

All payments **must** include the **LinkedIn invoice number detail** to ensure your account is credited.  Invoice numbers can be found on the top right-hand corner of your invoice

- § **Electronic Payments (Wires/ACH Transfers)**
  - ○ Via the ACH Payment Network (CTX, CCD+, PPD+ payments)
    All invoice numbers in full must be entered in *the correct required format*, within the RMR segment, including the invoice number qualifier "IV", and repeating for multiple invoices against one payment where relevant.
    Example:
    RMR*IV*3761234**25000.00*
    RMR*IV*3761235**12500.50*
    If paying via CCD or PPD formats, ACH network will not have an RMR segment available to you. In such cases please send your remittance advice directly to **ar-receipts@linkedin.com**
  - ○ Via Wire Transfer
    Include *all* invoice numbers *in full* in *correct format* in the remittance field provided by your bank with your payment – including the reference tag "INV?"
    Example
    INV?3761234
- § **For Check payments**
  Include *all* invoice numbers in remittance advice accompanied by check

| Financial Detail |
|---|

*Available methods of payment: Wire/ACH Transfer, Checks*

**United States Dollar (USD) only**

*For Electronic Transfers*
Bank name: Bank of America, N.A.
Bank address: 315 Montgomery St, 13th Fl, San Francisco, CA 94104

ABA/**Wire** Routing: 026009593 – **or** – ACH Routing: 121000358
Final Credit A/C #: 1499813713
SWIFT CODE: BOFAUS3N
Account Name: LinkedIn Corporation

*Check Payments*
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

**Contacts**
Remittance Email Address: **ar-receipts@linkedin.com**
Billing Inquiries: Please contact us via our webform http://lnkd.in/billinghelp

From:        Accounts Receivable
Sent:        Tue 4/25/2017 11:07 AM (GMT-07:00)
To:          darin.medeiros@hiqlabs.com
Cc:
Bcc:
Subject:     Reference Number(s):CS2003870-15 LinkedIn Invoice(s): HIQ LABS
Attachments: 10110146560.pdf


Dear Customer:
This email contains the most recent invoice(s) posted to your account as follows:

10110146560 (6 of 8)

Our payment instructions such as Lockbox location, electronic fund & wire transfer instructions
are located on the attached invoice(s).

Please contact us at http://lnkd.in/billinghelp with any questions.

Best regards & thank you for your partnership.

LinkedIn Accounts Receivable



hiQ_00006668



**Invoice**

**LinkedIn Corporation**
FEIN: 47-0912023
1000 West Maude Ave
Sunnyvale, CA 94085
United States
Fax No: 650-687-0505

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

| | |
|---|---|
| PAGE: | 1 of 2 |
| INVOICE NUMBER: | 10110146560 |
| INVOICE DATE: | 25-APR-17 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | CS2003870-15 |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | Medeiros, Darin |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | 25-MAY-17 |

| LINE | DESCRIPTION | UOM | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
|---|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407 : 6 of 8  Billing Period From 04/25/2017 To 07/24/2017 | Each | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | |
|---|---|
| TOTAL | 2,707.50 |
| SALES TAX | .00 |
| CURRENCY | BALANCE DUE |
| USD | 2,707.50 |

**SPECIAL INSTRUCTIONS:**

**Please contact us at http://lnkd.in/billinghelp with any questions.**



Please reference our invoice #(s) with your payment.

| | | | |
|---|---|---|---|
| **CUSTOMER NAME** HIQ LABS | | | **Wire Information:** Bank of America, NA 315 Montgomery St, 13th Fl San Francisco, CA 94104 |
| **CUSTOMER #** 120941 | **INVOICE #** 10110146560 | | |
| **CONTRACT #** LSS6012243 | **INVOICE DATE** 25-APR-17 | | ABA/ROUTING: 026009593 ACH Routing: 121000358 |
| **CURRENCY** USD | **AMOUNT PAID** 0.00 | | Final Credit A/C #: 1499813713 SWIFT CODE: BOFAUS3N Account Name: LinkedIn Corporation |
| | **NET AMOUNT DUE 2,707.50** | | Reference Invoice Number on Wire |

**REMIT TO:**
**LinkedIn Corporation**
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

hiQ_00006669

CE 0655



| Remittance Detail |
|---|

All payments **must** include the **LinkedIn invoice number detail** to ensure your account is credited.  Invoice numbers can be found on the top right-hand corner of your invoice

§ **Electronic Payments (Wires/ACH Transfers)**
  ○ Via the ACH Payment Network (CTX, CCD+, PPD+ payments)
    All invoice numbers in full must be entered in *the correct required format*, within the RMR segment, including the invoice number qualifier "IV", and repeating for multiple invoices against one payment where relevant.
    Example:
    RMR*IV*3761234**25000.00*
    RMR*IV*3761235**12500.50*
    If paying via CCD or PPD formats, ACH network will not have an RMR segment available to you. In such cases please send your remittance advice directly to **ar-receipts@linkedin.com**
  ○ Via Wire Transfer
    Include *all* invoice numbers *in full* in *correct format* in the remittance field provided by your bank with your payment – including the reference tag "INV?"
    Example
    INV?3761234
§ **For Check payments**
    Include *all* invoice numbers in remittance advice accompanied by check

| Financial Detail |
|---|

*Available methods of payment: Wire/ACH Transfer, Checks*

**United States Dollar (USD) only**

***For Electronic Transfers***
Bank name: Bank of America, N.A.
Bank address: 315 Montgomery St, 13th Fl, San Francisco, CA 94104

ABA/**Wire** Routing: 026009593 – **or** – ACH Routing: 121000358
Final Credit A/C #: 1499813713
SWIFT CODE: BOFAUS3N
Account Name: LinkedIn Corporation

***Check Payments***
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

**Contacts**
Remittance Email Address: **ar-receipts@linkedin.com**
Billing Inquiries: Please contact us via our webform http://lnkd.in/billinghelp

hiQ_00006670

From:       LinkedIn North America Receivables Team
Sent:       Fri 12/07/2018 10:23 AM (GMT-08:00)
To:         darin.medeiros@hiqlabs.com
Cc:
Bcc:
Subject:    Your overdue LinkedIn account sent to collections
Attachments: sgimage0.jpg; 10110291141.pdf; 10110217366.pdf

**3rd Party Referral – HIQ LABS**



Date: **December 7, 2018**

Account: **HIQ LABS**

Dear Darin,

As a result of non-payment, your contract with LinkedIn has been terminated and your amount due is being referred to a third-party debt collections agency.

As noted in our previous communications, our records show that you have a total open balance of:

(USD): 5,415.00

You'll be contacted by the agency to ensure payment.

| Invoice # | Due Date | Days Past Due | Description | Contract Number | P.O. # | Currency | Balance | Dispute Reason |
|---|---|---|---|---|---|---|---|---|
| 10110217366 | 8/24/17 | 470 | Sales Navigator Team (10-24 Seats) | CS2003870-15 | | USD | 2,707.50 | |
| 10110291141 | 11/24/17 | 378 | Sales Navigator Team (10-24 Seats) | CS2003870-15 | | USD | 2,707.50 | |

If you have any questions, please reply to this email without changing the subject line.

hiQ_00005955

CE 0657

Sincerely,

LinkedIn Collections
receivables-namerica@linkedin.com

hiQ_00005956

 **LinkedIn Corporation**
FEIN: 47-0912023   **Invoice**

| Invoice Number: 10110291141 | **Balance Due** : **USD 2,707.50** |
|---|---|
| | Due Date    : 24-NOV-2017 |

| | | |
|---|---|---|
| | Invoice Date | : **25-OCT-17** |
| | Payment Terms | : NET 30 |
| **Bill To:** | PO Number or I/O Number | : |
| HIQ LABS | Advertiser Campaign | : |
| 625 Market St. | Contract Contact | : Medeiros, Darin |
| San Francisco  CA 94105 | Currency | : USD |
| United States | Payment Method | : Invoice |
| Attn: Accounts Payable | | |

**Ship To:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

### Invoice Details

| Order Number | CS2003870-15 | **Billing Frequency** Quarterly | | | **Next Invoice Date** | N/A | |
|---|---|---|---|---|---|---|---|

| Line | Description | Order Line Amount | Qty | Unit Price | Billed Amount | Tax Amount |
|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)   : 8 of 8<br>Billing Period From 10/25/2017 To 01/24/2018 | 21,660.00 | 10 | 270.75 | 2,707.50 | 0.00<br>0.00% |

| **Special Instructions** | | |
|---|---|---|
| | Total | 2,707.50 |
| | Sales Tax | 0.00 |
| | Amount Paid | 0.00 |
| | **Balance Due** | **2,707.50** |

Questions? Please contact us at http://lnkd.in/billinghelp

### Payment Instructions

**Please reference invoice number(s) with your payment.**

**Pay via wire transfer/ACH**
Bank of America, NA
315 Montgomery St, 13th Fl
San Francisco, CA 94104

Account #: 1499813713
Account Name: LinkedIn Corporation
ABA/ROUTING: 026009593
ACH Routing: 121000358
SWIFT CODE: BOFAUS3N

**Pay by Check**
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622
United States

For ACH Payments, include the remittance advice identifier segment RMR*IV, your invoice number and payment amount. For example RMR*IV*3951653**179529.68*

For Wire payments, include the reference tag *INV?* and invoice numbers. For example, INV?3951653

In all other cases, send remittance advice to ar-receipts@linkedin.com

LinkedIn Corporation  1000 West Maude Ave  Sunnyvale, CA 94085 United States   (Note: Please do not remit to this address)

hiQ_00005958

CE 0659



**LinkedIn Corporation**
FEIN: 47-0912023
1000 West Maude Ave
Sunnyvale, CA 94085
United States
Fax No: 650-687-0505

**BILL TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States
Attn: Accounts Payable

## Invoice

**SHIP TO:**
HIQ LABS
625 Market St.
San Francisco  CA 94105
United States

| | |
|---|---|
| PAGE: | 1 of 2 |
| INVOICE NUMBER: | 10110217366 |
| INVOICE DATE: | 25-JUL-17 |
| PURCHASE/INSERTION ORDER NUMBER: | |
| LINKEDIN SALES ORDER: | CS2003870-15 |
| ADVERTISER/CAMPAIGN: | |
| CUSTOMER CONTACT: | |
| BILLING PERIOD: | |
| TERMS: | NET 30 |
| DUE DATE: | 24-AUG-17 |

| LINE | DESCRIPTION | QTY | UNIT PRICE | EXTENDED AMOUNT | SALES TAX% | TAX |
|---|---|---|---|---|---|---|
| 1 | Sales Navigator Team (10-24 Seats)  L_SNTXX02-1407  : 7 of 8<br>Billing Period From 07/25/2017 To 10/24/2017 | 10 | 270.75 | 2,707.50 | .00 | .00 |

| | | |
|---|---|---|
| | TOTAL | 2,707.50 |
| | SALES TAX | .00 |
| | CURRENCY | BALANCE DUE |
| | USD | 2,707.50 |
| SPECIAL INSTRUCTIONS: | | |
| | Please contact us at http://lnkd.in/billinghelp with any questions. | |



**Please reference our invoice #(s) with your payment.**

| | | | | |
|---|---|---|---|---|
| | **CUSTOMER NAME**<br>HIQ LABS | | | **Wire Information:**<br>Bank of America, NA |
| | **CUSTOMER #**<br>120941 | **INVOICE #**<br>10110217366 | **BILLING FREQUENCY**<br>Quarterly | 315 Montgomery St, 13th Fl<br>San Francisco, CA 94104 |
| | **CONTRACT #**<br>LSS6012243 | **INVOICE DATE**<br>25-JUL-17 | **NEXT INVOICE DATE**<br>25-OCT-17 | ABA/ROUTING: 026009593<br>ACH Routing: 121000358 |
| | **CURRENCY**<br>USD | **AMOUNT PAID**<br>0.00 | **UNBILLED CONTRACT AMOUNT**<br>2,707.50 | Final Credit A/C #: 1499813713<br>SWIFT CODE: BOFAUS3N<br>Account Name: LinkedIn |
| | | **NET AMOUNT DUE**<br>2,707.50 | **CONTRACT AMOUNT**<br>21,660.00 | Corporation<br>Reference Invoice Number on<br>Wire |

**REMIT TO:**
**LinkedIn Corporation**
62228 Collections Center Drive
Chicago, IL 60693-0622 United States

hiQ_00005959

CE 0660



| **Remittance Detail** |
|---|

All payments **must** include the **LinkedIn invoice number detail** to ensure your account is credited.  Invoice numbers can be found on the top right-hand corner of your invoice

- § **Electronic Payments (Wires/ACH Transfers)**
    - ○ Via the ACH Payment Network (CTX, CCD+, PPD+ payments)
      All invoice numbers in full must be entered in *the correct required format*, within the RMR segment, including the invoice number qualifier "IV", and repeating for multiple invoices against one payment where relevant.
      Example:
      RMR*IV*3761234**25000.00*
      RMR*IV*3761235**12500.50*
      If paying via CCD or PPD formats, ACH network will not have an RMR segment available to you. In such cases please send your remittance advice directly to **ar-receipts@linkedin.com**
    - ○ Via Wire Transfer
      Include *all* invoice numbers *in full* in *correct format* in the remittance field provided by your bank with your payment – including the reference tag "INV?"
      Example
      INV?3761234
- § **For Check payments**
    Include *all* invoice numbers in remittance advice accompanied by check

| **Financial Detail** |
|---|

*Available methods of payment: Wire/ACH Transfer, Checks*

**United States Dollar (USD) only**

*For Electronic Transfers*
Bank name: Bank of America, N.A.
Bank address: 315 Montgomery St, 13th Fl, San Francisco, CA 94104

ABA/**Wire** Routing: 026009593 – **or** – ACH Routing: 121000358
Final Credit A/C #: 1499813713
SWIFT CODE: BOFAUS3N
Account Name: LinkedIn Corporation

*Check Payments*
LinkedIn Corporation
62228 Collections Center Drive
Chicago, IL 60693-0622

**Contacts**
Remittance Email Address: ar-receipts@linkedin.com
Billing Inquiries: Please contact us via our webform http://lnkd.in/billinghelp

# Compendium Exhibit 13

# (Exhibit Filed Under Seal)

# Compendium Exhibit 14

# (CE770-791 of Exhibit Filed Under Seal)

```
1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4
    hiQ Labs, Inc.,
5
                 Plaintiff,
6                                    Case No.:
                 vs.                 17-cv-03301-EMC
7
    LinkedIn Corporation,
8
                 Defendant.
9   _____

10  LinkedIn Corporation,

11               Counterclaimant,

12               vs.

13  hiQ Labs, Inc.,

14               Counter-defendant.
    _____
15

16            VIDEO-RECORDED DEPOSITION

17      REMOTELY TAKEN VIA ZOOM CONFERENCE OF

18               DANIEL MILLER,

19         Individually and as 30(b)(6),

20         Volume II/PAGES 297 - 377

21            THURSDAY, MAY 26, 2022

22

23  Stenographically Reported by:
    Linda E. Marquette
24  RPR, CLR, CSR No. 11874

25  Job No. 10101218
```

Page 298

CE 0750

```
 1                VIDEO-RECORDED DEPOSITION

 2            REMOTELY TAKEN VIA ZOOM CONFERENCE

 3                 THURSDAY, MAY 26, 2022

 4            9:03 A.M. (PDST) to 11:31 A.M. (PDST)

 5

 6            VIDEOGRAPHER:  Good morning.  We are now on

 7   the record.  Today's date is May 26, 2022.  The time is

 8   9:03 a.m.

 9            This is the remote videotaped deposition of

10   Daniel Miller, Volume II, being taken via Zoom

11   videoconference.  This matter is entitled hiQ Labs, Inc.

12   versus LinkedIn Corp.

13            The deponent is appearing remotely from

14   Campbell, California.

15            My name is Aaron Isaacs, appearing for Aptus

16   Court Reporting, located at 600 West Broadway, Suite

17   300, San Diego, California 92101.

18            I'm the official videographer and this

19   recording is the only authorized video recording of this

20   deposition.  The audio and video recording will take

21   place at all times unless all counsel agree to go off

22   the record.

23            Will counsel please identify yourselves and

24   anyone with you, and state the parties that you

25   represent.
```

CE 0751

1    MS. HURST:  Yes.  Excuse me.  Annette Hurst

2 from Orrick for LinkedIn, and with me is Dan Justice.

3    MS. SHARMA:  And Renita Sharma for plaintiff

4 hiQ Labs from Quinn Emanuel, also for the witness.

5    VIDEOGRAPHER:  Thank you.

6    Our court reporter for today is Linda

7 Marquette, will now administer the oath.

8      DANIEL MILLER,

9  having been first duly administered an oath remotely,

10    was examined and testified as follows:

11

12     EXAMINATION (CONTINUED)

13 BY MS. HURST:

14  **Q.** **Mr. Miller, at the last session of your**

15 **deposition you mentioned that hiQ was running scrapers**

16 **from some cloud-based service other than Amazon.  Have**

17 **you been able to refresh your recollection as to the**

18 **identity of that account provider?**

19  A.   Yes, I have.  Actually, it turns out what we

20 ended up doing was creating another account with Amazon

21 services, and so we had two accounts with them.

22  **Q.** **Okay.  Did there come a time in -- after hiQ**

23 **filed its lawsuit against LinkedIn when you were trying**

24 **to cut costs with respect to the use of Amazon's AWS**

25 **services?**

CE 0752

1    don't recollect what I did with the other one.  I assume

2    I gave it to somebody or put it in safekeeping.  I know

3    that it's been -- it's been -- those drives are located

4    so ...

5         Q.    Were they identical?

6         A.    That was certainly the intent.  It's a lot of

7    data so ...

8         Q.    Mr. Miller, if I represent to you that we've

9    been informed that only the raw scrapes collection out

10   of Mongo database was preserved, can you explain that?

11        A.    No.  That seems surprising to me.  That's not

12   my recollection.

13        Q.    Did you have any role in archiving any data

14   from hiQ's Salesforce instance?

15        A.    No.  I don't believe I did anything with

16   Salesforce.

17        Q.    But you --

18        A.    I have --

19              I was not an administrator of that product.

20        Q.    You understood the need to preserve the

21   Salesforce data, however?

22        A.    I understood it but it wasn't my wheelhouse,

23   so I mean, I wasn't the only person who received those

24   sorts of instructions.

25        Q.    And did you communicate with anyone about the

1          Q.    You're right thank you.

2                MS. SHARMA:  Aaron has already provided 535,

3     so he's on it.

4                (Exhibit 535 marked for

5                identification by the Certified

6                Shorthand Reporter.)

7                MS. HURST:  I just have to scroll here in my

8     folder to get to the right document.  Okay.  Exhibit 535

9     is hiQ 00141957.  That's tab 41 Aaron.

10               THE WITNESS:  I see this.

11    BY MS. HURST:

12         Q.    All right.  Mr. Miller, you'll see this as an

13    e-mail thread between you and it appears someone from

14    NetNut --

15         A.    Yes.

16         Q.    -- Tal Sharon at NetNut?

17         A.    I see it.

18         Q.    Okay.  In the thread, Exhibit 535, it starts

19    out at the bottom in May 2017 indicating you would like

20    to purchase their services for the $300 a month level.

21               Do you see that?

22         A.    I'm scrolling down to the beginning of the

23    thread.  All right.  Let's see.

24               So I see a thread that starts with me saying:

25    Purchase monthly services of $300 a month logged in

1    using credentials.  So what is the question --

2        Q.    I just want to make sure that you see that we

3    started at the beginning.

4        A.    Yeah.

5        Q.    So did you purchase proxy services from NetNut

6    in May of 2017?

7        A.    It appears that I did from looking at this

8    document.

9        Q.    All right.  And then in June you asked how to

10   cancel the services?

11       A.    Correct.

12       Q.    And Mr. Sharon asks why are you canceling the

13   services in July.  Do you see that?

14       A.    I'm looking for it -- yeah.  He goes:

15                "Did something not work for you

16                with our service ..."

17       Q.    Yeah.  Right.  And what was your response?

18       A.    Well, they -- yeah, they were banned at

19   LinkedIn so they weren't helpful to us.

20       Q.    Okay.  So you tried to use NetNut as a proxy

21   service for scraping LinkedIn, but it didn't -- it

22   didn't work; is that correct?

23       A.    Correct.  As I say here, the ban rate was

24   greater than 99 percent, which is not -- not feasible.

CE 0755

5      Q.      Exhibit 536 is tab 207.  hiQ_00437111.

6              (Exhibit 536 marked for

7              identification by the Certified

8              Shorthand Reporter.)

9              MS. SHARMA:  How many more of these do you

10    have?  I was thinking we could take a break at some

11    point.

12             MS. HURST:  Sure.  Let's just do this one and

13    then we can take a break.

14             THE WITNESS:  Okay.  This is 536.  No, we

15    already did that.

16             MS. HURST:  That's right.

17             THE WITNESS:  Is 536 what you're asking me to

18    bring up?

19             MS. HURST:  Yep.

20             THE WITNESS:  Okay.  I think I have it.

21    BY MS. HURST:

22      Q.      You'll see a --

23      A.      Chat transcript.

24      Q.      -- two-line chat transcript with Mr. Weidick.

25    Do you see that?

CE 0756



```
15            MS. SHARMA:  Objection.

16      A.    -- about that.

17            Should I answer?

18            MS. HURST:  Okay.  Exhibit 539 is tab 140.

19      hiQ 00359637.

20            (Exhibit 539 marked for

21            identification by the Certified

22            Shorthand Reporter.)

23      BY MS. HURST:

24      Q.    So -- excuse me.

25            You'll see here, Mr. Miller, a series of
```

1   e-mails about logging -- logged out turking and whether

2   that's working or not.

3          A.   Okay.  I'd have to review them, yeah.

4          Q.   Yeah, go ahead and read them and let me know

5   when you've finished --

6          A.   Okay.

7          Q.   -- reading Exhibit 539.

8          A.   Okay.  I think I've read -- wait a sec.  Okay.

9   I've read it.

10         Q.   Do you recall this -- the issue that was

11  presented in this series of e-mails?

12         A.   I have refreshed my memory by looking at

13  documents.

14         Q.   You have refreshed memory?

15         A.   Yes, in my role as CTO, yes.

16         Q.   Okay.  When did you do that?

17         A.   In prep for the first deposition.

18         Q.   Okay.  And what documents did you look at that

19  refreshed your recollection on this issue?

20         A.   I believe I saw this one -- or one very

21  similar to it.

22         Q.   Mm-hmm.  Any others?

23         A.   There may have been a couple others, but this

24  is the one that I'm recalling right now since I'm

25  looking at it and sort of refreshing my memory.

CE 0758

1      Q.     Okay.  And what was the outcome of your

2    research on this issue?

3      A.     Well, I'm not sure I really did follow-up with

4    it much, but I don't remember -- I wasn't able to locate

5    any follow-up that refreshed my memory.

6      Q.     Okay.  Can you tell me any -- then, anything

7    else about the issue that's reflected in Exhibit 539?

8      A.     No.

9                   MS. HURST:  Okay.  Exhibit 540 is tab 11

10   hiQ_00060671.

11                  (Exhibit 540 marked for

12                  identification by the Certified

13                  Shorthand Reporter.)

14   BY MS. HURST:

15     Q.     If you look on the second page of Exhibit 540,

16   Mr. Miller, you'll see there's an e-mail that you wrote

17   on December 27 -- December 7, 2017, 3:30 p.m.

18                  "I am undertaking to migrate our

19                  main MongoDB database ... from

20                  California to the new Oregon zone.

21                  In this process we have to remove

22                  stale, unused collections.  ... I'm

23                  asking every technical contributor

24                  to respond with a list of

25                  collections from the below master

1              list that you know are presently in

2              use somehow and should not be

3              deleted."

4              Do you see that?

5      A.    Mm-hmm.

6      Q.    What was -- what was going on in December 2017

7   that you were -- that you sent this e-mail?

8      A.    Well, it looks like we were migrating our

9   data -- things from California to the Oregon AWS zone.

10     Q.    Was this a list of all of the collections in

11   the MongoDB at that time?

12     A.    I think that's what it was intended to be.

13   Yeah, that's what it looks like.

14     Q.    And did you delete some of the collections in

15   the process of moving the MongoDB from California to

16   Oregon?

17     A.    I'm not sure if we did it explicitly, but

18   eventually that account was closed, so those -- if they

19   weren't in -- well, actually, no, I'm sorry.  Let me --

20   let me restate that.

21              I would assume that we deleted the ones that

22   people -- that -- that we felt were not something we

23   needed to keep.

24     Q.    Not something that you needed to keep in order

25   to use?

1       A.    In order to use, or in order to keep to our

2    obligation not to delete relevant data for the case.  I

3    mean, I -- I knew that that was an issue.

4       Q.    Did you ever seek -- just yes or no without

5    disclosing the contents of any communication -- the

6    advice of your lawyers on whether you had an obligation

7    to preserve those database collections?

8       A.    I don't recall a conversation like that.

9              Let me be clear.  I don't recall a

10   conversation about this particular migration.  I did

11   have conversations with lawyers when the case first came

12   up about data retention.

13             MS. SHARMA:  Dan, I'll caution you not to

14   reveal the contents of those conversations.

15             THE WITNESS:  Got it.  Understood.

16             MS. HURST:  And I'm not agreeing to that

17   instruction just because -- but I don't want to waste

18   time with colloquy about it.

19             Exhibit 541 is tab 309.  hiQ_00444469.

20             (Exhibit 541 marked for

21                  identification by the Certified

22                  Shorthand Reporter.)

23   BY MS. HURST:

24      Q.    And you'll see, Mr. Miller, that Exhibit 541

25   is a chat transcript between you and Will Wegener dated

1    it.

2         Q.    And to whom did you give that advice?

3         A.    I don't remember specifics.  I mean, it was

4    sort of general knowledge.  And I wasn't really handing

5    out the laptops.

6                   MS. HURST:  Okay.  Exhibit 543 is tab 118,

7    HiQ_00329112.

8                   (Exhibit 543 marked for

9                   identification by the Certified

10                  Shorthand Reporter.)

11   BY MS. HURST:

12        Q.    And this is an e-mail thread, Mr. Miller, that

13   starts with you on -- at the bottom of the first page --

14        A.    Yes.

15        Q.    -- on May 9th, 2018.

16        A.    Scrolling down.  Oh, it's just one page?

17        Q.    Yeah.  So why don't you just go ahead and read

18   this whole thread --

19        A.    Okay.

20        Q.    -- every e-mail and let me know when you've

21   finished.

22        A.    Okay.  I've read it.

23        Q.    Okay.  So in Exhibit 543 you were asking about

24   various software vendors whose accounts --

25        A.    Right.

Page 348

1        Q.      -- were likely to be canceled.  Do you see

2     that?

3        A.      Yep.

4        Q.      And what was your purpose in making this

5     request?

6        A.      I was just reminding people who maybe weren't

7     as involved as I was in the data retention and, you

8     know, cost reduction measures, that these systems were

9     going to, you know, be deleted if we stopped paying for

10    them or canceled them, and I wanted to address, you

11    know, what should be done before that happens.

12       Q.      What was Squarespace?

13       A.      Oh, I believe that's a website design, like,

14    for corporate, just like informative websites, like

15    WordPress or something.

16       Q.      Got it.  All right.  And Mr. Medeiros

17    responded:

18               "We no longer use Pardot and

19               SalesForce expires" --

20       A.      Right.

21       Q.      "next March."

22               You wrote:

23               "We need to export Salesforce

24               before it expires.

25               He says:

1          "It expires in nine months."

2      You say:

3          "Okay.  If we're paid up

4          through 2019, I guess it's moot.  We

5          should do an export anyway just for

6          good luck."

7      Do you see that?

8    A.    Yep.

9    Q.    Did that export happen?

10   A.    I don't know.

11   Q.    Did you ever learn of anybody other than

12   Mr. Medeiros who had the credentials that would be

13   needed to do an export from Salesforce?

14   A.    Not that I recall.  I'm not aware of anybody

15   else.

16   Q.    Can you tell me anything at all about whether

17   any export of Salesforce ever occurred prior to the time

18   that hiQ Labs' account was canceled?

19   A.    I don't have any information about that.  I

20   don't know if I sent any follow-up emails or something.

21        COURT REPORTER:  Can we go off the record?  My

22   computer just kicked me out of my program.

23        MS. HURST:  Sure.

24        VIDEOGRAPHER:  Going off the record.  The time

25   is 10:34 a.m.



25          MS. HURST:   Okay.   Exhibit 545 is tab 393.

CE 0765

1    And this is -- Exhibit 545 is a chat transcript amongst

2    you, Mr. Kim, and Mr. Weidick.

3                    (Exhibit 545 marked for

4                    identification by the Certified

5                    Shorthand Reporter.)

6        A.    I see this.

7    BY MS. HURST:

8        Q.    Do you see there's a reference to a suspension

9    notice from AWS from you?  You're writing this on

10   May 16, 2018.  Do you see that?

11       A.    Yep, yes.

12       Q.    And was the AWS account suspended?

13       A.    My recollection is that it was.

14       Q.    And was there a period of time when the data

15   was still available after it was suspended?

16       A.    I believe that's correct.  That's -- that's

17   AWS's practice.

18       Q.    And then how long after that was it that the

19   account was completely deleted and no longer available?

20       A.    I'm not sure.  I don't know.

21       Q.    At any point while you, Mr. Kim, and

22   Mr. Weidick were dealing with the fact that the AWS

23   account was going to be shut down, did you consult with

24   counsel about that?

25       A.    Me personally?

CE 0766

```
 1              MS. SHARMA:  Objection.

 2    BY MS. HURST:

 3       Q.    Any of you.

 4              MS. SHARMA:  Dan, I'll caution that that is a

 5    yes-or-no question.  At least as to this question, that

 6    should be a yes-or-no answer.

 7              THE WITNESS:  What if I don't recollect?

 8              MS. SHARMA:  Fair enough.  Yes, no, or I don't

 9    recollect.

10       A.    I don't recollect.

11              MS. SHARMA:  That was better advice than I

12    gave, Dan.  Thanks.

13              MS. HURST:  All right.  Exhibit 546 is

14    tab 196, hiQ 00436300.

15              (Exhibit 546 marked for

16              identification by the Certified

17              Shorthand Reporter.)

18       A.    Another chat Slack transcript.  I see it.

19    BY MS. HURST:

20       Q.    Yep.  And this was a long one, Mr. Miller.

21    You're welcome to read as much of it as you like.  I'm

22    going to focus you on the third page.

23       A.    I understand.

24       Q.    6:12.

25       A.    P.M.
```

1        Q.    At -- date July 12th, 2018, at 2:37:52 p.m.

2    There's an e-mail here from -- or pardon me, a chat --

3    it's so easy to fall into that habit.  A chat from

4    Mr. Dev, Boris Dev:

5                "580 gigabytes spunk indexer can

6                be important for legal issues.  I

7                say do not delete."

8                Silas Barta responds:

9                "What kinds of stuff does it

10               have?"

11               Mr. Dev says:

12               "Scrape stats."

13               Can you tell me whether that 580 gigabytes of

14   Splunk indexer data was saved anywhere?

15       A.    I don't know the answer to that.

16       Q.    Did you personally save it?

17       A.    No.

18               MS. HURST:  Pardon me.  Exhibit 547 is tab 22,

19   hiQ 00078589.

20               (Exhibit 547 marked for

21               identification by the Certified

22               Shorthand Reporter.)

23   BY MS. HURST:

24       Q.    You'll see here an e-mail exchange involving

25   you, Mr. Weidick, Mr. Dev, Mr. Kim, Will Wegener.

1   State of California       )
                              )SS:
2   County of San Diego       )

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken

6   (X) remotely ( )live before me at the time and place

7   herein set forth; that any witnesses in the foregoing

8   proceedings, prior to testifying, were placed under

9   oath; that a verbatim record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; further, that the

12  foregoing is an accurate transcription thereof.

13       Further, that if the case is pending in the

14  Federal Court, before the proceedings were transcribed

15  by me, review [ ] was [X] was not requested.

16       I further testify that I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney of any of the parties.

19       IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21  DATED May 31, 2022.

22

23

24                              LINDA E. MARQUETTE, CSR

25                              Certificate No. 11874

CE 0769

# Compendium Exhibit 15

# (Filed Under Seal)

Page 1

1

2   IN THE UNITED STATES DISTRICT COURT

    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3   Case No. 17-cv-03301-EMC

    ----------------------------------------x

4   HIQ LABS, INC.,

5                      Plaintiff,

6        - against -

7   LINKEDIN CORPORATION,

8                      Defendant.

    ----------------------------------------x

9   LINKEDIN CORPORATION,

10                     Counterclaimant,

11       - against -

12  HIQ LABS, INC.,

13                     Counterdefendant.

14  ----------------------------------------x

15                  July 19, 2022

                    9:00 a.m.

16

17             *HIGHLY CONFIDENTIAL*

               *ATTORNEYS' EYES ONLY*

18

19      REMOTE VIDEOTAPED DEPOSITION of KEVIN

20  MURPHY, pursuant to Notice, before Anthony

21  Giarro, a Registered Professional Reporter,

22  a Certified Realtime Reporter and a Notary

23  Public of the State of New York.

24

25

Page 3

```
 1
 2              THE VIDEOGRAPHER:  Good
 3       morning, everyone.  We are going on
 4       the record at nine o'clock a.m.
 5       Central Time on Tuesday, July 19th,
 6       2022.  Please note that this
 7       deposition is being conducted
 8       virtually.  Quality of recording
 9       depends on the quality of camera and
10       Internet connection of participants.
11       What is seen from the witness and
12       heard on screen is what will be
13       recorded.  Audio and video recording
14       will continue to take place unless
15       all parties agree to go off the
16       record.
17              This is Media Unit 1 of the
18       video-recorded deposition of Kevin
19       Murphy in the matter of hiQ versus
20       LinkedIn.  This is filed in the
21       United States District Court for the
22       Northern District of California.  The
23       case number is 17-cv-03301-EMC.  This
24       deposition is being conducted
25       remotely using virtual technology.
```

Page 4

```
 1
 2              My name is Corey Wainaina,
 3      representing Veritext Legal
 4      Solutions.  And I'm the videographer.
 5      The court reporter is Anthony Giarro
 6      from the firm Veritext Legal
 7      Solutions.
 8              I am not authorized to
 9      administer an oath, I am not related
10      to any party in this action, nor am I
11      financially interested in the
12      outcome.
13              If there are any objections
14      to proceeding, please state them at
15      the time of your appearance.
16              Counsel and all present,
17      including remotely, will now state
18      their appearances and affiliations
19      for the record, beginning with the
20      noticing attorney.
21              MS. SKIBITSKY:  Good
22      morning.  Hope Skibitsky from Quinn
23      Emanuel Urquhart & Sullivan on behalf
24      of hiQ Labs, Inc.
25              MS. RENZELLI:  Good morning.
```

Page 5

1   KEVIN MURPHY - HIGHLY CONFIDENTIAL - AEO

2        Emily Renzelli of Orrick on behalf of

3        Defendant LinkedIn Corporation and

4        the witness, Professor Kevin Murphy.

5        With me today is my colleague from

6        Orrick, Russell Cohen.

7    K E V I N   M U R P H Y, after having

8   first been duly sworn by a Notary Public of

9   the State of New York, was examined and

10  testified as follows:

11   EXAMINATION BY

12   MS. SKIBITSKY:

13       Q        Good morning, Dr. Murphy.

14       A        Good morning.

15                MS. RENZELLI:  Sorry, Hope.

16                Before we get started, I

17       actually had a minor change that we

18       need to make to Mr. Murphy's report,

19       if that's okay.

20                MS. SKIBITSKY:  Okay.

21                MS. RENZELLI:  I don't know

22       if you want to pull it up.

23       Paragraph 34, line 3.

24                MS. SKIBITSKY:  Why don't we

25       go ahead -- can we mark tab 0 which

Page 11

1    KEVIN MURPHY - HIGHLY CONFIDENTIAL - AEO
2                    So we're looking at
3    Exhibit 603.
4                    Dr. Murphy, with the
5    exception of the note Ms. Renzelli made
6    with respect to paragraph 34 of your
7    opening report, dated June 7th, 2022,
8    does this appear to be a true and
9    accurate copy of an expert report you
10   submitted in connection with this matter?
11       A        The one that I have printed
12   here does.  I haven't gone through the
13   one on Exhibit Share.  I assume it's the
14   same one.  But, yeah, the one I have
15   sitting here appears to be a copy of my
16   report.
17       Q        For the record, can you
18   just -- if you have the Egnyte folder in
19   front of you, can you just confirm that
20   that does appear to be a true and correct
21   copy?  You don't need to look at that
22   throughout our discussion.  I just want
23   to make sure everybody's on the same
24   page, that we're all looking at the same
25   document.

Page 12

```
 1    KEVIN MURPHY - HIGHLY CONFIDENTIAL - AEO
 2         A        Yeah.  Based on a quick
 3    review because I don't want to spend an
 4    hour reading it, it does appear to be my
 5    report.  So it looks the same as the one
 6    I have next to me.
 7         Q        Okay.  Thank you.
 8                  And does this report
 9    accurately reflect each of the opinions
10    that you intend to provide in connection
11    with this matter, aside from any rebuttal
12    opinions?
13         A        It reflects the opinions I
14    had at the time that I wrote the report.
15    As additional information comes in, I may
16    add to those opinions or revise those
17    opinions.  But the purpose of the report
18    was to summarize my opinions as of that
19    point in time.
20         Q        And sitting here today on
21    July 19th, do you have any opinions now
22    that are additional to the opinions that
23    you have in your June 7th, 2022 report?
24         A        I don't think I have any
25    finalized opinions.  I began to analyze
```

Page 248

1

2                  C E R T I F I C A T I O N

3

4

5           I, ANTHONY GIARRO, a Shorthand

6      Reporter and a Notary Public, do hereby

7      certify that the foregoing witness, KEVIN

8      MURPHY, was duly sworn on the date

9      indicated, and that the foregoing, to the

10     best of my ability, is a true and accurate

11     transcription of my stenographic notes.

12           I further certify that I am not

13     employed by nor related to any party to

14     this action.

15

16

17

       _____

18                  ANTHONY GIARRO

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

hiQ Lab, Inc.,

     *Plaintiff,*

v.

LinkedIn Corp.,

     *Defendant.*

Case No. 3:17-cv-03301-EMC

# EXPERT REPORT OF KEVIN M. MURPHY
## June 7, 2022


**Exhibit
603**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................- 3 -

A.  Assignment .................................................................................................- 3 -

B.  Background and Qualifications....................................................................- 3 -

C.  Summary of Opinions ................................................................................- 5 -

II.  BACKGROUND ..................................................................................................- 7 -

A.  LinkedIn .....................................................................................................- 7 -
    1.  LinkedIn revenue and costs ...........................................................- 7 -
    2.  LinkedIn's policies and terms governing member privacy.............- 8 -
    3.  LinkedIn's anti-abuse efforts .......................................................- 10 -
    4.  Authorized use of members' information ......................................- 12 -

B.  Other SNPs................................................................................................- 13 -

C.  hiQ.............................................................................................................- 16 -

D.  Challenged Conduct...................................................................................- 19 -

III. ECONOMICS OF SOCIAL NETWORKING PLATFORMS...............................- 20 -

A.  SNPs create value by facilitating information sharing ................................- 20 -

B.  Competition Induces SNPs to Choose Practices that Increase the Value of the
    Platform and Benefit Users........................................................................- 22 -

C.  Conclusion ................................................................................................- 25 -

IV. LINKEDIN HAS VALID BUSINESS REASONS FOR ADOPTING ANTI-
    SCRAPING PRACTICES...................................................................................- 25 -

A.  Economics Suggests that Reducing Scraping Can Increase the Value of the
    Platform by Increasing the Incentives of Members to Share More Information ..........- 25 -
    1.  Scraping can reduce LinkedIn members' trust in the platform..............- 25 -
    2.  Empirical analysis .......................................................................- 29 -
    3.  LinkedIn's practices regarding authorized use of members' information
        increase the value of the platform ...............................................- 35 -
    4.  Other SNPs anti-scraping practices are evidence that LinkedIn's practices
        increase the value of the platform ...............................................- 36 -

B.  Reducing Scraping Reduces the Effects of Free Riding.............................- 37 -

C.  LinkedIn's Anti-Scraping Practices Can Enhance the Functionality of the Platform ..- 39 -

D.  Conclusion ................................................................................................- 40 -

V.  LINKEDIN HAD VALID REASONS FOR ATTEMPTING TO PREVENT
    HIQ FROM SCRAPING.....................................................................................- 40 -

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0801

## LIST OF APPENDICES

**APPENDIX A:**      **Curriculum Vitae**

**APPENDIX B:**      **List of Materials Relied Upon**

**APPENDIX C:**      **Appendix Exhibits**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0802

## I.   INTRODUCTION

1.       My name is Kevin M. Murphy.  I am the George J. Stigler Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where I have taught since 1983.  I have been retained by counsel for LinkedIn Corp. ("LinkedIn") to serve as an expert in economics in the above-captioned case.

### A.       Assignment

2.       hiQ Labs, Inc. ("hiQ") alleges that LinkedIn prevented hiQ from scraping data from LinkedIn members' profiles to eliminate the competitive threat imposed by hiQ.[1]  hiQ also alleges LinkedIn interfered with hiQ's contracts.[2]  The Court dismissed hiQ's allegations that LinkedIn's attempts to prevent it from scraping violated the Sherman Act.[3]  LinkedIn has asserted counterclaims that hiQ: 1) breached its contract with LinkedIn; 2) misappropriated LinkedIn's computer systems and servers, including member data from the LinkedIn site; 3) committed trespass on LinkedIn servers and infrastructure; and 4) violated computer fraud and abuse statutes.[4]

3.       Counsel for LinkedIn has asked me to evaluate whether LinkedIn had valid business reasons for attempting to prevent hiQ from scraping data from LinkedIn members' profiles.

### B.       Background and Qualifications

4.       I received my bachelor's degree in economics from the University of California, Los Angeles in 1981, and I received my doctorate in economics from the University of Chicago in 1986.

5.       At the University of Chicago, I am a member of the faculties of both the Booth School of Business and the Department of Economics.  I have taught graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues.  In these courses, I cover a wide range of topics, including the incentives that motivate

---

[1]   Amended Complaint, *hiQ Labs, Inc. v. LinkedIn Corp.*, February 14, 2020 ("Amended Complaint"), at ¶¶ 53-55.

[2]   Amended Complaint at ¶ 51.

[3]   Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, *hiQ Labs, Inc. v. LinkedIn Corporation*, September 9, 2020, at pp. 9-10, 15.

[4]   Defendant and Counterclaimant LinkedIn Corporation's Answer and Counterclaims ("LinkedIn Counterclaims"), *hiQ Labs, Inc. v. LinkedIn Corporation*, November 20, 2020, at ¶¶ 87-134 (pp. 44-49).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0803

firms and individuals, the operation of markets, and the impacts of regulation and the legal system.  Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms, and markets; and how to apply economic analysis to data.  My focus in both research and teaching is on integrating economic principles with empirical analysis.

6.         I have authored or co-authored more than 80 articles in a variety of areas in economics.  Those articles have been published in leading scholarly and professional journals, including the American Economic Review, Journal of Law and Economics, and Journal of Political Economy.  Several of those articles consider issues in antitrust economics.[5]

7.         I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences.  In 1997, I was awarded the John Bates Clark Medal, which, at the time, was awarded every two years by the American Economic Association to an outstanding American economist under the age of forty.[6]  In 2005, I was named a MacArthur Fellow, an award that provides a five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work.

8.         In addition to my positions at the University of Chicago, I am also a Senior Consultant at Charles River Associates ("CRA").  CRA is a consulting firm that specializes in

---

[5]   See Klein, Benjamin and Murphy, Kevin M. "Vertical Restraints as Contract Enforcement Mechanisms," *Journal of Law and Economics*, Vol. 31,October 1988, pp. 265-297; Klein, Benjamin and Murphy, Kevin M. "Vertical Integration as a Self-Enforcing Contractual Arrangement," *American Economic Review*, Vol. 87, 1997, pp. 415-420; Davis, Steven J., and Murphy, Kevin M. "A Competitive Perspective on Internet Explorer," *American Economic Review*, Vol. 90, 2000, pp. 184-187; Davis, Steven J., MacCrisken, Jack, and Murphy, Kevin M. "Economic Perspectives on Software Design: PC Operating Systems and Platforms," in *Microsoft, Antitrust, and the New Economy: Selected Essays,* Davis S. Evans editor, Kluwer, Boston, MA, 2001, pp. 361-420; Klein, Benjamin, Lerner, Andres V., and Murphy, Kevin M. "The Economics of Copyright 'Fair Use' In a Networked World," *American Economic Review*, Vol. 92, 2002, pp. 205-208; Davis, Steven J., Murphy, Kevin M. and Topel, Robert H. "Entry, Pricing and Product Design in an Initially Monopolized Market," *Journal of Political Economy*, Vol. 112, 2004, pp. S188-S225; Klein, Benjamin, Lerner, Andres V., Murphy, Kevin M. and Plache, Lacey, "Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," *Antitrust Law Journal*, Vol. 73, 2006, pp. 571-626; Kevin M. Murphy and Robert H. Topel, "Critical Loss Analysis in the Whole Foods Case," *Global Competition Policy Magazine*, 2008, pp. 2-9; Klein, Benjamin and Murphy, Kevin M. "Exclusive Dealing Intensifies Competition for Distribution," *Antitrust Law Journal*, Vol. 75, No. 2, 2008, pp. 433-466; Barry C. Harris, Kevin Murphy, Robert D. Willig, and Matthew B. Wright, "Activating Actavis:  A More Complete Story," *Antitrust*, Vol. 28, No. 2, Spring 2014; and Murphy, Kevin M., Snyder, Edward A. and Topel, Robert H., "Competitive Discounts and Antitrust Policy," in: Roger D. Blair and D. Daniel Sokol, editors, *The Oxford Handbook of International Antitrust Economics*, Volume 2, 2014.

[6]   The award is currently awarded every year. See American Economic Association, "John Bates Clark Medal," available at http://www.aeaweb.org/honors_awards/clark_medal.php (accessed October 23, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the application of economics to law and regulatory matters.  I have consulted on several cases related to platform industries.  My curriculum vitae is attached to this report as Appendix A. CRA is paid $1,500/hour for my time spent on this matter, and I receive compensation from CRA based on its billings in this case.  My compensation is not tied to the outcome of this case.

### C.      Summary of Opinions

9.       This report sets forth my opinions and describes the data and analyses that underlie my opinions on the issue of whether LinkedIn had valid business reasons for attempting to prevent hiQ from scraping data from LinkedIn members' profiles.  My opinions are based upon my analysis of the data provided by the parties, documents and testimony in the record, and publicly available information.  My opinions are also based upon my general expertise in economics and my knowledge of the relevant economic literature.  My analysis has been supported by colleagues at CRA working under my direction.  A list of the materials I have relied upon in forming those opinions is attached as Appendix B.

10.      My work is ongoing in this matter and my opinions are based on the information available to me as of the date of this report.  I will continue to examine information that may be relevant to the issues and opinions discussed in this report and I may respond to reports submitted by any hiQ expert(s).

11.      Economics suggests that competition induces social networking platforms ("SNPs") like LinkedIn to choose practices that maximize the value of the platform and benefit members. It is my opinion that LinkedIn's various efforts to prevent automated scraping of LinkedIn profiles ("LinkedIn's anti-scraping practices") increase the value of the LinkedIn platform and benefit LinkedIn members for at least three reasons.

   a) **LinkedIn's anti-scraping practices increase members' trust and enhance the value of the platform.**  The value of the LinkedIn platform depends on members' willingness to share information, which depends on members' trust that LinkedIn will protect their information from being used in ways that harm them.  Because scrapers can use information in ways that would be harmful to members, scraping reduces members' trust in the platform, reduces members' incentives to share information, and reduces the value of the platform.  My empirical analysis confirms that participation in the LinkedIn platform has fallen after publicized scraping events in

- 5 -
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

which members' information has been acquired by third-party scrapers.  This
confirms that scraping can reduce participation in the platform and demonstrates that
LinkedIn has valid business reasons for its anti-scraping practices.

b) **LinkedIn's anti-scraping practices increase the value of the platform by
reducing free riding.**  LinkedIn members can use the platform without paying a fee.
Instead, LinkedIn earns profits by selling services and advertising, and these profits
allow it to make investments that increase the value of the platform.  Scrapers free
ride on LinkedIn's investment in the platform by using information scraped from
LinkedIn members' profiles to sell members' data or sell services.  This reduces
LinkedIn's profits, reduces LinkedIn's incentives to invest in the platform, reduces
the value of the platform, and harms consumers.

c) **LinkedIn's anti-scraping practices enhance the performance of the platform.**
Economics suggests that the value of the LinkedIn platform depends on the
performance of the platform, such as the speed with which webpages load.  The
record evidence indicates that LinkedIn believes that scraping slows the
responsiveness of the web pages to non-automated requests and reduces the
performance of the platform.  If so, then scraping reduces the value of the platform by
reducing its performance, so enhancing the performance of the platform would be a
valid business reason for LinkedIn's anti-scraping practices.

12.       LinkedIn had valid business reasons for applying its anti-scraping practices to hiQ.
As noted above, LinkedIn's anti-scraping practices increased the value of LinkedIn's platform,
and LinkedIn therefore had an incentive to prevent scraping.  LinkedIn also had specific reasons
for applying those practices to hiQ.  hiQ was violating LinkedIn's user agreement.  It was
scraping LinkedIn member profiles to offer services to employers, including predictions of
which of their employees were more likely to leave.  hiQ's services harmed members who lost
the ability to control their member profiles, who did not consent to their data being used by hiQ,
and who did not want their employers to know they were considering leaving.  This means that
hiQ's services could have reduced members' trust in LinkedIn, reduced their willingness to share
information, and reduced the value of the platform.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.  BACKGROUND

### A.        LinkedIn

13.        LinkedIn is a SNP that focuses on professional networking and career development opportunities.[7]  LinkedIn was launched in 2003 and was acquired by Microsoft Corporation in 2016.[8]  LinkedIn describes its mission as connecting "the world's professionals to make them more productive and successful,"[9] and it describes its vision as creating "economic opportunity for every member of the global workforce."[10]

#### 1.        LinkedIn revenue and costs

14.        Exhibit 1 reports LinkedIn's annual revenue by line of business.  Over the period of 2015-2021, LinkedIn's revenue grew from nearly $3 billion to over $12 billion.  Revenue from Talent Solutions, which includes products and services related to hiring, people analytics, and professional development, grew from $1.6 billion in 2015 to $4.3 billion in 2021.[11]  LinkedIn Marketing Solutions, which includes advertising through ads, sponsored updates and sponsored InMail messages, almost doubled its revenue share from 20 percent in 2015 to 39 percent in 2021 and became the leading source of revenue in 2021.[12]

15.        Other sources accounted for about 25 percent of total revenue in 2021.  These include: 1) Premium Subscriptions with features that allow professionals to manage and grow their network more effectively;[13] 2) Sales Solutions that provide lead recommendations and real-

---

[7]    LinkedIn, "About LinkedIn," available at https://about.linkedin.com/ (accessed April 21, 2022); Johnson, Dave, "'What is LinkedIn?': A beginner's guide to the popular professional networking and career development site," *Insider*, September 6, 2019, available at https://www.businessinsider.com/what-is-linkedin (accessed May 6, 2022).

[8]    LinkedIn, "About LinkedIn," available at https://about.linkedin.com/ (accessed April 21, 2022); "Microsoft to acquire LinkedIn," *Microsoft*, June 13, 2016, available at https://news.microsoft.com/2016/06/13/microsoft-to-acquire-linkedin/ (accessed April 21, 2022).

[9]    LinkedIn, "About LinkedIn," available at https://about.linkedin.com/ (accessed April 21, 2022).

[10]   LinkedIn, "About LinkedIn," available at https://about.linkedin.com/ (accessed April 21, 2022).

[11]   Microsoft Corporation Form 10-K, 2021, p. 11.

[12]   Microsoft Corporation Form 10-K, 2021, p. 11; LinkedIn Corporation Form 10-K, 2015, p. 5.

[13]   Microsoft Corporation Form 10-K, 2021, p. 11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0807

time sales updates;[14] and 3) Learning Solutions that provide online education and professional development courses.[15]



### 2.    LinkedIn's policies and terms governing member privacy

16.       LinkedIn members' profile pages give members the option to provide information on their current employer, education, employment history and skills, professional affiliations, and their contact information.[16]  LinkedIn allows different levels of access to member information depending on the member-specified profile settings and the degree of connection with the viewing member.[17]  A member's network consists of all connections up to three degrees

---

[14]   Microsoft Corporation Form 10-K, 2021, p. 11; LinkedIn Corporation Form 10-K, 2015, p. 10.

[15]   Microsoft Corporation Form 10-K, 2021, p. 11; LinkedIn Help, "LinkedIn Learning - Overview," available at https://www.linkedin.com/help/learning/answer/71918/linkedin-learning-overview?lang=en (accessed May 6, 2022).

[16]   LinkedIn Help, "Your LinkedIn Profile," available at https://www.linkedin.com/help/linkedin/answer/a564064/your-linkedin-profile?lang=en (accessed April 21, 2022).

[17]   LinkedIn Help, "Your LinkedIn Profile," available at https://www.linkedin.com/help/linkedin/answer/a564064/your-linkedin-profile?lang=en (accessed April 21, 2022); LinkedIn Help, "Your Network and Degrees of Connection," available at https://www.linkedin.com/help/linkedin/answer/110/your-network-and-degrees-of-connection?lang=en (accessed April 21, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0808

away as well as fellow members of a common LinkedIn Group.[18]  Out-of-Network members are LinkedIn users who do not fall into any of the above categories and typically have the least access to one's profile, though still have greater visibility than the general public.[19]  Appendix Exhibit C-1 summarizes the visibility of various profile section components to a member's connections and to the general public.  Unless a member turns off their profile's public visibility, then name, number of connections, and region will be visible in a public search.  Photo, professional experience, and education are visible by default, but the member can change their profile settings to protect this information from non-members.[20]  Contact information and connections are only visible to first-degree connections.[21]

17.       LinkedIn's User Agreement describes the rights and obligations of LinkedIn's members and visitors.[22]  According to the User Agreement, members own their personal information and content and grant LinkedIn a non-exclusive license to it.[23]  LinkedIn visitors and members agree, among other things, not to scrape or copy profiles and other data from LinkedIn.  Scraping refers to the process of extracting data from webpages by automated bots or other

---

[18]   LinkedIn Help, "Your Network and Degrees of Connection," available at https://www.linkedin.com/help/linkedin/answer/110/your-network-and-degrees-of-connection?lang=en (accessed April 21, 2022).

[19]   LinkedIn Help, "Your Network and Degrees of Connection," available at https://www.linkedin.com/help/linkedin/answer/110/your-network-and-degrees-of-connection?lang=en (accessed April 21, 2022); LinkedIn Help, "What People Can See on Your Profile," available at https://www.linkedin.com/help/linkedin/answer/a545600 (accessed April 21, 2022); LinkedIn Help, "LinkedIn Public Profile Visibility," available at https://www.linkedin.com/help/linkedin/answer/a518980/linkedin-public-profile-visibility?lang=en (accessed April 21, 2022).

[20]   LinkedIn Help, "LinkedIn Public Profile Visibility," available at https://www.linkedin.com/help/linkedin/answer/a518980/linkedin-public-profile-visibility?lang=en (accessed April 21, 2022); LinkedIn Help, "Manage the Visibility of Articles  Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022); LinkedIn Help, "Changing How Your Name Appears on Your Profile," available at https://www.linkedin.com/help/linkedin/answer/79/changing-how-your-name-appears-on-your-profile?lang=en (accessed May 29, 2022); LinkedIn Learning, "Configure your public profile," available at https://www.linkedin.com/learning/learning-linkedin-2021/configure-your-public-profile (accessed May 31, 2022).

[21]   LinkedIn Help, "Contact Info Section of Your Profile," available at https://www.linkedin.com/help/linkedin/answer/a545600/what-people-can-see-on-your-profile?lang=en (accessed June 2, 2022).

[22]   The terms of the User Agreement are also incorporated into the LinkedIn Subscription Agreement, which governs the provision of services to LinkedIn customers. LinkedIn, "LinkedIn Subscription Agreement," available at https://www.linkedin.com/legal/l/lsa (accessed June 6, 2022).

[23]   LINK_HIQ_000095398 at -402; LINK_HIQ_000095423 at -425; LINK_HIQ_000095502 at -504.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

automated means.[24]  LinkedIn visitors and members also agree not to use or disclose or sell any data obtained from LinkedIn without its consent.[25]

18.        LinkedIn's Privacy Policy describes how LinkedIn collects, uses, and shares members' personal data.  The LinkedIn Privacy Policy, among other things states that: 1) LinkedIn uses member data to produce and share insights that do not identify individual members;[26] 2) members can manage their personal data visibility through various settings;[27] 3) members can ask LinkedIn to correct or delete some or all of their personal data;[28] 4) LinkedIn will not keep the personal data of a member after they have deleted their account;[29] 5) members can withdraw their consent for their data to be processed by LinkedIn at any time;[30] 6) LinkedIn will not share member personal data with any third-party advertisers without member consent.[31]

### 3.    LinkedIn's anti-abuse efforts

19.        LinkedIn devotes significant resources to anti-abuse efforts related to its members' information and security, including addressing spam, phishing, ID theft, fake profiles, job abuse, API abuse, and data scraping.[32]  Anti-abuse efforts are supported by several organizations within LinkedIn.[33]  In 2021, LinkedIn's spent over ██████ on employee costs related to its anti-abuse efforts.[34]

---

24   LINK_HIQ_000095398 at -407; LINK_HIQ_000095423 at -428; LINK_HIQ_000095502 at -507; Declaration of Paul Rockwell in Support of LinkedIn's Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to Fed R. Civ. P. 62.1, *hiQ Labs, Inc. v. LinkedIn Corporation*, October 14, 2021 ("2021 Rockwell Declaration"), at ¶ 4.

25   LINK_HIQ_000095398 at -407-408; LINK_HIQ_000095423 at -428; LINK_HIQ_000095502 at -507.

26   LINK_HIQ_000095337 at -346; LINK_HIQ_000095225 at -229; LINK_HIQ_000095326 at -328.

27   LINK_HIQ_000095337 at -346; LINK_HIQ_000095225 at -230; LINK_HIQ_000095326 at -331.

28   LINK_HIQ_000095337 at -349; LINK_HIQ_000095225 at -231; LINK_HIQ_000095326 at -333.

29   LINK_HIQ_000095337 at -350; LINK_HIQ_000095225 at -232; LINK_HIQ_000095326 at -333. Except if necessary to comply with legal obligations.

30   LINK_HIQ_000095337 at -351; LINK_HIQ_000095326 at -330.

31   LINK_HIQ_000095337 at -345; LINK_HIQ_000095225 at -229; LINK_HIQ_000095326 at -329. Except for hashed IDs or device identifiers or data not already visible to any users of LinkedIn services.

32   2021 Rockwell Declaration at ¶¶ 12-13; LINK_HIQ_000036232 at -232.

33   Declaration of Paul Rockwell in Support of LinkedIn Corporation's Opposition to Plaintiff's Motion to a Temporary Restraining Order, *hiQ Labs, Inc. vs. LinkedIn Corporation*, June 26, 2017 ("2017 Rockwell Declaration"), at ¶ 2.

34   See LINK_HIQ_000206255. This expenditure is for Trust Product, Trust and Safety, Trust Engineering, and InfoSec. This estimate excludes spend on the systems and infrastructure supporting LinkedIn's anti-abuse

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0810

20.        LinkedIn attempts to prevent all unauthorized automated requests to access public or logged-in profiles regardless of the purpose.[35]  The anti-abuse efforts include a number of technological measures to detect and prevent unauthorized scraping.[36]

21.        LinkedIn tracks a number of metrics related to anti-abuse efforts, including fake accounts, account takeovers, distinct profiles scraped, number of successful logins, jobs abuse, and public content abuse.[37]  Specifically regarding scraping, LinkedIn believes that it blocks around ████████████████████████  ███████████████████████████ ████████████████████████.[39]

22.        Third-party scrapers typically try to obfuscate their identity.[40]  In addition to relying on technical defenses to block scraping attempts, LinkedIn's anti-scraping practices include conducting investigations, reviewing logs and other records, reviewing public sources, in an effort to identify third parties that are scraping LinkedIn data.[41]  When it becomes aware of the identity of companies scraping members' profiles, LinkedIn frequently sends them cease-and-desist letters or letters notifying them that their access has been revoked due to violations of LinkedIn's User Agreement or Privacy Policy.[42]  ████████████████████████ ███████████████████.

---

technical defenses. I understand that Mr. James E. Malackowski has estimated LinkedIn's expenditure on anti-scraping efforts.

[35]   2021 Rockwell Declaration at ¶¶ 2, 5.

[36]   2017 Rockwell Declaration at ¶ 7; Deposition of Bob Rosin, May 23, 2022 ("Rosin Deposition"), at 104:19-105:3; LINK_HIQ_000169080 at -103, -105-107.

[37]   See, for example, LINK_HIQ_000150992 at -992-993, LINK_HIQ_000151006 at -006-007, and LINK_HIQ_000151020 at -020-021. See, also, 30(b)(6) Deposition of LinkedIn Corporation Through Jenelle Bray, May 18, 2022 ("Bray Deposition"), at 91:7–16, 99:1–20.

[38]   Bray Deposition at 115:25-117:7; LINK_HIQ_000091972 at p. 9.

[39]   See, for example, LINK_HIQ_000152263 at -263, LINK_HIQ_000150759 at -759, and LINK_HIQ_000150839 at -839. Based on the period March 2021 to March 2022.

[40]   Rosin Deposition at 138:21-139:13; Deposition of Boris Dev, May 4, 2022 ("Dev Deposition") at 149:9-151:14. Third Party scrapers and proxy services advertise the measures they use to circumvent anti-scraping measures implemented by websites, see, Zyte, "How to use proxies for web scraping," available at https://www.zyte.com/learn/use-proxies-for-web-scraping/ (accessed June 7, 2022).

[41]   2017 Rockwell Declaration at ¶¶ 2, 5; Rosin Deposition at 138:8-139:13.

[42]   Defendant LinkedIn Corporation's Response to Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corp.*, April 7, 2022 ("LinkedIn's Responses to Second Set of Interrogatories") at p. 11. See, also, Appendix Exhibit C-2.

[43]   See Appendix Exhibit C-2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

#### 4.    Authorized use of members' information

23.        LinkedIn provides recruiting and talent analytics services to customers using profile information LinkedIn members make available to other logged in members.[44]  LinkedIn's Service Terms govern how customers purchasing LinkedIn services can use the information from members' profiles.[45]  Customers purchasing recruiting services, such as Recruiter Corporate, Recruiter Professional Services, and Recruiter Lite can only use the member profile data for the purpose of recruiting employees or consultants.[46]  LinkedIn customers using Recruiter services agree not to share information from any LinkedIn member's profile with that member's current employer.[47]  Similarly, LinkedIn's Talent Insights service allows customers to run their own talent analytics reports based on access to aggregated profile data from LinkedIn.[48]

24.        LinkedIn's User Agreement prohibits "develop[ing], support[ing] or us[ing] software, devices, scripts, robots or any other means or processes (including crawlers, browser plugins and add-ons or any other technology) to scrape the Services or otherwise copy profiles and other data from the Services."[49] Search engines, such as Google and Bing, are allowed to crawl consistent with members' privacy settings, and they need to abide by the terms of robots.txt and only crawl the paths and directories authorized by LinkedIn.[50]

25.        LinkedIn also makes application programming interfaces ("APIs") available to companies developing applications that would enhance the value of the platform for members and customers.  These APIs allow third parties to develop applications for the LinkedIn platform.

---

[44]   LinkedIn, "LinkedIn Service Terms," available at https://www.linkedin.com/legal/l/service-terms (accessed April 27, 2022) at Section 4.2; Deposition of Eric Owski, May 23, 2022 ("Owski Deposition"), at 39:3-41:3.

[45]   LinkedIn, "LinkedIn Service Terms," available at https://www.linkedin.com/legal/l/service-terms (accessed April 27, 2022) at Section 4.1, 4.2, and 4.3.

[46]   LinkedIn, "LinkedIn Service Terms," available at https://www.linkedin.com/legal/l/service-terms (accessed April 27, 2022) at Section 1.1, 1.2, and 1.3.

[47]   LinkedIn, "LinkedIn Service Terms," available at https://www.linkedin.com/legal/l/service-terms (accessed April 27, 2022) at Section 1.4.

[48]   LinkedIn, "LinkedIn Service Terms," available at https://www.linkedin.com/legal/l/service-terms (accessed April 27, 2022) at Section 4.2.

[49]   LINK_HIQ_000095398 at -407; LINK_HIQ_000095423 at -428; LINK_HIQ_000095502 at -507.

[50]   LinkedIn, "Robot Exclusion Standards," available at https://www.linkedin.com/robots.txt (accessed December 9, 2021); LinkedIn, "LinkedIn Crawling Terms and Conditions," available at https://www.linkedin.com/legal/crawling-terms (accessed April 21, 2022). Companies permitted to crawl are also subject to LinkedIn's Crawling Terms and Conditions. See LinkedIn, "LinkedIn Crawling Terms and Conditions," available at https://www.linkedin.com/legal/crawling-terms (accessed April 21, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0812

LinkedIn's API agreements have significant protections over the use of its member data accessed via LinkedIn APIs.[51]

26.       The Self-Serve API Program provides limited platform access to make it easier for members to create accounts on third-party applications using their LinkedIn profile or share content to, and follow companies on, LinkedIn from third-party applications.[52]  Developers seeking access to the Self-Serve API Program must agree to the LinkedIn API Terms of Use.[53] Under the Partner API Program, developers can gain broader access but must undergo a formal review process[54] and must agree to terms that govern their access.[55]  Record evidence suggests that LinkedIn approves applications for the Partner API Program when it believes those applications will enhance the value of the platform.[56]  The approval process is managed by a cross-functional team including business development, developer relations, and product and engineering employees.[57]  LinkedIn's general approach is to approve API access for use cases that deliver services that are consistent with LinkedIn's members-first values and have the potential to benefit its members and customers in ways that are distinct from the services that LinkedIn is already offering or planning on offering in the near future.[58]

### B.       Other SNPs

27.       LinkedIn competes with several different SNPs.  Some of its larger SNP competitors include: 1) Facebook, a social networking platform that allows users to connect and

---

[51]   LinkedIn, "API Terms of Use," available at https://legal.linkedin.com/api-terms-of-use (accessed April 21, 2022) at Section 3, 4, and 5. Also, see Appendix Exhibit C-3.

[52]   LinkedIn, "API Terms of Use," available at https://legal.linkedin.com/api-terms-of-use (accessed April 21, 2022); LinkedIn Help, "Third Party Applications Data Use," available at https://www.linkedin.com/help/linkedin/answer/a519947/third-party-applications-data-use?lang=en (accessed May 25, 2022).

[53]   LINK_HIQ_000091535 at -538.

[54]   LINK_HIQ_000091535 at -538; LinkedIn, "API Terms of Use," available at https://legal.linkedin.com/api-terms-of-use (accessed April 21, 2022) at Sections 1.2, 1.4.

[55]   LinkedIn, "API Terms of Use," available at https://legal.linkedin.com/api-terms-of-use (accessed April 21, 2022) at Sections 1.2, 1.4; LINK_HIQ_000091535 at -543.

[56]   Deposition of Lee Womer, May 11, 2022 ("Womer Deposition"), at 114:16-115:23; LINK_HIQ_000012196 at -208; LINK_HIQ_000091535 at -538, -552.

[57]   LINK_HIQ_000091510 at -512-513, -515.

[58]   Womer Deposition at 114:16-121:7; Rosin Deposition at 37:23-38:4; LINK_HIQ_000012373 at -373; LINK_HIQ_000012196 at -197, -199.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

share information with friends and family;[59] 2) Twitter, a SNP that allows users to interact with their network of followers using short messages;[60] 3) Instagram, a SNP focusing on photo sharing with one's social network.[61]  Other SNPs include Snapchat, TikTok, Reddit, YouTube, Pinterest, and Yelp.[62]

28.        As of 2020, Facebook had the highest number of worldwide monthly active users, followed by WhatsApp, Instagram, TikTok and Pinterest.[63]  As of May 2020, LinkedIn had over 140 million monthly active users worldwide, but accounted for only a small share of active users relative to other popular SNPs. (See Exhibit 2).

---

[59]   Mosseri, Adam, "Bringing People Closer Together," *Meta*, January 11, 2018, available at https://about.fb.com/news/2018/01/news-feed-fyi-bringing-people-closer-together/ (accessed April 21, 2022).

[60]   Twitter Help Center, "New user FAQ," available at https://help.twitter.com/en/resources/new-user-faq (accessed April 27, 2022).

[61]   Instagram, "What is Instagram?" available at https://help.instagram.com/424737657584573 (accessed April 21, 2022).

[62]   For the provision of services, LinkedIn also competes with companies that develop and sell talent, marketing and sales services. LinkedIn has identified the following companies that it competes with in these areas: resource-heavy HCM providers (e.g., SAP SuccessFactors and Workday), well-established companies with more targeted product offerings (e.g., Burning Glass Technologies and Gartner TalentNeuron), large job search engines (e.g., Indeed and CareerBuilder), and an always-expanding roster of startups (e.g., Talennium). See LinkedIn's Responses to Second Set of Interrogatories at pp. 18-19.

[63]   Instagram did not publicly disclose its number of active users after 2018, although some sources estimate it surpassed 2 billion monthly active users in 2021. See Rodriguez, Salvador, "Instagram surpasses 2 billion monthly users while powering through a year of turmoil," *CNBC*, December 14, 2021, available at https://www.cnbc.com/2021/12/14/instagram-surpasses-2-billion-monthly-users.html (accessed May 23, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Exhibit 2
# Social Networking Platforms' Worldwide Active Users (in Millions)

| Platform | Year | | | |
|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 |
| LinkedIn | 111 | 121 | 134 | 143 |
| Facebook | 2,129 | 2,320 | 2,498 | 2,797 |
| WhatsApp | 1,500 | -- | -- | 2,000 |
| Instagram | 800 | 1,000 | -- | -- |
| TikTok | -- | 271 | 508 | 689 |
| Pinterest | 216 | 265 | 335 | 459 |
| Snapchat | 187 | 186 | 218 | 265 |
| Twitter | 115 | 126 | 152 | 192 |
| Yelp | -- | 69 | 69 | 63 |
| Reddit | -- | 12 | 19 | 40 |

Notes:
[1] For LinkedIn, reporting monthly active users (MAU) as of December for 2017-2019, and as of May for 2020.
[2] For Facebook, WhatsApp, Instagram, TikTok, and Pinterest, reporting latest reported MAU figure in a given year.
[3] For Snapchat, reporting latest reported daily active users (DAU) in a given year.
[4] For Twitter, reporting latest reported monetizable daily active usage (mDAU) in a given year.
[5] For Yelp, reporting Q4 monthly unique mobile website visitors for 2018-2019 and Q1 for 2020.
[6] For Reddit, reporting Q4 total combined Reddit app MAUs for iOS and Android.

Sources:
LINK_HIQ_000205997; Yelp Q1 2020 Letter to Shareholders; Statista.

29.        Appendix Exhibits C-4 and C-5 summarize the content ownership, anti-scraping, and crawling practices of these and other SNPs.  For most of these SNPs, some of the user content can be viewed by non-logged in users.[64]  Users own their content and grant the SNPs a non-exclusive license to it.[65]  Facebook, Twitter, and Instagram all prohibit unauthorized scraping.  For instance, Facebook does not allow any collection of data using automated means

---

[64]   See, for example, Facebook Help Center, "What is public information on Facebook?" available at https://www.facebook.com/help/203805466323736 (accessed May 6, 2022); Twitter Help Center, "About profile visibility settings," available at https://help.twitter.com/en/safety-and-security/birthday-visibility-settings (accessed May 6, 2022); Instagram Help Center, "Controlling Your Visibility," available at https://help.instagram.com/116024195217477 (accessed March 11, 2022).

[65]   See, for example, Twitter, "Twitter Terms of Service," available at https://twitter.com/en/tos (accessed May 6, 2022); Instagram Help Center, "Terms of Use," available at https://help.instagram.com/478745558852511 (accessed May 6, 2022); TikTok, "Terms of Service," available at https://www.tiktok.com/legal/terms-of-service?lang=en (accessed May 6, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0815

without prior authorization.[66]  Twitter states that "[s]craping the services without the prior consent of Twitter is expressly prohibited."[67] Instagram prohibits "creating accounts or collecting information in an automated way without [their] express permission" and TikTok prohibits scraping for commercial purposes.[68]  Reddit, Pinterest, Yelp, and YouTube all prohibit scraping without their prior consent. (See Appendix Exhibit C-5).

30.        Similar to LinkedIn, most SNPs only allow limited access for crawling in accordance with their robots.txt exclusion standards.  For example, Facebook and Instagram allow limited access to search engines such as Google, Bing, Yahoo, and several other companies including Apple, Twitter, and Alexa.[69]  Twitter, WhatsApp, and Pinterest allow limited access for crawling to all bots.[70]  TikTok allows full access to several search engines, Apple and Twitter; blocks Baidu, 360, Sougou, and Yisou; and allows limited access to all other bots.[71]

C.        hiQ

31.        hiQ Labs ("hiQ") was established in 2012 as a data science company focusing on human capital solutions.[72]  According to hiQ's CEO Mark Weidick, hiQ wound down its

---

[66]  Facebook, "Terms of Service," available at https://www.facebook.com/terms.php (accessed May 6, 2022); Twitter, "Twitter Terms of Service," available at https://twitter.com/en/tos (accessed April 27, 2022); Instagram Help Center, "Terms of Use," available at https://help.instagram.com/478745558852511 (accessed June 1, 2022).

[67]  Twitter, "Twitter Terms of Service," available at https://twitter.com/en/tos (accessed May 6, 2022).

[68]  Instagram Help Center, "Terms of Use," available at https://help.instagram.com/478745558852511 (accessed May 6, 2022); TikTok, "Terms of Service," available at https://www.tiktok.com/legal/terms-of-service?lang=en (accessed May 6, 2022).

[69]  Facebook, "Robots Exclusion Standards," available at https://www.facebook.com/robots.txt (accessed May 6, 2022); Instagram, "Robots Exclusion Standards," available at https://www.instagram.com/robots.txt (accessed May 6, 2022). Facebook also allows limited access for LinkedIn.

[70]  Twitter, "Robots Exclusion Standards," available at https://twitter.com/robots.txt (accessed May 6, 2022); WhatsApp, "Robots Exclusion Standards," available at https://www.whatsapp.com/robots.txt (accessed May 6, 2022); Pinterest, "Robots Exclusion Standards," available at https://www.pinterest.com/robots.txt (accessed May 7, 2022).

[71]  TikTok, "Robots Exclusion Standards," available at https://www.tiktok.com/robots.txt (accessed May 6, 2022).

[72]  CrunchBase, "hiQ Labs," available at https://www.crunchbase.com/organization/hiq-labs (accessed April 27, 2022); hiQ Labs, "hiQ Labs," available at https://www.hiqlabs.com/ (accessed April 27, 2022). hiQ was originally founded under the name OrgStars. See Deposition of Darren Kaplan, May 4, 2022 ("May 4, 2022 Kaplan Deposition"), at 39:24-40:14.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

operations in the second half of 2018, but hiQ continued to provide services on some of its client contracts into 2019.[73]

32.        hiQ's main service was called Keeper.[74] Keeper used data from LinkedIn members' profiles to predict which employees were at a high risk of leaving their current employer.[75] Since members who are considering leaving their current employer often prefer to have their profiles up to date, hiQ's predictions were based in part on whether employees had recently updated their profiles.[76] hiQ was also developing a service called Skill Mapper that used data from LinkedIn members' profiles to provide insights into the skill sets of company employees.[77]

33.        To obtain data for its services, hiQ scraped data from LinkedIn members' profiles.[78] During the early stages of its product development, hiQ mainly accessed the LinkedIn pages through its own IP address or through the use of IP addresses of its employees.[79] hiQ also used dynamically assigned IP addresses.[80] Following product development and testing, hiQ began using third-party vendors, including Luminati and OxyLabs, to provide it with numerous IP addresses to allow it to scrape large amounts of data.[81] According to hiQ, "these providers distributed their access requests among a broad network of requesters using randomized user agents to access the site."[82]

34.        hiQ anonymously applied for access to LinkedIn's APIs through the LinkedIn Partner Program.[83] In March 2017, LinkedIn rejected the application based on its proposed use case, which LinkedIn described as forecasting whether employees were leaving.[84]

---

[73]   Declaration of Mark Weidick in Opposition of LinkedIn's Motion to Dissolve Preliminary Injunction and for an Indicative Ruling, *hiQ Labs, Inc. v. LinkedIn Corporation*, September 24, 2021 ("Weidick Declaration") at ¶ 6.

[74]   May 4, 2022 Kaplan Deposition at 47:13-19.

[75]   hiQ Labs, "Keeper," available at https://www.hiqlabs.com/new-keeper (accessed April 27, 2022); Weidick Declaration at ¶ 3; May 4, 2022 Kaplan Deposition at 69:17–72:13.

[76]   May 4, 2022 Kaplan Deposition at 69:17-72:13;  HIQ_00722711 at -730;  HIQ_00723564 at -697-698.

[77]   Weidick Declaration at ¶ 3; May 4, 2022 Kaplan Deposition at 19:19-20:1;  HIQ_00722866 at -887-888.

[78]   Weidick Declaration at ¶ 3;  HIQ_00722866 at -884-885.

[79]   Plaintiff hiQ Labs, Inc.'s Responses to LinkedIn Corporation's First Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, September 10, 2021 ("hiQ's Responses to First Set of Interrogatories") at pp. 11-12.

[80]   hiQ's Responses to First Set of Interrogatories at p. 11.

[81]   hiQ's Responses to First Set of Interrogatories at pp. 11-12; hiQ's scraping requests were routed to LinkedIn through Luminati's network of thousands of IP addresses (see, Dev Deposition at 161:22-162:25).

[82]   hiQ's Responses to First Set of Interrogatories at p. 11.

[83]   HIQ_00200007 at -007.

[84]   HIQ_00200007 at -007;  LINK_HIQ_000073013 at -013-014.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

35.        Exhibit 3 reports hiQ's revenues and customers by year and product.  Over the period June 2014 to June 2017, hiQ had $2.2 million in overall revenues, with over 97% of the revenues coming from its Keeper product.  In the first half of 2017, there were 20 customers buying Keeper and three customers buying Skill Mapper.[85]

### Exhibit 3
## hiQ Revenue and Customers by Product

| Product Name | 2014 (Jun. - Dec.) | 2015 | 2016 | 2017 (Jan. - Jun.) |
|---|---|---|---|---|
| *(i) Revenue* | | | | |
| Keeper | $93,750 | $286,667 | $1,168,943 | $622,139 |
| Skill Mapper | -- | -- | $5,000 | $59,000 |
| **Total** | **$93,750** | **$286,667** | **$1,173,943** | **$681,139** |
| *(ii) Number of Customers* | | | | |
| Keeper | 4 | 14 | 25 | 20 |
| Skill Mapper | -- | -- | 1 | 3 |
| **Total** | **4** | **14** | **25** | **20** |

Notes:
[1] Table reports amortized revenues from contracts up to June 2017.
[2] For Keeper, the Customer field includes "Keeper" or "Impact." For Skill Mapper, the
    Customer field includes "Skill" or "Skills." Revenues without the product name are assumed
    to be Keeper.

Source: HIQ_00575579.

36.        Exhibit 4 contains hiQ's revenues, costs, and profits through June 2017.  For the period January 2016 to June 2017, hiQ's gross margins exceeded 90 percent, but its operating expense were much higher than its gross profit.  As a result, hiQ had a $5 million operating loss in 2016 and a $2.3 million operating loss in the first half of 2017.

---

[85]    A larger share of transactions in  HIQ_00575579 do not have a product identifier but these transactions took place when hiQ's main product offering was Keeper. This is consistent with other hiQ documents showing that in 2016 the majority of hiQ revenues came from Keeper (see  HIQ_00593588 at p. 10).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0818

**Exhibit 4**
**hiQ Revenue and Costs**

(in '000s)

|  |  | 2016 (Jan.-Jun.) | 2016 (Jul.-Dec.) | 2017 (Jan.-Jun.) |
|---|---|---|---|---|
| [1] | Revenue | $436 | $737 | $681 |
| [2] | COGS | $26 | $31 | $41 |
| [3] | Gross Profit | $409 | $706 | $640 |
| [4] | Gross Margin (%) | 94% | 96% | 94% |
|  |  |  |  |  |
| [5] | Total Operating Expenses | $2,968 | $3,210 | $2,965 |
|  | Personnel Related | $1,973 | $2,336 | $1,927 |
|  | Consultants | $241 | $298 | $157 |
|  | Other Cash | $753 | $546 | $882 |
|  | Non-Cash | $0 | $30 | $0 |
| [6] | Operating Profit/Loss | -$2,559 | -$2,504 | -$2,325 |
| [7] | Net Margin (%) | -587% | -340% | -341% |

Source: HIQ_00575579.

**D.    Challenged Conduct**

37.        On May 23, 2017, LinkedIn's legal team sent a cease-and-desist letter to hiQ's CEO Mark Weidick.[86]  The letter explained that hiQ was "impermissibly and illegally accessing and scraping data from LinkedIn," and was in violation of the LinkedIn User Agreement.[87]  The letter further stated that LinkedIn had implemented technical measures to prevent hiQ from accessing and scraping LinkedIn data, and requested that hiQ cease accessing and scraping data from LinkedIn and destroy all data and documents from LinkedIn's website in its possession.[88] In response to the cease-and-desist letter, hiQ filed a complaint seeking a preliminary injunction on June 7, 2017.[89]

---

[86]   LINK_HIQ_000002224 at -224.

[87]   LINK_HIQ_000002224 at -224-225.

[88]   LINK_HIQ_000002224 at -224.

[89]   On June 7, 2017, hiQ filed a motion for preliminary injunction, which was withdrawn on June 9, 2017 "so that the parties could engage in discussions to potentially resolve this matter." On June 22, 2017, hiQ filed a renewed motion for a temporary restraining order. See Order Granting Plaintiff's Motion for Preliminary Injunction, *hiQ Labs, Inc. v. LinkedIn Corporation*, August 14, 2017, at pp. 1, 3; Complaint for Declaratory Judgement, *hiQ Labs, Inc. v. LinkedIn Corporation*, June 7, 2017, at ¶ 101.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0819

38.        LinkedIn implemented technological blocks relating to a set of IP addresses believed to be associated with hiQ that were in effect only on June 29th and June 30th of 2017.[90] LinkedIn agreed to remove the technological block on June 30, 2017 while awaiting the decision on the preliminary injunction.[91]  On August 14, 2017, the Court granted hiQ a preliminary injunction and ordered LinkedIn to remove all technological blocks, which were already removed, that prevented hiQ from scraping or accessing public profile data on LinkedIn's website.[92]  Following the preliminary injunction decision, LinkedIn was required to permit scraping attempts from known hiQ IP addresses.[93]  Despite obtaining scraping access to LinkedIn public profiles, hiQ effectively ceased operations in the second half of 2018.[94]

## III. ECONOMICS OF SOCIAL NETWORKING PLATFORMS

39.        To understand why LinkedIn's challenged conduct increased the value of the platform and benefitted LinkedIn members, it is important to understand how SNPs create value and how competition induces them to choose practices, including anti-abuse practices, that increase the value of their platforms and benefit their members.

### A.        SNPs create value by facilitating information sharing

40.        SNPs are valuable to users because they facilitate information sharing by reducing users' cost of finding information about other SNP users and by reducing other users' costs of finding information about themselves.[95]  One way that users of SNPs share information is by providing a profile with information about themselves that can be viewed by other users.  Users can also provide information to other SNP members on an ad hoc basis by posting additional information that they believe other users will find valuable or by responding to other members' posts.

---

[90]   2021 Rockwell Declaration at ¶ 21.

[91]   2021 Rockwell Declaration at ¶ 21.

[92]   Order Granting Plaintiff's Motion for Preliminary Injunction, *hiQ Labs, Inc. v. LinkedIn Corporation*, August 14, 2017, at pp. 1, 25.

[93]   2021 Rockwell Declaration at ¶ 20.

[94]   Weidick Declaration at ¶ 6.

[95]   Evans, David S, "Chapter 3: How Catalysts Ignite: The Economics of Platform-Based Start-Ups," in David S. Evans, *Platforms Economics: Essays on Multi-Sided Business*, Competition Policy International, 2011, pp. 48-71, ("Evans (2011)") at pp. 49-50.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0820

41.        SNP operators typically do not charge members fees to participate in their networks.[96]  Instead, SNPs earn revenue from two main sources: 1) selling services to businesses that want access to platform members; and 2) selling advertisements.[97]  A SNP's revenue from these sources depends on its number of members and how much information they share.[98]  The practice of subsidizing some participants in a platform, SNP members, and earning revenue on sales to other platform participants, advertisers and purchasers of services, is a common feature of platform markets more generally.[99]

42.        The profitability of a SNP depends on both the number of members and on their level of participation.  SNPs can earn more revenue if they have more members, and those members engage with the platform more frequently.[100]  This means that one of the ways that SNPs compete with each other and with other methods of sharing information is by trying to attract members to their platforms and by encouraging members to share more information.[101]

43.        Economics suggests that SNP members' willingness to share information will depend in part on whether the information they share can be used to harm them.  This means that members will share more information when they trust that the SNP will prevent their information from being used to harm them.  As a result, SNPs also have rules designed to prevent the abuse of the information provided by their members.[102]

44.        Another way that SNPs can increase the use and value of their platforms is by encouraging third parties to develop applications that enhance the value of the platform. However, third-party application vendors do not have the incentive to maximize the value of the

---

[96]   Graef, Inge, "Market Definition and Market Power in Data: The Case of Online Platforms," *World Competition,* vol. 38, no. 4, 2015, pp. 473–506, ("Graef (2015)") at p. 476.

[97]   SNPs can also offer additional services to members for a fee, as in the case of LinkedIn. See LINK_HIQ_000095398 at -401; LINK_HIQ_000095423 at -424; LINK_HIQ_000095502 at -503.

[98]   Graef (2015) at pp. 476-477.

[99]   See, for example, Rochet, Jean-Charles, and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association,* vol. 1, no. 4, 2003, pp. 990-1029, ("Rochet and Tirole (2003)") at p. 991 "[…] platforms often treat one side as a profit center and the other as a loss leader, or, at best, as financially neutral."

[100]  Graef (2015) at pp. 476-477.

[101]  See, for example, Rysman, Marc, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives,* vol. 23, no. 3, 2009, pp. 125-43, ("Rysman (2009)") at pp. 129-131; Evans, David S, "The Economics of Attention Markets," 2020, available at http://dx.doi.org/10.2139/ssrn.3044858.

[102]  See Appendix Exhibits C-4 and C-5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0821

platform, and as a result, they can sometimes reduce the value of the platform if the services they offer conflict with other goals of the platform, such as protecting the privacy of its members.[103] This means that SNPs, as with platform operators in other industries, must decide how open to make their platform in terms of providing access to third-party developers.[104]  Having a more open platform can lead to higher investment in the platform by third parties, and having a more closed platform can allow the SNP providers to control which companies can provide third-party applications and to control aspects of the applications themselves.[105]

45.        Like LinkedIn, other SNPs address the tradeoff between more open and more closed platforms by developing Application Programing Interfaces ("APIs") that make it easier to develop applications for the platform, and then making those APIs available to vendors that have agreed to conditions that the SNP believes will enhance the value of the platform, including protecting the privacy of its members.[106] (See Appendix Exhibit C-3.)

46.        The popularity of SNPs creates incentives for companies to develop applications without being authorized by the SNP operator.  The same issue arises in other platforms such as mobile devices.[107]  Because unauthorized applications can reduce the value of the platform, SNPs have incentives to take steps to prevent unauthorized application vendors from accessing the platform and utilizing it for development of unauthorized applications.[108]

### B.        Competition Induces SNPs to Choose Practices that Increase the Value of the Platform and Benefit Users

47.        SNPs feature what economists call direct and indirect network effects.[109]  Direct network effects exist because SNPs can be more valuable when they have more members.

---

[103]  Hagiu, Andrei, "Strategic Decisions for Multisided Platforms," *MIT Sloan Management Review Special Collection Top 10 Lessons in Strategy*, 2015, pp. 4-14  at p. 7.

[104]  Rysman (2009) at p. 132.

[105]  Hagiu (2015) at pp. 6-7.

[106]  Boudreau, Kevin J., and Andrei Hagiu, "Platform Rules: Multi-Sided Platforms as Regulators," in Annabelle Gawer, *Platforms, Markets and Innovation*, Edward Elgar Publishing, 2009, pp. 163-191, ("Boudreau and Hagiu (2009)") at p. 173.

[107]  See "Unauthorized iPhone app stores emerging," *CNET*, March 6, 2009, available at https://www.cnet.com/tech/mobile/unauthorized-iphone-app-stores-emerging/ (accessed on May 21 2022).

[108]  Boudreau and Hagiu (2009) at pp.163-164.

[109]  Katz, Michael L., and Carl Shapiro, "Systems Competition and Network Effects," *Journal of Economic Perspectives*, vol. 8, no. 2, 1994, pp. 93-115, ("Katz and Shapiro (1994)") at p. 94. See, also, Evans (2011) at p. 55.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0822

Because the value of SNPs comes from facilitating information sharing, they are also more valuable when there are more people with whom to share information.  Indirect network effects exist because application vendors are more willing to devote the resources to developing applications that add functionality to a SNP if the SNP has more members.[110]

48.        One implication of the existence of network effects is that larger platforms can have some advantages competing against smaller platforms because people and businesses will want to participate in the SNP that has the most members.  This means that smaller SNPs may not be able to earn as much revenue as larger SNPs.

49.        For several reasons, the advantages that larger networks have do not mean that larger networks do not face significant competitive constraints.

a) People can become members of and participate in multiple SNPs.  Economists call this multi-homing.[111]  Because SNP members can multi-home, larger SNPs have to compete with smaller SNPs for the participation of members that belong to different SNPs.

b) Smaller SNPs can also provide competitive constraints to larger SNPs by differentiating themselves by, for example, attracting people with mutual interests to their platforms.  LinkedIn is an example of this because it was able to compete against Facebook by targeting the subset of potential Facebook users interested in professional networking and career development opportunities.[112]

c) There are alternative ways that people can share information about themselves and acquire information about others, other than using SNPs.  For example, professional associations, such as the American Bar Association, give members access to directories with other members' information, and they provide opportunities for

---

[110] Katz and Shapiro (1994) at p. 96. See, also, Evans (2011) at p. 56.

[111] Rochet and Shapiro (2003) at p. 992.

[112] See Chang, Shuchih Ernest, Anne Yenching Liu, and Wei Cheng Shen, "User trust in social networking services: A comparison of Facebook and LinkedIn," *Computers in Human Behavior*, vol. 69, 2017, pp. 207-217, at p.1 "Facebook is generally associated with community and group interactions while LinkedIn is associated with solely professional networking."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

members to share information with other members similar to LinkedIn posts.[113] Other examples of professional associations that provide similar services include: LawLink for legal professionals;[114] the American Medical Association, Sermo and Doximity for medical professionals;[115] and the CFA Institute and Wall Street Oasis for finance professionals.[116] Job sites, such as Indeed, also provide a platform for people to share personal information with recruiters.[117]

50.      This is consistent with the record evidence indicating that LinkedIn views itself as facing significant competitive threats from both other SNPs and from other sources of information sharing. For example, in its public financials, LinkedIn identifies companies such as Facebook, Google and Twitter as well as "smaller companies that focus on groups of professionals within a specific industry or vertical" as potential competitors in the area of members-professional networks.[118] In internal competitive intelligence documents, LinkedIn refers to Facebook, CareerBuilder, Glassdoor, Xing, and Seek as core competitors.[119] Other competitors mentioned in LinkedIn's internal documents include Instagram, Indeed, and ZipRecruiter.[120]

51.      Because the value of a SNP depends on the willingness of its members to share information, SNPs need to develop practices to encourage members to share more information.

---

[113]   American Bar Association, "Bar Directories and Lawyer Finders," available at https://www.americanbar.org/groups/legal_services/flh-home/flh-bar-directories-and-lawyer-finders/ (accessed April 27, 2022); American Bar Association, "ABA Terms of Use," available at https://www.americanbar.org/about_the_aba/terms/ (accessed April 27, 2022).

[114]   American Bar Association, "About the American Bar Association," available at https://www.americanbar.org/content/aba-cms-dotorg/en/about_the_aba/ (accessed April 27, 2022); LawLink, "About LawLink," available at https://lawlink.com/about (accessed April 27, 2022).

[115]   American Medical Association, "About the AMA," available at https://www.ama-assn.org/about (accessed April 27, 2022); Sermo, "About Sermo," available at https://www.sermo.com/about/ (accessed April 27, 2022); Doximity, "About Doximity," available at https://www.doximity.com/about/company (accessed April 27, 2022).

[116]   CFA Institute, "About CFA Institute," available at https://www.cfainstitute.org/en/about (accessed May 6, 2022); Wall Street Oasis, "About WallStreetOasis.com," available at https://www.wallstreetoasis.com/about-wallstreetoasiscom (accessed April 27, 2022).

[117]   Indeed, "About Indeed," available at https://www.indeed.com/about?hl=en (accessed April 27, 2022); Indeed Help Center, "What do Employers see on my profile," available at https://support.indeed.com/hc/en-us/articles/360051197532-What-do-Employers-see-on-my-profile- (accessed June 1, 2022).

[118]   LINK_HIQ_000014673 at -673-682; LINK_HIQ_000014527 at -527-528; Microsoft Corporation Form 10-K, 2021, p. 11; LinkedIn Corporation Form 10-K, 2015, p. 13.

[119]   LINK_HIQ_000014673 at -673-675.

[120]   LINK_HIQ_000014527 at -527, -529-530.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0824

This involves designing rules regarding what information can be shared and regarding how shared information can be used. For example, some SNPs have rules prohibiting the sharing of false information and, as discussed above, rules prohibiting scraping of members' profiles.[121]

####        C.        Conclusion

52.        Competition between SNPs induces SNPs to choose practices that increase the value of the platform and benefit consumers. If an SNP does not choose practices that maximize the value of the platform, then the SNP will lose participation to other competitors and will become less profitable. This means that allowing SNPs to choose their own anti-abuse and third-party application practices will benefit consumers.

## IV.  LINKEDIN HAS VALID BUSINESS REASONS FOR ADOPTING ANTI-SCRAPING PRACTICES

53.        hiQ alleges that LinkedIn attempted to prevent hiQ from scraping to eliminate its competitive constraint on LinkedIn. Economic principles and the economic and record evidence establish that LinkedIn has at least three valid business reasons for adopting its anti-scraping practices: 1) protecting members' information to encourage members to share more information; 2) preventing free riding that can reduce the value of the platform; and 3) enhancing the functionality of the network.

####        A.        Economics Suggests that Reducing Scraping Can Increase the Value of the Platform by Increasing the Incentives of Members to Share More Information

#####           1.        Scraping can reduce LinkedIn members' trust in the platform

54.        While sharing personal information can be valuable to SNP users because it lowers other members' costs of finding information about themselves, it can also subject users to the risk that their personal information can be used in ways that are harmful to them. This can reduce the incentives of members to share personal information.

55.        Economics suggests that members of SNPs like LinkedIn face a tradeoff regarding how much personal information to share. Sharing more personal information on their profiles

---

[121]   See, for example, LINK_HIQ_000095398 at -400, -407; LINK_HIQ_000095423 at -428; LINK_HIQ_000095502 at -506, -507; Twitter, "Twitter Terms of Service," available at https://twitter.com/en/tos (accessed April 27, 2022); WhatsApp, "WhatsApp Terms of Service," available at https://www.whatsapp.com/legal/terms-of-service (accessed April 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0825

makes it easier for members to find people and makes it easier for members to be found. The latter can be valuable to members because it can lead to more meaningful job and networking opportunities.[122] Sharing more personal information also reduces members' privacy and creates the possibility for parties to use the information in ways that harm members. Economics suggests that the amount of information members will share depends on the extent to which they can trust that they will have control over their privacy and prevent their information from being used in harmful ways.[123]

56.      This is consistent with the academic research that has examined the relationship between trust and online participation. There have been several studies based on surveys that have found that respondents' willingness or intention to use web sites, including SNPs, depends on the extent to which they trust that their personal information will be protected.[124] Other studies have found that the willingness to use SNPs and share information on SNPs depends on how much control they have over how their personal information is used.[125]

57.      These economic principles and the published academic research are both consistent with LinkedIn's business practices. The record evidence demonstrates that LinkedIn believes that maintaining members' trust that their personal information will be protected is crucial to being a successful SNP.[126] In internal documents, LinkedIn describes "members first" as a core value and recognizes its success is "based on the trust members have placed in [LinkedIn]."[127] LinkedIn also discusses its strategy of building trust by providing its members with clarity and

---

[122] See, for example, Davis, Joanna, Hans-Georg Wolff, Monica L. Forret, and Sherry E. Sullivan, "Networking via LinkedIn: An examination of usage and career benefits," *Journal of Vocational Behavior*, vol. 118, 2020, pp. 1-15, at p. 11.

[123] See Rainie, Lee, Duggan, M, "Privacy and Information Sharing," Pew Research Center, December 2015, available at http://www.pewinternet.org/2016/01/14/2016/Privacy-and-Information-Sharing.

[124] See, *for example*, Mukherjee, Avinanda and Prithwiraj Nath, "Role of electronic trust in online retailing: A re-examination of the commitment-trust theory," *European Journal of Marketing*, vol. 41, no. 9/10, 2007, pp. 1173-1202; Chang, Shuchih Ernest, Anne Yenching Liu, and Wei Cheng Shen, "User trust in social networking services: A comparison of Facebook and LinkedIn," *Computers in Human Behavior*, vol. 69, 2017, pp. 207-217.

[125] See, *for example*, Tucker, Catherine E., "Social networks, personalized advertising, and privacy controls," *Journal of Marketing Research*, vol. 51, no. 5, 2014, pp. 546-562; Bright, Laura F., Hayoung Sally Lim, and Kelty Logan, "Should I Post or Ghost?: Examining how privacy concerns impact social media engagement in US consumers." *Psychology & Marketing*, vol. 38, no. 10, 2021, pp. 1712-1722.

[126] LINK_HIQ_000169080 at -082; LINK_HIQ_000091821 at p. 2; LINK_HIQ_000092120 at p. 5; Deposition of Paul Rockwell, May 19, 2022 ("Rockwell Deposition"), at 22:15-23:17; Rosin Deposition at 168:20-169:4; LINK_HIQ_000206117 at -129.

[127] LINK_HIQ_000206117 at -128; LINK_HIQ_000169080 at -082; LINK_HIQ_000092120 at p. 5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consistency on how LinkedIn uses member data, and with control over how their data is used.[128]
In internal business presentations on third-party scraping, LinkedIn also emphasized its
responsibility to protect members' data in order to retain member trust.[129]  Internal LinkedIn
research from 2020 identifies "protecting members data and using it responsibly" as one of the
drivers of user trust.[130]

58.        As I discussed above, LinkedIn devotes considerable resources to maintaining the
trust of its members by attempting to prevent their information from being used in ways that can
harm them.  LinkedIn also surveys members about their attitudes toward privacy and about the
extent to which they trust that their information will be protected.[131]  Those survey results
confirm that members care about privacy and demonstrate that LinkedIn has been successful at
maintaining members' trust.[132]  In a survey of a panel of users of SNPs, 75 percent of US
respondents who ever used LinkedIn somewhat or definitely agreed that LinkedIn is a brand they
trust, while only 53 percent of respondents reported that they trusted Facebook and 63 percent of
respondents reported that they trusted Twitter as of October 2020.[133]

59.        This is consistent with evidence from third-party surveys suggesting that LinkedIn
is successful relative to other SNPs in preventing abuse and earning user trust.  For example,
since 2017, the Business Insider Trust Digital Reports have surveyed 1,300 to 2,000
consumers[134] annually on their perceptions of digital trustworthiness of major SNPs including

---

[128] LINK_HIQ_000206117 at -129; LINK_HIQ_000206106 at -114-116; Rockwell Deposition at 23:3-17.

[129] LINK_HIQ_000169080 at -082; LINK_HIQ_000091821 at p. 2; LINK_HIQ_000092120 at p. 5; LINK_HIQ_000206117 at -129.

[130] LINK_HIQ_000148097 at -099.

[131] LINK_HIQ_000148097 at -098, -137.

[132] LINK_HIQ_000148097 at -099.

[133] LINK_HIQ_000150433 at -464.

[134] For the period 2017-2019, the survey sample consisted of global consumers from the Business Insider proprietary panel. Starting in 2020, the survey sample was changed to US-only respondents representative of the population based on gender, age and income. See Elder, Robert and Kevin Gallagher, "The Digital Trust Report," *Business Insider Intelligence*, May 2017, at p. 2; Gallagher, Kevin and Audrey Schomer, "The Digital Trust Report 2018," *Business Insider Intelligence*, July 2018, at p. 2; Schomer, Audrey, "The Digital Trust Report 2019," *Business Insider Intelligence*, October 2019, at p. 2; Schomer, Audrey and Daniel Carnahan, "The Digital Trust Report 2020," *Business Insider Intelligence*, September 2020, at p. 2; Schomer, Audrey and Debra Aho Williamson, "Digital Trust Benchmark Report 2021," *Business Insider Intelligence*, October 2021, at p. 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

LinkedIn, Facebook, Twitter, Instagram, YouTube, and Snapchat.[135]  According to the surveys, users trust that a platform will protect their privacy and data is the main factor affecting user willingness to engage with content on the platform.[136]  In all five years that the survey was conducted, LinkedIn ranked first in user trust.  In 2020, 73 percent of US social media users agreed, strongly agreed, or somewhat agreed that LinkedIn is protecting their privacy and data, followed by 66 percent of Pinterest users and 53 percent of Facebook users.[137]

60.       By scraping data from members' profiles, scrapers operate outside of the LinkedIn terms of service agreements protecting the use of members' data.  When scrapers sell members' data or sell services based on that data, they can use members' information in ways that remove members' ability to control their data and can harm members.[138]  This means that scraping can reduce members' trust, reduce their incentives to share information, and reduce the value of the LinkedIn platform.

61.       Another reason why the scraping of data can reduce the incentives of members to share information is that third-party scraping preserves members' personal information that members chose to delete or replace.[139]  LinkedIn maintains the current information in members' profiles, so when members change their profiles, that prior information will not be used by LinkedIn.[140]  Similarly, LinkedIn provides members with the ability to control how much of their profile information can be accessed by non-members, to make changes over time to those

---

[135]  Elder, Robert and Kevin Gallagher, "The Digital Trust Report," *Business Insider Intelligence*, May 2017, at p. 2; Gallagher, Kevin and Audrey Schomer, "The Digital Trust Report 2018," *Business Insider Intelligence*, July 2018, at p. 2; Schomer, Audrey, "The Digital Trust Report 2019," *Business Insider Intelligence*, October 2019, at p. 2; Schomer, Audrey and Daniel Carnahan, "The Digital Trust Report 2020," *Business Insider Intelligence*, September 2020, at p. 2; Schomer, Audrey and Debra Aho Williamson, "Digital Trust Benchmark Report 2021," *Business Insider Intelligence*, October 2021, at p. 2. Pinterest was added to the survey in 2019. Starting in 2020, TikTok and Reddit were also added to the survey.

[136]  Schomer, Audrey and Daniel Carnahan, "The Digital Trust Report 2020," *Business Insider Intelligence*, September 2020, at pp. 3, 14.

[137]  Schomer, Audrey and Daniel Carnahan, "The Digital Trust Report 2020," *Business Insider Intelligence*, September 2020, at p. 31.

[138]  Bray Deposition at 158:11-159:2; Defendant and Counterclaimant LinkedIn Corporation's Answer and Counterclaims ("LinkedIn Counterclaims"), *hiQ Labs, Inc. v. LinkedIn Corporation*, November 20, 2020, at ¶ 13 (p. 32).

[139]  May 4, 2022 Kaplan Deposition at 68:20-73:8.

[140]  HIQ_00143889 at -390.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0828

settings, and to delete their profile entirely.[141]  Scrapers can maintain members' prior profiles without concern that the information may no longer be current or accurate and may be inconsistent with how those members wish to represent themselves.[142]  If members are concerned that information in their profiles can be maintained by third-party scrapers, they may be less likely to add information to their profiles or less likely to maintain a publicly viewable profile or create an account in the first place.

62.        LinkedIn's strategy of being a platform that its members trust and its anti-scraping practices are, therefore, interrelated.  A trusted platform is one that can protect its members from abuse.  If LinkedIn did not attempt to block scraping, then it would not be able to protect its members from this type of abuse.

### 2. Empirical analysis

63.        While the survey results and academic research described above confirm that concerns about privacy and control over their data have significant effects on the willingness of SNP members to share information, I have investigated more directly the effect of third-party scraping on participation in the LinkedIn platform.  To do so, I have tested whether publicity regarding scraping had the effect of reducing members' participation in LinkedIn.

64.        In 2021, there were two episodes in which scraping on the LinkedIn platform received widespread attention, and scrapers were reported to be using information in ways that could harm members.  On April 6, 2021, Cybernews reported that data from 500 million LinkedIn users was offered for sale on a hacker forum.[143]  The data was reported to include

---

[141]  LinkedIn Help, "LinkedIn Public Profile Visibility," available at https://www.linkedin.com/help/linkedin/answer/a518980/linkedin-public-profile-visibility?lang=en (accessed April 21, 2022); LinkedIn Help, "Close Your LinkedIn Account," available at https://www.linkedin.com/help/linkedin/answer/63/close-your-linkedin-account?lang=en (accessed June 1, 2022).

[142]  May 4, 2022 Kaplan Deposition at 68:20-70:9, 71:25-72:13.

[143]  "Scraped data of 500 million LinkedIn users being sold online, 2 million records leaked as proof," *CyberNews*, April 6, 2021, available at https://cybernews.com/news/stolen-data-of-500-million-linkedin-users-being-sold-online-2-million-leaked-as-proof-2/ (accessed April 27, 2022). News of the incident was widely reported beginning April 7, 2021. See, for example, "LinkedIn says some user data scraped and posted for sale," *Reuters*, April 9, 2021, available at https://www.reuters.com/technology/linkedin-says-some-user-data-extracted-posted-sale-2021-04-09/ (accessed April 27, 2022); Duffy, Clare, "500 million LinkedIn users' data is for sale on hacker site," *CNN*, April 8, 2021, available at https://www.cnn.com/2021/04/08/tech/linkedin-data-scraped-hacker-site/index.html (accessed April 27, 2022); "Hong Kong's privacy watchdog checking whether city residents exposed in massive LinkedIn data leak," *South China Morning Post*, April 8, 2021, available at

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0829

information on user names, emails, phone numbers and work-related information.[144]  In response, LinkedIn released a statement that the data appeared to be scraped from the publicly viewable profiles of LinkedIn members and combined with data from other sources.[145]  In the next two days, the news was widely reported including by Reuters, CNN, and Chinese and Indian news outlets.[146]  On June 29, 2021, multiple news outlets announced that LinkedIn data for more than 700 million members was available for purchase on a hacker forum.[147]  The sample provided by the hacker included full names, emails, phone numbers, physical addresses, geolocation records, personal and professional experiences.[148]  According to LinkedIn, the data was scraped from the public profiles of members and combined with data from other sources, similar to the April event.[149]

65.      If concerns about scraping would reduce trust and reduce members' participation in the platform, then publicity of these events should have led to some reduction in participation.

---

https://www.scmp.com/news/hong-kong/society/article/3128666/hong-kongs-privacy-watchdog-checking-whether-hongkongers (accessed February 3, 2022).

[144]  "Scraped data of 500 million LinkedIn users being sold online, 2 million records leaked as proof," *CyberNews*, April 6, 2021, available at https://cybernews.com/news/stolen-data-of-500-million-linkedin-users-being-sold-online-2-million-leaked-as-proof-2/ (accessed April 27, 2022).

[145]  "An update on report of scraped data," *LinkedIn Pressroom*, April 8, 2021, available at https://news.linkedin.com/2021/april/an-update-from-linkedin (accessed April 27, 2022).

[146]  "LinkedIn says some user data scraped and posted for sale," *Reuters*, April 9, 2021, available at https://www.reuters.com/technology/linkedin-says-some-user-data-extracted-posted-sale-2021-04-09/ (accessed April 27, 2022); Duffy, Clare, "500 million LinkedIn users' data is for sale on hacker site," *CNN*, April 8, 2021, available at https://www.cnn.com/2021/04/08/tech/linkedin-data-scraped-hacker-site/index.html (accessed April 27, 2022); "Hong Kong's privacy watchdog checking whether city residents exposed in massive LinkedIn data leak," *South China Morning Post*, April 8, 2021, available at https://www.scmp.com/news/hong-kong/society/article/3128666/hong-kongs-privacy-watchdog-checking-whether-hongkongers (accessed February 3, 2022); Das, Avik, "LinkedIn says user data scraped and put for sale: Report," *Times of India*, April 10, 2021, available at https://timesofindia.indiatimes.com/business/india-business/linkedin-says-user-data-scraped-and-put-for-sale-report/articleshow/81995973.cms (accessed April 27, 2022).

[147]  See, for example, Matthews, Lee, "Details on 700 Million LinkedIn Users For Sale On Notorious Hacking Forum," *Forbes*, June 29, 2021, available at https://www.forbes.com/sites/leemathews/2021/06/29/details-on-700-million-linkedin-users-for-sale-on-notorious-hacking-forum/?sh=761ce3e434a4 (accessed June 1, 2022); Spadafora, Anthony, "700m LinkedIn records up for sale on underground hacking forum," *TechRadar*, June 29, 2021, available at https://www.techradar.com/news/700m-linkedin-records-up-for-sale-on-underground-hacking-forum (accessed June 1, 2022); Guthrie, Gary, "LinkedIn data breach puts 700 million user records at risk," *ConsumerAffairs*, June 29, 2021, available at https://www.consumeraffairs.com/news/linkedin-data-breach-puts-700-million-user-records-at-risk-062921.html (accessed June 3, 2022).

[148]  Guthrie, Gary, "LinkedIn data breach puts 700 million user records at risk," *ConsumerAffairs*, June 29, 2021, available at https://www.consumeraffairs.com/news/linkedin-data-breach-puts-700-million-user-records-at-risk-062921.html (accessed June 3, 2022).

[149]  "An update on report of scraped data," *LinkedIn Pressroom*, June 29, 2021, available at https://news.linkedin.com/2021/june/an-update-from-linkedin (accessed April 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0830

The evidence suggests that these events were widely reported, so it is likely that many LinkedIn members were aware of those events.

66.         There are different ways that members who were concerned about the potential for harm from scraping could have reacted to these events.  One way to better protect themselves would have been to reduce the information in their public profile.  They could also have modified other LinkedIn options, such as the option not to allow crawling of their information or making their entire profile accessible only to members of their network.  A more extreme response could have been to close their LinkedIn accounts.

67.         I have investigated whether the publicity generated regarding scraping on the LinkedIn platform led to an increase in LinkedIn account closings.  Since closing a LinkedIn account is the most extreme way to reduce participation in the platform, my analysis understates how the scraping events could have reduced participation in the platform.

68.         I examined how the number of account closings in the weeks after the scraping events became public information changed relative to prior weeks.  If the scraping events induced more members to close their accounts, then we would observe an elevated change in the number of account closings relative to the preceding week.  The number of accounts closed in any week can depend on different factors including the time of the year.  For example, in weeks in which a higher percentage of professionals are on vacation, there tend to be fewer account closings.[150]  I compared the changes in account closings in the event weeks with changes in account closings during non-holiday weeks.[151]

69.         Exhibit 5 shows the results of this comparison using 2021 data.  In the week the June event became public, there is an increase of ███ account closings compared to the week before.  There are no other non-holiday weeks in 2021 that have a larger increase in the number of account closings than the week of the June event.  The likelihood of observing an increase in

---

[150]  In 2021, the average number of weekly account closings across all holiday weeks is ███, which is 8% lower than the average number of weekly account closings across non-holiday weeks.

[151]  In my analysis, I consider the following holidays in 2021: New Year's Day, Martin Luther King Jr.'s Birthday, Washington's Birthday, Good Friday (Easter), Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, and Christmas Day. Non-holiday weeks are weeks that do not have any of these holidays and that are not preceded by a week with a holiday.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

account closings of the same or larger magnitude in the week of the June event due to chance is, therefore, three percent.[152]



70.       Since the April event happened around the Easter holidays, I cannot directly compare the weekly change in account closings in the week of the April event relative to the week before.[153]  In Exhibit 6, I show the results of comparing changes in account closings relative to two weeks prior, which allows me to investigate the impacts of both the April and June events.  In the week the April event became public, there was an increase of ███ account closings compared to two weeks prior.  This change is the ████████ among all other non-holiday weekly changes in the number of account closings relative to two weeks prior in 2021.  In fact, the ████████████████████████████████████████████████████████  The likelihood of

---

[152]   I observed changes in weekly account closings in 31 non-holiday weeks in 2021. Since the week of the June event has the largest change in the number of account closings, the likelihood of observing an increase equal to or larger than the increase in the week of the June event is 1 in 31 or three percent.

[153]   The week of the April event started on April 4, 2021. The week prior to the April event week was the week of the Good Friday holiday.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

observing an increase in account closings of the same or larger magnitude in the week of the April event due to chance is thus 10 percent.[154]



71.　　　My comparisons in Exhibit 5 and Exhibit 6 are limited to weeks in 2021, the same year in which the scraping events happened, to better control for any common year-specific factors that might have affected account closings.  My conclusions are unchanged if I performed the same comparisons using all available data between February 2019 and March 2022 (see Appendix Exhibits C-6 and C-7).[155]

72.　　　In conclusion, my analysis demonstrates that the number of account closings in the weeks the scraping events became public is larger than either all or nearly all other weeks in

---

[154]  I observed changes in weekly account closings relative to two weeks prior in 31 non-holiday weeks in 2021. Since the week of the April event is the third largest, the likelihood of observing an increase equal to or larger than the increase in the week of the April event is 3 in 31 or 10 percent.

[155]  For the period between November 1, 2020 and December 8, 2020, because the number of US closed accounts appears unusually low, I re-calculated and imputed the number of LinkedIn US account closings based on its average share in the total number of LinkedIn worldwide account closings (excluding China).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2021.  In addition, the higher account closings in those weeks are very likely the result of the scraping events rather than other factors.

73.      To further investigate whether the increase in account closings was related to members' concerns about news reports concerning scraping events on the LinkedIn platform, I also analyze whether the number of social media mentions related to LinkedIn and scraping were higher during the weeks in which the events were reported in the press.  Exhibit 7 shows the results of this analysis.  The total height of each bar in Exhibit 7 captures the weekly number of user comments related to LinkedIn and scraping[156] on Twitter, Quora, and Reddit in 2021.[157] The number of comments related to LinkedIn and scraping increased from under 100 prior to the April event to over 2,700 (or nearly 30 times) in the week of the April event and continued to be elevated in the two weeks following the event.  For the June 2021 event, the number of comments related to LinkedIn and scraping increased by about 1,000 in the week of the event relative to the preceding week and continued to be elevated in the three weeks following the event.

74.      Analyzing the sentiment of these social media comments reveals that, for both events, there was a significant increase in comments with negative sentiment[158] with respect to LinkedIn and scraping in the weeks of the scraping events and the weeks following those events. In fact, over 65% of all comments with negative sentiment related to LinkedIn and scraping in 2021 were shared during the event weeks and subsequent two weeks.  Thus, in addition to receiving widespread news coverage, the two scraping events also received increased public attention and a significant share of the attention was associated with negative sentiments towards the events.

---

[156]  I included comments containing the keyword "LinkedIn" and at least one of the following keywords: "scrape," "scraped," or "scraping."

[157]  For this analysis, I collected data from Sprinklr, a tool providing, among other things, data on user comments and sentiments on various social media platforms. See Sprinklr, "Free Social Listening Tool | Modern Research Lite | Sprinklr," available at https://www.sprinklr.com/modern-research-lite (accessed June 3, 2022); Sprinklr, "What is Social Listening?" available at https://www.sprinklr.com/cxm/social-listening (accessed June 3, 2022).

[158]  Sprinklr relies on AI to classify sentiment (see Sprinklr, "Social Listening Tool," available at https://www.sprinklr.com/features/social-listening/, accessed June 3, 2022). Social media mentions are analyzed to understand customer sentiment and are categorized as positive, negative, or neutral based on their tone and context (Sprinklr, "What is Social Listening?" available at https://www.sprinklr.com/cxm/social-listening, accessed June 3, 2022). Sprinklr assigns a positive, neutral, or negative sentiment to each social media mention, but the detailed counts by sentiment are only available for positive and negative mentions. The remaining mentions were assumed to be neutral mentions.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0834

**Exhibit 7**



**Weekly Social Media Mentions**
Related to LinkedIn and Scraping

Notes:
[1] Social media mentions are from Twitter, Reddit, and Quora in 2021.
[2] Social media mentions contain the keyword "LinkedIn" and one of the following keywords: scrape, scraped, and/or scraping.
[3] Sprinklr classified some mentions as having a positive or negative sentiment, and the remaining mentions are assumed to have a neutral sentiment.

Source: Sprinklr Data.

### 3.   LinkedIn's practices regarding authorized use of members' information increase the value of the platform

75.      While scraping can erode trust and reduce the value of the platform, the provision of services based on the information in members' profiles can also increase the value of the platform.  For example, providing services like Recruiter to human resources departments of companies increases the value of the platform and benefits members by increasing their employment opportunities.  This means that LinkedIn has the incentive to maximize the benefits while minimizing the costs of using members' profile data.

76.      LinkedIn's practice of preventing unauthorized scraping while also selling services to businesses based on information from member profiles, subject to provisions that protect members' privacy, allows members to benefit from sharing their information, while also retaining control over how their information is used, and thus increases the value of the platform. As I discussed above, scrapers do not have the incentive to use members' information to maximize the value of the platform.  This means that preventing scraping reduces the chance that members' information could be used to harm them.  LinkedIn's use of members' information,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0835

subject to its privacy provisions, allows members and customers to benefit from the provision of services using member profile data without subjecting members to the same privacy and loss of control concerns they would have if third-party scrapers used that data.

77.        The same holds true with respect to LinkedIn's API programs.  Developers can build innovative service offerings that increase the value of the platform, and that LinkedIn does not provide.  For example, the Recruiter System Connect ("RSC") API connects the applicant tracking systems ("ATS") that human resource departments use with LinkedIn's Recruiter, allowing them to see applicant information from Recruiter in the ATS and vice versa.[159]  This integration allows recruiting professionals to see all the relevant applicant information in one place and increases the value of LinkedIn's Recruiter products.[160]

78.        LinkedIn's practices regarding search engine crawling are a good example of LinkedIn balancing the costs and benefits of allowing certain third parties automated access to members' information.  Crawling can enhance the value of the platform because it makes members' profiles more easily discoverable through search engines and it increases traffic to the platform.  This benefits members because, for example, it can make it easier for recruiters to find them and can lead to more valuable prospective networking opportunities.  LinkedIn allows crawling by certain search engines subject to protocols designed to protect members' information and consistent with member-specified preferences.[161]

### 4.        Other SNPs anti-scraping practices are evidence that LinkedIn's practices increase the value of the platform

79.        As I discussed above, competition among SNPs induces SNPs to adopt anti-abuse practices that enhance the value of the platform.  If, for example, allowing scraping enhanced rather than reduced the value of the platform, then SNPs would have incentives to allow it because it would allow the SNP to gain members relative to platforms that restricted scraping.

---

[159]   LINK_HIQ_000091565 at -580.

[160]   LINK_HIQ_000091565 at -580; LinkedIn Recruiter System Connect, "Customer Success Guide," available at https://business.linkedin.com/content/dam/me/business/en-us/talent-solutions/cx/2020/PDF/rsc-customer-success-guide.pdf (accessed May 25, 2022).

[161]   LinkedIn, "LinkedIn Crawling Terms and Conditions," available at https://www.linkedin.com/legal/crawling-terms (accessed April 21, 2022); LinkedIn, "Robot Exclusion Standards," available at https://www.linkedin.com/robots.txt (accessed December 9, 2021).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

80.        As shown in Appendix Exhibit C-5, SNPs including Facebook, Twitter, Instagram, Snapchat, TikTok, Reddit, Pinterest, Yelp and YouTube have all adopted anti-abuse and anti-scraping practices similar to LinkedIn's practices.  In addition, many professional associations which facilitate information sharing have similar anti-abuse practices. (See Appendix Exhibit C-8.)

81.        Again, if allowing third-party scraping increased the value of a SNP, then economics suggests that some platforms would have adopted practices permitting third-party scraping.  The fact that none of them have is evidence that LinkedIn has valid business reasons for adopting anti-scraping practices.

### B.        Reducing Scraping Reduces the Effects of Free Riding

82.        Companies typically need to make investments to fund innovations needed to create and sell products and services.  To have the incentive to make those investments, the profits they earn on sales must be sufficient to cover the costs of those investments.[162]

83.        In some cases, those investments can be easily appropriated by rival sellers.  It is simple, for example, to reverse engineer the properties of a small molecule drug or to copy works of art such as books, movies, or music.  Companies could also easily use rivals' valuable trademarks to help sell their products.  When companies do appropriate the investments of rivals, economists refer to this as free riding.[163]

84.        Free riding can have two effects on competition and consumers.[164]  First, free riding can lead to increased competition and lower prices than if the only seller of a product is the company that, for example, made the investment in developing the drug.  Consumers benefit from the lower prices.  Second, because it reduces the profits from selling products requiring investments, free riding reduces the incentives of firms to make investments needed to sell those products.  Consumers are harmed when free riding reduces investments.  Economics suggests

---

[162]  Jorgeson, Dale W., "Capital Theory and Investment Behavior," *The American Economic Review*, Vol. 53, No. 2, Papers and Proceedings of the Seventy-Fifth Annual Meeting of the American Economic Association, May 1963, pp. 247-259, at pp. 248-249.

[163]  Mankiw, N. Gregory, *Principles of Microeconomics (7th ed.)*, Stamford: Cengage Learning, 2015, at p. 218.

[164]  See Arrow, Kenneth, "Economic welfare and the allocation of resources for invention," *The rate and direction of inventive activity: Economic and social factors*, Princeton NJ: Princeton University Press, 1962, pp. 609-626, at pp. 618-622;  Dasgupta, Partha, and Joseph Stiglitz, "Uncertainty, industrial structure, and the speed of R&D," *The Bell Journal of Economics*, 1980, pp. 1-28.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that the latter effect is likely to be larger when a firms' investments would be easily appropriable. For example, since software could easily be copied and resold, companies' investments in developing software products are easily appropriable. This means that free riding would significantly affect the incentives to make the investment required to develop software products.[165]

85.     Applying these economic principles to this case is straightforward. First, LinkedIn has made significant investments in developing and maintaining its platform. These investments include, among other things, expenditures on the technical infrastructure supporting the platform, marketing expenses, and research and development expenses. In 2021 alone, LinkedIn spent over ▮▮▮▮▮▮ on research and development and had over ▮▮▮ employees dedicated to research and development efforts.[166] Those investments are intended to, among other things, encourage members to engage with the platform, and LinkedIn profits from the fact that it has created a platform in which members are willing to share information and engage with the platform.

86.     Second, if scrapers are able to easily acquire all the data in members' profiles that means LinkedIn's investments in the platform would be easily appropriable. Third, scrapers either sell the data combined with other information or, like hiQ, provide services using the data. This means that scrapers reduce the revenue LinkedIn can earn from selling services.[167] As a result, scraping is a form of free riding that reduces LinkedIn's incentives to invest in the platform and reduces the value of the platform.

87.     In summary, LinkedIn's investments in the platform are easily appropriable by third-party scrapers, and scrapers reduce LinkedIn's sales of services based on those investments. This means that LinkedIn has valid business reasons for its anti-scraping practices. Those practices limit free riding, increase investments in the platform, and benefit platform members.

---

[165] See, for example, Landes, William M., and Richard A. Posner, "An economic analysis of copyright law*," The Journal of Legal Studies*, vol. 18, no. 2, 1989, pp. 325-363, at p. 326.
[166] See LINK_HIQ_000206139.
[167] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**C.      LinkedIn's Anti-Scraping Practices Can Enhance the Functionality of the Platform**

88.      Economics suggests that the value of the LinkedIn platform to members and users depends on its performance, such as the amount of time it takes to load pages in a browser or the LinkedIn app. As I discussed above, LinkedIn reports that it blocks hundreds of millions of scraping attempts per day.[168]

89.      Record evidence suggests that LinkedIn believes that, absent its anti-scraping efforts, the number of scraping attempts occurring at any point in time would reduce the functionality of the platform by drastically increasing the number of requests made to access members' profiles.[169]  According to Paul Rockwell, head of LinkedIn's Trust and Safety organization, "LinkedIn's systems and dedicated security personnel turn back more unauthorized guest profile requests than they permit authorized profile requests every day."[170]



[172] LinkedIn has invested many resources into building defenses against scraping attacks to make sure that they do not bring down any part of LinkedIn service.[173]

90.      If scraping reduces the performance of the platform, then preventing scraping would be a valid business reason for LinkedIn's anti-scraping practices.

---

[168]   2021 Rockwell Declaration at ¶ 13.

[169]   Bray Deposition at 83:4-84:8; LINK_HIQ_000089691 at -716.

[170]   2021 Rockwell Declaration at ¶¶ 1, 12. See also LINK_HIQ_000091972 at p. 9, showing that between December 25, 2020 and January 24, 2021, LinkedIn's anti-scraping defenses blocked 98.8% of incoming requests and only 1.2% of requests resulted in a served profile.

[171]   Bray Deposition at 9:25-10:5; 83:4-84:8.

[172]   Bray Deposition at 126:6-127:7. This is also consistent with public sources on the effect of scraping on website performance. See "The Pandemic of the Internet: Imperva Research Labs Reveals Bot Traffic Climbs to Record High in 2020," *Imperva,* available at https://www.imperva.com/company/press_releases/the-pandemic-of-the-internet-imperva-research-labs-reveals-bot-traffic-climbs-to-record-high-in-2020/ (accessed June 7, 2022).

[173]   Bray Deposition at 85:12-86:20; Rosin Deposition at 104:19-105:3, 113:2-5; LINK_HIQ_000041653 at -653; LINK_HIQ_000168706 at -706-707; LINK_HIQ_000169080 at -103, -105.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D.  Conclusion

91.      Competition among SNPs induces SNPs to adopt practices that increase the value of the platform.  Economics suggest that LinkedIn's anti-scraping practices could increase the value of the platform, and the economic and record evidence confirms that those practices do increase the value of the platform because: 1) they increase member trust; 2) they reduce free riding; and 3) they increase the performance of the platform.

## V.  LINKEDIN HAD VALID REASONS FOR ATTEMPTING TO PREVENT HIQ FROM SCRAPING

92.      hiQ alleges that LinkedIn targeted hiQ because it was a competitive threat to LinkedIn's people analytics offerings.  The evidence discussed above demonstrates that LinkedIn's challenged conduct was part of its broader anti-scraping practices.  I also established that LinkedIn has valid reasons for its practices prohibiting scraping because scrapers can reduce the value of the platform.  I now address the question of whether LinkedIn had valid reasons for attempting to prevent hiQ specifically from scraping because hiQ's practices reduced the value of the platform.

93.      First, hiQ was scraping LinkedIn member profiles to offer services to employers.  As I explained above, scrapers that sell services based on members' profile data can reduce the value of the platform by reducing the incentives of members to share information and reducing the incentives of LinkedIn to invest in the platform.  Thus, LinkedIn had valid business reasons to attempt to prevent hiQ from scraping independent of hiQ's specific usage of the scraped data.

94.      In addition, LinkedIn had valid business reasons to attempt to prevent hiQ from scraping because the specific features of hiQ's primary product had the clear potential to harm members and reduce the value of the platform.  hiQ's Keeper product was designed to provide information to employers on whether their current employees were considering leaving the company.[174]  That information could only have been valuable to employers if they were not otherwise aware that individual employees were considering leaving.  If employers were otherwise unaware that an employee was considering leaving the company, then it is because the employees chose not to inform their employers.  From an economic perspective, employees that

---

[174]  hiQ Labs, "Keeper," available at https://www.hiqlabs.com/new-keeper (accessed April 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

were considering leaving and did not want their employers to know that they were updating their profiles were harmed by hiQ's Keeper service because it provided the employers with information that the employees did not want them to have.[175]

95.        The desire of members to keep the fact that they made changes to their profiles private is particularly evident for those members who selected the option not to publish to their connections any changes they might make to their profile.  LinkedIn also allows members to choose whether to notify their network of updates to their profile.  Members can select a general option under visibility settings,[176] which applies a global change to most[177] of their LinkedIn activity. ███████████████████████████████████████████████████████████
███████████████████████[178]  Even though some of LinkedIn's services, like Recruiter, contained features that allow customers to be notified of members' profile updates, LinkedIn did not provide such updates about members who chose not to broadcast their activity.[179]

96.        hiQ's Keeper product is, therefore, a good example of how third-party scraping can reduce the incentives of LinkedIn's members to share information.  If members knew that hiQ was notifying their employers they were changing their profile, they might not update their profiles, even if doing so would have provided more reliable information and would have enhanced the value of the platform to both the member and LinkedIn.

97.        In conclusion, hiQ's scraping reduced LinkedIn members' ability to control their profiles, and this harmed members and undermined member trust.  hiQ's specific service, moreover, had the potential to reduce member trust, reduce member willingness to share

---

[175] This is consistent with LinkedIn's rejection of hiQ's application for access to LinkedIn's APIs based on a use case of predicting the likelihood of employees leaving. See  HIQ_00200007 at -007 and LINK_HIQ_000073013 at -013-014.

[176] LinkedIn Help, "Share Profile Updates With Your Network," available at https://www.linkedin.com/help/linkedin/answer/a529062 (accessed May 23, 2022).

[177] There are some activities that will be shared regardless of a member's settings. "These include any content you share; following an influencer, channel, or publisher; and liking and commenting on shared content. If you don't want any of these things shared, LinkedIn advises you don't participate in those activities." See Burnham, Kristin, "LinkedIn tip: How to turn off activity broadcasts," *Computerworld*, May 12, 2017, available at https://www.computerworld.com/article/3196475/linkedin-tip-how-to-turn-off-activity-broadcasts.amp.html (accessed April 29, 2022).

[178] LINK_HIQ_000205996.

[179] LinkedIn Corporation's Amended Responses to Plaintiff hiQ Labs, Inc.'s First Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, at p. 4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

information, and reduce the value of the platform.  This means that LinkedIn had valid business reasons for attempting to prevent hiQ from scraping LinkedIn's members' profiles.

_____

Kevin M. Murphy

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
CE 0842

# APPENDIX A

# Curriculum Vitae

# *Curriculum Vitae*

# Kevin M. Murphy

June 2022

*Business Address:*

The University of Chicago
Booth School of Business
5807 South Woodlawn Avenue
Chicago, Illinois  60637
email: kevin.murphy@chicagobooth.edu

*Home Address:*

1810 Pennington Court
New Lenox, Illinois 60451
Phone: (815)463-4756
Fax: (815)463-4758

**Current Positions**

> July 2005 – Present: George J. Stigler Distinguished Service Professor of Economics, Department of Economics and Booth School of Business, The University of Chicago

> Faculty Research Associate, National Bureau of Economic Research

> Co-Director, Health and Human Capital Program, Health Economics Initiative, Becker Friedman Institute

**Education**

> University of California, Los Angeles, A.B., Economics, 1981

> The University of Chicago, Ph.D., 1986

> Thesis Topic: *Specialization and Human Capital*

**Previous Research and Academic Positions**

> 2002 – 2005: George J. Stigler Professor of Economics, Department of Economics and Booth School of Business, The University of Chicago

> 1993 – 2002: George Pratt Shultz Professor of Business Economics and Industrial Relations, The University of Chicago

> 1989 – 1993: Professor of Business Economics and Industrial Relations, The University of Chicago

1988 – 1989: Associate Professor of Business Economics and Industrial Relations, The University of Chicago

1986 – 1988: Assistant Professor of Business Economics and Industrial Relations, The University of Chicago

1983 – 1986: Lecturer, Booth School of Business, The University of Chicago

1982 – 1983: Teaching Associate, Department of Economics, The University of Chicago

1979 – 1981: Research Assistant, Unicon Research Corporation, Santa Monica, California

## Honors and Awards

2008: John von Neumann Lecture Award, Rajk College, Corvinus University, Budapest

2007: Kenneth J. Arrow Award (with Robert H. Topel)

October 2005: Garfield Research Prize (with Robert H. Topel)

September 2005: MacArthur Foundation Fellow

1998: Elected to the American Academy of Arts & Sciences

1997: John Bates Clark Medalist

1993: Fellow of The Econometric Society

1989 – 1991: Sloan Foundation Fellowship, The University of Chicago

1983 – 1984: Earhart Foundation Fellowship, The University of Chicago

1981 – 1983: Fellowship, Friedman Fund, The University of Chicago

1980 – 1981: Phi Beta Kappa, University of California, Los Angeles

1980 – 1981: Earhart Foundation Fellowship, University of California, Los Angeles

1979 – 1981: Department Scholar, Department of Economics, University of California, Los Angeles

## Publications

## Books

<u>Social Economics: Market Behavior in a Social Environment</u> with Gary S. Becker, Cambridge, MA: Harvard University Press (2000).

- 2 -

Measuring the Gains from Medical Research: An Economic Approach, edited volume with Robert H. Topel, Chicago: The University of Chicago Press (2003).

Chicago Price Theory, by Sonia Jaffe, Robert Minton, Casey B. Mulligan, and Kevin M. Murphy, Princeton University Press (2019).

## Chapters in Books

"Income and Wealth in America," with Emmanuel Saez, in Inequality and Economic Policy, ed. Tom Church, Christopher Miller, John B. Taylor, Stanford, CA: Hoover Press (2015)

## Articles

"Government Regulation of Cigarette Health Information," with Benjamin Klein and Lynne Schneider, 24 *Journal of Law and Economics* 575 (1981).

"Estimation and Inference in Two-Step Econometric Models," with Robert H. Topel, 3 *Journal of Business and Economic Statistics* 370 (1985).

"Unemployment, Risk, and Earnings: Testing for Equalizing Wage Differences in the Labor Market," with Robert H. Topel, in Unemployment and the Structure of Labor Markets, pp. 103-139, ed. Kevin Lang and Jonathan S. Leonard. London: Basil Blackwell (1987).

"The Evolution of Unemployment in the United States: 1968-1985," with Robert H. Topel, in NBER Macroeconomics Annual, pp. 11-58, ed. Stanley Fischer. Cambridge, MA: MIT Press (1987).

"Cohort Size and Earnings in the United States," with Mark Plant and Finis Welch, in Economics of Changing Age Distributions in Developed Countries, pp. 39-58, ed. Ronald D. Lee, W. Brian Arthur, and Gerry Rodgers. Oxford: Clarendon Press (1988).

"The Family and the State," with Gary S. Becker, 31 *Journal of Law and Economics* 1 (1988).

"A Theory of Rational Addiction," with Gary S. Becker, 96 *Journal of Political Economy* 675 (1988).

"Vertical Restraints and Contract Enforcement," with Benjamin Klein, 31 *Journal of Law and Economics* 265 (1988).

"Income Distribution, Market Size, and Industrialization," with Andrei Shleifer and Robert W. Vishny, 104 *Quarterly Journal of Economics* 537 (1989).

"Wage Premiums for College Graduates: Recent Growth and Possible Explanations," with Finis Welch, 18 *Educational Researcher* 17 (1989).

"Industrialization and the Big Push," with Andrei Shleifer and Robert W. Vishny, 97 *Journal of Political Economy* 1003 (1989).

- 3 -

"Building Blocks of Market Clearing Business Cycle Models," with Andrei Shleifer and Robert W. Vishny, in NBER Macroeconomic Annual, pp. 247-87, ed. Olivier Jean Blanchard and Stanley Fischer. Cambridge, MA: MIT Press (1989).

"Efficiency Wages Reconsidered: Theory and Evidence," with Robert H. Topel, in Advances in the Theory and Measurement of Unemployment, pp. 204-240. ed. Yoram Weiss and Gideon Fishelson. London: Macmillan (1990).

"Empirical Age-Earnings Profiles," with Finis Welch, 8 *Journal of Labor Economics* 202 (1990).

"Human Capital, Fertility, and Economic Growth," with Gary S. Becker and Robert F. Tamura, 98 *Journal of Political Economy*, S12 (1990).

"Accounting for the Slowdown in Black-White Wage Convergence," with Chinhui Juhn and Brooks Pierce, in Workers and Their Wages: Changing Patterns in the United States, pp. 107-143, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"The Role of International Trade in Wage Differentials," with Finis Welch, in Workers and Their Wages: Changing Patterns in the United States, pp. 39- 69, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"Why Has the Natural Rate of Unemployment Increased over Time?" with Robert H. Topel and Chinhui Juhn, 2 *Brookings Papers on Economic Activity* 75 (1991).

"The Allocation of Talent: Implications for Growth," with Andrei Shleifer and Robert W. Vishny, 106 *Quarterly Journal of Economics* 503 (1991).

"Rational Addiction and the Effect of Price on Consumption," with Gary S. Becker and Michael Grossman, 81 *American Economic Review* 237 (1991).

"Wages of College Graduates," in The Economics of American Higher Education, pp. 121-40, ed. William E. Becker and Darrell R. Lewis. Boston: Kluwer Academic Publishers (1992).

"Changes in Relative Wages, 1963-1987: Supply and Demand Factors," with Lawrence F. Katz, 107 *Quarterly Journal of Economics* 35 (1992).

"The Structure of Wages," with Finis Welch, 107 *Quarterly Journal of Economics* 285 (1992).

"The Transition to a Market Economy: Pitfalls of Partial Planning Reform," with Andrei Shleifer and Robert W. Vishny, 107 *Quarterly Journal of Economics* 889 (1992).

"The Division of Labor, Coordination Costs, and Knowledge," with Gary S. Becker, 107 *Quarterly Journal of Economics* 1137 (1992).

- 4 -

"Industrial Change and the Rising Importance of Skill" with Finis Welch, in Uneven Tides: Rising Inequality in America, pp. 101-132, ed. Peter Gottschalk and Sheldon Danziger. New York: Russell Sage Foundation Publications (1993).

"Wage Inequality and the Rise in Returns to Skill," with Chinhui Juhn and Brooks Pierce, 101 *Journal of Political Economy* 410 (1993).

"Occupational Change and the Demand for Skill, 1940-1990," with Finis Welch, 83 *American Economic Review* 122 (1993).

"Inequality and Relative Wages," with Finis Welch, 83 *American Economic Review* 104 (1993).

"Why Is Rent-Seeking So Costly to Growth?" with Andrei Shleifer and Robert W. Vishny, 83 *American Economic Review* 409 (1993).

"A Simple Theory of Advertising as a Good or Bad," with Gary S. Becker, 108 *Quarterly Journal of Economics* 941 (1993).

"Relative Wages and Skill Demand, 1940-1990," with Chinhui Juhn, in Labor Markets, Employment Policy, and Job Creation, pp. 343-60, ed. Lewis C. Solmon and Alec R. Levenson. The Milken Institute Series in Economics and Education. Boulder, CO: Westview Press (1994).

"Cattle Cycles," with Sherwin Rosen and Jose A. Scheinkman, 102 *Journal of Political Economy* 468 (1994).

"An Empirical Analysis of Cigarette Addiction," with Gary S. Becker and Michael Grossman, 84 *American Economic Review* 396 (1994).

"Inequality in Labor Market Outcomes: Contrasting the 1980s and Earlier Decades," with Chinhui Juhn, 1 *Economic Policy Review* 26 (1995).

"Employment and the 1990-91 Minimum Wage Hike," with Donald R. Deere and Finis Welch, 85 *American Economic Review* 232 (1995).

"Examining the Evidence on Minimum Wages and Employment," with Donald R. Deere and Finis Welch, in The Effects of the Minimum Wage on Employment, pp. 26-54, ed. Marvin H. Kosters. Washington, D.C.: The AEI Press (1996).

"Social Status, Education, and Growth," with Chaim Fershtman and Yoram Weiss, 104 *Journal of Political Economy* 108 (1996).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Quality and Trade," with Andrei Shleifer, 53 *Journal of Development Economics* 1 (1997).

- 5 -

"Vertical Integration as a Self-Enforcing Contractual Arrangement," with Benjamin Klein, 87 *American Economic Review* 415 (1997).

"Unemployment and Nonemployment," with Robert H. Topel, 87 *American Economic Review* 295 (1997).

"Wages, Skills, and Technology in the United States and Canada," with W. Craig Riddell and Paul M. Romen, in General Purpose Technologies and Economic Growth, pp. 283-309, ed. Elhanan Helpman.  Cambridge, MA: M.I.T. Press (1998).

"Perspectives on the Social Security Crisis and Proposed Solutions," with Finis Welch, 88 *American Economic Review* 142 (1998).

"Population and Economic Growth," with Gary S. Becker and Edward Glaeser, 89 *American Economic Review* 145 (1999).

"A Competitive Perspective on Internet Explorer," with Steven J. Davis, 90 *American Economic Review* 184 (2000).

"Industrial Change and the Demand for Skill," with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 263-84, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: The University of Chicago Press (2001).

"Wage Differentials in the 1990s: Is the Glass Half Full or Half Empty?" with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 341-64, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy. Chicago: The University of Chicago Press (2001).

"Economic Perspectives on Software Design: PC Operating Systems and Platforms," with Steven J. Davis and Jack MacCrisken, in Microsoft, Antitrust, and the New Economy: Selected Essays, pp. 361-420, ed. Davis S. Evans. Boston, MA: Kluwer (2001).

"Current Unemployment, Historically Contemplated," with Robert H. Topel and Chinhui Juhn, 1 *Brookings Papers on Economic Activity* 79 (2002).

"The Economics of Copyright 'Fair Use' in A Networked World," with Andres Lerner and Benjamin Klein, 92 *American Economic Review* 205 (2002).

"The Economic Value of Medical Research," with Robert H. Topel, in Measuring the Gains from Medical Research: An Economic Approach, pp. 41-73, ed. Robert H. Topel and Kevin M. Murphy. Chicago: The University of Chicago Press (2003).

"School Performance and the Youth Labor Market," with Sam Peltzman, 22 *Journal of Labor Economics* 299 (2003).

"Entrepreneurial ability and market selection in an infant industry: evidence from the Japanese cotton spinning industry," with Atsushi Ohyama and Serguey Braguinsky, 7 *Review of Economic Dynamics* 354 (2004).

"Entry, Pricing, and Product Design in an Initially Monopolized Market," with Steven J. Davis and Robert H. Topel, 112 *Journal of Political Economy* S188 (2004).

"Diminishing Returns: The Costs and Benefits of Increased Longevity," with Robert H. Topel, 46 *Perspectives in Biology and Medicine* S108 (2004).

"Persuasion in Politics," with Andrei Shleifer, 94 *American Economic Review* 435 (May 2004).

"Black-White Differences in the Economic Value of Improving Health," with Robert H. Topel, 48 *Perspectives in Biology and Medicine* S176 (2005).

"The Equilibrium Distribution of Income and the Market for Status," with Gary S. Becker and Iván Werning, 113 *Journal of Political Economy* 282 (2005).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, 114 *Journal of Political Economy* 38 (2006).

"Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," with Benjamin Klein, Andres V. Lerner, and Lacey Plache, 73 *Antitrust Law Journal* 571 (2006).

"The Value of Health and Longevity," with Robert H. Topel, 114 *Journal of Political Economy* 871 (2006).

"Social Value and the Speed of Innovation," with Robert H. Topel, 97 *American Economic Review* 433 (2007).

"Education and Consumption: The Effects of Education in the Household Compared to the Marketplace," with Gary S. Becker, 1 *The Journal of Human Capital* 9 (Winter 2007).

"Why Does Human Capital Need a Journal?" with Isaac Ehrlich, 1 The Journal of Human Capital 1 (Winter 2007).

"Critical Loss Analysis in the Whole Foods Case," with Robert H. Topel, 3 (2) GCP Magazine (March 2008).

"Exclusive Dealing Intensifies Competition for Distribution," with Benjamin Klein, 75 Antitrust Law Journal (October 2008).

"Fertility Decline, the Baby Boom and Economic Growth," with Curtis Simon and Robert Tamura, 2 The Journal of Human Capital 3 (Fall 2008).

"The Market for College Graduates and the Worldwide Boom in Higher Education of Women," with Gary S. Becker and William H. J. Hubbard, 100 American Economic Review: Papers & Proceedings 229 (May 2010).

"Explaining the Worldwide Boom in Higher Education of Women," with Gary S. Becker and William H. J. Hubbard," 4 Journal of Human Capital No. 3 (2010).

- 7 -

"How Exclusivity is Used to Intensify Competition for Distribution-Reply to Zenger," with Benjamin Klein, 77 Antitrust Law Journal No. 2 (2011).

"Achieving Maximum Long-Run Growth," *Federal Reserve Bank of Kansas City Proceedings of the Annual Jackson Hole Conference 2011.*

"On the Economics of Climate Policy," with Gary. S. Becker and Robert. H. Topel, 10 *B.E. Journal of Economic Analysis and Policy* No. 2 (2011**).**

"Measuring Crack Cocaine and its Impact," with Roland G. Fryer, Jr., Paul S. Heaton, and Steven D. Levitt, 51 *Economic Inquiry* No. 3 (July 2013).

"Some Basic Economics of National Security," with Robert H. Topel, 103 *American Economic Review* No. 3 (2013).

"Activating *Actavis*:  A More Complete Story," with Barry C. Harris, Robert D. Willig, and Matthew B. Wright, 28 *Antitrust* No. 2 (Spring 2014).

"Competitive Discounts and Antitrust Policy," with Edward A. Snyder and Robert H. Topel, Chapter 5 of *The Oxford Handbook of International Antitrust Economics*, Volume 2 (2014).

"Gary Becker as Teacher," 105 *American Economic Review* No. 5 (2015).

"Black and White Fertility, Differential Baby Booms: The Value of Equal Education Opportunity," with Robert Tamura and Curtis Simon, 82 *Journal of Demographic Economics*, Issue 1 (2016).

"Human Capital Investment, Inequality, and Economic Growth," with Robert H. Topel, 34 *Journal of Labor Economics,* No. S2/Part 2 (2016).

"A Theory of Intergenerational Mobility," with Gary S. Becker, Scott Duke Kominers, and Jörg L. Spenkuch, *Journal of Political Economy 126*, no. S1 (October 2018): S7-S25.

"Gary Becker Remembered," with James J. Heckman and Edward P. Lazear, J*ournal of Political Economy 126*, no. S1 (October 2018): S1-S6.

Sample of "The Power of the Economic Approach: Unpublished Manuscripts of Gary S. Becker," Edited by Julio J. Elías, Casey B. Mulligan, and Kevin M. Murphy, University of Chicago Press (Forthcoming). Journal of Human Capital 2019 13:2, 140-141.

## Selected Working Papers

"Gauging the Economic Impact of September 11th," with Gary S. Becker, Unpublished Working Paper (October 2001).

"War In Iraq Versus Containment: Weighing the Costs," with Steven J. Davis and Robert H. Topel, NBER Working Paper No.12092 (March 2006).

"The Interaction of Growth in Population and Income," with Gary S. Becker, Unpublished Working Paper (2006).

"Persuasion and Indoctrination," with Gary Becker (2007).

"The Value of Life Near Its End and Terminal Care," with Gary S. Becker and Tomas Philipson (2007).

"On the Economics of Climate Policy," with Gary S. Becker and Robert H. Topel, Working Paper No. 234 (January 2010, Revised September 2010).

"The Manipulation of Children's Preferences, Old Age Support, and Investment in Children's Human Capital," with Gary S. Becker and Jörg L. Spenkuch, Unpublished Working Paper (February 2012).

"The Collective Licensing of Music Performance Rights: Market Power, Competition and Direct Licensing" (March 2013).

"Activating *Actavis* with A More Complete Model," with Michael G. Baumann, John P. Bigelow, Barry C. Harris, Janusz A. Ordover, Robert D. Willig, and Matthew B. Wright, (January 2014).

"A Theory of Bundling Advertisements in Media Markets," with Ignacio Palacios-Huerta, NBER Working Paper No. 229994 (December 2016).

"Dynamic Bundling of Goods and Bads in Media Markets" with Ignacio Palacios-Huerta, Working Paper (2021) (available at *SSRN (https://ssrn,com/abstract=3899063).*

## Selected Comments

Comment on "Causes of Changing Earnings Equality" by Robert Z. Lawrence. Federal Reserve Bank of Kansas City (1998).

"Comment: Asking the Right Questions in the Medicare Reform Debate," Medicare Reform: Issues and Answers, pp. 175-81, ed. Andrew J. Rettenmaier and Thomas R. Saving. Chicago: The University of Chicago Press (2000).

Comment on "Social Security and Demographic Uncertainty" by Henning Bohn, in Risk Aspects of Investment-Based Social Security Reform, ed. John Y. Campbell and Martin Feldstein. Chicago: The University of Chicago Press (2001).

Comment on "High Technology Industries and Market Structure" by Hal R. Varian. Federal Reserve Bank of Kansas City (2001).

**Popular Press Articles**

"The Education Gap Rap," *The American Enterprise* (March-April 1990), pp. 62.

"Rethinking Antitrust," with Gary S. Becker, *Wall Street Journal* (February 26, 2001), A22.

"Prosperity Will Rise Out of the Ashes," with Gary S. Becker, *Wall Street Journal* (October 29, 2001), A22.

"The Economics of NFL Team Ownership," with Robert H. Topel, report prepared at the request of the National Football League Players' Association (January 2009).

**Articles About Murphy**

"Higher Learning Clearly Means Higher Earning," by Carol Kleiman. *Chicago Tribune*, March 12, 1989, Jobs Section pp. 1.  Long article about "The Structure of Wages" with picture of Murphy.

"Why the Middle Class Is Anxious," by Louis S. Richman. *Fortune*, May 21, 1990, pp. 106. Extensive reference to Murphy's work on returns to education.

"Unequal Pay Widespread in U.S.," by Louis Uchitelle, *New York Times,* August 14, 1990, Business Day section pp. 1. Long piece on income inequality.

"One Study's Rags to Riches Is Another's Rut of Poverty," by Sylvia Nasar, *New York Times*, June 17, 1992, Business Section pp. 1. Long piece on the income inequality research.

"Nobels Pile Up for Chicago, but Is the Glory Gone?" by Sylvia Nasar, *New York Times* November 4, 1993, Business Section pp. 1. Long piece on Chicago School of economics. Featured a photo of five of the "brightest stars on the economics faculty" (including Murphy) and a paragraph about Murphy's research.

"This Sin Tax is Win-Win," by Christopher Farrell. *Business Week*, April 11, 1994, pp. 30. Commentary section refers to Murphy, Becker, and Grossman's work on rational addiction.

"Growing inequality and the economics of fragmentation," by David Warsh, *Boston Sunday Globe*, August 21, 1994, pp. A1. Two-page article with picture and biographical details about Murphy and his research; part of a series about "how the new generation replaced the old in economics."

"A Pay Raise's Impact," by Louis Uchitelle. *New York Times*, January 12, 1995, Business Section pp. 1. Article about consequences of proposed increase in the minimum wage. Articles featuring Murphy's comments on the minimum wage appeared in numerous other publications, including the *Chicago Tribune*; in addition, Murphy was interviewed on CNN (January 26, 1995).

- 10 -

"The Undereducated American," *Wall Street Journal*, August 19, 1996, A12. Changes in the rate of returns to education.

"In Honor of Kevin M. Murphy: Winner of the John Bates Clark Medal," by Finis Welch, 14 *Journal of Economic Perspectives* 193 (2000).

**Testimony, Reports, and Depositions (Last 4 Years)**

Deposition of Kevin M. Murphy, January 17, 2018, in the Matter of Valassis Communications, Inc. v. News Corporation, News America Marketing, a/k/a News America Incorporated, a/k/a News America Marketing Group, a/k/a News America Marketing FSI L.L.C., a/k/a News America Marketing FSI, Inc.; and News America Marketing In-Store Services L.L.C., a/k/a News America Marketing In-Store Services, Inc., The United States District Court for the Southern District of New York. Case No. 1:17-cv-07378-PKC.

Verified Statement of Kevin M. Murphy, January 19, 2018, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-2734 (CCC/JAD).

Trial Testimony of Kevin M. Murphy, February 1, 2018, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-cv-2734 (CCC/JBC).

Expert Report and Testimony of Kevin M. Murphy, February 28, 2018 in the Matter of Washington Metropolitan Area Transit Authority and Amalgamated Transit Union Local 689, Interest Arbitration Under Sections 66(C) Of the WMATA Compact, The United States District Court for the District of Columbia.

Expert Report of Kevin M. Murphy, June 29, 2018, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Report of Kevin M. Murphy, July 30, 2018, in the Matter of Daniel Gordon, et al. v. Amadeus IT Group, S.A. et al.  The United States District Court for the Southern District of New York. Civ. A. No. 1:15-cv-05457-KPF.

Declaration of Kevin M. Murphy, August 16, 2018, in the Matter of Genentech, Inc., Biogen, Inc., Hoffmann-La Roche Inc., and City of Hope v. Celltrion, Inc., Celltrion Healthcare Co., Ltd., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals International GmbH, The United States District Court for the District of New Jersey. Civ. A. No. 18-cv-00574 (RMB) (KMW).

Expert Report of Kevin M. Murphy, September 21, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

- 11 -

Reply Declaration of Kevin M. Murphy, September 26, 2018, in the Matter of Genentech, Inc., Biogen, Inc., Hoffmann-La Roche Inc., and City of Hope v. Celltrion, Inc., Celltrion Healthcare Co., Ltd., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals International GmbH, The United States District Court for the District of New Jersey.  Civ. A. No. 18-cv-00574 (RMB) (KMW).

Expert Rebuttal Report of Kevin M. Murphy, October 9, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Deposition of Kevin M. Murphy, October 29, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Confidential Submission to the U.S. Department of Justice, Economic Considerations for Modification and Termination of the ASCAP Consent Decree, October 30, 2018.

Expert Report of Kevin M. Murphy, March 1, 2019, in the Matter of First Impressions Salon, Inc., Roy Mattson, KPH Healthcare Services, Inc., d/b/a Kinney Drugs, Inc. and Piggly Wiggly Midwest, LLC. v. National Milk Producers Federation, Cooperatives Working Together, Dairy Farmers of America, Inc., Land O'Lakes, Inc., Dairylea Cooperative Inc., Agri-Mark, Inc. d/b/a Cabot Creamery Cooperative, Inc., The United States District Court for the Southern District of Illinois. Case No. 3:13-cv-00454-SCW.

Expert Report of Kevin M. Murphy, March 15, 2019, in the Matter of Robert Binz V, Michael Binz, Leslie Clemenson, William Clynes, Andrew Margolick, Gregory Melita, and Nili Sinai-Nathan v. Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, The United States District Court for the Southern District of New York.  Civ A. No. 1:15-cv-05457-KPF.

Verified Statement of Kevin M. Murphy, April 25, 2019, On Behalf of Union Pacific Railroad Company in NAFCA vs. Union Pacific Railroad Company, Before the Surface Transportation Board. STB Docket No. NOR 42144.

Deposition of Kevin M. Murphy, May 9, 2019, in the Matter of Robert Binz V, Michael Binz, Leslie Clemenson, William Clynes, Andrew Margolick, Gregory Melita, and Nili Sinai-Nathan v. Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, The United States District Court for the Southern District of New York.  Civ A. No. 1:15-cv-05457-KPF.

Expert Report of Kevin M. Murphy, May 10, 2019, in the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 17-op-5004 and Case No. 18-op-45090. (Corrected and Restated Expert Report filed June 21, 2019).

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (Associated Wholesale Grocers, Inc. v. Bumble Bee Foods, LLC et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (W. Lee Flowers & Co., Inc. v. Bumble Bee Foods LLC, et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC. v. Bumble Bee Foods, LLC et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Addendum Report of Kevin M. Murphy, May 24, 2019, In Re Packaged Seafood Products Antitrust Litigation (Affiliated Foods Midwest Cooperative, Inc. v. Bumble Bee Foods LLC, et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Deposition of Kevin M. Murphy, June 6, 2019, in the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 17-op-5004 and Case No. 18-op-45090.

Expert Report of Kevin M. Murphy, June 10, 2019, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, In the United States District Court for the Eastern District of New York. No. 05-md-1720 (MKB) (JO).

Deposition of Kevin M. Murphy, June 25, 2019, In Re Packaged Seafood Products Antitrust Litigation, In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, July 15, 2019, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Submission to the U.S. Department of Justice, Economic Considerations for Modification and Termination of the ASCAP Consent Decree, August 9, 2019.

Expert Report of Kevin M. Murphy, November 15, 2019, In Re Dealer Management Systems Antitrust Litigation, MDL 2817, The United States District Court for the Northern District of Illinois Eastern Division. No. 1:18-CV-00864. (Corrected and Restated Expert Report filed January 15, 2020).

Expert Report of Kevin M. Murphy, December 6, 2019, in the Matter of North American Soccer League, LLC v. United States Soccer Federation, Inc., and Major League Soccer, LLC, In the United States District Court for The Eastern District of New York.  No. 1:17-cv-05495-MKB-ST.

Expert Report of Kevin M. Murphy, December 20, 2019, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Expert Rebuttal Report of Kevin M. Murphy, January 3, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Expert Rebuttal Report of Kevin M. Murphy, January 10, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Reply Report of Kevin M. Murphy, January 15, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, January 18, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, January 21, 2020, and January 22, 2020, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, In the United States District Court for the Eastern District of New York. No. 05-md-1720 (MKB) (JO).

Deposition of Kevin M. Murphy, January 24, 2020, In Re Dealer Management Systems Antitrust Litigation, MDL 2817, The United States District Court for the Northern District of Illinois Eastern Division. No. 1:18-CV-00864.

Deposition of Kevin M. Murphy, January 27, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Report of Kevin M. Murphy, February 3, 2020, In Re Opioid Litigation, In the Supreme Court of the State of New York County of Suffolk.  Index No.:400001/2017, Index No.: 400008/2017, and Index No.: 400016/2018.

Trial Testimony of Kevin M. Murphy, February 3, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, February 13, 2020, in the Matter of North American Soccer League, LLC v. United States Soccer Federation, Inc., and Major League Soccer, LLC, In the United States District Court for The Eastern District of New York.  No. 1:17-cv-05495-MKB-ST.

- 14 -

Deposition of Kevin M. Murphy, February 19, 2020, In Re Opioid Litigation, In the Supreme Court of the State of New York County of Suffolk.  Index No.:400001/2017, Index No.: 400008/2017, and Index No.: 400016/2018.

Arbitration Testimony of Kevin M. Murphy, February 25, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Report of Kevin M. Murphy, May 30, 2020, in the Matter of an Independent Review Process, Afilias Domains No. 3 Limited v. Internet Corporation for Assigned Names and Numbers, before The International Centre for Dispute Resolution.

Expert Report of Kevin M. Murphy, July 24, 2020, in the Matter of The State of Ohio v. McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Drug Corporation, and Miami-Luken, Inc., In the Court of Common Pleas for Madison County, Ohio. Case No. CVH20180055.

Expert Report of Kevin M. Murphy, August 27, 2020, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, September 1, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, September 15, 2020, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Expert Report of Kevin M. Murphy, September 18, 2020, in the Matter of Axon Enterprises, Inc., a corporation, In the United States of America Before the Federal Trade Commission Office of Administrative Law Judges.  Docket No. 9389.

Deposition of Kevin M. Murphy, October 2, 2020, in the Matter of Axon Enterprises, Inc., a corporation, In the United States of America Before the Federal Trade Commission Office of Administrative Law Judges.  Docket No. 9389.

Expert Report of Kevin M. Murphy, October 5, 2020, In Re Peanut Farmers Antitrust Litigation, In the United States District Court for the Eastern District of Virginia Norfolk Division, No. 2:19-cv-00463-RAJ-LRL.

Supplemental Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, October 13, 2020, Joint Petition for Rulemaking to Modernize Annual

- 15 -

Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, October 16, 2020, In Re Peanut Farmers Antitrust Litigation, In the United States District Court for the Eastern District of Virginia Norfolk Division, No. 2:19-cv-00463-RAJ-LRL.

Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, October 21, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, November 9, 2020, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP. Expert Report of Kevin M. Murphy, December 7, 2020, In Re Keurig Green Mountain Single Serve Coffee Antitrust Litigation, In the United States District Court for the Southern District of New York. Case No. 1:14-md-02542.

Expert Report of Kevin M. Murphy, January 11, 2021, in the Matter of The United States of America and Tobacco-Free Kids Action Fund, et al. v. Philip Morris USA Inc., et al. and ITG Brands, LLC, et al., The United States District Court for the District of Columbia. Civil Action No. 99-CV-2496 (PLF).

Declaration of Kevin M. Murphy, January 19, 2021, In Re Blue Cross Blue Shield Antitrust Litigation, In the United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Expert Report of Kevin M. Murphy, January 20, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567.

Deposition of Kevin M. Murphy, March 1, 2021, in the Matter of The United States of America and Tobacco-Free Kids Action Fund, et al. v. Philip Morris USA Inc., et al. and ITG Brands, LLC, et al., The United States District Court for the District of Columbia. Civil Action No. 99-CV-2496 (PLF).

Deposition of Kevin M. Murphy, March 10, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567.

Expert Report of Kevin M. Murphy, March 15, 2021, In the Matter of Altria Group, Inc. and JUUL Labs, Inc., The United States of America Federal Trade Commission Office of Administrative Law Judges. FTC Docket No. 9393.

Deposition of Kevin M. Murphy, March 23, 2021, and March 24, 2021, In Re Keurig Green Mountain Single Serve Coffee Antitrust Litigation, In the United States District Court for the Southern District of New York. Case No. 1:14-md-02542.

Deposition of Kevin M. Murphy, April 2, 2021, In the Matter of Altria Group, Inc. and JUUL Labs, Inc., The United States of America Federal Trade Commission Office of Administrative Law Judges. FTC Docket No. 9393.

Expert Report of Kevin M. Murphy, April 15, 2021, In Re Rail Freight Fuel Surcharge Antitrust Litigation, The United States District Court for The District of Columbia. MDL No. 1869. Case No. 07-489.

Expert Report of Kevin M. Murphy, April 15, 2021, In the Matter of Leilani Deslandes, et al. v. McDonald's USA LLC and McDonald's Corporation, and Stephanie Turner, et al. v. McDonald's USA LLC and McDonald's Corporation, In the United States District Court for the Northern District of Illinois Eastern Division. Case Nos. 17-cv-04857 & 19-cv-05524.

Expert Report of Kevin M. Murphy, May 10, 2021, In the Matter of Insignia Systems, Inc. v. News Corporation, News America Marketing FSI, L.L.C., and News America Marketing In-Store Services, L.L.C., In the United States District Court for the District of Minnesota. Case No. 19-cv-1820.

Deposition of Kevin M. Murphy, May 12, 2021, In the Matter of Leilani Deslandes, et al. v. McDonald's USA LLC and McDonald's Corporation, and Stephanie Turner, et al. v. McDonald's USA LLC and McDonald's Corporation, In the United States District Court for the Northern District of Illinois Eastern Division. Case Nos. 17-cv-04857 & 19-cv-05524.

Rebuttal Expert Report of Kevin M. Murphy, May 24, 2021, In the Matter of US Airways, Inc. v. Sabre Holdings Corporation; Sabre GLBL Inc.; and Sabre Travel International Limited, In the United States District Court for the Southern District of New York. Civil Action No. 1:11-cv-02725 (LGS).

Expert Report of Kevin M. Murphy, May 24, 2021, In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation (Commonwealth of Pennsylvania v. Exxon Mobil Corporation, et al.), In the United States District Court for the Southern District of New York.  Master File No. 1:00-1898. MDL No. 1358. Case No. 1:14-cv-06228.

Declaration of Kevin M. Murphy, May 28, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567. (Corrected and Restated Declaration filed June 7, 2021).

Expert Report of Kevin M. Murphy, June 2, 2021, In the Matter of Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC, In the United States District Court for the Northern District of California. Case No. 3:18-cv-03670-WHO.

- 17 -

Expert Report of Kevin M. Murphy, June 4, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567.

Deposition of Kevin M. Murphy, June 16, 2021, In the Matter of Insignia Systems, Inc. v. News Corporation, News America Marketing FSI, L.L.C., and News America Marketing In-Store Services, L.L.C., In the United States District Court for the District of Minnesota. Case No. 19-cv-1820.

Testimony of Kevin M. Murphy, June 22, 2021, In the Matter of Altria Group, Inc. and JUUL Labs, Inc., The United States of America Federal Trade Commission Office of Administrative Law Judges. FTC Docket No. 9393.

Expert Report of Kevin M. Murphy, June 25, 2021, In the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 18-op-45079 and Case No. 18-op-45032.

Trial Testimony of Kevin M. Murphy, July 8, 2021, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Trial Testimony of Kevin M. Murphy, July 12, 2021, and July 13, 2021, in the Matter of Valassis Communications, Inc. v. News Corporation, News America Marketing, a/k/a News America Incorporated, a/k/a News America Marketing Group, a/k/a News America Marketing FSI L.L.C., a/k/a News America Marketing FSI, Inc.; and News America Marketing In-Store Services L.L.C., a/k/a News America Marketing In-Store Services, Inc., The United States District Court for the Southern District of New York. Case No. 1:17-cv-07378-PKC.

Deposition of Kevin M. Murphy, July 16, 2021, In the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 18-op-45079 and Case No. 18-op-45032.

Expert Report of Kevin M. Murphy, July 22, 2021, In the Matter of the State of Rhode Island, by and through Peter F. Neronha, Attorney General v. Purdue Pharma L.P. et al., The United States District Court for the State of Rhode Island Providence/Bristol County Superior Court. C.A. No. PC2018-4555.

Deposition of Kevin M. Murphy, August 11, 2021, In the Matter of Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. v. SAP SE, SAP America, Inc., and SAP Labs, LLC, In the United States District Court for the Northern District of California. Case No. 3:18-cv-03670-WHO.

Reply Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, August 16, 2021, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Supplemental Expert Report of Kevin M. Murphy, August 16, 2021, In the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 18-op-45079 and Case No. 18-op-45032. (Corrected and Restated Report filed September 29, 2021).

Expert Report of Kevin M. Murphy, August 27, 2021, In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court for the Northern District of California. Case No. 19-md-02913-WHO.

Deposition of Kevin M. Murphy, September 2, 2021, In the Matter of US Airways, Inc. v. Sabre Holdings Corporation; Sabre GLBL Inc.; and Sabre Travel International Limited, In the United States District Court for the Southern District of New York. Civil Action No. 1:11-cv-02725 (LGS).

Testimony of Kevin M. Murphy, September 23, 2021, In Re Pre-Filled Propane Tank Antitrust Litigation, in The United States District Court for the Western District of Missouri Western Division. MDL No. 2567, Case No. 14-MD-02567.

Deposition of Kevin M. Murphy, October 15, 2021, In the Matter of Coordination Proceeding Special Title (Cal. R. Ct.1550(b)), Automobile Antitrust Cases I, II, The Superior Court of the State of California for the County of San Francisco Unlimited Jurisdiction. CJC-03-004298 and CJC-03-004303.

Trial Testimony of Kevin M. Murphy, November 4, 2021, In the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 18-op-45079 and Case No. 18-op-45032.

Supplemental Expert Report of Kevin M. Murphy, November 10, 2021, In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court for the Northern District of California. Case No. 19-md-02913-WHO.

Rebuttal Expert Report of Kevin M. Murphy, November 15, 2021, In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court for the Northern District of California. Case No. 19-md-02913-WHO.

Expert Report of Kevin M. Murphy, November 15, 2021, in the Matter of International Construction Products LLC, v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC, d/b/a Cat Auction Services, The United States District Court for the District of Delaware. Case No. 15-108-RGA.

Deposition of Kevin M. Murphy, December 3, 2021, in the Matter of International Construction Products LLC, v. Caterpillar Inc., Komatsu America Corp., Associated Auction Services, LLC, d/b/a Cat Auction Services, The United States District Court for the District of Delaware. Case No. 15-108-RGA.

Deposition of Kevin M. Murphy, December 7, 2021, In Re Rail Freight Fuel Surcharge Antitrust Litigation, The United States District Court for The District of Columbia. MDL No. 1869. Case No. 07-489.

Deposition of Kevin M. Murphy, December 10, 2021, In Re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court for the Northern District of California. Case No. 19-md-02913-WHO.

Expert Report of Kevin M. Murphy, February 21, 2022, In Re Broiler Antitrust Litigation, Direct Purchaser Plaintiff Action, Commercial and Institutional Purchaser Plaintiff Action, End-User Consumer Purchaser Plaintiff Action, and Direct Action Plaintiff Consolidated Actions, In the United States District Court for the Northern District of Illinois Eastern Division. Docket No. 1:16 cv-08637.

Deposition of Kevin M. Murphy, March 9, 2022, In Re: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation (Commonwealth of Pennsylvania v. Exxon Mobil Corporation, et al.), In the United States District Court for the Southern District of New York.  Master File No. 1:00-1898. MDL No. 1358. Case No. 1:14-cv-06228.

Expert Report of Kevin M. Murphy, April 11, 2022, In Re Opioid Litigation, In the Circuit Court of Kanawha County, West Virginia. Civil Action No. 21-C-9000 Distributor.

Expert Report of Kevin M. Murphy, May 6, 2022, in the Matter of AOT Holding AG and Maize Capital Group, LLC, individually and on behalf of all others similarly situated v. Archer Daniels Midland Company, In the United States District Court for the Central District of Illinois Urbana Division. Case No. 19-cv-2240, CSB-EIL.

Expert Rebuttal Report of Kevin M. Murphy, May 6, 2022, In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court for the Northern District of California. Case No. 19-md-02913-WHO.

Trial Testimony of Kevin M. Murphy, May 10, 2022, In the Matter of US Airways, Inc. v. Sabre Holdings Corporation; Sabre GLBL Inc.; and Sabre Travel International Limited, In the United States District Court for the Southern District of New York. Civil Action No. 1:11-cv-02725 (LGS).

Deposition of Kevin M. Murphy, June 6, 2022, In Re: JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation, In the United States District Court for the Northern District of California. Case No. 19-md-02913-WHO.

- 20 -

Expert Report of Kevin M. Murphy, June 6, 2022, In the Matters of the State of Colorado, et al. v. Google LLC, In the United States District Court for the District of Columbia. Case No.: 1:20-cv-03715-APM and United States of America, et al. v. Google LLC, In the United States District Court for the District of Columbia, Case No.: 1:20-cv-03010-APM.

# APPENDIX C

# Appendix Exhibits

# Appendix Exhibit C-1

# LinkedIn Profile Privacy and Visibility Options

| Profile Section[†] | Proximity to User | | | | | Default Option |
|---|---|---|---|---|---|---|
| | 1st Degree Connections | 2nd Degree Connections | In-Network | Out-of-Network | Public Visibility*[‡] | |
| First Name[2] | Visible. | Visible. | Visible. | Visible. | Visible. | Publicly Visible. |
| Number of Connections[3] | Visible. | Visible. | Visible. | Visible. | Visible. | Publicly Visible. |
| Region[4] | Visible. | Visible. | Visible. | Visible. | Visible. | Publicly Visible. |
| Last Name[5] | Visible. | Visible for all public profiles. Only visible if desired for non-public profiles. | Visible for all public profiles. Only visible if desired for non-public profiles. | Visible for all public profiles. Only visible if desired for non-public profiles. | Visible. | Publicly Visible. |
| Profile Photo[6] | Visible. | Only visible if desired. | Only visible if desired. | Only visible if desired. | Only visible if desired. | Publicly Visible. |
| Headline[7] | Visible. | Visible. | Visible. | Visible. | Only visible if desired. | Publicly Visible. |
| Current Experience (+ Details)[8] | Visible. | Visible. | Visible. | Visible. | Only visible if desired. | Publicly Visible. |
| Past Experience (+ Details)[9] | Visible. | Visible. | Visible. | Visible. | Only visible if desired. | Publicly Visible. |
| Posts + Activity[10] | Visible. | Only visible if desired. | Only visible if desired. | Only visible if desired. | Only visible if desired. | Publicly Visible. |
| Education[11] | Visible. | Visible. | Visible. | Visible. | Only visible if desired. | Publicly Visible. |
| Languages[12] | Visible. | Visible. | Visible. | Visible. | Only visible if desired. | Publicly Visible. |
| Groups[13] | Visible. | Visible. | Visible. | Visible. | Only visible if desired. | Publicly Visible. |
| Skills[14] | Visible. | Visible. | Visible. | Visible. | Not visible. | Out-of-Network. |
| Profile Update Notifications[15] | Only visible if desired. | Only visible if desired. | Only visible if desired. | Not visible. | Not visible. | In-Network. |
| Contact Information[16] | Only visible if desired. | Not visible. | Not visible. | Not visible. | Not visible. | 1st Degree. |
| Connections[17] | Only visible if desired. | Not visible. | Not visible. | Not visible. | Not visible. | 1st Degree. |
| Active Status[18] | Only visible if desired. | Only visible if desired. | Only visible if desired. | Only visible if desired. | Not visible. | 1st Degree. |
| News Mention Notifications[19] | Only visible if desired. | Not visible. | Not visible. | Not visible. | Not visible. | 1st Degree. |
| Race + Demographic Information[20] | Not visible. | Not visible. | Not visible. | Not visible. | Not visible. | Not visible. |

Notes:

[*]   Reflects settings for members who have turned on their profiles' public visibility. Members can also elect to completely hide their profiles from public view, in which case none of the above profile sections would be visible to non-members.

[†]   Descriptions of visibility options for each profile section are based on LinkedIn's current account settings and may not reflect previous iterations of privacy and visibility policies.

[‡]   If a user turns off their public profile, they can choose to display only the first initial of their last name to non-connected members. However, their profile can still be found in LinkedIn search using their full name.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-1 (cont.)

Sources:
[1]  LinkedIn Help, "Control Your Public Profile," available at https://www.linkedin.com/help/linkedin/answer/a528138 (accessed June 2, 2022); LinkedIn Help, "What People Can See On Your Profile," available at https://www.linkedin.com/help/linkedin/answer/a545600/what-people-can-see-on-your-profile?lang=en (accessed June 2, 2022).
[2]  LinkedIn Help, "Changing How Your Name Appears on Your Profile," available at https://www.linkedin.com/help/linkedin/answer/79/changing-how-your-name-appears-on-your-profile?lang=en (accessed May 29, 2022); Linkedin Help, "Manage the Visibility of Articles  Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[3]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[4]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[5]  LinkedIn Help, "Changing How Your Name Appears on Your Profile," available at https://www.linkedin.com/help/linkedin/answer/79/changing-how-your-name-appears-on-your-profile?lang=en (accessed May 29, 2022).
[6]  LinkedIn Help, "LinkedIn Public Profile Visibility," available at https://www.linkedin.com/help/linkedin/answer/a518980/linkedin-public-profile-visibility?lang=en (accessed May 29,2022); LinkedIn Help, "Settings for Profile Photo Visibility," available at https://www.linkedin.com/help/linkedin/answer/a545557 (accessed May 30, 2022).
[7]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[8]  LinkedIn Learning, "Configure your public profile," available at https://www.linkedin.com/learning/learning-linkedin-2021/configure-your-public-profile (accessed May 31, 2022).
[9]  LinkedIn Learning, "Configure your public profile," available at https://www.linkedin.com/learning/learning-linkedin-2021/configure-your-public-profile (accessed May 31, 2022).
[10]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022); LinkedIn Help, "Visibility of Shared Posts," available at https://www.linkedin.com/help/linkedin/answer/a523141/visibility-of-shared-posts?lang=en (accessed June 2, 2022).
[11]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[12]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[13]  LinkedIn Help, "Manage the Visibility of Articles Published on LinkedIn," available at https://www.linkedin.com/help/linkedin/answer/a521725/manage-the-visibility-of-articles-published-on-linkedin?lang=en (accessed May 29, 2022).
[14]  LinkedIn Help, "Display Order of Skills," available at https://www.linkedin.com/help/linkedin/answer/a568137 (accessed May 29, 2022); Miteva, Yana, "3 Reasons Why You Should Make Your Profile Public," thelinkedblog.com, available at https://thelinkedblog.com/2022/3-reasons-why-you-should-make-your-profile-public-1248/ (accessed May 30, 2022).
[15]  LinkedIn Help, "Share Profile Updates With Your Network," available at https://www.linkedin.com/help/linkedin/answer/a529062?trk=fromsettings (accessed May 23, 2022).
[16]  LinkedIn Help, "Contact Info Section of Your Profile," available at https://www.linkedin.com/help/linkedin/answer/a545600/what-people-can-see-on-your-profile?lang=en (accessed June 3, 2022).
[17]  LinkedIn Help, "Who Can See Your Connections," available at https://www.linkedin.com/help/linkedin/answer/a540663 (accessed May 29, 2022).
[18]  LinkedIn Help, "Change Active Status on LinkedIn Messaging," available at  https://www.linkedin.com/help/linkedin/answer/a553076/change-active-status-on-linkedin-messaging?lang=en (accessed May 29, 2022); LinkedIn Help, "Active Status in LinkedIn Messaging," available at https://www.linkedin.com/help/linkedin/answer/a553072/active-status-in-linkedin-messaging?lang=en (accessed May 29, 2022).
[19]  LinkedIn Help, "Mentioned in the News Feature," available at https://www.linkedin.com/help/linkedin/answer/50021/mentioned-in-the-news-feature?lang=en (accessed May 29, 2022).
[20]  LinkedIn Help, "How LinkedIn Uses Your Personal Demographic Data," available at https://www.linkedin.com/help/linkedin/answer/87454/how-linkedin-uses-your-personal-demographic-data?lang=en (accessed May 30, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-2

## Letters to Scrapers Sent by LinkedIn
## Between 2010 and 2021

| Document Bates Number | Date Sent | Recipient |
| --- | --- | --- |
| LINK_HIQ_000197562 | 2010-10-26 | RapLeaf, Inc. |
| LINK_HIQ_000197094 | 2012-01-24 | LookAcross, LLC |
| LINK_HIQ_000205801 | 2012-03-02 | Avature, Inc. |
| LINK_HIQ_000197086 | 2013-07-18 | Fliptop |
| LINK_HIQ_000205861 | 2013-08-22 | Ebsta |
| LINK_HIQ_000205808 | 2013-09-10 | DHI Group, Inc. f/k/a Dice Holdings, Inc. |
| LINK_HIQ_000205863 | 2013-12-17 | Ecquire |
| LINK_HIQ_000197112 | 2014-02-12 | SalesLoft, LLC |
| LINK_HIQ_000205961 | 2014-03-31 | Sell Hack |
| LINK_HIQ_000180452 | 2014-08-26 | Connectifier |
| LINK_HIQ_000197100 | 2015-06-05 | Prospect Visual |
| LINK_HIQ_000197104 | 2015-07-10 | Switch Tech, Inc. |
| LINK_HIQ_000205873 | 2015-07-15 | Enbekon DataServices GmbH / Siniša Grgić |
| LINK_HIQ_000205884 | 2015-07-15 | Enbekon DataServices GmbH / Marko Horvat |
| LINK_HIQ_000205835 | 2015-10-16 | Age-Insight / Juan Ramirez |
| LINK_HIQ_000205837 | 2015-10-20 | Social Media Marketing Software LLC / AutoPilot for LinkedIn |
| LINK_HIQ_000205826 | 2015-10-26 | 1-Page |
| LINK_HIQ_000205906 | 2015-10-30 | Lever, Inc. and Lever.co |
| LINK_HIQ_000002180 | 2015-11-12 | Comp Genome, Inc. |
| LINK_HIQ_000205788 | 2015-11-18 | Monster Worldwide, Inc. / TalentBin |
| LINK_HIQ_000002254 | 2015-12-07 | KiteDesk, Inc. |
| LINK_HIQ_000205941 | 2015-12-14 | OnLinked.In / Robust Haven |
| LINK_HIQ_000205902 | 2016-02-08 | Jobr, Inc. |
| LINK_HIQ_000002126 | 2016-03-11 | Aevy AB |
| LINK_HIQ_000205964 | 2016-04-04 | Social123 Inc. |
| LINK_HIQ_000205845 | 2016-05-17 | Connect6 Inc. |
| LINK_HIQ_000205947 | 2016-06-06 | RolePoint Inc. |
| LINK_HIQ_000205897 | 2016-06-07 | IKO System |
| LINK_HIQ_000002265 | 2016-06-17 | OnePageCRM.com / LeadClipper |
| LINK_HIQ_000205952 | 2016-06-17 | Score Assured Ltd. |
| LINK_HIQ_000002287 | 2016-06-20 | Paysa, Inc. |
| LINK_HIQ_000002326 | 2016-06-21 | Zoom Information Inc. |
| LINK_HIQ_000002294 | 2016-07-01 | CycleIO, Inc. d/b/a PersistIQ |
| LINK_HIQ_000002227 | 2016-07-20 | HireTeamMate, Inc. d/b/a Hiretual |
| LINK_HIQ_000002167 | 2016-07-21 | Colabo Inc. |
| LINK_HIQ_000002158 | 2016-07-22 | CareerBuilder, LLC |
| LINK_HIQ_000002271 | 2016-07-29 | Lucid Creative Group, LLC d/b/a LeadFuze |
| LINK_HIQ_000205957 | 2016-07-29 | SearchQuant LLC |
| LINK_HIQ_000002213 | 2016-08-12 | Kwaga SAS d/b/a Evercontact |
| LINK_HIQ_000002240 | 2016-08-19 | Workalytics, Inc. d/b/a Intro and IntroHQ, Inc. |
| LINK_HIQ_000205803 | 2016-08-26 | Crystal Project Inc. d/b/a Crystal |
| LINK_HIQ_000002196 | 2016-09-01 | Datananas SAS |
| LINK_HIQ_000205866 | 2016-09-23 | Firmapi SARL d/b/a Email Hunter |
| LINK_HIQ_000002277 | 2016-09-28 | Salestools Aps |
| LINK_HIQ_000205924 | 2016-09-28 | Pincer Dynamics Ltd. d/b/a LinkedIn Tool |
| LINK_HIQ_000002153 | 2016-10-10 | Connectors Marketplace Inc. |
| LINK_HIQ_000002323 | 2016-10-11 | X-Byte Technolabs Pvt Ltd. |
| LINK_HIQ_000002137 | 2016-11-02 | Beamery, Inc., Beamery Ltd., and Beamery Australia Pty Ltd. |
| LINK_HIQ_000002148 | 2016-11-11 | Brilent, Inc. |
| LINK_HIQ_000002143 | 2016-11-23 | Kompass International S.A. and ByPath SAS |
| LINK_HIQ_000002283 | 2016-12-22 | Lusha.co |
| LINK_HIQ_000002302 | 2017-01-06 | Prospectify, Inc. |
| LINK_HIQ_000002184 | 2017-01-20 | Data-Miner |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-2 (cont.)

| Document Bates Number | Date Sent | Recipient |
|---|---|---|
| LINK_HIQ_000002219 | 2017-01-27 | Found.ly |
| LINK_HIQ_000002132 | 2017-01-27 | AnyGrowth |
| LINK_HIQ_000205794 | 2017-01-27 | Prospex Network LLC d/b/a BizProspex |
| LINK_HIQ_000002307 | 2017-02-17 | RocketReach |
| LINK_HIQ_000002208 | 2017-02-21 | Dux-Soup c/o Supertec BV |
| LINK_HIQ_000002203 | 2017-03-22 | Discover.ly |
| LINK_HIQ_000002248 | 2017-03-30 | Copylead.com and ioGrow.com |
| LINK_HIQ_000205928 | 2017-04-04 | Algernon Associates, Ltd. d/b/a LinMailPro |
| LINK_HIQ_000205970 | 2017-05-05 | TalentIQ, Inc. |
| LINK_HIQ_000002235 | 2017-05-10 | HiringSolved / Prophet |
| LINK_HIQ_000002224 | 2017-05-23 | hiQ Labs, Inc. |
| LINK_HIQ_000205935 | 2017-06-05 | Nextio a/k/a ZipStorm Inc. |
| LINK_HIQ_000205891 | 2017-07-27 | HolaConnect and Evenrank Datascience Pvt. Ltd. |
| LINK_HIQ_000205918 | 2017-11-06 | Linked Helper |
| LINK_HIQ_000205856 | 2018-03-27 | Red Arbor, SL and DGNet Ltd. d/b/a Computrabajo |
| LINK_HIQ_000205830 | 2018-08-15 | SLI Technologies Inc. d/b/a Adapt.io and Saleslift |
| LINK_HIQ_000197098 | 2012-03-13 | eGrabber |
| LINK_HIQ_000034082 | 2012-09-27 | Yatedo France SAS |
| LINK_HIQ_000197091 | 2013-07-09 | Entelo |
| LINK_HIQ_000205842 | 2016-02-24 | Callbox Inc. |
| LINK_HIQ_000182560 | 2016-03-11 | Brisk.io |
| LINK_HIQ_000037437 | 2016-04-21 | Dobo.io (also known as secretsauce.xyz) / LinkedIn Assistant |
| LINK_HIQ_000205888 | 2016-05-02 | Glassdoor |
| LINK_HIQ_000037469 | 2016-05-13 | ProfileHopper |
| LINK_HIQ_000172841 | 2016-05-18 | VisiStat / Kickfire |
| LINK_HIQ_000205945 | 2016-08-25 | Reppify LLC |
| LINK_HIQ_000037638 | 2016-11-28 | Joberate |
| LINK_HIQ_000037614 | 2016-11-29 | GetProspect.io |
| LINK_HIQ_000205859 | 2017-01-10 | DistantJob |
| LINK_HIQ_000037942 | 2017-02-27 | Contact.ly |
| LINK_HIQ_000037940 | 2017-02-28 | Groo |
| LINK_HIQ_000173670 | 2017-03-23 | Mindmatrix |
| LINK_HIQ_000038028 | 2017-04-03 | Klenty |
| LINK_HIQ_000038025 | 2017-04-03 | Nymeria |
| LINK_HIQ_000205911 | 2017-05-16 | Limitless |
| LINK_HIQ_000205922 | 2017-05-16 | LinkedIn Boost |
| LINK_HIQ_000073401 | 2017-09-26 | LinkedIn Lead Extractor |
| LINK_HIQ_000001014 | 2017-11-15 | atompark |
| LINK_HIQ_000001013 | 2017-11-15 | Linkedeep / Eleven Yellow Pte. Ltd |
| LINK_HIQ_000001017 | 2017-11-15 | Protop.co |
| LINK_HIQ_000001019 | 2017-11-15 | DynaSource |
| LINK_HIQ_000001021 | 2017-11-15 | Loxo |
| LINK_HIQ_000001615 | 2017-11-16 | zhaopinzhuli.com |
| LINK_HIQ_000001030 | 2017-12-20 | Seven Lanes |
| LINK_HIQ_000001034 | 2018-01-23 | Linkelead |
| LINK_HIQ_000001040 | 2018-01-31 | Linkedin Sales Navigator Scraper / Extractor |
| LINK_HIQ_000001041 | 2018-01-31 | LinkMatch |
| LINK_HIQ_000001048 | 2018-02-22 | Scrapely.xyz |
| LINK_HIQ_000001047 | 2018-02-22 | Alore.io |
| LINK_HIQ_000001046 | 2018-02-22 | cleverstaff.net |
| LINK_HIQ_000001054 | 2018-03-26 | HR-Skyen |
| LINK_HIQ_000001055 | 2018-03-26 | Richlode Solutions / Social2Sugar |
| LINK_HIQ_000001056 | 2018-03-26 | SnapAddy / SnapAddy Grabber |
| LINK_HIQ_000001663 | 2018-08-21 | LinkedinEngine |
| LINK_HIQ_000001061 | 2018-08-23 | TurboHiring |
| LINK_HIQ_000001063 | 2018-08-28 | LinkedBot.io |
| LINK_HIQ_000001067 | 2018-08-29 | LinkMe Tool |
| LINK_HIQ_000001068 | 2018-08-29 | Almabase / Alumni Data Buddy |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-2 (cont.)

| Document Bates Number | Date Sent | Recipient |
|---|---|---|
| LINK_HIQ_000001687 | 2018-09-14 | BOL7 / LinkedIn Data Extractor |
| LINK_HIQ_000001713 | 2018-09-19 | WebRobots |
| LINK_HIQ_000001092 | 2018-10-01 | Peoplecamp |
| LINK_HIQ_000001705 | 2018-10-04 | Adorito |
| LINK_HIQ_000001097 | 2018-11-07 | LinkedPro |
| LINK_HIQ_000001933 | 2018-11-17 | Phantombuster |
| LINK_HIQ_000001943 | 2018-11-19 | SocialBFF |
| LINK_HIQ_000001496 | 2018-11-20 | People Finder |
| LINK_HIQ_000001162 | 2018-11-20 | JetBuzz by Social Selling Automation |
| LINK_HIQ_000001170 | 2018-11-21 | Popleads |
| LINK_HIQ_000000769 | 2018-12-06 | ConnectDingo |
| LINK_HIQ_000001293 | 2018-12-18 | Sales Lead Automation |
| LINK_HIQ_000000783 | 2019-01-14 | TopEchelon / Big Biller |
| LINK_HIQ_000000792 | 2019-01-15 | Octopus / Octopus-All-In-One-LinkedIn-Automation |
| LINK_HIQ_000000904 | 2019-01-16 | LinkedHacker |
| LINK_HIQ_000001449 | 2019-01-23 | noCRM / LeadClipper |
| LINK_HIQ_000000874 | 2019-01-23 | RecruiterFlow |
| LINK_HIQ_000000956 | 2019-02-12 | LeadGibbon |
| LINK_HIQ_000000964 | 2019-02-22 | LeadFindPro |
| LINK_HIQ_000000969 | 2019-02-26 | Linkedomata |
| LINK_HIQ_000001516 | 2019-02-26 | Search Firm Software LLC / RockstarFinder |
| LINK_HIQ_000000971 | 2019-02-28 | Orca |
| LINK_HIQ_000001529 | 2019-03-01 | SEO Vision / Linked Assist |
| LINK_HIQ_000001106 | 2019-03-04 | LinkedExport |
| LINK_HIQ_000000990 | 2019-03-14 | Bunch.ai / Emma |
| LINK_HIQ_000001581 | 2019-03-15 | UltraScrapper |
| LINK_HIQ_000001000 | 2019-03-15 | Sales Prospector |
| LINK_HIQ_000001011 | 2019-03-26 | Social Media Technolgies B.V. |
| LINK_HIQ_000001761 | 2019-06-24 | Private Notes for LinkedIn, Twitter, Facebook |
| LINK_HIQ_000001795 | 2019-07-16 | Resource.io |
| LINK_HIQ_000001117 | 2019-07-16 | Machine Sourcer |
| LINK_HIQ_000001884 | 2019-07-16 | Infinity Lead Gen |
| LINK_HIQ_000001801 | 2019-07-26 | inSeek Marketing f/k/a Szeak |
| LINK_HIQ_000001125 | 2019-07-26 | Social Lead Machine |
| LINK_HIQ_000182956 | 2019-07-26 | E-Reveal |
| LINK_HIQ_000001133 | 2019-07-31 | Clockwork / Contact Grabber |
| LINK_HIQ_000001141 | 2019-08-13 | LeadBloom and AlumniFOX |
| LINK_HIQ_000001857 | 2019-08-13 | Growth Busters |
| LINK_HIQ_000000657 | 2019-08-22 | NewtonX |
| LINK_HIQ_000001921 | 2019-09-03 | Jean-Michel Tournier |
| LINK_HIQ_000001925 | 2019-09-11 | Nearshore Staffing |
| LINK_HIQ_000001202 | 2019-11-12 | LeadZippo |
| LINK_HIQ_000001211 | 2019-11-14 | Zopto |
| LINK_HIQ_000001198 | 2019-11-14 | Benvolo and Source 500 |
| LINK_HIQ_000000752 | 2019-11-15 | Manatal |
| LINK_HIQ_000000758 | 2019-12-03 | Kaspr |
| LINK_HIQ_000001282 | 2019-12-05 | Stent |
| LINK_HIQ_000001290 | 2019-12-17 | Socinator |
| LINK_HIQ_000000788 | 2019-12-19 | WhiteHatBox / FollowingLike |
| LINK_HIQ_000000793 | 2019-12-19 | All the Way Up. Ltd d/b/a Swordfish |
| LINK_HIQ_000001331 | 2020-01-03 | We-Connect |
| LINK_HIQ_000000779 | 2020-01-03 | AeroLeads |
| LINK_HIQ_000000786 | 2020-01-16 | NeoDeal |
| LINK_HIQ_000000784 | 2020-01-16 | ProspectIn |
| LINK_HIQ_000000806 | 2020-01-27 | LeadMine |
| LINK_HIQ_000000822 | 2020-02-04 | Expandi |
| LINK_HIQ_000000844 | 2020-02-26 | Linkedinjl.com |
| LINK_HIQ_000000846 | 2020-02-26 | Linkedroid |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-2 (cont.)

| Document Bates Number | Date Sent | Recipient |
|---|---|---|
| LINK_HIQ_000000858 | 2020-03-12 | Infoveracity |
| LINK_HIQ_000000853 | 2020-03-12 | LinkedProspect |
| LINK_HIQ_000000870 | 2020-03-25 | Udemy |
| LINK_HIQ_000000902 | 2020-03-25 | Outreachly |
| LINK_HIQ_000000908 | 2020-04-20 | Wiza |
| LINK_HIQ_000000912 | 2020-04-30 | DNNae |
| LINK_HIQ_000000944 | 2020-05-12 | DIM Agency |
| LINK_HIQ_000000039 | 2020-06-04 | Lempod |
| LINK_HIQ_000000930 | 2020-06-08 | Bound Hound |
| LINK_HIQ_000000007 | 2020-06-08 | LeadLeaper |
| LINK_HIQ_000000005 | 2020-06-24 | Kuware, Inc. / ProfileMagnet |
| LINK_HIQ_000000011 | 2020-06-25 | Captain Data / Alcapod |
| LINK_HIQ_000000013 | 2020-06-30 | SalesQL |
| LINK_HIQ_000000019 | 2020-08-03 | Linkboost |
| LINK_HIQ_000000045 | 2020-08-04 | Le Clap Club |
| LINK_HIQ_000000396 | 2020-08-04 | Wexler LLC / Linkboost |
| LINK_HIQ_000000047 | 2020-08-05 | Social King |
| LINK_HIQ_000000458 | 2020-08-06 | Linkboost / Tiago Carrara |
| LINK_HIQ_000000074 | 2020-08-11 | TexAu |
| LINK_HIQ_000000057 | 2020-08-11 | Urdhva Tech / LeadGrabber |
| LINK_HIQ_000000118 | 2020-09-30 | GrowthLead |
| LINK_HIQ_000000164 | 2020-09-30 | FindThatLead / Scrab.in |
| LINK_HIQ_000000606 | 2020-09-30 | SMARTe / InfoGenie |
| LINK_HIQ_000000141 | 2020-10-07 | ZeroIn |
| LINK_HIQ_000000122 | 2020-10-07 | Leads Extractor |
| LINK_HIQ_000000296 | 2020-10-26 | ZeroIn / Maja Perovic |
| LINK_HIQ_000000212 | 2020-11-11 | ColdInbox |
| LINK_HIQ_000000192 | 2020-11-11 | Belkins |
| LINK_HIQ_000000263 | 2020-11-12 | SalesBlink / Mails.wtf |
| LINK_HIQ_000000632 | 2021-02-01 | GPZWeb |
| LINK_HIQ_000000287 | 2021-02-01 | Iknowvations / U! LinkedIn Targeting Helper |
| LINK_HIQ_000000569 | 2021-02-02 | Zap - x100 your LinkedIn Network |
| LINK_HIQ_000000323 | 2021-02-22 | Badapps Studio / Linkiomatic |
| LINK_HIQ_000000644 | 2021-07-26 | 2besales |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-3

# API Policies of Major Social Networking Platforms

| Platform | How Developers Gain Access to the APIs | Selected API Policies and Terms |
|---|---|---|
| LinkedIn [1] | To begin using the APIs, developers must first sign-in to LinkedIn using their personal or corporate LinkedIn account username and password, and then register their applications.<br><br>By registering a software application, website, product, or service at the LinkedIn developer site, developers acknowledge that they are currently LinkedIn members in good standing and have understood and agree to be bound by LinkedIn API Terms of Use. | All approved developers agree:<br>1) not to share, transfer or sell any member content (even if aggregated) to third parties;<br>2) not to access a member's network without their express permission;<br>3) not to store any LinkedIn content unless expressly permitted;<br>4) to obtain consent from each member in order to obtain or store their data by informing the member how the data will be used, when information will be collected and how they can withdraw their consent;<br>5) to immediately delete all member content collected through the APIs upon the request of that member or in the event the member uninstalls the application. |
| Facebook [2] | To begin using the APIs, developers must first create a Facebook Developer account, agree to Platform Terms and Developer Policies, and may need to obtain access tokens.<br><br>Facebook may require that developers submit their applications for Facebook's review or approval. Whether or not the application (including its access to any Platform Data) is approved (which will be at Facebook's sole discretion), developers will ensure that the application is compliant with the Platform Terms and all other applicable terms and policies, and Facebook may review the application for such compliance from time to time, in Facebook's sole discretion. | All approved developers agree:<br>1) not to sell, sublicense, or distribute Licensed Material;<br>2) not to place Platform Data on, or otherwise making Platform Data available to, a search engine or directory without our prior express written consent;<br>3) not to process friend lists from Facebook to establish social connections in developers' applications unless each person in that connection has granted developers access to that information for that purpose;<br>4) it must be clear to the user why developers are requesting their Restricted Platform Data (PII) in order to improve the quality of their experience;<br>5) to delete all Platform Data as soon as reasonably possible when requested. |
| Twitter [3] | All new developers must apply for a developer account to access the Twitter API. Current developers without an approved developer account must apply for one as directed to do so by Twitter. As part of this process, developers will need to provide Twitter with a written description of their intended uses of the Twitter API and Twitter Content.<br><br>By building on the Twitter API or accessing Twitter Content, developers must comply with all Twitter policies. Twitter reviews all proposed uses of the Twitter developer platform to verify policy compliance — so developers are required to disclose (and update, as applicable) their planned use of the Twitter API and Twitter Content in order to be granted and to maintain access. | All approved developers agree:<br>1) not to sell, license, or purchase Platform Data;<br>2) not attempt to exceed or circumvent limitations on access, calls and use of the Twitter API;<br>3) if developers store Twitter Content offline, they must keep it up to date with the current state of that content on Twitter;<br>4) to get express and informed consent from users before taking any actions on their behalf;<br>5) to make all reasonable efforts to delete or modify Twitter Content as soon as possible, and in any case within 24 hours after a written request to do so by Twitter or by a Twitter user with regard to their Twitter Content. |
| Instagram [4] | To begin using the APIs, developers must first create a Facebook Developer account, agree to Platform Terms and Developer Policies, and may need to obtain access tokens.<br><br>Facebook may require that developers submit their applications for Facebook's review or approval. Whether or not the application (including its access to any Platform Data) is approved (which will be at Facebook's sole discretion), developers will ensure that the application is compliant with the Platform Terms and all other applicable terms and policies, and Facebook may review the application for such compliance from time to time, in Facebook's sole discretion. | All approved developers agree:<br>1) not to sell, sublicense, or distribute Licensed Material;<br>2) not to place Platform Data on, or otherwise making Platform Data available to, a search engine or directory without our prior express written consent;<br>3) not to process friend lists from Facebook to establish social connections in developers' applications unless each person in that connection has granted developers access to that information for that purpose;<br>4) it must be clear to the user why developers are requesting their Restricted Platform Data (PII) in order to improve the quality of their experience;<br>5) to delete all Platform Data as soon as reasonably possible when requested. |

# Appendix Exhibit C-3 (cont.)

| Platform | How Developers Gain Access to the APIs | Selected API Policies and Terms |
|---|---|---|
| WhatsApp [5] | To begin using the APIs, developers must agree to the WhatsApp Business Terms of Service and other relevant terms, create a WhatsApp business account, and have a Facebook Business Manager account to link to the WhatsApp business account. Developers must also agree to pay Facebook the appropriate fees. | All approved developers agree:<br>1) not to use such data to track, build, or augment profiles on individual WhatsApp users with the exception of the content of your message threads;<br>2) not to share, transfer, sell, license, or distribute such data, including any anonymous, aggregate, or derived forms of such data, to any third parties;<br>3) not to retarget on or off of WhatsApp and the Facebook Companies' services, use piggybacking or redirects, or combine that data with any other third-party sources of data. |
| Snapchat [6] | To begin using the APIs, developers must first create a Snapchat account to gain access to the Developer Portal, agree to relevant terms and policies, and may need to obtain API tokens.<br><br>Snap may require developers to submit their applications for review and approval. Developers acknowledge and agree that Snap is under no obligation to approve the application or distribute the application or any content from the application to any Snap users. Snap may reject, cease, or limit distribution of the application or any content from the application at any time in its sole discretion without any liability to developers. | All approved developers agree:<br>1) not to sell, license, transfer Snapchat services without express prior written approval;<br>2) not to gather, access, or otherwise process any personal data via Snap services for any purpose without prior written consent;<br>3) to promptly delete all Snap Confidential Information and Business Services Data that is in your possession or control (including in your servers) upon request by Snap. |
| TikTok [7] | In order to gain access to TikTok Developer Services, developers must register with the TikTok Developer Site and provide the information requested by TikTok. Developers must also agree to be bound by TikTok Developer Terms of Service.<br><br>TikTok may require developers to submit their applications for review and approval by TikTok prior to distribution to end users. | All approved developers agree:<br>1) not to sell, license, distribute TikTok Services;<br>2) not to use or combine the TikTok Developer Services with software offered under an open source license in such a way that would cause the TikTok Developer Services to be subject to any obligations under any such open source license;<br>3) not to collect any personal data from TikTok users for any unauthorized or unlawful purpose;<br>4) immediately cease use and permanently delete all Platform Offerings, confidential information, and User Content upon termination of the Terms except for certain sections that contemplates a continuing obligation. |
| Reddit [8] | To begin using the APIs, developers must first complete registration, agree to API Terms of Use and any additional terms, and obtain OAuth access tokens. | All approved developers agree:<br>1) not to sell, lease or sublicense the Reddit APIs or access thereto or derive revenues from the use or provision of the Reddit APIs, whether for direct commercial or monetary gain unless there is express written approval from Reddit;<br>2) not to circumvent or exceed limitations on calls and use of the Reddit APIs as outlined in the API Documentation;<br>3) not to use the Reddit APIs to spam, incentivize, or harass users;<br>4) immediately stop using the Reddit APIs, delete any cached or stored content that was permitted or transferred via the Reddit APIs upon any termination of the Terms or discontinuation of developers' access to the Reddit APIs. |
| Pinterest [9] | To begin using the APIs, developers must first create a Pinterest Business account, agree to Pinterest Developer and API Terms of Service, Pinterest Developer guidelines, and all other Pinterest terms and policies, and submit requests for API access. | All approved developers agree:<br>1) not to distribute, sublicense, or provide any portion of Pinterest API;<br>2) not to store any information accessed through Pinterest API (except for your campaign analytics information accessed about your account);<br>3) not to access anyone's account without authorization;<br>4) not to take actions on behalf of end users without their specific knowledge and consent. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-3 (cont.)

| Platform | How Developers Gain Access to the APIs | Selected API Policies and Terms |
|---|---|---|
| Yelp [10] | In order to access or use the API, developers must first register for and receive a valid suite of OAuth consumer keys (also referred to as API Keys). Developers are only allowed to register for and use one set of login credentials, unless Yelp provides the functionality to create and use multiple API keys and otherwise permitted by Yelp in writing, including via email. All queries sent to the API requesting data must reference their valid login credentials.<br><br>By accessing or using the API or Yelp Content, developers agree to be bound by Yelp's API Agreement. | All approved developers agree:<br>1) not to sell any Yelp data or content whatsoever;<br>2) not to cache, record, pre-fetch, or otherwise store any portion of the Yelp Content for a period longer than 24 hours;<br>3) not to attempt or provide a means to execute any scraping or "bulk download" operations, with the exception of using the Yelp Content to perform non-commercial analysis or storing Yelp business IDs which developers may use solely for back-end matching purposes. |
| YouTube [11] | To begin using the APIs, developers need a Google Account to access the Google API Console, request an API key, and register their application. Developers may be required to provide certain information (such as identification or contact details) as part of the registration process.<br><br>Developers must comply with YouTube API Terms of Service at all times when accessing or using the YouTube API Services. | All approved developers agree:<br>1) not to sell, redistribute, or sublicense all or any portion of YouTube API Services, including YouTube audiovisual content;<br>2) not to download, import, backup, cache, or store copies of YouTube audiovisual content without YouTube's prior written approval;<br>3) to only access, collect and use data that an active user expressly authorizes a developer to access or otherwise use;<br>4) to delete all user data collected or stored through the APIs upon the request of that member as soon as possible and within seven calendar days. |

Sources:

[1] LinkedIn, "API Terms of Use," available at https://legal.linkedin.com/api-terms-of-use (accessed May 30, 2022).

[2] Meta for Developers, "Meta Platform Terms," available at https://developers.facebook.com/terms/dfc_platform_terms/ (accessed May 30, 2022); Meta for Developers, "Register as a Facebook Developer,"

available at https://developers.facebook.com/docs/development/register/ (accessed May 30, 2022); Meta for Developers, "Access Tokens," available at https://developers.facebook.com/docs/facebook-login/guides/access-tokens#usertokens (accessed May 30, 2022).

[3] Twitter Developer Platform, "Developer Agreement and Policy," available at https://developer.twitter.com/en/developer-terms/agreement-and-policy (accessed May 30, 2022).

[4] Meta for Developers, "Meta Platform Terms," available at https://developers.facebook.com/terms/dfc_platform_terms/ (accessed May 30, 2022); Meta for Developers, "Register as a Facebook Developer,"

available at https://developers.facebook.com/docs/development/register/ (accessed May 30, 2022); Meta for Developers, "Access Tokens," available at https://developers.facebook.com/docs/facebook-login/guides/access-tokens#usertokens (accessed May 30, 2022).

[5] WhatsApp, "Facebook Terms for WhatsApp Business," available at https://www.whatsapp.com/legal/FB-terms-whatsapp-business (accessed June 6, 2022); WhatsApp, "How to get started with the WhatsApp Business app,"

available at https://www.whatsapp.com/coronavirus/get-started-business (accessed June 6, 2022); WhatsApp, "WhatsApp Business Solutions Terms," available at https://www.whatsapp.com/legal/business-solution-terms (accessed May 30, 2022).

[6] Snap Inc., "Snap Developer Terms," available at https://snap.com/en-US/terms/developer (accessed May 30, 2022); Snap Inc., "Business Services Terms," available at https://snap.com/en-US/terms/business-services (accessed May 30, 2022);

Snap Inc. Docs, "Developing Your App," available at https://docs.snap.com/snap-kit/developer-portal/developing-your-app/#create-a-snapchat-account (accessed May 30, 2022).

[7] TikTok, "TikTok Developer Terms of Service," available at https://www.tiktok.com/legal/tik-tok-developer-terms-of-service?lang=en (accessed May 30, 2022).

[8] Reddit, "API Terms of Use," available at https://www.reddit.com/wiki/api-terms (accessed May 30, 2022).

[9] Pinterest Developers, "Developers and API Terms of Service," available at https://developers.pinterest.com/terms/ (accessed May 30, 2022);

Pinterest Developers, "Pinterest REST API (5.3.0)," available at https://developers.pinterest.com/docs/api/v5/ (accessed May 30, 2022).

[10] Yelp, "API Terms of Use," available at https://www.yelp.com/developers/api_terms (accessed May 30, 2022).

[11] YouTube, "YouTube Data API Overview," available at https://developers.google.com/youtube/v3/getting-started (accessed June 7, 2022); YouTube, "YouTube API Services Terms of Service," available at

https://developers.google.com/youtube/terms/api-services-terms-of-service#registration (accessed June 7, 2022); YouTube, "YouTube API Services - Developer Policies," available at https://developers.google.com/youtube/terms/developer-policies (accessed June 7, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-4

# User Content Policies of Major Social Networking Platforms

| Platform | Profile Visibility | User Content Ownership | How User Content Is Licensed |
|---|---|---|---|
| LinkedIn [1] | The users decide whether they want their profiles to be publicly visible and if so, what sections of the profile are publicly visible. They can also decide whether they want their posts and photos to be publicly visible. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| Facebook [2] | Information users share that is always publicly visible includes name, gender, username and user ID (account number), age range, language, country, profile picture, and cover photo. When users share something, they can choose to make it publicly visible or not. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| Twitter [3] | Tweets are publicly visible unless users choose to make them protected. Publicly visible profile information can include display name, username, biography, location, website, picture, display language, and when users created their account. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| Instagram [4] | The bio and profile image of an account is always publicly visible. User profiles are publicly visible unless users elect to make them private. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| WhatsApp [5] | Messages are encrypted. Users can use phone numbers to find other users. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| Snapchat [6] | Publicly visible content includes users' name, username, profile pictures, snapcode, highlights, custom stickers, lenses, story submissions that are set to be viewable by everyone, and any content users submit to public Snapchat services, like public profiles, snap map, or lens studio. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a transferable license to the content they submit. How broad the license is depends on which Snapchat service users use and the settings users have selected. |
| TikTok [7] | The profile and videos of a public TikTok account are always publicly visible. Users can elect to make their accounts private. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| Reddit [8] | The profile page of a Reddit account and associated profile information including the username, prior posts and comments, karma, awards received, trophies, moderator status, Reddit Premium status, and how long the user has been a Reddit member are publicly visible. When users submit content (a post, comment, chat message, or RPAN broadcast) to a public part of Reddit, that content, the username associated with the content, and the date and time users originally submitted the content will be publicly visible. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-4 (cont.)

| Platform | Profile Visibility | User Content Ownership | How User Content Is Licensed |
|---|---|---|---|
| Pinterest [9] | Users' names are always publicly visible. Profile information that users provide and boards and pins that are set to public are publicly visible, but there is an option to hide users' profiles from search engines. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| Yelp [10] | Users' account profiles and their photos, ratings, reviews, tips, lists, collections, compliments, posts, votes, likes, followers, bookmarks, and where they check in are publicly visible. Users can limit the public nature of some of these activities through account settings. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |
| YouTube [11] | YouTube videos and playlists that users share are publicly visible unless users decide to make them private or unlisted. Users can choose to make their subscriptions publicly visible. | Users retain any ownership rights they have in the content they provide. | Users grant the platform a non-exclusive license to their content. |

Sources:

[1] LinkedIn, "User Agreement," available at https://www.linkedin.com/legal/user-agreement (accessed May 29, 2022); LinkedIn Help, "LinkedIn Public Profile Visibility," available at https://www.linkedin.com/help/linkedin/answer/a518980/linkedin-public-profile-visibility?lang=en (accessed May 29, 2022).

[2] Facebook, "Terms of Service," available at https://www.facebook.com/terms.php (accessed May 29, 2022); Facebook Help Center, "What is public information on Facebook?" available at https://www.facebook.com/help/203805466323736 (accessed May 29, 2022).

[3] Twitter, "Twitter Terms of Service," available at https://twitter.com/en/tos (accessed May 29, 2022); Twitter, "Twitter Privacy Policy," available at https://twitter.com/en/privacy (accessed May 29, 2022); Twitter Help Center, "About profile visibility settings," available at https://help.twitter.com/en/safety-and-security/birthday-visibility-settings (accessed May 29, 2022); Twitter Help Center, "About public and protected tweets," available at https://help.twitter.com/en/safety-and-security/public-and-protected-tweets (accessed May 31, 2022).

[4] Instagram Help Center, "Controlling Your Visibility," available at https://help.instagram.com/116024195217477 (accessed May 29, 2022); Instagram Help Center, "Terms of Use," available at https://help.instagram.com/478745558852511 (accessed May 29, 2022).

[5] WhatsApp, "WhatsApp Terms of Service," available at https://www.whatsapp.com/legal/terms-of-service (accessed May 29, 2022); WhatsApp, "WhatsApp Privacy Policy," available at https://www.whatsapp.com/legal/privacy-policy/?lang=en (accessed May 29, 2022).

[6] Snap Inc., "Snap Inc. Terms of Service," available at https://snap.com/en-US/terms (accessed May 29, 2022); Snap Inc., "Privacy Policy," available at https://snap.com/en-US/privacy/privacy-policy (accessed May 29, 2022).

[7] TikTok, "Choosing between a private or public account," available at https://support.tiktok.com/en/account-and-privacy/account-privacy-settings/making-your-account-public-or-private (accessed May 29, 2022); TikTok, "Terms of Service," available at https://www.tiktok.com/legal/terms-of-service?lang=en (accessed May 29, 2022).

[8] Reddit, "Reddit User Agreement," available at https://www.redditinc.com/policies/user-agreement-september-12-2021#US (accessed May 29, 2022); Reddit, "Reddit Privacy Policy," available at https://www.redditinc.com/policies/privacy-policy-september-12-2021 (accessed May 29, 2022).

[9] Pinterest Policy, "Terms of service," available at https://policy.pinterest.com/en/terms-of-service (accessed May 29, 2022); Pinterest Policy, "Privacy policy," available at https://policy.pinterest.com/en/privacy-policy (accessed May 29, 2022); Pinterest Help Center, "Edit account privacy," available at https://help.pinterest.com/en/article/edit-account-privacy (accessed May 29, 2022); Pinterest Help Center, "Update your search privacy," available at https://help.pinterest.com/en/article/update-your-search-privacy (accessed May 31, 2022).

[10] Yelp, "Terms of Service," available at https://terms.yelp.com/tos/en_us/20200101_en_us/ (accessed May 29, 2022); Yelp, "Yelp Privacy Policy," available at https://terms.yelp.com/privacy/en_us/20200101_en_us/ (accessed May 29, 2022).

[11] YouTube, "Terms of Service," available at https://www.youtube.com/static?template=terms (accessed June 7, 2022); YouTube Help, "Change Video Privacy Settings," available at https://support.google.com/youtube/answer/157177?hl=en&ref_topic=9257402 (accessed June 7, 2022); YouTube Help, "Change your subscription privacy settings," available at https://support.google.com/youtube/answer/7280190?hl=en&ref_topic=9257519 (accessed June 7, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-5

# Anti-Scraping Policies of Major Social Networking Platforms

| Platform | Scraping Policies | Crawling Policies | Robots Exclusion Standards |
|---|---|---|---|
| LinkedIn [1] | LinkedIn prohibits unauthorized scraping, including public profile scraping. Users agree not to develop, support or use software, devices, scripts, robots or any other means or processes (including crawlers, browser plugins and add-ons or any other technology) to scrape LinkedIn services or otherwise copy profiles and other data from LinkedIn. | Automated Crawling & Indexing without the express permission of LinkedIn is strictly prohibited. If permitted, (among other terms) users agree that users will not use data collected through Automated Crawling & Indexing in connection with a competitive service (as determined by LinkedIn). | Limited access allowed for Apple, Twitter, Mail.ru, ByteDance, Zoom, Daum, OrangeBot, Deepcrawl, Moz Pro, Cincobot, and search engines such as Google, Bing, MSN, Yahoo, Baidu, 360, Sogou, Yandex, Rambler, Naver, DuckDuckGo, Neeva, Seznam, Teoma, Yeti, Vebidoo, Majestic. |
| Facebook [2] | Facebook prohibits unauthorized scraping and has initiated lawsuits against scrapers in the past. Users may not access or collect data from Facebook's products using automated means (without Facebook's prior permission). | Facebook prohibits unauthorized crawling. Users may not access or collect data from Facebook's products using automated means (without Facebook's prior permission). | Limited access allowed for Apple, Discord, Twitter, Facebook, Telegram, Alexa, LinkedIn, Pinterest, Screaming Frog SEO Spider, and search engines such as Google, Bing, MSN, Yahoo, Baidu, Yandex, Naver, Seznam, Teoma, Yeti. |
| Twitter [3] | Twitter prohibits unauthorized scraping. Users may not access or search or attempt to access or search Twitter services by any means (automated or otherwise) other than through Twitter's currently available, published interfaces that are provided by Twitter. Scraping the Services without the prior consent of Twitter is expressly prohibited. | Crawling the Services is permissible if done in accordance with the provisions of Twitter's robots exclusion standard. | Limited access allowed for all bots. |
| Instagram [4] | Instagram prohibits unauthorized scraping. Users cannot attempt to create accounts or access or collect information in unauthorized ways. This includes creating accounts or collecting information in an automated way without Instagram's express permission. | Instagram prohibits unauthorized crawling. Users cannot attempt to create accounts or access or collect information in unauthorized ways. This includes creating accounts or collecting information in an automated way without Instagram's express permission. | Limited access allowed for Apple, Alexa, Twitter, and search engines such as Google, Bing, MSN, Baidu, Yahoo, Yandex, Naver, DuckDuckGo, Seznam, Teoma, Yeti. |
| WhatsApp [5] | WhatsApp has no explicit scraping policy. | WhatsApp has no explicit crawling policy. | Limited access allowed for all bots. |
| Snapchat [6] | Snapchat prohibits scraping. Users may not use, attempt to use, enable, or encourage anyone else to use any robot, spider, crawler, scraper, or other automated means or interface to access Snapchat services or extract other users' information. | Snapchat prohibits crawling. Users may not use, attempt to use, enable, or encourage anyone else to use any robot, spider, crawler, scraper, or other automated means or interface to access Snapchat services or extract other users' information. | Full access allowed for all bots. |
| TikTok [7] | TikTok prohibits scraping for commercial purposes. Users may not use any automated system or software, whether operated by a third party or otherwise, to extract any data from TikTok for commercial purposes. | TikTok does not specify its policy towards crawling non-sensitive, public content. Do not use automated scripts, web crawling, software, deceptive techniques, or any other way to obtain, acquire, or request login credentials or other sensitive information, including non-public data, from TikTok or its users. | Full access allowed for Google, Apple, Bing, DuckDuckGo, Yeti, Twitter, and Yandex; Block Baidu, 360, Sogou, and Yisou; Limited access allowed for all other bots. |

# Appendix Exhibit C-5 (cont.)

| Platform | Scraping Policies | Crawling Policies | Robots Exclusion Standards |
|---|---|---|---|
| Reddit [8] | Reddit prohibits unauthorized scraping. Users may not access, search, or collect data from Reddit services by any means (automated or otherwise) except as permitted in the Reddit User Agreement or in a separate agreement with Reddit. Scraping Reddit services without Reddit's prior consent is prohibited. | Reddit conditionally grants permission to crawl Reddit services in accordance with the parameters set forth in Reddit's robots.txt file. | Block 80legs, Majestic, and Pipl; Limited access allowed for all other bots. |
| Pinterest [9] | Pinterest prohibits unauthorized scraping. Unacceptable uses of Pinterest materials such as Pinterest's developer tools and APIs include using any automated means or form of scraping or data extraction to access information from Pinterest, except as expressly permitted by Pinterest. | Pinterest prohibits unauthorized crawling. Don't use automation that hasn't been explicitly approved by Pinterest. This includes unauthorized services that automatically perform actions on the user's behalf. | Limited access allowed for all bots. |
| Yelp [10] | Yelp prohibits unauthorized scraping. Users agree not to use any robot, spider, Service search/retrieval application, or other automated device, process or means to access, retrieve, copy, scrape, or index any portion of the Yelp service or any Yelp service content, except as expressly permitted by Yelp. | Yelp prohibits unauthorized crawling. Users agree not to use any robot, spider, Service search/retrieval application, or other automated device, process or means to access, retrieve, copy, scrape, or index any portion of the Yelp service or any Yelp service content, except as expressly permitted by Yelp. | Limited access allowed for Google, Bing, Yahoo, Twitter, Alexa, DeepCrawl, Searchmetrics, stc, and Internet Archive. |
| YouTube [11] | YouTube prohibits unauthorized scraping. Users are not allowed to access YouTube using any automated means (such as robots, botnets or scrapers) except (a) in the case of public search engines, in accordance with YouTube's robots.txt file; or (b) with YouTube's prior written permission. | YouTube prohibits unauthorized crawling. Users are not allowed to access YouTube using any automated means (such as robots, botnets or scrapers) except (a) in the case of public search engines, in accordance with YouTube's robots.txt file; or (b) with YouTube's prior written permission. | Full access allowed for Google; Limited access allowed for all other bots. |

Sources:

[1] LinkedIn, "User Agreement," available at https://www.linkedin.com/legal/user-agreement (accessed May 29, 2022); LinkedIn Official Blog, "LinkedIn Safety Series: What is scraping?" available at https://blog.linkedin.com/2021/july/15/linkedin-safety-series-what-is-scraping (accessed May 29, 2022); LinkedIn, "LinkedIn Crawling Terms and Conditions," available at https://www.linkedin.com/legal/crawling-terms (accessed May 29, 2022); LinkedIn, "Robots Exclusion Standards," available at https://www.linkedin.com/robots.txt (accessed May 29, 2022).

[2] Facebook, "Terms of Service," available at https://www.facebook.com/terms.php (accessed May 29, 2022); Romero, Jessica, "Taking Legal Action Against Data Scraping," Meta, October 1, 2020, available at https://about.fb.com/news/2020/10/taking-legal-action-against-data-scraping/ (accessed May 29, 2022); Facebook, "Robots Exclusion Standards," available at https://www.facebook.com/robots.txt (accessed May 29, 2022).

[3] Twitter, "Twitter Terms of Service," available at https://twitter.com/en/tos (accessed May 29, 2022); Twitter, "Robots Exclusion Standards," available at https://twitter.com/robots.txt (accessed May 29, 2022).

[4] Instagram Help Center, "Terms of Use," available at https://help.instagram.com/478745558852511 (accessed May 29, 2022); Instagram, "Robots Exclusion Standards," available at https://www.instagram.com/robots.txt (accessed May 29, 2022).

[5] WhatsApp, "WhatsApp Terms of Service," available at https://www.whatsapp.com/legal/terms-of-service (accessed May 29, 2022); WhatsApp, "WhatsApp Privacy Policy," available at https://www.whatsapp.com/legal/privacy-policy/?lang=en (accessed May 29, 2022); WhatsApp, "Robots Exclusion Standards," available at https://www.whatsapp.com/robots.txt (accessed May 29, 2022).

[6] Snap Inc., "Snap Inc. Terms of Service," available at https://snap.com/en-US/terms (accessed May 29, 2022); Snapchat, "Robots Exclusion Standards," available at https://www.snapchat.com/robots.txt (accessed May 29, 2022).

[7] TikTok, "Terms of Service," available at https://www.tiktok.com/legal/terms-of-service?lang=en (accessed May 29, 2022); TikTok, "Community Guidelines," available at https://www.tiktok.com/community-guidelines?lang=en (accessed May 29, 2022); TikTok, "Robots Exclusion Standards," available at https://www.tiktok.com/robots.txt (accessed May 29, 2022).

[8] Reddit, "Reddit User Agreement," available at https://www.redditinc.com/policies/user-agreement-september-12-2021#US (accessed May 29, 2022); Reddit, "Robots Exclusion Standards," available at https://www.reddit.com/robots.txt (accessed May 29, 2022).

[9] Pinterest Policy, "Developer guidelines," available at https://policy.pinterest.com/en/developer-guidelines (accessed May 29, 2022); Pinterest Policy, "Community guidelines," available at https://policy.pinterest.com/en/community-guidelines (accessed May 29, 2022); Pinterest, "Robots Exclusion Standards," available at https://www.pinterest.com/robots.txt (accessed May 29, 2022).

[10] Yelp, "Terms of Service," available at https://terms.yelp.com/tos/en_us/20200101_en_us/ (accessed May 31, 2022); Yelp, "Robot Exclusion Standards," available at https://www.yelp.com/robots.txt (accessed May 31, 2022).

[11] YouTube, "Terms of Service," available at https://www.youtube.com/static?template=terms (accessed June 7, 2022); YouTube, "Robot Exclusion Standards," available at https://www.youtube.com/robots.txt (accessed June 7, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-6

## Changes in LinkedIn Weekly US Closed Accounts Relative to Preceding Week (Feb 2019 - Mar 2022)



Note: Excludes weeks with a holiday and weeks that are preceded by a week with a holiday.
Source: LINK_HIQ_000205996.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix Exhibit C-7

### Changes in LinkedIn Weekly US Closed Accounts
### Relative to Two Weeks Prior (Feb 2019 - Mar 2022)



Note: Excludes weeks with a holiday and weeks that are two weeks from a week with a holiday.
Source: LINK_HIQ_000205996.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-8

# Anti-Scraping Policies of Major Professional Networks

| Platform | Scraping Policies | Crawling Policies | Robots Exclusion Standards |
|---|---|---|---|
| American Bar Association (ABA) [1] | ABA has no explicit scraping policy. Users may not use the ABA Sites to collect or store personal data of other users of the ABA Sites. The reproduction, transmission, distribution, sale, publication, broadcast, circulation, or dissemination of any ABA Content by users, or by users through any other person or entity, is prohibited unless express written consent is separately obtained from the ABA. | ABA has no explicit crawling policy. Users may not use the ABA Sites to collect or store personal data of other users of the ABA Sites. The reproduction, transmission, distribution, sale, publication, broadcast, circulation, or dissemination of any ABA Content by users, or by users through any other person or entity, is prohibited unless express written consent is separately obtained from the ABA. | Block Baidu, Youdao, Sogou, and Yandex; Limited access allowed for all other bots. |
| LawLink [2] | LawLink prohibits scraping. Users may not use an automated devise, program, algorithm or bot program to create or respond to request, or to otherwise extract information from LawLink's website. | LawLink prohibits crawling. Users may not use an automated devise, program, algorithm or bot program to create or respond to request, or to otherwise extract information from LawLink's website. | Limited access allowed for all bots. |
| Sermo [3] | Sermo has no explicit scraping policy. Materials on Sermo may not be copied, reproduced, modified, published, uploaded, posted, transmitted, performed, or distributed in any way, without Sermo's prior written permission. | Sermo has no explicit crawling policy. Materials on Sermo may not be copied, reproduced, modified, published, uploaded, posted, transmitted, performed, or distributed in any way, without Sermo's prior written permission. | Limited access allowed for all bots. |
| Doximity [4] | Doximity prohibits scraping. Users agree not to use any software, devices, scripts, robots or any other means or process to view, access or "scrape" Doximity or otherwise copy information from Doximity. | Doximity prohibits crawling. Users agree not to use any software, devices, scripts, robots or any other means or process to view, access or "scrape" Doximity or otherwise copy information from Doximity. | Limited access allowed for all bots. |
| American Medical Association (AMA) [5] | AMA has no explicit scraping policy. Unless otherwise expressly stated in the Terms of Use or users receive the AMA's prior written consent, users may not modify, translate, create derivative works of, copy, distribute, market, display, remove or alter any proprietary notices or labels from, lease, sell, sublicense, clone, transfer, decompile, reverse engineer, or incorporate into any information retrieval system (electronic or mechanical), the AMA websites, any AMA Content, or any portion thereof. | AMA has no explicit crawling policy. Unless otherwise expressly stated in the Terms of Use or users receive the AMA's prior written consent, users may not modify, translate, create derivative works of, copy, distribute, market, display, remove or alter any proprietary notices or labels from, lease, sell, sublicense, clone, transfer, decompile, reverse engineer, or incorporate into any information retrieval system (electronic or mechanical), the AMA websites, any AMA Content, or any portion thereof. | Limited access allowed for all bots. |
| CFA Institute [6] | CFA Institute has no explicit scraping policy. CFA Institute authorizes users to view and download a single copy of the material on this website solely for the users' personal, noncommercial use. Users must retain all copyright and other proprietary notices contained in the original material on any copy users make of the site material. Users may not sell or modify CFA Institute's site material or reproduce, display, publicly perform, distribute, or otherwise use the material in any way for any public or commercial purpose. | CFA Institute has no explicit crawling policy. CFA Institute authorizes users to view and download a single copy of the material on this website solely for the users' personal, noncommercial use. Users must retain all copyright and other proprietary notices contained in the original material on any copy users make of the site material. Users may not sell or modify CFA Institute's site material or reproduce, display, publicly perform, distribute, or otherwise use the material in any way for any public or commercial purpose. | Limited access allowed for all bots. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Appendix Exhibit C-8 (cont.)

| Platform | Scraping Policies | Crawling Policies | Robots Exclusion Standards |
|---|---|---|---|
| Wall Street Oasis (WSO) [7] | WSO prohibits unauthorized scraping. Users should not use any automated means, including, without limitation, agents, robots, scripts, or spiders, to access, monitor, copy, or harvest data from any part of WSO sites, except those automated means that WSO has approved in advance and in writing. | WSO prohibits unauthorized crawling. Users should not use any automated means, including, without limitation, agents, robots, scripts, or spiders, to access, monitor, copy, or harvest data from any part of WSO sites, except those automated means that WSO has approved in advance and in writing. | Block Mail.ru, Pinterest, Sogou, Seznam, Majestic, Konqueror, Superfeedr, and crawlers such as Ahrefsbot and Magpie; Limited access allowed for all other bots. |
| AngelList [8] | Scraping AngelList is expressly prohibited without the prior consent of AngelList. | Crawling AngelList is permissible in accordance with the Terms of Service. | Block Mail.ru, Majestic, 80Legs, Feedburner, Jooble, Adbeat, and some backlink checkers and crawlers; Limited access allowed for all other bots. |
| Gust [9] | Gust prohibits unauthorized scraping. Users agree not to use any robot, spider, site search/retrieval application or other manual or automatic device to retrieve, index, "scrape," "data mine" or in any way Gust Platform Content without Gust's express prior written consent. | Gust prohibits unauthorized crawling. Users agree not to use any robot, spider, site search/retrieval application or other manual or automatic device to retrieve, index, "scrape," "data mine" or in any way Gust Platform Content without Gust's express prior written consent. | Limited access allowed for all bots. |
| XING [10] | XING prohibits scraping. The user is prohibited from employing any mechanisms, software or scripts when using XING Websites. | XING prohibits crawling. The user is prohibited from employing any mechanisms, software or scripts when using XING Websites. | Block CrazyWebCrawler and PimEyes; Limited access allowed for all other bots. |
| National Bureau of Economic Research (NBER) [11] | NBER has no explicit scraping policy. | NBER has no explicit crawling policy. | Limited access allowed for all bots. |
| National Education Association (NEA) [12] | NEA has no explicit scraping policy. | NEA has no explicit crawling policy. | Limited access allowed for all bots. |

Sources:

[1] American Bar Association, "ABA Terms of Use," available at https://www.americanbar.org/about_the_aba/terms/ (accessed May 29, 2022); American Bar Association, "Robots Exclusion Standards," available at https://www.americanbar.org/robots.txt (accessed May 29, 2022).

[2] LawLink, "Terms of Use Agreement," available at https://www.lawlink.com/term (accessed May 29, 2022); LawLink, "Robots Exclusion Standards," available at https://www.lawlink.com/robots.txt (accessed May 29, 2022).

[3] Sermo, "Terms of Service," available at https://www.sermo.com/terms-of-service/ (accessed May 29, 2022); Sermo, "Robots Exclusion Standards," available at https://www.sermo.com/robots.txt (accessed May 29, 2022).

[4] Doximity, "Terms of Service," available at https://www.doximity.com/terms-of-service (accessed May 29, 2022); Doximity, "Robots Exclusion Standards," available at https://www.doximity.com/robots.txt (accessed May 29, 2022).

[5] American Medical Association, "Terms of Use," available at https://www.ama-assn.org/general-information/general-information/terms-use (accessed May 29, 2022); American Medical Association, "Robots Exclusion Standards," available at https://www.ama-assn.org/robots.txt (accessed May 29, 2022).

[6] CFA Institute, "Legal Terms and Conditions of Use," available at https://www.cfainstitute.org/en/about/governance/policies/terms-conditions (accessed May 29, 2022); CFA Institute, "Robots Exclusion Standards," available at https://www.cfainstitute.org/robots.txt (accessed May 29, 2022).

[7] Wall Street Oasis, "Terms and Conditions," available at https://www.wallstreetoasis.com/legal (accessed May 29, 2022); Wall Street Oasis, "Robots Exclusion Standards," available at https://www.wallstreetoasis.com/robots.txt (accessed May 29, 2022).

[8] AngelList, "Terms of Service," available at https://angel.co/terms (accessed May 29, 2022); AngelList, "Robots Exclusion Standards," available at https://angel.co/robots.txt (accessed May 29, 2022).

[9] Gust, "Terms of Service," available at https://gust.com/tos (accessed May 29, 2022); Gust, "Robots Exclusion Standards," available at https://gust.com/robots.txt (accessed May 29, 2022).

[10] XING, "General Terms and Conditions," available at https://www.xing.com/terms/xing (accessed May 29, 2022); XING, "Robots Exclusion Standards," available at https://www.xing.com/robots.txt (accessed May 29, 2022).

[11] National Bureau of Economic Research, "Robots Exclusion Standards," available at https://www.nber.org/robots.txt (accessed May 29, 2022).

[12] National Education Association, "Robots Exclusion Standards," available at https://www.nea.org/robots.txt (accessed May 29, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Compendium Exhibit 16

(Filed Under Seal)

# Compendium Exhibit 17

# (CE927-929 of Exhibit
Filed Under Seal)

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   HIQ LABS, INC.,                )
                                    )
 6                    Plaintiff,    )
                                    )
 7        vs.                       )No. 17-cv-03301-EMC
                                    )
 8   LINKEDIN CORPORATION,          )
                                    )
 9                    Defendant.    )
                                    )
10   LINKEDIN CORPORATION,          )
                                    )
11          COUNTERCLAIMANT,        )
                                    )
12          vs.                     )
                                    )
13   HIQ LABS, INC.,                )
                                    )
14          COUNTERDEFENDANTS.      )
     _____)

15

16        VIDEO DEPOSITION OF ALEXANDER OLTMANN

17                FRIDAY, MAY 13, 2022

18             LOS ANGELES, CALIFORNIA

19

20

21

22   REPORTED BY:

23   JEANINE CURCIONE

24   CSR NO. 10223, RPR

25   JOB NO.: 10100467
```

CE 0915

Alexander Oltmann

```
 1   Orrick, Herrington and Sutcliffe on behalf of
 2   LinkedIn Corporation.
 3            MS. SKIBITSKY:  Good morning.  Hope
 4   Skibitsky from Quinn, Emanuel, Urouhart and Sullivan
 5   here on behalf of the witness Xander Oltmann and hiQ
 6   Labs, Inc.
 7            THE VIDEO OPERATOR:  The court reporter is
 8   Jeanine Curcione and will swear in the deponent.
 9
10                  ALEXANDER OLTMANN,
11              having been duly affirmed, was
12              examined and testified as follows:
13
14                     EXAMINATION
15   BY MR. COHEN:
16        Q.   Good morning, Mr. Oltmann.
17        A.   Good morning.
18        Q.   I introduced myself off the record.  My
19   name is Russell Cohen.  I'm the counsel for LinkedIn
20   in this case.  I'm going to be taking your
21   deposition today.  If we could start by having you
22   say your name for the record and spelling it,
23   please?
24        A.   Alexander Oltmann, A-l-e-x-a-n-d-e-r,
25   O-l-t-m-a-n-n.
```

CE 0916

Alexander Oltmann

```
 1        A.    It changed to chief operations officer.
 2        Q.    And approximately when was that?
 3        A.    2012, 2013.
 4        Q.    And what if anything that you're aware of
 5   prompted the change in title from advisor to chief
 6   operating officer?
 7        A.    I developed an increased interest in HR
 8   tech and using data to help employees which prompted
 9   the move from advisor to full time role as COO.
10        Q.    And in that full time role as COO were you
11   an employee of Orgstars?
12        A.    Yes.
13        Q.    At some point Orgstars changes its name to
14   hiQ Labs; correct?
15        A.    Yes.
16        Q.    Do you recall what year that was?
17        A.    I cannot recall.
18        Q.    So if I'm referring to Orgstars or hiQ
19   Labs I'm talking about the same entity that you
20   become an employee of in or around 2012, 2013.
21   Understood?
22        A.    Yes.
23        Q.    So as COO beginning at that point in time
24   can you tell me what your responsibilities were
25   generally?
```

CE 0917

Alexander Oltmann

1          MS. SKIBITSKY:  Objection to form.  Vague

2   as to time.

3          THE WITNESS:  Generally -- can you be more

4   specific time?

5   BY MR. COHEN:

6       Q.   What did you do as COO at that time, 2012,

7   2013?

8       A.   A little bit of everything except for

9   engineering and data science.

10      Q.   Does that include fundraising?

11      A.   Yes.

12      Q.   Does that include sales?

13      A.   Yes.

14      Q.   Does that include hiring?

15      A.   Yes.

16      Q.   Does that include marketing?

17      A.   Yes.

18      Q.   Does that include admin?

19      A.   Yes.

20      Q.   Is there anything I'm missing?

21      A.   Product.

22      Q.   Product.  That's an important one.

23   Anything else?

24          MS. SKIBITSKY:  Object to form.

25          THE WITNESS:  No.

CE 0918

Alexander Oltmann

1    an advisor to hiQ; is that correct?

2         A.   Cannot recall, yes.

3         Q.   Do you know whether you are currently a

4    consultant to hiQ?

5         A.   Cannot recall.

6         Q.   You know you're not currently an employee

7    of hiQ; is that correct?

8         A.   Correct.

9         Q.   Okay.  You are a member of LinkedIn; is

10   that right?

11        A.   Yes.

12        Q.   You have a LinkedIn profile.

13        A.   Yes.

14        Q.   With what has been marked as Exhibit 406

15   is a LinkedIn profile for Xander Oltmann.  Is that

16   your LinkedIn profile?

17             (Exhibit 406 was marked for identification

18        by the Reporter.)

19             THE WITNESS:  Yes.

20   BY MR. COHEN:

21        Q.   And is the information on here accurate?

22        A.   Generally speaking, yes.

23        Q.   Your LinkedIn page says that your time at

24   hiQ Labs went from May 2012 to January 2017.  Does

25   that help refresh your recollection as to when you

1          THE WITNESS:  As I stated before, I cannot

2    recall.

3    BY MR. COHEN:

4        Q.   Do you recall what the LinkedIn agreement

5    said about scraping?

6          MS. SKIBITSKY:  Objection to form.  Asked

7    and answered.  Foundation.  Calls for speculation.

8          THE WITNESS:  As I stated earlier I cannot

9    recall.

10   BY MR. COHEN:

11       Q.   Do you recall that it prohibited scraping?

12         MS. SKIBITSKY:  Objection to form.  Asked

13   and answered.  Calls for speculation.  Foundation.

14         THE WITNESS:  As I stated before, I can't

15   recall.

16   BY MR. COHEN:

17       Q.   Do you recall raising a concern with

18   Mr. Kaplan that the LinkedIn terms of use prohibited

19   scraping?

20       A.   As I stated before I could not recall.

21       Q.   Do you know who Deep Nishar is?

22       A.   I could not recall.

23       Q.   I've just put in front of you what was

24   previously marked as Kaplan Exhibit 4.  Do you see

25   that?

CE 0920

Alexander Oltmann

1        A.    Yes.

2              (Exhibit 4 was marked for identification

3        by the Reporter.)

4              THE WITNESS:   Yes.

5    BY MR. COHEN:

6        Q.    And this is an e-mail string involving you

7    and Mr. Kaplan in the latest in time e-mail and

8    others earlier on, do you see that?

9        A.    Yes.

10       Q.    And the subject line of the e-mail is re

11   flagging you, Deep Nishar?

12       A.    Yes.

13       Q.    Can you take a look at this e-mail string

14   which begins with an e-mail from Mr. Kaplan in which

15   he writes on March 9, 2015 over on the next page,

16   Mr. Oltmann, "Sherman and Steve, do you guys know

17   Deep Nishar?  We have our final round meeting with

18   him and Wing.  Can you guys speak next Wednesday or

19   Thursday?  If we nail the meeting we get the term

20   sheet."  Do you see that?

21       A.    Yes.

22       Q.    And then you see a response from Sherman

23   Hu on March 9, 2015 and he says, "I know of Deep.  I

24   don't know him well enough to be credible.  He came

25   much later in time and he was so high up.  You don't

Alexander Oltmann

1    want to BS Deep Nishar.  He's a product guy that

2    knows his shit.  You may need Rob to do his thing to

3    keep pace with Deep.  Is he angel investing or is he

4    a VC investing."  Do you see that?

5         A.   Yes.

6         Q.   Does this refresh your recollection at all

7    as to who Deep Nishar is?

8         A.   Yes.  My recollection of Deep Nishar would

9    be associated with Wing which is a venture capital

10   fund.  I could not give you the specifics on what

11   his role was, but I know he was affiliated with

12   Wing.

13        Q.   Does this also refresh your recollection

14   as to whether Deep was formerly an employee of

15   LinkedIn?

16        A.   No, it does not.

17        Q.   Okay.  Sherman Hu -- sorry, Darren Kaplan

18   responds, "He's an investor in Wing.  They would

19   lead our series A."  Did they lead your series A do

20   you recall?

21        A.   They did not.

22        Q.   Did they invest?

23        A.   They did not lead nor did they invest.

24        Q.   Sherman Hu responds to Mr. Kaplan's e-mail

25   and I'm reading from the last sentence in the second

Page 128

www.aptusCR.com

Alexander Oltmann

1   paragraph --

2        A.   Can I provide more context?

3        Q.   Let me finish my question and you can

4   provide context in response if there's context to

5   provide.

6        A.   Perfect.

7        Q.   I'm looking at Mr. Hu's e-mail.  He

8   responds to Mr. Kaplan, I'm looking at the last

9   sentence of the second paragraph, "Deep knows LI

10  product and data inside and out, probably more than

11  most people still working there."  Do you see that?

12       A.   Yes.

13       Q.   Mr. Kaplan I believe from the way the

14  e-mail is printed out forwarded the string to you

15  because you then respond to Mr. Kaplan.  Am I

16  reading that correctly?

17       A.   Yes.  And I want to go back to the

18  question earlier about did Wing invest or lead.

19  It's my recollection that they offered us a term

20  sheet but we did not accept it.  So that adds

21  context to this.

22       Q.   Okay.  Thank you.  So we've looked at this

23  e-mail string between Mr. Kaplan and Sherman Who

24  about a meeting with Deep Nishar who is with Wing of

25  EC and we've looked at the back and forth regarding

CE 0923

Alexander Oltmann

1   Deep's knowledge of LinkedIn product and data inside

2   and out.  Do you see that?

3        A.   Yes.

4        Q.   Mr. Kaplan forwards the e-mail to you and

5   you respond to Mr. Kaplan, do you see that?

6        A.   Yes.

7        Q.   And what did you write back to Mr. Kaplan?

8   Can you read the first sentence of your e-mail?

9        A.   "I'll let you share this with the team as

10  you see fit but don't want to freak anyone out."

11       Q.   And what do you send to Mr. Kaplan?  What

12  is linked below what you just read?

13       A.   According with the e-mail that you shared

14  with me it says,

15  "LinkedIn.com/legal/user-agreement."

16       Q.   And do you recall what that was that you

17  were sending a link of to Mr. Kaplan?

18       A.   I don't recall the specific e-mail.  It

19  probably requires more context as to whether that

20  was terms of service user agreement because it seems

21  like it's taken fairly out of context in this

22  e-mail.

23       Q.   I'm just asking you what it was you were

24  sending Mr. Kaplan?

25       A.   I don't recall.

CE 0924

Alexander Oltmann

1      Q.   And what is below the link that you

2   forwarded to Mr. Kaplan?  What is that that you've

3   pasted into the e-mail?  Do you recall?

4      A.   I don't recall writing it nor sending it.

5      Q.   But in looking at it now does it appear to

6   be an excerpt from the user agreement, the LinkedIn

7   user agreement?

8           MS. SKIBITSKY:  Objection to form.

9   Foundation.  Calls for speculation.

10          THE WITNESS:  Yeah, there's not enough

11   context here to be able to definitively answer what.

12   BY MR. COHEN:

13      Q.   Let's look at it.  It says from the

14   LinkedIn TOS.  And what does "TOS" stand for?

15      A.   In this context I'm assuming it's terms of

16   service.

17      Q.   So from the LinkedIn terms of service and

18   then there's a bullet point.  Can you read what that

19   bullet point says?

20      A.   According to this e-mail it says, "Scraper

21   copy profiles and information of others through any

22   means including crawlers, browser plug-ins, add-ons

23   and any other technology or manual work."

24      Q.   So in this e-mail, Mr. Oltmann, you were

25   sharing with Mr. Kaplan an excerpt from the LinkedIn

Page 131

CE 0925

Alexander Oltmann

```
 1              REPORTER'S CERTIFICATE

 2

 3          I, JEANINE CURCIONE, C.S.R. NO. 10223,

 4   RPR, in and for the State of California, do hereby

 5   certify:

 6          That prior to being examined, the witness

 7   named in the foregoing deposition was by me duly

 8   sworn to testify the truth, the whole truth and

 9   nothing but the truth and that the witness reserved

10   the right of signature;

11          That said deposition was taken down by me

12   in shorthand at the time and place therein named,

13   and thereafter reduced to typewriting under my

14   direction, and the same is a true, correct and

15   complete transcript of said proceedings.

16          I further certify that I am not interested

17   in the event of the action.

18          Witness my hand this 16th day of May,

19   2022.

20
                       _Jeanine Curcione_
21   _____

22   Certified Shorthand
     Reporter for the
23   State of California

24

25
```

CE 0926

# Compendium Exhibit 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4

5   hiQ LABS, INC.,                )
                                   )
6           Plaintiff,             )
                                   )
7      vs.                         )Case No.
                                   )17-CV-03301-EMC
8   LINKEDIN CORPORATION,          )
                                   )
9           Defendant.             )
                                   )
10

11

12

13

14

15     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

16

17

18              REMOTE VIDEO DEPOSITION OF

19                      DAN REID

20

21

22

23

    DATE TAKEN:  May 19, 2022

24

25   REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 7

1       APPEARING VIRTUALLY FROM LOS ANGELES, CALIFORNIA;

2               WEDNESDAY, MAY 18, 2022; 9:13 A.M.

3

4                         DAN REID,

5       called as a witness and having been first duly

6       sworn by the Certified Shorthand Reporter, was

7       examined and testified as follows:

8

9                       EXAMINATION

10

11      BY MS. SHIBITSKY:

12          Q.   Good morning, Mr. Reid.  How are you?

13          A.   I'm well.  Thank you for asking, Hope.

14      Good morning -- or afternoon.  It's actually

15      afternoon there.  My apologies.

16          Q.   It's afternoon there, but I'll go to your

17      time zone.

18               Mr. Reid, can you please state your full

19      name for the record?

20          A.   Daniel Bruce Reid.

21          Q.   And what is your current address?

22          A.   Where I live?

23          Q.   Yes.

24          A.   Okay.  45 Roxbury Lane, San Mateo,

25      California 94002.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                              Page 10
```

1             THE TECHNICIAN:  Stand by.

2             You said it was tab 50, right?

3             MS. SHIBITSKY:  Yes.

4             THE TECHNICIAN:  Okay.  And what was the

5        exhibit number you want to start on?

6             MS. SHIBITSKY:  Reid 1000, please.

7             THE TECHNICIAN:  1000, gotcha.  Okay.

8             Now introducing Exhibit Reid 1000, and it

9        should be in Exhibit Share now.

10            (Exhibit 1000 was received and marked

11             for identification on this date and is

12             attached hereto.)

13            MR. RUGANI:  This is -- so you just reset

14       the window?

15            THE TECHNICIAN:  Yes.  Just refresh your

16       browser and it will pop up.

17            THE WITNESS:  PDF Exhibit 1000

18       something -- something.  Okay.  Should I

19       click it?

20   BY MS. SHIBITSKY:

21       Q.  Yes, please do.

22            Mr. Reid, this is a Notice of Deposition

23   of Dan Reid as LinkedIn's Corporation's 30(b)(6)

24   designee for Topics 3, 10, 22, 25, 26, 27, 28, 31

25   and 34.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 11

```
 1            Do you see that?
 2       A.  I don't know about all those numbers, but
 3   I do see the document.  Should I read the whole
 4   document or...
 5       Q.  You can if you'd like.  You don't have to
 6   right now, but you're always welcome to read any
 7   document that I put in front of you.
 8            My -- my question is whether you know if
 9   you've seen this document previously.
10       A.  I do not believe I've ever seen this
11   document before.  Some of these topics are known
12   to me.  You said Nos. 3, 10, 22, 25, 26, 27, 28,
13   31 and 34.  Those appear to be what are in this
14   document.
15       Q.  Okay.  So if you scroll down to the last
16   page, which is page 6 of the PDF, it lists
17   deposition topics.
18       A.  Yes.  Those -- I see those.  They're on
19   my screen as deposition Topics 3, 10, bulleted
20   points 22, 25, 26, 27, 28, 31 and 34.
21            Are we on the same place?
22       Q.  Perfect.  We are in the same place.
23       A.  Super.
24       Q.  So -- so the first topic listed is 3, and
25   it says, "LinkedIn's attendance at hiQ's Elevate
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                          Page 12

 1   events including LinkedIn's decision to attend

 2   such events, the information and/or insights

 3   LinkedIn learned from those events, and LinkedIn's

 4   incorporation of such information/insights into

 5   its business plans, products, services or

 6   offerings."

 7          Do you see that one?

 8      A.  I see that section in the document, yes.

 9      Q.  Are you prepared to testify today as

10   LinkedIn's corporate designee on Topic No. 3?

11          MR. RUGANI:  And I just note for the

12          record, LinkedIn served objections and

13          responses to the 30(b)(6) notice as

14          originally served by hiQ.

15          Those objections carry over to the

16          specific notice that was served yesterday for

17          the specific topics for Mr. Reid.

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 35

 1   between those two offerings?

 2        A.   Recruiter Lite only allows a single user,

 3   as opposed to being purchased for an entire

 4   company, and it has substantially degraded

 5   functionality around the amount of searches that

 6   you can do, how far you can search.

 7             Many of the filters are not available

 8   inside of LinkedIn Recruiter -- Lite, excuse me,

 9   Recruiter Lite, and it is also at a much different

10   price point.

11        Q.   Okay.  So at the point in time in which

12   you were promoted from group product manager to

13   director -- to a director position, what were your

14   roles and responsibilities with respect to the

15   Recruiter product -- the Recruiter suite of

16   offerings?

17        A.   They were the same as what I had as a

18   group product manager.

19        Q.   And did you have responsibilities as a

20   director with respect to the Talent Insights

21   product?

22        A.   Not at that time.

23        Q.   Did there come a point in time in which

24   you had responsibilities as a director with

25   respect to the Talent Insights product?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36

1      A.  Yes.

2      Q.  And when was that?

3      A.  That would have been when I -- I was a

4  senior director at that time, and I became

5  responsible for the LTI product in, let's see,

6  starting to get the years blurred.  That would

7  have been -- what is it, 2022?  Late 2020, like

8  November, I think.

9      Q.  From becoming a -- from the period in

10 time that you became responsible for the LTI

11 product in late 2020 to present day, have your

12 responsibilities with respect to the LTI product

13 changed?

14     A.  No.

15     Q.  And from the point in time in which you

16 took responsibility -- strike that.

17         From the point in time in which you took

18 full ownership of the Recruiter suite of products

19 to today, has your responsibilities with respect

20 to the Recruiter suite of products changed?

21     A.  No.

22     Q.  Mr. Reid, do you -- do you report to

23 anyone at LinkedIn?

24     A.  Yes.

25     Q.  And who do you report to?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 37

```
 1       A.  Hari Srinivasan.  Be cool if I could say
 2   no to that.
 3       Q.  That would be pretty cool.
 4           Is -- is that Mr. Srinivasan?
 5       A.  Yes.
 6       Q.  What is Mr. Srinivasan's title?
 7       A.  I believe his title is vice president of
 8   product management.
 9       Q.  And is it right to assume that you have a
10   number of direct reports?
11       A.  Correct.
12       Q.  How many -- approximately how many direct
13   reports -- strike that.
14           Approximately how many LinkedIn employees
15   report to you?
16       A.  Something like 13.  I might be wrong a
17   little bit because things change and depends on
18   when someone gets hired.  Like, we put out offers
19   and they haven't started yet.  So it's in that
20   range.
21       Q.  Okay.  I'd like to speak a bit about --
22   about LinkedIn Talent Solutions.
23           Is LinkedIn Talent Solutions a business
24   division within LinkedIn?
25       A.  Yes.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 58

1   understand that you are appearing today to testify

2   as to Talent Insights and Recruiters comportment

3   with members first?

4        A.  Yes.

5        Q.  Mr. Reid, what is LinkedIn's members

6   first philosophy?

7        A.  LinkedIn's members first philosophy, I

8   guess I would say it's more than a philosophy.

9   It's a guiding principle and an agreement that we

10  have with our members is that we will uphold the

11  trust that they have placed in us.  We will

12  operate as a trust-first company in all ways, and

13  that the goal is to -- the goal is to provide

14  value first to members, and to respect the --

15  again, the trust that they have placed in us as a

16  corporation and in our business units by giving

17  us, voluntarily, their data.

18       Q.  When you say that "the goal is to provide

19  value first to members," does that mean that

20  the value provided to LinkedIn's members trumps

21  any business interest that LinkedIn has?

22            MR. RUGANI:  Objection to the form of the

23       question.

24            THE WITNESS:  I wouldn't say it that way.

25       Everything is always a balance.  I would say

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1    STATE OF CALIFORNIA        )

2                               (     ss.

3    COUNTY OF LOS ANGELES      )

4

5           I, RENEE HARRIS, do hereby certify that I

6    am a licensed Certified Shorthand Reporter, duly

7    qualified and certified as such by the State of

8    California;

9       That prior to being examined, the witness named

10   in the foregoing deposition was by me duly sworn

11   to testify to tell the truth, the whole truth, and

12   nothing but the truth;

13      That the said deposition was by me recorded

14   stenographically;

15      And the foregoing pages constitute a full,

16   true, complete and correct record of the testimony

17   given by the said witness;

18          That I am a disinterested person, not

19   being in any way interested in the outcome of said

20   action, or connected with, nor related to any of

21   the parties in said action, or to their respective

22   counsel, in any manner whatsoever.

23   DATED: May 19, 2022

24

     _____

25                  Renee Harris, CSR 14168, RPR

# Compendium Exhibit 19

# (CE957-987 of Exhibit
Filed Under Seal)

CONFIDENTIAL

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3   Case No. 17-CV-03301-EMC

4   ----------------------------------x

5   hiQ LABS, INC.,

6          Plaintiff and Counterclaim Defendant,

7          - against -

8   LINKEDIN CORPORATION,

9          Defendant and Counterclaim Plaintiff.

10  ----------------------------------x

11                  May 19, 2022

12                  9:02 a.m. (PST)

13                  12:02 p.m. (EST)

14

15      ** CONFIDENTIAL TRANSCRIPT **

16

17          Remote video-teleconference

18  deposition via Zoom of PAUL ROCKWELL,

19  pursuant to Notice, before Jineen Pavesi,

20  a Registered Professional Reporter,

21  Registered Merit Reporter, Certified

22  Realtime Reporter and Notary Public of the

23  State of New York.

24

25

CONFIDENTIAL

Page 7

```
 1  Pavesi from the firm Veritext.
 2               I am not authorized to
 3  administer an oath, I am not related to
 4  any party in this action, nor am I
 5  financially interested in the outcome.
 6               If there are any objections to
 7  proceeding, please state them at the time
 8  of your appearance.
 9               Counsel and all present,
10  including remotely, will now state their
11  appearances and affiliations for the
12  record, beginning with the noticing
13  attorney.
14               MS. MILLER:  Good morning,
15  Elisabeth Miller from Quinn Emanuel
16  Urquhart & Sullivan on behalf of hiQ Labs.
17               MS. HURST:  Good morning,
18  Annette Hurst from Orrick, Herrington &
19  Sutcliffe.
20               Also with me from Orrick is my
21  colleague Emilie Renzelli and also present
22  is Sarah Wight from LinkedIn.
23  P A U L   R O C K W E L L,
24  having first been duly sworn by a Notary
25  Public of the State of New York, was
```

Page 8

```
 1   examined and testified as follows:
 2   EXAMINATION BY
 3   MS. MILLER:
 4        Q.      Good morning, Mr. Rockwell.
 5                I am Elisabeth Miller from
 6   Quinn Emanuel on behalf of hiQ Labs, nice
 7   to meet you.
 8                Could you please state your
 9   name for the record.
10        A.      Yes, Paul Rockwell.
11        Q.      And where do you reside?
12        A.      I live in Los Gatos,
13   California.
14        Q.      Where are you currently located
15   for this deposition?
16        A.      At the offices of Orrick.
17        Q.      And I believe Ms. Hurst is in
18   the room with you, is that correct?
19        A.      That is correct.
20        Q.      Is anyone else in the room with
21   you?
22        A.      Yes, there are others.
23        Q.      Who are the others in the room
24   with you?
25        A.      Sarah Wight from LinkedIn,
```

Page 12

1      Q.        Throughout the deposition your
2    counsel is likely to make objections;
3    unless Ms. Hurst or Ms. Renzelli direct
4    you not to answer the question on the
5    basis of attorney-client privilege, you
6    still have to answer the question.
7                Do you understand that?
8      A.        I do.
9      Q.        And you are also entitled to
10   ask for breaks, but you must answer any
11   pending questions before we break.
12                Do you understand that?
13     A.        Yes.
14     Q.        What is your current title at
15   LinkedIn?
16     A.        I am the vice-president of
17   trust and safety.
18     Q.        How long have you been the
19   vice-president of trust and safety?
20     A.        A few months, I was promoted to
21   vice-president a few months ago.
22     Q.        Before that you were the senior
23   director in the same group?
24     A.        That is correct.
25     Q.        Do you understand that you're

Page 13

1    providing testimony at this deposition in
2    both your individual capacity and as a
3    corporate representative of LinkedIn?
4        A.      My understanding is that
5    today's testimony is as a representative
6    of LinkedIn.
7        Q.      And in your individual
8    capacity, do you understand that?
9                MS. HURST:  Well, objection, it
10   depends on the scope of whatever question
11   you're asking as to whether it's one or
12   the other.
13               It is not up to the witness to
14   figure that out.
15               MS. MILLER:  I would ask,
16   Ms. Hurst, that if you could please
17   refrain from speaking objections, I would
18   appreciate it.
19       Q.      Did you prepare for today's
20   deposition?
21       A.      Yes.
22       Q.      With whom did you meet to
23   prepare for today's deposition?
24       A.      I met with counsel.
25       Q.      Which counsel did you meet

CONFIDENTIAL

1      A.         No, but that is the example

2   that we did use there to highlight a

3   positive use case.

4      Q.         What are other examples of when

5   scraping isn't bad?

6      A.         I don't have any examples that

7   come to mind, sorry.

8      Q.         This is the only example when

9   scraping isn't bad?

10      A.         To be clear, I didn't say that;

11   I did say, though, that that is the one

12   example that I can think of.

13      Q.         Do you see where it says, "What

14   makes it nefarious is when it's done

15   without permission."

16              Do you see that?

17      A.         Yes.

18      Q.         And that's because you have no

19   ability to track where your data has gone

20   and how it is being used?

21      A.         Yes.

22      Q.         Below that it says, "What Isn't

23   Scraping," and the first sentence says,

24   "Unauthorized scraping by itself is not

25   always a breach or hack."

CONFIDENTIAL

Page 85

1                    Do you see that?

2        A.        It says "by itself is not a

3    breach or a hack."

4        Q.        Right; do you see that?

5        A.        I see that.

6        Q.        Two sentences later it says,

7    "But scraping does not mean an attacker

8    has been able to get inside secure

9    systems, subvert firewalls or access

10   protected network information."

11                   Do you see that?

12       A.        I see that.

13       Q.        And you wrote this article on

14   behalf of LinkedIn?

15       A.        I did.

16       Q.        In the next sentence it says,

17   "Unauthorized scraping can mean that bad

18   actors can collect a lot of data and use

19   it in ways that you didn't expect."

20                   What did you mean by "you

21   didn't expect"?

22       A.        Which paragraph are you looking

23   at now?

24       Q.        Same paragraph, under What

25   Isn't Scraping.

1          (Witness perusing document.)

2      A.          For example, taking your data

3  and combining it with other datasets and

4  selling it or in this particular situation

5  it could also mean taking your data and

6  changes to your profile and telling your

7  employer that you're thinking of leaving

8  and that is a private decision, a private

9  motive, that you may have and that is not

10  something that a member would necessarily

11  expect or want, especially if they changed

12  their settings to reflect not broadcasting

13  or updating changes that they're making to

14  their profile.

15      Q.          So how did LinkedIn determine

16  whether or not members expected --  what

17  members expected with respect to their

18  collection and use of data?

19          MS. HURST:  Objection, asked

20  and answered.

21      A.          Can you repeat that question.

22      Q.          How did LinkedIn determine what

23  members expected with respect to their

24  collection and use of data?

25      A.          Our privacy policy and user

Page 87

1   agreement outlines it and we provide them

2   with settings that provide our members

3   control over their data.

4        Q.       On the next page, at the bottom

5   it says, "What can members do to protect

6   themselves?"

7                 Do you see that?

8        A.       I do.

9        Q.       It says at the bottom, "You can

10  choose to limit or adjust choices if you

11  like.  From there it is our job to enforce

12  your choices to help to keep you and your

13  data safe."

14                Do you see that?

15       A.       Yes.

16       Q.       What do you mean by "enforce

17  your choices to help keep you and your

18  data safe"?

19       A.       When members make choices about

20  how their data is to be used through our

21  settings, we respect those settings and we

22  try and protect data from being taken

23  without our members' consent, for example,

24  scraping.

25       Q.       So you would not  -- strike

CONFIDENTIAL

Page 177

1    this date.)

2                    (Technical discussion off the

3    record.)

4                    (Rockwell Exhibit 1233-A,

5    LINK_hiQ_ 000169080, was marked for

6    identification, as of this date.)

7        Q.        If you can open up first 1233

8    and do you see that it is an e-mail

9    message from Mr. Womer to a number of

10   recipients, including yourself, dated

11   April 1, 2015, Subject: Third-Party

12   Scraping Discussion Materials, with an

13   attachment, Third-Party Scraping, April

14   2.Final?

15       A.        I do, I'm reading through it.

16                 MS. MILLER:   It is

17   LINK_hiQ_00169079.

18                 (Witness perusing document.)

19       A.        Okay.

20       Q.        Turning to the attachment,

21   which is LINK_hiQ_000169080, do you see

22   the cover page says LinkedIn Third-Party

23   Scraping, April 2, 2015?

24       A.        I do.

25       Q.        Do you recall attending a

Page 178

1  meeting on third-party scraping on April

2  2, 2015?

3      A.      I do recall a meeting about

4  this, I believe it was that day.

5      Q.      Who else was at the meeting?

6      A.      Ganesh Krishnan, Vicente

7  Silveira, Sarah Wight, myself, Lee Womer,

8  Bob Rosin, there was a number of people.

9      Q.      Where was the meeting held?

10      A.      In Mountainview at our offices.

11      Q.      Turn to the page ending 82,

12  titled Executive Summary, and then it

13  says, "A, we believe that third-party

14  scraping warrants meaningful

15  attention/investment."

16              Under that --  first of all, do

17  you agree with that statement, that

18  third-party scraping warrants meaningful

19  attention/investment?

20      A.      Yes.

21      Q.      Underneath that it says,

22  "Members First:  LinkedIn has a

23  responsibility to protect members' data

24  and failure to do so could undermine our

25  trust with members."

CONFIDENTIAL

Page 179

1           Do you agree with that

2   statement, that LinkedIn has a

3   responsibility to protect members' data

4   and failure to do so could undermine

5   LinkedIn's trust with members?

6       A.      Yes.

7       Q.      Underneath that it says,

8   "Franchise Risk:  Our business model is

9   built on our member data and if we're

10  unable to protect this data, it could have

11  a major impact on our business."

12           What major impact on LinkedIn's

13  business with respect to third-party

14  scraping was discussed at this April 2,

15  2015 meeting?

16           MS. HURST:  Objection, assumes

17  facts not in evidence, lacks foundation.

18      A.      The risk to the business is if

19  members don't believe they can trust that

20  their data is safe on LinkedIn, they will

21  not come to LinkedIn.

22      Q.      Where will they go if they

23  don't come to LinkedIn?

24           MS. HURST:  Objection, lacks

25  foundation, calls for speculation,

CONFIDENTIAL

Page 180

1    incomplete hypothetical.

2        A.        It's possible that they could

3    go to other platforms.

4        Q.        Such as?

5                  MS. HURST:   Same objections,

6    beyond the scope.

7        A.        There are a number of other

8    platforms for finding jobs and there are

9    always platforms experimenting with this,

10   so it's possible that it could have been

11   anything from Monster.com to Facebook or

12   Google, it could have been anywhere.

13                 But the main take-away is that

14   members trust us, we value that trust, we

15   invest in solutions that support our

16   members' choices, and when they choose to

17   have their data available on LinkedIn, we

18   do what we can to keep up our end and

19   protect that data.

20       Q.        Do you believe that LinkedIn

21   provides a unique service?

22                 MS. HURST:   Objection, vague,

23   beyond the scope.

24       A.        Can you help me understand,

25   when you say we provide a unique service?

CONFIDENTIAL

Page 248

1   engaged in maintaining defenses and

2   investigating behavior was very costly and

3   remains costly, so this is something that

4   continues to incur cost to the company.

5        Q.        Are those individuals who are

6   maintaining defenses and investigating

7   behavior assigned strictly to

8   investigating hiQ?

9        A.        No, not just hiQ.

10                 As mentioned previously, this

11  is a cross-functional effort and these

12  individuals are assigned to help with

13  scraping detection and defense work on

14  these specific things as well as the

15  broader defense.

16                 So it's not that necessarily

17  folks on the team are only, have only, and

18  will only be dedicated to one thing.

19       Q.        Do you know how much each of

20  these individuals' time is assigned

21  specifically to hiQ?

22       A.        I believe that that document

23  has been prepared, but off the top of my

24  head I do not remember how many people and

25  what percentage of their time, over what

CONFIDENTIAL

Page 271

1         C E R T I F I C A T I O N

2

3

4

5      I, Jineen Pavesi, a Registered

6   Professional Reporter, Registered Merit

7   Reporter, Certified Realtime Reporter and

8   a Notary Public, do hereby certify that

9   the foregoing witness, PAUL ROCKWELL, was

10   duly sworn on the date indicated, and that

11   the foregoing is a true and accurate

12   transcription of my stenographic notes.

13      I further certify that I am not employed

14   by nor related to any party to this

15   action.

16

17

18

19

20      JINEEN PAVESI, RPR, RMR, CRR

21

22

23

24

25