1 ANNETTE L. HURST (SBN 148738)
  ahurst@orrick.com
2 RUSSELL P. COHEN (SBN 213105)
  rcohen@orrick.com
3 PAUL F. RUGANI (SBN 342647)
  prugani@orrick.com
4 CATHERINE Y. LUI (SBN 239648)
  clui@orrick.com
5 NATHAN SHAFFER (SBN 282015)
  nshaffer@orrick.com
6 DANIEL JUSTICE (SBN 291907)
  djustice@orrick.com
7 EMILY RENZELLI (*Pro Hac Vice*)
  erenzelli@orrick.com
8 ORRICK, HERRINGTON & SUTCLIFFE LLP
  405 Howard Street
9 San Francisco, CA  94105-2669
  Telephone:   +1 415 773 5700
10 Facsimile:    +1 415 773 5759

11 *Attorneys for Defendant/Counterclaimant*
12 *LinkedIn Corporation*

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                       SAN FRANCISCO DIVISION

16 hiQ Labs, Inc.,                          Case No. 17-cv-03301-EMC

17              Plaintiff,                  **COMPENDIUM OF EVIDENCE FILED IN
                                            SUPPORT OF LINKEDIN**
18        vs.                               **CORPORATION'S AUGUST 5, 2022
                                            MOTIONS (4 OF 6)**
19 LinkedIn Corporation,
                                            Date:          September 29, 2022
20              Defendant.                  Time:          1:30 p.m.
                                            Courtroom:     5 – 17th Floor (Zoom)
21                                          Judge:         Hon. Edward M. Chen

22
   LinkedIn Corporation
23
                Counterclaimant,            Complaint Filed:   June 7, 2017
24        vs.                               Trial Date:        February 27, 2023

25 hiQ Labs, Inc.

26              Counterdefendant.

27

28

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 1 | Deposition Transcript of Jenelle Bray (Excerpts) | 05/18/2022 | 1 | 1 |
| 2 | Deposition Transcript of Boris Dev and exhibits (Excerpts) | 05/04/2022 | 1 | 16 |
| | **Dep. Ex. 231 –** Email string between Dev and Weidick re: Your application for private LinkedIn API access (3/23/17) (hiQ_00200007-08) | 03/27/2017 | | 49 |
| | **Dep. Ex. 237 –** Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 51 |
| 3 | Deposition Transcript of Daniel Francis and exhibits (Excerpts) | 05/25/2022 | 1 | 53 |
| | **Dep. Ex. 1335 –** hiQ Elevate Conference Notes (LINK_HIQ_000184276-77) | 04/20/2017 | | 62 |
| 4 | Deposition Transcript of McKinsey & Co. by and through 30(b)(6) designee Christopher Gagnon | 06/27/2022 | 1 | 64 |
| | **Dep. Ex. 591 –** Email string between Gagnon, Veynerchuk, et al. re: departure announcement (hiQ_00580838-40) | 02/04/2017 | | 77 |
| 5 | Deposition Transcript of Genevieve Graves and exhibits (Excerpts) | 05/25/2022 | 1 | 80 |
| | **Dep. Ex. 498 –** hiQ Tech Stack: Product Suite PPT (hiQ_00545758) | Undated | | 129 |
| | **Dep. Ex. 503 –** Email from Graves to Hammond, et al. re: Insufficient Data Coverage (hiQ_00023356-59) | 07/13/2016 | | 144 |
| | **Dep. Ex. 510 –** Email string between Miller, Graves, et al. re: Banned from LinkedIn (hiQ_00143432-33) | 07/14/2015 | | 148 |
| | **Dep. Ex. 512 –** Email from Cole to Marshall re: NDA, Training, and VPN access (hiQ_00191862-78) | 01/29/2016 | | 150 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 514 –** Email string between Cole, Graves, et al. re: feedback: list of frustrations (hiQ_00174514-15) | 05/22/2016 | | 167 |
| | **Dep. Ex. 525 –** Email string between Graves and Medeiros re: 2016 Customer Churn (hiQ_000855562-64) | 11/15/2016 | | 169 |
| 6 | Deposition Transcript of Yael Hochberg, Ph.D. and exhibits (Excerpts) | 07/29/2022 | 1 | 172 |
| | **Dep. Ex. 1385 –** Expert Report of Yael Hochberg, Ph.D. (Appendix C Materials Considered removed) | 06/07/2022 | | 180 |
| | **Dep. Ex. 1386 –** Expert Rebuttal Report of Yael Hochberg, Ph.D. | 06/30/2022 | | 283 |
| 7 | Deposition Transcript of Darren Kaplan and exhibits (Excerpts) | 05/04/2022 | 1 | 313 |
| | **Dep. Ex. 10 –** Email from McNutt to Cole re: Question [LinkedIn User Agreement and turking] (hiQ_00189601) | 05/05/2016 | | 328 |
| | **Dep. Ex. 17 -** hiQ Confidential Board Deck PPT (discussing state of the business, engineering and product update, financials, and administrative) (hiQ_003177150 | 02/08/2017 | | 329 |
| 8 | Deposition Transcript of Darren Kaplan (Excerpts) | 05/05/2022 | 1 | 361 |
| 9 | Deposition Transcript of Andrew Kim (Excerpts) | 05/09/2022 | 2 | 376 |
| | **Dep. Ex. 246 -** hiQ Product Strategy PPT (discussing current and new hiQ products) (hiQ_00304309) | Undated | | 397 |
| 10 | Deposition Transcript of James Malackowsi and exhibits (Excerpts) | 07/28/2022 | 2 | 425 |
| | **Dep. Ex. 1379 –** Expert Report of James E. Malackowski (Appendices 2-6 removed) | 06/07/2022 | | 437 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 11 | Deposition Transcript of Stephen B. McElfresh and exhibits (Excerpts) | 07/20/2022 | 3 | 543 |
| | **Dep. Ex. 650 –** Expert Report of Stephen B. McElfresh | 06/07/2022 | | 584 |
| 12 | Deposition Transcript of Darin Medeiros and exhibits (Excerpts) | 05/20/2022 | 3 | 606 |
| | **Dep. Ex. 436 –** Email from Berman to Medeiros re: Completed: Order form for hiQ Labs, Inc.-LSS (hiQ_00352028-30) | 12/23/2015 | | 637 |
| | **Dep. Ex. 437 –** Email from Sennert to Medeiros re: hiQ Labs Account #: 120941 with attached invoices (hiQ_00008090-91; 8509-11; 7822-24; 7273-75; 6812-14; 6668-70; 5955-60) | 06/10/2016 | | 640 |
| | **Dep. Ex. 438 –** Email string between Medeiros, Dick, et al. re: SFDC guide with hiQ's CRM Best Practices (hiQ_00123595-601) | 07/25/2017 | | 662 |
| | **Dep. Ex. 439 –** Email from Medeiros to DeSantis, et al. re: Weekly Update with hiQ Sales Dashboard (hiQ_00175647-50) | 11/28/2016 | | 669 |
| | **Dep. Ex. 443 –** Email from Medeiros to Weidick, et al. re: Customer asking why hiQ didn't scrape through a paid LinkedIn account (hiQ_00619694-97) | 05/16/2017 | | 673 |
| | **Dep. Ex. 447 –** Chat transcript between Medeiros and Barker re: Customer Feedback (hiQ_00443465-75) | 10/11/2017 | | 677 |
| | **Dep. Ex. 455 –** Email from Medeiros to Weidick, et al. re: State of Renewals 2017 (hiQ_00180173) | 10/16/2017 | | 688 |
| 13 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/13/2022 | 3 | 694 |
| | **Dep. Ex. 322A –** Email from Miller to Dev re: scraping tips (hiQ_00084314) | 08/11/2016 | | 729 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| | **Dep. Ex. 322B** – Tips for [scraping] LinkedIn (hiQ_00084315) | 08/11/2016 | | 730 |
| | **Dep. Ex. 331** – Notes on reverse engineering LinkedIn's defenses (hiQ_00354518-20) | Undated | | 731 |
| | **Dep. Ex. 344** – Chat transcript between Dev, Miller, et al. re: Scraper Update (hiQ_00437026-27) | 04/26/2017 | | 734 |
| | **Dep. Ex. 350A & 350B** – Email from Cole to Dev with attached file named "The Scraper Wars PPT" (hiQ_00189161-63) | Undated | | 736 |
| 14 | Deposition Transcript of Daniel Miller and exhibits (Excerpts) | 05/26/2022 | 3 | 749 |
| | **Dep. Ex. 535** – Email string between Miller and Sharon re: Purchase monthly services (hiQ_00141957-59) | 07/17/2017 | | 770 |
| | **Dep. Ex. 539** – Email string between Cole, Miller, et al. re: turking (hiQ_00359637-38) | 09/27/2017 | | 773 |
| | **Dep. Ex. 540** – Email string between Brokken and Miller re: culling the database nightmare (hiQ_00060671-75) | 12/07/2017 | | 775 |
| | **Dep. Ex. 543** – Email string between Miller, Medeiros, et al. re: Cancelling hiQ services (hiQ_00329112-13) | 05/09/2018 | | 780 |
| | **Dep. Ex. 545** – Chat transcript between Miller, Kim, et al. re: suspension notice from AWS (hiQ_00451932-33) | 05/16/2018 | | 782 |
| | **Dep. Ex. 546** – Chat transcript between Kim, Barta, et al. re: scraping (hiQ_00436300-07) | 06/12/2018 | | 784 |
| 15 | Deposition Transcript of Kevin Murphy and exhibits (Excerpts) | 07/19/2022 | 3 | 792 |
| | **Dep. Ex. 603** – Expert Report of Kevin M. Murphy (Appendix B removed) | 06/07/2022 | | 800 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 16 | Declaration of Kevin Murphy ISO LinkedIn's Motion for Summary Judgment and *Daubert* Motion to Exclude Expert Testimony of Stephen McElfresh and exhibit, No. 17-cv-03301 | 08/04/2022 | 3 | 883 |
| | **Ex. A –** Rebuttal Expert Report of Kevin M. Murphy | 06/30/2022 | | 886 |
| 17 | Deposition Transcript of Alexander Oltmann and exhibits (Excerpts) | 05/13/2022 | 3 | 914 |
| | **Dep. Ex. 4 –** Email string between Oltmann, Kaplan, et al. re: FLAGGING you DEEP Nishar (hiQ_00250311-13) | 03/09/2015 | | 927 |
| 18 | Deposition Transcript of Dan Reid (Excerpts) | 05/19/2022 | 3 | 930 |
| 19 | Deposition Transcript of Paul Rockwell and exhibits (Excerpts) | 05/19/2022 | 3 | 941 |
| | **Dep. Ex. 1233-A –** LinkedIn 3rd Party Scraping PPT (LINK_HIQ_000169080-110) | 04/02/2015 | | 957 |
| 20 | Deposition Transcript of Benjamin Sacks and exhibits (Excerpts) | 07/08/2022 | 4 | 988 |
| | **Dep. Ex. 599 –** Amended Expert Report of Benjamin A. Sacks (Appendices A-B removed) | 06/22/2022 | | 1072 |
| | **Dep. Ex. 608 -** Chart – Calculation 1: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, Before Application of 20% Discount | Undated | | 1124 |
| | **Dep. Ex. 609 –** Chart – Calculation 2: Prediction Intervals for Mr. Sacks' Predicted Values for hiQ's Series C Pre-Money Valuation, Various Confidence Levels, After Application of 20% Discount | Undated | | 1125 |
| | **Dep. Ex. 610 –** Sacks Work Paper E Showing Customers Included In Lost Profits (Excerpt of Native Excel file converted to PDF) | Undated | | 1125A |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 21 | Deposition Transcript of Minjae Song (Excerpts) | 07/27/2022 | 4 | 1126 |
| 22 | Deposition Transcript of Mark Weidick (Excerpts) | 03/18/2022 | 4 | 1135 |
| 23 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 05/23/2022 | 4 | 1145 |
| | **Dep. Ex. 475 –** Chat transcript between Miller and Weidick re: shutting down scraping (biQ_00442222) | 03/31/2017 | | 1173 |
| | **Dep. Ex. 480 –** Email from Weidick to Lustig, et al. re: Reading time 4 mins 39 sec (hiQ_00641062-64) | 04/05/2017 | | 1174 |
| | **Dep. Ex. 486 –** Email from Jeremias to Weidick, et al. re: Urgent: Suspension Warning (hiQ_00319806-07) | 04/08/2019 | | 1177 |
| 24 | Deposition Transcript of Mark Weidick and exhibits (Excerpts) | 06/01/2022 | 4 | 1179 |
| | **Dep. Ex. 489 –** hiQ Board Deck PPT (hiQ_00221829) | 05/15/2017 | | 1220 |
| | **Dep. Ex. 556 –** Email string between Sharma, Weidick, et al. re: hiQ budget information (hiQ_00705751-54) | 07/13/2020 | | 1254 |
| | **Dep. Ex. 564 –** Email string between Weidick and Dev re: Scraping (hiQ_00183419) | 04/11/2017 | | 1258 |
| | **Dep. Ex. 566 –** Email string between Miller, Weidick, et al. re: Scraping Update (hiQ_00576322-23) | 04/24/2017 | | 1259 |
| 25 | Deposition Transcript of Lee Womer and exhibits (Excerpts) | 05/11/2022 | 4 | 1261 |
| | **Dep. Ex. 294 –** Email string between Womer, Canlas, et al. re: Anti-scraping (LINK_HIQ_000205777-78) | 10/07/2015 | | 1279 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 26 | Deposition Transcript of Xiaofeng Wu and exhibits (Excerpts) | 07/25/2022 | 4 | 1281 |
|  | **Dep. Ex. 1361 –** LinkedIn's Rule 26 Disclosure of Xiaofeng Wu | 06/07/2022 |  | 1307 |
| 27 | Declaration of Paul Rockwell ISO LinkedIn's Opposition to Plaintiff's Motion for Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 26, 2017) (ECF No. 29) | 06/26/2017 | 4 | 1311 |
| 28 | Declaration of Paul Rockwell ISO LinkedIn's Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Pursuant to FRCP 62.1, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. Sept. 10, 2021) (ECF No. 216.13) | 09/10/2021 | 4 | 1377 |
| 29 | hiQ's Second Supplemental Responses to LinkedIn's Second Set of Interrogatories (No. 16) | 08/03/2022 | 4 | 1387 |
| 30 | Letter from Shaffer to Worcester, et al. re: ESI sources | 04/28/2022 | 4 | 1394 |
| 31 | Email string between counsel for the parties re: hiQ ESI Sources [Splunk] | 06/03/2022 | 4 | 1398 |
| 32 | Email from Skibitsky to Shaffer, et al. re: lost Splunk data | 06/13/2022 | 4 | 1417 |
| 33 | hiQ Sales Order for Pfizer (hiQ_00003890-92) | 11/03/2016 | 4 | 1419 |
| 34 | hiQ Labs Inc. Income Statement (hiQ_00004324) (Native Excel file converted to PDF) | 06/2017 | 4 | 1423 |
| 35 | Email string between Barta, Kim, et al. re: culling the database nightmare (hiQ_00028241-53) | 01/15/2018 | 4 | 1439 |
| 36 | Email string between Williams and Cole re: borrow your SDR team for a few days (hiQ_00080487-91) | 03/15/2016 | 4 | 1453 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 37 | Email from Klevecz to Mechanical Turkers and Cole re: Turking Interface Changes (hiQ_00080559) | 12/03/2015 | 4 | 1459 |
| 38 | Email string between Cherry and Graves re: Another LinkedIn account shutdown (hiQ_00087989-91) | 07/14/2015 | 4 | 1461 |
| 39 | Email from Kaplan to dk.nk41@hiqlabs with hiQ pitch deck showing release timing of Keeper (Control Center) (hiQ_00103925-40) | 09/20/2014 | 4 | 1465 |
| 40 | Master SAAS Agreement between hiQ and BMC Software Inc. (hiQ_00149369-98) | 06/22/2016 | 4 | 1482 |
| 41 | Email string between Cole, "science," et al. re: Weekly Turking Report (hiQ_00174125-28) | 03/10/2017 | 4 | 1513 |
| 42 | Amended and Restated Collaboration Agreement between McKinsey & Co. and hiQ (hiQ_00179991-180005) | 06/30/2016 | 4 | 1518 |
| 43 | Email from Miller to Weidick, et al. re: All-hands AWS cleanup (hiQ_00193748) | 02/02/2018 | 4 | 1534 |
| 44 | Email from Schwade to Graves re: Turking Work Instruction and attachment (hiQ_00211880 & hiQ_00211881) | 06/24/2015 | 4 | 1536 |
| 45 | Board Meeting – Plan Forward (Agenda: Litigation, Hibernation, Assorted Details) PPT (hiQ_00225254) (Native PPT file converted to PDF) | 05/23/2018 | 5 | 1550 |
| 46 | hiQ letter to Weidick re: offer of employment (hiQ_00251922-33) | 02/09/2017 | 5 | 1558 |
| 47 | Record of payments to turkers from Sep. 2015 to Sep. 2016 (hiQ_00316522) (Native Excel file converted to PDF) | Undated | 5 | 1571 |
| 48 | Purchase Order for Honeywell Int'l (hiQ_00318142-47) | 12/07/2017 | 5 | 1586 |
| 49 | Email string between Medeiros, Pauletich, et al. re: Next steps (hiQ_00332055-56) | 09/28/2017 | 5 | 1593 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 50 | Email from Amazon Web Services to ops@hiqlabs.com and Miller re: Your AWS Account has been suspended for non-payment (hiQ_00355253) | 04/20/2020 | 5 | 1596 |
| 51 | Email string between Weidick and Miller re: Belt & suspenders (hiQ_00358094) | 05/07/2018 | 5 | 1598 |
| 52 | Note re: Experiments that Genevieve is running (hiQ_00369157-59) | Undated | 5 | 1600 |
| 53 | Email string between Patch, Kaplan, et al. re: Board Deck (hiQ_00390283-84) | 02/05/2017 | 5 | 1604 |
| 54 | Email string between Weidick, Dev, et al. re: Your application for private LinkedIn API access (hiQ_00429401-02) | 03/23/2017 | 5 | 1607 |
| 55 | Chat transcript between Dev and Miller re: scraping (hiQ_00436623) | 04/18/2017 | 5 | 1610 |
| 56 | Chat transcript between Kim, Miller, et al. (hiQ_00437584-85) | 07/06/2018 | 5 | 1612 |
| 57 | Chat transcript between Miller and Dev re: Luminati (hiQ_00437609) | 05/03/2017 | 5 | 1615 |
| 58 | Chat transcript between Barta, Cole, et al. (hiQ_00438613-15) | 05/16/2018 | 5 | 1617 |
| 59 | Chat transcript between Dev and Miller (hiQ_00439403) | 05/25/2017 | 5 | 1621 |
| 60 | Chat transcript between Dev and Miller re: Luminati (hiQ_00439495) | 05/26/2017 | 5 | 1623 |
| 61 | Chat transcript between Miller and Dev (hiQ_00442040-41) | 06/01/2016 | 5 | 1625 |
| 62 | Chat transcript between Miller, Dev, et al. re: state of scrape (hiQ_00447111-13) | 03/30/2017 | 5 | 1628 |
| 63 | Chat transcript between Miller and Wegener (hiQ_00447584-86) | 08/22/2017 | 5 | 1632 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 64 | Chat transcript between Miller, Dev, et al. (hiQ_00449462-63) | 09/06/2018 | 5 | 1636 |
| 65 | Chat transcript between Wegener and Miller (hiQ_00451103-05) | 05/07/2018 | 5 | 1639 |
| 66 | Splunk Production Scraper Dashboard (hiQ_00457966-67) | 11/08/2016 | 5 | 1643 |
| 67 | Email string between Patch, Graves, et al. re: People not getting paid (hiQ_00463750-54) | 11/05/2015 | 5 | 1646 |
| 68 | Email from Dev to Miller re: [JIRA] (DENG-2) Find alternative sources of proxies (hiQ_00466086) | 01/19/2017 | 5 | 1652 |
| 69 | Purchase Order for Facebook (hiQ_00466148-55) | 06/15/2017 | 5 | 1654 |
| 70 | Software Services Agreement between The Gap and hiQ (hiQ_00466407-25) | 04/15/2015 | 5 | 1663 |
| 71 | Master SAAS Services Agreement between Hartford Fire Ins. Co. and hiQ, and Sales Order (hiQ_00467036-56) | 12/12/2016 | 5 | 1683 |
| 72 | Mutual Non-Disclosure Agreement between American Express Travel Related Services Co. and hiQ, and Sales Order (hiQ_00469682-91) | 11/10/2016 | 5 | 1705 |
| 73 | hiQ Labs Retention Module, Statement of Work between hiQ and Pfizer Inc. (hiQ_00473572-86) | 10/30/2015 | 5 | 1716 |
| 74 | Master Application Service Provider Agreement between Capital One Services LLC and hiQ (hiQ_00521357-412) | 08/15/2016 | 5 | 1732 |
| 75 | hiQ Sales Order for Celgene (hiQ_00521671) | 09/27/2016 | 5 | 1789 |
| 76 | Services Agreement between eBay Inc. and hiQ (hiQ_00521783-805) | 07/29/2015 | 5 | 1793 |
| 77 | Master SAAS Services Agreement between hiQ and UTC Aerospace Systems (hiQ_00536554-64) | 01/15/2016 | 5 | 1817 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 78 | hiQ Sales Order for Box Inc. (hiQ_00542110-13) | 03/31/2016 | 5 | 1829 |
| 79 | License and Services Agreement between hiQ and Comcast Cable Communications Management LLC and Order #1(hiQ_00542226-56) | 09/25/2015 | 5 | 1834 |
| 80 | Master "Software as a Service" (SAAS) Subscription Agreement between Allstate Ins. Co. and hiQ (hiQ_00555778-813) | 10/25/2016 | 6 | 1866 |
| 81 | PA Trend Report 2017 PPT (hiQ_00568929-60) | Undated | 6 | 1903 |
| 82 | Master SAAS Services Agreement between hiQ and Apax Partners LP and Sales Order for Apax (hiQ_00580069-88) | 01/13/2017 | 6 | 1936 |
| 83 | hiQ Revenue spreadsheet (hiQ_00621582) (Excerpt of Native Excel file converted to PDF) | Undated | 6 | 1957 |
| 84 | The Hershey Company SAAS Agreement between Hershey and hiQ (hiQ_00642063-107) | 03/31/2016 | 6 | 1964 |
| 85 | Master SAAS Services Agreement between hiQ and BNY Mellon and Sales Order for BNY (hiQ_00642108-25) | 03/01/2016 | 6 | 2010 |
| 86 | Master SAAS Services Agreement between hiQ and PayPal, Inc. (hiQ_00656809-35) | 01/26/2016 | 6 | 2029 |
| 87 | Consulting Agreement between hiQ and Allan Schwade (hiQ_00679076-77) | 05/24/2016 | 6 | 2057 |
| 88 | Email string between Werlin, Weidick, et al. re: hiQ Investor update (hiQ_00683817-18) | 05/24/2018 | 6 | 2060 |
| 89 | hiQ Company Pages Confluence Wiki (hiQ_00723764) (Excerpt of Native PDF file) | Undated | 6 | 2063 |
| 90 | Email string between Weidick, Gupta, et al. re: turking while logged out (hiQ_00727057) | 09/20/2017 | 6 | 2066 |

| Comp. Ex. No. | Document | Date | Vol. | Page |
|---|---|---|---|---|
| 91 | Screenshot at 14:31 (hiQ_00727061) (Screenshot of Native Video file converted to PDF) | Undated | 6 | 2068 |
| 92 | hiQ Labs Inc. General Ledger from 8/10/2012 to 9/1/2019 (hiQ_00734930) (Excerpt of Native Excel file converted to PDF) | Undated | 6 | 2071 |
| 93 | Memorandum from Gupta to Distribution List re: Notice of Legal Hold (hiQ_00734977-78) | 06/20/2017 | 6 | 2073 |
| 94 | hiQ Labs, Inc. Response to LinkedIn Cease and Desist Letter, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 7, 2017) (ECF No. 4-11) | 05/31/2017 | 6 | 2076 |
| 95 | Plaintiff hiQ Labs, Inc.'s First Supplemental Responses to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/11/2022 | 6 | 2082 |
| 96 | Plaintiff hiQ Labs, Inc.'s Supplemental Responses and Objections to LinkedIn Corporation's Second Set of Interrogatories, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC | 05/13/2022 | 6 | 2088 |

# Compendium Exhibit 20

# (Filed Under Seal)

Compendium Exhibit 21

(Filed Under Seal)

# Compendium Exhibit 22

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO DIVISION
3

4   hiQ Labs, Inc.,              )
            Plaintiff,           )
5                                )
            vs.                  )   Case No.
6                                )   17-cv-03301-EMC
    LinkedIn Corporation,        )
7           Defendant.           )
    _____)
8                                )
    LinkedIn Corporation,        )
9           Counterclaimant,     )
                                 )
10          vs.                  )
                                 )
11  hiQ Labs, Inc.,              )
            Counter-defendant.   )
12                               )
    _____)
13

14          REMOTE VIDEO-RECORDED 30(b)(6)

15            DEPOSITION OF MARK WEIDICK

16              Los Gatos, California

17                March 18, 2022

18                   Volume I

19  REPORTED BY:

20  JOHNNA PIPER

21  CSR 11268

22  Job No. 10097379

23

24  Pages 1 through 122

25

CE 1136

1   only take down audible responses, so yes, no,

2   et cetera.  You can't say "uh-huh."

3         And breaks are perfectly fine if you need

4   one.  I'll try to take one on the -- every hour, but

5   if you do need one, let us know, but if there's a

6   question pending, you will have to answer it before

7   going on break.  Do you understand all those ground

8   rules?

9       A.  I do.

10        MS. LUI:  Okay.  Can we go off record real

11  quick?  I want to --

12        VIDEO TECHNICIAN:  We're -- sure.  We are

13  going off the record.  The time is 10:08 a.m.

14                  (Recess taken.)

15        (Exhibit 1 was marked for identification.)

16        VIDEO TECHNICIAN:  We are back on the

17  record.  The time is 10:12 a.m.

18  BY MS. LUI:

19      Q.  Okay.  Thanks, Mr. Weidick, for that little

20  interruption.

21        So can you tell me your current position at

22  hiQ right now?

23      A.  Chief executive officer and board member.

24      Q.  Okay.  How long have you held that position

25  for?

CE 1137

1      A.   February of 2017, so a little over five

2   years.

3      Q.   Okay.  Thank you.  Any other employment you

4   currently have?

5      A.   Yes.

6      Q.   What is that?

7      A.   The president and general manager of the

8   commercial business unit for Onit, Inc.

9      Q.   How long have you been in -- in that role

10   for?

11      A.   Approximately two years, since February of

12   2020.

13      Q.   Okay.  So earlier when we were off the

14   record, I had introduced what is now marked as

15   Exhibit 1.  If you could take a look at that.

16   Exhibit 1 is LinkedIn's amended notice of deposition

17   to hiQ Labs.  Have you seen this document before,

18   Mr. Weidick?

19      A.   I don't know.  Is this a 30(b)(6)?

20      Q.   This is a deposition notice.  So you can go

21   ahead and scroll through and let me know if you've

22   seen this document before.

23      A.   I'd have to compare it to the document that

24   I think it might be to give you an exact answer.

25      Q.   Okay.  So you've seen something similar

1    before?

2          A.   Yes.

3          Q.   And if you can scroll to page 5 of this

4    document, you'll see there a heading called "Topics

5    for Examination."  Do you see that?

6          A.   I do.

7          Q.   Okay.  So there are Topics 39, 40, 41, and

8    42 and 43.  Do you see that?

9          A.   Yes.

10         Q.   Do you understand that you've been

11   designated to testify today on behalf of the company

12   as to these topics?

13         A.   I do indeed.

14         Q.   And are you prepared today to testify on

15   behalf of hiQ on these topics identified under

16   Exhibit 1?

17         A.   Yes.

18         Q.   Okay.  What did you do to prepare to

19   testify on these topics today?

20         A.   I've talked to legal counsel.  I have

21   across the course of several months spent time with

22   former colleagues to ensure proper understanding of

23   the topics contained in those numbered items you

24   delineated, and I read a long -- what I believe is a

25   longer version that looks a lot like the document

CE 1139

1        Q.  -- explain to you?

2        A.  He did not have it.

3        Q.  Okay.  He did not have the data --

4             (Reporter requests clarification.)

5   BY MS. LUI:

6        Q.  As to what?

7        A.  He didn't have the raw Salesforce data.

8        Q.  And when you say "raw Salesforce data,"

9   what are you referring to?

10        A.  Salesforce is a -- an organized repository

11   of information about customers and prospects, their

12   names, their phone numbers, many times an

13   appendment -- an amendment or an append --

14   appendage, email or proposal that we would have sent

15   to them that gets all housed in one place.  So that

16   would be the raw data.

17             The other part of it that was critical to

18   our business was the reports that we derived from

19   that which we used to operate the business as part

20   of our board meetings, our planning and forecasting.

21   Those reports are available, but Darin did not have

22   the raw data that those reports would have been

23   derived from.

24        Q.  And why was it that the raw data was

25   unavailable?

CE 1140

1 | BY MS. LUI:

2 |      Q.  You can answer --

3 |         MS. SKIBITSKY:  You can answer, Mark.

4 |         THE WITNESS:  I don't.

5 | BY MS. LUI:

6 |      Q.  So you don't know for the Gmail that you

7 | are using for hiQ whether deleted items are then

8 | later purged by the system after a certain period of

9 | time.

10 |      A.  Correct.

11 |      Q.  Did hiQ ever use Outlook 365 or -- or

12 | Microsoft products?

13 |      A.  Not to my knowledge.

14 |      Q.  Okay.  I want to talk about Salesforce now.

15 | Is Salesforce used to capture all information about

16 | actual or -- or prospective customers?

17 |         MS. SKIBITSKY:  Objection to form.

18 |         THE WITNESS:  All, no.

19 | BY MS. LUI:

20 |      Q.  All right.  I'll rephrase.

21 |         What kind of information did Salesforce

22 | used at hiQ to capture information about actual or

23 | prospective cust -- customers?

24 |      A.  Let's see.  I'll -- I'll do it in list

25 | form.  Included, but not limited to, for-profit

1    prospective customers and sales opportunities, the

2    name of the company; the name of the contacts at

3    that company; their phone numbers; their email

4    addresses; the nature of the business opportunity;

5    the expected timing in which we would be able to

6    have them join us as a customer, to close that sale,

7    so-called forecast; a defined estimate of the

8    probability that they would become a customer across

9    different steps of the sales cycle from the first

10   time we encounter them or they respond to our

11   marketing materials, the entire timeline of that

12   customer's journey to buy or not to buy.

13           Should they choose not to buy and we know

14   why; should they choose not to buy typically

15   designating that as a closed, lost opportunity, that

16   is tracked.  Should they choose to buy, then they

17   become a customer, and the ongoing communications,

18   email, presentations made for them typically

19   appended to that record in Salesforce.

20           And then all the subsequent reporting that

21   takes the forecast, dollar amount, contract that

22   would govern the commercial relationship, all the

23   reporting that comes from that would be exported

24   into some form, and we would use that as our -- you

25   know, for the purpose I described previously:

CE 1142

1   forecast meetings, pipeline reviews, board meetings,

2   investor presentations, valuation discussions, and

3   the like.

4           So we also used a component of Salesforce

5   for outbound marketing through list purchase, a

6   business called Pardot, P-A-R-D-O-T, that allowed us

7   to manage outbound marketing campaigns email, events

8   registration invites and that type of thing.  And

9   that would have largely the same information,

10  company name, person name, person title, email

11  address to the extent we had any; phone number, to

12  the extent we had it.

13      Q.  Thank you.  That was very comprehensive.  I

14  want to dig in a little bit.

15          So would Salesforce capture sales call

16  recordings?

17      A.  No, we didn't do that.

18      Q.  You didn't do that at a matter of

19  practice --

20      A.  You said "would it."  I should be --

21          THE WITNESS:  Sorry, Johnna.

22          Go ahead, Counsel.

23  BY MS. LUI:

24      Q.  Okay.  Yes.  Would Salesforce capture sales

25  call recordings?

CE 1143

```
1                    CERTIFICATE OF REPORTER

2              I, JOHNNA PIPER, a Certified Shorthand

3      Reporter, hereby certify that the witness in the

4      foregoing deposition was by me duly sworn to tell

5      the truth, the whole truth, and nothing but the

6      truth in the within-entitled cause;

7              That said deposition was taken in shorthand

8      by me, a disinterested person, at the time and place

9      therein stated, and that the testimony of the said

10     witness was thereafter reduced to typewriting, by

11     computer, under my direction and supervision;

12             That before completion of the deposition,

13     review of the transcript [  ] was [ X ] was not

14     requested.  If requested, any changes made by the

15     deponent (and provided to the reporter) during the

16     period allowed are appended hereto.

17             I further certify that I am not of counsel

18     or attorney for either or any of the parties to the

19     said deposition, nor in any way interested in the

20     event of this cause, and that I am not related to

21     any of the parties thereto.

22     DATED: 03/18/2022

23

24

25                        JOHNNA PIPER, CSR NO. 11268
```

CE 1144

Compendium Exhibit 23

(Filed Under Seal)

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4
     hiQ Labs, Inc.,
 5
                 Plaintiff,
 6                                     Case No.:
                 vs.                   17-cv-03301-EMC
 7
     LinkedIn Corporation,
 8
                 Defendant.
 9   _____

10   LinkedIn Corporation,

11               Counterclaimant,

12               vs.

13   hiQ Labs, Inc.,

14               Counter-defendant.
     _____
15

16                 - CONFIDENTIAL -

17

18              VIDEO-RECORDED DEPOSITION

19      REMOTELY TAKEN VIA ZOOM CONFERENCE OF

20        MARK WEIDICK, Individually, Volume I

21           Also as 30(b)(6), Volume II

22              MONDAY, MAY 23, 2022

23   Stenographically Reported by:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No. 10101215
```

CE 1146

1           MS. HURST:  Yes, I'm Annette Hurst from

2    Orrick, Herrington & Sutcliffe on behalf of LinkedIn.

3           With me are my colleagues, Maria Sokova and

4    Alec Cronin.

5           MR. WORCESTER:  And Corey Worcester from Quinn

6    Emanuel Urquhart & Sullivan on behalf of hiQ and the

7    witness.  And I'm by myself today.

8           VIDEOGRAPHER:  Thank you, Counselors.

9           Our court reporter for today, Linda Marquette,

10   will now administer the oath.

11                   MARK WEIDICK,

12    having been first duly administered an oath remotely,

13         was examined and testified as follows:

14

15                   EXAMINATION

16   BY MS. HURST:

17      **Q.   Good morning, Mr. Weidick.  I don't think**

18   **we've met before.  My name is Annette Hurst and I**

19   **represent LinkedIn in this matter.**

20      A.   Good morning.

21      **Q.   And I understand you've previously been**

22   **deposed in this matter.  Other than that deposition,**

23   **have you ever given sworn testimony before?**

24      A.   I have not.

25      **Q.   Is there any reason, such as medication or**

CE 1147

1   electronically on your computer there with you that

2   you're using that you may intend to consult?

3       A.    There are documents on my computer.  They're

4   not presently open.  Only the Zoom window is.

5       Q.    All right.

6       A.    The documents I held up here I also have

7   electronically.

8       Q.    All right.  If you -- I'm -- when I ask my

9   questions, I will be asking for your best understanding

10  without resort to other materials.  You are, of course,

11  welcome to say, I would like to consult with some

12  materials that are available to me here, but please

13  don't do that unless I ask you to.

14            Is that clear?

15      A.    It is.

16      Q.    Are you a LinkedIn member?

17      A.    Define "member," please.

18      Q.    Have you ever created an account on LinkedIn?

19      A.    Yes.

20      Q.    And when you created that account did you

21  agree to the LinkedIn User Agreement?

22      A.    I don't recall.

23      Q.    Do you have any reason to doubt that you

24  agreed to that agreement?

25      A.    No.

CE 1148

1      Q.      When did you first open an account on

2    LinkedIn?

3      A.      I don't remember.  Many years ago, though.

4      Q.      And did you at some point place a profile

5    describing your work history on LinkedIn?

6      A.      Yes.

7      Q.      Approximately when did you first place a

8    profile on LinkedIn?

9      A.      I don't know.  A long time ago.  Many years.

10      Q.      Was it prior to the time that you began

11    working for hiQ?

12      A.      Yes.

13      Q.      And any time since you first opened an account

14    with LinkedIn and placed a profile on there has LinkedIn

15    ever done anything to depublish, restrict access to, or

16    otherwise remove your profile from LinkedIn?

17      A.      Not that I'm aware of.

18      Q.      Including when you were the CEO of hiQ Labs,

19    is it true that LinkedIn did not do anything to

20    restrict, depublish or otherwise remove your profile

21    from LinkedIn?

22      A.      Again, not that I'm aware of.

23      Q.      So that's true that they did not restrict it?

24      A.      Well, all I'm saying is they may have and I

25    never noticed.

CE 1149

1    break so that you can ask them if they can move away

2    from the door of where you're currently sitting.

3              VIDEOGRAPHER:  Mr. Worcester, do you agree

4    to go off the record?

5              THE WITNESS:  Say it again.  That was fast.

6              VIDEOGRAPHER:  I was just asking your counsel

7    if he agrees to go off the record.

8              MR. WORCESTER:  Yeah.

9              VIDEOGRAPHER:  Off the record at 9:34 a.m.

10             (Recess taken from 9:34 a.m. (PDST)

11             to 9:36 a.m. (PDST).)

12             VIDEOGRAPHER:  We're back on the record at

13   9:36 a.m.

14   BY MS. HURST:

15        Q.    Did you look at the financials of the company

16   before agreeing to become its CEO?

17        A.    Yes.

18        Q.    What was the cash position of hiQ Labs in

19   January of 2017?

20        A.    Don't remember the exact number.  Sufficient

21   for me to say that's fine, I understand we'll need to

22   raise cash.  Likely it's -- I knew that we'd need --

23   need to raise cash at some point in the next, you know,

24   less than 12 months at the current burn rate.

25        Q.    Can you tell me anything about the cash

1      Q.    All right.  As part of your due diligence as

2    taking on the role of CEO of hiQ Labs, what was its cash

3    position in January of 2017?

4      A.    I don't recall the specific number, cash

5    balance in January of 2017.

6      Q.    What was the company's burn rate on a monthly

7    basis in January of 2017?

8      A.    I don't recall the company's specific monthly

9    burn rate as of January 2017.

10     Q.    How many months of cash did you believe that

11   the company had when you agreed to join it as the CEO in

12   January or February of 2017?

13     A.    My recollection is that we estimated we would

14   be able to get through the September to October time

15   frame of 2017, depending on some variable spend that we

16   had some control over.

17     Q.    Did you do any diligence as part of your

18   interview process for the position of CEO into the

19   technology that the company had developed?

20     A.    Yes.

21     Q.    What diligence did you conduct into the

22   company's technology?

23     A.    Discussion with the leadership names

24   previously mentioned about what led to the idea, what

25   customers said about it.  And then ultimately -- I'm not

1    just "yes" or "no," whether hiQ had ever consulted a

2    lawyer with respect to the question of scraping of

3    LinkedIn data?

4         A.    No.

5                MS. HURST:  Aaron, tab 249, please.  Tab 249

6    will be Exhibit 475.

7                (Exhibit 475 marked for

8                identification by the Certified

9                Shorthand Reporter.)

10   BY MS. HURST:

11        Q.    And this is hiQ_00442222.

12               And, Mr. Weidick, you should be able to click

13   on a link in the chat to see Exhibit 475.

14        A.    Do I click on it?

15        Q.    Sure.

16        A.    It's open.

17        Q.    Great.  I'll -- Mr. Weidick, I'll explain that

18   this is what a Slack Chat looks like when it gets

19   produced in litigation.  You can see there at the top

20   it's identified as a -- a chat transcript.

21               Do you see that?

22        A.    I do.

23        Q.    All right.  And -- and you can see here that

24   there's a -- it's got a little place where it says

25   "Participants."  Do you see that?

1        A.    Yes.

2        Q.    And it's got "DanX0R" and "mark_w."

3              Do you see that?

4        A.    I do.

5        Q.    And mark_w, was that your Slack username at

6   hiQ Labs?

7        A.    I suspect it is.  I would not have remembered

8   that, but it looks like it is, yes.

9        Q.    All right.  And DanX0R, that was Mr. Miller --

10  Dan Miller's username; is that correct?

11       A.    That's my understanding as well.

12       Q.    Okay.  So in Exhibit 475, Mr. Miller Slack

13  Chats you saying that:

14              "I am shutting down scraping for

15              the time being.  We're only getting

16              a trickle of data and we could be in

17              danger of hitting our proxies too

18              hard and creating a situation."

19              Do you see that?

20       A.    I do.

21       Q.    And the chat continues.  You discuss the

22  possibility of having a phone conversation with

23  Mr. Miller.  You also indicate at the end of the -- the

24  chat that we have:

25              "Tried it myself this evening and

1              got one public view and then the

2              mandatory 'sign in' or 'join'

3              screen."

4              Do you see that?

5         A.    I do.

6         Q.    And what was it that you tried yourself as --

7    as reflected here in this Slack Chat?

8         A.    To view a LinkedIn public profile through a

9    browser.

10        Q.    And do you recall the circumstances

11   surrounding Mr. Miller informing you that he was

12   shutting down scraping at the end of March 2017?

13        A.    Yes.

14        Q.    And -- and what were the circumstances?

15        A.    We were contending with a -- a -- a volatile

16   success rate as we tried to collect member public

17   profile.  That would be evidenced in the "We're only

18   getting a trickle of data."

19        Q.    And how long was scraping shut down when

20   Mr. Miller shut it down at the end of March?

21        A.    I don't recall.

22        Q.    And you recall that shortly after this period

23   of time one of your proxy providers, Luminati, stopped

24   offering its services for scraping LinkedIn?

25        A.    I do recall that, yes.

```
 1              help everyone figure out how they

 2              should feel."

 3              Do you see that?

 4      A.      I do.

 5      Q.      And did you modify your draft as a result of

 6  that feedback from Mr. DeSantis?

 7      A.      I don't recall that I modified the e-mail.

 8      Q.      Did you have any communication with him about

 9  the fact that this document could be interpreted to

10  reflect fear, anxiety and concern?

11      A.      I don't recall if I spoke to him live about

12  it.

13              THE WITNESS:  I can't stop that one.  I hear

14  it too.  I'm sorry.  That's my Slack.

15              MS. HURST:  I am fortunate for never having

16  adopted Slack.

17              Let me just see what my next document is here.

18  All right.  Exhibit 480 is -- it's tab 433, Aaron,

19  hiQ_00641062.

20              (Exhibit 480 marked for

21              identification by the Certified
```

CE 1155

1        A.    I do.

2        Q.    And you'll see that this is an e-mail that you

3    sent on April 5th, 2017, to Neil Lustig, Jesse Levin,

4    Chris Gagnon, Gary Vaynerchuk, Rob DeSantis and Ben

5    Patch.  Is that correct?

6        A.    Yes.

7        Q.    And this is similar to the one that we just

8    looked at in Exhibit 479.  It's your draft of the things

9    that you want the board to be apprised of in advance of

10   the upcoming May board meeting, correct?

11       A.    I would characterize it as the modified draft.

12   I took -- I clearly took Rob's advice.

13       Q.    Okay.  And what part of the e-mail are you

14   looking at in Exhibit 480 that you interpret as taking

15   Rob's advice?

16       A.    "I'm amped every day by the magnitude of the

17   opportunity.  All investors should" -- it's the things

18   that are different from the prior version.  All

19   investors should feel the same optimism.  They knew me

20   to be a guy who focused on what needs to be done and

21   celebrate later.  I highlight that to them and then

22   reinforce my optimism about our future as an insider

23   now, an employee.

24       Q.    So the change after Mr. DeSantis's suggestion

25   was that you included information about your optimism so

1    Exhibit 480.  You -- you have this section of your

2    e-mail called "Path Forward."  In general -- let's just

3    take a step back.

4              Is this a rubric, this -- this particular --

5    these particular headings or this particular

6    organization, does that reflect any kind of a rubric

7    that you had previously adopted for conveying

8    information in a -- in a situation like this?

9       A.    No, not in this case.  This is more just

10   spoke.

11      Q.    Okay.  Looking at "Path Forward," so the

12   very -- the very first item that you identify is "Data

13   collection."  Do you see that?

14      A.    Yes.

15      Q.    And then do each of these four subsets, "Data

16   Collection, Customers, Product, Resources," under the

17   "Path Forward," do that -- does that reflect the

18   organization of the -- the subsequent portions of the

19   e-mail?  In other words, each one of these maps to them

20   a subsequent discussion in the e-mail; is that right?

21      A.    Yes.

22      Q.    Okay.  So you reported to the board in

23   April -- on April 5th, 2017, that you were engaged in a

24   focused effort to find a modified data collection

25   approach due to aggressive LinkedIn blocking efforts.

1          Do you see that?

2      A.    I do.

3      Q.    Now was that something that was already

4   underway or were you saying this is what I recommend to

5   the board we do?  How -- what was -- what was the

6   context there?

7      A.    We were already in the midst of focusing on

8   this.  I characterized it, as you saw a moment ago, as

9   possibly the most important thing in the business from a

10  software development point of view.  So we were in the

11  middle of this already.  This was not a permission.

12  This was a I'm telling you what's going on.  There is a

13  focused effort to do this right now.

14      Q.    All right.  Second bullet point you wrote:

15          "Longer term effort to diversify

16          our data sources and collection

17          process."

18          What did you mean by that?

19      A.    At this point I'm in the job for however long

20  those days are, so outside of that, longer term, what

21  can we do to change the way we collect public profiles?

22  What can we do to supplement our data sources?  It's

23  pretty straightforward in that case -- in that bullet.

24      Q.    The goal behind diversifying data sources

25  would be to come up with other data sources other than

CE 1158

1   what the thing is at the time.  How could it be

2   interesting to LinkedIn.

3        Q.    While you were the CEO of hiQ Labs and before

4   you received a cease and desist letter from LinkedIn,

5   did you personally ever have any discussion with anyone

6   from LinkedIn?

7        A.    Recall being introduced to Lorenzo at Elevate

8   in that April Elevate time frame.

9        Q.    Did you have a discussion with him?

10       A.    It would have been a cursory interaction.

11       Q.    Can you tell me anything at all about what you

12   discussed with him?

13       A.    Glad that he was there.

14       Q.    Anything else?  I'm asking for your actual

15   recollection now, not what would have happened.  Just --

16       A.    Yeah, I -- no, I don't, I -- in fact, I want

17   to back away from that.  I don't know that I did meet

18   Lorenzo at Elevate in April of 2017.

19       Q.    So can you identify any communication that you

20   had with anyone from LinkedIn while you were the CEO of

21   hiQ Labs prior to receiving a cease and desist letter?

22       A.    Not prior to cease and desist letter, no, not

23   in that first window of time.

24       Q.    All right.  Continuing to look at Exhibit 480,

25   if you would look now at the section of the e-mail that

CE 1159



```
 1    you drafted, not just the header, "Data Collection"

 2    under "Path Forward" but the section entitled "Data

 3    Collection"?

 4        A.    Yep.

 5        Q.    You wrote:

 6              "A hundred percent dependent on

 7              LinkedIn for our data."

 8              Do you see that?

 9        A.    I do.

10        Q.    "LI actively blocking scraping of

11              public data, which is all hiQ uses

12              today."

13        A.    That's right.

14        Q.    Second bullet point is:

15              "60 percent coverage; need better

16              coverage over time via internal HRIS

17              and EU data."

18              Do you see that?

19        A.    I do.
```

CE 1160

1 did I think was going to happen.  They were restless to

2 know.  They wanted information.

3   Q.    Going back to the fundraising strategy, in

4 writing this e-mail that you wanted the fundraising

5 strategy set by the end of April, who did you understand

6 was responsible for that strategy?

7   A.    Ultimately I would be, the CEO.

8   Q.    And you identified a number of, I think what

9 you called, "moving parts" a couple of answers ago as to

10 what needed to be put into that strategy.  Did you

11 crystallize a -- a strategy made up of, you know,

12 elements that addressed each of those moving parts by

13 the end of April?

14   A.    Maybe not all of them but -- but the -- the

15 most important ones certainly in collaboration with the

16 board and board observers, as well as other key

17 significant investors.  Would have been an active

18 discussion with them as we highlighted or picked --

19 picked among the choices, which would be included in the

20 path.  Such as, let's do an Elevate conference before or

21 not.  Sorry.

22   Q.    Did you write down a fundraising strategy by

23 the end of April 2017?

24   A.    I did not put it in writing, no.

25   Q.    Did you ever put a fundraising strategy in

1  thought that we could resolve this so, no, not in that

2  immediate time frame of, say, days or even weeks, I

3  cannot.

4      Q.    Okay.  And can you tell me anything at all, as

5  you sit here today, about any discussion that anyone

6  other than you had with a customer about Exhibit 485,

7  LinkedIn's cease and desist letter?

8      A.    Well, certainly after the circumstance became

9  public I talked with our customer facing personnel as

10  they had to contend with it should their customers bring

11  it up.  So I talked to Amelia Barker, now Amelia

12  Jones -- she got married.  I can't remember the order of

13  her married name and premarried name, but Amelia Jones

14  Barker.  Darin Medeiros, of course.

15      Q.    And what did Ms. Barker or Ms. -- Mrs. Jones,

16  what did she tell you about any specific conversations

17  that she had had with any customers?

18      A.    That the customers were concerned about the

19  implications to their business, whether or not at the

20  most rudimentary level we'd be able to provide the work

21  that we were doing for them and whether or not there

22  would be some subsequent ramifications on their business

23  as being in business with us.

24      Q.    Okay.  And I want to really get to specific

25  conversations that she had with particular customers.

1  Which -- can you recount for me anything she told you

2  about a specific conversation she had with a particular

3  customer?

4      A.    I cannot.

5      Q.    At any point in time can you tell me -- can

6  you recount for me anything Ms. Barker told you about a

7  specific conversation she had with a particular

8  customer?

9      A.    Not at that level of specificity.  It's the

10  word "particular" and "specific" that lead me to I

11  cannot.

12     Q.    You said after it became public.  What did you

13  mean by that?

14     A.    We quickly ended up in a public courtroom

15  situation seeking a temporary restraining order so at

16  that point the media covered the situation.

17     Q.    In fact, you had a PR campaign related to the

18  lawsuit where you reached out to the media; isn't that

19  right?

20     A.    We retained a crisis management public

21  relations firm to help us contend with the inevitability

22  that we would be deemed guilty of the things levied in

23  this letter knowing full well that our reputation was a

24  tremendously valuable part of the business and it was

25  about to be sullied inappropriately.  So we planned

1    ahead for that, yes.

2              MS. HURST:  Move to strike as nonresponsive.

3              Would the court reporter read that back,

4    please, read back the question.

5              (Last question read.)

6              MR. WORCESTER:  Mark, I'm going to caution you

7    because I don't know the answer to this question.  I

8    don't know whether or not Deepak retained the PR firm or

9    whether or not you did.  So answer the question "yes" or

10   "no" and let Annette ask follow-ups.

11             THE WITNESS:  I'm not sure what's going to

12   happen next here.

13   BY MS. HURST:

14        Q.   **You're supposed to answer "yes" or "no."**

15             MR. WORCESTER:  You can answer the question

16   "yes" or "no."

17        A.   Are you going to ask it again or do I just --

18   I thought the court reporter was going to read my

19   response back.  I thought that was what --

20             MS. HURST:  No.

21             MR. WORCESTER:  No, no.  She read the question

22   back.  Now you can answer it "yes" or "no."  And then

23   Annette can ask follow-ups and give me a chance to

24   object.

25        A.   I retained a public relations firm, yes.

1   of any ideas that you discussed or heard about at the

2   Data Scraping Summit?

3       A.    I don't remember the linkage between the two,

4   that explicitly but HAILS would have been the -- you

5   know, perhaps more thoughtful analysis by me of the idea

6   of a crowd-sourced approach that I mentioned earlier in

7   this deposition for collecting public profiles.  And I

8   don't know which begat the other, if it was HAILS that

9   preceded the idea or it was the idea that begat the

10  acronym HAILS.

11      Q.    Prior to receiving Exhibit 485, the cease and

12  desist letter, you were aware that LinkedIn had an API

13  program whereby third parties could, under certain terms

14  and conditions, gain access -- authorize access to

15  member profile data, correct?

16      A.    I was aware that an API program along the

17  lines you described existed at some point, but at this

18  point in the story I don't recall if it -- I think it

19  had ceased to exist.  It had been stopped.  But I know

20  that it -- that it -- that at some point, historically

21  speaking, such an API program existed.

22      Q.    And, in fact, after discussions about LinkedIn

23  APIs, Mr. Dev, Boris Dev actually reached out to

24  LinkedIn and applied for API access to LinkedIn data,

25  correct?

CE 1165

1       A.      Yes, he did.

2       Q.      And what was your discussion with Mr. Dev

3   prior to that application?

4       A.      Give it a shot.  Worth trying.  I -- I had no

5   expectations.  I didn't know, as I said, whether the API

6   program even really existed beyond what we had been led

7   to believe on the website, but I encouraged him to give

8   it a try.

9       Q.      And he -- did you also encourage him to -- to

10  either conceal his true identity or otherwise obfuscate

11  the fact that he was making the application on behalf of

12  hiQ Labs?

13      A.      I wanted him to make the application as just a

14  pure off-the-street human looking to gaining API access

15  with our use case.

16      Q.      And you -- he did that and then reported to

17  you that the application had been rejected because of

18  the use case, correct?

19      A.      That's my recollection, yes.  Despite the fact

20  that it was public profile information, the request for

21  API access was oddly without explanation denied, while

22  others had plenty of access to the public profiles.  We

23  were denied.

24      Q.      After receiving Exhibit 485, the cease and

25  desist letter, did you internally at hiQ Labs embark on

1    retain the data and you would have acted to do so,

2    correct?

3        A.    Yes.

4              MS. HURST:  Aaron, tab 182 is hiQ_00319805.

5              (Exhibit 486 marked for

6              identification by the Certified

7              Shorthand Reporter.)

8    BY MS. HURST:

9        Q.    This is Exhibit 486.  Do you have Exhibit 486

10   in front of you, Mr. Weidick?

11       A.    I do.

12       Q.    And do you see there's an e-mail from

13   Salesforce?

14       A.    I do.

15       Q.    And it's addressed to you?

16       A.    I see that.

17       Q.    And it's addressed also to Cindy McNutt?

18       A.    I see that, yes.

19       Q.    And the subject is "Urgent:  Suspension

20   Warning," correct?

21       A.    It is.

22       Q.    And in the e-mail Salesforce advises you that

23   they've been -- there's an open balance.  They've made

24   attempts to collect and the service is scheduled for

25   suspension.  Correct?

CE 1167

1       A.    I see that, yes.

2       Q.    Now, this e-mail was sent to you after the

3    date of filing of the lawsuit, correct?

4       A.    Yes.

5            MS. HURST:  Just a moment.  I need to find my

6    next document.

7            Maria, would you help me identify that

8    document?

9            Aaron, Exhibit 487 is tab 785.

10           (Exhibit 487 marked for

11           identification by the Certified

12           Shorthand Reporter.)

13           MS. HURST:  Maria, which folder of ours is

14   that in?  I'm not seeing it in the main folder.

15           MS. SOKOVA:  Customer.

16           MS. HURST:  Okay.  Thank you.

17           MR. WORCESTER:  Annette, I don't want to run

18   your clock while you're looking at the document.  If you

19   wanted a break, we could take a short break and you

20   could find the document.

21           MS. HURST:  Nope, I got it.  We've got it.

22           Do you have it, Aaron?  Yeah.  Aaron's got it,

23   too.  It looks like it's been marked.

24           But thank you, Corey.  I've been trying to

25   abide by your request for an hour and a half.

Volume I                          Confidential                     hiQ Labs, Inc. vs.
Mark Weidick                                                        LinkedIn Corp.



18        Q.      At some point in time did the board direct

19    that the company go into hibernation?

20        A.      Hibernation, yes.  The idea of the -- the

21    board directing, not exactly.  It was a conscious

22    decision after discussion of available resources that we

23    would -- hibernation, by the way, is not a term of art.

24    It's something that -- I don't even remember who coined

25    it across the board.  But that we would put the business

**www.aptusCR.com**

CE 1169

1   in a state where it could be potentially reawakened.

2   That's where the hibernation came from.

3       Q.      When did the board direct that the company be

4   placed into a state of hibernation?

5       A.      Again, the board didn't direct that we do

6   that.

7       Q.      Whether -- putting aside your -- well, strike

8   that.

9               Are you denying that the board directed that

10  the company be put into hibernation?

11      A.      It wasn't -- I'm -- I'm denying the -- the

12  idea of a directive.  It was a -- a -- a topic of

13  conversation around what we could do to best preserve

14  the asset and -- and keep it viable for the purposes of

15  ongoing business in a outrageously capital-constrained

16  situation with the overhang of all litigation.  And the

17  move we made was to batten down the hatches, get rid of

18  the real estate, taking the expenses to zero, stop

19  payroll, and maintain an ability at the lowest cost

20  possible with the bare minimum number of resources to

21  fulfill our obligations and stay viable.

22              I know "hibernation" is one word, but there's

23  a lot underneath it.  As a board we concurred that that

24  was a -- a -- a -- the -- we -- as a board we agreed

25  that that's what we would do.

CE 1170

1      **Q.     So did you or didn't you put the company into**

2   **hibernation?**

3      **A.     I did each of the things I just delineated**

4   **under the broad heading of hibernation.  As I said,**

5   **hibernation is not a technical term.  We reduced**

6   **payroll.  We took it to zero.  I -- I did all those**

7   **things.**

8      **Q.     I mean, hibernation is the term that you used**

9   **internally at the time to describe what you were doing,**

10  **isn't it?**

11     A.     The literal definite -- yes, it is.  I used

12  that word.  I did not put the company to sleep in an

13  extended sleep during the winter with accumulated fat

14  stores, though.

15         MS. HURST:  This is a convenient breaking

16  point for me, Corey.  I know you wanted to go late.  But

17  I -- in light of the witness's voice and everything

18  else, I think now would be a good time to -- to break.

19         THE WITNESS:  Don't do this on account of me.

20  My voice is fine.

21         MR. WORCESTER:  No.  I -- it would be hard to,

22  Mark, to -- as a practical matter it's hard to change

23  topics for the questioner.

24         And you said you didn't think you were going

25  to go all day tomorrow anyway.

CE 1171

1   State of California     )
                            )SS:

2   County of San Diego    )

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken

6   (X) remotely ( )live before me at the time and place

7   herein set forth; that any witnesses in the foregoing

8   proceedings, prior to testifying, were placed under

9   oath; that a verbatim record of the proceedings was made

10   by me using machine shorthand which was thereafter

11   transcribed under my direction; further, that the

12   foregoing is an accurate transcription thereof.

13        Further, that if the case is pending in the

14   Federal Court, before the proceedings were transcribed

15   by me, review [  ] was [ X ] was not requested.

16        I further testify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19        IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21   DATED:  May 24, 2022

22

23   _____

24   LINDA E. MARQUETTE, CSR

25   Certificate No. 11874

CE 1172

# Compendium Exhibit 24

# (Filed Under Seal)

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4      hiQ Labs, Inc.,

5                  Plaintiff,
                                       Case No.:
6                  vs.
                                    17-cv-03301-EMC

7      LinkedIn Corporation,

8                  Defendant.

9      _____

10     LinkedIn Corporation,

11                 Counterclaimant,

12                 vs.

13     hiQ Labs, Inc.,

14                 Counter-defendant.
       _____

15

16

17                      - CONFIDENTIAL -

18              VIDEO-RECORDED DEPOSITION

19        REMOTELY TAKEN VIA ZOOM CONFERENCE OF

20        MARK WEIDICK, Individually, Volume III

21              Also as 30(b)(6), Volume IV

22              WEDNESDAY, JUNE 1, 2022

23     Stenographically Reported by:
       Linda E. Marquette
24     RPR, CLR, CSR No. 11874

25     Job No. 10101626

CE 1180

```
 1   anyone with you and state the parties that you

 2   represent.

 3            MS. HURST:  Yes, Annette Hurst from Orrick for

 4   LinkedIn.

 5            Also present for LinkedIn are Maria Sokova and

 6   Alec Cronin.

 7            MR. WORCESTER:  And Corey Worcester from Quinn

 8   Emanuel Urquhart & Sullivan on behalf of hiQ and the

 9   witness.

10            VIDEOGRAPHER:  Thank you.

11            Our court reporter for today, Linda Marquette,

12   will now administer the oath.

13                      MARK WEIDICK,

14   having been first duly re-administered an oath remotely,

15            was examined and testified as follows:

16

17            MS. HURST:  Aaron and Linda, if you're -- I'm

18   not sure what volumes we counted but May 23rd there was

19   some testimony, so if that was Volume III we do need a

20   transcript of it and this would be Volume IV.

21            VIDEOGRAPHER:  I believe that was Volume II

22   [sic] and this will be Volume III [sic].

23            MS. HURST:  Okay.

24            COURT REPORTER:  I agree.

25   ///
```

CE 1181

1    time with colloquy.  We can go off the record and do

2    that if you want.  I'm not going to keep --

3              (Simultaneous cross-talk.)

4              MR. WORCESTER:  (Inaudible) -- might as well,

5    Annette.  I --

6              MS. HURST:  I'm not going to keep doing that

7    on the record, Corey.  You want to go off the record and

8    have a big conversation about this, fine.  Otherwise,

9    we're going to keep going.

10             MR. WORCESTER:  You can do whatever you want.

11   You're the one asking the questions.

12   BY MS. HURST:

13        Q.    What term sheet did you negotiate with Vannin

14   Capital?

15        A.    Negotiated a term sheet with Vannin Capital

16   that they characterize as litigation funding.

17        Q.    And what was the structure of that term sheet?

18        A.    What was the structure of that term sheet?

19   Delineated the terms and conditions associated with

20   funding that Vannin would eventually put in place for

21   the purpose of pursuing this litigation.

22        Q.    And what was the structure of the deal

23   contemplated by that term sheet?

24             MR. WORCESTER:  Objection.  Beyond the scope.

25        A.    Vannin makes capital available for the pursuit

1   of this litigation.  HiQ had no money.  They were our

2   source of the funding to pursue the litigation.

3          They get paid back upon the success or not at

4   all.

5   BY MS. HURST:

6      Q.    And what was the form in which that capital

7   was provided?  Was it debt?  Was it equity?  Something

8   else?  How -- how was it --

9      A.    It's a -- it's a -- it's a technical area I

10  don't know that I can give you an adequate answer on.  I

11  would characterize it as a layman as nonrecourse debt

12  and that the company never owes the money back.  But I

13  don't know on a technical level if nonrecourse debt is

14  the right characterization.

15     Q.    Did the term sheet contemplate any ownership

16  in exchange -- of hiQ Labs -- any ownership interest in

17  hiQ Labs in exchange for the litigation funding capital?

18     A.    No.

19     Q.    You said that the term sheet you negotiated

20  was ultimately realized.  By whom?

21     A.    Fortress -- maybe Fortress Capital but

22  Fortress is what I refer to them as -- acquired Vannin

23  mid transaction.  Hence, the confusion around your

24  question about did Vannin provide capital to hiQ Labs.

25     Q.    All the time you had my question about that

CE 1183

1    a further equity investment in the company?  Was it

2    debt?  What was it?

3         A.     From memory, we -- we structured that as debt

4    with a small premium upon ability to repay.  So a small

5    percentage or integer multiple upon ability to repay and

6    it was outreached to all existing investors.  As I said

7    earlier, not everybody participated.

8              I did cull out that the money was to

9    specifically be used for a payable situation that the

10   company had that was well beyond any kind of standstill

11   agreement.

12        Q.     And that was because Import.io was threatening

13   litigation against hiQ Labs?

14        A.     Yes.

15        Q.     And -- and Import.io threatened you personally

16   with such litigation as well; isn't that correct?

17        A.     That's correct.

18             MS. HURST:  Exhibit 556, Aaron, is tab 838,

19   hiQ_000705751 through 54.

20             (Exhibit 556 marked for

21             identification by the Certified

22             Shorthand Reporter.)

23   BY MS. HURST:

24        Q.     Mr. Weidick, I'm going to ask you a number of

25   questions about this document, so I would like you to

CE 1184

1    just go ahead and read it in its entirety, please.

2         A.    Bottom's up the best way?

3         Q.    I think so.  It's an e-mail thread.  Let me

4    know when you --

5         A.    All right.

6         Q.    Let me know when you've finished.

7         A.    Oh, boy, that's tiny.

8         Q.    Yeah.  You should be able to zoom in on it.

9         A.    I am.  Let's see here.  But it gets grainy

10   when I do that.  Hold on here.  I -- I can -- oh, it's

11   not an e-mail, I'm sorry, it's -- it's the footer that I

12   was trying to zoom in on.

13              All right.  There we go.  I've read the full

14   set of e-mails.

15        Q.    Okay.  So the first e-mail on February 27,

16   2020, is from Adam Blake at Vannin.  Do you see that?

17        A.    I do.

18        Q.    And he's asking you about funding that would

19   be provided to pay off creditors; is that correct?

20        A.    He is.

21        Q.    Okay.  And then the next section of the e-mail

22   is you responding to him on March 2nd and providing a

23   summary -- excuse me -- a summary with respect to each

24   of the -- the payables that was -- that you were seeking

25   money for; is that right?

CE 1185

Volume III                          Confidential                    hiQ Labs, Inc. vs.
Mark Weidick                                                        LinkedIn Corp.

1          A.    Yes.

2          Q.    And do you see there in the next e-mail on

3     that same day, March 2nd, he says:

4                "I have reviewed and have some

5                follow-up queries in red below"?

6          A.    I do.

7          Q.    And -- and if you look at the -- the

8     paragraphs under your March 2nd e-mail on the page

9     ending 752, you'll see that there's -- there's a

10    different -- it's -- unfortunately, it's been produced

11    in black and white so we can't see the red.  But can you

12    tell that there's a different coloration between some of

13    the text there such that it looks like some of it is

14    yours and some of it is a response from Mr. Blake that's

15    been interlineated?

16         A.    Yeah, I think so.

17         Q.    All right.

18         A.    I think it's gray black enough to do that.

19         Q.    All right.  So your first receivable -- pardon

20    me -- payable that you identify is Amazon Web Services.

21               Do you see that?

22         A.    I do.

23         Q.    And -- excuse me.

24               You wrote:

25               "HiQ runs it's service via

1              computing resources in AWS.

2                  "We've pared down the footprint

3              but not turned off to preserve the

4              possibility that we can pursue paid

5              project work that relies upon the

6              software we run in AWS."

7              You -- you continue here for several more

8      sentences.

9              He asks:

10                 "Can the data be put into some

11             form of cold storage?"

12             And then is this you saying:

13                 "I'd need to hire contract

14             ex-hiQ resources to take on any

15             effort to put the code into cold

16             storage"?

17             Is that -- is that how you read this, that

18     your original e-mail ends with the word "available."

19     His questions end at the word "estimate."  And then your

20     response is the last sentence?

21        A.    I see it that way as well, yes.

22        Q.    All right.  Now, at the point of this -- of

23     this back and forth in e-mail with Mr. Blake on

24     March 2nd, 2020, you had already received notices from

25     AWS of pending suspension for nonpayment; is that

CE 1187

1    correct?

2         A.    I clearly called that off, yes.

3         Q.    And if you continue up to the -- the thread

4    through March 16, Mr. Blake suggests a call and then

5    seems to follow up with a further e-mail referencing the

6    fact that you didn't speak.

7              Did you ever have a conversation with

8    Mr. Blake about the funds requested in connection with

9    this e-mail to pay off creditors?

10        A.    Yes.

11        Q.    And what was your conversation with Mr. Blake?

12        A.    Litigation funding generally and then

13   specifically, not available for this type of

14   circumstance, was his final answer.

15        Q.    So Vannin declined -- or was it Fortress at

16   this point or was it still Vannin?

17        A.    My recollection is it was Fortress at this

18   point despite the fact that Mr. Blake had a Vannin

19   e-mail address.

20        Q.    So Mr. Blake on behalf of Vannin or Fortress,

21   whichever entity it was at the time, declined to provide

22   the funds; is that correct?

23        A.    I never viewed it as definitive and final as

24   that.  So the use of the word "declined," I would say he

25   declined at the time but I'm willing to go back and try

CE 1188

1   time and time again.  I'm resilient.  We didn't have

2   money.  He's a source of money so I'll keep knocking on

3   his door.  But at the time he declined.

4        Q.     And did you go back again and ask him again

5   for funds to pay off AWS and these other creditors?

6        A.     Yes, I -- I continued to talk about our

7   creditors with Adam every -- almost every time I talked

8   to him.

9        Q.     All right.  Has he or Fortress ever agreed to

10  provide you with funding in connection with your

11  creditors?

12       A.     They have not.

13       Q.     At the time that you were pursuing this

14  conversation with Mr. Blake in March of 2020, were you

15  then also pursuing funds from the other investors that

16  you've previously mentioned or did that come after this?

17       A.     I don't remember the sequence of events with

18  that level of specificity.  I knew I needed to get money

19  for something, but I don't remember if it was serial or

20  parallel.

21       Q.     Did anyone ever agree to provide you with

22  funds to pay Amazon Web Services?

23       A.     No.

24       Q.     So when the other investors agreed to provide

25  funds and provided you with funds, for what creditors

1          A.    That sounds -- that sounds correct.

2          Q.    Did you ever receive any instruction at any

3    time that hiQ had an obligation to preserve information

4    that might be relevant to this litigation?

5          A.    Yes, I did.

6          Q.    And did you, in fact, delete material from

7    AWS?

8          A.    Not material that we were asked to retain, as

9    I recall.

10         Q.    Did you delete the Mongo database?

11         A.    We backed it up, so we archived everything we

12   were instructed to keep.  And then we did delete some

13   services because the business was basically in the

14   process of shutting down at a certain point.  We

15   couldn't be liable for all those services, so we backed

16   them up before we shut them down.

17         Q.    When you say "services," what are you

18   referring to?

19         A.    Mostly AWS.  But there was some others like --

20   AWS is the main one.

21         Q.    When you archived the MongoDB, did you archive

22   it to AWS?

23         A.    No.  We archived it to local storage.

24         Q.    In what form?

25         A.    We may have also archived it to -- some of it

1   were those used?

2        A.    I designated that as funds to address the

3   creditor who we had not been able to reach.  And again,

4   I'm using the word "probably" that's -- as a technical

5   meaning.  I'm not an expert in this.  But where we

6   couldn't reach a standstill with.  And that was

7   Import.io very specifically.

8        Q.    And did the funds that those other -- that

9   those investors supplied you to pay off creditors, did

10   they go to anyone other than Import.io?

11        A.    Perhaps on the periphery in that we do a

12   drawdown from our Silicon Valley Bank account with some

13   of the subscription services we maintain, like the

14   Google applications for a few hundred dollars a month.

15   So he characterized the -- the money that they

16   contributed as being exclusively and only for Import.io

17   but largely to address the Import.io payables situation.

18        Q.    And how much -- how much of those funds were

19   provided to Import.io?

20        A.    I can't calculate that number right now.  It's

21   not -- it's not a complete process.  So I don't know if

22   you want --

23        Q.    Well, how much --

24        A.    I honestly don't know how to answer your

25   question.

CE 1190

1      Q.      How much -- how much total was owed to

2   Import.io and how much has been paid to date?

3      A.      Right there.  90K plus legal fees plus some

4   interest so it's on the order of 135K in Import.io's

5   view.  And to date we've paid somewhere in the order of

6   70,000ish.

7      Q.      And did they -- did they file a lawsuit?  This

8   indicates that they filed a lawsuit.  Was that -- is

9   that what happened?

10     A.      I don't know if it's technically a lawsuit.

11  Again, my language as a layman, but there were

12  complaints filed against the business, against me

13  personally as well.  So I -- I call that a lawsuit when

14  I talk about it.  As well as Darren Kaplan, as I

15  identify there in that paragraph.

16     Q.      Is it true that you were aware at the time

17  that AWS was sending to hiQ Labs notices of impending

18  suspension for nonpayment?

19     A.      Yes.

20     Q.      Was Citadel a customer of hiQ Labs'?

21     A.      My recollection is they were, though I tend to

22  conflate them with one -- one other entity.

23          But, yeah, my recollection is Citadel was a

24  customer.

25     Q.      And --

CE 1191

1    the last session.

2    BY MS. HURST:

3         Q.     Mr. Weidick, you should see there Exhibit 489

4    is the board deck, Monday, May 15, 2017.

5         A.     I've opened it.

6         Q.     All right.  I think where we left off, I don't

7    want to mischaracterize anything, is that you recognized

8    this document because you had -- had drafted it or

9    substantially drafted it in connection with the -- the

10   board meeting of hiQ Labs as indicated on May 15, 2017;

11   is that correct?

12        A.     That's correct.  And some of my team would

13   have contributed content that I ultimately organized for

14   this deck.

15        Q.     All right.

16             MR. WORCESTER:  We went about three minutes

17   last time, so I wasn't planning to hold that three

18   minutes against you.  If you just want to reask any

19   questions, it's fine, I won't object asked and answered.

20             MS. HURST:  All right.

21   BY MS. HURST:

22        Q.     So page 2 of Exhibit 489 has an agenda.  See

23   that?

24        A.     I do.

25        Q.     And did this meeting on May 15, 2017, occur?

1  A.   We had a board meeting on 27 -- May -- May,

2  whatever, now I forgot the date already, May 15, 2017,

3  we did have a board meeting, yes.

4  Q.   And was that in person?  Was it over the

5  phone?  How -- how was the board meeting conducted?

6  Maybe both?

7  (Simultaneous cross-talk.)

8  A.   Both in person and over --

9  BY MS. HURST:

10  Q.   And who was present for the board meeting?

11  A.   I don't recall who was physically in the room

12  with me.

13  Q.   Whether physically present or not, can you

14  identify who attended the board meeting?

15  A.   Oh, oh, I -- I'm sorry.  Again, from memory,

16  Darren Kaplan, Rob DeSantis, Chris Gagnon as board

17  observers.  Neil Lustig was still on the board at the

18  time I recall.  Gary Vaynerchuk.  I can't remember if

19  Gary made the first meeting.  And I don't remember the

20  timing of Christian Keane or Jesse Levin but one of

21  those two.  I'm fairly certain it was Christian Keane,

22  that the transition to Gartner had already taken place.

23  Q.   Okay.  And how long did the meeting last?

24  A.   I don't recall.

25  Q.   Can you approximate?

1      A.    Hour, hour and a half.

2      Q.    Did you provide the -- the deck -- the board

3  deck for the meeting in advance to the board members?

4      A.    I don't think I provided the actual deck, but

5  I provided the -- the synopsis that we've reviewed

6  previously in advance for their consideration.  So I

7  don't think in this final form until the meeting

8  actually happened.

9      Q.    All right.  Were there any other insiders from

10  the company, and by that I mean officers and employees

11  from the company, other than you who attended this board

12  meeting?

13      A.    I remember I think it was only me and Darren

14  as employees.

15      Q.    Excuse me.  Your agenda is organized into the

16  left-hand column "Must dos" and a right-hand side column

17  "As they come up."  Do you see that?

18      A.    I do.

19      Q.    And was that intended to indicate that the

20  matters on the left-hand columns were things that had to

21  be discussed and that things on the right-hand column

22  would be discussed as they came up with respect to the

23  topics in -- in the left-hand column?

24      A.    Yes.

25      Q.    Okay.  And under the "Discuss" heading there

1   Darin owned the sales organization in terms of direct

2   reporting responsibilities and had a certain degree of

3   latitude with respect to pricing that he would work with

4   his people directly, more than me being involved with

5   him.

6       Q.    Was the directive given to salespeople to

7   stick near this average number or did they have more

8   freedom to provide discounts or pick a price for selling

9   Keeper or Skill Mapper to a customer?

10      A.    Yeah, every selling price is a calculation.

11  It was a point of reference, a touchstone I believe is

12  the word I used earlier.  And that's how we employed it

13  in the process of coming up with a bespoke price for any

14  prospective opportunity.  We were aware of it.

15          The range of populations that we were

16  analyzing and performing our data science for our

17  customers was fairly wide.  Their price points were all

18  attractive, many of them in the six figures for -- for a

19  company at our stage of maturity.

20          So that average contract value would be, say,

21  in the back of our mind where we -- aware of it but

22  there was no adherence to landing at the average

23  contract value or even really in close proximity to it

24  for any given deal.

25      Q.    There was no kind of -- well, was there a full

CE 1195

1    price amount for Keeper or Skill Mapper?

2         A.    The price that we put in front of the customer

3    would be presented as the full price amount for -- for

4    Keeper.  Skill Mapper was a more nascent product.  It

5    was a -- and -- and paid proof of concept in beta at the

6    time LinkedIn brought its accusations and threats

7    against us on May 23rd.  So not as much of a history

8    around the pricing dynamic for Skill Mapper as there was

9    for Keeper.

10        Q.    Was there a standard full price amount that

11   hiQ would use to tell a customer what Keeper would

12   cost?

13        A.    A standard?  You said -- you said standard

14   full price amount?

15        Q.    That's correct.  Standard.

16        A.    No.

17        Q.    If a customer asked hiQ:  How much does

18   Keeper cost, what would hiQ tell that customer?

19        A.    We typically tell them a question or three to

20   qualify the circumstance, what they wanted to do before

21   we gave them a number.

22        Q.    What would those questions be?

23        A.    What are you trying to accomplish?  What's the

24   business value?  What value do you place on retaining a

25   key executive who would otherwise be recruited away that

CE 1196

1   convenience or don't do the deal, I'm going to tap into

2   20-plus years of doing this and make a judgment call on

3   whether we should or shouldn't.  I continue to do that

4   to this day.

5       Q.    Looking up one section under 6.2, do you see

6   that this says if -- let me find the right spot.

7           So it says:

8             "Either party may terminate this

9             agreement (or any order) immediately

10            if ..."

11          And then there's a number of reasons why.

12          But the very end it says:

13            "In such event, supplier will

14            refund the prorated portion of any

15            amounts that were to apply to the

16            remainder of the unexpired term (as

17            of the date of the notice of

18            breach)."

19          Do you see that?

20      A.    I do.

21      Q.    How often does hiQ allow customers to

22   terminate their contract without any financial penalty?

23      A.    Does?   I don't have any customers right now so

24   does would be zero.

25      Q.    How about did?

CE 1197

```
 1          A.     Fair enough.   I don't recall any.

 2                 We even post cease and desist with the

 3    accusations and threats over our head continued to

 4    deliver against all of our contracts.

 5                 One of the proudest aspects of hiQ Labs in the

 6    history of my time affiliated with it, that despite a

 7    customer being able to do what you're pointing out right

 8    now, we never had a customer post cease and desist come

 9    at us for that.   And I can't remember any -- any prior.

10    We had customers get grumpy about our timely delivery

11    when we were losing resources, but the action of

12    actually refunding prorated portions of any amounts that

13    were to apply to the remainder of unexpired term, I

14    don't recall a single one.

15                 MS. SOKOVA:   Move to strike as unresponsive

16    everything before "I don't recall a single one."

17    BY MS. SOKOVA:

18          Q.     Let's switch a bit to who are the current

19    employees at hiQ that exist to this day right now?

20          A.     Employees strikes me as a technical term.

21    What do you mean by it?

22          Q.     Who is offering -- providing services on

23    behalf of hiQ at this time or for hiQ at this time?

24          A.     Well, I certainly am right now as part of

25    these legal proceedings as are a big handful of others.
```

CE 1198

```
 1        A.      Darin would have been our VP of sales.

 2                MS. SOKOVA:  All right.  We've been going for

 3   a little while.  Maybe we'll take a -- a short break.

 4                MR. WORCESTER:  Sure.

 5                VIDEOGRAPHER:  Off the record at 2:30 p.m.

 6                (Recess taken from 2:30 p.m. (PDST)

 7                to 2:38 p.m. (PDST).)

 8                VIDEOGRAPHER:  We're back on the record at

 9   2:38 p.m.

10                MS. HURST:  Exhibit 564, Aaron, is tab 100,

11   hiQ_00183419.

12                     FURTHER EXAMINATION

13   BY MS. HURST:

14        Q.      Why don't you go ahead and take a look at

15   Exhibit 564, Mr. Weidick.

16                I think you'll find there an e-mail exchange

17   between you and Boris Dev?

18        A.      I see it.

19                (Exhibit 564 marked for

20                identification by the Certified

21                Shorthand Reporter.)

22   BY MS. HURST:

23        Q.      In this e-mail Mr. Dev was suggesting that you

24   meet one-on-one with him regarding the scraper.  Do you

25   see that?
```

1      A.    Love to talk about you.  Boston.  Let me

2   scroll down.

3      Q.    Sure.  Take your time.

4      A.    Oh, there.  Okay.  Just that.  I got it.

5      Q.    Okay.  And Mr. -- Mr. Dev wrote, among other

6   things:

7            "Given the urgency of matters

8            with LinkedIn's new bot detection

9            program happening in parallel with

10           the $.75 million McKinsey scraping

11           project, you might consider

12           rethinking communication about

13           scraper engineering.

14           "Essentially, I think that you

15           and Darin Medeiros should be

16           considered the customers, not

17           science."

18           You see that?

19     A.    I do.

20     Q.    And did you -- did you meet with Mr. Dev in

21   response to this e-mail?

22     A.    Most certainly I did.

23           Exactly when, I don't know, but I talked to

24   Boris quite regularly in this time frame and ongoing

25   about scraping.

1      Q.      And did you discuss with him LinkedIn's new

2   bot detection program?

3      A.      I don't know that I would -- I don't recall if

4   I specifically honed in on just that topic.  If it was

5   in Boris's mind I'm sure he shared it with me.

6      Q.      You responded to Mr. Dev in Exhibit 564; is

7   that right?

8      A.      You're talking about the top of this one?

9      Q.      Yes.

10      A.      Yes.  I see it, yes.

11      Q.      And that's an e-mail you sent to Mr. Dev on or

12   about April 11, 2017?

13      A.      That's right.

14      Q.      And you wrote:

15              "I know the LI dependency and

16              their aggressive position is a big

17              obstacle to us."

18              Do you see that?

19      A.      I do.

20      Q.      And what did you mean by LinkedIn's aggressive

21   position?

22      A.      Something was happening.  Something was

23   happening in our business that caused a materially

24   different change to our ability to collect public

25   profiles like we had been doing and I don't know what it

1        A.    I did.

2        Q.    And -- and did that meeting take place?

3        A.    It did.

4              MS. HURST:   Exhibit 565 is tab 129, Aaron.

5    And it's hiQ_00299989.

6              (Exhibit 565 marked for

7              identification by the Certified

8              Shorthand Reporter.)

9    BY MS. HURST:

10       Q.    And this may also have an attachment.  Let me

11   just check.  Actually, I think the attachment is just

12   with the original.  So Exhibit 565 is a series of

13   e-mails regarding the subject scraping update on -- in

14   April 2017.

15             Do you see that, Mr. Weidick?

16       A.    I do but it's showing up in a way that it

17   takes me out of the video, so I can only look at one or

18   the other right now.

19       Q.    Okay.

20       A.    Hold on.  Let me just -- okay.  It's

21   overlaying my video right now.

22       Q.    Okay.  Do you have -- and you have -- you see

23   there's -- the first e-mail is from Mr. LeBailly, Chris

24   LeBailly, to you April 21, 2017, "Scraping Update"?

25       A.    Not yet.  Hold on a second.  Oh, there we go.

1    I'm there.

2        Q.    Okay.

3              And Mr. LeBailly reports:

4                 "The good news is that ... we're

5              able to scrape enough for the next

6              data refresh ... The bad is that we

7              are basically back to square one

8              with scraping.

9                 "The ban rate has increased to

10             the point where it's no longer

11             working again."

12             You see that?

13       A.    I do.

14       Q.    All right.  And you forwarded this e-mail to

15   Mr. Miller and Mr. Kim; is that right?

16       A.    I did.

17       Q.    And you asked them:

18                "Is it time for something more

19             radical?"

20             You see that?

21       A.    I do.

22       Q.    On April 24th, 2017, when you asked Mr. Miller

23   and Mr. Kim if it was time for something more radical,

24   what did you mean?

25       A.    Let's think outside the box about our approach

1   to collecting LinkedIn member public profile data

2   because it feels as if there's damn near a coordinated

3   approach to shutting us down given the level of ban rate

4   that we're dealing with being so materially different.

5   And if it's going to be that coordinated attack on us,

6   we're going to be radical about what we do to get around

7   it to figure out how to collect public data.  That's --

8       Q.    And --

9             (Simultaneous cross-talk.)

10      A.    -- radical is radical.  I'm not -- there's

11  no -- nothing implied beyond the definition of the word.

12  Think outside the box.

13  BY MS. HURST:

14      Q.    And would you consider filing a lawsuit to be

15  that sort of a solution?

16      A.    At this point in time?  Absolutely not.  It's

17  April 24th.

18      Q.    Well, it's certainly -- anything outside the

19  box to what you had been pursuing at that time, wasn't

20  it?

21      A.    I viewed LinkedIn as a partner.  They were

22  well aware of what we were doing.  I thought, as I've

23  said multiple times over, that this was a mistake, even

24  up to -- even up to the point where I got the cease and

25  desist letter, I thought it was a mistake.  So radical

1          MS. HURST:  Exhibit 566 is tab 391, Aaron,

2     hiQ_00576322.

3          (Exhibit 566 marked for

4          identification by the Certified

5          Shorthand Reporter.)

6     BY MS. HURST:

7     Q.    And what you should see here, Mr. Weidick, is

8     the same e-mail that we were just looking at in

9     Exhibit 565, only now you see -- you'll see Mr. Miller's

10    response.  Is that -- is that what you're looking at?

11    A.    Yes.  Again, I -- it's overlaying my video, so

12    give me a second here to organize the panel.

13    Q.    Sure.

14    A.    I have it.

15    Q.    Sure.  Okay.  So you see there's that same

16    e-mail from you forwarding Mr. LeBailly's e-mail asking

17    is it time for something more radical.  And here in

18    Exhibit 566 we see Mr. Miller's response.  See that?

19    A.    I do.

20    Q.    And Mr. Miller writes:

21          "This issue obviously has come to

22          a head.  We definitely need to

23          discuss it.  The Oxylabs people now

24          appear to be the only ones capable

25          of scraping LinkedIn, at least to

 1            hear them claim it.

 2                "I suspect LI have figured out

 3            how to tell who is a Luminati proxy.

 4            I was planning to talk to Luminati

 5            at some point when I had all the

 6            data."

 7            You see that?

 8      A.    I do.

 9      Q.    And did you discuss with Mr. Miller his

10   thoughts here as he shared them with you in Exhibit 566?

11      A.    Most assuredly I would have talked to Dan

12   about his response.

13      Q.    And did you discuss with him whether LinkedIn

14   had come up with some way of figuring out who was using

15   Luminati proxy services in order to ban them?

16      A.    I don't recall that specific component of the

17   conversation, but again, as I said a moment ago, in this

18   time zone something had materially changed.  It felt

19   coordinated.  Oxylabs was getting it.  We were getting

20   it.  Something changed.  We didn't know what it was.  So

21   Dan offering a hypothetical supposition would have

22   been -- I was doing the same thing.  What could be going

23   on.  What's changed, right.  This didn't happen before.

24   It's doubly happening now.  Why?  We didn't do anything

25   different.  We didn't do anything wrong.  So, yes, I

CE 1206

1   would have talked to Dan about the Oxy and Luminati

2   proxy supposition hypothesis.

3       **Q.    And you were aware that Luminati actually**

4   **stopped offering its proxy services for scraping of**

5   **LinkedIn for a period of time, right?**

6       A.    I do.  I do recall that from -- I don't know

7   if that was from directly Luminati or from Dan but I do

8   recall that.

9       **Q.    And that was in this same April, early May**

10  **2017 time frame, correct?**

11      A.    Again, putting the exact date on it but that

12  time zone makes sense to me given our attention to the

13  situation, yes.

14      **Q.    Okay.  Mr. Weidick, you're aware that hiQ**

15  **has sued LinkedIn in this action for three claims**

16  **whereby it is claiming monetary remedies, interference**

17  **with contract, interference with prospective economic**

18  **advantage, and unfair competition; are you aware of**

19  **those claims?**

20      A.    I am perhaps in layman's terms but I recognize

21  those claims.

22      **Q.    And is hiQ claiming any monetary remedies in**

23  **this action -- is it claiming it's entitled to any**

24  **monetary remedies in connection with one or more of**

25  **those claims?**

CE 1207

1          MR. WORCESTER:  Objection.  Calls for a legal

2    conclusion.

3          You can answer if you know, Mark.

4      A.    At a technical level I have no idea what goes

5    beyond those three claims.

6          At a practical level I know that the business

7    was worth $48 million in March of 2016, had massive

8    milestone accomplishments and growth in front of it, and

9    legitimate opportunity to be a billion dollar business.

10         That looks like damages to me because all that

11   stopped after your accusations and threats were put in

12   the market from the cease and desist letter.  What felt

13   like a coordinated way to interfere with us.

14   BY MS. HURST:

15     Q.    Okay.  You say that the business was worth

16   $48 million in March of 2016.  What is the basis for

17   that assertion, sir?

18     A.    That's what sophisticated tech investors were

19   willing to pay for the business in an aggregate basis

20   driven by share price and the investment that they put

21   in.

22     Q.    And what specifically are you referring to?

23     A.    I'm not following you.

24     Q.    What -- what was the transaction in which that

25   was the valuation?

1        A.      Oh, a Series B equity investment.

2        Q.      And was that the premoney or post money

3   valuation?

4        A.      My recollection is that was the post.

5        Q.      Okay.  What was the basis for that valuation

6   in March of 2016?

7        A.      I wasn't party to that transaction so I -- I

8   can only speculate.

9        Q.      And you're aware, sir, that you're designated

10  as the company's corporate witness on the topic of its

11  financials and its claimed damages, right?

12       A.      Yes.

13       Q.      So did you prepare yourself to testify about

14  the valuations of the company and its financials and its

15  claim damages?

16       A.      I did.

17       Q.      Right.  So let me ask you again.  What was the

18  basis for the valuation of the company in connection

19  with the Series B equity investment that you just

20  described?

21       A.      The professional and expert opinion of those

22  putting the money into it had prior experience in

23  investing early stage tech companies that went on to

24  make them hundreds of millions of dollars in return.

25       Q.      Were there any --

CE 1209

1        A.    The revenue -- I'm sorry.

2        Q.    **No, I thought you were finished.**

3              **Go ahead.**

4        A.    Processing.

5              From that new license booking there's a

6    ratably recognized revenue profile that would in a SaaS,

7    software-as-a-service business, inevitably be a little

8    bit less revenue than new license booking for --

9        Q.    **Did --**

10       A.    -- beginning year.

11       Q.    **Did the company also supply projections for**

12   **the remainder of 2016 in connection with the March 2016**

13   **investment?**

14       A.    Yes.

15       Q.    **And is it true that by the end of 2016 the**

16   **company had suffered a significant miss on its expected**

17   **renewal rate and, therefore, was already well off of its**

18   **2016 projections?**

19       A.    Oh, I don't know that to be true.  I don't --

20   I don't know that there was a renewal rate

21   objective or -- or miss in 2016.

22       Q.    **Do you recall our earlier discussion of churn**

23   **in the board slides?**

24       A.    I do.

25       Q.    **And that was with request -- with reference to**

CE 1210

1    the latter half of 2016, correct?

2        A.    I do.

3        Q.    And churn is a loss of customers who decide

4    not to renew, correct?

5        A.    That's one of the things a churn can be.  It

6    could also be a reduction in contract value.  That would

7    be indicative of dollar churn, not logo churn.

8        Q.    Well, in your board slides you were referring

9    to loss of customer renewals, correct?

10       A.    I don't know that it was exclusively that but

11   it would have been primarily that.

12       Q.    Was there also a Series B1 equity investment

13   in 2017?

14       A.    Yeah, there was -- there was a follow-on

15   participation at the same terms.

16       Q.    What was the valuation of company in

17   connection with the Series B1 investment?

18       A.    Well, as a follow-on there wouldn't be --

19   there wouldn't be any churn other than the post money

20   addition.  It would be indicative of the same.

21       Q.    So it is your view that the valuation of the

22   company for the Series B1 investment was the same as for

23   the Series B investment?

24            MR. WORCESTER:  Can I get that question read

25   back.

CE 1211

 1   instance.

 2              MS. HURST:  Move to strike as nonresponsive.

 3   BY MS. HURST:

 4       Q.    As of May 31st, 2017, had hiQ used

 5   mechanical turkers to log in using passwords to

 6   LinkedIn's website and obtain data, yes or no?

 7       A.    Yes.

 8       Q.    And when hiQ represented in its May 31st

 9   letter that hiQ in no way accesses any area of

10   LinkedIn's website requiring a password, that was false,

11   wasn't it?

12       A.    I disagree because it --

13              MR. WORCESTER:  Asked and answered.

14       A.    -- was in the context of the accusations

15   against us vis-a-vis scraping and CFAA violations

16   scraping public data.

17   BY MS. HURST:

18       Q.    Does there -- does the word "scraping" appear

19   in that sentence, in the first sentence of paragraph 3

20   of the letter, Mr. Weidick?

21       A.    No.

22              MS. HURST:  Exhibit 568 is tab 7.  Declaration

23   of Mark Weidick in support of hiQ's motion for TRO,

24   dated June 7th, 2017.

25   ///

CE 1212

1              (Exhibit 568 marked for

2              identification by the Certified

3              Shorthand Reporter.)

4    BY MS. HURST:

5        Q.    Is that your signature on Exhibit 568,

6    Mr. Weidick?

7        A.    That is my digital signature via DocuSign.

8        Q.    And you agree that you executed this

9    declaration that's been marked as Exhibit 568 under

10   penalty of perjury?

11       A.    I do.

12       Q.    Would you please look at paragraph 8 of your

13   declaration, Mr. Weidick.  Do you see that paragraph,

14   sir?

15       A.    I am there now.

16       Q.        "hiQ uses a variety of software

17            and manual means to gather the raw

18            data it needs to analyze in order to

19            provide Keeper and Skill Mapper for

20            its clients.

21                "All of these means access only

22            the public profiles section of the

23            LinkedIn website.  None of these

24            means access any private sections of

25            LinkedIn."

CE 1213

1              Do you see that?

2       A.    I do.

3       Q.    Now, in fact, when you offered this testimony,

4    hiQ Labs had been using turking to access the private

5    sections of the LinkedIn website, correct?

6       A.    Correct.

7       Q.    And nowhere in your declaration did you

8    disclose that to the court; is that true?

9       A.    Not in Section 8.

10      Q.    Okay.  It's true that you did not disclose to

11   the court in connection with your application for

12   emergency relief that, in fact, hiQ Labs was logging in

13   to password protection sections of -- of LinkedIn's

14   website in order to gather URL data for its services,

15   true?

16      A.    At scale the -- no.  Not entirely.

17      Q.    Okay.  Can you find any reference whatsoever

18   in this declaration to mechanical turking and logging

19   in?  I'll wait as long as it takes you to read the

20   entire thing if you need to.

21      A.    I would offer that the -- that the word

22   "manual" would be pointing to so-called turking.

23      Q.    Okay.  So you represented to the court that

24   manual means only access to profile -- public profile

25   sections; is that -- is that your testimony?

1       A.    No.

2       Q.    Okay.  Because that would have been false,

3   right?  That would have been false if that's what you

4   meant?

5           MR. WORCESTER:  Objection.  Let him answer the

6   question.

7       A.    I'm pointing to the word "analyze," that the

8   analysis for the purpose of Keeper and Skill Mapper is

9   done in an automated way.  That those public profiles

10  are supplemented by the manual means, the turking

11  activity described there ultimately to be plugged into

12  the analysis in order to provide Keeper and Skill Mapper

13  outputs.

14  BY MS. HURST:

15      Q.    All right.  So when -- I just want to make

16  sure we're clear here.  When you said "manual means" in

17  this paragraph 8, you were referring to turking; is that

18  correct?

19      A.    Yes, and perhaps others, including nonturkers.

20          MS. HURST:  Aaron, there's a -- a new document

21  that's just been added.  It's tab 883.  Could you see if

22  you have it?

23          (Exhibit 569 marked for

24          identification by the Certified

25          Shorthand Reporter.)

1    BY MS. HURST:

2         Q.    All right.  Exhibit 569 is tab 883, hiQ's

3    memorandum in support of its ex parte motion for

4    temporary restraining order and order to show cause re:

5    Preliminary injunction.  Do you see that?

6         A.    I do.

7         Q.    I think I asked you earlier if you had

8    reviewed hiQ's brief in support of its application for

9    emergency relief and you indicated that you had.  Do

10   you -- do you recognize this document?

11        A.    I recognize this document but not the -- the

12   thing you said before.  Was that applicable to the

13   letter from Deepak Gupta?

14        Q.    No.  We're just talking about this document

15   right now --

16              (Simultaneous cross-talk.)

17        A.    Okay.  Then I didn't understand the -- I

18   didn't understand the question.

19   BY MS. HURST:

20        Q.    All right.  In looking at Exhibit 569 --

21        A.    I'm there.

22        Q.    -- this is -- this is the brief that your

23   lawyers filed in support of their application for an

24   injunction.  Did you review this before it was filed?

25        A.    Definitely in some form, some draft form.

1   Whether I gave final blessing to this final document, I

2   don't recall, but in some form, yes.

3        Q.    All right.  Let me direct your attention to

4   page 12 of the exhibit which is internal page 4 of the

5   brief.

6        A.    Okay.  I'm confused now.  On page 12 of 33 in

7   the document, statement of facts?

8        Q.    And do -- you see a Statement of Facts?

9        A.    Yeah.

10       Q.    That's right.  Could you look at line 18 on

11   page -- I'm going to call it page 4 because there's a

12   page 4 at the bottom.  Do you see that?

13       A.    I see it.

14       Q.    All right.  Line 18, page 4 of the brief

15   marked as Exhibit 569 says:

16               "hiQ uses the public profile

17               section of the LinkedIn website as

18               raw data for its analysis and has

19               historically used a variety of

20               software and manual means to

21               assimilate and organize this

22               information."

23               You see that?

24       A.    I do.

25       Q.    And again, that reference to "manual means"

1   that's referring to the turking, correct?

2        A.   "Manual means" would include, among my use,

3   the turking function.

4        Q.   Okay.  And then the brief says:

5             "hiQ does not access the

6             private sections of LinkedIn."

7             You see that?

8        A.   I do.

9        Q.   And that was not true as to the turking,

10  correct?

11       A.   In the context of the analysis, no, it is not

12  correct.  Or, rather, it is correct in the context of

13  the analysis that we do, it's scale in an automated way.

14       Q.   I'm sorry, that answer was incomprehensible so

15  let's try again.

16             It says, "hiQ does not access the private

17  sections of LinkedIn" but, in fact, your turkers were

18  accessing the private sections of LinkedIn, correct?

19       A.   I was as a LinkedIn user as were the turkers.

20       Q.   Have you made any calculation of damages that

21  you think are owing to hiQ in connection with this

22  matter?

23       A.   I'm not a damages expert but I think about the

24  havoc wreaked upon the business all the time.

25       Q.   I understand you're not a damages expert and

1　State of California　　　　　)
　　　　　　　　　　　　　　　　)SS:
2　County of San Diego　　　　)

3　　　　　I, the undersigned, a Certified Shorthand

4　Reporter of the State of California, do hereby certify:

5　　　　　That the foregoing proceedings were taken

6　( X ) remotely (  ) live before me at the time and place

7　herein set forth; that any witnesses in the foregoing

8　proceedings, prior to testifying, were placed under

9　oath; that a verbatim record of the proceedings was made

10　by me using machine shorthand which was thereafter

11　transcribed under my direction; further, that the

12　foregoing is an accurate transcription thereof.

13　　　　　Further, that if the case is pending in the

14　Federal Court, before the proceedings were transcribed

15　by me, review [  ] was [ X ] was not requested.

16　　　　　I further testify that I am neither financially

17　interested in the action nor a relative or employee of

18　any attorney of any of the parties.

19　　　　　IN WITNESS WHEREOF, I have this date subscribed

20　my name.

21　DATED　June 2, 2022.

22

23　　　　　　　　　　　　　_____

24　　　　　　　　　　　　　LINDA E. MARQUETTE, CSR

25　　　　　　　　　　　　　Certificate No. 11874

CE 1219

# Compendium Exhibit 25

CONFIDENTIAL

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3                       ---o0o---
4   hiQ LABS, INC.,                )
                                    )
5           Plaintiff,             )Case No.
                                    )17-CV-03301-EMC
6   vs.                            )
                                    )
7   LINKEDIN CORPORATION,          )
                                    )
8           Defendant.             )
    _____)
9
10                     CONFIDENTIAL
11                      ---o0o---
12              Videotaped Deposition of
13                     LEE WOMER
14              Wednesday, May 11, 2022
15                      ---o0o---
16
17
18
19
20
21
22
23   Katy E. Schmidt
24   RPR, RMR, CRR, CSR 13096
25   Veritext Job No.: 5226828
```

CONFIDENTIAL

Page 7

| | | |
|---|---|---|
| 1 | This deposition is taking place via Veritext | 09:12 |
| 2 | virtual.  All participants are attending remotely. | 09:12 |
| 3 | My name is Brandon Miller from the firm | 09:12 |
| 4 | Veritext Legal Solutions and I'm the videographer. | 09:12 |
| 5 | The court reporter is Kathryn Schmidt of the | 09:12 |
| 6 | firm Veritext Legal Solutions. | 09:12 |
| 7 | I am not related to any party in this action | 09:12 |
| 8 | nor am I financially interested in the outcome. | 09:12 |
| 9 | Counsels and all present in their room and | 09:12 |
| 10 | everyone attending remotely, besides the witness, will | 09:12 |
| 11 | now state their appearances and affiliation for the | 09:12 |
| 12 | record, beginning with the noticing attorney, and the | 09:12 |
| 13 | witness will be sworn in. | 09:12 |
| 14 | Thank you. | 09:12 |
| 15 | Go ahead, Ms. Skibitsky. | 09:12 |
| 16 | MS. SKIBITSKY:  Hi.  Good morning.  This is | 09:12 |
| 17 | Hope Skibitsky from Quinn Emanuel Urquhart & Sullivan, | 09:12 |
| 18 | here on behalf of Plaintiff hiQ Labs, Inc. | 09:12 |
| 19 | MR. COHEN:  Hello.  Good morning. | 09:13 |
| 20 | Russell Cohen on behalf of the witness and LinkedIn. | 09:13 |
| 21 | And also present is Sarah Wight from | 09:13 |
| 22 | LinkedIn Corporation. | 09:13 |
| 23 | ---o0o--- | 09:13 |
| 24 | LEE WOMER, | 09:13 |
| 25 | called as a witness by the Plaintiff, who, being first | 09:13 |

CONFIDENTIAL

```
 1   duly sworn to tell the truth, the whole truth and        09:13

 2   nothing but the truth, was examined and testified as     09:13

 3   follows:                                                 09:13

 4              EXAMINATION BY MS. SKIBITSKY                   09:13

 5   BY MS. SKIBITSKY:                                         09:13

 6        Q.   Good morning, Mr. Womer.                        09:13

 7        A.   Good morning.                                   09:13

 8        Q.   My name is Hope Skibitsky.  I represent         09:13

 9   hiQ Labs in this matter.                                 09:13

10             Mr. Womer, have you ever been deposed           09:13

11   before?                                                  09:13

12        A.   No.                                             09:13

13        Q.   So I'd like to just briefly go over some        09:13

14   instructions just to help the process move smoothly.     09:13

15             First, you have been placed under oath, so      09:13

16   even though this is an informal setting, your            09:13

17   testimony has the same effect as it would in court       09:13

18   before a judge.                                          09:13

19             I will be asking you questions and I will       09:14

20   ask you to answer to the best of your ability.           09:14

21             Please do respond verbally because the          09:14

22   court reporter won't be able to pick up nods or head     09:14

23   shakes.                                                  09:14

24        A.   Okay.                                           09:14

25        Q.   I ask that you wait for me to finish a         09:14
```

CONFIDENTIAL

Page 11

| | | |
|---|---|---|
| 1 | counsel preparing for today's deposition? | 09:20 |
| 2 | A.   I believe it was -- I'm trying to think | 09:20 |
| 3 | through the time blocks...  I think it was about | 09:20 |
| 4 | nine hours, maybe eight. | 09:20 |
| 5 | Q.   Did you review any documents in preparation | 09:21 |
| 6 | for your deposition? | 09:21 |
| 7 | A.   Yes. | 09:21 |
| 8 | Q.   And did any of those documents you reviewed | 09:21 |
| 9 | refresh your recollection about any events? | 09:21 |
| 10 | A.   No, I don't think so. | 09:21 |
| 11 | Q.   Mr. Womer, are you currently employed? | 09:21 |
| 12 | A.   Yes. | 09:21 |
| 13 | Q.   And who is your employer? | 09:21 |
| 14 | A.   LinkedIn Corporation. | 09:21 |
| 15 | Q.   How long have you been employed by LinkedIn? | 09:21 |
| 16 | A.   Since October of 2012. | 09:21 |
| 17 | Q.   What was your first position with LinkedIn | 09:21 |
| 18 | in October of 2012? | 09:21 |
| 19 | A.   Senior manager corporate development. | 09:21 |
| 20 | Q.   And what were your responsibilities as a | 09:21 |
| 21 | senior manager corporate development? | 09:21 |
| 22 | A.   Understanding the market that LinkedIn | 09:22 |
| 23 | participated in, learning about companies that | 09:22 |
| 24 | participated in that market, where appropriate, | 09:22 |
| 25 | evaluating whether or not M&A might make sense, | 09:22 |

```
1    mergers and acquisitions might make sense for        09:22
2    LinkedIn, and then working on the deal when there were 09:22
3    deals that were appropriate.                          09:22
4        Q.   You mentioned one of your roles was          09:22
5    understanding the market that LinkedIn participated   09:22
6    in.                                                   09:22
7            What was that market that LinkedIn            09:22
8    participated in?                                      09:22
9        A.   So there are several markets that I think    09:23
10   LinkedIn participates in.  And I guess what I would   09:23
11   say, to be clear, I was not -- I was not sort of      09:23
12   making authoritative decisions about defining the     09:23
13   market or things like that, but, you know, I guess you 09:23
14   could say my -- my interpretation of the market that  09:23
15   we participate in were SAS software, social           09:23
16   networking, recruiting at the time, advertising.  I   09:23
17   think those are some examples at the time in 2012.    09:23
18       Q.   Has the market that LinkedIn participated in 09:24
19   changed since October 2012?                           09:24
20           MR. COHEN:  Objection.  Form.                 09:24
21           THE WITNESS:  Yes.                            09:24
22   BY MS. SKIBITSKY:                                     09:24
23       Q.   And in what ways has that market changed?    09:24
24           MR. COHEN:  Objection.  Form.                 09:24
25           THE WITNESS:  Would you be more specific?     09:24
```

| 1  | your list, Hope.                                           | 09:26 |
| 2  | BY MS. SKIBITSKY:                                          | 09:26 |
| 3  |     Q.   In addition to advertising?                      | 09:26 |
| 4  |     A.   In addition to the categories you mentioned,     | 09:26 |
| 5  | I think you could say sales technology.  I would          | 09:26 |
| 6  | say -- I guess it's covered under social networking.      | 09:26 |
| 7  | I would say I think that's a good list.                   | 09:26 |
| 8  |     Q.   Okay.  And so you mentioned that part of         | 09:26 |
| 9  | your responsibilities were learning about the            | 09:26 |
| 10 | companies that participated in that market.              | 09:26 |
| 11 |         How did you go about learning about              | 09:27 |
| 12 | companies that participated in the market that           | 09:27 |
| 13 | LinkedIn participated in?                                 | 09:27 |
| 14 |     A.   So in many cases, companies would reach out      | 09:27 |
| 15 | to LinkedIn and ask to speak to someone about -- at       | 09:27 |
| 16 | LinkedIn about partnering opportunities or acquisition    | 09:27 |
| 17 | opportunities or just for sort of a general              | 09:27 |
| 18 | introduction.  So that was often -- often a way that     | 09:27 |
| 19 | it happened.                                              | 09:27 |
| 20 |         In some cases we would proactively identify      | 09:27 |
| 21 | companies that looked as though they made sense for      | 09:27 |
| 22 | LinkedIn to have a relationship with, and we would try   | 09:27 |
| 23 | to find the right sort of person at the company to       | 09:27 |
| 24 | speak with.                                               | 09:27 |
| 25 |         In addition to that, we would do research        | 09:27 |

CONFIDENTIAL

Page 15

| | | |
|---|---|---|
| 1 | online, you know, looking at -- looking at sort of | 09:27 |
| 2 | what was publicly available about those companies. | 09:27 |
| 3 | Q.   When you would do research online, would you | 09:28 |
| 4 | look at the companies' websites, if they had one? | 09:28 |
| 5 | A.   Yes. | 09:28 |
| 6 | Q.   Did your role at LinkedIn change at some | 09:28 |
| 7 | point in time from senior manager and corporate | 09:28 |
| 8 | development? | 09:28 |
| 9 | A.   Yes. | 09:28 |
| 10 | Q.   When did your role change? | 09:28 |
| 11 | THE COURT REPORTER:  I apologize.  Can I | 09:28 |
| 12 | just have like 30 seconds?  My file stopped. | 09:28 |
| 13 | MS. SKIBITSKY:  Yes.  No problem. | 09:28 |
| 14 | THE VIDEOGRAPHER:  Okay.  This marks the end | 09:28 |
| 15 | of Media No. 2.  Going off the record at 9:28 a.m. | 09:28 |
| 16 | Pacific. | 09:28 |
| 17 | (Pause in proceedings.) | 09:28 |
| 18 | THE VIDEOGRAPHER:  We are back on the record | 09:28 |
| 19 | at 9:43 a.m. Pacific.  And this marks the beginning of | 09:43 |
| 20 | Media No. 3 in the deposition of Lee Womer. | 09:43 |
| 21 | Please proceed, Counsel. | 09:43 |
| 22 | BY MS. MILLER: | 09:43 |
| 23 | Q.   Mr. Womer, at what point in time did your | 09:43 |
| 24 | role change from senior manager of corporate | 09:43 |
| 25 | development? | 09:43 |

CONFIDENTIAL

Page 16

| | | |
|---|---|---|
| 1 | A.    October 2012 -- '14.   October 2014. | 09:43 |
| 2 | Q.    And did you get a new title at LinkedIn in | 09:43 |
| 3 | October of 2014? | 09:44 |
| 4 | A.    Yes. | 09:44 |
| 5 | Q.    What title was that? | 09:44 |
| 6 | A.    Senior manager of business development. | 09:44 |
| 7 | Q.    Did your role change when you became senior | 09:44 |
| 8 | manager of business development? | 09:44 |
| 9 | A.    Yes. | 09:44 |
| 10 | Q.    What were your responsibilities as senior | 09:44 |
| 11 | manager of business development? | 09:44 |
| 12 | A.    So developing partner strategy.  So based | 09:44 |
| 13 | on -- how would I describe that? -- leveraging an | 09:44 |
| 14 | understanding of the landscape, thinking through what | 09:44 |
| 15 | companies we should potentially partner with.  That | 09:44 |
| 16 | was one element. | 09:45 |
| 17 | Negotiating those partnership deals and then | 09:45 |
| 18 | managing those partnerships after the deals were | 09:45 |
| 19 | signed. | 09:45 |
| 20 | Q.    Were you involved in LinkedIn's | 09:45 |
| 21 | anti-scraping initiative in connection with your role | 09:45 |
| 22 | as senior manager of business development? | 09:45 |
| 23 | A.    Yes. | 09:45 |
| 24 | Q.    And at some point in time after | 09:45 |
| 25 | October 2014, did you come into a new role at | 09:45 |

CONFIDENTIAL

Page 17

```
 1   LinkedIn?                                              09:45

 2       A.   At some time after October 2014?             09:45

 3       Q.   Yes.                                         09:45

 4       A.   Yes.  I was promoted several times after     09:45

 5   that -- after that time period.                       09:46

 6       Q.   When was the first time you were promoted    09:46

 7   after becoming senior manager of business development? 09:46

 8       A.   I believe it was March of 2015.              09:46

 9       Q.   Did you receive a new title in connection    09:46

10   with that promotion?                                  09:46

11       A.   Yes.  Director of business development.      09:46

12       Q.   Did your roles or responsibilities change    09:46

13   when you became director of business development?      09:46

14       A.   Very little.                                 09:46

15       Q.   In what ways did they change?                09:46

16       A.   I don't remember any meaningful changes.     09:46

17       Q.   Okay.  And then after March of 2015, were    09:46

18   you promoted a subsequent time?                       09:46

19            Mr. Womer, I'm not sure if you heard my      09:47

20   question or if you just need a minute to think about  09:47

21   it.                                                   09:47

22       A.   Oh, I said yes.                              09:47

23       Q.   Oh, okay.                                    09:47

24            And what -- at what point in time were you   09:47

25   promoted again?                                       09:47
```

CONFIDENTIAL

Page 18

| | | |
|---|---|---|
| 1 | A.    I believe it was March of 2017. | 09:47 |
| 2 | Q.    And did you receive a new title in | 09:47 |
| 3 | connection with that promotion? | 09:47 |
| 4 | A.    Yes.  Senior director of business | 09:47 |
| 5 | development. | 09:48 |
| 6 | Q.    Did your roles or responsibilities change | 09:48 |
| 7 | when you went from director of business development to | 09:48 |
| 8 | senior director of business development? | 09:48 |
| 9 | A.    So I don't recall a -- I don't recall a -- | 09:48 |
| 10 | sort of an abrupt shift in responsibilities.  I think | 09:48 |
| 11 | it's -- maybe I'll sort of say that, yeah, I think | 09:48 |
| 12 | my -- my roles and responsibilities kind of expanded | 09:48 |
| 13 | over the time that I was within business development. | 09:48 |
| 14 | Q.    In what ways did your roles and | 09:48 |
| 15 | responsibilities expand over time other than what | 09:48 |
| 16 | we've already discussed in connection with your | 09:48 |
| 17 | position in business development? | 09:48 |
| 18 | A.    So when I entered the group, I was | 09:48 |
| 19 | responsible -- I was responsible for the talent | 09:49 |
| 20 | solutions business and LinkedIn's -- LinkedIn's | 09:49 |
| 21 | self-service API platform. | 09:49 |
| 22 | Over time, I was no longer responsible for | 09:49 |
| 23 | the API platform at that point in time.  But my scope | 09:49 |
| 24 | expanded to include our online learning business, as I | 09:49 |
| 25 | mentioned.  And then later my scope expanded again to | 09:49 |

CONFIDENTIAL

Page 19

```
 1   include our sales solutions business in addition to      09:49
 2   our recruiting business and our online learning          09:49
 3   business.                                                09:49
 4        Q.   Okay.  After March of 2017, were you           09:49
 5   promoted from -- into a different role other than        09:49
 6   senior director in business development?                 09:49
 7        A.   Yes.                                            09:50
 8        Q.   Is that your current role?                      09:50
 9        A.   No.                                             09:50
10        Q.   What role were you promoted to after March     09:50
11   of 2017 and when did that promotion occur?               09:50
12        A.   Vice president of business development and     09:50
13   it happened in September of 2021.                        09:50
14        Q.   What were your roles and responsibilities as  09:50
15   of September of 2021 as vice president of business       09:50
16   development?                                             09:50
17        A.   So my roles and responsibilities -- some of   09:50
18   this will be repeat but it's the -- it's what I told     09:50
19   you earlier in terms of partner strategy and sort        09:50
20   of -- partner strategy and -- based on understanding     09:50
21   of the landscape, negotiating deals with partners of     09:50
22   LinkedIn, strategic partners, and managing those         09:50
23   partnerships after we signed them.                       09:50
24             And from a LinkedIn line of business           09:51
25   standpoint, I'm responsible for LinkedIn's LTS           09:51
```

CONFIDENTIAL

Page 20

```
 1   business, which now includes hiring and learning, as      09:51
 2   well as LinkedIn's sales solutions business.              09:51
 3        Q.   Did your role change at any point after         09:51
 4   September of 2021?                                        09:51
 5             Let me withdraw that.                           09:51
 6             Did your title change at any point after        09:51
 7   September of 2021?                                        09:51
 8        A.   No.                                             09:51
 9        Q.   So your current position at LinkedIn is         09:51
10   vice president of business development.                   09:51
11             Is that right?                                  09:51
12        A.   Yes.                                            09:51
13        Q.   Mr. Womer, I'd like to talk about scraping.     09:52
14             You testified a bit ago that you were           09:52
15   involved in LinkedIn's anti-scraping initiative in        09:52
16   your employment with LinkedIn.                            09:52
17             Is that right?                                  09:52
18        A.   Correct.                                        09:52
19        Q.   At what period of time were you involved in     09:52
20   LinkedIn's anti-scraping initiative?                      09:52
21        A.   So I was involved as -- really starting in      09:52
22   October of 2012, I worked on an evaluation of the         09:52
23   landscape as it related to scraping in 2012, and then     09:53
24   off and on over subsequent years.                         09:53
25        Q.   What did you do in order to evaluate the        09:53
```

Page 26

```
 1    limit scraping?                                    10:04

 2         A.    So I don't remember, but I think the context    10:04

 3    that's important is I was in the corporate development    10:04

 4    group, as I described.  And generally speaking, when    10:04

 5    it came time to sort of execute action, usually the    10:04

 6    thing that I would get involved in is if we were going    10:04

 7    to pursue an acquisition of a company.             10:04

 8              And so there are actions that -- that -- if    10:04

 9    actions were taken, they are not necessarily actions    10:04

10    that my team would have been deeply involved in.    10:04

11         Q.    Did you speak with anyone from LinkedIn's    10:05

12    trust and security team in connection with your work    10:05

13    on anti-scraping in 2012?                          10:05

14         A.    I don't remember.  I do remember discussing    10:05

15    this with LinkedIn's security engineering team who    10:05

16    worked closely with our trust and safety team.     10:05

17         Q.    And when did you discuss -- when you say    10:05

18    "this," are you referring to the issue of scraping?    10:06

19         A.    Yes.                                    10:06

20         Q.    At what point in time did you discuss    10:06

21    scraping with LinkedIn's security engineering team?    10:06

22         A.    In preparation for the executive meeting    10:06

23    that I described earlier in October 2012.          10:06

24         Q.    What did you discuss with that team in    10:06

25    October 2012 about scraping?                       10:06
```

Page 27

1        A.    I believe I spoke with that team about what        10:06
2    they knew about the issue of scraping, the methods,        10:06
3    the companies that were scraping, and potential --        10:07
4    potential things that LinkedIn was doing to stop it at     10:07
5    the time and additional measures that LinkedIn could       10:07
6    potentially take is my recollection.                       10:07
7        Q.    Do you recall what those additional measures      10:07
8    that LinkedIn could potentially take were?                 10:07
9        A.    I don't recall.                                   10:07
10       Q.    Do you recall discussing those measures that      10:07
11   LinkedIn could potentially take in that October 2012        10:07
12   meeting with executives?                                    10:07
13       A.    I don't recall.  I think we did, but I don't      10:07
14   recall exactly.                                             10:07
15       Q.    And do you recall any of those measures that      10:07
16   LinkedIn could potentially take regarding scraping          10:07
17   having been instituted at any time after that               10:08
18   October 2012 meeting with the executives?                   10:08
19       A.    I think I answered that question already.         10:08
20             So what I will say is I don't recall what         10:08
21   next steps were taken after that meeting exactly.           10:08
22             But the context that I think you should be        10:08
23   aware of is my team generally focused on acquisition        10:08
24   as a tactic.  And so if next steps were taken, it's         10:08
25   quite likely that me and my team would not have been        10:08

CONFIDENTIAL

Page 180

```
 1              Can we look at Tab 29, please, which should    04:24
 2   be Womer 294.                                            04:24
 3                        (Plaintiffs' Exhibit 294 was        04:24
 4                        marked for identification.)         04:24
 5   BY MS. SKIBITSKY:                                        04:25
 6        Q.    Mr. Womer, are you looking at a document      04:25
 7   with Bates stamp LINK HIQ 205777?                        04:25
 8        A.    Yeah.   205777, yes.                          04:25
 9        Q.    Okay.   So the last-in-time e-mail is from    04:25
10   you to Lorenzo Canlas, and it looks to me like there's   04:25
11   a scraper council, list serve, with a cc to             04:25
12   Adam Weinstein.                                          04:25
13            Do you see that e-mail?                         04:25
14        A.    Yes.                                          04:25
15        Q.    And the subject of this e-mail is            04:25
16   "Anti-scraping."                                         04:25
17            Is that right?                                  04:25
18        A.    Yes.                                          04:25
19        Q.    Okay.   Do you recall this e-mail exchange in 04:25
20   October of 2015?                                         04:25
21        A.    No.                                           04:26
22        Q.    What was the scraper council?                 04:26
23        A.    Scraper council was a cross-functional group 04:26
24   of individuals who were responsible for reducing        04:26
25   scraping on LinkedIn.   And so I've mentioned some of    04:26
```

CONFIDENTIAL

Page 181

| | | |
|---|---|---|
| 1 | the functions previously:   Trust and safety was a big | 04:26 |
| 2 | member, security engineering, the PM team that I | 04:26 |
| 3 | mentioned before that's responsible for anti-scraping, | 04:26 |
| 4 | legal, and business development was a representative, | 04:26 |
| 5 | at least at this time. | 04:26 |
| 6 | Q.   So the first e-mail on this document, it's | 04:26 |
| 7 | from Lorenzo Canlas. | 04:27 |
| 8 | Do you know who Lorenzo Canlas is? | 04:27 |
| 9 | A.   Yes. | 04:27 |
| 10 | Q.   Who is Mr. Canlas? | 04:27 |
| 11 | A.   He was responsible -- when he was at | 04:27 |
| 12 | LinkedIn, he was responsible for a team that worked in | 04:27 |
| 13 | our HR organization, and I believe was -- helped with | 04:27 |
| 14 | analytics on LinkedIn's workforce. | 04:27 |
| 15 | Q.   Okay.   So Mr. Canlas writes in this e-mail | 04:27 |
| 16 | on October 7, 2015: | 04:27 |
| 17 | "Hey, guys, what is the process for investigating | 04:27 |
| 18 | companies who we think are scraping this site." | 04:27 |
| 19 | Do you see that? | 04:27 |
| 20 | A.   Yes. | 04:27 |
| 21 | Q.   And then he writes: | 04:27 |
| 22 | "We were at a conference yesterday with hiQ Labs who | 04:27 |
| 23 | was using internal (HRIS, survey) data and external | 04:27 |
| 24 | (LinkedIn and other data) to predict attrition." | 04:27 |
| 25 | Do you see that? | 04:27 |

CONFIDENTIAL

Page 189

1              REPORTER'S CERTIFICATE
                     ---o0o---
2    STATE OF CALIFORNIA    )
                            ) ss.
3    COUNTY OF YOLO         )

4

5        I, KATY E. SCHMIDT, a Certified Shorthand
6    Reporter in and for the State of California, duly
7    commissioned and a disinterested person, certify:
8        That the foregoing deposition was taken before
9    me at the time and place herein set forth;
10       That LEE WOMER, the deponent herein, was put on
11   oath by me;
12       That the testimony of the witness and all
13   objections made at the time of the examination were
14   recorded stenographically by me to the best of my
     ability and thereafter transcribed into typewriting;
15       That the foregoing deposition is a record of
16   the testimony of the examination.
17       IN WITNESS WHEREOF, I subscribe my name on this
18   12th day of May, 2022.

19

20

21       Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
22       Certified Shorthand Reporter
23       in and for the County of Sacramento,
         State of California

24

25   Ref. No. 5226828 KES

Message
---

| From: | Lee Womer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2ABBAD0E3A174DEEA3567E91DABB1C8F-LEE WOMER] |
|---|---|
| Sent: | 10/7/2015 8:26:54 PM |
| To: | Lorenzo Canlas [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5fb700195d094089a60556afbdc6e0e6-Lorenzo Can]; scraper-council [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ccc4ec264ba74a33baea3d8b383af7f4-scraper-cou] |
| CC: | Adam Weinstein [aweinstein@linkedin.com]; Boyu Zhang [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5b2cdd7e16da4d19b4faab9500a6e3c7-Boyu Zhang_] |
| Subject: | Re: Anti scraping |

+Scraper Council

Looks like a new one to add to the list.

On Wed, Oct 7, 2015 at 12:48 PM, Lorenzo Canlas <lcanlas@linkedin.com> wrote:
> Sorry I forgot to take a picture. The general message is this:
>
> http://hiqlabs.tumblr.com/post/102287027166/hiq-labs-predictive-employee-retention-analytics
>
> "hiQ Labs' predictive employee retention SaaS tool mentioned by Mr. Bersin, gathers massive amounts of public data, analyzes and then makes highly significant predictions about who is most at risk of leaving an organization through 'push' or 'pull' factors (such as competitive pay or other job offers)."
>
> They also mentioned that pull factors include:
> - completeness of public profiles
> - recruiter demand for someones job type
>
> I'm not sure how they do these pull factors but I suspect it includes some LinkedIn data.
> They inadvertently mentioned "if you are getting a lot of inmails there is more pull for you to leave your job" but I have no idea if they can actually measure InMail demand.
>
> On Wed, Oct 7, 2015 at 11:20 AM, Adam Weinstein <aweinstein@linkedin.com> wrote:
> > +Lee
> >
> > We can investigate.  Do you have any screen shots of what they shared?  I take it they verbally mentioned us - doesn't seem they advertise their data sources on their website.
> >
> > -Adam
> >
> > On Wed, Oct 7, 2015 at 11:05 AM, Lorenzo Canlas <lcanlas@linkedin.com> wrote:
> > > Hey guys what is the process for investigating companies who we think are scraping the site?
> > >
> > > We were at a conference yesterday with HiQ labs who is using internal (HRIS, survey) data and external (Linkedin and other data) to predict attrition.
> > >
> > > Is there a way for us to understand how and if they are using our data and understanding if we are enabling and supporting it?

> **Exhibit 294**
> Womer

Confidential

LINK_HIQ_000205777

Confidential

LINK_HIQ_000205778

# Compendium Exhibit 26

Page 1

1
2 ** H I G H L Y   C O N F I D E N T I A L **
3 ** ATTORNEYS' EYES ONLY **
4 UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
5 SAN FRANCISCO DIVISION
Case No. 17-cv-03301-EMC
6 ----------------------------------x
HIQ LABS, INC.,
7
          Plaintiff,
8
9
      - against -
10
11
LINKEDIN CORPORATION,
12
          Defendant.
13 ----------------------------------x
14                July 25, 2022
15                12:00 p.m.
16
17      Videotaped Deposition of XIAOFENG
18 WU, taken by Plaintiff, pursuant to Notice,
19 held via Zoom videoconference, before Todd
20 DeSimone, a Registered Professional
21 Reporter and Notary Public of the State of
22 New York.
23
24
25

```
                                      Page 4
 1            WU - HIGHLY CONFIDENTIAL
 2    from Orrick Herrington & Sutcliffe on
 3    behalf of LinkedIn Corporation and the
 4    witness, and I am joined here today by
 5    Ms. Hanley Cook who is also from LinkedIn
 6    Corporation.
 7              THE VIDEOGRAPHER:  Thank you
 8    very much.  I will just note at this time I
 9    cannot go off the video record unless both
10    parties agree, and I would now ask
11    Mr. DeSimone to please administer the oath
12    and we can proceed.
13         *    *    *
14    X I A O F E N G    W U,
15    called as a witness, having been first duly
16    sworn, was examined and testified
17    as follows:
18    EXAMINATION BY MS. MILLER:
19         Q.     Hi, Mr. Wu.  You can put your
20    hand down.
21         A.     Okay.
22         Q.     Good afternoon.  I'm Elisabeth
23    Miller from Quinn Emanuel and I will be
24    asking you the questions today.
25         A.     Hi.
```

```
                WU - HIGHLY CONFIDENTIAL
 1
 2    sure, there is nothing that would prevent
 3    you from saying later that you didn't have
 4    the mental clarity to answer the questions
 5    truthfully.  Your answer to that is there
 6    is nothing that prevents you from answering
 7    questions truthfully today?
 8         A.     Yeah, I'm all good.
 9         Q.     Okay, great.
10                And you are currently the
11    Director of Software Engineering,
12    Anti-Abuse Systems at LinkedIn; is that
13    correct?
14         A.     Yes, that's correct.
15         Q.     And you have a college -- you
16    have a college degree in bachelor of
17    science, is that also correct?
18         A.     Yes.
19         Q.     What was your major in college?
20         A.     Computer science.
21         Q.     And your master's of science,
22    is that also in computer science?
23         A.     Yes.
24                MS. MILLER:  Could we please
25    put up tab 1.
```

```
                                              Page 8
 1              WU - HIGHLY CONFIDENTIAL

 2                 (Plaintiff's Exhibit 1360

 3      marked for identification.)

 4          Q.      Mr. Wu, is this a true and

 5      correct copy of your LinkedIn profile?

 6                    MR. SHAFFER:  Do you want him

 7      to look at it locally so he can look at the

 8      whole document?

 9                    MS. MILLER:  He is welcome to

10      download it or however he wants to view it

11      is fine.  Is it in the chat?  Duane, I

12      think you have put them in the chat.  But,

13      if not, if you could, please.

14          A.      Yeah, I saw it from the folder.

15      Yeah, I think this is generated from

16      LinkedIn, right?  Yes.

17          Q.      Okay.  And did you create this

18      profile?

19          A.      Yes, myself.

20          Q.      And it says that you are the

21      engineering director of anti-abuse systems

22      from 2021 to present, that's accurate?

23          A.      Yes.

24          Q.      What are your responsibilities

25      in that role?
```

```
                                        Page 9

 1            WU - HIGHLY CONFIDENTIAL
 2       A.       So we build the system
 3   infrastructures to make sure LinkedIn
 4   functions in the way that all the
 5   anti-abuse effort will be identified and
 6   stopped.  That's the purpose of the team.
 7   We actually build a lot of infrastructure
 8   and system to do so.  I manage a
 9   department, mostly software engineers, we
10   try to build those systems.
11       Q.       So just so we're on the same
12   page since I think we will be talking about
13   this topic a lot today, what do you mean by
14   anti-abuse systems?
15       A.       So anti-abuse system is
16   actually a very generic term.  It won't
17   really have like very specific accurate
18   definition.  Usually I think anti-abuse is
19   actually a very generic term in the whole
20   industry as well.  We can see that from all
21   the different companies.  We are no
22   different as well there.
23               So anti-abuse means all the
24   non-proper use of the system and trying to
25   actually access LinkedIn in that way.  We
```

Page 29

```
                       WU - HIGHLY CONFIDENTIAL
 1
 2    no if you wanted to?
 3                  MR. SHAFFER:  Objection on
 4    attorney-client privilege and work product
 5    grounds.  To the extent you would have to
 6    reveal the contents of attorney
 7    communications, you should not answer.
 8    Otherwise you can answer.
 9         A.      For sure I don't really think I
10    was forced to do this.  That's how I feel.
11         Q.      Okay.
12                  MS. MILLER:  Tab 26, please.
13                  (Plaintiff's Exhibit 1361
14    marked for identification.)
15         Q.      Do you have the document up?
16    Let me know when you have it open, please,
17    Mr. Wu.
18         A.      Yes, I'm opening it.  Yes, it
19    is open.
20         Q.      And do you recognize this
21    document as LinkedIn's disclosure of you as
22    a potential expert witness in this matter?
23         A.      Yes.
24         Q.      It is dated June 7, 2022, if
25    you look at the last page.
```

Page 30

1          WU - HIGHLY CONFIDENTIAL

2        A.      Yes.

3        Q.      Did you draft this document?

4        A.      Yes, I have seen this doc and

5   we worked together.  I remember we put

6   together this doc.  I offered some of my

7   background knowledge on this doc, yes, in

8   that sense we drafted it together.

9        Q.      When you say "we," do you mean

10   your counsel?

11        A.      Yes, my counsel.

12        Q.      Did you review this document

13   before it was filed on June 7th, 2022?

14        A.      Yes.

15        Q.      Is it accurate to your

16   knowledge?

17        A.      Yes, I carefully reviewed the

18   content of the doc.

19        Q.      Are there any changes as you

20   sit here today that you would make to this

21   document?

22        A.      No, I think this doc is the

23   right one.

24        Q.      Have you ever served as an

25   expert witness in any litigation?

```
                                            Page 31
              WU - HIGHLY CONFIDENTIAL
 1
 2       A.       No, this is the first time.
 3       Q.       What was the assignment that
 4   LinkedIn gave you with respect to your
 5   expert engagement in this matter?
 6                MR. SHAFFER:  Objection to
 7   form, and also caution you not to reveal
 8   the contents of attorney communications.
 9   But you can answer outside of that.
10       A.       I'm not sure about the
11   assignment.  I think, again, I was chosen
12   because of the knowledge I can do this,
13   then I reviewed the documents listed, some
14   of the responsibilities I have, I can
15   testify for.  I'm not sure about the
16   examine.  I don't really get that term.  I
17   think it is more about all the things
18   within this doc I was quite familiar with
19   and I can testify for the facts of this.
20       Q.       So they did not -- so LinkedIn
21   Corporation did not give you some documents
22   and say we would like you to analyze these
23   documents and give us an opinion based on
24   this information?
25                MR. SHAFFER:  Objection to
```

Page 40

WU - HIGHLY CONFIDENTIAL

is the part, but I think my knowledge and

skills are kind of listed here in the

disclosure.

Q.    Have you been asked to draft an

expert report in this case?

MR. SHAFFER:  Objection,

foundation and vague.

A.    Draft a report?  There is no

draft a report things.  I think I do

remember there was one IP data analysis

stuff.  My colleagues, Kavi, me, we would

discuss a plan and the output of that is

there was a spreadsheet.  I'm not sure when

you say report, that is a report.  But I

just want to make sure I answer the

question accurately.

Q.    So what was in that -- sorry,

go ahead.

A.    I mean, that is the effort we

spent on.  So I do actually work on some of

the analysis plan for that one.

Q.    And what spreadsheet is that,

what information was contained in that

spreadsheet?

Page 41

WU - HIGHLY CONFIDENTIAL

1    WU - HIGHLY CONFIDENTIAL

2        A.      So it is generated based on the

3    not very completed information provided by

4    hiQ, and we looked -- we generated a plan

5    of how can we identify the total request

6    traffic from hiQ in that sense.

7            So the output is actually based

8    on the analysis we have done, what kind of

9    traffic requests come from hiQ.  So that is

10   the generated output.  So, again, I'm just

11   like trying to understand your term about

12   report, what that actually means.

13       Q.      So what analysis did you run

14   for that spreadsheet or report?

15           MR. SHAFFER:   Objection to

16   form.  Do you want to show it to him?

17           MS. MILLER:   No.

18       A.      So it is a very complex

19   analysis.  There is multiple steps.

20           So basically I recall there is

21   a step to determine which IPs come from

22   hiQ, because hiQ didn't really provide the

23   complete access log, make it really, really

24   hard, and we actually need to do the

25   analysis drawing with our internal database

Page 42

1        WU - HIGHLY CONFIDENTIAL

2    to identify the IP address that were the

3    ones based on IP address to derive -- to

4    get how many requests from those IP

5    addresses.  So that is the different steps

6    of the analysis.  That's a high level how

7    it works.

8        Q.      And who developed those steps

9    that you just referenced?

10           MR. SHAFFER:  Objection on

11   attorney-client privilege and work product

12   grounds.  To the extent you can answer

13   without revealing the contents of

14   communications involving counsel, you can

15   answer, but any communications with counsel

16   or involving counsel, you should not

17   answer.

18       A.      Yeah, so one of the data

19   science engineer, that's basically the

20   standard procedure when we do data analysis

21   in my day-to-day work, I need to -- my

22   team's -- my team's role is in

23   infrastructure in here.  So we partner with

24   the data science.  So usually with this

25   kind of data analysis work, we collaborate

Page 43

1            WU - HIGHLY CONFIDENTIAL

2    together with the data science team.

3              In this analysis I did actually

4    work with one of our colleagues to talk

5    about the plan, because we don't have the

6    complete data from hiQ side, how do we

7    actually do those analysis to talk about

8    the plan of how to do those steps.

9              So it is a collaborative

10   effort.  My colleague was actually from the

11   data science team to take it on, to wrote

12   some script, to get the data.  We reviewed

13   the data.  I just need to make sure -- I

14   reviewed the data to make sure the data is

15   accurate.  So that's my involvement in this

16   analysis.

17      Q.     So what formed the basis of the

18   steps that you developed?  Was it your

19   school learning?  Was it textbooks?  Was it

20   peer-reviewed literature, for instance?

21            MR. SHAFFER:   Objection to

22   form.

23      A.     Can you help me understand that

24   question better?  Is that like --

25      Q.     Sure.

Page 44

WU - HIGHLY CONFIDENTIAL

1
2       A.      Is it like where my skills come
3   from on this kind of stuff?
4       Q.      Right.   So when you were
5   developing these steps, what did you turn
6   to to know which steps you should take to
7   develop your analysis?
8       A.      That's very hard to say.   I
9   think there is a lot of input to that.
10              One is my knowledge about the
11  whole computer science area in terms of how
12  data is presented, how data is stored.
13  Usually the request come to LinkedIn
14  website, what the procedure actually looks
15  like, where are the logs, what logs
16  responsible for what, and also a lot of
17  logical, like technical logical thinking on
18  top of that to help to develop those steps.
19              It is definitely not really
20  very easy for a person just to come in and
21  say hey, because the data is not complete,
22  how do we generate that.   It needs a lot of
23  careful thinking skills, background,
24  context.   I think a lot of it is actually
25  input.

Page 45

1              WU - HIGHLY CONFIDENTIAL

2         Q.      So anything else?

3         A.      Definitely more, but I'm

4    hesitant to say like which is one, two,

5    three, four, five.  Just if a person have

6    one through five, they just do it.

7              Just my understanding is how I

8    can work with my colleagues to develop

9    those kind of data analysis steps is

10   because of like my context of the system,

11   the domain, and I know, the knowledge part,

12   I know the data structure, how do we

13   present stored data, which log store which

14   type of data, how do you draw on this

15   together, those stuff.  I cannot really

16   give you a complete list of say hey, this

17   is the five or six.

18        Q.      Okay.  Well, so you said you

19   worked with one other person at LinkedIn

20   primarily on this analysis; is that right?

21        A.      Yes.

22        Q.      And who is that person?

23        A.      Her name is Kavi.  She come

24   from our data science team.  We actually

25   collaborate.  I think this is just one

Page 47

WU - HIGHLY CONFIDENTIAL

1
2  analysis?  Did you call it the hiQ
3  analysis?  Or was there some code name you
4  had for it?  Just so we know we are talking
5  about the same thing.
6        A.    I think every time we do those
7  analysis, we do actually have -- our
8  attorney actually schedule a meeting
9  together we are talking about that.  We
10 don't really talk about a given nickname,
11 not in those meetings.  So I think
12 everything is attorney privileged, so we
13 actually talk about that at that moment.
14        Q.    Okay.  So just for our
15 purposes, I will say that the analysis, if
16 there is any lack of clarity about what
17 analysis we are talking about, please ask
18 me to clarify, but I'm referring to the
19 analysis that you were asked to run for
20 this engagement and for which you are
21 testifying in the Rule 26 disclosure and
22 today.  Are we on the same page there?
23        A.    I'm talking about -- when I
24 talk about the analysis, it is about --
25 because I know exact the term, basically my

Page 48

1      WU - HIGHLY CONFIDENTIAL
2  understanding is hiQ provided a dataset to
3  LinkedIn about their requests, past, they
4  have requested and the timestamp of when
5  that happens.   But very key information was
6  lacked there, there is no IP address
7  information.   So that why it makes this
8  analysis more complex.   That's the analysis
9  I was doing.
10              MR. SHAFFER:  Can I make a
11  suggestion?  We could call it the hiQ IP
12  lookup or something along those lines.
13              MS. MILLER:  That's fine with
14  me.
15      Q.     I'm going to call it the hiQ IP
16  lookup and hopefully it won't be a tongue
17  twister.  But we will start there.
18              So you got these inputs and you
19  and Kavi then analyzed it; am I right?
20      A.     Yes.
21      Q.     And what was your understanding
22  as to why there was a lack of IP addresses
23  to analyze?
24      A.     I mean, mostly I think the hiQ
25  side know this better, I can give some



Page 137



Page 138



Page 139



Page 140



```
              WU - HIGHLY CONFIDENTIAL
```

1       WU - HIGHLY CONFIDENTIAL

2   focusing on the data analysis.  Then we

3   have product managers working with us

4   together.  So it is a joint effort.  There

5   is different roles in this whole effort.

6   So Kavi comes from the data science team.

7       Q.    So I believe that this is the

8   part of your report where it says that you

9   will offer testimony regarding LinkedIn's

10  records of site access and how such records

11  are maintained, queried and accessed,

12  specifically that you will describe a

13  two-step analysis performed to identify the

14  volume of requests for access made by hiQ

15  to LinkedIn servers based on the analysis

16  of request made from IP addresses

17  associated with hiQ.   Are we talking about

18  the same thing here?

19      A.    Yes.

20      Q.    So we just talked about the

21  first step, I believe, which is profile

22  data scraped from LinkedIn and produced by

23  hiQ in discovery was used to identify the

24  IP addresses that made requests on the

25  servers for such profile data.  Do I have

```
1              WU - HIGHLY CONFIDENTIAL
2    that right?
3         A.     I think a little bit of
4    correction on that.  We already talked
5    about the two steps.  So the two steps
6    analysis is referring to is step one to get
7    the IP address come from hiQ, because we
8    don't have that information provided by
9    hiQ, so we have to do the analysis first in
10   our end based on whatever hiQ provided to
11   generate the IP list first.  Then the step
12   two is based on the IP list from hiQ to get
13   the total profile request numbers.  So
14   that's the two steps.  I believe we
15   basically already talked about both of
16   them.
17        Q.     But the second step, did you --
18   is it your -- sorry, strike that.
19             Is it your opinion that the
20   number of access requests from hiQ
21   associated IP addresses exceeded 50 billion
22   requests?
23        A.     The total -- we have a range of
24   the dates we analyzed together, right.  So
25   after we have done the step one, step two,
```

Page 207

1                **WU - HIGHLY CONFIDENTIAL**

2      then the total amount of the requests from

3      hiQ is like the number of 50 billion.

4           Q.      And during what time period did

5      hiQ make those requests?

6           A.      I believe it is October 21 of

7      2016 to May 1st, 2018, but we should look

8      at the file.  The file will actually tell

9      exactly the start date and end date.

10          Q.      The file we were just looking

11     at?

12          A.      Yes.

13                  MS. MILLER:  If you want to put

14     it back up, please, Duane.  You don't have

15     to put it up.

16          Q.      If you want to pull it up,

17     Mr. Wu.

18          A.      Yeah, so if you check, for

19     example tab 3 -- tab 2, it started from

20     October 21st, 2016 until, if you scroll to

21     the bottom, it is April 30th, 2018, yes,

22     right before the May 1st, 2018.  So that's

23     the time range we are looking at.

24          Q.      How many access requests did

25     LinkedIn receive in total in that time

Page 231

1

2                    CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do hereby

6    certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me; and

9    that the within transcript is a true record

10   of the testimony given by said witness.

11     I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 25th day of July, 2022.

17

18              *Todd DeSimone*

19        _____

20           TODD DESIMONE

21

22

23

24

25

**Exhibit 1361**

1   ANNETTE L. HURST (SBN 148738)
     ahurst@orrick.com
2   RUSSELL P. COHEN (SBN 213105)
     rcohen@orrick.com
3   CATHERINE Y. LUI (SBN 239648)
     clui@orrick.com
4   NATHAN SHAFFER (SBN 282015)
     nshaffer@orrick.com
5   DANIEL JUSTICE (SBN 291907)
     djustice@orrick.com
6   ORRICK, HERRINGTON & SUTCLIFFE LLP
     405 Howard Street
7   San Francisco, CA  94105-2669
     Telephone:   +1 415 773 5700
8   Facsimile:    +1 415 773 5759

9   MARIA N. SOKOVA (SBN 323627)
     msokova@orrick.com
10  ORRICK, HERRINGTON & SUTCLIFFE LLP
     1000 Marsh Road
11  Menlo Park, CA  94025-1015
     Telephone:   +1 650 614 7400
12  Facsimile:    +1 650 614 7401

13  *Attorneys for LinkedIn Corporation*

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16              SAN FRANCISCO DIVISION

17

18  hiQ Labs, Inc.,                          Case No. 17-cv-03301-EMC

19              Plaintiff,                   **LINKEDIN CORPORATION'S
                                              FEDERAL RULE OF CIVIL
20       vs.                                  PROCEDURE 26(a)(2)(C) DISCLOSURE
                                              RE XIAOFENG WU**
21  LinkedIn Corporation,
                                             Complaint Filed:   June 7, 2017
22              Defendant.                   Trial Date:        February 27, 2023

23  ─────────────────────────
    LinkedIn Corporation
24
                Counterclaimant,
25       vs.

26  hiQ Labs, Inc.

27              Counterdefendants,

28

**CONFIDENTIAL**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) LinkedIn Corporation hereby discloses the subject matter on which LinkedIn employee Xiaofeng Wu may present testimony that could be deemed to fall under Federal Rules of Evidence 702, 703, or 705, and a summary of the facts and opinions as to which Mr. Wu may testify.  By providing this disclosure, LinkedIn does not concede that any of the subject matter disclosed below necessarily falls under Federal Rules of Evidence 702, 703, or 705.

**Disclosure**

Mr. Wu is a current LinkedIn employee and holds the position of Director of Software Engineering, Anti-Abuse Systems.  A summary of Mr. Wu's professional experience is available at https://www.linkedin.com/in/wuxiaofeng/.  Mr. Wu has a Bachelor of Science from Zhejiang University and a Master of Science from Tianjin University.

Mr. Wu will testify regarding aspects of LinkedIn's anti-scraping and anti-abuse systems, with a specific focus on infrastructure used to implement those systems.  He will testify about the investments and costs (monetary and nonmonetary) associated with carrying scraping traffic derived from an analysis calculating the per-request cost of guest requests to LinkedIn's website and computers.  Mr. Wu will testify as to the costs and burdens of provisioning anti-abuse systems to stop scraping with regard to both individual requests and in aggregate.  He will also testify regarding other investments in anti-abuse efforts, including departmental budgets and the costs of personnel, based on financial records of LinkedIn.  Mr. Wu will testify as to what technological measures LinkedIn uses to prevent scraping and other forms of abuse on LinkedIn's website, including defenses at an initial traffic layer through which all outside requests reach LinkedIn, as well as further defenses at other layers in LinkedIn's system including: the Sentinel restricted IP/Org filter; LinkedIn's guest filter system; machine-learning models used to detect scraping; Drools Rules used to block scraping requests; third party services such as Shape used to profile scraping requests; and the Scraping CV/UCV system using his personal knowledge and LinkedIn records.  Mr. Wu will testify as to operation of the robots.txt file on LinkedIn's website with respect to crawling permissions and how LinkedIn's IP Address Allow List works.  Mr. Wu's testimony will be based on his personal knowledge as well as documents produced by

LinkedIn showing scraping defenses, departmental budgets produced at LINK_HIQ_000206253–

55, compensation information produced at LINK_HIQ_000206262–3 and

LINK_HIQ_000206266, queries produced at LINK_HIQ_000206267–70, the results of those

queries produced via direct download link, summaries of the results of those queries produced at

LINK_HIQ_000206264, and cost analyses produced at LINK_HIQ_000206256,

LINK_HIQ_000206257, LINK_HIQ_000206259, and LINK_HIQ_000206261.  Mr. Wu may

offer the following opinions: (1) that LinkedIn's anti-abuse systems preclude access to LinkedIn

profiles by automated means absent use of technological circumvention measures by scrapers; (2)

explaining the cost to LinkedIn of a single scraping request; and (3) explaining the costs and

harms to LinkedIn of scraping requests in aggregate.

    Mr. Wu will present testimony regarding LinkedIn's records of site access and how such

records are maintained, queried, and accessed.  Mr. Wu will describe a two-step analysis

performed to identify the volume of requests for access made by hiQ to LinkedIn's servers based

on an analysis of requests made from IP addresses associated with hiQ.  First, profile data scraped

from LinkedIn and produced by hiQ in discovery was used to identify the IP addresses that made

requests on the servers for such profile data.  Second, those IP addresses were then used to query

LinkedIn's logs to find additional requests for profile data made from those same IP addresses.

Mr. Wu will offer the opinion that the number of access requests from hiQ-associated IP

addresses during a particular time period exceeded fifty billion (50,000,000,000) requests.  Mr.

Wu will further explain that it would not be possible for LinkedIn's servers and infrastructure to

respond to the overall volume of scraping requests, and that serving such volume would in effect

cause LinkedIn's site to be unable to operate.  Such a volume of requests, if not defended would

degrade LinkedIn's website performance, introduce latency to members and legitimate users of

the site, and impact availability of services that are required to run the website up to and

including, depending on the volume of requests at any given time, functioning as a denial-of-

service ("DOS") attack on the site.

    Mr. Wu's testimony will be based on his knowledge, data regarding scraped profiles that

was produced by hiQ and extracted into a table by Keystone Strategy, Inc. and then supplied to

**CONFIDENTIAL**              - 2 -                    FRCP 26(a)(2)(C) Disc. Re X. Wu
                                                                No. 17-cv-03301-EMC

1    LinkedIn for analysis, and a very large pool of data stored by LinkedIn in the ordinary course of

2    business showing requests made by third parties to LinkedIn's computers and servers.

3    Specifically, Mr. Wu's testimony may be based on data produced by hiQ in this litigation at

4    hiQ_00000001–2, queries produced at LINK_HIQ_000206267–70, the results of those queries

5    produced via direct download link, summaries of the results of those queries produced at

6    LINK_HIQ_000206264, and cost analyses produced at LINK_HIQ_000206256,

7    LINK_HIQ_000206257, LINK_HIQ_000206259, and LINK_HIQ_000206261.  Mr. Wu will also

8    explain (1) that the foregoing IP request analysis is reliable; (2) there is a lack of available

9    alternatives to the foregoing IP request analysis due to limited information produced by hiQ; and

10   (3) the costs of dealing with these requests made by hiQ.

11

12

13   Dated: June 7, 2022                              Orrick, Herrington & Sutcliffe LLP

14

15

16                                                    By:  _____/s/ Annette L. Hurst_____
                                                          ANNETTE L. HURST
17                                                        Attorneys for Defendant
                                                          LinkedIn Corporation

18

19

20

21

22

23

24

25

26

27

28

**CONFIDENTIAL**                    - 3 -                    FRCP 26(a)(2)(C) DISC. RE X. WU
                                                            NO. 17-cv-03301-EMC

Compendium Exhibit 27

1   JONATHAN H. BLAVIN (State Bar No. 230269)
    jonathan.blavin@mto.com
2   ROSEMARIE T. RING (State Bar No. 220769)
    rose.ring@mto.com
3   LAURA K. LIN (State Bar No. 281542)
    laura.lin@mto.com
4   NICHOLAS D. FRAM (State Bar No. 288293)
    nicholas.fram@mto.com
5   MUNGER, TOLLES & OLSON LLP
    560 Mission Street
6   Twenty-Seventh Floor
    San Francisco, California 94105-2907
7   Telephone:    (415) 512-4000
    Facsimile:    (415) 512-4077
8
9   Attorneys for LinkedIn Corporation

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14  hiQ Labs, Inc.,                    Case No. 17-CV-03301-EMC

15              Plaintiff,             **DECLARATION OF PAUL ROCKWELL
                                       IN SUPPORT OF LINKEDIN
16        vs.                          CORPORATION'S OPPOSITION TO
                                       PLAINTIFF'S MOTION FOR A
17  LinkedIn Corporation,              TEMPORARY RESTRAINING ORDER**

18              Defendant.

19

20

21

22

23

24

25

26

27

28

I, Paul Rockwell, declare as follows:

1.      I have worked at LinkedIn for five years and am currently head of the Trust & Safety organization.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.  I submit this declaration in opposition to hiQ's motion for a temporary restraining order.

2.      The Trust & Safety organization within LinkedIn is charged with addressing operational, product, and security risks.  Alongside the Trust Engineering and a Data Science team at LinkedIn responsible for developing detection and mitigation of scraping and for investigating significant and high-scale abuse incidents, Trust & Safety conducts investigations into unauthorized access of the LinkedIn website and responds to threats to the platform.  A primary goal of our teams is to ensure that the data LinkedIn's members entrust to LinkedIn remains secure, and to prevent unauthorized access to the platform—including automated access by bots, crawlers, or scrapers in order to scrape data from LinkedIn servers.

**LinkedIn's Technical Measures to Protect the LinkedIn Site from Scraping**

3.      Among the many challenges that LinkedIn faces, various individuals and business entities periodically attempt to misappropriate data from the LinkedIn website—data that LinkedIn's members have entrusted to it—by using automated means or "scraping," meaning the accessing, extraction, and copying of data on a large scale.

4.      LinkedIn takes its obligations to protect members' data and its platform seriously, and devotes resources accordingly.  The Investigations team in the Trust & Safety organization dedicates the equivalent of two full-time employees to anti-scraping investigation work.  This is in addition to over ten people from various other teams, including trust engineering, analytics, data science, product, and legal, who work to prevent scraping on LinkedIn's platform.  LinkedIn spends millions of dollars per year in compensation and other resources, including large-scale computing resources, on this protection effort.

5.      In addition to dedicated personnel, LinkedIn employs an array of technological safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from accessing and copying its members' data on a large scale.  Many of these technological safeguards

1    run in the background of the LinkedIn website to automatically detect suspicious activity, and

2    some are implemented on a more targeted basis when LinkedIn detects particular bad actors that

3    appear to be directing malicious activity at the LinkedIn website.

4          6.    One such safeguard is LinkedIn's FUSE system.  FUSE scans and imposes a limit

5    on the activity that an individual may initiate on the site.  This limit is intended to prevent would-

6    be data scrapers utilizing automated technologies from quickly accessing a substantial volume of

7    (public or private) member profiles.

8          7.    Another safeguard is LinkedIn's Quicksand system.  Quicksand monitors the

9    patterns of webpage requests by LinkedIn members in order to identify non-human activity

10   indicative of scraping.  Quicksand can quickly challenge or restrict an account to prevent scrapers

11   from continuing to access the site.

12         8.    Another protection measure is LinkedIn's Sentinel system, which scans, throttles,

13   and at times blocks suspicious activity associated with particular IP addresses.

14         9.    LinkedIn also monitors and blocks groups of IP addresses using its Org Block

15   system.  This system includes an evolving manual list of known bad IP addresses and a machine-

16   learned model that identifies, amongst others, groups of IP addresses serving large-scale scrapers.

17   This system also blocks traffic from IP addresses from which LinkedIn, as a consumer-facing

18   company, does not expect to receive traffic.

19         10.    LinkedIn also employs Member and Guest Request Scoring systems, which also

20   restrict automated, non-human forms of access that facilitate scraping.  The Member Request

21   Scoring System monitors page requests made by LinkedIn members while logged into their

22   accounts.  If high levels of activity are detected for certain types of accounts, the member is

23   logged out and may either be warned, restricted, or challenged with a CAPTCHA in order to log

24   back into LinkedIn.  The Guest Request Scoring system monitors and limits public page requests

25   made by users who are not logged into LinkedIn.  If unusual patterns or high levels of activity are

26   detected, the user is redirected to LinkedIn's log-in page and is prevented from viewing additional

27   LinkedIn pages while not logged in.

28

-2-

11. These technical measures are designed to prevent those who seek to access LinkedIn in an automated way from doing so. They are fairly standard ways through which website operators manage the number of calls to their servers. In order to access LinkedIn's website using automated means and scrape LinkedIn data, as hiQ has done, one must design ways to circumvent these technical measures. LinkedIn—principally through LinkedIn's Engineering team as well as the Trust & Safety organization that I head—remains constantly on the lookout for bad actors who have designed ways to circumvent LinkedIn's technical barriers.

12. LinkedIn's website also contains a "robots.txt" file that provides instructions to bots or crawlers that attempt to access LinkedIn's servers. The instructions expressly prohibit access via automated means, except for certain entities with express permission from LinkedIn (such as search engines like Google or Bing). hiQ is not listed as an entity that has express permission.

13. Unauthorized data scraping forces LinkedIn to expend resources in responding to scraping events and in deploying technical measures to prevent such scraping. I understand that, on average, on a daily basis, LinkedIn blocks approximately 95 million attempts to scrape data from LinkedIn's servers.

14. Most of LinkedIn's technical measures are automated and run continuously in the background, blocking suspicious activity regardless of its origin. If LinkedIn is forced grant hiQ and everyone else using automated technologies unfettered access to its website, LinkedIn would have to disable most if not all of these technical measures. This would expose LinkedIn's computers to increased data scraping by any number of actors with any number of objectives, including malicious ones, and render LinkedIn unable to regulate traffic to its own servers. This would undermine the trust and goodwill that LinkedIn seeks to create and preserve.

### LinkedIn's Prohibitions on Scraping and Commitments to Members in its User Agreement and Privacy Policy

15. LinkedIn makes all of its members aware of the fact that accessing and scraping the website through automated means, including bots, spiders, or crawlers, is prohibited. In particular,

-3-

Section 8.2 of the October 23, 2014 User Agreement,[1] a true and correct copy of which is attached in its entirety as Exhibit A, prohibits those who agree to it from engaging in any of the following activities:

    a.  "Us[ing] … automated software, devices, scripts robots, other means or processes to access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

    b.  "Us[ing] bots or other automated methods to access the Services";

    c.  "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser plugins and add-ons, and any other technology";

    d.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or related any information or data"

16.    Section 2.5 of the User Agreement governs the sharing of member information.  In this section, LinkedIn promises its members that when possible, LinkedIn will honor the choices that its members make about who can see content or information, which includes a member's choice to make or not make his or her information visible to search engines such as Google or Bing.  Even when a member chooses to make their profile publicly viewable, they can still choose not to broadcast that they've made changes to their profiles, to delete their profiles entirely, or to change their mind at any time about what fields, if any, they wish to make publicly viewable.

17.    As head of the Trust & Safety organization, I am also familiar with how people become members of LinkedIn and consent to the LinkedIn User Agreement.  In order to create a member profile on LinkedIn, prospective members must agree to the LinkedIn User Agreement.  A common way to become a member is through desktop computer access of LinkedIn's website.  As demonstrated by the screenshot below, when a prospective member registers for an account through the website, he or she provides a first name, last name, email address, and password, and

---

[1] This is the version of the User Agreement that I understand hiQ agreed to, and which was in effect during the period of unauthorized access by hiQ.  LinkedIn updated its User Agreement on June 7, 2017.  It contains substantially identical provisions to those set forth herein.  Attached hereto as Exhibit B is a true and correct copy of the June 7, 2017 User Agreement.

-4-

1   then clicks "Join Now," thereby "agree[ing] to LinkedIn's User Agreement, Privacy Policy, and

2   Cookie Policy," all of which are hyperlinked on the page.



12          18.     When prospective members register for accounts through other channels, such as

13   through LinkedIn's mobile website or app, they also must agree to LinkedIn's User Agreement,

14   Privacy, Policy, and Cookie Policy in a similar manner.  Anybody can become a LinkedIn

15   member provided they agree to these policies.

16          19.     The User Agreement states that "You agree that by clicking 'Join Now' 'Join

17   LinkedIn', 'Sign Up' or similar, registering, accessing or using our services …, you are entering

18   into a legally binding agreement (even if you are using our Services on behalf of a company)."

19          20.     If a user of LinkedIn's services, or a LinkedIn member, does not abide by the User

20   Agreement, Privacy Policy and Cookie Policy, or if a user is abusing LinkedIn's services,

21   LinkedIn "reserves the right to restrict, suspend, or terminate" that person or entity's access to

22   LinkedIn, as provided in Section 3.4 of the User Agreement.

23          21.     I am also familiar with LinkedIn's Privacy Policy.  In the October 23, 2014 Privacy

24   Policy, Section 2.6, LinkedIn pledges to its members that it will not rent or sell personal

25   information that members post.  It also provides in Section 2.6 that members can choose the parts

26   of their profiles that search engines index, and can completely opt out of this feature.  As set forth

27   in Section 2.7, members can also limit the data that they share with third parties with whom

28

-5-

1   LinkedIn has negotiated agreements to use LinkedIn's platform.  A true and correct copy of the

2   October 23, 2014 privacy policy is attached as Exhibit C hereto.[2]

3       22.     According to Section 3.1 of the Privacy Policy, LinkedIn's members can delete

4   information from their profiles, or their profiles entirely, at any time.  If a member deletes his or

5   her profile, LinkedIn will delete that information from its servers, generally within 30 days,

6   subject to limited exceptions that are detailed in Section 3.2 of the Privacy Policy.  LinkedIn will

7   not keep a copy of that data.

8       23.     In addition to the Privacy Policy, LinkedIn offers members a number of other

9   privacy settings that permit them to control what information is displayed and broadcast to others.

10  One of these settings allows members to choose to not broadcast changes in their LinkedIn profile

11  to their LinkedIn connections, as demonstrated by the below screenshot:

12

13   **Sharing profile edits**                                            Close

    Choose whether your network is notified about profile changes          Yes

14

15      Do you want to share your profile changes with your network?
        Your network may see when you change your profile, make
        recommendations, or follow companies.

16

     Yes  ⬤

17

18              **hiQ Has Repeatedly Consented to the LinkedIn User Agreement**

19      24.     hiQ has repeatedly consented to LinkedIn's User Agreement.

20      25.     I understand that beginning on January 25, 2016 and throughout 2016, hiQ

21  purchased advertising on LinkedIn.  In doing so, it agreed to LinkedIn's Ads Agreement, which in

22  turn incorporates the User Agreement.  A true and correct copy of the Ads Agreement hiQ

23  consented to is attached as Exhibit E.

24

25

26  _____

27  [2] This is the version of the Privacy Policy that I understand hiQ agreed to, and which was in effect
    during the period of unauthorized access by hiQ.  LinkedIn updated its Privacy Policy on June 7,
28  2017.  It contains substantially identical provisions to those set forth herein.  Attached hereto as
    Exhibit D is a true and correct copy of the June 7, 2017 Privacy Policy.

                                          -6-

26.     To agree to the Ads Agreement on the LinkedIn desktop website, one has to click through a screen where the Ads Agreement is hyperlinked above the button on which one needs to click to assent, as demonstrated by the below screenshot:

By clicking Launch campaign, you agree to the Linkedin Ads Agreement and Advertising Guidelines.

**Launch campaign**

27.     The LinkedIn Ads Agreement provides that "in addition" to "this Agreement, the standard LinkedIn User Agreement … applies to your use of the LinkedIn Ads service," and that "[a]s a consequence of your violation of any of the aforementioned agreements, LinkedIn may, at its sole discretion, prohibit you from any further participation in the LinkedIn Ads service and any other service or program offered by LinkedIn, or suspend or remove your LinkedIn account. LinkedIn may undertake technical measures in furtherance of such prohibition."

28.     I also understand that hiQ maintained a Company Page on LinkedIn.  Someone who is already a LinkedIn member—and thus who has already consented to the User Agreement—must create a Company Page.  LinkedIn's records indicate that hiQ's company page was set up by hiQ's then-Chief Operating Officer Xander Oltmann on June 23, 2014.  Mr. Oltmann is also a LinkedIn member, and has agreed to the User Agreement.

29.     I have been made aware that on December 23, 2015, Darin Medeiros—hiQ's vice president of sales, marketing and operations—purchased a team license for LinkedIn's Sales Navigator product.  A true and correct copy of the invoice for this license is attached as Exhibit F. In so doing, hiQ consented to the November 24, 2015 LinkedIn Subscription Agreement (or LSA), a true and correct copy of which is attached as Exhibit G.  The Subscription Agreement incorporates the LinkedIn User Agreement, stating in Section 2.1 that the "terms of the User Agreement are incorporated into this LSA.  Customer will ensure that Customer Users comply with the User Agreement."

-7-

CE 1319

**LinkedIn Has Incurred Expenses Investigating hiQ's Activities and
Has Suffered Harm By its Unauthorized Access**

30.     The Trust & Safety organization was made aware that hiQ may be circumventing LinkedIn's technical barriers, accessing LinkedIn's website through automated means, and scraping data from LinkedIn's computer servers.  Our organization, along with others at LinkedIn, have investigated hiQ's activities.  As of the date of this declaration, I estimate that LinkedIn employees have spent over 100 hours responding to hiQ's activities.  This represents over $5,000 in employee time.  This does not include the large-scale computing, overhead, and external vendor costs associated with LinkedIn's response.

31.     The Investigations team identified seven IP addresses that appear to be used by hiQ and/or its employees to access LinkedIn's website.  LinkedIn blocked traffic from those IP addresses on June 24, 2017.

32.     I understand that hiQ identifies its current customers as including eBay, Capital One, and GoDaddy.  Based on this list of companies, and hiQ's statements claiming that it periodically scrapes LinkedIn member profile information in order to deliver its services, our team has concluded that hiQ is likely scraping tens, if not hundreds, of thousands of LinkedIn member profiles on a routine basis.[3]  In addition, I understand that hiQ claims that it has scraped hundreds of thousands of LinkedIn profiles.  This volume of scraping is much higher than the volume of server requests that LinkedIn has identified as coming from hiQ's corporate IP addresses, meaning that hiQ would need to mask its calls to LinkedIn's servers and/or employ other means to circumvent the above-mentioned technical barriers.  Our investigation is continuing.

33.     To my knowledge, hiQ receives no cooperation from LinkedIn to access LinkedIn via automated means and scrape LinkedIn data.

34.     LinkedIn has suffered and will continue to suffer harm to its consumer goodwill and trust, which LinkedIn has worked hard for years to earn and maintain, if hiQ's unauthorized access to LinkedIn computers continues.  I understand and believe that hiQ provides two products

---

[3] Based on hiQ's list of prospective customers, which I understand includes Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier, and Jobvite, hiQ seeks to scrape hundreds of thousands, if not millions, of member profiles on a monthly basis.

-8-

1   that collect information about LinkedIn members, without their consent, that hiQ then sells to the

2   members' employers.  This is unlike LinkedIn, where, as discussed above, members have full

3   control over their information and can change the amount and content of information they share at

4   any time.  Thus, hiQ's unauthorized access to and scraping of LinkedIn's servers undermines the

5   consumer trust and goodwill LinkedIn has earned from its members.

6          ///

7          ///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CE 1321

1    I declare under penalty of perjury under the laws of the United States of America and the

2  State of California that the foregoing is true and correct.

3    Executed on June 24, 2017 at Los Gatos, California.

4

5    _____

6    Paul Rockwell

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-

# EXHIBIT A

  

SlideShare, a content sharing platform, and LinkedIn Pulse, a news reading application, are part of the LinkedIn family.

# User Agreement

Welcome, and thanks for using LinkedIn.com, SlideShare.net, Pulse and/or other LinkedIn services and apps! When you use our products and services, you're agreeing to our terms, so please take a few minutes to read over the User Agreement below.

Note: You are entering into a legally binding agreement.

# 1. Introduction

Last revised on October 23, 2014

We are a social network and online platform for professionals.

**1.1. Purpose**
Our mission is to connect the world's professionals to allow them to be more productive and successful. Our services are designed to promote economic opportunity for our members by enabling you and millions of other professionals to meet, exchange ideas, learn, and find opportunities or employees, work, and make decisions in a network of trusted relationships.

When you use our Services (including SlideShare and Pulse), you are entering into a legal agreement and you agree to all of these terms.

You also agree to our Privacy Policy, which covers how we collect, use, share, and store your personal information.

**1.2. Agreement**
You agree that by clicking "Join Now" "Join LinkedIn", "Sign Up" or similar, registering, accessing or using our services (including LinkedIn, SlideShare, Pulse, our related mobile apps, developer platforms, premium services, or any content or information provided as part of these services, collectively, "Services"), you are entering into a legally binding agreement (even if you are using our Services on behalf of a company). If you reside in the United States, your agreement is with LinkedIn Corporation and if you reside outside of the United States, your agreement is with LinkedIn Ireland (each, "LinkedIn" or "we").

This "Agreement" includes this User Agreement and the Privacy Policy, and other terms that will be displayed to you at the time you first use certain features (such as starting a "Group," downloading one of our software applications or purchasing advertisements or InMails™), as may be amended by LinkedIn from time to time. If you do not agree to this Agreement, do NOT click "Join Now" (or similar) and do not access or otherwise use any of our Services.

Registered users of our Services are "Members" and unregistered users are "Visitors". This Agreement applies to both.

Back to Top ▲

# 2. Obligations

Here are some promises you make to us in this Agreement:

You're eligible to enter into this Agreement and you are at least our "Minimum Age."

**2.1. Service Eligibility**
To use the Services, you agree that: (1) you must be the "Minimum Age" (defined below) or older; (2) you will only have one LinkedIn account (and/or one SlideShare or Pulse account, if applicable), which must be in your real name; and (3) you are not already restricted by LinkedIn from using the Services.

"Minimum Age" means (a) 18 years old for the People's Republic of China, (b) 16 years old for the Netherlands, (c) 14 years old for the United States, Canada, Germany, Spain, Australia and South Korea, and (d) 13 years old for all other countries. However, if law requires that you must be older in order for LinkedIn to lawfully provide the Services to you (including the collection, storage and

use of your information) then the Minimum Age is such older age. The Services are not for use by anyone under the age of 13.

You'll keep your password a secret.

You will not share an account with anyone else and will follow our rules and the law.

**2.2. Your Membership**

As between you and others, your account belongs to you. You agree to: (1) try to choose a strong and secure password; (2) keep your password secure and confidential; (3) not transfer any part of your account (e.g., connections, groups) and (4) follow the law and the Dos and Don'ts below. You are responsible for anything that happens through your account unless you close it or report misuse.

Note that for Premium Services purchased by another party for you to use (e.g. Recruiter seat bought by your employer), the party paying for the Premium Service controls such an account (which is different from your personal account) and may terminate your access to it.

---

You'll honor your payment obligations and you are okay with us storing your payment information. Also, there may be fees and taxes that are added to our prices.

We don't guarantee refunds.

**2.3 Payment**

If you purchase any of our paid Services ("Premium Services"), you agree to pay us the applicable fees and taxes. Failure to pay these fees may result in the termination of your subscription. Also:

- Your purchase may be subject to foreign exchange fees or differences in prices based on location (e.g. exchange rates).

- You authorize us to store and continue billing your payment method (e.g. credit card) even after it has expired, to avoid interruptions in your service (e.g. subscriptions) and to facilitate easy payment for new services.

- You must pay us for applicable fees and taxes unless you cancel the Premium Service, in which case you agree to still pay these fees through the end of the applicable subscription period. Learn how to cancel or change your Premium Services and read about LinkedIn's refund policy.

- Taxes are calculated based on the billing information that you provide us at the time of purchase.

For LinkedIn, you can get a copy of your invoice through your account settings under "Purchase History" for SlideShare you can request your invoice through Customer Support.

---

You're okay with us using our websites, mobile apps, and email to provide you with important notices. This Agreement applies to mobile applications as well. Also, you agree certain additional information can be shared with us.

If the contact information you provide isn't up to date, you may miss out on these notices.

**2.4. Notices and Service Messages**

You agree that we may provide notices to you in the following ways: (1) a banner notice on the Service, or (2) an email sent to an address you provided, or (3) through other means including mobile number, telephone, or mail. You agree to keep your contact information up to date.

Please review your LinkedIn.com and Slideshare.net settings to control and limit what kind of messages you receive from us.

---

When you share information, others can see, copy and use that information.

**2.5. Messages and Sharing**

Our Services allow messaging and sharing of information in many ways, such as your profile, slide deck, links to news articles, job postings, InMails and blogs. Information and content that you share or post may be seen by other Members or, if public, by Visitors. Where we have made settings available, we will honor the choices you make about who can see content or information (e.g., sharing to a group instead of your network, changing the default setting for SlideShare content from public to a more restricted view, limiting your profile visibility, or not letting people know when you change your profile, make recommendations or follow companies). Note that other activities, such as applying for a job or sending an InMail, are by default private, only visible to the addressee(s).

We are not obligated to publish any information or content on our Service and can remove it in our sole discretion, with or without notice.

Back to Top ▲

# 3. Rights and Limits

### 3.1. Your License to LinkedIn

You own all of the content, feedback and personal information you provide to us, but you also grant us a non-exclusive license to it.

As between you and LinkedIn, you own the content and information that you submit or post to the Services and you are only granting LinkedIn the following non-exclusive license: A worldwide, transferable and sublicensable right to use, copy, modify, distribute, publish, and process, information and content that you provide through our Services, without any further consent, notice and/or compensation to you or others. These rights are limited in the following ways:

a. You can end this license for specific content by deleting such content from the Services, or generally by closing your account, except (a) to the extent you shared it with others as part of the Service and they copied or stored it and (b) for the reasonable time it takes to remove from backup and other systems.

b. We will not include your content in advertisements for the products and services of others (including sponsored content) to others without your separate consent. However, we have the right, without compensation to you or others, to serve ads near your content and information, and your comments on sponsored content may be visible as noted in the Privacy Policy.

c. We will get your consent if we want to give others the right to publish your posts beyond the Service. However, other Members and/or Visitors may access and share your content and information, consistent with your settings and degree of connection with them.

d. While we may edit and make formatting changes to your content (such as translating it, modifying the size, layout or file type or removing metadata), we will not modify the meaning of your expression.

e. Because you own your content and information and we only have non-exclusive rights to it, you may choose to make it available to others, including under the terms of a Creative Commons license.

You agree that we may access, store and use any information that you provide in accordance with the terms of the Privacy Policy and your privacy settings.

By submitting suggestions or other feedback regarding our Services to LinkedIn, you agree that LinkedIn can use and share (but does not have to) such feedback for any purpose without compensation to you.

You own all of the content, feedback and personal information you provide to us, but you also grant us a non-exclusive license to it.

We'll honor the choices you make about who gets to see your information and content.

You promise to only provide information and content that you have the right to share, and that your LinkedIn profile will be truthful.

You agree to only provide content or information if that does not violate the law nor anyone's rights (e.g., without violating any intellectual property rights or breaching a contract). You also agree that your profile information will be truthful. LinkedIn may be required by law to remove certain information or content in certain countries.

### 3.2. Service Availability

We may change or discontinue any of our Services. We can't promise to store or keep showing any information and content you've posted.

We may change, suspend or end any Service, or change and modify prices prospectively in our discretion. To the extent allowed under law, these changes may be effective upon notice provided to you.

LinkedIn is not a storage service. You agree that we have no obligation to store, maintain or provide you a copy of any content or information that you or others provide, except to the extent required by applicable law and as noted in Section 3.1 of our Privacy Policy.

### 3.3. Other Content, Sites and apps

When you see or use others' content and information posted on our Services, it's at your own risk.

Third parties may offer their own products and services through LinkedIn, and we aren't responsible for those third-party activities.

By using the Services, you may encounter content or information that might be inaccurate, incomplete, delayed, misleading, illegal, offensive or otherwise harmful. LinkedIn generally does not review content provided by our Members. You agree that we are not responsible for third parties' (including other Members') content or information or for any damages as result of your use of or reliance on it.

You are responsible for deciding if you want to access or use third party apps or sites that link from our Services. If you allow a third party app or site to authenticate you or connect with your LinkedIn account, that app or site can access information on LinkedIn related to you and your connections. Third party apps and sites have their own legal terms and privacy policies, and you may be giving others permission to use your information in ways we would not. Except to the limited extent it may be required by applicable law, LinkedIn is not responsible for these other sites and apps -- use these at your own risk. Please see Sections 2.6 and 2.7 of the Privacy Policy.

### 3.4. Limits

We have the right to limit how you connect and interact on our Services.

We're providing you notice about our intellectual property rights.

LinkedIn reserves the right to limit your use of the Services, including the number of your connections and your ability to contact other Members. LinkedIn reserves the right to restrict, suspend, or terminate your account if LinkedIn believes that you may be in breach of this Agreement or law or are misusing the Services (e.g. violating any Do and Don'ts).

LinkedIn reserves all of its intellectual property rights in the Services. For example, LinkedIn, Slideshare, LinkedIn (stylized), the SlideShare and "in" logos and other LinkedIn trademarks, service marks, graphics, and logos used in connection with LinkedIn are trademarks or registered trademarks of LinkedIn. Other trademarks and logos used in connection with the Services may be the trademarks of their respective owners.

Back to Top ▲

# 4. Disclaimer and Limit of Liability

This is our disclaimer of legal liability for the quality, safety, or reliability of our Services.

**4.1. No Warranty**
TO THE EXTENT ALLOWED UNDER LAW, LINKEDIN (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) (A) DISCLAIM ALL IMPLIED WARRANTIES AND REPRESENTATIONS (E.G. WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OF DATA, AND NONINFRINGEMENT); (B) DO NOT GUARANTEE THAT THE SERVICES WILL FUNCTION WITHOUT INTERRUPTION OR ERRORS, AND (C) PROVIDE THE SERVICE (INCLUDING CONTENT AND INFORMATION) ON AN "AS IS" AND "AS AVAILABLE" BASIS.

SOME LAWS DO NOT ALLOW CERTAIN DISCLAIMERS, SO SOME OR ALL OF THESE DISCLAIMERS MAY NOT APPLY TO YOU.

These are the limits of legal liability we may have to you.

**4.2. Exclusion of Liability**
TO THE EXTENT PERMITTED UNDER LAW (AND UNLESS LINKEDIN HAS ENTERED INTO A SEPARATE WRITTEN AGREEMENT THAT SUPERSEDES THIS AGREEMENT), LINKEDIN (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) SHALL NOT BE LIABLE TO YOU OR OTHERS FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF DATA, OPPORTUNITIES, REPUTATION, PROFITS OR REVENUES, RELATED TO THE SERVICES (E.G. OFFENSIVE OR DEFAMATORY STATEMENTS, DOWN TIME OR LOSS, USE OR CHANGES TO YOUR INFORMATION OR CONTENT).

IN NO EVENT SHALL THE LIABILITY OF LINKEDIN (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) EXCEED, IN THE AGGREGATE FOR ALL CLAIMS, AN AMOUNT THAT IS THE LESSER OF (A) FIVE TIMES THE MOST RECENT MONTHLY OR YEARLY FEE THAT YOU PAID FOR A PREMIUM SERVICE, IF ANY, OR (B) US $1000.

THIS LIMITATION OF LIABILITY IS PART OF THE BASIS OF THE BARGAIN BETWEEN YOU AND LINKEDIN AND SHALL APPLY TO ALL CLAIMS OF LIABILITY (E.G. WARRANTY, TORT, NEGLIGENCE, CONTRACT, LAW) AND EVEN IF LINKEDIN HAS BEEN TOLD OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF THESE REMEDIES FAIL THEIR ESSENTIAL PURPOSE.

SOME LAWS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY, SO THESE LIMITS MAY NOT APPLY TO YOU.

Back to Top ▲

# 5. Termination

We can each end this Agreement anytime we want.

LinkedIn or You may terminate this Agreement at any time with notice to the other. On termination, you lose the right to access or use the Services. The following shall survive termination:

- Our rights to use and disclose your feedback;
- Members' and/or Visitors' rights to further re-share content and information you shared through the Service to the extent copied or re-shared prior to termination;
- Sections 4, 6 and 7 of this Agreement;
- Any amounts owed by either party prior to termination remain owed after termination.

You can visit our Help Center to learn how to close your LinkedIn account, close your Pulse account, or close your Slideshare account.

Back to Top ▲

## 6. Dispute Resolution

In the unlikely event we end up in a legal dispute, it will take place in California courts, applying California law.

You agree that the laws of the State of California, U.S.A., excluding its conflict of laws rules, shall exclusively govern any dispute relating to this Agreement and/or the Services. We both agree that all of these claims can only be litigated in the federal or state courts of Santa Clara County, California, USA, and we each agree to personal jurisdiction in those courts.

Back to Top ▲

## 7. General Terms

Here are some important details about how to read the Agreement.

If a court with authority over this Agreement finds any part of it not enforceable, you and us agree that the court should modify the terms to make that part enforceable while still achieving its intent. If the court cannot do that, you and us agree to ask the court to remove that unenforceable part and still enforce the rest of this Agreement. To the extent allowed by law, the English version of this Agreement is binding and other translations are for convenience only. This Agreement (including additional terms that may be provided by us when you engage with a feature of the Services) is the only agreement between us regarding the Services and supersedes all prior agreements for the Services.

If we don't act to enforce a breach of this Agreement, that does not mean that LinkedIn has waived its right to enforce this Agreement. You may not assign or transfer this Agreement (or your membership or use of Services) to anyone without our consent. However, you agree that LinkedIn may assign this Agreement to its affiliates or a party that buys it without your consent. There are no third party beneficiaries to this Agreement.

We reserve the right to change the terms of this Agreement and will provide you notice if we do and we agree that changes cannot be retroactive. If you don't agree to these changes, you must stop using the Services.

You agree that the only way to provide us legal notice is at the addresses provided in Section 10.

Back to Top ▲

## 8. LinkedIn "DOs" and "DON'Ts."

**8.1. Dos. You agree that you will:**
- Comply with all applicable laws, including, without limitation, privacy laws, intellectual property laws, anti-spam laws, export control laws, tax laws, and regulatory requirements;
- Provide accurate information to us and keep it updated;
- Use your real name on your profile;
- Use the Services in a professional manner.

**8.2. Don'ts. You agree that you will not:**
- Act dishonestly or unprofessionally, including by posting inappropriate, inaccurate, or objectionable content;
- Add content that is not intended for, or inaccurate for, a designated field (e.g. submitting a telephone number in the "title" or any other field, or including telephone numbers, email addresses, street addresses or any personally identifiable information for which there is not a field provided by LinkedIn);
- Use an image that is not your likeness or a head-shot photo for your profile;
- Create a false identity on LinkedIn;
- Misrepresent your current or previous positions and qualifications;
- Misrepresent your affiliations with a person or entity, past or present;
- Misrepresent your identity, including but not limited to the use of a pseudonym;
- Create a Member profile for anyone other than yourself (a real person);
- Invite people you do not know to join your network;

CE 1328

- Use or attempt to use another's account;

- Harass, abuse or harm another person;

- Send spam or other unwelcomed communications to others;

- Scrape or copy profiles and information of others through any means (including crawlers, browser plugins and add-ons, and any other technology or manual work);

- Act in an unlawful, libelous, abusive, obscene, discriminatory or otherwise objectionable manner;

- Disclose information that you do not have the right to disclose (such as confidential information of others (including your employer));

- Violate intellectual property rights of others, including patents, trademarks, trade secrets, copyrights or other proprietary rights;

- Violate the intellectual property or other rights of LinkedIn, including, without limitation, using the word "LinkedIn" or our logos in any business name, email, or URL except as provided in the Brand Guidelines;

- Use LinkedIn invitations to send messages to people who don't know you or who are unlikely to recognize you as a known contact;

- Post any unsolicited or unauthorized advertising, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation unauthorized by LinkedIn;

- Send messages to distribution lists, newsgroup aliases, or group aliases;

- Post anything that contains software viruses, worms, or any other harmful code;

- Manipulate identifiers in order to disguise the origin of any message or post transmitted through the Services;

- Create profiles or provide content that promotes escort services or prostitution.

- Creating or operate a pyramid scheme, fraud or other similar practice;

- Copy or use the information, content or data of others available on the Services (except as expressly authorized);

- Copy or use the information, content or data on LinkedIn in connection with a competitive service (as determined by LinkedIn);

- Copy, modify or create derivative works of LinkedIn, the Services or any related technology (except as expressly authorized by LinkedIn);

- Reverse engineer, decompile, disassemble, decipher or otherwise attempt to derive the source code for the Services or any related technology, or any part thereof;

- Imply or state that you are affiliated with or endorsed by LinkedIn without our express consent (e.g., representing yourself as an accredited LinkedIn trainer);

- Rent, lease, loan, trade, sell/re-sell access to the Services or related any information or data;

- Sell, sponsor, or otherwise monetize a LinkedIn Group or any other feature of the Services, without LinkedIn's consent;

- Deep-link to our Services for any purpose other than to promote your profile or a Group on LinkedIn (as set forth in the Brand Guidelines), without LinkedIn's consent;

- Remove any copyright, trademark or other proprietary rights notices contained in or on our Service;

- Remove, cover or obscure any advertisement included on the Services;

- Collect, use, copy, or transfer any information obtained from LinkedIn without the consent of LinkedIn;

- Share or disclose information of others without their express consent;

- Use manual or automated software, devices, scripts robots, other means or processes to access, "scrape," "crawl" or "spider" the Services or any related data or information;

- Use bots or other automated methods to access the Services, add or download contacts, send or redirect messages;

- Monitor the Services' availability, performance or functionality for any competitive purpose;

- Engage in "framing," "mirroring," or otherwise simulating the appearance or function of the Services;

- Access the Services except through the interfaces expressly provided by LinkedIn, such as its mobile applications, linkedin.com and slideshare.net;

- Override any security feature of the Services;
- Interfere with the operation of, or place an unreasonable load on, the Services (e.g., spam, denial of service attack, viruses, gaming algorithms); and/or
- Violate SlideShare's Community Guidelines or, if you're a commercial user of SlideShare, the SlideShare Commercial Terms of Service.

Back to Top ▲

# 9. Complaints Regarding Content

We respect the intellectual property rights of others. We require that information posted by Members be accurate and not in violation of the intellectual property rights or other rights of third parties. We provide a policy and process for complaints concerning content posted by our Members.

Back to Top ▲

# 10. How To Contact Us

If you want to send us notices or service of process, please contact us:

ONLINE at:
https://help.linkedin.com/app/home

OR BY MAIL at:

**For Members in the United States:**
LinkedIn Corporation
Attn: Agreement Matters (Legal)
2029 Stierlin Court
Mountain View CA 94043
USA

**For Members outside the United States:**
LinkedIn Ireland
Attn: Agreement Matters (Legal)
Wilton Plaza,
Wilton Place, Dublin 2
Ireland

Back to Top ▲

LinkedIn Corporation, Mountain View, California, USA, and LinkedIn Ireland, Dublin, Ireland, October 23, 2014

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2016 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

# EXHIBIT B

6/20/2017                                                          User Agreement | LinkedIn



Back to LinkedIn.com

# User Agreement

*Effective on June 7, 2017*

Our User Agreement has been updated. Click here to see a **summary of changes**.

Our mission is to connect the world's professionals to allow them to be more productive and successful. Our services are designed to promote economic opportunity for our members by enabling you and millions of other professionals to meet, exchange ideas, learn, and find opportunities or employees, work, and make decisions in a network of trusted relationships.

▶ View our User Agreement video

Table of Contents:

1. Introduction

2. Obligations

3. Rights and Limits

4. Disclaimer and Limit of Liability

5. Termination

6. Dispute Resolution

7. General Terms

8. LinkedIn "Dos" and "Don'ts"

9. Complaints Regarding Content

10. How To Contact Us

## 1. Introduction

**1.1 Contract**

When you use our Services you agree to all of these terms. Your use of our Services is also subject to our Cookie Policy and our Privacy Policy, which covers how we collect, use, share, and store your personal information.

You agree that by clicking "Join Now", "Join LinkedIn", "Sign Up" or similar, registering, accessing or using our services (described below), **you are agreeing to enter into a legally binding contract** with LinkedIn (even if you are using our Services on behalf of a company). If you do not agree to this contract ("Contract" or "User Agreement"), do **not** click "Join Now" (or similar) and do not access or otherwise use any of our Services.

Your use of our Services is also subject to our **Privacy Policy** and **Cookie Policy.**

**Services**

CE 1332



and "Share with LinkedIn" plugins. Registered users of our Services are "Members" and unregistered users are "Visitors". This Contract applies to both.

**LinkedIn**
You are entering into this Contract with LinkedIn (also referred to as "we" and "us"). If you reside in the United States, you are entering into this Contract with LinkedIn Corporation and your personal data provided to, or collected by or for, our Services is controlled by LinkedIn Corporation. If you reside outside the United States, you are entering into this Contract with LinkedIn Ireland U.C. and your personal data provided to, or collected by or for, our Services is controlled by LinkedIn Ireland U.C.

### 1.2 Members and Visitors

When you register and join the LinkedIn Service, you become a Member. If you have chosen not to register for our Services, you may access certain features as a visitor.

### 1.3 Change

We may modify this Contract, our Privacy Policy and our Cookies Policies from time to time. If we make material changes to it, we will provide you notice through our Services, or by other means, to provide you the opportunity to review the changes before they become effective. If you object to any changes, you may **close your account**. Your continued use of our Services after we publish or send a notice about our changes to these terms means that you are consenting to the updated terms.

# 2. Obligations

### 2.1 Service Eligibility

Here are some promises you make to us in this Contract:

You're eligible to enter into this Contract and you are at least our "Minimum Age."

The Services are not for use by anyone under the age of 16.

To use the Services, you agree that: (1) you must be the "Minimum Age" (described below) or older; (2) you will only have one LinkedIn account (and/or one SlideShare account, if applicable), which must be in your real name; and (3) you are not already restricted by LinkedIn from using the Services.

Members who were below this new Minimum Age when they started using the Services under a previous User Agreement may continue to use them, as they have already reached the new Minimum Age since then or will reach it in the near future.

"Minimum Age" means 16 years old. However, if law requires that you must be older in order for LinkedIn to lawfully provide the Services to you without parental consent (including using of your personal data) then the Minimum Age is such older age.

### 2.2 Your Account

You'll keep your password a secret.

You will not share an account with anyone else and will follow our rules and the law.

Members are account holders. You agree to: (1) try to choose a strong and secure password; (2) keep your password secure and confidential; (3) not transfer any part of your account (e.g., connections) and (4) follow the law and our list of Dos and Don'ts. You are responsible for anything that happens through your account unless you close it or report misuse.

As between you and others (including your employer), your account belongs to you. However, if the Services were purchased by another party for you to use (e.g. Recruiter seat bought by your employer), the party paying for such Service has the right to control access to and get reports on your use of such paid Service; however, they do not have rights to your personal account.

### 2.3 Payment

You'll honor your payment obligations and you are okay with us storing your payment information. You understand that there may be fees and taxes that are added to our prices.

We don't guarantee refunds.

If you buy any of our paid Services ("Premium Services"), you agree to pay us the applicable fees and taxes and to **additional terms** specific to the paid Services. Failure to pay these fees will result in the termination of your paid Services. Also, you agree that:

- Your purchase may be subject to foreign exchange fees or differences in prices based on location (e.g. exchange rates).

- We may store and continue billing your payment method (e.g. credit card) even after it has expired, to avoid interruptions in your Services and to use to pay other Services you may buy.

CE 1333



- All of your purchases of Services are subject to LinkedIn's refund policy.

- We may calculate taxes payable by you based on the billing information that you provide us at the time of purchase.

You can get a copy of your invoice through your LinkedIn account settings under **"Purchase History"**.

## 2.4 Notices and Service Messages

You're okay with us providing notices to you through our websites, apps, and contact information your provided to us. If the contact information you provide is out of date, you may miss out on important notices.

You agree that we will provide notices to you in the following ways: (1) a notice within the Service, or (2) a message sent to the contact information you provided us (e.g., email, mobile number, physical address). You agree to keep your **contact information** up to date.

Please review your settings to **control and limit** the messages you receive from us.

## 2.5 Sharing

When you share information, others can see, copy and use that information.

Our Services allow messaging and sharing of information in many ways, such as your profile, slide deck, links to news articles, job postings, InMails and blogs. Information and content that you share or post may be seen by other Members or Visitors. Where we have made settings available, we will honor the choices you make about who can see content or information (e.g., message content to your addressees, sharing content only to LinkedIn connections, restricting your profile visibility from search engines, or opting not to notify others of your LinkedIn profile update). For job searching activities, we default to not notifying your connections network or the public. So if you apply for a job through our Service or opt to signal that you are interested in a job, our default is to share it only with the job poster.

We are not obligated to publish any information or content on our Service and can remove it in our sole discretion, with or without notice.

# 3. Rights and Limits

### 3.1. Your License to LinkedIn

You own all of the content, feedback, and personal information you provide to us, but you also grant us a non-exclusive license to it.

We'll honor the choices you make about who gets to see your information and content

You promise to only provide information and content that you have the right to share, and that your LinkedIn profile will be truthful.

As between you and LinkedIn, you own the content and information that you submit or post to the Services and you are only granting LinkedIn and our affiliates the following non-exclusive license: A worldwide, transferable and sublicensable right to use, copy, modify, distribute, publish, and process, information and content that you provide through our Services, without any further consent, notice and/or compensation to you or others. These rights are limited in the following ways:

1. You can end this license for specific content by deleting such content from the Services, or generally by closing your account, except (a) to the extent you shared it with others as part of the Service and they copied, re-shared it or stored it and (b) for the reasonable time it takes to remove from backup and other systems.

2. We will not include your content in advertisements for the products and services of third parties to others without your separate consent (including sponsored content). However, we have the right, without payment to you or others, to serve ads near your content and information, and your social actions on sponsored content and company pages may be visible, as noted in the Privacy Policy.

3. We will get your consent if we want to give third parties the right to publish your posts beyond the Service. However, other Members and/or Visitors may access and share your content and information, consistent with your choices.

4. While we may edit and make formatting changes to your content (such as translating it, modifying the size, layout or file type or removing metadata), we will not modify the meaning of your expression.

5. Because you own your content and information and we only have non-exclusive rights to it, you may choose to make it available to others, including under the terms of a **Creative Commons license**.

You agree that we may access, store and use any information that you provide in accordance with the terms of the Privacy Policy and your choices (including settings).

By submitting suggestions or other feedback regarding our Services to LinkedIn, you agree that LinkedIn can use and share (but does not have to) such feedback for any purpose without compensation to you.

You agree to only provide content or information that does not violate the law nor anyone's rights (including intellectual property rights). You also agree that your profile information will be truthful. LinkedIn may be required by law to remove certain information or content in certain countries.

### 3.2 Service Availability

CE 1334



under law, these changes may be effective upon notice provided to you.

We may change or discontinue any of our Services. We don't promise to store or keep showing any information and content that you've posted.

LinkedIn is not a storage service. You agree that we have no obligation to store, maintain or provide you a copy of any content or information that you or others provide, except to the extent required by applicable law and as noted in our Privacy Policy.

### 3.3 Other Content, Sites and Apps

Your use of others' content and information posted on our Services, is at your own risk.

Others may offer their own products and services through LinkedIn, and we aren't responsible for those third-party activities.

By using the Services, you may encounter content or information that might be inaccurate, incomplete, delayed, misleading, illegal, offensive or otherwise harmful. LinkedIn generally does not review content provided by our Members or others. You agree that we are not responsible for others' (including other Members') content or information. We cannot always prevent this misuse of our services, and you agree that we are not responsible for any such misuse. You also acknowledge the risk that you or your organization may be mistakenly associated with content about others when we let connections and followers know you or your organization were mentioned in the news. You may opt out of this feature.

You are responsible for deciding if you want to access or use third party apps or sites that link from our Services. If you allow a third party app or site to authenticate you or connect with your LinkedIn account, that app or site can access information on LinkedIn related to you and your connections. Third party apps and sites have their own legal terms and privacy policies, and you may be giving others permission to use your information in ways we would not. Except to the limited extent it may be required by applicable law, LinkedIn is not responsible for these other sites and apps – use these at your own risk. Please see our Privacy Policy.

### 3.4 Limits

We have the right to limit how you connect and interact on our Services.

LinkedIn reserves the right to limit your use of the Services, including the number of your connections and your ability to contact other Members. LinkedIn reserves the right to restrict, suspend, or terminate your account if LinkedIn believes that you may be in breach of this Contract or law or are misusing the Services (e.g. violating any Do and Don'ts).

### 3.5 Intellectual Property Rights

We're providing you notice about our intellectual property rights.

LinkedIn reserves all of its intellectual property rights in the Services. Using the Services does not give you any ownership in our Services or the content or information made available through our Services. Trademarks and logos used in connection with the Services are be the trademarks of their respective owners. LinkedIn, SlideShare, and "in" logos and other LinkedIn trademarks, service marks, graphics, and logos used for our Services are trademarks or registered trademarks of LinkedIn.

# 4. Disclaimer and Limit of Liability

### 4.1 No Warranty

This is our disclaimer of legal liability for the quality, safety, or reliability of our Services.

TO THE EXTENT ALLOWED UNDER LAW, LINKEDIN AND ITS AFFILIATES (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) (A) DISCLAIM ALL IMPLIED WARRANTIES AND REPRESENTATIONS (E.G. WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY OF DATA, AND NONINFRINGEMENT); (B) DO NOT GUARANTEE THAT THE SERVICES WILL FUNCTION WITHOUT INTERRUPTION OR ERRORS, AND (C) PROVIDE THE SERVICE (INCLUDING CONTENT AND INFORMATION) ON AN "AS IS" AND "AS AVAILABLE" BASIS.

SOME LAWS DO NOT ALLOW CERTAIN DISCLAIMERS, SO SOME OR ALL OF THESE DISCLAIMERS MAY NOT APPLY TO YOU.

### 4.2 Exclusion of Liability

These are the limits of legal liability we may have to you.

TO THE EXTENT PERMITTED UNDER LAW (AND UNLESS LINKEDIN HAS ENTERED INTO A SEPARATE WRITTEN AGREEMENT THAT OVERRIDES THIS CONTRACT), LINKEDIN AND ITS AFFILIATES (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) SHALL NOT BE LIABLE TO YOU OR OTHERS FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF DATA, OPPORTUNITIES, REPUTATION, PROFITS OR REVENUES, RELATED TO THE SERVICES (E.G. OFFENSIVE OR DEFAMATORY STATEMENTS, DOWN TIME OR LOSS, USE OF, OR CHANGES TO, YOUR INFORMATION OR CONTENT).

IN NO EVENT SHALL THE LIABILITY OF LINKEDIN AND ITS AFFILIATES (AND THOSE THAT LINKEDIN WORKS WITH TO PROVIDE THE SERVICES) EXCEED, IN THE AGGREGATE FOR ALL CLAIMS, AN AMOUNT THAT IS THE LESSER OF (A) FIVE TIMES THE MOST RECENT MONTHLY OR YEARLY FEE THAT YOU PAID FOR A PREMIUM SERVICE, IF ANY, OR (B)



THIS LIMITATION OF LIABILITY IS PART OF THE BASIS OF THE BARGAIN BETWEEN YOU AND LINKEDIN AND SHALL APPLY TO ALL CLAIMS OF LIABILITY (E.G. WARRANTY, TORT, NEGLIGENCE, CONTRACT, LAW) AND EVEN IF LINKEDIN OR ITS AFFILIATES HAS BEEN TOLD OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF THESE REMEDIES FAIL THEIR ESSENTIAL PURPOSE.

SOME LAWS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY, SO THESE LIMITS MAY NOT APPLY TO YOU.

## 5. Termination

We can each end this Contract anytime we want.

Both you and LinkedIn may terminate this Contract at any time with notice to the other. On termination, you lose the right to access or use the Services. The following shall survive termination:

- Our rights to use and disclose your feedback;

- Members and/or Visitors' rights to further re-share content and information you shared through the Service to the extent copied or re-shared prior to termination;

- Sections 4, 6 and 7 of this Contract;

- Any amounts owed by either party prior to termination remain owed after termination.

You can visit our **Help Center** to close your account.

## 6. Dispute Resolution

In the unlikely event we end up in a legal dispute, we agree to resolve it in California courts (using California law) or Dublin, Ireland courts (using Irish law).

**If you live in the European Union:** You agree that the laws of Ireland, excluding conflict of laws rules, shall exclusively govern any dispute relating to this Contract and/or the Services. We both agree that all of these claims can only be litigated in Dublin, Ireland, and we each agree to personal jurisdiction of the courts located in Dublin, Ireland.

**For all others, including those who live outside of the United States**, you agree that the laws of the State of California, U.S.A., excluding its conflict of laws rules, shall exclusively govern any dispute relating to this Contract and/or the Services. We both agree that all of these claims can only be litigated in the federal or state courts in Santa Clara County, California, USA, and we each agree to personal jurisdiction in those courts.

## 7. General Terms

Here are some important details about how to read the Contract.

If a court with authority over this Contract finds any part of it not enforceable, you and us agree that the court should modify the terms to make that part enforceable while still achieving its intent. If the court cannot do that, you and us agree to ask the court to remove that unenforceable part and still enforce the rest of this Contract. To the extent allowed by law, the English language version of this Contract is binding and other translations are for convenience only. This Contract (including additional terms that may be provided by us when you engage with a feature of the Services) is the only agreement between us regarding the Services and supersedes all prior agreements for the Services.

If we don't act to enforce a breach of this Contract, that does not mean that LinkedIn has waived its right to enforce this Contract. You may not assign or transfer this Contract (or your membership or use of Services) to anyone without our consent. However, you agree that LinkedIn may assign this Contract to its affiliates or a party that buys it without your consent. There are no third party beneficiaries to this Contract.

We reserve the right to change the terms of this Contract and will provide you notice if we do and we agree that changes cannot be retroactive. If you don't agree to these changes, you must stop using the Services.

You agree that the only way to provide us legal notice is at the addresses provided in Section 10.

## 8. LinkedIn "Dos" and "Don'ts"

### 8.1. Dos

**You agree that you will:**

a. Comply with all applicable laws, including, without limitation, privacy laws, intellectual property laws, anti-spam laws, export control laws, tax laws, and regulatory requirements;

b. Provide accurate information to us and keep it updated;

CE 1336

6/20/2017                                                                                    User Agreement | LinkedIn



d. Use the Services in a professional manner.

## 8.2. Don'ts

You agree that you will *not*:

a. Act in an unlawful or unprofessional manner in connection with our Services, including being dishonest, abusive or discriminatory;

b. Post inaccurate, defamatory obscene, shocking, hateful, threatening or otherwise inappropriate content or airing personal grievances or disputes;

c. Use an **image** that is not your likeness or a head-shot photo for your profile;

d. Create a false identity on LinkedIn. The occasional creation of clearly fictional profiles by LinkedIn or with its express permission in connection with a promotional campaign does not waive this obligation;

e. Misrepresent your identity (e.g. by using a pseudonym), your current or previous positions, qualifications or affiliations with a person or entity;

f. Create a Member profile for anyone other than yourself (a real person);

g. Invite people you do not know to join your network;

h. Use or attempt to use another's account;

i. Harass, abuse or harm another person;

j. Send or post any unsolicited or unauthorized advertising, "junk mail," "spam," "chain letters," "pyramid schemes," or any form of solicitation unauthorized by LinkedIn;

k. Develop, support or use software, devices, scripts, robots, or any other means or processes (including crawlers, browser plugins and add-ons, or any other technology or manual work) to scrape the Services or otherwise copy profiles and other data from the Services;

l. Bypass or circumvent any access controls or Service use limits (such as caps on keyword searches);

m. Copy, use, disclose or distribute any information obtained from the Services, whether directly or through third parties (such as search engines), without the consent of LinkedIn;

n. Solicit email addresses or other personal information from Members you don't know, without authorization.

o. Use, disclose or distribute any data obtained in violation of this policy;

p. Disclose information that you do not have the consent to disclose (such as confidential information of others (including your employer));

q. Violate the intellectual property rights of others, including copyrights, patents, trademarks, trade secrets, or other proprietary rights. For example, do not copy or distribute (except through the available sharing functionality) the posts or other content of others without their permission, which they may give by posting under a Creative Commons license;

r. Violate the intellectual property or other rights of LinkedIn, including, without limitation, (i) copying or distributing our learning videos or other materials or (ii) copying or distributing our technology, unless it is released under open source licenses; (iii) using the word "LinkedIn" or our logos in any business name, email, or URL except as provided in the **Brand Guidelines**;

s. Use LinkedIn invitations to send messages to people who don't know you or who are unlikely to recognize you as a known contact;

t. Post anything that contains software viruses, worms, or any other harmful code;

u. Manipulate identifiers in order to disguise the origin of any message or post transmitted through the Services.

v. Create profiles or provide content that promotes escort services or prostitution.

w. Create or operate a pyramid scheme, fraud or other similar practice;

x. Reverse engineer, decompile, disassemble, decipher or otherwise attempt to derive the source code for the Services or any related technology that is not open source;

y. Imply or state that you are affiliated with or endorsed by LinkedIn without our express consent (e.g., representing yourself as an accredited LinkedIn trainer);

z. Rent, lease, loan, trade, sell/re-sell access to the Services or related data;

aa. Sell, sponsor, or otherwise monetize any Service without LinkedIn's consent;

ab. Deep-link to our Services for any purpose other than to promote your profile or a Group on our Services, without LinkedIn's consent;

ac. Remove any copyright, trademark or other proprietary rights notices contained in or on our Service;

ad. Remove, cover or obscure any advertisement included on the Services;

ae. Use bots or other automated methods to access the Services, add or download contacts, send or redirect messages;

af. Monitor the Services' availability, performance or functionality for any competitive purpose;

CE 1337



ah. Overlaying or otherwise modifying the Services or their appearance;

ai. Access the Services except through the interfaces expressly provided by LinkedIn, such as its mobile applications, linkedin.com and slideshare.net;

aj. Use a Service for tasks that it is not intended for;

ak. Override any security feature of the Services;

al. Interfere with the operation of, or place an unreasonable load on, the Services (e.g., spam, denial of service attack, viruses, gaming algorithms); and/or

am. Violate the **Professional Community Guidelines** or any additional terms concerning a specific Service that are provided when you sign up for or start using such Service.

## 9. Complaints Regarding Content

We respect the intellectual property rights of others. We require that information posted by Members be accurate and not in violation of the intellectual property rights or other rights of third parties. We provide a **policy and process** for complaints concerning content posted by our Members.

## 10. How To Contact Us

If you want to send us notices or service of process, please contact us:

**ONLINE**

OR BY **MAIL**

---

Help Center  |  About  |  Careers  |  Advertising  |  Talent Solutions  |  Sales Solutions  |  Small Business  |  Mobile  |  Language  |  **Upgrade Your Account**

LinkedIn Corporation © 2017  |  User Agreement  |  Privacy Policy  |  Ad Choices  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Send Feedback

CE 1338

User Agreement

CE 1339

# EXHIBIT C

  

SlideShare, a content sharing platform, and LinkedIn Pulse, a news reading application, are part of the LinkedIn family.

# Your Privacy Matters

At LinkedIn, our fundamental philosophy is "members first." That value powers all of the decisions we make, including how we gather and respect your personal information.

We've crafted the policy below to be as clear and straightforward as possible. Our aim is for you—our members—to always feel informed and empowered with respect to your privacy on LinkedIn. Visit our Safety Center for tips on using LinkedIn smartly and securely.

 {0} ›

 |  |  |  | 

**Introduction** | **Information Collected** | **Uses & Sharing of Personal Info** | **Your Choices & Obligations** | **Important Information**

## Introduction

Last revised on October 23, 2014

We are a social network and online platform for professionals.

LinkedIn's mission is to connect the world's professionals to allow them to be more productive and successful. Our registered users ("Members") share their professional identities, engage with their network, exchange knowledge and professional insights, post and view relevant content, and find business and career opportunities. Content on some of our services is also visible to unregistered viewers ("Visitors"). We believe that our services allow our Members to effectively compete and achieve their full career potential. The cornerstone of our business is to focus on our Members first.

We protect your personal information using industry-standard safeguards.

We may share your information with your consent or as required by law, and we will always let you know when we make significant changes to this Privacy Policy.

Maintaining your trust is our top priority, so we adhere to the following principles to protect your privacy:

- We protect your personal information and will only provide it to third parties: (1) with your consent; (2) where it is necessary to carry out your instructions; (3) as reasonably necessary in order to provide our features and functionality to you; (4) when we reasonably believe it is required by law, subpoena or other legal process; or (5) as necessary to enforce our User Agreement or protect the rights, property, or safety of LinkedIn, our Members and Visitors, and the public.

- We have implemented appropriate security safeguards designed to protect your information in accordance with industry standards.

This Privacy Policy applies to LinkedIn.com and the LinkedIn mobile application, SlideShare.net and SlideShare mobile app ("SlideShare"), Pulse.me and Pulse mobile app ("Pulse"), LinkedIn platform technology (such as "Share on LinkedIn" plugins for publishers), the advertising platform created by Bizo Inc. (and its successor products) and all other LinkedIn websites, apps, developer platforms and other products and services (collectively the "Services"). We may modify this Privacy Policy from time to time, and if we make material changes to it, we will provide notice through our Service, or by other means so that you may review the changes before you continue to use our Services. **If you object to any changes, you may close your account. Continuing to use our Services after we publish or communicate a notice about any changes to this Privacy Policy means that you are consenting to the changes.**

Back to Top ▲

# 1. What information we collect

Our Privacy Policy applies to any Member or Visitor. We collect information when you use our Services to offer you a personalized and relevant experience, including growing your network and enabling business opportunities.

**1.1. Data Controllers**
If you reside in the United States, then the personal information provided to or collected by our Services is controlled by LinkedIn Corporation, 2029 Stierlin Court, Mountain View, California 94043. If you reside outside the United States, then this personal information is controlled by LinkedIn Ireland, Wilton Plaza, Wilton Place, Dublin 2, Ireland. **If you have any concern about providing information to us or having such information displayed on our Services or otherwise used in any manner permitted in this Privacy Policy and the User Agreement, you should not become a Member, visit our websites, apps or otherwise use our Services.** If you have already registered, you can close your accounts (e.g., LinkedIn, SlideShare and Pulse).

We collect your personal information in the following ways:

When you create an account with us, we collect information (including your name, email address, and password).

**1.2. Registration**
To create an account on LinkedIn, you must provide us with at least your name, email address and/or mobile number, and a password and agree to our User Agreement and this Privacy Policy, which governs how we treat your information. You may provide additional information during the registration flow (for example, your postal code, job title, and company) to help you build your profile and to provide you more customized services (for example: language-specific profile pages, updates, content, more relevant ads and career opportunities). You understand that, by creating an account, we and others will be able to identify you by your LinkedIn profile. We may also ask for your credit card details if you purchase certain additional services.

We also provide the option to register for a SlideShare account, for which you must provide at least your name, email address and/or mobile number, and a password. We no longer provide the option to register for a separate Pulse account, but you may continue to use your existing Pulse account if you already have one.

We collect information when you fill out a profile. A complete LinkedIn profile that includes professional details – like your job title, education, and skills – helps you get found by other people for opportunities.

**1.3. Profile Information**
After you create an account (other than the distinct SlideShare and Pulse accounts), you may choose to provide additional information on your LinkedIn profile, such as descriptions of your skills, professional experience, and educational background. You can list honors, awards, professional affiliations, Group memberships, networking objectives, companies or individuals that you follow, and other information including content. Subject to the settings you choose, your connections may provide recommendations and endorsements of you. Providing additional information enables you to derive more benefit from our Services by helping you express your professional identity; find other professionals, opportunities, and information; and help recruiters and business opportunities find you. It also enables us to serve you ads and other relevant content on and off of our Services.

On SlideShare, you can choose what personal information you provide in addition to the information required for registration as noted above. Most of your SlideShare profile, as well as all content that you post on SlideShare, is publicly displayed (with the exceptions provided in the SlideShare account settings), so please do not provide personal information you would not want to be public. We may use and share information you provide in a SlideShare profile and/or Pulse account in the same manner as the information provided in a LinkedIn.com profile, in accordance with this Privacy Policy and our User Agreement.

We collect information when you sync non-LinkedIn content – like your email address book, mobile device contacts, or calendar – with your account. You can remove your address book and any other synced information whenever you like.

**1.4. Address Book and Other Services That Sync with LinkedIn**
You may use our address book or "contacts" importer (or other similar features) to upload your address book into our Services. We store this information (including phone numbers) and use it to help you manage and leverage your contacts in connection with our Services. We also use this information to enhance your experience with our Services by helping you to grow your network by: identifying your contacts that are already Members of our Services; providing a template to send invitations on your behalf to your contacts that are not Members; and suggesting people you may know (even if not in your contacts) but are not yet connected with you on our Services (as we may infer from your shared connections or shared managers, employers, educational institutions and other such factors). We may also use this information to show you and other Members that you share the same uploaded contacts who may or may not be Members.

Please note that when you send an invitation to connect to another individual on our Service (a "connection") or to join our Service to connect with you, that person may have access to your email address or, for SMS invitations, mobile number because it may be displayed in the invitation. After sending these invitations, we may also remind your invitees of your invitation on your behalf. Your LinkedIn connections will also have access to your email address.

We make other tools available to sync information with our Services, and may also develop additional features that allow Members to use their account in conjunction with other third-party services. For example, our mobile applications allow you to sync your device's calendar, email and/or contacts apps with our Services to show you the LinkedIn profiles of meeting attendees, email correspondents and/or your contacts.

Another example are software tools that allow you to see our and other public information about the people you email or meet with and leverage our Services to help you gain insights from and grow your network. If you grant these products (mobile applications or our other Services that sync external email and calendar services, such as "LinkedIn Connected") permission to access your email and calendar accounts, they will access and may store some of your email header and calendar history information. Our products that sync with external email services may also temporarily cache message content for performance reasons, in a way that is unreadable by us and our service providers.

**Any information that you upload or sync with our Services is covered by the User Agreement and this Privacy Policy. You can remove your information at your convenience** using the features we make available or in accordance with Section 3. You can remove your address book and any other synced information at any time.

| We collect information when you contact us for customer support. | **1.5. Customer Service** |
|---|---|

When you contact our customer support services (e.g. on our Help Center and SlideShare's Help Center), we may have to access your InMails, Groups and other contributions to our Services and collect the information we need to categorize your question, respond to it, and, if applicable, investigate any breach of our User Agreement or this Privacy Policy. We also use this information to track potential problems and trends and customize our support responses to better serve you. We do not use this information for advertising.

We collect information when you visit our Services (including, LinkedIn, SlideShare and Pulse), use our mobile applications, and interact with advertising on and off our Services.

**1.6. Using the LinkedIn Sites and Applications**

We collect information when you visit (whether as a Member or a Visitor) our websites, applications, our platform technology (such as "Share on LinkedIn" plugins for publishers) or other Services. For example, we collect information when you view or click on ads on and off our Services, perform a search, import your address book, join and participate in groups, participate in polls, install one of our mobile applications, view content on LinkedIn or SlideShare, share articles on our Services and apply to jobs through our Services. If you are logged in on LinkedIn.com, SlideShare.net, the Pulse app or another Service or one of our cookies on your device identifies you, your usage information and the log data described in Section 1.10 of this policy, such as your IP address, will be associated by us with your account. Even if you're not logged into a Service, we log information about devices used to access our Services, including IP address.

We collect information when you use your account to sign in to other sites or services, and when you view web pages that include our plugins and cookies.

**1.7. Using Third-Party Services and Visiting Third-Party Sites**

You allow us to receive information when you use your account to log in to a third-party website or application. Also, when you visit a third-party site that embeds our social plugins (such as "Share on LinkedIn" for publishers) we receive information that those pages have loaded in your web browser. If you are logged in as a Member when you visit sites with our plugins, we use this information to recommend tailored content to you. We will use this information to personalize the functionality we provide on third-party sites, including providing you insights from your professional network and allowing you to share information with your network. Our retention of this data is addressed in Section 3.2. We may provide reports containing aggregated impression information to companies hosting our plugins and similar technologies to help them measure traffic to their websites, but no personal data. Please note that SlideShare.net, Pulse.me and the Pulse app are part of the LinkedIn Services, not third-party sites or applications.

You also allow us to receive information about your visits and interaction with the sites and services of our partners that include our cookies and similar technologies, unless you opt out. If you are not a Member, we rely on the online terms between you and our partners.

We use cookies and similar technologies to collect information.

**1.8. Cookies**

As described in our Cookie Policy, we use cookies and similar technologies, including mobile application identifiers, to help us recognize you across different Services, learn about your interests both on and off our Services, improve your experience, increase security, measure use and effectiveness of our Services, and serve advertising. You can control cookies through your browser settings and other tools. **By visiting our Services, you consent to the placement of cookies and beacons in your browser and HTML-based emails in accordance with this Privacy Policy, which incorporates by reference our Cookie Policy.**

We use advertising technologies and

**1.9. Advertising Technologies and Web Beacons**

web beacons to collect information. We give you a number of ways to opt out of targeted ads, including through the Ad Choices icon shown with any ads we serve on third-party sites. If you do not want us to track your behavior on third-party sites, you can opt out. If you do not opt out, you consent to our use of beacons and other advertising technologies.

We target (and measure the performance of) ads to Members, Visitors and others both on and off of our Services through a variety of ad networks and ad exchanges, using the following, whether separately or combined:

- Advertising technologies on and off of our Services, like web beacons, pixels, ad tags, cookies, and mobile identifiers as permitted by mobile platforms;

- Member-provided profile and contact information and categories (for example, "product managers in Texas");

- Information inferred from a Member's profile (for example, using job titles to infer age, industry, seniority, and compensation bracket; or names to infer gender);

- Your use of our Services (for example, your search history, the content you read on SlideShare or Pulse, who you follow or is following you on SlideShare, Groups participation, which pages you visit, your clicking on a LinkedIn ad, etc.) and log files generated as described in Section 1.10;

- Information from 3rd parties (e.g. advertising partners, publishers and data aggregators) which we use in addition to the information from our cookies (and similar technologies), your profile and use of our Services.

We do not share your personal information with any third-party advertisers or ad networks for advertising without your separate permission. Note that, as described in Section 2.6, your profile is visible to other Members and through public search depending on your settings. Also, advertising partners may associate personal information collected by the advertiser directly from you with our cookies and similar technologies. In such instances, we contractually require such advertisers to obtain your explicit opt-in consent before doing so.

We may show you sponsored content in your network update stream (NUS), which will be designated as sponsored content and will behave like other NUS updates. If you take social action (for example, if you "like" or "comment" on the sponsored content), your action may be seen by your network and other Members who are shown the sponsored content after you have acted on it. Please note that all social actions on SlideShare (e.g. liking certain content, following or being followed by others) are public, unless expressly specified otherwise with respect to premium accounts.

We adhere to self-regulatory principles for interest based advertising. If you wish to not receive targeted ads from most third party companies, you may opt-out as described here. Please note this does not opt you out of being served advertising. You will continue to receive generic ads or targeted ads by companies not listed with these opt-out tools. You can also opt out specifically from our use of cookies and similar technologies to track your behavior on third party sites. For non-Members, this opt out setting is here.

We collect information from the devices and networks that you use to access our Services.

**1.10. Log Files, IP Addresses, and Information About Your Computer and Mobile Device**
When you visit or leave our Services (whether as a Member or Visitor) by clicking a hyperlink or when you view a third-party site that includes our plugin or cookies (or similar technology), we automatically receive the URL of the site from which you came or the one to which you are directed. Also, advertisers receive the URL of the page that you are on when you click an ad on or through our Services. We also receive the internet protocol ("IP") address of your computer or the proxy server that you use to access the web, your computer operating system details, your type of web browser, your mobile device (including your mobile device identifier provided by your mobile device operating system), your mobile operating system (if you are accessing LinkedIn using a mobile device), and the name of your ISP or your mobile carrier. We may also receive location data passed to us from third-party services or GPS-enabled devices that you have set up, which we use to show you local information (for example, Pulse articles about your area or jobs postings in your location) on our mobile applications and for fraud prevention and security purposes. Most mobile devices allow you to prevent real time location data being sent to us, and of course we will honor your settings.

In the case of our Android apps, you will be provided notice of the types of data (e.g. location) that will be sent to us. If you choose to use our app after this notice, we process this data to enable registration or preview product features for you (e.g. jobs near you). If you choose not to become a Member, we will delete this information.

We are constantly innovating to improve our Services, which means we may create new ways to collect information on the Services.

**1.11. Other**
Our Services are a dynamic, innovative environment, which means we are always seeking to improve the Services we offer you. We often introduce new features, some of which may result in the collection of new information (for example, when the Endorsements feature launched, we began collecting information about skills for which Members were endorsed and the individuals who endorsed them). Furthermore, new partnerships or corporate acquisitions may result in new features, and we may potentially collect new types of information. If we start collecting substantially new types of personal information and materially change how we handle your data, we will modify this Privacy Policy and notify you in accordance with Section 4.3.

CE 1344

# 2. How we use your personal information

You agree that information you provide on your profile can be seen by others and used by us as described in this Privacy Policy and our User Agreement.

**2.1. Consent to LinkedIn Processing Information About You**
The personal information that you provide to us may reveal or allow others to identify aspects of your life that are not expressly stated on your profile (for example, your picture or your name may reveal your gender). By providing personal information to us when you create or update your account and profile, **you are expressly and voluntarily accepting the terms and conditions of our User Agreement and freely accepting and agreeing to our processing of your personal information in ways set out by this Privacy Policy.** Supplying to us any information deemed "sensitive" by applicable law is entirely voluntary on your part. **You can withdraw or modify your consent to our collection and processing of the information you provide at any time, in accordance with the terms of this Privacy Policy and the User Agreement, by changing your account settings or your profile on** LinkedIn **or SlideShare, or by closing your** LinkedIn, SlideShare **and** Pulse **accounts.**

We communicate with you using LinkedIn messaging, email, and other ways available to us. We may send you messages relating to the availability of the Services, security, or other service-related issues. We also may send promotional InMail messages to your LinkedIn inbox. You can change your email settings at any time.

**2.2. LinkedIn Communications**
We communicate with you through email, notices posted on the LinkedIn websites or apps, messages to your LinkedIn inbox, and other means available through the Services, including mobile text messages and push notifications. Examples of these communications include: (1) welcome and engagement communications - informing you about how to best use our Services, new features, updates about other Members you are connected to and their actions, etc.; (2) service communications - these will cover service availability, security, and other issues about the functioning of our Services; (3) promotional communications - these include both email and InMail messages (InMail messages are only delivered to your LinkedIn InBox), and may contain promotional information directly or on behalf of our partners, including job opportunities and information from companies that are hiring. These messages will be sent to you based on your profile information and messaging preferences. We track the open rate of your InMails to provide your InMail acceptance score. You may change your email and contact preferences at any time by signing into your account and changing your LinkedIn or SlideShare email settings. You can also opt out of promotional messages by sending a request to LinkedIn Help Center.

Please be aware that you cannot opt out of receiving service messages from us.

With certain communications you send on our Services, the recipient can see your name, email address, and some network information.

**2.3. User Communications**
Many communications that you initiate through our Services (for example, an invitation sent to a non-Member) will list your name and primary email address in the header of the message. Messages you initiate may also provide the recipient with aggregate information about your network (for example, how many people are in your network). Other communications that you initiate through the Services, like a request for an introduction, will list your name as the initiator but will not include your personal email address contact information. Once you have connected with an individual, regardless of who sent the invitation, your contact information will be shared with that individual.

We use automatic scanning technology to help protect you and other Members. Such technology checks links and other content in your InMails, network updates and Group contributions to help us identify and block malicious links and malware, reduce spam and optimize the delivery of our Services.

We use the information and content you provide to us to conduct research and development and to customize your experience and try to make it relevant and useful to you.

**2.4. Service Development; Customized Experience**
We use information and content that you and other Members provide to us to conduct research and development for the improvement of our Services in order to provide you and other Members and Visitors with a better, more intuitive experience and drive membership growth and engagement on our Services and to help connect professionals to economic opportunity.

We also customize your experience and the experiences of others on our Services. For example, when you sign in to your account, we may display the names and photos of new Members who have recently joined your network or recent updates from your connections and companies you follow. We try to show you content, such as news and presentations, that is relevant to you, your industry, or your profession. We also use Members information and content for invitations and communications promoting our Services that are tailored to the recipient.

We share your information across our

**2.5. Sharing Information with Affiliates**
We may share your personal information with our affiliates (meaning entities controlled by,

different Services, among companies in the LinkedIn family.

controlling or under common control with LinkedIn) outside of the LinkedIn entity that is your data controller (for example, LinkedIn Corporation may share your information with LinkedIn Ireland, or other LinkedIn operating entities) as reasonably necessary to provide the Services. You are consenting to this sharing.

We combine information internally across different Services. For example, SlideShare may recommend better content to you based on your LinkedIn content preferences and the articles you read on Pulse, and LinkedIn could present you a better tailored network update stream based on your SlideShare activity, whether or not you tied your SlideShare, Pulse and/or LinkedIn accounts (e.g. by signing in SlideShare or Pulse with your LinkedIn account), as we may be able to identify you across different Services using cookies or similar technologies.

---

Any information you put on your profile and any content you post on LinkedIn may be seen by others.

We don't provide any of your non-public information (like your email address) to third parties without your consent, unless required by law, or as described in Sections 2.6 and 2.14 of this Policy.

Other people may find your LinkedIn profile information through search engines (you can choose which parts of your public profile are accessible to public search engines in your settings), or use services like Twitter in conjunction with your LinkedIn account.

**2.6. Sharing Information with Third Parties**

We offer a "public profile" feature that allows you as a Member to publish portions of your professional profile to the public Internet. This public profile will be indexed and displayed through public search engines when someone searches for your name. You may choose the parts of your profile that search engines index or completely opt out of this feature in your LinkedIn account settings, or limit the publicly visible information in your SlideShare profile. However, third-party search engines may not automatically update their caches, which may contain old public profile information. Unless you delete them, your profiles on LinkedIn.com and our corresponding app or on SlideShare.net are always viewable on the respective Services.

The visibility of your professional profile to other Members depends on your degree of connection with the viewing Member, the subscriptions they may have, the usage of the Services, access channels and search types (e.g. by name or by keyword). For example, first degree connections can see your full profile and contact information. Others have more limited access, as detailed in our Help Center. Please note that recruiters and other such professional subscribers can see your full profile even if you did not approve their InMail.

We do not rent or sell personal information that you have not posted on our Services, except as described in this Privacy Policy. We will not disclose personal information that is not published to your profile or generated through engagement with our other services, such as Groups and Company Pages, except to carry out your instructions (for example, to process payment information) or unless we have your separate consent, unless we have a good faith belief that disclosure is permitted by law or is reasonably necessary to: (1) comply with a legal requirement or process, including, but not limited to, civil and criminal subpoenas, court orders or other compulsory disclosures; (2) enforce this Privacy Policy or our User Agreement; (3) respond to claims of a violation of the rights of third parties; (4) respond to Member service inquiries; or (5) protect the rights, property, or safety of LinkedIn, our Services, our Members, Visitors, or the public. See Section 2.14 for additional details about our compliance with legal requests for information.

We support middleware providers that offer archiving solutions to firms subject to legal and regulatory archiving requirements, which, with your permission, facilitate the archiving of your communications and other activity by a third party for compliance purposes. Content distributed through our sharing features and third-party integrations may result in displaying some of your personal information outside of our Services. For example, when you post content to a Group that is open for public discussion, your content, including your name as the contributor, may be displayed in search engine results.

Also, if you have opted to bind any of your Service accounts to your Twitter, Facebook or other similar account, you can easily share content from our Services to these third party services, in accordance with your account settings (which you may change at any time) and respective policies of these third parties. Further, we allow third parties to look-up profile information (subject to your privacy settings) using your email address or first and last name information through its profile API (see Section 2.7. below).

Third parties (for example, your email provider) may give you the option to upload certain information in your contacts stored with us onto their own service. If you choose to share your contacts in this way, you will be granting your third party provider the right to store, access, disclose and use these contacts in the ways described in such third party's terms and privacy policy.

---

We work with developers to build Platform Applications using our developer tools. Whether you use Platform Applications is up to you.

If you have given a Platform Application access to your LinkedIn account, you can revoke that permission anytime. Also, you can opt

**2.7. Third Parties Using LinkedIn Platform Services**

We collaborate with and allow third parties to use our developer platform to offer services and functionality in conjunction with our Services. These third-party developers have either negotiated an agreement to use our platform technology or have agreed to our self-service API and Plugin terms in order to build applications ("Platform Applications"). Both the negotiated agreements and our API and Plugin terms contain restrictions on how third parties may access, store, and use the personal information you provide to us.

If you choose to use a Platform Application, you will be asked to confirm acceptance of the privacy policy and user agreement of the third-party developer. To revoke permission granted to a

out of providing information to developers through your connections.

Platform Application, please visit your settings. Note, however, that even if you revoke the permission granted to a Platform Application, your connections may still be using the Platform Application, so the Platform Application may still have access to certain information about you, just as your connections do. You may opt out of providing information to developers through your connections by accessing the "Turn on/off data sharing with third-party applications" control in the "Groups, Companies, and Applications" tab under settings.

---

We conduct our own surveys and polls and also help third parties do this type of research. Your participation in surveys or polls is up to you. You may also opt out of getting invitations to participate in surveys.

**2.8. Polls and Surveys**
Polls and Surveys may be conducted by us, Members, or third parties. Some third parties may target advertisements to you on the results page based on your answers in the poll. We or third parties may follow up with you via InMail regarding your participation unless you have opted out of receiving InMail messages. We may use third parties to deliver incentives to you to participate in surveys or polls. If the delivery of incentives requires your contact information, you may be asked to provide personal information to the third party fulfilling the incentive offer, which will be used only for the purpose of delivering incentives and verifying your contact information. It is up to you whether you provide this information, or whether you desire to take advantage of an incentive. Your consent to use any personal information for the purposes set forth in the poll or survey will be explicitly requested by the party conducting it. We are a member of the Council of American Survey Research Organizations ("CASRO") and abides by CASRO guidelines for market research. You may opt out of participating in surveys by changing your settings to stop receiving these inquiries and requests.

---

Our Services help you search for other professionals, companies, groups, professional content, and jobs.

**2.9. Search**
You can search for Members, employment opportunities, information about companies, and community content from Groups on our Services. For example, you can find Members with particular expertise or experience, or Members that you may know from your industry or profession. You can also find employment opportunities and information about companies. You can also find content from Groups, SlideShare and Pulse. We use personal information from our Services, including Member profiles, Groups content, and Company Pages, to inform and refine our search service.

---

You are responsible for any information you post on our Services, and this content will be accessible to others.

**2.10. Groups**
If you participate in Groups, share content on your network update stream, or import a blog or other content, you should be aware that any information you choose to disclose using these services can be read, collected, and used by other Members in these forums, developers, and other third parties, including advertisers. We are not responsible for the information you choose to submit in these forums. Your Groups contributions are typically searchable on our Services and some content in Groups may be public and searchable on the Internet if the group owner has not closed the group for public discussions. You can identify closed groups by the padlock icon next to the group name. You can remove your Groups posts at any time. However, others may have copied and used the information that you shared.

---

**2.11. Testimonials and Advertisements Placed through LinkedIn Ads**
If you provide any testimonials about our goods or services or place advertisements through the LinkedIn Ads, we may post those testimonials and examples of advertisements you place in connection with our promotion of these services to third parties. Testimonials and advertisements may include your name and other personal information that you have provided. For more information about LinkedIn Ads, please see the LinkedIn Ads Terms of Use.

---

We offer a premium service to recruiters and others, which can be used to search for, organize, and communicate with potential candidates or offer business opportunities. In some cases we allow the export of public profile information. You can control how your information is exported by changing which parts of your public profile are accessible to search engines.

**2.12. Talent Recruiting, Marketing and Sales Solutions**
We offer customized people-search functionality along with organizational and communications tools (including activity alerts) as part of our talent recruiting, marketing and sales solutions. These services allow subscribers - generally, enterprises and professional organizations - to export limited information from Members' public profiles, such as name, headline, current company, current title, and location (for example, San Francisco Bay Area), in order to effectively manage candidate sourcing. You may limit or prevent such subscribers from exporting your profile information by configuring your public profile visibility settings to restrict access to these fields. We do not provide email or other contact information to these subscribers. However, if you post that information as part of your profile it will be available to them and others. A recruiter or other such subscriber may also manage and store information it has independently obtained about you outside of our Services, such as a resume, in connection with our platform. Any personal information obtained independently of our Services will not be added by us to your profile and is not under our control but is subject to the policies of our recruiting, marketing or sales solution subscriber. We store such information on behalf of such subscriber who can remove it at any time. We do not further process such information.

---

CE 1347

Companies and other entities can create pages on our Services. If you follow one of these pages, non-identifiable information about you will be provided to the page's administrators.

**2.13. Pages for Companies, Schools, Influencers, and Other Entities**
Certain pages on the Services are public (e.g., company and college pages), and any communications or information shared through them will be accessible by the entity that created them. If you follow a person or organization, you will be listed among its followers, which can be viewed by others including the page owner. We use aggregate information about followers and viewers to provide data about such pages' performance (for example, visits and updates).

We may disclose your personal information if compelled by law, subpoena, or other legal process, or if necessary to enforce our User Agreement.

**2.14. Compliance with Legal Process and Other Disclosures**
It is possible that we may need to disclose personal information, profile information, or information about your activities as a Member or Visitor when required by law, subpoena, or other legal process, whether in the United States, Ireland, or other jurisdictions, or if we have a good faith belief that disclosure is reasonably necessary to (1) investigate, prevent, or take action regarding suspected or actual illegal activities or to assist government enforcement agencies; (2) enforce the User Agreement, investigate and defend ourselves against any third-party claims or allegations, or protect the security or integrity of our Service; or (3) exercise or protect the rights, property, or safety of LinkedIn, our Members, personnel, or others. We attempt to notify Members about legal demands for their personal information when appropriate in our judgment, unless prohibited by law or court order or when the request is an emergency. In light of our principles, we may dispute such demands when we believe, in our discretion, that the requests are overbroad, vague or lack proper authority, but do not commit to challenge every demand. To find out more about how we engage with government requests for data see our Law Enforcement Data Request Guidelines.

If there is a change in control or sale of all or part of LinkedIn, we may share your information with a third party, who will have the right to use that information in line with this Privacy Policy.

**2.15. Disclosures to Others as the Result of a Change in Control or Sale of LinkedIn Corporation**
We may also disclose your personal information to a third party as part of a sale of the assets of LinkedIn Corporation, a subsidiary, or division, or as the result of a change in control of the company or one of its affiliates, or in preparation for any of these events. Any third party to which we transfers or sells our assets will have the right to continue to use the personal and other information that you provide to us in the manner set out in this Privacy Policy.

We may employ third parties to help us with the Services

**2.16. Service Providers**
We may employ third party companies and individuals to facilitate our Services (e.g. maintenance, analysis, audit, marketing and development). These third parties have limited access to your information only to perform these tasks on our behalf and are obligated to LinkedIn not to disclose or use it for other purposes.

We may process your information outside the country where you live.

**2.17 Data Processing Outside Your Country**
We may transfer your information and process it outside your country of residence, wherever LinkedIn, its affiliates and service providers operate.

Back to Top ▲

# 3. Your Choices & Obligations

You can change your LinkedIn information at any time by editing your profile, deleting content that you have posted, or by closing your account. You can also ask us for additional information we may have about your account.

**3.1. Rights to Access, Correct, or Delete Your Information, and Closing Your Account**
You have a right to (1) access, modify, correct, or delete your personal information controlled by LinkedIn regarding your profile, (2) change or remove your content, and (3) close your account. You can request your personal information that is not viewable on your profile or readily accessible to you (for example, your IP access logs) through LinkedIn's Help Center. If you close your account(s), your information will generally be removed from the Service within 24 hours. We generally delete closed account information and will de-personalize any logs or other backup information through the deletion process within 30 days of account closure, except as noted below.

With respect to SlideShare accounts and activity, if you would like us to delete your record and/or remove a particular comment you have made on SlideShare.net, or to provide a copy of any personal information to which you may be entitled, please contact us at privacy@slideshare.com. We will remove your information from SlideShare.net within 24 hours and delete and/or de-personalize it from our systems within 30 days of closure, except as noted below.

**Please note:** Information you have shared with others (for example, through InMail, network updates, content sharing, or Groups) or that others have copied may also remain visible after you have closed your account or deleted the information from your own profile. Groups content

associated with closed accounts will show an unknown user as the source. In addition, you may not be able to access, correct, or eliminate any information about you that other Members copied or exported out of our Services, because this information may not be in our control. Your public profile may be displayed in search engine results until the search engine refreshes its cache.

| | |
|---|---|
| We keep your information for as long as your account is active or as needed. For example, we may keep certain information even after you close your account if it is necessary to comply with our legal obligations, meet regulatory requirements, resolve disputes, prevent fraud and abuse, or enforce this agreement. | **3.2. Data Retention**<br>We retain the personal information you provide while your account is in existence or as needed to provide you services. We may retain your personal information even after you have closed your account if retention is reasonably necessary to comply with our legal obligations, meet regulatory requirements, resolve disputes between Members, prevent fraud and abuse, or enforce this Privacy Policy and our User Agreement. We may retain personal information, for a limited period of time, if requested by law enforcement. Our Customer Service may retain information for as long as is necessary to provide support-related reporting and trend analysis only, but we generally delete or de-personalize closed account data consistent with Section 3.1., except in the case of our plugin impression data (i.e., the information that you visited on sites carrying our social plugin, but which you did not click on), which we de-personalize within 7 days (although we do maintain 30 days worth of webserver logs for security, debugging, and site stability purposes only) by creating aggregate data sets that cannot be traced back to individuals. |

Back to Top ▲

# 4. Important Information

| | |
|---|---|
| You have to meet LinkedIn's minimum age requirements to create an account.<br><br>Visit our Safety Center for tips on using LinkedIn smartly and securely. | **4.1. Minimum Age**<br>As described in Section 2.1 of the User Agreement, persons must be of Minimum Age to use LinkedIn. Please visit our Safety Center for additional information about safely using our Services. |
| We partner with TRUSTe because we take your privacy seriously and are committed to putting you and all of our Members first. TRUSTe certifies our compliance with the TRUSTe program and verifies our compliance with the US-EU and US-Swiss Safe Harbor programs. If you can't resolve a complaint through LinkedIn Customer Support, you may also contact TRUSTe.<br><br> | **4.2. TRUSTe and Safe Harbor**<br>LinkedIn.com and SlideShare.net have been awarded TRUSTe's Privacy Seal signifying that this Privacy Policy and its practices have been reviewed by TRUSTe for compliance with TRUSTe's program requirements.<br><br>If you have questions or concerns regarding this Policy, you should first contact LinkedIn. If contacting us does not resolve your complaint, you may raise your complaint with TRUSTe by Internet, by fax at 415-520-3420, or mail to TRUSTe Safe Harbor Compliance Dept. (click for mailing address). The complaint should include the name of company, the alleged privacy violation, your contact information, and whether you would like the particulars of your complaint shared with the company. The TRUSTe dispute resolution process shall be conducted in English. The TRUSTe program only covers information collected through www.linkedin.com, and does not cover information that may be collected through downloaded software or Plugins.<br><br>We comply with the U.S.-E.U. and U.S.-Swiss Safe Harbor Frameworks as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of personal data from European Union member countries and Switzerland. We have certified that it adheres to the Safe Harbor Privacy Principles of notice, choice, onward transfer, security, data integrity, access, and enforcement. To learn more about the Safe Harbor program, and to view LinkedIn's certification, please visit http://www.export.gov/safeharbor/.<br><br>**Note:** The U.S.-E.U. Safe Harbor Framework is no longer recognized as a legal mechanism to transfer personal data from the EU to the US. LinkedIn Ireland uses other legal mechanisms, including standard contractual clauses. Learn more. |
| We will notify you when we change this Privacy Policy. | **4.3. Changes to this Privacy Policy**<br>We may change this Privacy Policy from time to time. If we make significant changes in the way we treat your personal information, or to the Privacy Policy, we will provide notice to you on the Services or by some other means, such as email. Please review the changes carefully. If you agree to the changes, simply continue to use our Services. If you object to any of the changes to our terms and you no longer wish to use our Services, you may close your account(s). Unless stated otherwise, our current Privacy Policy applies to all information that we have about you and your account. Using our Services after a notice of changes has been communicated to you or published on our Services shall constitute consent to the changed terms or practices. |

Case 3:17-cv-03301-EMC   Document 29   Filed 06/26/17   Page 39 of 65

We don't share any of your personal information with third parties for direct marketing.

### 4.4. California's Shine the Light Law

California Civil Code Section 1798.83, known as the "Shine The Light" law, permits our customers who are California residents to request and obtain from us a list of what personal information (if any) we disclosed to third parties for direct marketing purposes in the preceding calendar year and the names and addresses of those third parties. Requests may be made only once a year and are free of charge. Under Section 1798.83, we currently do not share any personal information with third parties for their direct marketing purposes.

We take privacy and security seriously and have enabled HTTPS access to our site (turn on HTTPS), in addition to existing SSL access over mobile devices. Also, please know that the Internet is not a secure environment, so be careful and select strong passwords.

### 4.5. Security

We have implemented security safeguards designed to protect the personal information that you provide in accordance with industry standards. Access to your data on our Services is password-protected, and data such as credit card information is protected by SSL encryption when it is exchanged between your web browser and the Services. We also offer secure https access to the LinkedIn.com website. To protect any data you store on our servers, we also regularly monitor our system for possible vulnerabilities and attacks, and we use a tier-one secured-access data center. However, since the Internet is not a 100% secure environment, we cannot ensure or warrant the security of any information that you transmit to us. There is no guarantee that information may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards. It is your responsibility to protect the security of your login information. Please note that emails, instant messaging, and similar means of communication with other Members are not encrypted, and we strongly advise you not to communicate any confidential information through these means. Please help keep your account safe by using a strong password.

Back to Top ▲

---

## How To Contact Us

If you have questions or comments about this Privacy Policy, please contact us online or by physical mail at:

**For Members in the United States:**
LinkedIn Corporation
Attn: Privacy Policy Issues
2029 Stierlin Court
Mountain View, CA 94043
USA

**For Members outside the United States:**
LinkedIn Ireland
Attn: Privacy Policy Issues
Wilton Plaza
Wilton Place, Dublin 2
Ireland

Back to Top ▲

---

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2016   |   User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

# EXHIBIT D

6/20/2017                                              Privacy Policy | LinkedIn



Back to LinkedIn.com

# Privacy Policy

*Effective on June 7, 2017*
See a **guided tour** of the main changes.

## Your Privacy Matters

LinkedIn's mission is to connect the world's professionals to allow them to be more productive and successful. Central to this mission is our commitment to be transparent with you about the data we collect about you and how it is used and shared.

By using our Services, you consent to our use of your data under this Privacy Policy.

▷ **View our Privacy Policy video**

Table of Contents:

Introduction

Information We Collect

How We Use Your Data

How We Share Information

Your Choices & Obligations

Other Important Information

## Introduction

We are a social network and online platform for professionals. People use our services to find and be found for business opportunities and to connect with others and information. Our Privacy Policy applies to any Member or Visitor to the covered Services.

Our registered users ("**Members**") share their professional identities, engage with their network, exchange knowledge and professional insights, post and view relevant content, learn and find business and career opportunities. Content on some of our services is available to non-members ("**Visitors**").

**Data Controllers**
If you reside in the United States, you are entering into the **User Agreement** with LinkedIn Corporation, who will be responsible for your personal data provided to, or collected by or for, our Services. If you reside outside the United States, you are entering into the User Agreement with LinkedIn Ireland U.C., who will be the controller of your personal data provided to, or collected by or for, our Services.

**Services**
This Privacy Policy applies to LinkedIn.com, LinkedIn-branded apps, Slideshare, LinkedIn Learning and other LinkedIn-related sites, apps, communications and services ("**Services**"), including off-site Services, such as our ad services and the "Apply with LinkedIn" and "Share with LinkedIn" plugins, but excluding services that state that they are offered under a different privacy policy.

CE 1352

6/20/2017                                                                    Privacy Policy | LinkedIn



#### Consent

If you use our Services, you consent to the collection, use and sharing of your personal data under this Privacy Policy (which includes our **Cookie Policy** and other documents referenced in this Privacy Policy) and agree to the **User Agreement**. We provide you **choices** that allow you to opt-out or control how we use and share your data.

If you use our Services after an update to this Privacy Policy, you consent to the changed policy.

#### Change

We may modify this Privacy Policy, and if we make material changes to it, we will provide notice through our Services, or by other means, to provide you the opportunity to review the changes before they become effective. If you object to any changes, you may **close your account**. Your continued use of our Services after we publish or send a notice about our changes to this Privacy Policy means that you are consenting to the updated Privacy Policy.

# 1. Information We Collect

### 1.1 Information You Provide To Us

You provide data to create an account with us.

#### Registration

To create an account you provide data including your name, email address and/or mobile number, and a password. If you register for a premium Service, we ask you for payment (e.g., credit card) and billing information.

You create your LinkedIn profile (a complete profile helps you get the most from our Services).

#### Profile

You have **choices** about the information on your profile, such as your education, work experience, skills, photo, **city or area** and endorsements. Some professionals may choose to complete a separate **ProFinder profile**. Profile information helps you to get more from our Services, including helping recruiters and business opportunities find you. It's your choice whether to include **sensitive information** on your profile. **Please do not post or add personal data to your profile that you would not want to be publicly available.**

You give other data to us, such as by syncing your address book or calendar.

#### Posting and Uploading

We collect personal data from you when you provide, post or upload it to our Services, such as when you fill out a form, respond to a survey (e.g., Members' **salary**), submit a resume and apply for or save jobs or send invitations. If you opt to import your address book, we receive your contacts (including contact information your service provider(s) or app automatically added to your address book when you communicated with addresses or numbers not already in your list). If you sync your email or calendars with our Services, we will collect your "email header" and calendar meeting information (e.g. times, places, attendees and contacts).

### 1.2 Information From Others

Others may post or write about you.

#### Content and News

You and others may post content that includes information about you on our Services (as part of blog posts, feed updates and comments, videos). Unless you **opt-out**, we collect public information about you, such as professional-related news and accomplishments (e.g., patents granted, professional recognition, conference speakers, projects, etc.) and make it available as part of our Services (e.g. suggestions for your profile, or notifications of **mentions in the news**).

Others may sync their contacts or calendar with our Services.

#### Contact and Calendar Information

We receive personal data about you when others import or sync their address book or calendar with our Services, or send messages using our Services (including invites or connection requests).

Customers and partners may provide data to us.

#### Partners

We receive personal data about you when you use the services of our customers and partners, such as prospective employers and applicant tracking systems providing us job application data.

CE 1353



We log your visits and use of our Services, including mobile apps.

We log usage data when you visit or otherwise use our Services, including our sites, app and platform technology (e.g., our off-site plugins), such as when you view or click on content (e.g., learning video) or ads (on or off our sites and apps), perform a search, install one of our mobile apps, share articles or apply for jobs. We use log-ins, cookies, device information and internet protocol ("IP") addresses to identify you and log your use.

### 1.4 Cookies, Web Beacons and Other Similar Technologies

We collect data through cookies and similar technologies.

As further described in our Cookie Policy, we use cookies and similar technologies (e.g., web beacons, pixels, ad tags and device identifiers) to recognize you and/or your device(s) on, off and across different Services and devices. We also allow some others to use cookies as described in our Cookie Policy. You can control cookies through your browser settings and other tools. You can also opt out from our use of cookies and similar technologies that track your behavior on the sites of others for third party advertising. For Visitors, the opt out is here.

### 1.5 Your Device and Location

We receive data from your devices and networks, including location data.

When you visit or leave our Services (including our plugins or cookies or similar technology on the sites of others), we receive the URL of both the site you came from and the one you go to next. We also get information about your IP address, proxy server, operating system, web browser and add-ons, device identifier and features, and/or ISP or your mobile carrier. If you use our Services from a mobile device, that device will send us data about your location. Most devices allow you to prevent location data from being sent to us and we honor your settings.

### 1.6 Messages

If you communicate through our Services, we learn about that.

We collect information about you when you send, receive, or engage with messages in connection with our Services. For example, if you get a LinkedIn connection request, we track whether you have acted on it and will send you reminders. We also use automatic scanning technology on messages.

### 1.7 Workplace Provided Information

When your employer buys a premium Service for you to use at work, they may give us data about you.

An employer (or other person or entity procuring our Services for your use) may provide us information about their employees or contractors who make use of these Services. For example, we will get contact information for "Company Page" administrators and for authorizing users of our premium Services, such as our recruiting, sales or learning products.

### 1.8 Sites and Services of Others

We get data when you visit sites that include our plugins, ads or cookies or log-in to others' services with your LinkedIn account.

We receive information about your visits and interaction with services provided by others when you log-in with LinkedIn or visit others' services that include our plugins (such as "Share on LinkedIn" or "Apply with LinkedIn"), ads, cookies or similar technologies.

### 1.9 Other

We are improving our Services, which means we get new data and create new ways to use data.

Our Services are dynamic and we often introduce new features, which may require the collection of new information. If we collect materially different personal data or materially change how we use your data, we will notify you and you may also modify this Privacy Policy.

## 2. How We Use Your Data

We use your data to provide, support, personalize and develop our Services.

How we use your personal data will depend on which Services you use, how you use those Services and the choices you make in your settings. We use the data that we have about you to provide, support, personalize and make our Services (including ads) more relevant and useful to you and others.

CE 1354



Our Services help you connect with others, find and be found for work and business opportunities, stay informed, get training and be more productive.

We use your data to authenticate you and authorize access to our Services.

**Stay Connected**
Our Services allow you to stay in touch, in communication and up to date with colleagues, partners, clients, and other professional contacts. To do so, you will "connect" with the professionals who you choose, and who also wish to "connect" with you. When you connect, you will be able to search each others' connections in order to exchange professional opportunities.

We will use data about you (such as profiles you have viewed or data provided through address book uploads or partner integrations) to suggest connections for you and others (e.g. Members who share your contacts) and enable you to invite others to become a Member and connect with you. You can also opt to allow us to use your precise location or proximity to others to suggest other nearby Members for you to connect with. It is your choice whether to invite someone to our Services, send a connection request, or allow another Member to become your connection. When you invite someone to connect with you, your invitation will include your name, photo, network and contact information. We will send invitation reminders to the person you invited. You can choose whether or not to share your own list of connections with your connections.

Visitors have choices about how we use their data.

**Stay Informed**
Our Services allow you to stay informed about news, events and ideas regarding professional topics you care about, and from professionals you respect. Our Services also allow you to improve your professional skills, or learn new ones. We use the information about you to recommend relevant content across our Services, suggest skills you may have to add to your profile and skills that you might need to pursue your next opportunity. So, if you let us know that you are interested in a new skill (e.g., by watching a learning video), we will use this information to personalize content in your feed, suggest that you follow certain members on our site, or watch related learning content to help you towards that new skill. We use your content, activity and other data, including your name and picture, to provide notices to your network and others. For example, subject to your settings, we may notify others that you have updated your profile, posted a blog, took a social action, made new connections or were mentioned in the news.

**Career**
Our Services allow you to explore careers, evaluate educational opportunities, and seek out, and be found for, career opportunities. Your profile can be found by those looking to hire (for a job or a specific task) or be hired by you. We will use your data to recommend jobs, show you and others who work at a company, in an industry, function or location or have certain skills and connections. You can signal that you are interested in changing jobs and share information with job recruiters. We may use your profile and activity to recommend jobs to you and you to recruiters.

**Productivity**
Our Services allow you to collaborate with colleagues, search for potential clients, customers, partners and others to do business with. Our Services allow you to communicate with other professionals and schedule and prepare meetings with them. Subject to your settings, we can scan messages to provide "bots" or similar tools that facilitate tasks such as scheduling meetings, draft responses, summarize messages or recommend next steps.

## 2.2 Premium Services

Our premium Services allow paying users to search for and contact Members through our Services, such as searching for and contacting job candidates, sales leads and co-workers, manage talent and promote content through social media.

We sell premium Services that provide our customers customized-search functionality and tools (including messaging and activity alerts) as part of our talent, marketing and sales solutions. These subscribers can export limited information from your profile, such as name, headline, current company, current title, and general location (e.g., Dublin), in order to manage sales leads or talent, unless you opt out. We do not provide contact information to these subscribers as part of these premium Services without your consent. A premium Services subscriber can store information he/she has about you in our premium Services, such as a resume or contact information or sales history. The data provided about you by these subscribers is subject to the policies of those subscribers. Other enterprise Services that use your data include LinkedIn Referrals (job referrals), Lookup (enterprise directory) and Elevate (social promotion of content). Learn more.

## 2.3 Communications

We contact you and enable communications between members. We offer settings to control what and how often you receive some types of messages.

We will contact you through email, notices posted on our websites or apps, messages to your LinkedIn inbox, and other ways through our Services, including text messages and push notifications. We will send you messages about the availability of our Services, security, or other service-related issues. We also send messages about how to use the Services, network updates, reminders, job suggestions and promotional messages from us and our partners. You may change your communication preferences at any time. Please be aware that you cannot opt out of receiving service messages from us, including security and legal notices.

We also enable communications between you and others through our Services, including for example invitations, InMail, groups and messages between connections.

## 2.4 Advertising

CE 1355

6/20/2017                                     Privacy Policy | LinkedIn



out of seeing generic ads.

We target (and measure the performance of) ads to Members, Visitors and others both on and off of our Services through a variety of ad networks and exchanges, using the following data, whether separately or combined:

- Data from advertising technologies on and off our Services, like web beacons, pixels, ad tags, cookies, and device identifiers;

- Member-provided information (e.g., contact information, title and industry);

- Data from your use of our Services (e.g., search history, feed, content you read, who you follow or is following you, connections, groups participation, page visits, videos you watch, clicking on an ad, etc.), including as described in Section 1.3;

- Information from others (e.g. advertising partners, publishers and data aggregators);

- Information inferred from data described above (e.g., using job titles to infer age, industry, seniority, and compensation bracket; or names to infer gender).

We will show you ads called **sponsored content** which look like similar non-sponsored content, except that they are labeled ads or sponsored. If you take an action (such as like, comment or share) on these ads, your action is associated with your name and viewable by others, including the ad provider.

Ad Choices
We adhere to **self-regulatory principles** for interest-based advertising and participate in industry **opt outs** from such ads. This does not opt you out of receiving advertising - you will continue to get generic ads or ads by advertisers not listed with these self regulatory tools. You can also **opt out** specifically from interest-based advertising served through our platform for third parties. For non-Members, this setting is **here**.

Info to Advertisers
We do not share your personal data with any third-party advertisers or (other than hashed or device identifiers, to the extent they are personal data in some countries) ad networks for their advertising without your separate permission. However, if you click on an ad, the ad poster will know you visited the page that you clicked on. Also, advertising partners can associate personal data collected by the advertiser directly from you with our cookies and similar technologies. In such instances, we seek to contractually require such advertisers to obtain your explicit, opt-in consent before doing so.

## 2.5 Marketing

We promote our Services to you and others.

We use data and content about Members for invitations and communications promoting membership and network growth, engagement and our Services.

## 2.6 Developing Services and Research

We develop our Services and conduct research.

Service Development
We use data, including public feedback, to conduct **research** and development for the further development of our Services in order to provide you and others with a better, more intuitive and personalized experience, drive membership growth and engagement on our Services, and help connect professionals to each other and to economic opportunity.

Other Research
We seek to create economic opportunity for members of the global workforce and to help them be more productive and successful. We use the data available to us to research social, economic and workplace trends such as jobs availability and skills needed for these **jobs** and policies that help bridge the gap in various industries and geographic areas. In some cases, we work with trusted third parties to perform this research, under **controls** that are designed to protect your privacy. We publish or allow others to publish economic insights, presented as aggregated data rather than personal data.

Surveys
Polls and surveys are conducted by us and others through our Services. You are not obligated to respond to polls or surveys and you have choices about the information you provide. You may **opt out** of survey invitations.

## 2.7 Customer Support

We use data to help you and fix problems.

We use the data (which can include your communications) needed to investigate, respond to and resolve complaints and Service issues (e.g., bugs).

## 2.8 Aggregate Insights

We use data to generate aggregate insights.

CE 1356

6/20/2017



### 2.9 Security and Investigations

We use data for security, fraud prevention and investigations.

We use your data (including your communications) if we think it's necessary for security purposes or to investigate possible fraud or other violations of our User Agreement or this Privacy Policy and/or attempts to harm our Members or Visitors.

## 3. How We Share Information

### 3.1 Our Services

Any information you include on your profile and any content you post or social action (e.g. likes, follows, comments, shares) you take on our Services will be seen by others.

**Profile**
Your profile is fully visible to all Members and customers of our Services. As detailed in our **Help Center**, your settings, degree of connection with the viewing Member, the subscriptions they may have, their **usage of our Services**, access channels and search types (e.g., by name or by keyword) impact the availability of your profile and certain fields.

**Posts, Likes, Follows, Comments, Messages**
Our Services allow viewing and sharing information including through posts, follows, likes and comments.

- When you share a post (e.g., an update, video or blog), the default (which you can **change**) is to share it publicly. Others who are not your connections will be able to find (including through search engines) and see your post.

- When you like, comment on or share another's post, others will see it, including the person who initiated the post.

- In a **group**, posts are visible to others in the group. Your membership in groups is public and part of your profile unless you change the default **settings**.

- Any information you share through companies' or other organizations' pages on our Services will be viewable by it and others who visit those pages.

- When you follow a person or organization, you are visible to others and that "page owner" as a follower. We provide aggregate insights about the followers and viewers to the respective page owners.

- We let senders know when you act on their message, subject to your **settings** where applicable.

Your employer can see how you use Services they provided for your work (e.g. as a recruiter or sales agent) and related information. We will not show them your job searches or personal messages.

**Enterprise Accounts**
Your employer may offer you access to our enterprise Services such as Recruiter, Sales Navigator, Elevate, Referrals, Lookup or our advertising Campaign Manager. They can also buy access for you to our online learning products. Your employer can review and manage your use of such enterprise Services.

Depending on the enterprise Service, before you use such Service, we will ask for permission to share relevant data from your profile or use of our non-enterprise Services. For example, users of **Sales Navigator** will be asked to share their "social selling index", a score **calculated** in part based on their personal account activity. We understand that certain activities such as job hunting and personal messages are sensitive and so we do not share those with your employer unless you choose to share it with them through our Services (for example, by applying for a new position in the same company or mention your job hunting in a message to a co-worker through our Services).

### 3.2 Communication Archival

Regulated Members may need to store communications outside of our Service.

Some Members (or their employers) need, for legal or professional compliance, to archive their communications and social media activity, and will use services of others to provide these archival services. We enable such archiving outside of our Services. For example, a financial advisor needs to archive communications with her clients through our Services in order to maintain her professional financial advisor license.

### 3.3 Others' Services

You may link your account with others' services so that they can look up your contacts' profiles or post your shares on such platforms.

Subject to your preference, other services may look-up your profile.

CE 1357



other services, or your email provider may give you the option to upload your LinkedIn contacts into its own service. You may **revoke** the link with such accounts.

Subject to your **settings**, excerpts from your **profile** will appear on the services of others (e.g., search engine results, mail and calendar applications that show a user a "mini" LinkedIn profile of the person they are meeting or messaging, social media aggregators, talent and lead managers). "Old" profile information remains on these services until they update their data cache with changes you made to your profile.

### 3.4 Related Services

We share your data across our different Services and LinkedIn-affiliated entities.

We will share your personal data with our **affiliates** to provide and develop our Services. We combine information internally across the different Services covered by this Privacy Policy. For example, SlideShare will recommend better content to you based on your LinkedIn profile or the articles you read on Pulse, and LinkedIn could personalize your feed and job recommendations based on your learning video history, because we are able to identify you across different Services using cookies or similar technologies.

### 3.5 Service Providers

We may use others to help us with our Services.

We use others to help us provide our Services (e.g., maintenance, analysis, audit, payments, fraud detection, marketing and development). They will have access to your information as reasonably necessary to perform these tasks on our behalf and are obligated to not to disclose or use it for other purposes.

### 3.6 Legal Disclosures

We may need to share your data when we believe it's required by law or to protect your and our rights and security.

It is possible that we will need to disclose information about you when required by law, subpoena, or other legal process or if we have a good faith belief that disclosure is reasonably necessary to (1) investigate, prevent, or take action regarding suspected or actual illegal activities or to assist government enforcement agencies; (2) enforce our agreements with you, (3) investigate and defend ourselves against any third-party claims or allegations, (4) protect the security or integrity of our Service (such as by sharing with companies facing similar threats); or (5) exercise or protect the rights and safety of LinkedIn, our Members, personnel, or others. We attempt to notify Members about legal demands for their personal data when appropriate in our judgment, unless prohibited by law or court order or when the request is an emergency. We may dispute such demands when we believe, in our discretion, that the requests are overbroad, vague or lack proper authority, but we do not promise to challenge every demand. To learn more see our **Data Request Guidelines** and **Transparency Report**.

### 3.7 Change in Control or Sale

We may share your data when our business is sold to others, but it must continue to be used in accordance with this Privacy Policy.

We can also share your personal data as part of a sale, merger or change in control, or in preparation for any of these events. Any other entity which buys us or part of our business will have the right to continue to use your data, but only in the manner set out in this Privacy Policy unless you agree otherwise.

## 4. Your Choices & Obligations

### 4.1 Data Retention

We keep most of your personal data for as long as your account is open.

We retain the personal data you provide while your account is in existence or as needed to provide you Services. Even if you only use our Services when looking for a new job every few years, we will retain your information and keep your profile open until you decide to close your account. In some cases we choose to retain certain information (e.g., visits to sites carrying our "share with LinkedIn" or "apply with LinkedIn" **plugins** without clicking on the plugin) in a depersonalized or aggregated form.

### 4.2 Rights to Access and Control Your Personal Data

You can access or delete your personal data. You have many choices about how your data is collected, used and shared.

We provide many **choices** about the collection, use and sharing of your data, from deleting or correcting data you include in your **profile** and controlling the visibility of your **posts** to advertising **opt-outs** and **communication** controls. We offer **access** to the personal data we have about you (for SlideShare, please **contact us**).

### 4.3 Account Closure

We keep some of your data even after you close your account.

CE 1358



delete closed account information within 30 days of account closure, except as noted below.

We retain your personal data even after you have closed your account if reasonably necessary to comply with our legal obligations (including law enforcement requests), meet regulatory requirements, resolve disputes, maintain security, prevent fraud and abuse, enforce our User Agreement, or fulfill your request to "unsubscribe" from further messages from us. We will retain de-personalized information after your account has been closed.

Information you have shared with others (e.g., through InMail, updates or group posts) will remain visible after you closed your account or deleted the information from your own profile or mailbox, and we do not control data that other Members copied out of our Services. Groups content associated with closed accounts will show an unknown user as the source. Your profile may continue to be displayed in the services of others (e.g., search engine results) until they refresh their cache.

# 5. Other Important Information

### 5.1. Security

We monitor for and try to prevent security breaches. Please use the security features available through our Services.

We implement security safeguards designed to protect your data, such as HTTPS. We regularly monitor our systems for possible vulnerabilities and attacks. However, we cannot warrant the security of any information that you send us. There is no guarantee that data may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards. Please visit our **Safety Center** for additional information about safely using our Services, including **two-factor authentication.**

### 5.2. Cross-Border Data Transfers

We store and use your data outside your country.

We process data both inside and outside of the United States. **Learn more** about the legal mechanisms we rely on to transfer data across borders.

### 5.3. Direct Marketing and Do Not Track Signals

Our statements regarding direct marketing and "do not track" signals.

We currently do not share personal data with third parties for their direct marketing purposes without your permission. **Learn more** about this and about our response to "do not track" signals.

### 5.4. Contact Information

You can contact us or use other options to resolve any complaints.

If you have questions or complaints regarding this Policy, please first **contact LinkedIn** online. You can also reach us by **physical mail**. If contacting us does not resolve your complaint, you have more **options**.

---

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2017 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

CE 1359

6/20/2017

Case 3:17-cv-03301-EMC   Document 344   Filed 08/08/22   Page 195 of 246
Case 3:17-cv-03301-EMC   Document 29   Filed 06/26/17   Page 49 of 65

CE 1360

# EXHIBIT E



*Last revised on July 15, 2010*

## LinkedIn Ads Agreement

**Important! Please read:**

It is important that you read, understand, and agree to this entire document, as it creates a binding contract between you and LinkedIn ("LinkedIn" or "us" or "we"). These terms and conditions define and limit your rights and responsibilities in using LinkedIn Ads. We may revise these terms and conditions (the "Agreement") at any time by posting them to the site. You will be bound by such revisions and should therefore visit this page from time to time to review the current terms and conditions.

User Agreement:

In addition this Agreement, the standard LinkedIn User Agreement, and those documents which it references, including by not limited to the LinkedIn Privacy Policy and Copyright Policy, applies to your use of the LinkedIn Ads service. To the extent there is any conflict between this Agreement and any of the provisions in the standard LinkedIn User Agreement with respect to your use of the LinkedIn Ads service, this Agreement shall control but only to extent of such conflict.

Advertising Entity:

You may only advertise for yourself or your current employer or, if you are an advertising agency, for your client. You warrant and represent that you have the power and authority to enter into this Agreement and perform the obligations hereunder and that you are personally responsible for any charges incurred through your account. Use of any automated agents ("bots"), scripts or other devices or means to purchase advertising through LinkedIn Ads is prohibited without LinkedIn''s express written permission in each instance. You may not resell or transfer access to LinkedIn Ads to any other party. Your account is for your express use only and not transferable or assignable to anyone else inside or outside your organization.

Content and Advertising Guidelines:

Use of LinkedIn Ads is subject to the LinkedIn Advertising Guidelines. Because we may revise the LinkedIn Advertising Guidelines at any time by posting them to the site, and you will be bound by such revisions, you should visit the page for the LinkedIn Advertising Guidelines from time to time to review the current version.

You agree not to use LinkedIn Ads service for any unlawful purpose, including, without limitation, advertising any product or service that would violate any federal, state, local or foreign laws, regulations, administrative or judicial order.

LinkedIn has the editorial discretion to reject or cease serving any advertisement for any reason at any time, regardless of whether or not such advertisement was previously accepted or served.

You represent and warrant that you have the right to permit LinkedIn to serve the advertisement, including, without limitation, any copyrighted material, trademarks, service marks, logos or slogans; and the use, transmission or display by LinkedIn of the advertisement as authorized herein will not violate the rights of any third parties.

Targeting:

LinkedIn Ads advertisements will be shown to LinkedIn members based on non-personally identifiable profile data of the viewing members. This profile data is either provided by the member or algorithmically determined by data provided by the member. LinkedIn does not verify the accuracy of member-generated content on the site and, as such, is not liable for any advertisement that was shown to members based on inaccurate profile data or data algorithmically generated.

Member profile data will never be provided to you through your use of LinkedIn Ads, and you agree that you will not attempt to acquire any such member profile data through any means. Members viewing your advertisement will remain anonymous to you.

Payment:

You agree to pay for all fees you incur in connection with each advertisement including any advertisements placed by you on behalf of your employer and regardless of the payment instrument used, and you hereby either: (i) grant LinkedIn the

CE 1362

right to regularly charge the credit card you have provided in your account information as means of satisfying the fees you owe; or (ii) agree to pay invoices for the fees you owe net 30 from the date of invoice (to qualify for invoicing, you must spend at least $3,000 per month for two consecutive months and have an established credit history with LinkedIn). LinkedIn may terminate this invoicing ability unilaterally at its discretion.

Payment intervals will be determined by LinkedIn and posted in the Ads information section. Your fees will be owed in the currency indicated by us. Our measurements are the definitive measurements under these terms and conditions for calculating your fees, whether you have elected to pay by impressions (i.e., the number of times the advertisement is displayed to a member) or clicks (i.e., the number of times the advertisement is clicked on by a member). You also are responsible for paying (a) all taxes and government charges that we must levy on your fees for advertising, and (b) reasonable expenses and attorneys fees we incur collecting late amounts.

LinkedIn reserves the right to change which credit cards or invoiced customers it accepts in its sole discretion and (a) you may be required to modify your account to provide a then-acceptable credit card in order to maintain your Ads accounts and (b) your only recourse if you are not satisfied with the then-accepted payment options is to cancel your advertisements, provided that you will nevertheless be responsible for all fees incurred for when your ad ran prior to cancellation.

If LinkedIn charges you an initial one-time fee, it will be applied toward your Ads account and automatically applied toward your future advertising fees.

Amounts you pay pursuant to the Ads service are non-refundable.

LinkedIn reserves the unilateral right to remove any or all active ads if there is an amount owed under this Supplement that is past due by more than fifteen (15) days.

## Cancellation:

You may cancel your advertisement at any time after its submission by accessing the online Ads service and following the cancellation instructions provided. LinkedIn will endeavor to cease serving your advertisement promptly following your cancellation. You shall be required to pay for those impressions and/or clicks, as applicable, which occur prior to discontinuation of your advertisement.

## Removal of Advertisements by LinkedIn:

LinkedIn reserves the right to remove any advertisement at any time, with cause due to a violation of LinkedIn.com"s User Agreement, LinkedIn"s Advertising Guidelines, this Agreement, or any other agreement between you and LinkedIn. As a consequence of your violation of any of the aforementioned agreements, LinkedIn may, at its sole discretion, prohibit you from any further participation in the LinkedIn Ads service and any other service or program offered by LinkedIn, or suspend or remove your LinkedIn account. LinkedIn may undertake technical measures in furtherance of such prohibition.

LinkedIn shall also have the right to remove any advertisement at any time without cause as LinkedIn determines in its sole discretion. LinkedIn is not required to provide you with any explanation for its removal of any advertising and you agree that all of LinkedIn decisions relating to the placement and removal of advertising shall be final and binding.

In addition, your advertisements may be removed if LinkedIn, in its discretion, ceases offering the Ads program.

In the event of any removal of your advertising under this section, you will be responsible for paying for all ads that ran prior to time of removal or cessation.

## No Guarantees:

LinkedIn does not guarantee the results or distribution of any advertisement in any manner. LinkedIn does not guarantee you any number of impressions (i.e., times your advertisement is viewed by a member) or clicks (i.e., times your advertisement is clicked on by a member) through LinkedIn Ads. LinkedIn provides no guarantee or warranty regarding the placement, delivery, timing, or performance of advertisements purchased through LinkedIn Ads. LinkedIn does not screen or attempt to verify the accuracy of any information on the LinkedIn.com site or in the member profiles, and, as such, does not guarantee the identity or personal information of the individuals who will view the advertisements you purchase through LinkedIn Ads.

## Non-Exclusive:

This contract is not exclusive as to your business, products or services. LinkedIn retains the complete and unqualified right to solicit the business of and advertisements from persons and entities that may be in competition with your business, products or services, as well as to serve its own advertisements that may be in competition with your business, products or

CE 1363

services.You acknowledge that LinkedIn and its affiliates may participate in ad placing auctions to promote its own services or otherwise communicate to its users.

Ownership:

All materials and information on or available through the LinkedIn Ads service, including, without limitation, content, are protected by copyrights, trademarks and other intellectual property rights owned and controlled by us or by other parties that have licensed or otherwise provided their material to LinkedIn (collectively, "LinkedIn Intellectual Property Rights"). You agree that any feedback you provide to us (including suggestions, comments, improvements, ideas, etc.), about the Ads service and its content shall be part of LinkedIn Intellectual Property Rights and you hereby assign to us all your rights in such feedback.

You may not add, delete, distort, or otherwise modify the LinkedIn Intellectual Property Rights, except with the express consent of LinkedIn. Any unauthorized attempt to modify any LinkedIn Intellectual Property Rights, to defeat or circumvent our security features, or to utilize the LinkedIn Ads service or any part of the LinkedIn Intellectual Property Rights for any purpose other than its intended purposes, is strictly prohibited. You agree that you do not have nor will you make any claim of interest in or ownership of any such LinkedIn Intellectual Property Rights. You are granting LinkedIn a non-exclusive, fully paid up and royalty-free right to use, reproduce, and distribute any content you create, including the content of your advertisement for use in connection with the LinkedIn Ads service. You are also, by creating an advertisement, granting LinkedIn a non-exclusive, fully paid up and royalty-free right to use, reproduce, and communicate the name and trademarks of your organization as an advertiser on LinkedIn.com, unless requested otherwise in writing to LinkedIn"s customer service department. LinkedIn shall also have the non-exclusive, fully-paid up and royalty free, perpetual right to use any advertisements placed through the LinkedIn Ads service, and the name, trademarks and logos of any person or company on whose behalf a placement has been made, in connection with LinkedIn"s promotion of the service.

Limitation of Liability:

**SOME COUNTRIES DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY IN CONTRACTS WITH CONSUMERS AND AS A RESULT THE CONTENTS OF THIS SECTION MAY NOT APPLY TO YOU.**

Neither LinkedIn corporation nor any of its subsidiaries, affiliated companies, employees, shareholders, or directors ("LinkedIn Affiliates") shall be liable for (1) any damages in excess of five times the most recent monthly fees that you paid for your Ads account, if any, or $100, whichever amount is greater, or (2) any special, incidental, indirect, punitive or consequential damages or loss of use, profit, revenue or data to you or any third person arising from your use of the Ads service or any content displayed through the Ads service even if LinkedIn is aware or has been advised of the possibility of such damages. The limitation of liability set forth in the preceding sentence shall:

1. apply regardless of whether you base your claim on contract, tort, statute or any other legal theory, we knew or should have known about the possibility of such damages, or the limited remedies provided herein fail of their essential purpose, and

2. not apply to any damage that LinkedIn Affiliates cause you intentionally and knowingly in violation of this Agreement or applicable law, or as otherwise mandated by applicable law that cannot be derogated from in this Agreement.

Indemnification:

Notwithstanding any review or approval of any advertisement by LinkedIn, you agree to indemnify LinkedIn and the LinkedIn Affiliates, and hold LinkedIn and the LinkedIn Affiliates harmless from any damages, losses and costs (including, but not limited to, reasonable attorneys" fees) related to third party claims, charges or investigations, caused by a) your failure to comply with this Agreement, including, without limitation, your submission of advertisements that violates third party rights or applicable laws, b) any advertisement you submit to LinkedIn or c) any activity in which you engage on or through the LinkedIn.

Disclaimer of Warranties

**SOME COUNTRIES AND JURISDICTIONS DO NOT ALLOW THE DISCLAIMER OF IMPLIED TERMS IN CONTRACTS WITH CONSUMERS AND AS A RESULT THE CONTENTS OF THIS SECTION MAY NOT APPLY TO YOU.**

DO NOT RELY ON LINKEDIN ADS, ANY INFORMATION THEREIN, OR ITS CONTINUATION. WE PROVIDE THE LINKEDIN ADS SERVICE ON AN "AS IS" AND "AS AVAILABLE" BASIS. WE DO NOT PROVIDE ANY EXPRESS WARRANTIES OR REPRESENTATIONS.

TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, WE DISCLAIM ANY AND ALL IMPLIED WARRANTIES AND REPRESENTATIONS, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF

MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NONINFRINGEMENT. IF YOU ARE DISSATISFIED OR HARMED BY LINKEDIN ADS OR ANYTHING RELATED THERETO YOU MAY CANCEL YOUR ADVERTISEMENT IN ACCORDANCE WITH THIS AGREEMENT AND SUCH CANCELLATION SHALL BE YOUR SOLE AND EXCLUSIVE REMEDY.

WE NEITHER WARRANT NOR REPRESENT THAT YOUR USE OF THE LINKEDIN ADS SERVICE WILL NOT INFRINGE THE RIGHTS OF THIRD PARTIES. ANY MATERIAL, SERVICE, OR TECHNOLOGY DESCRIBED OR USED AS PART OF THE LINKEDIN ADS SERVICE MAY BE SUBJECT TO INTELLECTUAL PROPERTY RIGHTS OWNED BY THIRD PARTIES WHO HAVE LICENSED TO US SUCH MATERIAL, SERVICE, OR TECHNOLOGY.

LINKEDIN DOES NOT HAVE ANY OBLIGATION TO VERIFY THE VERACITY OR APPROPRIATENESS OF THE USERS OF LINKEDIN ADS OR THE ADVERTISEMENTS PLACED VIA THE LINKEDIN ADS SERVICE.

LINKEDIN DOES NOT GUARANTEE THAT THE LINKEDIN ADS SERVICE WILL FUNCTION WITHOUT INTERRUPTION OR ERRORS IN FUNCTIONING. IN PARTICULAR, THE SERVICE"S OPERATION MAY BE MOMENTARILY INTERRUPTED DUE TO MAINTENANCE, UPDATES, OR TECHNICAL IMPROVEMENTS. LINKEDIN DISCLAIMS ALL LIABILITY FOR DAMAGES CAUSED BY ANY SUCH INTERRUPTION OR ERRORS IN FUNCTIONING. FURTHERMORE, LINKEDIN DISCLAIMS ALL LIABILITY FOR ANY MISFUNCTIONING, IMPOSSIBILITY OF ACCESS, OR POOR USE CONDITIONS OF THE LINKEDIN SITE OR ADS SERVICE DUE TO INAPPROPRIATE EQUIPMENT, DISTURBANCES LINKED TO THE INTERNET SERVICE PROVIDER, TO THE SATURATION OF THE INTERNET NETWORK, AND FOR ANY OTHER REASON UNRELATED TO LINKEDIN. UNDER NO CIRCUMSTANCES WILL LINKEDIN BE LIABLE FOR ANY DAMAGES TO YOU, YOUR COMPUTER EQUIPMENT OR OTHER PROPERTY ON ACCOUNT OF YOUR ACCESS TO OR USE OF THE LINKEDIN ADS SERVICE.

Non-Waiver; Sever-ability:

If any provision is found to be illegal, invalid, or unenforceable, such provision shall be modified to the minimum extent necessary to make such provision valid and enforceable, and the remainder of this Agreement shall remain in full force and effect. No waiver of rights under this Agreement by either party shall constitute a subsequent waiver of this or any other right under this Agreement. No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by an authorized representative of LinkedIn. The remedies of LinkedIn under this Agreement shall be cumulative and not alternative, and the election of one remedy for a breach shall not preclude pursuit of other remedies. You hereby waive the right to seek specific performance or injunctive relief hereunder.

Force Majeure:

Notwithstanding anything to the contrary herein, LinkedIn shall not be liable to you if it is not able to post the advertisement or LinkedIn is rendered unable to timely perform any of its obligations hereunder for any reason, including, without limitation, strikes, boycotts, war, terrorism, Acts of God, labor troubles, riots, and restraints of public authority.

Copyright and Content Complaints:

We respect the intellectual property of others, and we ask our users to do the same, including your use of the Ads service. Regarding copyright infringement complaints, see our policies and procedures for Complaints regarding Copyright Infringement. With respect to content-related complaints, see our policies and procedures for Complaints Regarding Content.

Interpretation:

You agree that LinkedIn has sole discretion in determining the interpretation of the meaning of this Agreement, and those documents it incorporates by reference, including determining your compliance with such.

Jurisdiction:

This Agreement shall be governed by and construed in accordance with the laws of the State of California, including all matters of construction, validity, performance and enforcement. The parties agree that Santa Clara County, in the State of California, shall be the sole forum for any action brought against the other party. The parties waive trial by jury in any action, proceeding or counterclaim brought in respect of any matter whatsoever arising out of or in any way connected with this Agreement or your use of the Ads service.

Miscellaneous:

CE 1365

No agency, partnership, joint venture, or employment relationship is created between you and LinkedIn by this Agreement or any advertisement transaction, and neither party shall have the authority to bind the other in any way. This constitutes the entire agreement by and between you and LinkedIn with respect to the subject matter hereof and supersedes all prior agreements, understandings, representations or negotiations, whether written or oral, or whether established by custom, practice, policy or precedent, with respect to the subject matter of this Agreement. The section headings in this Agreement are for convenience only and have no legal or contractual effect.

---

Close this window

Copyright © 2017, LinkedIn Corporation

CE 1366

# EXHIBIT F

DocuSign Envelope ID: 0829C19-7047-41A1-882F-E8936D29F0C9



LinkedIn
2029 Stierlin Ct.
Mountain View, CA 94043
Phone: 650.687.3600
Fax: 1.650.429.2122

**Offer valid through: December 31, 2015**

Proposed by:
Nicholas Berman
nberman@linkedin.com
(415) 500-9185

**CONTRACT CONTACT:** Darin Medeiros

## ORDER FORM for hiQ Labs, Inc.

**BILL TO:**

| | |
|---|---|
| Contact: | Darin Medeiros |
| | 625 Market St. |
| Address: | |
| City/State/Zip: | San Francisco    CA    94105 |
| Country: | United States |
| Email: | darin.medeiros@hiqlabs.com |
| Phone: | 650-678-0547 |

**SHIP TO:**

hiQ Labs, Inc.
625 Market St.

San Francisco, CA  94105
United States

**ORDER INFORMATION**

| | |
|---|---|
| Contract #: | CS2003870-15 |
| Billing Period: | Quarterly |
| Billing Method: | Invoice |
| Billing Instructions: | |

**For Internal Only:**

| | |
|---|---|
| Master Agreement (LSA): | |
| Type: | New Business |
| Sales Rep Region: | |
| Agency Name: | |
| Currency: | USD |
| Sign Date: | |
| Close Date: | |
| Customer Requested Start Date*: | January 25, 2016 |

Contract End Date**:
*"The start date of the services on this Order Form will be the later of the Customer Requested Start Date or the date that the Order Form is fully executed. Renewals Only: Customer may select a later Start Date; however, this will cause a gap in service"

| Product Order Description | Qty | Term (Months) | Notes | Sales Price | Total |
|---|---|---|---|---|---|
| Product Name: Discount<br>Product SKU: DISCOUNT<br>Product Description: Please note: This is a one-time discount applied to this specific order. Future orders will not carry this discount amount. | 1 | 24 | | ($1,140.00) | ($1,140.00) |
| Product Name: Sales Navigator Team (10-24 Seats)<br>Product SKU: SNTXX02-1407<br>Product Description: Sales insights and customized recommendations from the world's largest professional network. Includes TeamLink, 30 InMail messages per month, extended network access, usage reporting, and other premium features. (Annual Subscription) | 10 | 24 | | $2,280.00 | $22,800.00 |
| | | | | **SUB TOTAL** | $21,660.00 |
| | | | | **ESTIMATED TAX*** | $0.00 |
| | | | | **ESTIMATED ORDER TOTAL** | $21,660.00 |

| PURCHASE ORDER INFORMATION | TAX INFORMATION |
|---|---|
| Is a Purchase Order required for the purchase or payment of the products on this order form?<br><br>Please Enter (Yes or No):    NO<br><br>If yes, please enter PO Number: | Check here if your company is tax exempt:<br>*Please attach any/all exemption certifications or email documentation to taxinquiry@linkedin.com.*<br><br>Your order will be taxed using the applicable tax rate for your shipping address. The tax listed on your order form is only an estimate and is calculated on the net price. Your invoice will reflect the final total taxes in effect at the time of invoicing and may differ from the amount listed on this order form. |
| **PAYMENT OPTIONS** | Applicable VAT taxes will be added to orders if a VAT registration number is not provided. LinkedIn reserves the right to charge any applicable unbilled VAT if you provide a VAT registration number that is determined to be invalid. Once you submit your VAT registration number, you will generally not be charged VAT on the invoice. |
| • USA Customers:  Check, Credit Card, or Bank Wire Transfer<br>• Non-US Customers:  Credit Card or Bank Wire Transfer only | With this exemption, you may be responsible for self-assessing any VAT due under the reverse charge procedure on your company's VAT returns. If your country of domicile is Ireland, South Africa, or Switzerland, applicable Irish VAT will be charged on all orders.<br><br>**\*For Non-US based orders ONLY:** If required, please provide **either** your VAT #:          or your Irish 13B |

LinkedIn Confidential and Proprietary
Rev. June 2015

1

CE 1368

DocuSign Envelope ID: 70820619-7947-41A1-883D-E8836D29F0D6

| | VAT#: |
|---|---|
| | *If this doesn't apply, please type N/A. |

**TERMS**
- This Order Form has been pre-signed by LinkedIn in anticipation of acceptance and signature by Customer.  Any hand-written or other changes to this Order Form without LinkedIn's prior written approval will not be binding against LinkedIn
- Services provided under this Order Form will terminate on the expiration date of the Term or the date terminated by either party as provided in the LinkedIn Subscription Agreement. Order forms with contiguous dates will ensure no gap in service.
- Please allow up to 3 business days for account provisioning.
- Add-on Products Orders must end coterminous with the originating contract.
- Future incremental Add-On or Renewal orders will be at list price at time of purchase.
- LinkedIn may adjust the dates of the Term, without increasing the Total Price, based on the date LinkedIn activates the products above. Any adjustments will be made internally.
- During the term of this Order Form, Customer will receive the applicable services set out in http://lnkd.in/sales-solutions-services. No refund or credit will be provided if services are not used during the term.
- Services provided under this Order Form are provided pursuant to LinkedIn's terms and conditions set forth at: http://business.linkedin.com/lcsa , the terms of which are incorporated into this Order Form.
- If Customer is charging for the Services purchased under this Order Form, LinkedIn will charge Customer's credit card upon receipt of the credit card information.
- If and to the extent Customer provides to LinkedIn any personal data of European Union residents in connection with its use of the Services (not including data provided by members to LinkedIn), LinkedIn Corporation and Customer will comply with standard contractual clauses as set forth at https://business.linkedin.com/c/15/10/eu-scc, which are incorporated by reference into the LinkedIn Subscription Agreement.

| CUSTOMER (or APPROVED AGENCY) | | LINKEDIN CORPORATION | |
|---|---|---|---|
| Signature: | *Darin Medeiros* | Signature: | *E Baruah* |
| | 8F364F316EAF45B... | | |
| Name: | Darin Medeiros | Name: | Elena Baruah |
| Title: | VP, Sales | Title: | Revenue Operations Manager |
| Date: | 23 December 2015 | Date: | December 23, 2015 |

Except as otherwise provided in the LSA, this is a non-cancelable and non-refundable purchase. I hereby represent that I am an authorized signatory and have read and agreed to the terms of this Order Form.

CE 1369

# EXHIBIT G

CE 1370



**LINKEDIN SUBSCRIPTION AGREEMENT**

This LinkedIn Subscription Agreement, including its exhibits ("**LSA**"), governs any ordering document executed by the customer identified in that ordering document ("**Customer**") and the LinkedIn company identified in that ordering document ("**LinkedIn**"). This LSA, the applicable ordering document, and any other incorporated terms, comprise the complete understanding between the parties on the subject matter ("**Agreement**").

## 1.    ORDERING AND THE PROVISION OF SERVICES

**1.1    Services.** Customer may access and use the LinkedIn subscription services offered via LinkedIn's websites to the extent and for the term stated in the ordering document ("**Services**").

**1.2    Affiliates.** Customer may allow its Affiliates to access and use the Services only if Customer is fully liable for its Affiliates' use of the Services and compliance with the Agreement. "**Affiliate**" means an entity that controls, is controlled by, or is under common control with, a party. Customer may allow its Affiliates to purchase Services under the terms of this LSA only if Customer informs LinkedIn in writing of the specific Affiliate authorized to make a purchase ("**Authorized Affiliate**"). If an Authorized Affiliate executes an ordering document under the terms of this LSA, that Authorized Affiliate will be (a) deemed a "Customer" for that purchase only; and (b) jointly and severally liable with Customer for its use of the Services and compliance with the Agreement.

**1.3    Payment.** Customer will pay the fees for the Services stated in the ordering document within 30 calendar days after receipt of LinkedIn's invoice, unless otherwise stated in the ordering document, subject to approved line of credit. For Services that require payment by credit card, LinkedIn will charge Customer's credit card upon receipt of the credit card information and also upon renewals. Customer's purchases are non-cancelable and payment for Services is non-refundable, except as otherwise stated in this LSA. Customer will maintain complete and accurate billing and contact information with LinkedIn.

**1.4    Taxes.** Customer will pay or reimburse LinkedIn for all federal, state, and local taxes, including sales, use, gross receipts, VAT, GST, or similar transaction taxes imposed on Customer's purchase of Services, unless Customer provides LinkedIn with a valid tax exemption certificate.  All taxes payable by Customer will be separately stated and exclusive of the fees.  Customer will have no liability for taxes that are statutorily imposed on LinkedIn including taxes or fees measured by LinkedIn's net or gross income.

## 2.    RESPONSIBILITIES

**2.1    Use of the Services**. Customer will use the Services solely for its intended purpose, as described in Exhibit A. Only Customer-designated employees and contractors are authorized to use the Services ("**Customer User**"). A Customer User must also be a Member. A "**Member**" is an individual who signs-up to use LinkedIn's services under LinkedIn's user agreement, currently available at https://www.linkedin.com/legal/user-agreement, as amended by LinkedIn from time to time ("**User Agreement**"). The terms of the User Agreement are incorporated into this LSA. Customer will ensure that Customer Users comply with the User Agreement. Customer will use the Services solely for Customer's internal use and will not provide access to the Services to any third party, except as otherwise permitted in the Agreement. Customer will notify LinkedIn immediately upon learning of any unauthorized use of the Services or any other breach of security relating to the Services. Customer may use content, data and other information about Members that Customer collects in connection with its use of the Services only as needed for use of the Services and as expressly permitted in this LSA. Customer will provide LinkedIn with the information necessary for LinkedIn to provide the Services.

1

**2.2   Handling of Personal Data.** If Customer uploads or otherwise provides LinkedIn with Personal Data (defined below) in connection with its use of the Services ("**Customer Personal Data**"), then LinkedIn, in providing the Services, processes Customer Personal Data on behalf of Customer. Customer is the controller of Customer Personal Data and LinkedIn will process Customer Personal Data (i) in accordance with applicable Data Protection Laws (defined in section 2.3); (ii) in compliance with the written instructions received from Customer including, as applicable, sub-processing as necessary; and (iii) only for the purpose of providing, supporting and improving the Services, using appropriate technical and organizational security measures. "**Personal Data**" means information about an individual that (a) can be used to identify, contact or locate a specific individual; (b) can be combined with other information that is linked to a specific individual to identify, contact or locate a specific individual; or (c) is defined as "personal data" or "personal information" by applicable laws or regulations relating to the collection, use, storage or disclosure of information about an identifiable individual.

**2.3   Compliance with Laws.** The parties will comply with all applicable international, federal, state, provincial and local laws relating to (a) corruption practice, bribery, and acts contrary to the public administration including the US Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-1, et seq.; (b) discrimination against employees or job applicants based on race, color, religion, sex, national origin, veteran status or disability; and (c) the privacy, confidentiality, security and protection of Personal Data including the EU Data Protection Directive 95/46/EC as amended and as implemented in the various European Economic Area countries or any similar and applicable legislation enacted outside of the European Economic Area and security breach notification laws ("**Data Protection Laws**"). LinkedIn complies with the U.S.-Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of Personal Data from Switzerland. With respect to any Customer Personal Data (excluding, for clarity, any Personal Data provided by Members to LinkedIn) of European Union residents, LinkedIn Corporation (as data importer) and Customer (as data exporter) will comply with the applicable standard contractual clauses located at: https://business.linkedin.com/c/15/10/eu-scc.

**3.   CONFIDENTIAL INFORMATION**

**3.1   Definition**. "**Confidential Information**" means any information disclosed under the Agreement that (a) if tangible, is clearly marked as "Confidential" or with a similar designation; (b) if intangible, is identified as "Confidential" by discloser at time of disclosure and confirmed in writing to recipient as being Confidential Information; or (c) from the relevant circumstances should reasonably be known by recipient to be confidential (e.g. pricing, non-public Personal Data, etc.).

**3.2   Exclusions.** Confidential Information does not include any portion of the information that recipient can prove (a) was rightfully known to recipient before receipt from discloser; (b) was generally known to the public on the Effective Date; (c) becomes generally known to the public after the Effective Date, through no fault of recipient; (d) was received by recipient from a third party without any confidentiality obligation; or (e) was independently developed by recipient without breach of this section 3.

**3.3   Limited Use and Non-Disclosure**. Recipient will (a) use Confidential Information solely to fulfill its obligations under the Agreement; (b) protect Confidential Information using the same degree of care it uses to protect its own confidential information of a like nature, but in no event less than a reasonable degree of care; (c) not disclose Confidential Information to any third party except (1) to Affiliates or employees, consultants, and agents who (i) have a need to know it in order to carry out their obligations under the Agreement, and (ii) are under written confidentiality and non-use obligations at least as restrictive as those stated in this LSA or (2) as required by law; and (d) not modify, reverse engineer, decompile, create other works from, or disassemble any Confidential Information, to the extent applicable, unless authorized in writing by discloser.

**4.   INTELLECTUAL PROPERTY RIGHTS AND OWNERSHIP.** No right, title or interest in any intellectual property right transfers to the other party, except for the limited rights stated in the Agreement. Customer is not obligated to provide LinkedIn or its Affiliates with any suggestions, enhancement requests, or other feedback about the Services or related technology. However, if Customer does provide any feedback to LinkedIn, LinkedIn may use and modify it without any restriction or payment.

LinkedIn Confidential and Proprietary
Last Updated: November 24 2015 v.3

**5.    TERM AND TERMINATION**

**5.1    Term.** This LSA is effective on the date the first ordering document is executed by Customer and LinkedIn ("**Effective Date**") and remains in effect until terminated.

**5.2    Termination and Suspension**. Either party may terminate this LSA or an ordering document if the other party materially breaches the Agreement and fails to cure the breach within 30 days after receiving notice of the breach. LinkedIn may immediately terminate this LSA or an ordering document if Customer is in breach of section 2.3. LinkedIn may suspend Customer's access to the Services if Customer is in breach of the Agreement and the suspension will continue for as long as reasonably necessary for Customer to remedy the breach. If all ordering documents under this LSA have expired or been terminated, then either party may terminate this LSA for convenience by providing written notice to the other party.

**5.3    Effect of Termination.** Termination of this LSA or an ordering document will not relieve Customer from its obligation to pay LinkedIn any fees stated in an ordering document. If Customer terminates this LSA or an ordering document because of LinkedIn's uncured material breach, LinkedIn will refund a pro-rata share of any pre-paid fees under the applicable ordering document. Customer will notify Customer Users that their access to the applicable Services has terminated and LinkedIn may remove or discard all content that Customer uploaded or otherwise made available to LinkedIn in accordance with LinkedIn's policies. Termination of an ordering document does not terminate this LSA; however, termination of this LSA will result in the immediate termination of all ordering documents. The provisions of this LSA that by their nature extend beyond the termination of this LSA will survive termination of this LSA.

**6.    NO WARRANTY.** The Services are provided "as is". LinkedIn makes no representation or warranty about the Services including any representation that the Services will be uninterrupted or error-free. To the fullest extent permitted under applicable law, LinkedIn disclaims any implied or statutory warranty, including any implied warranty of title, non-infringement, merchantability or fitness for a particular purpose.

**7.    THIRD-PARTY INDEMNIFICATION**

**7.1    Indemnification**. LinkedIn will defend and indemnify Customer, its Affiliates, and their respective directors, officers and employees from and against all third party claims to the extent resulting from or alleged to have resulted from (a) the Services' infringement of a third party's intellectual property right; or (b) LinkedIn's material breach of the Agreement. Customer will defend and indemnify LinkedIn, its Affiliates, and their respective directors, officers and employees from and against all third party claims to the extent resulting from or alleged to have resulted from (y) the infringement of a third party's intellectual property right by any content, data or other information uploaded into LinkedIn's system or otherwise provided by Customer; or (z) Customer's material breach of the Agreement.

**7.2    Indemnification Procedures**. Each party will notify the other in writing of any third party claim. The indemnifying party will (a) control the defense of the claim; and (b) obtain the other party's prior written approval of the indemnifying party's settlement or compromise of a claim. The indemnified party will (y) not unreasonably withhold or delay its approval of the request for settlement or compromise; and  (z) assist and cooperate in the defense as reasonably requested by the indemnifying party at the indemnifying party's expense.

**8.    LIMITATION OF LIABILITY**

**8.1    Damages Waiver.** To the fullest extent permitted by law, neither party, including its respective Affiliates, will be liable to the other in connection with the Agreement for lost profits or lost business opportunities, loss of data, or any indirect, incidental, consequential, special or punitive damages.

**8.2    Liability Cap.** Neither party, including its respective Affiliates, will be liable to the other in connection with the Agreement for an amount that exceeds the total fees paid or payable to LinkedIn during the 12-month period before the event giving rise to the liability. Subject to section 8.3 (b), LinkedIn will not be liable for any unauthorized third party access to Customer's content, data, programs, information, network, or systems.

3

**8.3**   **Exclusions**. The limitations of liability stated in sections 8.1 and 8.2, do not apply to a party's (a) confidentiality or indemnification obligations; (b) liability for fraud, gross negligence or intentional misconduct; (c) liability for death or personal injury; or (d) violation of the other party's intellectual property.

**9.**   **DISPUTE RESOLUTION.** If an issue arises under the Agreement (including non-contractual disputes or claims) and the applicable ordering document was signed by a LinkedIn entity in North America or South America, then the Agreement is governed by the laws of the State of California, and any action or proceeding (including those arising from non-contractual disputes or claims) related to the Agreement will be brought in a federal court in the Northern District of California. If an issue arises under the Agreement (including non-contractual disputes or claims) and the applicable ordering document was signed by a LinkedIn entity in any country other than North America and South America, then the Agreement is governed by the laws of Ireland, and any action or proceeding (including those arising from non-contractual disputes or claims) related to the Agreement will be brought in Dublin, Ireland. Each party irrevocably submits to the jurisdiction and venue of the applicable courts. The prevailing party in any litigation may seek to recover its legal fees and costs.

**10.**   **MISCELLANEOUS.** If a conflict exists between any of the terms in the Agreement, then the LSA will govern, followed by the ordering document, and then the User Agreement. If a conflict exists between any of the general terms in the LSA and the relevant exhibits, then the exhibits will prevail to the extent of that inconsistency. Neither party relies on any undertaking, promise, assurance, statement, representation, warranty or understanding (whether in writing or not) of any person (whether party to the Agreement or not) relating to the subject matter of the Agreement, other than as stated in the Agreement. The parties will provide notices in writing and deliver them by commercial overnight courier to the address of the other party stated on the ordering document, unless otherwise stated in the Agreement. Notices are effective on the date of delivery as indicated in the records of the courier. The Agreement does not create a partnership, agency relationship, or joint venture between the parties. Neither party has the power or authority to bind the other or to create any obligation or responsibility on behalf of the other. Under no circumstances will any employee of one party be deemed to be the employee of the other. Neither party will assign this LSA or an ordering document in whole or in part without the other party's prior written consent (which consent will not be unreasonably denied, delayed or conditioned), except an assignment to an Affiliate or a successor that is not a competitor of the non-assigning party, made in connection with a merger or sale of all or substantially all of a party's assets or stock. Any attempted assignment in violation of the foregoing restriction will be void. Customer will provide LinkedIn written notification if Customer is purchasing Services through a LinkedIn approved agency. If Customer is an agency binding a client under this LSA, Customer (a) represents and warrants that it has the authority to bind the client to the terms stated in this LSA; (b) will notify LinkedIn in writing of the name and address of its client that will access and use the Services; and (c) remains jointly and severally liable for all obligations of Customer under the Agreement. If the Agreement is translated into a language other than English, the translation is for convenience only, and the English language version will govern. LinkedIn may remotely monitor Customer's use of the Services to ensure compliance with the Agreement. If any provision of the Agreement is unenforceable, that provision will be modified to render it enforceable to the extent possible to affect the parties' intention and the remaining provisions will not be affected. The parties may amend the Agreement only in a written amendment signed by both parties, except for the User Agreement, which may be modified in accordance with its terms. If this LSA or an ordering document will be executed then it can be executed electronically and in counterparts, each of which is deemed to be an original and all of which taken together comprise a single document.  Each party represents and warrants to the other that the individual binding a party under this LSA or an ordering document is authorized to do so.

LinkedIn Confidential and Proprietary
Last Updated: November 24 2015 v.3

**Exhibit A**
**Service-Specific Terms**

The following Service-specific terms are in addition to the terms stated above. Service-specific terms apply to Customer to the extent the specific Service is included in an ordering document. LinkedIn may, in its sole discretion, change, modify, upgrade or discontinue any aspect or feature of a Service in whole or in part.

1.    **BY SERVICE**

    **A.**   **Sales Navigator Service.** Customer may use the Sales Navigator Service only to generate sales leads.

    **B.**   **Recruiter Service**. Customer will use the Recruiter Service and information about LinkedIn Members only to recruit individuals to become employees and consultants of Customer or its Affiliates, or, if Customer is an approved agency, only to recruit individuals to become employees and consultants of its clients. An agency is classified as a recruitment process outsourcer for a particular client of agency, if agency's Customer User uses that client's name, brand, or logo on Customer User's Member profile, profile summary, current employer description, or in messaging in the LinkedIn environment ("**RPO**"). Agency will inform LinkedIn of its RPO classification with a particular client and the name of that client (a) before purchasing any Recruiter Service, and (b) upon a change in classification. An RPO must use Recruiter-Corporate seats to support a client. An RPO must not use Recruiter Professional seats to support a client. If the Customer User is using its client's name, brand, or logo as described above, in conjunction with the RPO's name, brand or logo, its purchase of Recruiter-Corporate is governed by the master subscription agreement between LinkedIn and the RPO. If the Customer User is using its client's name, brand, or logo as described above, in place of the RPO's brand or logo, then its purchase of Recruiter-Corporate seats is governed by the master subscription agreement between LinkedIn and that client. Upon any termination, Customer is responsible for downloading any content, data or other information Customer Users uploaded to LinkedIn's system or otherwise provided to LinkedIn. Customer's breach of this section 1B is deemed a material breach of the LSA.

    **C.**   **Referral Service**. Customer will use the Referral Service and information about Members only to recruit individuals to become employees and consultants of Customer or its Affiliates. The Referral Service must integrate with Customer's applicant tracking system ("**ATS**"). The Referral Service will only operate with certain third party ATSs, as specified in the ordering document. Integration of any ATS to the Referral Service is Customer's sole responsibility. LinkedIn disclaims all liability resulting from or related to any ATS.

    **D.**   **Lynda.com and Video2brain Content Services**. Customer will state the name of its single designated administrator in the ordering document and that administrator will have access to the reporting and management tools available. Displaying or publicly performing lynda.com or video2brain content in a public setting (including a conference room or classroom) without LinkedIn's prior written consent constitutes an unauthorized use of the content and an infringement of LinkedIn's intellectual property rights. Customer will comply with the lynda.com Privacy Policy located at http://www.lynda.com/aboutus/otl-privacy.aspx and the video2brain Privacy Policy located at https://www.video2brain.com/de/datenschutzerklaerung, as applicable. Updates to the Privacy Policies are effective immediately upon posting to the respective website. If Customer is a school with children in any grade between kindergarten and twelfth grade or a school district, Customer represents and warrants that it will not allow a child under the age of 13 to access the lynda.com Service unless Customer has obtained written permission from the child's parent or legal guardian. Customer will promptly provide documentation of the permission upon LinkedIn's request.

    **E.**   **Elevate Service**. Customer will maintain a social media policy and ensure that its personnel comply with the policy. Only Customer's designated curator(s) is/are authorized to post content to the Elevate Service. Customer Users who are not curators may only read and forward content. Customer will ensure that it owns or has the necessary licenses, rights, consents, and permissions to the content it posts to the Elevate Service.

LinkedIn Confidential and Proprietary
Last Updated: November 24 2015 v.3

CE 1375

2. **ADDITIONAL REQUIREMENTS.** For Sales Navigator, Recruiter, or Referral Services, Customer (a) will designate in writing one Customer User for each seat it purchases; (b) will promptly provide to and maintain with LinkedIn accurate contact information for each Customer User; and (c) will not, and will not permit a Customer User to, share a Customer User's access to the Services with any other individual. In the event a Customer User ceases employment, takes any type of leave or vacation, or transfers work function, Customer may transfer the Customer User's seat to a different Customer User. LinkedIn reserves the right to limit the number of transfers of each seat.

LinkedIn Confidential and Proprietary
Last Updated: November 24 2015 v.3

# Compendium Exhibit 28

1   ANNETTE L. HURST (SBN 148738)
    ahurst@orrick.com
2   RUSSELL P. COHEN (SBN 213105)
    rcohen@orrick.com
3   NATHAN SHAFFER (SBN 282015)
    nshaffer@orrick.com
4   DANIEL JUSTICE (SBN 291907)
    djustice@orrick.com
5   SARAH K. MULLINS (SBN 324558)
    sarahmullins@orrick.com
6   MARIA N. SOKOVA (SBN 323627)
    msokova@orrick.com
7   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
8   405 Howard Street
    San Francisco, CA  94105-2669
9   Telephone:     +1 415 773 5700
    Facsimile:      +1 415 773 5759
10
    Attorneys for Defendant
11  LinkedIn Corporation

12

13                    UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15                      SAN FRANCISCO DIVISION

16

17  hiQ Labs, Inc.,                          Case No. 17-CV-03301-EMC

18              Plaintiff,                    **DECLARATION OF PAUL
                                             ROCKWELL IN SUPPORT OF
19       v.                                   LINKEDIN'S MOTION TO DISSOLVE
                                             PRELIMINARY INJUNCTION AND
20  LinkedIn Corporation,                     REQUEST FOR INDICATIVE RULING
                                             PURSUANT TO FED R. CIV. P. 62.1**
21              Defendants.
                                             Date:          Oct. 14, 2021
22  ─────────────────────────                 Time:          1:30 p.m.
                                             Courtroom:     5 – 17th Floor
23  LinkedIn Corporation                      Judge:         Hon. Edward M. Chen

24              Counterclaimant,              Complaint Filed:   June 7, 2017
                                             Trial Date:      February 27, 2023
25       v.

26  hiQ Labs, Inc.                           **REDACTED VERSION OF
                                             DOCUMENT SOUGHT TO BE
27              Counterdefendant,            SEALED.**

28
                                             DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                                             MOT. TO DISSOLVE PRELIM. INJ. AND
                                             REQUEST FOR INDICATIVE RULING
                                             17-cv-03301-EMC

1    I, Paul Rockwell, hereby declare as follows:

2        1.      I have worked at LinkedIn for nine years and am currently head of the Trust &

3    Safety organization.  I have personal knowledge of the facts stated in this declaration unless

4    otherwise indicated, and if called upon as a witness, could competently testify to them.  I submit

5    this declaration in support of LinkedIn's motion to dissolve the August 14, 2017 preliminary

6    injunction, request for indicative ruling, and related motion to seal.

7        2.      The Trust & Safety organization sits within Trust Engineering and is charged with

8    addressing operational, product, and security risks.  Trust Engineering, along with partner teams,

9    is responsible for developing mechanisms for detection and mitigation of scraping and for

10   investigating significant and high-scale abuse incidents.  A primary goal of our teams is to ensure

11   that the data LinkedIn's members entrust to LinkedIn remains secure, and to prevent unauthorized

12   access to the platform—including automated access by bots, crawlers, or scrapers that attempt to

13   scrape data from LinkedIn servers.

14       3.      LinkedIn is a professional network with over 750 million members around the

15   world.  LinkedIn's platform is made up of its members, who provide profile information to build

16   their professional online identities.  LinkedIn offers members a number of privacy settings that

17   permit them to control what information is displayed and published to others.

18       4.      Among the many challenges that LinkedIn faces, various individuals and business

19   entities periodically attempt to misappropriate data from the LinkedIn website—data that

20   LinkedIn's members have entrusted to it—by using automated means or "scraping," meaning the

21   accessing, extraction, and copying of data on a large scale.

22       5.      In order to communicate clear, binding terms for treatment of member data—as

23   well as how the public may use LinkedIn's website and the information viewable therein—

24   LinkedIn publishes its User Agreement, Privacy Policy, and Cookie Policy.  The LinkedIn User

25   Agreement applies not only to its members, but to anyone else who accesses LinkedIn's website.

26   The User Agreement expressly prohibits scraping LinkedIn's website.  In particular, Section 8.2

27   of the August 11, 2020 User Agreement, which is the most current version of the User

28

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-CV-03301-EMC

- 1 -

1  Agreement, prohibits:

2      a.  "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots or any other

3      means or processes (including crawlers, browser plugins and add-ons or any other

4      technology) to scrape the Services or otherwise copy profiles and other data from the

5      Services";

6      b.  "Overrid[ing] any security feature or bypass[ing] or circumvent[ing] any access

7      controls or use limits of the Service (such as caps on keyword searches or profile views)";

8      c.  "Copy[ing], us[ing], disclos[ing] or distribut[ing] any information obtained from the

9      Services, whether directly or through third parties (such as search engines), without the

10      consent of LinkedIn";

11      d.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] or otherwise

12      monetiz[ing] the Services or related data or access to the same, without LinkedIn's

13      consent."

14      6.      Attached hereto as Exhibit 1 is a true and correct copy of LinkedIn's August 11,

15  2020 User Agreement.

16      7.      Analogous prohibitions have been present in prior versions of the User Agreement

17  applicable during the period of hiQ's scraping LinkedIn data.

18      8.      Section 8.2 of the October 23, 2014 User Agreement prohibited those bound by it

19  from engaging in any of the following activities:

20      a.  "Us[ing] … automated software, devices, scripts robots, other means or processes to

21      access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

22      b.  "Us[ing] bots or other automated methods to access the Services";

23      c.  "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser

24      plugins and add-ons, and any other technology";

25      d.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or

26      related any information or data."

27      9.      Attached hereto as Exhibit 2 is a true and correct copy of LinkedIn's October 23,

28

- 2 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1    2014 User Agreement.[1]

2        10.      Section 8.2 of the June 7, 2017 User Agreement similarly prohibited:

3    a.  "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots, or any other

4        means or processes (including crawlers, browser plugins and add-ons, or any other

5        technology or manual work) to scrape the Services or otherwise copy profiles and other

6        data from the Services";

7    b. "Bypass[ing] or circumvent[ing] any access controls or Service use limits (such as caps

8        on keyword searches)";

9    c. "Copy[ing], us[ing], disclos[ing] or distribut[ing] any information obtained from the

10       Services, whether directly or through third parties (such as search engines), without the

11       consent of LinkedIn";

12   d. "Us[ing], disclos[ing] or distribut[ing] any data obtained in violation of this policy";

13   e.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or

14       related data";

15   f.  "Us[ing] bots or other automated methods to access the Services, add or download

16       contacts, send or redirect messages."

17       11.      Attached hereto as Exhibit 3 is a true and correct copy of LinkedIn's June 7, 2017

18   User Agreement.

19       12.      LinkedIn takes its obligations to protect members' data and its platform seriously,

20   and devotes resources accordingly.  LinkedIn dedicates over fifteen people across various teams,

21   including trust engineering, analytics, machine learning, product, and legal, who work to prevent

22   scraping on LinkedIn's platform.  LinkedIn spends millions of dollars per year in compensation

23   and other resources, including large-scale computing resources, on this protection effort.

24       13.      In addition to dedicated personnel, LinkedIn employs an array of technological

25   safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from

26

27   [1] This is the version of the User Agreement that hiQ agreed initially agreed to.  By continuing to
     access LinkedIn's website and data, hiQ agreed to subsequent versions of the User Agreement as
28   well.

- 3 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1   accessing and copying its members' data on a large scale.  Unauthorized data scraping forces

2   LinkedIn to expend resources in responding to scraping events and in deploying technical

3   measures to prevent such scraping.  On average, on a daily basis, LinkedIn blocks hundreds of

4   millions of unauthorized requests to access LinkedIn's servers.  LinkedIn's systems and dedicated

5   security personnel turn back more unauthorized guest profile requests than they permit authorized

6   guest profile requests every day.  Over the past four years, the cost and manpower LinkedIn has

7   devoted to combating scraping has only increased.

8          14.     At all relevant times, LinkedIn's Privacy Policy has limited what LinkedIn can and

9   cannot do with member data.  Section 3.1 of LinkedIn's current Privacy Policy, adopted August

10  11, 2020, allows members to adjust their settings to determine what portions of their profile, if

11  any, search engines can index and search.  Further, Section 4.2 of the Privacy Policy gives

12  members "many choices about how [their] data is collected, used and shared," including the

13  ability to delete data, restrict the use of data, or control the visibility of information members

14  placed on LinkedIn.  A true and correct copy of the August 11, 2020 Privacy Policy is attached

15  hereto as Exhibit 4.

16         15.     Among other protections LinkedIn offers, LinkedIn's members can delete

17  information from their profiles, or their profiles entirely, at any time.  If a member deletes his or

18  her profile, LinkedIn will delete that information from its servers, generally within 30 days,

19  subject to limited exceptions.  LinkedIn will not keep a copy of that data.  Members' ability to

20  remove their information helps ensure members retain ultimate control over it.

21         16.     Prior versions of the Privacy Policy, published on June 7, 2017 and October 23,

22  2014,[2] include similar statements permitting members to delete profile data, control who can see

23  their profile and activity, and limit how LinkedIn uses their data.  True and correct copies of the

24  June 7, 2017 and October 23, 2014 versions of the Privacy Policy are attached as Exhibits 5 and

25  6, respectively.

26

27  _____

    [2] This is the version of the Privacy Policy that hiQ initially agreed to.

28

                                        DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                     - 4 -                MOT. TO DISSOLVE PRELIM. INJ. AND
                                        REQUEST FOR INDICATIVE RULING
                                        17-cv-03301-EMC

1    17.    In addition to the Privacy Policy, LinkedIn offers members a number of other

2    privacy settings that permit them to control what information is displayed and broadcast to others.

3    For example, LinkedIn's "Do Not Broadcast" setting also promotes member control over their

4    information by allowing members to update their profiles at any time without broadcasting the

5    changes.  hiQ's scraping necessarily disregarded member privacy settings—which were invisible

6    to hiQ and its scraping vendors—including members' selection of LinkedIn's Do Not Broadcast

7    feature.

8    18.    LinkedIn has received numerous complaints from members when they suspect

9    scraping activity.  One example is a complaint from June 2017, where the member asked why a

10   third party was "allowed to harvest and republish" his LinkedIn data and asked LinkedIn "[w]hat

11   protection do you offer LinkedIn members?"  LinkedIn members have complained about hiQ's

12   scraping specifically.  For example, one member complained: "How the hell does hiQ Labs, Inc.

13   get the right to scrape data we placed on LinkedIn?  Is it just me or have things gotten way off the

14   rails."  Attached hereto as Exhibit 7 is a true and correct copy of examples of redacted customer

15   complaints to LinkedIn.

16   19.    hiQ and the third-party scrapers it retained bound themselves to the User

17   Agreement, among other ways, each time they accessed LinkedIn's website, as the User

18   Agreement provides: "You agree that by [. . .] accessing or using our services (including

19   LinkedIn, [. . .] or any content or information provided as part of these services, collectively,

20   'Services'), you are entering into a legally binding agreement."  *See* Exhibit 2, § 1.2.  The June 7,

21   2017 version of the User Agreement similarly provided: "You agree that by [. . .] accessing or

22   using our services (described below), **you are agreeing to enter into a legally binding contract**

23   with LinkedIn [. . .].  If you do not agree to this contract[, . . .] do not access or otherwise use any

24   of our Services."  *See* Exhibit 3, § 1.1 (emphasis in original).  The August 20, 2020 version

25   includes identical language to the June 7, 2017 agreement.  *See* Exhibit 1, § 1.1.

26   20.    Pursuant to the preliminary injunction entered in this case on August 14, 2017,

27   LinkedIn allowed hiQ unrestricted access to publicly viewable profile data on LinkedIn's servers.

28

- 5 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-CV-03301-EMC

1   LinkedIn confirmed via a letter to hiQ on November 28, 2017 that LinkedIn was "committed to

2   complying with the terms of the preliminary injunction order" and had "therefore taken steps to

3   ensure that hiQ is not prevented from accessing 'public profiles' on LinkedIn's website" by

4   ensuring that the IP address identified by hiQ was not blocked.[3]  A true and correct copy of

5   LinkedIn's November 28, 2017 letter is attached hereto as Exhibit 8.  As set forth in the letter,

6   LinkedIn personnel implemented affirmative measures to ensure hiQ's IP address had

7   unrestricted access to LinkedIn publicly viewable profile data.  LinkedIn accomplished this

8   through "allowlisting" (also referred to as "whitelisting") the IP address, which allows the device

9   connected to that address to access certain portions of LinkedIn's site without blocking access

10  through the anti-scraping measures described above.  hiQ requested the addition of new IP

11  addressed on April 8, 2018.  A true and correct copy of hiQ's April 8, 2018 email is attached

12  hereto as Exhibit 9.

13          21.     Even prior to the injunction, hiQ enjoyed largely unfettered access to LinkedIn.

14  LinkedIn had implemented IP blocks on certain IP addresses it thought were associated with hiQ

15  prior to the injunction.  In my prior declaration, I stated that LinkedIn blocked traffic from those

16  IP addresses on June 24, 2017.  I later learned that although LinkedIn started the process to block

17  traffic from those IP addresses on June 24, the block did not go into place until June 29, 2017.

18  LinkedIn then removed the block on June 30, 2017, after the hearing on hiQ's motion for a

19  temporary restraining order.

20          22.     LinkedIn continues to take affirmative steps to ensure that hiQ has access to

21  LinkedIn's servers.  As recently as January 2021, hiQ's counsel sent LinkedIn another letter

22  requesting that LinkedIn allowlist additional IP addresses, and LinkedIn took affirmative steps to

23  guarantee those IP addresses' access.  *See* Declaration of Annette Hurst, Exhibit 9.  LinkedIn has

24  no knowledge of who ultimately controls the IP addresses hiQ designates and no visibility into

25  what hiQ does with the information it accesses.

26

27  [3] An IP address (or Internet Protocol address) is an identifying number for a device (e.g., a
    computer or smart phone) connected to a network.

28

                                                      - 6 -

                                          DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                                          MOT. TO DISSOLVE PRELIM. INJ. AND
                                          REQUEST FOR INDICATIVE RULING
                                          17-cv-03301-EMC

23.    It is important that the IP addresses identified by hiQ remain confidential.  After consultation with LinkedIn's Chief Information Security Officer, I am concerned that if the IP addresses that LinkedIn has allowlisted for hiQ were publicly disclosed, third parties could use this knowledge to infer sensitive information about the sources and methods used in the defense of our computer systems and protection of our members' data, and disclosure could enable such third parties to devise novel methods, or attempt to use or "spoof" the IP addresses, to circumvent technical barriers that would otherwise prevent them from, among other things, scraping LinkedIn and thereby gaining access to scrape LinkedIn members' publicly viewable profile data, in violation of the member protections set forth in LinkedIn's User Agreement and Privacy Policy and described herein.  For that reason, LinkedIn does not publicly disclose the IP addresses it allowlists.

24.    The pendency of the injunction has created an ongoing perception that scrapers have an open door to LinkedIn profile data, which erodes the member trust LinkedIn has made the cornerstone of its business.  At least one scraper, ████████████████████████ ████████████████████, tells the public and its customers that this Court's injunction makes it "irrefutably legal" for anyone to scrape LinkedIn, even though LinkedIn's terms of use provide otherwise.  *Bright Data* website, https://brightdata.com/legality-of-web-data-collection.  And the sister company of OxyLabs, ████████████████████████████, conducted "an almost complete scrape of LinkedIn data" in 2019.  "Personal and Social Information of 1.2 Billion People Discovered in Massive Data Leak," *Night Lion Security Blog*, Nov. 22, 2019, a true and correct copy of which is attached as Exhibit 10.

25.    Data misuse has been the subject of extensive news coverage in recent years.  This coverage often describes scraping as a "fiasco" or (incorrectly) as "breaches" of member data.  Many articles explicitly refer to data scraped from LinkedIn, with headlines like: "LinkedIn's 1.2B Data-Scrape Victims Already Being Targeted by Attackers," *threatpost*, July 1, 2021; "Why Facebook and LinkedIn's data scraping fiascos are a huge security problem for their users," *Fortune*, April 17, 2021; "Data scraped from 500 million LinkedIn users found for sale online,"

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-CV-03301-EMC

DocuSign Envelope ID: 978D2614-778C-42BF-8A8E-28AEB9F32480

1   *TechRepublic*, April 6, 2021; "LinkedIn data breach grows to include over a billion hacked files:

2   The security of the social networking platform is very concerning, one expert says,"

3   *ConsumerAffairs*, July 1, 2021; "Massive data leak exposes 700 million LinkedIn users'

4   information," *Fortune*, June 30, 2021; "From Facebook to LinkedIn, data-scraping leaks

5   proliferate: The incentives and opportunities for harvesting valuable personal information have

6   multiplied," *Financial Times*, April 15, 2021.  Other coverage focuses on the proliferation of

7   companies—like Cambridge Analytica, Clearview AI, and others—using personal information on

8   social media profiles in ways users did not expect or intend.  Examples of this coverage include:

9   "Leaked: List of police, govt, uni orgs in Clearview AI's facial-recognition trials," *The Register*,

10  August 29, 2021; "Facebook data misuse and voter manipulation back in the frame with latest

11  Cambridge Analytica leaks," *TechCrunch*, Jan. 6, 2020.  These press cycles lead to member

12  complaints and confusion, and further erode members' trust by creating the impression that the

13  security of their personal information has been breached.  Press of this nature also has led to

14  regulatory inquiries that cost LinkedIn time and money as well as reputational harm.  Attached

15  hereto as Exhibit 11 are true and correct copies of the articles referenced in this paragraph.

16       26.     A court order compelling LinkedIn to provide privileged access to an admitted

17  scraper creates the impression among both scrapers and members that LinkedIn cannot legally

18  protect member data, harming LinkedIn's reputation.  This is especially true where a company,

19  like hiQ, has no apparent business purpose for accessing the data.

20       I declare under penalty of perjury under the laws of the United State that the foregoing is

21  true and correct.  Executed on September 10, 2021, at Los Gatos, California.

22

23                                                      DocuSigned by:

24                                                      _____
                                                        BDF7F452989E4D2...    Paul Rockwell

25

26

27

28
                                                        DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                        - 8 -                            MOT. TO DISSOLVE PRELIM. INJ. AND
                                                        REQUEST FOR INDICATIVE RULING
                                                        17-cv-03301-EMC

# Compendium Exhibit 28

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
SARAH K. MULLINS (SBN 324558)
sarahmullins@orrick.com
MARIA N. SOKOVA (SBN 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Defendant
LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-CV-03301-EMC |
| Plaintiff, | **DECLARATION OF PAUL ROCKWELL IN SUPPORT OF LINKEDIN'S MOTION TO DISSOLVE PRELIMINARY INJUNCTION AND REQUEST FOR INDICATIVE RULING PURSUANT TO FED R. CIV. P. 62.1** |
| v. | |
| LinkedIn Corporation, | |
| Defendants. | |
| | Date:        Oct. 14, 2021 |
| LinkedIn Corporation | Time:        1:30 p.m. |
| Counterclaimant, | Courtroom:  5 – 17th Floor |
| | Judge:       Hon. Edward M. Chen |
| v. | Complaint Filed:  June 7, 2017 |
| hiQ Labs, Inc. | Trial Date:        February 27, 2023 |
| Counterdefendant, | **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.** |

1    I, Paul Rockwell, hereby declare as follows:

2        1.      I have worked at LinkedIn for nine years and am currently head of the Trust &

3    Safety organization.  I have personal knowledge of the facts stated in this declaration unless

4    otherwise indicated, and if called upon as a witness, could competently testify to them.  I submit

5    this declaration in support of LinkedIn's motion to dissolve the August 14, 2017 preliminary

6    injunction, request for indicative ruling, and related motion to seal.

7        2.      The Trust & Safety organization sits within Trust Engineering and is charged with

8    addressing operational, product, and security risks.  Trust Engineering, along with partner teams,

9    is responsible for developing mechanisms for detection and mitigation of scraping and for

10   investigating significant and high-scale abuse incidents.  A primary goal of our teams is to ensure

11   that the data LinkedIn's members entrust to LinkedIn remains secure, and to prevent unauthorized

12   access to the platform—including automated access by bots, crawlers, or scrapers that attempt to

13   scrape data from LinkedIn servers.

14       3.      LinkedIn is a professional network with over 750 million members around the

15   world.  LinkedIn's platform is made up of its members, who provide profile information to build

16   their professional online identities.  LinkedIn offers members a number of privacy settings that

17   permit them to control what information is displayed and published to others.

18       4.      Among the many challenges that LinkedIn faces, various individuals and business

19   entities periodically attempt to misappropriate data from the LinkedIn website—data that

20   LinkedIn's members have entrusted to it—by using automated means or "scraping," meaning the

21   accessing, extraction, and copying of data on a large scale.

22       5.      In order to communicate clear, binding terms for treatment of member data—as

23   well as how the public may use LinkedIn's website and the information viewable therein—

24   LinkedIn publishes its User Agreement, Privacy Policy, and Cookie Policy.  The LinkedIn User

25   Agreement applies not only to its members, but to anyone else who accesses LinkedIn's website.

26   The User Agreement expressly prohibits scraping LinkedIn's website.  In particular, Section 8.2

27   of the August 11, 2020 User Agreement, which is the most current version of the User

28

- 1 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1    Agreement, prohibits:

2         a.  "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots or any other

3         means or processes (including crawlers, browser plugins and add-ons or any other

4         technology) to scrape the Services or otherwise copy profiles and other data from the

5         Services";

6         b.  "Overrid[ing] any security feature or bypass[ing] or circumvent[ing] any access

7         controls or use limits of the Service (such as caps on keyword searches or profile views)";

8         c.  "Copy[ing], us[ing], disclos[ing] or distribut[ing] any information obtained from the

9         Services, whether directly or through third parties (such as search engines), without the

10        consent of LinkedIn";

11        d.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] or otherwise

12        monetiz[ing] the Services or related data or access to the same, without LinkedIn's

13        consent."

14        6.     Attached hereto as Exhibit 1 is a true and correct copy of LinkedIn's August 11,

15    2020 User Agreement.

16        7.     Analogous prohibitions have been present in prior versions of the User Agreement

17    applicable during the period of hiQ's scraping LinkedIn data.

18        8.     Section 8.2 of the October 23, 2014 User Agreement prohibited those bound by it

19    from engaging in any of the following activities:

20        a.  "Us[ing] … automated software, devices, scripts robots, other means or processes to

21        access, 'scrape,' 'crawl' or 'spider' the Services or any related data or information";

22        b.  "Us[ing] bots or other automated methods to access the Services";

23        c.  "Scrap[ing] or copy[ing] profiles and information of others" through "crawlers, browser

24        plugins and add-ons, and any other technology";

25        d.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or

26        related any information or data."

27        9.     Attached hereto as Exhibit 2 is a true and correct copy of LinkedIn's October 23,

28

- 2 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

1    2014 User Agreement.[1]

2        10.    Section 8.2 of the June 7, 2017 User Agreement similarly prohibited:

3    a.  "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots, or any other

4        means or processes (including crawlers, browser plugins and add-ons, or any other

5        technology or manual work) to scrape the Services or otherwise copy profiles and other

6        data from the Services";

7    b. "Bypass[ing] or circumvent[ing] any access controls or Service use limits (such as caps

8        on keyword searches)";

9    c. "Copy[ing], us[ing], disclos[ing] or distribut[ing] any information obtained from the

10       Services, whether directly or through third parties (such as search engines), without the

11       consent of LinkedIn";

12   d. "Us[ing], disclos[ing] or distribut[ing] any data obtained in violation of this policy";

13   e.  "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] access to the Services or

14       related data";

15   f.  "Us[ing] bots or other automated methods to access the Services, add or download

16       contacts, send or redirect messages."

17       11.    Attached hereto as Exhibit 3 is a true and correct copy of LinkedIn's June 7, 2017

18   User Agreement.

19       12.    LinkedIn takes its obligations to protect members' data and its platform seriously,

20   and devotes resources accordingly.  LinkedIn dedicates over fifteen people across various teams,

21   including trust engineering, analytics, machine learning, product, and legal, who work to prevent

22   scraping on LinkedIn's platform.  LinkedIn spends millions of dollars per year in compensation

23   and other resources, including large-scale computing resources, on this protection effort.

24       13.    In addition to dedicated personnel, LinkedIn employs an array of technological

25   safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from

26   ─────────────────────

27   [1] This is the version of the User Agreement that hiQ agreed initially agreed to.  By continuing to
     access LinkedIn's website and data, hiQ agreed to subsequent versions of the User Agreement as

28   well.

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

- 3 -

1    accessing and copying its members' data on a large scale.  Unauthorized data scraping forces

2    LinkedIn to expend resources in responding to scraping events and in deploying technical

3    measures to prevent such scraping.  On average, on a daily basis, LinkedIn blocks hundreds of

4    millions of unauthorized requests to access LinkedIn's servers.  LinkedIn's systems and dedicated

5    security personnel turn back more unauthorized guest profile requests than they permit authorized

6    guest profile requests every day.  Over the past four years, the cost and manpower LinkedIn has

7    devoted to combating scraping has only increased.

8         14.    At all relevant times, LinkedIn's Privacy Policy has limited what LinkedIn can and

9    cannot do with member data.  Section 3.1 of LinkedIn's current Privacy Policy, adopted August

10   11, 2020, allows members to adjust their settings to determine what portions of their profile, if

11   any, search engines can index and search.  Further, Section 4.2 of the Privacy Policy gives

12   members "many choices about how [their] data is collected, used and shared," including the

13   ability to delete data, restrict the use of data, or control the visibility of information members

14   placed on LinkedIn.  A true and correct copy of the August 11, 2020 Privacy Policy is attached

15   hereto as Exhibit 4.

16        15.    Among other protections LinkedIn offers, LinkedIn's members can delete

17   information from their profiles, or their profiles entirely, at any time.  If a member deletes his or

18   her profile, LinkedIn will delete that information from its servers, generally within 30 days,

19   subject to limited exceptions.  LinkedIn will not keep a copy of that data.  Members' ability to

20   remove their information helps ensure members retain ultimate control over it.

21        16.    Prior versions of the Privacy Policy, published on June 7, 2017 and October 23,

22   2014,[2] include similar statements permitting members to delete profile data, control who can see

23   their profile and activity, and limit how LinkedIn uses their data.  True and correct copies of the

24   June 7, 2017 and October 23, 2014 versions of the Privacy Policy are attached as Exhibits 5 and

25   6, respectively.

26

27   ───────────────────
     [2] This is the version of the Privacy Policy that hiQ initially agreed to.

28
                                              DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                          - 4 -               MOT. TO DISSOLVE PRELIM. INJ. AND
                                              REQUEST FOR INDICATIVE RULING
                                              17-cv-03301-EMC

1    17.    In addition to the Privacy Policy, LinkedIn offers members a number of other

2    privacy settings that permit them to control what information is displayed and broadcast to others.

3    For example, LinkedIn's "Do Not Broadcast" setting also promotes member control over their

4    information by allowing members to update their profiles at any time without broadcasting the

5    changes.  hiQ's scraping necessarily disregarded member privacy settings—which were invisible

6    to hiQ and its scraping vendors—including members' selection of LinkedIn's Do Not Broadcast

7    feature.

8    18.    LinkedIn has received numerous complaints from members when they suspect

9    scraping activity.  One example is a complaint from June 2017, where the member asked why a

10   third party was "allowed to harvest and republish" his LinkedIn data and asked LinkedIn "[w]hat

11   protection do you offer LinkedIn members?"  LinkedIn members have complained about hiQ's

12   scraping specifically.  For example, one member complained: "How the hell does hiQ Labs, Inc.

13   get the right to scrape data we placed on LinkedIn?  Is it just me or have things gotten way off the

14   rails."  Attached hereto as Exhibit 7 is a true and correct copy of examples of redacted customer

15   complaints to LinkedIn.

16   19.    hiQ and the third-party scrapers it retained bound themselves to the User

17   Agreement, among other ways, each time they accessed LinkedIn's website, as the User

18   Agreement provides: "You agree that by [. . .] accessing or using our services (including

19   LinkedIn, [. . .] or any content or information provided as part of these services, collectively,

20   'Services'), you are entering into a legally binding agreement."  *See* Exhibit 2, § 1.2.  The June 7,

21   2017 version of the User Agreement similarly provided: "You agree that by [. . .] accessing or

22   using our services (described below), **you are agreeing to enter into a legally binding contract**

23   with LinkedIn [. . .].  If you do not agree to this contract[, . . .] do not access or otherwise use any

24   of our Services."  *See* Exhibit 3, § 1.1 (emphasis in original).  The August 20, 2020 version

25   includes identical language to the June 7, 2017 agreement.  *See* Exhibit 1, § 1.1.

26   20.    Pursuant to the preliminary injunction entered in this case on August 14, 2017,

27   LinkedIn allowed hiQ unrestricted access to publicly viewable profile data on LinkedIn's servers.

28

- 5 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-CV-03301-EMC

1   LinkedIn confirmed via a letter to hiQ on November 28, 2017 that LinkedIn was "committed to

2   complying with the terms of the preliminary injunction order" and had "therefore taken steps to

3   ensure that hiQ is not prevented from accessing 'public profiles' on LinkedIn's website" by

4   ensuring that the IP address identified by hiQ was not blocked.[3]  A true and correct copy of

5   LinkedIn's November 28, 2017 letter is attached hereto as Exhibit 8.  As set forth in the letter,

6   LinkedIn personnel implemented affirmative measures to ensure hiQ's IP address had

7   unrestricted access to LinkedIn publicly viewable profile data.  LinkedIn accomplished this

8   through "allowlisting" (also referred to as "whitelisting") the IP address, which allows the device

9   connected to that address to access certain portions of LinkedIn's site without blocking access

10  through the anti-scraping measures described above.  hiQ requested the addition of new IP

11  addressed on April 8, 2018.  A true and correct copy of hiQ's April 8, 2018 email is attached

12  hereto as Exhibit 9.

13         21.    Even prior to the injunction, hiQ enjoyed largely unfettered access to LinkedIn.

14  LinkedIn had implemented IP blocks on certain IP addresses it thought were associated with hiQ

15  prior to the injunction.  In my prior declaration, I stated that LinkedIn blocked traffic from those

16  IP addresses on June 24, 2017.  I later learned that although LinkedIn started the process to block

17  traffic from those IP addresses on June 24, the block did not go into place until June 29, 2017.

18  LinkedIn then removed the block on June 30, 2017, after the hearing on hiQ's motion for a

19  temporary restraining order.

20         22.    LinkedIn continues to take affirmative steps to ensure that hiQ has access to

21  LinkedIn's servers.  As recently as January 2021, hiQ's counsel sent LinkedIn another letter

22  requesting that LinkedIn allowlist additional IP addresses, and LinkedIn took affirmative steps to

23  guarantee those IP addresses' access.  *See* Declaration of Annette Hurst, Exhibit 9.  LinkedIn has

24  no knowledge of who ultimately controls the IP addresses hiQ designates and no visibility into

25  what hiQ does with the information it accesses.

26

27  [3] An IP address (or Internet Protocol address) is an identifying number for a device (e.g., a
    computer or smart phone) connected to a network.

28
                                                      DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
                          - 6 -                       MOT. TO DISSOLVE PRELIM. INJ. AND
                                                      REQUEST FOR INDICATIVE RULING
                                                      17-CV-03301-EMC

23.     It is important that the IP addresses identified by hiQ remain confidential.  After consultation with LinkedIn's Chief Information Security Officer, I am concerned that if the IP addresses that LinkedIn has allowlisted for hiQ were publicly disclosed, third parties could use this knowledge to infer sensitive information about the sources and methods used in the defense of our computer systems and protection of our members' data, and disclosure could enable such third parties to devise novel methods, or attempt to use or "spoof" the IP addresses, to circumvent technical barriers that would otherwise prevent them from, among other things, scraping LinkedIn and thereby gaining access to scrape LinkedIn members' publicly viewable profile data, in violation of the member protections set forth in LinkedIn's User Agreement and Privacy Policy and described herein.  For that reason, LinkedIn does not publicly disclose the IP addresses it allowlists.

24.     The pendency of the injunction has created an ongoing perception that scrapers have an open door to LinkedIn profile data, which erodes the member trust LinkedIn has made the cornerstone of its business.  At least one scraper, █████████████████████ ████████████████████, tells the public and its customers that this Court's injunction makes it "irrefutably legal" for anyone to scrape LinkedIn, even though LinkedIn's terms of use provide otherwise. *Bright Data* website, https://brightdata.com/legality-of-web-data-collection.  And the sister company of OxyLabs, █████████████████████████, conducted "an almost complete scrape of LinkedIn data" in 2019.  "Personal and Social Information of 1.2 Billion People Discovered in Massive Data Leak," *Night Lion Security Blog*, Nov. 22, 2019, a true and correct copy of which is attached as Exhibit 10.

25.     Data misuse has been the subject of extensive news coverage in recent years.  This coverage often describes scraping as a "fiasco" or (incorrectly) as "breaches" of member data. Many articles explicitly refer to data scraped from LinkedIn, with headlines like: "LinkedIn's 1.2B Data-Scrape Victims Already Being Targeted by Attackers," *threatpost*, July 1, 2021; "Why Facebook and LinkedIn's data scraping fiascos are a huge security problem for their users," *Fortune*, April 17, 2021; "Data scraped from 500 million LinkedIn users found for sale online,"

- 7 -

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-CV-03301-EMC

DocuSign Envelope ID: 978D2614-3786-42BF-8A86-28AEB9F32480

1   *TechRepublic*, April 6, 2021; "LinkedIn data breach grows to include over a billion hacked files:

2   The security of the social networking platform is very concerning, one expert says,"

3   *ConsumerAffairs*, July 1, 2021; "Massive data leak exposes 700 million LinkedIn users'

4   information," *Fortune*, June 30, 2021; "From Facebook to LinkedIn, data-scraping leaks

5   proliferate: The incentives and opportunities for harvesting valuable personal information have

6   multiplied," *Financial Times*, April 15, 2021.  Other coverage focuses on the proliferation of

7   companies—like Cambridge Analytica, Clearview AI, and others—using personal information on

8   social media profiles in ways users did not expect or intend.  Examples of this coverage include:

9   "Leaked: List of police, govt, uni orgs in Clearview AI's facial-recognition trials," *The Register*,

10  August 29, 2021; "Facebook data misuse and voter manipulation back in the frame with latest

11  Cambridge Analytica leaks," *TechCrunch*, Jan. 6, 2020.  These press cycles lead to member

12  complaints and confusion, and further erode members' trust by creating the impression that the

13  security of their personal information has been breached.  Press of this nature also has led to

14  regulatory inquiries that cost LinkedIn time and money as well as reputational harm.  Attached

15  hereto as Exhibit 11 are true and correct copies of the articles referenced in this paragraph.

16       26.    A court order compelling LinkedIn to provide privileged access to an admitted

17  scraper creates the impression among both scrapers and members that LinkedIn cannot legally

18  protect member data, harming LinkedIn's reputation.  This is especially true where a company,

19  like hiQ, has no apparent business purpose for accessing the data.

20       I declare under penalty of perjury under the laws of the United State that the foregoing is

21  true and correct.  Executed on September 10, 2021, at Los Gatos, California.

22

23  DocuSigned by:

24  BDF7F452989E4D2  Paul Rockwell

25

26

27

28

DECL. OF PAUL ROCKWELL ISO LINKEDIN'S
MOT. TO DISSOLVE PRELIM. INJ. AND
REQUEST FOR INDICATIVE RULING
17-cv-03301-EMC

Compendium Exhibit 29

(Filed Under Seal)

Compendium Exhibit 30

(Filed Under Seal)

# Compendium Exhibit 31

# (Filed Under Seal)

Compendium Exhibit 32

(Filed Under Seal)

Compendium Exhibit 33

(Filed Under Seal)

Compendium Exhibit 34

(Filed Under Seal)

# Compendium Exhibit 36

# (Filed Under Seal)

Compendium Exhibit 37

(Filed Under Seal)

Compendium Exhibit 38

(Filed Under Seal)

# Compendium Exhibit 39

# (Filed Under Seal)

# Compendium Exhibit 40

# (Filed Under Seal)

# Compendium Exhibit 41

# (Filed Under Seal)

# Compendium Exhibit 42

# (Filed Under Seal)

# Compendium Exhibit 43

# (Filed Under Seal)

# Compendium Exhibit 44

# (Filed Under Seal)