Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Elisabeth B. Miller (*pro hac vice*)
elisabethmiller@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
Daily Guerrero (*pro hac vice*)
Dailyguerrero@quinnemanuel.com
Zane Muller (*pro hac vice*)
zanemuller@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6331

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>*Plaintiff and Counterclaim Defendant*,<br><br>vs.<br><br>LinkedIn Corp.,<br><br>*Defendant and Counterclaim Plaintiff.* | Case No. 3:17-cv-03301-EMC<br><br>**PLAINTIFF AND COUNTERCLAIM DEFENDANT HIQ LABS, INC.'S MOTION FOR SUMMARY JUDGMENT ON LINKEDIN CORP.'S FIRST COUNTERCLAIM**<br><br>The Hon. Edward M. Chen<br><br>Date:       September 15, 2022<br>Time:       1:30 P.M.<br>Location:  Courtroom 5, 17th Floor<br>                450 Golden Gate Ave.<br>                San Francisco, CA 94102 |

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................................. 1

II.  BACKGROUND ................................................................................................................. 1

    A.   After Years of Engagement, LinkedIn Abruptly Targets hiQ With a Cease-And-Desist Letter Accusing hiQ of Violating the CFAA in May 2017 .......................... 1

    B.   LinkedIn Admits That It Suspected hiQ of Scraping in October 2014 ................... 3

    C.   LinkedIn Admits That a Senior Executive Was Separately Informed That hiQ Was Likely Scraping Data in December 2014, But Members of Its Anti-Scraping Council Did Not Act When Notified ........................................................................ 6

III. LEGAL STANDARD .......................................................................................................... 9

IV.  ARGUMENT ..................................................................................................................... 10

V.   CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Al-Ahmed v. Twitter, Inc.*,
  No. 21-CV-08017-EMC, 2022 WL 1605673 (N.D. Cal. May 20, 2022) .............................. 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................... 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................................... 10

*Conmar Corp. v. Mitsui Co. (U.S.A.), Inc.*,
  858 F.2d 499 (9th Cir. 1988) ........................................................................................... 10

*High Country Linens, Inc. v. Block*,
  No. C 01-02180 CRB (N.D. Cal. Aug. 19, 2002) ........................................................... 10

*Kyko Glob. Inc. v. Bhongir*,
  No. 20-17526, 2021 WL 4958989 (9th Cir. Oct. 26, 2021) ............................................. 12

*Maddalena v. Toole*,
  No. 2:13-CV-4873-ODW, 2013 WL 5491869 (C.D. Cal. Oct. 1, 2013) ................... 10, 11

*Reynolds v. Dave Applegate*,
  No. C 10-04427 CRB (N.D. Cal. Feb. 14, 2011) ............................................................ 11

*Volk v. D.A. Davidson Co.*,
  816 F.2d 1406 (9th Cir. 1987) ......................................................................................... 10

*West v. Ronquillo-Morgan*,
  No. CV 20-2711 DSF(EX), 2021 WL 2953160 (C.D. Cal. May 10, 2021) ............... 10, 11

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) ......................................................................................................... 11

*Yetter v. Ford Motor Co.*,
  428 F. Supp.3d 210 (N.D. Cal. 2019) .............................................................................. 11

**Rules / Statutes**

18 U.S.C. § 1030 .................................................................................................... 1, 11, 12

18 U.S.C. § 1030(g) ................................................................................................... 10

Fed. R. Civ. P. 56(a) .................................................................................................... 9

Fed. R. Civ. P. 56(c)(1)(A), (B) ...................................................................................... 10

Fed. R. Civ. P. 56(c)(3) .................................................................................................. 10

## I. INTRODUCTION

LinkedIn's claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, is time-barred by the statute's two-year period of limitation. LinkedIn admits that it suspected that hiQ was scraping its data in October of 2014. But despite receiving notice through multiple channels around that time, LinkedIn declined to investigate or stop hiQ's scraping until the spring of 2017, and then only *after* identifying hiQ as a competitive threat to its own analytics product and sending employees to attend a hiQ industry conference for the surreptitious gathering of "competitive intel" to exploit for its own benefit. The CFAA starts the two-year clock when a party has *inquiry*, rather than actual, notice. The record admits no other conclusion than that LinkedIn knew or should have known before June 7, 2015—the date two years before hiQ filed this action—that hiQ was scraping public data. Accordingly, hiQ respectfully requests that the Court grant summary judgment dismissing LinkedIn's untimely CFAA claim.

## II. BACKGROUND

### A. After Years of Engagement, LinkedIn Abruptly Targets hiQ With a Cease-And-Desist Letter Accusing hiQ of Violating the CFAA in May 2017

hiQ was founded in July 2012 to serve previously-unmet needs among employers (particularly large employers such as Fortune 500 companies) to assist in employee development and retention by (i) analyzing the full scope of current and potential employees' skills and (ii) identifying those employees that were at the highest risk of leaving the respective employer. ECF 131 at 2–3, 11–12; Ex. L (hiQ_00097102) (July 2012 OrgStars Certificate of Incorporation); Ex. M (hiQ_00603901) (Jan. 2016 Product Roadmap); Ex. N (Darren Kaplan May 4, 2022 Dep. Tr. 60:4 – 65:8). hiQ did so by researching and analyzing wholly public information that individuals chose to share via their professional social networking profiles on LinkedIn, a professional social networking site that currently has over 810 million users. ECF 131 at 3. hiQ's business was based on two products: Keeper, an attrition risk prediction platform, and SkillMapper, a talent analytics tool providing employers with insights into the depth and breadth of the skills possessed by their workforces. *Id.* at 13.

For years, LinkedIn knew about and sanctioned hiQ's services and activities, including by sending groups of employees to hiQ's semi-annual "Elevate" conferences, which gathered industry participants and customers to share insights and best practices. Ex. P (Mike Jennings Dep. Tr. 65:1-66:3). At the October 2016 "Elevate" Conference in Santa Clara, LinkedIn's Lorenzo Canlas accepted an award from hiQ for his team's work in the emerging people analytics field:

**IMPACT AWARD WINNER**

**Linked in**

**LORENZO CANLAS**

#hiqelevate        CONFIDENTIAL | OCTOBER 2016        hiQ elevate

Cindy Liang, *Product Analytics & Data Science, LinkedIn*
Rena Yi, *Talent Analytics, LinkedIn*
Lorenzo Canlas, *Head of Talent Analytics, LinkedIn*

See Ex. A (hiQ_00102004); Ex. P.

LinkedIn was apparently content to largely ignore hiQ's scraping activity until it developed its own talent analytics offering, LinkedIn Talent Insights, which was announced by CEO Jeff Weiner on June 21, 2017. ECF 131 at 19; Ex. B (LinkedIn's Response to hiQ's Second Interrogatories) at 12–13. A month prior, in May 2017, LinkedIn abruptly denied hiQ's access to the portion of the LinkedIn website containing wholly public user profiles. ECF No. 131 at 4. And on May 23, 2017, LinkedIn sent hiQ a cease-and-desist letter ordering hiQ to stop accessing LinkedIn and asserting that hiQ's continued access to the website violated the CFAA. *See* Ex. O (LINK_HIQ_000002224).

Deprived of access to the data that provided the foundation of its analytics, hiQ filed a complaint against LinkedIn on June 7, 2017, seeking a declaration that hiQ had not violated and would not violate federal or state law, including the CFAA, by accessing and copying wholly public information from LinkedIn's website. ECF No. 1 at 22–23.

### B. LinkedIn Admits That It Suspected hiQ of Scraping in October 2014

On June 6, 2022, LinkedIn filed an amended answer and counterclaim that asserted, *inter alia*, a cause of action against hiQ for allegedly violating the CFAA. (ECF No. 320 at 47–49.) Specifically, LinkedIn alleged that "hiQ knowingly and intentionally accessed LinkedIn's computers and servers without authorization or in excess of authorization" and "circumvented [LinkedIn's] technical barriers" by using concealment, such as fake accounts and proxy services, among other technical end-arounds. *Id.* at 47–48. LinkedIn's alleged injuries include harm to its computer systems and expenses associated with being forced to investigate and respond to the alleged unauthorized access and purported abuse of its computers. *Id.* at 49. LinkedIn also stated that it actively monitors its platform to prevent scraping. *Id.* at 34.

However, LinkedIn admits that it was on notice of hiQ's scraping activities as early as October 8, 2014, acknowledging an email exchange between employees on its Talent Analytics team explicitly describing hiQ's suspected scraping activity. *See* Ex. B at 4.[1] Daniel Maurath, an

---

[1] It is irrelevant whether LinkedIn knew that hiQ was scraping with 100% certainty because the statute of limitations begins to run when a party's duty to inquire is triggered by **suspicion** of harm, not certainty. *See* Argument Section I, *infra*.

Analyst on LinkedIn's Talent Analytics team, learned of hiQ through an invitation to hiQ's "Corporate Council" conference, a predecessor to its "Elevate" conferences, and notified his team. Will Gaker, a Senior Manager of Business Operations, expressed interest, noting his suspicion that "*they might be scraping our site*":

> From: William Gaker
> Sent: Wednesday October 08 2014 11:13 AM
>
> Confidential                                                                 LINK_HIQ_000038999
>
> To: Daniel Maurath; Talent Analytics
> Subject: RE: FYI Local HR Analytics conference at HiQ Labs
>
> This looks like a sales conference for a company presenting a new product. I would love to see what data they are using. It sounds like they might be scraping our site to see who has updated profiles and using that as a signal to predict turnover.
>
> ---
>
> Will Gaker
> Talent Analytics – Biz Ops
>
> **LinkedIn**
>
> (415) 845-4968
> wgaker@linkedin.com
> linkedin.com/williamgaker
>
> From: Daniel Maurath
> Sent: Wednesday, October 08, 2014 11:10 AM
> To: Talent Analytics
> Subject: FYI Local HR Analytics conference at HiQ Labs
>
> Has anyone heard of Hi Q Labs? They're hosting an upcoming HR analytics conference but unsure how valuable it would be.
>
> http://www.hiqlabs.com/corporatecouncil#agenda

*See* Ex. C (LINK_HIQ_000038999) at -39000.

In the same thread, Gaker also suggested *"[i]t might be good for someone (or at least alert someone who handles how our data gets used) to go [to the conference] to make sure this vendor isn't accessing our data without our permission"*:

> Message
> From: William Gaker [wgaker@linkedin.com]
> Sent: 10/8/2014 11:20:35 AM
> To: Daniel Maurath [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e50e586f9c6d4528883977723ec44bc2-Daniel Maur]; Lorenzo Canlas [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5fb700195d094089a60556afbdc6e0e6-Lorenzo Can]; Talent Analytics [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=3a33d5eb7146411ba8d51959846a874a-Talent_Anal]
> Subject: RE: FYI Local HR Analytics conference at HiQ Labs
>
> It might be good for someone (or at least alert someone who handles how our data gets used) to go to ==make sure this vendor isn't accessing our data without our permission.==
>
> ---
> Will Gaker
> Talent Analytics – Biz Ops
>
> LinkedIn
>
> (415) 845-4968
> wgaker@linkedin.com
> linkedin.com/williamgaker

*See id.* at -38999.

In its discovery responses, LinkedIn confirms that these suspicions were "something that required further investigation." Ex. B at 4. And in the same thread, Joseph Baribeau, another LinkedIn employee, echoed Gaker's view that a team member should investigate whether hiQ was, in fact, scraping LinkedIn data. Daniel Maurath agreed to "request to attend and at least find out more info":


> **Message**
> **From:** Daniel Maurath [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E50E586F9C6D4528883977723EC44BC2-DANIEL MAUR]
> **Sent:** 10/8/2014 11:20:51 AM
> **To:** Joseph Baribeau [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=46125ed762924e4191a08d399fa4d1a7-Joseph Bari]
> **Subject:** Re: FYI Local HR Analytics conference at HiQ Labs
> **Attachments:** image001.png
>
> Joe,
>
> ==I can request to attend and at least find out more info.==
>
> Daniel
>
> **From:** Joseph Baribeau <jbaribeau@linkedin.com>
> **Date:** Wednesday, October 8, 2014 at 11:18 AM
> **To:** William Gaker <wgaker@linkedin.com>, Lorenzo Canlas <lcanlas@linkedin.com>, Daniel Maurath <dmaurath@linkedin.com>, Talent Analytics <Talent_Analytics@linkedin.com>
> **Subject:** RE: FYI Local HR Analytics conference at HiQ Labs
>
> It is next week in "Silicon Valley" and the agenda looks to be 1Ž2 day.
>
> ==Seems like someone should go.== Anyone want to "request to attend" to get more info to figure out if there is a cost or not?

See Ex. D (LINK_HIQ_000039040).

But despite LinkedIn's acknowledgement that this issue "required further investigation", apparently none took place. *See* Ex. B at 4 (LinkedIn's admission that it "does not believe that any participant on that email thread reported hiQ's potential scraping to anyone with authority and responsibility regarding anti-scraping enforcement.").

      **C.**      **LinkedIn Admits That a Senior Executive Was Separately Informed That hiQ Was Likely Scraping Data in December 2014, But Members of Its Anti-Scraping Council Did Not Act When Notified**

In December 2014, Robin Vasan, a third-party venture capital investor, contacted LinkedIn's Vice President of Business Development, Bob Rosin, to notify him of a recent meeting he had had with hiQ. In his email of December 15, 2014, Vasan informed Rosin that hiQ was "look[ing] at public data (including LinkedIn)," and expressed his concern that LinkedIn would not "look favorably at a company that is analyzing profiles." *See* Ex. E (LINK_HIQ_000012281). Mr. Rosin forwarded this message from his personal email address to his LinkedIn email account:

> Message
> From: Bob Rosin [████████]
> Sent: 12/15/2014 9:06:30 PM
> To: Bob Rosin [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4e0798c65da94b4da5311f02c7c5f4be-Bob Rosin]
> Subject: Fwd: Happy Holidays!
>
> Begin forwarded message:
>
> From: Robin Vasan <rvasan@mayfield.com>
> To: ████████
> Subject: Happy Holidays!
> Date: December 15, 2014 at 2:11:59 PM PST
>
> Bob,
>
> I wanted to touch base since we are either working on or looking at companies that want to integrate more with LinkedIn.
>
> One company we are not involved in, but recently met, is called HiQ Labs. https://www.hiqlabs.com/ They are helping HR departments inside of companies ==look at public data (including LinkedIn)== to try to predict which employees might be at risk to leave. We found it interesting, but weren't sure that LinkedIn would ==look favorably at a company that is analyzing profiles== (combined with various other data sources). It would be great to get a sense on how LinkedIn figures out which partners to allow and work closely with or not.

*Id.* Mr. Rosin testified that he neither directed nor personally conducted any follow-up investigation other than to transmit this information to Director of Business Development Lee Womer, a LinkedIn employee who "[w]orked with [a] cross-functional team to reboot [LinkedIn's] anti-scraping initiative that dramatically improved defenses and enforcement."[2] Yet when he learned that hiQ was likely scraping LinkedIn data, Mr. Womer, in spite of his stated view that hiQ's attrition risk prediction service "was not a members-first use case," ***asked for an introduction to hiQ*** but declined to otherwise investigate its scraping activity:

---

[2] *See* Ex. F (Bob Rosin Tr. at 127:19–23) ("Q. And you never investigated what it was that hiQ was doing when Mr. Vasan said that it was "analyzing profiles"? A. No. I forwarded it to Lee because he was one who was responsible for this kind of stuff."; Ex. G (LinkedIn Profile of Lee Womer) (describing role and responsibilities vis-à-vis scraping enforcement).)

> **From:** Lee Womer <lwomer@linkedin.com>
> **Date:** Monday, December 15, 2014 at 9:15 PM
> **To:** Bob Rosin <brosin@linkedin.com>
> **Subject:** RE: Happy Holidays!
>
> Easilydo has been trying to get on my calendar for a few days (have a meeting on the calendar tomorrow that I have to move because of the planning debrief we set up). They seem a bit similar to Refresh so not sure if we'd support.
>
> I've not met HiQ but looks similar to some other companies that have reached out. ==Skeptical that it's a members' first use case== (the others were decidedly not), ==but I'd be interested in meeting them. Do you want to intro me?==
>
> Best,
> Lee
>
> ---
>
> **From:** Bob Rosin
> **Sent:** Monday, December 15, 2014 9:11 PM
> **To:** Lee Womer
> **Subject:** FW: Happy Holidays!
>
> Hi Lee,
>
> Please see the below note from a friend at Mayfield. Have you looked at either of these companies?
>
> Bob

*See* Ex. H (LINK_HIQ_000012274) at -12277; Ex. I (Lee Womer Tr. at 56:15–25). But Mr. Rosin did not "intro" Mr. Womer and no meeting occurred. Mr. Womer testified that he did not recall any follow-up, explaining that "[w]e had to sort of prioritize, and there was nothing about this engagement that sort of suggested to me that I should prioritize it . . . ." *Id.* at 57:19–21. In other words, as of December 2014, LinkedIn realized that it had a *choice* as to whether to investigate hiQ; it simply chose not to.

For years afterward, hiQ's scraping activity appparently remained "not a priority", despite LinkedIn having formed an internal "Scraper Council" to combat scraping in 2013 and filing lawsuits against other suspected scrapers as early as 2014. *See* Ex. B at 6; ECF No. 144-2. After attending the hiQ Elevate Conference in October of 2015, Mr. Canlas (the 2016 award recipient) notified members of LinkedIn's Scraper Council of hiQ's scraping activity:

```
From:     Lorenzo Canlas [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
          (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5FB700195D094089A60556AFBDC6E0E6-LORENZO CAN]
Sent:     10/7/2015 11:05:26 AM
To:       Adam Weinstein [aweinstein@linkedin.com]; Boyu Zhang [/o=ExchangeLabs/ou=Exchange Administrative Group
          (FYDIBOHF23SPDLT)/cn=Recipients/cn=5b2cdd7e16da4d19b4faab9500a6e3c7-Boyu Zhang_]
Subject:  Anti scraping

Hey guys what is the process for investigating companies who we think
are scraping the site?

We were at a conference yesterday with HiQ labs who is using internal
(HRIS, survey) data and external (Linkedin and other data) to predict
attrition.

Is there a way for us to understand how and if they are using our data
and understanding if we are enabling and supporting it?
```

Ex. J (LINK_HIQ_000067471). According to LinkedIn, this email was then forwarded to the Scraper Council at large; but yet again, no investigation was undertaken, and no other follow-up took place. Ex. B at 6–7. Mr. Canlas's later efforts to draw attention to hiQ's scraping activity continued to fall on deaf ears. *See, e.g.*, Ex. K (LINK_HIQ_000067901) (June 29, 2016 email from Canlas to senior LinkedIn managers noting his suspicion that hiQ continued to scrape profile data).

## III.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* at 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." *High Country Linens, Inc. v. Block*, No. C 01-02180 CRB, 2002 WL 1998272, at *2 (N.D. Cal. Aug. 20, 2002)(internal quotations and citations omitted). "The district court may grant summary judgment if uncontroverted evidence 'irrefutably demonstrates that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint.'" *Conmar Corp. v. Mitsui Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988) (quoting *Volk v. D.A. Davidson Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987)).

## IV.  ARGUMENT

LinkedIn's CFAA claim is time-barred by the two-year statute of limitations. A claim under the CFAA must be filed within two years from "the date of the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). The CFAA does not require that the claimant have **actual knowledge** of the violation; rather, it "demands only that the claimant have had a **reasonable notice to discover** the violation." *Maddalena v. Toole*, No. 2:13-CV-4873-ODW, 2013 WL 5491869, at *4 (C.D. Cal. Oct. 1, 2013) (emphasis added). When, as with the CFAA, "legislators have written the word 'discovery' directly into the statute . . . state and federal courts have typically interpret the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know." *West v. Ronquillo-Morgan*, No. CV 20-2711 DSF (EX), 2021 WL 2953160, at *3 (C.D. Cal. May 10, 2021) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 645 (2010)). Federal law determines when the limitations period begins to run, and the general federal rule is that "a limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action." *See Al-Ahmed v. Twitter, Inc.*, No. 21-CV-08017-EMC, 2022 WL 1605673, at *11 (N.D. Cal. May 20, 2022) (citation omitted).

It is undisputed that as early as October 8, 2014, LinkedIn suspected that hiQ was scraping its data "without permission." *See* Exs. B, C, D. It is also undisputed that LinkedIn did no due diligence to confirm or dispel its suspicion until years later. *See id.* At most, LinkedIn's excuses for why it failed to investigate hiQ at that time boil down to internal reporting failures: the employees who suspected that hiQ was scraping public profile data simply declined to "report[] hiQ's potential

scraping to anyone with authority and responsibility regarding anti-scraping enforcement." Ex. B at 4. But LinkedIn conspicuously fails to explain "why due diligence could not have revealed the violation earlier." *Reynolds v. Applegate*, No. C 10-04427 CRB, 2011 WL 560757, at *2 (N.D. Cal. Feb. 14, 2011) (rejecting argument for tolling the statute of limitations where "[p]laintiff had a reasonable opportunity to discover" a violation.); *Yetter v. Ford Motor Co.*, 428 F. Supp. 3d 210, 225 (N.D. Cal. 2019) (statute of limitations not tolled "because Plaintiff has not plausibly alleged reasonable diligence"). hiQ is not responsible for LinkedIn's administrative failure. Indeed, the fact that LinkedIn had already established a "Scraper Council . . . on or about September 2013," consisting of a "cross-functional group of individuals from multiple LinkedIn teams" (Ex. B at 6), makes this failure all the more stark.

For a claim to be time-barred, the aggrieved party need not know details such as the identity of the defendant, nor the exact legal claim. *See Al-Ahmed*, 2022 WL 1605673, at *11 (barring CFAA claim because "for statute of limitations purposes, a CFAA claim starts to run when the plaintiff is aware of the alleged damage, not when the plaintiff learns exactly what has happened") (citation and alteration omitted). In *Al-Ahmed*, the court found that since the plaintiff became aware of a data breach on his Twitter account, he had sufficient notice and could have sought out the unknown hackers within the statute of limitations period after filing a Doe complaint. *Id.* at *12; *Kyko Glob. Inc. v. Bhongir*, No. 20-17526, 2021 WL 4958989, at *1 (9th Cir. Oct. 26, 2021) (holding it was enough to have had "knowledge of the injury that gave rise to the claim" such as when plaintiff discovered fraudulent accounts that gave rise to plaintiff's fraud claims).

The record demonstrates beyond dispute—and LinkedIn's written discovery responses concede—that multiple LinkedIn employees received notice from multiple sources that hiQ was likely scraping data more than two years before this action commenced. Yet none of those employees undertook any investigation or initiated the filing of a claim until they saw a competitive advantage in doing so—and that was only after the statutory period had already expired. As a result, LinkedIn's CFAA claim is time-barred.

## V. CONCLUSION

The Court should grant Summary Judgment and dismiss LinkedIn's claim against hiQ under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

Dated: August 5, 2022

By

*/s/ Corey Worcester*

Corey Worcester (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
coreyworcester@quinnemanuel.com

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*