ANNETTE L. HURST (STATE BAR NO. 148738)
ahurst@orrick.com
RUSSELL P. COHEN (STATE BAR NO. 213105)
rcohen@orrick.com
NATHAN SHAFFER (STATE BAR NO. 282015)
nshaffer@orrick.com
CATHERINE Y. LUI (STATE BAR NO. 239648)
clui@orrick.com
DANIEL JUSTICE (STATE BAR NO. 291907)
djustice@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

MARIA N. SOKOVA (STATE BAR NO. 323627)
msokova@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

Attorneys for Defendant
LinkedIn Corp.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>    Plaintiff,<br><br> v.<br><br>LinkedIn Corp.,<br><br>    Defendant. | Case No. 3:17-cv-03301-EMC<br><br>**DEFENDANT LINKEDIN CORPORATION'S RESPONSE TO SECOND SET OF INTERROGATORIES**<br><br>**CONFIDENTIAL** |

**PROPOUNDING PARTY**:  PLAINTIFF HIQ LABS, INC.

**RESPONDING PARTY**:  DEFENDANT LINKEDIN CORP.

**SET NUMBER**:  SECOND

1    In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff LinkedIn Corporation ("LinkedIn") hereby provides the following objections and responses ("Responses") to the Second Set of Interrogatories (the "Interrogatories") propounded by Plaintiff and Counterclaim Defendant hiQ Labs, Inc. ("hiQ").

LinkedIn objects to the definition of "hiQ" as vague and ambiguous because hiQ's employees or representatives and its predecessors are not identified with reasonable particularity. Further, the term "predecessors" is not defined and it is unclear what sort of relationship between hiQ and other entities hiQ has in mind. LinkedIn's responses will address only hiQ, OrgStars Inc., and any employees or representatives where LinkedIn is aware of a relationship with hiQ.

LinkedIn objects to the definitions of "LinkedIn," "You," and "Your" as overbroad and beyond the scope permitted by the Federal Rules of Civil Procedure, which requires LinkedIn to furnish information available to the party. LinkedIn will respond for LinkedIn only and pursuant to its obligations.

LinkedIn objects to the definition of "People Analytics" or "HR Analytics" as vague, ambiguous, overbroad, and beyond the scope of the issues relevant to this litigation.

LinkedIn objects to hiQ's definition of "Document" as beyond the scope allowed by the Federal Rules of Civil Procedure ("FRCP") and instead uses the definition in FRCP 34(a)(1)(A).

LinkedIn objects to hiQ's definition of "Refer or Relate/Relating to" as being overbroad because the definition refers to such a broad range of subject matters that nearly all information would be responsive and the definitions effectively lack meaning. LinkedIn will construe "Refer or Relate/Relating to" according to their normal dictionary definitions.

LinkedIn further objects to hiQ's definition of "Including" as it is incomplete and lacks any definition. LinkedIn will construe "Including" according to its normal dictionary definition.

LinkedIn objects to the definition of "You," "Your," or "LinkedIn" because it exceeds the scope of LinkedIn's obligation to respond under Federal Rule of Civil Procedure 33. LinkedIn will respond for LinkedIn Corporation pursuant to its obligations under Federal Rule of Civil Procedure 33.

LinkedIn objects to the instructions preceding hiQ's interrogatories. Instructions are improper and objectionable because LinkedIn's only obligation is to respond according to its obligations under Federal Rule of Civil Procedure 33 and, to the extent appropriate, supplement pursuant to Federal Rule of Civil Procedure 26(e).

LinkedIn responds to hiQ's Second Set of Interrogatories as follows:

## INTERROGATORY REQUESTS

**INTERROGATORY NO. 8:**

Describe in detail when and how LinkedIn first suspected that hiQ was using automated means to access Your website, including by identifying the date you first suspected same, all individuals who had knowledge of same, and how those individuals came to that suspicion.

**RESPONSE TO INTERROGATORY NO. 8:**

LinkedIn objects to this interrogatory as overbroad and unduly burdensome in light of the phrase "all individuals who had knowledge of the same." As worded, this request applies to the individual subjective beliefs of any LinkedIn employee (of which there are many thousands), whether or not they had any responsibility for anti-scraping enforcement. LinkedIn further objects to the extent this interrogatory purports to assert that suspicion of scraping by hiQ by any individual employee can be imputed to LinkedIn as an entity. LinkedIn further objects to the extent this topic seeks to compel LinkedIn to identify the first time at which any individual associated in any way with LinkedIn became suspicious of hiQ's activities, which would be unduly burdensome, out of proportion with the needs of the case, and could involve information not within LinkedIn's possession, custody, or control, as well requiring LinkedIn to answer as to the content of oral communications, including communications that may have involved individuals that are no longer employed at LinkedIn. LinkedIn further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or attorney work-product doctrine. Subject to the foregoing objections, LinkedIn will respond to this interrogatory by providing information related to specific non-privileged instances where individual LinkedIn employees communicated in writing internally regarding hiQ's potential use of LinkedIn data for its products. By supplying such information, LinkedIn is not

conceding (and indeed disputes) that any individual person was suspicious of hiQ scraping data from LinkedIn in violation of LinkedIn's User Agreement and applicable law, or that the knowledge or suspicion of any one of these persons who was not responsible for anti-scraping enforcement is properly imputed to the company.

In light of the foregoing, and based upon a reasonable investigation, LinkedIn responds as follows:

**CONFIDENTIAL**

After a reasonable investigation, the first record of any LinkedIn employee wondering whether hiQ might be scraping LinkedIn data is an October 8, 2014, email from William Gaker (Senior Manager Business Operations on the Talent Analytics team) to Daniel Maurath (Analyst in Talent Analytics at the time). LINK_HIQ_000038998. Talent Analytics is an internal group focused on analyzing LinkedIn's own workforce. Its mission is to help LinkedIn make evidence-based internal decisions about its own employees. It is a division supporting LinkedIn's own Human Resources group. Talent Analytics is not directly involved in LinkedIn's external product offerings. Neither Mr. Gaker nor Mr. Maurath, nor the teams on which they worked, had responsibility on behalf of LinkedIn to identify potential scraping or take enforcement action against potential scrapers. Mr. Gaker and Mr. Maurath speculated that hiQ may be scraping LinkedIn's data but indicated that they had no knowledge one way or the other and it would be something that required further investigation. LinkedIn does not believe that any participant on that email thread reported hiQ's potential scraping to anyone with authority and responsibility regarding anti-scraping enforcement. *See* LINK_HIQ_000039090, LINK_HIQ_000038996, LINK_HIQ_000038994, LINK_HIQ_000039038, LINK_HIQ_000038999, LINK_HIQ_000039040, LINK_HIQ_000039092.

In December 2014, Robin Vasan, a third party analyst from Mayfield Fund, sent an unsolicited email to Bob Rosin, who was then the Vice President of Business Development at LinkedIn, about potential business opportunities, noting:

> One company we are not involved in, but recently met, is called HiQ Labs. https://www.hiqlabs.com/ They are helping HR departments inside of companies look at

public data (including LinkedIn) to try to predict which employees might be at risk to leave. We found it interesting, but weren't sure that LinkedIn would look favorably at a company that is analyzing profiles (combined with various other data sources). It would be great to get a sense on how LinkedIn figures out which partners to allow and work closely with or not.

Mr. Vasan's email also referenced a second company, as follows:

Another one that we are involved with is EasilyDo (www.easilydo.com) and they are seeing strong traction with their smart assistant solution. Today they have some lightweight/API integration with LinkedIn, but would be interested to have a deeper relationship.

Anyway, it would be great to catch up and hear where you see opportunities.

See LINK_HIQ_000012281.

There was no mention of the possibility of hiQ scraping LinkedIn data, and neither Mr. Rosin nor anyone from his group pursued anything further with hiQ. Lee Womer expressed doubt that hiQ's product was "a members' first use case." LINK_HIQ_000073013. Further discussions related to Mr. Vasan's e-mail focused on the other company mentioned, EasilyDo. *See, e.g.*, LINK_HIQ_000073013, LINK_HIQ_000072101, LINK_HIQ_000073009, LINK_HIQ_000072099, LINK_HIQ_000072083, LINK_HIQ_000073004, LINK_HIQ_000072079, LINK_HIQ_000072075, LINK_HIQ_000072999, LINK_HIQ_000012274, LINK_HIQ_000072994, LINK_HIQ_000072070, LINK_HIQ_000072065, LINK_HIQ_000072988, LINK_HIQ_000072118; LINK_HIQ_000012274.

In September 2015, hiQ apparently began publicizing its upcoming Elevate Conference. One or more LinkedIn employees from LinkedIn's internal Talent Analytics department (whose responsibilities did not include either anti-scraping enforcement or development of LinkedIn's products) were apparently invited by hiQ and discussed attending the conference. *See* LINK_HIQ_000040476, LINK_HIQ_000024027. Following the October 2015 hiQ Elevate conference, one of the attendees from Talent Analytics, Lorenzo Canlas, reached out to Adam Weinstein (Senior Manager, Platform and Emerging Products) and Boyu Zhang (Senior

Associate, Business Operations at the time) asking "what is the process for investigating companies who we think are scraping the site?" *See* LINK_HIQ_000067471.  Canlas noted that he had been "at a conference yesterday with HiQ labs who is using internal (HRIS, survey) data and external (LinkedIn and other data) to predict attrition" and asked, "Is there a way for us to understand how and if they are using our data and understanding if we are enabling and supporting it?" *Id.*  Canlas followed up noting that hiQ "mentioned that pull factors include: - completeness of public profiles – recruiter demand for someones job type" and that he "[wasn't] sure how they do these pull factors but [he] suspect[ed] it includes some LinkedIn data.  "[hiQ] inadvertently mentioned 'if you are getting a lot of inmails there is more pull for you to leave your job' but [he] ha[d] no idea if they can actually measure InMail demand." LINK_HIQ_000067470.  Mr. Canlas's email was forwarded to the Scraper Council email distribution list.

Scraper Council, originally formed on or about September 2013, is a cross-functional group of individuals from multiple LinkedIn teams created with a goal to bring together representatives who had knowledge of or an interest in the issue of scraping abuse on LinkedIn. The group was formed in order to collaborate on various methods to prevent scraping abuse on the platform, ranging from technical measures, product features, business discussions, to legal enforcement efforts, while seeking to ensure that everyone involved in anti-scraping efforts was properly advised by LinkedIn's attorneys on this topic.

The Scraper Council created a "scraper-council" email distribution list in October 2013, which continues to exist today and is made up of LinkedIn employees from multiple LinkedIn groups, including Legal, Product Trust, Trust Engineering, Trust and Safety, Data Science, and Business Development.  Over time, other employees learned of this distribution list and began using it to report instances of suspected scraping with greater frequency.

When hiQ was subsequently identified by email to Scraper Council in October 2015, at the time the cross-functional group was still working out its internal processes and there were not yet clear lines of responsibility or a playbook on how to proceed with reports made to the Scraper Council.  The volume of reports far exceeded the technical resources available to investigate or

the legal resources available to take action on reports that had been investigated and substantiated. At the time, LinkedIn also did not have a process for systematically tracking scraping abuse questions and reports. LinkedIn did not investigate Mr. Canlas's report in October 2015 that hiQ might be scraping data. Although Mr. Canlas continued to interact with hiQ on occasion afterwards, he was never responsible for anti-scraping investigation or enforcement activity, nor did he have any expertise on the subject of scraping. He continued to express uncertainty as to the nature of its activity, as reflected in a June 29, 2016, email where he notes that hiQ scrapes data "*possibly* including linkedin." LINK_HIQ_000067901 (emphasis added). This email was part of a larger set of notes sent to Sanjeev Kapur (former Director of Business Operations at the time), Mads Johnsen (former Head of Product Strategy & Business Operations), and Alok Paranjpye (former Senior Manager, Strategy and Business Operations). These individuals also had no involvement in anti-scraping enforcement activity.

In April 2017, hiQ came to the attention of LinkedIn's Scraper Council members in connection with hiQ's April 19, 2017 Elevate Conference. This conference was attended by Dan Francis, Mike Jennings, and Lorenzo Canlas from LinkedIn. Unlike in past conferences, hiQ expressly disclosed during the conference that it was using a quantity of data taken from LinkedIn profiles for both of its products, including its newly announced "Skill Mapper" product. *See, e.g.*, LINK_HIQ_000051988; Declaration of Lorenzo Canlas in support of Opposition to Motion for TRO (June 2, 2017) at ¶ 8. hiQ also stated that it frequently refreshed the data taken from LinkedIn profiles at a quantity that strongly indicated that hiQ must be scraping member profile data from LinkedIn, although hiQ did not explicitly state that it was scraping or using automated software means to obtain the large quantities of data it was using from LinkedIn's website. *Id.*; LINK_HIQ_000052487. hiQ further stated it provided these statistics and updates to its customers. After the April 2017 conference, the attendees reported their suspicions about hiQ to members of Trust Engineering, who consulted with LinkedIn's Legal team for direction on how to proceed. LinkedIn's Legal and Trust and Safety teams investigated hiQ.

There was no way in 2017 – and still is no way now – to identify which scraping requests for member profiles were coming from a specific company, or to otherwise tie scraping activity to

a specific company such as hiQ, because IP addresses used by computers to scrape data from LinkedIn without authorization are almost always entirely anonymous. Acting at the direction of LinkedIn's Legal team, members of the Trust and Safety team therefore investigated hiQ's website and performed other steps to assess what it could learn of hiQ's products and data sources, and put that information together with the information obtained at the 2017 Elevate Conference. Based on the statements at the Elevate conference and the subsequent investigation, LinkedIn's Legal team concluded that it was reasonable to believe that hiQ was scraping significant quantities of member profile data using automated means. It was at that time in late April/early May of 2017 that LinkedIn, as an entity with people specifically responsible for anti-scraping enforcement, first had "suspicion" that hiQ was scraping member profiles. Of course, this conclusion turned out to be correct. As part of its investigation, LinkedIn's Legal and Trust and Safety teams also determined that hiQ had not only agreed to the LinkedIn User Agreement by setting up a company page on the LinkedIn website, but also had previously entered into a number of other contracts with LinkedIn that incorporated its User Agreement and Privacy Policies as contractual requirements. Accordingly, LinkedIn confirmed that hiQ must have been aware of the terms of its User Agreement prohibiting scraping. The facts about what hiQ was actually doing to obtain LinkedIn data were entirely within hiQ's hands, and the only way to know for sure the nature of its activity was to communicate with hiQ.

LinkedIn's Legal team prioritized hiQ for enforcement because hiQ's Keeper product appeared to violate LinkedIn member's expectations regarding use of their personal information, and hiQ's Skill Mapper product appeared to be free riding off of LinkedIn's investments to build a potentially competitive product. On May 23, 2017, LinkedIn legal counsel sent a cease and desist letter to hiQ demanding that it cease scraping in violation of the terms of LinkedIn's User Agreement and a number of other laws. At the time, LinkedIn had an API program (described more fully in response to Interrogatory No. 22) that included business options for acquiring *free* access to member profile data while abiding by LinkedIn's Privacy Policy and User Agreement. On information and belief, hiQ was aware of this API program. Instead of pursuing business discussions with LinkedIn with a goal of obtaining an API license, hiQ chose to file a lawsuit.