# Exhibit I

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

hiQ LABS, INC.,                       )
                                      )
        Plaintiff,                    ) Case No.
                                      ) 17-CV-03301-EMC
vs.                                   )
                                      )
LINKEDIN CORPORATION,                 )
                                      )
        Defendant.                    )
_____)

CONFIDENTIAL

---o0o---

Videotaped Deposition of

LEE WOMER

Wednesday, May 11, 2022

---o0o---

Katy E. Schmidt

RPR, RMR, CRR, CSR 13096

Veritext Job No.: 5226828

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                          ---o0o---
 4   hiQ LABS, INC.,        )
                            )
 5        Plaintiff,        )Case No.
                            )17-CV-03301-EMC
 6   vs.                    )
                            )
 7   LINKEDIN CORPORATION,  )
                            )
 8        Defendant.        )
     _____)
 9
10        BE IT REMEMBERED that, pursuant to Notice,
11   and on Wednesday, the 11th day of May, 2022,
12   commencing at the hour of 9:10 a.m., thereof, in San
13   Francisco, California, before me, KATY E. SCHMIDT, a
14   Certified Shorthand Reporter in and for the County of
15   Yolo, State of California, there virtually personally
16   appeared
17
                        LEE WOMER
18
19   called as a witness herein, who, being by me first
20   duly sworn, was thereupon examined and interrogated as
21   hereinafter set forth.
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For The Plaintiff and Counter-defendant hiQ Labs, Inc.
 4        QUINN EMANUEL URQUHART AND SULLIVAN LLP
 5        BY: HOPE D. SKIBITSKY, Esq.
 6        51 Madison Avenue, 22nd Floor
 7        New York, New York 10010
          212.849.7000
 8        hopeskibitsky@quinnemanuel.com
 9
10   For The Defendants:
11          (Appeared via Zoom)
12        ORRICK, HERRINGTON & SUTCLIFFE LLP
13        BY: RUSSELL COHEN, Esq.
14        405 Howard Street
15        San Francisco, California 94105
          415.203.8021
16        rcohen@orrick.com
17
18   Also present:
19        Sarah Wight, In-house Counsel
20        Brandon Miller, Videographer
21        Tevin Frank, Veritext Concierge
22
23              ---o0o---
24
25
```

Page 4

```
 1                    INDEX OF EXAMINATION
 2                          ---o0o---
 3                                                   Page
 4   Examination by Ms. Skibitsky                     08
 5                          ---o0o---
 6
 7           QUESTIONS INSTRUCTED NOT TO ANSWER
 8
 9           Page      Line
10
11              (NOTHING OFFERED.)
12
13                          ---o0o---
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                      INDEX OF EXHIBITS
 2                          ---o0o---
 3                                                   Page
 4   Exhibit 285      Email, beginning Bates          45
                      LINK_HIQ_000073013
 5   Exhibit 286      Email, beginning Bates          63
 6                    LINK_HIQ_000012580
 7   Exhibit 287      Email, beginning Bates          95
                      LINK_HIQ_000072010
 8   Exhibit 288      Email, beginning Bates         121
 9                    LINK_HIQ_000072118
10   Exhibit 289      Email, beginning Bates         136
                      LINK_HIQ_000073067
11   Exhibit 290      Email, beginning Bates         155
12                    LINK_HIQ_0000169079
13   Exhibit 291      Document: User Agreement,      163
                      beginning Bates
14                    LINK_HIQ_000095502
15   Exhibit 292      Email, beginning Bates         169
                      LINK_HIQ_000012438
16   Exhibit 293      Email, beginning Bates         175
17                    LINK_HIQ_000172371
18   Exhibit 294      Email, beginning Bates         180
                      LINK_HIQ_000205777
19
20                          ---o0o---
21
22
23
24
25
```

Page 54

1 example.                                                11:08
2        And so I would say generally, LinkedIn's          11:08
3 terms of service prohibit the sort of activity that     11:09
4 we -- that is not okay with LinkedIn.                    11:09
5 BY MS. SKIBITSKY:                                        11:09
6    Q.  If we turn to the first page of this             11:09
7 document, you write to Mr. Rosin:                        11:09
8 "I've not met hiQ but looks similar to some other        11:09
9 companies that have reached out.  Skeptical that         11:09
10 it's a member's first use case."                        11:09
11       Do you recall why it is that you thought --      11:09
12 that you were skeptical that hiQ was a member's first   11:09
13 use case?                                                11:09
14    A.  So I don't recall, but I can -- I guess I       11:10
15 could read -- I could read this e-mail and -- so I     11:10
16 don't recall why at the time I thought that, no.        11:10
17    Q.  Okay.  Reading this e-mail now, do you have    11:10
18 any understanding as to why you would have said that   11:10
19 you were skeptical that it's a member's first use       11:10
20 case?                                                    11:10
21    A.  So as I read this e-mail today, my              11:10
22 understanding of the use case, of trying to predict    11:10
23 which employees might be a risk to leave, is            11:10
24 potentially at odds with the interest of those          11:10
25 employees and at odds with the interest of LinkedIn    11:10

Page 55

1 members, to the extent that those employees were        11:10
2 LinkedIn members.                                        11:11
3        And so I suspect that that was -- that --       11:11
4 well, that is how I -- that is how I sort of interpret  11:11
5 this today, and then that might have been what I was    11:11
6 thinking at the time.                                    11:11
7    Q.  When you say in this December 15th e-mail at   11:11
8 9:15 p.m. that "you are skeptical that hiQ is a         11:11
9 member's first use case," what do you mean by member's  11:11
10 first?                                                  11:11
11    A.  The member's first is one of LinkedIn's        11:11
12 corporate values that guides decision making, which is  11:11
13 that the interest of LinkedIn members on the platform  11:11
14 need to take first priority amongst a range of         11:11
15 priorities.                                              11:11
16       And so in the case of -- where there are use    11:11
17 cases that are -- that are misaligned with members'     11:11
18 interests, that would be problematic.                    11:12
19    Q.  Okay.  You testified that:                      11:12
20 "Member's first is one of LinkedIn's corporate          11:12
21 values that guides decision making where the             11:12
22 interest of LinkedIn members on the platform needs      11:12
23 to take first priority amongst a range of                11:12
24 priorities."                                             11:12
25       What are those other priorities in that         11:12

Page 56

1 range?                                                  11:12
2    A.  I don't have a -- I don't know that I could    11:12
3 give you an exhaustive list, but in general, we think  11:12
4 about -- you know, when we think about the LinkedIn    11:13
5 network or the LinkedIn ecosystem, as we sometimes     11:13
6 call it here, there are the interests of members,      11:13
7 there are the interests of customers who are sort of    11:13
8 paying for -- you know, entities paying for LinkedIn    11:13
9 services, there are the interests of companies that we 11:13
10 might partner with to deliver those services, there    11:13
11 are the business interests of LinkedIn.                  11:13
12       And so those are some of the main interests    11:13
13 we consider, but I don't -- I wouldn't consider that   11:13
14 to be an exhaustive list.                                11:13
15    Q.  When you identified that you were skeptical   11:13
16 that it's a member's first use case, did you do any    11:13
17 investigation into hiQ to determine what it was that   11:14
18 hiQ was doing with LinkedIn data?                        11:14
19    A.  I don't recall.                                  11:14
20    Q.  Do you see here that you write "Do you want   11:14
21 to intro me?"                                            11:14
22    A.  Yes.                                             11:14
23    Q.  Do you recall being introduced to hiQ at any  11:14
24 point in time?                                           11:14
25    A.  No.                                              11:14

Page 57

1    Q.  As of December 2014, were you aware that --   11:14
2 did you have an understanding that LinkedIn was         11:14
3 frequently targeted by scrapers?                         11:14
4    A.  As of December 2014, yes, I was aware that    11:15
5 there were -- I had a general understanding that there 11:15
6 were many companies that were scraping LinkedIn.        11:15
7    Q.  And in response to Mr. Vasan's e-mail where   11:15
8 he states that he's not sure that LinkedIn would look   11:15
9 favorably at a company that is analyzing profiles, you  11:15
10 didn't make any investigation into whether hiQ was     11:15
11 analyzing LinkedIn profiles?                             11:15
12       MR. COHEN:  Objection to form.                  11:15
13       THE WITNESS:  So I don't recall personally     11:15
14 having engaged in the sort of investigation you're      11:15
15 describing.                                              11:15
16       And maybe I'll just add some context to the    11:16
17 earlier point about being generally aware that there   11:16
18 were many companies that were scraping LinkedIn.        11:16
19       We had to sort of prioritize, and there was    11:16
20 nothing about this engagement that sort of suggested   11:16
21 to me that I should prioritize it beyond sort of        11:16
22 agreeing to or take a -- take a meeting with -- with   11:16
23 the company, per Bob's suggestion.  That's how I        11:16
24 interpret this now.                                      11:16
25 ///

CONFIDENTIAL

Page 58

```
 1  BY MS. SKIBITSKY:                              11:16
 2     Q.  Okay.  So when you say that "we had to sort   11:16
 3  of prioritize," what is it exactly that you were    11:17
 4  prioritizing in December of 2014?                11:17
 5     A.  So we had to prioritize, you know, which     11:17
 6  companies we would invest time in doing an        11:17
 7  investigation of and kind of engaging within a -- you  11:17
 8  know, either in business or -- or sort of other    11:17
 9  anti-scraping measures versus companies that -- that  11:17
10  we were not able to prioritize.                  11:17
11     Q.  How did you go about deciding which        11:17
12  companies to prioritize?                         11:17
13         MR. COHEN:  Objection to form.  Assumes    11:17
14  facts not in evidence.                           11:17
15         THE WITNESS:  So my recollection is that it   11:17
16  would be based in large part on what we would hear   11:18
17  about the company in the marketplace from customers,  11:18
18  from sales reps, from other companies in the space,  11:18
19  from sort of employees at LinkedIn.  I believe there  11:18
20  was probably also a fork where if there were sort of  11:18
21  customer service complaints, and then the use case   11:18
22  factored in as well.                             11:18
23  BY MS. SKIBITSKY:                                11:18
24     Q.  You said that "It would be based in large   11:18
25  part on what we heard from the company in the    11:18
```

Page 59

```
 1  marketplace, from customers, and from sales reps."   11:18
 2         If you heard from a sales rep in 2014 that   11:18
 3  the sales rep believed the company might be scraping  11:19
 4  LinkedIn data, would that encourage LinkedIn to   11:19
 5  prioritize that company over others in terms of its  11:19
 6  investigation?                                   11:19
 7         MR. COHEN:  Objection.  Calls for          11:19
 8  speculation.                                     11:19
 9         THE WITNESS:  Yes.  So just to be clear, you  11:19
10  paraphrased part of my answer.                   11:19
11         But what I would say is we used -- we used   11:19
12  kind of heads up from salespeople as a measure of   11:19
13  just, like, was the company at a meaningful scale   11:19
14  where it was -- it was sort of engaging at the level  11:19
15  where, you know, we -- we -- you know, zooming out in  11:19
16  terms of our anti-scraping efforts and in terms of any  11:20
17  business discussions we had, you know, we had to focus  11:20
18  all of our efforts on companies that were sort of big  11:20
19  enough to matter in terms of making an impact for   11:20
20  LinkedIn members and customers -- or making an impact  11:20
21  in harming members and customers.                11:20
22         So to get back to your direct question, we   11:20
23  used input from salespeople as one proxy of many for  11:20
24  whether or not the company was operating at a scale  11:20
25  that warranted prioritization.                   11:20
```

Page 60

```
 1  BY MS. SKIBITSKY:                                11:20
 2     Q.  So would you rely on sales reps identifying   11:20
 3  potential company as scraping as also identifying that  11:20
 4  the company was at a meaningful scale in deciding   11:20
 5  whether to prioritize investigating that company?   11:20
 6         MR. COHEN:  Objection to form.  Compound.   11:21
 7         THE WITNESS:  Can you please repeat the    11:21
 8  question?                                        11:21
 9         MS. SKIBITSKY:  Sure.                     11:21
10  BY MS. SKIBITSKY:                                11:21
11     Q.  I believe you testified that one of the    11:21
12  factors that LinkedIn or you would consider in    11:21
13  deciding whether to prioritize investigating a    11:21
14  company, as to whether that company was scraping, was  11:21
15  whether that company was at a meaningful scale.   11:21
16         Is that right?                            11:21
17     A.  Yes.                                      11:21
18     Q.  How would you determine whether that company  11:21
19  was at a meaningful scale?                       11:21
20     A.  It was -- I guess what I would say is it was  11:21
21  hard to come by clear data in many cases.  And so I   11:21
22  guess what I would say is the several factors that I   11:22
23  described were all in -- one of which being sort of   11:22
24  what we heard about from sales reps, were means of   11:22
25  triangulating whether or not companies had meaningful  11:22
```

Page 61

```
 1  scale in the marketplace.                        11:22
 2         And so I guess it would be the -- you know,   11:22
 3  the number of mentions and, you know, the specific   11:22
 4  context around each of those mentions where companies  11:22
 5  were highlighted to us.                          11:22
 6     Q.  Is the fact that a sales rep highlights a   11:22
 7  company as a potential scraper indicative that that   11:22
 8  company could be of a meaningful scale?          11:22
 9     A.  No.                                       11:22
10     Q.  Why not?                                  11:23
11     A.  It could be that one sales rep heard from   11:23
12  one customer in one meeting about a company, that that  11:23
13  particular employee at that particular customer was   11:23
14  interested in, and sort of, you know, saw fit to    11:23
15  mention to our salesperson and the salesperson    11:23
16  mentioned it to us.                              11:23
17         And so it could be -- it could be -- you    11:23
18  know, again, it could not be -- I guess one -- one   11:23
19  mention per your point does not -- did not sort of   11:23
20  necessarily suggest that it was -- that the company   11:23
21  was -- the company warranted prioritization.     11:23
22     Q.  If multiple sales reps highlight a company   11:24
23  based on independent information about that company,   11:24
24  would that indicate that the company warrants    11:24
25  prioritization?                                  11:24
```

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430