ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*pro hac vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

*Attorneys for LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>LinkedIn Corporation,<br><br>Defendant. | Case No. 17-cv-03301-EMC<br><br>**LINKEDIN'S MEMORANDUM AND POINTS OF AUTHORITIES IN OPPOSITION TO HIQ'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:           September 29, 2022<br>Time:          1:30 p.m.<br>Courtroom:  5 – 17th Floor (Zoom)<br>Judge:         Hon. Edward M. Chen<br><br>Complaint Filed:   June 7, 2017<br>Trial Date:           February 27, 2023 |
| LinkedIn Corporation<br><br>Counterclaimant,<br>vs.<br><br>hiQ Labs, Inc.<br><br>Counterdefendant. | |

1

**TABLE OF CONTENTS**

2    INTRODUCTION ............................................................................................................... 1

3    STATEMENT OF FACTS .................................................................................................. 3

4        A.    LinkedIn Protects Its Profile Servers From Unauthorized Access By Layers Of
            Anti-Scraping Defense Systems ............................................................................... 3

5

6        B.    hiQ's Scraping Of LinkedIn Uses Ever-Escalating Methods Of Circumvention
            And Concealment ...................................................................................................... 5

7        C.    hiQ Conceals Its Activity Including By Lying To Customers And Its Own
            Employees. ................................................................................................................ 8

8

9        D.    In Late 2014, LinkedIn Employees With No Anti-Abuse Responsibilities Become
            Aware Of hiQ ......................................................................................................... 10

10       E.    In October 2015—Within The Limitations Period—An Employee First Alerts
            LinkedIn's "Scraper Council" To hiQ. ................................................................... 13

11

12       F.    In 2017, LinkedIn Investigates hiQ's Scraping In Response To Detailed New
            Information. ............................................................................................................. 13

13       G.    hiQ Continues To Mislead About The Scope Of Its Conduct In This Litigation,
            Spoliates The Evidence Of Its Full Activity, And Does Not Disclose Its Use Of
14             Fake Accounts Until 2022 ...................................................................................... 14

15    ARGUMENT ................................................................................................................... 16

16    I.    UNDER THE SEPARATE ACCRUAL RULE LINKEDIN IS ENTITLED TO
       MAINTAIN ITS CFAA CLAIM AS TO ACTS OF SCRAPING OCCURRING AFTER
17      JUNE 7, 2015 .................................................................................................................. 17

18        A.    The Separate Accrual Rule Is Well Established Under State & Federal Law ............ 17

19        B.    The Separate Accrual Rule Plainly Applies To The CFAA. .................................... 18

20        C.    LinkedIn's CFAA Claim Is Timely Under The Separate Accrual Rule. .................... 20

21    II.    LINKEDIN IS ALSO ENTITLED TO PROCEED ON ITS CFAA CLAIM FOR ALL
       PERIODS BECAUSE OF DISPUTED FACTS CONCERNING LINKEDIN'S NOTICE
22      AND HIQ'S FRAUDULENT CONCEALMENT. ........................................................... 20

23        A.    Factual Disputes As To Who Knew What Prior To The Limitations Period
            Preclude Summary Judgment .................................................................................. 20

24

25        B.    Factual Disputes Concerning Whether And When LinkedIn "Should Have
            Known" Of hiQ's Conduct As Well As hiQ's Fraudulent Concealment Preclude
            Summary Judgment .................................................................................................. 24

26    CONCLUSION ................................................................................................................. 27

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Acasio v. Lucy*,
5
    No. 14-CV-04689-JSC, 2017 WL 1316537 (N.D. Cal. Apr. 10, 2017) ................................. 5

6
*Al-Ahmed v. Twitter, Inc.*,
    No. 21-CV-08017-EMC, 2022 WL 1605673 (N.D. Cal. May 20, 2022) ...................... 17, 21

7
*Aryeh v. Canon Bus. Sols., Inc.*,
8
    55 Cal. 4th 1185 (2013) ................................................................. 17, 24

9
*Bernson v. Browning–Ferris Indus. of Cal., Inc.*,
    7 Cal. 4th 926 (1994) .................................................................... 26
10

11
*Blake v. JP Morgan Chase Bank NA*,
    927 F.3d 701 (3d Cir. 2019) ............................................................. 18

12
*Bliss v. CoreCivic, Inc.*,
13
    978 F.3d 1144 (9th Cir. 2020) .................................................... 1, 18, 19

14
*Bourne v. Root*,
    125 Cal. App. 461 (1932) ................................................................ 22
15

16
*Calhoun v. Google LLC*,
    526 F. Supp. 3d 605 (N.D. Cal. 2021) ......................................... 17, 18, 19

17
*In re Conseco Ins. Co. Annuity Marketing & Sales Practices Litig.*,
18
    No. C-05-04726 RMW, 2008 WL 4544441 (N.D. Cal. Sept. 30, 2008) .............................. 26

19
*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    No. 18-CV-864, 2019 WL 4166864 (N.D. Ill. Sept. 3, 2019) ................................. 20
20

21
*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir. 1996) ............................................................. 18

22
*Klehr v. A.O. Smith Corp.*,
23
    521 U.S. 179 (1997) .................................................................... 18

24
*MH Pillars Ltd. v. Realini*,
    No. 15-cv-01383-PJH, 2018 WL 1184847 (N.D. Cal. Mar. 7, 2018) .................................... 17
25

26
*Miniace v. Pac. Mar. Ass'n*,
    No. C 04-03506 SI, 2006 WL 648732 (N.D. Cal. Mar. 13, 2006) ............................ 21, 22, 23

27
*Oldenburg v. Brody*,
28
    139 Cal. App. 2d 543 (1956) ............................................................. 24

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ................................................................................................ 24

*Peterson v. Sutter Med. Found.*,
    No. 21-CV-04908-WHO, 2022 WL 316677 (N.D. Cal. Feb. 2, 2022) .................................. 21

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014) ............................................................................................................. 18

*Phreesia, Inc. v. Certify Glob., Inc.*,
    No. DLB-21-678, 2022 WL 911207 (D. Md. Mar. 29, 2022) ......................................... 17, 19

*Primm v. Joyce*,
    87 Cal. App. 2d 288 (1948) .................................................................................................. 21

*Tortilla Factory, LLC v. Better Booch*,
    LLC, No. 18-cv-02980-CAS-SKx, 2018 WL 6179491 (C.D. Cal. Nov. 26,
    2018) ..................................................................................................................................... 26

*Triple A Mgmt. Co., Inc. v. Frisone*,
    69 Cal. App. 4th 520 (1999) ............................................................................................ 21, 22

**Statutes**

18 U.S.C. § 1030(g) ................................................................................................... 1, 2, 16, 19

Cal. Civ. Code § 2332 ....................................................................................................... 21

**Other Authorities**

Fed. R. Civ. P. 56(c) ........................................................................................................ 5, 21

Fed. R. Evid. 801(d)(2) ..................................................................................................... 21

1

## **INTRODUCTION**

2

There is no small irony in hiQ's thin bid for summary judgment against LinkedIn's

3 Computer Fraud and Abuse Act counterclaim, based solely on the statute of limitations.

4 Previously, hiQ moved to dismiss LinkedIn's CFAA counterclaim *on the merits* for failure to

5 state a claim.  But before this Court decided that motion, fact discovery revealed for the first time

6 that hiQ had actively concealed critical facts concerning the nature and scale of its scraping—

7 most notably that its primary product, Keeper, depended not merely on scraping what hiQ calls

8 "public" data, but on using fake, logged-in accounts to obtain information behind LinkedIn's

9 password barrier.  On the basis of this and other newly uncovered information, LinkedIn amended

10 its CFAA counterclaim (unopposed by hiQ), and hiQ withdrew its motion to dismiss, pledging to

11 address the merits on summary judgment.  hiQ Ltr. Re MTD, ECF No. 312 at 1.  But now, hiQ

12 has rightly concluded that it has no argument on the merits in light of the revelations during

13 discovery.  And yet, after deliberately concealing the facts that sink its argument on the merits,

14 hiQ moves for summary judgment on statute-of-limitations grounds, contending that LinkedIn

15 should have known all it needed to know about its CFAA claim years before hiQ even filed its

16 complaint.

17

hiQ's subterfuge belies the arguments in its motion.  A CFAA claim is timely if it is

18 brought "within 2 years of the date of the act complained of or the date of the discovery of the

19 damage."  18 U.S.C. § 1030(g).  All agree that here, the two-year period absent tolling for

20 "discovery" runs backwards from the filing of hiQ's initial complaint on June 7, 2017, to which

21 LinkedIn's CFAA counterclaim relates back.  LinkedIn's claim was brought within the CFAA's

22 limitations period, both because (1) it is based on acts that occurred within that period and (2)

23 tolling for the "discovery of the damage" provision of § 1030(g) applies because LinkedIn could

24 not have discovered hiQ's deliberately illicit conduct prior to the start of that period.

25

*First*, LinkedIn's claim is timely as to any acts occurring after June 7, 2015, under the

26 separate accrual rule (sometimes called the continuous accrual rule).  Under that rule, where the

27 triggering event of a statute of limitations is in and of itself a wrongful act, each such act triggers

28 its own limitations period.  *Bliss v. CoreCivic, Inc.*, 978 F.3d 1144, 1150 (9th Cir. 2020).  A claim

1

1   under such a statute is timely as to all conduct occurring within the limitations period, even if

2   similar conduct occurred prior to it.  *Id.*  Section 1030(g) is plainly such a statute, as other courts

3   have held.  Its limitations period is triggered by "the act complained of."  LinkedIn's CFAA claim

4   complains of literally *millions* of acts of unauthorized access—involving both scraping and

5   circumvention of LinkedIn's password wall—within the limitations period.  hiQ does not even

6   mention the separate accrual rule, let alone attempt to overcome it.  Summary judgment should

7   therefore be denied as to all of hiQ's conduct on or after June 7, 2015.  Part I, *infra*.

8       *Second*, and independently, LinkedIn's claim is timely as to all of hiQ's violations,

9   because LinkedIn did not discover—and could not have discovered—its claim prior to June 7,

10  2015.  hiQ's motion relies on two email threads from late-2014 in which LinkedIn employees

11  briefly discuss hiQ.  But only one of those email threads even mentions a possibility that hiQ was

12  scraping.  And not a single LinkedIn employee on those email threads was responsible in any way

13  for policing, investigating, preventing, or reporting scraping.  Because anti-scraping was not

14  within the scope of their job responsibilities at LinkedIn, these employees' knowledge cannot be

15  imputed to LinkedIn even if it were sufficient notice of hiQ's conduct.  At a minimum, factual

16  disputes on these issues preclude summary judgment.  Part II.A, *infra*.

17      In any event, LinkedIn could not have discovered hiQ's conduct prior to June 7, 2015,

18  because hiQ deliberately concealed it.  Indeed, hiQ's entire business was based on its ability to

19  circumvent LinkedIn's general technical defenses by disguising its scraping requests in a way that

20  evaded detection as such.  hiQ never admitted to scraping in public.  It never asked LinkedIn for

21  permission to scrape.  Both its CEO and its head of technology warned employees against contact

22  with LinkedIn that would reveal hiQ's conduct.  And hiQ's concealment persisted even into this

23  case.  hiQ misled LinkedIn and the Court into the false belief that its conduct never required it to

24  access information from the part of LinkedIn's website behind its password barrier.  And hiQ

25  spoliated evidence that would have demonstrated the full scope and scale of its scraping

26  operation.  hiQ's deception triggers both the delayed discovery rule and the doctrine of fraudulent

27  concealment, rendering LinkedIn's CFAA claim timely in its entirety.  Part II.B, *infra*.

28      hiQ's motion should be denied.

# STATEMENT OF FACTS

**A.     LinkedIn Protects Its Profile Servers From Unauthorized Access By Layers Of Anti-Scraping Defense Systems.**

When LinkedIn members upload information into their LinkedIn member profiles, that information is stored in profile databases that reside on LinkedIn's servers (the "Profile Servers"). *See* ECF No. 337-1 (Declaration of Douglas Schmidt ISO LinkedIn's Motion for Spoliation Sanctions, Exhibit A) (hereafter, "Schmidt Rpt.") ¶¶ 41-52 (describing how servers and databases work generally).  LinkedIn guards access to the Profile Servers with an array of general technical defenses—that is, technologies that screen requests to access LinkedIn's servers to determine whether the request is consistent with LinkedIn's prohibition on non-human access to the site. CE[1] 1313-15 (Rockwell Decl.); CE 10-12 (Bray Dep.); CE 810-11 (Murphy Rpt.).  Those defenses have been in place since at least 2012 and have continually evolved to thwart increasingly creative attempts to circumvent them.  CE 11-12 (Bray Dep.); CE 1298-1302 (Wu Dep.); CE 955 (Rockwell Dep.); CE 810-11 (Murphy Rpt.); CE 1274-75 (Womer Dep.).

During the years hiQ was an active company, any scraping request it made had to run a technological gauntlet that included some or all of the defenses described below.  All requests for site access are routed through LinkedIn's website defenses.  *See* Justice Decl. 1 (Bray Dep. Ex. 1378) (describing application of defense "filters" to all incoming requests); CE 1312-76 (Rockwell Decl.) ¶ 5.  These defenses include LinkedIn's FUSE system, which scans and imposes a limit on the activity that an individual may initiate on the site (*id.* ¶ 6); LinkedIn's Quicksand system, which monitors the patterns of webpage requests by LinkedIn members in order to identify non-human activity indicative of scraping (*id.* ¶ 7); LinkedIn's Sentinel system, which scans, throttles, and blocks suspicious activity associated with particular IP addresses (*id.* ¶ 8); and LinkedIn's Org Block system, which identifies and blocks groups of IP addresses that seemingly are serving anonymous, large-scale scrapers (*id.* ¶ 9).  LinkedIn also employs Member and Guest Request Scoring systems designed to restrict automated, non-human forms of access

---

[1] "CE" citations are to the Compendium of Evidence Filed In Support of LinkedIn Corporation's August 5, 2022, Motions, ECF Nos. 340.1-340.6 (public) and ECF Nos. 334.4-334.7, 335.6-335.11 (under seal).

LINKEDIN'S OPP TO HIQ'S MSJ
No. 17-cv-03301-EMC

1    that facilitate scraping.  *Id.* ¶ 10.

2          Each of these systems themselves may be based on one or more filters, which can be

3    modified and improved to better thwart prohibited access.  For instance, for a request to get

4    through the Sentinel system it must satisfy various rules within multiple filters as depicted in the

5    guest access flow chart below.  Justice Decl. Ex. 1 (Bray Dep. Ex. 1378).  Only requests that

6    make it through these filters and scraping detection defenses to "Request Allowed" in the below

7    flow chart may access the Profile Servers and retrieve a requested LinkedIn member profile.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



28   *Id.*

**B.**   **hiQ's Scraping Of LinkedIn Uses Ever-Escalating Methods Of Circumvention And Concealment.**

hiQ knew that LinkedIn prohibited scraping.  CE 927 (March 9, 2015, email showing ██████████████████████████████████████████████████████████████ ███████); CE 106-08 (Graves Dep.); CE 706, 714-16 (Miller Dep.).  It also knew that its scraping activities would run into LinkedIn's technical defenses.  CE 1601-03 (notes on reverse engineering LinkedIn's systems); CE 731-33 (same); CE 737-48 (Scraper Wars Presentation). So, over and over, hiQ devised illicit ways around the walls that guarded the Profile Servers, found itself blocked again by LinkedIn's ever-improving defenses, and then devised new ways to trespass.  All of this was unbeknownst to LinkedIn[2]—its technical defenses operate generally and against web traffic from anonymous sources, and, indeed, the very point of hiQ's techniques was to hide its identity and avoid ever being identified as a known scraper actively breaching LinkedIn's User Agreement.  But voluminous evidence produced during discovery shows precisely how hiQ—month after month, always taking the utmost care to conceal its identity and conduct—sought to gain access it knew was prohibited.  The following is (some of) what hiQ did in the nine-month stretch from May 2014 through February 2015, the time period during which hiQ suggests LinkedIn should have somehow uncovered its conduct.

*May 2014*.  To avoid detection, hiQ's first scraper, █████████████████████ ██████████████████████████████████████████████████████████.  Schmidt Rpt. ¶¶ 113-15.  ██████████████████████████████████████████████ ███████████████████████████████████████████   Schmidt Rpt. ¶ 126; CE 710-11 (Miller Dep.).  █████████████████████████████████████████ ███████████████████████████████████████████

---

[2] LinkedIn objects to hiQ's reliance on the Amended Complaint for evidentiary support.  *See* hiQ MSJ at 1:19-21, 1:23-24, 3:3-5 (e.g., "LinkedIn abruptly denied hiQ's access to the portion of the LinkedIn website containing wholly public user profiles"); *Acasio v. Lucy*, No. 14-CV-04689-JSC, 2017 WL 1316537, at *5 (N.D. Cal. Apr. 10, 2017) ("[A]llegations in the pleadings … are not admissible evidence."); Fed. R. Civ. P. 56(c).  Particularly, there is no evidence that LinkedIn imposed targeted barriers specific to hiQ in May 2017.

[3] A User-Agent is information contained in a web request that identifies the type of computer, operating system, and web browser, among other identifiers, issuing the request.

1     Schmidt Rpt. ¶¶ 123-26; Justice Decl. Ex. 2 (Dev Dep.)

2 91:25.

3     *June 2014*.

4

5     Schmidt Rpt. ¶¶ 120-22.

6

7 Schmidt Rpt. ¶¶ 131-32.

8

9     Schmidt Rpt. ¶¶ 135-36;

10 Justice Decl. Ex. 5 (Miller Dep. Ex. 300).

11

12 Schmidt Rpt. ¶¶ 137-38; Justice Decl. Ex. 5 (Miller Dep.) 213:23-214:19.

13     *September 2014*.

14     Schmidt Rpt. ¶ 139; Justice Decl. Ex. 5 (Miller Dep. Ex. 306).

15

16     *Id.*

17     *November 2014*.

18

19     Schmidt Rpt. ¶¶ 207-08; CE 137 (hiQ_00545758) at 9;

20 CE 151 (Turking Manual).

21

22     CE 95-96, 118-19 (Graves Dep.);

23 CE 151-54 (Turking Manual).

24     *December 2014*.

25     Schmidt

26

27 [4] Cookies are packets of information about the websites a device has recently visited. These
28 cookies are shared with any subsequent website that device visits and would typically be included
in a header with the same IP address for the given user.

LINKEDIN'S OPP TO HIQ'S MSJ
No. 17-cv-03301-EMC

1   Rpt. ¶ 140; Justice Decl. Ex. 23 (12/27/14 Kaplan email). ███████████████████

2   ████████████████████████████████████████████████ Schmidt Rpt.

3   Figure 27; Justice Decl. Ex. 23 (12/27/14 Kaplan email).

4       ***January 2015***. ███████████████████████████

5   ████████████████████████████████ Schmidt Rpt. ¶ 141.

6   ███████████████████████████████████████████████████

7   ████████████████████████████████ Schmidt Rpt.

8   ¶¶ 141-42 (quoting 1/28/15 hiQ email). ██████████████████████

9   ███████████████████████████████████████████████

10   ██████   Schmidt Rpt. ¶ 142; Justice Decl. Ex. 5 (Miller Dep. Ex. 5).

11       ***February 2015***. ███████████████████████████████

12   ██████████████████████████████████████████

13   ███████████████████████████████████████████████████

14   ███████████   Schmidt Rpt. ¶ 147. █████████████████████

15   █████████████████████████████████████████████

16   █████████████████████████████████ *Id.* ¶ 148. ████████

17   ████████████████████████████████████████████

18   ██████████████████████ *Id.* ¶ 145.

19       For the next two years, up until the filing of this lawsuit, hiQ continued with more illicit

20   attempts to gain access that are too voluminous to recount.[5]



**C.      hiQ Conceals Its Activity Including By Lying To Customers And Its Own Employees.**

As LinkedIn's computer science expert, Dr. Douglas Schmidt, explained, "up until spring of 2017… it would not have been possible for LinkedIn to know who hiQ was because of the evasive techniques that hiQ was using in order to masquerade the source of the requests that it was sending through its proxy forms to LinkedIn …. [LinkedIn] couldn't have known about hiQ based on an analysis of the traffic they were seeing."  Justice Decl. Ex. 8 (Schmidt Dep.) 104:24-105:18.  And hiQ did everything it could to conceal its conduct from not just LinkedIn, but from its customers and even its own employees.

For instance, in July 2015, LinkedIn restricted a member account used by a turker—one of the third parties hiQ had hired to log in and obtain data necessary to scrape profiles of hiQ customer employees.  Justice Decl. Ex. 3 (Graves Dep. Ex. 511).  A member of LinkedIn's customer support team asked the turker to "[p]lease describe your LinkedIn account activity right before your account got restricted."  *Id*.  Instead of responding to LinkedIn, the turker alerted Genevieve Graves, hiQ's technology head, who responded, "██████████████████████ ██████████████"  *Id*.  When the same turker reported that the second LinkedIn account she was using to turk was restricted, Ms. Graves responded, "██████████████████████ ███████████████████████████████████████████████████████ ██████████"  Justice Decl. Ex. 18 (hiQ 7/14/15 email).

A later incident, in 2017, again demonstrates hiQ's secretive posture towards LinkedIn at the time.  Apparently on CEO Mark Weidick's instruction, a hiQ data scientist, Boris Dev, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

1   ████████████████████████████████████████████" *Id.* Dev assured Weidick that he "████

2   ██████████████████████████████████████████████████████████████████████████████

3   ████████████████" CE 49-50; *see* CE 39-44 (Dev Dep.); CE 1165-66 (Weidick Dep.).

4          hiQ also concealed its scraping on its website and in public materials.  Nowhere on hiQ's

5   website did it divulge that LinkedIn was the source of its data, let alone that it obtained it by

6   scraping.  *See* Justice Decl. Exs. 29-30 (Wayback Machine captures of hiQ website as it appeared

7   on September 06, 2015 and December 20, 2014); *id.* Ex. 28 (10/7/2015 email: "doesn't seem they

8   advertise their data sources on their website").  hiQ's Blog, which is still available today, contains

9   posts from 2014 and 2015, none of which mention scraping or LinkedIn as a data source.  *See*

10  Justice Decl. Ex. 31 (captures from hiQ's blog).

11         hiQ did not even divulge its data sources in early materials sent to potential customers and

12  investors, and only later included LinkedIn as one of many sources for its data.  An October 2014

13  sales deck touted that hiQ used "██████████████████████" and leveraged "████

14  ████████████." Justice Decl. Ex. 19 (email), Ex. 20 (attached presentation).  Not until

15  November 2015 did hiQ divulge that LinkedIn was ███████████████████████████

16  ███████████████, but only in presentations sent directly to potential clients.  *See* Justice

17  Decl. Exs. 16, 17.  Later presentations, from 2016, that were confidentially shared with potential

18  investors and customers included █████████████████████████████████

19  █████████████████████" *See, e.g.* Justice Decl. Ex. 15.  None of the presentations at any

20  time stated that hiQ scraped data from LinkedIn servers or that hiQ's products were entirely

21  dependent on scraping LinkedIn.  And even if they had, these decks were not publicly available

22  on hiQ's website such that a LinkedIn investigation could find them.  *See* Justice Decl. Ex. 28

23  ("doesn't seem they advertise their data sources on their website").  hiQ cites no evidence that

24  hiQ made public statements or otherwise made public prior to June 2015 that hiQ was actively

25  scraping data from LinkedIn.

26         In fact, hiQ executives lied to their own sales team, who in turn perpetuated the lie to

27  potential customers, claiming hiQ obtained data from many sources rather than admitting its

28  dependence on scraping LinkedIn's data.  In a July 2017 chat between Darin Medeiros, hiQ's

Vice President of Sales, and Daniel Kim, hiQ's Head of Product/VP of Engineering, Medeiros stated, "██████████████████████████████████████████████████████ ██████████████████████████████████" Justice Decl. Ex. 4 (Medeiros Dep. Ex. 467).  To which Kim replied, "████████████████████████████████████████████████████████ ████████████████████████████████████" *Id.*  Medeiros then states, "s████████████████ ████████████████████████████████████████" *Id.*  Medeiros continues, "███ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████" *Id.*  In his exit interview, Medeiros stated, "████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████" Justice Decl. Ex. 4 (Medeiros Dep. Ex. 470).  While hiQ was telling potential customers that it obtained data from ████████████████████████████████████ (Justice Decl. Exs. 19, 20), hiQ's CEO, Mark Weidick, was telling its board of directors the company was "████████████████████████████████████████████████████████ ████████████████████████████" Justice Decl. Ex. 4 (Medeiros Dep. Ex. 462).

**D.**     **In Late 2014, LinkedIn Employees With No Anti-Abuse Responsibilities Become Aware Of hiQ's Existence.**

hiQ was effective at keeping its activities under LinkedIn's defense radar.  And, as a result, the first LinkedIn employees to hear about hiQ were *not* anti-abuse or anti-scraping employees, but instead potential users of hiQ's product within LinkedIn's Human Resources Department.  In October 2014, Daniel Maurath was a recent LinkedIn hire as an Analyst on LinkedIn's Talent Analytics team, which supported Human Resources.  Maurath Decl. ¶ 3.  In that role, he regularly searched for industry conferences on talent analytics, and he came across a conference hosted by hiQ.  *Id.* ¶ 4.  Emailing colleagues on his team, he noted the conference, expressed interest in "what data they're using," and suggested that "[i]t sounds like they might be

scraping our site to see who has updated profiles." *Id.* Ex. A.[6]  Another person on the chain, William Gaker, replied that '[i]t might be good for someone (or at least somehow who handles how our data gets used) to go to make sure this vendor isn't accessing our data without our permission." *Id.*  And a third employee, Peter Rigano, responded to Gaker, saying, "If our main interest in the company/conference is assessing their usage of LI data, I'd suggest we hand off to legal and let them investigate further." *Id.*

No one attended the conference, investigated hiQ, or reported hiQ to anyone in LinkedIn's legal department or anyone else at LinkedIn with anti-scraping responsibilities.  Justice Decl. Ex. 33 (Lawit Dep. (8/26/22)) 72:18-73:3; Maurath Decl. ¶ 4.  The reason was simple:  It was not their job.  Their group, Talent Analytics, was a small part of Business Operations that supported LinkedIn's internal Human Resources department, Maurath Decl. ¶ 3, itself one of many departments in a large company with thousands of employees in a complex organizational structure.  And their team's role was to help LinkedIn make evidence-based internal decisions about its own employees.  Justice Decl. Ex. 11 (ECF No. 28, Canlas Decl.) ¶ 2.  They had no responsibility for anti-scraping, nor was it ever part of their job responsibilities or expectations to investigate scraping or report it to someone else at LinkedIn—certainly not when it was merely vague supposition about an obscure start-up.  Maurath Decl. ¶¶ 4-5; Rigano Decl. ¶¶ 3, 5; Justice Decl. 32 (Lawit Dep. (5/20/22)) 51:20-53:9.

hiQ again came across a LinkedIn employee's radar a few months later in December 2014, but again through an employee who at the time had no anti-scraping responsibilities.  Robin Vasan, a third-party analyst from Mayfield Fund, sent an unsolicited email to Bob Rosin, who was then the Vice President of Business Development at LinkedIn, about two potential business opportunities—hiQ and EasilyDo.  Justice Decl. Ex. 7 (Womer Dep. Ex. 285), Ex. 6 (Rosin Dep.) 114:3-115:5.  Vasan's email stated that the companies "look at public data (including LinkedIn)

---

[6] In the course of working on LinkedIn's opposition to hiQ's summary judgment motion, counsel for LinkedIn discovered that Maurath Exhibit A, which is a continuation of hiQ Exhibit C (ECF No. 356-2), was inadvertently not produced.  LinkedIn promptly rectified the error, producing the document to hiQ on August 10, 2022, informing hiQ that the reviewer mistakenly "failed to designate it for production."  LinkedIn provided a further Rule 30(b)(6) witness for deposition on August 26, 2022, on the circumstances of the document.

1   to try to predict which employees might be at risk to leave."  Justice Decl. Ex. 7 (Womer Dep.

2   Ex. 285).  But he was not "sure that LinkedIn would look favorably at a company that is

3   analyzing profiles."  *Id.*  The email said nothing about scraping.

4         The email was one of many of the type Rosin received asking about LinkedIn's interest in

5   or thoughts about a company.  Justice Decl. Ex. 6 (Rosin Dep. 129:4-130:3).  Rosin received such

6   emails "all the time" and his practice was to forward the email to the appropriate person on his

7   team knowledgeable about the relevant business—in this case talent-retention related businesses.

8   *Id.*  In this instance, that was Lee Womer, a member of the Business Development team

9   responsible for LinkedIn partnerships with HR-related companies.  *Id.* (Rosin Dep.) 127:19-

10  128:8.  Womer expressed doubt that hiQ's product was "a members' first use case"—in other

11  words, doubt that hiQ's end-product was beneficial for LinkedIn members.  Justice Decl. Ex. 7

12  (Womer Dep. Ex. 285).  Although Womer suggested he was willing to meet with hiQ, no meeting

13  took place.  Justice Decl. Ex. 7 (Womer Dep. Ex. 285), Ex. 7 (Womer Dep.) 56:15-25, 57:7-15,

14  *see also* Ex. 6 (Rosin Dep.) 127:11-128:8, 212:6-11.

15        Rosin and Womer also never raised hiQ with LinkedIn's legal department or any other

16  LinkedIn employee responsible for anti-scraping operations.  At the time, neither was responsible

17  for anti-scraping efforts.  Justice Decl. Ex. 6 (Rosin Dep.) 117:15-118:4, 132:20-133:9.  Rosin

18  had not been involved in scraping issues, and would not be until early 2015.  *Id.* (Rosin Dep.)

19  117:15-118:1.  And while Womer briefly helped in October 2012 on a project to understand the

20  state of scraping at that time, he also did not take on responsibility for scraping-related work until

21  2015, when he was again asked to help analyze and summarize the scraping landscape for others.

22  Justice Decl. Ex. 7 (Womer Dep.) 29:14-31:1, 32:16-33:10.  In any event, even if Rosin and

23  Womer had been responsible for anti-scraping work in 2014, they had no reason to conclude that

24  hiQ was scraping.  At his deposition, Womer testified that he does not remember receiving

25  Rosin's email, but that if he received it today, he would not understand Vasan's statement that

26  hiQ was helping "companies look at public data, including LinkedIn" to mean that hiQ was

27  scraping LinkedIn.  *Id.* (Womer Dep.) 52:9-25 ("you can look at data on the LinkedIn website

28  without scraping data on the LinkedIn website").

1    Several months later, at the April 2015 meeting in which Womer participated, the

2    presenters sought to bring a renewed emphasis to scraping abuses on the platform.  The

3    presentation noted "that scraping is on the rise," CE 960, and listed more than a dozen third-party

4    scrapers, CE 967-68.  hiQ was not listed.

5        **E.    In October 2015—Within The Limitations Period—An Employee First Alerts
             LinkedIn's "Scraper Council" To hiQ.**

6

7    The first time hiQ was brought to the attention of anyone with anti-scraping

8    responsibilities was in October 2015, well within the limitations period.  On October 6, 2015,

9    Lorenzo Canlas, Han Givens, and Rena Yi, all employees on LinkedIn's talent analytics team that

10   supported LinkedIn's HR department, attended hiQ's Elevate Conference.  Justice Decl. Ex. 12

11   (hiQ's Response to Interrogatory No. 2).  The presentation slides for the event did not mention

12   LinkedIn as a data source, let alone that hiQ was scraping member data from LinkedIn servers.

13   Justice Decl. Ex. 12 (main hiQ deck), Ex. 13 (Hammond version of deck), Ex. 14 (Graves

14   version); Ex. 22 (Kaplan version), Ex. 12 (hiQ's Response to Interrogatory No. 2) (discussing

15   contents of slide decks without mention of LinkedIn or scraping).  But Canlas suspected that hiQ

16   could have been using LinkedIn data, so he reached out to some colleagues, asking, "Is there a

17   way for us to understand how and if they are using our data and understanding if we are enabling

18   and supporting it?"  ECF No. 356-10 (Muller Decl. Ex. K).  One of the recipients then forwarded

19   that email to LinkedIn's Scraper Council.  CE 1279.

20   Scraper Council, initially formed in Fall 2013, was a group of LinkedIn employees from

21   its Legal, Product Trust, Trust Engineering, Trust and Safety, Data Science, and Business

22   Development Groups.  ECF No. 336-1 (Lawit Decl.) ¶ 13.  Employees in the group collaborated

23   to prevent scraping abuse.  *Id.*  But Scraper Council lacked the resources to investigate every

24   report of potential third-party scraping it received, *id.* ¶ 15, and it did not investigate hiQ in

25   October 2015.

26       **F.    In 2017, LinkedIn Investigates hiQ's Scraping In Response To Detailed New
             Information.**

27

28   In April of 2017, a few LinkedIn employees attended hiQ's Elevate Conference where it

13

announced the launch of its Skill Mapper product.  CE 62-63 (employee notes from conference).

Unlike in past conferences, hiQ expressly disclosed during the conference that it was using data

taken from LinkedIn profiles for both of its products.  *See* CE 62-63 (employee notes from

conference); Justice Decl. Ex. 11 (Canlas Decl.) ¶ 8.  hiQ also stated that it frequently refreshed

the data taken from LinkedIn profiles at a pace that strongly indicated to LinkedIn's attendees that

hiQ must be scraping member profile data.  CE 62-63 (employee notes from conference

indicating hiQ "[r]efresh (scrape) profile data every few weeks"); Justice Decl. Ex. 11 (Canlas

Decl.) ¶¶ 8-9.

After the April 2017 conference, the attendees reported their suspicions about hiQ to a

department called Trust Engineering, which in turn referred the matter to LinkedIn's Legal team,

the department ultimately responsible for determining whether a user has violated LinkedIn's

rights.  ECF No. 336-2 (Bajoria Decl.) ¶¶ 3-5; ECF No. 336-1 (Lawit Decl.) ¶ 10.  LinkedIn's

Legal and Trust and Safety teams investigated hiQ.  *Id.*  LinkedIn's Legal department ultimately

concluded that LinkedIn had a good-faith, reasonable basis for believing that hiQ was violating

the CFAA (along with LinkedIn's User Agreement and several other provisions of law).  And on

May 23, 2017, LinkedIn legal counsel sent a cease-and-desist letter to hiQ demanding that it

cease scraping in violation of the terms of LinkedIn's User Agreement and a number of other

laws.  ECF No. 336-2 (Bajoria Decl.) ¶ 5; ECF No. 336-1 (Lawit Decl.) ¶ 12.

### G.   hiQ Continues To Mislead About The Scope Of Its Conduct In This Litigation, Spoliates The Evidence Of Its Full Activity, And Does Not Disclose Its Use Of Fake Accounts Until 2022.

LinkedIn would not discover the full nature and scope of hiQ's conduct until well into

discovery in this case—in part because hiQ took active steps to conceal it.

When hiQ first brought this case and sought preliminary relief, it pledged repeatedly that

it only ever accessed purely "public" areas of LinkedIn.  hiQ's May 31, 2017 response to

LinkedIn's C&D letter stated, "hiQ in no way accesses LinkedIn member private data *or any area*

*of LinkedIn's website requiring a password*; it merely accesses data which LinkedIn's members

have expressly made public."  CE 2078 (C&D Letter) (emphasis added).  hiQ's complaint stated,

"LinkedIn members can choose to … allow access to everyone, even members of the general

1   public … who can access the information without signing in or using any password.  It is only

2   this … category of information … that is at issue here."  ECF No. 1, ¶¶ 5, 9.  hiQ's complaint

3   further stated—incorrectly, *see* LinkedIn's Motion for Summary Judgment, ECF No. 336 at 12-

4   13—that LinkedIn could not assert its User Agreement against hiQ because "[t]he LinkedIn User

5   Agreement does not even apply to members of the general public who access LinkedIn's website

6   without an account or sign-in credentials."  ECF No. 1, ¶ 26.  hiQ CEO Mark Weidick's

7   declaration in support of hiQ's motion for a temporary restraining order stated, "hiQ uses a

8   variety of software and manual means to gather the raw data it needs to analyze in order to

9   provide Keeper and Skill Mapper for its clients.  All of these means access only the public

10  profiles section of the LinkedIn website; none of these means access any private sections of

11  LinkedIn, such as profile information visible only to those who are signed-in to the LinkedIn

12  website."  Justice Decl. Ex. 9 (Weidick Decl.) ¶ 8.  Weidick's declaration in support of hiQ's

13  renewed motion for a temporary restraining order said the same.  Justice Decl. Ex. 10 (Weidick

14  Decl.) ¶ 8.

15         This was all false.  In January 2022, nearly *five years* into this case, hiQ first produced a

16  document reflecting instructions for its mechanical turking process, which entailed the creation of

17  fake accounts for purposes of circumventing LinkedIn's password barrier.  hiQ omitted this

18  practice in response to LinkedIn's Interrogatory Nos. 3 & 4, which asked hiQ to "[d]escribe in

19  detail your means of access to LinkedIn's website" and "[d]escribe every way you have accessed

20  and extracted … data from LinkedIn's website, computers, or servers, including … every step

21  used to access and extract data."  Justice Decl. Ex. 12.  Clearly, hiQ's turking process should have

22  been described in response to these interrogatories (let alone in the earlier Weidick declaration

23  and pleadings), but instead hiQ waited and dribbled out documents about its access to password

24  protection portions of LinkedIn's site over time in various document productions, waiting to see if

25  LinkedIn would figure it out.  Once LinkedIn learned of hiQ's turking, it propounded discovery

26  that fully uncovered hiQ's deception.  As it turns out, starting in November 2014, hiQ employees

27  and hired third parties performed data collection *while logged-in to the LinkedIn platform*.  CE

28  151-54.  Because this logged-in data collection would trigger LinkedIn's "usage" restrictions, CE

15

1    148-49 (Graves discussing these restrictions), hiQ instructed its turkers to use fake accounts to

2    log-in to the LinkedIn platform, locate webpages of specific individuals, and copy the URL

3    information "█████████████████████████████████" CE 1545.  And the

4    process only worked if the turkers were logged in.  CE 773 (██████████████████████████

5    ████████); CE 2067 (same); CE 1462 (███████████████████████████████); CE

6    1460 (██████████████████████████████████████████████████████

7    ████████████████████████).  In response to these new revelations, LinkedIn sought

8    leave (unopposed) to amend its CFAA counterclaim, ECF No. 303, prompting hiQ to withdraw

9    its motion to dismiss, ECF No. 312.

10            Not only did hiQ mislead LinkedIn and the Court with its false narrative that it accessed

11   only "public" member profile data, it also has compromised the very integrity of this proceeding

12   by spoliating highly salient evidence that would prove the scale of its prohibited conduct.  As

13   explained in LinkedIn's motion for spoliation sanctions, ECF No. 337, hiQ spoliated evidence of

14   its scraping logs stored on two separate cloud providers, which would have established the timing

15   and massive number of access requests hiQ engaged in within the relevant period.  Moreover, the

16   spoliated data stored on one of those cloud providers would have showed the extent of hiQ's

17   logged-in (i.e., non-"public") access to the LinkedIn website.  *Id.*

18            Despite hiQ's spoliation of evidence concerning its *attempts* to scrape, LinkedIn's expert,

19   Schmidt, was still able to determine a minimum number of times hiQ *successfully* circumvented

20   LinkedIn's defenses during a particular period, gained unauthorized access to LinkedIn's Profile

21   Servers, and obtained information.  *See* Schmidt Rpt. Ex. A.  Schmidt's analysis was based on

22   raw profile data hiQ successfully scraped, stored, and used to power its products, which hiQ did

23   retain.  *Id.*  Based on that data, Schmidt explained that hiQ circumvented LinkedIn's defenses and

24   successfully accessed and scraped LinkedIn member profile data at least ███████████████

25   between June 2015 and June 2017.  Schmidt Rpt. Exs. A-B.

26                                            **ARGUMENT**

27            The CFAA provides a two-year statute of limitations, running from "the date of the act

28   complained of or the date of the discovery of the damage."  18 U.S.C. § 1030(g).  It is undisputed

1   that the limitations period here begins on June 7, 2015, two years before hiQ filed its complaint.

2   *See* hiQ MSJ 1 (contending that LinkedIn "knew or should have known before June 7, 2015—the

3   date two years before hiQ filed this action—that hiQ was scraping"); *see MH Pillars Ltd. v.*

4   *Realini*, No. 15-cv-01383-PJH, 2018 WL 1184847, at *3 (N.D. Cal. Mar. 7, 2018) (compulsory

5   counterclaims relate back to filing of plaintiff's complaint).  So, to obtain summary judgment

6   against LinkedIn's CFAA claim in its entirety, hiQ must establish, beyond any genuine dispute,

7   that no "act complained of" took place after June 7, 2015.  And to obtain even *partial* summary

8   judgment as to acts *prior* to June 7, 2015, hiQ must show that LinkedIn—beyond any factual

9   dispute—discovered or should have discovered its acts before that June 7, 2015 date.  *See* hiQ

10  MSJ 10 (acknowledging required showing).  hiQ can carry neither burden.

11  **I.    UNDER THE SEPARATE ACCRUAL RULE LINKEDIN IS ENTITLED TO**
       **MAINTAIN ITS CFAA CLAIM AS TO ACTS OF SCRAPING OCCURRING**
12     **AFTER JUNE 7, 2015.**

13          Under the separate accrual rule (sometimes also called the "continuous accrual" rule), "a

14  series of wrongs or injuries may be viewed as each triggering its own limitations period, such that

15  a suit for relief may be partially time-barred as to older events but timely as to those within the

16  applicable limitations period."  *Al-Ahmed v. Twitter, Inc*., No. 21-CV-08017-EMC, 2022 WL

17  1605673, at *14 (N.D. Cal. May 20, 2022).  That rule applies to each discrete "act complained of"

18  under the CFAA.  And the evidence shows that hiQ repeatedly committed such acts by

19  circumventing LinkedIn's defenses to access LinkedIn Profile Severs more than ▮▮▮▮ times

20  from June 7, 2015 to June 7, 2017.  Schmidt Rpt. Exs. A-B.  LinkedIn's claims are timely as to

21  those acts as a matter of law.

22          **A.    The Separate Accrual Rule Is Well Established Under State & Federal Law.**

23          Across myriad areas of state and federal law, "separate, recurring invasions of the same

24  right each trigger their own separate statute of limitations."  *Calhoun v. Google LLC*, 526 F.

25  Supp. 3d 605, 625 (N.D. Cal. 2021) (applying the separate accrual rule and concluding that a

26  CFAA claim was timely).  This rule is "long settled."  *Aryeh v. Canon Bus. Sols., Inc*., 55 Cal. 4th

27  1185, 1198 (2013).  Indeed, the "separate-accrual approach to computing the limitations period is

28  appropriate" whenever a statute "'forbids a discrete act, as most do.'"  *Phreesia, Inc. v. Certify*

1     *Glob., Inc.*, No. DLB-21-678, 2022 WL 911207, at *9 (D. Md. Mar. 29, 2022) (quoting *Blake v.*

2     *JP Morgan Chase Bank NA*, 927 F.3d 701 (3d Cir. 2019)).

3          Under the rule, when a plaintiff raises a statutory claim against a series of infractions or a

4     campaign of repeated misconduct, the statute of limitations is calculated separately for each

5     wrongful act in the series.  The Ninth Circuit's decision in *Bliss v. CoreCivic, Inc.* is instructive.

6     978 F.3d 1144, 1150 (9th Cir. 2020).  The plaintiff, a criminal defense lawyer, sued the operator

7     of a detention facility under the Wiretap Act for illegally recording numerous privileged

8     telephone calls between her and her clients at the facility.  *Id.* at 1145-47.  This practice of

9     recording calls took place over the course of several years, starting more than two years (the

10    relevant limitations period) before suit.  *Id.* at 1146-47.  The defendant argued that the claim was

11    time-barred because its conduct began outside the limitations period.  *Id.* at 1148.  But the court

12    ruled that "the statute of limitations is triggered anew for each call that [defendant] recorded."  *Id.*

13    at 1150.  Because "[e]ach interception of [plaintiff's] privileged telephone calls is a separate

14    violation of the Act," and because a "violation" is what "triggers the statute of limitations," each

15    "separate interception, whether the interception is a singular event or part of a larger pattern of

16    conduct," "trigger[s] its own limitations period."  *Id*. at 1147-50.  So, the Court concluded, "to the

17    extent [plaintiff's] claims are based on calls that were recorded less than two years before she

18    filed suit …, they are not time barred."  *Id*. at 1149-50.

19         This approach to accrual is commonplace and applies in numerous other areas of federal

20    law.  Applying the Copyright Act, the Supreme Court explained: "Each time an infringing work is

21    reproduced or distributed, the infringer commits a new wrong.  Each wrong gives rise to a

22    discrete 'claim' that 'accrue[s]' at the time the wrong occurs.  In short, each infringing act starts a

23    new limitations period."  *Petrella v. Metro-Goldwyn-Mayer, Inc*., 572 U.S. 663, 671 (2014).  The

24    rule is general and applies to many areas of federal law.  *See, e.g.*, *Klehr v. A.O. Smith Corp*., 521

25    U.S. 179, 189-90 (1997) (antitrust); *Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996) (civil

26    RICO); *Calhoun*, 526 F. Supp. 3d at 625 (Stored Communications Act).

27         **B.**     **The Separate Accrual Rule Plainly Applies To The CFAA.**

28         Under *Bliss*, the controlling question is whether, under the particular statute of limitations

in question, the "triggering event" for the limitations period "refers to each separate" instance of complained-of conduct or instead "the overall … scheme or practice." 978 F.3d at 1147.  For the CFAA, the "triggering event" is "singular," *id.* at 1148—it is "*the act* complained of."  18 U.S.C. § 1030(g) (emphasis added).  The separate accrual rule thus applies.

Courts have accordingly "applied the separate-accrual rule to claims under the CFAA" on the basis that the CFAA "forbids a discrete act" of unauthorized access to a computer.  *Phreesia*, 2022 WL 911207, at *9 (finding CFAA claims timely under separate accrual rule and collecting cases).  In *Calhoun*, for example, plaintiffs claimed that "Google engaged in interceptions of their communications" in violation of the CFAA and other state and federal laws.  526 F. Supp. at 3d 625.  Google argued that the CFAA claims were time barred because the interceptions began more than two years before the initiation of the suit.  *Id*. at 624.  Applying the separate accrual rule, in accord with *Bliss*'s reasoning, the court "reject[ed] Google's argument because each violation triggers a separate statute of limitations."  *Id*. at 625.

Similarly, in *Phreesia*, plaintiff raised a CFAA claim asserting "that defendants … access[ed] [plaintiff's] confidential and proprietary software and incorporate[d] the nonpublic information they acquired into their competing software system."  2022 WL 911207, at *1.  Defendants argued that the CFAA claim was time barred because the first "act complained of" was more than two years before the filing of suit.  *Id*. at *9.  The court held that the "separate-accrual approach to computing the limitations period is appropriate" for the CFAA claim, *id*., and concluded that "[u]nder the separate-accrual approach, [plaintiff's] CFAA claim is timely to extent it is based on acts of unauthorized access that occurred within two years of the date [plaintiff] filed suit," *id*. at *10.  "At most," defendants' argument would "narrow the claim to misconduct that occurred [within] two years before the complaint was filed."  *Id*. at *9.

hiQ advances no argument for "morphing what otherwise would be considered separate violations into a single violation because they flow from a common practice or scheme." *Bliss*, 978 F.3d at 1148.  Indeed, it ignores the separate accrual rule entirely, discussing none of the on-point authority described above.

1

**C.      LinkedIn's CFAA Claim Is Timely Under The Separate Accrual Rule.**

2          Applying the separate accrual rule here, LinkedIn's CFAA claims are timely as to

3   misconduct occurring within two years of suit.  The record demonstrates that hiQ circumvented

4   LinkedIn's defenses to access LinkedIn member profile data more than ████████ times within

5   two years of this suit.  *Supra* Stmt. of Facts § G.  It also demonstrates that hiQ engaged in the

6   qualitatively different conduct of "turking"—gaining access to information behind LinkedIn's

7   password wall through the use of fake accounts—repeatedly during the limitations period and

8   even after this suit was filed.  *Supra* Stmt of Facts § G.  Each time it gained such unauthorized

9   access, whether by scraping or turking, hiQ committed a separate, discrete act triggering the

10  CFAA's statute of limitations.  LinkedIn's CFAA claim is timely as to all such acts occurring or

11  discovered after June 7, 2015, two years before this lawsuit.  *See In re Dealer Mgmt. Sys.*

12  *Antitrust Litig.*, No. 18-CV-864, 2019 WL 4166864, at *9 (N.D. Ill. Sept. 3, 2019) (explaining

13  that "to the extent that [plaintiff's] CFAA counterclaim is based on misconduct occurring" within

14  two years of the suit, "the claim is timely").  hiQ's motion should therefore be denied as to any

15  conduct occurring after June 7, 2015.

16  **II.     LINKEDIN IS ALSO ENTITLED TO PROCEED ON ITS CFAA CLAIM FOR
           ALL PERIODS BECAUSE OF DISPUTED FACTS CONCERNING LINKEDIN'S**
17  **      NOTICE AND HIQ'S FRAUDULENT CONCEALMENT.**

18          Independently, LinkedIn's claim is timely as to all of hiQ's conduct because there are, at a

19  minimum, disputed factual questions concerning when LinkedIn had the requisite suspicion

20  concerning hiQ's conduct and whether hiQ fraudulently concealed the full scope and scale of its

21  activities.

22  **A.      Factual Disputes As To Who Knew What Prior To The Limitations Period
           Preclude Summary Judgment.**
23

24          hiQ's scant statute-of-limitations defense is based entirely on two short email threads from

25  late-2014 in which small groups of LinkedIn employees briefly discussed hiQ.  But hiQ glosses

26  over the all-important specifics of precisely *who* knew precisely *what* about hiQ before the

27  limitations period commenced.  On the *who* question, with a corporate entity like LinkedIn, it is

28  not enough to show that just *any* employee became aware of some fact.  Whether an employee's

1   notice is imputed to the company depends on the law of agency.  *See* Cal. Civ. Code § 2332

2   (limiting principal's imputed knowledge based on scope of agency).  And "the law is well settled

3   that notice to an agent is notice to the principal *only as to those things within the scope of the*

4   *agency*."  *Primm v. Joyce*, 87 Cal. App. 2d 288, 291-92 (1948) (emphasis added).[7]  The "scope of

5   the imputation of knowledge … has nothing to do with whether the agent actually has the

6   information in question"; it turns on "the scope of the duty arising from the agency agreement."

7   *Triple A Mgmt. Co., Inc. v. Frisone*, 69 Cal. App. 4th 520, 535 (1999).  As for the *what*, while

8   hiQ contends that LinkedIn did not need to know of its "exact legal claim," hiQ MSJ 11, it does

9   not and cannot dispute that LinkedIn at least had to have suspicions concerning the conduct that is

10  the basis of the CFAA claim—that is, hiQ's unauthorized access to its computers.

11          Neither of the email threads hiQ touts show that someone with anti-scraping

12  responsibilities suspected that hiQ was engaged in scraping.  By failing to put in any evidence

13  demonstrating the appropriate scope of agency, hiQ has not met its burden in the first instance to

14  demonstrate that *relevant* people had sufficient information to trigger inquiry notice.[8]  Moreover,

15  at a minimum, factual disputes on the *who* and *what* questions preclude summary judgment on the

16  statute of limitations.

17          ***October 2014 email***.  hiQ asserts that a single email chain from October 2014 about a hiQ

18  conference shows hiQ was scraping LinkedIn's data without permission.  hiQ MSJ 10.

19  Conceding that the October 2014 discussions did not extend beyond the participants on that chain,

20  hiQ argues that "LinkedIn's excuses for why it failed to investigate hiQ at that time boil down to

21

22  [7] These state-law based rules apply because, absent some indication otherwise, "'[t]he federal
    accrual standard is essentially the same as the discovery rule.'"  *Al-Ahmed*, 2022 WL 1605673, at

23  *11 (quoting *Peterson v. Sutter Med. Found.*, No. 21-CV-04908-WHO, 2022 WL 316677, at *12
    (N.D. Cal. Feb. 2, 2022)).  *See, e.g.*, *Miniace v. Pac. Mar. Ass'n*, No. C 04-03506 SI, 2006 WL

24  648732, at *2 (N.D. Cal. Mar. 13, 2006) ("Th[e] rule of imputed notice is limited by the scope of
    the agency relationship.") (citing *Primm*, 87 Cal. App. 2d at 291-92).

25  [8] LinkedIn further lodges an evidentiary objection that hiQ's attempt to impute the knowledge or
    statements of participants in the October 2014 and December 2014 email chains to LinkedIn lacks

26  foundation.  *See* hiQ MSJ at 3–9; Fed. R. Civ. P. 56(c)(1)–(4) (requiring party to support factual
    positions with "material … in a form that would be admissible in evidence"); *see also* Fed. R.

27  Evid. 801(d)(2) (requiring the proponent of "An Opposing Party's Statement" to establish "the
    existence or scope" of agency relationship through evidence other than the statement sought to be

28  admitted).

1    internal reporting failures" because the employees "simply declined" to report hiQ to others.  hiQ

2    MSJ 11-12; *see supra* 10.  But hiQ fails to provide any evidence that any of the employees on the

3    email were in any way responsible for doing those things—for conducting "due diligence to

4    confirm or dispel … suspicion," hiQ MSJ 12, or for "reporting" scraping to anyone else in the

5    company, *id.*  So hiQ's suggestion that LinkedIn's employees "failed" to take certain steps is just

6    empty rhetoric—doing those things was simply not a part of their jobs.

7         Undisputed evidence shows that investigating, reporting, or otherwise addressing

8    potentially unauthorized scraping was not within the scope of employment for Maurath, Rigano,

9    Gaker, or any other employee copied on the October 2014 email.  All of the relevant employees

10   worked in Talent Analytics, an internal group supporting LinkedIn's Human Resources group that

11   is focused on analyzing LinkedIn's own workforce.  *See* ECF No. 356-1 (hiQ Ex. B) at 4; *see also*

12   Justice Decl. Ex. 32 (Lawit Dep.) 51:20-53:9.  And none had any responsibility for anti-scraping

13   operations, nor even a connection to those operations.  Maurath Decl. ¶ 5; Rigano Decl. ¶ 5;

14   Justice Decl. Ex. 32 (Lawit Dep.) 51:20-53:9.  The face of the October 2014 email confirms that

15   the participants understood at the time that the participants were *not* "who handles how our data

16   gets used" and such inquiries were handled by another department such as legal.  Maurath Decl.

17   Ex. A.  Whatever these employees knew or suspected about hiQ is therefore irrelevant because it

18   cannot be imputed to LinkedIn.  *See Miniace*, 2006 WL 648732, at *3 (denying summary

19   judgment because movant "offered no evidence to show that th[e] authority was delegated" to

20   employee such that she "had an obligation to report the [information at issue] to her superiors");

21   *Bourne v. Root*, 125 Cal. App. 461, 464 (1932) ("Knowledge of an agent, however, is not

22   knowledge of the principal as to matters outside the scope of the agent's authority.").

23       In light of their job responsibilities, moreover, these employees' discussion of hiQ and the

24   possibility of scraping was not "suspicion," but is shown on the face of the email chain to be

25   speculation.  Maurath Decl. Ex. A ("I would love to see what data they are using.  It sounds like

26   they *might* be scraping….") (emphasis added).  Nothing suggests that they could have known to

27   any degree of certainty that hiQ was engaging in prohibited conduct.  Speculation does not suffice

28   to trigger discovery of a potential claim as a matter of law, meaning hiQ cannot obtain summary

judgment.  *See Miniace*, 2006 WL 648732, at *3 (denying summary judgment because movant "provided no evidence that" company general counsel actually "knew" the information allegedly imputable to company).

**December 2014 email**.  The other email thread, from December 2014, was initiated by a third-party venture capital investor, Robin Vasan.  hiQ MSJ 6-8.  Vasan emailed Bob Rosin, LinkedIn's Vice President of Business Development, and Rosin later looped in Lee Womer, LinkedIn's Director of Business Development.  Justice Decl. Ex. 7 (Womer Dep. Ex. 285), Ex. 6 (Rosin Dep.) 114:3-115:5.  Vasan's initial email stated that hiQ "look[s] at public data (including LinkedIn) to try to predict which employees might be at risk to leave."  Justice Decl. Ex. 7 (Womer Dep. Ex. 285).  But he was not "sure that LinkedIn would look favorably at a company that is analyzing profiles."  *Id*.  After Rosin forwarded the email to Womer, Womer expressed doubt that hiQ's product was "a members' first use case."  *Id.*

This exchange says not a word about scraping or unauthorized access.  It was a business inquiry in which Vasan "wanted to touch base since [Vasan's venture capital firm was] either working on or looking at companies that want to integrate more with LinkedIn."  *Id*.  Rosin and Womer both testified that they did not read the email to concern scraping.  Rosin understood this email to be "about if we had partnerships" with various HR companies.  Justice Decl. Ex. 6 (Rosin Dep.) 128:5-9, 129:23-130:3.  And although Womer did not remember the email, he testified that he would not have interpreted a reference to "looking" at data or "analyz[ing] profiles" as discussing scraping.  Womer explained, "you can look at data on the LinkedIn website without scraping data on the LinkedIn website."  Justice Decl. Ex. 7 (Womer Dep.) 52:22-23.  That neither Rosin nor Womer even considered scraping upon receiving Vasan's email is easily sufficient to create a fact issue concerning the subject matter of the email exchange.

As with Maurath, Gaker, and Rigano, moreover, neither Rosin nor Womer had any responsibilities at the time for anti-scraping operations.  Rosin testified that he was not aware of scraping being an issue for LinkedIn in 2014, Justice Decl. Ex. 6 (Rosin Dep.) 118:6-12, and that he was not involved with anti-scraping in 2014, *id.* at 108:2-109:1, 117:15-118:1, 152:16-25.  For Womer's part, hiQ argues he "[w]orked with [a] cross-functional team to reboot [LinkedIn's]

1   anti-scraping initiative that dramatically improved defenses and enforcement"—that is, Scraper

2   Council.  hiQ MSJ at 7 & n.2 (citing Exs. F, G[9]).  But hiQ is obscuring the timeline.  While both

3   Rosin and Womer would later become involved with Scraper Council in 2015, neither were

4   members of Scraper Council the time of the December 2014 email exchange.  At most, the

5   evidence suggests that Womer had evaluated the scraping landscape in 2012—long before anyone

6   at LinkedIn knew hiQ existed—and did not take on responsibility for scraping-related issues until

7   2015.  *See* Justice Decl. Ex. 7 (Womer Dep.) 30:11-31:1.[10]

8          Because the December 2014 emails do not even implicate scraping, and separately

9   because investigating or reporting potential scraping was not part of Rosin or Womer's job

10  responsibilities at the time, summary judgment is not appropriate.  *See Oldenburg v. Brody*, 139

11  Cal. App. 2d 543, 554 (1956) (no imputable notice "on account of the time element," where agent

12  "was not acting within the scope of his authority *at the time*" of the purported notice; and "[s]ince

13  the evidence does not affirmatively show that [the agent] was authorized or instructed on behalf

14  of the plaintiffs to ascertain the [information], information obtained by him is not necessarily

15  imputable to the principal") (emphasis added).

16       **B.**     **Factual Disputes Concerning Whether And When LinkedIn "Should Have**
        **Known" Of hiQ's Conduct As Well As hiQ's Fraudulent Concealment**
17      **Preclude Summary Judgment.**

18         Summary judgment should also be denied because hiQ actively and effectively concealed

19  its conduct from LinkedIn.  This triggers tolling under the discovery rule, which "postpones

20  accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of

21  action."  *Aryeh*, 55 Cal. 4th at 1192.  hiQ's concealment also triggers the doctrine of fraudulent

22  concealment, which "tolls the statute of limitations where a defendant, through deceptive conduct,

23  has caused a claim to grow stale."  *Id.*  Here LinkedIn could not have uncovered anything

---

[9] LinkedIn objects to Exhibit G (Womer LinkedIn Profile) because it is not authenticated and the exhibit does not contain the quotation hiQ attributes to it.  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773–74 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."); *compare* hiQ MSJ at 7:19-20 and 7 n.2 *with* text of Ex. G.

[10] LinkedIn objects to consideration of hiQ Exhibits F, I, and P because they are deposition extracts missing "the reporter's certification" or other authenticating evidence from a person with knowledge and are thus "not properly authenticated."  *Orr*, 285 F.3d at 774.

1   remotely approaching the full nature and scope of hiQ's conduct before June 7, 2015, because

2   hiQ did everything it could to conceal that conduct before and after that date—including during

3   this case.

4          There is extensive evidence that hiQ actively concealed its scraping.  As explained (at

5   Stmt. of Facts §§ B, C, & G), hiQ was well-aware that LinkedIn prohibited scraping and it was

6   well-aware that the LinkedIn's general technical defenses that blocked many of hiQ's scraping

7   requests were designed for that very purpose.  But hiQ admits that it never asked permission to

8   scrape.  ECF No. 327 at 22.  Instead, it resorted to various deceits.  Month after month it modified

9   its techniques to circumvent LinkedIn's defenses by trying to make its scraping attempts look like

10  they were coming not from a single entity employing non-human bots, but countless unrelated

11  humans engaging in ordinary and permissible access.  *Supra* Stmt. of Facts §§ B-C.  As

12  LinkedIn's expert, Schmidt, testified, "up until spring of 2017 … it would not have been possible

13  for LinkedIn to know who hiQ was because of the evasive techniques that hiQ was using in order

14  to masquerade the source of the requests that it was sending through its proxy forms to LinkedIn."

15  Justice Decl. Ex. 8 (Schmidt Dep.) 104:24-105:18.

16         Nor did any public source of information suggest that hiQ was scraping.  Indeed, hiQ

17  points to not a *single document* that LinkedIn could have possibly found that would have told it

18  hiQ was scraping at all—let alone scraping at extraordinary volume, while instructing third

19  parties to create fake accounts for purposes of obtaining information behind LinkedIn's password

20  wall.  It was not until the April 2017 Elevate Conference that hiQ said anything in public that

21  suggested the nature and extent of its activities—that is when it expressly disclosed that it was

22  using data from LinkedIn profiles and frequently refreshing that data at a rate that strongly

23  suggested scraping.  CE 62-63 (Elevate Conference Notes); Justice Decl. Ex. 11 (Canlas

24  Decl.) ¶ 8.  Even then, LinkedIn had to devote significant resources to an investigation led by the

25  Legal team before forming a reasonable basis to believe hiQ was violating the CFAA.  ECF No.

26  336-2 (Bajoria Decl.) ¶¶ 3-4.

27         hiQ continued to actively conceal the scope of its conduct even in this litigation.  *Supra*

28  Stmt. of Facts § G; *see, e.g.*, CE 2078-81 (hiQ response to LinkedIn C&D letter); Justice Decl.

1   Ex. 9 (Weidick Decl.).  hiQ's discovery responses repeatedly omitted mention of logged-in

2   turking activity, which relied on creating fake accounts.  Justice Decl. Ex. 12 (hiQ response to

3   Interrogatory No. 3), *id.* (hiQ response to Interrogatory No. 4).  At his May 4, 2022, deposition,

4   hiQ's former CEO Darren Kaplan testified that hiQ used only information available without

5   logging in and disclaimed any knowledge of what hiQ's turkers were doing on LinkedIn's site.

6   Justice Decl. Ex. 34 (Kaplan Dep.) 122:4-123:15, 143:5-146:2.  But in a deposition later that

7   same month, Genevieve Graves, hiQ's chief data scientist, finally admitted that hiQ had

8   instructed turkers to make fake accounts to log in and take data from LinkedIn profiles.  Justice

9   Decl. Ex. 3 (Graves Dep.) 23:5-8, 223:19-224:13; *see also* CE 1573-85 (record of payments to all

10  turkers from Sep. 2015 to Sep. 2016); CE 1538-49 (turking instructions); CE 151 (turking

11  instructions).  Graves also admitted that instructing turkers to make fake accounts violated

12  LinkedIn's User Agreement.  CE 118-19 (Graves Dep.).  And hiQ has also spoliated evidence of

13  its scraping logs, as detailed in LinkedIn's motion for sanctions, evidence which would have laid

14  bare the timing and number of access requests hiQ engaged in during the relevant time periods.

15         Because of hiQ's deliberate concealment of its actions, LinkedIn could never have

16  discovered hiQ's conduct through "reasonable diligence."  *In re Conseco Ins. Co. Annuity*

17  *Marketing & Sales Practices Litig.*, No. C-05-04726 RMW, 2008 WL 4544441, at *8 (N.D. Cal.

18  Sept. 30, 2008).  LinkedIn did not learn of the full range of conduct underlying its claims until

19  this case, after which LinkedIn promptly amended its complaint based on the newly discovered

20  evidence.  In analogous circumstances, courts have held that the statute of limitations should be

21  tolled by either the discovery rule or the doctrine of fraudulent concealment.  *See Tortilla*

22  *Factory, LLC v. Better Booch*, LLC, No. 18-cv-02980-CAS-SKx, 2018 WL 6179491, at *5 (C.D.

23  Cal. Nov. 26, 2018) ("'Whether a reasonable person in plaintiff's position would have discovered

24  the wrongdoing' at an earlier time," including whether plaintiff reasonably relied on defendant's

25  misrepresentations, "is a question of fact.") (citation omitted); *Bernson v. Browning–Ferris Indus.*

26  *of Cal., Inc.*, 7 Cal. 4th 926, 936 (1994) (defendant "equitably estopped from asserting the statute

27  of limitations when, as the result of intentional concealment, the plaintiff is unable to discover the

28  defendant's actual identity").  This Court should hold the same here.  hiQ should not be permitted

1  to benefit from its years-long attempt to evade detection.

2  **CONCLUSION**

3  For the foregoing reasons, the Court should deny hiQ's motion for summary judgment.

4

5  Dated: August 31, 2022                          Orrick, Herrington & Sutcliffe LLP

6

7                                                  By: _____
                                                          */s/ Annette L. Hurst*
8                                                        ANNETTE L. HURST
                                                     Attorneys for Defendant
9                                                    LinkedIn Corporation