1  ANNETTE L. HURST (SBN 148738)
   ahurst@orrick.com
2  RUSSELL P. COHEN (SBN 213105)
   rcohen@orrick.com
3  PAUL F. RUGANI (SBN 342647)
   prugani@orrick.com
4  CATHERINE Y. LUI (SBN 239648)
   clui@orrick.com
5  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
6  DANIEL JUSTICE (SBN 291907)
   djustice@orrick.com
7  EMILY RENZELLI (*pro hac vice*)
   erenzelli@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
9  San Francisco, CA  94105-2669
   Telephone:   +1 415 773 5700
10 Facsimile:    +1 415 773 5759

11

12 *Attorneys for LinkedIn Corporation*

   UNITED STATES DISTRICT COURT
13
   NORTHERN DISTRICT OF CALIFORNIA
14
   SAN FRANCISCO DIVISION
15

16 hiQ Labs, Inc.,

17          Plaintiff,

18    vs.

19 LinkedIn Corporation,

20          Defendant.

21

22 LinkedIn Corporation

23          Counterclaimant,
      vs.
24 hiQ Labs, Inc.

25          Counterdefendant,

26

27

28

Case No. 17-cv-03301-EMC

**DECLARATION OF DANIEL JUSTICE IN SUPPORT OF LINKEDIN CORPORATION'S OPPOSITION TO HIQ'S MOTION FOR SUMMARY JUDGMENT**

Date:          September 29, 2022
Time:          1:30 p.m.
Courtroom:  5 – 17th Floor (Zoom)
Judge:        Hon. Edward M. Chen

Complaint Filed:    June 7, 2017
Trial Date:          February 27, 2023

I, Daniel Justice, hereby declare as follows:

1.      I am an attorney at the law firm of Orrick, Herrington & Sutcliffe LLP, counsel of record for LinkedIn Corporation in this action.  I am a member of the California State Bar and am admitted to practice before this Court.  I have personal knowledge of the facts stated in this declaration, and if called as a witness I could and would testify competently thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the transcript of the deposition of Jenelle Bray taken on July 27, 2022, as well as a true and correct copy of Deposition Exhibit No. 1378, and a true and correct copy of a clearer image of the flow chart contained in Deposition Exhibit No. 1378, which was produced by LinkedIn with Bates Number LINK_HIQ_000205780.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the transcript of the deposition of Boris Dev taken on May 4, 2022, as well as true and correct copies of Deposition Exhibit Nos. 225, 232, & 234.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of the transcript of the deposition of Genevieve Graves taken on May 25, 2022, as well as a true and correct copy of Deposition Exhibit No. 511.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts of the transcript of the deposition of Darin Medeiros taken on May 20, 2022, as well as true and correct copies of Deposition Exhibit Nos. 462, 467, & 470.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts of the transcript of the deposition of Daniel Miller taken on May 13, 2022, as well as true and correct copies of Deposition Exhibit Nos. 300, 306, & 310.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts of the transcript of the deposition of Robert Rosin taken on May 23, 2022.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts of the transcript of the deposition of Lee Womer taken on May 11, 2022, as well as a true and correct copy of Deposition Exhibit No. 285.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of excerpts of the transcript of the deposition of Douglas Schmidt taken on July 29, 2022.

10.      Attached hereto as **Exhibit 9** is a true and correct copy of the Declaration of Mark Weidick ISO hiQ's Motion for Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 7, 2017) (ECF No. 6).

11.      Attached hereto as **Exhibit 10** is a true and correct copy of the Declaration of Mark Weidick ISO hiQ's Renewed Motion for Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 22, 2017) (ECF No. 23-4).

12.      Attached hereto as **Exhibit 11** is a true and correct copy of the Declaration of Lorenzo Canlas ISO LinkedIn's Opposition to Plaintiff's Motion for a Temporary Restraining Order, *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-cv-03301-EMC (N.D. Cal. June 26, 2017) (ECF No. 28).

13.      Attached hereto as **Exhibit 12** is a true and correct copy of hiQ's Responses to LinkedIn's First Set of Interrogatories, Response to Interrogatory Nos. 2, 3, & 4, served on July 29, 2021.  Uncited interrogatory responses and the uncited portion of Interrogatory Response No. 2 have been omitted.

14.      Attached hereto as **Exhibit 13** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00024558.

15.      Attached hereto as **Exhibit 14** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00031570.

16.      Attached hereto as **Exhibit 15** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00627612.

17.      Attached hereto as **Exhibit 16** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00059809.

18.      Attached hereto as **Exhibit 17** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00059810, which is an attachment to Exhibit 16.

19.      Attached hereto as **Exhibit 18** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00087998.

20.     Attached hereto as **Exhibit 19** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00177287.

21.     Attached hereto as **Exhibit 20** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00177290, which is an attachment to Exhibit 19.

22.     Attached hereto as **Exhibit 21** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00220336.

23.     Attached hereto as **Exhibit 22** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00241440.

24.     Attached hereto as **Exhibit 23** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00254210.

25.     Attached hereto as **Exhibit 24** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00442563.

26.     Attached hereto as **Exhibit 25** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00444036.

27.     Attached hereto as **Exhibit 26** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_00447685.

28.     Attached hereto as **Exhibit 27** is a true and correct copy of a document produced by hiQ from its files, initial page Bates Number hiQ_code_000145.

29.     Attached hereto as **Exhibit 28** is a true and correct copy of a document produced by LinkedIn from its files, initial page Bates Number LINK_HIQ_000067470.

30.     Attached hereto as **Exhibit 29** is a true and correct copy of a printout of hiQ's website, www.hiqlabs.com, as it appeared on December 20, 2014, as captured by the Internet Archive.   The archived webpage is available at https://web.archive.org/web/20141220114249/https:/www.hiqlabs.com/.

31.     Attached hereto as **Exhibit 30** is a true and correct copy of a printout of hiQ's website, www.hiqlabs.com, as it appeared on September 6, 2015, as captured by the Internet Archive.   The archived webpage is available at https://web.archive.org/web/20150906145207/https:/www.hiqlabs.com/.

32.     Attached hereto as **Exhibit 31** is a true and correct printout of hiQ's blog, available at hiqlabs-blog.tumblr.com, printed on August 30, 2022 at 4:26 PM.  The most recent post on the blog, titled "hiQ Labs is featured in Deloitte 2015 Trends People Data Everywhere…" is dated March 20, 2015.

33.     Attached hereto as **Exhibit 32** is a true and correct copy of excerpts of the transcript of the deposition of Blake Lawit taken on May 20, 2022.

34.     Attached hereto as **Exhibit 33** is a true and correct copy of excerpts of the transcript of the deposition of Blake Lawit taken on August 26, 2022.

35.     Attached hereto as **Exhibit 34** is a true and correct copy of excerpts of the transcript of the deposition of Darren Kaplan taken on May 4, 2022.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on August 31, 2022, at San Francisco, California.

_____
                    Daniel Justice

JUSTICE DECL. ISO LINKEDIN'S OPP TO HIQ MSJ
17-cv-03301-EMC

# EXHIBIT 1

# (EXHIBIT FILED UNDER SEAL)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 177

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5    HiQ LABS, INC.,                )

                                    )

6                   Plaintiff,      )

                                    )

7                   VS.             ) CASE NO. 17-CV-03301-EMC

                                    )

8    LINKEDIN CORPORATION,          )

                                    )

9                   Defendant.      )

     _____)

10                                  )

     AND RELATED CROSS-ACTION.      )

11   _____)

12

13

14         *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

15

16         VIDEOTAPED ZOOM DEPOSITION OF JENELLE BRAY

17                        Volume 2

18                Wednesday, July 27, 2022

19

20

21

22

23

24

25   REPORTED BY: MICHELLE MEDEL SABADO, RPR, CRR, CSR #7423

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 270

1    long time ago and don't remember.

2         Q       And so the first diagram that says "Sentinel

3    flow chart," you -- you have some familiarity with?

4         A       Yes, although it might be possible that the

5    flow chart -- I'd have to look.  Like the flow chart we

6    have might be a little updated from that but I've seen a

7    flow chart that is like this.

8         Q       Okay.  And what is Sentinel?

9         A       Sentinel is like the -- it's a plugin, so

10   it's like a piece of -- of big wrapper around a piece of

11   code that does all the -- when we were talking about

12   before when a request comes in and then there's all these

13   different filters before the model, it's essentially that

14   collection of all those filters that does all -- like the

15   IP filters and those simple rules and stuff.

16        Q       Got it.  Got it.  And so a request that comes

17   through the Azure Front Door, would then next go to

18   Sentinel before it gets to the machine-learning models,

19   is that accurate?

20        A       Yes, although sometimes the infrastructure is

21   changing but yes that is correct as of now.

22        Q       Okay.  Is Sentinel something that you or your

23   teamwork on?

24        A       Not really.  I mean, a long time ago I think

25   we may have put in a few rules in there, but in general,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 303

1

2          I, MICHELLE MEDEL SABADO, RPR, CRR, CSR NO. 7423, IN

3     AND FOR THE STATE OF CALIFORNIA, HEREBY CERTIFY:

4          THAT PRIOR TO BEING EXAMINED, THE WITNESS NAMED IN

5     THE FOREGOING DEPOSITION WAS DULY SWORN BY ME TO TESTIFY

6     THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH;

7          THAT SAID DEPOSITION WAS TAKEN DOWN BY ME IN

8     SHORTHAND AT THE TIME AND PLACE THEREIN NAMED, AND

9     THEREAFTER REDUCED TO TYPEWRITING UNDER MY DIRECTION, AND

10    THE SAME IS A TRUE, CORRECT AND COMPLETE TRANSCRIPT OF

11    SAID PROCEEDINGS;

12         THAT IF THE FOREGOING PERTAINS TO THE ORIGINAL

13    TRANSCRIPT OF AN EXAMINATION IN A FEDERAL CASE, BEFORE

14    COMPLETION OF THE PROCEEDINGS, REVIEW OF THE TRANSCRIPT

15    { } WAS  {  } WAS NOT REQUIRED.

16       I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

17    EVENT OF THE ACTION.

18         WITNESS MY HAND THIS 28TH DAY OF JULY, 2022.

19

20

21    _____

      MICHELLE MEDEL SABADO

22    RPR, CRR, CSR NO. 7423

23

24

25



Pages /... / ATS security plugin tests

# Sentinel functional test cases

Created by June Zhong, last modified on Apr 29, 2016

Exhibit
1378

## Sentinel

What does sentinel do?

The ATS plugin is designed as a series of filters. The plugin executes the filters in sequence. Every request is passed through all the filters. If any filter returns a 'DENY' action, the plugin stops the pipeline and fails the request.

The plugin currently has three filters implemented: RestrictedIpFilter, GuestFilter and BlockFilter.

For more details, please refer to sentinel wiki: Sentinel

Where is sentinel deployed? L0

Sentinel flow chart



### RestrictedIPFilter test



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only
LINK_HIQ_000089972



Write a comment...

Powered by Atlassian Confluence 7.4.8 · Report a bug · Atlassian News

ATLASSIAN

Highly Confidential - Attorneys' Eyes Only



LINK_HIQ_000205780

# EXHIBIT 2

# (EXHIBIT FILED UNDER SEAL)

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4   hiQ Labs, Inc.,

 5           Plaintiff,

 6       vs.                        No. 17-cv-03301-EMC

 7   LinkedIn Corporation,

 8           Defendant.
     _____/
 9

10   LinkedIn Corporation,

11           Counterclaimant

12   vs.

13   hiQ Labs, Inc.

14           Counterdefendants.
     _____/
15

16                 CONFIDENTIAL

17            VIDEOTAPED DEPOSITION OF

18                  BORIS DEV

19             Wednesday, May 4, 2022

20

21

22   Stenographically Reported by:

23   GINA V. CARBONE, CSR, RPR, RMR, CRR, CCRR

24   California State Lic. No. 8249

25   Job No. 10100029
```











1  BY MS. HURST:

2        **Q.  Is that correct?**

3        A.  That's correct.

4          MR. WIT:  Objection to form.

5  BY MS. HURST:

6        **Q.  Do you recall ever investigating a VPN**

7  **service called Hide My Ass!?**

8          MR. WIT:  Objection to form.

9          THE WITNESS:  No, I can't recall that.

10         MS. HURST:  Exhibit 225 is hiQ_00084065

11 through 68.

12         (Whereupon, Exhibit 225 was marked for

13         identification.)

14 BY MS. HURST:

15       **Q.  Okay.  And if you -- you can start from the**

16 **bottom, you'll see -- it's really on the second**

17 **page, a very -- sorry.  Third page.  Bottom of the**

18 **third page.**

19       A.  One, two, three.

20       **Q.  Boris Dev, March 2nd, "Can I get a free**

21 **business account trial?"**

22       **Do you see that?**

23       **Very bottom of the third page you'll see**

24 **your name there, Boris Dev?**

25       A.  One page.  Page 2, page 3 -- oh, right

 1   there.  Sorry.

 2        **Q.  No worries.**

 3        A.  "Can I get a free business account trial?"

 4        **Q.  Okay.  And then somebody named Giovanni**

 5   **from Hide My Ass! Support wrote back to you?**

 6        A.  Yeah.  That's what I see above it, yeah.

 7        **Q.  "Thank you for showing interest," blah,**

 8   **blah, blah.  "Would you mind telling me how many**

 9   **connections, devices you need?"**

10        **Right?**

11        MR. WIT:  Objection to form.  Misstates the

12   document.

13        You can answer.

14        THE WITNESS:  I'm sorry?

15   BY MS. HURST:

16        **Q.  Yeah.  He responded to you.**

17        A.  You said "right."

18        **Q.  He responded to you, correct?  You asked**

19   **him for a business account trial and he responded to**

20   **you?**

21        A.  Yeah.  That's what we're both looking at.

22        **Q.  And then -- sorry.  Sorry, I didn't mean to**

23   **interrupt.**

24        **And then you explained to him that you**

25   **planned to scrape LinkedIn profile pages, correct?**

1        A.  I'm sorry, where --

2        Q.  Middle of the second page, you'll see your

3    name, Boris Dev.

4        A.  Also it is going backwards now, so I'm

5    like --

6        Q.  Yep, I know it's hard.  We're going from

7    the bottom up.  Middle of the second page, March

8    2nd, Boris Dev --

9        A.  Yeah.  Got it.

10       Q.  -- 23 --

11       A.  We're both reading the same thing, right?

12   March 2nd, 23:56 GMT, we will scrape LinkedIn

13   profile pages.

14       Q.  Okay.

15           MR. WIT:  Try not to speak over her.  Thank

16   you.

17   BY MS. HURST:

18       Q.  And then Mr. -- and then Giovanni wrote,

19   "We do not support or encourage our customers to use

20   our VPN for scraping even if the information you

21   scrape for are publicly displayed, as this kind of

22   activity is considered illegal itself.  It could

23   lead to blockage of our IP address by server

24   providers, which will reduce our ability to deliver

25   the service our customers need and expect and your

1    account will be suspended permanently."

2            Do you see that?

3        A.  Yeah.

4        Q.  All right.  Now, when Giovanni at Hide My

5    Ass! Support --

6        A.  Uh-huh.

7        Q.  -- said we don't want you to use our VPN

8    for scraping because it's illegal, did you do

9    anything to investigate that?

10           MR. WIT:  Objection to form.  Vague.

11           THE WITNESS:   Investigate what?

12   BY MS. HURST:

13       Q.  Whether scraping was illegal.

14           MR. WIT:  Objection to form.  Vague.  Calls

15   for a legal conclusion.

16           THE WITNESS:  Did I start an

17   investigation -- finding -- a legal investigation

18   of -- I was an engineer.

19   BY MS. HURST:

20       Q.  Well, did you go to anybody and say, jeez,

21   this guy who I was investigating for a VPN called

22   Hide My Ass! says what we're doing is illegal.

23   Should I be concerned about this?

24       A.  No.

25           MR. WIT:  Objection to form.

1       A.   Yeah.   That's what we're both reading.

2       **Q.   Did you ever have any follow-up**

3  **communications with anyone at LinkedIn about API**

4  **access?**

5            MR. WIT:   Objection to form.

6            THE WITNESS:   Not that I remember.

7  BY MS. HURST:

8       **Q.   Did you ever form any understanding as to**

9  **why this use case was problematic?**

10      A.   No.

11      **Q.   Did Mr. Weidick ask you to investigate the**

12 **API?**

13           MR. WIT:   Objection to form.

14           THE WITNESS:   I think it was my idea.   I

15 think it was my idea.   I think it was my idea.   It

16 was a long time ago.   I think I said that a couple

17 answers ago.

18           MS. HURST:   Exhibit 232 is hiQ_00439693 and

19 694.

20           (Whereupon, Exhibit 232 was marked for

21           identification.)

22 BY MS. HURST:

23      **Q.   And this is a Slack transcript from March**

24 **29, 2017.   And Mr. Dev, you wrote, "Is there a way**

25 **for you to see if LinkedIn profiles have changed" --**

```
 1    I think that's supposed to be "schema," right?
 2         A.   Yes.
 3         Q.   And you wrote, "I keep getting banned."
 4              Right?
 5         A.   I'm following you.
 6         Q.   Okay.   And then Mr. Cole wrote, "We are all
 7    banned."
 8              Right?
 9         A.   I'm following what you're reading right
10    here.
11         Q.   Okay.   So midway down you wrote, "It's
12    funny because we have a new IP address in new
13    office."
14              Right?
15         A.   Yeah.   I'm reading what you're reading
16    right here.
17         Q.   So you had a new IP address for the office
18    and that IP address, was that being banned?
19              MR. WIT:   Objection to form.   Foundation.
20              THE WITNESS:   This new IP address in new
21    office is not to be confused with the LinkedIn new
22    IP address.   It's like we're at -- we have a new
23    office with a new router.
24    BY MS. HURST:
25         Q.   And that's not the IP address that you were
```

1   caused you to lose your temper?

2           MR. WIT:  Objection to form.  Misstates

3   testimony.  Assumes facts.

4           THE WITNESS:  Really nice guy.  Sweet guy.

5   Nothing bad about him.  Maybe it was immaturity.

6   Maybe it was -- yeah.

7   BY MS. HURST:

8       Q.  Did you reach out to Mr. Kim after this

9   episode and ask him for advice on how you should

10  patch things up with people?

11          MR. WIT:  Objection to form.

12          THE WITNESS:  No.  I don't remember.

13  BY MS. HURST:

14      Q.  Did you have a good relationship with

15  Mr. Kim?

16          MR. WIT:  Objection to form.  Vague and

17  ambiguous.

18          THE WITNESS:  Andrew and I had a good

19  relationship.

20          MS. HURST:  Exhibit 234 is hiQ_00450799 and

21  800.

22          (Whereupon, Exhibit 234 was marked for

23          identification.)

24  BY MS. HURST:

25      Q.  Okay.  We're looking at an April 10, 2017

1    Slack chat transcript.  You, Conner, Cameron Cole

2    focus in on the third line here.  "*Scraper Update*

3    *Current State*."

4              You see that?

5         A.  "*Scraper Update* *Current State*."



1              I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2    CCRR, certify: that the foregoing proceedings were taken

3    before me at the time and place herein set forth; at

4    which time the witness was duly sworn; and that the

5    transcript is a true record of the testimony given.

6

7              Witness review, correction and signature

8    was

9    ( ) by code.                    (X) requested.

10   ( ) waived.                     ( ) not requested.

11   ( ) not handled by the deposition officer due to

12   party stipulation.

13

14        The dismantling or unbinding of the original

15   transcript will render the reporter's certificate null

16   and void.

17        I further certify that I am not financially

18   interested in the action, and I am not a relative or

19   employee of any attorney of the parties, nor of any of

20   the parties.

21        Dated this 6th day of May, 2022.

22

23   _____

                                GINA V. CARBONE
24                              CSR #8249, STATE OF CALIFORNIA

25

Deposition Exhibit 225

(Filed Under Seal)

Deposition Exhibit 232

(Filed Under Seal)

Deposition Exhibit 234

(Filed Under Seal)

# EXHIBIT 3

# (EXHIBIT FILED UNDER SEAL)

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4
   hiQ Labs, Inc.,
5
                Plaintiff,
6                                    Case No.:
                vs.                  17-cv-03301-EMC
7
   LinkedIn Corporation,
8
                Defendant.
9  _____

10 LinkedIn Corporation,

11              Counterclaimant,

12              vs.

13 hiQ Labs, Inc.,

14              Counter-defendant.
   _____
15

16            VIDEO-RECORDED DEPOSITION

17      REMOTELY TAKEN VIA ZOOM CONFERENCE OF

18               GENEVIEVE GRAVES

19           Individually and as 30(b)(6)

20             WEDNESDAY, MAY 25, 2022

21

22

23 Stenographically Reported by:
   Linda E. Marquette
24 RPR, CLR, CSR No. 11874

25 Job No. 10101217

1    trajectory of companies, their perception as a workplace

2    and their sort of location.  And we were also using job

3    market data about what kinds of jobs were highly in

4    demand in which sorts of locations.

5         Q.    Okay.  And when you joined hiQ, what was your

6    position?

7         A.    I think I joined as chief science officer or

8    chief data scientist.

9         Q.    Who else worked at hiQ when you joined?

10        A.    I was the first employee so the only -- the

11   person who was at hiQ was Darren Kaplan, who was the

12   founder of hiQ.  There were a -- a number of advisers in

13   different topics and across different functionality.

14   But I was the first employee and then we, within a

15   matter of weeks or months, hired several more people.

16        Q.    Okay.  So -- so employee No. 1, would you say

17   that?

18        A.    Employee No. 1.

19        Q.    Okay.  And you said Mr. Kaplan was involved?

20        A.    That's correct.  Darren Kaplan was the founder

21   of hiQ and he is the person who hired me.

22        Q.    And --

23              MR. WORCESTER:  Genevieve, can I -- can I

24   interrupt for a second.  I think you've got someone in

25   your house who -- how do I say this delicately -- may

1              MR. SHAFFER:  Okay.  Let's look at 36.  We can
2  mark that as 509.
3              (Exhibit 509 marked for
4              identification by the Certified
5              Shorthand Reporter.)
6  BY MR. SHAFFER:
7     Q.    Let me know when you have it open.
8     A.    Mm-hmm.
9     Q.    Okay.  So we've got Chris LeBailly, yourself
10  and a couple other people on this thread, right?
11     A.    Uh-huh.
12     Q.    And this is around the same time as the one we
13  just saw from Anthony Kosinski.  It's about a week
14  earlier?
15     A.    Yeah.
16     Q.    And Chris LeBailly's July 6, 2015, e-mail at
17  2:53 p.m., do you see that e-mail?
18     A.    Yes, I do.
19     Q.    And he's saying there:
20              "I did make a fake account using
21              my hiQ e-mail address just so people
22              didn't see me browsing them with my
23              real profile" --
24     A.    Mm-hmm.
25     Q.       -- "but that's all."

1          Was it common practice for people that were
2   turking on behalf of hiQ to create fake profiles?
3      A.    I think that probably was.  I don't know
4   exactly who did what with turking because that typically
5   happened out of the office.  We -- I mean, at this phase
6   I don't think we were giving super explicit instructions
7   on how to do turking.  But that's -- it sounds like
8   that's what Chris did here.
9      Q.    Okay.  And Chris was not an off-site person.
10  He was a -- he's an employee of hiQ, right?
11     A.    Correct, yes.
12     Q.    Okay.  So not a contractor?
13     A.    No, not a contractor.
14     Q.    And you see at the top level Chris says in the
15  first paragraph here in the whole string, it says:
16              "I think LinkedIn has gotten a
17              bit stricter on this."
18     A.    Uh-huh.
19     Q.    Do you see that?
20     A.    I see that.
21     Q.    What did you do to -- to look into LinkedIn's
22  policy on -- on turking at this point?
23     A.    We didn't look into the policy specifically.
24  So LinkedIn, over the course of the time that I was at
25  hiQ, had a constantly moving set of sort of

```
 1              [As read.]
 2                 "I recognize this will impair the
 3              ability to find people, but it will
 4              not completely destroy it."
 5              Do you see that?
 6      A.      Mm-hmm.
 7      Q.      So was your plan at this point to just -- to
 8  continue turking but from logged-out access?
 9      A.      That's what it looks like in this e-mail.
10  I -- I don't remember, you know, 2015.  So this is seven
11  years ago.  I don't remember what I was thinking seven
12  years ago.  But yes, this e-mail looks like it was now
13  sort of moving forward into a new process that involved
14  not logging in for the turking.
15              MR. SHAFFER:  Okay.  Let's mark 38 as
16  Exhibit 511.
17              (Exhibit 511 marked for
18              identification by the Certified
19              Shorthand Reporter.)
20  BY MR. SHAFFER:
21      Q.      So I apologize about the quality of this one.
22  This is -- I think because there's images in it, this is
23  how it was produced to us.  Let me know when you have it
24  open and you've had a chance to look at it.
25      A.      This is July of 2015.
```

1      Q.     Right.  So, yeah, the -- the last two we

2  looked at were July 14th of 2015 and July 6th of 2015.

3  Another one before that, July 14th of 2015, so all

4  within either the same day or the week period.

5      A.     Yeah.  Yeah.  Looks like it was the 6th and

6  the 14th and now this is the 13th.  Yeah.  Fourteenth.

7  Okay.

8      Q.     All right.  And do you know who Shayla Cherry

9  was?

10     A.     She was one of the turkers.

11     Q.     Okay.  And she's e-mailing you.  She doesn't

12  actually saying anything.  She's e-mailing you a -- a

13  interaction she had with LinkedIn via their help center;

14  is that right?

15     A.     That is what it looks like, yes.

16     Q.     Okay.  And then it looks like you forwarded

17  this on to Ariel Klevecz; is that right?

18     A.     Yes.

19     Q.     Is that how you pronounce his name?

20     A.     I think so.

21     Q.     Okay.  And he was a -- he was a data scientist

22  on your team; is that right?

23     A.     That's correct.

24     Q.     Okay.  And then you say:

25             "Ari, can you follow up with

1                     Shayla this afternoon?  We need to

2                     resolve this without getting

3                     LinkedIn involved."

4                     Do you see that?

5          A.    Mm-hmm.

6          Q.    Why didn't you want to get LinkedIn involved?

7          A.    So we knew that we were doing things that were

8    kind of a cat and mouse game, right.  We had things that

9    we wanted to do using public LinkedIn data and there was

10   a little bit of this, you know, what -- what is -- like

11   what is actually possible and what is not going to be

12   possible.  So I -- you know, I -- I think that it was

13   clear that we wanted to figure out what was going to be

14   technically doable without having direct conversations

15   with LinkedIn.

16        Q.    So you didn't want LinkedIn to know what you

17   were doing on the site, right?

18        A.    Correct.

19        Q.    And I -- I just want to be clear about

20   something.  You said that you wanted to do things using

21   public LinkedIn data, right?

22        A.    Uh-huh.

23        Q.    But earlier in your testimony you made a

24   pretty clear distinction between public LinkedIn data

25   and private LinkedIn data and you said the private data

1    is what's available when you log in; is that right?

2        A.    That's correct.

3        Q.    And turkers were logging in, correct?

4        A.    That's correct.

5        Q.    All right.  So that implicated the private

6    portions of LinkedIn's website behind the password wall,

7    correct?

8        A.    That's correct.

9        Q.    Okay.  And they were turkers as we saw in

10   earlier exhibits.  They were logging into LinkedIn's

11   website and they were recording URLs from -- from the

12   website that they obtained while logged in; is that

13   right?

14       A.    They were logging in and they were recording,

15   yes or no, is this the person that we thought we were

16   looking for.

1    Q.   Got it.  And that's from a logged in --

2  logged-in access?

3    A.   That is correct.

4    Q.   Okay.  So then you've got this e-mail here,

5  July 20 -- July 14th, 2015.  You tell Ari to try to

6  resolve it without getting LinkedIn involved?

7    A.   Mm-hmm.

8    Q.   Did hiQ continue to turk after July 14th,

9  2015?

10   A.   Yes, we did.

11   Q.   Okay.  Who is Cameron Cole?  We talked about

12  him earlier.  Can you remind me what role he played?

13   A.   Cameron Cole joined the company as an intern

14  and then was in a -- I think his title was data

15  engineer.  But he was in a sort of -- he did some data

16  science and some engineering work.  And he's the person

17  who took over management of the turking process at some

18  point.

19      MR. SHAFFER:  Okay.  And let's mark tab 39.

20  So this is a document with a number of exhibits.  Can

21  you -- is it possible to mark them with sub numbers,

22  like the main e-mail will be Exhibit 512 and then the

23  attachments will be 512.1 and so on?

24      MR. WORCESTER:  That's fine by me.

25  ///

1    State of California       )
                               )SS:
2    County of San Diego       )

3         I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby certify:

5         That the foregoing proceedings were taken

6    ( X ) remotely (  ) live before me at the time and place

7    herein set forth; that any witnesses in the foregoing

8    proceedings, prior to testifying, were placed under

9    oath; that a verbatim record of the proceedings was made

10   by me using machine shorthand which was thereafter

11   transcribed under my direction; further, that the

12   foregoing is an accurate transcription thereof.

13        Further, that if the case is pending in the

14   Federal Court, before the proceedings were transcribed

15   by me, review [  ] was [ X ] was not requested.

16        I further testify that I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney of any of the parties.

19        IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21   DATED  May 27, 2022.

22
                                    _Linda E. Marquette_

23                          _____

24                          LINDA E. MARQUETTE, CSR

25                          Certificate No. 11874

Deposition Exhibit 511

(Filed Under Seal)

# EXHIBIT 4

# (EXHIBIT FILED UNDER SEAL)

```
 1              UNITED  STATES  DISTRICT  COURT

 2            NORTHERN  DISTRICT  OF  CALIFORNIA
                 SAN  FRANCISCO  DIVISION
 3

 4  hiQ Labs, Inc.,              )
             Plaintiff,          )
 5                               )
             vs.                 )  Case No.
 6                               )  17-cv-03301-EMC
    LinkedIn Corporation,        )
 7           Defendant.          )
    _____ )
 8                               )
    LinkedIn Corporation,        )
 9           Counterclaimant,    )
                                 )
10           vs.                 )
                                 )
11  hiQ Labs, Inc.,              )
             Counter-defendant.  )
12                               )
    _____ )
13

14

15      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

16   REMOTE VIDEO-RECORDED DEPOSITION OF DARIN MEDEIROS

17              Los Angeles, California

18                  May 20, 2022

19

20  REPORTED BY:

21  JOHNNA PIPER

22  CSR 11268

23  Job No. 10100978

24

25  Pages 1 through 209
```

1        Q.  You say, "Ugh."

2        A.  Yes.

3        Q.  And he says, "Yeah, I have an idea to save

4   it but we're totally not ready for it science wise,"

5   and you say, "Buy LinkedIn," and he says, "That's

6   the second option."  And he says, "Diversify our

7   data sources is the first one," and you say, "At

8   least we always have that in our back pocket."  Do

9   you see that?

10       A.  Yes.

11       Q.  And he says, "But nobody has been preparing

12  for D-Day so of course we got caught with our pants

13  down."  Do you see that?

14       A.  Yes.

15           MR. COHEN:  Let's go to Tab 45.

16       (Exhibit 462 was marked for identification.)

17  BY MR. COHEN:

18       Q.  Mr. -- Mr. Medeiros, Exhibit 462 has been

19  dropped into the chat.  It's an email from

20  Mr. Weidick to you and others from April 11th, 2017.

21  Do you see that?

22       A.  Yes.

23       Q.  And Mr. Weidick writes to you and to

24  others, "I thought it may be useful to read some of

25  the summary I provided to the board last week, in

1    particularly" -- "in particular, the commentary on

2    our data scraping situation, which is clearly an

3    area of intense focus and concern in the company."

4    Do you see that?

5         A.  Yes.

6         Q.  And if you look under the heading that says

7    "Data collection," the first bullet says,

8    "100 percent dependent on LI for our data."  Do you

9    see that?

10        A.  Yes.

11        Q.  And you understand LI referring to LinkedIn

12   there?

13        A.  Yeah.

14             MR. COHEN:  If we could go to Tab 53.

15        (Exhibit 463 was marked for identification.)

16   BY MR. COHEN:

17        Q.  Exhibit 463 is a Slack chat transcript

18   between you and Mr. Kim, who we talked about

19   earlier.  Do you see that?

20        A.  Yes.

21        Q.  And the date is May 26, 2017.  Do you see

22   that?

23        A.  Yes.

24        Q.  And is it your understanding, Mr. Medeiros,

25   that this is a few days after hiQ had received the

```
 1   suing LinkedIn to sell a product that nobody is
 2   buying."  Do you see that?
 3        A.  Yes.
 4           MR. COHEN:  And if we go to Tab 64, that's
 5   the next exhibit.
 6       (Exhibit 466 was marked for identification.)
 7   BY MR. COHEN:
 8        Q.  This is Exhibit 466, which has just been
 9   put in front of you, Mr. Medeiros, and this is a
10   chat transcript between you and Mr. Weidick.  Do you
11   see that?
12        A.  Yes.
13        Q.  And if you go to page 2 of the PDF of
14   Exhibit 466, you see in the second to bottom box you
15   say, "I am going to stab Kaplan dead."  See that?
16        A.  Yes.
17           MR. COHEN:  Let's go to Tab 66.
18       (Exhibit 467 was marked for identification.)
19   BY MR. COHEN:
20        Q.  You've just been given Exhibit 467, which
21   is a chat -- Slack chat transcript between you and
22   Andrew Kim and Mr. Weidick from July 25th, 2017.  Do
23   you see that?
24        A.  Yes.
25        Q.  And if you go to page 3 of the PDF of
```

1    Exhibit 467, see the bottom box on the page?  You

2    have that in front of you?

3         A.  Yes.

4         Q.  It says, "You want to know why the sales

5    team feel like the product team F'ed them?  Because

6    they have lied from the beginning," and if you turn

7    over to the next page, it says, "This was the deck

8    we were delivered."  Do you see that?

9         A.  Yes.

10        Q.  And if we go to the top of page 5 of the

11   PDF, you say, "You have been building product for

12   two years and no idea how the sales team has sold

13   it.  Not my fault.  I would not do that again.  And

14   the dev team told the sales team lies.  That's bad

15   too."  Do you see that?

16        A.  Yes.

17        Q.  Do you have an understanding of why

18   Mr. Kaplan was replaced as the CEO?

19        MS. SHARMA:  Objection.

20        THE WITNESS:  I -- my -- me sense is he

21   grew out his -- he grew out of his capability.

22   BY MR. COHEN:

23        Q.  You understand that at some point in time

24   Genevieve Graves sent a letter to the board

25   demanding that he be replaced?

1      Q.  And you say to her, "Why?  You have a great

2  story.  You crushed it at a shitty company.  Can you

3  imagine if there were product market fix," and then

4  scrolling to the next page, you say, "Fit, not fix."

5  Do you see that?

6      A.  Yes.

7          MR. COHEN:  Let's go to Tab 84, please.

8      (Exhibit 470 was marked for identification.)

9  BY MR. COHEN:

10      Q.  Mr. Medeiros, you are being shown

11  Exhibit 470.  Do you have that in front of you?

12      A.  Yes.

13      Q.  And this is an email from you to

14  Mr. Weidick and somebody named Sotha Saing from

15  November 2nd, 2017; is that right?

16      A.  Yes.

17      Q.  And the subject is "Exit interview,"

18  correct?

19      A.  Yes.

20      Q.  And attached to the cover -- strike that.

21          Ms. Saing had sent you earlier that day an

22  exit interview asking you to fill it out and email

23  it back to her ASAP.  Do you see that?

24      A.  Yes.

25      Q.  And you respond in your email from

1   1:49 p.m., "Here you go.  Enjoy.  Thanks for your

2   help.  Darin."  Do you see that?

3        A.  Yes.

4        Q.  And if we turn to the second page of the

5   PDF from Exhibit 470, we see, "Exit interview"; is

6   that right?

7        A.  Yes.

8        Q.  This is the exit interview that you

9   completed when you completed your employment at hiQ,

10  correct?

11       A.  Yes.

12       Q.  And you filled this form out yourself?

13       A.  Yes.

14       Q.  And if we look at the first question, it

15  asks, "Were promises made to you when you were hired

16  that did not materialize?"  Do you see that?

17       A.  Yes.

18       Q.  And you responded, "All of them.  They lied

19  about how the product works, funding, how large the

20  customers were, how interested their prospect base

21  is.  They lied about their ability to build product.

22  They lied about how happy their customer base is."

23  Did I read that correctly?

24       A.  Yes.

25       Q.  If we look at Question 9 on the next page,

```
 1              CERTIFICATE OF REPORTER
 2         I, JOHNNA PIPER, a Certified Shorthand
 3    Reporter, hereby certify that the witness in the
 4    foregoing deposition was by me duly sworn to tell
 5    the truth, the whole truth, and nothing but the
 6    truth in the within-entitled cause;
 7         That said deposition was taken in shorthand
 8    by me, a disinterested person, at the time and place
 9    therein stated, and that the testimony of the said
10    witness was thereafter reduced to typewriting, by
11    computer, under my direction and supervision;
12         That before completion of the deposition,
13    review of the transcript [ X ] was [  ] was not
14    requested.  If requested, any changes made by the
15    deponent (and provided to the reporter) during the
16    period allowed are appended hereto.
17         I further certify that I am not of counsel
18    or attorney for either or any of the parties to the
19    said deposition, nor in any way interested in the
20    event of this cause, and that I am not related to
21    any of the parties thereto.
22    DATED: 05/24/2022.
23
24
25              JOHNNA PIPER, CSR NO. 11268
```

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**                                                        **hiQ Labs, Inc. vs.**
                                                                          **LinkedIn Corp.**

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2    Case Name: hiQ Labs, Inc. vs. LinkedIn Corp.

 3    Date of Deposition: 05/20/2022

 4    Job No.: 10100978

 5

 6              I, DARIN MEDEIROS, hereby certify

 7    under penalty of perjury under the laws of the State of

 8    California_____ that the foregoing is true and correct.

 9              Executed this 22nd____ day of

10    June_____, 2022, at 4:35 PM_____.

11

12

13    _____

14              DARIN MEDEIROS

15

16    NOTARIZATION (If Required)

17    State of _____

18    County of _____

19    Subscribed and sworn to (or affirmed) before me on

20    this _____ day of _____, 20__,

21    by_____,    proved to me on the

22    basis of satisfactory evidence to be the person

23    who appeared before me.

24    Signature: _____ (Seal)

25
```

                                                                          **Page 207**

Deposition Exhibit 462

(Filed Under Seal)

Deposition Exhibit 467

(Filed Under Seal)

Deposition Exhibit 470

(Filed Under Seal)

# EXHIBIT 5

# (EXHIBIT FILED UNDER SEAL)

```
 1              UNITED STATES DISTRICT's COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4   hiQ Labs, Inc.,

 5           Plaintiff,

 6       vs.                        No. 17-cv-03301-EMC

 7   LinkedIn Corporation,

 8           Defendant.
     _____/

 9

10   LinkedIn Corporation,

11           Counterclaimant,

12       vs.

13   hiQ Labs, Inc.,

14           Counterdefendants.
     _____/

15

16               CONFIDENTIAL

17           VIDEOTAPED DEPOSITION OF

18               DANIEL MILLER

19             Friday, May 13, 2022

20

21

22   Stenographically Reported by:

23   GINA V. CARBONE, CSR, RPR, RMR, CRR, CCRR

24   California State Lic. No. 8249

25   Job No. 10100706
```

```
 1              THE WITNESS:  Yep.
 2              MS. HURST:  All right.  I'd like to mark as
 3    Exhibit 300, Onaje, this will be Tab 55
 4    hiQ_00143755.
 5              (Whereupon, Exhibit 300 was marked for
 6              identification.)
 7    BY MS. HURST:
 8         Q.  Mr. Miller, please go ahead and pull that
 9    up and read it.  Let me know when you've finished.
10         A.  It's in the chat?
11         Q.  Yes.
12         A.  Got it.
13              Right.  Okay.
14         Q.  All right.  Do you recognize Exhibit 300 as
15    an email that Ms. Graves sent to you and Elizabeth
16    Brokken on or about July 16, 2014, Subject:
17    thoughts on scraping/banning?
18         A.  Yep.  Yes.
19         Q.  All right.  And what were the circumstances
20    at the time when Ms. Graves sent the email in
21    Exhibit 300?
22         A.  I'm not sure what you're asking.  What do
23    you mean "circumstances"?
24         Q.  What, if anything, do you understand
25    prompted her to send you this email?
```

1      Q.  Yeah.  The same email, yep, from Ms. Graves

2  to you.

3      A.  Right.



```
 1              MS. HURST:  All right.  That's fine.  Go
 2     ahead.
 3              (Brief pause in the proceedings.)
 4              THE WITNESS:  Okay.  We should be good now.
 5              MS. HURST:  Okay.  Are you plugged in now?
 6              THE WITNESS:  Yep.
 7              MS. HURST:  Great.
 8              All right.  Exhibit 306 is Tab 24,
 9     hiQ_00079582.
10              (Whereupon, Exhibit 306 was marked for
11              identification.)
12     BY MS. HURST:
13         Q.  Let me know when you have Exhibit 306 in
14     front of you, Mr. Miller.
15         A.  Subject:  LinkedIn changing website format.
16     Yeah.
17         Q.  Great.  Go ahead and read that and let me
18     know when you are finished.
19         A.  Okay.  There's no thread, it's just one.
20         Q.  I believe that's correct.
21         A.  Okay.  I've read it.
22         Q.  All right.  In Exhibit 306 you were
23     expressing that a problem had arisen with the data
24     from LinkedIn profiles as a result of changes to the
25     format of profile pages, correct?
```

1          A.  Right.

2          Q.  And is it true that this was not the only

3     time that hiQ Labs experienced a problem with

4     collecting data from LinkedIn as a result of

5     formatting changes?

6          A.  That's correct.  It happened more than

7     once.

8          Q.  And each time there was a formatting change

9     at LinkedIn, you had to make changes to your code in

10    order to account for that, correct?

11         A.  Yes.

12         Q.  And were there times when you suspected

13    that LinkedIn was changing the contents of the HTML

14    and profile pages as one means of trying to defeat

15    scraping?

16         A.  My recollection is it didn't appear to be

17    for that reason.  It wasn't obvious that that was

18    what they were doing.  Well, let me amend that.

19    There were a couple times that they did remove some

20    things from the main profile page, but that's

21    distinct from basically redesigning the

22    page graphically, which is what I think is being

23    discussed in this email.

24         Q.  Apart from the email in Exhibit 306, do you

25    recall concluding, at any other time, that changes

```
 1    think at that point, if you want to collect more
 2    data you need more IP addresses. Just each IP
 3    address gets a certain throttled number of requests.
 4            MS. HURST:  Exhibit 310 is Tab 116,
 5    hiQ_00304786.
 6            (Whereupon, Exhibit 310 was marked for
 7            identification.)
 8    BY MS. HURST:
 9        Q.  Do you have Exhibit 310, Mr. Miller?
10        A.  It should be coming up in a sec.
11        Q.  I believe it's there in the chat now.
12        A.  I see it now.  Okay.  The one that begins
13    "Beautiful."
14        Q.  Yes.  As you'll see, there's an email
15    exchange here where you wrote, on Wednesday, January
16    28th, 2015 --
17        A.  Uh-huh.
18        Q.  -- to, it appears, Mr. Oltmann, Ms. Graves,
19    Mr. Kaplan, Andrew Kim, Chris LeBailly, Liz Brokken,
20    Silas Barta, Loren Howard, subject matter, "Scraping
21    the bottom of the Universe."
22            Do you see that?
23        A.  Yep.
24        Q.  Is that an email you sent to those folks on
25    or about that date, January 28th, 2015?
```

1       A.  Wait.  The -- it says from Xander; is there

2   a thread down below?

3       Q.  Yeah.

4       A.  He's forwarding my thread.

5           Yeah.  I mean, it sounds like me.

6       Q.  All right.  You're reporting, "I'm happy to

7   report that we have a shiny new batch of scraping

8   code up and running."

9           Do you see that?

10      A.  Yep.

11      Q.  "With a new set of proxies (from a

12  different provider), we are averaging 750 scrapes

13  per hour, which if sustainable gives us a bit over

14  half a million scrapes per month, or 250,000 URLs

15  scraped twice monthly.  Total cost for these proxies

16  is 110 a month down from over $150 with previous

17  setup."

18      A.  Right.

19      Q.  So I think in Exhibit 309 you mentioned

20  that you thought that it was Scrapus2 that was now

21  up and running, and is this your announcement that

22  Scrapus2 was up and running?

23      A.  I believe so.  Yes.  Because Scrapus was

24  the one that the consultant, Jake, had written, and

25  Scrapus2, as I recall, was my first draft of the one

```
1        A.   He --

2        Q.   Hold on.  Let me finish my question --

3        A.   Sorry.

4        Q.   -- sir, please.

5        A.   Excuse me.  Go ahead.
```

1    user-agents.  The lowest ban rate of 55% is

2    associated, I believe, to when 100% of the scrapers

3    were using random user agents.  I implemented this

4    using a small pool of ten user agents.

5            "In order to lower the ban rate, I propose

6    two features:  To use a larger pool of random user

7    agents.  To use cookie sessions.

8            "I would need to devote 3 days to implement

9    these new features."

10           Do you see that?

11       A.  Uh-huh.

12       Q.  And then you forwarded the email from

13   Mr. Dev to Ms. Graves and wrote, "Given that the

14   first indication is Mark wants to double down on

15   scraping, I think it's becoming mission-critical to

16   get Boris to spend more time on scraping."

17           Do you see that?

18       A.  I do.

19       Q.  So did you do that as an endorsement of

20   Mr. Dev's suggestion that he should work on these

21   features?

22       A.  That's what it looks like.  Yes.

23       Q.  All right.  And how would cookie sessions

24   help with the LinkedIn ban rate?

25       A.  You know, it's another element of HTTP and

1   the basic HTML echo system.  Browsers use cookies to

2   save information from session to session, so that

3   you're logged in, what your preferences are, that

4   sort of thing is how they do personalization.

5            So what we're seeing here is apparently --

6   and to my recollection, we did not do much with

7   cookies early on in our adventure.  But the

8   suggestion here is that that may be -- LinkedIn,

9   again, is getting more sophisticated and doing some

10  sort of analysis of cookies to decide who to allow

11  to collect data.  And we needed to do a little more

12  on that score.

13       Q.  And the goal here was to implement cookie

14  sessions so that, again, you could -- your scraping

15  collection code would appear to be a human being

16  using a browser with cookies in it, correct?

17            MS. MILLER:  Objection.  Form.

18            THE WITNESS:  I'll agree with that

19  assessment.  That's about right.

20  BY MS. HURST:

21       Q.  All right.  And do you -- can you say

22  whether these two items were ever implemented in

23  hiQ's code, a larger pool of random user agents, and

24  cookie sessions?

25            MS. MILLER:  Objection.  Vague.

1          I, GINA V. CARBONE, CSR No. 8249, RPR, RMR, CRR,

2     CCRR, certify: that the foregoing proceedings were taken

3     before me at the time and place herein set forth; at

4     which time the witness was duly sworn; and that the

5     transcript is a true record of the testimony given to

6     the best of my ability via remote teleconferencing.

7

8          Witness review, correction and signature

9     was

10    (   ) by code.                    (   ) requested.

11    (   ) waived.                    ( X ) not requested.

12    (   ) not handled by the deposition officer due to

13    party stipulation.

14

15         The dismantling or unbinding of the original

16    transcript will render the reporter's certificate null

17    and void.

18         I further certify that I am not financially

19    interested in the action, and I am not a relative or

20    employee of any attorney of the parties, nor of any of

21    the parties.

22         Dated this 17th day of May, 2022.

23

24    _____

      GINA V. CARBONE

25    CSR #8249, STATE OF CALIFORNIA

Deposition Exhibit 300

(Filed Under Seal)

Deposition Exhibit 306

(Filed Under Seal)

Deposition Exhibit 310

(Filed Under Seal)

EXHIBIT 6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4

5   hiQ LABS, INC.,                    )
                                       )
6          Plaintiff,                  )
                                       )
7      vs.                             )Case No.
                                       )17-CV-03301-EMC
8   LINKEDIN CORPORATION,              )
                                       )
9          Defendant.                  )
                                       )

10

11

12

13

14

15    *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***

16

17

18              REMOTE VIDEO DEPOSITION OF

19                    ROBERT ROSIN

20

21

22

23   DATE TAKEN:  May 23, 2022

24

25   REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1     APPEARING VIRTUALLY FROM SAN FRANCISCO, CALIFORNIA;

2            MONDAY, MAY 23, 2022, 9:00 A.M.

3

4                      ROBERT ROSIN,

5     called as a witness and having been first duly

6     sworn by the Certified Shorthand Reporter, was

7     examined and testified as follows:

8

9                      EXAMINATION

10

11    BY MS. SKIBITSKY

12         Q.   Good morning, Mr. Rosin.

13         A.   Good morning.

14         Q.   My name is Hope Skibitsky.  I represent

15    hiQ in this case.

16              Are you hearing me okay?  There's a bit

17    of a lag on my end.

18         A.   I can hear you just fine.

19         Q.   Okay.  Mr. Rosin, can you please state

20    your full name for the record.

21         A.   Yes.  It's Robert Bradley Rosin.

22              And there is a bit of a lag on your -- on

23    you, so -- I think -- it's acceptable now.  But

24    there's a bit of a lag.

25         Q.   Okay.  If it becomes an issue, please let

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 13

1          MS. SKIBITSKY:  Yes.

2          THE VIDEOGRAPHER:  This marks the end of

3      Media No. 1.  Going off the record at

4      9:08 a.m. Pacific.

5          (Pause in proceedings.)

6          THE VIDEOGRAPHER:  We are back on the

7      record at 9:12 a.m. Pacific, and this marks

8      the beginning of Media No. 2 in the

9      deposition of Robert Rosin.

10          Please proceed, Counsel.

11  BY MS. SKIBITSKY:

12      Q.  Mr. Rosin, before we went off the record,

13  I think you testified that you are currently

14  employed by Defy Partners; is that correct?

15      A.  Correct.  Yes.

16      Q.  And what is your position with Defy

17  Partners?

18      A.  Partner.

19      Q.  How long have you been a partner with

20  Defy Partners?

21      A.  Since September 1st of last year.  I'm

22  sorry, it's been a year -- almost two years.  So

23  that would be 2020.

24      Q.  And what business is Defy in?

25      A.  Venture capital.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 29

1    Q.   When did you become employed by LinkedIn?

2    A.   In 2013.

3    Q.   And what was your title with LinkedIn in

4  2013 when you became employed?

5    A.   Vice president of business development.

6    Q.   How long did you hold that role as vice

7  president of business development at LinkedIn?

8    A.   Until I left.

9    Q.   And when did you leave?

10    A.   I don't recall the exact date.

11    Q.   Do you recall the year --

12    A.   Roughly four and a half years later.

13  It's somewhere in my profile.

14    Q.   Do you recall the year that you left?

15    A.   No.  So it would have been roughly four

16  and a half years after my start date.

17         MS. SKIBITSKY:  Can we pull up Tab M,

18         please.

19         THE TECHNICIAN:  Stand by.

20         THE WITNESS:  Sorry, am I supposed to be

21         seeing something?

22         MR. COHEN:  I don't think it's up yet.

23         I'm not seeing anything there.  When it is

24         up, it should be in the Marked Exhibits

25         folder in the Exhibit Share.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 108

1    different teams that I mentioned.

2         Q.   Would you say that as of 2015 when you

3    came to oversee Scraper Council, you were

4    specifically responsible for LinkedIn's

5    anti-scraping enforcement?

6         A.   No, that's not the case.

7         Q.   Why is it not the case that as the

8    individual overseeing Scraper Council you were not

9    responsible for LinkedIn's anti-scraping

10   enforcement?

11        A.   The Scraper Council is a forum where

12   individuals who belong to different functional

13   areas in the company would get together to

14   coordinate and share information about their

15   activities.

16            So as an example, you know, legal would

17   go off and do -- in the office and send

18   cease-and-desist letter letters so it was

19   beneficial to let us know sometimes that that was

20   happening, right.  So Comms would be made aware,

21   for example, or BD would say, actually we know

22   someone there.

23            So each team would be responsible for

24   their own activities, and the Scraper Council is a

25   place we would get together to kind of share

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 109

1   information and coordinate.

2       Q.  So is it the case that collectively at

3   least as of 2015, the Scraper Council was

4   responsible for anti-scraping enforcement at

5   LinkedIn?

6           MR. COHEN:  Objection to form.

7           THE WITNESS:  Like I said, each of the

8       individuals who were attend were

9       representatives of different teams in the

10      country in different functional areas that

11      had different scopes and responsibilities.

12          Scraper Council is a place where we get

13      together to share what's happening.

14  BY MS. SKIBITSKY:

15      Q.  And were the representatives of the

16  different teams that were part of Scraper Council

17  responsible within their teams or divisions for

18  anti-scraping enforcement?

19      A.  I'm sorry, was -- I didn't catch the --

20  is your question, were the different people at the

21  Scraper Council responsible?  I didn't follow the

22  question exactly.

23      Q.  I'm having, it seems like, connection

24  issues.

25      A.  Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 114

1           Do you see that?

2       A.   Yes.

3       Q.   Okay.   And the earliest-in-time e-mail

4   starts at the bottom of page 1 of this

5   Exhibit 285, and it's from Robin Vasan to

6   yourself, Mr. Rosin on December 15th 2014.

7           Do you see that?

8       A.   Yes, Robin Vasan.

9       Q.   Vasan, okay.

10      A.   Vasan, yeah.

11      Q.   Who is Mr. Vasan?

12      A.   He was a managing director at Mayfield

13  Fund, venture capital.

14      Q.   And did you have a relationship with

15  Mr. Vasan as of December 2014?

16      A.   He's someone I knew.   I had met before.

17      Q.   How did you come to know Mr. Vasan?

18      A.   I don't recall the initial way that we

19  met each other.

20      Q.   And what is Mayfield Fund?

21      A.   It's a venture capital firm.

22      Q.   Did you have any personal relationship

23  with Mayfield Fund?

24      A.   No.

25      Q.   And did you have any business

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 115

1   relationship with Mayfield Fund?

2       A.   No.

3       Q.   Did you have a business relationship with

4   Mr. Vasan?

5       A.   No.

6       Q.   And Mr. Vasan writes in this e-mail with

7   the subject, "Happy Holidays.  I wanted to touch

8   base since we are either working on or looking at

9   companies that want to integrate more with

10  LinkedIn."

11          Do you see that?

12      A.   Yeah, if you can give me just a moment,

13  I'd like to read through the whole thread here.

14      Q.   Sure.

15      A.   Okay.  Thank you.  What was the question,

16  the first sentence?

17      Q.   Yeah, so the first sentence reads, "I

18  wanted to touch base since we are either working

19  on or looking at companies that wanted to

20  integrate more with LinkedIn."

21          Do you see that first sentence?

22      A.   Yes.

23      Q.   Had you prior to this December 15th, 2014

24  e-mail had discussions with Mr. Vasan about his

25  work looking at companies that want to integrate

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1    a company that is analyzing profiles combined with

2    various other data sources.  It would be great to

3    get a sense on how LinkedIn figures out which

4    partners to allow and work closely with or not."

5            Do you see that?

6        A.  Yes.

7        Q.  As of December 2014, you understood that

8    LinkedIn believed scraping to be an issue;

9    correct?

10           MR. COHEN:  Objection to form.

11           THE WITNESS:  I'm not exactly sure I

12       understand your question.  I was aware that

13       companies scraped LinkedIn, tried to.

14   BY MS. SKIBITSKY:

15       Q.  And you were aware in December of 2014

16   that LinkedIn at that time had an anti-scraping

17   initiative?

18           MR. COHEN:  Objection to form.

19           THE WITNESS:  Yeah, just to clarify, the

20       involvement I had in scraping, I believe, was

21       well after this point in time.  Because the

22       presentation, as you saw, the API program

23       changes was not until -- that wasn't even

24       presented until February of 2015.  And then

25       my involvement in scraping was significantly

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

1     after that point in time.

2          So I don't really know what I knew at

3     that point in time, at the time of this

4     e-mail.

5   BY MS. SKIBITSKY:

6     Q.  Your test -- your testimony earlier

7   today, I believe, was that at some point in 2014,

8   you as a LinkedIn employee understood or believed

9   that scraping of LinkedIn.com was problematic for

10  LinkedIn?

11    A.  No.  That was 2015, clearly.  I don't

12  know what I knew in 2014 exactly.

13    Q.  So you -- your testimony is that in

14  December of 2014, you didn't know whether you

15  understood that LinkedIn considered scraping of

16  LinkedIn.com to be potentially problematic?

17          MR. COHEN:  Objection to form.

18          THE WITNESS:  I don't know.  Years ago.

19  BY MS. SKIBITSKY:

20    Q.  Do you recall how long you were working

21  on developing that transition from the Open

22  Developer platform to the new API platform?

23    A.  I don't know how to answer that question.

24  So you saw Lee Womer who authored that deck.  He

25  had been working on it.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 127

1           exactly know in December of 2014 what my

2           understanding was of the issue.

3   BY MS. SKIBITSKY:

4       Q.  Do you know whether in December of 2014

5   you thought there was an issue with regard to

6   scraping of LinkedIn.com?

7           MR. COHEN:  Objection to form.

8           THE WITNESS:  Like I said, I don't -- I

9           just said I don't know.

10  BY MS. SKIBITSKY:

11      Q.  And in Mr. Vasan's e-mail, he writes to

12  you that, "Speaking of hiQ, we found it

13  interesting but weren't sure that LinkedIn would

14  look favorably at a company that is analyzing

15  profiles combined with various other data

16  sources."

17          Do you see that?

18      A.  Mm-hmm.  Yes.

19      Q.  And you never investigated what it was

20  that hiQ was doing when Mr. Vasan said that it was

21  "analyzing profiles"?

22      A.  No.  I forwarded it to Lee because he was

23  one who was responsible for this kind of stuff.

24  So you can see my note, asking Lee if he looked at

25  these.

Case 3:17-cv-03301-EMC   Document 358-3   Filed 08/31/22   Page 88 of 216

1    Q.   And when you say "he was the one
2    responsible for this kind of stuff," what kind of
3    stuff is it that Mr. Womer was responsible for?
4    A.   He was on the BD team.  He would know
5    about if we had partnerships with any of these
6    companies that were in the -- in these spaces
7    related to, you know, HR stuff, for example, his
8    area.
9    Q.   And Mr. -- and you write to Mr. Womer,
10   "Hi, Lee, please see the note below from a friend
11   at Mayfield.  Have you looked at either of these
12   companies?"
13        Do you see that?
14   A.   Yes.
15   Q.   Mr. Womer then responds.  And in the
16   second paragraph, he says, "I've not met hiQ but
17   look similar to some other companies that have
18   reached out.  Skeptical that it's a members' first
19   use case.  The others were decidedly not but I'd
20   be interested in meeting them.  Do you want to
21   intro me."
22        Do you see that?
23   A.   Mm-hmm.
24   Q.   Did you ever introduce Mr. Womer to hiQ?
25   A.   I don't know.  I don't recall.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 129

1          Q.  Did you ever introduce Mr. Womer to

2     Mr. Vasan?

3          A.  I don't recall.

4          Q.  And did you ever ask Mr. Vasan what he

5     meant when he said he "wasn't sure that LinkedIn

6     would look favorably at a company that was

7     analyzing profiles"?

8          A.  I don't know if I -- I doubt it.  We got

9     e-mails like this all the time.

10         Q.  You get e-mails like this all the time?

11         A.  We would know lots of people who would

12    ask us about companies, and then I would make sure

13    that I routed that to whoever the appropriate

14    person was to look at that area.

15              So to answer your question, no, I

16    don't -- I don't know if I got back to him or if I

17    asked him anything specific about hiQ.

18         Q.  Did you get e-mails all the time of

19    people saying, "I'm not sure whether LinkedIn

20    would look favorably at a company that is

21    analyzing profiles"?

22         A.  No, not that specifically.

23              Just regarding people who, maybe they are

24    an investor, they are looking at some companies;

25    they want to know if we want to partner with them,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 130

1    that company or not; what does LinkedIn think of

2    that company.  So those kind of e-mails would

3    happen all the time.

4         Q.  Did you have any understanding what

5    Mr. Vasan meant when he said he "wasn't sure that

6    LinkedIn would look favorably at a company that is

7    analyzing profiles"?

8         A.  I don't know what he was thinking.

9         Q.  And you did not ask him what he was

10   thinking?

11             MR. COHEN:  Objection to form.

12             THE WITNESS:  No, not that I recall.

13   BY MS. SKIBITSKY:

14        Q.  And you never investigated what hiQ was

15   doing with respect to LinkedIn profiles?

16             MR. COHEN:  Objection to form.

17             THE WITNESS:  I think you have this right

18        here.  I forwarded it to Lee.  I don't know

19        if the intro ever happened or not.

20   BY MS. SKIBITSKY:

21        Q.  So there's nothing off of this thread

22   that you did in order to investigate whether hiQ

23   was analyzing LinkedIn profiles?

24             MR. COHEN:  Objection to form.

25             THE WITNESS:  So I don't know if I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

1    first-in-time e-mail which starts on page 2 of the

2    PDF, this is an e-mail from Mr. Womer to yourself

3    and Mr. Roberts; is that right?

4         A.   Mm-hmm.

5         Q.   And Mr. Womer writes, "Bob/Scott,

6    following up on the action item from Friday's

7    meeting to send a summary of the scraping issue to

8    the executive team, I drafted a summary of where

9    things currently stand below that can be shared

10   with the exec team if you think appropriate."

11            Do you see that?

12        A.   Mm-hmm.

13        Q.   Okay.  And then he writes, "A combination

14   of recent observations and the proposed changes to

15   LinkedIn's Open Developer platform suggest that we

16   should reevaluate LinkedIn's efforts to stop third

17   parties from scraping our data."

18            Do you see that?

19        A.   Mm-hmm.

20        Q.   Prior to this January 19, 2015 e-mail,

21   what was the extent of LinkedIn's efforts to stop

22   third parties from scraping LinkedIn data?

23            MR. COHEN:  Objection to form.  Lacks

24        foundation.

25            THE WITNESS:  Can you repeat the -- what

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          you said.

2               MR. COHEN:  I objected to form.

3               THE WITNESS:  Okay.

4               MR. COHEN:  Lacks foundation.

5               THE WITNESS:  Lacks foundation, okay.

6               Yeah, I don't know exactly what prior to

7          this e-mail the state of anti-scraping

8          efforts were.  I wasn't involved with it at

9          that point in time.

10     BY MS. SKIBITSKY:

11          Q.  Mr. Womer writes, skipping down the page

12     that we are currently on, to the paragraph

13     starting, "While" -- "while it is difficult."

14          A.  Yes.

15          Q.  "While it is difficult to obtain specific

16     data about how much data is being scraped from

17     LinkedIn or the precise impact on our business,

18     the following recent observations suggest that

19     LinkedIn should revisit its scraping defenses and

20     increase the urgency around our efforts to stop

21     third-party scrapers."

22               Do you see that?

23          A.  Yes.

24          Q.  And he writes, "Lost business:

25     Historically we have not been able to directly

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 152

1    you're referring to, the one with the slide slip,

2    then I don't know what the date of that was.   I

3    thought that was April 2nd or April 1st.

4         Q.   Oh, I see.   I thought you were referring

5    to the presentation that we looked at a while ago.

6         A.   There's two different presentations that

7    I've seen today.   One was around changes to the

8    open API program.   The second one was around the

9    strategy review on anti-scraping.

10         Q.   I can represent to you that the one with

11    the slides flipped that was introduced but we

12    didn't actually look at as an exhibit is dated

13    April 2nd, 2015, which is the same date of this

14    e-mail that we're now looking at at Exhibit 1017.

15         A.   Right.

16         Q.   Okay.   So with this clarification, what

17    was your role with respect to anti-scraping at

18    LinkedIn as of April 2nd, 2015?

19         A.   So prior to the strategy review, I

20    believe my role was to talk with the team and try

21    to have the team put together a summary of the

22    situation, which usually would include

23    recommendations and then let's talk through it.

24              So that was my understanding of what was

25    likely my role at that point in time.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 212

1   2014 earlier in which you forwarded an e-mail on

2   from Mr. Vasan that referenced hiQ.

3        Do you recall that e-mail that we looked

4   at?

5        A.   Yes.

6        Q.   Okay.   So between the date of that e-mail

7   and December 2014 and May 23rd, 2017, when

8   LinkedIn sent hiQ a cease-and-desist letter, did

9   you have any conversations with any employees at

10  LinkedIn about hiQ?

11       A.   No.

12            MS. SKIBITSKY:   I don't have any more

13       questions.

14            MR. COHEN:   And I don't have any

15       questions.

16            THE WITNESS:   Thank you.

17            THE VIDEOGRAPHER:   Stand by, Mr. Rosin,

18       please.

19            Is there anything else that the court

20       reporter would like to put on the record or

21       anyone else, Counsels?   Okay.

22            This concludes today's deposition of

23       Robert Rosin.   Total number of media used is

24       15.   We are going off the record at 5:45 p.m.

25       Pacific Daylight Time.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 213

1    STATE OF CALIFORNIA          )

2                                 (     ss.

3    COUNTY OF LOS ANGELES        )

4

5         I, RENEE HARRIS, do hereby certify that I

6    am a licensed Certified Shorthand Reporter, duly

7    qualified and certified as such by the State of

8    California;

9        That prior to being examined, the witness named

10   in the foregoing deposition was by me duly sworn

11   to testify to tell the truth, the whole truth, and

12   nothing but the truth;

13       That the said deposition was by me recorded

14   stenographically;

15       And the foregoing pages constitute a full,

16   true, complete and correct record of the testimony

17   given by the said witness;

18         That I am a disinterested person, not

19   being in any way interested in the outcome of said

20   action, or connected with, nor related to any of

21   the parties in said action, or to their respective

22   counsel, in any manner whatsoever.

23   DATED: May 24, 2022

24

                       _____

25                       Renee Harris, CSR 14168, RPR

EXHIBIT 7

CONFIDENTIAL

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                      ---o0o---

4    hiQ LABS, INC.,                )

                                    )

5            Plaintiff,             )Case No.

                                    )17-CV-03301-EMC

6    vs.                            )

                                    )

7    LINKEDIN CORPORATION,          )

                                    )

8            Defendant.             )

     _____)

9

10                    CONFIDENTIAL

11                      ---o0o---

12            Videotaped Deposition of

13                   LEE WOMER

14             Wednesday, May 11, 2022

15                      ---o0o---

16

17

18

19

20

21

22

23   Katy E. Schmidt

24   RPR, RMR, CRR, CSR 13096

25   Veritext Job No.: 5226828

CONFIDENTIAL

Page 29

1    provide further updates to LinkedIn's executive team          10:11
2    about the scraping initiative at LinkedIn?                    10:11
3          A.   Yes.                                               10:11
4          Q.   In connection with those updates, did you          10:11
5    speak with anyone about any technical measures that           10:11
6    LinkedIn was taking in order to attempt to limit              10:11
7    scraping?                                                     10:12
8          A.   Yes.                                               10:12
9          Q.   And who did you speak with about any such          10:12
10   technical measures?                                           10:12
11         A.   Our security engineering team, trust and           10:12
12   safety, I believe legal, product management.  I think         10:12
13   those are the main groups.                                    10:12
14         Q.   How often were you providing updates to            10:12
15   LinkedIn's executive team after October 2012 as to the        10:12
16   state of scraping on LinkedIn?                                10:12
17         A.   I don't recall being involved in on an             10:12
18   update of the state of scraping for several years             10:12
19   after that, as in it was several years before I was           10:13
20   involved in another update to LinkedIn's executive            10:13
21   team that I can remember about the state of scraping.         10:13
22         Q.   Were you involved in any updates or                10:13
23   discussions with anyone else at LinkedIn about the            10:13
24   state of scraping after October of 2012?                      10:13
25              MR. COHEN:  Objection to form.                     10:13

CONFIDENTIAL

Page 30

| | | |
|---|---|---|
| 1 | THE WITNESS:  So I guess -- I think I | 10:13 |
| 2 | answered earlier.  After October 2012, yes, I was | 10:13 |
| 3 | involved in additional updates to LinkedIn's executive | 10:13 |
| 4 | team, but as it relates to the state of scraping, I | 10:13 |
| 5 | think it was several years. | 10:13 |
| 6 | I don't recall that I was involved in -- to | 10:13 |
| 7 | answer your last question, I don't recall that I was | 10:13 |
| 8 | involved in updates about the state of scraping to | 10:14 |
| 9 | other members of LinkedIn beyond the executive team. | 10:14 |
| 10 | BY MS. SKIBITSKY: | 10:14 |
| 11 | Q.   So if I'm understanding your testimony, is | 10:14 |
| 12 | it that in October 2012, you were involved in an | 10:14 |
| 13 | update to the executive team about the state of | 10:14 |
| 14 | scraping and then the next time you were involved in | 10:14 |
| 15 | any discussions with the executive team about the | 10:14 |
| 16 | state of scraping, it would have been several years | 10:14 |
| 17 | after October of 2012? | 10:14 |
| 18 | A.   Yes.  Me personally. | 10:14 |
| 19 | Q.   Do you recall what time frame that would | 10:14 |
| 20 | have been that you had subsequent discussions with the | 10:14 |
| 21 | executive team about the state of scraping after | 10:14 |
| 22 | October of 2012? | 10:14 |
| 23 | A.   So the next time that I recall personally | 10:15 |
| 24 | having engaged in a substantive discussion about the | 10:15 |
| 25 | state of scraping with LinkedIn's executive team was | 10:15 |

CONFIDENTIAL

Page 31

| | | |
|---|---|---|
| 1 | in basically the early part of 2015. | 10:15 |
| 2 | Q.   You said that "the next time that I recall | 10:15 |
| 3 | personally have engaged in a substantive discussion | 10:15 |
| 4 | about the state of scraping with LinkedIn's executive | 10:15 |
| 5 | team was in basically the early part of 2015." | 10:15 |
| 6 |         Do you recall your business development | 10:15 |
| 7 | group or team being involved in updates to LinkedIn's | 10:15 |
| 8 | executive team prior to the early part of 2015? | 10:16 |
| 9 | A.   I don't recall.  But just to clarify, I | 10:16 |
| 10 | moved into the business development team in October of | 10:16 |
| 11 | 2014. | 10:16 |
| 12 | Q.   Understood. | 10:16 |
| 13 |         So when you testified that you don't recall | 10:16 |
| 14 | personally having engaged in a substantive discussion | 10:16 |
| 15 | about the state of scraping with LinkedIn, do you -- | 10:16 |
| 16 | with the executive team prior to the early part of | 10:16 |
| 17 | 2015, do you recall assisting anyone with discussions | 10:16 |
| 18 | with LinkedIn's executive team on the state of | 10:16 |
| 19 | scraping prior to the early part of 2015, aside from | 10:16 |
| 20 | the October 2012 meeting we've discussed? | 10:17 |
| 21 | A.   I don't recall. | 10:17 |
| 22 | Q.   You mentioned that you spoke with the | 10:17 |
| 23 | security engineering team in connection with updating | 10:17 |
| 24 | LinkedIn's executive team on the state of scraping. | 10:17 |
| 25 |         Did I get that testimony correct? | 10:17 |

CONFIDENTIAL

Page 32

```
 1      A.   Yes.                                      10:17
 2      Q.   And were those discussions -- was the first   10:17
 3   time those discussions occurred after that       10:17
 4   October 2012 time period, in the early part of    10:17
 5   October -- of 2015?                               10:17
 6      A.   No.  I believe I said earlier that I engaged  10:17
 7   with LinkedIn's security engineering team in      10:17
 8   October 2012, in preparation for the executive team  10:17
 9   meeting in October 2012.  And I believe I described  10:17
10   earlier what we discussed, to the best of my      10:17
11   recollection.                                     10:18
12      Q.   After October of 2012, when was the next  10:18
13   time you spoke with the security engineering team  10:18
14   about scraping at LinkedIn?                       10:18
15      A.   I don't recall.                           10:18
16      Q.   After October 2012, do you recall discussing  10:18
17   scraping at LinkedIn with any engineering team or  10:18
18   engineering members at LinkedIn?                  10:18
19      A.   I believe I said earlier that in preparation  10:18
20   for some of the discussions in early 2015, I did have  10:18
21   discussions with LinkedIn's security engineering team,  10:18
22   as well as other teams, about measures that -- I mean,  10:18
23   about many topics, inclusive of measures that LinkedIn  10:18
24   had been taking to stop scraping.                 10:18
25           You know, before 2015 -- and just to      10:19
```

CONFIDENTIAL

Page 33

| | | |
|---|---|---|
| 1 | clarify, when I spoke to them in October of 2012, when | 10:19 |
| 2 | I spoke to the security engineering in October 2012, | 10:19 |
| 3 | part of that discussion was also about understanding | 10:19 |
| 4 | sort of what existing things the security engineering | 10:19 |
| 5 | team was doing to stop scraping at LinkedIn. | 10:19 |
| 6 | There was ongoing activity by that team -- | 10:19 |
| 7 | or my understanding is there was ongoing activity from | 10:19 |
| 8 | that team over the entire time period I've described, | 10:19 |
| 9 | including sort of predating when I got involved in the | 10:19 |
| 10 | initiative in October 2012. | 10:19 |
| 11 | That's sort of the best of my understanding. | 10:19 |
| 12 | Q.   So you understand -- your understanding was | 10:19 |
| 13 | that there was ongoing activity from that security | 10:19 |
| 14 | engineering team with respect to scraping.  You just | 10:19 |
| 15 | don't have a -- you don't have an understanding of | 10:19 |
| 16 | what that particular activity was. | 10:19 |
| 17 | Is that correct? | 10:19 |
| 18 | A.   My general -- yes.  My general recollection | 10:20 |
| 19 | is that that team was engaging in activity over that | 10:20 |
| 20 | entire period of time.  I do not recall exactly what | 10:20 |
| 21 | the specific actions and tactics were. | 10:20 |
| 22 | Q.   Do you recall who you spoke with in the | 10:20 |
| 23 | security engineering team on this topic? | 10:20 |
| 24 | A.   At what time period? | 10:20 |
| 25 | Q.   In October of 2012 time period. | 10:20 |

CONFIDENTIAL

Page 52

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Yes.  It's just if you | 11:04 |
| 2 | look down, just go ahead and look back up, and then | 11:04 |
| 3 | give your answer. | 11:04 |
| 4 | Thank you. | 11:04 |
| 5 | THE WITNESS:  I see.  Got it. | 11:05 |
| 6 | BY MS. SKIBITSKY: | 11:05 |
| 7 | Q.  Is it your understanding that if a company | 11:05 |
| 8 | is using public data, it's likely -- withdrawn. | 11:05 |
| 9 | Is it your understanding that if a company | 11:05 |
| 10 | is using LinkedIn public data and that company is -- | 11:05 |
| 11 | has an offering that it's selling to its own clients, | 11:05 |
| 12 | that that company is scraping LinkedIn public data? | 11:05 |
| 13 | MR. COHEN:  Objection to form. | 11:05 |
| 14 | THE WITNESS:  So I don't know that a company | 11:05 |
| 15 | would need to be scraping LinkedIn public data to use | 11:06 |
| 16 | LinkedIn public data.  But I -- so I'm not sure that | 11:06 |
| 17 | the two are -- if the two are one and the same. | 11:06 |
| 18 | And, again, the distinction I'm drawing is | 11:06 |
| 19 | this sentence says "They are helping HR departments | 11:06 |
| 20 | inside of companies look at public data including | 11:06 |
| 21 | LinkedIn." | 11:06 |
| 22 | So you can look at data on the LinkedIn | 11:06 |
| 23 | website without scraping data on the LinkedIn website | 11:06 |
| 24 | is why I'm -- is why I'm answering the way I'm | 11:06 |
| 25 | answering. | 11:06 |

CONFIDENTIAL

Page 56

```
 1   range?                                           11:12

 2       A.   I don't have a -- I don't know that I could   11:12

 3   give you an exhaustive list, but in general, we think   11:12

 4   about -- you know, when we think about the LinkedIn   11:13

 5   network or the LinkedIn ecosystem, as we sometimes   11:13

 6   call it here, there are the interests of members,   11:13

 7   there are the interests of customers who are sort of   11:13

 8   paying for -- you know, entities paying for LinkedIn   11:13

 9   services, there are the interests of companies that we   11:13

10   might partner with to deliver those services, there   11:13

11   are the business interests of LinkedIn.           11:13

12          And so those are some of the main interests   11:13

13   we consider, but I don't -- I wouldn't consider that   11:13

14   to be an exhaustive list.                         11:13

15       Q.   When you identified that you were skeptical   11:13

16   that it's a member's first use case, did you do any   11:13

17   investigation into hiQ to determine what it was that   11:14

18   hiQ was doing with LinkedIn data?                 11:14

19       A.   I don't recall.                          11:14

20       Q.   Do you see here that you write "Do you want   11:14

21   to intro me?"                                     11:14

22       A.   Yes.                                     11:14

23       Q.   Do you recall being introduced to hiQ at any   11:14

24   point in time?                                    11:14

25       A.   No.                                      11:14
```

CONFIDENTIAL

Page 57

| | | |
|---|---|---|
| 1 | Q.   As of December 2014, were you aware that -- | 11:14 |
| 2 | did you have an understanding that LinkedIn was | 11:14 |
| 3 | frequently targeted by scrapers? | 11:14 |
| 4 | A.   As of December 2014, yes, I was aware that | 11:15 |
| 5 | there were -- I had a general understanding that there | 11:15 |
| 6 | were many companies that were scraping LinkedIn. | 11:15 |
| 7 | Q.   And in response to Mr. Vasan's e-mail where | 11:15 |
| 8 | he states that he's not sure that LinkedIn would look | 11:15 |
| 9 | favorably at a company that is analyzing profiles, you | 11:15 |
| 10 | didn't make any investigation into whether hiQ was | 11:15 |
| 11 | analyzing LinkedIn profiles? | 11:15 |
| 12 | MR. COHEN:  Objection to form. | 11:15 |
| 13 | THE WITNESS:  So I don't recall personally | 11:15 |
| 14 | having engaged in the sort of investigation you're | 11:15 |
| 15 | describing. | 11:15 |
| 16 | And maybe I'll just add some context to the | 11:16 |
| 17 | earlier point about being generally aware that there | 11:16 |
| 18 | were many companies that were scraping LinkedIn. | 11:16 |
| 19 | We had to sort of prioritize, and there was | 11:16 |
| 20 | nothing about this engagement that sort of suggested | 11:16 |
| 21 | to me that I should prioritize it beyond sort of | 11:16 |
| 22 | agreeing to or take a -- take a meeting with -- with | 11:16 |
| 23 | the company, per Bob's suggestion.  That's how I | 11:16 |
| 24 | interpret this now. | 11:16 |
| 25 | /// | |

CONFIDENTIAL

Page 189

1                    REPORTER'S CERTIFICATE
                          ---o0o---
2    STATE OF CALIFORNIA    )
                            ) ss.
3    COUNTY OF YOLO         )

4

5         I, KATY E. SCHMIDT, a Certified Shorthand
6    Reporter in and for the State of California, duly
7    commissioned and a disinterested person, certify:
8         That the foregoing deposition was taken before
9    me at the time and place herein set forth;
10        That LEE WOMER, the deponent herein, was put on
11   oath by me;
12        That the testimony of the witness and all
13   objections made at the time of the examination were
14   recorded stenographically by me to the best of my
     ability and thereafter transcribed into typewriting;
15        That the foregoing deposition is a record of
16   the testimony of the examination.
17        IN WITNESS WHEREOF, I subscribe my name on this
18   12th day of May, 2022.

19

20

21        Katy E. Schmidt, RPR, RMR, CRR, CSR 13096
22        Certified Shorthand Reporter
23        in and for the County of Sacramento,
          State of California

24

25   Ref. No. 5226828 KES

Message
_____

| | |
|---|---|
| **From:** | Bob Rosin [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4E0798C65DA94B4DA5311F02C7C5F4BE-BOB ROSIN] |
| **Sent:** | 12/15/2014 9:16:44 PM |
| **To:** | Lee Womer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2abbad0e3a174deea3567e91dabb1c8f-Lee Womer] |
| **Subject:** | Re: Happy Holidays! |
| **Attachments:** | image001.jpg |

Excellent, thanks
_____

**From:** Lee Womer <lwomer@linkedin.com>
**Date:** Monday, December 15, 2014 at 9:15 PM
**To:** Bob Rosin <brosin@linkedin.com>
**Subject:** RE: Happy Holidays!

Easilydo has been trying to get on my calendar for a few days (have a meeting on the calendar tomorrow that I have to move because of the planning debrief we set up). They seem a bit similar to Refresh so not sure if we'd support.

I've not met HiQ but looks similar to some other companies that have reached out. Skeptical that it's a members' first use case (the others were decidedly not), but I'd be interested in meeting them. Do you want to intro me?

Best,
Lee

_____

**From:** Bob Rosin
**Sent:** Monday, December 15, 2014 9:11 PM
**To:** Lee Womer
**Subject:** FW: Happy Holidays!

Hi Lee,

Please see the below note from a friend at Mayfield. Have you looked at either of these companies?

Bob

_____

**From:** Bob Rosin <bob.rosin@gmail.com>
**Date:** Monday, December 15, 2014 at 9:06 PM
**To:** Bob Rosin <brosin@linkedin.com>
**Subject:** Fwd: Happy Holidays!

> **Exhibit 285**
> Womer

Begin forwarded message:

**From:** Robin Vasan <rvasan@mayfield.com>
**To:** '"bob.rosin@gmail.com'" <bob.rosin@gmail.com>
**Subject:** Happy Holidays!
**Date:** December 15, 2014 at 2:11:59 PM PST

Bob,

I wanted to touch base since we are either working on or looking at companies that want to integrate more with LinkedIn.

One company we are not involved in, but recently met, is called HiQ Labs. https://www.hiqlabs.com/ They are helping HR departments inside of companies look at public data (including LinkedIn) to try to predict which employees might be at risk to leave. We found it interesting, but weren't sure that LinkedIn would look favorably at a company that is analyzing profiles (combined with various other data sources). It would be great to get a sense on how LinkedIn figures out which partners to allow and work closely with or not.

Another one that we are involved with is EasilyDo ( www.easilydo.com) and they are seeing strong traction with their smart assistant solution. Today they have some lightweight/API integration with LinkedIn, but would be interested to have a deeper relationship.

Anyway, it would be great to catch up and hear where you see opportunities.

All the best,

Robin

*Mayfield*

***Robin Vasan*** — *Managing Director*
rvasan@mayfield.com | mayfield.com
2484 Sand Hill Road  | Menlo Park, CA  94025
(w) 650.854.5560 | (d) 650.233.5752

LINK_HIQ_000073014

EXHIBIT 8

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4    _____

5    hiQ LABS, INC.,                    )
                                        )
6                   Plaintiff,          )
                                        )
7    vs.                                ) No. 3:17-cv-03301-EMC
                                        )
8    LINKEDIN CORPORATION,              )
                                        )
9                   Defendant.          )

10   _____
                                        )
     AND RELATED CROSS-ACTION.          )
11                                      )
     _____

12

13   VIDEO-RECORDED ZOOM DEPOSITION UPON ORAL EXAMINATION OF

14                  DOUGLAS C. SCHMIDT, PhD

15   _____

16

17      *** HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY ***

18

19                       9:00 A.M.

20                  FRIDAY, JULY 29, 2022

21      (ALL PARTICIPANTS AT THEIR RESPECTIVE LOCATIONS)

22

23

24   Reported by: Tami Lynn Vondran, CRR, RMR, CCR/CSR

25   WA CCR #2157; OR CSR #20-0477; CA CSR #14435

Page 104

```
1        A.    I am observing -- having read the terms of
2    service, the terms of service and the usage agreement is
3    very clear, the expectation about how LinkedIn's data
4    would be accessed.
5             As to the broader legal implications of what
6    that means, that's not in my charge.  I'm just looking
7    at it from a technical point of view where it was made
8    clear to anyone who had taken the time to read the usage
9    agreement, or the terms of service, or looked at the
10   robots.txt file, that LinkedIn was very clear about what
11   was allowed and not allowed on -- from the point of view
12   of automated access to its site.
13            So I'm simply saying that their technical --
14   the way in which they scraped the site was -- did not
15   comport with the terms of service or the usage agreement
16   or the robots.txt file.
17        Q.    In paragraph 26 of your report, you state,
18   "LinkedIn was forced to not only incur the costs of
19   receiving and processing billions of requests, but also
20   the costs of developing new defenses to stop scraping
21   activity on its platform."
22            Do you see that?
23        A.    I do.
24        Q.    Are you opining that LinkedIn implemented any
25   technical measures in response to hiQ in particular, as
```

Page 105

1    opposed to in response to third-party scrapers

2    generally?

3              MR. SHAFFER:  Objection.  Foundation.

4         A.   So my opinion here is that for -- up until

5    spring of 2017, it's -- from my understanding, LinkedIn

6    didn't know who hiQ was; it would not have been possible

7    for LinkedIn to know who hiQ was because of the evasive

8    techniques that hiQ was using in order to masquerade the

9    source of the requests that it was sending through its

10   proxy forms to LinkedIn.

11             So therefore, necessarily, the types of

12   defensive measures put in place by LinkedIn would have

13   had to have been based on general-purpose scraper

14   defense as opposed to anything that was targeted for

15   hiQ.  Because as I mentioned, they didn't know about

16   hiQ, as far as I know, and they couldn't have known

17   about hiQ based on an analysis of the traffic they were

18   seeing.

19        Q.   (BY MS. SKIBITSKY)  Were any of the general

20   techniques that you have opined that hiQ implemented in

21   order to -- to use your words, circumvent LinkedIn's

22   technological barriers, techniques that you were not

23   familiar with prior to having reviewed the source code?

24        A.   So just to be specific here, the types of

25   techniques that I saw -- and then I'll answer your

Page 235

1                    REPORTER'S CERTIFICATE

2

3          I, TAMI LYNN VONDRAN, the undersigned Certified

4    Court Reporter/Shorthand Reporter for the State of

5    Washington, the State of Oregon and the State of

6    California, do hereby certify that the sworn testimony

7    and/or proceedings, a transcript of which is attached,

8    was given before me at the time and place stated

9    therein; that any and/or all witness(es) were duly sworn

10   to testify to the truth; that the sworn testimony and/or

11   proceedings were by me stenographically recorded and

12   transcribed under my supervision, to the best of my

13   ability; that the foregoing transcript contains a full,

14   true, and accurate record of all the sworn testimony

15   and/or proceedings given and occurring at the time and

16   place stated in the transcript; that a review of which

17   was requested; that I am in no way related to any party

18   to the matter, nor to any counsel, nor do I have any

19   financial interest in the event of the cause.

20          WITNESS MY HAND AND DIGITAL SIGNATURE this 1st

21   day of August, 2022.

22

23   TAMI LYNN VONDRAN, CRR, RMR, CCR/CSR

     Washington CCR #2157, Expires 10/6/2022

24   Oregon CSR #20-0477, Expires 9/30/2024

     California CSR #14435, Expires 10/31/2022

25

EXHIBIT 9

Exhibit 568

Weidick, M.
06/01/22
@ptus

1    C. Brandon Wisoff (State Bar No. 121930)
     bwisoff@fbm.com
2    Deepak Gupta (State Bar No. 226991)
     dgupta@fbm.com
3    Farella Braun + Martel LLP
   235 Montgomery Street, 17th Floor
4    San Francisco, California 94104
   Telephone: (415) 954-4400
5    Facsimile: (415) 954-4480

6    Laurence H. Tribe[1] (State Bar No. 39441)
   Carl M. Loeb University Professor and
7    Professor of Constitutional Law
   Harvard Law School
8    1575 Massachusetts Avenue
   Cambridge, Massachusetts 02138
9    Telephone: (617) 495-1767
   *Pro hac vice* pending

10

   Attorneys for Plaintiff hiQ Labs, Inc.

11

12                    UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14

15

16    hiQ Labs, Inc.                    Case No. 3:17-cv-03301

           Plaintiff,         **DECLARATION OF MARK WEIDICK IN**
17                         **SUPPORT OF HIQ'S MOTION FOR TRO**

18         vs.                     _____

19    LinkedIn Corporation

20             Defendant.

21

22    I, Mark Weidick, declare as follows:

23         1.       I am the Chief Executive Officer of hiQ Labs, Inc. ("hiQ"). The facts stated in this

declaration are based on my personal knowledge, discussions with company personnel and my
24
review of records kept in the ordinary course of business. I could and would testify truthfully to
25
these facts, under oath, if required.
26

27    _____

28    [1] *Affiliation noted for identification purposes only.*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK IN
SUPPORT OF hiQ'S MOTION FOR TRO

34556\6004725.2

DocuSign Envelope ID: D9BB0AB4-F03D-463E-995C-97E22C39FB97D

2. I joined hiQ as its Chief Executive Officer on Feb 14, 2017. My responsibilities include understanding our business, setting strategy, allocating resources, making key executive decisions, delivering results agreed upon with hiQ's Board of Directors, and managing the entire hiQ team, which includes our technology, marketing, sales, finance, and other personnel. I also interface with venture capitalists and other financers, meet with customers, partners, industry analysts, and report to our Board of Directors.

3. hiQ was founded in 2012 as OrgStars Inc. to apply predictive data science to issues related to a company's workforce. OrgStars changed its name to hiQ Labs, Inc. on May 23, 2014. Since its founding, hiQ has raised $14.5 million in two rounds of funding. hiQ currently has 24 employees, the majority of whom are in its San Francisco office. 11 have advanced degrees, including several Ph.Ds.

4. hiQ performs scientific, computerized analyses of public profile information available on the website www.linkedin.com ("LinkedIn website"). hiQ built its business on public profiles because they were described by LinkedIn as being public and accessible to everyone, whether LinkedIn members or not. Relying on this representation, hiQ has spent millions of dollars and thousands of hours investing in its business and developing its data science and analysis technology. Using the public profile information available on the LinkedIn website, hiQ produces and sells to Fortune 500 companies two data science based "people analytics" services that provide insights into a company's workforce: Keeper and Skill Mapper.

5. Keeper analyzes and predicts the retention risk—*i.e.* the risk of an employee being recruited away—for the employees of a given employer, and indicates which employees are at greatest risk of being recruited away. Employers can then develop action plans for retaining its talent, including, for example, by providing an employee who is at high risk of leaving a career development opportunity or bonus to stay.

6. Skill Mapper aggregates and summarizes the breadth and depth of the skills possessed by an employer's workforce by analyzing all of the skills its employees list on the LinkedIn website, including those skills acquired from previous positions. Using this information, employers can build succession plans, drive employee engagement, promote internal mobility, and

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK IN
SUPPORT OF hiQ'S MOTION FOR TRO

2

34556\6004725.2

1  reduce costs associated with external talent acquisition.  For example, employers can identify

2  areas where its employees lack depth in a particular skill area of value and offer training to its

3  employees to make up for that deficit.

4       7.      hiQ believes that its services are synergistic to LinkedIn's goals, as they help

5  LinkedIn's members maximize their professional and business opportunities.

6       8.      hiQ uses a variety of software and manual means to gather the raw data it needs to

7  analyze in order to provide Keeper and Skill Mapper for its clients.  All of these means access

8  only the public profile section of the LinkedIn website; none of these means access any private

9  sections of LinkedIn, such as profile information visible only to those who are signed-in to the

10  LinkedIn website, or member private data that can be viewed only by those who are "connected"

11  in LinkedIn to that member.

12       9.      hiQ does not offer a social networking platform and never republishes the public

13  profile information it gathers for its Keeper and Skill Mapper services.  Instead, such information

14  is analyzed using hiQ's analytical systems and developed into new business intelligence for its

15  clients.

16       10.     Current customers of hiQ include eBay, Capital One, and GoDaddy.  hiQ also has

17  prospective deals with Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier,

18  and Jobvite.

19       11.     LinkedIn has known of hiQ since at least October 2015, when it started

20  participating in hiQ's Elevate conference.

21       12.     hiQ's Elevate conference is designed to build a community around the emerging

22  field of people analytics and has provided a regular forum for participants to share insights and

23  disseminate best practices.  During these Elevate conferences, hiQ has openly discussed its

24  business model, growth, expansion, and its collection and use of public profile information from

25  the LinkedIn website.

26       13.     LinkedIn has sent representatives to Elevate conferences starting in October 2015.

27  Since then, at least ten different LinkedIn representatives have attended the Elevate conference,

28  and many of those LinkedIn employees attended multiple times.  LinkedIn has also spoken at

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK IN
SUPPORT OF hiQ'S MOTION FOR TRO

3

34556\6004725.2

1   Elevate conferences.  In 2016, hiQ awarded its Elevate "Impact Award" to LinkedIn employee

2   Lorenzo Canlas, who applied for the award, attended the conference, and accepted the award.  At

3   that conference, Mr. Canlas delivered a PowerPoint presentation on the power of talent analytics.

4   The title slide from his presentation is emblematic of the cooperation between our companies:



12      14.     In late 2016 and early 2017, hiQ's previous CEO, my predecessor, held a series of

13  in-person meetings with LinkedIn personnel.  During these meetings, he advised LinkedIn of

14  hiQ's active customer relationships.

15      15.     I was surprised to receive LinkedIn's cease-and-desist letter dated May 23, 2017, a

16  true and correct copy of which is attached as Exhibit J to hiQ's Motion for Temporary Restraining

17  Order.  LinkedIn did not provide any warning or suggest to hiQ that it disapproved of hiQ's

18  business.  LinkedIn has never hinted to hiQ that LinkedIn believes hiQ's access harms LinkedIn or

19  its members.  At all times before receiving the cease-and-desist letter, hiQ believed that LinkedIn

20  approved of its activities.

21      16.     After receiving the cease-and-desist letter, hiQ learned that LinkedIn had taken

22  down hiQ's company profile from LinkedIn, had terminated its LinkedIn membership, and had

23  purported to deauthorize hiQ's access to all LinkedIn profile pages, including those that LinkedIn

24  members have explicitly made public and which LinkedIn tells its members will be accessible by

25  members and non-members alike.

26      17.     hiQ's entire business depends on being able to access public LinkedIn member

27  profiles.  hiQ has investigated and concluded that there is no current viable alternative to

28  LinkedIn's member database to obtain data for hiQ's Keeper and Skill Mapper services.  Without

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK IN          4          34556\6004725.2
SUPPORT OF hiQ'S MOTION FOR TRO

1    access to these profiles, hiQ cannot deliver its services; its contracts with existing customers will

2    be in jeopardy and hiQ will be prevented from consummating its pending deals with prospective

3    clients.

4        18.    hiQ is also in the middle of a pending financing round, which has been disrupted

5    due to LinkedIn's actions.

6        19.    If LinkedIn continues to deny hiQ access to the public profiles on LinkedIn's

7    website, hiQ will be forced to close its business and lay off most, if not all, of its employees.

8        20.    I retained counsel on behalf of hiQ on May 24, 2017 to guide hiQ through this

9    dispute with LinkedIn and authorized counsel to send a May 31, 2017 response letter to LinkedIn.

10   In that letter, hiQ informed LinkedIn that its conduct has endangered hiQ's current contracts with

11   eBay, Capital One, and GoDaddy and others, and prospective deals with Bank of New York

12   Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite, as well as the needed financing.

13       I declare under penalty of perjury under the laws of the United States that the foregoing is

14   true and correct.  Executed June 7, 2017, at San Francisco, California.

15

16

17   

18   _____
                 MARK WEIDICK

19           Chief Executive Officer
                HiQ Labs, Inc.

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK IN
SUPPORT OF hiQ'S MOTION FOR TRO

5

34556\6004725.2

EXHIBIT 10

DocuSign Envelope ID: 3DCF8865-833D-4905-A98D-FDF2880F0531

1    C. Brandon Wisoff (State Bar No. 121930)
     bwisoff@fbm.com
2    Deepak Gupta (State Bar No. 226991)
     dgupta@fbm.com
3    Jeffrey G. Lau (State Bar No. 281629)
     jlau@fbm.com
4    Rebecca H. Stephens (State Bar No. 299234)
     rstephens@fbm.com
5    Farella Braun + Martel LLP
     235 Montgomery Street, 17th Floor
6    San Francisco, California 94104
     Telephone: (415) 954-4400
7    Facsimile: (415) 954-4480

8    Laurence H. Tribe* (State Bar No. 39441)
     Carl M. Loeb University Professor and
9    Professor of Constitutional Law
     Harvard Law School
10   1575 Massachusetts Avenue
     Cambridge, Massachusetts 02138
11   Telephone: (617) 495-1767
     *Admitted pro hac vice*

12
     Attorneys for Plaintiff hiQ Labs, Inc.
13

14                          UNITED STATES DISTRICT COURT

15                        NORTHERN DISTRICT OF CALIFORNIA

16

17
     hiQ Labs, Inc.                          Case No. 3:17-cv-03301-EMC
18
                 Plaintiff,                  **DECLARATION OF MARK WEIDICK IN
19                                           SUPPORT OF HIQ'S RENEWED
            vs.                              MOTION FOR TEMPORARY
20                                           RESTRAINING ORDER**
     LinkedIn Corp.
21                                           _____
                 Defendant.
22                                           The Hon. Edward M. Chen

23                                           Date:      June 29, 2017
                                             Time:      1:30 P.M.
24                                           Location:  Courtroom 5, 17th Floor
                                                        450 Golden Gate Ave.
25                                                      San Francisco, CA 94102

26   I, Mark Weidick, declare as follows:

27          1.      I am the Chief Executive Officer of hiQ Labs, Inc. ("hiQ"). The facts stated in this

28   declaration are based on my personal knowledge, discussions with company personnel and my

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK ISO hiQ'S          *Affiliation noted for identification purposes only.*
RENEWED MOTION FOR TRO                         34556\6004725.2

1   review of records kept in the ordinary course of business.  I could and would testify truthfully to

2   these facts, under oath, if required.

3       2.      I joined hiQ as its Chief Executive Officer on February 14, 2017.  My

4   responsibilities include understanding our business, setting strategy, allocating resources, making

5   key executive decisions, delivering results agreed upon with hiQ's Board of Directors, and

6   managing the entire hiQ team, which includes our technology, marketing, sales, finance, and other

7   personnel.  I also interface with venture capitalists and other financers, meet with customers,

8   partners, industry analysts, and report to our Board of Directors.

9       3.      hiQ was founded in 2012 as OrgStars Inc. to apply predictive data science to issues

10  related to a company's workforce.  OrgStars changed its name to hiQ Labs, Inc. on May 23, 2014.

11  Since its founding, hiQ has raised $14.5 million in two rounds of funding.  hiQ currently has 23

12  employees, the majority of whom are in its San Francisco office.  11 have advanced degrees,

13  including several Ph.Ds.

14      4.      hiQ performs scientific, computerized analyses of public profile information

15  available on the website www.linkedin.com ("LinkedIn website").  hiQ built its business on public

16  profiles because they were described by LinkedIn as being public and accessible to everyone,

17  whether LinkedIn members or not.  Relying on this representation, hiQ has spent millions of

18  dollars and thousands of hours investing in its business and developing its data science and

19  analysis technology.   Using the public profile information available on the LinkedIn website, hiQ

20  produces and sells to Fortune 500 companies two data science based "people analytics" services

21  that provide insights into a company's workforce: Keeper and Skill Mapper.

22      5.      Keeper analyzes and predicts the retention risk—*i.e.* the risk of an employee being

23  recruited away—for the employees of a given employer, and indicates which employees are at

24  greatest risk of being recruited away.  Employers can then develop action plans for retaining its

25  talent, including, for example, by providing an employee who is at high risk of leaving a career

26  development opportunity or bonus to stay.

27      6.      Skill Mapper aggregates and summarizes the breadth and depth of the skills

28  possessed by an employer's workforce by analyzing all of the skills its employees list on the

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK ISO hiQ'S
RENEWED MOTION FOR TRO

2

34556\6070127.1

DocuSign Envelope ID: 3DCE8365-233D-4D25-AC8D-EDFC8085051

LinkedIn website, including those skills acquired from previous positions.  Using this information, employers can build succession plans, drive employee engagement, promote internal mobility, and reduce costs associated with external talent acquisition.  For example, employers can identify areas where their employees lack depth in a particular skill area of value and offer training to its employees to make up for that deficit.

7. hiQ believes that its services are synergistic to LinkedIn's goals, as they help LinkedIn's members maximize their professional and business opportunities.

8. hiQ uses a variety of software and manual means to gather the raw data it needs to analyze in order to provide Keeper and Skill Mapper for its clients.  All of these means access only the public profile section of the LinkedIn website; none of these means access any private sections of LinkedIn, such as profile information visible only to those who are signed-in to the LinkedIn website, or member private data that can be viewed only by those who are "connected" in LinkedIn to that member.

9. hiQ does not offer a social networking platform and never republishes the public profile information it gathers for its Keeper and Skill Mapper services.  Instead, such information is analyzed using hiQ's analytical systems and developed into new business intelligence for its clients.

10. Current customers of hiQ include eBay, Capital One, and GoDaddy.  hiQ also has prospective deals with Bank of New York Mellon, Chevron, Groupon, Honeywell, IBM, Visier, and Jobvite.

11. LinkedIn has known of hiQ since at least October 2015, when it started participating in hiQ's Elevate conference.

12. hiQ's Elevate conference is designed to build a community around the emerging field of people analytics and has provided a regular forum for participants to share insights and disseminate best practices.  During these Elevate conferences, hiQ has openly discussed its business model, growth, expansion, and its collection and use of public profile information from the LinkedIn website.

13. LinkedIn has sent representatives to Elevate conferences starting in October 2015.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK ISO hiQ'S
RENEWED MOTION FOR TRO

3

34556\6070127.1

1  Since then, at least ten different LinkedIn representatives have attended the Elevate conference,

2  and many of those LinkedIn employees attended multiple times.  LinkedIn has also spoken at

3  Elevate conferences.  In 2016, hiQ awarded its Elevate "Impact Award" to LinkedIn employee

4  Lorenzo Canlas, who applied for the award, attended the conference, and accepted the award.  At

5  that conference, Mr. Canlas delivered a PowerPoint presentation on the power of talent analytics.

6  The title slide from his presentation is emblematic of the cooperation between our companies:



15         14.     I am informed and believe that in late 2016 and early 2017, hiQ's previous CEO,

16  my predecessor, held a series of in-person meetings with LinkedIn personnel.  I am further

17  informed and believe that during these meetings, he advised LinkedIn of hiQ's active customer

18  relationships.

19         15.     I was surprised to receive LinkedIn's cease-and-desist letter dated May 23, 2017, a

20  true and correct copy of which is attached as Exhibit J to hiQ's Renewed Motion for Temporary

21  Restraining Order.  LinkedIn did not provide any warning or suggest to hiQ that it disapproved of

22  hiQ's business.  LinkedIn has never hinted to hiQ that LinkedIn believes hiQ's access harms

23  LinkedIn or its members.  At all times before receiving the cease-and-desist letter, hiQ believed

24  that LinkedIn approved of its activities.

25         16.     After receiving the cease-and-desist letter, hiQ learned that LinkedIn had taken

26  down hiQ's company profile from LinkedIn, had terminated its LinkedIn membership, and had

27  purported to deauthorize hiQ's access to all LinkedIn profile pages, including those that LinkedIn

28  members have explicitly made public and which LinkedIn tells its members will be accessible by

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK ISO hiQ'S          4
RENEWED MOTION FOR TRO

34556\6070127.1

1   members and non-members alike.

2       17.     hiQ's entire business depends on being able to access public LinkedIn member

3   profiles.  hiQ has investigated and concluded that there is no current viable alternative to

4   LinkedIn's member database to obtain data for hiQ's Keeper and Skill Mapper services.  Without

5   access to these profiles, hiQ cannot deliver its services; its contracts with existing customers will

6   be in jeopardy and hiQ will be prevented from consummating its pending deals with prospective

7   clients.

8       18.     hiQ is also in the middle of a pending financing round, which has been disrupted

9   due to LinkedIn's actions.

10      19.     If LinkedIn continues to deny hiQ access to the public profiles on LinkedIn's

11  website, hiQ will be forced to close its business and lay off most, if not all, of its employees.  In

12  fact, hiQ has already started to lose employees as a result of LinkedIn's cease-and-desist letter.

13  One of our employees recently resigned due to hiQ's currently precarious position and uncertainty

14  over whether we will be able to continue operations.

15      20.     I retained counsel on behalf of hiQ on May 24, 2017 to guide hiQ through this

16  dispute with LinkedIn and authorized counsel to send a May 31, 2017 response letter to LinkedIn.

17  In that letter, hiQ informed LinkedIn that its conduct has endangered hiQ's current contracts with

18  eBay, Capital One, and GoDaddy and others, and prospective deals with Bank of New York

19  Mellon, Chevron, Groupon, Honeywell, IBM, Visier and Jobvite, as well as the needed financing.

20      I declare under penalty of perjury under the laws of the United States that the foregoing is

21  true and correct.  Executed June 22, 2017, at San Francisco, California.

22

DocuSigned by:

23  *Mark Weidick*

A1BA4B9F97BC429...

24                      MARK WEIDICK
                        Chief Executive Officer
25                      HiQ Labs, Inc.

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

DECLARATION OF MARK WEIDICK ISO hiQ'S          5          34556\6070127.1
RENEWED MOTION FOR TRO

EXHIBIT 11

JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
LAURA K. LIN (State Bar No. 281542)
laura.lin@mto.com
NICHOLAS D. FRAM (State Bar No. 288293)
nicholas.fram@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

Attorneys for LinkedIn Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-CV-03301 |
| Plaintiff, | **DECLARATION OF LORENZO CANLAS IN SUPPORT OF LINKEDIN'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| vs. | |
| LinkedIn Corporation, | |
| Defendants. | |

I, Lorenzo Canlas, declare as follows:

1.    I am a Director of Business Operations and Analytics at LinkedIn.  I have personal knowledge of the facts stated in this declaration and, if called as a witness, could competently testify to them.  I submit this declaration in opposition to hiQ's motion for a temporary restraining order.

2.    The Talent Analytics team at LinkedIn, which I manage, is an internal group focused on analyzing LinkedIn's own workforce.  Its mission is to help LinkedIn make evidence-based decisions about its own employees.  It is essentially a division supporting LinkedIn's Human Resources group.  We are not directly involved in LinkedIn's website offerings or any of its external products.  One of the ways our team adds value to LinkedIn is by more accurately predicting LinkedIn's hiring needs in the future (based on growth, attrition, and other factors), and adjusting the amount of recruiting that LinkedIn does in order to meet those anticipated needs.

3.    My recent background is in management.  Prior to joining LinkedIn, I spent eight years at McKinsey & Company and Accenture where I advised Fortune 500 companies on product strategy, operations, organization design, and large-scale transformation.  I understand what data scraping is, but am not familiar with the technical details of how it is accomplished or the legal framework that governs it.

4.    In October 2015, I attended a conference organized by hiQ called "Elevate."  I believe I was invited to this conference because I specialize in people/talent analytics.  Based on my observations at this conference and the few other Elevate conferences I attended over the ensuing year and a half, attendees at this conference are a mix of people analytics employees from various companies in a variety of industries  (such as LinkedIn, Chevron, and Nestle) and representatives of vendors that specialize only in people analytics.  I also recall luncheons for leaders in the people analytics space (from companies including Apple, Intel, JPMorgan, and AirBnB) that provide an opportunity for people in similar careers to network.  I attended these conferences in my capacity as a people analytics professional at LinkedIn who focuses on the LinkedIn workforce.

5.      At the October 2015 conference, I learned a bit about hiQ and the product it had at the time.  I learned that hiQ's product used data from a variety of sources—internal and external—to predict employee attrition.  I do not recall anyone at this conference saying how hiQ obtained the data it used for this product, or that hiQ was using LinkedIn data for this product.

6.      I attended another Elevate conference in the fall of 2016 where awards were presented to people analytics teams at a number of different companies including Chevron, Nestle, Johnson Controls, Scottrade, Pepsico, and LinkedIn.  I accepted an "Impact" award on behalf of LinkedIn.  The award was given for my team's internal work regarding people analytics.  The award's stated purpose was to recognize a team that had engaged in work with a strong impact and demonstrated return on investment in people analytics for their own company.  It was not related to the LinkedIn website or LinkedIn member data, or to hiQ's product offerings.

7.      I gave a presentation at that 2016 Elevate conference about how business leaders could use people analytics as a way to achieve business objectives.  My presentation concerned work that I had done at LinkedIn.  It was six slides long, including the cover slide.  It had nothing to do with hiQ's products or services.  The cover slide to the presentation contains the text "hiQ 2016 Elevate" because I was giving the presentation at the Elevate conference in 2016 organized by hiQ, not because I had collaborated with hiQ in any way on the presentation or in my work at LinkedIn more broadly.  I gave the presentation because I was asked by hiQ to speak for five to ten minutes about the subject of the award that LinkedIn was given.  There is no past or current cooperation or collaboration between the LinkedIn Talent Analytics group and hiQ on any LinkedIn or hiQ products or offerings.

8.      I attended another Elevate conference in April 2017.  There, hiQ formally launched a second product called "Skill Mapper."  I recall someone from hiQ stating that they collected skills data from public professional profiles in order to provide hiQ's customers information about their employees' skill sets.

9.      At no point did hiQ ever disclose to me any reliance on scraped LinkedIn data.  At no point have I ever been asked by any representative from hiQ for LinkedIn's permission for hiQ to scrape data from LinkedIn's website, nor would I have had the authority to condone or permit

1   that. I generally am aware that LinkedIn prohibits certain types of automated access and scraping

2   of data from LinkedIn's website, but I am not aware of the details because as previously

3   mentioned, I work for an internal group and am not involved in data security or the management

4   of LinkedIn's various websites and consumer-facing services.

5

6        I declare under penalty of perjury under the laws of the United States of America and the

7   State of California that the foregoing is true and correct.

8

9        Executed on June 21, 2017 at Sunnyvale, California.

10

11

12                                             Lorenzo Canlas

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 12

# (EXHIBIT FILED UNDER SEAL)

# EXHIBIT 13

# (EXHIBIT FILED UNDER SEAL)

EXHIBIT 14

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 15

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 16

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 17

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 18

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 19

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 20

(EXHIBIT FILED UNDER SEAL)

# EXHIBIT 21

# (EXHIBIT FILED UNDER SEAL)

EXHIBIT 22

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 23

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 24

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 25

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 26

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 27

(EXHIBIT FILED UNDER SEAL)

EXHIBIT 28

---

Message

| | |
|---|---|
| **From:** | Lorenzo Canlas [/O=EXCHANGELABS/OU=EXCHANGE  ADMINISTRATIVE  GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5FB700195D094089A60556AFBDC6E0E6-LORENZO  CAN] |
| **Sent:** | 10/7/2015 12:48:54 PM |
| **To:** | Adam Weinstein [aweinstein@linkedin.com] |
| **CC:** | Boyu Zhang [/o=ExchangeLabs/ou=Exchange  Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5b2cdd7e16da4d19b4faab9500a6e3c7-Boyu Zhang_]; Lee  Womer [/o=ExchangeLabs/ou=Exchange  Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=2abbad0e3a174deea3567e91dabb1c8f-Lee Womer] |
| **Subject:** | Re: Anti  scraping |

Sorry I forgot to take a picture. The general message is this:

http://hiqlabs.tumblr.com/post/102287027166/hiq-labs-predictive-employee-retention-analytics

"hiQ Labs' predictive employee retention SaaS tool mentioned by Mr. Bersin, gathers massive amounts of public data, analyzes  and then makes highly significant predictions about who is most at risk of leaving an organization through  'push' or 'pull' factors (such as competitive pay or other job offers)."

They also mentioned that pull factors include:
- completeness of public profiles
- recruiter demand for someones job type

I'm not sure how they do these pull factors but I suspect it includes  some LinkedIn data.
They inadvertently  mentioned "if you are getting a lot of inmails there is more pull for you to leave your job" but I have no idea if they can actually  measure InMail demand.

On Wed, Oct 7, 2015 at 11:20 AM, Adam Weinstein <aweinstein@linkedin.com>  wrote:
  +Lee

  We can investigate.  Do you have  any screen shots of what they shared?  I take it they verbally  mentioned us - doesn't seem they advertise  their data sources on their website.

  -Adam

On Wed, Oct 7, 2015 at 11:05 AM, Lorenzo  Canlas <lcanlas@linkedin.com>  wrote:
  Hey guys what is the process for investigating  companies  who we think are scraping  the site?

  We were at a conference  yesterday  with HiQ labs who is using  internal (HRIS, survey)  data and external (Linkedin  and other data) to predict attrition.

  Is there a way for us to understand  how and if they are using  our data and understanding  if we are enabling  and supporting  it?

Highly Confidential - Attorneys' Eyes Only

EXHIBIT 29

The Wayback Machine - https://web.archive.org/web/20141220114249/https://www.hiqlabs.com/

# People Analytics

Applying advanced algorithms and statistical methods to employee selection, development, and retention by modeling historical data to predict future outcomes.

# The Global Standard for People Analytics™

↘ Public data, internal company data, or a combination of both, this is the engine that drives our PREDICTIVE models

↘ Proprietary mathematical algorithms allow you to extract more powerful insights

↘  Dynamic modeling that updates continuously with new data

↘  Flexible reporting tools bring insight to the C-Suite as well as line-managers



Recruit



Develop



Retain

# CONTROL CENTER™

Leverage internal and external data

Predict using machine learning models

Access with state-of-the-art data security

# Get Started:

↘ hiQ Control Center

↘ SaaS pricing based on employee bands

↘ Multi-tier user accounts

↘ Secure Cloud environment

↘ Easy to implement

Trusted by Fortune 100 Strategic Workforce Planning and People Analytics Teams

## JOIN THE HIQ CORPORATE COUNCIL

REQUEST TO ATTEND

## JAN 28

**BOSTON**

JAN 29

**CHICAGO**

FEB 11

**SEATTLE**

MAR 2&3

**SAN FRANCISCO**

APR 21&22

**NEW YORK**

# Help Shape The Future of People Analytics

↘ Build your People Analytics practice by interacting with leaders in your field

↘ Increase your understanding of the predictive power of various Machine Learning Models and Training Sets

↘ Interact with Data Scientists who have built Attrition Models for the world's leading brands

↘ Learn how other people analytics teams use Personally Identifiable Information (PII) in their models

# Spend time with hiQ Labs Experts

↘ Data Scientists

↘ Workforce Scientists

↘ Talent Analysts

↘ IO Psychologists

## JOIN THE HIQ CORPORATE COUNCIL

REQUEST TO ATTEND

*"Everyone knows logistic regression, but what hiQ Labs is doing is more advanced than anything HR has ever seen before."*



-VP of Workforce Intelligence
Industry: Pharmaceutical
Employees: 75,000+

○   ○

hiQ Labs
818 Mission St.
San Francisco, CA 94103
United States

FIND US

866-765-5880 San Francisco, CA

MAIL US

info@hiqlabs.com (https://web.archive.org/web/20141220114249/mailto:info@hiqlabs.com)

JOIN US

Send your resume to: jobs@hiqlabs.com (https://web.archive.org/web/20141220114249/mailto:jobs@hiqlabs.com)

Privacy Policy (static/images/pp.html) | Terms Of Service (static/images/tos.html)

© 2014 hiQ Labs, Inc. ALL RIGHTS RESERVED

Follow us on  (https://web.archive.org/web/20141220114249/https://www.facebook.com/hiqlabs)  (https

(https://web.archive.org/web/20141220114249/https://www.linkedin.com/company/hiq-labs)

EXHIBIT 30

The Wayback Machine - https://web.archive.org/web/20150906145207/https://www.hiqlabs.com/

# People Analytics

Applying advanced algorithms and statistical methods to employee selection, development, and retention by modeling historical data to predict future outcomes.

‹                                                                                        ›

○    ○

# The Global Standard for People Analytics™

↘    Public data, internal company data, or a combination of both, this is the engine that drives our PREDICTIVE models

↘    Proprietary mathematical algorithms allow you to extract more powerful insights

↘    Dynamic modeling that updates continuously with new data

↘ Flexible reporting tools bring insight to the C-Suite as well as line-managers



Find                    Build                    Keep

# ▢ CONTROL CENTER™



Leverage internal and external data

Predict using machine learning models

Access with state-of-the-art data security

# Get Started:

↘ hiQ Control Center

↘ SaaS pricing based on employee bands

↘ Multi-tier user accounts

↘ Secure Cloud environment

↘ Easy to implement

Trusted by Fortune 100 Strategic Workforce Planning and People Analytics Teams

## JOIN hiQ ELEVATE

LEARN MORE (https://web.archive.org/web/20150906145

## APR 20

**BOSTON**

MAY 18 & 19

**NEW YORK**

JUN 10

**SEATTLE**

# OCT 5 & 6

## SAN FRANCISCO

(https://web.archive.org/web/20150906145207/https://hiqelevate.com/)

# Help Shape The Future of People Analytics

↘ Build your People Analytics practice by interacting with leaders in your field

↘ Increase your understanding of the predictive power of various Machine Learning Models and Training Sets

↘ Interact with Data Scientists who have built Attrition Models for the world's leading brands

↘ Learn how other people analytics teams use Personally Identifiable Information (PII) in their models

# Spend time with hiQ Labs Experts

↘ Data Scientists

↘ Workforce Scientists

↘ Talent Analysts

↘ IO Psychologists

## JOIN hiQ ELEVATE

LEARN MORE (https://web.archive.org/web/20150906145

 PRESS

## MEDIA

Blog
(https://web.archive.org/web/20150906145207/http://hiqlabs.tumblr.com/)

## IN THE NEWS

### 12 Best Tools for Screening Potential Hires
*April 2015*
Read at business.com
(https://web.archive.org/web/20150906145207/http://www.business.com/hu
resources/12-best-tools-for-screening-potential-hires/)

# hiQ Labs Revolutionizing Businesses with "Machine Learning"

*April 2015*
Read at Socialnomics
(https://web.archive.org/web/20150906145207/http://www.socialnomics.net
labs-revolutionizing-businesses-with-%E2%80%9Cmachine-
learning%E2%80%9D/)


# People data everywhere: Bringing the outside in

*February 2015*
Read at Deloitte University Press
(https://web.archive.org/web/20150906145207/http://dupress.com/articles/
data-everywhere-human-capital-trends-2015/?
id=us:2el:3dc:dup1137:eng:cons:hct15)


# 4 Companies Changing HR And How People Are Recruiting

*February 2015*
Read at SAP
(https://web.archive.org/web/20150906145207/https://blogs.sap.com/innov
resources/4-companies-changing-hr-and-how-people-are-recruiting-
02121182)


See more
(https://web.archive.org/web/20150906145207/https://www.hiqlabs.com/)

# hiQ Labs
# 625 Market St.
# San Francisco, CA 94105
# United States

FIND US

866-765-5880 San Francisco, CA

MAIL US

info@hiqlabs.com (https://web.archive.org/web/20150906145207/mailto:info@hiqlabs.com)

JOIN US

Careers (/web/20150906145207/https://www.hiqlabs.com/jobs)

Privacy Policy (/web/20150906145207/https://www.hiqlabs.com/static/wpublic/images/pp.html) | Terms Of Service
(/web/20150906145207/https://www.hiqlabs.com/static/wpublic/images/tos.html)

© 2015 hiQ Labs, Inc. ALL RIGHTS RESERVED

Follow us on  (https://web.archive.org/web/20150906145207/https://www.facebook.com/hiqlabs) (https://\

 (https://web.archive.org/web/20150906145207/https://www.linkedin.com/company/hiq-labs)

EXHIBIT 31

# hiQ  Labs is featured in  Deloitte 2015 Trends People Data Everywhere….



HiQ Labs was featured in the Deloitte University Press article "People Data Everywhere" as an innovative start-up quantifying the next generation of HR data - publicly available people data.  The article points out that leading organizations routinely use publicly available external employee data to monitor our company brands, industry sentiment and especially within recruiting functions as we search out top talent.

In today's information age, you'll miss the boat if you aren't aware of what your employees are doing and sharing out there. In fact, the article sites that 52% of their survey respondents indicated that capitalizing on "people data everywhere" is an "important" or "very important" priority for 2015.

Deloitte's research confirms that "today's forward-thinking HR organizations are well aware of the treasure trove of data available through outside sources—such as social networks—that can help monitor and build employment brand, identify and recruit talent, better understand compensation strategies, recognize flight risk, and monitor employee satisfaction and engagement."  And it's no surprise why that information is

hiQ Labs' Blog

so valuable- information volunteered by employees on social networking sites is more complete and accurate than what is housed inside our own HRIS system.

HiQ Labs takes that rich, external data and uses complex statistical algorithms that monitor and predict patterns of job-seeking behavior, as well as position, industry and geographic risk factors (such as hot market skills), to determine individual attrition risk, and it turns out that the external data is more predictive than internal data alone.

"For applications like predicting flight risk or understanding the drivers of retention, our experience shows that public data can be significantly more predictive than internal HR data about people." - Darren Kaplan, CEO, hiQ Labs

hr   hrdata   analytics   workforceanalytics   employeeretention   bigdata

# hiQ CEO, Darren Kaplan and Mckesson's leader of the Workforce Intelligence Center of Expertise Amit Mohindra, Keynote at Morgan Stanley's HR Data Analytics Event





hiQ Labs CEO Darren Kaplan was invited to speak at New York's largest HR Data Meetup hosted by Morgan Stanley.   It was a standing room only event attended by some of the most powerful brands from every sector including IBM, Avis and Pfizer .

The event was held on of the top floor overlooking the NYC skyline and was the perfect venue for this blue sky People Analytics conversation.

 Amit Mohindra,  Vice President, Talent Management & Diversity at McKesson kicked of the program with a compelling talkabout his experience and his vision on where Workforce Intelligence is heading.  His talk was framed around what he calls "Mohindra's laws." It was smart, sophisticated and spot on. It was easy to see why he is one of the most sought after HR Speakers.

Darren Kaplan, CEO hiQ Labs continued the momentum  focusing his TED talk around the importance of public data and data integrity at hiQ Labs.   The hiQ Labs team of PhDs who are all based in San Francisco, CA,  has proved that public data variables can increase the accuracy of  ANY company's retention  models, ensuring the right talent doesn't leave for the wrong reasons.   Mr. Kaplan applauded the

audience for being the new breed of HR People Analytics and asked them to challenge themselves to continue being disruptors in this space by using public make data driven decisions.

hIQ Labs known as the Global standard of People Analytics, spent the rest of the session answering smart questions about how our other Fortune 100 customers are using hiQ Labs models for retention selection and workforce planning.   Many attendees asked about our data sources, how our models work, and the importance of using public data.

 hiQ Labs is looking forward to many future HR technology discussions including a presentation at NYU in the coming months and we look forward to sharing these learnings with the HR community.

.

hr   hrdata   peopleanalytics   retention   recruiting

## Congratulations to hiQ Labs Corporate Council Member McKesson for being featured in The Rise of Adaptive Analytics – Five Principles for Maintaining a Competitive Edge in Workforce Analytics



hiQ Labs Corporate Council member Amit Mohindra of McKesson, was recently featured in a piece called *The Rise of Adaptive Analytics.*  As the Vice President of  Workforce Intelligence Center for Excellence at McKesson, Mr. Mohindra shares five principles for maintaining a competitive edge in workforce analytics and planning:

- **1. Don't let workforce planning be an island.**  By connecting with other analytics groups within the company, you can ensure that there is a large internal labor market for analytics  talent to expand and diversity career options.
- **2. Diversity your workforce analytics talent profiles.**  Mohindra recommends hiring people with various backgrounds – he's hired internal talent  from HR, Finance,  Operations and IT, as each person brings a new perspective, skills and relationships to the team.
- **3. Create matrix relationships across your organization.** Avoid building an 'ivory tower' where all of the data and understanding stay with your unit.  Look for ways to build analytics infrastructure in your business units and across other divisions.
- **4. Organize for success.**  Mohindra believes in a separate of reporting and analytics. At McKesson the basic HR reporting is housed within HR, and the more complicated analysis are escalated to his team.  Their team is organized into three pillars: Analytics, Workforce Planning and Operations & Technology.
- **5. Have an array of tools.**  Their team uses many tools including Excel, Stata, SPSS, and as a team they are learning R for its flexibility and positive budget impact (it's free, compared to SAS)

Contact us for more information about the article. To learn more about our Corporate Councils visit www.hiqlabs.com

hr   mckesson   retention   hrdata   peopleanalytics   talentanalytics   shrm

**1 note**

# Meet hiQ Labs, The Market Shaper says…The Economist



"Big Data is all the buzz these days. And with good reason.  It is a vast storehouse of information that – with the right algorithms and filters – can be turned into actionable insight. Nowhere  is Big Data more valuable than in Human Resources and Talent Management," said  Meghan Biro of Forbes in this recent article.  And we're just getting started.  With companies earmarking astronomical consulting and HR software budgets, you'll continue to see new and innovative tools disrupting the market.

**hiQ Labs featured as one of the market shapers in the HR Data space.**

hiQ Labs Chief Data Scientist  was featured this month in The Economist article, "Meet The Market Shapers" as one a market shaper of this multi-billion dollar space.

 "The data team at hiQ Labs reckons machine learning can revolutionize business. For most firms the cost of losing a senior employee is far greater than keeping existing workers happy. Leavers take knowledge and contacts with them and often induce loyal underlings to follow them out the door. In response big firms try to identify angst building in the workforce, using staff-wide surveys and blanket interviews to spot dissatisfaction. The result of this approach—a pay rise here, tax-free bikes or child care vouchers there—are then rolled out across all staff.

This blanket approach could be improved if firms knew who was most at risk of leaving, says Ms Graves. Algorithms devised by hiQ Labs solve this. Using a firm's in-house data—from pay scales to organograms and job titles—and comparing it with information on pay and vacancies in competitor firms, it can predict who might defect, and for what reason. Managers then hone in on the potential deserters, offering a tailored solution which often turns out to be something other than a pay raise."

According to the article, "the empirical technique [we] employ at hiQ Labs, known as 'machine learning', is at the core of the new world of business economics."

hiQ Labs couldn't agree more.

hr   peopleanalytics   shrm   retention   engagement   talent

# hiQ Labs Talks about Retention Programs and the Frustrating Cycle of Too Little, Too Late.



We all know that employee retention is critical to company success. And the longer a good employee stays with our company, the more valuable they become -They learn our systems, our clients, and how to work within our organization, making a good employee critical to smooth operations. Knowing that it's critical to keep our best employees from leaving, many HR Business Partners turn to retention programs to address the problem of employee turnover. It's common practice to take information from exit interviews, create sweeping retention programs to address problems, implement the program and then measure its success.  It takes months and costs big bucks.

 If you're on the HR Analytics side, you do the same thing, but gather data from a wide variety of sources, sometimes exit interviews or HRIS data.  We gather that data to retroactively explain what correlates with leaving the firm and come up with another retention program.  This has been the way that HR has approached turnover and retention in the past. We call this the cycle of WHY – focusing only on why we think employees are leaving.

 In some ways, it's incredibly valuable to know this information. But it shouldn't be the only information you act on, because it's not enough. Traditional retention programs only look BACK trying to create causational relationships out of correlates. The retention programs we create take months to implement, are costly and are not effective for everyone. So how do organizations break free of this cycle of too little, too late?  If we are going to be able to keep up with an improving economy, easier professional networking (allowing our best employees to be poached away), and the highest-ever mobility of employees, then **we must move from reactive to *predictive*.** And we must move from guessing at what most people want to focusing on the highest risk individuals.

 The good news is, new technologies not only allow us to do this, but we can do it with fewer resources using predictive analytics products like hiQ Labs Control Center.  hiQ Control Center is a next generation tool that allows HR Executives and Business Partners to proactively identify employees who are at the highest risk of leaving.  The complex algorithms search publicly available data, which has been shown to be more accurate than internal data alone, and assess the turnover risk of each individual.

Using hiQ Labs predictive retention model, HRBPs are then freed up to focus on the key employees with the highest turnover risk and use their existing toolkit on an individual level - all with less time, fewer resources and lower cost than traditional retention programs.  And it's a win-win for both companies and employees because the best employees benefit by getting access to exactly what they need to thrive at your organization.

It's time to move away from the too little, too late Cycle of Why and look forward to Predicting Who.

hr   shrm   machinelearning   peopleanalytics   talentanlytics   hire

**1 note**




**Human Resources and Quantitative Scientists**

This past year, hiQ Labs met with many Fortune 500 companies to discuss how Public Data is impacting their people decisions. One of the recurring themes we've been hearing is that it's an exciting time to be a quant person in HR. It's been well documented that there is a talent shortage when it comes to big data, and Human Resources is no exception. A 2011 McKinsey report estimates there will be 140,000 to 190,000 unfilled positions of U.S. data analytics experts by 2018. This is an exciting time to be a quant person in HR, as these skills are in high demand by Fortune 500 companies looking to build out their internal capacity for HR data analysis.

In the past, HR reporting has been focused what we'll call familiar data—  internal reporting on things like performance reviews, compensation, benefits - all important things to track and understand for your organization. Now, we're seeing leading companies turn to hiQ Labs to incorporate public data into their people models on both individual and industry levels.  Data saavy companies are starting to incorporate this public data into their operations and the big winners are employees who are getting more access to internal opportunities as companies work to stay competitive and develop their people rather than lose them.  And all of this analysis is made possible with the help of quantitative scientists.

We want to highlight a few top tier US universities that offer one and two year graduate programs in data science to help companies find their next quantitative scientists

Berkeley- Designed for data science professionals, the Master of Information and Data Science prepares students to derive insights from real-world data sets, using the latest tools and analytical methods to interpret and communication findings in ways that influence decision-making.

Rutgers - Masters of Business in Science, interdisciplinary program unites the fields of data management, statistics, machine learning and computation. It prepares students for careers as predictive modelers, data mining engineers and analysts in a wide variety of industries

MIT Sloan - Master in Business Administration, (and offers a 20 month executive MBA track), allowing candidates to create their own customizable curriculum and specialized tracks include Enterprise Management, Finance and Entrepreneurship and Innovation.

Michigan State - Master of Science in Business Analytics (one year program); Core courses include business strategy, data mining, applied statistics, project management, marketing technologies, communications and ethics. In the final semester, students complete a capstone practicum in business analytics.

Northwestern University - Online Master of Science in Predictive Analytics and Master of Science in Analytics covers areas like data mining, predictive modeling, and advanced statistics, but also works to help students hone business-focused skills like project management and communication, with the aim of preparing students to lead business initiatives based on data analysis.

Stanford - Master of Science in Computer Science, Information Management and Analytics track covers the principles underlying modern database and information management systems and methods for mining massive data sets.

Written by: hiQ Labs Data Scientist

hr   talentanalytics   workforceanalytics   shrm   data   MIT   Stanford
rutgers   northwestern



Professional Networking outpaces Employee Referrals as #1 Source of Hires.

It has taken ten years for professional networking to become part of mainstream hiring, but it's now considered to be one of the **most important sources of quality candidates** by almost half of US companies, outstripping even the reliable employee referral.

Employee referrals use to be a company's bread and butter and it's easy to see why;  typically employee referrals cost less to acquire, perform better and stay longer.  So what is so important about professional networking?  And are you missing the boat if you're not considering its effects in your strategic workforce planning?

Professional networking can cause serious heartburn for strategic workforce planning.  Because employees have access to a vastly larger field of contacts and employment opportunities through networking sites, such as LinkedIn, employees can easily see what else is out there -and with very little risk to their current job.  Many employees now see changing employers as the easiest way to advance in their careers.  Gone are the days of assuming a new hire will be on your roster for the next five years – and it wreaks havoc on a company's ability to plan for future work force needs.

Even though it causes headaches for workforce planning efforts, social networking is also a critical tool that companies can't afford to ignore.  Cultivating relationships with people outside of your organization who have key skills (even though they may not be ready to join today), is as critical as identifying employees inside of your organization to take on future roles.   And it's easier than ever to find and connect with them using professional networking tools.

Employee referrals were a wonderful way of learning of new talent- but passive.  You had to wait until an employee (who knew of the job opening in the first place) decided to tell a qualified friend, who in turn decided they were interested, and who then reached out to you.  Now, you can find the right talent and then figure out who they know within your organization.  Or lead them to someone if they don't already know anyone.  Professional networking is a valuable way to cultivate relationships well in advance of hiring, and to reach people your organization couldn't have reached in the past.

**Professional networking is a key driver to improve company referrals.**  It's time to take control of the heartburn and make professional networking work for you.

hr   hrdata   employeereferal   retention   talenanalytics



**Building a People Analytics Team**

It's well recognized that HR is starting to reposition itself as a strategic partner within their organizations. The word is out on HR Analytics, and you probably already know that the future of HR lies in developing data-driven analysis that can help organizations make better strategic decisions.

As companies embrace analytic decision making within HR, they are not only incorporating disruptive technologies –such as our predictive retention model  –  but are also creating internal capacity to gather, analyze and act on that information.

HR organizations around the country are beginning to grow this in-house capacity with new HR People Analytics roles.

Director of People Analytics – The hottest role of 2015!  This specialized role that didn't exist until recently at many organizations is becoming a must have strategic role. Directors help guide teams of analysts and functional directors with a laser focus on business strategy.

Dr. Janice Presser, CEO of The Gabriel Institute, says, "The current trends in big data will provide new ways for HR to prove its value, so we can expect HR departments to want to add people who can analyze and make projections using these tools, and people who can drive positive change using the information derived from the analysis."

"The future of the HR director is going from the generalist role to the strategist – the people strategist," said Ron Thomas, Director of talent and human resources solutions and New York City based Buck Consultants.

Data Analysts and Scientists – Listed as one of the hardest to fill jobs, Data Scientists have the skills necessary to manage and structure massive amounts of data.  And the need for specialized skills in data analysis and HR is growing.   Currently, most Data Analytics teams have an average of 3 employees. You'll continue to see HR data teams grow as demand increases for more access to their unique skillsets and new titles such as Workforce Analyst and Data Scientist.

Written by: hiQ Labs Data Scientist

hr    hrdata    retention    peopleanalytics    workforceplanning    talentanlytics



hiQ Labs' team was mentioned in  Forbes , "The Top 10 Disruptions in HR Technology: Ignore Them At Your Peril" by Josh Bersin.  Mr Bersin recognized our "innovative new analytics solution for retention, [and for attracting] some of the top data scientists in Silicon Valley".

Our first product - hiQ Control Center, referenced by Mr Bersin- is a SaaS tool using predictive analytics to address key employee turnover.  The driving minds behind our predictive power include PhDs from Harvard, MIT and Stanford.  They are from a range of backgrounds including former Data Scientists and HR Analysts from companies such as LinkedIn and Merck.  Our team has a deep HR Knowledge and a strong understanding of applying science and math to HR problems. Our team members have been guest speakers at prestigious conferences including Predictive Analytics World and  HR Technology. We have a select group of very smart people working behind the scenes on cutting edge data analytics.  But what we deliver to our clients is practical and implementable.

hiQ Labs believes that sophisticated analytics are only valuable when they lead to simpler and more powerful solutions.  That's why hiQ Labs predictive analytics allows companies to focus on the most valuable employees at the highest risk of leaving;  making customized intervention possible months ahead of two weeks' notice.

Contact us to learn more about what our team has accomplished and our predictive people analytics tools.

written by: hiQ Labs Data Scientist

#predictiveanalytics #talentanalytics #forbes #disruptiveHR #peopleanalytics #hrdata #hr #shrm



hiQ Labs' predictive employee retention analytics was featured in the Forbes article, "The Talent Analytics Market Heats Up With New Cloud Offerings" by Josh Bersin.

Mr. Bersin validates the people analytics market by highlighting the increased demand for "data-driven HR". He also points out that organizations are working feverishly to build out their HR Data Teams.

How big is this market opportunity? According to Deloitte research cited in the article, only 4% of HR departments are currently using any form of predictive analytics and more than 60% are struggling to get any usable information from the internal data they already have.

hiQ Labs' predictive employee retention SaaS tool mentioned by Mr. Bersin, gathers massive amounts of public data, analyzes and then makes highly significant predictions about who is most at risk of leaving an organization through 'push' or 'pull' factors (such as competitive pay or other job offers).

hiQ Labs' public data retention predictions are four times more accurate than internal data alone. This actionable insight gives organizations the power to individually intervene with their most valuable – and most at risk – employees well ahead of two weeks' notice.

Written by: hiQ Labs Data Scientist

hr   shrm   talentanalytics   peopleanalytics   hrdata



Forbes named hiQ Labs as one of the Top 10 Disruptions in HR Technology. We want to thank all our customers and hiQ Corporate Council Members  for always pushing us to build the best in-class people analytics tools.

hiQ Labs - The Global Standard for People Analytics

hr    shrm    workforceanalytics    peopleanalytics    hrdata

hiQ Labs' Blog



McKesson hiQ Experience table.  Great conversation about People Analytics, Workforce Planning and HR Machine Learning Models. Thank you McKesson!

hiQ Labs - Find | Build |  Keep


hr    shrm    peopleanalytics    workforceplanning    hrdata

h



GE Aviation talking about their People Analytics team at hiQ Labs Corporate Council. Predictive HR is the future! It was exciting to hear Ross speak about how GE Aviation's HR team makes data-driven people decisions.

hr   shrm   workforceanalytics   peopleanalytics





hiQ Corporate Council | October 15 |  Silicon Valley

People Analytics | Predictive Retention

Keynotes: GE, COKE and Pfizer

retention workforceanalytics peopleanalytics hrdata

EXHIBIT 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5   hiQ LABS, INC.                    )
                                       )
 6         Plaintiff,                  )
                                       )
 7     vs.                             )Case No.
                                       )17-CV-03301-EMC
 8   LINKEDIN CORPORATION,             )
                                       )
 9         Defendant.                  )
                                       )
10
11
12
13
14
15     *** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
16
17
18                REMOTE VIDEO DEPOSITION OF
19                       BLAKE LAWIT
20
21
22
23   DATE TAKEN:  May 20, 2022
24
25   REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR
```

Page 7

1          THE VIDEOGRAPHER:  Thank you.  Could the

2      court reporter please administer the oath.

3

4                    --o0o--

5

6     APPEARING VIRTUALLY FROM MENLO PARK, CALIFORNIA;

7           FRIDAY, MAY 20, 2022, 11:02 A.M.

8

9                    BLAKE LAWIT,

10   called as a witness and having been first duly

11   sworn by the Certified Shorthand Reporter, was

12   examined and testified as follows:

13

14                   EXAMINATION

15

16    BY MS. SKIBITSKY:

17      Q.  Good morning, Mr. Lawit.

18      A.  Good morning.

19      Q.  My name is Hope Skibitsky.  I represent

20   hiQ in this matter.

21          Can you please state your full name for

22   the record.

23      A.  Blake Justin Lawit.

24      Q.  And are you currently employed,

25   Mr. Lawit?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1        A.   I am.

2        Q.   Who is your employer?

3        A.   LinkedIn Corporation.

4        Q.   And what is your current title?

5        A.   Senior vice president and general

6   counsel.

7        Q.   Mr. Lawit, have you ever been deposed

8   before today?

9        A.   I have not.

10       Q.   Is it safe to assume, although you have

11  not been deposed, you have experience observing

12  depositions?

13       A.   Yes.

14       Q.   Okay.  In that case, I think we can

15  probably skip the general instructions.

16            And I will note, though, I'm not sure if

17  you've done recently some of these Zoom

18  depositions, but Zoom sometimes makes it a little

19  bit more difficult to not speak over each other.

20  So I'll try to give you a little bit of time after

21  I think you're done answering a question, and I'd

22  ask you to do the same for me because it's

23  sometimes -- the connection is somewhat delayed.

24            Mr. Lawit, is there any reason that you

25  cannot testify truthfully today?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 9

1          A.   No.

2          Q.   Do you understand that you have been

3    designated to testify on behalf of LinkedIn on

4    certain topics today?

5          A.   I do.

6          Q.   Is one of those topics the circumstances

7    under which LinkedIn, as an entity, first became

8    aware of hiQ?

9          A.   Yes, I believe that is -- I have Topics

10   1, 2, 4, 5, 9, 51.  I -- I forget the exact

11   language but if you -- if you show me the notice,

12   I'd be able to do that.  But generally speaking,

13   yes.

14         Q.   Okay.  Sure.  I'm happy to show you the

15   notice.

16         A.   Sure.

17              MS. SKIBITSKY:  I'm having a hard time

18         seeing the file names -- okay.  I have it

19         now.

20              Can we pull up Tab 54, please?

21              THE TECHNICIAN:  Yes, Counsel.

22              MS. SKIBITSKY:  Thank you.

23              THE TECHNICIAN:  You're very welcome.

24              Will this be Exhibit 1?

25              MS. SKIBITSKY:  This will be Exhibit

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 14

1    3, it states, "Subject to and without waiver of
2    the foregoing objections, LinkedIn will provide a
3    designated witness who is reasonably prepared to
4    provide non-privileged testimony regarding the
5    circumstances under which LinkedIn as an entity
6    first became aware of hiQ."
7         Do you see that language?
8    A.  I do.
9    Q.  Are you prepared to testify today as to
10   the circumstances under which LinkedIn as an
11   entity first became aware of hiQ?
12   A.  Yes.
13   Q.  And can we take a look at Topic of
14   Examination 2, please?
15   A.  Yes.
16   Q.  And if you look at line 23 through 26,
17   that topic -- that language states, "Subject to
18   and without waiver of the foregoing objections,
19   LinkedIn will provide a designated witness who is
20   reasonably prepared to provide non-privileged
21   testimony regarding the circumstances under which
22   LinkedIn as an entity first became aware of hiQ's
23   access to and use of LinkedIn member data."
24        Do you see that language?
25   A.  I do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 15

1    Q.  Are you prepared today to testify on that

2   topic?

3    A.  Yes.

4    Q.  Okay.  Mr. Lawit, can we look at Topic of

5   Examination No. 4, please.

6    A.  Yes.

7    Q.  Specifically, we can look at page 6,

8   lines 14 through 17.

9        That says, "Subject to and without waiver

10  of the foregoing objections, LinkedIn will provide

11  a designated witness who is reasonably prepared to

12  provide non-privileged testimony regarding

13  LinkedIn's cease-and-desist communications with

14  hiQ and communications between LinkedIn's Business

15  Development team and hiQ."

16        Do you see that language?

17   A.  I see it.

18   Q.  Are you prepared to testify today on that

19  topic?

20        MS. HURST:  Objection.  That's not the

21        scope of the designation for this witness.

22        THE WITNESS:  I'm prepared to testify

23        regarding LinkedIn's cease-and-desist

24        communications with hiQ.  I believe another

25        witness has been designated for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 51

1          MS. SKIBITSKY:  Okay.  I'd ask that that

2      document be produce to the extent it has not

3      already.

4          MS. HURST:  Sure.

5   BY MS. SKIBITSKY:

6      Q.  Okay.  Mr. Lawit, thank you for that.

7   And if you can pull up Exhibit 1007?

8      A.  Okay.

9      Q.  Okay.  So this again is Defendant

10  LinkedIn Corporation's Response to Second Set of

11  Interrogatories.

12          Can we please look at Interrogatory

13  No. 8, which starts on page 3.

14      A.  Yes.

15      Q.  And you're welcome to read whatever you'd

16  like to read of this interrogatory and its

17  response, but I'd like to direct your attention to

18  page 4, starting at line 7.

19      A.  Yes.

20      Q.  So this states, "After a reasonable

21  investigation, the first record of any LinkedIn

22  employee wondering whether hiQ might be scraping

23  LinkedIn data is an October 8th, 2014, e-mail from

24  William Gaker, (Senior Manager Business Operations

25  on the Talent Analytics team) to Daniel Maurath

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 52

1    (Analyst in Talent Analytics at the time)."

2             Do you see that?

3        A.   I do.

4        Q.   And if we go down to line 14, it states,

5    "Neither Mr. Gaker nor Mr. Maurath, nor the teams

6    on which they worked, had responsibility on behalf

7    of LinkedIn to identify potential scraping or take

8    enforcement action against potential scrapers."

9             Do you see that?

10       A.   I do.

11       Q.   In October of 2014, did anyone at

12   LinkedIn have responsibility on behalf of LinkedIn

13   to identify potential scrapers?

14       A.   Yes.

15       Q.   And who was that or those individuals?

16       A.   As a function, it would have been a

17   shared responsibility between the legal teams, the

18   trust and safety teams and support probably -- to

19   identify scrapers, it could also be the trust

20   product or trust engineering teams.

21       Q.   And in October of 2014, did anyone at

22   LinkedIn have responsibility on behalf of LinkedIn

23   to take enforcement against potential scrapers?

24       A.   Yes.

25       Q.   Is that the same group that you just

Page 53

1    identified?

2        A.   Are you talking about legal-related

3    enforcement?

4        Q.   Any enforcement.

5            MS. HURST:   Objection.   Vague.

6            THE WITNESS:   Broadly speaking, those

7        would be the functions that would be -- have

8        responsibility for our anti-scraping

9        strategy.

10   BY MS. SKIBITSKY:

11       Q.   Can we look at page 6 of Exhibit 1007.

12       A.   Yes.

13       Q.   Actually, I'm sorry, page 5, starting at

14   line 20.

15            Okay.   So this states, "In September

16   2015, hiQ apparently began publicizing its

17   upcoming Elevate Conference."

18            Do you see that?

19       A.   I do see that.

20       Q.   And then I'm skipping to line 24, where

21   it reads, "Following the October 2015 hiQ Elevate

22   conference, one of the attendees from Talent

23   Analytics, Lorenzo Canlas, reached out to Adam

24   Weinstein, (Senior Manager, Platform and Emerging

25   Products), and Boyu Zhang (Senior Associate,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 61

```
 1   STATE OF CALIFORNIA        )

 2                              (       ss.

 3   COUNTY OF LOS ANGELES      )

 4

 5           I, RENEE HARRIS, do hereby certify that I

 6   am a licensed Certified Shorthand Reporter, duly

 7   qualified and certified as such by the State of

 8   California;

 9      That prior to being examined, the witness named

10   in the foregoing deposition was by me duly sworn

11   to testify to tell the truth, the whole truth, and

12   nothing but the truth;

13      That the said deposition was by me recorded

14   stenographically;

15      And the foregoing pages constitute a full,

16   true, complete and correct record of the testimony

17   given by the said witness;

18           That I am a disinterested person, not

19   being in any way interested in the outcome of said

20   action, or connected with, nor related to any of

21   the parties in said action, or to their respective

22   counsel, in any manner whatsoever.

23   DATED: May 23, 2022

24

                         _____

25                         Renee Harris, CSR 14168, RPR
```

EXHIBIT 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4    --------------------------------------------------x

5    hiQ LABS, INC.,

6                  Plaintiff,

7    vs.                                Case No.

                                        17-cv-03301-EMC

8    LINKEDIN CORPORATION,

9                  Defendant.

10   --------------------------------------------------x

     AND RELATED CROSS-ACTION.

11   --------------------------------------------------x

12

13        *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

14

15

16      REMOTE 30(b)(6) VIDEOTAPED DEPOSITION BY ZOOM OF

17                   LINKEDIN CORPORATION

18           CORPORATE DESIGNEE: BLAKE LAWIT

19                Friday, August 26, 2022

20                        Day 2

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 68**

1    Solutions.

2         I'm not related to any party in this

3    action nor am I financially interested in the

4    outcome.

5         If there are any objections to proceeding,

6    please state them at the time of your appearance.

7         Counsel and all present, including

8    remotely, will now state their appearances and

9    affiliations for the record beginning with the

10   noticing attorney.

11        MS. SKIBITSKY:  Hope Skibitsky from Quinn

12   Emanuel Urquhart & Sullivan on behalf of hiQ Labs

13   Inc.

14        MS. HURST:  Annette Hurst from Orrick on

15   behalf of LinkedIn and the witness.

16        THE WITNESS:  Blake Lawit, the 30(b)(6)

17   witness for LinkedIn Corporation.

18        VIDEOGRAPHER:  Will the court reporter

19   swear in the witness.

20                      BLAKE LAWIT,

21   having been first duly sworn, testified as follows:

22        MS. HURST:  Just to note for the record

23   that Sarah Wight from LinkedIn is also present.

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 69

1                    EXAMINATION

2  BY MS. SKIBITSKY:

3        Q      Good morning, Mr. Lawit.

4        A      Good morning, Hope.

5        Q      Good to see you again.

6               Mr. Lawit, can you please state your full

7  name for the record?

8        A      Blake Justin Lawit.

9        Q      Are you currently employed by LinkedIn?

10       A      I am.

11       Q      What is your title with LinkedIn?

12       A      Senior vice president general counsel.

13       Q      Is there any reason you can't testify

14  truthfully today?

15       A      No.

16       Q      Do you recall sitting for a deposition in

17  this matter on May 20th, 2022?

18       A      I do.

19       Q      And you were designated as a 30(b)(6)

20  witness for purposes of that deposition; is that

21  correct?

22       A      Yes.

23       Q      And do you understand that you're still

24  designated as a 30(b)(6) witness for purposes of

25  today's deposition?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1        A     Yes.

2              MS. SKIBITSKY:  Can we pull up the tab

3     that's just called Link hiQ and then there is a

4     Bates number.  This should be marked as

5     Exhibit 1495.

6              VERITEXT CONCIERGE:  Exhibit 1495 has been

7     marked.

8              (Exhibit 1495 was marked for identification

9     by the court reporter.)

10    BY MS. SKIBITSKY:

11       Q     Mr. Lawit, you're looking at the exhibit

12    that has been marked as Exhibit 1495?

13       A     Yes, I am.

14       Q     Have you seen this document before?

15       A     Yes, I have.

16       Q     And you understand that this is a document

17    produced by LinkedIn in this litigation in August of

18    2022?

19       A     Yes.

20       Q     Mr. Lawit, on the second email of this

21    chain, so second email from the top, it's an email

22    from William Gaker to Daniel Maurath, Lorenzo Canlas

23    and the talent analytics listserv.

24              Do you see that?

25              MS. HURST:  Objection, form.  It's not the

Page 72

1      A     Yes, I want to be able to review the

2   document.  It's kind of confusing how it's moving

3   around like that.  So let me look at it again.

4            Yes.  The answer to your question is yes.

5      Q     And Peter Rigano responds to Mr. Gaker's

6   October 8th, 2014 email and Mr. Rigano's email is on

7   October 28th, 2014 at 11:50 a.m.

8            Do you see that, which is on the top of

9   the first page of the document?

10     A     Yes, I do.

11     Q     And Mr. Rigano's title at this time was

12  senior associate business operations on a talent

13  analytics team; correct?

14     A     I believe that he was -- he was in the

15  talent analytics team in our biz ops -- business

16  operations group.  I don't recall the exact title but

17  that sounds right.

18     Q     And Mr. Rigano writes, "If our main

19  interest in the company/conference is assessing

20  their usage of LI data, I'd suggest we hand off to

21  legal and let them investigate further."

22            Do you see that?

23     A     I see that.

24     Q     Did any participant on this email thread

25  report hiQ's potential access of LinkedIn data to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

1    any LinkedIn -- to anyone within LinkedIn's legal

2    department?

3           A      No.

4           Q      What is the basis for your understanding

5    that no one on this email thread reported

6    LinkedIn's -- hiQ's potential usage of LinkedIn data

7    to anyone within LinkedIn's legal department?

8           A      Spoke to Mr. Rigano, and that is what he

9    told me.  I spoke to Mr. Maurath, he confirmed that.

10          I asked Ms. Wight, who had responsibility

11   at the time, whether or not it had happened and she

12   told me it had not.

13          Q      When you say Ms. Wight had responsibility

14   at the time, what specifically did Ms. Wight have

15   responsibility for?

16          A      Our legal-related anti-scraping enforcement

17   efforts.

18          Q      Did you speak with Mr. Gaker about this

19   email?

20          A      I did not.

21          Q      Is Mr. Gaker still employed by LinkedIn?

22          A      No.

23          Q      Do you know when Mr. Gaker ceased to be

24   employed by LinkedIn?

25          A      No.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 86**

1        I, LYNNE M. LEDANOIS, a Certified

2   Shorthand Reporter of the State of California, do

3   hereby certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that a record of the proceedings was made by me

7   using machine shorthand which was thereafter

8   transcribed under my direction; that the foregoing

9   transcript is a true record of the testimony given.

10        Further, that if the foregoing pertains to

11   the original transcript of a deposition in a Federal

12   Case, before completion of the proceedings, review

13   of the transcript [] was [x] wasn't requested.

14        I further certify I am neither financially

15   interested in the action nor a relative or employee

16   of any attorney or party to this action.

17        IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20   Dated: August 29, 2022

21

22

23

24   _____

     LYNNE MARIE LEDANOIS

25   CSR No. 6811

EXHIBIT 34

1                   UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4    HIQ LABS, INC.,

5                   Plaintiff,

6    vs.                       Case No. 17-cv-03301-EMC

7    LINKEDIN CORPORATION,

8                   Defendant.

9    _____

10   AND RELATED CROSS-ACTION.

11   _____

12

13

14                       CONFIDENTIAL

15          VIDEOTAPED DEPOSITION OF DARREN KAPLAN

16                       May 4, 2022

17                        9:10 a.m.

18

19          2601 South Bayshore Drive, Suite 1550

20                      Miami, Florida

21

22   KATHIA CAMACHO, Court Reporter

23   Transcribed by TERRI NESTORE
     CSR No. 5614, RPR, CRR

24

25   Job No. 10103963

1        Q.  Focusing on the words, you took copies of the

2   words and brought those into hiQ's system?

3        A.  I took words.

4        Q.  And the product that you built depended on hiQ's

5   ability to take those copies of words from LinkedIn's

6   website and put them into hiQ's system, correct?

7             MS. SKIBITSKY:  Objection, form.

8             THE WITNESS:  I would say the -- I just want

9   to...  we were looking at someone's public information

10  that had their name and if it was on the LinkedIn website,

11  it was on the public side.  So I just want to clarify

12  that, of where it was.

13  BY MR. RUGANI:

14        Q.  Did hiQ get the information that was on

15  individuals' LinkedIn profile pages from anywhere other

16  than LinkedIn's website?

17            MS. SKIBITSKY:  Objection, form.

18            THE WITNESS:  I know that LinkedIn was a main

19  source.  I wasn't on the data science team so I don't know

20  other sources but that was a main source.

21  BY MR. RUGANI:

22        Q.  And specific to the information that was on

23  individual's LinkedIn profiles that hiQ used in its

24  products, did hiQ get the LinkedIn profile information

25  from anywhere other than LinkedIn's website?

1        MS. SKIBITSKY:  Objection, form.

2        THE WITNESS:  Certain customers provided us with

3    employee names and job titles, so there were times where

4    our customers provided us with information about a job

5    title, a location, a college so we could get -- if we got

6    certain information from the employer.

7    BY MR. RUGANI:

8        Q.  And so despite the fact that the product that you

9    built relied on information that was collected from

10   LinkedIn's website, you didn't do anything to assess

11   whether there were rules that LinkedIn published about

12   accessing its websites that might apply to hiQ's

13   collection of information?

14       A.  We spent a lot of time thinking and talking about

15   the logged in part and why not to touch it.

16       Q.  And with respect to the not logged in part, you

17   didn't do anything to determine whether LinkedIn had rules

18   in place around whether or not you could collect

19   information from the non-logged in part of the website?

20       MS. SKIBITSKY:  Objection, form.

21       THE WITNESS:  We've always believed that that was

22   public information.

23   BY MR. RUGANI:

24       Q.  Aside from your belief that that was public

25   information, you didn't review any LinkedIn terms of

1    LinkedIn of the nature that Mr. Weidick is referring to

2    here, at any time prior to April of 2017?

3        A.   I just remember him.  No, I don't remember.

4             I don't recall.

5        Q.   Mr. Kaplan, do you know what turking is?

6        A.   I don't.

7        Q.   Do you have any understanding as to whether hiQ

8    employed turking as part of its data collection efforts?

9        A.   We did.

10       Q.   How would you describe to me hiQ's use of turking

11   in its data collection efforts?

12       A.   We have turkers.  That's what I know.

13       Q.   Do you have any understanding of what they did on

14   hiQ's behalf?

15       A.   No.

16       Q.   Do you have any understanding as to whether

17   turkers did their work logged in, as opposed to logged out

18   of LinkedIn?

19       A.   I do not.

20            MR. RUGANI:  Nine.  This is our Tab 152.

21            (Exhibit 9 marked.)

22   BY MR. RUGANI:

23       Q.   Mr. Kaplan... would you mind, for just one

24   second.  So Exhibit 9, the Bates number is hiQ_00019673.

25            Have you ever seen this document before?

```
 1        A.  I have not.  No, I have not.

 2        Q.  If you go down to number 3, which starts at the

 3   very bottom of the first page -- actually, let's go --

 4   start up at the top.  So the top says, "This document is a

 5   debriefing and training on mechanical turking for the

 6   Keeper product."

 7             Do you have any reason to believe that this

 8   document is anything other than what is represented by

 9   that sentence?

10        A.  I would feel better if we know who it was written

11   to or something with hiQ, but it doesn't say anything but

12   I will...  I have no reason not to believe but it's not

13   signed or attached to anything, it's just a document.

14        Q.  If you look down at number 3, which starts at the

15   bottom of that first page, Item 3 says logged into a

16   linkedin.com -- sorry -- "Log into a linkedin.com account.

17   It is a good idea to make a fake account with a fake

18   email, to deal with the possibility of being banned" by

19   LinkedIn -- "banned on LinkedIn," excuse me.

20             Do you see those sentences?

21        A.  Yes.

22        Q.  Did you have an understanding that turkers

23   working on behalf of hiQ were doing so logged into

24   LinkedIn accounts?

25        A.  No.
```

1          Q.  Do you have an understanding that turkers who

2    were working on behalf of hiQ were making fake LinkedIn

3    accounts with fake emails in order to do the work logged

4    in into LinkedIn's system?

5               MS. SKIBITSKY:  Objection, form.

6               THE WITNESS:  I didn't know what LinkedIn -- I

7    didn't know what turkers were doing.

8    BY MR. RUGANI:

9          Q.  Sitting here today as you review this document,

10   does it cause you any concern that people were making fake

11   accounts to log into LinkedIn to perform work on hiQ's

12   behalf?

13              MS. SKIBITSKY:  Objection.

14              Form, assumes facts not in evidence.

15              THE WITNESS:  Yeah, I don't know what they were

16   doing.

17   BY MR. RUGANI:

18         Q.  Would it cause you concern as the CEO, former CEO

19   of hiQ, that there were people who, on hiQ's behalf,

20   logged into LinkedIn with a fake account in order to do

21   work for hiQ?

22              MS. SKIBITSKY:  Objection.  Form, assumes facts.

23              THE WITNESS:  I don't know what they were doing.

24   BY MR. RUGANI:

25         Q.  But if they were doing that, would that give you

 1   **any concern?**
 2       A.   I don't -- I do not know what they were doing.
 3            MR. RUGANI:  The next one is 10.  It's an email.
 4            The Bates number is hiQ_00189601.
 5            It's a May 5th, 2016, email.
 6            (Exhibit 10 marked.)
 7   BY MR. RUGANI:
 8       **Q.   And Mr. Kaplan, you are not on the email.**
 9            **Go ahead and read it, if you would like.**
10            MR. MULLER:  What tab will this be?
11            MR. RUGANI:  So sorry.  It was Tab 29.
12            MR. MULLER:  Will Tab 152 be available digitally
13   as well?
14            MR. RUGANI:  Yeah, we'll make sure we do so.
15       **Q.   All right, have you had a chance to read that?**
16       A.   Yes.
17       **Q.   Did anybody at any time, while you were CEO of**
18   **hiQ, raise a concern that by turking, hiQ might be in**
19   **violation of LinkedIn's user agreement?**
20            MS. SKIBITSKY:  Objection, form.
21            THE WITNESS:  I'm sorry, can you ask that one
22   more time?
23   BY MR. RUGANI:
24       **Q.   Sure.  At any time while you were CEO of hiQ, did**
25   **anyone raise any concerns to you that turking might be in**

```
1                    C E R T I F I C A T E

2

3          I, TERRI NESTORE, Certified Shorthand Reporter/

4   Transcriptionist, do hereby certify that I was authorized

5   to transcribe the foregoing recorded proceeding, and that

6   the transcript is a true and accurate transcription of my

7   shorthand notes, to the best of my ability, taken while

8   listening to the provided recording.

9

10         I further certify that I am not of counsel or

11  attorney for either or any of the parties to said

12  proceedings, nor in any way interested in the events of

13  this cause, and that I am not related to any of the

14  parties thereto.

15

16

17  Dated this 22nd day of July, 2022.

18

19

20         _____
           TERRI NESTORE, CSR 5614, RPR, CRR
21

22

23

24

25
```