Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Elisabeth B. Miller (*pro hac vice*)
elisabethmiller@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
Zane Muller (*pro hac vice*)
zanemuller@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6331

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>    *Plaintiff and Counterclaim Defendant*,<br><br>    vs.<br><br>LinkedIn Corp.,<br><br>    *Defendant and Counterclaim Plaintiff.* | Case No. 3:17-cv-03301-EMC<br><br>**HIQ'S RESPONSE TO LINKEDIN'S *DAUBERT* MOTION PURSUANT TO FRE 403, 702 TO EXCLUDE EXPERT TESTIMONY OF STEPHEN MCELFRESH**<br><br>The Hon. Edward M. Chen<br><br>Date:        September 29, 2022<br>Time:       1:30 P.M.<br>Location:   Courtroom 5, 17th Floor<br>               450 Golden Gate Ave.<br>               San Francisco, CA 94102<br><br>Complaint filed:  June 7, 2017<br>Trial Date:        February 27, 2023 |

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................... 1

STATEMENT OF FACTS ............................................................................................................... 3

    A.    McElfresh's Background and Qualifications ............................................................ 3

    B.    McElfresh's Assignment and Opinions..................................................................... 3

LEGAL STANDARD ...................................................................................................................... 5

ARGUMENT ................................................................................................................................... 6

I.    MCELFRESH'S OPINIONS ABOUT THE PEOPLE ANALYTICS MARKET ARE ADMISSIBLE ....... 6

    A.    Courts Regularly Recognize Human Resources Expertise ..................................... 6

    B.    McElfresh's Testimony Is Within His Expertise and Will Aid the Trier of Fact ................................................................................................................... 6

II.    MCELFRESH'S OPINIONS ABOUT HIQ'S PRODUCTS ARE INFORMED BY EXPERIENCE AND EXPERTISE AND ARE NOT LAY OPINION ...................................................................... 9

CONCLUSION ............................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page**

## Cases

*Butler v. Home Depot, Inc.*,
  984 F. Supp. 1257 (N.D. Cal. 1997) ........................................................................................ 5

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .......................................................................................................... 1, 5, 11

*Eng. v. Estes Express Lines*,
  2018 WL 1136058 (C.D. Cal. Feb. 15, 2018) ........................................................................ 6

*Exeltis USA Inc. v. First Databank, Inc.*,
  2020 WL 7025089 (N.D. Cal. Nov. 30, 2020) ....................................................................... 8

*Ferretti v. Pfizer Inc.*,
  2013 WL 140088 (N.D. Cal. Jan. 10, 2013) ........................................................................... 7

*Garcia v. McDonald*,
  2020 WL 7408235 (N.D. Cal. Apr. 20, 2020) ........................................................................ 1

*Gianfrancisco v. Excelsior Youth Centers, Inc.*,
  2012 WL 2890916 (D. Colo. July 16, 2012) ........................................................................... 6

*Giulano v. Sandisk*,
  2015 WL 10890654 (N.D. Cal. May 14, 2015) ...................................................................... 5

*Hernandez v. City of Vancouver*,
  2009 WL 279038 (W.D. Wash. Feb. 5, 2009) ........................................................................ 7

*Hiramanek v. Clark*,
  2016 WL 11033962 (N.D. Cal. Mar. 29, 2016) ...................................................................... 1

*In re Apollo Grp. Inc. Sec. Litig.*,
  527 F. Supp. 2d 957 (D. Ariz. 2007) ........................................................................................ 6

*In re High-Tech Emp. Antitrust Litig.*,
  2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ........................................................................... 8

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*,
  2022 WL 1817415 (N.D. Cal. June 2, 2022) .......................................................................... 8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................. 5, 7

*Lucido v. Nestle Purina Petcare Co.*,
  217 F. Supp. 3d 1098 (N.D. Cal. 2016) ............................................................................. 9, 10

*Rodriguez v. Gen. Dynamics Armament & Tech. Prod.*,
  510 F. App'x 675 (9th Cir. 2013) ............................................................................................ 9

*Sitter v. Ascent Healthcare Sols., Inc.*,
    2011 WL 2682976 (N.D. Cal. July 8, 2011) .................................................................. 6

*United States v. Hermanek*,
    289 F.3d 1076 (9th Cir. 2002) .................................................................................... 10

*United States v. Nelson*,
    533 F. Supp. 3d 779 (N.D. Cal. 2021) ......................................................................... 1

*United States v. Rodriguez-Salazar*,
    130 F. App'x 138 (9th Cir. 2005) ................................................................................. 7

*Waymo LLC v. Uber Techs., Inc.*,
    2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ............................................................. 10

**Rules and Regulations**

Fed. R. Evid. 701(c) ............................................................................................................ 9

Fed. R. Evid. 702 ..................................................................................................... 1, 5, 9

Fed. R. Evid. 702(a) ........................................................................................................... 2

Cal. Civ. L.R. § 7-4(b) ........................................................................................................ 1

# MEMORANDUM OF POINTS AND AUTHORITIES

# INTRODUCTION AND SUMMARY OF ARGUMENT

LinkedIn has moved to exclude an expert that does not exist. In lieu of responding to the actual opinions proffered by Dr. Stephen McElfresh ("McElfresh")—opinions grounded in his lengthy career as a Human Resources ("HR") professional—LinkedIn chooses to attack the antitrust and economics opinions of some other, non-existent expert. The Motion complains that "[m]arkets have a specialized meaning in antitrust economics" and that McElfresh "has performed none of the hallmarks of a product market analysis" by the standards that would be expected of an antitrust expert. ECF No. 338 ("LinkedIn's *Daubert* Motion Pursuant to FRE 403, 702 to Exclude Expert Testimony of Stephen McElfresh") at 2.[1] LinkedIn goes so far as to describe the "accepted methods of market analysis" in the field of antitrust, with reference to antitrust caselaw and an economics textbook laying out the methods of an antitrust analysis, and comparison to the work done by its own economics and antitrust expert. *Id.* at 8-9. Because McElfresh does not meet the standard LinkedIn seeks to impose upon him—*i.e.*, the standard of a professional economist conducting an antitrust analysis—LinkedIn attempts to characterize his expert opinions as mere "lay opinion." *Id.*

---

[1] LinkedIn's Motion violates the page length requirements established by this Court for motions *in limine*. Hon. Chen's Civil Pretrial Instructions ("Pretrial Instructions") at C.1 ("Each motion *in limine* should address a single topic and **contain no more than seven pages of briefing per side**.") (emphasis added); *United States v. Nelson*, 533 F. Supp. 3d 779, 789 (N.D. Cal. 2021) (denying motion to exclude or limit testimony, noting that a *Daubert* motion is a motion *in limine*; "[t]he Advisory Committee Note to the 1993 Amendment stated that the bases and reasons must be sufficient to allow counsel to frame ***a Daubert motion (or other motion in limine***), to prepare for cross-examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony") (Chen, J.) (emphasis added). hiQ therefore moves the Court to strike ECF No. 338 from page 8 through the end. *See Garcia v. McDonald*, 2020 WL 7408235, at *1 (N.D. Cal. Apr. 20, 2020) (striking those portions of motion over proscribed page limit). In violation of Your Honor's Pretrial Instructions and Civil Local Rule 7.4(b), LinkedIn never sought leave from the Court to file an oversized motion, instead simply filing a brief nearly triple the allowed length. Cal. Civ. L.R. § 7-4(b); Pretrial Instructions at C.1; *see also Hiramanek v. Clark*, 2016 WL 11033962, at *2 (N.D. Cal. Mar. 29, 2016) (denying *post hoc* request for leave to file oversized motion). Pending resolution of this motion, in an abundance of caution given the parties' stipulated briefing schedule and should the Court determine to consider LinkedIn's Motion in its entirety, hiQ hereby responds to LinkedIn's Motion with a similar number of pages. In all events, however, LinkedIn's Motion should count against LinkedIn's allotted five motions *in limine*. Pretrial Instructions at C.1.

at 2-3, 19-20. In short, LinkedIn asks this Court to exclude McElfresh for the sin of not being an economist.

None of this is relevant. McElfresh is not, and has never purported to be, an expert in either economics or antitrust. His expertise stems from his lengthy career in HR. McElfresh has served as the head of HR for multiple companies, as the CEO of a provider of people analytics, and is currently the principal of an HR consulting firm he founded. His opinions are those of an HR expert, not an antitrust expert, but they are nevertheless expert opinions, informed by "specialized knowledge [that] will help the trier of fact to understand the evidence." Fed. R. Evid. 702(a).

McElfresh offers an expert opinion informed by his knowledge in the field of HR, particularly his specialized knowledge in the field of people analytics, to discuss the people analytics software options available to HR professionals and their evolution over time. Ex. 86[2] (Expert Report of Stephen B. McElfresh ("McElfresh Rep.")) ¶¶ 14-25. He then evaluates hiQ's two particular product offerings, Keeper and Skill Mapper, comparing them to other available products and helping the finder of fact to understand what problems these products were intended to solve and how they offered functionality different from the competition and valuable to HR professionals. McElfresh Rep. ¶¶ 27-41. These opinions are grounded in McElfresh's significant professional experience and expertise, as well as additional research for his assignment in this action, and are reliable. The finder of fact in this action will be aided by his specialized knowledge in understanding what makes hiQ's products unique and how those products were positioned to assist companies with their HR needs.

LinkedIn's attempt to impose inapplicable standards from another field should be rejected. To the extent LinkedIn makes any criticism actually applicable to McElfresh's HR opinions (as opposed to non-existent economics opinions), those criticisms go to the weight, not the admissibility, of his testimony, and do not justify exclusion. McElfresh's opinions, when measured against the standards of his own field of expertise, are both relevant and reliable and should be permitted.

---

[2] Exhibits cited are attached to hiQ's Compendium of Exhibits in Opposition to LinkedIn's August 5, 2022 Motions.

# STATEMENT OF FACTS

## A.   McElfresh's Background and Qualifications

McElfresh's career in HR spans nearly 40 years.  Ex. 87 ("McElfresh Dep. Tr.") 12:3-5. After obtaining his Ph.D in social and organizational psychology, he taught classes in organizational dynamics, a "fairly fundamental part of human resources," at Boston College.  *Id.* at 34:14-17, 35:14-36:8.  He went on to serve as the Vice President or Director of HR at multiple major companies and as the CEO of the Saratoga Institute, the "premiere provider of HR analytics in the world" at the time.  McElfresh Rep. at Ex. A; McElfresh Dep. Tr. 42:11-15.  He is now the Principal of HR Futures, an HR consulting firm he founded offering services in people analytics and HR operations. McElfresh Dep. Tr. 36:9-17.  That work involves helping companies "become more focused and data driven in their decision-making" related to HR.  *Id.* at 37:2-6.  He also maintains engagement in the HR professional community, including work with the Northern California HR Association and the Society for HR Management, and "designed, wrote, and delivered the first HR metrics and analytics program" sponsored by that Society.  McElfresh Rep. at ¶ 4.

These qualifications and more are laid out in McElfresh's expert report as well as the CV attached to that report, and were explored in detail in his deposition.  At no point in his report or deposition did McElfresh represent himself to be an expert in economics or antitrust.

## B.   McElfresh's Assignment and Opinions

McElfresh was asked early in his deposition to summarize his assignment in this action, and replied "[i]t was to discuss the history and development of the field of people analytics and in particular the -- what I perceived and understood to be the market position and opportunity of hiQ." McElfresh Dep. Tr. 17:5-9.  At no point did McElfresh indicate that his assignment involved an economic market analysis.

Based on that assignment, McElfresh prepared an expert report.  McElfresh's report first discusses the world of "people analytics" within the field of HR, defined as "the practice of collecting and applying organizational, people, and talent data to improve critical business outcomes." McElfresh Rep. at ¶ 14.  Citing references including the Academy to Innovate HR, McKinsey, Forbes, and the Harvard Business Review, McElfresh describes the evolution of people analytics

offerings in the marketplace, including the various vendors offering Human Resource Information Systems. *Id.* at ¶¶ 15-20. He discusses a key limitation of these people analytics offerings, namely that they include only "data already known to the organization." *Id*. at ¶ 22. This discussion included mention of his own experience as "both a witness and a contributor to this emerging body of work." *Id.* at ¶ 21. Based on this professional literature and personal expertise, McElfresh opines that he is aware of no offerings other than hiQ's, "with the possible exceptions of Joberate and LinkedIn," which incorporate public data into a people analytics product available in the market. *Id.* at ¶ 25.

After this background information on the people analytics offerings available in the market, McElfresh discusses hiQ's two product offerings, Keeper and Skill Mapper. He opines that both were "novel and valuable." *Id*. at 5. For each product, McElfresh describes the HR problem it attempted to solve, the means by which it did so, and the product's potential usefulness to HR professionals.

For the Keeper product, this analysis involves a discussion of the costs of employee turnover and businesses' traditional means of attempting to reduce turnover. *Id.* at ¶¶ 27-30. He then describes the exact way in which Keeper adds value, by applying predictive algorithms to "pull factors," thus providing an additional tool to reduce employee turnover not previously provided by any HR people analytics tool available in the market. *Id.* at ¶¶ 31-32. McElfresh therefore concludes that Keeper was "desirable for organizations seeking to retain top talent" and had a "first-mover advantage" due to its novel approach. *Id.* at ¶ 36.

For the Skill Mapper product, McElfresh conducts a similar analysis, first identifying the problem of tracking the skills of employees. *Id.* at ¶ 38. He then goes on to describe how Skill Mapper would add value from the perspective of an HR professional, and notes that he is "not aware of any product that existed prior to Skill Mapper's launch that allowed organizations to analyze the skill sets of their workforce in a similar fashion as hiQ's Skill Mapper." *Id.* at ¶¶ 39-40.

In addition to the external sources cited in his report, which include a range of press (such as the Wall Street Journal), research institutions (such as Gallup), HR industry publications (such as the Work Institute), and academic sources (such as the Strategic Management Journal), McElfresh bases his opinions about hiQ's products on interactions in his professional capacity as a then-VP in

HR researching solutions to reduce voluntary turnover. *Id.* at. ¶ 47. In that capacity he attended several of hiQ's conferences where he gathered additional relevant information both from hiQ itself and from the other HR professionals present. *Id.* at ¶¶ 49-53.

## LEGAL STANDARD

In determining whether expert opinion evidence is admissible under Fed. R. Evid. 702, the court acts as a "gatekeeper" to ensure that any expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 599 (1993)). To be sufficiently relevant, the expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 590 (1993) (quoting Fed. R. Evid. 702). To be reliable, the opinion offered must have adequate support. *Id.* at 588-90. The proponent of the expert testimony bears the burden of establishing the testimony's admissibility by a preponderance of the evidence. *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1260 (N.D. Cal. 1997).

This inquiry applies to all expert testimony, whether it involves "scientific, technical, or other specialized knowledge." *Kumho Tire*, 526 U.S. at 147 (quoting Fed. R. Evid. 702). While the often-cited *Daubert* factors are relevant to much scientific and technical expert opinion, for expert testimony based on other kinds of specialized knowledge, those factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150. For experts in some disciplines, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.*

The Court must determine whether the expert's opinion has "a reliable basis in the knowledge and experience of" the relevant discipline—whatever discipline that may be. *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592). The trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable," but the key inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152; *see also Giulano v. Sandisk*, 2015 WL 10890654, at *4 (N.D. Cal. May 14, 2015).

# ARGUMENT

## I. MCELFRESH'S OPINIONS ABOUT THE PEOPLE ANALYTICS MARKET ARE ADMISSIBLE

### A. Courts Regularly Recognize Human Resources Expertise

LinkedIn can point to no authority, because none exists, that an expert must be an economist or must conduct an antitrust analysis to offer the opinions that McElfresh offers here. Human Resources is a valid area of specialized knowledge that can be the subject of expert testimony; indeed, "numerous courts have permitted extensive testimony by human resources experts." *Sitter v. Ascent Healthcare Sols., Inc.*, 2011 WL 2682976, at *1 (N.D. Cal. July 8, 2011). Logically enough, most cases in which HR experts are relevant are labor and employment cases, and courts routinely permit HR experts to testify in those matters. *See, e.g.*, *Gianfrancisco v. Excelsior Youth Centers, Inc.*, 2012 WL 2890916, at *2 (D. Colo. July 16, 2012) (collecting cases). However, nothing bars the presentation of testimony by an HR expert in other kinds of cases in which such testimony is relevant, as it is here.

Where HR expertise is relevant, that expert testimony depends on the expert's "specialized knowledge and experience in human resources management and organizational psychology"—the same experience and the same Ph.D that McElfresh possesses. *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 964 (D. Ariz. 2007). The testimony of an HR expert can validly be based upon "custom and practice in the industry." *Eng. v. Estes Express Lines*, 2018 WL 1136058, at *5 (C.D. Cal. Feb. 15, 2018).

McElfresh's HR expertise here is of the same kind that is regularly accepted by courts. Further, the main sources of information he relies on in this matter—his specialized knowledge of the HR field, his experience in the field of HR and the particular sub-field of people analytics, and the practice in the industry—constitute reliable sources of information appropriate to his field of specialized knowledge.

### B. McElfresh's Testimony Is Within His Expertise and Will Aid the Trier of Fact

Resolution of this action will involve the trier of fact evaluating hiQ's products and business within the contemporaneous context of HR consulting and solutions. Jurors must be able to evaluate

the value and scope of hiQ's services to HR organizations, which serve a specialized function in the business world.

Human Resource practices are "not a matter within the knowledge of the ordinary juror," *Ferretti v. Pfizer Inc.*, 2013 WL 140088, at *19 (N.D. Cal. Jan. 10, 2013), and the available Human Resource Information Systems and other software solutions are surely even less so. Because "the average juror is unlikely to be familiar with human resources management" and the software products that facilitate it, McElfresh's expertise will be helpful to the finder of fact. *Hernandez v. City of Vancouver*, 2009 WL 279038, at *5 (W.D. Wash. Feb. 5, 2009).

McElfresh is well-qualified to discuss the Human Resources software products on the market during the relevant time period in this action, when he himself was a VP of HR in the private sector who was researching software products "that could help the company reduce voluntary turnover." McElfresh Rep. ¶ 47. For his expert opinion in this case, McElfresh has supplemented that professional experience with searches to find "[a]ny firm that was using publicly sourced data for turnover prediction." McElfresh Dep. Tr. 24:4-6. The research that McElfresh did in his professional role as a VP of HR, as supplemented by additional research for this action, demonstrates "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field [*i.e.*, HR management]," *Kumho Tire*, 526 U.S. at 152, and falls squarely within McElfresh's field of specialized knowledge. Indeed, it is hard to think what kind of expert would be better suited to opine on available Human Resource Information Systems than a lifelong HR professional employed as a consultant advising other companies on their HR needs.

To the extent LinkedIn criticizes McElfresh's HR-related opinions, those criticisms go to the weight of McElfresh's opinion, not its admissibility. For example, LinkedIn claims that McElfresh does not have specific experience using hiQ's products, ECF No. 338 at 12—even though "[a]ny alleged 'lack of particularized expertise goes to the weight'" of expert opinion, not its admissibility. *United States v. Rodriguez-Salazar*, 130 F. App'x 138, 139 (9th Cir. 2005). LinkedIn also criticizes McElfresh for admitting that he does not know "whether Joberate or hiQ was technically the first" to offer its product, ECF No. 338 at 12—exactly the kind of admission that, at most, would go to the weight of testimony. LinkedIn, if it wishes, "will have every opportunity to undermine the testimony

through effective cross-examination," such as through questions about Joberate. *JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 2022 WL 1817415, at *8 (N.D. Cal. June 2, 2022). That vigorous cross-examination is the "traditional and appropriate means of attacking" McElfresh's testimony—not exclusion. *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *16 (N.D. Cal. Apr. 4, 2014).

But LinkedIn's Motion is not primarily concerned with McElfresh's opinion as an HR professional. LinkedIn does not contest McElfresh's qualifications as a HR expert, instead choosing to focus on the irrelevant fact that he happens to not be an economist. ECF No. 338 at 14. LinkedIn claims that McElfresh's specialized experience does not qualify him to opine on "harm to competition"—an analysis that LinkedIn admits he "does not appear even to have attempted to do." *Id.* at 14-15. LinkedIn is correct: McElfresh, not being an economist, has not and will not offer any opinion about competition issues. Instead, he offers opinions—as an HR professional—on the capabilities of various products and services available to HR professionals.

LinkedIn's Motion seems entirely based on the premise that only an economist conducting an antitrust analysis could possibly be qualified to opine on the products available to facilitate people analytics in the HR field. The Court should reject this fallacy. An HR professional with decades of experience and an ongoing consultancy practice advising clients regarding, *inter alia*, people analytics products has more than sufficient expertise to assist the finder of fact in understanding the options available in this market. McElfresh Dep. Tr. 37:13-18. The Court should evaluate the substance of McElfresh's opinions on their own terms, without allowing LinkedIn to impose strawman standards that are not appropriate for the opinions McElfresh actually offers. *See, e.g.*, *Exeltis USA Inc. v. First Databank, Inc.*, 2020 WL 7025089, at *9 (N.D. Cal. Nov. 30, 2020) (rejecting Defendant's effort to convince the court to "treat the qualitative research that Mr. Smith conducted as a quantitative survey, and [listing] the myriad ways in which Mr. Smith's work did not meet the requirements for quantitative surveys," then allowing expert testimony on qualitative survey).

Finally, LinkedIn asserts that it does not matter that McElfresh did not intend to undertake an economic analysis, because his opinions "could mislead or confuse the jury," "regardless of whether he intended to offer economic opinions." ECF No. 338 at 14. LinkedIn does not explain

what about McElfresh's opinion a jury would find confusing, and certainly does not demonstrate that the "probative value [of McElfresh's opinions] is substantially outweighed by a danger of . . . confusing the issues [or] misleading the jury," as required by Rule 403. *Id.* at 15. Indeed, LinkedIn does not make any effort to explain how McElfresh's non-economic opinions might confuse a jury at all, except for the possibility that LinkedIn may use its argument or questioning to imply (as it has here) that McElfresh was somehow required to offer such economic opinions.

## II. MCELFRESH'S OPINIONS ABOUT hiQ'S PRODUCTS ARE INFORMED BY EXPERIENCE AND EXPERTISE AND ARE NOT LAY OPINION

McElfresh offers opinions about the functionality and usefulness of hiQ's offerings as compared to other people analytics products available in the market. These opinions are directly informed by McElfresh's significant specialized knowledge and expertise in the field of HR and are therefore—by definition—not lay opinion. To be lay opinion, an opinion must be "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). Where opinions require such specialized knowledge, they must be evaluated as expert opinion and subjected to the requirements of Rule 702, "even when the expertise involved is specialized knowledge gained as part of a witness's job," as McElfresh's specialized knowledge was (in addition to his Ph.D.) *Rodriguez v. Gen. Dynamics Armament & Tech. Prod.*, 510 F. App'x 675, 676 (9th Cir. 2013).

Contrary to LinkedIn's assertions, these opinions are far from "familiar to any lay juror." ECF No. 338 at 17. A lay juror would not be expected to have any knowledge of the particular capabilities or value of people analytics software products marketed to and used by HR professionals, and would therefore be unable to compare them to hiQ's products. McElfresh provides additional information about the needs of HR professionals that a lay juror would not be expected to know without expert assistance; for example, in evaluating the usefulness of hiQ's Keeper product, McElfresh describes the costs of employee turnover, industry research regarding employee turnover, and standard methods of reducing turnover. McElfresh Rep. at ¶¶ 27-29. This specialized knowledge, unavailable to a lay juror, informs McElfresh's evaluation of the Keeper product. LinkedIn's authorities on the issue of specialized knowledge are simply not instructive here. *See, e.g., Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1103-04 (N.D. Cal.

2016) (Chen, J.) (finding veterinarian's specialized knowledge did not extend to consumer preferences regarding dog food).[3]

LinkedIn's misleading characterization of McElfresh's opinion about the value of Keeper as being only "that having more options . . . is valuable" is yet another strawman. ECF No. 338 at 17 (citing McElfresh Rep. at ¶ 32). This disregards McElfresh's expert analysis supporting his opinions, including his explanation of "push" versus "pull" factors leading to employee turnover and the significance of Keeper's predictive algorithms enabled by the use of public data. *Id.* at ¶ 32. A lay juror is well able to understand that having more software options is better—but only with the assistance of an HR expert can that lay juror understand that Keeper provided not simply "more" options, but a qualitatively ***different*** option allowing for a unique approach to a significant HR problem based on external information and analysis. That explanation of Keeper's value plainly falls in the realm of reliable expert opinion, not unreliable or lay opinion, and the inapposite cases on which LinkedIn relies are not to the contrary. *See, e.g., United States v. Hermanek*, 289 F.3d 1076, 1096 (9th Cir. 2002) (excluding government expert's opinion on cryptic drug-related terminology because it appeared to be based on the assumption defendants were traffickers); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) (excluding opinion where expert simply adopted opinions of others and performed arithmetic).

LinkedIn similarly glosses over McElfresh's opinion about the quality of Keeper as a product. LinkedIn claims that McElfresh's opinion is "not based on any empirical analysis" and "any lay juror could reach a similar conclusion" about the usefulness of Keeper. ECF No. 338 at 17. To the contrary, McElfresh cited statistics validating the results of Keeper, McElfresh Rep. at ¶ 33, then went on to cite to and explain Bureau of Labor Statistics data showing an increase in

---

[3] Notably, while in *Lucido* this Court excluded a veterinarian's testimony on a consumer preference issue as an expert, the Court allowed for the possibility of lay testimony by the veterinarian based on her experience, what her clients may have informed her of or indicated to her, or certain assumptions such clients may have made on safety testing issues. *See Lucido*, 217 F. Supp. 3d at 1103-04. Although hiQ firmly believes that McElfresh's opinions are expert in nature, should the Court determine that some would constitute lay testimony, hiQ respectfully requests that be similarly allowed here.

1  voluntary turnover, indicating the increased usefulness of Keeper over time.  *Id.* at ¶¶ 34-35.  These
2  opinions are similarly expert, not lay, as informed by McElfresh's specialized knowledge.

3        LinkedIn then minimizes the value of McElfresh's opinions about the functionality of hiQ's
4  products.  ECF No. 338 at 18-19.  But while McElfresh has not himself used either product—a fact
5  regarding which LinkedIn is free to cross-examine him, but is not a basis for exclusion—his
6  evaluation of their functionality is still an expert opinion, informed by his specialized industry
7  knowledge.  LinkedIn claims that "[j]urors are perfectly capable of making an assessment regarding
8  how hiQ's products worked" based on the same marketing materials that McElfresh reviewed.  *Id.*
9  at 19.  But McElfresh offers important context to those marketing materials based on his expertise
10 beyond what a lay juror would bring to them.  In particular, only with McElfresh's expert assistance
11 could jurors accurately understand the differences between the functionality of hiQ's products and
12 the other products available in the marketplace.  *E.g.* McElfresh Rep. at ¶¶ 31-32 (explaining the
13 difference between Keeper and previous products).

14       Finally, LinkedIn objects to McElfresh's opinions about LinkedIn as a unique source of
15 publicly available professional data, which is well within his ken as an HR professional but not
16 something necessarily known to the general public.  LinkedIn's apparent justification for trying to
17 exclude this opinion is that it may cause the jury to believe "that hiQ has a viable antitrust claim."
18 ECF No. 338 at 20.  But LinkedIn is once again seeking to exclude an imaginary antitrust expert
19 rather than the HR expert they were presented with.  It is unclear—and LinkedIn does not explain—
20 how any reasonable juror, when presented with the opinions of an HR expert who does not purport
21 to be an expert in antitrust and offers no opinions related to antitrust, would be led to believe anything
22 about any potential antitrust claim, particularly where the jury will not be asked to deliberate on any
23 such claim.  LinkedIn's conjecture simply does not meet its burden.

## CONCLUSION

25       hiQ respectfully requests that the Court deny LinkedIn's *Daubert* motion to exclude
26 McElfresh's opinions.

27
28

| | | |
|---|---|---|
| 1 | DATED: August 31, 2022 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |

By  *Corey Worcester*
R. Corey Worcester
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
coreyworcester@quinnemanuel.com

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*