1   Corey Worcester (*pro hac vice*)
    coreyworcester@quinnemanuel.com
2   Renita Sharma (*pro hac vice*)
    renitasharma@quinnemanuel.com
3   Elisabeth B. Miller (*pro hac vice*)
    elisabethmiller@quinnemanuel.com
4   Hope Skibitsky (*pro hac vice*)
    hopeskibitsky@quinnemanuel.com
5   Zane Muller (*pro hac vice*)
    zanemuller@quinnemanuel.com
6   QUINN EMANUEL URQUHART AND SULLIVAN, LLP
    51 Madison Avenue, 22nd Floor
7   New York, NY 10010
    Telephone:    (212) 849-7000
8
    Terry L. Wit (SBN 233473)
9   terrywit@quinnemanuel.com
    QUINN EMANUEL URQUHART AND SULLIVAN, LLP
10  50 California Street, 22nd Floor
    San Francisco, CA 94111
11  Telephone:    (415) 875-6331

12  *Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

13

14              **UNITED STATES DISTRICT COURT**

15              **NORTHERN DISTRICT OF CALIFORNIA**

16   hiQ Labs, Inc.,                              Case No. 3:17-cv-03301-EMC

17           *Plaintiff    and    Counterclaim*   **HIQ'S   RESPONSE    TO    LINKEDIN'S**
             *Defendant*,                         ***DAUBERT*  MOTION   TO   EXCLUDE**
18                                                **DAMAGES  OPINIONS  OF  BENJAMIN**
                                                  **SACKS**
19       vs.
                                                  The Hon. Edward M. Chen
20   LinkedIn Corp.,
                                                  Date:        September 29, 2022
21           *Defendant   and   Counterclaim*     Time:        4:30 P.M.
             *Plaintiff.*                         Location:    Courtroom 5, 17th Floor
22                                                             450 Golden Gate Ave.
                                                               San Francisco, CA 94102
23
                                                  Complaint filed:  June 7, 2017
24                                                Trial Date:       February 27, 2023

25

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..............................................................1

STATEMENT OF FACTS ............................................................................................................3

      A.     Summary of Assignment ................................................................................3

      B.     Sacks's "Full Damages" Opinion ..................................................................4

      C.     Sacks's "Subset Damages" Opinion ..............................................................7

LEGAL STANDARD .................................................................................................................8

ARGUMENT ..............................................................................................................................9

I.     The Damages Opinions Are Admissible ..................................................................9

      A.     Sacks's Full Damages Opinion Incorporates Profitability and Is Permissible Under California Law ..................................................................9

      B.     The "Subset Damages" Opinion Correctly Analyzes hiQ's Profitability ...............13

II.    Sacks's Regression Analysis Is A Reliable Valuation Method ............................................14

      A.     Sacks Extensively Considered and Controlled for Available "Major Factors" ..................................................................16

      B.     The Predicted Value of hiQ Was Not Statistically Meaningless ..........................19

Conclusion ................................................................................................................22

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Alpha GRP, Inc. v. Subaru of Am., Inc.*,
   2021 WL 1146029 (C.D. Cal. Feb. 8, 2021) ................................................... 11

5

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*,
   222 Cal. App. 4th 945 (2013) .......................................................................... 12

6

*ATA Airlines, Inc. v. Fed. Express Corp.*,
   665 F.3d 882 (7th Cir. 2011) ........................................................................... 21

7

*Baker v. SeaWorld Enter., Inc.*,
   423 F. Supp.3d 878 (S.D. Cal. 2019) ............................................................... 18

8

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.*,
   226 Cal. App. 3d 442, 469 (1990)...................................................................13

9

*Butler v. Home Depot, Inc.*,
   984 F. Supp. 1257 (N.D. Cal. 1997) ................................................................... 8

10

*Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................................. 8

11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ...................................................................................... 1, 8

12

*Elec. Funds Sols., LLC v. Murphy*,
   134 Cal. App. 4th 1161 (2005) ..................................................................... 9, 10

13

*Feduniak v. Old Republic Nat'l Title Co.*,
   No. 13-cv-02060, 2015 WL 1969369 (N.D. Cal. May 1, 2015) ........................... 8

14

*Garcia v. McDonald*,
   2020 WL 7408235 (N.D. Cal. Apr. 20, 2020) .................................................... 2

15

*Giuliano v. Sandisk*,
   2015 WL 10890654 (N.D. Cal. May 14, 2015) ..................... 8, 14, 15, 16, 17, 18

16

*Gomez v. Astrue*,
   695 F. Supp. 2d 1049 (C.D. Cal. 2010) ............................................................ 19

17

*Hiramanek v. Clark*,
   2016 WL 11033962 (N.D. Cal. Mar. 29, 2016) ................................................... 2

18

*Icon-IP Pty. Ltd v. Specialized Bicycle Components, Inc.*,
   87 F. Supp. 3d 928 (N.D. Cal. 2015) ............................................................... 21

19

*In re High-Tech Emp. Antitrust Litig.*,
   2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ......................................... 1, 9, 14, 21, 22

20

*In re Korean Ramen Antitrust Litig.*,
   2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ..................................................... 16

21

*In re Lithium Ion Batteries Antitrust Litig.*,
   2017 WL 1391491 (N.D. Cal. Apr. 12, 2017) ................................................... 21

22

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) .............................................................. 18

23

24

25

26

27

28

ii

*In re Optical Disk Drive Antitrust Litig.*,
    No. 2017 WL 11513318 (N.D. Cal. Dec. 18, 2017) ................................................. 14

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ....................................................... 16, 18

*Kids Universe v. In2Labs*,
    95 Cal. App. 4th 870 (2002) ............................................................... 9, 10, 11

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ......................................................................... 8

*Montes v. City of Yakima*,
    40 F. Supp. 3d 1377 (E.D. Wash. 2014) .......................................................... 19

*Orozco v. WPV San Jose, LLC*,
    36 Cal. App. 5th 375 (2019) ................................................................ 9, 10

*S. Jon Kreedman & Co. v. Meyers Bros. Parking-W. Corp.*,
    58 Cal. App. 3d 173 (1976) .................................................................. 10

*Sanchez-Corea v. Bank of America*,
    38 Cal. 3d 892 (1985) ....................................................................... 10

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
    55 Cal. 4th 747 (2012) ................................................... 1, 2, 9, 10, 12, 13

*True N. Composites, LLC. v. Trinity Indus., Inc.*,
    191 F. Supp. 2d 484 (D. Del. 2002), 65 F. App'x 266 (Fed. Cir. 2003) ................. 11, 12

*United States v. Nelson*,
    533 F. Supp. 3d 779 (N.D. Cal. 2021) ........................................................... 1

**Rules and Regulations**

Cal. Civ. L.R. § 7-4(b) ........................................................................ 2

Fed. R. Evid. § 702 ........................................................................... 8

**Additional Authorities**

Abdi, Hervé, "Least Squares", <u>Encyclopedia for Research Methods for the Social
    Sciences</u> (2003) ........................................................................ 4, 6

Baker, Malcolm & Richard Ruback, <u>Estimating Industry Multiples</u> (1999) ................... 15

Duffie, Darrell, <u>Dynamic Asset Pricing Theory</u> (2010) ................................... 5

*https://avc.com/2019/02/the-doubling-model-for-fundraising/* .................................. 7

*https://www.investopedia.com/terms/i/index.asp#:~:text=An%20index%20is%20an%20* ........... 18

*https://www.investopedia.com/terms/r/regression.asp.* ........................................ 5

*https://www.investopedia.com/terms/t/terminalvalue.asp.* ..................................... 6

Liu, Jing, Dorom Nissim & Jacob Thomas, <u>Equity Valuation Using Multiples</u>,
    Journal of Accounting Research 40, no. 1 (2002) ............................................ 15

Metrick, Andrew and Ayako Yasuda, <u>Venture Capital and the Finance of Innovation</u>
    (3rd Ed. 2021) .......................................................................... 6, 7, 16

Wooldridge, Jeffrey M., <u>Introductory Econometrics: A Modern Approach</u>
    (5th Ed. 2015) .......................................................................... 4, 6, 20

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## INTRODUCTION AND SUMMARY OF ARGUMENT

3    LinkedIn asks this Court to exclude the opinions of hiQ's damages expert, Benjamin Sacks,

4 based on a series of *ipse dixit* assertions and suggested alternative methodologies that its own

5 phalanx of experts has not tested.  In doing so, LinkedIn fails to establish that Sacks's opinions are

6 not relevant and reliable to the trier of fact.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

7 579, 591 (1993).  Therefore, LinkedIn's challenges to Sacks's opinions should fall to the "judge and

8 jury" to decide, as is "traditional and appropriate."  *In re High-Tech Emp. Antitrust Litig.*, 2014 WL

9 1351040, at *16 (N.D. Cal. Apr. 4, 2014) (rejecting multiple *Daubert* challenges).

10    ***First***, LinkedIn's attacks on Sacks's "full damages" opinion assume facts that LinkedIn

11 would have to prove at trial—such as that hiQ is an "unestablished" business (despite operating for

12 five years with paying customers and a Series B fundraise) or that LinkedIn's own interference did

13 not cause the full extent of damage.  Neither of those unproven (and incorrect) factual contentions

14 renders Sacks's full damages opinion unreliable or inadmissible, and the cases LinkedIn cites are

15 not to the contrary.

16    ***Second***, LinkedIn's attack on Sacks's subset damages opinion fares no better.  Again arguing

17 that Sacks's method is impermissible under California law, LinkedIn cites inapposite authority,

18 *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 778 (2012).  LinkedIn seeks to twist this

19 case—which merely says that an established business ***may*** base its claim to future profits on

20 evidence of its past profits, among other things—to definitively conclude that "a consistently

21 unprofitable business cannot project future lost profits based on past performance."  (ECF No. 339

22 ("LinkedIn's *Daubert* Motion to Exclude the Damages Opinions of Benjamin Sacks" or "Motion")

23 at 20-21.)[1]  Once again, LinkedIn (wrongly) assumes hiQ does not qualify as an established

24

25 ───────────────

[1]  LinkedIn's Motion violates the page length requirements established by this Court for motions *in limine*.  Hon. Chen's Civil Pretrial Instructions ("Pretrial Instructions") at C.1 ("Each motion *in limine* should address a single topic and ***contain no more than seven pages of briefing per side***.")

26

27 (emphasis added); *United States v. Nelson*, 533 F. Supp. 3d 779, 789 (N.D. Cal. 2021) (denying motion to exclude or limit testimony, noting that a *Daubert* motion is a motion *in limine*; "[t]he

28 Advisory Committee Note to the 1993 Amendment stated that the bases and reasons must be

Case No. 3:17-cv-03301-EMC
HIQ'S RESPONSE TO LINKEDIN'S DAUBERT MOTION PURSUANT
TO FRE 403, 702 TO EXCLUDE EXPERT TESTIMONY OF BENJAMIN SACKS

business, and LinkedIn's assumption in this regard does not serve as a basis for excluding Sacks's damages model.  In all events, the law is clear that—contrary to LinkedIn's assertion—a business need not have been profitable to be considered established, and even an ***unestablished*** business can assert damages based on anticipated profits where, as here, they can be shown by evidence of "reasonable reliability."  *Sargon*, 55 Cal. 4th at 774.  Indeed, the *Sargon* court expressly added a "cautionary note" that courts should not be quick to exclude expert evidence on these issues.  *Id.* at 775.  And LinkedIn's argument that Sacks's subset damages calculation is "incorrect as a matter of law" because "Sacks failed to deduct *all expenses* as required" (ECF No. 339 at 21) only underscores that what LinkedIn really seeks to do in its Motion is exclude Sacks's opinion based on nothing more than contentions that are (at most) fodder for cross examination.[2]

Finally, LinkedIn's criticism of Sacks's use of a linear regression analysis as an unreliable methodology warranting exclusion should be rejected.  LinkedIn cannot dispute that linear regression models are commonly used to assess damages.  Sacks has explained in his expert reports and during his deposition why a regression analysis is appropriate in the context of his damages assessment.  LinkedIn's challenges to Sacks's application of this well-established methodology go to the weight of his testimony and provide no basis to exclude his opinions—nor does LinkedIn's disagreement with Sacks's dataset for the regression.  While LinkedIn complains that the 257

---

sufficient to allow counsel to frame ***a Daubert motion (or other motion in limine)***, to prepare for cross-examination, and to allow a possible counter-expert to meet the purport of the case-in-chief testimony") (Chen, J.) (emphasis added).  hiQ therefore moves the Court to strike ECF No. 339 from page 8 through the end.  *See Garcia v. McDonald*, 2020 WL 7408235, at *1 (N.D. Cal. Apr. 20, 2020) (striking those portions of motion over proscribed page limit).  In violation of Your Honor's Pretrial Instructions and Civil Local Rule 7.4(b), LinkedIn never sought leave from the Court to file an oversized motion, instead simply filing a brief nearly triple the allowed length.  Cal. Civ. L.R. § 7-4(b); Pretrial Instructions at C.1; *see also Hiramanek v. Clark*, 2016 WL 11033962, at *2 (N.D. Cal. Mar. 29, 2016) (denying *post hoc* request for leave to file oversized motion).  Pending resolution of this motion, in an abundance of caution given the parties' stipulated briefing schedule and should the Court determine to consider LinkedIn's Motion in its entirety, hiQ hereby responds to LinkedIn's Motion with a similar number of pages.  In all events, however, LinkedIn's Motion should count against LinkedIn's allotted five motions *in limine*.  Pretrial Instructions at C.1.

[2]   And which are largely moot, as Sacks amended his report to deduct such costs after this issue was raised at his deposition.  That is the correct outcome here, not exclusion.

companies comparable to hiQ that Sacks selected from PitchBook constitute too "wide" a dataset, at no point does LinkedIn explain what a purportedly right-sized dataset would be. Likewise, LinkedIn's own expert's disagreement with Sacks on the appropriateness of Sacks's model does not justify the exclusion of the model entirely. Such arguments present nothing more than a quintessential battle of the experts and factual issues concerning only the weight the jury should accord the relative opinions.

For all these reasons and as set forth below, hiQ respectfully requests that the Court deny LinkedIn's motion to exclude the expert opinions of Benjamin Sacks.

## STATEMENT OF FACTS

### A.       Summary of Assignment

hiQ is a people analytics company founded in 2012, which, through the use of publicly available data, helped companies analyze and understand attrition, retention, and other employee performance metrics. (ECF No. 131 ("hiQ's Amended Complaint") at 2-3.) By 2017, it was a leader in a burgeoning market and had successfully signed up and retained large, well-regarded companies as clients. (*Id.* at 12.) The primary source of its data was public LinkedIn profiles. (*Id.* at 13 n.2.) On May 23, 2017, LinkedIn sent a cease-and-desist letter (the "C&D letter" or "C&D") to hiQ, demanding that hiQ stop accessing this public information. Exhibit 88[3] (Second Amended Expert Report of Benjamin Sacks ("Sacks Report") at 2.) At the time, hiQ was in the process of raising venture capital—it had completed a Round B and was likely to raise a successful Round C. (*Id.* at 3.) But the inability of hiQ to access LinkedIn data cratered hiQ's business by making it impossible for hiQ both to fulfill its obligations and to secure additional investors. (*Id.* at 23, 78.)

On August 30, 2022, hiQ's expert, Benjamin Sacks ("Sacks"), submitted a Second Amended Expert Report where he detailed his opinions on the quantum of hiQ's damages.[4] (*Id.* at 2.) Sacks's

---

[3]   Exhibits are herein referred to as "Ex." Exhibits cited are attached to hiQ's Compendium of Exhibits in Opposition to LinkedIn's August 5, 2022 Motions.

[4]   Sacks's Second Amended Expert Report (Ex. 88) made a handful of corrections and clarifications to his First Amended Expert Report issued on June 22, 2022, in response to certain questions posed to Sacks during his deposition.

1   assignment was to (1) assess the full range of damages incurred by hiQ as a result of LinkedIn's

2   actions ("full damages"), and (2) assess a subset of damages relating to existing client contracts and

3   likely partnerships as of the time of the C&D ("subset damages").  (*Id.*)  For the full damages

4   assessment, Sacks was instructed by counsel to assume that the C&D letter interfered with hiQ's

5   existing and prospective contracts and business relationships, effectively destroying hiQ's business,

6   and that LinkedIn was liable to hiQ for the damage caused.  (*Id.*)  In his review of the evidence,

7   Sacks further found that it is "a very reasonable assumption" that the C&D letter destroyed hiQ's

8   business. Ex. 90 (Sacks Dep. Tr. 26:18-27:7).

9       **B.      Sacks's "Full Damages" Opinion**

10      Sacks concluded that the full measure of hiQ's damages was equal to the present discounted

11   value of cash flows hiQ was expected to generate as of the May 23, 2017 valuation date (*i.e.*, the

12   date of the C&D), plus pre-judgment interest.  Ex. 88 (Sacks Report at 2.)  Given that hiQ was a

13   young firm backed by venture capital, most of its value came from prospective profits—because

14   growth prospects comprise the majority of a young firm's value in this space, the value of existing

15   customers and contracts is only one component to consider.  (*Id.*)  Indeed, many venture capital

16   investments occur in firms that have not yet made a profit.  (*Id.*)

17      Sacks calculated full damages as $69.6 million.  (*Id.* at 4.)  He was not asked to calculate

18   prejudgment interest nor punitive damages.  (*Id.*)  Sacks used a linear regression analysis as an input

19   to formulate his opinion.  Ex. 88 (Sacks Report at 32-36).  Regression is a statistical method used

20   in finance, investing, and other disciplines that attempts to determine the strength and character of

21   the relationship between one dependent variable (usually denoted by Y) and one or more other

22   variables (known as independent variables).[5]  Also called "simple regression" or "ordinary least

23   squares," linear regression is the most common form of this technique.  Linear regression establishes

24   the linear relationship between two variables based on a line of best fit.  Linear regression is thus

25   graphically depicted using a straight line with the slope defining how the change in one variable

26

27   [5]  Ex. 97 (Jeffrey M. Wooldridge, <u>Introductory Econometrics: A Modern Approach</u> (5th Ed. 2015));
     Ex. 92 (Hervé Abdi, "Least Squares", <u>Encyclopedia for Research Methods for the Social Sciences</u>

28   (2003), 792-795).

impacts a change in the other.  The y-intercept of a linear regression relationship represents the value of one variable when the value of the other is zero.[6]  A regression analysis is a commonly accepted method for evaluating data.

Sacks's analysis is based on a fundamental valuation principle of finance:  "the value of an asset or business is given by the discounted (conditional) expected value of that asset/business at any future date, along with the discounted (conditional) expected value of any intervening cash flows up to that date."[7]  When reliable cash flow projections are available up to some future date ("T"), this is the basis of the standard discounted cash flow ("DCF") valuation methodology, where an estimate of the conditional expected "Terminal/Exit Value" at the end of the projection period is typically obtained using an income or revenue multiple estimate based on comparable companies.[8]

In the case of hiQ, Sacks explained why cash flow and revenue projections were unreliable for valuation purposes:  startups, almost by definition, face a tremendous amount of uncertainty at this stage of development, and hiQ was no different.  *See* Ex. 88 (Sacks Report at 38).  Absent reliable cash flow projections, the cash flow component of the valuation equation for hiQ effectively drops away, which is why Sacks determined that a standard DCF approach using cash flow projections was not a reliable valuation method for hiQ (and LinkedIn does not claim otherwise). (*Id.*)  Because of that limitation, and based on his decades of expertise as a practicing economist, Sacks explored the available data and concluded that the most reliable method to analyze hiQ's damages was to assess hiQ's Terminal Value at some near-future date.  (*Id.* at 32-35) (discussing

---

[6]   *See Investopedia, https://www.investopedia.com/terms/r/regression.asp.*

[7]   *See* Ex. 88 (Sacks Report at 37); *see also, e.g.,* Ex. 4 (Darrell Duffie, <u>Dynamic Asset Pricing Theory</u> (2010)).  In its formulaic form this is represented as: *Value = Present Value of (Conditional) Expected Cash Flows to Date T + Present Value of Conditional Expected Terminal/Exit Value at Date T.*

[8]   Terminal Values are often based on a multiples approach – *i.e.*, *Terminal Value = Terminal EBITDA x Terminal EBITDA Multiple.*  The Multiple itself is often based on the average Multiple observed for comparable firms.  The average is the same thing as a linear regression on a constant and no other explanatory variable.  As such, regression is commonly used to derive key inputs into DCF valuations.  Further, those regressions control for fewer variables than Sacks controlled for in his regression.

1    Sacks's regression analysis).  And he determined that the most reliable Terminal Value to use in the

2    valuation model was the expected value of the company at its Round C, if it reached a Round C.[9]

3         As Sacks explained, hiQ was at a stage where it had completed a Round B that could be

4    analyzed and was contemplating a Round C, which would also be the next instance that an

5    observable market value for hiQ would be revealed.[10]  hiQ's value at the time of the C&D was thus

6    determined by two components: (1) the conditional expected value of hiQ if (and when) it were to

7    have a successful round C; and (2) the probability that hiQ would have a successful Round C, given

8    the information known at the time of the C&D.  Both of these components were the focus of Sacks's

9    analysis.

10        Specifically, to estimate the conditional expectation component in the valuation framework,

11   Sacks used the most widely known and accepted methodology in the finance realm (and the sciences

12   more generally) to estimate conditional expectations—a least squares regression.[11]  Sacks then

13   assessed the probability of reaching Round C at the time of the C&D (component 2) by analyzing

14   the Metrick factors and other elements of progress and setbacks that hiQ experienced after its Round

---

[9]  Exhibit 88 (Sacks Report at 32-35).  As noted above, the Terminal Value is just a future date set at the discretion of the valuation expert, and is often set as the last available date for reliable cash flow projections.  *See, e.g., Investopedia*, https://www.investopedia.com/terms/t/terminalvalue.asp.

[10]  Exhibit 88 (Sacks Report at 12, 17).  In the context of hiQ, the fundamental valuation equation discussed above would thus reduce to: *hiQ Value = Present Value of (Conditional) Expected Value at Round C*.  Or, more precisely: *hiQ Value = Present Value of Expected hiQ Value at Round C (Conditional on Reaching Round C) x Probability of Reaching Round C*.  At its essence this is simply a version of venture capital methodology (*see, e.g.,* Ex. 96 (Andrew Metrick and Ayako Yasuda, <u>Venture Capital and the Finance of Innovation</u> (3rd Ed. 2021), at 155-156), and explicitly recognizes the non-trivial probability that hiQ might not reach its Round C within the timing contemplated, as well as the fact that hiQ would have no value (*i.e.*, zero) if it fails to reach a Round C.  The factors involved in the venture capital methodology are referred to herein as the "Metrick Factors."

[11]  *See, e.g.*, Ex. 97 (Jeffrey M. Wooldridge, <u>Introductory Econometrics: A Modern Approach</u> (5th Ed. 2015)); Ex. 92 (Hervé Abdi, "Least Squares", <u>Encyclopedia for Research Methods for the Social Sciences</u> (2003), 792-795).

B and up to the C&D date, taking into account that hiQ was at a stage where it was contemplating, but had not yet priced, a Round C when it received the C&D letter.[12]

Based on this analysis, Sacks concluded that the best estimate of hiQ's Round C value was $87.0 million (if it were to reach Round C), given that it had an implied market value of $31.7 million at Round B.[13] Sacks further concluded that a weighting of 80% (*i.e.*, a discount of 20% based on the possibility that hiQ might not reach Round C) was appropriate to apply to this conditional value as the second component of the valuation equation—the probability that hiQ would reach Round C—which was based on his extensive analysis of the Metrick Factors and progress and challenges faced by hiQ since its Round B. Sacks's opinion is therefore that hiQ's full damages are $69.6 million.[14]

### C.     Sacks's "Subset Damages" Opinion

Sacks further concluded that hiQ's subset damages were $1.6 million. Ex. 88 (Sacks Report at 42.) This figure includes damages from lost profits on, *first*, certain existing customers, for which Sacks calculated expected annual profits from each customer, modeled to recur with a probability of renewal each year, and discounted for present value. (*Id.*) The customers included Pfizer, Gap,

---

[12]  Ex. 88 (Sacks Report at 16-30 (citing Andrew Metrick and Ayako Yasuda, <u>Venture Capital and the Finance of Innovation</u> (3rd Ed. 2021), at 121-24)).

[13]  Sacks calculated hiQ's Round B value at $31.7 million, which reflects the market's view of the combined impact of all of the factors that affect valuation, including long-term cash flows, growth rates, and eventual profit margins. Ex. 88 (Sacks Report at 12, 30). This is more conservative than the $41 million post-Round B value for hiQ listed in PitchBook, which assumed that one would obtain all shares of hiQ at the same value as the preferred shares sold at Round B, but did not account for the fact that the B shares were more valuable because of their preference. (*Id.* at 13.) Sacks therefore used a standard option value approach to account for this fact and provide a fair post-Round B valuation of hiQ at $31.7 million. (*Id.* at 13, 16 (citing Ex. 96 (Andrew Metrick and Ayako Yasuda, <u>Venture Capital and the Finance of Innovation</u> (3rd Ed. 2021), at Ch. 10).) Sacks amended the Round B valuation in his Second Amended Report (from $33.4 million) to account for a correction to the standard option calculation. (*See* Ex. 90 (Sacks Dep. Tr. 9:1-16).)

[14]  Ex. 88 (Sacks Report at 12). The result of Sacks's analysis showed that the Round C value (for the average similarly situated firm that makes it to Round C) was roughly 2x its observed Round B value. (*See id.* (Sacks Report at Figure 6); *see also id.* at 35) (stating estimated coefficient of 2.45.). This approach is consistent with a common rule of thumb in the venture capital world that valuations are expected to double between rounds. (*See, e.g.*, https://avc.com/2019/02/the-doubling-model-for-fundraising/).

eBay, Celgene, and Comcast, and each had a contract with hiQ for hiQ to provide analytics services regarding each entity's employees.  (*Id.* at 5.)  ***Second***, Sacks calculated the damages resulting from hiQ's relationship with IBM, which was thwarted due to the C&D letter.  (*Id* at 4, 42.; Ex. 90 (Sacks Depo Tr. 245:20-247:10).)   At the time of the C&D letter, hiQ and IBM were in discussions to partner, and IBM backed away from these negotiations in August 2017 "until the case [between hiQ and LinkedIn] concludes."  (Ex. 8 (hiQ_00332748); see Ex. 88 (Sacks Report at 27).)

## LEGAL STANDARD

In determining whether expert opinion evidence is admissible, the court acts as a "gatekeeper" to ensure that any scientific testimony or evidence admitted "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147 (1999); *Feduniak v. Old Republic Nat'l Title Co.*, No. 13-cv-02060, 2015 WL 1969369, at *1 (N.D. Cal. May 1, 2015).   To be sufficiently relevant, the expert testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue.'"   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (quoting Fed. R. Evid. 702).  To be reliable, the opinion offered "must be supported by appropriate validation" to be reliable.  *Id.* at 589-90.  Reliability is shown through factors such as: (1) whether the expert's theory or method is generally accepted in the scientific community; (2) whether the expert's methodology can be or has been tested; (3) the error rate of the technique; and (4) whether the method has been subjected to peer review and publication.  *See Daubert v. Merrell Dow Pharms., Inc.* (*Daubert II*), 43 F.3d 1311, 1316 (9th Cir. 1995) (citing *Daubert*, 509 U.S. at 593-94).

But, "[t]he reliability factors identified in *Daubert* – testing, peer review, error rates, and acceptability in the relevant scientific community – are not exhaustive; the Court's task is not to apply *Daubert* as 'a definitive checklist or test,' but to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the field.'"  *Giuliano v. Sandisk*, 2015 WL 10890654, at *4 (N.D. Cal. May 14, 2015) (quoting *Kumho Tire*, 526 U.S. at 138, 152).  The proponent of the expert testimony bears the burden of establishing the testimony's admissibility by a preponderance of the evidence.  *See Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1260 (N.D. Cal. 1997).  The Ninth Circuit has cautioned "not to confuse the role of judge and jury" by disregarding that it is "vigorous cross-examination, presentation of contrary

1    evidence, and careful instruction on the burden of proof," that "are the traditional and appropriate

2    means of attacking shaky but admissible evidence"—not exclusion.  *In re High-Tech Emp. Antitrust*

3    *Litig.*, 2014 WL 1351040, at *16 (rejecting multiple *Daubert* challenges) (internal quotation marks

4    and citations omitted).

5                                                **ARGUMENT**

6            Sacks's damages opinions should not be excluded because they are legally proper, based on

7    accepted methodology, and fundamentally sound.

8    **I.      THE DAMAGES OPINIONS ARE ADMISSIBLE**

9            **A.      Sacks's Full Damages Opinion Incorporates Profitability and Is Permissible
                       Under California Law**

10

11           LinkedIn applies the wrong legal standard when it summarily states that "Sacks's full

12   damages analysis is categorically barred by California law because it seeks recovery of hiQ's lost

13   business not the lost net profits. . . ."  (ECF No. 339 at 12.)  LinkedIn misconstrues the applicable

14   standard for evaluating profits.  (*See id.* at 11-12 (citing cases where courts did not permit recovery

15   for the value of lost business).)  To support its (erroneous) argument, LinkedIn relies on *Elec. Funds*

16   *Sols., LLC v. Murphy* to assert that because hiQ was a "startup with no profit," and only net profits

17   are recoverable, hiQ therefore cannot recover for any reason.  (ECF No. 339 at 13); 134 Cal. App.

18   4th 1161, 1180 (2005).   But as a threshold matter, LinkedIn is incorrect that hiQ was an

19   "unestablished business" whose prospective profits "are not recoverable."  (ECF No. 339 at 13)

20   (citing *Kids Universe v. In2Labs*, 95 Cal. App. 4th 870, 883 (2002).)

21           California courts make a distinction between established and unestablished businesses,

22   holding that for established businesses, lost profits are generally recoverable as damages.  *See*

23   *Sargon*, 55 Cal. 4th at 774.  A business is established if it has a track record on which to base

24   projections of future lost profits; it need not be presently profitable.  *See Orozco v. WPV San Jose,*

25   *LLC*, 36 Cal. App. 5th 375, 400 (2019).   The *Orozco* court rejected defendants'

26   "mischaracteriz[ation]" of plaintiff as an "unestablished" business where there was no dispute that

27   the business operated for approximately one year.  36 Cal.App.5th at 399.

28

An established business's lost profits may be ascertained with reasonable certainty from, *e.g.*, past volume of business, other provable data relevant to probable future sales, and evidence of the profits lost by similar businesses operating under similar conditions. *Sargon*, 55 Cal. 4th at 774. Lost profits may also be calculated by expert analysis of "historical data", such as existing revenue data, or "some reasonable basis of computation of damages" to determine reliable future assumptions. *Id.* at 774-75. For instance, in *Orozco*, the Court upheld the jury's lost profits award where the expert analyzed "raw sales data," provided calculations of the lost profit estimates, and "specified the different assumptions on which they were based and how he arrived at these particular amounts." *Id.*

Significantly, LinkedIn's own primary authority contradicts its argument that hiQ cannot recover damages. Even if, *arguendo*, hiQ were an unestablished business (it was not), the *Murphy* court made clear that even an unestablished business could recover any damages proven by "reasonably reliable evidence," which could include "expert testimony concerning 'economic and financial data, market surveys and analyses, business records of similar enterprises' or 'general business conditions and the degree of success of similar enterprises.'" 134 Cal. App. 4th at 663 (quoting *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 884 (2002))..

As discussed above, Sacks's comprehensive analysis is fully consistent with this approach, which is also available where, as here, the relevant market was itself a "newly developing" one. *See Sanchez-Corea v. Bank of America*, 38 Cal. 3d 892, 907 (1985) (affirming damages award for small business in "new and growing life safety systems field" harmed by large bank). The issue is whether damages can be calculated with "reasonable certainty." *S. Jon Kreedman & Co. v. Meyers Bros. Parking-W. Corp.*, 58 Cal. App. 3d 173, 184 (1976). In *Kreedman*, the Court of Appeal found that the evidence supported lost profits where the expert concluded—based on feasibility studies, comparison to a similar, established business, and other evidence developed at trial—that the company at issue would have been a profitable operation. *Id.* at 184-85.

This case differs vastly from the scenario in *Kids' Universe*, on which LinkedIn relies extensively to mischaracterize hiQ as an unestablished business that was "never profitable." (ECF No. 339 at 13.) Although hiQ was a young firm in the process of raising capital, it was founded in

2012, five years prior to the C&D letter, and had products and services it sold to paying customers. Ex. 88 (Sacks Report at 5).  In contrast, the plaintiff in *Kids' Universe* was an e-business that never launched, "had not previously operated their Web site as a profit-producing venture," and plaintiff presented "no evidence to the effect it was reasonably probable the venture would have been profitable." 95 Cal.App. 4th at 888.  Nonetheless, even in *Kids' Universe* the Court acknowledged that expert testimony can be a sufficient basis for an award of damages in the new business context where, as here, the expert's opinion is supported by tangible evidence rather than mere speculation. *See id.*, 95 Cal. App. 4th at 885.

In an attempt to shoehorn Sacks's full damages analysis into what LinkedIn views as an impermissible lost business valuation, LinkedIn makes the conclusory statement that Sacks's full damages opinion fails because it is not in fact a lost profits analysis, as Sacks claims it to be.  (ECF No. 339 at 13.)  Instead, LinkedIn contends that "hiQ's full business value as of the date of the C&D letter" should be limited to "existing profits related to existing customers and clients."  (*Id.* at 12-13.)  This argument misses the mark not only for the reasons explained above—namely, there is no "categorical bar on recovery of lost business value" (*id.*at 13)—but also because Sacks's full damages opinion was not based on ephemeral "unknown future economic relationships" of hiQ. (*Id.* at 13.)  Rather, as discussed further *infra* Section II(A), Sacks considered a wealth of information to formulate his opinion:  he reviewed and used the available and relevant economic and financial data concerning hiQ, he extensively reviewed academic literature, and as part of his analysis he collected a dataset of 257 similarly-situated enterprises with which to compare hiQ. Ex. 88 (Sacks Report at 31-32).  The ***entirety*** of this analysis led to his full damages opinion, not simply hiQ's "unknown future economic relationships."

This is corroborated by Sacks's own testimony, which LinkedIn may not want to credit, but which is a factual issue for the jury to assess, not a *Daubert* issue for the Court.  To wit, Sacks testified that his assignment was to assess the damages incurred by hiQ and that he was "instructed to assume that the cease and desist letter destroyed hiQ" and, "[g]iven that instruction, then logically damages are the value of what was destroyed, which is the value of hiQ."  Ex. 90 (Sacks Dep. Tr. 15:15-17:1).  When asked whether this was a lost profits approach, Sacks responded "[I]t amounts

1  to the same thing.  The – the value of the company on that date is the present value of future lost

2  profits and losses but the net present value of all future cash flows." *Id.* at 17:2-8; *see also, e.g.*,

3  *Alpha GRP, Inc. v. Subaru of Am., Inc.*, 2021 WL 1146029, at *8 (C.D. Cal. Feb. 8, 2021); *accord*

4  *True N. Composites, LLC. v. Trinity Indus., Inc.*, 191 F. Supp. 2d 484, 524 (D. Del. 2002) (noting

5  that the estimated market value of a company "is closely related to its profitability"), *aff'd in part*,

6  *vacated in part on other grounds*, *rev'd in part on other grounds*, 65 F. App'x 266 (Fed. Cir. 2003).

7           As Sacks explained, his full damages analysis **is** a lost profits analysis because the "value of

8  an enterprise is the net present value of expected future profits and losses"; *i.e.*, the expected value

9  of future cash flows, which are tightly linked to profits.  Ex. 90 (Sacks Dep. Tr. 69:13-18; 70:7-18).

10  LinkedIn dismisses this assertion with two words—"[i]t isn't"—and a straw-man discussion of how

11  a DCF analysis cannot save Sacks's opinion, which is a method that Sacks decidedly did not use

12  and explained was not applicable or reliable here.  (ECF No. 339 at 13.)[15]  LinkedIn has provided

13  no reason why LinkedIn's unsupported, irrelevant arguments should be credited over hiQ's expert's

14  statements.

15           Furthermore, "[i]t is for the jury to determine the probabilities as to whether damages are

16  reasonably certain to occur in any particular case,"  including via consideration of competent expert

17  testimony.  *Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal.App. 4th 945, 972, (2013), *as*

18  *modified on denial of reh'g* (Jan. 16, 2014) (finding lost profits award was supported by substantial

19  evidence where defendant interfered with license agreement of drug that was in development).

20  Where the fact of damages is certain, "[t]he law requires only that some reasonable basis of

21  computation of damages be used, and the damages may be computed even if the result reached is

22  an approximation." *Id.* at 972-73 (citing *Sargon*, 55 Cal. 4th at 774).  And "the method of calculation

---

15  As set forth in Section V of his Report and discussed above, Sacks explained why it is not possible to conduct a DCF or comparable companies analysis in this case and why the full damages analysis was necessary.  While hiQ was an established business, it remained a young one, and discounted cash flow is more appropriate for companies more mature than hiQ was on the valuation date.  A comparison analysis similarly would not be reliable because to compare the revenues of young, venture capital-backed firms, which often have negative earnings, only a revenue multiple can be used.  But a revenue multiple is often inaccurate given the high variance in outcomes and revenue trajectories of early-stage firms similar to hiQ, and where data on revenue is either unavailable or unreliable.

selected by [the expert] simply goes to the weight to be given [to the expert's] opinion evidence.  It is for the trier of fact to accept or reject this evidence . . ."  *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 469 (1990).  The bottom line is that others have tried the same argument that LinkedIn advances here—*i.e.*, that an unprofitable plaintiff is incapable of proving damages—and failed:  "If [LinkedIn's] rule were accepted, innovative and thriving businesses that have not yet turned a profit, including businesses like Uber for example, would be denied any relief against wrongdoers who damaged them. . . . California law would plainly reject such an unjust outcome."  *Alpha GRP*, 2021 WL 1146029, at *8 (citations omitted).

**B.**     **The "Subset Damages" Opinion Correctly Analyzes hiQ's Profitability**

LinkedIn's arguments to exclude Sacks's "subset damages" opinion also fail.  As with its argument against Sacks's full damages opinion, LinkedIn incorrectly asserts that "the lost profits calculation is facially wrong because it projects profits from an unprofitable company."  (ECF No. 339 at 20 (emphasis omitted).)

In a gross misreading of *Sargon*, LinkedIn states that "a consistently unprofitable business cannot project future lost profits based on past performance because an unprofitable track record cannot show the business is 'reasonably certain to produce profits."  (ECF No. 339 at 20 (citing *Sargon*, 55 Cal. 4th at 778, for the proposition that an established company ***may*** base its claim to future profits on evidence of its past profits).)  LinkedIn ignores that Sacks's subset analysis looks at profits related to specific customer relationships with which LinkedIn interfered, and that such relationships can be profitable on an individual basis even if the overall business might not be operating at a profit at a given time (*e.g.*, because the business is spending funds on other, loss-making activities, such as product development, marketing, and the like).  (*See* Ex. 90 (Sacks Dep. Tr. 257:6-259:5).)

LinkedIn also ignores that *Sargon* also provides other ways by which a plaintiff may calculate net profits.  55 Cal. 4th at 776 (*e.g.*, "An expert might be able to make reasonably certain lost profit estimates based on a company's share of the overall market.").  The reason the expert analysis in *Sargon* was found to be too speculative was because the comparison to other companies

was not based on any objective business metric.  *Id.* at 776, 778.  That is not the case here.  Indeed, the *Sargon* court added "a cautionary note" regarding the calculation of lost profits in this context:

> The lost profit inquiry is always speculative to some degree.  Inevitably, there will always be an element of uncertainty.  Courts must not be too quick to exclude expert evidence as speculative merely because the expert cannot say with absolute certainty what the profits would have been.  Courts must not eviscerate the possibility of recovering lost profits by too broadly defining what is too speculative.  A reasonable certainty only is required, not absolute certainty.  *Id.* at 776.

Concerning LinkedIn's assertion that Sacks did not deduct all hiQ expenses from his subset damages valuation (ECF No. 339 at 21), Sacks amended his report on August 30, 2022, to additionally deduct costs for rent, Turking costs, and overhead.  (*See* Ex. 88 (Sacks Report at 43).) hiQ's expenses in this scenario, however, would not include "marketing" or "product development" costs, (ECF No. 339 at 21), because those would be unexpected in a firm's runoff mode.  (*See* Ex. 90 (Sacks Dep. Tr. 251:11-16; 252:4-7).)  This is because in runoff mode, firms sensibly do not incur expenses focused on ***growing*** the business.  As such, when accounting for only those expenses related to servicing hiQ's then-current contracts, the subset damages analysis estimates a net profit, not a net loss.  Accordingly, Sacks's subset damages opinion both adopted the correct methodology and accounted for all hiQ's ***relevant*** expenses, and LinkedIn's critique fails—or at most goes to weight, not admissibility.[16]

## II.    SACKS'S REGRESSION ANALYSIS IS A RELIABLE VALUATION METHOD

LinkedIn asserts that "Sacks's novel regression-based method for calculating hiQ's value is also both unprecedented and unreliable." (ECF No. 339 at 14.)  As discussed *supra* at pp. 4-5, Sacks fundamentally relies on a long-established framework for the present value of conditional expected future values and cash flows.  Sacks then estimates the conditional expected value of hiQ at Round C using the most commonly accepted statistical method to estimate conditional expected value—a linear regression analysis.  (*Id.*); *see also In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *14 (N.D. Cal. Apr. 4, 2014) (rejecting *Daubert* challenge and finding a regression analysis "is

---

[16]   Regarding LinkedIn's claim that Sacks's subset damages analysis double counted as lost profits a small amount of revenues hiQ actually received after the valuation date, (ECF No. 339 at 22), Sacks has amended his report to address the issue.  (*See* Ex. 88 (Sacks Report at 42-45).)

14

Case No. 3:17-cv-03301-EMC
HIQ'S RESPONSE TO LINKEDIN'S DAUBERT MOTION PURSUANT
TO FRE 403, 702 TO EXCLUDE EXPERT TESTIMONY OF BENJAMIN SACKS

one of the mainstream tools in economic study and it is an accepted method of determining damages in antitrust litigation") (citation omitted); *In re Optical Disk Drive Antitrust Litig.*, No. 2017 WL 11513318, at *2 (N.D. Cal. Dec. 18, 2017) (rejecting *Daubert* challenge where regression analysis represented an acceptable method for calculating overcharge where expert explained basis of his analytical choices and the report was not fundamentally flawed).

LinkedIn asked Sacks whether he "relied on any academic literature that suggests that applying that type of regression using the input that [he] used is accepted or . . . been discussed in the academic literature." Ex. 90 (Sacks Dep. Tr. 47:14-18). Sacks explained that academic literature concerns itself with methods and techniques, such as the regression analysis itself, rather than its numerous applications (*e.g.*, to damages). (*Id.* at 45:17-46:9.) He correctly applied his professional expertise and training in using a linear regression analysis to analyze a novel scenario; that this precise usage has not previously come up in academic literature does not call into question Sacks's method, and certainly is not dispositive. *See Giuliano*, 2015 WL 10890654, at *10 (Court explaining that, in rejecting *Daubert* motion against expert's linear regression analysis, "Dr. Sullivan did not rely solely on 'economic theory' in rendering his impact and damages opinions. Dr. Sullivan's methodology . . . indicates that his analysis . . . is based on economic theory, economic literature, and statistical evaluation.").

Sacks's damages analysis of hiQ is rooted in well-established finance principles—it simply adapts a standard valuation formula to the special case of a startup firm. While applying a regression analysis to estimate one component of that formula (*i.e.*, the conditional expected value of hiQ at Round C) may seem novel, it is not. Regression analysis is the most common and well-accepted scientific method for estimating conditional expectations, and it is regularly applied in one form or the other to establish Terminal Values.[17] As discussed *supra* at p. 5, the commonly-used revenue multiple approach implicitly uses a regression to estimate the multiple, which is a key input into the Terminal Value calculation.

---

[17] *See, e.g.*, Ex. 95 (Jing Liu, Dorom Nissim, and Jacob Thomas, Equity Valuation Using Multiples, Journal of Accounting Research 40, no. 1 (2002), at 135-172); Ex. 93 (Malcolm Baker and Richard Ruback. Estimating Industry Multiples (1999), at 1-30).

Sacks explained why he explored and ultimately chose to use Round B value as a predictor of Round C value (using regression analysis), and why he found it more reliable than other variables typically used for valuing established firms in these circumstances.  Ex. 88 (Sacks Report at 31-36). In particular, Sacks opined that a regression analysis was more reliable to value hiQ than a standard DCF or a comparable companies analysis, since standard revenue and income data are not reliably available for hiQ or a set of comparable companies.  (*Id.* at 37-39.)  The use of Round B value to predict Round C value—which served as the "Terminal Value" component in the standard valuation formula—was determined to be more reliable for valuing hiQ in between rounds.  (*Id.*; Ex. 90 (Sacks Dep. Tr. 54:4-55:14).)  These statements are unrebutted by LinkedIn.  Nor does LinkedIn even attempt to explain how a DCF or a comparables analysis—or any other method or analysis, for that matter—would be more reliable than a regression analysis here.  Its arguments amount to views on the weight of Sacks's testimony and the opinions he reached based on the assumptions he made, which are issues to be decided by the trier of fact.  *See Giuliano*, 2015 WL 10890654, at *10.

### A.   Sacks Extensively Considered and Controlled for Available "Major Factors"

LinkedIn also complains that the variables Sacks applied are flawed.  In particular, LinkedIn erroneously asserts that Sacks simply did not analyze "major factors" that account for "other possible causes" of correlation that appear in regression results.  (ECF No. 339 at 15 (citing *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010)).)  However, once again, the selection of variables to include in a regression analysis in most cases is normally a question that goes to weight of the expert's analysis, not its admissibility.  *See Giuliano*, 2015 WL 10890654, at *10 (finding party did not show expert's regression analysis suffered from serious methodological flaws such that it should be excluded); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *16 (N.D. Cal. Jan. 19, 2017) (finding expert's opinions, which were based in part on a regression model, provided a "reliable and accepted source" of evidence and that alleged weaknesses in the regression model did not require exclusion of his opinions).

Contrary to LinkedIn's assertion, Sacks spent approximately ***thirteen pages*** of his report and an appendix thereto detailing "the major areas that Metrick's *Venture Capital and the Finance of Innovation* states that [venture capitalists]" consider when evaluating company's progress after a

round.  (*Id.* at 17-31, Appendix C.) (*i.e.*, the "Metrick Factors").  For instance, Sacks analyzed management, customers, people analytics market and competition, channels and partners, technology, and other factors.  (*Id.*)

Sacks then systematically analyzed all Round B and C data of 257 private companies that received venture capital funding and had similar characteristics as hiQ.  Ex. 88 (Sacks Report at 31-32).  The purpose of reviewing similarly situated companies in the relevant spaces was to discern any relationship between the valuations at Round B and Round C.  Ex. 90 (Sacks Dep. Tr. 65:2-6). Contrary to LinkedIn's assertion, (ECF No. 339 at 16-17), Sacks **did** screen for these firms' comparability with hiQ, including size, industry, dates, and reporting revenues.  Ex. 88 (Sacks Report, Appendix C).

Sacks also confirmed the comparability of time between Rounds B and C to ensure consistency. *Id.*  He correctly excluded firms that did not make it to Round C, as the express purpose of the regression was to discern the value at Round C, given the value at Round B, and assuming the firm made it to Round C.  Ex. 90 (Sacks Dep. Tr. 100:1-101:3.)  Then, applying the Metrick Factors, Sacks adjusted for the fact that hiQ may **not** survive to Round C by applying a 20% discount to his valuation.  (*Id.* at 37:23-38:25.)  The output of Sacks's analysis was a regression line that characterized the relationship between Round B and C valuations.  (*Id.* at 65:10-17; Ex. 88 (Sacks Report, Figure 5).)  He then used the regression line to infer what would have happened with hiQ at Round C based on the relationship observed in this real-world data.  Ex. 90 (Sacks Dep. Tr. 65:18-24).

From his examination and analysis of the data and other evidence—including Metrick Factors involving management, customers, people analytics market and competition, channels and partners, and technology—Sacks opined that there is no strong basis to conclude that hiQ would be better or worse situated (*i.e.*, would increase in value from Round B to C by more or less) than the average similarly-situated firm that makes it to Round C.  Ex. 90 (Sacks Dep. Tr. 146:5-147:7). Since Sacks believed that hiQ was an average firm in his sample, based on the Metrick Factors discussed above, he was correct to assign hiQ an average value, which is what the regression delivers.  (*Id.*)  While the Metrick Factors for each and every company in the dataset are not

accounted for in the regression model—because the underlying company data was not available to include—Sacks did not simply ignore major factors to arrive at his conclusion that hiQ had average value. (*See, e.g.*, Ex. 88 (Sacks Report at 17-31).)  Instead, as Sacks explains, these Metrick Factors were already baked into hiQ's Round B valuation (*i.e.*, investors considered these factors when landing on a fair price).  (*See* Ex. 89 (June 30, 2022 Rebuttal Expert Report of Benjamin A. Sacks ("Sacks Rebuttal Report") at 2) ("Information known at the time of Round B is reflected in hiQ's Round B price and is therefore already accounted for in my valuation of hiQ at the time of the C&D").).  LinkedIn disregards this, has pointed to no facts or data to support a conclusion that hiQ is *not* average, and instead offers an outlandish hypothetical in which the imaginary valuation relies *only* on a prior round's valuation and does *not* consider any company-specific factors.  (*See* ECF No. 339 at 15.)  At bottom, LinkedIn essentially ignores all of the hiQ-specific information that Sacks considered, then posits a dissection of Sacks's methodology that at most raises a fact issue going to the weight of his testimony, not a *Daubert* issue.  *See Giuliano*, 2015 WL 10890654, at *10.

LinkedIn also mistakenly equates Sacks's dataset to an "index" such as the S&P 500 and then discounts it as "mak[ing] little sense." (ECF No. 339 at 17.)  LinkedIn's example is inapposite and disregards that the dataset Sacks examined expressly included only similarly situated companies (which distinguishes it from the S&P 500).  (*See* Ex. 88 (Sacks Report, Appendix C).)  An index creates a portfolio of companies and tracks the performance of the portfolio's weighted value over an identical time period.[18]  As discussed above, Sacks's regression, on the other hand, considers paired relationships (*i.e.*, each company's *specific* value at Round B vs. its *specific* value at Round C), not weighted averages, and does so across variable time periods, depending on how long elapsed between each company's two rounds.  In any case, valuation professionals quite plainly do use indices (including the S&P 500) to estimate private company values.  *See, e.g.*, *Baker v. SeaWorld Enter., Inc.*, 423 F.Supp.3d 878, 900 (S.D. Cal. 2019) (denying *Daubert* motion where economist

---

[18]   *See* https://www.investopedia.com/terms/i/index.asp#:~:text=An%20index%20is%20an%20indicator,or%20a%20segment%20of%20it.

expert's regression model included "controll[ing] for market factors by using a broad market index (the S&P 500 Total Return Index)").

LinkedIn claims that "Sacks's technique and his application of that technique to this case are so fundamentally unreliable that his testimony carries 'very little explanatory power.'" (ECF No. 339 at 14 (citing *In re REMEC*, 702 F. Supp. 2d at 1273).)  However, LinkedIn ignores the fact that the court in *In Re REMEC* held that, unlike Sacks here, the expert's opinion there had very little explanatory power because he did ***not*** account for significant and quantifiable variables.  702 F. Supp. 2d at 1273.  Where, as here, a study accounts for major factors, it is admissible even if it does not include every single potentially measurable variable.  *Id.*  Similarly, LinkedIn's reliance on *In re Live Concert Antitrust Litig.*, is misplaced because the expert in that case alleged that the data disparity in his calculation was due entirely to defendants' anticompetitive conduct and failed to consider any other possible explanation.  863 F. Supp. 2d 966, 975 (C.D. Cal. 2012); (ECF No. 339 at 16).  In any event, LinkedIn's issues with Sacks's analysis manifestly "go to the weight, not the admissibility, of his impact and damages opinions."  *Giuliano*, 2015 WL 10890654, at *4.

### B.    The Predicted Value of hiQ Was Not Statistically Meaningless

Lastly, LinkedIn's argument concerning the statistical significance of Sacks's confidence interval is as misleading as it is irrelevant.  (ECF No. 339 at 17.)  Sacks's confidence interval around his estimated regression line is highly statistically significant and produces a particularly tight band for predicted Round C values for firms with Round B values comparable to those of hiQ.  (*See* Ex. 88 (Second Amended Sacks Report at 37, Figure 5).)  Contrary to LinkedIn's argument that Sacks failed to "test the reliability of the regression", (ECF No. 339 at 7-8), that is precisely what his confidence interval did.  Ex. 90 (Sacks Dep. Tr. 147:8-148:10 (when asked where he discussed the reliability of his regression, Sacks replies: "Well, if you go to Paragraph 89 of my report, it's right under the picture [*i.e.*, Figure 5]. . .[A] picture is worth a thousand words. . .[T]here's a clear, strong, positive relationship."); *see also Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1404 n.5 (E.D. Wash. 2014) ("[T]he narrower the confidence interval, the more reliable the estimate; the broader the confidence interval, the less reliable the estimate."); *accord Gomez v. Astrue*, 695 F. Supp. 2d 1049, 1054 n.3 (C.D. Cal. 2010).)  This can be seen clearly in Figure 5:



FIGURE 5. ROUND C PRE-MONEY VALUATIONS VS ROUND B POST-MONEY VALUATIONS IN A UNIVERSE OF COMPARABLE [PEOPLE ANALYTICS] COMPANIES FROM PITCHBOOK EXCLUDING ROUND B VALUATIONS GREATER THAN $200 MILLION[157]

Crucially, what LinkedIn calls a confidence interval is, in fact, a **prediction** interval, which is a different measure of uncertainty.   A confidence interval measures the uncertainty around predicted values for the average company, whereas a prediction interval measures the range of values that are possible across all firms—that is, the prediction interval essentially estimates the range between the highest value and lowest value that might be realized across all firms.[19]   In this case, Sacks was able to evaluate factors not available to the regression analysis (*i.e.,* the Metrick Factors) that allowed him to opine that hiQ would behave like an average company in going from Round B to Round C, which is why he utilized a confidence interval in his analysis.   As Sacks noted, because he found that hiQ would likely behave like the average firm, a confidence interval of the

---

[19]   *See, e.g.,* Ex. 97 (Wooldridge, at p. 209), which describes how a confidence interval is appropriate for the average person of the subpopulation, while the prediction interval accounts for another "source of variation: the variance in the unobserved error, which measures our ignorance of the unobserved factors that affect y." As noted, Sacks's analysis specifically assesses the "unobserved factors" (*i.e.,* those variables that could not be included in the regression) by his extensive review of the Metrick Factors for hiQ, which formed the basis for his opinion that hiQ would behave like an average firm in going from Round B to Round C.

Case No. 3:17-cv-03301-EMC
HIQ'S RESPONSE TO LINKEDIN'S DAUBERT MOTION PURSUANT
TO FRE 403, 702 TO EXCLUDE EXPERT TESTIMONY OF BENJAMIN SACKS

1  regression line is the appropriate measure to consider because it provides a measure of confidence

2  about average firm behavior.  (*See* Ex. 90 (Sacks Dep. Tr. 56:19-59:24).)  As such, Sacks did not

3  see any value in applying a prediction interval to hiQ and did not provide one in his report.

4        On the other hand, Professor Hochberg's ***prediction*** interval—which LinkedIn conflates

5  with a ***confidence*** interval in an effort to argue that Sacks's methodology is flawed (*see* Ex. 100

6  (June 30, 2022 Expert Rebuttal Report of Yael Hochberg, Ph.D, at 17-19); ECF No. 339 at 7-8, 17-

7  20)—is not only inappropriate in this circumstance, but also computationally flawed on its face, as

8  Sacks discussed at length during his deposition.  (*See* Ex. 90 (Sacks Dep. Tr. 218:15-221:18)) ("She

9  turned the wrong crank. . . .").  For example, a properly computed prediction interval would only

10  span the range of possible outcomes, but LinkedIn's interval nonetheless includes a large range of

11  ***negative*** Round C valuations, which are nonsensical (a firm cannot have a valuation of less than

12  zero).  (*Id*. 233:1-234:5.)

13        More generally, a prediction interval would only be relevant here if it were comparing two

14  estimates (or valuations), where the estimate with a smaller prediction interval might then be

15  considered "more reliable" (though in fact it may not be, depending on overall context).  But in this

16  instance, where LinkedIn has offered ***no other estimated valuation***, nor any alternative suggested

17  valuation method, the prediction interval is irrelevant statistically, economically and legally—

18  because there is nothing to compare.  *In re High-Tech Emp.*, 2014 WL 1351040, at *16 (rejecting

19  idea that a study is inadmissible as a matter of law just because it is less statistically significant); *In*

20  *re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017)

21  ("Moreover, courts generally have found that a statistical confidence level [*e.g.*, 95%] is more a

22  matter of weight than admissibility.").  Instead, the question of what is the best estimate of damages

23  is for the factfinder.  *In re High-Tech Emp.*, 2014 WL 1351040, at *18.

24        The bottom line is that if LinkedIn believed that DCF or an alternative method would have

25  a lower, and thus more reliable, prediction interval, then LinkedIn and its experts could have

26  presented an alternative method and calculated its prediction interval.  But they did not—they left

27  completely unrebutted Sacks's selection and discussion of his chosen valuation method, the use of

28  linear regression, and why certain alternatives would not suffice.  Instead, using Hochberg's

obviously flawed prediction interval—which Sacks expressly disavowed—while completely ignoring Sacks's confidence interval, and citing only to a case from outside this circuit concerning an expert's wide **confidence** interval, not **prediction** interval, LinkedIn asserts that Sacks's "model shows staggering variance and 'is so wide that there can be no reasonable confidence in it.'"  (ECF No. 339 at 18) (citing *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 896 (7th Cir. 2011). But, Sacks's confidence interval reflected in Figure 5 shows a tight band nothing like the wide variance in *ATA Airlines*.  Moreover, the one case from this circuit that LinkedIn does misleadingly cite, *Icon-IP Pty. Ltd v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 939 (N.D. Cal. 2015), contains **no** discussion of confidence intervals, prediction intervals, or variances and does **not** support the proposition that LinkedIn claims it does: *i.e.*, that "[b]ecause it gives no statistically significant valuation number upon which it is reasonable to rely, Sacks's regression model will *not* 'assist the trier of fact to understand or determine a fact in issue.'"  (ECF No. 339 at 18.)  LinkedIn's argument regarding statistical significance is an inapposite strawman and should be disregarded.[20]

## Conclusion

For the foregoing reasons, hiQ respectfully requests that the Court deny LinkedIn's *Daubert* motion to exclude Sacks's damages opinions.

---

[20]  Notably, even one of LinkedIn's own experts, Dr. Kevin Murphy, has "conceded [in another case] that a model's results need not necessarily be statistically significant to be reliable."  *In re High-Tech Emp.*, 2014 WL 1351040, at *15.  Accordingly, even if LinkedIn's misleading discussion of significance were credited, that would still not call for exclusion of Sacks's opinions here.

DATED:  August 31, 2022

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By ___*Corey Worcester*_____
Corey Worcester
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000
coreyworcester@quinnemanuel.com

*Attorneys for Plaintiff and Counterclaim
Defendant hiQ Labs, Inc.*