# Exhibit 47

# Filed Under Seal

# Exhibit 48

# Filed Under Seal

# Exhibit 49

# Filed Under Seal

# Exhibit 50

# Filed Under Seal

# Exhibit 51

# Filed Under Seal

# Exhibit 52

# Filed Under Seal

# Exhibit 53

Produced in Native Format

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Positioning, Strategy and Product Roadmap

For discussion at
HiQ Offsite - Jan 2016



Manisha Gupta, VP Products

# We are here to draw alignment on:

1. **hiQ Positioning**

2. hiQ Strategy

3. **L1-L3 Metrics**

4. SWOT Analysis for the Solution we sell

5. **Product Roadmap for March Elevate**

6. Product Backlog for May and Oct Elevate

# hiQ Positioning

| Questions we need to answer | Final Answer | Possible Answers |
|---|---|---|
| To (customers) | | People analytics teams, HRBP, Executives |
| who are (target market) | | Fortune 500, Enterprise across all verticals |
| hiQ offers (point of difference) | | People analytics, People analytics solutions, retention analytics, HR solutions, though leadership |
| relative to (competition/ other frame of reference) | | HCM solutions, work day, Job rate |
| because (reasons to believe). | | We use external data, have deep science expertise, ease of use, rich functionality |

# hiQ Strategy



Global Leader in People Analytics

Ambition

Fortune 500
All verticals

Where we play

How we win

- Community
- Data Science
- Experience and Usability

1. Identify <u>Product Market Fit</u> and <u>Product Positioning</u> that puts HiQ in the "Must Have" Budget Allocation.
2. Define and Execute on a <u>Balanced Product Portfolio</u> – Strategic, Impact, Complexity.
3. Establish HiQ as a <u>thought leader</u> and <u>Innovation Engine</u> in People Analytics
4. Strengthen the Community through and **beyond** Elevate
5. Deal flow and Deal closure

Strategic imperatives

Initiatives and roadmap to deliver results

- Elevate
- Product Roadmap features…
- Marketing
- etc

# L1-L3 Metrics

| L1 | Q1 | Q2 | Q3 | Q4 | FY | L2 | Q1 | Q2 | Q3 | Q4 | FY | L3 | Q1 | Q2 | Q3 | Q4 | FY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | Feed Only | | | | | | | | | | | |
| | | | | | | Dashboard | | | | | | | | | | | |
| | | | | | | Feed + Dashboard | | | | | | | | | | | |
| **Gross Margin** | | | | | | | | | | | | | | | | | |
| **# of Customers** | | | | | | Feed Only | | | | | | | | | | | |
| | | | | | | Dashboard | | | | | | | | | | | |
| | | | | | | Feed + Dashboard | | | | | | | | | | | |
| **# of New Customers** | | | | | | Feed Only | | | | | | # of Features | | | | | |
| | | | | | | Dashboard | | | | | | # of Features | | | | | |
| | | | | | | Feed + Dashboard | | | | | | | | | | | |
| | | | | | | Channel - Elevate | | | | | | | | | | | |
| | | | | | | Channel - Sales | | | | | | | | | | | |
| | | | | | | Channel - Referral | | | | | | | | | | | |

# SWOT Analysis
## Product, Platform and Overall Solution

- People Analytics Community
- Product : Retention predictions on External Data
- Customers
- Partners



- Clarity: Vision and direction
- Code base – lacks TDD;
- Wide Gap between what we have and what customers believe we do



- Co Create Products with ▮▮▮▮▮ and CEB
- Expand Retention Product: Internal Data -> Insights -> Actions-> Impact
- Expand People Analytics to use cases beyond Retention
- Expand target customer base beyond People Analytics to HRBP, Execs, Managers



- Competition
- Run out of funds



# Product Roadmap

# Product Roadmap – March Elevate

## 70% Locked

| | Theme | Feature | Source | WOW | Rev | Dev Cost | Feasi bility | Strat egic | Prior ity | J | F | M | A | M | J | J | A | S | O | N | D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Retention** | Security | Tiered Access: Selective access to specific departments | Customers | YES | H | M | H | H | 1 | | | | | | | | | | | | |
| | Security | I want to have an option for two-factor authentication | ▮▮▮ | | H | M | H | H | 2 | | | | | | | | | | | | |
| | Visualization | User can specify the high/ medium and low risk thresholds | Customers | | M | Live | H | M | 5 | | | | | | | | | | | | |
| | Insights | Individual Attrition Score | Internal | | M | Live | H | M | 6 | | | | | | | | | | | | |
| | Recommendation | Phase 1: Actions on HiQ Insights: Partner Content in Product | Customers | | H | M | M | H | 7 | | | | | | | | | | | | |
| | Product Help | I want to understand how the composite variables are defined | Customers | | H | S | H | M | 10 | | | | | | | | | | | | |

| | Theme | Feature | Source | WOW | Rev | Dev Cost | Feasi bility | Strat egic | Prior ity | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Internal Mobility** | Insights | SKill mapping within my organization / Skill to build a new business unit | Customers | YES | M | Live | H | H | 3 | | | | | | | | | | | | |

- **Revenue Impact**: Measured by # of Customers - HUGE (>50) | High (>10) | Medium (3-5) | Low (<3)
- **Development Cost**: Small(<1 month) | Med (< 1 Qtr) | High (<6m) | Extra Large (>6 m)
- **Strategic Fit:** depends on Positioning
- **Feasibility of Success** – depends on our overall capacity to build, ship, market and sell

Details at   https://docs.google.com/spreadsheets/d/1uDaHHnoMGfrCU8WDXFZjosEi3X6OjyFElPI8rTceeXE/edit#gid=0

# Product Roadmap – May and Oct Elevate

## 20% Locked

| Theme | | Feature | Source | WOW | Rev | Dev Cost | Feasibility | Strategic | Priority | J F M A M J J A S O N D |
|---|---|---|---|---|---|---|---|---|---|---|
| Retention | Data - Structured | Incorporate Jobs Market Data | Internal | | X | H | M | H | 4 | |
| | Insights | Retention Risk vs Retention Impact (2 by 2 Analysis) | | YES | | | | H | 8 | |
| | Recommendations | Phase 2: I to know what actions I can take on these Predictions | Customers | | | | | H | 9 | |
| | Impact | Impact of hiQ Retention Investments for Clients | | | | | | H | 11 | |
| | Data - Structured | I want to understand how you are predicting the churn? | Customers | | | | | | | |
| | Data - Regional | India | Customers | | | | | | | |
| | Data - Structured | I want to view these predictions at the aggregate, rather than individual, level within the tool | Customers | | | | | | | |
| | Data - Regional | Phillipines | Customers | | | | | | | |
| | Insights | Attrition Walk for the year | Internal | | | | | | | |
| | Insights | BookMarklet - Real time widget for attribution score | | YES | | | | | | |
| | Insights | Private Equity Analysis - What % of employees are at Retention Risk for acquisition target company | Customers | | | | | | | |
| Acquisition | Insights | Finder for Amex | Customers | | | | | | | |

- **Revenue Impact**: Measured by # of Customers - HUGE (>50) | High (>10) | Medium (3-5) | Low (<3)
- **Development Cost**: Small(<1 month) | Med (< 1 Qtr) | High (<6m) | Extra Large (>6 m)
- **Strategic Fit:** depends on Positioning
- **Feasibility of Success** – depends on our overall capacity to build, ship, market and sell

Details at   https://docs.google.com/spreadsheets/d/1uDaHHnoMGfrCU8WDXFZjosEi3X6OjyFElPI8rTceeXE/edit#gid=0

# Exhibit 54

# Filed Under Seal

Exhibit 55

**LinkedIn Attendees at hiQ's Elevate Conferences**

**October 6, 2015 Elevate Conference**
1. Lorenzo Canlas – Talent Analytics – Director, Business Operations and Analytics
2. Han Givens – Talent Analytics – Talent Analytics, Associate
3. Rena Yi – Talent Analytics – Talent Analytics Manager

**March 1, 2016 Elevate Conference**
1. Wojciech Krupa – Product Engineering – Staff Software Engineer
2. Richard Lee, HRIT Director
3. Aku Patel, Senior Technical Program Manager
4. Rena Yi – Talent Analytics – Talent Analytics Manager

**October 26, 2016 Elevate Conference**
1. Lorenzo Canlas – Talent Analytics – Director, Business Operations and Analytics
2. Cindy Liang – LSS Data – Product Analytics & Data Science Associate
3. Jason Silver – Human Resources – Talent Market Strategist
4. Rena Yi – Talent Analytics – Talent Analytics Manager

**April 18, 2017 Elevate Conference**
1. Lorenzo Canlas – Talent Analytics – Director, Business Operations and Analytics
2. Daniel Francis – Product Management – Senior Product Manager
3. Mike Jennings – Sales – Insights Program Manager

**Exhibit 1001**

Exhibit 56

Produced in Native Format

CONFIDENTIAL



# INAUGURAL
# ELEVATION
# AWARDS

*Honoring Excellence in People Analytics*



# GURU (LIFETIME ACHIEVEMENT AWARD)

THE GURU AWARD RECOGNIZES AN INDIVIDUAL WHO HAS DEVOTED HIS OR HER CAREER TO PEOPLE ANALYTICS & HAS SUCCEEDED IN ELEVATING THE FIELD TO A NEW LEVEL.





**GURU**

# LASZLO BOCK





**Laszlo Bock**, Senior Advisor, *Google*
**Darren Kaplan**, CEO/Co-Founder, *hiQ Labs*



**Laszlo Bock**, Senior Advisor, *Google*



# AESOP AWARD

The Aesop award seeks to recognize organizations that have excelled in the area of data-driven story telling.





## AESOP AWARD WINNER



## DAVE SACHS





# BOOTSTRAP AWARD

The Bootstrap award recognizes the people analytics team that managed to achieve the most in spite of limited resources, manpower, & budget.





## BOOTSTRAP AWARD WINNERS

 — TIE — Scottrade®

**R.J. MILNOR**                    **CRAIG STARBUCK**







**RJ Milnor,** Head of Talent Analytics, *Chevron*

**Craig Starbuck, PhD,** People Analytics,
Data Science, Organizational Effectiveness, *Scottrade*



# OUTLIER AWARD

The Outlier award recognizes the parts of the organization - like the CHRO, HR business partners, & Finance - that work together with people analytics teams to achieve great things.





## OUTLIER AWARD WINNER



## BEVERLY TARULLI



**Elena Drozdova**, Talent Management Lead Russia, *PepsiCo*
**Beverly Tarulli**, VP Human Capital Strategy & Workforce
Analytics*, PepsiCo*



# IMPACT AWARD

The Impact award recognizes the people analytics team that has engaged in work with a strong impact & a demonstrated return on investment for the parent company.





## IMPACT AWARD WINNER

**LinkedIn**

### LORENZO CANLAS





**Cindy Liang**, Product Analytics & Data Science, *LinkedIn*
**Rena Yi**, *Talent Analytics, LinkedIn*
**Lorenzo Canlas**, *Head of Talent Analytics, LinkedIn*



# PICASSO AWARD

The Picasso award recognizes creative technicians that have succeeded in building insightful, powerful, & compelling visualizations from HR data.





# PICASSO AWARD WINNER



## MATT BELKIN





**Matt Belkin**, Chief Analytics Officer, *Domo*



# LEMONADE AWARD

The Lemonade award recognizes the people analytics team that worked with difficult data (e.g., lemons) & managed to extract valuable insight (e.g., lemonade).





## LEMONADE AWARD WINNER



**SERGIO CORDIDO**





**Rodrigo Lenzi**, HRA Senior BI Analyst, *Nestl*é *USA*
**Michele Goldberg**, Director, People Insights & Innovation, *Nestl*é *USA*
**Sergio Cordido**, Manager HR Analytics, *Nestl*é S.A.
**Kate Walters**, Research Consultant*, Nestl*é USA



# ROOKIE AWARD

The Rookie award recognizes a relatively nascent & small people analytics team that has succeeded in achieving tremendous things.





## ROOKIE AWARD WINNER



## CRAIG STARBUCK





**Craig Starbuck, PhD,** People Analytics, Data Science, Organizational Effectiveness, *Scottrade*



**AESOP**
AWARD



**BOOTSTRAP**
AWARD

TIE



**IMPACT**
AWARD





**LEMONADE**
AWARD





**OUTLIER**
AWARD





**PICASSO**
AWARD





**ROOKIE**
AWARD





# Exhibit 57

# Filed Under Seal

# Exhibit 58

# Filed Under Seal

# Exhibit 59

# Filed Under Seal

# Exhibit 60

Produced in Native Format

CONFIDENTIAL

hiQ_00546034

# From Analytics to Action

*Key Principles for Launching Evidence-Based Initiatives*

George Lan | Senior People Analytics Consultant @ hiQ Labs

# Agenda

▶ Obstacles to Launching Evidence-Based Initiatives

▶ Key Principles to Overcome Obstacles

▶ Example: hiQ Impact Program and attrition predictions



# Obstacles to Evidence-Based, People Analytics Initiatives

▶ Getting attention

▶ Keeping attention

▶ Overcoming skeptics



# Big Data Landscape 2016



© Matt Turck (@mattturck), Jim Hao (@jimrhao), & FirstMark Capital (@firstmarkcap)

FIRSTMARK

hiQ elevate



# Impact assessment is integral, not an afterthought: key principles

▶ Not data collection / analysis for its own sake

▶ Helps define purpose



# Data analytics is a contact sport



▶ To create champions, you need to first create participants

▶ Get people engaged and working with analytics

▶ Involved in the beginning, invested at the end

# Experiment and learn



 A/B testing; intervention and control groups

 Work out kinks and understand complexity

hiQ elevate

# Design programs with multiple outcomes



▶ Get early wins; build momentum

▶ Results do not depend on a single outcome

▶ Engage multiple parts of the business





hiQ™ Impact Program

# Impact Program Goals

| | |
|---|---|
| Demonstrate ROI of Using hiQ Keeper | Create People Analytics Champions |
| Customize Organization-Wide Roll-Out | Collect Data for Overall Retention Strategy |

# Program Outline and Timeline

**Recommended: 6-8 weeks**

**Step 1**

Identify participants

**Step 2**

Analytics Training Session

**Step 3**

Stay interviews

**Step 4**

Feedback & Strategy Session

**Step 5**

Program Evaluation and Next Steps

1-2 weeks

3 hour session

1 month

3 hour session

1-2 weeks

hiQ

hiQ

**Step 1**

Identify participants

Choose Participants / Interviewers

Identify Potential People Analytics Champions

Customize Program Based on Participants' Goals

Ex) Participant wants to focus on attrition of diverse workers

Collect previous data on attrition (if available) for benchmarking



**Step 2**

Analytics Training Session

Capture Intuition of Participants / Interviewers

Compare intuition with predictions



Go through hiQ prediction scores and what they mean

Ex) Large external footprint



Interview design and training



**Step 3**

Stay interviews

Conduct "stay" interviews

Understand employee value proposition

Gather qualitative and quantitative data from interviews



**Step 4**

Feedback & Strategy Session

**Analyze results**

What common themes came out of interviews?



**Strategy Planning**

How, if at all, should we integrate results into overall retention strategy?



**Get feedback from Participants / Interviewers**

Did you face any difficulties in conducting the interviews?



**Step 5**

Program Evaluation and Next Steps

Evaluate success and broadcast



Identify internal owner



Build capabilities and launch wider roll-out



# Thank you and Q&A



# Exhibit 61

# Filed Under Seal

# Exhibit 62

Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6331

Attorneys for Plaintiff hiQ Labs, Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ LABS, INC., | Case No.: 17-CV-03301-EMC |
| Plaintiff, | **PLAINTIFF HIQ LABS, INC.'S RESPONSES TO LINKEDIN CORPORATION'S FIRST SET OF INTERROGATORIES** |
| vs. | |
| LINKEDIN CORPORATION, | |
| Defendant. | Judge:  Hon. Edward M. Chen |

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and this Court's Local

2    Civil Rules, Plaintiff hiQ Labs, Inc. ("hiQ"), by and through its undersigned counsel, hereby

3    provides the following objections and responses to Defendant LinkedIn Corporation's

4    ("LinkedIn's) First Set of Interrogatories dated June 29, 2021.

5    hiQ makes the responses herein solely for the purposes of this Action.  By responding to

6    each Interrogatory, hiQ does not waive objections to the admission of these responses into

7    evidence on the grounds of relevance, materiality, or any other proper grounds for objection.  hiQ

8    reserves all objections to the use of these responses to Interrogatories.  hiQ may impose all such

9    objections at the time of trial or as otherwise required by the applicable rules or order of the Court.

10   hiQ objects to the Interrogatories to the extent they seek information protected by the attorney-

11   client privilege, the attorney work product doctrine, and/or any other applicable privileges.

12   hiQ is willing to meet and confer with LinkedIn in relation to all Interrogatories, and hiQ's

13   responses and objections set forth herein are based upon information presently known to hiQ, at a

14   time when discovery is in the very early stages.  hiQ reserves the right to amend, supplement, or

15   withdraw its responses and objections to each Interrogatory, including to take into account

16   additional information that comes to light during the discovery process.

17                 **OBJECTIONS AND RESPONSES TO INTERROGATORIES**

18   **INTERROGATORY NO. 1:**

19   Separately, identify all persons to whom you have provided or intend to provide in the

20   future data from LinkedIn's website, computers, servers, or services, including, without limitation,

21   analyses, compilations, summaries, and reports that use, are derived from, rely upon, refer to, or

22   incorporate such data.

23   **RESPONSE TO INTERROGATORY NO. 1:**

24   hiQ has never provided and does not intend to provide in the future any data from

25   LinkedIn members' public profiles to any third-party.  hiQ has provided analyses and reports that

26   are prepared using data from LinkedIn members' public profiles (accessed through LinkedIn's

27   website) to the below entities, which were hiQ's customers.

28

| Customer | Main Customer Contact(s) |
|---|---|
| AIG PC Global Services, Inc. | Kelly Jackson (Kelly.Jackson2@aig.com)<br>121 Spear St. FL 5<br>San Francisco, CA 94105 |
| Allstate Insurance Company | Patrick Furey (patrick.furey@allstate.com) |
| Amazon Corporate LLC | Mike Reynoldson (reynolm@amazon.com)<br>Christopher Derecola (nonretail-invoices@amazon.com)<br>2001 Eighth Avenue<br>SEA35-Port 99<br>Seattle, WA 9121 |
| American Express, Inc. | Elaine Mason (elaine.mason@aexp.com); Danielle Labarbera (danielle.labarbera@aexp.com)<br>Services/PO1198430<br>World Financial Center, 200 Vesey Street<br>New York, NY 10285 |
| AOL Inc. | Kathy McMinn (kathy.mcminn@teamaol.com)<br>John Callery (john.callery@teamaol.com) |
| ███████████ | ████████████████████<br>████████████████<br>███████████ |
| BMC Software, Inc. | Michael Davis (Michael_Davis@bmc.com)<br>2103 City West Blvd<br>Houston, TX 77042<br>Ph: 415-916-5474 |
| Box, Inc. | Evan Wittenberg (evan@box.com)<br>daryn@box.com<br>invoices@box.coupahost.com<br>900 Jefferson Ave<br>Redwood City, CA 94063<br>650-543-7374 |
| ███████████ | ████████████████████<br>████████████████████<br>█████████████<br>██████████ |
| Celgene Corporation | Jim Topor (JTopor@celgene.com)<br>86 Morris Ave<br>Summit, NJ 07901 |
| Citadel LLC | Trish Leyden (Trish.Leyden@citadel.com)<br>131 South Dearborn Street<br>Chicago, IL 60603 |
| Comcast Cable Communications Management, LLC | Robert Delmarco (Robert_Delmarco@cable.comcast.com)<br>JANIS_OVERHOLTZER@CABLE.COMCAST.COM<br>ATT: APSS<br>1701 JFK Blvd<br>Philadelphia, PA 19103<br>Ph: 610-650-1052 |

| | | |
|---|---|---|
| 1 2 3 | Concur Technologies, Inc. | Nic.Hepton@concur.com concur_invoicecapture@concursolutions.com, allie.hanegan@concur.com 601 108th Ave. NE, Suite 1000 Bellevue, WA 98004 |
| 4 5 | Domo, Inc. | Geoff Hyman (geoff.hymas@domo.com) ap@domo.com 772 East Utah Valley Drive American Fork, UT 84003 |
| 6 7 8 9 | ▉▉▉▉▉ | ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉ ▉▉▉▉ ▉▉▉ |
| 10 11 12 | ▉▉▉▉▉ | ▉▉▉ ▉▉ ▉▉ ▉▉▉ |
| 13 14 | The Gap, Inc. | Jennifer Go (Jennifer_Go@gap.com) expense_payables@gap.com PO Box 27808 Albuquerque, NM 87102 |
| 15 16 17 | GoDaddy.com, LLC | Andrew Carges (acarges@godaddy.colm); August Goldman (agoldman@godaddy.com) 650 Castro St. Suite 120-218 Mountain View, CA 94041 Ph: 480-505-8800 |
| 18 19 | The Hershey Company | Emilie Thomas (APInvoices@Hersheys.com) 200 Crystal A Drive Hershey, PA 17033 |
| 20 | Honeywell International, Inc. | CorpUSinvoice981195@honeywell.com 115 Tabor Road Morris Plains, NJ 07950 |
| 21 22 23 | Liberty Mutual Ins. Group | Penn Chou (penn.chou@libertymutual.com); Ray Yang (ray.yang@libertymutual.com); Paul Batten (paul.batten@libertymutual.com); Ashley Buonasera (ashley.buonasera@libertymutual.com) 175 Berkeley Street, Mail Stop: J09H Boston, MA 02116 |
| 24 25 26 | MasterCard Worldwide | Geetanjali Gamel, Teresa Fragoso MC_US_Invoices@MasterCard.com 2000 Purchase Street Purchase, NY 10577 |

27

28

| | |
|---|---|
| ███████████ | ██████████████████████████ |
| | ████████████████████ |
| | ███████████ |
| | ███████████ |
| Meraki, LLC | Jennika Dunbar<br>accounts-payable@meraki.com<br>500 Terry Francois Blvd.<br>San Francisco, CA 94158 |
| Nestlé USA | Michele Goldberg (michele.goldberg@us.nestle.com)<br>800 N Brand Blvd.<br>Glendale, CA 91203 |
| Paypal, Inc. | Daniel Hilling-Smith (dhillingsmith@paypal.com); Jeromy Welland (jwelland@paypal.com)<br>nass.paypal@genpact.com<br>usap@paypal.com<br>2211 N. First Street<br>San Jose, CA 95131 |
| ██████████ | ████████████████ |
| | ██████████ |
| | █████████████ |
| | ██████████ |
| ██████████ | █████████████████ |
| | ██████████ |
| SanDisk Corporation | Marilyn Becker (Marilyn.Becker@sandisk.com)<br>951 SanDisk Drive<br>Milpitas, PA 95035<br>Ph: 408-801-7099 |
| The Bank of New York Mellon | John Callery (john.callery@bnymellon.com)<br>David Cullmann (David.A.Cullmann@bnymellon.com)<br>bnymellonsupport@cognizant.com<br>Cognizant Technology Solutions, PO Box 30124<br>College Station, TX 77842 |
| The Hartford Company | Laura Osborn<br>One Hartford Plaza<br>Hartford, CT 06155 |
| UTC Aerospace Systems | Doug Balsbough (Doug.Balsbough@hs.utc.com)<br>Christian Eatman (Christian.Eatman@utas.utc.com)<br>Angie Gwinn (angie.gwinn@hs.utc.com)<br>2730 West Tyvola Road<br>Charlotte, NC 28217<br>Ph: 704-423-1192 |

Additionally, in February 2018, hiQ published a report that analyzed the public LinkedIn profiles of employees of ten major pharmaceutical companies, titled "2018 Pharma Talent Report: *Focus on Immuno-Oncology Professionals*."  hiQ provided that Report to the following ten companies whose employee profiles were analyzed therein: AbbVie, AstraZeneca, Bristol-Myers Squibb, Celegne, Eli Lilly, Johnson & Johnson, Merck, Novartis, Pfizer, and Roche.  The Report has also been and continues to be made available on hiQ's website to anyone who provided or provides his or her name and email address to download the Report.  *See* https://www.hiqlabs.com/pharma-report-2018.  A list of those who received the Report by requesting same through hiQ's website is attached hereto as **Exhibit A.**

**INTERROGATORY NO. 2:**

For each and every instance in which you disclosed hiQ's customers, including, without limitation, prospective customers, customer contracts, or customer business arrangements, to LinkedIn, state the date of the disclosure, the person(s) providing and receiving the information, and the contents of the disclosure.

**RESPONSE TO INTERROGATORY NO. 2:**

hiQ objects to this Interrogatory as vague and ambiguous as "customer business arrangements" is undefined and unclear.  hiQ further objects to this Interrogatory as seeking information already known to LinkedIn.  Subject to the foregoing objections, hiQ states as follows:

Elevate Conferences

hiQ discussed its offerings at a number of conferences it hosted (referred to as "Elevate" conferences) between October 2015 and April 2017 with LinkedIn employees in attendance.  At these conferences, in addition to discussing its products and anticipated products during presentations, hiQ set up kiosks where attendees were given demonstrations of its products and answered questions about its data sources.

1      Further, at each of these conferences, dozens of representatives of hiQ's customers and

2   prospective customers were in attendance; their corporate names and logos were widely used in

3   promotional and other presentation material; and their status as customers or prospective

4   customers was open and known.  Many of hiQ's actual and prospective customers, business

5   partners, and investors presented at the conferences.  hiQ provides additional information about its

6   highly successful Elevate conferences below.

7      (a) On October 6, 2015, hiQ hosted its first "Elevate" conference at the Westin St. Francis

8   in San Francisco, which LinkedIn Employees Lorenzo Canlas, Han Givens and Rena Yi

9   attended.  Various representatives of hiQ, including Darren Kaplan (Founder & CEO), Genevieve

10  Graves (Chief Data Scientist), and Ryan Hammond (Head of People Analytics), presented or led

11  discussions at the conference.  In his opening remarks, Mr. Kaplan presented a slide deck that

12  stated that hiQ  had "customers in every vertical" including "Banking, Consumer Packaged

13  Goods, eCommerce, Insurance, Pharmaceutical, Retail, Technology, [and] Travel" and described

14  hiQ's "multi-dimensional relationship" with investor CEB.   Ms. Graves presented on the data

15  science underpinning hiQ's products, with her presentation noting that "public data" sources relied

16  on by hiQ included individuals' "external footprint, mobility history, [and] resume appeal."

17      Panelists and presenters included representatives from hiQ's actual and prospective

18  customers and partners, such as: Margarita Constantinides, Senior Director, Talent Analytics,

19  eBay (customer); Geetanjali Gamel, Global HR, MasterCard (prospective customer who became a

20  customer); Michele Goldberg, Director, HR Strategy, Nestlé (customer); Joshua Bersin, Principal

21  and Founder, *Bersin by Deloitte* (prospective partner).

22      (b) On March 1, 2016, hiQ hosted another "Elevate" conference at the Santa Clara

23  Marriott, which LinkedIn employees Jenna Goldstein, Wojciech Krupa, Richard Lee, Aku Patel

24  and Rena Yi attended.   In his opening remarks, Mr. Kaplan presented a deck stating that hiQ was

25  "building [an] ecosystem", and identified companies such as ███████ (customer), EY

26  (prospective partner), Deloitte (prospective partner), and CEB (investor) as part of that

27  "ecosystem."

28

1   hiQ's Genevieve Graves presented on the data science underpinning hiQ's products and on

2   hiQ's "push" and "pull" factor framework for understanding employee attrition.  Specifically, Ms.

3   Graves explained that factors that "push" employees out of current positions include such things

4   as compensation, career path, bad manager, commute, [and] culture", whereas factors that "pull"

5   employees out of current positions include such things as "heavily recruited, high demand skill,

6   career progression, growing sector, [and] high visibility performer."  Ms. Graves then explained

7   "public data" sources relied on by hiQ to understand push and pull factors included "external

8   footprint, mobility history, [and] resume appeal".  Ms. Graves presented a deck that showed hiQ's

9   "Model Validation" and stated that the validation comes from data of "~35,000 employees from a

10  dozen customers."

11  Presentations were given by representatives of hiQ's customers, including: Auguste

12  Goldman, Chief People Officer of GoDaddy (customer), Burke Powers, Senior Director, People

13  Data, Reporting & Analytics, PayPal (customer); Ramesh Karpagavinayagam, Head of HR

14  Analytics for Capital One (customer); and Alexander Dileonardo, Solution Expert, ████████

15  ██ (customer).

16  Manisha Gupta (VP, Products and Strategy) presented on hiQ's Platform product,

17  describing hiQ's ability to "defend your employees from being recruited away" and "optimize

18  your human capital after you hire your Employees."  She also noted that "Social Media has

19  changed recruiting…" and that "external data – the same data visible to recruiters" was key to

20  assessing turnover risk.   Ms. Gupta provided a demo of hiQ's platform.

21  During "breakout sessions", hiQ's Andrew Kim (Director of Engineering) presented with

22  Workday's Greg Thompson; their presentation described how hiQ leveraged "data science" using

23  "external data."  In another session, hiQ's George Lan (Senior Consultant, People Analytics)

24  presented alongside CEB's (hiQ's investor) Neeraj Pradhan on "Innovative Ways of Combining

25  Survey and External Data", with their presentation explicitly identifying LinkedIn as one source of

26  "Public data."

27  (c) On October 26, 2016, hiQ hosted another "Elevate" conference at Intel's campus

28  located at 3600 Juliette Lane, Santa Clara, California, followed by the inaugural hiQ "Elevation

1  Awards" at the Santa Clara Marriott, which LinkedIn employees Lorenzo Canlas, Cindy Liang,

2  Jason Silver and Rena Yi attended.  At the conference, hiQ's Ryan Hammond and Nestlé's

3  Michele Goldberg presented on the companies' partnership, with their presentation discussing the

4  "push" and "pull" framework used by hiQ and noting, among other things, that "Professional

5  Profiles" were a source of public data for assessing employees' attrition risk.

6      Additional presentations were given by representatives of hiQ's customers or business

7  partners, including Matt Belkin, Chief Analytics Officer, SVP of Consulting, Domo (customer).

8      At the Elevation Awards, Lorenzo Canlas received an "Impact Award" on behalf of

9  LinkedIn and presented on a LinkedIn talent analytics project.

10     (d) On April 18, 2017, hiQ hosted another "Elevate" conference at the Quadrus Conference

11  Center in Menlo Park, which LinkedIn employees Daniel Francis, Lorenzo Canlas and Mike

12  Jennings attended.  hiQ's Genevieve Graves, Chris LeBailly (Director of Data Science) and

13  Amelia Barker (Director of Customer Success) unveiled hiQ's Skill Mapper product, which, as

14  their presentation noted, incorporated data including "LinkedIn Users updat[ing] their data", and

15  provided an in-depth demo of its function and interface.

16     Presentations were given by representatives of hiQ's current or prospective customers and

17  strategic partners, including: Kevin Diestel, Principal, Sapphire Ventures (potential investor and

18  prospective strategic partner); Cathy Donahoe, Vice President Human Resources, Domo

19  (customer); Davis Carlin, People Analytics, ███████ (customer); Andrew Carges, Vice

20  President of Human Resources – Talent, Technology & Insights, GoDaddy (customer); Katie

21  Meger, PhD, Data Scientist, People Analytics, eBay (customer); David Green, Global Director,

22  People Analytics Solutions, IBM (prospective strategic partner).

23          <u>Discussions with LinkedIn's Director of Business Operations and Analytics</u>

24     hiQ's founder and then-CEO, Darren Kaplan had a series of in-person meetings with

25  LinkedIn's Lorenzo Canlas from late 2016 through early 2017.  During this time period, Mr.

26  Canlas was Director of Business Operations and Analytics for LinkedIn.  In or around August

27  2016, Mr. Canlas became part of hiQ's "Guru" group, composed of leaders in the People

28

1   Analytics space.  The following summarizes the discussions between Messrs. Kaplan and Canlas

2   wherein Mr. Kaplan expressly stated that hiQ uses public data on LinkedIn's website.

3        (a) On July 26, 2016, Mr. Kaplan attended the Talent Analytics Conclave at Apple's

4   Office, wherein Apple brought together thought leaders to discuss People Analytics and data that

5   can be used to build recruiting and retention models.  Mr. Canlas attended that gathering as well.

6   During the conclave, Mr. Kaplan moderated a discussion regarding using publicly available data

7   for human resources models.  Mr. Kaplan was asked to lead that session because hiQ is one of the

8   pioneers to apply machine learning models on publicly available data to make employee decisions.

9   Mr. Canlas, along with at least seven other individuals, participated in that session.  Mr. Kaplan's

10  presentation focused on the importance of using publicly-available data to compliment internal

11  data to inform decision-making.  He spoke about how employees keep their LinkedIn profiles

12  current but do not keep their internal resumes (such as those stored in systems like Workday)

13  current.  Mr. Kaplan then explained to the audience, including Mr. Canlas, how hiQ uses the

14  publicly-available portion of LinkedIn's member profiles (i.e., the part of the profiles that Google

15  indexes) for hiQ's analyses.  Mr. Kaplan further explained that, unlike hiQ, recruiters access

16  information on LinkedIn profiles that can only be accessed by logging in to LinkedIn.  Mr. Kaplan

17  further discussed the "push" and "pull" framework that hiQ uses to analyze employee attrition and

18  stated that LinkedIn data is a source that hiQ considers in its assessment of "pull" factors.

19       (b) On September 30, 2016, Mr. Kaplan met with Mr. Canlas in the lobby of LinkedIn's

20  office located at 222 Second Street in San Francisco, California.  The meeting lasted from 10:00

21  a.m. until 11:00 a.m. Pacific Time.  Mr. Kaplan and Mr. Canlas spoke about how great it was to

22  see the People Analytics space continue to grow and how it was an exciting time to be in that

23  space.  Mr. Kaplan caught Mr. Canlas up on how hiQ was building out its action platform to help

24  companies take meaningful actions in response to an employee who was discovered to be at risk of

25  leaving the company.  Specifically, Mr. Kaplan discussed the "push" and "pull" framework and

26  how public data, such as that on Linkedin, provide a different data point from internal surveys.

27  Mr. Kaplan and Mr. Canlas discussed the possibility of LinkedIn hosting hiQ's next event, and

28  looked at one of LinkedIn's training rooms to that end.

1       (c) On November 14, 2016, Messrs. Kaplan and Canlas met again at LinkedIn's office

2  located at 222 Second Street in San Francisco, California.  During this meeting, the two spoke

3  about hiQ's Keeper product, including about how hiQ uses LinkedIn members' publicly-available

4  data in connection with that product.  Mr. Kaplan updated Mr. Canlas on how the Keeper product

5  continues to add "actions" (i.e., recommendations to companies at risk of losing employees).  Mr.

6  Kaplan and Mr. Canlas also discussed how much more employee data is available on the internet,

7  especially through logging in to LinkedIn.  Mr. Kaplan and Mr. Canlas further discussed

8  Microsoft's purchase of LinkedIn and the subsequent risk profile to LinkedIn employees on

9  account of the acquisition.  Mr. Kaplan explained to Mr. Canlas that hiQ was doing more work in

10  the space of mergers and acquisitions to use public data to map risk of employee attrition.  Mr.

11  Canlas then shared with Mr. Kaplan some of the projects that LinkedIn was working on, including

12  working with Glint for culture and survey but not for employee retention and Hacker Rank for

13  better applicant screening.  The two discussed how Glint is a survey tool provides "push" factors,

14  whereas hiQ analyzes "pull" factors using public LinkedIn data.

15       (d) On March 21, 2017, Mr. Kaplan and Mr. Canlas met again at LinkedIn's office located

16  at 222 Second Street in San Francisco, California.  The focus of the meeting was thought

17  leadership and what each was seeing in the people analytics space.  Mr. Kaplan disclosed to Mr.

18  Canlas that hiQ would be announcing its Skill Mapper product at hiQ's anticipated April 2017

19  Elevate conference.  Mr. Kaplan told Mr. Canlas that this was hiQ's first step to go beyond

20  retention predictions and further told Mr. Canlas that hiQ was using publicly-available LinkedIn

21  data for this product.  Mr. Kaplan explained to Mr. Canlas that the Skill Mapper product was a

22  result of hiQ's clients asking what else hiQ could do with publicly-available data from LinkedIn.

23  Mr. Kaplan advised Mr. Canlas that hiQ was able to move fast in developing Skill Mapper

24  because it had created a new job title taxonomy based on the retention data science work hiQ had

25  already built with the self-reported job titles from LinkedIn public profiles.

26       <u>Response to Cease-And-Desist Letter</u>

27       On May 31, 2017, hiQ, through its counsel Deepak Gupta of Farella Braun + Martel LLP,

28  sent a letter to Abhishek Bajoria, Senior Litigation Counsel of LinkedIn via email

1  (abajoria@linkedin.com) responding to LinkedIn's May 23, 2017 cease-and-desist letter.  In that

2  May 31, 2017 correspondence, hiQ advised LinkedIn: "hiQ's current customers include eBay,

3  Capital One, and GoDaddy.  Prospective customers include Bank of New York Mellon, Chevron,

4  Groupon, Honeywell, IBM, Visier and Jobvite."  (May 31, 2017 Ltr. at 4 n.1).

5  **INTERROGATORY NO. 3:**

6      Describe in detail your means of access to LinkedIn's website by listing all IP addresses

7  and user agents that you have used—currently or have reason to believe you will use in the

8  future—to access LinkedIn's website, computers, or servers, whether directly or indirectly, and for

9  each such IP address and user agent stating how hiQ gained access to the IP address or user agent,

10  the time period for which the IP address or user agent was in use, the number of calls or requests

11  you made to LinkedIn's website, servers, or computers from each IP address or user agent, the

12  specific LinkedIn webpages accessed through each IP address or user agent, and the organization

13  or provider formally associated with each IP address or user agent at the time of your use.

14  **RESPONSE TO INTERROGATORY NO. 3:**

15      hiQ accessed public LinkedIn pages either directly (through its own IP addresses and those

16  of hiQ's employees working remotely) or indirectly (via arrangement with a third-party vendor).

17      **hiQ's Direct Access.**  hiQ accessed the publicly-available LinkedIn members' profile

18  pages directly: hiQ employees—either from hiQ's offices or while working remotely—would

19  access such public profile pages from, respectively, the IP address associated with hiQ or their

20  own personal IP addresses.  hiQ sometimes also used dynamically-assigned IP addresses.  While

21  hiQ accessed public data directly throughout the period that it was a going concern, this direct

22  access was more common during earlier stages of hiQ's product development, including for

23  testing code.  Generally, these IP addresses would have been traceable back to hiQ and/or hiQ's

24  employees.  hiQ used Python-based user agents to access LinkedIn's website.

25      As disclosed in a January 22, 2021 letter from Renita Sharma to Robert Uriarte, hiQ used

26  the following IP addresses until in or about January 2021:

27  - 34.211.215.114
    - 34.211.30.33
28  - 34.206.56.174

- 34.234.103.91
- 34.213.99.139
- 52.8.230.165
- 54.153.107.141

In the January 22 letter referenced above, hiQ requested the following IP addresses be added to LinkedIn's "whitelist," which IP addresses are currently active, but not actively being used by hiQ:

- 44.236.146.245
- 44.236.56.238

Each of the above-listed IP addresses were held on Amazon Web Services.

**hiQ's Indirect Access.** hiQ began using third-party vendors to scrape public data at a larger scale. While hiQ experimented with a few third-party vendors for scraping data, hiQ ultimately used third-party providers ███████████████ and ███████ (effective May 2017). hiQ does not have a list of the IP addresses or specific user agents used by these providers to access LinkedIn members' public profile data, but believes that these providers distributed their access requests among a broad network of requesters using randomized user agents to access the site. Given that the majority of data scraping was performed by third parties, hiQ lacks information regarding "the time period for which the IP address or user agent was in use, the number of calls or requests [hiQ] made to LinkedIn's website, servers, or computers from each IP address or user agent, the specific LinkedIn webpages accessed through each IP address or user agent, and the organization or provider formally associated with each IP address or user agent at the time of use."

Notwithstanding the above, hiQ estimates that over any given month, hiQ (via its third-party vendors) scraped data from between several hundred thousand to one million public profile URLs. hiQ would only scrape data from those URLs once or twice a month at most.

## INTERROGATORY NO. 4:

Describe every way you have accessed and extracted or have reason to believe you will access and extract data from LinkedIn's website, computers, or servers, including for each way the applicable time frame of use and every step used to access and extract data.

**RESPONSE TO INTERROGATORY NO. 4:**

Generally, hiQ compiled or was provided with lists of employees whom its clients wished to analyze and identified the URL for each employee's public LinkedIn profile page.  From the sources described in its Response to Interrogatory No. 3, hiQ sent HTTP requests to LinkedIn's servers, which returned the requested HTML documents from these URL addresses.  hiQ stored these responses and used proprietary software to internally process the collected HTML documents, pulling out information about employees' skills and experience that those users had publicly posted.  hiQ employed contractors to manually verify some of that information by accessing public LinkedIn profiles using traditional web browsers and visually confirming the accuracy of the automated data gathering.  Additionally, from early to mid-2017, hiQ purchased public profile data from third-party data gatherers.

**INTERROGATORY NO. 5:**

Identify and describe each and every source of information that hiQ has ever used or considered for its products, including the timeframe that each source was accessed, the IP addresses or user agents hiQ used to access each source, the fields of data retrieved from each source, and the products into which the source of information (or analyses derived from the source of information) was incorporated.

**RESPONSE TO INTERROGATORY NO. 5:**

hiQ objects to this request as unduly burdensome in that it seeks IP addresses or user agents used with respect to each source of data and that information is not reasonably available at this stage of discovery.

Subject to the foregoing objection, hiQ states as follows.  On occasion, hiQ's customers would provide hiQ with a list of employee names or other information (i.e., job title or geographic location) to assist hiQ in identifying the correct employee.  More often than not, however, hiQ was not given any information from its customers about their employees.   hiQ has never used or considered using personal social media data (such as that on Facebook, Twitter, Instagram, or Pinterest) for any of its products.

The public data sources hiQ has used are as follows:

| Source | Time Frame Used | Products(s) Used For | Fields of Data Retrieved |
|---|---|---|---|
| Google Search API | Throughout hiQ's operations | Keeper and Skill Mapper | Public professional profiles |
| Google Scholar | Throughout hiQ's operations | Keeper | Public professional profiles |
| LinkedIn | Throughout hiQ's operations | Keeper and Skill Mapper | Public professional profiles |
| Stack Overflow | Used sporadically for experimental purposes | Keeper and Skill Mapper | Public professional profiles |
| GitHub | Used sporadically for experimental purposes | Keeper and Skill Mapper | Public professional profiles |
| Yahoo! | Throughout hiQ's operations | Keeper | Public company data |
| Glass Door | Throughout hiQ's operations | Keeper | Public company data |
| United States Department of Labor | Throughout hiQ's operations | Keeper | Public company data |
| United States Bureau of Labor Statistics | Throughout hiQ's operations | Keeper | Public local labor market data |
| Indeed.com | Throughout hiQ's operations | Keeper and Skill Mapper | Public local labor market data and public (for Keeper) professional profiles (for Skill Mapper) |

Additionally, hiQ may have considered using Google Maps and the United States Department of Transportation (for local labor market data) and Fortune (for public company data). To be clear, while hiQ's products used some data from the above sources, not all data from the above sources was relied upon in hiQ's products.

**INTERROGATORY NO. 6:**

Describe in detail, including identifying all related documents or communications, why hiQ believed that LinkedIn approved of its activities with respect to LinkedIn's website, computers, servers, or data, including each and every instance in which you informed an employee of LinkedIn of the sources and methods hiQ uses to obtain data.

**RESPONSE TO INTERROGATORY NO. 6:**

LinkedIn has long been aware that hiQ was using publicly-available profile information from LinkedIn in connection with its products and LinkedIn never advised hiQ that it disapproved of hiQ's business or activities until its May 23, 2017 cease-and-desist letter.

Elevate Conferences

hiQ discussed its offerings the "Elevate" conferences hosted by hiQ between October 2015 and April 2017, with LinkedIn employees in attendance.  Specifically:

(a) On October 6, 2015, hiQ hosted its first "Elevate" conference at the Westin St. Francis in San Francisco, which LinkedIn Employees Lorenzo Canlas, Han Givens and Rena Yi attended.  Various representatives of hiQ, including Darren Kaplan, Genevieve Graves and Ryan Hammond, presented or led discussions at the conference.  Ms. Graves presented on the data science underpinning hiQ's products, with her presentation noting that "public data" sources relied on by hiQ included individuals' "external footprint, mobility history, [and] resume appeal."

At no point in time during or after this Elevate conference (until the May 23, 2017 cease-and-desist letter) did anyone from LinkedIn advise hiQ that LinkedIn disapproved of hiQ's use of its member' publicly-available profile data.

(b) On March 1, 2016, hiQ hosted another "Elevate" conference at the Santa Clara Marriott, which LinkedIn employees Jenna Goldstein, Wojciech Krupa, Richard Lee, Aku Patel and Rena Yi attended.   hiQ's Genevieve Graves presented on the data science underpinning hiQ's products and on hiQ's "push" and "pull" factor framework for understanding employee attrition.  Specifically, Ms. Graves explained that factors that "push" employees out of current positions include such things as compensation, career path, bad manager, commute, [and] culture", whereas factors that "pull" employees out of current positions include such things as "heavily recruited, high demand skill, career progression, growing sector, [and] high visibility performer."  Ms. Graves then explained "public data" sources relied on by hiQ to understand push and pull factors included "external footprint, mobility history, [and] resume appeal".  Ms. Graves presented a deck that showed hiQ's "Model Validation" and stated that the validation comes from data of "~35,000 employees from a dozen customers."

Manisha Gupta presented on hiQ's Platform product, describing hiQ's ability to "defend your employees from being recruited away" and "optimize your human capital after you hire your Employees."  She also noted that "Social Media has changed recruiting…" and that "external data – the same data visible to recruiters" was key to assessing turnover risk.   Ms. Gupta provided a demo of hiQ's platform.

During "breakout sessions", hiQ's Andrew Kim presented with Workday's Greg Thompson; their presentation described how hiQ leveraged "data science" using "external data."  In another session, hiQ's George Lan presented alongside CEB's (hiQ's investor) Neeraj Pradhan on "Innovative Ways of Combining Survey and External Data", with their presentation explicitly identifying LinkedIn as one source of "Public data."

At no point in time during or after this Elevate conference (until the May 23, 2017 cease-and-desist letter) did anyone from LinkedIn advise hiQ that LinkedIn disapproved of hiQ's use of its member' publicly-available profile data.

(c) On October 26, 2016, hiQ hosted another "Elevate" conference at Intel's campus located at 3600 Juliette Lane, Santa Clara, California, which was followed by the inaugural hiQ "Elevation Awards" at the Santa Clara Marriott, which LinkedIn employees Lorenzo Canlas, Cindy Liang, Jason Silver and Rena Yi attended.  At the conference, hiQ's Ryan Hammond and Nestlé's Director, People Insights & Innovation, Michele Goldberg presented on the companies' partnership, with their presentation discussing the "push" and "pull" framework used by hiQ and noting, among other things, that "Professional Profiles" were a source of public data for assessing employees' attrition risk.

At the Elevation Awards, Lorenzo Canlas received an "Impact Award" on behalf of LinkedIn and presented on a LinkedIn talent analytics project.

At no point in time during or after this Elevate conference (until the May 23, 2017 cease-and-desist letter) did anyone from LinkedIn advise hiQ that LinkedIn disapproved of hiQ's use of its member' publicly-available profile data.

(d) On April 18, 2017, hiQ hosted another "Elevate" conference at the Quadrus Conference Center in Menlo Park, which LinkedIn employees Daniel Francis, Lorenzo Canlas and Mike

1  Jennings attended.  hiQ's Genevieve Graves, Chris LeBailly and Amelia Barker unveiled hiQ's

2  Skill Mapper product, which, as their presentation noted, incorporated data including "LinkedIn

3  Users updat[ing] their data", and provided an in-depth demo of its function and interface.

4        At no point in time during or after this Elevate conference (until the May 23, 2017 cease-

5  and-desist letter) did anyone from LinkedIn advise hiQ that LinkedIn disapproved of hiQ's use of

6  its member' publicly-available profile data.

7                <u>Discussions with LinkedIn's Director of Business Operations and Analytics</u>

8        hiQ's founder and then-CEO, Darren Kaplan had a series of in-person meetings with

9  LinkedIn's Lorenzo Canlas from late 2016 through early 2017.  During this time period, Mr.

10  Canlas was Director of Business Operations and Analytics for LinkedIn.  In or around August

11  2016, Mr. Canlas became part of hiQ's "Guru" group, composed of leaders in the People

12  Analytics space.  The following summarizes the discussions between Messrs. Kaplan and Canlas

13  wherein Mr. Kaplan expressly stated that hiQ uses public data on LinkedIn's website.

14        (a) On July 26, 2016, Darren Kaplan attended the Talent Analytics Conclave at Apple's

15  Office.  Lorenzo Canlas attended that gathering as well.  During the conclave, Mr. Kaplan

16  moderated a discussion regarding using publicly available data for human resources models.  Mr.

17  Kaplan was asked to lead that session because hiQ is one of the pioneers to apply machine

18  learning models on publicly available data to make employee decisions.  Mr. Canlas, along with at

19  least seven other individuals, participated in that session.  Mr. Kaplan's presentation focused on

20  the importance of using publicly-available data to compliment internal data to inform decision-

21  making.  He spoke about how employees keep their LinkedIn profiles current but do not keep their

22  internal resumes (such as those stored in systems like Workday) current.  Mr. Kaplan then

23  explained to the audience, including Mr. Canlas, how hiQ uses the publicly-available portion of

24  LinkedIn's member profiles (i.e., the part of the profiles that Google indexes) for hiQ's analyses.

25  Mr. Kaplan further explained that, unliked hiQ, recruiters access information on LinkedIn profiles

26  that can only be accessed by logging in to LinkedIn.  Mr. Kaplan further discussed the "push" and

27  "pull" framework that hiQ uses to analyze employee attrition and stated that LinkedIn data is a

28  source that hiQ considers in its assessment of "pull" factors.

1    At no point in time during or after this discussion did Mr. Canlas express disapproval of

2    hiQ's use of publicly-available profile information from LinkedIn.

3        (b) On September 30, 2016, Mr. Kaplan met with Mr. Canlas in the lobby of LinkedIn's

4    office located at 222 Second Street in San Francisco, California.  The meeting lasted from 10:00

5    a.m. until 11:00 a.m. Pacific Time.  Mr. Kaplan and Mr. Canlas spoke about how great it was to

6    see the People Analytics space continue to grow and how it was an exciting time to be in that

7    space.  Mr. Kaplan caught Mr. Canlas up on how hiQ was building out its action platform to help

8    companies take meaningful actions in response to an employee who was discovered to be at risk of

9    leaving the company.  Specifically, Mr. Kaplan discussed the "push" and "pull" framework and

10   how public data, such as that on Linkedin, provide a different data point from internal surveys.

11   Mr. Kaplan and Mr. Canlas discussed the possibility of LinkedIn hosting hiQ's next event, and

12   looked at one of LinkedIn's training rooms to that end.

13       At no point in time during or after this discussion did Mr. Canlas express disapproval of

14   hiQ's use of publicly-available profile information from LinkedIn.

15       (c) On November 14, 2016, Messrs. Kaplan and Canlas met again at LinkedIn's office

16   located at 222 Second Street in San Francisco, California.  During this meeting, the two spoke

17   about hiQ's Keeper product, including about how hiQ uses LinkedIn members' publicly-available

18   data in connection with that product.  Mr. Kaplan updated Mr. Canlas on how the Keeper product

19   continues to add "actions."  Mr. Kaplan and Mr. Canlas also discussed how much more employee

20   data is available on the internet, especially through logging in to LinkedIn.  Mr. Kaplan and Mr.

21   Canlas further discussed Microsoft's purchase of LinkedIn and the subsequent risk profile to

22   LinkedIn employees on account of the acquisition.  Mr. Kaplan explained to Mr. Canlas that hiQ

23   was doing more work in the space of mergers and acquisitions to use public data to map risk of

24   employee attrition.  Mr. Canlas then shared with Mr. Kaplan some of the projects that LinkedIn

25   was working on, including work with Glint for culture and survey but not for employee retention

26   and Hacker Rank for better applicant screening.  The two discussed how Glint is a survey tool that

27   provides "push" factors, whereas hiQ analyzes "pull" factors using public LinkedIn data.

28

1    At no point in time during or after this discussion did Mr. Canlas express disapproval of

2  hiQ's use of publicly-available profile information from LinkedIn.

3    (d) On March 21, 2017, Mr. Kaplan and Mr. Canlas met again at LinkedIn's office located

4  at 222 Second Street in San Francisco, California. The focus of the meeting was thought

5  leadership and what each was seeing in the people analytics space. Mr. Kaplan disclosed to Mr.

6  Canlas that hiQ would be announcing its Skill Mapper product at hiQ's anticipated April 2017

7  Elevate conference. Mr. Kaplan told Mr. Canlas that this was hiQ's first step to go beyond

8  retention predictions and further told Mr. Canlas that hiQ was using publicly-available LinkedIn

9  data for this product. Mr. Kaplan explained to Mr. Canlas that the Skill Mapper product was a

10  result of hiQ's clients asking what else hiQ could do with publicly-available data from LinkedIn.

11  Mr. Kaplan advised Mr. Canlas that hiQ was able to move fast in developing Skill Mapper

12  because it had created a new job title taxonomy based on the retention data science work hiQ had

13  already built with the self-reported job titles from LinkedIn public profiles.

14    At no point during this discussion or prior to LinkedIn's May 23, 2017 cease-and-desist

15  letter did Mr. Canlas or *anyone* from LinkedIn express disapproval of hiQ's use of publicly-

16  available profile information from LinkedIn.

17  **INTERROGATORY NO. 7:**

18    Describe in detail the "series of in-person meetings" held "in late 2016 and early 2017"

19  between hiQ's former CEO and "LinkedIn personnel," as described in paragraph 14 of the Mark

20  Weidick declaration dated June 22, 2017, by, for each meeting, identifying all persons who

21  attended the meeting, stating all topics discussed at the meeting, and stating the dates and locations

22  of the meeting.

23  **RESPONSE TO INTERROGATORY NO. 7:**

24    (a) On October 6, 2015, hiQ's then-CEO, Darren Kaplan, met LinkedIn's Lorenzo Canlas

25  in person for the first time at a cocktail hour at the hiQ Elevate conference at the Saint Francis

26  hotel in San Francisco. Mr. Kaplan introduced himself to Mr. Canlas and asked if the two could

27  have coffee.

28

1          (b) On July 26, 2016, Darren Kaplan attended the Talent Analytics Conclave at Apple's

2     Office.  Lorenzo Canlas attended that gathering as well.  During the conclave, Mr. Kaplan

3     moderated a discussion regarding using publicly available data for human resources models.  Mr.

4     Kaplan was asked to lead that session because hiQ is one of the pioneers to apply machine

5     learning models on publicly available data to make employee decisions.  Mr. Canlas, along with at

6     least seven other individuals, participated in that session.  Mr. Kaplan's presentation focused on

7     the importance of using publicly-available data to compliment internal data to inform decision-

8     making.  He spoke about how employees keep their LinkedIn profiles current but do not keep their

9     internal resumes (such as those stored in systems like Workday) current.  Mr. Kaplan then

10    explained to the audience, including Mr. Canlas, how hiQ uses the publicly-available portion of

11    LinkedIn's member profiles (i.e., the part of the profiles that Google indexes) for hiQ's analyses.

12    Mr. Kaplan further explained that, unliked hiQ, recruiters access information on LinkedIn profiles

13    that can only be accessed by logging in to LinkedIn.  Mr. Kaplan further discussed the "push" and

14    "pull" framework that hiQ uses to analyze employee attrition and stated that LinkedIn data is a

15    source that hiQ considers in its assessment of "pull" factors.

16         (c) On September 30, 2016, Mr. Kaplan met with Mr. Canlas in the lobby of LinkedIn's

17    office located at 222 Second Street in San Francisco, California.  The meeting lasted from 10:00

18    a.m. until 11:00 a.m. Pacific Time.  Mr. Kaplan and Mr. Canlas spoke about the growth of the

19    People Analytics space and their shared excitement to be working in it.  Mr. Kaplan informed Mr.

20    Canlas of how hiQ was building out its action platform to help companies take meaningful actions

21    in response to an employee who was discovered to be at risk of leaving the company.

22    Specifically, Mr. Kaplan discussed the "push" and "pull" framework and how public data, such as

23    that on Linkedin, provide a different data point from internal surveys.  Mr. Kaplan and Mr. Canlas

24    discussed the possibility of LinkedIn hosting hiQ's next event, and looked at one of LinkedIn's

25    training rooms to that end.

26         (d) On November 14, 2016, Messrs. Kaplan and Canlas met again at LinkedIn's office

27    located at 222 Second Street in San Francisco, Califomia.  During this meeting, the two spoke

28    about hiQ's Keeper product, including about how hiQ uses LinkedIn members' publicly-available

data in connection with that product.  Mr. Kaplan updated Mr. Canlas on how the Keeper product

continues to add "actions."  Mr. Kaplan and Mr. Canlas also discussed how much more employee

data is available on the internet, especially through logging in to LinkedIn.  Mr. Kaplan and Mr.

Canlas further discussed Microsoft's purchase of LinkedIn and the subsequent risk profile to

LinkedIn employees on account of the acquisition.  Mr. Kaplan explained to Mr. Canlas that hiQ

was doing more work in the space of mergers and acquisitions to use public data to map risk of

employee attrition.  Mr. Canlas then shared with Mr. Kaplan some of the projects that LinkedIn

was working on, including working with Glint for culture and survey but not for employee

retention and Hacker Rank for better applicant screening.  The two discussed how Glint is a

survey tool provides "push" factors, whereas hiQ analyzes "pull" factors using public LinkedIn

data.

        (e) On March 21, 2017, Mr. Kaplan and Mr. Canlas met again at LinkedIn's office located

at 222 Second Street in San Francisco, California.  The focus of the meeting was thought

leadership in the people analytics space.  Mr. Kaplan disclosed to Mr. Canlas that hiQ would be

announcing its Skill Mapper product at hiQ's anticipated April 2017 Elevate conference.  Mr.

Kaplan told Mr. Canlas that this was hiQ's first step to go beyond retention predictions and further

told Mr. Canlas that hiQ was using publicly-available LinkedIn data for this product.  Mr. Kaplan

explained to Mr. Canlas that the Skill Mapper product was a result of hiQ's clients asking what

else hiQ couuld do with publicly-available data from LinkedIn.  Mr. Kaplan advised Mr. Canlas

that hiQ was able to move fast in developing Skill Mapper because it had created a new job title

taxonomy based on the retention data science work hiQ had already built with the self-reported job

titles from LinkedIn public profiles.

        Messrs. Kaplan and Canlas then spoke about trends in the human resources technology

space, and Mr. Canlas advised Mr. Kaplan that he was looking for a new job.  Mr. Kaplan

responded that he was not surprised to hear that and also stated that hiQ measures post mergers

and acquisitions opportunities and that there are a lot of opportunities.  Mr. Kaplan subsequently

connected Mr. Canlas with Domo, ADP for a new potential job and TWIC as a startup that he

could advise.

**INTERROGATORY NO. 8:**

Describe in detail all instances where any person stated or indicated that they would not do business with hiQ, including, without limitation, purchase hiQ's products, as a result of LinkedIn's actions by identifying such persons, stating the dates and contents of their statements or indications, and describing the circumstances under which such statements or indications were made.

**RESPONSE TO INTERROGATORY NO. 8:**

At the time hiQ received the May 23, 2017 cease-and-desist letter, hiQ was involved in a funding round in which it had significant investor interest.  Just twenty days before the cease-and-desist letter, on May 3, 2017, CB Insights described hiQ as "[o]ne of the more well-funded startups" in the human resources technology companies space.[1]  On May 11, 2017, hiQ had received a favorable write-up in a Venture Beat article titled "Data-first tools score $1.8 billion to make US workers super-productive."[2]  In short, hiQ had significant momentum prior to receiving the cease-and-desist letter, with interest from prospective investors, clients, and business partners. When these groups learned about LinkedIn's efforts to crush hiQ's business, they generally declined to paper deals with hiQ.  Discovery will bear out that the these arrangements fell through because of LinkedIn's conduct.

Subject to the above caveat that discovery will bear out additional instances of lost business opportunities as a direct result LinkedIn's conduct, hiQ states as follows:

(a) In the Spring of 2017, hiQ and International Business Machines Corp. ("IBM") were actively engaged in advanced discussions of an OEM partnership.  On August 1, 2017, Jackie Ryan, IBM's Director, Watson Talent Analytics Offering Management, advised hiQ's Darin Medeiros and Mark Weidick via e-mail that "[f]or now, I'm not able to make further progress on

---

[1]   Emerging AI: 7 Industries Where AI Is Making An Impact (cbinsights.com)

[2]   Data-first tools score $1.8 billion to make US workers super-productive | VentureBeat

use case scenario planning until the case concludes."  She further explained: "In the interim, I've taken the approach of getting you connected within the team here assuming an outcome in hiQ's favor."

(b)  Prior to the May 23, 2017 cease-and-desist letter, hiQ was working with SAP's Venture Capital Group, Sapphire Ventures.  After hiQ won a preliminary injunction, Mark Weidick had a phone call with Kevin Diestel of Sapphire Ventures.  On September 1, 2017, Kevin Diestel of Sapphire Ventures wrote to hiQ's Mark Weidick that he was "looking into who might be willing to chat, but my guess is no one is going to stick their neck out, but will try to find anyone who is interested."  Thereafter, on September 8, 2017, Mr. Diestel e-mailed Mr. Weidick to advise him of the following: "Hey Mark, my team and I chatted with a number of people within SAP and SuccessFactors, the sentiment has been the same that they don't think anyone within the organization will touch this given its relationship with Microsoft and the sensitivity of the topic.  Sorry we couldn't be more helpful on this front.  Pulling for you guys."

(c)  In or about late 2017 or early 2018, hiQ's Mark Weidick reached out to Ted Wang of venture capitalist firm Cowboy Ventures to inquire about an investment opportunity for Cowboy Ventures in hiQ.  In response to this proposal, Mr. Weidick was met with immediate incredulity from Mr. Wang at the prospect of Mr. Wang taking any proposal involving hiQ back to his partners given hiQ's legal circumstance with LinkedIn.  Mr. Wang stated that Mr. Weidick had to have been "crazy" to think that Mr. Wang would take a deal like this back to his partners and that this was "not even close."

**INTERROGATORY NO. 9:**

Identify all of hiQ's customers without limitation as to time.

**RESPONSE TO INTERROGATORY NO. 9:**

hiQ incorporates by reference its response to Interrogatory Number 1 herein.  Specifically, each customer of hiQ is listed in the chart included in response to Interrogatory Number 1 herein.

**INTERROGATORY NO. 10:**

Identify all of hiQ's prospective customers without limitation as to time.

**RESPONSE TO INTERROGATORY NO. 10:**

hiQ objects to this Interrogatory as unduly burdensome as hiQ's "prospective customers" were limitless and insofar as this Interrogatory is not limited as to time period.  Thus, any identification of "prospective customers" will necessarily be woefully underinclusive.

Subject to the foregoing objections, attached hereto as **Exhibit B** is a chart identifying a small subset of hiQ's "prospective customers".

**INTERROGATORY NO. 11:**

Identify all "potential strategic partners" as that term is used in paragraph 45 of hiQ's First Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 11:**

hiQ objects to this Interrogatory as unduly burdensome as hiQ's "potential strategic partners" were numerous and thus any identification of "potential strategic partners" will necessarily be woefully underinclusive.  For example, all actual and prospective customers, partners, and investors had the potential to become strategic partners of hiQ; indeed, that was hiQ's intention.

Subject to the foregoing objection, hiQ's states that a small subset of its potential strategic partners are identified in **Exhibit B** attached hereto.  hiQ further states that it had potential strategic partnerships with IBM, Visier, Jobvite, Accenture, PwC, Ernst & Young, Deloitte, ███████ CEB, Workday, and SAP Success Factors.

**INTERROGATORY NO. 12:**

Describe every way hiQ contends that it competes with or is likely to compete with LinkedIn, including without limitation, identifying for each competitive LinkedIn product or service the nature of the competition with hiQ, the hiQ products or services implicated, and the time period associated with the competition or likely competition.

**RESPONSE TO INTERROGATORY NO. 12:**

hiQ objects to this Interrogatory as vague and ambiguous as to the phrases "competes with" and "is likely to compete with," which are undefined.  hiQ further objects to this

1   Interrogatory to the extent that LinkedIn may be better positioned to identify all the ways its

2   products competed with hiQ's products and/or would have competed with hiQ's products if hiQ

3   had not been wrongfully forced out of business by LinkedIn.

4       Subject to the foregoing objection, hiQ states that, when the predecessor of what became

5   "hiQ Labs, Inc." was founded in 2012 as "OrgStars," no person or business was attempting to

6   solve the problems hiQ was and would be solving—which were running data analytics on external

7   professional employee data (that is, information not held by an employer) to determine employees'

8   risk of leaving their employer (the "Keeper" product) and to analyze the skill set of employers (the

9   "Skill Mapper" product).  The work hiQ was doing in the space was novel.  In fact, hiQ won the

10  "Human Resources Executive's Top Product of 2016" for its innovative business solution that

11  predicts employee attrition.  As such, initially, LinkedIn was *not* a competitor of hiQ.

12      However, in an earnings call three years after hiQ's launch, LinkedIn's then-CEO

13  announced a plan to "enter a new category" by creating products for other companies which

14  "leverag[e] content and data that members are already sharing publicly."  He explained:

15          So by way of example, our public profile information, which particularly at
16      larger organizations, you see some of those companies turning to LinkedIn *to look
        up someone within their own company,* because of how robust that public profile
17      information can prove to be . . . . *[W]e're trying to think about ways in which we
        can better leverage that to create value within an organization.*

18
19  On June 21, 2017, LinkedIn's then-CEO announced the launch of a product that would

20  analyze skills data from member profiles, just as hiQ's SkillMapper did:

21          [W]hat LinkedIn would like to do is leverage all this extraordinary data
        we've been able to collect by virtue of having 500 million people join the site. We
22      have over 10 million jobs that are now listed on the site. 50,000 standardized skills.
        *For employers, it's an understanding of what skills they're gonna need to be able
23      to continue to grow, and where that talent exists.*

24      A few days later, an IT buyer at a blue-chip Wall Street firm who had been evaluating

25  hiQ's technology for purchase revealed that LinkedIn was marketing its SkillMapper-like product

26  head-to-head against hiQ.

27      Now, LinkedIn offers employers a range of products through its Talent Solutions business,

28  many of which replicate hiQ's previous offerings.  For example, LinkedIn's Talent Insights

1  product uses "real time data" comprising "over 12 billion data points... from the world's largest

2  professional network" to help businesses "[f]ind or deploy talent effectively using workforce

3  snapshots," "[a]ddress current and future skill gaps," and "[i]nform retention and headcount

4  planning...."[3]  LinkedIn's Recruiter tool lets employers "search current employees to see who's a

5  good fit and ready for a new role" and "share candidate profiles with hiring managers (with our

6  without Recruiter access)...."[4]  Some of LinkedIn's current "happy customers" of these offerings

7  are hiQ's former clients.[5]

8  **INTERROGATORY NO. 13:**

9       Identify each product or service offered by a third party that competes with, competed

10  with, or provides similar functionality to hiQ's Keeper product.

11  **RESPONSE TO INTERROGATORY NO. 13:**

12       hiQ objects to this Interrogatory as vague and ambiguous as to the terms "competes with,

13  competed with, or provides similar functionality to," none of which are defined.

14       Subject to the foregoing objection, hiQ states that, with the exception of LinkedIn's

15  products discussed above, at the time hiQ was a going concern, no other person or business was

16  running data analytics on external professional employee data (that is, information not held by an

17  employer) to determine employees' risk of leaving their employer (the "Keeper" product).  Thus,

18  hiQ had no direct competitors when it was a going concern.  Moreover, because hiQ is no longer

19  operational, it cannot be said to have any competitors.

20  **INTERROGATORY NO. 14:**

21       Identify each product or service offered by a third party that competes with, competed

22  with, or provides similar functionality to hiQ's Skill Mapper product.

23  **RESPONSE TO INTERROGATORY NO. 14:**

24       hiQ objects to this Interrogatory as vague and ambiguous as to the terms "competes with,

25  competed with, or provides similar functionality to," none of which are defined.

26

27  [3]  https://business.linkedin.com/talent-solutions/talent-insights
    [4]  https://business.linkedin.com/talent-solutions/recruiter

28  [5]  https://business.linkedin.com/talent-solutions

1    Subject to the foregoing objection, hiQ states that, with the exception of LinkedIn's

2  products discussed above, at the time hiQ was a going concern, no other person or business was

3  running data analytics on external professional employee data (that is, information not held by an

4  employer) to analyze the skill set of employers (the "Skill Mapper" product).  Moreover, because

5  hiQ is no longer operational, it cannot be said to have any competitors.

6  **INTERROGATORY NO. 15:**

7    State all facts concerning the circumstances of any customer who canceled or reduced their

8  contracted services with hiQ from May 23, 2017, to August 14, 2017, including identification of

9  each such customer and the dates on which each customer canceled or reduced contracted

10  services.

11  **RESPONSE TO INTERROGATORY NO. 15:**

12    hiQ states that no customer cancelled or reduced their contracted services with hiQ

13  from May 23, 2017 to August 14, 2017.

14    Dated: July 29, 2021

15                                        QUINN EMANUEL URQUHART &
16                                        SULLIVAN LLP

17

18                        By:   */s/ Corey Worcester*
19                              Corey Worcester
20                              coreyworcester@quinnemanuel.com
                               QUINN EMANUEL URQUHART
20                              & SULLIVAN, LLP
                               51 Madison Avenue, 22nd Floor
21                              New York, NY 10010
                               Telephone: (212) 849-7000
22                              Facsimile:  (212) 849-7100

23                              *Attorneys for Plaintiffs hiQ Labs Inc.*

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit A

| Name | Email Address |
|------|---------------|
| Mark Scott | mark.scott@hiqlabs.com |
| Andrew Kim | andrew.kim@hiqlabs.com |
| mark weidick | mark.weidick@hiqlabs.com |
| Isaac Benjamin | ibenjamin@prcg.com |
| Josh Bersin | Jbersin@deloitte.com |
| RAKESH DIXIT | DIXITR@MEDIMMUNE.COM |
| maqbul jamil | maqbul.jamil@merck.com |
| Joan Sman | dudehey@gmail.com |
| Lisa Henderson | lisa.henderson@ubm.com |
| Brittany Meiling | brittany@endpointsnews.com |
| Damian Garde | damian.garde@statnews.com |
| Al W | alice@walsh.pizza |
| Andy Cook | andy.cook@hansonwade.com |
| Bernard Munos | bhmunos@stanfordalumni.org |
| Sanjeev Dugar | sanjeev.dugar@bms.com |
| Wen Shi | wenshi@gmail.com |
| Ron Thompson | ron.thompson@point72.com |
| James Pedicano | james.pedicano@astrazeneca.com |
| Peter Goodwin | peter.goodwin@point72.com |
| Jacob Bell | jbell@industrydive.com |
| Stacey Davis | stacey.davis@novartis.com |
| Isaac Benjamin | ibenjamin@prcg.com |
| Matthew Baggott | baggottm@gene.com |
| Birgit Wellmann-Pichler | Birgitwellmann@yahoo.de |
| Ashley Fernandez | a.fernandez@realstaffing.com |
| Jd Porter | Portbook@mac.com |
| Murdo Gordon | murdo.gordon@bms.com |
| Monica Beam | mbeam@are.com |
| Rachel Meighan-Mantha | rachel.meighan-mantha@citeline.com |
| Jeff cohan | jcohan@fchs.com |
| Aman Bhandari | Aman_bhandari@vrtx.com |
| L V | Lvargapharmd@gmail.com |
| Simon King | swk6@icloud.com |
| Kathy Fernando | kfernando@gmail.com |
| winston kung | wkung@pmvpharma.com |
| Fern Barkalow | fern.barkalow@globaldata.com |
| Ruby Chan | schan31@its.jnj.com |
| Ruby Chan | schan31@its.jnj.com |
| jacques raynaud | jraynaud@fondation-arc.org |
| john ho | john.c.ho59@gmail.com |
| William Whyte | Wwhyte@its.jnj.com |
| John Hennessy | hennessyjk@outlook.com |
| Bradley Hubbard | Bradley.Hubbard@bms.com |
| Mythili Koneru | konerm01@gmail.com |
| Charlie Stuart | cstuart47s@gmail.com |
| Ashley Fernandez | a.fernandez@realstaffing.com |

| | |
|---|---|
| Patrick Arensdorf | parensdorf@bluestargenomics.com |
| Tsvetan Biyukov | biyukov@gmail.com |
| Christina Espiritu | christina.espiritu@pfizer.com |
| Christina Espiritu | christina.espiritu@pfizer.com |
| tom Bramswig | tom.bramswig@pfizer.com |
| M Schmidt | mms2005@juno.com |
| Allan Snyder | dsnyder@lilly.com |
| Charles Fisher | cfisher@elanco.com |
| kathy fernando | kfernando@gmail.com |
| Linda Ho | linda.ho@abbvie.com |
| charles fisher | cfisher@elanco.com |
| Rick Satitpunwaycha | rick.sati@abbvie.com |
| Rick Satitpunwaycha | rick.sati@abbvie.com |
| Rick Satitpunwaycha | rickps@me.com |
| jesus gomez-navarro | Jesus.Gomez-Navarro@takeda.com |
| Matt Houseman | mhousem2@its.jnj.com |
| Dominic Lai | dominic.lai@abbvie.com |
| Emmanuelle Huisman | ehuisman@its.jnj.com |
| Dominic Lai | dominic.lai@abbvie.com |
| Dominic Lai | dominic.lai@abbvie.com |
| Emmanuelle Huisman | ehuisman@its.jnj.com |
| Christina Espiritu | christina.espiritu@pfizer.com |
| Lauren Zollinger | lauren.zollinger@theabisgroup.com |
| Timmy Mani | mani_timmy@lilly.com |
| John Doe | shr38@aol.com |
| Alim Seit-Nebi | alimstnb@gmail.com |
| Michelle Salerno | msalerno@marshallbio.com |
| Claude Farrugia | claude.farrugia@um.edu.mt |
| Bruce the Shark | iambrucetheshark@gmail.com |
| Neha r | n.rajdev@coulterpartners.com |
| Tracy Wharton | tracy.wharton@alexmann.com |
| Bistra Kirova | Kirova.bistra@gmail.com |
| Andrea Casati | acasati1@its.jnj.com |
| M S | Msmithrep@gmail.com |
| Michael Lew | remilew@live.com |
| Sean Lewis | ask@seanlewis.info |
| Dominik Wittenbeck | dominik.wittenbeck@roche.com |
| Ashutosh Mangalik | ashutosh.mangalik@fresenius-kabi.com |
| Fernando Arias | fmab35@gmail.com |
| James Bandara | james.bandara@schroders.com |
| Miriam Muley | miriammuley@aol.com |
| Andy Homan | ahoman@vikingglobal.com |
| asdf aesfd | asdf@sadf.fom |
| james osborn | jamesosborn@icover.com |
| kiran kumar | kirsindia@gmail.com |
| Esther Lau | estherlau65@gmail.com |
| Jerrell Moore | jerrell.moore@gmail.com |
| ashley fernandez | fernandezashley11@gmail.com |
| Jacob Thompson | jt125@aol.com |
| Carlo Martinez | carlo@steppingblocks.com |
| Prashant Kumar | prashantkumar18@gmail.com |
| Katherine Lamb | katherine.lamb@astrazeneca.com |
| Adam Chen | adam_chen@merck.com |
| Adithya Satheesan | adithya.satheesan@ril.com |
| sterling huang | shuang@smu.edu.sg |

| | |
|---|---|
| Yolanda Michael | yolanda.michael@novartis.com |
| Yolanda Michael | yolanda.michael@novartis.com |
| YOlanda Michael | adnaloy15@yahoo.co.in |
| Ayu Permana | ayupermana456@gmail.com |
| rune palm | motaruwy@amail.club |
| Joe Smoe | jsmoe@yahoo.com |
| Yue Han | xingqing09654@126.com |
| Benjamin Zweig | ben@reveliolabs.com |
| Russell Pekala | russellpekala@college.harvard.edu |
| Catherine Wang | wang.catherine@bcg.com |
| Jim Livengood | lalob17@gmail.com |
| Dr mel Kay | Banjoman5thstring@yahoo.ca |
| Valeria Colombo | valeria.colombo@alexmann.com |
| T. Schmidt-Bader | tsba@e-qrm.com |
| Chris Gore | chris@d4cglobal.com |
| Mark Tay | Taylorcapyards@gmail.com |
| Jon Davis | jdavis2@illumina.com |
| Jennymarie Lawhorn | Jenny.Lawhorn1@gmail.com |
| David Rettino | drettino@bridgeconsultinggroup.net |
| roop dhania | roopender.dhania@accenture.com |
| John Smith | anonymousanaheim@gmail.com |
| Taylor Malmsheimer | taylor@section4.com |
| EID BADSHAH | sumamatravel@gmail.com |
| Patrick Andrews | support@upgradz.com |
| Jet Zhang | jet2000@live.com |
| Bruno Pierri | Pierribruno@hotmail.com |
| Lennart Panknin | lennart.p@outlook.com |
| fatiha belorf | belorf@sheffieldhaworth.com |
| Whitney Morris | whitney.morris@abbvie.com |
| vincenzo cirrito | Vincenzo_Alberto.Cirrito@ecb.europa.eu |
| Michelle Riegman | Michelle.Riegman@gmail.com |
| Bryan Russel | bryanrussel@hotmail.co.uk |
| Mohamed Toub | mtoub@mtu.edu |
| Mansoor Basha | mbasha@plumdrop.co |
| Tito Santiago | Mailbox921@consiltant.com |
| meng liu | liuxiaoshu@sina.com |
| M Rama Reddy | ram.hnonline@gmail.com |
| ashley glover | ashley.glover@researchandmarkets.com |
| Jeannie Y | Jy233@Hotmai.com |
| Ridho Akbar | ridhomakbar@gmail.com |
| Nathan Barnes | nathan.a.barnes@pwc.com |
| Florian Fontaine-Papion | florian.fp@gmail.com |
| Xiaoguang Li | 461844908@qq.com |
| p m | pmchek@umich.edu |
| Ahmed Hussein | ah969300@gmail.com |
| Jacko Yup | jacko@scrap.com |
| Shobie Ramakrishnan | shobie.ramakrishnan@gsk.com |
| Josh Davis | josh.davis@talentintelligence.com |
| Nik Shah | nik.shah@pwc.com |
| Sherman Lowery | shermandewayne@gmail.com |
| Eduardo Licea | spaghettilb@icloud.com |
| Silvio nda | ndanda07@gmail.com |
| Ekin Ilseven | ekin.ilseven@insead.edu |
| a a | aaa@aaa.com |
| Nirmal Kumar Mudaliar | mrnirmalkumar@gmail.com |

| | |
|---|---|
| Joseph Smith | a@gmail.com |
| Tanguy Delvoye | tanguy.delvoye@q7leader.com |
| Ignacio Benitez | ignacio.benitez@schroders.com |
| Ignacio Benitez | ignacio.benitez@schroders.com |
| Drew Clark | drew.clark26@gmail.com |
| Rasmus Palazzi | palazzi89@gmail.com |
| Donatas Varnas | don.varnas@gmail.com |
| sanjeev Senta | ssenta@tekwissen.com |
| Boris Dev | boris.dev@gmail.com |
| Joshua O'Connor | joshua.oconnor@skillcapital.com |
| Cassie Sinderhoff | cassiesinderhoff@clinlinks.com |
| John Schmidt | john.stanfordcs@gmail.com |
| Yaje Nabes | yajenabes@mailnet.top |
| James Puvanendran | james.prashan@gmail.com |
| Yingdong Wang | amer4@126.com |
| Rahul Castelino | rahul.castelino@pwc.com |
| a ss | wavega7083@3dmail.top |
| Jiayin Qu | quxxx179@umn.edu |
| TJ Crawford | tcrawford@marcusa.com |
| federico ruilova | dev@greenpow.cr |
| Wouter Hylarides | w.h.hylarides@gmail.com |
| Ron Anny | terrongt@gmail.com |
| Chip Steele | corporatecoma@gmail.com |
| Barbara Lond | drbarbaralond@gmail.com |
| adama abanteriba | aabanteriba@gmail.com |
| W. Mark Shanley | gpsw@telusplanet.net |
| Filip Dvorak | filip@dvorak.fr |
| Biwen Zhang | biwen.zhang@simon.rochester.edu |
| Quentin Amaudry | quentin.amaudry@mail.mcgill.ca |
| Folkersinson Crouch | d1483778@urhen.com |
| Guru Raman | igururaman@gmail.com |
| michel stokvis | michel.stokvis@eu.randstadsourceright.com |
| ABDUL BASIT kirmani | abdul.basit.kirmani@accenture.com |
| Nimisha Dutta | nimishadutta23@gmail.com |
| Aashish Parajuli | aashishparajuli4@gmail.com |
| Ryma Meziane | ryma.meziane@d-rating.com |
| Emil Saabye | emil.seaton@gmail.com |
| Stephen Wroblewski | wroble16@gmail.com |
| ab salaam | ab3salaam@gmail.com |
| Johnny Buzzingo | Johnnybuzzbuzz@protonmail.com |
| Paul Hrimiuc | igomodo@gmail.com |
| MASSIMILIANO BONFANTI | testaresemper@gmail.com |
| John Heves | johneves3443661122@gmail.com |
| Mohammad hasan | mohammadhasan@gmail.com |
| Katie Moyna | moynakatie@gmail.com |
| Shepherd Mahupa | Smahupa@gmail.com |
| Rutkay Kursun | rutkaykursun@gmail.com |
| Samura Atallah | samura.h.atallah@gmail.com |
| Vinicius Buso | vinicius.buso@treeintelligence.com |
| Ashrit Kulkarni | ashritfall2019@gmail.com |
| Balan Dhanka | dhankabalan@gmail.com |
| David Jones | davidmjones500@gmail.com |
| Nitish A V | nitishnitu17@gmail.com |
| dave lee | davelee646@yahoo.com |
| Martin Heimburger | mheimburger@gmail.com |

| | |
|---|---|
| Leandra Lopez | leandrallopez@gmail.com |
| Jukka Luoma | jukka.luoma@aalto.fi |
| tak yan | takayano1228@yahoo.co.jp |
| Tim Davis | timothydavis@eurofinsus.com |
| jon v | jonnievlahos@gmail.com |

# Exhibit B

Produced in Excel Sheet Format

## VERIFICATION OF HIQ LABS, INC.'S RESPONSES AND OBJECTIONS TO LINKEDIN CORPORATION'S FIRST SET OF INTERROGATORIES

I, Mark Weidick, hereby verify that the information provided in hiQ Labs, Inc.'s Responses and Objections to LinkedIn Corporation's First Set of Interrogatories is true and correct to the best of my knowledge, information, and belief.

Date: 7/29/21

Mark Weidick

Exhibit 63

1   Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
2   Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
3   Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
4   QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
5   New York, NY 10010
Telephone:     (212) 849-7000
6
Terry L. Wit (SBN 233473)
7   terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
8   50 California Street, 22nd Floor
San Francisco, CA 94111
9   Telephone:     (415) 875-6331

10
Attorneys for Plaintiff hiQ Labs, Inc.
11

12   **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
13

| | |
|---|---|
| 14  hiQ LABS, INC., | Case No.:  17-CV-03301-EMC |
| 15                                    Plaintiff, | **PLAINTIFF HIQ LABS, INC.'S** |
| 16         vs. | **SUPPLEMENTAL RESPONSES AND OBJECTIONS TO LINKEDIN CORPORATION'S SECOND SET OF** |
| 17  LINKEDIN CORPORATION, | **INTERROGATORIES** |
| 18                                    Defendant. | Judge:  Hon. Edward M. Chen |

18

19

20

21

22

23

24

25

26

27

28

Exhibit 488
Weidick, M.
5/23/22
*@ptus*

1    Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and this Court's Local

2  Civil Rules, Plaintiff hiQ Labs, Inc. ("hiQ"), by and through its undersigned counsel, hereby

3  provides the following supplemental responses and objections to Defendant LinkedIn Corporation's

4  ("LinkedIn's) Second Set of Interrogatories dated March 1, 2022.

5    hiQ makes the responses herein solely for the purposes of this Action.  By responding to

6  each Interrogatory, hiQ does not waive objections to the admission of these responses into evidence

7  on the grounds of relevance, materiality, or any other proper grounds for objection.  hiQ reserves all

8  objections to the use of these responses to Interrogatories.  hiQ may impose all such objections at

9  the time of trial or as otherwise required by the applicable rules or order of the Court.  hiQ objects

10 to the Interrogatories to the extent they seek information protected by the attorney-client privilege,

11 the attorney work product doctrine, and/or any other applicable privileges.

12    hiQ's responses and objections set forth herein are based upon information presently known

13 to hiQ.  hiQ reserves the right to amend, supplement, revise, or withdraw its responses and

14 objections to each Interrogatory, including to take into account additional information that comes to

15 light during discovery.

16    Each person or company marked with an asterisk ("*") must be protected as Confidential in

17 accordance with the Court's Protective Order for Litigation Involving Patents, Highly Sensitive

18 Confidential Information and/or Trade Secrets (Dkt. 213).   Each person or company marked with

19 two asterisks ("**") must be protected as Highly Confidential – Attorneys' Eyes Only in accordance

20 with the same.

21 **OBJECTIONS AND RESPONSES TO INTERROGATORIES**

22 **INTERROGATORY NO. 17:**

23    Describe in detail all instances of logged-in access to LinkedIn's website that occurred at

24 your direction or on your behalf, including access by employees, by Turkers, or by any other person,

25 by stating who logged in, when the logged-in access occurred, whether logging in was automated

26 or manual, whether use of the website after logging in was automated or manual, and what

27 information was collected or used through such logged-in access.

28

CONFIDENTIAL

**RESPONSE TO INTERROGATORY NO. 17:**

hiQ objects to this Interrogatory as premature, as discovery is ongoing.  hiQ also objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, as it is not limited by time period and seeks information regarding "all instances of logged-in access to LinkedIn's website."   hiQ further objects to this Interrogatory as seeking information already known to LinkedIn.  hiQ further objects to this Interrogatory on the ground that it contains compound, conjunctive, or disjunctive questions.  In light of the foregoing, hiQ states as follows:

hiQ's employees and Turkers, on occasion, manually logged in to LinkedIn's website to test and validate code (employees) and to verify data (employees and Turkers).  The code that was being validated by Turkers was code used to identify hiQ clients' employees based on their public profiles: that is, once hiQ's code identified the URLs for its clients' employees' public profiles, employees or Turkers would manually view these profiles to visually confirm that hiQ's code made the correct identification.

In addition to performing verification exercises, certain hiQ employees would log in to LinkedIn through their personal accounts for the purpose of networking with other professionals and identifying sales prospects for hiQ's services.  Neither hiQ's employees nor Turkers scraped data from LinkedIn's website while logged in.

**INTERROGATORY NO. 18:**

Describe in detail the end of each of your customer relationships by stating the customer, the date of termination/end of relationship, the proffered reason for termination, and whether you contend LinkedIn is responsible in whole or part for the termination.

**RESPONSE TO INTERROGATORY NO. 18:**

hiQ objects to this Interrogatory as premature, as discovery is ongoing.  hiQ also objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case, as it is not limited by time period. hiQ further objects to this Interrogatory as seeking information already known to LinkedIn.  hiQ further objects to this Interrogatory on the ground that it contains compound, conjunctive, or disjunctive questions.  In light of the foregoing, hiQ states as follows:

CONFIDENTIAL

1    hiQ is one of the many companies harmed by LinkedIn's anticompetitive course of conduct..

2  In particular, hiQ lost nearly all of its employees, customers, investors, partners, and prospective

3  relationships as a result of LinkedIn's efforts to exclude it from using public member data, including

4  the pretextual legal threats in its cease-and-desist letter of May 22, 2017.  On information and belief,

5  LinkedIn's conduct either deterred hiQ's existing customers from renewing their relationships

6  and/or interrupted or seriously burdened hiQ's performance under each of the following contracts

7  and was a substantial factor preventing their continuation or renewal:

8  **Client/Investment Contracts – Active as of May 2017**

| Client | Effective Date and Term | Circumstances of Termination |
|---|---|---|
| Allstate* | Master "Software as a Service" (SAAS) Subscription Agreement effective October 25, 2016<br><br>Term: 3 years | Contract expired and was not renewed. |
| Amex* | Sales Order effective November 10, 2016 for 12 months | Contract expired and was not renewed. |
| ▮▮▮▮ | ▮▮▮ ▮▮ ▮▮▮ ▮▮▮<br>▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮<br>▮▮▮ | ▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮▮▮▮<br>▮▮▮▮▮▮ |
| BNY Mellon* | Master SAAS Services Agreement effective March 1, 2016<br><br>Term: 12 months (automatic renewal for successive terms of 12 months)<br><br>Sales Order effective December 23, 2016 for 12 months (automatic renewal for successive 12-month terms) | Contract expired and was not renewed. |
| Box* | Sales Order effective March 8, 2017 for 13 months (automatic renewal for successive 12-month terms) | Contract expired and was not renewed. |
| ▮▮▮<br>▮▮ | ▮▮ ▮▮ ▮ ▮ ▮▮<br>▮▮▮▮▮▮<br>▮▮▮▮▮▮<br>▮▮▮▮▮▮<br>▮▮▮▮▮ | ▮▮ ▮▮ ▮ ▮ ▮. |

CONFIDENTIAL

| | | |
|---|---|---|
| | ██████████████████████ ███████ | |
| Celgene* | Sales Order Only effective September 26, 2016 for 12 months (automatic renewal for successive 12-month terms) | hiQ and Celgene were in discussions for renewal when hiQ received the cease-and-desist letter from LinkedIn.  On information and belief, Celgene terminated these discussions because of the uncertainty of the lawsuit. |
| Comcast* | License and Services Agreement effective September 25, 2015<br><br>Term: Shall continue until terminated as set forth in the Agreement<br><br>Statement of Work effective from September 25, 2016 to September 24, 2017 | Contract expired and was not renewed. |
| ███████ | ██████████████████████<br>████<br><br>██████████████████████<br>███████████████████<br><br>██████████████████████<br>████████ | ████████████████████████<br>███████████████████████<br>████████████████████████<br>██████████████████████<br>████████████████ |
| ███████ | ██████████████████████ | ████████████████████████<br>███████████████████████<br>████████████████████████ |
| Gap* | Software Services Agreement effective April 15, 2015<br><br>Term: 1 year (option to renew for additional 1 year terms)<br><br>Sales Order effective April 30, 2017 for 12 months. | Contract expired and was not renewed. |
| GoDaddy* | ██████████████████████<br>██████████<br><br>██████████████████████<br>██████████████████████<br>██████████████████████<br>██████████████████<br><br>██████████████████████<br>████████ | ████ ██ ████ █ ████ ████<br>███████████████████████ █<br>████████████████████<br>████████ |

CONFIDENTIAL

| | | |
|---|---|---|
| Hartford* | Master SAAS Services Agreement effective December 12, 2016<br><br>Term: Shall continue until terminated as provided in the Agreement.<br><br>Sales Order effective December 12, 2016 for 12 months | Contract expired and was not renewed. |
| Hershey* | ██████ ██ █ ██████ ███████<br><br>████████████████████████<br>████████████████████████<br>████████████████████████<br>████████████████<br><br>████████ | ██████ █████ ███ ██ ██ |
| Honeywell* | Master Services Agreement effective June 20, 2017<br><br>Term: 3 years, terminable with 30 days notice | Honeywell declined to renew on 5/13/2019 due to "other business priorities." *See* hiQ_00067456. On information and belief, hiQ's staffing shortages led to problems performing under the contract. |
| ██████████ | ████████ ██ ███ ████<br>████████████████<br>████████████████<br>████████████████ | ██████ ██ ███ ██ ███<br>██ ██ ██ █ ██ ████<br>██ ██ ██ ██ ███<br>████ |
| PayPal* | Master SaaS Services Agreement effective January 26, 2016<br><br>Term: 12 months (automatic renewal for successive terms of 12 months)<br><br>Sales Order effective March 2017 for 12 months | hiQ's point of contact at Paypal left the company. Contract expired and was not renewed. |
| ██████ | ██████ ██ █ ██ ████<br>████████████████<br>████ ██ ██ ██ ██ ████<br>████████ | ██████ ███ ████████ |
| ██████ | ██████████████<br>████████ | ██████ ██ ██ ██ ██<br>██████ █ ████████<br>████████████████<br>████████ |

SUPPLEMENTAL RESPONSES TO SECOND SET OF INTERROGATORIES

CONFIDENTIAL

| UTC Aerospace* | Master SaaS Services Agreement effective January 15, 2016<br><br>Term: 12 months (automatic renewal for successive terms of 12 months).<br><br>Sales Order effective November 16, 2016 for 12 Months beginning January 1, 2017 (automatic renewal for successive 12-month terms) | Contract expired and was not renewed. |

Prior to the cease-and-desist letter, each of the following contracts with customers had expired, though hiQ continued to maintain relationships with many or all of these customers and considered them prospective customers for future engagements as hiQ refined its existing products and developed new offerings:

**Client/Partnership Contracts – Expired Prior to May 2017**

| Client | Effective Date and Term | Circumstances of Termination |
|---|---|---|
| AIG* | Master Software as a Service Agreement effective August 10, 2015<br><br>Term: Shall continue until terminated in accordance with the Agreement<br><br>Sales Order effective August 12, 2015 for 1 year (option of renewing for an unlimited number of successive 1 year periods). | AIG's Human Capital Projects group disbanded at the end of 2015 and AIG discontinued the relationship. *See* hiQ_00530652.<br><br>From August 2017 through April 2018, the parties discussed renewing the relationship but were unable to come to terms (*see, e.g.*, hiQ_00121703.) |
| Amazon* | Master Services Agreement effective April 1, 2015<br><br>Term: 1 year (automatic extension on a month-to-month basis)<br><br>Work Order Effective April 1, 2015 for 1 year | Amazon and hiQ discussed extending the relationship as late as March 2017 but were not able to come to an agreement at that time. |
| AOL* | Subscription Agreement effective January 6, 2015<br><br>Term: Shall continue for so long as AOL continues to subscribe to the Services. | hiQ's contacts at AOL left the company, and AOL did not renew. *See* hiQ_00399759. |
| BMC* | Master SAAS Services Agreement effective June 22, 2016<br><br>Term: 24 months<br><br>Sales Order effective June 30, 2016 for 24 months | This relationship ended in February of 2017 (*see* hiQ_00512867). On information an belief, BMC's new leadership terminated the agreement. |

-6-

SUPPLEMENTAL RESPONSES TO SECOND SET OF INTERROGATORIES

CONFIDENTIAL

| Concur* | Terms of Service effective date listed on the applicable hiQ Order Form<br><br>Term: Continues until the Subscription to the Service granted in accordance with the Agreement has expired or the Agreement is terminated earlier (automatic renewal for additional 1 year periods).<br><br>Latest invoice was issued July 1, 2015. | Concur was unable to renew as a result of being acquired: "We have reviewed and have decided not to renew with HiQ.  I want to be clear this has nothing to do with you, HiQ or the team which I think are all amazing, however with the integration, there is no window for us to integrate this tool into our platform and use." *See* hiQ_00121847. |
| --- | --- | --- |
| Liberty Mutual* | Master SaaS Services Agreement effective February 5, 2016<br><br>Term: 12 months (automatic renewal for successive terms of 12 months)<br><br>Sales Order effective October 14, 2016 for 3 months | Liberty Mutual declined to extend the contract, but relationship and discussions around renewal remained ongoing through at least 2019 (*see*, e.g. hiQ_00311440, hiQ_00221835). |
| MasterCard* | Master Supplier Agreement effective August 21, 2015<br><br>Term: 1 year (automatic renewal for successive 1-year terms)<br><br>Purchase Order placed March 24, 2016 | hiQ's point of contact at the company left.  Contract expired and was not renewed. |
| Meraki* | Order Form effective September 26, 2014 for 1 year | Contract expired and was not renewed. *See*  hiQ_00062454 |
| Nestle* | Order From effective September 17, 2015 for 1 year (September 30, 2015 to December 1, 2016). | Contract expired and was not renewed. |
| SanDisk* | Master SaaS Services Agreement effective December 22, 2015<br><br>Term: 12 months (automatic renewal for successive terms of 12 months)<br><br>Sales Order effective January 4, 2016 for 6 months | SanDisk was acquired by Western Digital in 2016 and, on information and belief, the acquisition played a role in their decision to discontinue the relationship. |

**INTERROGATORY NO. 19:**

Summarize your interactions with each potential and/or actual investor in hiQ by identifying the prospective investor, the date you first communicated with them about a potential investment, anything they communicated to you about their desire or willingness to invest and/or any evaluation of such investment opportunity, the proffered reason for any decision not to make an investment in

CONFIDENTIAL

1   hiQ, and the basis of any contention that any act of LinkedIn is the cause in whole or part for an

2   investors' decision regarding an investment in hiQ.

3   **RESPONSE TO INTERROGATORY NO. 19:**

4       hiQ objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the

5   needs of the case, as it is not limited by time period and requests communications pre-dating LinkedIn's

6   May 23, 2017 cease-and-desist letter.  hiQ also objects to this Interrogatory on the ground that it contains

7   compound, conjunctive, or disjunctive questions.  hiQ further objects to this Interrogatory as vague,

8   ambiguous, and unduly burdensome, as hiQ's "potential" investors were limitless and any identification

9   of "potential" investors and communications regarding any potential investment will necessarily be

10  underinclusive. hiQ further objects to this Interrogatory as duplicative of Interrogatories 9 and 10 and

11  incorporates its responses and objections to those Interrogatories herein.  hiQ further objects to this

12  Interrogatory as premature, as discovery is ongoing.  In light of the foregoing, hiQ states as follows:

13      hiQ's Series A round of investment took place from around February 2014 through

14  September 2015.  The investors in that Series included the Zachary H. Shafran Trust; STFII Partners

15  LP; Curtis G. MacNguyen; Wendy Surkis; James McCoy & Natasha L. Schmitz Revocable Trust;

16  Double M Partners LP; Barry Cottle; Rob DeSantis; The Paul and Valerie Mellinger Trust; Jack

17  Messman; Payne Living Trust, Glen & Caroline Payne Trustees; Robert and Julie Webster Living

18  Trust; Marshall and Chasen Manley Joint Tenants with Right of Suvivorship; Michael S. Kirsh;

19  Hugh B and Carole P Blacutt-Underwood Trust; Chance Technologies Seed II LLC; Macomber

20  Family Trust – 2004; Marks Family Trust; Kelly Perdew; PENSCO Trust Company Custodian FBO

21  John Porges IRA; Falcon Global Partners, LLC; PENSCO Trust Company Custodian FBO Dean

22  Benjamin IRA; Michael and Leslie Mook, as Tenants in Common; A2 Limited Partnership; Neil

23  Lustig; John S. Bonanni; ▬▬▬▬ (represented by ▬▬▬▬); and CEB, Inc (represented

24  by Jesse Levin).

25      Rob DeSantis and Darren Kaplan were the primary points of contact for these investors.  In

26  conversations leading up to and during the financing round, these investors expressed that they

27  decided to invest in hiQ because they believed in the market opportunity presented by company-

28  facing HR analytics solutions, which were few at the time in comparison to recruiter-facing HR

CONFIDENTIAL

1    analytics solutions.  hiQ was first-to-market in retention analytics, had received recognition from

2    industry observers, and was able to present compelling customer demonstrations.  ███████

3    which was affiliated with ███████ and some of whose clients overlapped with hiQ's, received

4    favorable reports on hiQ from shared customers which encouraged them to invest.

5          Despite engaging in extensive negotiations and presenting hiQ with an offer sheet, Wing

6    Capital Group's offer of investment was rejected by hiQ in favor of a better term sheet offer from

7    CEB to lead the Series A round.  Additionally, Robin Vasan of Mayfield declined to invest because

8    hiQ relied on LinkedIn data.

9          hiQ's Series B round of investment took place from around February 2016 through June

10   2016.  The investors in that Series included CEB, Inc. (represented by Jesse Levin); ███████

11   (represented by ███████ and Davis Carlin); Temp Innovation Fund LLC (represented by

12   Takeyuki Kato); Hugh B and Carole P Blacutt-Underwood Trust; Macomber Family Trust – 2004;

13   Marks Family Trust; Neil Lustig; Vayner Capital (represented by Gary Vaynerchuk); Moonshots

14   Capital, LLC; and SMR Holdings, LLC.  In conversations with Rob Desantis and/or Darren Kaplan

15   leading up to and during this round, these investors and/or their representatives expressed that they

16   based their decision to invest in hiQ on its fulfillment of key product milestones, customer

17   references, and revenue momentum.  Neil Lustig, Jeff Marks (of the Marks Trust) and Brian

18   Underwood (of the Blacutt-Underwood Trust) based their investments on the belief that hiQ's

19   growth trajectory was accelerating.

20         Stacey Bishop declined to invest on the basis that hiQ did not yet have enough clients.

21   Correlation ventures declined to invest because they believed the Series B valuation was too high.

22   Kevin Diestel of Sapphire Ventures assisted hiQ with developing its presentations to investors and

23   expressed strong interest in hiQ, but explained that he was unable to commit his firm until hiQ's

24   revenue increased.  Insight Ventures was in discussions with hiQ but ultimately declined to invest

25   and did not give a reason.  Scale Ventures declined to invest but did not give a reason.

26         hiQ's Series C round of investment took place from around April 2017 through October

27   2017.  In the middle of that round, in May 2017, LinkedIn's cease-and-desist letter and the attendant

28

CONFIDENTIAL

1  legal risk caused a seismic disruption of hiQ's efforts to attract investment, even among those who

2  believed in hiQ's prospects for continued growth and success.

3  Rob DeSantis, Darren Kaplan and Mark Weidick were the primary points of contact with

4  investors during this period.  Among hiQ's base of larger institutional investors, there was little

5  appetite for further investment given that Microsoft, LinkedIn's parent company, had determined to

6  wage a legal campaign against hiQ.  After the lawsuit was filed, ████████ told Rob DeSantis

7  and Mark Weidick that ██████ could not continue to invest in hiQ, despite hiQ's promise,

8  because Microsoft was an important customer of ███████ and ███████ did not want to be

9  perceived as fighting back against Microsoft's lawsuit.  Likewise, Chris Keane of Gartner (which

10  had merged with CEB) informed DeSantis that Microsoft was too important of a customer to cross.

11  Gary Vaynerchuk told DeSantis that the lawsuit precluded any further investment by Vayner Capital

12  or SMR Holdings, because Microsoft's superior resources meant that hiQ would face an uphill battle

13  regardless of the merits of its claims or the prospects for its business.

14  Additionally, Mark Weidick spoke with over fifty potential investors after the cease-and-

15  desist letter who declined to invest in hiQ, in spite of hiQ experiencing its strongest revenue forecast

16  based on its results in the first quarter of 2017.  hiQ refers LinkedIn to the following documents

17  reflecting written communications with these prospective investors: hiQ700648; hiQ700648;

18  hiQ701625; hiQ701699; hiQ702773; hiQ703350; hiQ701747; hiQ702528; hiQ703155; hiQ701735;

19  hiQ701699;  hiQ701699;  hiQ702716;  hiQ70283;  hiQ701699;  hiQ702843;  hiQ702854;

20  hiQ_00529352; and hiQ702854.

21  In conversations with Weidick, many of these potential investors specifically cited the

22  lawsuit, and Microsoft's perceived willingness and ability to prosecute the lawsuit regardless of the

23  merits of its claims and defenses, as rendering hiQ "toxic" or "radioactive" and precluding their

24  ability to invest.  Specifically, Kevin Diestel of Sapphire Ventures expressed his hopes on behalf of

25  hiQ but told Weidick that the lawsuit itself (and not its underlying merits) prevented him from being

26  able to invest.  Likewise, Ted Wang of Cowboy Ventures told Weidick that neither his firm nor any

27  others would be willing to invest in a company of hiQ's size when it was threatened by a company

28  with the resources and market power of Microsoft.  Rob DeSantis spoke with Sid Trivedi from

CONFIDENTIAL

1   Omidyar Ventures, who also declined to invest in light of the lawsuit.  Salesforce Ventures also

2   expressed interest in investing in hiQ, but was unwilling to move forward given the threat posed by

3   the lawsuit.

4         Nonetheless, many of hiQ's prior investors believed in the strength of the company and in

5   the merits of hiQ's claims and the wrongfulness of LinkedIn's actions, and invested in order to both

6   increase their equity in the company and to help "keep the lights on" under pressure from LinkedIn.

7   Investors in hiQ's Series C round included Chance Technologies Seed II LLC; Rob DeSantis;

8   Double M Partners LP; Hugh B and Carole P Blacutt-Underwood Trust; Macomber Family Trust;

9   Marks Family Trust; Jack L. Messman; Michael and Leslie Mook, Tenants in Common; SRSW, LP;

10  Payne Living Trust; Robert and Julie Webster Living Trust; STFII Partners LP; Paul and Valerie

11  Mellinger Trust; Wendy Surkis; Ernest Werlin; and Zachary H. Shafran Trust.

12  **INTERROGATORY NO. 21:**

13        Describe in detail the money you contend you are entitled to recover in this action, including

14  damages, restitution, or any other form of monetary recovery, by stating the category of recovery or

15  type of recovery and amount claimed.

16  **RESPONSE TO INTERROGATORY NO. 21:**

17        hiQ objects to this Interrogatory as premature, as that discovery is ongoing.  hiQ further

18  objects to this Interrogatory on the basis that the information it seeks is more appropriately sought

19  through other sources such as expert discovery.  The deadline for opening expert reports is not until

20  June 3, 2022, and expert discovery is far from complete.  In light of the foregoing, hiQ states as

21  follows:

22        hiQ's claimed damages include (1) direct and indirect damages incurred as a result of lost

23  contracts, or burdens imposed on hiQ in the performance of its contracts resulting from LinkedIn's

24  conduct; (2) direct and indirect damages resulting from the loss of hiQ's economic expectancy

25  resulting from LinkedIn's conduct, including the expected value of its customer, partner and/or

26  investor relationships which were damaged by LinkedIn's conduct; (3) restitution damages for the

27  harm inflicted on hiQ's business and corresponding advantage gained by LinkedIn in selling its

28  competing services; (4) punitive damages for LinkedIn's deliberate, oppressive, fraudulent and

CONFIDENTIAL

1  malicious destruction of hiQ's business; (5) attorneys' fees and costs; and (6) pre-judgment and

2  post-judgment interest.  hiQ reserves the right to supplement and further amend its response.

3  **INTERROGATORY NO. 22:**

4       State the basis for your contention that LinkedIn's conduct constituted unfair competition

5  under California Business & Professions Code § 17200, et seq., as alleged in the Seventh Claim for

6  Relief in the Amended Complaint.

7  **RESPONSE TO INTERROGATORY NO. 22:**

8       hiQ objects to this Interrogatory to the extent it seeks disclosure of information that is already

9  in LinkedIn's possession, custody, or control, including the claims pled in hiQ's Amended

10  Complaint (Dkt. 131).  hiQ also objects to this Interrogatory because it calls for a legal conclusion

11  to be resolved by the factfinder.  hiQ further objects to this Interrogatory as premature, as discovery

12  is ongoing.  In light of the foregoing, hiQ states as follows:

13       LinkedIn touts itself as "the world's largest professional social network", and, with its 810

14  million members, retains an effective monopoly on a crucial resource for the growing field of talent

15  analytics: real-time resume data, updated maintained by the professionals who use the platform.

16  LinkedIn promises these users that they control their own data and decide who has access to it, and

17  a huge percentage of its users choose to make certain information accessible to anyone with a web

18  browser by including information in public profiles.  LinkedIn benefits from its users making data

19  public, because it draws traffic to its website and encourages its users to engage more with the

20  platform, generating additional valuable data.   LinkedIn allows other powerful incumbent

21  commercial entities, such as Google and Microsoft (its parent company), to collect and index this

22  data via automated means.

23       In spite of its promises to members, LinkedIn's actions and statements show that it considers

24  its members' data (both public and non-public), and access thereto, to be a proprietary resource and

25  potentially insuperable competitive advantage for its Business Solutions businesses, including

26  Talent Solutions.  LinkedIn member data fuels a host of analytics-based products and services that

27  LinkedIn sells to other businesses and which earn LinkedIn billions of dollars in annual revenue.

28  LinkedIn has systematically sought to stifle competition and prevent anyone except from LinkedIn

CONFIDENTIAL

from making use of the subset of data that members make public, by acquiring startups in markets it seeks to dominate before they gain enough traction to become a threat; by privatizing its API and forcing "partners" to purchase user data on its terms; by imposing API throttle limits to identify any competitors who might begin to gain traction in order to shut them down; by implementing targeted technical blocks against anyone attempting automated collection of public data to prevent entry into the talent analytics market; by selectively enforcing its anti-scraping policies and tools, including to gain leverage in negotiations with acquisition targets; and by leveraging pretextual legal threats against competitors who are using public LinkedIn data.

hiQ is one of the many companies harmed by LinkedIn's anticompetitive course of conduct. For *years* before LinkedIn sent hiQ the May 23, 2017 C&D letter, LinkedIn knew (because hiQ told it) that hiQ was using public data to help fuel its products.  And for *years*, LinkedIn said nothing to hiQ.  It was not until immediately after learning about hiQ's Skill Mapper product—which would have competed with LinkedIn's nascent Talent Insights offering—that LinkedIn sent hiQ a C&D letter with the specific intent of shutting down hiQ as a competitor.  In particular, hiQ lost nearly all of its employees, customers, investors, partners, and prospective relationships as a result of LinkedIn's efforts to exclude it from using public member data, including the pretextual legal threats in its cease-and-desist letter of May 22, 2017.

**INTERROGATORY NO. 23:**

State the basis for your contention that LinkedIn's conduct constituted unlawful competition under California Business & Professions Code § 17200, et seq., as alleged in the Eighth Claim for Relief in the Amended Complaint.

**RESPONSE TO INTERROGATORY NO. 23:**

hiQ objects to this Interrogatory to the extent it seeks disclosure of information that is already in LinkedIn's possession, custody, or control, including the claims pled in hiQ's Amended Complaint (Dkt. 131). hiQ also objects to this Interrogatory because it calls for a legal conclusion to be resolved by the factfinder. hiQ further objects to this Interrogatory as premature, as discovery is ongoing.  In light of the foregoing, hiQ states as follows:

CONFIDENTIAL

1       LinkedIn touts itself as "the world's largest professional social network", and, with its 810

2   million members, retains an effective monopoly on a crucial resource for the growing field of talent

3   analytics: real-time resume data, updated maintained by the professionals who use the platform.

4   LinkedIn promises these users that they control their own data and decide who has access to it, and

5   a huge percentage of its users choose to make certain information accessible to anyone with a web

6   browser by including information in public profiles.  LinkedIn benefits from its users making data

7   public, because it draws traffic to its website and encourages its users to engage more with the

8   platform, generating additional valuable data.  LinkedIn allows other powerful incumbent

9   commercial entities, such as Google and Microsoft (its parent company), to collect and index this

10  data via automated means.

11      In spite of its promises to members, LinkedIn's actions and statements show that it considers

12  its members' data (both public and non-public), and access thereto, to be a proprietary resource and

13  potentially insuperable competitive advantage for its Business Solutions businesses, including

14  Talent Solutions.  LinkedIn member data fuels a host of analytics-based products and services that

15  LinkedIn sells to other businesses and which earn LinkedIn billions of dollars in annual revenue.

16  LinkedIn has systematically sought to stifle competition and prevent anyone except from LinkedIn

17  from making use of the subset of data that members make public, by acquiring startups in markets

18  it seeks to dominate before they gain enough traction to become a threat; by privatizing its API and

19  forcing "partners" to purchase user data on its terms; by implementing targeted technical blocks

20  against anyone attempting automated collection of public data to prevent entry into the talent

21  analytics market; by selectively enforcing its anti-scraping policies and tools, including to gain

22  leverage in negotiations with acquisition targets; and by leveraging pretextual legal threats against

23  competitors who are using public LinkedIn data.

24      hiQ is one of the many companies harmed by LinkedIn's anticompetitive course of conduct.

25  In particular, hiQ lost nearly all of its employees, customers, investors, partners, and prospective

26  relationships as a result of LinkedIn's efforts to exclude it from using public member data, including

27  the pretextual legal threats in its cease-and-desist letter of May 22, 2017.

28

CONFIDENTIAL

1    **INTERROGATORY NO. 24:**

2    State the basis for your contention that LinkedIn's conduct constituted fraudulent

3    competition under California Business & Professions Code § 17200, et seq., as alleged in the Ninth

4    Claim for Relief in the Amended Complaint.

5    **RESPONSE TO INTERROGATORY NO. 24:**

6    hiQ objects to this Interrogatory to the extent it seeks disclosure of information that is already

7    in LinkedIn's possession, custody, or control, including the claims pled in hiQ's Amended

8    Complaint (Dkt. 131).  hiQ also objects to this Interrogatory because it calls for a legal conclusion

9    to be resolved by the factfinder.  hiQ further objects to this Interrogatory as premature, as discovery

10   is ongoing.  In light of the foregoing, hiQ states as follows:

11   LinkedIn touts itself as "the world's largest professional social network", and, with its 810

12   million members, retains an effective monopoly on a crucial resource for the growing field of talent

13   analytics: real-time resume data, updated maintained by the professionals who use the platform.

14   LinkedIn promises these users that they control their own data and decide who has access to it, and

15   a huge percentage of its users choose to make certain information accessible to anyone with a web

16   browser by including information in public profiles.  LinkedIn benefits from its users making data

17   public, because it draws traffic to its website and encourages its users to engage more with the

18   platform, generating additional valuable data.   LinkedIn allows other powerful incumbent

19   commercial entities, such as Google and Microsoft (its parent company), to collect and index this

20   data via automated means.

21   In spite of its promises to members, LinkedIn's actions and statements show that it considers

22   its members' data (both public and non-public), and access thereto, to be a proprietary resource and

23   potentially insuperable competitive advantage for its Business Solutions businesses, including

24   Talent Solutions.  LinkedIn member data fuels a host of analytics-based products and services that

25   LinkedIn sells to other businesses and which earn LinkedIn billions of dollars in annual revenue.

26   LinkedIn has systematically sought to stifle competition and prevent anyone except from LinkedIn

27   from making use of the subset of data that members make public, by acquiring startups in markets

28   it seeks to dominate before they gain enough traction to become a threat; by privatizing its API and

CONFIDENTIAL

1  forcing "partners" to purchase user data on its terms; by implementing targeted technical blocks

2  against anyone attempting automated collection of public data to prevent entry into the talent

3  analytics market; by selectively enforcing its anti-scraping policies and tools, including to gain

4  leverage in negotiations with acquisition targets; and by leveraging pretextual legal threats against

5  competitors who are using public LinkedIn data.

6        hiQ is one of the many companies harmed by LinkedIn's anticompetitive course of conduct.

7  In particular, hiQ lost nearly all of its employees, customers, investors, partners, and prospective

8  relationships as a result of LinkedIn's efforts to exclude it from using public member data, including

9  the pretextual legal threats in its cease-and-desist letter of May 22, 2017.

10  **INTERROGATORY NO. 25:**

11        To the extent any of your claims against LinkedIn are based in whole or in part on a

12  contention that LinkedIn committed acts of unfair competition related to a relevant product market,

13  identify the relevant product market and describe in detail the bases for your contention that it

14  constitutes a relevant product market.

15  **RESPONSE TO INTERROGATORY NO. 25:**

16        hiQ objects to this Interrogatory as premature, as discovery is ongoing.  hiQ further objects

17  to this Interrogatory on the basis that the information it seeks is more appropriately sought through

18  other sources such as expert discovery.  The deadline for opening expert reports is not until June 3,

19  2022, and expert discovery is far from complete.  Furthermore, hiQ rejects any implication that it

20  need to plead or prove a relevant product market, as required by Federal antitrust law, in order to

21  show that LinkedIn has engaged in acts of unfair or fraudulent competition that harmed hiQ.  In

22  light of the foregoing, hiQ states as follows:

23        hiQ and LinkedIn competed in the nascent market for People Analytics[1], HR Analytics[2], or

24  Talent Analytics[3]: products or services "applying data analytics to HR management", as LinkedIn

25

26  _____

27  [1] ████████████████████████████████████

28  [2] https://www.gartner.com/en/human-resources/glossary/hr-analytics

[3] https://business.linkedin.com/talent-solutions/resources/talent-strategy/talent-analytics

CONFIDENTIAL

1   defines it.[4]   More specifically, hiQ's SkillMapper product, which used data analytics to provide

2   companies with insights and recommendations on how to manage their workforces, competed

3   directly with LinkedIn's Talent Insights platform, "a talent intelligence platform that empowers you

4   to make smart workforce and hiring decisions."[5]   Discovery to date has shown that LinkedIn

5   considered hiQ a direct competitor in this market.

6

7     Dated: May 13, 2022                                          QUINN EMANUEL URQUHART &
                                                                            SULLIVAN LLP

8

9

10

11                  By:   _/s/ Hope Skibitsky_____
                                                                            Hope Skibitsky

12                                                                          hopeskibitsky@quinnemanuel.com
                                                                            QUINN EMANUEL URQUHART

13                                                                          & SULLIVAN, LLP
                                                                            51 Madison Avenue, 22nd Floor

14                                                                          New York, NY 10010
                                                                            Telephone: (212) 849-7000

15                                                                          Facsimile:  (212) 849-7100

16                                                                          *Attorneys for Plaintiffs hiQ Labs Inc.*

17

18

19

20

21

22

23

24

25

26

27      [4]   https://business.linkedin.com/content/dam/me/business/en-us/talent-solutions/talent-
     intelligence/workforce/pdfs/Final_v4_NAMER_Rise-of-Analytics-Report.pdf

28      [5]   https://business.linkedin.com/talent-solutions/talent-insights

### VERIFICATION OF HIQ LABS, INC.'S RESPONSES AND OBJECTIONS TO LINKEDIN CORPORATION'S SECOND SET OF INTERROGATORIES AND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO LINKEDIN CORPORATION'S INTERROGATORIES 16, 17, 18, 19, 21-25

I, Mark Weidick, hereby verify that the information provided in hiQ Labs, Inc.'s

Responses and Objections to LinkedIn Corporation's Second Set of Interrogatories and hiQ

Labs, Inc.'s Supplemental Responses and Objections to LinkedIn Corporation's Interrogatory

Nos. 16, 17, 18, 19, and 21-25 is true and correct to the best of my knowledge, information, and

belief.

Date: May 13, 2022

Mark Weidick

Exhibit 64

6/7/22, 2:44 PM
hiQ Labs People Analytics Solution Wins HR Tech Product of the Year - hiQ Labs
Case 3:17-cv-03301-EMC Document 864-12 Filed 08/31/22 Page 134 of 390



# HIQ LABS PEOPLE ANALYTICS SOLUTION WINS HR TECH PRODUCT OF THE YEAR

September 21, 2016

SAN FRANCISCO, CA — September 21, 2016 — hiQ Labs, the leader in people analytics, announced today that it has won the "Human Resources Executive's Top Product of 2016."

hiQ Labs' award winning turnover model predicts employee attrition months before it happens giving CHRO's and business leaders time to have prescriptive interventions. Utilizing public data and machine learning models, hiQ Control Center maps out the "recruitability" of a company's employees, and alerts employers to the talent that might be at risk of being approached by competitors. This offers tremendous insight for employers, eliminating staffing surprises and saving millions of dollars in unplanned turnover all while strategically retaining key talent.

For the past 19 years, editors of Human Resource

MCELFRESH_0000146

Executive have recognized the newest HR product innovators that are transforming how key HR tasks and processes are done. Following the extensive evaluation of each solution, winning products were selected based on their level of innovation, business impact and intuitiveness for the user combined with their ability to deliver on

what they promise. Amongst a very intense field of entries, hiQ Labs' Control Center was selected as Product of the Year, based on the business impact it provides by using predictive models to help employers protect their most valuable asset – their employees.  hiQ Labs will accept this momentous award in front of industry champions and thought leaders at the HR Technology Conference and Expo in Chicago, on October 5, 2016.

"We started hiQ Labs to help companies compete for their own talent against the recruiters trying to pull their talent away.  We empower business leaders to stop the damaging loss of top talent within their organization before it can begin. hiQ Labs is humbled to be recognized by the leaders at HR Tech. This prestigious award acknowledges it's time for a pivot in the industry; time for data science and people analytics to massively influence workforce planning," says Genevieve Graves, Chief Science and Strategy Officer, Co-Founder at hiQ Labs.

MCELFRESH_0000147

**About hiQ Labs**

Founded in 2013, hiQ Labs is the global standard for People Analytics. By applying data science and machine learning to internal and external data, hiQ Labs helps HR teams make better, more reliable people decisions. Easy to deploy and fast

to deliver predictive insights, hiQ Labs' cloud platform transforms how enterprises retain their best talent. The world's most forward thinking brands rely on hiQ Labs to significantly reduce turnover and save millions of dollars in employee attrition.

For more information, visit: www.hiqlabs.com Get your free Employee Risk Analysis at: https://www.hiqlabs.com/risk-report Join our People Analytics community at www.hiqlabs.com/elevate





Previous

# HIQ LABS LISTED AS AN HR INNOVATOR

In The News

Next

# 15 TIPS TO HELP HR GET STARTED WITH PEOPLE ANALYTICS

HR Articles

## CONTACT US

E: SALES@HIQLABS.COM

P: 866-765-5880

© 2018 HIQ LABS

# Exhibit 65

# Filed Under Seal

# Exhibit 66

# Filed Under Seal

# Exhibit 67

# Filed Under Seal

# Exhibit 68

# Filed Under Seal

# Exhibit 69

# Filed Under Seal

# Exhibit 70

# Filed Under Seal

# Exhibit 71

# Filed Under Seal

# Exhibit 72

# Filed Under Seal

# Exhibit 73

# Filed Under Seal

Exhibit 74

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF CALIFORNIA

3  SAN FRANCISCO DIVISION

4

  hiQ Labs, Inc.,

5

  Plaintiff,

6                              Case No.:
  vs.                         17-cv-03301-EMC

7

  LinkedIn Corporation,

8

  Defendant.

9  _____

10  LinkedIn Corporation,

11  Counterclaimant,

12  vs.

13  hiQ Labs, Inc.,

14  Counter-defendant.

15  _____

16  VIDEO-RECORDED DEPOSITION

17  REMOTELY TAKEN VIA ZOOM CONFERENCE OF

18  GENEVIEVE GRAVES

19  Individually and as 30(b)(6)

20  WEDNESDAY, MAY 25, 2022

21

22

23  Stenographically Reported by:
  Linda E. Marquette
24  RPR, CLR, CSR No. 11874

25  Job No. 10101217

1    Miller or from Lou Wegener and Conner Swann.  So some of

2    these slides must have been things that I asked people

3    on the team to make to summarize what their piece of it

4    was doing because -- basically because those were parts

5    of the tech process that I was, you know, less involved

6    in the day to day.  So I asked whoever was the person

7    who was -- who was sort of leading that effort to -- to

8    produce a slide.

9        Q.    Okay.  And then was this -- was this document

10   -- was this document created in the ordinary course of

11   hiQ's business?

12       A.    Well, this document was created to help

13   onboard a new CEO.

14       Q.    Okay.  So that was part of the business?

15       A.    Yes.

16       Q.    And then you said --

17       A.    I don't -- I don't know that I would consider

18   onboarding a new CEO ordinary -- you know, like, yes.

19   It was something we only did once so it was not a repeat

20   activity, but yes.

21       Q.    Okay.  And you said that some other people

22   contributed to this.  Would they have been people with

23   personal knowledge of the information that they were

24   putting into the document?

25       A.    Yes.

Genevieve Graves

1      Q.    And it would have been personal knowledge of

2    their -- their jobs or roles in the company as it

3    existed at that time; is that right?

4      A.    Yes.

5      Q.    Okay.  And then going up to the second page of

6    the presentation?

7      A.    Mm-hmm.

8            MR. WORCESTER:  You mean the page of the

9    actual presentation or the second slide?  So can you

10   read the --

11           MR. SHAFFER:  The second page of the document,

12   Corey.

13   BY MR. SHAFFER:

14     Q.    So you see here there's like a list of -- of

15   products and future products, two lists; is that right?

16     A.    Yeah.

17     Q.    Okay.  So we talked a little bit about the

18   Keeper product.  That was a hiQ product as of

19   February 2017, right?

20     A.    Mm-hmm.

21     Q.    And then Skill Mapper is another hiQ product

22   as of February 2017; is that correct?

23     A.    As of February 2017 Skill Mapper was in the, I

24   would say, late stage of develop.  It -- in that the

25   product -- at least a, you know, sort of MVP, minimum

Genevieve Graves

 1  viable product version of the product existed.  I

 2  believe we had demoed it at -- at the most recent, you

 3  know, at least one, maybe even more than one, hiQ

 4  Elevate conference.  And we had demoed it to customers.

 5  I do not know that we had actually started selling it.

 6  So it was -- it would have been in that kind of ready to

 7  launch but not necessarily already launched.  I don't --

 8  I don't remember exactly where the -- where the timeline

 9  was on that.

10      Q.    Okay.  And then the third one listed here is

11  platform.  What's that refer to?

12      A.    Platform wasn't really a separate product.

13  This was more -- more of a sort of sales team, like how

14  do we bundle things.  So the platform was just the idea

15  that there is this, like, web app that you can log into.

16  And then if you've -- you know, initially we just had

17  Keeper.  You would log in and you would have Keeper.

18  But the idea is add -- we added other products.  You

19  would have a platform that you would log into and then

20  you would sort of delve down into whichever of the

21  products you had -- had purchased as a customer.  So the

22  platform didn't really -- it didn't have interact --

23  like, user functionality, other than just, like, log in

24  and user management.

25      Q.    So it was -- it was the means by which

Genevieve Graves

1    you don't have -- you need to get a bird's eye view

2    picture of what's going on with that company you're

3    about to acquire really quickly from -- you know, from

4    the outside and without a lot of information.

5             And -- and also not -- assuming that their

6    internal systems may have -- you know, may be totally

7    different from your existing internal systems and so

8    actually kind of, like, ingesting and, you know,

9    structuring their -- whatever internal systems they used

10   to merge it into your own might be hard, right.  So the

11   idea was that it would be useful to be able to know,

12   okay, here is this new incoming component of the

13   workforce in this company that we've acquired.  Where do

14   I have, you know, teams with a lot of high risk of

15   turnover.

16            So if we have critical teams, where we might

17   lose a lot of people we can figure out either if we

18   haven't decided to do the merger yet, we might

19   incorporate that into how we value the -- the merger and

20   the offer we make.

21            If we have already bought this company, then

22   how are we going to, you know -- maybe there are

23   teams or areas or -- or, you know, geographic location

24   offices where we want to, you know, move rapidly to try

25   to make people feel onboarded and included in the new

Genevieve Graves

1   company because they're at higher risk of -- of -- of

2   leaving.  And we -- you know, the whole point of the

3   acquisition is we want these people so we don't want to

4   lose them.  So kind of, like, a triage list of where do

5   we have risk and how do we manage it.

6           On the Skill Mapper side it's about where do

7   we have core -- like, you know, sort of centers of

8   excellence, right, at different kinds of useful skill

9   sets.  So as we are, you know, absorbing this other

10  company, ingesting that workforce, where are the pockets

11  of skills that we want to use, you know, as is and where

12  are pockets of skills that maybe we really need to --

13  like we need this and we want to rapidly redeploy it on

14  this other project.

15       Q.    Okay.

16       A.    So just -- like, how do I understand the

17  workforce, this new large workforce that's coming into

18  my company.

19       Q.    Got it.  So, Dr. Graves, I appreciate all the

20  background information.  As we go through these I -- I

21  have a plan of all the questions that I want to ask you.

22  And I'm likely going to cover all of these subjects.  So

23  if we could just focus in on the question I'm asking,

24  get the answer, and then move to the next question, I

25  think that will help keep the record clean and also save

1    the court reporter from -- from typing a whole lot.  Can

2    we agree to do that?

3        A.    Yes.

4        Q.    Thank you.  So focusing just on the Risk

5    Mapper extension of Keeper.  So we were talking about

6    the M&A and private equity use cases.  So -- so my

7    question is, one, you'd talked about the use of that

8    product to -- for retention purposes following a

9    merger or an acquisition, correct?

10       A.    Yes.

11       Q.    Now in many mergers and acquisitions there's

12   also a reduction in force that occurs, correct?

13       A.    I am not an expert in mergers and acquisitions

14   but it would not surprise me if that were true.

15       Q.    Okay.  And then for your -- for hiQ's merger

16   and acquisition clients, what would -- they could use

17   the Risk Mapper product to make reduction in force

18   decisions as well, correct?

19       A.    Yes.

20       Q.    And then same for private equity purchases,

21   you're familiar with the general concept of private

22   equity where a company is purchased with the idea that

23   it can be streamlined and made more profitable, correct?

24       A.    Yes.

25       Q.    And part of that streamlining often includes

1     Q.     -- remind you to do a yes --

2     A.     I'm sorry.

3     Q.     -- or correct.  It will -- it will be helpful.

4            Okay.  And then Cameron Cole, not an engineer,

5     he's -- he's blue, so he's a data scientist?

6     A.     Mm-hmm.

7     Q.     What was his role in the data collection team?

8            Sorry, you -- you did the "mm-hmm" again.

9     A.     Yes.

10    Q.     So Cameron Cole, he's -- he's an engineer and

11    he's a data scientist?

12    A.     Cameron -- yeah.  Cameron was -- I mean,

13    whether he was a data science or a data engineer person

14    is -- is somewhat amorphous.  There's overlap between

15    these titles and roles.  So is your question, what was

16    Cameron responsible for on the data --

17    Q.     That's correct.

18    A.     -- collection team?

19    Q.     That's right.

20    A.     Cameron's primary responsibility on the data

21    collection team was managing the turking process.

22    Q.     Okay.  What is -- what is turking?

23    A.     Ah, turking.  So we were collecting LinkedIn

24    profile information on individuals from their public

25    pages.  It was critical to make sure that the

```
 1   information we were collecting was for the right person,
 2   right, because what you don't want to do is serve data
 3   and it's somebody else's data because there's two
 4   different John Smiths or something like that.  So the --
 5   I think -- I would assume we're going to get into this
 6   in detail somewhere else in the deposition about the
 7   whole turking process.  But in summary, it was the -- it
 8   was a human vetting method that we used to have a human
 9   verify yes or no.  Like is this the correct LinkedIn
10   profile to go with this person, yes or no.  That's --
11       Q.    Okay.
12       A.    So that was done by a set of people.  That was
13   a process that we outsourced.  Cameron managed the
14   process of finding and hiring those people.  And managed
15   the process -- and also built the sort of form in which
16   they put -- you know, recorded what their -- their
17   work -- and recorded their yes-or-no answers about is
18   this the right profile and which -- you know, which ones
19   they had done versus which ones had not been done yet.
20       Q.    Okay.  And, if I understand correctly, the
21   people that were engaged in turking were hiQ employees;
22   is that right?
23       A.    No.  They were outside contractors.  So they
24   worked -- they worked from home at what -- with flexible
25   hours part time.  Many of them were stay-at-home moms,
```

1  right, who basically wanted something they could do

2  after they put the kids to bed.  They could log onto the

3  web app, spend a few hours doing this turking process of

4  human vetting, like, looking at a bunch of LinkedIn

5  pages and saying yes or no.  I think this is the right

6  one or no, I think it is not.

7          And the work was -- was sort of -- work they

8  did on their own laptops, in their own homes on whatever

9  hours they chose.  And what we did is that then they

10  would submit -- I'm not -- I'm not sure if it was, like,

11  biweekly or monthly or maybe it was just whenever they

12  felt like it, they would submit an invoice saying --

13  which could be corroborated by our internal system where

14  they've logged in and actually done their note taking,

15  saying I've done this many people, and we would pay them

16  for that.

17      **Q.    Okay.  So going back to Exhibit 498, the**

18  **PowerPoint we've been looking at?**

19      A.    Yeah.

20      **Q.    If you go down to the ninth page of the**

21  **document.**

22      A.    The ninth page?  Is this the one that says

23  "Data collection from Chris LeBailly"?

24      **Q.    Yep.**

25      A.    Yes, I see it.

# Exhibit 75

# Filed Under Seal

# Exhibit 76

**Confidential**

**Darren Kaplan**                                    hiQ Labs, Inc. vs.
                                                    LinkedIn Corp.

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4   HIQ LABS, INC.,

 5              Plaintiff,

 6   vs.                    Case No. 17-cv-03301-EMC

 7   LINKEDIN CORPORATION,

 8              Defendant.

 9   _____

10   AND RELATED CROSS-ACTION.

11   _____

12

13

14              CONFIDENTIAL

15       VIDEOTAPED DEPOSITION OF DARREN KAPLAN

16                May 4, 2022

17                 9:10 a.m.

18

19       2601 South Bayshore Drive, Suite 1550

20                Miami, Florida

21

22   KATHIA CAMACHO, Court Reporter

23   Transcribed by TERRI NESTORE
     CSR No. 5614, RPR, CRR
24

25   Job No. 10103963
```

**Confidential**

1  part of your process for preparing for the deposition?

2      A.  Yes.

3      Q.  Aside from the Elevate brochures, Elevate

4  attendee list, the interrogatory responses and listening

5  to that podcast, are there any other materials that you

6  reviewed in preparation for your deposition?

7      A.  No.

8      Q.  Okay.  Mr. Kaplan, I understand that you founded

9  the company --

10     A.  Actually, can I ask you a quick -- are we still

11  on me or are we on the 30?

12     Q.  On you.

13     A.  We're still on me?  Sorry to cut you off, just --

14     Q.  Want to make sure we're on the same page.

15         So yes, still on you.

16     A.  Thank you.

17     Q.  Does that change in any way the answer to the

18  last question?

19     A.  No, no, I just -- just -- just didn't know.

20         MS. SKIBITSKY:  Sorry, Paul, I just want to state

21  for the record, the questions about what Mr. Kaplan was

22  reviewing to prepare, have you intended those to be

23  specific, with regards to his personal deposition?

24         MR. RUGANI:  I was.

25         MS. SKIBITSKY:  Okay.  I'm just going to state

**Confidential**

1   for the record, I don't know that that's something that

2   Mr. Kaplan would necessarily know, which documents he was

3   reviewing in the course of his personal preparation versus

4   his 30(b)(6).

5           MR. RUGANI:  Understood.

6       **Q.  There are documents that you reviewed in**

7   **preparation for your deposition, generally speaking?**

8       A.  Generally speaking.

9       **Q.  That's fine.**

10          **So I understand that you founded the company that**

11  **became hiQ in 2012; is that correct?**

12      A.  Yes.  Co-founded.

13      **Q.  That was my next question.**

14          **Who did you found the company with?**

15      A.  Um, the...  there was a few co-founders.  They

16  came in at different times.  So Sherman Hu, H-U.

17      **Q.  H-U.**

18      A.  Then Rob DeSantis, then Genevieve Graves.

19      **Q.  Any other co-founders?**

20      A.  No.

21      **Q.  You said they came in at different times.  Are**

22  **any of the three people that you mentioned, co-founders**

23  **from the very start of the company?**

24          MS. SKIBITSKY:  Objection, vague.

25          THE WITNESS:  When it was founded, Sherman Hu and

**Confidential**

Darren Kaplan                                                                hiQ Labs, Inc. vs.
LinkedIn Corp.

1   I were the first two.

2   BY MR. RUGANI:

3       **Q.   And I understand that at the time the company was**

4   **founded it was called OrgStars; is that correct?**

5       A.   Yes.

6       **Q.   How did you know Sherman Hu?**

7       A.   Sherman worked at LinkedIn, I worked at a

8   different company and Sherman was my sales rep so when I

9   needed to buy LinkedIn job postings and profiles, I would

10  call Sherman and that's how we met.

11      **Q.   What company were you working at at that time?**

12      A.   A company named eQuest.

13      **Q.   What did eQuest do?**

14      A.   They were a job posting aggregator.

15          We worked with big companies and we helped them

16  post jobs on the internet?

17          So LinkedIn was a destination of job postings.

18      **Q.   What was your job at eQuest?**

19      A.   Sales.  Sales rep.

20      **Q.   At the time that you and Mr. Hu decided to start**

21  **OrgStars, was he a current LinkedIn employee?**

22      A.   Um, when we started -- he left.

23          He was not there at that time.

24      **Q.   When you and Mr. Hu started OrgStars, what was**

25  **the business plan for the company?**

**Confidential**

1        MS. SKIBITSKY:  Objection, vague.

2        THE WITNESS:  I would say there's probably -- can

3   you ask that in a different way?

4   BY MR. RUGANI:

5       Q.  What was the purpose of OrgStars when you started

6   the company with Mr. Hu?

7       A.  OrgStars was short for Organizational Stars and

8   we were focused on employees and setting employees up for

9   success and trying to find if we can understand culture

10  fit for an employee inside an organization.

11      Q.  Prior to starting OrgStars, had you been a CEO

12  anywhere before?

13      A.  No.

14      Q.  What was Mr. Hu's role at the start of OrgStars?

15      A.  Co-founder.

16      Q.  Aside from being co-founder, did he have any

17  other title at the company?

18      A.  No.

19      Q.  Did you have a title of CEO at OrgStars?

20      A.  Yes.

21      Q.  How would you describe the...  the duties that

22  Mr. Hu had as a co-founder of OrgStars?

23      A.  Market research and...  I would say market

24  research and um...  um...  I'm not sure I have the right

25  phrasing here, but like sounding board, like...

**Page 50**

Darren Kaplan                                  LinkedIn Corp.

1     A.  OrgStars, yes, not hiQ.  Because when Rob came in

2  we understood how to do it at scale but at that moment of

3  just proving like there is a need, there is an absolute

4  need, there is a hunger for this, and it was during that

5  time that we understood that the need was for data science

6  for human resources.  There was a need to understand what

7  are the external factors that are impacting organizations.

8        So what came out of it were the insights of HR

9  has woken up to the fact that their entire -- most of

10  their employee database is on LinkedIn and although it was

11  great for recruiting when you want to recruit, it's not

12  great when they want to recruit from you.

13        So that was what came out of that prototyping

14  exercise was the need and want to understand external

15  forces, impacts on the workforce, and then a roadmap that

16  followed.

17        THE REPORTER:  And then?

18        THE WITNESS:  A roadmap followed.

19  BY MR. RUGANI:

20     **Q.  And at the prototype stage was there a specific**

21  **method that the retention product was following to help**

22  **give information about those external forces to human**

23  **resources departments?**

24     A.  Yes.

25     **Q.  And what was that method?**

1      A.   So we were...  there's a few ways.  There's a few

2  ways to have that method.  So just if you can clarify when

3  you say "method," I just want to make sure I understand

4  like your word "method."

5      **Q.   When you were prototyping --**

6      A.   Right.

7      **Q.   -- a retention product --**

8      A.   Okay.

9      **Q.   -- what did you envision that it was going to do?**

10     A.   Right.  So what we envisioned the product can do

11 would be an employee would have to do nothing.  They

12 wouldn't have to take a survey, they wouldn't have to fill

13 out a form, they wouldn't have to be poked or prodded.

14          They can just live their life.

15          And we felt that the way people live their life

16 publicly, true publicly, how they put their information

17 out in a public way, we believe could give us indicators

18 of behavior, and the behavior we believed that we can

19 start to predict was the likelihood of them leaving.

20          But the key thing was can they do nothing; live

21 your life and the model should be able to understand

22 certain things?  And that's when we really started

23 thinking about bringing data science at scale to human

24 resources, and so method also could be data science.

25     **Q.   And so from that prototype stage was one source**

1 **of information that you envisioned the retention product**

2 **using, information that people put on their LinkedIn**

3 **profiles?**

4     A.  We...  because we had several former LinkedIn

5 people around our table, we were very thoughtful on what

6 LinkedIn as a data source and the lines around that data

7 source could be, and when we discussed it, LinkedIn has a

8 public-facing part of a profile which is indexed on places

9 what one would be Google.

10         And being able -- LinkedIn's ability to have that

11 information found and discovered, indexed, scraped --

12 whatever the word we want to use, you want to use -- on

13 Google, it's important to their SEO rankings, and this was

14 part of LinkedIn's founding pillars.

15         So we were thinking, okay, if we just look at

16 what we want to be true, as something that's truly public

17 information, LinkedIn has this public part which has less

18 information than a logged in part.  That was interesting

19 to us and it kept within our core pillar of public

20 information and let the employee do what they want to do.

21 Let's not poke or prod but if you want to put your name or

22 job title, that's just -- we were curious about that.

23     **Q.  What analysis did you perform at the time to lead**

24 **you to conclude that you were able to use the information**

25 **on LinkedIn profiles that you used in the manner that you**

1 | wanted to use it?

2 | MS. SKIBITSKY:  Objection to form, vague as to

3 | time.

4 | THE WITNESS:  There was a lot of -- one more

5 | time, sir.

6 | BY MR. RUGANI:

7 | **Q.  Sure.**

8 | A.  There was just a lot to the question.

9 | **Q.  When OrgStars was prototyping --**

10 | A.  Okay.

11 | **Q.  -- a product --**

12 | A.  Okay.

13 | **Q.  -- they would use information on individuals'**

14 | **LinkedIn profile pages.**

15 | A.  Okay.

16 | **Q.  What analysis did you perform at that time to**

17 | **lead you to conclude that OrgStars could use that**

18 | **information in a way that it wanted to use it?**

19 | A.  Okay.

20 | MS. SKIBITSKY:  Objection, form, misstates

21 | testimony.

22 | THE WITNESS:  If you can ask it one more time --

23 | and if you cannot type for one second.  Can you ask it one

24 | more time?  There's something -- please ask it one more

25 | time.

Darren Kaplan
**Confidential**                                    hiQ Labs, Inc. vs.
                                                   LinkedIn Corp.

1       Q.  Aside from prep, had you read a LinkedIn user

2   agreement previously?

3       A.  I'm not a lawyer.  I probably...  I wouldn't say

4   I've read the agreement.

5       **Q.  What if anything did you do personally during**

6   **your time at either OrgStars or hiQ to understand**

7   **LinkedIn's terms of service applicable to the use of its**

8   **website?**

9           MS. SKIBITSKY:  Objection to form.

10          THE WITNESS:  We -- me -- had advisors that were

11  former LinkedIn employees and I would -- or they would

12  tell me or I'd ask them questions and we'd just talk about

13  if it was a LinkedIn topic, they were known entities at

14  LinkedIn and we just -- we talked through it.

15          Even as we got later and later and more

16  established and bigger and bigger, we started having

17  events, and I got to spend time with LinkedIn employees

18  and they openly knew what we were doing.

19          So I would say just a lot of conversations.

20  BY MR. RUGANI:

21      **Q.  With respect to the advisors that you referenced,**

22  **did you ever have a conversation with an advisor to ask**

23  **the advisor whether LinkedIn permitted scraping of profile**

24  **data?**

25          MS. SKIBITSKY:  Objection, vague.

1          THE WITNESS:  I don't know if that was that exact

2  question.  I just was always focused on the public part of

3  LinkedIn.  Our focus was just public data.

4  BY MR. RUGANI:

5      **Q.  Did you ever ask any advisor any question about**

6  **whether or not it was permissible for hiQ to collect data**

7  **from LinkedIn?**

8      A.  I would never phrase it like that.

9      **Q.  Why not?**

10     A.  I just wouldn't phrase it that way.

11     **Q.  Do you agree with me that hiQ, in connection with**

12  **the products that it offered, collected data from**

13  **LinkedIn?**

14         MS. SKIBITSKY:  Objection, form.

15         THE WITNESS:  For us, how we always talked about

16  it with advisors and others were how does Google index

17  public information.  So our whole focus was more about

18  Googling, indexing or scraping or capturing -- I wouldn't

19  say capturing -- but public information.

20         So our whole focus was like if it's -- we believe

21  that if it was public it would be able to be found on

22  Google, and that's everything kind of what we really

23  focused on, was how does Google get this information, and

24  that was really how we would think about conversations.

25  BY MR. RUGANI:

1       Q.  Do you think that what hiQ was doing to get

2  information from LinkedIn is the same thing that Google

3  was doing?

4            MS. SKIBITSKY:  Objection.

5            Form, calls for speculation.

6            THE WITNESS:  Sorry, can you ask it one more

7  time?  Do I think that...  say it one more time, sir.

8  BY MR. RUGANI:

9       Q.  What hiQ was doing to collect information from

10  LinkedIn is the same thing that Google was doing?

11           MS. SKIBITSKY:  Objection to form, calls for

12  speculation.

13           THE WITNESS:  I'm not sure how Google does it so

14  I can't say same, but we all know Google has -- you type

15  in a name and Google has it.  So I don't know if it's the

16  same but there is a way that you want to search on Google

17  and it gives you something.

18           And then, you know, Google takes that something

19  and sells their ad words, so you can buy ad words based on

20  a company title, based on the shampoo, whatever you want.

21           So I don't know how they do it, but they do make

22  a lot of money indexing public information and selling

23  that information.

24  BY MR. RUGANI:

25       Q.  So going back to conversations that you had with

# Exhibit 77

# Filed Under Seal

Exhibit 78

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION
 3

 4  hiQ Labs, Inc.,              )
             Plaintiff,          )
 5                               )
             vs.                 )   Case No.
 6                               )   17-cv-03301-EMC
    LinkedIn Corporation,        )
 7           Defendant.          )
    _____)
 8                               )
    LinkedIn Corporation,        )
 9           Counterclaimant,    )
                                 )
10           vs.                 )
                                 )
11  hiQ Labs, Inc.,              )
             Counter-defendant.  )
12                               )
    _____)
13

14

15      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

16   REMOTE VIDEO-RECORDED DEPOSITION OF DARIN MEDEIROS

17              Los Angeles, California

18                  May 20, 2022

19

20  REPORTED BY:

21  JOHNNA PIPER

22  CSR 11268

23  Job No. 10100978

24

25  Pages 1 through 209
```

```
 1   didn't renew.
 2           MR. COHEN:  Can we go to Tab 128, please?
 3       (Exhibit 453 was marked for identification.)
 4   BY MR. COHEN:
 5       Q.  Mr. Medeiros, Exhibit 453 has just been put
 6   into the chat.  It is a Slack chat transcript
 7   between you, Amelia Barker, and Mark David Scott.
 8   Do you see that?
 9       A.  Yes.
10       Q.  And it is dated October 25th, 2017.  You
11   see that?
12       A.  Yes.
13       Q.  If you go to the last page of the exhibit,
14   page 7 of the PDF --
15       A.  Okay.
16       Q.  -- in the second box from the top you ask,
17   "Who's the contact at Hartford?"  Do you see that?
18       A.  Yes.
19       Q.  And Ms. Barker responds, and you say, "They
20   are relitigating why there is churn and of course it
21   wasn't our fault."  And then you go on in the next
22   box to say it is Hartford, and Ms. Barker, a few
23   boxes down, responds "The predictions didn't
24   predict."  Do you see that?
25       A.  Yes.
```

1    Q.  Beyond the information in Exhibit 453, do

2  you have any other information as to why Hartford

3  churned?

4    A.  No.

5    Q.  You don't know whether there is any

6  additional information that would be in Salesforce?

7         MS. SHARMA:  Objection.

8         THE WITNESS:  No, I have no idea.

9  BY MR. COHEN:

10    Q.  What is your understanding for why McKinsey

11  stopped working with hiQ?

12         MS. SHARMA:  Objection.

13         THE WITNESS:  I was told that McKinsey --

14  hiQ went on a do-not-touch list for McKinsey once

15  their cease and desist was delivered.

16  BY MR. COHEN:

17    Q.  And who told you that?

18    A.  Either Mark Weidick or Darren Kaplan.

19    Q.  You never heard that directly from

20  McKinsey?

21    A.  No, I -- I didn't talk to McKinsey

22  directly.  I did, but not often.

23    Q.  You didn't talk to McKinsey directly about

24  the reason why they churned?

25    A.  Well, the -- I'm sorry.  You are asking two

1   different questions.  So do you -- why they stopped

2   working with hiQ or -- their projects were never

3   like annual subscriptions, they were one-time

4   projects, so there was never an expectation that it

5   would renew.

6          Q.  Understood.  I -- I used the wrong

7   terminology.  So -- so let me go back to the way

8   that you said it.  You didn't have any direct

9   discussions with McKinsey about why they stopped

10  working with hiQ?

11         A.  No.  No direct ones.

12             MR. COHEN:  Can we look at Tab 141, please?

13      (Exhibit 454 was marked for identification.)

14  BY MR. COHEN:

15         Q.  Mr. Medeiros, Exhibit 454 has just been

16  dropped into the chat.  Do you have that in front of

17  you?

18         A.  Yes.

19         Q.  You see that this is an email string among

20  -- well, let me -- let me say it this way:  This is

21  an email that Mr. Weidick is having with Chris

22  Gagnon at McKinsey that is forwarded to you; is that

23  correct?

24         A.  Yes.

25         Q.  And if we look at Mr. Gagnon's email from

Exhibit 79

1    UNITED STATES DISTRICT's COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4  hiQ Labs, Inc.,

5    Plaintiff,

6    vs.                          No. 17-cv-03301-EMC

7  LinkedIn Corporation,

8    Defendant.
   _____/

9

10  LinkedIn Corporation,

11    Counterclaimant,

12    vs.

13  hiQ Labs, Inc.,

14    Counterdefendants.
   _____/

15

16    CONFIDENTIAL

17    VIDEOTAPED DEPOSITION OF

18    DANIEL MILLER

19    Friday, May 13, 2022

20

21

22  Stenographically Reported by:

23  GINA V. CARBONE, CSR, RPR, RMR, CRR, CCRR

24  California State Lic. No. 8249

25  Job No. 10100706

**Confidential**                    hiQ Labs, Inc. vs.
                                                                **LinkedIn Corp.**

```
 1            THE WITNESS:  I don't know, but I suspect
 2     they probably were.
 3            MS. HURST:  Onaje, Exhibit 334 is Tab 145.
 4            (Whereupon, Exhibit 334 was marked for
 5            identification.)
 6            THE WITNESS:  I have it.
 7     BY MS. HURST:
 8        Q.  All right.  Exhibit 334, you'll see, is an
 9     email from Ms. Graves to Mr. Weidick, copied to you.
10     Subject:  conversation:  data collection challenges.
11     February 23rd, 2017.
12            Do you see that?
13        A.  Yep.
14        Q.  Now who is Mark Weidick?
15        A.  He took over as CEO at some point, I think
16     in early 2017, or maybe it was late 2016.
17        Q.  And did you welcome that change?
18        A.  Yes, I did.  I thought it was a good move.
19        Q.  And did Mr. Weidick spend some time meeting
20     with the people in the company to understand what
21     was happening in the business, what challenges it
22     faced, what opportunities it had and the like?
23        A.  Yeah, he did.
24        Q.  And did you have such a meeting with him?
25        A.  Several, as I recall.
```

Daniel Miller

1       Q.  In any of those meetings with Mr. Weidick,

2   did you identify the difficulty -- ongoing and

3   seemingly increasing difficulty with scraping

4   LinkedIn profiles as one of the challenges the

5   company faced?

6       A.  Yes, I did.

7       Q.  What did you tell Mr. Weidick in your

8   initial meetings with him on that subject?

9       A.  On the technical side I told him that it

10  was -- we used to use the term red queen/black

11  queen.  It was a, you know, contentious adversarial

12  relationship.  The company clearly was putting in

13  measures to keep people from collecting data.

14          Our business was founded on the idea that

15  that data was collectible, you know, both

16  technically and ethically and legally.  We talked

17  about that a little bit.  About the principles

18  behind open data and public data versus private data

19  and privacy concerns versus, you know, the commons,

20  as it's sometimes called.  So we had pretty

21  wide-ranging discussions on those subjects.

22      Q.  As part of those conversations, did you

23  ever -- did you explain to Mr. Weidick, just yes or

24  no without discussing the contents, whether the

25  company had previously gotten legal advice on those

1   issues?

2       A.  I don't recall having a conversation about

3   that.  So no.  Rather, not to my recollection.

4       Q.  Sorry, what -- I didn't understand that.

5       A.  I don't recall having a conversation about

6   that with Mr. Weidick.

7       Q.  All right.  Looking back at Exhibit 334 --

8       A.  Is that the one that's open right now?

9       Q.  Yes.  The February 23rd email --

10      A.  Yeah.  Got it.

11      Q.  -- from Ms. Graves.  "I would like to talk

12  to you about various challenges associated with our

13  data collection efforts.  They fall into two main

14  categories:  1, our dependence on LI for

15  individual-level data.  2, challenges we will

16  encounter moving from US-only to global data:  legal

17  challenges, technical challenges."

18          And Ms. Graves suggests some timing for

19  this conversation.

20          Do you see that?

21      A.  Yep.

22      Q.  Now, had Ms. Graves left hiQ Labs at this

23  point?

24      A.  My recollection is that she had.  Around

25  the same time she gave notice that she was leaving

# Exhibit 80


# Filed Under Seal

# Exhibit 81

# Filed Under Seal

# Exhibit 82

# Filed Under Seal

Exhibit 83

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4
   hiQ Labs, Inc.,
5
                 Plaintiff,
6                                     Case No.:
            vs.                       17-cv-03301-EMC
7
   LinkedIn Corporation,
8
                 Defendant.
9  ─────────────────────────────────

10 LinkedIn Corporation,

11               Counterclaimant,

12               vs.

13 hiQ Labs, Inc.,

14               Counter-defendant.
   ─────────────────────────────────
15

16                - CONFIDENTIAL -

17
                VIDEO-RECORDED DEPOSITION
18
         REMOTELY TAKEN VIA ZOOM CONFERENCE OF
19
          MARK WEIDICK, Individually, Volume I
20
              Also as 30(b)(6), Volume II
21
                MONDAY, MAY 23, 2022
22

23 Stenographically Reported by:
   Linda E. Marquette
24 RPR, CLR, CSR No. 11874

25 Job No. 10101215

1        Q.      And what --

2        A.      I was engaged -- I was engaged with a couple

3    different clients.  Maybe one at the time.

4        **Q.      What was the nature of that consulting**

5    **practice?**

6        A.      I would join early stage tech companies,

7    helping the CEOs figure out a wide, wide range of things

8    to help their businesses grow better.  How to sell

9    product better.  How to develop product better.  How to

10   retain, hire, attract talent, fire in the case of the

11   last engagement at the time I took the phone call for

12   the hiQ opportunity.  And I did that as a retained

13   consultant.

14       **Q.      When the recruiter reached out to you, what**

15   **did they tell you about the possible opportunity with**

16   **hiQ Labs?**

17       A.      That he was representing a high tech business

18   in a highly disruptive -- in a -- in a very high growth

19   category, the highly disruptive technology with great

20   traction from marquee customers.  A team of Ph.D.s and

21   data scientists who were doing something that was very

22   easily quantifiable for Fortune 500s -- businesses to

23   get their arms around and pay for.  And that the company

24   was looking to continue on a growth path with a -- a far

25   greater focus on things that he knew I did well, like,

1   execution, rigor to grow a business.

2           He highlighted further the quality investors,

3   investors who had historically been great company

4   pickers who had invested in the likes of Uber and

5   Facebook and Twitter and even LinkedIn in this case and

6   made hundreds and hundreds of millions of dollars on

7   those investments before investing in hiQ Labs.

8       **Q.     And what was the name of this recruiter?**

9       A.     Mark Jacobson.

10      **Q.     With True Search?**

11      A.     Yes.

12      **Q.     Did you express interest in the opportunity?**

13      A.     I said I was open to learning more.

14      **Q.     And after that initial communication with**

15  **Mr. Jacobson, what were the next steps whereby**

16  **you pursued any opportunity to be employed by hiQ Labs?**

17      A.     A series of interviews with the leadership

18  team, some members of the leadership team who were at

19  the time at hiQ Labs.  One-on-one discussions with

20  several investors and board members.  It was two-way

21  interview, me -- me understanding their interest in the

22  business, what drove them to put their money and their

23  scarce time into the business while they sized up my fit

24  for the purpose at hand.  Very traditional interview

25  process.

1      Q.    At some point did you receive an offer to

2   become the CEO of hiQ Labs?

3      A.    I did.

4      Q.    When was that?

5      A.    Exact date of the offer, a little bit hazy in

6   my mind, but given that I started in February of 2017, I

7   would say probably in the January 2017 time frame.

8      Q.    And what was your start date?

9      A.    I engaged with the company before an official

10  start date.  I was wrapping up some of the consulting

11  engagement, so I was in meetings, on calls prior to an

12  official start date.  But I don't recall the official

13  date in February.

14     Q.    What -- did you meet with any members of the

15  board during your interview process?

16     A.    Yes.  As I -- as I just said I did.

17     Q.    And who was the -- who was the chair of the

18  board at that time?

19     A.    I don't recall who had the designation of

20  chair of the board.

21     Q.    Who, in your estimation, was in charge of the

22  board?

23     A.    It was a shared responsibility across several

24  board members.  So I -- no one -- no one ever presented

25  as the -- as the authoritative, you know, buck stops

1   here chair so to speak.  Neil Lustig I spoke to as a

2   board member.  Darren Kaplan as the CEO and a board

3   member.  Rob DeSantis as a board observer.  After

4   accepting the job, Gary Vaynerchuk as a board member.  A

5   representative whose name escapes me from SMR Holdings

6   who was not a board member but did the interview for SMR

7   as a -- as a big investor.  And Jesse Levin who was on

8   the board at the time from CEB.

9      Q.    **So among those you just named, who were the**

10  **actual board members at the time you were interviewing,**

11  **as opposed to observers or investor representatives,**

12  **folks who had actually been elected to the board?**

13     A.    I'm reluctant to speculate on that in that

14  I -- I -- I don't recall.

15     Q.    **Okay.**

16     A.    The -- the -- yeah.  I -- I -- I left one out,

17  by the way.  I -- I spoke to Chris Gagnon from McKinsey

18  as well.

19     Q.    **What did any of them tell you about why they**

20  **were hiring a new CEO?  What was the need for a new CEO?**

21     A.    We had immense opportunity in front of it.  It

22  achieved a compelling set of very, very tangible

23  milestones in terms of helping to create a new category,

24  putting forth new disruptive technology, achieving

25  monstrous milestones around name recognizable customers,

1  paying, in some cases, six figures for access to their

2  retention risk analysis so that the company was -- was

3  poised for tremendous growth.

4          A lot of the storming and norming and figuring

5  out and imagination phase that so many tech companies go

6  through had been resolved to the satisfaction of some

7  seriously high-powered investors.  And that they were

8  looking for a leader to step in and take all of that

9  success and put some more rigor around it, help it be a

10  bit more predictable and then find opportunities that

11  were adjacent to the one currently being fulfilled.  And

12  to grow the business, to deliver shareholder value,

13  likely raise more capital in the near term and then

14  figure out what the best way to achieve liquidity would

15  be.

16      **Q.    Did you present a plan for your first hundred**

17  **days as part of your interview process?**

18          THE WITNESS:  Sorry about that.

19          MR. WORCESTER:  Mark, we just lost your video.

20      A.    That was -- the lights are timed so they will

21  turn off, I forget when, 30 or 45 minutes to make me

22  move.

23          MR. WORCESTER:  Yeah, they're -- they're in my

24  office, too so that happens here, too.

25      A.    I'm sorry, Counsel.  You asked if I presented

1   a plan?

2   BY MS. HURST:

3       **Q.     Yeah.**

4       **Did you prepare a hundred-day plan as part of**

5   **your interview process?**

6       A.     I don't specifically remember it being part of

7   the interview process.  It would have -- been something

8   I normally did as I -- I conducted diligence on the

9   business.  I certainly flashed the idea of a -- an early

10  assessment of the company's opportunity upon joining.

11  Whether that actually happened before I started, I don't

12  recall.

13      **Q.   Did anyone as part of your interview process**

14  **explain to you that Mr. Kaplan had had personality**

15  **conflicts with a number of the executives of the**

16  **company?**

17      A.     I knew that Darren had done a phenomenal job

18  of getting the business to where it was.  I met with

19  Darren personally.  I've seen his art type in many, many

20  different situations and understand how something as

21  wildly successful as this could come from a guy like

22  him.  And I simultaneously understood from the interview

23  process that it was a good time for him to move on.  So,

24  yeah, that conversation was fair game.

25          MS. HURST:  Move to strike as nonresponsive.

 1   BY MS. HURST:

 2       Q.    Mr. Weidick, listen to my question and answer

 3   it, please.

 4            Did anyone tell you as part of the interview

 5   process that Mr. Kaplan had had personality conflicts

 6   with a number of the executives of the company?

 7            MR. WORCESTER:  Objection.  Asked and

 8   answered.

 9       A.    I knew that Mr. Kaplan -- or that Darren --

10            THE WITNESS:  I heard something in the

11   background there.  Good to answer, Corey?

12            MR. WORCESTER:  Yeah, yeah.  If there's an

13   objection, unless it's a privilege objection, you can

14   answer the question.

15            THE WITNESS:  Okay.

16            MR. WORCESTER:  And if it's a privilege

17   objection, I will instruct you not to answer, so you can

18   just listen for my instruction.  So unless I say "Don't

19   answer," you can go ahead and answer.

20            THE WITNESS:  Understand.

21            MR. WORCESTER:  Annette, can we get the

22   question read back.

23            MS. HURST:  Yes.

24   BY MS. HURST:

25       Q.    Did -- yes or no.  Did anyone tell you as part

1  of your interview process that Mr. Kaplan had had

2  personality conflicts with one or more of the executives

3  of the company?

4        A.    No.

5              MR. WORCESTER:   Objection.  Asked and

6  answered.

7        A.    I don't remember the words "personality

8  conflict" specifically being used.  I know that there

9  were those who thought that Darren's time and -- and --

10  and applicability to the needs of the company had

11  passed.  But the word "personality conflict" weren't

12  part of the discussion.

13  BY MS. HURST:

14        Q.    Did anybody tell you that he and Ms. Graves

15  had come to the point where they had significant

16  problems working together?

17        A.    Not that I recall.

18        Q.    Did anyone tell you that Mr. Kim had

19  relinquished his role as the head of product because of

20  personality conflicts with Mr. Kaplan?

21        A.    No.

22        Q.    Did anyone tell you that Mr. Medeiros had had

23  significant dissatisfaction with Mr. Kaplan?

24        A.    I was aware of from the diligence process and

25  meeting with Darin Medeiros that Darin Medeiros and

 1   Darren Kaplan had a different view of how to grow the

 2   business from that point forward.  So I had those

 3   discussions directly with Darin Medeiros.

 4      Q.    Was -- did anyone tell you whether or not

 5   Mr. Kaplan was being fired as the CEO?

 6      A.    Again, the words "fired" not used but it was

 7   patently obvious that I was about to become the new CEO.

 8   So he was, in fact, being replaced and that was very

 9   openly discussed between everybody I just mentioned,

10   including Darren Kaplan and I.

11           MS. HURST:  I am hearing a fair amount of

12   background noise of talking and other noises.  I'm not

13   sure, Corey, is that on your end or what -- what are we

14   hearing?

15           Is that you, Mr. Weidick?

16           THE WITNESS:  I -- I'm in a shared office

17   space but I'm in a private office with a closed door,

18   but it's sort of like a WeWork environment here so

19   there -- there are people outside right now.

20           MS. HURST:  Okay.  Thank you.

21   BY MS. HURST:

22      Q.    Other than speaking with people as part of

23   your interview process, did you conduct any diligence on

24   the company before agreeing to become its CEO?

25      A.    Yes.

1    discussion?

2        A.    Not that I remember, no.

3        Q.    Did you ever discuss LinkedIn's cease and

4    desist letter with any customers?

5        A.    Yes.

6        Q.    Which customers -- with which customers did

7    you discuss Exhibit 485, LinkedIn's cease and desist

8    letter?

9        A.    I know that I discussed with Bank of New York

10   Mellon.

11       Q.    Any others?

12       A.    In what time frame?  Ever?

13       Q.    Ever.

14       A.    I recall I spoke with eBay.  I believe I

15   spoke with Andrew Carges from GoDaddy.  McKinsey as a

16   customer.  There may have been others.  Those are the --

17   those are the key that I remember.  And then others in

18   the business were deputized to share the circumstances

19   they needed to.

20       Q.    And with respect to that, can you describe for

21   me today anyone -- any conversation that anyone else

22   within the business reported to you about having

23   discussed Exhibit 485, the cease and desist letter with

24   a customer?

25       A.    You know, there was a period of time where I

1  thought that we could resolve this so, no, not in that

2  immediate time frame of, say, days or even weeks, I

3  cannot.

4  **Q.  Okay.  And can you tell me anything at all, as**

5  **you sit here today, about any discussion that anyone**

6  **other than you had with a customer about Exhibit 485,**

7  **LinkedIn's cease and desist letter?**

8  A.  Well, certainly after the circumstance became

9  public I talked with our customer facing personnel as

10  they had to contend with it should their customers bring

11  it up.  So I talked to Amelia Barker, now Amelia

12  Jones -- she got married.  I can't remember the order of

13  her married name and premarried name, but Amelia Jones

14  Barker.  Darin Medeiros, of course.

15  **Q.  And what did Ms. Barker or Ms. -- Mrs. Jones,**

16  **what did she tell you about any specific conversations**

17  **that she had had with any customers?**

18  A.  That the customers were concerned about the

19  implications to their business, whether or not at the

20  most rudimentary level we'd be able to provide the work

21  that we were doing for them and whether or not there

22  would be some subsequent ramifications on their business

23  as being in business with us.

24  **Q.  Okay.  And I want to really get to specific**

25  **conversations that she had with particular customers.**

1    Which -- can you recount for me anything she told you

2    about a specific conversation she had with a particular

3    customer?

4        A.    I cannot.

5        Q.    At any point in time can you tell me -- can

6    you recount for me anything Ms. Barker told you about a

7    specific conversation she had with a particular

8    customer?

9        A.    Not at that level of specificity.  It's the

10   word "particular" and "specific" that lead me to I

11   cannot.

12       Q.    You said after it became public.  What did you

13   mean by that?

14       A.    We quickly ended up in a public courtroom

15   situation seeking a temporary restraining order so at

16   that point the media covered the situation.

17       Q.    In fact, you had a PR campaign related to the

18   lawsuit where you reached out to the media; isn't that

19   right?

20       A.    We retained a crisis management public

21   relations firm to help us contend with the inevitability

22   that we would be deemed guilty of the things levied in

23   this letter knowing full well that our reputation was a

24   tremendously valuable part of the business and it was

25   about to be sullied inappropriately.  So we planned

1   agreement?  What was its term?  What was the pricing?

2   What were the -- you know, how -- how did it -- how did

3   that agreement work?

4        A.     Pricing on the order of $25,000 per analytical

5   block for a single point in time or a very well defined

6   period of time, not an ongoing subscription, the likes

7   of which hiQ sold to the large majority of its direct

8   end customers.  And then memorialized for each

9   individual engagement that we were party to with

10  McKinsey.  So if we did one for company A, you would

11  have an agreement, if we did one for company B, we'd

12  have an agreement.  Although we did contemplate a

13  package and put in place an agreement for a -- a bundle

14  just to resolve that we had in place a purchase

15  agreement for more than one that they could tap into.

16       Q.     What was the term, that is the period of time,

17  covered by this contractual commercial relationship with

18  McKinsey?

19       A.     In the -- in the -- in these cases it would be

20  more of a project based engagement.  We'll do this

21  project, work for you for as long as it takes us to do

22  the work.  Not a term in the sense of a 12-month

23  agreement with insights delivered on a monthly basis.

24  So the concept of term for those agreements really isn't

25  applicable.

1      Q.    Had McKinsey deposited any sums -- like you

2    said there was an open purchase order for more than one

3    of these engagements.  Had McKinsey deposited any money

4    with hiQ Labs for that?

5      A.    Not that I was aware of.  It was paid for the

6    work we did.

7      Q.    So each time there was the need for some kind

8    of consulting, McKinsey would come to hiQ Labs, would

9    identify that, would execute a new purchase agreement,

10   you would deliver and then get paid $25,000; is that

11   correct?

12     A.    Yeah, broad strokes, yes.  And we were always

13   looking to reduce friction on the purchasing process and

14   the engagement terms so we sought to bundle those in

15   more than quantity one at a time.  McKinsey was open to

16   that.

17     Q.    Did you ever achieve an agreement with them

18   where they agreed to purchase in advance more than one

19   of these engagements?

20     A.    My recollection is the work toward that

21   outcome was scuttled when the litigation and cease and

22   desist showed up, so no.

23     Q.    Is it true that under the terms that you had

24   in effect with McKinsey at the time of the cease and

25   desist letter they were not obligated to pay you or

1   purchase anything from you?

2        A.    That's true.   That's true.

3        Q.    **Did you ever have any communications directly**

4   **with a customer Aramark regarding any reasons it had for**

5   **not renewing or continuing business with hiQ Labs?**

6        A.    Aramark?

7             I am not.

8        Q.    **No?**

9        A.    I -- I'm sorry, maybe I was too soft.   I said

10  I am not.

11            MR. WORCESTER:   Mark, if you have any more

12  water maybe take it.

13            THE WITNESS:   Water is not going to solve it

14  at this point.

15            MR. WORCESTER:   Overnight use some lozenges.

16  BY MS. HURST:

17       Q.    **Did you have any communications with Blue**

18  **Shield about any reasons why that company chose not to**

19  **continue a contractual relationship with hiQ Labs?**

20       A.    No.

21       Q.    **Same question with respect to Bristol Myers**

22  **Squibb?**

23       A.    No.   Not that I recall.   Not that I recall.

24       Q.    **Same question with respect to Chevron, did you**

25  **have any communications directly with Chevron about any**

Page 245

 1   into 2018.

 2      Q.    At the time that you -- at the time that you

 3   started at hiQ Labs, was there a contract in place

 4   between IBM and hiQ Labs of any kind?

 5      A.    No, not that I'm aware of.

 6      Q.    HiQ -- IBM was not a customer when you joined?

 7      A.    Oh.

 8      Q.    Correct?

 9      A.    I wasn't thinking in that vein.  I -- no, not

10   that I recall.  They were not a commercial customer.

11      Q.    And they also did not have any kind of other

12   commercial agreement with you of a reseller/distributor

13   partnership nature, there was no agreement in place,

14   correct?

15      A.    No agreement in place that had been discussed

16   and I picked up that thread upon arrival.

17      Q.    All right.  You continued those discussions

18   and your goal was to try to get IBM to try to enter into

19   some kind of a commercial distribution or reselling

20   arrangement; is that right?

21      A.    Not exactly.  It was more specifically to OEM,

22   our software capability to embed it into the software

23   that they had ran, partially from a $1.3 billion

24   acquisition of Kenexa that we would be embedded in their

25   talent analytics software application.

1    Q.    That would have required a substantial

2  technical work in order to cause your application to be

3  embedded in an IBM application, correct?

4    A.    Define "substantial."

5    Q.    Can you answer the question the way I posed

6  it?

7    A.    I cannot.

8    Q.    Did IBM ever express to you that any -- that

9  its reasons for discontinuing pursuit of that

10  relationship had anything to do with the hiQ versus

11  LinkedIn lawsuit?

12    A.    They explicitly in conversation and

13  subsequently an e-mail pointed directly to the LinkedIn

14  situation as reason for not continuing.

15    Q.    What do you mean by "LinkedIn situation"?

16    A.    At the time IBM chose to disengage we were in

17  the throes of litigation.  We were post cease and desist

18  and several other legal actions.  And our counterparts

19  from IBM, at the advice -- this is in writing, at the

20  advice of their legal team, had to stop engaging with

21  us.

22    Q.    Did you ever have any communications directly

23  with anyone from Seal Air about a decision -- that

24  company not to renew or continue a relationship with

25  hiQ Labs?

 1       A.    It didn't come over.  Did you say "steel"

 2    as in --

 3       Q.    Sorry seal, like the water mammal, seal,

 4    S-E-A-L?

 5       A.    I don't recall, no.

 6       Q.    Same question with respect to Sony?

 7       A.    I don't recall talking to -- I don't recall

 8    talking to Sony.

 9       Q.    Same question with respect to SpaceX?

10       A.    I don't recall talking to them either.

11       Q.    How about Twitter?

12       A.    I -- I may have -- I may have interacted with

13    Twitter on -- on different matters but not specifically

14    around their circumstance as a customer, as I recall.

15       Q.    And what did you interact with Twitter about?

16       A.    I -- I don't want to guess.  I -- I don't

17    remember.

18       Q.    At some point in time did the board direct

19    that the company go into hibernation?

20       A.    Hibernation, yes.  The idea of the -- the

21    board directing, not exactly.  It was a conscious

22    decision after discussion of available resources that we

23    would -- hibernation, by the way, is not a term of art.

24    It's something that -- I don't even remember who coined

25    it across the board.  But that we would put the business

# Exhibit 84

```
 1              UNITED  STATES  DISTRICT  COURT

 2            NORTHERN  DISTRICT  OF  CALIFORNIA

 3                 SAN  FRANCISCO  DIVISION

 4   hiQ Labs, Inc.,

 5              Plaintiff,
                                   Case No.:
 6              vs.
                            17-cv-03301-EMC
 7
     LinkedIn Corporation,
 8
                Defendant.
 9   _____

10   LinkedIn Corporation,

11              Counterclaimant,

12              vs.

13   hiQ Labs, Inc.,

14              Counter-defendant.
     _____
15

16
                 - CONFIDENTIAL -
17
              VIDEO-RECORDED DEPOSITION
18
         REMOTELY TAKEN VIA ZOOM CONFERENCE OF
19
         MARK WEIDICK, Individually, Volume III
20
              Also as 30(b)(6), Volume IV
21
               WEDNESDAY, JUNE 1, 2022
22

23   Stenographically Reported by:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No. 10101626
```

**Page 271**

 1    breakfast meeting here in the Bay Area.  So that would

 2    be face-to-face.

 3         Q.    **Had you -- at the time of that breakfast**

 4    **meeting, face-to-face breakfast meeting, had you**

 5    **received the cease and desist letter from LinkedIn?**

 6         A.    I don't recall.  I don't remember the time.

 7         Q.    **How did you leave the -- the -- what were the**

 8    **next steps, if any, that -- to occur after the breakfast**

 9    **meeting with the fellow from Visier whose name you don't**

10    **recall?**

11         A.    Very similar to what we had done with IBM.

12    There was a little bit of a recipe in place because of

13    the success we'd had with IBM that led to a term sheet.

14    We would agree that we would talk about use cases that

15    were appealing to Visier's customer base and start to

16    sketch out, perhaps even on a whiteboard, the -- the --

17    the way the two products would be instantiated together,

18    the way that hiQ insights would be supplied to Visier

19    and then represented to the customers in the web -- or

20    in the software application that Visier sold.  That

21    would have been the logical next step.  We talked about

22    that.  That's all.

23         Q.    **Okay.  And -- and when you left the breakfast**

24    **meeting had you planned the next meeting?**

25         A.    No, we had not worked out dates at that point.

1       Q.     Were there any subsequent e-mails with Visier

2    in which you attempted to plan a next meeting?

3       A.     I don't think so.  This was so close to

4    May 23rd.  No, I don't think so.

5       Q.     Did anyone from Visier tell you that they were

6    unwilling to proceed in discussions with you?

7       A.     Prior to the cease and desist letter we could

8    get an audience with anybody we wanted to, an investor,

9    a candidate for employment, a customer prospect, you

10   name it, they'd talk to us.

11             Post cease and desist some customers told us

12   why they wouldn't talk to us, some prospects, some

13   partners, some candidates.  Some didn't.  Visier didn't.

14             MS. HURST:  Move to strike everything up until

15   "Visier didn't."

16   BY MS. HURST:

17       Q.     Other than that one breakfast meeting, were

18   there any other meetings, phone calls, e-mails or any

19   other form of communications with Visier regarding a

20   prospective OEM relationship with them?

21       A.     Not that I recall.

22       Q.     Did you ever have any meetings or discussions

23   with anyone from Jobvite regarding a prospective OEM

24   opportunity?

25       A.     We did.

**Page 330**

1     Q.     And how many such meetings were there?

2     A.     Can't put a specific number on it but a few.

3   More -- more than one, less than -- less than ten.

4     Q.     And over what period of time did those

5   meetings occur?

6     A.     With Jobvite it was over a couple of months.

7     Q.     And what months were those?

8     A.     Again, I'm going to struggle with the

9   specifics.  I -- I remember meeting their CEO at a

10  Silicon Valley Bank sponsored event close to the time I

11  joined, so that would have been in the March 2017 time

12  frame.  Give or take a few months.  From memory.

13    Q.     And how far along did your discussions with

14  Jobvite get regarding a potential OEM opportunity?

15    A.     We made progress on several fronts

16  simultaneously with respect to Jobvite.  There was a

17  clear appetite for new and disruptive technology the

18  likes of which hiQ Labs could supply to them.  They were

19  a bit long in the tooth, so the advances happened at the

20  executive level between myself and -- and Jobvite's CEO.

21         We had an acute understanding of what it would

22  do to their enterprise value to be able to bring

23  hiQ Labs, data science and machine learning and AI, all

24  buzzwords that were topical into their application

25  footprint.

 1            Simultaneous to that, our product teams did

 2   multiple meetings in and around the opportunity, the way

 3   that we do it, the -- the use cases, the wireframes, the

 4   pictures, the whiteboarding that were indicative of how

 5   the two products would be brought together at a

 6   technical level.

 7       Q.    Did you have a term sheet with Jobvite for an

 8   OEM relationship?

 9       A.    We did not get to a term sheet with Jobvite

10   before the cease and desist.

11       Q.    Did you have an approved product roadmap for

12   integration between any of your products and those of

13   Jobvite?

14       A.    Approved by -- I don't understand the concept

15   of the word "approved" there.

16       Q.    By the companies, who were in the discussions?

17       A.    We had an agreed-to set of -- of concepts and

18   use cases that we would attend to.

19       Q.    And did Jobvite tell you any reason why those

20   discussions ended?

21       A.    Yes.

22       Q.    And who -- who from Jobvite told you that?

23       A.    Conversations between myself and their CEO.

24       Q.    And what was his or her name?

25       A.    Dan Finnigan.

1        Q.     And what did Mr. Finnigan tell you?

2        A.     That hiQ Labs was fighting a good fight

3   against the ability to collect public information from

4   LinkedIn.  That it was important for the industry to get

5   this right.  That he was disappointed that he couldn't

6   be more vocal as a business on that topic.  That he felt

7   immense appreciation for what we were trying to do.  And

8   that many levels he needed to walk very cautiously given

9   the role that Microsoft and LinkedIn played in his

10  business environment.  I -- yeah.

11       Q.     And what role was that, if any, that he

12  explained -- as he explained it to you?

13       A.     He viewed Microsoft and LinkedIn as a

14  potential business partner.  Potential acquirer.  And

15  that he knew he couldn't be on the wrong side of that

16  for the purposes of his shareholders.

17       Q.     Okay.  The next target listed here is Ultimate

18  Software.  Do you see that?

19       A.     I do.

20       Q.     And did you have any discussions with Ultimate

21  Software regarding any potential OEM opportunity?

22       A.     We did not.

23       Q.     Under the "TBD" there are listed a number of

24  companies.  Did you have discussions with any of them

25  regarding a potential OEM opportunity?

1      A.    SAP/Success Factors we did.  Oracle/Taleo we

2  did.  And I don't -- I don't recall Cornerstone, ADP,

3  Paychexx or Workday.

4      **Q.    Okay.  How many meetings, conversations of any**

5  **sort did you have with SAP/Success Factors?**

6      A.    Including e-mail exchange with SAP/Success

7  Factors, on the order of, I don't know, eight to ten

8  e-mails back and forth.  Maybe more, few more.  Not 50.

9  Conversations with SAP, three or four.

10     **Q.    Did you have any in-person meetings with**

11 **anyone from SAP?**

12     A.    I did.

13     **Q.    How many in-person meetings did you have?**

14     A.    I recall one.

15     **Q.    And who was that with?**

16     A.    It was with Kevin Distel, Distel, D-I-S-T-E-L,

17 I believe spelling, from SAP.

18     **Q.    And did you get to the point of a term sheet**

19 **with SAP?**

20     A.    SAP was a multipronged opportunity with OEM

21 that got shut down when Kevin Distel relayed to me they

22 were told -- he told me that his counterparts couldn't

23 go anywhere near this given the Microsoft/LinkedIn

24 situation vis-a-vis hiQ Labs so no term sheet.

25     **Q.    Well, had they committed to a term sheet prior**

1   to the time he communicated that to you?

2       A.    They had not committed to a term sheet.  They

3   were frightened to even engage with us.

4       **Q.    And when -- when was it that Mr. Distel**

5   **conveyed this to you, this fright on the part of SAP?**

6       A.    Post cease and desist.  I don't remember what

7   the timing was but that -- that came over via e-mail.

8       **Q.    So there's an e-mail somewhere from SAP,**

9   **Mr. Distel, indicating that they were frightened of**

10  **LinkedIn?**

11      A.    He didn't use the word "frightened."  But I

12  think the word he used -- the specific words he used

13  were no one -- he can't find anybody to stick their neck

14  out on this given the LinkedIn situation.

15      **Q.    Did you have any in-person meetings with**

16  **anyone from Oracle?**

17      A.    I don't think so.  No.

18      **Q.    Did you ever have any discussions with**

19  **Accenture regarding any potential business relationship**

20  **partnership of some kind between hiQ Labs and Accenture?**

21      A.    We did.

22      **Q.    And when did those discussions occur?**

23      A.    I think the earliest of those discussions

24  happened in the Elevate time frame where I would have

25  been -- been introduced to them.  As part of that confab

1 | where everybody gets together to hear about what --

2 | what hiQ Labs was doing, so that would have been the

3 | April 27 time frame.  Could have been a little before,

4 | little bit after.  But subsequent to that we continued

5 | to talk to Accenture.

6 |     **Q.**    **And what was the nature of the use case that**

7 | **you were exploring with Accenture?**

8 |     A.    The use case for Accenture was multifaceted.

9 | They had human capital management practices that focused

10 | on the types of things that McKinsey was already doing

11 | around retention risk analysis for their clients'

12 | populations.  They also have an active M&A practice

13 | where they did advisory work for customers who were

14 | either looking to integrate acquisitions or to size up

15 | the attractiveness of an acquisition.  So the use cases

16 | with Accenture were -- were many.

17 |     **Q.**    **And when did any discussions that you were**

18 | **having with Accenture end?**

19 |     A.    After the cease and desist.

20 |     **Q.**    **Did anyone from Accenture express to you any**

21 | **reason why they were no longer pursuing any discussions**

22 | **with hiQ?**

23 |     A.    I recall a conversation about the -- the --

24 | the details of what was going on that came across to me

25 | as trepidation and concern about the situation and the

# Exhibit 85


# Filed Under Seal

Exhibit 86

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

hiQ Labs, Inc.,

        *Plaintiff and Counterclaim Defendant*,

    vs.

LinkedIn Corp.,

        *Defendant and Counterclaim Plaintiff.*

Case No. 3:17-cv-03301-EMC

**EXPERT REPORT OF**

**Stephen B. McElfresh**

**June 7, 2022**

CONFIDENTIAL

CONTENTS

I.      Qualifications ................................................................................................................1

II.     Summary of Opinions .....................................................................................................1

III.    People Analytics ..............................................................................................................2

        A.      Definition ...................................................................................................................2

        B.      Evolution of People Analytics Offerings .................................................................3

IV.     hiQ Introduced Novel and Valuable People Analytics Offerings.......................................5

                1.      Keeper ...............................................................................................................5

                2.      Skill Mapper.......................................................................................................8

V.      hiQ's Use of LinkedIn as a Source of Publicly Available Profile Data..............................9

VI.     hiQ was an Industry Leader ...........................................................................................10

VII.    LinkedIn as a Competitor of hiQ ...................................................................................11

CONFIDENTIAL

## I.  Qualifications

1. I am the founder of HR Futures, a consultancy firm providing Human Resources ("HR") services and programs since 2000.

2. I have served as the chief HR officer for Friden Alcatel (now Neopost), Failure Analysis (now Exponent), SRI International, New Relic, and Duo Security.

3. I was the CEO and President of the Saratoga Institute, a premier global provider of HR benchmarking services and metrics consultation.

4. From 2009 through 2011, I was the Conference Chair and organizer of the Northern California HR Association's annual HR Metrics & Analytics Conference.  In 2011, I designed, wrote, and delivered the first HR metrics and analytics program to be sponsored by the Society for HR Management ("SHRM"); subsequently, I delivered this program across North America as well as in India, Egypt, and Dubai.  I was a member of the SHRM/ANSI working group on Guidelines for Reporting on Human Capital to Investors.

5. I received a Ph.D. in social psychology from Boston College and taught at the Boston College School of Management.

6. A copy of my CV is attached to this report as Exhibit A.

7. A list of materials relied on in preparing this report is attached to this report as Exhibit B.

8. I am being compensated at a rate of $695 per hour for this engagement.  This compensation does not depend on the results of my report or the results of the case.

## II.  Summary of Opinions

9. Each year, organizations within the United States incur enormous costs resulting from employee voluntary turnover.  The opportunity cost of failing to adequately take on turnover prevention and optimize the utilization of skills appears to be enormous.

10. Turnover prevention and employee skill analysis are valuable corporate tools – both separately and especially when combined.  For most organizations, the data available for these applications is limited to internal sources.

11. Beginning in or around 2014, hiQ pioneered innovative tooling that was well targeted to meet these needs and was creatively building visibility and momentum for an entirely new product

CONFIDENTIAL

category in the HR marketplace.[1]  hiQ was well ahead of the market in applying predictive analytics to public data and offering a solution for organizations trying to retain talent and combat the costs associated with turnover.  That hiQ is no longer able to offer its products is detrimental both to employers and employees (whether potential or current) who may have benefited therefrom.

12.  To fuel its products, hiQ used LinkedIn member data that LinkedIn members chose to make publicly available.  LinkedIn.com is a unique resource in terms of the extensiveness of its collection of publicly available professional data and the tendency of members to keep their profiles up-to-date.

13.  As of May 23, 2017, the time that hiQ received the cease-and-desist letter from LinkedIn, LinkedIn was developing an offering, LinkedIn Talent Insights, that would have competed with hiQ's second product – Skill Mapper.  Based on my experience, I believe Skill Mapper's offerings would have provided unique and important value to the people analytics market and to individual organizations' assessments of their workforce.

## III.    People Analytics

### A.    Definition

14.  While there is no single definition of "people analytics," generally speaking, "People analytics is the practice of collecting and applying organizational, people, and talent data to improve critical business outcomes."[2]  Today, people analytics is often discussed in the framework of applying big data to decision-making.[3]

---

[1]  I am aware that a company called Joberate introduced an offering with functionality similar to Keeper's around the same time period.  While I do not know whether Joberate or hiQ was technically the first to offer its respective product, I was not aware of Joberate while hiQ was fully operational. *See* GlobeNewswire, *Joberate Launches J-index to Measure Job Seeking Behaviors of Fortune 100 Companies' Employees*, Aug. 7, 2014, https://www.globenewswire.com/news-release/2014/08/07/656920/29616/en/Joberate-Launches-J-index-to-Measure-Job-Seeking-Behaviors-of-Fortune-100-Companies-Employees.html (last visited June 7, 2022).

[2]  Erik van Vulpen, *What is People Analytics? An Essential Guide*, Academy to Innovate HR, https://www.aihr.com/blog/people-analytics/ (last visited June 5, 2022).

[3]  *See*, *e.g.*, Elizabeth Ledet et. al., *How to be great at people analytics*, McKinsey & Co. (Oct. 2, 2020), https://www.mckinsey.com/business-functions/people-and-organizational-performance/our-insights/how-to-be-great-at-people-analytics (last visited June 7, 2022); Paul Leonardi & Noshir Contractor, *Better People Analytics*, Harvard Business Review (Nov.-Dec. 2018), https://hbr.org/2018/11/better-people-analytics (last visited June 7, 2022).

### B. Evolution of People Analytics Offerings

15. Traditionally, the role of human resources management ("HRM") was focused on administrative tasks, with the primary responsibilities of many HR personnel being hiring, onboarding, and overseeing payroll.[4]

16. In the 1960s and 1970s, large corporations began using computer programs to centralize and organize human resource data.[5]  These programs came to be known as Human Resource Information Systems ("HRIS") or Human Resource Management Systems ("HRMS").[6]

17. HRIS became increasingly widespread in the 1980s as Enterprise Resource Planning applications and client-server technology (as opposed to the use of mainframe computer system programs) gained popularity.[7]  The early HRIS offerings were primarily used to facilitate record-keeping and meet legal requirements.[8]  These programs were written on mainframe computers that served as central data stores with little or no real-time transaction processing.[9]

18. Beginning in the 1990s, HRIS vendors like PeopleSoft, Oracle, and NCR/Teradata began transforming traditional HRIS to systems that offer analytics modules.[10]  Due to the complexity of those systems and difficulties of implementation, the modules were not commonly implemented; however, they were nonetheless the beginning of routinized people analytics software.[11]

19. A key aspect of early HRIS offerings is that those offerings provided organizations with a way to centralize internal employee data – that is, data that organizations had themselves collated about their employees.[12]

---

[4]  IceHrm, *Evolution of the human resource information system*, Blog (Mar. 5, 2020), https://icehrm.com/blog/evolution-of-human-resource-information-system/ (last visited June 7, 2022).

[5]  *Id.*

[6]  *Id.*

[7]  *Id.*

[8]  *Id.*

[9]  *Id.*

[10]  Josh Bersin, *The Geeks Arrive in HR: People Analytics Is Here*, Forbes (Feb. 1, 2015), https://www.forbes.com/sites/joshbersin/2015/02/01/geeks-arrive-in-hr-people-analytics-is-here/?sh=1e6200a573b4 (last visited June 7, 2022).

[11]  *Id.*  Around 2001, as the CEO of Saratoga Institute, I worked with PeopleSoft on the design of their analytics module.  When I followed up many months later, I was told that it was valuable as a selling point – but rarely implemented for reasons like those noted above.  *See also* Bersin, *supra* note 10.

[12]  *Id.*

CONFIDENTIAL

20.  In 2010, a Harvard Business Review article urged that HR organizations should be "competing on talent analytics", making use of (internal) people-related data to assess and improve productivity and profitability.[13]

21.  I was both a witness and a contributor to this emerging body of work.  For example, from 2009-2011, I was the conference chair and organizer for the annual Northern California HR Association's Conference on HR Metrics (later, HR Analytics).  I also designed and delivered globally the first-ever metrics/analytics training program for the Society of HR Management.

22.  A unifying characteristic of HRIS was that the data inputs into HRIS were primarily internal data – that is, data already known to the organization.[14]  Thus, while these offerings enabled organizations to be better organized and understand data that the organization had already collected through, e.g., resumes, interviews, and employee surveys, the offerings did not provide organizations with any external information about their employees.  The analytics features of any HRIS that relies only on internal data are only as valid as that organization's underlying internal data itself.

23.  In or around 2014, hiQ emerged in the people analytics market with disruptive technology.[15]  Specifically, hiQ's Keeper product offered what may have been the first-ever product that analyzed data from public sources to provide HR functions with valuable insights for managing employees.

24.  The availability of distributed computing, cloud processing, and Software-as-a-Service (SaaS) delivery has enabled organizations large and small to apply people analytics to their *internal* data and has fostered a plethora of HR-specific software applications.

25.  Nonetheless, with the possible exceptions of Joberate and LinkedIn, I am not aware of any company that uses *public* data to provide an individualized assessment of turnover risk or the thoughtful, easy compilation of skills and abilities throughout an organization that hiQ offered.

---

[13]  Thomas H. Davenport et al., *Competing on Talent Analytics*, Harv. Bus. Rev. (Oct. 2010), https://hbr.org/2010/10/competing-on-talent-analytics (last visited June 7, 2022).

[14]  Bersin, *supra* note 10.

[15]  *See* hiQ Labs, *HiQ Labs People Analytics Solution Wins HR Tech Product of the Year*, Press Release (Sept. 21, 2016), https://www.hiqlabs.com/news-1/2016/9/21/hiq-labs-people-analytics-solution-wins-hr-tech-product-of-the-year (last visited June 7, 2022) (announcing Keeper winning the "Human Resources Executive's Top Product of 2016").

## IV.    hiQ Introduced Novel and Valuable People Analytics Offerings

26. I understand that hiQ offered two products when it was fully operational.  hiQ's first, Keeper, was introduced to the market in or around 2014.  hiQ's second, Skill Mapper, was formally introduced to the market in April 2017.[16]

### 1.    Keeper

27. The cost of turnover can be enormous.  Visier estimates that for their people analytics customers the cost of turnover ranges from 50% to 200% of a departed employee's salary.[17]  It is estimated that U.S. businesses lose approximately $1 trillion every year as a result of voluntary turnover.[18] And, in 2015, Credit Suisse was building its turnover prediction model with an understanding that just a 1% reduction in unwanted resignations could save the bank between $75 and $100 million annually.[19]

28. Nonetheless, the rate of employee turnover can be reduced.  Indeed, Work Institute research in 2020 indicated that as much as 75% of voluntary turnover is preventable.[20]  That same year, Gallup concluded that in more than half of voluntary exits, an employee's "manager or organization could have done something to prevent them from leaving their job" if they had acted in the months before the employee left.[21]

---

[16]   *See* Deposition of Darren Kaplan, May 4, 2022, at 38:19-39:16, 41:8-15.

[17]   Jon Burton, *Ask Visier: How Much Does it Cost to Replace an Employee?*, OUTSMART, https://www.visier.com/blog/ask-visier-how-much-does-it-cost-to-replace-an-employee/ (last visited June 5, 2022); David G. Allen, *Retaining Talent: A Guide to Analyzing and Managing Employee Turnover*, SHRM Foundation (2008), https://blog.shrm.org/sites/default/files/reports/Retaining%20Talent-%20A%20Guide%20%28Q1%29.pdf.

[18]   Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Business $1 Trillion*, Gallup (Mar. 13, 2019), https://www.gallup.com/workplace/247391/fixable-problem-costs-businesses-trillion.aspx (last visited June 7, 2022).

[19]   Rachel Emma Silverman & Nikki Waller, *The Algorithm That Tells the Boss Who Might* Quit, WALL ST. J. (Mar. 13, 2015, 7:05 PM), https://www.wsj.com/articles/the-algorithm-that-tells-the-boss-who-might-quit-1426287935 (last visited June 7, 2022).

[20]   Thomas F. Mahan et al., *2020 Retention Report: Trends, Reasons & Wake Up Call*, Work Institute (2020), https://info.workinstitute.com/hubfs/2020%20Retention%20Report/Work%20Institutes%202020%20Retention%20Report.pdf (last visited June 5, 2022).

[21]   Denise McClain & Iseult Morgan, *Overwhelmed by Employee Turnover? Have Stay Conversations*, Gallup (Oct. 11, 2021), https://www.gallup.com/workplace/355238/overwhelmed-employee-turnover-stay-conversations.aspx (last visited June 7, 2022).

29. Gallup encourages employers to have "stay conversations" with employees, which are "one-on-one conversations designed to learn more about the employee, including their passions and career goals, what they value in life, and what they need to be more successful in their role."[22]

30. Of course, organizations that have more information about which employees are likely to leave that organization are better able to prioritize those "stay conversations" and other efforts to retain talent.

31. hiQ's Keeper offering gave companies valuable insight into which employees were at risk of attrition. Keeper was the first product in the people analytics space that I was aware of that used external data (i.e., data that LinkedIn members chose to make visible to anyone), often combined with internal company data, to offer predictive analytics to help its clients retain talent.[23]

32. Traditionally, companies and thought leaders who were thinking about voluntary employee turnover were focused on the impact of what hiQ deemed "push factors," such as compensation, career path, a bad manager, commute, and/or culture.[24] A critical value-add of hiQ's Keeper solution was to apply predictive algorithms to what hiQ coined "pull factors," such as whether the employee is likely to be heavily recruited, has a high-demand skill, is in a growing sector, and/or is a high visibility performer.[25]

33. Moreover, I understand that Keeper's attrition risks were highly predictive of whether an employee would in fact leave their current employer. For example, hiQ reported that "[i]n our

---

[22] *Id.*

[23] *See, e.g.*, hiQ_00059479 at 1; Deposition of Darren Kaplan, May 4, 2022, at 40:9-40:22 ("Q. …Let's start with Keeper in the 2012 to May 23rd, 2017 timeframe. What companies offered products or services that were competitive with Keeper in that timeframe? A. In that timeframe, using applying data science to public profiles or public information or what we call pull factors, which are external forces like – like external factors that recruiters can use to recruit you. We were the only person company using that. As far as push factors, these are internal factors. There were survey companies, I wouldn't call them competitors – I don't know what I call, but they would – they were focusing on internal data. We were focusing on external data. So, for external data, we were the only person thinking about that and doing that."); Deposition of Genevieve Graves, May 25, 2022, at 102:12-20 ("So those were things -- so we -- we started using -- we started out with LinkedIn data because it was all formatted exactly the same way which makes it easier to use. You can get that same data from resumes, so we were -- we were looking at resumes on Indeed and then also, like, internal -- like the internal companies, like the applicant tracking system…").

[24] hiQ_00053566 at 8 (listing push and pull factors); Rohit Punnoose & Pankaj Ajit, *Prediction of Employee Turnover in Organizations using Machine Learning Algorithms: A case for Extreme Gradient Boosting*, 5 Int'l J. of Advanced Rsch. in A.I. 22, 22 (2016), https://www.researchgate.net/publication/308043155_Prediction_of_Employee_Turnover_in_Organizations_using_Machine_Learning_Algorithms (last visited June 7, 2022) (discussing that in an analysis of voluntary turnover, "the strongest predictors for voluntary turnover were age, tenure, pay, overall job satisfaction, and employee's perceptions of fairness").

[25] hiQ_00053566 at 8 (listing push and pull factors).

training and validation, the 10% of individuals with the highest risk scores leave the organization at rates about 3-4 times higher than the lower risk employees."[26]

34. hiQ's emergence occurred during a key period of ever-rising voluntary exits (which increased 5% between 2016 and 2017), increasing the importance of hiQ's offering every year.[27]  The below graph from the Bureau of Labor Statistics shows a year-to-year increase in voluntary exits from 2009 to 2017.



35. Indeed, whatever the precise value, the costs of turnover have increased substantially with the post-pandemic "Great Resignation",[28] which some suggest is a new reality, not just a short-term, one-off phenomenon.[29]

36. Accordingly, I believe that if hiQ had remained fully operational, its Keeper offering would have become increasingly desirable for organizations seeking to retain top talent.  Additionally,

---

[26]   *See, e.g.*, hiQ_00059479 at 2; *see also* hiQ_00578764 at 60-73.

[27]   The Economics Daily, *Hires and quits rose in 2017*, U.S. Bureau of Labor Statistics (Mar. 23, 2018), https://www.bls.gov/opub/ted/2018/hires-and-quits-rose-in-2017.htm (last visited June 7, 2022).

[28]   Emma Goldberg, *All of Those Quitters? They're at Work*, N. Y. TIMES (May 13, 2022), https://www.nytimes.com/2022/05/13/business/great-resignation-jobs.html (last visited June 7, 2022).

[29]   Erica Pandey, *The Great Resignation has no end date*, Axios (May 6, 2022), https://www.axios.com/2022/05/06/great-resignation-turnover-lasting-remote-hybrid-work (last visited June 7, 2022).

CONFIDENTIAL

because Keeper had "first-mover advantage",[30] Keeper had an opportunity to be the dominant player in the people analytics space for the foreseeable future.

## 2.    Skill Mapper

37.  hiQ's second major product offering, Skill Mapper, was publicly launched in April 2017.[31]

38.  Like Keeper, Skill Mapper used data which LinkedIn members chose to make publicly available to offer insights about an organization's workforce.[32]  Skill Mapper presented a solution to organizations attempting to answer questions such as: "How much do you know about the people who work at your company?"; "What are the skills of our employees?"; "What skills can they learn?"; and "What could their next role be?"

39.  Based on my understanding of the Skill Mapper tool and the utility of knowledge of employee skillsets, this tool allowed the effortless creation of company skill inventories that could support the likes of:

   a.  *Launching agile project teams* – identifying and drawing together individuals with a unique mix of skills and capabilities that would otherwise not have been visible;

   b.  *Internal hiring* – providing immediate and challenging opportunities to present employees rather than having to depend on lengthy, expensive, and error-prone external recruiting;

   c.  *Job-sharing* – enabling employees to discover colleagues with whom they could collaborate during a period of partial leave for child-rearing, phased retirement, or career development; and

   d.  *M&A analysis* – developing and comparing taxonomies of the underlying skills and capabilities of a set of possible acquisition target companies, a value lens that would otherwise not be available.

40.  I am not aware of any product that existed prior to Skill Mapper's launch that allowed organizations to analyze the skill sets of their workforce in a similar fashion as hiQ's Skill Mapper.  While it is not unknown for companies to try to develop internal skill databases, I have found that it is difficult to convince employees to participate in – much less regularly update –

---

[30]  *See generally* Marvin B. Lieberman & David B. Montgomery, *First-Mover Advantages*, 9 Strategic Mgmt. J. 41 (1998), https://www.jstor.org/stable/2486211 (last visited June 5, 2022); *see also* Corporate Finance Institute, *First Mover Advantage* (February 6, 2022), https://corporatefinanceinstitute.com/resources/knowledge/strategy/first-mover-advantage/ (last visited June 5, 2022).

[31]  *See* Deposition of Darren Kaplan, May 4, 2022, at 41:8-15.

[32]  hiQ_00050578.

CONFIDENTIAL

internal skills inventories.[33]  hiQ's use of publicly available skills data offered a more accurate, complete, and up-to-date assessment of an organization's workforce than the understanding a company is likely to have obtained based solely on internal data.

41. Further, Keeper and Skill Mapper could have been combined to great effect – to the benefit of both employers and employees.[34]  Understanding skill mapping at the individual level and turnover prediction together could allow a company to build well-targeted initiatives to retain and redeploy critical talent and develop proactive initiatives to address emerging skills gaps, to the benefit of everyone involved.

## V.     hiQ's Use of LinkedIn as a Source of Publicly Available Profile Data

42. I understand that hiQ's offerings relied on information that LinkedIn members posted on their LinkedIn profiles and chose to make available to anyone with internet access, whether or not logged in to LinkedIn.

43. As discussed, *infra*, certain data points that hiQ incorporated into its products were internal to organizations.  However, internal data, such as that in corporate databases, is often stale and infrequently updated.  Unlike corporate databases, LinkedIn members will often keep their professional profiles, including skills data, up to date in order to network and maintain visibility in the labor market.

44. Currently, LinkedIn reports over 188 million members located in the United States.[35]  This is more than the 164 million individuals that the U.S. Bureau of Labor Statistics reports were in the civilian labor force as of May 2022.[36]

---

[33]  *See* Deposition of Darren Kaplan, May 4, 2022, at 41:20-42:9 ("Q.· From hiQ's perspective to be competitive with hiQ's products, did a product need to be using information gathered from public facing profiles?...  A. It was not just about a public profile, it was about employees not having to be poked and prodded and surveyed and asked and there was no other product out there that let employees just live their life instead of internally being prodded for information."); The Conference Board, *Navigating to a Skills-Based Approach to Talent Development*, Next Generation HR (Mar. 19, 2021), https://www.conference-board.org/topics/next-generation-HR/skills-based-to-talent-development (last visited June 5, 2022).

[34]  *See, e.g.*, VentureBeat, *Data-first tools score $1.8 billion to make US workers super productive*, May 11, 2017 https://venturebeat.com/2017/05/11/data-first-tools-score-1-8-billion-to-make-us-workers-super-productive/ (last visited June 7, 2022).

[35]  LinkedIn, *About Us*, LinkedIn Pressroom (2022), https://news.linkedin.com/about-us#Statistics (last visited June 5, 2022).

[36]  Economics News Release, *Table A-1. Employment status of the civilian population by sex and age*, U.S. Bureau of Labor Statistics (June 3, 2022), https://www.bls.gov/news.release/empsit.t01.htm.

CONFIDENTIAL

45. Active participation in LinkedIn is indeed commonplace and, in my experience, professionals in the high-value labor markets in the United States often view such active participation in LinkedIn as an essential component of their professional careers.

46. LinkedIn is therefore unique as a source for publicly available professional data.  To the best of my knowledge, there is no comparable resource that comes anywhere close to LinkedIn with regard to offering professional data and incorporating work history and well-delineated professional skills.[37]  While I am aware of special-purpose websites, such as GitHub or Kaggle, with information about capabilities in very specific skill sets (programming and data science respectively), such websites can complement, but not replace, the rich cross-section of professional data on LinkedIn.

### VI.   hiQ was an Industry Leader

47. In the 2015 through 2017 time period, I was the VP of HR for New Relic, a swiftly growing SaaS company with approximately 800 employees.  As the VP of HR, I was interested in any approach that could help the company reduce voluntary turnover.  Accordingly, in 2015, I came to learn about hiQ's offerings.

48. Beginning in or around August 2015, I had discussions with hiQ about licensing its Keeper product for New Relic.  Although ultimately I did not have the budget, I was enthusiastic about the creative work that hiQ was doing in the people analytics space and wanted to be a user of Keeper.

49. I attended several of hiQ's Elevate conferences, which brought together thought leaders in the people analytics space.  At each Elevate event, I was impressed by the quality of the hiQ staff and materials, the case studies presented, and customer testimonials.

50. I attended the morning session of hiQ's October 6, 2015 Elevate conference, as well as the March 1, 2016 and April 18, 2017 Elevate conferences.  During the April 18, 2017 Elevate conference, hiQ announced, to audience acclaim, the launch of its nascent Skill Mapper offering.

51. It was apparent from hiQ's Elevate events that hiQ was accessing public data sources and applying sophisticated algorithms to identify employees' attrition risk.  It was well understood that hiQ's offerings were uniquely valuable.

52. Based on my experience as CEO of the Saratoga Institute, an HR data analytics vendor with a well-established market position, I was also struck by the capability hiQ applied to positioning

---

[37]  *See also* Deposition of Daniel Francis, May 25, 2022 at 174:24-175:2 (Q. "Are you aware of any other general professional social networks in the United States? A. No, I'm not.")

their Keeper product, effectively building a new market niche that to the best of my knowledge had little to no prior presence in the HR marketplace.[38]

53. The Elevate events were high-energy, intellectually stimulating, and skillfully subtle in promoting hiQ's offerings.  In addition to high-quality materials and presentations, hiQ built a foundation of credibility through their association with companies well regarded in the HR analytics community, including CapitalOne, IBM, and Workday, as well as by the visible presence of thought-leaders like McKinsey and Josh Bersin.

54. In addition to hosting successful Elevate conferences, hiQ received public praise for its innovative technology.  For example, in January 2016, Peter Wagner, of Wing Venture Capital, authored an article in VentureBeat that highlighted hiQ.  That article began: "We are about to witness an upheaval in the enterprise software market that will put billions of dollars of IT spending up for grabs."[39]  The article noted that "[e]ven in HR, … new entrants are championing a data-first approach.  They include hiQ, which uses data science and public information to identify employee flight risks …."[40]  Mr. Wagner predicted that "[d]ata-first alternatives are already capturing beachheads that will allow them, some day, to topple empires."[41]  In September 2016, hiQ won the "Human Resources Executives Top Product of 2016" for its Keeper offering.[42]  And in May 2017, hiQ was described as "a data-first HR application" with the "ability to generate valuable 'synthetic' data."[43]

## VII.   LinkedIn as a Competitor of hiQ

55. I understand that LinkedIn Talent Insights ("LTI") was publicly announced at a LinkedIn Talent Connect conference on October 4, 2017 and that LTI was publicly launched on September 25, 2018.[44]

---

[39] VentureBeat, *A new breed of 'data-first' tools could soon dominate the enterprise*, Jan. 31, 2016 https://venturebeat.com/2016/01/31/a-new-breed-of-data-first-tools-could-soon-dominate-the-enterprise/ (last visited June 7, 2022).

[40] *Id.*

[41] *Id.*

[42] *See* hiQ Labs, *HiQ Labs People Analytics Solution Wins HR Tech Product of the Year*, Press Release (Sept. 21, 2016), https://www.hiqlabs.com/news-1/2016/9/21/hiq-labs-people-analytics-solution-wins-hr-tech-product-of-the-year (discussing Keeper winning the "Human Resources Executive's Top Product of 2016").

[43] VentureBeat, *Data-first tools score $1.8 billion to make US workers super productive*, May 11, 2017 https://venturebeat.com/2017/05/11/data-first-tools-score-1-8-billion-to-make-us-workers-super-productive/ (last visited June 7, 2022).

[44] LinkedIn's Responses to hiQ's Second Set of Interrogatories, No. 13.

CONFIDENTIAL

56. I also understand that, prior to the launch of LTI, LinkedIn considered hiQ's Skill Mapper to be a competitor of its as-yet-launched offering.[45]

57. I agree with LinkedIn that LTI was would have competed with hiQ's Skill Mapper. For example, LinkedIn's website states that LTI can be used to "[a]ddress current and future skill gaps using skills trends and competitive benchmarking."[46] Skill Mapper offered that very functionality and did so before the LinkedIn Talent Insights offering was available for general release.[47]

58. Because hiQ is no longer an active participant in the market, consumers have one less vendor to choose from for people analytics of public data relating to the attrition and skill inventories.

---

[45] LinkedIn's Responses to hiQ's Second Set of Interrogatories, No. 19; LINK_HIQ_000183741; LINK_HIQ_000042967; LINK_HIQ_000052184.

[46] LinkedIn, *LinkedIn Talent Insights*, LinkedIn Talent Solutions (2022), https://business.linkedin.com/talent-solutions/talent-insights (last visited June 4, 2022).

[47] *See* Deposition of Eric Owski, May 23, 2022, at 243:5-244:11 ("Q. Do you recall at this time [April 2017], did you view hiQ as a direct competitor to [Talent Insights]? A. I would have marked them as one of many companies that I would have been monitoring, but our product probably hadn't taken shape yet…I don't know precisely where we were on our own product development timeline at this point. They are a competitor in a really broad sense.").

CONFIDENTIAL

Dated: June 7, 2022

_____

Stephen B. McElfresh

# EXHIBIT A

# Stephen B. McElfresh

408.605.1870
SteveM@HRFutures.net

---

**HR Futures**                                                            **2000 - Present**
*"People engineering" consultancy addressing the people problems of fast-scaling organizations*

Principal and Founder
Strategy planning, interim HR management, executive coaching, workforce diagnostics, and employee engagement services.  Client companies include software, publishing, manufacturing, non-profits, utilities, higher education, medical devices, federal agencies, and biotech. Litigation consulting in employment-related matters.


**Duo Security**                                                               **2018 - 2019**
*User-centric zero-trust security platform for all users, all devices, and all applications*

Senior VP, People
Led all People functions with a 40% growth in staff in nine months while laying the foundation for an IPO. And then oversaw the people-related due diligence and integration for a $2.3B Cisco acquisition.


**New Relic**                                                                  **2008 - 2017**
*Fast growth SaaS provider of web analytic tools for IT, devops, and developers*

Vice President, People (2012 – 2017)
Consultant          (2008 – 2012)
Partnered with founder/CEO at initial funding to build business strategy, hire/develop leadership, evolve organizational design and culture/values. In the first four years, grew staff 100% each year. Opened offices in Ireland, UK, Australia, Switzerland, and Spain.  Led People operations and advised management through a successful IPO.


**Saratoga Institute**                                                         **1998 - 2000**
*Global leader in assessing the value of human capital, provided unique benchmarking and analytic services to help F500 companies to improve productivity, retention, and motivation.*

President & CEO
Led consulting, strategy, sales & marketing, accounting, and operations.  Grew revenues 18% YTY in 21-year old, previously stable business. Led creation of web-based product, business process redesign, and channel development. Integrated operations following acquisition by Spherion.


**SRI International**                                                           **1994 -1998**
*A world-class, multi-disciplinary research center, SRI International creates and brings to fruition new scientific discoveries for government and commercial clients worldwide.*

Vice President of Human Resources, Health, Safety & Security
Responsible for people strategy and HR operations, as well as Health/Safety and Security in an environment of exceptionally sensitive research. Top Secret security clearance. Managed organizational change and cultural renewal to build more focus, flexibility, and capability.

**Failure Analysis Associates** (now Exponent)                                  **1989 - 1994**
*Scientific, engineering, epidemiological and economic assessment services to industry and government; provides rapid, intelligible, and quality solutions to complex technical and scientific issues, generally in a litigation context.*

Director of HR                          (1989 – 1994)
Corporate Secretary                     (1992 – 1994)
Responsible for people strategy, human resources operations, and served as Corporate Secretary for this public company's Board and wholly-owned subsidiaries. Led people operations and advised management through a successful IPO. Drove reorganization to reduce overhead, accelerate hiring, and build out European operations.


**Friden Alcatel** (now Neopost)                                   **1984 - 1988**
*Second largest manufacturer of electronic mailroom equipment in North America.*

Vice President, HR

Responsible for people strategy and all HR operations and supporting sales training & development.


**OTHER**

- Advisor, PeopleTechPartners
- Equity Advisor, Roots (tryroots.io) and Cultivate.ai

**EDUCATION & CERTIFICATIONS**

- PhD, Social/Organizational Psychology, Boston College
- JD, Santa Clara University School of Law
- Senior Professional in Human Resources (former)


**PRESENTATIONS & CLASSES**

A list of presentations made and classes taught globally is available on request

**PROFESSIONAL SERVICE**

- President, Bay Area Human Resources Executive Council
- Board Member, Forensic Expert Witness Association, Northern California
- Reviewer, Academy of Management conference programs
- Trustee, Palo Alto University; Chair, Academic Affairs Committee
- Board of Directors, Bay Area Organizational Development Network
- Charter Member, SHRM National Panel on Human Capital Measurement & HR Metrics
- Sponsor/Facilitator, VPHR Forum
- Charter Member, SHRM Measurement and Metrics Standards Task Force,
- Conference Chair, Strategic Metrics and Analytics Annual Conference, 2002-2011
- Instructor for SHRM training throughout North America, India, and the Middle East

# EXHIBIT B

CONFIDENTIAL

## Materials Considered

| |
|---|
| hiQ's Complaint (ECF 1) |
| LinkedIn's Responses to hiQ's Second Set of Interrogatories |
| GlobeNewswire, *Joberate Launches J-index to Measure Job Seeking Behaviors of Fortune 100 Companies' Employees*, Aug. 7, 2014, https://www.globenewswire.com/news-release/2014/08/07/656920/29616/en/Joberate-Launches-J-index-to-Measure-Job-Seeking-Behaviors-of-Fortune-100-Companies-Employees.html |
| Erik van Vulpen, *What is People Analytics? An Essential Guide*, Academy to Innovate HR, https://www.aihr.com/blog/people-analytics/ (last visited June 5, 2022) |
| Elizabeth Ledet et. al., *How to be great at people analytics*, McKinsey & Co. (Oct. 2, 2020), https://www.mckinsey.com/business-functions/people-and-organizational-performance/our-insights/how-to-be-great-at-people-analytics |
| Paul Leonardi & Noshir Contractor, *Better People Analytics*, Harvard Business Review (Nov.-Dec. 2018), https://hbr.org/2018/11/better-people-analytics |
| IceHrm, *Evolution of the human resource information system*, Blog (Mar. 5, 2020), https://icehrm.com/blog/evolution-of-human-resource-information-system/ |
| Josh Bersin, *The Geeks Arrive in HR: People Analytics Is Here*, Forbes (Feb. 1, 2015), https://www.forbes.com/sites/joshbersin/2015/02/01/geeks-arrive-in-hr-people-analytics-is-here/?sh=1e6200a573b4 |
| Thomas H. Davenport et al., *Competing on Talent Analytics*, Harv. Bus. Rev. (Oct. 2010), https://hbr.org/2010/10/competing-on-talent-analytics |
| hiQ Labs, *HiQ Labs People Analytics Solution Wins HR Tech Product of the Year*, Press Release (Sept. 21, 2016), https://www.hiqlabs.com/news-1/2016/9/21/hiq-labs-people-analytics-solution-wins-hr-tech-product-of-the-year |
| Jon Burton, *Ask Visier: How Much Does it Cost to Replace an Employee?*, OUTSMART, https://www.visier.com/blog/ask-visier-how-much-does-it-cost-to-replace-an-employee/ (last visited June 5, 2022) |
| David G. Allen, *Retaining Talent: A Guide to Analyzing and Managing Employee Turnover*, SHRM Foundation (2008), https://blog.shrm.org/sites/default/files/reports/Retaining%20Talent%20A%20Guide%20%28Q1%29.pdf |
| Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Business $1 Trillion*, Gallup (Mar. 13, 2019), https://www.gallup.com/workplace/247391/fixable-problem-costs-businesses-trillion.aspx |
| Rachel Emma Silverman & Nikki Waller, *The Algorithm That Tells the Boss Who Might* Quit, WALL ST. J. (Mar. 13, 2015, 7:05 PM), https://www.wsj.com/articles/the-algorithm-that-tells-the-boss-who-might-quit-1426287935 |
| Thomas F. Mahan et al., *2020 Retention Report: Trends, Reasons & Wake Up Call*, Work Institute (2020), https://info.workinstitute.com/hubfs/2020%20Retention%20Report/Work%20Institutes%202020%20Retention%20Report.pdf (last visited June 5, 2022) |
| Denise McClain & Iseult Morgan, *Overwhelmed by Employee Turnover? Have Stay Conversations*, Gallup (Oct. 11, 2021), https://www.gallup.com/workplace/355238/overwhelmed-employee-turnover-stay-conversations.aspx |
| Rohit Punnoose & Pankaj Ajit, *Prediction of Employee Turnover in Organizations using Machine Learning Algorithms: A case for Extreme Gradient Boosting*, 5 Int'l J. of Advanced Rsch. in A.I. 22, 22 (2016), https://www.researchgate.net/publication/308043155_Prediction_of_Employee_Turnover_in_Organizations_using_Machine_Learning_Algorithms |
| The Economics Daily, *Hires and quits rose in 2017*, U.S. Bureau of Labor Statistics (Mar. 23, 2018), https://www.bls.gov/opub/ted/2018/hires-and-quits-rose-in-2017.htm |

CONFIDENTIAL

| |
|---|
| Emma Goldberg, *All of Those Quitters? They're at Work*, N. Y. TIMES (May 13, 2022), https://www.nytimes.com/2022/05/13/business/great-resignation-jobs.html |
| Erica Pandey, *The Great Resignation has no end date*, Axios (May 6, 2022), https://www.axios.com/2022/05/06/great-resignation-turnover-lasting-remote-hybrid-work |
| Marvin B. Lieberman & David B. Montgomery, *First-Mover Advantages*, 9 Strategic Mgmt. J. 41 (1998), https://www.jstor.org/stable/2486211 |
| Corporate Finance Institute, *First Mover Advantage* (February 6, 2022), https://corporatefinanceinstitute.com/resources/knowledge/strategy/first-mover-advantage/ |
| The Conference Board, *Navigating to a Skills-Based Approach to Talent Development*, Next Generation HR (Mar. 19, 2021), https://www.conference-board.org/topics/next-generation-HR/skills-based-to-talent-development |
| VentureBeat, *Data-first tools score $1.8 billion to make US workers super productive*, May 11, 2017 https://venturebeat.com/2017/05/11/data-first-tools-score-1-8-billion-to-make-us-workers-super-productive/) (last visited June 7, 2022) |
| LinkedIn, *About Us*, LinkedIn Pressroom (2022), https://news.linkedin.com/about-us#Statistics (last visited June 5, 2022) |
| Economics News Release, *Table A-1. Employment status of the civilian population by sex and age*, U.S. Bureau of Labor Statistics (June 3, 2022), https://www.bls.gov/news.release/empsit.t01.htm |
| VentureBeat, *A new breed of 'data-first' tools could soon dominate the enterprise*, Jan. 31, 2016 https://venturebeat.com/2016/01/31/a-new-breed-of-data-first-tools-could-soon-dominate-the-enterprise/ (last visited June 7, 2022) |
| LinkedIn, *LinkedIn Talent Insights*, LinkedIn Talent Solutions (2022), https://business.linkedin.com/talent-solutions/talent-insights |
| LINK_HIQ_000183741 |
| LINK_HIQ_000042967 |
| LINK_HIQ_000184275 |
| LINK_HIQ_000059739 |
| hiQ_00059479 |
| hiQ_00295369 |
| hiQ_00579668 |
| hiQ_00290109 |
| hiQ_00220250 |
| hiQ_00175495 |
| hiQ_00053566 |
| hiQ_00578764 |
| hiQ_00050578 |
| hiQ_00617973 |
| hiQ_00246632 |
| hiQ_00537015 |
| hiQ_00175141 |
| hiQ_00046957 |
| hiQ_00469707 |
| hiQ_00656949 |
| hiQ_00656994 |
| hiQ_00657010 |
| hiQ_00656978 |
| hiQ_00657026 |
| hiQ_00043006 |
| hiQ_00499774 |

CONFIDENTIAL

| |
|---|
| hiQ_00220336 |
| hiQ_00220369 |
| hiQ_00466143 |
| hiQ_00587342 |
| 2019.09.10 Electronic Frontier Foundation.pdf |
| 2019.09.23 ERE.pdf |
| 2019.01.02 Staffing Industry Analysis.pdf |
| Data Integration – Driving Attrition Prediction Workday and Andrew Kim hiQ.pptx |
| Data Integration – Innovations in Integrating Survey and External Data.pptx |
| Data Science Chris LeBaily Elevate Skills Clustering.pptx |
| Deposition of Darren Kaplan |
| Deposition of Genevieve Graves |
| Deposition of Daniel Francis |
| Deposition of Eric Owski |

Exhibit 87

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4  hiQ Labs, Inc.,                )
                                  )
5              Plaintiff,         )
                                  )
6       vs.                       )
                                  )
7  LinkedIn Corporation,          )
                                  )
8              Defendant.         )
   _____   ) Case No. 17-cv-03301-EMC
9                                 )
                                  )
10 LinkedIn Corporation,          )
                                  )
11         Counterclaimant,       )
                                  )
12            vs.                 )
                                  )
13 hiQ Labs, Inc.,                )
                                  )
14         Counter-defendant      )
                                  )
15

16

17              - CONFIDENTIAL -

18      REMOTE VIDEOTAPED EXPERT DEPOSITION OF

19          STEPHEN B. McELFRESH, Ph.D.

20     _____

21            Wednesday, July 20, 2022

22

23

24  REPORTED BY:
    ANGELA KOTT, CSR 7811
25  JOB NO: 10103971

1  record, have you opened the version of your report

2  that has been dropped into the chat and that has

3  been marked as Exhibit 650?

4      A.  Yes, I have.

5      Q.  And you have confirmed by reviewing that

6  electronic version of your report that it is a true

7  and correct copy of the report that you filed in

8  this case?

9      A.  To the best of my ability, to do that very

10  briefly, yes.

11     Q.  And you indicated that you have some

12  corrections to your report?

13     A.  Yes.

14     Q.  Can we go over those?

15     A.  Yes.  It's the only writing I have in the

16  room, and I will tear it up when I'm done with this.

17  But I inserted incorrectly a footnote 38.  It has no

18  citation because it shouldn't have been there.

19          (Reporter clarification)

20          MS. MILLER:  Yes.  Sorry.  I'm trying to

21  switch locations, I apologize, without interrupting

22  too much.  I'm settling into a new place.  Go ahead.

23  I should be good.

24  BY MR. COHEN:

25     Q.  Footnote 38 shouldn't be there?

1       A.   Should not be there.

2       Q.   Okay.

3       A.   There are four references to Mr. Kaplan's

4  deposition.  All of them cite April 4th, and they

5  should all cite his deposition on April 5th.

6            Those are footnote 16, 23, 31 and 33.

7       Q.   Okay.  Anything else?

8       A.   And there -- in paragraph 56 there is a

9  word missing.  The hyphenated phrase "its

10  as-yet-launched" should have "its

11  as-yet-not-launched."

12       Q.   Got it.  Anything else?

13       A.   That is all I have seen at the moment.

14  I'll dispose of the note.  I'll be right back.

15       Q.   Okay.  Thank you.

16            Dr. McElfresh, have you ever prepared an

17  expert report before?

18       A.   Yes.

19       Q.   About how many times?

20       A.   Three times.

21       Q.   And what was the nature of the case in each

22  of those three instances?

23       A.   To the best of my memory, one of them was a

24  wrongful termination case having to do with a

25  harassment investigation.

 1            One of them was a reasonable expectation of

 2   compensation in a wrongful death suit.

 3            I'm not sure I can place the third.

 4       Q.  Okay.

 5       A.  My memory is imperfect on those.

 6       Q.  And can you give me an estimate of when you

 7   prepared those reports?

 8       A.  Those would have been all at least ten

 9   years ago, and as much as 15 years ago.

10       Q.  And in connection with any of those cases,

11   were you ever deposed?

12       A.  I was deposed twice.  I don't think in

13   either case it was one where I prepared a report.

14       Q.  Okay.  I know you don't recall at least in

15   detail the third matter.  Was it employment related,

16   do you recall that?

17       A.  The report?  No, I don't -- I couldn't -- I

18   couldn't tell you at this moment.

19       Q.  Have you ever testified in court?

20       A.  I've testified twice.

21       Q.  And was that in the first two cases that

22   you identified for me, the wrongful termination and

23   the reasonable expectation of compensation?

24       A.  One was the wrongful termination.  The

25   other was a divorce case.

1      Q.   Have you ever submitted an expert report as

2    an industry expert?

3      A.   Can you define "industry expert" for me?

4      Q.   Well, let me try to get -- let me try to

5    clarify what I'm getting at.

6           I mean, you described for me testifying in

7    a wrongful termination case and a reasonable

8    expectation of compensation case.

9           Both of those, to my understanding, have to

10   do with employment law issues.

11          Is that accurate?

12     A.   Yes.  Employment issues.  The reasonable

13   expectation is not necessarily employment law.  I

14   mean, I wasn't -- anyway, it had to do with

15   compensation.

16     Q.   Understood.  And in the divorce case, you

17   were testifying about the treatment of separate

18   property that increased in value during the course

19   of the marriage?

20     A.   It was the analysis, the organizational

21   structure and development of that organization.

22     Q.   Right.  So my question to you is whether

23   you've ever testified as an industry expert.  So

24   provided testimony about a particular industry the

25   way in which the industry operates, the firms in

**Confidential**

1   that industry, the financing of the firms in that

2   industry, competition in the industry.  That's what

3   I'm getting at.

4        A.   Sorry.  No, I have not.

5        Q.   What was your assignment in this case?

6        A.   It was to discuss the history and

7   development of the field of people analytics and in

8   particular the -- what I perceived and understood to

9   be the market position and opportunity of hiQ.

10       Q.   Is there a reason why you didn't set out

11   your assignment in the report itself?

12       A.   There is not.

13       Q.   Okay.  Based on your prior testimony, it's

14   accurate to say that you haven't previously

15   testified as an expert before on the history and

16   development of the field of people analytics,

17   correct?

18       A.   That is correct.

19       Q.   If we turn to your report, Exhibit 650, am

20   I correct that paragraphs 9 through 13 contain the

21   summary of the opinions that you are offering here?

22       A.   Yes.

23       Q.   Are there any other opinions, and I

24   recognize this is a summary of what is discussed

25   further in the report, but are there any other

1   opinions beyond those that are summarized in

2   paragraphs 9 to 13 that you intend to offer in this

3   case?

4        A.   I don't know what will be asked of me, but

5   in terms of the report, those are the summary of my

6   opinions.

7        Q.   Well, let me ask it this way.  At this

8   point in time, do you have any other opinions that

9   you intend to offer beyond those that are summarized

10  in paragraphs 9 to 13 of your report?

11       A.   No.

12       Q.   Can you explain to me what you did in order

13  to prepare your report?

14       A.   I reviewed materials that were provided to

15  me by the law firm, as well as reviewing my memories

16  of my conversations and attendance at --

17  conversations with Mr. Kaplan and at least one of

18  his salespeople, and some of the other staff, as

19  well as the attendance at the Elevate conferences.

20       Q.   Did you do anything else?

21       A.   No.

22       Q.   How, do you know, were the materials that

23  were provided to you by the Quinn Emanuel firm

24  selected?

25       A.   I do not know how they were selected.

**Confidential**

1    Q.   Other than the documents that they provided

2  you with, did they share with you any information

3  that you relied upon in preparing your report?

4    A.   I can't think of any offhand, no.

5    Q.   What were the nature of the materials that

6  Quinn Emanuel shared with you?

7         MS. MILLER:  Objection.  I'm going to

8  caution the witness that you can share materials

9  that you relied on in your report, but materials

10  that you just reviewed generally, you shouldn't

11  identify them because they are attorney

12  work-product.

13        THE WITNESS:  The materials I relied on in

14  the report are listed in the exhibits.

15        Are you asking me also to characterize

16  those?

17  BY MR. COHEN:

18    Q.   That's fine.

19        Aside from the materials that were provided

20  to you by Quinn Emanuel, did you identify any

21  additional materials for purposes of your report?

22    A.   Yes.

23    Q.   What materials were those?

24    A.   I specifically was looking for any evidence

25  of a true competitor, and that was -- I was doing

**Page 23**

1  some searching in that regard.

2      Q.  **Where were you searching?**

3      A.  On Google.

4      Q.  **And what were you searching for?**

5      A.  Any firm that was using publicly sourced

6  data for turnover prediction.

7      Q.  **Okay.  Is it your view that only firms that**

8  **were using publicly sourced data for turnover**

9  **prediction -- strike that.**

10         **In your view, are the only competitors to**

11  **hiQ firms that were using publicly sourced data for**

12  **turnover prediction?**

13      A.  I'm sorry.  Could you say the question

14  again?

15      Q.  **Sure.  In your view, are the only**

16  **competitors that hiQ faced firms that were using**

17  **publicly sourced data for turnover prediction?**

18      A.  Well, in a business context, competition

19  comes in many forms.  You know, it's -- you know,

20  books compete with television.

21         So, you know, that's what I meant by "true

22  competitors."  Something who is doing a -- well, not

23  a similar product, but certainly there are other

24  things, like books that compete with television and

25  other things, other than a true competitor that

**Confidential**

1  competes with getting the attention of HR groups

2  that -- somebody who provides publicly sourced

3  termination prediction.

4      **Q.  What do you mean by the term "true**

5  **competitor"?**

6      A.  Well, somebody whose business model is

7  comparable, that is providing this very unique

8  analysis to the HR community.

9      **Q.  And what is -- what is your basis for**

10  **distinguishing between a competitor and a true**

11  **competitor?**

12      A.  Well, like I say, there are many, many

13  things that are competitive in one way or another.

14  I mean, as a chief HR officer, I have lots of

15  competitive investments that I can make with my

16  resources.

17          And in a very real sense, when I'm talking

18  to somebody like Xander, all of those are

19  competitive.  I mean, do I get more value out of

20  turnover prediction than I do out of increased

21  benefits?

22          Am I doing better if I improve my quality

23  of selection than I do with that kind of turnover

24  prediction?

25          So those are all competitive investments.

```
 1            THE WITNESS:  That has not -- that was not
 2    my conclusion.
 3    BY MR. COHEN:
 4        Q.  Since preparing your report, Exhibit 650,
 5    have you done any work in this case aside from
 6    preparing for the deposition?
 7        A.  I briefly reviewed two rebuttal statements
 8    and also a rebuttal to the rebuttals.  And I'm not
 9    sure on the authors of any of those at this moment.
10        Q.  In reviewing those rebuttal reports, did
11    they cause you to reconsider any of your opinions?
12        A.  No.
13        Q.  And what, if anything, did you do to
14    prepare to testify today?
15        A.  I reviewed the documents that are in the
16    exhibit, skimmed them.  You know, focused on that
17    which I cited, the parts of those that I cited.
18        Q.  Anything else?
19        A.  No.
20        Q.  Did you meet with the attorneys?
21        A.  I did.
22        Q.  For about how long?
23        A.  Perhaps three, four hours.
24        Q.  And who was it that you met with?
25        A.  Ms. Miller.
```

1      Q.   Anybody else there?

2      A.   I believe there was another attorney for

3  part of it, but I don't remember whom, and it was

4  only for part.

5      Q.   Your CV is attached as Exhibit A to your

6  report, Exhibit 650.

7           Is that correct?

8      A.   Yes.

9      Q.   And the CV, that is Exhibit A, that is

10  accurate?

11      A.   Yes.

12      Q.   And up to date?

13      A.   Yes.

14      Q.   You have a Ph.D. in social organizational

15  psychology.

16           Is that correct?

17      A.   That is correct.

18      Q.   And what is -- what was the subject matter

19  of your thesis?

20      A.   The subject matter of my thesis concerned

21  the development of power relationships between

22  husbands and wives in relation to what is referred

23  to as resource theory.

24      Q.   It was not in the field of HR; is that

25  correct?

1      A.  It was actually in the field of

2  organizational structure and dynamics.  I used

3  congeable pairing, but it's a metaphor for power

4  relationships more broadly.

5      **Q.  Did you write about or study in connection**

6  **with that HR relationships or was it focused on**

7  **congeable?**

8      A.  To the thesis, no.

9      **Q.  You have a law degree; is that correct?**

10      A.  That's correct.

11      **Q.  And are you a member of the Bar of**

12  **California?**

13      A.  I am not.  I never took the bar.

14      **Q.  You say that you taught at Boston College.**

15  **That's in your report at paragraph 5.**

16          **What did you teach?**

17      A.  I taught organizational dynamics,

18  organizational research, and other -- another class

19  I don't remember offhand.

20      **Q.  And when was that, approximately?**

21      A.  That would have been 1980, '81-ish.

22      **Q.  Understood.  Is that three classes that you**

23  **taught or --**

24      A.  It was three topics I taught for two

25  semesters, probably three to four sections each

1    semester.

2        Q.  Was any of that teaching related to the

3    human resources field?

4        A.  Organizational dynamics is a fairly

5    fundamental part of human resources.  I was not

6    talking about the technology of HR, per se, but how

7    practitioners can move into organizations and

8    understand their operations and dynamics.

9        Q.  Okay.  Let's turn to HR Futures.

10           If you could tell me -- I mean, you

11   explained briefly at the beginning what it is, but

12   if you could tell me what types of consulting you

13   provide, I would appreciate that.

14       A.  There are probably two general categories

15   that we've operated in.  One is analytics and people

16   analytics, and the second is HR operations.

17           I can go into more detail, if you wish.

18       Q.  If you would, starting with the first, what

19   types of consulting you provide relating to people

20   analytics?

21       A.  So I've done training with organizations

22   where I would say the general task was how to

23   reposition an HR leadership group to be more of an

24   active business contributor by thinking analytically

25   at monetizing their services, making cogent business

 1  decisions about investments.

 2          I've worked with a company on their --

 3  several companies on their analytics presentations,

 4  on how to become more focused and data driven in

 5  their decision-making, rather than just generating

 6  masses of data.

 7          Those are ones that come to mind at the

 8  moment.

 9      **Q.  Can you give me an estimation of how many**

10  **consulting engagements you've had relating to people**

11  **analytics, as you've described it?**

12      A.  Perhaps five, maybe six.

13      **Q.  Have you advised in connection with any of**

14  **those the purchase of people analytics products or**

15  **services?**

16      A.  I -- that has been a discussion item.

17  Whether I've "advised" sounds like making a

18  recommendation.  I do not make recommendations.

19      **Q.  Do you in connection with any of those**

20  **people analytics consulting engagements provide any**

21  **kind of analysis of the market for people analytics**

22  **products or services?**

23      A.  Again, it was a discussion item with some

24  of those clients.  Yeah.

25      **Q.  When you say it's a discussion item, what**

Stephen B. McElfresh, Ph.D.

1  do you mean by that?

2      A.  Well, I had at that point far more

3  experience in people analytics than most HR people.

4  And so my opinion about the status and evolution of

5  the technology was of interest to some people.

6      **Q.  Okay.  But as you testified, you were not**

7  **providing the recommendation, correct?**

8      A.  That is correct.

9      **Q.  And you did not provide an analysis of the**

10  **products or services that were available in the**

11  **people analytics market?**

12      A.  That is correct.

13      **Q.  Anything else relating to people analytics**

14  **from your consulting work that you haven't already**

15  **told me about?**

16      A.  Well, not in terms of client engagements.

17  I've also done a fair amount of public speaking on

18  the topic.

19      **Q.  Okay.  Tell me about that.**

20      A.  So I've talked to an array of HR groups.  I

21  put together the first program on people analytics

22  for the Society for Human Resources Management and

23  delivered that in many cities across North America,

24  as well as the Middle East, India.

25      **Q.  Timeframe on that?**

1       A.  I don't remember.

2       Q.  Would it have been in the 2011 through 2014

3    period relating to the topics discussed in

4    paragraph 4 of your report?

5       A.  I don't remember.

6       Q.  On your CV, one of the things that is

7    listed under HR Futures is "Litigation consulting in

8    employment-related matters."

9           Do you see that?

10      A.  Yes.

11      Q.  And is that the expert work that you

12   described earlier in your testimony?

13      A.  Yes.  Though, as you can tell from the

14   divorce cases, it's not necessarily a complete

15   description.

16      Q.  Understood.  You also held senior HR

17   officer roles at a number of companies.

18          Is that correct?

19      A.  Yes.

20      Q.  And if you could tell me briefly about

21   those companies, please.

22      A.  My first was a company called Friden

23   Alcatel, now called Neopost.  And let's see, we are

24   proudly described as the second largest mailing

25   equipment company in the world after Pitney-Bowes,

1   who has 94 percent of the marketplace.

2          And so I was the chief HR officer there for

3   I think roughly five years.  Left there to join a

4   firm then known as Failure Analysis, now Exponent,

5   and led their HR group for roughly another five

6   years.

7          Left there to join SRI International, a

8   large nonprofit research and development

9   organization.  And again, ballpark five years

10  leading their HR organization.

11         I was then asked to lead a company called

12  Saratoga Institute as the CEO.  Saratoga was at that

13  moment the premiere provider of HR analytics in the

14  world, I would contend.  But, of course, I was -- I

15  have a dog in that fight.

16         And did that for three years, I believe,

17  roughly.  And the primary task there was to maintain

18  the operation, but also to integrate after an

19  acquisition from a sole proprietorship to a

20  $4 billion corporation.

21      Q.  Okay.  Is Saratoga now owned by PWC?

22      A.  That is correct.

23      Q.  And was it owned by PWC at the time you

24  were there?

25      A.  No.

1      Q.   Okay.   New Relic and Duo Security are two

2   that you haven't told me about yet.

3      A.   Okay.   So when I left Saratoga at the

4   completion of the acquisition, I started my own

5   consulting firm, which we've talked about.

6           One of my early clients was a company

7   called Relic.   They had 17 employees.   I worked with

8   them as a consultant for five years.   And at that

9   point, the CEO came and asked if I would come inside

10   and run the HR group.

11          I was conflicted, but very interested in

12   the company.   So I came inside.   I didn't end my

13   consulting practice, but it was a very limited

14   practice at that point for the next five years while

15   I was at New Relic.

16          I left there fully intending to stay with

17   the consulting practice.   And probably a year later

18   was -- was drawn into a company called Duo to help

19   them take -- help take them public.

20          I had done that at New Relic, and they

21   wanted to use that expertise to go public.   They

22   ended up not going public after an acquisition by

23   Cisco.

24          I wasn't interested in being part of Cisco,

25   so I managed that integration and then left to

# Exhibit 88

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

hiQ Labs, Inc.,

      *Plaintiff and Counterclaim Defendant,*

    vs.

LinkedIn Corp.,

      *Defendant and Counterclaim Plaintiff.*

Case No. 3:17-cv-03301-EMC

**EXPERT REPORT OF**

**BENJAMIN A. SACKS**

**June 7, 2022**

**Amended June 22, 2022**

**Amended August 30, 2022**

CONTENTS

I.   Qualifications ........................................................................................................... 1

II.  Assignment and Summary of Opinions ............................................................. 2
     A.   Full Damages................................................................................................. 2
     B.   Subset damages ........................................................................................... 4
     C.   Organization of this Report ...................................................................... 5

III. Case Background................................................................................................... 5

IV.  The Value of hiQ on the Valuation Date ...................................................... 12
     A.   hiQ's Post-Money Value after Series B................................................. 13
     B.   hiQ was Likely to Raise a Successful Round C Shortly after the Valuation Date........... 17
          1.   Management .................................................................................... 17
          2.   Customers........................................................................................ 19
          3.   People Analytics Market and Competition ............................... 22
          4.   Channels and Partners .................................................................. 26
          5.   Technology ...................................................................................... 28
          6.   Other factors .................................................................................. 30
     C.   The Change in Value from Round B to the Valuation Date............................. 31
          1.   The Data on Similar Young VC-Backed Firms ............................ 31
          2.   Regression Analysis of the Change in Value from B to C Rounds ......................... 32
          3.   Discount for Time to Series C ...................................................... 35

V.   Other Valuation Methods Are Less Reliable in this Matter ............................. 37
     A.   Problems with the DCF Method for Valuing hiQ................................. 37
     B.   Problems with Applying the Standard Comparable Companies Approach to hiQ ........ 39

VI.  Subset damages ................................................................................................. 42
     A.   Subset damages from Existing Customers ............................................ 42
     B.   Damages from Loss of the Potential IBM Relationship........................ 44
     C.   Subset damages from Existing Customers and IBM............................. 44

CONFIDENTIAL

Appendix A: Curriculum Vitae of Benjamin Sacks

Appendix B: Materials Considered in Forming Opinion

Appendix C: Comparability of Firms in Our Data Set

CONFIDENTIAL

# I.   Qualifications

1. I am a principal at The Brattle Group, a global economic consulting firm headquartered in Boston, Massachusetts with additional offices in Washington, D.C., New York, Chicago, San Francisco, Brussels, London, Madrid, Rome, Sydney, Toronto, Beijing, and Shanghai.

2. As a financial economist, I routinely conduct financial analyses, including valuation analyses and assessments of damages. I received a B.A. in Mathematical Economics from Columbia University and an M.A. in Economics from the University of Chicago. I have more than twenty years' experience providing expert advice and testimony on the application of economics, finance, and statistics to valuations, damages, and determination of liability. I have testified on the valuation of startup firms, and the methods I used have been accepted by an International Tribunal in its Award on Quantum (Damages).[1] I have served as an expert in matters before federal and state courts, including the Delaware Court of Chancery, and before Tribunals constituted under bilateral and multilateral international treaties (i.e., in international arbitration). My analyses have been accepted as the basis for a damages award by a Federal Court.[2]

3. A copy of my CV is attached as Appendix A, including my testimony and publications. I am being compensated at a rate of USD $925 per hour for my time in this matter. My opinions are my own, and my compensation does not depend on my opinions or the outcome of the case.

4. My opinions and findings are based on information available to me when this report was prepared. The sources I considered on in writing this report are listed in Appendix B. I reserve the right to supplement and/or amend this report if and when new information becomes available, including any expert reports submitted by LinkedIn and any additional discovery in this matter.

---

[1] *CC/Devas (Mauritius) Ltd., Devas Employees Mauritius Private Limited, and Telcom Devas Mauritius Limited v. Republic of India*, PCA Case No. 2013-09, Award on Quantum, 13 October 2020.

[2] *Jason Rezaian, et al. v Islamic Republic of Iran, et al.*, United States District Court for the District of Columbia, Civil Case No. 16-1960 (RJL), Memorandum Opinion, November 21, 2019.

CONFIDENTIAL

# II.   Assignment and Summary of Opinions

This litigation concerns hiQ Labs, Inc. ("hiQ") as Plaintiff and Counterclaim Defendant, who was served a cease-and-desist letter on May 23, 2017 (the "C&D"),[3] by LinkedIn Corporation ("LinkedIn") as Defendant and Counterclaim Plaintiff. In the C&D, LinkedIn demanded that hiQ stop accessing LinkedIn and asserted various legal violations. The C&D had ramifications for hiQ's ability to conduct its business. I was asked by hiQ's counsel to:

a.   Assess the damages incurred by hiQ as a result of LinkedIn's actions. For the purposes of my analysis, I am instructed to assume that the C&D interfered with hiQ's existing and prospective contracts and business relationships, effectively destroying hiQ's business, and that LinkedIn is liable to hiQ for the damage that caused. The C&D was received by hiQ on May 23, 2017, which I consider to be the Valuation Date as of which I perform my valuation. ("Full damages").

b.   Separately, assess damages from lost profits, and hence lost cash flows, from existing clients and likely partnerships as of the time of the C&D ("Subset damages").

## A.   Full Damages

5.   I conclude that Full damages are the value of hiQ on the Valuation Date plus Pre-Judgment Interest ("PJI"), since the C&D destroyed the value of hiQ. Like all firms, the value of hiQ is equal to the present discounted value of cash flows it is expected to generate.[4] For young VC-backed firms like hiQ, most of that value comes from growth prospects, i.e., prospective profits.[5] In fact, many VC investments occur in firms that have not yet made a profit.[6] The basis of the

---

[3]   *See* LINK_HIQ_000002224 (May 23, 2017 C&D).

[4]   "Value today always equals future cash flow discounted at the opportunity cost of capital." Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance*, 13th Ed. McGraw-Hill Education, 2020, Sec.4-5.

[5]   Andrew Metrick. Venture Capital and the Finance of Innovation, 3rd Edition (p. 3). Wiley. Kindle Edition. ("… It is therefore typical for VCs to invest in small businesses – but they only do so when these small companies have a realistic chance to grow enough to become a large company within five to seven years after the initial investment. Such rapid growth is difficult to attain in most industries; therefore, VCs tend to focus on high-technology industries, where new products can potentially penetrate (or even create) large markets. ")

[6]   Andrew Metrick. Venture Capital and the Finance of Innovation, 3rd Edition (p. 185). Wiley. Kindle Edition, ("EV/Revenue: This is the multiple used in the quick-and-dirty analysis in the introduction to this chapter. At first glance, this multiple appears completely divorced from any cash flow rationale because no measure of profitability is included in the denominator. Nevertheless, this measure often provides the most useful valuation ratio, particularly for high-growth industries favored by VCs. In these industries, many companies

investment is, of course, that the growth prospects and future profitability of the company make it valuable today. Because the value of young VC-backed firms is mostly due to their growth prospects, the value of existing customers and contracts is only one component of the value of the firm.

6.  I calculate the value of hiQ on the Valuation Date to have been $69.6 million. I have not been asked to calculate PJI. This report does not account for any punitive damages that hiQ may be seeking in this matter.

7.  I value hiQ by estimating the change in its value from hiQ's Post-Money Series B value in June 2016 to its Pre-Money value on the Valuation Date.[7] I do so in four steps:

    a.  First, I calculate hiQ's Post-Money Series B value at $31.7 million.

    b.  Second, I consider hiQ's characteristics on the Valuation Date, focusing on changes since Round B, and find that hiQ had the characteristics of a firm that would have raised a Round C in the near future.

    c.  Third, I estimate a change in value from Round B to Round C, based on a regression analysis of Pre-Money Round C to Post-Money Round B value amongst a large set of comparable firms. Doing so, I estimate hiQ to have a Pre-Money Series C value of $87 million.

    d.  Fourth, to account for the fact that, hiQ was contemplating, but had not priced, a Round C when it received the C&D, I discount its value by 20%, reflecting the discount to Round C values contemplated in hiQ's contemporaneous ordinary course of business discussions.[8] I therefore estimate hiQ's value as of the valuation date at $69.6 million.

8.  Starting with the Series B value anchors the analysis to an arms-length market transaction, which reflects the market's view of all the complex factors that determine value in a young VC-backed firm. Using a regression analysis to calculate how hiQ's value would have changed bases my estimate on market data on the median change in value among a large number of firms similar in relevant part to hiQ. Basing the 20% discount on contemporaneous ordinary course

---

have negative EBIT and EBITDA, thus making it impossible to form reasonable multiples for those measures. Because revenue is never negative, the EV/Revenue multiple is always available.")

[7]   The "pre-money" valuation is the implied value of a startup from a funding round excluding the additional capital that will be raised from that funding round. The "post-money" valuation is the "pre-money" valuation from a funding round plus the additional capital raised in the funding round.

[8]   *See* Section IV.C.3.

3

discussions uses the knowledgeable parties' contemporaneous, non-litigation, evaluation of hiQ, its market, its competitors, and the financial environment.

9.  I use a regression approach because it is more reliable, given the facts and circumstances of this matter, than other more standard methods. As discussed in Section IV.C.3:

a.  A discounted cash flow ("DCF") analysis for a young firm requires, among other key inputs, long-term cash-flow projections.[9] In this case the record does not contain any such projections. In a DCF, the ultimate value is no more reliable than this input. Estimating this, and other, key inputs without an ordinary course of business projection (or even projections designed for a transaction) as a basis, will almost certainly have a substantially larger margin of error than the regression approach.

b.  A current-multiples-based valuation for hiQ (e.g., a comparables analysis) is less reliable than the regression approach for several reasons. First, many young VC-backed firms – like hiQ – have negative earnings, so only revenue multiple can be used. However, a revenue multiple is often noisy and often inaccurate given the high variance in outcomes and revenue trajectories of early-stage firms similar to hiQ, and the PitchBook data on revenue is somewhat unreliable. Second, actually observed Series B and C revenue multiples vary widely and there is little information (other than the observed multiple from Round B, which I use and which places hiQ in a reasonable part of the range) on which to evaluate them.

## B.    Subset damages

10. I conclude that Subset damages are $1.6 million. This figure includes damages from lost profits on (1) certain existing customers and (2) hiQ's relationship with IBM.

11. I calculate expected profits from each customer as the annual profits from that customer, modeled to recur with a probability of renewal each year, discounted back to present value. I calculate the expected profitability from a partnership with IBM similarly, with minor adjustments for proposed contractual terms and timing.

---

[9]   *See* Section V.A for a discussion of why these projections must be long-term, as well as the other parameters one must estimate to value a young rapidly growing private firm.

## C.    Organization of this Report

12.   The rest of this report proceeds as follows: Section III provides background on the case and hiQ; Section IV outlines the regression analysis approach and data I employ to estimate the valuation of hiQ at the time of the Valuation Date; Section V explains why this method is superior to other valuation methods which are ill-suited for the hiQ context, and; Section VI calculates Subset damages; and Section VII is an Appendix on Comparability of Firms in our Data Set.

# III.  Case Background

13.   hiQ was founded in 2012 and is based in San Francisco, California.[10] The company develops and offers a predictive cloud-based SaaS platform for employee selection, development, and retention, including two key HR analytic products utilizing publicly available LinkedIn data:

   a.   *Keeper* (launched in 2014) – a product that provides predictive analytics designed to predict employee turnover before it occurs[11]; and

   b.   *Skill Mapper* (launched April 2017) – a product that provides information about employee skills and skill gaps, and maps the distribution of these skills across organizations.[12]

14.   hiQ's scalable platform relies on information derived from public (i.e., LinkedIn) and, in some instances, private data sources. hiQ's products were engineered to be easy to use and to deliver immediate impact for clients.[13] The Company's customers can receive actionable results in just a few weeks of purchasing hiQ's services.[14] Prior to the C&D, hiQ's customers included high profile companies such as ████████ Pfizer, Gap, eBay, Celgene, and Comcast.[15]

---

[10]   *See* hiQ_00004033 at -037 (August 19, 2016 hiQ Valuation discussing hiQ background).

[11]   While certain documents indicate that Keeper was launched in the 2015 time period (*see, e.g.*, hiQ_00003275 at -299 (May 12, 2016 Board Deck indicating Keeper was launched in October 2015), I understand that hiQ had was offering certain Keeper functionality as early as 2014 before it had arrived at the name "Keeper" (*see, e.g.,* hiQ_00003835 (September 26, 2014 Meraki, LLC Order Form describing the "services" as "hiQ Control Center") and hiQ_00003639 (June 9, 2014 ████████ Statement of Work identifying one of the "services" as "Run existing orgStar's attrition models").

[12]   hiQ_00592515 at -518 (January 17, 2017 email from S. Macomber to D. Kaplan indicating that Skill Mapper would be released on April 18, 2017.

[13]   hiQ_00004033 at -037 (August 19, 2016 hiQ Valuation).

[14]   *See* hiQ_00004086 at -091 ("hiQ Investor Deck July.pdf", slide 'WITHOUT hiQ IT IS EXPENSIVE AND SLOW'.)

[15]   hiQ's Supplemental Responses to Second Interrogatories, May 13, 2022, pp. 4-5.

CONFIDENTIAL

15. The market for people analytics solutions is on the rise worldwide. People analytic products are used for a variety of applications including talent acquisition, training programs, performance evaluation, real time retention prediction, employee success prediction, and mapping the distribution skills across organizations.[16] In 2020, the people analytics market was valued at $2.03 billion and is expected to reach $4.2 billion by 2026.[17]  North America was the largest global people analytics market in 2020.[18]

16. More than 50 percent of companies now actively use social network and external data to understand attrition, retention and other performance metrics.[19] In 2018, more than 80 percent of organizations indicated that people data was an important or very important priority.[20] However, around the same period, only 8 percent of organizations reported they have usable data, while only 9 percent believed they have a good understanding of the talent factors that drive performance.[21] Furthermore, a majority of North American CEOs indicated that their organizations "lack the ability to embed data analytics in day-to-day HR processes consistently and to use analytics' predictive power to propel better decision making."[22]

---

[16]  *See* Expert Report of Stephen B. McElfresh, June 7, 2022, Section III ("People Analytics") and Section IV ("hiQ's Offerings"), submitted in this matter. *See also* Stacia Garr and Priyanka Mehrotra, "People Analytics Technology 2022: Executive Summary", RedThread Research, May 17, 2022, p.9 (last accessed June 3, 2022: https://redthreadresearch.com/pat-2022-complimentary/?).

[17]  "Global People Analytics Markets Outlook Report 2021: Market was Valued at $2.03 Billion in 2020 and is Expected to Reach $4.24 Billion by 2026, Growing at a CAGR of 13.08%", PR Newswire, October 28, 2021, (last accessed June 3, 2022: https://www.prnewswire.com/news-releases/global-people-analytics-markets-outlook-report-2021-market-was-valued-at-2-03-billion-in-2020-and-is-expected-to-reach-4-24-billion-by-2026--growing-at-a-cagr-of-13-08-301410895.html).

[18]  "Global People Analytics Markets Outlook Report 2021: Market was Valued at $2.03 Billion in 2020 and is Expected to Reach $4.24 Billion by 2026, Growing at a CAGR of 13.08%", PR Newswire, October 28, 2021, (last accessed June 3, 2022: https://www.prnewswire.com/news-releases/global-people-analytics-markets-outlook-report-2021-market-was-valued-at-2-03-billion-in-2020-and-is-expected-to-reach-4-24-billion-by-2026--growing-at-a-cagr-of-13-08-301410895.html).

[19]  2017 Deloitte Global Human Capital Trends, Deloitte Report, p. 100, (last accessed June 2, 2022: https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/central-europe/ce-global-human-capital-trends.pdf).

[20]  2018 Deloitte Global Human Capital Trends, Deloitte Report, p. 5, (last accessed June 2, 2022: https://www2.deloitte.com/content/dam/insights/us/articles/HCTrends2018/2018-HCtrends_Rise-of-the-social-enterprise.pdf).

[21]  2017 Deloitte Global Human Capital Trends, Deloitte Report, p. 7, (last accessed June 2, 2022: https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/central-europe/ce-global-human-capital-trends.pdf).

[22]  ███████████████████████████████████████████████████████████████

17. As a result, there was a strong, growing demand for companies like hiQ that provide such analytics solutions. The main drivers of this growth include businesses' growing interest in workforce planning and recruiting more specific or the "right people"; growth in HR technology and innovation; and an increasingly competitive landscape.[23] This demand for people analytics technology has continued into the present, where demand increased 53% from 2020 to 2021.[24]

18. Today, key players in the people analytics industry include LinkedIn, IBM, Koch Industries, MicroStrategy Incorporated, Oracle, Ultimate Kronos Group (UKG), SAP, Workday, BambooHR, Workday People Analytics, and Innovisor.[25]

19. In 2017, hiQ was an industry leader in this space,[26] with a strong executive and data science team that included several ex-LinkedIn and Google People Analytics leaders.[27] The Company's leadership and tech team included:



---

[23]  "The Rise of Analytics in HR", LinkedIn Report, p. 6, (last accessed June 2, 2022: https://business.linkedin.com/content/dam/me/business/en-us/talent-solutions/talent-intelligence/workforce/pdfs/Final_EMEA_Rise-of-Analytics-Report.pdf).

[24]  "Demand for People Analytics Tech Soared by 53% in 2021, According to RedThread Research, Driven by the Need to Improve Employee Experience," WFMZ News, May 17, 2022, (last accessed June 2, 2022: https://www.wfmz.com/news/pr_newswire/pr_newswire_technology/demand-for-people-analytics-tech-soared-by-53-in-2021-according-to-redthread-research-driven/article_d366bd7c-2eb6-5714-8fb3-d0fe2ed3179f.html).

[25]  *See* "People Analytics Market – Global Outlook & Forecast 2021-2026 Featuring Key Vendors – IBM, Koch Industries, MicroStrategy, Oracle, Ultimate Kronos Group (UKG), SAP, Workday – ResearchAndMarkets.com", Business Wire, October 28, 2021, (last accessed June 2, 2022: https://www.businesswire.com/news/home/20211028005571/en/People-Analytics-Market---Global-Outlook-Forecast-2021-2026-Featuring-Key-Vendors---IBM-Koch-Industries-MicroStrategy-Oracle-Ultimate-Kronos-Group-UKG-SAP-Workday---ResearchAndMarkets.com). "Insights Report – Human Resources Technology: Empowering Talent and Enterprises Through Technology", Klecha & Co., November 2021, at pp. 9-10, (last accessed June 3, 2022: https://www.klecha-co.com/last-research/human-resources-technology-empowering-talent-and-enterprises-through-technology/). *See also* Stacia Garr and Priyanka Mehrotra, "People Analytics Technology 2022: Executive Summary", RedThread Research, May 17, 2022, p.9 (last accessed June 3, 2022: https://redthreadresearch.com/pat-2022-complimentary/).

[26]  *See* Marlene Jia, "113 Enterprise AI Companies You Should Know," Venture Beat, April 23, 2017 (last accessed June 6, 2022: https://venturebeat.com/2017/04/23/113-enterprise-ai-companies-you-should-know/. (Listing hiQ Labs as one of 9 key firms in the HR and talent industry engaged in enterprise AI.)

[27]  See hiQ_00 p0561 (Presentation: "People Analytics For Talent Retention"): hiQ predecessor Orgstars investor presentation highlighting team members from Google People Analytics (Michael West, people analyst, Employee #2; Ryan Hammond, PhD, People Analyst, Employee #4) and LinkedIn (Sherman Hu, LinkedIn's first direct sales rep and employee #61; Kevin Schlaufman, former Senior Data Scientist at LinkedIn; and Scott Nicholson, former Data Scientist at LinkedIn.) Sherman Hu LinkedIn Profile (last accessed June 6, 2022: https://www.linkedin.com/in/sherman); Kevin Schlaufman LinkedIn Profile (last accessed June 6, 2022:

a.   Rob DeSantis – Co-founder, strategic advisor, investor, and board observer, experienced serial entrepreneur, angel investor and former Board Member of LinkedIn, co-founder of Ariba.[28]

b.   Darren Kaplan – Co-founder and former CEO, holds two provisional patents for predicting employee culture fit and performance.[29]

c.   Genevieve Graves, Ph.D – Advisor, former Chief Data Scientist and Chief Science Officer, former astrophysics researcher at UC Berkeley and Princeton.[30]

d.   Mark Weidick – CEO (starting February 2017), an experienced entrepreneur and CEO whose pre-hiQ successes include growing Cisco's TelePresence video business from startup to $1B and the $420M acquisition of Savi Technology.[31]

e.   Scott Nicholson – former Chief Science Officer, former Team Lead in Data Science at LinkedIn and Chief Data Scientist at Accretive Health.[32]

f.   Darin Medeiros – VP of Sales, recruited the first enterprise team at LinkedIn and grew HackerRank from 9 to 70 employees while growing revenue 10x in 12 months.[33]

---

https://www.linkedin.com/in/kevin-schlaufman-2b36012b). Scott Nicholson LinkedIn Profile (last accessed June 6, 2022: https://www.linkedin.com/in/scottnicholsonphd); See also hiQ_00004086 (Presentation: "People Analytics to Protect Your Talent") hiQ presentation highlighting Rob DeSantis as an early investor and board member at LinkedIn, Darin Medeiros as having recruited the first enterprise team at LinkedIn, and Manisha Gupta as having had global leadership roles at LinkedIn and eBay. At LinkedIn, Gupta was a Founding Leader of the Global Technical Product Consulting & Partnership. Manisha Gupta LinkedIn Profile, (last accessed June 6, 2022: https://www.linkedin.com/in/manishagupta;  See also at -988 (hiQ presentation concluding with an image of hiQ team members Sherman Hu and Steven Perez with LinkedIn cofounder Reid Hoffman from their days at LinkedIn, respectively as a direct sales rep and Enterprise Territory Manager. Sherman Hu LinkedIn Profile (last accessed June 6, 2022: https://www.linkedin.com/in/sherman); Steven Perez LinkedIn Profile (last accessed June 6, 2022: https://www.linkedin.com/in/stevenperez). See also DeSantis_00000350 (Presentation describing Ryan Hammond, hIQ Head of People Analytics, as previously working in HR analytics at Merck.

28   hiQ_00004086 at -098 (Presentation: "People Analytics to Protect Your Talent"). *See also* Videotaped Deposition of Robert J. DeSantis, taken remotely via Zoom, May 17, 2022, ("DeSantis Deposition"), 11:17-12:4, 16:17-17:1.

29   *See* hiQ_00004086 at -098 (Presentation: "People Analytics to Protect Your Talent").

30   *See* hiQ_00004086 at -098 (Presentation: "People Analytics to Protect Your Talent").

31   hiQ_00685964 (February 16, 2016 – Mark Weidick's Employment Agreement) and Mark Weidick's LinkedIn Profile, (last accessed: June 3, 2022, https://www.linkedin.com/in/weidick/).

32   Scott Nicholson LinkedIn Profile (last accessed June 6, 2022: https://www.linkedin.com/in/scottnicholsonphd).

33   *See* hiQ_00004086 at -098 (Presentation: "People Analytics to Protect Your Talent").

g.  Manisha Gupta – former Vice President of Products, former Global Head of Product at eBay, and former Founding Leader for LinkedIn's Global Technical Product Consulting & Partnership group.[34]

h.  Michael Housman, Ph.D – Workforce Scientist in Residence, former Chief Analytics Officer at Cornerstone OnDemand, and author of peer-reviewed articles on workforce economics that have been profiled by major media outlets.[35]

20.  hiQ had attracted a number of high profile and valuable investors and partners, including:

a.  ███████ – an A round investor, Board Observer and former customer.[36]

b.  The Corporate Executive Board (CEB), since bought by Gartner – an A round investor and Board Member.[37]

c.  Gary Vaynerchuk – Round B investor, Board Member[38] and named partner of a venture capital firm who was also an early investor in ███████ Twitter, Tumblr and Snapchat.[39] Vaynerchuk's investment was backed by angel investor and billionaire Stephen M. Ross,[40] founder of RSE Ventures, a private investment firm.[41]

21.  hiQ had a partnering agreement with ███████ to co-develop a pipeline of hiQ clientele / subscriptions from ███████ large and established network of clients. ███████ "loved the idea that hiQ could create a risk profile at the employee level and that they could take those insights and put them into action to help companies retain their best and brightest

---

34  Manisha Gupta LinkedIn Profile, (last accessed June 6, 2022: https://www.linkedin.com/in/manishagupta).

35  *See* DeSantis_00000350 at -359.

36  DeSantis Deposition, 61:18-62:23, 68:5-69:4 . *See also* hiQ_00580704 (August 23, 2017 email identifying ███████ ███████ as Board Observer); hiQ_00678399 (Series A Preferred Stock Purchase Agreement).

37  DeSantis Deposition, 35:16-22, 68:15-69:4; hiQ_00678399 (Series A Preferred Stock Purchase Agreement identifying Jesse Levin of CEB as Board Director)

38  DeSantis Deposition 84:5-8, 101:22-103:12; *see also* Videotaped Deposition of Genevieve Graves, taken remotely via Zoom, May 25, 2022, 304:13-17 ("Graves Depositions"). ("Gary Vaynerchuk was the newest board member and an investor.")

39  *See* hiQ_00676973, which identifies Vaynerchuk as a board member as of Series B. ███████

40  DeSantis Deposition, 101:22-102:13.

41  See RSE Ventures, Stephen M. Ross Biography (last accessed June 6, 2022: https://rseventures.com/team-members/stephen-m-ross/).

CONFIDENTIAL

employees."[42] ███████ had sold hiQ services to several of its clients including Whole Foods, Anheuser Busch, and Bristol Myers Squibb.[43]

22. hiQ also had a partnering arrangement with CEB, who sat on hiQ's board. hiQ participated in CEB venture development programs, and had access to the CEB membership network as a pipeline of potential customers. After CEB's investment to own 11.7% of hiQ,[44] hiQ received operational guidance from CEB, and participated in CEB Ventures, Talent Neuron, and Workforce Surveys and Analytics Collaboration programs.[45] CEB facilitated introductions with American Express, Comcast, eBay, Expedia, Gartner, Mastercard, Pepsi, and Salesforce.[46] hiQ subsequently contracted with eBay, American Express, Comcast, eBay, Mastercard, and Pepsi.[47]

23. hiQ initiated and hosted the Elevate industry conferences that brought together customers, investors, potential partners, friends, and industry thought leaders.[48] In addition to fostering the budding people analytics community, hiQ's Elevate events showcased hiQ's offerings to the industry and to potential customers and allowed hiQ to further it's relationships with key investors through co-hosting of panels, among other networking related activities.[49]

24. In June 2015, hiQ raised $6.6 million in its Series A round, selling 24 million Series A Preferred shares at $0.2707 per share. In June 2016, hiQ raised another $5 million in its Series B round, selling 9 million Series B Preferred shares at $0.5429 per share. The B funding round implied a

---

[42] DeSantis Deposition, 62:5-15.

[43] hiQ_00003783 (███████ - Anheuser Busch Sales Order); hiQ_00578479 (███████ - Barclays Morgan Stanley Sales Order); hiQ_00578500 (███████ - Bristol-Myers Squibb Sales Order); hiQ_00003797 ([Redacted] - SAB Miller Sales Order); hiQ_00175359 (███████ - Sprouts/Whole Foods Sales Order).

[44] hiQ_00484052 (July 22, 2015 email thread regarding CEB investment.)

[45] hiQ_00484690 (May 28, 2015 email thread regarding CEB site visit and CEB product groups.)

[46] hiQ_00245781 (June 10, 2015 email thread regarding eBay, Salesforce, Comcast and other prospects); hiQ_00253109 (January 19, 2017 email thread regarding meeting with Gartner); hiQ_00388193 (July 15, 2014 email generated by website contact form referencing referral by American Express); hiQ_00591204 (July 24, 2015 email thread regarding sales prospects with Pepsi, Expedia, and others); hiQ_00626383 (January 6, 2017 email thread regarding Gartner relationship.)

[47] hiQ_00004345 (HiQ Revenue Deferred Revenue July '17.xlsx) ('Rev-Def Rev' tab).

[48] hiQ's Responses to LinkedIn's First Set of Interrogatories, July 29, 2021, ("Responses to First Set of Interrogatories") Response to Interrogatory No. 6; DeSantis Deposition, 38:17-21; hiQ_00220250 (January 3, 2016 Santa Clara Elevate Agenda); hiQ_00220268 (May 17, 2016 NY Elevate Agenda).

[49] *See* hiQ_00579668 (October 6, 2015 San Francisco Elevate Agenda); hiQ_00220250 (March 1, 2016 Santa Clara Elevate Agenda); hiQ_00220268 (May 17, 2016 NY Elevate Agenda); hiQ_00220284 (October 6, 2016 Intel Elevate Agenda); hiQ_00597596 (April 18, 2017 Silicon Valley Elevate Agenda); *See* Expert Report of Stephen B. McElfresh, June 7, 2022, Section VI ("hiQ was an Industry Leader").

$31.7 million value for hiQ.[50] Gary Vaynerchuk and Steven M. Ross bought over 99% of the B preferred shares.[51]

25. In or around Q3 2016 hiQ began developing its Skill Mapper offering.[52] hiQ publicly launched Skill Mapper at its April 18, 2017 conference.[53]

26. In or around January 2017 hiQ hired a professional CEO, Mark Weidick, to grow and scale the firm.[54] Between June 2016 and May 2017, hiQ was in discussions to partner with IBM PwC, and JobVite.[55]

27. As of the Valuation Date, hiQ had greater trailing twelve-month revenue, bookings, renewals, and average customers than as of the Series B round.[56]

28. In May 2017, when it received the C&D, hiQ was contemplating a Round C in the next few months and was in the process of raising funds through interim notes linked to a future Round C.[57]

---

[50]  Section IV.A.

[51]  *See* hiQ_00004130 (Hi Q - Summary and Detail Capitalization (2016.12.31).xlsx) ("Detail Tab," row 124). Vaynerchuk and Ross bought 9,209,799, or 99.5%, of Series B Preferred Stock under SMR Holdings, LLC. See also, DeSantis disposition, 101:22-102:13.

[52]  Graves Deposition, 202:18-23 ("Skill Mapper was in development starting, I believe, in Q3 of 2016. So fall, sort of late summer, fall, winter 2016, and then into 2017. But I believe we started development of that in Q3 of 2016.").

[53]  hiQ_00592515 at -518 (January 1, 2017 email from S. Macomber to D. Kaplan indicating that Skill Mapper would be released on April 18, 2017); hiQ_00597596 at -517 (April 18, 2017 Elevate Agenda announcing Skill Mapper).

[54]  Videotaped Deposition of Mark Weidick, taken remotely via Zoom, May 23, 2022, Volume 1, 19:1-13 ("Weidick May 23, 2022 Deposition"). (M. Weidick testifies that he "started [as CEO of hiQ] in February of 2017" and was "probably [given the offer] in the January 2017 time frame"); hiQ_00685964 (February 15, 2017 - Weidick's Employment Agreement).

[55]  See Section IV.B.4.

[56]  See Section IV.B.2.

[57]  *See, e.g.,* hiQ_00485279 (May 16, 2017 email from M. Weidick to D. Kaplan); hiQ_00485309 (May 16, 2017 email from S. Trivedi to D. Kaplan and R. DeSantis); hiQ_00485317 (May 16, 2017 email from D. Kaplan to M. Weidick and R. Desantis); hiQ_00557342 ((May 16, 2017 email from D. Kaplan to M. Weidick and R. Desantis), and hiQ_00592515 (January 17, 2017 email from S. Macomber to D. Kaplan).

CONFIDENTIAL

# IV.  The Value of hiQ on the Valuation Date

29.  I value hiQ on the Valuation Date with a regression approach. The main steps are:

    a.  First, I calculate hiQ's Post-Money Series B value at $31.7 million.

    b.  Second, I consider hiQ's characteristics on the Valuation Date, focusing on changes since Round B, and find that hiQ had the characteristics of a firm that would have raised a Round C in the near future.

    c.  Third, I calculate the change in value from Round B to Round C, based on regressions of Pre-Money Round C to Post-Money Round B values amongst a large set of firms, similar to hiQ in relevant part. I calculate hiQ's Round C value to be $87.0 million.

    d.  Fourth, to account for the fact that hiQ was anticipating, but had not priced, a Round C when it received the C&D, I discount its value by 20%, reflecting the discount to Round C values contemplated in hiQ's contemporaneous ordinary course of business discussions.[58] This yields a final value of $69.6 million.

30.  hiQ's Series B value reflects the market's view of the combined impact of all of the factors that that affect valuation, including: long-term cash flows, growth rates, eventual profit margins, odds of success or failure, competitive conditions, technical obstacles, customer reactions, customer retention, partnering opportunities, and investor retention percentage. By starting the analysis with the Series B Valuation, I avoid having to estimate from the ground up the impact of all of these factors and their impact on valuation. Instead I ask the more limited question: how would the Series B value change to the Valuation Date?

31.  My analysis of data of comparables – young, VC-backed firms in similar industries – and the 20% discount based on contemporaneous ordinary course of business discussions answers this question. It shows that there are reliable statistical relationships between Post-Money Series B and Pre-Money Series C valuations that can be used to predict how hiQ's value would change from its Post-Money B value to a Round C, and the discount between its value on the Valuation Date and at a Round C.

32.  Section IV.A calculates hiQ's Post-Money value at the time of Series B to be $31.7 million, and explains why a Post-Money valuation (as opposed to pre-money) is the right value to start with. Section IV.B shows that, on the Valuation Date, hiQ had the characteristics of a firm that would

---

[58]  *See* Section IV.C.3.

CONFIDENTIAL

raise a Series C in the near future. Section IV.C shows that hiQ's value would be expected to increase to $87.0 million by its Series C, and that a 20% discount is appropriate to reflect that the C&D occurred a few months before hiQ would have raised its Round C.  For a final value of $69.6 million.

## A.   hiQ's Post-Money Value after Series B

33. I calculate hiQ's Post-Money value after its Round B as $31.7 million. PitchBook lists hiQ at $41 million Post-Money. I confirm that this is approximately the value that one would get assuming that all shares of hiQ have the same value as the preferred B shares sold in Round B, and accounting for options and warrants.[59] However, such valuation do not account for the fact that the B preferred shares are more valuable than other shares because of their preference. I use a standard option value approach to account for this fact, and conclude that the fair Post-Money value of hiQ is $31.7 million.

34. Series B investors paid $5.0 million for 9.2 million shares of B Preferred stock, a price of $0.5429 per share.[60] After that transaction – *i.e.*, on a Post-Money basis – there were 67.8 million shares (both preferred and common) outstanding. There were an additional 13.1 million shares that would be issued if certain options and warrants were exercised. All such shares, options and warrants would be exercised if hiQ's per share value exceeded $0.10, and the total value of the cost to exercise was $875.2 thousand.[61] On a fully diluted basis, that is 81.0 million shares.

35. Multiplying the $0.5429 per share value (for B Preferred) by the 81.0 million fully diluted shares, and subtracting the $875.2 thousand from the option and warrant exercise, yields $43.1 million. The PitchBook post-money value of $41 million is relatively consistent with this value.[62]

36. That value, however, overstates hiQ's actual value because the B Preferred shares have a higher per share value due to their preference at exit. The B preference is that, at a liquidation or liquidity event, the B's (along with one other class of share) receive all value up until they have received $0.5429 per share ($0.4343 per share for B1), which is the amount of their

---

[59]  S*ee* hiQ_00004033 (August 19, 2016 Alvarez & Marsal Valuation Services, LLC - *Hi Q Labs, Inc. Valuation of a Minority, Non-Marketable Common Stock Interest As of June 6, 2016*. ("A&M")).

[60]  hiQ_00676973 at -009 (June 6, 2016 Series B Stock Purchase Agreement).

[61]  *See* A&M for details on options and warrants as of Round B.

[62]  PitchBook, *hiQ Labs (hiQ) Profile,* PitchBook, (Last Accessed June 6, 2022: https://my.pitchbook.com/profile/101867-68/company/profile).

CONFIDENTIAL

original investment. This breakpoint occurs when hiQ's value is $7.4 million.[63] For value above that breakpoint the B's receive nothing more until all other shareholders[64] receive $0.5429. That second breakpoint occurs when hiQ's value is $43.1 million.[65] At that point the B's convert to common, which is the sole remaining class and all shares receive the additional value on a pro-rata basis. Figure 1. represents this situation graphically.

FIGURE 1. THE VALUE OF SERIES B SHARES OVER DIFFERENT POSSIBLE MARKET VALUES FOR HIQ (SERIES B EXIT VALUE DIAGRAM)[66]



37. The blue line represents the payoff that the B preferred holders receive as a function of total exit value. The dashed red line indicates what a pro-rata payoff would be (as if all shares,

---

[63]  *See* the breakpoint analysis in A&M.

[64]  Including: A preferred, common, A shares that convert to common, and all common shares issued under options and warrants.

[65]  *See* the breakpoint analysis in A&M.

[66]  *See* discussion in text and A&M breakpoint analysis.

including the B preferred, were actually common). The extra value for the B preferred stems from the difference between the dashed red and blue lines.

38.  To estimate the implied value of hiQ in May 2016 while accounting for the Series B liquidation preference, I apply standard option pricing methodology to value the non-linear Series B exit payoff as of May 2016. The details of this approach can be found in Chapters 13-18 of Andrew Metrick's ("Metrick") *Venture Capital and the Finance of Innovation* (3rd Ed.).[67, 68]

39.  The basic premise of the options approach is to recognize that the exit value for Series B preferred can be viewed as the payoff from a combination of call options (bought or sold) on hiQ's total exit value. These call options depend on the time to exercise (i.e., years to exit), the volatility of hiQ value, the risk-free rate, the strike price of each option (which occur at the inflection points of the blue line in the Exit Diagram), and the current value of hiQ. Since we know that Series B investors valued this combination of options at $5 million, we can solve for the current value of hiQ that rationalizes this value for the Series B preferred. In this way, the impact of the Series B liquidation preference on the value that Series B investors were willing to pay is properly accounted for.

40.  As of May 2016, 3 to 5-year U.S. Treasuries were yielding approximately 2 percent.[69] The volatility and time-to-exit must be based on judgement and empirical evidence. Metrick considers a range of 60 percent to 120 percent, and notes that the 90 percent mid-point is a

---

[67]  Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (Chapters 13-18). Wiley. Kindle Edition.

[68]  Alvarez and Marsal Valuation Services ("A&M") also attempt to provide a valuation of hiQ at its B funding Round (i.e., as of June 6, 2016) (*see* hiQ_00004033 (August 19, 2016 Alvarez & Marsal Valuation Services, LLC - *Hi Q Labs, Inc. Valuation of a Minority, Non-Marketable Common Stock Interest As of June 6, 2016*). Their valuation also attempts to recognize the liquidation preference of hiQ's Series B using option theory. However, I find the A&M valuation unreliable due to a number of implementation errors, including a much too low volatility estimate of 40% based on a slight adder to the volatility of publically traded companies. Publically traded companies have overcome substantial risk hurdles that a company like hiQ is still facing. As such, much larger volatilities are appropriate. As discussed below, Metrick cites literature and recommends an annualized volatility of about 90 percent for any industry pre-exit, with sensitivities of 60 percent and 120 percent. A&M's use of a 40 percent volatility creates a significant bias in their results. Moreover, the implementation is not a standard approach in the industry and it appears to misapply option theory (*e.g.*, it appears to presume an unsubstantiated exit in three years at a value of $21M). For these reasons, among others, I provide my own estimate of hiQ's Round B post-money market value using accepted finance theory and practices.

[69]  *See* Board of Governors of the Federal Reserve System (US), Market Yield on U.S. Treasury Securities at 5-Year Constant Maturity, Quoted on an Investment Basis [DGS5], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/DGS5, June 1, 2022.

15

CONFIDENTIAL

good estimate to use for any industry, citing a study by John H. Cochrane in 2005.[70] I view this as a reasonable range for hiQ, given that volatilities for comparable companies that have already exited – and are therefore past this important risk hurdle – are observed to have annualized volatilities of about 38%.[71]

41.   It is difficult to predict years to exit for companies at the Series B stage that hiQ was at in May 2016, but 3 to 7 years, with a mid-point of 5 years, which is the range used by Metrick, seems reasonable based on the data.[72] Figure 2 below shows the sensitivity of hiQ values to different assumptions on volatility and years to exit. The table shows that the value of hiQ is increasing with both the volatility and the years to exit, ranging from $25.0 million to $38.8 million. I rely on the $31.7 million mid-point of these ranges as my estimate for hiQ's post-money value after Series B.

FIGURE 2. SENSITIVITY OF HIQ ESTIMATED (POST-MONEY) MARKET VALUE
TO VOLATILITY AND YEARS TO EXIT ($ MILLIONS)

|  |  | Volatility | | |
|---|---|---|---|---|
|  |  | 0.6 | 0.9 | 1.2 |
|  | 3 | 25.0 | 28.0 | 31.7 |
| Years to Exit | 5 | 27.5 | **31.7** | 36.0 |
|  | 7 | 29.5 | 34.4 | 38.8 |

42.   My Series B value for hiQ is reliable because it is based on (1) a market price negotiated at arms-length between unrelated parties and (2) a standard approach to accounting for the value of the preferred nature of the shares sold in Round B.

---

[70]   *See, e.g.*, Exhibit 14-2: Sensitivity Analysis for Breakdown Valuation in Metrick. Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (p. 217). Wiley. Kindle Edition; John H. Cochrane, "The Risk and Return of Venture Capital," *Journal of Financial Economics* 75 (2005): 3-52.

[71]   *See, e.g.*, hiQ_00004033 at -045 and -046 (August 19, 2016 Alvarez & Marsal Valuation Services - Hi Q Labs, Inc. Valuation of a Minority, Non-Marketable Common Stock Interest As of June 6, 2016).

[72]   *See, e.g.*, Exhibit 14-2: Sensitivity Analysis for Breakdown Valuation in Metrick. Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (p. 217). Wiley. Kindle Edition.

# B.   hiQ was Likely to Raise a Successful Round C Shortly after the Valuation Date

43.   Had hiQ not received the C&D, it was likely to raise a successful Round C shortly after the Valuation Date. In the weeks and months prior to the Valuation Date, hiQ's management had been anticipating a future Round C financing.[73] This was a reasonable expectation given that:

a.   It had been eleven months since hiQ's Round B. For firms that raise a Round C, the median time from Round B to C is about 1.6 years.[74]

b.   hiQ's achievements and milestones since Round B were substantial, and occurred in areas that VC firms consider critical when evaluating VC investments.

44.   The following sections list the major areas that Metrick's "Venture Capital and the Finance of Innovation" states that VC's consider, and evaluate hiQ's progress since Round B.[75]

## 1.   Management

45.   Gompers (2020) states that:

> *We find that in selecting investments, VCs place the greatest importance on the management/founding team. The management team was mentioned most frequently both as an important factor (by 95% of VC firms) and as the most important factor (by 47% of VC firms).*[76]

46.   And that

---

[73]   *See* Section IV.C.3.

[74]   With 78 of 298 startups (26%) occurring in less than a year, another 120 (40%) occurring between 1 and 2 years and another 100 (33%) occurring in more than 2 years (*see* Figure 7 below).

[75]   Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (p. 121-124). Wiley. Kindle Edition.

[76]   Paul Gompers et al, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics* 135(1) (January 2020): 169-190, p. 170.

> *We then asked VCs what factors contributed most to their successes and failures.*
> *Again, the team was by far the most important factor identified, both for*
> *successes (96% of respondents) and failures (92%).[77]*

47.   Metrick also emphasises the importance of management:

> *The management test was a key hurdle for the screening stage, and it remains*
> *(with the market test) the most important part of due diligence. […]  Often, these*
> *evaluations will lead to **VC demands that seasoned executives be hired** to fill*
> *new roles such as CFO or VP of marketing.[78]*

48.   As indicated by Metrick, young VC-backed firms often hire seasoned executives as they grow.
Founders, whose skills are essential at the founding and in proof of concept, sometimes do not
have the skills necessary to impose more rigor as a firm moves into the growth / scaling
phase.[79] Between the Series B funding & the Valuation Date, hiQ had made this very transition.

49.   In early 2017, hiQ transitioned the CEO role. Replacing the CEO was an important milestone in a
roadmap to achieving greater scale for the company in terms of sales and operations. Darren
Kaplan was a founder serving as CEO,[80] but young firms typically replace the founding CEO with

---

[77]   Paul Gompers et al, "How Do Venture Capitalists Make Decisions?" Journal of Financial Economics 135(1)
(January 2020): 169-190, p. 171.

[78]   Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (p. 121). Wiley. Kindle Edition.
Emphasis added.

[79]   *See* Weidick May 23, 2022 Deposition, 20:19-21:15 (describing discussions with hiQ's board members around
the time M. Weidick was hired as CEO regarding hiQ's decision to bring in a new CEO and explaining: "We had
immense opportunity in front of it. It achieved a compelling set of very, very tangible milestones in terms of
helping to create a new category, putting forth new disruptive technology, achieving monstrous milestones
around name recognizable customers, paying, in some cases, six figures to access to their retention risk analysis
so that the company was – was poised for tremendous growth. A lot of the storming and norming and figuring
out and imagination phase that so many tech companies go through had been resolved to the satisfaction of
some seriously high-powered investors. And that they were looking for a leader to step in and take all of that
success and put some more rigor around it, help it be a bit more predictable and then find opportunities that
were adjacent to the one currently being fulfilled. And to grow the business, to deliver shareholder value, likely
raise more capital in the near term and then figure out what the best way to achieve liquidity would be.").

[80]   Weidick May 23, 2022 Deposition, 118:5-119:5 (discussing Mr. Kaplan's role with hiQ after Mr. Weidick took
over as CEO).

a more tenured CEO as the firm moves from the startup / proof of concept phase into the scale / growth phase. hiQ's philosophy was "to check egos at the door, hire people better than ourselves, be willing to play musical chairs and find people who'd done it before."[81] Kaplan agreed that hiQ had reached the stage where it needed an experienced CEO, instead of a founder CEO.[82] A letter to the board dated August 6, 2016 discussed the CEO transition plan in line with the idea of achieving a new milestone, and stated that the search for the next CEO, which selected Mark Weidick, should identify an individual "who is decisive and knows how to lead a team this size to the next level."[83]

## 2.    Customers

50.  Figure 3 shows that between Series B and the Valuation Date, hiQ significantly increased its revenues, its bookings (sales are booked ahead of revenues being recognized), its average number of active customers, and its renewals.

---

[81]  DeSantis Deposition, 124:3-125:22; *see also* Videotaped Deposition of Alexander Oltmann, May 13, 2022, ("Oltmann Deposition") 205:4-18 ("As I stated before, any good startup operator, entrepreneur needs to go through the tour of duty that I had spoken about before, also what we internally call musical chairs and my understanding of [Mr. Kaplan] no longer being CEO was that the CEO or any job title is merely a placeholder in what you're kind of focused on at any point in time. … So my assumptions of Darren Kaplan no longer being CEO is part of that musical chairs and part of the tour of duty."); Oltmann Deposition. 19:16-18 ("It's also part of Reid Hoffman's theory of tour of duty where at any early stage company you play whatever role is needed wherever the gaps are…"); Oltmann Deposition 28:8-12 ("As I stated before, musical chairs is a large part of work at an early stage into a fast growing company. So at this exact moment in time that might have been my role but as I said before, it evolved continuously.").

[82]  Graves Deposition, 301:25-302:7 (explaining that Mr. Kaplan "agreed by the end of that conversation that it made sense to hire an experienced – that he – that the skills he had as a founder that had helped him start things were not the skill set that was necessary to take the company through the next phase. And he was comfortable with and willing to support the process of finding an external – finding and hiring an external experienced CEO who had done it before."); *see also* Graves Deposition 310:4-19 (agreeing that "there's a lot of reasons that [it] makes sense" to "bring in an experienced outside CEO,
 and noting that "having someone who is experienced and has done it before has real value").

[83]  Videotaped Deposition of Darren Kaplan, May 5, 2022, Exhibit 16 at -400 (August 6, 2016 Letter to hiQ Board).

**FIGURE 3: COMPARISON OF REVENUES, BOOKINGS, CUSTOMERS AND RENEWALS AT TIME OF SERIES B AND THE C&D[84]**

|  |  | Twelve Months Ending | | |
| --- | --- | --- | --- | --- |
|  |  | As of Round B (June 2016) | Proxy for Valuation Date (May 2017) | Change |
| Revenue | [1] | $639,883 | $1,415,597 | 121% |
| Bookings | [2] | $1,054,200 | $1,492,234 | 42% |
| Total Customers | [3] | 23 | 26 | 13% |
| Renewals | [4] | 6 | 13 | 117% |

51. On the Valuation Date, hiQ had approximately 20 active contracts, including with many high profile companies such as ▮▮▮▮▮ Nestle, AOL, Amazon, Gap, eBay, Mastercard, American Express, and AIG, amongst others.[85]

52. Critically, many customers renewed their contracts. This is especially important for a young firm with a new service. Prior to the Valuation Date, hiQ was doing more than twice as much business on Keeper annually as it had done prior to Round B. After Round B, hiQ demonstrated that they could successfully service a great dollar value of customer business and inspire a greater renewal rate while doing so – a critical market test that their services had commercial value to paying 3rd party customers.

53. At Round B hiQ had a single product, Keeper, which offered "predictive attrition insights about an organization's employees."[86] Keeper was in Beta release at Round B, and Version 1.0 was released in November 2016.[87]

54. Keeper was dependent upon regular intake of live resume data, which hiQ scraped from public profile data available from LinkedIn.[88] Following the Round B, hiQ developed and released a new product that demonstrated hiQ could leverage that costly dataset: Skill Mapper, which

---

84  *See* figure 3 and associated work papers in Sacks_report_support.xlsx.

85  hiQ_00004345 (Revenue Deferred Revenue July '17.xlsx) ("Rev-Def Rev" tab); 657403_hiQ Revenue Deferred Revenue July '17_xlsx.xlsx ("Rev-Def Rev" tab); hiQ's Supplemental Responses to LinkedIn's Second Set of Interrogatories, May 13, 2022, pp. 3-6 (listing 20 contracts as of May 2017).

86  "Keeper", hiQ Labs, (last accessed June 3, 2022: https://www.hiqlabs.com/new-keeper).

87  hiQ_00503845. Other documents may call it Keeper 2.0 beta instead of 1.0. See, for example, hiQ_00503845, which also discusses Keeper 2.0 and 2.1 being release in the 4th quarter of 2016.

88  *See* Graves Deposition, 100:11-112:18. Also, communication with Genevieve Graves.

allowed clients to understand the mix of skills in an employee population, and relied on some of the same database as Keeper.[89] Customer reaction to Skill Mapper was strongly positive. eBay, the first beta customer for Skill Mapper in December 2016, reported they were "thrilled" with the product.[90]

55.  In January 2017, Managing Director and Global Head of Workforce Strategy at BNY Mellon, John Callery, emailed Jeanne Mcfadden, Regional Director at hiQ[91]:

> *I'd like to get a few minutes to map out the next steps for Skill Mapper. We're excited to get started, and I'm looking to build a more detailed plan around how we will roll this out within the organization.* [92]

56.  hiQ publicly launched Skill Mapper at its April 18, 2017 conference.[93] Kaplan stated, "There was nothing like it on the market when we unveiled it. And then, LinkedIn unveiled LinkedIn Talent Insights a few weeks later."[94]

57.  In addition to being a valuable source of additional revenue, the development of Skill Mapper demonstrated that

   a.  hiQ could develop additional quality products while servicing and selling its existing Keeper product, and

   b.  hiQ could leverage its investment in the LinkedIn-derived database for additional revenue generating products.[95]

---

[89]  hiQ_00050578 (Skill Mapper Overview); Graves Deposition, 116:9-15.

[90]  Kaplan Deposition, Exhibit 17 at p. 27 (February 8, 2017 Confidential Board Deck).

[91]  *See* Jeanne McFadden LinkedIn profile *(*last accessed 6/6/2022: https://www.linkedin.com/in/jeanne-mcfadden-b7551b4*)*.

[92]  hiQ_00505836 at -837 (January 26, 2017 email from J. Callery to J. Mcfadden).

[93]  hiQ_00592515 at -518 (January 1, 2017 email indicating that Skill Mapper would be released on April 18, 2017); hiQ_00597596 (April 18, 2017 Elevate Agenda announcing Skill Mapper).

[94]  Kaplan May 5, 2022 Deposition, 41:08-15; Ingrid Lunden, "LinkedIn to Launch Talent Insights, a New Analytics Tool, as It Dives Deeper into Data," *TechCrunch,* October 4, 2017 (last accessed June 7, 2022: https://techcrunch.com/2017/10/04/linkedin-to-launch-talent-insights-a-new-analytics-tool-as-it-dives-deeper-into-data).

[95]  hiQ_00050578 (Skill Mapper Overview).

58.  Such leveraging of the costly-to-build database of publicly available LinkedIn data would be particularly appealing to VC investors because it indicates that hiQ was scalable in that it could leverage the substantial fixed costs of Keeper to provide additional services at low marginal cost (i.e., that only required software but not additional and ongoing additional data acquisition).

## 3.    People Analytics Market and Competition

59.  At the time of hiQ's Round B in June 2016, the People Analytics market was an immature but promising market.[96] hiQ's Keeper and Skill Mapper were unique (or nearly unique) offerings in this field – Keeper having won the "Human Resources Executive's Top Product of 2016" in September of 2016.[97] hiQ states that, when its predecessor firm OrgStars was founded in 2012, "no person or business was attempting to solve the problems hiQ was and would be solving"[98] and that it had few, if any, direct competitors prior to the Valuation Date.[99]

---

[96]  DeSantis Deposition, 44:20-46:9 (testifying that "the nature" of discussions with Series A prospective investors was "there was a whole new market category that was being established on the HR side of the enterprise in the area of people analytics.  And that is in the opportunity to retain employees, high-valued employees.  And we say corollaries, the last ten years a lot of companies have spent time – a lot of technology has been applied to the marketplace towards recruiting people away from the current jobs and to new jobs. …"); *see also* Kaplan May 5, 2022 Deposition, 54:9-16 (testifying that the people analytics market is "a market that we believe we created around 2012-13."); Kaplan May 5, 2022 Deposition, 57:12-58:16 (explaining how hiQ built up the people analytics community and created the people analytics market).

[97]  Responses to First Set of Interrogatories, Response to Interrogatory No. 12; *see also* "HiQ Labs People Analytics Solution Wins HR Tech Product of the Year", hiQ Labs, September 21, 2016, (last accessed June 4, 2022: https://www.hiqlabs.com/news-1/2016/9/21/hiq-labs-people-analytics-solution-wins-hr-tech-product-of-the-year).

[98]  Responses to First Set of Interrogatories, Response to Interrogatory No. 12; *see also* Kaplan May 5, 2022 Deposition, 38:22-24 ("[W]hen we launched Keeper, we were the first company to apply data science to public profiles."); Kaplan May 5, 2022 Deposition, 39:13-16 ("In 2012 and 2013, 2014, as far as I remember, we were the leader in using public data to predict risk.  Companies would use internal data like survey data, but back in 2013-2014, as far as I remember, we were the leader and the only for a Keeper product."); *see also* Kaplan May 5, 2022 Deposition, May 5, 2022 40:9-22 (testifying that in the "2012 to May 23, 2017 timeframe", hiQ was the only company "applying data science to public profiles or public information or what we call pull factors, which are…external factors that recruiters can use to recruit you")

[99]  hiQ's Responses to First Set of Interrogatories, July 29, 2021, Response to Interrogatory No. 13 and 14; Kaplan May 5, 2022 Deposition, 41:12-15 (Skill Mapper was "publicly unveiled in April 2017.  There was nothing like it on the market when we unveiled it.  And then, LinkedIn unveiled theirs a few weeks later.  That was very similar from taxonomies, retention, and skill gaps of an organization."); *see also* Kaplan May 5, 2022 Deposition, 54:9-16 (that that the people analytics market is "a market that we believe we created around 2012-13"), and 57:12-58:16. However, Kaplan indicates that Joberate may have been a competitor as of March 2016, prior to hiQ's B Round. Kaplan Deposition, May 5, 2022, 48:13-49:6 and Exhibit 23; Kaplan also indicates that Careerbuilder may have been a competitor as of May 2016, also prior to hiQ's Round B. Kaplan May 5,

CONFIDENTIAL

60. If the People Analytics market in general, and Keeper and Skill Mapper in particular, were to eventually attain a level of commercial success leading hiQ to a multi-hundred million dollar exit value, as was hoped for, it was inevitable that more competitors to hiQ would emerge. Shortly after the C&D, LinkedIn announced that it was launching LinkedIn Talent Insights, a product that would compete with Skill Mapper. [100] LinkedIn Talent Insights was in development at the time of the C&D.[101]

61. The entrance of a competitor has two effects on hiQ's value. The direct competitive effect would be to lower its value, as it is almost always worse to have a given competitor than to not have it. However, the signal that the entrance of a competitor sends about the commercial potential of the field, and of hiQ's products in particular, is to increase hiQ's value. Both effects are magnified when the competitor is a large firm like LinkedIn.

62. Given that, if hiQ is eventually successful at the level hoped for, the entry of competitors is a virtual certainty, much of the impact of expected eventual competition would be baked into the Series B value. This expectation mitigates the direct competitive impact on the *change* in hiQ's value from before LinkedIn entered –at the time of series B – to after LinkedIn had decided to enter – at the Valuation Date.

63. The signaling effect is not mitigated by this expectation. A significant part of the uncertainty facing investors in hiQ at the time of Series B related to the ultimate value of the market for the kinds of services hiQ sells. Much of that uncertainty is resolved – in a positive direction – by LinkedIn's entrance. It is much harder to doubt the significant commercial potential of hiQ's market once LinkedIn has publicly disclosed that it is a market they want to compete in.

64. Further, as the timeline below indicates, it appears that LinkedIn itself was intrigued by hiQ's novel offerings and that its decision to send the C&D is related to LinkedIn's awareness of hiQ's

---

2022 Deposition, May 5, 2022, 49:24-51:3 and Exhibit 24. PwC was unlikely to be a competitor as hiQ was in talks to partner with PwC – *see* Section IV.B.4); *see generally* June 7, 2022 Report of Stephen McElfresh.

[100] hiQ's Responses to First Set of Interrogatories, July 29, 2021, Response to Interrogatory No. 12.

[101] Defendant LinkedIn Corp.'s Responses to hiQ Labs, Inc.'s Second Set of Interrogatories, April 7, 2022, Response to Interrogatory No. 13 ("Responses to Second Set of Interrogatories") (stating that "[t]he internal launch meeting for Project Athena," which would eventually become LinkedIn Talent Insights, "occurred in September 2015.").

CONFIDENTIAL

products and LinkedIn's view of the increased commercial potential on the Valuation Date as compared to the Series B round (and before).[102]

a. In an October 27, 2016 email to LinkedIn's Talent Analytics email list, Mike Jennings sent screen shots of hiQ's analytics products Skill Mapper and Keeper and noted, "We should consider if any of these are good ideas for us to develop for ourselves." [103]

b. In a February 15, 2017 email to Mike Jennings and others, Lorenzo Canlas stated, regarding some of the functionality of the Skill Mapper product: "I think we could do by simply re-skimming recruiter and filtering for your existing company."[104]

c. In a March 28, 2017 email to Daniel Francis, Lorenzo Canlas gave "examples of what I think [LinkedIn] can do better" regarding Skill Mapper.[105]

d. On April 4, 2017, Lorenzo Canlas forwarded an invitation to hiQ's Elevate Conference and wrote "FYI HiQ will be unveiling their new skills mapped product if you want to get some intel on similar products to athena...."[106]  Daniel Francis responded by stating "would be great if at least one of us could join with you. But I wonder if all of us going would be suspicious ;)."[107]

e. In an April 6 2017 email, Mike Jennings identified hiQ as a direct competitor in the "Internal Workforce Insights" category. Responding to that email on the same day Eric Owski identified hiQ as one of five "initial direct competitors" to LinkedIn (in the People Analytics space overall), and LinkedIn's head of Talent Insight head, Daniel Francis, agreed.[108]

---

[102] Responses to Second Set of Interrogatories, Response to Interrogatory No. 13,  (stating that "[t]he internal launch meeting for Project Athena," which would eventually become LinkedIn Talent Insights, "occurred in September 2015.").

[103] LINK_HIQ_000068229 (2016.10.27 Email sending screen shots from hiQ's conference).

[104] Videotaped Deposition of Michael Jennings, taken remotely via Zoom, May 26, 2022, ("Jennings Deposition") Exhibit 1023, (2017.02.15 Email from Canlas to Jennings and other regarding hiQ's offerings.)

[105] LINK_HIQ_000042850, (2017.03.28 Email chain regarding hiQ analytics products.)

[106] Jennings Deposition, Exhibit 1026, (2017.04.04 email discussing LI registering for hiQ's Elevate Conference in which D. Francis writes: "would be great if at least one of us could join with you. But I wonder if all of us going would be suspicious.")

[107] Jennings Deposition, Exhibit 1026, (2017.04.04 email discussing LI registering for hiQ's Elevate Conference in which D. Francis writes: "would be great if at least one of us could join with you. But I wonder if all of us going would be suspicious").

[108] LINK_HIQ_000059739, at -739 and -740 (April 4, 2017 email thread between D. Francis, E. Owski, and others regarding competitive analysis); *See also* LINK_HIQ_000076813, at -896 and -897 (Presentation titled Enterprise Analytics Products – Competitor and Other Product Notes listing hiQ as a competitor.)

f.  hiQ's April 18, 2017 Elevate Conference was attended by LinkedIn employees Lorenzo Canlas, Daniel Francis, and Mike Jennings.[109]  The morning of the conference, Daniel Francis wrote: "Mike and I were able to get last minute tickets to a workforce analytics conference hosted by a competitor (HiQ), so we're going to attend today. Will share with you what we learn."[110]

g.  hiQ publicly launched Skill Mapper at its April 18, 2017 Elevate Conference.[111]  Mike Jennings drafted detailed notes regarding the conference and Skill Mapper.[112]

h.  Two days after the conference, Mike Jennings internally emailed notes regarding hiQ's April 18, 2017 conference to which Kate Garvey—LinkedIn's Senior Director, Product Marketing[113]-- replied "Thanks, Mike, really interesting. What's LinkedIn's policy on blocking (soon-to-be) competitors from scraping our data?"  Eric Owski responded stating "we generally don't pursue cases of public profile scraping, but I'll engage with them and see if we can push a bit harder."  Garvey then wrote "Wearing my product marketing hat, I'm a big fan of making my job easier by knocking out the competition :)"[114]

i.  In an April 21 2017 email to Kate Hastings, Mike Jennings wrote, "we expect our product to be better [than Skill Mapper], but it makes our job easier by knocking off the competition by cutting off their data source."[115]

j.  In and around the time of the C&D, hiQ was gaining press attention.[116]

k.  hiQ received LinkedIn's C&D in May 2017.[117]

---

109  LINK_HIQ_000069617 (February 15, 2017 email from D. Kaplan to L. Canlas indicating that L. Canlas would be attending hiQ's April 2017 Elevate Conference); LINK_HIQ_000059771 (April 18, 2017 email from D. Francis to J. Lwanga); Owski Deposition  Exhibit 1316, (April 20, 2017 hiQ Elevate Conference Notes).

110  LINK_HIQ_000059771 (April 18, 2017 email from D. Francis to J. Lwanga).

111  hiQ_00592515 at -518 (January 1, 2017 email from S. Macomber to D. Kaplan indicating that Skill Mapper would be released on April 18, 2017); hiQ_00597596 at -517 (April 18, 2017 Elevate Agenda announcing Skill Mapper).

112  Owski Deposition, Exhibit 1316 (April 20, 2017 hiQ Elevate Conference Notes).

113  Kate Garvey LinkedIn Profile (last accessed June 6, 2022: https://www.linkedin.com/in/kmgarvey).

114  HIQ_000042967 (April 20, 2022 email from E. Owski to K. Garvey and others discussing hiQ's April 2017 Elevate Conference)

115  Jennings Deposition Exhibit 1028 at -741 (April 21, 2017 email from M. Jennings to K. Hastings regarding Athena update.)

116  See Jennings Deposition, Exhibit 1033; Marlene Jia, "113 Enterprise AI Companies You Should Know," Venture Beat, April 23, 2017 (last accessed June 6, 2022: https://venturebeat.com/2017/04/23/113-enterprise-ai-companies-you-should-know/.

117  LINK_HIQ_000002224 (May 23, 2017 Cease and Desist Letter to hiQ).

l.   Following the C&D, on June 1, 2017, Eric Owski, in an email discussing hiQ, wrote "We really like the product category. They are operating in an adjacent problem space to Project Athena. A couple of people on my team attended a recent conference they hosted and anecdotally, customers seem to love the product."[118]

m.   LinkedIn announced LinkedIn Talent Insights on October 4, 2017, at a LinkedIn Talent Connect conference.[119]

n.   LinkedIn publicly launched LinkedIn Talent Insights on September 25, 2018.[120]

## 4.   Channels and Partners

65.   In a March 7, 2017 email to Kaplan, Jackie Ryan, the head of IBM's People Analytics group at the time, expressed IBM's interest in partnering with hiQ as part of their Watson Talent portfolio:

> *Net is we would like to partner with hiQ to adopt the retention risk analysis services as part of our Watson Talent portfolio, specifically, Watson Recruiter (WR), Watson Career Coach (WCC), and Employee Voice (EV). The retention risk services would be used to proactively detect whether a candidate has a potential to leave shortly after joining (WR), consider an employee's retention risk profile as part of career recommendations (WCC), and affect manager recommendations to improve engagement considering the retention risk profile of their individual team members (EV). Incremental value added to the solutions would be chargeable to the client such that revenue flow could be established through a partner agreement. There is also opportunity to partner on Watson Talent Insights if there is a data Vs UI option to integrate with the hiQ retention risk service (one we'd need to explore further).[121]*

---

[118]  LINK_HIQ_000030615 at -616 (June 5, 2017 email from K. Colombo to F. Funnell and others discussing hiQ labs).

[119]  LinkedIn Responses to Second Set of Interrogatories, April 7, 2022, Response to Interrogatory No. 13.

[120]  LinkedIn Responses to Second Set of Interrogatories, April 7, 2022, Response to Interrogatory No. 13.

[121]  hiQ_00247488 (March 7, 2017 email from D. Kaplan to J. Ryan regarding IBM-hiQ partnership.) *See also* Kaplan May 5, 2022 Deposition, 46:12-23 (testifying that "IBM approached [hiQ] because we were able to access public information to help make their product work and work better").

66. The partnership would embed hiQ in IBM as an OEM with hiQ selling through that channel to IBM customers. IBM and hiQ were in the process of signing an MOU in May 2017, just prior to the C&D.[122] Also in 2017, IBM introduced hiQ to RBC, whose contact told hiQ that he was "very interested to learn about hiQ, how it works and what the results have been."[123]

67. A February 2018 LinkedIn presentation shows that IBM was spending $15.2 million per year on LinkedIn Talent Solutions, the section of LinkedIn that houses its Recruiter and Talent Insights products that were competitors to hiQ's Keeper and Skill Mapper.[124]

68. In August 2016, hiQ and PwC were emailing about M&A data.[125] By December 2016 hiQ responded to the interest expressed by PwC's M&A teams in understanding flight risk at acquired companies.[126]

69. hiQ was also in discussions about a potential partnership with Jobvite in mid 2017, which were interrupted by the C&D.[127]

70. hiQ was also in discussions with Silicon Valley Bank about a potential relationship.  hiQ and Silicon Valley Bank's HR team and hiQ had a "great" meeting in May 2017 for a demo of hiQ's product and discussing next steps.[128]  Silicon Valley Bank's representative raved to Mark Weidick, "You have a really cool product!", saying there was no need for hiQ to "sell to us" and that there would soon be follow up.[129]

---

[122] Videotaped Deposition of Chris Lamb, taken remotely via Zoom, May 18, 2022, 8:15-21:8; *see also* Lamb Deposition Exhibits 1200 - 1204.

[123] hiQ_00312832 (2017.05.23 email thread regarding RBC's interest in hiQ).

[124] LINK_HIQ_000179452 at -472 (LinkedIn BD Partner Overview and Update – Q2 FY18); "Hiring and Development Tools Across the Entire Talent Lifecycle," LinkedIn, (last accessed June 4, 2022: https://business.linkedin.com/talent-solutions/product-overview) (identifying LinkedIn Talent Insights as a LinkedIn Talent Solutions product);  "LinkedIn Announces It's Moving Its Core Talent Products Onto One Platform," LinkedIn, August 12, 2019, (last accessed June 6, 2022: https://www.linkedin.com/business/talent/blog/product-tips/linkedin-moving-core-talent-tools-onto-one-platform (Heading #7 - Talent Insights integrated into Recruiter); Owski Exhibits 1313, 1314, 1317, LINK_HIQ_000075325 at -325 (identifying hiQ as a direct competitor to Project Athena/Talent Insights); Owski Deposition 183:6-11, and Francis Deposition, 44:11-16 (identifying Project Athena as Talent Insights).

[125] hiQ_00522858 (August 8, 2016 email from S. Pollak to D. Medeiros).

[126] hiQ_00340904 (December 8, 2016 email from M. Epshteyn to S. Pollak).

[127] hiQ_00332646 (August 7, 2018 email from F. Tsao to D. Medeiros and others); hiQ_00334452 (July 10, 2017 email from D. Finigan to M. Weidick regarding Jobvite partnership).

[128] hiQ_00428965 (May 23, 2017 email from J. Zamudilo to M. Weidick regarding SVB next steps).

[129] hiQ_00334864 (May 22, 2017 email from C. Edmonds-Waters to D. Medeiros and M. Weidick).

71. Bank of New York Mellon was likewise considering using "hiQ's external data about skills and attrition risk" for an integration with Visier-provided internal data.[130]  Through this partnership, BNY Mellon identified "three major places that we would look to user [*sic*] hiQ's data to start with."[131]  This partnership was being discussed on May 18, 2017, just five days before the C&D.[132]

## 5.   Technology

72. To the extent that "technology" for a firm like hiQ includes the creation of new products, hiQ had substantial progress in technology (*see* Section IV.B.3).

73. hiQ had also faced an ongoing technological challenge from LinkedIn which was attempting to prevent scraping of the public data on its website ("blocking").  My understanding is that this was a general effort aimed at scraping in general, and not specifically at hiQ.[133] Historically, hiQ had navigated this challenge successfully.[134]

74. One of the primary ways LinkedIn sought to block scraping was to not permit access to more than a few LinkedIn profiles from a given IP address within a limited timeframe without the

---

[130]  hiQ_00571008 at -008 (May 18, 2017 email from D. Miller to G. Graves).

[131]  hiQ_00571008 at -008 (May 18, 2017 email from D. Miller to G. Graves).

[132]  hiQ_00571008 (May 18, 2017 email from D. Miller to G. Graves).

[133]  *See, e.g.* Bray Deposition 84:9-23, ("definitely more than 95 percent of our [incoming web traffic] requests are scraping.  So I think we have something like on a normal week, like 5 billion requests… something like 5 billion scraping requests to LinkedIn."); id. at 85:17-87:6 ("We've put a lot of work in [to scraping defenses]… we have like essentially a series of checkpoints that make sure that the – that too much traffic doesn't get in like each checkpoint… You have to always be investing more time and resources to like improving defenses because the adversaries will also be improving their defenses."); *see generally* LINK_HIQ_000169080 (April 21, 2015 LinkedIn presentation re: 3rd Party Scraping listing proposed anti-scraping initiatives); LINK_HIQ_000027959 at -960 (2016 Sales Solution Plan stating "We will invest heavily in each of these issues in 2016 and in addition, we must make more aggressive progress against the increasingly growing scraper challenge."); LINK_HIQ_000084713 at -723 (June 2015 LinkedIn LTS 18 Month Product Plan indicating that LI's response to social profile aggregators would be "Better scraping defense"); LINK_HIQ_000012441 (June 3, 2015 email from L. Womer to B. Rosin in which Lee Womer writes "Re: Project Equilibreum: not sure if you're aware but I'm project managing a cross-functional project to crack down on scraping of Linkedin data (particularly LinkedIn profiles). Equilibreum is one of the workstreams that will help stop scraping, which is why I'm in the Monday product review."); LINK_HIQ_000030305 at -313 (2016 Business Integration Plan listing Anti-Scraping as a strategic initiative and indicating that LI Pursued legal measures against Top 15 Scrapers); LINK_HIQ_000095502 at 507 (LinkedIn User Agreement [Oct 23, 2014 - June 6, 2017]).

[134]  *See, e.g.,* Miller Deposition Exhibit 320 (March 23, 2016 email from G. Graves to D. Miller  with the subject discussing possible plans to circumnavigate LinkedIn efforts to block scraping.

CONFIDENTIAL

user logging in.[135] Starting a few months prior to the C&D, the challenge posed by LinkedIn's blocking increased.[136] At the time, hiQ was outsourcing some, if not all, of its scraping to third parties. This blocking prevented those third parties from scraping LinkedIn and they informed hiQ they would no longer do so – at least until they found a work around.[137] On April 6, 2017, Mark Weidick informed hiQ's Board of Directors that the "LinkedIn matter is serious but has *not* impacted customers so far."[138] He added that he was "amped everyday by the magnitude of our opportunity."[139] Later that month, Weidick again remarked that hiQ had still "been able to satisfy customer requirements" despite LinkedIn's blocking.[140] Genevieve Graves, hiQ's Chief Science Officer, was at that time likewise "optimistic that we will be able to get back on track with our scraping efforts" as hiQ had been "exploring multiple options, both with upgrading our old system of scraping and with new proxy provider relationships."[141]

75.   Since hiQ would not login when it scraped, it had to find a way to scrape with reasonable efficiency subject to only scraping one (or a few) profiles before switching IP address. hiQ had identified the MiFi solution as promising and had conducted proof of concept research on it.[142]

---

[135] LINK_HIQ_000116739 (December 23, 2014 email from T. Hwa to Fraud Abuse and Risk indicating that LI was limiting requests to 4.5K per hour); LINK_HIQ_000073689 at -960 (April 5, 2018email from P. Carrelha to GCO SOS MANAGERS and others stating "A new rehab rule will catch people that review 400 profiles in 60 minutes"); LINK_HIQ_000011965 at -965 (April 20, 2016 email from C. McLean to A. Dalal stating "We are working on improving our limits to reduce guest scraping. We are reducing the number of pages a Guest can see per cookie per hour.").

[136] *See, e.g.,* Dev Deposition Exhibit 212 (August 31, 2016 email from A. Kim to B. Dev); Dev Exhibit 216 (October 14, 2016 email from B. Dev to A. Kim).

[137] *See* Miller Deposition Exhibit 346 (April 28, 2017 email from D. Miller to M. Weidick and others stating that Luminati "started banning all LinkedIn scraping").

[138] *See* hiQ_00641058. (emphasis in original).

[139] *See* hiQ_00641058.

[140] *See* hiQ_00641039 at -039 (April 26, 2017 email from J. Levin to M. Weidick and others).

[141] *See* hiQ_00204550 (April 11, 2017 email from G. Graves to M. Weidick).

[142] *See* hiQ_00189163 at -030, 032 (ScraperWars_Presentation.pptx); Miller Deposition Exhibit 348 (May 11, 2017 chat transcript between G. Graves and D. Miller stating "There *is* going to be a way to solve this", "so don't let anyone tell you this is impossible", "but with 100 iPhones, I could do 10,000 scrapes a day ... and I would probably still look like a human." at -032); hiQ_00447685 (August 9, 2017 chat transcript between B. Dev. L. Brokken, D. Miller, and C. Cole); Miller Deposition Exhibit 331 (memo summarizing results of MiFi experiments stating, "How many URLs can be scraped from an iPhone in incognito mode? (Link to results) (a) Lots! (i) *Must* open a new tab each time, or you get the sign-in overlay (ii) All done from a single IP address (cellular network, not WiFi) (iii) Did 360 scrapes from a single IP within 4 hours. Still not blocked. (iv) Has to be using Safari Chrronrium get banned").

76. That MiFi solution used MiFi devices that selected randomly from a large number of IP
    addresses (on the order of 16 to 128) every time they power-cycled.[143] Each MiFi device could
    scrape about 2 profiles a minute or 120 an hour.[144] If hiQ needed to scrape a half million
    profiles a month, this implies 4167 device hours per month.[145] One employee could operate
    two devices, so a set of 24 devices operated by 12 employees for 8 hours a day (about 173
    hours per month) could accomplish the task.[146] At the time of the C&D, hiQ was considering if it
    should, and if so how to, automate that process to be even less expensive.[147]

## 6.    Other factors

77. In the period between hiQ's series B (June 2016) and the Valuation Date (May 23, 2017) there
    was not material change in the five other factors that Metrick lists.

78. **Projections**: hiQ did not have long term projections.[148] It did have a more substantial record of
    growing sales and customer renewals as of the Valuation Date than at its Round B – which
    would form the basis for any sales projections. Those improvements are discussed separately in
    Section IV.B.2 on Customers).

79. **Money**: hiQ's Round A was subscribed by highly regraded firms like ████████ and CEB. hiQ's
    Round B was subscribed by highly successful investors – Gary Vaynerchuk and Steven M
    Ross.[149] hiQ had not raised money since then. hiQ had not burned through its funds, though it
    was looking to raise additional capital to finance its future growth, as is normal for a firm
    anticipating a Round C.

---

[143] Communication with Genevieve Graves.

[144] A power cycle took about the same time it takes to power-cycle a cell phone, about 10 seconds, and it would
    take a few seconds to scrape a profile. Communication with Graves. 8,333 = 1,000,000 / 120.

[145] hiQ would scrape data from between several hundred thousand and one million public profile URLs in a given
    month. hiQ's Responses to LinkedIn's First Set of Interrogatories, July 29, 2021, Response No. 3.

[146] Two employees with skill level of hiQ's existing Turkers could accomplish the same task. (Communication with
    Graves). At the time hiQ paid their Turkers starting at $13 per hour (hiQ_00443139 at -147). Experienced
    Turkers made $15 per hour (hiQ_00018451).

[147] Communication with Graves.

[148] *See, e.g.*, hiQ_00004543 (variations on hiQ's fourth quarter 2016 projections of its 2017 operating plan, which
    projected at most 19 months out).

[149] *See* hiQ_00676973, which identifies Vaynerchuk as a board member as of Series B. ███████████████
    ████████████████████████████████████████████████████████████████
    ████████████████████████████████████████████████
    ████████████████████████████████████████

80. **Transaction terms**: there were no specific terms for a Round C established yet.

81. **Terrible things**:[150] Other than the C&D, the only other "terrible thing" as per Metrick's definition, was the blocking by LinkedIn, which had shut down hiQ's third-party scrapers and interfered with hiQ's ability to run its scraper as it previously could.[151] As discussed in Section IV.B.5, hiQ was developing a promising solution when they received the C&D.

# C.   The Change in Value from Round B to the Valuation Date

82. I estimate the change in hiQ's value from its $31.7 million Post-Money Round B value to its $69.6 million value the Valuation Date based on:

   a.  A regression analysis of the change in value from Round B to Round C actually experienced among a large sample of other young VC-backed companies.

   b.  The 20% discount to a Round C value contemplated in hiQ's contemporaneous ordinary course of business discussions regarding raising additional funds immediately prior to the Valuation Date.[152]

## 1.   The Data on Similar Young VC-Backed Firms

83. I use data from the PitchBook database, which contains information on private companies receiving VC funding. I collect data on 409 firms meeting the following characteristics:

   a.  Round C was completed or announced in progress

   b.  Round C was between 1/1/10 and 17/5/22

   c.  Reported trailing twelve month revenue for the Round C[153]

   d.  The firm was located in the United States

   e.  One or more of the following conditions were met[154]

---

[150]  Andrew Metrick. Venture Capital and the Finance of Innovation, 3rd Edition (p. 123-124). Wiley. Kindle Edition.

[151]  *See* Section IV.B.5.

[152]  See Section IV.C.3.

[153]  It can be reported at 0, it just must be reported.

[154]  *See* Section III - Background.

  i. The PitchBook 'Keyword' field describing the company contained the phrase "predictive analytics"; or

  ii. The PitchBook 'Industry' field for the firm was Human Capital Services; or

  iii. The PitchBook 'Vertical' field included any of: Big Data, HR Tech, or SaaS (software as a service).

84. I collect data on all B and C funding rounds, including:

  a. The date of the round,

  b. If the round was B or C,

  c. The amount funded,

  d. Reported trailing twelve months revenue in the period of the deal, which PitchBook measures as any trailing twelve months revenue reported for the firm within six months of the deal date,

  e. The pre-money valuation,

  f. The post-money valuation,

  g. Industry information.

85. The selection criteria are designed to ensure that the sample of firms is large enough to yield meaningful results, yet comparable to hiQ in terms of how their Round B to C values change. I perform a variety of analyses to ensure that this is the case.[155]

## 2. Regression Analysis of the Change in Value from B to C Rounds

86. As noted earlier, I rely on a regression approach to estimate how C round pre-money valuations relate to B round post-money valuations for a large comparable set of startups, as tracked by PitchBook. This relationship is the basis of how I map hiQ's Round B post-money valuation to a predicted Round C pre-money valuation for hiQ.

87. PitchBook provided complete data for a universe of 301 startups that were comparable to hiQ in relevant part. The median Round B post-money valuation of this set is $65.4 million, and the median Round C pre-money valuation is $161.6 million. An initial examination of the data,

---

[155] See Appendix C.

however, revealed an extreme outlier company ("Ant Group") with a reported series B post-money valuation of $60 billion (and C pre-money valuation of $136 billion). I discard this company from my analysis. The relationship between the Round B and C valuations for the remaining 300 companies are plotted in Figure 4 below.

**FIGURE 4. ROUND C PRE-MONEY VALUATIONS VS ROUND B POST-MONEY VALUATIONS[156]**



Source: Pitchbook (Broad Industry Filter, 300 complete data points)

88. However, even removing this one extreme outlier, the figure shows that there remain a number of startups that are outliers with a large impact on the regression. They are orders of magnitude larger than hiQ at their round B funding stage (over $1 billion). To provide more comparability to hiQ, I further exclude startups with a round B post-money valuation greater than $200 million (i.e., these are more than 6 times larger than hiQ at their series B funding round). The plot for the remaining companies is provided in Figure 5 below.

---

[156] *See* supporting r-code and Sacks_report_support.xlsx.



FIGURE 5. ROUND C PRE-MONEY VALUATIONS VS ROUND B POST-MONEY VALUATIONS IN A UNIVERSE OF COMPARABLE [PEOPLE ANALYTICS] COMPANIES FROM PITCHBOOK EXCLUDING ROUND B VALUATIONS GREATER THAN $200 MILLION[157]

Source: Pitchbook (Broad Industry Filter, 257 complete data points)

89. Figure 5 shows a clear and strong and positive relationship between round C pre-money valuations and round B post-money valuations for over 250 VC-backed firms. The relationship is reasonable and visually compelling. I use a regression on this reduced sample to more carefully explore the relationship. A summary of that regression's results is presented in Figure 6 below.

---

[157] *See* supporting r-code and Sacks_report_support.xlsx.

**FIGURE 6. REGRESSION APPROACH ANALYSIS[158]**

|  | Estimate |
|---|---|
| Intercept ($M) | 9.2 |
| Std.Dev | (15.8) |
| Round B Post-Money Valuation | 2.5*** |
| Std.Dev | (0.2) |
| | |
| $R^2$ | 0.37 |
| Adjusted $R^2$ | 0.37 |

90. The regression shows that round B post-money valuations explain a significant amount of round C pre-money valuations, with an Adj. r-squared of 37%. Moreover, the co-efficient on round B valuations (2.45) is highly significant at less than a 0.1 percent significance threshold (e.g., more than 99.9% confidence). The implication of the results is that for a start-up with a $10 million round B post-money valuation, the regression predicts a round C pre-money valuation of $9.2 M + 2.45 x $10 M = $33.7 M.

91. Figure 7 below walks through the regression-implied prediction of hiQ's round C pre-money valuations, had its round C not been interrupted by LinkedIn's C&D. Given the corrected post-money round B valuation for hiQ of $31.7 million from option theory (and as prescribed in Metrick), the Regression Approach predicts a round C pre-money value for hiQ of $87.0 million.

**FIGURE 7. PREDICTED HIQ PRE-MONEY VALUATION USING THE REGRESSION APPROACH[159]**

| hiQ Regression Approach Valuation (May 2017) | | Estimate | Std. Error | t-Stat | p-value |
|---|---|---|---|---|---|
| Regression Intercept ($M) | [1] | 9.2 | 15.8 | 0.6 | 0.6 |
| Regression Co-efficient on B-Post Value | [2] | 2.5 | 0.2 | 12.3 | 0.0 |
| | | | | | |
| hiQ (Pref Corrected) Series B Post-Money Valuation ($M) | [3] | 31.7 | | | |
| | | | | | |
| hiQ Predicted C Pre-Money Valuation ($M) | [4] = [1] + [2]x[3] | 87.0 | | | |

## 3.  Discount for Time to Series C

92. The regression analysis gives the value hiQ would have at its Series C. hiQ was anticipating a Series C in the coming months when it received the C&D, but had not raised nor priced that

---

[158] *See* supporting r-code and Sacks_report_support.xlsx.

[159] *See* supporting r-code and Sacks_report_support.xlsx.

round yet. To account for the difference in value between hiQ's value on the Valuation Date and at its Series C funding round, I discount the computed valuation by 20%.

**FIGURE 8. ESTIMATED VALUE OF HIQ PRE-C&D (MAY 2017)** [160]

| hiQ Regression Approach Valuation (May 2017) | | Estimate |
|---|---|---|
| Regression Intercept ($M) | [1] | 9.2 |
| Regression Co-efficient on B-Post Value | [2] | 2.5 |
| hiQ (Pref Corrected) Series B Post-Money Valuation ($M) | [3] | 31.7 |
| hiQ Predicted C Pre-Money Valuation ($M) | [4] = [1] + [2]x[3] | 87.0 |
| Less: Estimated Discount from distance to C | [5] | 20% |
| hiQ Value Estimate as of May 2017 ($M) | [6] = [4] x (1-[5]) | 69.6 |

93. At a 20% discount, the value of hiQ at the Valuation Date is $69.6 million (*see* Figure 8).[161]

94. This discount is based upon hiQ's contemporaneous ordinary course of business discussions in which it contemplated financing options immediately prior to the receipt of the C&D. Just prior to the C&D, hiQ management was preparing a subsequent funding round involving a sale of convertible notes to investors with an anticipated investment of $1.5 million. The notes would convert to Series C shares at a 20% discount to the series C price with; otherwise, the notes would convert to Series B shares.[162]

95. This 20% discount is reliable because it is based on contemporaneous ordinary course of business discussions. It is hiQ management's own assessment of the discount to a Round C value just prior to the valuation date.

---

[160] *See* supporting r-code and Sacks_report_support.xlsx.

[161] 69.6M = 87.0M x 80%.

[162] Communication with Mark Weidick. *See also* hiQ_00485279, hiQ_00485309, hiQ_00557342, hiQ_00592515, hiQ_00245917, hiQ_00428965, hiQ_00652752, and hiQ_00652760.

# V.   Other Valuation Methods Are Less Reliable in this Matter

96. Traditional valuation methods, including DCF, comparable multiples and comparable transactions, are substantially less reliable in this matter than is my approach. Section V.A discusses the shortcomings of the DCF method (and variants tailored to VC firms) for valuing hiQ. Section V.B discusses the shortcomings of the standard comparables approaches (comparable trading, comparable transaction, and comparable VC).

## A.   Problems with the DCF Method for Valuing hiQ

97. A DCF valuation is based on the principle that the value of a business is equal to the expected value of cash flows it produces, discounted by a rate that reflects the time value of money and the risks associated with those cash flows. Typically, cash flows are forecasted for a finite period of time, and then a terminal value is calculated, which represents the value of all cash flows after that time.[163]

98. This method must be modified slightly for a young VC-backed firm to take into account aspects of young VC-backed firms that differ from publicly-traded or mature firms, where DCF is most commonly applied. While these modifications all require additional inputs that must be estimated, the one that is most problematic in this matter is the need for long-term cash flow projections. I discuss that issue first, and the others afterwards.

99. Young VC-backed firms typically grow rapidly for many years and subsequently slow in growth as scale is achieved.[164] Therefore, it is inappropriate to forecast three-to-five year cash-flows and then assume a perpetual growth rate. The growth rate after five years will still be substantially higher than the eventual mature, and hence "perpetual" growth rate. Typically, perpetual growth rates are anchored to the rate of expected GDP growth (or inflation).[165] Using that anchoring for a perpetual growth at the end of a five-year forecast would substantially

---

[163] Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (Ch. 11). Wiley. Kindle Edition.

[164] *See, e.g.*, Andrew Metrick, Venture Capital and the Finance of Innovation, 3rd Edition (Exhibit 11-1). Wiley. Kindle Edition.

[165] Perpetual growth rates are typically set between inflation and GDP growth, reflecting the idea that a firm will not shrink in real terms, but will not grow so fast that it becomes an increasing share of GDP forever. *See, e.g.*, Joshua Rosenbaum and Joshua Pearl, Investment Banking: Valuation, Leveraged Buyouts and Mergers & Acquisitions (Hoboken, NJ: John Wiley & Sons, 2009), 132-3.

undervalue a still rapidly growing firm. Using some other perpetual growth rate at the end of five years simply begs the question of how fast the firm is expected to grow until it matures.

100. The need to forecast cash flows to maturity, which may take 10 or 15 years, is not alleviated by using a "terminal multiple" approach instead of a perpetual growth rate approach. The terminal multiple approach seeks to identify firms whose multiples (typically enterprise value multiple to some metric of profitability like EBITDA) will be similar to the multiple that the subject company will have at the end of the five-year forecast period. For mature firms, this may work because mature firms in the same industry can be assumed to likely grow at a similar rate. But this assumption, and hence this procedure, does not work for young rapidly growing firms – it simply begs the question of how fast the firm will be growing at the end of five years.

101. Further, young VC-backed firms like hiQ often have negative earnings and negative cash flows.[166] In addition to projecting revenues for many years, one must also project profit margins. Though one must also project profit margins for mature firms, one typically has an operating history to rely on to calibrate a reasonable range. That range is larger for young firms that have never been profitable and were not expected to be profitable for many years.

102. The reliability of the DCF valuation is only as good as the reliability of its inputs. Had there been contemporaneous cash-flow forecasts produced in the ordinary course of business, they could be used (at least as a starting point). But the record contains no such projections. Estimating long-term cash-flows for hiQ without contemporaneous ordinary course of business projections to based them on, is likely to have a very large margin of error. It is extremely unlikely that a DCF analysis in these circumstances could plausibly be as reliable as the regression analysis.[167]

103. It is not that unusual for a firm like hiQ to lack long-term cash flow projections. In a meaningful minority of VC valuations, cash flow is not forecast.[168] This may reflect the inherently judgment-heavy aspect.

---

[166] Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (p. 156). Wiley. Kindle Edition.

[167] An approach that seeks to "calibrate" a DCF to the Series B value, and then to value hiQ at the time of C&D based on changes in the DCF, is closer to, but not as good as, the approach that I use, which also uses the Series B valuation as a starting point. I use data on actual Series B to C changes in value to estimate the change in hiQ's value. A DCF calibration approach would need to find some similarly data-centric method to estimate the change in value. I am not aware of any such data. A DCF calibration approach does not have the same quality of information available to assess the change in hiQ's value as does the approach I use.

[168] Paul Gompers et al, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics* 135(1) (January 2020): 169-90, p. 180.

104. The second unusual aspect of DCF for young VC-backed firms is that their cash-flow projections are typically optimistic in the sense that they typically represent "success" scenarios. They are the sort of cash flows that the firm would have if it was to be acquired for substantial value or to IPO. However, many young VC-backed firms fail. The standard DCF must be modified for young VC-backed firms by (i) valuing the firms as if it would succeed (IPO or be acquired) and then to (ii) discount that by the probability of success.[169] For example, if a firm would be worth $300 million if it succeeded, but it had only a 1/3 chance of success, it would be valued today at $100 million. So for young VC-backed firms, if one is doing DCF, one must also estimate the risk of failure.[170]

105. The third unusual aspect of DCF for young VC-backed firms is that one must also estimate the percentage of the firm that the current owners will retain at exit (the "retention percentage").[171]

# B.    Problems with Applying the Standard Comparable Companies Approach to hiQ

106. In principle, one could use the comparable companies approach to value hiQ. In the standard comparables approach (for mature companies), one identifies a set of comparable firms and computes the average (or median, or the range of) financial multiples for the comparables, and uses those multiples to value the subject firm. For example, one might compute the average ratio of Enterprise Value to Earnings Before Interest Taxes Depreciation and Amortization (the "EV/EBITDA" multiple) and then compute the value of the subject company as that multiplied by the subject firm's EBITDA.[172]

107. As with the DCF method, we have to modify this method somewhat to apply to a young VC-backed firm like hiQ. First, we would have to rely on a multiple to revenue, since earnings for

---

[169] Valuers sometimes try to compensate for such optimism by choosing an unrealistically high discount rate. That is a mistake, as it is not simply assigning an incorrect discount rate, but it reflects the wrong type of risk. Discount rates compound over time but the failure risk that a startup faces is short-term and then dissipates. The risk of failure should be treated like a haircut to value or cash-flows, not an increase in the discount rate. See Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition, pp. 155-156, Wiley, Kindle Edition.

[170] There are methods to do this, but they involve additional steps and judgement.

[171] Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition, p. 153, Wiley, Kindle Edition. Note that I avoid this issues by using the Pre-Money C Round value.

[172] Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition, p. 185, Wiley, Kindle Edition. Note that I avoid this issues by using the Pre-Money C Round value.

hiQ (and most other young VC-backed firms) are negative. Second, we would have to look to revenue multiples for other young VC-backed firms – since mature public firms are not comparable.

108.   Using a revenue multiple is problematic for several reasons. First, firm value is the present discounted value of future cash flows, not of revenues. A multiple to earnings can be viewed as akin to a terminal multiple that expresses, essentially, the product of:

   a.   The expected long-term ratio of cash flows to earnings; and

   b.   The inverse of the discount rate minus the growth rate.[173]

109.   Cash flows are generally closely related to earnings, and discount and growth rates are often similar across mature firms in similar industries. As such, a multiple to earnings has at least a theoretical basis to be potentially reliable. Earnings are closely related to EBITDA – and usually similarly related in industry – and multiples to EBITDA are also commonly used.

110.   However, the relationship of revenue to cash flows is much less certain, especially for young firms, and firms in new industries – like hiQ – where typical profit margins for mature firms cannot be observed. As Metrick (3rd) observes "… this multiple appears completely divorced from any cash flow rationale because no measure of profitability is included in the denominator."[174] He then explains that it is often the best measure than can be used because young VC-backed firms often have negative earnings, EBITDA and cash flow.

111.   Given the wide dispersion of revenues experienced by early stage firms, and the lack of certainty in the relationship between revenue multiples and expected cash flows, some venture capital firms often do not consider revenue models altogether.[175]

112.   Revenue data from PitchBook is somewhat unreliable. PitchBook states that the revenue figures it reports, if it does report revenues, are those reported within six months of the transaction, covering the trailing twelve months. At a rapidly growing firm, this can mean that

---

[173] The Gordon growth model gives a steady state value = FCF/(r-g) (*see, e.g.,* Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance*, 13th Ed. McGraw-Hill Education, 2020, Sec.2-3). So we have a multiple with FCF/EBITDA / (r-g).

[174] Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition (p. 185), Wiley, Kindle Edition.

[175] See, e.g., Paul Gompers et al, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics* 135(1) (January 2020): 169-190, p. 181: "Several VCs, particularly those who invested early-stage and in the Bay Area, did not build formal revenue models."

the reported figures do not actually correspond to the timeframe of the valuation PitchBook reports.

113. More problematic is that the range of revenue multiples for young VC-backed firms is extremely wide, and there is no reliable way to identify where in that range the subject firm belongs based on firm characteristics.[176] Figure 9 shows the dispersion or revenue multiples for a large set of comparable firms, in both the B and C rounds.[177] The standard deviation of the revenue multiple, even the trimmed one, is nearly as large as the trimmed average and the 75th percentile.

FIGURE 9: REVENUE MULTIPLES IN COMPARABLE FIRMS[178]

|  | Round B Post-Money Rev. Multiple | Round C Pre-Money Rev. Multiple |
|---|---|---|
| Mean | 66.3 | 152.0 |
| Trimmed Mean* | 26.7 | 21.4 |
|  |  |  |
| *25th percentile* | 4.9 | 4.8 |
| *50th percentile (median)* | 11.8 | 10.4 |
| *75th percentile* | 31.3 | 26.9 |
|  |  |  |
| Std.Dev | 263.2 | 1,826.5 |
| Trimmed Std.Dev* | 27.9 | 20.4 |
|  |  |  |
| Inter-quartile Ratio | 6.3 | 5.6 |
|  |  |  |
| Number of Observations | 168 | 320 |

114. Finally, hiQ's Round B Post-Money revenue multiple was 50x,[179] which places it well above the 75th percentile for Round B. Any attempt to value hiQ in Round C based on a straight multiples

---

[176] One can calibrate based on hiQ's observed Round B valuation, but that moves away from a standard multiples approach and towards the approach I use.

[177] The development of this dataset is discussed in Section IV.C.1. Note that we consider Post-Money multiples for Round B and Pre-Money multiples for Round C because hiQ's Post-Money valuation is the most up-to-date value we observe, but its Pre-Money Round C valuation is closest to the concept of an "as of the C&D" valuation that we want to estimate.

[178] *See* supporting r-code and Sacks_report_support.xlsx.

[179] $31.7 million / 640 thousand (*see* Figure 3) = 49.5

approach would need to address this fact – but other than relying on the Round B multiple itself, it is not clear how a multiples approach could do so reliably.

# VI.  Subset damages

115.  I conclude that Subset damages are $1.6 million. I calculate these damages as lost profits from (1) hiQ's existing customers, and (2) certain of hiQ's potential relationship with IBM. I discuss each in turn.

## A.    Subset damages from Existing Customers

116.  I model lost profits for Subset damages in real (as opposed to nominal) terms. So I do not inflate figures over time, and I discount using a real interest rate.

117.  I calculate expected profits from each existing customer as the annual profits from that customer derived from the customer's payments to hiQ for the contract, modeled to recur with a probability of renewal each year, discounted back to present value. For hiQ customers, active as of the Valuation month, who have never previously had the opportunity to renew a contract of the same type, I model their probability of renewing for the next contract period as equal to the average probability of renewal for all customers who have ever had the opportunity to renew. That probability is 58%, and there were 10 such customer contracts with a total annual revenue of $651 thousand.[180]

118.  The probability of renewal for customers who have already renewed at least once is higher. There were 12 such customer contracts with a total revenue of $544 thousand.[181] For these hiQ customers, I model their probability of renewing for the next contract period as 71% (essentially, assuming they are half as likely to not renew as are customers that have never renewed). Once a customer has renewed, I model their probability of subsequent renewal as this same 71%.

---

[180]  *See* figure 10 and associated work papers in Sacks_report_support.xlsx.

[181]  *See* figure 10 and associated work papers in Sacks_report_support.xlsx.

119. Profits for each customer for each year are equal to the revenues for the contract, minus the costs of delivering on the contract. hiQ would need to continue to incur the costs of hosting on AWS.[182]

120. The other major cost that hiQ would have to incur to service these customers was to scrape LinkedIn data. The costs to scrape are partly fixed and partly variable. The fixed component is that hiQ scraped about 100,000 profiles per month for a "training set". These profiles do not com from customers. The variable part is that, when it was a going concern, hiQ scraped about 400,000 profiles of customer employees per month.[183] The number of scrapes it would need going forwards to cover customers employees would change as its customer base changed. I assume the number of scrapes changes in proportion to revenue from customers (as a proxy for the number of customer employees covered).

121. In Section IV.B.5. I discussed the MiFi solution that hiQ was developing. The maximum cost of that solution would occur if it cannot be automated. In that case, hiQ would have to pay 12 FTEs at the average Turker wage, which is about $14 / hour.[184] That equates to a cost of $350,000 per year to scrape 500,000 profiles a month.

122. Additionally, hiQ would incur costs that, depending on the business decisions of hiQ when operating in a run-down mode where it was only servicing current contracts, would be small to non-existent. These costs are administrative overhead, rent, and the costs associated with Turkers disambiguating LinkedIn profiles to match employees with common names. At most, these costs are estimated to be:

   a. Administrative Overhead - $43,680 per year;[185]

   b. Rent – a third of hiQ's annualized rental costs in 2017;[186]

   c. Profile Disambiguation – 5% of estimated annual Turker labor costs for MiFi solution.[187]

---

[182] Communication with Graves. I assume that COGS in hiQ financials includes this cost.

[183] Communication with Graves. hiQ would scrape data from between several hundred thousand and one million public profile URLs in a given month. hiQ's Responses to LinkedIn's First Set of Interrogatories, July 29, 2021, Response No. 3. I assume 500,000 on average. So 400,000 = 500,000 total scrapes minus the 100,000 for the training set.

[184] See Section IV.B.5.

[185] Communication with Mark Weidick and hiQ_SACKS_00000001. *See* work papers in Sacks_report_support.xlsx.

[186] Communication with Mark Weidick and hiQ_00004324. *See* work papers in Sacks_report_support.xlsx.

[187] Communication with Mark Weidick. *See* work papers in Sacks_report_support.xlsx.

123. I discount back to present value at an 8.13% real discount rate.[188]

## B.   Damages from Loss of the Potential IBM Relationship

124. As discussed in Section IV.B.4, hiQ and IBM were in discussions to partner at the time of the C&D. Contemporaneous ordinary course of business documents value this relationship to hiQ, initially, at $1 million in revenue per year for at least two years.[189]

125. I assume that this relationship would not begin until 2018, and had a 75% chance of beginning. It is a two-year contract, which then renews as a series of one-year contracts. The first renewal has a 58% probability (the same as for customers who have not renewed), and each subsequent renewal has a 71% probability, the same as I use to model customer renewals for those who have already renewed at least once.

## C.   Subset damages from Existing Customers and IBM

126. I calculate Subset damages based on the above method as summarized in Figure 10. Note that I have assumed that all of the contracts existing as of the month of C&D were fully paid – so there are no Subset damages for 2017.[190] For 2018, I adjust the lost profits calculation to remove the value from payments by customers that are plausibly for the subset contracts.[191]

---

[188] Based on an average cost of venture capital of 10% nominal (Andrew Metrick. Venture Capital and the Finance of Innovation, 3rd Edition (p. 69). Wiley. Kindle Edition), and expected inflation of 1.87%. See "Inflation Expectations," Federal Reserve Bank, May 11, 2022 (last accessed June 7, 2022: https://www.clevelandfed.org/en/our-research/indicators-and-data/inflation-expectations.aspx.)

[189] hiQ_00422044 and hiQ_00650882.

[190] Note also that I have assigned revenue to the year of the contract.

[191] See Figure 10 and associated work papers in Sacks_report_support.xlsx.

FIGURE 10: SUBSET DAMAGES[192]

| Year | Revenue from Customers | Payments from Customers | Unreceived Revenue from Customers | Revenue from IBM Partnership | Cost to Service | Raw Profit | Profit | Discount Factor at 8.1% (real) | Present Value of Lost Profits (Subset Damages) |
|---|---|---|---|---|---|---|---|---|---|
| 2017 | $ 1,195,581 | Assume Received | $ - | | $ 497,443 | $ 698,138 | $ 698,138 | 96% | Assume Received |
| 2018 | $ 786,441 | $ 357,100 | $ 429,341 | $ 750,000 | $ 494,236 | $ 721,546 | $ 721,546 | 89% | $ 641,719 |
| 2019 | $ 561,744 | $ - | $ 561,744 | $ 750,000 | $ 520,383 | $ 603,104 | $ 603,104 | 82% | $ 496,051 |
| 2020 | $ 401,245 | $ - | $ 401,245 | $ 437,500 | $ 426,975 | $ 375,515 | $ 375,515 | 76% | $ 285,638 |
| 2021 | $ 286,604 | $ - | $ 286,604 | $ 312,500 | $ 379,651 | $ 193,557 | $ 193,557 | 70% | $ 136,160 |
| 2022 | $ 204,717 | $ - | $ 204,717 | $ 223,214 | $ 345,848 | $ 63,586 | $ 63,586 | 65% | $ 41,367 |
| 2023 | $ 146,226 | $ - | $ 146,226 | $ 159,439 | $ 321,703 | $ (29,250) | $ - | 60% | $ - |
| 2024 | $ 104,447 | $ - | $ 104,447 | $ 113,885 | $ 304,456 | $ (95,561) | $ - | 56% | $ - |
| 2025 | $ 74,605 | $ - | $ 74,605 | $ 81,346 | $ 292,137 | $ (142,927) | $ - | 51% | $ - |
| 2026 | $ 53,290 | $ - | $ 53,290 | $ 58,105 | $ 283,338 | $ (176,759) | $ - | 48% | $ - |
| 2027 | $ 38,064 | $ - | $ 38,064 | $ 41,503 | $ 277,053 | $ (200,925) | $ - | 44% | $ - |
| Subset Damages | $ 1,600,936 | | | | | | | | |



Benjamin A. Sacks

---

[192] *See* Figure 10 and associated work papers in Sacks_report_support.xlsx.

CONFIDENTIAL

# Appendix A

## Curriculum Vitae of Benjamin Sacks

CONFIDENTIAL

## BENJAMIN A. SACKS
### Principal

Washington, DC                    +1.202.486.9511                    Benjamin.Sacks@brattle.com

**Benjamin Sacks** is a Principal in the Washington, DC office of The Brattle Group. Mr. Sacks has more than 20 years of experience assisting corporations, investors, U.S. government agencies, and foreign governments in developing and presenting economic and financial testimony in complex litigations and arbitrations. He has provided expert reports and testimony in numerous matters before Courts and arbitral Tribunals both in the United States and internationally.

Mr. Sacks has submitted expert reports and testimony in numerous valuations and corporate governance matters before international tribunals and U.S. courts.  Recently, the Tribunal in Devas v. India (PCA Case No. 2013-09) accepted his testimony as the basis for DCF-based damages of a start-up company. Mr. Sacks also served as the economic damages expert for Washington Post reporter Jason Rezaian and his family in their lawsuit against the Islamic Republic of Iran and the Islamic Revolutionary Guard Corp, claiming damages for Iran's holding Mr. Rezaian hostage for more than a year. The court ordered Iran to pay $180 million in damages, including $10 million in economic damages and substantially adopted Mr. Sacks' analysis in reaching that figure.

In a major US litigation, Mr. Sacks was retained by Shareholders in the In Re Facebook Inc., Class C Reclassification Litigation that sought to enjoin Facebook from issuing non-voting shares designed to allow Facebook's founder, Mr. Zuckerberg, to maintain his voting control of Facebook indefinitely. Mr. Sacks submitted expert reports and was deposed several times. Facebook cancelled its plans to issue those shares five days before trial was to begin.

Mr. Sacks teaches a Continuing Legal Education course on damages featuring several valuation case studies, has taught classes to attorneys on valuation and served as a panelist on damages at the recent Fordham Conference on International Arbitration in New York City. He has lectured at several law firms on the modern DCF method, which was used in the recent Tethyan matter. Mr. Sacks received his B.A. in mathematical economics from Columbia University and his M.A. in economics from the University of Chicago.

### AREAS OF EXPERTISE

- International Arbitration
- Finance, Valuation & Securities Analysis
- Commercial Damages & Lost Profits
- Statistical Analysis



CONFIDENTIAL

## BENJAMIN A. SACKS

### TESTIMONY and REPORTS

- IN RE Dell Technologies Inc. Class V Stockholders Litigation, Delaware Court of Chancery, Consol. C.A. No. 2018-0816-JTL. Report April 25, 2022.

-

- In Re Mindbody Inc., Securities Litigation, United States District Court for the Southern District of New York, Civil Action No. 1:19-cv-08331-VEC. Class-wide damages method (class certification). Report October 2021.

- Nantahala Capital Partners II Limited Partnership, on behalf of itself and all other similarly situated stockholders of QAD INC. v QAD Inc, et. al, In the Delaware Court of Chancery, Consol. C.A. 2021-0573-PAF. Report and Deposition September 2021.

- Public Employees' Retirement System of Mississippi, individually and on behalf of all others similarly situated v Advance Auto Parts, Inc., Thomas R. Greco, Thomas Okray, Starboard Value LP, and Jeffrey C. Smith, In The United States District Court For The District Of Delaware, Case No. 1:18-cv-00212-MN. Reasonability of forecasts. Reports July, August and September 2021. Deposition October 2021.

- Hollywood Firefighters' Pension Fund and Sheet Metal Workers' Local Union no. 80 Pension Trust Fund, on behalf of themselves and all others similarly situated v John C. Malone, Gregory B. Maffei, Gregg L. Engles, Ronald A. Duncan, Donne F. Fisher, and Richard R. Green, Delaware Court of Chancery C.A. No. 2020-0880-SG. Fee application for settlement of corporate governance issues. Report July 2021, Deposition September 2021.

- Matthew Sciabacucchi and Hialeah Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated v John Malone, Gregory Maffei, Michael Huseby, Balan Nair, Eric Zinterhofer, Craig Jacobson, Thomas Rutledge, David Merritt, Lance Conn, John Markley, Defendants and Charter Communications, Nominal Defendant, Delaware Court of Chancery C.A. No. 11418-VCG. Damages from alleged breach of fiduciary duty in the context of a merger. Reports January and March 2021. Deposition April 2021.

- Market Efficiency and possibility to calculate class-wide damages in In Re Synchronoss Technologies, Inc. Securities Litigation, United States District Court District Of New Jersey, Civil Action No. 17-2978 (FLW)(ZNQ). Reports October 2020 and March 2021. Deposition February 2021.

- Financial Analysis in Washtenaw County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated, v. Walgreen Co., et al., United States District Court Northern District Of Illinois, Eastern Division, Case No. 1:15-cv-3187. Report November 2020. Deposition December 2020.

## BENJAMIN A. SACKS

- Valuation of a Russian Trucking firm (London Court of International Arbitration). Reports 2018 and 2019. Testimony September 2019.

- Damages from improper oversight of servicing. Phoenix Light SF DAC, et al. vs. The Bank of New York Mellon, SDNY, Case No 1:18-cv-01194-VEC. Report September 2019. Deposition January 2020.

- Value of assets transferred out of a firm by the controlling shareholders.  United States District Court for the Southern District of New York. Report June 2019.

- Valuation of a Canadian Telecommunications firm (ICSID). Reports February 2018 and January 2019. Testimony April 2019.

- Mudrick Capital Management, L.P. and Warlander Asset Management, L.P., on behalf of themselves and all other similarly situated stockholders of Globalstar, Inc. and derivatively on behalf of Nominal Defendant Globalstar, Inc v. James Monroe, et. al., Delaware Court of Chancery, C.A. No. 2018-0699 TMR. Benefit of Settlement relating to corporate governance changes at a telecommunications firm. Deposition and Report March 2019.

- Report on contractual damages relating to a buy/sell agreement for a controlling interest in a Korean Bank (International Chamber of Commerce). Report 2018.

- Valuation of Telecommunications firm in a developing country. Bilateral Investment Treaty heard under UNICTRAL rules, Permanent Court of Arbitration.  Reports 2017 and 2018. Testimony 2018.

- In Re Starz Stockholder Litigation, Delaware Court of Chancery Consolidated C.A. No. 12584-VCG. Damages from alleged breach of fiduciary duty in the context of a merger. Reports and Deposition 2018.

- NexBank, SSB v. Jeffrey Soffer and Jacquelyn Soffer, Supreme Court of the State of New York, County of New York, Index No. 652072 / 2013. Value of real estate encumbered by cloud on title. Report January 2018.

- In Re Facebook, Inc. Class C Reclassification Litigation, Delaware Court of Chancery, Consolidated C.A. No 12286-VCL. Harm from issuance of zero vote stock. Reports and Deposition 2017. Additional Reports and Deposition 2018.

- Damages for Mr. Jason Rezaian, who was taken hostage by Iran. U.S. District Court for the District of Columbia. Civil Action No. 1:16-cv-01960-RJL. Report June 2017.

- Application of the National Railroad Passenger Corporation under 49 u.s.c. § 24308(a) – Canadian National Railway Company, Before the Surface Transportation Board, Finance Docket No. 35743, Verified Statement of Benjamin Sacks filed September 4, 2015. Expert testimony on a proposed penalty system for sub-standard service to Amtrak by host railroad. September 2015. Rebuttal filed September 2017.

- SEC Administrative Proceeding in the Matter of BioElectronics Corp, et. al., File No. 3-17104. Event study related to a corporate disclosure. Reports and Testimony, September 2016.

- Confidential Arbitration. Valuation of privately held telecommunications firm. Report October 2015.

- State of West Virginia ex rel., Patrick Morrisey, Attorney General v. Wells Fargo Insurance Services of West Virginia and Wells Fargo Insurance Services USA, Inc, Circuit Court of Hancock County, WV, Civil Action No. 05-C-115 W. Deposition January 21, 2016. Expert Affidavit and disclosure on opinions regarding existence and size of alleged overcharge for insurance policies, and related damages. Reports September 2015; Deposition November 2015.

- National Credit Union Administration Board, as Liquidating Agent of Central Federal Credit Union v. RBS Securities, et. al, Case No. 11-cv-2340-JWL-JPO and National Credit Union Administration Board, as Liquidating Agent of Western Corporate Federal Credit Union v. RBS Securities CV 11-05887 GW (JEMx), Declaration of Benjamin Sacks Regarding Compilation and Summarization of RBS Due Diligence data. October 2015.

- United States of America, ex rel., Michael Saunders, v. Unisys, Inc., United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No 1:12 CV 379 GBL/TCB. Damages Report July 2014. Deposition, September 2014.

- Curbow Family LLC v. Morgan Stanley Investment Advisors Inc., Index No. 651059/2010 (Sup. Ct. NY) and Rotz v. Van Kampen Asset Management, Index No. 651060/2010 (Sup. Ct. NY).  Expert report in support of Plaintiff's opposition to a motion for summary judgment, September 2012.

- Howard M. Ehrenberg, Chapter 7 Trustee for the Estate of Ruderman Capital Partners, LLC v. Kevin L. Washington, James King and Knight Capital Group, et al., Superior Court of the State of California for the County of Orange, Case No. 30-2011 00450602.  Declaration filed in support of defendant's motion for summary judgment or adjudication of claims, July 2012.

- In re Delphi Financial Group Shareholder Litigation, Delaware Court of Chancery, Consolidated C.A. No. 7144-VCG.  Expert report and deposition, February 2012.

BENJAMIN A. SACKS

- Wolfson-Verrichia Group, et al., v. Metro Commercial Real Estate, Inc., et al., United States District Court for the Eastern District of Pennsylvania, No. 08-CV-4997. Expert report October 2011, deposition November 2011.

- FIFRA data compensation matter (AAA Arbitration), Summary of Expert Opinions disclosed October 2010. Testimony November 2010.

- Eastbanc, Inc. and Anthony M. Lanier v. Georgetown Park Associates II Limited Partnership, et al., Superior Court of the District of Columbia, 2006 CA 002291 B. Supplemental Expert Statement and Rule 26(b)(4) Statement filed October 2010, deposition December 2008, Rule 26(b)(4) Statement filed October 2008.

- Navy Federal Credit Union v. Fiserv Solutions and XL Specialty Insurance Company, Index No. 09-601217-2009. Affidavit Of Benjamin Sacks in Support of Plaintiff Navy Federal Credit Union's Motion for Partial Summary Judgment filed October 2010, Expert Witness Disclosure filed pursuant to New York State CPLR § 3101(d) filed September 2010.

- In re ACS Shareholder Litigation, Delaware Court of Chancery, Consolidated C.A. No. 4940-VCP. Expert reports March and April 2010. Deposition April 2010.

- FIFRA data compensation arbitration: Summary of Expert Opinions disclosed in August 2009.

- Teachers Retirement System of Louisiana v. Maurice R. Greenberg, Edward E. Matthews, Howard I. Smith, Thomas R. Tizzio, and C. V. Starr & Co. Inc, Delaware Court of Chancery, C.A. No 20106-VCS. Expert reports January and May 2008. Deposition June 2008.

- PW 5672, Harrison County fee dispute with FEMA regarding reasonable costs. Expert written opinion July 2007.

- Breach of contract matter (AAA arbitration). Testimony October 2006.

## ACADEMIC PAPERS

- Sacks, B.A, J.V. Hotz, C. Mulligan, and A. Zellner: "Three Essays on Bayesian Methods for Analyzing Limited Dependent Variable and Multinomial Choice Models with Measurement Error and Missing Data." Applications of Monte Carlo methods to statistical estimation.

- Sacks, B.A., and A. Zellner: "Bayesian Method of Moments (BMOM) Analysis of the Multiple Regression Model with Autocorrelated Errors." Presented paper at the 1996 summer conference of the International Society for Bayesian Analysis.

## PRESENTATIONS

- Speaker on Knowledge Group webcast October 21, 2020. Topic "Valuation and Forensic Accounting: Demystifying Trends, Critical Issues, and Best Practices"

- Lecture on the modern DCF method as used in the Tethyan matter (joint with Dr. Florin Dorobantu), February 2020: WilmerHale, Voltera Fietta, Boies Schiller, White & Case.

- Panelist November 2019 at Fordham Conference on International Arbitration and Mediation in New York City.

- Panelist March 2018 Juris International Arbitration conference. Session entitled "To Hot Tub or Not to Hot Tub?" March 6, 2018 in Washington D.C.

- CLE Presentation on Facebook Reclassification matter. Cleary Gottlieb, Washington, D.C., 2017.

- Panelist at May 2016 Juris International Arbitration conference. Session entitled "Damages in investment arbitration – a revolutionary remedy or reward for rich corporations at the expense of the world's poor? A fundamental examination of Chorzow's children." May 12-13, 2016 in Washington D.C.

- Seminar on DCF valuation presented to Debevoise and Plimpton, New York City, March 19, 2015.

- CLE Presentation "Lessons for Attorneys from Damages War-Stories" at WilmerHale, Washington, D.C., June 22, 2011, Venable, Washington, D.C., October 18, 2011, Kramer Levin Naftalis & Frankel, New York City, November 10, 2011, White & Case, Washington, D.C., November 15, 2011, Cadwalader Wickersham & Taft, New York City, November 17, 2011; Dilworth Paxson, Philadelphia, November 30, 2011; Baker Botts, Washington, D.C., December 19, 2011; Bernstein Litowitz Berger & Grossmann, New York City, February 16 2012; New York County Lawyers Association, February 28, 2012; Cleary Gottlieb Steen & Hamilton, Washington, D.C., June 6, 2013; Day Pitney, Newark, NJ, December 6, 2013.

- Securities and Exchange Commission, Washington, D.C., June 17, 2010. Presented on corporate governance and self-dealing.

- Lex Mundi Conference, Rome, Italy, March 5, 2004. Presented "Economic experts and asbestos liability."

- Asbestos Alliance Teach-In (joint with Jefferies & Company, Inc., and Sonnenschein Nath and Rosenthal), via teleconference, December 16, 2002. Lecturer.

- Credit Suisse First Boston, New York, New York, April 2001. Presented "Asbestos liability and M&A and divestitures."

CONFIDENTIAL

# Appendix B

## Materials Considered in Forming Opinion

## Appendix B: Materials Considered

**Report Sources**

I considered financial documents created by hiQ in the general course of business from approximately 2015 to 2017, such as client contracts and equity documents prepared for Series A, B, and C funding.

Communications with Genevieve Graves, Andrew Kim,  Mark Weidick, and Darren Kaplan.

***Legal Pleadings and Other Filings***

[1] Amended Complaint, *hiQ Labs, Inc., v. LinkedIn Corp.,*  February 14, 2020, Case No. 3:17-cv-03301-EMC.

[2] hiQ's Responses to LinkedIn's First Set of Interrogatories, July 29, 2021.

[3] hiQ's Supplemental Responses to Linkedin's Second Set of  Interrogatories, May 13, 2022.

[4] hiQ's Responses to Second Set of Interrogatories, April 7, 2022.

[5] Defendant LinkedIn Corp.'s Responses to hiQ Labs, Inc.'s Second Set of Interrogatories, April 7, 2022.

***Expert Reports and Deposition Transcripts***

[1] Expert Report of Stephen B. McElfresh, June 7, 2022, and exhibits thereto.

[2] Videotaped Deposition of Alexander Oltmann, May 13, 2022, and exhibits thereto.

[3] Videotaped Deposition of Boris Dev, May 4, 2022, and exhibits thereto.

[4] Videotaped Deposition of Chris Lamb, taken remotely via Zoom, May 18, 2022, and exhibits thereto.

[5] Videotaped Deposition of Daniel Francis, taken remotely via Zoom, May 25, 2022, and exhibits thereto.

[6] Videotaped Deposition of Daniel Miller, taken remotely, May 13, 2022, and exhibits thereto.

[7] Videotaped Deposition of Darren Kaplan, May 4, 2022, and exhibits thereto.

[8] Videotaped Deposition of Darren Kaplan, May 5, 2022, and exhibits thereto.

[9] Videotaped Deposition of Eric Owski, taken remotely via Zoom, May 23, 2022, and exhibits thereto.

[10] Videotaped Deposition of Genevieve Graves, taken remotely via Zoom, May 25, 2022, and exhibits thereto.

[11] Videotaped Deposition of Jenelle Bray, taken remotely via Zoom, May 18, 2022, and exhibits thereto.

[12] Videotaped Deposition of Mark Weidick, taken remotely via Zoom, May 23, 2022, and exhibits thereto.

[13] Videotaped Deposition of Michael Jennings, taken remotely via Zoom, May 26, 2022, and exhibits thereto.

[14] Videotaped Deposition of Robert J. DeSantis, taken remotely via Zoom, May 17, 2022, and exhibits thereto.

***Produced Documents***

| | | |
|---|---|---|
| [1] DeSantis_00000350 | hiQ_00004321 | hiQ_00180936 |
| [2] hiQ_00001075 | hiQ_00004322 | hiQ_00181615 |
| [3] hiQ_00001079 | hiQ_00004323 | hiQ_00181736 |
| [4] hiQ_00001081 | hiQ_00004324 | hiQ_00182138 |
| [5] hiQ_00001082 | hiQ_00004325 | hiQ_00182441 |
| [6] hiQ_00001083 | hiQ_00004326 | hiQ_00182563 |
| [7] hiQ_00001085 | hiQ_00004327 | hiQ_00182565 |
| [8] hiQ_00001085 | hiQ_00004328 | hiQ_00182632 |
| [9] hiQ_00001201 | hiQ_00004329 | hiQ_00182643 |
| [10] hiQ_00001664 | hiQ_00004330 | hiQ_00182802 |
| [11] hiQ_00001667 | hiQ_00004331 | hiQ_00183331 |
| [12] hiQ_00001670 | hiQ_00004332 | hiQ_00183335 |
| [13] hiQ_00001671 | hiQ_00004333 | hiQ_00189163 |
| [14] hiQ_00001876 | hiQ_00004334 | hiQ_00204550 |
| [15] hiQ_00002119 | hiQ_00004335 | hiQ_00209135 |
| [16] hiQ_00002965 | hiQ_00004336 | hiQ_00217949 |
| [17] hiQ_00003032 | hiQ_00004337 | hiQ_00217955 |
| [18] hiQ_00003034 | hiQ_00004338 | hiQ_00217967 |
| [19] hiQ_00003052 | hiQ_00004339 | hiQ_00218861 |
| [20] hiQ_00003060 | hiQ_00004340 | hiQ_00218928 |
| [21] hiQ_00003084 | hiQ_00004341 | hiQ_00218941 |
| [22] hiQ_00003100 | hiQ_00004342 | hiQ_00218952 |
| [23] hiQ_00003116 | hiQ_00004343 | hiQ_00219030 |
| [24] hiQ_00003140 | hiQ_00004344 | hiQ_00220189 |
| [25] hiQ_00003148 | hiQ_00004345 | hiQ_00220250 |
| [26] hiQ_00003150 | hiQ_00004345 | hiQ_00220268 |
| [27] hiQ_00003151 | hiQ_00004346 | hiQ_00220284 |
| [28] hiQ_00003152 | hiQ_00004347 | hiQ_00233819 |
| [29] hiQ_00003153 | hiQ_00004348 | hiQ_00233970 |
| [30] hiQ_00003154 | hiQ_00004349 | hiQ_00233986 |
| [31] hiQ_00003155 | hiQ_00004350 | hiQ_00234171 |
| [32] hiQ_00003156 | hiQ_00004351 | hiQ_00235656 |
| [33] hiQ_00003157 | hiQ_00004352 | hiQ_00241320 |
| [34] hiQ_00003198 | hiQ_00004353 | hiQ_00242154 |

| | | |
|---|---|---|
| [35] hiQ_00003199 | hiQ_00004355 | hiQ_00242197 |
| [36] hiQ_00003200 | hiQ_00004356 | hiQ_00245781 |
| [37] hiQ_00003238 | hiQ_00004357 | hiQ_00245917 |
| [38] hiQ_00003275 | hiQ_00004358 | hiQ_00247488 |
| [39] hiQ_00003275 | hiQ_00004359 | hiQ_00250102 |
| [40] hiQ_00003307 | hiQ_00004360 | hiQ_00253109 |
| [41] hiQ_00003316 | hiQ_00004361 | hiQ_00262859 |
| [42] hiQ_00003333 | hiQ_00004362 | hiQ_00312832 |
| [43] hiQ_00003341 | hiQ_00004363 | hiQ_00317734 |
| [44] hiQ_00003366 | hiQ_00004364 | hiQ_00321677 |
| [45] hiQ_00003367 | hiQ_00004365 | hiQ_00323580 |
| [46] hiQ_00003375 | hiQ_00004366 | hiQ_00327829 |
| [47] hiQ_00003376 | hiQ_00004367 | hiQ_00327833 |
| [48] hiQ_00003400 | hiQ_00004368 | hiQ_00332646 |
| [49] hiQ_00003401 | hiQ_00004369 | hiQ_00332646 |
| [50] hiQ_00003402 | hiQ_00004370 | hiQ_00334452 |
| [51] hiQ_00003403 | hiQ_00004375 | hiQ_00334452 |
| [52] hiQ_00003432 | hiQ_00004376 | hiQ_00334864 |
| [53] hiQ_00003433 | hiQ_00004377 | hiQ_00335841 |
| [54] hiQ_00003476 | hiQ_00004378 | hiQ_00337948 |
| [55] hiQ_00003479 | hiQ_00004379 | hiQ_00340904 |
| [56] hiQ_00003481 | hiQ_00004380 | hiQ_00344489 |
| [57] hiQ_00003482 | hiQ_00004381 | hiQ_00351671 |
| [58] hiQ_00003511 | hiQ_00004382 | hiQ_00351884 |
| [59] hiQ_00003520 | hiQ_00004383 | hiQ_00352299 |
| [60] hiQ_00003526 | hiQ_00004384 | hiQ_00377725 |
| [61] hiQ_00003531 | hiQ_00004385 | hiQ_00379288 |
| [62] hiQ_00003533 | hiQ_00004386 | hiQ_00379301 |
| [63] hiQ_00003537 | hiQ_00004387 | hiQ_00388193 |
| [64] hiQ_00003555 | hiQ_00004388 | hiQ_00388583 |
| [65] hiQ_00003558 | hiQ_00004389 | hiQ_00389081 |
| [66] hiQ_00003562 | hiQ_00004390 | hiQ_00391424 |
| [67] hiQ_00003564 | hiQ_00004391 | hiQ_00391545 |
| [68] hiQ_00003568 | hiQ_00004392 | hiQ_00391714 |
| [69] hiQ_00003569 | hiQ_00004393 | hiQ_00391746 |
| [70] hiQ_00003572 | hiQ_00004394 | hiQ_00422044 |
| [71] hiQ_00003573 | hiQ_00004395 | hiQ_00428965 |
| [72] hiQ_00003574 | hiQ_00004396 | hiQ_00443139 |
| [73] hiQ_00003605 | hiQ_00004397 | hiQ_00443139 |
| [74] hiQ_00003606 | hiQ_00004398 | hiQ_00447685 |
| [75] hiQ_00003607 | hiQ_00004399 | hiQ_00463481 |
| [76] hiQ_00003610 | hiQ_00004400 | hiQ_00466114 |
| [77] hiQ_00003612 | hiQ_00004401 | hiQ_00466141 |
| [78] hiQ_00003621 | hiQ_00004402 | hiQ_00466146 |
| [79] hiQ_00003629 | hiQ_00004403 | hiQ_00466148 |
| [80] hiQ_00003632 | hiQ_00004404 | hiQ_00466261 |
| [81] hiQ_00003639 | hiQ_00004405 | hiQ_00466328 |
| [82] hiQ_00003639 | hiQ_00004406 | hiQ_00466407 |
| [83] hiQ_00003654 | hiQ_00004407 | hiQ_00466594 |
| [84] hiQ_00003673 | hiQ_00004408 | hiQ_00466596 |
| [85] hiQ_00003676 | hiQ_00004409 | hiQ_00466683 |
| [86] hiQ_00003679 | hiQ_00004410 | hiQ_00466694 |
| [87] hiQ_00003682 | hiQ_00004411 | hiQ_00466714 |
| [88] hiQ_00003685 | hiQ_00004412 | hiQ_00466749 |
| [89] hiQ_00003688 | hiQ_00004413 | hiQ_00466841 |
| [90] hiQ_00003690 | hiQ_00004414 | hiQ_00466892 |
| [91] hiQ_00003692 | hiQ_00004415 | hiQ_00466966 |
| [92] hiQ_00003701 | hiQ_00004416 | hiQ_00467097 |
| [93] hiQ_00003767 | hiQ_00004417 | hiQ_00467201 |
| [94] hiQ_00003769 | hiQ_00004418 | hiQ_00467219 |
| [95] hiQ_00003771 | hiQ_00004419 | hiQ_00467277 |

CONFIDENTIAL

| | | |
|---|---|---|
| [96] hiQ_00003773 | hiQ_00004420 | hiQ_00467408 |
| [97] hiQ_00003776 | hiQ_00004421 | hiQ_00467466 |
| [98] hiQ_00003780 | hiQ_00004422 | hiQ_00467709 |
| [99] hiQ_00003783 | hiQ_00004423 | hiQ_00467746 |
| [100] hiQ_00003783 | hiQ_00004424 | hiQ_00467759 |
| [101] hiQ_00003797 | hiQ_00004425 | hiQ_00467769 |
| [102] hiQ_00003835 | hiQ_00004426 | hiQ_00467884 |
| [103] hiQ_00003835 | hiQ_00004430 | hiQ_00467964 |
| [104] hiQ_00003837 | hiQ_00004436 | hiQ_00468101 |
| [105] hiQ_00003839 | hiQ_00004437 | hiQ_00468262 |
| [106] hiQ_00003841 | hiQ_00004438 | hiQ_00468477 |
| [107] hiQ_00003842 | hiQ_00004439 | hiQ_00468538 |
| [108] hiQ_00003844 | hiQ_00004440 | hiQ_00468633 |
| [109] hiQ_00003847 | hiQ_00004441 | hiQ_00468743 |
| [110] hiQ_00003849 | hiQ_00004442 | hiQ_00469178 |
| [111] hiQ_00003890 | hiQ_00004443 | hiQ_00469370 |
| [112] hiQ_00003893 | hiQ_00004452 | hiQ_00469433 |
| [113] hiQ_00003895 | hiQ_00004453 | hiQ_00469462 |
| [114] hiQ_00003911 | hiQ_00004462 | hiQ_00469466 |
| [115] hiQ_00003913 | hiQ_00004463 | hiQ_00469640 |
| [116] hiQ_00003915 | hiQ_00004464 | hiQ_00469660 |
| [117] hiQ_00003916 | hiQ_00004465 | hiQ_00469682 |
| [118] hiQ_00003919 | hiQ_00004466 | hiQ_00469771 |
| [119] hiQ_00003920 | hiQ_00004467 | hiQ_00470229 |
| [120] hiQ_00003921 | hiQ_00004468 | hiQ_00470373 |
| [121] hiQ_00003922 | hiQ_00004469 | hiQ_00470450 |
| [122] hiQ_00003923 | hiQ_00004470 | hiQ_00470483 |
| [123] hiQ_00003924 | hiQ_00004471 | hiQ_00470497 |
| [124] hiQ_00003925 | hiQ_00004472 | hiQ_00470509 |
| [125] hiQ_00003939 | hiQ_00004473 | hiQ_00470561 |
| [126] hiQ_00003969 | hiQ_00004474 | hiQ_00470561 |
| [127] hiQ_00003999 | hiQ_00004475 | hiQ_00470665 |
| [128] hiQ_00004000 | hiQ_00004477 | hiQ_00470721 |
| [129] hiQ_00004031 | hiQ_00004479 | hiQ_00470791 |
| [130] hiQ_00004031 | hiQ_00004480 | hiQ_00470842 |
| [131] hiQ_00004032 | hiQ_00004481 | hiQ_00470856 |
| [132] hiQ_00004033 | hiQ_00004482 | hiQ_00472237 |
| [133] hiQ_00004078 | hiQ_00004490 | hiQ_00472244 |
| [134] hiQ_00004082 | hiQ_00004499 | hiQ_00473249 |
| [135] hiQ_00004085 | hiQ_00004500 | hiQ_00475119 |
| [136] hiQ_00004086 | hiQ_00004508 | hiQ_00480667 |
| [137] hiQ_00004086 | hiQ_00004509 | hiQ_00482170 |
| [138] hiQ_00004100 | hiQ_00004510 | hiQ_00484052 |
| [139] hiQ_00004116 | hiQ_00004511 | hiQ_00484690 |
| [140] hiQ_00004119 | hiQ_00004512 | hiQ_00485279 |
| [141] hiQ_00004125 | hiQ_00004513 | hiQ_00485309 |
| [142] hiQ_00004127 | hiQ_00004514 | hiQ_00485317 |
| [143] hiQ_00004129 | hiQ_00004515 | hiQ_00492638 |
| [144] hiQ_00004130 | hiQ_00004516 | hiQ_00503845 |
| [145] hiQ_00004131 | hiQ_00004517 | hiQ_00505836 |
| [146] hiQ_00004133 | hiQ_00004518 | hiQ_00511654 |
| [147] hiQ_00004139 | hiQ_00004519 | hiQ_00518563 |
| [148] hiQ_00004140 | hiQ_00004520 | hiQ_00522858 |
| [149] hiQ_00004141 | hiQ_00004521 | hiQ_00530180 |
| [150] hiQ_00004142 | hiQ_00004522 | hiQ_00530208 |
| [151] hiQ_00004143 | hiQ_00004523 | hiQ_00531086 |
| [152] hiQ_00004144 | hiQ_00004524 | hiQ_00531097 |
| [153] hiQ_00004145 | hiQ_00004525 | hiQ_00532229 |
| [154] hiQ_00004146 | hiQ_00004526 | hiQ_00536476 |
| [155] hiQ_00004147 | hiQ_00004527 | hiQ_00536549 |
| [156] hiQ_00004148 | hiQ_00004528 | hiQ_00536916 |

| | | |
|---|---|---|
| [157] hiQ_00004151 | hiQ_00004529 | hiQ_00540650 |
| [158] hiQ_00004152 | hiQ_00004530 | hiQ_00540666 |
| [159] hiQ_00004153 | hiQ_00004531 | hiQ_00540666 |
| [160] hiQ_00004154 | hiQ_00004532 | hiQ_00540930 |
| [161] hiQ_00004155 | hiQ_00004533 | hiQ_00540931 |
| [162] hiQ_00004156 | hiQ_00004534 | hiQ_00541161 |
| [163] hiQ_00004157 | hiQ_00004535 | hiQ_00541188 |
| [164] hiQ_00004160 | hiQ_00004536 | hiQ_00541837 |
| [165] hiQ_00004164 | hiQ_00004537 | hiQ_00542057 |
| [166] hiQ_00004172 | hiQ_00004538 | hiQ_00546011 |
| [167] hiQ_00004173 | hiQ_00004540 | hiQ_00554230 |
| [168] hiQ_00004174 | hiQ_00004541 | hiQ_00557341 |
| [169] hiQ_00004175 | hiQ_00004542 | hiQ_00557342 |
| [170] hiQ_00004176 | hiQ_00004543 | hiQ_00571008 |
| [171] hiQ_00004177 | hiQ_00004543 | hiQ_00577898 |
| [172] hiQ_00004178 | hiQ_00004544 | hiQ_00577907 |
| [173] hiQ_00004179 | hiQ_00004545 | hiQ_00577921 |
| [174] hiQ_00004182 | hiQ_00004546 | hiQ_00577969 |
| [175] hiQ_00004183 | hiQ_00004547 | hiQ_00578479 |
| [176] hiQ_00004184 | hiQ_00004548 | hiQ_00578479 |
| [177] hiQ_00004185 | hiQ_00004549 | hiQ_00578500 |
| [178] hiQ_00004186 | hiQ_00004550 | hiQ_00578500 |
| [179] hiQ_00004187 | hiQ_00004551 | hiQ_00578799 |
| [180] hiQ_00004190 | hiQ_00004555 | hiQ_00578802 |
| [181] hiQ_00004191 | hiQ_00004556 | hiQ_00579465 |
| [182] hiQ_00004192 | hiQ_00004557 | hiQ_00579469 |
| [183] hiQ_00004193 | hiQ_00004561 | hiQ_00579668 |
| [184] hiQ_00004194 | hiQ_00004562 | hiQ_00580069 |
| [185] hiQ_00004195 | hiQ_00004563 | hiQ_00580704 |
| [186] hiQ_00004196 | hiQ_00004564 | hiQ_00587277 |
| [187] hiQ_00004197 | hiQ_00004565 | hiQ_00589362 |
| [188] hiQ_00004200 | hiQ_00004566 | hiQ_00591204 |
| [189] hiQ_00004201 | hiQ_00004567 | hiQ_00592515 |
| [190] hiQ_00004203 | hiQ_00004568 | hiQ_00596356 |
| [191] hiQ_00004204 | hiQ_00004569 | hiQ_00596684 |
| [192] hiQ_00004205 | hiQ_00004570 | hiQ_00597596 |
| [193] hiQ_00004206 | hiQ_00004571 | hiQ_00602737 |
| [194] hiQ_00004207 | hiQ_00004572 | hiQ_00621248 |
| [195] hiQ_00004208 | hiQ_00004573 | hiQ_00623131 |
| [196] hiQ_00004209 | hiQ_00004574 | hiQ_00626383 |
| [197] hiQ_00004210 | hiQ_00004575 | hiQ_00629210 |
| [198] hiQ_00004211 | hiQ_00004576 | hiQ_00641039 |
| [199] hiQ_00004212 | hiQ_00004577 | hiQ_00641058 |
| [200] hiQ_00004213 | hiQ_00004578 | hiQ_00641588 |
| [201] hiQ_00004214 | hiQ_00004579 | hiQ_00650882 |
| [202] hiQ_00004215 | hiQ_00004580 | hiQ_00651579 |
| [203] hiQ_00004216 | hiQ_00004581 | hiQ_00651698 |
| [204] hiQ_00004217 | hiQ_00004582 | hiQ_00652752 |
| [205] hiQ_00004219 | hiQ_00004583 | hiQ_00652760 |
| [206] hiQ_00004220 | hiQ_00004584 | hiQ_00652934 |
| [207] hiQ_00004221 | hiQ_00004589 | hiQ_00652938 |
| [208] hiQ_00004222 | hiQ_00004590 | hiQ_00656718 |
| [209] hiQ_00004223 | hiQ_00004591 | hiQ_00656746 |
| [210] hiQ_00004224 | hiQ_00004598 | hiQ_00657353 |
| [211] hiQ_00004225 | hiQ_00004599 | hiQ_00657374 |
| [212] hiQ_00004226 | hiQ_00004600 | hiQ_00657749 |
| [213] hiQ_00004227 | hiQ_00004601 | hiQ_00658425 |
| [214] hiQ_00004228 | hiQ_00004602 | hiQ_00658426 |
| [215] hiQ_00004229 | hiQ_00004603 | hiQ_00658676 |
| [216] hiQ_00004230 | hiQ_00004604 | hiQ_00658679 |
| [217] hiQ_00004231 | hiQ_00004605 | hiQ_00658734 |

| | | |
|---|---|---|
| [218] hiQ_00004232 | hiQ_00004606 | hiQ_00658741 |
| [219] hiQ_00004233 | hiQ_00004607 | hiQ_00658795 |
| [220] hiQ_00004235 | hiQ_00004608 | hiQ_00658855 |
| [221] hiQ_00004236 | hiQ_00004609 | hiQ_00660256 |
| [222] hiQ_00004240 | hiQ_00004610 | hiQ_00667841 |
| [223] hiQ_00004241 | hiQ_00004611 | hiQ_00667885 |
| [224] hiQ_00004242 | hiQ_00004612 | hiQ_00667929 |
| [225] hiQ_00004243 | hiQ_00004613 | hiQ_00667973 |
| [226] hiQ_00004244 | hiQ_00004614 | hiQ_00668017 |
| [227] hiQ_00004245 | hiQ_00004615 | hiQ_00668061 |
| [228] hiQ_00004246 | hiQ_00004616 | hiQ_00668105 |
| [229] hiQ_00004247 | hiQ_00004617 | hiQ_00668149 |
| [230] hiQ_00004248 | hiQ_00004618 | hiQ_00668237 |
| [231] hiQ_00004249 | hiQ_00004619 | hiQ_00668426 |
| [232] hiQ_00004250 | hiQ_00004620 | hiQ_00668514 |
| [233] hiQ_00004251 | hiQ_00004621 | hiQ_00668558 |
| [234] hiQ_00004252 | hiQ_00004622 | hiQ_00668602 |
| [235] hiQ_00004253 | hiQ_00004623 | hiQ_00669121 |
| [236] hiQ_00004254 | hiQ_00004624 | hiQ_00669514 |
| [237] hiQ_00004255 | hiQ_00004625 | hiQ_00669520 |
| [238] hiQ_00004256 | hiQ_00004626 | hiQ_00669529 |
| [239] hiQ_00004257 | hiQ_00004627 | hiQ_00669574 |
| [240] hiQ_00004258 | hiQ_00004628 | hiQ_00673662 |
| [241] hiQ_00004259 | hiQ_00004629 | hiQ_00676973 |
| [242] hiQ_00004260 | hiQ_00004630 | hiQ_00676973 |
| [243] hiQ_00004261 | hiQ_00004631 | hiQ_00677246 |
| [244] hiQ_00004262 | hiQ_00004632 | hiQ_00677469 |
| [245] hiQ_00004263 | hiQ_00004633 | hiQ_00678127 |
| [246] hiQ_00004264 | hiQ_00004634 | hiQ_00678363 |
| [247] hiQ_00004265 | hiQ_00004635 | hiQ_00678399 |
| [248] hiQ_00004266 | hiQ_00004636 | hiQ_00678655 |
| [249] hiQ_00004267 | hiQ_00004637 | hiQ_00678656 |
| [250] hiQ_00004268 | hiQ_00004638 | hiQ_00680738 |
| [251] hiQ_00004269 | hiQ_00004639 | hiQ_00681575 |
| [252] hiQ_00004270 | hiQ_00004640 | hiQ_00685613 |
| [253] hiQ_00004271 | hiQ_00004641 | hiQ_00685964 |
| [254] hiQ_00004272 | hiQ_00004642 | hiQ_00687750 |
| [255] hiQ_00004273 | hiQ_00004643 | hiQ_00705413 |
| [256] hiQ_00004274 | hiQ_00004644 | hiQ_00707954 |
| [257] hiQ_00004275 | hiQ_00004645 | hiQ_00708383 |
| [258] hiQ_00004276 | hiQ_00004646 | hiQ_00708675 |
| [259] hiQ_00004277 | hiQ_00004647 | hiQ_00708990 |
| [260] hiQ_00004278 | hiQ_00004648 | hiQ_00709000 |
| [261] hiQ_00004279 | hiQ_00004649 | hiQ_00709010 |
| [262] hiQ_00004280 | hiQ_00004650 | hiQ_00709020 |
| [263] hiQ_00004281 | hiQ_00004651 | hiQ_00709030 |
| [264] hiQ_00004282 | hiQ_00004652 | hiQ_00709040 |
| [265] hiQ_00004283 | hiQ_00004653 | hiQ_00709050 |
| [266] hiQ_00004284 | hiQ_00004654 | hiQ_00709060 |
| [267] hiQ_00004285 | hiQ_00004999 | hiQ_00709070 |
| [268] hiQ_00004286 | hiQ_00018451 | hiQ_00709080 |
| [269] hiQ_00004287 | hiQ_00018451 | hiQ_00709090 |
| [270] hiQ_00004288 | hiQ_00031051 | hiQ_00709100 |
| [271] hiQ_00004289 | hiQ_00031069 | hiQ_00709110 |
| [272] hiQ_00004290 | hiQ_00050578 | hiQ_00709120 |
| [273] hiQ_00004291 | hiQ_00051719 | hiQ_00709130 |
| [274] hiQ_00004292 | hiQ_00054199 | hiQ_00709140 |
| [275] hiQ_00004293 | hiQ_00058707 | hiQ_00709150 |
| [276] hiQ_00004294 | hiQ_00062950 | hiQ_00709160 |
| [277] hiQ_00004295 | hiQ_00066134 | hiQ_00714829 |
| [278] hiQ_00004296 | hiQ_00066897 | LINK_HIQ_000002224 |

| | | |
|---|---|---|
| [279] hiQ_00004297 | hiQ_00067107 | LINK_HIQ_000010676 |
| [280] hiQ_00004298 | hiQ_00077565 | LINK_HIQ_000011965 |
| [281] hiQ_00004299 | hiQ_00175137 | LINK_HIQ_000012441 |
| [282] hiQ_00004300 | hiQ_00175271 | LINK_HIQ_000014336 |
| [283] hiQ_00004301 | hiQ_00175273 | LINK_HIQ_000014932 |
| [284] hiQ_00004302 | hiQ_00175284 | LINK_HIQ_000027959 |
| [285] hiQ_00004303 | hiQ_00175312 | LINK_HIQ_000030305 |
| [286] hiQ_00004304 | hiQ_00175333 | LINK_HIQ_000030615 |
| [287] hiQ_00004305 | hiQ_00175337 | LINK_HIQ_000040582 |
| [288] hiQ_00004306 | hiQ_00175345 | LINK_HIQ_000040614 |
| [289] hiQ_00004307 | hiQ_00175359 | LINK_HIQ_000042850 |
| [290] hiQ_00004308 | hiQ_00175359 | LINK_HIQ_000042967 |
| [291] hiQ_00004309 | hiQ_00175378 | LINK_HIQ_000059739 |
| [292] hiQ_00004310 | hiQ_00175680 | LINK_HIQ_000059771 |
| [293] hiQ_00004311 | hiQ_00176642 | LINK_HIQ_000068229 |
| [294] hiQ_00004312 | hiQ_00176659 | LINK_HIQ_000069617 |
| [295] hiQ_00004313 | hiQ_00176716 | LINK_HIQ_000070792 |
| [296] hiQ_00004314 | hiQ_00176852 | LINK_HIQ_000073689 |
| [297] hiQ_00004315 | hiQ_00179340 | LINK_HIQ_000076813 |
| [298] hiQ_00004316 | hiQ_00179825 | LINK_HIQ_000084713 |
| [299] hiQ_00004317 | hiQ_00179826 | LINK_HIQ_000095502 |
| [300] hiQ_00004318 | hiQ_00179827 | LINK_HIQ_000116739 |
| [301] hiQ_00004319 | hiQ_00179828 | LINK_HIQ_000169080 |
| [302] hiQ_00004320 | hiQ_00179881 | LINK_HIQ_000179452 |
| [303] hiQ_00734930 | hiQ_SACKS_00000001 | |

*Academic Texts*

[1] Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance* , 13th Ed. McGraw-Hill Education, 2020.

[2] Cochrane, John H. "The Risk and Return of Venture Capital," *Journal of Financial Economics* 75 (2005): 3-52.

[3] Gompers, Paul et al, "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics* 135(1) (January 2020): 169-190.

[4] Metrick, Andrew. *Venture Capital and the Finance of Innovation* , 3rd Edition,  Wiley, Kindle Edition.

[5] Rosenbaum, Joshua and  Pearl,  Joshua. *Investment Banking: Valuation, Leveraged Buyouts and Mergers & Acquisitions*  (Hoboken, NJ: John Wiley & Sons, 2009).

*Public Press & Other Materials*

[1] "Global People Analytics Markets Outlook Report 2021: Market was Valued at $2.03 Billion in 2020 and is Expected to Reach $4.24 Billion by 2026, Growing at a CAGR of 13.08%", PR Newswire, October 28, 2021, https://www.prnewswire.com/news-releases/global-people-analytics-markets-outlook-report-2021-market-was-valued-at-2-03-billion-in-2020-and-is-expected-to-reach-4-24-billion-by-2026--growing-at-a-cagr-of-13-08-301410895.html.

[2] "HiQ Labs People Analytics Solution Wins HR Tech Product of the Year", hiQ Labs, September 21, 2016, https://www.hiqlabs.com/news-1/2016/9/21/hiq-labs-people-analytics-solution-wins-hr-tech-product-of-the-year).

[3] "Demand for People Analytics Tech Soared by 53% in 2021, According to RedThread Research, Driven by the Need to Improve Employee Experience", WFMZ News, May 17, 2022, https://www.wfmz.com/news/pr_newswire/pr_newswire_technology/demand-for-people-analytics-tech-soared-by-53-in-2021-according-to-redthread-research-driven/article_d366bd7c-2eb6-5714-8fb3-d0fe2ed3179f.html

[4] "Hiring and Development Tools Across the Entire Talent Lifecycle," LinkedIn, https://business.linkedin.com/talent-solutions/product-overview.

[5] "Insights Report – Human Resources Technology: Empowering talent and enterprises through technology", Klecha & Co., November 2021, at pp. 9-10, https://www.klecha-co.com/last-research/human-resources-technology-empowering-talent-and-enterprises-through-technology/).

[6] "Keeper", hiQ Labs, https://www.hiqlabs.com/new-keeper.

[7] "LinkedIn Announces It's Moving Its Core Talent Products Onto One Platform," LinkedIn, August 12, 2019, https://www.linkedin.com/business/talent/blog/product-tips/linkedin-moving-core-talent-tools-onto-one-platform.

[8] "People Analytics Market – Global Outlook & Forecast 2021-2026 Featuring Key Vendors – IBM, Koch Industries, MicroStrategy, Oracle, Ultimate Kronos Group (UKG), SAP, Workday – ResearchAndMarkets.com", Business Wire, October 28, 2021, https://www.businesswire.com/news/home/20211028005571/en/People-Analytics-Market---Global-Outlook-Forecast-2021-2026-Featuring-Key-Vendors---IBM-Koch-Industries-MicroStrategy-Oracle-Ultimate-Kronos-Group-UKG-SAP-Workday---ResearchAndMarkets.com

[9] "The Rise of Analytics in HR," LinkedIn Report, https://business.linkedin.com/content/dam/me/business/en-us/talent-solutions/talent-intelligence/workforce/pdfs/Final_EMEA_Rise-of-Analytics-Report.pdf.

[10] 2017 Deloitte Global Human Capital Trends, Deloitte Report, https://www2.deloitte.com/content/dam/Deloitte/global/Documents/About-Deloitte/central-europe/ce-global-human-capital-trends.pdf.

[11] 2018 Deloitte Global Human Capital Trends, Deloitte Report, https://www2.deloitte.com/content/dam/insights/us/articles/HCTrends2018/2018-HCtrends_Rise-of-the-social-enterprise.pdf).

[12] ███████████████████████████████████████████████████████████

[13] Ingrid Lunden, "LinkedIn to Launch Talent Insights, a New Analytics Tool, as It Dives Deeper into Data," TechCrunch, October 4, 2017, https://techcrunch.com/2017/10/04/linkedin-to-launch-talent-insights-a-new-analytics-tool-as-it-dives-deeper-into-data.

CONFIDENTIAL

[14]  Jeanne McFadden LinkedIn profile, https://www.linkedin.com/in/jeanne-mcfadden-b7551b4.

[15]  Kate Garvey LinkedIn Profile, https://www.linkedin.com/in/kmgarvey.

[16]  ████████████████████████████████████████████████████████████████████████

[17]  Marlene Jia, "113 Enterprise AI Companies You Should Know," Venture Beat, April 23, 2017, https://venturebeat.com/2017/04/23/113-enterprise-ai-companies-you-should-know.

[18]  PitchBook, hiQ Labs (hiQ) Profile, PitchBook, https://my.pitchbook.com/profile/101867-68/company/profile.

[19]  RSE Ventures, https://rseventures.com/team-members/stephen-m-ross.

[20]  Stacia Garr and Priyanka Mehrotra, "People Analytics Technology 2022: Executive Summary", RedThread Research, May 17, 2022, https://redthreadresearch.com/pat-2022-complimentary/?.

[21]  Kevin Schlaufman LinkedIn Profile, https://www.linkedin.com/in/kevin-schlaufman-2b36012b.

[22]  Manisha Gupta LinkedIn Profile, https://www.linkedin.com/in/manishagupta.

[23]  Mark Weidick LinkedIn Profile, https://www.linkedin.com/in/weidick.

[24]  Scott Nicholson LinkedIn Profile, https://www.linkedin.com/in/scottnicholsonphd.

[25]  Sherman Hu LinkedIn Profile, https://www.linkedin.com/in/sherman.

[26]  Steven Perez LinkedIn Profile, https://www.linkedin.com/in/stevenperez.

      * Sources otherwise cited in Report & Appendices

CONFIDENTIAL

# Appendix C

## Comparability of Firms in Our Data Set

CONFIDENTIAL

# I.     Comparability of Firms in Our Data Set

1.  It is important for my analysis that firms in my data set are comparable to hiQ in (1) the ratio of their Pre-Money C round value to their Post-Money B round value. This section establishes that this comparability is not negatively affected by issues of year, or time between rounds.

## A.     Year

### 1.     Considering B Rounds from 2010 to 2021 is Reasonable

2.  Figure 11 shows that the year when round B occurred does not have a systematic impact on the average, trimmed average or median of the ratio of Pre-Money Series C Value to Post-Money Series B Value ("B to C Value Ratio").[1]  Hence, including firms in the dataset for analysis that had a round B from 2010 to 2021, instead of just 2016 (highlighted), which is when hiQ had its series B, is likely to lead to the most reliable results.

---

[1]     Trimming is again done by removing the top and bottom 5% of B post-money valuations.

CONFIDENTIAL

FIGURE 11: B TO C VALUE RATIO BY YEAR WHEN SERIES B CLOSE (HIQ CLOSED B IN 2016)[2]

| Series B Deal Year | Mean | Trimmed Mean | Median | Observations |
|---|---|---|---|---|
| 2007 | 1.9 | 1.9 | 1.5 | 12 |
| 2008 | 3.4 | 3.4 | 1.8 | 14 |
| 2009 | 2.4 | 2.4 | 2.3 | 17 |
| 2010 | 4.3 | 3.5 | 2.8 | 23 |
| 2011 | 2.4 | 2.3 | 1.8 | 22 |
| 2012 | 2.3 | 2.1 | 2.1 | 25 |
| 2013 | 2.9 | 2.7 | 2.9 | 23 |
| 2014 | 2.1 | 2.0 | 1.9 | 34 |
| 2015 | 2.1 | 1.9 | 1.8 | 24 |
| 2016 | 4.1 | 4.1 | 2.3 | 17 |
| 2017 | 2.7 | 2.6 | 2.1 | 20 |
| 2018 | 2.3 | 2.2 | 2.1 | 29 |
| 2019 | 2.4 | 2.1 | 2.0 | 26 |
| 2020 | 3.1 | 3.1 | 2.4 | 16 |

## 2.   Considering C Rounds from 2010 to 2021 is Reasonable

3. Figure 12 shows that for the year when a round C occurred, it does not have a systematic impact on the average, trimmed average or median B to C Value Ratio.[3]  Hence, including firms in the dataset for analysis that had a round C from 2010 to 2021, instead of just 2016 (highlighted), which is when hiQ had its series B, is likely to lead to the most reliable results.

---

[2]   *See* supporting r-code and Sacks_report_support.xlsx.

[3]   Trimming is again done by removing the top and bottom 5% of B post-money valuations.

CONFIDENTIAL

**FIGURE 12: B TO C VALUE RATIO BY YEAR WHEN SERIES C CLOSED (HIQ EXPECTED C IN 2017 OR 2018)[4]**

| Series C Deal Year | Mean | Trimmed Mean | Median | Observations |
|---|---|---|---|---|
| 2010 | 2.3 | 2.3 | 2.1 | 18 |
| 2011 | 2.5 | 2.2 | 2.1 | 25 |
| 2012 | 3.8 | 3.2 | 2.6 | 23 |
| 2013 | 2.2 | 2.0 | 1.8 | 22 |
| 2014 | 2.6 | 2.5 | 2.4 | 26 |
| 2015 | 3.2 | 2.6 | 2.2 | 35 |
| 2016 | 1.9 | 1.9 | 1.7 | 21 |
| 2017 | 2.1 | 2.1 | 2.0 | 24 |
| 2018 | 3.4 | 3.4 | 2.3 | 18 |
| 2019 | 2.2 | 2.2 | 2.0 | 37 |
| 2020 | 2.7 | 2.2 | 2.0 | 29 |
| 2021 | 3.3 | 3.1 | 2.3 | 24 |

## B.   Time between rounds

4. Figure 13 shows that the time between the B and C rounds has little effect on the B to C Value Ratio. Hence, I do not need to limit the comparison data set to firms that had a C round within 15 to 24 months of their B round, as hiQ would have.

---

[4]   *See* supporting r-code and Sacks_report_support.xlsx.

CONFIDENTIAL

**FIGURE 13: THE TIME BETWEEN B AND C ROUNDS HAS LITTLE EFFECT ON THE B TO C VALUE RATIO[5]**

| Time Gap Between B & C -> | Less than 1 yr | 1 - 2 yrs | 2+ yrs |
|---|---|---|---|
| Mean | 2.4 | 2.6 | 3.0 |
| Trimmed Mean* | 2.3 | 2.3 | 2.4 |
| | | | |
| *25th percentile* | 1.8 | 1.4 | 1.4 |
| *50th percentile (median)* | 2.1 | 2.1 | 2.1 |
| *75th percentile* | 2.7 | 2.9 | 3.1 |
| | | | |
| Std.Dev | 1.3 | 1.8 | 3.6 |
| Trimmed Std.Dev* | 0.9 | 1.1 | 1.3 |
| | | | |
| Inter-quartile Ratio | 1.5 | 2.0 | 2.3 |
| | | | |
| Number of Observations | 79 | 123 | 100 |

---

[5] *See* supporting r-code and Sacks_report_support.xlsx.

Exhibit 89

CONFIDENTIAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

hiQ Labs, Inc.,

      *Plaintiff and Counterclaim Defendant,*

    vs.

LinkedIn Corp.,

      *Defendant and Counterclaim Plaintiff.*

Case No. 3:17-cv-03301-EMC

**REBUTTAL EXPERT REPORT OF**

**BENJAMIN A. SACKS**

**June 30, 2022**

CONTENTS

I.    Qualifications and Assignment .............................................................. 1

II.   Assignment and Summary of Opinions ................................................. 1

III.  Hochberg's Main Conclusion Is Consistent with my Valuation .......................... 6

IV.   Hochberg's Opinion on Information Already Factored in Round B Value Is Irrelevant to My Valuation, and Undermines the Relevance of Her Report for Valuation .................................................................... 9

      A.   Hochberg Criticizes hiQ for Not Meeting its Product Development Timelines ............. 10

      B.   Hochberg's Criticism of hiQ's Business Strategy ........................................... 11

      C.   Hochberg Criticizes hiQ's Investors, Whose Identities Were Known at Round B .......... 12

      D.   Hochberg's Claim that "hiQ's Core Business Model Relied on Scraping a Single Data Source Without Permission" Was Understood at Round B ........................... 12

      E.   Hochberg Raises Numerous Competition Related Risks that Were Known at Round B 13

            1.   Investors Had Hochberg's Information on hiQ's Competitive Advantage at Round B ............................................................................... 13

            2.   Investors Knew hiQ Would Face Competition From Other HR Analytics Firms at Round B ....................................................................... 14

            3.   Investors Knew hiQ Would Face Competition from Established Incumbents, Other Startups, and In-House Analytics Teams at Round B ............................. 16

      F.   Hochberg Criticizes hiQ's Funding, Which Was Known at Round B ............................. 17

V.    Hochberg Erroneously Criticizes hiQ's Series A and B Funding ........................ 17

      A.   Hochberg's Claims about hiQ's Rounds A and B Undermine Her Basic Approach ........ 19

      B.   Hochberg Incorrectly Concludes that hiQ "Consistently Struggled with Fundraising".. 19

            1.   Hochberg Erroneously Concludes that hiQ's Runway After Round B Was Problematic ...................................................................... 19

            2.   Hochberg Erroneously Concludes that Round B was "Underfunded" and "Unsuccessful" ................................................................. 22

      C.   Hochberg's Criticism of hiQ's Round B Ignores Her Own Research ............................. 24

VI.   Hochberg Ignores the Benefits and Validation Provided by Its Prominent Investors ...................................................................... 24

VII. Hochberg Erroneously Casts hiQ's Huge Potential Market as a Negative while Ignoring the Importance Placed on that by Her Most Frequently Cited Source .......................................................................................... 25

VIII.    Hochberg Ignores Partnerships and Channels, Which Were a Major Positive for hiQ and Considered Important by Hochberg's Sources ............... 28

IX. Hochberg Selectively Cites Sources and Ignores Evidence to Miscast hiQ's Achievement of Replacing a Founder with a Professional CEO as a Setback ... 30

    A.    Hochberg's Sources Show that Replacing a Founder with a Professional CEO is An Expected and Often Necessary Step .............................................................. 32

    B.    hiQ Investors, Founders and Employees Understood that Kaplan was a Great Founder, but Likely Would be Replaced with a Professional CEO when hiQ Matured ................ 34

    C.    Weidick Joining hiQ Validates its Increasing Prospects.................................... 39

X. Hochberg's Critiques of Events After Round B and Before the C&D Omit Key Facts and Are Overstated ................................................................. 40

    A.    Hochberg's Major Critiques Relating to Events After Round B ...................... 40

    B.    Hochberg's Miscellaneous Critiques Relating to Events After Round B ........ 47

        1.    Churn and Customer Feedback ................................................. 47

        2.    Hochberg Claims hiQ's Staff was Unprofessional .................... 49

        3.    Hochberg states that hiQ Had Problems with Data Integrity and Reliability of Predictions ....................................................... 49

        4.    Hochberg Questions if hiQ's Business Model Will Scale Like a Normal SaaS Company ..................................................... 50

        5.    Hochberg's Claim that Graves's Departure Prior to May 15, 2017 Was a "Troubling Sign" is Overstated ................................ 51

XI. Conclusion ......................................................................................... 53

Appendix A: Additional Materials Considered in Forming Opinion

CONFIDENTIAL

# I.    Qualifications and Assignment

1.  I submitted a report ("Opening Report") in these proceedings on June 7, 2022, subsequently amended on June 22, 2022 ("Amended Report"), concerning damages to hiQ Labs, Inc. ("hiQ") from LinkedIn Corporation's ("LinkedIn") serving of a cease-and-desist letter on May 23, 2017 (the "C&D") demanding that hiQ stop accessing LinkedIn's public web data and asserting various legal violations. As I noted in the Amended Report, my damages estimate was predicated on the assumption that the C&D interfered with hiQ's existing and prospective contracts and relationships, and effectively destroyed hiQ's business.

2.  I have now been asked by counsel for hiQ to respond/opine on issues raised in Professor Yael Hochberg's ("Hochberg") expert report ("Hochberg Report"), also submitted on June 7, 2022, as they concern my estimate of damages to hiQ from LinkedIn's C&D.

3.  My CV has not materially changed since I submitted the Amended Report[1], and I continue to be compensated at a rate of USD $925 per hour for my time in this matter.

4.  My opinions and findings are based on information available to me when this report was prepared. The additional sources I considered on in writing this rebuttal report are listed in Appendix B. I reserve the right to supplement and/or amend this report if and when new information becomes available, including any further expert reports submitted by LinkedIn and any additional discovery in this matter.

# II.   Assignment and Summary of Opinions

5.  In my Opening Report I valued hiQ at $72.9 million on the Valuation Date and found subset damages of $2.6 million.[2] Nothing in the Hochberg Report alters my opinion.

6.  **Hochberg's conclusion is does not relate to valuing a startup**: The Hochberg Report discusses startup risks in general and specific challenges that hiQ was facing and working to overcome. But Hochberg's main conclusion does not draw a connection between risk and value. She states

---

[1]   On June 27, 2022, I filed a rebuttal report in the matter of IN RE Dell Technologies Inc. Class V Stockholders Litigation, Delaware Court of Chancery, Consol. C.A. No. 2018-0816-JTL.

[2]   Expert Report of Benjamin A. Sacks, June 7, 2022, Amended June 22, 2022 ("Amended Report"), ¶¶ 6 and 10.

"[i]n conclusion, as of May 23, 2017, prior to receiving LinkedIn's cease-and-desist letter, hiQ had not shown typical indicators of success and therefore it would have been highly speculative to expect hiQ to survive or reach profitability."[3] Startups typically have speculative chances of success. However, markets/investors price that risk and provide a value that incorporates it. Both Hochberg and I cite evidence that shows the most likely outcome for any startup at Round B and C is for investors to lose money. Yet, a small chance of a large positive outcome makes such startups worth tens or hundreds of millions of dollars. Hochberg's conclusion that hiQ's chances of success are speculative says nothing about hiQ's value, and is entirely consistent with hiQ having a high value at the time of the C&D – potentially above the $72.9 million I assign.  I discuss that Hochberg's main opinion is consistent with my valuation in Section III.

7. **Much of Hochberg's analysis relates to information priced into Round B, is irrelevant for my valuation, and demonstrates the irrelevancy of her "speculative" conclusion on risk for value.** My valuation methodology starts with hiQ's Round B valuation and then assesses how it would change to the C&D. Information known at the time of Round B is reflected in hiQ's Round B price and is therefore already accounted for in my valuation of hiQ at the time of the C&D. Most of Hochberg's criticisms of hiQ relate to information known at the time of its Round B. Hochberg views these factors – as she views essentially every factor she discusses – as negative for hiQ. When Hochberg claims "hiQ had not shown typical indicators of success" many of those relate to information known at or prior to Round B; yet, hiQ was valued at over $30 million in Round B which was an increase from its Round A.[4] Many of Hochberg's judgements about what she considers to be negative, a risk or a problem, including her attacks on hiQs funding, its cash runway, its business strategy, its investors, its competitive advantage, its competitive landscape and its product delivery timeframes, are nonetheless consistent with hiQ being **valued in the tens of millions and increasing in value from round to round**. This track record provides no reason to doubt that Hochberg's negative judgements regarding events occurring after Round B, would also be consistent with hiQ being valued in the tens of millions and increasing from Round B to the C&D. I discuss this issue in Section IV.

8. **Hochberg selectively cites her sources and information from discovery to cast positives as negatives or to ignore key facts altogether**: Hochberg's views on hiQ are almost exclusively negative. This negativity is not consistent with the fact that hiQ was worth over $30 million at Round B, and increased from round A to B. In repeatedly arriving at these negative judgements,

---

[3]   Hochberg Report, ¶ 115, see also ¶ 18 (last bullet) and ¶50.

[4]   For absence of doubt: I do not agree with Hochberg's claims about these factors. I only point out the consequences of her statements about them.

Hochberg often selectively cites both her sources and information from discovery to miscast as negative what are actually positive achievements by, or facts about, hiQ. As discussed below, the most significant examples are her assessment of hiQ's funding, cash runway, investors, the positioning of hiQ's large market as a negative, ignoring hiQ's potential partnerships, and her assessment of hiQ's replacing its founder CEO (Kaplan) with a professional CEO (Weidick). I discuss Hochberg's selective use of her sources and evidence from discovery to paint an overly negative picture throughout this report.

9. **Hochberg selectively cites sources and misleadingly frames evidence to criticize hiQ's fundraising**:  Hochberg's section on hiQ's fundraising is entitled "hiQ Had Limited Cash Runway Due to Fundraising Problems".[5] She claims that hiQ's Series B was "unsuccessful" because, among other issues, hiQ did not raise as much money as she claims it wanted to raise.[6] She states that hiQ "consistently struggled with fundraising, which is reflective of a market that likely assessed that the Company had a low potential for success," and that "hiQ's underfunded Series B round left hiQ with limited runway by May 2017…"[7] However, Hochberg's opinions are refuted by the statements *and actions* of hiQ investors and employees, as well as by Hochberg's own calculations and sources – all of which she ignores. Further, investors valued the firm at approximately $11.23 million at Round A[8] and at a higher value, $33.6 million, at Round B, despite knowing – in both cases – the amount of funding and amount of runway that gave hiQ. When Hochberg criticizes an aspect of hiQ as a "failure" indicating "a low potential for success," it does not mean the market will assign a low or falling value to hiQ. **To the contrary, Hochberg concluding that hiQ "had a low potential for success" is consistent with hiQ being valued in the tens of millions and *increasing* from Round to Round**. I discuss this issue in Section V.

10. **Hochberg stresses the importance of well-regarded VC investors, but ignores the high quality of hiQ's investors**. HiQ's investors include CEB, ▓▓▓▓▓▓ Rob DeSantis and Gary Vaynerchuk. Between them, they provide an incredible span of reach into the corporate and VC world, as well as a wealth of experience in running and investing in successful startups with multi-billion dollar exits. I discuss this issue in Section VI.

---

[5]   Hochberg Report, Section VI.A.

[6]   Hochberg Report, ¶ 53.

[7]   Hochberg Report, ¶ 63.

[8]   PitchBook, *hiQ Labs (hiQ) Profile*, ("PitchBook") (Last Accessed April 14, 2022: https://my.pitchbook.com/profile/101867-68/company/profile).

11. **Hochberg selectively cites sources and evidence to miscast hiQs huge potential market as a negative**: Hochberg cites Scott Kupor's ("Kupor") book "Secrets of Sand Hill Road" more than any other source (23 times). But while she cites Kupor on market size several times, she does not cite Kupor's "cardinal rule of VC investing: everything starts and ends with market size."[9] Hochberg does not have a section on "market size" (or a similar concept under a different name). Instead, she discusses the size of the market *indirectly* in a section entitled "hiQ Faced Competition From Other HR Analytics Firms". As with other analyses, Hochberg is consistently negative: she has a chapter on the fact that a large market for hiQ's services means competition, which is a negative factor, but does not mention that a large market is also a positive from the standpoint of the "cardinal rule of VC investing" of her most cited source.[10] My Opening Report presents facts on hiQ's large market and accurately portrays that as a positive for hiQ's value.[11] I also discuss the fact that a large market means competition is inevitable and that this was understood at Round B.[12] I discuss Hochberg's positioning of hiQ's large market as a negative in Section VII.

12. **Hochberg selectively cites sources and ignores evidence on hiQ's progress on valuable partnerships and sales channels**: Following Metrick's[13] list of the major areas that VCs consider when investing, my Opening Report discusses hiQ's progress following Round B regarding "Channels and Partners".[14] I provide evidence that hiQ was advancing in talks with IBM, PwC, Jobvite, Silicon Valley Bank, and Bank of New York Mellon at the time of the C&D.[15] These potential partnerships were highly valuable, as they were, among other things, potential channels for substantial sales. Hochberg, however, ignores this topic: she does not mention any of these potential partnerships despite the fact she cites Metrick numerous times,[16] that she acknowledges the complaint alleges hiQ "experienced an almost immediate (unwilling) cessation of conversations with potential strategic partners" following the C&D,[17] and Weidick's

---

[9]   Scott Kupor, *Secrets of Sand Hill Road: Venture Capital and How to Get It,* Penguin Publishing Group (2019) Kindle Edition, ("Kupor") p. 113.

[10]  Hochberg Report, Section VI.F and especially ¶98 and Figure 12.

[11]  Amended Report, ¶¶ 15 – 17.

[12]  Amended Report, ¶60 and Section IV.B.3 generally.

[13]  Andrew Metrick, *Venture Capital and the Finance of Innovation*, 3rd Edition, Wiley (2021) Kindle Edition ("Metrick").

[14]  Amended Report, Section IV.B.4.

[15]  Amended Report, Section IV.B.4.

[16]  Metrick is her second most cited source after Kupor.

[17]  Hochberg Report, ¶ 13.

deposition where these partnerships were discussed.[18] I discuss that Hochberg ignores hiQ's progress on partnerships in Section VIII.

13. **Hochberg selectively cites sources and ignores evidence to cast hiQ's achievement of replacing a founder with a professional CEO as if it were a setback**: In my Opening Report, I explained that hiQ hiring a professional CEO to replace its founder CEO was an important accomplishment that VCs would understand is often necessary.[19] Hochberg selectively cites her sources and evidence from discovery to miscast this positive achievement as a negative. She portrays it as an example of turnover that is "a troubling sign for a startup" and as if Kaplan was suddenly fired for incompetence.[20] Hochberg ignores evidence from discovery that both Kaplan and DeSantis understood that Kaplan had the characteristics of a great founder CEO but not of a professional CEO and that they both planned to replace him as CEO once the company had reached certain milestones. Hochberg ignores evidence from discovery and her own sources that shows this general phenomenon is well understood among VCs.[21] She ignores evidence that Weidick, the professional CEO who replaced Kaplan, joined after doing due diligence and took substantial compensation in hiQ stock – facts that serve to validate that hiQ had a promising future. I discuss Hochberg's treatment of hiQ's replacing its founder CEO with a professional CEO in Section IX.

14. **Hochberg's critiques of events occurring after Round B and before the C&D are overstated.**
Hochberg paints an almost entirely negative picture of events at hiQ. This includes the period after Round B when such events are potentially relevant to my valuation. In my Opening Report, I presented evidence that in the twelve months preceding the C&D, hiQ had higher bookings, revenue, customer counts and renewals than in the twelve months preceding its Round B.[22] Nothing in the Hochberg Report challenges these findings. However, Hochberg paints an almost entirely negative picture of hiQ's progress in other and potentially related areas.  Hochberg claims that, among other things, following Round B hiQ's headcount decreased because Round B was underfunded, hiQ failed to meet its financial projections, hiQ's revenues flatlined, hiQ experienced a declining customer base, it experienced troubling

---

[18] Hochberg Report, Appendix C, Videotaped Deposition of Mark Weidick, taken remotely via Zoom ("Weidick Deposition"), May 23, 2022, pp. 131, 221-22, 247, and Weidick Deposition, June 1, 2022, pp. 325-27, 331, for example.

[19] Amended Report, Section IV.B.1.

[20] Hochberg Report, ¶¶ 76 – 77.

[21] See Section IX.

[22] Amended Report, Figure 3.

executive turnover, and hiQ had internal concerns about product fit.[23] Hochberg's claims are overstated and paint a misleading picture, as discussed in Section X.

15. The Hochberg Report argues that events after the C&D strengthen her negative view of hiQ.  I do not address events after the C&D as it is my understanding and instruction that the C&D effectively destroyed hiQs business.[24]

16. My Amended Report values hiQ at $72.9 million on the Valuation Date.[25] That value reflects a 20% discount from hiQ's expected pre-money Round C value of $91.1 million – a discount based on contemporaneous ordinary course of business discussions.[26] Given that hiQ's post-money Round B value was $33.4 million, the 80% discount means that I value hiQ at the C&D as being essentially 2/3 of the way to its Round C value.[27] This implied level of progress seems reasonable given the totality of the evidence: hiQ had made progress since Round B in (1) releasing Skill Mapper, (2) hiring a professional CEO with a track record of increasing sales, (3) increasing its trailing twelve month bookings, revenues, customers and renewals, (4) hiring a sales expert, Barry Rhein,  with an all-stock compensation package, and (5) progressing in partnership discussion with a number of firms, including IBM and PwC, but hiQ was also experiencing some of the typical startup issues of growing sales, and managing cash responsibly while searching for a new CEO. Overall, hiQ's progress is consistent with a firm about 2/3 of the way from Round B to Round C.[28]

## III.  Hochberg's Main Conclusion Is Consistent with my Valuation

17. Hochberg states that startups are generally risky ventures with high failure rates. She states that many fail to provide a positive return to investors, and even those that do may never reach profitability.[29] I generally agree with these statements – and they are accounted for in my

---

[23]  Hochberg Report, Sections VI.A. and VI.B.

[24]  Amended Report, ¶ 4a.

[25]  Amended Report, ¶ 6.

[26]  Amended Report, ¶7 (note that hiQ's pre-money Round C value is misstated in ¶ 7c as $81 million. It is $91.1 million as shown in Section IV.C and Figure 8 of my Amended Report).

[27]  ( $72.9 = $33.4 + ($91.1 - $33.4) x 0.685)

[28]  Amended Report, Section IV.B. See also Section X of this report.

[29]  See Hochberg Report, Section V (specifically ¶ 27) and V.B. I discuss these risks in more detail in the following section.

valuation. Risk is always there – even for mature companies. For purposes of damages, we are not concerned with the risk in of itself, but with valuing the firm, given its risk profile.

18. Nothing in the Hochberg Report undermines my valuation of hiQ as of Round B or a hypothetical Round C.  Indeed, my valuations reflect the risks that Hochberg describes. Investors in Round B put a market price on hiQ given its typical startup risks, and the Hochberg Report does nothing substantive to call that market price into question.  hiQ's value at Round B was *only* about $33.4 million because of the kinds of risks that Hochberg describes – without those risks, hiQ would have been *more* valuable.

19. However, a startup faces the risk of failure at all rounds. Metrick, cited by both Hochberg and me, shows that 67.3 percent of investments made in round B fail to provide a return or lose money; the corresponding rate for round C investments is about the same, at 65.8 percent.[30]

20. Hochberg's published papers indicate similar rates of success. For example, Hochberg (2007), shows that the odds of write-off at each stage are approximately twice the odds or greater of successful exit at that stage for the first five rounds.[31] Furthermore, Hochberg (2007) also shows that the vast majority of firms that receive Round 2 (Round B) funding also move on to have a Round C ($6,913/9,875 \approx 70\%$). And this is consistent with the survival tables in Metrick,[32] demonstrating that although the eventual outcome remains uncertain ("speculative" in Hochberg's language), hitting the next funding round is still likely.

21. Hence a conclusion that a startup in general, or that hiQ in particular, is risky and that its odds of success are "speculative", restate what one already knew at the outset, and is generally true of startups in Rounds B and C where valuations in the tens or hundreds of millions nevertheless are common.

---

[30]  For round B investments, see Metrick, Exhibit 7-7, p. 114 ("GVMs for All Second-Round Investments"), which shows the "Gross Value Multiple" (GVM) is less than 1x for 67.33 percent (sum of the top 4 rows in the table) of second round investments. The GVM is the average gross payout from the investment e.g., a $100 investment in second round with a GVM of 1x means that the investor will only get their $100 capital back; with a GVM less than 1x, the investor gets less than $100 back (lose money); and a GVM more than 1x means they get more than $100 back (make money). For round C investments, see Metrick, Exhibit 7-10, p. 116 ("GVMs for All Third-Round Investments"), which shows a GVM of less than 1x for 65.81 percent of investments (sum of the top 4 rows in the table).

[31]  Specifically, in Hochberg's sample, the odds of write-off to exit range from 5.31 in Round 1 to 1.94 in Round 5. See Figure 2 in Yael V. Hochberg, Yael V., Alexander Ljungqvist, and Yang Lu. "Whom You Know Matters: Venture Capital Networks and Investment Performance." The Journal of Finance 62, No. 1, (2007): 251-301. (2007) ("Hochberg (2007)").

[32]  See Metrick exhibits 7-5, 7-7, and 7-10.

22. Despite the "speculative" chances of success in these early rounds, the PitchBook data that I
    relied on in my report shows a range of pre-money valuations for Series B of between $1.7
    million and $5.4 billion, with a median of $44 million and mean of $114.9 million (Figure 1
    below).[33] The pre-money valuations for Series C are between $4.4 million and $14.6 billion,
    with a median of $140 million and mean of $373 million (also Figure 1 below). This data
    demonstrates that the large risks inherent in startups are fully consistent with significant and
    increasing values in Rounds B and C. This is because the payoff of the success of a startup can
    be so high that even a relatively small chance of success supports substantial value in Rounds B
    and C. This connection between risk and market value is the critical link for a damages estimate,
    and is absent from the Hochberg Report's conclusions.



FIGURE 1. ROUND B AND C VALUATIONS IN PEOPLE ANALYTICS STARTUPS (1997-2022).[34]



Source: Pitch Book, excludes outlier Ant Group with value > $15 billion

---

[33] I group pre-money valuations greater than $1 billion in the histograms. Both the histogram and the
     mean/median statistics exclude Ant Group, which has extreme outlier valuations greater than $55.5 billion at
     Round B, and $136.0 billion at Round C.

[34] See supporting r code – "2022_hiQ Sacks rebuttal r code.r".

# IV.  Hochberg's Opinion on Information Already Factored in Round B Value Is Irrelevant to My Valuation, and Undermines the Relevance of Her Report for Valuation

23.  As noted in the prior section, Hochberg's conclusion that hiQ had a speculative chance of success is a *non-sequitur* –startups typically have "speculative" chances of success at Round B and C, but that does not prevent them from being worth tens or hundreds of millions of dollars, nor does it prevent their value from increasing round to round.[35] A funding round provides a market-based value of the startup <u>given</u> its risks of success and failure at the time of the funding round.

24.  As documented in both Hochberg's and my reports, hiQ had a Series B funding round about a year before the C&D – in June 2016 – which placed hiQ's value at about $33.4 million at that time. This timing is important since many risks[36] that Hochberg discusses *were known at Round B*, and hence were already reflected in its value at that time. There are two important consequences to this:

a.  First, since the $33.4 million value at Round B is the starting point of my valuation analysis, many of the risks raised by Hochberg are already accounted for in my analysis.

b.  Second, it emphasizes that hiQ's value was increasing and being in the tens of millions is fully consistent with a long litany of what Hochberg considers material risks.

25.  Below, I discuss the purported problems and/or risks that Hochberg discusses that were known at Round B.

---

[35]  See, for example, the growth in the value of comparable firms in the PitchBook data sample I rely upon between Series B and Series C rounds in Figure 1. Median value, for example, grows by nearly $100 million between Series B and Series C.

[36]  For convenience I use the word "risk" but at various points Hochberg may call them "issues" or "problems". I use "risks" to refer generally to all of the – almost exclusively – negative inferences she draws about hiQ.

## A.    Hochberg Criticizes hiQ for Not Meeting its Product Development Timelines

26.  Hochberg criticizes hiQ for not meeting its product development timelines. She does not draw any explicit conclusions from that criticism.  She does not, in the context of development timelines, draw a link to her claim about a "speculative" chance of success. It is not clear whether she will opine that such missed deadlines informed her "speculative" conclusion, or that they are unusual and had any particular relevance to the value. Should she advance such opinions, I will evaluate them at that time.

27.  However, much of the information that Hochberg cites on missed timelines was known at the time of Round B, and hence hiQ's Round B value reflected the impact (if any) of these missed deadlines on value, and therefore so did my valuation of hiQ on the Valuation Date.

28.  Hochberg cites a variety of deadlines that it was clear at the time of Round B (which closed in June 2016) had not been met, or would not be met.

> *[…] around mid-2014, hiQ advertised that a second product would launch in Q3 2015, followed by a third product in Q3 2016; one pitch deck even anticipated that hiQ's third product would launch in Q3 2015. However, hiQ's product development timeline kept shifting further into the future over time. In January 2016, hiQ pitched the "potential for product 2 in late 2016" and internally discussed "[s]hipping our first Skills Product for Amex." A draft March 2016 pitch deck envisioned the addition of future modules tackling a variety of HR matters, such as internal mobility, diversity, selection, and recruiting. A March 15, 2016 pitch deck noted "Skills Matching" as a potential module.[37]*

29.  hiQ delivered an initial version of Skill Mapper in 2017, after Round B. That would have been viewed as a positive development by investors at that time.[38] To the extent investors had doubts about hiQ's ability to deliver product (based on observation like those Hochberg advances), this would have been an especially important achievement.

---

[37]  Hochberg Report, ¶ 74.

[38]  *See,* e.g., discussion on the value of Skill Mapper in Amended Report, Section IV.B.2 and IV.B.3.

30. Since Hochberg's criticisms of hiQ supposedly not meeting its deadlines relate to information known at hiQ's Round B, they are already accounted for in my valuation of hiQ both at Round B and on the Valuation Date.

## B.   Hochberg's Criticism of hiQ's Business Strategy

31. Hochberg claims that hiQ lacked a clear business strategy.[39] This criticism does not appear to reflect all the relevant strategic actions hiQ was taking.[40] Further, that issue is mostly irrelevant for my analysis as the majority of issues that Hochberg cites were known as of hiQ's Round B, and were therefore reflected in its market value at the time as well as my valuation of hiQ on the Valuation Date. To the extent Hochberg believes her criticisms are fatal to hiQ's value, or its ability to raise funds at a higher value than in previous rounds (as opposed to generic claims that hiQ's chances of success were "speculative"), the market disagreed.

32. Rehashing a claim about product deadlines, Hochberg cites, in the context of her "business strategy" criticism, that "[a]round mid-2014, hiQ pitched to investors that a second product would launch in Q3 2015, followed by a third product in Q3 2016."[41] At Round B, investors would have know that neither had, nor would, occur in the stated timeframe.

33. Hochberg claims that "hiQ did not launch its product in a targeted way, but instead focused on all enterprise customers purchasing HR analytics solutions. hiQ sold its products to customers across different industries, which introduced a lot of complexities during product development."[42] Keeper was launched well prior to Round B, so investors would have known how it was targeted. The extent to which they agreed (or disagreed) with Hochberg would have been reflected in the Round B valuation.

34. Hochberg claims that "hiQ's business strategy was also overly broad and non-specific" and cites a "March 2016 pitch deck" describing its go-to-market strategy and how hiQ planned to target

---

[39]  Hochberg Report, Section VI.C.

[40]  hiQ was innovating and releasing new products, including Skill Mapper, as it had planned (see Section IV.A); it had hired a professional CEO as it had planned (See Section IX) with a track record of scaling firms and growing sales; and hiQ was in partnership discussions with several prominent firms that could serve as sales channels or even potential acquirers (see Section VIII).

[41]  Hochberg Report, ¶ 79.

[42]  Hochberg Report, ¶ 80.

its products – all of which she criticizes and finds inadequate.[43] All of those supposed flaws were known at the time of Round B.

35. Since Hochberg's criticisms of hiQ's business strategy relate to information known at hiQ's Round B, they are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

## C.    Hochberg Criticizes hiQ's Investors, Whose Identities Were Known at Round B

36. Hochberg discusses "the importance of procuring financing from high-quality venture capital firms" and lists several well-known VC firms that decided not to invest in hiQ's Round B.[44] As discussed in Section VI, however, Hochberg ignores or gives no credit to the high quality backers that hiQ did have. And, hiQ's Round B investors who valued hiQ at over $33 million, were clearly aware of the identity of hiQ's investors.

37. Since Hochberg's criticisms of hiQ's investors relate to information known at hiQ's Round B, they are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

## D.    Hochberg's Claim that "hiQ's Core Business Model Relied on Scraping a Single Data Source Without Permission" Was Understood at Round B

38. Hochberg criticizes hiQ's business model for relying on the scraping of data from a single data source without explicit permission, and even makes the stronger claim that hiQ deliberately tried to hide this from investors.[45] First, I take no position on the legal issue surrounding hiQ's use of LinkedIn data. Second, Vaynerchuk, hiQ's main investor at Round B was aware that hiQ relied on scraped LinkedIn data.[46]

---

[43]   Hochberg Report, ¶ 81.
[44]   Hochberg Report, ¶¶  42 and 56.
[45]   *See, e.g.,* Hochberg Report, ¶ 85.
[46]   Communication with Darren Kaplan.

39. Since Hochberg's criticisms of hiQ's reliance on LinkedIn data are based on information known at Round B, they are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

## E.    Hochberg Raises Numerous Competition Related Risks that Were Known at Round B

40. Hochberg lists competition related concerns/risks with hiQ, claiming that it "Lacked a Sustainable Competitive Advantage,"[47] "Faced Competition From Other HR Analytics Firms,"[48] and "Faced Competition from Established Incumbents, Other Startups, and In-House Analytics Teams."[49] However, she does not prove the severity of the threat that she suggests they posed. These competitive issues are the kinds of issues that apply to most companies – startup or otherwise. Additionally, knowledge of the competitive environment was available to investors at Round B, and therefore reflected in hiQ's Round B value. As such, these risks accounted for in my valuation.

41. Hochberg presents no evidence that a rational investor would have evaluated the competitive landscape for hiQ materially differently between its Round B and the C&D. Therefore, none of these risks should materially impact my analysis of how hiQ's value changed between Round B and the C&D.

### 1.    Investors Had Hochberg's Information on hiQ's Competitive Advantage at Round B

42. Hochberg criticizes hiQ's competitive advantage on a number of fronts. These issues would have been known to Investors at Round B and, therefore, are accounted for in my valuation of hiQ at the C&D.

43. Hochberg states that hiQ's reliance on public data meant that competitors could use the same data.[50] That information was available to Investors at Round B.. In a version of "heads I win /

---

[47]  Hochberg Report, ¶¶ 90-91.
[48]  Hochberg Report, ¶¶ 95-98.
[49]  Hochberg Report, ¶¶ 100-08.
[50]  Hochberg Report, ¶¶ 91-93.

tails you lose", Hochberg then claims that "[i]n reality, hiQ's competitors relied on different avenues to collect the data needed for their products to work, which possibly suggests that other start-ups did not perceive hiQ's business model of entirely relying on LinkedIn data as sustainable."[51] At Round B the market would have been aware of what other firms in the HR field were doing and could potentially do. Hochberg points to no material changes in what investors would have expected following Round B and before the C&D.

44. Hochberg claims that hiQ had no "moat" around its business.[52] She points to nothing preventing investors at Round B from making their own determination on this.

45. Since Hochberg's criticisms of hiQ's competitive advantage relate to facts known at Round B, they are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

46. Hochberg presents no evidence that a rational investor would have evaluated hiQ's competitive advantage materially differently between its Round B and the C&D. Therefore, none of these risks should materially impact my analysis of how hiQ's value changed between Round B and the C&D.

## 2. Investors Knew hiQ Would Face Competition From Other HR Analytics Firms at Round B

47. Hochberg criticizes hiQ's prospects on the basis that it would face competition because the market for its services was very large and a hot area for VC investment.[53] I discuss in Section VII that, overall, having a large market is a positive fact for hiQ, though it is mitigated by the fact that a large market attracts competition. I also discuss that Hochberg's own sources emphasize the importance of market size. In this section I explain that all of this – whether investors would have agreed or disagreed with Hochberg – would have been known at Round B and therefore are accounted for in my valuation of hiQ at the C&D.

---

[51] Hochberg Report, ¶ 92. Hochberg's logic here is a version of "heads I win / tails you lose": If hiQ is unique in using LinkedIn data, then Hochberg interprets it as a weakness, not a competitive advantage or even a first-mover advantage; but if hiQ faced competition in this respect, Hochberg would not interpret it as showing that the strategy is sound – instead she claims hiQ lacked a competitive advantage.

[52] Hochberg Report, ¶ 93.

[53] Hochberg Report, ¶¶ 94-99.

48. In her section portraying hiQ's large market as a problem due to the competition it attracts, Hochberg states that hiQ's claim to a first-mover status is incorrect. Her argument is semantic and evades the important point.[54] Hochberg disputes that hiQ was a "first mover" on the basis that:[55]

   a. Google used the term "people analytics" in 2007;

   b. "While the application of statistical and predictive models on employee data has become more widespread within the last decade, the use of data to drive better business outcomes goes back much further," including that "Human Capital Management ("HCM") Software Vendors, such as SAP, emerged in the 1970s…. These HCM Software Vendors eventually added HR analytics functionality such as employee retention and talent management on top of their existing software."

49. The relevant sense in which hiQ's has a commercially important first mover status is that it was the first firm to use big data from outside client firms to inform retention-related (and other) decisions. Hochberg does not address that issue, other than in her "heads she wins / tails hiQ loses" analysis discussed in this Section. Further, all the salient facts about first-mover status (defined either as Hocheberg does or as was commercially relevant) were known at Round B.

50. Hochberg states that there was a lot of investor interest and a lot of VC investment in the HR analytics market. She focuses on the competition this investment implied.[56] These issues would have been known at Round B.

51. Since Hochberg's criticisms of hiQ's competition relate to facts known at Round B, they are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

52. Hochberg presents no evidence that a rational investor would have evaluated hiQ's competition materially differently between its Round B and the C&D. Therefore, none of these risks should materially impact my analysis of how hiQ's value changed between Round B and the C&D.

---

[54] Hochberg Report, ¶ 95 and subsequent discussion.

[55] Hochberg Report, ¶¶ 96-97.

[56] Hochberg Report, ¶ 98 and Figure 12. See also my discussion in Section VII of this report.

### 3.  Investors Knew hiQ Would Face Competition from Established Incumbents, Other Startups, and In-House Analytics Teams at Round B

53.  Hochberg criticizes hiQ's prospects on the basis that it would face competition from established incumbents, other startups, and in-house analytics teams.[57] These facts would have been known at Round B and therefore accounted for in my valuation of hiQ at the C&D.

54.  Hochberg discusses various competitive issues known since 2010 or 2015 (i.e., before Round B):

> *There are several notable examples of HCM Software Vendors that either developed or acquired HR analytics capabilities since 2010. One example is "Workday Talent Insights," which allowed Workday's customers to identify the "top performers at a high risk of leaving in the next year and the projected cost to replace them." Another example is ADP, which launched its "DataCloud" product in 2015 …[58]*

55.  Hochberg then provides data on startups she considers as potential competitors to hiQ, which were all founded in 2015 or before (again, before Round B):

> *In Exhibit 6, I summarize 23 HR analytics startups identified by hiQ as being competitors during the years of hiQ's operation. These HR analytics startups were all founded between the years of 2003 and 2015.[59]*

56.  Since Hochberg's criticisms of hiQ's competition from incumbents, startups, and in-house analytics teams relate to facts known at Round B, they are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

---

[57]  Hochberg Report, Section VI.F.2.

[58]  Hochberg Report, ¶ 103.

[59]  Hochberg Report, ¶ 104.

57. Hochberg presents no evidence that a rational investor would have evaluated hiQ's competition from incumbents, startups, and in-house analytics teams materially differently between its Round B and the C&D. Therefore, none of these risks should materially impact my analysis of how hiQ's value changed between Round B and the C&D.

## F.    Hochberg Criticizes hiQ's Funding, Which Was Known at Round B

58. Hochberg severely criticizes hiQ's fundraising. Of course, the facts about hiQ's fundraising were known at Round B – by definition. The impact of these facts are already accounted for in my valuation of hiQ. They are also examples of Hochberg's criticisms being consistent with hiQ being valued in the tens of millions and that value increasing from round to round.

59. Hochberg discusses hiQ's funding to such an extent that I devote the entire next Section to it.

# V.   Hochberg Erroneously Criticizes hiQ's Series A and B Funding

60. The largest section of the Hochberg Report discussing hiQ (as opposed to startups generally) is entitled "hiQ Had Limited Cash Runway Due to Fundraising Problems", in which she claims that:

> *hiQ consistently struggled with fundraising, which is reflective of a market that likely assessed that the Company had a low potential for success. In particular, hiQ's underfunded Series B round left hiQ with limited runway by May 2017 …*[60]

61. Hochberg claims that hiQ's Series B was "unsuccessful" because it raised less money than Hochberg claims hiQ wanted to raise and "[a]n underfunded round like hiQ's Series B financing round can cause multiple problems", including that a "shorter runway makes it more difficult to

---

[60]   Hochberg Report, ¶ 63.

meet milestones necessary for attracting further financing."[61] She also criticizes hiQ's Series A on the basis that "hiQ's Series A financing provided hiQ less than a year of runway."[62]

62.   As an initial matter, Hochberg's negative evaluation of hiQ's fundraising contradicts her own data, analysis, and conclusion advanced in a different part of her report, but that directly relate to hiQ's fundraising. In discussing hiQ's competition, Hochberg states:

> *[…] some of hiQ's competitors that were HR analytics startups were far more successful at attracting venture capital funding. Of the 23 HR analytics start-ups listed in Exhibit 6, ten attracted more funding than hiQ from venture capital investors as of May 2017.[63]*

Though Hochberg portrays her data as being negative for hiQ, Hochberg herself calculates that hiQ was **slightly better than average** – 11 of 23 – by her own metric of total fundraising, and compared to firms she herself selected as relevant. I value hiQ as if it would have had **average** success in Round C (and at a 20% discount from that average to account for hiQ's distance from Round C).

63.   In addition to this basic contradiction between her rhetoric and data, there are two main issues with Hochberg's analysis: a conceptual problem and an analytical problem. Conceptually, Hochberg's criticism of hiQ's Round A and B all relate to facts known as of Round B. These criticisms undermine Hochberg's approach because they demonstrate that her negative judgements are consistent with hiQ having a substantial and increasing value. Analytically, many of her criticisms of the Round A and B funding are incorrect and contradicted by her own sources.

---

[61]   Hochberg Report, ¶¶ 53 - 55. Hochberg lists other issues a supposedly underfunded round can cause including "the startup may need to preserve cash and therefore trim its operations". I discuss this issue in Section V.B.

[62]   Hochberg Report, ¶ 52.

[63]   Hochberg Report, ¶ 107.

## A.    Hochberg's Claims about hiQ's Rounds A and B Undermine Her Basic Approach

64.  Hochberg's conclusions about hiQ's fundraising demonstrate that her approach of citing "issues", "problems" and "risks" and then claiming that it "would have been highly speculative to expect hiQ to survive or reach profitability" contains no useful information about hiQ's value. hiQ *increased in value* from Series A to Series B, despite investors being aware of the size of each funding round and the runway each would provide. **Thus, when Hochberg identifies "failures" and "multiple problems" and concludes that hiQ "was left in a precarious position after the underfunded Series B financing round" – in her longest substantive section – that is nonetheless fully consistent with hiQ being valued by investors at tens of millions of dollars and increasing in value from round to round**.

## B.    Hochberg Incorrectly Concludes that hiQ "Consistently Struggled with Fundraising"

65.  Second, Hochberg is wrong that hiQ "consistently struggled with fundraising." Her opinion is the result of selective citation of her own sources and evidence from discovery. As discussed above, Hochberg's own data and analysis show that hiQ raised more money than most firms she considered as relevant fundraising peers.[64] I first discuss her erroneous analysis of the adequacy of hiQ's "runway" and then her related and also erroneous analysis of whether or not hiQ's Round B was "unsuccessful" or "underfunded".

### 1.    Hochberg Erroneously Concludes that hiQ's Runway After Round B Was Problematic

66.  Hochberg presents evidence that following hiQ's Round B, in December 2016, hiQ was on track to run out of cash by December 2017. I reproduce her summary chart (her Figure 4) as my Figure 2.

---

[64]  See Hochberg Report ¶ 62.

FIGURE 2: HIQ CASH RUNWAY AS PRESENTED BY HOCHBERG'S FIGURE 4



**Figure 4**
**hiQ's Actual and Projected Cash Position as of December 2016**

Sources:
[1] hiQ_00234171–173, at 172.
[2] hiQ_00003157–194, at 179.

67. Thus, according to Hochberg's own analysis, hiQ had about 18 months of runway from hiQ's Round B in June 2016 until it would need to obtain additional funds in December 2017. Hochberg also states that hiQ's Series A only provided "less than a year of runway."[65] Both funding Rounds are consistent with the range of runway that DeSantis stated he typically desires in funding rounds:

> *Q: … internally what is the fund raising goal for hiQ for Series B when you're going out to speak with investors?*

[65]   Hochberg Report, ¶ 52.

> *A: Internally my goal is always to go establish enough -- to raise enough money
> to get a nine- to 18-month runway to go build more value.*[66]

68. DeSantis explained that this was an approach he has employed many times, and it is motivated, in part, by a desire not to sell too much of the company too early at a lower valuation:

> *So I've done this many times. And -- and this was one of them. And so we didn't
> set a specific target other than trying to get -- typically, I would sit there and say
> let's get enough money to get us through on a few key major milestones so that
> we can build more value. Some -- probably the minimal amount of time that you
> want to do that would be nine months and the maximum amount of time of
> fundraising might be 18 months. So you get -- you try and raise enough money to
> give you -- you give you runway that lasts nine to 18 months because you know
> after 18 months you're going to have to build a whole bunch of new value. So you
> don't want to raise five years' worth of money because then you give away too
> much of the company.*[67]

69. Hochberg acknowledges in a footnote that DeSantis considered Series B a success,[68] but she does not deal substantively with his reasons for that view – including DeSantis's view of an optimal runway. Hochberg also fails to acknowledge that she apparently also disagrees with her most frequently cited source, Kupor, who is in line with DeSantis on both the length of the runway and the considerations behind it:

> *As we've discussed before, we at a16z often advise companies that **the right
> amount of money to raise** in the current round is what you think you need to hit
> the required milestones for the next round, **generally twelve to twenty-four
> months later**. In other words, you optimize for success in the next round by giving
> yourselves the right amount of execution runway in the current round. Obviously,*

---

[66] Videotaped Deposition of Robert J. DeSantis, taken remotely via Zoom, May 17, 2022, ("DeSantis Deposition") 83: 3-9. See also the same response to Series A at DeSantis Deposition, 38:22 – 40:19.

[67] DeSantis Deposition, 39:24 – 40:12.

[68] Hochberg Report, footnote 103.

> *more money now generally means more dilution, so this is always a balancing*
> *act.[69]*

70. Hochberg also does not consider the statistics, shown in my Opening Report, that among over 300 firms comparable in relevant part to hiQ, over two-thirds raised a Round C less than two years after their Round B, implying that an 18 month runway is not atypical.[70]

## 2.    Hochberg Erroneously Concludes that Round B was "Underfunded" and "Unsuccessful"

71. The prior section shows that Hochberg's conclusion that Round B was "underfunded" and "unsuccessful" because it left hiQ with an inadequate runway is incorrect. This section shows that it is also incorrect on additional grounds.

72. DeSantis testified that he thought hiQ needed between $4 and $8 million to hit his optimal nine to eighteen month runway,[71] which as Hochberg shows, he achieved. He flatly denied that Round B was undersubscribed and explained that the opportunity to bring Gary Vaynerchuk on board as a major investor was part of his calculation:

---

[69]  Kupor, p. 191 (emphasis added). See also pp. 146-47 ("This dance between these two competing interests—properly incenting an entrepreneur and minimizing the dilution for other shareholders—is a carefully choreographed one that recurs many times throughout the life cycle of a company. … The bottom line is that this problem can be avoided easily by just being mindful as an entrepreneur of this constant trade-off between raising the capital you need to grow your business and minimizing the dilution to yourself and other employees and investors who are coming along the journey with you. For every dollar of VC you take, do the calculation to figure out what that means for your existing crew of people involved.") Compare to DeSantis Deposition, May 17, 2022,  81:23- 82:17 ("So in the Silicon Valley, you know, I remember ·seeing one time some -- some statistic that, you know, the majority -- and I can't tell you what the majority is, whether it's 60 or 70 percent of -- or 80 percent of all venture backed companies end up being 70 percent or more investor owned, which leaves very little equity for the employees. And at Ariba, we were able to -- to raise money at the right times in our life such that we were able to maintain more than a 50 percent employee ownership in the company. So my goal was to try to allow the company to maintain more than a 50 or even 60 percent to keep the investors at 40 to 50 percent investor owned. ·Maybe the investors would get up to 60 percent if the market didn't grow as fast as we wanted or maybe if we didn't execute like we should sales. So my whole goal was to beat that traditional number and keep as much of -- equity for the employees as possible.")

[70]  Amended Report, Appendix C. 79 firms raised a Round C a year or less after Round B. 123 raised Round C in one to two years after Round B and 100 firms took more than two years.

[71]  DeSantis Deposition, May 17, 2022, 83:2-15.

> *[O]ur Series B, we raised $5 million from Gary Vaynerchuk from Vayner Capital. That was a whole new branding opportunity. Five million dollars was the largest raise we had ever done. And we knew we'd have some follow-on from our existing investors. And, based on all of that, we knew that with Gary we were going to be able to create tremendous -- a tremendous amount of value. So it became very strategic to say, okay, why not take less rather than more and go build some more value and raise money at a different -- at a much better valuation down the road. And we already knew that we could – we already knew that we could raise convertible notes because we had done that in the past. And I was quite comfortable with -- with -- with us being in control and toggling the switch.*[72]

73. DeSantis stated that he could personally have funded the company an additional five to ten million, so there was "always a backstop" but that he:

> *[S]aw the Vaynerchuk -- the Vayner Capital investment as an incredible opportunity to drive value in a different way. And I personally was quite happy with -- with closing the round at -- at that level with any other investors that wanted to tag along.*[73]

74. DeSantis also testified that convertible notes were one of his standard ways of fundraising.

> *I always have two ways to go about getting runway. Runway No. 1 is when we would do the next financing. Runway No. 2 is to do a convertible note to -- to the*

---

[72] DeSantis Deposition, May 17, 2022, 84:6-21. See also 89: 11-17 ("Q. So from hiQ's perspective, Series B was successful? A. Yes. Q Did -- did hiQ fall short in any way for Series B? A. Not to my recollection.") and 102:22-103:1 ("I knew that he [Vaynerchuk] was well-known and well-respected. So when I was able to do some – some checking on him I was, like, wow, you got Gary. Wow, you have Gary. And so then I was like, okay. This is great.")

[73] DeSantis Deposition, May 17, 2022, 85:2-10.

*subsequent financing. But that's ·always a way to try to keep -- keep -- keep money in and keep things going.*[74]

---

## C.     Hochberg's Criticism of hiQ's Round B Ignores Her Own Research

75.   Hochberg's 2007 article, "Whom You Know Matters - Venture Capital Networks and Investment Performance," focuses on the benefits experienced by portfolio companies (i.e., the firms invested) of VC's who are well-networked.[75] One of the reasons DeSantis was so happy with Round B was that it was led by the extremely successful VC-investor Gary Vaynerchuk, ("Vaynerchuk") who was an early investor in █████████ Twitter, Tumblr and Snapchat, and also owns and is a presence in various media companies.[76] When DeSantis saw the "Vayner Capital investment as an incredible opportunity to drive value in a different way," he is referring to opportunities presented by Vaynerchuk's network and reputation.

## VI. Hochberg Ignores the Benefits and Validation Provided by Its Prominent Investors

76.   Hochberg discusses "the importance of procuring financing from high-quality venture capital firms" and lists well-known VC firms that decided not to invest in hiQ's Round B.[77] But Hochberg ignores or gives no credit to the high quality backers that hiQ did have.

77.   HiQ's investors include CEB, ███████ Rob DeSantis and Gary Vaynerchuk. Between them they provide an incredible span of reach into the corporate and VC world, as well as a wealth of experience in running successful startups with multi-billion dollar exists.

---

[74]   DeSantis Deposition, May 17, 2022, 65:18-23.

[75]   Hochberg 2007, Abstract, p. 251.

[76]   See biographical description on Gary Vaynerchuk's website (https://www.garyvaynerchuk.com/biography). See, also, Amended Report, ¶20c.

[77]   See Hochberg Report, ¶¶ 42-43 and 56.

a.   ███████ invested $500,000 in hiQ's Round A and was a Board observer. ███████ is one of the most respected and prestigious firms in the world. They have a reach into the Boardrooms and C-Suites of more firms than almost any other firm in the world.[78] Every potential competitor that Hochberg cites would be attempting to sell to a myriad of firms that ███████ had long-standing relationships with at the Board and C-Suite level. Yet in evaluating the signal that hiQ's investors send about hiQ's value, Hochberg totally ignores ███████

b.   CEB was a well-known firm that provided "best practice research, benchmarks, and decision support tools to business leaders in HR" and other areas.[79] When it acquired CEB, Gartner described CEB as "the industry leader in providing best practice and talent management insights."[80]

c.   Between them, DeSantis and Vaynerchuk have been early investors in LinkedIn, Ariba, ███████ Twitter, Tumblr and Snapchat. Very few VC firms in the world can boast that record of success. DeSantis was a former Board member at LinkedIn and a co-founder of Ariba.

# VII. Hochberg Erroneously Casts hiQ's Huge Potential Market as a Negative while Ignoring the Importance Placed on that by Her Most Frequently Cited Source

78. Hochberg selectively cites sources and misleadingly frames evidence to erroneously cast hiQ's huge potential market as a negative. Hochberg cites Kupor's book "The Secrets of Sand Hill Road" more than any other source (23 times). Though she cites Kupor on market size several

---



[79]   "CEB Inc.," Wikipedia, (last accessed June 29, 2022: https://en.wikipedia.org/wiki/CEB_Inc).

[80]   "Garner acquires CEB", Gartner, (last accessed June 29, 2022: https://www.gartner.com/en/about/acquisitions/history/ceb-acquisition).

times, she somehow misses Kupor's key "**cardinal rule of VC investing: everything starts and ends with market size.**"[81]

79. Despite the importance placed on market size by investors[82], and by Hochberg's most cited source, Hochberg does not have a section on "market size" akin to the discussion in ¶¶ 15 to 18 of my Opening Report. Instead, she discusses the size of the market *indirectly* in a section entitled "hiQ Faced Competition From Other HR Analytics Firms." That is, Hochberg frames the facts about the market size as relating not to the large size of hiQ's market itself, nor to investor interest in that market, but to the indirect effect that a large market has on competition.

80. Consistent with my Opening Report, that section establishes that the HR analytics market was large and attracted substantial VC investment.[83] Figure 3 reproduces Hochberg's Figure 12, which demonstrates high VC interest in hiQ's market space. Hochberg portrays this interest as a negative as it leads to competition.[84]

---

[81]   Kupor, p. 113 (emphasis added).

[82]   See, for example, Metrick, pp. 121-122 ("At the screening stage, the market test required large, addressable markets. In the due-diligence phase, the first impressions of such markets must be carefully analyzed. What might have been a quick and dirty estimate now must be backed up by hard data. Many of the remaining items on this list cover some component of market due diligence. When all these items are put together, the VC should critically examine his initial impressions of the overall market and convince himself (and his partners) that a large, addressable market exists.")

[83]   Hochberg Report, ¶¶ 98-99 and Figure 12.

[84]   Hochberg Report, ¶¶ 98-99.

**FIGURE 3: HOCHBERG PORTRAYS HIGH VC INTEREST IN HIQ'S MARKET AS A NEGATIVE (REPRODUCTION OF HER FIGURE 12)**



**Figure 12**
**Venture Capital Investments in HR Tech Startups**

Source: Priyamvada Mathur, "VC Investment in HR Tech Skyrockets as Opportunities Abound," PitchBook, October 21, 2021, available at https://pitchbook.com/news/articles/venture-capital-human-resources-tech-valuations.

81. Instead of stressing – as her main source Kupor does – the importance of a large market and the *positive effect* that it would have had for hiQ's prospects or inevitability, she styles her discussion of the large market as a discussion of competition, which is a *negative*.

82. My Opening Report presents facts on hiQ's large market and more accurately portrays that as a positive for hiQ's value.[85] I also discuss the fact that a large market means competition is inevitable in the upside scenario where hiQ successfully exits, and that this was understood at Round B, and would rationally be largely priced into hiQ's Round B value.[86]

83. Further, as discussed in Section IV, most of the facts about hiQ's market and the implications for competition would have been known at the time of hiQ's Round B and reflected in hiQ's Round B valuation.

---

[85]   Amended Report, ¶¶ 15-17.

[86]   Amended Report, ¶¶ 59-60 and Section IV.B.3 generally.

# VIII. Hochberg Ignores Partnerships and Channels, Which Were a Major Positive for hiQ and Considered Important by Hochberg's Sources

84. In my Opening Report, I evaluated hiQ's progress since Round B in the major areas that Metrick's "Venture Capital and the Finance of Innovation" states that VCs consider.[87] As regards two of those, "Channels and Partners", [88] I provide evidence that hiQ was advancing in talks with IBM, PwC, Jobvite, Silicon Valley Bank, and Bank of New York Mellon at the time of the C&D.[89] These potential partnerships were highly valuable, as they were potential channels for substantial sales and scaling of the business.

85. Hochberg, however, ignores this topic. She does not mention any of these potential partnerships despite the fact she:

   a. repeatedly cites Metrick – who discusses the importance of partners and channels;[90]

   b. cites the complaint alleging that hiQ "experienced an almost immediate (unwilling) cessation of conversations with **potential strategic partners**" following the C&D;[91] and

   c. considered Weidick's deposition where these partnerships were discussed.[92]

86. Hochberg's failure to address these critical areas where hiQ made significant strides is all the more inexplicable because her most frequently cited source, Kupor, also discusses the importance of partners. Kupor explains that partnerships can help firms like hiQ in the critical areas of sales and distribution (something Hochberg criticizes hiQ for), and can also become **eventual acquirers**:

---

[87]  Amended Report, ¶ 44 and Section IV.B generally.

[88]  Amended Report, Section IV.B.4.

[89]  Amended Report, Section IV.B.4.

[90]  Metrick is her second most cited source after Kupor.

[91]  Hochberg Report, ¶ 13 (emphasis added).

[92]  Hochberg Report, Appendix C and Weidick Deposition, for example, 131:3-10, 221:22-25, 222:15-23, 247:17-248:21, 325:17-328:7, 330:22-333:16.

*In the same vein, the founder has to be able to attract customers to buy the product, **partners to help distribute the product**, and, eventually, other VCs to fund the business beyond the initial round of financing. Will the founder be able to explain her vision in a way that causes others to want to join her on this mission? And will she walk through walls when the going gets tough—which it inevitably will in nearly all startups—and simply refuse to even consider quitting?*[93]

And

*Well, it goes without saying that you don't need to expose any of these players to your core intellectual property, trade secrets, or detailed road maps. But that being said, building relationships is important nonetheless—and you can choose to disclose whatever level of information with which you are comfortable. **Even if you are not interested in an acquisition, these companies may often be good business development partners as they likely have existing sales channels into some of the markets you are planning to enter. Some of the best acquisitions often stem from relationships that begin as business development partnerships***.[94]

And

*Once you've successfully convinced the VCs of your fitness to the market opportunity, you still need to help them understand how you are going to build the right team around you. No matter how great a product genius any founder*

---

[93]   Kupor, p. 47. (emphasis added).

[94]   Kupor, pp. 247-48. (emphasis added).

> *may be, **she can't build a large business without employees and other business partners**.*[95]

87.   As discussed in more detail in Section IX.C, Hochberg extensively criticizes hiQ's sales and customer counts: she has three figures covering customers and contracts, and two figures covering revenues. As discussed in that section, her criticisms are overstated – in part because she ignores the progress hiQ made on the sort of partnerships that her own sources indicate often help startups with the very challenges she overstates.

## IX.  Hochberg Selectively Cites Sources and Ignores Evidence to Miscast hiQ's Achievement of Replacing a Founder with a Professional CEO as a Setback

88.   In my Opening Report I evaluated hiQ's progress since Round B in the major areas that Metrick's "Venture Capital and the Finance of Innovation" states that VCs consider,[96] the most important of which was "Management."[97] I explained that startups often decide to replace founder CEOs with professional CEOs as they mature and move into a growth / scaling phase. I explained that hiQ had done that by replacing their Founder CEO, Kaplan, with a professional CEO, Weidick. Kaplan had agreed with and asked for such change. I credited this as an important milestone hiQ had hit following Round B.[98]

89.   Hochberg views this transition as a negative. She portrays Kaplan as having been essentially fired, and positions it as a "troubling sign" and part of a pattern of turnover in key positions. She states:

---

[95]   Kupor, p. 133. (emphasis added). See also pp. 133-134 ("And to be clear, we are using the word "story" in its purest sense; that is, the ability to captivate an audience (whether that audience is employees, customers, partners, financiers, etc.) and take them along for the proverbial ride.").

[96]   Amended Report, ¶ 44 and Section IV.B generally.

[97]   Amended Report, Section IV.B.1.

[98]   Amended Report, Section IV.B.1.

> *As I discussed in Section V.C, executive turnover is often a troubling sign for a startup, as it can signal internal conflict about the direction of the startup, concerns about the quality of management, or executives' lack of belief in the startup's potential. hiQ experienced turnover at several key positions in the run-up to May 2017.[99]*

90. She then cites a series of negative comments about Kaplan including that

   a. DeSantis thought "Mr. Kaplan was not a strong fundraiser and not able to effectively manage company operations";

   b. Graves stated Kaplan (i) had "lost a de facto vote of no-confidence with his team", (ii) "did not have what it takes to lead the company through the next year", and (iii) was not capable of leading hiQ's next fundraising round, which was important since, Graves stated, "[w]e will need to raise money again in 2017 and need a credible CEO solidly at the helm."

   c. Medeiros stated that Kaplan "wasn't a fundraiser and he wasn't a CEO. He was a networker." [100]

91. Hochberg is correct that the individuals she cites maintained the opinions she credits to them, though she does not present their positive statements about Kaplan.[101] However, her presentation of the evidence and context – including what her own sources say about a founder versus professional CEO – is so selective that the impression she generates is misleading.

92. I fill in the information that Hochberg omits in three steps. First, I show that Hochberg's sources state that effective founders typically have unusual characteristics that make them ill-suited to running their firms after the initial startup / evangelizing phase, and that it is common and expected that founders are replaced as CEOs as the firm matures.

---

[99]   Hochberg Report, ¶ 76.

[100]  Hochberg Report, ¶ 77.

[101]  For example, DeSantis was impressed that Kaplan could land Vaynerchuck as an investor (DeSantis Deposition, May 17, 2022, 101:17-103:1) and thought Kaplan "had some visionary thoughts, really good thoughts" (112:14-17). Graves stated founders are "selling a vision mindset, which Darren Kaplan was extremely good at, and which this -- you know, salespeople that you hire as normal salespeople don't know how to do because that's not what they do". Videotaped Deposition of Genevieve Graves, taken remotely via Zoom, May 25, 2022, ("Graves Deposition") 295:16-296:20.

93.  Second, I show that both Kaplan and DeSantis recognized that while Kaplan had those unusual characteristics that did make him a successful founder, he did not have the skills to be an effective CEO as the firm matured, and that he and DeSantis had long envisioned that Kaplan would step down and be replaced by a professional CEO when the firm was mature enough to require one.

94.  Third, Hochberg also omits to state that the fact that hiQ attracted a high quality CEO – who necessarily did due diligence on hiQ before joining and was substantially compensated by stock – which is another validating event.

95.  Essentially, Hochberg omits that the shortcomings she points to were to be expected from her sources, and were known by Kaplan and DeSantis, and that the fact that they became relevant after Round B is due to hiQ having matured to the point where a professional CEO was needed.

## A.  Hochberg's Sources Show that Replacing a Founder with a Professional CEO is An Expected and Often Necessary Step

96.  Hochberg's most cited source, Kupor, explains that – given the enormous odds that startups initially face – founders must often be unusual in ways that are obviously often problematic in a more mature firm to succeed:

> *Will the founder be **able to explain her vision** in a way that causes others to want to join her on this mission? And will **she walk through walls** when the going gets tough—which it inevitably will in nearly all startups—and **simply refuse to even consider quitting**? When Marc and Ben first started Andreessen Horowitz, they described this **founder leadership capability as "egomaniacal."** Their theory— notwithstanding the choice of words—was that to make the decision to be a founder (a job fraught with likely failure), an **individual needed to be so confident in her abilities to succeed that she would border on being so self-absorbed as to be truly egomaniacal**. [...] the principle remains today: you have to be **partly delusional to start a company** given the prospects of success and the*

> *need to keep pushing forward in the wake of the constant stream of*
> *doubters.[102]*

97. Kupor states that Boards often replace the founder:

> *[…]probably the most foundational thing that a board does is to hire (or fire) the*
> *CEO. Understandably so, many founder CEOs have been paying much more*
> *attention to the composition of the board of directors given historical concerns*
> *over VCs being quick to replace the founder CEO.[103]*

98. It follows logically from Kupor's description of founders that this replacement occurs when firms outgrow the need for the evangelizing ability of founders and instead need the organizational and operational excellence of a professional CEO. As discussed below, that is supported by DeSantis's testimony.

99. Metrick discusses the need for VCs to "rein in" founders:

> *In the recent investment environment where money is chasing talent, it has*
> *become more of a challenge for VCs to effectively exercise their governance role*
> *as board members. Since VCs want to retain warm relationships with the*
> *founders, they may refrain from reining them in until the company prepares to go*
> *public.[104]*

100. I note that hiQ managed to "rein in" its founder by replacing him with a professional CEO and still retain the important "warm relationship" with Kaplan, who both agreed that a transition was appropriate and took a seat on hiQ's Board.[105] Hence, hiQ did as Metrick suggests VCs want to do –transitioned Kaplan, the founder, while maintaining a positive relationship.

---

[102] Kupor, pp. 46-47. (emphasis added).

[103] Kupor, p. 171.

[104] Metrick, p. 83.

[105] Robert DeSantis indicates the decision for Darren Kaplan to step down as CEO was "mutual." DeSantis Deposition, 115: 18-22.

101. Gornal and Strebulaev, whom Hochberg also cite, agree that founder CEOs often need to be replaced by professional CEOs:

> *The most contentious disagreements are often about the suitability of the founders as corporate leaders, with VCs frequently seeking to replace them with professional managers.*[106]

102. I again note that hiQ here did better than many firms, according to Hochberg's source, in that this transition was long-planned, not contentious, and Kaplan took a seat on the Board. [107]

## B.    hiQ Investors, Founders and Employees Understood that Kaplan was a Great Founder, but Likely Would be Replaced with a Professional CEO when hiQ Matured

103.   In agreement with Hochberg's sources, DeSantis stated that:

> *In Silicon Valley it's well known that most entrepreneurs are not going to be the CEOs two, three, four, five companies -- years into a company. You know. The Mark Zuckerbergs are a rare example -- a rare example of people that can do that.*[108]

---

Genevieve Graves noted: "[I]t was critically important for the company, I believe, and for the company culture, that Darren Kaplan -- continue to be involved in the company and be supportive of and on board with the CEO transition." Graves Deposition, 310: 5-8. Graves agreed that Kaplan "on board" with the CEO transition, as she understood. Graves Deposition, 303: 10-11. Graves further noted Kaplan was "comfortable with and willing to support the process of […] finding and hiring an external experienced CEO" as "the skills that he had as a founder that had helped him start things were not the skill set that was necessary to take the company to the next phase." Graves Deposition, 301:25-302:7.

[106]  Will Gornall and Ilya A. Strebulaev, "The Contracting and Valuation of Venture Capital-Backed Companies," *Forthcoming, Handbook of the Economics of Corporate Finance, Vol 1: Private Equity and Entrepreneurial Finance*, March 3, 2022, p. 12.

[107]  "Leadership Team", hiQ Labs, (last accessed June 30, 2022: https://www.hiqlabs.com/new-leadership-team).

[108]  DeSantis Deposition, May 17, 2022, 119:1-5.

104.  DeSantis stated that the situation at hiQ was similar to what he had experienced at LinkedIn
with Reid Hoffman, emphasizing the founder's visionary ability, but limited operation skill:

> *Reid Hoffman was a great visionary, but operational skills were very*
> *unremarkable. And so at LinkedIn we went through Reid being CEO, then*
> *stepping over to just a founder and then back to CEO. He moved back and forth*
> *several times until we finally got the right CEO that gelled with Reid, but that*
> *could shore up the -- the -- the areas that Reid wasn't strong at. So those type of*
> *examples were -- were -- were very evident to me of what I was experiencing*
> *with Darren.*[109]

105.  DeSantis told Kaplan that he thought Kaplan was a typical entrepreneur but likely not a long-
term CEO:

> *And it was pretty clear to me in the first few months that Darren was not going*
> *to have the skill set to be a long-term CEO of the company. And -- and I'd already*
> *communicated that to Darren. And he knew that.* [110]

And

> *So I said to Darren on day one, I said: You know, Darren, you're a typical*
> *entrepreneur. The day may come where the growth of this company is going to*
> *outpace your growth. And another one of our group of values was no on-the-job*
> *training. So I said: You're a first time CEO. As an entrepreneurial company right*
> *now. ... that's okay, but time will tell whether or not you have the -- the skill set*
> *to keep pace with the growth of the company and to keep pace with the*

---

[109]  DeSantis Deposition, May 17, 2022, 119:15-24. See also 112:14-25 ("Darren, at this stage of the company,
reminded me a lot of Reid Hoffman when LinkedIn was at this stage of the company. So had some visionary
thoughts, really good thoughts. Was not the best operator, as far as managing people, operations. And where
Darren maybe differed from Reid was -- Reid ·was -- was -- was very good with potential investors and -- and
Edmond -- I mean, Edmond -- and Darren -- ·Darren was not always the best with investors.  Things like he was
very eager and very ·excited. Well, eager, excited entrepreneurs scare investors. You know. You have to be
deliberate.")

[110]   DeSantis Deposition, May 17, 2022, 119:5-9.

CONFIDENTIAL

> *experience set that you need to be successful. So this was an ongoing*
> *conversation and Darren would poll me every now and then to find out where it*
> *was.· So when -- as soon as we raised the money, the Series B, successfully I*
> *thought to myself, and I spoke with Darren as well, about, hey, this might be a*
> *great time to make a change. And somewhere in **July or August** of that year*
> *Darren put together a letter. I don't recall the element -- a lot of the element. I*
> *think -- I think the title of it was "Good to Grade" [sic]  And he sent a*
> *companywide -- and I can't remember if he did it at the board first and then to*
> *the company or the company first and then the board. I want to say he did it to*
> *the board first and then the company. But he put together a -- a note that said,*
> *hey, I've been a -- I -- I've been a good CEO. I -- I've been a great CEO up till now.*
> *But I won't be a good CEO going forward. It's time for us to – we have -- we have*
> *the money. We have the -- the – the momentum. It's time for us to go get a great*
> *CEO. And he said he was prepared to move to -- and to take on whatever role we*
> *wanted him to.*[111]

106.  DeSantis described the skill sets he was looking for in the next CEO after Kaplan as those of a
more professional and experienced CEO:

> *Operational excellence. The ability to – to attract and retain and build and*
> *motivate a very strong team of leaders and managers. The ability to understand*
> *in a balanced way the company from an engineering technology sales and*
> *marketing and business and operations. The ability to have a network to go find*
> *great operators as well as great engineers and scientists.*[112]

107.  Kaplan also recognized that while he was a great founder, with the same unusual characteristics
mentioned by Kupor, he was not likely to be a great CEO once the firm matured:

> *I thought I was the perfect CEO for a specific stage of that company. Q. What*
> *stage? A. Getting it started. [….] Recruiting talent when you have no money,*
> *getting people to have faith in you when you have no money, getting people to*

---

[111]  DeSantis Deposition, May 17, 2022, 113:20-114:25.

[112]   DeSantis Deposition, May 17, 2022, 119:25-120:12.

*invest in you on an idea and just straight grit and coachability and I loved being
with customers. And then next thing, you know, you have less time with
customers and you have to be in more operational meetings and I was lucky
enough to pick my successor and I was absolutely delighted that we found
Marc.[113]*

108.  Kaplan knew from early on that he was only a founder CEO, but was not likely suited to be the
      CEO once hiQ matured. He viewed that situation as similar to Reid Hoffman at LinkedIn:

*Q. Did there come a time when you concluded that you were not the right person
for the CEO role?*

*A. Yes.*

*Q. When did that occur?*

*A. Early on.*

*Q. Can you give me a more concrete timeframe than early on?*

*A. When the company was Orgstores [sic] [...] and Sherman and I decided to
create a company. Sherman said, "I think you'd be a great CEO". And I said,
"Sherman, I think you'd be a great CEO". And he said, "I think you're the CEO".
So, I became the CEO of Orgstores [sic]. And we talked, Sherman and I, a lot
about LinkedIn. Sherman was employee 41 at LinkedIn and we would have a lot
of long conversations about how Reid Hoffman was the CEO and founder of
LinkedIn. But knew early on, he didn't want to be the CEO forever. And we would
talk a lot about how did Reid put together a team and how did Reid navigate
building something and stepping away, but being on the board and being
involved. So, a lot of the decisions that I made with Sherman and with Rob and
with the board, they started the day the company started on how to build a great
company. But great companies need sometimes different CEOs at different
stages. So, Sherman would tell the story about after Reid, there was another CEO*

---

[113]  Kaplan Deposition, May 4, 2022, 138:2-14.

> *that no one remembers, but that CEO got LinkedIn to 100 million. But that CEO*
> *could not get LinkedIn public. So, that's when that they brought in Jeff Weiner*
> *and Sherman was there for when Reid stepped down and Sherman helps ....*[114]

109. Graves similarly thought Kaplan was a great founder – in terms similar to that of Kupor (all of
which Hochberg ignores) – but recognized "the challenge of transitioning from that early sales
process":

> *Darren -- so, you know, for the first two years of the company, Darren was the*
> *sales team. And -- or at least for the first year, year and a half, right. He was the*
> *sales team and so -- and when you are super early with a company, what you are*
> *selling -- you don't have a product yet. You're building -- you're frantically*
> *building product in the background so what you're selling is a vision. It's a very*
> *different sales process from selling an existing product. And so what is reflected*
> *here is the challenge of transitioning from that early sales process, you know, I'm*
> *selling a vision mindset, which Darren Kaplan was extremely good at, and which*
> *this -- you know, salespeople that you hire as normal salespeople don't know*
> *how to do because that's not what they do, to this more formalized, you know,*
> *repeatable, scalable, like we have a salesperson. We hire a salesperson. They get*
> *a sales script. They learn how to demo the product. They sort of go and sell the*
> *product. Wash and repeat.*[115]

110. Weidick also thought Kaplan was a great founder but that the company now needed a
professional CEO:

> *I knew that Darren had done a phenomenal job of getting the business to where*
> *it was. I met with Darren personally. I've seen his art type [sic] in many, many*
> *different situations and understand how something as wildly successful as this*

---

[114]  Kaplan Deposition, May, 4, 2022, pp. 136:22-137:18.
[115]  Graves Deposition, May 25, 2022, 295:16-296:20.

*could come from a guy like him. And I simultaneously understood from the interview process that it was a good time for him to move on.*[116]

## C.   Weidick Joining hiQ Validates its Increasing Prospects

111.  Mark Weidick was an experienced entrepreneur and CEO whose pre-hiQ successes included growing Cisco's TelePresence video business from a startup to $1B and the $420M acquisition of Savi Technology.[117]

112.  Like any CEO candidate considering joining a young firm, Mark did due diligence on hiQ before accepting its offer.[118] Mark's employment contract was heavily weighted towards higher value only if hiQ had a higher value. In addition to salary and a performance-contingent bonus, Mark received about 5% of hiQ's equity, the value of which would be larger than his other compensation even at hiQ's Series B value, and would certainly dwarf it if hiQ had a successful exit.[119]

113.  Having an experienced and successful CEO with a track record of growing sales into the ten figures and a multi-hundred million dollar exit join hiQ after performing due diligence, and accepting a performance-centric compensation package further validated that hiQ's prospects were improving.

---

[116]  Weidick Deposition, May 23, 2022, 22:17-23.

[117]  Amended Report, ¶ 19d.

[118]  Weidick Deposition, May 23, 2022, 25:22-26:13.

[119]  Mark's compensation was $250,000 annually plus bonus with an expectation of $350,000. He also received 9.7 million shares equal to about 9% of hiQs equity, which would vest over the next four years. At the end of four years Weidick's total cash compensation would have been about $1.4 million in nominal terms ($350,000 x 4). If hiQ's value had continue to increase over that time, and was worth $200 million by then (a doubling from Round C), his shares would be worth nearly $20 million.See hiQ_00251922.

# X.   Hochberg's Critiques of Events After Round B and Before the C&D Omit Key Facts and Are Overstated

114.  In my Opening Report, I presented evidence that in the twelve months preceding the C&D, hiQ had higher bookings, revenue, customer counts and renewals than in the twelve months preceding its Round B.[120] Nothing in the Hochberg Report challenges these findings. However, Hochberg paints an almost entirely negative picture of hiQ's progress in other and potentially related areas. I first deal with her more substantial claims that most directly relate to my findings of progress on key metrics above, and then address Hochberg's other miscellaneous criticisms of hiQ.

## A.   Hochberg's Major Critiques Relating to Events After Round B

115.  Hochberg claims that following Round B:

a.   "[c]onsistent with the cash conservation plan hiQ enacted following its underfunded Series B financing round, hiQ's headcount had declined between Q3 2016 and May 2017"[121]

b.   "hiQ also consistently failed to meet its financial projections"[122]

c.   "hiQ's revenues flatlined"[123]

d.   hiQ experienced a "declining customer base"[124]

e.   hiQ had "Internal Concerns About Product-Market Fit."[125]

116.  While not all of these claims are entirely false, they selectively present evidence out of context to create a misleading impression. First, I explained in Section IV.F that Round B was not underfunded. As I explain below, the "cash conservation plan" was due to other factors,

---

[120]  Amended Report, Figure 3.
[121]  Hochberg Report, ¶ 61.
[122]  Hochberg Report, ¶ 62.
[123]  Hochberg Report, ¶ 59.
[124]  Hochberg Report, ¶ 67.
[125]  Hochberg Report, ¶ 71.

significant among them the search for a new CEO, and does not present the dire situation Hochberg implies.

117. Second, Hochberg appears to be unaware that (i) hiQ's financial projections were aspirational and were understood to be aggressive, and (ii) that this is typical at a startup and expected by investors. It does not indicate anything unusual or unusually negative about hiQ.

    a.   Kaplan declined to call hiQ's forecasts "reliable" or "reasonable," testifying that hiQ always "pushed to forecast big numbers," "we've always forecasted in an aggressive way," and that hiQ's Board understood those numbers were aggressive.[126] Graves also understood the forecasts were optimistic.[127]

    b.   Hochberg's two most frequently cited sources, Kupor and Metrick, state, respectively:

> *[…] the financial forecasts for the business are probably not worth more than the Excel spreadsheet on which they were created. VCs often joke that "we can make the spreadsheet say whatever we want"[128]*

And

> *All business plans have projections, and of course they are always grossly inflated. Although such inflation is expected, it is still important that management understands how it will grow.[129]*

118. Though Hochberg graphs hiQ's monthly count of active customers and contracts, revenues versus projections, and headcount to paint a misleading picture of stagnation,[130] the issues of revenues, customers and headcount are related and best understood with reference to Figure 4, which shows hiQ's sales along with key events that Hochberg references in her critique – as

---

[126] Videotaped Deposition of Darren Kaplan, taken remotely via Zoom ("Kaplan Deposition"), May 4, 2022, 120:17-122:20, 127:1-9, 130:5-9.

[127] Graves Deposition, May 25, 2022, Exhibit 524, hiQ_00461428.

[128] Kupor, p. 150.

[129] Metrick, p. 122.

[130] Hochberg Report, Figures 7 to 10 and associated discussion.

well as some relevant events she omits. Figure 4 plots bookings – i.e. sales – as recorded by hiQ when revenue is received. Because hiQ sells a service, revenue is recognized throughout the period of the contract, typically after revenue is received. [131] Thus revenues are not the same as sales – they are a blended average of *past sales from prior months*. Bookings represent current sales that will *translate into revenue in the coming months*. A downturn or upturn in bookings will only show up in revenues in several months.



**FIGURE 4: BOOKINGS AND TIMELINE OF EVENTS[132]**

Source: hiQ_00004345 (HiQ Revenue Deferred Revenue July '17.xlsx) ('Rev-Def Rev' tab).

119. hiQ closed its Round B in June 2016 at a time when bookings had been falling for several months. Hochberg cites two documents (repeatedly) from the end of July 2016 (the 29th and 30th) from Kaplan and then from Graves to imply that hiQ internally believed it had problems

---

[131] I.e., in accounting terms, hiQ was like many SaaS companies, which receive the bulk of revenue as *deferred revenues*.

[132] See Work Papers in "Sacks_rebuttal_support.xlsx".

with "product fit" and needed to conserve cash.[133] It is not surprising from the then-current trend in bookings, shown in Figure 4, that the Kaplan email from the 29th focuses on sales. It opens "I spent July digging into product and sales trying to get my arms around what is broken" and states "[b]elow are my findings, they all can be fixed, but we need to reduce the burn to buy more time."[134] Hochberg quotes the "broken" statement (but not the "can be fixed") as well as Kaplan's statements about potential fit issues and needing to reduce burn.[135]

120. Graves emailed hiQ's Board on the 30th expressing her concerns about Kaplan, potential product fit issues, sales, and burn rate. She closed her email stating "I and my colleagues remain convinced that hiQ represents an enormous opportunity. However, it is essential that we have strong top leadership through this next phase, which Darren Kaplan cannot provide."[136] Hochberg cites this email to show Grave's complaints, including about Kaplan, but omits to state that Graves and her colleagues "remain convinced that hiQ represents an enormous opportunity".

121. Immediately after these emails were sent, however, bookings recovered. Every month in 2016 after these emails – the ones Hochberg cites repeatedly to anchor her claims about fit and excessive burn necessitating "cash conservation" – had bookings above any month in 2016 prior to Series B. Hochberg does not discuss either the bookings slow-down prior to these emails, or the recovery surpassing the level prior to Series B that occurred after these emails.

122. There was another temporary dip in the early months of 2017. This occurred as the CEO change was happening and also corresponded to hiQ's lead salesperson, Medeiros, taking a vacation of nearly three weeks in Australia.[137] Bookings recovered in April 2017, and the C&D occurred in May.

---

[133] Hochberg Report, ¶¶ 57, 71, 74.

[134] hiQ_00462236. Graves testified that she did not agree with Kaplan's characterization of things that were "broken", Graves Deposition, May 25, 2022, 295:8-15 ("So me personally, I would not have described that as broken.·I would have described those as, you ·know -- if we're going to make a list of what our business challenge is right now which a business should do all the time, you know, there would be things on that list of challenges that we -- what are our current challenges, right? So for Darren on some level if there ·are current challenges it's broken.")

[135] Hochberg Report, ¶ 71.

[136] Graves Deposition, Exhibit 522, hiQ_00462203 at -205.

[137] See Amended Report ¶ 49 and hiQ_00340019.

123. Hochberg also cites statements by LeBailly and Medeiros critical of hiQ's product market fit. Hochberg does not, however, cite Medeiros's testimony flatly denying that hiQ had a product market fit problem and disagreeing with Graves's statement that it might.[138] Hochberg also cites the part of Medeiros' exit interview relating to product market fit.[139] She does not, however, temper her use of Medeiros' exit interview with a recognition of the tone and content of the exit interview: it is so extreme that it suggests Medeiros was grossly exaggerating negative aspects of hiQ.[140]

124. On August 6, 2016, Kaplan emailed the Board that:

   a. Sales were the number one priority. At the time, Kaplan would have only seen the numbers in Figure 4 through July. He stated that hiQ was attempting to bring on Barry Rhein, a Stanford professor and well-known sales guru with a track record of success.[141] Barry eventually joined, which was a significant validation as (i) Barry was in extremely high demand and (ii) he accepted 100% of his payment in hiQ shares.[142]

   b. Controlling burn was the second priority. Kaplan related that to the sales issue and to bringing Barry on:

> *Burn is our second Priority. We are early and the established leader. We would like to hold off on Q3 and Q4 hires until we have developed sales confidence. Genevieve has already stage-gated the tech hires. Next up is our enterprise sales team. I tasked Barry with a 30-day plan so we can make quick decisions on October 1.[143]*

   c. hiQ should transition to "an experienced operational CEO who is decisive and knows how to lead a team this size to the next level".

---

[138] Videotaped Deposition of Darin Medeiros, taken remotely via Zoom ("Medeiros Deposition"), May 20, 2022, 186:6-187:16..

[139] Hochberg, ¶ 71. She also cites some of Medeiros' slack chats, which have a similar character. Hochberg, ¶ 71 at footnote 172.

[140] Medeiros Deposition, Exhibit 470, hiQ_00157976 at -977-979.

[141] Kaplan Deposition, Exhibit 16, hiQ_00264399 at -400. See also, Stanford Graduate School of Business, "Barry Rhein: Lecturer in Management," https://www.gsb.stanford.edu/faculty-research/faculty/barry-rhein.

[142] hiQ_00241698.

[143] Kaplan Deposition, Exhibit 16, hiQ_00264399 at -400.

125. The concern with burn was linked to the sales issue, which substantially improved after July and which hiQ would address with Barry Rhein. The headcount reduction noted by Hochberg was driven by natural attrition without replacement,[144] which was a prudent course of action when the company was intending to bring on a new CEO. Typically, a new CEO may want to make their own key hires and investments. Thus, far from being a crisis generated by an underfunded Round B, hiQ's reaction and Kaplan's email demonstrates responsible actions:

   a. the plan to reduce burn was a reasonable reaction to then-current information – information that improved in the rest of 2016;

   b. the plan to reduce burn was also reasonable in light of the CEO transition;

   c. hiQ moved decisively to address its perceived sales issue by hiring a recognized expert in the field;

   d. hiQ would transition – as Kaplan and DeSantis knew it eventually must – to a professional CEO.[145] As it turned out, they hired Weidick who had a track record at Cisco of massively increasing sales.

126. Hochberg also cites Graves' email to Lustig from October 1, 2016, which expresses concerns about possible product fit issues as well as hiQ's cash position, especially as it searches for a new CEO.[146] Hochberg does not mention that Graves also states in her email to Lustig "I see some evidence that conversations with customers and prospects are going better after Rhein's training, but have no confidence in the projected numbers for Q4."[147]

127. However, hiQ had a cash runway to December 2017, which Hochberg's own sources and DeSantis indicate was reasonable,[148] and hiQ did successfully recruit Weidick in early 2017. Further, though Hochberg positions being careful with cash as a negative, it is considered *positive* by VCs, especially in the immediate aftermath of a big funding round. In discussing how VC's evaluate potential investments Metrick states that they ask:

---

[144] See hiQ-00003149, slide 6. .

[145] See Section IX.

[146] Hochberg Report, ¶¶ 71 and 83.

[147] hiQ_00206956. See also the discussion above about start-up forecasts often being aggressive and hiQ's Board being aware of this at hiQ.

[148] See Section IV.F.

> *How has the company been financed up to this point?* **How well does it take care**
> **of its cash**? *What exactly does it intend to do with the investment?* **VCs should**
> **insist on a high level of financial controls** *(hence the common requirement to*
> *add a CFO) and should make sure they understand the cash situation of their*
> *portfolio companies at all times. Many startups begin on shoestring budget **and***
> **do not have the discipline to handle the large new sums from a VC**
> **investment**.[149]

128.  When Weidick took over in February 2017, he made further reductions in certain expenditures
      that he viewed as not cost effective, and that naturally had the effect of reducing cash burn:

> *I didn't think we needed the -- some of the resourcing in and around Elevate.*
> *There was a consultant by the name of Stu Gold who was outrageously in*
> *demand, and I didn't think we were getting enough of his attention to justify the*
> *consulting engagement, so I ended that. I think made some decisions in and*
> *around the way we were looking to generate leads in an automated way. Your --*
> *some -- some portions of our selling motion that weren't yielding the kind of*
> *results that I expected. I didn't think it was worth what we were paying for or*
> *duplicative. I don't remember the names of those vendors but I looked at them*
> *recently and I shut that down.*[150]

129.  The fact that Weidick, an experienced CEO with a track record of massively growing sales, and a
      multi-hundred million dollar exit, viewed some of the sales expenditure as still not optimal
      (even after the attrition) supports the views that (i) hiQ's decision to let the sales force decline
      by natural attrition was correct and (ii) hiQ's decision not to make substantial personnel and
      other investments prior to the new CEO joining was also correct as the new CEO did want to do
      things his own way – which was the essential point of hiring a professional CEO.

---

[149]  Metrick, p. 123. (emphasis added).

[150]  Weidick Deposition, May 23, 2022, 40:22-41:9.

CONFIDENTIAL

# B.    Hochberg's Miscellaneous Critiques Relating to Events After Round B

130.   Hochberg criticizes hiQ on a number of other grounds for events that occurred after Round B. She claims that:

   a.   hiQ had a high churn rate and customer complaints;[151]

   b.   hiQ's staff was unprofessional;[152]

   c.   hiQ had problems with data integrity and reliability of predictions;[153] and

   d.   hiQ's unit economics might not scale despite it being a Software as a Service ("SaaS") company;[154]

   e.   Graves left prior to May 15, 2017, which was another "troubling sign".[155]

131.   I address each in turn.

## 1.    Churn and Customer Feedback

132.   Customer churn is inevitable at all firms, and especially at startups, as they are refining their product. Customers that do churn will have basis for doing so. If expressed and documented, this basis will typically reflect at least somewhat negatively on the service they chose not to renew.

133.   As the data I presented in my Opening Report shows, hiQ had substantially more customer renewals after Round B than before it.[156] I calculate that the overall renewal rate – across all of hiQ's customers – was about 58% and over 70% of customers that renewed once did so again.[157]

134.   Of the seven examples of negative feedback:

---

[151] Hochberg Report Section VI.B.2 and ¶ 67.

[152] Hochberg Report Section VI.B.5.

[153] Hochberg Report Section VI.B.4.

[154] Hochberg  Report ¶¶ 59 and 63.

[155] Hochberg Report, ¶¶ 76 and 78.

[156] Amended Report, Figure 3.

[157] See Amended Report Work Paper K in "Sacks_report_support.xlsx" and source r code. Renewal rates are only estimated among customers who were capable of a renewal (i.e., not active on their first contract) as of the date of the C&D.

   a.  Two (AIG and Concur) churned prior to Round B.

   b.  Two (Genetech and ███ were potential customers that simply never bought hiQ's services

   c.  One, Pfizer, actually renewed and was a customer as of the C&D.

   d.  One, eBay, churned and then re-signed and was an active customer as of the C&D.

135.  Hochberg provides negative feedback from only one customer, Nestle, who churned after Round B and before the C&D.

136.  Further, Hochberg systematically ignores all of the positive feedback hiQ received. A partial list of these examples includes:

   a.  Keeper won the "Human Resources Executive's Top Product of 2016" in September of 2016.[158]

   b.  eBay, the first beta customer for Skill Mapper in December 2016, reported they were "thrilled" with the product.[159]

   c.  Positive comments about Skill Mapper from, John Callery, Managing Director and Global Head of Workforce Strategy at BNY Mellon.[160]

   d.  Positive comments by Silicon Valley Bank that "You have a really cool product!" and there was no need for hiQ to "sell to us."[161]

   e.  Statement in hiQ's December Board deck, from which Hochberg selects only information she casts in a negative light,[162] that:

      i.  "Product enhancements are being well received"[163]

      ii.  "Elevate demos: hugely positive reception for both Keeper 2.0 and Skill Mapper prototype"[164]

      iii.  "50% of customers moved to Keeper 2.0, early feedback very positive"[165]

---

[158] Amended Report, ¶ 59.

[159] Amended Report, ¶ 54.

[160] Amended Report, ¶ 55.

[161] Amended Report, ¶ 70.

[162] Hochberg Report, footnotes 115, 125, 138, 153, and 275.

[163] hiQ_00003157 at -159.

[164] hiQ_00003157 at -160.

[165] hiQ_00003157 at -160.

iv. "Customer Survey and Net Promoter Score: (i) NPS = 13 (room for improvement); (ii) Positivity about hiQ in general and our customer support (4.25 and 4.63 out of [five stars] respectively" (Hochberg chose to report only the first item, the NPS score). [166]

137. As discussed in Section VIII, Hochberg ignores hiQ's progress in partnership discussions with IBM, PwC, Jobvite, Silicon Valley Bank, and Bank of New York Mellon at the time of the C&D – all of which imply a positive view of hiQ and its products.[167]

138. Hochberg ignores that LinkedIn's decision to send the C&D itself was related to LinkedIn's awareness of the commercial potential of hiQ's Skill Mapper.[168]

## 2.    Hochberg Claims hiQ's Staff was Unprofessional

139. Hochberg cites two examples, one from April 2016 and one from August 2016 of unprofessional conduct by hiQ staff. However, she does not establish that these examples are indicative of a pattern or outside the norm of what is typical.

140. In addition to a complaint about one hiQ employee, the letter from Amazon (complaining about Stuart Agtsteribbe) that Hochberg cites also states:

> *I think having Genevieve onsite with us was a great asset to your company. We're tough customers and her level of knowledge about the product and general interest in our feedback earned my trust that you're working to create a product/company we want to use.*[169]

## 3.    Hochberg states that hiQ Had Problems with Data Integrity and Reliability of Predictions

141. Hochberg lists seven customers with what Hochberg calls issues relating to data integrity and reliability of predictions.[170] Four of those churned.[171] While it is not certain that their decision

---

[166] hiQ_00003157 at -161. See also Hochberg Report, footnote 153.

[167] Amended Report, Section IV.B.4.

[168] Amended Report, Section IV.B.3.

[169] hiQ_00472806.

[170] Hochberg Report, ¶ 72.

[171] Hochberg Exhibit 4 and Hochberg work paper "Figure 09, 10, 11.xlsx" tab 'Unique Customer Data'.

to churn was directly linked to these complaints it is possible that it was. Presumably, hiQ customers who did not churn did not have these issues or otherwise found hiQ's Keeper product to be of value. In some cases, it may be that hiQ would not ever be able to address certain issues to a firm's satisfaction and that firm would never be a hiQ customer. In others, it may be that as hiQ refined their product and improved their execution under their new professional CEO they would have been able to eventually serve those customers. However, the relatively small fraction of customers that Hochberg cites who churned and may have had these issues, does nothing to substantially limit the addressable market for hiQ, especially given hiQ's stage of development.

## 4.   Hochberg Questions if hiQ's Business Model Will Scale Like a Normal SaaS Company

142.   Hochberg argues that hiQ's products and business model may not have been scalable.[172] In economic terms, a business model is scalable if it can increase revenues and/or customers with relatively little additional costs – i.e., if the bulk of costs are fixed, not variable. An iPhone app is an example. While there can be considerable fixed development costs to write, test, and deploy the app, once it is on the Apple store, it can be downloaded by hundreds of millions of customers at almost no marginal cost to the app developer. The only additional (marginal) costs to the developer may be additional server space (storing customer data, etc.) and perhaps some customer service costs to manage unexpected issues that arise. However, these are typically small relative to the growth of revenues that can be supported. In a sense, these are cash cow type businesses – once a product is developed, revenues from additional sales (revenues) are essentially profits. SaaS companies are scalable companies. By questioning hiQ's ability to scale, Hochberg is essentially questioning if hiQ is a SaaS company.

143.   The allegation is misguided on at least two fronts. First, the evidence that Hochberg cites questioning scalability is from hiQ's product development stage, where (like any startup) hiQ was incurring the high fixed costs to develop the product – hiQ was only just transitioning to a phase of scaling when the C&D occurred. For example, Hochberg cites 2016 and early 2017 board decks that note the data science team are spending more than 50 percent of their time pushing data to the Keeper product.[173] However, this process was automated shortly after that, reducing the required data scientists' time to 4 hours a week.[174] That is a typical path for SaaS

---

[172]   Hochberg Report, ¶¶ 59 and 63.
[173]   Hochberg Report, ¶ 60.
[174]   Communication with Andrew Kim.

firms – they first develop the technology, even if some components are not yet automated, and then automate everything that can be automated to bring down marginal costs. Further, Weidick began a process of restructuring sales teams/strategy around scalability (e.g., the IBM platform).[175] In other words, hiQ was taking steps towards scale when it received the C&D. Hochberg ignores this critical context.

144.   Second, to the extent that historical financials from hiQ's early stage can give insight to the scalability issue, they suggest that it was scalable (i.e., hiQ costs/COGS would not, in fact, scale significantly with sales). As I established in my Amended Report, variable costs were small relative to typical revenues at the time of the C&D, and would be an even smaller fraction as revenues increased.[176]

145.   Contrary to Hochberg's assertion, there is both qualitative and quantitative evidence that hiQ was rightly seen as a SaaS business, and that its business would have been scalable had it been allowed to progress further.

## 5.   Hochberg's Claim that Graves's Departure Prior to May 15, 2017 Was a "Troubling Sign" is Overstated

146.   Hochberg states that "hiQ also lost co-founder and Chief Science Officer Genevieve Graves prior to May 15, 2017.[177] According to Hochberg this is another example of executive turnover, which is a "troubling sign."[178] Hochberg cites evidence to suggest that Graves's departure was motivated by her "concerns regarding the company's direction and lack of runway."[179] She cites evidence that Board members were concerned by the news of Graves's departure.[180] These claims are overstated.

147.   First, though Graves did send a letter of resignation in February, she agreed to stay and did stay until June 2017 after speaking with Weidick.[181]

---

[175]   Amended Report, ¶ 26.

[176]   Amended Report, Figure 10 and associated work papers.

[177]   Hochberg Report, ¶ 78.

[178]   Hochberg Report, ¶ 76 and Section VI.7 generally.

[179]   Hochberg Report, ¶ 78.

[180]   Hochberg Report, ¶ 78.

[181]   Graves Deposition, May 25, 2022, 309:9-314:7, 32:23-25.

148. Second, Graves took an unpaid advisory role after June because, she testified, "I believed in the company and the team," and stated that "I was making a decision to leave for personal reasons." [182]

149. Third, Graves testified that though her departure was a loss to hiQ, it was less of a loss in reality than it may have felt emotionally at the time because:

> … what I knew that they did not know was how much of the product and science innovation that we had been pushing forward since Manisha's departure was driven by and the sort of mind ideation of the brain child of people on the team who were not me …. [A]nd where we had someone competent and experienced coming in, and where – I mean, I had sort of been pulling, like -- holding the reins more and more loosely on the science side for a while, in part to give space for people -- for some of the younger scientists to develop and have their ideas be the ones that were pushing things forward. So I -- like, I was partly trying to manage the situation to a place where I could leave without it being a really difficult loss. [183]

150. Fourth, though Hochberg cites slide 6 of a May 15, 2017 deck to show that Graves had left hiQ by May 15[184] (which is technically incorrect as explained above), she does not cite Weidick's deposition testimony on this slide:

> Q. Were you contemplating any reorganization in connection with this board meeting?
>
> A. I absolutely was. I -- since I said it a moment ago, the idea that engineering and science would move under Andrew Kim, we ultimately did that. To get more predictability out of our software development team. I hinted at the idea of -- of potentially bringing in a fellow named Scott Nicholson down there in the last line for science leadership.

---

[182] Graves Deposition, May 25, 2022, 34:17-22.

[183] Graves Deposition, May 25, 2022, 311:10-312:23.

[184] Hochberg Report, ¶ 78.

*With all due respect to **Genevieve**, who is brilliant in so many ways, **Scott** had that brilliance, that same level of Ph.D. data science brilliance but with an added understanding of the software development process done at scale in a -- in a -- in an extended career. So short version, **Scott is an upgrade**. Similar thinking with respect to Marcelo Oliveira of Chronicle. I think previously **Prakash's shortcomings** as a product leader, we ultimately did bring in **Marcelo as a contractor**. So, yes, this was a document designed to cover discussions around **up-leveling** the organization and moving the piece parts around to be a better company.[185]*

# XI. Conclusion

151. The Hochberg Report focuses on the general riskiness of startups, as well as what she considers to be hiQ specific risks. Her report, however, does not establish the impact of those risks on hiQ's value. Investors value startups accounting for their risks. As such, Hochberg's conclusion that "it is highly speculative that hiQ would have survived or reached profitability" has no real implication for value. It characterizes almost all startups, including those worth hundreds of millions of dollars.

152. In contrast, my Amended Report uses hiQ's Round B market value as a starting point, which already reflected the value of hiQ's risks (and opportunities) as of Round B. Many of the hiQ-specific risks raised by Hochberg existed at Round B and would have been reflected in hiQ's Round B value. To calculate hiQ's value at the time of the C&D, I estimated what hiQ's Round C valuation would have been given its Round B value. I then evaluated hiQ's progress towards Round C to estimate a specific value as of the Valuation Date.

153. I valued hiQ at $72.9 million on the Valuation Date. That value reflects a 20% discount from hiQ's expected pre-money Round C value of $91.1 million – a discount based on contemporaneous ordinary course of business discussions. Given that hiQ's post-money Round B value was $33.4 million, I am valuing hiQ at the C&D as being essentially 2/3 of the way to its Round C value.[186] That level of implied progress seems reasonable  based on the progress that hiQ had made since Round B in (1) releasing Skill Mapper, (2) hiring a professional CEO with a

---

[185] Weidick Deposition, June 1, 2022, 323:12-324:9. (emphasis added).

[186] ( $72.9 = $33.4 + ($91.1 - $33.4) x 0.685)

track record of increasing sales, (3) increasing its trailing twelve month bookings, revenues, customers and renewals, (4) hiring a sales expert, Barry Rhein, with an all-stock compensation package, and (5) progressing in partnership discussion with a several major firms, such as IBM and PwC, as well as the typical startup issues hiQ faced on growing sales, and managing cash responsibly while searching for a new CEO. [187]

154. As noted in this report, most of Hochberg's report concerns facts that were known at Round B. These factors were already reflected in my $72.9 million valuation for hiQ at the time of the C&D. Further, the negative views Hochberg expresses about these factors are, as its Round B value shows, consistent with hiQ having been valued at $33.4 million in Round B and having increased in value from its Round A. Hence, when Hochberg expresses negative views about events after Round B, we have evidence that such negative judgments are consistent with hiQ continuing to increase in value.

155. I also disagree with the almost entirely negative interpretation that Hochberg ascribes to events/facts for hiQ, including those between Round B and the C&D. With proper context, some of these described negatives are more properly understood as positive developments. To the degree that I concur with some factors Hochberg raises as being less positive for hiQ, my discounting of Round C value – by 20% or about $18 million – reflects such issues. As such, nothing in the Hochberg Report alters my conclusion that hiQ value at of the Valuation Date was $72.9 million.

Benjamin A. Sacks

---

[187]  Amended Report, Section IV.B. See also Section X of this report.

CONFIDENTIAL

# Appendix A

## Additional Materials Considered in Forming Opinion

CONFIDENTIAL

## Appendix A: Additional Materials Considered

**Report Sources**

*Legal Pleadings and Other Filings*

[1] Amended Complaint, *hiQ Labs, Inc., v. LinkedIn Corp.,*  February 14, 2020, Case No. 3:17-cv-03301-EMC.

[2] hiQ's Responses to LinkedIn's First Set of Interrogatories, July 29, 2021.

[3] LinkedIn's Amended Responses to hiQ's First Set of Interrogatories, November 29, 2021.

[4] LinkedIn Corp.'s Responses to hiQ Labs, Inc.'s Second Set of Interrogatories, April 7, 2022.

[5] hiQ's First Supplemental Responses to LinkedIn's Second Set of Interrogatories, May 11, 2022.

[6] hiQ's Supplemental Responses to Linkedin's Second Set of Interrogatories, May 13, 2022.

*Expert Reports*

[1] Expert Report of Benjamin A. Sacks, June 7, 2022, Amended June 22, 2022.

[2] Expert Report of Yael Hochberg, June 7, 2022.

[3] Expert Report of Woodrow Hartzog, June 7, 2022.

[4] Expert Report of James E. Malackowski, June 7, 2022.

[5] Expert Report of Kevin M. Murphy, June 7, 2022.

*Deposition Transcripts*

[1] Videotaped Deposition of Alexander Oltmann, May 13, 2022, and exhibits thereto.

[2] Videotaped Deposition of Andrew Kim, taken remotely via Zoom, May 9, 2022, and exhibits thereto.

[3] Videotaped Deposition of Blake Lawit, taken remotely via Zoom, May 13, 2022, and exhibits thereto.

[4] Videotaped Deposition of Boris Dev, May 4, 2022, and exhibits thereto.

[5] Videotaped Deposition of Christopher Edward Gagnon, taken remotely via Zoom, June 27, 2022, and exhibits thereto.

[6] Videotaped Deposition of Daniel Francis, taken remotely via Zoom, May 25, 2022, and exhibits thereto.

[7] Videotaped Deposition of Daniel Miller, taken remotely, May 13, 2022, and exhibits thereto.

[8] Videotaped Deposition of Darin Medeiros, May 20, 2022, and exhibits thereto.

[9] Videotaped Deposition of Darren Kaplan, May 4, 2022, and exhibits thereto.

[10] Videotaped Deposition of Darren Kaplan, May 5, 2022, and exhibits thereto.

[11] Videotaped Deposition of Eric Owski, taken remotely via Zoom, May 23, 2022, and exhibits thereto.

[12] Videotaped Deposition of Genevieve Graves, taken remotely via Zoom, May 25, 2022, and exhibits thereto.

[13] Videotaped Deposition of Jenelle Bray, taken remotely via Zoom, May 18, 2022, and exhibits thereto.

[14] Videotaped Deposition of Lee Womer, taken remotely via Zoom, May 11, 2022, and exhibits thereto.

[15] Videotaped Deposition of Mark Weidick, taken remotely via Zoom, March 18, 2022, and exhibits thereto.

[16] Videotaped Deposition of Mark Weidick, taken remotely via Zoom, May 23, 2022, and exhibits thereto.

[17] Videotaped Deposition of Mark Weidick, taken remotely via Zoom, May 24, 2022, and exhibits thereto.

[18] Videotaped Deposition of Mark Weidick, taken remotely via Zoom, June 1, 2022, and exhibits thereto.

[19] Videotaped Deposition of Robert J. DeSantis, taken remotely via Zoom, May 17,2022, and exhibits thereto.

[20] Videotaped Deposition of Scott Roberts, taken remotely via Zoom, May 5, 2022, and exhibits thereto.

*Produced Documents*

| | | | | |
|---|---|---|---|---|
| [1] DeSantis_00000465 | hiQ_00444145 | LINK_HIQ_000000323 | LINK_HIQ_000001663 | LINK_HIQ_000075286 |
| [2] hiQ_00003149 | hiQ_00446298 | LINK_HIQ_000000396 | LINK_HIQ_000001687 | LINK_HIQ_000075371 |
| [3] hiQ_00003157 | hiQ_00458577 | LINK_HIQ_000000458 | LINK_HIQ_000001705 | LINK_HIQ_000089691 |
| [4] hiQ_00003654 | hiQ_00461428 | LINK_HIQ_000000569 | LINK_HIQ_000001713 | LINK_HIQ_000095225 |
| [5] hiQ_00004167 | hiQ_00462203 | LINK_HIQ_000000606 | LINK_HIQ_000001761 | LINK_HIQ_000095326 |
| [6] hiQ_00004230 | hiQ_00462236 | LINK_HIQ_000000617 | LINK_HIQ_000001795 | LINK_HIQ_000095337 |
| [7] hiQ_00004324 | hiQ_00463334 | LINK_HIQ_000000632 | LINK_HIQ_000001801 | LINK_HIQ_000095398 |
| [8] hiQ_00004345 | hiQ_00467218 | LINK_HIQ_000000644 | LINK_HIQ_000001857 | LINK_HIQ_000095412 |
| [9] hiQ_00004355 | hiQ_00469385 | LINK_HIQ_000000657 | LINK_HIQ_000001884 | LINK_HIQ_000095413 |
| [10] hiQ_00004357 | hiQ_00469439 | LINK_HIQ_000000752 | LINK_HIQ_000001921 | LINK_HIQ_000095423 |
| [11] hiQ_00004358 | hiQ_00469760 | LINK_HIQ_000000758 | LINK_HIQ_000001925 | LINK_HIQ_000095502 |
| [12] hiQ_00004443 | hiQ_00469936 | LINK_HIQ_000000769 | LINK_HIQ_000001933 | LINK_HIQ_000148097 |
| [13] hiQ_00004480 | hiQ_00470023 | LINK_HIQ_000000779 | LINK_HIQ_000001943 | LINK_HIQ_000150433 |
| [14] hiQ_00004531 | hiQ_00471426 | LINK_HIQ_000000783 | LINK_HIQ_000002126 | LINK_HIQ_000150759 |
| [15] hiQ_00004568 | hiQ_00472802 | LINK_HIQ_000000784 | LINK_HIQ_000002132 | LINK_HIQ_000150839 |
| [16] hiQ_000076813 | hiQ_00472806 | LINK_HIQ_000000786 | LINK_HIQ_000002137 | LINK_HIQ_000150992 |
| [17] hiQ_00011947 | hiQ_00493258 | LINK_HIQ_000000788 | LINK_HIQ_000002143 | LINK_HIQ_000151006 |
| [18] hiQ_00013995 | hiQ_00501832 | LINK_HIQ_000000792 | LINK_HIQ_000002148 | LINK_HIQ_000151020 |
| [19] hiQ_00016770 | hiQ_00512861 | LINK_HIQ_000000793 | LINK_HIQ_000002153 | LINK_HIQ_000152623 |
| [20] hiQ_00018050 | hiQ_00516682 | LINK_HIQ_000000806 | LINK_HIQ_000002158 | LINK_HIQ_000168706 |
| [21] hiQ_00020362 | hiQ_00527585 | LINK_HIQ_000000822 | LINK_HIQ_000002167 | LINK_HIQ_000169079 |
| [22] hiQ_00021085 | hiQ_00534194 | LINK_HIQ_000000844 | LINK_HIQ_000002180 | LINK_HIQ_000169080 |
| [23] hiQ_00021120 | hiQ_00542675 | LINK_HIQ_000000846 | LINK_HIQ_000002184 | LINK_HIQ_000172841 |
| [24] hiQ_00023141 | hiQ_00543482 | LINK_HIQ_000000853 | LINK_HIQ_000002196 | LINK_HIQ_000173670 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| [25] hiQ_00028554 | hiQ_00543587 | LINK_HIQ_000000858 | LINK_HIQ_000002203 | LINK_HIQ_000180451 |
| [26] hiQ_00028734 | hiQ_00544797 | LINK_HIQ_000000870 | LINK_HIQ_000002208 | LINK_HIQ_000180452 |
| [27] hiQ_00028736 | hiQ_00568929 | LINK_HIQ_000000874 | LINK_HIQ_000002213 | LINK_HIQ_000180455 |
| [28] hiQ_00032133 | hiQ_00574382 | LINK_HIQ_000000902 | LINK_HIQ_000002219 | LINK_HIQ_000182560 |
| [29] hiQ_00033651 | hiQ_00575579 | LINK_HIQ_000000904 | LINK_HIQ_000002224 | LINK_HIQ_000182956 |
| [30] hiQ_00043152 | hiQ_00579593 | LINK_HIQ_000000908 | LINK_HIQ_000002227 | LINK_HIQ_000183741 |
| [31] hiQ_00044584 | hiQ_00579631 | LINK_HIQ_000000912 | LINK_HIQ_000002235 | LINK_HIQ_000197086 |
| [32] hiQ_00049496 | hiQ_00579645 | LINK_HIQ_000000930 | LINK_HIQ_000002240 | LINK_HIQ_000197089 |
| [33] hiQ_00050709 | hiQ_00579648 | LINK_HIQ_000000944 | LINK_HIQ_000002248 | LINK_HIQ_000197091 |
| [34] hiQ_00055414 | hiQ_00579649 | LINK_HIQ_000000956 | LINK_HIQ_000002254 | LINK_HIQ_000197093 |
| [35] hiQ_00055543 | hiQ_00579661 | LINK_HIQ_000000964 | LINK_HIQ_000002265 | LINK_HIQ_000197094 |
| [36] hiQ_00057411 | hiQ_00580838 | LINK_HIQ_000000969 | LINK_HIQ_000002271 | LINK_HIQ_000197096 |
| [37] hiQ_00062877 | hiQ_00580863 | LINK_HIQ_000000971 | LINK_HIQ_000002277 | LINK_HIQ_000197098 |
| [38] hiQ_00069052 | hiQ_00584616 | LINK_HIQ_000000990 | LINK_HIQ_000002283 | LINK_HIQ_000197100 |
| [39] hiQ_00069398 | hiQ_00584617 | LINK_HIQ_000001000 | LINK_HIQ_000002287 | LINK_HIQ_000197104 |
| [40] hiQ_00069433 | hiQ_00584743 | LINK_HIQ_000001011 | LINK_HIQ_000002294 | LINK_HIQ_000197112 |
| [41] hiQ_00074348 | hiQ_00587159 | LINK_HIQ_000001013 | LINK_HIQ_000002302 | LINK_HIQ_000197562 |
| [42] hiQ_00077620 | hiQ_00593586 | LINK_HIQ_000001014 | LINK_HIQ_000002307 | LINK_HIQ_000205788 |
| [43] hiQ_00086517 | hiQ_00593588 | LINK_HIQ_000001017 | LINK_HIQ_000002323 | LINK_HIQ_000205794 |
| [44] hiQ_00157976 | hiQ_00593589 | LINK_HIQ_000001019 | LINK_HIQ_000002326 | LINK_HIQ_000205801 |
| [45] hiQ_00174606 | hiQ_00593590 | LINK_HIQ_000001021 | LINK_HIQ_000012194 | LINK_HIQ_000205803 |
| [46] hiQ_00176393 | hiQ_00593591 | LINK_HIQ_000001030 | LINK_HIQ_000012196 | LINK_HIQ_000205808 |
| [47] hiQ_00177244 | hiQ_00621582 | LINK_HIQ_000001034 | LINK_HIQ_000012373 | LINK_HIQ_000205826 |
| [48] hiQ_00179129 | hiQ_00623589 | LINK_HIQ_000001040 | LINK_HIQ_000012572 | LINK_HIQ_000205830 |
| [49] hiQ_00184523 | hiQ_00628155 | LINK_HIQ_000001041 | LINK_HIQ_000012580 | LINK_HIQ_000205835 |
| [50] hiQ_00200007 | hiQ_00628200 | LINK_HIQ_000001046 | LINK_HIQ_000014527 | LINK_HIQ_000205837 |
| [51] hiQ_00203225 | hiQ_00640412 | LINK_HIQ_000001047 | LINK_HIQ_000014673 | LINK_HIQ_000205842 |
| [52] hiQ_00206956 | hiQ_00640854 | LINK_HIQ_000001048 | LINK_HIQ_000027912 | LINK_HIQ_000205845 |
| [53] hiQ_00209104 | hiQ_00651116 | LINK_HIQ_000001054 | LINK_HIQ_000030863 | LINK_HIQ_000205856 |
| [54] hiQ_00222598 | hiQ_00658795 | LINK_HIQ_000001055 | LINK_HIQ_000034073 | LINK_HIQ_000205859 |
| [55] hiQ_00222854 | hiQ_00671244 | LINK_HIQ_000001056 | LINK_HIQ_000034075 | LINK_HIQ_000205861 |
| [56] hiQ_00225197 | hiQ_00676121 | LINK_HIQ_000001061 | LINK_HIQ_000034082 | LINK_HIQ_000205863 |
| [57] hiQ_00225254 | hiQ_00679645 | LINK_HIQ_000001063 | LINK_HIQ_000036231 | LINK_HIQ_000205866 |
| [58] hiQ_00234171 | hiQ_00709867 | LINK_HIQ_000001067 | LINK_HIQ_000036232 | LINK_HIQ_000205873 |
| [59] hiQ_00239033 | hiQ_00715239 | LINK_HIQ_000001068 | LINK_HIQ_000037437 | LINK_HIQ_000205884 |
| [60] hiQ_00241698 | hiQ_00722711 | LINK_HIQ_000001092 | LINK_HIQ_000037469 | LINK_HIQ_000205888 |
| [61] hiQ_00251922 | hiQ_00722748 | LINK_HIQ_000001097 | LINK_HIQ_000037614 | LINK_HIQ_000205891 |
| [62] hiQ_00255712 | hiQ_00722866 | LINK_HIQ_000001106 | LINK_HIQ_000037638 | LINK_HIQ_000205897 |
| [63] hiQ_00264399 | hiQ_00723564 | LINK_HIQ_000001117 | LINK_HIQ_000037940 | LINK_HIQ_000205902 |
| [64] hiQ_00265989 | LINK_HIQ_000000005 | LINK_HIQ_000001125 | LINK_HIQ_000037942 | LINK_HIQ_000205906 |
| [65] hiQ_00311442 | LINK_HIQ_000000007 | LINK_HIQ_000001133 | LINK_HIQ_000038025 | LINK_HIQ_000205911 |
| [66] hiQ_00317715 | LINK_HIQ_000000011 | LINK_HIQ_000001141 | LINK_HIQ_000038028 | LINK_HIQ_000205918 |
| [67] hiQ_00322380 | LINK_HIQ_000000013 | LINK_HIQ_000001162 | LINK_HIQ_000041653 | LINK_HIQ_000205922 |
| [68] hiQ_00331705 | LINK_HIQ_000000019 | LINK_HIQ_000001170 | LINK_HIQ_000042832 | LINK_HIQ_000205924 |
| [69] hiQ_00339008 | LINK_HIQ_000000039 | LINK_HIQ_000001198 | LINK_HIQ_000042967 | LINK_HIQ_000205928 |
| [70] hiQ_00340019 | LINK_HIQ_000000045 | LINK_HIQ_000001202 | LINK_HIQ_000046126 | LINK_HIQ_000205935 |
| [71] hiQ_00349190 | LINK_HIQ_000000047 | LINK_HIQ_000001211 | LINK_HIQ_000046410 | LINK_HIQ_000205941 |
| [72] hiQ_00387121 | LINK_HIQ_000000057 | LINK_HIQ_000001282 | LINK_HIQ_000047346 | LINK_HIQ_000205945 |
| [73] hiQ_00394865 | LINK_HIQ_000000074 | LINK_HIQ_000001290 | LINK_HIQ_000048548 | LINK_HIQ_000205947 |
| [74] hiQ_00428617 | LINK_HIQ_000000118 | LINK_HIQ_000001293 | LINK_HIQ_000048556 | LINK_HIQ_000205952 |
| [75] hiQ_00429005 | LINK_HIQ_000000122 | LINK_HIQ_000001331 | LINK_HIQ_000052184 | LINK_HIQ_000205957 |
| [76] hiQ_00437889 | LINK_HIQ_000000141 | LINK_HIQ_000001449 | LINK_HIQ_000052186 | LINK_HIQ_000205961 |
| [77] hiQ_00440352 | LINK_HIQ_000000164 | LINK_HIQ_000001451 | LINK_HIQ_000059742 | LINK_HIQ_000205964 |
| [78] hiQ_00442515 | LINK_HIQ_000000192 | LINK_HIQ_000001496 | LINK_HIQ_000059745 | LINK_HIQ_000205970 |
| [79] hiQ_00443337 | LINK_HIQ_000000212 | LINK_HIQ_000001516 | LINK_HIQ_000072010 | MCELFFRESH_0000342 |
| [80] hiQ_00443465 | LINK_HIQ_000000263 | LINK_HIQ_000001529 | LINK_HIQ_000072378 | |
| [81] hiQ_00443621 | LINK_HIQ_000000287 | LINK_HIQ_000001581 | LINK_HIQ_000073013 | |
| [82] hiQ_00444070 | LINK_HIQ_000000296 | LINK_HIQ_000001615 | LINK_HIQ_000073401 | |

*Academic Texts*

[1] Abrams, Eliot, "Securities Crowdfunding: More than Family, Friends, and Fools?" January 19, 2017.

[2] ███████████████████████

[3] David H. Hsu, "What Do Entrepreneurs Pay for Venture Capital Affiliation?," *The Journal of Finance* 59(4) (August 2004):1805-1844.

[4] Deutsch, Waverly, "The Elusive Hockey-Stick Sales Curve," *Chicago Booth Review*, February 27, 2017.

CONFIDENTIAL

[5] Ewens, Michael and Joan Farre-Mensa, "The Deregulation of the Private Equity Markets and the Decline in IPOs," February 7, 2020.

[6] Ewens, Michael, and Joan Faree-Mensa, "Private or Public Equity?: The Evolving Entrepreneurial Landscape," *Forthcoming Annual Review of Financial Economics* , February 2, 2022.

[7] Ewens, Michael, Ramana Nanda, and Matthew Rhodes-Kropf, "Cost of Experimentation and the Evolution of Venture Capital," Harvard Business School Working Paper 15-070, March 2017.

[8] Gao, Xiaohui, Jay R. Ritter, and Zhongyan Zhu, "Where Have All the IPOs Gone?," *Journal of Financial and Quantitative Analysis* 48(6) (December 2013):1663-1692.

[9] Garvin, David A., "How Google Sold Its Engineers on Management," *Harvard Business Review* , December 2013.

[10] Gompers, Paul A., "Optimal Investment, Monitoring, and the Staging of Venture Capital," *The Journal of Finance* 50(5) (December 1995):1461-1489.

[11] Gompers, Paul et. al. "How Do Venture Capitalists Make Decisions?" *Journal of Financial Economics* 135(1) (2020): 169-190.

[12] Gorman, Michael and William A. Sahlman, "What Do Venture Capitalists Do?," *Journal of Business Venturing* 4(4) (1989):231-248.

[13] Gornall, Will and Ilya A. Strebulaev, "Squaring Venture Capital Valuations with Reality," *Journal of Financial Economics* 135 (2020):120-143.

[14] Gornall, Will and Ilya A. Strebulaev, "The Contracting and Valuation of Venture Capital-Backed Companies," *Forthcoming, Handbook of the Economics of Corporate Finance, Vol 1: Private Equity and Entrepreneurial Finance* , March 3, 2022.

[15] Hellmann, Thomas and Manju Puri, "Venture Capital and the Professionalization of Start-Up Firms: Empirical Evidence," *The Journal of Finance* 57(1) (February 2002):169-197.

[16] Hochberg, Yael V., Alexander Ljungqvist, and Yang Lu, "Whom You Know Matters: Venture Capital Networks and Investment Performance," *The Journal of Finance* 62(1) (2007): 251-301.

[17] Hochberg, Yael V., Carlos J. Serrano, and Rosemarie H. Ziedonis, "Patent Collateral, Investor Commitment, and the Market for Venture Lending," *Journal of Financial Economics* 130 (2018):74-94.

[18] Hochberg, Yael V., Carlos Serrano, and Rosemarie Ziedonis, "Intagible but Bankable," *Science,* 348(6240) (June 2015):1202.

[19] Kane-Sellers, Marjorie Laura, "Predictive Models of Employee Voluntary Turnover in a North American Professional Sales Force Using Data-Mining Analysis," Submitted to the Office of Graduate Studies of Texas A&M University in partial fulfillment of the requirements for a degree of Doctor of Philosophy, August 2007.

[20] Kaplan, Steven N. and Per Stromberg, "Characteristics, Contracts, and Actions: Evidence from Venture Capitalist Analyses," *The Journal of Finance* 59(5)(2004):2177-2210.

[21] Kaplan, Steven N. and Per Stromberg, "Venture Capitalists as Principals: Contracting, Screening, and Monitoring," *American Economic Review* 91(2) (May 2001):426-430.

[22] Kupor, Scott, *Secrets of Sand Hill Road: Venture Capital and How to Get It* , Penguin Publishing Group (2019) Kindle Edition.

[23] Malnight, Thomas W. and Ivy Buche, "The Strategic Advantage of Incumbency," *Harvard Business Review* , January-February 2022, https://hbr.org/2022/01/the-strategic-advantage-of-incumbency.

[24] ████████████████████████████████████████████████████

[25] Metrick, Andrew, *Venture Capital and the Finance of Innovation* , 3rd Edition, Wiley (2021), Kindle Edition.

[26] Moore, Geoffrey "To Succeed in the Long Term, Focus on the Middle Term," *Harvard Business Review* , July 2007,  https://hbr.org/2007/07/to-succeed-in-the-long-term-focus-on-the-middle-term.

[27] Punnose, Rohit et. al. "Prediction of Employee Turnover in Organizations using Machine Learning Algorithms," *International Journal of Advanced Research in Artificial Intelligence* 5(9) (2016):22-26.

[28] Shaw, Jason D. et. al. "An Organization-Level Analysis of Voluntary and Involuntary Turnover," *Academy of Management Journal* 41(5) (1998):411-525.

[29] Suarez, Fernando F. and Gianvito Lanzolla, "The Half-Truth of First-Mover-Mover Advantage," *Chicago Booth Review* , April 2005.

***Public Press & Other Materials***

[1] "CEB Inc.," Wikipedia, https://en.wikipedia.org/wiki/CEB_Inc.

[2] "Garner acquires CEB", Gartner, https://www.gartner.com/en/about/acquisitions/history/ceb-acquisition.

[3] Communication with Darren Kaplan.

[4] Communication with Andrew Kim.

[5] Gary Vaynerchuk Biography, https://www.garyvaynerchuk.com/biography).

[6] KeyBanc, "12th Annual 2021 SaaS Survey Results," 2021.

[7] PitchBook, hiQ Labs (hiQ) Profile.

[8] Priyamvada Mathur, "VC Investment in HR Tech Skyrockets as Opportunities Abound," PitchBook, October 21, 2021, https://pitchbook.com/news/articles/venture-capital-human-resources-tech-valuations.

[9] Stanford Graduate School of Business, "Barry Rhein: Lecturer in Management," https://www.gsb.stanford.edu/faculty-research/faculty/barry-rhein.

* Sources otherwise cited in Report & Appendices