# Exhibit 90

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-cv-03301-EMC |
| Plaintiff, | NOTICE OF DEPOSITION OF HIQ LABS, INC.'S EXPERT WITNESS BENJAMIN A. SACKS |
| vs. | |
| LinkedIn Corporation, | Judge: Hon. Edward M. Chen |
| Defendant. | |
| | Date: July 8, 2022<br>Time: 10 a.m. Eastern<br>Place: Remotely (via Zoom) |
| LinkedIn Corporation | |
| Counter-claimant, | |
| vs. | |
| HiQ Labs, Inc. | |
| Counter-defendant. | |

VIDEOTAPED DEPOSITION OF BENJAMIN A. SACKS

TAKEN BY: NATHAN SHAFFER, ESQ.

DATE: July 8, 2022

TIME: 9:00 a.m.

PLACE: Zoom Teleconference

REPORTED BY: RICHARD S. SCIRÉ, RPR, FPR-C

JOB NO: 10103315

**Q. -- that you served in this case?**

A. I'm -- I'm going to need to download that. Give me one second. Tab 4. I think I see it here. I'm clicking on it and I'm going to hit download.

Okay. Let me go open it. It says Tab -- 598. It should be my rebuttal expert report.

Yeah. That looks like it. Yes.

**Q. Great. And then so that was Exhibit 598 and then Exhibit 599 should be your amended report dated June 22, 2022, if you can just confirm that please?**

A. 599. It -- this is the amended report?

**Q. Correct, the -- the one dated June 2, 2022?**

A. That's what it looks like, yes.

**Q. Okay. And the amended expert report so the June 7, 2022 report amended June 22, 2022, that is your current version of your report, that's the report that reflects your opinions in the case; correct?**

A. For -- for the opening report, yeah.

**Q. For the opening report. Not the rebuttal, I understand. And did you -- did you write this report?**

A. I did.

**Q. And the reports are -- this report contains your opinions for the -- for the opening portion of the case?**

A. Correct.

**Q. And -- and you stand by these opinions?**

A. I -- I do. I have -- I think there is -- there are -- there are two things I would modify slightly based on based on -- based on having read the -- the rebuttal reports.

**Q. And what are those two things?**

A. I -- I would alter the -- the main damages figure is now I think 72.9 million and I think that gets altered to 69.6 million based on what was essentially a technical math correction Hoakberg makes to -- to the option pricing methodology for pricing RAND B and you run that through damages and that's -- that's the impact it has. It's about another five percent correction and that -- I've reviewed her work there and I -- I think it's correct, so I think I would accept that correction and modify my -- my final damages number.

The other correction is to the subset damages where I think Malakowski points out that I think we may have double counted Hershey's and that -- that reduces the subset damages from I think 2.6 million to 2.5 and change. It's -- it's less than a hundred thousand dollar change but other than those two things yes I stand by everything in the report.

**Q. Okay. So, starting with the first one, the reduction of your full damages opinion to 69.6 million,**

**that alternative calculation doesn't appear in this report; is that right?**

A. It does not.

**Q. Okay. And you said that you're relying on Dr. Hoakberg, another expert's in the case's correction of the mathematics essentially for that new figure; is that right?**

A. Yeah. That's it. The early stage of the calculation we take her correction and you flow it through to the end, it -- it results in -- in I think 69.6 million is the final damage number.

**Q. Okay. And then the Hershey's correction -- so this is referring to your subset damages which is a lost profits analysis; is that right?**

A. Yeah, the subset damages.

**Q. Okay. And you're -- you're saying that your original analysis was reflected in your amended report here in Exhibit 599 had Hershey's 2018 contract and Hershey's included in the 2017 figures and then it was added again in 2018; is that --**

A. Not -- not quite. The -- the issue is that Hershey's had signed up for another year, like, the 2018 year during 2017. And the way we modeled that is we modeled it as they have a 2017-year contract and then instead of them having some probability renewing for the

**opening report as amended or your rebuttal report have a response to Mr. Malakowski's opinions; correct?**

A. No. I'm not -- I'm not fully sure what his opinion in the first case was, so I don't want to rule out the possibility that something I have said is relevant to him, but I -- I was not explicitly rebutting him in either report.

**Q. Okay. I mean, you don't mention Mr. Malakowski's name in the rebuttal report; right?**

A. Correct, I don't.

**Q. Okay. And you said you, like, sitting here today you're not even sure what his opinion in the opening round of expert reports was; correct?**

A. Correct.

**Q. Okay.**

A. I -- it's not -- I have some rough idea, I believe. I believe he was talking about harm to LinkedIn but he -- that I'm not completely certain of so I -- I don't want to put that in, like, a -- I read his report -- well, I skimmed his report. I looked at it to see if it had anything that was relevant to me and I believe it didn't -- is --

**Q. Okay. So --**

A. -- is not perfect.

**Q. Yeah. So right now you don't have a formal**

**rebuttal to Mr. Malakowski; correct?**

A. Not to his first report.

**Q. Okay?**

A. To his report about me, I do have opinions about that.

**Q. And that's not been -- your opinions responsive to his rebuttal report, you haven't submitted a report on that, there's nothing in writing as to what your opinions may be there; is that right?**

A. Yeah, well, I mean, his report was filed eight days ago so -- so, no, this is the first chance I'll have to talk about it --

**Q. Okay. I understand.**

A. -- if -- if you want to ask about it.

**Q. And your assignment in this case in the opening report was to assess damages incurred by hiQ; is that right?**

A. Correct.

**Q. And you've done that?**

A. Yes.

**Q. And you have two approaches to damages. Can you state what they are?**

A. Sure. I call them the full damages and the subset damages.

**Q. And the full damages analysis that's in the**

**first part of the report; correct?**

A. Yes.

**Q. And -- and the full damages is a damages approach based on hiQ's valuation as a company; right?**

A. Yes.

**Q. So, it's an enterprise valuation analysis?**

A. Yes.

**Q. And it's your opinion that due to LinkedIn's claims in this case, hiQ is entitled to recover or --**

MR. SHAFFER: Strike that.

**Q. It's your opinion in this case, assuming that LinkedIn is liable as found by the Court, that hiQ would then be entitled to recover its enterprise value as damages for LinkedIn's claims in this case; correct?**

A. Well, that -- my -- I'm instructed to assume that the cease and desist letter destroyed hiQ; right? Given that instruction, then logically damages are the value of what was destroyed, which is the value of hiQ.

**Q. Okay. So, it's your -- your opinion, assuming that a cease and desist letter that LinkedIn sent to hiQ destroyed hiQ, then the damages that hiQ should recover are the full value of the company as of the date of the cease and desist letter; is that right?**

A. I --I believe that that's right, yes.

**Q. And that's not a lost profits approach; correct?**

A. It -- it amounts to the same thing. The -- the value of the company on that date is the present value of future lost profits and losses but the net present value of all future cash flows. So, it is the same thing as a -- a full lost profits analysis.

**Q. Let's look at it a little more. So, the subset damages is also a lost profits analysis?**

A. It -- yes, but that's why I call it subset because it -- it only captures part of the lost profits, just those from the -- the current or, you know, near-expected clients. It's not the full enterprise value. It's very, very narrow, small subset of -- of that.

**Q. Okay.**

A. But -- but both are ultimately based, as is all value, on future net -- the net present value of future expected cash flows, which are both the sum of profits and losses.

**Q. So, in the -- in the full damages analysis, which you said is an enterprise damages analysis, you're - you're not tracing profits from particular customers; correct?**

A. That's -- that's not the mechanism by which the -- the calculations operate. Ultimately it's -- it's aimed at getting at the same place but it follows a different procedure because we have different information.

**Q. Okay. So, in the full enterprise damages analysis, you're not starting with existing profits related to existing clients and customers; correct?**

A. No. We're -- we're trying to look at -- at the all-expected profits from, you know, including into the -- the distant future and we're using different kinds of tools to estimate that.

**Q. And as compared to the subset damages, in the subset damages analysis, you are looking at individual clients and likely partners and attempting to project what profits from those clients and partners would have been but for the C and D letter; is that right?**

A. Yes, with -- with -- with some restrictions. We're -- we're assuming no growth. We're assuming some version of a runoff mode. I don't think it's appropriate to view these as the full profits expected from these clients if the C and D had never occurred because these clients might have bought additional products or have been up sold or things like

**Q. Yeah. I think your -- I think your answer explains it for our purposes. We may go into that a little bit more later.**

**I want to ask you a little bit about the assumption that you used. So, focusing on the assumption that the LinkedIn C and D letter effectively destroyed hiQ's business, did you do an analysis as to whether there is evidence that supports that assumption?**

A. I -- I have.

**Q. Is it reflected -- is your analysis reflected in your amended report here, Exhibit 599?**

A. No.

**Q. Is your analysis reflected in your rebuttal report, Exhibit 598?**

A. I'm sorry I spoke over you but, no, it's not.

**Q. So you're not planning to testify to any analysis that you did regarding whether there's evidence that supports the assumption of the C and D letter from LinkedIn to hiQ effectively destroyed hiQ's business; is that right?**

MS. MILLER: I'm going to make an objection to these sort of planning to testify questions on the basis that, you know, we're still developing the facts and some of these communication, you

know, we're developing strategy and they're attorney-clients so with that standing objection, I -- he can answer the question.

THE WITNESS: So -- so, planning to might be a bit of a broad term. I don't know. But -- but I -- I would expect to -- to talk about this at -- at trial.

BY MR. SHAFFER:

**Q. Okay. But you don't offer an opinion on whether there's an evidentiary basis to support the assumption that the C and D letter from LinkedIn to hiQ effectively destroyed hiQ's business; is that right?**

A. I haven't yet. Malakowski makes the case in his rebuttal to me, which, you know, was filed eight days ago that he thinks that's a major -- he criticizes me upon that regard and I -- I have a response to it.

**Q. Okay. So, as of the date that you submitted this June 22, 2022 amended expert report of Benjamin A. Sacks, had you done an analysis as to whether there was factual support for the assumption that the C and D letter from LinkedIn to hiQ effectively destroyed hiQ's business?**

A. Analysis -- I'm -- I'm hesitating over the word analysis. I -- I -- I was aware that it was a very

reasonable assumption. I -- I -- I can talk about why and I believe I've read deposition testimony providing evidence that it was a very reasonable assumption. I -- I had not considered the matter as much as I have now consider it, which I guess you can call an analysis since, you know, I hadn't yet read Malakowski saying that this was in his opinion some enormous problem.

**Q. Okay. And any -- any analysis that you may have done prior to June 22, 2022 regarding factual support for the assumption that the C and D letter from LinkedIn to hiQ effectively destroyed hiQ's business does not appear in your report, Exhibit 599; is that right?**

A. That -- that's right.

**Q. And such an analysis does not appear in your rebuttal report, Exhibit 598; is that right?**

A. Correct.

**Q. Does your opening report, the June 22, 2022 report, contain an -- an opinion as to whether the C and D letter caused any harm to hiQ?**

A. I think there I'm operating under an instruction.

**Q. Okay. So, that's an assumption, not an opinion that you affirmatively offer; is that right?**

A. Well, it's a little bit different than an assumption. It's an instruction. But, yes, I am not

there offering that as an affirmative opinion, though I do think it's very reasonable.

**Q. And you also don't have an opinion as to whether or not LinkedIn is liable for any harm to hiQ; is that right?**

A. That's right.

**Q. For -- for purposes of the assumption that you deploy in your opening report that the C and D effectively destroyed hiQ's business, does that assumption mean that there is no business after the valuation date for purposes of your analysis?**

MS. MILLER: Objection, vague and ambiguous.

THE WITNESS: I think that the cleanest answer is that in -- in the extreme you just say, yes, and -- and be done with it. I don't know that that's really the necessary assumption. I -- I think it's that what -- whatever value is left after the cease and desist is -- is very minimal and close to zero after you net out all the -- the costs that people incur, including their -- their time and things like that. So, it's -- I think it's a very, very good approximation and I'm not -- I'm not really legally -- it's not clear to me legally how much to even think about that because

**Q. Entered liquidation.**

A. Yeah. That -- that's not -- well, okay. There's a couple parts to that answer.

First part is that that is not the right way of thinking about startups. All -- so, let me get the -- the responses down.

That's not the right way of thinking about startups.

Two, I -- I kind of think there is, in my rebuttal, some -- some generalized analysis, the part in which I cite Hochberg's research talking about, you know, the general odds of a startup, making the loss for its investors at least versus, you know, making a lot of money.

So, those are -- those are the two broad categories and we can talk about whichever one you want next.

**Q. So, I mean, what -- what I'm trying to ask about is -- is based on your assumption that the cease and desist letter effectively destroyed hiQ's business as of May 23, 2017, you did not do an analysis as to whether hiQ would have ended up returning a negative return to its investors after that date but for the C and D; right?**

MS. MILLER: Objection, vague, ambiguous, asked and answered.

THE WITNESS: I -- I kind of think it's the same answer. There -- there is some analysis of -- of firms in round B and Round C generally about the odds of that exact event happening and maybe in my opening but certainly in my rebuttal report but really I think -- I talk about it at quite some length in my rebuttal report that that is the wrong way of thinking about startups.

BY MR. SHAFFER:

**Q. Okay. Well, whether it's right or wrong, I just want to know if you -- you've done the analysis and have an opinion about it in your opening report?**

A. Well, I -- I think my opening report kind of -- I don't recall if there's analysis of the general odds to startups succeeding or failing in the way you defined it in this hypothetical or in this question I guess in my opening report. It is in my rebuttal. But as it refers to hiQ, I am effectively assuming that on the date of the cease and desist they -- they had a 20-percent chance of going to zero before hitting Round C. That's -- that's sort of how the math of my estimate works out.

**Q. Okay. And that -- and that's based on the -- what you described as an ex-ante analysis starting on -- with an end date of May 23, 2017, right, so the**

**math carries forward a 20-percent chance but you didn't do an evaluation based on record evidence or anything like that as to whether hiQ was likely to return money to its investors; right?**

A. Well, I don't think that that's -- the analysis I did was about its likelihood of hitting Round C and -- and I assumed that if it didn't hit Round C it basically went to zero. So, that -- that is a prediction of -- of one branch of the tree in which they go to zero. After Round C, they still might go to zero but they might go much higher, which is why round C has the value it has. And I didn't analyze that specifically because I was focused on -- on how the market deals with -- with companies at Round C and impounds all of that probability. So, the market value at Round C fully includes market's view of the odds of going to zero, as well as the odds going to this -- a really high number. So, that's how I account for -- for the odds of going to zero after Round C through the analysis I did in my -- my opening report.

But for the odds of going to zero before Round C, that's -- that's really what the 20-percent discount from the Round C value is there for because if they weren't at Round C it's possible they might not make it and that reduces their value.

**Q. All right. So -- so, focusing in on the assumption that you made that the C and D letter interfered with hiQ's existing and perspective contracts and business relationships effectively destroying hiQ's business, you say that that's an assumption; right?**

A. I think I said several times it's an instruction.

**Q. Okay. So, you were instructed to assume?**

A. That's fair.

**Q. And because you were instructed to assume, you didn't do a causation analysis as to whether or not the C and D letter from LinkedIn actually did destroy hiQ's business; correct?**

MS. MILLER: Objection, asked and answered.

THE WITNESS: I did not at -- in either my first or second reports but now that Malakowski has raised it, I have. Well, I've -- I've looked into it. I thought about it substantially more. I'm not sure I'm at the point where I say it's a full causation analysis, but I have a response to the claim that the two are as unconnected as Malakowski says they are.

BY MR. SHAFFER:

**Q. Okay. And then you -- I think you acknowledged this but I just want to make sure it's**

words, it's possible the nature of the bad outcome, the bad act, could have been something that became relevant. So, you think about that. As it turns out, it -- it doesn't. But it's not like I didn't think about that at all. I did. I just thought about it and realized, okay, it's not really relevant. The most relevant thing is -- is that it's alleged to have destroyed the value of the company and that's a reasonable assumption.

BY MR. SHAFFER:

**Q. And -- and before selecting and applying a -- a damages calculation methodology, do you consider whether the methodology has been used and relied on in a non-litigation context such as a business context?**

A. In principal that's something I do think about, yes.

**Q. Did you think about it with respect to your full damages enterprise value analysis?**

A. Yes.

**Q. And what was your conclusion there? Has this style of regression analysis that you've applied, so far as you know, been applied in a non-litigation context?**

A. No, but that's -- that's often -- well, often the case. It's -- when you deal with damages

cases, you sometimes need answers to things for which out-of-the-box solutions don't exist. And I've -- I've viewed as closely as I can to what a typical analysis is, but there are unavoidably places here where we just don't have the information to do the kinds of things that people do either in other damages cases or sometimes even in -- in the real world. So, we've had to do the best that can possibly be done, which I think is what I have done, use the information available, but I don't think it is the kind of thing that -- it's not a situation that people in the real world ever, ever actually face, so they never have -- they never do anything like this because they don't face the same constraints I do.

**Q. Do you consider, before deciding to employ a damages calculation methodology, whether the methodology is supported in the academic literature?**

MS. MILLER: Objection, vague, ambiguous.

THE WITNESS: The -- the academic literature doesn't concern itself with damages. There are -- there are techniques you can use. So, I use a regression technique. That's really, really, really -- I mean, that's about as well-established of the academic literature as anything you can possibly say.

Analyzing data. That's been -- that's

pretty much all a science, you know, except for maybe theoretical physics. But people don't write academic papers about damages. They right academic papers about techniques or tools or specific facts that you then -- because they've been created, you can use even outside of the very specific context in which they have been used. So, I do consider that but, of course, I used extremely standard techniques.

BY MR. SHAFFER:

**Q. I -- I asked about the methodology that you applied and whether you considered whether the methodology was supported in the academic literature.**

A. I --

**Q. Did you do that?**

MS. MILLER: Same objection.

THE WITNESS: Well -- well, I do write a regression and regressions are supporting academic literature. I -- I kind of answered on that. What -- what am I -- is that not sufficient or what am I missing.

BY MR. SHAFFER:

**Q. Well, I guess -- so, what I'm trying to ask you, I -- I don't actually see any citations that -- that say this style of regression analysis has been discussed**

**and a paper published here subject to peer review, something along those lines. So, I'm asking you if you considered whether this style of regression analysis has been accepted or discussed in academic literature?**

A. I -- I don't -- can I -- can I just clarify what you're asking for? You're not questioning whether regressions are accepted; right? That's not your question?

**Q. No. So, I'm trying to ask if you considered that. So, I understand that generally the relatively straightforward equation for a single variable regression is well accepted. So, I'm not asking you that.**

**What I'm asking is if -- if you relied on any academic literature that suggests that applying that type of regression using the inputs that you used is accepted or, you know, has been discussed in the academic literature.**

A. I -- I don't know why anyone -- I don't know that anyone in the academic literature that has faced this kind of problem before, but the -- the academic literature is certainly supportive of using regression analysis even for things that haven't already been done. For example, the first time a -- a phenomenon is assessed, the regression, that will be the first time

it's assessed and I have never heard of it being said that, oh, you can't apply a regression to this. It -- but, no, I am not specifically aware of someone who has tried to -- to value a company between rounds or using -- using a -- a regression methodology.

**Q. Did you check into that before you applied it in this case?**

A. I did. I did look. I didn't -- I didn't see anything that provided -- well, that's not true. I did look. I didn't see anything that provided more specific items than -- than I've used in this case. But I think I have used the guide that's available. And -- and I haven't seen anything that Hoakberg or others have cited that alters that.

**Q. A -- a little bit earlier you mentioned that there are certain types of analyses that the courts may accept or not accept. Is that your general understanding?**

MS. MILLER: Objection, calls for a legal conclusion.

THE WITNESS: Broadly, yes.

BY MR. SHAFFER:

**Q. Is that something that you consider before applying a -- a particular methodology, whether courts in the applicable jurisdiction would accept it as a valid**

**Q. And then in your -- your opening report, the -- the June 22, 2022 report, where do you discuss the evaluation of the regression method that you used in this case in its selection?**

A. So, this is now my -- my amended report and -- and we want to look for -- that's -- that's Tab 599?

**Q. That's right. Yeah.**

A. Okay. Give -- give me a moment to look through. I know I discussed this at -- at some length.

Okay. So, if you look down at paragraph nine, I think it's on page seven of the PDF where it says I use a regression approach because, and then, you know, I list -- I list the reasons. So, that -- well, we can start there and if you want -- want more, we can go on from there. That's -- that's the first place, I think, where I discuss why I chose the approach that I chose.

**Q. Okay. So, you're using the regression approach as compared to the DCF or current multiples based valuation, otherwise known as a comparables analysis; is that right?**

A. Could -- could you ask that question again? There was something weird about or I heard that weird. Please, again, one more time?

**Q. Yeah. So, here you're saying in paragraph nine quote I use a regression approach because it is more**

reliable end quote.

Do you see that?

A. Yes.

Q. And then you're comparing it to a discounted cash flow analysis and a comparables analysis; right?

A. Those being the other more standard methods, yes.

Q. Okay. And I guess what -- what my question is, I see that you criticize application of the discounted cash flow analysis in this report as being inappropriate; right? You know -- strike that.

I mean, I can say less reliable. You criticize the just kind of cash flow analysis as being less reliable in this case; right?

A. Yes.

Q. And then you criticize the comparables approach as also being less reliable than the regression approach; is that right?

A. Yes.

Q. So, I -- I understand that you're saying that the regression approach is more reliable than those two approaches. The -- would you do an analysis that the regression analysis is sufficiently reliable as you've deployed it here to base your opinion on?

MS. MILLER: Objection, vague, ambiguous.

THE WITNESS: So, there's -- there's a couple of parts to that answer and maybe the easiest way of -- of answering that -- well, first, let me -- let me -- I think I need to establish the overall framework because the regression analysis is part of my overall analysis so it matters how it fits into my analysis.

So, first, I think I have to explain -- to begin to answer that question, I have to explain how the analysis works from beginning to end and then talk specifically about how the regression part fits in and why it's reliable. Is that -- is that okay?

BY MR. SHAFFER:

**Q. Well, let's -- let's go through it in the course of the deposition. So, I mean, I'm really looking for a section in the report where -- where that's specifically discussed, like, you know, I looked at this style of analysis and I think it's reliable in this case because --**

A. So, I think the -- the easiest thing to do would be to -- let's go down to -- oh, I hit -- I hit a button.

I'm back. Sorry.

Okay. Let's go down to figure five on page 37.

**Q. Is that 37 in the PDF or the -- the page number?**

A. That's the PDF. Yeah.

**Q. Okay.**

A. It's apart of paragraph 88, 89.

**Q. Yeah. So, this is your -- your scatterplot with your regression line?**

A. Yeah.

**Q. Okay.**

A. So --

**Q. So, you apply -- you apply the methodology --**

A. I wasn't --

**Q. Sorry.**

A. There was something I wanted to say about that.

**Q. Okay. Go ahead.**

A. Yeah. So, in general, you know, regressions give you the best answer that the data can give you. Independent of how big your uncertainty is, it's still the best. And -- and because I'm trying to do the best, that's essentially sort of always good enough. The -- the only real question is, is that the best better

than what DCF or multiples could do. And the answer is, DCF and multiples would be so bad in this case that it's virtually inconceivable that a regression analysis would -- would be worse. But -- but we don't have to go with virtually inconceivable. We can look at the data and the data, I think, show very clearly -- I mean, you don't -- you don't need a statistician to tell you that this data shows a clear, strong, reliable, repeatable, reasonable pattern relating the -- the Round B post-money value, the Round C pre-money value for firms that have both and that if we do this regression, we're -- we're really picking up something real genuine in -- in the real world that has predicted power over hundreds of observations in -- in which our uncertainty about the prediction -- not -- the uncertainty about the average, what we expect in Round C is pretty small, even without doing statistics. If -- if I were to just -- and I sort of have. I have. I looked at this line and I said, wow, you can draw a line straight through this, like, without even doing a regression. Without even doing math. If -- if any normal person were to be asked to draw a line through this data that -- that represents what you sort of -- if I called out a value for the horizontal axis, what would you expect me to get on the vertical axis? Most people draw a line almost exactly like the one I actually have.

The -- the uncertainty about the expectation is really small and that's, in fact, what the dark -- the dark band around the blue line is, it's some measure of the uncertainty. It doesn't have to be exactly precise. The point is it's really, really small.

**Q. Okay.**

A. And so I -- I know that DCF and multiples are -- are going to be very bad because we -- it's an exercise in making things up. Okay. Let's just call it what it is. Well, this is database. People love database. It's got a regression that's lightly used. It's hard to imagine saying you -- instead of -- using a regression than you have making up a bunch of numbers ten years out into the future. And -- and when you plot it, it gives you a totally reasonable, normal, reliable answer just visually, let alone applying, you know, very basic statistics to this. So --

**Q. Okay. Let's talk about the statistics.**

A. So, there's no question that this is a reliable method, and if you ever have any doubt, just look at the picture.

**Q. Okay. So -- all right. Let's talk a little bit about the statistics. So, you mentioned this gray band. So, we're looking at figure five of Exhibit 599, your amended report, page 34 and figure five**

**there.**

A. Okay.

**Q. So, you have the blue line and you said that's an estimate of the average?**

A. It's a line of best fit, so, yes, it would be the estimate of the expectation. If you called out a number on the horizontal line and you said, now, what do I expect you to get in Round C if you make Round C, the answer would be, wherever the blue line is, you know, on that -- that horizontal.

So, the answer for a company with $33.4 million of Round B value is about 91.2 million, whatever -- whatever number in my report is, that would be the height of the blue line at the 33.4 on the horizontal axis.

**Q. So, I -- I think I'm misunderstanding something here. So, my understanding is that the blue line is attempting to measure the average value based on a sample of data and it's telling you with reasonable, you know, you're saying it's telling you with reasonable certainty what the average relationship is based on your sample of data; is that right?**

A. That -- that's not a terrible way of putting it so that -- that's reasonably okay. Sure.

**Q. I mean, is -- is my explanation accurate or**

**inaccurate?**

A. Well, it's -- it's one way of -- I think of this as the data being primary, not the statistics. The data is primary. The picture tells you that there is this upward sloping relationship that's very, very, very apparent and not really in question.

Now, if we want to go to math, we have to formalize that fact that the data is telling you. And then once we go to math, we go to statistics, and we have to make some choices. I make the most basic, simple, straightforward choice using regular, ordinary -- these squares that everyone has seen a thousand times and that gives me an estimate of the expected value in Round C, given a value in Round B and the assumption that you're going to make Round C.

**Q. Now, you're --**

A. I was -- that's how I would characterize the blue line. I think the way you characterized it is not -- is a reasonable approximation to that.

**Q. So, I mean, you're skipping -- you're skipping the first part. I'm trying to break down what you did into its component parts so that I can understand it. You're skipping ahead to the prediction. So, you're saying what you did with this line once you had it. I'm trying to understand what the line is and where it's**

the answer is no.

BY MR. SHAFFER:

**Q. Okay.**

A. But I don't exactly know if they have that.

**Q. Well -- and they certainly don't have it for hiQ, right, because hiQ never hit Series C?**

MS. MILLER: Objection, foundation.

THE WITNESS: Well -- but that wasn't part of your question; right.

BY MR. SHAFFER:

**Q. It's a different question; right? So, I'm asking you a new question.**

A. Oh, sorry. What's your new question?

**Q. So, PitchBook -- the PitchBook would not have data on hiQ's Series C because hiQ never got there; right?**

MS. MILLER: Objection, foundation.

THE WITNESS: Well, they never got to a healthy Series C. If they had one, it was after the cease and desist and I don't -- I don't actually know one way or the other --

BY MR. SHAFFER:

**Q. Okay.**

A. -- whether they -- that happened or how they classify or if that's in PitchBook or -- I just

don't know.

**Q. And -- and the point of looking at comparable companies is to try to discern some sort of relationship between the valuation of Series B and the valuation of Series C; right?**

A. Yes.

**Q. And that relationship is based on real -- real-world data from PitchBook; right?**

A. Yes.

**Q. In the measurement that you've done is this blue line, correct, on figure five?**

A. That -- that is the -- that is the -- the least squares progression line.

**Q. Okay. So, that line characterizes a relationship that you've derived from the real-world data; correct?**

A. Yes.

**Q. And then the next step is to take that relationship and apply it to hiQ because you're saying that you can infer what would have happened with hiQ based on a relationship that you've observed in real-world data; correct?**

A. Very broadly, yes, but it -- it requires important modifications and -- and if it's okay with you, after I answer this question, can we take a short break?

**Q. Yeah. We can take a break now.**

A. Well, I mean, I feel like I'm in the middle of an answer.

**Q. Oh, go ahead. Yeah. Yeah.**

A. Okay. Actually -- actually, I forgot the precise question so maybe -- maybe if you're okay with re-asking it after we come back from the break, we can take a break or you can re-ask it now. It's up to you.

MS. MILLER: We can have Richard reread that. Whatever makes sense.

MR. SHAFFER: Let's -- let's take a break. We'll come back. I am going to continue asking you about figure five.

Let's go off the record.

THE VIDEOGRAPHER: Off the record at 11:36 a.m.

(BREAK.)

THE VIDEOGRAPHER: We're back on the record at 11:44 a.m.

BY MR. SHAFFER:

**Q. Okay. Mr. Sacks, I'm going to go back to the starting point of your full damages analysis and hopefully we can work through -- we'll get back to the regression once we have a little more understanding because I feel like we're -- we're missing search other**

hiQ. I don't -- it's -- it's just the value of -- of the company that was destroyed and I have no idea if LinkedIn took something or exactly what took might mean in this case.

**Q. Well, I mean, I'm asking about your opinion. So, I'm not -- I'm not asking about the truth of the facts. I'm asking if you have an opinion or a calculation that values some sort of money or property that LinkedIn may have taken from hiQ?**

A. It -- my -- my opinion is limited in that sense to the value of hiQ, which was by assumption, destroyed by the C and D on the date when it was received and -- and does not contemplate or deal with notions of taking. So, I have -- I have no opinion one way or another if that happened. Outside -- to -- to the extent that that is somehow different or separate from having destroyed the value of the enterprise, I have no opinion on that.

**Q. Yeah. I mean, an example of taking money or property directly would be if LinkedIn were to have, you know, obtained hiQ's bank account number and taken money from the bank account. You're not aware of any -- anything like that that's reflected in your opinions; right?**

A. Correct.

**Q. And -- and you're not aware of any situation where LinkedIn took a piece of property where hiQ had a vested interest in, you know, maybe, like, a stock grant or stock options or something like that; right?**

A. Correct.

**Q. So, that's outside the scope of your opinions?**

A. Yes, it's outside the scope.

**Q. Do you have an understanding of what net profits are?**

A. Generally, yeah.

**Q. Okay. So, this full damages analysis, this is an enterprise value analysis. It's not a lost profits analysis in the sense of your subset damages; right?**

A. It -- it is a lost profits analysis in the sense that the value of an enterprise is the net present value of expected future profits and losses.

**Q. Okay. So -- so, in the profits context you said that you have an understanding of net profits, that term?**

A. I have an understanding of profits. Net -- net profits sounds like it's the net profit that -- it's what most people mean by profit.

**Q. Okay.**

A. In the accounting sense there's, you know, operating profit and things like that. Unless there's some special definition that net profits is what you would ordinarily mean by profits, the total, after everything is accounted for, this is how much you made or lost.

**Q. Okay. So -- so, profits is basically revenue minus expenses?**

A. It -- it can be more complicated. You have taxes in it and all sorts of other things and -- and then there's a difference between accounting profits, there's accounting concept, cash flow, cash concept. When I say this is the -- the present value of expected future profits and losses, I really mean it's the expected present value of future cash flows, both positive and negative. They're so tightly linked to profits that I think it's fair to say profits and cash flows but technically it's cash flows.

**Q. Right. I mean, profits and cash flows are two different things; right?**

A. In principle. In -- in general, the value of one is -- they're rightly defined essentially, the value of the other but they're not always exactly identical.

**Q. Okay. Yeah. I mean, cash flow is the net**

**of cash coming in with cash going out; right?**

A. Put it this way, when you're doing lost profits, you're actually doing lost cash flow, and if you're not doing loss cash flow, you're doing something wrong unless there's some really bizarre reason why you count -- care about an accounting concept as opposed to a cash concept.

**Q. Is there a reason why you can't give me a definition of cash flow today?**

A. I --

MS. MILLER: Objection, argumentative.

THE WITNESS: I -- I -- sorry. I think I -- I think I am. I mean -- well, cash flow is just cash flow. It's the cash that you have at the end, whether you have more cash or you don't. The -- the -- the more complicated concept is the accounting concept of profits. I'm just saying we're using the term lost profits and it is true that people very often use the term lost profits but really to get a value you have to be talking cash flow. I mean, unless you're in some really strange legal environment in which -- which the accounting concept of profit matters and cash flow doesn't matter. That would be strange.

///

THE WITNESS: Right. That is correct.

BY MR. SHAFFER:

**Q. And you also didn't include any companies that didn't reach Round C because they -- their value went to zero before that time; is that right?**

A. That's also correct.

**Q. All right. Did you try to run this regression with companies that did not reach Series C included?**

A. That would not have made any sense and I didn't try to do that.

**Q. Okay. So, you don't know one way or the other including companies that didn't hit Series C would change your regression or not?**

A. That's not true.

**Q. Well, let me ask a different question.**

**You -- you don't know if including companies that did not reach Series C in this analysis would increase or decrease hiQ's predicted value; is that right?**

A. Predicted value for -- for what exactly?

**Q. Well, you've done a regression analysis here that you said is predicting hiQ's enterprise value at the time of a hypothetical Series C; right?**

A. Assuming they make it, yes.

**Q. Mm-hmm, and you didn't include companies that did not make it to Series C here; right?**

A. That's right.

**Q. So, my question is, if you had calculated a regression on the data set that included companies that didn't make it to Series C, you don't know whether the impact of that would have been to increase hiQ's predicted value or decrease it; is that right?**

A. It -- it would be the wrong regression. You -- you would no longer be estimating the expected value given that you've reached Round C. You would be estimating something different.

If I made the mistake of running a regression including the firms that did not reach Series C but treated it as if it were a regression affirmed that did reach Series C, then -- then I would get the wrong number. But if I made the mistake of -- of treating that as if it was the right number, then it would be a lower number for sure, if you average in -- if you put in a bunch of zeros, you're going to lower anything that you get. But it's a different concept. It would be a mistake to do that.

It's sort of like saying conditional upon winning -- conditional upon being the MVP in the World Series, what kind of Wheaties contract do you get. I'm

asking, well, did you average in all of the people who have never played in the world series. I -- if you do, you're going to get a much lower Wheaties contract.

**Q. Right.**

A. It doesn't even answer the question that you set out to answer. It would just be a mistake.

**Q. Well -- and just to be clear, hiQ didn't reach a Series C in your analysis, like, you assume that they never reach Series C for purposes of this analysis; right?**

A. I --

**Q. Let me -- let me strike that?**

**So, I mean, the thing I'm struggling with is I know that hiQ did raise some money and then called it a Series C in January of 2018; right?**

A. I -- I -- I have some notion that that is true or might be true or something like that.

**Q. But you didn't look at that because your analysis is based on a hypothetical Series C assuming that the C and D letter had never been sent; is that right?**

A. Yeah, but if the C and D killed hiQ, then whatever it raises for Round C after the C and D is going to be, you know, some terrible number reflecting the fact that the company is dying.

**Q. Okay.**

A. And that's reflective of what the company would have been absent the C and D and that's the whole assumption.

**Q. Right. Right. So, that's my understanding.**

A. It's correct.

**Q. And I'm asking you -- so, I'm asking you -- strike that.**

**So, if I understand what you said correctly, it's your assumption that if you added in companies that failed to hit Series C to this regression, it would lower the predicted value of hiQ; is that right?**

A. We're -- we're going back to the Wheaties box thing. You would be -- you would be estimating a different concept. It -- it would no longer be the -- the right concept to fit into my valuation framework, so I wouldn't -- I don't know that it would lower the value of hiQ because I wouldn't use the number in the same way unless I had made a mistake.

**Q. Look, it's fine -- it's fine to disagree that that would be the right thing to do but that's not my question. What I'm asking you is if you, in fact, did that, I believe that you said during your speech about the Wheaties box and contracts that if you added in those**

**as of the date of the LinkedIn cease and desist letter; correct?**

A. It's -- it's a major input to that calculation. Yes.

**Q. It's a necessary input to the calculation; correct?**

A. It -- it is.

I'm just saying it's not -- it's not the final answer but it's -- it's an input, a necessary and major input into the calculation.

**Q. Okay. And specifically you are plotting Series B post-money valuations against Series C pre-money valuations for the PitchBook firms; right?**

A. Yes.

**Q. And the -- the goal of that is to produce a regression line that in your view can be used to predict the value of hiQ based on its Series B post-money valuation; correct?**

A. Well, it gets you -- its expected value for Round C if it is to complete Round C.

**Q. Okay. So, just to make sure that my question is complete: The goal of the regression is to produce -- produce a regression line that in your view can be used to predict the value of hiQ at the hypothetical Round C pre-money valuation based on its**

**Series B post-money valuation; is that right?**

A. I could -- could you read that back one more time? I just want to make sure I got the pre and posts right in there.

**Q. The goal of the regression is to produce a regression line that in your view can be used to predict the value of hiQ at a hypothetical Round C pre-money valuation based on a Series B post-money valuation; is that right?**

A. Yes, with caveat. I am -- I recognize -- I mean, a regression can only predict the expectation. It -- it can't predict deviations from that expectation. All of -- by definition, that's not what a regression permits you to do. So, if you're doing a regression and you're making a, quote, prediction based on you're -- you're predicting the expected or the average is -- again, the word you wanted to use before, that's fine -- I -- I recognize that the -- if -- if hiQ were to make Round C it's actual value would likely be different than the exact expected or exact predicted number. As all -- as all would be. But I am taking the expectation because I don't think I have compelling evidence to say that I believe as the C and D we know it would have done better than the average, the expectation or that we know it would have done worse than -- than the expectation.

So, what I'm really doing is -- is taking -- making my prediction based, as investors do, on the expected, the average value. With that clarification, which may or may not be important later, that this is what I am doing. I'm using that progression line to establish an expected Round C value for hiQ based on its Round B value and assuming that it hit Round C.

**Q. And then where -- where in your report do you discuss the reliability of applying a regression that uses change in implied valuation from Series B on a post-money basis to imply a value at Series C on a pre-money basis to predict a hypothetical Series C value for -- for a company?**

A. Well, if you go to Paragraph 89 of my report, it's right under the picture. And I, you know, a picture is worth a thousand words. So, it -- there's a clear, strong, positive relationship. It's reasonable, it's really compelling, and it, you know, I see it here, elsewhere, but I do say that it is -- that's going to be much more reliable than necessarily making something up for -- for a DCF or -- or the other even-worse problems that the multiples approach have. And that's really the only sense in which reliability matters here is -- is when you're choosing between different estimates.

That -- that -- the fact that one estimate

has -- has uncertainty around it, doesn't really matter unless there's some other estimate you could use which might be better. But I believe there's not. I believe there's no plausible way someone could claim -- and I don't think anyone in this case has claimed that DCF or multiples is, in fact, more reliable. But -- but in case you had doubts, just in theory, seeing this picture and seeing how -- how clear the relationship is, I think, would basically extinguish those doubts in -- in the mind of anyone who's -- who's reasonable about this.

**Q. And so Paragraph 89 is your discussion of reliability. You don't say to any academic literature to suggest that your -- your inputs here -- so, Series B and Series C evaluations -- are reliable and accepted methodology; right?**

A. For -- for valuing a company between Round B and C? For -- I mean, people do use these numbers as Round B and Round C values.

**Q. Yeah. But you're -- you're extrapolating a relationship between these companies and the data set and some other company. So, that's my question as -- you don't have any citation here, any sort of academic literature that says that that relationship is a reliable predictor of other companies actual value; correct?**

A. That's -- that's right. This is, as far as

I know, the first application of the world's most standard regression methodology to the exhaustive data set of all companies meeting criteria similar to hiQ and, I think, therefore, of -- of necessity reliable because it combines two things that are completely standard: A regression technique, which no one questions; and -- and comparabilities analysis, which not only no one questions but I think Malakowski actually advocates doing in another context.

Both of those are widely accepted, completely standard, and -- and I don't -- I don't know that anyone has actually questioned either of them in this case -- I mean, not -- not as -- as valid concepts. No one else has brought them together before. That may be. And maybe that's because they -- there was no interesting question that they were trying to answer for which this would be a -- a necessary methodology but they were presented with one.

**Q. So, there's -- there's a lot to unpack in your answer there.**

**You refer to the data set as exhaustive; do you have any support for that claim?**

A. Well, just that I -- I -- my selection criteria admitted every firm that met broad industry classifications. More can give you similar or at least

A. I understand.

**Q. Okay. And you see the confidence level at 99 percent ranges from negative 228.2 up to $374 million?**

A. I see that.

**Q. And total range is 602.2 million?**

A. That's the number on the page.

**Q. Okay. And then you go down to 80 percent confidence and you get a range from negative 76.2 million up to 222 million; right?**

A. Yes.

**Q. And then the full range there is 298.2 million at the 80 percent confidence level?**

A. That's -- yes, that's the number in the column.

**Q. Okay. With respect to the predicted value for hiQ, it's possible to mathematically calculate the probability that the true value of hiQ's valuation at the hypothetical Series C is within certain margins; correct?**

A. I mean, if you have a model that you trust to do that, you can do it. I mean, I guess sometimes you could always do it with any model whether you -- whether you trust it or not. But meaningfully you need to have a model that you trust to make that calculation -- to make that calculation meaningful.

**Q. Have you tried to do that with respect to**

**hiQ?**

A. No.

MS. MILLER: Objection, vague, ambiguous.

THE WITNESS: I --

BY MR. SHAFFER:

**Q. I'm sorry. Go ahead.**

A. I don't think it's -- I don't think the -- the outer bounds here are unusual. I don't think that they're relevant because the other alternative, as I discussed, DCF and multiples are so much worse and nor -- nor do I think the numbers Hoakberg has -- has calculated are -- are relevant, correct or at all helpful to -- to anyone in -- in this case and, you know, I can explain why if you want now or I guess explain why later.

**Q. Well, let me -- so, you said that you don't think that Dr. Hoakberg's numbers are correct but you're not -- you're not contesting the accuracy of the mathematics; right? I just want to make that clear.**

A. That's right. I'm -- I'm --

MS. MILLER: Misstates the testimony.

THE WITNESS: I'm -- I'm disputing whether or not those are the right math to apply in this instance but not that given if you're bound and determined to -- to apply his math, yeah, she turned -- she did turn the crank.

BY MR. SHAFFER:

**Q. Okay.**

A. She turned the wrong crank.

**Q. And you said that you disagree with the relevance of that calculations so -- so calculating the prediction interval, why do you disagree?**

A. For several reasons.

First, as we've discussed, I'm using the expectation for Round C because I don't have good information that would tell me that if hiQ hit Round C it would be substantially above or substantially below its expectation.

We all know that it -- that it probably will be one of those two. It won't be exactly on it. But because we don't really know which direction it's going to go, it doesn't really matter what the uncertainty is. Unless we think there is some other estimate that's better than this regression estimate.

Now there is no such estimate in the case. Hoakberg hasn't produced one. Malakowski hasn't produced one. I've explained why I don't think one can be produced.

So, if someone is trying to decide what is the right number to use for hiQ, this is the only game in town, and I just told you I think the expectation is the

best number because I don't know if it's higher or lower. So, what difference does it -- does it make whether -- what -- what one upper bound or another means?

Just because the upper bound is big couldn't possibly justify zero as the other side tries to say; right?

I mean, imagine -- imagine someone on the jury who -- who has an asset, who has an expected value of $91 million and -- but there is an uncertainty about it and zero is within someone's calculation of the uncertainty bound. So, like, someone could steal it from you and give you zero because we don't know for certain what it's worth? I mean, it's crazy. You'd have to have someone else with an alternative estimate of its value. So it's -- I know -- here is my other estimated, it's only worth 10 million, let me tell you why it's better and then we have a fight about uncertainty.

But you don't -- you don't say we all agree 91 is the right expectation but there's uncertainty so therefore it's zero as opposed to this uncertainty. You want to pick on top of the range. Why not pick all the -- all the risk on the defendants? You want to -- you want to -- if -- if you're liable, you've done something bad. Why don't I hit you with the absolute maximum? Instead of, you're liable, let's hit you with the

absolute minimum.

Like -- so, I -- that the -- I -- I know. That's one of the reasons why -- why it's -- well -- so, we've talked about relevance. So, I mean, if we stick to relevance, it -- that -- that's why it's not relevant because there's no decision you would make differently depending upon how -- how big it is unless you actually wanted to say, I have looked at the uncertainty here and it is bigger than the uncertainty we get by doing DCF or multiples. But I don't think anyone's even attempting to make that statement, and I think it's almost facially ridiculous to try and claim that that's the case.

Now that separate and above, my -- my criticism of the numbers Hoakberg put forth for how big the prediction interval should actually be, I think she's -- those -- those are not the numbers I would talk about with someone if I were going to talk about this subject. But that's a separate question.

**Q. So -- so, for clarity of the record, let me just ask a couple of follow-ups and we can -- we can break up your answer but I'm going to give you a full chance to -- to give me all of the reasons.**

**So, you said that you believe that the regression analysis is -- is more reliable than DCF or comparables, standard comparables; right?**

A. Yes.

**Q. But -- but you didn't run the prediction intervals for your opening report; right?**

A. No. You don't need --

**Q. So -- so, you what's your statement based on that the prediction from the regression is more reliable than these other methods?**

A. Let's go to -- oh, my.

I feel like I -- I think I accidently closed my amended report. I need to open it. It's Tab -- it's 599 is my -- yeah.

There you go. Okay. So, go back to Figure 5.

**Q. Mm-hmm.**

A. Now, looking at Figure 5 is what tells me that this is for sure going to be more reliable than trying to do DCF or multiples, because I know and I -- I believe, like, you know, probably everyone is a fact finder to this that guessing that discounted cash flow for a company that doesn't have any cash flow projections as an over stage startup like hiQ is really -- really -- I mean, you're assuming -- you're just kind of making up numbers.

So -- so, DCF is -- is at the limit of unreliability for hiQ. It's hard to imagine anything

And let's look, you know, focus your eyes around wherever 30 -- wherever you think 33 is on the X axis, you know, close -- sort of two-thirds of the way to 250.

**Q. Mm-hmm.**

A. What's -- what's -- what's Hochberg's 99 percent confidence interval for this?

**Q. It's a $700 million range give or take.**

A. Yeah. Since her Calculation 1, the lower bound is negative 295 and the upper bound is 467; right? I think I'm reading that off of Exhibit 608?

**Q. Mm-hmm.**

A. Okay. So -- so, let's first focus on the lower number. Negative 285. And let's focus your eyes around 33 and ask: How many observations do we see in the vicinity of negative 280-something?

The answer is zero.

Okay. How many do we see in the neighborhood of negative 200-something?

Again, zero.

How many do we see in the neighborhood of negative 100?

Still zero.

**Q. Well, let me -- let me stop you for a second.**

**So, a company valuation generally stops at zero; right? Like, everybody walks away?**

A. Very, very good.

What is she doing predicting negative numbers?

In whose -- in whose world is a negative number part of a confidence interval for -- for an estimate, for -- of something that can't go below zero?

Like --

**Q. Well --**

A. -- what are you trying to convey?

**Q. -- I -- I think the answer --**

A. Put it this way. If we had cut off her numbers at negative one, would anything change?

She would still be able to say it's a 99 percent confidence interval. Why? Because there's zero-percent chance it goes from negative one to negative 278.

What is she doing with negative 278 there?

You know that that's never going to be the number. You know nothing is ever going to live between negative one and negative 278. Yet -- yet the bottom keeps growing because she's turning the crank and there's no -- there's not thought.

I'm not -- you're not telling any finder of

fact about the actual uncertainty in hiQ's value; right? Because we all know it can't be below zero. Yet her negative number keeps getting bigger and bigger and bigger as -- as she gets more and more certainty as if -- as if you need to. You don't.

It's not -- it's not -- it's completely wrong. It doesn't tell you anything about the actual uncertainty in the real world. This is a mechanical, turn-the-crank thing that gives you a number that has no real connection to the real world. It is wildly misleading. I -- I mean, I'm sorry. Maybe she's going to walk in and tell the jury that -- that -- that you need to --

**Q. So, I think -- I think I understand your answer.**

A. But -- but I'm not done.

**Q. We don't --**

A. I don't --

**Q. We don't need to get into ad-hominem attacks here; right?**

A. I -- I'm sorry. I don't -- I don't mean to.

You -- I just find it so, so ridiculous but I -- I will try and be more chill about it.

So, let's now talk about the upper bound

too.

**Q. Well, let me ask you a question about the lower bound, please?**

A. Sure.

**Q. So, you said it doesn't make sense to drop it below zero and I think that goes back to the issue that we talked about earlier where -- where a confidence interval contains zero it's said to be not statistically significant; right? Like, the result that you're measuring is not statistically significant; do you agree with that?**

A. The -- that's -- that's, like, the part of the problem with the -- the way she's using this, but, yeah. That's -- that's how you get nonstatistically significant but you don't -- you don't use nonstatistically significant for a prediction interval. That's not --

**Q. Right. Okay?**

A. What do you even mean to say a prediction is not statistically significant?

A prediction is a prediction. You -- you can have a coefficient estimate not be nonstatistically significant because you think the coefficient might be zero and your testing isn't zero but with a prediction it -- it's not going to go below zero.

smaller than the uncertainty we're going to get from DCF or from multiples and no one has even put forward another methodology.

**Q. All right. And you don't have a methodology on that either; correct?**

A. On -- on DCF or multiples?

**Q. No, no. I'm talking about the prediction interval, the relative uncertainty of the prediction. You do not have a model on that question; correct?**

A. Correct. I am satisfied with -- with looking -- basically looking at the data, looking at -- at Figure 5 and whatever that certainty is, if you were to care about it, which I'm not -- I'm not -- I don't think you really should, but if you were, it would be smaller than the uncertainty associated with any other method and therefore again of no real consequence because you have -- you -- you just have to take the best number you have. The best number you have is -- is from the methodology that uses the blue line.

**Q. Let's talk a little bit about the DCF method and your -- your critique there.**

A. Yeah.

Actually, if now is a convenient time to take another short break --

**Q. It would be.**

A. -- again.

**Q. Yep. That's fine with me?**

A. Yep.

THE VIDEOGRAPHER: Off the record at 4:24 p.m.

(BREAK.)

THE VIDEOGRAPHER: We're back on the record at 4:29 p.m.

BY MR. SHAFFER:

**Q. Okay. Let's talk about your subset or lost profits damages analysis. Just to confirm the subset damages is a lost profit so you tried specific customers in anticipate profits that would have been made but for the cease and desist letter; right?**

A. Yes, subject to, I think, to some other caveats I gave earlier in -- in the case and I, you know, just being restricted to no -- no growth or anything like that with these guys, just -- just these contracts renewing or not.

**Q. And you use the same assumption that hiQ's business was destroyed because of LinkedIn sending a C and D; right?**

A. I -- I guess this is making a -- a limited -- well, let me think or, I mean, I'll just reorient myself.

This is the damages just from the existing customers and -- and the likely IBM partnership, how much profit would have been made from those, only looking at renewals and nothing else. So, yes, this is assuming that the C and D destroyed hiQ but instead of taking all of the value of hiQ, we only take the value associated with these particular customers in this particular way.

I hope -- I think that answered your question but at least this reoriented me to exactly what this analysis is about.

**Q. It -- it does answer my question.**

**So -- so, another way to put it is that you're limiting the subset damages or lost profits analysis here to customers or partners where hiQ had an existing relationship or in your view a likely relationship but for the C and D?**

A. Yes. It's -- it's putting some other limitations on that too that -- that those relationships could only shrink, it wouldn't grow.

**Q. Right. Well, in the IBM situation for instance you do assume it grows, right, because they didn't have a relationship on the date of the C and D?**

MS. MILLER: Objection. Vague and ambiguous, misstates the document, testimony.

THE WITNESS: So, I -- I wouldn't -- I

don't think of that as a growth. That -- that's saying that there -- there was a 75 percent chance that they would have had that relationship. So, I take 75 percent of the value of that relationship and assign it to them. That -- that's not really growth. That's just taking an expectation. You could argue with whether you think the expectation is correct or not but the -- the thought process is that at the time of the C and D that's the expected value of that contract.

BY MR. SHAFFER:

**Q. Well, they didn't have a contract with IBM on the date of the C and D; correct?**

A. They did not.

**Q. So any profits associated with an IBM relationship would be based on some prospective new relationship; right?**

A. Yes.

MS. MILLER: Objection, misspeaks the document.

THE WITNESS: Yes. But -- but I'm weighting it by the probability that it occurs. So I'm trying to take the expectation. I'm not -- I'm not giving them the full, you know, the IBM relationship is there's a million bucks for two

years and then maybe it renews and maybe it doesn't. I don't give them the full million because they don't have it in hand. There -- there's some chance it happens and some chance it doesn't so I -- I weigh it by the chance it happens.

BY MR. SHAFFER:

**Q. And then you -- as part of your lost profits analysis here, you didn't look at hiQ's actuals after the C and D date; correct? So, like, you didn't say this customer renewed or didn't renew? You stopped your analysis on the date of the C and D and projected forward from that date; is that right?**

A. Yes.

**Q. And when you say profits, you're measuring profits -- we talked about this a little bit earlier but profits are essentially gross revenues with some deduction; is that right?**

A. Well, with the deduction of all costs.

**Q. All costs. And you endeavored to do that here in this analysis?**

A. Yes.

**Q. Okay. So in 119 of your report, you said --**

A. Paragraph 119?

A. Let me see what else --

**Q. Let -- let's mark Tab 5 as the next exhibit so that's 610. That's your work papers, Mr. Sacks, and you can reference those if you need to.**

A. Okay. And that's -- okay. It's showing up. Okay.

**Q. And you're going to want to -- when you get that open, look at work paper J in the little tabs at the bottom.**

A. So, I think it is just the -- the costs of goods sold plus the -- the cost of scraping and those are the costs I deduct.

**Q. Any others?**

A. I don't believe so.

**Q. So if you go over to -- in your work papers you actually reproduce a hiQ income statement so you kind of have to slide over on the bottom until you get to hiQ, 00004324 and then the next to that is income statement?**

A. Yes.

**Q. So on hiQ's income statement, they -- they reflect COGS.**

**You see that on line 11?**

A. Yeah.

**Q. And that's a deduction from revenue; right?**

A. Yes.

**Q. And then they do a number of operating expenses which include personnel consultants, other cash expenses, and noncash expenses.**

**Do you see that?**

A. Yes.

**Q. Did you deduct these categories from the profits that hiQ would have received from -- from the customers included in your lost profits analysis?**

A. Only to the extent that those categories cover scraping costs.

**Q. Okay. So, you know, marketing costs aren't included?**

A. In -- in my analysis here that I'm marketing, there's no growth. They -- they got the customers and they either renew or they don't renew but they're not marketing to anybody.

**Q. Okay. And you didn't deduct rents?**

A. No, I believe -- I believe rent is -- is relatively trivial especially if they were in this runoff mode but unless it's in COGS which I don't actually know.

Is -- is there a line for rents?

Do you see one?

**Q. I don't.**

A. Yeah, so I -- I don't, you know, because we estimate some separate number for rent and deduct it.

But like I said to the extent it's not in COGS I think it's trivial for -- in this runoff mode that they would be in I'd imagine.

**Q. And you didn't include any development costs to produce the products?**

A. Well, they're -- in this analysis they're not developing any new products.

**Q. So, did you take a look at what took to produce Keeper reports? I mean, hiQ had a staff of data scientists that developed those reports on a monthly basis; right?**

A. Are you -- are you referring to the it takes us time to push data to the -- the Keeper concept?

**Q. No, I -- I mean, you -- you understand you that hiQ employed a number of data scientists to support its products; right?**

A. I -- I think that's largely automated in Keeper, that once you built Keeper you just need to feed it data and you run this stuff through and that process is -- is automated. So, there -- there really is no staff costs. Once you build it, it costs a lot to build it at -- or to change it but once you have it, that's the whole point. It's -- it's a computer program. It's automated.

**Q. And what's that understanding based on?**

A. Discussion -- I mean, my understanding of things in the record and, you know, discussions I guess with Graves and -- well, I -- I ultimately don't remember exactly who but it -- I think it's consistent with everything that I know about the case.

**Q. And you're -- you're familiar with mechanical-turking; right?**

A. Yes.

**Q. And you assign costs for people paid at the turking rate to manage my five devices in order to keep scraping and you deducted that that as the cost of scraping; correct?**

A. That's right.

**Q. But you didn't deduct any of the costs for turking itself, like, going to LinkedIn's Web site and gathering URLs; correct?**

A. You -- you mean sort of in the -- what I call the disambiguation part? Where, like, there's two John Smiths because that's what the implied turking for, to my understanding, prior to the my five concept is, if -- if there are two John Smiths and you got to make sure you get the right one and you got to, you know, look at the -- pay someone to go to the Web page and look.

**Q. Yeah. Did you deduct those costs?**

A. Not -- not unless they were in COGS. My

**have to put in the business to keep -- keep it running and they could have done something else with it. So, my question is did you impute an interest deduction and -- and deduct that from their profits?**

A. It's -- that's what I'm saying. I don't -- I don't think that that is an appropriate concept for this. There is the cost of AWS which they pay and that's not an interest expense. You just subtract that. There is the cost of the -- the scraping which you pay on the interest expense. You just take that out of profit -- take that out of revenues. Then you get the resulting profits that you discount the profits back to present value at a discount rate. That's what reflects what a COG opportunity costs that -- that's a version of opportunity costs. It reflects the -- the risks and the waiting for -- for the money off in the future. But there's -- there's no interest-cost concept here other than that discount, which I do.

**Q. Okay. And you understand that at the time of the C and D letter hiQ was not profitable; right? I think you said that; right?**

A. Overall it wasn't -- it was still, you know, marketing and trying to sell and incurring development costs and all -- all the rest and that was costing it more money than it was, you know, making on --

on selling these products as it typical for --

**Q. And -- and there -- there was never a quarter in hiQ's history where it was profitable; correct?**

A. I believe that that's true.

**Q. In order to project profits past the C and D date, did you do any analysis to see if hiQ would become profitable within the period of time of your analysis?**

A. Are -- are you not talking about subset or --

**Q. Subset. This is all subset.**

A. Well, the -- the subset analysis is -- is a very particularized thing. It's not -- it's not really about how hiQ would have performed but for the C and D. It's how -- it's what the value of these particular contracts were but for the C and D. I'm not paying attention to hiQ trying to develop or sell other products or all the other that things that hiQ is mostly doing. So, the -- the notion of would hiQ written large be profitable during this period isn't -- isn't relevant to this analysis. It's -- what's relevant to this analysis is just focusing on these things, which is sort of like cash counts. These are the -- these are the in-hand clients that are paying us for stuff we've already done.

Just -- just focusing on that, what's the profitability of that.

**Q. I mean, I guess, the -- the problem that I have, those contracts were not profitable at the date of the C and D, right, because hiQ was not profitable as a business overall?**

A. That is not the right way of thinking about it.

**Q. Well --**

A. I mean I -- the very simple example, let's pick a contract with, I don't know who -- company -- Acme Company. Not a real company, a hypothetical company that they have at the time of the -- the C and D and that contract brings in, let's, say, 50,000 bucks a year. It only costs them 20,000 bucks a year to service contract. They'd make plenty of money on that contract and if -- that contract means they'll make plenty of money but at the same time hiQ is an overall entity might be making losses, because they're investing, you know, a million dollars in -- in marketing to other firms or -- or developing SkillMapper or doing all of the other things that the -- that the company is trying to do. There's lots of other activities. Those activities are currently loss-making. They hope that they will generate profits in the future but they're currently loss-making so the

overall company can make a loss even though specific activities the company is doing, like, fulfilling the contracts, those could be individually profitable even though the company overall is losing money because other things it's doing lose more money than those make.

**Q. And based on your understanding on the data of the C and D, hiQ had released SkillMapper as a product?**

A. Yes.

**Q. Are you aware of any other products they were developing at that time?**

A. I think they were developing some modifications to -- to Keeper and things like that but I -- I am not aware of any particular new product that was under development, though I -- I can't rule out the possibility that there was one. I'm just -- I'm not aware of it.

**Q. Okay. So, did you do any markets surveys or analysis to see if hiQ was likely to become profitable past the C and D late -- date just with respect to the lost profits analysis?**

A. No. The only thing I did was inspect the loss and profits analysis as -- as I described in my report which didn't include that.

**Q. Okay. And you didn't look at business**

**records of similar enterprises either; right?**

A. No. I mean, they're -- they're really -- I don't know that there were any at the time and if there were, I don't have access to that. I -- I did look at some business records at LinkedIn. It's not really contemporaneous. These are records, I think, from 2018, 2019. But I guess that overlaps with some of the period of -- of my subset analysis.

**Q. Did you use that information to determine whether hiQ's operations would have become profitable during the subset analysis period?**

A. No. And as I say, I'm not making a determination about whether hiQ's operations would have become profitable. Making a determination about profits on these particular contracts not as overall activity.

**Q. Okay. And then you said that you included an IBM relationship that -- that hadn't been entered into as of the date of the C and D as part of your lost profits analysis?**

MS. MILLER: Objection, misstates his testimony.

THE WITNESS: Weighted by the -- the probability that it would become a real relationship, yes.

BY MR. SHAFFER:

# Exhibit 91

**Exhibit**
1495

Message

**From:** Peter Rigano [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=613335B0AF85495DACE6E6740E34A25D-PETER RIGAN]
**Sent:** 10/8/2014 11:50:32 AM
**To:** William Gaker [wgaker@linkedin.com]; Daniel Maurath [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e50e586f9c6d4528883977723ec44bc2-Daniel Maur]; Lorenzo Canlas [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5fb700195d094089a60556afbdc6e0e6-Lorenzo Can]; Talent Analytics [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=3a33d5eb7146411ba8d51959846a874a-Talent_Anal]
**Subject:** RE: FYI Local HR Analytics conference at HiQ Labs

If our main interest in the company/conference is assessing their usage of LI data, I'd suggest we hand off to legal and let them investigate further.

-Peter

---

**From:** William Gaker
**Sent:** Wednesday, October 08, 2014 11:21 AM
**To:** Daniel Maurath; Lorenzo Canlas; Talent Analytics
**Subject:** RE: FYI Local HR Analytics conference at HiQ Labs

It might be good for someone (or at least alert someone who handles how our data gets used) to go to make sure this vendor isn't accessing our data without our permission.

---

**Will Gaker**
Talent Analytics – Biz Ops

(415) 845-4968
wgaker@linkedin.com
linkedin.com/williamgaker

---

**From:** Daniel Maurath
**Sent:** Wednesday, October 08, 2014 11:19 AM
**To:** Lorenzo Canlas; William Gaker; Talent Analytics
**Subject:** Re: FYI Local HR Analytics conference at HiQ Labs

Will, I think that's what is too. I was hesitant to request attendance or enter any info, assuming it was for marketing purposes.

Lorenzo, I don't think I'll attend. It may be useful for networking, but I would rather focus conferences where I can learn something new.

Daniel

---

**From:** Lorenzo Canlas <lcanlas@linkedin.com>
**Date:** Wednesday, October 8, 2014 at 11:14 AM
**To:** William Gaker <wgaker@linkedin.com>, Daniel Maurath <dmaurath@linkedin.com>, Talent Analytics

<Talent_Analytics@linkedin.com>
**Subject:** RE: FYI Local HR Analytics conference at HiQ Labs

Will and I are already traveling to conferences the week of Oct 20 so I probably won't go to this.

If you have some contacts attending and the cost is reasonable you may be able to go but I would be thoughtful about what you want to attend. We get to invited to a lot of conferences and they decrease in value after about 1 maybe 2/year.

---

**From:** William Gaker
**Sent:** Wednesday October 08 2014 11:13 AM
**To:** Daniel Maurath; Talent Analytics
**Subject:** RE: FYI Local HR Analytics conference at HiQ Labs

This looks like a sales conference for a company presenting a new product. I would love to see what data they are using. It sounds like they might be scraping our site to see who has updated profiles and using that as a signal to predict turnover.

---

**Will Gaker**
Talent Analytics – Biz Ops

(415) 845-4968
wgaker@linkedin.com
linkedin.com/williamgaker

---

**From:** Daniel Maurath
**Sent:** Wednesday, October 08, 2014 11:10 AM
**To:** Talent Analytics
**Subject:** FYI Local HR Analytics conference at HiQ Labs

Has anyone heard of Hi Q Labs? They're hosting an upcoming HR analytics conference but unsure how valuable it would be.

http://www.hiqlabs.com/corporatecouncil#agenda

# Exhibit 92

**In Neil Salkind (Ed.), *Encyclopedia of Research Design.***
**Thousand Oaks, CA: Sage. 2010**

# Least Squares

**Hervé Abdi**

## 1 Introduction

The least square methods (LSM) is probably the most popular technique in statistics. This is due to several reasons. First, most common estimators can be casted within this framework. For example, the mean of a distribution is the value that minimizes the sum of squared deviations of the scores. Second, using squares makes LSM mathematically very tractable because the Pythagorean theorem implies that, when the error is independent of an estimated quantity, then the *squared* observed variable is the sum of the *squared* error and the *squared* estimated quantity. Third, the mathematical tools and algorithms involved in LSM (derivatives, eigendecomposition, singular value decomposition) have been well studied for a relatively long time.

LSM is one of the oldest techniques of modern statistics, and even though ancestors of LSM can be traced up to Greek mathematics, the first modern precursor is probably Galileo (see Harper, 1974,

Hervé Abdi
The University of Texas at Dallas
Address correspondence to:
Hervé Abdi
Program in Cognition and Neurosciences, MS: Gr.4.1,
The University of Texas at Dallas,
Richardson, TX 75083–0688, USA
***E-mail:*** herve@utdallas.edu http://www.utd.edu/∼herve

for a history and pre-history of LSM). The modern approach was first exposed in 1805 by the French mathematician Legendre in a now classic memoir, but this method is somewhat older because it turned out that, after the publication of Legendre's memoir, Gauss (the famous German mathematician) contested Legendre's priority. Gauss often did not published ideas when he though that they could be controversial or not yet ripe, but would mention his discoveries when others would publish them (the way he did, for example for the discovery of Non-Euclidean geometry). And in 1809, Gauss published another memoir in which he mentioned that he had previously discovered LSM and used it as early as 1795 in estimating the orbit of an asteroid. A somewhat bitter anteriority dispute followed but it did not affect the popularity of the technique.

The use of LSM in a modern statistical framework can be traced to Galton (1886) who used it in his work on the heritability of size which laid down the foundations of correlation and (also gave the name to) regression analysis. The two antagonistic giants of statistics Pearson and Fisher, who did so much in the early development of statistics, used and developed it in different contexts (correlation analysis for Pearson and experimental design for Fisher).

Nowadays, the LSM is widely used to find or estimate the numerical values of the parameters to fit a function to a set of data and to characterize the statistical properties of estimates. It exists with several variations: Its simpler version is called ordinary least squares (OLS), a more sophisticated version is called weighted least squares (WLS), which often performs better than OLS because it can modulate the importance of each observation in the final solution. Recent variations of the least square method are alternating least squares (ALS) and partial least squares (PLS).

## 2 Functional fit example: regression

The oldest (and still the most frequent) use of OLS is linear regression, which corresponds to the problem of finding a line (or curve) that best fits a set of data points. In the standard formulation, a set of $N$ pairs of observations $\{Y_i, X_i\}$ is used to find a function relating the value of the dependent variable ($Y$) to the values of the independent variable ($X$). When a linear function is chosen to fit the data,

the prediction is given by the following equation:

$$\hat{Y} = a + bX. \tag{1}$$

This equation involves two free parameters which specify the intercept ($a$) and the slope ($b$) of the regression line. The least square method defines the estimate of these parameters as the values which minimize the sum of the squares (hence the name *least squares*) between the measurements and the model (*i.e.*, the predicted values). This amounts to minimizing the expression:

$$\mathcal{E} = \sum_i (Y_i - \hat{Y}_i)^2 = \sum_i \left[Y_i - (a + bX_i)\right]^2 \tag{2}$$

(where $\mathcal{E}$ stands for "error" which is the quantity to be minimized). The estimation of the parameters is obtained using basic results from calculus and, specifically, uses the property that a quadratic expression reaches its minimum value when its derivatives vanish. Taking the derivative of $\mathcal{E}$ with respect to $a$ and $b$ and setting them to zero gives the following set of equations (called the *normal* equations):

$$\frac{\partial \mathcal{E}}{\partial a} = 2Na + 2b \sum X_i - 2 \sum Y_i = 0 \tag{3}$$

and

$$\frac{\partial \mathcal{E}}{\partial b} = 2b \sum X_i^2 + 2a \sum X_i - 2 \sum Y_i X_i = 0\ . \tag{4}$$

Solving the normal equations gives the following least square estimates of $a$ and $b$ as:

$$a = M_Y - bM_X \tag{5}$$

(with $M_Y$ and $M_X$ denoting the means of $X$ and $Y$) and

$$b = \frac{\sum (Y_i - M_Y)(X_i - M_X)}{\sum (X_i - M_X)^2}\ . \tag{6}$$

OLS can be extended to more than one independent variable (using matrix algebra) and to non-linear functions.

## 2.1 The geometry of least squares

OLS can be interpreted in a geometrical framework as an orthogonal projection of the data vector onto the space defined by the independent variable. The projection is orthogonal because the predicted values and the actual values are uncorrelated. This is illustrated in Figure 1, which depicts the case of two independent variables (vectors $\mathbf{x}_1$ and $\mathbf{x}_2$) and the data vector ($\mathbf{y}$), and shows that the error vector ($\mathbf{y} - \hat{\mathbf{y}}$) is orthogonal to the least square ($\hat{\mathbf{y}}$) estimate which lies in the subspace defined by the two independent variables.



**Figure 1:** The least square estimate of the data is the orthogonal projection of the data vector onto the independent variable subspace.

### 2.2 Optimality of least square estimates

OLS estimates have some strong statistical properties. Specifically when (1) the data obtained constitute a random sample from a well-defined population, (2) the population model is linear, (3) the error has a zero expected value, (4) the independent variables are linearly independent, and (5) the error is normally distributed and uncorrelated with the independent variables (the so-called homoscedasticity assumption); then the OLS estimate is the *b*est *l*inear *u*nbiased *e*stimate often denoted with the acronym "BLUE" (the 5 conditions and the proof are called the Gauss-Markov conditions and theorem). In addition, when the Gauss-Markov conditions hold, OLS estimates are also maximum likelihood estimates.

### 2.3 Weighted least squares

The optimality of OLS relies heavily on the homoscedasticity assumption. When the data come from different sub-populations for which an independent estimate of the error variance is available, a better estimate than OLS can be obtained using weighted least squares (WLS), also called generalized least squares (GLS). The idea is to assign to each observation a weight that reflects the uncertainty of the measurement. In general, the weight $w_i$, assigned to the $i$th observation, will be a function of the variance of this observation, denoted $\sigma_i^2$. A straightforward weighting schema is to define $w_i = \sigma_i^{-1}$ (but other more sophisticated weighted schemes can also be proposed). For the linear regression example, WLS will find the values of $a$ and $b$ minimizing:

$$\mathcal{E}_w = \sum_i w_i (Y_i - \hat{Y}_i)^2 = \sum_i w_i \left[Y_i - (a + bX_i)\right]^2 \ . \qquad (7)$$

### 2.4 Iterative methods: Gradient descent

When estimating the parameters of a nonlinear function with OLS or WLS, the standard approach using derivatives is not always possible. In this case, iterative methods are very often used. These methods search in a stepwise fashion for the best values of the estimate.

Often they proceed by using at each step a linear approximation of the function and refine this approximation by successive corrections. The techniques involved are known as gradient descent and Gauss-Newton approximations. They correspond to nonlinear least squares approximation in numerical analysis and nonlinear regression in statistics. Neural networks constitutes a popular recent application of these techniques

## 3 Problems with least squares, and alternatives

Despite its popularity and versatility, LSM has its problems. Probably, the most important drawback of LSM is its high sensitivity to outliers (*i.e.,* extreme observations). This is a consequence of using *squares* because squaring exaggerates the magnitude of differences (*e.g.,* the difference between 20 and 10 is equal to 10 but the difference between $20^2$ and $10^2$ is equal to 300) and therefore gives a much stronger importance to extreme observations. This problem is addressed by using *robust* techniques which are less sensitive to the effect of outliers. This field is currently under development and is likely to become more important in the next future.

## Related entries

Analysis of variance and covariance, canonical correlation, general linear model, multiple regression, principal component analysis,

## Further readings

1. Abdi, H., Valentin D., Edelman, B.E. (1999) *Neural networks.* Thousand Oaks: Sage.

2. Bates, D.M. & Watts D.G. (1988). *Nonlinear regression analysis and its applications.* New York: Wiley

3. Greene, W.H. (2002). *Econometric analysis.* New York: Prentice Hall.

4. Harper H.L. (1974–1976). The method of least squares and some alternatives. Part I, II, II, IV, V, VI. *International Satistical Review,* **42**, 147–174; **42**, 235–264; **43**, 1–44; **43**, 125–190; **43**, 269–272; **44**, 113–159;

5. Nocedal J. & Wright, S. (1999). *Numerical optimization.* New York: Springer.

6. Plackett, R.L. (1972). The discovery of the method of least squares. *Biometrika*, **59**, 239–251.

7. Seal, H.L. (1967). The historical development of the Gauss linear model. *Biometrika*, **54**, 1–23.

# Exhibit 93

# Estimating Industry Multiples

Malcolm Baker*
Harvard University

Richard S. Ruback
Harvard University

First Draft: May 1999
Rev. June 11, 1999

## Abstract

We analyze industry multiples for the S&P 500 in 1995. We use Gibbs sampling to estimate simultaneously the error specification and small sample minimum variance multiples for 22 industries. In addition, we consider the performance of four common multiples: the simple mean, the harmonic mean, the value-weighted mean, and the median. The harmonic mean is a close approximation to the Gibbs minimum variance estimates. Finally, we show that EBITDA is a better single basis of substitutability than EBIT or revenue in the industries that we examine.

---

* Email: mbaker@hbs.edu, rruback@hbs.edu. We would like to thank Scott Mayfield, Andre Perold, Jack Porter, and seminar participants at Harvard University and Harvard Business School for helpful comments. This study has been supported by the Division of Research of the Harvard Graduate School of Business Administration.

## 1.  Introduction

Valuing firms as a multiple of a financial or operating performance measure is a simple, popular, and theoretically sound approach to valuation. It can be used by itself, or as a supplement to a discounted cash flow approach. It applies the only the most basic concept in economics: perfect substitutes should sell for the same price. The basis of substitutability is generally a measure of financial or operating performance and the multiple is the market price of a single unit. If, for example, the basis of substitutability is revenue, then the revenue multiple is the market price of a dollar of revenue. Multiplying the amount of revenue by the revenue multiple provides an estimate of value. The basis of substitutability can be a financial measure from either the income statement or the balance sheet or an operating measure, such as potential customers, subscribers, or established reserves.

The method of multiples has advantages over the discounted cash flow method. Implicit in the multiple is a forecast of future cash flows and an estimate of the appropriate discount rate. The method of multiples uses current market measures of the required return and industry growth rates. It avoids the problems in applying the discounted cash flow techniques of selecting a theoretical model of the appropriate discount rate and estimating it using historical data. It also avoids the difficulty of independently determining future cash flows. If a truly comparable publicly traded firm or transaction were available, if the basis of substitutability could be determined, and if the multiple could be estimated reliably, then the method of multiples would be clearly superior to discounted cash flow analysis.

The drawback to the method of multiples is in its three implementation challenges. The first is determining the basis of substitutability. Typically, the basis of substitutability is chosen qualitatively as some measure of financial performance, such as revenue, earnings before interest, taxes, and depreciation (EBITDA), or cash flow, or a measure of operating performance, such as established reserves or subscribers. The second implementation challenge is measuring the multiple. Practitioners generally use the simple mean or median of the multiples implicit in the market pricing of a set of publicly traded comparable firms or comparable publicly disclosed transactions. The third implementation challenge is choosing a set of comparable companies or transactions.

This paper focuses on the first two implementation challenges of the method of multiples. We abstract from the difficulty of choosing a set of appropriate comparable firms or transactions and focus on the econometric problem of inferring the industry multiple and basis of substitutability. There are two related econometric problems. The first is that estimating multiples from comparable companies or transactions invariably involves a small number of observations. In our study, for example, we have only 10 firms on average across the 22 S&P industries we examine. The small number of observations means that standard approaches, like ordinary least squares regression analysis, do not lead to minimum variance estimators. The second problem is that the statistical errors from the multiple valuation model are unlikely to be homoskedastic. Firms with different values may have different error variances, and the minimum variance estimator depends on the form of this variance.

Section 2 presents our econometric approach. Our aim is to determine the minimum variance estimate for the industry multiple $M$. The method of multiples, as typically used

in practice, presumes a linear relationship within a given industry between value and the basis of substitutability:

$$V_j = MX_j + \varepsilon_j \quad \text{for } j = 1, \ldots, N \tag{1}$$

where $V$ and $X$ denote the value and a measure of financial or operating performance for firm $j$, $M$ is a multiple that is constant across $N$ firms of a particular industry, and $\varepsilon$ is an error which reflects the variation in multiples across firms within an industry.

The minimum variance industry multiple depends on the specification of the errors. We assume that the error $\varepsilon$ is proportional to a power of the value $V$:

$$\varepsilon_j \sim V_j^{\lambda} \tag{2}$$

We show that this error specification is both conceptually and empirically reasonable. Conceptually, the errors from a growing perpetuity of cash flows valuation model will depend on the value of the firm. Empirically, we show that, when (1) is transformed to account for the dependence of the errors on firm value, the resulting errors appear to be normally distributed.

In section 3, we use Gibbs sampling to simultaneously estimate the multiple and the error structure. We use data for 22 S&P 500 industry groups in 1995. We restrict the model so that the errors are related to value in the same way across all of the firms within all of the industries. This method provides the minimum variance estimate of the multiple in (1). The Gibbs results also show that the standard deviation of the errors is linearly related to the value of the firm.

Although the Gibbs estimation provides a multiple for each industry, we view it as an impractical method of estimating multiples for practitioners. The Gibbs approach requires that the error structure and the multiples be estimated simultaneously and thereby

requires data across industries. The typical practitioner problem, however, involves estimating a multiple for a single industry or group of transactions. In section 4, we therefore also consider four common estimators of multiples: the simple mean, the harmonic mean, the value-weighted mean, and the median. The harmonic mean is calculated by averaging the inverse of the multiples $\frac{x}{V}$, and taking the inverse of that average. The value-weighted mean is the total industry market value $\sum V$ divided by the industry total for the basis of substitutability $\sum x$.

Figure 1 plots the simple mean, the harmonic mean, the value-weighted mean, and the median EBITDA multiples for 22 S&P industries. The range of these multiple estimates varies across industries. In some industries, such as chemicals and telephones, the four different measures are virtually identical. In other industries, such as computer hardware and metals mining, the differences across the multiples are substantial. For example, the value-weighted mean EBITDA multiple for computer hardware is 7.0 whereas the simple mean is 12.0, a difference of over 71%.

In evaluating the four alternative estimators, we use the Gibbs results in two ways. First, we show that the harmonic mean is most consistent with the estimated error structure from the Gibbs approach. Second, we use the multiples from the Gibbs approach as a minimum variance benchmark and evaluate the four alternative estimators relative to the Gibbs estimate. We compute the three types of means and the median for each of the 22 industries and compare them to the Gibbs estimate of the multiple. Our results show that the harmonic mean is the closest to the Gibbs estimate. Mathematically, the harmonic mean is always less than the simple mean. The closeness of the harmonic

mean to the Gibbs estimate, therefore, implies that valuations based on the simple mean will consistently overestimate value.

In section 5 we examine three common measures of comparability: EBITDA, earnings before interest and taxes (EBIT), and revenue. We compute the harmonic means for each of our 22 industries for each of the three measures of comparability. We then compare the dispersion of the multiples to identify which measure of comparability results in the narrowest distribution. Although the results vary by industry, EBITDA appears to be the best single basis of substitutability for the industries we examine.

## 2. A Model of Multiples

In this section we provide a rationale for our econometric specification of the multiples model. The model, as typically used in practice is simple and straightforward: Value *V* equals the basis of substitutability *X* times the multiple *M*. That means there is a linear relation within a given industry between value and the basis of substitutability:

$$V_j = MX_j + \varepsilon_j \qquad (3)$$

The difficulty in estimating (3) directly is that the valuation errors $\varepsilon$ are unlikely to be independent of value because firms with higher values are likely to have larger errors. The multiple valuation model (3) can be interpreted as an application of a growing perpetuity of cash flows valuation model. The multiple in this situation depends on the relationship between the basis of substitutability and the expected cash flows, the discount rate, and the growth rate. Because errors arise in all three elements of the capitalization factor, the errors in (3) will depend on value.

The first source of error in a perpetuity model is in the relationship between the basis of substitutability and the expected cash flows. We define the expected cash flow one period hence *CF* for firm *j* as a multiple $\delta$ of the basis of substitutability *X* plus a firm specific error $\varepsilon_1$:

$$CF_j = \delta X_j + \varepsilon_{1j} \tag{4}$$

Errors also arise when the expected growth and discount rate for each firm *j* differ from the industry average rates:

$$r_j = r + \varepsilon_{2j} \text{ and} \tag{5}$$

$$g_j = g + \varepsilon_{3j}$$

The familiar perpetuity relationship relates value to cash flow, the discount rate, and the growth rate. We substitute (4) and (5) into this formula.

$$V_j = \frac{CF_j}{r_j - g_j} = \frac{\delta}{r - g} X_j + \frac{1}{r - g}\left[\varepsilon_{1j} + V_j\left(\varepsilon_{3j} - \varepsilon_{2j}\right)\right] \tag{6}$$

The errors in (6) depend on value, with value entering directly into the error term. The three separate sources of error may also depend on *V*. Consistent with errors depending on value, we assume that the errors in (3) are proportional to a power function of value:

$$\varepsilon_j \sim V_j^{\lambda} \tag{7}$$

The econometric challenge of estimating the multiple *M* is that the value of the firm *V* appears on both the left-hand side of the equation as the dependent variable and on the right-hand side in the error term. We therefore transform (3) into an econometric model in which the basis of comparability *X* appears on the left-hand side and value *V* appears on the right-hand side.

$$X_j = \frac{1}{M} V_j + e_j \tag{8}$$

$$E\left[e_j^2\right] = \sigma^2 V_j^{2\lambda}$$

where the new error $e$ is equal to $\frac{1}{M}\varepsilon$.

Estimating multiples using (8) from comparable companies or transactions invariably involves a small number of observations.There are only 10 firms on average, for example, across the 22 S&P industries that we use in our empirical analysis. . As a result, relying on large sample econometric techniques is inappropriate. Finding minimum variance estimates for the parameters in (8) therefore requires a distributional assumption. Our assumption is that the errors $e$ are normally distributed.

We test this assumption empirically. Our data on the S&P 500 for 1995 is from COMPUSTAT. Value $V$ is the sum of the market value of equity, book value of long term debt, debt due in one year, and notes payable. For the basis of substitutability $X$, we use revenue, earnings before interest, taxes, and depreciation (EBITDA), and earnings before interest and tax (EBIT). Any firm without all seven of these items in the COMPUSTAT database for 1995 is excluded. S & P industry classifications divide the 500 firms into 103 groups. Only those industry groupings that contain at least seven firms are included. The final sample consists of 225 firms in 22 industry groups.

Figure 2 and Table 1 summarize our analysis on the normality of the errors from our econometric model. We calculate the residuals $e$ from (8) using the harmonic mean as the multiple $M$. Because we find that the standard deviation of the errors scale linearly with value in Section 3, we scale $e$ by $V$ in the empirical tests of normality. Figure 2 presents a histogram of the scaled errors Figures 2a and 2b show that the EBITDA and EBIT errors

appear to be normally distributed. Both histograms appear symmetric and roughly conform to the superimposed normal distribution. The revenue multiple, in contrast, does not appear to be normal because the distribution is skewed to the right.

Table 1 presents more formal test statistics for the normality of the errors. The table reports chi-squared tests of the null hypothesis that the error distributions are normal. We report the results for two statistical tests. The first panel of Table 1 presents separate tests for skewness and kurtosis and a combined test statistic. These tests are described in D'Agostino et al. (1990). The results support the casual observation of figure 2. For EBITDA, the combined test statistic is 1.99, and the associated p-value is 0.37. Because this p-value exceeds 5%, there is no evidence to reject the null hypothesis of normality. For EBIT, the p-value is 0.17, still well above the 5% cutoff. We reject the normality of the revenue errors with a p-value less than 0.01. Looking separately at skewness and kurtosis reveals that the revenue errors do not have fat tails, or kurtosis, but they are skewed: The p-value for kurtosis is 0.29, while the p-value for skewness is below 0.01.

The second panel presents Shapiro and Wilk (1965) tests of normality. These tests support the qualitative conclusions of the skewness-kurtosis test in panel A. For EBITDA, the chi-squared test statistic is 0.49, and the associated p-value is 0.31. The Shapiro-Wilk p-value is lower, but we are again unable to reject the null hypothesis that the EBITDA are normally distributed at the 5% level of significance. For EBIT, the p-value also lies above the 5% cutoff, but by a small margin. Finally, we again conclude that the revenue errors are not normally distributed at the 1% level.

These statistical tests suggest that our assumption of normality for the EBITDA and EBIT errors *e* in (8) is reasonable. Because the revenue errors appear not to be normally

distributed, we view the Gibbs estimation of (8) for revenue as only an approximate solution.

## 3.  Measurement of Multiples

This section describes the empirical estimation of the econometric model developed in section 2. In section 3.1, we describe the Gibbs sampling approach used to simultaneously estimate the multiple and the error structure. Section 3.2 presents the results from the Gibbs estimation.

### 3.1. The Econometric Approach

Gibbs sampling, a special case of Markov Chain Monte Carlo (MCMC) simulation, is a simple and powerful tool for estimation in small samplesWe begin by using Gibbs sampling to simultaneously estimate the multiple and the error specification. It is not practical to estimate a separate error structure for each sample of comparable firms. We therefore impose the restriction that $\lambda$, the coefficient of the power function that describes our errors, is constant across industries. We do however allow for a separate multiple $M_i$ and a separate variance parameter $\sigma_i$ for each industry. This approach gives us more degrees of freedom for estimating the form of the heteroskedasticity. Hence, the econometric specification for the model in (8) is:

$$X_{ij} = \frac{1}{M_i} V_{ij} + e_{ij} \tag{9a}$$

$$E\left[e_{ij}^2\right] = \sigma_i^2 V_{ij}^{2\lambda} \tag{9b}$$

where the subscript $i$ denotes the industry and the subscript $j$ denotes firms within the industry.

We estimate the industry multiples $M$ and the variance parameters, $\lambda$ and $\sigma$. With our industry definitions, estimating an industry multiple leaves as few as five degrees of freedom (seven comparable firms and two industry parameters, $M$ and $\sigma$). For this reason, relying on large-sample, or asymptotic, econometric theory is inappropriate. The maximum likelihood (ML) approach therefore may not provide minimum variance estimates of the multiple. Even when the variance parameters $\lambda$ and $\sigma$ are known, only the ML estimate of the inverse multiple $\frac{1}{M}$ is guaranteed to be minimum variance in small samples.

Gibbs sampling is an alternative approach that provides minimum variance estimates of $M$, $\lambda$, and $\sigma$ in a small sample. The procedure is summarized in figure 3. Before beginning the simulation, we choose initial values for $\lambda$ and $\sigma$. We then compute the mean and variance of $\frac{1}{M}$ conditional on the initial values using regression analysis on (9a) and (9b). Because the errors $e$ are normally distributed conditional on value $V$, $\frac{1}{M}$ is also distributed normally. We draw a value for $\frac{1}{M}$ at random from its normal distribution.

With the drawn $\frac{1}{M}$, we calculate the residuals $e$ from (9a). The residuals can be used to calculate the mean and variance of $\lambda$ conditional on the initial value of $\sigma$ using regression analysis on a log transformation of (9b). The transformation removes the expectations operator and takes logs of both sides of the equation.

$$e_{ij}^2 = \sigma_i^2 V_{ij}^{2\lambda} u_{ij} \tag{10}$$

$$\ln e_{ij}^2 - \ln \sigma_i^2 = \lambda \ln V_{ij}^2 + \ln u_{ij}$$

Because we use the entire sample of 225 firms to estimate (10), $\lambda$ is distributed approximately normally even though the errors may not be.[1] We draw a value for $\lambda$ at random from its asymptotic normal distribution.

With the calculated residuals $e$ and the drawn $\lambda$, we can transform (9b):

$$E\left[\frac{e_{ij}^2}{V_{ij}^{2\lambda}}\right] = \sigma_i^2 \qquad (11)$$

Because the scaled errors $e$ are normally distributed, $\frac{1}{\sigma^2}$ has a gamma distribution. The parameters of the gamma distribution are a function of the squared residuals scaled by value as in (11) and the number of firms in industry $i$. We draw a value for $\frac{1}{\sigma^2}$ at random from its gamma distribution.

Now, we have drawn values of $\lambda$ and $\sigma$. This means that we can draw a value of $\frac{1}{M}$ as before and repeat the process for a second iteration. After the first 100 iterations, the initial values become irrelevant.[2] The subsequent 1,000 iterations represent draws from the joint distribution of the parameters in (9). Because each draw has an equal probability, the average of 1,000 Gibbs draws provides minimum variance parameter estimates.

---

[1] We also include fixed industry effects in the estimation of (10) to ensure that $\lambda$ reflects the influence of value on the errors within and not across industries.

[2] Gelman et al. (1995) describe the problem of assessing convergence in iterative simulation.

3.2. Empirical Results

In Table 2, we present the results from the Gibbs estimation of the empirical model in (9). The first two columns of Table 2 show the results using EBITDA data, the next two columns perform the same estimation for EBIT, and the last two columns report results for revenue. The parameter estimates are the average of 1,000 Gibbs draws from the joint distribution of the parameters in (9). The reported standard errors are the standard deviation of the 1,000 Gibbs draws.

Panel A of the table shows the minimum variance estimates and standard errors for the 22 industry multiples $M$. For EBITDA, the minimum variance multiples range from 4.6 for paper products to 19.0 for gold and precious metals mining firms. This means that an average paper products firm was worth 4.6 times EBITDA in 1995, while an average gold and precious metals mining firm was worth 19.0 times EBITDA. The standard errors range from 0.26 for telephone, or less than 4% of the multiple estimate of 6.7, to 6.21 for gold and precious metals, or over 32% of the multiple estimate of 19.0. For EBIT, which is always less than EBITDA, the minimum variance multiples are higher. The pattern across industries is similar however, ranging from 6.6 for paper products to 65.3 for gold and precious metals. Revenue, which is always higher than EBITDA, produces multiples that are lower than and less correlated with the EBITDA multiples. The lowest multiple is computer hardware at 0.8 and the highest is gold and precious metals at 4.9.

In panel B, we present the parameter estimates and standard errors for the common variance parameter $\lambda$. As with $M$, the estimates are equal to the average of 1,000 Gibbs draws for $\lambda$. The estimate for $\lambda$ is equal to 0.99 for EBITDA, 0.88 for EBIT, and 0.99 for

revenue. The standard deviations of 0.12 for EBITDA, 0.12 for EBIT, and 0.18 for revenue suggest that it is unlikely that $\lambda$ could be less than 0.65, two standard deviations below the mean, or greater than 1.35, two standard deviations above the mean.

Because $\lambda$ is not necessarily normally distributed, this may not be an appropriate test. As a check, we look at its full distribution. Figure 4 plots the results from the Gibbs simulation for $\lambda$. By grouping the draws together, we form a picture of the distribution of $\lambda$. The midpoint of each group of draws is reported on the horizontal axis. For example, the group labeled 1.0 contains draws lying between 0.975 and 1.025. We plot the number of draws in each group on the vertical axis. There are a total of 1,000 draws, so a level of 100 indicates that 10% of the distribution lies in that group. The overall picture confirms that $\lambda$ most likely is between 0.65 and 1.35. For EBITDA, the draws are centered on 1.0. EBIT is centered a somewhat below 1.0 and revenue somewhat above.

## 4.  Common Multiples

Although the Gibbs estimation provides a multiple for each industry, we view it as an impractical method of estimating multiples for practitioners. The Gibbs approach requires that the error structure and the multiples be estimated simultaneously and thereby requires data across industries. The typical practitioner problem, however, involves estimating a multiple for a single industry or group of transactions. We therefore also consider four common estimators of multiples: the median, the simple mean, the harmonic mean, and the value-weighted mean.

In section 4.1, we use the Gibbs point estimates of the variance parameter $\lambda$ from section 3 to derive a maximum likelihood (ML) estimate of the multiple. Although ML

does not necessarily provide minimum variance estimators even when $\lambda$ is known, it does represent a simpler approach. In section 4.2, we empirically examine the four common multiples empirically and compare their performance against the Gibbs minimum variance estimates. The ML analysis and our empirical results both suggest that the harmonic mean is the best among common multiples.

4.1. Maximum Likelihood Estimation of Multiples

Our Gibbs estimates in section 3 show that $\lambda$, the coefficient of the power function that describes the errors in (8), is centered around one. When the variance parameter $\lambda$ is equal to one, maximum likelihood estimation (ML) of *M* has a familiar solution. Because the error *e* in (8) is normally distributed, maximizing the likelihood function is also equivalent to minimizing the weighted sum of squared errors. Our empirical model, with $\lambda$ equal to one, is:

$$X_j = \frac{1}{M} V_j + V_j v_j \qquad (12)$$

where *v* is normally distributed with constant variance $\sigma^2$. Dividing both sides by value yields:

$$\frac{X_j}{V_j} = \frac{1}{M} + v_j \qquad (13)$$

The least squares estimate of *M* in (13) is the harmonic mean:

$$1 \Big/ \sum_j \frac{X_j}{V_j} \qquad (14)$$

The harmonic mean is therefore the ML estimate implied by the error structure estimated in section 3. In the next subsection, we compare the harmonic mean, along with

the simple mean, the value-weighted mean, and the median, to the Gibbs minimum variance estimates.

4.2. Comparison of Common Multiples

Table 3 presents the four common multiples for the S&P 500 sample. The first column shows the number of firms in each industry. We consider only industries with at least seven firms. The largest industry, electric companies, has 26 firms. The second column calculates the simple mean, which is the average of the individual firm multiples $\frac{V}{X}$. For 1995, the mean industry multiple is between 4.8 for forest and paper products and 23.2 for gold and precious metals mining. The average of the simple means across the 22 industry groups is 9.5.

The third, fourth, and fifth columns present the harmonic mean, the value-weighted mean, and the median. The harmonic mean is the inverse of the average of the individual firm yields $\frac{X}{V}$. The value-weighted mean is the sum of firm values across firms within an industry $\sum V$ divided by the sum of the basis of substitutability $\sum X$. The median is simply the median of the individual firm multiples $\frac{V}{X}$. The pattern of multiples across industries is similar for each of the four common multiples. In all four cases, the paper products industry has the lowest multiple at around 4.8, and gold and precious metals mining has the highest multiple at about 18.0.

The last column of Table 3 shows the economic importance of multiple estimation. We calculate the range between the lowest and highest multiple as a fraction of the lowest multiple. For example, the maximum multiple for the auto parts industry is the simple mean of 7.0. The minimum multiple is the value-weighted mean of 6.0. The last

column shows the maximum error from multiple estimation in percentage terms. This is the range of 1.0 divided by the minimum of 6.0, or about 17%. If the value-weighted mean were minimum variance, using the simple mean would result in a valuation error of 17%. The economic importance of multiple estimation varies across the 22 industries. For the telephone industry, multiple estimation is irrelevant: The maximum estimate is within 2% of the minimum. For computer hardware, in contrast, changing the approach can lead to as much as a 71% difference in the industry multiple.

We compare each of the four common multiples to the minimum variance multiples from the Gibbs estimationin table 4. The second column of table 4 reproduces the minimum variance multiple estimates from Table 2 for each of the 22 industry groups. In the next four columns, we evaluate the performance of the four common multiples. Our measure of performance is the absolute difference between the common multiple estimate and the minimum variance multiple expressed as a percentage of the minimum variance multiple. For example, the simple mean from Table 3 for banks is 6.2. This is 0.4 higher than the minimum variance estimate of 5.8. This difference is 6.17% of the minimum variance multiple.

The third column shows the performance of the simple mean. The simple mean is as much as 39% different from the minimum variance estimate. For some industries however, such as telephone companies, the difference is less than 1%. On average the difference is approximately 8.5%. The fourth column shows the performance of the harmonic mean. In contrast to the simple mean, the difference from the minimum variance estimate is never greater than about 7%, and the average is less than 2%. The fifth column shows the value-weighted mean, and the sixth column shows the median.

The average performance of the value-weighted mean is similar to the simple mean. The difference from the minimum variance estimate is as high as about 50% and averages about 10%. The median, which is commonly used in practice, performs better. The average error is around 6% and the worst difference is only 15%. The median however does fall short of the harmonic mean.

Table 4 shows that the harmonic mean empirically is very close to the minimum variance multiple from Table 2. This result is consistent with and closely related to the finding that the harmonic mean is the maximum likelihood estimate when, as the Gibbs results suggest, the standard deviation of the errors is proportional to value. These results suggest that the harmonic mean should be used when estimating a single industry multiple. The superiority of the harmonic mean is also economically reasonable. The harmonic mean effectively averages the yields, which are the inverse of the multiples. By averaging the yields, the harmonic mean gives equal weight to equal dollar investments. Because the simple mean is always greater than the harmonic mean, using the simple mean instead of the harmonic mean will consistently over-estimate value.[3]

## 5. Basis of Substitutability

We compute the harmonic mean multiples for each of our 22 industries using three common measures of comparability: EBITDA, EBIT, and revenue. We then compare the distribution of the multiples and identify which measure of comparability results in the narrowest distribution. We focus on the dispersion of the multiples for two reasons. First,

[3] This mathematical relationship holds whenever the individual firm multiples are all greater than zero.

economically, a narrow distribution of multiples for firms within an industry around the harmonic mean indicates a common value driver across firms in the industry. A substantial dispersion around the harmonic mean, in contrast, indicates that the basis of substitutability is not an effective descriptor of value. Second, statistically, the standard deviation of the harmonic mean measures the precision of the estimator. The lower the standard deviation, the more effectively the multiple method describes value. Thus, the best basis of substitutability is the choice that results in the lowest standard deviation around the harmonic mean.

The standard deviation of the harmonic mean is influenced by two factors: the number of comparable firms and the dispersion of the errors from (8). Holding dispersion constant, the number of comparable firms reduces the standard deviation. More firms mean more information about the industry multiple. Holding constant the number of comparable firms, the dispersion across firms increases the standard deviation. Technically, we define dispersion as the average squared error, where the error is equal to the difference between the individual firm yield $\frac{X}{V}$ and the average yield.

Because the number of comparable firms is constant within each industry, we use the dispersion of the errors to measure the accuracy of the harmonic mean for each of the three measures of comparability. The first set of two columns in Table 5 looks at EBITDA multiples. The first of the two columns shows the harmonic mean multiple and the second of the two columns shows the dispersion of the errors. To measure dispersion, we use the standard deviation of the individual firm yields $\frac{X}{V}$. To compare across the three measures of comparability, we scale this standard deviation by the average yield.

The second set of two columns performs the same set of calculations for EBIT, and the last set of two columns shows results for revenue. The final column reports which of the three basis of substitutability has the narrowest distribution measured by the standard deviation of the yields.

EBITDA is the best basis of substitutability for 10 of the 22 industries. The standard deviation of the yields ranges from about 10% of the industry average yield for telephone to 50% for gold and precious metals. The overall average is 28% and the median is 27%. If the yields are normally distributed, this means that about two thirds of the individual firm yields will lie within 28% of the average. EBIT, which is best for 9 of the 22 industries, performs almost as well as EBITDA. The standard deviations range from 8% to 161%. The overall average is 39%, but the median is only 29%. A simple t-test rejects the hypothesis that the mean EBIT and EBITDA standard deviations are the same at the 10% level of significance. Revenue multiples are worse. The standard deviations range from 12% to 120%. The overall average is 40% and the median is 35%. A t-test in this case rejects the hypothesis that the mean revenue and EBITDA standard deviations are the same at the 1% level of significance.

The basis of substitutability that provides the most precise estimate of value varies by industry because the underlying value drivers differ across industries. In some industries, for example, chemicals, value seems to be proportional to revenue, whereas in others EBITDA or EBIT proves the best basis of substitutability. Furthermore, while we have limited our analysis to financial measures, operating statistics like number of customers serviced may be better measures of substitutability. Our purpose in this section is twofold. First, we argue that the basis of substitutability should be selected by choosing

the measure that minimizes the spread across yields within an industry. Second, we show that the basis varies across industries.

## 6.  Conclusions

This paper focuses on two implementation challenges when using valuation multiples: how to estimate the industry multiple and how to choose a measure of financial performance as a basis of substitutability.

We use Gibbs sampling to simultaneously estimate minimum variance multiples and the error structure for 22 S&P industries in 1995. The estimated error structure is consistent with the harmonic mean, and the harmonic mean is the closest, out of four common multiple estimators, to the Gibbs sampling results. Thus, our answer to the first implementation problem – how to estimate the industry multiple – is to use the harmonic mean. Because the harmonic mean is mathematically always less than the simple mean, the results imply that using the simple mean industry multiple will overestimate value.

We argue that the basis of substitutability should be selected by choosing the measure that minimizes the spread across multiples within an industry. To study alternative bases of substitutability, we examine the harmonic mean multiple based on EBIT, EBITDA, and revenue. We show that the basis varies across industries.  One explanation is that the basis of substitutability that provides the most precise estimate of value varies by industry because the underlying value drivers differ across industries.

## 7.  Bibliography

D'Agostino, R. B., A. Balinger, and R. B. D'Agostino Jr., 1990, A suggestion for using powerful and informative test of normality, *The American Statistician* 44, 316-321.

Gelman, A., J. B. Carlin, H. S. Stern, and D. B. Rubin, 1995, *Bayesian Data Analysis* (Chapman and Hall: London).

Shapiro, S. S. and M. B. Wilk, 1972, An analysis of variance test for normality, *Biometrika* 52, 591-611.

**Figure 1. Mutliple measurement.** EBITDA multiples for the S&P 500 in 1995. Industries are plotted on the horizontal axis. On the vertical axis, we shows the arithmetic mean, harmonic mean, value-weighted mean, and median of total firm value to EBITDA. The sample includes only those S&P 500 industry groups that contain at least seven firms.



**Figure 2. Normality assumption.** Plot of the error term using the harmonic mean multiple. The errors are standardized to have zero mean and unit variance.

$$\text{Error} = \frac{1}{s_j}\left(\frac{X_{ij}}{V_{ij}} - \frac{1}{M_j}\right)$$

The distribution of the errors is plotted using data on EBITDA (1a), EBIT (1b), and revenue (1c). The sample includes only those S&P 500 industry groups that contain at least seven firms.

2a. EBITDA distribution
2b. EBIT distribution
2c. Revenue distribution
0
5
10
15
20
25
30
35
40
45
50
-3.0
-1.8
-0.6
0.6
1.8
3.0

23



**Figure 3. Gibbs sampling flow diagram.** Flow diagram for a Gibbs sampling estimation of the following model of multiples:

$$X_{ij} = \frac{1}{M_i} V_{ij} + e_{ij} \qquad E\left[e_{ij}^2\right] = \sigma_i^2 V_{ij}^{2\lambda}$$

We iteratively draw values at random from the distribution of each parameter, $M$, $\lambda$, and $\sigma$, conditional on the data and the other parameter draws. In addition, we assume that the errors $e$ are normally distributed conditional on $V$.



**Figure 4. Empirical model of multiples.** The posterior distribution of $\lambda$ for a Gibbs sampling estimation of the following model of multiples:

$$X_{ij} = \frac{1}{M_i} V_{ij} + e_{ij} \qquad E\left[e_{ij}^2\right] = \sigma_i^2 V_{ij}^{2\lambda}$$

The distribution of the parameter estimate is plotted using data on EBITDA, EBIT, and revenue. The sample includes only those S&P 500 industry groups that contain at least seven firms.



**Table 1. Normality assumption.** Tests of a normal error term using the harmonic mean multiple. The errors are standardized to have zero mean and unit variance.

$$\text{Error} = \frac{1}{s_j}\left(\frac{X_{ij}}{V_{ij}} - \frac{1}{M_j}\right)$$

The distribution of the errors is tested against the hypothesis of no skewness, no kurtosis, no skewness or kurtosis, and using the Shapiro-Wilk and Shapiro-Francia tests of normality. The tests use data on EBITDA, EBIT, and revenue. The sample includes only those S&P 500 industry groups that contain at least seven firms.

| | | *EBITDA* | | *EBIT* | | *Revenue* | |
|---|---|---|---|---|---|---|---|
| **Industry** | **N** | **$\chi^2$ Test Statistic** | **p-value** | **$\chi^2$ Test Statistic** | **p-value** | **$\chi^2$ Test Statistic** | **p-value** |
| Panel A: Skewness and Kurtosis | | | | | | | |
| Skewness-Kurtosis Test | 225 | 1.99 | [0.37] | 3.49 | [0.17] | 14.20 | [0.00] |
| No Skewness | 225 | | [0.16] | | [0.21] | | [0.00] |
| No Kurtosis | 225 | | [0.85] | | [0.17] | | [0.29] |
| Panel B: Shapiro-Wilk Test | | | | | | | |
| Shapiro-Wilk Test | 225 | 0.49 | [0.31] | 1.47 | [0.07] | 3.88 | [0.00] |

**Table 2. Empirical model of multiples.** Gibbs sampling estimation of the following empirical model of multiples:

$$X_{ij} = \frac{1}{M_i} V_{ij} + e_{ij} \qquad E\left[e_{ij}^2\right] = \sigma_i^2 V_{ij}^{2\lambda}$$

The parameter estimates and standard errors are calculated using data on EBITDA, EBIT, and revenue. Panel A shows parameter estimates and standard errors for the industry multiple *M*. Parameter estimates and standard errors for the common variance parameter $\lambda$ are shown in panel B. The sample includes only those S&P 500 industry groups that contain at least seven firms.

| | *EBITDA* | | *EBIT* | | *Revenue* | |
|---|---|---|---|---|---|---|
| **Industry** | **Mean** | **SE** | **Mean** | **SE** | **Mean** | **SE** |
| | | | Panel A: Industry Multiple *M* | | | |
| Auto Parts & Equipment | 6.5 | 0.82 | 9.0 | 0.78 | 0.8 | 0.14 |
| Banks (Major Regional) | 5.8 | 0.31 | 6.8 | 0.42 | 1.7 | 0.09 |
| Chemicals | 6.2 | 0.76 | 8.9 | 1.44 | 1.4 | 0.13 |
| Chemicals (Specialty) | 10.6 | 1.25 | 14.0 | 1.80 | 2.3 | 0.30 |
| Communication Equipment | 10.6 | 2.16 | 14.6 | 1.99 | 1.7 | 0.54 |
| Computers (Hardware) | 8.7 | 1.27 | 14.8 | 14.60 | 0.8 | 0.15 |
| Computers Software/Services | 11.8 | 2.58 | 17.7 | 2.92 | 2.4 | 23.07 |
| Electric Companies | 6.5 | 0.27 | 9.3 | 0.41 | 2.3 | 0.15 |
| Electrical Equipment | 9.9 | 1.72 | 14.9 | 2.81 | 1.6 | 0.54 |
| Foods | 9.7 | 0.57 | 12.4 | 0.57 | 1.3 | 0.94 |
| Gold/Precious Metals Mining | 19.0 | 6.21 | 65.3 | 726.44 | 4.9 | 0.95 |
| Health Care (Diversified) | 10.9 | 1.17 | 13.9 | 0.93 | 2.5 | 0.47 |
| Health Care (Med Prods/Sups) | 11.4 | 1.55 | 15.7 | 1.48 | 2.7 | 0.72 |
| Iron & Steel | 6.1 | 1.39 | 9.5 | 1.96 | 0.7 | 2.40 |
| Machinery (Diversified) | 6.9 | 0.75 | 9.3 | 0.54 | 0.9 | 0.14 |
| Manufacturing (Diversified) | 6.5 | 0.80 | 9.3 | 1.56 | 0.9 | 0.16 |
| Natural Gas | 7.7 | 0.49 | 13.1 | 1.33 | 1.4 | 0.15 |
| Oil & Gas (Drilling & Equip) | 10.3 | 1.39 | 24.7 | 37.39 | 1.5 | 0.46 |
| Oil (Domestic Integrated) | 6.8 | 0.84 | 15.5 | 8.71 | 1.2 | 0.19 |
| Paper and Forest Products | 4.6 | 0.31 | 6.6 | 0.61 | 0.9 | 0.08 |
| Retail (Department Stores) | 7.8 | 0.40 | 10.7 | 0.58 | 0.9 | 0.11 |
| Telephone | 6.7 | 0.26 | 12.0 | 0.37 | 2.8 | 0.15 |
| | | | Panel B: Variance Parameter $\lambda$ | | | |
| $\lambda$ | 0.99 | 0.12 | 0.88 | 0.12 | 0.99 | 0.18 |

**Table 3. Multiple measurement.** EBITDA multiples for the S&P 500 in 1995. The first column shows the number of firms in each industry group. The next four columns show the arithmetic mean, harmonic mean, value-weighted mean, and median of total firm value to EBITDA. The sixth column reports the range of the four multiples as a percentage of the minimum multiple. The sample includes only those S&P 500 industry groups that contain at least seven firms.

| | | *EBITDA Valuation Multiples* | | | | |
|---|---|---|---|---|---|---|
| **Industry** | **N** | **Mean** | **Harmonic Mean** | **Value Weighted Mean** | **Median** | **Range (%)** |
| Auto Parts & Equipment | 8 | 7.0 | 6.5 | 6.0 | 6.7 | 16.73 |
| Banks (Major Regional) | 21 | 6.2 | 5.8 | 5.7 | 6.0 | 7.44 |
| Chemicals | 8 | 6.5 | 6.1 | 6.1 | 6.5 | 7.43 |
| Chemicals (Specialty) | 7 | 11.0 | 10.4 | 11.3 | 10.1 | 12.38 |
| Communication Equipment | 8 | 11.9 | 10.3 | 8.8 | 11.6 | 35.35 |
| Computers (Hardware) | 12 | 12.0 | 8.6 | 7.0 | 7.7 | 71.46 |
| Computers Software/Services | 7 | 13.0 | 11.2 | 16.4 | 11.2 | 45.80 |
| Electric Companies | 26 | 6.7 | 6.4 | 6.5 | 6.8 | 4.77 |
| Electrical Equipment | 9 | 11.1 | 9.5 | 14.7 | 8.4 | 74.27 |
| Foods | 11 | 10.0 | 9.6 | 9.5 | 9.3 | 7.24 |
| Gold/Precious Metals Mining | 7 | 23.2 | 17.7 | 19.9 | 16.9 | 37.83 |
| Health Care (Diversified) | 7 | 11.1 | 10.8 | 11.8 | 11.6 | 9.66 |
| Health Care (Med Prods/Sups) | 10 | 12.6 | 11.2 | 13.0 | 11.6 | 16.12 |
| Iron & Steel | 7 | 6.9 | 5.8 | 5.8 | 6.2 | 17.73 |
| Machinery (Diversified) | 10 | 7.2 | 6.8 | 7.3 | 7.6 | 11.70 |
| Manufacturing (Diversified) | 13 | 7.1 | 6.4 | 7.3 | 7.3 | 15.29 |
| Natural Gas | 14 | 8.1 | 7.6 | 8.3 | 7.2 | 14.77 |
| Oil & Gas (Drilling & Equip) | 7 | 11.3 | 10.1 | 10.5 | 9.2 | 22.20 |
| Oil (Domestic Integrated) | 7 | 7.2 | 6.7 | 6.5 | 6.6 | 10.99 |
| Paper and Forest Products | 11 | 4.8 | 4.6 | 4.6 | 4.9 | 7.39 |
| Retail (Department Stores) | 7 | 7.8 | 7.7 | 8.0 | 8.0 | 3.62 |
| Telephone | 8 | 6.8 | 6.7 | 6.8 | 6.7 | 1.89 |
| Average | | 9.5 | 8.5 | 9.2 | 8.6 | 20.55 |
| Minimum | | 4.8 | 4.6 | 4.6 | 4.9 | 1.89 |
| Maximum | | 23.2 | 17.7 | 19.9 | 16.9 | 74.27 |

**Table 4. Evaluating simple multiples.** EBITDA multiple errors as a percentage of the minimum variance multiple. The first column shows the minimum variance multiple estimated with Gibbs sampling. The next four columns show the arithmetic mean, harmonic mean, value-weighted mean, and median multiple errors. The multiple error is defined as the absolute difference between the multiple estimate and the minimum variance multiple expressed as a percentage of the minimum variance multiple. The sample includes only those S&P 500 industry groups that contain at least seven firms.

| | | | *EBITDA Multiple Errors (%)* | | | |
|---|---|---|---|---|---|---|
| **Industry** | **N** | **Minimum Variance Multiple** | **Mean** | **Harmonic Mean** | **Value Weighted Mean** | **Median** |
| Auto Parts & Equipment | 8 | 6.5 | 6.25 | -1.43 | -8.98 | 2.40 |
| Banks (Major Regional) | 21 | 5.8 | 6.17 | -0.13 | -1.18 | 3.75 |
| Chemicals | 8 | 6.2 | 5.25 | -1.14 | -1.39 | 5.94 |
| Chemicals (Specialty) | 7 | 10.6 | 3.57 | -1.95 | 6.61 | -5.14 |
| Communication Equipment | 8 | 10.6 | 12.43 | -2.58 | -16.93 | 9.49 |
| Computers (Hardware) | 12 | 8.7 | 38.81 | -1.35 | -19.04 | -11.14 |
| Computers Software/Services | 7 | 11.8 | 10.26 | -5.06 | 38.25 | -5.18 |
| Electric Companies | 26 | 6.5 | 3.04 | -0.24 | 0.78 | 4.52 |
| Electrical Equipment | 9 | 9.9 | 12.56 | -4.16 | 48.87 | -14.58 |
| Foods | 11 | 9.7 | 2.94 | -0.56 | -1.94 | -4.02 |
| Gold/Precious Metals Mining | 7 | 19.0 | 22.13 | -6.96 | 4.38 | -11.39 |
| Health Care (Diversified) | 7 | 10.9 | 1.33 | -1.25 | 8.29 | 5.98 |
| Health Care (Med Prods/Sups) | 10 | 11.4 | 10.17 | -2.05 | 13.73 | 2.00 |
| Iron & Steel | 7 | 6.1 | 12.78 | -4.04 | -4.20 | 0.99 |
| Machinery (Diversified) | 10 | 6.9 | 4.71 | -1.14 | 5.71 | 10.43 |
| Manufacturing (Diversified) | 13 | 6.5 | 8.81 | -1.67 | 12.34 | 13.36 |
| Natural Gas | 14 | 7.7 | 5.25 | -0.60 | 7.54 | -6.30 |
| Oil & Gas (Drilling & Equip) | 7 | 10.3 | 9.92 | -1.83 | 1.66 | -10.05 |
| Oil (Domestic Integrated) | 7 | 6.8 | 5.83 | -1.70 | -4.65 | -3.80 |
| Paper and Forest Products | 11 | 4.6 | 3.16 | -0.38 | 0.24 | 6.98 |
| Retail (Department Stores) | 7 | 7.8 | 0.53 | -0.40 | 3.20 | 3.20 |
| Telephone | 8 | 6.7 | 0.71 | -0.22 | 1.10 | -0.77 |
| Mean Error | | | 8.48 | -1.86 | 4.29 | -0.15 |
| Minimum | | | 0.53 | -6.96 | -19.04 | -14.58 |
| Maximum | | | 38.81 | -0.13 | 48.87 | 13.36 |

**Table 5. Accuracy of the harmonic mean multiple.** Gibbs sampling estimates of the mean and dispersion of the harmonic mean multiple, using EBITDA, EBIT, and revenue. The first column shows the number of firms in each industry group. The next three sets of columns show the harmonic mean multiple and the standard deviation of the industry yields expressed as a percentage of average industry yield. The final column reports the best basis of substitutability for each industry using standard deviation as a criterion. The sample includes only those S&P 500 industry groups that contain at least seven firms.

| | | *EBITDA* | | *EBIT* | | *Revenue* | | |
|---|---|---|---|---|---|---|---|---|
| **Industry** | **N** | **Harmonic Mean** | **Yield Standard Deviation (%)** | **Harmonic Mean** | **Yield Standard Deviation (%)** | **Harmonic Mean** | **Yield Standard Deviation (%)** | **Best Basis** |
| Auto Parts & Equipment | 8 | 6.5 | 29.42 | 9.1 | 18.87 | 0.8 | 38.09 | EBIT |
| Banks (Major Regional) | 21 | 5.8 | 23.81 | 6.8 | 26.09 | 1.7 | 24.07 | EBITDA |
| Chemicals | 8 | 6.1 | 26.56 | 8.7 | 34.33 | 1.4 | 22.85 | Revenue |
| Chemicals (Specialty) | 7 | 10.4 | 24.33 | 13.6 | 26.52 | 2.2 | 26.66 | EBITDA |
| Communication Equipment | 8 | 10.3 | 40.81 | 14.6 | 32.79 | 1.6 | 58.92 | EBIT |
| Computers (Hardware) | 12 | 8.6 | 41.85 | 16.1 | 112.19 | 0.7 | 41.46 | Revenue |
| Computers Software/Services | 7 | 11.2 | 37.26 | 16.4 | 30.28 | 1.6 | 119.64 | EBIT |
| Electric Companies | 26 | 6.4 | 19.74 | 9.3 | 21.46 | 2.3 | 30.75 | EBITDA |
| Electrical Equipment | 9 | 9.5 | 32.49 | 13.3 | 33.82 | 1.4 | 35.73 | EBITDA |
| Foods | 11 | 9.6 | 17.09 | 12.4 | 13.99 | 1.3 | 57.61 | EBIT |
| Gold/Precious Metals Mining | 7 | 17.7 | 50.05 | 64.6 | 161.40 | 4.7 | 37.10 | Revenue |
| Health Care (Diversified) | 7 | 10.8 | 19.24 | 13.6 | 14.98 | 2.5 | 31.19 | EBIT |
| Health Care (Med Prods/Sups) | 10 | 11.2 | 33.64 | 15.1 | 23.38 | 2.5 | 52.35 | EBIT |
| Iron & Steel | 7 | 5.8 | 39.74 | 9.2 | 35.22 | 0.7 | 42.95 | EBIT |
| Machinery (Diversified) | 10 | 6.8 | 28.39 | 9.2 | 19.22 | 0.9 | 35.22 | EBIT |
| Manufacturing (Diversified) | 13 | 6.4 | 38.27 | 8.7 | 47.94 | 0.8 | 48.46 | EBITDA |
| Natural Gas | 14 | 7.6 | 20.98 | 12.7 | 33.61 | 1.3 | 34.00 | EBITDA |
| Oil & Gas (Drilling & Equip) | 7 | 10.1 | 29.31 | 22.9 | 72.12 | 1.4 | 45.07 | EBITDA |
| Oil (Domestic Integrated) | 7 | 6.7 | 24.55 | 15.1 | 59.05 | 1.2 | 30.35 | EBITDA |
| Paper and Forest Products | 11 | 4.6 | 19.85 | 6.6 | 28.18 | 0.9 | 24.90 | EBITDA |
| Retail (Department Stores) | 7 | 7.7 | 10.72 | 10.7 | 12.52 | 0.9 | 24.42 | EBITDA |
| Telephone | 8 | 6.7 | 10.43 | 11.9 | 7.63 | 2.8 | 11.57 | EBIT |

# Exhibit 94



DYNAMIC ASSET

PRICING THEORY

THIRD EDITION

DARRELL DUFFIE

# Dynamic Asset Pricing Theory

THIRD EDITION

**Darrell Duffie**

**Princeton University Press**
**Princeton and Oxford**

Copyright © 2001 by Princeton University Press

Published by Princeton University Press, 41 William Street, Princeton, New Jersey 08540

In the United Kingdom: Princeton University Press, 3 Market Place, Woodstock, Oxfordshire OX20 1SY

All Rights Reserved

**Library of Congress Cataloging-in-Publication Data**

Duffie, Darrell.

Dynamic asset pricing theory / Darrell Duffie.—3rd ed. p. cm.

Includes bibliographical references and index.

ISBN 0-691-09022-X (alk. paper)

1. Capital assets pricing model. 2. Portfolio management 3. Uncertainty. I. Title.

HG4637.D84 2001

332.6—dc21 2001021235

British Library Cataloging-in-Publication Data is available

This book has been composed in New Baskerville

Printed on acid-free paper ∞

www.pup.princeton.edu

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

# 2

## The Basic Multiperiod Model

THIS CHAPTER EXTENDS the results of Chapter 1 on arbitrage, optimality, and equilibrium to a multiperiod setting. A connection is drawn between state prices and martingales for the purpose of representing security prices. The exercises include the consumption-based capital asset pricing model and the multiperiod "binomial" option pricing model.

### A. Uncertainty

As in Chapter 1, there is some finite set, say $\Omega$, of states. In order to handle multiperiod issues, however, we will treat uncertainty a bit more formally as a *probability space* $(\Omega, \mathcal{F}, P)$, with $\mathcal{F}$ denoting the *tribe* of subsets of $\Omega$ that are *events* (and can therefore be assigned a probability), and with $P$ a *probability measure* assigning to any event $B$ in $\mathcal{F}$ its probability $P(B)$. Those not familiar with the definition of a probability space can consult Appendix A. The terms "$\sigma$-algebra" and "$\sigma$-field," among others, are often used in place of the word "tribe."

There are $T + 1$ dates: $0, 1, \ldots, T$. At each of these, a tribe $\mathcal{F}_t \subset \mathcal{F}$ denotes the set of events corresponding to the information available at time $t$. In effect, an event $B$ in $\mathcal{F}_t$ is known at time $t$ to be true or false. (A definition of tribes in terms of "partitions" of $\Omega$ is given in Exercise 2.11.) We adopt the usual convention that $\mathcal{F}_t \subset \mathcal{F}_s$ whenever $t \leq s$, meaning that events are never "forgotten." For simplicity, we also take it that every event in $\mathcal{F}_0$ has probability 0 or 1, meaning roughly that there is no information at time $t = 0$. Taken altogether, the *filtration* $\mathbb{F} = \{\mathcal{F}_0, \ldots, \mathcal{F}_T\}$ represents how information is revealed through time. For any random variable $Y$, we let $E_t(Y) = E(Y \mid \mathcal{F}_t)$ denote the conditional expectation of $Y$ given $\mathcal{F}_t$. (Appendix A provides definitions of random variables and of conditional expectation.) An *adapted process* is a sequence $X = \{X_0, \ldots, X_T\}$ such that for each $t$, $X_t$ is a random variable with respect to $(\Omega, \mathcal{F}_t)$. Informally, this means that $X_t$ is observable at time $t$. An adapted process $X$ is a *martingale* if, for any times $t$ and $s > t$, we have $E_t(X_s) = X_t$. As we shall see, martingales are useful in the characterization of security prices. In order to simplify things, for any two random variables $Y$ and $Z$, we always write "$Y = Z$" if the probability that $Y \neq Z$ is zero.

### B. Security Markets

A security is a claim to an adapted *dividend process*, say $\delta$, with $\delta_t$ denoting the dividend paid by the security at time $t$. Each security has an adapted *security-price process* $S$, so that $S_t$ is the price of the security, *ex dividend*, at time $t$. That is, at each time $t$, the security pays its dividend $\delta_t$ and is then available for trade at the price $S_t$. This convention implies that $\delta_0$ plays no role in determining ex-dividend prices. The *cum-dividend* security price at time $t$ is $S_t + \delta_t$.

Suppose there are $N$ securities defined by the $\mathbb{R}^N$-valued adapted dividend process $\delta = (\delta^{(1)}, \ldots, \delta^{(N)})$. These securities have some adapted price process $S = (S^{(1)}, \ldots, S^{(N)})$. A *trading strategy* is an adapted process

$\theta$ in $\mathbb{R}^N$. Here, $\theta_t = (\theta_t^{(1)}, \ldots, \theta_t^{(N)})$ represents the portfolio held after trading at time $t$. The dividend process $\delta^\theta$ *generated* by a trading strategy $\theta$ is defined by

$$\delta_t^\theta = \theta_{t-1} \cdot (S_t + \delta_t) - \theta_t \cdot S_t,$$

(1)

with "$\theta_{-1}$" taken to be zero by convention.

## C. Arbitrage, State Prices, and Martingales

Given a dividend-price pair $(\delta, S)$ for $N$ securities, a trading strategy $\theta$ is an *arbitrage* if $\delta^\theta > 0$. (The reader should become convinced that this is the same notion of arbitrage defined in Chapter 1.) Let $\Theta$ denote the space of trading strategies. For any $\theta$ and $\varphi$ in $\Theta$ and scalars $a$ and $b$, we have $a\delta^\theta + b\delta^\varphi = \delta^{a\theta+b\varphi}$. Thus the *marketed subspace* $M = \{\delta^\theta : \theta \in \Theta\}$ of dividend processes generated by trading strategies is a linear subspace of the space $L$ of adapted processes.

*Proposition. There is no arbitrage if and only if there is a strictly increasing linear function $F : L \to \mathbb{R}$ such that $F(\delta^\theta) = 0$ for any trading strategy $\theta$.*

*Proof:* The proof is almost identical to that of Theorem 1A. Let $L_+ = \{c \in L : c \geq 0\}$. There is no arbitrage if and only if the cone $L_+$ and the marketed subspace $M$ intersect precisely at zero. Suppose there is no arbitrage. The Separating Hyperplane Theorem, in a form given in Appendix B for cones, implies the existence of a nonzero linear functional $F$ such that $F(x) < F(y)$ for each $x$ in $M$ and each nonzero $y$ in $L_+$. Since $M$ is a linear subspace, this implies that $F(x) = 0$ for each $x$ in $M$, and thus that $F(y) > 0$ for each nonzero $y$ in $L_+$. This implies that $F$ is strictly increasing. The converse is immediate.

The following result gives a convenient *Riesz representation* of a linear function on the space of adapted processes. Proof is left as an exercise, extending the single-period Riesz representation lemma of Section 1F.

*Lemma. For each linear function $F : L \to \mathbb{R}$, there is a unique $\pi$ in $L$, called the Riesz representation of $F$, such that*

$$F(x) = E\left(\sum_{t=0}^{T} \pi_t x_t\right), \qquad x \in L.$$

*If $F$ is strictly increasing, then $\pi$ is strictly positive.*

For convenience, we call any strictly positive adapted process a *deflator*. A deflator $\pi$ is a *state-price deflator* if, for all $t$,

$$S_t = \frac{1}{\pi_t} E_t\left(\sum_{j=t+1}^{T} \pi_j \delta_j\right).$$

(2)

A state-price deflator is variously known in the literature as a *state-price density*, a *pricing kernel*, and a *marginal-rate-of-substitution process.*

For $t = T$, the right-hand side of (2) is zero, so $S_T = 0$ whenever there is a state-price deflator. The notion here of a state-price deflator is a natural extension of that of Chapter 1. It can be shown as an exercise that a deflator $\pi$ is a state-price deflator if and only if, for any trading strategy $\theta$,

$$\theta_t \cdot S_t = \frac{1}{\pi_t} E_t\left(\sum_{j=t+1}^{T} \pi_j \delta_j^\theta\right), \qquad t < T,$$

(3)

meaning roughly that the market value of a trading

strategy is, at any time, the state-price discounted expected future dividends generated by the strategy. The *cum-dividend* value process $V^\theta$ of a trading strategy $\theta$ is defined by $V_t^\theta = \theta_{t-1} \cdot (S_t + \delta_t)$. If $\pi$ is a state-price deflator, we have

$$V_t^\theta = \frac{1}{\pi_t} E_t\left(\sum_{j=t}^{T} \pi_j \delta_j^\theta\right).$$

The *gain process* $G$ for $(\delta, S)$ is defined by $G_t = S_t + \sum_{j=1}^{t} \delta_j$, the price plus accumulated dividend. Given a deflator $\gamma$, the *deflated gain process* $G^\gamma$ is defined by $G_t^\gamma = \gamma_t S_t + \sum_{j=1}^{t} \gamma_j \delta_j$. We can think of deflation as a change of numeraire.

*Theorem. The dividend-price pair $(\delta, S)$ admits no arbitrage if and only if there is a state-price deflator. A deflator $\pi$ is a state-price deflator if and only if $S_T = 0$ and the state-price-deflated gain process $G^\pi$ is a martingale.*

*Proof:* It can be shown as an easy exercise that a deflator $\pi$ is a state-price deflator if and only if $S_T = 0$ and the state-price-deflated gain process $G^\pi$ is a martingale.

Suppose there is no arbitrage. Then $S_T = 0$, for otherwise the strategy $\theta$ is an arbitrage when defined by $\theta_t = 0, t < T, \theta_T = -S_T$. The previous proposition implies that there is some strictly increasing linear function $F : L \to \mathbb{R}$ such that $F(\delta^\theta) = 0$ for any strateg $\theta$. By the previous lemma, there is some deflator $\pi$ such that $F(x) = E(\sum_{t=0}^{T} x_t \pi_t)$ for all $x$ in $L$. This implies that $E(\sum_{t=0}^{T} \delta_t^\theta \pi_t) = 0$ for any strategy $\theta$.

We must prove (2), or equivalently, that $G^\pi$ is a martingale. From Appendix A, an adapted process $X$ is a martingale if and only if $E(X_\tau) = X_0$ for any stopping time $\tau \le T$. Consider, for an arbitrary security $n$ and an arbitrary stopping time $\tau \le T$, the trading strategy $\theta$ defined by $\theta^{(k)} = 0$ for $k \neq n$ and $\theta_t^{(n)} = 1, t < \tau$, with $\theta_t^{(n)} = 0, t \ge \tau$. Since $E(\sum_{t=0}^{T} \pi_t \delta_t^\theta) = 0$, we have

$$E\left(-S_0^{(n)} \pi_0 + \sum_{t=1}^{\tau} \pi_t \delta_t^{(n)} + \pi_\tau S_\tau^{(n)}\right) = 0,$$

implying that the deflated gain process $G^{n\pi}$ of security $n$ satisfies $G_0^{n,\pi} = E(G_\tau^{n,\pi})$. Since $\tau$ is arbitrary, $G^{n,\pi}$ is a martingale, and since $n$ is arbitrary, $G^\pi$ is a martingale.

This shows that absence of arbitrage implies the existence of a state-price deflator. The converse is easy.

## D. Individual Agent Optimality

We introduce an agent, defined by a strictly increasing utility function $U$ on the set $L_+$ of nonnegative adapted "consumption" processes, and by an *endowment process* $e$ in $L_+$. Given a dividend-price process $(\delta, S)$, a trading strategy $\theta$ leaves the agent with the total consumption process $e + \delta^\theta$. Thus the agent has the *budget-feasible consumption set*

$$X = \{e + \delta^\theta \in L_+ : \theta \in \Theta\},$$

and the problem

$$\sup_{c \in X} U(c).$$

(4)

The existence of a solution to (4) implies the absence of arbitrage. Conversely, it can be shown as an exercise that if $U$ is continuous, then the absence of arbitrage implies that there exists a solution to (4). For purposes of checking continuity or the closedness of sets in $L$, we will say that $c_n$ converges to $c$ if $E[\sum_{t=0}^{T} |c_n(t) - c(t)|] \to 0$. Then $U$ is continuous if $U(c_n) \to U(c)$ whenever $c_n \to c$.

Suppose that (4) has a strictly positive solution $c^*$ and that $U$ is continuously differentiable at $c^*$. We can use the first-order conditions for optimality (which can be reviewed in Appendix B) to characterize security prices in terms of the derivatives of the utility function $U$ at $c^*$. Specifically, for any $c$ in $L$, the derivative of $U$ at $c^*$ in the direction $c$ is the derivative $g'(0)$, where $g(\alpha) = U(c^* + \alpha c)$ for any scalar $\alpha$ sufficiently small in absolute value. That is, $g'(0)$ is the marginal rate of improvement of utility as one moves in the direction $c$ away from $c^*$. This derivative is denoted $\nabla U(c^*; c)$. Because $U$ is continuously differentiable at $c^*$, the function $c \to \nabla U(c^*; c)$, on $L$ into $\mathbb{R}$, is linear. Since $\delta^\theta$ is a budget-feasible direction of change for any trading strategy $\theta$, the first-order conditions for optimality of $c^*$ imply that

$$\nabla U(c^*; \delta^\theta) = 0, \qquad \theta \in \Theta.$$

We now have a characterization of a state-price deflator.

*Proposition. Suppose that (4) has a strictly positive solution $c^*$ and that $U$ has a strictly positive continuous derivative at $c^*$. Then there is no arbitrage and a state-price deflator is given by the Riesz representation $\pi$ of $\nabla U(c^*)$:*

$$\nabla U(c^*; x) = E\left(\sum_{t=0}^{T} \pi_t x_t\right), \qquad x \in L.$$

Despite our standing assumption that $U$ is strictly increasing, $\nabla U(c^*;\cdot)$ need not in general be strictly increasing, but is so if $U$ is concave.

As an example, suppose $U$ has the *additive* form

$$U(c) = E\left[\sum_{t=0}^{T} u_t(c_t)\right], \qquad c \in L_+,$$

(5)

for some $u_t : \mathbb{R}_+ \to \mathbb{R}$, $t \geq 0$. It is an exercise to show that if $\nabla U(c)$ exists, then

$$\nabla U(c; x) = E\left[\sum_{t=0}^{T} u_t'(c_t) x_t\right].$$

(6)

If, for all $t$, $u_t$ is concave with an unbounded derivative and $e$ is strictly positive, then any solution $c^*$ to (4) is strictly positive.

*Corollary. Suppose $U$ is defined by (5). Under the conditions of the proposition, for any times $t$ and $\tau \geq t$,*

$$S_t = \frac{1}{u_t'(c_t^*)} E_t\left[S_\tau u_\tau'(c_\tau^*) + \sum_{j=t+1}^{\tau} \delta_j u_j'(c_j^*)\right].$$

For the case $\tau = t + 1$, this result is often called the *stochastic Euler equation*. Extending this classical result for additive utility, the exercises include other utility examples such as *habit-formation* utility and *recursive* utility. As in Chapter 1, we now turn to the multi-agent case.

## E. Equilibrium and Pareto Optimality

Suppose there are $m$ agents. Agent $i$ is defined as above by a strictly increasing utility function $U_i : L_+ \to \mathbb{R}$ and an endowment process $e^{(i)}$ in $L_+$. Given a dividend process $\delta$ for $N$ securities, an *equilibrium* is a collection $(\theta^{(1)}, \ldots, \theta^{(m)}, S)$, where $S$ is a security-price process and, for each $i$, $\theta^{(i)}$ is a trading strategy solving

$$\sup_{\theta \in \Theta} U_i(c) \text{ subject to } c = e^{(i)} + \delta^\theta \in L_+,$$

(7)

with $\sum_{i=1}^{m} \theta^{(i)} = 0$.

We define markets to be *complete* if, for each process

$x$ in $L$, there is some trading strategy $\theta$ with $\delta_t^\theta = x_t$, $t \geq 1$. Complete markets thus means that any consumption process $x$ can be obtained by investing some amount at time 0 in a trading strategy that generates the dividend $x_t$ in each future period $t$. With the same definition of Pareto optimality, Proposition 1D carries over to this multiperiod setting. Any equilibrium $(\theta^{(1)}, \ldots, \theta^{(m)}, S)$ has an associated feasible consumption allocation $(c^{(1)}, \ldots, c^{(m)})$ defined by letting $c^{(i)} - e^{(i)}$ be the dividend process generated by $\theta^{(i)}$.

*Proposition. Suppose $(\theta^{(1)}, \ldots, \theta^{(m)}, S)$ is an equilibrium and markets are complete. Then the associated consumption allocation is Pareto optimal.*

The completeness of markets depends on the security-price process $S$ itself. Indeed, the dependence of the marketed subspace on $S$ makes the existence of an equilibrium a nontrivial issue. We ignore existence here and refer to the Notes for some relevant sources.

## F. Equilibrium Asset Pricing

Again following the ideas in Chapter 1, we define for each $\lambda$ in $\mathbb{R}^m_+$ the utility function $U_\lambda : L_+ \to \mathbb{R}$ by

$$U_\lambda(x) = \sup_{(c^{(1)}, \ldots, c^{(m)})} \sum_{i=1}^{m} \lambda_i U_i(c^i) \qquad \text{subject to } c^{(1)} + \cdots + c^{(m)} \leq x.$$

(8)

*Proposition. Suppose for all $i$ that $U_i$ is concave and strictly increasing. Suppose that $(\theta^{(1)}, \ldots, \theta^{(m)}, S)$ is an equilibrium and that markets are complete. Then there exists some nonzero $\lambda \in \mathbb{R}^m_+$ such that $(0, S)$ is a (no-trade) equilibrium for the one-agent economy $[(U_\lambda, e), \delta]$, where $e = e^{(1)} + \ldots + e^{(m)}$. With this $\lambda$ and with $x = e = e^{(1)} + \ldots + e^{(m)}$, problem (8) is solved by the equilibrium consumption allocation.*

Proof is assigned as an exercise. The result is essentially the same as Proposition 1E. A method of proof, as well as the intuition for this proposition, is that with complete markets, a state-price deflator $\pi$ represents Lagrange multipliers for consumption in the various periods and states for all of the agents simultaneously, as well as for the *representative agent* $(U_\lambda, e)$.

*Corollary 1. If, moreover, $U_\lambda$ is differentiable at $e$, then $\lambda$ can be chosen so that for any times $t$ and $\tau \geq t$, there is a state-price deflator $\pi$ equal to the Riesz representation of $\nabla U_\lambda(e)$.*

Differentiability of $U_\lambda$ at $e$ can be shown by the arguments used in Exercise 1.10.

*Corollary 2. Suppose for each $i$ that $U_i$ is of the additive form*

$$U_i(c) = E\left[\sum_{t=0}^{T} u_{it}(c_t)\right].$$

*Then $U_\lambda$ is also additive, with*

$$U_\lambda(c) = E\left[\sum_{t=0}^{T} u_{\lambda t}(c_t)\right],$$

*where*

$$u_{\lambda t}(y) = \sup_{x \in \mathbb{R}^m_+} \sum_{i=1}^{m} \lambda_i u_{it}(x_i) \qquad \textit{subject to } x_1 + \cdots + x_m \leq y.$$

*In this case, the differentiability of $U_\lambda$ at $e$ implies that for any times $t$ and $\tau \geq t$,*

$$S_t = \frac{1}{u'_{\lambda t}(e_t)} E_t\left[u'_{\lambda\tau}(e_\tau) S_\tau + \sum_{j=t+1}^{\tau} u'_{\lambda j}(e_j)\delta_j\right].$$

(9)

## G. Arbitrage and Martingale Measures

This section shows the equivalence between the absence of arbitrage and the existence of a probability measure $Q$ with the property, roughly speaking, that the price of a security is the sum of $Q$-expected discounted dividends.

There is *short-term riskless borrowing* if, for each given time $t < T$, there is a security trading strategy $\theta$ with $\delta^{\theta}_{t+1} = 1$ and with $\delta^{\theta}_{s} \theta = 0$ for $s < t$ and $s > t + 1$. The associated *discount* is $d_t = \theta_t \cdot S_t$. If there is no arbitrage, the discount $d_t$ is uniquely defined and strictly positive, and we may define the associated *short rate* $r_t$ by $1 + r_t = 1/d_t$. This means that at any time $t < T$, one may invest one unit of account in order to receive $1 + r_t$ units of account at time $t + 1$. We refer to $\{r_0, r_1, \ldots, r_{T-1}\}$ as the associated "short-rate process," even though $r_T$ is not defined.

We suppose throughout this section that there is short-term riskless borrowing at some uniquely defined short-rate process $r$. We can define, for any times $t$ and $\tau \le T$,

$$R_{t,\tau} = (1 + r_t)(1 + r_{t+1}) \cdots (1 + r_{\tau-1}),$$

the payback at time $\tau$ of one unit of account borrowed risklessly at time $t$ and "rolled over" in short-term borrowing repeatedly until date $\tau$.

It would be a simple situation, both computationally and conceptually, if any security's price were merely the expected discounted dividends of the security. Of course, this is unlikely to be the case in a market with risk-averse investors. We can nevertheless come close to this sort of characterization of security prices by adjusting the original probability measure $P$. For this, we define a new probability measure $Q$ to be *equivalent* to $P$ if $Q$ and $P$ assign zero probabilities to the same events. An equivalent probability measure $Q$ is an *equivalent martingale measure* if

$$S_t = E^Q_t\left(\sum_{j=t+1}^{T} \frac{\delta_j}{R_{t,j}}\right), \qquad t < T,$$

where $E^Q$ denotes expectation under $Q$, and likewise $E^Q_t(x) = E^Q(x|\mathcal{F}_t)$ for any random variable $x$. An equivalent martingale measure is often called a *risk-neutral measure.*

It is easy to show that $Q$ is an equivalent martingale measure if and only if, for any trading strategy $\theta$,

$$\theta_t \cdot S_t = E^Q_t\left(\sum_{j=t+1}^{T} \frac{\delta^{\theta}_j}{R_{t,j}}\right), \qquad t < T.$$

(10)

If interest rates are deterministic, (10) is merely the total discounted expected dividends, after substituting $Q$ for the original measure $P$. We will show that the absence of arbitrage is equivalent to the existence of an equivalent martingale measure.

The deflator $\gamma$ defined by $\gamma_t R^{-1}_{0,t}$ defines the discounted gain process, $G^{\gamma}$. The word "martingale" in the term "equivalent martingale measure" comes from the following equivalence.

*Lemma. A probability measure $Q$ equivalent to $P$ is an equivalent martingale measure for $(\delta, S)$ if and only if $S_T = 0$ and the discounted gain process $G^{\gamma}$ is a martingale with respect to $Q$.*

We already know from Theorem C that the absence

of arbitrage is equivalent to the existence of a state-price deflator $\pi$. As explained in Appendix A, a probability measure $Q$ equivalent to $P$ can be defined in terms of a Radon-Nikodym derivative, a strictly positive random variable $\frac{dQ}{dP}$ with $E(\frac{dQ}{dP}) = 1$, via the definition of expectation with respect to $Q$ given by $E_Q(Z) = E(\frac{dQ}{dP} Z)$, for any random variable $Z$. We will choose a particular equivalent probability measure $Q$ by the Radon-Nikodym derivative $\frac{dQ}{dP} = \xi_T$, where

$$\xi_T = \frac{\pi_T R_{0,T}}{\pi_0}.$$

(Indeed, one can check that $\xi_T$ is strictly positive and of expectation 1.) The *density process* $\xi$ for $Q$ is defined by $\xi_t = E_t(\xi_T)$. Relation (A.2) of Appendix A implies that for any times $t$ and $j > t$, and any $\mathcal{F}_j$-measurable random variable $Z_j$,

$$E_t^Q(Z_j) = \frac{1}{\xi_t} E_t(\xi_j Z_j).$$

(11)

Fixing some time $t < T$, consider a trading strategy $\theta$ that invests one unit of account at time $t$ and repeatedly rolls the value over in short-term riskless borrowing until time $T$, with final value $R_{t,T}$. That is, $\theta_t \cdot S_t = 1$ and $\delta_T^\theta = R_{t,T}$. Relation (3) then implies that

$$\pi_t = E_t(\pi_T R_{t,T}) = \frac{E_t(\pi_T R_{0,T})}{R_{0,t}} = \frac{E_t(\xi_T \pi_0)}{R_{0,t}} = \frac{\xi_t \pi_0}{R_{0,t}}.$$

(12)

From (11), (12), and the definition of a state-price deflator, (10) is satisfied, so $Q$ is indeed an equivalent martingale measure. We have shown the following result.

*Theorem. There is no arbitrage if and only if there exists an equivalent martingale measure. Moreover, $\pi$ is a state-price deflator if and only if an equivalent martingale measure $Q$ has the density process $\xi$ defined by $\xi_t = R_{0,t}\pi_t/\pi_0$.*

*Proposition. Suppose that $\mathcal{F}_T = \mathcal{F}$ and there is no arbitrage. Then markets are complete if and only if there is a unique equivalent martingale measure.*

*Proof:* Suppose that markets are complete and let $Q_1$ and $Q_2$ be two equivalent martingale measures. We must show that $Q_1 = Q_2$. Let $A$ be any event. Since markets are complete, there is a trading strategy $\theta$ with dividend process $\delta^\theta$ such that $\delta_T^\theta = R_{0,T}1_A$ and $\delta_t^\theta = 0$, $0 < t < T$. By (10), we have $\theta_0 \cdot S_0 = Q_1(A) = Q_2(A)$. Since $A$ is arbitrary, $Q_1 = Q_2$.

Exercise 2.18 outlines a proof of the converse part of the result. ∎

This martingale approach simplifies many asset pricing problems that might otherwise appear to be quite complex. This approach also applies much more generally than indicated here. For example, the assumption of short-term borrowing is merely a convenience. More generally, as elaborated in Chapter 6, one can typically obtain an equivalent martingale measure after normalizing prices and dividends by the price of some particular security (or trading strategy).

### H. Valuation of Redundant Securities

Suppose that the given dividend-price pair $(\delta, S)$ is arbitrage-free, with an associated state-price deflator $\pi$. Now consider the introduction of a new security with dividend process $\hat{\delta}$ and price process $\hat{S}$. We say that $\hat{\delta}$ is *redundant* given $(\delta, S)$ if there exists a trading strategy $\theta$, with respect to only the original security dividend-

# Exhibit 95

Journal of Accounting Research
Vol. 40 No. 1 March 2002
*Printed in U.S.A.*

# Equity Valuation Using Multiples

JING LIU,* DORON NISSIM,† AND JACOB THOMAS‡

Received 2 January 2000; accepted 27 July 2001

ABSTRACT

We examine the valuation performance of a comprehensive list of value drivers and find that multiples derived from forward earnings explain stock prices remarkably well: pricing errors are within 15 percent of stock prices for about half our sample. In terms of relative performance, the following general rankings are observed consistently each year: forward earnings measures are followed by historical earnings measures, cash flow measures and book value of equity are tied for third, and sales performs the worst. Curiously, performance declines when we consider more complex measures of intrinsic value based on short-cut residual income models. Contrary to the popular view that different industries have different "best" multiples, these overall rankings are observed consistently for almost all industries examined. Since we require analysts' earnings and growth forecasts and positive values for all measures, our results may not be representative of the many firm-years excluded from our sample.

## 1. *Introduction*

In this study we examine the proximity to stock prices of valuations generated by multiplying a value driver (such as earnings) by the corresponding multiple, where the multiple is obtained from the ratio of stock price to that value driver for a group of comparable firms. While multiples are used extensively in practice, there is little published research in the academic literature documenting the absolute and relative performance of different

* University of California at Los Angeles; † Columbia University; ‡ Columbia University. We thank Richard Leftwich and an anonymous referee for their many useful suggestions. We also received helpful comments from David Aboody, Sanjay Bhagat, Ted Christensen, Glen Hansen, Jack Hughes, Jim Ohlson, Stephen Penman, Phil Shane, Michael Williams, and seminar participants at the AAA Annual Meeting at Philadelphia, University of Colorado, Columbia University, Copenhagen Business School, Ohio State University, and UCLA.

Copyright ©, University of Chicago on behalf of the Institute of Professional Accounting, 2002

Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 128 of 251

multiples.[1] We seek to investigate the performance of a comprehensive list of multiples, and also examine a variety of related issues, such as the variation in performance across industries and over time and the performance improvement obtained by using alternative approaches to compute multiples.

Although the actual valuation process used by market participants is unobservable, we assume that stock prices can be replicated by comprehensive valuations that convert all available information into detailed projections of future flows. Given this efficient markets framework for traded stocks, what role do multiples play? Even in situations where market valuations are absent, either because the equity is privately-held or because the proposed publicly traded entity has not yet been created (e.g., mergers and spinoffs), is there a role for multiples vis-à-vis comprehensive valuations? While the multiple approach bypasses explicit projections and present value calculations, it relies on the same principles underlying the more comprehensive approach: value is an increasing function of future payoffs and a decreasing function of risk. Therefore, multiples are used often as a substitute for comprehensive valuations, because they communicate efficiently the essence of those valuations. Multiples are also used to complement comprehensive valuations, typically to calibrate those valuations and to obtain terminal values.[2]

In effect, our study documents the extent to which different value drivers serve as a summary statistic for the stream of expected payoffs, and comparable firms resemble the target firm along important value attributes, such as growth and risk. We first evaluate value drivers using the conventional ratio representation (i.e., price doubles when the value driver doubles). To identify the importance of incorporating the average effect of omitted variables, we extend the ratio representation to allow for an intercept in the price/value driver relation. To study the impact of selecting comparable firms from the same industry, we contrast our results obtained by using industry comparables (the middle category from the Sector/Industry/Group classification provided by IBES) with results obtained when all firms available each year are used as comparables. As in prior research, we evaluate performance by examining the distribution of pricing errors (actual price less predicted price, scaled by actual price).

The value drivers we consider include measures of historical cash flow, such as cash flow from operations and EBITDA (earnings before interest,

---

[1] Studies offering descriptive evidence include Boatsman and Baskin [1981], LeClair [1990], and Alford [1992]. Recently, a number of studies have examined the role of multiples for firm valuation in specific contexts, such as tax and bankruptcy court cases and initial public offerings (e.g., Beatty, Riffe, and Thompson [1999], Gilson, Hutchkiss, and Ruback [2000], Kim and Ritter [1999], and Tasker [1998]).

[2] Another very different role for multiples that has been examined in the literature is the identification of mispriced stocks. We do not investigate that role because we assume market efficiency. Two such market inefficiency studies are Basu [1977] and Stattman [1980], where portfolios derived from earnings and book value multiples are shown to earn abnormal returns.

taxes, depreciation, and amortization), and historical accrual-based measures, such as sales, earnings, and book value of equity. We also consider forward-looking measures derived from analysts' forecasts of EPS (earnings per share) and long-term growth in EPS, such as 2-year out consensus EPS forecasts and PEG (price-earnings-growth) ratios (e.g., Bradshaw [1999a; 1999b]). Since sales and EBITDA should properly be associated with enterprise value (debt plus equity), rather than equity alone, for those two value drivers we also consider multiples based on enterprise value (market value of equity plus book value of debt). Finally, we consider short-cut intrinsic value measures based on the residual income model that have been used recently in the academic literature (e.g., Frankel and Lee [1998], and Gebhardt, Lee, and Swaminathan [2001]).

The following is an overview of the relative performance of different value drivers: (1) forward earnings perform the best, and performance improves if the forecast horizon lengthens (1-year to 2-year to 3-year out EPS forecasts) and if earnings forecasted over different horizons are aggregated; (2) the intrinsic value measures, based on short-cut residual income models, perform considerably worse than forward earnings;[3] (3) among drivers derived from historical data, sales performs the worst, earnings performs better than book value; and IBES earnings (which excludes many one-time items) outperforms COMPUSTAT earnings; (4) cash flow measures, defined in various forms, perform poorly; and (5) using enterprise value, rather than equity value, for sales and EBITDA further reduces performance.

Turning from relative performance to absolute performance, forward earnings measures describe actual stock prices reasonably well for a majority of firms. For example, for 2-year out forecasted earnings, approximately half the firms have absolute pricing errors less than 16 percent. The dispersion of pricing errors increases substantially for multiples based on historical drivers, such as earnings and cash flows, and is especially large for sales multiples.

Some other important findings are as follows: (1) performance improves when multiples are computed using the harmonic mean, relative to the mean or median ratio of price to value driver for comparable firms, (2) performance declines substantially when all firms in the cross-section each year are used as comparable firms, (3) allowing for an intercept improves performance mainly for poorly-performing multiples, and (4) relative performance is relatively unchanged over time and across industries.

Our findings have a number of implications for valuation research. First, we confirm the validity of two precepts underlying the valuation role of accounting numbers: (1) accruals improve the valuation properties of cash flows, and (2) despite the importance of top-line revenues, its value

---

[3] Bradshaw [1999a and 1999b] observes results that are related to ours. He finds that valuations based on PEG ratios (this ratio of forward P/E to forecast growth in EPS is described later in section 3.1) explain more variation in analysts' target prices and recommendations than more complex intrinsic value models.

relevance is limited until it is matched with expenses. Second, we confirm that forward earnings contain considerably more value-relevant information than historical data, and they should be used as long as earnings forecasts are available. Third, contrary to general perception, different industries are not associated with different "best multiples." Finally, our investigation of the signal/noise tradeoff associated with the more complex intrinsic value drivers based on the residual income model suggests that even though these measures utilize more information than that contained in forward earnings and impose a structure derived from valuation theory on that information, measurement error associated with the additional variables required, especially terminal value estimates, negatively impacts performance.[4]

These findings are associated with certain caveats. Since we exclude firms not covered by IBES, typically firms with low and medium market capitalization, we are uncertain about the extent to which our results extend to those firms. Even firms with IBES data are not fully represented in our sample, since we exclude firm-years with negative values for any value driver. In particular, our results may not be descriptive of start-up firms reporting losses and high growth firms with negative operating cash flows.

## 2. *Prior Research*

While textbooks on valuation (e.g., Copeland, Koller, and Murrin [1994], Damodaran [1996], and Palepu, Healy, and Bernard [2000]) devote considerable space to discussing multiples, most published papers that study multiples examine a limited set of firm-years and consider only a subset of multiples, such as earnings and EBITDA. Also, comparisons across different studies are hindered by methodological differences.

Among commonly used value drivers, historical earnings and cash flows have received most of the attention. Boatsman and Baskin [1981] compare the valuation accuracy of P/E multiples based on two sets of comparable firms from the same industry. They find that valuation errors are smaller when comparable firms are chosen based on similar historical earnings growth, relative to when they are chosen randomly. Alford [1992] investigates the effects of choosing comparables based on industry, size (risk), and earnings growth on the precision of valuation using P/E multiples. He finds that pricing errors decline when the industry definition used to select comparable firms is narrowed from a broad, single digit SIC code to classifications based on two and three digits, but there is no additional improvement when the four-digit classification is considered. He also finds that controlling for size and earnings growth, over and above industry controls, does not reduce valuation errors.

[4] Given our efficient markets framework, we do not investigate here whether the relatively poor performance of the intrinsic value measures is due to an inefficient market that values stocks using multiples of forward earnings. We find evidence inconsistent with that explanation in a separate paper (Liu, Nissim, and Thomas [2001]).

Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 131 of 251

Kaplan and Ruback [1995] examine the valuation properties of the discounted cash flow (DCF) approach for highly leveraged transactions. While they conclude that DCF valuations approximate transacted values reasonably well, they find that simple EBITDA multiples result in similar valuation accuracy. Beatty, Riffe, and Thompson [1999] examine different linear combinations of value drivers derived from earnings, book value, dividends, and total assets. They derive and document the benefits of using the harmonic mean, and introduce the price-scaled regressions we use. They find the best performance is achieved by using (1) weights derived from harmonic mean book and earnings multiples and (2) coefficients from price-scaled regressions on earnings and book value.

In a recent study, Baker and Ruback [1999] examine econometric problems associated with different ways of computing industry multiples, and compare the relative performance of multiples based on EBITDA, EBIT (or earnings before interest and taxes), and sales. They provide theoretical and empirical evidence that absolute valuation errors are proportional to value. They also show that industry multiples estimated using the harmonic mean are close to minimum-variance estimates based on Monte Carlo simulations. Using the minimum-variance estimator as a benchmark, they find that the harmonic mean dominates alternative simple estimators such as the simple mean, median, and value-weighted mean. Finally, they use the harmonic mean estimator to calculate multiples based on EBITDA, EBIT, and sales, and find that industry-adjusted EBITDA performs better than EBIT and sales.

Instead of focusing only on historical accounting numbers, Kim and Ritter [1999], in their investigation of how initial public offering prices are set using multiples, add forecasted earnings to a conventional list of value drivers, which includes book value, earnings, cash flows, and sales. Consistent with our results, they find that forward P/E multiples (based on forecasted earnings) dominate all other multiples in valuation accuracy, and that the EPS forecast for next year dominates the current year EPS forecast.

Using large data sets could diminish the performance of multiples, since the researcher selects comparable firms in a mechanical way. In contrast, market participants may select comparable firms more carefully and take into account situation-specific factors not considered by researchers. Tasker [1998] examines across-industry patterns in the selection of comparable firms by investment bankers and analysts in acquisition transactions. She finds the systematic use of industry-specific multiples, which is consistent with different multiples being more appropriate in different industries.[5]

[5] Since it is not clear whether the objective of investment bankers/analysts is to achieve the most accurate valuation in terms of smallest dispersion in pricing errors, our results may not be directly comparable with those in Tasker [1998].

## *3. Methodology*

### 3.1 VALUE DRIVERS

We group the value drivers based on whether they refer to cash flows or accruals, whether they relate to stocks or flows, and whether they are based on historical or forward-looking information.[6] We provide a brief description here for some variables that readers may not be familiar with (details for all variables are provided in Appendix A) and then describe the links drawn in the prior literature between different value drivers and equity value. (1) Accrual flows: sales, actual earnings from COMPUSTAT (CACT) and actual earnings from IBES (IACT). (2) Accrual stocks: book value of equity (BV). (3) Cash flows: cash flow from operations (CFO), free cash flow to debt and equity holders (FCF), maintenance cash flow (MCF), equal to free cash flows for the case when capital expenditures equal depreciation expense, and earnings before interest, taxes, depreciation and amortization (EBITDA). (4) Forward looking information: consensus (mean) one year and two year out earnings forecasts (EPS1, and EPS2), and two forecasted earnings-growth combinations (EG1 = EPS2*(1 + g) and EG2 = EPS2*g), which are derived from EPS2 and *g* (the mean long-term EPS growth forecast provided by analysts). (5) Intrinsic value measures (P1*, P2*, and P3*): These measures are based on the residual income (or abnormal earnings) valuation approach, where equity value equals the book value today plus the present value of future abnormal earnings. Abnormal earnings for years +1 to +5, projected from explicit or implied earnings forecasts for those years, are the same for the first two measures. We assume that after year +5, abnormal earnings remain constant for P1* and equal zero for P2*. For P3*, we assume the level of profitability (measured by ROE) trends linearly from the level implied by earnings forecasted for year +3 to the industry median by year +12, and abnormal earnings remains constant thereafter. (6) Sum of forward earnings (ES1 and ES2): These measures aggregate the separate forward earnings forecasts. ES1 is the sum of the EPS forecasts for years +1 to +5, and ES2 is the sum of the present value of those forecasts.[7] As explained later, these two measures are designed to provide evidence on the poor performance of the intrinsic value measures.

Value drivers based on accruals, which distinguish accounting numbers from their cash flow counterparts, have been used extensively in multiple valuations. Book value and earnings, which are often assumed to represent "fundamentals," have been linked formally to firm value (e.g., Ohlson [1995] and Feltham and Ohlson [1995]). Although the use of sales as a value driver has less theoretical basis, relative to earnings and cash flows,

[6] Some value drivers are not easily classified. For example, Sales, which we categorize as an accrual flow, could contain fewer accruals than EBITDA, which we categorize as a cash flow measure.

[7] We thank Jim Ohlson for suggesting ES1.

we consider it because of its wide use in certain emerging industries where earnings and cash flow are perceived to be uninformative.

At an intuitive level, accounting earnings could be more value-relevant than reported cash flows because some cash flows do not reflect value creation (e.g., asset purchases/sales), and accruals allow managers to reflect their judgment about future prospects. The COMPUSTAT EPS measure we consider is reported primary EPS excluding extraordinary items and discontinued operation and the IBES EPS measure is derived from reported EPS by deleting some one-time items, such as write-offs and restructuring charges. To the extent that the IBES measure is a better proxy for "permanent" or "core" earnings expected to persist in the future, it should exhibit superior performance.

The use of cash flow multiples in practice appears to be motivated by the implicit assumption that reported cash flow is the best available proxy for the future cash flows that underlie stock prices, and by the feeling that they are less susceptible to manipulation by management. The four cash flow measures we consider remove the impact of accruals to different extents. EBITDA adjusts pre-tax earnings to debt and equity holders for the effects of depreciation and amortization only. CFO deducts interest and taxes from EBITDA and also deducts the net investment in working capital. FCF deducts from CFO net investments in all long-term assets, whereas MCF only deducts from CFO an investment equal to the depreciation expense for that year.

The potential for analysts' EPS forecasts to reflect value-relevant data not captured by historical earnings has long been recognized in the literature. For example, Liu and Thomas [2000] find that revisions in analysts' earnings forecasts along with changes in interest rates explain a substantially larger portion of contemporaneous stock returns than do earnings surprises based on reported earnings. Consensus estimates are often available for forecasted earnings for the current year (EPS1) and the following year (EPS2). Consensus estimates are also frequently available for the long-term growth forecast ($g$) for earnings over the next business cycle (commonly interpreted to represent the next 5 years). The measure EG1 ($=$EPS2$^*(1+g)$), which is an estimate of three-year out earnings, should reflect value better than EPS2, if three-year out earnings reflect long-term profitability better than two-year out earnings.

While the second earnings-growth measure EG2 ($=$EPS2$^*$g) also combines the information contained in EPS2 and $g$, it imposes a different structure. Recently, analysts have justified valuations using the following rule of thumb: forward P/E ratios (current price divided by EPS2) should equal $g$. If, for example, EPS is expected to grow at 30 percent over the next business cycle, forward P/E should equal 30. Stated differently, the ratio of forward P/E to $g$ (referred to as the PEG ratio) should equal 1. For certain sectors, such as technology, analysts have suggested that even higher PEG ratios are appropriate. Using EG2 as a value driver is equivalent to using a PEG ratio obtained from the PEG ratios of comparable firms.

Several recent studies provide evidence that the intrinsic values derived using the residual income model explain stock prices (e.g., Abarbanell and Bernard [2000], Claus and Thomas [2000]) and returns (e.g., Liu and Thomas [2000], Liu [1999]). The three generic patterns we use to project abnormal earnings past a horizon date have been considered in Frankel and Lee [1998] (P1*), Palepu, Healy, and Bernard [2000] (P2*), and Gebhardt, Lee, and Swaminathan [2001] (P3*). Although these generic approaches do not allow for firm-specific growth patterns for abnormal earnings past a terminal date, they offer a convenient alternative to comprehensive valuations as long as observed long-term growth patterns tend to converge to the generic patterns assumed by these measures.

While the two final earnings sum measures we consider (ES1 and ES2) have not been discussed in the literature, we examine them to understand better the poor performance observed for the intrinsic value measures. ES1 simply sums the earnings forecasted for years +1 to +5, and ES2 attempts to control heuristically for the timing and risk of the different earnings numbers by discounting those forecasted earnings before summing them. If both ES1 and ES2 perform poorly, relative to simple forward earnings multiple (e.g., EPS2) the earnings projected for years +3 to +5 probably contain considerable error. If ES1 performs well, but ES2 does not, estimation errors in the firm-specific discount rates used to discount flows at different horizons are responsible for the poor performance of the intrinsic value measures. If both ES1 and ES2 perform well, the poor performance of intrinsic value measures is probably because the assumed terminal values in each case diverge substantially from the market's estimates of terminal values.

We also consider the impact of using enterprise value (TP), rather than equity value, for sales and EBITDA multiples, since both value drivers reflect an investment base that includes debt and equity. We measure TP as the market value of equity plus the book value of debt. To obtain predicted share prices, we estimate the relation between TP and the value driver for comparable firms, generate predicted TP for target firms, and then subtract the book value of their debt.

### 3.2 TRADITIONAL MULTIPLE VALUATION

In the first stage of our analysis, we follow the traditional ratio representation and require that the price of firm $i$ (from the comparable group) in year $t$ ($p_{it}$) is directly proportional to the value driver:

$$p_{it} = \beta_t x_{it} + \varepsilon_{it} \tag{1}$$

where $x_{it}$ is the value driver for firm $i$ in year $t$, $\beta_t$ is the multiple on the value driver and $\varepsilon_t$ is the pricing error. To improve efficiency, we divide equation (1) by price:

$$1 = \beta_t \frac{x_{it}}{p_{it}} + \frac{\varepsilon_{it}}{p_{it}}. \tag{2}$$

Baker and Ruback [1999] and Beatty, Riffe, and Thompson [1999] demonstrate that estimating the slope using equation (2) rather than equation (1) is likely to produce more precise estimates because the valuation error (the residual in equation (1)) is approximately proportional to price.

When estimating $\beta_t$, we elected to impose the restriction that expected pricing errors (E[$\varepsilon/p$]) be zero, even though an unrestricted estimate for $\beta_t$ from equation (2) offers a lower value of mean squared pricing error. (Throughout the paper, the term "pricing error" refers to proportional pricing error, or the pricing error scaled by share price.) Empirically, we find that our approach generates lower pricing errors for most firms, relative to an unrestricted estimate, but it generates substantially higher errors in the tails of the distribution.[8] By restricting ourselves to unbiased pricing errors, we are in effect assigning lower weight to extreme pricing errors, relative to the unrestricted approach. We are also maintaining consistency with the tradition in econometrics that strongly prefers unbiasedness over reduced dispersion.

$\beta_t$ is the only parameter to be estimated in equation (2), and it is determined by the restriction we impose that pricing errors be zero on average, i.e., $E[\frac{\varepsilon_{it}}{p_{it}}] = 0$. Rearranging terms in equation (2) and applying the expected value operator, we obtain the harmonic mean of $p_{it}/x_{it}$ as an estimate for $\beta_t$:

$$E\left[\frac{\varepsilon_{it}}{p_{it}}\right] = 1 - E\left[\frac{\beta x_{it}}{p_{it}}\right] = 0 \Rightarrow \beta_t = \frac{1}{E\left[\frac{x_{it}}{p_{it}}\right]} \quad (3)$$

We multiply this harmonic mean estimate for $\beta_t$ by the target firm's value driver to obtain a prediction for the target firm's equity value, and calculate the pricing error as follows:[9]

$$\frac{\varepsilon_{it}}{p_{it}} = \frac{p_{it} - \hat{\beta}_t x_{it}}{p_{it}}. \quad (4)$$

To evaluate the performance of multiples, we examine measures of dispersion, such as the interquartile range, for the pooled distribution of $\varepsilon_{it}/p_{it}$.

[8] We estimated equation (2) for comparable firms from the cross-section without imposing the unbiasedness restriction. (When using comparable firms from the same industry, the estimated multiples for this unrestricted case generated substantial pricing errors.) We find that the pricing error distributions for all multiples are shifted to the right substantially, relative to the distributions for the restricted case reported in the paper (our distributions tend to peak around zero pricing error). This shift to the right indicates that the multiples and predicted valuations for the unrestricted case are on average lower than ours. We find that the bias created by this shift causes greater pricing errors for the bulk of the firms not in the tails of the distribution, relative to our restricted case.

[9] While some studies measure pricing error as predicted value minus price (e.g., Alford [1992]) we measure pricing error as price minus predicted value.

### 3.3 INTERCEPT ADJUSTED MULTIPLES

For the second stage of our analysis, we relax the direct proportionality requirement and allow for an intercept:

$$p_{it} = \alpha_t + \beta_t x_{it} + \varepsilon_{it}. \tag{5}$$

Many factors, besides the value driver under investigation, affect price, and the average effect of such omitted factors is unlikely to be zero.[10] Since the intercept in equation (5) captures the average effect of omitted factors, allowing for an intercept should improve the precision of out of sample predictions.

As with the simple multiple approach, we divide equation (5) by price to improve estimation efficiency:

$$1 = \alpha_t \frac{1}{p_{it}} + \beta_t \frac{x_{it}}{p_{it}} + \frac{\varepsilon_{it}}{p_{it}}, \tag{6}$$

Estimating equation (6) with no restrictions minimizes the square of pricing errors, but the expected value of those errors is nonzero.[11] For the reasons mentioned in section 3.2, we again impose the restriction that pricing errors be unbiased.[12] That is, we seek to estimate the parameters $\alpha_t$ and $\beta_t$ that minimize the variance of $\varepsilon_{it}/p_{it}$, subject to the restriction that the expected value of $\varepsilon_{it}/p_{it}$ is zero:

$$\min_{\alpha,\beta} \operatorname{var}(\varepsilon_{it}/p_{it}) = \operatorname{var}[(p_{it} - \alpha_t - \beta_t \cdot x_{it})/p_{it}]$$

$$= \operatorname{var}\left[1 - \left(\alpha_t \frac{1}{p_{it}} + \beta_t \frac{x_{it}}{p_{it}}\right)\right] \tag{7a}$$

$$s.t. \quad \mathrm{E}\left[\frac{\varepsilon_{it}}{p_{it}}\right] = 0. \tag{7b}$$

It can be shown that the estimates for $\alpha_t$ and $\beta_t$ that satisfy (7a) and (7b) are as follows

$$\beta_t = \frac{E\left[\frac{x_t}{p_t}\right]\operatorname{var}\left(\frac{1}{p_t}\right) - \operatorname{cov}\left(\frac{1}{p_t}, \frac{x_t}{p_t}\right)E\left[\frac{1}{p_t}\right]}{E\left[\frac{1}{p_t}\right]^2\operatorname{var}\left(\frac{x_t}{p_t}\right) + E\left[\frac{x_t}{p_t}\right]^2\operatorname{var}\left(\frac{1}{p_t}\right) - 2E\left[\frac{1}{p_t}\right]E\left[\frac{x_t}{p_t}\right]\operatorname{cov}\left(\frac{1}{p_t}, \frac{x_t}{p_t}\right)} \tag{8}$$

$$\alpha_t = \frac{1 - \beta_t E\left[\frac{x_t}{p_t}\right]}{E\left[\frac{1}{p_t}\right]} \tag{9}$$

---

[10] If the relation between price and the value driver is non-linear, the omitted factors include higher powers of the value driver.

[11] In general, this bias could be removed by allowing for an intercept. That avenue is not available, however, when the dependent variable is a constant (=1), since the intercept captures all the variation in the dependent variable, thereby making the independent variables redundant.

[12] As with equation (2), pricing errors from the unrestricted approach for equation (6) are higher for most firms (in the middle of the distribution) but there are fewer firms in the tails of the distribution. (See footnote 8.)

where the different $E_t[.]$, var(.), and cov(.) represent the means, variances, and covariances of those expressions for the population, and are estimated using the corresponding sample moments for the comparable group. We compute prediction errors, defined by equation (10), and examine their distribution to determine performance.

$$\frac{\varepsilon_{it}}{p_{it}} = \frac{p_{it} - \hat{\alpha}_t - \hat{\beta}_t x_{it}}{p_{it}}. \tag{10}$$

## 4. *Sample and Data*

To construct our sample, we merge data from three sources: accounting numbers from COMPUSTAT; price, analyst forecasts, and actual earnings per share from IBES; and stock returns from CRSP. As of April of each year (labeled year t + 1), we select firm-years that satisfy the following criteria: (1) COMPUSTAT data items 4, 5, 12, 13, 25, 27, 58, and 60 are non-missing for the previous fiscal year (year t); (2) at least 30 monthly returns (not necessarily contiguous) are available on CRSP from the prior 60 month period; (3) price, actual EPS, forecasted EPS for years t + 1 and t + 2, and the long term growth forecast are available in the IBES summary file; and (4) all price to value-driver ratios for the simple multiples (excluding the three P* and two ES measures) lie within the 1st and 99th percentiles of the pooled distribution. The resulting sample, which includes 26,613 observations between 1982 and 1999, is used for the descriptive statistics reported in table 1.

For the results reported after table 1, we impose three additional requirements: (1) share price on the day IBES publishes summary forecasts in April is greater than or equal to $2; (2) all multiples are positive; and (3) each industry-year combination has at least five observations. The first condition avoids large pricing errors in the second stage analysis (where an intercept is allowed) due to firms with low share prices. The second condition avoids negative predicted prices, and the third condition ensures that the comparable group is not unreasonably small. Regarding the second condition, we discovered that many firm-years were eliminated because of negative values for two cash flow measures: free cash flow and maintenance cash flow. More important, preliminary analysis indicated that both measures exhibited larger pricing errors than the other measures. As a result, we felt that these two measures were unsuitable for large sample multiples analyses and dropped them from the remainder of our study. The final sample has 19,879 firm-years.

Our sample represents a small fraction of the NYSE + AMAX + NASDAQ population that it is drawn from: the fraction included varies between 11 percent earlier in the sample period to 18 percent later in our sample period. The fraction of market value of the population represented, however, is considerably larger because the firms deleted for lack of analyst data are on average much smaller than our sample firms. Also, firm-years excluded because they have negative value drivers are potentially different from our

**TABLE 1**

*Distribution of Ratio of Value Driver to Price*

Summary descriptions of the variables are as follows (all amounts are on per share basis): P is stock price; BV is book value of equity; MCF is maintenance cash flow (equivalent to free cash flow when depreciation expense equals capital expenditure); FCF is free cash flow to debt and equity holders; CFO is cash flow from operations; EBITDA is earnings before interest, taxes, depreciation and amortization; CACT is COMPUSTAT earnings before extraordinary items; IACT is IBES actual earnings; EPS1 and EPS2 are one year out and two year out EPS forecasts; EG1 = EPS2*(1 + g), EG2 = EPS2*g, where g is the growth forecast; and TP is enterprise value (market value of equity + book value of debt).

$$P1_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+4})}{k_t(1+k_t)^s},$$

$$P2_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right)$$

$$P3_t^* = BV_t + \sum_{s=1}^{2}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \sum_{s=3}^{11}\frac{[\mathrm{E}_t(ROE_{t+s}) - k_t]BV_{t+s-1}}{(1+k_t)^s}$$

$$+ \frac{[\mathrm{E}_t(ROE_{t+12}) - k_t]BV_{t+11}}{k_t(1+k_t)^{11}},$$

where $\mathrm{E}_t(ROE_{t+s})$ for s = 4, 5, ..., 12 is forecasted using a linear interpolation to the industry median ROE. The industry median ROE is calculated as a moving median of the past ten years' ROE of all firms in the industry. To eliminate outliers, industry median ROEs are Winsorized at the risk free rate and 20%.

$$ES1_t = \sum_{s=1}^{5}\mathrm{E}_t(EPS_{t+s}), \text{ and } ES2_t = \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s})}{(1+k_t)^s}\right).$$

Sample firms are collected in April each year between 1982 and 1999, and we require non-missing values for a set of core financial variables from COMPUSTAT, 30 non-missing monthly returns from the prior 60 months from CRSP, and non-missing share price, 1 and 2-year out EPS forecasts and long-term growth forecasts from IBES. The sample is trimmed at 1% and 99% for each value driver using the pooled distribution, resulting in a sample of 26,613 firm-years.

| | Mean | Median | SD | 1% | 5% | 10% | 25% | 75% | 90% | 95% | 99% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BV/P | 0.549 | 0.489 | 0.336 | 0.050 | 0.131 | 0.184 | 0.308 | 0.717 | 0.985 | 1.180 | 1.620 |
| MCF/P | 0.035 | 0.035 | 0.183 | −0.566 | −0.171 | −0.076 | −0.002 | 0.074 | 0.145 | 0.238 | 0.626 |
| FCF/P | −0.025 | 0.002 | 0.252 | −1.008 | −0.379 | −0.218 | −0.069 | 0.050 | 0.131 | 0.234 | 0.648 |
| CFO/P | 0.093 | 0.079 | 0.190 | −0.516 | −0.100 | −0.019 | 0.034 | 0.146 | 0.239 | 0.328 | 0.693 |
| CACT/P | 0.050 | 0.056 | 0.073 | −0.249 | −0.043 | 0.005 | 0.033 | 0.080 | 0.108 | 0.130 | 0.178 |
| IACT/P | 0.057 | 0.059 | 0.060 | −0.184 | −0.013 | 0.018 | 0.040 | 0.082 | 0.109 | 0.130 | 0.175 |
| Ebitda/P | 0.173 | 0.148 | 0.128 | −0.051 | 0.032 | 0.055 | 0.095 | 0.224 | 0.320 | 0.397 | 0.617 |
| Sales/P | 1.419 | 0.988 | 1.416 | 0.098 | 0.215 | 0.313 | 0.552 | 1.773 | 2.991 | 4.080 | 7.112 |
| EPS1/P | 0.073 | 0.070 | 0.037 | −0.026 | 0.024 | 0.036 | 0.052 | 0.092 | 0.117 | 0.137 | 0.178 |
| EPS2/P | 0.091 | 0.085 | 0.036 | 0.027 | 0.043 | 0.052 | 0.067 | 0.108 | 0.138 | 0.160 | 0.205 |
| EG1/P | 0.105 | 0.097 | 0.040 | 0.034 | 0.052 | 0.062 | 0.077 | 0.124 | 0.159 | 0.183 | 0.235 |
| EG2/P | 0.013 | 0.011 | 0.007 | 0.002 | 0.004 | 0.005 | 0.008 | 0.016 | 0.021 | 0.026 | 0.036 |
| P1*/P | 0.708 | 0.658 | 0.296 | 0.222 | 0.318 | 0.383 | 0.500 | 0.863 | 1.086 | 1.264 | 1.660 |
| P2*/P | 0.587 | 0.553 | 0.241 | 0.186 | 0.258 | 0.308 | 0.407 | 0.732 | 0.910 | 1.029 | 1.304 |
| P3*/P | 0.652 | 0.577 | 0.366 | 0.125 | 0.203 | 0.266 | 0.393 | 0.834 | 1.120 | 1.330 | 1.918 |
| ES1/P | 0.525 | 0.489 | 0.202 | 0.164 | 0.259 | 0.310 | 0.389 | 0.624 | 0.794 | 0.912 | 1.168 |
| ES2/P | 0.350 | 0.334 | 0.125 | 0.111 | 0.173 | 0.209 | 0.265 | 0.417 | 0.517 | 0.588 | 0.723 |
| Ebitda/TP | 0.113 | 0.110 | 0.060 | −0.031 | 0.026 | 0.044 | 0.075 | 0.147 | 0.187 | 0.215 | 0.276 |
| Sales/TP | 0.939 | 0.708 | 0.788 | 0.086 | 0.169 | 0.234 | 0.396 | 1.234 | 1.925 | 2.495 | 3.981 |

sample, because they are more likely to be young firms and/or technology firms. For these reasons, our results may not be descriptive of the general population.

We adjust all per share numbers for stock splits and stock dividends using IBES adjustment factors. If IBES indicates that the consensus forecast for that firm-year is on a fully diluted basis, we use IBES dilution factors to convert those numbers to a primary basis. We use a discount rate ($k_t$) equal to the risk-free rate plus beta times the equity risk premium. The risk-free rate is the 10-year Treasury bond yield on April 1 of year $t+1$ and we assume the equity premium is 5 percent. We estimate betas using monthly stock returns and value-weighted CRSP returns over the 60 month period ending in March of year $t+1$. Since individual firm betas are measured with considerable error, we set firm beta equal to the median beta of all firms in the same beta decile.

For a subgroup of firm-years (less than 5 percent), we were able to obtain mean IBES forecasts for all years in the five-year horizon. For all other firms, with less than complete forecasts available between years 3 and 5, we generate forecasts by applying the mean long-term growth forecast ($g$) to the mean forecast for the prior year in the horizon; i.e., $eps_{t+s} = eps_{t+s-1}{}^{*}(1+g)$.

We obtain book values for future years by assuming the "ex-ante clean surplus relation" (ending book value in each future period equals beginning book value plus forecasted earnings less forecasted dividends). Since analyst forecasts of future dividends are not available on IBES, we assume that the current dividend payout ratio will be maintained in the future. We measure the current dividend payout as the ratio of the indicated annual cash dividends to the earnings forecast for year $t+1$ (both obtained from the IBES summary file).[13] To minimize biases that could be induced by extreme dividend payout ratios (caused by forecast $t+1$ earnings that are close to zero), we Winsorize payout ratios to lie between 10% and 50%. The results are relatively insensitive to assumed payout ratios, since altering the payout has only a small effect on future book values and an even smaller effect on computed future abnormal earnings.

## 5. *Results*

We report results separately for two sets of comparable firms with data available that year: all firms from the same industry and all firms in the cross-section. In either case, our analysis is always conducted out of sample; i.e., the target firm is removed from the group of comparable firms. Since the traditional approach involves the no-intercept relation and the selection of comparable firms from the same industry, much of our discussion focuses

[13] Indicated annual dividends are four times the most recent quarter's declared dividends. We use EPS1 as the deflator because it varies less than current year's earnings and is less likely to be close to zero or negative.

on that combination, and most of our ancillary investigations relate only to this combination.

To conduct the analysis using comparable firms from the same industry, we considered alternative industry classifications. Because of the evidence that SIC codes frequently misclassify firms (Kim and Ritter [1999]), we use the industry classification provided by IBES, which is indicated to be based loosely on SIC codes, but is also subject to detailed adjustments.[14] The IBES industry classification has three levels (in increasing fineness): sector, industry, and group. We use the intermediate (industry) classification level because visual examination of firms included in the same sector suggested it was too broad a classification to allow the selection of homogeneous firms, and tabulation of the number of firms in different groups suggested it was too narrow to allow the inclusion of sufficient comparable firms (given the loss of observations due to our data requirements).

Because of the volume of results generated, we report only some representative results and describe briefly some interesting extensions. In particular, we do not report on tests of statistical significance we conducted to compare differences in performance across value drivers. Our statistical significance tests focus on the interquartile range as the primary measure of dispersion that is relevant to us, and we conduct a bootstrap-type analysis for each pair of value drivers for all sets of results reported in tables 2 and 3. We generate "samples" of 19,879 firm-years by drawing observations randomly from our sample, with replacement. For each trial we compute the inter-quartile range for each multiple, and then compute the difference between all pairs of inter-quartile ranges. This process is repeated 100 times and a distribution is obtained for each pairwise difference. (Increasing the number of trials beyond 100 has little impact on the t-statistics generated.) We compute a t-statistic by dividing the mean by the standard deviation for each of these distributions. Those t-statistics (available from the authors) indicate that almost every pairwise difference for the different interquartile ranges reported in our tables is statistically significant (t-statistic greater than 2). In essence, readers can safely assume that if differences in performance across value drivers are economically significant, they are also statistically significant.

In section 5.4, we provide a summary of our results on variation in performance of different value drivers across different industries and years in our sample. Appendix B contains more details of the across-industry variation in performance.

### 5.1 DESCRIPTIVE STATISTICS

Table 1 reports the pooled distribution of different value drivers, scaled by price. While most distributions contain very few negative values, the

[14] The IBES classification resembles the industry groupings suggested by Morgan Stanley.

**TABLE 2**

*Distribution of Pricing Errors for Simple Multiples*

Value and value drivers are assumed to be proportional: $p_{it} = \beta_t x_{it} + \varepsilon_{it}$. Multiples are estimated using harmonic means: $\beta_t = 1/E_t(\frac{x_{it}}{p_{it}})$ in panels A&B, and medians are used in panel C. Pricing error is $\frac{\varepsilon_{it}}{p_{it}} = \frac{p_{it} - \beta x_{it}}{p_{it}}$ Summary descriptions of the variables are as follows (all amounts are on per share basis): P is stock price; BV is book value of equity; CFO is cash flow from operations; EBITDA is earnings before interest, taxes, depreciation and amortization; CACT is COMPUSTAT earnings before extraordinary items; IACT is IBES actual earnings; EPS1, EPS2 are one year out and two year out EPS forecasts; EG1 = EPS2*(1 + g), EG2 = EPS2*g, where g is growth forecast. TP is enterprise value (market value of equity plus book value of debt). When TP multiples are used, predicted equity value is calculated by subtracting the book value of debt.

$$P1_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{E_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \frac{E_t(EPS_{t+s} - k_t BV_{t+4})}{k_t(1+k_t)^s},$$

$$P2_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{E_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right)$$

$$P3_t^* = BV_t + \sum_{s=1}^{2}\left(\frac{E_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \sum_{s=3}^{11}\frac{[E_t(ROE_{t+s}) - k_t]BV_{t+s-1}}{(1+k_l)^s} + \frac{[E_t(ROE_{t+12}) - k_t]BV_{t+11}}{k_t(1+k_1)^{11}},$$

where $E_t(ROE_{t+s})$ for s = 4, 5, ..., 12 is forecasted using a linear interpolation to the industry median ROE. The industry median ROE is calculated as a moving median of the past ten years' ROE of all firms in the industry. To eliminate outliers, industry median ROEs are Winsorized at the risk free rate and 20%.

$$ES1_t = \sum_{s=1}^{5} E_t(EPS_{t+s}), \text{ and } ES2_t = \sum_{s=1}^{5}\left(\frac{E_t(EPS_{t+s})}{(1+k_t)^s}\right).$$

Sample firms are collected in April each year between 1982 and 1999, and we require non-missing values for a set of core financial variables from COMPUSTAT, 30 non-missing monthly returns from the prior 60 months from CRSP, and non-missing share price, 1- and 2-year out EPS forecasts and long-term growth forecasts from IBES. The sample is trimmed at 1% and 99% for each value driver. We then require a minimum $2 share price, that all value drivers be positive, and that each industry-year combination have at least five observations. The final sample contains 19,879 firm-years.

| | Mean | Median | SD | 75%-25% | 90%-10% | 95%-5% |
|---|---|---|---|---|---|---|
| **Panel A: Multiples based on harmonic means of firms from the same industry** | | | | | | |
| BV/P | −0.016 | 0.066 | 0.560 | 0.602 | 1.266 | 1.710 |
| CFO/P | −0.042 | 0.150 | 0.989 | 0.777 | 1.652 | 2.355 |
| CACT/P | −0.012 | 0.012 | 0.490 | 0.518 | 1.119 | 1.549 |
| IACT/P | −0.009 | 0.023 | 0.421 | 0.442 | 0.941 | 1.317 |
| Ebitda/P | −0.017 | 0.066 | 0.573 | 0.553 | 1.163 | 1.631 |
| Sales/P | −0.032 | 0.163 | 0.859 | 0.738 | 1.645 | 2.357 |
| EPS1/P | −0.005 | 0.015 | 0.321 | 0.348 | 0.744 | 1.037 |
| EPS2/P | −0.004 | 0.021 | 0.290 | 0.317 | 0.677 | 0.935 |
| EG1/P | −0.004 | 0.027 | 0.290 | 0.313 | 0.671 | 0.936 |
| EG2/P | −0.009 | 0.071 | 0.435 | 0.424 | 0.907 | 1.280 |
| P1*/P | −0.006 | 0.037 | 0.351 | 0.377 | 0.807 | 1.118 |
| P2*/P | −0.006 | 0.033 | 0.352 | 0.410 | 0.835 | 1.124 |
| P3*/P | −0.009 | 0.055 | 0.443 | 0.469 | 0.983 | 1.377 |
| ES1/P | −0.004 | 0.026 | 0.285 | 0.307 | 0.661 | 0.915 |

TABLE 2—*continued*

| | Mean | Median | SD | 75%-25% | 90%-10% | 95%-5% |
|---|---|---|---|---|---|---|
| ES2/P | −0.004 | 0.023 | 0.283 | 0.311 | 0.664 | 0.919 |
| Ebitda/TP | −0.013 | 0.024 | 0.645 | 0.619 | 1.266 | 1.753 |
| Sales/TP | −0.057 | 0.156 | 1.067 | 0.901 | 1.919 | 2.763 |
| **Panel B: Multiples based on harmonic means of firms from the entire cross-section** | | | | | | |
| BV/P | 0.000 | 0.080 | 0.565 | 0.744 | 1.343 | 1.732 |
| CFO/P | −0.001 | 0.261 | 1.086 | 0.812 | 1.682 | 2.460 |
| CACT/P | 0.000 | 0.045 | 0.512 | 0.625 | 1.228 | 1.627 |
| IACT/P | 0.000 | 0.048 | 0.453 | 0.551 | 1.077 | 1.431 |
| Ebitda/P | 0.000 | 0.127 | 0.613 | 0.692 | 1.343 | 1.778 |
| Sales/P | −0.001 | 0.265 | 0.943 | 0.801 | 1.766 | 2.531 |
| EPS1/P | 0.000 | 0.028 | 0.361 | 0.452 | 0.880 | 1.166 |
| EPS2/P | 0.000 | 0.030 | 0.320 | 0.388 | 0.781 | 1.038 |
| EG1/P | 0.000 | 0.041 | 0.317 | 0.368 | 0.754 | 1.024 |
| EG2/P | 0.000 | 0.077 | 0.500 | 0.526 | 1.168 | 1.608 |
| P1*/P | 0.000 | 0.053 | 0.378 | 0.479 | 0.923 | 1.211 |
| P2*/P | 0.000 | 0.052 | 0.396 | 0.549 | 0.986 | 1.250 |
| P3*/P | 0.000 | 0.098 | 0.511 | 0.652 | 1.257 | 1.587 |
| ES1/P | 0.000 | 0.040 | 0.312 | 0.362 | 0.740 | 1.008 |
| ES2/P | 0.000 | 0.030 | 0.312 | 0.379 | 0.760 | 1.011 |
| Ebitda/TP | −0.008 | 0.029 | 0.734 | 0.704 | 1.415 | 1.939 |
| Sales/TP | 0.026 | 0.284 | 1.337 | 1.097 | 2.374 | 3.648 |
| **Panel C: Multiples based on median of comparable firms from the same industry** | | | | | | |
| BV/P | −0.110 | 0.000 | 0.638 | 0.649 | 1.407 | 1.962 |
| CFO/P | −0.263 | 0.000 | 1.235 | 0.903 | 2.020 | 2.944 |
| CACT/P | −0.041 | 0.000 | 0.527 | 0.513 | 1.164 | 1.640 |
| IACT/P | −0.046 | 0.000 | 0.457 | 0.450 | 0.985 | 1.394 |
| Ebitda/P | −0.111 | 0.000 | 0.676 | 0.581 | 1.283 | 1.814 |
| Sales/P | −0.287 | 0.001 | 1.157 | 0.887 | 2.062 | 3.020 |
| EPS1/P | −0.028 | −0.001 | 0.351 | 0.350 | 0.761 | 1.074 |
| EPS2/P | −0.033 | 0.000 | 0.314 | 0.320 | 0.696 | 0.980 |
| EG1/P | −0.039 | 0.000 | 0.318 | 0.318 | 0.702 | 0.982 |
| EG2/P | −0.099 | −0.003 | 0.490 | 0.444 | 0.988 | 1.419 |
| P1*/P | 0.014 | 0.029 | 0.441 | 0.425 | 0.982 | 1.604 |
| P2*/P | −0.051 | 0.000 | 0.378 | 0.421 | 0.882 | 1.205 |
| P3*/P | −0.087 | 0.000 | 0.497 | 0.499 | 1.070 | 1.522 |
| ES1/P | −0.039 | 0.000 | 0.312 | 0.312 | 0.691 | 0.967 |
| ES2/P | −0.035 | 0.000 | 0.306 | 0.319 | 0.691 | 0.961 |
| Ebitda/TP | −0.054 | 0.000 | 0.678 | 0.629 | 1.321 | 1.842 |
| Sales/TP | −0.290 | 0.000 | 1.312 | 1.038 | 2.279 | 3.361 |

incidence of negative values is higher for cash flow measures. In particular, free cash flow and maintenance cash flow are often negative (approximately 30% and 20% of the sample, respectively). Moreover, the mean of FCF/P is negative, and the mean of MCF/P is close to zero, despite the deletion of observations with extreme values (top and bottom 1%). Including these two value drivers would result in a drastic reduction in sample size. Since we discovered that they perform considerably worse than other value

**TABLE 3**

*Distribution of Pricing Errors for Intercept Adjusted Multiples*

Value and value drivers are assumed to be linear: $p_{it} = \alpha_t + \beta_t x_{it} + \varepsilon_{it}$. Multiple is estimated excluding the firm under valuation, by solving the following constrained minimization problem:

$$\min_{\alpha,\beta} \text{var}(\varepsilon_{it}/p_{it}) = \text{var}[(p_{it} - \alpha_t - \beta_t \cdot x_{it})/p_{it}]; \; s.t.\; \text{E}\left(\frac{\varepsilon_{it}}{p_{it}}\right) = 0.$$

Pricing error is $\frac{\varepsilon_{it}}{p_{it}} = \frac{p_{it}-\alpha_t-\beta_t x_{it}}{p_{it}}$ Summary descriptions of the variables are as follows (all amounts are on per share basis): P is stock price; BV is book value of equity; CFO is cash flow from operations; EBITDA is earnings before interest, taxes, depreciation and amortization; CACT is COMPUSTAT earnings before extraordinary items; IACT is IBES actual earnings; EPS1, EPS2 are one year out and two year out EPS forecasts; EG1 = EPS2*(1 + g), EG2 = EPS2*g, where g is growth forecast. TP is enterprise value (market value of equity plus book value of debt). When TP multiples are used, predicted equity value is calculated by subtracting the book value of debt.

$$P1_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{\text{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \frac{\text{E}_t(EPS_{t+s} - k_t BV_{t+4})}{k_t(1+k_t)^s},$$

$$P2_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{\text{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right)$$

$$P3_t^* = BV_t + \sum_{s=1}^{2}\left(\frac{\text{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \sum_{s=3}^{11}\frac{[\text{E}_t(ROE_{t+s}) - k_t]BV_{t+s-1}}{(1+k_t)^s} + \frac{[\text{E}_t(ROE_{t+12}) - k_t]BV_{t-11}}{k_t(1+k_1)^{11}},$$

where $\text{E}_t(ROE_{t+s})$ for s = 4, 5, ..., 12 is forecasted using a linear interpolation to the industry median ROE. The industry median ROE is calculated as a moving median of the past ten years' ROE of all firms in the industry. To eliminate outliers, industry median ROEs are Winsorized at the risk free rate and 20%.

$$ES1_t = \sum_{s=1}^{5}\text{E}_t(EPS_{t+s}), \text{and } ES2_t = \sum_{s=1}^{5}\left(\frac{E_t(EPS_{t+s})}{(1+k_t)^s}\right).$$

Sample firms are collected in April each year between 1982 and 1999, and we require non-missing values for a set of core financial variables from COMPUSTAT, 30 non-missing monthly returns from the prior 60 months from CRSP, and non-missing share price, 1- and 2-year out EPS forecasts and long-term growth forecasts from IBES. The sample is trimmed at 1% and 99% for each value driver. We then require a minimum $2 share price, that all value drivers be positive, and that each industry-year combination have at least five observations. The final sample contains 19,879 firm-years.

| | Mean | Median | SD | 75%-25% | 90%-10% | 95%-5% |
|---|---|---|---|---|---|---|
| **Panel A: Comparable firms from the same industry** | | | | | | |
| BV/P | −0.027 | 0.058 | 0.538 | 0.538 | 1.153 | 1.599 |
| CFO/P | −0.037 | 0.091 | 0.621 | 0.577 | 1.237 | 1.765 |
| CACT/P | −0.018 | 0.027 | 0.439 | 0.433 | 0.953 | 1.352 |
| IACT/P | −0.015 | 0.029 | 0.387 | 0.390 | 0.843 | 1.179 |
| Ebitda/P | −0.025 | 0.052 | 0.488 | 0.482 | 1.041 | 1.459 |
| Sales/P | −0.039 | 0.101 | 0.646 | 0.614 | 1.312 | 1.841 |
| EPS1/P | −0.010 | 0.018 | 0.310 | 0.323 | 0.704 | 0.982 |
| EPS2/P | −0.008 | 0.019 | 0.290 | 0.305 | 0.656 | 0.917 |
| EG1/P | −0.007 | 0.023 | 0.291 | 0.306 | 0.654 | 0.912 |
| EG2/P | −0.012 | 0.055 | 0.400 | 0.402 | 0.855 | 1.195 |

TABLE 3—*continued*

| | Mean | Median | SD | 75%-25% | 90%-10% | 95%-5% |
|---|---|---|---|---|---|---|
| P1*/P | −0.013 | 0.034 | 0.348 | 0.365 | 0.775 | 1.078 |
| P2*/P | −0.014 | 0.028 | 0.360 | 0.392 | 0.819 | 1.120 |
| P3*/P | −0.020 | 0.045 | 0.428 | 0.433 | 0.919 | 1.276 |
| ES1/P | −0.007 | 0.022 | 0.285 | 0.301 | 0.648 | 0.888 |
| ES2/P | −0.007 | 0.021 | 0.283 | 0.302 | 0.649 | 0.891 |
| Ebitda/TP | −0.008 | 0.025 | 0.626 | 0.538 | 1.121 | 1.576 |
| Sales/TP | −0.038 | 0.094 | 0.838 | 0.730 | 1.532 | 2.154 |
| **Panel B: Comparable firms from the entire cross-section** | | | | | | |
| BV/P | 0.008 | 0.084 | 0.518 | 0.610 | 1.171 | 1.581 |
| CFO/P | 0.013 | 0.175 | 0.654 | 0.582 | 1.279 | 1.833 |
| CACT/P | −0.002 | 0.053 | 0.447 | 0.513 | 1.006 | 1.385 |
| IACT/P | −0.005 | 0.050 | 0.405 | 0.475 | 0.923 | 1.252 |
| Ebitda/P | 0.012 | 0.111 | 0.517 | 0.560 | 1.090 | 1.513 |
| Sales/P | 0.038 | 0.206 | 0.646 | 0.595 | 1.293 | 1.849 |
| EPS1/P | −0.009 | 0.025 | 0.339 | 0.415 | 0.811 | 1.092 |
| EPS2/P | −0.007 | 0.023 | 0.315 | 0.376 | 0.759 | 1.024 |
| EG1/P | −0.003 | 0.040 | 0.314 | 0.361 | 0.743 | 1.016 |
| EG2/P | 0.031 | 0.120 | 0.459 | 0.495 | 1.060 | 1.459 |
| P1*/P | −0.007 | 0.049 | 0.359 | 0.445 | 0.855 | 1.141 |
| P2*/P | −0.007 | 0.042 | 0.385 | 0.517 | 0.934 | 1.200 |
| P3*/P | −0.010 | 0.078 | 0.455 | 0.556 | 1.047 | 1.380 |
| ES1/P | −0.002 | 0.040 | 0.308 | 0.355 | 0.732 | 0.993 |
| ES2/P | −0.006 | 0.028 | 0.307 | 0.366 | 0.739 | 0.994 |
| Ebitda/TP | 0.044 | 0.059 | 0.686 | 0.587 | 1.207 | 1.710 |
| Sales/TP | 0.143 | 0.246 | 1.010 | 0.835 | 1.860 | 2.805 |

drivers, we decided to remove them from the set of value drivers considered hereafter.

Examination of correlations for different pairs of value drivers, scaled by price, indicates that most value drivers are positively correlated, which suggests that they share considerable common information. (These results, which are available from the authors, show that Pearson correlations are very similar to Spearman correlations.) The correlations among different forward earnings and earnings-growth measures are especially high, generally around 90%. Interestingly, the correlations between the different forward earnings measures and the three intrinsic value measures (P1*, P2*, and P3*) are much lower (only about 50 percent).

### 5.2 NO-INTERCEPT RELATION BETWEEN PRICE AND VALUE DRIVERS

The results of the first stage analysis, based on the ratio representation (no intercept), are reported in table 2. Our primary results are those reported in panel A, where comparable firms are selected from the same industry. The results reported in panel B are based on comparable firms including all firms in the cross-section. We report the following statistics that describe the distribution of the pricing errors: two measures of central tendency

(mean and median) and four measures of dispersion (the standard deviation and three non-parametric dispersion measures: interquartile range, 90th percentile less 10th percentile, and 95th percentile less 5th percentile). We separate our results into four categories: historical value drivers, forward earnings measures, intrinsic value and earnings sum measures, and multiples based on enterprise value.

To offer a visual picture of the relative and absolute performance of different categories of multiples, we provide in figure 1, Panel A, the histograms for pricing errors for the following selected multiples: EPS2, P1*, IACT, EBITDA, BV, and Sales. The histograms report the percentage of the sample that lies within ranges of pricing error that are of width equal to 10% of price (e.g. −0.1 to 0, 0 to 0.1, and so on). To reduce clutter, we draw a smooth line through the middle of the top of each histogram column, rather than provide the histograms for each of the multiples. We consider a multiple superior if it has a more peaked distribution. The differences in performance across the different value drivers are clearly visible in figure 1.

In general, the valuation errors we report are skewed to the left, indicated by medians that are greater than means.[15] While the skewness is less noticeable for multiples based on forward earnings, it is quite prominent for multiples based on sales and cash flows. Since predicted values are bounded from below at zero, while they are not bounded above, the right side of the pricing error distribution cannot exceed +1, whereas the left side is unbounded. One way to make the error distribution more symmetrical is to take the log of the ratio of predicted price to observed price (Kaplan and Ruback [1995]). Although we find that the distributions are indeed more symmetric for the log pricing error metric, we report the results using the pricing error metric because it is easier to interpret absolute performance using that metric. We did, however, recalculate the dispersion metrics reported here using the log pricing error metric to confirm that all our inferences regarding relative performance remain unchanged.

Examination of the standard deviation and the three non-parametric dispersion measures in panel A suggests the following ranking of multiples. Forecasted earnings, as a group, exhibit the lowest dispersion of pricing errors. This result is intuitively appealing because earnings forecasts should reflect future profitability better than historical measures. Consistent with this reasoning, performance increases with forecast horizon. The dispersion measures for two-year out forward earnings (EPS2) are lower than those for one-year out earnings (EPS1), and they are lower still for three-year out forward earnings (EG1). The multiple derived from PEG ratios (EG2) does not perform as well, however, suggesting that the specific relation between

---

[15] Means are close to zero because we require pricing errors to be unbiased, on average. Of course, the observed means would deviate slightly from zero by chance, since the valuations are done out of sample.

forward earnings and growth implied by the PEG ratio is not supported for our sample of firm-years.

Multiples generated from the three intrinsic value measures (P1*, P2*, and P3*) also do not perform as well as the simple forward earnings multiples. This result is consistent with measurement error in the estimated discount rates, forecasted forward abnormal earnings, or assumed terminal values for these three measures. The larger pricing errors associated with P2* relative to P1* suggests that the terminal value assumption of zero abnormal earnings past year +5 (for P2*) is less appropriate than the assumption of zero growth in abnormal earnings past year +5 (for P1*). The very high pricing errors associated with P3* suggest that the more complex structure of profitability trends imposed for this measure and/or the assumption that abnormal earnings remain constant past year +12 at the level determined by current industry profitability are inappropriate.

The sharp improvement in performance observed for ES1 and ES2 supports the view that the poor performance of the intrinsic value measures is caused by the generic terminal value assumptions. Recall that ES1 simply aggregates the same five years' earnings forecasts that are used for P1* and P2*, and ES2 discounts those forecasts using firm-specific discount rates ($k_t$) before summing them. The fact that the performance of ES2 is only slightly worse than that of ES1 suggests that the estimated values of $k_t$ in the denominators of the intrinsic value terms (used to discount future abnormal earnings) are unlikely to be responsible for the poor performance of those measures. The improvement in performance observed for ES1 over the one-, two-, and three-year earnings forecasts suggests that despite the high correlation observed among these forecasts for different horizons, they contain independent value relevant information.

Comparing book value and earnings, the two popular accounting value drivers, we find that earnings measures clearly outperform book value. Pricing errors for book value (BV) exhibit greater dispersion than those for COMPUSTAT earnings (CACT). The performance of historical earnings is further enhanced by the removal of one-time transitory components. Consistent with the results in Liu and Thomas [2000], pricing errors for IBES earnings (IACT) exhibit lower dispersion than those for CACT. The sales multiple performs quite poorly, suggesting that sales do not reflect profitability until expenses have been considered.

Contrary to the belief voiced by some that cash flow measures are better than accrual measures at representing future cash flows, our results show that cash flows perform significantly worse than accounting earnings. Between the two cash flow measures, CFO fares considerably worse than EBITDA; in fact it is consistently the worst performer in all our analyses.

The last two rows in panel A of table 2 relate to valuations for sales and EBITDA multiples based on enterprise value. Even though enterprise

Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 147 of 251

value is more appropriate for these two value drivers, the performance for both multiples is even worse than that reported for the same multiples based on equity value. For example, the interquartile range of pricing errors for sales increases from 0.738 to 0.901 when the base is changed from equity value (P) to enterprise value (TP). We find this result surprising and are unable to provide any rationale for why such a result might be observed. (Similar results are reported in Alford [1992].)

A frequent reason for using sales as a value driver is because earnings and cash flows are negative. Since we restrict our sample to firms with positive earnings and cash flows, our sample is less likely to contain firms for which the sales multiple is more likely to be used in practice. In particular, our sample is unlikely to contain emerging technology firms such as Internet stocks. While some early research, such as Hand [1999] and Trueman, Wong, and Zhang [2000], suggests that traditional value drivers are inappropriate for such stocks, Hand [2000] finds that economic fundamentals, especially forward earnings forecasts, explain valuations for such firms.

To provide some evidence on the impact of deleting firms with negative values for earnings and cash flow measures, we examine the pricing errors for sales and forward earnings multiples for a larger sample of 44,563 firm-years with positive values for sales, EPS1, and EPS2. Although this sample is obtained by applying the same conditions used to generate our primary sample it is more than twice as large because we do not require positive values for all the other value drivers. We find that even though the relative performance differences reported in table 2, panel A, are observed again in this larger sample, the dispersion of pricing errors increases for all three multiples. For example, the interquartile ranges for sales, EPS1, and EPS2 increase to 0.805, 0.448, and 0.396, respectively, from 0.738, 0.348, and 0.317 in table 2, panel A. These results emphasize our earlier caution that the results reported for our main sample may not be descriptive of other samples.

In addition to ranking the relative performance of different multiples, the results in table 2, panel A, and the histograms in figure 1 can also be used to infer absolute performance. Our main finding is that industry multiples based on simple forward EPS forecasts provide reasonably accurate valuations for a large fraction of firms. Consider, for example, the percentages of the sample covered by the two intervals on either side of zero for EPS2 in figure 1. The sum of those four percentages (13 percent between −0.2 and −0.1, 18 percent between −0.1 and 0, 16.5 percent between 0 and 0.1, and 12 percent between 0.1 and 0.2) suggests that multiples based on industry harmonic means for EPS2 generate valuations within 20 percent of observed prices for almost 60 percent of firm years. Alternatively, halving the interquartile range of 0.348 for EPS2 in panel A suggests that absolute pricing errors below 17.4 percent are observed for approximately

Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 148 of 251

50 percent of the sample.[16] The lower interquartile ranges for other value drivers, such as 0.313 for EG1 and 0.307 for ES1, indicate the potential for further improvement with other value drivers derived from forward earnings.

The pricing error distributions in panel B of table 2, when the comparable group includes all firms in the cross-section, are systematically more dispersed for all multiples, relative to those reported in panel A. The superior performance observed when the comparable group is selected from the same industry, is consistent with the joint hypothesis that (1) increased homogeneity in the value-relevant factors omitted from the multiples results in better valuation, and (2) the IBES industry classification identifies relatively homogeneous groups of firms.[17] Overall, we find that the frequency of small (medium) pricing errors increases (decreases), when comparable firms are selected from the same industry. (The frequency of large valuation error remains relatively unchanged.)

The multiples used in calculating the pricing errors in panels A and B are estimated using the harmonic mean. To allow comparison with results in previous studies (e.g., Alford [1992]), we repeat the panel A analysis using the median instead of the harmonic mean. Those results are reported in panel C. Consistent with the evidence in Baker and Ruback [1999] and Beatty, Riffe, and Thompson [1999], we find that the absolute

---

[16] This statement assumes the distribution is symmetric around zero. Since that assumption is only approximately true, and only for better-performing multiples (e.g. forward earnings), this description is intended primarily for illustrative purposes.

[17] Even if these conditions are satisfied, it is not clear that there should be an improvement. Moving from the cross-section to each industry results in a substantial decrease in sample size, and consequently the estimation is less precise. This fact is also reflected in the increase in the deviation of the sample mean of the valuation errors from zero.

---

FIG. 1.—Distribution of Pricing Errors Using Simple Industry Multiples. Value for firm $i$ in year $t$ ($p_{it}$) and value drivers ($x_{it}$) are assumed to be proportional: $p_{it} = \beta_i x_{it} + \varepsilon_{it}$. The multiple, $\beta_t$, is estimated using the industry harmonic mean: $\beta_t = 1/\mathrm{E}(\frac{x_{it}}{p_{it}})$, and pricing errors are computed as $\frac{\varepsilon_{it}}{p_{it}} = \frac{p_{it} - \hat{\beta}_t x_{it}}{p_{it}}$. The variables are defined as follows (all amounts are on a per share basis): P is stock price; BV is book value of equity; EBITDA is earnings before interest, taxes, depreciation and amortization; IACT is IBES actual earnings; EPS2 is two year out earnings forecast and g is growth forecast, and $P1^*_t = BV_t + \sum_{s=1}^{5} (\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}) + \frac{E_t(EPS_{t+s} - k_t BV_{t+4})}{k_t(1+k_t)^s}$. All multiples are calculated using the harmonic means for comparable firms within each industry (based on IBES industry classification), and the firm being valued is excluded when computing industry multiples. Sample firms are collected in April each year between 1982 and 1999, and we require non-missing values for a set of core financial variables from COMPUSTAT, 30 non-missing monthly returns from the prior 60 months from CRSP, and non-missing share price, 1- and 2-year out EPS forecasts and long-term growth forecasts from IBES. The sample is trimmed at 1% and 99% for each value driver. We then require a minimum $2 share price, that all value drivers be positive, and that each industry-year combination have at least five observations. The final sample contains 19,879 firm-years.

**Panel A:** Pooled distribution of pricing errors: The chart below is derived from a histogram with columns of width = 0.1 (or 10% of price). For example, for EPS2, the fraction of the sample with pricing error between 0 and −0.1 is about 18%



Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 150 of 251

**Panel B:** Performance across industries: For each of 81 industries, value drivers are ranked based on the interquartile range for pricing errors (scaled by share price). Lower ranks imply lower pricing errors (better performance). The table and figure below report the # of industries for each value driver/rank combination. For example, Sales was never ranked first or second, was ranked third for 2 industries, and so on

| | rank | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| SALES | 0 | 0 | 2 | 5 | 14 | 60 |
| BV | 1 | 3 | 5 | 17 | 41 | 14 |
| EBITDA | 1 | 1 | 10 | 44 | 21 | 4 |
| IACT | 0 | 12 | 53 | 11 | 3 | 2 |
| P1* | 13 | 54 | 9 | 2 | 2 | 1 |
| EPS2 | 66 | 11 | 2 | 2 | 0 | 0 |

FIG. 1.—*continued*

**Panel C:** Performance across years: Plotted below are the annual interquartile ranges for the distribution of pricing errors (scaled by share price) for each value driver

0.9
0.8
0.7
0.6
0.5
0.4
0.3
0.2
Interquartile range of pricing errors
SALES
BV
EBITDA
IACT
P1*
EPS2
1982
1983
1984
1985
1986
1987
1988
1989
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
Year

FIG. 1.—*continued*

EQUITY VALUATION USING MULTIPLES 159

performance of median multiples is worse than that for harmonic mean multiples. To be sure, the mean pricing error is no longer close to zero, whereas the median pricing error is now close to zero. Note that the improvement observed for harmonic means, relative to median multiples, is inversely related to the absolute performance of that multiple, and the improvement for forward earnings multiples is quite small. Importantly, the relative performance of the different multiples remains unchanged.

We also examined the impact of using the industry mean of price-to-value driver ratios as the multiple, rather than the harmonic mean (results available from authors). We find that the pricing error distributions for different value drivers exhibit much greater dispersion, and mean values that are substantially negative. Similar to the results reported for medians, the decline in performance is greater for multiples that perform poorly in table 2, panel A.

While it is inappropriate to include the target firm in the group of comparable firms, we investigated the bias caused by doing so. The bias (in terms of the impact on the distribution of pricing errors for multiples computed in sample versus out of sample) is negligible when the group of comparable firms includes all firms in the cross-section (corresponding to panel B results), since the addition of one firm has almost no effect on the multiple. When firms are selected from the same industry, however, there is a decrease in the dispersion of pricing errors when we use in-sample harmonic means (e.g. the interquartile range for EPS2 declines from 0.317 in table 2, panel A, to 0.301). The decline in dispersion is even larger for in-sample median multiples (e.g., interquartile range for EPS2 declines from 0.320 in table 2, panel C, to 0.290).

We considered two other extensions to the multiple approach (results available upon request). First, we combined two or more value drivers (e.g., Cheng and McNamara [1996]). Our results, based on a regression approach that is related to the intercept adjusted multiple approach discussed in section 3.3 (e.g., Beatty, Riffe, and Thompson [1999]) indicate only small improvements in performance over that obtained for forward earnings. Second, we investigated conditional earnings and book value multiples. That is, rather than using the harmonic mean P/E and P/B values of comparable firms, we use a P/E (P/B) that is appropriate given the forecast earnings growth (forecast book profitability) for that firm. We first estimate the relation between forward P/E ratios and forecast earnings growth (P/B ratios and forecast return on common equity) for each industry-year, and then read off from that relation the P/E (P/B) corresponding to the earnings growth forecast (forecast ROCE) for the firm being valued. Despite the intuitive appeal of conditioning the multiple on relevant information, little or no improvement in performance was observed over the unconditional P/E and P/B multiples.

### 5.3 INTERCEPT ALLOWED IN PRICE-VALUE DRIVER RELATION

In this subsection, we report results based on the second stage analysis, where we allow for an intercept in the relation between price and value drivers. Again, the analysis is conducted separately for comparable firms from the same industry (table 3, panel A) and for comparable firms from the entire cross-section (panel B).

As predicted, relaxing the no-intercept restriction improves the performance of all multiples. The best performance is achieved when we allow for an intercept and select comparable firms from the same industry (table 3, panel A). Comparison of these results with those in table 2, panel B, provides the joint improvement created by limiting comparable firms to be from the same industry and allowing for an intercept. Generally, the improvement generated by selecting comparable firms from the same industry (panel B to panel A in each table) is relatively uniform across value drivers. In contrast, the improvement generated by allowing an intercept (table 2 to table 3 for each panel) is inversely related to that value driver's performance in table 2. Value drivers that perform poorly in table 2 improve more than those that do well in that table. Contrast, for example, the improvement observed for Sales (interquartile range of 0.738 in table 2, panel A, to 0.614 in table 3, panel A) with the improvement observed for EG1 (interquartile range of 0.313 in table 2, panel A, to 0.306 in table 3, panel A). Although the improvement in absolute performance of the value drivers is not uniform, the rank order of different value drivers remains unchanged from table 2 to table 3.

### 5.4 VARIATION IN PERFORMANCE ACROSS INDUSTRIES AND YEARS

Given our focus on understanding the underlying information content of the different multiples, our results so far relate to pooled data. We consider next variation in the performance of different value drivers across years and industries to determine if the overall results are observed consistently in different years and industries. Arguments have been made before for different value drivers to perform better in certain industries than in others. For example, Tasker [1998] reports that investment bankers and analysts appear to use different preferred multiples in different industries. Although we recognize that our search is unlikely to offer conclusive results, since we do not pick comparable firms with the same skill and attention as is done in other contexts, we offer some preliminary findings.

Since investment professionals use simple multiples (no intercept) and select comparable firms from the same industry, we conduct the analysis only for that combination (corresponding to table 2, panel A). We pool the valuation results for each industry across years, and rank multiples based on the interquartile range of pricing errors within each industry. The results for the 81 industries we analyze are reported in Appendix B. The

rankings range between 1 (best) and 17 (worst). We also report summary statistics of the rankings at the bottom of the table. The rankings reported in our pooled results are observed with remarkable consistency across all industries.

To illustrate graphically the essence of these rankings, we focus only on the six representative value drivers considered in figure 1, panel A, compute rankings again for each industry, and tabulate the number of times each value driver was ranked first, second, and so on in an industry. The results of that tabulation are reported in figure 1, panel B, and the consistency of the rankings across industries is clearly evident. EPS2 is ranked first in 66 of 81 industries, ranked second in 11 industries and ranked third and fourth in two industries each. It is never ranked fifth or sixth. The modal rank for P1* is second, is third for IACT, is fourth for EBITDA, is fifth for BV, and sixth for Sales. These modal ranks are observed in more than half the 81 industries in each case. Removing P1* from the analysis only strengthens further the performance of EPS2 (it is ranked first 77 times out of 81).

This pattern of superior relative performance for forward earnings multiples, which is consistent with the results in Kim and Ritter [1999], suggests that the information contained in forward looking value drivers captures a considerable fraction of value, and this feature is common to all industries. The absence of a significant number of industries where EBITDA performs better than other value drivers is inconsistent with the conventional wisdom that this cash flow measure is particularly useful in low growth industries or industries with considerable amortization of goodwill. The absence of superior performance for Sales in any industry (it is never ranked first or second in figure 1, panel B) is also inconsistent with Sales multiples being useful in certain industries.

Our evidence on the consistency of these rankings across different years is reported in figure 1, panel C. We focus only on the six representative value drivers and report the interquartile range of pricing errors each year for the six value drivers. The absolute and relative levels of those interquartile ranges appear fairly consistent over time. One noticeable deviation from that overall description is that although the performance of P1* is similar to that of EPS2 during the 1980s, it declines during the 1990s (interquartile range for EPS2 increases from about 0.35 in 1991 to 0.46 by 1999). Notwithstanding this deviation, these results suggest that our overall results are robust and observed consistently throughout the 18-year sample period.

## *6. Conclusions*

In this study we examine the valuation properties of a comprehensive list of value drivers. Although our primary focus is on the traditional approach, which assumes direct proportionality between price and value driver and

selects comparable firms from the same industry, we also consider a less restrictive approach that allows for an intercept and examine the effect of expanding the group of comparable firms to include all firms in the cross-section.

We find that multiples based on forward earnings explain stock prices reasonably well for a majority of our sample. In terms of relative performance, our results show historical earnings measures are ranked second after forward earnings measures, cash flow measures and book value are tied for third, and sales performs the worst. This ranking is robust to the use of different statistical methods and, more importantly, similar results are obtained across different industries and sample years. We find that the common practice of selecting firms from the same industry improves performance for all value drivers. Although we find that the improvement in performance obtained by allowing for an intercept in the price/value driver relation is quite large for value drivers that perform poorly, it is minimal for value drivers that perform well (such as forward earnings). We speculate that multiples are used primarily because they are simple to comprehend and communicate and the additional complexity associated with including an intercept may exceed the benefits of improved fit.

Our results regarding the information in different value drivers are consistent with intuition. For example, forward-looking earnings forecasts reflect value better than historical accounting information, accounting accruals add value-relevant information to cash flows, and profitability can be better measured when revenue is matched with expenses. Some results in this paper are surprising, however. For example, multiples based on the residual income model, which explicitly forecasts terminal value and adjusts for risk, perform worse than simple multiples based on earnings forecasts. And adjusting for leverage does not improve the valuation properties of EBITDA and Sales. We investigate these results further and feel that these results indicate the trade-off that exists between signal and noise when more complex but theoretically correct structures are imposed. As a caveat, we recognize that our study is designed to provide an overview of aggregate patterns, and thus may have missed more subtle relationships that are apparent only in small sample studies.

## APPENDIX A

This appendix describes how the variables are constructed. The #s in parentheses refer to data items from COMPUSTAT. Number of shares and per share data from COMPUSTAT are adjusted for subsequent splits and stock dividends to allow comparability with IBES per share data.

P: Share price from IBES, as of April each year.

TP: Enterprise value per share = book value of debt, deflated by shares outstanding (#25), plus share price (P), where book value of debt = long term debt (#9) + debt in current liabilities (#34) + preferred stock (#130) − preferred treasury stock (#227) + preferred dividends in arrears (#242).

BV: Per share book value of equity = book equity (#60) deflated by shares outstanding (#25).

SALES: Per share sales = sales (#12) deflated by shares outstanding (#25).

CACT: COMPUSTAT actual earnings per share = EPS excluding extraordinary items (#58).

IACT: IBES actual earnings per share (per share earnings adjusted for one-time items).

EBITDA: Per share earnings before interest, taxes, depreciation and amortization = EBITDA (#13), deflated by shares outstanding (#25).

CFO: Per share cash flow from operations = EBITDA minus the total of interest expense (#15), tax expense (#16) and the net change in working capital, deflated by shares outstanding (#25), where net change in working capital is change in current assets (#4) minus change in cash and cash equivalents (#1) minus change in current liabilities (#5) plus change in debt included in current liabilities (#34).
Data items 15, 16, 1 or 34 are set to zero if missing.

FCF: Per share free cash flow = CFO minus net investment, where net investment is capital expenditures (#128) plus acquisitions (#129) plus increase in investment (#113) minus sale of PP&E (#107) minus sale of investment (#109), deflated by shares outstanding (#25).
Data items 128, 129, 113, 107 or 109 are set to zero if missing.

MCF: Per share maintenance cash flow = CFO minus depreciation expense (#125), deflated by shares outstanding (#25).

EPS1: mean IBES one year out earnings per share forecast

EPS2: mean IBES two year out earnings per share forecast

EG1: IBES three year out earnings per share forecast, measured as EPS2*(1 + g), where g is mean IBES long term growth forecast

EG2: EPS2*g, where g is mean IBES long term EPS growth forecast

The three P* measures are defined as follows:

$$P1_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{E_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \frac{E_t(EPS_{t+s} - k_t BV_{t+4})}{k_t(1+k_t)^s}$$

$$P2_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{E_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right)$$

$$P3_t^* = BV_t + \sum_{s=1}^{2}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \sum_{s=3}^{11}\frac{[\mathrm{E}_t(ROE_{t+5}) - k_t]BV_{t+s-1})}{(1+k_t)^s} + \frac{[\mathrm{E}_t(ROE_{t+12}) - k_t]BV_{t+11}}{K_t(1+k_t)^{11}}$$

The variables used in the P* calculations are obtained as follows: The discount rate ($k_t$) is calculated as the risk-free rate plus beta times the equity risk premium. We use the 10-year Treasury bond yield on April 1 of year t + 1 as the risk-free rate and assume a constant 5% equity risk premium. We measure beta as the median beta of all firms in the same beta decile in year t. We estimate betas using monthly stock returns and value-weighted CRSP returns for the five years ending in March of year t + 1 (we require a minimum of 30 non-missing monthly returns in those 5 years).

For a subgroup of firm-years (less than 5 percent), we were able to obtain mean IBES forecasts for all years in the five-year horizon. For all other firms, with less than complete forecasts available between years 3 and 5, we generated forecasts by applying the mean long-term growth forecast (g) to the mean forecast for the prior year in the horizon; i.e., $EPS_{t+s} = EPS_{t+s-1}{}^*(1+g)$.

The book values for future years, corresponding to the earnings forecasts, are determined by assuming the "ex-ante clean surplus" relation (ending book value in each future period equals beginning book value plus forecasted earnings less forecasted dividends). Since analyst forecasts of future dividends are not available on IBES, we assume that the current dividend payout ratio will be maintained in the future. We measure the current dividend payout as the ratio of the indicated annual cash dividends to the earnings forecast for year t + 1 (both obtained from the IBES summary file). To minimize biases that could be induced by extreme dividend payout ratios (caused by forecast t + 1 earnings that are close to zero), we Winsorize payout ratios at 10% and 50%.

In the calculation of $P3_t^*$, we forecast $\mathrm{E}_t(ROE_{t+5})$ for s = 4, 5, . . . , 12 using a linear interpolation to the industry median ROE. The industry median ROE is calculated as a moving median of the past ten years' ROE of all firms in the industry. To eliminate outliers, industry median ROEs are Winsorized at the risk free rate and 20%.

The earnings forecasts for years +1 to +5 are summed to obtain the two earnings sum measures.

$$ES1_t = \sum_{s=1}^{5}\mathrm{E}_t(EPS_{t+s}) \quad \text{and} \quad ES2_t = \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s})}{(1+k_t)^s}\right)$$

## APPENDIX B

## INDUSTRY RANKINGS OF MULTIPLES

Pricing errors (scaled by share price) are computed for each firm-year using harmonic means of firms in each industry. Multiples are ranked for each industry according to the inter-quartile range of pricing errors. Lower ranks indicate better performance. Industry classification is from the IBES sector/industry group classification code. Years covered are 1981 through 1999. Sample size is 19,879. Summary descriptions of the variables are as follows (all amounts are on per share basis): P is stock price; BV is book value of equity; CFO is cash flow from operations; EBITDA is earnings before interest, taxes, depreciation and amortization; CACT is COMPUSTAT earnings before extraordinary items; IACT is IBES actual earnings; EPS1, EPS2 are one year out and two year out earnings forecasts; EG1 = EPS2* (1 + g), EG2 = EPS2*g, where g is growth forecast. TP is enterprise value (market value of equity plus book value of debt). When TP multiples are used, predicted equity value is calculated by subtracting the book value of debt.

$$P1_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+4})}{k_t(1+k_t)^s},$$

$$P2_t^* = BV_t + \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right)$$

$$P3_t^* = BV_t + \sum_{s=1}^{2}\left(\frac{\mathrm{E}_t(EPS_{t+s} - k_t BV_{t+s-1})}{(1+k_t)^s}\right) + \sum_{s=3}^{11}\frac{[\mathrm{E}_t(ROE_{t+s}) - k_t]BV_{t+s-1}}{(1+k_t)^s} + \frac{[\mathrm{E}_t(ROE_{t+12}) - k_t]BV_{t+11}}{k_t(1+k_t)^{11}},$$

where $\mathrm{E}_t(ROE_{t+s})$ for s = 4, 5, ..., 12 is forecasted using a linear interpolation to the industry median ROE. The industry median ROE is calculated as a moving median of the past ten years' ROE of all firms in the industry. To eliminate outliers, industry median ROEs are Winsorized at the risk free rate and 20%.

$$ES1_t = \sum_{s=1}^{5}\mathrm{E}_t(EPS_{t+s}), \quad \text{and} \quad ES2_t = \sum_{s=1}^{5}\left(\frac{\mathrm{E}_t(EPS_{t+s})}{(1+k_t)^s}\right).$$

Years covered are 1982 through 1999. Sample size is 19,879.

| Sector | Industry | BV | CFO | CACT | IACT | Ebitda | Sales | EPS1 | EPS2 | EG1 | EG2 | P1* | P2* | P3* | ES1 | ES2 | Ebitda/ TP | Sales/ TP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basic Ind. | Building & Related | 17 | 15 | 10 | 11 | 12 | 16 | 8 | 6 | 7 | 2 | 1 | 9 | 3 | 5 | 4 | 13 | 14 |
| Basic Ind. | Chemicals | 14 | 16 | 11 | 8 | 13 | 15 | 5 | 4 | 3 | 7 | 6 | 9 | 10 | 1 | 2 | 12 | 17 |
| Basic Ind. | Containers | 14 | 17 | 15 | 10 | 11 | 16 | 6 | 3 | 2 | 7 | 5 | 9 | 8 | 4 | 1 | 12 | 13 |
| Basic Ind. | EAFE Metals-Nonfer | 8 | 17 | 16 | 15 | 6 | 7 | 13 | 4 | 1 | 11 | 12 | 3 | 9 | 2 | 5 | 10 | 14 |
| Basic Ind. | Forest Products | 13 | 14 | 15 | 11 | 10 | 16 | 8 | 2 | 4 | 9 | 6 | 5 | 7 | 3 | 1 | 12 | 17 |
| Basic Ind. | Metal Fab & Dist | 14 | 15 | 9 | 10 | 13 | 16 | 4 | 5 | 3 | 2 | 8 | 7 | 12 | 1 | 6 | 11 | 17 |
| Basic Ind. | Multi-Ind Basic | 11 | 16 | 10 | 9 | 12 | 14 | 3 | 1 | 4 | 15 | 7 | 6 | 8 | 5 | 2 | 13 | 17 |
| Basic Ind. | Nonfer Base Met | 13 | 15 | 11 | 12 | 10 | 16 | 7 | 1 | 8 | 6 | 9 | 5 | 2 | 3 | 4 | 14 | 17 |
| Basic Ind. | Paper | 13 | 16 | 11 | 10 | 12 | 15 | 7 | 6 | 2 | 9 | 3 | 8 | 5 | 4 | 1 | 14 | 17 |
| Basic Ind. | Precious Metals | 13 | 12 | 14 | 8 | 10 | 16 | 11 | 6 | 4 | 15 | 2 | 7 | 1 | 5 | 3 | 9 | 17 |
| Basic Ind. | Steel | 5 | 16 | 14 | 11 | 12 | 15 | 8 | 2 | 3 | 10 | 7 | 1 | 9 | 6 | 4 | 13 | 17 |
| Basic Ind. | Textiles | 14 | 17 | 10 | 9 | 13 | 15 | 5 | 2 | 4 | 8 | 6 | 7 | 11 | 1 | 3 | 12 | 16 |
| Cap. Goods | Aerospace | 14 | 15 | 11 | 9 | 13 | 16 | 6 | 1 | 3 | 5 | 7 | 10 | 8 | 2 | 4 | 12 | 17 |
| Cap. Goods | Auto OEMS | 10 | 17 | 11 | 12 | 13 | 14 | 6 | 1 | 2 | 8 | 7 | 5 | 9 | 3 | 4 | 15 | 16 |
| Cap. Goods | Bldg Materials | 14 | 16 | 11 | 10 | 13 | 15 | 5 | 2 | 3 | 7 | 6 | 9 | 8 | 1 | 4 | 12 | 17 |
| Cap. Goods | Defense | 12 | 17 | 11 | 10 | 13 | 15 | 6 | 3 | 5 | 8 | 4 | 7 | 9 | 1 | 2 | 14 | 16 |
| Cap. Goods | Electrical | 14 | 16 | 11 | 10 | 12 | 15 | 3 | 7 | 5 | 9 | 1 | 6 | 8 | 2 | 4 | 13 | 17 |
| Cap. Goods | Machinery | 12 | 16 | 13 | 9 | 11 | 15 | 5 | 3 | 1 | 8 | 6 | 7 | 10 | 2 | 4 | 14 | 17 |
| Cap. Goods | Multi-Ind Cap Good | 17 | 16 | 8 | 9 | 10 | 12 | 2 | 3 | 4 | 1 | 7 | 14 | 13 | 5 | 6 | 11 | 15 |
| Cap. Goods | Office Products | 16 | 14 | 9 | 7 | 13 | 15 | 3 | 1 | 2 | 8 | 6 | 12 | 11 | 4 | 5 | 10 | 17 |
| Cap. Goods | Undesig Capital | 15 | 14 | 11 | 13 | 8 | 16 | 5 | 1 | 2 | 12 | 6 | 10 | 9 | 4 | 3 | 7 | 17 |

APPENDIX B—*continued*

| Sector | Industry | BV | CFO | CACT | IACT | Ebitda | Sales | EPS1 | EPS2 | EG1 | EG2 | P1* | P2* | P3* | ES1 | ES2 | Ebitda/ TP | Sales/ TP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consumer Dur. | Auto Part Mfg | 14 | 17 | 11 | 7 | 12 | 15 | 4 | 1 | 3 | 8 | 9 | 6 | 10 | 2 | 5 | 13 | 16 |
| Consumer Dur. | Automotive Mfg | 3 | 8 | 15 | 14 | 16 | 7 | 13 | 11 | 12 | 6 | 4 | 1 | 2 | 10 | 9 | 17 | 5 |
| Consumer Dur. | Home Bldg | 13 | 17 | 11 | 10 | 12 | 15 | 5 | 1 | 3 | 6 | 7 | 8 | 9 | 2 | 4 | 14 | 16 |
| Consumer Dur. | Home Furnish | 14 | 17 | 12 | 8 | 11 | 15 | 5 | 3 | 4 | 10 | 6 | 7 | 13 | 2 | 1 | 9 | 16 |
| Consumer Dur. | Leisure Prods | 14 | 15 | 7 | 4 | 11 | 16 | 1 | 2 | 3 | 6 | 9 | 10 | 13 | 5 | 8 | 12 | 17 |
| Consumer Dur. | Rec Vehicles | 14 | 16 | 10 | 7 | 13 | 17 | 1 | 3 | 5 | 6 | 8 | 9 | 12 | 2 | 4 | 11 | 15 |
| Consumer Dur. | Rubber | 16 | 17 | 13 | 9 | 10 | 15 | 7 | 5 | 4 | 8 | 3 | 11 | 6 | 2 | 1 | 12 | 14 |
| Consumer Dur. | Tools & Hardware | 12 | 15 | 3 | 4 | 16 | 17 | 7 | 2 | 5 | 13 | 10 | 9 | 11 | 6 | 1 | 8 | 14 |
| Cons. Non-Dur. | Beverages | 15 | 14 | 10 | 8 | 12 | 16 | 7 | 5 | 2 | 6 | 4 | 11 | 9 | 1 | 3 | 13 | 17 |
| Cons. Non-Dur. | Clothing | 14 | 16 | 12 | 10 | 9 | 15 | 4 | 1 | 5 | 6 | 7 | 8 | 13 | 3 | 2 | 11 | 17 |
| Cons. Non-Dur. | Consumer Containers | 13 | 15 | 12 | 10 | 9 | 16 | 2 | 4 | 5 | 11 | 6 | 7 | 8 | 3 | 1 | 14 | 17 |
| Cons. Non-Dur. | Cosmetics | 17 | 14 | 8 | 6 | 13 | 15 | 5 | 3 | 2 | 11 | 7 | 12 | 9 | 1 | 4 | 10 | 16 |
| Cons. Non-Dur. | Food Processors | 15 | 14 | 9 | 8 | 13 | 16 | 1 | 3 | 5 | 6 | 7 | 12 | 11 | 2 | 4 | 10 | 17 |
| Cons. Non-Dur. | Home Prods | 14 | 15 | 12 | 8 | 13 | 16 | 6 | 5 | 1 | 3 | 7 | 9 | 10 | 2 | 4 | 11 | 17 |
| Cons. Non-Dur. | Leisure Time | 16 | 17 | 14 | 12 | 10 | 13 | 5 | 4 | 3 | 9 | 8 | 6 | 11 | 1 | 2 | 7 | 15 |
| Cons. Non-Dur. | Leisure Times | 12 | 14 | 11 | 9 | 15 | 16 | 7 | 4 | 1 | 8 | 6 | 5 | 10 | 2 | 3 | 13 | 17 |
| Cons. Non-Dur. | Paint & Rel Mats | 13 | 16 | 10 | 8 | 12 | 15 | 6 | 4 | 5 | 2 | 7 | 11 | 9 | 3 | 1 | 14 | 17 |
| Cons. Non-Dur. | Tobacco | 16 | 15 | 13 | 7 | 11 | 14 | 6 | 1 | 3 | 8 | 5 | 10 | 9 | 4 | 2 | 12 | 17 |
| Cons. Services | Communications | 15 | 14 | 13 | 8 | 12 | 16 | 7 | 3 | 5 | 4 | 6 | 10 | 9 | 1 | 2 | 11 | 17 |
| Cons. Services | Ind Svcs | 13 | 16 | 10 | 6 | 14 | 15 | 4 | 7 | 3 | 8 | 1 | 9 | 11 | 5 | 2 | 12 | 17 |
| Cons. Services | Retail—Foods | 14 | 15 | 10 | 8 | 12 | 16 | 5 | 4 | 2 | 7 | 6 | 9 | 11 | 1 | 3 | 13 | 17 |
| Cons. Services | Retail—Goods | 14 | 16 | 10 | 9 | 12 | 15 | 6 | 4 | 2 | 3 | 7 | 8 | 11 | 1 | 5 | 13 | 17 |
| Cons. Services | Undesig Conr Svc | 12 | 16 | 10 | 8 | 14 | 15 | 4 | 3 | 2 | 7 | 6 | 9 | 11 | 1 | 5 | 13 | 17 |

APPENDIX B—*continued*

| Sector | Industry | BV | CFO | CACT | IACT | Ebitda | Sales | EPS1 | EPS2 | EG1 | EG2 | P1* | P2* | P3* | ES1 | ES2 | Ebitda/ TP | Sales/ TP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Energy | Canadian Energy | 14 | 16 | 10 | 8 | 11 | 15 | 5 | 1 | 6 | 13 | 7 | 9 | 2 | 3 | 4 | 12 | 17 |
| Energy | Coal | 12 | 16 | 7 | 10 | 14 | 17 | 6 | 5 | 2 | 8 | 4 | 11 | 9 | 3 | 1 | 13 | 15 |
| Energy | EAFE Energy Srcs | 2 | 13 | 16 | 15 | 1 | 12 | 11 | 8 | 4 | 9 | 10 | 6 | 14 | 3 | 5 | 7 | 17 |
| Energy | Gas | 7 | 14 | 8 | 12 | 10 | 16 | 3 | 4 | 6 | 15 | 11 | 1 | 9 | 5 | 2 | 13 | 17 |
| Energy | Oil | 9 | 13 | 15 | 12 | 11 | 16 | 8 | 5 | 2 | 10 | 6 | 1 | 7 | 3 | 4 | 14 | 17 |
| Finance | Banking | 11 | 16 | 9 | 6 | 12 | 13 | 5 | 3 | 4 | 8 | 10 | 7 | 14 | 2 | 1 | 17 | 15 |
| Finance | Finan & Loan | 8 | 17 | 7 | 4 | 11 | 10 | 6 | 1 | 2 | 13 | 12 | 9 | 14 | 3 | 5 | 15 | 16 |
| Finance | Finan Svcs | 17 | 16 | 12 | 6 | 13 | 11 | 9 | 5 | 3 | 8 | 1 | 7 | 10 | 4 | 2 | 14 | 15 |
| Finance | Insurance | 15 | 16 | 12 | 8 | 10 | 14 | 5 | 2 | 3 | 7 | 6 | 11 | 9 | 4 | 1 | 13 | 17 |
| Finance | Investments | 14 | 15 | 11 | 9 | 12 | 17 | 6 | 2 | 5 | 10 | 4 | 8 | 7 | 3 | 1 | 13 | 16 |
| Finance | S & L | 11 | 15 | 12 | 7 | 9 | 14 | 1 | 4 | 2 | 10 | 8 | 5 | 13 | 3 | 6 | 17 | 16 |
| Finance | Undesignated Finance | 10 | 14 | 6 | 7 | 12 | 16 | 15 | 11 | 9 | 2 | 1 | 4 | 3 | 8 | 5 | 13 | 17 |
| Health Care | Biotech | 14 | 17 | 13 | 11 | 9 | 15 | 10 | 1 | 4 | 2 | 7 | 8 | 3 | 6 | 5 | 16 | 12 |
| Health Care | Drugs | 15 | 17 | 13 | 10 | 11 | 14 | 5 | 4 | 2 | 9 | 7 | 6 | 8 | 1 | 3 | 12 | 16 |
| Health Care | Hosp Supplies | 14 | 17 | 11 | 9 | 12 | 15 | 7 | 6 | 2 | 4 | 5 | 8 | 10 | 1 | 3 | 13 | 16 |
| Health Care | Hospitals | 14 | 15 | 12 | 10 | 13 | 16 | 6 | 1 | 5 | 9 | 4 | 8 | 7 | 2 | 3 | 11 | 17 |
| Health Care | Med Supplies | 15 | 17 | 10 | 9 | 13 | 14 | 5 | 4 | 2 | 6 | 7 | 8 | 12 | 1 | 3 | 11 | 16 |
| Health Care | Svc to Med Prof | 14 | 15 | 12 | 9 | 11 | 16 | 7 | 5 | 4 | 1 | 8 | 6 | 13 | 2 | 3 | 10 | 17 |
| Misc. Undesig. | Unclassified | 12 | 13 | 11 | 10 | 14 | 16 | 5 | 3 | 4 | 7 | 6 | 9 | 8 | 2 | 1 | 15 | 17 |
| Public Utilities | Electrical Util | 11 | 14 | 10 | 9 | 12 | 15 | 5 | 2 | 4 | 13 | 6 | 7 | 8 | 3 | 1 | 16 | 17 |
| Public Utilities | Gas Util | 8 | 16 | 11 | 9 | 10 | 15 | 5 | 1 | 2° | 14 | 7° | 6° | 12 | 3° | 4° | 13 | 17 |
| Public Utilities | Phone Util | 15 | 16 | 13 | 8 | 12 | 11 | 5 | 4 | 2° | 10 | 7° | 6° | 9° | 1° | 3° | 17 | 14 |
| Public Utilities | Water Util | 9 | 12 | 8 | 4 | 5 | 13 | 1 | 3° | 2° | 15 | 11 | 10 | 14 | 6° | 7° | 16 | 17 |

APPENDIX B—*continued*

| Sector | Industry | BV | CFO | CACT | IACT | Ebitda | Sales | EPS1 | EPS2 | EG1 | EG2 | P1* | P2* | P3* | ES1 | ES2 | Ebitda/ TP | Sales/ TP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Technology | Computers | 14 | 17 | 11 | 10 | 12 | 15 | 6 | 4 | 2 | 5 | 7 | 8 | 9 | 1 | 3 | 13 | 16 |
| Technology | Electronics Sys/Dev | 14 | 15 | 10 | 8 | 11 | 16 | 6 | 4 | 3 | 5 | 7 | 9 | 12 | 1 | 2 | 13 | 17 |
| Technology | Electronics | 13 | 15 | 14 | 11 | 12 | 16 | 6 | 3 | 4 | 7 | 5 | 8 | 9 | 2 | 1 | 10 | 17 |
| Technology | Office/Comm Equip | 13 | 17 | 15 | 9 | 14 | 12 | 5 | 3 | 1 | 7 | 6 | 8 | 10 | 2 | 4 | 11 | 16 |
| Technology | Other Computers | 15 | 14 | 11 | 9 | 13 | 16 | 4 | 6 | 3 | 5 | 7 | 8 | 10 | 1 | 2 | 12 | 17 |
| Technology | Photo-Optic Equip | 14 | 17 | 11 | 10 | 15 | 13 | 5 | 4 | 2 | 7 | 6 | 8 | 9 | 3 | 1 | 16 | 12 |
| Technology | Semicond/Comp | 14 | 15 | 12 | 9 | 11 | 16 | 6 | 4 | 3 | 8 | 7 | 5 | 13 | 1 | 2 | 10 | 17 |
| Technology | Software EDP | 17 | 15 | 14 | 8 | 12 | 13 | 5 | 4 | 1 | 6 | 9 | 7 | 10 | 3 | 2 | 11 | 16 |
| Technology | Undesignated Tech | 12 | 14 | 7 | 9 | 15 | 16 | 1 | 3 | 4 | 10 | 8 | 6 | 11 | 2 | 5 | 13 | 17 |
| Technology | Undesignated Technology | 15 | 17 | 12 | 11 | 10 | 13 | 7 | 2 | 6 | 14 | 8 | 5 | 9 | 3 | 4 | 1 | 16 |
| Transportation | Airlines | 11 | 15 | 13 | 10 | 12 | 16 | 8 | 7 | 5 | 1 | 6 | 3 | 9 | 2 | 4 | 14 | 17 |
| Transportation | Maritime | 9 | 16 | 13 | 8 | 12 | 17 | 7 | 4 | 2 | 11 | 3 | 1 | 14 | 6 | 5 | 10 | 15 |
| Transportation | Railroads | 12 | 13 | 11 | 7 | 15 | 16 | 5 | 2 | 4 | 8 | 6 | 9 | 10 | 3 | 1 | 14 | 17 |
| Transportation | Trucking | 12 | 14 | 8 | 10 | 16 | 15 | 4 | 3 | 5 | 9 | 7 | 6 | 11 | 1 | 2 | 13 | 17 |
| | Mean Rank | 12.9 | 15.3 | 11.1 | 9.0 | 11.7 | 14.8 | 5.7 | 3.5 | 3.5 | 7.5 | 6.4 | 7.5 | 9.4 | 2.8 | 3.2 | 12.3 | 16.1 |
| | Median Rank | 14 | 16 | 11 | 9 | 12 | 15 | 5 | 3 | 3 | 8 | 7 | 8 | 9 | 2 | 3 | 13 | 17 |
| | Standard Deviation of Rank | 2.90 | 1.53 | 2.37 | 2.18 | 2.30 | 1.90 | 2.61 | 2.08 | 1.87 | 3.44 | 2.35 | 2.68 | 2.95 | 1.79 | 1.76 | 2.55 | 1.72 |

Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 163 of 251

REFERENCES

ABARBANELL, J., AND V. L. BERNARD. "Is the U.S. Stock Market Myopic?" *Journal of Accounting Research* (Autumn, 2000): 221–42.

ALFORD, A. "The Effect of the Set of Comparable Firms on the Accuracy of the Price-earnings Valuation Method." *Journal of Accounting Research* 30 (1992): 94–108.

BAKER, M., AND R. RUBACK. "Estimating Industry Multiples." Working paper, Harvard University, Cambridge, MA, 1999.

BASU, S. "Investment Performance of Common Stocks in Relation to Their Price-earnings Ratios: A Test of the Efficient Markets Hypothesis." *Journal of Finance* (1977): 663–82.

BEATTY, R. P.; S. M. RIFFE; AND R. THOMPSON. "The Method of Comparables and Tax Court Valuations of Private Firms: An Empirical Investigation." *Accounting Horizons* 13 (1999): 177–99.

BOATSMAN, J., AND E. BASKIN. "Asset Valuation with Incomplete Markets." *The Accounting Review* 56 (1981): 38–53.

BRADSHAW, M. T. "How Do Analysts Use Their Earning Forecasts in Generating Stock Recommendations?" Working paper, University of Michigan, Ann Arbor, MI, 1999a.

BRADSHAW, M. T. "Analysts Reports, Target Prices, and Stock Recommendations." Working paper, University of Michigan, Ann Arbor, MI, 1999b.

CHENG, C. S. A., AND R. MCNAMARA. "The Valuation Accuracy of the Price-Earnings and Price-Book Benchmark Valuation Methods." Working paper, University of Houston, Houston, TX, 1996.

CLAUS, J. J., AND J. K. THOMAS. "Equity Premia as Low as Three Percent? Empirical Evidence from Analysts' Earnings Forecasts for Domestic and International Stock Markets." Working paper, Columbia University, New York, NY, 2000.

COPELAND, T.; T. KOLLER; AND J. MURRIN. *Valuation.* New York: Wiley, 1994.

DAMODARAN, A. *Damodaran on Valuation.* New York: Wiley, 1996.

FELTHAM, G., AND J. A. OHLSON. "Valuation and Clean Surplus Accounting for Operating and Financial Activities." *Contemporary Accounting Research* (Spring 1995): 689–731.

FRANKEL, R., AND C. M. C. LEE. "Accounting Valuation, Market Expectation, and Cross-Sectional Stock Returns." *Journal of Accounting and Economics* 25 (1998): 283–319.

GEBHARDT, W. R.; C. M. C. LEE; AND B. SWAMINATHAN. "Toward an Implied Cost-of-Capital." *Journal of Accounting Research* 39 (June 2001): 135–176.

GILSON, S. C.; E. S. HOTCHKISS; AND R. S. RUBACK. "Valuation of Bankrupt Firms." *Review of Financial Studies* 13 (2000): 43–74.

HAND, J. R. M. "Profits, Losses, and the Stock of Internet Firms." Working paper, University of North Carolina, Chapel Hill, NC, 1999.

HAND, J. R. M. "The Role of Economic Fundamentals, Web Traffic, and Supply and Demand in the Pricing of US Internet Stocks." Working paper, University of North Carolina, Chapel Hill, NC, 2000.

KAPLAN, S. N., AND R. S. RUBACK. "The Valuation of Cash Flow Forecasts: An Empirical Analysis." *The Journal of Finance* 50 (1995): 1059–93.

KIM, M., AND J. RITTER. "Valuing IPOs." *Journal of Financial Economics* 53 (1999): 409–37.

LECLAIR, M. S. "Valuing the Closely-held Corporation: The Validity and Performance of Established Valuation Procedures." *Accounting Horizons* 4 (September, 1990) 31–42.

LIU, J. 1999. "Post-earnings-announcement Drift and Analyst Forecasts." Working paper, UCLA, Los Angeles, CA, 1999.

LIU, J., AND J. THOMAS. "Stock Returns and Accounting Earnings." *Journal of Accounting Research* 38 (Spring 2000): 71–101.

LIU, J.; D. NISSIM; AND J. THOMAS. "Valuations Based on Multiples and Future Stock Returns." Working paper, Columbia University, New York, NY, 2001.

OHLSON, J. "Earnings, Book Values, and Dividends in Equity Valuation." *Contemporary Accounting Research* (Spring 1995): 661–87.

Case 3:17-cv-03301-EMC Document 364-13 Filed 08/31/22 Page 164 of 251

PALEPU, K.; P. HEALY; AND V. BERNARD. "Business Analysis and Valuation." 2nd Edition. Cincinnati, Ohio: South-Western College Publishing, 2000.

PENMAN, S. H. "Financial Statement Analysis and Security Valuation." Irwin: McGraw-Hill, 2001.

STATTMAN, D. "Book Value and Stock Returns." *The Chicago MBA: A Journal of Selected Papers*, Chicago: University of Chicago, 1980, pp. 25–45.

TASKER, S. C. "Industry Preferred Multiples in Acquisition Valuation." Working paper, Cornell University, Ithaca, NY, 1998.

TRUEMAN, B.; M. H. F. WONG; AND X. ZHANG. "The Eyeballs Have It: Searching for the Value in Internet Stocks." *Journal of Accounting Research* 38 (2000): 137–62.

# Exhibit 96

## 10.1.2 Target Returns

Exit valuations are estimates of company value at some time in the future. To convert this value to today's dollars, we need an appropriate discount rate, which we call the target return. In Chapter 4, we showed how to estimate the cost of VC by using historical data and a factor model regression. It is important to note, however, that the target return is not the same thing as the cost of VC. Our estimate of 10 percent for the cost of VC is appropriate for the *typical* VC investment. When VCs discuss target returns, they are referring to *successful* investments. In a VC method valuation, only the successful cases are considered, with unsuccessful failure cases given an effective value of 0. Let $p$ represent the probability of success. Then, the expected value at exit is

$$\text{Expected value at exit} = \text{exit valuation} * p. \tag{10.1}$$

If this exit is expected in $T$ years with no further rounds of investment, then the present discounted value for this exit is

$$\text{Present discounted value of exit} = \text{exit valuation} * p/(1 + r_{vc})^T, \tag{10.2}$$

where $r_{vc}$ is the cost of venture capital. In Equation 10.2, the expression $p/(1 + r_{vc})^T$ represents the effective discount factor for the exit valuation; we call the inverse of this discount factor the target multiple of money and denote it as M. We can also convert the target multiple of money to an annual target return, which is implicitly computed as:

$$p/(1 + r_{vc})^T = 1/M = 1/(1 + \text{Target Return})^T. \tag{10.3}$$

Exhibit 10-1 shows output from the worksheet, *TARGET*, from the *VC_method.xls* spreadsheet. The worksheet uses Equations (10.2) and (10.3) to relate inputs for the cost of venture capital into

**Exhibit 10-1** Target Returns and Target Multiples of Money

Cost of capital for VC 10.0%

Table of "Target Return" [R] (top cell) and "Target Multiple-of-Money" [M] (bottom cell)

| | | Probability of successful exit (p) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 10.0% | 20.0% | 25.0% | 30.0% | 35.0% | 40.0% | 50.0% |
| | 2 | 248% | 146% | 120% | 101% | 86% | 74% | 56% |
| | | 12.1 | 6.1 | 4.8 | 4.0 | 3.5 | 3.0 | 2.4 |
| | 3 | 137% | 88% | 75% | 64% | 56% | 49% | 39% |
| | | 13.3 | 6.7 | 5.3 | 4.4 | 3.8 | 3.3 | 2.7 |
| Years To | 4 | 96% | 64% | 56% | 49% | 43% | 38% | 31% |
| Exit = T | | 14.6 | 7.3 | 5.9 | 4.9 | 4.2 | 3.7 | 2.9 |
| | 5 | 74% | 52% | 45% | 40% | 36% | 32% | 26% |
| | | 16.1 | 8.1 | 6.44 | 5.4 | 4.6 | 4.0 | 3.2 |
| | 6 | 61% | 44% | 39% | 34% | 31% | 28% | 23% |
| | | 17.7 | 8.9 | 7.1 | 5.9 | 5.1 | 4.4 | 3.5 |
| | 7 | 53% | 38% | 34% | 31% | 28% | 25% | 21% |
| | | 19.5 | 9.7 | 7.8 | 6.5 | 5.6 | 4.9 | 3.9 |

a matrix of outputs relating the target return and target multiple of money with the probability of success and the time to successful exit. For example, if time to exit is five years and the probability of a successful exit is 20 percent, then we can look in the corresponding cell and find a target multiple of money of 8.1 (calculated from Equation (10.2), and a target return of 52 percent per year (calculated from Equation (10.3)).

It might seem as though all these steps require significant guesswork. Although guesses are certainly required, there are many ways to provide structure for these guesses using personal experience and historical data. In the exercises at the end of this chapter, you are asked to use the data from Chapter 7 to evaluate some specific probability assumptions. More generally, however, the estimate of $p$ is where a VC must use their experience and judgment. What appears to be a wild guess to the untrained eye can in fact be the exercise of hard-won intuition. For example, many basketball players can correctly assess whether their shots will go in the basket from the instant the shot leaves their hands. (And for shots that miss, they have a pretty good idea of where the rebound will go.) Talented scientists are adept at judging the success probability of an untried experiment. Champion poker players can estimate not only the mathematical odds of receiving any given card (that part is easy) but also whether other players are bluffing. All these skills combine some natural intuition with "data", where the data may be drawn from daily experience or from past experiments.

### 10.1.3 Expected Retention

In the valuation of mature companies, a DCF analysis usually includes positive cash flows before the terminal date. In the VC method, the opposite is true: we must usually account for negative cash flows, which then require further rounds of investment and a reduction in the ownership percentage for previous investors. For example, if a VC purchases 5M of Newco's 20M shares in a Series A investment, then a 5M Series B round will reduce the Series A stake from 25 percent to 20 percent. In that case, we would say that the Series A investors have a **retention percentage** of 0.20/0.25 = 80 percent. Even if the same VC participates by purchasing 1.25M shares of the Series B—thus maintaining a 25 percent stake over the two rounds—the impact on the 5M share Series A investment remains the same. If we expect all future rounds to be made at a fair market price, then the identity of the Series B investor is irrelevant to the Series A investment decision, and it is necessary to account for future reductions when analyzing the Series A investment.

The mathematics of retention is straightforward, but the underlying assumptions—as always—require some educated guesswork. We start with the number of shares outstanding after the current round of investment. This share total should include all founders' shares (including those not yet vested) and all employee options (including those not yet issued or vested). The reason to include nonvested and even nonissued options and shares is that we are focused on the valuation at a successful exit, and all these shares will certainly be issued, vested, and valuable at such a time. Here we follow the same rule as used for pre-money valuation (Chapter 8) and include the option pool in the computation of current shares outstanding.

The next step is to estimate the number of shares necessary to achieve a successful exit. This estimate should include all new shares issued at an IPO, assuming that a post-IPO valuation is used as a successful exit. The ratio of current shares to final (new + current) shares becomes our estimate of the expected retention. This estimation can be done by appealing to past experience, data on successful exits, and formal modeling.

We can make a first approximation for retention percentages by examining data in the Sand Hill Econometrics database. When we analyze the experience for all IPOs—a simple measure of "success"—we find that the average retention for all first-round investments was about 50 percent, meaning that for every 10 percent of the company owned by a first-round investor, an average

# Exhibit 97

# INTRODUCTORY Econometrics

## A MODERN APPROACH

5th EDITION

Jeffrey M. Wooldridge

# Introductory Econometrics

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# Introductory Econometrics

## A MODERN APPROACH

FIFTH EDITION

**Jeffrey M. Wooldridge**
*Michigan State University*

SOUTH-WESTERN
CENGAGE Learning

Australia • Brazil • Japan • Korea • Mexico • Singapore • Spain • United Kingdom • United States

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

This is an electronic version of the print textbook. Due to electronic rights restrictions, some third party content may be suppressed. Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. The publisher reserves the right to remove content from this title at any time if subsequent rights restrictions require it. For valuable information on pricing, previous editions, changes to current editions, and alternate formats, please visit www.cengage.com/highered to search by ISBN#, author, title, or keyword for materials in your areas of interest.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

SOUTH-WESTERN
CENGAGE Learning

***Introductory Econometrics: A Modern Approach*, Fifth Edition**
**Jeffrey M. Wooldridge**

Senior Vice President, LRS/Acquisitions & Solutions Planning: Jack W. Calhoun

Editorial Director, Business & Economics: Erin Joyner

Editor-in-Chief: Joe Sabatino

Executive Editor: Michael Worls

Associate Developmental Editor: Julie Warwick

Editorial Assistant: Libby Beiting-Lipps

Brand Management Director: Jason Sakos

Market Development Director: Lisa Lysne

Senior Brand Manager: Robin LeFevre

Senior Market Development Manager: John Carey

Content Production Manager: Jean Buttrom

Rights Acquisition Director: Audrey Pettengill

Rights Acquisition Specialist, Text/Image: John Hill

Media Editor: Anita Verma

Senior Manufacturing Planner: Kevin Kluck

Senior Art Director: Michelle Kunkler

Production Management and Composition: PreMediaGlobal

Internal Designer: PreMediaGlobal

Cover Designer: Rokusek Design

Cover Image: © Elena R/Shutterstock.com; Milosz Aniol/Shutterstock.com

© 2013, 2009 South-Western, Cengage Learning

ALL RIGHTS RESERVED. No part of this work covered by the copyright herein may be reproduced, transmitted, stored, or used in any form or by any means graphic, electronic, or mechanical, including but not limited to photocopying, recording, scanning, digitizing, taping, web distribution, information networks, or information storage and retrieval systems, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without the prior written permission of the publisher.

For product information and technology assistance, contact us at
**Cengage Learning Customer & Sales Support, 1-800-354-9706**

For permission to use material from this text or product,
submit all requests online at **www.cengage.com/permissions**
Further permissions questions can be emailed to
**permissionrequest@cengage.com**

Library of Congress Control Number: 2012945120

ISBN-13: 978-1-111-53104-1

ISBN-10: 1-111-53104-8

**South-Western**
5191 Natorp Boulevard
Mason, OH 45040
USA

Cengage Learning products are represented in Canada by Nelson Education, Ltd.

For your course and learning solutions, visit **www.cengage.com**

Purchase any of our products at your local college store or at our preferred online store **www.cengagebrain.com**

Printed in the United States of America
1 2 3 4 5 6 7 16 15 14 13 12

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

**CHAPTER**

# 2

# The Simple Regression Model

T he simple regression model can be used to study the relationship between two vari-
ables. For reasons we will see, the simple regression model has limitations as a
general tool for empirical analysis. Nevertheless, it is sometimes appropriate as an
empirical tool. Learning how to interpret the simple regression model is good practice for
studying multiple regression, which we will do in subsequent chapters.

## 2.1 Definition of the Simple Regression Model

Much of applied econometric analysis begins with the following premise: $y$ and $x$ are two
variables, representing some population, and we are interested in "explaining $y$ in terms
of $x$," or in "studying how $y$ varies with changes in $x$." We discussed some examples in
Chapter 1, including: $y$ is soybean crop yield and $x$ is amount of fertilizer; $y$ is hourly wage
and $x$ is years of education; and $y$ is a community crime rate and $x$ is number of police
officers.

In writing down a model that will "explain $y$ in terms of $x$," we must confront three
issues. First, since there is never an exact relationship between two variables, how do we
allow for other factors to affect $y$? Second, what is the functional relationship between
$y$ and $x$? And third, how can we be sure we are capturing a ceteris paribus relationship
between $y$ and $x$ (if that is a desired goal)?

We can resolve these ambiguities by writing down an equation relating $y$ to $x$. A simple
equation is

$$y = \beta_0 + \beta_1 x + u. \qquad \textbf{[2.1]}$$

Equation (2.1), which is assumed to hold in the population of interest, defines the **simple
linear regression model**. It is also called the *two-variable linear regression model* or
*bivariate linear regression model* because it relates the two variables $x$ and $y$. We now dis-
cuss the meaning of each of the quantities in (2.1). [Incidentally, the term "regression" has
origins that are not especially important for most modern econometric applications, so we
will not explain it here. See Stigler (1986) for an engaging history of regression analysis.]

When related by (2.1), the variables $y$ and $x$ have several different names used inter-
changeably, as follows: $y$ is called the **dependent variable**, the **explained variable**, the

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has
deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

**TABLE 2.1 Terminology for Simple Regression**

| *y* | *x* |
|---|---|
| Dependent variable | Independent variable |
| Explained variable | Explanatory variable |
| Response variable | Control variable |
| Predicted variable | Predictor variable |
| Regressand | Regressor |

© Cengage Learning, 2013

**response variable**, the **predicted variable**, or the **regressand**; $x$ is called the **independent variable**, the **explanatory variable**, the **control variable**, the **predictor variable**, or the **regressor**. (The term **covariate** is also used for $x$.) The terms "dependent variable" and "independent variable" are frequently used in econometrics. But be aware that the label "independent" here does not refer to the statistical notion of independence between random variables (see Appendix B).

The terms "explained" and "explanatory" variables are probably the most descriptive. "Response" and "control" are used mostly in the experimental sciences, where the variable $x$ is under the experimenter's control. We will not use the terms "predicted variable" and "predictor," although you sometimes see these in applications that are purely about prediction and not causality. Our terminology for simple regression is summarized in Table 2.1.

The variable $u$, called the **error term** or **disturbance** in the relationship, represents factors other than $x$ that affect $y$. A simple regression analysis effectively treats all factors affecting $y$ other than $x$ as being unobserved. You can usefully think of $u$ as standing for "unobserved."

Equation (2.1) also addresses the issue of the functional relationship between $y$ and $x$. If the other factors in $u$ are held fixed, so that the change in $u$ is zero, $\Delta u = 0$, then $x$ has a *linear* effect on $y$:

$$\Delta y = \beta_1 \Delta x \quad \text{if} \quad \Delta u = 0. \qquad [2.2]$$

Thus, the change in $y$ is simply $\beta_1$ multiplied by the change in $x$. This means that $\beta_1$ is the **slope parameter** in the relationship between $y$ and $x$, holding the other factors in $u$ fixed; it is of primary interest in applied economics. The **intercept parameter** $\beta_0$, sometimes called the *constant term*, also has its uses, although it is rarely central to an analysis.

## EXAMPLE 2.1 SOYBEAN YIELD AND FERTILIZER

Suppose that soybean yield is determined by the model

$$yield = \beta_0 + \beta_1 fertilizer + u, \qquad [2.3]$$

so that $y = yield$ and $x = fertilizer$. The agricultural researcher is interested in the effect of fertilizer on yield, holding other factors fixed. This effect is given by $\beta_1$. The error term $u$ contains factors such as land quality, rainfall, and so on. The coefficient $\beta_1$ measures the effect of fertilizer on yield, holding other factors fixed: $\Delta yield = \beta_1 \Delta fertilizer$.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

### EXAMPLE 2.2 A SIMPLE WAGE EQUATION

A model relating a person's wage to observed education and other unobserved factors is

$$wage = \beta_0 + \beta_1 educ + u. \quad [2.4]$$

If *wage* is measured in dollars per hour and *educ* is years of education, then $\beta_1$ measures the change in hourly wage given another year of education, holding all other factors fixed. Some of those factors include labor force experience, innate ability, tenure with current employer, work ethic, and numerous other things.

The linearity of (2.1) implies that a one-unit change in $x$ has the *same* effect on $y$, regardless of the initial value of $x$. This is unrealistic for many economic applications. For example, in the wage-education example, we might want to allow for *increasing* returns: the next year of education has a *larger* effect on wages than did the previous year. We will see how to allow for such possibilities in Section 2.4.

The most difficult issue to address is whether model (2.1) really allows us to draw ceteris paribus conclusions about how $x$ affects $y$. We just saw in equation (2.2) that $\beta_1$ *does* measure the effect of $x$ on $y$, holding all other factors (in $u$) fixed. Is this the end of the causality issue? Unfortunately, no. How can we hope to learn in general about the ceteris paribus effect of $x$ on $y$, holding other factors fixed, when we are ignoring all those other factors?

Section 2.5 will show that we are only able to get reliable estimators of $\beta_0$ and $\beta_1$ from a random sample of data when we make an assumption restricting how the unobservable $u$ is related to the explanatory variable $x$. Without such a restriction, we will not be able to estimate the ceteris paribus effect, $\beta_1$. Because $u$ and $x$ are random variables, we need a concept grounded in probability.

Before we state the key assumption about how $x$ and $u$ are related, we can always make one assumption about $u$. As long as the intercept $\beta_0$ is included in the equation, nothing is lost by assuming that the average value of $u$ in the population is zero. Mathematically,

$$\mathrm{E}(u) = 0. \quad [2.5]$$

Assumption (2.5) says nothing about the relationship between $u$ and $x$, but simply makes a statement about the distribution of the unobserved factors in the population. Using the previous examples for illustration, we can see that assumption (2.5) is not very restrictive. In Example 2.1, we lose nothing by normalizing the unobserved factors affecting soybean yield, such as land quality, to have an average of zero in the population of all cultivated plots. The same is true of the unobserved factors in Example 2.2. Without loss of generality, we can assume that things such as average ability are zero in the population of all working people. If you are not convinced, you should work through Problem 2 to see that we can always redefine the intercept in equation (2.1) to make (2.5) true.

We now turn to the crucial assumption regarding how $u$ and $x$ are related. A natural measure of the association between two random variables is the *correlation coefficient*. (See Appendix B for definition and properties.) If $u$ and $x$ are *uncorrelated*, then, as random variables, they are not *linearly* related. Assuming that $u$ and $x$ are uncorrelated goes a long way toward defining the sense in which $u$ and $x$ should be unrelated in equation (2.1). But it does not go far enough, because correlation measures only linear dependence between $u$ and $x$. Correlation has a somewhat counterintuitive feature: it is possible for $u$ to be uncorrelated with $x$ while being correlated with functions of $x$, such as $x^2$. (See Section B.4 for further discussion.) This possibility is not acceptable for most regression purposes, as it

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

causes problems for interpreting the model and for deriving statistical properties. A better assumption involves the *expected value of u given x*.

Because $u$ and $x$ are random variables, we can define the conditional distribution of $u$ given any value of $x$. In particular, for any $x$, we can obtain the expected (or average) value of $u$ for that slice of the population described by the value of $x$. The crucial assumption is that the average value of $u$ does *not* depend on the value of $x$. We can write this assumption as

$$E(u|x) = E(u). \quad [2.6]$$

Equation (2.6) says that the average value of the unobservables is the same across all slices of the population determined by the value of $x$ and that the common average is necessarily equal to the average of $u$ over the entire population. When assumption (2.6) holds, we say that $u$ is **mean independent** of $x$. (Of course, mean independence is implied by full independence between $u$ and $x$, an assumption often used in basic probability and statistics.) When we combine mean independence with assumption (2.5), we obtain the **zero conditional mean assumption**, $E(u|x) = 0$. It is critical to remember that equation (2.6) is the assumption with impact; assumption (2.5) essentially defines the intercept, $\beta_0$.

Let us see what (2.6) entails in the wage example. To simplify the discussion, assume that $u$ is the same as innate ability. Then (2.6) requires that the average level of ability is the same regardless of years of education. For example, if $E(abil|8)$ denotes the average ability for the group of all people with eight years of education, and $E(abil|16)$ denotes the average ability among people in the population with sixteen years of education, then (2.6) implies that these must be the same. In fact, the average ability level must be the same for *all* education levels. If, for example, we think that average ability increases with years of education, then (2.6) is false. (This would happen if, on average, people with more ability choose to become more educated.) As we cannot observe innate ability, we have no way of knowing whether or not average ability is the same for all education levels. But this is an issue that we must address before relying on simple regression analysis.

In the fertilizer example, if fertilizer amounts are chosen independently of other features of the plots, then (2.6) will hold: the average land quality will not depend on the amount of fertilizer. However, if more fertilizer is put on the higher-quality plots of land, then the expected value of $u$ changes with the level of fertilizer, and (2.6) fails.

The zero conditional mean assumption gives $\beta_1$ another interpretation that is often useful. Taking the expected value of (2.1) conditional on $x$ and using $E(u|x) = 0$ gives

$$E(y|x) = \beta_0 + \beta_1 x. \quad [2.8]$$

Equation (2.8) shows that the **population regression function (PRF)**, $E(y|x)$, is a linear function of $x$. The linearity means that a one-unit increase in $x$ changes the *expected value* of $y$ by the amount $\beta_1$. For any given value of $x$, the distribution of $y$ is centered about $E(y|x)$, as illustrated in Figure 2.1.

It is important to understand that equation (2.8) tells us how the *average* value of $y$ changes with $x$; it does not say that $y$ equals $\beta_0 + \beta_1 x$ for all units in the population.

### EXPLORING FURTHER 2.1

Suppose that a score on a final exam, *score*, depends on classes attended (*attend*) and unobserved factors that affect exam performance (such as student ability). Then

$$score = \beta_0 + \beta_1 attend + u. \quad [2.7]$$

When would you expect this model to satisfy (2.6)?

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



FIGURE 2.1 $E(y|x)$ as a linear function of $x$.

For example, suppose that $x$ is the high school grade point average and $y$ is the college GPA, and we happen to know that $E(colGPA|hsGPA) = 1.5 + 0.5\ hsGPA$. [Of course, in practice, we never know the population intercept and slope, but it is useful to pretend momentarily that we do to understand the nature of equation (2.8).] This GPA equation tells us the *average* college GPA among all students who have a given high school GPA. So suppose that $hsGPA = 3.6$. Then the average *colGPA* for all high school graduates who attend college with $hsGPA = 3.6$ is $1.5 + 0.5(3.6) = 3.3$. We are certainly *not* saying that every student with $hsGPA = 3.6$ will have a 3.3 college GPA; this is clearly false. The PRF gives us a relationship between the average level of $y$ at different levels of $x$. Some students with $hsGPA = 3.6$ will have a college GPA higher than 3.3, and some will have a lower college GPA. Whether the actual *colGPA* is above or below 3.3 depends on the unobserved factors in $u$, and those differ among students even within the slice of the population with $hsGPA = 3.6$.

Given the zero conditional mean assumption $E(u|x) = 0$, it is useful to view equation (2.1) as breaking $y$ into two components. The piece $\beta_0 + \beta_1 x$, which represents $E(y|x)$, is called the *systematic part* of $y$—that is, the part of $y$ explained by $x$—and $u$ is called the *unsystematic part*, or the part of $y$ not explained by $x$. In Chapter 3, when we introduce more than one explanatory variable, we will discuss how to determine how large the systematic part is relative to the unsystematic part.

In the next section, we will use assumptions (2.5) and (2.6) to motivate estimators of $\beta_0$ and $\beta_1$ given a random sample of data. The zero conditional mean assumption also plays a crucial role in the statistical analysis in Section 2.6.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

## 2.2 Deriving the Ordinary Least Squares Estimates

Now that we have discussed the basic ingredients of the simple regression model, we will address the important issue of how to estimate the parameters $\beta_0$ and $\beta_1$ in equation (2.1). To do this, we need a sample from the population. Let $\{(x_i, y_i): i = 1, \ldots, n\}$ denote a random sample of size $n$ from the population. Because these data come from (2.1), we can write

$$y_i = \beta_0 + \beta_1 x_i + u_i \quad [2.9]$$

for each $i$. Here, $u_i$ is the error term for observation $i$ because it contains all factors affecting $y_i$ other than $x_i$.

As an example, $x_i$ might be the annual income and $y_i$ the annual savings for family $i$ during a particular year. If we have collected data on fifteen families, then $n = 15$. A scatterplot of such a data set is given in Figure 2.2, along with the (necessarily fictitious) population regression function.

We must decide how to use these data to obtain estimates of the intercept and slope in the population regression of savings on income.

There are several ways to motivate the following estimation procedure. We will use (2.5) and an important implication of assumption (2.6): in the population, $u$ is uncorrelated with $x$. Therefore, we see that $u$ has zero expected value and that the *covariance* between $x$ and $u$ is zero:

$$E(u) = 0 \quad [2.10]$$

**FIGURE 2.2 Scatterplot of savings and income for 15 families, and the population regression $E(savings|income) = \beta_0 + \beta_1 income$.**

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

and

$$\text{Cov}(x,u) = \text{E}(xu) = 0, \quad [2.11]$$

where the first equality in (2.11) follows from (2.10). (See Section B.4 for the definition and properties of covariance.) In terms of the observable variables $x$ and $y$ and the unknown parameters $\beta_0$ and $\beta_1$, equations (2.10) and (2.11) can be written as

$$\text{E}(y - \beta_0 - \beta_1 x) = 0 \quad [2.12]$$

and

$$\text{E}[x(y - \beta_0 - \beta_1 x)] = 0, \quad [2.13]$$

respectively. Equations (2.12) and (2.13) imply two restrictions on the joint probability distribution of $(x,y)$ in the population. Since there are two unknown parameters to estimate, we might hope that equations (2.12) and (2.13) can be used to obtain good estimators of $\beta_0$ and $\beta_1$. In fact, they can be. Given a sample of data, we choose estimates $\hat{\beta}_0$ and $\hat{\beta}_1$ to solve the *sample* counterparts of (2.12) and (2.13):

$$n^{-1}\sum_{i=1}^{n}(y_i - \hat{\beta}_0 - \hat{\beta}_1 x_i) = 0 \quad [2.14]$$

and

$$n^{-1}\sum_{i=1}^{n}x_i(y_i - \hat{\beta}_0 - \hat{\beta}_1 x_i) = 0. \quad [2.15]$$

This is an example of the *method of moments* approach to estimation. (See Section C.4 for a discussion of different estimation approaches.) These equations can be solved for $\hat{\beta}_0$ and $\hat{\beta}_1$.

Using the basic properties of the summation operator from Appendix A, equation (2.14) can be rewritten as

$$\bar{y} = \hat{\beta}_0 + \hat{\beta}_1 \bar{x}, \quad [2.16]$$

where $\bar{y} = n^{-1}\sum_{i=1}^{n} y_i$ is the sample average of the $y_i$ and likewise for $\bar{x}$. This equation allows us to write $\hat{\beta}_0$ in terms of $\hat{\beta}_1$, $\bar{y}$, and $\bar{x}$:

$$\hat{\beta}_0 = \bar{y} - \hat{\beta}_1 \bar{x}. \quad [2.17]$$

Therefore, once we have the slope estimate $\hat{\beta}_1$, it is straightforward to obtain the intercept estimate $\hat{\beta}_0$, given $\bar{y}$ and $\bar{x}$.

Dropping the $n^{-1}$ in (2.15) (since it does not affect the solution) and plugging (2.17) into (2.15) yields

$$\sum_{i=1}^{n} x_i[y_i - (\bar{y} - \hat{\beta}_1 \bar{x}) - \hat{\beta}_1 x_i] = 0,$$

which, upon rearrangement, gives

$$\sum_{i=1}^{n} x_i(y_i - \bar{y}) = \hat{\beta}_1 \sum_{i=1}^{n} x_i(x_i - \bar{x}).$$

From basic properties of the summation operator [see (A.7) and (A.8)],

$$\sum_{i=1}^{n} x_i(x_i - \bar{x}) = \sum_{i=1}^{n}(x_i - \bar{x})^2 \quad \text{and} \quad \sum_{i=1}^{n} x_i(y_i - \bar{y}) = \sum_{i=1}^{n}(x_i - \bar{x})(y_i - \bar{y}).$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Therefore, provided that

$$\sum_{i=1}^{n} (x_i - \bar{x})^2 > 0, \qquad [2.18]$$

the estimated slope is

$$\hat{\beta}_1 = \frac{\sum_{i=1}^{n} (x_i - \bar{x})(y_i - \bar{y})}{\sum_{i=1}^{n} (x_i - \bar{x})^2}. \qquad [2.19]$$

Equation (2.19) is simply the sample covariance between $x$ and $y$ divided by the sample variance of $x$. (See Appendix C. Dividing both the numerator and the denominator by $n - 1$ changes nothing.) This makes sense because $\beta_1$ equals the population covariance divided by the variance of $x$ when $E(u) = 0$ and $Cov(x,u) = 0$. An immediate implication is that if $x$ and $y$ are positively correlated in the sample, then $\hat{\beta}_1$ is positive; if $x$ and $y$ are negatively correlated, then $\hat{\beta}_1$ is negative.

Although the method for obtaining (2.17) and (2.19) is motivated by (2.6), the only assumption needed to compute the estimates for a particular sample is (2.18). This is hardly an assumption at all: (2.18) is true provided the $x_i$ in the sample are not all equal to the same value. If (2.18) fails, then we have either been unlucky in obtaining our sample from the population or we have not specified an interesting problem ($x$ does not vary in the population). For example, if $y = wage$ and $x = educ$, then (2.18) fails only if everyone in the sample has the same amount of education (for example, if everyone is a high school graduate; see Figure 2.3). If just one person has a different amount of education, then (2.18) holds, and the estimates can be computed.

**FIGURE 2.3 A scatterplot of wage against education when $educ_i = 12$ for all $i$.**

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

The estimates given in (2.17) and (2.19) are called the **ordinary least squares (OLS)** estimates of $\beta_0$ and $\beta_1$. To justify this name, for any $\hat{\beta}_0$ and $\hat{\beta}_1$ define a **fitted value** for $y$ when $x = x_i$ as

$$\hat{y}_i = \hat{\beta}_0 + \hat{\beta}_1 x_i. \qquad [2.20]$$

This is the value we predict for $y$ when $x = x_i$ for the given intercept and slope. There is a fitted value for each observation in the sample. The **residual** for observation $i$ is the difference between the actual $y_i$ and its fitted value:

$$\hat{u}_i = y_i - \hat{y}_i = y_i - \hat{\beta}_0 - \hat{\beta}_1 x_i. \qquad [2.21]$$

Again, there are $n$ such residuals. [These are *not* the same as the errors in (2.9), a point we return to in Section 2.5.] The fitted values and residuals are indicated in Figure 2.4.

Now, suppose we choose $\hat{\beta}_0$ and $\hat{\beta}_1$ to make the **sum of squared residuals**,

$$\sum_{i=1}^{n} \hat{u}_i^2 = \sum_{i=1}^{n} (y_i - \hat{\beta}_0 - \hat{\beta}_1 x_i)^2, \qquad [2.22]$$

as small as possible. The appendix to this chapter shows that the conditions necessary for $(\hat{\beta}_0, \hat{\beta}_1)$ to minimize (2.22) are given exactly by equations (2.14) and (2.15), without $n^{-1}$. Equations (2.14) and (2.15) are often called the **first order conditions** for the OLS estimates, a term that comes from optimization using calculus (see Appendix A). From our previous calculations, we know that the solutions to the OLS first order conditions are given by (2.17) and (2.19). The name "ordinary least squares" comes from the fact that these estimates minimize the sum of squared residuals.

**FIGURE 2.4 Fitted values and residuals.**

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

When we view ordinary least squares as minimizing the sum of squared residuals, it is natural to ask: Why not minimize some other function of the residuals, such as the absolute values of the residuals? In fact, as we will discuss in the more advanced Section 9.4, minimizing the sum of the absolute values of the residuals is sometimes very useful. But it does have some drawbacks. First, we cannot obtain formulas for the resulting estimators; given a data set, the estimates must be obtained by numerical optimization routines. As a consequence, the statistical theory for estimators that minimize the sum of the absolute residuals is very complicated. Minimizing other functions of the residuals, say, the sum of the residuals each raised to the fourth power, has similar drawbacks. (We would never choose our estimates to minimize, say, the sum of the residuals themselves, as residuals large in magnitude but with opposite signs would tend to cancel out.) With OLS, we will be able to derive unbiasedness, consistency, and other important statistical properties relatively easily. Plus, as the motivation in equations (2.13) and (2.14) suggests, and as we will see in Section 2.5, OLS is suited for estimating the parameters appearing in the conditional mean function (2.8).

Once we have determined the OLS intercept and slope estimates, we form the **OLS regression line**:

$$\hat{y} = \hat{\beta}_0 + \hat{\beta}_1 x, \qquad [2.23]$$

where it is understood that $\hat{\beta}_0$ and $\hat{\beta}_1$ have been obtained using equations (2.17) and (2.19). The notation $\hat{y}$, read as "$y$ hat," emphasizes that the predicted values from equation (2.23) are estimates. The intercept, $\hat{\beta}_0$, is the predicted value of $y$ when $x = 0$, although in some cases it will not make sense to set $x = 0$. In those situations, $\hat{\beta}_0$ is not, in itself, very interesting. When using (2.23) to compute predicted values of $y$ for various values of $x$, we must account for the intercept in the calculations. Equation (2.23) is also called the **sample regression function** (**SRF**) because it is the estimated version of the population regression function $E(y|x) = \beta_0 + \beta_1 x$. It is important to remember that the PRF is something fixed, but unknown, in the population. Because the SRF is obtained for a given sample of data, a new sample will generate a different slope and intercept in equation (2.23).

In most cases, the slope estimate, which we can write as

$$\hat{\beta}_1 = \Delta\hat{y}/\Delta x, \qquad [2.24]$$

is of primary interest. It tells us the amount by which $\hat{y}$ changes when $x$ increases by one unit. Equivalently,

$$\Delta\hat{y} = \hat{\beta}_1 \Delta x, \qquad [2.25]$$

so that given any change in $x$ (whether positive or negative), we can compute the predicted change in $y$.

We now present several examples of simple regression obtained by using real data. In other words, we find the intercept and slope estimates with equations (2.17) and (2.19). Since these examples involve many observations, the calculations were done using an econometrics software package. At this point, you should be careful not to read too much into these regressions; they are not necessarily uncovering a causal relationship. We have said nothing so far about the statistical properties of OLS. In Section 2.5, we consider

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

statistical properties after we explicitly impose assumptions on the population model equation (2.1).

## EXAMPLE 2.3 CEO SALARY AND RETURN ON EQUITY

For the population of chief executive officers, let $y$ be annual salary (*salary*) in thousands of dollars. Thus, $y = 856.3$ indicates an annual salary of \$856,300, and $y = 1{,}452.6$ indicates a salary of \$1,452,600. Let $x$ be the average return on equity (*roe*) for the CEO's firm for the previous three years. (Return on equity is defined in terms of net income as a percentage of common equity.) For example, if $roe = 10$, then average return on equity is 10%.

To study the relationship between this measure of firm performance and CEO compensation, we postulate the simple model

$$salary = \beta_0 + \beta_1 roe + u.$$

The slope parameter $\beta_1$ measures the change in annual salary, in thousands of dollars, when return on equity increases by one percentage point. Because a higher *roe* is good for the company, we think $\beta_1 > 0$.

The data set CEOSAL1.RAW contains information on 209 CEOs for the year 1990; these data were obtained from *Business Week* (5/6/91). In this sample, the average annual salary is \$1,281,120, with the smallest and largest being \$223,000 and \$14,822,000, respectively. The average return on equity for the years 1988, 1989, and 1990 is 17.18%, with the smallest and largest values being 0.5 and 56.3%, respectively.

Using the data in CEOSAL1.RAW, the OLS regression line relating *salary* to *roe* is

$$\widehat{salary} = 963.191 + 18.501\, roe \qquad [2.26]$$

$$n = 209,$$

where the intercept and slope estimates have been rounded to three decimal places; we use "*salary* hat" to indicate that this is an estimated equation. How do we interpret the equation? First, if the return on equity is zero, $roe = 0$, then the predicted *salary* is the intercept, 963.191, which equals \$963,191 since *salary* is measured in thousands. Next, we can write the predicted change in salary as a function of the change in *roe*: $\Delta\widehat{salary} = 18.501\,(\Delta roe)$. This means that if the return on equity increases by one percentage point, $\Delta roe = 1$, then *salary* is predicted to change by about 18.5, or \$18,500. Because (2.26) is a linear equation, this is the estimated change regardless of the initial salary.

We can easily use (2.26) to compare predicted salaries at different values of *roe*. Suppose $roe = 30$. Then $\widehat{salary} = 963.191 + 18.501(30) = 1{,}518{,}221$, which is just over \$1.5 million. However, this does *not* mean that a particular CEO whose firm had a $roe = 30$ earns \$1,518,221. Many other factors affect salary. This is just our prediction from the OLS regression line (2.26). The estimated line is graphed in Figure 2.5, along with the population regression function $E(salary|roe)$. We will never know the PRF, so we cannot tell how close the SRF is to the PRF. Another sample of data will give a different regression line, which may or may not be closer to the population regression line.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



**FIGURE 2.5 The OLS regression line $\widehat{salary} = 963.191 + 18.501\ roe$ and the (unknown) population regression function.**

salary
salary = 963.191 + 18.501 roe
E(salary|roe) = β0 + β1roe
963.191
roe
© Cengage Learning, 2013

## EXAMPLE 2.4 WAGE AND EDUCATION

For the population of people in the workforce in 1976, let $y = wage$, where *wage* is measured in dollars per hour. Thus, for a particular person, if $wage = 6.75$, the hourly *wage* is \$6.75. Let $x = educ$ denote years of schooling; for example, $educ = 12$ corresponds to a complete high school education. Since the average wage in the sample is \$5.90, the Consumer Price Index indicates that this amount is equivalent to \$19.06 in 2003 dollars.

Using the data in WAGE1.RAW where $n = 526$ individuals, we obtain the following OLS regression line (or sample regression function):

$$\widehat{wage} = -0.90 + 0.54\ educ \qquad [2.27]$$

$$n = 526.$$

> **EXPLORING FURTHER 2.2**
>
> The estimated wage from (2.27), when $educ = 8$, is \$3.42 in 1976 dollars. What is this value in 2003 dollars? (*Hint*: You have enough information in Example 2.4 to answer this question.)

We must interpret this equation with caution. The intercept of −0.90 literally means that a person with no education has a predicted hourly wage of −90¢ an hour. This, of course, is silly. It turns out that only 18 people in the sample of 526 have less than eight years of

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

education. Consequently, it is not surprising that the regression line does poorly at very low levels of education. For a person with eight years of education, the predicted wage is $\widehat{wage} = -0.90 + 0.54(8) = 3.42$, or \$3.42 per hour (in 1976 dollars).

The slope estimate in (2.27) implies that one more year of education increases hourly wage by 54¢ an hour. Therefore, four more years of education increase the predicted wage by $4(0.54) = 2.16$, or \$2.16 per hour. These are fairly large effects. Because of the linear nature of (2.27), another year of education increases the wage by the same amount, regardless of the initial level of education. In Section 2.4, we discuss some methods that allow for nonconstant marginal effects of our explanatory variables.

### EXAMPLE 2.5 VOTING OUTCOMES AND CAMPAIGN EXPENDITURES

The file VOTE1.RAW contains data on election outcomes and campaign expenditures for 173 two-party races for the U.S. House of Representatives in 1988. There are two candidates in each race, A and B. Let *voteA* be the percentage of the vote received by Candidate A and *shareA* be the percentage of total campaign expenditures accounted for by Candidate A. Many factors other than *shareA* affect the election outcome (including the quality of the candidates and possibly the dollar amounts spent by A and B). Nevertheless, we can estimate a simple regression model to find out whether spending more relative to one's challenger implies a higher percentage of the vote.

The estimated equation using the 173 observations is

$$\widehat{voteA} = 26.81 + 0.464\, shareA \qquad [2.28]$$

$$n = 173.$$

This means that if Candidate A's share of spending increases by one percentage point, Candidate A receives almost one-half a percentage point (0.464) more of the total vote. Whether or not this is a causal effect is unclear, but it is not unbelievable. If $shareA = 50$, *voteA* is predicted to be about 50, or half the vote.

**EXPLORING FURTHER 2.3**

In Example 2.5, what is the predicted vote for Candidate A if $shareA = 60$ (which means 60%)? Does this answer seem reasonable?

In some cases, regression analysis is not used to determine causality but to simply look at whether two variables are positively or negatively related, much like a standard correlation analysis. An example of this occurs in Computer Exercise C3, where you are asked to use data from Biddle and Hamermesh (1990) on time spent sleeping and working to investigate the tradeoff between these two factors.

## A Note on Terminology

In most cases, we will indicate the estimation of a relationship through OLS by writing an equation such as (2.26), (2.27), or (2.28). Sometimes, for the sake of brevity, it is useful to indicate that an OLS regression has been run without actually writing out the equation. We will often indicate that equation (2.23) has been obtained by OLS in saying that we *run the regression of*

$$y \text{ on } x, \qquad [2.29]$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

or simply that we *regress* $y$ on $x$. The positions of $y$ and $x$ in (2.29) indicate which is the dependent variable and which is the independent variable: we always regress the dependent variable on the independent variable. For specific applications, we replace $y$ and $x$ with their names. Thus, to obtain (2.26), we regress *salary* on *roe*, or to obtain (2.28), we regress *voteA* on *shareA*.

When we use such terminology in (2.29), we will always mean that we plan to estimate the intercept, $\hat{\beta}_0$, along with the slope, $\hat{\beta}_1$. This case is appropriate for the vast majority of applications. Occasionally, we may want to estimate the relationship between $y$ and $x$ *assuming* that the intercept is zero (so that $x = 0$ implies that $\hat{y} = 0$); we cover this case briefly in Section 2.6. Unless explicitly stated otherwise, we always estimate an intercept along with a slope.

## 2.3 Properties of OLS on Any Sample of Data

In the previous section, we went through the algebra of deriving the formulas for the OLS intercept and slope estimates. In this section, we cover some further algebraic properties of the fitted OLS regression line. The best way to think about these properties is to remember that they hold, by construction, for *any* sample of data. The harder task—considering the properties of OLS across all possible random samples of data—is postponed until Section 2.5.

Several of the algebraic properties we are going to derive will appear mundane. Nevertheless, having a grasp of these properties helps us to figure out what happens to the OLS estimates and related statistics when the data are manipulated in certain ways, such as when the measurement units of the dependent and independent variables change.

### Fitted Values and Residuals

We assume that the intercept and slope estimates, $\hat{\beta}_0$ and $\hat{\beta}_1$, have been obtained for the given sample of data. Given $\hat{\beta}_0$ and $\hat{\beta}_1$, we can obtain the fitted value $\hat{y}_i$ for each observation. [This is given by equation (2.20).] By definition, each fitted value of $\hat{y}_i$ is on the OLS regression line. The OLS residual associated with observation $i$, $\hat{u}_i$, is the difference between $y_i$ and its fitted value, as given in equation (2.21). If $\hat{u}_i$ is positive, the line underpredicts $y_i$; if $\hat{u}_i$ is negative, the line overpredicts $y_i$. The ideal case for observation $i$ is when $\hat{u}_i = 0$, but in most cases, *every* residual is not equal to zero. In other words, none of the data points must actually lie on the OLS line.

**EXAMPLE 2.6 CEO SALARY AND RETURN ON EQUITY**

Table 2.2 contains a listing of the first 15 observations in the CEO data set, along with the fitted values, called *salaryhat*, and the residuals, called *uhat*.

The first four CEOs have lower salaries than what we predicted from the OLS regression line (2.26); in other words, given only the firm's *roe*, these CEOs make less than what we predicted. As can be seen from the positive *uhat*, the fifth CEO makes more than predicted from the OLS regression line.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

**TABLE 2.2 Fitted Values and Residuals for the First 15 CEOs**

| obsno | roe | salary | salaryhat | uhat |
|---|---|---|---|---|
| 1 | 14.1 | 1095 | 1224.058 | −129.0581 |
| 2 | 10.9 | 1001 | 1164.854 | −163.8542 |
| 3 | 23.5 | 1122 | 1397.969 | −275.9692 |
| 4 | 5.9 | 578 | 1072.348 | −494.3484 |
| 5 | 13.8 | 1368 | 1218.508 | 149.4923 |
| 6 | 20.0 | 1145 | 1333.215 | −188.2151 |
| 7 | 16.4 | 1078 | 1266.611 | −188.6108 |
| 8 | 16.3 | 1094 | 1264.761 | −170.7606 |
| 9 | 10.5 | 1237 | 1157.454 | 79.54626 |
| 10 | 26.3 | 833 | 1449.773 | −616.7726 |
| 11 | 25.9 | 567 | 1442.372 | −875.3721 |
| 12 | 26.8 | 933 | 1459.023 | −526.0231 |
| 13 | 14.8 | 1339 | 1237.009 | 101.9911 |
| 14 | 22.3 | 937 | 1375.768 | −438.7678 |
| 15 | 56.3 | 2011 | 2004.808 | 6.191895 |

© Cengage Learning, 2013

## Algebraic Properties of OLS Statistics

There are several useful algebraic properties of OLS estimates and their associated statistics. We now cover the three most important of these.

(1) The sum, and therefore the sample average of the OLS residuals, is zero. Mathematically,

$$\sum_{i=1}^{n} \hat{u}_i = 0. \qquad [2.30]$$

This property needs no proof; it follows immediately from the OLS first order condition (2.14), when we remember that the residuals are defined by $\hat{u}_i = y_i - \hat{\beta}_0 - \hat{\beta}_1 x_i$. In other words, the OLS estimates $\hat{\beta}_0$ and $\hat{\beta}_1$ are *chosen* to make the residuals add up to zero (for any data set). This says nothing about the residual for any particular observation $i$.

(2) The sample covariance between the regressors and the OLS residuals is zero. This follows from the first order condition (2.15), which can be written in terms of the residuals as

$$\sum_{i=1}^{n} x_i \hat{u}_i = 0. \qquad [2.31]$$

The sample average of the OLS residuals is zero, so the left-hand side of (2.31) is proportional to the sample covariance between $x_i$ and $\hat{u}_i$.

(3) The point $(\bar{x},\bar{y})$ is always on the OLS regression line. In other words, if we take equation (2.23) and plug in $\bar{x}$ for $x$, then the predicted value is $\bar{y}$. This is exactly what equation (2.16) showed us.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

## EXAMPLE 2.7 WAGE AND EDUCATION

For the data in WAGE1.RAW, the average hourly wage in the sample is 5.90, rounded to two decimal places, and the average education is 12.56. If we plug $educ = 12.56$ into the OLS regression line (2.27), we get $\widehat{wage} = -0.90 + 0.54(12.56) = 5.8824$, which equals 5.9 when rounded to the first decimal place. These figures do not exactly agree because we have rounded the average wage and education, as well as the intercept and slope estimates. If we did not initially round any of the values, we would get the answers to agree more closely, but to little useful effect.

Writing each $y_i$ as its fitted value, plus its residual, provides another way to interpret an OLS regression. For each $i$, write

$$y_i = \hat{y}_i + \hat{u}_i. \quad [2.32]$$

From property (1), the average of the residuals is zero; equivalently, the sample average of the fitted values, $\hat{y}_i$, is the same as the sample average of the $y_i$, or $\bar{\hat{y}} = \bar{y}$. Further, properties (1) and (2) can be used to show that the sample covariance between $\hat{y}_i$ and $\hat{u}_i$ is zero. Thus, we can view OLS as decomposing each $y_i$ into two parts, a fitted value and a residual. The fitted values and residuals are uncorrelated in the sample.

Define the **total sum of squares** (**SST**), the **explained sum of squares** (**SSE**), and the **residual sum of squares** (**SSR**) (also known as the sum of squared residuals), as follows:

$$\text{SST} \equiv \sum_{i=1}^{n}(y_i - \bar{y})^2. \quad [2.33]$$

$$\text{SSE} \equiv \sum_{i=1}^{n}(\hat{y}_i - \bar{y})^2. \quad [2.34]$$

$$\text{SSR} \equiv \sum_{i=1}^{n}\hat{u}_i^2. \quad [2.35]$$

SST is a measure of the total sample variation in the $y_i$; that is, it measures how spread out the $y_i$ are in the sample. If we divide SST by $n - 1$, we obtain the sample variance of $y$, as discussed in Appendix C. Similarly, SSE measures the sample variation in the $\hat{y}_i$ (where we use the fact that $\bar{\hat{y}} = \bar{y}$), and SSR measures the sample variation in the $\hat{u}_i$. The total variation in $y$ can always be expressed as the sum of the explained variation and the unexplained variation SSR. Thus,

$$\text{SST} = \text{SSE} + \text{SSR}. \quad [2.36]$$

Proving (2.36) is not difficult, but it requires us to use all of the properties of the summation operator covered in Appendix A. Write

$$\begin{aligned}\sum_{i=1}^{n}(y_i - \bar{y})^2 &= \sum_{i=1}^{n}[(y_i - \hat{y}_i) + (\hat{y}_i - \bar{y})]^2 \\ &= \sum_{i=1}^{n}[\hat{u}_i + (\hat{y}_i - \bar{y})]^2 \\ &= \sum_{i=1}^{n}\hat{u}_i^2 + 2\sum_{i=1}^{n}\hat{u}_i(\hat{y}_i - \bar{y}) + \sum_{i=1}^{n}(\hat{y}_i - \bar{y})^2 \\ &= \text{SSR} + 2\sum_{i=1}^{n}\hat{u}_i(\hat{y}_i - \bar{y}) + \text{SSE}.\end{aligned}$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Now, (2.36) holds if we show that

$$\sum_{i=1}^{n} \hat{u}_i(\hat{y}_i - \bar{y}) = 0. \quad [2.37]$$

But we have already claimed that the sample covariance between the residuals and the fitted values is zero, and this covariance is just (2.37) divided by $n-1$. Thus, we have established (2.36).

Some words of caution about SST, SSE, and SSR are in order. There is no uniform agreement on the names or abbreviations for the three quantities defined in equations (2.33), (2.34), and (2.35). The total sum of squares is called either SST or TSS, so there is little confusion here. Unfortunately, the explained sum of squares is sometimes called the "regression sum of squares." If this term is given its natural abbreviation, it can easily be confused with the term "residual sum of squares." Some regression packages refer to the explained sum of squares as the "model sum of squares."

To make matters even worse, the residual sum of squares is often called the "error sum of squares." This is especially unfortunate because, as we will see in Section 2.5, the errors and the residuals are different quantities. Thus, we will always call (2.35) the residual sum of squares or the sum of squared residuals. We prefer to use the abbreviation SSR to denote the sum of squared residuals, because it is more common in econometric packages.

## Goodness-of-Fit

So far, we have no way of measuring how well the explanatory or independent variable, $x$, explains the dependent variable, $y$. It is often useful to compute a number that summarizes how well the OLS regression line fits the data. In the following discussion, be sure to remember that we assume that an intercept is estimated along with the slope.

Assuming that the total sum of squares, SST, is not equal to zero—which is true except in the very unlikely event that all the $y_i$ equal the same value—we can divide (2.36) by SST to get 1 = SSE/SST + SSR/SST. The ***R*-squared** of the regression, sometimes called the **coefficient of determination**, is defined as

$$R^2 \equiv \text{SSE/SST} = 1 - \text{SSR/SST}. \quad [2.38]$$

$R^2$ is the ratio of the explained variation compared to the total variation; thus, it is interpreted as the *fraction of the sample variation in y that is explained by x*. The second equality in (2.38) provides another way for computing $R^2$.

From (2.36), the value of $R^2$ is always between zero and one, because SSE can be no greater than SST. When interpreting $R^2$, we usually multiply it by 100 to change it into a percent: $100 \cdot R^2$ is the *percentage of the sample variation in y that is explained by x*.

If the data points all lie on the same line, OLS provides a perfect fit to the data. In this case, $R^2 = 1$. A value of $R^2$ that is nearly equal to zero indicates a poor fit of the OLS line: very little of the variation in the $y_i$ is captured by the variation in the $\hat{y}_i$ (which all lie on the OLS regression line). In fact, it can be shown that $R^2$ is equal to the *square* of the sample correlation coefficient between $y_i$ and $\hat{y}_i$. This is where the term "$R$-squared" came from. (The letter $R$ was traditionally used to denote an estimate of a population correlation coefficient, and its usage has survived in regression analysis.)

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

### EXAMPLE 2.8 CEO SALARY AND RETURN ON EQUITY

In the CEO salary regression, we obtain the following:

$$\widehat{salary} = 963.191 + 18.501\ roe \quad [2.39]$$

$$n = 209,\ R^2 = 0.0132.$$

We have reproduced the OLS regression line and the number of observations for clarity. Using the *R*-squared (rounded to four decimal places) reported for this equation, we can see how much of the variation in salary is actually explained by the return on equity. The answer is: not much. The firm's return on equity explains only about 1.3% of the variation in salaries for this sample of 209 CEOs. That means that 98.7% of the salary variations for these CEOs is left unexplained! This lack of explanatory power may not be too surprising because many other characteristics of both the firm and the individual CEO should influence salary; these factors are necessarily included in the errors in a simple regression analysis.

In the social sciences, low *R*-squareds in regression equations are not uncommon, especially for cross-sectional analysis. We will discuss this issue more generally under multiple regression analysis, but it is worth emphasizing now that a seemingly low *R*-squared does not necessarily mean that an OLS regression equation is useless. It is still possible that (2.39) is a good estimate of the ceteris paribus relationship between *salary* and *roe*; whether or not this is true does *not* depend directly on the size of *R*-squared. Students who are first learning econometrics tend to put too much weight on the size of the *R*-squared in evaluating regression equations. For now, be aware that using *R*-squared as the main gauge of success for an econometric analysis can lead to trouble.

Sometimes, the explanatory variable explains a substantial part of the sample variation in the dependent variable.

### EXAMPLE 2.9 VOTING OUTCOMES AND CAMPAIGN EXPENDITURES

In the voting outcome equation in (2.28), $R^2 = 0.856$. Thus, the share of campaign expenditures explains over 85% of the variation in the election outcomes for this sample. This is a sizable portion.

## 2.4 Units of Measurement and Functional Form

Two important issues in applied economics are (1) understanding how changing the units of measurement of the dependent and/or independent variables affects OLS estimates and (2) knowing how to incorporate popular functional forms used in economics into regression analysis. The mathematics needed for a full understanding of functional form issues is reviewed in Appendix A.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

## The Effects of Changing Units of Measurement on OLS Statistics

In Example 2.3, we chose to measure annual salary in thousands of dollars, and the return on equity was measured as a percentage (rather than as a decimal). It is crucial to know how *salary* and *roe* are measured in this example in order to make sense of the estimates in equation (2.39).

We must also know that OLS estimates change in entirely expected ways when the units of measurement of the dependent and independent variables change. In Example 2.3, suppose that, rather than measuring salary in thousands of dollars, we measure it in dollars. Let *salardol* be salary in dollars ($salardol = 845{,}761$ would be interpreted as $845,761). Of course, *salardol* has a simple relationship to the salary measured in thousands of dollars: $salardol = 1{,}000 \cdot salary$. We do not need to actually run the regression of *salardol* on *roe* to know that the estimated equation is:

$$\widehat{salardol} = 963{,}191 + 18{,}501\ roe. \qquad [2.40]$$

We obtain the intercept and slope in (2.40) simply by multiplying the intercept and the slope in (2.39) by 1,000. This gives equations (2.39) and (2.40) the *same* interpretation. Looking at (2.40), if $roe = 0$, then $\widehat{salardol} = 963{,}191$, so the predicted salary is $963,191 [the same value we obtained from equation (2.39)]. Furthermore, if *roe* increases by one, then the predicted salary increases by $18,501; again, this is what we concluded from our earlier analysis of equation (2.39).

Generally, it is easy to figure out what happens to the intercept and slope estimates when the dependent variable changes units of measurement. If the dependent variable is multiplied by the constant $c$—which means each value in the sample is multiplied by $c$—then the OLS intercept and slope estimates are also multiplied by $c$. (This assumes nothing has changed about the independent variable.) In the CEO salary example, $c = 1{,}000$ in moving from *salary* to *salardol*.

**EXPLORING FURTHER 2.4**

Suppose that salary is measured in hundreds of dollars, rather than in thousands of dollars, say, *salarhun*. What will be the OLS intercept and slope estimates in the regression of *salarhun* on *roe*?

We can also use the CEO salary example to see what happens when we change the units of measurement of the independent variable. Define $roedec = roe/100$ to be the decimal equivalent of *roe*; thus, $roedec = 0.23$ means a return on equity of 23%. To focus on changing the units of measurement of the independent variable, we return to our original dependent variable, *salary*, which is measured in thousands of dollars. When we regress *salary* on *roedec*, we obtain

$$\widehat{salary} = 963.191 + 1{,}850.1\ roedec. \qquad [2.41]$$

The coefficient on *roedec* is 100 times the coefficient on *roe* in (2.39). This is as it should be. Changing *roe* by one percentage point is equivalent to $\Delta roedec = 0.01$. From (2.41), if $\Delta roedec = 0.01$, then $\Delta\widehat{salary} = 1{,}850.1(0.01) = 18.501$, which is what is obtained by using (2.39). Note that, in moving from (2.39) to (2.41), the independent variable was divided by 100, and so the OLS slope estimate was multiplied by 100, preserving the interpretation of the equation. Generally, if the independent variable is divided or multiplied

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

by some nonzero constant, $c$, then the OLS slope coefficient is multiplied or divided by $c$, respectively.

The intercept has not changed in (2.41) because $roedec = 0$ still corresponds to a zero return on equity. In general, changing the units of measurement of only the independent variable does not affect the intercept.

In the previous section, we defined $R$-squared as a goodness-of-fit measure for OLS regression. We can also ask what happens to $R^2$ when the unit of measurement of either the independent or the dependent variable changes. Without doing any algebra, we should know the result: the goodness-of-fit of the model should not depend on the units of measurement of our variables. For example, the amount of variation in salary explained by the return on equity should not depend on whether salary is measured in dollars or in thousands of dollars or on whether return on equity is a percentage or a decimal. This intuition can be verified mathematically: using the definition of $R^2$, it can be shown that $R^2$ is, in fact, invariant to changes in the units of $y$ or $x$.

## Incorporating Nonlinearities in Simple Regression

So far, we have focused on *linear* relationships between the dependent and independent variables. As we mentioned in Chapter 1, linear relationships are not nearly general enough for all economic applications. Fortunately, it is rather easy to incorporate many nonlinearities into simple regression analysis by appropriately defining the dependent and independent variables. Here, we will cover two possibilities that often appear in applied work.

In reading applied work in the social sciences, you will often encounter regression equations where the dependent variable appears in logarithmic form. Why is this done? Recall the wage-education example, where we regressed hourly wage on years of education. We obtained a slope estimate of 0.54 [see equation (2.27)], which means that each additional year of education is predicted to increase hourly wage by 54 cents. Because of the linear nature of (2.27), 54 cents is the increase for either the first year of education or the twentieth year; this may not be reasonable.

Probably a better characterization of how wage changes with education is that each year of education increases wage by a constant *percentage*. For example, an increase in education from 5 years to 6 years increases wage by, say, 8% (ceteris paribus), and an increase in education from 11 to 12 years also increases wage by 8%. A model that gives (approximately) a constant percentage effect is

$$\log(wage) = \beta_0 + \beta_1 educ + u, \qquad [2.42]$$

where $\log(\cdot)$ denotes the *natural* logarithm. (See Appendix A for a review of logarithms.) In particular, if $\Delta u = 0$, then

$$\%\Delta wage \approx (100 \cdot \beta_1)\Delta educ. \qquad [2.43]$$

Notice how we multiply $\beta_1$ by 100 to get the percentage change in *wage* given one additional year of education. Since the percentage change in *wage* is the same for each additional year of education, the change in *wage* for an extra year of education *increases*

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



**FIGURE 2.6** $wage = \exp(\beta_0 + \beta_1 educ)$, with $\beta_1 > 0$.

## EXAMPLE 2.10 A LOG WAGE EQUATION

Using the same data as in Example 2.4, but using log(*wage*) as the dependent variable, we obtain the following relationship:

$$\widehat{\log(wage)} = 0.584 + 0.083\ educ \qquad [2.44]$$

$$n = 526,\ R^2 = 0.186.$$

The coefficient on *educ* has a percentage interpretation when it is multiplied by 100: $\widehat{wage}$ increases by 8.3% for every additional year of education. This is what economists mean when they refer to the "return to another year of education."

It is important to remember that the main reason for using the log of *wage* in (2.42) is to impose a constant percentage effect of education on *wage*. Once equation (2.44) is obtained, the natural log of *wage* is rarely mentioned. In particular, it is *not* correct to say that another year of education increases log(*wage*) by 8.3%.

The intercept in (2.44) is not very meaningful, because it gives the predicted log(*wage*), when *educ* = 0. The *R*-squared shows that *educ* explains about 18.6% of the variation in log(*wage*) (*not wage*). Finally, equation (2.44) might not capture all of the nonlinearity in the relationship between wage and schooling. If there are "diploma effects," then the twelfth year of education—graduation from high school—could be worth much more than the eleventh year. We will learn how to allow for this kind of nonlinearity in Chapter 7.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

as education increases; in other words, (2.42) implies an *increasing* return to education. By exponentiating (2.42), we can write $wage = \exp(\beta_0 + \beta_1 educ + u)$. This equation is graphed in Figure 2.6, with $u = 0$.

Estimating a model such as (2.42) is straightforward when using simple regression. Just define the dependent variable, $y$, to be $y = \log(wage)$. The independent variable is represented by $x = educ$. The mechanics of OLS are the same as before: the intercept and slope estimates are given by the formulas (2.17) and (2.19). In other words, we obtain $\hat{\beta}_0$ and $\hat{\beta}_1$ from the OLS regression of log(*wage*) on *educ*.

Another important use of the natural log is in obtaining a **constant elasticity model**.

## EXAMPLE 2.11 CEO SALARY AND FIRM SALES

We can estimate a constant elasticity model relating CEO salary to firm sales. The data set is the same one used in Example 2.3, except we now relate *salary* to *sales*. Let *sales* be annual firm sales, measured in millions of dollars. A constant elasticity model is

$$\log(salary) = \beta_0 + \beta_1 \log(sales) + u, \quad [2.45]$$

where $\beta_1$ is the elasticity of *salary* with respect to *sales*. This model falls under the simple regression model by defining the dependent variable to be $y = \log(salary)$ and the independent variable to be $x = \log(sales)$. Estimating this equation by OLS gives

$$\widehat{\log(salary)} = 4.822 + 0.257 \log(sales) \quad [2.46]$$

$$n = 209, R^2 = 0.211.$$

The coefficient of log(*sales*) is the estimated elasticity of *salary* with respect to *sales*. It implies that a 1% increase in firm sales increases CEO salary by about 0.257%—the usual interpretation of an elasticity.

The two functional forms covered in this section will often arise in the remainder of this text. We have covered models containing natural logarithms here because they appear so frequently in applied work. The interpretation of such models will not be much different in the multiple regression case.

It is also useful to note what happens to the intercept and slope estimates if we change the units of measurement of the dependent variable when it appears in logarithmic form. Because the change to logarithmic form approximates a proportionate change, it makes sense that *nothing* happens to the slope. We can see this by writing the rescaled variable as $c_1 y_i$ for each observation $i$. The original equation is $\log(y_i) = \beta_0 + \beta_1 x_i + u_i$. If we add $\log(c_1)$ to both sides, we get $\log(c_1) + \log(y_i) = [\log(c_1) + \beta_0] + \beta_1 x_i + u_i$, or $\log(c_1 y_i) = [\log(c_1) + \beta_0] + \beta_1 x_i + u_i$. (Remember that the sum of the logs is equal to the log of their product, as shown in Appendix A.) Therefore, the slope is still $\beta_1$, but the intercept is now $\log(c_1) + \beta_0$. Similarly, if the independent variable is $\log(x)$, and we change the units of measurement of $x$ before taking the log, the slope remains the same, but the intercept changes. You will be asked to verify these claims in Problem 9.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

**TABLE 2.3 Summary of Functional Forms Involving Logarithms**

| Model | Dependent Variable | Independent Variable | Interpretation of $\beta_1$ |
|---|---|---|---|
| Level-level | $y$ | $x$ | $\Delta y = \beta_1 \Delta x$ |
| Level-log | $y$ | $\log(x)$ | $\Delta y = (\beta_1/100)\%\Delta x$ |
| Log-level | $\log(y)$ | $x$ | $\%\Delta y = (100\beta_1)\Delta x$ |
| Log-log | $\log(y)$ | $\log(x)$ | $\%\Delta y = \beta_1 \%\Delta x$ |

© Cengage Learning, 2013

We end this subsection by summarizing four combinations of functional forms available from using either the original variable or its natural log. In Table 2.3, $x$ and $y$ stand for the variables in their original form. The model with $y$ as the dependent variable and $x$ as the independent variable is called the *level-level* model because each variable appears in its level form. The model with $\log(y)$ as the dependent variable and $x$ as the independent variable is called the *log-level* model. We will not explicitly discuss the *level-log* model here, because it arises less often in practice. In any case, we will see examples of this model in later chapters.

The last column in Table 2.3 gives the interpretation of $\beta_1$. In the log-level model, $100 \cdot \beta_1$ is sometimes called the **semi-elasticity** of $y$ with respect to $x$. As we mentioned in Example 2.11, in the log-log model, $\beta_1$ is the **elasticity** of $y$ with respect to $x$. Table 2.3 warrants careful study, as we will refer to it often in the remainder of the text.

## The Meaning of "Linear" Regression

The simple regression model that we have studied in this chapter is also called the simple *linear* regression model. Yet, as we have just seen, the general model also allows for certain *nonlinear* relationships. So what does "linear" mean here? You can see by looking at equation (2.1) that $y = \beta_0 + \beta_1 x + u$. The key is that this equation is linear in the *parameters* $\beta_0$ and $\beta_1$. There are no restrictions on how $y$ and $x$ relate to the original explained and explanatory variables of interest. As we saw in Examples 2.10 and 2.11, $y$ and $x$ can be natural logs of variables, and this is quite common in applications. But we need not stop there. For example, nothing prevents us from using simple regression to estimate a model such as $cons = \beta_0 + \beta_1\sqrt{inc} + u$, where *cons* is annual consumption and *inc* is annual income.

Whereas the mechanics of simple regression do not depend on how $y$ and $x$ are defined, the interpretation of the coefficients does depend on their definitions. For successful empirical work, it is much more important to become proficient at interpreting coefficients than to become efficient at computing formulas such as (2.19). We will get much more practice with interpreting the estimates in OLS regression lines when we study multiple regression.

Plenty of models *cannot* be cast as a linear regression model because they are not linear in their parameters; an example is $cons = 1/(\beta_0 + \beta_1 inc) + u$. Estimation of such models takes us into the realm of the *nonlinear regression model*, which is beyond the scope of this text. For most applications, choosing a model that can be put into the linear regression framework is sufficient.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

## 2.5 Expected Values and Variances of the OLS Estimators

In Section 2.1, we defined the population model $y = \beta_0 + \beta_1 x + u$, and we claimed that the key assumption for simple regression analysis to be useful is that the expected value of $u$ given any value of $x$ is zero. In Sections 2.2, 2.3, and 2.4, we discussed the algebraic properties of OLS estimation. We now return to the population model and study the *statistical* properties of OLS. In other words, we now view $\hat{\beta}_0$ and $\hat{\beta}_1$ as *estimators* for the parameters $\beta_0$ and $\beta_1$ that appear in the population model. This means that we will study properties of the distributions of $\hat{\beta}_0$ and $\hat{\beta}_1$ over different random samples from the population. (Appendix C contains definitions of estimators and reviews some of their important properties.)

### Unbiasedness of OLS

We begin by establishing the unbiasedness of OLS under a simple set of assumptions. For future reference, it is useful to number these assumptions using the prefix "SLR" for simple linear regression. The first assumption defines the population model.

**Assumption SLR.1 Linear in Parameters**

In the population model, the dependent variable, $y$, is related to the independent variable, $x$, and the error (or disturbance), $u$, as

$$y = \beta_0 + \beta_1 x + u, \quad [2.47]$$

where $\beta_0$ and $\beta_1$ are the population intercept and slope parameters, respectively.

To be realistic, $y$, $x$, and $u$ are all viewed as random variables in stating the population model. We discussed the interpretation of this model at some length in Section 2.1 and gave several examples. In the previous section, we learned that equation (2.47) is not as restrictive as it initially seems; by choosing $y$ and $x$ appropriately, we can obtain interesting nonlinear relationships (such as constant elasticity models).

We are interested in using data on $y$ and $x$ to estimate the parameters $\beta_0$ and, especially, $\beta_1$. We assume that our data were obtained as a random sample. (See Appendix C for a review of random sampling.)

**Assumption SLR.2 Random Sampling**

We have a random sample of size $n$, $\{(x_i, y_i): i = 1, 2, \ldots, n\}$, following the population model in equation (2.47).

We will have to address failure of the random sampling assumption in later chapters that deal with time series analysis and sample selection problems. Not all cross-sectional samples can be viewed as outcomes of random samples, but many can be.

We can write (2.47) in terms of the random sample as

$$y_i = \beta_0 + \beta_1 x_i + u_i, \quad i = 1, 2, \ldots, n, \quad [2.48]$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



**FIGURE 2.7** Graph of $y_i = \beta_0 + \beta_1 x_i + u_i$.

where $u_i$ is the error or disturbance for observation $i$ (for example, person $i$, firm $i$, city $i$, and so on). Thus, $u_i$ contains the unobservables for observation $i$ that affect $y_i$. The $u_i$ should not be confused with the residuals, $\hat{u}_i$, that we defined in Section 2.3. Later on, we will explore the relationship between the errors and the residuals. For interpreting $\beta_0$ and $\beta_1$ in a particular application, (2.47) is most informative, but (2.48) is also needed for some of the statistical derivations.

The relationship (2.48) can be plotted for a particular outcome of data as shown in Figure 2.7.

As we already saw in Section 2.2, the OLS slope and intercept estimates are not defined unless we have some sample variation in the explanatory variable. We now add variation in the $x_i$ to our list of assumptions.

**Assumption SLR.3** **Sample Variation in the Explanatory Variable**

The sample outcomes on $x$, namely, $\{x_i, i = 1, \ldots, n\}$, are not all the same value.

This is a very weak assumption—certainly not worth emphasizing, but needed nevertheless. If $x$ varies in the population, random samples on $x$ will typically contain variation, unless the population variation is minimal or the sample size is small. Simple inspection of summary statistics on $x_i$ reveals whether Assumption SLR.3 fails: if the sample standard deviation of $x_i$ is zero, then Assumption SLR.3 fails; otherwise, it holds.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Finally, in order to obtain unbiased estimators of $\beta_0$ and $\beta_1$, we need to impose the zero conditional mean assumption that we discussed in some detail in Section 2.1. We now explicitly add it to our list of assumptions.

**Assumption SLR.4 Zero Conditional Mean**

The error $u$ has an expected value of zero given any value of the explanatory variable. In other words,

$$\mathrm{E}(u|x) = 0.$$

For a random sample, this assumption implies that $\mathrm{E}(u_i|x_i) = 0$, for all $i = 1, 2, \ldots, n$.

In addition to restricting the relationship between $u$ and $x$ in the population, the zero conditional mean assumption—coupled with the random sampling assumption—allows for a convenient technical simplification. In particular, we can derive the statistical properties of the OLS estimators as *conditional* on the values of the $x_i$ in our sample. Technically, in statistical derivations, conditioning on the sample values of the independent variable is the same as treating the $x_i$ as *fixed in repeated samples*, which we think of as follows. We first choose $n$ sample values for $x_1, x_2, \ldots, x_n$. (These can be repeated.) Given these values, we then obtain a sample on $y$ (effectively by obtaining a random sample of the $u_i$). Next, another sample of $y$ is obtained, using the *same* values for $x_1, x_2, \ldots, x_n$. Then another sample of $y$ is obtained, again using the same $x_1, x_2, \ldots, x_n$. And so on.

The fixed-in-repeated-samples scenario is not very realistic in nonexperimental contexts. For instance, in sampling individuals for the wage-education example, it makes little sense to think of choosing the values of *educ* ahead of time and then sampling individuals with those particular levels of education. Random sampling, where individuals are chosen randomly and their wage and education are both recorded, is representative of how most data sets are obtained for empirical analysis in the social sciences. Once we *assume* that $\mathrm{E}(u|x) = 0$, and we have random sampling, nothing is lost in derivations by treating the $x_i$ as nonrandom. The danger is that the fixed-in-repeated-samples assumption *always* implies that $u_i$ and $x_i$ are independent. In deciding when simple regression analysis is going to produce unbiased estimators, it is critical to think in terms of Assumption SLR.4.

Now, we are ready to show that the OLS estimators are unbiased. To this end, we use the fact that $\sum_{i=1}^{n}(x_i - \bar{x})(y_i - \bar{y}) = \sum_{i=1}^{n}(x_i - \bar{x})y_i$ (see Appendix A) to write the OLS slope estimator in equation (2.19) as

$$\hat{\beta}_1 = \frac{\sum_{i=1}^{n}(x_i - \bar{x})y_i}{\sum_{i=1}^{n}(x_i - \bar{x})^2}. \qquad [2.49]$$

Because we are now interested in the behavior of $\hat{\beta}_1$ across all possible samples, $\hat{\beta}_1$ is properly viewed as a random variable.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

We can write $\hat{\beta}_1$ in terms of the population coefficients and errors by substituting the right-hand side of (2.48) into (2.49). We have

$$\hat{\beta}_1 = \frac{\sum_{i=1}^{n}(x_i - \bar{x})y_i}{\text{SST}_x} = \frac{\sum_{i=1}^{n}(x_i - \bar{x})(\beta_0 + \beta_1 x_i + u_i)}{\text{SST}_x}, \quad [2.50]$$

where we have defined the total variation in $x_i$ as $\text{SST}_x = \sum_{i=1}^{n}(x_i - \bar{x})^2$ to simplify the notation. (This is not quite the sample variance of the $x_i$ because we do not divide by $n - 1$.) Using the algebra of the summation operator, write the numerator of $\hat{\beta}_1$ as

$$\sum_{i=1}^{n}(x_i - \bar{x})\beta_0 + \sum_{i=1}^{n}(x_i - \bar{x})\beta_1 x_i + \sum_{i=1}^{n}(x_i - \bar{x})u_i$$

$$= \beta_0 \sum_{i=1}^{n}(x_i - \bar{x}) + \beta_1 \sum_{i=1}^{n}(x_i - \bar{x})x_i + \sum_{i=1}^{n}(x_i - \bar{x})u_i. \quad [2.51]$$

As shown in Appendix A, $\sum_{i=1}^{n}(x_i - \bar{x}) = 0$ and $\sum_{i=1}^{n}(x_i - \bar{x})x_i = \sum_{i=1}^{n}(x_i - \bar{x})^2 = \text{SST}_x$. Therefore, we can write the numerator of $\hat{\beta}_1$ as $\beta_1 \text{SST}_x + \sum_{i=1}^{n}(x_i - \bar{x})u_i$. Putting this over the denominator gives

$$\hat{\beta}_1 = \beta_1 + \frac{\sum_{i=1}^{n}(x_i - \bar{x})u_i}{\text{SST}_x} = \beta_1 + (1/\text{SST}_x)\sum_{i=1}^{n} d_i u_i, \quad [2.52]$$

where $d_i = x_i - \bar{x}$. We now see that the estimator $\hat{\beta}_1$ equals the population slope, $\beta_1$, plus a term that is a linear combination in the errors $\{u_1, u_2, \ldots, u_n\}$. Conditional on the values of $x_i$, the randomness in $\hat{\beta}_1$ is due entirely to the errors in the sample. The fact that these errors are generally different from zero is what causes $\hat{\beta}_1$ to differ from $\beta_1$.

Using the representation in (2.52), we can prove the first important statistical property of OLS.

**THEOREM 2.1**

**UNBIASEDNESS OF OLS:**

**Using Assumptions SLR.1 through SLR.4,**

$$\text{E}(\hat{\beta}_0) = \beta_0, \text{ and } \text{E}(\hat{\beta}_1) = \beta_1, \quad [2.53]$$

for any values of $\beta_0$ and $\beta_1$. In other words, $\hat{\beta}_0$ is unbiased for $\beta_0$, and $\hat{\beta}_1$ is unbiased for $\beta_1$.

***PROOF***: In this proof, the expected values are conditional on the sample values of the independent variable. Because $\text{SST}_x$ and $d_i$ are functions only of the $x_i$, they are nonrandom in the conditioning. Therefore, from (2.52), and keeping the conditioning on $\{x_1, x_2, \ldots, x_n\}$ implicit, we have

$$\text{E}(\hat{\beta}_1) = \beta_1 + \text{E}\left[(1/\text{SST}_x)\sum_{i=1}^{n} d_i u_i\right] = \beta_1 + (1/\text{SST}_x)\sum_{i=1}^{n} \text{E}(d_i u_i)$$

$$= \beta_1 + (1/\text{SST}_x)\sum_{i=1}^{n} d_i \text{E}(u_i) = \beta_1 + (1/\text{SST}_x)\sum_{i=1}^{n} d_i \cdot 0 = \beta_1,$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

where we have used the fact that the expected value of each $u_i$ (conditional on $\{x_1, x_2, ..., x_n\}$) is zero under Assumptions SLR.2 and SLR.4. Since unbiasedness holds for any outcome on $\{x_1, x_2, ..., x_n\}$, unbiasedness also holds without conditioning on $\{x_1, x_2, ..., x_n\}$.

The proof for $\hat{\beta}_0$ is now straightforward. Average (2.48) across $i$ to get $\bar{y} = \beta_0 + \beta_1\bar{x} + \bar{u}$, and plug this into the formula for $\hat{\beta}_0$:

$$\hat{\beta}_0 = \bar{y} - \hat{\beta}_1\bar{x} = \beta_0 + \beta_1\bar{x} + \bar{u} - \hat{\beta}_1\bar{x} = \beta_0 + (\beta_1 - \hat{\beta}_1)\bar{x} + \bar{u}.$$

Then, conditional on the values of the $x_i$,

$$\mathrm{E}(\hat{\beta}_0) = \beta_0 + \mathrm{E}[(\beta_1 - \hat{\beta}_1)\bar{x}] + \mathrm{E}(\bar{u}) = \beta_0 + \mathrm{E}[(\beta_1 - \hat{\beta}_1)]\bar{x},$$

since $\mathrm{E}(\bar{u}) = 0$ by Assumptions SLR.2 and SLR.4. But, we showed that $\mathrm{E}(\hat{\beta}_1) = \beta_1$, which implies that $\mathrm{E}[(\hat{\beta}_1 - \beta_1)] = 0$. Thus, $\mathrm{E}(\hat{\beta}_0) = \beta_0$. Both of these arguments are valid for any values of $\beta_0$ and $\beta_1$, and so we have established unbiasedness.

Remember that unbiasedness is a feature of the sampling distributions of $\hat{\beta}_1$ and $\hat{\beta}_0$, which says nothing about the estimate that we obtain for a given sample. We hope that, if the sample we obtain is somehow "typical," then our estimate should be "near" the population value. Unfortunately, it is always possible that we could obtain an unlucky sample that would give us a point estimate far from $\beta_1$, and we can *never* know for sure whether this is the case. You may want to review the material on unbiased estimators in Appendix C, especially the simulation exercise in Table C.1 that illustrates the concept of unbiasedness.

Unbiasedness generally fails if any of our four assumptions fail. This means that it is important to think about the veracity of each assumption for a particular application. Assumption SLR.1 requires that $y$ and $x$ be linearly related, with an additive disturbance. This can certainly fail. But we also know that $y$ and $x$ can be chosen to yield interesting nonlinear relationships. Dealing with the failure of (2.47) requires more advanced methods that are beyond the scope of this text.

Later, we will have to relax Assumption SLR.2, the random sampling assumption, for time series analysis. But what about using it for cross-sectional analysis? Random sampling can fail in a cross section when samples are not representative of the underlying population; in fact, some data sets are constructed by intentionally oversampling different parts of the population. We will discuss problems of nonrandom sampling in Chapters 9 and 17.

As we have already discussed, Assumption SLR.3 almost always holds in interesting regression applications. Without it, we cannot even obtain the OLS estimates.

The assumption we should concentrate on for now is SLR.4. If SLR.4 holds, the OLS estimators are unbiased. Likewise, if SLR.4 fails, the OLS estimators generally will be *biased*. There are ways to determine the likely direction and size of the bias, which we will study in Chapter 3.

The possibility that $x$ is correlated with $u$ is almost always a concern in simple regression analysis with nonexperimental data, as we indicated with several examples in Section 2.1. Using simple regression when $u$ contains factors affecting $y$ that are also

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

correlated with $x$ can result in *spurious correlation*: that is, we find a relationship between $y$ and $x$ that is really due to other unobserved factors that affect $y$ and also happen to be correlated with $x$.

### EXAMPLE 2.12 STUDENT MATH PERFORMANCE AND THE SCHOOL LUNCH PROGRAM

Let *math10* denote the percentage of tenth graders at a high school receiving a passing score on a standardized mathematics exam. Suppose we wish to estimate the effect of the federally funded school lunch program on student performance. If anything, we expect the lunch program to have a positive ceteris paribus effect on performance: all other factors being equal, if a student who is too poor to eat regular meals becomes eligible for the school lunch program, his or her performance should improve. Let *lnchprg* denote the percentage of students who are eligible for the lunch program. Then, a simple regression model is

$$math10 = \beta_0 + \beta_1 lnchprg + u, \quad [2.54]$$

where $u$ contains school and student characteristics that affect overall school performance. Using the data in MEAP93.RAW on 408 Michigan high schools for the 1992–1993 school year, we obtain

$$\widehat{math10} = 32.14 - 0.319\, lnchprg$$
$$n = 408,\ R^2 = 0.171.$$

This equation predicts that if student eligibility in the lunch program increases by 10 percentage points, the percentage of students passing the math exam *falls* by about 3.2 percentage points. Do we really believe that higher participation in the lunch program actually *causes* worse performance? Almost certainly not. A better explanation is that the error term $u$ in equation (2.54) is correlated with *lnchprg*. In fact, $u$ contains factors such as the poverty rate of children attending school, which affects student performance and is highly correlated with eligibility in the lunch program. Variables such as school quality and resources are also contained in $u$, and these are likely correlated with *lnchprg*. It is important to remember that the estimate $-0.319$ is only for this particular sample, but its sign and magnitude make us suspect that $u$ and $x$ are correlated, so that simple regression is biased.

In addition to omitted variables, there are other reasons for $x$ to be correlated with $u$ in the simple regression model. Because the same issues arise in multiple regression analysis, we will postpone a systematic treatment of the problem until then.

## Variances of the OLS Estimators

In addition to knowing that the sampling distribution of $\hat{\beta}_1$ is centered about $\beta_1$ ($\hat{\beta}_1$ is unbiased), it is important to know how far we can expect $\hat{\beta}_1$ to be away from $\beta_1$ on average.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Among other things, this allows us to choose the best estimator among all, or at least a broad class of, unbiased estimators. The measure of spread in the distribution of $\hat{\beta}_1$ (and $\hat{\beta}_0$) that is easiest to work with is the variance or its square root, the standard deviation. (See Appendix C for a more detailed discussion.)

It turns out that the variance of the OLS estimators can be computed under Assumptions SLR.1 through SLR.4. However, these expressions would be somewhat complicated. Instead, we add an assumption that is traditional for cross-sectional analysis. This assumption states that the variance of the unobservable, $u$, conditional on $x$, is constant. This is known as the **homoskedasticity** or "constant variance" assumption.

**Assumption SLR.5 Homoskedasticity**

The error $u$ has the same variance given any value of the explanatory variable. In other words,

$$\text{Var}(u|x) = \sigma^2.$$

We must emphasize that the homoskedasticity assumption is quite distinct from the zero conditional mean assumption, $\text{E}(u|x) = 0$. Assumption SLR.4 involves the *expected value* of $u$, while Assumption SLR.5 concerns the *variance* of $u$ (both conditional on $x$). Recall that we established the unbiasedness of OLS without Assumption SLR.5: the homoskedasticity assumption plays *no* role in showing that $\hat{\beta}_0$ and $\hat{\beta}_1$ are unbiased. We add Assumption SLR.5 because it simplifies the variance calculations for $\hat{\beta}_0$ and $\hat{\beta}_1$ and because it implies that ordinary least squares has certain efficiency properties, which we will see in Chapter 3. If we were to assume that $u$ and $x$ are *independent*, then the distribution of $u$ given $x$ does not depend on $x$, and so $\text{E}(u|x) = \text{E}(u) = 0$ and $\text{Var}(u|x) = \sigma^2$. But independence is sometimes too strong of an assumption.

Because $\text{Var}(u|x) = \text{E}(u^2|x) - [\text{E}(u|x)]^2$ and $\text{E}(u|x) = 0$, $\sigma^2 = \text{E}(u^2|x)$, which means $\sigma^2$ is also the *unconditional* expectation of $u^2$. Therefore, $\sigma^2 = \text{E}(u^2) = \text{Var}(u)$, because $\text{E}(u) = 0$. In other words, $\sigma^2$ is the *unconditional* variance of $u$, and so $\sigma^2$ is often called the **error variance** or disturbance variance. The square root of $\sigma^2$, $\sigma$, is the standard deviation of the error. A larger $\sigma$ means that the distribution of the unobservables affecting $y$ is more spread out.

It is often useful to write Assumptions SLR.4 and SLR.5 in terms of the conditional mean and conditional variance of $y$:

$$\text{E}(y|x) = \beta_0 + \beta_1 x. \quad [2.55]$$

$$\text{Var}(y|x) = \sigma^2. \quad [2.56]$$

In other words, the conditional expectation of $y$ given $x$ is linear in $x$, but the variance of $y$ given $x$ is constant. This situation is graphed in Figure 2.8 where $\beta_0 > 0$ and $\beta_1 > 0$.

When $\text{Var}(u|x)$ depends on $x$, the error term is said to exhibit **heteroskedasticity** (or nonconstant variance). Because $\text{Var}(u|x) = \text{Var}(y|x)$, heteroskedasticity is present whenever $\text{Var}(y|x)$ is a function of $x$.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



**FIGURE 2.8 The simple regression model under homoskedasticity.**

## EXAMPLE 2.13 HETEROSKEDASTICITY IN A WAGE EQUATION

In order to get an unbiased estimator of the ceteris paribus effect of *educ* on *wage,* we must assume that $\text{E}(u|educ) = 0$, and this implies $\text{E}(wage|educ) = \beta_0 + \beta_1 educ$. If we also make the homoskedasticity assumption, then $\text{Var}(u|educ) = \sigma^2$ does not depend on the level of education, which is the same as assuming $\text{Var}(wage|educ) = \sigma^2$. Thus, while average wage is allowed to increase with education level—it is this rate of increase that we are interested in estimating—the *variability* in wage about its mean is assumed to be constant across all education levels. This may not be realistic. It is likely that people with more education have a wider variety of interests and job opportunities, which could lead to more wage variability at higher levels of education. People with very low levels of education have fewer opportunities and often must work at the minimum wage; this serves to reduce wage variability at low education levels. This situation is shown in Figure 2.9. Ultimately, whether Assumption SLR.5 holds is an empirical issue, and in Chapter 8 we will show how to test Assumption SLR.5.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



**FIGURE 2.9** Var(*wage*|*educ*) increasing with *educ*.

With the homoskedasticity assumption in place, we are ready to prove the following:

**THEOREM 2.2**

**SAMPLING VARIANCES OF THE OLS ESTIMATORS**

**Under Assumptions SLR.1 through SLR.5,**

$$\mathrm{Var}(\hat{\beta}_1) = \frac{\sigma^2}{\sum_{i=1}^{n}(x_i - \bar{x})^2} = \sigma^2/\mathrm{SST}_x, \quad [2.57]$$

and

$$\mathrm{Var}(\hat{\beta}_0) = \frac{\sigma^2 n^{-1}\sum_{i=1}^{n} x_i^2}{\sum_{i=1}^{n}(x_i - \bar{x})^2}, \quad [2.58]$$

where these are conditional on the sample values $\{x_1, \ldots, x_n\}$.

***PROOF***: We derive the formula for $\mathrm{Var}(\hat{\beta}_1)$, leaving the other derivation as Problem 10. The starting point is equation (2.52): $\hat{\beta}_1 = \beta_1 + (1/\mathrm{SST}_x)\sum_{i=1}^{n} d_i u_i$. Because $\beta_1$ is just a constant, and we are conditioning on the $x_i$, $\mathrm{SST}_x$ and $d_i = x_i - \bar{x}$ are also nonrandom.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Furthermore, because the $u_i$ are independent random variables across $i$ (by random sampling), the variance of the sum is the sum of the variances. Using these facts, we have

$$\begin{aligned}\text{Var}(\hat{\beta}_1) &= (1/\text{SST}_x)^2\text{Var}\left(\sum_{i=1}^{n} d_i u_i\right) = (1/\text{SST}_x)^2\left(\sum_{i=1}^{n} d_i^2 \text{Var}(u_i)\right) \\ &= (1/\text{SST}_x)^2\left(\sum_{i=1}^{n} d_i^2 \sigma^2\right) \qquad [\text{since Var}(u_i) = \sigma^2 \text{ for all } i] \\ &= \sigma^2(1/\text{SST}_x)^2\left(\sum_{i=1}^{n} d_i^2\right) = \sigma^2(1/\text{SST}_x)^2\text{SST}_x = \sigma^2/\text{SST}_x,\end{aligned}$$

which is what we wanted to show.

Equations (2.57) and (2.58) are the "standard" formulas for simple regression analysis, which are invalid in the presence of heteroskedasticity. This will be important when we turn to confidence intervals and hypothesis testing in multiple regression analysis.

For most purposes, we are interested in $\text{Var}(\hat{\beta}_1)$. It is easy to summarize how this variance depends on the error variance, $\sigma^2$, and the total variation in $\{x_1, x_2, \ldots, x_n\}$, $\text{SST}_x$. First, the larger the error variance, the larger is $\text{Var}(\hat{\beta}_1)$. This makes sense since more variation in the unobservables affecting $y$ makes it more difficult to precisely estimate $\beta_1$. On the other hand, more variability in the independent variable is preferred: as the variability in the $x_i$ increases, the variance of $\hat{\beta}_1$ decreases. This also makes intuitive sense since the more spread out is the sample of independent variables, the easier it is to trace out the relationship between $\text{E}(y|x)$ and $x$. That is, the easier it is to estimate $\beta_1$. If there is little variation in the $x_i$, then it can be hard to pinpoint how $\text{E}(y|x)$ varies with $x$. As the sample size increases, so does the total variation in the $x_i$. Therefore, a larger sample size results in a smaller variance for $\hat{\beta}_1$.

**EXPLORING FURTHER 2.5**

Show that, when estimating $\beta_0$, it is best to have $\bar{x} = 0$. What is $\text{Var}(\hat{\beta}_0)$ in this case? [*Hint:* For any sample of numbers, $\sum_{i=1}^{n} x_i^2 \geq \sum_{i=1}^{n} (x_i - \bar{x})^2$, with equality only if $\bar{x} = 0$.]

This analysis shows that, if we are interested in $\beta_1$ and we have a choice, then we should choose the $x_i$ to be as spread out as possible. This is sometimes possible with experimental data, but rarely do we have this luxury in the social sciences: usually, we must take the $x_i$ that we obtain via random sampling. Sometimes, we have an opportunity to obtain larger sample sizes, although this can be costly.

For the purposes of constructing confidence intervals and deriving test statistics, we will need to work with the standard deviations of $\hat{\beta}_1$ and $\hat{\beta}_0$, $\text{sd}(\hat{\beta}_1)$ and $\text{sd}(\hat{\beta}_0)$. Recall that these are obtained by taking the square roots of the variances in (2.57) and (2.58). In particular, $\text{sd}(\hat{\beta}_1) = \sigma/\sqrt{\text{SST}_x}$, where $\sigma$ is the square root of $\sigma^2$, and $\sqrt{\text{SST}_x}$ is the square root of $\text{SST}_x$.

## Estimating the Error Variance

The formulas in (2.57) and (2.58) allow us to isolate the factors that contribute to $\text{Var}(\hat{\beta}_1)$ and $\text{Var}(\hat{\beta}_0)$. But these formulas are unknown, except in the extremely rare case that $\sigma^2$ is known.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Nevertheless, we can use the data to estimate $\sigma^2$, which then allows us to estimate $\text{Var}(\hat{\beta}_1)$ and $\text{Var}(\hat{\beta}_0)$.

This is a good place to emphasize the difference between the *errors* (or disturbances) and the *residuals*, since this distinction is crucial for constructing an estimator of $\sigma^2$. Equation (2.48) shows how to write the population model in terms of a randomly sampled observation as $y_i = \beta_0 + \beta_1 x_i + u_i$, where $u_i$ is the error for observation $i$. We can also express $y_i$ in terms of its fitted value and residual as in equation (2.32): $y_i = \hat{\beta}_0 + \hat{\beta}_1 x_i + \hat{u}_i$. Comparing these two equations, we see that the error shows up in the equation containing the *population* parameters, $\beta_0$ and $\beta_1$. On the other hand, the residuals show up in the *estimated* equation with $\hat{\beta}_0$ and $\hat{\beta}_1$. The errors are never observed, while the residuals are computed from the data.

We can use equations (2.32) and (2.48) to write the residuals as a function of the errors:

$$\hat{u}_i = y_i - \hat{\beta}_0 - \hat{\beta}_1 x_i = (\beta_0 + \beta_1 x_i + u_i) - \hat{\beta}_0 - \hat{\beta}_1 x_i,$$

or

$$\hat{u}_i = u_i - (\hat{\beta}_0 - \beta_0) - (\hat{\beta}_1 - \beta_1)x_i. \quad [2.59]$$

Although the expected value of $\hat{\beta}_0$ equals $\beta_0$, and similarly for $\hat{\beta}_1$, $\hat{u}_i$ is not the same as $u_i$. The difference between them does have an *expected value* of zero.

Now that we understand the difference between the errors and the residuals, we can return to estimating $\sigma^2$. First, $\sigma^2 = \text{E}(u^2)$, so an unbiased "estimator" of $\sigma^2$ is $n^{-1}\sum_{i=1}^{n} u_i^2$. Unfortunately, this is not a true estimator, because we do not observe the errors $u_i$. But, we do have estimates of the $u_i$, namely, the OLS residuals $\hat{u}_i$. If we replace the errors with the OLS residuals, we have $n^{-1}\sum_{i=1}^{n}\hat{u}_i^2 = \text{SSR}/n$. This *is* a true estimator, because it gives a computable rule for any sample of data on $x$ and $y$. One slight drawback to this estimator is that it turns out to be biased (although for large $n$ the bias is small). Because it is easy to compute an unbiased estimator, we use that instead.

The estimator SSR/$n$ is biased essentially because it does not account for two restrictions that must be satisfied by the OLS residuals. These restrictions are given by the two OLS first order conditions:

$$\sum_{i=1}^{n}\hat{u}_i = 0, \quad \sum_{i=1}^{n} x_i\hat{u}_i = 0. \quad [2.60]$$

One way to view these restrictions is this: if we know $n - 2$ of the residuals, we can always get the other two residuals by using the restrictions implied by the first order conditions in (2.60). Thus, there are only $n - 2$ **degrees of freedom** in the OLS residuals, as opposed to $n$ degrees of freedom in the errors. It is important to understand that if we replace $\hat{u}_i$ with $u_i$ in (2.60), the restrictions would no longer hold.

The unbiased estimator of $\sigma^2$ that we will use makes a degrees of freedom adjustment:

$$\hat{\sigma}^2 = \frac{1}{(n-2)}\sum_{i=1}^{n}\hat{u}_i^2 = \text{SSR}/(n-2). \quad [2.61]$$

(This estimator is sometimes denoted as $s^2$, but we continue to use the convention of putting "hats" over estimators.)

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

**THEOREM 2.3**

**UNBIASED ESTIMATION OF $\sigma^2$**

**Under Assumptions SLR.1 through SLR.5,**

$$\mathrm{E}(\hat{\sigma}^2) = \sigma^2.$$

***PROOF***: If we average equation (2.59) across all $i$ and use the fact that the OLS residuals average out to zero, we have $0 = \bar{u} - (\hat{\beta}_0 - \beta_0) - (\hat{\beta}_1 - \beta_1)\bar{x}$; subtracting this from (2.59) gives $\hat{u}_i = (u_i - \bar{u}) - (\hat{\beta}_1 - \beta_1)(x_i - \bar{x})$. Therefore, $\hat{u}_i^2 = (u_i - \bar{u})^2 + (\hat{\beta}_1 - \beta_1)^2 (x_i - \bar{x})^2 - 2(u_i - \bar{u})(\hat{\beta}_1 - \beta_1)(x_i - \bar{x})$. Summing across all $i$ gives $\sum_{i=1}^{n} \hat{u}_i^2 = \sum_{i=1}^{n} (u_i - \bar{u})^2 + (\hat{\beta}_1 - \beta_1)^2 \sum_{i=1}^{n} (x_i - \bar{x})^2 - 2(\hat{\beta}_1 - \beta_1) \sum_{i=1}^{n} u_i(x_i - \bar{x})$. Now, the expected value of the first term is $(n - 1)\sigma^2$, something that is shown in Appendix C. The expected value of the second term is simply $\sigma^2$ because $\mathrm{E}[(\hat{\beta}_1 - \beta_1)^2] = \mathrm{Var}(\hat{\beta}_1) = \sigma^2/s_x^2$. Finally, the third term can be written as $2(\hat{\beta}_1 - \beta_1)^2 s_x^2$; taking expectations gives $2\sigma^2$. Putting these three terms together gives $\mathrm{E}\left(\sum_{i=1}^{n} \hat{u}_i^2\right) = (n - 1)\sigma^2 + \sigma^2 - 2\sigma^2 = (n - 2)\sigma^2$, so that $\mathrm{E}[\mathrm{SSR}/(n - 2)] = \sigma^2$.

If $\hat{\sigma}^2$ is plugged into the variance formulas (2.57) and (2.58), then we have unbiased estimators of $\mathrm{Var}(\hat{\beta}_1)$ and $\mathrm{Var}(\hat{\beta}_0)$. Later on, we will need estimators of the standard deviations of $\hat{\beta}_1$ and $\hat{\beta}_0$, and this requires estimating $\sigma$. The natural estimator of $\sigma$ is

$$\hat{\sigma} = \sqrt{\hat{\sigma}^2} \qquad [2.62]$$

and is called the **standard error of the regression** (**SER**). (Other names for $\hat{\sigma}$ are the *standard error of the estimate* and the *root mean squared error*, but we will not use these.) Although $\hat{\sigma}$ is not an unbiased estimator of $\sigma$, we can show that it is a *consistent* estimator of $\sigma$ (see Appendix C), and it will serve our purposes well.

The estimate $\hat{\sigma}$ is interesting because it is an estimate of the standard deviation in the unobservables affecting $y$; equivalently, it estimates the standard deviation in $y$ after the effect of $x$ has been taken out. Most regression packages report the value of $\hat{\sigma}$ along with the $R$-squared, intercept, slope, and other OLS statistics (under one of the several names listed above). For now, our primary interest is in using $\hat{\sigma}$ to estimate the standard deviations of $\hat{\beta}_0$ and $\hat{\beta}_1$. Since $\mathrm{sd}(\hat{\beta}_1) = \sigma/\sqrt{\mathrm{SST}_x}$, the natural estimator of $\mathrm{sd}(\hat{\beta}_1)$ is

$$\mathrm{se}(\hat{\beta}_1) = \hat{\sigma}/\sqrt{\mathrm{SST}_x} = \hat{\sigma}\Big/\left(\sum_{i=1}^{n}(x_i - \bar{x})^2\right)^{1/2};$$

this is called the **standard error of $\hat{\beta}_1$**. Note that $\mathrm{se}(\hat{\beta}_1)$ is viewed as a random variable when we think of running OLS over different samples of $y$; this is true because $\hat{\sigma}$ varies with different samples. For a given sample, $\mathrm{se}(\hat{\beta}_1)$ is a number, just as $\hat{\beta}_1$ is simply a number when we compute it from the given data.

Similarly, $\mathrm{se}(\hat{\beta}_0)$ is obtained from $\mathrm{sd}(\hat{\beta}_0)$ by replacing $\sigma$ with $\hat{\sigma}$. The standard error of any estimate gives us an idea of how precise the estimator is. Standard errors play a central role throughout this text; we will use them to construct test statistics and confidence intervals for every econometric procedure we cover, starting in Chapter 4.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

## 2.6 Regression through the Origin and Regression on a Constant

In rare cases, we wish to impose the restriction that, when $x = 0$, the expected value of $y$ is zero. There are certain relationships for which this is reasonable. For example, if income ($x$) is zero, then income tax revenues ($y$) must also be zero. In addition, there are settings where a model that originally has a nonzero intercept is transformed into a model without an intercept.

Formally, we now choose a slope estimator, which we call $\tilde{\beta}_1$, and a line of the form

$$\tilde{y} = \tilde{\beta}_1 x, \qquad [2.63]$$

where the tildes over $\tilde{\beta}_1$ and $\tilde{y}$ are used to distinguish this problem from the much more common problem of estimating an intercept along with a slope. Obtaining (2.63) is called **regression through the origin** because the line (2.63) passes through the point $x = 0$, $\tilde{y} = 0$. To obtain the slope estimate in (2.63), we still rely on the method of ordinary least squares, which in this case minimizes the sum of squared residuals:

$$\sum_{i=1}^{n}(y_i - \tilde{\beta}_1 x_i)^2. \qquad [2.64]$$

Using one-variable calculus, it can be shown that $\tilde{\beta}_1$ must solve the first order condition:

$$\sum_{i=1}^{n} x_i(y_i - \tilde{\beta}_1 x_i) = 0. \qquad [2.65]$$

From this, we can solve for $\tilde{\beta}_1$:

$$\tilde{\beta}_1 = \frac{\sum_{i=1}^{n} x_i y_i}{\sum_{i=1}^{n} x_i^2}, \qquad [2.66]$$

provided that not all the $x_i$ are zero, a case we rule out.

Note how $\tilde{\beta}_1$ compares with the slope estimate when we also estimate the intercept (rather than set it equal to zero). These two estimates are the same if, and only if, $\bar{x} = 0$. [See equation (2.49) for $\hat{\beta}_1$.] Obtaining an estimate of $\beta_1$ using regression through the origin is not done very often in applied work, and for good reason: if the intercept $\beta_0 \neq 0$, then $\tilde{\beta}_1$ is a biased estimator of $\beta_1$. You will be asked to prove this in Problem 8.

In cases where regression through the origin is deemed appropriate, one must be careful in interpreting the $R$-squared that is typically reported with such regressions. Usually, unless stated otherwise, the $R$-squared is obtained without removing the sample average of $\{y_i : i = 1, ..., n\}$ in obtaining SST. In other words, the $R$-squared is computed as

$$1 - \frac{\sum_{i=1}^{n}(y_i - \tilde{\beta}_1 x_i)^2}{\sum_{i=1}^{n} y_i^2}. \qquad [2.67]$$

The numerator here makes sense because it is the sum of squared residuals, but the denominator acts as if we know the average value of $y$ in the population is zero. One

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

reason this version of the $R$-squared is used is that if we use the usual total sum of squares, that is, we compute $R$-squared as

$$1 - \frac{\sum_{i=1}^{n}(y_i - \tilde{\beta}_1 x_i)^2}{\sum_{i=1}^{n}(y_i - \bar{y})^2}. \quad [2.68]$$

it can actually be negative. If expression (2.68) is negative then it means that using the sample average $\bar{y}$ to predict $y_i$ provides a better fit than using $x_i$ in a regression through the origin. Therefore, (2.68) is actually more attractive than equation (2.67) because equation (2.68) tells us whether using $x$ is better than ignoring $x$ altogether.

This discussion about regression through the origin, and different ways to measure goodness-of-fit, prompts another question: what happens if we only regress on a constant? That is, we set the slope to zero (which means we need not even have an $x$) and estimate an intercept only? The answer is simple: the intercept is $\bar{y}$. This fact is usually shown in basic statistics, where it is shown that the constant that produces the smallest sum of squared deviations is always the sample average. In this light, equation (2.68) can be seen as comparing regression on $x$ through the origin with regression only on a constant.

## Summary

We have introduced the simple linear regression model in this chapter, and we have covered its basic properties. Given a random sample, the method of ordinary least squares is used to estimate the slope and intercept parameters in the population model. We have demonstrated the algebra of the OLS regression line, including computation of fitted values and residuals, and the obtaining of predicted changes in the dependent variable for a given change in the independent variable. In Section 2.4, we discussed two issues of practical importance: (1) the behavior of the OLS estimates when we change the units of measurement of the dependent variable or the independent variable and (2) the use of the natural log to allow for constant elasticity and constant semi-elasticity models.

In Section 2.5, we showed that, under the four Assumptions SLR.1 through SLR.4, the OLS estimators are unbiased. The key assumption is that the error term $u$ has zero mean given any value of the independent variable $x$. Unfortunately, there are reasons to think this is false in many social science applications of simple regression, where the omitted factors in $u$ are often correlated with $x$. When we add the assumption that the variance of the error given $x$ is constant, we get simple formulas for the sampling variances of the OLS estimators. As we saw, the variance of the slope estimator $\hat{\beta}_1$ increases as the error variance increases, and it decreases when there is more sample variation in the independent variable. We also derived an unbiased estimator for $\sigma^2 = \text{Var}(u)$.

In Section 2.6, we briefly discussed regression through the origin, where the slope estimator is obtained under the assumption that the intercept is zero. Sometimes, this is useful, but it appears infrequently in applied work.

Much work is left to be done. For example, we still do not know how to test hypotheses about the population parameters, $\beta_0$ and $\beta_1$. Thus, although we know that OLS is unbiased for the population parameters under Assumptions SLR.1 through SLR.4, we have no way of drawing inferences about the population. Other topics, such as the efficiency of OLS relative to other possible procedures, have also been omitted.

The issues of confidence intervals, hypothesis testing, and efficiency are central to multiple regression analysis as well. Since the way we construct confidence intervals and test

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

statistics is very similar for multiple regression—and because simple regression is a special case of multiple regression—our time is better spent moving on to multiple regression, which is much more widely applicable than simple regression. Our purpose in Chapter 2 was to get you thinking about the issues that arise in econometric analysis in a fairly simple setting.

## THE GAUSS-MARKOV ASSUMPTIONS FOR SIMPLE REGRESSION

For convenience, we summarize the **Gauss-Markov assumptions** that we used in this chapter. It is important to remember that only SLR.1 through SLR.4 are needed to show $\hat{\beta}_0$ and $\hat{\beta}_1$ are unbiased. We added the homoskedasticity assumption, SLR.5, to obtain the usual OLS variance formulas (2.57) and (2.58).

### Assumption SLR.1 (Linear in Parameters)

In the population model, the dependent variable, $y$, is related to the independent variable, $x$, and the error (or disturbance), $u$, as

$$y = \beta_0 + \beta_1 x + u,$$

where $\beta_0$ and $\beta_1$ are the population intercept and slope parameters, respectively.

### Assumption SLR.2 (Random Sampling)

We have a random sample of size $n$, $\{(x_i,y_i): i = 1, 2, \ldots, n\}$, following the population model in Assumption SLR.1.

### Assumption SLR.3 (Sample Variation in the Explanatory Variable)

The sample outcomes on $x$, namely, $\{x_i, i = 1, \ldots, n\}$, are not all the same value.

### Assumption SLR.4 (Zero Conditional Mean)

The error $u$ has an expected value of zero given any value of the explanatory variable. In other words,

$$\mathrm{E}(u|x) = 0.$$

### Assumption SLR.5 (Homoskedasticity)

The error $u$ has the same variance given any value of the explanatory variable. In other words,

$$\mathrm{Var}(u|x) = \sigma^2.$$

# Key Terms

Coefficient of Determination
Constant Elasticity Model
Control Variable
Covariate
Degrees of Freedom
Dependent Variable
Elasticity
Error Term (Disturbance)
Error Variance
Explained Sum of Squares (SSE)
Explained Variable
Explanatory Variable
First Order Conditions
Fitted Value
Gauss-Markov Assumptions
Heteroskedasticity
Homoskedasticity
Independent Variable
Intercept Parameter
Mean Independent
OLS Regression Line
Ordinary Least Squares (OLS)
Population Regression Function (PRF)
Predicted Variable
Predictor Variable

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# INTRODUCTORY Econometrics

## A MODERN APPROACH

5th EDITION

Jeffrey M. Wooldridge

# Introductory Econometrics

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# Introductory Econometrics

## A MODERN APPROACH

FIFTH EDITION

**Jeffrey M. Wooldridge**
*Michigan State University*

SOUTH-WESTERN
CENGAGE Learning

Australia • Brazil • Japan • Korea • Mexico • Singapore • Spain • United Kingdom • United States

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

This is an electronic version of the print textbook. Due to electronic rights restrictions, some third party content may be suppressed. Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. The publisher reserves the right to remove content from this title at any time if subsequent rights restrictions require it. For valuable information on pricing, previous editions, changes to current editions, and alternate formats, please visit www.cengage.com/highered to search by ISBN#, author, title, or keyword for materials in your areas of interest.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.


***Introductory Econometrics: A Modern Approach*, Fifth Edition**
**Jeffrey M. Wooldridge**

Senior Vice President, LRS/Acquisitions & Solutions Planning: Jack W. Calhoun

Editorial Director, Business & Economics: Erin Joyner

Editor-in-Chief: Joe Sabatino

Executive Editor: Michael Worls

Associate Developmental Editor: Julie Warwick

Editorial Assistant: Libby Beiting-Lipps

Brand Management Director: Jason Sakos

Market Development Director: Lisa Lysne

Senior Brand Manager: Robin LeFevre

Senior Market Development Manager: John Carey

Content Production Manager: Jean Buttrom

Rights Acquisition Director: Audrey Pettengill

Rights Acquisition Specialist, Text/Image: John Hill

Media Editor: Anita Verma

Senior Manufacturing Planner: Kevin Kluck

Senior Art Director: Michelle Kunkler

Production Management and Composition: PreMediaGlobal

Internal Designer: PreMediaGlobal

Cover Designer: Rokusek Design

Cover Image: © Elena R/Shutterstock.com; Milosz Aniol/Shutterstock.com

© 2013, 2009 South-Western, Cengage Learning

ALL RIGHTS RESERVED. No part of this work covered by the copyright herein may be reproduced, transmitted, stored, or used in any form or by any means graphic, electronic, or mechanical, including but not limited to photocopying, recording, scanning, digitizing, taping, web distribution, information networks, or information storage and retrieval systems, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without the prior written permission of the publisher.

For product information and technology assistance, contact us at
**Cengage Learning Customer & Sales Support, 1-800-354-9706**

For permission to use material from this text or product,
submit all requests online at **www.cengage.com/permissions**
Further permissions questions can be emailed to
**permissionrequest@cengage.com**

Library of Congress Control Number: 2012945120

ISBN-13: 978-1-111-53104-1

ISBN-10: 1-111-53104-8

**South-Western**
5191 Natorp Boulevard
Mason, OH 45040
USA

Cengage Learning products are represented in Canada by Nelson Education, Ltd.

For your course and learning solutions, visit **www.cengage.com**

Purchase any of our products at your local college store or at our preferred online store **www.cengagebrain.com**

Printed in the United States of America
1 2 3 4 5 6 7 16 15 14 13 12

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Because adding such a variable does not induce multicollinearity in the population (and therefore multicollinearity in the sample should be negligible), but it will reduce the error variance. In large sample sizes, the standard errors of all OLS estimators will be reduced.

As an example, consider estimating the individual demand for beer as a function of the average county beer price. It may be reasonable to assume that individual characteristics are uncorrelated with county-level prices, and so a simple regression of beer consumption on county price would suffice for estimating the effect of price on individual demand. But it is possible to get a more precise estimate of the price elasticity of beer demand by including individual characteristics, such as age and amount of education. If these factors affect demand and are uncorrelated with price, then the standard error of the price coefficient will be smaller, at least in large samples.

As a second example, consider the grants for computer equipment given at the beginning of Section 6.3. If, in addition to the grant variable, we control for other factors that can explain college GPA, we can probably get a more precise estimate of the effect of the grant. Measures of high school grade point average and rank, SAT and ACT scores, and family background variables are good candidates. Because the grant amounts are randomly assigned, all additional control variables are uncorrelated with the grant amount; in the sample, multicollinearity between the grant amount and other independent variables should be minimal. But adding the extra controls might significantly reduce the error variance, leading to a more precise estimate of the grant effect. Remember, the issue is not unbiasedness here: we obtain an unbiased and consistent estimator whether or not we add the high school performance and family background variables. The issue is getting an estimator with a smaller sampling variance.

Unfortunately, cases where we have information on additional explanatory variables that are uncorrelated with the explanatory variables of interest are somewhat rare in the social sciences. But it is worth remembering that when these variables are available, they can be included in a model to reduce the error variance without inducing multicollinearity.

## 6.4 Prediction and Residual Analysis

In Chapter 3, we defined the OLS predicted or fitted values and the OLS residuals. **Predictions** are certainly useful, but they are subject to sampling variation, because they are obtained using the OLS estimators. Thus, in this section, we show how to obtain confidence intervals for a prediction from the OLS regression line.

From Chapters 3 and 4, we know that the residuals are used to obtain the sum of squared residuals and the $R$-squared, so they are important for goodness-of-fit and testing. Sometimes, economists study the residuals for particular observations to learn about individuals (or firms, houses, etc.) in the sample.

### Confidence Intervals for Predictions

Suppose we have estimated the equation

$$\hat{y} = \hat{\beta}_0 + \hat{\beta}_1 x_1 + \hat{\beta}_2 x_2 + \ldots + \hat{\beta}_k x_k. \quad [6.27]$$

When we plug in particular values of the independent variables, we obtain a prediction for $y$, which is an estimate of the *expected value* of $y$ given the particular values for the explanatory variables. For emphasis, let $c_1, c_2, \ldots, c_k$ denote particular values for each of

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

the $k$ independent variables; these may or may not correspond to an actual data point in our sample. The parameter we would like to estimate is

$$\begin{aligned}\theta_0 &= \beta_0 + \beta_1 c_1 + \beta_2 c_2 + \ldots + \beta_k c_k \\ &= \mathrm{E}(y|x_1 = c_1, x_2 = c_2, \ldots, x_k = c_k).\end{aligned} \quad [6.28]$$

The estimator of $\theta_0$ is

$$\hat{\theta}_0 = \hat{\beta}_0 + \hat{\beta}_1 c_1 + \hat{\beta}_2 c_2 + \ldots + \hat{\beta}_k c_k. \quad [6.29]$$

In practice, this is easy to compute. But what if we want some measure of the uncertainty in this predicted value? It is natural to construct a confidence interval for $\theta_0$, which is centered at $\hat{\theta}_0$.

To obtain a confidence interval for $\theta_0$, we need a standard error for $\hat{\theta}_0$. Then, with a large *df*, we can construct a 95% confidence interval using the rule of thumb $\hat{\theta}_0 \pm 2\cdot\mathrm{se}(\hat{\theta}_0)$. (As always, we can use the exact percentiles in a $t$ distribution.)

How do we obtain the standard error of $\hat{\theta}_0$? This is the same problem we encountered in Section 4.4: we need to obtain a standard error for a linear combination of the OLS estimators. Here, the problem is even more complicated, because all of the OLS estimators generally appear in $\hat{\theta}_0$ (unless some $c_j$ are zero). Nevertheless, the same trick that we used in Section 4.4 will work here. Write $\beta_0 = \theta_0 - \beta_1 c_1 - \ldots - \beta_k c_k$ and plug this into the equation

$$y = \beta_0 + \beta_1 x_1 + \ldots + \beta_k x_k + u$$

to obtain

$$y = \theta_0 + \beta_1(x_1 - c_1) + \beta_2(x_2 - c_2) + \ldots + \beta_k(x_k - c_k) + u. \quad [6.30]$$

In other words, we subtract the value $c_j$ from each observation on $x_j$, and then we run the regression of

$$y_i \text{ on } (x_{i1} - c_1), \ldots, (x_{ik} - c_k), i = 1, 2, \ldots, n. \quad [6.31]$$

The predicted value in (6.29) and, more importantly, its standard error, are obtained from the *intercept* (or constant) in regression (6.31).

As an example, we obtain a confidence interval for a prediction from a college GPA regression, where we use high school information.

## EXAMPLE 6.5 CONFIDENCE INTERVAL FOR PREDICTED COLLEGE GPA

Using the data in GPA2.RAW, we obtain the following equation for predicting college GPA:

$$\begin{aligned}\widehat{colgpa} &= \underset{(0.075)}{1.493} + \underset{(.00007)}{.00149}\, sat - \underset{(.00056)}{.01386}\, hsperc \\ &\quad - \underset{(.01650)}{.06088}\, hsize + \underset{(.00227)}{.00546}\, hsize^2 \\ n &= 4{,}137,\ R^2 = .278,\ \bar{R}^2 = .277,\ \hat{\sigma} = .560,\end{aligned} \quad [6.32]$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

where we have reported estimates to several digits to reduce round-off error. What is predicted college GPA, when *sat* = 1,200, *hsperc* = 30, and *hsize* = 5 (which means 500)? This is easy to get by plugging these values into equation (6.32): $\widehat{colgpa}$ = 2.70 (rounded to two digits). Unfortunately, we cannot use equation (6.32) directly to get a confidence interval for the expected *colgpa* at the given values of the independent variables. One simple way to obtain a confidence interval is to define a new set of independent variables: $sat0 = sat - 1{,}200$, $hsperc0 = hsperc - 30$, $hsize0 = hsize - 5$, and $hsizesq0 = hsize^2 - 25$. When we regress *colgpa* on these new independent variables, we get

$$\begin{aligned}\widehat{colgpa} &= \underset{(0.020)}{2.700} + \underset{(.00007)}{.00149}\, sat0 - \underset{(.00056)}{.01386}\, hsperc0 \\ &\quad - \underset{(.01650)}{.06088}\, hsize0 + \underset{(.00227)}{.00546}\, hsizesq0 \\ n &= 4{,}137,\ R^2 = .278,\ \bar{R}^2 = .277,\ \hat{\sigma} = .560.\end{aligned}$$

The only difference between this regression and that in (6.32) is the intercept, which is the prediction we want, along with its standard error, .020. It is not an accident that the slope coefficents, their standard errors, *R*-squared, and so on are the same as before; this provides a way to check that the proper transformations were done. We can easily construct a 95% confidence interval for the expected college GPA: 2.70 ± 1.96(.020) or about 2.66 to 2.74. This confidence interval is rather narrow due to the very large sample size.

Because the variance of the intercept estimator is smallest when each explanatory variable has zero sample mean (see Question 2.5 for the simple regression case), it follows from the regression in (6.31) that the variance of the prediction is smallest at the mean values of the $x_j$. (That is, $c_j = \bar{x}_j$ for all $j$.) This result is not too surprising, since we have the most faith in our regression line near the middle of the data. As the values of the $c_j$ get farther away from the $\bar{x}_j$, $\text{Var}(\hat{y})$ gets larger and larger.

The previous method allows us to put a confidence interval around the OLS estimate of $\text{E}(y|x_1, \ldots, x_k)$ for any values of the explanatory variables. In other words, we obtain a confidence interval for the *average* value of $y$ for the subpopulation with a given set of covariates. But a confidence interval for the average person in the subpopulation is not the same as a confidence interval for a particular unit (individual, family, firm, and so on) from the population. In forming a confidence interval for an unknown outcome on $y$, we must account for another very important source of variation: the variance in the unobserved error, which measures our ignorance of the unobserved factors that affect $y$.

Let $y^0$ denote the value for which we would like to construct a confidence interval, which we sometimes call a **prediction interval**. For example, $y^0$ could represent a person or firm not in our original sample. Let $x_1^0, \ldots, x_k^0$ be the new values of the independent variables, which we assume we observe, and let $u^0$ be the unobserved error. Therefore, we have

$$y^0 = \beta_0 + \beta_1 x_1^0 + \beta_2 x_2^0 + \ldots + \beta_k x_k^0 + u^0. \quad [6.33]$$

As before, our best prediction of $y^0$ is the expected value of $y^0$ given the explanatory variables, which we estimate from the OLS regression line: $\hat{y}^0 = \hat{\beta}_0 + \hat{\beta}_1 x_1^0 + \hat{\beta}_2 x_2^0 + \ldots + \hat{\beta}_k x_k^0$. The **prediction error** in using $\hat{y}^0$ to predict $y^0$ is

$$\hat{e}^0 = y^0 - \hat{y}^0 = (\beta_0 + \beta_1 x_1^0 + \ldots + \beta_k x_k^0) + u^0 - \hat{y}^0. \quad [6.34]$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Now, $\mathrm{E}(\hat{y}^0) = \mathrm{E}(\hat{\beta}_0) + \mathrm{E}(\hat{\beta}_1)x_1^0 + \mathrm{E}(\hat{\beta}_2)x_2^0 + \ldots + \mathrm{E}(\hat{\beta}_k)x_k^0 = \beta_0 + \beta_1 x_1^0 + \ldots + \beta_k x_k^0$, because the $\hat{\beta}_j$ are unbiased. (As before, these expectations are all conditional on the sample values of the independent variables.) Because $u^0$ has zero mean, $\mathrm{E}(\hat{e}^0) = 0$. We have shown that the expected prediction error is zero.

In finding the variance of $\hat{e}^0$, note that $u^0$ is uncorrelated with each $\hat{\beta}_j$, because $u^0$ is uncorrelated with the errors in the sample used to obtain the $\hat{\beta}_j$. By basic properties of covariance (see Appendix B), $u^0$ and $\hat{y}^0$ are uncorrelated. Therefore, the **variance of the prediction error** (conditional on all in-sample values of the independent variables) is the sum of the variances:

$$\mathrm{Var}(\hat{e}^0) = \mathrm{Var}(\hat{y}^0) + \mathrm{Var}(u^0) = \mathrm{Var}(\hat{y}^0) + \sigma^2, \quad [6.35]$$

where $\sigma^2 = \mathrm{Var}(u^0)$ is the error variance. There are two sources of variation in $\hat{e}^0$. The first is the sampling error in $\hat{y}^0$, which arises because we have estimated the $\beta_j$. Because each $\hat{\beta}_j$ has a variance proportional to $1/n$, where $n$ is the sample size, $\mathrm{Var}(\hat{y}^0)$ is proportional to $1/n$. This means that, for large samples, $\mathrm{Var}(\hat{y}^0)$ can be very small. By contrast, $\sigma^2$ is the variance of the error in the population; it does not change with the sample size. In many examples, $\sigma^2$ will be the dominant term in (6.35).

Under the classical linear model assumptions, the $\hat{\beta}_j$ and $u^0$ are normally distributed, and so $\hat{e}^0$ is also normally distributed (conditional on all sample values of the explanatory variables). Earlier, we described how to obtain an unbiased estimator of $\mathrm{Var}(\hat{y}^0)$, and we obtained our unbiased estimator of $\sigma^2$ in Chapter 3. By using these estimators, we can define the standard error of $\hat{e}^0$ as

$$\mathrm{se}(\hat{e}^0) = \{[\mathrm{se}(\hat{y}^0)]^2 + \hat{\sigma}^2\}^{1/2}. \quad [6.36]$$

Using the same reasoning for the $t$ statistics of the $\hat{\beta}_j$, $\hat{e}^0/\mathrm{se}(\hat{e}^0)$ has a $t$ distribution with $n - (k + 1)$ degrees of freedom. Therefore,

$$\mathrm{P}[-t_{.025} \leq \hat{e}^0/\mathrm{se}(\hat{e}^0) \leq t_{.025}] = .95,$$

where $t_{.025}$ is the 97.5th percentile in the $t_{n-k-1}$ distribution. For large $n - k - 1$, remember that $t_{.025} \approx 1.96$. Plugging in $\hat{e}^0 = y^0 - \hat{y}^0$ and rearranging gives a 95% prediction interval for $y^0$:

$$\hat{y}^0 \pm t_{.025} \cdot \mathrm{se}(\hat{e}^0); \quad [6.37]$$

as usual, except for small $df$, a good rule of thumb is $\hat{y}^0 \pm 2\mathrm{se}(\hat{e}^0)$. This is wider than the confidence interval for $\hat{y}^0$ itself because of $\hat{\sigma}^2$ in (6.36); it often is much wider to reflect the factors in $u^0$ that we have not accounted for.

## EXAMPLE 6.6 CONFIDENCE INTERVAL FOR FUTURE COLLEGE GPA

Suppose we want a 95% CI for the future college GPA of a high school student with $sat$ = 1,200, $hsperc$ = 30, and $hsize$ = 5. In Example 6.5, we obtained a 95% confidence interval for the *average* college GPA among all students with the particular characteristics $sat$ = 1,200, $hsperc$ = 30, and $hsize$ = 5. Now, we want a 95% confidence interval for any *particular* student with these characteristics. The 95% prediction interval must account for the variation in the individual, unobserved characteristics that affect college performance. We have everything we need to obtain a CI for *colgpa*. $\mathrm{se}(\hat{y}^0) = .020$ and

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# Exhibit 98

ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*Pro Hac Vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

*Attorneys for Defendant/Counterclaimant LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

hiQ Labs, Inc.,

Plaintiff,

v.

LinkedIn Corp.,

Defendant.

AND RELATED COUNTERCLAIM

Case No. 3:17-cv-03301-EMC

**DEFENDANT LINKEDIN CORPORATION'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**

**PROPOUNDING PARTY**: PLAINTIFF HIQ LABS, INC.

**RESPONDING PARTY**: DEFENDANT LINKEDIN CORP.

**SET NUMBER**: SUPPLEMENTAL TO SECOND SET (NO. 8)

In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff LinkedIn Corporation ("LinkedIn") hereby provides the following Supplemental Response to Interrogatory No. 8 to the Second Set of Interrogatories ("Interrogatories") propounded by Plaintiff and Counterclaim Defendant hiQ Labs, Inc. ("hiQ").

LinkedIn objects to the definition of "hiQ" as vague and ambiguous because hiQ's employees or representatives and its predecessors are not identified with reasonable particularity. Further, the term "predecessors" is not defined and it is unclear what sort of relationship between hiQ and other entities hiQ has in mind. LinkedIn's responses will address only hiQ, OrgStars Inc., and any employees or representatives where LinkedIn is aware of a relationship with hiQ.

LinkedIn objects to the definitions of "LinkedIn," "You," and "Your" as overbroad and beyond the scope permitted by the Federal Rules of Civil Procedure, which requires LinkedIn to furnish information available to the party. LinkedIn will respond for LinkedIn only and pursuant to its obligations.

LinkedIn further objects to hiQ's definition of "Including" as it is incomplete and lacks any definition. LinkedIn will construe "Including" according to its normal dictionary definition.

LinkedIn objects to the definition of "You," "Your," or "LinkedIn" because it exceeds the scope of LinkedIn's obligation to respond under Federal Rule of Civil Procedure 33. LinkedIn will respond for LinkedIn Corporation pursuant to its obligations under Federal Rule of Civil Procedure 33.

LinkedIn objects to the instructions preceding hiQ's interrogatories. Instructions are improper and objectionable because LinkedIn's only obligation is to respond according to its obligations under Federal Rule of Civil Procedure 33 and, to the extent appropriate, supplement pursuant to Federal Rule of Civil Procedure 26(e).

LinkedIn supplements its response to Interrogatory No. 8 as follows:

//

//

//

//

**INTERROGATORY REQUESTS**

**INTERROGATORY NO. 8:**

Describe in detail when and how LinkedIn first suspected that hiQ was using automated means to access Your website, including by identifying the date you first suspected same, all individuals who had knowledge of same, and how those individuals came to that suspicion.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

LinkedIn objects to this interrogatory as overbroad and unduly burdensome in light of the phrase "all individuals who had knowledge of the same." As worded, this request applies to the individual subjective beliefs of any LinkedIn employee (of which there are many thousands), whether or not they had any responsibility for anti-scraping enforcement. LinkedIn further objects to the extent this interrogatory purports to assert that suspicion of scraping by hiQ by any individual employee can be imputed to LinkedIn as an entity. LinkedIn further objects to the extent this topic seeks to compel LinkedIn to identify the first time at which any individual associated in any way with LinkedIn became suspicious of hiQ's activities, which would be unduly burdensome, out of proportion with the needs of the case, and could involve information not within LinkedIn's possession, custody, or control, as well requiring LinkedIn to answer as to the content of oral communications, including communications that may have involved individuals that are no longer employed at LinkedIn. LinkedIn further objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or attorney work-product doctrine. Subject to the foregoing objections, LinkedIn will respond to this interrogatory by providing information related to specific non-privileged instances where individual LinkedIn employees communicated in writing internally regarding hiQ's potential use of LinkedIn data for its products. By supplying such information, LinkedIn is not conceding (and indeed disputes) that any individual person was suspicious of hiQ scraping data from LinkedIn in violation of LinkedIn's User Agreement and applicable law, or that the knowledge or suspicion of any one of these persons who was not responsible for anti-scraping enforcement is properly imputed to the company.

//

In light of the foregoing, and based upon a reasonable investigation, LinkedIn responds as follows:

After a reasonable investigation, the first record of any LinkedIn employee wondering whether hiQ might be scraping LinkedIn data is an October 8, 2014, email from William Gaker (Senior Manager Business Operations on the Talent Analytics team) to Daniel Maurath (Analyst in Talent Analytics at the time). LINK_HIQ_000038998. Talent Analytics is an internal group focused on analyzing LinkedIn's own workforce. Its mission is to help LinkedIn make evidence-based internal decisions about its own employees. It is a division supporting LinkedIn's own Human Resources group. Talent Analytics is not directly involved in LinkedIn's external product offerings. Neither Mr. Gaker nor Mr. Maurath, nor the teams on which they worked, had responsibility on behalf of LinkedIn to identify potential scraping or take enforcement action against potential scrapers. Mr. Gaker and Mr. Maurath speculated that hiQ may be scraping LinkedIn's data but indicated that they had no knowledge one way or the other and it would be something that required further investigation. Mr. Rigano (Senior Associate Business Operations on the Talent Analytics team) noted that the legal department would be the proper personnel to assess any usage by hiQ of LinkedIn data. LinkedIn does not believe that any participant on that email thread reported hiQ's potential scraping to any LinkedIn attorney or anyone else with authority and responsibility regarding anti-scraping enforcement. *See* LINK_HIQ_000206273, LINK_HIQ_000039090, LINK_HIQ_000038996, LINK_HIQ_000038994, LINK_HIQ_000039038, LINK_HIQ_000038999, LINK_HIQ_000039040, LINK_HIQ_000039092.

In December 2014, Robin Vasan, a third party analyst from Mayfield Fund, sent an unsolicited email to Bob Rosin, who was then the Vice President of Business Development at LinkedIn, about potential business opportunities, noting:

> One company we are not involved in, but recently met, is called HiQ Labs. https://www.hiqlabs.com/ They are helping HR departments inside of companies look at public data (including LinkedIn) to try to predict which employees might be at risk to leave. We found it interesting, but weren't sure that LinkedIn would look favorably at a company that is analyzing profiles (combined with various other data sources). It would

> be great to get a sense on how LinkedIn figures out which partners to allow and work closely with or not.

Mr. Vasan's email also referenced a second company, as follows:

> Another one that we are involved with is EasilyDo (www.easilydo.com) and they are seeing strong traction with their smart assistant solution. Today they have some lightweight/API integration with LinkedIn, but would be interested to have a deeper relationship.
>
> Anyway, it would be great to catch up and hear where you see opportunities.

*See LINK_HIQ_000012281.*

There was no mention of the possibility of hiQ scraping LinkedIn data, and neither Mr. Rosin nor anyone from his group pursued anything further with hiQ. Lee Womer expressed doubt that hiQ's product was "a members' first use case." LINK_HIQ_000073013. Further discussions related to Mr. Vasan's e-mail focused on the other company mentioned, EasilyDo. *See, e.g.*, LINK_HIQ_000073013, LINK_HIQ_000072101, LINK_HIQ_000073009, LINK_HIQ_000072099, LINK_HIQ_000072083, LINK_HIQ_000073004, LINK_HIQ_000072079, LINK_HIQ_000072075, LINK_HIQ_000072999, LINK_HIQ_000012274, LINK_HIQ_000072994, LINK_HIQ_000072070, LINK_HIQ_000072065, LINK_HIQ_000072988, LINK_HIQ_000072118; LINK_HIQ_000012274.

In September 2015, hiQ apparently began publicizing its upcoming Elevate Conference. One or more LinkedIn employees from LinkedIn's internal Talent Analytics department (whose responsibilities did not include either anti-scraping enforcement or development of LinkedIn's products) were apparently invited by hiQ and discussed attending the conference. *See* LINK_HIQ_000040476, LINK_HIQ_000024027. Following the October 2015 hiQ Elevate conference, one of the attendees from Talent Analytics, Lorenzo Canlas, reached out to Adam Weinstein (Senior Manager, Platform and Emerging Products) and Boyu Zhang (Senior Associate, Business Operations at the time) asking "what is the process for investigating companies who we think are scraping the site?" *See* LINK_HIQ_000067471. Canlas noted that he had been "at a conference yesterday with HiQ labs who is using internal (HRIS, survey) data

and external (LinkedIn and other data) to predict attrition" and asked, "Is there a way for us to understand how and if they are using our data and understanding if we are enabling and supporting it?" *Id.* Canlas followed up noting that hiQ "mentioned that pull factors include: - completeness of public profiles – recruiter demand for someones job type" and that he "[wasn't] sure how they do these pull factors but [he] suspect[ed] it includes some LinkedIn data. "[hiQ] inadvertently mentioned 'if you are getting a lot of inmails there is more pull for you to leave your job' but [he] ha[d] no idea if they can actually measure InMail demand." LINK_HIQ_000067470. Mr. Canlas's email was forwarded to the Scraper Council email distribution list.

Scraper Council, originally formed on or about September 2013, is a cross-functional group of individuals from multiple LinkedIn teams created with a goal to bring together representatives who had knowledge of or an interest in the issue of scraping abuse on LinkedIn. The group was formed in order to collaborate on various methods to prevent scraping abuse on the platform, ranging from technical measures, product features, business discussions, to legal enforcement efforts, while seeking to ensure that everyone involved in anti-scraping efforts was properly advised by LinkedIn's attorneys on this topic.

The Scraper Council created a "scraper-council" email distribution list in October 2013, which continues to exist today and is made up of LinkedIn employees from multiple LinkedIn groups, including Legal, Product Trust, Trust Engineering, Trust and Safety, Data Science, and Business Development. Over time, other employees learned of this distribution list and began using it to report instances of suspected scraping with greater frequency.

When hiQ was subsequently identified by email to Scraper Council in October 2015, at the time the cross-functional group was still working out its internal processes and there were not yet clear lines of responsibility or a playbook on how to proceed with reports made to the Scraper Council. The volume of reports far exceeded the technical resources available to investigate or the legal resources available to take action on reports that had been investigated and substantiated. At the time, LinkedIn also did not have a process for systematically tracking scraping abuse questions and reports. LinkedIn did not investigate Mr. Canlas's report in October 2015 that hiQ

might be scraping data. Although Mr. Canlas continued to interact with hiQ on occasion afterwards, he was never responsible for anti-scraping investigation or enforcement activity, nor did he have any expertise on the subject of scraping. He continued to express uncertainty as to the nature of its activity, as reflected in a June 29, 2016, email where he notes that hiQ scrapes data "*possibly* including linkedin." LINK_HIQ_000067901 (emphasis added). This email was part of a larger set of notes sent to Sanjeev Kapur (former Director of Business Operations at the time), Mads Johnsen (former Head of Product Strategy & Business Operations), and Alok Paranjpye (former Senior Manager, Strategy and Business Operations). These individuals also had no involvement in anti-scraping enforcement activity.

In April 2017, hiQ came to the attention of LinkedIn's Scraper Council members in connection with hiQ's April 19, 2017 Elevate Conference. This conference was attended by Dan Francis, Mike Jennings, and Lorenzo Canlas from LinkedIn. Unlike in past conferences, hiQ expressly disclosed during the conference that it was using a quantity of data taken from LinkedIn profiles for both of its products, including its newly announced "Skill Mapper" product. *See, e.g.,* LINK_HIQ_000051988; Declaration of Lorenzo Canlas in support of Opposition to Motion for TRO (June 2, 2017) at ¶ 8. hiQ also stated that it frequently refreshed the data taken from LinkedIn profiles at a quantity that strongly indicated that hiQ must be scraping member profile data from LinkedIn, although hiQ did not explicitly state that it was scraping or using automated software means to obtain the large quantities of data it was using from LinkedIn's website. *Id.*; LINK_HIQ_000052487. hiQ further stated it provided these statistics and updates to its customers. After the April 2017 conference, the attendees reported their suspicions about hiQ to members of Trust Engineering, who consulted with LinkedIn's Legal team for direction on how to proceed. LinkedIn's Legal and Trust and Safety teams investigated hiQ.

There was no way in 2017 – and still is no way now – to identify which scraping requests for member profiles were coming from a specific company, or to otherwise tie scraping activity to a specific company such as hiQ, because IP addresses used by computers to scrape data from LinkedIn without authorization are almost always entirely anonymous. Acting at the direction of LinkedIn's Legal team, members of the Trust and Safety team therefore investigated hiQ's

website and performed other steps to assess what it could learn of hiQ's products and data sources, and put that information together with the information obtained at the 2017 Elevate Conference. Based on the statements at the Elevate conference and the subsequent investigation, LinkedIn's Legal team concluded that it was reasonable to believe that hiQ was scraping significant quantities of member profile data using automated means. It was at that time in late April/early May of 2017 that LinkedIn, as an entity with people specifically responsible for anti-scraping enforcement, first had "suspicion" that hiQ was scraping member profiles. Of course, this conclusion turned out to be correct. As part of its investigation, LinkedIn's Legal and Trust and Safety teams also determined that hiQ had not only agreed to the LinkedIn User Agreement by setting up a company page on the LinkedIn website, but also had previously entered into a number of other contracts with LinkedIn that incorporated its User Agreement and Privacy Policies as contractual requirements. Accordingly, LinkedIn confirmed that hiQ must have been aware of the terms of its User Agreement prohibiting scraping. The facts about what hiQ was actually doing to obtain LinkedIn data were entirely within hiQ's hands, and the only way to know for sure the nature of its activity was to communicate with hiQ.

LinkedIn's Legal team prioritized hiQ for enforcement because hiQ's Keeper product appeared to violate LinkedIn member's expectations regarding use of their personal information, and hiQ's Skill Mapper product appeared to be free riding off of LinkedIn's investments to build a potentially competitive product. On May 23, 2017, LinkedIn legal counsel sent a cease and desist letter to hiQ demanding that it cease scraping in violation of the terms of LinkedIn's User Agreement and a number of other laws. At the time, LinkedIn had an API program (described more fully in response to Interrogatory No. 22) that included business options for acquiring *free* access to member profile data while abiding by LinkedIn's Privacy Policy and User Agreement. On information and belief, hiQ was aware of this API program. Instead of pursuing business discussions with LinkedIn with a goal of obtaining an API license, hiQ chose to file a lawsuit.

//

//

//

Dated: August 15, 2022

ANNETTE L. HURST
Orrick, Herrington & Sutcliffe LLP

By: */s/ Annette L. Hurst*
ANNETTE L. HURST
Attorneys for Defendant
LinkedIn Corp.

- 9 -

3:17-CV-03301-EMC
DEF. LINKEDIN CORP.'S SUPPL. RESP.
TO INTERROGATORY NO. 8

**VERIFICATION**

I, Blake Lawit, am an employee at LinkedIn, a party to this action, and am authorized to make this verification for and on its behalf with regard to LinkedIn's supplemental response to Interrogatory No. 8. I have reviewed LinkedIn's response to the supplemental response and am informed and believe that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 15, 2022, at Mountain View, CA.

Blake Lawit

**CERTIFICATE OF SERVICE**

I am over the age of eighteen years and not a party to this action. My business address is Orrick, Herrington & Sutcliffe LLP, 405 Howard Street, San Francisco, CA 94105-2669.

On August 15, 2022, I served the foregoing documents described as:

**DEFENDANT LINKEDIN CORPORATION'S SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8**

upon the interested parties in this action as follows:

☐ (BY MAIL) I caused copies of the foregoing document(s) to be placed in a sealed envelope addressed as set forth below. Each such envelope was placed for collection and mailing following ordinary business practices. I am readily familiar with this Firm's practice for collection and processing of correspondence for mailing. Under that practice, the correspondence would be deposited with the United States Postal Service on that same day, with postage thereon fully prepaid at Irvine, California, in the ordinary course of business.

☒ (BY EMAIL) By transmitting a true pdf copy of the foregoing document(s) by e-mail transmission from ahurst@orrick.com to the interested parties at the e-mail address(es) set forth below. Said transmission(s) were completed on the aforesaid date, and there were no errors reported in the transmission process.

☐ (BY OVERNIGHT DELIVERY) I caused to be deposited in a box or other facility regularly maintained by Federal Express, a true copy of the foregoing document(s) in a sealed envelope or package designated by Federal Express, addressed as set forth below, with fees for overnight delivery paid or provided for.

| | |
|---|---|
| Corey Worcester (*pro hac vice*)<br>coreyworcester@quinnemanuel.com<br>Renita Sharma (*pro hac vice*)<br>renitasharma@quinnemanuel.com<br>Hope Skibitsky (*pro hac vice*)<br>hopeskibitsky@quinnemanuel.com<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>Telephone: (212) 849-7000<br><br>Terry L. Wit (SBN 233473)<br>terrywit@quinnemanuel.com<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>Telephone: (415) 875-6600<br><br>***SERVICE LIST CONTINUED ON NEXT PAGE*** | *Counsel for Plaintiff hiQ Labs, Inc.* |

| | |
|---|---|
| Adam Bryan Wolfson<br>adamwolfson@quinnemanuel.com<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>865 S. Figueroa Street<br>Los Angeles, CA 90017<br>Telephone: (213) 443-3000<br><br>Zane Muller (*Admitted Pro Hac Vice*)<br>zanemuller@quinnemanuel.com<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>51 Madison Ave., 22nd Floor<br>New York, NY 10010<br>Telephone: (212) 849-7000<br><br>Elisabeth B. Miller (*Admitted Pro Hac Vice*)<br>elisabethmiller@quinnemanuel.com<br>QUINN EMANUEL URQUHART & SULLIVAN LLP<br>51 Madison Ave., 22nd Floor<br>New York, NY 10010<br>Telephone: (212) 849-7097 | |

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on August 15, 2022, at San Francisco, California.

______________________________
Annette L. Hurst

# Exhibit 99

# Filed Under Seal

# Exhibit 100

# Filed Under Seal

# Exhibit 101

# Filed Under Seal

# Exhibit 102

Confidential

The contents of this document are confidential and intended solely for the recipient. Reproduction of, or forwarding to anyone not directly sent this document is strictly forbidden

The purpose of this document is to debrief and train mechanical turkers for the hiQ labs Keeper product.

## Introduction to the Keeper

The following instructions are the requisite information for mechanically turking for the hiQ labs Keeper. Keeper is a program which assesses the probability of employees' risk of leaving a company. Keeper does this primarily through publicly available social media behavior. It combs google for each employee, searching for a publicly available linkedin.com profile, making the best match possible.

For each employee name, Keeper has associated nicknames to build a list of possible pseudonyms. For each name, Keeper makes a google query in this form: "site:linkedin.com '*employee name' 'company'*". It scrapes the search results to find the strongest match, the strength being primarily contingent on the last names matching as well as the company names.

Each profile then goes into validation, where Keeper assesses how confidently it found the correct profile. If the profile is strongly matched with the employee, the linkedin profile is sent to be analyzed in the model. If it fails validation, employee data is sent to the turker queue to be searched manually.



## Set Up

    Log into linkedin.com, you may want to create new accounts for turking to avoid having your account harassed.  It is important that you are browsing anonymously:

    Hover over your portrait until you see the dropdown menu, then click the "**manage**" button for **privacy and settings.**



In the privacy and settings menu, click the **select what others see when you've viewed their profile** button.  On the menu that pops up, make sure to mark **I will be totally anonymous**



Ask a member of the data science team to assign you items.  Open a browser and navigate to http://54.153.107.141:8888/turk.  You should see this screen:



Your username is your first name capitalized.  The company field should be filled in all caps.  A data science team member will assign you a password.  Once you log in, you will a screen like this:

88 left to turk.

**Name:** Janet Jablonski

**raw data:**

| | |
|---|---|
| *first_name* | Janet |
| *middle_name* | |
| *last_name* | Jablonski |
| *employ_city* | Bingham Farms |
| *employ_state* | MI |
| *hire_date* | 1/5/2015 |
| *job_title* | Acct Exec 2, Ad Sales- Local |
| *position_start_dt* | 1/5/2015 |

USE **proposed URL:** ca.linkedin.com/pub/james-jablonski/77/15a/202/

Last name + company | Google

REPLACE

CONFIDENCE (0-100): 95

PRIVATE NOT ON LINKEDIN

BACK NEXT

FIX MISTAKE

Each company offers different raw data, but the most important data to use will be each data point listed in this example. Use the data available to search linkedin.com for a match on the employee.

## Processing the Employee

There are four outcomes available per employee in your turk queue. For any input you use, you must adjust the confidence accordingly. Please exercise forethought in turking; the purity of data is most important for the Keeper's analyses.

### -Confidence

The confidence level is any number between 1-100, and is associated with how confident you are about the outcome you've decided for the employee. Typically there are three confidence levels used. 95 means that you're certain. 65 is used when your pretty sure about the outcome you've selected, however there may be some information missing to be completely accurate. 45 is used when you believe the profile you found is the employee, but the profile is missing crucial data to match the employee. One example is the name is the same, the location is the same, and this person works in the

same field and industry. However, perhaps they were hired by our client within the last month, and they haven't yet updated their linkedin resumé.

Any confidence below 50 will set the keeper to record the outcome you found, but that profile information will not be sent to the clients. Do not use a confidence of 50, or any confidence above 95

**-USE , REPLACE, NOT ON LINKEDIN, and PRIVATE**

If the proposed URL is accurate, select the "USE" button next to the URL. If you have searched for the employee and found their profile, you must copy the URL at the. bottom of the header of their linkedin profile, NOT the URL in the address bar of your browser

If there is no URL in the region circled above, then the profile is private

When you select the "PRIVATE" button, the profile will not be scraped.

If after sufficiently searching, you cannot find a profile for the customer, simply select NOT ON LINKEDIN.

- **FIX MISTAKE**

If you feel that you have made a mistake on your last entry, you may select the fix mistake button. This button will take the last employee that you turked, reset all their values, and place them back in your turking queue. You may press the button again to go back multiple people. Please note, the more you press the FIX MISTAKE button, the more work you undo for yourself.

## Successful Query Strategies

It is up to each turker to use strategic searches in linkedin in order to be accurate and efficient. The following are just some potential strategies

-Full name + company

Copying the name listed in webturk and pasting it into the search bar with the company title is the quickest way to find some hidden profiles. Note that copy and pasting is a deterrent against misspelling names with unconventional spelling. If somebody has more than one last name, it may be helpful to try each one individually with the first name. Additionally, it may be valuable to search with the middle name replacing the first name

- Last Name + Company in Advanced search.

Linkedin.com has an advanced search bar feature. Using the employee last name in the “last name” search bar as well as the company in the “keywords” bar is very effective at finding common nicknames people use. If this search brings up a very large list, it is helpful to specify a little more, such as adding the state. This search with the state included is used in the “Last name+company” search link on webturk

- Full name + Company in Google search

Google has a fantastic system of dictionaries for related words. This system comes in handy for odd nicknames or people who work for a subsidiary of the company you’re turking for. Additionally, the results on Google are cached information, which means that if somebody has recently changed their name, the result will still show on the google search. This is the search performed in the “Google Search” field on webturk.

- Full name + location + industry modifier

Another way to check for subsidiaries is to search the full name and loose location in linkedin, then filter the results by industry. This is effective in finding people who were reluctant to provide their company, or when the subsidiary does not the client’s company as a parent.

# Exhibit 103



# Save a Profile as a PDF

Last updated: 6 months ago

You can save a copy of your profile or another LinkedIn member's profile as a resume in a PDF from the introduction section on your profile. This feature is not available on the LinkedIn mobile app.

To save a profile as a PDF from your desktop:

1. Click the **Me** icon at the top of your LinkedIn homepage.
2. Click **View profile**.
    - If you wish to save a LinkedIn member's profile as a PDF file, navigate to their profile.
3. Click the **More** button in the introduction section.

4. Select **Save to PDF** from the dropdown.

Language profiles that can't be downloaded

**Notes:**

- You're limited to 100 PDF downloads of other LinkedIn members' profiles per month. The limit doesn't apply for downloads of your

own profile.

- Only characters from the English language will display properly in a PDF.
- We currently don’t offer the option to choose which sections will be included in saved versions of your profile unless you have access to LinkedIn Resume Builder via a Premium subscription.

Learn more about:

- **Share a profile with connections and co-workers**
- **Edit the introduction section on your profile**
- **LinkedIn Resume Builder**

Was this answer helpful?
Yes
No
LinkedIn
Contact us
English (English)
About
Safety Center
Privacy and Terms
LinkedIn Corporation © 2022

# Exhibit 104

# Filed Under Seal