Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Elisabeth B. Miller (*pro hac vice*)
elisabethmiller@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
Zane Muller (*pro hac vice*)
zanemuller@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6331

*Attorneys for Plaintiff and Counterclaim Defendant hiQ Labs, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 3:17-cv-03301-EMC |
| *Plaintiff and Counterclaim Defendant*, | **HIQ LABS, INC.'S OPPOSITION TO LINKEDIN'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | The Hon. Edward M. Chen |
| LinkedIn Corp., | Date:      September 29, 2022 |
| *Defendant and Counterclaim Plaintiff.* | Time:      1:30 P.M. |
| | Location:  Courtroom 5, 17th Floor |
| | 450 Golden Gate Ave. |
| | San Francisco, CA 94102 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

    A.    hiQ Builds An Innovative People Analytics Technology ...................................... 2

    B.    LinkedIn Engages With hiQ, Knowing hiQ Uses Public LinkedIn Data ............... 3

    C.    LinkedIn Identifies hiQ As A Competitive Threat ................................................ 4

    D.    LinkedIn Launches A Plan To Collect Competitive Intel From hiQ Then
           Shut Down Its Business ......................................................................................... 5

    E.    hiQ's Business Falters As A Result Of LinkedIn's Interference .......................... 6

    F.    LinkedIn's "Members First" Policy Is A Pretext For Anticompetitive
           Conduct ................................................................................................................. 7

LEGAL STANDARD ................................................................................................................ 9

ARGUMENT ............................................................................................................................. 9

I.      QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON
       LINKEDIN'S BREACH OF CONTRACT CLAIM ....................................................... 9

    A.    Factual Disputes Exist As To Whether LinkedIn Has Unclean Hands That
           Bar Its Contract Claim ........................................................................................ 10

    B.    A Question Of Fact Exists As To Whether The Relevant User Agreement
           Bars The Conduct LinkedIn Claims Constitutes A Breach ................................. 11

II.     FACTUAL DISPUTES BAR SUMMARY JUDGMENT ON HIQ'S UCL
       CLAIMS ........................................................................................................................ 17

    A.    The Evidence Supports hiQ's "Unfair" UCL Claim ........................................... 17

    B.    The Evidence Supports hiQ's "Fraudulent" UCL Claim ..................................... 21

    C.    The Evidence Supports hiQ's "Unlawful" UCL Claim ....................................... 22

    D.    This Court Has Discretion To Fashion An Appropriate UCL Remedy ............... 22

III.    Issues Of Fact Bar Summary Judgment On hiQ's Tortious Interference Claims ............ 23

    A.    Genuine Issues Of Material Fact Preclude Judgment On hiQ's Intentional
           Interference With Contract Claim ....................................................................... 24

      B.      Genuine Issues Of Material Fact Preclude Judgment On hiQ's Intentional Interference With Economic Relationship ............................................................ 26

IV.      LinkedIn's Affirmative Defenses to hiQ's Claims Fail ...................................... 28

      A.      Factual Disputes Exist As LinkedIn's Litigation Privilege Defense .................... 28

      B.      LinkedIn's Justification Defense Fails Because It Acted In Bad Faith ................ 29

V.      CONCLUSION ................................................................................................. 31

TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Alexander v. Codemasters Group Limited*,
  104 Cal.App.4th 129 (Cal. Ct. App. 2002) ............................................................................ 14

*Am. Philatelic Soc'y v. Claibourne*,
  3 Cal. 2d 689 (1935) ............................................................................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................................. 9

*Arden v. Kastell*,
  553 F. App'x 697 (9th Cir. 2014) ............................................................................................. 9

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
  No. C-16-0923 BLF (N.D. Cal.) ............................................................................................ 29

*Babot v. Equilon Enters.*,
  No. 18-cv-04802-DMR, 2020 WL 3833282 (N.D. Cal. July 8, 2020) ...................................... 9

*Ballesteros v. Stek*,
  No. 20-CV-06207-JSC, 2021 WL 6125492 (N.D. Cal. Dec. 28, 2021) .................................... 9

*Beauperthuy v. 24 Hour Fitness USA, Inc.*,
  2009 WL 3809815 (N.D. Cal. Nov. 10, 2009) ....................................................................... 10

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*,
  52 Cal. App. 4th 867 (Cal. Ct. App. 1997) ............................................................................ 25

*Berkla  v. Corel Corp.*,
  66 F. Supp. 2d 1129 (E.D. Cal. 1999) .................................................................................... 18

*Bramalea California, Inc. v. Reliable Interiors, Inc.*
  (2004) 119 Cal.App.4th 468 ................................................................................................... 16

*Cal-Agrex, Inc. v. Tassell*,
  258 F.R.D. 340 (N.D. Cal. 2009) ........................................................................................... 10

*California Grocers Ass'n, Inc. v. Bank of America, Nat. Trust and Sav. Ass'n*,
  20 Cal. App. 4th 1355 (Cal. Ct. App. 1993) .......................................................................... 11

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999)................................................................................................. 17, 20, 22

*Chapman v. Skype Inc.*,
  220 Cal. App. 4th 217 (2013)................................................................................................. 21

*Cisco Sys., Inc. v. STMicroelectronics, Inc.*,
  77 F. Supp. 3d 887 (N.D. Cal. 2014) ................................................................................ 28, 29

*City of Anaheim v. Southern California Edison Co.*,
  955 F.2d 1373, 1378 (1992) ...................................................................................................... 7

*Craigslist, Inc. v. Naturemarket, Inc.*,
   694 F. Supp. 2d 1039 (N.D. Cal. 2010) ............................................................................ 11

*Dickerson v. Solutions*,
   No. C 08-03773 WHA, 2009 WL 1226986 (N.D. Cal. Apr. 30, 2009) .................................. 18

*Dore v. Arnold Worldwide, Inc.*,
   139 P.3d 56 (Cal. 2006) ....................................................................................................... 14

*Duke Kelso Constr., Inc. v. Silva*,
   2013 WL 1393475 (Cal. Ct. App. Mar. 26, 2013) .............................................................. 14

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................................................... 23, 30

*Epic Games Inc. v. Apple, Inc.*,
   Case No. 21-16506, Dkt. No.118 (N.D. Cal. Mar. 31, 2022) .............................................. 20

*Flores v. Transamerica HomeFirst, Inc.*,
   93 Cal. App. 4th 846 (2001) ................................................................................................ 12

*Graham v. DaimlerChrysler Corp.*,
   101 P.3d 140 (Cal. 2004), *as modified* (Jan. 12, 2005) ........................................................ 23

*Granite State Ins. Co. v. Smart Modular Techs., Inc.*,
   No. C 90-3136 BAC, 1994 WL 173858 (N.D. Cal. Apr. 28, 1994),
   aff'd, 76 F.3d 1023 (9th Cir. 1996) .................................................................................... 13

*Gutierrez v. Autowest, Inc.*,
   114 Cal.App.4th 77 (Cal. Ct. App. 2003) ........................................................................... 11

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   273 F. Supp. 3d 1099 (N.D. Cal. 2017) ......................................................................... 17, 20

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ............................................................................................. 19

*Hunt v. Cromartie*,
   526 U.S. 541, 552 (1999) ...................................................................................................... 9

*Huynh v. Quora, Inc.*
   508 F. Supp. 3d 633 (N.D. Cal. 2020) ................................................................................ 23

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
   527 F. Supp. 2d 1084 (N.D. Cal. 2007) .............................................................................. 29

*In re Volkswagen "clean Diesel" Mktg.*,
   2019 WL 670607 (N.D. Cal. Feb. 19, 2019) ...................................................................... 26

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ......................................................................................................... 21

*Ixchel Pharma, LLC v. Biogen, Inc.*,
   9 Cal. 5th 1130, 470 P.3d 571 (2020) ............................................................................ 25, 26

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
   287 F.3d 866 (9th Cir. 2002) ............................................................................................... 10

*Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc.*,
    36 Cal.App.5th 766 (Cal. Ct. App. 2019) ........................................................... 24

*Kraus v. Trinity Management Services, Inc.*,
    23 Cal. 4th 116 (Cal. 2000) ................................................................................. 22

*Lamb v. Wells Fargo Bank, N.A.*,
    2006 WL 925490 (Cal. Ct. App. Apr. 11, 2006) .................................................. 23

*Lennar Homes of California, Inc. v. Stephens*,
    232 Cal.App.4th 673 (Cal. Ct. App. 2014) ................................................... 11, 13

*Lentz v. McMahon*,
    49 Cal. 3d 393, 777 P.2d 83 (1989) .................................................................... 13

*Metal Jeans, Inc. v. Metal Sport, Inc.*,
    843 F. App'x 898 (9th Cir. 2021) ........................................................................ 10

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    No. 20-CV-07182-JCS, 2022 WL 1990225 (N.D. Cal. June 6, 2022) ................. 11

*Monex Deposit Co. v. Gilliam*,
    680 F. Supp. 2d 1148 (C.D. Cal. 2010) ............................................................... 27

*Moore v. Apple, Inc.*,
    73 F. Supp. 3d 1191 (N.D. Cal. 2014) ................................................................. 20

*Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*,
    462 P.3d 461 (Cal. 2020) ..................................................................................... 20

*New York v. Facebook, Inc.*,
    2021 WL 2643724 (D.D.C. June 28, 2021) ......................................................... 18

*Niantic, Inc. v. Global++*,
    No. 19-CV-03425-JST, 2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ................ 11

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*,
    210 F.3d 1099  (9th Cir. 2000) .............................................................................. 9

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) .................................................................................. 24, 25

*Patent Scaffolding Co. v. William Simpson Constr.*,
    (1967) 256 Call.App.2d 506 ................................................................................ 16

*Powerine Oil Co. v. Super. Ct.*,
    118 P.3d 589 (Cal. 2005) ..................................................................................... 14

*Rambus, Inc. v. Infineon Technologies AG*,
    330 F. Supp. 2d 679 (E.D. Va. 2004) ................................................................... 19

*Ramona Manor Convalescent Hosp. v. Care Enterprises*,
    177 Cal. App. 3d 1120 (Ct. App. 1986) .......................................................... 24, 27

*Richardson v. La Rancherita*,
    98 Cal. App. 3d 73 (1979) ................................................................................... 30

*Sandquist v. Lebo Auto., Inc.*,
    376 P.3d 506 (Cal. 2016) ..................................................................................... 14

*Sargon Enterprises, Inc. v. Univ. of S. California*,
    288 P.3d 1237 (Cal. 2012) ............................................................................................ 26

*Sebastian Intern., Inc. v. Russolillo*,
    128 F. Supp. 2d 630 (C.D. Cal. 2001) ........................................................................... 28

*Sebastian Intern., Inc. v. Russolillo*,
    162 F. Supp. 2d 1198 (C.D. Cal. 2001) ......................................................................... 26

*Secci v. United Indep. Taxi Drivers, Inc.* ,
    8 Cal.App.5th 846 (Cal. Ct. App. 2017) ....................................................................... 16

*Selden v. Airbnb, Inc.*,
    No. 16-CV-00933(CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016),
    *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) ............................................................................... 12

*Silicon Labs Integration, Inc. v. Melman*,
    No. C-08-04030-RMW, 2010 WL 890140 (N.D. Cal. Mar. 8, 2010) ............................ 27

*Sole Energy Co. v. Petrominerals Corp.*,
    128 Cal.App.4th 212 (Cal. Ct. App. 2005) .................................................................... 26

*Southern Cal. Edison Co. v. Superior Court*
    (1995) 37 Cal.App.4th 839 .............................................................................. 13, 14, 15

*Stark Packing Corp. v. Sunkist Growers, Inc.*,
    F052658, (Cal. Ct. App. Jul. 23, 2009) ......................................................................... 30

*Starling Endeavors Ltd. v. Crescendo Ventures IV, LLC*,
    No. C 06-1250 PJH (N.D. Cal. Mar. 31, 2006) ............................................................. 15

*Thomas v. County of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992) ......................................................................................... 22

*United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp.*,
    No. 07CV2172 AJB, 2012 WL 3861946 (S.D. Cal. Sept. 5, 2012) ................................ 25

*Visto Corp. v. Sproqit Techs., Inc.*,
    360 F. Supp. 2d 1064 (N.D. Cal. 2005) ......................................................................... 27

*Wind Dancer Production Group v. Walt Disney Pictures*
    (2017) 10 Cal.App.5th 56 [215 Cal.Rptr.3d 835]) ......................................................... 13

*Winding Creek Solar LLC v. Peevey*,
    293 F. Supp. 3d 980 (N.D. Cal. 2017) ............................................................................. 9

*Zeiger v. Wellpet LLC*,
    526 F. Supp. 3d 652 (N.D. Cal. 2021) ........................................................................... 17

## **Statutory Authorities**

Cal. Bus. & Prof. Code § 17200 ............................................................................................ 17, 28

Cal. Bus. & Prof. Code § 17203 ................................................................................................. 22

Cal. Civ. Code § 1670.5 ............................................................................................................. 11

Cal. Civ. Code § 3294 ................................................................................................................ 26

California Code of Civil Procedure § 1021.5 .............................................................................. 23

1

2

### <u>Additional Authorities</u>

*https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf* ........................... *19*

https://www.linkedin.com/robots.txt ................................................................................ 7, 15

Mozilla, "How the web works", available at https://developer.mozilla.org/en-
   US/docs/Learn/Getting_started_with_the_web/How_the_Web_works .................................... 12

SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF
THE HOUSE COMMITTEE ON THE JUDICIARY, 116TH CONG., INVESTIGATION OF
COMPETITION IN DIGITAL MARKETS (2020)   19

HIQ LABS, INC.'S OPPOSITION TO LINKEDIN'S MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

In May 2017, hiQ was a thriving startup with more than a dozen Fortune 500 clients, 23 employees, and a first-mover advantage in people analytics.  It was on the cusp of its third and largest round of investor funding and had won an industry award for its flagship Keeper product.  hiQ had just announced the launch of a game-changing new product, SkillMapper, that promised to provide employers with novel insights into how to manage their workforces and make the most of employees' untapped skills, and was a leader in the burgeoning people analytics field, drawing prominent executives and technical experts from companies including Google, ████ Pfizer, GoDaddy, and LinkedIn to present at its biannual "Elevate" industry conferences.

But hiQ's new SkillMapper product also would compete with a product LinkedIn intended to launch. ███ ████████████████████████████████████████████████ ██████████████████ Despite LinkedIn's attendance at several hiQ conferences over the prior years without complaint as to hiQ's use of LinkedIn data, LinkedIn suddenly began using every means at its disposal to thwart hiQ's business.  LinkedIn—the dominant source of the publicly available data that hiQ used for its products—accused hiQ of a variety of state and federal crimes (supposed "crimes" it had known about for years) and targeted hiQ with technical blocking measures designed to prevent it from collecting public data otherwise available to anyone on the internet.

As discovery has confirmed, and as LinkedIn's own witnesses and documents acknowledge, in actuality LinkedIn saw no violation of the law or its own vaguely worded user agreement until it viewed hiQ's growing business as a threat to LinkedIn's own attempts to monetize the publicly available user data that LinkedIn hosts.  As a result, LinkedIn cannot show the absence of any factual dispute on its claim for breach of contract, hiQ's claims for unfair competition and tortious interference, or LinkedIn's purported affirmative defenses.  Rather, in light of the extensive evidence of LinkedIn's misconduct, its motion for summary judgment should be denied.

*First*, factual disputes render judgment on LinkedIn's breach of contract claim inappropriate.  At the threshold, LinkedIn's claim is barred by its own unclean hands in asserting it as a means to put hiQ out of business.  But, in any event, LinkedIn's claim rests on an interpretation of the user agreement that would render everyday usage by any user a breach.  For that reason, LinkedIn's

agreement—a contract of adhesion to which it purports to bind every visitor to its website—is unconscionable and cannot be enforced.  LinkedIn's own conduct—including in the years in which it knew of hiQ's use of the same publicly available user data but never objected—contradicts the interpretation of the agreement on which it bases it contract claim, as does its representation to users that they (not LinkedIn) control the data made public.  At a minimum, the ambiguous nature of the agreement creates a factual dispute as to whether hiQ breached any terms or caused any damage.

*Second*, LinkedIn's motion seeking summary judgment on hiQ's unfair competition claim cannot be squared with California's Unfair Competition Law or the facts.  California law does not incorporate the stringent requirements of federal antitrust law, but rather seeks to protect more broadly against the exact type of misconduct in which LinkedIn has engaged here, for which hiQ is entitled to equitable relief.

*Third*, LinkedIn cannot show its entitlement to summary judgment on hiQ's tortious interference claims because the record shows that hiQ had many live contracts and economic relationships when LinkedIn launched its assault. LinkedIn knew about hiQ's economic relationships prior to retaliating against hiQ for being a competitor.  And the record indicates that hiQ's customers, investors, and partners ceased their relationships with hiQ in light of LinkedIn's threats.  LinkedIn cannot demonstrate the absence of a triable issue as to whether its conduct interfered with such contracts and economic relationships or whether such interference caused damage to hiQ.

*Finally,* LinkedIn cannot show the absence of material factual disputes on its affirmative defenses because the evidence shows LinkedIn's concerted plan to gather intel from hiQ, cut off hiQ's data, and then shut down hiQ's business.  Neither the litigation privilege nor any economic justification insulates LinkedIn from liability for its misconduct.  Factual disputes exist as to whether LinkedIn can invoke these defenses to stifle competition and capitalize on its dominant position.

## BACKGROUND

### A.   hiQ Builds An Innovative People Analytics Technology

In 2012, Darren Kaplan and Sherman Hu (later to be joined by Rob DeSantis) founded OrgStars, a people analytics startup that later became hiQ. Ex. 76 (Kaplan 5/4 Tr. 48:10-49:1).  hiQ

used machine learning algorithms to process publicly available data, including public LinkedIn profiles, to assist in employee development and retention by (i) analyzing the full scope of current and potential employees' skills and (ii) identifying those employees who were at the highest risk of leaving the respective employer.  (ECF No. 131 ("hiQ's Amended Complaint") at 2-3.)  hiQ's first product, Keeper, offered attrition risk predictions to employers who sought to retain valuable talent. Ex. 53 (Jan. 2016 Product Roadmap).[1]  hiQ won an award for "Top HR Product" for Keeper in 2016, and by 2017 had sold its services to dozens of Fortune 500 companies.  Ex. 64 (9/21/16 Press Release); Ex. 63 (hiQ's Suppl. Responses to LinkedIn's Second Interrogatories) at 3-7 (listing hiQ's clients).

**B.**     **LinkedIn Engages With hiQ, Knowing hiQ Uses Public LinkedIn Data**

For years, LinkedIn knew about and sanctioned hiQ's services and activities.  Specifically, on October 8, 2014, employees on LinkedIn's Talent Analytics team stated their suspicion that hiQ was scraping.  Ex. 91. ███████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████     ████████████     ██████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████     LinkedIn then continued to engage with hiQ for years, including by sending groups of employees to hiQ's semi-annual "Elevate" conferences, which gathered industry participants and customers to share insights and best practices in the growing people analytics field.

██████████████████████     ██████████████████████████████     ██████

██████████     ██████████████████████████████████████

_____

[1]  Exhibits cited are attached to hiQ's Compendium of Exhibits in Opposition to LinkedIn's August 5, 2022 Motions.

At "Elevate" events, hiQ discussed the company's products and described how they worked—including the fact that they used public professional data, of which LinkedIn was an important source.  Ex. 62 (hiQ's Response to LinkedIn's Interrogatory No. 6).  Many of hiQ's clients presented at these events and participated in panel discussions where they discussed their relationships with hiQ.  *See, e.g.*, Ex. 62 (hiQ's Responses to LinkedIn's First Interrogatories) at 5-11 (describing client presentations at Elevate events); Ex. 49 (█████████████████   ████ ███████████████   █████████████████████████████████████████ ████████████████  Most or all of these customers were also formal sponsors of, or panelists at, the conferences.  Ex. 3; Ex. 4; Ex. 5; Ex. 14; Ex. 15; Ex. 62.

One LinkedIn employee in particular, Director of Analytics and Business Development Lorenzo Canlas, had a strong relationship with hiQ.  Ex. 62 (hiQ's Response to LinkedIn's Interrogatory No. 6).  Mr. Canlas attended Elevate conferences in 2015, 2016, and 2017, and even received an "Impact" award from hiQ for a talent analytics project he led at LinkedIn and about which he presented at the March 2016 Elevate conference in Santa Clara, California.  Ex. 75 (Jennings Tr. 65:14-66:3) (discussing Mr. Canlas's award); Ex. 56.  Mr. Canlas also had a professional relationship with hiQ's then-CEO, Darren Kaplan.  Mr. Canlas was present at the July 2016 Talent Analytics Conclave hosted at Apple's Cupertino, California office, where Mr. Kaplan presented on hiQ's products and its use of data from the public portions of LinkedIn profiles.  Ex. 62 (hiQ's Response to LinkedIn's First Interrogatories) at 16-18.  Mr. Canlas also invited Mr. Kaplan to a meeting in September 2016 in LinkedIn's San Francisco office, where they discussed new developments in the talent analytics field, hiQ's innovations with its Keeper product (including its use of public LinkedIn data), and even the possibility of LinkedIn hosting hiQ's next Elevate conference.  *Id.* at 18.  At no point in any of these conversations did Mr. Canlas (or anyone else from LinkedIn) raise any concerns about hiQ's use of public LinkedIn data.  *Id.*

### C.     LinkedIn Identifies hiQ As A Competitive Threat

By 2016, hiQ had applied its technology to develop a new product known as SkillMapper, a talent analytics tool providing employers with insights into the depth and breadth of the skills possessed by their workforces.  Ex. 74 (Graves Tr. 86:6-14).  hiQ planned to demonstrate its product

1  at the April 20, 2017 Elevate conference, and had already offered it to some of its customers on a

2  trial basis.  *Id.* at 80:21-81:9 (discussing SkillMapper's development).



14  One of these businesses was hiQ.

21  **D.  LinkedIn Launches A Plan To Collect Competitive Intel From hiQ Then Shut Down Its Business**



**E.     hiQ's Business Falters As A Result Of LinkedIn's Interference**

LinkedIn's legal threats and targeted technical blocking torpedoed hiQ's business. Employees ran for the exits.  Ex. 11 (Chris LeBailey exit interview); Ex. 12 (Maciej Smuga-Otto exit interview); Ex. 16 (Ben Teusch exit interview).  Investors and prospective partners backed off. Ex. 84 (Weidick 6/1/22 Tr. 330:5-13) (testifying that "[p]rior to the cease and desist letter [hiQ] could get an audience with anybody [it] wanted to, an investor, a candidate for employment, a customer prospect," but "[p]ost cease and desist some customers told us why they wouldn't talk to us, some prospects, some partners, some candidates" and "[s]ome didn't"); *id.* at 333:20-335:14 (testifying that, after the cease and desist, potential partner SAP said they "can't find anybody to

stick their neck out on this given the LinkedIn situation"); Ex. 83 (Weidick 5/23/22 Tr. 157:4-23)

(testifying that, as a result of the cease and desist, "the customers were concerned about the

implications to their business, whether or not at the most rudimentary level we'd be able to provide

the work that we were doing for them and whether or not there would be some subsequent

ramifications on their business as being in business with us."). For example, Mr. Weidick testified

that a potential ████████████████████████ was "scuttled when the litigation and cease

and desist showed up" *id.* at 244:17-22, and hiQ's █████████████ ████████

█████ ████████████████ ████████████████████████████

███████████████████████████████████████████████████

█████ ███ ███ █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ ███████████ ████████

█████████████████ ██████████████████████ ████████

██████ █████████████████████████████████████████

LinkedIn's plan succeeded: having been rendered toxic by LinkedIn's threats and starved of

the resources it needed to sustain and grow its business, hiQ's operations effectively ceased by 2019.

*See* ECF 329 (Order granting motion to dissolve preliminary injunction).

**F.      LinkedIn's "Members First" Policy Is A Pretext For Anticompetitive Conduct**

Fundamentally, LinkedIn operates as a broker of its members' data, ████████████

███████████████████████████████████████████████████

████████ ████████████████ ███████████████████████ ████

█████████████ LinkedIn invites the dominant search engines to collect and index

public profile data and deliver it to their billions of users (for whatever purpose or reuse) at the

stroke of a key. ██████ █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████ ████████

███████████████████████████████████████████████████

██████████████████████ ███ Ex. 104 (robots.txt). LinkedIn knows that

1  the more its user data is widely disseminated through search engines, the better for LinkedIn's

2  bottom line. ███████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████

4  ██████████████ ████████████████████████████████████████████

5  ███████████████ ██████████████████████████ Nor does it stop with

6  search engines—LinkedIn sells direct access to profile data through its APIs to a host of undisclosed

7  third parties. ████████████████████████████████████████████

8  ████████ ███████████████████████████ ████████████

9       LinkedIn urges its members to make as much profile information public as possible. *See*

10  Ex. 52 at -198257 (LinkedIn's Privacy Policy); *id.* at -198260.  In order to induce members to hand

11  over as much data as possible, LinkedIn holds itself out as a stern guardian of user privacy.  *See*

12  *generally* Ex. 51; Ex. 52; Ex. 46 (LinkedIn's promise to users that "We'll honor the choices you

13  make about who gets to see your information and content.") at -95504.  But, in practice, LinkedIn's

14  promise to users is irreconcilable with how the platform actually works. ██████████████

15  ████████████████████████████████████████████████████████████

16  █ █████████████████████████████ █████████████

17       LinkedIn's internal records make clear that, in reality, member privacy takes a backseat to

18  commercial opportunity for LinkedIn. ████████████████████████ ██████ ████

19  █████████████████ ████████████████████████████████████████

20  ██████████████ ████████████████ ████████████████████████████

21  ██████████████████████████ ████████████████████████████████

22  ███████████ █████████████████████████████████████████████████

23  ██████████████████████████████████████████ ████████████████

24  ████████████ ██████████████████████████████████████████████ ██

25  ███████████████ ██████████████████████████████████████████

26  ██████████████ █████████████████████████ ████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████ ████████████

Whatever it says publicly, 

## LEGAL STANDARD

"Summary judgment is improper if the evidence raises a genuinely disputed issue of material fact." *Arden v. Kastell*, 553 F. App'x 697, 698 (9th Cir. 2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The party moving for summary judgment always bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 988 (N.D. Cal. 2017). "[I]f the nonmoving party 'produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion.'" *Id.* at 988-89 (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000)). "The existence of a single genuine dispute of material fact as to any claim precludes summary judgment." *Babot v. Equilon Enters.*, 2020 WL 3833282, at *5 (N.D. Cal. July 8, 2020). "If more than one reasonable inference can be drawn from undisputed facts, the trial court must credit the inference in favor of the nonmoving party." *Ballesteros v. Stek*, 2021 WL 6125492, at *3 (N.D. Cal. Dec. 28, 2021) (citing *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## ARGUMENT

## I.   QUESTIONS OF FACT PRECLUDE SUMMARY JUDGMENT ON LINKEDIN'S BREACH OF CONTRACT CLAIM

LinkedIn's motion for summary judgment on its contract claim should be denied because factual disputes exist as to whether LinkedIn's unlawful, anticompetitive conduct precludes such a claim and, fundamentally, whether LinkedIn's user agreement bars the conduct LinkedIn now asserts breached the agreement but for years knew about and condoned.

### A.    Factual Disputes Exist As To Whether LinkedIn Has Unclean Hands That Bar Its Contract Claim

The Court should deny LinkedIn's request for summary judgment on its contract claim for the simple reason that a question of fact exists as to whether the unclean hands doctrine bars LinkedIn's belated attempt to assert, in an effort to stifle competition, that hiQ's conduct breached the agreement.[2]

Under California law, "unclean hands is available as an affirmative defense to a contract claim." *Cal-Agrex, Inc. v. Tassell*, 258 F.R.D. 340, 348, n.2 (N.D. Cal. 2009); *see also* ECF 327 at 46 (hiQ's assertion of pled unclean hands as an affirmative defense).  The affirmative defense of unclean hands may be shown based on inequitable conduct related directly to the subject matter of the claim.  *See Metal Jeans, Inc. v. Metal Sport, Inc.*, 843 F. App'x 898, 899 (9th Cir. 2021).

At the threshold, "[f]actual questions related to the defense of unclean hands 'may only be resolved on summary judgment if the evidence presented by both sides would permit the trier of fact to come to only one conclusion.'"  *Id.* at 899 (citation omitted)  LinkedIn's brief argument addressing four affirmative defenses in one paragraph (Mot. 15) falls far short of this standard.

████████████████████████████████████████████████████

████████████████████████████████████         ██████████

███████████████████████████████████       █████████████

████████████████████████████  While LinkedIn asserts it "did *nothing* towards hiQ, other than ultimately enforce its bargained-for rights under the User Agreement" (Mot. 15),

---

[2]    "As the moving party, Plaintiffs bear the initial burden of proving that there are no issues of material fact with respect to Defendants' affirmative defense — even though Defendants will bear the burden of proving this affirmative defense at trial." *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 2009 WL 3809815, at *9 (N.D. Cal. Nov. 10, 2009)

1    that is for the jury to decide in light of the fact that LinkedIn declined to enforce its supposed anti-

2    scraping policies against hiQ for years, and changed its mind **only** once hiQ emerged as a

3    competitive threat.  *See generally* hiQ's Mot. for Summary Judgment, ECF 331.[3]

   **B.    A Question Of Fact Exists As To Whether The Relevant User Agreement Bars
4         The Conduct LinkedIn Claims Constitutes A Breach**

5         Independently, summary judgment for LinkedIn on its contract claim should be denied

6    because factual disputes exist as to whether the relevant User Agreement barred hiQ's conduct.[4]

7         *First*, LinkedIn has failed to show its User Agreement—and specifically the provisions of

8    the User Agreement of which it alleges breach—are enforceable.  As a general matter, in the context

9    of a contract of adhesion, "a contract or provision which does not fall within the reasonable

10   expectations of the weaker or 'adhering' party will not be enforced against him."  *Lennar Homes of

11   California, Inc. v. Stephens*, 232 Cal.App.4th 673, 687 (Cal. Ct. App. 2014); *Gutierrez v. Autowest,

12   Inc.*, 114 Cal.App.4th 77, 87 (Cal. Ct. App. 2003) ("[A] contract clause found to be unconscionable

13   is unenforceable, unless the court severs the clause or so limits its application as to avoid any

14   unconscionable result.") (citing Cal. Civ. Code § 1670.5).  "Procedural unconscionability may result

15   from oppression (an inequality of bargaining power curtailing real negotiation and an absence of

16   meaningful choice) or surprise (the assertion of hidden and unexpected contractual provisions).  A

17   contract is substantively unconscionable if it is one-sided, is unreasonable, and lacks justification."

18   *California Grocers Ass'n, Inc. v. Bank of America, Nat. Trust and Sav. Ass'n*, 20 Cal.App.4th 1355,

19   1363 (Cal. Ct. App. 1993) (quotation marks omitted).  "[N]umerous factual inquiries bear upon that

20   question, e.g., the business conditions under which the contract was formed, and to the extent there

---

[3]  hiQ is not raising the statute of limitation or laches affirmative defenses as to LinkedIn's contract claims.

[4]  In each of the cases LinkedIn proffers as controlling and "indistinguishable" (Mot. 11), none of the defendants actually offered an argument against the breach of contract claim at issue.  *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 2022 WL 1990225, at *22 (N.D. Cal. June 6, 2022) (where defendant "waived any argument that . . . [it] did not violate the terms of use as written"); *Niantic, Inc. v. Global++*, 2019 WL 8333451, at *7 (N.D. Cal. Sept. 26, 2019) (granting a preliminary injunction where defendants "do not respond to the allegation that they copied Niantic's source code", which "amounts to a concession."); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1047 (N.D. Cal. 2010) (granting default judgment where defendants "have not filed an opposition or otherwise appeared in this matter.").

1   are conflicts in the evidence or in the factual inferences which may be drawn therefrom." *Flores v.*

2   *Transamerica HomeFirst, Inc.*, 93 Cal.App.4th 846, 851 (Cal. Ct. App. 2001).

3        Here, procedural unconscionability is met.  The User Agreement is a contract of adhesion as

4   "a standardized contract, imposed upon the subscribing party without an opportunity to negotiate

5   the terms." *Flores*, 93 Cal. App. 4th at 853; *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C.

6   Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021) ("browsewrap" is an "online adhesion contract").

7   As LinkedIn admits, no alternative to LinkedIn exists for the public information gathered from

8   hundreds of millions of people.  *See* Ex. 101 (███████████████ ██████████████████████

9   ███████████████████████████████████████████ ████████

10        As to substantive unconscionability, the User Agreement is worded such that every user—

11   whether member or visitor—violates it simply by using LinkedIn.  LinkedIn's 2014 user agreement[5]

12   purports to forbid any visitor from "scrap[ing] or copy[ing] profiles and information of others

13   through any means (including crawlers, browser plugins and add-ons, and any other technology or

14   manual work)."  *See* Ex. 46 at § 8.2.  But this prohibition—in particular, against "copy[ing] profiles

15   and information through . . . any . . . technology"—is incompatible with simply ***visiting the website***,

16   where a visitor uses a web browser ("technology") to request that the LinkedIn server deliver a copy

17   of the HTML code—the "information" that makes up a profile—to the user's computer.[6]  *See* Ex.

18   61 (Schmidt Report at § IV) (describing how the internet works).  Like any web browser, hiQ's

19   software simply requests and receives HTML code from LinkedIn's servers—which is why, as

20   LinkedIn concedes, it can never know for certain whether a given request for profile data comes

21   from a human user or a scraper.  ████████████████████████████ ████████

22   ███████████████████████████████ LinkedIn itself provides a tool on its website

23   interface through which logged-in users can download a PDF copy of a person's profile—an

24

25   [5]  LinkedIn's Blake Lawit avers that this form of the agreement was in effect from October of 2014
     through June 7, 2017.  *See* ECF No. 336-1 (Lawit Dec.) at 1.

26
     [6]  "When a client device wants to access a webpage, ***a copy of the webpage is downloaded from***
27   ***the server onto the client machine to be displayed in the user's web browser.***"  *See* Mozilla, "How
     the    web    works",    available    at    https://developer.mozilla.org/en-
28   US/docs/Learn/Getting_started_with_the_web/How_the_Web_works.

apparent violation of the user agreement.  Ex. 103.  Likewise, the User Agreement says that users agree not to "use . . . the content or data of others available on the Services (except as expressly authorized)."  Ex. 46 at § 8.2.  Left unexplained is what a visitor to LinkedIn's website has permission to do with the information she encounters other than "use" it.  For these reasons, the LinkedIn User Agreement does "does not fall within the reasonable expectations of the weaker or 'adhering' party [and] will not be enforced against him."  *Lennar Homes*, 232 Cal.App.4th at 687.

Second, LinkedIn's argument that there can be no factual dispute that hiQ breached the User Agreement cannot be squared with LinkedIn's course of conduct in managing its users.[7]  Under California law, "[t]he rule is well-settled that in construing the terms of a contract the construction given it by the acts and conduct of the parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent."  *S. Cal. Edison Co. v. Superior Ct.*, 37 Cal.App.4th 839, 851 (1995), *as modified on denial of reh'g* (Sept. 7, 1995).  ████████████████████████████████████████████ ████████████████████ ████████████████████ ████████████████████ ██████████████████████████████████████████████████████████████████████LinkedIn's publicly acknowledged practices, such as its public profile API and *carte blanche* permission for search engines to harvest public profile data, made plain that it did not actually object to public scraping when hiQ was building its products.  *See* Background (Section F), *supra*.  This position was reinforced by its utter lack of objection to hiQ's scraping in LinkedIn's numerous dealings with

---

[7]  For the same reason, LinkedIn is incorrect that "hiQ can point to no act by LinkedIn which constitutes a waiver of its contractual rights."  Mot. 14.  California courts will find waiver by a party "when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."  *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 78 [215 Cal.Rptr.3d 835]) (internal quotations and citations omitted).  And, as described at Background (Section B), *supra*, hiQ reasonably believed that LinkedIn had no intention to prosecute hiQ for its use of public data, given LinkedIn's years of knowing acquiescence and the parties' history of productive engagement.  Likewise, LinkedIn has not carried its burden to preclude hiQ's estoppel affirmative defense because hiQ has adduced evidence that (1) LinkedIn was apprised of hiQ's scraping and (2) acted in a way that encouraged hiQ to believe that LinkedIn acquiesced to it; and that (3) hiQ was unaware that LinkedIn planned to cut off its data source and (4) was injured as a result of its reliance on access.  *See Lentz v. McMahon*, 49 Cal. 3d 393, 399 (Cal. 1989); *see also Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 1994 WL 173858, at *4 (N.D. Cal. Apr. 28, 1994), *aff'd*, 76 F.3d 1023 (9th Cir. 1996).

hiQ prior to May 2017, despite being fully aware of it.  *See* Background (Section B), *supra*.  This established course is relevant "to show the contract is reasonably susceptible to the meaning evidenced by that party's conduct."  *S. Cal. Edison Co.*, 37 Cal. App. 4th at 851; *see also Duke Kelso Constr., Inc. v. Silva*, 2013 WL 1393475, at *13 (Cal. Ct. App. Mar. 26, 2013) ("As our Supreme Court has held, where the subsequent conduct of parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied.").  In light of this evidence, a factual dispute exists as to whether hiQ breached the User Agreement.

*Third*, at a minimum, the internally inconsistent provisions of LinkedIn's user agreement are ambiguous, such that a jury must determine whether hiQ's conduct constitutes a breach.  "Generally, if the terms of a contract are ambiguous, determining the contract's terms is a question of fact for the trier of fact, based on 'all credible evidence concerning the parties' intentions.'"  *Alexander v. Codemasters Group Limited*, 104 Cal.App.4th 129, 147 (Cal. Ct. App. 2002).  In California, a contract is ambiguous "when it is capable of two or more constructions, both of which are reasonable."  *Powerine Oil Co. v. Super. Ct.*, 118 P.3d 589, 598 (Cal. 2005).  Contracts may be ambiguous as a whole despite terms and phrases that are not themselves inherently ambiguous.  *See Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006).  Ambiguity is construed against the drafter, a rule that "applies with peculiar force in the case of a contract of adhesion."  *Sandquist v. Lebo Auto., Inc.*, 376 P.3d 506, 514 (Cal. 2016).

To accept the plain language of LinkedIn's user agreement is to accept that literally ***everyone who visits LinkedIn's website violates that agreement***—it provides no intelligible standard to separate permissible and prohibited conduct.  Before the extensive list of "Don'ts" in the agreement, there are a mere four "Dos": to "comply with all applicable laws", to "provide accurate information to us and keep it updated; to "Use your real name on your profile;" and "Use the Services ***in a professional manner***."  Ex. 46 § 8 (emphasis added).  Only the last of those four is even plausibly an expression of authorization for how a visitor may "use the content or data of others," but it is hopelessly vague.  *Id.* § 8.2.

Conversely, users are promised that "[a]s between you and LinkedIn, you own the content

1   and information that you submit" and that, "[b]ecause you own your content and information and

2   we [LinkedIn] only have **non-exclusive rights** to it, **you may choose to make it available to others**."

3   § 3.1 (emphasis added).  And Users are further notified that "other Members and/**or Visitors may**

4   **access and share your content and information consistent with your settings**," *see id.*, and that

5   "[w]hen you share information, **others can see, copy and use that information**," *id.* §2.5.  As such,

6   hiQ reasonably believed that the subset of profile information that members had made public could

7   be "accessed… consistent with [that member's] settings."  *See* Mot. 12-13 (quoting Kaplan Dep.

8   Tr.).  "Inconsistent provisions" such as these "may create ambiguity in a contract."  *Starling*

9   *Endeavors Ltd. v. Crescendo Ventures IV, LLC*, 2006 WL 862939, at *10 (N.D. Cal. Mar. 31, 2006).

10       With respect to its data collection activity, hiQ believed that any data that could be accessed

11   by a logged-out visitor—the very same data that is readily available through the dominant public

12   search engines—was publicly available and therefore fair to use. Ex. 76 (Kaplan 5/4/22 Tr. 69:25-

13   70:22; 77:11-24:, Ex. 79 (Miller Tr. 216:14-21).  hiQ understood that it was not doing anything with

14   user data that LinkedIn itself was not doing or permitting other companies to do.  *Id.*; Ex. 104

15   (robots.txt).  And LinkedIn's years of inaction despite its knowledge of hiQ's scraping (*see*

16   *generally* hiQ's Motion for Summary Judgment, ECF 331), as well as its implicit and explicit

17   approval of hiQ's activities communicated via, *inter alia*, its regular participation in hiQ's Elevate

18   conferences and Mr. Canlas's words and conduct, are "admissible on the issue of the parties' intent."

19   *S. Cal. Edison Co.*, 37 Cal.App.4th at 851.

20       Tellingly, after making no changes to its User Agreement for almost three years, LinkedIn

21   made significant alterations in June of 2017—shortly after receiving a cease-and-desist letter from

22   hiQ that called certain provisions of the agreement into question.  Ex. 17.  For instance, LinkedIn

23   added novel language forbidding users from "**Bypass[ing]** or **circumvent[ing]** any **access controls**

24   or Service **use limits**", which is the precise conduct that LinkedIn accuses hiQ of engaging in.  *See*

25   ECF 320 at ¶¶ 70, 73, 94 (detailing allegations that hiQ "evaded" LinkedIn's technical defenses).

26   Even more tellingly, LinkedIn eliminated language purporting to prohibit "Copy[ing] or us[ing] the

27   information, content or data on LinkedIn **in connection with a competitive service** (as determined

28   by LinkedIn)."  *Compare* ECF No. 336-1 (Lawit Dec. Ex. C) *with* ECF No. 336-2 (Lawit Dec. Ex.

D).  A jury reasonably could infer that such a change was a direct response to hiQ's letter (sent two weeks prior to the date the new agreement was published) in which it notified LinkedIn that it was contemplating bringing anticompetition claims.  In any event, these modifications and their timing indicate that LinkedIn itself considered its terms ambiguous in light of the issues raised by hiQ.

*Finally*, while LinkedIn has placed much emphasis on the use of so-called "turkers," it has failed to connect the turkers to the scraping it claims violated the User Agreement or any harm it suffered.  While LinkedIn characterizes hiQ's use of remotely-hired independent contractors known as "turkers" to play a minor role in hiQ's quality assurance processes, LinkedIn does not present any evidence that these ***turkers ever scraped any profile information***.  Mot. 5-7.  Instead, these turkers ***manually*** viewed profile pages and confirmed the identities of some percentage of customers' employees where hiQ's automated processes for identifying them came in below a certain confidence threshold.  Ex. 102 (describing the manual process of turking).  And, in any event, these turkers were not hiQ employees, but independent contractors (*see* Ex. 74 (Graves Tr. 131:23) employed by hiQ for a limited purpose, and "one who employs an independent contractor ordinarily is not liable to others for the acts or omissions of the independent contractor."  *Secci v. United Indep. Taxi Drivers, Inc.*, 8 Cal.App.5th 846, 853 (Cal. Ct. App. 2017).  LinkedIn has adduced no evidence that turkers were in fact employees; nor has it shown why there should be an exception to the usual rule of non-liability here.

Nor has LinkedIn presented any evidence of how turkers simply logging in to view profile pages ***actually harmed*** LinkedIn or its users.  *Cf.* Ex. 70 ███████████ ████████████████████████████████████████████ █████████████████████████████  It is well settled that "[a] breach of contract is not actionable without damage."  *Bramalea California, Inc. v. Reliable Interiors, Inc.*, 119 Cal. App. 4th 468, 473 (Cal. Ct. App. 2004); *Patent Scaffolding Co. v. William Simpson Constr.*, 256 Cal. App. 2d 506, 511 (Cal. Ct. App. 1967) (similar).  Even if nominal damages were available, as LinkedIn claims (Mot. 13), whether to award such damages is a question for the jury.  LinkedIn's separate argument that "hiQ . . .  breached the User Agreement's prohibition on 'creating a false identity'" and thereby caused damages as a matter of law accordingly fails.

**II.    FACTUAL DISPUTES BAR SUMMARY JUDGMENT ON HIQ'S UCL CLAIMS**

LinkedIn's attempt to convert this Court's vacatur of the preliminary injunction into summary judgment on hiQ's Unfair Competition Law claims should be rejected.

The Court previously held that hiQ raised serious questions on the merits of its UCL claims under Cal. Bus. & Prof. Code § 17200 *et. seq.* based on its allegations that "LinkedIn terminated hiQ's access to its public member data in large part because it wanted exclusive control over that data for its own business purposes . . . [which] is supported by the timing of the commencement of its [Talent Insights] product which appears to coincide roughly with its terminating hiQ's access." *hiQ Labs, Inc. v. Linkedin Corp.*, 273 F. Supp. 3d 1099, 1118 (N.D. Cal. 2017).[8]  As discussed *supra*, Background (Sections C, D), discovery has borne that out, and more.  hiQ can thus demonstrate violations of all three prongs of the UCL—unfair, fraudulent, and unlawful conduct— and these violations present questions of fact that preclude summary judgment here.  *See Zeiger v. Wellpet LLC*, 526 F. Supp. 3d 652, 682 (N.D. Cal. 2021).

**A.    The Evidence Supports hiQ's "Unfair" UCL Claim**

"Unfair" in the context of the UCL means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  The California Supreme Court has made clear that there need not be a present violation of federal antitrust law to state a UCL claim—an incipient violation or otherwise competition-threatening misconduct is actionable.  *Id.*  LinkedIn's effort to import all the requirements of federal antitrust law into the UCL should be rejected.[9]

---

[8]    The Ninth Circuit agreed, finding that "[i]f companies like LinkedIn, whose servers hold vast amounts of public data, are permitted selectively to ban only potential competitors from accessing and using that otherwise public data, the result—complete exclusion of the original innovator in aggregating and analyzing the public information—may well be considered unfair competition under California law."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1193-94 (9th Cir. 2022).

[9]    Despite having declined to challenge hiQ's UCL claims in its motion to dismiss (ECF 137), LinkedIn now raises arguments about the sufficiency of hiQ's pleadings.  *See* Mot. 23-29 (arguing

---

1   While some of LinkedIn's actions towards hiQ may appear innocuous or defensible in

2   isolation, taken together, the intent and effect are unmistakably anticompetitive.  LinkedIn's course

3   of conduct with respect to hiQ exemplifies "what some courts have referred to as a course of conduct

4   or monopoly broth theory of antitrust liability."  *New York v. Facebook, Inc.*, 2021 WL 2643724, at

5   *46 (D.D.C. June 28, 2021) (internal quotations omitted).  The Ninth Circuit has endorsed this

6   approach.  *See City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1376, 1378

7   (1992) (holding that "it would not be proper to focus on specific individual acts of an accused

8   monopolist while refusing to consider their overall combined effect").  And here, LinkedIn's

9   undisputed course of conduct easily clears the bar for what amounts to an unfair business practice.

10   Specifically, the evidence produced by LinkedIn in discovery has confirmed precisely what

11   hiQ suspected when it filed this case.  LinkedIn tolerated hiQ and accepted its scraping for years,

12   engaging with hiQ through its Elevate conferences and even internally expressing interest in the

13   products hiQ was developing.  Ex. 45 (12/15/14 LinkedIn email discussing "interest[] in meeting

14   [hiQ]" in response to a third-party's email asking whether "LinkedIn would look favorably at a

15   company that is analyzing profiles"); Ex. 30 ███████████████████████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████  ███████████████████████████████████████████████

18   ██████████████████████████  ██████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   █████████████████████████████████████  ██████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ██████████████████████████████  The same employees who attended that conference

23   then ████████████████████████████████████████  ████████  ██  ██████

24   ████████████████████████████████████████████████████████████████

25

26   ────────────────────────
that hiQ's UCL claims "should be dismissed").  This belated argument should be rejected, "[a]s we

27   are at the summary judgment stage and well beyond the pleading stage, [so] the Court will not hear

   motions relating to the sufficiency of the pleadings."  *Dickerson v. Solutions*, 2009 WL 1226986, at

28   *8 (N.D. Cal. Apr. 30, 2009).

1 ██████████████████████████████████████████████████ ████████

2 ████████████████████████████████████████████████████████████

3 ██████ ████████ LinkedIn apparently believed that because hiQ was a small startup, it could be

4 smothered without much fuss.  From such actions, a reasonable jury could easily determine that

5 LinkedIn's conduct constitutes an unfair business practice.  *See*, *e.g.*, *Rambus, Inc. v. Infineon*

6 *Technologies AG*, 330 F. Supp. 2d 679, 683, 699 (E.D. Va. 2004) (evidence proving that defendant

7 attended an industry conference for the clandestine purpose of obtaining information to be used to

8 prosecute patents against competitors "would constitute an unfair business practice under" the

9 UCL); *Berkla v. Corel Corp.*, 66 F. Supp. 2d 1129, 1151 (E.D. Cal. 1999) (denying summary

10 judgment on UCL claim where defendant software company acquired competitor's technology on

11 pretextual basis, then used it as a model for competing product feature.)

12 Moreover, in recognition of the ever-growing risk that "companies like LinkedIn" are

13 evolving into "information monopolies that []disserve the public interest," *hiQ Labs, Inc. v. LinkedIn*

14 *Corp.*, 31 F.4th at 1202, the U.S. House of Representatives has called for revision of the federal

15 antitrust laws to better meet their policy goals and address anticompetitive conduct by the powerful

16 tech platforms that play an increasingly dominant role in various aspects of public life.  *See generally*

17 SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF

18 THE HOUSE COMMITTEE ON THE JUDICIARY, 116TH CONG., INVESTIGATION OF

19 COMPETITION      IN      DIGITAL      MARKETS      (2020),      *available      at*

20 https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf  (finding  widespread

21 evidence of conduct by incumbent tech platforms tending to harm competition and violate policies

22 and principles underpinning antitrust law).

23 LinkedIn's targeting of nascent startups, including hiQ, is precisely the kind of

24 anticompetitive conduct that is increasingly causing harm to competition, competitors, and

25 consumers in digital markets. ██████ ████████████████████████████████████████

26 ████ ██████████████████████ ████████████████████████████████████

27 ██████████████████████ ██████████████████████████████████████████

28 ████████████████████████████ ██████████████████████████████████████

1　████████████████████████████████████████████████

2　████████████████████████████████████████████████

3　████████████████████████████　████████████████

4　　　　Whether or not it may be necessary to amend the antitrust laws to render such

5　anticompetitive conduct actionable under federal law, it is already actionable under the UCL.  As

6　this Court has recognized, "'unfair' practices under the UCL are not limited to actual antitrust

7　violations."  *hiQ Labs, Inc.* 273 F. Supp. 3d at 1117.  LinkedIn's drawn-out rehashing of its

8　arguments against hiQ's federal antitrust claims (Mot. 24-29) all rest on the invalid assumption that

9　unfair conduct under the UCL must be analyzed by the standards and satisfy the requirements of

10　federal antitrust law.  But "[t]he UCL's coverage is sweeping, and its standard for wrongful business

11　conduct intentionally broad."  *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1204 (N.D. Cal. 2014)

12　(internal quotations removed).  That is because the California legislature deliberately drafted the

13　UCL to be broader than federal antitrust law to address the innumerable "new schemes which the

14　fertility of man's invention would contrive."  *Am. Philatelic Soc'y v. Claibourne*, 3 Cal. 2d 689, 698

15　(Cal. 1935); *accord*, *Cel-Tech*, 20 Cal. 4th at 181.  The State of California has recently affirmed this

16　view in a case that bears striking factual similarities to this one.  *See* BRIEF OF THE STATE OF

17　CALIFORNIA AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY, *Epic Games Inc. v.*

18　*Apple, Inc.*, Case No. 21-16506, Dkt. No.118, at 12-16 (N.D. Cal. Mar. 31, 2022).  To serve this goal,

19　the particular methods of federal antitrust analysis are not required—instead, the court conducts an

20　equitable analysis "often requiring the consideration of a variety of factors or circumstances" and

21　not necessarily tied to the standards of federal antitrust.  *Nationwide Biweekly Admin., Inc. v.*

22　*Superior Ct. of Alameda Cnty.*, 462 P.3d 461, 473 (Cal. 2020).

23　　　　In light of the flexible nature of the UCL, LinkedIn's criticisms of hiQ's claims for failing

24　to satisfy the standards of federal antitrust law are inapposite.  LinkedIn cites to no authority

25　requiring a federal antitrust claim to remain in the action.  Mot. 24.  Similarly, hiQ's claim does not

26　require a market definition—a topic that would have been appropriate for expert discovery if hiQ's

27　federal antitrust claims had survived, but is no longer necessary for the remaining UCL claim.  Mot.

28　26-27.  LinkedIn's other criticisms attack strawmen that hiQ has not pled, such as the "essential

facilities" doctrine, and suffer from the same flaw of assuming without basis that hiQ's UCL claim must meet the standards of federal antitrust.  Mot. 27-28.  None establishes the absence of a factual dispute on this claim and LinkedIn's motion should be denied.

### B.     The Evidence Supports hiQ's "Fraudulent" UCL Claim

Likewise, the record reveals a factual dispute as to whether hiQ relied on LinkedIn's fraudulent statements that ultimately caused hiQ harm.

To prove the reliance component of a "fraudulent" UCL claim, a plaintiff may "show[] that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct." *In re Tobacco II Cases*, 207 P.3d 20, 39 (2009) (citations omitted).  "A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct." *Id.* (citations and quotations omitted).  LinkedIn made a clear promise that members' profile pages would be "public."  *See, e.g.*, Ex. 52 at -57 (8/11/20 LinkedIn Privacy Policy).  LinkedIn guarantees members that *the members* "control the visibility and reach of [their] LinkedIn profile," "own the content and information that [they] submit," and "grant[] LinkedIn [only a] non-exclusive license."  Ex. 46 at -04 (User Agreement).  It further provides, "Members and/or Visitors *may access and share your content and information, consistent with your settings and degree of connection with them*." *Id.*  These statements are likely to deceive the public, as LinkedIn now takes the position that it has the ability to control—and enforce via litigation—who can access member profiles, how often, how quickly, for what purpose, and which information will be public.  hiQ relied on these statements in formulating its business model that relied on scraping data that LinkedIn told its members was public such that it could fairly be accessed and shared by visitors (*i.e.*, anyone not logged in) to LinkedIn's website. Ex. 76 (Kaplan 5/4/22 Tr. 69:25-70:22); *see, e.g.*, *Chapman v. Skype Inc.*, 220 Cal.App.4th 217, 227-30 (Cal. Ct. App. 2013) (holding that "consumers are likely to believe that Skype's 'Unlimited US & Canada' [] calling plan offers unlimited calling within the United States and Canada for a fixed monthly fee and that they will fail to notice the disclosure to the contrary in the fair usage policy" and reversing summary judgment because "whether a reasonable consumer is likely to be deceived by the

1    representation that the calling plan is 'Unlimited' is a question of fact").

2    **C.    The Evidence Supports hiQ's "Unlawful" UCL Claim**

3    A practice is "unlawful" under the UCL if it violates a law other than the UCL.  *Cel-Tech*,

4    20 Cal. 4th at 180.  Because, as discussed *infra*, LinkedIn cannot obtain summary judgment in its

5    favor on the tortious interference claims, it also cannot obtain summary judgment in its favor on the

6    unlawful prong of the UCL, as LinkedIn acknowledges.  Mot. 30.

7    **D.    This Court Has Discretion To Fashion An Appropriate UCL Remedy**

8    Finally, LinkedIn seeks to avoid liability for its inequitable conduct by claiming, without

9    support, that injunctive relief is "unavailable" as a remedy for hiQ's UCL claims (Mot. 23), in an

10   effort to parlay this Court's recent order dissolving the June 2017 preliminary injunction into a shield

11   against any relief whatsoever on hiQ's UCL claims.  *See id.* (quoting ECF 329).  This is incorrect.

12   To start, dissolution of a preliminary injunction "does not preclude the grant of narrower

13   preliminary or permanent injunctive relief on the basis of a more fully developed record."  *Thomas*

14   *v. County of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992).  As this Court specifically noted, its

15   dissolution order "does not preclude hiQ from seeking injunctive relief in the future should its

16   business opportunities ripen that would require access to public LinkedIn profiles and would suffer

17   irreparable injury absent injunctive relief."  ECF 329 at 6.

18   Under the UCL, the court has wide latitude to fashion an appropriate equitable remedy for

19   conduct that violates the UCL.  *See* Cal. Bus. & Prof. Code § 17203 ("The court may make such

20   orders or judgments . . . as may be necessary to prevent the use or employment by any person of any

21   practice which constitutes unfair competition. . . ");  *Allergan, Inc. v. Athena Cosms., Inc.*, 2013 WL

22   12142655 (C.D. Cal. Mar. 6, 2013) ("Injunctive relief 'may be as wide and diversified as the means

23   employed in perpetration of the wrongdoing'") (internal citation omitted).

24   hiQ pled for injunctive and declaratory relief to remedy LinkedIn's violations of the UCL,

25   seeking such "relief as the Court deems just and proper."  *See* ECF 131 at 36;  *Kraus v. Trinity*

26   *Management Services, Inc.*, 23 Cal.4th116, 126-27 (Cal. 2000) (discussing the broad equitable

27   power granted to courts by the UCL to issue relief).  LinkedIn cannot, at this stage, foreclose the

28   range of options available to the Court to enjoin its anticompetitive conduct.  As a case recently

1   decided in this District shows, a UCL remedy against anticompetitive conduct may consist of—for

2   example—the elimination of certain anticompetitive provisions of an agreement.  *See Epic Games,*

3   *Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1068 (N.D. Cal. 2021) ("[The Court] does find that Apple's

4   conduct in enforcing anti-steering restrictions is anticompetitive.  A remedy to eliminate those

5   provisions is appropriate.").[10]  While hiQ has remedies at law for its tortious interference claims,

6   there would be no adequate remedy at law for the irreparable harm that would be caused by

7   LinkedIn's efforts to deny hiQ access to otherwise public data should hiQ prevail on its claims.

8       In addition to the injunctive relief that this Court has the power to fashion, hiQ also may be

9   entitled to attorneys' fees under California Code of Civil Procedure § 1021.5, which provides for

10  attorneys' fees for a prevailing plaintiff whose action confers a benefit on "a large class of persons."

11  The "fundamental objective" of that statute "is to encourage suits enforcing important public

12  policies." *Graham v. DaimlerChrysler Corp.*, 101 P.3d 140, 147 (Cal. 2004), *as modified* (Jan. 12,

13  2005).  Awards under § 1021.5 are permitted for suits alleging violations of the UCL.  *See, e.g.*,

14  *Lamb v. Wells Fargo Bank, N.A.*, 2006 WL 925490, at *8 (Cal. Ct. App. Apr. 11, 2006) (affirming

15  an award of attorneys' fees for a claim under the UCL).  hiQ is entitled to attorneys' fees should this

16  Court fashion an injunction that remedies LinkedIn's false and fraudulent statements to its members

17  regarding their control over their own data—or even absent such an injunction, if this suit is the

18  "catalyst" for LinkedIn to make such a change, to the benefit of the large class of LinkedIn members.

19  *Graham*, 101 P. 3d at 154-55.

20      Summary judgment in favor of LinkedIn should be denied as to hiQ's UCL claims.

**III.   ISSUES OF FACT BAR SUMMARY JUDGMENT ON hiQ'S TORTIOUS INTERFERENCE CLAIMS**

22      LinkedIn's attempt to obtain summary judgment on hiQ's tortious inference claims also fails

23  because the evidence overwhelmingly shows LinkedIn interfered with hiQ's business relationships

24  and creates the factual dispute necessary to defeat summary judgment.

---

27  [10]   LinkedIn's reliance on *Huynh v. Quora, Inc.* (Mot. 23) is unavailing because hiQ, unlike the plaintiff in that case, pled irreparable harm.  508 F. Supp. 3d 633, 662-63 (N.D. Cal. 2020); *cf.* ECF 131 at 26, 28-9.

**A.**     **Genuine Issues Of Material Fact Preclude Judgment On hiQ's Intentional Interference With Contract Claim**

"To prevail on a claim for intentional interference with contract under California law, hiQ must show (i) it had valid contracts with third parties; (ii) LinkedIn's knowledge of those contracts; (iii) LinkedIn's intentional acts designed to induce a breach or disruption of those contracts; (iv) actual breach *or disruption* of the contractual relationships; and (v) resulting damage.  *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (emphasis added).

As to the first element, it is undisputed that hiQ had numerous valid contracts with third parties as of May 22, 2017.  Mot. 18, n.6 (citing to hiQ's contracts); Ex. 63 (hiQ's First Supplemental Response to Interrogatory No. 18) (listing active contracts as of May 2017).

Likewise, to the extent LinkedIn argues it did not know about any such contracts, the evidence shows otherwise.  LinkedIn was well aware that hiQ had contracts with clients and in many cases even knew the identities of those clients.  *See Ramona Manor Convalescent Hosp. v. Care Enterprises*, 177 Cal.App.3d 1120, 1133 (Cal. Ct. App. 1986), *as modified on denial of reh'g* (Mar. 5, 1986) (defendant's knowledge of the existence of contracts, even without knowledge of other party's identity, may meet this element). ███████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████  And there can be no dispute that LinkedIn intended to interfere with hiQ's contracts.  Interference is intentional "even where the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his or her action." *Jenni Rivera Enters., LLC v. Latin World Entm't Holdings, Inc*., 36 Cal.App.5th 766, 782 (Cal. Ct. App. 2019) (internal quotations omitted).  Contemporaneous documents show that LinkedIn knew that (1) hiQ's performance of its contracts relied on its ability to access public LinkedIn data and (2) they could "knock[] of [hiQ] by cutting off their data source."  Ex. 48 (4/21/17 internal LinkedIn email discussing 4/20/17 Elevate conference).

While LinkedIn asserts that hiQ cannot show "actual breach or disruption," Mot. at 17, because "every contract that was active at the time LinkedIn sent its C&D letter was fully paid and performed," Mot. at 18, this argument rests on a misunderstanding of the applicable law. "[I]nterference with the plaintiff's performance may give rise to a claim for interference with contractual relations if plaintiff's performance *is made more costly or more burdensome*." *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1129 (emphasis added).[11]

The evidence shows (and certainly creates a triable issue of fact regarding) LinkedIn's interference with those contracts, which was intended to and did disrupt hiQ's performance under them, which a juror could find made hiQ's performance more costly and burdensome. The customer and employee goodwill that hiQ had cultivated evaporated—hiQ had difficulty performing to client expectations and customers suddenly had reason to question "whether [they] were paying for a product that no longer exist[ed]," and prospective partners cited the lawsuit as a deal-breaker. Ex. 13 (9/18/18 hiQ email request to Hershey for a change in performance noting "[b]ased on hiQ's resources constraints, it's increasingly difficult to maintain business as usual"); Ex. 8 at -332748 (8/1/17 IBM email discontinuing partnership discussions "until th[is] case concludes"); *see United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp.*, 2012 WL 3861946, at *8 (S.D. Cal. Sept. 5, 2012) (the "loss of business relations due to a dwindling workforce and loss of goodwill are also compensable by monetary damages."). The disruption caused by LinkedIn's conduct also derailed hiQ's upcoming financing round, Ex. 63 at 10 (hiQ's First Supplemental Response to Interrogatory No. 18) (describing Weidick's post-cease-and-desist discussions with hiQ's investors), which would have provided the company with needed liquidity (Ex. 83 (Weidick 5/23/2022 Tr. 18-24)) and drained hiQ's existing resources, forcing hiQ to slash its payroll and pare down its operations.

---

[11]   LinkedIn's cited cases are easily distinguishable.  Unlike in *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*, 52 Cal.App.4th 867 (Cal. Ct. App. 1997), where the court found an orally-negotiated, unsigned lease agreement subject to the statute of frauds and therefore unenforceable, here, hiQ's sales agreements were reduced to writing.  *See, e.g.*, Exs. 66-69.  And *Ixchel Pharma, LLC v. Biogen, Inc.*, merely stands for the rule that an interference claim for at-will contracts requires independent wrongfulness.  470 P.3d at 575.  hiQ pled independently wrongful acts by LinkedIn, and in any event, LinkedIn has adduced no evidence that hiQ's contracts were at-will.

1   *Compare* Ex. 7 (Payroll Register 2017) *with* Ex. 6 (Payroll Register 2018).

2          As hiQ employees will testify at trial, all of these consequences in turn hampered hiQ's

3   ability to meet its obligations under its existing contracts.  *See, e.g.,* Ex. 13 (asking Hershey's to

4   accept an alternative delivery model in light of resource constraints); Ex. 9 (GoDaddy expressing

5   frustration with service).  Thus, "whether performance of [hiQ's] contractual obligation [wa]s made

6   more expensive or burdensome is also an issue that should be determined by the ultimate trier of

7   fact in this case."  *Sebastian Int'l Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1206-07 (C.D. Cal. 2001).

8          Finally, the extent of hiQ's damages is a question of fact that is supported by substantial

9   record evidence.  *See Sole Energy Co. v. Petrominerals Corp.*, 128 Cal.App. 4th 212, 232-33 (Cal.

10  Ct. App. 2005).  California courts permit various methods for calculating lost profits, which include

11  methods such as the analysis performed by hiQ's expert, Benjamin Sacks.  *See Sargon Enterprises,*

12  *Inc. v. Univ. of S. California*, 288 P.3d 1237, 1253 (Cal. 2012).  As discussed in hiQ's opposition to

13  LinkedIn's motion to exclude Mr. Sacks' expert testimony, LinkedIn's criticisms of the Sacks report

14  go to the weight, but not the admissibility, of this evidence.  ECF No. 363.

15         hiQ can also establish punitive damages, and LinkedIn's conclusory statement otherwise

16  (Mot. 23-24) is unavailing.  California law permits punitive damages for tort claims where the

17  defendant "has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  The record

18  contains ample evidence of LinkedIn's oppression and malice towards hiQ; after all, ███████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  Indeed, LinkedIn's fraudulent competition independently satisfies the standard.  *See In re*

22  *Volkswagen "clean Diesel" Mktg.*, 2019 WL 670607, at *11 (N.D. Cal. Feb. 19, 2019).

23  **B.      Genuine Issues Of Material Fact Preclude Judgment On hiQ's Intentional
             Interference With Economic Relationship**

24

25         A reasonable juror also could find that LinkedIn "knowingly interfered with an economic

26  relationship between [hiQ] and [ ] third part[ies], [which carried] the probability of future economic

27  benefit to [hiQ]" and that such interference with independently wrongful.  *Ixchel Pharma, LLC v.*

28  *Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (internal quotation marks omitted).  As with intentional

1    interference with contract, the defendant need not know the precise identities of the plaintiff's

2    prospective counterparties.  *Ramona Manor,* 177 Cal. App. 3d at 1133.

3         hiQ can demonstrate that it lost existing customer relationships that otherwise would have

4    continued (*see Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1162 (C.D. Cal. 2010)) and

5    "potential customers with which it had previous sales relationships" (*Silicon Labs Integration, Inc.*

6    *v. Melman*, No. C-08-04030-RMW, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010)).  hiQ can

7    also recover for lost relationships with investors and potential investors.  *Visto Corp. v. Sproqit*

8    *Techs., Inc.*, 360 F. Supp. 2d 1064, 1067–68 (N.D. Cal. 2005) (noting that interference with existing

9    and prospective relationships with customers and investors is sufficient to show actual disruption).

10        The evidence that hiQ had existing and prospective relationships with customers—many of

11   whom had previously renewed their contracts with hiQ over multiple years—is indisputable, and

12   LinkedIn does not seriously contest it.  *See* Ex. 63 (hiQ's Supplemental Response to Interrogatory

13   No. 18) (listing active clients as of May 23, 2017).  Substantial evidence shows that hiQ's customers

14   valued hiQ's service and would have continued to purchase it had hiQ remained a going concern.

15   ██████████████████████████████████████████████████████████

16   ████████  ██████████████████████████████  ████████  Likewise, hiQ had a

17   number of investors who had participated in its Series A and B rounds, and who would have

18   participated in the Series C round but for LinkedIn's pretextual legal threats.  *See* Ex. 63 at 10 (hiQ's

19   First Supplemental Responses to Interrogatory No. 18) (describing hiQ's post-cease-and-desist

20   discussions with hiQ's investors).  Further, hiQ's opportunity to partner with IBM was derailed

21   specifically due to LinkedIn's threats, with significant consequences for hiQ's business.  *See* Ex. 83

22   (Weidick 5/23/2022 Tr. 248:8-21) (IBM "explicitly in conversation and subsequently an e-mail

23   pointed directly to the LinkedIn situation as reason for not continuing"); Ex. 8 (8/1/17 IBM email

24   discontinuing partnership discussions "until th[is] case concludes"); *see generally* Ex. 8 Second

25   Amended Report of Benjamin Sacks.  LinkedIn's bald contention that the harms hiQ suffered were

26   proximately caused by other factors (Mot. 20) is belied by the record, and exactly the kind of

27   disputed factual assertion that requires resolution by the jury.

28        Further, hiQ can satisfy the independent "wrongfulness" element both by showing that (i)

1   LinkedIn violated Cal. Bus. Prof. Code §17200 and/or (ii) tortiously interfered with hiQ's existing

2   contracts.  *See e.g.*, *Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001)

3   (wrongfulness requirement satisfied by conduct that violates "a statute, regulation or recognized

4   common rule of law."); *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F. Supp. 3d 887, 898–99

5   (N.D. Cal. 2014) ("[T]he torts of intentional interference with contractual relations and intentional

6   interference with prospective economic advantage are distinct.").  LinkedIn's focus on the UCL as

7   the only basis for satisfying this element—and its contention that hiQ is playing a "shell game"

8   (Mot. at 19)—not only fails as to the UCL, but disregards that hiQ's tortious interference with

9   contract claim *also* satisfies this element, and disputes of fact as to that claim preclude summary

10  judgment.

11       Finally, as discussed *supra*, Section III.A, consideration of the damages hiQ suffered as a

12  result of LinkedIn's tortious interference, and any punitive damages warranted, must be reserved

13  for the jury.

14  **IV.   LINKEDIN'S AFFIRMATIVE DEFENSES TO HIQ'S CLAIMS FAIL**

15       **A.   Factual Disputes Exist As LinkedIn's Litigation Privilege Defense**

16       LinkedIn's argument that it is entitled to summary judgment that its conduct is protected by

17  the litigation privilege also should be rejected because the gravamen of hiQ's complaint is

18  LinkedIn's multifaceted effort to shut down its business.

19       LinkedIn is wrong that the "*sole* cause of harm" is the cease-and-desist letter.  Mot. 15

20  (emphasis added).  LinkedIn executed a scheme to drive it out of the market by sending a team to

21  covertly gather information on hiQ's products and customer base and executed a targeted blocking

22  of hiQ in order to "cut[] off" hiQ's data source.  Ex. 48.  The gravamen of hiQ's claims is that

23  LinkedIn sought to gather competitive intelligence on hiQ's customers, partners, and product

24  features, use these to LinkedIn's benefit, and then drive hiQ out of the market to "capture the easiest

25  dollars."  Ex. 32.  This scheme was effectuated, in part, by the targeted technical blocking of IP

26  addresses belonging to hiQ—separate from the general anti-scraping defenses that LinkedIn applies

27  to all incoming traffic to its website.  *See* ECF No. 217-4 Rockwell Decl. ¶ 21.  The C&D letter was

28  merely the "enforcement mechanism . . . [of LinkedIn's] anticompetitive scheme," designed to force

1    hiQ to defend itself in a manner that would render it radioactive to its customers.  *Arista Networks,*
2    *Inc. v. Cisco Sys. Inc.*, 2018 WL 11230167, at *9, *21 (N.D. Cal. May 21, 2018) (denying summary
3    judgment on UCL and antitrust claims despite "strong arguments" and "sound evidence" under
4    "application of the demanding criterion for summary judgment.")

5           "Because the litigation privilege protects only publications and communications, a
6    'threshold issue in determining the applicability' of the privilege is whether the defendant's conduct
7    was communicative or noncommunicative."  *Angelo v. Winet*, 2013 WL 5236746, at *5 (Cal. Ct.
8    App. Sep. 18, 2013).  "The distinction between communicative and noncommunicative conduct
9    hinges on the gravamen of the action. . .  [that is,] whether the privilege applies is whether the injury
10   allegedly resulted from an act that was communicative in its essential nature."  *Id.*  hiQ bases its
11   claim on LinkedIn's overall course of conduct, of which its litigation threat was merely a part.  *See*
12   *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1095-96 (N.D. Cal. 2007); *see*
13   *also Arista Networks*, 2018 WL 11230167 (taking note of argument that defendant used the litigation
14   and conduct incidental to that litigation "as tools to further" the anticompetitive scheme).  While
15   LinkedIn asserts that "a few emails between non-lawyer LinkedIn employees expressing a desire to
16   get rid of hiQ as a competitor [do not] create an exception to the privilege," Mot. 16, they do create
17   a triable issue of fact, especially when drawing all inference in hiQ's favor, as the Court must.

18          As this Court has previously noted, "before otherwise protected litigation can be a part of an
19   'anticompetitive scheme' claim, the court must first find that the other aspects of the scheme
20   independently produce anticompetitive harms."  ECF 158 at 7 (quoting *Rambus*, 527 F. Supp 2d at
21   1096-7). Here, hiQ has adduced substantial evidence of LinkedIn's anticompetitive scheme.  *See*
22   *supra* section II.D.  As such, "a reasonable jury could find that [LinkedIn] raised the specter of the
23   . . . lawsuit to persuade customers to abandon [hiQ]."). *Arista Networks, Inc. v. Cisco Sys. Inc.*, No.
24   C-16-0923 BLF (Docket No. 281) (Order at 21-22).

25          **B.    LinkedIn's Justification Defense Fails Because It Acted In Bad Faith**

26          Nor can LinkedIn show the absence of a factual dispute as to whether it is entitled to invoke
27   a justification defense to hiQ's tortious interference claims because factual disputes exist as to
28   whether LinkedIn acted in an "arbitrary or unfair" manner towards hiQ.

1    Whether tortious interference is justified "turns on a balancing of the social and private

2    importance of the objective advanced by the interference against the importance of the interest

3    interfered with, considering all the circumstances including the nature of the actor's conduct and the

4    relationship between the parties.  *Richardson v. La Rancherita*, 98 Cal. App. 3d 73, 76, 159 Cal.

5    Rptr. 285 (Ct. App. 1979).  The question of justification "requires an examination of the entire

6    context of the factual situation."  *Stark Packing Corp. v. Sunkist Growers, Inc.*, 2009 WL 2185407,

7    at *11 (Cal. Ct. App. Jul. 23, 2009); *see also Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898,

8    1054 (N.D. Cal. 2021) (rejecting justification defense to UCL claims where "the evidence presented

9    showed anticompetitive effects . . . under any normative measure.").  California courts have

10   recognized that, even where a party accused of interference acted to enforce "a legally protected

11   interest" such as a contract, the "determinative question" is whether the party acted in good faith.

12   *Richardson*, 98 Cal. App. 3d 73, 81 (Cal. Ct. App. 1979).

13   The record is replete with evidence from which a juror could conclude that LinkedIn acted

14   arbitrarily, unfairly, and in bad faith.  LinkedIn selectively enforced or threatened to enforce its anti-

15   scraping policies as a means of solidifying its dominant position, tolerating scrapers when there was

16   an economic advantage to be gained by doing so and singling out nascent competitors to clear the

17   field when it planned to roll out a competing product. ▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26   ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Finally, LinkedIn's assertion that its entitlement

27   to summary judgment on its breach of contract claim "alone" establishes its justification defense

28   (Mot. at 21) is both circular and wrong, for the reasons set forth above.

**V.      CONCLUSION**

The Court should deny LinkedIn's Motion for Summary Judgment.


Dated:  August 31, 2022

By

*/s/ Corey Worcester*

Corey Worcester (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000
coreyworcester@quinnemanuel.com


*Attorneys for Plaintiff and Counterclaim
Defendant hiQ Labs, Inc.*