Corey Worcester (*pro hac vice*)
coreyworcester@quinnemanuel.com
Renita Sharma (*pro hac vice*)
renitasharma@quinnemanuel.com
Hope Skibitsky (*pro hac vice*)
hopeskibitsky@quinnemanuel.com
Elisabeth Miller (*pro hac vice*)
elisabethmiller@quinnemanuel.com
Zane Muller (*pro hac vice*)
zanemuller@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:     (212) 849-7000

Terry L. Wit (SBN 233473)
terrywit@quinnemanuel.com
QUINN EMANUEL URQUHART AND SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:     (415) 875-6331

*Attorneys for Plaintiff and
Counterclaim Defendant
hiQ Labs, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| hiQ Labs, Inc.,<br><br>　　　*Plaintiff and Counterclaim Defendant*,<br><br>　　vs.<br><br>LinkedIn Corp.,<br><br>　　　*Defendant and Counterclaim Plaintiff.* | Case No. 3:17-cv-03301-EMC<br><br>**PLAINTIFF HIQ LABS, INC.'S BRIEF IN OPPOSITION TO DEFENDANT  LINKEDIN CORP.'S MOTION FOR SPOLIATION SANCTIONS**<br><br>Judge:　　　Hon. Edward M. Chen<br>Hearing Date:　Sept. 29, 2022<br>Hearing Time:　1:30 p.m. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

    A.    hiQ Issues a Litigation Hold Notice ....................................................2

    B.    hiQ Endeavors to Preserve Scraping Data ...........................................3

    C.    hiQ's Splunk Account ..........................................................................4

    D.    hiQ's Salesforce Account .....................................................................5

    E.    hiQ's Chorus Account ..........................................................................6

ARGUMENT ....................................................................................................................7

I.       LINKEDIN'S MOTION IS UNTIMELY ....................................................8

II.      LINKEDIN IS NOT ENTITLED TO RULE 37(E)(2) SANCTIONS ...............11

    A.    hiQ Did Not "Intend To Deprive" LinkedIn of Evidence .....................11

    B.    LinkedIn's Rule 37(e)(2) Sanctions Would Amount To A Windfall ......18

III.    LINKEDIN IS NOT ENTITLED TO RULE 37(E)(1) SANCTIONS ...............21

    A.    LinkedIn Suffered No Prejudice .........................................................22

    B.    Any Attorneys' Fees Award Would Be Improper .................................24

IV.    THE DOCTRINE OF INHERENT AUTHORITY IS INAPPLICABLE .........25

CONCLUSION .................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aramark Management, LLC v. Borgquist*,
  2021 WL 864067 (C.D. Cal. Jan. 27, 2021) ................................................................. 7

*Borum v. Brentwood Vill., LLC*,
  332 F.R.D. 38 (D.D.C. 2019) .............................................................. 13, 16, 17

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,
  2020 WL 1809191 (D. Md. Apr. 9, 2020) ......................................................... 14

*Cardinal v. Lupo*,
  2019 WL 4450859 at *3 (N.D. Cal. Sep. 17, 2019) ............................... 18, 19, 21

*Chinitz v. Intero Real Est. Servs.*,
  2020 WL 7389417 (N.D. Cal. May 13, 2020) ............................................ 20, 25

*Cottle-Banks v. Cox Commc'ns, Inc.*,
  2013 WL 2244333 (S.D. Cal. May 21, 2013) ..................................................... 9

*Federal Trade Comm. v. Noland*,
  2021 WL 3857413 (D. Ariz. Aug. 30, 2021) ..................................................... 13

*Ferrone v. Onorato*,
  2007 WL 2973684 *10 (W.D. Pa. Oct. 9, 2007), *aff'd*, 298 Fed. App'x. 190 (3rd Cir.
  2008) ................................................................................................................... 10

*Fourth Dimension Software v. DER Touristik Deutschland GmbH*,
  2021 WL 5919821 (N.D.Cal. Dec. 15, 2021) ................................. 12, 13, 14, 15

*Franklin v. Shelby Cnty. Bd. of Educ.*,
  2021 WL 6066673 (W.D. Tenn. Sept. 28, 2021), *report and recommendation
  adopted in relevant part*, 2021 WL 5449005 (W.D. Tenn. Nov. 22, 2021) ............. 16

*Freeman v. Allstate Life Insurance Co.*,
  253 F.3d 533 (9th Cir. 2001) ........................................................................... 10

*Gaina v. Northridge Hosp. Med. Ctr.*,
  2018 WL 6258895 (C.D. Cal. Nov. 21, 2018) .................................................. 16

*Gallagher v. Magner*,
  619 F.3d 823 (8th Cir. 2010) ........................................................................... 22

*Glenn v. Scott Paper Co.*,
  1993 WL 431161 at *17 n.3 (D.N.J. Oct. 20, 1993) ......................................... 10

*Hernandez v. Tulare Cnty. Correction Ctr.*,
  2018 WL 784287 (E.D. Cal. Feb. 8, 2018) ...................................................... 17

*Hice v. Lemon*,
  2021 WL 6053812 (E.D.N.Y. Nov. 17, 2021) .................................................. 20

*Jarrell v. Wal-Mart Stores, Inc.*,
   2021 WL 1169889 (D. Nev. Mar. 26, 2021) ............................................................... 10

*Karsch v. Blink Health Ltd.*,
   2019 WL 2708125 (S.D.N.Y June 20, 2019) .............................................................. 17

*Larios v. Lunardi*,
   442 F. Supp. 3d 1299 (E.D. Cal. 2020) ........................................................................ 8

*Laub v. Horbaczewski*,
   2020 WL 9066078 (C.D. Cal. July 22, 2020) ...................................................... 11, 13

*Leon v. IDX Sys. Corp.*,
   464 F.3d 951 (9th Cir. 2006)....................................................................................... 12

*Leonard v. Denny*,
   2020 WL 5039065 (E.D. Cal. Aug. 26, 2020), *report and recommendation adopted*,
   2020 WL 5891389 (E.D. Cal. Oct. 5, 2020) ............................................................... 11

*Mahboob v. Educ. Credit Mgmt. Corp.*,
   2021 WL 791853 (S.D. Cal. Mar. 1, 2021), *report and recommendation adopted in
   relevant part*, 2021 WL 7448531 (S.D. Cal. Mar. 31, 2021) ..................................... 10

*Matthew Enter., Inc. v. Chrysler Grp. LLC*,
   2016 WL 2957133 (N.D. Cal. May 23, 2016) ......................................................... 7, 25

*Medical Laboratory Manag. v. Am. Broadcasting*,
   306 F.3d 806 (9th Cir. 2002) ...................................................................................... 22

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
   2022 WL 1990225 (N.D. Cal. June 6, 2022) .......................................................... 17, 25

*MGA Ent., Inc. v. Nat'l Prod. Ltd.*,
   2012 WL 4052023 (C.D. Cal. Sept. 14, 2012)............................................................. 8

*Moody v. CSX Transp., Inc.*,
   271 F. Supp. 3d 410 (W.D.N.Y. 2017) .................................................................. 14, 15

*Newberry v. Cnty. of San Bernardino*,
   750 F. App'x 534 (9th Cir. 2018)................................................................................ 25

*Nuvasive, Inc. v. Madsen Med., Inc.*,
   2016 WL 305096 (S.D. Cal. Jan. 26, 2016) ............................................................... 12

*O'Berry v. Turner*,
   2016 WL 1700403 (Apr. 27, 2016) ............................................................................ 13

*Ottoson v. SMBC Leasing and Finance, Inc.*,
   268 F. Supp. 3d 570 (S.D.N.Y. 2017) .................................................................. 12, 13

*Rahbarian v. Cawley*,
   701 F. App'x 676 (9th Cir. 2017)................................................................................ 10

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
   306 F.3d 99 (2d Cir. 2002) ..................................................................................... 12, 13

HIQ'S OPPOSITION TO LINKEDIN'S MOT. FOR SPOLIATION SANCTIONS

*RG Abrams Ins. v. L. Offs. of C.R. Abrams*,
  2022 WL 3133293 (C.D. Cal. July 1, 2022) ............................................................... 21

*Rhabarian v. Cawley*,
  2014 WL 546015 (E.D. Cal. Feb. 11, 2014), *aff'd sub nom. Rahbarian v. Cawley*, 701
  F. App'x 676 (9th Cir. 2017)..................................................................................... 10

*Ronnie Van Zant, Inc. v. Pyle*,
  270 F.Supp.3d 656 (S.D.N.Y. 2017) ........................................................................ 20

*Scalpi v. Amorim*,
  2018 WL 1606002 (S.D.N.Y. Mar. 29, 2018) ........................................................... 12

*Shackleford v. Vivint Solar Developer, LLC*,
  2020 WL5203340 at *7 (D. Md. Sept. 1, 2020) .......................................................... 8

*Sines v. Kessler, is*,
  likewise unpersuasive.  2021 WL 4943742 (W.D.Va. Oct. 22, 2021)........................ 13

*SiteLock LLC v. GoDaddy.com LLC.*,
  2022 WL 3716499 (D. Ariz. Aug. 29, 2022) ........................................................ 24, 25

*Spencer v. Lunada Bay Boys*,
  2017 WL 10518023 (C.D. Cal. Dec. 13, 2017), *report and recommendation adopted*,
  2018 WL 839862 (C.D. Cal. Feb. 12, 2018), *aff'd,* 806 F. App'x 564 (9th Cir. 2020)....... 18, 20

*Ungar v. City of New York*,
  329 F.R.D. 8 (E.D.N.Y. 2018) .................................................................................. 13

*Wallace v. Martinez*,
  2022 WL 2872998 (E.D. Cal. July 21, 2022) ............................................................ 22

*Warner Records Inc. v. Charter Commc'ns*,
  2022 WL 1567142 (D. Colo. May 18, 2022) .............................................................. 23

*United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*,
  857 F.2d 600 (9th Cir. 1988)..................................................................................... 21

**Rules / Statutes**

Civil L.R. 7-8(c) ........................................................................................................... 8

Fed. R. Civ. P. 37(e).............................................................................................. passim

Fed. R. Civ. P. 37(e)(1).......................................................................................... passim

Fed. R. Civ. P. 37(e)(2).......................................................................................... passim

## MEMORANDUM OF POINTS AND AUTHORITIES

hiQ Labs, Inc. ("hiQ") respectfully submits this opposition to LinkedIn Corporation's ("LinkedIn's") Motion for Spoliation Sanctions (the "Motion").

## INTRODUCTION

Since November 2021, hiQ has produced **over 235,000 documents**, consisting of over **736,000 pages and thousands of native files**.[1]  These documents have come from numerous sources and custodians, including from hiQ's G Suite, Box, Slack, and Confluence accounts and from its former CEO's DropBox account—all of which hiQ preserved for the more than five years since receiving LinkedIn's cease and desist letter.  hiQ has also produced large amounts of source code, as well as audio recordings from its join.me account.  Armed with and relying on hiQ's extensive and highly technical productions, LinkedIn has propounded **five** expert reports and moved for summary judgment on the vast majority of remaining claims in this case.  Nonetheless, LinkedIn argues that it **needs more**.

Notwithstanding the abundance of evidence at its disposal from a company that LinkedIn largely succeeded in driving out of business, LinkedIn now asks this Court for the draconian relief of (1) dismissing five of hiQ's claims, (2) deeming the opinions of LinkedIn's "expert" (who is also a LinkedIn employee) to be true, (3) precluding hiQ from offering evidence to support elements of its claims, (4) instructing the jury that hiQ spoliated evidence, and (5) requiring hiQ to bear the costs of the Motion and the cost of LinkedIn's own employees' analysis—which would functionally be a case-ending sanction given hiQ's precarious financial position resulting from LinkedIn's own tortious conduct and unfair business practices.  LinkedIn seeks the above sanctions under Federal Rule of Civil Procedure 37(e)(2) or, alternatively, Rule 37(e)(1).  But LinkedIn has not shown an entitlement to relief under either prong.

*First*, with respect to the "relief" it seeks on account of lost Salesforce data, LinkedIn's Motion is clearly untimely.  Both the Federal Rules of Civil Procedure and the Civil Local Rules

---

[1]  For context, and in contrast, LinkedIn produced only just-over 66,000 documents consisting of less than 207,000 pages—less than one-third of hiQ's production, despite being a much larger enterprise.

required LinkedIn to move for spoliating sanctions as soon as practicable after it discovered the facts supporting its Motion.  LinkedIn did no such thing.  LinkedIn concedes that hiQ advised LinkedIn **by early September 2021** that it did not have an export of the raw Salesforce data regarding which LinkedIn now complains, yet LinkedIn sat on that information for **nearly a full year**, moving for sanctions only after the parties engaged in extensive discovery and filed dispositive motions. LinkedIn's strategic violation of this Court's Rules and caselaw should not be countenanced.

*Second*, having received the benefit of over a quarter of a million documents and troves of other material during the course of discovery, much of which relates to and provides the same insight that the subset of data implicated in LinkedIn's Motion would, LinkedIn simply cannot show the prejudice required for Rule 37(e)(1) sanctions.

*Third*, LinkedIn offers no evidence—either direct or circumstantial—to support its claim that hiQ acted with the requisite "intent" (or any intent, for that matter) to support the harsh sanctions LinkedIn requests.  LinkedIn's arguments that this Court should apply a negligence standard and the doctrine of inherent authority ignore established law rendering them inapplicable.

*Finally*, even if the Court were to find that hiQ acted with intent to deprive LinkedIn of evidence such that any of the sanctions it seeks were ***permissible***, those sanctions are well beyond any that would be necessary to mitigate the limited (at best) harm purportedly suffered by LinkedIn. Having suffered no prejudice given the troves of data that hiQ produced, LinkedIn's attempt to seek a windfall should be rejected, and its Motion, denied.

## **BACKGROUND**

### A.    hiQ Issues a Litigation Hold Notice

On June 20, 2017—shortly after receiving LinkedIn's May 23, 2017 cease-and-desist letter and guided by legal counsel—hiQ's CEO, Mark Weidick, issued a comprehensive litigation hold notice to the individuals at hiQ "who would have accountability" over hiQ's data and communications.   HCE 17 (C&D); Ex. P (Weidick 3/18/22 Tr. 48:16-48:14)[2]; LCE 93 (hold

---

[2]   All citations to Exhibits are to those attached to the September 2, 2022 Declaration of Zane Muller accompanying this Opposition.

notice).[3]  During an all-employee meeting that occurred on or almost immediately after the June 20 litigation hold notice was distributed, Mr. Weidick read that notice to all employees in attendance. Ex. P (Weidick 3/18/22 Tr. at 49:19-50:25).  The requirements of the hold notice became "a regular part of the vernacular for a short period of time while [hiQ's employees] were all together" and there were "[r]eminders just as a normal course of conversation." *Id.* at 51:1-14.  As a practical matter, the litigation hold resulted in "really no change in the way [hiQ already] did business" because hiQ's data "was all cloud-hosted." *Id.* at 51:15-24.

However, after the hold notice was implemented, employees "started to leave the business rather quickly." *Id.* at 51:5-11.  In 2018, hiQ was left with 13 individuals on its payroll, barely half the personnel on its payroll the year prior.  HCE 7 (Payroll Register 2017), HCE 6 (Payroll Register 2018)).[4]  And, by January 2019, hiQ was left with no personnel on its pay roll.  Ex. Z (9/1/22 Declaration of Mark Weidick ¶ 2.  Without employees to run its operations, and operating under a cloud of uncertainty arising out of LinkedIn's conduct, hiQ also lost its customers, and it became apparent to hiQ's CEO that hiQ would likely soon be unable to continue to pay its bills.  Ex. P (Weidick 3/18/22 Tr. 55:2-7).  Accordingly, Mr. Weidick took the proactive step of asking certain hiQ personnel to archive certain data repositories.  *Id.* at 53:21-54:21.

**B.     hiQ Endeavors to Preserve Scraping Data**

For example, hiQ understood that data on its MongoDB and AWS accounts should be preserved for litigation.  Accordingly, Mr. Weidick instructed hiQ's CTO, Daniel Miller to archive MongoDB in its existing form, and expected that Mr. Miller did so. *Id.* 94:24-95:3.  On or around April 25, 2018, Mr. Miller archived the raw scraped LinkedIn member profile data from its MongoDB database.  LCE 95 at 2084-7 (hiQ's Second Supp. Resp. to LinkedIn's Interrogatory No. 16).  However, MongoDB also contained certain "collections" of data that included the "Scrapus

---

[3]  "HCE" refers to the Compendium of Exhibits attached to the Declaration of Zane Muller, ECF 364.  "LCE" refers to the Compendium of Exhibits attached to the Declaration of Daniel Justice, ECF 340.

[4]  In addition to the 11 individuals indicated on this exhibit, hiQ contracted with two others in 2018.

Data Collections" and "Proxie Collections,"[5] as well as certain data relating to hiQ's use of "mechanical turkers" (remote independent contract workers whom hiQ engaged to perform certain manual tasks). While these collections were not archived in 2018, they remained in hiQ's Amazon Web Services ("AWS") account for several years thereafter. By March 2020, hiQ owed AWS, which hosted hiQ's technical infrastructure, $22,600. LCE 24 at 1255. AWS ultimately terminated hiQ's account for non-payment in or around April 2020, and AWS deleted the data that was stored on that account in or around September 2020. *See* Ex.I; *see also* LCE 95 at 2086 (hiQ's Second Suppl. Response to LinkedIn's Interrogatory No. 16) at 3. As of September 2020, when the data was permanently deleted from hiQ's AWS account, hiQ did not have even a single paid employee. Wedick Decl. ¶ 2. To the contrary, Mr. Weidick was at that time (and has since been) serving as hiQ's CEO without a salary. *Id.*. When, through the course of discovery, hiQ learned that LinkedIn was seeking information and data from AWS beyond that which hiQ had previously archived, hiQ, through its counsel, earnestly attempted to restore the lost AWS account but was told by the vendor that hiQ's data was permanently deleted. *Id.* ¶ 3.

**C.   hiQ's Splunk Account**

In addition to an AWS account, hiQ had a Splunk account that it used to log certain of its scraping activity. Although hiQ did not do a full export of its Splunk account to archive it, hiQ never had any intention to delete data stored in Splunk. On the contrary, as LinkedIn concedes in its Motion (at 14), on June 12, 2018, Boris Dev, who controlled hiQ's Splunk account, indicated that Splunk data should not be deleted as it "can be important for legal issues." LCE 14 at 0782, 0786. Later during the course of discovery, hiQ learned that it was unable to access its Splunk account. Ex. Z ¶ 3. Accordingly, hiQ worked in earnest, with the assistance of counsel, to reactivate its Splunk account. *Id.*¶ 3. Although hiQ was advised by Splunk that all of hiQ's data would remain available in the event of reactivation, and thus reactivated the account, hiQ learned upon logging in that only a subset of the data continued to exist in the account. *Id.* Those logs, which hiQ has produced, included data corresponding to a window of time in 2020. Mot. 8.

---

[5]   "Scrapus Data Collections" and "Proxies Collections" are defined in LinkedIn's Motion at 4.

1    **D.    hiQ's Salesforce Account**

2         As LinkedIn notes, hiQ used Salesforce and had a "best practices" guide regarding the use

3    of its Salesforce account to track communications with hiQ's customers.  Mot. 9.  But in reality, hiQ

4    did not use Salesforce in that way.  hiQ's Vice President of Sales, Darin Medeiros, testified:

5              Q.  And while you were head of sales at hiQ, it was hiQ policy for the sales
           team and the account executives to log every customer interaction at Salesforce; is
6          that correct?

7              A.  No.  No, we had no automated way.  I mean, we tried, but they just didn't
           do it, right.  It – like to get like email or call activity into Salesforce, it is pretty
8          laborious, and so I would say we captured a small percentage of the actual activity.
           But the – the rule was, in fact, to – to do that, but the – the actual participation was
9          very low.

10   Ex. O (Medeiros Tr. 66:5-17).

11        Notwithstanding that hiQ's sales team did not have high participation rates with Salesforce,

12   hiQ understood that it should maintain the data from its Salesforce account for the purposes of

13   litigation.  LCE 14 at 780.  In May 2018, for example, hiQ's CTO wrote Mr. Medeiros—who at that

14   time was no longer a paid employee or consultant of hiQ (Ex. O (Medeiros Tr: 13:3-9)— that "we

15   need to export Salesforce before it expires."  LCE 14 at 780.  When Mr. Medeiros advised Mr.

16   Miller that Salesforce would not expire for many months, Mr. Miller said: "We should do an export

17   anyway just for good luck."  *Id.*  Unfortunately, hiQ did not ultimately perform that export.

18        While it is true that hiQ did not perform an export of its Salesforce account, a great deal of

19   data from that account exists in the quarter of a million documents that hiQ has produced during the

20   course of discovery—including the Salesforce data that hiQ itself actually used in the normal course.

21   *See* Ex. P (Weidick 3/18/22 Tr. 33:10-23) ("The other part of [Salesforce] that was critical to our

22   business was the reports that we derived from that which we used to operate the business as part of

23   our board meetings, our planning and forecasting.  Those reports are available, but Darin did not

24   have the raw data that those reports would have been derived from."); *id.* at Tr. 45:13-22) ("You

25   know, the [Salesforce] raw data has a lot of borderline nonsense in it; emails that are already

26   available, customer phone numbers that are already available.  It's a repository.  It is the reporting

27   that comes out of it that Darin and I quickly turned to to understand what had been preserved because

28   of the – because the documents would serve a purpose in those settings; monthly forecasts, weekly

1   pipeline reviews with the sales team, board meetings."). For example, exports and information from

2   Salesforce relating to hiQ's clients and prospects were routinely circulated to hiQ's executive team

3   via emails that have been produced. *See, e.g.*, Exs. S-V. Likewise, hiQ used Salesforce to generate

4   information for its board decks, which hiQ also produced. *See, e.g.* Exs. W-Y.

5         More than a year ago, during the parties' meet and confer process, hiQ advised LinkedIn

6   that hiQ used Salesforce but that its account had expired and the data once there had been deleted.

7   Ex. (9/8/21 Ltr.) at 3. In doing so, hiQ learned that Salesforce deleted the raw data from hiQ's

8   Salesforce instance around January 2020 after hiQ had been unable to pay its Salesforce bills. LCE

9   95 at 2085-6 (5/11/22 hiQ's First Resp. to LinkedIn's Interrogatory No. 16). hiQ, with the assistance

10   of counsel, immediately sought to retrieve that data, including through "[e]scalation into Salesforce

11   through our customer support, customer service, and multiple organizations at Salesforce to try to

12   reconstitute the data," (Ex. P (Weidick 3/18/22 Tr. 103:14-21)); but that data could not be retrieved.

13         **E.     hiQ's Chorus Account**

14         LinkedIn falsely claims that it was prevented from learning more about what might have

15   been in hiQ's Chorus account based on hiQ's supplemental interrogatory response produced "late

16   in the day on August 3, 2022." Mot. 10. LinkedIn forgets the facts. On May 20, 2022, prior to Mr.

17   Weidick's two additional days of deposition, hiQ served an amended deposition errata sheet for Mr.

18   Weidick's earlier March 18 deposition to clarify that hiQ "used join.me and Chorus to record various

19   calls or meetings, including sales calls, sales trainings, and internal meetings." Ex. P (Weidick

20   3/18/22 Tr. Amended Errata). Two days later, on May 22, hiQ again advised LinkedIn that its

21   Chorus subscription "was not renewed at the end of 2017" and that "Chorus deleted any data from

22   the account in early 2018." Ex. L. These notifications occurred before Mr. Weidick's two additional

23   days of deposition testimony during which LinkedIn could have asked questions about this Chorus

24   account or any other discovery.

25                                          *       *       *

26         While hiQ did not export the entirety of AWS, Splunk, and Salesforce, it was in dire financial

27   straits and hiQ's CEO was diligently working with his Board and hiQ's creditors to determine ways

28   to pay its bills and keep hiQ's services active. Ex. P (Weidick 3/18/22 Tr. 102:1-16). By September

2018, "and to this day," Mr. Weidick "ha[d] several hundred thousand dollars' worth of creditors . . . . .   There was a regular discussion with [hiQ's] board at who [it] could pay and who [it] couldn't pay."  *Id.*  Indeed, at times hiQ's CEO and its employees were forced to put their personal credit cards on accounts to keep the accounts active.  *Id.* 23:12-20.  At no point in time did hiQ direct AWS, Splunk, or Salesforce to delete any data in those accounts or intend for data to be lost, whether for some perceived litigation benefit or otherwise.  *Id.* at 117:14-18.

## **ARGUMENT**

Federal Rule of Civil Procedure 37(e) permits a court to impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  "If these requirements are satisfied, and if another party is prejudiced by the loss, under Rule 37(e)(1) the court 'may order measures no greater than necessary to cure the prejudice.'"  *Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 2957133, at *3 (N.D. Cal. May 23, 2016) (quoting Fed. R. Civ. P. 37(e)(1)).  "The court should take care, however, 'to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2)[.]'"  *Id.* (quoting Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment).

Rule 37(e)(2), in turn, is triggered "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2).  "Negligent or even grossly negligent behavior is insufficient to support sanctions under Rule 37(e)(2)."  *Aramark Management, LLC v. Borgquist*, 2021 WL 864067, at *6 (C.D. Cal. Jan. 27, 2021 (Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment).).  Upon a finding of intent, a court "may", but need not: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."  Fed. R. Civ. P. 37(e)(2).[6]

---

[6]  LinkedIn states that if the Court does not find that hiQ acted with intent, "then LinkedIn also relies upon inherent authority for its request for the full panoply of sanctions."  Mot. at 11, n.9.  As discussed, *infra* Section IV, the doctrine of inherent authority is plainly inapplicable.

## I.       LINKEDIN'S MOTION IS UNTIMELY

At the threshold, this Court should deny LinkedIn's Motion seeking sanctions relating to hiQ's Salesforce data because it is untimely.  LinkedIn waited nearly a year after it learned of the facts giving rise to the Motion to file it, long after the close of fact discovery and concurrently with its dispositive and expert motions *in limine*.

Federal courts in California "insist parties raise these types of claims as soon as reasonably possible after [uncovering] the facts that underlie the motion." *Larios v. Lunardi*, 442 F. Supp. 3d 1299, 1306 (E.D. Cal. 2020) (internal quotation marks omitted).  That makes sense, given that this District's Civil Local Rules state sanctions motions "must be made as soon as practicable after the filing party learns of the circumstances that it alleges make the motion appropriate."  Civil L.R. 7-8(c).  Further, "[i]t is well-established that 'unreasonable delay can render a spoliation motion untimely.'" *Larios*, 442 F. Supp. 3d at 1305 (collecting cases) (citation omitted); *see also MGA Ent., Inc. v. Nat'l Prod. Ltd.*, 2012 WL 4052023, at *4 (C.D. Cal. Sept. 14, 2012) ("It is generally agreed that a motion for sanctions, regardless of the source of authority for the imposition of sanctions, must be timely filed.").

The rationale behind the timeliness rule is, "in deciding a spoliation motion, the court may order that additional discovery take place either to develop facts needed to rule on the motion or to afford the party deprived of relevant evidence an additional opportunity to develop it from other sources" and "the least disruptive time to undertake this is *during* the discovery phase, not after it has closed." *Shackleford v. Vivint Solar Developer, LLC*, 2020 WL5203340 at *7 (D. Md. Sept. 1, 2020) (denying sanctions motion as untimely when filed after discovery closed) (emphasis in original).

hiQ advised LinkedIn a year ago that hiQ no longer had access to its Salesforce account and did not have an export of that data.  Ex. K (9/8/21 Discovery Ltr. from LinkedIn memorializing LinkedIn's understanding that the "Salesforce CRM database . . . has since been lost").  Had LinkedIn been concerned that the lack of any Salesforce export was prejudicial to LinkedIn, it should have complied with Local Civil Rule 7-8(c) and moved for sanctions at that time.  Specifically, LinkedIn could have requested sanctions in the form of mitigation from any purported

prejudice it believed it would suffer on account of the absence of a Salesforce export.  For example, LinkedIn could have sought additional discovery, including additional depositions beyond the numerical limit imposed by the Federal Rules, so it could seek further information from hiQ's third-party clients—the very information it now claims it is lacking in order to try to manufacture its assertion of prejudice, and in a form that would be more direct and more comprehensive than Salesforce data.

Instead, after nearly a **year-long** discovery period during which hiQ produced a quarter of a million documents, many of which relate to its client and prospective client relationships,[7] LinkedIn asks the Court to "employ terminating sanctions to dismiss all customer and prospective-customer related claims, including hiQ's Intentional Interference with Contract, Intentional Interference with Prospective Economic Advantage, and California Unfair Competition Law claims."  Mot. 25.  To be clear, with the exception of claims for declaratory relief, those are all of hiQ's claims.  As an "alternative" to an order dismissing these claims, LinkedIn asks the Court to throw out hiQ's damages expert[8] and preclude hiQ from offering any evidence of causation (*id.*)—sanctions which, of course, would likely amount to a dismissal of those claims as a practical matter.

Under these circumstances, LinkedIn's request for terminating sanctions on each of hiQ's affirmative claims must be denied as untimely.  *See*, *Cottle-Banks v. Cox Commc'ns, Inc.*, 2013 WL

---

[7]  *See, e.g.*, HCE 8 (IBM email), 9 (GoDaddy email), 13 (Hershey email) , 66 (eBay master agreement and sales orders), 67 (Hershey master agreement and sales orders), 68 (master agreement and sales orders, 69 (PayPal master agreement and sales orders); LCE 33 (Pfizer sales order), 34 (hiQ income statement), 40 (BMC master agreement), 48 (Honeywell purchase order), 49 (email thread with Entelo), 69 (purchase order), 70 (Gap master agreement ), 71 (Hartford master agreement), 72 (American Express master agreement and sales order), 74 (Capital One master agreement); 75 (Celgene sales order), 76-86 (additional client agreements and sales orders).

[8]  LinkedIn's request to preclude hiQ's damages expert, Benjamin Sacks, on this basis is beyond the pale.  As set forth in hiQ's opposition (ECF No. 363) to LinkedIn's *Daubert* motion (ECF No. 339), Sacks's "subset damages" opinion is based on, *inter alia*, an analysis of the actual contracts hiQ had with its customers, which have all been produced to LinkedIn, and his "full damages" opinion is based on an extensive analysis of a panoply of evidence, including hiQ documents (all produced), venture capital factors, academic literature, a dataset of 257 similarly situated startup companies, and well-established regression principles.  LinkedIn's argument is a naked attempt to impermissibly leverage preclusion based on the inadvertent loss of certain data because it cannot establish that Sacks's opinions should be precluded under *Daubert*, and should be rejected out of hand.

2244333, at *16 (S.D. Cal. May 21, 2013) (holding spoliation motion filed "almost nine months" after plaintiff learned of spoliation was untimely).  Had this motion been timely filed, then, from LinkedIn's perspective, any prejudice it may have suffered on account of the loss of raw Salesforce data may have been mitigated by, for example, certain discovery permissions.

Courts routinely deny sanctions motions filed after the close of discovery and/or contemporaneously with summary judgment motions.  *See, e.g.*, *Jarrell v. Wal-Mart Stores, Inc.*, 2021 WL 1169889, at *2 (D. Nev. Mar. 26, 2021) (denying motion for exclusion sanctions as untimely where movant sought sanctions "almost two years after it alleges it learned of [the violation]; long after discovery closed and on the eve of trial"); *Mahboob v. Educ. Credit Mgmt. Corp.*, 2021 WL 791853, at *2 (S.D. Cal. Mar. 1, 2021) ("Because waiting a year and a half to bring a spoliation motion is unreasonable and violates chambers rules, the portion of the motion concerning call data should be denied as untimely."), *report and recommendation adopted in relevant part*, 2021 WL 7448531 (S.D. Cal. Mar. 31, 2021); *Rhabarian v. Cawley*, 2014 WL 546015, at *3 (E.D. Cal. Feb. 11, 2014) (denying sanctions motion as untimely even where spoliation allegations were "troubling" because "the time to raise these issues was during discovery, and not after the deadline for dispositive motions."), *aff'd sub nom. Rahbarian v. Cawley*, 701 F. App'x 676 (9th Cir. 2017);   *Ferrone v. Onorato*, 2007 WL 2973684 *10 (W.D. Pa. Oct. 9, 2007) (spoliation argument should have been made in "appropriate discovery motion," and not in "opposition to summary judgment"), *aff'd*, 298 Fed. App'x. 190 (3rd Cir. 2008); *Glenn v. Scott Paper Co.*, 1993 WL 431161 at *17 n.3 (D.N.J. Oct. 20, 1993) (spoliation argument presented to defend a summary judgment motion was untimely, as the plaintiff did not raise the issues "during the discovery phase or bring them to the attention of the magistrate [judge]"); *see also Freeman v. Allstate Life Insurance Co.*, 253 F.3d 533, 537 (9th Cir. 2001) (affirming denial of motion in limine to exclude evidence because issue could have been prosecuted earlier during discovery before the magistrate judge).  Here, the deadline to move to compel fact discovery was May 25, 2022, (ECF No. 236 at 2), and LinkedIn should have moved for sanctions by that date at the latest—and, indeed, much earlier.

1  Accordingly, because LinkedIn unreasonably delayed filing a sanctions motion and has

2  otherwise failed to offer any justification for its tactical delay, its Motion should be denied as

3  untimely.  *See Leonard v. Denny*, 2020 WL 5039065, at *2 (E.D. Cal. Aug. 26, 2020), *report and*

4  *recommendation adopted*, 2020 WL 5891389 (E.D. Cal. Oct. 5, 2020) ("Plaintiff offers no

5  explanation as to why he did not file his motion during the time permitted after the parties completed

6  their discovery discussions, at which point he had been aware that the documents had not been

7  produced for a significant period of time, and the close of discovery.  Nor does he explain the lengthy

8  delay between the close of discovery and his filing of the spoliation motion.  The motion is clearly

9  untimely and will therefore be denied.").

10  **II.    LINKEDIN IS NOT ENTITLED TO RULE 37(E)(2) SANCTIONS**

11  LinkedIn is not entitled to sanctions under Rule 37(e)(2) because it cannot show that hiQ

12  possessed the requisite intent and because the requested sanctions seek far more relief than any

13  alleged harm LinkedIn even claims to have suffered.

14  **A.    hiQ Did Not "Intend To Deprive" LinkedIn of Evidence**

15  The harsh sanctions permissible (though not required) under Rule 37(e)(2) may "***only***" be

16  imposed "upon finding that [hiQ] acted with the intent to deprive [LinkedIn] of the information's

17  use in the litigation."  Fed. R. Civ. P. 37(e)(2) (emphasis added).  "Intent to deprive," not merely

18  "intent to destroy," is a very high bar.  *See Laub v. Horbaczewski*, 2020 WL 9066078, at *6 (C.D.

19  Cal. July 22, 2020) ("Accordingly, although Defendants may have established that Plaintiff Laub

20  negligently destroyed relevant evidence, they have not established that he did so with the specific

21  intent to deprive Defendants of the use of these text messages in this litigation.").  As the 2015

22  Committee Notes on Rule 37(e)(2) explain:

23  > Adverse-inference instructions were developed on the premise that a party's
> intentional loss or destruction of evidence to prevent its use in litigation gives rise to

24  > a reasonable inference that the evidence was unfavorable to the party responsible for
> loss or destruction of the evidence.  Negligent or even grossly negligent behavior

25  > does not logically support that inference.  Information lost through negligence may
> have been favorable to either party, including the party that lost it, and inferring that

26  > it was unfavorable to that party may tip the balance at trial in ways the lost
> information never would have.  The better rule for the negligent or grossly negligent

27  > loss of electronically stored information is to preserve a broad range of measures to
> cure prejudice caused by its loss, but to limit the most severe measures to instances

28  > of intentional loss or destruction.

1    LinkedIn's arguments in favor of finding "intent" here fail to overcome this high bar for three

2    reasons.

3         **First**, LinkedIn is simply wrong on the law.  LinkedIn's attempt to show "intent" through a

4    watered down "failure to preserve" evidence standard is entirely inconsistent with the plain text of

5    Rule 37(e)(2), the Committee notes interpreting that rule, and even the case law on which LinkedIn

6    itself relies on.  *See* Mot. 15-18.  While LinkedIn claims that "[a] knowing failure to save evidence

7    relevant to a litigation—such as the scraping activity records and Salesforce CRM Database here—

8    satisfies the intent requirement of Rule 37(e)(2)"—that is not the law.

9         Unlike the pre-2015 Rule that prohibited courts from imposing sanctions on a party whose

10   electronic material was "lost as a result of a routine, good-faith operation of an electronic system,"

11   under the new regime, Rule 37(e) "authorizes and specifies measures a court may employ if

12   information that should have been preserved is lost, and specifies findings necessary to justify these

13   measures."   Fed. R. Civ. P. 37(e)(1) (advisory committee's note to 2015 amendment).

14   Consequently, parties seeking spoliating sanctions for electronic discovery "face a tougher climb

15   than in years past."  *Scalpi v. Amorim*, 2018 WL 1606002, at *16 (S.D.N.Y. Mar. 29, 2018); *see,*

16   *e.g.*, *Nuvasive, Inc. v. Madsen Med., Inc.*, 2016 WL 305096, at *2-3 (S.D. Cal. Jan. 26, 2016)

17   (vacating a pre-amendment decision to impose an adverse inference instruction against a party for

18   not enforcing compliance with a litigation hold, because the record did not support intentional

19   spoliation under the amended Rule).

20        While LinkedIn's primary support for its "failure to preserve" standard—*Fourth Dimension*

21   *Software v. DER Touristik Deutschland GmbH*, 2021 WL 5919821 (N.D.Cal. Dec. 15, 2021) (Mot.

22   16-18)—post-dates the amendment, it relies on an inapplicable pre-2015 amendment caselaw, *Leon*

23   *v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006).  See *Fourth Dimension*, 2021 WL 5919821,

24   at *10 (quoting *Leon*, 464 F.3d at 959).  As other courts have noted, such cases are inapt as they

25   were decided prior to the more stringent "intent" requirements under the 2015 amendments.[9]  *See*

26

27   _____

     [9]   For similar reasons, LinkedIn's reliance on *Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F.
28   Supp. 3d 570, 580 (S.D.N.Y. 2017), is misplaced.  The *Ottoson* court relied on *Residential Funding*
     *Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), in stating that, in addition to Rule

*Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 48 (D.D.C. 2019) ("On the contrary, Rule 37(e)(2) rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of [(e)(2) sanctions] on a finding of negligence or gross negligence." (cleaned up)); *Ungar v. City of New York*, 329 F.R.D. 8, 14 (E.D.N.Y. 2018) ("Many of the cases Plaintiff cites are inapposite, as they are traceable to *Residential Funding* and therefore can no longer be considered valid for the proposition that mere negligence is sufficient for an adverse inference instruction.") (internal citation omitted).

        *Second*, *Fourth Dimension* and the other cases LinkedIn cites support a determination that hiQ acted, at most, negligently.  As the court in *Fourth Dimension* explained: "In determining whether deletion is intentional, courts assess the circumstances of the deletion, including 'the timing of the destruction' and 'the method of deletion (*e.g.*, automatic deletion vs. affirmative steps of erasure)." *Fourth Dimension*, 2021 WL 5919821, at *10 (quoting *Laub v. Horbaczewski*, 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020)).  Both factors militate in hiQ's favor.

        In *Fourth Dimension*, the Court found a party to have intentionally destroyed records where that party affirmatively destroyed records "shortly after receiving notice that [plaintiff] was prepared to file suit." *Id.* at *10.  And indeed, courts generally focus on the short period between receipt of a notice of litigation and deletion in finding deletion intentional.  *See Federal Trade Comm. v.*

_____

37(e)(2), "the court may impose discovery sanctions pursuant to its 'inherent power to manage its own affairs." *Ottoson*, 268 F. Supp. 3d at 580.  Then, citing a string of inapplicable pre-amendment cases, the Court concluded that "[a]n adverse inference instruction is warranted here because Defendants have provided sufficient evidence that additional communications between Plaintiff and her witnesses likely existed, were not produced, and were relevant." *Id.* at 584.  *Sines v. Kessler*, is likewise unpersuasive.  2021 WL 4943742 (W.D.Va. Oct. 22, 2021).  There, the Court stated that "The Fourth Circuit, like most circuits, has yet to interpret the new Rule 37(e) and the 'standard for proving intent under that rule is not settled.'" *Id.* at *3.  The Court found that "Heimbach's professed inability to recall almost *any* fact about the steps he took (or did not take) to preserve or recover this ESI, combined with his occasionally flippant or dismissive answers to opposing counsel's questions at his court-ordered deposition, 'demonstrates a contempt' for his discovery obligations," which the Court found "reinforces th[e] conclusion" that he acted with an "intent to deprive." *Id.* at *10-11.  To the contrary, here, as LinkedIn itself acknowledges, hiQ took its preservation obligations seriously.  Finally, in *O'Berry v. Turner*, while the Court stated that it was applying Rule 37(e)(2) as amended, it ultimately concluded that the parties "acted with the intent to deprive Plaintiffs" as a result of losing the paper copy of a document during the course of an office move.  2016 WL 1700403 (Apr. 27, 2016).  Respectfully, *O'Berry* did not apply the Rule 37(e) intent standard that the Ninth Circuit has adopted, and thus is not informative.

*Noland*, 2021 WL 3857413, *12 (D. Ariz. Aug. 30, 2021).  ("The most decisive factor [in the 'intent' analysis] is the timing of the installation and use of Signal and ProtonMail.  The Individual Defendants installed these apps in late May 2019, *one day* after Noland discovered the FTC was investigating him and SBH").  By the same token, the more removed the loss is from notice of litigation, the stronger the evidence that the loss was ***not*** intentional.  *See Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.,* 2020 WL 1809191, at *10 (D. Md. Apr. 9, 2020) (finding a delay of "more than a month" between receipt of subpoena and routine deletion of records "suggests that Sinclair did not intend to deprive Gobble of evidence for litigation but merely allowed the routine e-mail deletion to proceed in accordance with a timeframe and procedures established before it received the Subpoena.").  Here, the data at issue was in existence for not months, but ***years*** after hiQ received the cease and desist and that data was lost through automatic processes.  As such, the relevant parts of *Fourth Dimension* that Rule 37(e)(2) has not supplanted militate in favor of finding hiQ lacked the requisite intent to support Rule 37(e)(2) sanctions when the data was inadvertently lost.

LinkedIn tries to twist communications by hiQ employees or contractors indicating an awareness that certain repositories should be preserved to show malintent.  *See* Mot. 12 (citing an email stating: "[F]or posterity / legal reasons," "[w]e need to export Salesforce before it expires."); *id.* (citing hiQ's CTO testimony that hiQ should have archived all AWS data); Mot. 14 (citing a statement that Splunk logs could be "important for legal issues").  But rather than evidencing an intent to deprive LinkedIn of evidence, these statements reflect hiQ's consciousness about preserving material for litigation, even if hiQ's last remaining employees failed in some instances to fully act on those statements.  If anything, these statements reflect that at most there may have been negligence in the preservation of data—not an effort to seek a tactical litigation or other advantage by the intentional destruction of data—particularly on a record where LinkedIn has proffered not a shred of evidence of any such intent, just unsupported speculation.

LinkedIn's reliance on *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410 (W.D.N.Y. 2017) (Mot. 16-17), is similarly misplaced, and LinkedIn's representation of the facts of that case

misleading.  In *Moody*, the Court found defendant's explanation as to how data was lost not credible, explaining:

> According to defendants, although Lewandowski uploaded certain event recorder data to the Vault within hours of Moody's accident, no one attempted to access or review the data at any time during the next four years, despite the fact that defendants had been sued by the injured party and the data—had it been uploaded correctly—would have established relevant and material facts, such as: (1) whether the bell and/or horn were sounded prior to train movement; (2) how fast the train was moving when Moody was struck; and, (3) whether the brakes had been applied.  The proposition that a sophisticated railroad transportation corporation such as CSX could be involved in a serious accident in which an individual lost a limb and thereafter fail for four years to review critical data relating to how that accident occurred is unfathomable.  The implausible nature of defendants' narrative is heightened by their complete inability to explain what happened to Lewandowski's laptop after he returned it to Jacksonville.  Of course, a court is not required to credit explanations for the loss of the relevant evidence that it finds incredible.

*Id.* at 426-27.  The Court in *Moody* also took issue with the fact that defendant had not bothered to make the "inquiry reasonable under the circumstances" required by Rules 11 and 26(a) before answering Moody's complaint and serving initial disclosures.  Had they taken such inquiry (e.g., accessing the data from the black box), defendants would have noticed that the data was missing at a time when it was still capable of being retrieved.  *Id.* at 427.  Thus, the Court inferred intent based on defendant's allowing the original data to be overwritten and destruction or recycling of the laptop that would have contained a backup of that data, as well as the incredible claim that they failed to make any effort over four years to confirm that the data was preserved.  *Id.* at 430.

In comparison to *Fourth Dimension* and *Moody*, here, both "'the timing of the destruction' and 'the method of deletion (*e.g.*, automatic deletion vs. affirmative steps of erasure)," *Fourth Dimension*, 2021 WL 5919821, at *10, militate in hiQ's favor.  Unlike in *Fourth Dimension* where the Court found the deletion of data just a day after the party learned about the potential dispute to be indicative of an intent to deprive, here, the automatic deletion of certain materials occurred ***years*** after hiQ learned of LinkedIn's potential claims against it.  HCE 17 (C&D); LCE 95 at 2084-7 (hiQ's Second Supp. Resp. to LinkedIn's Interrogatory No. 16).  As LinkedIn itself admits, hiQ's Splunk data "was completely accessible to hiQ until the point at which Splunk discontinued its services to hiQ."  Mot. 8 (citing Murphy Devorakonda deposition).  Likewise, data from hiQ's Salesforce account was deleted by Salesforce for nonpayment around January 2020—nearly three

years after hiQ received the C&D.  LCE 29 at 1389-92 (hiQ's Second Supp. Resp. to LinkedIn's Interrogatory No. 16).  And, AWS deleted the data in hiQ's AWS instance for nonpayment in or around September 2020—well over two year years after hiQ received the C&D.  *Id.*

Moreover, hiQ's conduct after learning about the automated deletion of data from its cloud storage accounts undercuts any claim that hiQ ever sought to prevent the use of such material in litigation.  Shortly after the parties' discovery discussions began, hiQ, acting through counsel, contacted each of AWS, Splunk, and Salesforce to endeavor to retrieve the deleted raw data.  Ex Z ¶ 3.  And, in the case of Splunk, hiQ in fact succeeded in recovering some of that data.  LCE 29 at 1389-92 (hiQ's Second Supp. Resp. to LinkedIn's Interrogatory No. 16); Mot. 8.  Courts have found similar attempts to recover lost material as indicative of a lack of intent.  *See, e.g.*, *Gaina v. Northridge Hosp. Med. Ctr.*, 2018 WL 6258895, at *5 (C.D. Cal. Nov. 21, 2018) (finding no intent where "Plaintiff . . . contacted her service provider, attempted to recover her text messages from her other devices and applications, and contacted people with whom she had texted" to recover lost data); *see also Franklin v. Shelby Cnty. Bd. of Educ.*, 2021 WL 6066673, at *4 (W.D. Tenn. Sept. 28, 2021) (denying sanctions in part because "after discovering that [recordings] were fully overwritten, [plaintiff] took steps to retrieve them"), *report and recommendation adopted in relevant part*, 2021 WL 5449005 (W.D. Tenn. Nov. 22, 2021); *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 42, 48-49 (D.D.C. 2019) (considering defendant's "attempt[] to recover" lost emails in finding no intent for purposes of Rule 37(e)(2)).

*Third*, and finally, LinkedIn's attempt to paint the circumstances of hiQ "retain[ing] *some* material" but not other material as suggestive of intent (Mot. 17-18), is belied by both the facts and law.  Unless a party has deleted every shred of relevant evidence, every case where spoliation is at issue necessarily involves a situation where some evidence has been deleted and some has not.  In its efforts to show a non-existent intent, LinkedIn suggests that hiQ undertook a targeted and intentional destruction campaign (*id.*), but common sense shows the futility of this argument.  For example, LinkedIn claims that hiQ "kept the evidence that supported its story that it was only scraping publicly available data, but deleted evidence of how effective (or ineffective) hiQ's scrapers were at skirting LinkedIn's general technical defenses and obtaining member profiles, and

how much of a burden this placed on LinkedIn." Mot. 17.  But that is simply not true, and one need

look no further than LinkedIn's Summary Judgment Motion wherein it relies on and enumerates

hiQ-produced documents relating to ban rates.  ECF No. 336 at 7-8.  The more glaring deficiency

in LinkedIn's argument, however, is its failure to explain why hiQ would have decided to target just

the subset of data that is the subject of the Motion while simultaneously producing ***over 730,000***

***pages of documents*** that, as discussed *infra*, Section III.A, cover many of the same topics and areas.

*Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at \*22 (S.D.N.Y June 20, 2019) ("Defendants

provide no explanation for why Karsch would have intentionally damaged the server containing one

of his email accounts – in an unsuccessful effort to deprive defendants of those emails – while

sparing his three other accounts, including the account he primarily used for communications

relevant to this action."); *see also Meta Platforms, Inc. v. BrandTotal Ltd.,* 2022 WL 1990225, at

\*6 (N.D. Cal. June 6, 2022) ("While BrandTotal certainly should have recognized its obligation to

preserve those records, it is not hard to imagine that BrandTotal's employees might have overlooked

their transient diagnostic log as a source of relevant and discoverable information while they,

presumably, took steps to preserve more obvious sources of relevant information like email accounts

and the databases they used to prepare analysis for BrandTotal's corporate clients.").

Although LinkedIn attempts to paint hiQ as a nefarious actor that intentionally deleted the

documents in these specific accounts for some litigation benefit, the true story is that hiQ was in a

period of intense employee turnover and corporate shake up that resulted in certain tasks falling

through the cracks.  The mere fact that a relatively small subset of material was lost in contravention

of a litigation hold does not indicate "intent."  *See Hernandez v. Tulare Cnty. Correction Ctr.*, 2018

WL 784287, at \*5 (E.D. Cal. Feb. 8, 2018) ("Upon consideration of the evidence in the record, it

appears that this failure was a result of Tulare County either being misinformed about the relevant

scope of this litigation or that the staff responsible for the preservation were poorly trained.

However, the record does not contain any evidence suggesting that the failure to preserve the video

was a result of bad faith or intent to deprive."); *Borum v. Brentwood Vill., LLC*, 332 F.R.D. 38, 49

(D.D.C. 2019) ("Although the Court agrees that One DC exercised significantly inadequate record-

keeping practices, this alone does not satisfy the stringent standard of Rule 37(e)(2).").

1    Because LinkedIn has failed to show any more than the fact of deletion despite efforts to

2    retain these documents, it has not shown that hiQ acted with the required intent and the Court should

3    deny Rule 37(e)(2) sanctions.

4        **B.    LinkedIn's Rule 37(e)(2) Sanctions Would Amount To A Windfall**

5        Because hiQ did not act with "intent to deprive" LinkedIn of evidence, LinkedIn is not

6    entitled to any sanctions.  Yet, LinkedIn asserts that "***all three sanctions***" available under Rule

7    37(e)(2) are appropriate and thus asks this Court to "order evidentiary sanctions up to and including

8    dismissal of hiQ's claims, and also award monetary sanctions."  Mot. 24.  But even if the Court

9    finds that hiQ acted with intent, that finding "does not require a court to adopt any of the measures

10   listed in subdivision (e)(2)."  *Spencer v. Lunada Bay Boys*, 2017 WL 10518023, at *6 (C.D. Cal.

11   Dec. 13, 2017), (citing Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment).

12   *report and recommendation adopted*, 2018 WL 839862 (C.D. Cal. Feb. 12, 2018), *aff'd,* 806 F.

13   App'x 564 (9th Cir. 2020).

14       Instead, if spoliation is found, courts often consider three factors to determine whether and

15   what type of sanctions to issue: "(1) the degree of fault of the party who altered or destroyed the

16   evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser

17   sanction that will avoid substantial unfairness to the opposing party."  *Cardinal v. Lupo*, 2019 WL

18   4450859 at *3 (N.D. Cal. Sep. 17, 2019); *see also* Fed. R. Civ. P. 37(e)(1) advisory committee's

19   note to 2015 amendment) ("The remedy should fit the wrong, and the severe measures authorized

20   by [subdivision (e)(2)] should not be used when the information lost was relatively unimportant or

21   lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the

22   loss")).  Here, hiQ's degree of fault is low, the prejudice to LinkedIn, if any, is minimal, and

23   LinkedIn's proposed sanctions, if granted, would amount a windfall.

24       1.    LinkedIn's Sanctions Requests Relating to Scraping Should be Denied

25       LinkedIn asks this Court to "presume that LinkedIn's expert Xiaofeng Wu's analysis is

26   correct and that hiQ's scrapers made at least fifty billion requests on LinkedIn's servers."  Mot. 24.

27   LinkedIn also asks the Court to "instruct the jury that hiQ had a duty to preserve the scraping activity

28   records, that hiQ failed to preserve them, and because of that, the jury must presume that the data

1   would have shown that hiQ's scrapers made at least fifty billion requests on LinkedIn's web servers

2   in the analyzed period." *Id.*  Finally, LinkedIn asks the Court to "preclude hiQ from offering any

3   evidence to the contrary or otherwise disputing that analysis in connection with summary judgment,

4   Rule 702 motions, and trial." *Id.*

5         Each of the above-requested sanctions is ostensibly tethered to the loss of certain scraping-

6   related Splunk data.  *See* Mot. 24.  However, as discussed *supra*, Section II.A, hiQ's fault for that

7   loss—which occurred due to automatic deletion functions—is low, so the first factor courts consider

8   in issuing a Rule 37(e)(2) sanction is in hiQ's favor.  Further, as discussed *infra*, Section III.A, any

9   prejudice to LinkedIn resulting from the loss of scraping data is minimal given the availability of

10  vast amounts of similar data in hiQ's productions, as well as the information already within

11  LinkedIn's possession relating to hiQ's scraping (*see* ECF No. 271-5 at ¶ 2  (9/10/21 declaration of

12  LinkedIn's proffered "expert", Mr. Wu, discussing its logs of hiQ's scraping activity)).  Thus, the

13  second factor of the Court's sanctions analysis also leans in hiQ's favor.

14        Finally, as to the question of "whether there is a lesser sanction that will avoid substantial

15  unfairness to the opposing party," *Cardinal*, 2019 WL 4450859, at *3, the answer must be "yes" as

16  to each of LinkedIn's requested sanctions.

17        LinkedIn's sanctions request that Mr. Wu's report would be taken as true (by both this Court

18  and the jury) and would not be permitted to be challenged would substantially prejudice hiQ in light

19  of the absurdity of Mr. Wu's conclusions against the record evidence.  For example, in Mr. Wu's

20  September 2021 Declaration in support of LinkedIn's motion to dissolve the TRO, he explained that

21  "LinkedIn tracks and logs requests to access LinkedIn's website, including the IP address associated

22  with each request. . . . As part of its log, LinkedIn records the path that is accessed, which reflects

23  whether the request is for a profile or non-profile view."  ECF No. 271-5 at ¶ 2.  At that time, Mr.

24  Wu stated that between the 11-month period of August 14, 2017 through September 30, 2018, hiQ

25  made approximately 75 ***million total*** requests to LinkedIn profile pages, with 49,648 average visits

26  per day.  *Id.* at ¶ 6).  This, of course, is alarmingly far from the "***at least 50 billion***" requests Mr.

27  Wu now posits hiQ made during an 18-month period.  Mot. 20.  LinkedIn does not provide any

28  explanation for why the data at issue in its Motion would support Mr. Wu's conclusion and hiQ (and

the fact finder) should be entitled to vet Mr. Wu's figures, including with contemporaneous, ordinary course business records that hiQ produced during this litigation speaking more credibly to its scraping efforts. *See, e.g.*, Exs. A-H (Splunk dashboards). A ruling in LinkedIn's favor would substantially hamper the truth-seeking process. If the Court (and jury) were to simply accept Mr. Wu's untested figures, LinkedIn would be getting a windfall.

In any event, even if the Court were inclined to grant either a permissive adverse inference or "the quite extraordinary relief . . . of mandatory adverse inference instructions," *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7389417, at *3 (N.D. Cal. May 13, 2020)—including that  the jury "presume that, prior to hiQ's receipt of the C&D letter, LinkedIn's general technical defenses had blocked hiQ's anonymous scraping from collecting data to such a degree that hiQ could no longer effectively scrape LinkedIn profiles" (Mot. 24)—the Court should decline to make such a determination until ***after*** the evidence has been presented during trial. *See Spencer*, 2017 WL 10518023, at *12 ("Rule 37(e)(2) does not prohibit a court from allowing the parties, as a measure under subdivision (e)(1), to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision.)" At that point, the Court will be better able to engage the propriety of such an instruction. *Id.* at *12. Further, even if the Court is inclined to grant an instruction on the quantum of hiQ's scraping requests to LinkedIn's servers, that instruction should be narrowly tailored under these circumstances, and should not include an instruction that the reason the jury should presume a specific number of requests is because hiQ failed to preserve evidence, which would be far "greater than necessary to cure the [limited (if any)] prejudice." Fed. R. Civ. P. 37(e)(1).[10]

---

[10]   LinkedIn's cited cases (Mot. 17) are easily distinguishable. In *Ronnie Van Zant, Inc. v. Pyle*, the missing text messages were the "principal" source of information related to an "important piece of the puzzle", the relationship between a party and a contractor, without which "the precise nature and frequency of those communications c[ould not] be verified." 270 F.Supp.3d 656, 670 (S.D.N.Y. 2017). Here, by contrast, there are ample sources of produced evidence relating to the subjects (i.e. the extent of scraping and hiQ's customer relationships) that could address the missing material. Likewise, *Hice v. Lemon*, 2021 WL 6053812, at *6 (E.D.N.Y. Nov. 17, 2021) is inapposite, as that case involved purposeful selective deletion of messages from a single source, as well as "compelling

1

### 2.      The Court Should Not Dismiss hiQ's Claims

2      LinkedIn asks the Court to dismiss each of hiQ's claims because hiQ does not have access

3 to the raw Salesforce data.  LinkedIn claims that "[t]he status of hiQ's customers and prospects goes

4 straight to the heart of hiQ's affirmative claims, and no lesser sanction could remedy the prejudice

5 that LinkedIn has suffered."  Mot. 25.  As discussed, *supra*, Section I, LinkedIn's Motion for

6 sanctions relating to the Salesforce instance is plainly untimely, and therefore should be denied.  The

7 Motion should also be denied because LinkedIn has not shown the requisite intent.  However, should

8 the Court determine that LinkedIn is entitled to sanctions, case-dispositive sanctions are not

9 warranted under these facts.

10      As with the loss of data from Splunk, hiQ's degree of fault for the loss of Salesforce data is

11 low where the data was not affirmatively deleted by hiQ.  Likewise, as discussed, *infra*, Section

12 III.A, any prejudice LinkedIn might claim to have suffered as a result of not having access to a full

13 expert of raw Salesforce data is minimal, in light of the troves of evidence in the record either

14 coming from that Salesforce export or duplicating what may have existed in that export.  Finally, if

15 the Court finds hiQ's conduct was sanctionable, it must be the case that "there is a lesser sanction

16 that will avoid substantial unfairness" to hiQ than a dismissal of each of hiQ's (non-declaratory

17 judgment) claims.  *See Cardinal*, 2019 WL 4450859 at *5; *see also* Fed. R. Civ. P. 37(e)(1) advisory

18 committee's note to 2015 amendment) ("The remedy should fit the wrong, and the severe measures

19 authorized by [subdivision (e)(2)] should not be used when the information lost was relatively

20 unimportant or lesser measures such as those specified in subdivision (e)(1) would be sufficient to

21 redress the loss")).

22 ## III.      LINKEDIN IS NOT ENTITLED TO RULE 37(E)(1) SANCTIONS

23      Sanctions under Rule 37(e)(1) are only permissible "upon finding prejudice to another party

24 from loss of the information."  Fed. R. Civ. P. 37(e)(1).  "Prejudice exists where 'the [spoiling

25 party's] actions impaired [the moving party's] ability to go to trial or threatened to interfere with the

26 rightful decision of the case.'"  *RG Abrams Ins. v. L. Offs. of C.R. Abrams*, 2022 WL 3133293, at

27

28 circumstantial evidence of Plaintiff's intent to subvert the judicial process", which is utterly absent
here.

*29 (C.D. Cal. July 1, 2022) (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988)).   Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other", but instead "leaves judges with discretion to determine how best to assess prejudice in particular cases."   Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

      **A.**      **LinkedIn Suffered No Prejudice**

              **1.**      LinkedIn Suffered No Prejudice Regarding the Scope of hiQ's Scraping

      "The availability of other sources or types of evidence, in addition to the despoiled evidence" is a basis to deny sanctions. *See Wallace v. Martinez*, 2022 WL 2872998, at *7 (E.D. Cal. July 21, 2022) (citing *Medical Laboratory Manag. v. Am. Broadcasting*, 306 F.3d 806, 824 25 (9th Cir. 2002)).

      LinkedIn avers that "[t]he scraping activity records would have shown very clearly the number of requests to LinkedIn's servers that hiQ's scraping bots made over the years."  Mot. 19. But LinkedIn fails to explain why the ***over 600 daily Splunk scraping dashboards*** in addition to other documentation concerning hiQ's scraping efforts that hiQ produced do not do ***exactly that***. The scraping dashboards, for example, were created in the regular course of business, and appear in hiQ's productions from November 11, 2016 to July 7, 2020.  Exs. A-H (sampling of Splunk dashboards spanning 2016-2020).  These dashboards showed numerous statistics relating to hiQ's scraping technology, including information regarding the number of requests hiQ made to LinkedIn's servers, as well as the ban rates of those requests.  *Id.*  And if that were not enough, hiQ produced communications between its engineers regarding the success rate of hiQ's scraping attempts throughout the relevant period—documents that LinkedIn itself relies on in support of its Motion for Summary Judgment.  *See* LCE at 51, 770, 1173-4, 1258-9, 1616, 1626-27.  LinkedIn does not claim—because it cannot—that it did not have the benefit of troves of data relating to the number of requests hiQ's scraping bots made to LinkedIn over the years.  *See* Mot. 19-20.

      Against the existing record that clearly shows the activity of hiQ's scraper, LinkedIn simply cannot show it has been prejudiced by not having the entirety of hiQ's raw scraping data.  *See, e.g.*, *Gallagher v. Magner*, 619 F.3d 823, 844 (8th Cir. 2010) ("There is no basis for inferring that the

1  missing emails would be of a different character than the emails already recovered and produced.

2  Therefore, we agree that Appellants have not demonstrated the requisite prejudice.").

3          2.    <u>LinkedIn Suffered No Prejudice With Respect to Salesforce Data</u>

4        LinkedIn similarly cannot show it has been prejudiced by hiQ's inability to produce an

5  export of raw data from hiQ's Salesforce account.  LinkedIn claims that "[t]he full CRM Database

6  is the only contemporaneous evidence of what relationships hiQ had, what existing customer

7  contracts LinkedIn supposedly interfered with, and whether hiQ's customers opted not to renew

8  their contracts because they were dissatisfied with hiQ's products or some other reason unrelated to

9  LinkedIn." Mot. 23.  This is simply untrue.

10        hiQ's production includes many documents which include precisely the information

11  LinkedIn claims only Salesforce contained.  For example, hiQ produced email communications

12  between hiQ and its clients and prospective clients. *See, e.g.*, HCE 8, 9, 13; Ex. P (Weidick 3/18/22

13  Tr. 45:8-16) (Salesforce raw data included "emails that are already available, customer phone

14  numbers that are already available").  Of course, hiQ also produced its actual contracts with clients,

15  further evidencing what contractual relationships hiQ had.[11]   hiQ likewise produced numerous

16  exports generated from Salesforce in the regular course of business, including exports that went into

17  Board decks and were routinely secured to hiQ's executives.  Exs. S-W.  LinkedIn cannot "show

18  that the emails [and exports] that do remain do not paint a full picture." *Warner Records Inc. v.*

19  *Charter Commc'ns*, 2022 WL 1567142, at *2 (D. Colo. May 18, 2022) (denying sanctions motion

20  for this reason).

21        Even if hiQ had not produced the same type of information that LinkedIn claims it needed

22  specifically from Salesforce, the record evidence suggests that LinkedIn is strategically over valuing

23  the robustness of hiQ's Salesforce instance.  *See* Mot. 22.  Although hiQ had a "best practices"

24  document outlining how sales representatives ***should*** use Salesforce, (Mot. 22), LinkedIn disregards

25

26  ---

[11]   *See* LCE 1867-1902 (Allstate); LCE 1706-15 (American Express); LCE 1496 (BMC); LCE

27  1733-88 (Capital One); LCE 1835-65 (Comcast); LCE 1794-1816 (eBay); LCE 1664-82 (Gap); LCE 1684-1704 (Hartford); LCE 1965-2009 (Hershey); LCE 1587-92 (Honeywell); LCE 1420-22

28  (Pfizer); LCE 2011-28 (BNY Mellon); LCE 1829-33 (Box); LCE 1789-92 (Celgene); LCE 2030-56 (PayPal); LCE 1818-28 (UTC).

1  the testimony of hiQ's Vice President of Sales, Darin Medeiros, to the effect that Salesforce was

2  ***not*** utilized in that way. Ex. O (Medeiros Tr. 66:5-17) ("I mean, we tried, but they just didn't do it,

3  right.  It – like to get like email or call activity into Salesforce, it is pretty laborious, and so I would

4  say we captured a small percentage of the actual activity.  But the – the rule was, in fact, to – to do

5  that, but the – the actual participation was very low.").

6      Having been unable to demonstrate any prejudice by the loss of raw data, LinkedIn's Motion

7  for sanctions under Rule 37(e)(1) should be denied.

8          **B.     Any Attorneys' Fees Award Would Be Improper**

9      Even if this Court finds that LinkedIn has been prejudiced, it is not entitled to its requested

10  sanctions under Rule 37(e)(1).  LinkedIn seeks "attorneys' fees and costs for this motion, as well as

11  the costs associated with analysis directed by Mr. Wu."  Mot. 25.  Rule 37(e)(1) requires that

12  sanctions be "no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1).  Because,

13  as discussed, *supra*, Section III.A, LinkedIn has not been prejudiced, any award of fees would be

14  improper.

15      However, even if this Court finds that LinkedIn has been prejudiced, it should still decline

16  to award LinkedIn fees or costs associated with the Motion because, given hiQ's precarious financial

17  position—which is directly caused by LinkedIn's own unlawful conduct—such an award would be

18  a case-ending sanction.  Rule 37(e)(1) does not countenance such a windfall.  *See SiteLock LLC v.*

19  *GoDaddy.com LLC.*, 2022 WL 3716499, at *9 (D. Ariz. Aug. 29, 2022) (declining to "impose such

20  disproportionate, windfall-producing sanctions" for the "destruction of evidence that was [ ]

21  potentially helpful" for the spoliating party).  "Care must be taken . . . to ensure that curative

22  measures under subdivision (e)(1) do not have the effect of measures that are permitted under

23  subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use

24  in the litigation."  Fed. R. Civ. P. 37(e) (advisory committee's note to 2015 amendment).

25      Furthermore, to the extent LinkedIn seeks the "costs associated with analysis directed by

26  Mr. Wu," (Mot. 25) that request should be denied.  As discussed, *supra*, there is sufficient evidence

27  in the record from which Mr. Wu—or LinkedIn's non-employee experts—could seek to understand

28  the extent of hiQ's access requests to LinkedIn's servers.  LinkedIn fails to explain how Mr. Wu's

analysis could not have been prepared with the reams of material hiQ did produce relating to its scraping, and with a higher degree of accuracy.  hiQ is not responsible for LinkedIn's wasteful inattention and hiQ should not be made to pay the salaries of LinkedIn's own employees.  *See* Ex. R (Wu Decl. 36:13-24) (testifying he is not being paid beyond his salary).  LinkedIn cannot turn its sanctions motion into request for a windfall, *see SiteLock LLC*, 2022 WL 3716499, at *9, and hiQ should not be forced to pay for LinkedIn's overreach.  *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 2022 WL 1990225, at *9 (N.D. Cal. June 6, 2022) (concluding, "[b]ased on Meta's overreach in seeking a more extreme remedy under Rule 37(e)(2)," that "not all of the fees expended in bringing this motion were reasonably incurred" and ordering BrandTotal to reimburse Meta a percentage of those fees and costs).  The Court should, therefore, deny this request.

## IV.   THE DOCTRINE OF INHERENT AUTHORITY IS INAPPLICABLE

LinkedIn states that if the Court finds that hiQ did not act with intent, "then LinkedIn also relies upon inherent authority for its request for the full panoply of sanctions."  Mot. 11, n.9.  But, contrary to LinkedIn's position, and, as the Ninth Circuit has made clear, the current Rule 37(e) plainly forecloses the application of this doctrine.  *See, e.g.*, *Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018) (rejecting the "fram[ing] of the sanctions issue as invoking the district court's inherent authority" because "at the time the sanctions motion was filed, sanctions were governed by the current version of Rule 37(e)"); *see also Chinitz.,* 2020 WL 7389417, at *4 ("The Court, therefore, does not have the inherent authority to impose adverse inference instructions because the evidence in question . . . consists of ESI[,]" and thus FRCP 37(e) controls.); *see also Matthew Enter., Inc. v. Chrysler Grp. LLC*, 2016 WL 2957133, at *1 (N.D. Cal. May 23, 2016) ("The committee also sought to foreclose "reliance on inherent authority or state law to determine when certain [curative or sanctioning] measures should be used.").

## <u>CONCLUSION</u>

For the foregoing reasons, LinkedIn's Motion should be denied.

Dated: September 2, 2022

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:     */s/ Corey Worcester*
        Corey Worcester

*Attorneys for Plaintiff hiQ Labs, Inc.*