# EXHIBIT O

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA
                  SAN FRANCISCO DIVISION
 3

 4   hiQ Labs, Inc.,              )
              Plaintiff,          )
 5                                )
              vs.                 )   Case No.
 6                                )   17-cv-03301-EMC
     LinkedIn Corporation,        )
 7            Defendant.          )
     ─────────────────────────────)
 8                                )
     LinkedIn Corporation,        )
 9            Counterclaimant,    )
                                  )
10            vs.                 )
                                  )
11   hiQ Labs, Inc.,              )
              Counter-defendant.  )
12                                )
     ─────────────────────────────)
13

14

15      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

16   REMOTE VIDEO-RECORDED DEPOSITION OF DARIN MEDEIROS

17              Los Angeles, California

18                  May 20, 2022

19

20   REPORTED BY:

21   JOHNNA PIPER

22   CSR 11268

23   Job No. 10100978

24

25   Pages 1 through 209
```

**Darin Medeiros**

1  that?

2     A.  Yes.

3     Q.  And if you don't ask me for clarification,

4  I will assume you've understood my question.  Fair?

5     A.  Yes.

6     Q.  Okay.  We're not going to go without a

7  break.  If you need a break at some point, you just

8  let me know, and I'll be happy to go off the record

9  and we'll take a break.  The only thing I would ask

10  of you is if we're going to take a break, that we

11  not do it while a question is pending.  So I -- I

12  would like for you to answer the question first, and

13  then we can take a break.  Do you understand?

14     A.  Yes.

15     Q.  All right.  And, Mr. Medeiros, is there any

16  reason why you can't provide truthful and accurate

17  testimony today?

18     A.  No.

19     Q.  Okay.  Let -- let -- let me start by asking

20  about your time at hiQ.  I'm going to get to some of

21  your other positions, but let's start there.  When

22  did you join hiQ?

23     A.  2015.  I -- I believe it was in the March

24  or April time frame.

25     Q.  And what was the position at which you

**Highly Confidential - Attorneys' Eyes Only**

**Darin Medeiros**                                                        hiQ Labs, Inc. vs.
                                                                         LinkedIn Corp.

 1   joined?

 2        A.   VP of sales.

 3        Q.   **And when did you leave hiQ -- leave your**

 4   **employment there?**

 5        A.   I think formally in December, but then I --

 6   December of 2017, and then I continued to consult

 7   for them for about four or five months.

 8        Q.   **Taking you into early 2018?**

 9        A.   Like April.  April 2018.

10        Q.   **Got it.  Got it.  And when you left hiQ in**

11   **December of 2017, formally left before you switched**

12   **over to a consultant, what was your position at that**

13   **time?**

14             (Reporter requests clarification.)

15             THE WITNESS:  I ran sales and marketing.

16             COURT REPORTER:  Thank you.

17   BY MR. COHEN:

18        Q.   **Did you have the same title, VP sales?**

19        A.   Yes.

20        Q.   **Let's go to the responsibilities that you**

21   **had as VP sales when you joined hiQ in April of**

22   **2015.  How would you describe your role?**

23        A.   I essentially built -- hired the sales team

24   and taught them how to sell our product to our

25   prospects and customers.

1    Q.   And how big a team did you build?

2    A.   I think at its peak there were 14 of us.

3    Q.   And that's 14 sales reps or 14 positions

4  including sales reps and others?

5    A.   There was sales staff.  There was account

6  executives.  There was a CS, customer success

7  person.  And then we had people analytic experts

8  that would, you know, help in the sales process.

9    Q.   And when you joined hiQ, did you also have

10  responsibility for marketing?

11    A.   I took that over after the first year.

12    Q.   Okay.  And how many people did you have

13  responsibility for in marketing?

14    A.   We used an outside agency, so there was

15  maybe one person internally and then the outside

16  agency.

17    Q.   And then you said you had 14 employees at

18  its peak.  At the time that you left your formal

19  employment at hiQ in December of 2017, what was the

20  size of that sales organization?

21    A.   I -- maybe three or four.  I can't quite

22  remember.

23    Q.   And you mentioned at -- at least at some

24  point while you were there when you were responsible

25  for marketing you had one person who was an employee

1        THE WITNESS:  Yeah, I -- I think, you know,

2   Quinn Emanuel have -- we've talked maybe, you know,

3   a handful of times about, you know, the state of

4   hiQ, so I think that is pretty much what -- that's

5   the pretty much only talking point I've had with the

6   hiQ team.

7   BY MR. COHEN:

8        **Q.  Any discussions with Mr. Weidick after you**

9   **left in April 2018?**

10       A.  Yes.  I -- I have a very good relationship

11   with Mark, and so I've talked to him on -- on

12   non-hiQ-related topics periodically.

13       **Q.  What about on hiQ-related topics?**

14       MS. SHARMA:  And, Darin, again, to the

15   extent you discussed anything that involves the

16   lawsuit and communications with counsel with Mark,

17   we claim common interest privilege over that.  To

18   the extent you had discussions with Mark about the

19   lawsuit that weren't about any discussions you had

20   with counsel, you can share that.

21       THE WITNESS:  Yeah.  So Mark would send me

22   -- if there was -- I didn't follow the -- the case

23   as close as he did, so any publicly available like

24   link about, you know, the Supreme Court or what is

25   happening, he would share that with me, but we never

1  really talked about it.  It really wasn't an active

2  conversation that we went back and forth on.

3  BY MR. COHEN:

4      **Q.  You understand that Mark Weidick shut down**

5  **hiQ at some point in time after you left?**

6          MS. SHARMA:  Objection.  Objection.

7          THE WITNESS:  No, I didn't know that.

8  BY MR. COHEN:

9      **Q.  You don't have an understanding of**

10 **Mr. Weidick shutting down hiQ?**

11         MS. SHARMA:  Same objection.

12         THE WITNESS:  I -- I -- I didn't know that

13 he shut down hiQ.

14 BY MR. COHEN:

15     **Q.  Do -- do you understand it to continue to**

16 **be an operating entity?  Is that your testimony?**

17     A.  I --

18              (Indiscernible crosstalk.)

19         MS. SHARMA:  Objection.

20         THE WITNESS:  Sorry.  I didn't -- I -- I

21 don't know.  I don't -- I don't know.

22 BY MR. COHEN:

23     **Q.  Okay.  When you -- when you worked as a**

24 **consultant for hiQ in this period from December of**

25 **2017 to approximately April of 2018, you had a**

```
 1  consulting agreement with them, right?
 2       A.  I -- I can't remember.  Probably.  I -- I
 3  -- I don't -- I can't remember if we had a formal
 4  consulting agreement.
 5       Q.  All right.  Let's -- let's put it in the
 6  record.  That might refresh your recollection.
 7            MR. COHEN:  Can we -- can we introduce
 8  Tab 138, please?
 9            COURT REPORTER:  Will this be Exhibit 431?
10            MR. COHEN:  It will.
11       (Exhibit 431 was marked for identification.)
12  BY MR. COHEN:
13       Q.  So, Mr. Medeiros, I don't know if this has
14  been explained to you, but the exhibits get dropped
15  into the chat.  You can click on the link.  You can
16  open the document and -- and you can navigate the
17  document any way that you would like and review any
18  part of it.  I'm not driving.  I will ask you
19  questions about the document, but you should feel
20  free to review it on the screen so that you are
21  comfortable answering my questions.  Do you
22  understand?
23       A.  Yes.
24            MS. SHARMA:  Russ, while the witness is
25  looking at the exhibit, I note that there are some
```

**Darin Medeiros**                                                   **hiQ Labs, Inc. vs.**
                                                                    **LinkedIn Corp.**

```
 1        A.  I'm not sure.  I -- I think so.  I -- I do

 2   know we bought licenses after I started for the

 3   expanded team, so we may have had a couple licenses.

 4   I -- I just -- I can't remember.

 5        Q.  As VP sales, were you the -- the executive

 6   at hiQ who was responsible for the Salesforce

 7   subscription?

 8             MS. SHARMA:  Objection.

 9             THE WITNESS:  I think it was in Darren

10   Kaplan's name.

11   BY MR. COHEN:

12        Q.  You were experienced with using Salesforce

13   from prior employment; is that accurate?

14        A.  Yes.

15        Q.  You had used Salesforce for more than a

16   decade by the time you had joined hiQ?

17        A.  Sadly, yes.

18        Q.  You mentioned that you were responsible for

19   creating a workflow for how to track new

20   opportunities and customer renewals and the like.

21   How exactly were sales and account executives

22   trained in order to do that at hiQ?  Do you recall?

23             MS. SHARMA:  Objection.

24             THE WITNESS:  We had a weekly sales meeting

25   and we would do a forecast review, and if someone
```

**Page 65**

**Darin Medeiros**

1   miscategorized an opportunity or the wrong stage,

2   then we would make all the corrections there.  So it

3   was done weekly.

4   BY MR. COHEN:

5        **Q.  And while you were the head of sales at**

6   **hiQ, it was hiQ policy for the sales team and the**

7   **account executives to log every customer interaction**

8   **at Salesforce; is that correct?**

9             MS. SHARMA:  Objection.

10            THE WITNESS:  No.  No, we had no automated

11  way.  I mean, we tried, but they just didn't do it,

12  right.  It -- like to get like email or call

13  activity into Salesforce, it is pretty laborious,

14  and so I would say we captured a small percentage of

15  the actual activity.  But the -- the rule was, in

16  fact, to -- to do that, but the -- the actual

17  participation was very low.

18  BY MR. COHEN:

19       **Q.  You -- you had a best practices at hiQ on**

20  **how to use Salesforce; is that accurate?**

21       A.  Yes.

22       **Q.  And you shared that best practices with**

23  **your team, correct?**

24            MS. SHARMA:  Objection.

25            THE WITNESS:  Yes.

```
 1  BY MR. COHEN:

 2      Q.  With the expectation that they would follow

 3  those best practices, correct?

 4          MS. SHARMA:  Objection.

 5          THE WITNESS:  Yes, but they never do.  Like

 6  you never get 100 percent participation, no matter

 7  what you do, in any company.

 8              (Indiscernible crosstalk.)

 9          MR. COHEN:  Sorry.  Didn't mean to speak

10  over you.

11          Can we go to Tab 39, please?

12      (Exhibit 438 was marked for identification.)

13  BY MR. COHEN:

14      Q.  Mr. Medeiros, if you could turn -- what has

15  been marked as Exhibit 438, do you see that?

16      A.  Yeah.

17      Q.  And this is -- this is an email string.

18  The first email in the string appears to be from

19  Mateo Epshteyn -- Epshteyn.  And -- and I think you

20  mentioned earlier that Mateo was one of the sales

21  reps at hiQ; is that right?

22      A.  Yes.

23      Q.  And Mateo is forwarding to you on

24  March 30th, 2017, the -- excuse me, the SFDC guide.

25  Do you see that?
```

1          THE WITNESS:  Yeah.  Mostly yes, but

2   sometimes the -- the contact information wasn't

3   always accurate.  So -- again, they -- it just -- it

4   is a -- it is a rep behavior issue whether they --

5   they keep Salesforce up to date or not.

6   BY MR. COHEN:

7       **Q.  Got it.  And -- and was that a use of**

8   **Salesforce that -- strike that.**

9          **Did you use Salesforce in that way; in**

10  **other words, to find out, you know, the status of**

11  **particular accounts, while you were at hiQ?**

12          MS. SHARMA:  Objection.

13          THE WITNESS:  No, I would really just reach

14  out to the reps.  The -- the thing that we did do is

15  we could run a renewal report so we could see what

16  accounts were renewing and when, and -- but when it

17  came to close date and amount and stuff like that,

18  that is really something we would do kind of on a

19  one-on-one on a weekly basis.  So as much as I would

20  love to say Salesforce is a source of truth, the --

21  the challenge is making it the source of truth and

22  getting everybody to comply.

23  BY MR. COHEN:

24      **Q.  You communicated with your sales team at**

25  **these weekly meetings to get information about the**

1   status of their accounts, correct?

2           MS. SHARMA:  Objection.

3           THE WITNESS:  Yes.

4   BY MR. COHEN:

5       Q.  And you used the Salesforce reports at

6   these weekly meetings in the way that you just

7   described to us, correct?

8           MS. SHARMA:  Objection.

9           THE WITNESS:  Yes, but they were never

10  right.  But -- and -- and running a sales team --

11  like once you've run a sales team multiple times,

12  you'll always have like a surprise experience when

13  you go through these reports.  So would I live and

14  die based on these dashboards?  No, because it is --

15  there's always a ton of corrections as you go

16  through the weekly sales meetings.

17  BY MR. COHEN:

18      Q.  That -- that wasn't my question, but -- my

19  question to you was:  Did you use these Salesforce

20  reports at your weekly meetings?

21          MS. SHARMA:  Objection.

22          THE WITNESS:  Yes, we would start here.

23  BY MR. COHEN:

24      Q.  Did you communicate directly with your

25  sales team in between these weekly meetings as well?

Darin Medeiros

1     A.  Yes.

2     Q.  And what were the modes of communication?

3  In person, email, Slack, what -- what -- how did you

4  communicate with them?  All of the above?

5     A.  Yes, all of the above.

6     Q.  Slack was one of the means you used to

7  communicate with your team in order to get updates,

8  for example, on the status of certain accounts or

9  prospects?

10    A.  Yeah.

11    Q.  Common to use Slack in that way with your

12 team?

13    A.  Yeah.

14    Q.  All right.  I want to ask about hiQ's

15 products.  How would you explain to me the way in

16 which Keeper was used by hiQ customers?

17    A.  Typically, the -- the typical customer

18 using Keeper had some retention -- like regrettable

19 retention issue where they didn't know why people

20 were leaving and they wanted to start to identify

21 those individuals ahead of time and maybe, you know,

22 start some sort of retainment type programs for

23 those individuals.  And so there's -- there's been

24 some companies, they had very valuable assets that

25 were a flight risk and they wanted to mitigate that