# EXHIBIT P

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA
               SAN FRANCISCO DIVISION
 3

 4   hiQ Labs, Inc.,              )
             Plaintiff,          )
 5                                )
             vs.                  )   Case No.
 6                                )   17-cv-03301-EMC
     LinkedIn Corporation,        )
 7           Defendant.           )
     _____)
 8                                )
     LinkedIn Corporation,        )
 9           Counterclaimant,     )
                                  )
10           vs.                  )
                                  )
11   hiQ Labs, Inc.,              )
             Counter-defendant.   )
12                                )
     _____)
13

14        REMOTE VIDEO-RECORDED 30(b)(6)

15         DEPOSITION OF MARK WEIDICK

16            Los Gatos, California

17              March 18, 2022

18                 Volume I

19   REPORTED BY:

20   JOHNNA PIPER

21   CSR 11268

22   Job No. 10097379

23

24   Pages 1 through 122

25
```

1   drive?

2       A.   I -- I would expect not.  The dataset is.

3       **Q.   Why would you expect that MongoDB would not**

4   **be on that hard drive?**

5       A.   Because it's an applica -- a software

6   application.

7       **Q.   How did Mr. Miller extract the data from**

8   **MongoDB to preserve onto that hard drive?**

9       A.   An export function similar to what you

10  would run to export any information from one place

11  to another.

12      **Q.   Do you know if he exported everything from**

13  **the MongoDB onto that hard drive?**

14      A.   Everything?

15      **Q.   Yes.**

16      A.   Everything?

17      **Q.   Yes.**

18      A.   Well, he didn't -- he didn't -- our email

19  wasn't in MongoDB, so he wouldn't have exported

20  email from MongoDB, so, no, not everything.

21      **Q.   So my question was specific to MongoDB.  Do**

22  **you know if Mr. Miller extracted everything**

23  **available that was in MongoDB and exported it onto**

24  **that hard drive?**

25      A.   Yes.

1    Q.   And my question was "do you know," so you

2    said "yes."  So did Mr. Miller extract everything

3    available that was on MongoDB and exported it onto

4    that hard drive?

5    A.   Yes.

6    Q.   How do you know that?

7    A.   Verbal confirmation, discussion with Dan.

8    Q.   Do you know when that export from MongoDB

9    to the hard drive occurred?

10   A.   Not precisely.  Years ago, though.

11   Q.   What else did you discuss with Mr. Miller

12   to prepare for your deposition today?

13   A.   Some of the billing logistics associated

14   with the applications that had a subscription fee

15   associated with them and the assorted credit cards

16   that were expiring; in that case, you know, that we

17   would potentially put our own credit cards to pay

18   for it.  So largely to find a way to pay when we're

19   out of money for applications that counsel advised

20   the data was critical and needed to be preserved.

21   Q.   Okay.  And which applications did you

22   discuss?

23   A.   Our email system -- well, our -- our Google

24   suite of applications including email, documents,

25   slides, Google Sheets, et cetera -- "G Suite" I

1   think is what they call it -- Slack, our Slack

2   service for internal communications; AWS where we

3   were in arrears more than six months for several

4   years; GitHub, similar situation, not in a position

5   to pay them because we didn't have any money because

6   we were nonoperational.

7       Q.   Any other applications discussed with

8   Mr. Miller?

9       A.   Probably all of them at some point.  I mean

10   even casually, "Dan, are we" -- you know, they're

11   listed here, Box -- all of them that are listed

12   there.

13       Q.   Did you discuss with Mr. Miller Salesforce?

14       A.   At the time, we -- probably not.  My

15   recollection is that at that point, Salesforce had

16   shut us off.  They had unilaterally shut us off for

17   nonpayment.

18       Q.   Okay.  We'll get back to that.  I just want

19   to keep focusing on your conversation with

20   Mr. Miller as to your preparation for the deposition

21   today.  Anything else that we haven't covered?

22       A.   Not to my recollection.

23       Q.   Okay.  You also said you had a conversation

24   with Mr. Kim in preparation for your deposition

25   today.  When did that occur?

1    Q.   That'd be great.   Thank you.   If you can do

2    that at a break and provide a date.

3         A.   Sure.

4         Q.   Thank you.   Okay.   So did you ever speak

5    with Mr. Kaplan in preparation for your deposition

6    today?

7         A.   I don't think I have, no.

8         Q.   Okay.   You also said a Mr. -- I believe --

9    is it Madras?

10        A.   Medeiros.

11        Q.   Medeiros.   Sorry.   I can't read my

12   handwriting.   Medeiros.

13             When did you speak with Mr. Medeiros in

14   preparation for your deposition?

15        A.   A few months back.   Again, I'm terrible

16   with dates, so end of 2021.

17        Q.   And what did you speak with Mr. Medeiros

18   about?

19        A.   Conversations -- those discussions were

20   largely about our Salesforce dataset and reports

21   that we housed as part of the archiving process, in

22   our board minutes, and a bunch of other places, but

23   the availability of the raw data from Salesforce.

24        Q.   And what did Mr. Medeiros --

25        A.   He did not have it.

1      Q.   -- explain to you?

2      A.   He did not have it.

3      Q.   Okay.  He did not have the data --

4          (Reporter requests clarification.)

5  BY MS. LUI:

6      Q.   As to what?

7      A.   He didn't have the raw Salesforce data.

8      Q.   And when you say "raw Salesforce data,"

9  what are you referring to?

10      A.   Salesforce is a -- an organized repository

11  of information about customers and prospects, their

12  names, their phone numbers, many times an

13  appendment -- an amendment or an append --

14  appendage, email or proposal that we would have sent

15  to them that gets all housed in one place.  So that

16  would be the raw data.

17          The other part of it that was critical to

18  our business was the reports that we derived from

19  that which we used to operate the business as part

20  of our board meetings, our planning and forecasting.

21  Those reports are available, but Darin did not have

22  the raw data that those reports would have been

23  derived from.

24      Q.   And why was it that the raw data was

25  unavailable?

1    A.  He accidentally reconfigured the laptop

2  that he had with that raw data.

3    **Q.  When did he accidentally reconfigure the**

4  **laptop that he had with the raw Salesforce data?**

5    A.  I don't know.  He told me in the same time

6  frame in this conversation I'm describing to you, so

7  toward the end of 2021.

8    **Q.  So my understanding is Salesforce is a**

9  **cloud-based platform.  Is that correct?**

10    A.  My understanding as well.

11    **Q.  And it sounds like -- is it correct that**

12  **Mr. Medeiros actually had some type of local copy of**

13  **the cloud-based Salesforce account for hiQ on his**

14  **laptop?**

15    A.  I expected that he did.

16    **Q.  And why do you say expect that he did?**

17    A.  Because when I went to verify it with him,

18  his laptop was no longer in a condition to prove

19  that it was there.

20    **Q.  And what -- what occurred with the**

21  **accidental reconfiguration that rendered the**

22  **Salesforce raw data inaccessible?**

23    A.  He reimaged the laptop.

24    **Q.  Why did he do that?**

25    A.  He wanted to make it available to a family

1      A.   No.

2      Q.   Did Mr. Medeiros tell you that he had items

3  locally saved on his laptop?

4      A.   He did not.

5      Q.   I'm still a little bit confused.  Was there

6  ever a discussion that indicated that Mr. Medeiros

7  potentially had some type of raw Salesforce data on

8  his laptop?

9      A.   I likely would have asked, "Hey, did -- did

10 we ever download all the data," but, again, as I --

11 as I've said a few times here now, there would be no

12 motivation to do so.  The data's all in the cloud.

13 Salesforce had it, and at the time we had a

14 subscription.  It was only after subscription was

15 cut off from us by the -- by Salesforce that I would

16 have made the query with low expectations.

17     Q.   And did you make the query --

18     A.   Oh, yeah.

19     Q.   -- to Mr. Medeiros?

20     A.   Absolutely --

21     Q.   -- or to others?

22     A.   To others.  I know I -- yes, I know I asked

23 Darin Medeiros.

24     Q.   Okay.  And his response was "No, I did not

25 have" --

1               (Indiscernible crosstalk.)

2    BY MS. LUI:

3       **Q.   Let -- let me start, Mr. Weidick.  So when**

4    **you asked Mr. Medeiros, "Do you have a local copy of**

5    **the Salesforce raw data?" what was his response?**

6       A.   "I accidentally reimaged the laptop," to

7    paraphrase.

8       **Q.   And anything else that Mr. Medeiros told**

9    **you about Salesforce raw data and his access to it**

10   **at any point prior to reimaging the laptop?**

11      A.   The -- the discussion that ensued was about

12   the -- the availability of the subsequent reports

13   from the raw data.  You know, the raw data has a lot

14   of borderline nonsense in it; emails that are

15   already available, customer phone numbers that are

16   already available.  It's a repository.

17            It is the reporting that comes out of it

18   that Darin and I quickly turned to to understand

19   what had been preserved because of the -- because

20   the documents would serve a purpose in those

21   settings; monthly forecasts, weekly pipeline reviews

22   with the sales team, board meetings.

23            MS. LUI:  Thank you.  So I think it's a

24   good time to take a -- a break.  Why don't we come

25   back in ten minutes, if that is okay with you, Hope?

 1          MS. SKIBITSKY:  Yes, that's great, Cathy.

 2          Is that okay for you, Mark?

 3          THE WITNESS:  Yes.

 4          MS. LUI:  Okay.  Go off the record.  Thank

 5   you.

 6          VIDEO TECHNICIAN:  We're going off the

 7   record.  The time is 11:14 a.m.

 8                        (Recess taken.)

 9          VIDEO TECHNICIAN:  We are back on the

10   record.  The time is 11:27 a.m.

11   BY MS. LUI:

12      **Q.  Mr. Weidick, you also said that you had a**

13   **conversation with a Mr. Dev related to preparation**

14   **for the topics that are covered under the deposition**

15   **today.  When did you have that conversation with**

16   **Mr. Dev?**

17          MS. SKIBITSKY:  Objection.  Misstates the

18   testimony.

19          THE WITNESS:  Again, exact dates -- I'll

20   give you rough time frames.  I've known Boris since

21   2017 and subsequent to the -- to the preparation

22   session over the summer, a handful of times,

23   single-digits conversations.  For Boris oftentimes

24   in relation to our -- our ongoing ability to scrape

25   should we need to as we consented -- continued to

1   pursue commercial opportunities that would come

2   inbound to the business even in this state.  People

3   would still reach out to do business with us.

4          So my conversations with Boris Dev were

5   largely around the -- the -- you know, the condition

6   of anything that we had archived, set aside, put

7   elsewhere for -- for some period of time that was

8   still operational in AWS to be able to use it.  So

9   maybe peripheral to the deposition itself, but in my

10  mind, it was helping me prepare for this.

11  **   Q.  All right.  What in particular systems did**

12  **you speak with Mr. Dev that -- that would either be**

13  **archived or potentially operational?**

14          MS. SKIBITSKY:  Objection to form.

15          THE WITNESS:  The -- I'm sorry, Hope.  I

16  couldn't hear you.

17          MS. SKIBITSKY:  I just made an objection,

18  but you can answer.

19          THE WITNESS:  With Boris, who's a data

20  scientist, very well educated, Ph.D., we would spend

21  time talking about the ability to continue scraping,

22  whether or not updates to the applications we used

23  to scrape were necessary.  Typically they were.

24  It's kind of ongoing piece of operational work even

25  in -- in a nonoperational business.  So that would

1  be the focus.

2         I don't remember the names of the

3  applications we used to scrape, but they would have

4  been applications hosted at AWS.

5  BY MS. LUI:

6      **Q.  You earlier testified that there was a**

7  **litigation hold that was issued to hiQ to preserve**

8  **information and documents and systems related to**

9  **this litigation.**

10         MS. SKIBITSKY:  Objection --

11             (Indiscernible crosstalk.)

12         THE WITNESS:  I didn't say that.  I didn't

13  say that.

14  BY MS. LUI:

15      **Q.  Okay.  Well --**

16      A.  I said there was a litigation hold issued

17  to us.

18      **Q.  Okay.  And when was that litigation hold**

19  **issued?**

20      A.  Approximately June of 2017.  I'd have to

21  look at the dates from the -- from our counsel

22  who -- who crafted it and prepared it.

23      **Q.  Who was it issued to?**

24         MS. SKIBITSKY:  Objection.  Vague.

25         THE WITNESS:  In its initial draft form, it

1  came to me.

2  BY MS. LUI:

3       **Q.   And then was it ever officially issued to**

4  **anybody else besides you?**

5       A.   I distributed the document -- actually, did

6  I hit the "send" on the -- whether I hit "send" on

7  the email or Farella Braun, the law firm at the

8  time, hit "send" on the document, I don't recall,

9  but it was issued in -- from recollection -- I can

10 check this rather easily, but it was issued to, I

11 think all told, nine of the most senior people who

12 would have accountability for all the data we've

13 talked about across the last hour and a half, to

14 those nine people.

15      **Q.   At the time in June 2017 when the**

16 **litigation hold was issued, how many total employees**

17 **did hiQ have?**

18      A.   Again from memory, I think 23.

19      **Q.   Is there any reason that the litigation**

20 **hold was not issued to all 23 employees?**

21      A.   Litigation hold wasn't issued to all 23,

22 but all of the company knew darn near immediately

23 that we were under a litigation hold.  I ran an

24 all-hands meeting to share that.  It was a regularly

25 talked about thing.  The folks that were identified

1  specifically, again under the advice of Counsel,

2  were the -- the people in charge of all the data.

3  There was nothing beyond what they would be able to

4  account for beyond those nine.

5      **Q.  When you ran the all-hands meeting, what**

6  **did you tell the employees about the litigation hold**

7  **and preservation of data?**

8      A.  I used the document itself as a -- as a --

9  as a prompt or script; you know, a document to say,

10  "Hey, this is what is happening."  You know,

11  remember, a lot of these people are wondering if

12  they have a job tomorrow, and I'm telling them what

13  they need to do with data that is critically

14  important.  So it was, you know, fairly narrowly

15  defined.  "Here's what's happening.  Here's the

16  document."  I -- I used it for the purpose it was

17  intended to make them aware.

18      **Q.  And what specifically did you tell the**

19  **employees about data preservation?**

20      A.  As I said, I would have read directly from

21  the document.  So whatever is in that document, I

22  would have read to them.

23      **Q.  The litigation hold is what you're**

24  **referring to?**

25      A.  Yes.

1      Q.   Other than that time you read the

2   litigation hold directly to all employees, did you

3   ever have any other conversation about preservation

4   of data for this litigation?

5      A.   It's the type of topic that just comes up,

6   so, yes, I did and others did.  We had -- none of us

7   had ever been under any -- any kind of circumstance

8   like this, so, yes, don't -- save everything.

9   It's -- it was a regular part of the vernacular for

10   a short period of time while we were all together.

11   People started to leave the business rather quickly,

12   but while we were there, of course we talked about

13   it.  Reminders just as a normal course of

14   conversation.

15          There's really no change in the way we did

16   business, though, because we don't -- we didn't have

17   some sort of a priority data deletion policy in any

18   way, shape, or form in our business.  We're all

19   about the data.  It was all cloud-hosted.  So

20   telling them that they needed to keep it in some

21   sense was -- you know, you're telling me to -- well,

22   I was going to say "put pants on," but you just tell

23   me to do something that I already do.  I don't -- we

24   don't delete data, but yes --

25      Q.   Okay.

1      A.   -- conversations did happen, Counsel.

2      **Q.  And -- and that goes to one of my other**

3  **questions that were there ever at hiQ prior to the**

4  **litigation any sort of policy about document**

5  **retention or document destruction in the ordinary**

6  **course of business?**

7      A.   There were no policies about data

8  destruction.

9      **Q.  Were there any policies about data**

10  **preservation prior to the institution of the**

11  **litigation hold?**

12      A.   Certainly not after my arrival.  It wasn't

13  even a topic contemplated, let alone discussed.

14      **Q.  How about prior to your arrival?  Was there**

15  **ever any type of practice or policy as to document**

16  **retention, preservation, or destruction in the**

17  **ordinary course of business?**

18      A.   My speculation is no, and in part informed

19  by the fact by the fact I did a full diligence on

20  quarters' and years' worth of documentation before I

21  took the CEO job.  It's a high-profile job with

22  literally billionaire investors involved, so my

23  diligence on preparing constituted reviewing a

24  proverbial truckload of -- of information.

25      **Q.  Since the institution of the litigation**

1   hold in or around June 2017, did hiQ take any steps

2   to turn off or stop any autodeletion of any of its

3   systems?

4       A.   As I said, as a practice, we don't -- there

5   are no autodeletion designations in any of the

6   applications we use.  Outside of those done by

7   vendors who we couldn't pay who had a data retention

8   policy, you know, for nonpayers, so --

9       Q.   So it's your understanding that the time

10  June 2017, every one of the applications or

11  repositories that hiQ used the default setting would

12  be on "do not delete"?

13      A.   No, I can't make that as aggressively as

14  you did for every application we used, right?  I've

15  not looked at every of the probably 20-plus

16  applications we use to run the business to know on

17  an ongoing basis the data deletion or, you know,

18  data cleanup for excessive storage capacity or that

19  type of operational thing was attended to that way.

20  But not as a normal course of doing business, no.

21      Q.   What I'm getting at here is on the back end

22  of a lot of systems, there will be some type of

23  either data destruction on a regular basis, and my

24  question is, when the institution of the litigation

25  hold occurred, were there any steps taken by hiQ to

1   ensure that there would not be any autodeletion or

2   autodestruction of applications and systems?

3        A.  Yes.  Steps were taken to ensure the things

4   you just described.

5        Q.  And what were those steps?

6        A.  One of the first things we did was

7   immediately archive all things as described by

8   Farella Braun to the hard drive I've referenced a

9   couple of times.

10       Q.  That occurred in June 2017?

11       A.  Again -- no, no.  That -- that occurred

12  well before -- oh, June of 2017.  I think it was

13  later than that.  We -- we still had access to the

14  core applications we used to run the business.  One

15  month after the cease-and-desist letter, we still

16  had access to the core applications one month after

17  we won the preliminary injunction.  So there was

18  still this glimmer of hope that this was going to

19  continue so there was no -- even under a legal hold,

20  we had access to all the data.  Everything was

21  there.

22       Q.  Right --

23               (Indiscernible crosstalk.)

24  BY MS. LUI:

25       Q.  Are you done with your answer?  I'm sorry.

1  I don't want to cut you off.

2      A.  There was a point in time when our

3  inability -- our likely inability to pay and restart

4  the business in addition to the legal hold

5  designation, those three things made it clear that

6  let's -- let's be proactive here and archive.  I

7  don't remember the exact date.

8      Q.  So let's talk about right now June 2017.

9  Were there any steps that hiQ took to ensure that

10  any autodeletion or autodestruction settings for any

11  of your systems would be turned off?

12      A.  Not that I can recall.

13      Q.  Do you know if individuals could override

14  the mechanism or settings of autodestruction of data

15  on any of your systems?

16      A.  Do I know if individuals --

17          MS. SKIBITSKY:  Objection to form.

18          THE WITNESS:  As a matter of policy, the

19  administrative super -- my word -- super-user

20  administrative rights would have been confined to a

21  very few people, each of whom would have been on

22  their list of recipients for the legal hold.  And as

23  a result of --

24              (Indiscernible crosstalk.)

25          THE WITNESS:  -- that circumstance, no.

1   BY MS. LUI:

2        Q.   Who would have been the individuals who

3   would have super-user administrative rights to hiQ

4   system?

5        A.   Dan -- "super user's" my word to be fair,

6   Counsel --

7        Q.   Understand.

8        A.   -- not a term of art, right?  I don't want

9   -- Dan Miller, Andrew Kim -- I don't think we had a

10  designation like that for Salesforce.  I'm thinking

11  of the IT systems.  AWS, GitHub, Jira and the like

12  would be confined to -- Darin -- I'm sorry -- Darin,

13  not Darin.  Dan Miller and Andrew Kim.

14       Q.   And who were those nine recipients of the

15  litigation hold?

16       A.   Oh, I didn't go do that.  I'm sorry.  Would

17  you like me to do that right now, to pop open that

18  document?

19       Q.   Yes.  Why don't you go ahead and do that.

20            MS. LUI:  We're going to request also that

21  be produced, Hope, along with the other documents

22  that Mr. Weidick has reviewed in preparation for his

23  documents.

24            THE WITNESS:  I couldn't make out the

25  second part of that.

1          MS. SKIBITSKY:  Objection to -- apologies,

2   Cathy.

3          Objection to form and misstates this

4   testimony.

5          THE WITNESS:  Say again, Counsel.

6   BY MS. LUI:

7      **Q.  Yeah.  So any scraped data from LinkedIn**

8   **would be stored in MongoDB on AWS?**

9      A.  That's correct but no longer, of course.

10     **Q.  And you say "no longer of course"**

11  **because --**

12     A.  I don't have an AWS account anymore.  They

13  turned me off because I couldn't pay the bill.  I

14  was six months in arrears for two years.  We owe

15  them more than $30,000.

16     **Q.  So I had a prior understanding from**

17  **Orrick's discussions with your counsel that LinkedIn**

18  **scraped data would be stored in flat files or in its**

19  **original form on AWS, and that there was also a**

20  **MongoDB database where the parsed or processed**

21  **LinkedIn data were stored.  Is that understanding**

22  **incorrect now?**

23     A.  No, we --

24         MS. SKIBITSKY:  Counsel, objection to form.

25         Yeah, go ahead, Mark.

1          THE WITNESS:  Okay.  There's -- there's a

2   sequencing processing dynamic around the collection

3   of scraped profiles that are subsequently sorted out

4   to turn into usable data minus the stuff that is

5   extraneous.  We have the raw, unparsed, scraped

6   information that we pull out extreme -- like

7   hashtags, or carets or commas or whatever assorted

8   nonnumerical, noncharacter, as examples, from the

9   data to make it more readily both machine and human

10  readable and usable.

11         And then the -- the location of those

12  datasets -- "flat file's" a little bit of a

13  misnomer, but, yeah, as a flat file on MongoDB to be

14  parsed and cleaned up and then housed somewhere

15  else, say, S3, that was our business process.

16  BY MS. LUI:

17     **Q.   Okay.  So -- so walk me through that and**

18  **let me get this -- let me see if I get this correct.**

19  **When it's raw data, unparsed, it's housed in**

20  **MongoDB.  Is that correct?**

21         MS. SKIBITSKY:  Objection.  Misstates

22  testimony.  Objection as well as vague as to time.

23         THE WITNESS:  Exactly.  So ask your

24  question --

25              (Indiscernible crosstalk.)

 1           THE WITNESS:  -- I'll answer it exactly as

 2    you asked it.

 3    BY MS. LUI:

 4       Q.  Okay.  What is the timing distinction

 5    between -- let -- let me back up here.

 6           Here's what I'm trying to understand:  The

 7    process is you scraped data from LinkedIn.  That's

 8    in a raw data form.  Where is it stored at -- at

 9    that point?

10           MS. SKIBITSKY:  Objection to form.

11           THE WITNESS:  What point?  Today it's on a

12    hard drive.  Today that data you just described is

13    on a hard drive.

14    BY MS. LUI:

15       Q.  Before, when hiQ was operational and it

16    would scrape the LinkedIn profiles, that raw data

17    would then be put into MongoDB?  Is that correct?

18           MS. SKIBITSKY:  Objection to form; vague as

19    to time.

20           THE WITNESS:  Prior to having MongoDB

21    available and Amazon, yes.

22    BY MS. LUI:

23       Q.  Okay.  So prior to having MongoDB on

24    Amazon, is that what you are referring to?

25       A.  Exactly what I said, yes.

1  BY MS. LUI:

2      Q.  Thank you.  I -- I didn't hear that.

3          And there's a test, underscore, D-B

4  database.  Was that archived?

5          MS. SKIBITSKY:  Objection.  Assumes facts.

6          THE WITNESS:  I don't know.

7  BY MS. LUI:

8      Q.  My understanding of MongoDB is that within

9  each database there are also collections stored in

10 MongoDB.  Do you know if the risk model collection

11 was archived in the same form that was -- it

12 previously existed at the time access was shut off

13 to Mongo?

14         MS. SKIBITSKY:  Objection.  Assumes facts

15 not in evidence.

16         THE WITNESS:  Access to Mongo wasn't cut

17 off, so I don't -- I don't -- go try again.

18 BY MS. LUI:

19     Q.  Okay.  Do -- do you know if the risk model

20 collection was archived in the same form that it

21 previously -- previously existed -- existed at the

22 time it was transferred to the hard drive? --

23 actually, let me back up.  I'm sorry.  After lunch.

24 Let me get my bearings again.

25         Do you know if the risk model collection in

1   MongoDB was archived in the same form that it

2   previously -- previously existed?

3          MS. SKIBITSKY:  Objection.  Assumes facts

4   not in evidence.

5          THE WITNESS:  I want to try to repeat the

6   question as I heard it.  Do I know if the risk model

7   previously -- no, go ahead.  I'll write it down --

8   BY MS. LUI:

9      Q.  Do you -- yeah.  Do you know if the risk

10  model collection was archived in the same form

11  that --

12         MS. SKIBITSKY:  Objection.  Assumes facts.

13         MS. LUI:  Sorry.  Let me just start over.

14     Q.  Do you know if the risk model collection

15  was archived in the same form that existed in the

16  MongoDB database?

17         MS. SKIBITSKY:  Objection.  Assumes facts.

18         THE WITNESS:  I have no reason to believe

19  it would be archived in a different form.  That's

20  the part I'm bogging down on.  I don't know if it

21  was archived.  There is no reason to archive in a

22  different form.

23  BY MS. LUI:

24     Q.  Okay.  To your expectation was that when

25  Mr. Miller archived MongoDB to the hard drive

1  that -- that all of -- all the raw data and contents

2  within MongoDB would be archived in its existing

3  form?

4          MS. SKIBITSKY:  Objection.  Misstates

5  testimony.

6          THE WITNESS:  Yeah, that -- that is my

7  expectation.  That was the instruction.

8  BY MS. LUI:

9      Q.  Thank you.  What else is on that hard drive

10  that Mr. Miller created besides MongoDB?

11          MS. SKIBITSKY:  Objection.  Misstates

12  testimony.

13          THE WITNESS:  The unparsed profiles; the

14  Jira repository of task management for the software

15  development team would be there; GitHub, like GitHub

16  repositories.  That's what I recall right now.

17  BY MS. LUI:

18      Q.  Does GitHub also still -- let me -- let me

19  back up and rephrase.

20          Does hiQ still have access to its GitHub

21  repository?

22      A.  Yes.

23      Q.  Other than the hard drive, does hiQ still

24  have a license or a seat to GitHub to access its

25  repository?

1        A.  I don't think so.  I'm not -- I don't

2    recall paying a bill for that.

3        Q.  So all of hiQ's repository on GitHub would

4    have been archived on the hard drive that Mr. Miller

5    created.  Is that correct?

6        A.  GitHub perhaps contains refactored code

7    branches, refactored -- code that had been modified

8    in some way or shape or form and then -- then

9    orphaned, not in use anymore, code branches that are

10   no longer in use.  So it's possible that those

11   orphaned code branches would have been left behind.

12   That's -- that's -- so the word "all" at the front

13   end causes me to say I don't know.

14       Q.  Who would have made the decision as to

15   which repository on GitHub should have been archived

16   on the hard drive?

17            MS. SKIBITSKY:  Objection.  Form.

18            THE WITNESS:  Those -- those -- the data,

19   let's see, who -- who -- who.  Dan and Andrew would

20   have been in the position to make the call on what

21   was extraneous artifacta, unused code branch

22   material versus that in use to run the business.

23   BY MS. LUI:

24       Q.  Did hiQ archive on the hard drive all

25   repositories that were in use to run the business

 1  accounting at hiQ.

 2      Q.  Do you know if Salesforce provided several

 3  warnings that it was going to turn off the account

 4  due to nonpayment?

 5      A.  I do not.

 6      Q.  Prior to September 2018, had there been any

 7  discussion of archiving or preserving the data in

 8  Salesforce?

 9      A.  We had talked multiple times over under

10  legal hold and thereafter about a general policy of

11  no data deletion.

12      Q.  Was there ever any specific discussion

13  about archiving or preserving the data in Salesforce

14  prior to September 2018?

15      A.  No, because it was expected that it was

16  available to us.

17      Q.  Prior to September 2018, was there ever any

18  discussion that the data in Salesforce should be

19  exported to a local copy?

20      A.  The reporting we took from it was the

21  main -- the main result of that, and it was

22  sufficient for so many things, informing investors,

23  et cetera, so no.  At that point, customers were

24  largely expired out of the business.  There was no

25  tracking being done in Salesforce specifically so --

1    Q.  Prior to September 2018, was there ever any

2  discussion at hiQ to figure out ways to pay the bill

3  to Sales Force?

4    A.  I have several hundred thousand dollars'

5  worth of creditors at this point in the story end to

6  this day.  There was a regular discussion with my

7  board at who I could pay and who I can't pay.  So

8  that's an emphatic yes.

9    Q.  Well, prior to September of 2018, was there

10  ever any discussion that Salesforce should be paid

11  in lieu of another creditor?

12    A.  I can't prioritize one creditor over

13  another.  I sought out creditors to negotiate

14  standstills based on the volume of money owed to

15  them -- based on the amount of money owed to them.

16  So Salesforce was never carved out specifically.

17    Q.  Prior to September 2018, did you or anybody

18  else at hiQ ever reach out to Salesforce to discuss

19  a potential billing plan or standstill agreement?

20    A.  You put two things in there.

21    Q.  You can answer either or both.

22    A.  You're asking the questions.

23    Q.  Prior to September 2018, did you or anybody

24  else at hiQ ever reach out to Salesforce to discuss

25  a potential billing plan?

**Page 102**

1      A.  We changed our billing plan with Salesforce

2   to reduce the number of subscribers to take it down

3   to what we thought was the bare minimum, which

4   yielded a $3600-a-year bill for two subscribers

5   prior to September 2018.

6      **Q.  Beyond reducing the number of subscribers,**

7   **any other discussions with Salesforce about a**

8   **billing plan?**

9      A.  No.

10     **Q.  Prior to September 2018, did you or anybody**

11  **else at hiQ ever reach out to Salesforce to discuss**

12  **a potential standstill agreement?**

13     A.  The way you asked the question, no.  No.

14     **Q.  When hiQ learned that Salesforce had ended**

15  **access to its server due to nonpayment, what steps**

16  **did hiQ take to try to obtain that data back?**

17     A.  Escalation into Salesforce through our

18  customer support, customer service, and multiple

19  organizations at Salesforce to try to reconstitute

20  the data, including, if I remember right, getting

21  the -- getting some assistance from Quinn Emanuel.

22     **Q.  And what were the results of those efforts?**

23     A.  Data was no longer available -- outside of

24  the reports that I've pointed to several times over

25  that were created from the raw data which are in our

1          MS. SKIBITSKY:  Objection.  Assumes facts

2    not in evidence.

3          THE WITNESS:  OrgStars code, code for the

4    website?  I -- tell me what do you mean.

5    BY MS. LUI:

6       **Q.  The -- the code that was used to create the**

7    **product when hiQ was in its predecessor form in**

8    **OrgStars.**

9       A.  I would expect it would evolve -- I'll

10   speculate on this.  It --

11         MS. SKIBITSKY:  Mark -- Mark, don't --

12   don't speculate.

13         THE WITNESS:  So, no, I don't.

14   BY MS. LUI:

15      **Q.  If -- if you don't know, that's fine.**

16   **Thank you.**

17      A.  I don't know that there was ever anything

18   called "the OrgStars code."  That is the point.

19      **Q.  Okay.  That's fine.  I -- I'm done with**

20   **questions as to these topics.  Thank you.**

21         MS. SKIBITSKY:  Okay.  I do have some

22   redirect, not long, but just a few -- a few redirect

23   questions for Mr. Weidick.

24                       EXAMINATION

25

 1  BY MS. SKIBITSKY:

 2       Q.  Mark, you were asked whether there had been

 3  any restrictions placed on Box to ensure that there

 4  would be no deletion or autodeletion of materials

 5  from Box.  Do you remember that question?

 6       A.  I do.

 7       Q.  Are you aware of any autodeletion settings

 8  on hiQ's Box account at any point in time?

 9       A.  No, I am not.

10       Q.  And are you aware of any materials being

11  removed from hiQ's Box account at any point in time

12  after hiQ received May 2017 cease and desist letter?

13       A.  I am not.

14       Q.  Did you ever instruct any service provider

15  to turn off hiQ's access to any systems at any point

16  in time after hiQ received the May 2017 cease and

17  desist letter?

18       A.  No.

19       Q.  You testified earlier today that --

20       A.  I take that back.  We turned off Join Me.

21       Q.  And when was that?

22       A.  There -- there were -- there were a series

23  of applications that we subscribed to including Join

24  Me at the point where we could not pay, so many

25  others that I systematically reviewed from our

1   credit card bill to cancel.  The one I remember is

2   Join Me.  I believe there were two or three others

3   that we eliminated and proactively canceled.

4          **Q.  Did Join Me store data?**

5          A.  No.

6          **Q.  You testified earlier that you couldn't**

7   **remember whether Darren Kaplan had participated in a**

8   **call with several other employees a few months back.**

9   **Have you had a chance to confirm whether or not**

10  **Mr. Kaplan did participate in that call?**

11         A.  I -- I have confirmed that he was invited

12  to the call on the -- on the invitation I have.

13             MS. SKIBITSKY:  That's all I have.

14             MS. LUI:  No recross.

15             THE COURT REPORTER:  Hope, do you want a

16  copy of the transcript?

17             MS. SKIBITSKY:  Yes, that would be great.

18  Thank you, Johnna.

19             VIDEO TECHNICIAN:  All right.  This now --

20             MS. SKIBITSKY:  We can go off the record.

21             VIDEO TECHNICIAN:  Yes.  This now concludes

22  today's deposition.  We are off the record.  The

23  time is 2:13 p.m.

24                  (TIME NOTED:  2:13 p.m.)

25

**Page 118**

**Amended Deposition Errata Sheet**
**30(b)(6) Deposition of Mark Weidick, March 18, 2022**
*hiQ Labs, Inc. v. LinkedIn Corp.*, 17-cv-03301-EMC (N.D. Cal)

| PAGE NO. | LINE NO. | FROM | TO | REASON FOR CHANGE |
|---|---|---|---|---|
| 7 | 11 | Steven | Stephan | Transcription error. |
| 31 | 25 | invoice | invite | Transcription error. |
| 33 | 13-14 | "…appendment -- an amendment or an append -- appendage …" | "… appendment -- an amendment or an attach -- attachment …" | Transcription error. |
| 56 | 12 | "… Darin --I'm sorry -- Darin, …." | "… Darin --I'm sorry -- Dan, …." | Transcription error. |
| 63 | 13 | "I don't think so." | "Yes, Dan Miller exported some data from G Suite during the archiving process." | Accuracy. |
| 63 | 17-18 | "I don't recall if we archived that part." | "The hard drive Mr. Miller created does contain data from G Suite." | Accuracy. |
| 67 | 13 | "Not to my knowledge." | "hiQ used Microsoft Excel and Microsoft PowerPoint." | Initially understood the question to be about hiQ's use of Microsoft for email services in light of the question's reference to "Outlook 365." |
| 70 | 10-12 | "I don't recall us using a recording mechanism at all for – for running – for operating the business.  So no." | "We used join.me and Chorus to record various calls or meetings, including sales calls, sales trainings, and internal meetings." | Accuracy. |
| 70 | 16-20 | "I – I don't recall that we used to record sales calls.  We | "We used join.me to record certain sales calls.  We used join.me as our | Accuracy. |

1

| | | used join.me as our collaboration platform for communications to share content and the like, presume." | collaboration platform for communications to share content and the like, presume." | |
|---|---|---|---|---|
| 70 | 17-18 | "We used join, dot, me …." | "We used join.me …." | Transcription error. |
| 70 | 25 | "No.  It was the delivery mechanism." | "There are recordings with some customers stored in join.me" | Accuracy |
| 71 | 7-9 | "For collaborative communications both internally and externally, conference calling, had the ability to share content." | "For collaborative communications both internally and externally, conference calling, had the ability to share content.  It also recorded some calls and internal meetings and trainings." | Accuracy |
| 82 | 6 | extreme | extraneous | Transcription error. |
| 82 | 9 | readily | readable | Transcription error. |
| 83 | 21 | "and Amazon" | "on Amazon" | Transcription error. |
| 86 | 17 | "plenty good" | "pretty good" | Transcription error. |
| 89 | 3 | "buying for us" | "buying from us" | Transcription error. |
| 89 | 3 | "run out data" | "run our data" | Transcription error. |
| 96 | 21 | artifacta | artifacts | Transcription error. |
| 96 | 1 | "I don't think so." | "We continue to have access to Github." | Accuracy. Question unclear because the meaning of "license" and "seat" is vague. |
| 98 | 98:24-99:5 | "Again, we couldn't pay for a – a subscription to QuickBooks, so we let that expire in a very proactive way. | "We still have access to our QuickBooks account." | Accuracy. |

| | | It was not necessary for the level of business accounting we were doing when the business was nonoperational, but all the data from QuickBooks is available, preserved, and archived." | | |
|---|---|---|---|---|
| 99 | 24 | "Approximately end of 2018." | "Approximately January 2020." | Accuracy. |
| 102 | 5 | end | and | Transcription error. |
| 103 | 17 | "through our" | "through their" | Transcription error. |
| 105 | 17 | "a priory" | "a priori" | Transcription error. |
| 117 | 20 | "Join Me" | join.me | Transcription error. |
| 118 | 5 | No. | Yes. | Accuracy. |
| 118 | 2 | "Join Me" | join.me | Transcription error. |
| 118 | 4 | "Join Me" | join.me | Transcription error. |