# EXHIBIT Q

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4   hiQ Labs, Inc.,

 5              Plaintiff,
                                    Case No.:
 6        vs.
                              17-cv-03301-EMC
 7
     LinkedIn Corporation,
 8
                Defendant.
 9   _____

10   LinkedIn Corporation,

11              Counterclaimant,

12        vs.

13   hiQ Labs, Inc.,

14              Counter-defendant.
     _____
15

16
                       - CONFIDENTIAL -
17
                 VIDEO-RECORDED DEPOSITION
18
          REMOTELY TAKEN VIA ZOOM CONFERENCE OF
19
          MARK WEIDICK, Individually, Volume III
20
                Also as 30(b)(6), Volume IV
21
                  WEDNESDAY, JUNE 1, 2022
22

23   Stenographically Reported by:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No. 10101626
```

Case 3:17-cv-03301-EMC   Document 368-18   Filed 09/02/22   Page 3 of 8

Volume III    Confidential    hiQ Labs, Inc. vs.
Mark Weidick                  LinkedIn Corp.

1  were required according to the terms of your agreement
2  with Import.io?
3       A.    We're in the process of doing that.
4       Q.    Where did hiQ Labs obtain the funds to make
5  payment to Import.io?
6       A.    Exclusively from a series of existing
7  investors who had previously invested money in the
8  company.
9       Q.    Which investors provided those funds?
10      A.    I don't recall all the names specifically.
11 There are several that I could offer to you here if you
12 want a -- a partial list.
13      Q.    Yeah.  Tell me as many as you can identify.
14      A.    Rob DeSantis put money against that.  Wendy
15 Circus.  Ernest Werlin.  The Frankels, Stuart Frankel.
16 Paul Mellinger.  Those are what -- those that come to
17 mind.  There are a few more, I believe, though.
18      Q.    Did Vannin Capital supply any of the funds to
19 pay Import.io?
20      A.    Not a dime.
21      Q.    Did you discuss with Vannin Capital your need
22 for funds to pay Import.io?
23      A.    After the cease and desist I talked to
24 hundreds of people about our need for funds, including
25 Vannin.  You -- the company was -- it was -- this is

| Volume III<br>Mark Weidick | Confidential | hiQ Labs, Inc. vs.<br>LinkedIn Corp. |
|---|---|---|

1  post cease and desist by a year.  No payroll.  No
2  ability to pay vendors.  Absolutely I asked Vannin for
3  money, for anything.  I'd asked anybody for money.  So,
4  yes, I asked Vannin.  They said no.
5       Q.    Okay.  Did Vannin Capital loan or invest any
6  money in hiQ Labs?  Did it provide funding to hiQ Labs
7  in any form?
8       A.    You brought four things into that.  Any form,
9  invest, loan?  Which question would you like me to
10 answer?
11      Q.    Did Vannin provide any funds to hiQ Labs in
12 any form, period?
13            MR. WORCESTER:  That's a yes or a no question,
14 Mark.
15      A.    Yeah.  And in the end, though, it wasn't
16 Vannin.
17 BY MS. HURST:
18      Q.    Yes --
19      A.    Vannin was acquired.
20      Q.    Yes or no, did Vannin provide any funds?
21      A.    I honestly don't know how to answer the
22 question yes or no.  My --
23            MR. WORCESTER:  If you can't answer it, you
24 can't answer it.  But if you can answer it, it's a yes
25 or a no question.

Case 3:17-cv-03301-EMC   Document 368-18   Filed 09/02/22   Page 5 of 8

Volume III | Confidential | hiQ Labs, Inc. vs.
Mark Weidick | | LinkedIn Corp.

```
 1        A.    And your question is, did Vannin Capital?
 2   BY MS. HURST:
 3        Q.    Yes, that's my question.
 4        A.    I'm worried I'm going to get the answer wrong,
 5   I mean, because of the construct of the question.
 6        Q.    So are you -- are you refusing to answer the
 7   question, Mr. Weidick?
 8        A.    No, I'm thinking about how I answer you
 9   accurately.  The -- the question is poorly constructed.
10              MR. WORCESTER:  I -- I -- I think the
11   confusion in that is that Vannin was purchased.
12              MS. HURST:  I don't think there's any
13   confusion, Corey.  I think the witness is hostile and
14   uncooperative, and if he wanted to answer the question,
15   he could provide truthful and accurate information.
16              THE WITNESS:  Counselor, that's not accurate.
17              MS. HURST:  It's quite obvious -- quite
18   obvious already from the short time we've been on the
19   record this morning that the witness has no intention of
20   providing responsive and accurate, truthful testimony.
21              MR. WORCESTER:  That's quite the speech but I
22   disagree with all of it.
23              In any event, Mark, if you can answer it, you
24   can answer it yes or no.
25        A.    My interest is in giving you a specific
```

Case 3:17-cv-03301-EMC   Document 368-18   Filed 09/02/22   Page 6 of 8

Volume III  Confidential  hiQ Labs, Inc. vs.
Mark Weidick  LinkedIn Corp.

1    A.    Fair enough.  I don't recall any.
2          We even post cease and desist with the
3    accusations and threats over our head continued to
4    deliver against all of our contracts.
5          One of the proudest aspects of hiQ Labs in the
6    history of my time affiliated with it, that despite a
7    customer being able to do what you're pointing out right
8    now, we never had a customer post cease and desist come
9    at us for that.  And I can't remember any -- any prior.
10   We had customers get grumpy about our timely delivery
11   when we were losing resources, but the action of
12   actually refunding prorated portions of any amounts that
13   were to apply to the remainder of unexpired term, I
14   don't recall a single one.
15         MS. SOKOVA:  Move to strike as unresponsive
16   everything before "I don't recall a single one."
17   BY MS. SOKOVA:
18   **Q.    Let's switch a bit to who are the current**
19   **employees at hiQ that exist to this day right now?**
20   A.    Employees strikes me as a technical term.
21   What do you mean by it?
22   **Q.    Who is offering -- providing services on**
23   **behalf of hiQ at this time or for hiQ at this time?**
24   A.    Well, I certainly am right now as part of
25   these legal proceedings as are a big handful of others.

Case 3:17-cv-03301-EMC   Document 368-18   Filed 09/02/22   Page 7 of 8

| Volume III<br>Mark Weidick | Confidential | hiQ Labs, Inc. vs.<br>LinkedIn Corp. |

1  Andrew Kim, Genevieve Graves, Dan Miller, Darren Kaplan,
2  Darin Medeiros, Andrew Oltmann.  I don't know who I'm
3  leaving out, but there are a number of people who are
4  providing services on behalf of hiQ Labs for the
5  purposes of this litigation.
6      Q.   What about for purposes outside of the
7  litigation?
8      A.   Again, it comes back to the use of the word
9  "employee" that I think is a technical term.  There are
10 no employees -- my definition of the word, which is
11 properly entirely wrong -- there's no payroll for hiQ
12 Labs.  Nobody is being paid for the work they're doing
13 for hiQ Labs as a data science provider.  There is a
14 loose confederation of like-minded, in it for the --
15 in-it-to-win-it people who I can tap into at a moment's
16 notice to convene around a commercial opportunity,
17 including Andrew Kim, including Boris Dev.
18           While I haven't had to do it, I suspect that
19 Dan Miller would equally jump into the -- into the
20 process if we needed him.  And that -- that type of
21 situation has occurred six, eight, ten, maybe 12 times
22 across even the last couple of years where we won't
23 convene because of our kindred spirit to work on things
24 because we're on the right side of this and try to
25 deliver to a commercial opportunity.  But they're not

1  employees.  They are not paid prior to that type of
2  project work being in front of us.
3      Q.   What would you categorize them as then?
4      A.   I almost don't have a word for it.  Friends of
5  the business.  Former employees.  Smart colleagues who
6  know how to run the business.
7      Q.   But they perform work for hiQ?
8      A.   Mostly they've agreed to perform work for
9  hiQ should we have work.  There are a couple of
10 occasions outside of, you know, operational payroll
11 where we've, again, convened to look at things like can
12 we get the scraper running?  Can we access LinkedIn
13 profile data?  Can we get it into the pipeline?  The
14 validity testing before I go engage with a commercial
15 opportunity where that same group of people I mentioned
16 will -- will come together to do it out of the goodness
17 of their heart.
18           MS. SOKOVA:  Move to strike as nonresponsive
19 after "mostly they've agreed to perform work for hiQ
20 should we have work."
21     A.    Out of the goodness of their heart.
22           No payment.
23           MS. SOKOVA:  Move to strike as nonresponsive
24 and there was no question pending.
25 ///