ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*Pro Hac Vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

*Attorneys for Defendant/Counterclaimant
LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-cv-03301-EMC |
| Plaintiff, | **LINKEDIN'S REPLY IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE DAMAGES OPINIONS OF BENJAMIN SACKS** |
| vs. | |
| LinkedIn Corporation, | Date:          September 29, 2022 |
| Defendant. | Time:          1:30 p.m. |
| | Courtroom:  5 – 17th Floor (Zoom) |
| | Judge:         Hon. Edward M. Chen |
| | |
| | Complaint Filed:   June 7, 2017 |
| | Trial Date:           February 27, 2023 |
| LinkedIn Corporation, | |
| Counterclaimant, | |
| vs. | |
| hiQ Labs, Inc., | |
| Counterdefendant. | |

1

## <u>TABLE OF CONTENTS</u>

2
**Page**

3

INTRODUCTION ......................................................................................................... 1

4

ARGUMENT ................................................................................................................ 2

5

I.      Sacks's Full Damages Analysis Is A Lost Business Value Calculation Barred By
        California Law. ................................................................................................... 2

6

     A.      hiQ Cannot Recover Business Value Damages. .................................... 2

7

     B.      Sacks's Full Damages Is Not A "Lost-Profits" Analysis. ...................... 3

8

     C.      If It Were A Lost-Profits Opinion, Sacks's Full Damages Opinion Would
                Still Be Inadmissible Because It Lacks The Factual Basis Required To

9

           Project Profits For An Unprofitable Unestablished Business. ................ 5

10

II.     Sacks's Regression Analysis Is Flawed And Unreliable. ................................... 8

     A.      hiQ's "Major Factors" Were EXCLUDED From Sacks's Regression. ................. 9

11

     B.      hiQ's Own Academic Text Establishes That The "Prediction Interval" Is

12

           The Right Test Of Reliability. ............................................................... 10

     C.      Admissibility of Expert Testimony Is Not A "Reliability Battle." ...................... 14

13

III.    Sacks's Subset Damages Opinion Is Inadmissable Because It Does Not Meet The
        Requirements Of California Law. ..................................................................... 14

14

IV.     Evidentiary Objections .................................................................................... 15

15

CONCLUSION ........................................................................................................... 15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Alpha GRP, Inc. v. Subaru of Am., Inc.,*
5
 No. CV182133MWFMRWX, 2021 WL 1146029 (C.D. Cal. Feb. 8, 2021) .................. 3, 5, 7

6

*Bazemore v. Friday,*
 478 U.S. 385 (1986) ........................................................................................................ 10
7

*Bickerstaff v. Vassar Coll.,*
8
 196 F.3d 435 (2d Cir. 1999) ........................................................................................... 10

9

*Butler v. Home Depot, Inc.,*
10
 984 F. Supp. 1257 (N.D. Cal. 1997) ............................................................................... 14

11

*In re High-Tech Emp. Antitrust Litig.,*
 No. 11-CV-02509-LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014)............................ 15
12

13

*Pac. Rollforming, LLC v. Trakloc N. Am., LLC,*
 No. 07cv1897 IEG (MDD), 2011 WL 13176817 (S.D. Cal. Dec. 1, 2011) ........................ 2

14

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.,*
15
 87 F. Supp. 3d 928 (N.D. Cal. 2015) ............................................................................... 14

16

*In re REMEC Inc. Securities Litgation,*
 702 F. Supp. 2d 1202 (C.D. Cal. 2010)........................................................................... 10
17

18

**California Cases**

19
*Elec. Funds Sols., LLC v. Murphy,*
 134 Cal. App. 4th 1161 (2005)...................................................................................... 2, 3

20

*Elsbach v. Mulligan,*
21
 58 Cal. App. 2d 354 (1943) .............................................................................................. 3

22

*Kids' Universe v. In2Labs,*
 95 Cal. App. 4th 870, 116 Cal. Rptr. 2d 158 (2002)..................................................... 4, 5, 7
23

24

*Orozco v. WPV San Jose, LLC,*
 36 Cal. App. 5th 375 (2019) ............................................................................................. 6

25

*Parlour Enterprises, Inc. v. Kirin Grp., Inc.,*
26
 152 Cal. App. 4th 281 (2007)......................................................................................... 15

27

*S. Jon Kreedman & Co. v. Meyers Bros. Parking-W. Corp.,*
 58 Cal. App. 3d 173 (1976)............................................................................................... 6

28

*Sanchez-Corea v. Bank of America*,
    38 Cal. 3d 892 (1985) ................................................................................................ 6

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
    55 Cal. 4th 747 (2012) ......................................................................................... 6, 15

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507(1996) ...................................................................................... 3

**Other Authorities**

CACI Nos. 2201 & 2202 ................................................................................................. 3

Fed. R. Civ. P. 16 ........................................................................................................... 2

Fed. R. Civ. P. 26 ..................................................................................................... 1, 15

Fed. R. Civ. P. 30(b)(6) .................................................................................................. 6

Fed. R. Evid. 702 .................................................................................................. 1, 8, 14

N.D. Cal. L.R. 7 ............................................................................................................. 2

## INTRODUCTION

With no legal basis to sustain the admission of Sacks's business valuation damages opinion ("full damages," as he calls it), hiQ tries to call it something else. But relabeling a business valuation calculation as "lost profits" is no answer. For one, Sacks was clear that his full "damages opinion" is a business valuation calculation, ***not*** a lost-profits analysis like his "subset damages" opinion. Second, California courts have consistently rejected attempts to recast business value claims as "lost profits" in order to end-run the prohibition on claiming lost business value as damages. In any event, hiQ's attempted relabeling of Sacks's full damages opinion does nothing to address the requirement under California law that economic interference torts be based on interference with specific existing economic relationships—something Sacks does not even purport to quantify. These are just the threshold issues why Sacks's opinion is categorically inadmissible. When the specifics are examined using common statistical tests approved in the very academic texts hiQ relies on, the resulting $69.6 million in damages hiQ seeks from LinkedIn is further shown to be wildly uncertain and unsupported.[1] Indeed, hiQ effectively concedes that Sacks should have compared companies in his regression dataset with hiQ on "major factors" that drive company valuations in order to address the uncertainty. But despite hiQ's post hoc lawyer-driven comparisons, no such analysis appears in Sacks's Rule 26 report and he testified in deposition that none was done. Sacks's full damages opinion is inadmissible at the threshold as a matter of law, and it is independently inadmissible because it is so uncertain and unreliable that it fails to meet Rule 702's admissibility standard as applied by *Daubert*.

Sacks's "subset damages" opinion fares no better. hiQ does not dispute that California law limits recovery under economic interference torts to recovery of lost profits, i.e., "loss of net pecuniary gain." Sacks's subset damages opinion, however, projects *profits* from *unprofitable* contracts, picking and choosing expenses to deduct that have no relationship to hiQ's actual fiscal track record. hiQ is required to show through nonspeculative evidence that profits were actually

---

[1] Sacks miscalculated damages in his initial report, and hiQ served an amended report the day before its opposition was due with the $69.6 million figure. LinkedIn uses the more recent figure now that it was provided, but the amended figure has no impact on the bases for LinkedIn's motion. *See* Mot. at 7.

1  lost and Sacks's failure to even consider hiQ's *profitability* in calculating lost *profits* renders his

2  calculation inadmissible.

3      Sacks has no admissible opinions and he should not be permitted to testify.[2]

4  **ARGUMENT**

5  **I.    SACKS'S FULL DAMAGES ANALYSIS IS A LOST BUSINESS VALUE**
   **CALCULATION BARRED BY CALIFORNIA LAW.**

6

7      In the face of clear authority foreclosing lost business value damages, hiQ's response is

8  twofold.  First, hiQ rejects the proposition without any support whatsoever.  Second, hiQ seeks to

9  avoid it by falsely claiming that, in fact, this is not a "business valuation" calculation after all, but

10  a "lost-profits" claim.  Opp. at 11.  Both arguments fail.

11      **A.    hiQ Cannot Recover Business Value Damages.**

12      California law is clear that "a plaintiff 'may recover only the profits lost, not the value of

13  the lost business.'"  Mot. at 11 (quoting *Elec. Funds Sols., LLC v. Murphy*, 134 Cal. App. 4th 1161,

14  1180 (2005)); *see also Pac. Rollforming, LLC v. Trakloc N. Am., LLC*, No. 07cv1897 IEG (MDD),

15  2011 WL 13176817, at *3 (S.D. Cal. Dec. 1, 2011) ("California courts have rejected the proposition

16  that a plaintiff may recover the value of the lost business."); *see also* Mot. at 11-14 (citing authority

17  holding that business value is not recoverable).  Lost enterprise value simply is not a permissible

18  theory of tort damages under California law.

19      In the face of this plain bar on enterprise valuation theories, hiQ cites no California or

20  federal case permitting a plaintiff to use an expert's valuation of a company as the basis to recover

21  damages for *any claim*, let alone the economic interference claims hiQ asserts.  *See id.* at 9-11.  To

22  the contrary, all the authorities cited by *both parties* are plain that "[t]he measure of damages for

---

23  [2] hiQ's footnote motion to strike because LinkedIn somehow violated page limitations lacks merit.
24  LinkedIn noticed its *Daubert* motion pursuant to L.R. 7-1 following the specifications in L.R. 7-2
   and on the specific Rule 16 deadline.  ECF No. 236 (Ord. Re Case Schedule) at 4 (setting separate
25  deadlines for *Dauberts* and Motions *in Limine*).  The pretrial instructions cited by hiQ, Opp. at 1
   n.1, apply to the motions due "twenty-one (21) days prior to the final pretrial conference," not
26  motions due on the much earlier and separately set *Daubert* / Dispositive Motion deadline.  Further,
   the pretrial instructions prohibit replies for motions filed 21 days before trial, but the case schedule
27  in this case specifically permits replies in support of *Daubert* motions consistent with L.R. 7.  ECF
   No. 236 (Ord. Re Case Schedule) at 4.  LinkedIn's motion was properly noticed under L.R. 7-1 and
28  complied with the page limit in L.R. 7-2.

REPLY ISO MOT. TO EXCLUDE SACKS
17-cv-03301-EMC

the diminution of the value of business due to a wrongful act is reflected by *loss of profits*, expenses incurred or similar concrete evidences of injury."  Mot. at 12 (quoting *Elsbach v. Mulligan*, 58 Cal. App. 2d 354, 366-67 (1943)); *see also* Opp. at 9 (relying on *Murphy*, 134 Cal. App. 4th at 1181); *Alpha GRP, Inc. v. Subaru of Am., Inc.*, No. CV182133MWFMRWX, 2021 WL 1146029, at *11 (C.D. Cal. Feb. 8, 2021) (excluding expert damages opinion seeking business value that was based on unsubstantiated profit projections and lacked valid comparisons to similar business's profitability for failing to "prove prospective profits") (cited at Opp. 12).

Moreover, hiQ does nothing to show how a business value recovery meets the substantive elements of hiQ's claims, effectively conceding the issue.  Mot. at 12-13.  "Economic interference torts"—such as hiQ's claims for intentional interference with contract and interference with prospective economic advantage—"make actionable only interference with specific, established relationships, not abstract opportunities in 'the market' generally."  Mot. at 12-13 (*citing Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521 (1996) and similar authority). The law requires tethering hiQ's claims to specific *existing* relationships with the expectancy of future economic benefit.  *See* Opp. at 9-13 (not disputing the specific relationship element); *see also* CACI Nos. 2201 & 2202 (requiring named third party).  Sacks's full damages opinion was not limited to "the value of existing customers and contracts"—that was "only one component" of the analysis.  Opp. at 4.  hiQ concedes that the full damages opinion seeks to recover "all-expected profits … from the distant future," which are precisely the type of speculative and unsupported damages that California law forbids.  Mot. at 13 (quoting LinkedIn Compendium of Evidence ("LI CE") 997 (Sacks Dep.)); *see also* Opp. at 12 (Sacks's opinion includes "the net present value of expected future profits and losses").  The full damages opinion is, accordingly, not an appropriate measure of damages for hiQ's economic interference torts both because it is a "business value" calculation and because it includes damages from unknown and unidentified relationships extending into "the distant future," and should be excluded in its entirety.

**B.     Sacks's Full Damages Is Not A "Lost-Profits" Analysis.**

In an attempt to save Sacks's full damages opinion from being excluded as an impermissible business valuation opinion, hiQ tries to retroactively recast it as a "lost-profits" analysis.  *See* Opp.

at 11-12 (arguing the "full damages analysis *is* a lost profits analysis because the value of an enterprise is the net present value of expected future profits and losses") (emphasis original). Initially, there can be no serious dispute that Sacks's full damages opinion is an impermissible "lost business valuation." Opp. at 11. Sacks's full damages method calculated enterprise value based on a statistical model that took into account investor valuation of companies. He relied on implicit investor valuations of hiQ based on its funding rounds. He did not estimate a revenue or profit stream for the company. He repeatedly admitted at deposition and in his report that the full damages opinion "is based on hiQ's valuation as a company" and is "an enterprise valuation analysis." hiQ Opp. Ex. 90 (Sacks Dep.) 16:3-7. He agreed that the full damages opinion seeks "to recover [hiQ's] enterprise value as damages." *Id.* at 16:12-20; *see also, e.g.*, *id.* at 99:22-25 (admitting the full damages opinion is "a regression analysis … predicting hiQ's enterprise value"); LI CE 1086 (Sacks Rpt.) ("I value hiQ on the valuation date with a regression approach."); *id*. 1012 ("it's just the value of—of the company that was destroyed"). It is thus unsurprising that hiQ itself repeatedly states elsewhere in its opposition brief that the full damages opinion is based on a "valuation equation" and is intended to be a "valuation method" for hiQ. *E.g.*, Opp. at 5, 14, 21.

hiQ's post hoc attempt by counsel to recast Sacks's opinion as "lost profits" seizes upon one out-of-context statement from Sacks's deposition that his method implicitly reflects an assumption about the ultimate profitability of the firm. Of course, when investors make an investment they often do so with the hope and expectation that a firm will eventually become profitable. That does not mean their investment valuations reflect a profitability projection that meets legal standards for a damages case. Not surprisingly, hiQ does not even offer a declaration from Sacks to explain that his method is, in fact, a lost-profits calculation. Undoubtedly Sacks would not sign such a declaration. A "business value" calculation redubbed as "lost profits" by lawyers (not even by the expert) does not suddenly make the analysis proper.

hiQ's attempt to recast Sacks's full damages opinion as "lost profits" fails because it is not a lost-profits analysis. Sacks himself said so, and the analysis contains none of the attributes of a proper net profits calculation method. It is indistinguishable from the method that was rejected by *Kids' Universe v. In2Labs* as insufficient under California's lost-profits standard. 95 Cal. App. 4th

870, 887 (2002) (emphasis original); *see* Mot. at 13-14 (discussing *Kids' Universe*). As explained in LinkedIn's opening brief, *id.*, *Kids' Universe* considered and rejected an expert's attempt to equate an enterprise value calculation with a lost-profits calculation. There, as hiQ tries to do here, an expert offered an expected market valuation as a proxy for lost net profits. *Kids'* found the analysis insufficient as a matter of law because a valuation "would not allow a reasonable trier of fact to find with reasonable certainty lost net *profits*." *Kids' Universe*, 95 Cal. App. 4th at 887 (emphasis original). As *Kids'* makes clear and hiQ concedes, the key question is whether the proffered expert testimony provides a basis to find "that the company at issue would have been *a profitable operation*." Opp. at 10 (emphasis added). But Sacks was crystal clear in his deposition that he conducted no such analysis—it was *not* something he even *considered*. LI CE 1058-59 (Sacks Dep.) ("I'm not making a determination about whether hiQ's operations would have become profitable."), *id.* 1057 ("the notion of would hiQ written large be profitable in this period isn't – isn't relevant"), *id.* 1112 (Sacks Rpt.) ¶ 101 ("[Y]oung VC-backed firms like hiQ … have never been profitable and were not expected to be profitable for many years.").

As with the analysis in *Kids'*, Sacks's full damages opinion is a business valuation made with no consideration as to whether hiQ's operations "would have resulted in *profits*" and is accordingly *inadmissible* as a lost-profits analysis under California law. *Kids'*, 95 Cal. App. 4th at 888 (emphasis original); *see also Alpha GRP*, 2021 WL 1146029 at *11 (relying on *Kids'* to strike business valuation opinion proffered as proxy for lost profits).

**C.** **If It Were A Lost-Profits Opinion, Sacks's Full Damages Opinion Would Still Be Inadmissible Because It Lacks The Factual Basis Required To Project Profits For An Unprofitable Unestablished Business.**

Even if Sacks's method were a lost-profits analysis—it is not—there is a separate and independent basis to exclude the full damages opinion. hiQ was unprofitable, and as an unprofitable business ("unestablished" in the case law), hiQ must come forward with evidence to show that it *would have become* profitable—an analysis that is similarly absent from Sacks's opinions. *E.g.*, *Alpha GRP*, 2021 WL 1146029 at *11 (rejecting expert testimony seeking "a massive verdict based on speculative projections of future spectacular success"). hiQ concedes that it was consistently **un**profitable—i.e., an **un**established business. *Compare* Mot. at 13 ("there was

never a quarter in hiQ's history where it was profitable") *with* Opp. at 9 (hiQ "need not be presently profitable").  hiQ also concedes that an *unprofitable* business cannot recover "anticipated lost profits" unless it has "evidence of 'reasonable reliability.'"  Opp. at 2 (quoting *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012) (defining "unestablished" as a business where profits are "dependent upon future events")).  Such evidence, per hiQ, is "past volume of business, other provable data relevant to probable future sales, and evidence of the profits lost by similar businesses operating under similar conditions;" or "economic and financial data, market surveys and analyses, business records of similar enterprises or general business conditions and the degree of success of similar enterprises."  Opp. at 10 (quotation marks omitted).

There is no such evidence in this case, as is obvious from Sacks's report and hiQ's admissions.  hiQ CEO Weidick, testifying for hiQ under Rule 30(b)(6), admitted that hiQ had never been profitable and never even made a projection showing that it would eventually become profitable.  Supp. Justice Decl., filed concurrently herewith, Ex. 99 (Weidick Dep. at 416:13-417:8).  Undoubtedly this is why Sacks's full damages analysis has none of the hallmarks required by the authority cited in hiQ's opposition brief.  Sacks's method utterly fails to provide a reliable basis to establish lost profits under California law.

Thus, *Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375, 399-400 (2019) (cited at Opp. 9-10), approved a lost-profits projection based on "actual sales data" from "five months" where the plaintiff was "profitable."  There was a "track record" of *profitability* "to base the projections of future lost profits" that "both sides' experts … used."  *Id.* at 399.  The plaintiff in *Sanchez-Corea v. Bank of America*, 38 Cal. 3d 892, 907-908 (1985) (cited at Opp. 10), "had been in operation for 10 years" and had seen "tenfold growth in contracts (sales) from $180,000 in 1970 to $1.5 million in 1973," the three years prior to suit.  Further, the plaintiff introduced evidence of "the earnings of other companies … which occupied the market after [plaintiff's] departure" to establish a profit projection.  *Id.* at 907.  *S. Jon Kreedman & Co. v. Meyers Bros. Parking-W. Corp.*, 58 Cal. App. 3d 173, 185 (1976) (cited at Opp. 10), involved an existing profitable parking business run by "a highly experienced garage operator."  There was also testimony that the plaintiff had another comparable location that was presently profitable.  *Id.*  The factual foundation to project future

profits in these cases stands in stark contrast to the "lost profits" supposedly baked into Sacks's full damages opinion.  Sacks did none of the market comparisons or other work to establish a basis for hiQ's future profits.  To the contrary, he was expressly "*not* making a determination about whether hiQ's operation would have become profitable."  LI CE 1059 (Sacks Dep.).

hiQ contends that Sacks conducted a detailed factual analysis to collect "a dataset of 257 similarly-situated enterprises with which to compare hiQ."  Opp. at 11.  Similarly situated how? Sacks testified that for the 257 companies in the full damages dataset:

- He didn't compare their profitability to hiQ because he didn't "even know if they report profitability."  LI CE 1018 (Sacks Dep.).

- He did not "ever compare[] the – the revenue" of the dataset firms to hiQ's because he did not think it "relevant."  *Id.*

- He did not consider if the dataset firms "had a similar investor profile" to hiQ, or "consider whether any of those firms were facing a pretty substantial barrier with respect to producing their products" (hiQ's inability to scrape LinkedIn as of April 2017) "such that they were similarly situated to hiQ."  *Id.* at 1021.

Sacks considered almost nothing of relevance between the dataset firms and hiQ, acknowledging he did not "have any knowledge of their similarity or dissimilarity" to hiQ.  *Id.* at 1029.  He did no "market surveys," did not examine records of "similar enterprises," or make *any effort* to determine "whether hiQ's operations would have become profitable."  *Id.* at 1058-59; *see also* LI CE 1072-1118 (Sacks Rpt.) (not analyzing whether hiQ's operations would become profitable).

Sacks's analysis is similar to the "fantastical" damages analysis rejected under *Daubert* in *Alpha GRP, Inc. v. Subaru of Am., Inc*., 2021 WL 1146029 at *10 (cited at Opp. at 13), which sought to establish business value as a proxy for future lost profits on "extremely optimistic and unsubstantiated" projections.  In other words, the *Alpha GRP* analysis lacked reliable bases approved under California law to support a finding of future profits, such as "economic and financial data, market surveys and analyses, business records of similar enterprises and the like." *Id.* (quoting *Kids' Universe*, 95 Cal. App. 4th at 884).  While the expert excluded in *Alpha GRP* tried and failed to establish the plaintiff's future profitability, Sacks did not even try with hiQ and

his full damages opinion is inadmissible as insufficient under California law.  *See* LI CE 1058-59 (Sacks Dep.) ("I'm not making a determination about whether hiQ's operations would have become profitable.").  hiQ's lawyer-driven effort to relabel Sacks's method fails, because it is simply not true that it is a lost-profits analysis, and because even if it were true, the method is still plainly inadequate to pass muster under Rule 702.

## II.      SACKS'S REGRESSION ANALYSIS IS FLAWED AND UNRELIABLE.

hiQ admits that it would be "outlandish" for an expert to perform a valuation analysis that "relies ***only*** on a prior round's valuation and does ***not*** consider any company-specific factors." Opp. at 18 (emphasis original).  Unfortunately for hiQ, that is exactly what Sacks did.  The regression is limited to Series B and Series C valuation data as inputs—it does not consider the "major factors" listed by hiQ or anything else.  Mot. at 7-8 (describing regression inputs as only Series B and Series C values).  Certainly Sacks did not consider whether firms included in the regression dataset were comparable to hiQ on "major factors"—he did not know anything about the dataset firms beyond metrics so broad they are irrelevant (e.g., that they were potentially "Big Data" or "Software as a Service" companies).  The result is a regression that is entirely unreliable for predicting an individual company's valuation.[3]  The analysis that hiQ claims Sacks performed to account for his model's uncertainty—comparing hiQ to companies that perform to the *average* of the regression—appears nowhere in Sacks's report or deposition.  Finally, hiQ argues that Sacks should be allowed to testify to the full damages because LinkedIn did not submit an alternative calculation.  But the parties agree that it is *hiQ*'s burden as proponent to establish admissibility and the Court's duty to screen unreliable testimony as a threshold question.  Sacks's regression, the lynchpin of the full damages analysis, is fundamentally flawed, unreliable, and inadmissible.

---

[3] hiQ confusingly discusses a "Terminal Value" calculation based on a "standard valuation formula."  Opp. at 15-16; *see id.* at 5-6 (describing calculation of Terminal Value and the standard Terminal Value formula ("*Terminal Value = Terminal EBITDA x Terminal EBITDA Multiple*")).  This discussion is irrelevant because Sacks did not use the standard formula; it appears nowhere in his report, and he specifically rejected use of actual financial metrics such as EBITDA to value hiQ.  *E.g.*, LI CE 1112 (Sacks Rpt.) (opining that it was inappropriate to use EBITDA because it "does not work" for startups like hiQ).

**A.      hiQ's "Major Factors" Were EXCLUDED From Sacks's Regression.**

In another attempt to retroactively rewrite Sacks's full damages opinion, hiQ claims that Sacks analyzed a series of "major areas," the "Metrick Factors," and then, "applying the Metrick Factors," created his "regression line that characterized the relationship between Round B & C valuations." Opp. at 16-17.  Only after building a regression that included the Metrick Factors, according to hiQ, did Sacks "use[] the regression line to infer what would have happened with hiQ at Round C." *Id.* at 16.  This is, again, a complete fiction because *none* of the Metrick Factors were included as variables in Sacks's regression or otherwise considered in building the regression itself.

The Metrick Factors identified by Sacks are the "major areas … that VC's consider" when making an investment decision in a startup, and are Management, Customers, the relevant Market & Competition; Channels and Partners, Technology, Projections, Money, Transaction Terms, and Terrible Things.  LI CE 1091-105 (Sacks Rpt.).  Sacks considered the Metrick Factors only for the purpose of supporting his opinion that "hiQ was likely to raise a successful Round C" shortly after the LinkedIn C&D letter.  *See* LI CE 1091 (heading capitalization omitted).  Once he decided the answer to that question was "yes," he did not revisit the Metrick Factors, include them as variables in his regression, use them as a basis to select the 257 companies in the dataset, or use them to test the regression results.  *The only variables* considered in Sacks's regression were Series B and Series C valuations.  LI CE 1023-24 (Sacks Dep.) (describing the regression as based on a comparison between Series B and Series C valuations); *id*. 1106-08 (Sacks Rpt.) (describing regression as based only on Series B and Series C valuations).

The *only* factors Sacks considered when comparing hiQ to the dataset firms were so broad as to be effectively meaningless as a basis for comparability:  whether the firms completed a Series C after 2010 and whether firms were in a set of industries with no reasonable connection to hiQ (i.e., *all* Big Data, HR Tech, and Software-as-a-Service firms).  Mot. at 5.  When it came to specifics like the Metrick Factors, Sacks ignored them.  *Id.* at 5-6 (establishing that the regression did *not* consider comparability of revenues, profitability, valuations, investor funding, type of business, type of products, or "terrible things" like hiQ's technical inability to scrape as of April 2017).  In fact, when directly asked whether he assessed factors *other than* Series B and Series C valuation to

explain the variance in his regression model, *see* Mot. at 7-8 (discussing 63% unexplained variation), Sacks conceded "there's no way of doing that.  There's no – no real data on these – on these firms to look at."  LI CE 1023-24 (Sacks Dep.).  hiQ's Opposition is contradictory on this point—arguing on the one hand that the regression is reliable *because of* the "analysis of the data and other evidence—including the Metrick Factors," but then *conceding* "the Metrick Factors for *each and every* company in the dataset are not accounted for in the regression model—because the underlying company data was not available to include."  Opp. at 17-18 (emphasis added).  The reality is that *none* of the Metrick Factors were considered for *any* of the dataset firms.  The only variables were Series B values and Series C values—no other variables were considered or tested.

As hiQ concedes, a regression that fails to "account for significant and quantifiable variables" has "very little explanatory power" and is inadmissible.  Opp. at 19.  The significant variables—the Metrick Factors identified by hiQ—are demonstrably *not considered* and hiQ has not met its "burden of proving helpfulness and relevance" of Sacks's regression.  *In re REMEC Inc. Securities Litgation*, 702 F. Supp. 2d 1202, 1273 (C.D. Cal. 2010) ("[W]here significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable.") (*citing Bazemore v. Friday*, 478 U.S. 385, 400 (1986), and *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999)).

**B.      hiQ's Own Academic Text Establishes That The "Prediction Interval" Is The Right Test Of Reliability.**

Sacks did not test the reliability of his regression for predicting the Series C value of hiQ and hiQ's argument to the contrary is demonstrably specious.  *Compare* Mot. at 7-8 *with* Opp. at 19-22.  hiQ acknowledges that the "prediction interval" for Sacks's predicted value of hiQ is a recognized "measure of uncertainty" in a regression.  Opp. at 20.  Then hiQ argues that the prediction interval should just be disregarded because Sacks's regression is pretty good at predicting the *average* relationship between Series B and Series C of firms in the regression dataset.  Per hiQ, the prediction interval can be disregarded because Sacks evaluated the Metrick Factors to find that "hiQ would behave like an average company in going from Round B to Round C."  Opp. at 20.  hiQ's opposition fails because (1) the prediction interval for hiQ's predicted value is the

REPLY ISO MOT. TO EXCLUDE SACKS
17-cv-03301-EMC

1    right measure of uncertainty according to the very academic text hiQ submitted, and (2) Sacks did

2    not actually do any analysis to determine that hiQ was "average."

3              **1.      The Prediction Interval Shows Sacks's Regression Is Fatally Flawed.**

4         hiQ relies on Introductory Econometrics: A Modern Approach (Wooldridge, 5th Ed.) to

5    argue that the prediction interval should be disregarded in favor of a 'confidence interval.'  Opp. at

6    20 n.19 (citing hiQ Opp. Ex. 97).  That text, however, explains that a confidence interval for the

7    regression line is "a confidence interval for the *average* value."  hiQ Opp. Ex. 97 (Wooldridge) at

8    208 (emphasis added); Opp. at 20.  A confidence interval, however, *does not* "account for another

9    very important source of variation:  the variance in the unobserved error, which measures our

10   ignorance of the unobserved factors that affect *y*."  hiQ Opp. Ex. 97 (Wooldridge) at 209; Mot. at

11   18 (discussing prediction intervals).  In other words, the prediction interval quantifies the error

12   caused by all the "major factors" that Sacks *couldn't include* because he *lacked data* and explains

13   how good his model is at predicting ***individual*** company values in light of the missing information.[4]

14        Wooldridge provides a simple real-world example of how this works in Examples 6.5 and

15   6.6.  Example 6.6 was cut off in the excerpt submitted by hiQ but is included in Supp. Justice Decl.

16   Ex. 97.  Example 6.5 generates the initial model to predict students' college GPAs based on two

17   variables, SAT score and high school rank.  *Id.* at 208-209.  The model is useful for predicting the

18   average college GPA for students with a 1,200 SAT score and ranked 30th in their high school,

19   with a narrow confidence interval of 2.70 ± .0392 or about 2.66-2.74 at 95% significance.  "This

20   confidence interval is rather narrow due to the very large sample size."  *Id.* at 209.  But the model

21   is not good at predicting ***individual*** outcome, as shown in Example 6.6.  There, the question is how

22   good the model is at predicting the college GPA for "any *particular* student" with the same

23   characteristics (as opposed to the average across all students).  *Id.* at 210-211 (emphasis original).

24   The confidence interval for the ***individual*** prediction—the prediction interval—ends up giving a

25   range of "about 1.60 to 3.80," which "is a wide confidence interval and shows that, based on the

26   factors we included in the regression, we cannot accurately pin down an individual's future college

27   _____
     [4] hiQ's claim that LinkedIn is conflating confidence intervals and prediction intervals is false.  Per
28   hiQ's Opp. Ex. 97, a "prediction interval" is merely the "confidence interval for a particular unit
     … from the population."

1   grade point average." In other words, "the unobserved characteristics that affect college GPA vary

2   widely among individuals with the same observed SAT score and high school rank." *Id.* at 211.

3   The same relationship holds for Sacks's regression and shows that omitted variables render his

4   model statistically useless for predicting hiQ's *individual* value at Series C.

5          With Sacks's regression, there is a large sample size of 257 companies, so the regression is

6   able to provide a statistically significant estimate of the average for the sample reflected by the

7   regression line in Sacks Figure 5. Opp. at 20. If the average Series C valuation of the population

8   for any given Series B valuation were the relevant information, the model would provide a

9   reasonably precise estimate of the average. Here, however, Sacks is *not* predicting the average, he

10  is using the model to predict a value for an *individual* company—"the Regression Approach

11  predicts a round C pre-money value for hiQ." CE 1109 (Sacks Rpt.). Thus, the prediction interval

12  is the relevant measure of significance. Supp. Justice Decl. Ex. 97 (Wooldridge) at 210-11.

13         The prediction interval for hiQ's valuation is so broad at *any* significance level—ranging

14  over hundreds of millions—that the prediction of hiQ's *individual* value is meaningless. *See id.*;

15  *see also* Mot. at 8, 17-20. hiQ argues in opposition that the prediction interval is "computationally

16  flawed," but that claim is unsupported and contradicts Sacks's sworn testimony. *Compare* Opp. at

17  21 *with* LI CE 1041 ("Q. [T]hese are the prediction intervals for your regression at the $91.1 million

18  value? A. Yeah .... In – in a mechanical sense, I – I believe that they are."); *see also* CE 1038-

19  1042. hiQ goes on to admit that the prediction interval "includes a large range of *negative* Round

20  C valuations, which are nonsensical (a firm cannot have a valuation of less than zero)." Opp. at

21  21. But the predication interval is just a mathematical calculation measuring error in Sacks's model

22  from omitted variables, hiQ Opp. Ex. 97 (Wooldridge) at 209-10 (describing calculation of

23  prediction intervals), and any criticism of the prediction interval is just criticism of Sacks's model

24  itself. If the mathematically calculated prediction interval is nonsensical, that is because Sacks's

25  regression spits out nonsensical results and predicts substantial negative valuations as being just as

26  likely as large positive valuations. *See* Supp. Justice Decl. Ex. 97 (Wooldridge) at 210-11.

27         **2.      Sacks Did Not Evaluate hiQ's Comparability To The "Average."**

28  hiQ argues that Sacks analyzed and determined "hiQ would likely behave like the average

firm" meaning that hiQ's predicted value should be based on "a measure of confidence about average firm behavior." Opp. at 20-21. The argument inherently acknowledges that the regression has no predictive value at the ***individual*** level, so the population average should be substituted for a prediction specific to hiQ. Setting aside the inherent methodological impropriety of inferring an individual prediction from a population-wide average, the argument still fails because *Sacks conducted no such analysis*.

Sacks's expert report contains no analysis as to whether hiQ would perform near the average of firms in the regression dataset. Sacks calculates a Series B value for hiQ, LI CE 1087 (Sacks Rpt. § IV.a), considers whether hiQ was likely to make it to Series C as of May 23, 2017, LI CE 1091 (Sacks Rpt. § IV.b), plugs hiQ's Series B value into the regression equation, LI CE 1105 (Sacks Rpt. § IV.C), discounts it 20% for the time value of money, LI CE (Sacks Rpt. § IV.C.3), and stops. There is only one place in the relevant sections where Sacks refers to other companies, and it is to *exclude* a few extreme outliers from the dataset, not compare hiQ's performance to a dataset average. *Id.* at 1106-07. hiQ suggests that Appendix C was used as a basis for comparison to hiQ, Opp. at 17, but Sacks testified that "Appendix C is only looking at characteristics … of the sample from PitchBook," and not any hiQ data. LI Ex. 98 (Sacks Dep. 136:3-16). At his deposition, Sacks confirmed that he did no investigation into why firms in his dataset deviated from the average. Sacks knew nothing about Tapjoy and Bounty Jobs, two firms that underperformed the average by hundreds of millions of dollars. Mot. at 19. Certainly, he did not "have any knowledge of their similarity or dissimilarity" to hiQ. LI CE 1029 (Sacks Dep.); *see* Supp. Justice Decl. Ex. 98 (Sacks Dep. 190:20-191:10). With respect to the Metrick Factors, which *could* be a basis to compare, Sacks did not consider them at all as to the dataset companies, as discussed *supra*.

Given how unreliable Sacks's regression is at predicting ***individual*** value, it's unsurprising that there is no academic support. Mot. at 15; Opp. at 15 (conceding there is no academic support). hiQ's only response to the lack of academic support is that academia isn't interested in the specifics of company valuation, Opp. at 15, but that claim is facially absurd as Sacks uses the academic Metrick text to value hiQ at Series B (although not for the regression itself, as discussed *supra*) and hiQ submits several academic articles discussing company valuation. hiQ Opp. Exs. 93-95.

REPLY ISO MOT. TO EXCLUDE SACKS
17-cv-03301-EMC

1

**C.      Admissibility of Expert Testimony Is Not A "Reliability Battle."**

2        hiQ concludes its argument by turning the applicable evidentiary burden on its head and

3 suggesting that it was incumbent on LinkedIn to propose some "alternative suggested valuation

4 method" to Sacks's full damages methodology.  Opp. at 21.  LinkedIn has no obligation to calculate

5 hiQ's supposed damages.  Both parties agree that the "*proponent* of the expert testimony bears the

6 burden of establishing the testimony's admissibility by a preponderance of the evidence."  Opp. at

7 8 (emphasis added) (citing *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1260 (N.D. Cal. 1997);

8 Mot. at 10 (same); *see also Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp.

9 3d 928, 938-39 (N.D. Cal. 2015) (holding that it is the district court's function under *Daubert* to

10 "exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards" and

11 placing the burden on the proponent to prove the "evidence is … both reliable and relevant")

12 (quotation omitted)).  It was hiQ's burden to show that Sacks's "full damages" opinion stood on its

13 own merits.  Having failed to do so it cannot shift the burden on admissibility to LinkedIn and force

14 LinkedIn to cure the defects in Sacks's opinions.

15 **III.     SACKS'S SUBSET DAMAGES OPINION IS INADMISSABLE BECAUSE IT
            DOES NOT MEET THE REQUIREMENTS OF CALIFORNIA LAW.**

16

17        hiQ does not dispute that a valid lost-profits calculation under California law is based on

18 "net profits" defined as "gains made from sales after deducting the value of the labor, materials,

19 rents, and *all expenses*, together with the interest of the capital employed [i.e., opportunity cost]."

20 *Compare* Mot. at 20 *with* Opp. at 13-14.  Nor does hiQ dispute that the object of the net profits

21 requirement is to ensure a plaintiff recovers only "loss of net pecuniary gain, not just loss of gross

22 revenue."  *Compare* Mot. at 20 *with* Opp. at 13-14.  hiQ in fact *concedes* that Sacks's subset

23 damages opinion *did not* make the necessary deductions by serving an amended report the day

24 before its opposition was due that made some (but not all) of the additional deductions for both

25 hiQ's expenses *and* revenues actually received that Sacks impermissibly double counted, the effect

26 of which was to shave $1 million or nearly 40% off the original subset damages amount.  *See* Mot.

27 at 20-22; Opp. at 2 n.2, 14 n.16.

28        But even with hiQ's last-minute adjustments, the subset damages analysis is inadmissible

1  because a lost-profits award cannot be based on "prospective profits" if their "occurrence is
2  uncertain, contingent and speculative." *Sargon*, 55 Cal. 4th at 774.  It is undisputed that hiQ was
3  *unprofitable* at the time of the C&D Letter, and Sacks includes no analysis showing hiQ would
4  have become *profitable*.  *See* Opp. at 14; *see also Supra* at § I.C.  hiQ's only response is to suggest
5  that hiQ would have entered "runoff mode" after the C&D Letter and stopped incurring "expenses
6  focused on *growing* the business."  Opp. at 14.  This is methodologically improper because in the
7  same breath Sacks says it would have earned profits "but-for" the C&D letter, but only if savings
8  *because of* the C&D letter are counted.  Moreover, hiQ *did* enter runoff mode and hiQ was *still*
9  unprofitable.  ECF No. 329 (Ord. Dissolving PI) ("hiQ wound down its operations in 2018, though
10  its servers continued running into 2019 to deliver on client contracts."); LI CE 1057 (Sacks Dep.)
11  ("Q: [T]here was never a quarter in hiQ's history where it was profitable, correct?  A. I believe that
12  that's true.").  Even so, Sacks performed no analysis "to determine whether hiQ's operations would
13  have become profitable during the subset analysis period."  LI CE 1059 (Sacks Dep.).  Given hiQ's
14  track record of *un*profitability both before and after the C&D Letter in May 2017, it was incumbent
15  on hiQ to come forward with some analysis showing it lost "net pecuniary gain, not just loss of
16  gross revenue" during the subset damages period.  *Parlour Enterprises, Inc. v. Kirin Grp., Inc.*, 152
17  Cal. App. 4th 281, 287 (2007).  Without that foundation, the subset damages opinion is
18  inadmissible.

19  **IV.    EVIDENTIARY OBJECTIONS**

20          LinkedIn objects to and moves to strike the academic articles in hiQ Opposition Exhibits
21  92, 93, 94 and 95.  The articles were not disclosed in Sacks's report as bases for his opinions and
22  thus they were not timely disclosed under Rule 26(a)(2)(B)(i)-(iii).  Any Sacks testimony based on
23  Exhibits 92-95 is inadmissible undisclosed expert opinion.  *In re High-Tech Emp. Antitrust Litig.*,
24  No. 11-CV-02509-LHK, 2014 WL 1351040, at *12 (N.D. Cal. Apr. 4, 2014) (striking portions of
25  late-disclosed expert testimony because it is impermissible to "'sandbag' … with new analysis that
26  should have been included at the very least in [the expert's] opening merits report.").

27                              **<u>CONCLUSION</u>**
28          Both of Sacks's opinions are inadmissible and LinkedIn's motion should be granted.

1    Dated: September 12, 2022                 Orrick, Herrington & Sutcliffe LLP

2

3                                              By:  */s/ Annette L. Hurst*
                                                    ANNETTE L. HURST
4                                                   Attorney for Defendant
                                                    LinkedIn Corporation
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28