1  ANNETTE L. HURST (SBN 148738)
   ahurst@orrick.com
2  RUSSELL P. COHEN (SBN 213105)
   rcohen@orrick.com
3  PAUL F. RUGANI (SBN 342647)
   prugani@orrick.com
4  CATHERINE Y. LUI (SBN 239648)
   clui@orrick.com
5  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
6  DANIEL JUSTICE (SBN 291907)
   djustice@orrick.com
7  EMILY RENZELLI (*pro hac vice*)
   erenzelli@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
9  San Francisco, CA  94105-2669
   Telephone:   +1 415 773 5700
10 Facsimile:   +1 415 773 5759

11 *Attorneys for LinkedIn Corporation*

12                 UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15 hiQ Labs, Inc.,                          Case No. 17-cv-03301-EMC

16                  Plaintiff,              **LINKEDIN'S REPLY IN SUPPORT OF
                                            MOTION FOR SUMMARY JUDGMENT**
17         vs.
                                            Date:          September 29, 2022
18 LinkedIn Corporation,                    Time:          1:30 p.m.
                                            Courtroom:     5 – 17th Floor (Zoom)
19                  Defendant.              Judge:         Hon. Edward M. Chen

20                                          Complaint Filed:   June 7, 2017
                                            Trial Date:        February 27, 2023
21

22 LinkedIn Corporation

23                  Counterclaimant,
              vs.
24
   hiQ Labs, Inc.
25
                    Counterdefendant.
26

27

28             **FILED UNDER SEAL**

1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ................................................................................................................................ 2

I.    HIQ BREACHED LINKEDIN'S USER AGREEMENT AS A MATTER OF LAW ........... 2

    A.    Undisputed Facts Establish That hiQ Breached The User Agreement. ........................ 2

    B.    hiQ's Affirmative Defenses Are Baseless. ..................................................................... 4

II.    HIQ'S TORT AND UCL CLAIMS ARE BARRED BY CAL. CIV. CODE § 47. ............... 6

III.    HIQ'S INTERFERENCE TORT CLAIMS FAIL FOR OTHER REASONS ...................... 8

    A.    hiQ Cannot Satisfy Essential Elements Of Its Tort Claims. ........................................ 8

        1. hiQ identifies no live contract with which LinkedIn interfered. ............................... 9

        2. hiQ cannot establish interference with prospective advantage. ............................. 10

        3. hiQ cannot show that the C&D letter burdened its ability to perform or to accept
           business opportunities ........................................................................................... 11

    B.    LinkedIn's Conduct Was Legally Justified ................................................................. 11

    C.    hiQ Has Failed To Sustain Its Monetary Demands ..................................................... 12

IV.    HIQ'S UCL CLAIMS ALSO MUST BE DISMISSED. ..................................................... 12

    A.    hiQ's "Unfair," "Unlawful," And "Fraudulent" UCL Claims Must All Be
        Dismissed Because hiQ Has No Cognizable Remedy. ................................................ 12

    B.    hiQ's "Unfair" Prong UCL Claim Must Be Dismissed As A Matter Of Law ............. 13

        1. hiQ's failure to establish any cognizable form of anticompetitive conduct requires
           dismissal of its Seventh Claim for Relief. ............................................................. 13

        2. hiQ's attempt at a "monopoly broth" claim fails as a matter of law ...................... 16

    C.    hiQ's "Fraudulent" Prong UCL Claim Fails As A Matter Of Law Because hiQ
        Can Show Neither A Fraudulent Statement Nor Reliance. ......................................... 19

    D.    hiQ's "Unlawful" Prong UCL Claim Fails As A Matter Of Law ............................... 20

V.    HIQ HAS SYSTEMATICALLY DISREGARDED THE RULES OF EVIDENCE. .......... 20

CONCLUSION ......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
No. 16-cv-00923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018) ................................ 8

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ...................................................................................................... 15

*AT & T Corp. v. Dataway Inc.*,
577 F. Supp. 2d 1099 (N.D. Cal. 2008) .......................................................................... 20

*Bakst v. Community Memorial Health System, Inc.*,
Case No. CV 09-08241, 2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) ............................ 5

*Berkla v. Corel Corp.*,
66 F. Supp. 2d 1129, 1150-51 (E.D. Cal. 1999) .............................................................. 18

*Cardinal v. Lupo*,
No. 18-cv-00272-JCS, 2019 WL 4450859 (N.D. Cal. Sept. 17, 2019) ............................ 20

*City of Anaheim v. Southern California Edison Co*,
955 F.2d 1373, 1376 (9th Cir. 1992) .............................................................................. 18

*City of San Jose v. Office of the Comm'r of Baseball*,
776 F.3d 686 (9th Cir. 2015) ................................................................................... 15, 19

*Coremetrics, Inc. v. Atomic Park.com, LLC*,
No. C-04-0222 EMC, 2005 WL 3310093 (N.D. Cal. Dec. 7, 2005) .................................. 2

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ............................................................................ 13

*Epic Games Inc. v. Apple, Inc.*,
No. 21-16506 (9th Cir. Mar. 31, 2022), ECF No. 118 ...................................................... 19

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ......................................................................................... 7

*Facebook, Inc. v. Rankwave Co.*,
No. 19-cv-03738-JST, 2020 WL 4460550 (N.D. Cal. May 1, 2020) .................................. 5

*Guaranty Trust Co. of N.Y. v. York*,
326 U.S. 99 (1945) ....................................................................................................... 13

*Huynh v. Quora, Inc.*,
508 F. Supp. 3d 633 (N.D. Cal. 2020) ............................................................................ 12

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
527 F. Supp. 2d 1084 (N.D. Cal. 2007) ............................................................................ 8

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
828 F.3d 1098 (9th Cir. 2016)..................................................................................... 9, 20

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    No. 20-cv-07182-JCS, 2022 WL 1990225 (N.D. Cal. June 6, 2022) ...................................... 5

*Moore v. Equity Residential Mgmt., L.L.C.*,
    No. 16-cv-07204-JCS, 2019 WL 5697934 (N.D. Cal. Nov. 3, 2019) ............................. 10, 20

*New York v. Facebook, Inc.*,
    549 F. Supp.3d 6 (D.D.C. June 28, 2021) .............................................................................. 18

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015) ................................................................................................. 16

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ................................................................................................. 11

*Pac. Rollforming, LLC v. Trakloc N. Am., LLC*,
    No. 07-cv-1897-IEG (MDD), 2011 WL 13176817 (S.D. Cal. Dec. 1, 2011) ....................... 12

*Rambus, Inc. v. Infineon Technologies, AG*
    330 F. Supp. 2d 679 (E.D. Va. 2004) .................................................................................... 18

*Rubio v. Cap. One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ................................................................................................. 5

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ................................................................................................. 13

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011) ................................................................................................... 5

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ......................................................................................................... 1, 15

*Vinson v. Cal. Dep't of Corrs. & Rehab.*,
    No. 13-CV-00699-JST, 2014 WL 4594208 (N.D. Cal. Sept. 15, 2014) ................................. 8

*Westley v. Oclaro, Inc.*,
    No. C-11-2448 EMC, 2012 WL 1038647 (N.D. Cal. Mar. 27, 2012) .................................... 6

**California Cases**

*Aguilar v. Atlantic Richfield Co.*,
    25 Cal. 4th 826 (2001) ..................................................................................................... 14, 15

*Anderson v. Chancellor W. Oil Dev. Corp.*,
    53 Cal. App. 3d 235 (1975) ..................................................................................................... 3

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
    204 Cal. App. 4th 1 (2012) ................................................................................................... 15

*Brown v. Grimes*,
    192 Cal. App. 4th 265 (2011) ................................................................................................. 5

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 163 (1999) ............................................................................................. 14, 17, 18

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001)................................................................ 14, 15, 19

*City of Ukiah v. Fones*,
    64 Cal. 2d 104 (1966) ........................................................................ 6

*East West Bank v. Rio School Dist.*,
    235 Cal. App. 4th 742 (2015)............................................................ 5

*Elec. Funds Sols. v. Murphy*,
    134 Cal. App. 4th 1161 (2005).......................................................... 12

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (2020) ...................................................................... 10

*Kendall-Jackson Winery, Ltd. Superior Ct.*,
    76 Cal. App. 4th 970 (1999).............................................................. 4

*Marsh v. Anesthesia Servs. Med. Grp., Inc.*,
    200 Cal. App. 4th 480 (2011)............................................................ 17

*Mireskandari v. Gallagher*,
    59 Cal. App. 5th 346 (2020).............................................................. 7

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*,
    9 Cal. 5th 279 (2020) ........................................................................ 17

*Richardson v. La Rancherita of La Jolla, Inc.*,
    98 Cal. App. 3d 73 (1979)................................................................. 11

*Rubin v. Green*,
    4 Cal. 4th 1187 (1993) ...................................................................... 6, 8

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990) ....................................................................... 8

*Winet v. Price*,
    4 Cal. App. 4th 1159 (1992).............................................................. 2

**Federal Rules**

Fed. R. Evid. 602 ..................................................................................... 20

Fed. R. Evid. 801 ..................................................................................... 9, 20

Fed. R. Civ. P. 56 ..................................................................................... 12

**California Statutes**

California Civil Code
    § 47 (Privileged Communications) ................................................... 1, 6, 7, 8
    § 1670.5(a) (Unconscionability) ...................................................... 5
    § 3294 (Punitive Damages) .............................................................. 12

Cartwright Act, California Business & Professions Code § 16600 ........... 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Without the law or evidence on its side, hiQ pounds the table in its effort to avoid summary judgment.  It cranks up the rhetoric on its UCL unfair competition claim hoping that claim will narrowly survive, then bootstraps its opposition on every other issue to its colorful narrative of a predatory monopolist run amok.  Time and again—from LinkedIn's breach-of-contract claim, to hiQ's rhetorical evasion of § 47's absolute privilege, to hiQ's attempt to establish a tortious interference claim—the refrain is the same:  See the UCL claim.

But with the breadth of its factual and legal concessions now in full view, hiQ has no UCL claim.  It has abandoned completely every theory of anticompetitive conduct it has ever raised in this case—it does not even attempt to argue that its duty to deal, essential facilities, tethering, or other theories remain viable as a way of showing unfair competition.  hiQ leaves completely uncontested LinkedIn's "right" as "an entirely private business, freely to exercise [its] own independent discretion as to parties with whom [it] will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).  hiQ now says its claim rests on a previously unpled "monopoly broth" theory.  This watery concoction is missing the main ingredient: the monopoly.  Indeed, there is no market analysis at all.  hiQ defines no market.  It makes no attempt to show that LinkedIn has market power in any such market, let alone that LinkedIn is a monopolist.  And it offers no objectively measurable standard or showing of harm to competition in any market.  hiQ's UCL claim is a paragraph's worth of rhetoric.

For all its big talk of an "anticompetitive scheme" executed in "bad faith" by a "dominant" market player, hiQ's evidence at most supports the assertion that a few employees thought it would serve LinkedIn's business interests if hiQ could no longer engage in prohibited scraping, and one of them brought that likely scraping to the attention of attorneys.  So what?  Undisputed evidence establishes that LinkedIn's Legal team, exercising legal judgment and applying then-current case law, independently made the decision to assert LinkedIn's legal rights.  Ultimately, the law *protects* LinkedIn's right to set and enforce the conditions under which it offers services, and hiQ's case collapses under that reality.

For these reasons and a host of others, LinkedIn's motion should be granted.

1

## ARGUMENT

2

## I.  HIQ BREACHED LINKEDIN'S USER AGREEMENT AS A MATTER OF LAW.

3

### A.  Undisputed Facts Establish That hiQ Breached The User Agreement.

4      hiQ contests only the breach and damages elements of LinkedIn's contract claims.

5  *Compare* LinkedIn MSJ 11-15 *with* hiQ Opp. 11-16.  Its arguments are unavailing.

6      ***Breach.***  Although hiQ purports to challenge whether it breached various provisions of the

7  User Agreement by scraping, hiQ Opp. 13-16, it neither addresses the language of any provision

8  nor disputes that it did precisely what the contract forbids: "[s]crape profiles and information of

9  others through any means"; "[u]se manual or automated software … , devices, scripts, robots,

10  other means or processes to access, 'scrape,' 'crawl,' or 'spider' the Services"; "[u]se bots or

11  other automated methods to access the services;" "create … false identities] on LinkedIn"; "use,

12  disclose, or distribute … information …without the consent of LinkedIn"; "sell/re-sell access to

13  the Services or related data"; and "[s]hare or disclose information of others without their express

14  consent."  Lawit Decl. Ex. C (User Agreement § 8.2); *see* LinkedIn MSJ 4.

15      hiQ instead argues that "LinkedIn's course of conduct in managing its users" somehow

16  converts the meaning of the plain language above from a question of law for the Court into a

17  question of fact.  hiQ Opp. 13.  hiQ notes, for example, an internal email in which a LinkedIn

18  employee (incorrectly, *see* Lawit Decl. ¶ 17) suggested that LinkedIn "generally do[es]n't pursue

19  cases of public scraping," and hiQ contends (irrelevantly) that "LinkedIn … scraped its

20  competitors' websites."  hiQ Opp. 13.  Even if these things were true, though, it would not matter,

21  because "parol evidence is admissible only to prove a meaning to which *the language* is

22  'reasonably susceptible,' not to flatly contradict the express terms of the agreement."  *Winet v.*

23  *Price*, 4 Cal. App. 4th 1159, 1167 (1992) (emphasis added) (citations omitted).  In other words, a

24  court considers "extrinsic evidence to determine whether … the contract is fairly susceptible of

25  more than one interpretation," a "question of law to be answered by the court."  *Coremetrics, Inc.*

26  *v. Atomic Park.com, LLC*, No. C-04-0222 EMC, 2005 WL 3310093, at *3, 5 (N.D. Cal. Dec. 7,

27  2005).  Here hiQ does not even address the User Agreement's language, let alone posit some

28  alternative meaning for the various contractual prohibitions to which it assented.

1       hiQ next argues that "internally inconsistent provisions of LinkedIn's user agreement are

2   ambiguous."  hiQ Opp. 14-15.  Most of the provisions it points to are simply irrelevant.  For

3   example, even if it were true that other provisions of the User Agreement could be read to make

4   "literally everyone" a violator of that agreement, hiQ Opp. 14—and they cannot, the argument is

5   silly—that is just a distraction from the unambiguous provisions barring precisely what hiQ did.

6   Other provisions are not inconsistent at all.  For example, hiQ suggests that promises *to members*

7   about control over their information somehow generate ambiguity as to provisions that say

8   "Don't":  "scrape … through any means,"  "use bots,"  "create false identities," and so forth.

9   These provisions are not even in tension, let alone contradictory, as this Court previously noted

10  when finding hiQ's promissory estoppel claim "meritless."  *See* ECF No. 63 at 23.

11      Even more misleading is hiQ's suggestion that LinkedIn "permitt[ed] other companies to"

12  collect data in spite of the User Agreement through robots.txt.  hiQ Opp. 15.  What hiQ is

13  effectively saying here is:  "Even though the User Agreement says don't scrape, it seemed to us

14  like Google and Bing were indexing LinkedIn, so we believed the User Agreement actually meant

15  that we *could* scrape."  Confabulation is not contract interpretation.  In any event, hiQ is

16  misrepresenting what robots.txt is.  robots.txt is a standardized file by which a website can permit

17  certain identified bots to "crawl" identified URLs.  Schmidt Rep. 24.  LinkedIn's robots.txt states

18  that crawling "without the express permission of LinkedIn is strictly prohibited," specifies who is

19  permitted, and bars crawling by non-listed bots.  hiQ Opp. Ex. 104.  Nothing in LinkedIn's

20  robots.txt file would justify hiQ's disregard of the plain meaning of the User Agreement.

21      hiQ's response to its flagrant breach of the User Agreement through turking is yet another

22  red herring.  It says that LinkedIn "failed to connect the turkers to the scraping it claims violated

23  the User Agreement."  hiQ Opp. 16.  Untrue (the evidence submitted shows the turking was used

24  to feed the scraping, LinkedIn MSJ 6-7), but in all events irrelevant—it is undisputed that hiQ

25  directed turkers' activities in knowing breach of the User Agreement's prohibition on

26  "[c]reat[ing] a false identity on LinkedIn."  Lawit Decl. Ex. C (User Agreement § 8.2); LinkedIn

27  MSJ 6-7, 12-13; *see Anderson v. Chancellor W. Oil Dev. Corp.*, 53 Cal. App. 3d 235, 239 (1975)

28  (defendant liable where it "direct[ly] controls" independent contractors).

1    *Damages.*  hiQ provides no facts to rebut LinkedIn's evidence that it sustained damages

2    stemming from security and investigation costs.  *See* LinkedIn MSJ 13.  hiQ also does not dispute

3    that its scraping increased LinkedIn's costs of providing service by imposing a substantial burden

4    on LinkedIn's servers.  *See id.*  hiQ likewise does not contest the availability of damages from

5    hiQ's unjust enrichment, and hiQ concedes that nominal damages are sufficient to sustain

6    liability.  *See* hiQ Opp. 16; LinkedIn MSJ 13.  Any one of these bases supports the existence of

7    damages in an amount to be determined at trial.

8         **B.     hiQ's Affirmative Defenses Are Baseless.**

9         *Unclean hands.*  hiQ's principal argument against LinkedIn's breach-of-contract claim is

10   that "a question of fact exists as to whether the unclean hands doctrine bars LinkedIn's belated

11   attempt to assert, in an effort to stifle competition, that hiQ's conduct breached the agreement."

12   hiQ Opp. 10.  It is puzzling that hiQ calls LinkedIn's claim "belated"—hiQ concedes that it has

13   no "statute of limitations or laches … defense[]."  *Id.* at 11 n.3.  It is also audacious for hiQ—

14   having lied to LinkedIn and the Court concerning its access to non-public information through

15   turking, and having spoliated evidence concerning the scope and scale of its conduct—to ask this

16   Court to exercise equitable discretion in *its* favor.  And anyway, an unclean hands defense "is not

17   a legal or technical defense to be used as a shield against a particular element of a cause of

18   action"; it is "an equitable rationale for refusing a plaintiff relief."  *Kendall-Jackson Winery, Ltd.*

19   *Superior Ct.*, 76 Cal. App. 4th 970 (1999).  So even if there were a dispute of fact on unclean

20   hands, that would not preclude summary judgment on hiQ's *liability* for breach of contract.

21        In any event, hiQ's unclean hands theory is meritless as a matter of law.  The argument is

22   that holding hiQ to its own contractual promises is somehow inequitable as "part of [a] plan to

23   'cut off' hiQ's access to otherwise public data and put hiQ out of business."  *Id.* at 10 (internal

24   citation omitted).  But hiQ does not and cannot contest LinkedIn's general right to prohibit

25   scraping, fake accounts, and so forth in the User Agreement, or argue that these provisions are

26   themselves unfair, exclusionary, or anticompetitive.  In other words, it implicitly concedes that

27   LinkedIn is free to set the terms of use on its own platform.  So hiQ is left with the untenable

28   position that while the many promises hiQ undertook (and breached) were not themselves the

                                    4                          LINKEDIN'S REPLY ISO MSJ
                                                               No. 17-cv-03301-EMC

1  product of unfair competition or inequitable conduct, they somehow turn into unfair competition
2  and inequitable conduct merely because of the alleged *reason* LinkedIn decided to assert them.

3       hiQ cites no authority suggesting that the reason for asserting contractual rights can
4  constitute the required "inequitable conduct toward the defendant," *Brown v. Grimes*, 192 Cal.
5  App. 4th 265, 283 (2011).  That absence of authority alone is "sufficient to warrant the denial of
6  the defense," because "analogous case law supporting the application of the unclean hands
7  defense to the facts present" is a required element under California law.  *East West Bank v. Rio*
8  *School Dist.*, 235 Cal. App. 4th 742, 751 (2015).  In fact, numerous California cases have held
9  that motive is irrelevant in a breach of contract action.  *See Bakst v. Community Memorial Health*
10 *System, Inc.*, Case No. CV 09-08241, 2011 WL 13214315 (C.D. Cal. Mar. 7, 2011) (collecting
11 cases).  "The doctrine is unclean hands, not impure thoughts." *TrafficSchool.com, Inc. v. Edriver*
12 *Inc.*, 653 F.3d 820, 834 (9th Cir. 2011).  And the very notion of hiQ's motive-for-asserting theory
13 flies in the face of California's litigation privilege, discussed *infra* 6-8, which absolutely *protects*
14 LinkedIn's right to assert its own contractual rights.  In any event, because summary judgment is
15 appropriate as to hiQ's UCL claims, its unclean hands defense fails, too.

16      ***Unconscionability.***  hiQ's argument that "LinkedIn has failed to show its User
17 Agreement … [is] enforceable" is actually an attempt to smuggle in an unpled unconscionability
18 defense.  hiQ Opp. 11.  The argument is waived.  "Under California law, … unconscionability is
19 an affirmative defense."  *See Rubio v. Cap. One Bank*, 613 F.3d 1195, 1205 (9th Cir. 2010).
20 "[A]n affirmative defense … must be alleged in the answer to the complaint."  *Facebook, Inc. v.*
21 *Rankwave Co.*, No. 19-cv-03738-JST, 2020 WL 4460550, at *2-3 (N.D. Cal. May 1, 2020).

22      Even if not waived, this question of law (*see* Cal. Civ. Code § 1670.5(a)) must be decided
23 against hiQ because it cannot establish unconscionability.  The decision in *Meta Platforms, Inc. v.*
24 *BrandTotal Ltd.* is directly on point.  No. 20-cv-07182-JCS, 2022 WL 1990225 (N.D. Cal. June
25 6, 2022).  hiQ built its business around scraping information from LinkedIn's website and cannot
26 claim surprise because it "would reasonably have been expected to seek out and understand th[e]
27 terms [of service] before agreeing to them."  *Id.* at *19.  As the undisputed evidence shows here,
28 hiQ had the opportunity to review the User Agreement not only as a registered account user, but

1  also part of its subscription and advertising agreements with LinkedIn.  LinkedIn MSJ 5-6.

2  "[W]ith respect to a sophisticated user like" hiQ, the User Agreement is at most "procedurally

3  unconscionable in that [it] represent[s] a contract of adhesion." *Id.*

4      That means hiQ faces "the high standard of substantive unconscionability applicable

5  where the only meaningful procedural defect is a contract of adhesion." *Id.*  But hiQ's only

6  argument for how the many provisions it breached are substantively unconscionable is the far-

7  fetched suggestion that somehow the prohibition on "copying profiles" is "incompatible with

8  simply visiting the website."  hiQ Opp. 12.  Merely visiting the website is not the conduct at issue

9  here and absolutely no one thinks that it would violate the User Agreement anyway.  hiQ does not

10  even begin to establish that the anti-scraping and other prohibitions that are actually at issue here

11  would shock the conscience, let alone contend with case law that has repeatedly upheld such

12  terms of use as consistent with the public interest.  LinkedIn MSJ 11 (collecting cases).

13      ***Waiver (Fifth Defense) and Estoppel (Third Defense).***  hiQ asserts its waiver and

14  estoppel defenses in a footnote, without any specific record analysis, waiving the defenses.  hiQ

15  Opp. 13 n.7; *see Westley v. Oclaro, Inc.*, No. C-11-2448 EMC, 2012 WL 1038647, at *6 (N.D.

16  Cal. Mar. 27, 2012) (declining to address argument "made in passing and only in a footnote").

17  Even if not waived, hiQ's fleeting assertion of its defenses contains no record response to hiQ's

18  CEOs Kaplan and Weidick's admissions that LinkedIn never provided express consent to hiQ's

19  conduct.  *Compare* LinkedIn MSJ 14; ECF No. 327 at 22, *with* hiQ Opp. 13 n.7.  Nor does hiQ

20  offer the "clear and convincing evidence" of an "intentional relinquishment of a known right"

21  necessary for a waiver defense.  *City of Ukiah v. Fones*, 64 Cal. 2d 104, 107 (1966).

22  **II.    HIQ'S TORT AND UCL CLAIMS ARE BARRED BY CAL. CIV. CODE § 47.**

23      Pre-suit letters are quintessential communicative conduct protected by California's

24  litigation privilege.  Cal. Civ. Code § 47(b); *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993).

25  Because hiQ's own CEO testified that the injuries underlying its tort and UCL claims are based

26  solely on LinkedIn's C&D letter, those claims are barred by § 47.  *See* LinkedIn MSJ 15-17.

27      To try to evade this "absolute" bar, hiQ tries to broaden its injuries beyond the C&D

28  letter, claiming that the "gravamen of [its] claims is that LinkedIn sought to gather competitive

LINKEDIN'S REPLY ISO MSJ
No. 17-cv-03301-EMC

1    intelligence on hiQ's customers, partners, and product features, use these to LinkedIn's benefit,

2    and then drive hiQ out of the market."  hiQ Opp. 28.  To begin with, the argument is contradicted

3    by its own CEO's 30(b)(6) testimony that ███████████████████████████████

4    ████████████████████████████████████████  Supp. Justice Decl. (LI Ex. 100 (5/23

5    Weidick Depo.) at 165:5-7), and its business "stopped after [LinkedIn's] accusations and threats

6    were put in the market from the cease-and-desist letter," CE 1208,[1] as well as its damages

7    expert's foundational assumption of the same.  CE 998-1004 (Sacks Dep.).  hiQ's lawyers cannot

8    create a dispute of fact by arguing with its own witnesses.

9         But even if one indulged hiQ's broadened narrative, § 47 would still bar its claims.  Under

10   the "gravamen" principle hiQ invokes, hiQ Opp. 29, hiQ must ground its claims in "an

11   independent, noncommunicative, wrongful act" outside of the C&D letter in order to dodge the

12   privilege.  *Mireskandari v. Gallagher*, 59 Cal. App. 5th 346, 369 (2020).  hiQ cannot do so.

13        To see why, remove the C&D letter from the mix.  Two alleged acts remain: (1) that

14   LinkedIn employees attended a conference to gain competitive intelligence, and (2) that LinkedIn

15   briefly imposed "technical blocking of IP addresses belonging to hiQ."  hiQ Opp. 28.  Accepting

16   hiQ's invitation to a conference is not wrongful and hiQ has never argued otherwise.  As for the

17   blocking of hiQ IP addresses, that was not independent—it was the direct upshot of the express

18   assertion of rights and revocation of access in the C&D letter, per the letter's terms and the

19   established framework in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016).

20   *See* Bajoria Decl. Ex. A at 2.

21        Nor could these blocks be an independently wrongful basis for hiQ's injury, because hiQ

22   has offered no evidence that they had any effect at all.  Indeed, it is *impossible* that they had an

23   effect, because it is undisputed that hiQ conducted no scraping activities through the IP addresses

24   that LinkedIn briefly blocked post-C&D letter—all of its scraping was through the third-party

25   proxy IP addresses hiQ used to conceal its identity from LinkedIn.  *See* LinkedIn MSJ 7-8;

26   LinkedIn Opp. to hiQ's MSJ 5-10.  The targeted IP blocks therefore did nothing.  So the record is

27
     ---
     [1] And it was hiQ, not LinkedIn, who publicized the C&D letter to its employees, customers,
28   prospective business partners, board members, and investors, as well as hiring a publicist to alert
     the general public.  Supp. Justice Decl. (LI Ex. 100 (5/23 Weidick Depo.) at 153:3-165:16).

LINKEDIN'S REPLY ISO MSJ
No. 17-cv-03301-EMC

1   unmistakable that the only conduct in hiQ's "scheme" that could conceivably have injured hiQ

2   was the C&D letter.  And hiQ itself says that it was the C&D letter—not attending a conference

3   or imposing an ineffective IP block—that "force[d] hiQ to defend itself in a manner that would

4   render it radioactive to its customers."  hiQ Opp. 28-29.

5          hiQ's invocation of federal law applying the *Noerr-Pennington* doctrine fares no better.

6   hiQ Opp. 29 (citing *Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-cv-00923-BLF, 2018 WL

7   11230167 (N.D. Cal. May 21, 2018); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d

8   1084 (N.D. Cal. 2007)).  None of it even applies.  As LinkedIn explained and hiQ does not

9   contest, § 47 is "broader" than *Noerr-Pennington*, *see Vinson v. Cal. Dep't of Corrs. & Rehab.*,

10  No. 13-CV-00699-JST, 2014 WL 4594208, at *6 (N.D. Cal. Sept. 15, 2014), and there are no

11  special rules for competition claims, *see Rubin*, 4 Cal. 4th at 1193.  *See* LinkedIn MSJ 17.

12         In any event, as hiQ expressly concedes, even *Hynix* and *Arista* would require it to show

13  that absent the protected conduct—i.e., the C&D letter—"other aspects of the scheme

14  independently produce[d] anticompetitive harms."  *Hynix*, 527 F. Supp. 2d at 1097.  Again, hiQ

15  cannot do so; there is no evidence that attending a conference and LinkedIn's general website

16  defenses against automated barrages "independently produce[d] anticompetitive harms," *id.*  So

17  hiQ's suggestion that the C&D letter was "merely the enforcement mechanism" of a larger

18  scheme is empty.  hiQ Opp. 28 (internal quotation marks omitted).  The C&D letter is the only act

19  in hiQ's imagined "scheme" that had any effect at all.

20         Finally, hiQ argues that emails between non-lawyers expressing a desire to get rid of hiQ

21  as a competitor create a "triable issue of fact" concerning § 47.  hiQ Opp. 29.  Undisputed

22  evidence establishes that these employees were not involved in the decision to send the C&D

23  letter.  LinkedIn MSJ 9.  But it would not matter even if they were.  The "privilege is … absolute

24  in nature," and "appl[ies] to *all* publications, irrespective of their maliciousness."  *Silberg v.*

25  *Anderson*, 50 Cal. 3d 205, 215-16 (1990).  hiQ offers no response.  Its claims are barred by § 47.

26  **III.   HIQ'S INTERFERENCE TORT CLAIMS FAIL FOR OTHER REASONS.**

27         **A.   hiQ Cannot Satisfy Essential Elements Of Its Tort Claims.**

28  hiQ says that "the evidence overwhelmingly" supports its tortious interference claims.

1   hiQ Opp. 23.  Hardly—virtually everything hiQ cites is inadmissible hearsay that the Court

2   should not consider because hiQ has not demonstrated it can provide admissible evidence at trial.

3   *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see*

4   *also infra* § V (evidentiary objections).  And in any event, hiQ's bits of hearsay do not establish a

5   prima facie case of intentional interference for a *single* customer relationship.

6           **1.    hiQ identifies no live contract with which LinkedIn interfered.**

7           hiQ does not dispute that all customer contracts that were live at the time of the C&D

8   letter were fully performed and paid.  Nor does it dispute that they were renewable at will, such

9   that non-renewal cannot be a predicate for an interference with *contract* claim.  LinkedIn MSJ 17-

10  18.  hiQ tries to salvage something by arguing a factual dispute as to whether LinkedIn's C&D

11  letter "made hiQ's performance more costly and burdensome."  hiQ Opp. 25.  For which

12  customer contracts?  hiQ points to only two (Hershey's and GoDaddy).  So at the outset, hiQ has

13  dramatically limited its interference with contract claim:  What remains is an allegation of more

14  costly performance on a term-limited, renewable-at-will contract as to two customers.

15          But even as to those two customers, hiQ has no admissible evidence supporting a claim.

16  hiQ cites an email from a hiQ employee "asking Hershey's to accept an alternative delivery

17  model," which another email on the chain attributes to "resource constraints."  hiQ Opp. 26

18  (citing Ex. 13).  Those are out-of-court statements offered for their truth, i.e., classic inadmissible

19  hearsay.  Fed. R. Evid. 801.  In any event, the customer stated that it was perfectly "open to

20  discussing an alternative delivery method."  hiQ Opp. Ex. 13.  The exhibit provides no evidence

21  that hiQ's performance was more burdensome as a result of the letter.  hiQ then cites an email in

22  which "GoDaddy express[ed] frustration with service."  hiQ Opp. 26.  Also classic hearsay.  Even

23  if it were not, the same email attests that hiQ "collected, analyzed, an[d] provided results to all of

24  our customers, including GoDaddy, exactly as we previously have."  hiQ Opp. Ex. 9.  hiQ points

25  to no evidence of any disruption, burden, or added cost for any other live contract.

26          hiQ also seeks to confuse matters by pointing to an "IBM email discontinuing partnership

27  discussions," which it suggests was scuttled by this case.  hiQ Opp. 25.  Once again, that is

28  hearsay, as is CEO Weidick's deposition testimony claiming that IBM "explicitly in

1    conversation" identified the "LinkedIn situation" as a reason to stop discussions.  *Id.* at 27.  This

2    is particularly egregious since hiQ deposed IBM and failed to get an admissible answer on exactly

3    this question.  In any event, IBM was an inchoate "opportunity to partner"—not a ripened

4    contractual expectancy that could support an interference with contract claim.  *See Ixchel*

5    *Pharma, LLC v. Biogen, Inc*., 9 Cal. 5th 1130, 1147-48 (2020).  The same defects dispose of

6    hiQ's contention that "[t]he disruption caused by LinkedIn's conduct also derailed hiQ's

7    upcoming financing round."  hiQ Opp. 25.  The only evidence hiQ offers for that is *its own*

8    *interrogatory response*, which is "inadmissible hearsay."  *Moore v. Equity Residential Mgmt.,*

9    *L.L.C.*, No. 16-cv-07204-JCS, 2019 WL 5697934, at *17 (N.D. Cal. Nov. 3, 2019)*.  And again,

10   hiQ is not talking about a live contract—just its speculative hope of additional financing.

**2.     hiQ cannot establish interference with prospective advantage.**

12   Anything beyond hiQ's claim that the C&D letter made performance more burdensome

13   goes to hiQ's purported intentional interference with advantage claims.  These also fail.

14   ***No wrongful act.***  There is no dispute that interference with advantage claims require an

15   independently wrongful act.  *See* hiQ Opp. 26; *Ixchel*, 9 Cal. 5th at 1147-48.  hiQ points to its

16   UCL and tortious interference with contract claims to try to satisfy this element.  hiQ Opp. 26.

17   Because summary judgment is appropriate as to both claims, neither can prop up hiQ's

18   interference with prospective advantage claim.  *See* LinkedIn MSJ 24-29.

19   hiQ's attempt to bootstrap an interference with *prospective advantage* claim with an

20   interference with *contract* claim fails for other reasons.  As a practical matter, this tactic would be

21   limited to the two customers upon which hiQ bases interference with contract claims.  There is no

22   authority for it.  And the concept makes little sense, because it would effectively permit a party to

23   use a claim for interference with a limited contractual expectation to automatically claim

24   interference with *prospective* business indefinitely.  That a future expectancy has not ripened is

25   precisely why some *independent* type of misconduct is required.  *Ixchel*, 9 Cal. 5th at 1147-48.

26   ***No specific, beneficial relationships.***  hiQ does not dispute that an interference with

27   prospective advantage claim cannot be based on "the market" generally—that it must be based on

28   specific relationships with a probable benefit to hiQ.  LinkedIn MSJ 19-20.  Nor does it dispute

1    that LinkedIn had to have known of the existence of specific relationships (if not their actual

2    identities) to be liable for interference.  *Id.*  hiQ fails to satisfy its burden.

3        hiQ claims to have "indisputable evidence" of "prospective relationships" that LinkedIn

4    does not "seriously contest."  hiQ Opp. 27.  Yet *every* exhibit that follows the assertion is

5    inadmissible.  hiQ cites its own hearsay interrogatory response, which itself is just a list of

6    customers.  *Id.*  It cites an email saying that "customers seem to love the product"—also obvious

7    hearsay.  *Id.*  It cites testimony from Andrew Carges concerning ███████████████████

8    ███████ *id.*, which is based on hearsay statements Carges relays.  hiQ also fails to provide an

9    evidentiary foundation for who Carges is and why he could speak authoritatively on the topic.

10   *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002).  Then it is back to

11   hearsay interrogatory responses again, this time claims about "Series A and B rounds" of funding,

12   before finishing with the same hearsay about IBM addressed above.  hiQ Opp. 27.

13       As plaintiff, hiQ had the burden of pointing to admissible evidence demonstrating specific

14   beneficial relationships upon which it can base claims.  It had every opportunity to adduce such

15   evidence.  So it is telling indeed that hiQ can muster only a sparse hodgepodge of hearsay.

        **3.    hiQ cannot show that the C&D letter burdened its ability to perform
16              or to accept business opportunities.**

17

18       hiQ also fails to create a factual dispute on the causation element.  As LinkedIn

19   established, even if hiQ did have evidence that it was struggling to perform customer contracts or

20   unable to accept new business after receiving the C&D letter, undisputed evidence shows that hiQ

21   was *already* unable to scrape *before* the letter because hiQ could not circumvent LinkedIn's

22   general technical defenses.  LinkedIn MSJ 7-9, 20-21.  Nowhere does hiQ cite a single piece of

23   evidence suggesting that, absent the C&D letter, it could have maintained its business in spite of

24   its own technical inability to scrape and its dire business failures.  hiQ therefore cannot

25   demonstrate a causal link between the C&D letter and its claimed injury.

26       **B.    LinkedIn's Conduct Was Legally Justified.**

27       LinkedIn's C&D letter is a textbook example of justified conduct for which LinkedIn

28   cannot be liable.  *See* LinkedIn MSJ 21-22.  The letter was an "appropriate means" of enforcing

1    LinkedIn's valid contractual rights under the User Agreement, *Richardson v. La Rancherita of La*

2    *Jolla, Inc.*, 98 Cal. App. 3d 73, 81 (1979); and the record demonstrates that protecting LinkedIn's

3    users from scraping was unquestionably a legitimate business purpose.  LinkedIn MSJ 21.  hiQ's

4    only response is to once again point to its UCL claim to suggest LinkedIn's bad faith.  hiQ Opp.

5    30.  Again, that claim fails, so hiQ cannot rely on it here.

6        **C.    hiQ Has Failed To Sustain Its Monetary Demands.**

7        As explained in LinkedIn's Motion to Exclude Opinions of Benjamin Sacks and Reply in

8    support of that motion, hiQ may not "recover the value of the lost business."  *See, e.g., Pac.*

9    *Rollforming, LLC v. Trakloc N. Am., LLC,* No. 07-cv-1897-IEG (MDD), 2011 WL 13176817, at

10   *3 (S.D. Cal. Dec. 1, 2011); *Elec. Funds Sols. v. Murphy*, 134 Cal. App. 4th 1161, 1180 (2005).

11       Punitive damages are available only in extreme cases of "oppression, fraud, or malice."

12   Cal. Civ. Code § 3294; hiQ Opp. 26.  The record does not supply "clear and convincing

13   evidence" meeting this standard.  LinkedIn MSJ 22-23; Cal. Civ. Code § 3294.  And hiQ's

14   additional claim that "LinkedIn's fraudulent competition independently satisfies the standard"

15   fails because hiQ's effort to show fraud is meritless.  *Infra* 19-20; LinkedIn MSJ 29.

16   **IV.   HIQ'S UCL CLAIMS ALSO MUST BE DISMISSED.**

17       **A.    hiQ's "Unfair," "Unlawful," And "Fraudulent" UCL Claims Must All Be**
18       **Dismissed Because hiQ Has No Cognizable Remedy.**

19       LinkedIn's motion explained that hiQ's UCL claims fail because hiQ has no evidence that

20   would entitle it to any UCL remedy cognizable in federal court.  LinkedIn MSJ 23-24.  hiQ's

21   opposition (at 22-23) confirms it.

22       To begin with, hiQ does not seriously contest that summary judgment is warranted if hiQ

23   cannot establish entitlement to a UCL remedy.  LinkedIn MSJ 23 (citing *Huynh v. Quora, Inc.*,

24   508 F. Supp. 3d 633, 662-63 (N.D. Cal. 2020)).  It notes that it "*pled* for injunctive relief," hiQ

25   Opp. 22 (emphasis added), and "*pled* irreparable harm," *id.* at 23 n.10 (emphasis added).  But that

26   is not enough at the summary judgment stage.  *Huynh* granted summary judgment because the

27   plaintiff failed to "allege *or demonstrate*" potential entitlement to an equitable UCL remedy.  508

28   F. Supp. 3d at 662 (emphasis added).  And Rule 56 is clear that summary judgment is appropriate

1    if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a

2    matter of law"—regardless of what the plaintiff initially pled.

3         hiQ also does not (and cannot) dispute what is required to obtain a permanent injunction.

4    For UCL claims brought in federal court, *federal* law governs entitlement to injunctive relief.

5    LinkedIn MSJ 23 (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)).

6    And hiQ does not contest that under federal law, it must establish a "'likelihood of substantial and

7    immediate irreparable injury.'"  LinkedIn MSJ 23 (quoting *American-Arab Anti-Discrimination*

8    *Comm. v. Reno*, 70 F.3d 1045, 1066-67 (9th Cir. 1995)).  Yet it then attempts to invoke "broad

9    equitable power granted to courts by the UCL" and "wide latitude" under the UCL "to fashion an

10   appropriate equitable remedy."  hiQ Opp. 22.  *Sonner* flatly rejects the argument that the UCL

11   expands the equitable powers of federal courts.  971 F.3d at 841-42.  While "a State may

12   authorize its courts to give equitable relief unhampered" by traditional requirements in federal

13   court, it "cannot remove these fetters from the federal courts."  *Guaranty Trust Co. of N.Y. v.*

14   *York*, 326 U.S. 99, 106 (1945); *Sonner*, 971 F.3d at 843-44.  So the UCL does not "grant[]" this

15   Court power to issue injunctive relief absent a likelihood of substantial and immediate injury.

16        hiQ does not even try to satisfy that burden.  It implicitly concedes that it has no products,

17   no agreements, no customers, no employees, and no operations.  *See* LinkedIn MSJ at 23.  And it

18   offers no evidence suggesting possible future harm.  Without evidence, hiQ claims support from

19   the injunctive relief issued in *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal.

20   2021).  hiQ Opp. 22-23.  But *Epic* was (and is) a going concern with millions of users, and the

21   injunction there was issued after a finding that an "injury has occurred and continues."  559

22   F. Supp. at 1057-58.  Because hiQ has failed to make even the slightest showing of potential

23   entitlement to a UCL remedy, summary judgment is warranted.

24        **B.    hiQ's "Unfair" Prong UCL Claim Must Be Dismissed As A Matter Of Law.**

25        hiQ's case depends largely on its UCL unfair competition claim.  But hiQ is still

26   struggling to articulate what that claim *is*, let alone to ground it in case law and evidence.

27             **1.    hiQ's failure to establish any cognizable form of anticompetitive**
                       **conduct requires dismissal of its Seventh Claim for Relief.**

28

                                        13

1    As LinkedIn's motion explained, *every* theory of anticompetitive conduct hiQ has ever

2    posited—in both the preliminary injunction phase and in its complaint—has already been

3    rejected.  LinkedIn MSJ 24-26.  So too any theory of anticompetitive impact—hiQ has never

4    defined a market, nor sought to show harm to competition in that market.  LinkedIn MSJ 25.

5    Under two independent rules, established in *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363,

6    375 (2001) and *Aguilar v. Atlantic Richfield Co.*, 25 Cal. 4th 826, 866-67 (2001), hiQ's failures

7    on its antitrust claims also doom its UCL claim.  LinkedIn MSJ 25-26.

8    Of course, hiQ does not and cannot dispute the procedural history of this case.  It invokes

9    this Court's finding of "serious questions" at the preliminary injunction stage, hiQ Opp. 17, but

10   cannot contest that this finding was based on theories of "unfair leveraging" and "essential

11   facilities" that this Court subsequently dismissed, LinkedIn MSJ 24.  Nor can it contest that all of

12   its other antitrust theories were previously dismissed.  ECF No. 158 at 9-12.  What is most

13   remarkable, though, is that hiQ has now abandoned every one of these theories *completely*, in any

14   form, for any claim.  In other words, hiQ is *not* arguing that it has evidence through which these

15   theories of anticompetitive conduct or harm can still support an unfair competition claim under

16   the standard in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.

17   4th 163 (1999).  It is conceding that each theory is completely baseless.

18   The weight of these concessions is staggering.  hiQ makes no offer of evidence supporting

19   a theory that LinkedIn's refusal to deal with hiQ was anticompetitive.  *See* LinkedIn MSJ 27.  It

20   explicitly abandons any notion that LinkedIn is an "essential facility" for competition in any

21   market.  hiQ Opp. 20-21; *see* LinkedIn MSJ 28.  It makes clear that it has no intention or ability

22   to ever define a market.  hiQ Opp. 20-21; *see* LinkedIn MSJ 26-27.  And it offers no theory or

23   evidence that would allow it to establish harm to competition in such a market anyway.

24   hiQ brushes all of this aside in a footnote, calling it a challenge "about the sufficiency of

25   hiQ's pleadings."  hiQ Opp. 17 n.9.  But it is not—it is about the substantive effect of hiQ's

26   failure to plead or establish even a dispute of fact on the only theories of anticompetitive conduct

27   it has ever advanced.  And hiQ does not even address the "two independent reasons," supported

28   by case law, that establish that the failure of hiQ's antitrust claims and of its underlying theories

14

of anticompetitive conduct are dispositive of its UCL claim.  LinkedIn MSJ 24.  First, by

operation of law, "the determination that [allegedly anticompetitive] conduct is not an

unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward

consumers."  *Chavez*, 93 Cal. App. 4th at 375.  So if "activities are lawful under the antitrust

laws," those activities cannot support a UCL unfair competition claim.  *City of San Jose v. Office

of the Comm'r of Baseball*, 776 F.3d 686, 692 (9th Cir. 2015).  And second, as a "matter of fact,"

where a UCL claim is merely derivative of a failed theory of anticompetitive conduct—for

example, where both theories are based on the same ultimately non-existent conspiracy—the

UCL claim falls with the antitrust claim.  *Aguilar*, 25 Cal. 4th at 866-67 (emphasis omitted).

This case is controlled by both rules.  At bottom, hiQ's unfair competition claim rests on

the notion that LinkedIn harmed competition by denying hiQ access to LinkedIn's website.  To

sustain that premise, hiQ had to overcome what the Supreme Court has described as the "'long

recognized right of … an entirely private business, freely to exercise [its] own independent

discretion as to parties with whom [it] will deal.'"  *Verizon Commc'ns Inc. v. Law Offices of

Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250

U.S. 300, 307 (1919)).  To be sure, "the high value that [the Court has] placed on the right to

refuse to deal with other firms does not mean that the right is unqualified."  *Aspen Skiing Co. v.

Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985).  But it was hiQ's job to establish an

exception, and it does not attempt to do so.  As for California law, hiQ does not contest that

California's Cartwright Act and related case law *completely rejects* single-firm monopolization

theories altogether.  *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 626

(2012).  So not only is LinkedIn's conduct "lawful under the antitrust laws," *City of San Jose*, 776

F.3d at 692—it is *protected* by a "long recognized right," which hiQ does not challenge.

Without addressing any of this, hiQ falls back repeatedly on the platitude "that there need

not be a present violation of federal antitrust law to state a UCL claim."  hiQ Opp. 17; *see id.* at

18-20.  That is true as a general matter, but insufficient here.  Indeed, both *Chavez* and *Aguilar*

acknowledged that a UCL claim *can* sweep more broadly than a federal antitrust claim before

rejecting the UCL claims in those cases on the grounds described above.  *Chavez*, 93 Cal. App.

15

1    4th at 375; *Aguilar*, 25 Cal. 4th at 866-67.

2                **2.**       **hiQ's attempt at a "monopoly broth" claim fails as a matter of law.**

3        Having failed to establish each of its previous theories of unfair competition, hiQ purports

4    to advance a new one: that "LinkedIn's course of conduct with respect to hiQ exemplifies 'what

5    some courts have referred to as a course of conduct or monopoly broth theory of antitrust

6    liability.'" hiQ Opp. 18 (quoting *New York v. Facebook, Inc.*, 549 F. Supp.3d 6, 46 (D.D.C. June

7    28, 2021)). But its theory is unpled, standardless, and unsupported by any authority.

8        Since hiQ first invoked the concept of "monopoly broth" in an eleventh hour (and

9    unsuccessful) motion to compel, ECF No. 262 at 3, LinkedIn anticipated that hiQ might deploy it

10   here to try to save its gutted UCL claim. *See* LinkedIn MSJ 28-29. LinkedIn explained: "To be

11   clear, hiQ never even *attempted* to plead a 'monopoly broth' theory in its complaint." *Id.* at 29.

12   hiQ does not dispute this, which dooms its claim. A party cannot avoid summary judgment based

13   on a "new, unpled liability theor[y]," even if it has made some form of "disclosure … during

14   discovery." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 924 n.3 (9th Cir. 2015)

15   (citing *Oliver v. Ralph's Grocery Co.*, 654 F.3d 903, 908-09 (9th Cir. 2011)).

16        In any event, hiQ's new theory is meritless both factually and legally. hiQ contends that

17   "LinkedIn tolerated hiQ and accepted its scraping for years" and "internally express[ed] interest"

18   in hiQ's products; that this interest became "acute" in 2017 and then "predatory" once LinkedIn

19   decided to develop a competing product; and that LinkedIn then "hatched a plan to surreptitiously

20   collect competitive intelligence." hiQ Opp. 18. Then, says hiQ, the "same employees …

21   conspired to 'shut down' hiQ's business …, all on the pretext of defending user privacy." *Id.*

22   hiQ also points to evidence that LinkedIn considers its business interests when deciding whether

23   to grant third parties access to its APIs. *Id.* at 19.

24        This narrative is unsupported by the evidence. Most significantly, both the lawyer who

25   sent the C&D letter and LinkedIn's GC have submitted sworn declarations explaining that the

26   Legal department alone exercised legal judgment in deciding to assert LinkedIn's rights.

27   LinkedIn MSJ 9; Bajoria Decl. ¶ 5; Lawit Decl. ¶¶ 18-19. hiQ provides no evidence to dispute

28   this, and attributes all of its harm to that assertion of rights.

1    But let us assume for present purposes that hiQ's account has support.  hiQ says that from

2    the above evidence, a "jury could easily determine that LinkedIn's conduct constitutes an unfair

3    business practice."[2]  hiQ Opp. 19.  But under what legal standard?  What is the standard of

4    conduct or harm against which a jury could evaluate the evidence above, determine that LinkedIn

5    is indeed a monopolist in some market, conclude that LinkedIn has harmed competition in that

6    market, and thus legitimately decide that some alleged soup of conduct has caused not just

7    "[i]njury to a competitor" but "injury to competition"?  *Cel-Tech*, 20 Cal. 4th at 186.

8    hiQ never says, because it can satisfy no recognized standard.  hiQ has abandoned seven

9    monopolization theories based on leveraging, lock-in, raising rivals' costs, tying, unilateral

10    refusal to deal, denial of essential facilities, and vertically-arranged boycott.  It has not otherwise

11    posited any "incipient violation" of antitrust law.  *Id.* at 187.  Though it suggests its theory is

12    based on monopolization, hiQ has eschewed any market definition, leaving no "objective

13    benchmarks" for evaluating LinkedIn's market power, let alone concluding that LinkedIn is a

14    monopolist.  *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 496 (2011).

15    This makes it impossible to analyze whether LinkedIn's conduct had "effects [that] are

16    comparable to or the same as a violation of the [antitrust] law."  *Cel-Tech*, 20 Cal. 4th at 187.

17    hiQ asserts that its "claim does not require a market definition."  hiQ Opp. 20.  But it does not

18    explain how it can establish actual or threatened monopoly power without one.

19    And even if hiQ did posit a market, it points to no evidence that LinkedIn's alleged

20    conduct "significantly threatens or harms competition" there.  *Cel-Tech*, 20 Cal. 4th at 187.  As

21    LinkedIn pointedly explained, hiQ's experts did not even try to show harms in any market in any

22    form.  LinkedIn MSJ 26-27.  hiQ does not dispute this, nor does it contest that there are many

23    competitors who offer people analytics products, and that many of these competitors do not

24    depend on scraped data from LinkedIn as an essential input.  *Id.*  After lengthy discovery, the best

25    hiQ can offer is a report by the House of Representatives, which it says "find[s] widespread

26    evidence of conduct by incumbent tech platforms tending to harm competition," paired with

27

28    [2] hiQ has no right to a jury for its UCL claim.  *Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279 (2020).

hiQ's naked assertion that LinkedIn's "targeting of nascent startups, including hiQ, is precisely

the kind of anticompetitive conduct that is increasingly causing harm to competition, competitors,

and consumers in digital markets." hiQ Opp. 19. That is not legal authority or evidence. It is

just the sort of standardless bluster *Cel-Tech* condemns as "sanction[ing] arbitrary or

unpredictable decisions" that leave businesses with no way of knowing "what conduct California

law prohibits and what it permits." 20 Cal. 4th at 185.

hiQ's attempt to adduce legal authority for its theory also fails. *New York v. Facebook*—

which hiQ cites as authority for the existence of a "monopoly broth" theory—holds that even if

such a theory exists, "it does not allow unilateral refusals to deal that are lawful (such as

Facebook's mere adoption of a policy of not offering API access to competitors) to be considered

as part of a 'monopoly broth' or 'course of conduct' that violates Section 2." 549 F. Supp. 3d at

46. *City of Anaheim v. Southern California Edison Co.* indeed suggests that an alleged

monopolist's conduct should be considered for its "overall combined effect," but expressly

demands a showing of "monopoly power in the relevant market," and ultimately rejects clearly

articulated theories of price squeeze and essential facilities. 955 F.2d 1373, 1376 (9th Cir. 1992).

That is not remotely an "endorse[ment]," hiQ Opp. 18, of hiQ's theory here.

hiQ's two UCL cases are far afield. hiQ cites *Rambus, Inc. v. Infineon Technologies, AG*,

in which Rambus was alleged to have attended a meeting for a standard-setting organization

(SSO) to learn what technology might be adopted as industry standard, so that it could obtain a

patent that would provide it with exclusive rights to that technology. 330 F. Supp. 2d 679 (E.D.

Va. 2004). Noting that the "collusive atmosphere" of SSOs "presents a very real opportunity for

anticompetitive behavior," the court explained that "antitrust law historically has been concerned

with the risk of one or a small number of participants capturing the economic power of an

industry-wide standard and turning the SSO into a source of exclusionary power." *Id.* at 696.

That is nothing like this case, which concerns LinkedIn's unilateral refusal to deal—a

"historically" *protected* right—and in which hiQ has not even attempted to show harm to

competition. And *Berkla v. Corel Corp.* is even less relevant. 66 F. Supp. 2d 1129, 1150-51

(E.D. Cal. 1999). The legal standard for the unfair competition claim there "merely borrow[ed]

1    its unfair practices from other areas of state law," and was viable based on breach of a non-

2    disclosure agreement and breach of confidence claims that have no analog in this case.  *Id.*

3          Finally, hiQ points to an amicus brief filed by the State of California in the appeal in *Epic*,

4    a case it says "bears striking factual similarities to this one."  hiQ Opp. 20.  There are no

5    similarities.  The decision in that case was based on extensive expert testimony, evaluating the

6    proper market definition, defendant Apple's power in that market, and quantifiable

7    anticompetitive effects in the form of harm to innovation and higher costs for developers.  559

8    F. Supp. 3d at 1057-58.  Only upon that rigorous showing did the court find an "incipient

9    violation" of antitrust law.  *Id.* at 1055.  Here there is no market, no analysis of LinkedIn's market

10   power, and no evidence of any effect on competition of any alleged conduct.

11         As for California's amicus brief, it offers hiQ no support.  In fact, it endorses *LinkedIn's*

12   argument that under *Chavez* and *City of San Jose*, where "longstanding antitrust doctrine"

13   "expressly preclude[s]" certain conduct "from antitrust liability"—as with a private business's

14   right to decide with whom it deals—that conduct cannot be the basis for a UCL claim.  Br. of the

15   State of Cal. as *Amicus Curiae* at 17-18, *Epic Games Inc. v. Apple, Inc.*, No. 21-16506 (9th Cir.

16   Mar. 31, 2022), ECF No. 118.  And in any event, the brief makes clear that *any* claim must be

17   grounded, at a minimum, in "prior cases in California or other jurisdictions or in administrative

18   guidelines developed by the Federal Trade Commission or other consumer protection agencies."

19   *Id.* at 20 (*quoting Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 304 (2020)).

20   hiQ offers nothing of the sort.  Its claim is just a paragraph of empty rhetoric.

21         **C.    hiQ's "Fraudulent" Prong UCL Claim Fails As A Matter Of Law Because
22                hiQ Can Show Neither A Fraudulent Statement Nor Reliance.**

23         As LinkedIn explained in its motion, hiQ's claim of fraud based on LinkedIn's statements

24   *to members* about their control over their profile information fails for multiple reasons.  LinkedIn

25   MSJ 29.  Most obviously, hiQ has no evidence of reliance.  *Id.*  While it claims that "hiQ relied on

26   these statements in formulating its business model," hiQ Opp. 21, the snippet of deposition

27   testimony it cites does not even mention the statements in question.  *See* hiQ Opp. Ex. 76 (Kaplan

28   Dep.).  hiQ's own internal emails also show that hiQ was well-aware its conduct violated the User

1    Agreement.  LinkedIn MSJ 5.  In any event, as this Court previously held, nothing about the

2    statements in question suggests that hiQ was permitted to scrape LinkedIn despite express and

3    unambiguous prohibitions in the User Agreement.  ECF No. 63 at 23.

4                    **D.    hiQ's "Unlawful" Prong UCL Claim Fails As A Matter Of Law.**

5              All agree that hiQ's claim under the "unlawful" prong of the UCL depends entirely on its

6    tortious interference claims.  LinkedIn MSJ 30; hiQ Opp. 22.  Because hiQ's tortious interference

7    claims fail, so too does its unlawful competition claim.

8    **V.    HIQ HAS SYSTEMATICALLY DISREGARDED THE RULES OF EVIDENCE.**

9              At summary judgment a district court may only consider evidence that would be

10   admissible at trial.  *JL Beverage*, 828 F.3d at 1110.  hiQ "has not argued that the hearsay

11   declarants would be available to testify at trial, or that its hearsay evidence would be admissible at

12   trial in some other form."  *Id.*  The following is inadmissible and should not be considered:

13             Exhibits 62 and 63 are hiQ's *own interrogatory responses*, which are inadmissible

14   hearsay.  *Moore*, 2019 WL 5697934, at *17; *Cardinal v. Lupo*, No. 18-cv-00272-JCS, 2019 WL

15   4450859, at *22 (N.D. Cal. Sept. 17, 2019); *AT & T Corp. v. Dataway Inc.*, 577 F. Supp. 2d 1099,

16   1109 (N.D. Cal. 2008).  Exhibits 3-5, 8-9, 13-15, and 56 are hiQ emails (and one presentation)

17   containing out-of-court statements by hiQ and/or third parties offered for their truth, i.e., classic

18   inadmissible hearsay.  *See* Fed. R. Evid. 801 *et seq.*  Exhibits 26, 38, and 47 are LinkedIn emails,

19   but the cited language contains embedded hearsay by someone not on the email.  *Id.*

20             Exhibits 83 and 84 are deposition transcripts containing embedded hearsay where Mark

21   Weidick relays or describes what others told him.  *See* hiQ Opp. Ex. 83 at 157:4-23, 248:8-21.

22   Similarly, Exhibit 79 contains Daniel Miller testifying about the topic of previous conversations

23   with Weidick.  *See* Ex. 79 at 216:14-21.  Further, Exhibits 70-75, 77, 79-80, 82-85, 99, and 101—

24   lack any foundational testimony as to who the person is or why they have personal knowledge of

25   the subject of the cited testimony, and are thus inadmissible.  *See* Fed. R. Evid. 602.

26                                       **CONCLUSION**

27             The Court should grant the motion for summary judgment.

28

LINKEDIN'S REPLY ISO MSJ
No. 17-cv-03301-EMC

1   Dated:  September 12, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Orrick, Herrington & Sutcliffe LLP


By:      _/s/ Annette L. Hurst_
                ANNETTE L. HURST
              Attorneys for Defendant
               LinkedIn Corporation

21