1  ANNETTE L. HURST (SBN 148738)
   ahurst@orrick.com
2  RUSSELL P. COHEN (SBN 213105)
   rcohen@orrick.com
3  PAUL F. RUGANI (SBN 342647)
   prugani@orrick.com
4  CATHERINE Y. LUI (SBN 239648)
   clui@orrick.com
5  NATHAN SHAFFER (SBN 282015)
   nshaffer@orrick.com
6  DANIEL JUSTICE (SBN 291907)
   djustice@orrick.com
7  EMILY RENZELLI (*pro hac vice*)
   erenzelli@orrick.com
8  ORRICK, HERRINGTON & SUTCLIFFE LLP
   405 Howard Street
9  San Francisco, CA  94105-2669
   Telephone:   +1 415 773 5700
10 Facsimile:   +1 415 773 5759

11 *Attorneys for LinkedIn Corporation*

12                 UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                   SAN FRANCISCO DIVISION

15

16 hiQ Labs, Inc.,                          Case No. 17-cv-03301-EMC

17           Plaintiff,                     **SUPPLEMENTAL DECLARATION
                                            OF DANIEL JUSTICE IN SUPPORT
18      vs.                                 OF LINKEDIN CORPORATION'S
                                            AUGUST 5TH, 2022 MOTIONS**
19 LinkedIn Corporation,

20           Defendant.                     Date:        September 29, 2022
                                            Time:        1:30 p.m.
21 ─────────────────────────────           Courtroom:   5 – 17th Floor (Zoom)
                                            Judge:       Hon. Edward M. Chen
22 LinkedIn Corporation
                                            Complaint Filed:   June 7, 2017
23           Counterclaimant,               Trial Date:        February 27, 2023
        vs.
24
   hiQ Labs, Inc.
25
           Counterdefendant,
26 ─────────────────────────────

27

28

I, Daniel Justice, hereby declare as follows:

1.      I am an attorney at the law firm of Orrick, Herrington & Sutcliffe LLP, counsel of record for LinkedIn Corporation in this action.  I am a member of the California State Bar and am admitted to practice before this Court.  I have personal knowledge of the facts stated in this declaration, and if called as a witness I could and would testify competently thereto.

2.      Attached hereto as **Exhibit 97** is a true and correct copy of excerpts of Introductory Econometrics: A Modern Approach (Wooldridge, 5th Ed.), other excerpts of which were included in hiQ's compendium of evidence as Exhibit 97.  *See* ECF No. 364.13.

3.      Attached hereto as **Exhibit 98** is a true and correct copy of excerpts of the transcript of the deposition of Benjamin Sacks taken on July 08, 2022.

4.      Attached hereto as **Exhibit 99** is a true and correct copy of excerpts of the transcript of the deposition of Mark Weidick taken on July 01, 2022.

5.      Attached hereto as **Exhibit 100** is a true and correct copy of excerpts of the transcript of the deposition of Mark Weidick taken on May 23, 2022.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on September 12, 2022, at San Francisco, California.

_____
Daniel Justice

SUPP. JUSTICE DECL.
17-cv-03301-EMC

# EXHIBIT 97

# INTRODUCTORY Econometrics

## A MODERN APPROACH

### 5th EDITION



# Jeffrey M. Wooldridge

# Introductory
## Econometrics

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# Introductory
## Econometrics
### A MODERN APPROACH

FIFTH EDITION

**Jeffrey M. Wooldridge**

*Michigan State University*



SOUTH-WESTERN
CENGAGE Learning

Australia • Brazil • Japan • Korea • Mexico • Singapore • Spain • United Kingdom • United States

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

This is an electronic version of the print textbook. Due to electronic rights restrictions, some third party content may be suppressed. Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. The publisher reserves the right to remove content from this title at any time if subsequent rights restrictions require it. For valuable information on pricing, previous editions, changes to current editions, and alternate formats, please visit www.cengage.com/highered to search by ISBN#, author, title, or keyword for materials in your areas of interest.

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.



**SOUTH-WESTERN**
CENGAGE Learning·

---

*Introductory Econometrics: A Modern Approach*, **Fifth Edition**
**Jeffrey M. Wooldridge**

Senior Vice President, LRS/Acquisitions & Solutions Planning: Jack W. Calhoun

Editorial Director, Business & Economics: Erin Joyner

Editor-in-Chief: Joe Sabatino

Executive Editor: Michael Worls

Associate Developmental Editor: Julie Warwick

Editorial Assistant: Libby Beiting-Lipps

Brand Management Director: Jason Sakos

Market Development Director: Lisa Lysne

Senior Brand Manager: Robin LeFevre

Senior Market Development Manager: John Carey

Content Production Manager: Jean Buttrom

Rights Acquisition Director: Audrey Pettengill

Rights Acquisition Specialist, Text/Image: John Hill

Media Editor: Anita Verma

Senior Manufacturing Planner: Kevin Kluck

Senior Art Director: Michelle Kunkler

Production Management and Composition: PreMediaGlobal

Internal Designer: PreMediaGlobal

Cover Designer: Rokusek Design

Cover Image: © Elena R/Shutterstock.com; Milosz Aniol/Shutterstock.com

© 2013, 2009 South-Western, Cengage Learning

ALL RIGHTS RESERVED. No part of this work covered by the copyright herein may be reproduced, transmitted, stored, or used in any form or by any means graphic, electronic, or mechanical, including but not limited to photocopying, recording, scanning, digitizing, taping, web distribution, information networks, or information storage and retrieval systems, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without the prior written permission of the publisher.

For product information and technology assistance, contact us at
**Cengage Learning Customer & Sales Support, 1-800-354-9706**

For permission to use material from this text or product, submit all requests online at **www.cengage.com/permissions**
Further permissions questions can be emailed to
**permissionrequest@cengage.com**

Library of Congress Control Number: 2012945120

ISBN-13: 978-1-111-53104-1

ISBN-10: 1-111-53104-8

**South-Western**
5191 Natorp Boulevard
Mason, OH 45040
USA

Cengage Learning products are represented in Canada by Nelson Education, Ltd.

For your course and learning solutions, visit **www.cengage.com**

Purchase any of our products at your local college store or at our preferred online store **www.cengagebrain.com**

Printed in the United States of America
1 2 3 4 5 6 7 16 15 14 13 12

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# BRIEF CONTENTS

**Chapter 1**     The Nature of Econometrics and Economic Data    1

## PART 1: Regression Analysis with Cross-Sectional Data    21

**Chapter 2**     The Simple Regression Model    22
**Chapter 3**     Multiple Regression Analysis: Estimation    68
**Chapter 4**     Multiple Regression Analysis: Inference    118
**Chapter 5**     Multiple Regression Analysis: OLS Asymptotics    168
**Chapter 6**     Multiple Regression Analysis: Further Issues    186
**Chapter 7**     Multiple Regression Analysis with Qualitative Information: Binary (or Dummy) Variables    227
**Chapter 8**     Heteroskedasticity    268
**Chapter 9**     More on Specification and Data Issues    303

## PART 2: Regression Analysis with Time Series Data    343

**Chapter 10**     Basic Regression Analysis with Time Series Data    344
**Chapter 11**     Further Issues in Using OLS with Time Series Data    380
**Chapter 12**     Serial Correlation and Heteroskedasticity in Time Series Regressions    412

## PART 3: Advanced Topics    447

**Chapter 13**     Pooling Cross Sections Across Time: Simple Panel Data Methods    448
**Chapter 14**     Advanced Panel Data Methods    484
**Chapter 15**     Instrumental Variables Estimation and Two Stage Least Squares    512
**Chapter 16**     Simultaneous Equations Models    554
**Chapter 17**     Limited Dependent Variable Models and Sample Selection Corrections    583
**Chapter 18**     Advanced Time Series Topics    632
**Chapter 19**     Carrying Out an Empirical Project    676

## APPENDICES

**Appendix A**   Basic Mathematical Tools    703
**Appendix B**   Fundamentals of Probability    722
**Appendix C**   Fundamentals of Mathematical Statistics    755
**Appendix D**   Summary of Matrix Algebra    796
**Appendix E**   The Linear Regression Model in Matrix Form    807
**Appendix F**   Answers to Chapter Questions    821
**Appendix G**   Statistical Tables    831

**References**    838
**Glossary**    844
**Index**    862

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Because adding such a variable does not induce multicollinearity in the population (and therefore multicollinearity in the sample should be negligible), but it will reduce the error variance. In large sample sizes, the standard errors of all OLS estimators will be reduced.

As an example, consider estimating the individual demand for beer as a function of the average county beer price. It may be reasonable to assume that individual characteristics are uncorrelated with county-level prices, and so a simple regression of beer consumption on county price would suffice for estimating the effect of price on individual demand. But it is possible to get a more precise estimate of the price elasticity of beer demand by including individual characteristics, such as age and amount of education. If these factors affect demand and are uncorrelated with price, then the standard error of the price coefficient will be smaller, at least in large samples.

As a second example, consider the grants for computer equipment given at the beginning of Section 6.3. If, in addition to the grant variable, we control for other factors that can explain college GPA, we can probably get a more precise estimate of the effect of the grant. Measures of high school grade point average and rank, SAT and ACT scores, and family background variables are good candidates. Because the grant amounts are randomly assigned, all additional control variables are uncorrelated with the grant amount; in the sample, multicollinearity between the grant amount and other independent variables should be minimal. But adding the extra controls might significantly reduce the error variance, leading to a more precise estimate of the grant effect. Remember, the issue is not unbiasedness here: we obtain an unbiased and consistent estimator whether or not we add the high school performance and family background variables. The issue is getting an estimator with a smaller sampling variance.

Unfortunately, cases where we have information on additional explanatory variables that are uncorrelated with the explanatory variables of interest are somewhat rare in the social sciences. But it is worth remembering that when these variables are available, they can be included in a model to reduce the error variance without inducing multicollinearity.

# 6.4 Prediction and Residual Analysis

In Chapter 3, we defined the OLS predicted or fitted values and the OLS residuals. **Predictions** are certainly useful, but they are subject to sampling variation, because they are obtained using the OLS estimators. Thus, in this section, we show how to obtain confidence intervals for a prediction from the OLS regression line.

From Chapters 3 and 4, we know that the residuals are used to obtain the sum of squared residuals and the $R$-squared, so they are important for goodness-of-fit and testing. Sometimes, economists study the residuals for particular observations to learn about individuals (or firms, houses, etc.) in the sample.

## Confidence Intervals for Predictions

Suppose we have estimated the equation

$$\hat{y} = \hat{\beta}_0 + \hat{\beta}_1 x_1 + \hat{\beta}_2 x_2 + \ldots + \hat{\beta}_k x_k. \qquad \textbf{[6.27]}$$

When we plug in particular values of the independent variables, we obtain a prediction for $y$, which is an estimate of the *expected value* of $y$ given the particular values for the explanatory variables. For emphasis, let $c_1, c_2, \ldots, c_k$ denote particular values for each of

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

the $k$ independent variables; these may or may not correspond to an actual data point in our sample. The parameter we would like to estimate is

$$\theta_0 = \beta_0 + \beta_1 c_1 + \beta_2 c_2 + ... + \beta_k c_k$$
$$= E(y|x_1 = c_1, x_2 = c_2, ..., x_k = c_k). \qquad \textbf{[6.28]}$$

The estimator of $\theta_0$ is

$$\hat{\theta}_0 = \hat{\beta}_0 + \hat{\beta}_1 c_1 + \hat{\beta}_2 c_2 + ... + \hat{\beta}_k c_k. \qquad \textbf{[6.29]}$$

In practice, this is easy to compute. But what if we want some measure of the uncertainty in this predicted value? It is natural to construct a confidence interval for $\theta_0$, which is centered at $\hat{\theta}_0$.

To obtain a confidence interval for $\theta_0$, we need a standard error for $\hat{\theta}_0$. Then, with a large *df*, we can construct a 95% confidence interval using the rule of thumb $\hat{\theta}_0 \pm 2 \cdot \text{se}(\hat{\theta}_0)$. (As always, we can use the exact percentiles in a $t$ distribution.)

How do we obtain the standard error of $\hat{\theta}_0$? This is the same problem we encountered in Section 4.4: we need to obtain a standard error for a linear combination of the OLS estimators. Here, the problem is even more complicated, because all of the OLS estimators generally appear in $\hat{\theta}_0$ (unless some $c_j$ are zero). Nevertheless, the same trick that we used in Section 4.4 will work here. Write $\beta_0 = \theta_0 - \beta_1 c_1 - ... - \beta_k c_k$ and plug this into the equation

$$y = \beta_0 + \beta_1 x_1 + ... + \beta_k x_k + u$$

to obtain

$$y = \theta_0 + \beta_1(x_1 - c_1) + \beta_2(x_2 - c_2) + ... + \beta_k(x_k - c_k) + u. \qquad \textbf{[6.30]}$$

In other words, we subtract the value $c_j$ from each observation on $x_j$, and then we run the regression of

$$y_i \text{ on } (x_{i1} - c_1), ..., (x_{ik} - c_k), i = 1, 2, ..., n. \qquad \textbf{[6.31]}$$

The predicted value in (6.29) and, more importantly, its standard error, are obtained from the *intercept* (or constant) in regression (6.31).

As an example, we obtain a confidence interval for a prediction from a college GPA regression, where we use high school information.

<div style="border-left: 4px solid; padding-left: 8px;">

**EXAMPLE 6.5**     **CONFIDENCE INTERVAL FOR PREDICTED COLLEGE GPA**

Using the data in GPA2.RAW, we obtain the following equation for predicting college GPA:

$$\widehat{colgpa} = 1.493 + .00149 \, sat - .01386 \, hsperc$$
$$\qquad (0.075) \quad (.00007) \qquad (.00056)$$
$$\qquad - .06088 \, hsize + .00546 \, hsize^2 \qquad \textbf{[6.32]}$$
$$\qquad (.01650) \qquad\quad (.00227)$$
$$n = 4,137, R^2 = .278, \bar{R}^2 = .277, \hat{\sigma} = .560,$$

</div>

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

where we have reported estimates to several digits to reduce round-off error. What is predicted college GPA, when $sat = 1{,}200$, $hsperc = 30$, and $\underline{hsize = 5}$ (which means 500)? This is easy to get by plugging these values into equation (6.32): $\widehat{colgpa} = 2.70$ (rounded to two digits). Unfortunately, we cannot use equation (6.32) directly to get a confidence interval for the expected $colgpa$ at the given values of the independent variables. One simple way to obtain a confidence interval is to define a new set of independent variables: $sat0 = sat - 1{,}200$, $hsperc0 = hsperc - 30$, $hsize0 = hsize - 5$, and $hsizesq0 = hsize^2 - 25$. When we regress $colgpa$ on these new independent variables, we get

$$\widehat{colgpa} = 2.700 + .00149\ sat0 - .01386\ hsperc0$$
$$(0.020)\quad (.00007)\qquad\ (.00056)$$
$$-\ .06088\ hsize0 + .00546\ hsizesq0$$
$$(.01650)\qquad\quad (.00227)$$
$$n = 4{,}137,\ R^2 = .278,\ \bar{R}^2 = .277,\ \hat{\sigma} = .560.$$

The only difference between this regression and that in (6.32) is the intercept, which is the prediction we want, along with its standard error, .020. It is not an accident that the slope coefficients, their standard errors, $R$-squared, and so on are the same as before; this provides a way to check that the proper transformations were done. We can easily construct a 95% confidence interval for the expected college GPA: $2.70 \pm 1.96(.020)$ or about 2.66 to 2.74. This confidence interval is rather narrow due to the very large sample size.

Because the variance of the intercept estimator is smallest when each explanatory variable has zero sample mean (see Question 2.5 for the simple regression case), it follows from the regression in (6.31) that the variance of the prediction is smallest at the mean values of the $x_j$. (That is, $c_j = \bar{x}_j$ for all $j$.) This result is not too surprising, since we have the most faith in our regression line near the middle of the data. As the values of the $c_j$ get farther away from the $\bar{x}_j$, $\text{Var}(\hat{y})$ gets larger and larger.

The previous method allows us to put a confidence interval around the OLS estimate of $\text{E}(y|x_1, \ldots, x_k)$ for any values of the explanatory variables. In other words, we obtain a confidence interval for the *average* value of $y$ for the subpopulation with a given set of covariates. But a confidence interval for the average person in the subpopulation is not the same as a confidence interval for a particular unit (individual, family, firm, and so on) from the population. In forming a confidence interval for an unknown outcome on $y$, we must account for another very important source of variation: the variance in the unobserved error, which measures our ignorance of the unobserved factors that affect $y$.

Let $y^0$ denote the value for which we would like to construct a confidence interval, which we sometimes call a **prediction interval**. For example, $y^0$ could represent a person or firm not in our original sample. Let $x_1^0, \ldots, x_k^0$ be the new values of the independent variables, which we assume we observe, and let $u^0$ be the unobserved error. Therefore, we have

$$y^0 = \beta_0 + \beta_1 x_1^0 + \beta_2 x_2^0 + \ldots + \beta_k x_k^0 + u^0. \qquad \textbf{[6.33]}$$

As before, our best prediction of $y^0$ is the expected value of $y^0$ given the explanatory variables, which we estimate from the OLS regression line: $\hat{y}^0 = \hat{\beta}_0 + \hat{\beta}_1 x_1^0 + \hat{\beta}_2 x_2^0 + \ldots + \hat{\beta}_k x_k^0$. The **prediction error** in using $\hat{y}^0$ to predict $y^0$ is

$$\hat{e}^0 = y^0 - \hat{y}^0 = (\beta_0 + \beta_1 x_1^0 + \ldots + \beta_k x_k^0) + u^0 - \hat{y}^0. \qquad \textbf{[6.34]}$$

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

Now, $E(\hat{y}^0) = E(\hat{\beta}_0) + E(\hat{\beta}_1)x_1^0 + E(\hat{\beta}_2)x_2^0 + \ldots + E(\hat{\beta}_k)x_k^0 = \beta_0 + \beta_1x_1^0 + \ldots + \beta_kx_k^0$, because the $\hat{\beta}_j$ are unbiased. (As before, these expectations are all conditional on the sample values of the independent variables.) Because $u^0$ has zero mean, $E(\hat{u}^0) = 0$. We have shown that the expected prediction error is zero.

In finding the variance of $\hat{e}^0$, note that $u^0$ is uncorrelated with each $\hat{\beta}_j$, because $u^0$ is uncorrelated with the errors in the sample used to obtain the $\hat{\beta}_j$. By basic properties of covariance (see Appendix B), $u^0$ and $\hat{y}^0$ are uncorrelated. Therefore, the **variance of the prediction error** (conditional on all in-sample values of the independent variables) is the sum of the variances:

$$\text{Var}(\hat{e}^0) = \text{Var}(\hat{y}^0) + \text{Var}(u^0) = \text{Var}(\hat{y}^0) + \sigma^2, \qquad \textbf{[6.35]}$$

where $\sigma^2 = \text{Var}(u^0)$ is the error variance. There are two sources of variation in $\hat{e}^0$. The first is the sampling error in $\hat{y}^0$, which arises because we have estimated the $\beta_j$. Because each $\hat{\beta}_j$ has a variance proportional to $1/n$, where $n$ is the sample size, $\text{Var}(\hat{y}^0)$ is proportional to $1/n$. This means that, for large samples, $\text{Var}(\hat{y}^0)$ can be very small. By contrast, $\sigma^2$ is the variance of the error in the population; it does not change with the sample size. In many examples, $\sigma^2$ will be the dominant term in (6.35).

Under the classical linear model assumptions, the $\hat{\beta}_j$ and $u^0$ are normally distributed, and so $\hat{e}^0$ is also normally distributed (conditional on all sample values of the explanatory variables). Earlier, we described how to obtain an unbiased estimator of $\text{Var}(\hat{y}^0)$, and we obtained our unbiased estimator of $\sigma^2$ in Chapter 3. By using these estimators, we can define the standard error of $\hat{e}^0$ as

$$\text{se}(\hat{e}^0) = \{[\text{se}(\hat{y}^0)]^2 + \hat{\sigma}^2\}^{1/2}. \qquad \textbf{[6.36]}$$

Using the same reasoning for the $t$ statistics of the $\hat{\beta}_j$, $\hat{e}^0/\text{se}(\hat{e}^0)$ has a $t$ distribution with $n - (k + 1)$ degrees of freedom. Therefore,

$$P[-t_{.025} \leq \hat{e}^0/\text{se}(\hat{e}^0) \leq t_{.025}] = .95,$$

where $t_{.025}$ is the 97.5th percentile in the $t_{n-k-1}$ distribution. For large $n - k - 1$, remember that $t_{.025} \approx 1.96$. Plugging in $\hat{e}^0 = y^0 - \hat{y}^0$ and rearranging gives a 95% prediction interval for $y^0$:

$$\hat{y}^0 \pm t_{.025} \cdot \text{se}(\hat{e}^0); \qquad \textbf{[6.37]}$$

as usual, except for small *df*, a good rule of thumb is $\hat{y}^0 \pm 2\text{se}(\hat{e}^0)$. This is wider than the confidence interval for $\hat{y}^0$ itself because of $\hat{\sigma}^2$ in (6.36); it often is much wider to reflect the factors in $u^0$ that we have not accounted for.

---

| **EXAMPLE 6.6** | **CONFIDENCE INTERVAL FOR FUTURE COLLEGE GPA** |
|---|---|

Suppose we want a 95% CI for the future college GPA of a high school student with *sat* = 1,200, *hsperc* = 30, and *hsize* = 5. In Example 6.5, we obtained a 95% confidence interval for the *average* college GPA among all students with the particular characteristics *sat* = 1,200, *hsperc* = 30, and *hsize* = 5. Now, we want a 95% confidence interval for any *particular* student with these characteristics. The 95% prediction interval must account for the variation in the individual, unobserved characteristics that affect college performance. We have everything we need to obtain a CI for *colgpa*. se($\hat{y}^0$) = .020 and

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

$\hat{\sigma}$ = .560 and so, from (6.36), se($\hat{e}^0$) = [(.020)$^2$ + (.560)$^2$]$^{1/2}$ ≈ .560. Notice how small se($\hat{y}^0$) is relative to $\hat{\sigma}$: virtually all of the variation in $\hat{e}^0$ comes from the variation in $u^0$. The 95% CI is 2.70 ± 1.96(.560) or about 1.60 to 3.80. This is a wide confidence interval and shows that, based on the factors we included in the regression, we cannot accurately pin down an individual's future college grade point average. (In one sense, this is good news, as it means that high school rank and performance on the SAT do not preordain one's performance in college.) Evidently, the unobserved characteristics that affect college GPA vary widely among individuals with the same observed SAT score and high school rank.

## Residual Analysis

Sometimes, it is useful to examine individual observations to see whether the actual value of the dependent variable is above or below the predicted value; that is, to examine the residuals for the individual observations. This process is called **residual analysis**. Economists have been known to examine the residuals from a regression in order to aid in the purchase of a home. The following housing price example illustrates residual analysis. Housing price is related to various observable characteristics of the house. We can list all of the characteristics that we find important, such as size, number of bedrooms, number of bathrooms, and so on. We can use a sample of houses to estimate a relationship between price and attributes, where we end up with a predicted value and an actual value for each house. Then, we can construct the residuals, $\hat{u}_i = y_i - \hat{y}_i$. The house with the most negative residual is, at least based on the factors we have controlled for, the most underpriced one relative to its *observed* characteristics. Of course, a selling price substantially below its predicted price could indicate some undesirable feature of the house that we failed to account for, and which is therefore contained in the unobserved error. In addition to obtaining the prediction and residual, it also makes sense to compute a confidence interval for what the future selling price of the home could be, using the method described in equation (6.37).

Using the data in HPRICE1.RAW, we run a regression of *price* on *lotsize*, *sqrft*, and *bdrms*. In the sample of 88 homes, the most negative residual is −120.206, for the 81st house. Therefore, the asking price for this house is $120,206 below its predicted price.

There are many other uses of residual analysis. One way to rank law schools is to regress median starting salary on a variety of student characteristics (such as median LSAT scores of entering class, median college GPA of entering class, and so on) and to obtain a predicted value and residual for each law school. The law school with the largest residual has the highest predicted value added. (Of course, there is still much uncertainty about how an individual's starting salary would compare with the median for a law school overall.) These residuals can be used along with the costs of attending each law school to determine the best value; this would require an appropriate discounting of future earnings.

Residual analysis also plays a role in legal decisions. A *New York Times* article entitled "Judge Says Pupil's Poverty, Not Segregation, Hurts Scores" (6/28/95) describes an important legal case. The issue was whether the poor performance on standardized tests in the Hartford School District, relative to performance in surrounding suburbs, was due to poor school quality at the highly segregated schools. The judge concluded that "the disparity in test scores does not indicate that Hartford is doing an inadequate or poor job in educating its students or that its schools are failing, because the predicted scores based upon the relevant socioeconomic factors are about at the levels that one would expect." This conclusion is based on a regression analysis of average or median scores on

Copyright 2012 Cengage Learning. All Rights Reserved. May not be copied, scanned, or duplicated, in whole or in part. Due to electronic rights, some third party content may be suppressed from the eBook and/or eChapter(s). Editorial review has deemed that any suppressed content does not materially affect the overall learning experience. Cengage Learning reserves the right to remove additional content at any time if subsequent rights restrictions require it.

# EXHIBIT 98

Benjamin A. Sacks

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
2                SAN FRANCISCO DIVISION

3
hiQ Labs, Inc.,                Case No. 17-cv-03301-EMC
4
        Plaintiff,             NOTICE OF DEPOSITION OF HIQ
5                              LABS, INC.'S EXPERT WITNESS
vs.                            BENJAMIN A. SACKS
6
LinkedIn Corporation,          Judge:  Hon. Edward M. Chen
7
        Defendant.
8
                               Date:  July 8, 2022
9  LinkedIn Corporation         Time:  10 a.m. Eastern
                               Place:  Remotely (via Zoom)
10         Counter-claimant,

11  vs.

12  HiQ Labs, Inc.

13         Counter-defendant.

14

15

16      VIDEOTAPED DEPOSITION OF BENJAMIN A. SACKS

17

18          TAKEN BY:  NATHAN SHAFFER, ESQ.

19             DATE:  July 8, 2022

20             TIME:  9:00 a.m.

21            PLACE:  Zoom Teleconference

22      REPORTED BY:  RICHARD S. SCIRÉ, RPR, FPR-C

23                    JOB NO: 10103315

24

25

1    to see that it doesn't look like things are changing very

2    much overtime, or -- or in some other respects.

3         Q.    So, if we go to Appendix C, that you just

4    referenced, which is the whole way down on page 63 of the

5    PDF file -- there's no page numbers down there.

6                Well, I guess there are but they --

7         A.    I gotcha.  Yeah.

8         Q.    So, as you go through this analysis, it

9    seems to me like the entire analysis is based on the data

10   collected from PitchBook but there's -- there's no

11   mention of any hiQ data in this appendix; is that right?

12        A.    No, nor -- nor should there be.

13        Q.    Okay.  So, Appendix C is only looking at

14   characteristics -- characteristics of the sample from

15   PitchBook?

16        A.    Yes.

17        Q.    And -- and where do you compare the

18   characteristics of that sample to hiQ in this report?

19        A.    Ah.  Okay.  These -- these are, I believe,

20   all about how value changes from Round B to Round C.  So,

21   by definition, you -- you don't have hiQ's Round C value

22   or not -- not the pre -- not one that happened before

23   this C and D.  So, we're not -- we're not trying to test

24   that because that's not -- that's not testable.  What

25   we're trying to test is that the -- the B to C

1  subsequent adjustments; right?

2          A.    Subsequent adjustments for the odds of

3  reaching Round C but, yeah, as regards to Round C itself,

4  I would -- I -- I have no strong reason to put them above

5  or as Tapjoy is below the line, you know, perhaps if hiQ

6  had had the characteristics of -- of Tapjoy, then -- then

7  we'd have a different conversation where we were both

8  talking about how much below the line is it because of,

9  you know, whatever -- whatever bad things were true about

10  Tapjoy.

11          Maybe you could have told -- this for

12  Tapjoy.  I don't know.  But very possibly you could have

13  because it's one of the worst performers relative to

14  expectation.

15          Q.    Right.

16          A.    If it's for hiQ I -- I don't believe that

17  the information indicates, justifies deviating from --

18  from the line more strongly in the up direction than in

19  the down direction.

20          Q.    And did you -- did you take a look at

21  Tapjoy's characteristics as a company between Series B

22  and Series C value -- valuations?

23          A.    No.  Other --

24          Q.    So, you don't --

25          A.    Other than what's in the data set.

Benjamin A. Sacks

1      Q.     Right.   So you don't know if they had

2    revenues similar to hiQ or not; right?

3           A.     I don't.

4           Q.     And you -- you don't know if their business

5    was similar to hiQ or not; right?

6           A.     Well I know that they're in -- in, you

7    know, one of the -- the categories that we selected on.

8    And I could probably tell you exactly which ones they are

9    from -- from the data set but other than that, I don't

10   have any knowledge of their similarity or dissimilarity.

11          Q.     Let's -- let's do another one.

12                 So, if you go back to the Series B data

13   there's one called BountyJobs.

14          A.     Okay.

15          Q.     And it is on line 71.

16          A.     Okay.

17          Q.     So you see there they have a post-money

18   Series B valuation of 84 million?

19          A.     I -- I see that.

20                 Are you -- do you want me to do the same

21   sort of --

22          Q.     Yeah.

23          A.     -- calculation for them?

24          Q.     Yup.   I'm just building up the record.

25                 MS. MILLER:   I'm going to -- same

```
 1                    CERTIFICATE OF REPORTER

 2

 3    THE STATE OF FLORIDA)

 4

 5              I, RICHARD S. SCIRÉ, RPR, FPR-C, certify

 6    that I was authorized to and did stenographically report

 7    the deposition of BENJAMIN A. SACKS; that a review of the

 8    transcript was not requested; and that the transcript is

 9    a true and complete record of my stenographic notes.

10              I further certify that I am not a relative,

11    employee, attorney, or counsel of any of the parties, nor

12    am I a relative or employee of any of the parties'

13    attorney or counsel connected with the action, nor am I

14    financially interested in the action.

15

16              Dated this 18th day of July, 2022.

17

18

19    _____

20    Richard S. Sciré, RPR, FPR-C

21

22

23

24

25
```

**Page 316**

# EXHIBIT 99

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4    hiQ Labs, Inc.,

5              Plaintiff,
                                    Case No.:
6              vs.
                            17-cv-03301-EMC

7
     LinkedIn Corporation,
8
               Defendant.
9    _____

10   LinkedIn Corporation,

11             Counterclaimant,

12             vs.

13   hiQ Labs, Inc.,

14             Counter-defendant.
15   _____

16

17               - CONFIDENTIAL -

18            VIDEO-RECORDED DEPOSITION

19        REMOTELY TAKEN VIA ZOOM CONFERENCE OF

20        MARK WEIDICK, Individually, Volume III

21             Also as 30(b)(6), Volume IV

22             WEDNESDAY, JUNE 1, 2022

23   Stenographically Reported by:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No. 10101626

1          (Last question read.)

2          MR. WORCESTER:  You can answer.

3          THE WITNESS:  Oh, okay.

4          MR. WORCESTER:  I didn't hear the second half

5      of the question.

6      A.    The -- the -- the -- the idea of keeping a --

7      a round open for subsequent equity, for subsequent

8      follow-on is what was in play there that we would have

9      kept around open for other investors at those prior

10     terms under the so-called B1, is what we're -- what

11     we're talking about right now.

12     BY MS. HURST:

13     Q.    At any time was there a projection for

14     hiQ Labs which showed the company becoming profitable?

15     A.    Not in the time frame I would have been there.

16     Not in the time frame that preceded me.  The

17     profitability profile isn't what drives value at an

18     early stage tech company.  Amazon, a shining example of

19     that.  There are so many others.  So this was -- this

20     was a -- a -- a revenue new license bookings growth

21     story far more than profitability.  So no.

22     Q.    Did anyone at hiQ Labs ever create any kind of

23     a projection of when the company would reach

24     profitability?

25     A.    I don't know.

1     Q.    Can you identify such a projection as you sit

2   here today?

3     A.    Can I identify a --

4     Q.    Any projection in exist -- that was previously

5   in existence at hiQ showing the company -- a timeline

6   for the company achieving profitability of its

7   operations?

8     A.    It wasn't a metric of interest, so no.

9     Q.    Can you identify any customer of hiQ that

10  you believe you lost a sale because that customer --

11  when that customer subsequently went and purchased a

12  LinkedIn product instead?

13    A.    I can identify a customer that shared with us

14  a LinkedIn presentation of a competitive offering that

15  caused them to stall and not buy what we were offering

16  them.  I don't know if they subsequently bought

17  LinkedIn's product.

18    Q.    Okay.  What customer was that?

19    **IRRELEVANT TEXT DESIGNATED AS CONFIDENTIAL REDACTED**

20    Q.    And what LinkedIn product presentation did

21  JPMC identify to you?

22    A.    From memory, they didn't give it a name.  They

23  said LinkedIn just presented Skill Mapper to me.

24    Q.    And when was this?

25    A.    2017 time frame.  I don't remember the exact

1   State of California        )
                              )SS:
2   County of San Diego       )

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken

6   ( X ) remotely (  ) live before me at the time and place

7   herein set forth; that any witnesses in the foregoing

8   proceedings, prior to testifying, were placed under

9   oath; that a verbatim record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; further, that the

12  foregoing is an accurate transcription thereof.

13       Further, that if the case is pending in the

14  Federal Court, before the proceedings were transcribed

15  by me, review [  ] was [ X ] was not requested.

16       I further testify that I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney of any of the parties.

19       IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21  DATED  June 2, 2022.

22

23  _____

24  LINDA E. MARQUETTE, CSR

25  Certificate No. 11874

**Page 451**

# EXHIBIT 100
# FILED UNDER SEAL

1              UNITED  STATES  DISTRICT  COURT

2            NORTHERN  DISTRICT  OF  CALIFORNIA

3                SAN  FRANCISCO  DIVISION

4
   hiQ Labs, Inc.,
5
              Plaintiff,
6                                     Case No.:
              vs.                     17-cv-03301-EMC
7
   LinkedIn Corporation,
8
              Defendant.
9    _____

10   LinkedIn Corporation,

11              Counterclaimant,

12              vs.

13   hiQ Labs, Inc.,

14              Counter-defendant.
     _____
15

16                - CONFIDENTIAL -

17
                 VIDEO-RECORDED  DEPOSITION
18
         REMOTELY  TAKEN  VIA  ZOOM  CONFERENCE  OF
19
          MARK  WEIDICK,  Individually,  Volume  I
20
              Also as 30(b)(6), Volume II
21
                 MONDAY,  MAY  23,  2022
22

23   Stenographically Reported by:
     Linda E. Marquette
24   RPR, CLR, CSR No. 11874

25   Job No. 10101215

1   question before -- before you were done.

2   BY MS. HURST:

3       Q.    So you got a copy of the letter and then you

4   showed it to some other hiQ employees or vice versa?

5       A.    I don't remember the specifics of what I did

6   next at an internal level in -- in that next hour or two

7   at an internal level.  At some point in there, though,

8   very quickly, again, within hours, I reached out to our

9   then law firm of record to make them aware and get their

10  take.

11      Q.    Okay.  Did you -- did you communicate the

12  letter to any board members?

13      A.    I'm certain I did but I don't recall the

14  sequence of events between internal dialogue, getting in

15  front of our law firm, and then reaching out to -- to

16  board members to notify them that the cease and desist

17  came in.

18      Q.    Okay.  When you notified board members --

19  well, was it the same day?

20      A.    I shouldn't speculate so I don't recall the

21  specific timing.

22      Q.    How did you notify board members that you had

23  received the letter?

24      A.    I don't remember specifically.

25      Q.    Was it by telephone?  By e-mail?

1    A.   I still don't remember specifically.  I know

2  that I ultimately had phone conversations with several

3  board members, but in that moment, the first move, I

4  don't recall what it was.

5    Q.   All right.  When you had those phone

6  conversations with board members about the letter, were

7  any of them already aware of it prior to the time that

8  you made them aware of it?

9    A.   Not that I recall, no.

10   Q.   So the first knowledge that any of your board

11 members had of the cease and desist letter from LinkedIn

12 came from you, correct?

13   A.   Yes.

14   Q.   And did you -- did you notify anyone other

15 than your lawyer and your board members of the letter?

16   A.   Did you just only say my lawyers and my board

17 members?

18   Q.   Oh, yeah, and let's include employees as well.

19 Right.  Yeah.  Did you notify -- did you notify anyone

20 other than employees, board members, and your lawyer of

21 the letter?

22   A.   In -- in -- in those next few hours, no.  But

23 I know I shared it with my wife when I got home that

24 night.

25   Q.   Okay.  In any of those communications did you

1    learn that anyone already knew about the letter at the

2    time that you showed it to them?

3       A.    No.

4       Q.    So the first --

5       A.    I don't recall.

6       Q.    As far as you understand, the first knowledge

7    that any of your employees or board members or your

8    lawyer had of this letter was when you provided it to

9    them, correct?

10      A.    That's my understanding, yes.

11      Q.    Did you ever encounter anyone to whom you

12   disclosed Exhibit 485, LinkedIn cease and desist letter

13   that already knew about it at the time you disclosed it

14   to them?

15      A.    This specific letter?

16      Q.    Right.

17      A.    I think at the time I assumed that when I

18   reached out to LinkedIn general counsel he would have

19   been aware of it in advance but I -- I don't recall

20   confirming that.  I assumed that it wouldn't be news to

21   -- to him.

22      Q.    Any -- other than LinkedIn employees, did you

23   ever encounter anyone whom -- with whom you discussed

24   LinkedIn's cease and desist letter that you believe

25   already knew about it at the time you had that

1    discussion?

2         A.    Not that I remember, no.

3         Q.    Did you ever discuss LinkedIn's cease and

4    desist letter with any customers?

5         A.    Yes.

20        Q.    And with respect to that, can you describe for

21   me today anyone -- any conversation that anyone else

22   within the business reported to you about having

23   discussed Exhibit 485, the cease and desist letter with

24   a customer?

25        A.    You know, there was a period of time where I

1 thought that we could resolve this so, no, not in that

2 immediate time frame of, say, days or even weeks, I

3 cannot.

4     **Q.  Okay.  And can you tell me anything at all, as**

5 **you sit here today, about any discussion that anyone**

6 **other than you had with a customer about Exhibit 485,**

7 **LinkedIn's cease and desist letter?**

8     A.  Well, certainly after the circumstance became

9 public I talked with our customer facing personnel as

10 they had to contend with it should their customers bring

11 it up.  So I talked to Amelia Barker, now Amelia

12 Jones -- she got married.  I can't remember the order of

13 her married name and premarried name, but Amelia Jones

14 Barker.  Darin Medeiros, of course.

15     **Q.  And what did Ms. Barker or Ms. -- Mrs. Jones,**

16 **what did she tell you about any specific conversations**

17 **that she had had with any customers?**

18     A.  That the customers were concerned about the

19 implications to their business, whether or not at the

20 most rudimentary level we'd be able to provide the work

21 that we were doing for them and whether or not there

22 would be some subsequent ramifications on their business

23 as being in business with us.

24     **Q.  Okay.  And I want to really get to specific**

25 **conversations that she had with particular customers.**

1    Which -- can you recount for me anything she told you

2    about a specific conversation she had with a particular

3    customer?

4         A.    I cannot.

5         Q.    At any point in time can you tell me -- can

6    you recount for me anything Ms. Barker told you about a

7    specific conversation she had with a particular

8    customer?

9         A.    Not at that level of specificity.  It's the

10   word "particular" and "specific" that lead me to I

11   cannot.

12        Q.    You said after it became public.  What did you

13   mean by that?

14        A.    We quickly ended up in a public courtroom

15   situation seeking a temporary restraining order so at

16   that point the media covered the situation.

17        Q.    In fact, you had a PR campaign related to the

18   lawsuit where you reached out to the media; isn't that

19   right?

20        A.    We retained a crisis management public

21   relations firm to help us contend with the inevitability

22   that we would be deemed guilty of the things levied in

23   this letter knowing full well that our reputation was a

24   tremendously valuable part of the business and it was

25   about to be sullied inappropriately.  So we planned

1   ahead for that, yes.

2          MS. HURST:  Move to strike as nonresponsive.

3          Would the court reporter read that back,

4   please, read back the question.

5          (Last question read.)

6          MR. WORCESTER:  Mark, I'm going to caution you

7   because I don't know the answer to this question.  I

8   don't know whether or not Deepak retained the PR firm or

9   whether or not you did.  So answer the question "yes" or

10  "no" and let Annette ask follow-ups.

11          THE WITNESS:  I'm not sure what's going to

12  happen next here.

13  BY MS. HURST:

14     **Q.    You're supposed to answer "yes" or "no."**

15          MR. WORCESTER:  You can answer the question

16  "yes" or "no."

17     A.    Are you going to ask it again or do I just --

18  I thought the court reporter was going to read my

19  response back.  I thought that was what --

20          MS. HURST:  No.

21          MR. WORCESTER:  No, no.  She read the question

22  back.  Now you can answer it "yes" or "no."  And then

23  Annette can ask follow-ups and give me a chance to

24  object.

25     A.    I retained a public relations firm, yes.

1    BY MS. HURST:

2        Q.    And who was that public relations firm?

3        A.    PRCG is what they went by, Public Relations

4    Crisis Group.

5        Q.    And how did you identify them as someone that

6    you wanted to retain?

7        A.    I sought guidance from others in the world of

8    public relations and asked if they had any

9    recommendations or referrals.

10       Q.    Who did you seek those recommendations from?

11       A.    I called a contact, a spouse of a friend

12   and -- and professional colleague who was at, oh, gosh,

13   a big giant public relations firm whose name escapes me

14   right now.  At -- I apologize.  I can't remember the

15   name of the firm.  Right now it escapes me.

16       Q.    All right.  In any event you called a spouse

17   of the professional contact and --

18       A.    Yes.

19       Q.    -- and they gave you one or more names, is

20   that -- of options; is that -- is -- is that right?

21       A.    Yes.

22       Q.    And then what were your next steps after

23   talking to this person who made some recommendations to

24   you?

25       A.    I thought that I could retain her firm,

1  despite not remembering the name right now.  Her name is

2  Ava Riser.  But the firm's name -- and she could not --

3  understanding the -- the -- the dynamic of Microsoft,

4  LinkedIn and hiQ Labs and the role that they played

5  vis-a-vis providing services potentially to hiQ -- I'm

6  sorry, to LinkedIn and Microsoft, her firm was not in a

7  position to engage with us.  And I took her list.  I

8  don't remember any other names on the list other than

9  PRCG.  And I called that.

10       **Q.  And when you called PRCG, did you speak**

11  **with -- you spoke with somewhere there.  Did you have a**

12  **specific name of someone that you were calling?**

13       A.  Yes, Jim Haggerty, James Haggerty.

14       **Q.  All right.  And did you -- did you retain**

15  **Mr. Haggerty?**

16       A.  I retained his firm.

17       **Q.  Okay.  And what were your initial**

18  **conversations with him?**

19       A.  What do I do?  I asked him a question.  What

20  do I do?

21       **Q.  And what did he recommend?**

22       A.  That we take a somewhat metered approach.

23  That we plan for every possible outcome from the worst

24  to the best.  And knowing full well that I thought it

25  could be resolved in a nonlegal way, that we ended up

1   spending a lot of time talking about plans, writing out

2   plans.



5    Q.    All right.  So McKinsey, as both a customer

6    and an investor, knew about the cease and desist letter

7    when you reached out to Mr. Gagnon shortly in the wake

8    of receiving it, correct?

9    A.    I don't think he knew about it prior to my

10   outreach, so no, not correct.

11   Q.    Oh, I -- maybe my question was confusing.  He

12   learned about it as a result of your outreach to him?

13   A.    Yes.

14   Q.    Okay.  Thank you.

15         At some point hiQ decided to file a lawsuit

16   against LinkedIn, correct?

17   A.    Yes.

18   Q.    Who made that decision on behalf of hiQ?

19   A.    It's a board of directors decision.

20   Q.    And when did the board of directors make that

21   decision?

22   A.    I don't remember the exact date.

23   Q.    What business reasons did the board of

24   directors have for its decision to file a lawsuit

25   against LinkedIn?

```
 1           MR. WORCESTER:  And, Mark, the question is

 2   what business reasons, not legal reasons.  She's not

 3   asking you for any conversations you had with Deepak or

 4   anyone else who's a lawyer.
```

```
11   endeavor, as I've mentioned previously here.  The impact

12   on our discussions with multiple partners for OEM deals

13   that were being brought into the 2017 operating plan.

14   So for all of those business reasons, the board reached

15   a conclusion that we should try to correct this wrong

16   and, in essence, push back.

17   BY MS. HURST:

18       Q.    When you received the letter did you make any

19   instructions to your employees about anything that they

20   should or shouldn't do in connection with the company's

21   ongoing scraping at that point in time?

22       A.    Not before talking to legal counsel, I did

23   not.

24       Q.    So the only instructions that you made to

25   employees about whether they should or should not
```

```
 1  State of California      )
                             )SS:
 2  County of San Diego      )

 3          I, the undersigned, a Certified Shorthand

 4  Reporter of the State of California, do hereby certify:

 5          That the foregoing proceedings were taken

 6  (X) remotely ( )live before me at the time and place

 7  herein set forth; that any witnesses in the foregoing

 8  proceedings, prior to testifying, were placed under

 9  oath; that a verbatim record of the proceedings was made

10  by me using machine shorthand which was thereafter

11  transcribed under my direction; further, that the

12  foregoing is an accurate transcription thereof.

13          Further, that if the case is pending in the

14  Federal Court, before the proceedings were transcribed

15  by me, review [  ] was [ X ] was not requested.

16          I further testify that I am neither financially

17  interested in the action nor a relative or employee of

18  any attorney of any of the parties.

19          IN WITNESS WHEREOF, I have this date subscribed

20  my name.

21  DATED:  May 24, 2022

22

23  _____

24  LINDA E. MARQUETTE, CSR

25  Certificate No. 11874
```

**Page 254**