1  Corey Worcester (*pro hac vice*)
   coreyworcester@quinnemanuel.com
2  Renita Sharma (*pro hac vice*)
   renitasharma@quinnemanuel.com
3  Hope Skibitsky (*pro hac vice*)
   hopeskibitsky@quinnemanuel.com
4  Elisabeth Miller (*pro hac vice*)
   elisabethmiller@quinnemanuel.com
5  Zane Muller (*pro hac vice*)
   zanemuller@quinnemanuel.com
6  QUINN EMANUEL URQUHART AND SULLIVAN LLP
   51 Madison Avenue, 22nd Floor
7  New York, NY 10010
   Telephone:    (212) 849-7000
8
   Terry L. Wit (SBN 233473)
9  terrywit@quinnemanuel.com
   QUINN EMANUEL URQUHART AND SULLIVAN LLP
10 50 California Street, 22nd Floor
   San Francisco, CA 94111
11 Telephone:    (415) 875-6331

12 *Attorneys for Plaintiff and*
   *Counterclaim Defendant*
13 *hiQ Labs, Inc.*

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16

17 hiQ Labs, Inc.,                          Case No. 3:17-cv-03301-EMC

18         *Plaintiff and Counterclaim*    **PLAINTIFF HIQ LABS, INC.'S REPLY**
           *Defendant*,                     **BRIEF IN FURTHER SUPPORT OF ITS**
19                                          **MOTION FOR SUMMARY JUDGMENT**

        vs.
20                                          Judge:        Hon. Edward M. Chen
21 LinkedIn Corp.,                          Hearing Date: Sept. 29, 2022
                                            Hearing Time: 1:30 p.m.
22         *Defendant and Counterclaim*
           *Plaintiff.*
23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................1

I.      THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT LINKEDIN WAS
        ON NOTICE OF HIQ'S SCRAPING BEFORE JUNE 2015 ...................................................1

        A.      Baribeau, Maurath, Gaker, Rigano And Others Were On Notice, And That
                Notice Is Imputed To LinkedIn ...........................................................................2

        B.      Contemporaneous Documentary Evidence Plainly Shows That Rosin And
                Womer Also Were On Notice Of hiQ's Scraping .....................................................7

        C.      Fraudulent Concealment Does Not Toll The Statute Of Limitations Any
                Further Than The Discovery Rule ........................................................................8

II.     THE CONTINUOUS ACCRUAL RULE CANNOT REVIVE LINKEDIN'S CFAA
        CLAIMS ...........................................................................................................9

CONCLUSION ....................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aryeh v. Canon Bus. Sols., Inc.*,
    55 Cal. 4th 1185 (2013)............................................................................................ 8, 9

*Baker v. Beech Aircraft Corp.*,
    39 Cal. App. 3d 315 (1974) ........................................................................................ 8

*Barrileaux v. Mendocino Cty.*,
    2018 WL 3585133 (N.D. Cal. July 26, 2018) ............................................................ 3

*Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*,
    522 U.S. 192 (1997) .................................................................................................. 16

*Bliss v. CoreCivic, Inc.*,
    978 F.3d 1144 (9th Cir. 2020)................................................... 10, 11, 12, 13, 15, 16

*Cada v. Baxter Healthcare Corp.*,
    920 F.2d 446 (7th Cir. 1990) ...................................................................................... 8

*Calhoun v. Google LLC*,
    526 F. Supp. 3d 605 (N.D. Cal. 2021) ................................................................ 12, 15

*Cooper v. Simpson Strong-Tie Co.*,
    460 F. Supp. 3d 894 (N.D. Cal. 2020) ........................................................................ 8

*Creative Computing v. Getloaded.com LLC*,
    5,000 damages threshold.  386 F.3d 930 (9th Cir. 2004)...................................... 12, 13

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
    566 U.S. 221 (2012) .................................................................................................... 8

*Doubt v. NCR Corp.*,
    2014 WL 3897590 (N.D. Cal. Aug. 7, 2014) .............................................................. 5

*Early v. Owens*,
    109 Cal. App. 489 (Ct. App. 1930) ............................................................................. 5

*Fraser v. Goodale*,
    342 F.3d 1032 (9th Cir. 2003)..................................................................................... 3

*Grede v. Bank of N.Y. Mellon Corp. (In re Sentinel Mgmt. Grp., Inc.)*,
    809 F.3d 958 (7th Cir. 2016)....................................................................................... 7

*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir. 1996)....................................................................................... 16

*Grisham v. Philip Morris, USA, Inc.*,
    40 Cal. 4th 623 (2007)................................................................................................. 8

*In re Sunset Bay Assocs.*,
 944 F.2d 1503 (9th Cir. 1991) .................................................................................. 7

*Klehr v. A.O. Smith Corp.*,
 521 U.S. 179, 192 (1997) ......................................................................................... 16

*Maddalena v. Toole*,
 2013 WL 5491869 (C.D. Cal. Oct. 1, 2013) .............................................................. 8

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*,
 454 F. Supp. 2d 966 (C.D. Cal. 2006) ...................................................................... 6

*Meyer v. Glenmoor Homes, Inc.*,
 246 Cal. App. 2d 242 (1966) ............................................................................... 3, 7

*Miniace v. Pac. Mar. Ass'n*,
 2006 WL 648732 (N.D. Cal. Mar. 13, 2006) ............................................................ 6

*Mountain Copper Co. v. Welcome Growers Gin Co.*,
 197 Cal. App. 2d 253 (1961) ................................................................................... 3

*National Ass'n of Radiation Survivors v. Turnage*,
 115 F.R.D. 543 (N.D. Cal. 1987) ............................................................................. 5

*O'Riordan v. Federal Kemper Life Assur.*,
 36 Cal. 4th 281 (2005) ............................................................................................ 4

*People v. Forest E. Olson, Inc.*,
 137 Cal. App. 3d 137 (1982) ................................................................................... 3

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
 572 U.S. 663 (2014) .......................................................................................... 15, 16

*Phreesia, Inc. v. Certify Global, Inc.*,
 2022 WL 911207 (D. Md. 2022) ....................................................................... 14, 15

*Primm v. Joyce*,
 87 Cal. App. 2d 288 (1948) ..................................................................................... 4

*Raifman v. Wachovia Secs*,
 649 Fed. Appx. 611 (9th Cir. 2016) .......................................................................... 8

*Rustico v. Intuitive Surgical, Inc.*,
 424 F. Supp. 3d 720 (N.D. Cal. 2019) ...................................................................... 9

*Sanders v. Magill*,
 9 Cal. 2d 145, 70 P.2d 159 (1937) ........................................................................... 5

*Snyder v. Bank of Am., N.A.*,
 2019 WL 6219217 (N.D. Cal. Nov. 21, 2019) ........................................................... 2

*Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*,
 594 F.2d 730 (9th Cir. 1979) .................................................................................... 2

*Triple A Mgmt. Co., Inc. v. Frisone*,
    69 Cal. App. 4th 520 (1999) ................................................................................................ 4

*United States v. Georgia-Pacific Company*,
    421 F.2d 92 (9th Cir. 1970) ................................................................................................. 4

*Valley Fruit Orchards v. Global Horizons Manpower*,
    2010 WL 1286367 (E.D. Wash. Mar. 26, 2010) ................................................................ 4

*Van v. Language Line Servs., Inc.*,
    2016 WL 3143951 (N.D. Cal. June 6, 2016) ...................................................................... 9

*Weil v. Citizens Telecom Servs. Co., LLC*,
    922 F.3d 993 (9th Cir. 2019) ............................................................................................... 7

**Statutory Authorities**

17 U.S.C. § 507(b) ........................................................................................................... 15, 16

18 U.S.C. § 1030 ...................................................................................................................... 1

18 U.S.C. § 1030(c)(4)(a)(i)(I) ............................................................................................. 13

18 U.S.C. § 1030(c)(4)(A)(i)(I) ............................................................................................ 12

18 U.S.C. § 1030(e)(8) ..................................................................................................... 12, 13

18 U.S.C. § 1030(g) ......................................................................................................... 12, 14

18 U.S.C. §§ 2510-2523 ........................................................................................................ 10

18 U.S.C. § 2510(4) ............................................................................................................... 11

18 U.S.C. § 2511(1)(b) .......................................................................................................... 11

18 U.S.C. § 2520(a) ......................................................................................................... 10, 11,

18 U.S.C. § 2520(e) ............................................................................................................... 11

18 U.S.C. § 2520(c)(2)(B) ............................................................................................... 11, 12

Cal. Civ. Code § 2332 ......................................................................................................... 2, 3

**Rules and Regulations**

Fed R. Civ. P. 801(d)(2) ......................................................................................................... 6

Fed R. Civ. P. 801(d)(2)(D) ................................................................................................... 6

Fed. R. Civ. P. 56(c)(1) .......................................................................................................... 6

Fed. R. Civ. P. 56(c)(1)(A) ..................................................................................................... 6

**Additional Authorities**

*https://careers.linkedin.com/culture-and-values* ................................................................. 3

HIQ'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

hiQ Labs, Inc. ("hiQ") respectfully submits this reply in further support of its Motion for Summary Judgment to dismiss LinkedIn Corp's ("LinkedIn's") claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.* (the "Motion").

## INTRODUCTION

It is undisputed that LinkedIn's employees (including executives) (i) knew or, at a minimum, suspected that hiQ was accessing LinkedIn's data via scraping and (ii) never bothered to do anything about it until years later when LinkedIn decided it wanted to release a product that would compete with hiQ's offering.

Despite its hand-waving about "Members First" and its misleading assurances to this Court and the public that it is fully committed to preventing scraping, LinkedIn now claims that its own employees actually have ***no*** obligation to do anything at all about scraping, unless, apparently, they are one of the select few anonymous employees who LinkedIn purports to have anointed for anti-scraping enforcement responsibilities.  Not only does LinkedIn claim that its employees do not have responsibility to report the very scraping that LinkedIn claims to disavow, but it also admits that it did not even have any system for reporting scraping until 2017—around the time that LinkedIn decided that it wanted to compete with scrapers.  Thus, LinkedIn seeks to sidestep the CFAA's statutory limitations period by, in essence, not having cared about the activity that now constitutes its *ex post facto* explanation for its anti-competitive conduct.  But the record shows that LinkedIn knew all along that hiQ was scraping its data, and the statute of limitation therefore bars its CFAA claim.

## ARGUMENT

### I.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT LINKEDIN WAS ON NOTICE OF HIQ'S SCRAPING BEFORE JUNE 2015

Faced with incontrovertible evidence that its employees knew about hiQ's scraping before 2015, LinkedIn resorts to bald-faced denials of responsibility or understanding on the part of those same personnel.[1]  But the law is clear:  "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary

---

[1]    *See* ECF 358 (LinkedIn's Opposition to hiQ's Motion for Summary Judgment ("Opp.")).

care and diligence, to communicate to the other." Cal. Civ. Code § 2332.[2]  LinkedIn's counterclaims in this suit are based on the premise that scraping in general, and hiQ's scraping in particular, inflicts serious harm on its business.  *See* ECF 320 at ¶ 5 ("Data scraping therefore poses a significant threat to LinkedIn's business because it undermines the trust that LinkedIn has built with its members.").  But to avoid summary judgment, LinkedIn now claims that scraping was not even a significant enough event for its employees to act upon, or, alternatively, that LinkedIn's employees—including its executives—did not even understand what scraping was when the concept was put to them.  *See* ECF 320 at 11-12.  But such "[c]onclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment."  *Snyder v. Bank of Am., N.A.*, 2019 WL 6219217, at *1 (N.D. Cal. Nov. 21, 2019) (*citing Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)).  LinkedIn contorts itself to argue on the one hand that scraping seriously harms LinkedIn and its members, but on the other hand its employees had no reason to report or in any way act on knowledge of scraping in "the exercise of ordinary care and diligence." Cal. Civ. Code § 2332.  These positions are irreconcilable, and provide no basis upon which to deny summary judgment on the clear record here.

### A.  Baribeau, Maurath, Gaker, Rigano And Others Were On Notice, And That Notice Is Imputed To LinkedIn

In filing after filing, LinkedIn has trumpeted the "members first" principles that supposedly animate its claims in this suit.  *See* ECF 30 (Rosin Decl.) ("LinkedIn's 'Members First' philosophy guides the decisions LinkedIn makes."); ECF 35 ("hiQ's products . . . are fundamentally contrary to LinkedIn's 'Members First' policy"); ECF 144-2 ("LinkedIn's core guiding value is Members First"); ECF 217-4 (Rockwell Decl.) ("At LinkedIn, our fundamental philosophy is "members first".  That value powers all of the decisions we make."); ECF 320 ¶ 2 ("At the heart of LinkedIn's platform are its members"); ("We put members first. . . . Every day, ***when making decisions large and small***, we will always prioritize doing the right thing for our members"; "***Each of us is***

---

[2]  LinkedIn's mystifying assertion that a principal's knowledge vis-à-vis knowledge of its agents is somehow "limit[ed]" by this language is unsupported by any argument or analysis.  Tellingly, LinkedIn declines to quote the statutory language in its brief.

1   ***responsible*** for making decisions as owners: prioritizing the whole over any part[.]").[3]   But faced

2   with summary judgment, LinkedIn now attempts to argue that it cannot be held responsible for

3   knowledge of hiQ's scraping in 2014, 2015, or 2016, or even early 2017 because its employees had

4   no "authority" or "responsibility" to report scraping of which they were aware—right up until the

5   moment that LinkedIn coincidentally decided to enter into competition with hiQ.   This argument

6   fails as a matter of law, as LinkedIn's reliance on sparse, outdated and factually divergent authority

7   makes clear.

8       "A corporation, of course, can acquire knowledge only through its officers and agents."

9   *Meyer v. Glenmoor Homes, Inc.* 246 Cal.App.2d 242, 264 (1966); *see also* Cal. Civ. Code § 2332.

10  That remains true so long as a corporation's agents collectively know something, even if no single

11  agent "has all the information necessary to realize that specific fact."   *See People v. Forest E. Olson,*

12  *Inc.*, 137 Cal. App. 3d 137, 139-40 (1982) (to find otherwise would "permit a corporation, by not

13  letting its right hand know what is in its left hand, to mislead and deceive those who are dealing

14  with it in perfectly good faith.").   LinkedIn, of course, cannot credibly dispute that Baribeau,

15  Maurath, Gaker, Rigano, or anyone else on the "Talent Insights" email listserv were its agents.

16  Instead, it attempts to declare that they were not "responsible" for scraping, without citing any

17  precedent or other authority to support the idea that some specific assignment of responsibility

18  within an employment relationship is required to impute constructive notice to LinkedIn.[4]   But this

19

20  [3]   *See https://careers.linkedin.com/culture-and-values* (Muller Dec. Ex. A).  LinkedIn misleadingly

21  cites to superseded law for its purported objections to the admissibility of certain exhibits attached
    to hiQ's Motion.  *See* Opp. at 24 n. 9, 10 (citing *Orr v. Bank of America, NT & SA,* 285 F.3d 764,

22  773-74 (9th Cir. 2002)); *cf. Fraser v. Goodale,* 342 F.3d 1032, 1036 (9th Cir. 2003) ("Nonetheless,
    we need not decide whether the diary itself is admissible. It would be sufficient if the contents of

23  the diary are admissible at trial, even if the diary itself may be inadmissible. At the summary
    judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on

24  the admissibility of its contents."); *see also Barrileaux v. Mendocino Cty.*, 2018 WL 3585133, at *
    5 n. 2 (N.D. Cal. July 26, 2018) ("The County cites to *Orr v. Bank of America, NT & SA,* 285 F.3d

25  764, 773 (9th Cir. 2002) for the proposition that unauthenticated documents cannot be considered
    in a motion for summary judgment. While the County accurately quotes *Orr*, it appears that *Orr* is

26  no longer an accurate summary of the law in this circuit in light of *Fraser* and the other courts in
    this district that have followed *Fraser*.") (collecting cases).  Accordingly, the Court should overrule

27  LinkedIn's objections.

28  [4]   hiQ does not "concede" that "the October 2014 discussions did not extend beyond the participants
    on that chain" (Opp. 21).  For one, an additional email (LINK_HIQ_000206273) revealing a new
    participant on that chain (Rigano) was belatedly produced to hiQ on August 10, 2022—*after* hiQ

1    is not the law: rather, "[k]nowledge *acquired* by an agent *while acting within the course and scope*

2    of his employment is chargeable to his principal, his employer."  *Mountain Copper Co. v. Welcome*

3    *Growers Gin Co.*, 197 Cal. App. 2d 253, 256 (1961) (emphasis added).

4            In other words, the question is whether the facts were *acquired within* the scope and course

5    of employment, and accordingly, whether the LinkedIn employees who concededly had knowledge

6    of, or suspected, hiQ's scraping activity had a duty to disclose that knowledge.  "Under well-

7    established principles of agency, a principal is bound by the knowledge of its agent concerning a

8    matter upon which it is the agent's duty to give the principal information." *United States v. Georgia-*

9    *Pacific Company*, 421 F.2d 92, 98 n.9 (9th Cir. 1970); *see also Valley Fruit Orchards v. Global*

10   *Horizons Manpower,* 2010 WL 1286367, at *7 (E.D. Wash. Mar. 26, 2010) (applying California

11   law, *citing in turn O'Riordan v. Federal Kemper Life Assur.*, 36 Cal. 4th 281, 288 (2005), and noting

12   that an agent's knowledge is imputed to a principal "even if the agent fails to advise the principal of

13   the information.").

14           LinkedIn cannot argue that Baribeau, Gaker, Maurath and Rigano became aware of hiQ

15   outside "the scope and course of [their] employment"—they discussed hiQ in what is plainly a

16   workplace conversation carried out in the scope of their day-to-day employment, through their

17   LinkedIn email, about the subject matter of their work—talent analytics.[5]  *See generally* Mot. Ex.

18   D.  LinkedIn's attempt to read Gaker's statement that "it might be good for someone to go [to hiQ's

19

20   had filed its opening brief in support of this Motion.

21   [5]  LinkedIn's reliance on the 1948 case of *Primm v. Joyce*, is unavailing.  Opp. 21 (citing *Primm v.*
     *Joyce*, 87 Cal. App. 2d 288 (1948)).  There, the Court held that the knowledge of plaintiff's

22   "secretary and auditor" could not be imputed to plaintiff because "[t]he record is destitute of any
     evidence that Mr. Shroeder was Mr. Primm's agent with authority to deal with any of Mr.

23   Schroeder's property except to collect rents; the evidence is insufficient to establish even an
     ostensible agency to the extent that knowledge of the agent is knowledge of the principal as

24   contended for by respondent." *Id.* at 292.  There is no such ambiguity about the scope of the agency
     relationship here, where the record includes affirmative statements from LinkedIn's employees

25   acknowledging their obligation to report potential scraping.  Likewise, the "scope of the duty" at
     issue in *Triple A Mgmt. Co., Inc. v. Frisone*, 69 Cal. App. 4th 520, 534-35 (1999) was that of an

26   escrow agent, that is, a "dual agent" of the parties to a real estate transaction who "is only a limited
     or special agent" of each party.  As a result, an escrow agent's "obligations to disclose matters to

27   [the] principal are also limited" to that narrowly circumscribed agency relationship.  *Id.*  Here, by
     contrast, the employees with knowledge of hiQ's scraping activity had a broader agency

28   relationship, and accordingly a broader duty to disclose, as full-time and single-agent employees of
     LinkedIn.

                                                   -4-                     Case No. 3:17-cv-03301-EMC

1  Elevate conference] to make sure this vendor isn't accessing our data", and Baribeau's agreement

2  that, indeed, "someone should go", as *disavowal* of responsibility on the part of the email

3  participants (Opp. 22) borders on the absurd, especially given that Maurath, in response, *explicitly*

4  *assumes responsibility*—establishing beyond dispute that LinkedIn possessed the knowledge

5  relevant here: "I can request to attend and at least find out more info."  Mot. Ex. D.[6]

6        In any event, the claim that these employees were not affirmatively designated enforcers of

7  LinkedIn's anti-scraping policy is irrelevant to the constructive notice analysis.  The implication of

8  LinkedIn's argument is that it could only be held to have constructive notice if *certain* of its

9  employees were aware of hiQ's scraping.  But that logic "would permit an agency, corporate officer,

10 or legal department to shield itself from discovery obligations by keeping its employees ignorant."

11 *National Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Cal. 1987); *see also*

12 *Early v. Owens,* 109 Cal. App. 489, 495 (Ct. App. 1930) ("[O]ne who acts through another will be

13 presumed to know all that the agent learns during the transaction, whether it is actually

14 communicated to him or not," otherwise "an agent would be employed whenever it was convenient

15 to remain in ignorance"); *Sanders v. Magill,* 9 Cal. 2d 145, 154, 70 P.2d 159, 163 (1937) (it is a

16 "well-established rule of law . . . that notice to the agent or officer of a corporation is imputable to

17 the corporation itself").

18        This is all the more so because ████████████████████

19 ████████████████████████████.  *See* LinkedIn's Supp. Resp. to Interrogatory 8

20 ("When hiQ was subsequently identified by email to Scraper Council in October 2015, at the time

21 the cross-functional group was still working out its internal processes and *there were not yet clear*

22 *lines of responsibility or a playbook on how to proceed with reports* made to the Scraper Council.").

23

24

_____

25 [6]   Notably, LinkedIn does not claim that reporting scraping was "not within the scope of
   employment" of *Baribeau*, in contrast to its denials of the same for Maurath, Rigano, and Gaker.
26 *See* Opp. 22.  Thus, even to the extent the Court credits LinkedIn's argument that one has to have
   specific responsibility vis-à-vis scraping in order for his or her knowledge to be imputed to
27 LinkedIn, Baribeau's knowledge should be imputed to LinkedIn.  *See Doubt v. NCR Corp.*, 2014
   WL 3897590, at *5 (N.D. Cal. Aug. 7, 2014) ("If a party . . . fails to properly address another party's
   assertion of fact, the court may consider the fact undisputed for purposes of the motion or grant
28 summary judgment if the motion and supporting materials—including the facts considered
   undisputed—show that the movant is entitled to it.").

1   And though Rigano explicitly suggested that the group "hand off to legal and let them investigate

2   further", ███████████████████████████████████████████████████ *Id.*; *see*

3   *also* Ex. B[7] (LINK_HIQ_000206273);   Ex. C (Lawit 30(b)(6) Tr. 72:24-73:9).   LinkedIn

4   conspicuously fails to explain whose knowledge, if anyone's, would have been sufficient to put

5   LinkedIn on notice—and elides the fact that this information was *widely circulated* within LinkedIn.

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████ That is not

11  the law.[8]

12      LinkedIn's proffered distinction between "suspicion" and "speculation" (Opp. 22) is

13  similarly meaningless and has no basis in case law.  hiQ has adduced indisputable evidence that

14  LinkedIn employees knew hiQ was scraping.  Summary judgment is therefore appropriate.

15      Finally, LinkedIn's purported evidentiary objection against the admissibility of statements

16  *made by its own employees within the scope of their employment* is inappropriate and should be

17  rejected out of hand.  Opp. at 21 n. 8.  *First*, LinkedIn misleadingly omits key language from Rule

18  56(c)(1), which expressly permits as evidence "materials in the record, including . . . *documents*[.]"

19  Fed. R. Civ. P. 56(c)(1)(A) (emphasis added).  *Second*, LinkedIn notably does not dispute that

20  Baribeau, Maurath, Gaker, and Rigano were employees of LinkedIn in October and December 2014

21  when the at-issue e-mails were sent, and the statements within are therefore admissible under Rule

22  801(d)(2) as non-hearsay statements by LinkedIn employees.  Fed R. Civ. P. 801(d)(2)(D); *Metro-*

23  *Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*, 454 F.Supp.2d 966**,** 973 (C.D. Cal. 2006)

24

25

26  [7]  All Exhibits are attached to the September 12, 2022 Declaration of Zane Muller unless otherwise
    indicated.

27  [8]  LinkedIn's authority on this point is inapposite, because it deals with actual lack of knowledge
    rather than lack of responsibility for acting on it, *see Miniace v. Pac. Mar. Ass'n*, 2006 WL 648732,

28  at *3 (N.D. Cal. Mar. 13, 2006) (finding no evidence of notice where movant adduced no evidence
    of employee's attendance at meetings where the relevant subject was discussed.).

("StreamCast admits that these individuals served as its corporate officers or employees during the relevant time period. . . . Thus, emails sent by these individuals are all admissible non-hearsay under Rule 801(d)(2)(D)."). That certain LinkedIn executives were supposedly unaware of the content of these emails at the time they were sent is irrelevant.

LinkedIn's assertion that these statements were not made within the scope of the employees' employment at LinkedIn is also unpersuasive. These employees worked in LinkedIn's Talent Insights group, regularly evaluated and discussed LinkedIn's competition in the talent analytics space, and their statements concerning scraping by hiQ fall well within the scope of these roles. *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 999 (9th Cir. 2019) ("'[S]tatements need only *concern* matters within the scope of the agency; they need not be made within the scope of the agency.'") (quoting *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1519 (9th Cir. 1991) (emphasis in original). "Additionally, a matter may fall within the scope of a declarant's employment even though the declarant did not have final decision-making authority on that matter." *Id*. Thus, such emails should be considered and, once considered, establish that LinkedIn's CFAA is time barred.

### B. Contemporaneous Documentary Evidence Plainly Shows That Rosin And Womer Also Were On Notice Of hiQ's Scraping

LinkedIn's assertion that Rosin and Womer "did not read the email to concern scraping" (Opp. 23) defies credulity and misrepresents the sworn testimony of Rosin and Womer, ███████

Rosin was a Vice President at LinkedIn, and Womer was a Director of Business Development; "[g]enerally, the knowledge of a corporate officer within the scope of his employment

is the knowledge of the corporation." *Meyer*, 246 Cal. App. 2d at 264.  As such, their notice of hiQ's scraping, and the likelihood that "it was not a members-first use case" (Mot. Ex. H), "was enough, given [their] position[s] [at LinkedIn], to place [LinkedIn] on inquiry notice and thus require it to conduct an investigation" *Grede v. Bank of N.Y. Mellon Corp. (In re Sentinel Mgmt. Grp., Inc.)*, 809 F.3d 958, 962 (7th Cir. 2016) (finding inquiry notice where senior bank executive was presented with information inconsistent with normal operation of a lender).

### C.   Fraudulent Concealment Does Not Toll The Statute Of Limitations Any Further Than The Discovery Rule

LinkedIn's argument that the statute of limitations should be tolled on the basis of fraudulent concealment fails on its own terms.  "[T]o establish fraudulent concealment so as to toll the statute of limitations, 'the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry.'"  *Cooper v. Simpson Strong-Tie Co.*, 460 F. Supp. 3d 894, 918 (N.D. Cal. 2020) (quoting *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (1974)); *see also Raifman v. Wachovia Secs*, 649 Fed. Appx. 611, 613 (9th Cir. 2016) ("To take advantage of the discovery rule, a plaintiff must 'specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'" (quoting *Grisham v. Philip Morris, USA, Inc.*, 40 Cal. 4th 623, 638 (2007))).[9]

"It is well established [] that when a limitations period is tolled because of fraudulent concealment of facts, the tolling ceases when those facts are, or should have been, discovered by the plaintiff."  *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012).[10]  Here, the record plainly establishes that LinkedIn came into possession of facts showing that hiQ was scraping in October of 2014, and again independently in December 2014.  *See* Section I, *supra*.  Fraudulent

---

[9]   Fraudulent concealment is an equitable defense under both state and federal law to a statute of limitations defense.  *See generally Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990) (Posner, J.).

[10]   *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185 (2013) dealt with a state law Unfair Competition Law claim, which statute, unlike the CFAA, has no discovery provision tolling the statute of limitations.

concealment would, at most, delay the start date of LinkedIn's claim accrual to the date on which LinkedIn received constructive notice of hiQ's scraping—*i.e.*, October 2014. LinkedIn's claim that it "could never have discovered hiQ's conduct through 'reasonable diligence'" (Opp. 26) cannot be reconciled with this record. *See Maddalena v. Toole,* 2013 WL 5491869, at *5 (C.D. Cal. Oct. 1, 2013) (finding "argument that the 'secretive technological nature' of Toole's wrongdoing prevented them from fully discovering the arsenal of spyware he installed and the extent to which he was monitoring their activities is irrelevant."). And LinkedIn's argument that it "did not learn of the full range of conduct underlying its claims" until this litigation (Opp. 26) is of no importance, because "California courts have repeatedly held that the doctrine of fraudulent concealment for tolling the statute of limitation does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Rustico v. Intuitive Surgical, Inc.*, 424 F. Supp. 3d 720, 740 (N.D. Cal. 2019) (internal quotations and citations omitted). The bottom line is that LinkedIn was manifestly aware of hiQ and its business, and ***could have simply inquired*** of hiQ what data it was using and how it was getting that data, including through any number of the LinkedIn employees who were already familiar with hiQ. What LinkedIn cannot do is leverage its own inaction into a means of defeating summary judgment.

## II.   THE CONTINUOUS ACCRUAL RULE CANNOT REVIVE LINKEDIN'S CFAA CLAIMS

The Court likewise should reject LinkedIn's argument that the statute of limitations has not run because the continuous accrual doctrine applies.

LinkedIn claims that it is "long settled" that the continuous accrual doctrine, also known as the separate accrual doctrine, applies to federal law. Opp. 17 (quoting *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1198 (2013)). But LinkedIn has not cited a single case supporting its position that the continuous accrual doctrine applies to federal statutes as a matter of course, nor is hiQ aware of such a case. *Cf. Van v. Language Line Servs., Inc.*, 2016 WL 3143951, at *8 (N.D. Cal. June 6, 2016) (rejecting application of continuous accrual doctrine to claims under the Fair Labor Standards Act and "not[ing] that continuous accrual is a development of California law, and no case cited by Plaintiff applies the continuous accrual theory to a federal cause of action."), *aff'd in part*, 733 F.

App'x 349 (9th Cir. 2018).  A finding that the continuous accrual doctrine is applicable on these facts would allow a party to sit on its rights beyond the limitations period despite knowing of the defendant's conduct giving rise to the alleged CFAA violations—albeit not the exact nature of that conduct—for ***years*** beyond the CFAA's statutory limitations period, thus rendering the CFAA's explicit limitations provision a nullity.

Although hiQ does not dispute that, in some cases, courts have applied the continuous accrual doctrine to CFAA claims, *see* Opp. at 17-19, hiQ disagrees that the doctrine applies on these facts.  Here, LinkedIn concedes that even the continuous accrual doctrine cannot save its claims related to conduct before June 2015, but contends that each of the alleged scrape attempts from June 7, 2015 to June 7, 2017 trigger its own statute of limitations and therefore LinkedIn's CFAA claims are not time-barred.  LinkedIn's argument fails, however, because LinkedIn's damages claim pursuant to the CFAA is premised on the ***aggregated*** purported losses relating to individual scrapes.  Because LinkedIn could not bring a CFAA claim based on any single scrape (because it cannot meet the damages threshold), LinkedIn's CFAA claim is ***necessarily*** based on hiQ's course of conduct over time rather than any specific access requests.  And, because LinkedIn was aware of hiQ's conduct as early as 2014, its CFAA claim based on that conduct is time-barred.

LinkedIn principally rests its plea for the continuous accrual doctrine's applicability on *Bliss v. CoreCivic, Inc.*, a non-CFAA case which LinkedIn contends "is instructive." Opp. 18 (discussing *Bliss v. CoreCivic, Inc.*, 978 F.3d 1144 (9th Cir. 2020)).  In *Bliss*, plaintiff, a criminal defense attorney, filed suit on behalf of herself and similarly situated attorneys under the federal Wiretap Act based on defendant detention facility's recording of privileged telephone calls between plaintiff and her clients over the course of several years.  Plaintiff first received a copy of a recorded call through discovery in June 2016, but waited more than two years, until July 2018, to sue under the Wiretap Act.  *Id.* at 1146.  Defendant moved for summary judgment, arguing that plaintiff's claims were time-barred by the Wiretap Act's two-year statutory limitation period because plaintiff first had the reasonable opportunity to discover its policy of recording conversations in June 2016, when plaintiff received a recorded call from defendant.  *Id.*  Plaintiff argued that because the defendant's unlawful recordings continued through February 2019, her claims were timely.

The Ninth Circuit explained that "[t]he Wiretap Act provides a civil cause of action to 'any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of 18 U.S.C. §§ 2510-2523.'" *Id.* at 1147 (quoting 18. U.S.C. § 2520(a)). The Wiretap Act provides that an action must be brought not "'later than two years after the date upon which the claimant first has a reasonable opportunity to discover *the violation.*'" *Id.* (quoting 18. U.S.C. § 2520(e) (emphasis added by court)). Thus, "[t]he question [the Ninth Circuit] . . . decide[d in *Bliss*] is whether 'the violation' triggering the statute of limitations is CoreCivic's call-recording protocol as a whole or each individual call that it recorded." *Id.* at 1146.

The Court first looked at the plain text of the Wiretap Act, noting that the Act does not "define the meaning or scope of 'the violation' that triggers the statute of limitations." *Id.* at 1147. Accordingly, the Court considered "the public understanding of the words at the time of enactment . . . as well as the language and design of the statute as a whole." *Id.* (quotations omitted). As to the public meaning of the word "violation," the Court stated that "violation" was understood to be defined singularly. *Id.* at 1148. With this definition, the Court explained that "the material question is [thus] how the Act defines violative conduct, *i.e.*, whether it prohibits individual acts, or practices and schemes that result in unlawful acts." *Id.* The Court explained as follows:

> Considering "the violation" in the larger context of the Act indicates that this phrase refers to each individual interception (or other action) that violates the Act, not overall practices or schemes that result in many individual interceptions. As stated above, the Act prohibits the interception of certain types of communication. 18 U.S.C. § 2520(a). "Intercept" is defined as "the aural or other acquisition of the contents of *any* wire, electronic, or oral *communication* through the use of any electronic, mechanical, or other device." *Id.* § 2510(4) (emphasis added). Anyone who "intentionally uses" a "device to intercept *any* oral *communication*" under circumstances specified in the Act is subject to punishment. *Id.* § 2511(1)(b) (emphasis added). And a civil cause of action is available to anyone "whose wire, oral, or electronic *communication* is intercepted." *Id.* § 2520(a) (emphasis added).

*Id.* Ultimately, the Court concluded that "the plain import of these definitions is that each interception is a discrete violation." *Id.* at 1148.

The Ninth Circuit then considered defendant's argument that the Wiretap "Act's statutory-damages provision indicates that the overall scheme [*i.e.*, defendant's policy of recording phone

calls], and not individual acts taken as part of that scheme [*i.e.*, each individual recording], is the relevant violation." *Id.* at 1148.  The Court reasoned as follows:

> The Act provides for statutory damages "of $100 a day for each day of violation or $10,000," whichever is greater.  18 U.S.C. § 2520(c)(2)(B).  We do not see how this provision necessitates interpreting "the violation" to refer to an overall pattern or scheme that results in multiple violations. . . .  The statutory-damages provision clarifies that violations are remedied on a per-day basis, not a per-occurrence basis. That is, if multiple violations occur in a single day, only one damage assessment is made.  And were a single violation to extend over multiple days, the number of assessments would be based on the number of days the violation continued.  This provision does not address the question before us, nor does it indicate, as CoreCivic suggests, that a course of conduct leading to multiple interceptions must be treated as a single violation.

*Id.* at 1148-49.  Accordingly, the Ninth Circuit held that "[e]ach interception of Bliss's privileged telephone calls is a separate violation of the Act", that the "statute of limitations is triggered anew for each call that CoreCivic recorded," and that claims based on calls recorded two years prior to plaintiff's lawsuit were time-barred.  *Id.* at 1149-50.

A comparison of the Wiretap Act's damages and statutory limitations provisions shows why the *Bliss* Court's application of the accrual doctrine to plaintiff's claims in *Bliss* should not be followed on the facts here under the CFAA.

Unlike the Wiretap Act's damages provision, which "clarifies that violations are remedied on a per-day basis, not a per-occurrence basis," a party may only bring a CFAA claim if "an offense" causes "loss to 1 or more persons during any 1-year period . . . ***aggregating*** at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 634 (N.D. Cal. 2021) ("Plaintiffs may aggregate losses from multiple violations over the one-year period to meet the $5,000 requirement.").  Thus, unlike a claim under the Wiretap Act that is immediately actionable upon a violation (*i.e.*, an "interception"), a claim under the CFAA is not actionable unless and until a plaintiff can meet the $5,000 damages threshold, which a plaintiff may do by aggregating losses from independent events.

Further, unlike the Wiretap Act's statutory limitations language, which provides that an action must be brought not "later than two years after the date upon which the claimant first has a reasonable opportunity to discover ***the violation***."  *Bliss*, 978 F.3d at 1147 (quoting 18. U.S.C. §

2520(e) (emphasis added by court)), the CFAA statutory clock starts ticking on "the date of the act complained of ***or the date of the discovery of the damage***" 18 U.S.C. § 1030(g) (emphasis added). "Damage", in turn, "means any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

In *Creative Computing v. Getloaded.com LLC*, the Ninth Circuit had occasion to consider whether the rule adopted by other courts—that only damage or loss from a "single act" may be aggregated to meet the $5,000 damages threshold.  386 F.3d 930, 934 (9th Cir. 2004).  The Ninth Circuit declined to impose a "single act" requirement, noting that "[t]he damage floor in the [CFAA] contains no 'single act' requirement."[11]  *Id.* at 935.  The Ninth Circuit reasoned as follows:

> Getloaded argues that "impairment" is singular, so the floor has to be met by a single intrusion.  The premise does not lead to the conclusion.  The statute (both the earlier and the current versions) says "damage" means "any impairment to the integrity or availability of data[etc.] . . . that causes loss aggregating at least $5,000."  Multiple intrusions can cause a single impairment, and multiple corruptions of data can be described as a single "impairment" to the data.  The statute does not say that an "impairment" has to result from a single intrusion, or has to be a single corrupted byte.  A court construing a statute attributes a rational purpose to Congress.  Getloaded's construction would attribute obvious futility to Congress rather than rationality, because a hacker could evade the statute by setting up thousands of $4,999 (or millions of $4.99) intrusions.  As the First Circuit pointed out in the analogous circumstance of physical impairment, so narrow a construction of the $5,000 impairment requirement would merely "reward sophisticated intruders."  The damage floor in the Computer Fraud and Abuse Act contains no "single act" requirement.

*Id.* at 934-35 (alteration in original).  Thus, the Court found that "impairment" (*i.e.*, "damage") can result from multiple acts, as LinkedIn claims to be the case here.

LinkedIn's theory of loss and damage is decidedly not based on any single server request made by hiQ, and LinkedIn cannot credibly claim that any singular request caused LinkedIn any damage or loss such that LinkedIn had a viable claim based on such request (as the *Bliss* court found supported application of the continuous accrual doctrine for interception of wires).   Instead,

---

[11]  In *Creative Computing*, the Ninth Circuit considered an early version of the CFAA that defined "damage" as "any impairment to the integrity or availability of data [etc.] . . . that causes loss aggregating at least $5,000."  While the statute now includes the $5,000 minimum in a provision separate from the definition of "damage", the Court's analysis applies just the same today because "damage" is still defined as a singular "impairment" 18 U.S.C. § 1030(e)(8) and a plaintiff still needs to meet the $5,000 aggregated loss requirement, 18 U.S.C. § 1030(c)(4)(a)(i)(I).

1  LinkedIn's damages theory is premised on hiQ's **_aggregated_** conduct over time.  LinkedIn alleges

2  its CFAA damages as "including, without limitation, harm to LinkedIn's computer systems,

3  expenses associated with being forced to investigate and respond to the unauthorized access and

4  abuse of its computers and servers, and other losses and damage in an amount to be proven at trial,

5  in excess of $5,000 aggregated over a one-year period."  ECF No. 303-3 ¶ 98.  To that end, LinkedIn

6  has offered multiple expert reports purporting to opine on the **_cumulative_** effect of hiQ's conduct.

7  For example, one of LinkedIn's experts, James Malackowski explained: "I have been asked to

8  consider whether, under the [CFAA], LinkedIn has suffered losses aggregating at least $5,000

9  during any 1-year period as a result of hiQ's conduct."  Ex. G (Malackowski Report) at 18.

10  Malackowski's assessment considered hiQ's conduct in the aggregate and posited a per-request

11  "cost" to LinkedIn's servers that is not independently actionable.  Malackowski adopted the alleged

12  cost LinkedIn incurs to "check" any guest profile request (_i.e._, a scrape attempt) of $0.0000027164,

13  and multiplied that cost by the more than 50 billion guest profile requests that LinkedIn alleges to

14  be associated with hiQ to determine the "total cost to check profile requests associated with hiQ."

15  _Id._ at 25-26.  Malackowski also calculated the "value of LinkedIn Profiles misappropriated by hiQ"

16  by multiplying the alleged "value of each scraped LinkedIn profile" (with a low of $0.25 and a high

17  of $0.91) by the "number of unique LinkedIn profiles in hiQ's production" and the "number of

18  unique LinkedIn profiles sold to Klarna."  _Id._ at 29.  Thus, LinkedIn's damages theory is based upon

19  the alleged aggregated number of access attempts made by hiQ during the relevant period and

20  LinkedIn's alleged needs to respond to hiQ's cumulative conduct rather than any singular server

21  request issued by hiQ.  Given that LinkedIn cannot state an independent claim based upon any single

22  scraping event (as it would not meet the $5,000 threshold), hiQ's conduct necessarily should be

23  considered as a whole for purposes of the statute of limitations.

24       The other cases LinkedIn cites are distinguishable.

25       In _Phreesia, Inc. v. Certify Global, Inc._, a non-binding case from the District of Maryland,

26  Phreesia alleged "that defendants worked with an existing Phreesia client to access Phreesia's

27  confidential and proprietary software and incorporate the nonpublic information they acquired into

28  their competing software system."  2022 WL 911207, at *1 (D. Md. 2022).  "Phreesia charges the

defendants accessed the Phreesia System without authorization and, for more than a year, tested and probed the system hundreds of times with different queries to reverse engineer the underlying logic and algorithms." *Id.* at *3.   Defendant moved to dismiss Phreesia's CFAA claim as untimely because Phreesia learned about defendant's unauthorized access in or around April 2018.   Phreesia argued that the statutory clock started running "in or around January 2021," which Phreesia alleged was the "date of the discovery of the damages" for purposes of the CFAA limitations period. *Id.* at *6 (quoting 18 U.S.C. 1030(g)).   After considering plaintiff's allegations, the Court concluded that plaintiff had not alleged "damages" as defined by the CFAA.   Specifically, "Phreesia did not allege defendants affected the 'wholeness' or 'soundness' of its data or information or that the defendants caused 'any diminution in the completeness or usability of the data.'" *Id.* at *8.   Thus, Phreesia's allegations did not constitute "an impairment of the integrity of its data and information" as "damage" is defined by the CFAA. *Id.* at *8.   In the absence of alleged "damage", "Phreesia's CFAA claim began to run from 'the date of the act complained of.'" *Id.* at *9.   Here, by contrast, LinkedIn **has** alleged "damage" as defined by the CFAA in the form of "harm to LinkedIn's computer systems."   Accordingly, here, the statute of limitations began to run when LinkedIn learned of, or was on notice of, the alleged "harm to [its] computer systems" based on hiQ's scraping—that is, October 2014.

LinkedIn also cites *Calhoun v. Google, LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021).   In *Calhoun*, users of Google's web browser brought claims against Google for violations of the Wiretap Act, Stored Communications Act, California Invasion of Privacy Act, the CFAA, and other common law and state statutory claims alleging that Google, through its Chrome extension, repeatedly collected information from their web browsing histories.   Google moved to dismiss the putative class's claims as time-barred.   In its discussion, the Court recognized the *Bliss* holding that "for Wiretap Act claims, 'each interception is a discrete violation' with its own statute of limitations." *Id.* at 625 (quoting *Bliss*, 978 F.3d at 1148).   In a summary fashion, the *Calhoun* court stated that "[t]he Ninth Circuit's reasoning applies to Plaintiffs' other claims, which also refer to 'communication' or 'act' in the singular," quoting from and citing only language from plaintiff's California Penal Code claims. *Id.*   But it does not appear that the Court's statute of limitations

1   analysis was particularly tethered to the CFAA claim, especially because the Court ultimately

2   **dismissed** plaintiff's CFAA claim for failure to plead the $5,000 loss threshold. *Id.* at 634.

3       Finally, the Supreme Court's discussion of the continuous accrual doctrine in *Petrella v.*

4   *Metro-Goldwyn-Mayer, Inc.*, in the context of a copyright infringement claim under 17 U.S.C. §

5   507(b) is irrelevant here. 572 U.S. 663 (2014). *Petrella* stands for the unremarkable and "widely

6   recognized" proposition "that the separate-accrual rule attends the copyright statute of limitations."

7   *Id.* at 671. Under the Copyright Act, "[n]o civil action shall be maintained . . . unless it is

8   commenced within three years after the claim accrued." *Id.* at 670 (quoting 17 U.S.C. § 507(b)).

9   The Supreme Court explained that "[t]o comprehend how the Copyright Act's limitations period

10  works, one must understand when a copyright infringement claim accrues," and that "[a] claim

11  ordinarily accrues 'when [a] plaintiff has a complete and present cause of action.'" *Id.* at 670

12  (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,* 522 U.S.

13  192, 201 (1997)). Thus, "[a] copyright claim [ ] arises or 'accrue[s]' when an infringing act occurs."

14  *Id.* (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund*, 522 U.S. at 201). In this

15  way, the Copyright Act is, to some degree, similar to the Wiretap Act discussed in *Bliss*. However,

16  unlike both the Copyright Act and the Wiretap Act, under the CFAA, and on these facts, LinkedIn

17  cannot bring a claim upon a single alleged unlawful access into a computer system unless such

18  conduct meets the $5,000 minimum. LinkedIn's analogies are simply inapposite here.[12]

19                              **CONCLUSION**

20      For the foregoing reasons and those stated in hiQ's opening brief (ECF No. 331), hiQ

21  respectfully requests that the Court grant its Motion for Summary Judgment on LinkedIn's CFAA

22  claim.

23

24

25

26

27  [12] LinkedIn's analogies (Opp. 18.) to cases with unrelated facts decided under different statutes are unavailing, *See Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 192, (1997) (resolving circuit split in interpretation of Clayton Act's statute of limitations as incorporated in federal RICO action);

28  *Grimmett v. Brown*, 75 F.3d 506, 508 (9th Cir. 1996) (affirming dismissal of RICO claim stemming from divorce settlement and alleged fraudulent concealment of community property).

1   Dated: September 12, 2022

2                                                          QUINN EMANUEL URQUHART &
                                                         SULLIVAN, LLP

3                                                        By:      /s/ Corey Worcester
                                                                 Corey Worcester

4                                                        Attorneys for Plaintiff hiQ Labs, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28