ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
RUSSELL P. COHEN (SBN 213105)
rcohen@orrick.com
PAUL F. RUGANI (SBN 342647)
prugani@orrick.com
CATHERINE Y. LUI (SBN 239648)
clui@orrick.com
NATHAN SHAFFER (SBN 282015)
nshaffer@orrick.com
DANIEL JUSTICE (SBN 291907)
djustice@orrick.com
EMILY RENZELLI (*Pro Hac Vice*)
erenzelli@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105-2669
Telephone:   +1 415 773 5700
Facsimile:   +1 415 773 5759

*Attorneys for Defendant/Counterclaimant
LinkedIn Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| hiQ Labs, Inc., | Case No. 17-cv-03301-EMC |
| Plaintiff, | **LINKEDIN CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SPOLIATION SANCTIONS** |
| vs. | |
| LinkedIn Corporation, | Hearing Date:    September 29, 2022 |
| Defendant. | Hearing Time:   1:30 p.m. |
| | Courtroom:       5 – 17th Floor (Zoom) |
| LinkedIn Corporation | Complaint Filed:   June 7, 2017 |
| Counterclaimant, | Trial Date:             February 27, 2023 |
| vs. | |
| hiQ Labs, Inc. | |
| Counterdefendant. | |

1

**TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................. 1

3

ARGUMENT ........................................................................................................ 2

4

    I.     HIQ ACTED WITH THE REQUISITE INTENT TO JUSTIFY
         APPLICATION OF SANCTIONS UNDER RULE 37(E)(2). ............................. 3

5

         A.    Courts Routinely Find that a Party Acted with "Intent to Deprive"
               by Drawing Inferences from Circumstantial Evidence. ............................ 3

6

         B.    There Is Ample Evidence of hiQ's Intent that hiQ Does Not
               Address—Let Alone "Credibly Explain." .................................................. 4

7

    II.    HIQ'S SPOLIATION PREJUDICED LINKEDIN. ............................................ 8

8

         A.    Splunk "Dashboards" and Other Anecdotal Material Are Not
               Adequate Substitutes for the Records. ..................................................... 8

9

         B.    The Salesforce CRM Database Evidence Was Central to this Case
               and Its Loss Prejudices LinkedIn. ........................................................... 9

10

    III.   LINKEDIN'S REQUESTED SANCTIONS ARE NARROWLY
         TAILORED TO THE PREJUDICE IT HAS SUFFERED. ................................ 11

11

         A.    Severe Sanctions Are Appropriate for Spoliation of the Scraping
               Activity Records and Salesforce CRM Database. .................................... 11

12

         B.    Courts Routinely Award Costs and Fees as Sanctions for
               Spoliation. ............................................................................................... 12

13

    IV.   LINKEDIN'S MOTION IS TIMELY. ................................................................ 13

14

         A.    LinkedIn Could Not Have Been Aware of the Full Scope and
               Import of the Loss of the Salesforce Data Until Well Into
               Discovery. ............................................................................................... 13

15

         B.    hiQ Cannot Claim Any Prejudice. .......................................................... 15

16

CONCLUSION ................................................................................................... 15

17

18

19

20

21

22

23

24

25

26

27

28

MOT. FOR SPOLIATION SANCTIONS
No. 17-cv-03301-EMC

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Auer v. City of Minot*,
   896 F.3d 854 (8th Cir. 2018).................................................................................................... 3

*Borum v. Brentwood Village, LLC*,
   332 F.R.D. 38 (D.D.C. 2019) ................................................................................................... 7

*CAT3, LLC v. Black Lineage, Inc.*,
   164 F. Supp. 3d 488 (S.D.N.Y. 2016) .......................................................................... 3, 5, 12

*Cottle-Banks v. Cox Commc'ns, Inc.*,
   No. 10cv2133, 2013 WL 2244333 (S.D. Cal. May 21, 2013) ................................................ 15

*In re: Ezenia! Inc.*,
   536 B.R. 485 (Bankr. D.N.H. 2015) ...................................................................................... 12

*Facebook, Inc. v. OnlineNIC Inc.*,
   No. 19-cv-07071, 2022 WL 2289067 (N.D. Cal. Mar. 28, 2022)........................................... 13

*Fast v. GoDaddy.com LLC*,
   340 F.R.D. 326 (D. Ariz. 2022) ............................................................................................... 3

*Ferrone v. Onorato*,
   No. 05-303, 2007 WL 2973684 (W.D. Pa. Oct. 9, 2007) ...................................................... 15

*Fourth Dimension Software v. DER Touristik Deutschland GmbH*,
   No. 19-cv-05561, 2021 WL 5919821 (N.D. Cal. Dec. 15, 2021)................................... 4, 6, 7

*Franklin v. Shelby Cnty. Bd. of Educ.*,
   No. 20-cv-02812, 2021 WL 6066673 (W.D. Tenn. Sept. 28, 2021)........................................ 7

*Freeman v. Allstate Life Ins. Co.*,
   253 F.3d 533 (9th Cir. 2001).................................................................................................. 15

*Gaina v. Northridge Hosp. Med. Ctr.*,
   No. CV 18-00177, 2018 WL 6258895 (C.D. Cal. Nov. 21, 2018) ......................................... 7

*Glenn v. Scott Paper Co.*,
   No. 92-1873, 1993 WL 431161 (D.N.J. Oct. 20, 1993).......................................................... 15

*GN Netcom, Inc. v. Plantronics, Inc.*,
   No. 12-1318, 2016 WL 3792833 (D. Del. July 12, 2016) ....................................................... 6

*Goodman v. Praxair Servs., Inc.*,
   632 F. Supp. 2d 494 (D. Md. 2009) ................................................................................. 13, 14

*Greyhound Lines, Inc. v. Wade*,
   485 F.3d 1032 (8th Cir. 2007)................................................................................................... 3

*Jarrell v. Wal-Mart Stores, Inc.*,
    No. 18-cv-01219, 2021 WL 1169889 (D. Nev. Mar. 26, 2021) ........................... 15

*John v. Cnty. of Lake*,
    No. 18-cv-06935, 2020 WL 3630391 (N.D. Cal. July 3, 2020)................................ 8

*Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*,
    No. 19-cv-1756, 2022 WL 2801180 (D. Minn. July 18, 2022) ............................... 8

*Larios v. Lunardi*,
    442 F. Supp. 3d 1299 (E.D. Cal. 2020).............................................................. 15

*Laub v. Horbaczewski*,
    No. CV 17-6210, 2020 WL 9066078 (C.D. Cal. July 22, 2020) ............................ 3

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006)................................................................................ 4

*Mahboob v. Educ. Credit Mgmt. Corp.*,
    No. 15-cv-0628, 2021 WL 791853 (S. D. Cal. March 1, 2021) ..................... 13, 15

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
    No. 20-cv-07182, 2022 WL 1990225 (N.D. Cal. Jun. 6, 2022)......................... 8, 12

*Moody v. CSX Transp., Inc.*,
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) ....................................................... 3, 5, 6, 7

*Morris v. Union Pac. R.R.*,
    373 F.3d 896 (8th Cir. 2004)............................................................................... 3

*Newberry v. County of San Bernadino*,
    750 F. App'x 534 (9th Cir. 2018) ....................................................................... 8

*O'Berry v. Turner*,
    No. 15-CV-00064, 2016 WL 1700403 (M.D. Ga. Apr. 27, 2016) ..................... 4, 7

*Ottoson v. SMBC Leasing & Fin., Inc.*,
    268 F. Supp. 3d 570 (S.D.N.Y. 2017)............................................................ 4, 6, 7

*Paisley Park Enters., Inc. v. Boxill*,
    330 F.R.D. 226 (D. Minn. 2019)......................................................................... 3

*Rhabarian v. Cawley*,
    No. 10–cv–00767, 2014 WL 546015 (E. D. Cal. Feb. 11, 2014) ....................... 15

*Scott Griffith Collaborative Sols., LLC v. Falck N. Cal. Corp.*,
    No. 19-cv-06104, 2021 WL 4846926 (N.D. Cal. Sept. 10, 2021) ....................... 8

*Se. Mech. Servs., Inc. v. Brody*,
    657 F. Supp. 2d 1293 (M.D. Fla. 2009) .............................................................. 8

*Sec. Alarm Fin. Enters., L.P. v. Alarm Protection Tech., LLC*,
    No. 13-cv-00102, 2016 WL 7115911 (D. Alaska Dec. 6, 2016) ..................... 13, 15

*Shackleford v. Vivint Solar Dev. LLC*,
No. 19-cv-00954, 2020 WL 5203340 (D. Md. Sept. 1, 2020) ................................. 15

*Shamis v. Ambassador Factors Corp.*,
34 F. Supp. 2d 879 (S.D.N.Y. 1999) ......................................................................... 14

*Sherwin-Williams Co. v. JB Collision Servs., Inc.*,
No. 13cv1946, 2015 WL 4077732 (S.D. Cal. July 6, 2015) ..................................... 13

*Silvestri v. Gen. Motors Corp.*,
271 F.3d 583 (4th Cir. 2001) ..................................................................................... 5

*Sines v. Kessler*,
No. 17-cv-00072, 2021 WL 4943742 (W.D. Va. Oct. 22, 2021) ........................ 4, 7

*SiteLock LLC v. GoDaddy.com LLC*,
No. CV-19-02746, 2022 WL 3716499 (D. Ariz. Aug. 29, 2022) ............................ 12

*Matter of In re Skanska Skanska USA Civ. Se. Inc.*,
340 F.R.D. 180 (N.D. Fla 2021) .......................................................................... 8, 10

*Spencer v. Lunada Bay Boys*,
No. CV 16-02129, 2018 WL 839862 (C.D. Cal. Feb. 12, 2018) ............................. 12

*United States v. Jenkins*,
567 F.2d 896 (9th Cir. 1978) ...................................................................................... 4

*Vezzetti v. REMCEC, Inc.*,
No. 99CV0796, 2001 WL 37118900 (S.D. Cal. July 23, 2001) ................................ 5

*Watson v. Allen Cnty. Sheriff's Officers*,
No. 12-CV-55, 2013 WL 4540597 (N.D. Ind. Aug. 27, 2013) ............................... 12

*Williams v. Nationwide Ins. Co.*,
No. 12-13904, 2014 WL 12659422 (E.D. Mich. Apr. 29, 2014) ............................ 15

**Other Authorities**

Fed. R. Civ. P. 11 .................................................................................................................. 13

Fed. R. Civ. P. 30(e)(1) ....................................................................................................... 10

Fed. R. Civ. P. 37(e) ..................................................................................................... *passim*

Fed. R. Civ. P. 37(e)(2) .......................................................................................... 3, 4, 7, 12

Fed. R. Civ. P 37(e), Comm. Note ............................................................................. 7, 8, 10

1

## **INTRODUCTION**

2
3
4
5

hiQ does not dispute that it has spoliated a vast trove of relevant evidence.  It does not challenge that it had a duty to preserve, that it failed to take reasonable steps to preserve, or that the evidence is lost forever.  Instead, hiQ's claim is that the deletion—which occurred after many months' notice across multiple systems—was just an accident.  hiQ's story doesn't add up.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

hiQ makes no effort to explain why, if it intended to preserve evidence, it did not simply alert LinkedIn and the Court that its accounts were about to be shut down and evidence lost forever.  LinkedIn could have served third-party subpoenas to activate preservation obligations and obtain the data.  It was that simple.  hiQ could have sent a letter to its service providers instructing them that there was an obligation to preserve the evidence for litigation, which likely would have done the trick.  hiQ did not.  Nor does hiQ offer even the most basic explanation for why it failed to create backups that it *knew* it was supposed to make, and that officers and senior engineers repeatedly discussed making.  The cost of making backups was the cost of buying a few hard drives (several hundred dollars, tops), and obviates any reasonable claim that hiQ lacked resources to preserve.  To top it off, hiQ offers *nothing* in the way of any sort of explanation for its failures—no declarations (or even deposition testimony) from employees, nor written contemporaneous communications—that give a coherent answer to why it simply stood back and let mountains of evidence be destroyed during this litigation.  Under Rule 37(e) and the applicable cases, where, as here, a party knows that its actions will lead to the destruction of relevant evidence, where it could take simple and cheap steps to preserve the evidence, and where the evidence is subsequently destroyed, an inference of intent to deprive the other side of that evidence is plainly warranted.

23
24
25
26
27
28

Because hiQ has no factual explanation consistent with a lack of requisite intent, hiQ quarrels over the legal standard for "intent to deprive."  But LinkedIn has correctly identified the relevant cases and legal standard.  In hiQ's apparent view, nothing short of an email saying "let's get rid of this stuff because it might be useful to LinkedIn" would satisfy Rule 37(e).  The standard is preponderance of evidence, and circumstantial evidence is sufficient.  Otherwise Rule 37(e) would be toothless.  The facts here are more than sufficient to establish intent to deprive.

1   On the prejudice to LinkedIn, hiQ attempts to shift the burden to LinkedIn to prove

2   exactly what was contained in the Salesforce CRM Database, arguing that hiQ employees didn't

3   really use it, anyway.  But other produced evidence shows that assertion is wrong: the CRM

4   Database contained highly relevant information.  In any event, hiQ should not be able to benefit

5   from destroying evidence and then casting doubt on what that evidence contained.

6   hiQ's other argument on prejudice—that it produced adequate substitutes for the

7   destroyed data—is similarly lacking.  It points to Salesforce "reports" as substitutes for the CRM

8   Database.  Those reports do not contain the customer logs and notes—the most important

9   evidence of hiQ's own evaluation of its customers.  hiQ points to Splunk "dashboards" as

10  substitutes for the real Splunk logging data.  But those consist of barely legible line graphs that do

11  not contain the information that we know was in the Splunk scraping activity records.

12  Knowing that its spoliation was extremely serious and puts the Court's fact-finding ability

13  in jeopardy, hiQ argues that LinkedIn's motion is untimely as to the Salesforce data.  It points to a

14  letter it sent in September 2021 stating that the Salesforce CRM Database was likely lost.  hiQ

15  omits the months of subsequent back-and-forth where hiQ claimed the data was replicated

16  elsewhere and would be produced, and more months it took LinkedIn to sift through a mountain

17  of discovery to understand that critical information was in fact lost notwithstanding hiQ's

18  representations to the contrary.  Making the motion earlier would have made no difference—as

19  hiQ itself concedes, it has produced literally everything left in its files.

20  The Motion for Sanctions should be granted.

21  ## ARGUMENT

22  hiQ does not dispute and thus concedes that LinkedIn has made the necessary threshold

23  showing for spoliation under Rule 37(e): that hiQ had a duty to preserve; that hiQ failed to take

24  reasonable steps to preserve the evidence; and that the evidence is irreplaceable.  *See* Mot. 11. [1]

25  Thus, spoliation occurred, and Rule 37(e) applies.  So hiQ argues that no sanctions are warranted

26  because (1) despite all the evidence to the contrary, it did not act with "intent to deprive," and

27
28  [1] References to the Memorandum of Points and Authorities in Support of LinkedIn's Motion for
    Spoliation Sanctions are noted as "Mot."  References to hiQ's Brief in Opposition to LinkedIn's
    Motion for Spoliation Sanctions are noted as "hiQ Opp."

REPLY IN SUPP. OF MOT. FOR SPOLIATION
SANCTIONS
No. 17-cv-03301-EMC

1   (2) LinkedIn was not prejudiced despite the destruction of so much evidence.  It then rehashes the

2   same arguments and says LinkedIn's requested sanctions would be a windfall.  hiQ also argues

3   LinkedIn's Motion is untimely.  hiQ is wrong on all counts.

4   **I.      HIQ ACTED WITH THE REQUISITE INTENT TO JUSTIFY APPLICATION OF**
         **SANCTIONS UNDER RULE 37(e)(2).**

5

6           It is hiQ, not LinkedIn, that improperly interprets the standard for "intent to deprive."  Part

7   A, *infra*.  hiQ's failure to credibly explain what happened not only does not dispel, but cements

8   the inference of intent to deprive.  Part B, *infra*.  Indeed, by failing to even address the point, hiQ

9   concedes that it had a duty to inform LinkedIn and/or the Court of the impending loss of

10  evidence; failure to do so shows it acted with intent.  *See* Mot. 14.

11          **A.      <u>Courts Routinely Find that a Party Acted with "Intent to Deprive" by</u>**
                 **<u>Drawing Inferences from Circumstantial Evidence.</u>**

12

13          hiQ's main argument is that LinkedIn is misrepresenting the legal standard for finding an

14  "intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P.

15  37(e)(2); Mot 15.  Direct proof of "intent to deprive" is not necessary; instead, parties can prove

16  "intent to deprive" circumstantially.  *See* Mot. 15; *see also Fast v. GoDaddy.com LLC*, 340

17  F.R.D. 326, 339 (D. Ariz. 2022) ("Although direct evidence of such intent is always preferred, a

18  court can find such intent from circumstantial evidence."); *Auer v. City of Minot*, 896 F.3d 854,

19  858 (8th Cir. 2018) (concluding that intent to deprive "can be proved indirectly").[2]

20          Courts routinely find that "stunningly derelict" conduct like hiQ's is sufficient

21  circumstantial evidence of "intent to deprive."  *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410,

22  432 (W.D.N.Y. 2017).  That is what the court in *Moody* found.  *Id.* at 432 ("[D]efendants' actions

23  presented sufficient *circumstantial evidence* from which to *infer* that they intended to deprive

---

24  [2] This is not a controversial point.  *See* Mot. 15 (citing *Greyhound Lines, Inc. v. Wade*, 485 F.3d
    1032, 1035 (8th Cir. 2007), and *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir. 2004));

25  *see also Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019) ("[A] district
    court has substantial leeway to determine intent through consideration of circumstantial

26  evidence…."); *Laub v. Horbaczewsk*i, No. CV 17-6210, 2020 WL 9066078, at *6 (C.D. Cal. July

27  22, 2020) ("[Courts] must look to circumstantial evidence to determine intent."); *CAT3, LLC v.
    Black Lineage, Inc.*, 164 F. Supp. 3d 488, 500 (S.D.N.Y. 2016) ("[C]ircumstantial evidence may

28  be accorded equal weight with direct evidence").

REPLY IN SUPP. OF MOT. FOR SPOLIATION
SANCTIONS
NO. 17-CV-03301-EMC

Moody." (emphases added)).  That is what the Court in *Fourth Dimension* found.  *Fourth Dimension Software v. DER Touristik Deutschland GmbH*, No. 19-cv-05561, 2021 WL 5919821, at \*10–11 (N.D. Cal. Dec. 15, 2021) ("The record here supports an *inference* that DTDE intentionally destroyed the usage records." (emphasis added)).  That is what the Court in *Ottoson* did.  *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (finding "sufficient evidence, both direct and circumstantial" supporting "logical inferences" that satisfied the intent requirement in 37(e)).  It is what the court in *Sines* did.  *Sines v. Kessler*, No. 17-cv-00072, 2021 WL 4943742, at \*10 (W.D. Va. Oct. 22, 2021) (noting that repeated failures to confirm data preservation "evince[s]" intentionality).  And it is what the *O'Berry v. Turner* court did.  Nos. 15-CV-00064, 15-CV-00075, 2016 WL 1700403, at \*4 (M.D. Ga. Apr. 27, 2016) ("Such irresponsible and shiftless behavior can only *lead to one conclusion*…." (emphasis added)).

hiQ's argument is premised almost entirely on a misreading of a single case—*Fourth Dimension*, 2021 WL 5919821 (Breyer, J.).  *Fourth Dimension* is from 2021, long after the amendment to Rule 37(e).  In his thorough opinion, Judge Breyer cited the "intent to deprive another party of the information's use in litigation" standard from amended Rule 37(e)(2) several times.  *Id.* at \*3, \*8, \*9.[3]  That *Fourth Dimension* cited a pre-amendment Ninth Circuit case does not render Judge Breyer's analysis meaningless.  hiQ Opp. 12–13.  To the contrary, the cited case, *Leon v. IDX Sys. Corp.*, made an express "finding of willfulness, fault, or bad faith" similar to the current Rule 37(e) intent standard.  464 F.3d 951, 958-59 (9th Cir. 2006) (quotation omitted).

## B.   There Is Ample Evidence of hiQ's Intent that hiQ Does Not Address—Let Alone "Credibly Explain."

A finding of hiQ's intent flows naturally from the "distilled common sense and experience" that "a person intends the natural and probable consequences of acts knowingly done."  *United States v. Jenkins*, 567 F.2d 896, 897 (9th Cir. 1978).  Here, hiQ knew that a failure to pay for its AWS, Splunk, and Salesforce accounts would cause the data in those accounts to be

---

[3] The same is true in *Ottoson*, 268 F. Supp. 3d at 582 (finding "the requisite level of intent required by Federal Rule of Civil Procedure 37(e)").  In fact, *Ottoson* relied on no less than *seven* post-amendment district court cases in so holding.  *Id.* at 582–83 (collecting cases).

deleted permanently.  Mot. 6–7 (AWS); *id.* 7 (Splunk); *id.* 9-10 (Salesforce).  And then, knowing it had already preserved the specific data it thought it might want later (the raw scrapes), it did nothing to preserve the rest.  It did not notify the service providers of an obligation to preserve the data; it did not tell LinkedIn or the Court so that LinkedIn could do so.  It did not purchase a few hundred dollars' worth of hard drives and export *all* of the data.  It is a small step, not a giant leap, to conclude that hiQ's failure to stop AWS, Splunk, and Salesforce from deleting the data reflected its intention as to the natural and probable consequences of that failure—preventing LinkedIn from using the evidence in this litigation.  *See Moody*, 271 F. Supp. 3d 432.

An important factor in deciding whether a party acted with the intent to deprive is whether that party can "credibly explain" its failure.  *Moody*, 271 F. Supp. 3d at 431-32; *see also CAT3*, 164 F. Supp. 3d at 501 (finding intent under Rule 37(e) due to lack of "any other credible explanation").  hiQ's Response is devoid of any credible explanation for the loss of this evidence.

The most obvious gap in hiQ's Opposition is its failure to explain why it did not tell LinkedIn and the Court that evidence was about to be lost while this case was pending.  Mot. 14 ("hiQ was under an obligation to, at the very least, notify either LinkedIn or the Court that the evidence was about to be permanently destroyed." (citing, inter alia, *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591-92 (4th Cir. 2001)).  Despite all of hiQ's claims of poverty (it had millions of dollars in litigation funding, Mot. 14), *it has no answer* to why it failed to provide notice.  *See* hiQ Opp. 3-4.  hiQ could have told LinkedIn that mountains of evidence were about to be lost so that LinkedIn could have arranged to preserve the evidence or, more simply, served subpoenas and activated the third parties' obligation to preserve evidence for this litigation.  *See Vezzetti v. REMCEC, Inc.*, No. 99CV0796, 2001 WL 37118900, at *1 (S.D. Cal. July 23, 2001) (issuing "non-party subpoenas to preserve evidence").  hiQ could have sent letters itself to its service providers, asking them to preserve the evidence for litigation, and that probably would have been enough.

hiQ also fails to explain why it failed to act after discussing the impending loss of the evidence so much.  It fails to explain why a Salesforce backup was discussed in detail by hiQ executives, Mot. 9-10, but *never made*, hiQ. Opp. 5 (conceding, without explaining,

- 5 -

"[u]nfortunately, hiQ did not ultimately perform that export.").  And it fails to explain why the same thing happened with AWS, Mot. 6, and Splunk, which hiQ knew was "important for legal issues," Mot. 7.  Contrary to hiQ's argument, the fact that it recognized that it *should* preserve the evidence does not dispel an inference of intent when it took no steps to preserve the evidence.

And although hiQ takes issue with LinkedIn's evidence of selective preservation, hiQ Opp. 16-17, there, too, it cannot credibly explain how or why it allowed scraping activity records to be deleted from *both* AWS and Splunk, while saving other data, such as the raw scrapes.  Nor does hiQ explain how it managed to save *some* MongoDB collections, but *not* the ones that showed the true scale of its scraping activity or its illicit Turking activity.  That hiQ saved some chat logs discussing scraping data (e.g., ban rates), hiQ Opp. 17, is irrelevant, because all of the hard data that those chats discussed is gone.  Further, the deletion of Turking evidence is telling in light of hiQ's repeated deception and attempts to conceal Turking activity, and hiQ does not even address the issue in its Opposition.  *Compare* Mot. 18, *with* hiQ Opp. 16-17.  Consistent with the attempt to cover it up, hiQ deleted vast amounts of data in MongoDB collections relating to Turking.[4]  *See, e.g.*, *GN Netcom, Inc. v. Plantronics, Inc.*, No. 12-1318, 2016 WL 3792833, at *7-8 (D. Del. July 12, 2016) (noting that a party's bad faith conduct during litigation can support an inference of intent to deprive).  hiQ's failure to explain is striking—the only declaration it submits talks about the *recovery* effort (after hiQ was found out) but says *nothing* about the initial deletions of *any* of this material.  hiQ Ex. Z (Weidick Decl.).

That is all strong circumstantial evidence of intent to deprive.  *See Moody*, 271 F. Supp. 3d 432.  So when hiQ argues that LinkedIn "has proffered not a shred of evidence of any such intent," hiQ Opp. 14, what it really means is that there is no *direct* proof—something like an email saying, "let's get rid of this stuff because it might be useful to LinkedIn."  Direct evidence has never been required, and hiQ is wrong under cases like *Moody*, *Fourth Dimension*, *Ottoson*,

---

[4] LinkedIn found out about Turking *despite* hiQ's false filings and incomplete discovery responses about its manual, logged-in data collection using fake accounts.  *E.g.*, CE 150 (Turking instructions).  That some evidence of Turking made it through does not show a lack of intent to destroy other evidence, it just shows that hiQ was not able to scrub this activity from its records entirely.  The cover-up certainly affected LinkedIn's selection and the timing of witnesses for deposition, and may well affect its ability to present the Turking evidence at trial.

1  *Sines,* and *O'Berry*—there is plenty of evidence here to prove intent to deprive.

2          hiQ's attempt to distinguish *Fourth Dimension* and *Moody* based on the "timing" and

3  "method of destruction," hiQ Opp. 15, is plainly wrong.  The *Moody* court recognized that the

4  spoliation in that case, similar to hiQ's, evolved over "four years," all while litigation was

5  pending.  271 F. Supp. 3d at 426; *see also Sines*, 2021 WL 4943742, at *4, *6, *10 (noting that

6  the phone at issue was destroyed months after the lawsuit was filed, and noting a "repeated failure

7  over a period of years" (quoting *Moody*)).  Similarly, hiQ's belated attempt to recover some of the

8  evidence does not excuse its actions.  Those efforts started *after* discovery opened and hiQ was

9  forced to disclose the spoliation to LinkedIn.  Up until that point, hiQ did nothing.  *See Moody*,

10  271 F. Supp. 3d at 423 (finding intent to deprive despite the defendant's asking Mr. Lewandowski

11  (the person responsible for the data loss) to check his laptop for the spoliated data); *Ottoson*, 268

12  F. Supp. 3d. at 583 (finding an intent to deprive even though the spoliating party stopped deleting

13  emails at some point during litigation).  hiQ is not an unsophisticated individual who spoliated

14  evidence, realized their mistake, and genuinely tried to get it back.  *Cf. Gaina v. Northridge Hosp.*

15  *Med. Ctr.*, No. CV 18-00177, 2018 WL 6258895, at *5 (C.D. Cal. Nov. 21, 2018) (employee

16  lawsuit regarding reasonable access to sign language interpreters); *Franklin v. Shelby Cnty. Bd. of*

17  *Educ.*, No. 20-cv-02812, 2021 WL 6066673, at *4 (W.D. Tenn. Sept. 28, 2021) ("His conduct

18  reflects a lack of understanding about how digital recording works….").[5]  Here, the CEO, CTO,

19  Head of Sales, and a senior Engineer at a supposedly multi-million dollar company (at the time)

20  all discussed the need to keep this evidence, and all failed to do it.  Mot. 6-7 (AWS); *id.* 7

21  (Splunk); *id.* 9-10 (Salesforce).[6]

22  ───────────────

23  [5] The court in *Borum v. Brentwood Village, LLC* did not even consider the "attempt[] to recover"
    in its discussion of intent to deprive under Rule 37(e)(2). 332 F.R.D. 38, 41, 48–49 (D.D.C.

24  2019).

25  [6] As the discussion in the text demonstrates, LinkedIn more than meets Rule 37(e)'s "intent to
    deprive" standard.  That standard was adopted to avoid situations where parties were sanctioned

26  for routine automated behavior.  Fed. R. Civ. P. 37(e), Comm. Note.  Here, hiQ's conduct goes to
    the core of the Court's ability to regulate the integrity of its processes.  While inherent authority is

27  not necessary because LinkedIn has met the "intent to deprive" standard, inherent authority
    remains applicable and the standard for sanctions under inherent authority is also clearly met.

28

REPLY IN SUPP. OF MOT. FOR SPOLIATION
SANCTIONS
NO. 17-cv-03301-EMC

## II.     HIQ'S SPOLIATION PREJUDICED LINKEDIN.

hiQ argues that *no* sanctions are appropriate because LinkedIn did not suffer any prejudice.  It argues that the missing evidence is cumulative of some evidence it managed to save (Splunk "dashboards" and Salesforce "reports"), and that what was lost was unimportant anyway (because hiQ didn't really use Salesforce).  hiQ is wrong: it overstates the value of the evidence that was preserved and improperly shifts the burden to LinkedIn to prove exactly what was in the missing evidence.  *See* Fed. R. Civ. P. 37(e), Comm. Note ("Determining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair."); *see also Matter of In re Skanska USA Civ. Se. Inc.*, 340 F.R.D. 180, 187–88 (N.D. Fla. 2021) ("[C]ourts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of the evidence."); *accord Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1300 (M.D. Fla. 2009); *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, No. 19-cv-1756, 2022 WL 2801180, at *10 (D. Minn. July 18, 2022).  hiQ also completely ignores other missing evidence described in LinkedIn's Motion on this point.  *See* Mot. 5-6 (discussing deletion of other AWS data).

### A.     Splunk "Dashboards" and Other Anecdotal Material Are Not Adequate Substitutes for the Records.

LinkedIn explained in its Motion that the scraping activity records from Splunk and AWS would have shown precisely how many requests hiQ's scraping bots made to LinkedIn's servers, and also the degree to which LinkedIn's anonymous technical defenses had rendered hiQ's

---

hiQ claims that the Court's inherent authority is "inapplicable" under an unpublished and non-precedential Ninth Circuit case, *Newberry v. County of San Bernadino*, 750 F. App'x 534, 537 (9th Cir. 2018).  *Newberry* did not contain an in-depth discussion of the issue.  *Id.*  Courts in this district have continued to rely on their inherent authority in issuing spoliation sanctions after *Newberry*.  *See, e.g.*, *Meta Platforms, Inc. v. BrandTotal Ltd.*, No. 20-cv-07182, 2022 WL 1990225, at *5 (N.D. Cal. Jun. 6, 2022); *Scott Griffith Collaborative Sols., LLC v. Falck N. Cal. Corp.*, No. 19-cv-06104, 2021 WL 4846926, at *6 (N.D. Cal. Sept. 10, 2021); *John v. Cnty. of Lake*, No. 18-cv-06935, 2020 WL 3630391, at *7-8 (N.D. Cal. July 3, 2020).  There plainly would be a serious separation of powers problem with any legislative act taking away the courts' ability to regulate the fundamental integrity of proceedings conducted before them.

scraping inoperable prior to the C&D Letter.  Mot. 18-22.  hiQ now argues that it produced "over

600 daily Splunk scraping dashboards," that "do exactly that."  hiQ Opp. 22.  Except they don't.

The "scraping dashboards," hiQ Exs. A-H, consist of barely legible line graphs showing general

scraping trends, as one can see from the excerpt below:



hiQ Ex. B.  There is no way to discern from these dashboards the actual number of requests that

were made, unlike the Splunk data itself, which did contain the precise number of requests in

precise electronic tables with exact date and time stamps.  *See* Schmidt Decl. ¶ 13.  Moreover,

these dashboards do not contain information from the AWS scraping activity records at all.  In

fact, hiQ completely ignores the loss of the AWS data, which included not only all of the pre-

August 2016 scraping activity records, but also other data, such as the Turking data.

hiQ also argues that the production of internal hiQ communications discussing the "ban

rate" of its scraping attempts eliminate any prejudice LinkedIn suffered.  These communications

are no substitute for the hard numbers showing the burden hiQ placed on LinkedIn's servers—

particularly where hiQ has already sought dismissal of LinkedIn's counterclaims by arguing that

LinkedIn lacks sufficiently concrete evidence of harm.

**B.**   **The Salesforce CRM Database Evidence Was Central to this Case and Its**
**Loss Prejudices LinkedIn.**

hiQ's other argument on prejudice is that "LinkedIn is strategically overvaluing the

robustness of hiQ's Salesforce instance," relying on self-serving deposition testimony from head of sales, Darin Medeiros.  hiQ Opp. 23.  This is wrong for several reasons.  First, there is evidence suggesting that hiQ staff *did* take detailed notes and recorded them into Salesforce.  hiQ (belatedly) produced a few dozen pages of internal wiki documents containing examples of such notes—the type of notes that should have been in Salesforce.  LI Ex. 101 (Customer Success Wiki).  We also know that sales staff recorded tons of data in Salesforce because the screenshots from board presentations show glimpses of a wealth of customer information in hiQ's Salesforce account.  Mot. 9; CE 2070 (presentation screenshot).  Just those isolated screen shots show, for instance, that hiQ had notes about a "mid July planning meeting with head of HR" of Intel, and plans to "[c]heck back with Mike in early Sept" regarding its customer Point72.  *Id.*  That is more than enough to suggest that Salesforce likely had a wealth of crucial evidence here.  *See* Fed. R. Civ. P 37(e), Comm. Note; *In re Skanska*, 340 F.R.D. at 187–88.  In any event, Mr. Medeiros made this statement *after* hiQ knew that the loss of Salesforce data was a major issue in the case and years after the fact.  It deserves little or no weight.

Shifting gears, hiQ points to other evidence it produced, like emails between hiQ and its customers, contracts with customers, and "numerous exports generated from Salesforce."  hiQ Opp. 23.  LinkedIn explained in its Motion for Sanctions that the "exports" or "reports" are simply one-to-two-page summaries of sales data that hiQ executives would receive via email to see general trends.  Mot. 10; *e.g.*, CE 669-672 (Salesforce Report).  None of those reports contain the logs of customer communications that should have been in the CRM Database.  Contracts, while part of the equation, do not contain those communications either.  And email communications are only one part of the story; records of any phone calls have been lost, as are the kind of evaluative judgments about customers that are so crucial to rebutting hiQ's claims.[7]

The loss of this contemporaneous, written evidence is central to this case because hiQ's

---

[7] LinkedIn's Motion pointed out that the Salesforce spoliation was likely exacerbated by the destruction of hiQ's Chorus sales recordings.  hiQ claims it told LinkedIn about the spoliated sales calls in its Chorus account in May 2022.  Opp. at 6.  Exhibit K *does not* disclose that Chorus contained *sales calls* with customers.  Exhibit P is an improper errata served months after the Rule 30(e)(1) deadline that directly contradicts a sworn answer given in Weidick's deposition.  In all events, hiQ has not demonstrated that there are adequate substitutes for this data.

1    argument about how the C&D letter drove its customers away is all based on hearsay.  Mot. 22

2    (citing CE 1063-65 (Sacks Dep.)); ECF No. 384 at 9.  hiQ is asserting claims based on an

3    evidentiary shoestring, and it spoliated the main repository of information on critical causation

4    elements of its claims.  *See* ECF No. 336 at 20–21.

5    **III.    LINKEDIN'S REQUESTED SANCTIONS ARE NARROWLY TAILORED TO**
     **THE PREJUDICE IT HAS SUFFERED.**

6

7        hiQ argues that LinkedIn's proposed sanctions would amount to a windfall.  Most of hiQ's

8    argument on this front is assertion—that LinkedIn suffered "minimal" prejudice and that hiQ's

9    degree of fault is "low"—untethered to the realities of this case as addressed above.  hiQ Opp. 18.

10   hiQ's other arguments on this front fail to acknowledge the context of the lost evidence.

11       **A.    <u>Severe Sanctions Are Appropriate for Spoliation of the Scraping Activity</u>**
         **<u>Records and Salesforce CRM Database.</u>**

12

13       First, hiQ takes issue with LinkedIn's request for a presumption that LinkedIn's expert

14   Xiaofeng Wu's analysis is correct, arguing that Mr. Wu's conclusions are "absurd[]."  hiQ Opp.

15   19.  hiQ bases this on the fact that LinkedIn Data Scientist Yukai Zhong[8] counted 75 million

16   requests on LinkedIn's servers between August 2017 and September 2018 through hiQ's post-

17   injunction allowlisted IP addresses.  LinkedIn engineer Mr. Wu conducted a different counting

18   analysis based on information produced by hiQ in discovery that found that there were 50 billion

19   requests over a *different* eighteen-month period, including months *before* hiQ's IP addresses were

20   added to the allowlist.  *Id.*  Once hiQ was assured successful scraping access, it didn't need to

21   make multiple requests for member profiles.  But the number of requests that hiQ's scrapers made

22   on LinkedIn's servers was vastly greater when hiQ's access was subject to LinkedIn's general

23   technical defenses because hiQ's "ban rate" was 99–100%, i.e., it sometimes took 100 requests

24   for 1 successful request to slip through.  *See* Schmidt Decl. Ex. A, ¶ 25 ("Given the high ban rates

25   hiQ faced when attempting to access LinkedIn content, my estimate is consistent with billions of

26   access attempts.").  Of course, if hiQ had kept the Splunk data, we would know for certain.

27       Second, hiQ argues that the Court should wait until trial before deciding whether to

28   _____
     [8] hiQ's brief mistakes Mr. Zhong for Mr. Wu.

impose an adverse inference for the destruction of the scraping activity records, and allow the parties to introduce evidence of hiQ's spoliation to the jury.  hiQ Opp. 20.  Discovery disputes do not belong in this trial.  *See Watson v. Allen Cnty. Sheriff's Officers*, No. 12-CV-55, 2013 WL 4540597, at *3 (N.D. Ind. Aug. 27, 2013) (noting that such evidence has the "potential to confuse the issues, mislead the jury, or unduly delay the trial.").  Moreover, hiQ has not demonstrated that it has any evidence to warrant injecting this issue into the trial.  It has not submitted any employee declarations or other evidence that could be used to credibly explain its spoliation.  This motion is ripe for decision now by the Court.

Finally, hiQ argues that dismissal of its customer-related claims is inappropriate, simply rehashing its arguments of no intent and no prejudice.  For the reasons stated above and in LinkedIn's opening brief, those arguments are unpersuasive, and terminating sanctions are the only way to cure the prejudice of the loss of the CRM Database.

## B.   Courts Routinely Award Costs and Fees as Sanctions for Spoliation.

hiQ argues that attorneys' fees and costs would amount to a "case-ending sanction" because of its tenuous financial condition.  The argument is devoid of *any* factual support.  hiQ Opp. 24.  It is also wrong on the law, and fails to grapple with the authority LinkedIn relies on.  *Compare* hiQ Opp. at 24 (citing *SiteLock LLC v. GoDaddy.com LLC*, No. CV-19-02746, 2022 WL 3716499, at *9 (D. Ariz. Aug. 29, 2022), which discussed the "windfall" issue in the context of *evidentiary* not *monetary* sanctions), *with* Mot. 25 (collecting authority approving of monetary sanctions for spoliation).  In fact, courts *routinely* award monetary sanctions in much less serious cases than this.  *See Spencer v. Lunada Bay Boys*, No. CV 16-02129, 2018 WL 839862, at *1 (C.D. Cal. Feb. 12, 2018) (noting that a finding of "bad faith" or intent is not necessary to award monetary sanctions and collecting cases); *see also CAT3*, 164 F. Supp. 3d at 501-02 (imposing monetary sanctions while declining to dismiss case or impose adverse inference); *In re: Ezenia! Inc.*, 536 B.R. 485, 525-527 (Bankr. D.N.H. 2015) (similar).[9]

---

[9] *Meta Platforms, Inc. v. BrandTotal Ltd.*, does not help hiQ.  2022 WL 1990225, at *9; hiQ Opp. 25.  Meta sought Rule 37(e)(2) sanctions for intentional spoliation arising out of a singular failure to suspend an automatic deletion policy, which was an "overreach," according to that court.  2022 WL 1990225, at *9.  The facts there have no resemblance to the evidence of hiQ's selective preservation and intentional spoliation of multiple repositories.  *See* Mot. 15–18; *supra* Part I.

1    **IV.      LINKEDIN'S MOTION IS TIMELY.**

2         hiQ argues that LinkedIn's motion with respect to the spoliation of the Salesforce CRM

3    Database is untimely because hiQ made LinkedIn aware of the loss of the Salesforce CRM

4    Database in September 2021.[10]  hiQ's argument is wrong because it ignores the long period of

5    time hiQ spent obscuring the true scope and import of the loss of the Salesforce data.  Moreover,

6    hiQ cannot point to any prejudice it suffered from the timing of this Motion.

7         Rule 37(e) does not contain an express time limit, and "[a] spoliation motion doesn't need

8    to be filed before the close of discovery."  *Sherwin-Williams Co. v. JB Collision Servs., Inc.*, No.

9    13cv1946, 2015 WL 4077732, at *2 (S.D. Cal. July 6, 2015) (citing *Goodman v. Praxair Servs.,*

10   *Inc.*, 632 F. Supp. 2d 494, 506 (D. Md. 2009)).  Moreover, "a party need not file a [Rule 37(e)]

11   motion at the first inkling of spoliation but is entitled to gather evidence—such as discovery

12   responses—before filing a motion."  *Sec. Alarm Fin. Enters., L.P. v. Alarm Protection Tech.,*

13   *LLC*, No. 13-cv-00102, 2016 WL 7115911, at *1 (D. Alaska Dec. 6, 2016).

14        **A.      LinkedIn Could Not Have Been Aware of the Full Scope and Import of the**
              **Loss of the Salesforce Data Until Well Into Discovery.**
15

16        hiQ's main argument on timeliness is that it told LinkedIn about the loss of the Salesforce

17   Database in September 2021.  The mere fact of loss is not sufficient to bring a motion for

18   sanctions.  A party moving for sanctions must also show that the lost evidence is "irreplaceable."

19   *Sec. Alarm Fin.*, 2016 WL 7115911, at *3.  This requires understanding what other evidence the

20   spoliating party has produced, and its relationship to the lost evidence.  *See Facebook, Inc. v.*

21   *OnlineNIC Inc.*, No. 19-cv-07071, 2022 WL 2289067, at *7 (N.D. Cal. Mar. 28, 2022)

22   (comparing produced evidence to what was destroyed).  And a party needs to understand how the

23   evidence was lost (to prove intent) and what it might have proved (to prove prejudice).  *See* Fed.

24   R. Civ. P. 37(e); *cf.* Fed. R. Civ. P. 11 (requiring filings to be "warranted by existing law" and

---

25   [10] hiQ's delay argument appears to refer only to the Salesforce CRM evidence.  hiQ Opp. 21
26   ("LinkedIn's Motion for sanctions [sic] *relating to the Salesforce instance* is plainly untimely,
     and therefore should be denied.").  hiQ did not admit to the loss of the Splunk logs until June 13,
27   2022, CE 1418 (6/13/22 email).  *See Mahboob v. Educ. Credit Mgmt. Corp.*, No. 15-cv-0628,
     2021 WL 791853, at *2 (S. D. Cal. March 1, 2021) (analyzing timeliness separately for each
28   separate ground).

have "evidentiary support").  Thus, Courts have found similar motions timely when, for instance, they were filed more than two months after the close of discovery, *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 886 (S.D.N.Y. 1999), or even when they were filed "more than five months after the conclusion of discovery, and *more than two months after dispositive motions had been fully briefed*," *Goodman*, 632 F. Supp. 2d at 509 (emphasis added).

hiQ focuses solely on one September 8, 2021, communication, before document productions had even begun, stating that the Salesforce database was "lost."  But hiQ leaves out the rest of the story.  On October 6, 2021, for example, hiQ stated that it would produce evidence that would "constitute a partial replacement for the lost Salesforce data."  LI Ex. 102.  Later, LinkedIn had to investigate contradictory deposition testimony regarding how "the raw data from Salesforce" might have been deleted from a company laptop.  LI Ex. 103 (3/18/22 Weidick Dep. 32:17-23). [11]  And hiQ continued to be evasive about the scope of the Salesforce spoliation, maintaining *as late as August 2022* that "the information stored in that Salesforce instance is otherwise available and has been produced."  CE 1390 (8/3/22 hiQ Interrogatory Resp.).  In other words, hiQ repeatedly promised LinkedIn that the data was probably produced somewhere, and it took months for LinkedIn to sift through 750,000+ pages and determine that it was not.

Moreover, it was not until May 13, 2022, that hiQ finally laid out a detailed list of customers and the bases for terminating their contracts.  CE 2088 (5/13/22 hiQ Interrogatory Resp.).  Only then did it become clear to LinkedIn that there was no documentary evidence substantiating the claim that customers left because of the C&D letter, and that hiQ was going to rely solely on self-serving employee testimony and hearsay to prove this crucial point.  *See* ECF 384 at 9 (explaining how all of hiQ's evidence regarding customer relationships is hearsay).

It was incumbent on LinkedIn, beginning in September 2021, to conduct a thorough analysis of all of the evidence that hiQ had produced throughout the fall of 2021 and the spring of 2022, to determine if the Salesforce CRM Database was effectively replicated by other

---

[11] As it turned out, Mr. Medeiros "accidentally reconfigure[d] the laptop that he had with that raw data."  *Id*. (3/18/22 Weidick Dep. 32:24-25, 33:24-34:7).  "Accidentally" is charitable, as Medeiros testified he "deleted it and then … emptied the trash."  LI Ex. 104 (Medeiros Dep. 200:19-201:4).

productions.  (It wasn't.)  *See Sec. Alarm Fin.*, 2016 WL 7115911, at *1 (holding that a party "is entitled to gather evidence…before filing a [Rule 37(e)] motion").  When the investigation was reasonably complete, LinkedIn moved for sanctions, mere months after the close of discovery and within the deadline for dispositive motions.  *Cf. Larios v. Lunardi*, 442 F. Supp. 3d 1299, 1305–06 (E.D. Cal. 2020) (noting that the motion was filed after "the dispositive motion deadline passed" and without any explanation for its lateness); *Jarrell v. Wal-Mart Stores, Inc.*, No. 18-cv-01219, 2021 WL 1169889, at *2 (D. Nev. Mar. 26, 2021) (noting a two-year delay, and the filing of the motion "on the eve of trial"); *Rhabarian v. Cawley*, No. 10–cv–00767, 2014 WL 546015, at *3 (E. D. Cal. Feb. 11, 2014) (noting motion came "after the deadline for dispositive motions").[12]

**B.     hiQ Cannot Claim Any Prejudice.**

Courts also look to the prejudice to the non-moving party when deciding the timeliness of a sanctions motion.  *Sec. Alarm Fin.*, 2016 WL 7115911, at *1 ("SAFE has not argued that it was prejudiced by any delay in filing"); *Williams v. Nationwide Ins. Co.*, No. 12-13904, 2014 WL 12659422, at *5 (E.D. Mich. Apr. 29, 2014) (same).  Here, hiQ makes no argument it has suffered prejudice.  This is unsurprising; if LinkedIn brought this motion during discovery, the parties would be in the same positions they are now.  Its reliance on cases that ordered additional discovery rings hollow because hiQ has not suggested what additional discovery might be able to show.  *Cf. Shackleford v. Vivint Solar Dev. LLC*, No. 19-cv-00954, 2020 WL 5203340, at *8 (D. Md. Sept. 1, 2020) (explaining that the *movant* asked for more discovery).

**CONCLUSION**

LinkedIn respectfully requests that the Court sanction hiQ for its intentional spoliation of evidence.

---

[12] hiQ's other authority is similarly inapposite.  *Cf. Mahboob*, 2021 WL 791853, at *2 (noting a three-and-a-half-year delay); *Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10cv2133, 2013 WL 2244333, at *16 (S.D. Cal. May 21, 2013) (denying motion on the merits); *Ferrone v. Onorato*, No. 05-303, 2007 WL 2973684, at *10 (W.D. Pa. Oct. 9, 2007) (rejecting spoliation allegation raised solely in opposition to a summary judgment motion); *Glenn v. Scott Paper Co.*, No. 92-1873, 1993 WL 431161, at *17 n.3 (D.N.J. Oct. 20, 1993) (same); *Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 537 (9th Cir. 2001) (briefly noting that the motion should have been brought before a magistrate judge under court's local rule).

Dated: September 15, 2022                    Orrick, Herrington & Sutcliffe LLP


                                             By: _____ */s/ Annette L. Hurst*
                                                        ANNETTE L. HURST
                                                     Attorneys for Defendant
                                                     LinkedIn Corporation