**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

_____

| | | |
|---|---|---|
| **hiQ Labs, Inc.,** | ) | |
| | ) | No.  **3:17-CV-3301-EMC** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | San Francisco, California |
| | ) | September 29, 2022 |
| **LinkedIn Corporation, et al.,** | ) | 2:02 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE EDWARD M. CHEN, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS**</u>


<u>**MOTIONS HEARING**</u>


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                   **A P P E A R A N C E S**

3

For the Plaintiff:
4       Quinn Emannuel Urquhart & Sullivan
        By:  **Richard Corey Worcester**, Esq.
5            **Elizabeth Bach Miller**, Esq.
             **Hope Skibitsky**, Esq.
6       51 Madison Avenue, 22nd Floor
        New York, New York 10010
7
        Quinn Emanuel, et al.
8       By:  **Terry Lee Wit**, Esq.
        50 California Street, 22nd Floor
9       San Francisco, California 94111

10      By:  **Zane Muller**, Esq.
        573 Metropolitan Avenue, Apartment 5e
11      Brooklyn, New York 11211

12  For the Defendants:
        Orrick, Herrington & Sutcliffe
13      By:  **Annette L. Hurst**, Esq.
             **Russell P. Cohen**, Esq.
14           **Nathan D. Shaffer**, Esq.
        405 Howard Street
15      San Francisco, California 94105

16

17

18

19

20

21

22

23

24

25

——— 1:17-CV-3301-EMC - September 29, 2022 ———

1          (Proceedings begin at 2:02 p.m.)

2          THE CLERK:  Court is now calling the case hiQ Labs,

3    Inc. versus LinkedIn Corporation, case number 17-3301.

4          Counsel, please state your appearance for the record,

5    beginning with the plaintiff.                                    00:00:06

6          MR. WORCESTER:  Good afternoon, Your Honor, Corey

7    Worcester from Quinn Emanuel Urquhart Sullivan on behalf of

8    hiQ.  With me are my colleagues Elizabeth Miller, Hope

9    Skibitsky, Zane Muller, and my colleague Terry Wit is in a

10   different screen.                                                00:00:25

11         THE COURT:  All right.  Thank you.

12         MS. HURST:  Good afternoon, Your Honor, Annette Hurst

13   from Orrick on behalf of defendant LinkedIn.  With me are my

14   colleagues Russ Cohen and Nathan Shaffer.

15         THE COURT:  All right.  Good afternoon, Miss Hurst.       00:00:39

16         Well, I don't think we're going to get to every single

17   thing here, but I want to get to the main questions.

18         And let me start off focusing on the motion for

19   summary judgment on the breach of contract by LinkedIn.

20         hiQ contends that -- a number of things, one of which    00:01:06

21   is that the user agreement is ambiguous and, therefore, that

22   there are factual questions about breach or not.

23         And I guess I want to get some clarification as to

24   what is it that is unambiguous about the prohibition on

25   scraping profiles and information of others through crawlers,   00:01:33

1   et cetera, et cetera, or other technology?

2        I mean, putting aside waiver, estoppel, unclean hands

3   and all that, what is it that's ambiguous about that?

4        MR. WORCESTER:  Thank you, Your Honor.

5        So the question I think is -- putting aside the other          00:01:58

6   issues which we think are important, looking at the text

7   itself, what's ambiguous?  And if you turn to 8.2.2 and you

8   look and you see, scrape or copied profiles and information of

9   others, including crawlers, browser, plugins and add-ons.

10       And the position here is, it is impossible, literally          00:02:24

11  impossible to log onto LinkedIn's website without copying.

12       This issue, Your Honor, you may remember came up at

13  the preliminary injunction hearing.  And we're hearing it again

14  now.  And the question -- and there's no further response from

15  LinkedIn that's been developed over the past five years.          00:02:43

16       The response is, we're not talking about copying.  But

17  the problem is, it's in the same provision.  Right.  Your Honor

18  can't take a black pen to the provision without getting rid of

19  the scraping provision as well.

20       And there's a second point, Your Honor, which is, that        00:03:01

21  provision prevents use.  What does "use" mean in the context of

22  a contract that in other provisions says the materials belong

23  to the user, the LinkedIn customer.  Those folks can do

24  whatever they want with those materials, including mark them

25  public.                                                            00:03:24

1           And if they mark them public, others will have access

2      to them based on that.

3           In that context of a contract that has provisions

4      saying you can do whatever you want with the data if it's

5      public, and a provision saying, you can't scrape or copy where          00:03:38

6      it's literally impossible to even log onto the website without

7      doing one of those two things.  I think there's some ambiguity

8      in the contract about what it is that's being prohibited.

9           THE COURT:  Well, let me ask you, the first argument

10     is kind of an overbreadth argument, that this thing is so              00:03:53

11     overbroad, that anybody just logs on is violating this term.

12           And yet that's not to say that there is some conduct

13     that would be squarely within the target of that provision.

14     So -- unless this is a First Amendment overbreadth argument,

15     which I don't think applies in a context of a contract               00:04:14

16     construction.  Why can't something be, although perhaps

17     ambiguous on the edges, not so ambiguous in the middle?

18           MR. WORCESTER:  A, I don't think that's how we treat

19     contract provisions.  I think either the contract provision is

20     ambiguous or not.                                                     00:04:29

21           The second point, the one I raised, that given that

22     also in the same document statements that user data will be

23     public if they want it to be public, I think there's a question

24     about how those provisions need to be read together.  And I

25     think that's an issue for the jury to think about, particularly      00:04:46

1   when you look at the course of conduct between the parties

2   here.

3            And in California, course of conduct can be taken into

4   account, even on a contract that's otherwise unambiguous.  It

5   can be taken into account both to show the understanding of the   00:05:00

6   parties and to discuss whether or not the parties impliedly

7   modified the contract by doing nothing.

8            And here what we have is a several years long course

9   of conduct, starting in 2014, when LinkedIn first identified

10  hiQ and said, looks like they're scraping.  Through 2015 when   00:05:19

11  LinkedIn started attending the Elevate conferences.  Through

12  2016 when they continued to attend the Elevate conferences, and

13  actually invited hiQ to LinkedIn's offices to present.  Through

14  2017, when they went back to the Elevate conference.

15           That's a several years long course of conduct between   00:05:42

16  the parties that suggests the proper understanding of the

17  provision is no scraping of nonpublic data.  Right.

18           When -- when the customers of LinkedIn marked the

19  information as public, I think both the reading of the

20  contract, which I put forward, which is -- those need to be   00:06:03

21  reconciled, and with the course of conduct suggesting how those

22  were reconciled, is at least a question for the jury about

23  whether or not the proper interpretation is no scraping of

24  nonpublic data.

25           THE COURT:  And would that be use of course of conduct   00:06:19

1    as a modification or an interpretive tool of the contract?

2          MR. WORCESTER:  I'm not sure that's an issue you have

3    to decide today, Your Honor.  I think either one of them is

4    allowed.  I would suggest both.

5          But I -- honestly I'm not sure that's something you          00:06:35

6    need to decide today.

7          THE COURT:  All right.  Let me hear the response,

8    given it's summary judgment, got to construe the facts and

9    inferences in favor of the nonmoving party, given the sort of

10   liberality generally of California law of contracts that allows  00:06:51

11   for extrinsic evidence to be used to demonstrate ambiguity.  I

12   mean, I know there's some grey area about that.

13         Why isn't there at least an issue here that ought to

14   go to trial?

15         MS. HURST:  Thank you, Your Honor.                          00:07:07

16         I'll be addressing those issues on the LinkedIn side.

17         Your Honor, I believe we had permission to share

18   screen.  And if I may, I'll share.

19         THE COURT:  Yep.

20         MS. HURST:  Your Honor, this is all of the provisions       00:07:19

21   of Section 8.2 that are implicated by hiQ's conduct.  These

22   unambiguous prohibitions that were undisputedly violated by hiQ

23   include creating a false identity on LinkedIn and

24   misrepresenting your identity.  Those provisions were violated,

25   Your Honor, when hiQ undisputedly instructed it's turking        00:07:48

1  contractors to create fake accounts.

2        Your Honor, an additional six provisions were

3  violated -- unambiguously violated by virtue of its scraping

4  activity.  The prohibition on scraping profiles and information

5  of others through any means, from copying the information                    00:08:09

6  content or data of others available on the service, or copying

7  the information and using it in connection with a competitive

8  service, from collecting information obtained from LinkedIn

9  without the consent of LinkedIn, from sharing information of

10  others without their express consent, which was done here                   00:08:31

11  through the Keeper product, and from using manual or automated

12  software devices, scripts, robots, or other means or processes

13  to access scrape, crawl, or spider the services.

14        These provisions all unambiguously prohibit what hiQ

15  was undisputedly doing.                                                     00:08:54

16        THE COURT:  What if -- to take your opponent's view

17  that, well, we're going to put a twist on that, when it says

18  information, it really means, bracket, nonpublic, closed

19  bracket, information.  Even though that's not stated, that can

20  be imported by virtue of course of conduct, for instance.                  00:09:08

21        MS. HURST:  Your Honor, a couple of things.

22        First of all, that's not consistent with the overall

23  terms of the agreement, because if we look at Provision 1, the

24  agreement applies both to registered users and to visitors.

25        Your Honor, and the only thing visitors can access on                00:09:25

UNITED STATES DISTRICT COURT

1    the site would be public information.  And these provisions

2    expressly apply to visitors as well as members.

3            So it's simply not consistent with the overall terms

4    of the contract.

5            Second, Your Honor, the privacy policy on its face is      00:09:38

6    an agreement between LinkedIn and its members with respect to

7    member sharing of data.

8            What hiQ is trying to do is basically create

9    themselves a third-party beneficiary right under the privacy

10   policy.  And there's no basis for doing that under California    00:09:54

11   law.  They haven't met any of their requirements of

12   demonstrating themselves to be third-party beneficiaries.

13           Basically they're trying to claim that because it was

14   public -- quote, unquote, public in the privacy policy where

15   it's a term of art between LinkedIn and its members, somehow     00:10:11

16   that modifies the user agreement.

17           And there's simply no basis for reading these express

18   and unambiguous prohibitions in that way, Your Honor.

19           In order to do that interpretive exercise, what would

20   have to be done here is they would have to pick out the phrases  00:10:30

21   that they say are ambiguous with reference to those privacy

22   policy provisions, and then explain how that applies to their

23   conduct in order that that interpretive effort enables them to

24   avoid breach.

25           And this goes to Your Honor's point that, well, maybe,    00:10:47

1  there's some conduct with respect to which it might be

2  ambiguous, such as a member simply accessing a profile.  But

3  that doesn't mean it's ambiguous with respect to the core of

4  what hiQ was doing, and it plainly is covered by numerous

5  provisions.                                                    00:11:06

6          Your Honor, with respect to course of conduct, first

7  of all, I'll note that this is an argument that wasn't even

8  raised in the papers.

9          But more importantly, for hiQ to dispute that, it

10  would have to have put in evidence that the people who -- and  00:11:19

11  to treat that as course of conduct, it would have had to put in

12  evidence that the people who were attending its conferences had

13  a relevant duty with respect to the terms of the user

14  agreement.  And there's no evidence whatsoever in the record.

15          And to the contrary, Your Honor, Mr. Lawit's          00:11:38

16  declaration submitted on behalf of LinkedIn makes clear that as

17  the general counsel it was a legal function to address the user

18  agreements.  There's simply no way that a business operations

19  associate going to third-party conferences can work a

20  modification of the standard terms of the LinkedIn user        00:11:59

21  agreement.

22          Your Honor, that's not what hiQ argued in its papers.

23  It never pled such a theory.  It doesn't have any evidence in

24  support of such a theory.  And that would be a wholly

25  unreasonable approach to contract interpretation under         00:12:13

1    California law.

2           Even with California's liberal parole evidence rule,

3    Your Honor, the only thing that could go to trial was if there

4    was a dispute with respect to credibility here.  You know, in

5    general, even when there's parole evidence pointing to multiple     00:12:30

6    interpretations, the Court still makes the ultimate

7    interpretation.  That's a question of law.

8           The only thing that would go to the jury would be if

9    there was a dispute of credibility here, and there simply isn't

10   one, Your Honor.                                                    00:12:47

11          There's no evidence that any of the dealings between

12   LinkedIn -- LinkedIn's business talent analytics associate and

13   hiQ ever pertained in any way, shape, or form to modification

14   or construction of the user agreement.

15          THE COURT:  Well, that raises -- it's a segue into the      00:13:04

16   next issue, and that is the defenses of, for instance, unclean

17   hands or waiver or estoppel hinge in part upon whether the

18   knowledge and the participation of, for instance, the Town

19   Analytics Team in 2014 and the various emails and Elevate

20   conference, et cetera, et cetera.  Are those actions something     00:13:28

21   that can be imputed to LinkedIn for purposes -- whether you

22   call it modification, interpretation of contract, or an

23   affirmative defense.

24          And I guess I'd like to hear from hiQ the counter to

25   the argument that these were essentially sort of lower level       00:13:47

1  employees that didn't have the charge or the agency authority

2  to make decisions, or whose knowledge could be imputed to

3  management -- sufficiently have management such that it had

4  some legal consequences.

5         What's your response to that?                                00:14:05

6         If you can take down the --

7         MS. HURST:  Yes, Your Honor.

8         THE COURT:  I'd like to hear on that front.

9         MR. WORCESTER:  Thank you, Your Honor.

10        Would it be okay if I respond to your question after          00:14:15

11  addressing a few points Miss Hurst made?

12        THE COURT:  Yeah, go ahead.

13        MR. WORCESTER:  The first point that we didn't raise

14  course of conduct in our brief is that -- the opposition at

15  page 13.  And LinkedIn actually responds to it in their brief.     00:14:28

16        And they respond by saying, well, course of conduct is

17  only available to vary the terms of -- to vary the terms of an

18  ambiguous contract.  That's not what we have here.

19        But that's actually not true under the California Law.

20  If you look at *Duke Kelso Construction v. Silva*, it says, as     00:14:50

21  our Supreme Court has held, where the subsequent conduct of the

22  parties is inconsistent with and clearly contrary to the

23  provisions of the written agreement, the parties' modification

24  setting aside the written provisions will be implied.

25        And then also if you take a look at *Southern*              00:15:06

1  *California Edison Company versus Superior*, it discusses that

2  even with an unambiguous contract the course of conduct would

3  be admissible on the understanding of the parties.

4           That's the first point, Your Honor.

5           The second point that I wanted to make is responding          00:15:25

6  to the -- hiQ trying to turn itself into a third-party

7  beneficiary.  That is, I think, an argument that wasn't in the

8  papers.

9           But in any event, here we have a contract of adhesion.

10  And that's a contract that under the law of every state I've          00:15:42

11  ever heard of, including California, will be read against the

12  drafter.  It's a click-through agreement that's called

13  BrowseGraph.  There's no ability to negotiate it.  hiQ was

14  never told that there would be an ability to negotiate it.

15           And both of those are a factor that courts consider          00:15:59

16  when deciding how to read the contract of adhesion.

17           And the law is fairly clear that if there's any

18  question of ambiguity at all, it's going to be read against the

19  drafter.

20           Here I think that that's the situation that we're in.          00:16:14

21           And let me add one more point in response to what

22  Miss Hurst said, and then I'll answer your question,

23  Your Honor.

24           Miss Hurst put up the seven bullet points.  She said,

25  six of the provisions relate to scraping.  And if you look,          00:16:27

1    about half of them referred to copy.  That's just what I culled

2    out.  Right.

3            You literally cannot log onto the website without

4    copying.  And that's half of what they're saying is the problem

5    with what hiQ did.                                              00:16:43

6            The other one related to scraping, that's an issue I

7    raised previously.  I won't revisit those.

8            Except I'd like to hit the first point that Miss Hurst

9    put up.  And I'd like to note that it was put first, even

10   though it's an issue that really hasn't been briefed in this    00:16:59

11   case up until now.  And I think it's suggestive of LinkedIn not

12   being very confident on the scraping issues.

13           But they put up first this issue about turking.  And

14   they said, well, there were some people who used false

15   identities, these turkers.                                      00:17:15

16           That, of course, is not what the cease and desist

17   letter referred to.  And also, as we explained in our

18   opposition brief, the turkers were independent contractors.

19   And we cited case law saying that the independent contractor's

20   action can't be attributed to hiQ.  And that case law was not   00:17:29

21   rebutted in the reply brief.

22           THE COURT:  Well, but why can't they be agents?  Even

23   if they're not employees, their employment status as

24   independent contractors, that doesn't mean they can't be

25   agents.                                                         00:17:41

1       MR. WORCESTER:  That would be an issue of fact, I

2   think, Your Honor, and the jury would have to determine whether

3   they were agents.

4       THE COURT:  Let me ask you a question before you go on

5   to answer my other question.                                    00:17:50

6       The question of contract interpretation, whether it's

7   applying the contract of adhesion presumptions against the

8   drafter, whether it's whether or not there's sufficient

9   ambiguity to admit course of conduct, and how did the course of

10  conduct influence the contract interpretation question.         00:18:07

11      Do you agree those are questions of law for the Court?

12      And if that's true, can the Court just decide that now

13  as a matter of law and not await trial?

14      MR. WORCESTER:  I think some of them are questions of

15  law, Your Honor.                                                00:18:27

16      So, for example, determining whether or not a contract

17  is ambiguous is usually something a court determines, I agree

18  with that.  But there could be factual questions concerning

19  whether or not something is, in fact, a contract of adhesion.

20      I don't think that LinkedIn here is arguing that they      00:18:41

21  told us the contract was modifiable, so I'm not sure we're in

22  that world.  I think, given the facts before you, you can

23  decide it was a contract of adhesion.  But at least

24  hypothetically that could be.

25      THE COURT:  So predicate facts -- if there are issues      00:18:56

1    of predicate facts, those would be for the jury, but the

2    ultimate determination is for the Court?

3            MR. WORCESTER:  I mean, Your Honor, you would know

4    better than me, but that's my understanding.

5            THE COURT:  Well, actually it's one of those mysteries     00:19:07

6    we always --

7            MR. WORCESTER:  It's a chicken and an egg problem, for

8    sure.

9            THE COURT:  It's just like one could ask, if patent

10   construction is a law, why are we going to jury trials on these   00:19:16

11   things.

12           So in any event, what about the question about

13   impugning knowledge, what's your response?

14           MR. WORCESTER:  And let me just walk through a little

15   bit of the history here, because I think it's helpful for the     00:19:30

16   question of imputing the knowledge.

17           THE COURT:  Okay.

18           MR. WORCESTER:  In 2013 -- 2014, the head -- one of

19   the heads of the Product Analytics Team at LinkedIn,

20   Mr. Canlas, began attending the Elevate conferences, and each     00:19:54

21   year he brought two people with him.  That continued 2015,

22   2016.

23           There were other meetings in 2016 between LinkedIn and

24   hiQ, and it went up to 2017.

25           And in 2017 Mr. Canlas sent emails, which we note in      00:20:12

1    our papers, and I'm sure you have looked at, but we can put

2    them up on the screen if you'd like, Your Honor.

3            Mr. Canlas sent emails to the People Analytics Team at

4    LinkedIn and said, hey, this Elevate conference is coming up in

5    April, perhaps we should go and get a look at the product.  And    00:20:31

6    the reason for that is, in September 2016 Mr. Canlas had met

7    with hiQ at LinkedIn's offices.

8            hiQ had gone in and discussed whether or not LinkedIn

9    would host the 2017 conference.  And they had also discussed

10   the new product that hiQ was rolling out.  And Mr. Canlas sent    00:20:52

11   that around the People Analytics Team, a screen shot of hiQ's

12   new product.  And says, if there's anything in here that's

13   better than ours, we should rep, in essence.

14           Following those conversations he said, hey, maybe we

15   should go to the LinkedIn Elevate conference and get some    00:21:11

16   competitive intelligence.  And, in fact, three members of the

17   Legal Analytics Team go to that conference.  And they decided

18   not to send the entire team.  And the reason they don't want to

19   send the entire team is, that would be suspicious.

20           They come back from the conference, and about three    00:21:30

21   weeks later they send out the cease and desist.

22           So that's the background.  Right.

23           I want to flag something, Your Honor, because this is

24   something that Miss Hurst said a few minutes ago, and it's

25   something that is repeated throughout their briefing.  And the    00:21:46

1   argument is that those people had nothing to do with the

2   decision to send the cease and desist letter.  And that is just

3   not what discovery showed.

4          And I'm going to walk through some of that now.

5          THE COURT:  I'm going to get to that.  I understand          00:22:02

6   that that comes up in a different context.  But just for

7   purposes --

8          MR. WORCESTER:  I think it's in this context though,

9   Your Honor, because we don't have to ask whether or not the

10  knowledge can be imputed to LinkedIn.  We know that the          00:22:17

11  knowledge was actually passed to LinkedIn through those people.

12         Mr. Owski was literally the person.  And he's the head

13  of the Products Analytics Team.  He was literally the person

14  who asked the legal department to send a cease and desist

15  letter.          00:22:36

16         So the question about whether or not the knowledge

17  could be imputed isn't even a question we need get to because

18  the knowledge actually was passed.

19         THE COURT:  Okay.  But there's a question of timeline.

20  There's a timeline here.  And the timeline, as your narrative          00:22:45

21  suggests, grows stronger with time.

22         So by the time you get to 2017, and two weeks before

23  the C&D letter, you're amassing more and more evidence of

24  corporate purpose.

25         On the other hand in 2014, before they started          00:23:02

─────── **1:17–CV–3301–EMC – September 29, 2022** ───────

1    attending the conferences on a regular basis, you've got a

2    thinner --

3            So the question is, at what point is there sufficient

4    imputation that then implicates all these other defenses and

5    contract interpretations?                                        00:23:18

6            MR. WORCESTER:  Understood, Your Honor.

7            And I'm going to try and go back to 2014, if we can

8    find it, Your Honor.  I would just like the Court to --

9            THE COURT:  Are you doing a screen share?

10           MR. WORCESTER:  Yeah, if we can, I'd like to put a       00:23:32

11   particular exhibit up.

12           THE COURT:  Okay.

13           MR. WORCESTER:  It's an email from Mr. Canlas in 2014.

14   And it says that, we suspect that hiQ is scraping and flagging

15   it for you, quote, for you.                                      00:23:49

16           And so, once again, we don't have to have the question

17   about whether or not the knowledge of these people, who are

18   part of the products -- the Competitive Product Team at

19   LinkedIn, can be imputed to the whole company, because they

20   were literally passing the knowledge on to the legal department  00:24:03

21   in real time.

22           And I'll flag a second issue related to this,

23   Your Honor.  And it's from -- I believe it's Exhibit 38.

24   That's not what I want to put up right now.

25           But if you take a look at some of the exhibits that we   00:24:21

1   cited in our papers, it's clear that LinkedIn's business

2   strategy was at the least in part.  At least in part, if

3   someone is competitive with us, we shut them down.  And if

4   they're not competitive with us, we just let it go.

5           And that's important because it goes to the question        00:24:42

6   of the factual issue of what knowledge should be imputed.

7           If the business strategy is, competitor gets shut down

8   and noncompetitors don't, a jury could well conclude from that

9   that is, in fact, the employees at LinkedIn who run the

10  competitor processes who have the relevant knowledge for         00:25:02

11  LinkedIn's purposes.

12          And I think that the emails show over and over and

13  over again that LinkedIn's business strategy was, in fact, to

14  shut down their competitors.

15          THE COURT:  And that became evident in late 2016, or      00:25:16

16  what's the time frame for that?

17          MR. WORCESTER:  I believe that was their business

18  strategy throughout the entire period, Your Honor.

19          THE COURT:  What's the evidence of, let's say, in

20  2015?  Do you have a 2015 document that shows that was their     00:25:30

21  intent?

22          You have stuff in 2017 before the cease and desist.

23  You've got a direct competitor comment earlier than that.

24  You've got the October 2016 circulation of the screen shots,

25  which included Skill Mapper.                                     00:25:57

1            Is there much in -- is there anything in 2015?

2            MR. WORCESTER:  What year is Exhibit 38?

3            Your Honor, we've got the Exhibit 91, which is the

4    document that I was hoping would appear on the screen, which

5    has -- it's from 2014.                                          00:26:28

6            THE COURT:  Are you currently screen sharing?  Because

7    I'm not seeing anything.

8            All right.  Here we go.

9            Exhibit 98?

10           MR. WORCESTER:  91.                                      00:26:48

11           THE COURT:  91?  Okay.

12           MR. WORCESTER:  So this is from October 2014,

13   Your Honor.  It says, if our main interest in the company

14   conference is assessing their usage of allied data, I suggest

15   we hand off to legal and let them investigate further.          00:27:25

16           That's from as far back as 2014 at the time they were

17   attending the very first of the Elevate conferences.

18           Then if we go forward to 2015.  This is Exhibit 22.

19   We've got an email to LinkedIn's vice president of business

20   development.  And Kevin Scott writes to Emily Choi and          00:27:43

21   Bob Rosen.  And Bob Rosen is the head of the Trust and

22   Securities Department at LinkedIn.  The startup is probably not

23   doing, quote, anything overtly bad, but they are scraping our

24   data, and have built a product that is competitive with

25   Recruiter.                                                       00:28:03

1      Mr. Scott responds, I'm not sure if they have or will

2 get enough traction for us to worry about shutting them down.

3      So that's from 2015.  We just showed 2014, we just

4 showed 2015.

5      2016 we have Mr. Canlas sending the Elevate                00:28:15

6 information around to the LinkedIn Products Liability Team

7 which prompts the discussions.

8      This is throughout the entire period, Your Honor, that

9 LinkedIn was aware of hiQ, was suspicious at least that hiQ was

10 scraping, and basically was making a constant business decision   00:28:35

11 about, are they competitive enough yet to bother shutting them

12 down.

13      THE COURT:  All right.  So let me ask -- let me ask

14 LinkedIn first, why isn't this enough to at least allow for the

15 defenses of unclean hands, waiver and estoppel, et cetera, to   00:28:55

16 proceed?

17      And construing all the facts in favor of the nonmoving

18 party and all reasonable inferences therefrom, how can one

19 possibly say that those defenses can't apply here?

20      MS. HURST:  Well, Your Honor, with respect to contract   00:29:13

21 construction and modification, first of all, I'd like to note,

22 the issue is not imputation of knowledge, it's actual or

23 apparent authority.

24      Because the question here is the objective intent of

25 the parties at the time of contracting.                         00:29:32

1           And as Mr. Worcester has pointed out, this is a

2    contract of adhesion.  And so on the LinkedIn side, the only

3    question that's relevant here is, did the person who is

4    supposedly making an expression as to the interpretation of the

5    contract, which by the way there's no evidence of here, have          00:29:49

6    either actual authority to express the intent of the contract

7    or apparent authority such that hiQ could properly rely on

8    whatever interpretation was being expressed.

9           THE COURT:  Well, I think the argument here is that

10   this is a foundation from which one could imply that somebody         00:30:08

11   higher up with that authority did know and did make a decision

12   to either tolerate or decide whether to squelch only those who

13   compete.

14          This is not -- it doesn't hinge just on one person.

15   But the implication here is that we're going to send it up to,        00:30:24

16   quote, legal.  We're going to send it up where they make major

17   decisions.  So somebody is making major decisions.

18          And can't it be inferred from this that somebody with

19   sufficient actual or apparent authority did make the decision

20   to either tolerate or not tolerate depending on whether or not        00:30:42

21   it's competitive?

22          MS. HURST:  No, Your Honor.  No.

23          But also, that's not the standard for waiver or

24   consent.

25          Your Honor, waiver or consent requires the knowing and         00:30:53

1    intentional relinquishment of a right.  That's waiver.  And

2    consent requires an affirmative expression of consent.

3           And both Mr. Kaplan, the first CEO, and Mr. White, the

4    second CEO, testified that there was no expression of consent.

5           So, Your Honor, it's just not reasonable under                00:31:13

6    California law to infer some kind of waiver or consent from

7    entirely internal emails at LinkedIn when we have hiQ admitting

8    that there was no expression of consent on their side.  Right.

9           And so if we're looking at contract interpretation --

10   we'll go to the other issues in a minute, Your Honor.  But just     00:31:34

11   looking at both contract interpretation and the defenses of

12   waiver and consent, there's no evidence in the record of any

13   kind of any affirmative expression by anyone from LinkedIn to

14   anyone at hiQ that would indicate any other interpretation of

15   the contract than the one that we're offering here.                  00:31:56

16          There's no -- no evidence whatsoever of an intentional

17   relinquishment of a known right.

18          Now, is this email in Exhibit 91 where they say, maybe

19   we should hand it off to legal and let them investigate, is

20   that -- does that indicate a waiver or a consent?                    00:32:13

21          It doesn't, Your Honor, because it's not being

22   communicated to the contracting counterparty.  There's nothing

23   here upon which hiQ could reasonably rely.

24          But more importantly, Your Honor, it's undisputed that

25   it wasn't handed off to legal.  Mr. Lawit testified that it was     00:32:31

1    not handed off to legal.  Mr. Rigano testified it was not

2    handed off to legal.  Mr. Maurath testified it was not handed

3    off to legal.

4             There's just no evidence that it was handed off to

5    legal.                                                          00:32:48

6             And, Your Honor, so when we're talking about contract

7    interpretation -- and we have different standards here for

8    different issues.  But when we're talking about contract

9    interpretation, where the issue is objective manifestations of

10   intent, these emails simply don't give rise to the kind of     00:33:04

11   interpretive or defenses that hiQ would like to impose on them.

12   There's no actual or apparent authority for anyone involved in

13   this on these emails.

14            And there's no communication to hiQ.

15            And it simply doesn't -- it's not a manifestation of   00:33:24

16   the parties' objective intent with respect to Section 8.2 of

17   the User Agreement.

18            THE COURT:  Let me ask you, the defense of waiver,

19   which unlike estoppel I don't think requires reliance

20   necessarily, does that require -- can you have a waiver without 00:33:41

21   an outward manifestation of that?

22            Other than the behavior of not enforcing, do you have

23   to have some outward manifestation of the intentional

24   relinquishment or can that be inferred from conduct?

25            MS. HURST:  Your Honor, there has to be an outward     00:33:59

1    manifestation, because it has to be expressed.  A waiver has to

2    be expressed under California law.

3              And the intentional relinquishment of a known right

4    requires some kind of an expression of waiver.

5              THE COURT:  So it can't be done by conduct?          00:34:15

6              MS. HURST:  It can't be done by this conduct,

7    Your Honor.  I mean, whether there's any conduct scenario that

8    might give rise to a waiver, you know, we don't have those

9    facts here.  It can't be done by this.

10             THE COURT:  All right.  Let me hear the response to    00:34:31

11   the --

12             MS. HURST:  Your Honor, may I add one more thing?

13             THE COURT:  All right.

14             MS. HURST:  The rule that a contract will be construed

15   against the drafter is a rule of interpretation of last resort.  00:34:41

16   It only applies if no other rule of interpretation supplies the

17   answer.

18             And, Your Honor, there are multiple other rules of

19   interpretation here that supply the answer.

20             First of all, it's not ambiguous as applied to hiQ's  00:34:56

21   conduct.

22             But second of all, Your Honor, with respect to

23   interpretation and this course of conduct argument, there's

24   just no evidence that the person that attended had any actual

25   or apparent authority to make an expression as to the           00:35:12

1    interpretation of the contract.

2         THE COURT:  All right.  Let me hear the response to

3    the requirement of some outward manifestation, whether it's

4    modification, waiver, estoppel, et cetera, et cetera.

5         MR. WORCESTER:  Sure.                              00:35:31

6         And, Your Honor, if I could just address the last

7    point that was made first on the rule that contracts would be

8    construed against the drafter being a matter of interpretation

9    after ambiguity is found.

10        Respectfully, that's not the case with respect to the   00:35:46

11   contract of adhesion.

12        With respect to a contract of adhesion, a contractual

13   provision which does not fall within the reasonable

14   expectations of the weaker or adhering party will not be

15   enforced against them.                                 00:36:02

16        And that's from the *Lennar Homes of California, Inc.*

17   *versus Stephens* case.

18        And that's a very important point, Your Honor, because

19   it's the reasonable expectations of hiQ that matter here.  And

20   the evidence that we were just talking about, of years of   00:36:16

21   nonenforcement, years of nonenforcement in the industry,

22   despite numerous interactions goes to the reasonable

23   expectation.

24        THE COURT:  Well, let me ask you -- let me drilldown

25   on that question.                                      00:36:29

1          If you're looking at the reasonable expectations of

2     the nondrafter in a contract of adhesion, normally you look at

3     that at the time that the contract is entered into.

4          You're sort of saying, well, it's subsequent to

5     that -- I think you're saying, subsequent to that the course of          00:36:45

6     conduct led hiQ to believe differently.

7          Does that apply?  I mean, can you sort of

8     retroactively apply the reasonable expectations?

9          MR. WORCESTER:  Sorry, Your Honor, I didn't mean to

10    cut you off.          00:37:00

11          I don't think it is a retroactive application,

12    Your Honor.  The argument here is sort of twofold.

13          One is the question you were discussing at the

14    beginning about, what does it mean to say you can't scrape in a

15    contract that also says that everything's that's public will be          00:37:16

16    public and can be accessed by anybody who visits the site.

17          So you've got those two competing things, you've got

18    to look at that and say, how am I thinking about this if I'm on

19    the outside?

20          Then you can look at the four years of relationship          00:37:30

21    between the parties and say, okay, that tells me how the

22    parties were looking at it themselves, which reinforces the

23    view that hiQ, which the former CEO Daren Kaplan testified that

24    he, in fact, had, was looking at the contract.

25          At the very least, that has to be a question that can          00:37:46

1   go to the jury, about whether or not Mr. Kaplan's understanding

2   of the agreement was reasonable, given the circumstances.

3          And if that answers that question, Your Honor --

4          THE COURT:  Why don't you address the objective or

5   outward manifestation issue.                                          00:38:02

6          MR. WORCESTER:  Sure.

7          I'll start with the waiver question, Your Honor.

8          And Miss Hurst said, well, Your Honor, yes, you don't

9   need an outward manifestation of waiver, but we don't have that

10  conduct here.  Right.                                                  00:38:19

11         There's no doubt that there was an implied waiver.  We

12  all know this on this phone call.

13         The question of whether or not there was an implied

14  waiver on this set of facts is a question of fact for the jury

15  to decide, not for Your Honor to decide.                              00:38:32

16         There are issues here that could call into question

17  whether or not, once LinkedIn suspected scraping by hiQ in

18  2014, sitting on its hands and doing nothing for the next

19  three-and-a-half years until after it had gathered up

20  information on hiQ's new product, and only then deciding to           00:38:54

21  shut it down, was going beyond the implied waiver it had given

22  to hiQ.

23         The second point that I would make, Your Honor, is

24  Miss Hurst, I think, was playing a little bit of a shell game,

25  saying, this isn't a question of consent or waiver.                   00:39:10

1      Well, it doesn't need to be, Your Honor.  We're

2  talking about contract interpretation.  And the points that I

3  was raising, while they can go to waiver and, in fact, do go to

4  waiver, are also simply matters of contract interpretation that

5  don't require a waiver for Your Honor to reach the reasonable          00:39:27

6  expectation of hiQ in the contract.

7      THE COURT:  All right.

8      MS. HURST:  If I may --

9      THE COURT:  Yeah, briefly.  Then I want to move on to

10  the -- hiQ's tort claims and the California privilege.                00:39:40

11      MS. HURST:  Your Honor, hiQ is trying to bring the

12  unconscionability standard in under the tent here.

13      What was just described is not the standard for

14  interpretation of contract under California law.  It is the

15  objective manifestation of the parties' intent.  And the             00:39:56

16  contract says right on its face, you agree that you will not

17  scrape.  All right.

18      There's nothing ambiguous about that.  Nor would it be

19  outside the parties' expectations to understand that that means

20  you do not scrape.                                                    00:40:10

21      By citing *Lennar* and saying it's an adhesive contract

22  and it's not within the parties' expectations, what

23  Mr. Worcester is trying to do is argue substantive

24  unconscionability.

25      The problem with that is that they didn't plead             00:40:26

UNITED STATES DISTRICT COURT

1   unconscionability.  And that's not the right standard.

2          And I would urge the Court to look at the *Meta versus*

3   *BrandTotal* case for the proper standard, which is, when you

4   have a contract, even one of adhesion, between sophisticated

5   commercial parties, like you have here, the standard is, does          00:40:42

6   it shock the conscience?  That's the standard, Your Honor.

7          And here, not only did -- did hiQ agree to the user

8   agreement by signing up with its company page, but they also

9   agreed to it through ads agreements, through advertising, and

10  through the subscription to the Sales Navigator, Your Honor.          00:41:07

11         So this was a sophisticated commercial party signing

12  up to the user agreement in three different contexts.  The user

13  agreement on its face says, you agree that you will not scrape.

14  And they didn't even plead an unconscionability defense.

15         Both of their CEOs have admitted that no express             00:41:25

16  consent was ever provided.

17         Your Honor, that is just not a scenario in which there

18  is any disputed fact over the interpretation and enforcement of

19  this contract.

20         THE COURT:  All right.  Let me switch gears and go to        00:41:40

21  hiQ's claims and the California litigation privilege.

22         There's a temptation to compare that, as I sort of

23  did, with *Noerr-Pennington* and federal First Amendment issues.

24  But there's also case law that suggests that the California

25  litigation privilege is broader.                                    00:42:06

1          Some cases suggest that it does not incorporate the

2    sham exception to *Noerr-Pennington*.  That it is more absolute.

3    That it even applies to the UCL 17200.  Even though one could

4    argue that the UCL statute is not necessarily superseding by a

5    civil code, the privilege.                                        00:42:35

6          So I guess -- I want to ask hiQ -- and one other thing

7    is, to the extent that this Court looked at the *Hynix*

8    *Semiconductor* case and chose the -- that route of

9    interpretation with respect to *Noerr-Pennington*, and that is

10   where there is a body of anticompetitive conduct that is not    00:43:01

11   communicative, but as part of that plan there was an element

12   that was communicative, and that that should not necessarily

13   preclude the -- you know, the claim.

14         I know that argument is made here, but when all is

15   said and done, and the description of the damages caused when  00:43:22

16   it describes -- when hiQ describes the tortious interference,

17   is that that C&D letter was destructive.  It was that letter

18   that caused customers to say, hey, you know, backing off.

19   Funders to say, I'm not so interested, et cetera.

20         That was the turning point.                                00:43:44

21         And so it does seem like the central act, even though

22   it was part of a larger scheme of -- alleged scheme of

23   anticompetitive squelch the competition, the real damage that

24   was done here was the communicative act, the prelitigation

25   cease and desist letter.                                         00:44:03

1       And that seems to put it pretty squarely within --

2  arguably, within the California litigation privilege, if that

3  privilege is interpreted as broadly as some cases suggest it

4  should be.

5       So how do you get around the privilege?                    00:44:17

6       MR. WORCESTER:  And, Your Honor, this is one of the

7  things that happens in every case I've ever been in where new

8  counsel subs in, which we've had here on both sides.  It feels

9  like we wind up rearguing the same issues ad nauseam.

10       This exact issue was raised at the motion to dismiss      00:44:31

11  phase, and Your Honor just referred to that.  And the point, I

12  think, is largely along the lines of what you just laid out,

13  which is, as LinkedIn itself focuses on the cease and desist

14  letter, and said that's the sole -- sole thing you have to look

15  at, Your Honor.  The reason is they know that if there's a       00:44:53

16  larger scheme, that the litigation privilege doesn't apply.

17       And as you just said yourself, Your Honor, this was

18  part of a larger scheme.  There was the attendance in 2016 at

19  the Elevate conference, which then caused LinkedIn to invite

20  hiQ to its own offices for competitive intelligence purposes,    00:45:17

21  to get screen shots of hiQ's product, which it could then share

22  around with its own people in order to make LinkedIn's

23  competitive product even better.

24       There was then the plan among the team at LinkedIn

25  about how many of them should attend the next Elevate            00:45:36

1  conference.  How many of them should go so that it wouldn't be

2  suspicious and tip hiQ off ahead of time as to what was coming.

3       They then went to the conference, gathered up more

4  intelligence to help make their product better, then three

5  weeks later sent a cease and desist letter.                    00:45:53

6       THE COURT:  Let me stop you right there.

7       What's the evidence that the spying, if you will,

8  intelligence gathering, was not for purposes of trying to

9  figure out how much scraping there was and whether we should

10 shut them down, but to actually get information to make        00:46:07

11 LinkedIn's product better?

12      MR. WORCESTER:  There's an email from Mr. Canlas to

13 the team following the meeting at LinkedIn's offices in 2016

14 that -- and if we can share it up on the screen -- that says,

15 Your Honor --                                                  00:46:26

16      THE COURT:  I'm not seeing your screen share, by the

17 way, for some reason.  I'm not sure if your screen sharer is

18 working.

19      Vicky, do they have permission -- everybody have

20 permission?                                                    00:46:40

21      THE CLERK:  They don't need permission, Your Honor,

22 they just use it on their own.  And I can't see it as well.

23      THE COURT:  I'm not seeing anything, for some reason.

24      Here we go.  Here we go.

25      This is 91?                                              00:47:33

1          MR. WORCESTER:  Yeah, we're looking for 59.

2          Yeah, so this is from Mr. Canlas to the LinkedIn team.

3          THE COURT:  Okay.

4          MR. WORCESTER:  And he's describing the screen shot

5     that he'd been taking from hiQ.  And he's saying the Keeper          00:47:51

6     attrition product shows how they predict, allows you to cut,

7     basically walking through the different things that it does,

8     allows you to identify.  And then -- scroll down.

9          Then it says, we should consider if any of these are

10    good ideas for us to develop for ourselves.          00:48:17

11         It says, following hiQ's visit to LinkedIn, then the

12    person at hiQ is sending screen shots around to the team,

13    saying, here's the product, and we should figure out if we want

14    any of these things.

15         And then if you look at the emails surrounding the          00:48:32

16    visit to the 2017 Elevate conference, Your Honor, it's

17    specifically the stuff with the competitive intelligence with

18    it, by the team.

19         And so I don't think there's any real dispute -- or

20    certainly there's enough of a dispute that the jury can decide          00:48:50

21    it.

22         But what the purpose of those visits was, what it is

23    that LinkedIn thought it was doing with hiQ's product.  And

24    that goes to the point of this being not just a cease and

25    desist letter, but many, many steps, the end of which was the          00:49:05

—— 1:17-CV-3301-EMC - September 29, 2022 ——

1   cease and desist letter.

2        And it's not the case that you can benefit from the

3   litigation provision if you happen to drive a nail through the

4   vampire's heart, or however you kill the vampire, with one

5   action that is publically communicated, when there was a lot of        00:49:24

6   actions, a lot of steps, more to the scheme than just the one

7   public --

8        THE COURT:  Is there any evidence that these other

9   aspects of the scheme -- I'll just shorthand it, industrial

10  spying or, you know, getting information about the way a        00:49:39

11  product operates, I'm not sure if that's inside information or

12  not.  But assuming there was something illicit about that.  And

13  attempts to erect enough technological barriers, antitbot

14  stuff, that any of that caused any real damage?

15       It seems to me that, when I read your brief on the        00:49:58

16  tortious interference, it's all about the letter and what

17  happened.  Everything happened right when the letter was

18  issued.  That's when everything fell apart.

19       MR. WORCESTER:  Your Honor, the letter was certainly

20  the most important event.  And no one is disputing that.        00:50:13

21       At the moment that LinkedIn said, we're cutting off

22  your access, and are going to sue you if you continue to do

23  what you've been doing for years with our knowledge, the world

24  changed, there's no doubt about that.

25       At the same time, one of your principal competitors or        00:50:33

1  soon to be principal competitors, inviting you to their office

2  to gather up competitive intelligence so they can then make

3  their own product better, after they've attended meetings to

4  find out who your customers are, after they've found out that

5  customers like the products.  Right.  That's also damaging,      00:50:51

6  because your competitors are entering the market space with an

7  advantage at that point.

8         So I don't think it's fair to say it's the only

9  source.  But we're not disputing it isn't the principal source.

10        THE COURT:  Well, in one of the tests, I mean, one way   00:51:05

11  to look at it is, what's the gravamen of the action?  What's

12  the core of the action?

13        And if the core of the action is not petitioning

14  activity, anticompetitive activity, then *Hynix*, I think,

15  affords broader protection.                                     00:51:21

16        On the other hand, if the true gravamen of the

17  complaint is the actual petitioning activity, which under the

18  California privilege is a cease and desist letter, that seems

19  more problematic to me.

20        MR. WORCESTER:  The action, Your Honor, is -- if we      00:51:36

21  take a look at Exhibit 32.

22        We're looking at Exhibit 32, Your Honor, which is a

23  list of the five principal competitors that LinkedIn identified

24  as heading toward the product launch.  And you'll see that hiQ

25  is one of them.                                                 00:52:17

1          And so part of the scheme was the effort to shut down

2     competitors through the cease and desist process.  But it was

3     not the only part of the scheme.  Right.

4          The scheme is, identify your competitors.  Figure out

5     what they're doing.  Lead them down the primrose path and take          00:52:31

6     them out.  Right.

7          It's not, I think, fair to say -- and I said, we had

8     already addressed this at both, I think, the PI hearing and the

9     motion to dismiss when the same argument was made.

10          There is more to this scheme than simply sending a          00:52:49

11     cease and desist letter.  This was an effort by LinkedIn to

12     behead the entire industry.  Not just hiQ, but an industry-wide

13     attack, of which hiQ was one part, to eliminate its

14     computation.

15          And it did send a cease and desist to hiQ, and that          00:53:10

16     was extremely damaging.  But that is not the only action they

17     took.  And if they took more actions than that, then we get to

18     go to the jury on --

19          THE COURT:  Other than spying and gathering

20     information about products, what is the other non-petitioning          00:53:25

21     activity that caused the shutdown or had consequence?

22          MR. WORCESTER:  Those are the ones I would speak to,

23     Your Honor.

24          THE COURT:  Okay.

25          All right.  Let me hear the -- let me hear the counter          00:53:44

1    to that.

2              Why shouldn't there -- that given that this in the

3    context of a larger anti-competitive scheme which involved both

4    petitioning and non-petitioning activities, why isn't that a

5    fair importation into the California litigation privilege?          00:53:58

6              At least I haven't seen any case law that says we

7    reject the *Hynix Semiconductor* kind of approach to a mixed bag,

8    so to speak.

9              MS. HURST:  Thank you, Your Honor.

10             First of all, there's just no evidence of spying.          00:54:11

11             And I just need to say this for the record.  I'll get

12   to the legal standard in a moment, Your Honor.

13             By their own evidence, LinkedIn was invited to these

14   conferences.  And they gave a LinkedIn employee a public award

15   at one of these conferences.  Right.                                 00:54:27

16             That's their showing on their other motion.

17             To claim that this was surreptitious or spying, it's

18   frankly outrageous, Your Honor.  It goes far beyond any

19   reasonable inference from the record, as shown by their own

20   summary judgment motion.                                             00:54:42

21             You know, there was an open and notorious attendance

22   by LinkedIn at their conferences, Your Honor.  And so this idea

23   of illicit activity is just -- it's beyond the bounds of

24   advocacy, Your Honor.

25             Now let me get to the legal standard here.                 00:54:56

─────── 1:17-CV-3301-EMC – September 29, 2022 ───────

1       Your Honor, in the -- the California Supreme Court is

2  the last word on the Section 47 litigation privilege.  We did

3  not litigate this issue at the motion to dismiss stage or the

4  preliminary injunction stage, because Section 47 wasn't really

5  briefed at that point.                             00:55:13

6       And those *Noerr-Pennington* cases, Your Honor,

7  *Noerr-Pennington* has exceptions, and Section 47 does not.  As

8  the California Supreme Court has said unequivocally in *Silberg*

9  *versus Anderson,* 50 Cal. 3d 205 at 215, the only exception to

10  application of Section 47 to tort suits has been for malicious   00:55:33

11  prosecution actions.

12       And, Your Honor, the malicious prosecution action

13  requires a favorable termination, a lack of objective

14  reasonableness on the merits, and malice.  That is a claim that

15  can only be brought after the conclusion of the main action.   00:55:51

16       Now, Your Honor, the Supreme Court addressed the very

17  kinds of arguments that hiQ is making here again in *Rubin*

18  *versus Green,* when the scope of the Section 47 privilege was

19  again visited.

20       And in *Rubin versus Green* they tried to claim that   00:56:07

21  there was uncommunicative conduct that was part of the scheme

22  that they should be permitted to maintain a 17200 claim.  In

23  fact, they claim that they went to secret meetings.

24       It's on all fours here, Your Honor.  Basically that

25  the lawyers went to secret meetings with the trailer park   00:56:28

1    residents and they ginned them up in some way that violated the

2    rules against barratry, and that they should be permitted to

3    proceed with the Section 17200 claim under those circumstances.

4    And Your Honor, the court said no.

5           This is the California Supreme Court.  And it said,          00:56:46

6    the rule for interpreting Section 47 will be no different for

7    claims under Section 17200 than it is for any other claim under

8    California law.

9           And the gravamen of this is the communications.  And

10   because the gravamen of it is the communications, Section 47     00:57:05

11   has to apply.

12          Your Honor, there is no claim here in this case that

13   hiQ suffered harm from anything other than the sending of the

14   cease and desist letter.

15          And if we're precise, it's not really even the cease       00:57:22

16   and desist letter.  It was hiQ's decision to run into court in

17   response to that cease and desist letter that in its own

18   counsel's words in its opposition brief made it, quote,

19   unquote, radioactive to its customers, its investors and its

20   employees.                                                        00:57:41

21          Your Honor, Mr. Weidick testified it was the C&D

22   letter that destroyed hiQ.  Their interrogatory responses, 8

23   and 19 say, it's the cease and desist letter that destroyed us.

24          Exhibits -- their own exhibits, 8, 12 and 73, show

25   their customers, employees and investors saying, it's the        00:58:02

1  lawsuit, it's the case, it's LinkedIn's assertion of its legal

2  rights that are causing me to have concern about this business.

3       Your Honor, their damages expert, Mr. Sacks, was

4  instructed to assume that the only harm came from the cease and

5  desist letter.                                              00:58:23

6       There's simply no other way around it, Your Honor,

7  that is the source of the harm.  Actually more importantly it's

8  probably the lawsuit that they filed in response to the cease

9  and desist letter.  But it's clearly activity that's covered by

10  Section 47.                                                00:58:41

11       And the California Supreme Court is really the last

12  word on interpretation of California law, Your Honor.  And

13  *Silberg* plus *Rubin* together make clear that this claim simply

14  cannot proceed.

15       THE COURT:  All right.  I'll give you last chance --  00:58:54

16  or one more chance to respond to the *Silberg/Rubin* line of

17  cases.

18       MR. WORCESTER:  Sure.

19       Your Honor, one thing before I do that, while

20  Miss Hurst was speaking I looked at the brief and noted that we  00:59:08

21  had also mentioned that the scheme was effectuated because of

22  technical blocking of IP addresses, which I didn't list out for

23  you.  But that is an additional step that was taken by LinkedIn

24  to impair its competitive rival hiQ.

25       The second point I would make, Your Honor, and I think  00:59:29

1  this goes without saying, is that where the California Supreme

2  Court has not yet ruled on an issue, the federal courts have to

3  fill in the gaps.

4        And I think Your Honor is right that there is no

5  California case saying that *Hynix Semiconductor* is incorrect.          00:59:46

6  And I think that Your Honor has to think that, given that that

7  is how the federal courts have looked at this issue, what would

8  a state court do in the federal court's position?  I think

9  Your Honor has to make that determination for yourself.

10       And then the final point I would make, Your Honor, is      01:00:06

11 the same one we started with, which is, it's at least an open

12 question, which I think is for Your Honor to decide, not the

13 jury, in candidness, about whether the UCL is superceded by a

14 civil corporate breach.

15       THE COURT:  All right.  Thank you.                          01:00:19

16       Let me -- I know we've got this spoliation motion and

17 *Daubert*, but I want to spend the rest of the time on the

18 summary judgment motion for summary judgment on LinkedIn's

19 counterclaim on the CFAA as untimely.

20       And that hinges -- and we've already kind of touched       01:00:41

21 on that -- on what sort of notice LinkedIn had prior to the

22 cutoff date, which I think is June 7th, 2015, two years before

23 the filing.

24       So that's kind of the key date.  If there was notice

25 and, therefore, discovery before that, there's a statute of     01:01:00

1    limitations problems.  We can then address the continuous

2    accrual doctrine, whether claims thereafter might apply.

3            But what about -- so we've already sort of touched on

4    that.  But now the critical time frame is between, I think it

5    started with the October 2014 email, I think that's the first      01:01:24

6    step, and the June 7th, 2015 date.  I think those are the

7    brackets, if I understand that correctly.

8            MS. SKIBITSKY:  Yes, Your Honor.

9            Hope Skibitsky for the record on behalf of hiQ Labs,

10   Inc.                                                               01:01:44

11           Your Honor is correct, the first in time email that we

12   have in the record of LinkedIn identifying hiQ as likely

13   scraping is October 4 -- October 8th of 2014.

14           And, Your Honor, in that email there are no less than

15   seven members of the LinkedIn Talent Analytics Team who are        01:01:58

16   discussing hiQ and the fact that hiQ is likely scraping

17   LinkedIn's website.

18           In that email they recognize that this is something

19   that should be investigated further.  In fact, one of the

20   members of that email chain offers to go investigate LinkedIn.     01:02:16

21   And another says, we should raise this to legal.

22           So that's the October 4th -- October 8th, 2014 email,

23   Your Honor, well beyond the statute of limitations period.

24           And those are the members of the LinkedIn Talent

25   Insights Team which, of course, is the team that built the         01:02:36

UNITED STATES DISTRICT COURT

1   product that would compete against hiQ's Skill Mapper product.

2          And then we have the December 2014 email chain,

3   Your Honor.

4          THE COURT:  And before you get to the December one,

5   let me ask you, Miss Hurst indicated that there was no evidence          01:02:48

6   that legal was ever actually contacted.  Do you have any

7   contrary evidence that there was a follow-up, that it did get

8   to legal?

9          MS. SKIBITSKY:  We have no contrary evidence,

10  Your Honor, that it did get to legal.  And I think that that          01:03:02

11  fact is undisputed.  And I think that that fact is problematic

12  for LinkedIn.

13         It's problematic for LinkedIn because it just shows

14  their negligence.  You can't circumvent the statute of

15  limitations by saying, our employees knew that scraping was bad          01:03:19

16  and scraping is supposed to be reported upwards.  And then just

17  having seven, probably more because we don't know the

18  identities of all the members of that Talent Analytic Team,

19  just simply not reporting that to the legal team.

20         THE COURT:  Well, let me ask you, the limitations          01:03:37

21  period under 1030(g) says the date of the complaint or date of

22  discovery of the damage.

23         Is there a should have known inquiry notice implied

24  into that statutory provision or is it actual knowledge?

25         MS. SKIBITSKY:  It's inquiry notice, Your Honor.          01:04:00

1        And the federal courts in numerous cases, one being

2   the *Al-Ahmed versus Twitter* case Your Honors having indicated

3   that when you have the word discovery in the statute, it

4   is -- it is actual knowledge or it's should have known inquiry

5   notice.                                                              01:04:17

6        And certainly here LinkedIn's employees were on

7   inquiry notice.

8        And what I think is important, Your Honor, is LinkedIn

9   makes much to do in their brief about the fact that they

10  couldn't possibly have figured out what it is that hiQ was      01:04:29

11  doing, because of some technical measures that hiQ was doing.

12       But the reality is, if you look at that October 8,

13  2014 email, all it is is something from talent analytics

14  sending the link to hiQ's website.

15       And then Mr. Maurath responds, looks like their            01:04:46

16  scraping our data.

17       So the suggestion, Your Honor, that they were on

18  inquiry notice, or the suggestion that they weren't actually on

19  actual notice, is just belied by the first in time document we

20  have in the record of LinkedIn discussing hiQ.                   01:05:00

21       THE COURT:  All right.  So then you have the

22  December 15.

23       MS. SKIBITSKY:  Yes, Your Honor.  Then we get to the

24  December 2014 email chain.

25       And this is with Mr. Rosen, who is the vice -- vice        01:05:10

1  president of business development at LinkedIn, certainly a high

2  ranking executive at LinkedIn.

3         And Mr. Rosen received an email from a third-party

4  venture capitalist, Robin Vassan, who says, hey -- and I'm

5  paraphrasing, Your Honor.  Hey, we met this company hiQ.         01:05:28

6  They're using LinkedIn data to predict analytics, but we

7  weren't sure how LinkedIn would feel about that, or if LinkedIn

8  would look favorably on that.

9         The clear suggestion in that email, Your Honor, is

10  that hiQ is scraping LinkedIn data.  And anyone in the industry  01:05:45

11  at the time -- at any time would understand that if hiQ is

12  developing a product, helping employers understand which

13  employees were at risk of attrition, clearly there's some

14  scraping going on.  This is not a manual process.

15         And so what does Mr. Rosen do, Your Honor?  He           01:06:02

16  forwarded that email to another high-ranking person at

17  LinkedIn, Mr. Wilmer, and he says, have you heard of these

18  guys?  And Mr. Wilmer says, I haven't, but I'd be interested in

19  meeting them.  And he says, I doubt it's a members first use

20  case.                                                          01:06:21

21         And members first we hear over and over from LinkedIn,

22  that they always put their members first.  Which is, of course,

23  belied by numerous documents in the record.

24         But in particular, in this case, in this particular

25  document, Mr. Wilmer is saying, I doubt it's a members first   01:06:33

———— **1:17-CV-3301-EMC - September 29, 2022** ————

```
 1    use case.
 2          But it's undisputed by both Mr. Wilmer and Mr. Rosen,
 3    who both testified, that they didn't elevate this, they didn't
 4    even bother to meet hiQ.
 5          And this is interesting, Your Honor, because, again,      01:06:48
 6    the suggestion by LinkedIn is that the statute of limitations
 7    can be tolled because there's some equitable tolling or
 8    fraudulent concealment or the discovery period -- the
 9    document -- the equitable tolling of discovery, that they
10    couldn't have possibly discovered this earlier.                 01:07:04
11          But what's interesting is that no one ever calls hiQ
12    and says, are you scraping our data.
13          And LinkedIn has the burden of showing -- if they're
14    going to put forth this doctrine, LinkedIn has the burden of
15    showing a prime due diligence they could have discovered the    01:07:20
16    facts upon which they could have brought their claim.
17          They can't do that, Your Honor, when no one even
18    bothered to pick up the phone and call hiQ and say, are you
19    using our data.
20          And they say that if they had done that they wouldn't     01:07:33
21    have gotten a truthful answer.  But look what happened when
22    they did do that, Your Honor, when they did reach out to hiQ.
23    HiQ said, you're right, we're scraping your data.
24          And that's why we're here today.
25          THE COURT:  So what about the argument, I can feel it     01:07:48
```

1  coming, that this was -- these folks who were on the email

2  chain did not have within their scope of employment and job

3  responsibilities anti-scraping responsibilities.  And,

4  therefore, given the limited scope of their employment duties,

5  there can be no imputation, including any imputation of        01:08:11

6  negligence to the principal.

7          What's your response to that?

8          MS. SKIBITSKY:  Our response to that, Your Honor, is

9  that's just simply inconsistent with the law.  And the law in

10 California -- and that's California Civil Code Section 2332 --  01:08:23

11 is that an agent -- a principal is presumed to have notice that

12 an agent has if the agent has notice of and in good faith in

13 the exercise of ordinary care and diligence to communicate to

14 the other.  That's what the standard is.

15         LinkedIn tries to make the standard of, does so and     01:08:40

16 so's employment agreement say, if you see something about

17 scraping you have to report it?  That's simply not the

18 standard, Your Honor, and that's not the standard, because were

19 that the case, defendants or parties like LinkedIn could simply

20 avoid statutes of limitations by keeping their employees        01:08:57

21 ignorant.

22         And certainly that would have been the case here where

23 the evidence in the record shows that as of 2015 there were

24 2.25 people who were involved in LinkedIn's anti-scraping

25 process.                                                        01:09:13

1       So it is LinkedIn's position then that if the 2.25

2  people of LinkedIn's thousands and thousands of employees

3  didn't have this information about hiQ, LinkedIn had no

4  obligation to investigate.

5       I mean, that's -- that's the first problem with their        01:09:26

6  argument, Your Honor, that these people didn't have an

7  obligation.

8       The second problem with the argument is the record is

9  clear that they did have an obligation, or they felt that they

10  did.                                                              01:09:39

11       And the section -- the code says, has notice of if in

12  good faith in the exercise of ordinary care and diligence to

13  communicate to the other.

14       In the October 2014 email you have at least seven

15  employees acknowledging that this needed to be communicated     01:09:52

16  upwards.  Let's bring it to legal.  But nobody does that.

17       And why does nobody do that, Your Honor?  It's because

18  LinkedIn didn't have a system in place by which people could

19  report.  And that's undisputed as well.

20       LinkedIn said, we didn't have anybody -- we didn't         01:10:09

21  have actually a system for reporting this kind of stuff until

22  we developed this scraper console.  And the scraper console was

23  developed in 2013 or so.

24       But even then we didn't really have a system to report

25  this stuff.                                                      01:10:26

1          And that's why, Your Honor, when you see that Lorenzo

2     Canlas, the same person on the October 2014 email chain, and

3     the same individual who Mr. Worcester spoke about having

4     invited hiQ to LinkedIn's offices.

5          That's why when you see Mr. Canlas attend an Elevate          01:10:41

6     conference in October of 2015, and then write to two other

7     individuals at LinkedIn, what do we do when we suspect

8     scraping?  I was just at this conference with this company hiQ,

9     and I think that they're scraping.  How do we report this?

10         So that email, Your Honor -- that's an October 2015         01:11:01

11    email.  That gets forwarded to the scraper counsel.

12         But it is undisputed that the scraper counsel and

13    LinkedIn did nothing about it.

14         And, Your Honor, those emails --

15         THE COURT:  By October 2015, we're beyond the June 7th      01:11:16

16    date.  So I'm not sure that's consequential.

17         MS. SKIBITSKY:  It's correct that we are beyond that

18    date, Your Honor, but I do think it's consequential.  And I

19    think it's consequential, because if LinkedIn's argument is,

20    well, these people didn't really have authority, well then, who  01:11:31

21    at LinkedIn did?

22         If even in 2015, when it was reported -- or when it

23    was actually reported to the so-called scraper counsel,

24    LinkedIn admits we didn't do anything about it.  That got lost

25    in translation, we didn't have a system in place by which we     01:11:49

1    could figure out what to do with this.

2            So, Your Honor, I think it is consequential, because

3    it shows that LinkedIn tries to come in and say, well, our

4    employees had -- they didn't really -- they shouldn't have

5    anything to do with scraping, notwithstanding what they tell          01:12:04

6    the market and what they put on their website about everybody

7    being all about members first.

8            And then they just simply -- they simply don't have a

9    process by which their own employees can actually have their

10   concerns elevated.                                                     01:12:19

11           THE COURT:  All right.  Let me hear the response.

12           There's great reliance placed on Civil Code Section

13   2332, and the requirement of exercise of ordinary care and

14   diligence.  Why doesn't that prevail here?

15           MR. COHEN:  Thank you, Your Honor.                             01:12:43

16           In answering this question it's very important to look

17   at the context, and that includes the who in the emails and the

18   what.

19           And it's important to look at the law that speaks

20   specifically to this question of how do we determine imputed          01:12:56

21   knowledge.

22           And the cases that we cited in our papers, including

23   the *Miniace versus Pacific Maritime Association* and the *Prim*

24   case and the *AAA* case, they speak about this specific

25   situation.  What does a court do when faced with the question         01:13:13

1   on summary judgment as to whether an employee who becomes aware

2   of a certain fact has the duty to bind the corporation?

3              That's exactly the issue here.

4              And in the *Pacific Maritime Association* case, *Miniace*,

5   the issue was whether changes to a benefit plan that were made        01:13:32

6   by a consultant, and shared with the head of human resources at

7   the company, was enough to bind the company.  The company

8   should have known to bring their lawsuit sooner.

9              And what the court said -- for purposes of summary

10  judgment, the court said, well, Page-Wilson -- pardon me, the        01:13:49

11  court finds that an issue of fact remains regarding whether

12  Page-Wilson had an obligation to report these benefit changes

13  to her superiors.  Corrigan, the moving party, has offered no

14  evidence to show that this authority was delegated to

15  Page-Wilson.                                                         01:14:13

16             That is exactly the situation we're dealing with here,

17  Your Honor.

18             So going back to the who.  We're dealing with a

19  group -- I think Miss Skibitsky referred to them as talent

20  insights.  But it's the Talent Analytics Group.  That's an          01:14:26

21  internal group that supports business operations, that provides

22  support for internal human resources functions at LinkedIn.  It

23  is not a product group.

24             This is a group of employees that obtained information

25  that hiQ was hosting a conference.  And they emailed with one        01:14:41

1    another.  And one of them asked in the course of that email, it

2    sounds like they might be scraping our site to see who has

3    updated profiles, and using that as a signal to predict

4    turnover.

5         There was discussion about whether anybody would          01:15:02

6    attend the conference, and ultimately it was determined that

7    nobody would attend.

8         And then it was proposed, if our main interest is

9    assessing the use of LinkedIn data, I'd suggest we hand off to

10   legal and let them investigate further.                        01:15:16

11        And as Miss Skibitsky acknowledged, it is undisputed

12   that it was not handed off and it was not investigated further.

13        So we submit, Your Honor, there is a question of fact

14   here that would defeat summary judgment on this question, on

15   this record, given this email chain, given these employees, and  01:15:34

16   given the lack of evidence put forward by hiQ that these

17   employees had a duty to report this information, there's an

18   absence of a foundational basis to find imputation on this

19   email.

20        THE COURT:  Are you saying that only knowledge             01:15:55

21   obtained by somebody charged with anti-scraping could ever

22   count?

23        MR. COHEN:  Your Honor, the knowledge that would count

24   would be knowledge that goes to the organization within

25   LinkedIn that has that responsibility.                          01:16:14

1        And it's undisputed from Mr. Lawit's evidence that

2   legal has that responsibility.  And it's undisputed here that

3   this did not go to legal.

4        We are talking about a group of lower level employees

5   that are working in an internal HR function.  So at least on          01:16:30

6   these facts, Your Honor, there is nothing that would bind the

7   corporation.

8        THE COURT:  So your position is that under the -- even

9   under California agency law, the only agent or employee of

10  LinkedIn that -- whose knowledge would be imputable to the            01:16:55

11  corporation would be that department or that person charged

12  with that specific task.  And in this case that would be legal

13  and only legal.

14       MR. COHEN:  I don't need to go that far, Your Honor.

15  It could be that high level officers, general agents of the           01:17:11

16  company, legal, trust and safety employees, or even scraper

17  counsel, could bind the corporation.  But that's not what we

18  have here.  Those aren't the facts we have here.

19       THE COURT:  And the position of those who are party to

20  the 2014 letters, how would you describe the Talent Analytics         01:17:35

21  Team as part of the human resources group?  What's their -- how

22  would you describe their scope or responsibility?

23       MR. COHEN:  So they worked within a group called

24  Business Operations at LinkedIn, and they provided data support

25  for the human resources group at LinkedIn.                            01:17:56

1    In other words, this was a team that was looking at

2    data to provide information to the LinkedIn human resources

3    team that was hiring and managing the LinkedIn work force.

4    THE COURT:  So it was all internal, it was for the

5    hiring process internally?                                      01:18:13

6    MR. COHEN:  Exactly, Your Honor.

7    THE COURT:  And what about Rosen and Wilmer?

8    MR. COHEN:  So let's talk about the 2015 email.

9    And, again, I think it's very important to look at the

10   what we are talking about.                                      01:18:26

11   THE COURT:  There's a December 15, 2014, or are you

12   talking about a different --

13   MR. COHEN:  Pardon me, it's December 2014, Your Honor.

14   Thank you.

15   THE COURT:  Okay.                                               01:18:35

16   MR. COHEN:  It's an email from the venture capitalist

17   Vassan who is talking about hiQ.  And this is what he says in

18   his email:  We found it interesting, but weren't sure that

19   LinkedIn would look favorably at a company that is analyzing

20   profiles combined with various other data sources.  It would be 01:18:50

21   great to get a sense on how LinkedIn figures out which partners

22   to allow and work closely with or not.

23   That's what the email says.

24   A company that is analyzing profiles combined with

25   various other data sources.  It does not say scraping.          01:19:06

1          THE COURT:  All right.  Put aside the what.

2          In terms of the who, if it had said, there's scraping

3    going on, you should know about this, would that have been

4    enough if it got to Rosen and Wilmer?

5          MR. COHEN:  Well, Wilmer was a vice president at the          01:19:25

6    time.  He didn't have specific responsibility for anti-scraping

7    at that time.  He was a vice president.  But certainly this

8    email doesn't twig Rosen to the fact that there was scraping

9    going on.  And his deposition testimony says nothing of the

10   sort.                                                              01:19:45

11         Same with Wilmer.  Wilmer is a director at this point,

12   he's not a vice president.  He receives this email.  He

13   testifies about it in his deposition.  He says, I don't recall

14   receiving it, but if I look at this email now, there's nothing

15   in here that says scraping.                                        01:19:58

16         So the evidence we have in the record in support of

17   this, Your Honor, is at best disputed evidence.  This is not a

18   determination that could be made as a matter of undisputed

19   facts for purposes of summary judgment.

20         THE COURT:  All right.  So the question in this case         01:20:13

21   is the what.  And the what didn't mention scraping.  In your

22   view it is somewhat vague about this company hiQ, quote,

23   analyzing profiles, close quote, and that raises at least

24   a -- there's a factual question as to how that was or should

25   have been interpreted.                                             01:20:35

1          MR. COHEN:  Yes.

2          And I would go back to the *Miniace* case, Your Honor,

3    where it was the vice president of human resources who receives

4    the changed benefit plan from the consultant.  And that wasn't

5    enough for the court for purposes of summary judgment, in the          01:20:47

6    absence of evidence that that person, a vice president of human

7    resources, had been delegated that responsibility with respect

8    to that benefit plan.

9          THE COURT:  All right.  So let me go back to hiQ.

10         Why isn't there at least a question of fact here?              01:21:05

11         MS. SKIBITSKY:  Your Honor, there's a question of fact

12   for -- there is no question of fact for a few reasons.

13         One is, to address the what, Mr. Cohen seems to

14   suggest that the standard is whether that email from

15   Mr. Vassan, third party, actually said hiQ was scraping.             01:21:18

16         But that's not what the what is.  The what is, was

17   LinkedIn on inquiry notice?

18         And the answer has to be yes.  If a third party is

19   coming to you and saying, we're interested in investing in hiQ,

20   but they're using LinkedIn data, and we don't know how you           01:21:38

21   would feel about that, that's certainly inquiry notice,

22   Your Honor.

23         And Mr. Rosen was the vice president of business

24   development.  The vice president of business development,

25   Your Honor.  If the vice president of business development at        01:21:51

1    LinkedIn doesn't realize when a third party is saying, hiQ is

2    using your data to predict analytics, that -- there should

3    be -- somebody should be looking into this.  I don't know what

4    else could possibly be inquiry notice.

5           And the thing is, Mr. Cohen correctly notes that          01:22:11

6    Mr. Rosen testified in his deposition that nothing here says

7    scraping.

8           But in the email that Mr. Worcester showed during the

9    earlier argument, the January 2015 email, so that's a month

10   after this December 2014 email, Mr. Rosen is being told by      01:22:31

11   Kevin Scott at LinkedIn, hey, there's this third party that's

12   scraped -- that's not doing anything overtly bad, but they are

13   scraping our data.  Not sure whether it's doing enough traction

14   for us to go after them.

15          So this suggestion that the vice president of business    01:22:51

16   development doesn't understand what scraping is is belied by a

17   document the very next month where LinkedIn is considering, do

18   we go after these guys who are scraping, even though scraping's

19   not, quote, overtly bad.  So that's the first thing.

20          The second thing is, it doesn't matter whether the       01:23:10

21   information was actually conveyed to the principal under

22   California law.

23          Here -- I mean, here it was.  Here we have the vice

24   president of business development at LinkedIn.  But under the

25   law -- and that's the *Valley Fruit Orchards versus Global*     01:23:26

UNITED STATES DISTRICT COURT

1   *Horizon Manpower* case.  Even if the agent fails to advise the

2   principal of the information, the information is imputed to the

3   principal.

4        And that's for the very same reason that we have here,

5   Your Honor, you can't not tell your agents how to do their job.    01:23:43

6   And if LinkedIn's position throughout this litigation and it's

7   if position for the market is, you know, we fight against

8   scraping.  But its agent has no idea, you know, who do we

9   report this to.  LinkedIn can't then sidestep the statute of

10  limitations.                                                       01:24:05

11       And Mr. Cohen raises the *Miniace* case, which I think

12  is interesting, because in that case, Your Honor, there was

13  absolutely no indication of -- that this vice president of

14  human resources, Page-Wilson, would have had any knowledge that

15  this document she received was at all problematic.  In fact,      01:24:24

16  she received the document from her boss.

17       That's in stark contrast to this case, Your Honor,

18  where we have people saying, I think they're scraping our site,

19  and we need to investigate this.

20       So the cases cited in LinkedIn's own brief actually          01:24:43

21  supports hiQ's position.

22       Mr. Cohen also raised the *Prim* case.  That case

23  involved the agency of a secretary slash auditor from 1948 who

24  the court found, this secretary slash auditor has no

25  relationship to the principal vis-a-vis the principal's           01:25:03

1    property management company.  That's entirely distinct from the

2    stipulation that we have here.

3         LinkedIn hasn't cited a single case where a corporate

4    employee is said to be saying, this is highly problematic, and

5    that corporate employee's knowledge wasn't imputed to the        01:25:23

6    corporation.

7         And Mr. Cohen identified these members of the

8    talent -- inside their Talent Analytics Group as lower level

9    employees, quote.  Lower level employees.  And that's

10   interesting, because these lower level employees' voices get     01:25:44

11   heard in April 2017 when they talked to legal and they say,

12   hey, let's shut these guys down.

13        So at what point do lower level employees at LinkedIn

14   become important, Your Honor?

15        THE COURT:  Well, maybe they didn't become important       01:25:59

16   until 2017.  I mean, it's not necessarily the case that what

17   existed in 2014 was the same as in 2017.

18        Let me ask you this:  The question of what

19   consequences there are.  If I were to find in your favor that

20   there was sufficient notice, what about the doctrine of          01:26:18

21   continuous accrual?  And why doesn't that permit claims with

22   respect to scraping that occurred after June 7th of 2015?

23        MS. SKIBITSKY:  Your Honor, the doctrine of continuous

24   approval just doesn't apply here, because LinkedIn's whole

25   theory of the case is, hiQ's conduct -- and the way in which    01:26:41

——— 1:17-CV-3301-EMC - September 29, 2022 ———

1    LinkedIn is seeking damages under the CFAA is, hiQ was engaged

2    in 30 plus million scrapes.  And those scrapes all amount to

3    damage to us.  And LinkedIn pleads damage in their complaint.

4         So they say -- you know, they try to get the best of

5    both worlds.  They try to say, well, the statute of limitations    01:27:01

6    starts ticking every time a scrape happens.  But the reality

7    is, in order to seek the relief they're seeking under the CFAA,

8    all of these events have to be advocated to meet the $5,000

9    floor.

10        And, Your Honor, they can't -- they can't just slow         01:27:20

11   roll to try to increase their damages along the way.

12        THE COURT:  Well, why can't you aggregate everything

13   that occurred after the limitations period on an accrual theory

14   and have that meet the aggregate minimum?

15        MS. SKIBITSKY:  Potentially you could aggregate            01:27:42

16   everything after the accrual period and have that meet the

17   5,000 minimum.  But you still lose, because you still had

18   notice of the damage pre-2015.  And that's the key, Your Honor,

19   it's when did they know.

20        They should have discovered or did discover the damage     01:28:01

21   in 2014.  So it's the same damage.  Whether it's pre June 7,

22   2015, post June 7, 2015, it's the same exact damage.

23        THE COURT:  Well, the damages might be -- if one were

24   to apply the statute of limitations and find that anything

25   before June 2015 is barred, but under the accrual theory not    01:28:21

1   that that could you affect the magnitude of the damages.

2         MS. SKIBITSKY:  It's the same conduct and it's the

3   same type of damages, Your Honor, so that's the key.

4         They knew about the damages that they're alleging in

5   the post 2015 time period, well before the statute had expired.   01:28:43

6         THE COURT:  But some courts have applied the accrual

7   doctrine to the CFAA; right?

8         MS. SKIBITSKY:  That's correct, Your Honor, some

9   courts have applied the accrual doctrine to the CFAA.

10         LinkedIn hasn't cited, and we're aware -- and we're   01:29:06

11   not aware of any court in this district applying the accrual

12   doctrine on any facts similar to this one.

13         And, Your Honor, LinkedIn cites to the United States

14   Supreme Court case of *Claire*.  And in *Claire*, in that United

15   States Supreme Court case, the Supreme Court explained -- and   01:29:26

16   this was in the context of the civil RICO statute.  The Supreme

17   Court explained that, because a series of predicate acts in the

18   civil RICO context can continue indefinitely, a rule that would

19   start the statutory clock at the last predicate act creates a

20   longer limitations period than Congress could have   01:29:45

21   contemplated, in conflict with the concept of repose that

22   underlies the limitations period.

23         The court went to say -- this is the Supreme Court --

24   the rule would permit plaintiffs who know of the defendant's

25   pattern of activity simply to wait, sleeping on their rights,   01:30:00

1    as the pattern continues and treble damages accumulate, perhaps

2    bringing suit only long after memories of witnesses have faded

3    or evidence lost.

4            And that's the United States Supreme Court,

5    Your Honor.                                                    01:30:19

6            And the same principles apply here.  Here we are in

7    2022.  LinkedIn knew in 2014.  And memories have faded.  And

8    LinkedIn can't seek the benefit of a separate accrual rule for

9    all of these reasons, Your Honor.

10           THE COURT:  All right.  Let me hear the response.       01:30:36

11           I'm particularly interested in the continuous accrual

12   response.

13           MR. COHEN:  Thank you, Your Honor.

14           I think the policy behind the separate accrual rule

15   or continuous accrual rule as discussed by the California       01:30:52

16   Supreme Court in the *Aryeh v. Canon* case is particularly

17   critical here.

18           What that court said was, the separate accrual theory

19   is a response to the inequities that would arise if the

20   limitations period following a first breach of duty or instance 01:31:08

21   of misconduct were treated as sufficient to bar suit for any

22   subsequent breach or misconduct.

23           The parties engaged in longstanding misfeasance would

24   thereby obtain immunity in perpetuity from suit even for recent

25   and ongoing misfeasance.                                        01:31:26

1          In addition, where misfeasance is ongoing, defendant's

2   claim to repose the principal justification underlying the

3   limitations defense is vitiated.  I think that speaks precisely

4   to this situation.

5          We have continuous conduct.  We have conduct that is          01:31:42

6   carried out in secret.  We have conduct that is concealed from

7   LinkedIn.  We have conduct that is concealed from hiQ's own

8   customers.  And, in fact, from this Court, Your Honor, we did

9   not learn about the turking until March of this year.

10          So we have a situation in which hiQ is repeatedly          01:32:02

11   evading defenses and scraping.  And that is precisely the kind

12   of case in which separate accrual has applied.

13          Courts have found that separate accrual applies to the

14   CFAA.  They found it in the *Phreesia* case in the District of

15   Maryland, and it's well discussed there.  And Judge Koh found          01:32:23

16   it in this district in the *Calhoun* case.

17          And what it turns on is the language of the statute,

18   which says, no action may be brought under this subsection

19   unless such action is begun within two years of the date of the

20   act complained of.  The act complained of.          01:32:39

21          That is singular.  And that singular use of the act

22   complained of means that where there are repeated violations,

23   where there are repeated acts complained of, that a claim may

24   be timely with respect to the acts complained of within the two

25   years prior to the filing of the complaint, even if it's not          01:32:59

1    timely with respect to the period before that.

2            And so that's precisely the situation we have here,

3    and it's precisely the way that the Ninth Circuit has

4    analyzed this with respect to the Wiretap Act, but in this

5    circuit.                                                    01:33:20

6            In *Bliss*, the case involved the Wiretap Act, it

7    involved -- the language that was the trigger there was a

8    violation.  And what the court said there is, we have to look

9    at whether the conduct at issue triggers the statute of

10   limitations.                                               01:33:36

11           There there were a series of intercepted phone calls

12   between an attorney and her client who was in prison.  Some of

13   the phone calls preceded the limitations period.  Other phone

14   calls were during the period.

15           And what the court said was, given that the trigger   01:33:49

16   for the statute is a violation, then notwithstanding that some

17   of those calls may have occurred before the limitations period,

18   we can nevertheless find timely the calls that occurred during

19   the limitations period.

20           And hiQ's only defense to this, Your Honor, is to say,  01:34:05

21   well, LinkedIn is aggregating its damages and, therefore, you

22   must aggregate the course of conduct.  And they could only have

23   sued within two years of the first scrape.

24           That's not what the statute says.  The statute uses

25   very different language for the act complained of, which      01:34:25

1    triggers the statute of limitations and the $5,000 requirement

2    which is referring to the conduct involved.  That is the

3    language of the statute, the conduct involved.

4          So they're reading out that language.  There's no case

5    that says you would interpret the trigger for the statute of          01:34:44

6    limitations differently depending on the way in which one

7    calculates damage.

8          And let's be clear, Your Honor, we don't have full

9    visibility into all of the scrapes and all of the damages that

10   were caused from those scrapes.  That's the subject of the           01:34:58

11   spoliation motion.

12         So while it is the case that we have put forward an

13   aggregated damages claim, that does not mean that with the

14   benefit of all of the records we would not have been able to

15   establish more damage potentially from any single act.  We'll        01:35:14

16   never know that.

17         So in closing, Your Honor, it's clear that on these

18   facts, under this statute, with that triggering language, that

19   the continuous accrual doctrine or the separate accrual

20   doctrine would apply here regardless of whether one finds            01:35:33

21   untimely claims before June 7, 2015.

22         THE COURT:  All right.  Thank you, counsel.

23         As I said, I wasn't going to reach everything.  And I

24   understand the other motion that we didn't address, that I

25   will take all of this under submission, and take a second look       01:35:48

1   at the record as well as some of the relevant cases you've

2   cited.

3           So thank you.

4      (Proceedings concluded at 3:38 p.m.)

6                              -oOo-

1

2

3

4                              C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify the foregoing

7    pages constitute a full, true, and accurate transcript of all

8    of that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 14th day of October,

12   2022.

13

14

15                              s/Candy L. Potter_____

16                              Candy L. Potter, RMR, CRR

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT